# EXHIBIT  47

09.22,.2020_ _Broken-Seeking Justice_  Season 2, Episode 2. "Witness" – [WITH JUAN ALESSI]


\

Sept 22, 2020  _Broken-Seeking Justice_ – Season 2, Episode 2. "Witness"  [WITH JUAN ALESSI]
https://www.sonymusic.co.uk/podcast/broken-jeffrey-epstein/

INTRO:

**0:10 [Voice of] JuanAlessi:**  One time before I left, I remember I was in the kitchen and he [JE] was sitting on top of the counter, in the kitchen.  Sometimes he would talk to me.

**0.22. Host** Tara Palmeri: This is Juan Alessi, Epstein's one-time house manager and driver in PB.  He's talking about his former boss, who called him John, instead of Juan. ....

0:31
**Alessi:** And he complained about his back. I says, Jeffrey, take it easy, all these women that [unintelligible] I says you are gonna be in trouble, as a man, how can you perform with so many people?

Virginia Roberts Giuffre [VR]: Right

**Alessi:** Right. And I say, one of these girls, one day, is gonna get you in trouble.  I swear to god, one of these girls is going to get you in trouble.  He says, John they just want money. That was his answer - They only want money, John.

HOST: Juan worked for E for 10 years and was in a perfect position to witness Epstein's massive sex abuse operation. But when I knocked on his door last February, he never talked about Epstein publicly. He says Epstein fired him after that conversation about the girls.

**Alessi:** I told him, I says, one time, one of these girls, one day, is gonna get you in trouble.  I swear to God.

2:27
**Host:** I'm Tara Palmeri, Host of Broken, Seeking Justice. Epstein is dead but according to dozens of his victims, many individuals helped him run his sex trafficking operation, and in some cases, took part in abusing girls. Only Ghislaine Maxwell, Epstein's right-hand woman, has been indicted. No one else has been prosecuted or gone to jail.  I've spent the last 10 months with some of Epstein's survivors as they fight to hold these people accountable, in order to get justice, both on a personal and legal level they need people like Juan Alessi to come forward and speak about what they witnessed.  I spent weeks with Virginia Roberts Guiffre.  I traveled with her all over the country to try to get Epstein's former employees to talk to her, to come out of the shadows and help her in her pursuit of justice.  And it's been hard.  Virtually every door Virginia knocks on, is slammed in her face.

3:16.
VR: Ok so would you meet me for lunch?  No.

1

09.22,.2020_  *Broken-Seeking Justice*    Season 2, Episode 2. "Witness" ~ [WITH JUAN ALESSI]

Host: It's an uphill battle for Virginia to have her existence acknowledged, let alone her accounts of abuse corroborated.

V/O of Brad Edwards, Atty at Depo of Jeffrey Epstein: Let's talk about Jane Doe 102. Virginia Roberts, do you know Virginia Roberts?

JE: Say, she's, say again who?

Host: That was Jeffrey Epstein claiming he did not even know her name.

JE: Can you spell it?

ATTY: Common name, Virginia like the State.
JE: Can you spell it for me please.

HOST: What Virginia really wants is for someone who was there to say 'I remember you. What Epstein did was wrong and horrible. I'm sorry that was your childhood. She isn't looking to sue anyone else, she simply wants acknowledgement of the abuse.

VR: Jeffrey's dead, and you know we are not coming after you criminally. We are just coming after you for answers to help.

Host: So when Virginia and I showed up exhausted at Juan Alessi's house in Florida, I was not exactly optimistic about him letting us in.

[Virginia and Tara try his bell..] He told us he was buzzing us in…oh thank you so much, he's buzzing us in… we are on our way.

4:50
Host: This was the first time that he and Virginia have seen each other since their Epstein days. After a long embrace with Virginia, Jean sees my recording equipment and asks me to shut it off, so I do.

[Host then describes Juan's home, near a golf course, paintings [by him] and what he is wearing. Juan asks us to sit down on a tufted couch across from his wife, Maria who also worked for him as a housekeeper. They have 2 small dogs who bark a lot. They seemed anxious to see Virginia and nervously repeat how surprised they are to see her.

5:57
Juan says he remembers the day when he met Virginia. He was driving GM, doing something he says she often did, roaming the streets of PB looking for pretty girls who could become masseuses for Epstein. She spotted Virginia at the Country Club, Mar A Lago. And sure enough, Ghislaine told Juan, 'stop, I have to talk to this girl'. Juan waited for a long time while Ghislaine tried to persuade Virginia to become E's masseuse. He remembers sweating, sitting in the convertible. Juan says that Virginia was so skinny and pretty, he knew that she was just the right type. That day, he told his wife Maria, 'just you wait, you are going to see this girl this

2

09.22,.2020   *Broken-Seeking Justice*   Season 2, Episode 2, "Witness" – [WITH JUAN ALESSI]

afternoon. The story about Ghislaine is exactly what Virginia has been looking for. I can see the appreciation and excitement on her face.   Here is the first person witness to her time with Maxwell and Epstein, who is willing to talk about it. After 15 minutes of conversation, I take out my recorder and ask him tentatively, would he please agree to be recorded. I am shocked when he says, OK.

7:40 I asked Juan to start from the beginning. What was it like working for JE? At first Juan says it was a regular job working for a regular guy. He started working for E in the early 90s, before E was wildly rich, before he had all the homes, the jets, an island. Epstein was just one of Juan's clients.

7.58
Alessi: I went to work for him as a maintenance. I was doing maintenance in the house and I did repairs in maybe 30 homes in Palm Beach. Jeffrey a normal guy, er he didn't have the money. The money came like [click] that.

Host: After the money started flowing, Juan saw Epstein's life start to change. Juan was hired to work there, full time. GM came into the picture; girls started visiting in large numbers, and Juan found himself living under a regime of silence and secrecy.

8:35
Alessi:  This didn't happen in 1990.  This happens in 2002, 2003, 200 after that. Yes it was visits, it was girls. He likes massages from the day 1 that I met him.

VR: Did he ever say to you like, 'don't you dare ever say anything about this?

Alessi: Oh yeah, I was not supposed to talk to the guests. I was not supposed to talk to Virginia. Not talk.

Host: How did you get to know each other then?

9:05
Well you come to the house, she says, Hi, Hi John [in a whisper voice]. And that was it.  I was not supposed to talk any conversations - in the pool or in the house or in the kitchen. Nothing. No talking. I was not allowed. I was not allowed to discuss anything. I was not allowed to interrupt the conversation.

**Host:** It took a while for Juan and Virginia to get to know each other because none of the staff was allowed to interact.  But what blossomed was a bond, kind of like the bond that forms between prisoners of war. It reminded me of what Virginia said about her relationship with Epstein's chef, Adam Perry Lang, who we talked about last episode.  Viginia's friendships with E's staff were a big part of her life back then. She looks back at them fondly, almost like a silver lining if there can be one. Juan and Virginia both explain that these staff to staff friendships had to be conducted in secret out of Ghislaine's sight and like unhappy employees everywhere, they bonded over a shared dislike of the boss, Ghislaine. They speculated ad nauseam about her

3

dysfunctional relationship with Epstein, that's what bought them together. And they still can't make sense of it all.

**10:13**
**Alessi:** That er, how you call, relationship between E and her I never understood.

**VR:** Me neither. You know I asked him once, I asked Maxwell, I said, so

**Alessi:** I said, what are you doing? I told her many times, because she would come sometimes crying in the car for me to drive right?

VR: oh, wow

Alessi: And I says, "Ghislaine, Why are you doing this, why are you staying with this guy? [GM]: 'I hate him. I hate him. But John, I can't leave. I say, why? You have money. She had money

VR: Yes she had money

**10:49**
**Alessi:** Why you are not leaving? That relationship [unintelligible]

**10:55**
HOST: It's fascinating to learn that even the people right there – first hand witnesses found E's and Ghislaine's relationship as baffling as we all do. Why did Ghislaine do all the things she did for Epstein? Were they in love? Was it for the money? Did she want to do it? A few weeks after we talked with Juan, Ghislaine seemed to provide an answer to some of these questions. She sued Epstein's Estate claiming that Epstein promised in writing to always provide for her financially, that now includes paying her legal fees and personal security costs for any claims from the dozens of women who say she recruited for Epstein. But those claims obscured some interesting information. When Ghislaine was later arrested on Jul 2nd, a Govt filing said that they thought that she had up to $20 m at her disposal. Despite almost all of the victims referring to Ghislaine's role in E's scheme, she has claimed that she had no knowledge of his crimes. Juan's willingness to speak to V meant a lot to her. Even more than just opening his door, he seemed to believe her and expressed seemingly heartfelt sympathy for what she went through.

I feel so sorry that this jerk was at the end abusing little girls, that's sickening, sickening. He could have had all the women it the world. He could have buy a woman a day, an adult woman. Right. No, he went and abused these girls. That's sickness.

**12:25**
HOST: Virginia looked downright triumphant when she heard Juan acknowledge that she and others had been sexually abused as children. This moment, this admission was what she had flown all the way from Australia to hear. And Juan's retelling of his conversation where he warned Epstein about what was going on "one of these girls is going to get you in trouble, Jeffrey" – that story seemed to indicate that Juan knew something troubling was happening. Yet

4

09.22,.2020_  *Broken-Seeking Justice*    Season 2, Episode 2, "Witness" – [WITH JUAN ALESSI]

despite all of this, Juan insisted to us that he had no idea about the sexual abuse happening in the house, that he really wishes he could help Virginia out, but he just didn't see anything.

Alessi: I wish I could help them more. I wish I could be more helpful these girls. But I never saw -my job was to take care of the house, to take care of the food, open the doors, make sure the guests were feeling right, and that's it.

HOST:
So Juan maintains that he kept his head down and just did his job.  It was disturbing to hear and unsatisfying. If this were an ordinary house, maybe, but the thing about working for Epstein mean that doing your job involved doing some pretty out of the ordinary things.  Doing your job meant driving GM around to recruit young girls to massage your boss. Doing your job meant calling these young girls to come visit Epstein.

Alessi: He would come to me and say, John, call this girl, call Alison, it was hundreds of of girls, I had a list and he said, . call this, call this, call Johann, call Judy, call Nicole, call .. so many girls, I thought they were adults and they were massage therapists.

VR: How did you know they were adults though?

Alessi: I don't know.

Host: doing your job meant walking by photos of very young naked girls.

VR:  But what about all the pictures of the girls naked everywhere.

14:22
Alessi: They were [unintelligible] and that was Ghislaine taking those photos.

Host: It's all very confusing and frankly frustrating. But Juan has always been very cautious about discussing what he saw at Epstein's.  He's changed his story over the years. A lot. 15 years ago, he was a lot more open with investigators than he was with Virginia that day. In 2005 when the police first began investigating Epstein, the police called Juan.. We were able to get a recording of that call

14:51
**Alessi:**    This is something I really not like to be involved with it, if I'm not involved with it I prefer. Not to be involved with it, I've been out of a job for 3 years now….

**Det Recarey's voice:** I understand but you may hold some information that would assist me in this case.
Alessi: Ok.  I'm not going to say no. I'm not going to say no to you . because that would be dumb, but I would prefer to come to this with my attorney and see what he says.

**Det Recarey's voice:** Absolutely you have the [right]

09.22,.2020_  *Broken-Seeking Justice* _ Season 2, Episode 2, "Witness" – [WITH JUAN ALESSI]

**Alessi:** I don't want to involved I don't want to get in trouble or get sued by Mr Epstein or by his company.....

15:20
**HOST:** 11 days later Juan was interviewed by that same Detective - Josephy Recarey. You'll hear more about him in our next episode - According to a Police report, Juan told Detective Recarey that towards the end of his employment, the masseuses appeared to be younger and younger. When asked how young, Juan said they appeared to be about 16 or 17. Juan told Recarey the massages took place in E's bedroom or bathroom. He knew this because he often had to set up massage tables. Juan stated that towards the end of his employment, he would have to wash off a vibrator and a long rubber penis that were left in the sink after the massage. He said that the bed would almost always have to be made after the massages suggesting that the massage was not limited to the massage table.

Juan's story has been changing ever since that first interview with Law Enforcement. Years later in 2009, Juan gave a deposition where he said he was certain that one of these girls was under the age of 18. He concluded she was a minor because he dropped her off at High School. Then in 2016, the prominent defense lawyer, Alan Dershowitz obtained a sworn statement from Juan. He's the same Alan Dershowitz who Virginia claims sexually abused her, which Dershowitz denies saying that he has never met her. He also says that he has proof that Virginia is lying. She is included in his book, *Guilt By Accusation*. That evidence includes emails between Virginia and a reporter *[Sharon Churcher]*, a recording of a call between Virginia and one of Virginia's childhood friends, Dershowitz' own records of his whereabouts during the period of Virginia's allegations and a phone call he had with Virginia's lawyer David Boies, plus Virginia's own unpublished memoir. Connie Bruck who examined similar evidence for a story in The New Yorker, was only able to conclude that Dershowitz' often led to further disputes. Now, Virginia and Dershowitz are suing each other for defamation. Juan's 2016 statement for Dershowitz is notable in that his story has changed from what he told the police 7 years earlier. In this second statement, J said he never knew of any masseuse being under the age of 18. The masseuses were apparently mostly middle aged. Some were men, one was called Olga.

17: 34 And yet here is Juan, sitting in front of us, now saying that he knew that V was underage. Not only that, but that there was another girl who visited Epstein who was also underage.
15:48
**Alessi:** that was the only two girls that I saw that were underage, Virginia and ████ If they were abused, I don't know.

HOST: Virginia was 16 and the other victim was 14 at the time, we agreed not to use her name.

**Alessi:** *[unintelligible word, sound v faded]* that in my statements that she was young she was er um, she was not a massage therapist, it was [conversation cuts completely off here ]

18:30
HOST: The dogs start barking like crazy and Virginia leans forward.

09.22,.2020_ _Broken-Seeking Justice_   Season 2. Episode 2. "Witness" – [WITH JUAN ALESSI]

**Alessi:** She came to the house with her **mother.** And her **mother** would leave her there. I don't know if she did anything with him, maybe you know, but er she was abused [word a bit unintelligible].

We were flabbergasted. Despite Juan's statement just minutes earlier that he was unaware there was any sexual abuse happening in the house, he was admitting that this 14year old girl that he drove to and from the house, had been abused. But how does he know this if he never saw anything?

**18:48**
**Alessi:** And She was young, probably younger than you. And she never [emphasis]

Host: Juan would drive the 14 year old to and from Epstein's house.

Alessi: Every day that she come to the house I have to drive her home. And she never mentioned to me, never spoke a word.

HOST: It's possible that none of the victims ever told J about the abuse. And so in that sense, Juan can claim that he didn't know anything. If that's the test for right and wrong, then Juan may have passed. But is that really our test? Do we live in a world where if a 14 year old doesn't voluntarily come forward, it's ok to look the other way, ignoring all the signs staring you in the face? Virginia tried to get Juan to admit that he did indeed see even more than he was admitting to. At one point in the interview Virginia confronted Juan about seeing her naked and paying her money. He said he didn't recall any of it.

19:40: I swear to God, Virginia, as is my god, I **never** [emphasis] saw you naked. I didn't even know you. [over dog barks]. I saw other girls – adult – not you or _____ ████████

19:55
HOST: Virginia um, she recalls in her memoir and affidavit that you often paid her

Alessi: Virginia?

VR: Yeah

Alessi: I don't remember paying you

VR: just from the black bag

Alessi: No I never took $ from the black bag. No I had my own money I had my own [mumble] pay cash

VR: It had like a little TV in it, behind the kitchen and then I would .. sometimes I would have to put E to bed in Palm Beach and he would go off to sleep and then I'd have to come downstairs and get the money. It wasn't like you

7

09.22..2020_ *Broken-Seeking Justice    Season 2, Episode 2. "Witness"* – [WITH JUAN ALESSI]

20: 27.

**Alessi:** I swear. It is not incriminating. I never remember I..in a matter of fact that can be a record - they should have it in the office. Because I used to send, when I pay somebody, they would have to sign it, sign it and I would send that to NY because they checked me up every penny that went out

VR: Of course, because Epstein was very tight on his money right

**Alessi:** Every tight I would have to send the office a statement – this girl paid here's the signature. here's the check, copies of the check. I would make copies of the check. If it was cash you would have had to sign for me.. I don't know if you did but I cannot remember paying you.

21:10

HOST: We talked to Juan in February but in May the British Tabloid The Mirror, released a story about Juan. They interviewed him about this exact thing. The payments. And his story changed. The article says Juan admitted to paying Virginia and other girls, they he didn't realize what the money was really for. " Juan is quoted as saying "I used to go to the bank, withdraw $10k. I paid them out of petty cash and filled out a receipt. So what's going on in all this. Why is Juan changing his story so much? Why is he now denying seeing things that he has admitted to seeing before?

21:45 Voice of SPENCER KUVIN, Atty : Any good lawyer could cross examine him based upon the statements he's made.

HOST: I called Spencer Kuvin, a lawyer who has represented a number of Epstein's victims, to explain how Juan's changing story may become an issue.

**Spencer Kuvin:** And when there's conflicting statements, it tends to lead one to believe that maybe the full story is not being told truthfully. So er, he should be concerned. But again, if he co-operates fully with authorities, then he can probably execute some kind of a deal.

HOST: Could making untruthful statements get him in legal trouble?

Spencer Kuvin: Yes, as long as those statements are made in the context of some legal proceedings like a deposition or some other sworn testimony. If we see er, for example, Ms. Maxwell's charges, two of her charges are for perjury. And that perjury was lies that she made during a civil deposition.

Host: But making untruthful statements to the press, is that consequential at all?

Spencer Kuvin: It's not. It happens all the time in major news media outlets unfortunately and even by politicians nowadays, but those are not criminally chargeable.

Host:  What would a prosecutor need to charge him?

8

He could be charged with similar counts like Ms. Maxwell was charged with such as conspiracy. Um even if he wasn't engaged in the actual acts themselves, if there was a conspiracy to cover up those acts, or to assist in those acts in any regard, then he doesn't need to be an active participant. He could be a portion of that conspiracy.

But the NPA in Fl has been upheld so far. So if he is actually a co-conspirator is he protected?

Spencer Kuvin: Um I think that's a legal question that will. Have to be fought and deal with later – there are a number of co-conspirators specifically identified in the NPA and then there's a vague general statement about any others so that will be hashed out later. But I certainly don't think that should stop the US Attorney's office form doing their job which would be prosecuting the criminals that they feel committed these heinous acts.

HOST: How valuable is he as a witness?

**Spencer Kuvin:** I think he's certainly important as a corroborating witness for many of the charges brought against other individuals like Ms. Maxwell. Frankly I think he's more important to the government as a co-operating witness if he chooses to do so.

**Host:** Do you think that Juan is changing his story because he realizes that he may be in some sort of legal jeopardy?

**Spencer Kuvin:** Without a doubt, er I think that his story probably continually changes because he's seen what has been happening around him because the people he thought were untouchable like Ms. Maxwell and Mr. Epstein are getting arrested. So, if those powerful people are getting arrested, then you know, there's no one around to protect him anymore.

**Host:** I didn't know all those things back in February. I was shocked to hear some of the things Juan was saying.

24:33
**Host:** And then something even crazier happened right in front of us. Juan got a call

**Alessi:** Shhhh I think this is the FBI

**Host:** Yeah, the FBI called, in the middle of our conversation.

**Alessi:** [Whispering] Don't say a word. Hello? Hi _____ How are you? How are you doing?

25: 39
**Host:** Virginia and I are staring at Juan, hardly able to believe that of all the times, the FBI would call, it would be at the exact moment we are talking to him. We were spooked. Were they following us? Timing was uncanny. From Juan's end of the conversation, it seems like he's surprised too. He said he had not heard from the FBI since last July. And today, of all days, they were calling.

09.22,.2020_ _Broken-Seeking Justice_ _Season 2, Episode 2, "Witness" – [WITH JUAN ALESSI]

Alessi: How are you? I thought this was over, I thought I he was dying it was finally over and I guess it is not.

Host: We hear the agent ask Juan to do a follow up interview. And they both agree to talk next week.

Alessi: Give me a call back, any time, Ok bye _____ bye bye.

26:26
HOST: So the investigation was still moving along in some fashion. But after our conversation it made me wonder if Juan could ever be a reliable witness. Why would he admit to some things and deny others?

Beyond legal repercussions he could be protecting his reputation. This is understandable but my gut sense is there is something more at play here. IF his were a legal or reputational issue why speak at all. I think what's happening here is that Juan is revealing how people, at least some people, allowed themselves to continue to work as what as what they might have known in their guts as a massive operation to sexually abuse girls. It goes by a simple name – denial. You see each discreet fact, but you just deny the obvious conclusion. Because not denying it would mean you would have to give up a job that pays a fortune or admitting to yourself that you are standing by something very very wrong. But denial doesn't always work, because sometimes you are faced with something more compelling. Something like sitting on a sofa facing Virginia, a woman you've known since she was a girl. So he sees all these girls coming over every day, girl after girl, but he tells himself they are just massaging Epstein. Epstein really likes massages, and for some reason, likes them from teenage amateurs. Of course, it's absurd but that's the whole frigging point. The only people who are going to work in that house are those who have this mental capacity for profound denial. I can't say any of this is clearly true. I am not inside Juan's head. I've tried repeatedly to reach Juan since we went to his house but I haven't heard hack. Even amidst the denials, Juan places some of Epstein's more prominent friends at the house during a period of time when there was a constant inflow of girls including very young ones.

I was interested to hear if you remember seeing Alan Dershowitz. He did.

28:28
Alessi: Alan Dershowitz was many times at the house. Many times at the house.

Host: With children or girls, young girls?

Alessi: No, no no no. I never saw children with him.

This is one point however where his story hasn't changed. Juan has consistently said he never saw Dershowitz around young girls and that Dershowitz had never been at Epstein's house at the same time as Virginia. Dershowitz acknowledges that he has been to Epstein's properties including his residences in NY and PB. He says that his time there was limited to public areas of the homes and that he never saw anything inappropriate including photos of naked girls. He's also said that he never observed Epstein with underaged girls. If he had, he told us that he would

10

09.22,.2020_ *Broken-Seeking Justice* _ Season 2. Episode 2. "Witness" – [WITH JUAN ALESSI]

have reported it to the authorities. Juan also remember Prince Andrew but says he never saw him with girls.

29:16
Alessi: Prince Andrew was at the house maybe 2 or three times when I was there, he was always nice and very nice guy. He was the only guy who ever left us a tip.

V is sitting here listening to all of this. Juan's inconsistences, the FBI calling, and it gives me a sense of her life for the past decade. She is trying to reveal the truth, she is trying to get witnesses to come forward. Yet each of those witnesses is deeply problematic, either because of their un-willingness to speak like Adam Perry Lang or because of their utter unreliability like Juan Alessi. And yet, Virginia remains positive through all of it. She's just so grateful despite Juan's contradictions and denials and in a way, her relentless optimism is inspiring. As we left Juan's house he apologized to her again.

30:11
**Alessi:** Virginia, I feel so bad what happened. To you but I feel so good to see you so great now. So good that you make up your life, that you have a family and try to nail that son of a bitch.

VR: Absolutely. This has been a beautiful reunion. Thanks so much. Thank you for opening up your doors and your heart to me.

Alessi:  You were the person I never imagined will be in my house. I thought you hate me because
VR: oh really I told these ladies here we have to stop off and see Juan,

Alessi -let me give you my email.

Virginia it as so worth it because I said, these are the people.

Host: Why would she hate you though?

Alessi: I thought you know she would have blamed me by not doing something. I thought these girls would go against me. Or they would say, 'Oh John, John! Knew it!  **I didn't know!**

VR: [Sounds of kissing/hugging] You were an amazing person then and an amazing person now. Thank you.

I'm so glad to see you as a full-grown woman and beautiful. Ok. .

VR:
Thank you so much for your time. Let your knee get better. Thank you guys so much. Have a beautiful night.

31:26

09.22,.2020_ _Broken-Seeking Justice_   Season 2, Episode 2, "Witness" – [WITH JUAN ALESSI]

**Host:** When we leave Juan's house, I feel tired and frustrated as we walk out to our car. We had come so close to getting a full detailed account of life under Epstein from one of the witnesses best positioned to see everything, at least everything at E's PB house. And yet he kept denying that he knew anything substantial. Virginia though was elated. How do you feel right now?

**VR:** I felt really happy. You know I do feel like he had to protect himself in some ways, which is totally cool. I don't expect everyone to come full forward and say exactly what they saw cos that could incriminate them.

**Host:** Yeah, I mean I was a little frustrated to be honest. I tried probing him on like, how did you not see girls naked when like Virginia writes in her Affidavit that she, you paid her that she was often naked round there; and he was, 'I saw nothing, I saw nothing'.

VR: The sheer fact that he puts Dershowitz there, the sheer fact that he puts Andrew there, even though he says he doesn't think Andrew does anything wrong, he's had to set up all these massage tables upstairs. What were these massage tables about? No, they weren't just about Shiatsu.

32:36
HOST: She's talking about Prince Andrew of Britain right there. He's had to step back from royal duties because of his links to Epstein. He denies having any sexual contact with Virginia.

32:45
VR: And what he means is like his heart is good. He couldn't do shit about it. He feels horrible about it but um at least he took us in and at least let us inside the condo. It wasn't all bad, so

Host: So you are just happy that he was willing to engage/

VR: Yeah, very much so and even you are willing to admit 10% of what you know there, that 10% can help so many other people.

Host: That's fair. There's a part of me that's like he was lying, like he <u>was</u> lying. He knew. He was out with G hunting for masseuses, I mean, it's just..

33:22

*VR:* I know he saw me and like he goes back to his wife and says you watch, this one is going to come back to the house. We have to go between the fine lines of um what's truth and what's not; and for him that's as much truth as he was willing to give. So even though it was only a very small % of truth we still have to be grateful. And maybe down the track as things go on. I just think he is seriously afraid of the FBI like because he did see all this stuff.

Host: She may be thrilled but Virginia still has clear painful memories of those times when she needed Juan's help and did not get it .

09.22..2020_ *Broken-Seeking Justice* _Season 2, Episode 2, "Witness"_ – [WITH JUAN ALESSI]

VR: I was crying n the car on the way home. I still remember crying silently to myself. I was scared. My eyes were tearing up. He didn't say one word to me on the trip home. Now it doesn't make him like the worst person in the world because here he is wanting to help and talk. Could he have. Helped more, could he have talked more? Yes. But it's the beginning of a dialog so I'll help that as a plus.

34:24
HOST: Right, I mean I id think to myself. I mean like I have a lot of thoughts on that and I didn't want to ruin that moment for you cos I know that it's so hard to get people to talk so just to have somebody let you into their house. I'm like, Is a big thing but for me yeah, i was just like, yeah, I don't believe that you didn't know what was happening. You admitted that you were cleaning off dildoes. Like what the heck do you think - why would, why would Ghislaine go looking for new masseuses and come home with the prettiest youngest girls she found? Girls that weren't even masseuses, girls that were underage hadn't even finished high school.

35:03
VR: Right. So there's a point where he, he had to try to stop himself from telling the truth which you could see; and then there's just no point in asking for the truth any further because he obviously wasn't going to say what he knew. But he said what he knew to the extent that he felt comfortable with and for that I'm grateful. This is as good as it gets. And I'm ok with that, Juan I'm grateful that you invited me to your home and hugged me and treated me like a human being and wanted to help. So for that I'm grateful.

35:36
Host: But he knew how young you were. Like that was pretty clear. That was the one thing that was pretty clear, that was the one thing I take away from all that, was like, whether he knew there was abuse or not, he knew that you were very young.

35:46
VR: Yeah he did remember that and me and ▇▇▇▇ for some reason we stick out in his mind although we all know there was lots and lots and lots of under-age girls. Ummm, that's just something he's going to have to live with until the day he dies. You know, I think it's sad, maybe as time goes on and more comes out, maybe he will feel OK to come out.

HOST: After the break, how Virginia led the charge to collect evidence against Jeffrey Epstein at a time when he still seemed invincible.

HOST: 36:40
Every now and then after having spent time with Virginia and other victims of Jeffrey Epstein, I find myself overwhelmed, emotionally exhausted. It is so much. And then I realize they have been going through this for decades. They were abused and they kept telling their story and nobody seemed to care. It's only been a year and a half since this has been a big story. They spent most of those years struggling to get anybody to listen. Which makes it even more remarkable that Virginia is still at it. I could barely stand 10 days of knocking on doors and hearing 'no' hearing the absurd denials. Virginia has been actively hearing that for 10 years.

09.22..2020_ *Broken-Seeking Justice* – Season 2, Episode 2, "Witness" – [WITH JUAN ALESSI]

Has she ever really been able to get anyone though? I put that question to Brad Edwards, a lawyer who represents many of Jeffrey Epstein's victims:

37:27
**BRAD EWARDS:** Oh yeah.

**Host:** Really?

Brad Edwards – Oh Yeah. For sure.

**HOST:** And maybe that's why she keeps going. Sometimes she wins. Virginia has been central to the many fights against Epstein both in civil and in criminal cases, not because she is involved in every case, she is not, but because she is always ready to go on the record and speak truth to power. Back when Edwards first started working on the case, he couldn't get anybody to talk – witnesses or any victims to come forward and talk publicly. That was, until he talked to Virginia.

38:04
Brad Edwards: I remember the first day she came into my office. It was like, 'let's go get everyone.' You know, a different kind of attitude. Not like other clients where 'ok, you are going to issue subpoenas, she said, 'let's just go get these people'. I said, 'what do you mean' she says, 'listen, I was part of their dysfunctional family for a two or three year period of time. Let's just go to New York and I'll just get them to come co-operate'. 'You really don't understand. I mean, these people are not going to cooperate.' She said, 'just let's get on a plane. So I thought, actually I have never had a client like this before, you know, where she's like 'I'll just take on the world, and come hang out with me and I had a very take on the world kind of attitude too, so I thought alright, she's a breath of fresh air. So we get on an airplane and come up to New York.

38:49
Host: They had some other meetings scheduled but Virginia knew who she wanted to track down - the long-time housekeeper of Epstein's upper east side home. She was confident that he still worked at 9 E 71 street for Epstein. She told Edwards,

**Brad Edwards:** I'll get him to come out and tell he'll just tell us everything. He knows it all, he's going to tell you all of this as if it is going to happen right in the middle of the street. And she's so brave and has so much courage and it's like 'nothing's going to stand in my way' which you know, who doesn't love that?

**HOST:** Edwards waited for Virginia across the street from Epstein's house. He actually hid behind a car. Epstein already thought of him as an enemy and Virginia was nervous about what would happen if E saw the two of them and figured out they were working together.

**Brad Edwards:** Hey these are 2 people who could destroy my life and now they've teamed up. We are going to get like killed right in the middle of the street. So she like walks up to the door and bangs on that big door.
39:46

14

09.22..2020   *Broken-Seeking Justice* – Season 2, Episode 2, "Witness" – [WITH JUAN ALESSI]

I'm like looking from across the road thinking, what kind of liability is this, her husband tells, hey don't let her do anything crazy. And now she's like banging on this guy's door who I know is this evil powerful person. What do I do when she just walks in the house, like now what.

**HOST:** So she bangs on the door so there's a female who comes to the door. Brad can see V talking to the woman who appears to be Epstein's staff. Virginia asks her to see the House Manager calling him an old friend. The woman disappears into the house.

**Brad Edwards:** And comes back out let's say 5 minutes later and says, um, he can't talk to you
.
And she says well why can't he talk to me; I'll just stay here all day, she doesn't care. And they said, he's not going to be able to come out. So she says, I'm Virginia Roberts, this happened to me, I need him to be on the good side, he's a good guy, I always thought he is a good guy, you know I always thought he was a good guy. The house slams the door in her face. The conversation is over. That's kind of the rsvp that I expected 'cos I had been litigating with him for a while. She comes over and she has that look of like she's so perplexed. I can't believe they won't let me in, you know, these are all his disciples in his house and you basically tried to infiltrate him by just by bum-rushing his house you know, just walk right in and take him out. She almost believed that she was going to accumulate all of the staff and they were going to go up and just put him in handcuffs and drag him out of the house. So then she told me why don't we just go to all the girls that he has at E 66th Street, the stash houses. But then we went there – yeah, we went there and she starts reeling off all the Apt #s that Jeffrey owned there where he kept all the girls. And tells the bellman, 'bring this person down, bring that person down'. And he said, I can't even tell you that they live here. And she's like, 'I know that they live here'. She's just like this fireball that is ready to go, you know, get these people. Which you know, you've met Virginia. There is nobody that has no credibility than somebody who is willing to go directly to their house and call them out.

Next week, Ghislaine Maxwell. She's still in jail in New York waiting for trial, but notably not for anything to do with her time with Epstein in Florida. How Ghislaine Maxwell ended up being charged with crimes a decade earlier? That's next week on *Broken – Seeking Justice.*

END

15

# EXHIBIT 48

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------x
UNITED STATES OF AMERICA

    -against-                                                 S2 20 Cr. 330 (AJN)

GHISLAINE MAXWELL,                                          DECLARATION

                Defendant.
-------------------------------------------------x

       ALEXANDER "RAI" HAMILTON, pursuant to 28 U.S.C. § 1746, hereby declares under

penalty of perjury:

1. I am ▮ years of age having been born in ▮▮▮.

2. I worked in ▮▮▮▮▮▮▮ for most of my working life.

3. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

4. I had homes in ▮▮▮▮▮▮▮▮▮▮ in the 1990s.

5. I was based out of ▮▮▮▮▮▮▮▮ and returned to ▮▮▮ that year.

6. I have known ▮▮▮▮▮ from the mid-1990s until the present day.

7. I remember her from the 1990s as very pretty and very sociable.

8. I have met her in ▮▮▮ many times.

9. I did not have a sexual relationship with ▮▮▮▮.

10. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

11. ▮▮▮ went out with ▮▮▮▮▮▮ on and off for some years.

1

12. After ████████████████████████████████████████████
and I was her wearing a ring.

13. ████████████████████████████████████████████████

14. ████████████████████████████████████████████████

15. ████████████████████████████████████████████████

16. I last met ████████████ on a plane in 2020. She approached me and we chatted.

17. I remember her words in the context of Jeffrey Epstein. She said with a meaningful laugh 'it fell right in my lap.'

18. In the first quarter of 2021, ████████████ started calling me from time to time when I was in ██████

19. During these conversations, she spoke to me about the upcoming trial of Ghislaine Maxwell. She mentioned that she was claiming money from the Epstein estate.

20. She told me that the case against Ghislaine Maxwell was getting stronger, the women in the case against her were strengthening their stories.

21. She left me with the impression that the stories were being rehearsed and shared among the women accusing Ghislaine Maxwell.


I declare under penalty of perjury that the foregoing is true and correct.


Executed on December 6, 2021.


_____

ALEXANDER "RAI" HAMILTON

# EXHIBIT 51

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————— x

UNITED STATES OF AMERICA

- against -

GHISLAINE MAXWELL,

S2 20 Cr. 330 (AJN)

DECLARATION

Defendants.

———————————————————— x

KEVIN MORAN, pursuant to 28 U.S.C § 1746 herby declares under penalty of perjury:

1.  I am 81 years of age having been born in 1940.

2.  I served in the Guards Division of the armed forces of Her Majesty the Queen.

3.  On retirement from the army eventually I took over the running of the Nag's Head Pub located at 53 Kinnerton Street, London SW1X 8ED immediately opposite 44 Kinnerton Street in November 1982.

4.  Apart from the odd illness and holiday I am in the pub every day. I have a flat above the bar  I have always known all my neighbours and have done since I moved here.

5.  I first met Ghislaine Maxwell in early 1997. She came over the road to the pub to introduce herself to me as a new neighbour who had purchased 44 Kinnerton Street. I had not met her before either at the pub or on the street before this meeting.  The house was under renovation for many months after this first meeting.

6.  Ghislaine Maxwell told me she had purchased the house at 44 Kinnerton from the O'Neills who had lived there for a few years. John and Nessa O'Neill were owner occupiers who did not let out their property at any stage. When the couple split up in approximately 1996 the actor Danny McCall, af friend of the O'Neills, house-sat 44 Kinnerton Street for them during their separation/split for approximately one year until the sale of the property to Ghislaine Maxwell in 1997. Danny lived at 44 Kinnerton Street on his own in this period.

7.  I did not see or meet Ghislaine Maxwell until after the sale had gone through and she walked over

to introduce herself.

8. I continued to meet with Ghislaine Maxwell from time to time whenever she was in London which was infrequently over the years.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on December 17, 2021.

KEVIN MORAN

# EXHIBIT 52

M6SQmaxl


 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x
     UNITED STATES OF AMERICA,
 3
                v.                              20 CR 330 (AJN)
 4                                              Sentencing
     GHISLAINE MAXWELL,
 5
                    Defendant.
 6   ------------------------------x
                                                New York, N.Y.
 7                                              June 28, 2022
                                                11:00 a.m.
 8
     Before:
 9                  HON. ALISON J. NATHAN,

10                              United States Circuit Judge
                                Sitting by Designation
11

12                      APPEARANCES

13

     DAMIAN WILLIAMS
14        United States Attorney for the
          Southern District of New York
15   BY:  MAURENE COMEY
          ALISON MOE
16        LARA POMERANTZ
          ANDREW ROHRBACH
17        Assistant United States Attorneys

18   HADDON MORGAN AND FOREMAN
          Attorneys for Defendant
19   BY:  CHRISTIAN R. EVERDELL
          -and-
20   BOBBI C. STERNHEIM

21   Also Present:  Amanda Young, FBI
                    Paul Byrne, NYPD
22                  Sunny Drescher,
                     Paralegal, U.S. Attorney's Office
23

24

25

M6SQmax1

1          (In open court; case called)

2          DEPUTY CLERK:  Counsel, please state your name for the

3   record starting with the government.

4          MS. MOE:  Good morning, your Honor.  Alison Moe, Lara

5   Pomerantz, Maurene Comey and Andrew Rohrbach for the

6   government.  We're joined at counsel table by paralegal

7   specialist Sunny Drescher.  Also as a member of our team in the

8   gallery are our case agents, Special Agent Amanda Young and

9   Detective and Paul Byrne.

10          THE COURT:  Good morning to you all.

11          MS. STERNHEIM:  Good morning.  Bobbi C. Sternheim and

12   Christian R. Everdell for Ghislaine Maxwell, who is present at

13   counsel table.

14          THE COURT:  Good morning, Counsel.

15          Good morning, Ms. Maxwell.

16          Please, be seated everyone.

17          We are here today for sentencing in United States v.

18   Ghislaine Maxwell 20 CR 330.

19          In preparation for today's proceeding, I have reviewed

20   the probation report, which is dated June 9, 2022 by revision

21   date.

22          I have also received and reviewed the following

23   additional submissions:  I have the defense memorandum in

24   support of PSR objections, which is dated June 15, 2022.  I

25   have the defendant's primary sentencing submission, which is

M6SQmax1

1    dated June 15, 2022.  There are exhibits attached to that

2    sentencing submission, Exhibits A through J.  A through H --

3    I'm sorry -- A through I were a series of letters from friends

4    and family members of Ms. Maxwell.  J is a forensic psychiatric

5    evaluation.  And then I received by a later transmission date

6    of June 26, 2022 a letter from an inmate at MDC related to

7    Ms. Maxwell's assistance of other inmates with tutoring.

8              I have the government's sentencing submission, which

9    is dated June 22, 2022.

10             With respect to victim impact statements, I have dated

11   June 22, 2022 a victim impact statement from Annie Farmer.  I

12   have a victim impact statement from the witness who went by the

13   name of Kate under my pseudonym order during trial.  That I

14   believe is undated.  I have a statement dated June 22, 2022

15   from Virginia Roberts, or Giuffre.  I have same date from

16   Juliette Bryant, same date from Maria Farmer, same date from

17   Teresa Helm.  I also have undated statements from Sarah

18   Ransome -- I apologize if I'm saying your name wrong -- and

19   Elizabeth Stein.

20             Counsel, is there anything else I should have in front

21   of me for purposes of sentencing?

22             MS. MOE:  No, your Honor.  Thank you.

23             THE COURT:  Ms. Sternheim.

24             MS. STERNHEIM:  Other than the submissions that we

25   made in connection with the CVRA, that is a complete record of

4

M6SQmax1

1    what we have received and reviewed.

2          THE COURT:  Yes.  Thank you.  And that is part of the

3    record including there was an ethics letter and other materials

4    submitted in connection with your objection to that.

5          MS. STERNHEIM:  Thank you very much.

6          THE COURT:  Thank you.

7          All right.  Counsel, would you just please confirm

8    that you've received each other's submissions?

9          MS. MOE:  Yes, your Honor.

10         MS. STERNHEIM:  Yes.

11         THE COURT:  Let's also confirm all submissions are

12   filed on ECF.

13         MS. MOE:  That's correct, your Honor.

14         MS. STERNHEIM:  Yes.

15         THE COURT:  Thank you.

16         Ms. Moe, I did have the government indicate this in a

17   letter, but if you would confirm and articulate what the

18   government has done to notify any crime victims of their rights

19   under the Justice For All Act?

20         MS. MOE:  Yes, your Honor.

21         With respect to the six individuals who were proved at

22   trial to be directly impacted by the offense conduct, the

23   government has notified those individuals through their counsel

24   about the sentencing and about their right to be heard.

25         In addition to that notification, the government has

M6SQmax1

1    used the victim notification page on the U.S. Attorney's Office

2    website regarding this case about the upcoming sentencing.

3            THE COURT:  And you posted the Court's order there

4    regarding a process for submission of statements.

5            MS. MOE:  Yes, your Honor.

6            THE COURT:  Thank you.

7            We'll turn to the presentence report.

8            Ms. Sternheim, I know that you have because you've

9    objected to a lot which we will talk about, but for the record,

10   have you read the presentence report and discussed it with your

11   client?

12           MS. STERNHEIM:  Yes, your Honor.

13           And, if I may, Mr. Everdell will handle the objections

14   portion of our presentation.

15           THE COURT:  Okay.  We'll get to that in just a moment.

16   Thank you.

17           Ms. Maxwell, can you please confirm that you've read

18   the presentence report and had a full opportunity to discuss it

19   with your counsel?

20           THE DEFENDANT:  I did have an opportunity to read it.

21           THE COURT:  And an opportunity to discuss it with your

22   counsel?

23           THE DEFENDANT:  I did.

24           THE COURT:  Okay.

25           Ms. Moe, for the record, have you reviewed the

6

M6SQmax1

1    presentence report?

2         MS. MOE:  Yes, your Honor.

3         THE COURT:  Thank you.

4         So we will turn first -- we'll set aside first the

5    guideline calculation.  We'll turn to the factual accuracy of

6    the report.  And I did receive substantial factual objections

7    to factual assertions in the report.  I am prepared to go

8    through those with respect to any continuing factual objections

9    by the defense.

10        Let me confirm, Ms. Moe, does the government have any

11   objections to the report regarding factual accuracy?

12        MS. MOE:  None, aside from those which are already

13   noted in the PSR.

14        THE COURT:  No continuing objections.

15        MS. MOE:  That's correct, your Honor.

16        THE COURT:  Mr. Everdell, I know that you do have

17   continuing objections.  Tell me where you'd like to begin.

18        MR. EVERDELL:  Well, your Honor, I don't know if the

19   Court is planning on resolving each and every factual

20   discrepancy or dispute or whether there are certain ones that

21   the court will find are relevant to sentencing or whether we

22   should go through each in detail.

23        THE COURT:  I am prepared to -- what I typically do is

24   go through each one so that if there is a correction to the

25   report that is being requested to be made, whether it's

M6SQmax1

1    material to sentencing or not, I am prepared to address it.

2    So I believe the first -- what I see as your first

3    continued objection is to paragraph 22.

4    MR. EVERDELL:  I'm just getting my submissions.

5    Yes, that's correct, your Honor.

6    THE COURT:  I overrule the objection.  I do credit

7    Juan Alessi's testimony that the defendant identified and

8    targeted Virginia after seeing her in the Mar-a-Lago parking

9    lot.  The defendant also worked with Epstein to identify and

10   target Jane.

11   Paragraph three I see three objections to this

12   paragraph.  Is that a continuing objection, Mr. Everdell?

13   MR. EVERDELL:  Paragraph three, your Honor?

14   THE COURT:  23.  I apologize.

15   MR. EVERDELL:  Yes, your Honor.

16   THE COURT:  I overrule the objection.  The first

17   objection is regarding the conclusion that Ms. Maxwell was the

18   author of the essay in the paragraph.  I overrule the objection

19   because a reasonable inference supported by the trial evidence

20   is that the defendant authored the essay.  Metadata indicated

21   that the computer was registered to "GMax" and the document was

22   saved under the user name "Ghislaine."

23   The second objection is to the assertion that Epstein

24   transferred Ms. Maxwell approximately $23 million during the

25   conspiracy.  I overrule that objection.  Bank statements

M6SQmax1

1    admitted at trial showed that accounts under Epstein's name

2    wired approximately $23 million over two occasions during the

3    conspiracy to accounts of "Ghislaine Maxwell." The defendant's

4    assertion that Epstein's accountant may have had access to and

5    control over these accounts does not undermine the reasonable

6    inference that the defendant controlled the funds in accounts

7    bearing her name, so that is established by a preponderance.

8         As to the third objection that there's no evidence in

9    the record that Epstein bought the defendant her New York City

10   townhouse, I overrule that objection because I credit Kate's

11   testimony that the defendant told her that Epstein bought the

12   defendant her New York townhouse.

13        Paragraph 25 is an objection to the characterization

14   of the Palm Beach residence being operated through a culture of

15   silence.

16        You'll let me know if you're not maintaining an

17   objection.

18        MR. EVERDELL: Yes. I think that the default is we

19   are, your Honor.

20        THE COURT: Understood.

21        I overrule this objection. Evidence at trial

22   indicates that this was the case. For example, the household

23   manual instructed employees to "see nothing, hear nothing, say

24   nothing." I credit Mr. Alessi's testimony that he understood

25   this instruction to be a kind of warning that he was supposed

M6SQmax1

1    to be blind, deaf and dumb, and to say nothing of Epstein's and

2    Ms. Maxwell's lives.

3         Paragraph 26, there's an objection to the

4    characterization concerning the defendant's identification and

5    isolation of minor girls as inconsistent with the trial

6    evidence.  I overrule this objection for the same reasons as

7    articulated with respect to paragraph 22.  In addition, the

8    trial evidence established that the defendant and Epstein

9    isolated girls by spending time with them alone away from their

10   families.  For example, Annie's testimony regarding the trip to

11   New Mexico.  Jane's testimony that she would spend time at the

12   Palm Beach residence alone with Epstein and the defendant.

13        Paragraphs 27 and 28 the defendant makes two

14   objections:  First, to the assertion that the defendant and

15   Epstein developed a scheme that created a "constant stream of

16   girls who recruited each other."  And, second, she objects to

17   the assertion that she encouraged minor girls to bring other

18   minor girls to provide Epstein with sexualized massages.

19        Again, based on the trial testimony and evidence, I

20   overrule the objection.  It supported the information in these

21   paragraphs.  The evidence indicated the scheme started with the

22   defendant's recruitment of Virginia.  Virginia then enlisted

23   Carolyn in addition to at least two other girls.  Carolyn in

24   turn recruited at least three friends, and those friends then

25   brought more girls.

M6SQmax1

1          Carolyn credibly testified that she was paid twice as

2     much when she brought friends to the massages.  Based on the

3     defendant's control of household and Carolyn's testimony that

4     the defendant on occasion paid her directly, I find it more

5     probable than not by a preponderance of the evidence that

6     Virginia was also paid more as encouragement to recruit

7     additional girls.

8          Paragraph 9, there's an objection to the inclusion of

9     Kate in this paragraph.  It argues that her name should be

10    deleted because Kate is not a victim of the crimes charged in

11    the indictment.

12         MR. EVERDELL:  Your Honor, I'm sorry to interrupt.  I

13    think you said paragraph 9.

14         THE COURT:  I did.  I'm sorry.  I'm skipping the first

15    number for some reason.  29.  Thank you, Mr. Everdell.

16         I overrule this objection because the paragraph

17    doesn't assert that Kate was a statutory victim as we've

18    discussed throughout trial and the government didn't contend

19    that Kate was a victim of the crimes charged in the indictment,

20    and that paragraph doesn't assert that she was.

21         Paragraphs 30 to 38, there's objection throughout

22    these to the characterization of the defendant having groomed

23    Jane.  I overrule these objections.  I think the government is

24    right here that the objection is conflating grooming with

25    enticement to travel for purposes of sexual contact.  Jane's

M6SQmax1

1   credible trial testimony established that the defendant took

2   steps to make Jane comfortable and encouraged her to engage in

3   illegal sex acts with Epstein.

4        Paragraphs 39 to 45 which describe specific conduct

5   involving Kate, I think the specific request here -- well,

6   first, was that it should be removed from the PSR because Kate

7   was not a victim of the crimes charged in the indictment, and

8   then, alternatively, that it be moved to a different paragraph

9   with a heading offense behavior not part of relevant conduct.

10  I don't see that this is necessary.  I overrule the objection.

11  Conduct involving Kate may be considered at sentencing her

12  testimony revealed additional details of the defendant's method

13  of identifying and introducing to Epstein young girls for

14  sexualized massages.  Her testimony also established the

15  defendant's knowledge of the sexualized nature of massages with

16  Epstein.

17       Paragraph 43, the defendant contends this paragraph

18  should include a sentence that Kate was above the age of

19  consent at all times.  I think the paragraph says that Kate was

20  age 17 or above at all relevant times, and I have no objection

21  to including that she was above the age of consent at all times

22  based on the trial evidence, so I will make that change to

23  paragraph 43 of the PSR.

24       Paragraph 54, the defendant objects that there's no

25  evidence that Epstein paid for Annie's trip to Thailand.  That

12

M6SQmax1

1    objection is overruled.  Annie testified to this fact at trial,

2    and I credit this testimony.

3            Paragraph 5 -- sorry -- did it again.  55, defendant

4    makes three objections to the paragraph.  I overrule the

5    objections.  The record supports that the defendant personally

6    recruited Virginia to provide Epstein with sexualized massages

7    when she was a minor.  Jane and Kate's testimony established

8    that the defendant was aware that the massages were sexualized.

9    I credit Mr. Alessi's testimony that the defendant approached

10   Virginia, and that Virginia visited the residence -- approached

11   Virginia for the first time, and that Virginia visited the

12   residence later that day.  Flight records and credible witness

13   testimony established that this meeting occurred before

14   Virginia was 18.  In addition, when Virginia brought Carolyn to

15   the residence, the defendant greeted them and instructed

16   Virginia to show Carolyn -- quoting from the trial record --

17   "what to do."  Carolyn then witnessed Virginia give Epstein a

18   sexualized massage involving sexual intercourse.  Finally, as I

19   explained in my resolution to paragraphs 27 and 28, I do

20   conclude that there is a sufficient basis to find by a

21   preponderance of the evidence that the defendant used monetary

22   incentives to encourage Virginia to recruit Carolyn.

23           Paragraph 58, the defendant objects to the assertion

24   that Carolyn was 14 years old when Virginia brought her to

25   Epstein's residence, claiming that Carolyn's recollection is

M6SQmax1

1    inconsistent and unreliable.  I overrule this objection.

2    Carolyn testified at trial that Virginia first brought her to

3    Epstein's residence when she was 14 years old.  I found Carolyn

4    to be credible and credit her testimony.  I'm not persuaded by

5    the arguments to the contrary.  Moreover, @Sean's credible

6    testimony corroborated Carolyn's recollection.

7         Paragraph 59, the defendant makes two objections.

8    Same objection to Carolyn being 14.  For the reasons I've

9    stated, that's overruled.  She objects to Carolyn's assertion

10   that she visited Epstein's residence more than a hundred times.

11   I overrule that objection.  Again, I credit Carolyn's

12   testimony.  She testified that she went to the house "over 100

13   times."  I reject the suggestion that this is improbable based

14   on Epstein's travel schedule.

15        Paragraphs 61 and 62 again object to Carolyn's age,

16   and I overrule for the same reasons.

17        Paragraph 64, three objections.  First, the defendant

18   objects to Carolyn's assertion that she visited the Palm Beach

19   residence over a hundred times and her assertion that she was

20   14.  For the reasons I've given, I overrule those objections.

21   She objects to the assertion that Carolyn stopped performing

22   sexualized massages in 2001 when she was 18 years old and

23   argues that the evidence indicates she was 17 years old.  We're

24   going to take up the issue of this timing question with respect

25   to the issue of which Guidelines Manual controls.  So I'll skip

M6SQmax1

1    that for now.

2          Paragraph 72, defendant objects to the assertion that

3    Epstein briefly penetrated Carolyn's vagina with his penis

4    because her trial testimony the defense claims is contradicted

5    by a 2009 deposition testimony.  I overrule this objection.

6    Again, I credit Carolyn's testimony.  Carolyn plainly testified

7    to this at trial.

8          Paragraph 74, the defendant again objects to the

9    assertion as to the age and timing.  Again, we'll pick up on

10   that issue when we discuss the appropriate guideline manual.

11         Paragraphs 75 and 76 the defendant objects to the

12   inclusion of these paragraphs in the presentence report because

13   the perjury counts have not been presented to a jury, and so

14   she contends have no bearing on the sentence in this case.  I

15   do overrule this objection.  A sentencing court's discretion is

16   largely unlimited as to the kind of information it may

17   consider.  It's free to consider evidence of uncharged crimes,

18   dropped counts of an indictment, criminal activity resulting in

19   acquittal in determining sentence.  *United States v. Bennett*,

20   839 F.3d 153 (2d Cir. 2016).  I may consider the information as

21   long as the information is reliable and accurate.  For the

22   following reasons, I do conclude the information underlying the

23   severed perjury charges is reliable.  The defendant testified

24   under oath in 2016 that she was not aware of Epstein's scheme

25   to recruit underage girls for sexual massages and other than

M6SQmax1

1    Virginia, was unaware if she had interacted with anyone under

2    the age of 18 at Epstein's properties.  She never gave Annie

3    Farmer a massage.  She was unaware whether Epstein possessed

4    sex toys.  She was unaware that he was engaging in sexual

5    activity with anyone other than her in the 1990s and 2000s.

6    She never gave Epstein a massage.  The credible testimony and

7    evidence admitted at trial disproves these assertions which

8    were made under oath.

9         Paragraph 79, the defendant objects to the

10   characterization of the offense conduct as contrary to the

11   trial record.  Here, defense hasn't provided any reason

12   specifying this, and I don't see one.  So based on the written

13   objection, it's overruled.

14        Paragraph 81, the defendant objects to the assertion

15   that Ms. Maxwell had direct responsibility for any sexualized

16   massages that several women or any other people that Carolyn

17   may have brought to Epstein's residence may have performed, and

18   she contends there's no record that she interfaced with these

19   individuals.  I am prepared to overrule that objection.

20        The paragraph makes clear that these individuals did

21   not interact directly with Ms. Maxwell.  Nevertheless, for the

22   reasons explained a little while ago in overruling the

23   objections to paragraphs 27 and 28, I do conclude that the

24   evidence at trial established that the defendant's recruitment

25   of Virginia set the recruitment scheme in motion that resulted

M6SQmax1

1    in the abuse of these individuals.

2             Paragraph 82, the objection is to the assertion that

3    the records recovered from the Palm Beach residence during the

4    2005 search reveal that additional minors provided Epstein with

5    sexualized massages between 2001 and 2004.  Again, I overrule

6    the objection.  The trial record including message pads, phone

7    book entries, and testimony of witnesses establishes by a

8    preponderance that the information contained in this paragraph

9    is accurate.

10            Paragraph 83, so there was a revision here.  I'm not

11   sure if there is a continuing objection, Mr. Everdell.  The

12   previous objection was to the assertion that the defendant is

13   responsible for the victimization of untold number of other

14   victims.  The probation department adopted the government's

15   suggestion, revised the paragraph to assert that the defendant

16   is responsible for the victimization of additional minor

17   victims.  To the extent there is a continuing objection, I

18   overrule it for the reasons stated regarding paragraphs 27 and

19   28.

20            Paragraph 85 is an objection to the inclusion of

21   Kate's victim impact statement and her status under the CVRA.

22   We have litigated the question of Kate's ability to make a

23   statement here.  I believe that defense's ultimate position was

24   that with the requested redactions, there were no objections to

25   her making a statement.  Do I have that right?

M6SQmax1

1          MR. EVERDELL:  That's correct, your Honor.

2          THE COURT:  So I did reject the request for redactions

3    for the reasons explained in my order.  And as I explained in

4    overruling the objection to paragraphs 39 to 45, Kate's

5    testimony and her statement are relevant to sentencing which

6    I've indicated she may give.  And with that, there's objections

7    pertaining to fine and assets and the like.  I think we can

8    turn to those when we get to the fine.  Mr. Everdell, okay with

9    that?

10         MR. EVERDELL:  Yes, your Honor.  So we'll delay the

11   offense level calculation objections and the ones related to

12   the financial penalties for now?

13         THE COURT:  Yes, precisely, and we'll pick those up.

14   I think otherwise that's it for what I understand to be

15   continuing objections after probation responded to your

16   requests and assertions.  Agree with that, Mr. Everdell?

17         MR. EVERDELL:  Your Honor, the only one that I would

18   highlight is there was an objection, I believe it's framed

19   according to paragraph 173, which deals with the financial

20   penalties.  The government made in their response some

21   representations that we take issue with, but if you're planning

22   on covering that later, we can reserve that till later because

23   it does deal with the financial penalties.

24         THE COURT:  Yes, I have objections to 172, 178, 192

25   and 193.

M6SQmax1

1        MR. EVERDELL:  I guess in the final version, it

2   probably pertains to 172.

3        THE COURT:  Thank you.

4        And with that, no further factual objections that need

5   resolution, Mr. Everdell?

6        MR. EVERDELL:  Other than the ones we've just

7   discussed, no, your Honor.

8        THE COURT:  Ms. Moe?

9        MS. MOE:  No, your Honor.  Thank you.

10        THE COURT:  So, with those rulings, hearing no further

11   objections, with those rulings, I otherwise adopt the factual

12   recitations set forth in the PSR.  As in all cases, the PSR is

13   sealed and made a part of the record in this matter.  If an

14   appeal is taken, counsel on appeal may have access to the PSR

15   without further application to this court.

16        We'll turn now to the guideline calculation.  As

17   counsel is aware, I am no longer required to follow the United

18   States Sentencing Guidelines, but I am still required to

19   consider the applicable guidelines in imposing sentence and

20   must therefore accurately calculate the Sentencing Guideline

21   range.  The parties dispute multiple aspects of the guideline

22   calculation.

23        Just to outline the relevant overall calculations, the

24   defense contends that the correct guideline calculation is 51

25   to 63 months' imprisonment.  The government contends that the

M6SQmax1

1    correct calculation is 360 to 660 months' imprisonment and

2    argues that a guideline sentence is warranted.

3           The probation department has calculated the range at

4    292 to 365 months' imprisonment, but recommends a downward

5    variance to a term of 240 months' imprisonment.

6           Counsel, I have reviewed your written arguments

7    carefully.  I have a few questions I want to ask, but I don't

8    need to hear repetition of your written arguments, but I would

9    be happy to give you an opportunity to add anything beyond your

10   submission if you'd like to make any additional arguments.

11          I'll hear from you now, Mr. Everdell.

12          MR. EVERDELL:  Thank you, your Honor.

13          I will largely rely on my written submissions.  I just

14   would like to amplify one or two things.

15          Your Honor, our initial argument, of course, is that

16   the Court must resolve who is to make the determination about

17   which book like -- when the offense conduct ended, which

18   determines guidelines book applies: the 2003 or 2004

19   guidelines.  We argue that that is a jury determination because

20   the issue implicates the *Ex Post Facto* Clause.  So the 2003

21   guidelines must apply because the jury was never asked to make

22   that factual determination.

23          I know your Honor is familiar with the arguments we

24   raised.  I would just point out that the government in their

25   response really did not engage with our arguments about the

M6SQmax1

1    issue of the *Ex Post Facto Clause* being implicated.  They want

2    to cast this as purely a Sixth Amendment issue and cited cases

3    along the *Apprendi* lines.  But this is an ex post facto issue

4    properly framed.  This decision of when the offense conduct

5    ended implicates whether or not an ex post facto violation will

6    occur if the later guidelines is applied.

7          Under the cases that we've cited, your Honor, we think

8    that that is an issue for the jury to decide, and it is not

9    really in the *Apprendi* line of cases.  It is focused on

10   ex post facto law.  I just, for example, highlight for your

11   Honor the *Tykarsky* opinion that we cited for the Court.  That

12   is not an *Apprendi* decision.  That is not a Sixth Amendment

13   decision.  In that case, there was an increase in the mandatory

14   minimum that took effect potentially after the offense conduct

15   ended.  It's interesting that at the time the law was that you

16   could do that, a judge could make a finding and increase it as

17   long as it didn't increase beyond the statutory maximum, so

18   there was no *Apprendi* issue there.  That decision later got

19   overruled by the Supreme Court, but at the time of *Tykarsky*, it

20   clearly wasn't a Sixth Amendment *Apprendi* issue.  They resolved

21   that issue on an ex post facto basis.  This decision about

22   whether or not the offense conduct ended at a certain time, if

23   it triggers an increase that implicates the ex post facto

24   clause is a decision for the jury to make.  The government has

25   not responded to that argument, and we think that that is a

M6SQmax1

1  persuasive -- along with the other sources and opinions we've

2  cited, it's persuasive authority for the fact this is a jury

3  decision, not a Court determination.

4          THE COURT:  Are you leaving that argument?

5          MR. EVERDELL:  Yes, your Honor.

6          THE COURT:  We'll do a little back-and-forth so I have

7  everybody's arguments in mind.  Thank you.

8          Go ahead, Ms. Moe.

9          MS. MOE:  Thank you, your Honor.

10         The government is confident the 2004 Manual applies in

11  this case.  I believe we did engage with the ex post facto

12  issue thoroughly in our brief.  The question is whether the

13  factual record at trial establishes that the offense continued

14  throughout the duration of 2004, which it emphatically did.

15  The testimony of a crime victim who testified at this trial

16  establishes that the offense conduct went past November 1,

17  2004.

18         THE COURT:  So I think the framing of the question

19  here is very important and its technical -- this whole

20  discussion is very technical.  It seems to me the question is

21  can the government point to a preponderance of the evidence

22  that conspiratorial conduct took place in this very small time

23  window, basically November and December 2004.  That is what's

24  in issue, and the question is what the trial record establishes

25  with respect to that two-month window.

M6SQmax1

1          To some extent, the government points, I think, to

2     post conspiracy conduct, and that concerns me.  And so I would

3     like to ask you to draw my attention to what in the trial

4     record specifically speaks to November and December of 2004.

5          MS. MOE:  Yes, your Honor.

6          As a threshold matter, the government's understanding

7     that the case law is that the question is what is the end date

8     of the conspiracy.  In other words, if the conspirators are

9     taking actions periodically over time, the question is what is

10     the last date of the conspiracy?  What does the trial evidence

11     establish about the final date?  And here the trial evidence

12     was that the conspiracy was ongoing through all of 2004 and

13     into 2005.

14          THE COURT:  But to make that point, I think you're

15     relying on post conspiracy evidence.

16          MS. MOE:  No, your Honor.  We're relying on evidence

17     that exceeds the date in the indictment, but it --

18          THE COURT:  It exceeds also the date of Carolyn's 18th

19     birthday.  And so it's not just what the indictment charges --

20          MS. MOE:  Yes, your Honor.

21          THE COURT:  -- but by a conspiracy that is dependent

22     here on Carolyn being under 18 for its continuation.  And so

23     that's why I see what you're pointing to as post conspiracy,

24     not only because it goes past what the indictment charged, but

25     because I think legally you're pointing to non-conspiracy

M6SQmax1

1    evidence.

2        MS. MOE:  No, your Honor.  I think our point is that

3    the conspiracy was still live at the end of 2004, and we know

4    that because in fact the conspiracy was still ongoing beyond

5    that, and I don't mean to be --

6        THE COURT:  But, see, just in that sentence, the

7    conspiracy was going on beyond that, what you point to, I

8    think -- and tell me if I should look at something else, but

9    what you point to to make that argument is definitionally

10   non-conspiracy conduct.

11       MS. MOE:  No, your Honor, in part because -- well, to

12   step back and discuss the framing of the issue.  The question

13   is whether a conspiracy was still ongoing throughout 2004.  And

14   the key thought tells us it's the defendant's burden to show

15   that she withdraw from the conspiracy if it was ongoing.  The

16   question is in framing it, when did this conspiracy end.  We

17   know that it was still live as of the end of 2004, in fact,

18   because, among other reasons, Carolyn testified that she was

19   continually going to Epstein's house through age 17 and through

20   age 18, which would have been throughout the duration of 2004

21   and 2005.

22       The government is not required to show that any

23   conspirator took an action in between those specific dates

24   because the question is when did the conspiracy terminate?  Was

25   it still live at the end of 2004?  And the evidence here shows

M6SQmax1

1    that it certainly was.  The message pads show that Carolyn was

2    still going to the house.  Her testimony establishes that she

3    was still going to the house throughout that time period.  We

4    do not agree that we're required to show that any conspirator

5    took a specific act in that exact window but just that the

6    conspiracy was still live, and the fact that there were

7    additional acts ratifying membership of the conspiracy

8    throughout 2004 and into 2005 satisfies that burden.

9             THE COURT:  Again, just to make sure I'm not missing

10   anything you want to point to, the into 2005 is pointing to

11   post conspiracy conduct.

12            MS. MOE:  Post indictment conduct, your Honor.

13            THE COURT:  Post indictment.  Is it in some way not

14   post conspiracy?

15            MS. MOE:  Well, your Honor, again, the question before

16   the Court, according to the application is when the did offense

17   end.

18            THE COURT:  Ms. Moe, I do understand you're framing

19   that question.  I'm asking record evidence question.  Is there

20   something you're pointing to for your statement, the post 2005

21   which consists of conspiratorial conduct?

22            MS. MOE:  I think separate from the 2005 evidence, we

23   would point to in the fall of 2004, a message from Carolyn in

24   November of 2004 showing that she was contacting the house to

25   make a scheduled appointment.

M6SQmax1

1          THE COURT:  It's not dated November 2004; am I right?

2     It's on a page that has dates surrounding it of December,

3     November.

4          MS. MOE:  Yes, your Honor, all of the dates

5     surrounding the message would be after November 1, 2004.  The

6     neighboring dates are November 13.  There's a date in December.

7     And I think looking at the message pads as a whole, it tells us

8     they're dated essentially sequentially.

9          THE COURT:  Is there any way to tell -- again, this is

10    very technical -- if it's October and November?

11         MS. MOE:  Your Honor, I'd be happy to take a look at

12    physical book.  I just have the sheet in front of me to see the

13    page before and after, if the Court would like to examine it.

14    Our view is the combination of the message itself and the

15    neighboring dates tell us it's November of 2004.  In addition,

16    as we noted in our brief, the defendant was still traveling

17    with Epstein during this exact same time period.  Again, it's

18    the defendant's burden to establish withdrawal from an ongoing

19    conspiracy, which they've not attempted to do, nor could they.

20    We think that the message pads, the flight records, the fact

21    that the testimony of a crime victim Carolyn was that the

22    conspiracy was ongoing more than meets this burden.

23         THE COURT:  Okay.

24         MR. EVERDELL:  Your Honor, if I could just respond to

25    that.  I do pick up on what the Court is saying, and we agree

M6SQmax1

1    with the point, which is we're focusing on the record evidence.

2    The conspiracy as charged requires there be to be a minor

3    involved.  Carolyn is not a minor in 2005.  Her birthday is

4    January -- I don't know if I can say that, I'm sorry, but you

5    understand it's at the beginning.

6             THE COURT:  It's early.

7             MR. EVERDELL:  It's early.  So as of 2005, she is not

8    a minor any more.  So if we're looking to the end date of the

9    conspiracy that's charged in the indictment, that does not

10   exist in 2005, and Carolyn is not a minor in 2005, that

11   evidence can't be used to support the end date of the

12   conspiracy that is charged.

13            So what we're really talking about is one message pad

14   that is undated, unverified, and not even in evidence.  It's

15   not even properly authenticated.  I would also point out --

16   it's not reliable, your Honor.  But I would also point out that

17   I think we did have testimony that there were multiple message

18   pads going on at any one time.  The surrounding message pads

19   are not a perfect indicator of when that message would have

20   been taken if it's undated.  It could have been weeks, months

21   afterwards that someone decided to use that message pad to take

22   that message instead of another of message pad that was ongoing

23   at the same time.  So there is no reliable credible evidence

24   that's the date of that message pad.

25            And so, your Honor, we cited a number of cases in our

M6SQmax1

1  submission about the Court has to consider the weight and

2  reliability of the evidence when determining a factor -- a

3  sentencing factor that is going to increase the guidelines,

4  especially by the amount that this is going to increase it by.

5  And this one uncorroborated, unadmitted, unreliable message pad

6  is not sufficient for that purpose. So if we're relying on a

7  factual record argument, there is not enough of evidence in the

8  record to support that the conspiracy ended in November or

9  December of 2004. Therefore, the 2003 guidelines must apply.

10         THE COURT: Okay. I have a question about the

11  leadership enhancement, as I said, but anything else you want

12  to raise that you didn't have the opportunity to raise in your

13  papers, Mr. Everdell?

14         MR. EVERDELL: Your Honor, just one point about that

15  same book issue. I think there was a section of the

16  government's brief where they were trying to show -- this was

17  the point about the Court's discretion. We argued the Court

18  has discretion to sentence as if it were the 2003 guidelines.

19  I realize that might not be where the Court is headed, but I

20  would point out --

21         THE COURT: You mean as a variance argument.

22         MR. EVERDELL: Exactly. In that section, the

23  government made reference to an argument that the defendant was

24  receiving money into the 2007 time period. I believe they

25  pointed to $7 million. I think that is an extreme stretch,

M6SQmax1

1    your Honor.  If the Court remembers the record evidence, there

2    was some evidence of money moving, but it was to buy a

3    helicopter that was not for her.  We heard testimony from Larry

4    Visoski that he often kept assets of cars in his name for

5    Mr. Epstein.  That doesn't make Larry Visoski a participant in

6    the criminal endeavors.  I think it's a stretch for the

7    government to point to that as some sort of evidence of

8    continued involvement or continued profit after the end date of

9    the conspiracy.  I just wanted to make that one point, your

10   Honor.

11          THE COURT:  Anything on that, Ms. Moe?

12          MS. MOE:  Your Honor, with respect to the financial

13   transaction, we offered that along with other evidence to

14   refute the claim that the defendant had moved on, which, as we

15   noted, is an expression that has no legal meaning.  And so

16   contrary to the assertion that the defendant had moved on and

17   was no longer associated with Epstein, the trial evidence

18   established that she remained a close associate for many years,

19   and that is the purpose for which we offered that evidence.

20          THE COURT:  Understood.  Thank you.

21          I do want to address -- do you have other -- I want to

22   ask about 3(b)(1).

23          MR. EVERDELL:  Yes, your Honor.

24          THE COURT:  I think it's for the government.  So as I

25   see the question here, the guidelines require me to find that

M6SQmax1

1    the defendant was an organizer or leader, and that the criminal

2    activity either involved five or more participants or was

3    otherwise extensive.  The guidelines defines a participant as a

4    person who is criminally responsible for the commission of the

5    offense but need not have been convicted.

6        So I think my question for the government is, you're

7    asking the Court to look to as a criminally responsible -- a

8    person who is criminally responsible for the commission of the

9    offense over whom Ms. Maxwell exercised supervisory or

10    leadership role.

11        MS. MOE:  Yes, your Honor.  As we noted in our

12    briefing, our view is that the trial evidence establishes that

13    the defendant had a supervisory role over Sarah Kellen.  Here,

14    we're not required to establish that there were five or more

15    participants; that is, people who were criminally responsible

16    for the charged conduct, but rather that it was extensive, and

17    that the defendant supervised at least one other person.

18    That's the text of the commentary, although as we noted, the

19    Second Circuit in applying this factor hasn't really engaged

20    with that from what we can tell, but on the factual question of

21    the trial record and whether it establishes the defendant

22    supervised another participant, it absolutely does.

23        THE COURT:  And the government is pointing to Sarah

24    Kellen for that conclusion, which you agree, there has to be

25    one criminally responsible participant who we can point to.

30

M6SQmax1

1        MS. MOE:  Yes, your Honor.  Looking at the text of the

2    application note -- again, it's unclear from some case law on

3    this, but under the text of the application note, if we're

4    looking to one criminal participant, we would direct the

5    Court's attention to Sarah Kellen.

6        THE COURT:  And the leadership over her as opposed to

7    Epstein being the leader over her or them being -- Kellen sort

8    of replacing the defendant's role, could you focus my mind on

9    what specifically you point to to show supervision and

10   leadership by Ms. Maxwell over Ms. Kellen.

11       MS. MOE:  Yes, your Honor.

12       The trial evidence was that Sarah Kellen became an

13   assistant, and that she worked for both Maxwell and Epstein.

14   Essentially, when you look at defendant's role in earlier

15   years, she was doing things like calling victims and arranging

16   for massage appointments.  As the scheme shifted, they brought

17   in another member of the scheme beneath them in the structure

18   and hierarchy of the scheme.  The defendant remained a close

19   associate.  She was often traveling with them, often traveling

20   with Kellen together.  So as Kellen took on some of the tasks

21   that were then delegated to a lower member of the conspiracy,

22   the defendant was higher up in the leadership structure.

23       There wasn't direct evidence about, you know, the

24   defendant directly instructing Kellen to make a certain phone

25   call, and we acknowledge that, but we think the inference is

M6SQmax1

1    very clear that when you have two knowing conspirators, Maxwell

2    and Epstein, and they bring in a much younger woman as an

3    assistant and have her take on some of those roles while the

4    defendant remains a lady of the house in the hierarchy of the

5    structure to whom a person like Sarah Kellen would report, that

6    she has leadership of that person; that she is directing that

7    person; that she has control.  Even the simple task of

8    directing her to take on some of those responsibilities, which,

9    of course, to transition parts of that role she would have to

10   do would qualify for leadership.

11             THE COURT:  And there's clear time overlap in the

12   role?

13             MS. MOE:  Yes, your Honor.  As we noted in our brief,

14   the flight records reflect that the defendant continued flying

15   on Epstein's private jet at the same time that Sarah Kellen was

16   also traveling, and that there was an overlap in the years of

17   the time period where they were all close associates of Jeffrey

18   Epstein and the scheme was ongoing.

19             THE COURT:  Go ahead.

20             MR. EVERDELL:  Yes.  Your Honor, before I address the

21   Sarah Kellen point, I would just make the point that the

22   government seems to argue that there is some case law that is

23   not clear that you don't have to necessarily show that they're

24   supervising another criminal participant.  That's just wrong.

25   All those cases that the government cites, the issue has

M6SQmax1

1   already been decided or conceded by the defendant.  The court

2   found they were leader or the defendant didn't contest that, so

3   the issue was only about whether the criminal activity was

4   otherwise extensive.  So that is not -- that is clear under

5   Second Circuit law, that they have to supervise another

6   criminal participant, and it's clear from the guidelines too,

7   as the government concedes.

8         Let's just talk a bit about Sarah Kellen.  I don't

9   think it is a fair inference to say from the trial record that

10  Ms. Maxwell was supervising Sarah Kellen.  In fact, the

11  inference is exactly the opposite.  And you can rely on

12  Carolyn's testimony alone for that; that she herself testified

13  that there was a clear break between when she says that

14  Ms. Maxwell was calling her to schedule for massage

15  appointments versus when Sarah Kellen took over and scheduled

16  for massage appointments.  They did not overlap.  There was a

17  break.  That is corroborated by Juan Alessi no less, who said

18  the same thing.  He said Sarah Kellen came at the end of my

19  employment, to his recollection, and as soon as she got there,

20  she took over the responsibility of scheduling the massage

21  appointments.  Again, a clear break.

22        What the record shows is that there was a replacement.

23  Sarah Kellen replaced Ms. Maxwell, at least according to the

24  trial testimony; not that there was some sort of ongoing

25  supervision by Ms. Maxwell over Sarah Kellen.  It couldn't be

33

M6SQmax1

1    clearer, your Honor, this notion that she was somehow -- Sarah

2    Kellen was an assistant of both Epstein and Maxwell is again

3    belied by the trial record.

4         If you look at Larry Visoski's testimony, which I

5    believe is what the government is relying on there, he

6    originally testified, oh, I think she was an assistant for

7    both.  But on cross-examination, he conceded that he really

8    didn't know what her role was, and his best recollection was

9    that she was an assistant for Epstein.

10        And again, just look again at Cimberly Espinosa's

11   testimony who was the actual assistant for Ms. Maxwell, and she

12   says unequivocally, "I was her assistant.  Kellen was Epstein's

13   assistant."  So there is no fair inference that Ms. Maxwell was

14   supervising Sarah Kellen.  The inference is exactly the

15   opposite, and it can't provide a basis for that leadership

16   enhancement.

17        THE COURT:  All right.  Anything further on the

18   enhancements for the government's objection?

19        MS. MOE:  Your Honor, just very briefly with respect

20   to the leadership question, I just want to direct the Court's

21   attention, we noted this on page 27 of our brief, but the

22   testimony at trial was that Carolyn recalled that even after

23   Sarah Kellen took over calling to schedule massages, Maxwell

24   was still present inside the Palm Beach residence when Carolyn

25   arrived for massage appointments.

M6SQmax1

1          With respect to the testimony of the pilots who

2     testified, whether they -- whether an employee was paid by

3     Maxwell or Epstein or technically reported to one, according to

4     their job descriptions, is not the question here.  The fact

5     that pilots based on their observation thought at one point

6     that Kellen reported to Maxwell proves the point that she had

7     supervisory authority over Kellen and exercised it, whether in

8     the chain of command or on their formal employment paperwork,

9     she was just an employee for one or the other, it makes no

10    difference.  There was an overlap here.  They had different

11    roles in the conspiracy, and the defendant had a supervisory

12    roll over Kellen.

13          MR. EVERDELL:  Your Honor, just to that point.  Being

14    present does not mean that you're a supervisor.  That's way too

15    far a stretch.  So the fact that there was testimony she was

16    present still in the house while Kellen was making the calls

17    and scheduling the massage appointments means nothing in terms

18    of supervisory authority.

19          THE COURT:  Thank you.  Other enhancements before the

20    government's objection is to be addressed.

21          MS. MOE:  No, your Honor.  Thank you.

22          MR. EVERDELL:  Your Honor, I assume you don't want to

23    hear or have any questions about the five-point enhancement for

24    repeated and dangerous sex offenders.

25          THE COURT:  I believe I have what I need, but as I

M6SQmax1

1    said, I don't need repetition of the arguments in the papers,

2    but if there is any additional points you want to make, you're

3    welcome to.

4            MR. EVERDELL:  Your Honor, just one point.  I will be

5    brief.  The government in its papers makes the argument that

6    the background commentary can't be relied upon as authoritative

7    because it is not explanatory or interpretative of what the

8    guideline is.  I think that is incorrect.

9            It is not simply a recitation of what Congress was

10   considering.  That first sentence or two which talks about how

11   this guideline can only be applied to offenders who represent a

12   continuing danger to the community is interpretative of what

13   the guideline is.  The title of the guideline is repeat and

14   dangerous sex offenders.  That explanatory commentary explains

15   how to interpret what dangerous means.  It means someone who is

16   continuously dangerous to the community, not someone who's

17   never been accused of a crime in the 18 plus years since the

18   crime in this case, and has never been accused of re-offending.

19   So I don't agree with that point.  This is authoritative

20   guidance from the Sentencing Commission, and the Court should

21   consider it as such.  Thank you.

22           THE COURT:  Ms. Moe, do you want to respond?

23           MS. MOE:  No, your Honor.  We rest on our briefing on

24   this issue, but thank you.

25           THE COURT:  Thank you.  Anything else?

SOUTHERN DISTRICT REPORTERS, P.C. •••
(212) 805-0300

M6SQmax1

1          MR. EVERDELL:  No, your Honor.  We rest on the papers.

2          THE COURT:  I thank you counsel for your thorough

3     briefing.  I am prepared to rule.

4          The defendant raises four objections to the

5     calculation of the guideline range contained in the PSR.  As we

6     discussed, first, she argues I must apply the 2003 guidelines

7     rather than the 2004 guidelines.  Beyond that, she objects to

8     the application of three sentencing enhancements.  The

9     government's sole objection to the calculation of the

10    guidelines is that Virginia Roberts and Melissa should be

11    considered victims.  So I will address the defense objections

12    and then the government's objections.

13         I begin by determining which of the Guideline manuals

14    apply.  Generally, a sentencing court applies the version of

15    the guidelines in effect on the date that the defendant is

16    sentenced.  18 U.S.C. Section 3553(a)(4)(A)(ii).  But the

17    *Ex Post Facto* Clause is violated if a defendant is sentenced

18    under Guidelines issued after she's committed her offense and

19    the new Guidelines provide a higher sentencing range than the

20    version in place at the time of the offense.  That's the

21    principle of a case called *Peugh v. United States*, 569 U.S. 530

22    (2013).  In that case, a sentencing court must -- in the case

23    of a higher range at the time of sentencing than in place at

24    the time of the offense, in that case the sentencing court must

25    apply the guidelines in effect when the offense was committed.

M6SQmax1

*United States v. Guerrero*, 910 F.3d 72 (2d Cir. 2018).  Here,

the parties and the probation department agree that applying

the current Guidelines would result in a significantly longer

sentence than the application of the guidelines in place when

the defendant committed her offense, whether that is the 2003

or 2004 guidelines.

The controlling date for ex post facto purposes is the

last date of the offense of conviction.  The 2004 Guidelines

became effective on November 1, 2004.  So I must determine if

the last date of the offense was after November 1, 2004.

Because it seeks an increased punishment, the

government bears the burden of persuasion.  The government

charged a decade-long conspiracy of sexual abuse that the

indictment alleged ended in 2004.  It's proof at trial that the

conspiracy continued in 2004 related to Carolyn.  And the

charged conspiracy had to end no later than very early 2005

because that's when Carolyn turned 18 and can no longer be

deemed a victim of the federal sex-trafficking offense charged

which proscribes conduct with respect to individuals under the

age of 18.  So the government purports to carry its burden on

this issue based on portions of Carolyn's testimony and some

message pads regarding what occurred in 2004 and 2005.

Let me state clearly, I found, as I said repeatedly in

my factual conclusions on the PSR objections, I found Carolyn

to be a credible witness, as did the jury.  The question before

M6SQmax1

 1    me is specific and highly technical.  Does the preponderance of

 2    the evidence demonstrate that the offense to sex traffic

 3    Carolyn continued after November 1, 2004 before she turned 18

 4    in early 2005?  In other words, does a preponderance of the

 5    evidence establish that acts in furtherance of the conspiracy

 6    to traffic Carolyn occurred in either November or

 7    December 2004?  Although Carolyn testified regarding contact

 8    earlier in 2004 and after she turned 18 in 2005, there is no

 9    evidence, either in the form of testimony or documentary

10    evidence, including the message pads, that demonstrates by a

11    preponderance of the evidence conspiratorial conduct during

12    those last two months of 2004 before Carolyn turned 18 in 2005.

13              In those portions of Carolyn's testimony cited by the

14    government, Carolyn stated that she was 18 years old the last

15    time she went to Epstein's house, which would have been in

16    2005.  As Carolyn further explained, she returned more than

17    four or five times to Epstein after she gave birth to her son

18    in March of 2004, and that testimony is supported by message

19    pads entered at trial that show Carolyn called Epstein several

20    times in the summer of 2004:  Once in late April or early May

21    again on July 6, and again on July 30.  When she did return to

22    Epstein, Carolyn testified Epstein asked if she had younger

23    friends, and she explained during her testimony that at 18

24    years old, she was too old for him.  Carolyn wasn't asked, and

25    her testimony doesn't specifically address, whether she went to

M6SQmax1

1  Epstein's house after November 2004 before she turned 18.

2  Message pads entered at trial show contact only before

3  November 1.

4  　　　　The government's reliance on two additional pads that

5  were not entered into evidence doesn't change my analysis.  The

6  first message GX-4B, it's undated, and the context does not

7  give sufficient confidence that it came after November 1.  The

8  other message pad is dated March 1, 2005, which falls outside

9  the scope of the conspiracy alleged in the indictment, and

10  after Carolyn turned 18.  Because I cannot on this record find

11  by a preponderance of the evidence that the offense continued

12  during that two-month window after November 1, 2004, and before

13  early 2005, I must apply the 2003 guidelines.  Because I find

14  that the date of the offense was not after November 1, 2004, I

15  do not address the defendant's alternative argument that a jury

16  must decide if the 2004 Guidelines apply.

17  　　　　Within the Guidelines themselves, the defendant

18  objects to the application of three enhancements in the PSR.

19  She takes issue first with 4B1.5(b).  The enhancement

20  statements that the offense level is increased by five if:

21  One, the offense of conviction is a covered sex crime; two,

22  4B1.5(a) for prior convictions does not apply; three, the

23  defendant engaged in a pattern of activity involving prohibited

24  sexual conduct.  All three requirements are met:  The defendant

25  was convicted of a covered sex crime; she was not previously

M6SQmax1

1    convicted of a sex crime; and I readily find she engaged in a

2    pattern of activity involving prohibited sexual conduct.

3    Specifically, the Guidelines define a pattern of such activity

4    as the defendant engaging in prohibited sexual conduct with a

5    minor on at least two separate occasions.

6        The defendant doesn't contest any of these enumerated

7    requirements.  Rather, she argues that I may apply this

8    enhancement only if I further find that the defendant poses a

9    continuing danger to the public.  Here, the defense draws this

10   requirement from background commentary by the Sentencing

11   Commission and a few statements made by members of the Congress

12   who of emphasized high recidivism rates in enhancing sentences

13   for sex offenders.

14       I overrule this objection because it lacks any basis

15   in the Guidelines.  As with all interpretive matters, I start

16   with the text of the Guidelines.  If the text is unambiguous, I

17   apply it as written and do not resort to background commentary.

18   *United States v. Sash*, 396 F.3d 515 (2d Cir. 2005).  Commentary

19   cited by the defendant simply provides policy rationale for a

20   particular enhancement.  It does not purport to interpret the

21   Guidelines and so is not binding.  Nor can scattered

22   legislative history override the clear text of the Guidelines,

23   especially when that history amounts to only a few short floor

24   statements which are "among the least illuminating forms of

25   legislative history."  *NLRB v. SW General, Inc.* 137, S. Ct. 929

M6SQmax1

1    (2017).

2            Moreover, the defendant fails to prove that 4B1.5(b)

3    was enacted only to prevent future danger to the public.

4    Background commentary explains that aside from recidivism,

5    Congress "directed the Commission to ensure lengthy

6    incarceration for offenders who engage in a pattern of activity

7    involving the sexual abuse or exploitation of minors."  That's

8    4B1.5 comment background.

9            Further, the legislative history quoted by the

10   defendant says that Congress increased Guidelines sentences for

11   sexual abuse of minors "to address the egregiousness of these

12   crimes."  And, in fact, the defendant's brief cites that I

13   believe at 12.  Thus, I find no basis for a requirement that I

14   must first find the defendant to be a public danger before

15   applying the enhancement.  The defendant's remaining argument

16   that applying this enhancement would result in an excessive

17   sentence is appropriately considered as part of the defendant's

18   request for a downward variance.

19           Next the defendant objects to the application

20   3B1.1(a), which we've discussed, which adds four offense levels

21   for her leadership role in a criminal activity.  "a court must

22   make two specific factual findings before it can properly

23   enhance a defendant's offense level under 3B1.1(a): (i) that

24   the defendant was an organizer or leader; and (ii) that the

25   criminal activity involved five or more participants or was

M6SQmax1

1   otherwise extensive." Quoting from *United States v. Patasnik*,

2   89 F.3d 63 (2d Cir. 1996). The Guidelines define a participant

3   as a person who is criminally responsible for the commission of

4   the offense, but need not have been convicted. That's Section

5   3B1.1, comment note 1. And in assessing whether criminal

6   activity is extensive, all persons involved during the course

7   of the entire offense are to be considered, including persons

8   who provided services unknowingly. Comment note 3.

9       The defendant argues that she did not lead another

10  criminal participant. I overrule this objection because I do

11  conclude that the government has proved by a preponderance that

12  the defendant supervised Sarah Kellen, who was a knowing

13  participant in the criminal conspiracy.

14      Larry Visoski and David Rodgers both testified for

15  that at least part of the time period at issue Sarah Kellen

16  acted as a personal assistant to the defendant. I credit that

17  testimony which is corroborated by further testimony that the

18  defendant was Epstein's number two and the lady of the house.

19  At some point, Kellen took over some of the defendants duties.

20  But even after that time, the defendant retained her leadership

21  position, as evidenced by Carolyn's testimony, by flight

22  records in evidence, and the household manual in evidence. I

23  do conclude by a preponderance of the evidence that the

24  defendant led a criminally responsible participant.

25      I further find that the defendant's criminal activity

M6SQmax1

1    was extensive.  Whether criminal activity is extensive is based

2    primarily on the number of people involved, criminally and

3    noncriminally, rather than on other possible indicators of the

4    extensiveness of the activity.  District courts must determine

5    the number of knowing participants in the criminal activity,

6    the number of unknowing participants whose activities were

7    organized or led by the defendant with specific criminal

8    intent, and the extent to which the services of the unknowing

9    participants were peculiar and necessary to the criminal

10   scheme.  For example, a taxi driver that drives a defendant to

11   a crime scene would not count.  That is an example from a case

12   called *Carrozzella*, 105 F.3d at 804.

13            At all relevant times, the conspiracy proved at trial

14   included at least two knowing participants:  Epstein and the

15   defendant.  Beginning in 2002, Sarah Kellen joined, and

16   beginning in approximately 2001, additional minor victims were

17   recruited through Virginia and Carolyn.  Additionally, trial

18   evidence established that services were unknowingly provided by

19   various Epstein employees.  For example, I credit Juan Alessi's

20   testimony that following the defendant's instructions, he

21   scheduled massage appointments, set up the massage table for

22   appointments, cleaned up after sexualized massages, and on at

23   least one occasion drove Virginia to an appointment.

24            Additionally, both Visoski and Rodgers were employed

25   as Epstein's pilots over the same time period as the counts of

M6SQmax1

1    conviction.  Visoski testified that Maxwell partially owned the

2    jet, and both pilots testified that she would tell them when to

3    fly Epstein or schedule flights for herself.  The evidence at

4    trial demonstrates that Epstein and the defendant had the

5    pilots fly victims of the conspiracy.  Across the timeframe of

6    all counts of conviction, Alessi, Visoski and Rodgers provided

7    personalized services that were peculiarly tailored to the

8    defendant's offenses and were not fungible services generally

9    available to the public.  Again, I'm citing from the

10   *Carrozzella* case, 105 F.3d at 804.

11           In addition to these unknowing participants that

12   testified at trial, I find by a preponderance of the evidence

13   that there were other unknowing persons led by Maxwell.  As

14   Epstein's number one, Ms. Maxwell managed Epstein's numerous

15   households and interviewed, hired and oversaw the household

16   staff.  The defendant had her own personal assistants, like

17   Sarah Kellen and another individual.  From the record, I can't

18   determine the precise number of these other individuals that

19   unknowingly assisted Epstein and the defendant in their

20   criminal activity, but I find an adequate basis in the record

21   that the number is sufficient to make the activity extensive

22   within the meaning of 3B1.1(a) from 1994 to 2004.  See *United*

23   *States v. Archer*, 671 F.3d 149 (2d Cir. 2011).

24           Last, the defendant objects to enhancement

25   2G1.1(b)(4)(B).  That provision increases the offense level by

M6SQmax1

1    two if a participant unduly influenced a minor to engage in a

2    commercial sex act.  In defining the enhancement, the

3    Commission instructs courts to closely consider the facts of

4    the case to determine whether a participant's influence over

5    the minor compromised the voluntariness of the minor's

6    behavior.  2G1.1, comment note 7.  And if the participant is at

7    least ten years older than the minor, there is a rebuttable

8    presumption that the participant unduly influenced the minor to

9    engage in a commercial sex act.  I overrule the defendant's

10   objection.

11         The defendant first says the undue influence

12   enhancement would punish her for the same harm already counted

13   in her base offense level.  Impermissible double counting

14   occurs when a guideline enhancement is applied to reflect the

15   kind of harm that's already fully accounted for elsewhere in

16   the Guidelines but does not occur if the enhancement aims at

17   differing harms emanating from the same conduct or reflects

18   different facets of the defendant's conduct.  *United States v.*

19   *Watkins*, 667 F.3d 254 (2d Cir. 2012).  There isn't double

20   counting here.  The 2G1.1(a) base offense level reflects the

21   aggregating factor that the victim of the defendant's sex

22   offense was a minor.  The enhancement, by contrast, reflects

23   the use of undue influence to engage in a commercial sex act.

24   I'll cite a few cases that stand for that proposition,

25   including *United States v. Kohlmeier*, 858 F. App'x, 444 (2d

M6SQmax1

1    Cir. 2021) (summary order).    Similar conclusion, *United States*

2    *v. Smith*, a Ninth Circuit case from 2013, 719 F.3d 1120.    That

3    case explains 2G1.3(a) base offense level and the undue

4    influence enhancement "serve unique purposes under the

5    Guidelines."

6        The defense argues that because the enhancement

7    applies only if undue influence was exerted with the aim of a

8    commercial sex act, it does not apply here.    But the jury in

9    Count Six did convict the defendant of sex trafficking Carolyn

10    to participate in commercial sex acts.    The Court finds that

11    Virginia Roberts, who brought Carolyn and Melissa who was

12    brought by Carolyn similarly were paid.    The remaining victims,

13    including Jane and Annie, also testified that they received

14    money and gifts during their abuse which satisfies the

15    enhancement.

16        The defendant argues Carolyn was not unduly influenced

17    to sexually massage Epstein.    I find this argument meritless.

18    The age gap between Carolyn and Epstein and the defendant far

19    exceeded ten years, and the defendant does not rebut the

20    resulting presumption of undue influence.    2G1.1, comment note

21    7.    Carolyn testified she was paid to give Epstein sexualized

22    massages, and she needed the money for her drug addiction.

23    Later, Carolyn returned to Epstein because she needed the money

24    for herself and her newborn son.    Plainly, taking advantage of

25    a victim's financial need is a form of undue influence.    I'll

M6SQmax1

1    cite some cases for that proposition.  *Watkins* 667 F.3d at 265;

2    *United States v. Streb*, 36 F.4th 782.  That's and Eighth

3    Circuit case from 2022.  Courts have repeatedly concluded that

4    a minor can be the victim of undue influence even if the minor

5    initiates a sexual meeting.  See, for example, *United States v.*

6    *Lay*, 583 F.3d 436 (6h Cir. 2009).  I therefore overrule the

7    defendant's objection.

8            I next turn to the government's only objection to the

9    PSR Guideline calculation.  I do find that Virginia Roberts and

10   Melissa were minor victims of sex offenses -- they were

11   trafficked and abused by the defendant and Epstein during the

12   charged period.  The Guidelines require that each minor victim

13   be considered a separate count of conviction.  2G1.1.(d)1.

14   Probation department excluded Virginia and Melissa from this

15   provision only because they were not named in the indictment.

16   This is an incorrect basis for excluding them from the

17   calculation.  Relying on commentary by the Commission, the

18   Second Circuit has instructed "that conduct against victims

19   other than those charged in the indictment may constitute

20   relevant conduct, and, if such conduct qualifies, should be

21   treated for sentencing purposes as though it occurred in a

22   separate count of conviction."  I United States V. Wernick,

23   691, F.3d 108 (2d Cir. 2012) (citing 2G1.1 comment note 4).  I

24   therefore consider Virginia and Melissa as two additional

25   groups of victims and assign each a unit under Section 3D1.4.

M6SQmax1

1          Having resolved the parties' objections, I will

2    calculate the Guideline range.  As explained, I will use the

3    2003 Guidelines manual.  Following Section 2G1.1(d)(1), each

4    victim is considered a separate count of conviction.  In

5    addition to the three victims for which an offense level was

6    calculated in the PSR -- Jane, Annie, and Carolyn -- I

7    calculate offense levels, for Virginia and Melissa, coming to a

8    total of 5 groups.

9          For all groups, the base offense level is 19.  That's

10   Sections 2G1.1(a) and 2X1.1(a).

11         For Jane and Carolyn, because they were older than 12

12   but were not yet 16 when abuse began, the offense level is

13   enhanced by 2.  2G1.1(b)(2)(B).

14         The offense level for Jane and Carolyn is further

15   enhanced by 2 because they were unduly influenced into a

16   commercial sex act.  2G1.1(b)(4)(B).

17         For Annie, Virginia, and Melissa, who were at least

18   16, the offense level is increased by 2 because they were

19   unduly influenced into a commercial act.  2G1.1.(b)(4)(B).

20         The offense level for all groups are also enhanced by

21   4 points because of the supervisory role in an extensive

22   criminal activity.  3B1.1(a).

23         This brings the total offense level for Jane's and

24   Carolyn's groups to 27.  And Annie's, Virginia's and Melissa's

25   groups each to 25.

M6SQmax1

1          Because there are multiple counts, all within at least

2     four offense levels of each other, I determine 5 units under

3     3D1.4(a).  And under 3D1.4, 5 units increases the total offense

4     level of the group with the highest total offense level by 5

5     from 27 to 32.

6          Last, because the defendant engaged in a pattern of

7     activity involving prohibited sexual conduct, the total offense

8     level is increased by 5 from 32 to 37.  4B1.5(b)(1).

9          In conclusion, I find the correct total offense level

10    under the 2003 Guidelines is 37.

11         No party disputes the defendant's Criminal History

12    Category of I.

13         Under the 2003 Guidelines, a Criminal History Category

14    of I and total offense level of 37, produces a guideline range

15    of 210 to 262 months' imprisonment.

16         The range for the fine, again, under the 2003 manual

17    is $20,000 to $200,000 for each count.  That's 5E1.2(c)(3).

18         The range for supervised release is three years to

19    life.  5D1.2(a)(1) and (c) and 18 U.S.C. 3583(k), although I

20    believe there is a -- yeah, I think that's supervised release.

21         I don't want to hear repeated objections, but any

22    objections based on anything I said that is new?

23         MS. MOE:  Yes, your Honor.  With respect to the unit

24    analysis, we wanted to note that under 3D1.4, a total of 5

25    units adds 4 levels, not 5 levels.  I think the next layer on

50

M6SQmax1

1    the table is more than 5, as 5 levels.  And, thus, the total

2    number would be 36.

3            THE COURT:  I presume you agree with that,

4    Mr. Everdell?

5            MR. EVERDELL:  Yes, your Honor.

6            THE COURT:  Under the 2003 manual -- I see.  The

7    highest total offense level, increase by 4 from 32 to 36.

8            MS. MOE:  Yes, your Honor.  Thank you.

9            THE COURT:  Thank you, Ms. Moe.  And that produces a

10   guideline range 188 to 235.

11           MS. MOE:  Yes, your Honor.

12           MR. EVERDELL:  We agree with that, your Honor.

13           THE COURT:  Thank you.  Same question to you,

14   Mr. Everdell.  Preserving your objections, of course, but

15   anything new based on what I said?

16           MR. EVERDELL:  Yes, your Honor.  I don't think because

17   the government's response was the one added their request to

18   add Virginia and Melissa as separate groups, so we do object to

19   that.  I know the Court has already ruled on that.  We don't

20   think the record is adequate to make them separate offense

21   groups.  I understand the Court has already ruled on that, but

22   we would like to preserve that objection.

23           THE COURT:  Understood.  Thank you.

24           Do you want to respond, Ms. Moe?

25           MS. MOE:  Your Honor, I think the Court's rulings

M6SQmax1

1    addressing the factual objections speak directly to this issue.

2    The record at trial amply established that Melissa and Virginia

3    were victims of this conspiracy, and that the defendant had

4    been involved with recruiting Virginia, who in turn recruited

5    Carolyn, who in turn recruited Melissa.

6         With respect to Melissa in particular, we would not

7    that, like Virginia, her name appears in the defendant's little

8    black book, noting that she's a friend of Carolyn's. For all

9    those reasons, and the reasons in our brief, we think the trial

10   record amply establishes that they were both victims of the

11   conspiracy.

12        THE COURT:  I agree with that, and for the reasons

13   indicated, do -- I agree with the government's objection to the

14   probation calculation for that reason.

15        I think that means we don't need to resolve the

16   factual objections that pertain to Carolyn's age. As I said, I

17   credit Carolyn's testimony.  The objections I would overrule

18   because I think she accurately testified regarding her age both

19   in 2004 and 2005, but it doesn't answer the question, as I see

20   it, the legal question as to establishment of acts

21   conspiratorial conduct in the relevant two-month period.

22        With respect to fines, Mr. Everdell, what is now

23   paragraph 172 of the revised report, the defendant objects to

24   the inclusion a $10 million bequest from Epstein being included

25   in her assets for purposes of determining her ability to pay a

M6SQmax1

1    fine.  I can't quite tell from the papers whether -- I know you

2    say the bequest is likely to be contested.  What is the current

3    status of the bequest?

4         MR. EVERDELL:  Your Honor, my understanding is that

5    the document says what it says, and the estate is undergoing

6    bankruptcy proceedings.  I don't believe there is any -- this

7    issue has been addressed because I think the estate is still

8    dealing with victims' claims and other claims against the

9    estate.  But because it's in bankruptcy, I assume that this

10   will be contested, and we don't know if there will be any money

11   left at the end of that proceeding to honor the bequest.  So

12   that's one of the many reasons why I think this is such a

13   tenuous asset that it shouldn't be considered for purposes of

14   fines.

15        THE COURT:  It's listed as an asset in the financial

16   affidavit, is it not?

17        MR. EVERDELL:  It is, your Honor, because we felt we

18   wanted to fully disclose everything we know about, and we do

19   know about simply because we were produced that document.  We

20   didn't know about it before.  We knew about it because we got

21   it in discovery, and we saw it was there, so we felt in good

22   faith, we had to list it or at least disclose it, but I don't

23   think it should be considered for purposes of fine.

24        THE COURT:  Ms. Moe, do you want to respond to that?

25        MS. MOE:  Your Honor, I don't have additional

M6SQmax1

1     information about the status of the estate.  With respect to

2     whether this information should be in the PSR, I think the

3     Court is exactly right.  This is listed on an asset on her

4     balance sheet.  Whether she ultimately recovers that amount or

5     not, it's listed in the same way that liabilities are listed

6     even though it may be uncertain as to how those are resolved.

7     So I don't think the objection is founded.

8             THE COURT:  Yes, I'm going to overrule this objection

9     to the PSR paragraph.  It is included as an asset in

10    Ms. Maxwell's financial aid affidavit.  The uncertain assertion

11    that she may lose the asset is not a basis to exclude it from a

12    considered asset for purposes of determining a fine.

13            Paragraph 178, the assertion here is that she is

14    unable to pay a fine.

15            Do I have that right, Mr. Everdell?

16            MR. EVERDELL:  Yes, your Honor.

17            THE COURT:  I overrule the objection.  Section

18    5E1.2(a) of the Guidelines requires the Court to impose a fine

19    in all cases except where the defendant establishes that she is

20    unable to pay and is not likely to become able to pay any fine.

21    The defendant has failed to establish this.  As I just noted,

22    there is a $10 million bequest from Epstein this is in addition

23    to other assets noted in the PSR.

24            I will say the assets and finances have been a moving

25    target.  In July 2020, Ms. Maxwell reported $3.8 million in

M6SQmax1

1    assets, and then reported $22 million in assets in support of

2    the December 2020 bail application.  The claim now of an

3    inability to pay the fine, as I understand it, at the same time

4    in which the defense has not provided documentation of her

5    marriage or the purported pending divorce settlement.  So I am

6    unpersuaded based on the balance of facts that the defendant is

7    indigent, and I do intend to impose a fine.

8          I will address restitution at the end.  I understand

9    the government is not seeking restitution.  So we will pick

10    that up at the end.

11          All right.  With that, I'm going to take a break, and

12    then I will come back and hear from -- just fill a few

13    formalities.  Neither of the papers make an argument for formal

14    downward departures, as I understood them.  In any event, I've

15    considered whether there's an appropriate basis for departure

16    from the advisory range within the Guideline system and do not

17    find any grounds warranting departure under the Guidelines.

18          When we return with the Guideline calculation

19    complete, I will hear from the parties as to what they contend

20    a reasonable sentence is for Ms. Maxwell, taking into account

21    the 3553(a) factors.

22          It's 12:30, which is a shocking fact to me.  I suppose

23    we should take a 30-minute break so that everyone can get

24    lunch, as I imagine we still have a fair amount of matters to

25    discuss and time to get through.  So we'll take a 30-minute

M6SQmax1

1    break.

2          Ms. Moe

3          MS. MOE:  With respect to the sequence of events, just

4    so victims are aware, would the Court prefer to hear from

5    victims before the Court hears from the parties or after?  We

6    defer to the Court, but it would be helpful to know for the

7    victims.

8          THE COURT:  I was anticipating government, victim

9    statements, defense counsel and then Ms. Maxwell if she wishes

10   to make a statement.  My staff did provide counsel for the

11   victims making statements an order in which they're speaking.

12         MS. MOE:  Thank you, your Honor.

13         THE COURT:  Any objection to that ordering, Ms. Moe?

14         MS. MOE:  No, your Honor.  Thank you.

15         THE COURT:  Ms. Sternheim?

16         MS. STERNHEIM:  I'm on now.  No.  Thank you.

17         THE COURT:  I'll see you at 1:00.  Thank you.

18         (Luncheon recess taken)

19         (Continued on next page)

20

21

22

23

24

25

M6SQmaxS1

1                        AFTERNOON SESSION

2                            1:10 p.m.

3          THE COURT:  As I indicated, I'll hear first from the

4     government as to what a reasonable sentence is under the

5     3553(a) factors.

6          Ms. Moe, when you're ready.

7          MS. MOE:  Thank you, your Honor.  May I take the

8     podium?

9          THE COURT:  You may.  Thank you.

10          MS. MOE:  Your Honor, Ghislaine first met Jane at

11     summer camp in August of 1994.  Jane was 14 years old.  What

12     Maxwell did in the years that followed to Jane and Kate and

13     Annie and Virginia and Carolyn and Melissa, was almost

14     unspeakable, but the truth came out in this case; and while

15     many years have past, their pain is palpable, it's real, and it

16     matters.

17          Today we ask the Court to impose an above-guideline

18     sentence of multiple decades in prison, a sentence that holds

19     Maxwell accountable for the essential role she played in an

20     extensive and disturbing child exploitation scheme.

21          Maxwell trapped young girls in a horrifying nightmare.

22     Her victims were vulnerable kids who found themselves alone in

23     giant mansions where they were sexually exploited by adults

24     they thought would help them.  These girls were just kids.

25     They were just finding their way in the world, trying to figure

M6SQmaxS1

1    out who they were and who they might be some day when they grew

2    up.  These kids had hopes and dreams for their future and the

3    defendant used those dreams as her tool to abuse them.

4        We ask the Court to take an unflinching look at the

5    defendant's actions and consider what that tells you about who

6    she really is.  What kind of person persuades young girls to

7    massage the feet of a middle-aged man?  What kind of person

8    gets a 16-year-old girl all alone at a ranch in the middle of

9    nowhere and tells her to take off her clothes and get on a

10   massage table so that she can grope that girl's chest?  What

11   kind of person teaches a 14-year-old girl how a middle-aged man

12   likes his penis to be touched?  What kind of person sees a

13   17-year-old girl on the street and pulls over so that she can

14   persuade that girl to come to a house of horrors where that

15   young girl will be trafficked for sex?  What kind of person

16   flies around on a plane with underage girls so that when her

17   boyfriend travels, he always has a young girl to touch?  What

18   kind of person would use their privilege, their power in this

19   world to intentionally prey on the vulnerable, young girls from

20   struggling families:  Girls without fathers, girls who needed

21   help.  These are the actions of a person who was indifferent to

22   the suffering of other human beings.

23        The defendant's actions were not a one-time mistake;

24   not at all.  Maxwell was an adult woman, and she made the

25   choice, week in, week out for years to commit crimes with

M6SQmaxS1

1    Jeffrey Epstein, to be his right hand, to make his crimes

2    possible.  Those choices were hers, and they have to have

3    serious consequences.

4         What's more, her actions portrayed a disturbing view

5    of the world we live in.  To Maxwell there were two kinds of

6    people in this world:  The people who really mattered and the

7    people who were disposable.  Maxwell wanted to make sure that

8    she stayed among the people who she thought mattered.  She

9    wanted to live a luxurious lifestyle jet-setting around the

10   world.  She took millions of dollars from Epstein over the

11   years and that's because they were predators together, they

12   were partners in crime together, and they molested kids

13   together.

14        The defendant's actions had serious consequences for

15   her victims.  These girls, now women, are strong.  They have

16   shown the world what true bravery really is.  But when the

17   defendant preyed on them, they were just kids, and they'll

18   carry with them for their entire lives the trauma of what

19   they've experienced.  What is truly remarkable about this case,

20   your Honor, is that we don't have to speculate about the

21   lasting irreparable harm that the defendant's actions have had.

22   You have seen for yourself the devastating effects of the

23   defendant's crimes and how much her actions have affected her

24   victims even years later.

25        The defendant has shown absolutely no remorse for her

M6SQmaxS1

1    crimes.  She has not owned up to the truth.  She has lied

2    repeatedly.  She has been dishonest with the Court, and she has

3    made misrepresentations when it suits her.  Your Honor, we

4    recognize that the Court has calculated the guidelines to be

5    188 to 235 months.  That is far below the sentence that the

6    government believes is appropriate in this case.  We recognize

7    that there are a small number of cases where the Court imposes

8    an above-guideline sentence.  This is that case, your Honor.

9          In the almost 20 years since the 2003 manual was

10   enacted, our Sentencing Commission, our Congress, and our

11   country have all recognized just how serious sex crimes against

12   children are.  Our country now recognizes how woefully

13   inadequate the 2003 guidelines were, and the Supreme Court has

14   expressly held that sentencing courts can vary upwards for

15   exactly that reason.  Again, this is that case.  This is

16   exactly that case.  This is the time to impose an

17   above-guideline sentence.  A guideline sentence in this case

18   would create unwarranted sentencing disparities with

19   individuals being sentenced today for sex-trafficking offenses.

20   This case calls out for an above-guideline sentence because of

21   the breathtaking scope of the defendant's conduct, the length

22   of her crimes, the number of victims, the vulnerability of her

23   victims, the sophistication of the defendant's predatory

24   conduct and the degree to which she psychologically manipulated

25   her victims.  Her conduct was shockingly predatory, and it

60

M6SQmaxS1

1    calls out for an above-guideline sentence.

2            We ask the Court to impose an above-guideline

3    sentence, a sentence that sends a message that those who would

4    conspire with sexual predators would be held responsible for

5    their significant role in these crimes.  We ask the Court to

6    send a message that nobody is above the law, and nobody is too

7    rich or powerful to be held accountable.  We ask the Court to

8    send a message that it is never too late for justice.

9            Your Honor, you should not hesitate to hold the

10   defendant accountable for the full measure of her crimes.  She

11   deserves to spend decades in prison for her crimes.  Thank you.

12           THE COURT:  Thank you, Ms. Moe.

13           And I will ask that the individuals who are making

14   statements come to the podium.

15           Ms. Farmer is first.  You're welcome to remove the

16   mask when you get there, Ms. Farmer, if you'd like.

17           MS. FARMER:  Judge Nathan:  For a long time I wanted

18   to erase from my mind the crimes that Ghislaine Maxwell and

19   Jeffrey Epstein committed against me and pretend they hadn't

20   happened.  It was the type of dark memory that feels safest to

21   keep locked away.  But I've had to acknowledge the long-lasting

22   effects.  One of the most painful and ongoing impacts of

23   Maxwell's and Epstein's abuse was a loss of trust in myself, my

24   perceptions and my instincts.  When predators groom and then

25   abuse or exploit you, they are in a sense training you to

61

M6SQmaxS1

1    distrust yourself.  When a boundary is crossed or an

2    expectation violated, you tell yourself, "Someone who cares

3    about me to do all these nice things surely wouldn't also be

4    trying to harm me."  This pattern of thinking is insidious, so

5    these seeds of self-doubt took root even as I learned my sister

6    had also been harmed by them and came to find out years later

7    that many others had been exploited.

8              THE COURT:  Just a request to slow down.

9              MS. FARMER:  For years these memories triggered

10   significant self-recrimination, minimization and guilt.  I

11   blame myself for believing these predators actually wanted to

12   help me.  I felt tremendous survivor guilt when I heard about

13   what other girls and young women had experienced at hands of

14   Maxwell and Epstein.  I saw about how my sister's concern about

15   me weighed on her and felt guilty about this as well.

16             This toxic combination of being sexually exposed and

17   exploited, feeling confused and naïve and blaming myself all

18   resulted in significant shame; that sickening feeling that

19   makes you want to disappear.  It was not constant but would

20   come in waves, similar to the waves that anxiety would also

21   show up.  When I think back, I see a slide-show of moments when

22   these feelings would surface and overwhelm me.  There are too

23   many of these moments to name and though I have come a long way

24   in my path of healing, I know that these feelings will continue

25   to be triggered at times.

M6SQmaxS1

1           The ripple effects of trauma are undeniable.  When one

2     person is abused, many others are also harmed.  In addition to

3     the way I was impacted as an individual, there was the pain I

4     experienced as a sister due to how Maria was abused by Maxwell

5     and Epstein and the harm caused to the rest of my family due to

6     these events.  My sister Maria's abuse, the sexual assault,

7     Maxwell's threats that stole her sense of safety and her

8     career, the way they used her to get to me had devastating

9     effects on her.  As my family watched her grow more isolated

10    and more physically ill from the stress of all of it, we all

11    felt powerless.  It was heartbreaking and infuriating, and we

12    later learned how often this pattern was repeated.  A young

13    person on the path of pursuing her dreams was pulled in by

14    Maxwell, was abused and exploited, and then had to try and

15    piece together a life in the aftermath of this trauma that left

16    them feeling distrustful and fearful.  Most of these

17    individuals had families who also were negatively impacted as

18    they witnessed and felt the systemic effects of their loved

19    one's losses and struggles.  The number of people harmed is

20    impossible to measure.  Maxwell had many opportunities to come

21    clean but instead continued to make choices that caused more

22    harm.

23           When my sister and I first spoke out to the media

24    about what happened to us, Maxwell lied about us and threatened

25    Maria, thus helping shut down investigations into their

M6SQmaxS1

1    behavior so they could together continue to harm children and

2    young women.  After this attempt to alert people to Epstein and

3    Maxwell's abusive behavior, I avoided being public about it for

4    two decades.  My shame told me I should hide this fact because

5    it was embarrassing.  Later as I pursued my profession as a

6    psychologist, I feared it could potentially ruin my career.  I

7    worried clients would not want to work with me if I was

8    associated with this story, wrongly labeled as one of child

9    prostitution.  I feared being on Epstein's and Maxwell's radar

10   as a problem because of their previous lies and threats.

11       Once arrested, Maxwell faced another choice.  She

12   could admit her participation in this scheme, acknowledge the

13   harm caused or even provide information that could have helped

14   hold others accountable.  Instead, she chose again to lie about

15   her behavior, causing additional harm to all of those she

16   victimized.

17       Judge Nathan, I hope when you consider the appropriate

18   prison sentence for the role Maxwell played in this

19   sex-trafficking operation, you take into account the ongoing

20   suffering of the many women whom she abused and exploited as we

21   will continue to live with the memories of the way she harmed

22   us.  I hope you weigh the systemic effects of the crimes she

23   perpetrated, the ways that our family members, romantic

24   partners and friends have been hurt through our suffering.  I

25   ask you to bear in mind how Maxwell's unwillingness to

M6SQmaxS1

1  acknowledge her crimes, her lack of remorse and her repeated

2  lies about her victims created the need for many of us to

3  engage in a long fight for justice that has felt like a black

4  hole sucking in our precious time, energy and well-being for

5  much too long now, things that cannot be replaced.  Thank you.

6              THE COURT:  Thank you, Ms. Farmer.

7              Kate may make a statement now.

8              MS. MOE:  Your Honor, before Kate speaks, I just

9  wanted to confirm that the Court's anonymity order, in

10  particular with respect to sketch artists, is in effect.

11             THE COURT:  Yes.  Consistent with the Court's prior

12  anonymity and pseudonym order, we will refer to this witness as

13  Kate only, and the sketch artists shall not draw an exact image

14  of Kate so that she can remain anonymous.

15             Thank you, Ms. Moe.

16             Kate, you may proceed.

17             KATE:  Good afternoon, your Honor.  Thank you for

18  hearing me.  I believe you've already seen my victim impact

19  statement, so I have something else to say.

20             At a time when women's rights have so callously been

21  discarded, as the mother a young daughter, I fear for the

22  safety and freedom of my child.  Today offers hope that change

23  is possible.  Our voices may not have been heard before, but we

24  united to bring justice to a common enemy.  If we cannot stop

25  women who have been raped from being forced to bear the

M6SQmaxS1

1    children of their rapists, then we must take a stand on zero

2    tolerance to those who abuse their power to groom and traffic

3    and rape the vulnerable.

4        How you do anything is how you do everything.  Every

5    single person should have equal value.  Every single person

6    should have an equal right to be protected.  Every single child

7    must have their innocence defended.  No person should be

8    shielded from the consequences of their actions no matter their

9    status or class.  Ghislaine's lack of remorse and her blatant

10   refusal to take responsibility for her crimes towards us is the

11   final insult.

12       Having a difficult childhood is irrelevant to the

13   choices she made to traffic and supply women/children to

14   Jeffrey Epstein and other powerful men.  Despite the atrocities

15   perpetrated on me, I have never recruited a child or any person

16   to be sexually abused.  Someone being a hard worker does not

17   excuse sex trafficking of minors.  Someone starting a

18   non-profit does not excuse sex trafficking of minors.  Someone

19   who had it difficult or even an abusive father does not excuse

20   sex trafficking of minors.  Losing money and prestige does not

21   excuse sex trafficking of minors.  The lack of remorse or

22   responsibility taken by Ghislaine for how she ruined the lives

23   of countless women and children is exactly how we can tell that

24   she doesn't think what she did is wrong.  She is not sorry, and

25   she would do it again.

M6SQmaxS1

I have known Ghislaine for many years now, and I have seen her be kind and generous to me and many others until she doesn't get what she wants from that person, and then I have seen her stop at nothing to enforce her will -- a manipulative cruel and merciless person who only uses kindness to manipulate and generosity to seek recognition.

Today for the first time I stand with my sisters, bonded by a trauma that I wish on no one, to draw a line and to set a precedent to say enough is enough; to say no with a chorus of voices that you cannot ignore. May that chorus ring through the ears of people still being victimized and give them strength. May it echo in the ears of perpetrators to remind them that there are those of us who will never stop until we stop them.

Today is not a happy day. I take no pleasure in being part of a world where this is necessary, but I am proud to stand shoulder to shoulder with these brave women and do what is necessary to stop Ghislaine, to hold her accountable, and for the first time in my life not to feel afraid. I could not have done this alone, and I thank those who walked alongside me and those who carried me. Today I can look at Ghislaine and tell her that I became what I am today in spite of her and her efforts to make me feel powerless and insignificant, and I will pass that empowerment on to my daughter that she may never consider being silent when faced with injustice because she

M6SQmaxS1

1    will feel all of us standing behind her.  Thank you.

2            THE COURT:  Thank you.

3            I will hear the statement from counsel for Virginia

4    Roberts.

5            VIRGINIA ROBERTS COUNSEL:  Good afternoon, your Honor.

6            May it please the Court, this statement I am reading

7    on behalf of my client, Virginia Giuffre, is written to

8    Ghislaine Maxwell.

9            Ghislaine:  22 years ago in the summer of 2000, you

10   spotted me at Mar-a-Lago in Florida, and you made a choice:

11   You chose to follow me and procure me for Epstein.  Just hours

12   later, you and he abused me together for the first time.

13   Together you damaged me physically, mentally, sexually and

14   emotionally.  Together you did unthinkable things that still

15   have a corrosive impact on me to this day.

16           I want to be clear about one thing:  Without question,

17   Jeffrey Epstein was a terrible pedophile, but I never would

18   have met Jeffrey Epstein if not for you.  For me, and for so

19   many others, you opened the door to hell, and then, Ghislaine,

20   like a wolf in sheep's clothing, you used your femininity to

21   betray us and you led us all through it.  When you did that,

22   you changed the course of our lives forever.  You joked that

23   you were like a new mother to us.  As a woman, I think you

24   understood the damage that you were causing, the price you were

25   making us victims pay.  You could have put an end to the rapes,

M6SQmaxS1

the molestation, the sickening manipulation that you arranged,
witnessed and even took part in. You could have called the
authorities, and reported that you were part of something
awful.

I was young and naïve when we met, but you knew that.
In fact, you were counting on it. My life as a young person
was just beginning. You robbed me of that by exploiting my
hopes and ambitions. Ghislaine, the pain you have caused me is
almost indescribable. Because of your choices and the world
you brought me into, I don't sleep. Nightmares wake me at all
hours. In those dreams, I relive the awful things that you and
others did to me and the things that you forced me to do.
Those memories will never go away.

I have trouble meeting new people without questioning
if somehow they're going to hurt me too. There is not a day
that doesn't go by that I don't ask why. Why did you enjoy
hurting us so much? I worry every single day and night that
you will get away with it and evade being punished. I will
worry about that until you're brought to justice. And what
should that justice look like? Ghislaine, you deserve to spend
the rest of your life in prison in a jail cell. You deserve to
be trapped in a cage forever just like you trapped your
victims. But I want you to know that while you tried to break
me, you did not succeed. Despite you, I've grown into a woman
who tries to do good in the world; a woman who on her best days

M6SQmaxS1

1    feels like she's making a difference.

2          My promise to you is as follows:  As long as you and

3    perpetrators like you continue to prey on the vulnerable, I

4    will not stop standing up and speaking out.  Together with so

5    many others you abused, we will do all we can to keep predators

6    from stealing the innocence of children.  I will never give up.

7    I will never go away.  If you ever get out of prison, I will be

8    here watching you and making sure you never hurt anyone else

9    again.  Thank you.

10          THE COURT:  Thank you, counsel.

11          And I do have the written submissions submitted in

12    accordance with the Court's order from Ms. Bryant, Ms. Maria

13    Farmer and Ms. Helm, who I understand was not able to be

14    present.  And so I'll hear from Ms. Ransome.  Please tell me

15    how tell me how to say your name correctly.

16          MS. RANSOME:  Ransome.

17          THE COURT:  Thank you.

18          MS. RANSOME:  Your Honor, it's been a long journey to

19    bring Maxwell to justice.  Although I have physically escaped

20    the hideous trap set by Epstein, Maxwell and other

21    co-conspirators, I continue now, 17 years later, to suffer from

22    the horrific trauma it has caused.

23          I came to New York at the age of 22 hoping to attend

24    New York's FIT and work in the fashion industry.  Soon after

25    arriving, I made met an Epstein-Maxwell recruiter named Natalya

M6SQmaxS1

1   Malyshev.  She described him as a kind philanthropist who could

2   help me get into FIT and provide much needed support.

3          Over the next seven to eight months, I became against

4   my will nothing more than a sex toy for the entertainment of

5   Epstein, Maxwell and others.  I was subjected to sexual

6   predation multiple times per day, both in his New York mansion

7   and on his private island in the U.S. Virgin Islands.  On one

8   of the visits to the island, the sexual demands, degradation

9   and humiliation became so horrific that I tried to escape by

10  attempting to jump off a cliff into shark-infested waters.

11          Epstein and Maxwell were masters at finding young,

12  vulnerable girls and young women to exploit.  Upon targeting a

13  vulnerable girl/young woman, they would ingratiate themselves

14  to her, giving her compliments and small gifts, telling her how

15  special she was.  Soon after lulling me and others into a false

16  sense of security and comfort, they pounced, ensnaring us in

17  the upside-down, twisted world of rape, rape, rape.  Like Hotel

18  California, you can check into the Epstein-Maxwell dungeon of

19  sexual hell, but you could never leave.

20          The manipulation, intimidation and emotional abuse

21  used to control the victims took many forms.  In my case,

22  Epstein and Maxwell used my dysfunctional family history,

23  naivete, visa status, lack of education and desire to go to FIT

24  to manipulate, scare and ensnare me.  They told me that I was

25  exceptionally intelligent and that I had real potential to be

M6SQmaxS1

1    someone and something in life one day.

2         Epstein's and Maxwell's strong ties to FIT could make

3    this happen.  With their help, my admission was almost assured,

4    but there was always a but.  First I had to write my

5    application, which I did.  But Maxwell had to review it and

6    conveniently always found fault.  Then another but, I needed to

7    lose 30 pounds because I was a piglet.  Maxwell's numerous

8    degrading descriptions of me.  Epstein and Maxwell put me on a

9    strict Atkins diet while simultaneously sending me to a

10   psychiatrist who prescribed antidepressants that caused weight

11   gain.  It was a classic no-win situation, and they knew it:

12   Precisely what human traffickers seek.  I never lost the

13   weight, my application was never good enough, and it never got

14   submitted.

15        I thank the almighty God that in 2007, I managed to

16   escape the horror by fleeing to the U.K.  Since then, I have

17   been coping as best as I can and frequently experience

18   flashbacks and wake up in a cold sweat from nightmares from

19   reliving the awful experience.  I'm hypervigilant.  I do not

20   trust people easily.  I experience dramatic mood changes.  I

21   will sometimes start crying uncontrollably for reasons I cannot

22   always comprehend.  I worked hard with several mental health

23   professionals.  They have diagnosed me with extreme symptoms of

24   anxiety, depression, low self-esteem, PTSD and tendency to

25   self-harm.

M6SQmaxS1

1    Despite my earnest effort I have not realized life's

2  true potential professionally, nor entered any healthy personal

3  relationships.  I have never married, and I do not have

4  children, something I always wished for when I was a little

5  girl.  I shy away from meeting new people and have difficulty

6  making new friends because I fear they too could be associated

7  with Epstein and Maxwell and their enablers and

8  co-conspirators.

9    To this day I attend meetings to treat alcoholism, but

10  I have had numerous relapses, and I cannot always control that.

11  I know that only by the grace of God do I continue to live.  I

12  have attempted suicide twice since the abuse -- both near

13  fatal.

14    Last year, I traveled to New York to attend Maxwell's

15  trial.  It was therapeutic to hear the testimony of the four

16  brave victim-witnesses, whose experience paralleled my own, to

17  know that I was not alone, and that our story was finally being

18  told for the world to hear.

19    I am grateful the jury believed the victims and

20  returned a guilty verdict, but a question still tears at my

21  soul.  After all of this, how can this five-star general of

22  this enormous sex-trafficking conspiracy involving hundreds, if

23  not thousands, of vulnerable girls and young women over three

24  decades continue to maintain her innocence?  Reflecting on it,

25  I know the answer to my questions.

M6SQmaxS1

1          Maxwell is today the same woman I met almost 20 years

2   ago, incapable of compassion and human common decency.  Because

3   of her wealth, her social status and connections, she believes

4   herself beyond reproach and above the law.  Sentencing her to

5   the rest of her life in prison will not change her, but it will

6   give the other survivors and I a slight sense of justice and

7   help us as we continue to work to recover from the

8   sex-trafficking hell she perpetrated.

9          She will never ever hurt another young woman or child

10  again in this lifetime, and for that I am sure.

11         To Ghislaine, I say, you broke me in unfathomable

12  ways, but you did not break my spirit, nor did you dampen my

13  eternal flame that now burns brighter than ever before.

14         Thank you, your Honor.

15         THE COURT:  Thank you, Ms. Ransome.  I will hear the

16  statement from Ms. Stein.

17         MS. STEIN:  Good afternoon, your Honor.

18         THE COURT:  Good afternoon.

19         MS. STEIN:  I came to New York in 1991 at the age of

20  18 to attend FIT and immediately began to excel academically.

21  In my sophomore year, I accepted a Christmastime internship at

22  Henri Bendel New York.  I performed well and was asked to stay

23  on as a part-time employee.

24         In the fall semester of my senior year at FIT,

25  Ghislaine Maxwell came into the store where she was a frequent

M6SQmaxS1

1    customer.  Her usual salesperson wasn't there, so I helped her.
2    Ghislaine was electrifying.  We hit it off immediately.  In
3    this first meeting we spoke of our mutual love of fashion, of
4    difficult fathers and formal upbringing, of boyfriends and of
5    how we both saw New York as a chance to start over.  She told
6    me that her boss, who I later came to understand was Jeffrey
7    Epstein, was close friends with Lex Wexner, the CEO and founder
8    of The Limited, which owned Henri Bendel at the time.

9          When she completed her purchases, I offered to deliver
10   them to her so she didn't have to carry them around all day.
11   This was a courtesy I frequently extended to my high-end
12   clients.  Later that day, I called her office for delivery
13   instructions and was told to bring them to a hotel close by to
14   the store.  When I arrived, the hotel concierge told me
15   Ms. Maxwell was in the bar and wanted me to meet someone.  It
16   was Jeffrey Epstein.  That night in the hotel was the first of
17   many times they sexually assaulted me.

18         Afterwards I tried to pretend everything was normal.
19   I returned to my classes at FIT and continued to work at Henri
20   Bendel, but I started to crack.  I failed a course that was
21   necessary for my degree and had to retake it to get my diploma.
22   Shortly after my first meeting with Epstein and Maxwell, I was
23   offered a full-time position at Henri Bendel.  It was a newly
24   created position at the store, and it would have required me to
25   leave FIT a semester short of completing my degree.  I had

M6SQmaxS1

1  aspirations of going to law school, and I knew I could not do

2  so without my undergraduate degree, so I declined it.

3          When Ghislaine found out, she flew into a rage.  I

4  didn't understand why until she told me that she and Epstein

5  were responsible for giving me that opportunity and that in

6  turning it down I was being ungrateful.  I now know that this

7  was their standard operating procedure.  Give a gift or a favor

8  and then demand sex in return.  Nevertheless, I completed my

9  course work, got my degree from FIT, at which point I left

10  Henri Bendel and took a position at Bloomingdales.  I wanted to

11  leave Epstein and Maxwell and the abuse they perpetrated

12  against me behind as I started my professional life.  I never

13  wanted to or expected to see them again.

14          One day in the fall of 1995, Maxwell showed up at

15  Bloomingdales looking for me.  When I asked her how she knew

16  where I was, she said she asked my colleagues at Henri Bendel.

17  She immediately began befriending me once again, asking me to

18  go out socially.  I tried to resist but eventually she wore me

19  down, and I began spending time with them again.  They made me

20  feel like they were friends, contemporaries.

21          In one instance, they took me to Florida and insisted

22  that I stay longer than planned which caused me to miss work

23  and led to me being fired.  Seizing on this new vulnerability

24  they began trafficking me to their friends.  By that time I was

25  trapped.  I was assaulted, raped and trafficked countless times

M6SQmaxS1

1   in New York and Florida during a three-year period.  Things
2   happened that were so traumatizing that to this day I am unable
3   to speak about them.  I don't even have the vocabulary to
4   describe them.  In the most literal sense of the word, Epstein
5   and Maxwell terrified me.  They told me that if I told anyone,
6   no one would believe me; and if they did, they would kill me
7   and the people closest to me.  I believed them.

8          I was once bright, fun, outgoing and kind.  I loved
9   life and people genuinely enjoyed being around me.  After
10  meeting Jeffrey Epstein and Ghislaine Maxwell, it felt like
11  someone shut off the lights to my soul.  My secrets became too
12  much for me to handle, and I began doing whatever I could to
13  try to get away from Maxwell and Epstein.  I changed jobs,
14  apartments, cities and even states to try to get away.
15  Everywhere I went, they found me.

16         In 1997 I moved to Philadelphia with the hopes of
17  finally starting law school.  They found me again, and it was
18  more than I could take.  I was hospitalized with a nervous
19  breakdown.  It would be the first of over two dozen
20  hospitalizations in a decade following my involvement with
21  Epstein and Maxwell.

22         In addition to my escalating mental health problems, I
23  began to experience physical symptoms that doctors could never
24  quite put their fingers on.  I could no longer even pretend to
25  be able to hold down a job or take care of myself in any

M6SQmaxS1

1   meaningful way, and I had to move back home once again.

2   Emotionally, I had cracked and nobody thought I would ever get

3   better, but I didn't give up.  I was determined to do whatever

4   I had to to prove everyone wrong.  I wasn't crazy.  I was hurt.

5           For over a decade and a half, I went to all kinds of

6   medical specialists and was in and out of medical and

7   psychiatric hospitals, having tests and procedures, even

8   submitting to clinical trials and an experimental implantable

9   medical device.  Nothing helped.

10          Just as I began to repair the emotional damage, I was

11  diagnosed with complex regional pain syndrome.  CRPS is a rare

12  neuro-inflammatory disorder characterized raised by intense

13  relentless physical pain.  Both CRPS and PTSD are

14  psychophysical states in which the sympathetic nervous system

15  is engaged and remains inappropriately hyperaroused.  There is

16  no cure.  The mind and body are interconnected.  Despite of

17  this, I immersed myself this trauma therapy and repaired my

18  emotional health.  I began physical therapy and regained my

19  physical mobility.  I started to rebuild my life.

20          The arrest of Epstein in 2019 and Maxwell in 2020

21  helped me immensely.  For the first time, I was finally able to

22  disclose their abuse to friends and medical providers.  25

23  years after meeting them my experience was validated.  I could

24  finally see the possibility of closure.  This past November and

25  December I commuted almost every day from my home in

M6SQmaxS1

1    Philadelphia to attend Ghislaine Maxwell's trial in Manhattan.

2    For weeks I sat in this courtroom anonymously, only revealing

3    my identity the day before the verdict.  I had to see justice

4    myself.

5          At the age of 48, I feel as if I'm just starting my

6    life.  All those things I assumed I would have in life, the

7    things that my siblings and my friends have achieved:  A

8    career, success, partner, family, a home, a legacy to be proud

9    of leaving behind were jeopardized for more than two and a half

10   decades.  The only pronounced difference between my life

11   experience and theirs is that one day when I was doing my job,

12   I met Ghislaine Maxwell who fed me to Jeffrey Epstein.

13          (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

M6s2Max2

```
 1              MS. STEIN:  In more ways than one, they almost killed
 2    me, but I wasn't going to let them.  Overcoming what happened
 3    to me became my decades-long, full-time career.  In that, I
 4    have been successful.
 5              For the past 25 years, Ghislaine Maxwell has been free
 6    to live a life of wealth and privilege that is almost
 7    incomprehensible.  Meanwhile, I have had virtually none of the
 8    life experiences I might have had we never met.  For over two
 9    and a half decades, I felt like I was in prison.  She has had
10    her life.  It's time to have mine.  She needs to be imprisoned
11    so all of her victims can finally be free.
12              Thank you, your Honor
13              THE COURT:  Thank you, Ms. Stein.
14              Ms. Sternheim?
15              MS. STERNHEIM:  Thank you, Judge.  Judge, I would like
16    to stand at the podium.
17              THE COURT:  Please.
18              Let me just note again that I did have the statements
19    of the victims in the record.  I thank them for making
20    statements today and thank their counsel for working with them
21    in conformity with my order.
22              MS. STERNHEIM:  Your Honor, I would like to address
23    the victims.  I am going to try to turn around if the Court
24    permits me.
25              THE COURT:  As long as I can hear you and the court
```

M6s2Max2

1    reporters can hear you.

2              MS. STERNHEIM:  I am going to speak as best as I can.

3              I want to acknowledge the courage that all of you have

4    exhibited in coming forward at the trial and again today.  Your

5    statements are immensely powerful.  We feel the pain.  We can

6    only hope that the end of this case and the sentence to be

7    imposed will give you some solace and the sanctity that you

8    have the ability to move forward and beyond all of this.

9              Judge Nathan, can you hear me?  I didn't pull it out,

10   I hope.

11             THE COURT:  I can.

12             MS. STERNHEIM:  Okay.

13             You have heard all of the trial testimony and you are

14   fully familiar with the record.  We will refrain from pointing

15   out many statements that we disagree with by the government

16   that we believe stretches the elasticity of the record well

17   beyond what we believe is fair inference.  But the purpose of

18   today is not to take issue with the record; that will be

19   addressed to the Court of Appeals.

20             The government asks the Court to sentence Ms. Maxwell

21   above the more reasonable guideline range that the Court

22   determined is applicable in this case and seeks a sentence of

23   multiple decades in prison for a woman who is almost 61 years

24   old and for almost the last 20 years has not engaged in any

25   conduct similar to that which was the subject of the trial and

M6s2Max2

1    the conviction.

2          The government has asked for an immense sentence.  We

3    recognize that any sentence in this case is going to be

4    significant and is going to be immensely punishing.  The

5    probation department, based on the original guidelines in the

6    presentence report, recommended a downward variance to 20

7    years.  That recommendation is now higher than the guideline

8    range that is applicable in this case.  But we ask the Court to

9    consider the justification that probation articulated in the

10   presentence report in fashioning a sentence that takes into

11   consideration that a sentence lower than the guideline range is

12   appropriate in this case.

13         The government's sentence asks for the outer limits,

14   and although we still believe that even the recommendation is

15   too high, a sentence within the guideline range now may be more

16   reasonable, but it still does not take into consideration some

17   of the various factors that we have brought to the Court's

18   attention in our submission.  Simply stated, based upon the

19   conduct of conviction, the government's request is out of

20   proportion.  Jeffrey Epstein would have faced the same

21   sentence, and he is clearly far more culpable than Ghislaine

22   Maxwell.

23         THE COURT:  You mean he would have faced the same

24   guidelines.

25         MS. STERNHEIM:  Yes, that is correct, Judge.

M6s2Max2

1              The sentencing submissions, which I know the Court has

2      read—and I know the Court reads everything very critically and

3      carefully—outlines and details our position, and I am not

4      going to take the time to repeat those things unless the Court

5      requests me to answer certain questions.

6              But in fashioning the appropriate sentence for this

7      case and this defendant, the Court needs to take into

8      consideration the various 3553(a) factors that the Court must

9      take into consideration in every case regardless of what the

10     crime of conviction is.

11             I know that what we heard today does not beg sympathy

12     for Ms. Maxwell, but there are circumstances in her life that

13     bear attention by the Court in imposing a reasonable sentence

14     in this case.  She has lived the entirety of her life under

15     giant clouds that have cast very dark shadows.  The tragic

16     accident of her eldest brother within 72 hours of her birth on

17     Christmas Day left him in a coma for seven years, until he

18     died, an event that impacted her family to this day and

19     overshadowed infant Ghislaine's entry into the world and her

20     early childhood.  Her narcissistic, brutish, and punitive

21     father overwhelmed her adolescence and early adulthood.  And

22     the controlling, demanding, manipulative Jeffrey Epstein cast a

23     deceptive shadow over Ghislaine's adulthood, the repercussions

24     of which will plague her until her last breath.  And like the

25     past two years of intense presentence incarceration, which was

M6s2Max2

1   unusually harsh and punishing, she will remain in the shadow of

2   prison bars until she can return to the sunlight of liberty.

3         As I said before, she is over 60 years old.  She has

4   no history of violence.  She had no criminal history before or

5   after the crimes of conviction, which ended some 20 years ago,

6   and the Court needs to consider that there is an extensive

7   period that has elapsed from the end of the charged conduct.

8   She poses no danger to society or of recidivism.  Her personal

9   circumstances include many accomplishments and good deeds.

10        As I said, she has been subjected to extensive

11   punishing conditions of presentence incarceration in solitary

12   confinement.  When she was moved within the last two months to

13   general population, she began interacting with the inmates and

14   assisting them in many, many ways.  She began conducting

15   English classes and GED tutoring, programs that were no longer

16   being offered in the MDC and certainly had been suspended as a

17   result of the ongoing pandemic.  Her asset to the unit in

18   general population is recited in the unsolicited letter

19   submitted to the Court from one of her fellow unit inmates.

20   But I have also been contacted personally by counsel for other

21   inmates in Ms. Maxwell's unit, reporting to me that she is

22   providing needed educational assistance that has not been

23   ongoing for at least two years.

24        Ms. Maxwell is being sentenced for terrible conduct.

25   There is no denying that.  But she has the ability and the

M6s2Max2

1    desire to be law-abiding, which she has exhibited, and to do

2    good.  Before the charged offense and for the better part of

3    the past 20 years, she has demonstrated that she is not a

4    danger to anyone.  A sentence below the applicable guidelines

5    is sufficient, but not greater than necessary, punishment for

6    Ghislaine Maxwell.  The Court should not send her away for the

7    rest of her life.

8            Thank you.

9            THE COURT:  Thank you, Ms. Sternheim.

10           Ms. Maxwell, you have the right to make a statement.

11   You are not obligated to do so, but if you would like to, you

12   may do so now.

13           THE DEFENDANT:  I would, your Honor.

14           MS. STERNHEIM:  She would.  Where would you like her

15   to -- I'm sorry, Judge.  Where would you like her to address

16   the Court?

17           THE COURT:  Are the marshals comfortable with the

18   podium?

19           THE MARSHAL:  Yes, your Honor.

20           THE COURT:  You can go to the podium, Ms. Maxwell.

21           MS. STERNHEIM:  Thank you very much.

22           And she may remove her mask?

23           THE COURT:  Once you are at the podium, yes, you may

24   remove your mask.

25           THE DEFENDANT:  Thank you, your Honor.

```
 1              Your Honor, it is hard for me to address the Court
 2    after listening to the pain and anguish expressed in the
 3    statements made here today.  The terrible impact on the lives
 4    of so many women is difficult to hear and even more difficult
 5    to absorb, both in its scale and in its extent.  I want to
 6    acknowledge their suffering and empathize.  I empathize deeply
 7    with all of the victims in this case.
 8              I also acknowledge that I have been convicted of
 9    helping Jeffrey Epstein commit these crimes.  And despite the
10    many helpful and positive things I have done in my life, and
11    will continue to do, to assist others during my sentence, I
12    know that my association with Epstein and this case will
13    forever and permanently stain me.
14              It is the greatest regret of my life that I ever met
15    Jeffrey Epstein.  I have had plenty of time to think, having
16    spent two years in solitary confinement.  I believe that
17    Jeffrey Epstein was a manipulative, cunning, and controlling
18    man who lived a profoundly compartmentalized life and fooled
19    all of those in his orbit.
20              Variously, his victims considered him as a godfather,
21    a mentor, benefactor, friend, lover.  It is absolutely
22    unfathomable today to think that that is how he was viewed
23    contemporaneously.
24              His impact on all those who were close to him has been
25    devastating, and today those who knew him even briefly, or
```

 1    never met him but were associated with someone who did, have

 2    lost relationships, have lost jobs, and have had their lives

 3    completely derailed.

 4         Jeffrey Epstein should have been here before all of

 5    you.  He should have stood before you all those years ago.  He

 6    should have stood before you in 2005, again in 2009, and again

 7    in 2019, all of the many times he was accused, charged, and

 8    prosecuted.

 9         But today it is not about Epstein ultimately.  It is

10    for me to be sentenced and for the victims to address me, and

11    me alone, in this court.

12         To you, all the victims, those who came in court and

13    to those outside, I am sorry for the pain that you experienced.

14    I hope that my conviction, along with my harsh and unusual

15    incarceration, brings you closure.  I hope this brings the

16    women who have suffered some measure -- I hope that this brings

17    the women who have suffered some measure of peace and finality

18    to help you put the experiences of those many years ago in a

19    place that allows you to look forward and not back.

20         I also acknowledge the pain this case has brought to

21    those that I love, the many I held and still hold close, which

22    tortures me every single day, and the relationships that I have

23    lost and will never be able to regain.

24         It is my sincerest wish to all those in this courtroom

25    and to all those outside this courtroom that this day brings a

M6s2Max2

1    terrible chapter to the end, to an end.  And to those of you

2    who spoke here today and to those of you who did not, may this

3    day help you travel from darkness into the light.

4            Thank you, your Honor.

5            THE COURT:  Thank you, Ms. Maxwell.

6            Counsel, is there anything else -- I'm sorry, let

7    me -- I do want to ask defense counsel, before I get there, if

8    there are any objections to any of the conditions recommended

9    by the Probation Department with respect to supervised release.

10           MS. STERNHEIM:  No, Judge.

11           THE COURT:  Okay.  And I understand the government is

12   not -- I just want to talk about restitution before I get to

13   the statement of judgment.

14           Count Six is mandatory restitution, but the

15   government's position is that no restitution should be ordered

16   because all victims have been compensated.

17           MS. MOE:  That is correct, your Honor.

18           THE COURT:  Counsel, is there anything else I should

19   consider or any reason why sentence should not be imposed at

20   this time?

21           MS. MOE:  No, your Honor.  Thank you.

22           MS. STERNHEIM:  No.

23           THE COURT:  All right.  Let me gather my thoughts for

24   one moment.

25           (Pause)

M6s2Max2

1          THE COURT:  Thank you for your patience.

2          As I have stated, the guideline range applicable to

3    this case is 188 to 235 months' imprisonment.

4          Under the Supreme Court's decision in a case called

5    *Booker* and related cases, the guideline range is only one

6    factor that the Court must consider in deciding the appropriate

7    sentence.  I am also required to consider the other factors set

8    forth in a provision called 18 U.S.C. 3553(a).  These include

9    the nature and circumstances of the offense, and the history

10   and characteristics of the defendant; the need for the sentence

11   imposed to reflect the seriousness of the offense, to promote

12   respect for the law, to provide just punishment for the

13   offense, to afford adequate deterrence to criminal conduct, to

14   protect the public from further crimes of the defendant, to

15   provide needed educational, vocational training, medical care,

16   or other treatment.  I am to take into account the kinds of

17   sentences available, as I have said, the guideline range, any

18   pertinent policy statement, the need to avoid unwarranted

19   sentence disparities among defendants with similar records who

20   have been found guilty of similar conduct, the need to provide

21   restitution as appropriate under the law to any victims of the

22   offense.

23          I am required to impose a sentence sufficient, but no

24   greater than necessary, to comply with the purposes I have just

25   described.  I have given substantial thought and attention to

M6s2Max2

1    the appropriate sentence in this case in light of the 3553(a)

2    factors and the appropriate purposes of sentencing as reflected

3    in that statute.

4         The crimes for which I sentence Ms. Maxwell today are

5    the crimes for which a jury convicted her of committing

6    following trial.  I do want to emphasize that today the

7    sentence is based entirely on those crimes and the harm done to

8    the victims of those charged and proved crimes.  The evidence

9    at trial established that Ms. Maxwell directly and repeatedly

10   and over the course of many years participated in a horrific

11   scheme to entice, transport, and traffic underage girls, some

12   as young as 14, for sexual abuse by and with Jeffrey Epstein.

13        I will pause on those words for a moment, "by and with

14   Epstein."  It is important at the outset to emphasize that

15   although Epstein was, of course, central to this criminal

16   scheme, Ms. Maxwell is not being punished in place of Epstein

17   or as a proxy for Epstein.  Like every other participant in a

18   multi-defendant case, Ms. Maxwell is being punished for the

19   role that she played in the criminal conduct.  As to that role,

20   the trial evidence established that Ms. Maxwell was

21   instrumental in the abuse of several underage girls and that

22   she herself participated in some of the abuse, and it is her

23   conduct for which she has been convicted in the court under the

24   laws of this country and it is her conduct for which she must

25   be held accountable.

M6s2Max2

1        Turning to that conduct, the punishment here must

2   reflect the seriousness of the offense, promote respect for the

3   law, provide just punishment for the offense, and deter.

4        First, as to the seriousness, the defendant's conduct

5   was, as aptly described by the probation department, heinous

6   and predatory.  Ms. Maxwell worked with Epstein to select young

7   victims who were vulnerable.  Once selected, Ms. Maxwell played

8   a pivotal role in facilitating the abuse of the underaged girls

9   through a series of deceptive tactics.  A sophisticated adult

10  woman, she provided an initial venire of responsibility and

11  even safety.  She befriended and developed relationships of

12  trust.  She then manipulated the victims and normalized sexual

13  abuse through her involvement, encouragement, and instruction.

14       To give one example from trial, Jane testified that

15  Ms. Maxwell cultivated a friendship with her, took her to

16  movies and shopping.  In an initial sexual interaction, while

17  Jane was 14 years old, the defendant engaged in sexual conduct

18  with Epstein while Jane was present.  After that, the defendant

19  instructed Jane, again, while she was only 14 years old, on how

20  to massage Epstein, including instructions on how to touch his

21  penis during massages.  The abuse later escalated to Epstein

22  using vibrators on Jane, penetrating her with his fingers.

23  During some of the sexual abuse, the defendant would herself

24  touch Jane's breasts.

25       Carolyn, the victim of the sex trafficking charge,

M6s2Max2

1    provides another example.  She testified that she confided in

2    the defendant that her mother was an alcohol and that she had

3    been raped and molested by her grandfather starting at a very

4    young age.  The defendant, aware of this knowledge, used it to

5    subject Carolyn to a continuing cycle of sexual abuse.  The

6    defendant wasn't an impassive observer, but herself touched

7    Carolyn's breasts, again, at the time Carolyn was 14.  For

8    years, Carolyn was paid for the sexualized massages, including

9    personally paid by the defendant.

10          Similar patterns of conduct were described by other

11   witnesses.  Indeed, the criminal conduct established at trial

12   was extensive and it was far-reaching.  Ms. Maxwell and Epstein

13   victimized multiple underaged girls using this pattern, this

14   playbook, over the span of many years and in a variety of

15   locations.  And the damage done to these young girls was

16   incalculable.  They did bravely testify at trial about what

17   happened to them despite the extraordinary difficulty that

18   entailed.  They withstood cross-examination from zealous

19   defense counsel and testified credibly at trial about the

20   trauma that they had endured and the painful, horrific, and

21   lasting impact of that trauma.  They did so, they told me in

22   their statements, in order to help ensure justice for

23   themselves and others and to do what they could to try to

24   prevent other girls from suffering in the future as they had

25   suffered.

92

M6s2Max2

1          The sentence I impose must reflect the gravity of

2     Ms. Maxwell's conduct, of Ms. Maxwell's offense, the pivotal

3     role she played in facilitating the offense, and the

4     significant and lasting harm it inflicted.  So, too, must the

5     sentence promote respect for the law, provide just punishment,

6     and afford adequate deterrence.

7          As I have described, this scheme was long-lasting, it

8     was far-reaching, it was horribly damaging to the victims.

9     Just punishment and promotion of respect for the law, it

10    demands a substantial sentence that meets the scope of the

11    conduct and the scope of the harm.

12         Moreover, general deterrence is critically important

13    to the sentence I will impose.  A substantial sentence will

14    send an unmistakable message that those who engage in and

15    facilitate the sexual abuse and trafficking of underaged

16    victims will be held accountable by the law.

17         As the probation department stated, a significant

18    sentence should promote general deterrence against the

19    exploitation and degradation of humans made possible by this

20    offense, and I fully agree.  But let me be clear that

21    Ms. Maxwell is wealthy or that this case is high profile is not

22    a basis for increasing punishment in any regard, but the rule

23    of law demands, and this Court must ensure that, whether you

24    are rich or poor, powerful or entirely unknown, nobody is above

25    the law.  That message serves the important interest in

M6s2Max2

1    deterrence and just punishment as well.  All of these factors

2    suggest that a very serious, a very significant sentence is

3    necessary to achieve the purposes of punishment that I have

4    just described.

5         Of course I must, and I do, take into account the

6    history and characteristics of the defendant.  Ms. Maxwell is

7    over 60 years old.  This is her first conviction.  Neither in

8    arguing for pretrial detention nor with respect to sentencing

9    has the government contended that Ms. Maxwell represents a

10   continuing danger to the public.  As I explained, I do not need

11   to find she is a continuing danger to apply 4B1.5(b), as her

12   decade-long pattern of predatory activity amply justifies that

13   enhancement and a substantial sentence, but her present lack of

14   dangerousness is a factor in my consideration of a proper

15   sentence.

16        Her sentencing submission letters and psychological

17   report discuss the impacts of an overbearing and demanding

18   father and the tragic death of her brother at the beginning of

19   her life.  The record indicates that she has engaged in some

20   charitable works, including environmental conservation and

21   health-related charitable organizing and giving.  The set of

22   letters I received from her family members and friends describe

23   her as attentive and loving to her family and a loyal and

24   generous friend.  A letter from an inmate describes her

25   tutoring of other inmates while incarcerated and Ms. Sternheim

M6s2Max2

1    represents that she has heard similarly from other defense

2    counsel.  I take all of these factors into account consistent

3    with the 3553(a) statutory provision when deciding what

4    sentence to impose.

5            Beyond these factors, much of the defense written

6    submission, not the oral statement today, but much of the

7    written submission focused on a series of complaints about

8    Ms. Maxwell's pretrial detention.  As I have said in many

9    sentencing proceedings since the pandemic began, the conditions

10   in the MDC have been extremely difficult for all inmates as a

11   result.  There have been extended periods of lockdown, health

12   risks, and the lack of access to legal and social visits and

13   programming and the like.  Conditions at the MDC are, to put it

14   mildly, not what they should be, and serving time during the

15   pandemic has been more difficult than serving time before it.

16   As I have in other sentencings, I take into account this in

17   imposing an appropriate sentence.  I also take into account

18   that, as a high-profile defendant charged and convict of sex

19   offenses against minors, Ms. Maxwell faces security risks and

20   has endured additional isolation and surveillance beyond the

21   typical pretrial detainee.

22           That said, I largely reject the defense's primary

23   written contention that Ms. Maxwell has been singled out for

24   uniquely harsh and punishing treatment.  To the contrary, I

25   agree with the government that many of the complaints have been

M6s2Max2

unfounded and exaggerated and that Ms. Maxwell's treatment at MDC was overall as good as or better than that of the typical pretrial detainee at the MDC during the pandemic.

I also reject the repeated allegations that Ms. Maxwell, who was provided extensive access to computers and legal materials, as well as to highly involved counsel, was in any way not able to prepare for trial or sentencing. I will say that I think a lack of full candor regarding treatment is consistent with a lack of candor to Pretrial Services and to the Court regarding finances, as well as the dishonesty that I have concluded occurred during the civil deposition that makes up the perjury counts. Overall, the behavior appears consistent with a pattern of deflection of blame.

I will note that I was -- I would emphasize that the sentencing submission talks about these complaints and blames others but did not express remorse or acceptance of responsibility. Ms. Sternheim and Ms. Maxwell today acknowledge the courage of the victims who testified and who spoke, talked about the pain and anguish that they have expressed, to some extent acknowledged the impact on them and their suffering, and I think that is important for the victims to hear. What there wasn't expressed was acceptance of responsibility. Now let me be clear. Ms. Maxwell is fully entitled to exercise her constitutional -- was fully entitled and is fully entitled to exercise her constitutional right to

M6s2Max2

1    go to trial. She has every right to appeal that verdict. But

2    it is appropriate for this Court, in the face of genuine

3    expressions of remorse and acceptance of responsibility, to

4    decrease punishment because that's part of the message that's

5    being sent by the law. It's appropriate to note and to take

6    into account a lack of acceptance of responsibility, a lack of

7    expression of remorse as to her own conduct. Today's sentence

8    will attempt to acknowledge the harm that Ms. Maxwell caused

9    and it will strongly and unequivocally condemn her criminal

10    conduct.

11         I do conclude, consistent with the Probation

12    Department recommendation, that a sentence of 240 months, which

13    is slightly above the guideline range that I found, is both

14    sufficient and necessary -- and no greater than necessary to

15    meet the purposes of punishment that I have described.

16         I will now formally state the sentence I intend to

17    impose. I will ask Ms. Maxwell and her counsel to please rise.

18         Ms. Maxwell, it is the judgment of this Court that you

19    be sentenced to a period of 240 months, 20 years, to be

20    followed by a period of five years' supervised release.

21         You may be seated.

22         To be precise, I am sentencing Ms. Maxwell to 60

23    months on Count Three, 120 months on Count Four, and 240 months

24    on Count Six, all to run concurrently, for a total of 240

25    months' imprisonment. I am sentencing her to three years of

M6s2Max2

1    supervised release on Counts Three and Four and five years on

2    Count Six, all to run concurrently, for a total of five years

3    of supervised release.

4         Defense counsel indicated no objection to the

5    conditions of supervised release indicated in the presentence

6    report, and so I impose them precisely as stated in the

7    presentence report, including the standard conditions, special

8    conditions, and mandatory conditions of supervised release.

9    Again, I am imposing them precisely as stated in the PSR.

10        I order Ms. Maxwell to pay a fine in the amount of

11   $750,000.  The maximum amount per count is $250,000, so that is

12   $750,000 total.  As I have indicated, I reject the contention

13   that the defendant is unable to pay a fine.  Ms. Maxwell has

14   received a $10 million bequest from Epstein.  This is in

15   addition to her other assets.  And the defendant, I conclude,

16   is able to afford a substantial fine, and I conclude that the

17   maximum amount per count is reasonable under all relevant

18   circumstances in light of the counts of conviction.

19        The government has indicated that it is not seeking

20   restitution nor forfeiture.

21        I am imposing a mandatory special assessment, as I

22   must, of $100 per count, which is due immediately.

23        Does either counsel know of any legal reason, other

24   than those already argued, why the sentence shall not be

25   imposed as stated?

M6s2Max2

1          MS. MOE:  No, your Honor.

2          MS. STERNHEIM:  Your Honor, I would just like to make

3    one statement, if I may.  With regard to the fine, the Court

4    indicated the bequest in the will.  I just want the record to

5    reflect that that is an unactualized bequest, as Ms. Maxwell

6    has received nothing, and it is the expectation that she will

7    receive nothing.

8          THE COURT:  I understand.  And to be clear, I am not

9    finding and accept that she hasn't received anything, but there

10   have only been nonspecific claims that she won't receive

11   anything and there are additional assets that lead me to the

12   conclusion that she is able to pay the fine.

13         MS. STERNHEIM:  Thank you, Judge.

14         THE COURT:  Thank you.

15         And just to confirm, Ms. Sternheim, any legal reason

16   why the sentence should not be imposed as stated other than

17   what already was argued?

18         MS. STERNHEIM:  No, your Honor, but I do have requests

19   for recommendation.

20         THE COURT:  I will get there.  Thank you.

21         The sentence as stated is imposed.  I do find the

22   sentence is sufficient but not greater than necessary to

23   satisfy the sentencing purposes that I described earlier.

24         Ms. Maxwell, when you are released and on supervised

25   release, you will have the guidance and support of the

M6s2Max2

1    probation department.  I must caution you to comply strictly

2    with all of your conditions of supervised release.  If you are

3    brought back before me for a violation of those conditions, I

4    may sentence you to another term of imprisonment.

5            With that, Ms. Sternheim, requests regarding

6    designation?

7            MS. STERNHEIM:  Thank you, Judge.

8            We request that Ms. Maxwell be designated, based on a

9    recommendation by the Court, to the BOP facility, the women's

10   facility in Danbury, and also a recommendation that she be

11   enrolled in the FIT program, which is the Female Integrated

12   Treatment program, to address past familial and other trauma.

13           THE COURT:  Okay.

14           MS. STERNHEIM:  Thank you.

15           THE COURT:  I recommend to the Bureau of Prisons

16   consideration of placement in Danbury and consideration of

17   eligibility for enrollment in the FIT program.

18           Ms. Moe, remaining counts and underlying indictments

19   that need to be dismissed at this time?

20           MS. MOE:  Yes, your Honor.  The government moves to

21   dismiss Counts Seven and Eight and any underlying indictments.

22           THE COURT:  The motion is granted.  Counts Seven and

23   Eight are dismissed and any underlying indictments are

24   dismissed.

25           Ms. Maxwell, I am required to inform you of your

M6s2Max2

```
 1    appellate rights.  You have the right to appeal your conviction
 2    and your sentence.  The notice of appeal must be filed within
 3    14 days of the judgment of conviction.
 4              Other matters to take up counsel?
 5              MS. MOE:  Not from the government, your Honor.  Thank
 6    you.
 7              MS. STERNHEIM:  No.  Thank you.
 8              THE COURT:  Let me note, I will issue a housekeeping
 9    order posttrial to ensure complete docketing of all -- any
10    outstanding materials and complete records, so please look for
11    that.  I will issue the judgment -- I should just say, Ms. Moe,
12    the Court intends to indicate the end of the conspiracy date as
13    the last date in the record, which I believe is in July of
14    2004, of acts in furtherance of the criminal conduct, and
15    obviously the government took a different position with respect
16    to that.  But in light of the Court's finding, any objection to
17    that?
18              MS. MOE:  No, your Honor.  We will review the
19    exhibits.  If that date is different from the sentencing
20    transcript, we will submit a letter to the Court, but otherwise
21    no objection, your Honor.
22              MS. STERNHEIM:  No objection.
23              THE COURT:  All right.
24              MS. MOE:  With apologies, your Honor, with respect to
25    the judgment, in light of the Court's decision to impose an
```

M6s2Max2

1    above-guidelines sentence and an above-guidelines fine, we

2    would respectfully request that the Court address both the

3    sentence and the fine in the Court's statement of reasons.

4         THE COURT:  Yeah, I actually -- guideline range, let

5    me just check.  I meant to talk about that.  I'm not sure it is

6    an above-guidelines, but it may be since, as we know, I read

7    over five to mean five.  So maybe I got that wrong.  Let me

8    just check.

9         Oh, you are right.  It is 20 to 200,000 for each

10   count.  Do I have that right?

11        MS. MOE:  Yes, your Honor.  Thank you.

12        THE COURT:  All right.  Thank you.

13        I want to thank counsel.  As I indicated, I do thank

14   the victims who made statements in writing or orally and their

15   counsel who supported them in that endeavor.  I thank counsel

16   for Ms. Maxwell and counsel for the government.

17        We are adjourned.

18                              oOo

19

20

21

22

23

24

25

EXHIBIT 53

LC3KMAX2                         Alessi - Cross

1   Q.  I think you testified that there were many properties that

2   Mr. Epstein owned, right?

3   A.  Yes.

4   Q.  And you had been to those properties, correct?

5   A.  Briefly, yes.

6   Q.  And all of those properties required substantial daily

7   maintenance and care, correct?

8   A.  I imagine so.

9   Q.  Okay, just like the Palm Beach property required, correct?

10  A.  Of course.

11  Q.  Okay.

12          So that was why there was a plan to do regular

13  scheduled checklists for maintenance and things, correct?

14  A.  I guess so.

15  Q.  Mr. Epstein was your boss, correct?

16  A.  That's correct.

17  Q.  When Mr. Epstein was in Palm Beach, you would go to

18  Mr. Epstein for direction, correct?

19  A.  No.  I will go directly to Ms. Maxwell.  She was my

20  immediate superior.  I will go to her first.

21  Q.  Do you recall that -- let's talk about Mr. Epstein for a

22  little bit.

23          Mr. Epstein wanted his properties to be run like

24  five-star hotels, correct?

25  A.  That's correct.

# EXHIBIT  54

Provided to Jordan A. Esteban, Neiman Mays Floch & Almeida, PLLC on 9/24/2025

1

1

2

3

4

5     COMMITTEE ON OVERSIGHT AND GOVERNMENT REFORM,

6     U.S. HOUSE OF REPRESENTATIVES,

7     WASHINGTON, D.C.

8

9

10

11

12     INTERVIEW OF:   R. ALEXANDER ACOSTA

13

14

15

16                          Friday, September 19, 2025

17

18                          Washington, D.C.

19

20

21          The interview in the above matter was held in room 2247, Rayburn House Office Building,

22     commencing at 9:58 a.m.

23          Present:   Representatives Comer, Biggs, Burchett, Lynch, Krishnamoorthi, Stansbury, Garcia,

24     Frost, Lee, Casar, Crockett, Subramanyam, Ansari, Min, and Walkinshaw.

Provided to Jordan A. Esteban, Neiman Mays Floch & Almeida, PLLC on 9/24/2025

1    <u>Appearances:</u>

2

3

4    For the COMMITTEE ON OVERSIGHT AND GOVERNMENT REFORM:

5

6    ████████, GENERAL COUNSEL

7    ████████, PROFESSIONAL STAFF MEMBER

8    ████████, FELLOW

9    ████████, COUNSEL, OVERSIGHT

10   ████████, CHIEF COUNSEL FOR INVESTIGATIONS

11   ████████, RESEARCH ASSISTANT

12   ████████, STAFF DIRECTOR

13   ████████, COUNSEL

14   ████████, MINORITY DEPUTY STAFF DIRECTOR

15   ████████, MINORITY POLICY DIRECTOR

16   ████████, MINORITY STAFF DIRECTOR

17   ████████, MINORITY COMMUNICATIONS DIRECTOR

18   ████████, MINORITY STAFF ASSISTANT

19   ████████, MINORITY COUNSEL

20   ████████, MINORITY SENIOR COUNSEL

21   ████████, MINORITY FELLOW

22   ████████, MINORITY SENIOR ADVISOR

23   ████████, MINORITY DEPUTY CHIEF OVERSIGHT COUNSEL

Provided to Jordan A. Esteban, Neiman Mays Floch & Almeida, PLLC on 9/24/2025

3

1    For R. ALEXANDER ACOSTA:

2

3    JEFFREY NEIMAN, ESQ.

4    JORDAN ESTEBAN, ESQ.

5    Neiman Mays Floch & Almeida PLLC

6    100 SE 3rd Avenue, Suite 805

7    Fort Lauderdale, FL 33394-0002

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Provided to Jordan A. Esteban, Neiman Mays Floch & Almeida, PLLC on 9/24/2025

1        Mr. ▮▮▮▮.   We can go on the record.

2        This is a transcribed interview of Mr. R. Alexander Acosta, conducted by the House

3    Committee on Oversight and Government Reform under the authority granted to it pursuant to

4    House rule X.

5        Accordingly, House rule X grants the Committee broad jurisdiction for the Committee to

6    conduct investigations of any matter at any time.

7        The Committee may use the results of this investigation to inform legislative solutions to

8    improve Federal efforts to combat sex trafficking and reform the use of non-prosecution agreements

9    and/or plea agreements in sex crime investigations.

10        Additionally, the Committee is assessing possible legislation aimed at bolstering or otherwise

11    amending laws aimed at ethics disclosures for elected officials.

12        Can the witness please state his name and spell his last name for the record?

13        Mr. Acosta.   Rene Alexander Acosta, A-c-o-s-t-a.

14        Mr. ▮▮▮▮.   Thank you.

15        My name is ▮▮▮▮▮▮, and I am the general counsel for Chairman James Comer.

16        Under the Committee on Oversight and Government Reform's Rules, you are allowed to have

17    counsel present to advise you during this interview.

18        Do you have counsel representing you in a personal capacity with you today?

19        Mr. Acosta.   Yes, I do.

20        Mr. ▮▮▮▮.   Will counsel please identify themselves?

21        Mr. Neiman.   Good morning.   Jeffrey Neiman, on behalf of Mr. Acosta.

22        Mr. Esteban.   Jordan Esteban, on behalf of Mr. Acosta.

23        Mr. ▮▮▮▮.   For the record, starting with the remainder of the majority staff, can the

24    additional staff members please introduce themselves with their name, title, and affiliation?

25        Mr. ▮▮▮▮.   ▮▮▮▮▮▮, chief counsel for investigations, with Chairman Comer.

Provided to Jordan A. Esteban, Neiman Mays Floch & Almeida, PLLC on 9/24/2025

1      Mr. ███ █████, staff assistant for the majority.

2      Ms. ██ █████, counsel for the majority.

3      Ms. ███ ██████, professional staff member for the majority.

4      Mr. ███ █████, intern for majority.

5      Mr. ██ █████, majority.

6      Mr. ██ █████, chief counsel, minority.

7      Mr. ███ █████, senior counsel, minority.

8      Mr. █ █████, fellow, minority.

9      Ms. ██ █████, fellow, minority.

10     Mr. ██ █████, minority.

11     Mr. █████ ██████, minority.

12     Mr. ███ █████, senior advisor, minority.

13     Ms. ███ █████, counsel, minority.

14     Mr. █████   Mr. Chairman?

15     Chairman Comer.   James Comer, Chairman, House Oversight Committee.

16     Mr. █████   Thank you all.

17     Mr. Acosta, before we begin, I would like to go over the ground rules for this interview.

18     The questioning will proceed in rounds.   The majority will ask questions for an hour, and

19     then the minority will have the opportunity to ask questions for an hour if they choose.

20     To the extent members have questions for the witness, they will be propounded during their

21     side's respective rounds.

22     There aren't any right now, but if there are members on the dais, we'd ask that they please

23     come down to the table to ask questions, not ask them from the dais.

24     The clock will stop if you need to confer with counsel, your counsel is speaking, and when

25     members or staff are speaking during the opposing side's rounds of questions.

Provided to Jordan A. Esteban, Neiman Mays Floch & Almeida, PLLC on 9/24/2025

1    We will alternate back and forth until there are no more questions.

2    Do you understand?

3    Mr. Acosta.    Yes, I do.

4    Mr. ███████.    There is a court reporter taking down everything I say and everything you say

5    to make a written record of the interview.

6    For the record to be clear, please wait until the staffer questioning you finishes each question

7    before you begin your answer, and the staffer will wait until you finish your response before

8    proceeding to the next question.

9    Further, to ensure the court reporter can properly record this deposition, please speak

10   clearly, concisely, and slowly.    The court reporter cannot record nonverbal answers, such as

11   nodding or shaking your head, so it is important that you answer each question with an audible,

12   verbal answer.

13   Do you understand?

14   Mr. Acosta.    Yes, I do.

15   Mr. ███████.    Exhibits may be entered into the record.    Majority exhibits will be identified

16   numerically; minority exhibits will be identified alphabetically.

17   We want you to answer our questions in the most complete and truthful manner possible, so

18   we will take our time.    If you have any questions or do not fully understand the question, please let

19   us know.    We will attempt to clarify, add context to, or rephrase our questions.

20   If we ask about specific conversations or events in the past and you are unable to recall the

21   exact words or details, you should testify to the substance of those conversations or events to the

22   best of your recollection.    If you recall only a part of a conversation or event, you should give us

23   your best recollection of those events or parts of conversations that you do recall.

24   Do you understand?

25   Mr. Acosta.    Yes, I do.

Provided to Jordan A. Esteban, Neiman Mays Floch & Almeida, PLLC on 9/24/2025



1    Let me add, because it was so long ago and because there have been so many reports along

2    the line, sometimes my recollection merges with what I've read, and I will try to distinguish.

3    Mr. ■■■■ Thank you.

4    You are required by law to answer questions from Congress truthfully.   This also applies to

5    questions posed by congressional staff in this interview.

6    Do you understand?

7    Mr. Acosta.   Yes, I do.

8    Mr. ■■■■ If at any time you knowingly make false statements, you could be subject to

9    criminal prosecution, including but not limited to perjury.

10   Do you understand?

11   Mr. Acosta.   Yes, I do.

12   Mr. ■■■■ This includes both knowingly providing false testimony but also stating that

13   you do not recall or remember something when, in fact, you do.

14   Do you understand?

15   Mr. Acosta.   Yes, I do.

16   Mr. ■■■■ Furthermore, you cannot tell half-truths or exclude information necessary to

17   make statements accurate.   You are required to provide all information that would make your

18   response truthful.   A deliberate failure to disclose information can constitute a false statement.

19   Do you understand?

20   Mr. Acosta.   Yes, I do.

21   Mr. ■■■■ Is there any reason you are unable to provide truthful testimony in today's

22   interview?

23   Mr. Acosta.   There is not.

24   Mr. ■■■■ Please note that if you wish to assert a privilege over any statement today,

25   that assertion must comply with the Rules of the Committee on Oversight and Government Reform.

Provided to Jordan A. Esteban, Neiman Mays Flich & Almeida, PLLC on 9/24/2025

1    Pursuant to that, Committee rule 16(c)(1) states, "For the Chair to consider assertions of

2    privilege over testimony or statements, witnesses or entities must clearly state the specific privilege

3    being asserted and the reason for the assertion on or before the scheduled date of testimony or

4    appearance."

5    Do you understand?

6    Mr. Acosta.   Yes, I do.

7    Mr. ███.   Ordinarily, we take a 5-minute break at the end of each hour of questioning,

8    but if you need a longer break or a break before that, please let us know, and we will be happy to

9    accommodate.

10    However, to the extent that there is a pending question, we would ask that you finish

11    answering the question before we take the break.

12    Do you understand?

13    Mr. Acosta.   Yes, I do.

14    Mr. ███.   Do you have any questions before we begin?

15    Mr. Acosta.   Not at this time.

16    Mr. ███.   Will Mr. Krishnamoorthi please identify himself?

17    Mr. Krishnamoorthi.   Hello.   I'm Congressman Raja Krishnamoorthi from Illinois.

18    Mr. ███.   Thank you.

19    The time reads 10:05, and we will begin our hour now.

20                                    EXAMINATION

21    BY MR. ███:

22    Q    Thank you again for being here voluntarily, and we appreciate your testimony.

23    I want to start briefly with your background and a couple questions surrounding that.

24    Where did you attend undergrad, and what year did you graduate?

25    A    I attended Harvard College, and I graduated in 1990.

Provided to Jordan A. Esteban, Neiman Mays Floch & Almeida, PLLC on 9/24/2025

1    Q    What was your degree in?

2    A    Economics.

3    Q    And then you went to Harvard for law school.    Is that correct?

4    A    That is correct.

5    Q    In what year did you graduate?

6    A    '94, I believe.

7    Q    While in law school, did you ever have Mr. Dershowitz as a professor?

8    A    I did not.

9    Q    He taught at Harvard during your time there —

10   A    He did teach at Harvard during my time.

11   Q    — but did not teach you directly.

12   A    He did not teach me directly.

13   Q    Did you ever have any interactions with Mr. Dershowitz while in law school?

14   A    Not that I recall.    I may have, but I don't recall them if I did.

15   Q    And, then, did you have any interactions with Mr. Dershowitz prior to him being

16   retained by Mr. Epstein?

17   A    Not that I recall.

18   Q    After law school — I believe right after law school, you became an associate at Kirkland &

19   Ellis.    Is that correct?

20   A    That is incorrect.

21   Q    Okay.

22   A    I clerked for a year.

23   Q    Who did you clerk for?

24   A    Sam Alito, then in the Third Circuit.

25   Q    And then went to Kirkland & Ellis?

Provided to Jordan A. Esteban, Neiman Mays Floch & Almeida, PLLC on 9/24/2025

1       A       And then I went to Kirkland & Ellis.

2       Q       Did you ever work directly for Jay Lefkowitz while there?

3       A       I don't recall if I worked directly for Mr. Lefkowitz.    I did work directly for Mr. Starr in

4       one case.

5       Q       Did you ever have any interactions with Mr. Lefkowitz while at Kirkland & Ellis?

6       A       I did.

7       Q       What were the nature of those interactions?

8       A       He was a partner; I was an associate.    Relatively small office back then.    You – known

9       in terms of partners.

10      Q       All right.    But he was never, like, your supervising partner on a case or anything?

11      A       Not that I recall.    At some point, I may have had a small assignment that I don't recall

12      for him, but I don't recall him being a supervising partner on a case.    I don't -- he was not my

13      mentor.    I don't recall any of those.

14      Q       All right.

15              You then proceeded to serve multiple government positions, beginning with the Principal

16      Deputy Assistant Attorney General in the Civil Rights Division.    Is that correct?

17      A       In between that, I spent some years at the Ethics and Public Policy Center and some

18      time teaching at George Mason.

19      Q       And then after Civil Rights Division, went to the National Labor Relations Board?

20      A       That's correct.

21      Q       And then came back to be the Assistant Attorney General in the Civil Rights Division?

22      A       That is correct.

23      Q       By that point, had you ever tried a criminal case?

24      A       I had not.

25      Q       And then you were appointed to be the U.S. attorney for the Southern District of

Provided to Jordan A. Esteban, Neiman Mays Floch & Almeida, PLLC on 9/24/2025

1     Florida?

2          A     That is correct.

3          Q     Do you recall about when you were appointed?

4          A     Early in the second term of President Bush's Presidency.

5          Q     2005, 2006, something like that?

6          A     2005 --

7          Q     Okay.

8          A     -- at some point.     It could be 2006, but I believe it was 2005, middle or late 2005.

9          Q     And when did you leave that post?

10         A     I believe it would have been summer of 2009.

11         Q     And then in 2017 you were appointed as United States Secretary of Labor?

12         A     That is correct.

13         Q     And subsequently resigned from this position in summer of 2019?

14         A     That is correct.

15         Q     Did you resign over the Epstein case?

16         A     I chose to resign because of concern that the Epstein case would distract from what I

17    was doing as Secretary of Labor.

18         Q     Were you instructed to resign?

19         A     I was not instructed to resign.

20         Q     Have you ever met Mr. Epstein?

21         A     I have not met Mr. Epstein.

22               Can I go back 1 minute?

23         Q     Yes.

24         A     I was neither instructed to resign, it wasn't suggested that I resign.     It was entirely my

25    choice, my decision.

Provided to Jordan A. Esteban, Neiman Mays Floch & Almeida, PLLC on 9/24/2025



1     I remember calling a little bit after breakfast, asking to speak to the President, seeing him, and

2     then telling him that I thought it would be best for his administration if I stepped aside.

3          A trial at that point was pending.   And I come from the school that these jobs are

4     temporary -- you step into them; you leave -- and if you become a distraction, it's time to go.   So it

5     was entirely my choice.

6     Q     And your resignation was post-arrest but pre-death-while-in-custody, correct?

7     A     That is correct.

8     Q     Have you ever met Ghislaine Maxwell?

9     A     I have not.

10          Did I answer the question about meeting Mr. Epstein?   I don't remember.

11    Q     Yes.   You said no, I believe.

12    A     I have not met Mr. Epstein.   I have never met -- is it "Giss-lane" or --

13    Q     Ghislaine.

14    A     -- Ghislaine Maxwell.

15    Q     Do you recall if anyone in your U.S. Attorney's Office met with Mr. Epstein?

16    A     Not to my knowledge.

17    Q     What about with Ms. Maxwell?

18    A     Not to my knowledge.

19    Q     And throughout this, I'm going to say "U.S. Attorney's Office."   We'll just say I'm

20    referencing the Southern District of Florida.

21    A     Yeah, no, I understood that.

22    Q     Okay.   Perfect.

23         Have you ever met Sarah Kellen?

24    A     Not to my knowledge.

25    Q     Do you recall if anyone in the U.S. Attorney's Office met with her?

Provided to Jordan A. Esteban, Neiman Mays Floch & Almeida, PLLC on 9/24/2025



1       A       I wouldn't -- I wouldn't have that information.    It's possible one of our trial attorneys

2    did, but I would not know.

3       Q       What about, have you ever met Nadia Marcinkova?

4       A       I have not.

5       Q       And same question.    Do you recall if anyone in your office met with --

6       A       I'm sorry.    Can I back up?    There was --

7       Q       Yeah.

8       A       There was a woman that we considered a victim but the State attorney did not

9    necessarily consider a victim, and that's -- that was my pause.    I don't know if at some point -- I

10   don't know if that was Ms. Kellen or someone else.    I don't know if at some point one of her trial

11   team or a case agent or someone met with that person.

12      Q       Uh-huh.

13      A       I can't speak to that.    I did not meet with her.

14      Q       Okay.    Then I'll re-ask the -- to the best of your recollection, did anyone in your office

15   meet with Ms. Marcinkova?

16      A       Not that I'm aware of.    But, again --

17      Q       But she could've been one of the people that your office characterized as a victim, the

18   State's -- didn't.

19      A       There was some subgroup of victims that we thought -- we characterized as a victim, the

20   State's Attorney's Office did not, based on my recollection or based on what I've read.    I don't know

21   if those individuals were interviewed or not by my attorneys.    I simply can't speak to it.

22      Q       Okay.

23   I've got two more, and --

24      A       Sure.

25      Q       -- if it's the same answer, it's the same answer.

Provided to Jordan A. Esteban, Neiman Mays Floch & Almeida, PLLC on 9/24/2025

1    Did you ever personally meet with Lesley Groff?

2    A    Same answer.

3    Q    And same answer for anyone in your office?

4    A    The same answer, yes.

5    Q    And then personally meet with Adriana Ross?

6    A    Same answer --

7    Q    And --

8    A    -- on both.

9    Q    On both.    Thank you.

10    Just kind of, like, laying the foundation for what the U.S. attorney's job is versus what the

11    office does overall, in general or in your experience in the Southern District of Florida, are you made

12    aware of every Federal criminal investigation going on in the district?

13    A    Certainly not.

14    The Southern District of Florida, depending how it's measured, one of the three or four

15    largest, depending if you're measuring it by caseload, by number of assistant United States attorneys.

16    We have several hundred.   We, you know, while I was U.S. attorney, had the most active caseload

17    in terms of going to trials in the country.

18    And so, as U.S. attorney, my focus was much more at the policy level than at the

19    managing-a-particular-case level.

20    Q    And, then, what sorts of cases would raise to your level?

21    A    Issues that involved policy, issues that were particularly high-profile, issues where there

22    was some type of dispute among AUSAs or among my supervisory staff.

23    Q    Can -- I'll let him sit.   I'll ask a followup question, and then I'll move to him.

24    Can you explain what an issue involving policy would be?   I can guess on the "high-profile"

25    and "dispute," but what would be a policy issue?

Provided to Jordan A. Esteban, Neiman Mays Floch & Almeida, PLLC on 9/24/2025

1       A      An issue that would -- that would affect an interpretation of law.   An issue where it

2    might be a novel approach.   An issue where there might be an emphasis coming from Main Justice

3    in Washington, D.C., where they wanted us to focus on that particular issue, and then the question is,

4    how do we focus on that issue?

5       Q      All right.

6       Mr. ▇▇▇▇.   Mr. Lynch, would you mind identifying yourself for the record?

7       Mr. Lynch.   Congressman Steve Lynch, Eighth Congressional District of Massachusetts and

8    member of the Oversight Committee.

9       Mr. ▇▇▇▇.   Thank you, sir.

10      Mr. Lynch.   Thank you.

11           BY MR. ▇▇▇▇:

12      Q      You brought up issues that Main Justice might have more of a focus on advancing -- like,

13   prioritizing.   Would a line AUSA be able to communicate with D.C. on a case, or would they need to

14   go through a supervisor or through you?

15      A      I think that would depend on the case and the issues.   There are several cases where

16   line AUSAs were talking with Washington because it was their issues and they had back-and-forth

17   with Criminal Division on a regular basis.

18           I would characterize the Southern District of Florida as much more -- much more permissive

19   of communications with Main Justice, as opposed to Main Justice might want more control between

20   communications between divisions.

21      Q      And, then, what was the -- did the -- was the Epstein case high-profile, that it came

22   across your desk prior to the non-prosecution agreement?

23      A      So I have no recollection that it came across my desk prior to that.

24           I have read in the OPR report -- and I have no reason to discredit what the OPR report

25   said -- that the prosecuting AUSA briefed the first assistant and myself on the case early on when the

Provided to Jordan A. Esteban, Neiman Mays Floch & Almeida, PLLC on 9/24/2025

1    decision -- the Palm Beach Police were very upset about what the State attorney had done.

2        The State attorney was charging -- the police wanted the State attorney to charge felony

3    counts that would've resulted in imprisonment.   The State attorney looked at the facts, didn't think

4    that the facts justified the counts the police wanted; offered initially, I believe, an offer that would've

5    resulted in probation.   I believe Mr. Epstein rejected that offer.

6        The State attorney then decided to take it to a grand jury to let the people of Palm Beach, in

7    essence, decide and presented all the charges, from the highest to the lowest, to the grand jury.

8    The grand jury returned a charge that would've required the State equivalent of pre-trial diversion,

9    not even probation, I believe.   And so the police then came to us.

10       Somewhere around that point, my understanding is that the first assistant -- then-Criminal

11   chief and I were briefed.   I don't recall.   I don't know.   I suspect it was a very brief heads-up.

12       Q    Generally, how would you -- putting aside the Epstein case, but generally, how would

13   you monitor high-profile cases?

14       A    I had an excellent management staff.   My first assistant had been the Criminal chief

15   before that, had been an executive in the Fort Lauderdale office before that.   I had a Criminal chief

16   that had been the head of Major Crimes.   And in the Palm Beach case, we had a managing attorney,

17   a managing AUSA, that before that had been the acting head of Public Integrity at one point and had

18   been an AUSA for any number of years.

19       And so, typically, I would sit down with my management staff and we'd talk about the

20   high-profile cases that were pending, we'd talk about what I needed to focus on, and they would

21   bring the issues to me that they thought were pertinent.

22       Q    Do you recall who the team was handling the Epstein case at the time?

23       A    So, when it first came into the office -- again, I don't recall when it first came into the

24   office.   The prosecuting attorney, according to OPR, briefed the then-Criminal chief/subsequent first

25   assistant and myself.   And then there's not a lot of communication for several months.

Provided to Jordan A. Esteban, Neiman Mays Floch & Almeida, PLLC on 9/24/2025

1        Her chain of command would've been a deputy chief in Palm Beach that, based on the OPR

2   report, wasn't heavily involved.    I don't know why.

3        The managing attorney in Palm Beach County, then the Criminal chief and then the first

4   assistant.

5      Q   All right.

6   Did your office have a sex crime division?

7      A   We did not have a sex crime division per se, no.

8      Q   "Per se"?    What does --

9      A   We had some individuals that specialized or chose to do those types of cases.

10     Q   Do you recall anyone recommending to you more involvement in the Epstein matter?

11     A   It was 20 years ago.    I do not.

12     Q   Okay.    Do you recall any direct interaction between yourself and Main Justice in D.C.

13  regarding the Epstein matter?

14     A   I can either answer that or you can rephrase it by time periods, because it varied heavily

15  over time.

16     Q   In -- we'll start in --

17     A   Would you like me to try?

18     Q   Well, I'll go, like, year by year, because I imagine it -- but our understanding is that the

19  case originally came to the U.S. Attorney's Office in 2006.    Do you recall any conversations with

20  Main Justice at the onset of the FBI and U.S. attorney case?

21     A   I do not.

22     Q   And then the non-prosecution agreement was being negotiated and signed in mid- to

23  late 2007.    Do you recall any conversations with D.C. around then?

24     A   Yes, there would have been some.    And I can try to break that down if you'd like.

25     Q   Yeah.

Provided to Jordan A. Esteban, Neiman Mays Floch & Almeida, PLLC on 9/24/2025

1          A        So, to my knowledge or at least to my recollection, the first communications with D.C.

2    took place after -- so -- and I'm sure we'll talk about this.    I'll put it to one side for now.

3          But after we had told defense counsel that we were proceeding with a requirement of 2 years

4    imprisonment, registration, and a right for victims to recover monetary damages, also known as

5    restitution, we made a decision and I approved that decision that we — you know, the State attorney

6    had let him off entirely.    That was just wrong.    And we wanted imprisonment, registration, and

7    restitution.

8          At that point, perhaps a week or some number of days later, counsel came in.    Mr. Epstein

9    hired -- let's just call him "Epstein."    Epstein hired additional counsel.    I thought at that point that

10   the case would be appealed to Washington.

11         I communicated with my first assistant that they wanted a meeting, we should give them the

12   meeting, because I didn't want the case to just jump to Washington because I refused to hear them

13   out.    And so we granted the meeting.

14         At that time, at my request, the head of the Criminal Division's Child Exploitation and

15   Obscenity Section, called "CEOS," Drew Oster--- Oosterbaan?

16         Q        That sounds right.

17         A        I asked my first assistant to invite him down so that he became aware of the case, so

18   that he became aware of how we were approaching the case, and so that he would be present when

19   we heard defense pushback.    Because I just had a suspicion that it would end up in Washington, and

20   I thought it better to give them process in south Florida so that they can't say that we didn't give

21   them a hearing and didn't give them their due.

22         He, in fact, did come down.    We had that meeting.    He was present for the meeting.

23         I heard out defense counsel.    I rejected -- they wanted us to drop the case.    Their theory

24   was that it was a local case, that it was not a Federal case, because at the time we didn't have

25   evidence that he traveled with any victims, we didn't have evidence that -- and maybe we'll talk

Provided to Jordan A. Esteban, Neiman Mays Floch & Almeida, PLLC on 9/24/2025

1    about this, but -- we didn't have evidence that there were other individuals involved, we didn't have

2    evidence that he traveled interstate or internationally with any victims.

3          And so they wanted us to drop it.   I said no.   They wanted us to do something similar to the

4    State.   I said, no, we're going to stick to our guns, we're going to stick to our initial offer and go and

5    negotiate.

6         Q    You said that Epstein hired more counsel.   Was that when he brought in Dershowitz,

7    Lefkowitz, and Starr?

8         A    I don't know when he brought in Dershowitz, but that's when he brought in Lefkowitz

9    and Starr.

10        Q    All right.   And was that the concern, that they were -- I mean, both of them had

11    worked in White Houses before.   Was that the concern, that they would elevate straight to D.C.

12    because of who they are?

13        A    Yes.   I mean, they -- I mean, Dershowitz, you know, we can put to one side, but, you

14    know, Lefkowitz was a Washington lawyer, Starr was a Washington lawyer.

15         And, you know, I recall very clearly going to my first assistant and saying, "Epstein just hired

16    these folks.   It's going to go to Washington.   So let's give them -- they want a meeting.   Let's give

17    them the process down here to try to head it off going to Washington."

18        Q    And, then, just -- who was your first assistant in your office?

19        A    So, at that time, that was Mr. Sloman.

20        Q    Okay.

21        A    He was previously Criminal chief.   At some point in this process, that shifted.   I

22    believe at that time he was first assistant.   But when we were first notified, I believe he was

23    Criminal chief.

24        Q    All right.

25         And, then, what's, kind of -- you said the phrase "appeal to Washington."   What's, kind of,

Provided to Jordan A. Esteban, Neiman Mays Floch & Almeida, PLLC on 9/24/2025

1    the process for -- you made an offer to Epstein's counsel.    How would they appeal to Washington?

2    A    So, at the time, one of the major questions in the case was, is this a Federal case or is it

3    a local case?

4    Again -- and, you know, we'll, I'm sure, talk about the evidence at some point, but -- our

5    evidence was that there were no other individuals involved, that there was no travel involved, that

6    the victims went to his home.    What happened -- and unless we really need to, let's not get into the

7    details -- what happened happened in his home, and they left.    And some of the victims didn't come

8    back.    Other victims came back on other days, and the same thing happened.    And other victims

9    suggested to their friends that they come back, and those things happened.

10    But it was all within Palm Beach County.    It was all local.    And one of the issues was, where

11    is the Federal connection?    Where is the interstate travel?

12    I have a vague recollection, but the OPR report talks about it with sufficient detail that I think

13    my recollection is refreshed -- I'm not using that as a technical term, so don't take that --

14    Q    Yeah.

15    A    -- what it means technically -- that one of the theories was whether or not we can say

16    that he traveled for the purpose of engaging in these acts with these victims.    And, at the time, the

17    question of law was whether travel needs -- whether purpose simply needs to be a purpose or the

18    dominant purpose or a predominant purpose or something along those lines.

19    And so those were the kinds of policy questions that I would typically talk about and, also, the

20    kinds of policy questions that I could see being appealed through the entire, you know -- and I think

21    it's difficult today to put ourselves back in 2006, because federalism was viewed very differently in

22    2006 than it is today.    Congress was having major debates about federalization of crime; Congress

23    was having major debates about whether Department of Justice is impinging on local authority.

24    And, as a result, those are the sorts of debates -- was this a local crime or a Federal crime -- that I

25    could see being appealed to Washington.

Provided to Jordan A. Esteban, Neiman Mays Floch & Almeida, PLLC on 9/24/2025

1    Q    And that would be, as much as you know or remember, the vague hypothetical of

2    defense counsel would call someone, and in this case in the Criminal Division, and be like, "I need a

3    ruling on whether or not the Southern District for Florida is interpreting the law correctly,"

4    something along those lines?

5    A    Yes.    Or -- or -- I mean, ultimately, the U.S. attorney works for the Department of

6    Justice, and Department of Justice in entirely, you know, authorized and in their right mind to

7    overrule a U.S. attorney or say that this isn't appropriate, and that's their prerogative.

8    Q    Thank you.

9    I want to -- I'm going to go ahead and introduce it as exhibit 1.

10                        [Acosta Majority Exhibit No. 1

11                        was marked for identification.]

12                BY MR. ▮▮▮▮▮ :

13    Q    It's being passed around.    It's marked as exhibit 68 because it's pulled from civil

14    litigation, but it's exhibit 1 for our purposes.

15    A    Okay.

16    Q    It's a letter that you wrote just to "whom it may concern" in 2011.

17    A    Yes.

18    Q    Do you recall writing this letter?

19    A    I do.

20    Q    What was the purpose of this letter?

21    A    So, at the time, I believe there was some media concerning this and some criticism of

22    the office, and I thought it important to -- I didn't want to engage with multiple reporters.    I

23    just -- that's not my style.    And so I thought the best approach was to just write an open letter

24    defending the office and what it did.

25    Q    And how did you publish it or disseminate it?

Provided to Jordan A. Esteban, Neiman Mays Flach & Almeida, PLLC on 9/24/2025

1          A     I provided it to one of the reporters that was engaged in the story.

2          Q     Do you recall who?

3          A     I believe it was one of the reporters at The Daily Beast, I believe.

4          Q     We're going to go through a little bit of this because I actually think it kind of lays the

5     foundation nicely for going into more detail later.

6          A     Uh-huh.

7          Q     But I want to go ahead and flip to page -- I don't know who did the Bates marks,

8     but -- 1796.   It's the second page.

9          A     Yes.

10         Q     In the second-to-the-last paragraph, about midway through, there's a sentence that

11     begins, "Our judgment."

12         A     "Our judgment," yes.

13         Q     Yeah.   I'll read it.

14              "Our judgment in this case, based on the evidence known at the time, was that it was better

15     to have a billionaire serve time in jail, register as a sex offender and pay his victims restitution than

16     risk a trial with a reduced likelihood of success.   I supported that judgment then, and based on the

17     state of the law as it then stood and the evidence known at that time, I would support that judgment

18     again."

19              Do you -- we're now another 14 years ahead of this.   Do you still support that judgment?

20         A     So I think something that has -- there are a few parts to this, and we can break it down.

21              One question is, go to trial Federal versus State, and we'll talk about that, because I do think

22     there were some issues on the State resolution that we did not foresee that became an issue.

23              I think, today, there's also -- the public wants trials more than it did back then, in some ways.

24     There's a greater desire for, "Just go for it."   And as U.S. attorney, I think you've got to be in touch

25     with public desire.

Provided to Jordan A. Esteban, Neiman Mays Floch & Almeida, PLLC on 9/24/2025

1          All that said, myself, the prosecuting attorney, the managing attorney of the Palm Beach

2    office, the Criminal chief, and the first assistant all favored a pre-trial resolution.    It was

3    across-the-board.

4          If I may --

5    Q      Uh-huh.

6    A      -- I've got a statement.    This is the prosecuting attorney who was likely the most

7    pro-prosecution.    The higher up you went in the management chain, as a general rule, the more

8    concern there was about the evidence.

9    Q      Was that Ms. Villafana?

10   A      Yes, it was.

11   Q      Okay.

12   A      But this is her giving a sworn declaration in this -- I think it was the civil case.    I can't be

13   certain.

14         "Some have alleged that Epstein would easily have been convicted and that all victims were

15   eager to participate in a full-fledged Federal prosecution.    As the prosecutor who handled the

16   investigation, I can say that these contentions overlook the facts that existed at the time.    We

17   would meet with victims, we would ask them how they wanted the case to be resolved, and most of

18   them wanted it to be resolved via a plea.    Some of them wanted him not to be prosecuted at all.

19   Most of them did not want to have to come to court to testify."

20         And she goes on to say how she favored a negotiated resolution and it was her understanding

21   that the office did as well.

22         And so we had, a little bit later in the case, an attorney from CEOS, the Child Exploitation and

23   Obscenity Section, from Washington come down and look at the case.    And this attorney went

24   through the entire file.    She specialized in these types of cases, and she went through the entire file.

25   And she looked at it and said that there were serious evidentiary issues and, while the evidentiary

Provided to Jordan A. Esteban, Neiman Mays Floch & Almeida, PLLC on 9/24/2025

1    issues were not insurmountable -- and these are her words -- going to trial would be a,

2    quote/unquote, "crapshoot."

3           And so our thinking at the time was, you know, the State attorney is letting him get away with

4    this.   The State attorney is asking pre-trial diversion.   Unacceptable.   Entirely unacceptable.   But

5    a billionaire going to jail sends a strong signal to the community that this is not acceptable, that this is

6    not right, that this cannot happen.

7           His registering as a sex offender puts the world on notice -- whether the world listened or not

8    we can put to one side, but it puts the world on notice that he was an offender and a sexual

9    offender.

10          And, on top of that, we included a means for the victims to recover monetary damages, not

11   because we thought that it makes them whole, but because we wanted a mechanism for them to at

12   least try to restart their lives.

13          And, at the end of the day, it was our judgment that -- and my judgment that the signal this

14   would send to the community was an important signal.   On the other hand, if we go to trial and we

15   roll the dice and we do the crapshoot and we lose, what kind of signal does that send?   That says

16   that he got away with it, that you can do that more.   And so we thought it was very, very important

17   to send that signal, and that's why -- that's one reason we favored the negotiated plea.

18          I think less so in my mind but perhaps more so in the minds of others was concerns about the

19   victims.   If you look at the similar declaration from the case agent, the case agent on this case, in a

20   similar declaration -- and I'll tell you what she wrote.

21          This is the case agent, also sworn testimony -- or sworn statement.

22          "Many of the victims were troubled about the existence of the investigation.   Some victims

23   who were identified through the investigation refused even to speak to us.   During the interviews

24   conducted from 2006 to 2008, no victim expressed a strong opinion that Epstein be prosecuted."

25          That's OPR 2000-1 -- I'm sorry — 200-1.

Provided to Jordan A. Esteban, Neiman Mays Floch & Almeida, PLLC on 9/24/2025

1       And so in part it was influenced by that, and in large part it was also influenced by the viability

2   of the case.    Every attorney that looked at the case, from the prosecuting attorney, again, through

3   the entire chain, looked at the evidence, and there were evidentiary issues with the victims.

4       Many victims refused to testify.    Many victims had changing stories.    All of us understood

5   why they had changing stories, but they did.    And defense counsel would have -- cross-examination

6   would have been withering.

7       Many of them had issues in their background.    They had MySpace pages; they had priors

8   that would've been used against them by defense counsel.    And that was a time when, in all candor,

9   defense could be much, much tougher on victims on the stand.

10      And then, finally, I think another factor that went into it in 2006 that's very different than

11  today is -- and I think it's really -- it's almost impossible for us to understand fully how different the

12  community viewed these crimes.

13      The best way I have of explaining that:    After the OPR report came out, I read what the State

14  attorney told the Office of Professional Responsibility.    And I want to read that, because I think this

15  is evidence of what some of the community thought.    Because this is what the State's Attorney's

16  Office thought --

17      Q    And just for the record, I just want to be clear.    The statements you're reading are from

18  the OPR report?

19      A    From the OPR report, quoting the State attorney.

20      Q    Yeah.

21      A    And so the OPR report, on page 15:    "Meanwhile, the State Attorney's Office took the

22  unusual step of preparing to present the case to a grand jury.    Krischer," who was then the State

23  attorney, "told OPR that under state law as it existed until changed," not in 2010 or whenever -- this

24  is my interjection --

25      Q    Uh-huh.

Provided to Jordan A. Esteban, Neiman Mays Floch & Almeida, PLLC on 9/24/2025

1          A    -- but in 2016 -- "as it existed" --

2          Mr. Neiman.    2007.

3          Mr. Acosta.    -- "as it existed until changed in 2016" -- right? -- 10 years after this case -- "his

4    office prosecuted minors as young as 14 for" those actions.

5          "The possibility that Epstein's victims themselves could have been prosecuted caused 'great

6    consternation within the office'" -- his words, caused "great consternation within [his] office" -- "and

7    according to Krischer, resulted in the decision to put the case before the grand jury."

8          "Belohlavek," his lead attorney, "told OPR that her office took the allegations against Epstein

9    'seriously, because...it was an organized scheme to involve young girls by offering them money.'"

10          "However, she said, although Epstein's 'behavior was reprehensible...I'm limited by...the state

11    statutes as to what I can charge.    There were so many issues involving the victim-witnesses that, to

12    my mind, in consultation with [the prosecutors]'" -- and she goes on to say that there was an element

13    of solicitation.

14          And so I want to be crystal-crystal-clear, lest I be taken out of context or lest I be clipped on

15    this:    No one in our office ever thought that the victims were anything less than victims.    No one

16    thought that they were -- you know, the idea that they were involved as anything other than victims

17    did not cross the mind of a soul.

18          But the fact that the State's Attorney's Office had, quote/unquote, "great consternation"

19    because they prosecuted women in these situations at the time does reflect at least how some

20    people in the Palm Beach community thought and does reflect to some degree at least what some

21    jurors would think and does reflect at least to some degree some of the issues that we would have

22    faced with victims that had quite a bit of impeachment evidence.

23          And, ultimately, the trial was a crapshoot, and we just wanted the guy to go to jail.

24          BY MR. ████ :

25          Q    No.    Thank you for all that.    Appreciate all the context that doesn't come across in the

Provided to Jordan A. Esteban, Neiman Mays Floch & Almeida, PLLC on 9/24/2025

1    letter and doesn't always come across in everything else.

2        I have a couple questions on what you said.

3        So, in the 2006-to-2008 timeframe, from when Palm Beach PD handed it over to the FBI to

4    the non-prosecution agreement, your office did interview victims?

5        A    Based on what I have read, the office did.   I believe the office did.   I did not direct the

6    investigation, so I can't personally speak to it, but I believe the office did.

7        Q    And some of the evidentiary concerns would be, the victim wouldn't be able to go

8    on -- didn't want to or wouldn't be able to go on the stand to back up their statement, but also that

9    some of their statements contradicted each other or contradicted themselves.   Is that a fair

10   summary?

11       A    Some refused to talk whatsoever.   Others said he did nothing wrong and that we were

12   just wrong.   And, again, we knew that he had, but if someone tells the FBI he did nothing wrong,

13   that's the evidence you have, right?

14       Q    Uh-huh.

15       A    Some changed their story.   Some had MySpace pages that would've been used on

16   impeachment.   Some had priors.

17       And so -- you know, this isn't my opinion.   This is the opinion of every, you know -- every

18   individual in the office that looked at the case.

19       This is the managing -- the Palm Beach managing attorney:   "Everybody at the U.S.

20   Attorney's Office working on the matter had expressed concerns at various times about the

21   long-term viability of a federal prosecution of Epstein due to factual and legal hurdles, as well as

22   issues with the cooperation and desire of the victims."

23       And so every person that looked at the case had serious and substantial concerns about how

24   the victims would -- I believe my first assistant described it as "withering impeachment" by the

25   defense.

Provided to Jordan A. Esteban, Neiman Mays Floch & Almeida, PLLC on 9/24/2025

1      Q      You've mentioned, kind of, the lack of evidence beyond victim statements.     I believe

2    the Palm Beach PD -- or it might've been the FBI -- got, you know, like, message pads out of Epstein's

3    home and a couple other items of evidence, but after the Palm Beach PD executed their search

4    warrant on his house, they described it as being cleaned up.

5          Do you recall any of that?

6      A      I don't.

7      Q      Um --

8      A      My recollection is based on the opinions given to me -- so, as U.S. attorney, my

9    background, when I was litigating, I was an appellate lawyer.     And my approach was, "I am the legal

10   issues guy; I'm the policy guy."     The Miami office is known as one of the best trial offices in the

11   country.     We have a lot of great trial lawyers.     I trust their judgment on this.     And I still trust their

12   judgment on this, because they have been doing this for years.     My Criminal chief at the time,

13   Mr. Menchel, had done sex crimes cases before.

14          And so, on those matters, I would look to them for their judgment, but, based on what I

15   know, I think their judgments were valid.

16     Q      Were there ever any discussions about a lack of digital evidence, a lack of computer

17   hard drives or videos or photos or anything like that?

18     A      I don't recall discussions with that degree of granularity.     I believe the discussions

19   would have been, "We've looked at the evidence.     There are a lot of issues going to trial."

20     Q      I want to come back to the letter itself.     And I'm going to try to work down the letter.

21     A      Yes.

22     Q      The third paragraph on the first page, you discuss how "local police were dissatisfied"

23   and then talk about how a case can become a Federal criminal prosecution -- an "interstate nexus"

24   and then as a "back-stop" to State authorities.

25     A      Yes.

Provided to Jordan A. Esteban, Neiman Mays Floch & Almeida, PLLC on 9/24/2025

1    Q    Do you recall your team ever uncovering potential witnesses in New York?

2    A    I do not.

3    Q    Do you recall reading it since?

4    A    Yes, I have read it since.    Well, let me be clear.    I have not read that my team

5    discovered witnesses in New York since.    I have read that there are witnesses in New York.

6    Q    Okay.

7    Do you recall if your office ever got flight logs of Epstein's private jet?

8    A    I can't speak to what evidence we had or didn't have.

9    Q    Is that because you don't remember the evidence or --

10    A    I -- I don't -- I don't remember the evidence with granularity.

11    Q    At the time, was your office aware that Epstein had houses in New York, New Mexico,

12    and an island in the Virgin Islands?

13    A    We are aware that he had multiple house.    I don't know -- I assume they would've

14    known exactly where those were.    I don't know if that was all his houses or what.    But, as a

15    general matter, yes.    How's that?

16    Q    And then you had mentioned that one of the legal issues was, kind of -- was there, to

17    create a Federal nexus, was there a purpose of traveling across State lines or internationally to

18    commit the crime, and then what, kind of, like, amount of purpose the crime had to be.    Is that --

19    A    That's --

20    Q    -- a good layman's explanation?

21    A    That is a good layman's explanation.

22    And here's why this is important, to my mind.

23    If -- I don't recall; it was 20 years ago.    But if there had been clear evidence that he traveled

24    from Florida to New York with a minor victim in order to engage in sexual activity in New York, then

25    we wouldn't have had debate after debate after debate about the degree of purpose on an entirely

Provided to Jordan A. Esteban, Neiman Mays Floch & Almeida, PLLC on 9/24/2025

1    different statute that involves traveling from one place to another by yourself in order to engage in

2    sexual activity at that second location.    And so those discussions would not have happened if we

3    had evidence of clear interstate travel.

4         And so, while I don't have a clear recollection from 20 years ago, it follows that, given all

5    those discussions, we didn't have evidence of interstate travel.

6         Q    So is there, then --

7         A    Interstate travel for purposes of sex.

8         Q    Yeah.

9         A    Yes.

10        Q    So this is kind of a crude question, but is there a difference -- and correct me if I'm

11   wrong; this is how I understood what you just said -- a difference in traveling with the minor to a

12   second location for the purposes of nefarious activity versus traveling alone to the second location to

13   meet someone for the purposes of nefarious activity?

14        A    Absolutely.

15        Q    Okay.

16        A    Traveling with the minor across State lines makes it a Federal case.    But traveling from

17   State one to State two in order to engage in activity with a person at State two, then that -- that's the

18   conversations that we had.    And those conversations would not have happened if we had clear

19   evidence of the first.

20        Q    Okay.

21        So would that -- the second instance, traveling to a second location for the purposes of

22   engaging in nefarious activity, that's the conversation of whether or not it is now a Florida, New

23   Mexico -- like, Florida case, New Mexico case, New York case, versus lumping it all together?

24        A    I don't understand.    I'm not with you.

25        Q    So I'll be more specific.    The first, kind of, known tip is from Marie and Annie Farmer in

Provided to Jordan A. Esteban, Neiman Mays Floch & Almeida, PLLC on 9/24/2025

1    1997, Maria Farmer alleging that Epstein assaulted her in New York as a minor and Annie Farmer

2    alleging that Mr. Epstein assaulted her in New Mexico as a minor.

3         So my understanding of those allegations -- and I apologize if I get it wrong -- is that they were

4    flown to those locations, not with Epstein, but met Epstein there.

5         A    So I don't know those facts, and I can't discuss those facts.   I can discuss the facts

6    about south Florida, and I don't know to what degree our office was aware of that information.

7         Q    I'm sorry — never mind.   Okay.   That's helpful to know.   Because, like, when we hear

8    those tips, we sound -- it sounds to us like that's a clear interstate --

9         A    Right.

10        Q    — nexus, right?   Like, you've now got three States involved.   I don't know if it would

11   be a prosecution in New Mexico, a prosecution in New York, and a prosecution in Florida or —

12        A    Again, I can only speak to:   Our understanding was that this was a south Florida

13   matter, and there were multiple attorneys debating whether we had an interstate nexus, debates

14   which would not have taken place -- and OPR talks about those debates.   And OPR talks about, you

15   know, the legal issues.   I think, at one point, the managing attorney -- let me see if I can find this,

16   because it seems relevant.

17        I can't find it now.   But, at some point, the managing attorney for Palm Beach said that he

18   thought that the argument about whether or not travel to Florida for purposes of sex -- whether

19   we'd win or not was a closer call than our prosecuting attorney thought.

20        So there was a debate ongoing, and I don't see why we would've had that debate if we had

21   that schema.

22        And I think one of the important distinctions here is, from a 2025 perspective, this is a big

23   scheme.   This is an international --

24        Q    Uh-huh.

25        A    -- scheme.   There are other individuals involved, you know.

Provided to Jordan A. Esteban, Neiman Mays Floch & Almeida, PLLC on 9/24/2025

1        The way it's talked about in the media, the way, you know -- given what the victims say

2   now -- and those victims, let me just say, I thought they were confident, I thought they were

3   courageous.   I heard their statements, and, you know -- "wow" is enough, right?

4        But, you know, back then -- again, the words of our prosecuting attorney:   "None of the

5   victims that we ever spoke to" -- these are her words -- "ever talked about any other men being

6   involved in abusing them."   That's OPR 167.   We already talked about the travel.

7        And so, from our perspective, this was a local case, as I understood it.   They went to his

8   house; they left.   Some didn't come back.   Some did.   Some came back with others.   That's it.

9        Q     And so the interstate-nexus debate that you're having, just so that I'm clear, is, he would

10  travel from New York, Virgin Islands, Paris, New Mexico, wherever, to Florida for the purposes of

11  nefarious activity and whether or not that was sufficient enough to meet the Federal nexus.

12       A     Correct.   What --

13       Q     Okay.

14       A     -- our attorneys were trying to establish was whether we could say, because he knew

15  that these women were present in Palm Beach, that he would travel from New York or Paris or Virgin

16  Islands or the places that you mentioned to Palm Beach so that he could engage in what he engaged

17  in with these women, and whether or not that had to be the dominant or whether that simply had to

18  be a purpose.

19       Q     Okay.   Thank you.   Sorry that took a while.

20       A     It's --

21       Q     Trying to weed out all this web of stuff is --

22       A     Understood.   No, it's important.

23       Q     And then you had mentioned that the State's attorney was worried -- and these are my

24  words, so correct me if I'm wrong -- that it was a possibility, and that it had happened before, that

25  victims in these situations had been prosecuted for, I'm assuming, prostitution?

Provided to Jordan A. Esteban, Neiman Mays Floch & Almeida, PLLC on 9/24/2025

1        The way it's talked about in the media, the way, you know -- given what the victims say

2    now -- and those victims, let me just say, I thought they were confident, I thought they were

3    courageous.    I heard their statements, and, you know -- "wow" is enough, right?

4        But, you know, back then -- again, the words of our prosecuting attorney:    "None of the

5    victims that we ever spoke to" -- these are her words -- "ever talked about any other men being

6    involved in abusing them."    That's OPR 167.    We already talked about the travel.

7        And so, from our perspective, this was a local case, as I understood it.    They went to his

8    house; they left.    Some didn't come back.    Some did.    Some came back with others.    That's it.

9        Q    And so the interstate-nexus debate that you're having, just so that I'm clear, is, he would

10   travel from New York, Virgin Islands, Paris, New Mexico, wherever, to Florida for the purposes of

11   nefarious activity and whether or not that was sufficient enough to meet the Federal nexus.

12       A    Correct.    What --

13       Q    Okay.

14       A    -- our attorneys were trying to establish was whether we could say, because he knew

15   that these women were present in Palm Beach, that he would travel from New York or Paris or Virgin

16   Islands or the places that you mentioned to Palm Beach so that he could engage in what he engaged

17   in with these women, and whether or not that had to be the dominant or whether that simply had to

18   be a purpose.

19       Q    Okay.    Thank you.    Sorry that took a while.

20       A    It's --

21       Q    Trying to weed out all this web of stuff is --

22       A    Understood.    No, it's important.

23       Q    And then you had mentioned that the State's attorney was worried -- and these are my

24   words, so correct me if I'm wrong -- that it was a possibility, and that it had happened before, that

25   victims in these situations had been prosecuted for, I'm assuming, prostitution?

Provided to Jordan A. Esteban, Neiman Mays Floch & Almeida, PLLC on 9/24/2025

1      A    So those are his words.

2      Q    Yes.

3      A    And I read that in the OPR report.    No one told me that at the time.

4      Q    Okay.

5      A    What I understood at the time was that the State attorney had looked at the case, had

6   looked at the evidence, had evaluated how to proceed, and had decided that he didn't have evidence

7   to proceed with the charges the police wanted.    And so he offered a lesser charge; that would've

8   been probation.    Mr. Epstein turned that down.    And then he offered -- and then he's like, "Okay.

9   We'll take it to the grand jury.    We'll let the people of Palm Beach decide."

10     I have subsequently read that three victims were invited to testify to the grand jury.    Two of

11  the victims did not show.    Only one victim showed.    The grand jury heard from that victim.    The

12  grand jury made the decision to charge -- they had from the highest to the lowest, and that's what

13  the grand jury decided.

14     And something that I think is important to say:    The State attorney could have made the

15  charging decision.    He didn't have to go to the grand jury.    But he asked the people of Palm Beach,

16  what should we do?

17     And the only reason that's relevant, to my mind -- well, two reasons.    One, it's relevant

18  because he should -- I mean, he had to go to jail.    And early on in the case, when it was first -- when

19  Mr. Sloman and I were first briefed, the record shows and OPR discussed how the line attorney was

20  preparing a Petite waiver.

21     And a Petite waiver, just to explain it briefly -- typically, someone isn't prosecuted twice for a

22  crime.    But when a State's prosecution is manifestly inadequate, then the Federal authorities can

23  ask for a Petite waiver, which means they can prosecute again.

24     And when it was first brought to the office, it was brought in the context of a possible Petite

25  waiver, because there was an agreement for pre-trial diversion, no jail time, no registration.    And so

Provided to Jordan A. Esteban, Neiman Mays Floch & Almeida, PLLC on 9/24/2025

1    it always came in the context of a Petite.

2            And so, to go back, the U.S. attorney -- I'm sorry -- the State attorney took it to the grand jury,

3    the grand jury made that decision, and that was just not okay.

4        Q    But, at the time, like, my, kind of, understanding of one of the -- one of the concerns

5    that the State's attorney said after the fact was that it was possible that there would be criminal

6    liability for the victims for what occurred.    Is that fair?

7        A    Yes.    Um -- look, I --

8        Q    Not that a case would actually be brought, but --

9        A    -- I am hesitating here because that's not what this was.    But that's what the State

10   attorney is saying.    And maybe that's why the State attorney was an unreliable partner, as we can

11   talk about later on.    But that is a reflection of at least an opinion of some people in Palm Beach

12   County at the time and something that -- it is what it is.

13       Q    I just wanted to make sure that I was understanding that that was not brought to you at

14   the time, it was something that you read --

15       A    Yes.

16       Q    -- after the fact, and that my understanding of what his statements were is accurate,

17   that there was a --

18       A    Yes.

19       Q    -- possible criminal liability.    Thank you.

20       A    And, again, I want to be crystal-clear, lest I be taken out of context.    None of us

21   thought that that was the case --

22       Q    Yeah.

23       Mr. Neiman.    At the U.S. Attorney's Office.

24       Mr. Acosta.    -- at the U.S. Attorney's Office.    And that's why we thought it was important

25   that he go to jail.

Provided to Jordan A. Esteban, Neiman Mays Floch & Almeida, PLLC on 9/24/2025

1          BY MR. ████ :

2     Q    Yes.

3     A    And all of us thought that the victims were victims.

4     Q    No, I appreciate that.    And we all agree too.    That's why I was --

5     A    Yes.

6     Q    -- surprised.    Thank you.

7          Going back to the letter, the last paragraph on the first page begins, "What followed was a

8     year-long assault on the prosecution and the prosecutors.    I use the word 'assault' intentionally, as

9     the defense in this case was more aggressive than any which I, or the prosecutors in my office, had

10    previously encountered."    And then you talk about the army of lawyers that Mr. Epstein hired.

11         And, later on -- I'm trying to find the right page.    On what is the second-to-the-last page but

12    the -- or, the last page, the first full paragraph --

13    A    Yes.

14    Q    -- that "some may also believe the prosecution should have been tougher in retaliation

15    for the defense's tactics," you write it here, but can you explain some of Epstein's defense tactics in

16    this case?

17    A    So they would agree and then say they didn't agree, and we'd have to -- the prosecuting

18    attorney would start negotiations again.    They would sometimes say that we agreed to something

19    that we did not agree to, and we'd spend time on that.

20         They at one point tried to recuse the prosecuting attorney -- this was a little bit later, but they

21    tried to recuse a prosecuting attorney.    At one point, they tried to recuse my first assistant.    They

22    found what I refer to as a "peccadillo" and tried to recuse the first assistant.

23         And then, I think perhaps the most egregious of all, he signed an agreement, and he signed

24    that agreement I believe in September.    And, in my experience, once counsel and defendant sign

25    the agreement, it's done and you follow through.    And then they started relitigating everything

Provided to Jordan A. Esteban, Neiman Mays Floch & Almeida, PLLC on 9/24/2025

1    again.

2          And then they started saying, "You can't do this because of federalism concerns and because

3    you're impinging on a local matter."

4          And they charged our office with being unethical -- or, I don't want to say "unethical."    They

5    charged our office with improperly interpreting the law.    And this is when I became more involved,

6    because it was more of a policy issue and it was more of an attack on the office.

7          And then they appealed us to the Criminal Division in Washington.    And then, after that,

8    they ultimately appealed us to the Deputy Attorney General's Office.

9          And so, from the time that he signed the agreement to the ultimate plea was a span of about

10   8 months, something --

11   Q    Uh-huh.

12   A    -- that is unheard of.

13         I'll provide another example.    We'd had assurance from the State attorney and we had

14   assurance from his counsel that he would be in continuous confinement.    And then, after he goes to

15   jail, he applies for work release, and Palm Beach gives him work release.    And we're not even

16   notified that he gets work release.    And our office objects to it, but -- but we had assurances that

17   that would not happen.    And OPR talks about those assurances as well.

18   Q    Uh-huh.

19   A    So, at multiple levels, you know, they -- their tactic is something that you can only do

20   once, because no -- you know, if you're a south Florida lawyer that had to interact with the office

21   multiple times, that could not happen.

Provided to Jordan A. Esteban, Neiman Mays Floch & Almeida, PLLC on 9/24/2025

1    [10:59 p.m.]

2                    BY MR. ███████:

3        Q    The paragraph also mentions like -- I am going to characterize it as stalking assistant U.S.

4    attorneys, investigating assistant U.S. attorneys, investigating their families.

5        A    It does.

6        Q    Did you experience that as -- like, did you personally experience that?

7        A    I did not.    My first assistant did.

8        Q    And that's a fair characterization from me that -- I mean, I'm -- you can correct me if I'm

9    wrong, but hiring private investigators to follow them, go through their trash, kind of like that kind of

10   stuff, or was this --

11       A    So let me see how to characterize this, and then if you want details, you can ask me for

12   details.    They uncovered something involving -- involving his daughter.    So I don't want to say that

13   they hired private investigators to stalk him.    I think that'd be a mischaracterization.    But, yes, they

14   uncovered something regarding his daughter to try to recuse him.

15       Q    And then --

16       A    Actually -- that sounds -- I want to answer that more fully lest there be -- look back on

17   her.    There was an incident that involved someone peeping at his daughter at the time, and he

18   called police and he followed up, as I think any father would and should.    And they said that

19   because of that he could not be fair and impartial and tried to recuse him.

20       Q    Thank you.

21       You say, and I think it's a --

22       A    Which, let me just add, is just outrageous.

23       Q    Yes.    The accusation being that because someone stalked his daughter he would be

24   impartial to someone that committed similar crimes, I guess, is what they were going for?

25       A    That was the argument, yes.

Provided to Jordan A. Esteban, Neiman Mays Floch & Almeida, PLLC on 9/24/2025

38

1    Q    Just a couple minutes late, a lot of people have come in, so I'm going to go through and

2    announce them at the end of the hour.

3    But you say, and I think it's a bedrock American principle, that everyone is entitled to an

4    aggressive defense.    Is there a line, and was it crossed?

5    A    So, unfortunately, or fortunately, maybe -- I don't know.    Let me restart.    Everyone's

6    entitled to an aggressive defense.    I don't think the line was crossed.    I don't think that -- it is not

7    the way I would want to litigate.    It is not the way I would teach lawyers to litigate.    But it is

8    allowed within the legal profession, and so I don't think there was misconduct, and misconduct is the

9    line.    But it was distasteful.    It did frustrate our attorneys.

10   And one of my challenges as a manager was, at various times, all of us, including myself,

11   would be like, yeah, we're sick of this.    But if something is right initially, you can't sort of let defense

12   counsel get under your skin.    If it's right initially, then it's right then, and you just keep going.

13   Q    Based off that, were there any discussions about filing sanctions against any defense

14   counsel?

15   A    Not that I recall.

16   Mr. ▮▮▮▮.    That is a good stopping point for our hour.    But before we go off the record, a

17   number of members have come in, so I will have -- we'll start back here, if you wouldn't mind

18   introducing yourself for the record, please.

19   Mr. Subramanyam.    Yeah.    Congressman Suhas Subramanyam, Virginia 10.

20   Ms. Lee.    Summer Lee, Pennsylvania 12.

21   Mr. ▮▮▮▮.    And Mr. Biggs?

22   Mr. Biggs.    Andy Biggs, Arizona 5.

23   Mr. ▮▮▮▮.    And the Ranking Member?

24   Mr. Garcia.    Ranking Member Garcia from California.

25   Mr. Acosta.    How are you?

Provided to Jordan A. Esteban, Neiman Mays Floch & Almeida, PLLC on 9/24/2025



1     Mr. ███. And then ███.

2     Ms. ███. ███████.

3     Mr. ███. And I think we're good.   We can go off --

4     Mr. <u>Acosta.</u>  Can I just finish the answer to the prior question before we stop?

5     Mr. ███. Yes.

6     Mr. <u>Acosta.</u>  I don't recall any conversations about sanctions.   And if I'm being fair, I do

7     think defense counsel have a right to challenge whether or not someone should be recused.   And

8     distasteful as it is to look up someone's -- to look up some of the matters that we just talked about,

9     defense counsel has a right to do that, and I don't think that should be sanctioned.

10    Mr. ███. All right.   I appreciate it.

11    Mr. Min, could you announce yourself?

12    Mr. <u>Min.</u>  Sure.   Congressman Dave Min, California 47.

13    Mr. <u>Walkinshaw.</u>  Congressman James Walkinshaw, Virginia 11.

14    Mr. ███. Thank you very much.

15    We can go off the record for this hour.

16    [Recess.]

17    Mr. ██. All right.   We'll go on the record.   The time is 11:16.

18    Before we begin, if the members could please introduce themselves, starting with the

19    minority here at the table.

20    Mr. <u>Garcia.</u>  Robert Garcia, the Ranking Member.

21    Ms. <u>Crockett.</u>   Jasmine Crockett, Texas 30.

22    Mr. <u>Casar.</u>  Greg Casar, Texas 35.

23    Mr. <u>Min.</u>  Dave Min, California 47.

24    Mr. <u>Frost.</u>  Maxwell Frost, Orlando, Florida.

25    Mr. <u>Subramanyam.</u>  Suhas Subramanyam, Virginia 10.

Provided to Jordan A. Esteban, Neiman Mays Floch & Almeida, PLLC on 9/24/2025

1        Mr. Walkinshaw.    James Walkinshaw, Virginia 11.

2        Ms. Lee.    Summer Lee, Pennsylvania 12.

3        Mr. ███.    Mr. Biggs?

4        Mr. Biggs.    Andy Biggs, Arizona 5.

5        Mr. ███.    And, Mr. Burchett?

6        Mr. Burchett.    Burchett.    Birch like the tree, and ett like I just ett breakfast.    Burchett.

7        Mr. ███.    Thank you.

8        Mr. Burchett.    Tennessee 02.    I'm here in support of Ms. Crockett.

9        Ms. Crockett.    I appreciate that.

10                            EXAMINATION

11                BY ███████:

12        Q    Mr. Acosta, good morning.

13        A    Good morning.

14        Q    We're going to delve into greater depth into some of the issues that my majority

15   colleagues raised with you during the previous round, but at the outset I'd like to just establish some

16   facts that I think lie at the core of today's proceeding.

17            And to begin with, it's my understanding that the line prosecutor in your office who handled

18   the Epstein investigation, Ms. Villafana, concluded that there was enough evidence in her view to

19   support a 60-count Federal indictment against Mr. Epstein.    Is that accurate?

20        A    The prosecuting attorney, Ms. Villafana, sent a draft indictment up her supervisory chain

21   that was never fully reviewed by the supervisory chain.    That was a first draft that was written by

22   her.    And in the usual course of the office, it would then go to the managing attorney in Palm Beach

23   County and the criminal chief.

24            And earlier we had talked about, for example, the interstate statues.    And the managing

25   attorney in the Palm Beach office that supervised her expressed concerns about, for example,

Provided to Jordan A. Esteban, Neiman Mays Floch & Almeida, PLLC on 9/24/2025

1    whether or not the Federal nexus existed.    So she did draft that.    That wasn't -- that had not gone

2    through the supervisory chain.

3         Q    That I understand, but would you agree with me that it reflected her view of the

4    evidence and the charges that the evidence supported at the time?

5         A    It reflected her view of what the case could have looked like if it went to trial.    But,

6    again, in her sworn deposition, she said that a negotiated plea would have been a better outcome,

7    and that did reflect her assessment as to the viability of a case.    And so just because you draft an

8    indictment doesn't mean you think it's a slam dunk.

9         And she went on to say -- and if I could, because it's an important point -- this is her talking,

10    not me, and this is her sworn statement.    "Some have alleged that Epstein would easily have been

11    convicted, and that all the victims were eager to participate in a full-fledged Federal prosecution.

12    As a prosecutor who handled the investigation, I can say that these contentions overlook the facts at

13    the time."    So her sworn statement is that it would not have been an easy case and that there were

14    issues.

15         Q    Sure.    And you're talking about litigation risk, which, of course, is inherent in every

16    prosecution.    But her draft indictment was accompanied by an 80-some-odd-page charging memo.

17    Isn't that correct?

18         A    I can't speak to the pages, but it was accompanied by a charging memo that, again, the

19    supervisory chain in the office had a different assessment than she did.

20         Q    But it's fair to say that she wouldn't have sent up that draft indictment and the 80-page

21    charging memo if she didn't have faith in the allegations that she was outlining and the merits of the

22    prosecution.    Isn't that a fair characterization?

23         A    So you wouldn't send up something that you didn't believe was factual and accurate.

24    Again, I don't think it is fair to characterize her position as saying this is what we need to do, because

25    in her sworn statement she herself said that she favored a negotiated outcome.

Provided to Jordan A. Esteban, Neiman Mays Floch & Almeida, PLLC on 9/24/2025

1     Q     And wasn't it also her judgment that the appropriate sentence for Mr. Epstein under

2     Federal sentencing guidelines was, at a minimum, 168 to 210 months?

3     A     It was her judgment that if we had gone to trial on the charges in the memo, again,

4     charges that the supervisory chain in the office had concerns over, that if we had gone to trial, that

5     would have been the guideline range.

6     Q     And it's my understanding, having read the OPR report, that Ms. Villafana repeatedly

7     pressed her supervisors to authorize an indictment of Mr. Epstein, and that authorization was

8     repeatedly denied.   Isn't that accurate?

9     A     I think it would be fair to say that she pressed them.   I don't know how you define

10    "repeatedly", but she did press them.

11    Q     Despite Ms. Villafana's views, you ultimately decided that a resolution of the case on

12    State charges was appropriate.   Is that correct?

13    A     So there was discussion within the office, and I think -- I think an important in between

14    is that, if we were to go forward on Federal, there was -- the discussion ended up landing on what's

15    called a 371, which is a different charge, which would be a 5-year charge with a what's called a Rule

16    11 cap.   But, ultimately, there was discussion within the office, I talked with my supervisory staff,

17    and I approved a three-prong term sheet, or approach.

18    The first required that he serve 24 months imprisonment.   And my understanding at the

19    time, as I recall it, was that that is what the Palm Beach Police initially sought, right.   And, again, the

20    Palm Beach Police went to the State Attorney's Office, the State Attorney's Office was willing

21    to -- were unwilling to file the charges the Palm Beach Police sought.   They offered him probation.

22    Then they took it to the grand jury, offered pre-trial diversion.

23    What I ultimately approved, and I approved it, was 2 years, which is what the Palm Beach

24    Police sought, registration as a sexual offender, and then we also added in a mechanism for

25    monetary recovery for the victims.

Provided to Jordan A. Esteban, Neiman Mays Floch & Almeida, PLLC on 9/24/2025

1      Q      And looking at the terms of the non-prosecution agreement, which I'll refer to, for

2   brevity sake, as the NPA, if that's okay with you.

3      A      Yes.

4      Q      So the NPA permitted Mr. Epstein to plead to a single charge.    Is that right?

5      A      Yes, that is correct.

6      Q      Okay.    As opposed to the 53 Federal counts that Ms. Villafana had initially proposed in

7   her charging memo?

8      A      Again, I take issue with your characterization of the charging memo, but, yes.

9      Q      And the NPA also allowed Mr. Epstein to -- I'm sorry.    Pursuant to the NPA, your office

10   agreed to a sentence for Mr. Epstein of only 18 months in the Palm Beach County jail.    Is that

11   accurate?

12      A      That is ultimately accurate.    After I approved the, we'll call it a term sheet for simplicity

13   because that's how it was labeled, the prosecuting team entered into a negotiation.    In the process

14   of that negotiation, it went from 24 to 18.    My perspective on that was, the prosecuting attorney,

15   Ms. Villafana, wanted him to go to jail, perhaps more than any of us, and I think the record makes

16   that clear, and so if in the process of that give-and-take it ends up at 18, it's appropriate to defer to

17   that process.

18      Q      So just to clarify, the initial proposal from your office as to the NPA was a 2-year

19   sentence, that was further reduced to 18 months, and of that 18 months, Mr. Epstein only served 13.

20   Is that correct?

21      A      That is factually correct, but I want to clarify my prior answer, if I could.    When I said

22   she more than anyone else wanted him to go to jail, I don't think that is accurate.    And I said

23   that -- all of us, every single person, the whole reason we took this case is because we wanted him to

24   go to jail.    Because the State attorney said pre-trial diversion; like, how could the State attorney say

25   that.

Provided to Jordan A. Esteban, Neiman Mays Floch & Almeida, PLLC on 9/24/2025

44

1    But on the continuum of how the case was assessed and the viability of the case, as you went

2    up the experienced chain, there was more concerns about viability, and so I trusted her to negotiate

3    that agreement.    And I think she did a really, really good job under very difficult circumstances given

4    the way the defense treated her and approached the case.

5        Q    The 18-month sentence was ultimately approved by you, correct?

6        A    Yes.    Let me be clear on something else.    I'm not pushing away.    Ultimately, it

7    was -- you know, I was the U.S. attorney, the decisions are mine.    I told that to the Office of

8    Professional Responsibility.    I'm not pushing away.    The decisions were mine.

9        Q    Understood.    And pursuant to the NPA, Mr. Epstein was permitted work release while

10   serving his sentence.    Is that correct?

11       A    So I would not say that was pursuant to the NPA.    And we had assurances on multiple

12   levels that it would be, quote/unquote, continuous confinement.

13       One of the issues that you may -- you may want to talk about, or not, is I think the State

14   turned out to be an unreliable partner.    And OPR did a 300-page report, and there are some

15   conclusions that, quite honestly, are critical of me that I will agree with.    And one of those was I

16   relied on the -- you know, by approving a State resolution, I partnered with the State attorney and a

17   Palm Beach sheriff that was an unreliable partner.    We had an assurance that he would be in

18   continuous confinement, we were told multiple times that he would be.

19       He obtained work release from the Palm Beach sheriff under a factual situation that's sketchy

20   at best.    I don't remember all the details, but I think his work release was at an institution that had

21   just been incorporated, or something along those lines.    That was the Palm Beach sheriff's decision.

22   When we found out about it we objected.    We objected in writing.    We objected fully.    And so

23   that was under the authority of the State.

24       Mr. ▮▮▮.    Mr. Min, do you have a question?

25       Mr. Min.    Yeah.    I just want to follow up on this line of questioning.    Did you feel like the

Provided to Jordan A. Esteban, Neiman Mays Floch & Almeida, PLLC on 9/24/2025

1   investigation was complete at the time you decided to proffer the 24-month sent- -- the proposal?

2        Mr. Acosta.   So I would have -- I would have deferred to the trial team at the time.   At the

3   time --

4        Mr. Min.   So following up on that -- go ahead.

5        Mr. Acosta.   No, no.   But I think the timeline's important.   The case was brought into the

6   office in late spring of 2006.

7        Mr. Min.   Sure.

8        Mr. Acosta.   About a year later, we -- I approved that term sheet.   There had been a year.

9   During that year, victims had been interviewed, the prosecuting team had done whatever they

10  thought needed to be done.   And I don't recall any discussion of there's more than we need.   If

11  anything, I recall, you know, let's put -- let's proceed now because it's important the -- you know, one

12  of the concerns is that the victims, as they get older, might be less -- might --

13       Mr. Min.   So I just want to turn, because Marie Villafana repeatedly has said that she at the

14  time, and after the fact, believed that the computer evidence, the files, the surveillance videos, all of

15  that, were -- I think she said, would have put this case completely to bed.   And the defense

16  attorneys, and I think he'll go into that, repeatedly pushed that particular request off.   They did not

17  respond to it.   I know that there's a long record of her going to her superiors, including to you, and

18  asking for permission to be more persistent in trying to get these records.   And then at some point,

19  Ken Starr and Lefkowitz became the attorneys of record.   And then at that point, imme- -- about 2

20  weeks later I think is when you entered into the NPA.

21       And so I'm interested in that timeline.   But I guess my question right now is, if there's a big

22  pile of evidence here that, you know, I think a number of people have noted would probably have

23  surveillance videos that would have corroborated the witnesses' testimony and their claims that they

24  were visiting Epstein's house, you might have had child pornography, you might have had videos, a

25  known video in his New York residence, and I think a number of people had noted that it was

Provided to Jordan A. Esteban, Neiman Mays Floch & Almeida, PLLC on 9/24/2025

46

1   shocking that he wouldn't have had a similar surveillance system in Palm Beach, why would you not

2   get that information before, which might have had everything you needed to get rid of the litigation

3   risk in this case?

4        Mr. Acosta.   So there were a number of -- there were a number of statements in that, some

5   of which I think confuse the timeline and some of which I think are inaccurate, but -- and so I can take

6   those one at a time.

7        So, first, the -- I approved the terms of the -- I approved the term sheet before Mr. Starr was

8   brought into the matter.   When Mr. Starr was brought into the matter was, I believe, a week or 2

9   after that term sheet was approved.   And at that point, we did have a meeting with defense,

10   everyone was present at the meeting with the defense, and at that meeting I rejected everything

11   that was asked.   They asked that we not proceed because it's a local case.   They asked that we

12   drop the 2-year demand.   I rejected all of those.   I said you've been heard.

13        And the reason we had that meeting is because it was my assessment, and it ended up being

14   true for better or worse, that the case would be appealed to Washington, and I didn't want it to be

15   appealed on the grounds that we had not heard defense arguments.   I thought it's better that we

16   hear them in Miami first.

17        And I invited the head of the child exploitation section from Washington down to the meeting

18   in south Florida so that Washington was fully aware of what we were doing so that Washington

19   understood the case and understood the matter.   And so I just want to clarify that timeline first.

20        Mr. Garcia.   Let me move on really quick, Mr. Acosta, before I go back to the attorneys.   On

21   the 18-month final sentencing, do you stand by that?   Do you stand by the decision that you made

22   and the office made?

23        Mr. Acosta.   On the 18 months?

24        Mr. Garcia.   Yes.

25        Mr. Acosta.   So here's -- so let me say this, we put him in jail.

Provided to Jordan A. Esteban, Neiman Mays Floch & Almeida, PLLC on 9/24/2025

1       Mr. Garcia.   Do you stand by the 18 months?

2       Mr. Acosta.   No.   I understand, but allow me to give you a fulsome answer, if I could.   We

3  put him in jail, he registered as a sex offender, and the victims had an opportunity to recover.   And

4  that was a win.

5       Looking back in hindsight, there are a number of issues that I will, you know, that I will say

6  caused the community and the victims to feel -- to feel that this was not a good resolution, and I get

7  that.   But from the perspective of our prosecutors at the time, based on the evidence we had at the

8  time, you know, everyone in our office wanted to put him in jail, and that's what we did.   And it

9  wasn't just me.   These are experienced career prosecutors.   Our first assistant had been with the

10  office for years, he had been the criminal chief before.

11      Mr. Garcia.   So you would disagree that calling it a sweetheart deal, you would disagree with

12  that assessment?

13      Mr. Acosta.   I disagree with that.   And I think it's really easy, with respect --

14      Mr. Garcia.   And you're also aware, sir, that he, of course, went on to abuse other women?

15      Mr. Acosta.   So what I was saying is I think it's really easy in this era to sort of label

16  something with an easy sound bite.   We talked about, and I can talk again, about our -- and I need

17  to go back to your question.

18      Mr. Min.   I was going to ask you, you answered the question --

19      Mr. Acosta.   Yeah.   I need to go back to your question.   I'm sorry, but I was interrupted in

20  my -- I'm trying.   But we talked about the assessment of the first assistant was that this would be a

21  very difficult case.   The assessment of the Child Exploitation and Obscenity prosecutor that came

22  down from Washington, D.C., that looked at all the evidence, looked at all the evidence and said,

23  quote/unquote, this case would be a crap shoot.   That wasn't my -- those weren't my words; those

24  were her words.   The assessment of the Criminal chief, who used to be the head of Major Crimes,

25  was that this would be a difficult case.   The assessment of the managing attorney of the Palm Beach

Provided to Jordan A. Esteban, Neiman Mays Floch & Almeida, PLLC on 9/24/2025

48

1    office.    And more than a difficult case, a highly difficult case where we weren't sure what the

2    outcome would be.

3            And so looking at all of this, the ultimate judgment was, do you roll the dice, and if he gets

4    away with it you're sending a signal to the community that he can get away with it, and given the

5    State attorney's, you know, approach where the State attorney was, in essence, letting him get away

6    with it, what would that say, or do you proceed with a sure prosecution where he goes to jail.    And

7    none of us, none of us thought that 18 months or 24 months was the right outcome in terms of this is

8    what we wanted, but based on the facts that we had, based on the --

9            Mr. Garcia.    And I understand that.

10           Mr. Acosta.    Right.

11           Mr. Garcia.    And, sir, you would -- so you don't agree that it was a sweetheart deal.    That's

12   clear.    And you do recognize that he went on to abuse other women.    You recognize that?

13           Mr. Acosta.    If there's evidence that he went on to abuse other women, that evidence

14   should be brought forward and --

15           Mr. Garcia.    You're not aware -- you can't say with certainty that he abused other women

16   after he was -- in his -- during his sentence?

17           Mr. Acosta.    I have not reviewed facts after the prosecution.

18           Mr. Garcia.    I mean, it's been widely reported, so that's surprising.

19           Mr. Acosta.    So, you know, my understanding of our criminal justice system is what is

20   reported and what is proven in court are two different things.    And so I am -- you know, I read

21   reports.    I understand reports.    Let me say, I saw -- I saw the press conference given by the victims.

22   I thought their statements were courageous.    They were confident, they were eloquent.    We

23   believed the victims back then.    Despite the reality that defense would have impeached these

24   victims and the impeachment would have been withering, we believed them fully, but -- but I don't

25   take a press report --

Provided to Jordan A. Esteban, Neiman Mays Floch & Almeida, PLLC on 9/24/2025

49

1        Ms. Crockett.  Can I stop you right there?   Real quick.   I'm sorry.   Because you actually

2    answered a question that I was going to ask.   What made you feel like this case was so weak?   And

3    it sounds like you were convinced that the case was so weak because you felt like the victims,

4    multiple victims, were going to be impeached, even though you believed them.   What specifically

5    did you believe was going to be detrimentally impeachable -- hold on one second.

6        So I just want to know, number one, what did you believe was going to be detrimentally

7    impeachable?   Number two, as someone who's done criminal defense, these have always been the

8    easiest cases, in my experience for the prosecution, because juries typically want to believe victims.

9    They never want to get it wrong.   And so, typically, from a defense standpoint, it has always been

10   the most difficult cases for me to defend against, even when there should have been, say, DNA based

11   upon the testimony or the statements of a victim and there wasn't.   There have been so many

12   things that I have had to try to get over.

13       And when I say, like, trying these kind of cases, I literally had a serial rapist as a defendant one

14   time, and the evidence was -- I mean, we're talking about prostitutes, we're talking about very

15   impeachable witnesses, and they gave him life.   I mean, like, it was their word against his because,

16   as you know, that's enough.   If a jury believes -- the one witness rule.

17       So I'm curious to know, what is it that you felt like was so impeachable about them?   And

18   then I'll go on to my next because I did want to know why you felt like these cases were so bad.

19       Mr. Min.   Can I get an answer to my question?

20       Mr. Garcia.   What we're going to do is we're going --

21       Mr. Neiman.   Please.

22       Mr. Acosta.   So I didn't finish, and so I'm aware, but -- and you'll probably rephrase at some

23   point and remind me.   So let me first say, it wasn't solely my opinion.   It was the opinion of the

24   first assistant.   It was the opinion of the Criminal chief.   It was the opinion of the managing

25   attorney of the Palm Beach office, who had at one point been the head of Public Corruption in

Provided to Jordan A. Esteban, Neiman Mays Floch & Almeida, PLLC on 9/24/2025

50

1   Washington, D.C., and who went on to be chief of staff in the Criminal Division.   The first assistant

2   went on to be the U.S. attorney under the following administration.   And it was even the opinion of

3   the career prosecutor that was prosecuting the case, where she said, you know, everyone that says

4   this would be an easy case -- you know, and, again, let me read you her words in a sworn statement

5   in the CVRA:   "Some have alleged that Epstein would easily have been convicted, and all victims

6   were eager to participate in a full-fledged Federal prosecution.   As the prosecutor who handled the

7   investigation, I can say that these contentions overlooked the facts as they existed at the time."

8          And so --

9          Ms. Crockett.   And I'm not contesting that.   I want you to know that.   I'm not contesting

10   that representation.   What I'm asking you to do is transport us into that room.   If you're saying

11   that there was an entire team of people that came to this conclusion, my question is, that's still not

12   giving me -- you're saying that they were impeachable.

13          Mr. Acosta.   So I'm going to offer you -- so you're looking for granularity.   So if you look at

14   the same statements by her in her sworn declaration and by the FBI case agent, we can start with,

15   several of the victims just refused to talk to the investigators.   They refused to talk to the agents.   I

16   subse- --

17          Ms. Crockett.   Let me ask you this.   So if a witness refuses to speak to law enforcement,

18   you believe that makes them impeachable?

19          Mr. Acosta.   I don't believe that makes them impeachable.   This is going to the viability of

20   the case.

21          Ms. Crockett.   Okay.   So can we back up really quick.   My question was -- and the only

22   reason I jumped in is because my ears perked up -- because it seemed like one of the main reasons, if

23   not the main reason, for deciding that there was an inherent weakness in the case had to do with

24   multiple victims being impeachable.   So I am trying to understand, what is it that was impeachable

25   about multiple victims?

Provided to Jordan A. Esteban, Neiman Mays Floch & Almeida, PLLC on 9/24/2025

1    Mr. Acosta.    And what I'm -- and if you'll let me.    So some -- some victims just wouldn't

2    talk, and obviously they couldn't be impeached if they didn't talk.

3        Ms. Crockett.    Correct.

4        Mr. Acosta.    Right?    Some victims said he did nothing wrong, just outright.    And, look, you

5    know, our prosecutors have been around the block, they know just because a young woman says he

6    did nothing wrong doesn't mean he did nothing wrong.

7        Ms. Crockett.    Correct.    Correct.

8        Mr. Acosta.    Many were scared and just didn't want to testify.    You know, many had

9    backgrounds.    Multiple kept going back to his house again and again.    And while nowadays that

10   would not be an issue, this was 2006, this was a time when Weinstein and Cosby and all these other

11   folks were doing what they were doing.    And something that we don't want to accept -- let me

12   rephrase because that's not -- something that's really hard for us to internalize is how much harder

13   these cases were back then.    Victim shaming was much more common.    The support structures

14   that we have for victims today, all the victims' rights, the victim support structures, didn't exist to the

15   same extent at the time.

16       They didn't want to talk about it.    They said they did nothing wrong.    Their stories changed

17   over time.    And this is not me speaking.    This is telling you what I was hearing from the

18   prosecutors that did this again and again.    The woman who came down from the child exploitation

19   section --

20       Ms. Stansbury.    I'm sorry.    Can I interrupt you just really quickly on this particular point?

21       Mr. Neiman.    Well, if he could finish.

22       Ms. Stansbury.    I just want to clarify, because as I understand it, the lead prosecutor in this

23   case actually sent you a memo recommending prosecution and drafted a 53-page indictment, did

24   they not?

25       Mr. Acosta.    So we talked about this, and I'm happy to circle back, if I could.

Provided to Jordan A. Esteban, Neiman Mays Floch & Almeida, PLLC on 9/24/2025

1   Ms. Stansbury. But you just asserted just now that the lead prosecutor in this case did not

2 recommend prosecution and indictment. Didn't you just say that?

3   Ms. Crockett. No, no, no.

4   Mr. Acosta. What I did -- and can I finish one question, then I'll get to yours and I'll get back?

5   Ms. Crockett. I'll clarify. I don't think that's what — because we're trying to figure out why

6 they did not go -- this is after they were actually pursuing charges of some sort, and we're trying to

7 figure out why it was that they weren't heading to a trial and why they decided to enter into what

8 has been characterized as a sweetheart deal. And as I understood the testimony from the witness,

9 it was because -- or partially because of impeachable issues with some of the witnesses. But it

10 doesn't sound like -- and you can finish, for sure, I want you to finish. But in everything that you've

11 said, it doesn't sound like there was very much impeachment.

12   It seems like we are going more so into territory, and please correct me if I'm wrong, that is a

13 matter of it was just going to be a difficult prosecution, which typically when dealing with child sex

14 cases, which is why I'm happy that you were talking about the person who actually had an expertise

15 in this area, because there are experts that testify typically as it relates to children and their

16 memories and why the trauma a lot of times can cause them to have inconsistencies, and judges

17 have consistently found that those experts can take the stand so that juries can have a full picture of

18 what's going on.

19   And while I appreciate the time period, I do want to clarify that I was practicing law by this

20 time and having to deal with some of these issues on the defense side. So please continue as you

21 were talking about the...

22   Mr. Acosta. So -- no. And I appreciate that, and I think it's an important question. And

23 so -- where was I? So, you know --

24   Ms. Crockett. The child exploitation.

25   Mr. Acosta. Yeah. So an expert in child exploitation from Washington came down, this

Provided to Jordan A. Esteban, Neiman Mays Floch & Almeida, PLLC on 9/24/2025

1    was a little bit later, but it sort of aligns, it confirms the opinion of my prosecutors, of our

2    prosecutors, from Washington came down and she looked at the entire case.    And this was -- these

3    were her words, these aren't mine -- where is it?    I can't find the exact quote right now.

4         But she looked at the entire case and she said there are a number of evidentiary issues.    And

5    while there are not, quote/unquote, insurmountable, in her opinion it was a, quote/unquote, crap

6    shoot.    Her word was crap shoot.    And so --

7         Mr. Min.    Which gets right into my question.

8         Mr. Acosta.    And so we were looking at -- we are looking at a case.    So from our

9    perspective -- and I sit around the table with the managing attorney and the Criminal chief and all of

10   that, and talk about how do we do this.    The State attorneys, candidly, dropped the ball, right.    The

11   State attorneys offered pre-trial diversion.    Epstein -- the Palm Beach Police wanted what I

12   understood to be 2 years.    The State attorney offered probation.    When Epstein rejected

13   probation he said, oh, let's take it to a grand jury.    And the reason he wanted to take it to a grand

14   jury is there was great consternation within his office about whether or not this was a case in the first

15   place, a viable case.

16        He took it to grand jury.    He presented the grand jury all the charges from the highest to the

17   lowest.    And he didn't have to do a grand jury, but he chose to.    The grand jury came back with a

18   relatively low charge that made him eligible for pre-trial diversion.    He entered into an agreement

19   with Epstein to do a pre-trial diversion.    And then the -- you know, then what do we do.    The Palm

20   Beach Police get upset at this process, and in this process come to our office.

21        And so the question is what is the value of a sure thing where someone like him goes to jail

22   and has to register, and you send a signal to the community that he can't get away with all of this,

23   versus going to trial and doing a crap shoot, quote/unquote, not my words, where he might get away

24   with it again.

25        Mr. Garcia.    Mr. Acosta, let me do this, do you have anything else to add on Ms. Crockett's

Provided to Jordan A. Esteban, Neiman Mays Floch & Almeida, PLLC on 9/24/2025

54

1    questioning?

2        Mr. Acosta.    No, but I --

3        Mr. Garcia.    I'm going to let you briefly finish -- hold on one second.    I'm going to let you

4    finish Mr. Min's question really briefly, and Mr. Frost has a question, and then we're going back to

5    the attorney.

6        Mr. Min.    I want to rephrase the question and add a slight addendum.    So, basically,

7    if your -- if you thought your case was weak evidentiarily, and your chief prosecutor thought that the

8    computer evidence, which was not being produced by the defense, and a series of notable

9    back-and-forth, why would you not -- and she thought, I don't want to say -- this would have put the

10    case completely to bed -- that was a quote from her -- why would you not support her efforts to

11    obtain that information and instead enter into either a settlement or a non-prosecution agreement?

12        And then as a followup, I just want to add that according to the OPR report, Villafana learned

13    that the computer equipment was in the possession of a particular individual who's not identified in

14    the OPR report.    Are you able to share with us who that individual is?

15        Mr. Acosta.    So, one, I am not able to share who that individual is because I have no idea.

16        Mr. Min.    Okay.

17        Mr. Acosta.    Second, in my usual course, I would sit around with my supervisory staff and

18    we'd talk about some of the issues that we just talked about, we'd talk about policy issues.    How the

19    investigation proceeded and what they sought and the types of evidence that they sought is not

20    something that I typically became involved with.    So I can't answer your question.    What I can say

21    is at some point -- at some point, the team thought that it was appropriate to go forward with a plea

22    negotiation, and we went forward with that.

23        Mr. Min.    But you didn't think that it was appropriate to get the computer evidence?

24        Mr. Acosta.    I don't recall discussions about the computer evidence.    U.S. Attorney, this is

25    an office much like -- I believe you're from the L.A. area.    This is an office very similar to -- I'm sorry.

Provided to Jordan A. Esteban, Neiman Mays Floch & Almeida, PLLC on 9/24/2025

1    Are you from the --

2         Mr. Min.   Orange County.

3         Mr. Acosta.   Yeah.   Yeah.   So an office the size of pretty much the L.A. office, there are

4    multiple cases.   As U.S. attorney, I would get involved in ultimate decisions such as how do we plead

5    this, do we go State versus -- you know, do we do a deferred prosecution to the State, what are the

6    terms that we're looking at.   I had amazing attorneys that are expert in this, and the gathering of

7    evidence is something that I would leave to them.

8         Mr. Min.   I am not satisfied with that answer, but I will yield to my colleagues.

9         Mr. Garcia.   Let's go to Mr. Frost.

10        Mr. Frost.   I want to chat really quick about the work release.   You mentioned that you in

11   writing objected to it?

12        Mr. Acosta.   Yes.

13        Mr. Frost.   Was that to the sheriff directly or to someone in the office, or who did you reach

14   out to?

15        Mr. Acosta.   I don't recall, but our office reached out to whatever Palm Beach

16   authority -- whatever Palm Beach authority was responsible for the work release.   I believe it was a

17   sheriff.   It may have been the State Attorney's Office.   But I'm leaning in the direction of the sheriff

18   because the sheriff is the office that authorized that.

19        We had received assurances from both defense counsel and throughout the process that

20   there would be, quote/unquote, continuous confinement.   We understood that to be the case.

21   When the work release happened, I believed we weren't even notified.   When we found out about

22   it, the office objected to it and --

23        Mr. Frost.   Were these emails?

24        Mr. Acosta.   I think it was a -- I don't know if it was an email transmitting a letter, but I

25   believe it was an actual letter.

Provided to Jordan A. Esteban, Neiman Mays Floch & Almeida, PLLC on 9/24/2025

1   Mr. <u>Frost.</u>   Is that typical of your office, to send letters in terms of objecting to work release

2   or anything like that?

3   Mr. <u>Acosta.</u>   I don't know if that was typical, and I want to check the record, but --

4   Mr. <u>Frost.</u>   Do you have the records on that?

5   Mr. <u>Acosta.</u>   Well, I have the OPR report that goes into that and talks about that.   I don't

6   have independent records, but I do have the OPR report.   And I believe there is a -- page 113 talks

7   about the assurances they received, and then it talks about the -- sent a letter to his attorney, and I

8   believe a letter was ultimately sent to the Palm Beach sheriff.   Our office --

9   Mr. <u>Frost.</u>   You're saying you sent a letter to his attorney objecting on the work release?

10  Mr. <u>Acosta.</u>   I believe the office sent a letter to his attorney --

11  Mr. <u>Frost.</u>   And you might have sent a letter to the sheriff?

12  Mr. <u>Acosta.</u>   And I believe -- so the office fully objected.   Twenty years later, I do not know

13  which letters went, but OPR found that the office fully objected to this work release.   It was not

14  what we thought.   All of us were upset about it.   If we thought he would have been put out on

15  work release, it would have looked really different, because all of us thought very -- you know, all of

16  us --

17  Mr. <u>Frost.</u>   To your recollection, did you give the order to object to it or did someone under

18  you make that decision and object to it?   You're saying the office objected to it.

19  Mr. <u>Acosta.</u>   To my recollection, I don't think I had to give the order because the entire office

20  was upset over it, because our understanding was that he would be in jail.   Throughout the entire

21  time what we were seeking is that he would be in jail.

22  Mr. <u>Frost.</u>   How often do those objections lead to anything, in your tenure as an attorney?

23  Mr. <u>Acosta.</u>   As a general matter, if the U.S. attorney objects to those types of things, often

24  people do listen.   And if the U.S. Attorney's Office objects, often people do listen.   And if you look

25  into the details of how he obtained the work release, the details are troubling at best.

Provided to Jordan A. Esteban, Neiman Mays Floch & Almeida, PLLC on 9/24/2025

1       And so, you know, I can't speak to what Palm Beach did, but I can speak to the fact that

2   everyone in our office was upset because that is not what we contemplated.

3       Mr. Garcia.  Thank you, Mr. Frost.   We're going to go back to --

4           BY MR. ███████:

5       Q    Mr. Acosta, just to follow up on that answer.   The OPR report took issue with your

6   office's reliance on the State and the trust it reposed in the State to ensure --

7       A    I'm sorry.   Can I just interrupt to --

8       Q    Let me finish my question, please.   -- to ensure that Mr. Epstein was incarcerated for

9   his full sentence, and it faulted your office for reposing that trust without the knowledge of how the

10  State system worked or an understanding of the mechanisms of State enforcement.   Is that a

11  conclusion that you would dispute?

12      A    I think -- so I'm sorry, but -- so the letter did go out to the Correction Division of the

13  Palm Beach Sheriff's Office, and I believe that was on December 11th, from the office.   And so, I'm

14  sorry, could you restate?

15      Q    Sure.   My question is simply, would you disagree with OPR's conclusion that reposing

16  trust in the State to ensure that Jeffrey Epstein served his full sentence in State prison was an error in

17  judgment?

18      A    I wouldn't.   I would not disagree.   I think the State turned out to be an unreliable

19  partner on multiple levels.   And had we known the way it would have gone, we would not have

20  done so.   And so, yes, that is on me.

21      Q    Okay.   I wanted to return to a point you had made earlier because I think this is pretty

22  fundamental to our conversation.   You've spoken a lot about your office's assessment of the

23  litigation risk, which informed the decision of whether to plead out or to proceed to trial.   That's an

24  assessment that every U.S. Attorney's Office makes in every case.   Would you agree with that?

25      A    I think to call it litigation risk undervalues what it's about, because it's not just about the

Provided to Jordan A. Esteban, Neiman Mays Floch & Almeida, PLLC on 9/24/2025

1    risk of trial.   It's about signals that are sent to the community.    But that is certainly something that

2    is part of every case.

3            Q    Okay.   And, you know, there were clearly different views within the office about

4    whether it was advisable to go to trial or not.    But it didn't follow, from the existence of litigation

5    risk or the other implications that you've described of potentially going to trial, that the result should

6    be a non-prosecution agreement to a single State charge and an 18-month sentence.    That was not

7    an inexorable resolution whether or not there was litigation risk.    Isn't that correct?

8            A    So the litigation -- so I understand your question, but the litigation, because of the

9    viability of the case, because of some legal issues that we've already discussed, and because of the

10   importance to the community of putting him away and sending the signal that people like him can't

11   get away with it, we made the assessment, and I ultimately approved 2 years, registration, and --

12           Q    Two years incarceration?

13           A    Two years incarceration, registration, and a mechanism for victims to recover some

14   monetary money, not because it makes them whole, but because it at least would help.    In the

15   process --

16           Q    I understand that --

17           A    In the process of negotiation, some of those terms changed from 24 months to

18   18 months.

19           Q    Sure.

20           A    And the trial team --

21           Q    I understand all that.    But my question is, the NPA wasn't the only possible resolution,

22   right?   You could have pled to Federal charges.    You had a line prosecutor who proposed 53

23   counts.   So there clearly was a lot of middle ground in between your assessment of litigation risk

24   and the outcome that you ultimately agreed to.    Isn't that right?

25           A    So if your question -- if your question is was the deference to the State the only possible

Provided to Jordan A. Esteban, Neiman Mays Floch & Almeida, PLLC on 9/24/2025

1    outcome, my answer would be, no, we could have proceeded federally with, for example, a 371 with

2    a Rule 11.

3         Q    Thank you.

4              BY MR. ███:

5         Q    Mr. Acosta, I'm going to change gears a bit.    When did you first become aware that

6    Donald Trump had a social relationship with Jeffrey Epstein?

7         A    So I haven't the slightest idea, but certainly not during the pendency of this case.

8         Q    And as part of the investigation into Jeffrey Epstein, while you were U.S. attorney, was

9    Donald Trump ever interviewed?

10        A    Not to my knowledge.    But to also be clear, I wouldn't know, as a general matter, who

11   was interviewed or not interviewed because, as I mentioned to the gentleman from -- is it -- from

12   California earlier -- I was trying to remember the city, sorry -- the gentleman from California, it would

13   not have been my practice to get involved in who was and was not interviewed or the -- how the

14   evidence was acquired.

15        Q    Understood.    But you --

16        Ms. Stansbury.    Can I follow up on that question?

17        Mr. Acosta.    But let me be clear.    To my knowledge, Mr. Trump, President Trump was not

18   interviewed.

19        Ms. Stansbury.    I just want to follow up on that specific question.    So it was not a part of

20   your practice in making decisions about whether to prosecute or not prosecute to actually review the

21   302s and evidentiary, investigatory things that were collected as a part of the case?

22        Mr. Acosta.    So -- so --

23        Ms. Stansbury.    It's just a simple question.

24        Mr. Acosta.    And I'm going to give you a fulsome answer.    So as a general practice in a U.S.

25   Attorney's Office, there are experienced prosecutors, and they look at the 302s and they look at

Provided to Jordan A. Esteban, Neiman Mays Floch & Almeida, PLLC on 9/24/2025

1    the --

2          Ms. Stansbury.   But did you in this case?   It's just a yes or no.   Did you review the 302s in

3    this case?

4          Mr. Acosta.   As U.S. attorney, it was not my practice to review 302s.

5          Ms. Stansbury.   But did you in this case?

6          Mr. Acosta.   In this case I did not review the 302s.

7          Mr. ███.   Thank you.

8          Sir, I'm going to hand you what will be marked as Minority Exhibit A, and my colleague will

9    pass around copies for you.

10                        [Acosta Minority Exhibit A

11                        was marked for identification.]

12                BY MR. ███:

13          Q    Now, sir, what you have in front of you is a New York Magazine article dated

14    October 28th, 2002, titled, quote, "Jeffrey Epstein:   International Moneyman of Mystery."   Quote,

15    "Terrific guy," Donald Trump booms from a speakerphone.   "He's a lot of fun to be with."

16          And if I hadn't mentioned this, this is dated October 28th, 2002.

17          And, Mr. Acosta, I am going to have you turn to the fourth page of this document.   The top

18    of the page there you'll see starts, "The wizard."   Do you see that?

19          A    Yes.

20          Q    And if you go three paragraphs down, there's a paragraph that starts, "Epstein likes to

21    tell people."   Do you see that?

22          A    Yes.

23          Q    This paragraph reads, Epstein likes to tell people that he's a loaner, a man who's never

24    touched alcohol or drugs, and whose nightlife is far from energetic.   And yet if you talk to Donald

25    Trump, a different Epstein emerges.   Quote, "I've known Jeff for 15 years.   Terrific guy", end

Provided to Jordan A. Esteban, Neiman Mays Floch & Almeida, PLLC on 9/24/2025

1    quote, Trump booms from a speakerphone.    Quote, "He's a lot of fun to be with.    It is even said

2    that he likes beautiful women as much as I do, and many of them are on the younger side.    No

3    doubt about it -- Jeffrey enjoys his social life."

4           Mr. Acosta, this article was published in 2002 before the U.S. Attorney's Office launched its

5    investigation into Jeffrey Epstein.    Was Donald Trump ever questioned about this article or this

6    quote that he gave to the reporter?

7           A     So first —

8           Q     It's a yes or no question.

9           A     Not to my knowledge.

10          Q     Thank you.

11          Sir, I'm going to hand you another exhibit which we'll mark as Minority Exhibit B.

12          Mr. Biggs.    Just so you know, we'd like copies.

13                              [Acosta Minority Exhibit B

14                              was marked for identification.]

15                        BY MR. ███:

16          Q     So, Mr. Acosta, what you have in front of you is a Page Six article dated October 15th,

17   2007.    It's titled, "Sex Case 'Victims' Lining Up."    And I'll note for the record that Page Six is owned

18   and operated by the New York Post.

19          Now, I will read the first paragraph to you.    It starts, "Lawyers."    It says, Lawyers for

20   Manhattan billionaire investor Jeffrey Epstein -- who's agreed to plead guilty to soliciting underaged

21   hookers -- are bracing for a slew of lawsuits from as many as 40 young women who came to his Palm

22   Beach mansion for massage sessions, Page Six has learned.

23          And then I'll have you flip the page, and we'll go to the very last paragraph here.    It reads,

24   Meanwhile, the Mar-a-Lago Club in Palm Beach last night confirmed a website report that Epstein

25   has been banned there.    Quote, "He would use the spa to try to procure girls.    But one of them, a

Provided to Jordan A. Esteban, Neiman Mays Floch & Almeida, PLLC on 9/24/2025

62

1    masseuse about 18 years old, he tried to get her to do things," end quote, a source told us.    Quote,

2    "Her father found out about it and went absolutely ape-[bleep].    Epstein's not allowed back," end

3    quote.    Epstein denies he is banned from Mar-a-Lago and says, in fact, he was recently invited to an

4    event there.

5            Now, Mr. Acosta, as it says in this article, this was published in October 2007, after your office

6    had executed the non-prosecution agreement with Jeffrey Epstein but before he pleaded guilty to

7    the charges.    Did the U.S. Attorney's Office ask Donald Trump about any women at Mar-a-Lago?

8        A    So I'm going to --

9        Q    Sir, it's a yes or no question.

10       A    No, no, no.

11       Q    It is very simple, sir.    It's a yes or no question.

12       A    With respect -- with respect, you're asking questions based on headlines that are pretty

13   explosive, and I think --

14       Q    I'm asking about your knowledge.    Are you aware of anyone in the U.S. Attorney's

15   Office asking Donald Trump about this article?

16       A    I think -- I think --

17       Q    It's a simple question, sir.

18       Mr. Neiman.    Let him answer.

19       Mr. Acosta.    I understand, but I want to provide a fulsome answer, if I can.    First, these are

20   the words of the prosecuting attorney in this case.

21            BY MR. ▮▮▮:

22       Q    Sir, that's not my question.    I'm asking you if you are aware --

23       A    I am providing you --

24       Q    -- if Donald Trump was interviewed about women at Mar-a-Lago.

25       A    I am not aware of who was interviewed and not interviewed in the case generally

Provided to Jordan A. Esteban, Neiman Mays Floch & Almeida, PLLC on 9/24/2025

1    because U.S. attorneys do not become involved in deciding who gets interviewed and who does not

2    get interviewed.

3         Q    I do believe you said in this hour, the decisions are mine.    You are the U.S. attorney.

4    Is that right?

5         A    So when I said the decisions are mine, you're taking my comments out of context,

6    because I said I am ultimately responsible for what my office does.    I'm not pushing away blame.

7    I'm not pushing away responsibility.    That doesn't mean that the U.S. attorney of a district with

8    several hundred attorneys, even in high-profile cases, directs who is interviewed and not

9    interviewed.

10        And so as U.S. attorney, I do not have knowledge who was interviewed in this case.    As U.S.

11   attorney, I don't have knowledge who was interviewed in the Abramoff case, which we did as well.

12   As U.S. attorney, I don't have knowledge in who was interviewed in the UBS case, which was a major

13   case.

14        So as U.S. attorney, my job was to allow my line prosecutors, our line prosecutors, line

15   prosecutors that have great experience, one of whom -- one of the supervisory attorneys of whom

16   used to be the head of Public Corruption, Public Integrity here in Washington, D.C., to determine how

17   to proceed with investigations.

18        Q    Thank you.

19        You have relied frequently on the OPR report, and you'd with me that the OPR report outlines

20   that you negotiated the non-prosecution agreement.    Is that right?

21        A    That is not correct, and that is --

22        Q    That is not correct?

23        A    -- not what the OPR says.

24        Q    Did you have any role in negotiating the non-prosecution agreement?

25        A    The OPR report says that I ultimately approved the term sheet that required 2 years,

Provided to Jordan A. Esteban, Neiman Mays Floch & Almeida, PLLC on 9/24/2025

1    that required registration, and that required a mechanism for individuals to recover monetary, and

2    so I approved that.

3         Q    Understood.

4         A    It was then negotiated after that by the AUSAs.    The report also says —

5         Q    Did you meet with Epstein's defense attorneys?

6         A    Let me finish.    If I could finish my answer, please.    The report, as I was saying, that

7    also says that Epstein's defense attorneys then requested a meeting.    It says that I then went to our

8    first assistant and I said, I bet you this case ends up in Washington, because what they had done was

9    they had hired Mr. Starr.    And --

10        Q    And Mr. Lefkowitz.

11        A    And Mr. Lefkowitz.

12        Q    And Mr. Dershowitz.

13        A    And Professor Dershowitz.    And when they hired them, I predicted — I got a phone call

14   asking for a meeting.    I predicted to my career first assistant that the case would end up in

15   Washington.    I said, we should meet with them so that the first time Washington hears about this is

16   not the south Florida office refused a meeting.

17        I then asked him to call the Criminal Division in Washington, D.C., and invite the head of the

18   Child Exploitation and Obscenity Section, who are the experts in this from Washington, D.C., down to

19   the meeting so that the Child Exploitation and Obscenity Section would be fully briefed on the case,

20   would be fully briefed on how we were proceeding on the case, would know what we were doing,

21   because my prediction was that this would end up in Washington --

22        Mr. Garcia.    Thank you, Mr. Acosta.    I think we're going to — ▓▓ , we're going to move on?

23        Mr. ▓▓ .    Yes.

24        Mr. Garcia.    Yeah.    I'm going to move on to Mr. Subramanyam really quick.    But before I

25   do that, really quick, I just want to be clear also, when you were -- during your time as U.S. attorney,

Provided to Jordan A. Esteban, Neiman Mays Floch & Almeida, PLLC on 9/24/2025

1    did you ever speak to Donald Trump generally?

2         Mr. Acosta.  I did not.

3         Mr. Garcia.  So you never -- the entire time you were U.S. attorney, you never once spoke to

4    Donald Trump?

5         Mr. Acosta.  The entire time -- let me be more clear.  I did not speak with President Trump,

6    with Donald Trump before I was considered for Secretary of Labor.

7         Mr. Garcia.  Thank you.

8         Mr. Subramanyam.  I was going to ask that too.  But had you met him before?

9         Mr. Acosta.  There was one instance where I saw him in the lobby across the way and I

10   remember thinking, oh, that's Donald Trump.  If you define that as meeting.  We didn't have a

11   conversation.  I just saw him kind of like I'm seeing people in this room.

12        Mr. Garcia.  You never had a phone conversation, also not just a meeting, never a phone

13   convers- -- any kind of conversation with Donald Trump before?

14        Mr. Acosta.  I did not have an in-person conversation.  I did not have a phone conversation.

15        Mr. Min.  Email?

16        Mr. Acosta.  We hadn't shaken hands.

17        Mr. Subramanyam.  What about with any of his associates?

18        Mr. Min.  Email?  Text?  Any of that?

19        Mr. Acosta.  No email, to my recollection.  No text, to my recollection.  No associates, to

20   my recollection.  He moved in circles that I did not move in, to be honest.

21        Mr. Frost.  Can I ask real quick.  During the time that you were considering this case, did

22   anybody reach out to you, you know, any form of communication inquiring about it?

23        Mr. Acosta.  So the office got any number of communications.  I assume you mean from

24   the media --

25        Mr. Frost.  You personally.

Provided to Jordan A. Esteban, Neiman Mays Flisch & Almeida, PLLC on 9/24/2025

1        Mr. Acosta.    -- and those have gone through -- so it was 20 years ago.    I don't know if a

2    reporter at some point cornered me and asked me a question if --

3        Mr. Frost.    Anybody from Washington?

4        Mr. Acosta.    So at some point, the case was appealed to Washington, and at that point then

5    there were conversations.    Primarily letters that we provided Washington, but --

Provided to Jordan A. Esteban, Neiman Mays Floch & Almeida, PLLC on 9/24/2025

1    [12:09 p.m.]

2    Mr. Frost.    No.    Specifically around the NPA and consideration over it, did anyone reach out

3    to you?    From Washington?    Anyone from local government in Florida, in south Florida?

4    Mr. Acosta.    So is your question, before the non-prosecution agreement was signed --

5    Mr. Frost.    Yes, before it was signed.

6    Mr. Acosta.    -- were there any communications by government officials?

7    Ms. Frost.    Government officials, donors, anyone like that that would reach out to you asking

8    questions about this case or to provide their --

9    Mr. Acosta.    I don't recall any communications from what you would term as "donors"; I'll

10    just call them "wealthy people."

11    Mr. Frost.    Wealthy people.

12    Mr. Acosta.    I don't recall any communications.

13    So I reached out to Washington to ask the head of the Child Exploitation and Obscenity

14    Section to come to our meeting, because I wanted Washington to be fully briefed because I thought

15    Washington would be brought into this.    That was my reaching out.

16    And so, in that process, I'm sure that there was some back-and-forth so that the person could

17    come to this meeting, where, to be clear, I rejected every ask the defense made of me, and I said,

18    we're going with the original --

19    Mr. Frost.    Okay.

20    Mr. Acosta.    -- decision that I made.

21    Mr. Frost.    Just to skip ahead in the timeline, did you discuss with President Trump or

22    anyone in his administration -- fast-forward to when you were being considered for Secretary of

23    Labor.    Before the confirmation, did you discuss Epstein?

24    Mr. Acosta.    I'm going to answer that fully, but your prior question, I think, was very

25    important, and I want to be clear.    I did not receive communications from donors.

Provided to Jordan A. Esteban, Neiman Mays Floch & Almeida, PLLC on 9/24/2025

1        I likely received some communications from the State attorney, because the State

2    attorney -- and I don't recall any communications, but if it was not with me, it could've been with my

3    office.    I think the State attorney would have had some equity in what we were doing because we

4    were requiring jail time where he was not.

5        Mr. Frost.    Okay.

6        Mr. Acosta.    But --

7        Mr. Frost.    I'm going to --

8        Mr. Acosta.    -- I don't recall any of what you would characterize as improper communication.

9        Mr. Frost.    Okay.

10        Mr. Acosta.    Now, going forward, your question was?

11        Mr. Frost.    When you were being considered to be the Secretary of Labor --

12        Mr. Acosta.    Yes.

13        Mr. Frost.    -- in your conversations with Donald Trump or anyone in his administration, did

14    you talk about the Epstein investigation?

15        Mr. Acosta.    The first time --

16        Mr. Frost.    Before confirmation.

17        Mr. Acosta.    The first time that I recall --

18        Mr. Neiman.    Before confirmation.

19        Mr. Acosta.    -- talking about this -- from the time I was being considered for a position in the

20    Trump administration to confirmation, the first time I recall talking about this is -- there may -- I don't

21    know -- there are two points at which I may have -- one point at which I did and one point at which I

22    may have.

23        The point at which I did was, I believe there were some stories -- I forget where.    I know in

24    The Washington Post there was a story above the fold at one point, but I think that was later.    And

25    so I talked to the communications team, because the communications team needed to be briefed

Provided to Jordan A. Esteban, Neiman Mays Floch & Almeida, PLLC on 9/24/2025

1    about it, obviously.    And so I had a conversation with the communications team.

2    　　　　Mr. Frost.    And then you said there was another?

3    　　　　Mr. Acosta.    And the other instance where I may have had a communication -- I don't recall

4    if I did or if it was simply -- or if there was some written question or otherwise.    But at some point in

5    the vetting process, a question may have arisen.    And if the question arose --

6    　　　　Mr. Frost.    And you don't remember?

7    　　　　Mr. Acosta.    I honestly don't remember.    But if the question arose in the vetting process

8    where the FBI does its background --

9    　　　　Mr. Frost.    Okay.    Okay.

10    　　　　Mr. Acosta.    -- then I --

11    　　　　Mr. Frost.    Very good.    Thank you.

12    　　　　Ms. Crockett.    Okay.    So I've just got two questions, and you may not be able to finish

13    answering them before we have to end this part.    I still want them to get on the record, because I'm

14    going to have to go.

15    　　　　You talked about how weak the case was, and there were a number of followup questions on

16    that from Dave Min.    I'm trying to figure out, are you aware as to whether or not any of Jeffrey

17    Epstein's employees were ever interviewed as part of the investigation?

18    　　　　Mr. Acosta.    So, again, as U.S. attorney, I did not get involved in who was --

19    　　　　Ms. Crockett.    Okay.

20    　　　　Mr. Acosta.    -- interviewed.    They may have been interviewed; they may not have.

21    　　　　Ms. Crockett.    Okay.

22    　　　　Mr. Acosta.    That was not -- that was not the role that I played in this.

23    　　　　Ms. Crockett.    Okay.    I understand.

24    　　　　And the only reason I ask is because you talked about basically how you all came together,

25    and I'm aware that a lot of times there's basically, like, conferences that you pull together your entire

Provided to Jordan A. Esteban, Neiman Mays Floch & Almeida, PLLC on 9/24/2025

1    team and you talk about these things, right?    But it doesn't sound like you asked those questions in

2    those meetings either to know whether or not, well, did you go and do this, that, or whatever, the

3    things to better the case and make the case stronger.

4            But I'm going to hold that there.    And if you have anything to provide as it relates to

5    testimony of things that you did to try to make the case better or to try to make sure that you had

6    everything that you could to make sure it was the best case, then please let us know on the record

7    later.

8            But the final question — because I want to kind of get to the end -- is, it sounds like you had

9    lots of meetings with lots of people, but it seems like the victims were left out of this.    And

10   ultimately we know that there was a problem with you potentially -- I don't know the exact

11   language -- violating Federal statute that requires victims to be made aware.

12           So, while there were all these other conversations taking place -- and I'm used to prosecution

13   offices talking to victims and explaining to victims why they are going to have weaknesses with their

14   cases and explaining prior to making an offer.    Because there have been victims that have told

15   prosecutors, "Yes, I hear you saying that the case is weak, but I want to testify, I want my day in

16   court, I want you to go forward," and I've had prosecutors go forward simply because victims are

17   saying, "We want you to go forward."

18           It doesn't sound like that was done.    If it was done, please let us know.    But it's my

19   understanding that Sarah Kellen, Nadia Marcinkova, and Adriana Mucinska -- I'm messing that

20   up -- that they were being investigated as co-conspirators or that they were being included in the

21   NPA either before or after it was signed.

22           But is that common practice for the Southern District of Florida, number one?    And how can

23   you explain including young women in a non-prosecution agreement without their knowledge at the

24   request of a clear serial sexual predator?

25           Mr. Acosta.    Okay.    So let me -- that was a lot of questions.    Let me try to take the gist of

Provided to Jordan A. Esteban, Neiman Mays Floch & Almeida, PLLC on 9/24/2025

1    this.

2        In reading from the case agent's sworn statement -- I believe you cited litigation where they

3    filed suit under the CVRA.

4        Ms. Crockett.    Yes.

5        Mr. Acosta.    So, first, at the time -- and it has since changed, but, at the time, it was the

6    Department of Justice's position that the CVRA did not attach until indictment.    And that was the

7    written position under an Office of Legal Counsel decision.

8        And so things have changed, but I want to be very clear up front.    The Office of Professional

9    Responsibility reviewed this matter fully.    And there are some things -- I agreed with the question

10    earlier where I agreed with the criticism of OPR.    But OPR found we did not violate any law, we did

11    not violated any Department policy, and there was no misconduct with respect to victim notification.

12        Reading from the case agent's sworn declaration:    "Many of the victims were troubled about

13    the existence of the investigation.    Some victims who were identified through the investigation

14    refused even to speak to us.    During interviews conducted from 2006 to 2008" -- continuing

15    after -- after -- the agreement was signed -- "no victim expressed a strong opinion that Epstein be

16    prosecuted."

17        And so that was actually filed in response to the claims that you made in that -- that you

18    quoted from that litigation.    That is the litigation that preceded and that declaration was filed as a

19    response to the claims that you made.

20        Now, with respect to victim notification, very briefly, one of the issues that arose -- and this

21    went a little bit to your question about some of the difficulties that I will own with the proceeding on

22    the State -- was that we included a provision that allowed the victims to recover monetary damages.

23    And our prosecuting attorney and the FBI case agent started notifying the victims.

24        And this isn't my recollection, let me be clear.    This is what the OPR discussed and found.

25    Because, you know, I was not, as U.S. attorney, supervising victim notification.    This was, you know,

Provided to Jordan A. Esteban, Neiman Mays Floch & Almeida, PLLC on 9/24/2025

1    left to the prosecuting attorneys and the supervisory chain.    And this is what OPR found.

2         And so they became concerned that they were generating more impeachment evidence,

3    because if victims became aware that they could recover monetarily, they would have -- when

4    they're put on the stand, you can imagine how the questioning would go.    "Isn't it true that if this

5    person is convicted you stand to recover $100,000?" or $150,000 or whatever the amount was.

6         And because of that, they went to their professional responsibility officer, to their ethics

7    officer, and said, "We feel uncomfortable continuing with these victim notifications."    And the

8    ethics officer at the time told them, "If you feel uncomfortable, then don't go forward."

9         And so the notifications, based on my understanding of the OPR report, proceeded (ph) by

10   saying the investigation is ongoing -- because, at that time, the appeal was pending in O.C. and we

11   didn't know how it would turn out.

12        And so that is the decision that was made.    It was made with the best of intentions of

13   preserving the case, and it was made in conjunction with the professional responsibility officer of the

14   office.

15        Mr. ▮▮▮.    We're going to end the Democratic round there, but before we do, Ms. Stansbury,

16   can you please introduce yourself on the record?

17        Ms. Stansbury.    I'm Melanie Stansbury, New Mexico.    Thank you for being here.

18        Mr. Acosta.    How are you?

19        Ms. Ansari.    Hi.    Yassamin Ansari, Arizona's Third.

20        Mr. Acosta.    How are you?

21        Mr. ▮▮▮.    Great.    We'll go off the record.

22        [Recess.]

23        Mr. ▮▮▮▮.    We'll go back on the record and back to one questioner --

24        Mr. Acosta.    Please.

25        Mr. ▮▮▮.    -- of regularly scheduled programming.

Provided to Jordan A. Esteban, Neiman Mays Floch & Almeida, PLLC on 9/24/2025



1           BY MR. ▇▇▇:

2           Q    So, just for a clean record, the Epstein case in the Southern District of Florida was

3     resolved via non-prosecution agreement, correct?

4           A    Yes.   So -- yes, it was.

5           Q    And you -- I want to differentiate a little bit.   Did you approve the terms of the NPA

6     itself or -- you've been using "terms sheet," I think was the language that you've been using.   Is

7     there a difference between the two?

8           A    So the terms sheet was the initial proposal that was presented to the defense, I believe

9     in late July.   The ultimate agreement differed primarily, as we've already discussed, from 24 to 18.

10          Q    Uh-huh.

11          A    And I approved both.

12          Q    Okay.

13          Is there a difference between a non-prosecution agreement and the kind of colloquial plea

14    agreement?

15          A    There is.

16          Q    What is it?

17          A    So a non-prosecution agreement is typically kept in the U.S. Attorney's Office, and it's an

18    agreement not to prosecute.   And, in this case, it was in deference to the State that would be

19    prosecuting pursuant to these terms.

20          Q    Are plea agreements traditionally more public than non-prosecution agreements?

21          A    Non-prosecution agreements traditionally are not public.

22          Q    Okay.

23          A    Or at least were not public traditionally at that time.

24          Q    At that time.   So a non-prosecution agreement, like, wouldn't -- I'm sure PACER didn't

25    exist in 2006, but -- wouldn't go online or wouldn't be available at a courthouse for public view?

Provided to Jordan A. Esteban, Neiman Mays Floch & Almeida, PLLC on 9/24/2025

1        A     It would not.    It would be kept within the U.S. Attorney's Office.

2        Q     Was that part of the rationale to choose a non-prosecution agreement versus a plea

3    agreement?

4        A     No, it was not.

5        Q     Did defense counsel ever suggest that they wanted it to remain private?

6        A     So, at some point in the process, that came up, and that came up in the negotiation

7    process.    As a matter of just U.S. attorney policy, it would remain within the U.S. Attorney's Office.

8    But it's always subject to FOIA.

9        Q     Okay.    But from your side of the negotiating table, it being private was not pivotal in

10   the negotiations.

11       A     It being private was not pivotal at all.

12       Q     Was there ever discussion in forcing a plea agreement verses an NPA?

13       A     I don't understand the question of forcing a plea agreement.

14       Q     So it was obviously in the defense's interest for an NPA, because one of the rationales, I

15   would think, would be that it's not a public document.    Did it ever come up in conversation of the

16   U.S. Attorney's Office would prefer a public document versus the NPA?

17       A     So I wasn't part of the team that negotiated this, and so I can't speak to what came up in

18   conversation.    The ultimate plea was in State court.

19       Q     Uh-huh.

20       A     So we need to be -- well, let me separate out the terms.    The plea was in State court.

21   It was a public State plea.    The Federal resolution was that we are going to withhold prosecution

22   pending the State plea and his serving his term --

23       Q     Okay.

24       A     -- as we had envisioned it, under continuous confinement, in the State court.

25       Q     Okay.    Thank you.

Provided to Jordan A. Esteban, Neiman Mays Flich & Almeida, PLLC on 9/24/2025

75

1       I'm going to introduce — I think it's exhibit 2 — the actual NPA.

2                                    [Acosta Majority Exhibit No. 2

3                                    was marked for identification.]

4               BY MR.  :

5       Q       So this is the non-prosecution agreement in the Epstein matter.

6       Just for the record, this looks like the non-prosecution agreement that you approved?

7       A       It does, and it has signatures, so yes.

8       Q       I believe from everybody.

9       A       Yes.

10      Q       And it was originally signed in September 2007, but he did not plead in State court until

11      the summer of 2008.    Is that your recollection as well?

12      A       That is my recollection.

13      Q       Do you recall as to why the large delay there?

14      A       Yes.    Because after he signed it we expected him to plead right away, like defendants

15      typically do, and then he started challenging it collaterally.    He started challenging the authority of

16      the office to enter into this agreement.    And then he started appealing us to Washington, D.C., to

17      the Criminal Division, and then subsequently to the Deputy Attorney General.

18      Q       And you had said this before, but, in your experience, it's kind of strange for someone to

19      agree to an agreement and then attempt to backtrack?

20      A       In my experience, it hadn't happened previously.    And let me just add, in the

21      experience of — I think I can speak for our office.    Everyone was very upset.

22      Q       Is there — my own, kind of, intellectual curiosity.    I mean, he signed it; your office

23      signed it.    Was there any reason to go through the delay?    Could you not summon him to court

24      and say, "You have to follow this agreement"?

25      A       So, at various points in this delay process, I think everyone was — at some point,

Provided to Jordan A. Esteban, Neiman Mays Floch & Almeida, PLLC on 9/24/2025

76

1    everyone became frustrated and said, why don't we just declare a breach?

2         One thing -- we did not foresee all these appeals and all these collateral attacks.    And I will

3    accept that criticism.

4         But, having signed this, if we declare a breach, now we're litigating as to whether or not it is a

5    valid breach, if it's because it's a unilateral breach, and now we're putting off the criminal trial and

6    the criminal prosecution that much longer as we go through the litigation of, "So, once it's signed, do

7    we have grounds to withdraw?"

8         And we had discussions at various points about whether we should or should not.    But,

9    ultimately, you know, he was appealing to Washington.    We were shocked, but Washington heard

10   him out.    I asked Washington to expedite the appeals, because I wanted it just done and I wanted

11   him in jail.    But, you know, Americans do have a right to appeal decisions of U.S. attorneys to their

12   bosses.

13        Q     But you had said, like, he was appealing after he agreed to it --

14        A     Look --

15        Q     -- which is unprecedented.

16        A     -- it is absurd.    It is absurd and unprecedented.    But it is what it was.    And if we

17   declared a unilateral breach, now something that's already been delayed is going to be further

18   delayed as we litigate whether or not we had a right to breach.

19        Q     And then the appeals process -- you said the head of the Criminal Division in

20   Washington and the DAG?    Is that correct?

21        A     He appealed to the Criminal Division.    I think the head of the Criminal Division

22   delegated that down.    And then he appealed to the Deputy Attorney General.

23        Q     So I -- well, I just -- I won't testify for you.    What did the Criminal Division -- what was

24   their decision?

25        A     The Criminal Division supported the office, and then the Deputy Attorney General

Provided to Jordan A. Esteban, Neiman Mays Floch & Almeida, PLLC on 9/24/2025

77

1    supported the office.

2        Q    Who was the DAG at the time?

3        A    I'm sorry.   I should remember, and I don't.

4        Q    That's okay.   That one we can figure out.

5        But the Deputy Attorney General's Office supported the -- your U.S. Attorney's Office's

6    decision in this matter?

7        A    They authorized us to go forward.

8        Q    All right.

9        And was there any delay between the DAG approval and the final plea in State court?

10       A    Once the Deputy Attorney General authorized it to go forward, then the plea in State

11   court proceeded -- I don't want to say "expeditiously," but -- in relatively short order.

12       Q    Were you aware of any appeals to the Attorney General?

13       A    I was not aware of any appeals to the Attorney General.

14       Q    In non-prosecution agreements generally -- this one sounds pretty unprecedented in its

15   number of appeals and steps, but -- does a U.S. attorney have the authority to enter into them

16   without Washington approval?

17       A    Yes.

18       Q    What are they -- again, a general question.   What kind of crimes are they normally

19   used for?

20       A    So non-prosecution agreements are typically used more in the white-collar setting.

21       In this case, it was different because it's not a non-prosecution on a Federal crime, but it's a

22   non-prosecution in deference to an alternative prosecution in the State where the case began so that

23   he could proceed as police initially had thought appropriate.

24       Q    So not -- I mean, this is kind of an untraditional non-prosecution agreement generally,

25   but they're not traditionally used in sex crimes or --

Provided to Jordan A. Esteban, Neiman Mays Floch & Almeida, PLLC on 9/24/2025



1        A      That's correct.

2        Q      -- other violent crimes?

3        This is kind of the hot-button issue going into September 29th, but are non-prosecution

4    agreements binding on all U.S. attorneys within the United States?

5        A      They are not.    And I'm sure as you're aware, that matter is pending in the Supreme

6    Court.

7        Q      But a district court has said that, and an appeals court has said --

8        A      A district court has said that, and an appeals court has said that.    And that is the

9    position of the Department of Justice.

10       Q      While U.S. attorney, had you used non-prosecution agreements prior to this one?

11       A      Not to my recollection.

12       Q      Did you use any after?

13       A      Not to my recollection.

14       Q      And just -- you were there for a number of years, and this was the only case that a

15   non-prosecution --

16       A      So non-prosecution agreements are typically -- are more typical in the types of cases

17   that are litigated in Washington or in other districts.

18       Q      Okay.    You said white-collar cases?

19       A      Yes.

20       Q      More common financial crimes or tax crimes, those kinds of things?

21       A      Correct.

22       Q      All right.

23       We've touched on this, kind of around this topic, an awful lot today, and there was an awful

24   lot of back-and-forth in the last hour, but just -- this is a broad question, so as briefly as you can and

25   to the best of your recollection:    Why a non-prosecution agreement in this case?

Provided to Jordan A. Esteban, Neiman Mays Floch & Almeida, PLLC on 9/24/2025

1          A      So ultimately the question was, do we proceed federally or do we defer to the State?

2          It came from the State.    The State police wanted certain charges, I understood, that would

3   result in 2 years.    It entered the office in the context of, we may have to proceed with a double

4   prosecution.    And the facts, as I understood them, were local facts.    We felt comfortable that -- we

5   felt we had an argument for an interstate case, that if we had to go to trial, we had no issue going to

6   trial.    But everyone favored a resolution that was negotiated.    And because of all those issues, it

7   seemed that a State resolution at the time made sense.

8          As I said before, I note OPR's comments.    If we had -- I think what I told the Office of

9   Professional Responsibility was, if we had foreseen all the issues that the State resolution raised, we

10  would not have gone down that path, and I don't advise others to go down that path.    But we didn't

11  foresee them at the time.    And when I say "we," again, that's on me.    I will take responsibility for

12  that.    And, in that sense, I think OPR was generally correct.

13         Q      And prior to the execution of the NPA, it was largely believed in the office that a

14  negotiated agreement was -- I'm going to use the phrase, the, like, "safer" outcome.    It was going to

15  result in jail time --

16         A      It was the superior outcome, because it would result in jail time, it would result in

17  registration, it would send a signal to the community.    And as I, you know, cited from multiple

18  people, it was the sense that you didn't have to put the victims that didn't want to go through a trial

19  through a trial.

20         And there was a continuum.    We talk about the victims as if they all had one view.    And,

21  you know, multiple victims with different views.

22         Q      Were there -- I'll read you -- it's page 40 of the OPR report.

23         "Villafana," the lead line prosecutor on this case, "told OPR that she was angry when she

24  received Menchel's July email explaining that he had proposed to Sanchez resolving the federal

25  investigation through a state plea.    In Villafana's view, the proposed state resolution 'didn't make

Provided to Jordan A. Esteban, Neiman Mays Floch & Almeida, PLLC on 9/24/2025

1    any sense' and 'did not correspond' to Department policy requiring that a plea offer reflect 'the most

2    serious readily provable offense.'    In her view, a plea to a state charge 'obviously' would not satisfy

3    this policy."

4        Did Ms. Villafana ever express to you concerns regarding the language of the NPA?

5        A    Ms. Villafana ended up negotiating the language of the NPA.    I think -- I think it's fair to

6    say she would've preferred a Federal resolution.

7        I think my supervisory staff differed from her, in that they were comfortable with the State

8    resolution, although, to some extent, the federalism concerns, the deference to the State, if I'm

9    being fair in all this, primarily comes from me.    And I think OPR found that, and I think OPR was fair

10    in that judgment.

11        Q    So it's Ms. Villafana's words, not yours, but just in your interaction with her and with

12    others in negotiating this agreement or getting to this agreement, would it be fair to characterize

13    her -- and you've said this -- as in favor of a negotiated resolution but not necessarily in favor of a

14    State resolution?

15        A    I think that would be fair.

16        Q    Okay.    I just wanted to, kind of, dissect that out because it was a little confusing.

17        Do you recall who first initiated the negotiations with Epstein's defense regarding the NPA?

18        A    I do not.

19        Q    Were there ever any concerns regarding using an NPA versus going to trial?

20        A    So "ever" is a very broad word, right?

21        I think -- this is 20 years ago.    Thinking back, these conversations, sometimes they happen

22    around the table; sometimes they also happen in a hallway.    You know, the first assistant had his

23    office right next to mine; we shared a suite.    The Criminal chief had his office down the hall.    You

24    get together, you talk about things, and the proposal formed.

25        And ultimately I approved it, but the proposal -- people come together, they generate a

Provided to Jordan A. Esteban, Neiman Mays Floch & Almeida, PLLC on 9/24/2025

1    consensus.   "What do you think?   What do you think?   How do we go forward?"   But,

2    ultimately, look, I approved it, and -- and so I was U.S. attorney, and I take responsibility.

3         Q    Would you characterize the process as, like, a rigorous debate that led to this outcome

4    versus trial?

5         A    I think there was a fulsome and rigorous debate that wasn't simply one meeting but

6    happened over a number of days, if not weeks, where ideas would be discussed back and forth.

7         Q    And then while -- I'm going to have two different time periods.   While it was being

8    negotiated prior to it being signed in September of 2007, do you recall discussions regarding no

9    longer moving forward with it based off how defense counsel was acting or any new information?

10        A    There were some -- I don't recall them, but I've read in the OPR report that there are

11   were some discussions about no longer moving forward.   And it was based largely on defense

12   counsel getting very close to the line of what's proper and not proper for defense counsel to do.

13        And my view on that is, I understand defense counsel are who they are, I understand they're

14   frustrating, and I understand that they agree and then say they didn't agree.   But if that's the

15   decision that we had, we should make a good-faith effort to follow through on what we thought was

16   the right approach, despite defense tactics that were frustrating at best and -- you had asked

17   earlier -- I'd say bordered on the -- it's not -- frustrating and unprofessional and it came very close to

18   the line.

Provided to Jordan A. Esteban, Neiman Mays Floch & Almeida, PLLC on 9/24/2025

82

1    [12:47 p.m.]

2                 BY MR. ███████:

3         Q    And then the next time block, between September and -- it was June or July when he

4    finally pled in State court -- you touched on it briefly, but there were discussions about declaring a

5    breach and going to trial?

6         A    At some point, I think every one of us was frustrated and threw up our hands and said,

7    enough's enough, you know; do we just move forward?   Because how long are we going to wait for

8    this man that agreed in September to do something, to finally do something?

9              And then, once the heat of the moment subsides, you realize that if the goal is to get him in

10   jail, declaring a breach and starting litigation over whether there was a breach in the first place is not

11   moving toward that goal.

12        Q    Again, my experience in NPAs is limited to this one.   It seems odd, verging on

13   concerning, that it included a blanket immunity for the Southern District of Florida to both unnamed

14   and four known co-conspirators.

15             Do you recall the origination of that line?

16        A    So, as you're aware, the matter's pending litigation, and I don't want to create evidence.

17   But I'm going to read from the OPR report.   It's not that I'd be creating evidence, but I need --

18        Q    Yeah.

19        A    -- to be careful here.

20             Page 166:   "As the NPA drafting process concluded, Villafana circulated to Lourie and

21   another supervisor a draft that contained the non-prosecution provision" -- let me actually start up a

22   little bit before that.

23             "G" on page 166:   "OPR examined the decision by the subjects who negotiated the

24   NPA -- Villafana, Lourie, and Acosta -- to include in the agreement a provision in which the USAO

25   agreed not to prosecute 'any potential co-conspirators of Epstein,' in addition to four named

Provided to Jordan A. Esteban, Neiman Mays Floch & Almeida, PLLC on 9/24/2025

83

1    individuals."

2        "Other than the various drafts of the NPA and [the] federal plea...OPR found

3    little...contemporaneous records mentioning [it]" -- dot, dot, dot.

4        "Drafts of the NPA and the federal plea...show that the final...language promising not to

5    prosecute" -- dot, dot, dot.    "The provision expanded as" — not -- I'm sorry, "not to prosecute" -- let

6    me not do "dot, dot, dot."    Let's start again.

7        "Drafts of the NPA and of the federal plea agreement show that the final broad language

8    promising not to prosecute 'any potential co-conspirators of Epstein' evolved from a more narrow

9    provision sought by the defense.    The provision expanded as Villafana and defense counsel

10    exchanged drafts of, first, a proposed federal plea agreement and, then, of the NPA, with apparently

11    little analysis and no substantive discussion within the USAO about the provision."

12        "As the NPA drafting process concluded, Villafana circulated to Lourie" -- who was then the

13    managing attorney in Palm Beach -- "and another supervisor a draft that contained a

14    non-prosecution provision, telling Lourie it was 'some of [defense counsel's] requested language

15    regarding promises not to prosecute other people,' and commenting only, 'I don't think it hurts us.'"

16        "In a reply email, Lourie responded to another issue Villafana had raised...but Lourie did not

17    comment on the provision promising not to prosecute co-conspirators or ask Villafana to explain why

18    she believed the provision did not harm the government's interests."

19        "In a subsequent email about the draft NPA, Villafana asked Lourie for 'any other thoughts,'

20    but there is no indication that he provided further input.    OPR found no document that suggested

21    Villafana and Lourie discussed the provision further, or that the other individuals who were copied on

22    Villafana's email referencing the provision — her immediate supervisor, the supervisor designated to

23    succeed Lourie as manager of the West Palm Beach office, and Villafana's co-counsel -- commented

24    or had substantive discussions about it."

25        "Villafana told OPR that because none of the three supervisors responded to observation that

Provided to Jordan A. Esteban, Neiman Mays Floch & Almeida, PLLC on 9/24/2025

1    the non-prosecution provision 'doesn't hurt us,' Villafana assumed that they agreed with her

2    assessment."

3            And so they went through how it came to be and discuss that.    And because it's pending

4    certiorari --

5        Q    No, I --

6        A    -- I don't think it wise for me to comment.

7        Q    I totally understand that, so I'm not going to ask about your, kind of, like, legal

8    understanding of that language, what it means to you, or anything.    But the origination of the

9    language I don't think is under potential review; it's more what it means for Ms. Maxwell.

10            So the provisions from the OPR report you read said that it was a broadening of a less-narrow

11    version that defense counsel had suggested.    Do you recall any conversations about why it was

12    broader?

13        A    So I don't recall any conversations about this.    I ultimately approved the agreement,

14    and because as U.S. attorney I ultimately approved it, I'm responsible for it.

15            What's contained in the report is -- I have no recollection of this.    My assumption as I

16    approved the ultimate agreement is that we had very experienced attorneys and that this would've

17    been thought through and negotiated.

18            I was focused, honestly, on him going to jail, him serving as -- you know, him having to

19    register as an offender, and the recovery.

20            And my edits to the agreement focused on -- the agreement was directing the State to take

21    action, and I didn't think, as the U.S. attorney, I had authority to direct the State.    So I changed it

22    from directing the State to directing Epstein to work with the State.

23        Q    Okay.    So no --

24        A    I have no --

25        Q    -- no overall recollection about how that sentence came to be, how those four names

Provided to Jordan A. Esteban, Neiman Mays Floch & Almeida, PLLC on 9/24/2025

1    came to be?

2          A    No independent recollection of that.

3          Q    All right.

4          Do you have any recollection of whether or not your office informed those four individuals

5    that they were going to be named in the non-prosecution agreement?

6          A    I have no independent recollection.

7          Q    And then, based off what you just said -- again, not trying -- we don't want to interfere

8    in any ongoing litigation either.    But based off what you said, the past decisions, it is your

9    understanding that this language does not limit the Southern District of New York from prosecuting

10   those individuals or other known co-conspirators?

11         A    So, you know, it is my -- was my understanding at the time, and as I read this I would

12   have been aware of the Department's policy, that any such provision authorized by a U.S. attorney

13   does not bind outside of south Florida.    And a district court has held that.    A court of appeals has

14   held that.    It's pending certiorari.    And that's also the written policy of the United States.

15         Q    And, kind of, I mean -- and I understand it's still pending the final outcome, but -- kind of

16   exemplified by the Maxwell case of the Southern District of New York did choose to move forward

17   despite this provision being in place.

18         A    That is correct.

19         Q    All right.

20         I don't want to get into the nitty-gritty of the CVRA because I don't have it memorized, I'm not

21   a crime victim's lawyer.    So I don't want to touch too much on the individual terms.    My general

22   understanding of it is that it requires notification to potential victims prior -- I think you said prior to

23   indictment.    Is that fair?

24         A    At the time, the Office of Legal Counsel had written an opinion for the Department.

25   The CVRA, I think, was relatively new, had just been passed by Congress a year or two prior.    The

Provided to Jordan A. Esteban, Neiman Mays Floch & Almeida, PLLC on 9/24/2025

1    Office of Legal Counsel had written an opinion that said it does not attach until an actual indictment.

2    So it doesn't even attach pre-indictment.    It doesn't at the time until indictment.

3        Q    So I guess -- I mean, was there ever actually an indictment in this case?

4        A    There was not.

5        Q    So was there -- is it -- based off that OLC opinion, your understanding is that, if there's

6    not an indictment, if it goes with a non-prosecution agreement and there's not a plea in court, that

7    victims would not have to be notified?

8        A    So, not only is that my understanding, but the Justice Department, in this 300-page

9    report, found that there was no misconduct, no violation of law, no violation of policy, because it was

10    the Justice Department's position that it did not attach.

11        And in the litigation that was cited, the Justice Department, through multiple administrations,

12    through the Bush administration and then in the subsequent administrations, both Republican and

13    Democrat, kept taking that position, that there was no violation because the CVRA did not attach.

14        Q    On October 10th, Mr. Lefkowitz sent you a letter saying that -- it was cited in the OPR

15    report -- no Federal agent or employee of the U.S. Attorney's Office "should" contact the victims to

16    inform them of the resolution of the case.    And then 2 days later you had breakfast, so I'm going to

17    ask about the breakfast.

18        But I think most of us are lawyers in this room.    Is there a difference between "should" and

19    "could"?

20        A    I would say that there is.    But, you know, as the record will show later, we basically

21    said that he's wrong and we can do what we want.

22        Q    So you weren't precluded from notifying --

23        A    We weren't precluded.    I think -- I think the phrase that I remember from the report

24    said, "What you're suggesting is a gag order, and the U.S. attorney does not accept a gag order."

25        Q    Was it odd for defense counsel to suggest to you how to work with victims in an ongoing

Provided to Jordan A. Esteban, Neiman Mays Floch & Almeida, PLLC on 9/24/2025

1  case?

2      A    Not this defense counsel.

3      Q    Can you explain that a little bit more?

4      A    I think we've talked about how this defense counsel skirted the line.

5      Q    So this is one instance of them telling a U.S. attorney how to interact with victims in an

6  ongoing case.   Do you have other examples off the top of your head?

7      A    Of defense lawyers doing that?   No.

8      Q    In this case.   Do you have other examples of Mr. Lefkowitz, Mr. Dershowitz, or Mr.

9  Starr --

10      A    So, in this --

11      Q    -- telling you --

12      A    -- you know, in this very context of -- you mentioned they (ph) were going to the

13  breakfast.   And then, after the breakfast -- the breakfast took place in Palm Beach.   I was giving a

14  speech there.   It was a convenient location.

15      And after the breakfast, I called my first assistant, debriefed him.

16      And I don't have independent recollection of this.   This, again, is based on the Justice

17  Department report finding that there was no impropriety, nothing wrong with the breakfast.

18      And he then emails the first assistant, saying that I had agreed to something which I had not

19  agreed to.   And we had to email him something back, saying, "You're wrong.   Acosta did not agree

20  to such a thing."

21      Q    Do you have any other examples off the top of your head of one of those three

22  individuals trying to, like --

23      A    I think there are multiple examples in the record where they would claim that there was

24  agreement where there was none or vice versa.

25      Q    No, I'm more interested in defense attorneys for Mr. Epstein attempting to interfere in

Provided to Jordan A. Esteban, Neiman Mays Floch & Almeida, PLLC on 9/24/2025

1    the U.S. Attorney's Office's ability work with, interview, or notify victims.

2        So this is one example of that --

3        A    So --

4        Q    -- where a defense attorney is telling you their read of the law, and I read it as an

5    attempt to block you from talking to victims.

6        A    I --

7        Q    Are there any other --

8        A    I understand the question now.

9        So one of the issues that arose was, as a result of our seeking a mechanism, a way, for the

10    victims to recover money, we set up a system whereby he would concede liability and they would, in

11    essence, just argue over amounts.

12        Q    Uh-huh.

13        A    Defense counsel argued that the way we set it up was a conflict of interest and that we

14    couldn't proceed.    And that was one of the grounds on which they appealed to Washington.    And

15    my first assistant and defense counsel had a vigorous exchange over a number of weeks over that

16    topic.

17        We wanted the victims to be able to recover.    And we thought, once he signed, he meant

18    what he said.    And after he signed, he tried to get out of it.

19        Q    Did defense counsel ever try to interfere with your ability to work with the FBI or other

20    investigators in order to gather information?

21        A    Not to my knowledge.    But, again, as I said before, I wouldn't typically direct the FBI

22    how to gather their information or our line attorneys how to gather information.

23        Q    Understanding OPR found the breakfast was fine, I'm just wondering, like, what -- was

24    the discussion at breakfast regarding informing the victims?

25        A    So, as I told OPR, I don't remember 20 years later what the discussion was.    I can infer.

Provided to Jordan A. Esteban, Neiman Mays Floch & Almeida, PLLC on 9/24/2025

1    At the time, he was trying to recuse our lead prosecutor, Ms. Villafana.

2        Part of the mechanism for seeking recovery for the victims was to appoint what, for

3    simplicity's sake, we could call a "special master" —

4        Q    Uh-huh.

5        A    — to follow this process.    Ms. Villafana had recommended someone who was known,

6    or a friend of, or somehow associated with her boyfriend.    And defense counsel claimed that she

7    had acted unethically and improperly and was looking to recuse her.

8        Based on the timing, I can see how I would want to know what their allegations are.    Ms.

9    Villafana is a key part of this case.    She was probably in the process of negotiating these issues,

10    negotiating the victim recovery issues, and notifying victims.    And I can infer that that's what I

11    would have viewed the topic as.

12        Now, whether defense counsel brought something else or not, that -- that's up to them.

13        Q    Is it common for defense counsel to seek information to cause recusal, or does it more

14    often just kind of come up in the course of practice?

15        A    It's not unheard of for defense counsel to seek recusal or generate conflicts of interest.

16        In this case, I didn't think they had a basis, and I did not recuse Ms. Villafana.    I thought their

17    attempt to recuse my first assistant was much more egregious.

18        Q    I'm going to come back to the NPA, but want to ask just, kind of, your own thoughts and

19    if you ever had a conversation about it.    Epstein obviously hired two people that could have

20    potentially created a conflict for you.    Do you think he did it on purpose?

21        A    I think it was clear he hired the two attorneys from Kirkland, one, because, having

22    worked with me, they would know my thinking and my style; two, they could likely get an appeal to

23    Washington, D.C.    And I think — yes, I think he did that.

24        He hired someone that had previously worked with my Criminal chief.    He hired someone

25    that had been a partner with my first assistant, I believe.    He hired an AUSA in our office that may

Provided to Jordan A. Esteban, Neiman Mays Floch & Almeida, PLLC on 9/24/2025

1    have been privy to hallway conversations about the case.    So there is a pattern here that we were

2    all well aware of.    He hired someone that had an association with the managing attorney of the

3    Palm Beach office.

4        Q    And, I mean, it's one thing to hire those people because they might know how opposing

5    counsel --

6        A    Right.

7        Q    -- thinks, but all the facts kind of point to an attempt to subvert the case.

8        A    So let me make one thing clear as you're going there.    The Office of Professional

9    Responsibility at Department of Justice looked at all these contacts, they looked at everyone

10    involved, they looked at all the emails, they looked at every communication, and they found no

11    improper conduct, they found no improper influence, they found --

12        Mr. Neiman.    On your behalf.

13        Mr. Acosta.    On -- not only on my behalf, but on behalf of everyone in the U.S. Attorney's

14    Office.

15        Mr. Neiman.    Right.

16        Mr. Acosta.    No improper influence, no wrongdoing.    So this is something that was fully

17    looked at, fully considered.

18        And so, you know, he hired who he hired, but we proceeded the way we wanted to proceed.

19    And the record shows that, from before these two attorneys were brought on board, where I

20    approved for 2 years the registration and the recovery mechanisms to the ultimate plea, what

21    changed was negotiations among the trial team.

22        BY MR. ▮▮▮▮▮:

23        Q    And I want to be -- I'm not suggesting that you should've declared a conflict or,

24    like -- you guys were in the best position to figure that out.    What I'm suggesting is that it looks like

25    it's another defense tactic in an attempt to get even closer to the line of intentionally hiring people

Provided to Jordan A. Esteban, Neiman Mays Floch & Almeida, PLLC on 9/24/2025

1    that would conflict the --

2        A    A failed --

3        Q    -- lead prosecutor out.

4        A    A failed defense tactic, because -- so one of the Justice Department's policies on

5    recusals is that you don't just recuse, because then every defense attorney could simply recuse all

6    the good attorneys —

7        Q    Uh-huh.

8        A    -- and experienced attorneys in a U.S. Attorney's Office.

9        Q    I'm going to introduce exhibit 3.    It's two letters.

10                          [Acosta Majority Exhibit No. 3

11                          was marked for identification.]

12            BY MR. ▮▮▮▮▮ :

13        Q    While we pass that out, I'll describe them.    It's two letters sent from FBI West Palm

14    Beach to -- they're redacted, but -- two victims, notifying them in regards to the Epstein case, one

15    from May 30th, 2008, and one from January 10th, 2008.

16        Have you seen these letters prior to today?

17        A    I don't recall.

18        Q    Okay.    I'm going to focus more on the timeline and one sentence versus the whole

19    notification.

20        So, looking at the January 10th one, which the cover page is "Exhibit 97," it's the first

21    sentence in that letter, and then in the second letter it is the second full paragraph.    But it reads,

22    "This case is currently under investigation.    This can be a lengthy process and we request your

23    continued patience while we conduct a thorough investigation."

24        By January 10th, 2008, and May 30th, 2008, the case was no longer under investigation.    Is

25    that correct?

Provided to Jordan A. Esteban, Neiman Mays Floch & Almeida, PLLC on 9/24/2025

1       A    So that is not accurate.

2       Q    Okay.

3       A    So — and this was looked at by the Office of Professional Responsibility by the Justice

4    Department, and again they found no wrongdoing.

5            I don't have an independent recollection, but based on the Justice Department's conclusions,

6    let me try to walk through this.

7       Q    Uh-huh.

8       A    He had signed a plea in September.    Our expectation was, he signed -- I'm sorry.    He

9    had signed the agreement in September.    Our expectation was, he signed the agreement, he'd go

10   take the plea, he'd go to jail, we're done.    But he did not do that.

11           And so my understanding at the time was that we did not just sit around but that the

12   prosecuting attorney and the case agent continued to work the case, because we did not know if we

13   would have to go to trial or not.    And so the case was not done, because he was not in jail.    And so,

14   during that time, the case, as a technical matter and an actual matter, was under investigation.

15           The prosecuting attorney and the case agent started notifying the victims of the actual

16   agreement.    They then became concerned because they, in essence, were saying, here's an

17   agreement, and he goes to jail, and you'll have the opportunity to recover what for these victims

18   would've been substantial sums.    And they became concerned that they were generating evidence

19   that would undermine the case.    Because in the usual course, he would be pleading, but he's not.

20      Q    Uh-huh.

21      A    He's challenging this on appeal.

22           And so they went to the professional responsibility officer -- again, this is from OPR, not my

23   independent recollection -- and they asked the professional responsibility officer, "What should we

24   do?"    And the professional responsibility officer said, in essence, "If you feel uncomfortable with

25   this, then just stop."

Provided to Jordan A. Esteban, Neiman Mays Floch & Almeida, PLLC on 9/24/2025

1    And so they proceeded, but at the same time the FBI generated these letters, which are

2    accurate, but -- but let me sort of say here, this is another area where I understand why victims felt

3    that this wasn't -- you know, I think OPR's view was -- you know, they found that we complied with

4    the rules and the law, but said it wasn't fully forthright.    And I understand that.

5        And, in retrospect, we were focused, again, "send him to jail; registration," and should have

6    probably thought more about how victims would have viewed this.

7        Q    All right.    I appreciate that and appreciate the timeline.

8        So, just for clari- -- when these letters went out, your understanding was that there was still

9    investigation happening?

10        A    So, again, I wasn't aware that the letters were going out, because U.S. attorneys don't

11    get involved in this as a typical matter, but that was my words, yes.

12        Q    And then --

13        A    I'm sorry -- that that was -- that would be my understanding, yes.

14        Q    And then your understanding, too, is that -- so we get back to the, like, kind of, notifying

15    of the victims and that the ethics advice was, if it's going to mess up the case, it's still — it's

16    permissive, right?    So, like, you could make the determination whether or not to notify, whether or

17    not it's going to mess up the case.

18        A    And, at some point, the office had the Appellate Division check either independently or

19    check with Washington on that and was told that the -- that's when they were told specifically that

20    the CVRA did not attach until indictment.

21        Q    All right.

22        And we talked about the addition of the four named co-conspirators a little bit.    And I know

23    that you don't get into, kind of, picking and choosing who gets interviewed, but do you recall if those

24    four women were interviewed?

25        A    I do not recall.    And I wouldn't have reason to recall.

Provided to Jordan A. Esteban, Neiman Mays Floch & Almeida, PLLC on 9/24/2025

1      Q    The Palm Beach Police Department attempted to interview those people and were,

2   according to their report, told by Alan Dershowitz that those four women were out of the country.

3  Do you have any knowledge of that?

4      A    I have no knowledge of that.

5      Q    I won't ask the followup.

6      Would it be odd that the primary suspect's lawyer is the one communicating with Palm Beach

7  PD regarding four witnesses?

8      A    Again, I was not involved, you know, in how the investigation proceeded.

9      Q    And then, to your knowledge, again, understanding that you're not picking and choosing

10  who gets interviewed, did anyone in your office or the FBI ever interview Ms. Maxwell?

11      A    To my knowledge, they did not.   I recall reading somewhere in the Justice Department

12  report that I believe our lead prosecutor wasn't aware of Ms. Maxwell.   I don't -- I think she at some

13  point said she didn't recognize the name.   But I could be wrong.   That's just a vague recollection.

14      Q    And, again, I'm prefacing all this with the understanding that you're not picking and

15  choosing the -- and would have no and don't have recollection of whether or not they were

16  interviewed.

17      It seems odd and verging on not a fulsome investigation to enter into this level of agreement

18  without interviewing these types of people.   Do you agree?

19      A    So, again, I don't know.   I was not involved in how the investigation proceeded.   We

20  have very, very good prosecutors in the Southern District of Florida, and my approach would've been

21  to trust them to proceed as they saw appropriate.

22      Q    And so, with that trust, when they proposed a non-prosecution agreement, it was your

23  belief that they had checked all the, kind of, investigatory boxes to make sure that this was the best

24  path forward?

25      A    That would be my belief and expectation in this and other cases.

Provided to Jordan A. Esteban, Neiman Mays Floch & Almeida, PLLC on 9/24/2025

1    Q    All right.

2         I want to go back to the agreement itself.    I just have some, kind of, like,

3    four-corners-of-the-agreement-type questions.    And if it's, A, you don't recall your thoughts at the

4    time, that's fine.    If you have an opinion about it now, that's fine too.

5    A    All right.

6    Q    On page 1, the first, kind of, stipulation is that -- I'm sorry.

7         So most of the document refers to "minor females."    And did you find any evidence of

8    Mr. Epstein trafficking non-minor females?

9    A    Not to my recollection.

10   Q    And then what would, kind of, like, constitute a breach of this agreement on

11   Mr. Epstein's side?

12   A    Well, it requires him to take certain steps on page 3.    You know, it outlines one, two,

13   three, four, and so on.    You know, ultimately, if he didn't plead, if he didn't serve the term as

14   outlined in the agreement, or if he didn't take any of the other steps, it would be a breach.

15   Q    And then the actual, kind of, like, agreement of what the jail confinement would look

16   like, what work release would look like, what parole or home confinement would look like was all out

17   of your hands?

18   A    So one of the issues -- look, we never expected that -- we handed this to the State

19   attorney and the Palm Beach County.    They had no jail time, and we gave him jail time.    We never

20   expected them to do anything less than say, "Outstanding, great" and have him serve his time.

21        Particularly when, if you look into the details of the work release, the way he obtained that

22   work release is troubling at best.    And I think that was outlined in a letter from our office.

23   Q    And we'll get to some of that a little bit later.

24        Just, to your recollection, would it be common in a parole agreement or a home-confinement

25   agreement to require that the convicted individual not commit any other crimes while on home

Provided to Jordan A. Esteban, Neiman Mays Floch & Almeida, PLLC on 9/24/2025



1    confinement or parole?

2        A    So I would think so, and I'd think that'd be part of the State's management of their

3    prisoners.

4        Q    But, again, not up to the U.S. --

5        A    Again, not up to the U.S. attorney.

6        Q    Right.

7        A    He is within the State system.

8        Q    If he were to breach parole, would that be a breach of the NPA?

9        A    I would have to read the NPA --

10        Q    Okay.

11        A    -- in a lot more detail before I gave an opinion on that.

12        Q    Did Ms. Villafana ever approach you with evidence that Mr. Epstein was violating the

13    NPA?

14        A    There were certainly discussions within the office as to how to proceed on work release,

15    but I don't think that was viewed as evidence.    I think that was viewed as -- to be honest, I think it

16    was viewed as the office was hoodwinked.

Provided to Jordan A. Esteban, Neiman Mays Floch & Almeida, PLLC on 9/24/2025

1

2      [1:16 p.m.]

3      BY MR. ███████:

4    Q    Hoodwinked by whom?

5    A    The State attorney, in part, or the State -- let me not -- because the State attorney

6 would say the Palm Beach sheriff.

7    It was not what we expected.   We expected, quote/unquote, continuous confinement.   We

8 were given an assurance of continuous confinement.   Whichever system in the Palm Beach

9 correctional hierarchy chose to give this to him is not what we expected, and we made it pretty clear

10 that we didn't think it was appropriate.

11    Q    You said earlier, a lot earlier at this point, that the State was an unfair partner.   You

12 might have said a different word, but --

13    A    I think an unreliable partner is what I said.

14    Q    Unreliable partner.   Is this part of the evidence that supports that statement?

15    A    Yes, it is.

16    Q    Do you have any other support for them being an unfair partner?

17    A    So one of the issues in this case was I believe we got notified on a Friday afternoon that

18 he was taking his plea Monday morning.   I would expect that a law enforcement partner would give

19 us at least a business day, and I'm being sarcastic here, on a plea of this nature.   And so our

20 attorneys were left to scramble and work with the Palm Beach State Attorney's Office and Victim

21 Notification on very, very short notice, and I think that led to some of the feelings of lack of

22 forthrightness on the part of the victims.

23    Q    You had discussed some of the -- you know, I'm paraphrasing -- the shadiness of his

24 work release detail and where he was working.   Does the Florida Science Foundation ring a bell as

25 his work release?

Provided to Jordan A. Esteban, Neiman Mays Floch & Almeida, PLLC on 9/24/2025

1    A    It does.

2    Q    And sitting here today, what's your understanding of the Florida Science Foundation?

3    A    When I was referencing shady, I think I used "troublesome", because I tend to -- just for

4  the record, I tend -- I believe in being professional and opting over the combative, and I sometimes

5  understate.   I've been told that that's a bad habit.   So "shady" might be a better term.   I believe

6  that that's part of what I considered shady.

7    Q    And I'm going to maybe jump a little bit out.   And we'll introduce both of these

8  documents together as exhibit 4.

9                          [Acosta Majority Exhibit No. 4

10                         was marked for identification.]

11               BY MR. ██████ :

12    Q    While they're being passed out, so it's the Articles of Incorporation For Bruce Reinhart,

13  P.A., his law firm, and the Articles of Incorporation for the Florida Science Foundation.

14          Was Bruce Reinhart an employee in the U.S. Attorney's Office while you were there?

15    A    So you've just disclosed something that I did not know.

16    Q    Okay.

17    A    Bruce Reinhat was an employee.   He was an AUSA that worked in the Palm Beach

18  office during this [inaudible].   I knew that he had left to work for Epstein while this case was

19  pending.   I did not know that he is the one that filed these articles of incorporation.

20    Q    So that gets to some of my questions.   Was he directly involved in the Epstein

21  investigation while at the U.S. Attorney's Office?

22    A    So I would not have knowledge as to whether he was directly involved.   He was not

23  part of the core team, but within any office, as might be the case in any congressional office or

24  others, there is sometimes hallway discussions, sometimes --

25    Q    Hear things, you chat with colleagues near the water cooler, that kind of thing.

Provided to Jordan A. Esteban, Neiman Mays Floch & Almeida, PLLC on 9/24/2025

1      A      And the Palm Beach office is much smaller than the Miami office.   And so I can't speak

2   to what he did or did not know.

3      Q      And it's my understanding he left -- officially left the U.S. Attorney's Office in January of

4   2008.   Is that your understanding now?

5      A      I don't recall, but I know he left, and I know he left at some point while the case was

6   pending appeal.

7      Q      All right.   We'll flip to his incorporation paperwork.   You have it.   Up in the top right

8   corner of the first page it says filed October 23rd, 2007.   That's 3-ish months prior to him officially

9   leaving the U.S. Attorney's Office.

10      To the best of your recollection and knowledge, is it ethically questionable to begin private

11   practice while still in the U.S. Attorney's Office?

12      A      Yes.

13      Q      Is it actually unethical to do so?

14      A      Yes.

15      Q      Did you have knowledge of this at the time?

16      A      No.   So — I'm sorry.   To clarify, he filed this under Bruce Reinhart, P.A., before he left

17   the U.S. Attorney's Office?

18      Q      Yes, sir.   He filed it October 23rd, 2007.   We pulled this right off the Florida

19   corporation website.   And then it's our understanding that his last day in the U.S. Attorney's Office

20   was January 1st, 2008.

21      We're going to flip to the next one, the one with the big Sharpie writing on it.   The first page

22   on this one is not as interesting, but the second page is the beginning of the Articles of Incorporation

23   for the Florida Science Foundation.   And this was incorporated, the stamp says, November 1st,

24   2007, so about a week after Mr. Reinhart's incorporation?

25      A      Yes.

Provided to Jordan A. Esteban, Neiman Mays Floch & Almeida, PLLC on 9/24/2025

1       Q    And I want to compare the second page of the Florida Science Foundation to the first

2    page of Mr. Reinhart.

3          Article II for Mr. Reinhart says the principal place of business is 250 Australian Avenue, Suite

4    1400, in West Palm Beach, Florida.   And Article II for the Florida Science Foundation says 250

5    Australian Avenue, Suite 1400, West Palm Beach, Florida.

6          On its face, looking at this, does it appear that Mr. Reinhart and the Florida Science

7    Foundation, which was a front for Mr. Epstein, shared the same office?

8       A    On its face, it does, yes.

9       Q    Would that be of concern to you that --

10      A    Yes.

11      Q    And then, again, it is our understanding that Mr. Reinhart's first clients were

12    Mr. Epstein's maid, Sarah Kellen, and Mr. Epstein's pilots.   Would that be unethical to shift straight

13    from a U.S. Attorney's Office working on that case to then taking them as defense clients?

14      A    So I recall the office was troubled by Mr. Reinhart leaving and shifting to Epstein-related

15    clients.   I don't know what conversations he had with what ethics officials, but shady.

16      Q    Do you recall any conversations about Mr. Reinhart taking Epstein clients at the time?

17      A    I recall some conversations at some point.   I don't know what that time period would

18    be.

19      Q    I'm going to not ask you to speculate, but it would certainly appear like there was some

20    coordination here, Mr. Reinhart's articles of incorporation being at the same address a week before

21    the Florida Science Foundation's incorporation and then him taking their clients.

22          We've talked a lot about --

23      A    What is most troubling is that this was before he left the office.

24      Q    We've talked a lot about Mr. Epstein's defense counsel attempting to find conflicts of

25    interest in your office.   Is this a conflict of interest for -- not in your office, but is Mr. Reinhart taking

Provided to Jordan A. Esteban, Neiman Mays Floch & Almeida, PLLC on 9/24/2025

101

1    Epstein clients a conflict of interest?

2        A    So as a technical matter, whether it is a conflict would have to do if he was involved in

3    the case.    As an ethical matter, as a professional matter, all of us thought that it was deploring.

4        Q    All right.    Thank you.

5        Mr. ████.    We can go off the record.

6        [Recess.]

Provided to Jordan A. Esteban, Neiman Mays Floch & Almeida, PLLC on 9/24/2025

1    [2:06 p.m.]

2                    BY MR. ████████:

3        Q    Good afternoon, Mr. Acosta.    I'd just like to turn back to the Federal investigation in

4    your office and make sure we have a complete understanding of the players.    And to begin with, the

5    members of the U.S. Attorney's Office team who handled this case, we've spoken about

6    Ms. Villafana --

7        A    Yes.

8        Q    -- the line prosecutor.    I understand that Jeffrey Sloman was also part of the team?

9        A    He was.

10        Q    Okay.    And he was the chief of the Criminal Division from 2004 to 2006, and first

11    assistant U.S. attorney in your office from October 2006.

12        A    I can't vouch for the dates, but that generally sounds correct.

13        Q    And then Matthew Menchel?

14        A    Menchel.

15        Q    Menchel.

16    Andrew Lourie?

17        A    Correct.

18        Q    I'm pronouncing it correctly?

19        A    Yes, Lourie.    He was managing attorney for the Palm Beach office and then went on to

20    be the chief of staff for the Criminal Division.

21        Q    Anyone else I haven't named who belongs on this list?

22        A    I think that would be the core team.    Other individuals may have been consulted from

23    time to time, but I think that'd be the core team.

24        Q    What about the FBI agents on the case?    Do you recall any of their names?

25        A    I do not.

Provided to Jordan A. Esteban, Neiman Mays Floch & Almeida, PLLC on 9/24/2025



1       Q       Did you ever interact with them during the investigation?

2       A       I believe they were in one or two meetings, but as a general matter, I would not interact

3       with them.    I may -- not I may.    I did interact from time to time with the special agent in charge.

4       Q       Do you recall that person's name?

5       A       John.    I forget his last name.    I'm sorry.

6       Q       And then Mr. Epstein's legal team.

7       A       Yes.

8       Q       And it's a fairly fulsome list, at least to my understanding.    First name is Roy Black.

9       Do you recall Mr. Black?

10      A       Yes.

11      Q       Did you know him at the time the investigation started?

12      A       I did.

13      Q       And how?

14      A       He had litigated other cases in the office.    He was well known.    I had met him socially.

15      Miami's a smaller legal community than Washington.    You get to know attorneys.    I also thought it

16      was important and I did -- you know, I met with well-known defense attorneys from time to time just

17      to see their assessment of how the office was proceeding.

18      Q       Did you have a social relationship with Mr. Black?

19      A       I don't think so.

20      Q       Gerald Lefcourt?

21      A       I knew the name.    I did not know him much beyond that.

22      Q       Guy Lewis?

23      A       So Guy Lewis, if the question is who he was -- I assume that's your question?

24      Q       So I understand that he was the former U.S. attorney and your predecessor in the

25      Southern District of Florida.    Is that right?

Provided to Jordan A. Esteban, Neiman Mays Floch & Almeida, PLLC on 9/24/2025

1    A    I thought that he was the predecessor one before me.

2    Q    Okay.   So you've answered the first question.

3    The second is whether you knew him at the time the investigation started.

4    A    I knew him.   I think he had served in Main Justice for some period of time.   We had

5    interactions from time to time.

6    Q    It's also my understanding that Mr. Lewis was close friends with Mr. Lourie in your office

7    at the time.   Is that right?

8    A    I will accept your understanding.   I don't have independent recollection.

9    Q    Lilly Anne Sanchez?

10   A    So she was in our office when I started in the office.   She later left for private practice.

11   Q    And represented Mr. Epstein?

12   A    And represented Mr. Epstein.

13   Q    And that was immediately after she left the office, if I'm correct?

14   A    I can't speak to the timeline.

15   Q    And she had been Mr. -- I'm sorry.   Menchel?

16   A    Menchel.

17   Q    -- Mr. Menchel's deputy at the office before she left.   Is that right?

18   A    That is correct.

19   Q    And I understand that she also dated him for a period of time?

20   A    During the Office of Professional Responsibility investigation, it came out that they had

21   dated previously.

22   Q    Jay Lefkowitz we've spoken about.   If I understood your testimony earlier, you knew

23   Mr. Lefkowitz from your time at Kirkland as an associate.   Is that correct?

24   A    Correct, in the mid-nineties, I believe.

25   Q    And please tell me if I'm mischaracterizing, but I understood you to say that you may

Provided to Jordan A. Esteban, Neiman Mays Floch & Almeida, PLLC on 9/24/2025 105

1    have had an assignment from Mr. Lefkowitz when you were in --

2         A    It was more than 20 years ago.    I did not -- I don't recall working with him on

3    something, but that doesn't mean that in the course of being a young associate you don't get an

4    assignment from a partner.

5         Q    Did you have any contact with Mr. Lefkowitz between the time you left Kirkland and the

6    inception of the Epstein investigation?

7         A    So he was in the Bush administration in a White House role, and from time to time we

8    may have come into contact.    I don't recall what White House role he was in.

9         Q    I understand that he was the former general counsel of OMB under President George

10   W. Bush.    Is that consistent with your understanding?

11        A    Again, I remember a White House role.    If you've looked him up, you have more

12   information at this point than I do.

13        Q    Ken Starr, also at Kirkland.    I believe you said that you also knew Mr. Starr from

14   Kirkland.    Is that right?

15        A    So I did work with a case.    It was a Supreme Court -- wasn't a certiori.    It was a full

16   Supreme Court matter, and I did work with him on that.    I was the junior associate on the team.

17        Q    And Mr. Starr, of course, is the former Clinton Whitewater special prosecutor, and that

18   was prior to your tenure at Kirkland, if my chronology is correct.

19        Again, did you have any contact with Mr. Starr between the time you left Kirkland and the

20   inception of the Epstein investigation?

21        A    If I could go back, I'm not sure your chronology is correct, because I remember that

22   Mr. Starr was out of the office quite a bit while I was at Kirkland working on some matters.    So if it

23   wasn't that matter, it would have been another similar non-Kirkland special assignment matter.

24        Q    Okay.

25        A    And I think your second question was did I have contact with him.    Again, he's a

Provided to Jordan A. Esteban, Neiman Mays Floch & Almeida, PLLC on 9/24/2025

1   well-known Washington figure.   I'm sure I would have come into contact with him at some event at

2   some point.

3       Q     We spoke about Alan Dershowitz.

4   Jack Goldberger?

5       A     Yes.

6       Q     Do you know Mr. Goldberger?

7       A     Not to my recollection.

8       Q     Are you aware that he represented Jeffrey Epstein?

9       A     I am.   Not based on independent recollection, but I've obviously reviewed material.

10      Q     It's my understanding that Mr. Goldberg's law partner at the time of the State's

11  investigation into Mr. Epstein was married to the assistant State attorney who was handling the

12  Epstein case, and that once Mr. Epstein retained Mr. Goldberger, that assistant State attorney was

13  removed from the case on the basis of a conflict of interest.

14      Did you become aware of that?

15      A     I have read that.   I don't recall if I became aware of that 20 years ago.

16      Q     Next name, Martin Weinberg.   Do you know Mr. Weinberg?

17      A     Again, I don't know him, but I recognize the name.

18      Q     Do you recognize him as one of Mr. Epstein's attorneys?

19      A     I will accept your assertion.

20      Q     Getting close to the end of this list, but the next name is Joe Whitley, W-h-i-t-l-e-y.

21      A     Yes.

22      Q     Do you know Mr. Whitley?

23      A     I do.   He was, I believe, the U.S. attorney for Northern District of Georgia, I believe, and

24  was in private practice by this time.

25      Q     It's my understanding that he also served as Acting U.S. Associate Attorney General

Provided to Jordan A. Esteban, Neiman Mays Floch & Almeida, PLLC on 9/24/2025

1    under President George H.W. Bush.    Is that consistent with your understanding?

2            A    I don't remember.

3            Q    And it's also my understanding that Mr. Whitley joined the legal team after the NPA was

4    signed.    Is that right?

5            A    I will accept your assertion.

6            Q    And finally, I don't have a name, but I noted that the OPR report notes that the former

7    principal deputy chief of the Child Exploitation and Obscenity Section, or CEOS as you've been

8    referring to it, joined the defense team also after the NPA was signed.    Were you aware of that?

9            A    I don't recall being aware of that, but I've read that in the report.

10           Q    Do you know who that individual is?

11           A    I do not.

12           Q    So that's obviously a somewhat substantial list.

13           A    I believe I called it an army.

14           Q    An army seems apt.    It's typical for there to be, you know, movement between DOJ

15    and private legal practice, sort of the prominence of these individuals, as well as the closeness of

16    their relationships with certain people in your office, both personally and in terms of the closeness in

17    time to their tenures in your office, from my standpoint, seems somewhat exceptional.    Did you

18    ever have any concerns about that?

19           A    At the time, we were -- there was clearly a bit of a pattern here, right, and everyone,

20    from my perspective, talked to ethics folks.    Everything was disclosed, to my understanding at that

21    time, and something that we had to be very careful about, because on top of that, there were

22    instances where he attempted to recuse our prosecutors.

23           A defendant doesn't get to recuse prosecutors simply by hiring people that are associated

24    with them or else the criminal justice system breaks down, because wealthy people can just hire

25    armies and get rid of the most experienced prosecutors.

Provided to Jordan A. Esteban, Neiman Mays Floch & Almeida, PLLC on 9/24/2025

1    And so, yes, we were aware of it.   We, I believe, managed it.   We acted entirely

2    appropriately.   The Office of Professional Responsibility reviewed all that, and they found no

3    impropriety.   They found no improper influence.   They found that everyone acted as they should

4    have.

5        Q    But to be more specific about the concerns, so you mentioned the prospect of

6    necessitating recusal.

7        A    Yes.

8        Q    Is that the inquiry that the ethics office engaged in that you just described?

9        A    No.   The ethics office engaged in a full review of everyone's relationships with prior

10    attorneys, and they went person by person in this OPR report and found that there was no

11    impropriety, no improper influence, and no favoritism.

12        Q    Where in the OPR report does it conclude that?

13        A    I believe there's an entire discussion beginning of page 140.   Beginning on page 140,

14    proceeding through, looks like, page 169.

15        Q    So that section speaks to the motivations of the attorneys in your office in negotiating

16    the NPA, if I understand it correctly.   I think I'm asking more specifically about concerns about the

17    closeness of the ties between Mr. Epstein's attorneys and their ability to potentially influence staff in

18    your office, whether it's the NPA itself or meetings or just access in general.   Was that a concern

19    that was ever raised?

20        A    I believe all of us were aware and had discussions with the ethics counsel, and it was

21    known by the office.   And, you know, all of us proceeded in the way that we thought was correct

22    and professional.

23        Q    Do you remember specific conversations with the ethics counsel?

24        A    I believe the Office of Professional Responsibility talks about how various individuals

25    consulted with them.   In my case, it was publicly known that I had worked at Kirkland, and there

Provided to Jordan A. Esteban, Neiman Mays Floch & Almeida, PLLC on 9/24/2025

1   was no concern at the time, and there was no concern found by the Office of Professional

2   Responsibility.

3          Q    I understand that in December of 2008 you recused yourself from the Epstein

4   investigation.

5          A    I did.

6          Q    Is that right?

7          And that was at a time when you were engaged in discussions with Kirkland about returning

8   there as an attorney.    Is that right?

9          A    I was not engaged in discussions with Kirkland about returning as an attorney.

10         Q    Okay.

11         A    This was after he had gone to jail and after he had pled.    The election had just taken

12  place.    I was considering whether to apply to private practice, whether at Kirkland or any other law

13  firm.    I had a general conversation at the time with Mr. Lefkowitz about what private practice was

14  like.    I hadn't practiced since the mid-nineties, and I thought it best to have -- and I also had a

15  general conversation with several other folks in Miami about private practice.

16         I thought it best to recuse because it's at the same time that our office started objecting to

17  the Palm Beach sheriff's decision to put him on work release.    Given the number of attorneys that

18  he had on the case, I did not think it made sense to enter a job market when I was in charge of this

19  case, and so I recused myself.

20         Q    So if I can unpack that a bit, at what point in time did you begin to consider returning to

21  private practice?

22         A    Most likely after the election.    Before the election, I had been looking into and ended

23  up rejecting private practice and going into the legal academy.    I considered applying to my old law

24  school for a practitioner position for a period of time.

25         At the time, I believe I had a conversation with our ethics counsel about whether I had to

Provided to Jordan A. Esteban, Neiman Mays Floch & Almeida, PLLC on 9/24/2025

1    recuse because Mr. Dershowitz was one of his defense attorneys.    Either he decided or he

2    consulted with the Department and decided I did not have to recuse because Mr. Dershowitz would

3    not be involved in my being hired, whether at the Kennedy School or at the law school.

4          I believe I also applied right around that time to the University of Miami and then ultimately

5    went to FIU.

6    Q    When did you have your conversation with Mr. Lefkowitz?

7    A    Sometime around Thanksgiving.

8    Q    Thanksgiving of?

9    A    Of '08, post-election.

10    Q    And was this an in-person conversation, over the phone?

11    A    It was in person.

12    Q    It was in person.    Where?

13    A    It was over dinner.    I don't recall.

14    Q    What did you discuss, to the extent you recall?

15    A    So it was 20 years ago.    What I can infer was on my mind is how does one transition

16    from being a government lawyer for 8 years into private practice, he having been a government

17    lawyer and then having returned to private practice, and what private practice is like.

18          But, again, it was 20 years ago.    And to be clear, I did not seek a position, I did not apply for a

19    position.    And I ultimately determined not to pursue private practice.

20    Q    Thanksgiving of '08 is roughly, by my calculation, 5 months after Mr. Epstein entered his

21    plea.    Did you discuss Mr. Epstein with Mr. Lefkowitz at all?

22    A    Not to my recollection, and there's no reason because it was far after the plea.

23    Q    Thank you.

24          I'm going to now shift back to the conduct of your office's investigation of Mr. Epstein.

25    A    Yes.

Provided to Jordan A. Esteban, Neiman Mays Floch & Almeida, PLLC on 9/24/2025

111

1   Q  And just as an initial matter, when you first became aware of the investigation, did you

2  perceive that there was a Federal interest in investigating Mr. Epstein?

3   A  So it was 20 years ago. I honestly perceived that there was an interest in having him

4  go to jail. And I think my initial reaction would have been where is the Federal interest, but how

5  can we get him to go to jail, because it was brought up in the context of look at what the State's

6  doing.

7   But I would say that, yes, there is a Federal interest. And I felt, as an ethical matter -- if the

8  question is as an ethical matter did I feel comfortable bringing a case, I believe there's a sufficient

9  Federal nexus to bring a case, with the caveat of all the issues we've already discussed.

10   Ms. Stansbury. Can I follow up on that just very quickly?

11   Mr. ████. Yes.

12   Ms. Stansbury. Given what you just said about there being a significant Federal interest to

13  bring a case and an interest in his potential prosecution, you know, you said in the first hour that we

14  talked to you that you felt -- or it was on the recommendation or you said your team said that some

15  of the witnesses may have lacked credibility. Is that -- is that --

16   Mr. Acosta. So --

17   Ms. Stansbury. Let me finish my question very quickly. Let me just say, if you felt there

18  was a Federal interest in this case and the evidence was pointing in the direction of a potential

19  prosecution, why did you not pursue additional witnesses, additional evidence, and potentially,

20  instead of giving a non-prosecution agreement to co-conspirators, actually questioning them and

21  collecting further evidence and their cooperation to prosecute him?

22   Mr. Acosta. So let me unpack that, if I could, and let me start off with the word "credibility",

23  because I've heard that some of my comments have been mischaracterized to say that I thought the

24  witnesses lacked credibility.

25   I believe what I had said, and if that's not what I said, then, you know, I want to correct the

Provided to Jordan A. Esteban, Neiman Mays Floch & Almeida, PLLC on 9/24/2025

1    record.    I believe what I said was that I and every prosecutor in our office believed that what

2    happened happened and believed the witnesses but that we also understood that defense would

3    have withering impeachment, and at the end of -- and that some of them didn't want to talk or

4    wouldn't talk to us.    And at the end of the day, that affected the viability of a Federal case.    It

5    affected what the outcome would have been.

6            Ms. Stansbury.    So why did you not pursue other witnesses or cooperation with

7    co-conspirators?

8            Mr. Acosta.    And so the office opened the file I believe sometime around May 2006, it could

9    have been June 2006, and investigated it for an entire year.    The prosecuting attorney, the case

10    agents pursued leads as they saw fit, investigated as they saw fit, spoke with individuals as they saw

11    fit, do what they're trained -- did what they're trained to do, which is to pursue the case.

12            At some point as they're doing the investigation, they felt that it was time to move to the next

13    stage, which is to proceed to bring charges so he can go to jail.    And it is at that point that the case

14    came up to our office, to my personal office for discussions about how to resolve it.

15            And so I think to say that we did not pursue is mischaracterizing what took place.

16            Ms. Stansbury.    I'm asking after it was elevated to your office for a decision about whether

17    or not to proceed with a prosecution, if you -- well, let me ask this.    This is just a yes or no question.

18    Did you personally come to the conclusion that there was not sufficient evidence to prosecute?

19    Just a yes or no.

20            Mr. Acosta.    So I can't answer that yes or no, with respect, because it's not a is there

21    sufficient evidence to prosecute.    If there is not sufficient evidence to prosecute, then, as an ethical

22    matter, if you don't think there's sufficient evidence, you cannot go forward.    It's a continuum --

23            Ms. Stansbury.    But you could have -- you could have decided at that point the case was not

24    ready, we should collect additional evidence, statements, and cooperation, correct?

25            Mr. Acosta.    In theory, despite the fact that my career experts in the field were saying the

Provided to Jordan A. Esteban, Neiman Mays Floch & Almeida, PLLC on 9/24/2025

113

1    case is ready, I could have said, no, I don't think the case is ready, we should collect additional.    Or

2    they could have said, you know, given --

3            Ms. Stansbury.    So just pausing it right there.    So you could have said, yes, let's -- the case is

4    not ready, let's not proceed yet, but, instead, you decided to pursue a non-prosecution agreement.

5            Mr. Acosta.    So, again, I think this is mischaracterizing the process.    The career attorneys

6    had decided the case was ready to proceed --

7            Ms. Stansbury.    And which of the career attorneys?

8            Mr. Acosta.    In this case, I suspect that would be Ms. Villafana.    Because I don't -- as a

9    general course, I don't get involved in how evidence is gathered.    I believe that would have been

10    Ms. Villafana, the supervising attorney, in consultation with the Palm Beach managing attorney, and

11    perhaps the Criminal chief.

12            Ms. Stansbury.    So Andrew Lourie and Matt Menchel and then Jeff Sloman.    Is that correct?

13    Those were the supervisors?

14            Mr. Acosta.    Yeah.    I doubt this would have gotten to Jeff Sloman's level.    At some point,

15    when they thought that the case was ready to go forward, then we would have had a discussion

16    about resolutions.

17            And I will own the resolution.    I will readily admit that I approved the term sheet.    But

18    when that was approved, it came up in the context of a case that was ready to go.    It did not come

19    up in the context of we need additional time.    If anything, there was an interest on the part of the

20    prosecuting attorney to move the case more quickly.

21            Ms. Stansbury.    Okay.    So let's follow up very quickly there.    So you, you know, in

22    communications with your office, it was discussed that you had prosecutorial discretion about

23    whether or not to move forward with this case, and you chose instead -- that was your decision -- to

24    move to a non-prosecution agreement, correct?

25            Mr. Acosta.    I approved the negotiation of the non-prosecution agreement.

Provided to Jordan A. Esteban, Neiman Mays Floch & Almeida, PLLC on 9/24/2025

1    Ms. Stansbury.   And so can you tell me, was there anyone in the chain of command between

2    Maria Villafana and you who recommended it not be prosecuted or that you move to

3    non-prosecution?

4    Mr. Acosta.   I don't recommend -- I don't recall anyone that recommended that we not

5    proceed with the case.   There was --

6    Ms. Stansbury.   So everyone in the chain of command from the line prosecutor up to you

7    was recommending prosecuting?

8    Mr. Acosta.   No.   If I could.   Your question was proceed with the case.   In proceeding --

9    Ms. Stansbury.   Well, let me ask the question I'm asking, not the one you want to answer.

10   The question I'm asking is, is there anyone in the chain of command between the line prosecutor,

11   Villafana, and you when the recommendation came up who recommended to you to pursue a

12   non-prosecution agreement?

13   Mr. Acosta.   So this was 20 years ago.   Everyone in the chain of command was

14   recommending that we proceed with the negotiated resolution.   There was a discussion about

15   whether that should be --

16   Ms. Stansbury.   I don't think that's correct, right, because we know that the line prosecutor

17   provided a memo and an indictment.   So you're saying every single person in the chain of command

18   from the line prosecutor to you was recommending that you not prosecute?

19   Mr. Acosta.   No, that's not -- so what I said --

20   Ms. Stansbury.   Let me have an affirmative statement.

21   Mr. Acosta.   Right.   So what I said -- and I don't have the declaration in front of me.   I wish

22   I did.

23   Ms. Stansbury.   Let me ask the question a different way, because I don't want to parse

24   words.

25   You said that you had a discussion with your senior team, and as I understand it, based on the

Provided to Jordan A. Esteban, Neiman Mays Floch & Almeida, PLLC on 9/24/2025

1    documentation, there was Maria Villafana, she had two field supervisors, then Jeff Sloman, and then

2    you.    You signed off on proceeding with the non-prosecution agreement.

3            So going back to what you stated earlier today, I'm trying to understand, what informed your

4    thinking when you decided to proceed with a non-prosecution agreement rather than telling the field

5    prosecutors to continue to pursue the evidence and build a stronger case?

6            Mr. Acosta.    Okay.    So Ms. Villafana, the line prosecutor, the prosecuting attorney, in

7    sworn statements said the following --

8            Ms. Stansbury.    No.    I'm asking about your own thought process.

9            Mr. Acosta.    But I'm trying to answer your question, if I could.

10           "Some have alleged that Epstein would easily have been convicted and all the victims were

11    eager to participate in a full-fledged Federal prosecution.    As the prosecutor who handled the

12    investigation, I can say that these contentions overlook the facts that existed at the time."

13           She then goes on to say that she favored a negotiated resolution, that she thought it was in

14    the interests of the victims and the office, and it was her understanding that the office as a whole

15    favored a negotiated resolution.

16           Ms. Stansbury.    Did you read her memo and indictment?

17           Mr. Acosta.    And if you --

18           Ms. Stansbury.    And do you have copies of those documents?

19           Mr. Acosta.    And if I can finish my sentence.

20           Ms. Stansbury.    But can you answer that question?

21           Mr. Acosta.    Can I please finish my sentence, then I'll answer your question?

22           Ms. Stansbury.    Can you answer that question, please?

23           Mr. Acosta.    And if you go to the OPR report, the managing attorney of the Palm Beach

24    office favored a negotiated resolution.    The Criminal chief favored a negotiated resolution.    The

25    first assistant favored a negotiated resolution.

Provided to Jordan A. Esteban, Neiman Mays Floch & Almeida, PLLC on 9/24/2025

1       Ms. Stansbury.    We're asking about people that were in your chain of command.

2       Mr. Acosta.    These were all in my chain of command.    They were my supervisory staff.

3  And so the entire chain favored a negotiated resolution.

4       Ms. Stansbury.    Was that before or after you made the decision to proceed to a

5  non-prosecution?

6       Mr. Acosta.    That was before.

7       Ms. Stansbury.    Okay.    Have you read Ms. Villafana's memo and indictment?

8       Mr. Acosta.    So that was 20 years ago.    I don't recall if I read it or not.

9       Ms. Stansbury.    You don't know if your own line -- you made a decision on a case about

10  nonprosecuting a high-profile case without reading the memo of the line prosecutor?

11       Mr. Acosta.    So let me answer fully because I was cut off.    It was 20 years ago.    I don't

12  remember any document that I read 20 years ago.    It was a long time ago.

13       What I do know is that there were fulsome discussions, that we would have talked about this.

14  I may have read it.    I may have sat around the table and said let's go over the document, and you

15  flip through it.    We may have had conversations among senior staff about it.

16       You know, this is no different than legislation where sometimes it's read.    Sometimes you

17  rely on your staff for summaries, and you empower your staff to do it correctly, which I did.    I

18  ultimately --

19       Ms. Stansbury.    Can I ask one quick follow-up question?

20       Mr. Acosta.    Yes.

21       Ms. Stansbury.    Is that memo and draft indictment in the files at DOJ for this case?

22       Mr. Acosta.    I don't know if it's in the files.    I would presume it's in the files, but that's a

23  question for the Department of Justice.

24       Ms. Stansbury.    But it would be reasonable to presume that it's in the files, the DOJ files?

25       Mr. Acosta.    I have no reason to think otherwise.

Provided to Jordan A. Esteban, Neiman Mays Floch & Almeida, PLLC on 9/24/2025

1    Ms. Stansbury.    And then my second question, just going back.    I think we're really trying to

2    understand the motivation to pursue non-prosecution.    Can you lay out to us very clearly and

3    simply what evidence and your own thought process that led you to decide, rather than continuing to

4    prosecute the case, you decided to move to a non-prosecution agreement?

5    Mr. Acosta.    So I think part of maybe the difficulty here is terminology, because the

6    non-prosecution agreement was not prosecution.    The non-prosecution agreement was

7    backstopping the State to obtain a guilty plea through the State system.    And so --

8    Ms. Stansbury.    But you -- well, actually, yeah, that is a terminology thing.    You chose not

9    to pursue a Federal case.    That's non-prosecution of a Federal case.    So I understand where you're

10   headed with that line.

11   But let's go back to -- I want to hear your line of thinking as the U.S. attorney as to why you

12   decided not to pursue a Federal case based on the evidence.

13   Mr. Acosta.    Okay.    So if you will indulge me and allow me to finish the question, I think I

14   understand what you're asking.    I will try to answer the question.

15   This case came to the U.S. Attorney's Office on referral from the Palm Beach Police, which is

16   unusual.    Usually we get our cases from the FBI.    It came from the Palm Beach Police because the

17   Palm Beach State attorney -- they wanted the Palm Beach State attorney to bring charges, and they

18   wanted the Palm Beach State attorney to bring three charges that would have resulted in what I

19   understood at the time to be about 2-years imprisonment.

20   The Palm Beach State attorney initially then offered -- they said, we've looked at the

21   evidence.    We don't feel comfortable with the evidence.    We don't think the case is viable.    And

22   they offered a resolution of probation.

23   My understanding is that Epstein rejected the State attorney's probation resolution, at which

24   point the State attorney, even though they could have indicted, took it to a grand jury and asked the

25   grand jury to decide how to proceed.    And the grand jury took a look from the highest to the lowest

Provided to Jordan A. Esteban, Neiman Mays Floch & Almeida, PLLC on 9/24/2025

1    charge, and they took a look at this, and the grand jury returned a charge that would have allowed

2    for pre-trial diversion.    And that's how the case first came to us.

3            In that context, the first assistant at some point early on in 2006 asked the then-prosecuting

4    attorney to start what's called a Petite waiver.    A Petite waiver is a case that allows for double

5    prosecution.    If a State prosecution is so manifestly unjust, then the Federal Government can

6    prosecute it as well.    And so it came into our office in the context of a State case where we might be

7    doing a double prosecution.

8            So fast-forward 1 year, give or take.    The case is investigated further by our office, and it's

9    time to proceed to resolution, and there are two paths on which we can proceed.    One would be a

10    Federal resolution, and the Federal resolution that was most talked about was a 371.    And the other

11    path, which would be about -- which would be capped at much less than the guideline range, that

12    would also have been a negotiated plea.    And the other path is the State resolution.

13            Everyone in the office felt that a negotiated outcome was the best choice.    Everyone --

14            Ms. Stansbury.    Did they all feel that a non-Federal prosecution was the correct —

15            Mr. Acosta.    If you'll allow me to answer.    I'm trying to answer.

16            Ms. Stansbury.    I'm going to come back to it, but I want you to finish this story.    But just to

17    pin right in this moment, was the --

18            Mr. Acosta.    Right.    I'm going to where you'd like to go, if you'll just let me finish.

19            Ms. Stansbury.    Okay.

20            Mr. Acosta.    Everyone in the office felt a negotiated resolution was the best outcome.

21            Ms. Stansbury.    Under State charges?

22            Mr. Acosta.    A negotiated resolution was the best --

23            Ms. Stansbury.    I just want an answer to that question.

24            Mr. Acosta.    -- was the best outcome.

25            Ms. Stansbury.    Did they agree State versus Federal in your office?

Provided to Jordan A. Esteban, Neiman Mays Floch & Almeida, PLLC on 9/24/2025

1    Mr. Acosta.    On the continuum of State versus Federal, I believe the line attorney probably

2    had concerns about proceeding State.    I think the supervisory attorneys were in between and did

3    not feel strongly one way or the other.    I think a fair way to characterize that was that the Federal

4    versus State was more my concern than their concern, although they also felt comfortable

5    proceeding with the non -- with the State charges.    And at no point do I recall a supervisory

6    attorney saying we should not do this.

7    Ms. Stansbury.    But the ultimate call to not proceed federally was yours?

8    Mr. Acosta.    The ultimate call was mine, as I've said -- as I've said previously.    It was my

9    decision.    I'm not --

10    Ms. Stansbury.    And why?    That's what we're trying to understand.    I want to know the

11    why.

12    Mr. Acosta.    Well, the why is it had come up as a State case, and from the evidentiary --

13    Ms. Stansbury.    No.    What's your thought process?    Like, why were you like, okay, we've

14    got 40 witness statements, a child sex abuse -- these are Federal crimes.    Why were you like, no,

15    we're going to just send it back to the State, who we didn't think was going to handle it competently

16    to begin with?

17    Mr. Garcia.    And then I have a question.    As soon as she's done with that one, I have a

18    question.

19    Ms. Stansbury.    This is the part that I don't quite understand.    Like, even in your timeline

20    just there you were saying that part of why the Feds got involved is because there was a feeling that

21    the States weren't going to fully prosecute the case.    It's also child sex trafficking, a Federal crime.

22    Why did you -- what was going on in your head that you decided not to pursue the Federal?

23    Mr. Acosta.    So you've labeled it as child sex trafficking, and one of the discussions we've

24    had today has to do with the Federal nexus and fulsome conversations that we had within the office

25    because we didn't have any evidence that there was travel.

Provided to Jordan A. Esteban, Neiman Mays Floch & Almeida, PLLC on 9/24/2025

120

1          Ms. Stansbury.   That there was what?

2          Mr. Acosta.   Travel.   We did not have evidence that Epstein traveled across State lines with

3     any of the victims.

4          Ms. Stansbury.   What about the witness statements that they had been flown on his jet to

5     his private island?   That is evidence of travel across State lines.

6          Mr. Acosta.   So to my recollection, we did not have evidence of travel.   And the reason that

7     I am willing -- the reason that I say that is not based on independent recollection but based on the

8     fact that the OPR report, which talks about contemporaneous discussions in the office and interviews

9     with the various attorneys in the office, has a long discussion about the viability of bringing a Federal

10    case based not on transporting victims but on Mr. Epstein traveling on his own to south Florida and

11    whether or not -- and whether or not the purpose of travel was a purpose -- predominant purpose.

12         For example, on page I think 34 --

13         Ms. Stansbury.   Okay.   I understand the point you're trying to make about travel, but let

14    me go back to the thought process.

15         Mr. Acosta.   But can I answer your question fully?

16         Ms. Stansbury.   But I think where I'm coming at here is, like, the evidence and witness

17    statements were very clearly pointing in the direction of abuse of minors.

18         Mr. Acosta.   Yes.

19         Ms. Stansbury.   Yes.   And it was the overwhelming consensus of the line prosecutor to

20    pursue a Federal prosecution.   You just stated a little while ago that it was viewed that the State

21    might not fully prosecute the case or hold him accountable, that he should be incarcerated.

22         So why did you not say, okay, this guy has been involved in abusing minors.   We have the

23    statements.   We know this is happening.   Why did you not proceed with the case?

24         Mr. Acosta.   So two points --

25         Mr. Garcia.   And then after this question, I have a question.

Provided to Jordan A. Esteban, Neiman Mays Floch & Almeida, PLLC on 9/24/2025

121

1        Ms. Stansbury.   Yeah.

2        Mr. Acosta.   So two points.   First, you know, we thought that the State would be -- from

3    our perspective, we thought if we hand the case back to the State, the State will say thank you.   We

4    can now put him away in jail and have him in continuous confinement for X number of months or 2

5    years.

6        Ms. Stansbury.   But your non-prosecution agreement said that they couldn't.

7        Mr. Acosta.   No.   It actually said that they could and they should.

8        And so we thought if we went back to the State, that the State would be a reliable partner.

9    Should I have assumed that?   No, I should not have assumed that.

10       Ms. Stansbury.   You thought the State, based on your discussions, was going to fully

11   investigate and prosecute after you engaged in that non-prosecution agreement?

12       Mr. Acosta.   That's not what I said.

13       Ms. Stansbury.   No, I'm asking you that question.

14       Mr. Acosta.   So I thought that the State would be a reliable partner and put him in jail for the

15   period of time that he agreed to go in and not put him on work release, but --

16       Ms. Stansbury.   Okay.   So you did not believe they were going to fully investigation and

17   prosecute --

18       Mr. Acosta.   Can you allow me to finish?

19       But going to page 34, going to your point about travel, and I'm reading the last paragraph --

20       Ms. Stansbury.   It's actually not my point; it's yours.

21       And I'm going to pass it back to the Ranking Member.

22       Mr. Garcia.   Let me move on.   I appreciate it.

23       Mr. Acosta -- and I'm going to pass it back -- just really briefly.   Just back to the line

24   prosecutor, Ms. Villafana, I believe, did you believe that she was a credible prosecutor?

25       Mr. Acosta.   Yes, I did.

Provided to Jordan A. Esteban, Neiman Mays Floch & Almeida, PLLC on 9/24/2025

122

1    Mr. Garcia.   In your recollection of her work, you would have found her to have been a good

2    prosecutor?

3    Mr. Acosta.   Yes, I would have, and I did.

4    Mr. Garcia.   Okay.   Great.   I just wanted to make sure that we established that.

5    And then, Mr. ▮▮▮▮, do you want to first have -- I know we've got about 20 minutes.   Do

6    you want to take another 15 and then the last 5 minutes you want to go to Ms. Ansari?

7    Go ahead, sure.

8    Ms. Stansbury.   And I have one more set of questions before the end of the hour, if possible.

9    Mr. Garcia.   One more question at the end of the hour?

10    Ms. Stansbury.   Yeah, before the end of the hour.

11    Mr. Garcia.   Okay.   Let's go ahead and try to get through this next round of questions, then

12    Ms. Ansari, and then Ms. Stansbury can wrap it up.

13    Ms. Stansbury.   I'll go after because it's a slightly different topic.

14    BY MR. ▮▮▮▮▮▮:

15    Q    Just following up on the previous conversation.   I did want to note for the record that

16    according to the OPR report, and I'm quoting from page 40, Ms. Villafana was opposed to the

17    State-based resolution.   And the report states, quote, "In Villafana's view, the proposed State

18    resolution, quote, 'didn't make any sense,' and, quote, 'did not correspond,' unquote, to Department

19    policy requiring that a plea offer reflect, quote, 'the most serious, readily provable offense.'"   And

20    that's quoting from the Ashcroft memo.

21    Is that consistent with your recollection?

22    A    So my recollection, as I presented previously, which is I would characterize her as being

23    the most in favor of a Federal and the least in favor of a State.   What she told OPR is much stronger

24    than -- at no point do I recall her telling me I am opposed to this.

25    And so what she told OPR is a much stronger characterization of her position than my

Provided to Jordan A. Esteban, Neiman Mays Floch & Almeida, PLLC on 9/24/2025

1    recollection of what she told me.

2        Q    Do you have any reason to believe she was being untruthful when she spoke with OPR?

3        A    Not at all.

4        Q    Okay.

5        A    But I do think that over time people's --

6        Q    I'm sorry.    On that Ms. Villafana, can we agree that as the line prosecutor, she was the

7    most closely acquainted with the evidence?

8        A    I think that's fair, but I also think that, given the degree of involvement Mr. Menchel had

9    in this case, Mr. Menchel was very closely associated with the evidence, and he had been a former

10   sex crimes prosecutor, and so he received quite a bit of deference.

11       I should also say that the office had substantial disagreements with her analysis.    For

12   example, on page 34, Lourie sent to Menchel --

13       Q    That's okay.    I will get to those issues as we proceed.    I just want to also address an

14   issue with respect to the victims and concerns you had described with respect to what certain people

15   in your office viewed as the impeachability of them as witnesses at trial.

16       The OPR report found that your office identified 32 victims that the office was prepared to

17   include in Federal charges against Mr. Epstein.    Did you or anyone else in the office do any sort of

18   quantitative analysis as to how many of those 32 were impeachable versus more credible on the

19   spectrum?

20       A    I am certain that the supervisory team sat down and went through that.    That's what

21   they do.    That's what they do.

22       Q    But do you have any personal knowledge of that?

23       A    I don't have personal -- I didn't ask them, show me the chart where you went through

24   this memo, but this is what they do for a living.    I wouldn't ask them in any case show me the chart

25   because this is what they do for a living every day.

Provided to Jordan A. Esteban, Neiman Mays Floch & Almeida, PLLC on 9/24/2025

1    Q    But 32 victims is a lot of potential victims.    Does it seem plausible that all 32 were

2    unreliable witnesses at trial?

3    A    I do know one of the concerns that Ms. Villafana had -- and this is, again, going back to

4    her declaration -- was the interlocking nature of the victims and whether or not it could be portrayed

5    that they were supporting one another and whether it was possible to bring the case with

6    interlocking victims that had all -- not that all, many of whom had previously known one another.

7    Q    But, again, do you have personal knowledge that she took that view as to all 32?

8    A    I don't have pers--- I didn't and I wouldn't and I don't think it's appropriate to sit down

9    and ask your prosecutors show me the chart with respect to all 32.

10    Q    And I'm just going to note that the Southern District of New York in 2019 charged

11    Mr. Epstein on several Federal counts on the basis of only two unnamed victims in its indictment.

12    Are you aware of that?

13    A    I'm aware that they charged on the basis of a number.    I didn't know it was two.    I

14    may have known that it was two.    But, again --

15    Q    I think you've answered my question, Mr. Acosta.    Thank you.    I appreciate that.

16    Mr. ▮▮▮▮.    Ms. Ansari, did you have some questions?

17    Ms. Ansari.    Sure.    Very different topic.

18    I'm curious about your resignation from the first Trump administration.    First of all, were you

19    offered a position in the Trump administration as it pertains to or because of your role in the Jeffrey

20    Epstein prosecution?

21    Mr. Acosta.    Not in the least bit, no.

22    Ms. Ansari.    Okay.    And why did you resign from your position in the administration?

23    Mr. Acosta.    The resignation was my choice.    I resigned from the position.    And let me just

24    say I was not asked to resign.    It was not suggested by anyone at the White House that I resign.    I

25    resigned -- you know, I think I said earlier I'm old school.    I think that you come into these jobs, you

Provided to Jordan A. Esteban, Neiman Mays Floch & Almeida, PLLC on 9/24/2025

1    serve, and you leave, and they're special and they're a privilege.    And if you become a distraction,

2    then it's not appropriate for you to serve in these jobs.

3         And so I made a decision.    I called the White House shortly after breakfast, asked to speak to

4    the President.    I told him that I thought it was time for me to move on.    I did not want to be a

5    distraction to his administration, and I chose to resign.

6         We stepped out onto the South Lawn.    He did an impromptu press conference right there.

7    And that's why I resigned.    That's what I wrote, and I actually mean what I write usually.    So, yes.

8         Ms. Ansari.    And I think we touched on this a little bit earlier, but just to reemphasize.    Had

9    you ever discussed the Epstein investigation or Jeffrey Epstein with Donald Trump prior to your

10   confirmation?

11        Mr. Acosta.    No, I had not.

12        Ms. Ansari.    Okay.

13             BY MR. ▮▮▮:

14   Q    How about anyone in the White House?

15   A    So as I said a little earlier, at some point in the confirmation process, the Epstein

16   matter came up, and at that point I know -- I don't recall who, but I know I discussed it with the

17   communications staff.    I think it may have been in the context of a Washington Post article, but it

18   may have been before that.    I don't remember.    I know that there was a Washington Post article

19   above the fold at some point.

20   Q    So to be clear --

21   A    But can I finish answering -- I discussed it with other people, but --

22   Q    Let's back up a little bit.

23   A    Okay.

24   Q    When were you first approached about potentially serving in the Trump administration?

25   A    So I wasn't approached.    I approached the Trump administration about serving in the

Provided to Jordan A. Esteban, Neiman Mays Floch & Almeida, PLLC on 9/24/2025

1    Trump administration.

2           Q     And when was that?

3           A     Sometime after the election.

4           Q     After the election and before the inauguration or after the inauguration?

5           A     Probably sometime after the inauguration.

6           But I want to complete my previous answer.   At some point in the vetting or confirmation

7    process, I also may have discussed this with -- you go through an FBI background check, and it may or

8    may not have come up, and I may have talked with folks about that during the vetting process.

9           Ms. Ansari.   Do you remember who you spoke to?

10          Mr. Acosta.   Whoever's involved vetting.   I didn't say I spoke to.   I said I may have and

11    whoever would have been involved in that.    But that was after I was given the position -- not given

12    the position.   That would be an awful misnomer.   That's after it was publicly announced that I was

13    to be nominated while I was being vetted.

Provided to Jordan A. Esteban, Neiman Mays Floch & Almeida, PLLC on 9/24/2025

1    [2:57 p.m.]

2            BY MR. ▊:

3        Q    So you mentioned that you approached the Trump administration.

4        A    Yes.

5        Q    Who did you approach?

6        A    I believe I approached -- a system had been set up that was -- that operated out of

7    Trump Tower, and I submitted my name through that system.

8        Q    And after you approached the Trump administration and before your confirmation, did

9    you speak to Donald Trump at all?

10        A    Before my confirmation? Yes.   Before I was -- before he selected me as Secretary of

11    Labor, then I spoke to him.

12        Q    And what did you say during that conversation?

13        A    So he asked me some questions.   None of them related to Epstein in any way.   They

14    were all related to my background.   They were all related to labor.   I answered the questions.

15    And the next day he selected me.

16        Q    Did you discuss your time at the U.S. Attorney's Office for the Southern District of

17    Florida?

18        A    Beyond an item on my resume -- first, I don't know if I did or did not.   But it was an

19    item on my resume, and I'm certain he had my resume.

20        Q    So, just so I'm clear with the timeline -- and please correct me if I'm wrong -- did you say

21    you received the nomination before you went through a vetting process?

22        A    So I believe there's a -- there's an announcement, and once the announcement's made,

23    then the FBI vetting process begins, the nomination is transmitted, and then the typical confirmation

24    process.   That's not unusual.

25        Q    Sure --

Provided to Jordan A. Esteban, Neiman Mays Floch & Almeida, PLLC on 9/24/2025

128

1       Mr. Garcia.  Could I ask a followup?

2       Mr. ▮.  Please.

3       Mr. Garcia.  [Inaudible] vetting -- an interview or into a vetting process before the

4 announcement was made?

5       Mr. Acosta.  So I had been vetted by the FBI for multiple positions before.  I had

6 been interviewed -- I interviewed before the announcement was made with multiple members of the

7 administration.  And my final interview was with President Trump.  I interviewed with him.  Then

8 the announcement was made.

9       BY MR. ▮:

10     Q   And at any time during these other interviews before Donald Trump that you just

11 mentioned --

12     A   Yes.

13     Q   -- did the Jeffrey Epstein case come up?

14     A   No.

15     Q   Not once?

16     A   Not to my recollection.

17     Q   Did your tenure at the U.S. Attorney's Office for the Southern District of Florida come up

18 in any of these interviews prior?

19     A   Not with any degree of specificity.

20     Q   So -- all right.  So the nomination is announced.  Then you go through a vetting

21 process.  Can you describe that vetting process for me?

22     A   You fill out a lot of FBI forms.  You answer questions at the Office of Presidential

23 Personnel.  You have conversations, and it's either Presidential Personnel or White House Counsel

24 or both.  And then once -- and then you're formally nominated, and you proceed to confirmation.

25     Q   So, at any point from your approach to the Trump administration to potentially serve as

Provided to Jordan A. Esteban, Neiman Mays Floch & Almeida, PLLC on 9/24/2025

1   Secretary of Labor to your confirmation, did you have a discussion with anyone in the Trump

2   administration about political concerns regarding Jeffrey Epstein?

3           A       Again, I did not.   It may have come up during the vetting.   It came up after I was

4   publicly announced, I believe while I was probably doing Hill visits.   I think it was during Hill visits

5   because it was while I was in Washington.   And I had a conversation with the communications staff

6   about it.

7           Ms. Stansbury.   Can I ask a quick followup question?   Sort of a sideline, and then going

8   back to you.

9           Over the course of your engagement at DOJ, did you ever see any documents in which Donald

10  Trump's name appeared with regards to the Epstein case?

11          Mr. Acosta.   Not to my recollection.

12          Ms. Stansbury.   Were you aware that Donald Trump was friends with Jeffrey Epstein?

13          Mr. Acosta.   I have no recollection of Donald Trump associated with this investigation in any

14  way, shape, or form.

15          Ms. Stansbury.   No, I'm just asking if they were friends.   It is a well-known fact.   It's okay.

16  You can answer in the affirmative on things that are well- --

17          Mr. Acosta.   Of course I can answer in the affirmative if it's an affirmative answer.   It's

18  20 years later.   It's a well-known --

19          Ms. Stansbury.   You read the newspaper, though, right?

20          Mr. Acosta.   I'm sorry?

21          Ms. Stansbury.   I said, you read the newspaper.

22          Mr. Acosta.   I read newspapers now, and I know what's talked about in newspapers now.

23  In 2006, I don't -- you know, I don't think this was talked about as headline news in 2006.

24          Ms. Stansbury.   Did the FBI interview Donald Trump or speak to him with regards to this

25  case?

Provided to Jordan A. Esteban, Neiman Mays Floch & Almeida, PLLC on 9/24/2025

1      Mr. Acosta.   I have -- again, I did not direct the investigation.   If our prosecutors thought

2   they should pursue that lead, they were free to pursue that lead.   If a prosecutor thought –

3      Ms. Stansbury.   But it is possible that they did based on their relationship?

4      Mr. Acosta.   I have no knowledge that any person spoke to Donald Trump with respect to

5   Epstein.   I have no knowledge of Donald Trump's name appearing in any Epstein document.   I have

6   no knowledge of Donald Trump being associated with the Epstein investigation in any way.   I am

7   not saying that it wasn't, because I can't speak on behalf of the many, many attorneys and case

8   agents involved.   I can simply say that I have no knowledge of that.

9      And let me also say, I think if there was, I think it's pretty spectacular it hasn't leaked by now.

10   But that's just speculation.

11      Mr. Garcia.   Let me also --

12      Ms. Stansbury.   And then I just have one quick followup.

13      Mr. Garcia.   How much time do we have left, ███?   Can I check?

14      Ms. Stansbury.   Please?

15      Mr. Garcia.   ███, how much time do we have left?

16      Mr. ███.   Five minutes left.

17      Mr. Garcia.   Five minutes left.   One last question from Ms. Stansbury --

18      Ms. Stansbury.   Okay.

19      Mr. Garcia.   -- and then we'll go to ███.

20      Ms. Stansbury.   I just want to ask — and I would love if you would just say "yes" or "no."

21   And I know you're an attorney, so you know how this works.

22      So, since January 20th of this year, 2025, have you spoken to or engaged in any form of

23   communication with the following individuals.

24      Mr. Acosta.   Okay.

25      Ms. Stansbury.   Donald Trump?

Provided to Jordan A. Esteban, Neiman Mays Floch & Almeida, PLLC on 9/24/2025

1       Mr. Acosta.   No.

2       Ms. Stansbury.   Pam Bondi?

3       Mr. Acosta.   Um --

4       Ms. Stansbury.   It's just "yes" or "no."

5       Mr. Acosta.   Yes.   And I'm going to answer --

6       Ms. Stansbury.   Okay.

7       Mr. Acosta.   -- the question.   I have --

8       Ms. Stansbury.   Director Patel?

9       Mr. Acosta.   I have been --

10      Ms. Stansbury.   I've got a list.   I've got a list.

11      Mr. Acosta.   But I need to answer the question.

12      Ms. Stansbury.   Okay.

13      Mr. Acosta.   I have had pleasantries with -- I've had pleasantries -- what you'd categorize as

14      pleasantries with Pam Bondi, "hello," "how are you" --

15      Ms. Stansbury.   Okay.

16      Mr. Acosta.   -- as part of a large Zoom conference.

17      Ms. Stansbury.   Okay.

18      Mr. Acosta.   But I have not spoken to her in person and have not spoken to her in any way

19      about anything having to do with Jeffrey Epstein.

20      Ms. Stansbury.   Director Patel?

21      Mr. Acosta.   No.

22      Ms. Stansbury.   Any employee or political appointee of the White House?

23      Mr. Acosta.   That is a broad question.   I'm sure I've had multiple conversations with

24      employees of the White House.   I have not spoken to anyone at the White House, to my

25      recollection, about anything having to do with Jeffrey Epstein since January 20th.

Provided to Jordan A. Esteban, Neiman Mays Floch & Almeida, PLLC on 9/24/2025

132

1    Ms. Stansbury.    Any employee or political appointee of the Department of Justice?

2    Mr. Acosta.    As I said, I was in a Zoom -- in a Zoom meeting with Attorney General Bondi and

3    several other individuals.    We probably said "hello," "how are you," and had pleasantries, but

4    nothing beyond that.

5    Ms. Stansbury.    And any employee or appointee of the FBI?

6    Mr. Acosta.    No one for the FBI, no.

7    Ms. Stansbury.    Okay.    So DOJ and the White House.    Got it.    Okay.

8    Mr. Garcia.    ■?

9        BY MR. ■:

10    Q    So I just want to go back quickly.    You said, at some point during the vetting process --

11    A    Yeah.

12    Q    -- Jeffrey Epstein may have come up.    Is that right?

13    A    I said it may have.    I don't recall if it did or did not.

14    Q    If it, in fact, had come up, when would it have come up, in your speculation?

15    A    In my speculation, it would have come up if -- the question may have arisen as part of

16    "here are newspaper articles" or something along those lines.

17    Q    And, in leading up, in your preparation for the confirmation hearing with the Senate —

18    A    Yes.

19    Q    -- did you prepare for questions on Jeffrey Epstein?

20    A    So there were articles in the media about that, and so, yes, I did prepare.    And I was

21    asked by the Senate about this, and I answered consistent with my answers today.

22    Q    Who did you prepare your questions with?

23    A    Myself.

24    Q    No one from the White House?

25    A    I didn't prepare -- these are questions that would be within my general knowledge, not

Provided to Jordan A. Esteban, Neiman Mays Floch & Almeida, PLLC on 9/24/2025

1    the White House, and so, no.

2          Q    You didn't coordinate with the White House on your questions?    They didn't review

3    your questions in any respect?

4          A    So I was given binders about the Department of Labor and preparatory documents

5    having to do with Department of Labor that is consistent with any transition.    And as part of that, I

6    certainly had discussions about labor policy and the Department of Labor with part of the transition

7    team, which was then at the Department of Labor, actually not at the White House, but at the

8    Department of Labor.    This would not have been within their purview.    It wouldn't have

9    been -- these were matters about me, not about labor policy.    And so I would not have -- that would

10   not have been part of that particular so-called "prep."

11         Q    I understand.    Just so we're very clear, you did not discuss your answers, regardless of

12   labor policy, with the White House prior to your confirmation hearing?

13         A    I'm sorry.    When you say "regardless of" —

14         Q    Sure.    I'll clarify.    Labor policy aside --

15         A    Labor --

16         Q    -- did you discuss your answers for the Senate confirmation hearing with anyone at the

17   White House?

18         A    So, to be clear, I did not, to my recollection, discuss anything having to do with Epstein

19   or my answers --

20         Q    That wasn't my question, sir.

21         A    -- for -- you know, with anyone at the White House.

22              And I recall very few instances -- as a general matter, the conversations about preparing for

23   hearings took place with transition staff at the Department and not the White House.    So I don't

24   even know if we discussed the answers to any confirmation question with anyone at the White

25   House, including labor policy.

Provided to Jordan A. Esteban, Neiman Mays Floch & Almeida, PLLC on 9/24/2025

134

1     Mr. ▓▓▓.  We'll go off the record.

2     [Recess.]

3     Mr. ▓▓▓▓.  We can go on the record.

4          BY MR. ▓▓▓▓:

5     Q     I have a couple questions just to make sure the record's clear, and then I've been

6     crossing off questions as you've been answering them.

7          You were asked at the very end by Ms. Stansbury if you had ever spoken with anyone about

8     any subject from January 20th, 2025, until present at the White House or DOJ.   You said, yes, but

9     not about the Epstein case.    Is that correct?

10    A     That is correct.

11    Q     Those were either social or professional, but not Epstein?

12    A     To my knowledge, I have spoken with no -- no one in government about the Epstein

13    matter.

14    Q     Thank you.   It just felt like that was fishing for a "yes" that's going to end up on the

15    cameras here in a second, so I appreciate the scoping clarification.

16         You were also asked a lot about whether or not the FBI or anyone in your office interviewed

17    Donald Trump during the 2006-to-2008 Epstein investigation.   And remind me of your answer again,

18    that --

19    A     I'm sorry.   I became preoccupied because of the -- the statement I said wasn't limited

20    in scope for time.   Since January 20th, to my knowledge, I haven't spoken with anyone in

21    government about the Epstein matter.

22    Q     Thank you.

23         So you were also asked about whether or not the FBI or your office interviewed Donald

24    Trump in the 2006-to-2008 investigation into Epstein --

25    A     Yes.

Provided to Jordan A. Esteban, Neiman Mays Floch & Almeida, PLLC on 9/24/2025

1      Q    -- based off a couple articles and that they both live in Palm Beach and Epstein went to

2    Mar-a-Lago.

3          Do you know how many members there are at Mar-a-Lago?

4      A    I would assume hundreds, maybe more.

5      Q    Did you interview all of them?

6      A    Again, I don't know who we interviewed.   I don't direct interviews.   I have no

7    knowledge of who was interviewed or not interviewed.   I have no knowledge -- to my knowledge, to

8    my recollection, to my memory, Donald Trump's name did not appear in any document or any matter

9    related to Jeffrey Epstein.

10      Q    What about, do you know how many people lived on Palm Beach Island at the time?

11      A    I have no idea.

12      Q    Did you interview all those people too?

13      A    Again, I don't think so.   I'm pretty certain we did not.

14      Q    All right.   And you were confident in your line attorneys that, if they found a lead, they

15    would follow it and they would interview that person?

16      A    They would, yes.

17      Q    All right.   Thank you.

18          We have talked about the non-prosecution agreement a lot, the OPR report a lot.   I just

19    want to -- the OPR report, I believe, came to the conclusion nothing illegal, against a regulation,

20    unethical happened regarding the non-prosecution report but that it showed poor judgment, I think

21    is what they said.

22          Do you agree with their characterization of events?

23      A    I agree with their findings with respect to events, and I agree with their core finding that

24    the State resolution was poor judgment.   In hindsight, it had any number of problems.

25      Q    And you've touched on this a little bit, but I think you testified today that you did not

Provided to Jordan A. Esteban, Neiman Mays Floch & Almeida, PLLC on 9/24/2025

136

1    foresee or anticipate a lot of the State problems that would follow the NPA.   Is that correct?

2          A      That is correct.

3          Q      And, again, hindsight being 20/20, if you had known the State was going to be a

4    not-supportive actor in this endeavor, would you have maybe addressed this case differently?

5          A      There is no way if we knew that the State was going to proceed as it did that we would

6    have addressed this case the way we did.

7          Q      Thank you.

8          I'm going further back in time, so, again, I understand if there is a lack of recollection.

9          Were you aware -- I'll back up.   When did you become U.S. attorney for the Southern District

10   of Florida?

11         A      Sometime in 2005.

12         Q      Were you aware of Jeffrey Epstein prior to the investigation into him?

13         A      I was not.

14         Q      Were you aware that Palm Beach was investigating him prior to your office taking over?

15         A      The first recollection that I remember of Jeffrey Epstein was shortly before I decided

16   how to proceed on the terms sheet.   I know I was briefed in 2006.   I don't even recall being

17   briefed.   And I don't recall even recognizing his name when I was briefed.

18         Q      Do you recall any communications between yourself and Palm Beach Police Chief

19   Michael Reiter?

20         A      We may have communicated.   I don't know.   I don't remember.

21         Q      Communications -- I mean, he was the chief of police in Palm Beach -- may not have

22   been specific to Epstein; it could've been any number of criminal matters in the jurisdiction.

23         A      That's correct.

24         Q      But do you recall any specific to Epstein?

25         A      I do not remember, no.

Provided to Jordan A. Esteban, Neiman Mays Floch & Almeida, PLLC on 9/24/2025

1      Q    What about with the Palm Beach lead detective, Joseph Recarey?    Do you recall any

2  specific to Epstein?

3      A    I don't recall any communications specific to Epstein.    And I also think it would've been

4  unusual for me to communicate with a detective without his boss present.

5      Q    You've talked about the Petite -- is that right?

6      A    Yes.

7      Q    -- the Petite motion that would allow concurrent Federal and State investigations.

8      A    Correct.

9      Q    When did it -- if you remember, when did it shift to -- like, away from that?

10     A    So one of the difficulties is, it -- at the end of the day, the State did not ink their deal.

11  They had an agreement, but they did not ink the deal.

12     Q    Uh-huh.

13     A    And so the Petite waiver does not technically apply.    But it informed the decision.

14  The avenue of proceeding through the State and looking at this as a State case informed the

15  outcome.

16     Q    Did you review, personally review, the findings of the Palm Beach investigation?

17     A    The -- which investigation, when you say "Palm Beach investigation"?

18     Q    The investigation that they handed off to your office.

19     A    At the time, I did not.

20     Q    Did you review it prior to the NPA?    The evidentiary --

21     A    I would've been fully briefed on the evidence, whether that was through my supervisory

22  staff or by my reading summaries of it.    As a general course, U.S. attorneys don't sit down with all

23  the evidence files and the 302s.

24     Q    Have you ever -- do you know who Sandy Berger is?

25     A    I do not.

Provided to Jordan A. Esteban, Neiman Mays Floch & Almeida, PLLC on 9/24/2025

1    Q    So I'm assuming you've never spoken to Sandy Berger, if you don't know who he is?

2    A    I would assume so.

3    Q    All right.

4         What about Doug Band?    Have you ever spoken to Doug Band?

5    A    Not to my knowledge, no.

6    Q    All right.

7         Do you recall reviewing the West Palm Beach Police report regarding Mr. Epstein from 2005?

8    A    Again, in the usual course, I would've been briefed, I would've had summaries.    I

9    wouldn't review the police reports or the 302s.

10    Q    Shifting to when it became an FBI investigation --

11    A    Yes.

12    Q    -- after Palm Beach PD handed it over, were you involved at all in the decision-making

13    process of the FBI or the U.S. Attorney's Office taking up the case?

14    A    I was not.

15    Q    That's something that someone on the supervisory staff can make on their own?

16    A    Let me -- let me -- let me revise the answer.

17         I have no recollection of being briefed.    My understanding was, based on the OPR report,

18    that when Ms. Villafana approached my then-Criminal chief and myself, it was before taking up the

19    case, to ask if the office wanted to pursue the case.    And I said, yes, this is the kind of thing we

20    should pursue.    And we pursued it.

21         So, yes, I was -- it was unusual for me to say "take up the case."    Typically she would've had

22    authority to do this, but she thought she should check.    And I said, yes, go forward.

23    Q    Do you recall any conversations of why she thought she should check in this case?

24    A    Again, not my recollection, but the report.    Because the State had dropped the ball,

25    she wanted to check to see if we were willing to proceed.

Provided to Jordan A. Esteban, Neiman Mays Floch & Almeida, PLLC on 9/24/2025

1       Q       Because it might make the State look a little bad?

2       A       Perhaps because it might make the State bad.   For whatever other reasons she wanted

3   to check.   And I said, go forward.

4       Q       All right.

5               And then I think you touched on it briefly, but:   Don't recall and would be odd for you to

6   have communication with the FBI case agents, but possible communication with the special agent in

7   charge?

8       A       That is correct.

9       Q       All right.

10              Do you recall if the FBI ever recommended bringing Federal sex trafficking charges?

11      A       Not to my recollection.

12      Q       And this may be in the OPR report.   In May of 2007, Ms. Villafana recommended

13  indicting Epstein, and the FBI wanted to arrest him while he was in the Virgin Islands.   Were you

14  aware of that?

15      A       In May 2007, I believe she submitted a draft recommendation that had not gone

16  through the supervisory chain.   Her immediate supervisor actually had concerns about it, and I

17  believe the OPR report talks about how he thinks it should proceed, that there are different charging

18  decisions that he would make.   And so she and he and others proceeded to have those discussions.

19      Q       You're referencing the 60-count indictment that we've --

20      A       That's correct.

21      Q       -- the draft 60-count indictment that we've talked about?

22      A       Yes.

23      Q       Just generally, is it common for line prosecutors to draft indictments that then get

24  negotiated with senior managers?

25      A       You start with something, and you negotiate it.   That's very typical.

Provided to Jordan A. Esteban, Neiman Mays Floch & Almeida, PLLC on 9/24/2025

1      It's been characterized as this was ready to go.   It was her draft of something that hadn't

2   been vetted through the usual office process.

3      Q    In conjunction with that indictment, do you recall any conversations about the FBI

4   wishing to take Epstein into custody in the Virgin Islands?

5      A    It was 20 years ago.   I don't remember.

6      Q    Yeah.

7      Moving forward in the timeline -- and, kind of, there's the normal state of play, and then

8   there's the defense counsel's state of play in this case.

9      Normally, would line prosecutors like Ms. Villafana have the authority to negotiate with

10   defense counsel on their own and then come to you for -- come up the chain for approval?   Or

11   would they have to bring a more senior attorney in?

12      A    Normally, they would have the authority to proceed on their own.

13      Q    In this case, was that authority curtailed because of defense counsel tactics?

14      A    In this case, I think, actually -- and we saw it where we talked about previously -- where I

15   read from the OPR report on that clause that you asked about.

16      Q    Uh-huh.

17      A    She negotiated that.   She sent an email to her supervisor saying, "I don't see any

18   problem with this.   Do you?"   And that's how it would typically proceed, and I think that's pretty

19   normal.

20      Q    Okay.

21      There weren't -- what's the -- I mean, I don't know how -- I'm not asking you how old she was

22   in -- what's, kind of, the average age of a line prosecutor in the U.S. Attorney's Office?

23      A    I don't even want to begin to speculate about that.

24      Q    Okay.   Younger than Alan Dershowitz?

25      A    Younger than Alan Dershowitz.

Provided to Jordan A. Esteban, Neiman Mays Floch & Almeida, PLLC on 9/24/2025



1        But she was experienced, and we trusted her.   And I think the record -- that's a good

2    example where she negotiated -- she was checking with her supervisor --

3        Q    Uh-huh.

4        A    -- but she was conducting the negotiations.

5        Q    All right.

6        Do you recall any 2006 meetings between yourself and Ms. Villafana and Mr. Sloman

7    regarding Epstein?

8        A    2006?

9        Q    Yeah.   July 2006.

10        A    I believe that is the initial meeting where she just said, can I pursue this, and we said

11    yes.

12        Q    Okay.   Were there any limitations placed on her in this case?

13        A    Not that I remember, and I'd be highly surprised if -- I'm going to guess it was a very

14    short meeting.   She gave a summary and said, can I pursue this, and the answer was yes.

15        Q    Do you recall, outside of Epstein's defense counsels, who were high-profile in their own

16    right, do you recall getting any phone calls or communications from other high-profile individuals

17    suggesting you back off the Epstein case?

18        A    No.

19        Q    He flew around the world with President Clinton.   Did President Clinton ever call you?

20        A    President Clinton never called me.

21        Q    He flew around the world with Woody Allen and others.   Did you ever --

22        A    Had no --

23        Q    -- get a phone call from Woody Allen?

24        A    -- no communications with any high-profile or mid-profile individual.

25        Q    Queen of England ever call you?

Provided to Jordan A. Esteban, Neiman Mays Floch & Almeida, PLLC on 9/24/2025

142

1    A    Not yet.

2    Q    All right.   Thank you.

3         You said that you hadn't heard Mr. Epstein's name prior to them coming to you for approval

4    to take on the case.   So not aware of any reputation prior to then?

5    A    No.

6    Q    We've talked a lot about the kind of defense tactics, the various types of pressure and

7    methods that they employed to, I'll say, advocate for their client, but get awfully close to the line --

8    A    Yes.

9    Q    -- of unethical.

10   A    And that we resisted at all points.

11   Q    Did the State's Attorney's Office or the Palm Beach PD ever brief you about similar

12   tactics that Epstein had used against them?

13   A    Not that I remember.

14   Q    Did you ever become aware of Epstein using similar tactics against them?

15   A    I have since then read that Mr. Dershowitz met with the State attorney, and I imagine

16   the meetings were similar.

17   Q    You've said today and in the letter from 2011, too, that you resisted the defense tactics.

18        To the best that you can recall -- and this is a lot to recall -- did the draft NPA that your office

19   put together change a lot between your drafting and the final signature?

20   A    I think it changed in -- of the three core terms, it went from 24 to 18, but we still got

21   registration, and we still got recovery for the victims.

22   Q    To the best of your recollection, did Epstein's defense counsels suggest significant

23   changes to the agreement?

24   A    Epstein's defense counsels were asking for home confinement.   They were asking for

25   no jail time.   They were asking us to drop the case entirely.   Epstein's defense counsels wanted

Provided to Jordan A. Esteban, Neiman Mays Floch & Almeida, PLLC on 9/24/2025

1    everything.    And again and again we told them no.

2            Q    I think you've touched on this a little bit when I asked if you had interviewed Ms.

3    Maxwell.    Do you recall if your prosecutorial team was aware of Ms. Maxwell at the time?

4            A    I don't recall the name whatsoever back then.

5            Q    She was mentioned in the original Palm Beach Police report.    Do you have any

6    recollection of that?

7            A    I do not.

8            Q    Were you contacted at all when she was subsequently arrested in, I think, late 2019?

9            A    I was not.

10           Q    Were you contacted at all during her trial?

11           A    I was not.

12           Q    We've talked a lot about the original proposed draft 60-count indictment that Ms.

13   Villafana drafted, and then there's been mention of the lengthy prosecution memo.

14               What is the purpose of a prosecution memo versus an indictment?

15           A    So a prosecution memo has two purposes:    one, to go forward, but, two, to test -- to

16   write a draft so you can test your theories so that other people can review and say, I agree/I

17   disagree, so you can pressure-test what an eventual indictment might look like.

18           Q    On -- I'm going to use a term, and if you don't recognize it, I'll try to explain it.    But on

19   high-profile cases like this, would you have a red team, someone that wasn't read in, that could

20   review the prosecution memo and indictment?

21           A    We might.    In this case, we did not, but we did later have individuals review the case

22   just to get independent assessments.

23           Mr. ████.    And are those prosecution memos and -- the prosecution memo and the draft

24   indictment, are those kept in the case file, like, through perpetuity?    Is it remaining in the case file

25   to this day?

Provided to Jordan A. Esteban, Neiman Mays Floch & Almeida, PLLC on 9/24/2025

1    Mr. <u>Acosta.</u>  I can't speak to that.   I don't know how -- I think your definition of a case file is

2    more specific than reality.

3    Mr. ████.  Okay.

4    BY MR. ████:

5    Q    I'm sure this has been touched on, but I'm going to ask it again.    Did you ever

6    personally review the memo or the draft indictment?

7    A    Again, it was 20 years ago.   Sometimes I'd review the memo.   Sometimes I'd sit

8    around a table and say, "Let's go over this."   Sometimes I'd say, "What do y'all think?"

9    Q    Would that have been a situation of checking with Main Justice if that was the way that

10   they would want to proceed versus a non-prosecution agreement?

11   A    We had authority to proceed as we saw fit.   We didn't check with Main Justice, as I

12   remember it.

13   Q    Ballpark, how many AUSAs are in that office?

14   A    Three hundred?

15   Q    Understanding it's one case out of what I'm sure is at least hundreds at any given time in

16   that office, how often would you meet with the attorneys on this case to discuss it, to the best of

17   your recollection?

18   A    So that would vary.

19   Before the NPA, before the agreement was signed, other than the decision to go forward with

20   the State resolution and other than giving defense counsel their hearing, very, very little.   I thought

21   it was important that Ms. Villafana have authority to negotiate.

22   After it was signed, when it was being appealed to Washington and when they were

23   challenging whether or not the office had authority to seek monetary recoveries, first, those were

24   policy decisions in which I would more naturally get involved; secondly, they were appeals to

25   Washington in which I'd more naturally get involved; and, thirdly, they were, you know, about

Provided to Jordan A. Esteban, Neiman Mays Floch & Almeida, PLLC on 9/24/2025

1    whether the office is acting correctly or not.

2        And so, at that point, the first assistant was supervising the case with Ms. Villafana directly,

3    and I probably spoke to him about it often.

4        Q    We've talked about, kind of, the overarching theme is that the prosecutors in your office

5    favored a negotiated agreement, with the, kind of, sub-themes of some favored Federal charges

6    more than State and some favored State and some just favored a negotiated agreement.

7        At any point did D.C. express concerns about a negotiated agreement versus going to trial?

8        A    They did not.    They were aware of it when it was presented.    When defense counsel

9    came in, the head of CEOS was present at that meeting.    He understood how we were proceeding.

10    I don't recall him taking a side and saying, D.C. disagrees with this.

11        Q    And, of course, during Epstein's defense counsels' petitions to D.C., they sided with you

12    throughout that?

13        A    They supported our authority to go forward.

14        Q    You spoke a little bit about State Attorney "Kryscher"?

15        A    Krischer.

16        Q    Krischer.    Do you recall any discussions with him regarding the Epstein case?

17        A    I don't recall any discussions.    We may have had them.    I think they'd be fairly brief.

18        Q    Would he have had any involvement in the post-plea situation with Epstein?

19        A    To the extent his office was involved in victim notification, he would have had

20    involvement in some of those discussions.    I believe the OPR report states -- and you can

21    confirm -- that the decision to go from 18 -- that one of the key parts of the decision to go from 24 to

22    18 months took place in a discussion between him and our trial attorneys in his office.

23        Q    But you don't know, or maybe he just wouldn't have been involved in any discussions

24    regarding the work-release program or anything like that?

25        A    So his office was consulted about work release.    My understanding was, they were

Provided to Jordan A. Esteban, Neiman Mays Floch & Almeida, PLLC on 9/24/2025

1    supposed to notify us.    And his office did not notify us.    My understanding was that that came out

2    of the Palm Beach Sheriff's Office.

3          Q    And, again, you never, to the best of your recollection, received any communication

4    from DOJ leadership advising caution in prosecuting Jeffrey Epstein?

5          A    No, I did not.

6          Q    Were you aware of a letter that the Epstein defense counsels sent in support of him,

7    citing and referencing his political connections, in regards to the non-prosecution agreement?

8          A    I have since read that.    I don't recall any details.    And whoever it was sent to, I don't

9    think it had any influence on them.

10          Q    And you don't recall any high-profile individuals making a call to your office, saying,

11    "We've got to go easy on this guy"?

12          A    I do not.

13          Q    The minority touched on it a little bit, the former Criminal chief, Menchel, and his

14    relationship with Lily Sanchez, who became one of Epstein's counsels.    And you said you were

15    aware of that after the fact, not concurrently?

16          A    I became aware of that when I was asked about it by the Office of Professional

17    Responsibility.    My first assistant became aware of it when he was asked about it at the Office of

18    Professional Responsibility.

19          Q    Did -- and just pardon me for not remembering, if it was already touched on.    Did Mr.

20    Menchel recuse himself because of that relationship?

21          A    He did not.

22          Q    Should he have?

23          A    I should have known about it, or my first assistant should have known about it, and we

24    should have had a fulsome discussion -- how long ago was the relationship, what was the nature of

25    the relationship.

Provided to Jordan A. Esteban, Neiman Mays Floch & Almeida, PLLC on 9/24/2025

147

1          I wish I would've been informed.    I was not informed.    I still don't know what the details

2    are.

3          Q    Are you -- were you aware then of photographs of Menchel with Epstein in Aspen,

4    Colorado, skiing?

5          A    I was not.    And I wasn't aware of it 'til this minute.

6          Q    If you were aware of it, would that raise some concerns?

7          A    Yes, it would.    When were the pictures?

8    Mr. ████.    Do you know when?

9    Mr. ████.    I think it was early 2000s.

10          BY MR. ████:

11          Q    We're working on finding it.

12          And then my maybe last bucket, and maybe the fastest one, maybe the slowest one -- we'll

13    find out.

14          Steve Bannon has publicly stated that you told him that Epstein, quote, "belonged to

15    intelligence."

16          Do you recall ever speaking to Steve Bannon about Jeffrey Epstein?

17          A    I don't recall ever speaking to Steve Bannon about Jeffrey Epstein.

18          Q    Have you ever spoken to Steve Bannon?

19          A    I have spoken to Steve Bannon.    I have no recollection of speaking to Steve Bannon

20    about Jeffrey Epstein.

21          I have been asked -- up until now, I did not know if that was the source of that anonymous

22    White House quote.    I've been asked about that.    I didn't know where it came from.    I'll take your

23    word it came from Mr. Bannon, but I don't know where it came from.    I never made that assertion.

24          I was asked about it at my press conference.    I said, that's not truthful.    I was asked about it

25    in the Office of Professional Responsibility interview.    I said, I have no knowledge as to whether he

Provided to Jordan A. Esteban, Neiman Mays Floch & Almeida, PLLC on 9/24/2025

148

1    was or was not a member of the intelligence community.

2         Q    So that gets to some of my next ones.

3         You've never made a statement similar to Epstein "belonging to intelligence"?

4         A    I have not.

5         Q    During the course of your investigation, did anyone from the intelligence community

6    approach you regarding Mr. Epstein?

7         A    No.

8         Q    No one from the CIA?

9         A    No.

10        Q    No one from the State Department or NSA or --

11        A    No.

12        Q    -- well, FBI would've.    No one from the FBI Intelligence --

13        A    Yes.

14        Q    -- Division?

15        A    But no.

16        Q    Any foreign intelligence services like Mossad?

17        A    No.

18        Again, I do not know if he did or did not.    If you want to know that, you need to ask the

19    intelligence community.    I have not been approached by any member of the intelligence

20    community, and I have no knowledge of his membership in the intelligence community.

21        Q    And on that -- my last question -- do you have any reason to believe that Jeffrey Epstein

22    was an asset for a domestic or foreign intelligence operation?

23        A    I have no reason to believe that.    And if there was any secure information, procedures

24    would have been triggered that were never triggered.

25        Q    And no one approached you and said, you can't prosecute this guy, he's an asset?

Provided to Jordan A. Esteban, Neiman Mays Floch & Almeida, PLLC on 9/24/2025

1      A    No one approached me and said that.

2      Q    Thanks.

3      Mr. ███████.    We can go off the record.    Thank you.

4      [Recess.]

5      Mr. ███████.    On the record.

6           BY MR. ███████:

7      Q    Mr. Acosta, I just wanted to return to our conversation earlier about the investigative

8    steps that your office undertook.

9           Going back to the NPA, that document identifies four women as potential co-conspirators,

10    correct?

11     A    Yes, it does.    I don't know if -- I don't want to give them a status that identifies

12    four -- four women, yes.

13     Q    I'll represent, that's how the language in the agreement identifies them.

14     A    Okay.

15     Q    All right.    Did your office ever interview any of them?

16     A    I do not know.    As I said previously, I would not have directed who was interviewed or

17    not interviewed in these types of investigations.

18     Q    Well, it's typical, isn't it, in criminal investigations for potential co-conspirators to be

19    interviewed and hopefully cooperated up the chain of command?    Isn't that so?

20     A    I would say it's typical.

21     Q    Okay.    Would you have expected it to happen in this case?

22     A    I don't know if they were.    And if they were not, I don't know why.

23     Q    To your knowledge, it did not?

24     A    To my knowledge, I don't know.

25     Q    Okay.

Provided to Jordan A. Esteban, Neiman Mays Floch & Almeida, PLLC on 9/24/2025

1      A    Which is different than "it did not."

2      Q    Okay.

3            And I think the question of whether any of Mr. Epstein's employees were interviewed was

4      also raised earlier, and I understood your testimony to be that you also didn't know if that happened.

5      A    Again, I did not direct how -- how a matter was investigated.

6      Q    Okay.

7            Would you expect that, in order to perform a thorough investigation concerning sex crimes,

8      you would need to talk to the employees who worked at the premises where the crimes potentially

9      occurred?

10     A    I will accept that.

11     Q    Okay.

12           We spoke earlier about the removal of computer equipment from Mr. Epstein's home prior to

13     execution of the search warrant by the Palm Beach Police Department and your office's attempts to

14     obtain those materials from Mr. Epstein's attorneys.

15           To your knowledge, did they ever succeed in doing so?

16     A    I do not know.

17     Q    Would those materials, in your view, potentially have shed more light on the scope and

18     magnitude --

19     A    Let me revise my prior question.

20     Q    Just -- can I just get this one out first?

21     A    Yes.

22     Q    Would those materials, in your view, potentially have shed more light on the scope and

23     magnitude of Mr. Epstein's crimes?

24     A    They may have.

25           And I do want to revise my prior answer.    I do not know based on my personal recollection.

Provided to Jordan A. Esteban, Neiman Mays Floch & Almeida, PLLC on 9/24/2025

151

1    I am aware, I believe from the OPR report, that they were not obtained.    But I don't have any

2    personal recollection of the computer material issue or what may or may not have been on them.

3    And so I just wanted to make that clear.

4        Q    Okay.    Understood.

5        To your knowledge, did your office obtain Mr. Epstein's flight records?

6        A    Once again, I did not direct how the office proceeded with the investigation.    I don't

7    know 20 years later what may or may not have been part of a factual briefing.

8        Q    So I'm going to ask the same question with respect to Mr. Epstein's financial records.    If

9    you want to give the same answer --

10       A    Again --

11       Q    -- that's fine.

12       A    Same answer.

13       Q    Okay.

14       So my question, in light of all of that:    Would it, in your view, have been possible at the time

15   the NPA was entered into to make a reliable assessment regarding the strength of the case against

16   Mr. Epstein without cooperating witnesses, without having spoken to employees, without flight logs,

17   without the contents of Mr. Epstein's computers or his financial records, to the extent that evidence

18   existed?

19       A    So the matter came to our office in 2006.    The prosecutor on the case was an

20   experienced prosecutor.    She had discretion to proceed as she saw fit.    At some point, she said,

21   "It's now time to move to the next stage, and it's time to bring this matter to resolution."    That,

22   again, was within her discretion.

23       Hindsight's 20/20.    In retrospect, maybe she should have done more; maybe she should not

24   have done more.    It's very difficult, sitting here 20 years later, to second-guess her decisions.

25       Q    Hindsight is 20/20, but that information was ascertainable at the time, wasn't it?

Provided to Jordan A. Esteban, Neiman Mays Floch & Almeida, PLLC on 9/24/2025

1          A      Again, I think it's very difficult to second-guess her decisions.    She's an outstanding

2    prosecutor.    She worked on this case.    She wanted to put him in jail.    And I have to trust that she

3    would have pursued the types of evidence, whether flight logs or other matters, that would have

4    contributed to her theory of how you can put this man in jail, because that was her focus.

5          Q      And, again, it was you, as I think you said earlier this morning, who approved the

6    execution of the NPA --

7          A      Yes.

8          Q      -- on the basis of the evidentiary record as it existed at the time.

9          A      That is correct.

10         Q      We have spoken on and off today about the involvement of the DOJ's Child Exploitation

11   and Obscenity Section, or CEOS, in your office's investigation.

12         I just wanted to note for the record that the OPR report, at page 47, notes that Mr.

13   Oosterbaan, who, as I understand, was the chief of that section --

14         A      Yeah.

15         Q      -- reviewed Ms. Villafana's charging memo and, in an email to Mr. Sloman, Mr. Menchel,

16   and Mr. Lourie, stated that Ms. Villafana, quote, "did a terrific job," unquote, and that CEOS, quote,

17   "agrees with her legal analysis.    Her charging decisions are legally sound," end quote.

18         A      On page --

19         Q      Forty-seven.

20         Were you ever made aware of Mr. Oosterbaan's views?

21         A      I was not.    And I'd note that Mr. Sloman, Menchel, and Lourie at various points have

22   stated counter-views to that.

23         Mr. Oosterbaan was invited to the meeting that we had in September.    He was present for

24   that meeting.    He understood our approach.    I have no recollection of him taking me aside and

25   saying, "Alex," or "Mr. Acosta" -- I would've been "Alex" to him, because I didn't have that level of

Provided to Jordan A. Esteban, Neiman Mays Floch & Almeida, PLLC on 9/24/2025

1    formality -- "just so you know," dot, dot, dot, dot, dot.

2    Q    And I am correct that CEOS is the component of DOJ that's charged with specific

3    expertise in sex cases, child exploitation cases --

4    A    And CEOS was the one who then sent an expert to review not just the memo but the

5    entire file, and that expert was the one that said it's, quote/unquote, a "crapshoot."

6    Q    And that person was a subordinate of Mr. Oosterbaan?

7    A    That person was a subordinate but a very experienced -- I think OPR notes that -- a

8    highly experienced prosecutor.

9    Ms. Stansbury.    Can I just ask one quick followup on that?

10    Mr. Acosta.    Yeah.

11    Ms. Stansbury.    So, earlier when you said that part of the discussions with the team about

12    prosecution --

13    Mr. Acosta.    Yeah.

14    Ms. Stansbury.    -- you did mention the quote, a "crapshoot," that was just with respect to

15    the CEOS investigation, then, correct?

16    Mr. Acosta.    That was with respect to if we were to go to trial.

17    Ms. Stansbury.    But based on the evidence around the investigation into these particular

18    materials?

19    Mr. Acosta.    I don't know what she reviewed or didn't review.    She had access to the full

20    file and whatever was in the file.

21    Ms. Stansbury.    Okay.

22    BY MR. ██████ :

23    Q    The OPR report, as I read it, concluded that your decision to defer to the State was

24    based, at least in part, on your interpretation of the DOJ's Petite policy.    Is that correct?

25    A    I think it was influenced by the Petite policy.    And it was influenced by the idea that

Provided to Jordan A. Esteban, Neiman Mays Floch & Almeida, PLLC on 9/24/2025

154

1    there were two sovereigns and this was a State case.

2          Q    The report concluded that — or noted, rather, that the policy applies only to Federal

3    prosecutions that follow completed State prosecutions, not when a State investigation or

4    prosecution remains pending.   Is that correct?

5          A    I think I said earlier that, as a technical matter, the Petite policy did not apply because it

6    was not inked, the agreement was not inked at the State level, but that the fact that it came in

7    through that analysis continued to influence how we looked at the case.

8          Q    Again per the OPR report, it was your decision, as I understand it, that the U.S.

9    Attorney's Office should offer Mr. Epstein a 2-year term of imprisonment.   Is that correct?

10         A    That is correct.

11         Q    Okay.   How did you arrive at 2 years?

12         A    So, to my recollection, that's what he would have received if he had gone to jail on the

13   original State charges.

14         I would not have had the expertise to guess that, because I do not know the State system as

15   well as the Federal system.   So I would infer that at some point I asked our supervisory team, "If this

16   had gone right from the beginning, if the State attorney had not dropped the ball, what would he be

17   serving?" and someone told me, "Two years."

18         Q    Okay.

19         So that brings me back to the question of, why not follow Ms. Villafana's recommendations

20   under the Federal sentencing guidelines of a substantially higher sentence in the range of 160 to

21   210 months with an upward departure?

22         A    Once again, I don't think Ms. Villafana's guidelines were on the table -- not because of

23   me, but because everyone in the office favored a negotiated resolution.   I think the alternative

24   would have been a 371.

25         Ms. Stansbury.   Could you clarify what that means?

Provided to Jordan A. Esteban, Neiman Mays Floch & Almeida, PLLC on 9/24/2025

1        Mr. <u>Acosta.</u>    A 371 is a Federal charge of conspiracy, and it's used when you're trying to

2    obtain a negotiated plea.    It's not used exclusively, but it's often used by Federal prosecutors,

3    because a negotiated plea of a 371 with a Rule 11 provides a mechanism for having a term of years

4    that someone may agree to.

5        I don't think anyone -- something that I think is being lost in this:    No one in the office

6    thought that, "Oh, 2 years is enough."    No one thought, "Oh, 2 years is full justice."    The question

7    was, do you go to trial and risk him getting off entirely or do you take a certainty of a sentence?

8    And how do you -- how do you get there?

9        And so the idea of what the police were originally seeking is where I sort of ended up.    But

10    no one -- no one said, "Oh, 2 years is enough."    It was negotiated plea or risk going to trial, and

11    that's what motivated this.    A 371 with a Rule 11 was the alternative that we talked about.

12        BY MR. ▇▇▇▇ :

13        Q    To return to our discussion this morning, the decision to proceed via a State plea rather

14    than Federal charges was a choice, right?

15        A    It was a choice.    And my ultimate decision was to do that.    I don't think I've implied

16    otherwise.

17        Q    Just, again, the 2-year proposed sentence was negotiated down over time, initially to

18    20 months and then ultimately to 18 months, of which Mr. Epstein, as we spoke about, only served

19    13.

20        Why the reduction over the course of your negotiations?

21        A    So, two parts to it.

22        First, in the negotiations, the prosecuting attorney needs some discretion to proceed.    She

23    wanted Epstein to go to jail, just like everyone else, and she had that discretion.    I believe there was

24    a meeting at the State's Attorney's Office -- this isn't my recollection; this is the report -- where it

25    went from 24 to 18.    And I would support -- if she thought or her supervising attorney thought that

Provided to Jordan A. Esteban, Neiman Mays Floch & Almeida, PLLC on 9/24/2025

1    that was the right outcome, I would support their discretion.

2         That is separate and apart from how it was finally served.    Because the idea of work release

3    was something that none of us contemplated.    We had assurance that he would not get that.    All

4    of us were shocked, upset about that.    And had we known that he was going to get work release,

5    this would not have gone forward, because what we contemplated was continuous confinement.

6         Q    And in terms of the decision to reduce the sentence by a substantial amount, what was

7    Mr. Epstein's leverage, in your view?    Why did the government agree to it, and what did it gain from

8    that concession?

9         A    I can't speculate, 20 years after the fact, what the leverage was.    What the government

10   gained -- what the government gained is to have Mr. Epstein -- to have Epstein go to jail.    And I

11   understand the 18 and the 24, but to have him actually plead guilty and say he abused these victims

12   and go to jail and send a signal to Palm Beach, where these prosecutions hadn't happened, that you

13   can't get away with this was, in our view, a substantial interest and a substantial win.

14        And I understand it's viewed very differently now.    And had we known back then what we

15   know now, it would've proceeded along a different route.    And I understand along the way that the

16   victims weren't fully informed, for reasons that our office acted in the best motive but that left them

17   feeling that we weren't forthright.    I get all that.    But having him go to jail was a big deal.    And

18   having him register and tell the world, look, he is a sex offender, that matters.

19        Q    So, if I'm understanding your testimony correctly, the truncated length of his prison

20   sentence was the result of the State-based regime that you opted to pursue over the Federal course.

21        A    What I was testifying to is that the move from -- I don't know why we moved from 24 to

22   18.    That happened in a negotiation.    What I am trying to convey, and maybe doing so poorly, is

23   that we can't undervalue the importance of his going to jail.

24        Q    I think we're all agreed on that point, but I think the question remains, would Mr.

25   Epstein not have faced potentially substantially greater exposure, in terms of sentencing, under

Provided to Jordan A. Esteban, Neiman Mays Floch & Almeida, PLLC on 9/24/2025

1    Federal charges as opposed to the State charges to which his sentence apparently was conformed in

2    the process of negotiating the NPA?

3          A     So the two paths on the table were the 371 -- that might have been -- with the Rule 11,

4    that may or may not have been a higher -- if they had gone to trial and won, he certainly would have

5    faced a higher charge.

6          But the question is, do we go to trial, or do we -- and risk losing everything, right?    At some

7    point, I forget which attorney, which of my supervisors said it -- I think it was --

8          Q     Mr. Acosta, I think we agreed this morning that going to trial was not your only option.

9    A Federal plea was also an option, wasn't it?

10          A     A Federal plea under a 371 with a Rule 11.

11          Ms. Stansbury.    And what would the sentence for that have been?

12          Mr. Acosta.    So, under a Rule 11, you recommend a plea.    The maximum under a 371

13    would be 5 years.    I think there was consensus in the office that he would not have pled to

14    5 years, and so we very possibly may have ended up putting aside the whole work release.

15          And I will own that the State was -- that I should have expected the State to sort of drop the

16    ball on that, and OPR is correct.

17          But under a 371, the sentence would have been -- it depended what we negotiated.

Provided to Jordan A. Esteban, Neiman Mays Floch & Almeida, PLLC on 9/24/2025

158

1     [4:09 p.m.]

2               BY MR. ███████:

3          Q     I'm just going to note another one of CEOS Chief Oosterbaan's expressed views as set

4     forth in the OPR report -- this is at page 95 -- which notes that Mr. Oosterbaan reviewed the NPA and

5     told Mr. Lourie that he is, quote, "not thrilled about the NPA", described Epstein's conduct as

6     unusually, quote/unquote, "egregious" particularly because of its serious nature, and observed that

7     the NPA was, quote, "pretty advantageous for the defendant and not at all that helpful for the

8     victims," unquote.

9          Were you aware of Mr. Oosterbann's view in that respect?

10         A     Two points.    First, I was not aware of that.    But secondly, I would note that that took

11    place after the agreement had been signed.    And Mr. Oosterbaan was in our office for the meeting

12    where the terms were talked about and presented and had an opportunity to speak up at that time.

13    He didn't have to speak up, he may have assumed that he had previously communicated his views,

14    but that was an after-the-fact email.

15         Q     Briefly with respect to the review that took place both in your office and at Main Justice

16    that had been requested by defense counsel.    I just want to note for the record what the results of

17    those reviews were as, again, set forth in the OPR report, pages 101 and 102.

18         The report notes that your office undertook a, quote, "soup to nuts", unquote, review of the

19    investigation and that your Criminal Division chief, Robert Senior, quote, "concluded that the

20    proposed charges were sound, and he told Acosta that he would approve proceeding with a Federal

21    case," unquote.

22         Do you recall Mr. Senior communicating that to you?

23         A     So that took place when we thought -- after the NPA had been signed, after we had

24    already agreed, we thought he may never follow through.    It's been a while since we've looked at

25    the case afresh.    And so investigation may have taken place in the interim.    So let's have the new

Provided to Jordan A. Esteban, Neiman Mays Floch & Almeida, PLLC on 9/24/2025

1    Criminal chief review it soup to nuts.    And if we have to go to trial, are we ready to go to trial?

2    And he said, yes, if you have to go to trial, you're ready to go to trial.

3        The question was not how would you proceed or would you favor a negotiated plea.    The

4    question would be, if we have to go to trial, can we drop it?    Can we drop an indictment.

5        Q    And is that an accurate account of what Mr. Senior communicated to you?

6        A    I believe what he said was, if we have to go to trial, we can be ready.    That

7    wasn't -- that wasn't how should we proceed.    That wasn't about the viability of a case betwe- -- or

8    a balance between a negotiated plea and going to trial.    That's, if we have to go to trial, do we have

9    enough or do we need to go back and do more.

10        Q    Let me try it a different way.    Any reason to believe that the quote I just read into the

11    record is inaccurate?

12        A    I believe that that is taken out of context, given the time that that review took place and

13    why that review took place.

14        The defense counsel at the time was charging that we had insufficient grounds for going to

15    trial.    This was during the debate.

16        Q    Mr. Acosta, I understand the context as you've just laid it out, but my question is simply,

17    are the quoted words accurate?    Did Mr. Senior say that?

18        A    And my response is, that is taken out of context, because the question was not, as

19    you're implying, with respect, how should we proceed.    The question is -- we are being told that

20    we're acting unethically because we do not have a Federal case.    And so Mr. Senior, you haven't

21    been involved, take a look and tell us if you believe that this is a -- an ethical case to bring if the

22    arguments are strong enough that if we have to go to trial, we can do so in an ethical manner.

23        Q    Not hearing you disputing Mr. Senior's words, I'll move on.

24        The report goes on to note that upon additional review by CEOS, which concluded in May

25    2008, the section concluded that, quote, "Federal prosecution in this case would not be improper or

Provided to Jordan A. Esteban, Neiman Mays Floch & Almeida, PLLC on 9/24/2025

160

1    inappropriate," unquote.    Again, is that consistent with your recollection?

2         A    Again, the context of that is that there was an appeal to Washington saying that Federal

3    prosecution would be improper -- period, full stop -- negotiated plea, going to trial, that we did not

4    have a case even to obtain a 2-year sentence, that we had to drop the case.

5         Q    And in that context?

6         A    And in that context, CEOS concluded that we could go forward as we had been doing.

7         Q    And just with respect to the question in general of review, both at senior levels within

8    your office and at Main Justice, how common in your experience is it for the target of a Federal

9    criminal investigation to obtain that amount of attention and review as Mr. Epstein did?

10        A    In my experience, I've never had a case that has been elevated to that level.    That said,

11   several high-profile cases have been done.    Like, Jack Abramoff was done in conjunction and others

12   were done in conjunction with Main Justice.    But that is the only case where multiple levels of

13   review were granted by Main Justice.

14        Q    Would you agree that the notoriety of Mr. Epstein's counsel, along with their multiple

15   connections to senior personnel at the DOJ, helped him to secure that level of attention?

16        A    I'm not going to speculate why DOJ granted the reviews.    They did, and people have a

17   right to request a review by Main Justice.

18        Q    So without speculating in this specific case, would you agree that as a general matter

19   criminal targets with prominent, highly placed, well-connected counsel are more likely to receive that

20   type of attention at DOJ?

21        A    Again, I'm not going to speculate.    He received the reviews and our office was

22   reviewed, and we received permission to go forward.

23             The argument that they presented at the meeting in Miami was that this wasn't a Federal

24   case, that it was a State case, and that we should drop the case.    I refused to drop the case.    They

25   went to the Criminal Division, they asked the same question.    The Criminal Division said I had

Provided to Jordan A. Esteban, Neiman Mays Floch & Almeida, PLLC on 9/24/2025

161

1    authority to go forward.    They went to the Deputy Attorney General's Office, they asked the same

2    question.    The Deputy Attorney General said I had authority to go forward.

3            BY MR. ▮▮▮:

4        Q    Mr. Acosta, FBI Director Kash Patel testified before the House Judiciary Committee on

5    Wednesday.    And during his testimony he stated, quote, "The original sin on the Epstein case was

6    how it was handled by Mr. Acosta when he first brought the case in 2006, '07, and '08."    And Dr.

7    Patel continued, quote, "Mr. Acosta allowed Mr. Epstein to enter into a plea agreement where he

8    served weeks in jail for trafficking minor women."

9        Do you have a response to that?

10        A    Mr. Patel is entitled to say what he says.    I think I've been very clear.    The work

11    release was granted by the Palm Beach sheriff.    Our office opposed it.    Our office had every

12    expectation that he would have continuous confinement.    We were upset -- more than upset.    We

13    were -- what's the polite word for ticked off?    I'll say ticked off.    We were ticked off that he didn't

14    do so.

15        Our office transmitted an objection to the correctional department of Palm Beach.    Our

16    office was upset over the manner in which he obtained this, because the place where he was doing

17    work release was shady, at best.    And so it was what it was.    We weren't happy.

18        You know, if we had known that he would have been on work release, we would never have

19    gone through with this.    We insisted and actually at multiple points obtained assurances that it

20    would be continuous confinement, but clearly somehow Palm Beach gave it to him.

21        Q    Fair to say you disagree with Director Patel?

22        A    I'm not here to create a clash between one person or another.    I'm here to give my

23    views.    And I'm not about the quick headline.    That's not who I am.

24        Ms. Stansbury.    I'm just so perplexed.    You know, this is one of those cases where the more

25    you learn about it, it becomes more and more perplexing.

Provided to Jordan A. Esteban, Neiman Mays Floch & Almeida, PLLC on 9/24/2025

162

1       I want to just dig in a little bit more about the --

2       Mr. Acosta.    Yeah.

3       Ms. Stansbury,    -- Federal nexus piece of this.

4       Mr. Acosta.    Yeah.

5       Ms. Stansbury.    And I know you had some things you wanted to say about transportation.

6       Mr. Acosta.    Yeah.

7       Ms. Stansbury.    And at the time at which the investigation occurred prior to the

8    recommendation that you gave for a non-prosecution agreement, there had already been victim

9    witness statements taken that indicated that Jeffrey Epstein had taken young women and children on

10    his plane and transported them across State lines, correct?

11       Mr. Acosta.    Not to my knowledge.

12       Ms. Stansbury.    Virginia Giuffre's statement had not yet been in the record?

13       Mr. Acosta.    Again, I don't know what statement that was.    Not to my knowledge.    Here

14    is -- it goes to your point.    The managing attorney from --

15       Ms. Stansbury.    Did you -- just before you go into that, though.    Again, perplexing to me.

16    So I know you said that you did not review the investigatory interviews yourself.    So you're relying,

17    then, on secondary information from --

18       Mr. Acosta.    So if I could --

19       Ms. Stansbury.    Okay.

20       Mr. Acosta.    Simply, the managing attorney, Mr. Lourie, Lourie believed the defense

21    argument that Epstein did not travel to Florida, quote, with the purpose of engaging in illicit sex with

22    a minor was more persuasive.    So he believed the defense argument that Epstein did not travel to

23    Florida with the purpose was more persuasive.

24       Ms. Stansbury.    But that's not the question I asked.

25       Mr. Acosta.    It is the question, and here's why.    Because we wouldn't have had this internal

Provided to Jordan A. Esteban, Neiman Mays Floch & Almeida, PLLC on 9/24/2025

1    debate over whether the purpose of his flying from New York to Florida was to have sex and whether

2    that had to be a purpose or the dominant purpose, if we had evidence that he actually transported a

3    minor to engage in sex trafficking.    So if we had the evidence that you talked about, the supervisory

4    chain would not have been engaging in this secondary discussion of finding a workaround.

5         Ms. Stansbury.    I do want to press on that just a little bit.    I mean, the committing of crimes

6    across a State border regardless of intent to commit the crime across a State border, it's still a

7    Federal crime if it happens across the State --

8         Mr. Acosta.    So to my recollection, we did not -- based on this, we did not have evidence

9    that he was transporting minors across State lines for purposes of sex.

10        Ms. Stansbury.    Okay.    So this is where I would like to follow up.    So in the negotiation of

11   the non-prosecution -- as the plea agreement that was at the heart of the non-prosecution

12   agreement, as I'm understanding it, Ms. Villafana engaged in direct negotiations with Jay Lefkowitz.

13        Mr. Neiman.    Lefkowitz.

14        Ms. Stansbury.    Lefkowitz, thank you.

15        And so we do have copies of correspondence that was held by email between -- between

16   Epstein's attorneys and the line prosecutor that was instructed to pursue this plea agreement.    And

17   they went back and forth about what State crime Jeffrey Epstein would plea to, right?

18        Mr. Acosta.    Uh-huh.

19        Ms. Stansbury.    And in this correspondence specifically there was a discussion about the

20   possibility of maybe Mr. Epstein could plead guilty to some sort of assault on his plane.    And in that

21   correspondence, it is literally said by the line prosecutor, no, we can't do that because that's illegal

22   under 49 U.S.C. 46506, meaning it's a Federal crime.

23        So, in fact, your own line prosecutor was aware that there were women being transported

24   across State lines.    And it was at the heart of the plea agreement that she was specifically talking to

25   Epstein's attorney about negotiating a State plea rather than a Federal plea.

Provided to Jordan A. Esteban, Neiman Mays Floch & Almeida, PLLC on 9/24/2025

1   Mr. Acosta.   So with respect, and I'd have to see the full content of what -- where you're

2   quoting from.   I don't interpret that as saying that she was aware that victims were being

3   transported across State lines for the purpose of sex.   And the assault charge was something that, if

4   it had come up to me, I don't -- I think this went beyond assault, and this -- assault would not have

5   been a registrable --

6   Ms. Stansbury.   It's an actual email between a Federal prosecutor and the defendant's

7   attorney.   And I'll just read it.   Quote, "Hi, Jay, I looked at some Eleventh Circuit cases on simple

8   assault and found some good language.   I also learned that every moment --

9   Mr. Acosta.   On simple assault, you said?

10   Ms. Stansbury.   Yeah.   She's in the middle of negotiating --

11   Mr. Acosta.   Right.   But she looked at Eleventh Circuit on what kind of -- on simple assault?

12   Ms. Stansbury.   This says simple assault.

13   Mr. Acosta.   Okay.

14   Ms. Stansbury.   Okay.   And then the next sentence says, "I learned that every moment that

15   one is aboard an enclosed civil airplane they are in the, quote/unquote, special aircraft jurisdiction of

16   the United States.   So the assault charge is really a violation of 49 U.S.C. 46506, which doesn't

17   change the penalty."

18   And so the nature of this correspondence is that she is actually talking to Epstein's attorney to

19   come up with a State plea.   And so she's saying you can't use that plea because it makes this a

20   Federal crime.

21   Do you see what I'm saying?

22   Mr. Acosta.   So I'm not sure that -- again, I'm not sure that's what she's saying.   And at

23   some point, you know, in this negotiation process, she really focused on getting him in jail and was

24   starting to get creative with some statutes.   And ultimately, that didn't go anywhere because you

25   can't get that creative.   Whatever he pled to had to be registrable, in my opinion.

Provided to Jordan A. Esteban, Neiman Mays Floch & Almeida, PLLC on 9/24/2025

1    And again, the office had extensive discussions about travel and about the travel to Florida

2    statute.    Those discussions, we would have not had that entire line of discussions if there was

3    evidence that he transported minors for purposes of sex.    I can't --

4    Ms. Stansbury.    Is it -- oh --

5    Mr. Acosta.    I can't recreate 20 years later what may have been in someone else's mind in an

6    email.    What I can talk to is it wouldn't have made sense to have those extensive discussions and

7    debates about dominant or a purpose if there was an easier path to follow.

8    Ms. Stansbury.    But let me ask you this.    Was it normal for a Federal prosecutor who was

9    recommending Federal charges to engage in back-and-forth email with a defendant's attorney, giving

10    them ideas for potential lesser crimes that they could plea to?

11    Mr. Acosta.    So --

12    Ms. Stansbury.    Did you experience that in other cases?

13    Mr. Acosta.    So --

14    Ms. Stansbury.    Just a yes or no.

15    Mr. Acosta.    So --

16    Ms. Stansbury.    Did that happen during your time as U.S. attorney in other cases?

17    Mr. Acosta.    So, first, I don't have the benefit of all these emails in all these cases, because

18    this case is fairly unique.

19    Ms. Stansbury.    But just --

20    Mr. Acosta.    But secondly, I think Ms. Villafana was asked about that in an OPR.    And I do

21    want to defend her here for a minute.

22    Ms. Stansbury.    I'm not impugning her character.

23    Mr. Acosta.    You know --

24    Ms. Stansbury.    I'm asking you about the prosecution of the case.

25    Mr. Acosta.    But let me -- and I think her answer to OPR was, you know, look, she believes

Provided to Jordan A. Esteban, Neiman Mays Floch & Almeida, PLLC on 9/24/2025

1    it's really -- that that part of who she is as a prosecutor is to be friendly and to have these discussions.

2    And that in no way should be led -- should lead anyone to think she is anything but a tough

3    prosecutor.    That in no way should imply that she was anything less than fully, fully dedicated to

4    putting him in jail.

5        Ms. Stansbury.    But when you made the decision -- because you said it multiple times

6    today -- that you were going to proceed to not pursue Federal prosecution and we're going to go to

7    the non-prosecution agreement, did you direct her or someone in her chain of command to look for

8    a lesser crime under State jurisdiction for him to plead guilty to?

9        Mr. Acosta.    No.    The decision was made to proceed.    She went forward and then

10    she -- she negotiated this, using her best judgement.    No one --

11        Ms. Stansbury.    Did you personally speak to Epstein's attorneys at any point during that

12    negotiation?

13        Mr. Acosta.    So as I've said previously, they asked for a meeting.    I thought the case would

14    go to Washington.    I thought it was better to have the meeting in the office.    We granted the

15    meeting.    I was there, she was there, the first assistant was there, the Criminal chief was there,

16    representatives of the FBI was there, the managing attorney of the Palm Beach office was there.

17    They came in, they asked us to drop the case.    I think they said in the alternative do some kind of

18    home confinement thing.

19        Ms. Stansbury.    Uh-huh.

20        Mr. Acosta.    Their argument was that it's a local crime, not a Federal crime, and that we

21    don't have evidence to make it a Federal crime.    I said, I've heard you.    Can you leave the room?

22    I looked around.    I said, Does anyone disagree with our approach?    No one spoke up.    They

23    came --

24        Ms. Stansbury.    Did you --

25        Mr. Acosta.    They came back in and I said, We've heard you, but we're proceeding as we see

Provided to Jordan A. Esteban, Neiman Mays Floch & Almeida, PLLC on 9/24/2025

1    fit.   And the meeting was concluded.

2            Ms. Stansbury.   Did you socialize with them outside of the office?

3            Mr. Acosta.   Not during this time.   I knew them before, and we've talked about that.   But

4    during the negotiation --

5            Ms. Stansbury.   At any point between the beginning of the DOJ, FBI investigation and the

6    execution of the non-prosecution agreement, did you ever socialize with Jeffrey Epstein's attorneys?

7            Mr. Acosta.   I did not socialize.   There was a breakfast meeting that took place after the

8    agreement was signed.   We've talked about that at that breakfast meeting.   It was 20 years ago, I

9    don't remember the content.

10           My informed speculation is that that's when they were trying to recuse Ms. Villafana from the

11   case.   The agreement had already been signed.   She was recommending an associate of her

12   boyfriend, as we'll call it, the special master, the person that was going to help obtain monetary

13   recoveries for the victims.

14           I'm going to speculate it would have made sense for me to find out why they were trying to

15   recuse her, what the specifics were.   We decided not to recuse her from the case.   We thought

16   that she did not act incorrectly.   Other than that, I have no recollection of any social interaction

17   with them.

18           Ms. Stansbury.   Going back to the Federal --

19           Mr. Acosta.   And I should add, I was in Miami, they were in Washington.   And so it was

20   different cities as well.

21           Ms. Stansbury.   Going back to the Federal nexus.   It's our understanding that there were

22   financial records collected as a part of the investigation that included an investigation into

23   international wire transfers.   Are you aware of that?

24           Mr. Acosta.   I don't recall a financial aspect of this.   We were focused on the inappropriate

25   acts that took place in Palm Beach.

Provided to Jordan A. Esteban, Neiman Mays Floch & Almeida, PLLC on 9/24/2025

1        Ms. Stansbury.    Was it ever discussed as a part of the Federal investigation?

2        Mr. Acosta.    This was 20 years ago.    I don't remember --

3        Ms. Stansbury.    You don't recall whether or not in the most high-profile cases of your life

4    that led to your resignation from the administration whether or not financial transactions were

5    investigated --

6        Mr. Acosta.    With --

7        Ms. Stansbury.    -- as a part of the investigation?

8        Mr. Acosta.    With respect -- with respect, at the time it was high profile, it was not the most

9    high-profile case of my life at the time.

10        Ms. Stansbury.    Uh-huh.    That's fine.

11        Mr. Acosta.    And -- but the focus --

12        Ms. Stansbury.    But in any case --

13        Mr. Acosta.    Right.

14        Ms. Stansbury.    -- it's an established fact.    Okay.    You know, we've been working with the

15    majority to get copies of the financial records.

16        Why --

17        Mr. Acosta.    Could I ask a question?

18        Ms. Stansbury.    Yes.

19        Mr. Acosta.    Are there communications about a financial aspect to the case?    Are

20    there -- you know, we've got a full OPR report here of 300 pages.    I don't believe that there's

21    references to a financial aspect to this case in this OPR report.

22        Ms. Stansbury.    I'm asking you --

23        Mr. Acosta.    But --

24        Ms. Stansbury.    -- if --

25        Mr. Acosta.    But -- but you said it was an established fact, and I'm just --

Provided to Jordan A. Esteban, Neiman Mays Floch & Almeida, PLLC on 9/24/2025

1       Ms. Stansbury.   Well, let me --

2       Mr. Acosta.    -- gently -- gently questioning how much of an established fact.

3       Ms. Stansbury.   You were the prosecutor, not me.   I'm asking you questions to understand

4   what you investigated.

5       So what I am trying to understand is, did you look at potential financial crimes and discuss

6   that as part of the decision as to whether or not to pursue Federal charges?

7       Mr. Acosta.   To my recollection, the discussion was focused on the sex crimes.

8       Ms. Stansbury.   And why not on the financial crimes?

9       Mr. Acosta.   Again, this was 20 years ago, I can't speak to that.

10      Ms. Stansbury.   Was that not a part of what was recommended through the line prosecutor?

11      Mr. Acosta.   Again, I can't speak to that.   I do not recall a discussion over financial -- if there

12   had been, you know, a Federal nexus on financial crimes, again, we wouldn't have had these long

13   discussions about a Federal nexus.

14      Ms. Stansbury.   Okay.   Well, we'll see where evidence leads us.

15      I think I'm done with that line, if you have other things.

16      Rep. Ansari, do you have anything else you want to ask?

17      Ms. Ansari.   No, no.

18      Ms. Stansbury.   Give me one moment here.

19      I think the final set of questions that we had were around the FBI's recommendation to arrest

20   Mr. Epstein.   Based on communications that were transmitted to us, it looks like the FBI

21   communicated that they had prepared to arrest Mr. Epstein in this case but that the U.S. Attorney's

22   Office had, essentially, interfered in the arrest.

23      Mr. Acosta.   So let me ask [sic] that question, then I want to backup to your prior question

24   about financial crimes.

25      I believe what you're referring to is a request to go forward when he was in the Virgin Islands.

Provided to Jordan A. Esteban, Neiman Mays Floch & Almeida, PLLC on 9/24/2025

1    That was discussed a little bit earlier today.    And what I pointed out, at the time what we had was a

2    draft memo to go forward.    That memo had not been vetted by the supervisory chain.    In every

3    case, not just this case, the prosecuting attorney writes a memo, they write a draft.    That draft then

4    gets vetted, it gets changed.    Not everyone in the office agrees, the charges are changed.

5         I believe at that point, her direct supervisor had already commented that he did not agree

6    with her charging decisions, and it was the beginning of a conversation on how to charge.

7         And so it would not be the case that a U.S. Attorney's Office would authorize an arrest on a

8    draft document that hasn't been approved by the immediate supervisor and is still being drafted.

9         Ms. Stansbury.    And why did you not sign off on it or why did -- why did the supervisor not

10    sign off on it?

11         Mr. Acosta.    So based on the OPR report, I believe that there was a difference of opinion as

12    to the theory of the case and how to proceed.    And that was the beginning of the discussions within

13    the office.

14         Ms. Stansbury.    About the non-prosecution agreement?

15         Mr. Acosta.    That eventually led -- that eventually led that way.

16         And I want to back -- back up, if I could, to -- to the extent there were financial crimes, those

17    financial crimes would not have been covered by and could have proceeded in other districts or

18    could have even proceeded in the Southern District because it's a different set of statutes.    And so

19    just like New York proceeded with this, you know, with Ghislaine Maxwell, if there are financial

20    crimes, that could have proceeded.    And so -- so if that was being investigated, it could continue to

21    have been investigated.

22         The two matters, unless they were so heavily interlinked, but even if they were, you know, it's

23    a separate set of matters to my mind.    And so one would not have precluded the other, just --

24         Ms. Stansbury.    Including the non-prosecution agreement would not apply to financial

25    crimes?

Provided to Jordan A. Esteban, Neiman Mays Floch & Almeida, PLLC on 9/24/2025

1    Mr. Acosta.   So my read on the non-prosecution agreement is it would not apply to financial

2    crimes, no.   And the non-prosecution agreement, I should also add to be clear, by its terms, was

3    limited to the Southern District of Florida, which is why the case in New York was able to be brought.

4    Ms. Stansbury.   I have one more question.   With regards to any evidence that may have

5    been collected by the FBI or DOJ, does the President have the authority to unseal those documents, if

6    there is not otherwise a very specific court order regarding them?

7    Mr. Acosta.   If the seal is placed by the court, then it would have to be the court that goes to

8    that.

9    Ms. Stansbury.   But any other document that is not under a court order can technically --

10    Mr. Acosta.   Documents that aren't under court orders can be -- if there is no prohibition,

11    then whoever is the custodian of that document can proceed as they see fit.

12    Ms. Stansbury.   I think that's it.

13    Mr. Acosta.   That's my opinion.   I'm not speaking for the executive branch.   But absent a

14    prohibition, a custodian can proceed.

15    Ms. Stansbury.   Well, I'm sure the White House attorneys thinks the President has total

16    power in this matter, but that's my editorializing.

17    Mr. Acosta.   Off the record.

18    [Discussion off the record.]

19    Mr. ███.   We are now off the record.

20    Mr. █████.   Thank you.   All right.   We're done, sir.

21    [Whereupon, at 4:39 p.m., the interview was adjourned.]

Provided to Jordan A. Esteban, Neiman Mays Floch & Almeida, PLLC on 9/24/2025

1                  Certificate of Deponent/Interviewee

2

3

4        I have read the foregoing _____ pages, which contain the correct transcript of the answers made

5 by me to the questions therein recorded.

6

7

8

9                 _____

10                      Witness Name

11

12

13                 _____

14                          Date

15

16

17

# EXHIBIT  55

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 3/22/21
```

United States of America,

    –v–

Ghislaine Maxwell,

          Defendant.

20-CR-330 (AJN)

ORDER

ALISON J. NATHAN, District Judge:

    Defendant Ghislaine Maxwell has been indicted by a grand jury on charges of conspiracy to entice minors to travel to engage in illegal sex acts, in violation of 18 U.S.C. § 371; enticing a minor to travel to engage in illegal sex acts, in violation of 18 U.S.C. §§ 2422 and 2; conspiracy to transport minors to participate in illegal sex acts, in violation of 18 U.S.C. § 371; transporting minors to participate in illegal sex acts, in violation of 18 U.S.C. §§ 2423 and 2; and two charges of perjury, in violation of 18 U.S.C. § 1623.

    On July 14, 2020, the Court held a lengthy bail hearing and concluded that the Defendant was a clear risk of flight and that no conditions or combination of conditions would ensure her appearance. It therefore denied bail. On December 8, 2020, the Defendant filed a renewed motion for release on bail pending trial, which was entered into the public docket on December 14, 2020. Dkt. No. 96. On December 28, 2020, the Court denied that motion, concluding that the Defendant posed a risk of flight and that no combination of conditions could ensure her appearance. Dkt. Nos. 104, 106.

    The Defendant then filed a third motion for release on bail on February 23, 2021. Dkt. No. 160. In this motion, the Defendant attempts to respond to the reasons that the Court

1

provided in denying bail, proposing two additional conditions to the ones she proposed in her second motion for bail. Specifically, she offers to renounce her French and British citizenship, and she also proposes to have her and her spouse's assets placed in a new account that will be monitored by a retired federal judge. *See* Dkt. No. 160 at 2.

As set forth below, the Court concludes that none of the Defendant's new arguments and proposals disturb its conclusion that the Defendant poses a risk of flight and that there are no combination of conditions that can reasonably assure her appearance. Thus, for substantially the same reasons that the Court denied the Defendant's first and second motions for release, the Court DENIES the Defendant's third motion for release on bail.

## I.    Background

On July 14, 2020, this Court held a hearing regarding the Defendant's request for bail. After a thorough consideration of all of the Defendant's arguments and of the factors set forth in 18 U.S.C. § 3142(g), the Court concluded that no conditions or combination of conditions could reasonably assure the Defendant's appearance, determining as a result that the Defendant was a flight risk and that detention without bail was warranted under 18 U.S.C. § 3142(e)(1). The Defendant has been incarcerated at the Metropolitan Detention Center since that time.

The Defendant renewed her motion for release on bail on December 8, 2020. The Court again denied the Defendant's motion. In doing so, the Court explained that none of the Defendant's new arguments materially impacted its conclusion that the Defendant posed a risk of flight. It noted that the charges, which carry a presumption of detention, are serious and carry lengthy terms of imprisonment if convicted; the evidence proffered by the Government, including multiple corroborating and corroborated witnesses, remained strong; the Defendant's substantial resources and foreign ties created considerable uncertainty and opportunities for

escape; and that the Defendant's lack of candor regarding her family ties and financial situations raised serious doubts as to her willingness to comply with any conditions imposed by the Court. *See* Dkt. No. 106.

On February 23, 2021, the Defendant filed a third motion for release on bail. Dkt. No. 160 ("Def. Mot."). The Government opposed the Defendant's motion on March 9, 2021. Dkt. No. 165 ("Gov't Opp'n"). The Defendant filed her reply under temporary seal on March 16, 2021.

## II.    Legal Standard

The parties dispute whether the divestiture of jurisdiction rule precludes this Court from granting the Defendant's third bail motion while Defendant's bail appeal is pending. *See* Gov't Opp'n at 2–3; Reply at 2–3; *see also United States v. Rodgers*, 101 F.3d 247, 251 (2d Cir. 1996) ("As a general matter, 'the filing of a notice of appeal is an event of jurisdictional significance— it confers jurisdiction on the court of appeals and divests the district court of its control over those aspects of the case involved in the appeal.'") (citation omitted). Under Rule 37(a) of the Federal Rules of Criminal Procedure, however, the Court unquestionably has authority to defer considering the motion, deny the motion, or state either that it would grant the motion if the court of appeals remands for that purpose or that the motion raises a substantial issue. Fed. R. Crim. P. 37(a). Because the Court denies the Defendant's motion, it does not resolve the question of whether it would have jurisdiction to grant it.

Pretrial detainees have a right to bail under the Eighth Amendment to the United States Constitution and under the Bail Reform Act, 18 U.S.C. § 3141, *et seq.* The Bail Reform Act requires that a court release a defendant "subject to the least restrictive further condition, or combination of conditions, that [it] determines will reasonably assure the appearance of the

3

person as required and the safety of any other person and the community." 18 U.S.C. §
3142(c)(1)(B). The Court may order that the defendant be held without bail only if, after
considering the factors set forth in 18 U.S.C. § 3142(g), the Court concludes that "no condition
or combination of conditions will reasonably assure the appearance of the person as required and
the safety of any other person and the community." 18 U.S.C. § 3142(e)(1).

After a court has made an initial determination that no conditions of release can
reasonably assure the appearance of the Defendant as required, the Bail Reform Act allows the
Court to reopen the bail hearing if "information exists that was not known to the movant at the
time of the hearing and that has a material bearing on the issue" of whether pretrial detention is
warranted. 18 U.S.C. § 3142(f). The Court is not required to do so if it determines that any new
information would not have a material bearing on the issue. *See United States v. Raniere*, No.
18-CR-2041 (NGG) (VMS), 2018 WL 6344202, at *2 n.7 (E.D.N.Y. Dec. 5, 2018) (noting that
"[a]s the court has already held one detention hearing, it need not hold another"); *United States v.
Havens*, 487 F. Supp. 2d 335, 339 (W.D.N.Y. 2007) (electing not to reopen a detention hearing
because the new information would not have changed the court's decision to detain the defendant
until trial). In addition, the Court may also revisit its own decision pursuant to its inherent
authority, even when the circumstances do not match § 3142(f)'s statutory text. *See, e.g., United
States v. Rowe*, No. 02-CR-756 (LMM), 2003 WL 21196846, at *1 (S.D.N.Y. May 21, 2003)
(noting that "a release order may be reconsidered even where the evidence proffered on
reconsideration was known to the movant at the time of the original hearing."); *United States v.
Petrov*, No. 15-CR-66 (LTS), 2015 WL 11022886, at *3 (S.D.N.Y. Mar. 26, 2015) (noting the
"Court's inherent authority for reconsideration of the Court's previous bail decision").

4

If, as here, there is probable cause to find that the defendant committed an offense specifically enumerated in § 3142(e)(3), a rebuttable presumption arises "that no condition or combination of conditions will reasonably assure" the defendant's appearance or the safety of the community or others. 18 U.S.C. § 3142(e)(3). In such circumstances, "the defendant 'bears a limited burden of production . . . to rebut that presumption by coming forward with evidence that he does not pose a danger to the community or a risk of flight.'" *United States v. English*, 629 F.3d 311, 319 (2d Cir. 2011) (quoting *United States v. Mercedes*, 254 F.3d 433, 436 (2d Cir. 2001)); *see also United States v. Rodriguez*, 950 F.2d 85, 88 (2d Cir. 1991) ("[A] defendant must introduce some evidence contrary to the presumed fact in order to rebut the presumption."). Nonetheless, "'the government retains the ultimate burden of persuasion by clear and convincing evidence that the defendant presents a danger to the community,' and 'by the lesser standard of a preponderance of the evidence that the defendant presents a risk of flight.'" *English*, 629 F.3d at 319 (quoting *Mercedes*, 254 F.3d at 436); *see also United States v. Martir*, 782 F.2d 1141, 1144 (2d Cir. 1986) ("The government retains the burden of persuasion [in a presumption case]."). Even when "a defendant has met his burden of production," however, "the presumption favoring detention does not disappear entirely, but remains a factor to be considered among those weighed by the district court." *United States v. Mattis*, 963 F.3d 285, 290–91 (2d Cir. 2020).

## III. Discussion

The Defendant bases her third motion for bail on the Court's inherent powers to review its own bail decisions, arguing that the new conditions she proposes warrant reconsideration of the Court's earlier rulings. *See* Def. Mot. at 4. She also argues that the strength of the Government's case is diminished in light of the arguments she advances in her pre-trial motions, which are currently pending before the Court. *Id.* at 7. Having considered those arguments, the

5

Court's view has not changed. The Court again concludes that the Government has shown by a preponderance of the evidence that the Defendant presents a risk of flight and that there are no set of conditions, including the Defendant's third set of proposed conditions, that are sufficient to reasonably assure her appearance. The presumption in favor of detention, the weight of the evidence, and the history and characteristics of the Defendant all continue to support that conclusion. The Defendant's proposed conditions do not alter the Court's determination.

### A. The Court's assessment of the 18 U.S.C. § 3142(g) factors has not changed

To begin with, the presumption in favor of detention continues to apply with equal force. *See* Dkt. No. 106 ("Dec. Op.") at 7–8. And though the Court again concludes that the Defendant has met her burden of production, the presumption "remains a factor to be considered among those weighed by the district court." *Mercedes*, 254 F.3d at 436 (quoting *Martir*, 782 F.2d at 1144). The Court is mindful "that Congress has found that these offenders pose special risks of flight, and that 'a strong probability arises' that no form of conditional release will be adequate to secure their appearance." *Martir*, 782 F.2d at 1144 (citation omitted).

The Court's analysis of the 18 U.S.C. § 3142(g) factors also remains unchanged. Because the nature and circumstances of the offenses charged include crimes involving a minor victim, the first 18 U.S.C. § 3142(g) factor continues to weigh strongly in favor of detention. And the Court remains of the opinion that the Defendant does not pose a danger to any person or to the community. The fourth § 3142(g) factor thus weighs against detention.

With respect to the second § 3142(g) factor, none of the Defendant's new arguments alter the Court's conclusion as to the weight of the evidence. The Defendant argues that the pre-trial motions "raise serious legal issues that could result in dismissal of charges, if not the entire indictment," and she contends that "[t]hese motions cast substantial doubt on the alleged strength

6

of the government's case and warrant granting bail on the conditions proposed." Def. Mot. at 7.

Those motions became fully briefed one week ago and are now pending before this Court. The

Government strenuously contests each of the motions and the Court has not yet adjudicated

them. Without prejudging the merits of any of those pending motions and mindful of the

presumption of innocence, the Court remains of the view that in light of the proffered strength

and nature of the Government's case, the weight of the evidence supports detention. *See* Dec.

Op. at 9–10.

      The Court's assessment of the Defendant's history and characteristics has not changed.

*See* Dec. Op. at 10–16. The Defendant continues to have substantial international ties, familial

and personal connections abroad, substantial financial resources, and experience evading

detection. *Id.* at 10–11. And the Court's concerns regarding the Defendant's lack of candor

regarding her assets when she was first arrested have also stayed the same. As the Court

emphasized in its denial of the second motion for release on bail, the discrepancies between the

information presented to the Court and to Pretrial Services in July 2020 and the information

presented to the Court in December 2020 raised significant concerns about candor. *See* Dec. Op.

at 16. There remains considerable doubt as to the Defendant's willingness to abide by any set of

conditions of release. *Id.* While there continue to be certain mitigating circumstances cutting in

the opposite direction, including the Defendant's family ties in the United States, these do not

overcome the weight of the considerations that lean in favor of continued detention.

      As a result, none of the evidence or arguments presented in this third motion for bail alter

the Court's assessment of the 18 U.S.C. § 3142(g) factors. While the fourth factor continues to

favor release, the first three factors and the presumption of detention all support the conclusion

that the Defendant poses a significant risk of flight. Thus, the Court again concludes that there are no conditions of release that will reasonably assure her appearance in future proceedings.

### B. Pretrial detention continues to be warranted

The thrust of the Defendant's argument in her third motion for bail is that the two new proposed conditions vitiate the Court's concerns regarding the risk of flight. The Defendant first offers to renounce her French and British citizenship. Def. Mot. at 2. And she also proposes to have most of her and her spouse's assets placed in a new account that will be monitored by a retired federal judge, who would function as an asset monitor and will have co-signing authority over the account. *Id.* Those conditions are offered in addition to the bail package she proposed in December. *See* Dec. Op. at 16–17; *see also* Def. Mot. at 2. The new bail package does not disturb the Court's conclusion that the Government has carried its burden of showing that these conditions are insufficient to mitigate the flight risks, and the Court again determines that no set of conditions—including the two new ones—can reasonably assure her future appearance.

The Court begins with the Defendant's offer to renounce her French and United Kingdom citizenship. She notes that she can renounce her UK citizenship "immediately upon granting of bail," and she informs the Court that "[t]he process of renouncing her French citizenship, while not immediate, may be expedited." Def. Mot. at 4. As the Government notes, the offer is of unclear validity, and the relevance and practical impact of the renunciations is, at best, unclear. *See* Gov't Opp'n at 5. With respect to her offer to renounce her French citizenship, the Court is again confronted with dueling opinions on the correct interpretation of French law. The Government relies on the position of the head of the International Criminal Assistance Bureau of the French Ministry of Justice, who argues that "the fact that the wanted individual is a French national constitutes an insuperable obstacle to his/her removal," and that "[a]s long as said

8

nationality is assessed at the time the offense was committed, any loss of nationality subsequent to said offense has no bearing upon the removal proceedings and shall not supersede said assessment of nationality."[1] Gov't Opp'n, Ex. A at 2. The Defendant, meanwhile, relies on the opinion of a French legal expert who argues that nationality is assessed at the time of the extradition request. *See* Reply, Ex. A ¶ 11. The Defendant's expert concedes that there is no case law addressing this precise issue. *Id.* ¶ 21.

Exacerbating the uncertainty is the fact that the relevant legal materials also lend themselves to multiple interpretations. For instance, Article 3(1) the Extradition Treaty between the United States and France of April 23, 1996 provides that "[t]here is no obligation upon the Requested State to grant the extradition of a person *who is a national of the Requested State*, but the executive authority of the United States shall have the power to surrender a national of the United States if, in its discretion, it deems it proper to do so. *The nationality of the person sought shall be the nationality of that person at the time the offense was committed.*" *See* Reply, Ex. A ¶ 9 (emphasis added)). Article 694-4 of the French Code of Criminal Procedure similarly provides that "Extradition shall not be granted . . . [w]hen the person claimed has French nationality, the latter being assessed at the time of the offense for which extradition is requested."[2] *Id.* ¶ 10; *see also* Gov't Opp'n, Ex. A at 2. Thus, there is considerable uncertainty as to the relevance of the Defendant's offer of renunciation of her French citizenship to her ability to frustrate, if not entirely bar, extradition. The Court's assessment of the risks largely

---

[1] The Court cites the translated version of the letter, though the original letter is in French.
[2] Here, there are minor discrepancies between the two sides' respective translations. The translated letter from the Ministry of Justice cites Article 694-4 as reading, "When the individual claimed to have French citizenship, said citizenship having been assessed at the time of the offense on the basis of which removal is being requested." Gov't Opp'n, Ex. A at 2.

parallel those that the Court articulated when the Defendant proposed signing an extradition waiver. *See* Dec. Op. at 12–13.

Similar doubts exist as to the Defendant's offer to renounce her UK citizenship. The Court is persuaded by the Government's arguments that even if the Defendant were to renounce her UK citizenship, she would still likely be able to delay or resist extradition from the UK. *See* Gov't Opp'n at 6–7. And for largely similar reasons, the Court again concludes that the proposed conditions do not meaningfully diminish the Court's concerns regarding the Defendant's ability to flee and to frustrate or impair any subsequent extradition attempts. The possibility that the Defendant could successfully resist or forestall extradition heightens the Defendant's incentive to flee.

To summarize, the Defendant's willingness to renounce her French and UK citizenship does not sufficiently assuage the Court's concerns regarding the risk of flight that the Defendant poses. Considerable uncertainty regarding the enforceability and practical impact of the renunciations cloud whatever relevance they might otherwise have to the Court's assessment of whether the Defendant poses a risk of flight. *See United States v. Cohen*, No. C 10-00547 (SI), 2010 WL 5387757, at *9 n.11 (N.D. Cal. Dec. 20, 2010). And that same uncertainty—and the possibility that she will be able to successfully resist, or at least delay, extradition—incentivizes flight, particularly because of the Defendant's substantial international ties.

Nor does the second proposed condition materially alter the Court's determination that no condition or combination of conditions can reasonably assure the Defendant's appearance. The Defendant proposes to have a retired federal judge provide oversight authority over her financial affairs, and, if granted, he would have the authority to restrain, monitor, and approve disbursement of assets requiring his signature. *See* Reply at 5. The Court continues to have

concerns about whether the full extent of the Defendant's assets have been disclosed in light of the lack of transparency when she was first arrested. But the Court assumes, for purposes of resolving this motion, that the financial report that it reviewed in December is accurate and that it accounts for all of the Defendant's and her spouse's assets. *See* Dec. Op. at 16–17.

The monitorship condition does not reasonably assure the Defendant's future appearance, even when viewed in combination with the rest of the Defendant's bail package. The Defendant would continue to have access to substantial assets—certainly enough to enable her flight and to evade prosecution. These include the $450,000 that the Defendant would retain for living expenses and any future salaries for her or her spouse, along with other assets, including jewelry and other chattels, that are potentially worth hundreds of thousands of dollars. *See* Def. Mot. at 5–6; *see also* Dkt. 97, Ex. O at 9. While those amounts may be a small percentage of the Defendant's total assets, they represent a still-substantial amount that could easily facilitate flight. When combined with the Court's weighing of the § 3142(g) factors and the presumption of detention, the Court concludes that the proposed restraints are insufficient to alter its conclusion that no combination of conditions can reasonably assure her appearance.

If the Court could conclude that any set of conditions could reasonably assure the Defendant's future appearance, it would order her release. Yet while her proposed bail package is substantial, it cannot provide such reasonable assurances. As a result, the Court again determines that "no condition or combination of conditions will reasonably assure the appearance of" the Defendant, and it denies her motion for bail on this basis. 18 U.S.C. § 3142(e)(1).

11

## IV.    Conclusion

Defendant Ghislaine Maxwell's third motion for release on bail, Dkt. No. 160, is

DENIED. The parties are ORDERED to meet and confer and propose and justify any redactions

to the Defendant's reply brief by March 24, 2021. If they conclude that redactions are

unnecessary, the Defendant is ORDERED to docket the unredacted version of the brief by March

24, 2021.

SO ORDERED.

Dated: March 22, 2021
     New York, New York

ALISON J. NATHAN
United States District Judge

12

# EXHIBIT 57

(Rev. 05-01-2008)

UNCLASSIFIED

# FEDERAL BUREAU OF INVESTIGATION

Precedence:  IMMEDIATE                    Date:  03/11/2011

To:  Miami                         Attn: ██████████████████

From:  Miami
        PB-3/PBCRA
        Contact:

Approved By:

Drafted By:

Case ID #: █████████████████████

Title:  JEFFREY EPSTEIN;

        GHISLAINE MAXWELL;
        WSTA - CHILD PROSTITUTION

Synopsis:  Update case file as to interview conducted by ████████
on March 9, 2011.

Details:  On March 7, 2011, ████████████████████████████
████████████████████ concurred with two requests from
████████████████ to have ████████ join her in a telephone
call to ████████ in ████████ on March 7, 2011 and accompany
████████ to an interview on March 9, 2011 with ████████████
████████████ and ████████████

        On the evening of March 7, 2011, ████████████████ and
████████ placed a telephone call to ████████████ indicated she
is willing to cooperate fully with any FBI investigation
involving JEFFREY EPSTEIN and others.  She has requested to meet
with FBI Agents in ████████████████████ along with the ████████
████████ for the debriefing.

        On March 9, 2011, ████████████████████████
████████ and ████████ Private Investigator ████████████
████████ and ████████ met for the interview at the United
States Attorney's Office in Fort Lauderdale, Florida.

UNCLASSIFIED

CONFIDENTIAL

3501.226-022
Page 1 of 4

UNCLASSIFIED

To: Miami  From: Miami
Re: ??███████████    03/11/2011

████████ ███████ and ██████ provided information about crimes uncovered during the lengthy civil investigation of EPSTEIN by Mr. ████████ office. These allegations include possible perjury charges against EPSTEIN, which is outlined in the February 17, 2010 deposition transcript; possible allegations of human trafficking of underage females by EPSTEIN to high-level public officials and others; and obstruction of justice.

████████ has also made contact with ████████ about her relationship with EPSTEIN, to include allegations of human trafficking and child exploitation, not previously known by investigators and prosecutors. ████████ explained that ████████ would like to make a formal statement to the Federal Bureau of Investigation and cooperate in any criminal investigation.

████████ provided documents obtained during the civil investigation for review. Below is the list of items produced to ████:

1 CD containing:
  1. Deposition of █████████████
  2. Deposition of █████████████ (Vol I and II)
  3. Deposition of █████████████
  4. Deposition of █████████████ (Vol I only)
  5. Deposition of David Rogers (no transcript)
  6. Deposition of █████████████
  7. Deposition of █████████████ (both parts)
  8. Deposition of █████████████
  9. Deposition of █████████████
  10. Deposition of █████████████ (Vol I, II and III)
  11. Deposition of █████████ (Vol II only)
  12. Statement of ████████████
  13. Confidentiality agreement with Ghislaine Maxwell
  14. Jeffrey Epstein Probation File

Hard copies of the following documents:
  1. Complete flight logs from Jeffrey Epstein plane
  2. Non-Prosecution Agreement
  3. Transcript of Jeffrey Epstein Deposition taken on February 17, 2010 ████ vs. Epstein)
  4. Court Reporter Affidavit (not signed)

UNCLASSIFIED

2

UNCLASSIFIED

To: Miami  From: Miami
Re: ?? ███████████ , 03/11/2011

        5.   Copy of portion of Jeffrey Epstein probation
           file showing Jean Luc Brunel staying at
           Jeffrey Epstein residence
        6.   Violation of Probation of Jeffrey Epstein

Two DVDs containing the videotaped Deposition of
Jeffrey Epstein on February 17, 2010

Evidence obtained during interview will be turned over
to case agent SA ████████████

UNCLASSIFIED

3

3501.226-022
Page 3 of 4

UNCLASSIFIED

To: Miami   From: Miami
Re: ?? ███████████, 03/11/2011


LEAD(s):

Set Lead 1:  (Info)

   MIAMI

      AT MIAMI, FLORIDA

      Read and clear.

Set Lead 2:  (Action)

   MIAMI

      AT WEST PALM BEACH, FLORIDA (PB-2)

      Determine if follow-up interview of ████████████ in
█████████ is warranted.  Contact Legat ████████████ in
████████ for interview if appropriate.


◆◆

UNCLASSIFIED

4

CONFIDENTIAL

# EXHIBIT  58

"U.S. GPO 2004-337-114 §0013

FD-597 (Rev 8-11-94)

Page __1__ of __1__

**UNITED STATES DEPARTMENT OF JUSTICE**
**FEDERAL BUREAU OF INVESTIGATION**
Receipt for Property Received/Returned/Released/Seized

File # __31E - mm - 108062__

On (date) __03/17/2011__

item(s) listed below were:
- ☒ Received From
- ☐ Returned To
- ☐ Released To
- ☐ Seized

(Name)

(Street Addre

(City)

Description of Item(s):

NOTHING FOLLOWS

Received B                    Received From:

CONFIDENTIAL

3501.226-029
Page 1 of 41



CONFIDENTIAL

Prince Andrew,

Ghislane i Maxwell    2001 (JANUARY)

CONFIDENTIAL

# EXHIBIT  59

# PANORAMA – BBC TRANSCRIPT CLEAN
2019.12.02 - (Incl D Boies)

PANORAMA – BBC TRANSCRIPT CLEAN
DECEMBER 2, 2019  (Incl David Boies & Virginia  Guiffre)  .

HOST, DARRAGH MACINTYRE: Tonight, on Panorama we hear from a woman who says she
was trafficked to a prince for sex.

0.12
CUT to Virginia _VRGI _speaking to camera:
He got up and he said thanks. I sat there in bed just horrified and ashamed and felt dirty.

HOST V/O: Prince Andrew insists it isn't true.

0.25
PRINCE ANDREW _HRH_ talking to Emily Maitlis - I can absolutely, categorically tell you, it
never happened.

0.30
VRGI: He knows what happened. I know what happened and there' s only one of us telling the
truth and I know that's me.

HOST: Tonight, we reveal how another 5 women want to call Prince Andrew as a witness to
events in Jeffrey Epstein's homes.

0:48
DAVID BOIES _DBOI_ [to camera]: With respect to Prince Andrew, I think he needs to come
clean, and I think the facts need to be revealed.

0.56
GHISLAINE MAXWELL _GMAX [ OLD VIDEO - about to do an interview about Terra Mar]:
How does it look, does it all look is my hair good?

0.59
HOST: We investigate the woman Prince Andrew still calls his friend.

1.04
███████████████████ : Ghislaine controlled the girls - she was like the Madam - she was
like the nuts and bolts of the sex trafficking operation.

V/O And we uncover new information about the photo at the heart of a royal scandal.

1.19
VRGI: It's a real photo, I've given it to the FBI for their investigation and it's an authentic photo.

## PANORAMA GRAPHIC – THE PRINCE AND THE EPSTEIN SCANDAL

1.44

PANORAMA – BBC TRANSCRIPT CLEAN
2019.12.02 - (Incl D Boies)

VRGI: The world that I was living in, it was not glamorous. It was not pretty. I might have been meeting some of the most famous people in the world, but it didn't matter to me because these are bad people who were hurting me.

2.06
HOST: VG is now a married mom of three. Her life today couldn't be more different than when he was the teenage Virginia Roberts.

2.18
VRGI: It was a fancy cage, but it didn't make it better, it didn't make it easier to do what I had to do

2:23
HOST: She's the woman who says she was trafficked to London to have sex with Prince Andrew. Her allegations have created a crisis for the Royal Family. And Prince Andrew's interview on News Night made it worse.

2.43
**Emily Maitlis**, News Night: Do you recall any kind of sexual contact with Virginia Roberts then?

HRH: None

Emily Maitlis: or at any other time?

2.49
HRH: None. Whatsoever. I have no recollection of ever meeting this lady. I admit fully that my judgement was probably colored by my um, tendency to be too honorable.

3.14
HOST: The Prince's interview has been widely judged to have been disastrous. The backlash has forced him to step away from public life and it has cast a shadow over the whole royal family. Now the woman making the allegations wants the people in the UK to hear her side. She spoke to Panorama before Prince Andrew went public. She's since told us she stands by every word.

3,48
VRGI: I implore the citizens in the UK to stand up beside me to help me fight this fight – to not accept this as being ok. This is not some sordid sex story, this is a story of being trafficked. This is a story of abuse, and this is a story of your guys' royalty.

4.20
HOST: To really understand about Virginia Robert's story, you need to understand the princes' friendship with a prolific sex offender

PANORAMA – BBC TRANSCRIPT CLEAN
2019.12.02 - (Incl D Boies)

OVER VIDEO OF A DEPOSITION OF JEFFREY EPSTEIN: Do you solemnly swear the testimony you will give today will be the truth, the whole truth and nothing but the truth so help you God.

Jeffrey Epstein: Yes I do

ATTY Q [Spencer Kuvin].: Could you please give us your name.

Jeffrey Epstein: Jeffrey Epstein

4.43
HOST:   Wealthy financier Jeffrey Epstein was accused of sexual assault by more than 30 underage girls in 2006. He was convicted, then released after just 13 months in jail. Then earlier this year he was charged with sex trafficking. But he took his own life in custody before his victims got justice.

5.11
██████████████████████ ON THE COURTHOUSE STEPS [27 Aug 2019]: It's pretty upsetting to see how many lives he's devastated and to see how long this has been going on for and nobody did anything about it.

5.25
HOST: For over a decade, Prince Andrew visited Epstein at his homes in Florida, New York and the Caribbean.  He even traveled on one of Epstein's private planes.

5.39
HRH [SPEAKING TO EMILY MAITLIS ON NEWSNIGHT: He had the most extraordinary ability to bring um extraordinary people together er and that's the bit that I remember is going to the dinner parties where you would meet academics, politicians, people from the United Nations,

SCENE AT ONE OF JEFFREY EPSTEIN'S DEPOSITIONS – V/O of Spencer Kuvin: We have tried to cooperate in said deposition,

6.00
SPENCER KUVIN_SKUV_: I think the best way to describe Jeffrey Epstein would be that he was just creepy. He would use his power to he would use his money to convince these young girls that really didn't know any better, to engage in some things that they just would have otherwise hopefully never have done.

6.26
HOST: [host driving in Palm Beach past Royal Palm Beach High School]: This is where Epstein found many of his youngest victims, Royal Palm Beach High School in Florida. He recruited schoolgirls and paid them to give him and his guests, massages. ████████████ was approached when she was 16.

6.50

3

PANORAMA – BBC TRANSCRIPT CLEAN
2019.12.02 - (Incl D Boies)

████████████████ I knew a girl in high school – she said want to make a little bit of money? I know a rich man who lives in downtown west palm – he pays girls to give him a naked massage in the nude. And I'm thinking, well that sounds awful easy you know, how much? $300 for an hour. I'm thinking to myself well, ok, I said OK, how do we set it up? That was when she said oh no, I'm not looking for you, but what you would do is find someone else.



What exactly was the profile he was looking for?

7.30
████████: Teenage young girls, slim body figure. Small breasts,

HOST: in 2005 the parents of a 14year old girl called the police to report Epstein.

07:45
MINOR WOMAN V/O ON TAPE: They start off by giving this gentleman a massage and he pays them and if he likes them, and he thinks they are pretty enough he keeps them around to do other things. OK.

HOST: The police had recorded the first interviews with Epstein's young victims.

8.08
VOICE OF OTHER MINOR WOMAN: You were at my house last night. I didn't really tell the whole truth about Jeffrey because my parents were there.

HOST: The recordings paint a sordid picture of Prince Andrew's friend.

8.21
MINOR WOMAN: I wore a skirt and a regular T-Shirt and I was massaging his legs and he asked me to take off my skirt.

V/O. Epstein would send taxis to collect the girls from school. They were brought here to his house in Palm Beach where he abused them.

8.48
MINOR WOMAN VOICE: I had problems with it the first time but $200 for 40 minutes, that was a lot for a 16year old girl making $6 an hour.

9.05

4

PANORAMA – BBC TRANSCRIPT CLEAN
2019.12.02 - (Incl D Boies)

HOST: Many of Epstein's young victims came from troubled backgrounds. You think of gitz, glamor, beach and money. But not all of Palm Beach is like that. Places like here just a couple of miles away from Jeffrey Epstein's home, this is where many of the girls, many of the victims he chose – this is where they came from.
[OVER SHOTS OF SPENCER KUVIIN AT HIS DESK] Lawyer  Spencer Kuvin represented some of the first girls to come forward. He put their allegations to
Epstein in filmed testimony.

09:47
SPENCER KUVIN: Sir, acccording to the police departments probable cause affidavit one witness described your penis as egg-shaped  these are not my words, I apologize but as Mr. Critten has stated – [The Deposition is stopped]
10.08
He would frequently say through his lawyers, I don't understand why everybody so upset at me, you know these young girls came voluntarily I didn't drug them I didn't force them into any of this and they got money out of it as well, completely ignoring the fact that they are 14,15 years old.

10.24
HOST:  It was a pattern of behavior that spanned decades and Jeffrey Epstein may not have acted alone. In the 1990s he started dating Ghislaine Maxwell soon after the death of her father the newspaper Baron Robert Maxwell.

10:44
V/O GHISLAINE MAXWELL ON VIDEO about to give an interview about TerraMar:  Is it all good, is my hair good,

10:50
CONCHITA SARNOFF _CSAR_AUTHOR OF BOOK ON EPSTEIN]: I think perhaps the trauma of her father's death left Ghislaine quite  uneasy and feeling unprotected and I think that is one of the reasons why she gravitated toward Epstein and stayed with him for so long.

11.10
HOST:  some of Epstein's victims also blame Ghislaine Maxwell for what happened.
11.17
▬▬▬▬▬▬▬▬▬▬▬ There wasn't Jeffrey or wasn't Ghislaine, they, they they fed off each other they literally they would feed off each other's energy.

HOST: ▬▬▬▬▬▬ was 22 when Epstein enticed her into his circle.

11.43
▬▬▬▬▬▬ She was his right hand woman, his right hand lieutenant, you know she was the one getting all the girls in chec. She knew what Jeffrey liked, she helped maintain Jeffrey's standard intimidation, by intimidating the girls so so this was very much a joint effort.

12.08

5

PANORAMA – BBC TRANSCRIPT CLEAN
2019.12.02 - (Incl D Boies)

HOST: Ghislaine Maxwell also happens to be one of prince Andrew's oldest friends he's known her for more than 30 years. She was a socialite who introduced Epstein to the rich and powerful.

12:25
CONCHITA SARNOFF:  Ghislaine was the one who introduced him,  she introduced him to Peter Mandelson, she introduced him to prince Andrew I understand she forged the relationship with President Clinton; er she introduced him to many, many people that he eventually became friendly with him.

12:43
HOST: In July 1999 G Ghislaine Maxwell and Epstein visited the Prince at Balmoral. The next summer he invited them to Royal birthday celebrations at Windsor Castle.  The day after, the prince took them to Ascot.  These pictures have never been published before.  In December that year, the couple was invited to Sandringham for a shooting weekend.  Prince Andrew says it was always more about Ghislaine Maxwell than Epstein.

13.31
HRH [SPEAKING TO EMILY MAITLISS]: It was his girlfriend that was the key element in this. He was the, as it were, the plus one to some extent.

 HOST: It was Ghislaine Maxwell who introduced Virginia Roberts to Epstein. She was exactly the kind of vulnerable girl he preyed on.

13.54
VRGI: I was abused from a very young age, from 7 years old and um,  my childhood was quickly taken away for me. I was just so mentally scarred already at such a young age and then I ran away from that. I found nothing on the streets except for hunger and pain and abuse. And er, and it was scary, I wanted to get out of it.

14:29
HOST: In 2000 Virginia Roberts was working as a locker room attendant at Donald Trump's Mar a Lago Resort in Palm Beach. She was just turning 17 and was getting her life together. Then Ghislaine Maxwell offered her the chance to train as a massage therapist.

VRGI: I ran over to my dad who works on the tennis courts at Mar a Lago, and he he knows I'm trying to fix up my life at that point which is why he got me the job there and I said, you're not going to believe it Dad,  I just got offered a job, an interview, but if he likes me for the interview then I'm gonna be they are going to train me as a masseuse, as a real massage therapist.

15.14
HOST:  Virginia Roberts went to Epstein's Palm Beach home for the interview.

15:21
VRGI: Ghislaine walks me up the stairs and there's this naked guy laying on a massage  table in the middle of the room so although there was a naked man laying on the table, I thought this is

6

PANORAMA – BBC TRANSCRIPT CLEAN
2019.12.02 - (Incl D Boies)

just how they do it, I suppose. He looked up at Ghislaine, so she's like here, here's the lotions, here's the oils. Put your lotions and your oils always on your arm, always keep your hand on the person you massaging and start with one foot and she'll get the other foot, and then we'll work together so you just mimic my movements. So that thought went fleeting from my head like that was strange cos we are doing this massage now. Through that time I mean they were asking me questions about who I was and you know how I got to work in Mar a Lago, and I really wanted them to know how important it was to me to nail this interview and possibly be educated to become a real massage therapist. And they seemed like nice people so I trusted them; and I told them I had a really hard time in my life up until then. I had been a run-away, I've been sexually abused, I've been physically abused. I've had a really hard [unintelligible word] and um, that was the worst thing that I could've told them because now they knew how vulnerable I was.

It was like a gift for them that's exactly what they needed, that's exactly what they wanted and they got it.

So they told me to take my clothes off and already nude and Ghislaine takes her clothes off and Epstein's already nude; and um, they start touching me and they asked me to do things for him and um, then I just did. I fell right into the back of that circle. I thought this is just what life's about – this must be what life's about because I have never had somebody just take me in and say that they're going to do something and not do something. So yeah I was his real big kick in the gut in the face of reality that I just succumbed all I know so I let them abuse me and it was a face of reality that I just succumbed to, it's all I had known. [Crying ] So I let them abuse me and I did what they told me to do.

17.53
HOST: She would be trapped with Epstein for almost 2 years before she broke away. In court papers, Ghislaine Maxwell calls Virginia Roberts a liar and denies assaulting her. But she admits she arranged massages for Epstein. This note [over image of list of first names

7

PANORAMA – BBC TRANSCRIPT CLEAN
2019.12.02 - (Incl D Boies)

names] later recovered from the Palm Beach house by the police shows Epstein had a list of women who were paid to massage him and his guests. Many of them were teenagers.

I just gassed many of them were teenagers Mike works as a handyman and Epstein street are used to see the girls come and go I have no idea it was just one a day, when I would see him coming our way back there was a lot of girls going on exactly what was going on I knew that the people I work for a new what was going on and most of all the people on the street knew what was going on prince  Andrew was a visitor here too

18.27
HOST WALKING ALONG EPSTEIN'S STREET WITH A HANDYMAN – Mike Pezzulo - works as a handyman on Epstein's street. He used to see the girls come and go.

HANDYMAN: Sometimes 3 or 4 a day, I have no idea. But they I would see them coming from way back. There was a lot of girls coming.

HOST: What did you think was going on?

HANDYMAN: Exactly what was going on. I knew that the people I worked for knew what was going on. And most of all the people on this street knew what was going on.

19.10
HOST: Prince Andrew was a visitor here too.  In legal papers, Epstein's former housekeeper says, Prince Andrew spent weeks with us.  He's asked if the prince would frequently have massages. The housekeeper says I would say daily massages. We asked Prince Andrew whether he ever had a massage while he was visiting here. He didn't answer our question.  Many of the allegations concerning the Prince are based on statements made in court cases. When they were released the Judge warned that the statements did not reflect the court's findings and that legal filings could be untrue. Prince Andrew says he neve saw anything suspicious at Epstein's homes.

20.16
VOICE OF ALAN DERSHOWITZ [POINTING OUT NY VIEWS TO HOST]: That's the United Nations

20.22
HOST: And so does another well connected guest.

20.28
ALAN DERSHOWITZ: We met in his homes with many, many people for conferences. None of us had any [emphasized] suspicion that he was leading a private life involving young women. We just had no hint of that. He always had a taste for beautiful women, but in their middle to late twenties and thirties. We never ever saw him or suspected that he was involved with teenagers.

20.52

PANORAMA – BBC TRANSCRIPT CLEAN
2019.12.02 - (Incl D Boies)

HOST: Through his friendship with Epstein, Alan Dershowitz also got to meet the prince. The lawyer still has a letter that Prince Andrew wrote after attending one of his Harvard lectures – [Letter shown] in 1999.

21.05
ALAN DERSHOWITZ: This is the letter, I have it. And he ends the letter with 'I look forward to continuing my intellectual challenge with you and Jeffrey E, Epstein, in the coming months.

HOST: Wow. Well he certainly regarded you as someone to learn from

ALAN DERSHOWITZ: Well, he enjoyed the experience very much, he called it a fantastic experience

HOST: And also Jeffrey Epstein.

ALAN DERSHOWITZ: Yes. He clearly looked to Jeffrey Epstein as somebody who could help educate him, in matters of finance or anything else, I don't know.

21.41
HOST: Epstein didn't just charm lawyers and princes. He was welcomed into the houses of the rich and powerful around the world. And there was a constant stream of visitors to his homes. 9 of Epstein's victims say he forced them to have sex with other people as well.

22.15
VRGI It went from just being abused by Epstein to then being passed around like a platter. Like a platter of fruit. It was always explicit that there was the massage aspect of it. The majority of the times people did want the massage first and then they wanted to um to have intercourse or whatever they needed or wanted that day, sexually to happen.

22.53
HOST: Virginia Roberts was taken around the world by Epstein.

23.00
VRGI: I was flying on private jets. I'm going places I never imagined I would go to . He took her to parties for the rich and famous. In 2001, Epstein brought the 17 year old to London. They arrived on the 9th of March and left 2 days later. Virginia Roberts stayed here at GM's house. And she says, Prince Andrew came to visit.

EXTRACTS
00.03: [GRAPHIC AS VRS IS SHOWN WALKING IN STREET]
Virginia says she was bought to London in 2001 [OVER ALLEGED PHOTO OF HRH W VR + GM] when she was 17 and met Prince Andrew.

23.45

PANORAMA -- BBC TRANSCRIPT CLEAN
2019.12.02 - (Incl D Boies)

VRGI We are having tea and Andrew is talking about Fergie, which is his ex-wife at that point and Ghislaine is bad-mouthing Fergie as well. Epstein's just socially awkward [rolling her eyes] he's laughing about everything. I was just sitting there like I was always told to do. Just sit there and don't talk unless you are talked to. Be polite and laugh at everything  someone says when they are trying to be funny. It seemed like friends just catching up.

24:16
HOST: According to Virginia Roberts, the prince then went her to Tramp Night Club. He asked me to dance.  He is the most hideous dancer I've ever seen in my life. I mean it was horrible and this guy [holding up her hands with fingers outstretched] was sweating all over me, like his sweat, it was raining basically, everywhere. It was just like [makes vomiting sound] I was grossed out,  but I knew I had to keep him happy because that's what Jeffrey and Ghislaine would expect from me.,

24.50
HRH [talking with Emily Maitliss]: There's a slight problem with the sweat because I I have a peculiar condition which is that I don't sweat. Well I didn't sweat at the time and that was. yes, I didn't sweat at the time because I had suffered what I would describe as an overdose of adrenalin in the Falklands war when I was shot at, er and I simply it was almost impossible for me to sweat.

25.22
HOST: Prince Andrew's response has been widely questioned. There are pictures of him from the same period where he appears to be sweating.
[camera zooms in on his armpit]



Virginia Roberts says her night out with the prince took a darker turn when they left the club. He's not with us, he's with the security guards.

PANORAMA – BBC TRANSCRIPT CLEAN
2019.12.02 - (Incl D Boies)

And then in the car, Ghislaine tells me that I have to do for Andrew what I do for Jeffrey. And that made me sick. I just didn't expect it from Royalty. I didn't expect it from someone that people look up to and admire, you know, in the Royal Family.

[CUT TO EXTERIOR OF G'S HOUSE. IT IS RAINING {!}]
26:38
HOST: When they got back to the house, she says she asked Epstein to take a picture to show her family. She then carried out the instructions to entertain the prince.

26.56
VRGI: There was a bath and it started there. And then it led into the bedroom. It didn't last very long, the whole entire procedure. It was disgusting. He wasn't mean or anything. But he got up and he said thanks and walked out and I sat there in bed just horrified and ashamed and felt dirty and I had to get up and go have a shower. And the next day, Ghislaine tells me I did a really good job and she pats me on the back and says you made him really happy. [Pause. VRGI closes eyes, sighs, crying]
It was a wicked time in my life. It was a really scary time in my life. I had just been abused by a member of the Royal Family. So when you talk about these chains, you know, yeah I wasn't chained to a sink but these powerful people were my chains. I didn't know what happened. I didn't I couldn't comprehend how on the highest levels of the government; very powerful people were allowing this to happen not only allowing it to happen but participating in it. [Crying hard now].

HOST: Do you want to stop for a second?
VRGI If you don't mind just for a second for a tissue, I'm sorry.

28.24
HRH to Emily Maitlis: I can absolutely categorically tell you it never happened.

**Emily Maitlis**, News Night: Do you recall any kind of sexual contact with Virginia Roberts then?

HRH: None

Emily Maitlis: or at any other time?

2.49
HRH: None. Whatsoever.

28.38
HOST: Prince Andrew says it couldn't have happened because he has an alibi for the 10th March.

V28.44

11

PANORAMA – BBC TRANSCRIPT CLEAN
2019.12.02 - (Incl D Boies)

HRH: I was home, I was with the children. I had taken Beatrice to a Pizza Express in Woking for a party at I suppose 4 or 5 in the afternoon. And then, because the Duchess was away, we have a simple rule in the family that when one's away, the other one is there.

29.11 EXTERIOR LONDON NIGHT RAINING

HOST: Prince Andrew says he deplores the exploitation of any human being and would not condone, participate in or encourage any such behavior. He says he can't remember ever meeting Virginia Roberts. So what about the photo?  [now outside 44 Kinnerton] The photograph was taken on the first floor of the house. Prince Andrew says he's been here but says he's never been up the stairs.  The photo was first published in 2011 after a newspaper tracked Virginia Roberts down. They paid her $160,000 for her story. This year Palace sources started suggesting for the first time that the photo was a fake. But Prince Andrew stopped just short of that.

30.12
HRH: From the investigations that we've done, you can't prove whether or not that photograph is a fake or not because it is a photograph of a photograph of a photograph. That's me but whether that's my hand or whether that's the position, I , I , but I don't, I have simply no recollection of the photograph ever being taken.

30.36
DAVID BOIES [LAWYER FOR VICTIMS]: They have had this photograph for years. They just figured out that they think it's a forgery? If it wasn't a real photograph, what's the first thing they would have said years ago? Well that's not real.

30.50 External at Kinnerton – Again it's raining. We've spoken to the original photographer who copied the original photo in 2011. He has no doubt it's genuine. And we found evidence that backs that up. This is an affidavit from a man Virginia Roberts was dating in 2001.
Q. Did you see a photograph of her with Prince Andrew- -
A. Yes.

HOST: He says he saw the photograph back then.
And then in 2011, it was in a bundle of 20 photos Virginia Roberts gave the FBI. They were scanned front and back but only 19 were made public. The photo of Prince Andrew and Virginia Roberts was removed and so were the reference numbers. We've been told these missing numbers are for the Prince Andrew photo.

PANORAMA – BBC TRANSCRIPT CLEAN
2019.12.02 - (Incl D Boies)



31.49
HOST: Virginia Roberts says there's a date stamped on the back of the photo from when it was
printed – the 13th March, 2001, two days after she left London.

32.04
VRGI: I think the world is getting sick of these ridiculous excuses. It's a real photo. I've given it
to the FBI for their investigation and it's an authentic photo – with a date on the back of it from
when it was er printed um, it's a real photo.

32.26
HOST: Virginia Roberts reported the events of that night in London to the Metropolitan Police
force in 2015.

32.34
VRGI: I gave them all the details about that night with Prince Andrew and how the trafficking
took place and what it looked like and they said ok well that's fantastic, thank you for letting us
know. I said well what are you guys going to be able to do about it?

32.51:
HOST: She made an allegation that she was forcibly trafficked for sex with Prince Andrew. But
the Met didn't investigate.

33.03:
DAI DAVIES – Former head of royal protection, Met Police: Scotland Yard should follow any
available evidence which is credible or at least purports to be credible, against anyone involved
to be sexually abusing and trafficking young ladies. None of us are above the law. If you and I
were alleged to have committed this, I think the Metropolitan Police would have been knocking
on our doors.

33.29
HOST: The Met says it always takes allegations of sexual exploitation seriously, but following
legal advice, it decided it was not the appropriate authority to conduct enquiries focused outside

13

# PANORAMA – BBC TRANSCRIPT CLEAN
2019.12.02 - (Incl D Boies)

the United Kingdom. The Met reviewed its decision after Epstein's death and it's position remains unchanged.

33.56
HOST: All told, how many times did you have sex in the circumstances that you describe with Prince Andrew?

34.02
VRGI There's 3 times

HOST: Where was that?

34.07
VRGI: Ghislaine's townhouse in London; Jeffrey's mansion in New York and Jeffrey's Island in the Caribbean.

34.24
HOST: This is Little Saint James [over video of the island], one of Jeffrey Epstein's two private islands in the Caribbean.  Virginia Roberts says she was forced to take part in an orgy with Prince Andrew here in 2001. The prince admits visiting the Island, but he categorically denies any sexual contact

HOST CONTINUES:
34.51 [over picture of a young ▮▮▮▮▮▮▮ with black hair]: Five years later, ▮▮▮▮▮▮▮ was taken to the island. She thought Epstein was a benefactor who would support her though college.

35.04
▮▮▮▮▮▮▮ TO CAMERA: Great, going to a private island, private plane, this is something out of another world. This is something that the average person would never have the opportunity in their life ever, to experience.

35.17
HOST: It was her first big trip with Epstein. She says she was on his private jet when she realized a very different World.

35.35
▮▮▮▮▮▮▮ On the plane he started having full erotic sex in front of the entire plane. I thought that I was the mad one because everyone else found it completely normal. It was like making a cup of tea.

35.50
HOST: His home was stranger still.

35.54

14

PANORAMA – BBC TRANSCRIPT CLEAN
2019.12.02 - (Incl D Boies)

▓▓▓▓▓▓▓▓ There were very strange, the perspex box was full of condoms and it was very much set for orgies. The first few hours it was always being softened up and being shown how to massage properly. And then I noticed girls disappearing and I didn't really understand what was going on. You know it's not a very openly spoken about thing; and then it was my turn and then I was called into his room um where there was a massage table. Ummm he asked me to lie on the massage table and um he was going to give me a full body massage to show me how he liked it and because he's like it's all about doing a massage professionally and getting those knots out. And yeah, he started massaging me which is when he took out that this big vibrator and that's when he started um abusing me with um, sexual apparatus. And um yeah he raped me.

37.17
HOST: ▓▓▓▓▓▓ stayed with Epstein for six months she says she was under his control. It was on the island [CUT TO PHOTO OF GM WITH JEAN-LUC BRUNEL WHOSE FACE IS BOCKED OUT] that she met Ghislaine Maxwell for the first time.

37.32
▓▓▓▓▓▓▓▓ So I'm just told that this woman is arriving, this is who she is, and you better stay well clear and do exactly what she asks you to do, exactly. I've never met someone that has been so dismissive of other human beings in my life - basically treated us like we were shit on her shoe.
The way she spoke to us, the way she bullied us right from the start.

38.01
HOST: In court documents ▓▓▓▓▓▓ says it got so bad she wanted to escape the island but the couple had taken her passport.

38.11
▓▓▓▓▓▓▓▓ I was definitely going to swim off. I didn't care how who why what when, I was going to get off that island, but you can't there's no way off. [CUT TO PHOTO OF ▓▓▓▓▓▓ & VRGI HOLDING EACH OTHER ON A SOFA]

38.27
HOST: There's no doubt ▓▓▓▓▓▓ and Virginia Roberts are victims of Epstein. But there are inconsistencies in both women's accounts of how they were abused by Epstein's friends. ▓▓▓▓▓▓ told a paper she had videos of Bill Clinton on the island, She then admitted this wasn't true. Virginia Roberts once claimed to have met Prince Andrew in New Mexico rather than on Epstein's island and and she hasn't always mentioned an orgy involving the prince. In 2015 Virginia Roberts claimed she had been forced to have sex with Alan Dershowitz too.

39.14
ALAN DERSHOWITZ:_ADER_ There's never been a #METOO case where the accuser and the accused didn't know each other. In my case it's the only one where there isn't a scintilla of evidence that I ever met this woman ever [emphasized] and overwhelming evidence that I couldn't have met her.

15

PANORAMA – BBC TRANSCRIPT CLEAN
2019.12.02 - (Incl D Boies)

39.29
HOST: Alan Dershowitz points to this email - it was sent to Virginia Roberts four years before she accused him. It's from a journalist who is advising her about a book deal. It says, 'don't forget Alan Dershowitz, JE's buddy and lawyer. good name for your pitch. you probably met him.'

HOST [TALKING TO DAVID BOIES]: There was an email exchange between a newspaper reporter and Virginie Roberts where it seemed the newspaper reporter is suggesting that Dershowitz be included as a potential offender.

40:07
DAVID BOIES: You have to ask the newspaper reporter why she would be suggesting that if she was suggesting it. I don't think she was suggesting that. I think she was reminding Virginia of something that Virginia had said previously. The real issues here are -was there a sex trafficking operation? Was Virginia a victim of that? Absolutely. Was she trafficked to a variety of people? Absolutely. There's never been any inconsistency about those central issues.

40.41
HOST: Alan Dershowitz says he only had one massage at Epstein's home and he kept his underwear on.

40.48
ALAN DERSHOWITZ [looking over his schedule]: I was in New York; I had dinner at Chung Lee Dynasty

HOST: He says he has detailed records that prove he wasn't in the places where the abuse was alleged.

41.02
ALAN DERSHOWITZ: One thing is crystal clear - the allegations against ME are totally made up. I never met these people I never touched them, I never had sex with them. I've never had sex with anyone other than my wife from the day I met Jeffrey Epstein. Totally, totally, totally false story.

41.21
HOST TALKING TO VRGI: People who say you are not telling the truth they point to inconsistencies in your tale, how do you account for those?

41.27
VRGI: You are left with a foggy memory sometimes you really are. So yeah, you know I might be wrong on dates, absolutely. I might be wrong on places even, sometimes, but one thing that I can tell you is you never forget the face of someone who has heaved over you.

41.55
HOST: Jeffrey Epstein abused girls and young women at all of his luxury homes. Many of his crimes were committed here in New York. Just imagine some young girl, some young woman

16

PANORAMA – BBC TRANSCRIPT CLEAN
2019.12.02 - (Incl D Boies)

coming to New York for the first time into this world. And falling into the orbit of someone like Jeffrey Epstein. This is Epstein's house off Fifth Avenue. Virginia Roberts says that she met Prince Andrew here too. During the visit she says Ghislaine Maxwell brought out a Spitting Image puppet of the prince. This woman [Shows pic of █████████████] has also said she was also there that night.



42.48
VRGI: Prince Andrew put the puppet on ████████'s breast. Ghislaine was like, I want to take a picture of that; and they did, they took a picture and they were laughing about it. Like I said, it just goes to show how we were not even dignified as humans to them, we were just, we were there as toys, to be passed around.

43:13
HOST: In a court statement, ██████████████ confirms the puppet story but she has a slightly different version of events. [SHOWING EXTRACT OF ██████████████ DEPOSITION] She says ' I sat on Andrew's lap, and they took the puppet's hands and put it on Virginia's breast, and so Andrew put his on mine.



Virginia Roberts says she was ordered to have sex with the prince later that evening – a claim he denies.

43.46
HRH talking to Emily Maitlis: I'm staying with the Consul- General which is further down the street on Fifth, so I wasn't, I wasn't staying there. I may have visited, but [shaking head], but no. Definitely no, no no activity.

44.10

PANORAMA – BBC TRANSCRIPT CLEAN
2019.12.02 - (Incl D Boies)

VOICE OF PALM BEACH POLICE over Palm Beach police footage: This is exit photographs, it is now 2.15pm.

44.19
HOST: In 2005, Epstein's prolific abuse finally caught up with him. This is footage from a police search of Epstein's Palm Beach home – a house Prince Andrew admits he visited four times. Some walls are decorated with pictures of naked young women. The police also found hidden cameras and recording equipment. Epstein was being investigated for "Unlawful sex acts with 4 minors", but it wasn't made public.  In July 2006, Prince Andrew invited him to Windsor Castle again, Epstein was a guests at Beatrice's 18th birthday party. Palm Beach police were waiting to arrest him when he returned, but the charge had been reduced to solicitation of prostitution.

45.44
ALAN DERSHOWITZ: Well he called me and said he needed me to be his lawyer, I said what for and he told me and I said oh my God, did you do that?? And he then told me that he had had massages. He underplayed the story very, very much, but that was the first hint or inkling that he had done anything wrong.

46.04
HOST: Epstein's arrest was made public but that doesn't seem to have put Prince Andrew off. Six weeks later, flight logs show the prince and Ghislaine Maxwell flew to Edinburgh in Epstein's private jet. By 2008, Epstein was being accused of sex crimes by dozens of underage girls. Alan Dershowitz would help negotiate a secret plea deal. Epstein pleaded guilty to two prostitution charges and served just 13 months in prison.

46.42
SPENCER KUVIN, [LAWYER FOR VICTIMS]:  We could never understand why the US Attorney's office gave him such a sweetheart deal. At the end of the day I don't think it was just his money and power because people who are powerful and have a lot of money are prosecuted regularly here in the United States if they have done something wrong. This was something else it just didn't make sense.

47.03
HOST:  The plea deal also barred the prosecution of anybody who'd helped Epstein. It was later found to be unlawful because it violated the rights of his victims.
By December 2010, Epstein was free, and Prince Andrew attended the convicted sex offender's 'welcome home dinner party. The prince stayed at Epstein's New York mansion for five days.

47.47
DAI DAVIES, FORMER HEAD OF ROYAL PROTECTION, MET POLICE: I would hope that if Prince Andrew was taking advice from anyone, somebody would've warned him of the consequence and his reputation, and if anyone knew that he was continuing to associate with a known convicted pedophile surely common sense would've said 'stop it'.
The prince and the pedophile took a walk in Central Park and a second infamous photo was taken. At the time the prince's former wife, Sarah Ferguson, suggested the prince was sorting out a 15,000 pound loan for her. The prince now says he went to New York because he thought

PANORAMA – BBC TRANSCRIPT CLEAN
2019.12.02 - (Incl D Boies)

he should end his friendship with Epstein in person. But why did he stay with a convicted sex offender for five days?

48:50
HRH TALKING TO EMILY MAITLIS: It was a convenient place to stay. At the end of the day with the benefit of all hindsight that one could have, it was definitely the wrong thing to do. But at the time I felt it was the honorable and right thing to do and I, I admit fully that my judgment was probably colored by my tendency to be too honorable but that's just the way it is.

49.22
HOST: Prince Andrew also kept in contact with Ghislaine Maxwell. She was first publicly named as a sex abuser in court documents back in 2009, but the prince didn't end their friendship. Our evidence suggests he even asked for her help in dealing with Virginia Roberts claims. We found an email the prince sent to Ghislaine Maxwell in 2015. It was buried in thousands of pages of legal documents that have been filed in America. The email is short but significant. The prince tells Ghislaine Maxwell 'let me know when we can talk got some specific questions to ask you about Virginia Roberts'. She replies 'have some info - call me when you have a moment'. Three days later Ghislaine Maxwell sent Alan Dershowitz what she calls a dossier of inconsistencies and inaccuracies and articles about Virginia Roberts. She repeatedly comments on stories about the prince and that visit to her London home.
You'd expect Ghislaine Maxwell to simply say it never happened, the prince never met Virginia Roberts. The photo is a fake. But she doesn't do that. She never disputes that Virginia Roberts was in her house and took a photo with Prince Andrew. In April this year, [2019] new sex abuse allegations were made against Epstein and Ghislaine Maxwell. The story was widely reported but in June, Prince Andrew met his old friend Ghislaine Maxwell once again.

51.19
EMILY MAITLIS TO HRH: Did you discuss Epstein at all then?

HRH: No. Actually, funnily enough, no, not at all. There wasn't anything to discuss about him because he wasn't in the news, it was just we'd moved on.

51.42
HOST: In July Jeffrey Epstein was arrested and charged with sex trafficking. A month later, he'd killed himself. Ghislaine Maxwell is now herself being investigated by the FBI. They are interviewing Epstein's victims about her. 9 women have also made complaints against her in civil court cases.
52.17
███████████████████ Ghislaine controlled the girls - she was like the Madam - she was like the nuts and bolts of the sex trafficking operation. She'd always visit Jeffrey on the island – make sure the girls were doing what they were supposed to be doing.

52:37
VRGI: Jeffrey had a sickness, right, he had a sickness that could not be cured, and he does not belong in society at all. But Ghislaine had a viciousness to her, she had a really mean streak about her so the more pain you went through, the more pain she got off.

19

PANORAMA – BBC TRANSCRIPT CLEAN
2019.12.02 - (Incl D Boies)


52:57
HOST: Another of Prince Andrew's friends could now face sex trafficking charges.

53.04
DAVID BOIES: I must say I think she is very culpable. She was a central part of the Epstein sex trafficking operation.  Er she played a important role in recruiting, grooming, manipulating.

53.20
HOST: She denies all of this of course.

53.22-53.24 SILENCE
DAVID BOIES [STARES AT CAMERA]: Um
53.24-53.34 SILENCE STARING AGAIN AT CAMERA
53.34 –
DVID BOIES: If you say so.

HOST: Am I miss characterizing her response?

53.37
DAVID BOIES: Well no, I think, I think I think that's probably fair in some respects. Um er, there was a um a deposition, multiple depositions that were tak, that were er um, she gave in the case we bought against her. Er those depositions are sealed.

54.01
HOST: Some of those sealed court statements may soon be made public. In the documents that are already public Ghislaine Maxwell says the allegations are lies. She denies abusing or trafficking any women.  If Ghislaine Maxwell is prosecuted prince, Andrew could be a crucial witness. He's already been asked twice by the victims 'lawyers for an interview, but he hasn't replied to the letters.

54.35
DAVID BOIES: One of the things that we've tried and actually tried in in in quite a respectful way, um, to do, is to interview Prince Andrew and try to get what his explanation is! He was a frequent visitor, he ought to submit to an interview.  He ought to talk about it.

55.07
HOST: We have discovered that five more women want Prince Andrew to testify in court. They say he witnessed how young women were giving massages at Epstein's homes.  Subpoenas have been prepared in all five cases; and that means that the next time Prince Andrew visits the States, he faces being ordered to give evidence whether he likes it or not.

55.45
SPENCER KUVIN: I have no doubt if he comes here to United States that he likely will have to answer to someone whether it be the US attorney's office or under subpoena by another attorney here.

20

PANORAMA – BBC TRANSCRIPT CLEAN
2019.12.02 - (Incl D Boies)


55.54
HOST: The prince told Panorama he's willing to help any appropriate law-enforcement agency with their investigations if required. He says Epstein's suicide has left many unanswered questions, particularly for his victims. He says he deeply sympathize with those affected and hopes that in time they will be able to rebuild their lives. And it is emphatically denied that he had any form of sexual contact or relationship with Virginie Roberts.

56.41
HOST CONTINUES: One of America's most prolific sex offenders was never brought to justice.

56.50
EMILMAITLIS: Do you regret the whole friendship with Epstein?

HRH: Now, still not. For the reason being is that the people that I met and the opportunities that I was given to learn either by him or because of him, were actually very useful.

57.13
DAVID BOIES: With respect to Prince Andrew, I think he needs to come clean and I think the facts need to be revealed. No one is above the law, not the president of the United States, not a prince of the United Kingdom.

57.31
HOST: Prince Andrew now says he unequivocally regrets his ill-judged association with Jeffrey Epstein.

57.45
VRGI: The people on the inside are going to keep coming up with these ridiculous excuses like the photo is doctored or he came to New York to break up with Jeffrey Epstein. I mean come on, I'm calling BS on this because that's what it is. He knows what happened I know what happened and there's only one of us telling the truth and I know that's me.

58.13
HOST: The next time Prince Andrew tells his story, it may be as a witness under oath. The sex life and honesty of a Senior Royal will be under scrutiny as never before.


E N D

DAVID BOIES TALKING TO PIERS MORGAN ON TALK TV - Feb 20, 2023
Discussing HRH, VRG, GM and AD - - TRANSCRIPT -

DAVID BOIES TALKING TO PIERS MORGAN ON TALK TV -
Discussing inter alia, The Photo…. Feb 20 2023

Piers Morgan Interviews Virginia Giuffre's Lawyer David Boies About Prince Andrew
Settlement   TRANSCRIPT  FEB 20, 2023



FEB 20 2023

PIERS MORGAN (PM) I'm joined now by David Boies,  you are one of America's
greatest lawyers and I don't say that lightly. And I realize that in the general scheme of
things probably this case actually isn't that big a deal, certainly not as big a deal as it
has been for us back in the UK .

00.18
DAVID BOIES (DB): Yeah,  I think that's probably right although it's still a pretty big deal.

0.23
PIERS MORGAN (PM): And it gets a lot of attention because It involves a senior
member of our Royal family, obviously. It's been a year since Prince Andrew settled his,
his civil case with Virginia Giuffre, your client.  At the time that it was settled, he had until
that point repeatedly said I'm going to clear my name I'm gonna go all the way I'm

DAVID BOIES TALKING TO PIERS MORGAN ON TALK TV - Feb 20, 2023
Discussing HRH, VRG, GM and AD - - TRANSCRIPT -

gonna go to court and I'm gonna have my day and I'm gonna clear my name; and at the last minute he caved and paid a large check were you surprised?
........

DAVID BOIES   07.28
And as far as Prince Andrew is concerned, um er, we've got the photograph, um we've got the photograph of Prince Andrew, Maxwell and Virginia there at exactly the time um Virginia said and the date of that photograph because it was what the Daily Mail found out was that it was processed at Walgreens shortly after Virginia said she came back from that trip. So all of the evidence with respect to the legitimacy of that photograph,  I think demonstrates that that photograph is real.

07.59
PM:  With all your experience of these things, if you established that Prince Andrew was lying about the photograph that he had met her, that he had put his arm around her, it was with Ghislaine Maxwell at her home, would that in itself have been enough do you think to get a conviction?

08.18
DB:I think it probably would've been because um you have her testimony and you have his complete denial so the question is, um, is he credible or not and once the jury concludes that he's not credible about having never met her, I think the jury probably concludes he's not credible about claiming that he did not have sex with her.

08.37
PM: And do you think that's why in the end he settled?

08.39
DB: Well I think it was partly that but I also think that he recognized and I think his lawyers recognized that it would be a disaster for him to appear for a deposition. I mean remember as you say, I deposed Ghislaine Maxwell and she was indicted for perjury as a result of that deposition and um I think he would have been taking a terrible criminal risk to appear for a deposition where he'd have to answer these questions under oath

PM: Right

DB: And if he did not answer those questions truthfully under oath, he could then expose himself to real criminal liability.

EXHIBIT 60

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
╔════════════════════════════════╗
║ USDC SDNY                       ║
║ DOCUMENT                        ║
║ ELECTRONICALLY FILED            ║
║ DOC #:_____           ║
║ DATE FILED: 2/24/22             ║
╚════════════════════════════════╝
```

United States of America,

　　　　　　--v--

Ghislaine Maxwell,

　　　　　　　　Defendant.

20-CR-330 (AJN)

OPINION & ORDER

ALISON J. NATHAN, District Judge:

Before the Court is the Defendant's motion for a new trial pursuant to Federal Rule of Criminal Procedure 33, which the Government opposes. *See* Maxwell Br., Jan. 19, 2022; Gov. Br., Feb. 2, 2022. The Defendant seeks a new trial on the basis that Juror 50 "falsely answered a material question during *voir dire* and . . . that, had he answered truthfully, he would have been subject to a challenge for cause." Maxwell Br. at 48. The Defendant contends that the current paper record sufficiently supports her motion and should be granted without a hearing. *Id.* In the alternative the Defendant requests an evidentiary hearing to inquire into Juror 50's alleged nondisclosure. She also argues a broader hearing is required based on a news article that suggests a second juror was allegedly a victim of sexual abuse. *Id.* at 49. The Government urges this Court to deny the Defendant's motion on the current record, but it consents to a limited hearing on the issue of whether Juror 50 provided a materially false answer to Question 48 of the questionnaire. Gov. Br. at 31–32.

The Defendant's motion for a new trial based on the current record is DENIED. Defendant's motion on the current record relies extensively on statements made by Juror 50 regarding what occurred during jury deliberations that the Court is prohibited from considering under Rule 606. With regard to Juror 50's statements that do not pertain to jury deliberations, in

1

order to resolve the motion at this stage, the Court would have to accept these unsworn statements made to media outlets as true and reach factual determinations that are not available on the current record.

Accordingly, a hearing is necessary to resolve the Defendant's motion. The Court concludes, and the Government concedes, that the demanding standard for holding an evidentiary hearing is met as to Juror 50's answer to Question 48 of the questionnaire. The Court further concludes that Juror 50's response to Question 25 is relevant to the inquiry. Following trial, Juror 50 made several direct, unambiguous statements to multiple media outlets about his own experience that do not pertain to jury deliberations and that cast doubt on the accuracy of his responses to Questions 25 and 48. Such statements are "clear, strong, substantial and incontrovertible evidence that a specific, nonspeculative impropriety"—namely a false statement during jury selection—has occurred. To be clear, the potential impropriety is not that someone with a history of sexual abuse may have served on the jury. Rather, it is the potential failure to respond truthfully to questions during the jury selection process that asked for that material information so that any potential bias could be explored. Conversely, the demanding standard for ordering an evidentiary hearing is not met as to Juror 50's use of social media nor the conduct of any other juror. The Court therefore ORDERS a hearing take place at which the Court will question Juror 50 under oath. The Defendant's request for a broader hearing and pre-hearing discovery is DENIED.

## I.  Background

On December 29, 2021, the jury returned a verdict in this case, finding the Defendant guilty of five counts. A week after the jury announced its verdict, on January 5, 2022, the Government informed the Court that a juror had given at least three post-verdict interviews to

2

press outlets about his jury service and requested a hearing be held on the matter. Dkt. No. 568. The letter noted that in the interviews, which were both in print and on video, the juror "described being a victim of sexual abuse" and asserted that he "flew through" the juror questionnaire and did not recall being asked whether he had been a victim of sexual abuse. *Id.* at 1. The Government indicated in a redacted footnote that it believed the juror to be Juror 50, and a review of his questionnaire showed that he had provided a negative response to a question that asked whether a prospective juror had been a victim of sexual abuse. *Id.* at 2 n.2.[1] Finally, the Government requested that the Court offer court-appointed counsel to the juror in the event a hearing was ordered. A letter from the Defendant followed shortly thereafter also informing the Court about the juror's interviews. Dkt. No. 569. The Defendant filed a second letter that same day opposing the Government's request "because based on undisputed, publicly available information, the Court can and should order a new trial without any evidentiary hearing." Dkt. No. 570.[2]

The Defendant filed a motion for a new trial on January 19, 2022. The Government opposed the motion on February 2, 2022, and the Defendant filed a reply in support on February 9, 2022. In addition to Juror 50's post-trial interviews, the Defendant's motion relies on a *New York Times* article reporting that "a second juror described in an interview . . . having been

---

[1] The Government proposed redacting the footnote because the juror questionnaire was not a public document at that time. Because (for the reasons explained below) the Court now unseals the questionnaire, that redaction is no longer necessary.

[2] For completeness of the record, the Court notes the following occurred also on January 5, 2022: The Jury Department of the Southern District of New York received a call from Juror 50 asking for guidance because of statements he had given to certain media outlets that were being widely reported on in the press and inquiring whether he needed an attorney. At the Court's direction, the District Executive returned Juror 50's call and informed him that the Court was unable to provide any guidance or response to his question. Juror 50 then asked the District Executive if he could access his questionnaire. The District Executive, again at the Court's direction, informed Juror 50 that the questionnaire was not a public document and could not be provided to him.

sexually abused as a child" as a basis for a broader hearing beyond inquiry into Juror 50.

Maxwell Br. at 21, 49.

## II.    Motion for a new trial on the current record

Federal Rule of Criminal Procedure 33 provides that "[u]pon the defendant's motion, the

court may vacate any judgment and grant a new trial if the interest of justice so requires."  Fed.

R. Crim. P. 33(a).  The parties agree that a defendant's Rule 33 motion premised on a juror's

alleged nondisclosure during *voir dire* is governed by *McDonough Power Equipment, Inc. v.*

*Greenwood*, 464 U.S. 548 (1984).  Maxwell Br. at 22–28; Gov. Br. at 11.  In *McDonough*, the

Supreme Court held that to obtain a new trial on the basis of juror nondisclosure during *voir dire*,

"a party must first demonstrate that a juror failed to answer honestly a material question on *voir*

*dire*, and then further show that a correct response would have provided a valid basis for a

challenge for cause."  *McDonough*, 464 U.S. at 556; *see also United States v. McCoy*, 995 F.3d

32, 51 (2d Cir. 2021); *United States v. Shaoul*, 41 F.3d 811, 815–16 (2d Cir. 1994); *United States*

*v. Langford*, 990 F.2d 65, 68 (2d Cir. 1993).[3]

> The *McDonough* inquiry is restricted by Federal Rule of Evidence 606, which states:
>
> During an inquiry into the validity of a verdict or indictment, a juror may not
> testify about any statement made or incident that occurred during the jury's
> deliberations; the effect of anything on that juror's or another juror's vote; or
> any juror's mental processes concerning the verdict or indictment. The court
> may not receive a juror's affidavit or evidence of a juror's statement on these
> matters.

Fed. R. Evid. 606(b)(1).

---

[3] The parties dispute certain contours of the *McDonough* test, including whether it requires a deliberately false answer.  But at a minimum, the parties agree that the deliberateness of a juror's incorrect answer is relevant to this inquiry.  Maxwell Reply at 13–14.  Because, as explained below, the Court does not now resolve at this juncture whether Juror 50's answers on the questionnaire and *voir dire* merit a new trial, it need not and does not resolve those disputes pre-hearing.

4

The Defendant urges this Court to resolve the motion on the papers, without the need for a hearing. Maxwell Br. at 28. But resolving the motion now would require the Court to accept as true Juror 50's unsworn statements made to media outlets. Moreover, in arguing for a new trial based on the current record, the Defendant relies extensively on statements prohibited from consideration by Rule 606. *E.g.*, Maxwell Br. at 12–14 (describing Juror 50's statements in deliberation and other jurors' reactions). The Defendant also urges the Court to reach factual conclusions that are unavailable on the current record; for example, that Juror 50 deliberately lied in failing to disclose that he was the victim of sexual abuse. *See* Maxwell Br. at 39–43. Finally, the Defendant cites no authority—nor is the Court aware of any—in which a court granted a new trial under the *McDonough* standard without first conducting an evidentiary hearing. As the Second Circuit has instructed, "if any significant doubt as to a juror's impartiality remains in the wake of objective evidence of false *voir dire* responses, an evidentiary hearing generally should be held." *United States v. Stewart*, 433 F.3d 273, 306 (2d Cir. 2006) (citing *United States v. Boney*, 977 F.2d 624, 634 (D.C. Cir. 1992)). The Court therefore denies the Defendant's motion to grant a new trial on the current record.

## III. Evidentiary hearing

For the reasons outlined below, the Court determines that a hearing must be held regarding Juror 50's alleged nondisclosure during the jury selection process.

### A. Threshold for an evidentiary hearing

Because of the importance of finality of judgments, the threshold for conducting a post-verdict inquiry is high. A post-verdict inquiry into juror misconduct is conducted only "when there is clear, strong, substantial and incontrovertible evidence that a specific, nonspeculative impropriety has occurred which could have prejudiced the trial of a defendant." *United States v.*

5

*Baker*, 899 F.3d 123, 130 (2d Cir. 2018) (cleaned up) (quoting *United States v. Moon*, 718 F.2d 1210, 1234 (2d Cir. 1983)). Mere "[g]ossip and anonymous tips do not satisfy this standard." *United States v. Stewart*, 317 F. Supp. 2d 432, 443 (S.D.N.Y. 2004). Rather, "[a]llegations of impropriety must be 'concrete allegations of inappropriate conduct that constitute competent and relevant evidence.'" *Baker*, 899 F.3d at 130 (quoting *United States v. Ianniello*, 866 F.2d 540, 543 (2d Cir. 1989)).

The Defendant argues that this is the wrong standard. Maxwell Reply, Feb. 9, 2022, at 8 n.4. But the Defendant does not identify an alternative standard. And the Second Circuit has applied precisely this standard to determine whether a district court should hold a *McDonough* hearing on the basis of a juror's nondisclosure during *voir dire*. *Stewart*, 433 F.3d at 302–03. The Court is bound to apply this demanding standard.

This high standard for an evidentiary hearing intentionally raises an "exacting hurdle" for defendants because "motions to set aside a jury verdict are disfavored." *United States v. Ventura*, No. 09-CR-1015 (JGK), 2014 WL 259655, at *3 (S.D.N.Y. Jan. 21, 2014). As the Second Circuit has repeatedly warned, "post-verdict inquiries may lead to evil consequences: subjecting juries to harassment, inhibiting juryroom deliberation, burdening courts with meritless applications, increasing temptation for jury tampering and creating uncertainty in jury verdicts." *Ianniello*, 866 F.2d at 543; *see also Tanner v. United States*, 483 U.S. 107, 119–20 (1987) (citing *McDonald v. Pless*, 238 U.S. 264, 267–68 (1915)). And an evidentiary hearing "is not held to afford a convicted defendant the opportunity 'to conduct a fishing expedition.'" *Stewart*, 433 F.3d at 306 (quoting *Moon*, 718 F.2d at 1234).

The Defendant argues that the considerations in *Tanner* and *Ianniello* are inapplicable to her motion because those cases "involved alleged conduct during trial and, crucially, during

6

deliberations." Maxwell Reply Br. at 8. This argument is wrong, as "the ultimate purpose of the [requested] post-trial evidentiary hearing is to set aside a jury verdict." *Ventura*, 2014 WL 259655, at *3. And "there is no discernible reason to apply a different general standard to new trial motions based on juror misconduct than to those premised on any other reason." *United States v. Guzman Loera*, No. 09-CR-0466 (BMC), 2019 WL 2869081, at *5 n.5 (E.D.N.Y. July 3, 2019), *aff'd*, 24 F.4th 144 (2d Cir. 2022). "[E]ven though there are additional considerations . . . when ruling on an evidentiary hearing and new trial motion premised upon allegations of juror misconduct, these are the overarching legal standards applicable to all Rule 33 motions, including when juror misconduct is at issue." *Id.*

If a hearing is held, "its scope should be limited to only what is absolutely necessary to determine the facts with precision." *Ianniello*, 866 F.2d at 544. "Therefore, in the course of a post-verdict inquiry . . . , when and if it becomes apparent that the above-described reasonable grounds to suspect prejudicial jury impropriety do not exist, the inquiry should end." *Moon*, 718 F.2d at 1234. The Court has discretion to structure the hearing and to determine what testimony is needed. *Ianniello*, 866 F.2d at 544.

## B. The scope of the hearing

The Court will conduct an evidentiary hearing on ████████████████████

████████████████████████████████████████████

████████████████████████████████████████ The Government

acknowledges that Juror 50's answer to Question 48 satisfies the demanding standard for an evidentiary hearing under *McDonough*. Gov. Br. at 33. The Court agrees. Question 48 asked jurors:

> Have you or a friend or family member ever been the victim of sexual harassment, sexual abuse, or sexual assault? (This includes actual or attempted

7

> sexual assault or other unwanted sexual advance, including by a stranger, acquaintance, supervisor, teacher, or family member.)

Dkt. No. 462 at 24. In response to that question, Juror 50 checked the box for "No," not the box for either "Yes (self)" or "Yes (friend or family member)." But in several public statements made to media outlets after the trial, including interviews in *The Independent* and *The Daily Mail* dated January 5, 2022, Juror 50 stated that he was sexually abused as a minor. The statements are direct, unambiguous, and made by Juror 50 himself to multiple media outlets. Moreover, the statements themselves describe Juror 50's own experience.[4] They constitute "clear, strong, substantial and incontrovertible evidence that a specific, nonspeculative impropriety has occurred," and so warrant an evidentiary hearing. *Baker*, 99 F.3d at 130.

Although the Court does not decide whether the threshold to hold a hearing based on Question 25 alone has been met, because the Court will hold a hearing on Juror 50's answer to Question 48 and because Question 48 and 25 are sufficiently related, the Court will inquire into Juror 50's answer to Question 25. Question 25 asked jurors:

Have you, or any of your relatives or close friends, ever been a victim of a crime?

Dkt. No. 462 at 13. Again, Juror 50 checked the box for "No," and not the box for either "Yes (self)" or "Yes (friend or family member)." But Juror 50's post-trial statements, if true, may describe criminal conduct of which he was the victim. Therefore, Juror 50's answer to Question 25 is sufficiently related to the answer to Question 48 and so the Court will also inquire as to Question 25 at an evidentiary hearing. *See Baker*, 99 F.3d at 130.

---

[4] The articles additionally state that Juror 50 shared this experience with the jury during deliberations. The Court is prohibited by Rule 606 from considering that Juror 50 also told this information to the jury. That Juror 50 revealed that he also disclosed this information to the jury does not prohibit the Court from considering Juror 50's independent statements made to a reporter about his own experience.

The potential impropriety that warrants a hearing is not that someone with a history of sexual abuse may have served on the jury. Rather, it is Juror 50's potential failure to respond truthfully to questions during the jury selection process that asked for such material information so that any potential bias could be explored. Accordingly, the Court will hold a hearing limited in scope to Juror 50's answers to Questions 25 and 48 of the questionnaire.

### C. The Defendant has not justified an inquiry into Juror 50's social media

The parties devote significant portions of the briefs to the question of whether Juror 50 answered falsely the Court's questions about social media usage during *voir dire*. To the extent that the Defendant seeks a hearing to probe Juror 50's answers to *voir dire* about his social media usage, her arguments are based on speculation, and she has failed to make the high showing required. *See Baker*, 899 F.3d at 130. At *voir dire*, when asked if he "use[s] social media," Juror 50 stated, "I do, but I actually just deleted them because I just got out of a relationship and I didn't want to see anything regarding them. So I am fully off of it right now." Nov. 16, 2021 Tr. at 133. The Court then asked, "What did you use, Facebook, Twitter?" to which Juror 50 replied "Facebook and Instagram," clarifying that the accounts contained "[p]ersonal stuff, like selfies." *Id.*

The screenshots proffered by the Defendant do not demonstrate that any of these answers implicate *McDonough*. First, Juror 50 did not deny having a Twitter account. Second, Juror 50's account had only 1 follower and followed only 39 people, which corroborates that his Twitter use was, at most, relatively minimal. *See* Maxwell Br. at 17. Third, the fact that Juror 50's Twitter account was opened in April 2021 and that he used it again in January 2022, after the completion of the trial, is consistent with Juror 50's answer that he deleted his social media accounts, or just the social media applications, shortly before *voir dire*. The same is true of Juror

9

50's Instagram account, on which he also posted in January 2022, after the completion of the trial. *Id.* at 20. And fourth, the screenshots proffered match Juror 50's description of his social media accounts as containing only "[p]ersonal stuff, like selfies." *Id.* The threshold for a hearing has not been met on this issue and the Court will not permit "a fishing expedition" into Juror 50's social media usage. *Moon*, 718 F.2d at 1234 (quoting *United States v. Moten*, 582 F.2d 654, 667 (2d Cir. 1978)).

### D. The Defendant has not justified an inquiry into other jurors

The Defendant seeks to examine not only Juror 50 at an evidentiary hearing but also the other eleven members of the jury in order to identify a second juror who, according to an article published by the *New York Times*, also was sexually abused as a minor. Maxwell Br. at 21, 49–50. The Defendant further argues that even if the article alone is insufficient to order a hearing as to the juror mentioned in the article, Juror 50's post-trial statements corroborate that another juror discussed sexual abuse during deliberations. Maxwell Reply at 24. As explained below, the evidence of this allegation is inadequate to meet the exacting standard for a hearing and the Court denies the Defendant's request to examine any jurors on this basis.[5]

---

[5] On December 31, 2021, the Court informed the parties by sealed order that a juror had contacted court staff about being approached by a reporter despite the fact that the juror had not identified themselves publicly and wished to remain anonymous. Because the contact by the member of the media had been uninvited by the juror, chambers staff notified all jurors via email on December 30, 2021, about the development. Subsequently, on January 5, 2022, a juror replied to the December 30 email sent by court staff. In that reply email, the juror wrote regarding news reports about the issue with Juror 50. The Court informed the parties of the juror communications by sealed order on January 6, 2022. The Defendant requested the communications, which the Court denied without prejudice. *See* Sealed Memo Endorsement, Jan. 13, 2022. The Defendant now renews her request on the theory that the communications could shed light on the identity of the second juror referred to by the *New York Times*. *See* Maxwell Br. at 21 n.10; Maxwell Reply at 23 n.12. Such a request is nothing but unfounded speculation. A juror's communication expressing fear about the media reports and the parties' responses to Juror 50's interviews are not relevant to the current inquiry. Nonetheless, in order to ensure a complete record, the Court will transmit under seal the concerned juror's communications to the parties with the name and contact information of the concerned juror redacted in order to protect the juror's privacy and prevent juror harassment. *See Ianniello*, 866 F.2d at 543. The Court also includes a subsequent communication with the same juror expressing additional concerns so that the parties have a complete record of non-logistical juror communications. The Court will file the unredacted communications under seal for preservation for the appellate record.

10

*First*, the news article upon which the Defendant relies does not warrant a hearing. *Baker*, 899 F.3d at 130. The article includes a short, non-detailed mention of an anonymous juror. As the Second Circuit recently held in affirming the denial of a hearing after a high-profile trial, "the unsworn, uncorroborated statements that one unidentified juror made to a magazine reporter do not constitute the 'clear, strong, substantial and incontrovertible evidence'" of misconduct that requires a hearing. *United States v. Guzman Loera*, 24 F.4th 144, 161 (2d Cir. 2022) (quoting *Moon*, 718 F.2d at 1234). Another court in this circuit held that a *New York Times* article that, in a single sentence, alleged misconduct by an unidentified juror was insufficient to justify a hearing. *United States v. Bin Laden*, No. S7R 98-CR-1023 (KTD), 2005 WL 287404, at *2 (S.D.N.Y. Feb. 7, 2005), *aff'd sub nom. In re Terrorist Bombings of U.S. Embassies in E. Afr.*, 552 F.3d 93 (2d Cir. 2008) ("This single sentence, an unsworn snippet of hearsay within a newspaper article, is far less substantial than the sworn affidavits present in cases where evidentiary hearings have been ordered.").

Other courts have also concluded that unsworn, hearsay, and/or anonymous reports of juror misconduct are not the clear, strong, and nonspeculative evidence required for a hearing. *See, e.g.*, *King v. United States*, 576 F.2d 432, 438 (2d Cir. 1978) (affirming the denial of a hearing where the defendant presented "weakly authenticated, vague, and speculative material as to one juror," even where that juror was not anonymous); *United States v. Wilbern*, 484 F. Supp. 3d 79, 87 (W.D.N.Y. 2020) (finding a "double hearsay" report of misconduct inadequate to justify a hearing); *Stewart*, 317 F. Supp. 2d at 438 (denying the defendant's request for an evidentiary hearing where the defendant's support, including post-trial media interviews, "amount[s] to little more than hearsay, speculation, and in one instance, vague allegations made by a person who refused to identify himself"). Accordingly, the *New York Times* article is an

11

insufficient basis for an evidentiary hearing, especially one that, according to the Defendant, would require the Court to "haul [11] jurors in after they have reached a verdict" to probe for who, if anyone, may have been mentioned in the article. *Guzman Loera*, 24 F.4th at 161 (quoting *Moon*, 718 F.2d at 1234).

*Second*, Federal Rule of Evidence 606 bars the Court from considering Juror 50's statements as evidence of another juror's statements purportedly made during deliberations. As previously quoted, the rule states:

> During an inquiry into the validity of a verdict or indictment, a juror may not testify about any statement made or incident that occurred during the jury's deliberations; the effect of anything on that juror's or another juror's vote; or any juror's mental processes concerning the verdict or indictment. The court may not receive a juror's affidavit or evidence of a juror's statement on these matters.

Fed. R. Evid. 606(b)(1).

Rule 606(b) is subject to three enumerated exceptions that permit a juror to testify about whether (A) "extraneous prejudicial information was improperly brought to the jury's attention"; (B) "an outside influence was improperly brought to bear on any juror"; or (C) "a mistake was made in entering the verdict on the verdict form." Fed. R. Evid. 606(b)(2). In addition to these exceptions enumerated in the rule, the Supreme Court has held that Rule 606 "give[s] way" where "a juror makes a clear statement that indicates he or she relied on racial stereotypes or animus to convict a criminal defendant." *Pena-Rodriguez v. Colorado*, 137 S. Ct. 855, 863 (2017). Absent one of these circumstances, evidence within the ambit of Rule 606 may not be considered.

Here, the Defendant relies on Juror 50's statements of what another juror allegedly stated during deliberations. That proffer is barred by Rule 606.

In response, the Defendant argues that Juror 50's statements about the second juror fall outside the scope of Rule 606 because she "does not seek to impeach the verdict based on the

12

content of deliberations" but instead to demonstrate that the second juror made a false statement during *voir dire*, like Juror 50 allegedly did. Maxwell Br. at 50. But this reading of Rule 606 has been squarely rejected by the Supreme Court, which held that the "plain meaning" of this language is that "Rule 606(b) applies to juror testimony during a proceeding in which a party seeks to secure a new trial on the ground that a juror lied during *voir dire*." *Warger v. Shauers*, 574 U.S. 40, 44 (2014). The Defendant's one-sentence attempt to dismiss *Warger* because it involved a civil rather than a criminal case is unavailing. Maxwell Reply at 23 n.11. It is the same rule of evidence in issue, and the principles enunciated by the Supreme Court apply here with equal force.

The Defendant may also be suggesting in this argument that Rule 606 does not bar Juror 50's statements because they concern "extraneous prejudicial information," which is an enumerated exception to the rule. *See* Fed. R. Evid. 606(b)(2)(A). To the extent that argument is raised, it is meritless. Information is "extraneous" when it is "external to the jury"—that is, "publicity and information related specifically to the case the jurors are meant to decide," rather than "the general body of experiences that jurors are understood to bring with them to the jury room." *Warger*, 574 U.S. at 51 (cleaned up). So, for example, the Supreme Court has held that a foreperson's undisclosed experience with a car accident is not extraneous information, even in a motor-vehicle lawsuit where that failure to disclose could have supported a for-cause strike. *Id.* at 42–43. The same is true here, as the second juror's alleged undisclosed experience "did not provide either [the juror] or the rest of the jury with any specific knowledge regarding" this particular case. *Id.* at 51–52. Rather, as this Court instructed, jurors are expected to bring their "reason, experience, and common sense" to bear in evaluating witnesses' credibility and the

13

Defendant's ultimate guilt. Trial Tr. at 3066; *see also U.S. ex rel. Owen v. McMann*, 435 F.2d 813, 818 (2d Cir. 1970).

Last, the Defendant argues—in a single sentence of her reply brief—that if Rule 606 does bar consideration of Juror 50's statements about the second juror, then the rule "violates Ms. Maxwell's constitutional rights to due process and to confrontation as applied to her." Maxwell Reply at 23. The Court rejects this argument. The Confrontation Clause guarantees a criminal defendant the right "to be confronted with the witnesses against him." U.S. Const., amend. VI. The Defendant's right to confrontation is not implicated here because Juror 50 is not a "witness[] against" the Defendant but was instead a factfinder in her trial. Simply put, Juror 50's testimony at the hearing will be proffered to determine whether *Juror 50* has engaged in any misconduct warranting a new trial, not to accuse *the Defendant* of any crime. *Cf. Crawford v. Washington*, 541 U.S. 36, 43 (2004) (describing the Confrontation Clause as a "right to confront one's *accusers*" (emphasis added)). Even if the Confrontation Clause were implicated, Rule 606's prohibition on juror affidavits to impeach a verdict is a reasonable limitation, subject to other exceptions not at issue here, on the evidence that a defendant may muster, a limitation with a long historical pedigree. *See Pena-Rodriguez*, 137 S. Ct. at 863 (tracing Rule 606 to traditional English common law); *Crawford*, 541 U.S. at 54 (explaining that the Confrontation Clause "is most naturally read as a reference to the right of confrontation at common law, admitting only those exceptions established at the time of the founding").

Next, the Defendant's due-process claim is squarely foreclosed by controlling precedent. The Supreme Court in *Tanner v. United States* rejected a constitutional challenge to Rule 606, explaining that a criminal defendant's right to an impartial jury is "protected by several aspects of the trial process," including questions asked in *voir dire*; observations in court made by the

14

judge, court personnel, and counsel; observations by other jurors, who "may report inappropriate juror behavior to the court *before* they render a verdict"; and "impeach[ment] [of] the verdict by nonjuror evidence of misconduct." 483 U.S. at 127; *see also Warger*, 574 U.S. at 51 ("[A] party's right to an impartial jury remains protected despite Rule 606(b)'s removal of one means of ensuring that jurors are unbiased."). The Defendant cites in support the Supreme Court's decision in *Pena-Rodriguez v. Colorado*, but that case is unavailing to her position. There, the Supreme Court held that "where a juror makes a clear statement that indicates he or she relied on racial stereotypes or animus to convict a criminal defendant, the Sixth Amendment requires that the no-impeachment rule give way in order to permit the trial court to consider the evidence of the juror's statement and any resulting denial of the jury trial guarantee." 137 S. Ct. at 869. Throughout the opinion, the Supreme Court took great care to hold that the "unique historical, constitutional, and institutional concerns" intrinsic to a juror with racial animus do not attach to other forms of juror misconduct. *Id.* at 868. In fact, it *expressly* contrasted the case of a juror with racial animus to a juror that "ha[s] a personal experience that improperly influences her consideration of the case," as was at issue in *Warger v. Shauers* and as is alleged here. *Id.* at 869.

*Third*, even if the Court did consider Juror 50's statements about what another juror said during deliberations—which Rule 606 prohibits—the statements proffered by the Defendant do not meet the threshold of "clear, strong, substantial and incontrovertible evidence that a specific, nonspeculative impropriety has occurred." *Baker*, 899 F.3d at 130. According to an article in the *Daily Mail*, Juror 50 "revealed that he was not the only juror to share a story of sexual abuse." That sentence summarizes an unsworn and non-specific statement, which does not identify the alleged misconduct or the juror in question with any particularity. It therefore falls

15

short of the demanding standard for ordering a post-verdict evidentiary hearing. *See Bin Laden*,
2005 WL 287404, at \*2. Notably, this case is far from *United States v. Colombo*, where the
Second Circuit ordered an evidentiary hearing on the basis of two sworn affidavits that identified
another juror by name and described with particularity the alleged misconduct. 869 F.2d 149,
151 (2d Cir. 1989).

The Court therefore rejects the Defendant's as-applied constitutional challenge to Rule
606 and further concludes that Rule 606 bars the Court's consideration of Juror 50's statements
about the second juror. Even if the Court considered Juror 50's statement about another juror,
the evidence would be insufficient to meet the high threshold for an inquiry. Without
nonspeculative evidence of misconduct by any juror but Juror 50, the Court restricts the focus of
the evidentiary hearing to Juror 50. *See Ianniello*, 866 F.2d at 544.[6]

## IV.    The nature of the hearing

### A.    The Court will examine the witnesses and the parties may submit questions

In concluding that an inquiry into Juror 50's conduct is warranted, the Court is mindful
that the "object of the proceeding is to permit the truth to be discovered with the least possible
harm to other interests." *Moten*, 582 F.2d at 666. Accordingly, the Court denies the Defendant's
request that counsel directly question the juror—a decision committed to this Court's "sound
discretion." *Id.* at 667; *see also Ianniello*, 866 F.2d at 544 ("We leave it to the district court's
discretion to decide the extent to which the parties may participate in questioning the witnesses,
and whether to hold the hearing in camera."). The Court will conduct the questioning at the

---

[6] The Defendant's briefing is unclear as to whether she seeks to question the other 11 jurors only to identify the juror
implicated by the news article, or if she would seek to question the other jurors in any event to determine "what
Juror No. 50 said to the other jurors." *See* Maxwell Br. at 49. To the extent the Defendant is requesting the ability
to question jurors about what Juror 50 allegedly disclosed during deliberations, that request is denied as it is plainly
foreclosed by Rule 606. *See also Ianniello*, 866 F.2d at 544.

public hearing with input from counsel. The parties may submit questions consistent with this ruling, including what the Court holds in this Opinion are the limitations imposed by Rule 606 and the appropriate scope of the hearing. Once again, the scope of the inquiry is ▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Per this Court's prior order, the parties must submit the proposed questions under temporary seal to ensure the integrity of the inquiry. *See* Dkt. No. 596 at 4. Proposed questions must be submitted via email on or before **March 1, 2022**. The proposed questions will be unsealed following the hearing.

### B. The Defendant's subpoena requests are denied

The Defendant seeks two sets of subpoenas to conduct discovery in advance of the hearing. Maxwell Br. at 48–49. First, from Juror 50, the Defendant seeks any emails or other communications between Juror 50 and any alleged victim or witness; any other juror; any other person or media organization about Juror 50's jury service; and, finally, any record of payments for any interview or information that Juror 50 gave about his jury service. Second, from Facebook, Twitter, LinkedIn, Instagram, and other social media platforms, the Defendant seeks all communications to and from Juror 50 regarding his jury service; all posts, comments, or photographs by Juror 50 regarding his jury service; and all documents reflecting when Juror 50 opened or closed his accounts. In her initial brief, the Defendant simply lists these requests without justification. In her reply, she provides only a short rebuttal to the Government's objections and does not explain why each request is relevant or proper.

The Court denies these requests as vexatious, intrusive, unjustified, and a fishing expedition. Given the focused inquiry the Court is ordering, the evidentiary hearing's scope

must be "limited to only what is absolutely necessary to determine the facts with precision." *Ianniello*, 866 F.2d at 544. The Defendant can only speculate that the requested communications between Juror 50 and unknown persons and entities would shed any light on Juror 50's answers to the questionnaire and his bias *before* the trial at the time of *voir dire*. Nor has the Defendant explained why Juror 50's receipt of financial payment for interviews *after* the trial, if true, would be probative of his inclination to not disclose at *voir dire prior* to trial. The Court will not grant the Defendant "the opportunity to 'conduct a fishing expedition.'" *Moon*, 718 F.2d at 1234 (quoting *Moten*, 582 F.2d at 667).

Moreover, the Defendant's requested subpoenas directed at social media companies who have custody of Juror 50's communications, comments, and posts are procedurally improper. Those requests for social media content are subject to the Stored Communications Act, 18 U.S.C. §§ 2701–11, which requires an additional factual showing for the Court to order disclosure, *see* 2 Wayne LaFave et al., Criminal Procedure §§ 4.8(b), 4.8(d) (4th ed. 2021); *Matter of Warrant to Search a Certain E-Mail Acct. Controlled & Maintained by Microsoft Corp.*, 829 F.3d 197, 206 (2d Cir. 2016), *vacated and remanded on other grounds*, 138 S. Ct. 1186 (2018). And only the Government, not private parties like the Defendant, may request disclosure pursuant to the Act. *United States v. Nix*, 251 F. Supp. 3d 555, 559 (W.D.N.Y. 2017) ("[T]he [SCA] does not permit a defendant in a criminal case to subpoena the content of a Facebook or Instagram account."); *Facebook, Inc. v. Wint*, 199 A.3d 625, 629 (D.C. 2019) (collecting cases). Though the Government raised the Act in its briefing, the Defendant does not acknowledge it or purport to show she is entitled to make a request. Accordingly, the requests as to the listed social media companies are denied.

18

The Court concludes that the Defendant has not made a showing that any pre-hearing discovery is appropriate, and the request to engage in an intrusive fishing expedition is denied.

### C. The Court will release Juror 50's questionnaire

This Court previously reserved ruling on Juror 50's request that the Court release his jury questionnaire to counsel, but that the document otherwise remain under seal to protect his supposed privacy interest. *See* Dkt. No. 596 at 5 n.1. The Defendant opposes both the unsealing and releasing the questionnaire to counsel, arguing that "advance disclosure . . . will undoubt[edly] color Juror No. 50's testimony and allow him to place himself in the best possible posture." Maxwell Br. at 53. The Government argues that there is no legitimate interest in limiting Juror 50's access and opposes maintaining the questionnaire under seal. Gov. Br. at 42; *see also* Dkt. No. 594.

The Court will provide Juror 50 a copy of his completed questionnaire. Unlike the parties' proposed questions, Juror 50's access to his completed questionnaire—the answers to which he wrote—will not undermine the integrity of the inquiry. The Defendant's concern that advance disclosure may somehow taint Juror 50's testimony is unfounded. *See United States v. McCoy et al.*, No. 14-CR-6181 (EAW), Dkt. No. 329, at 15 (W.D.N.Y. June 2, 2017) (providing the jury questionnaire to juror's counsel in advance of the hearing). Rather, delaying disclosure until the hearing would needlessly delay the fact-finding process.

Moreover, the Court concludes that the presumption of access dictates that the questionnaire must be docketed. Juror 50's and the Defendant's request that the questionnaire remain sealed is governed by the three-part test articulated by the Second Circuit in *Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d 110 (2d Cir. 2006). *See* Dkt. No. 596 at 2 (outlining the test). First, the jury questionnaire easily qualifies as a judicial document. It is a key exhibit to

19

the Defendant's motion for a new trial. *Cf. Carbon Inv. Partners, LLC v. Bressler*, No. 20-cv-3617 (ER), 2020 WL 5441497, at *2 (S.D.N.Y. Sept. 10, 2020). Accordingly, a high presumption of access attaches. For the reasons stated in this Court's prior order, this presumption of access is not outweighed by the possibility of media interest in the document. *See* Dkt. No. 596 at 3. Nor is sealing necessary to safeguard a possible hearing for the reasons stated above. Finally, any privacy interest Juror 50 may have had in his questionnaire, *see Press-Enterprise Co. v. Superior Ct. of Cal.*, 464 U.S. 501, 511–12 (1984), has at least been greatly diminished, if not extinguished, since his public comments. The Court further notes that prospective jurors had the opportunity to request that particular questionnaire answers remain confidential; Juror 50 did not make any such request. Accordingly, Juror 50's privacy interest in the questionnaire is now outweighed by the presumption of access. *Lugosch*, 435 F.3d at 119–20. The Defendant is accordingly ORDERED to docket Exhibit 1 to her motion for a new trial, Juror 50's completed questionnaire.

## V.    Conclusion

For the reasons stated above, the Court will hold a hearing regarding Juror 50's answers to Questions 25 and 48 of the questionnaire. The public proceeding will take place on **March 8, 2022, at 10:00 a.m.** Juror 50 is hereby ORDERED to appear in Courtroom 906 of the Thurgood Marshall United States Courthouse, 40 Centre Street, New York, New York at that date and time to give testimony under oath in response to the Court's questions. Counsel for the Defendant and the Government are ORDERED to submit via email proposed questions in accordance with this Opinion & Order on or before **March 1, 2022**.

SO ORDERED.

Dated: February 24, 2022
New York, New York

_____
ALISON J. NATHAN
United States District Judge

21

# EXHIBIT  62

516

LC1VMAX3                    Jane - cross

1           MS. MENNINGER:  Okay.

2    Q.  Isn't it true you told the government you do not remember

3    any specific abuse that occurred in New Mexico on the trips

4    that you took there?

5    A.  I don't recall.

6    Q.  And yesterday you testified about an incident in New Mexico

7    that you now specifically remember two years later.

8    A.  That's right.

9    Q.  Today you remember it; in 2020 you did not.

10   A.  I don't recall saying any of what's written here.

11   Q.  I'm going to ask you about the homes that you testified you

12   visited for Epstein in the mid 1990s, okay, between the ages of

13   14 and 16.

14           You recall in Palm Beach that you went to a pool

15   house; correct?

16   A.  That's correct.

17   Q.  And you only went to one house for Epstein in Palm Beach

18   ever; correct?

19   A.  Yes.

20   Q.  You remember the whole house in Florida was light-colored

21   and beachy; correct?

22   A.  I think so; correct.

23   Q.  You remember a winding staircase with pictures on the wall;

24   correct?

25   A.  Correct.

544

LC1Qmax4                    Jane - Cross

Q.  When did you hire Mr. Glassman?

A.  September 3, 2019.

Q.  That was two weeks before you met with the government for

the first time, right?

A.  I don't know those dates.

Q.  I want to look back at 3509-001, at the date.  Does looking

at the left-hand corner of 001 refresh your recollection about

the date that you first met with the government?

A.  It doesn't, but if that's what it says, then --

Q.  September 19, 2019 seems about right, correct?

A.  Correct.

Q.  You hired Mr. Glassman before this meeting with the

government, right?

A.  Right.

Q.  Mr. Glassman was at the first meeting with the government,

right?

A.  Yes.

Q.  As well as Mr. Werksman, the second lawyer, right?

A.  Right.

Q.  And those were both personal injury lawyers that you had

selected?

A.  Yes.

Q.  You didn't hire a lawyer that specializes in victims'

rights, correct?

A.  I hired a lawyer based on advice from my husband's friend,

LC1Qmax6                    Jane - Redirect

1    Q.  Can you please explain for the jury what were the

2    circumstances under which a reporter approached you?

3    A.  Well, it was a reporter who called me and said --

4            MS. MENNINGER:  Objection.  Hearsay, your Honor.

5    A.  Okay.  Sorry.

6            MS. MOE:  I'm happy to rephrase, your Honor.

7            THE COURT:  Go ahead.

8    Q.  When you had that conversation with the reporter, did you

9    want to have that conversation?

10   A.  No.

11   Q.  Why did you agree to speak to that reporter?

12   A.  Because he basically blackmailed me.

13           MS. MENNINGER:  Objection, your Honor.  Hearsay.

14           THE COURT:  Overruled.  Go ahead.

15   A.  He said that he -- that court documents with my name on it

16   were unredacted, and that the Epstein's little black book was

17   out, and my name was in it, and he was going to print --

18           MS. MENNINGER:  Objection, your Honor.  Hearsay.

19           THE COURT:  We'll limit what the witness has testified

20   to as not being offered for the truth of what was stated by

21   someone else but the effect on the listener.

22           And let's re-narrow the question.

23           MS. MOE:  Yes, your Honor.  May I ask a leading

24   question to navigate through this?

25           THE COURT:  Let me hear the question.

# EXHIBIT 64

PANORAMA – BBC TRANSCRIPT CLEAN
2019.12.02 - (Incl D Boies)

PANORAMA – BBC TRANSCRIPT CLEAN
DECEMBER 2, 2019  (Incl David Boies & Virginia  Guiffre)

HOST, DARRAGH MACINTYRE: Tonight, on Panorama we hear from a woman who says she was trafficked to a prince for sex.

0.12
CUT to Virginia _VRGI _speaking to camera:
He got up and he said thanks. I sat there in bed just horrified and ashamed and felt dirty.

HOST V/O: Prince Andrew insists it isn't true.

0.25
PRINCE ANDREW _HRH_ talking to Emily Maitlis - I can absolutely, categorically tell you, it never happened.

0.30
VRGI: He knows what happened. I know what happened and there's only one of us telling the truth and I know that's me.

HOST: Tonight, we reveal how another 5 women want to call Prince Andrew as a witness to events in Jeffrey Epstein's homes.

0:48
DAVID BOIES _DBOI_ [to camera]: With respect to Prince Andrew, I think he needs to come clean, and I think the facts need to be revealed.

0.56
GHISLAINE MAXWELL _GMAX [ OLD VIDEO - about to do an interview about Terra Mar]:
How does it look, does it all look is my hair good?

0.59
HOST: We investigate the woman Prince Andrew still calls his friend.

1.04
███████  ███████  ████████ : Ghislaine controlled the girls - she was like the Madam - she was like the nuts and bolts of the sex trafficking operation.

V/O And we uncover new information about the photo at the heart of a royal scandal.

1.19
VRGI: It's a real photo, I've given it to the FBI for their investigation and it's an authentic photo.

**PANORAMA GRAPHIC – THE PRINCE AND THE EPSTEIN SCANDAL**

1.44

PANORAMA – BBC TRANSCRIPT CLEAN
2019.12.02 - (Incl D Boies)

VRGI: The world that I was living in, it was not glamorous. It was not pretty. I might have been meeting some of the most famous people in the world, but it didn't matter to me because these are bad people who were hurting me.

2.06
HOST: VG is now a married mom of three. Her life today couldn't be more different than when he was the teenage Virginia Roberts.

2.18
VRGI: It was a fancy cage, but it didn't make it better. it didn't make it easier to do what I had to do

2:23
HOST: She's the woman who says she was trafficked to London to have sex with Prince Andrew. Her allegations have created a crisis for the Royal Family. And Prince Andrew's interview on News Night made it worse.

2.43
**Emily Maitlis**, News Night: Do you recall any kind of sexual contact with Virginia Roberts then?

HRH: None

Emily Maitlis: or at any other time?

2.49
HRH: None. Whatsoever. I have no recollection of ever meeting this lady. I admit fully that my judgement was probably colored by my um. tendency to be too honorable.

3.14
HOST: The Prince's interview has been widely judged to have been disastrous. The backlash has forced him to step away from public life and it has cast a shadow over the whole royal family. Now the woman making the allegations wants the people in the UK to hear her side. She spoke to Panorama before Prince Andrew went public. She's since told us she stands by every word.

3.48
VRGI: I implore the citizens in the UK to stand up beside me to help me fight this fight – to not accept this as being ok. This is not some sordid sex story, this is a story of being trafficked. This is a story of abuse, and this is a story of your guys' royalty.

4.20
HOST: To really understand about Virginia Robert's story, you need to understand the princes' friendship with a prolific sex offender

2

PANORAMA – BBC TRANSCRIPT CLEAN
2019.12.02 - (Incl D Boies)

OVER VIDEO OF A DEPOSITION OF JEFFREY EPSTEIN: Do you solemnly swear the
testimony you will give today will be the truth, the whole truth and nothing but the truth so help
you God.

Jeffrey Epstein:  Yes I do

ATTY Q [Spencer Kuvin].: Could you please give us your name.

Jeffrey Epstein: Jeffrey Epstein

4.43
HOST:   Wealthy financier Jeffrey Epstein was accused of sexual assault by more than 30
underage girls in 2006. He was convicted, then released after just 13 months in jail. Then earlier
this year he was charged with sex trafficking. But he took his own life in custody before his
victims got justice.

5.11
[REDACTED] ON THE COURTHOUSE STEPS [27 Aug 2019]: It's pretty
upsetting to see how many lives he's devastated and to see how long this has been going on for
and nobody did anything about it.

5.25
HOST: For over a decade, Prince Andrew visited Epstein at his homes in Florida, New York and
the Caribbean.  He even traveled on one of Epstein's private planes.

5.39
HRH [SPEAKING TO EMILY MAITLIS ON NEWSNIGHT: He had the most extraordinary
ability to bring um extraordinary people together er and that's the bit that I remember is going to
the dinner parties where you would meet academics, politicians, people from the United Nations,

SCENE AT ONE OF JEFFREY EPSTEIN'S DEPOSITIONS – V/O of Spencer Kuvin: We have
tried to cooperate in said deposition,

6.00
SPENCER KUVIN_SKUV_: I think the best way to describe Jeffrey Epstein would be that he
was just creepy. He would use his power to he would use his money to convince these young
girls that really didn't know any better, to engage in some things that they just would have
otherwise hopefully never have done.

6.26
HOST: [host driving in Palm Beach past Royal Palm Beach High School]:  This is where Epstein
found many of his youngest victims, Royal Palm Beach High School in Florida. He recruited
schoolgirls and paid them to give him and his guests, massages. [REDACTED] was
approached when she was 16.

6.50

3

PANORAMA – BBC TRANSCRIPT CLEAN
2019.12.02 - (Incl D Boies)

████████████: I knew a girl in high school – she said want to make a little bit of money? I know a rich man who lives in downtown west palm – he pays girls to give him a naked massage in the nude. And I'm thinking, well that sounds awful easy you know, how much? $300 for an hour. I'm thinking to myself well, ok, I said OK, how do we set it up? That was when she said oh no, I'm not looking for you, but what you would do is find someone else.



What exactly was the profile he was looking for?

7.30
████████: Teenage young girls, slim body figure. Small breasts,

HOST: in 2005 the parents of a 14year old girl called the police to report Epstein.

07:45
MINOR WOMAN V/O ON TAPE: They start off by giving this gentleman a massage and he pays them and if he likes them, and he thinks they are pretty enough he keeps them around to do other things. OK.

HOST: The police had recorded the first interviews with Epstein's young victims.

8.08
VOICE OF OTHER MINOR WOMAN: You were at my house last night. I didn't really tell the whole truth about Jeffrey because my parents were there.

HOST: The recordings paint a sordid picture of Prince Andrew's friend.

8.21
MINOR WOMAN: I wore a skirt and a regular T-Shirt and I was massaging his legs and he asked me to take off my skirt.

V/O. Epstein would send taxis to collect the girls from school. They were brought here to his house in Palm Beach where he abused them.

8.48
MINOR WOMAN VOICE: I had problems with it the first time but $200 for 40 minutes, that was a lot for a 16year old girl making $6 an hour.

9.05

PANORAMA – BBC TRANSCRIPT CLEAN
2019.12.02 - (Incl D Boies)

HOST: Many of Epstein's young victims came from troubled backgrounds. You think of gitz, glamor, beach and money. But not all of Palm Beach is like that. Places like here just a couple of miles away from Jeffrey Epstein's home, this is where many of the girls, many of the victims he chose – this is where they came from.
[OVER SHOTS OF SPENCER KUVIIN AT HIS DESK] Lawyer  Spencer Kuvin represented some of the first girls to come forward. He put their allegations to
Epstein in filmed testimony.

09:47
SPENCER KUVIN: Sir, according to the police departments probable cause affidavit one witness described your penis as egg-shaped  these are not my words. I apologize but as Mr. Critten has stated – [The Deposition is stopped]
10.08
He would frequently say through his lawyers, I don't understand why everybody so upset at me, you know these young girls came voluntarily I didn't drug them I didn't force them into any of this and they got money out of it as well, completely ignoring the fact that they are 14,15 years old.

10.24
HOST:  It was a pattern of behavior that spanned decades and Jeffrey Epstein may not have acted alone. In the 1990s he started dating Ghislaine Maxwell soon after the death of her father the newspaper Baron Robert Maxwell.

10:44
V/O GHISLAINE MAXWELL ON VIDEO about to give an interview about TerraMar: Is it all good, is my hair good,

10:50
CONCHITA SARNOFF _CSAR_AUTHOR OF BOOK ON EPSTEIN]: I think perhaps the trauma of her father's death left Ghislaine quite  uneasy and feeling unprotected and I think that is one of the reasons why she gravitated toward Epstein and stayed with him for so long.

11.10
HOST:  some of Epstein's victims also blame Ghislaine Maxwell for what happened.
11.17
▬▬▬▬▬▬▬▬▬▬▬▬ : There wasn't Jeffrey or wasn't Ghislaine, they, they they fed off each other they literally they would feed off each other's energy.

HOST: ▬▬▬▬▬▬ was 22 when Epstein enticed her into his circle.

11.43
▬▬▬▬▬▬ : She was his right hand woman, his right hand lieutenant, you know she was the one getting all the girls in chec. She knew what Jeffrey liked, she helped maintain Jeffrey's standard intimidation, by intimidating the girls so so this was very much a joint effort.

12.08

5

PANORAMA – BBC TRANSCRIPT CLEAN
2019.12.02 - (Incl D Boies)

HOST: Ghislaine Maxwell also happens to be one of prince Andrew's oldest friends he's known her for more than 30 years. She was a socialite who introduced Epstein to the rich and powerful.

12:25
CONCHITA SARNOFF:  Ghislaine was the one who introduced him,  she introduced him to Peter Mandelson, she introduced him to prince Andrew I understand she forged the relationship with President Clinton; er she introduced him to many, many people that he eventually became friendly with him.

12:43
HOST: In July 1999 G Ghislaine Maxwell and Epstein visited the Prince at Balmoral. The next summer he invited them to Royal birthday celebrations at Windsor Castle.  The day after, the prince took them to Ascot.  These pictures have never been published before.  In December that year, the couple was invited to Sandringham for a shooting weekend.  Prince Andrew says it was always more about Ghislaine Maxwell than Epstein.

13.31
HRH [SPEAKING TO EMILY MAITLISS]: It was his girlfriend that was the key element in this. He was the, as it were, the plus one to some extent.

 HOST: It was Ghislaine Maxwell who introduced Virginia Roberts to Epstein. She was exactly the kind of vulnerable girl he preyed on.

13.54
VRGI: I was abused from a very young age, from 7 years old and um,  my childhood was quickly taken away for me. I was just so mentally scarred already at such a young age and then I ran away from that. I found nothing on the streets except for hunger and pain and abuse. And er, and it was scary, I wanted to get out of it.

14:29
HOST: In 2000 Virginia Roberts was working as a locker room attendant at Donald Trump's Mar a Lago Resort in Palm Beach. She was just turning 17 and was getting her life together. Then Ghislaine Maxwell offered her the chance to train as a massage therapist.

VRGI: I ran over to my dad who works on the tennis courts at Mar a Lago, and he he knows I'm trying to fix up my life at that point which is why he got me the job there and I said, you're not going to believe it Dad,  I just got offered a job, an interview, but if he likes me for the interview then I'm gonna be they are going to train me as a masseuse, as a real massage therapist.

15.14
HOST:  Virginia Roberts went to Epstein's Palm Beach home for the interview.

15:21
VRGI: Ghislaine walks me up the stairs and there's this naked guy laying on a massage  table in the middle of the room so although there was a naked man laying on the table, I thought this is

6

PANORAMA -- BBC TRANSCRIPT CLEAN
2019.12.02 - (Incl D Boies)

just how they do it, I suppose. He looked up at Ghislaine, so she's like here, here's the lotions, here's the oils. Put your lotions and your oils always on your arm, always keep your hand on the person you massaging and start with one foot and she'll get the other foot, and then we'll work together so you just mimic my movements. So that thought went fleeting from my head like that was strange cos we are doing this massage now. Through that time I mean they were asking me questions about who I was and you know how I got to work in Mar a Lago, and I really wanted them to know how important it was to me to nail this interview and possibly be educated to become a real massage therapist. And they seemed like nice people so I trusted them; and I told them I had a really hard time in my life up until then. I had been a run-away, I've been sexually abused, I've been physically abused, I've had a really hard [unintelligible word] and um, that was the worst thing that I could've told them because now they knew how vulnerable I was.

It was like a gift for them that's exactly what they needed, that's exactly what they wanted and they got it.

So they told me to take my clothes off and already nude and Ghislaine takes her clothes off and Epstein's already nude; and um, they start touching me and they asked me to do things for him and um, then I just I did. I fell right into the back of that circle. I thought this is just what life's about – this must be what life's about because I have never had somebody just take me in and say that they're going to do something and not do something. So yeah I was his real big kick in the gut in the face of reality that I just succumbed all I know so I let them abuse me and it was a face of reality that I just succumbed to, it's all I had known. [Crying ] So I let them abuse me and I did what they told me to do.

17.53
HOST: She would be trapped with Epstein for almost 2 years before she broke away. In court papers, Ghislaine Maxwell calls Virginia Roberts a liar and denies assaulting her. But she admits she arranged massages for Epstein. This note [over image of list of first names

PANORAMA – BBC TRANSCRIPT CLEAN
2019.12.02 - (Incl D Boies)

names] later recovered from the Palm Beach house by the police shows Epstein had a list of women who were paid to massage him and his guests. Many of them were teenagers.

I just gassed many of them were teenagers Mike works as a handyman and Epstein street are used to see the girls come and go I have no idea it was just one a day, when I would see him coming our way back there was a lot of girls going on exactly what was going on I knew that the people I work for a new what was going on and most of all the people on the street knew what was going on prince Andrew was a visitor here too

18.27
HOST WALKING ALONG EPSTEIN'S STREET WITH A HANDYMAN – Mike Pezzulo - works as a handyman on Epstein's street. He used to see the girls come and go.

HANDYMAN: Sometimes 3 or 4 a day. I have no idea. But they I would see them coming from way back. There was a lot of girls coming.

HOST: What did you think was going on?

HANDYMAN: Exactly what was going on. I knew that the people I worked for knew what was going on. And most of all the people on this street knew what was going on.

19.10
HOST: Prince Andrew was a visitor here too. In legal papers, Epstein's former housekeeper says, Prince Andrew spent weeks with us. He's asked if the prince would frequently have massages. The housekeeper says I would say daily massages. We asked Prince Andrew whether he ever had a massage while he was visiting here. He didn't answer our question. Many of the allegations concerning the Prince are based on statements made in court cases. When they were released the Judge warned that the statements did not reflect the court's findings and that legal filings could be untrue. Prince Andrew says he neve saw anything suspicious at Epstein's homes.

20.16
VOICE OF ALAN DERSHOWITZ [POINTING OUT NY VIEWS TO HOST]: That's the United Nations

20.22
HOST: And so does another well connected guest.

20.28
ALAN DERSHOWITZ: We met in his homes with many, many people for conferences. None of us had any [emphasized] suspicion that he was leading a private life involving young women. We just had no hint of that. He always had a taste for beautiful women, but in their middle to late twenties and thirties. We never ever saw him or suspected that he was involved with teenagers.

20.52

8

PANORAMA – BBC TRANSCRIPT CLEAN
2019.12.02 - (Incl D Boies)

HOST: Through his friendship with Epstein, Alan Dershowitz also got to meet the prince. The lawyer still has a letter that Prince Andrew wrote after attending one of his Harvard lectures – [Letter shown] in 1999.

21.05
ALAN DERSHOWITZ: This is the letter. I have it. And he ends the letter with 'I look forward to continuing my intellectual challenge with you and Jeffrey E, Epstein, in the coming months.

HOST: Wow. Well he certainly regarded you as someone to learn from

ALAN DERSHOWITZ: Well, he enjoyed the experience very much, he called it a fantastic experience

HOST: And also Jeffrey Epstein.

ALAN DERSHOWITZ: Yes. He clearly looked to Jeffrey Epstein as somebody who could help educate him, in matters of finance or anything else, I don't know.

21.41
HOST: Epstein didn't just charm lawyers and princes. He was welcomed into the houses of the rich and powerful around the world. And there was a constant stream of visitors to his homes. 9 of Epstein's victims say he forced them to have sex with other people as well.

22.15
VRG1 It went from just being abused by Epstein to then being passed around like a platter. Like a platter of fruit. It was always explicit that there was the massage aspect of it. The majority of the times people did want the massage first and then they wanted to um to have intercourse or whatever they needed or wanted that day, sexually to happen.

22.53
HOST: Virginia Roberts was taken around the world by Epstein.

23.00
VRG1: I was flying on private jets. I'm going places I never imagined I would go to . He took her to parties for the rich and famous. In 2001, Epstein brought the 17 year old to London. They arrived on the 9th of March and left 2 days later. Virginia Roberts stayed here at GM's house. And she says, Prince Andrew came to visit.

EXTRACTS
00.03: [GRAPHIC AS VRS IS SHOWN WALKING IN STREET]
Virginia says she was bought to London in 2001 [OVER ALLEGED PHOTO OF HRH W VR + GM] when she was 17 and met Prince Andrew.

23.45

## PANORAMA – BBC TRANSCRIPT CLEAN
2019.12.02 - (Incl D Boies)

VRGI We are having tea and Andrew is talking about Fergie, which is his ex-wife at that point and Ghislaine is bad-mouthing Fergie as well. Epstein's just socially awkward [rolling her eyes] he's laughing about everything. I was just sitting there like I was always told to do. Just sit there and don't talk unless you are talked to. Be polite and laugh at everything someone says when they are trying to be funny. It seemed like friends just catching up.

24:16
HOST: According to Virginia Roberts, the prince then went her to Tramp Night Club. He asked me to dance. He is the most hideous dancer I've ever seen in my life. I mean it was horrible and this guy [holding up her hands with fingers outstretched] was sweating all over me, like his sweat, it was raining basically, everywhere. It was just like [makes vomiting sound] I was grossed out, but I knew I had to keep him happy because that's what Jeffrey and Ghislaine would expect from me.,

24.50
HRH [talking with Emily Maitliss]: There's a slight problem with the sweat because I I have a peculiar condition which is that I don't sweat. Well I didn't sweat at the time and that was. yes, I didn't sweat at the time because I had suffered what I would describe as an overdose of adrenalin in the Falklands war when I was shot at, er and I simply it was almost impossible for me to sweat.

25.22
HOST: Prince Andrew's response has been widely questioned. There are pictures of him from the same period where he appears to be sweating.
[camera zooms in on his armpit]



Virginia Roberts says her night out with the prince took a darker turn when they left the club. He's not with us, he's with the security guards.

PANORAMA -- BBC TRANSCRIPT CLEAN
2019.12.02 - (Incl D Boies)

And then in the car, Ghislaine tells me that I have to do for Andrew what I do for Jeffrey. And that made me sick. I just didn't expect it from Royalty. I didn't expect it from someone that people look up to and admire, you know, in the Royal Family.

[CUT TO EXTERIOR OF G'S HOUSE. IT IS RAINING {!}]
26:38
HOST: When they got back to the house, she says she asked Epstein to take a picture to show her family. She then carried out the instructions to entertain the prince.

26.56
VRGI: There was a bath and it started there. And then it led into the bedroom. It didn't last very long, the whole entire procedure. It was disgusting. He wasn't mean or anything. But he got up and he said thanks and walked out and I sat there in bed just horrified and ashamed and felt dirty and I had to get up and go have a shower. And the next day, Ghislaine tells me I did a really good job and she pats me on the back and says you made him really happy. [Pause. VRGI closes eyes, sighs, crying]
It was a wicked time in my life. It was a really scary time in my life. I had just been abused by a member of the Royal Family. So when you talk about these chains, you know, yeah I wasn't chained to a sink but these powerful people were my chains. I didn't know what happened. I didn't I couldn't comprehend how on the highest levels of the government; very powerful people were allowing this to happen not only allowing it to happen but participating in it. [Crying hard now].

HOST: Do you want to stop for a second?
VRGI If you don't mind just for a second for a tissue, I'm sorry.

28.24
HRH to Emily Maitlis: I can absolutely categorically tell you it never happened.

**Emily Maitlis**, News Night: Do you recall any kind of sexual contact with Virginia Roberts then?

HRH: None

Emily Maitlis: or at any other time?

2.49
HRH: None. Whatsoever.

28.38
HOST: Prince Andrew says it couldn't have happened because he has an alibi for the 10th March.

V28.44

# PANORAMA – BBC TRANSCRIPT CLEAN
2019.12.02 - (Incl D Boies)

HRH: I was home. I was with the children. I had taken Beatrice to a Pizza Express in Woking for a party at I suppose 4 or 5 in the afternoon. And then, because the Duchess was away, we have a simple rule in the family that when one's away, the other one is there.

## 29.11 EXTERIOR LONDON NIGHT RAINING

HOST: Prince Andrew says he deplores the exploitation of any human being and would not condone, participate in or encourage any such behavior. He says he can't remember ever meeting Virginia Roberts. So what about the photo?  [now outside 44 Kinnerton] The photograph was taken on the first floor of the house. Prince Andrew says he's been here but says he's never been up the stairs. The photo was first published in 2011 after a newspaper tracked Virginia Roberts down. They paid her $160,000 for her story. This year Palace sources started suggesting for the first time that the photo was a fake. But Prince Andrew stopped just short of that.

## 30.12

HRH: From the investigations that we've done, you can't prove whether or not that photograph is a fake or not because it is a photograph of a photograph of a photograph. That's me but whether that's my hand or whether that's the position, I , I . but I don't. I have simply no recollection of the photograph ever being taken.

## 30.36

DAVID BOIES [LAWYER FOR VICTIMS]: They have had this photograph for years. They just figured out that they think it's a forgery? If it wasn't a real photograph, what's the first thing they would have said years ago? Well that's not real.

30.50 External at Kinnerton – Again it's raining. We've spoken to the original photographer who copied the original photo in 2011. He has no doubt it's genuine. And we found evidence that backs that up. This is an affidavit from a man Virginia Roberts was dating in 2001.
Q. Did you see a photograph of her with Prince Andrew- -
A. Yes.

HOST: He says he saw the photograph back then.
And then in 2011, it was in a bundle of 20 photos Virginia Roberts gave the FBI. They were scanned front and back but only 19 were made public. The photo of Prince Andrew and Virginia Roberts was removed and so were the reference numbers. We've been told these missing numbers are for the Prince Andrew photo.

12

PANORAMA – BBC TRANSCRIPT CLEAN
2019.12.02. - (Incl D Boies)



31.49
HOST: Virginia Roberts says there's a date stamped on the back of the photo from when it was printed – the 13th March, 2001, two days after she left London.

32.04
VRGI: I think the world is getting sick of these ridiculous excuses. It's a real photo. I've given it to the FBI for their investigation and it's an authentic photo – with a date on the back of it from when it was er printed um, it's a real photo.

32.26
HOST: Virginia Roberts reported the events of that night in London to the Metropolitan Police force in 2015.

32.34
VRGI: I gave them all the details about that night with Prince Andrew and how the trafficking took place and what it looked like and they said ok well that's fantastic, thank you for letting us know. I said well what are you guys going to be able to do about it?

32.51:
HOST: She made an allegation that she was forcibly trafficked for sex with Prince Andrew. But the Met didn't investigate.

33.03:
DAI DAVIES – Former head of royal protection, Met Police: Scotland Yard should follow any available evidence which is credible or at least purports to be credible, against anyone involved to be sexually abusing and trafficking young ladies. None of us are above the law. If you and I were alleged to have committed this, I think the Metropolitan Police would have been knocking on our doors.

33.29
HOST: The Met says it always takes allegations of sexual exploitation seriously, but following legal advice, it decided it was not the appropriate authority to conduct enquiries focused outside

PANORAMA – BBC TRANSCRIPT CLEAN
2019.12.02 - (Incl D Boies)

the United Kingdom. The Met reviewed its decision after Epstein's death and it's position remains unchanged.

33.56
HOST: All told, how many times did you have sex in the circumstances that you describe with Prince Andrew?

34.02
VRGI There's 3 times

HOST: Where was that?

34.07
VRGI: Ghislaine's townhouse in London; Jeffrey's mansion in New York and Jeffrey's Island in the Caribbean.

34.24
HOST: This is Little Saint James [over video of the island], one of Jeffrey Epstein's two private islands in the Caribbean. Virginia Roberts says she was forced to take part in an orgy with Prince Andrew here in 2001. The prince admits visiting the Island, but he categorically denies any sexual contact

HOST CONTINUES:
34.51 [over picture of a young ███████████ with black hair]: Five years later, ████████████ was taken to the island. She thought Epstein was a benefactor who would support her though college.

35.04
█████████████ TO CAMERA: Great, going to a private island, private plane, this is something out of another world. This is something that the average person would never have the opportunity in their life ever, to experience.

35.17
HOST: It was her first big trip with Epstein. She says she was on his private jet when she realized a very different World.

35.35
█████████████: On the plane he started having full erotic sex in front of the entire plane. I thought that I was the mad one because everyone else found it completely normal. It was like making a cup of tea.

35.50
HOST: His home was stranger still.

35.54

PANORAMA – BBC TRANSCRIPT CLEAN
2019.12.02 - (Incl D Boies)

███████████████: There were very strange, the perspex box was full of condoms and it was very much set for orgies. The first few hours it was always being softened up and being shown how to massage properly. And then I noticed girls disappearing and I didn't really understand what was going on. You know it's not a very openly spoken about thing; and then it was my turn and then I was called into his room um where there was a massage table. Ummm he asked me to lie on the massage table and um he was going to give me a full body massage to show me how he liked it and because he's like it's all about doing a massage professionally and getting those knots out. And yeah, he started massaging me which is when he took out that this big vibrator and that's when he started um abusing me with um, sexual apparatus. And um yeah he raped me.

37.17
HOST: ████ ██████ stayed with Epstein for six months she says she was under his control. It was on the island [CUT TO PHOTO OF GM WITH JEAN-LUC BRUNEL WHOSE FACE IS BOCKED OUT] that she met Ghislaine Maxwell for the first time.

37.32
███████████████: So I'm just told that this woman is arriving, this is who she is, and you better stay well clear and do exactly what she asks you to do, exactly. I've never met someone that has been so dismissive of other human beings in my life - basically treated us like we were shit on her shoe.
The way she spoke to us, the way she bullied us right from the start.

38.01
HOST: In court documents ███████████ says it got so bad she wanted to escape the island but the couple had taken her passport.

38.11
███████████████: I was definitely going to swim off. I didn't care how who why what when, I was going to get off that island, but you can't there's no way off. [CUT TO PHOTO OF ███████████ & VRGI HOLDING EACH OTHER ON A SOFA]

38.27
HOST: There's no doubt ███████████ and Virginia Roberts are victims of Epstein. But there are inconsistencies in both women's accounts of how they were abused by Epstein's friends. ████ ██████ told a paper she had videos of Bill Clinton on the island, She then admitted this wasn't true. Virginia Roberts once claimed to have met Prince Andrew in New Mexico rather than on Epstein's island and and she hasn't always mentioned an orgy involving the prince. In 2015 Virginia Roberts claimed she had been forced to have sex with Alan Dershowitz too.

39.14
ALAN DERSHOWITZ:_ADER_ There's never been a #METOO case where the accuser and the accused didn't know each other. In my case it's the only one where there isn't a scintilla of evidence that I ever met this woman ever [emphasized] and overwhelming evidence that I couldn't have met her.

PANORAMA – BBC TRANSCRIPT CLEAN
2019.12.02 - (Incl D Boies)

39.29
HOST: Alan Dershowitz points to this email - it was sent to Virginia Roberts four years before she accused him. It's from a journalist who is advising her about a book deal. It says, 'don't forget Alan Dershowitz, JE's buddy and lawyer. good name for your pitch. you probably met him.'

HOST [TALKING TO DAVID BOIES]: There was an email exchange between a newspaper reporter and Virginie Roberts where it seemed the newspaper reporter is suggesting that Dershowitz be included as a potential offender.

40:07
DAVID BOIES: You have to ask the newspaper reporter why she would be suggesting that if she was suggesting it. I don't think she was suggesting that. I think she was reminding Virginia of something that Virginia had said previously. The real issues here are -was there a sex trafficking operation? Was Virginia a victim of that? Absolutely. Was she trafficked to a variety of people? Absolutely. There's never been any inconsistency about those central issues.

40.41
HOST: Alan Dershowitz says he only had one massage at Epstein's home and he kept his underwear on.

40.48
ALAN DERSHOWITZ [looking over his schedule]: I was in New York; I had dinner at Chung Lee Dynasty

HOST: He says he has detailed records that prove he wasn't in the places where the abuse was alleged.

41.02
ALAN DERSHOWITZ: One thing is crystal clear - the allegations against ME are totally made up. I never met these people I never touched them, I never had sex with them. I've never had sex with anyone other than my wife from the day I met Jeffrey Epstein. Totally, totally, totally false story.

41.21
HOST TALKING TO VRGI: People who say you are not telling the truth they point to inconsistencies in your tale, how do you account for those?

41.27
VRGI: You are left with a foggy memory sometimes you really are. So yeah, you know I might be wrong on dates, absolutely. I might be wrong on places even, sometimes, but one thing that I can tell you is you never forget the face of someone who has heaved over you.

41.55
HOST: Jeffrey Epstein abused girls and young women at all of his luxury homes. Many of his crimes were committed here in New York. Just imagine some young girl, some young woman

16

PANORAMA -- BBC TRANSCRIPT CLEAN
2019.12.02 - (Incl D Boies)

coming to New York for the first time into this world. And falling into the orbit of someone like Jeffrey Epstein. This is Epstein's house off Fifth Avenue. Virginia Roberts says that she met Prince Andrew here too. During the visit she says Ghislaine Maxwell brought out a Spitting Image puppet of the prince. This woman [Shows pic of ████████ ████████, has also said she was also there that night.



42.48
VRGI: Prince Andrew put the puppet on ████████ breast. Ghislaine was like. I want to take a picture of that; and they did, they took a picture and they were laughing about it. Like I said, it just goes to show how we were not even dignified as humans to them, we were just, we were there as toys, to be passed around.
43:13
HOST: In a court statement, ████████ confirms the puppet story but she has a slightly different version of events. [SHOWING EXTRACT OF ████████ DEPOSITION] She says ' I sat on Andrew's lap. and they took the puppet's hands and put it on Virginia's breast, and so Andrew put his on mine.



Virginia Roberts says she was ordered to have sex with the prince later that evening – a claim he denies.

43.46
HRH talking to Emily Maitlis: I'm staying with the Consul- General which is further down the street on Fifth, so I wasn't, I wasn't staying there. I may have visited, but [shaking head]. but no. Definitely no, no no activity.

44.10

PANORAMA – BBC TRANSCRIPT CLEAN
2019.12.02 - (Incl D Boies)

VOICE OF PALM BEACH POLICE over Palm Beach police footage: This is exit photographs, it is now 2.15pm.

44.19
HOST: In 2005, Epstein's prolific abuse finally caught up with him. This is footage from a police search of Epstein's Palm Beach home – a house Prince Andrew admits he visited four times. Some walls are decorated with pictures of naked young women. The police also found hidden cameras and recording equipment. Epstein was being investigated for "Unlawful sex acts with 4 minors", but it wasn't made public.  In July 2006, Prince Andrew invited him to Windsor Castle again. Epstein was a guests at Beatrice's 18th birthday party. Palm Beach police were waiting to arrest him when he returned, but the charge had been reduced to solicitation of prostitution.

45.44
ALAN DERSHOWITZ: Well he called me and said he needed me to be his lawyer, I said what for and he told me and I said oh my God, did you do that?? And he then told me that he had had massages. He underplayed the story very, very much, but that was the first hint or inkling that he had done anything wrong.

46.04
HOST: Epstein's arrest was made public but that doesn't seem to have put Prince Andrew off. Six weeks later, flight logs show the prince and Ghislaine Maxwell flew to Edinburgh in Epstein's private jet. By 2008, Epstein was being accused of sex crimes by dozens of underage girls. Alan Dershowitz would help negotiate a secret plea deal. Epstein pleaded guilty to two prostitution charges and served just 13 months in prison.

46.42
SPENCER KUVIN, [LAWYER FOR VICTIMS]:  We could never understand why the US Attorney's office gave him such a sweetheart deal. At the end of the day I don't think it was just his money and power because people who are powerful and have a lot of money are prosecuted regularly here in the United States if they have done something wrong. This was something else it just didn't make sense.

47.03
HOST:  The plea deal also barred the prosecution of anybody who'd helped Epstein. It was later found to be unlawful because it violated the rights of his victims.
By December 2010, Epstein was free, and Prince Andrew attended the convicted sex offender's 'welcome home dinner party. The prince stayed at Epstein's New York mansion for five days.

47.47
DAI DAVIES. FORMER HEAD OF ROYAL PROTECTION, MET POLICE: I would hope that if Prince Andrew was taking advice from anyone, somebody would've warned him of the consequence and his reputation, and if anyone knew that he was continuing to associate with a known convicted pedophile surely common sense would've said 'stop it'.
The prince and the pedophile took a walk in Central Park and a second infamous photo was taken. At the time the prince's former wife, Sarah Ferguson, suggested the prince was sorting out a 15,000 pound loan for her. The prince now says he went to New York because he thought

18

PANORAMA – BBC TRANSCRIPT CLEAN
2019.12.02 - (Incl D Boies)

he should end his friendship with Epstein in person. But why did he stay with a convicted sex offender for five days?

48:50
HRH TALKING TO EMILY MAITLIS: It was a convenient place to stay. At the end of the day with the benefit of all hindsight that one could have, it was definitely the wrong thing to do. But at the time I felt it was the honorable and right thing to do and I, I admit fully that my judgment was probably colored by my tendency to be too honorable but that's just the way it is.

49.22
HOST: Prince Andrew also kept in contact with Ghislaine Maxwell. She was first publicly named as a sex abuser in court documents back in 2009, but the prince didn't end their friendship. Our evidence suggests he even asked for her help in dealing with Virginia Roberts claims. We found an email the prince sent to Ghislaine Maxwell in 2015. It was buried in thousands of pages of legal documents that have been filed in America. The email is short but significant. The prince tells Ghislaine Maxwell 'let me know when we can talk got some specific questions to ask you about Virginia Roberts'. She replies 'have some info - call me when you have a moment'. Three days later Ghislaine Maxwell sent Alan Dershowitz what she calls a dossier of inconsistencies and inaccuracies and articles about Virginia Roberts. She repeatedly comments on stories about the prince and that visit to her London home.
You'd expect Ghislaine Maxwell to simply say it never happened, the prince never met Virginia Roberts. The photo is a fake. But she doesn't do that. She never disputes that Virginia Roberts was in her house and took a photo with Prince Andrew. In April this year, [2019] new sex abuse allegations were made against Epstein and Ghislaine Maxwell. The story was widely reported but in June, Prince Andrew met his old friend Ghislaine Maxwell once again.

51.19
EMILY MAITLIS TO HRH: Did you discuss Epstein at all then?

HRH: No. Actually, funnily enough, no, not at all. There wasn't anything to discuss about him because he wasn't in the news, it was just we'd moved on.

51.42
HOST: In July Jeffrey Epstein was arrested and charged with sex trafficking. A month later, he'd killed himself. Ghislaine Maxwell is now herself being investigated by the FBI. They are interviewing Epstein's victims about her. 9 women have also made complaints against her in civil court cases.

52.17
█████████████████: Ghislaine controlled the girls - she was like the Madam - she was like the nuts and bolts of the sex trafficking operation. She'd always visit Jeffrey on the island – make sure the girls were doing what they were supposed to be doing.

52:37
VRGI: Jeffrey had a sickness, right, he had a sickness that could not be cured, and he does not belong in society at all. But Ghislaine had a viciousness to her, she had a really mean streak about her so the more pain you went through, the more pain she got off.

PANORAMA – BBC TRANSCRIPT CLEAN
2019.12.02 - (Incl D Boies)


52:57
HOST: Another of Prince Andrew's friends could now face sex trafficking charges.

53.04
DAVID BOIES: I must say I think she is very culpable. She was a central part of the Epstein sex trafficking operation.  Er she played a important role in recruiting, grooming, manipulating.

53.20
HOST: She denies all of this of course.

53.22-53.24 SILENCE
DAVID BOIES [STARES AT CAMERA]: Um
53.24-53.34 SILENCE STARING AGAIN AT CAMERA
53.34 –
DVID BOIES: If you say so.

HOST: Am I miss characterizing her response?

53.37
DAVID BOIES: Well no, I think, I think I think that's probably fair in some respects. Um er, there was a um a deposition, multiple depositions that were tak, that were er um, she gave in the case we bought against her. Er those depositions are sealed.

54.01
HOST: Some of those sealed court statements may soon be made public. In the documents that are already public Ghislaine Maxwell says the allegations are lies. She denies abusing or trafficking any women.  If Ghislaine Maxwell is prosecuted prince, Andrew could be a crucial witness. He's already been asked twice by the victims 'lawyers for an interview, but he hasn't replied to the letters.

54.35
DAVID BOIES: One of the things that we've tried and actually tried in in in quite a respectful way, um, to do, is to interview Prince Andrew and try to get what his explanation is! He was a frequent visitor, he ought to submit to an interview.  He ought to talk about it.

55.07
HOST: We have discovered that five more women want Prince Andrew to testify in court. They say he witnessed how young women were giving massages at Epstein's homes.  Subpoenas have been prepared in all five cases; and that means that the next time Prince Andrew visits the States, he faces being ordered to give evidence whether he likes it or not.

55.45
SPENCER KUVIN: I have no doubt if he comes here to United States that he likely will have to answer to someone whether it be the US attorney's office or under subpoena by another attorney here.

PANORAMA – BBC TRANSCRIPT CLEAN
2019.12.02 - (Incl D Boies)


55.54
HOST: The prince told Panorama he's willing to help any appropriate law-enforcement agency with their investigations if required. He says Epstein's suicide has left many unanswered questions, particularly for his victims. He says he deeply sympathize with those affected and hopes that in time they will be able to rebuild their lives. And it is emphatically denied that he had any form of sexual contact or relationship with Virginie Roberts.

56.41
HOST CONTINUES: One of America's most prolific sex offenders was never brought to justice.

56.50
EMILMAITLIS: Do you regret the whole friendship with Epstein?

HRH: Now, still not. For the reason being is that the people that I met and the opportunities that I was given to learn either by him or because of him, were actually very useful.

57.13
DAVID BOIES: With respect to Prince Andrew, I think he needs to come clean and I think the facts need to be revealed. No one is above the law, not the president of the United States, not a prince of the United Kingdom.

57.31
HOST: Prince Andrew now says he unequivocally regrets his ill-judged association with Jeffrey Epstein.

57.45
VRGI: The people on the inside are going to keep coming up with these ridiculous excuses like the photo is doctored or he came to New York to break up with Jeffrey Epstein. I mean come on, I'm calling BS on this because that's what it is. He knows what happened I know what happened and there's only one of us telling the truth and I know that's me.

58.13
HOST: The next time Prince Andrew tells his story, it may be as a witness under oath. The sex life and honesty of a Senior Royal will be under scrutiny as never before.

E N D

# EXHIBIT 64

PANORAMA – BBC TRANSCRIPT CLEAN
2019.12.02 - (Incl D Boies)

PANORAMA – BBC TRANSCRIPT CLEAN
DECEMBER 2, 2019  (Incl David Boies & Virginia  Guiffre)

HOST, DARRAGH MACINTYRE: Tonight, on Panorama we hear from a woman who says she was trafficked to a prince for sex.

0.12
CUT to Virginia _VRGI _speaking to camera:
He got up and he said thanks. I sat there in bed just horrified and ashamed and felt dirty.

HOST V/O: Prince Andrew insists it isn't true.

0.25
PRINCE ANDREW _HRH_ talking to Emily Maitlis - I can absolutely, categorically tell you, it never happened.

0.30
VRGI: He knows what happened. I know what happened and there's only one of us telling the truth and I know that's me.

HOST: Tonight, we reveal how another 5 women want to call Prince Andrew as a witness to events in Jeffrey Epstein's homes.

0:48
DAVID BOIES_DBOI_ [to camera]: With respect to Prince Andrew, I think he needs to come clean, and I think the facts need to be revealed.

0.56
GHISLAINE MAXWELL_GMAX [ OLD VIDEO - about to do an interview about Terra Mar]: How does it look, does it all look is my hair good?

0.59
HOST: We investigate the woman Prince Andrew still calls his friend.

1.04
███████████████████ : Ghislaine controlled the girls - she was like the Madam - she was like the nuts and bolts of the sex trafficking operation.

V/O And we uncover new information about the photo at the heart of a royal scandal.

1.19
VRGI: It's a real photo, I've given it to the FBI for their investigation and it's an authentic photo.

**PANORAMA GRAPHIC – THE PRINCE AND THE EPSTEIN SCANDAL**

1.44

## PANORAMA – BBC TRANSCRIPT CLEAN
2019.12.02 - (Incl D Boies)

VRGI: The world that I was living in, it was not glamorous. It was not pretty. I might have been meeting some of the most famous people in the world, but it didn't matter to me because these are bad people who were hurting me.

2.06
HOST: VG is now a married mom of three. Her life today couldn't be more different than when he was the teenage Virginia Roberts.

2.18
VRGI: It was a fancy cage, but it didn't make it better, it didn't make it easier to do what I had to do

2:23
HOST: She's the woman who says she was trafficked to London to have sex with Prince Andrew. Her allegations have created a crisis for the Royal Family. And Prince Andrew's interview on News Night made it worse.

2.43
**Emily Maitlis**, News Night: Do you recall any kind of sexual contact with Virginia Roberts then?

HRH: None

Emily Maitlis: or at any other time?

2.49
HRH: None. Whatsoever. I have no recollection of ever meeting this lady. I admit fully that my judgement was probably colored by my um, tendency to be too honorable.

3.14
HOST: The Prince's interview has been widely judged to have been disastrous. The backlash has forced him to step away from public life and it has cast a shadow over the whole royal family. Now the woman making the allegations wants the people in the UK to hear her side. She spoke to Panorama before Prince Andrew went public. She's since told us she stands by every word.

3.48
VRGI: I implore the citizens in the UK to stand up beside me to help me fight this fight – to not accept this as being ok. This is not some sordid sex story, this is a story of being trafficked. This is a story of abuse, and this is a story of your guys' royalty.

4.20
HOST: To really understand about Virginia Robert's story, you need to understand the princes' friendship with a prolific sex offender

2

# PANORAMA – BBC TRANSCRIPT CLEAN
2019.12.02 - (Incl D Boies)

OVER VIDEO OF A DEPOSITION OF JEFFREY EPSTEIN: Do you solemnly swear the testimony you will give today will be the truth, the whole truth and nothing but the truth so help you God.

Jeffrey Epstein:  Yes I do

ATTY Q [Spencer Kuvin].: Could you please give us your name.

Jeffrey Epstein: Jeffrey Epstein

4.43
HOST:  Wealthy financier Jeffrey Epstein was accused of sexual assault by more than 30 underage girls in 2006. He was convicted, then released after just 13 months in jail. Then earlier this year he was charged with sex trafficking. But he took his own life in custody before his victims got justice.

5.11
███████████████_CDAV_ON THE COURTHOUSE STEPS [27 Aug 2019]: It's pretty upsetting to see how many lives he's devastated and to see how long this has been going on for and nobody did anything about it.

5.25
HOST: For over a decade, Prince Andrew visited Epstein at his homes in Florida, New York and the Caribbean.  He even traveled on one of Epstein's private planes.

5.39
HRH [SPEAKING TO EMILY MAITLIS ON NEWSNIGHT: He had the most extraordinary ability to bring um extraordinary people together er and that's the bit that I remember is going to the dinner parties where you would meet academics, politicians, people from the United Nations,

SCENE AT ONE OF JEFFREY EPSTEIN'S DEPOSITIONS – V/O of Spencer Kuvin: We have tried to cooperate in said deposition,

6.00
SPENCER KUVIN_SKUV_: I think the best way to describe Jeffrey Epstein would be that he was just creepy. He would use his power to he would use his money to convince these young girls that really didn't know any better, to engage in some things that they just would have otherwise hopefully never have done.

6.26
HOST: [host driving in Palm Beach past Royal Palm Beach High School]: This is where Epstein found many of his youngest victims, Royal Palm Beach High School in Florida. He recruited schoolgirls and paid them to give him and his guests, massages. ████████████, was approached when she was 16.

6.50

# PANORAMA – BBC TRANSCRIPT CLEAN
2019.12.02 - (Incl D Boies)

[REDACTED]: I knew a girl in high school – she said want to make a little bit of money? I know a rich man who lives in downtown west palm – he pays girls to give him a naked massage in the nude. And I'm thinking, well that sounds awful easy you know, how much? $300 for an hour. I'm thinking to myself well, ok, I said OK, how do we set it up? That was when she said oh no, I'm not looking for you, but what you would do is find someone else.



What exactly was the profile he was looking for?

7.30
[REDACTED] Teenage young girls, slim body figure. Small breasts.

HOST: in 2005 the parents of a 14year old girl called the police to report Epstein.

07:45
MINOR WOMAN V/O ON TAPE: They start off by giving this gentleman a massage and he pays them and if he likes them, and he thinks they are pretty enough he keeps them around to do other things. OK.

HOST: The police had recorded the first interviews with Epstein's young victims.

8.08
VOICE OF OTHER MINOR WOMAN: You were at my house last night. I didn't really tell the whole truth about Jeffrey because my parents were there.

HOST: The recordings paint a sordid picture of Prince Andrew's friend.

8.21
MINOR WOMAN: I wore a skirt and a regular T-Shirt and I was massaging his legs and he asked me to take off my skirt.

V/O. Epstein would send taxis to collect the girls from school. They were brought here to his house in Palm Beach where he abused them.

8.48
MINOR WOMAN VOICE: I had problems with it the first time but $200 for 40 minutes. that was a lot for a 16year old girl making $6 an hour.

9.05

4

PANORAMA – BBC TRANSCRIPT CLEAN
2019.12.02 - (Incl D Boies)

HOST: Many of Epstein's young victims came from troubled backgrounds. You think of gitz, glamor, beach and money. But not all of Palm Beach is like that. Places like here just a couple of miles away from Jeffrey Epstein's home. this is where many of the girls, many of the victims he chose – this is where they came from.
[OVER SHOTS OF SPENCER KUVIIN AT HIS DESK] Lawyer  Spencer Kuvin represented some of the first girls to come forward. He put their allegations to
Epstein in filmed testimony.

09:47
SPENCER KUVIN: Sir, aeccording to the police departments probable cause affidavit one witness described your penis as egg-shaped  these are not my words, I apologize but as Mr. Critten has stated – [The Deposition is stopped]
10.08
He would frequently say through his lawyers. I don't understand why everybody so upset at me, you know these young girls came voluntarily I didn't drug them I didn't force them into any of this and they got money out of it as well. completely ignoring the fact that they are 14,15 years old.

10.24
HOST: It was a pattern of behavior that spanned decades and Jeffrey Epstein may not have acted alone. In the 1990s he started dating Ghislaine Maxwell soon after the death of her father the newspaper Baron Robert Maxwell.

10:44
V/O GHISLAINE MAXWELL ON VIDEO about to give an interview about TerraMar:  Is it all good, is my hair good,

10:50
CONCHITA SARNOFF _CSAR_AUTHOR OF BOOK ON EPSTEIN]: I think perhaps the trauma of her father's death left Ghislaine quite  uneasy and feeling unprotected and I think that is one of the reasons why she gravitated toward Epstein and stayed with him for so long.

11.10
HOST:  some of Epstein's victims also blame Ghislaine Maxwell for what happened.
11.17
███████ ██████████████: There wasn't Jeffrey or wasn't Ghislaine, they, they they fed off each other they literally they would feed off each other's energy.

HOST: ████ ████████: was 22 when Epstein enticed her into his circle

11.43
███████████: She was his right hand woman. his right hand lieutenant, you know she was the one getting all the girls in chee. She knew what Jeffrey liked, she helped maintain Jeffrey's standard intimidation. by intimidating the girls so so this was very much a joint effort.

12.08

PANORAMA – BBC TRANSCRIPT CLEAN
2019.12.02 - (Incl D Boies)

HOST: Ghislaine Maxwell also happens to be one of prince Andrew's oldest friends he's known her for more than 30 years. She was a socialite who introduced Epstein to the rich and powerful.

12:25
CONCHITA SARNOFF: Ghislaine was the one who introduced him, she introduced him to Peter Mandelson, she introduced him to prince Andrew I understand she forged the relationship with President Clinton; er she introduced him to many, many people that he eventually became friendly with him.

12:43
HOST: In July 1999 G Ghislaine Maxwell and Epstein visited the Prince at Balmoral. The next summer he invited them to Royal birthday celebrations at Windsor Castle. The day after, the prince took them to Ascot. These pictures have never been published before. In December that year, the couple was invited to Sandringham for a shooting weekend. Prince Andrew says it was always more about Ghislaine Maxwell than Epstein.

13.31
HRH [SPEAKING TO EMILY MAITLISS]: It was his girlfriend that was the key element in this. He was the, as it were, the plus one to some extent.

 HOST: It was Ghislaine Maxwell who introduced Virginia Roberts to Epstein. She was exactly the kind of vulnerable girl he preyed on.

13.54
VRGI: I was abused from a very young age, from 7 years old and um, my childhood was quickly taken away for me. I was just so mentally scarred already at such a young age and then I ran away from that. I found nothing on the streets except for hunger and pain and abuse. And er, and it was scary, I wanted to get out of it.

14:29
HOST: In 2000 Virginia Roberts was working as a locker room attendant at Donald Trump's Mar a Lago Resort in Palm Beach. She was just turning 17 and was getting her life together. Then Ghislaine Maxwell offered her the chance to train as a massage therapist.

VRGI: I ran over to my dad who works on the tennis courts at Mar a Lago, and he he knows I'm trying to fix up my life at that point which is why he got me the job there and I said, you're not going to believe it Dad, I just got offered a job, an interview, but if he likes me for the interview then I'm gonna be they are going to train me as a masseuse, as a real massage therapist.

15.14
HOST: Virginia Roberts went to Epstein's Palm Beach home for the interview.

15:21
VRGI: Ghislaine walks me up the stairs and there's this naked guy laying on a massage  table in the middle of the room so although there was a naked man laying on the table. I thought this is

PANORAMA – BBC TRANSCRIPT CLEAN
2019.12.02 - (Incl D Boies)

just how they do it, I suppose. He looked up at Ghislaine, so she's like here, here's the lotions, here's the oils. Put your lotions and your oils always on your arm, always keep your hand on the person you massaging and start with one foot and she'll get the other foot, and then we'll work together so you just mimic my movements. So that thought went fleeting from my head like that was strange cos we are doing this massage now. Through that time I mean they were asking me questions about who I was and you know how I got to work in Mar a Lago, and I really wanted them to know how important it was to me to nail this interview and possibly be educated to become a real massage therapist. And they seemed like nice people so I trusted them; and I told them I had a really hard time in my life up until then. I had been a run-away, I've been sexually abused, I've been physically abused. I've had a really hard [unintelligible word] and um, that was the worst thing that I could've told them because now they knew how vulnerable I was.

It was like a gift for them that's exactly what they needed, that's exactly what they wanted and they got it.

So they told me to take my clothes off and already nude and Ghislaine takes her clothes off and Epstein's already nude; and um, they start touching me and they asked me to do things for him and um, then I just I did. I fell right into the back of that circle. I thought this is just what life's about – this must be what life's about because I have never had somebody just take me in and say that they're going to do something and not do something. So yeah I was his real big kick in the gut in the face of reality that I just succumbed all I know so I let them abuse me and it was a face of reality that I just succumbed to, it's all I had known. [Crying ] So I let them abuse me and I did what they told me to do.

17.53
HOST: She would be trapped with Epstein for almost 2 years before she broke away. In court papers, Ghislaine Maxwell calls Virginia Roberts a liar and denies assaulting her. But she admits she arranged massages for Epstein. This note [over image of list of first names

PANORAMA – BBC TRANSCRIPT CLEAN
2019.12.02 - (Incl D Boies)

names] later recovered from the Palm Beach house by the police shows Epstein had a list of women who were paid to massage him and his guests. Many of them were teenagers.

I just gassed many of them were teenagers Mike works as a handyman and Epstein street are used to see the girls come and go I have no idea it was just one a day, when I would see him coming our way back there was a lot of girls going on exactly what was going on I knew that the people I work for a new what was going on and most of all the people on the street knew what was going on prince  Andrew was a visitor here too

18.27
HOST WALKING ALONG EPSTEIN'S STREET WITH A HANDYMAN – Mike Pezzulo - works as a handyman on Epstein's street. He used to see the girls come and go.

HANDYMAN: Sometimes 3 or 4 a day, I have no idea. But they I would see them coming from way back. There was a lot of girls coming.

HOST: What did you think was going on?

HANDYMAN: Exactly what was going on. I knew that the people I worked for knew what was going on. And most of all the people on this street knew what was going on.

19.10
HOST: Prince Andrew was a visitor here too.  In legal papers, Epstein's former housekeeper says, Prince Andrew spent weeks with us.  He's asked if the prince would frequently have massages. The housekeeper says I would say daily massages. We asked Prince Andrew whether he ever had a massage while he was visiting here. He didn't answer our question.  Many of the allegations concerning the Prince are based on statements made in court cases. When they were released the Judge warned that the statements did not reflect the court's findings and that legal filings could be untrue. Prince Andrew says he neve saw anything suspicious at Epstein's homes.

20.16
VOICE OF ALAN DERSHOWITZ [POINTING OUT NY VIEWS TO HOST]: That's the United Nations

20.22
HOST: And so does another well connected guest.

20.28
ALAN DERSHOWITZ: We met in his homes with many, many people for conferences. None of us had any [emphasized] suspicion that he was leading a private life involving young women. We just had no hint of that.  He always had a taste for beautiful women, but in their middle to late twenties and thirties. We never ever saw him or suspected that he was involved with teenagers.

20.52

8

PANORAMA – BBC TRANSCRIPT CLEAN
2019.12.02 - (Incl D Boies)

HOST: Through his friendship with Epstein, Alan Dershowitz also got to meet the prince. The lawyer still has a letter that Prince Andrew wrote after attending one of his Harvard lectures – [Letter shown] in 1999.

21.05
ALAN DERSHOWITZ: This is the letter, I have it. And he ends the letter with 'I look forward to continuing my intellectual challenge with you and Jeffrey E, Epstein. in the coming months.

HOST: Wow. Well he certainly regarded you as someone to learn from

ALAN DERSHOWITZ: Well, he enjoyed the experience very much, he called it a fantastic experience

HOST: And also Jeffrey Epstein.

ALAN DERSHOWITZ: Yes. He clearly looked to Jeffrey Epstein as somebody who could help educate him, in matters of finance or anything else, I don't know.

21.41
HOST: Epstein didn't just charm lawyers and princes. He was welcomed into the houses of the rich and powerful around the world. And there was a constant stream of visitors to his homes. 9 of Epstein's victims say he forced them to have sex with other people as well.

22.15
VRGI It went from just being abused by Epstein to then being passed around like a platter. Like a platter of fruit. It was always explicit that there was the massage aspect of it. The majority of the times people did want the massage first and then they wanted to um to have intercourse or whatever they needed or wanted that day, sexually to happen.

22.53
HOST: Virginia Roberts was taken around the world by Epstein.

23.00
VRGI: I was flying on private jets. I'm going places I never imagined I would go to . He took her to parties for the rich and famous. In 2001, Epstein brought the 17 year old to London. They arrived on the 9th of March and left 2 days later. Virginia Roberts stayed here at GM's house. And she says, Prince Andrew came to visit.

EXTRACTS
00.03: [GRAPHIC AS VRS IS SHOWN WALKING IN STREET]
Virginia says she was bought to London in 2001 [OVER ALLEGED PHOTO OF HRH W VR + GM] when she was 17 and met Prince Andrew.

23.45

PANORAMA – BBC TRANSCRIPT CLEAN
2019.12.02 - (Incl D Boies)

VRGI We are having tea and Andrew is talking about Fergie, which is his ex-wife at that point and Ghislaine is bad-mouthing Fergie as well. Epstein's just socially awkward [rolling her eyes] he's laughing about everything. I was just sitting there like I was always told to do. Just sit there and don't talk unless you are talked to. Be polite and laugh at everything  someone says when they are trying to be funny. It seemed like friends just catching up.

24:16
HOST: According to Virginia Roberts, the prince then went her to Tramp Night Club. He asked me to dance.  He is the most hideous dancer I've ever seen in my life. I mean it was horrible and this guy [holding up her hands with fingers outstretched] was sweating all over me, like his sweat, it was raining basically, everywhere. It was just like [makes vomiting sound] I was grossed out,  but I knew I had to keep him happy because that's what Jeffrey and Ghislaine would expect from me.,

24.50
HRH [talking with Emily Maitliss]: There's a slight problem with the sweat because I I have a peculiar condition which is that I don't sweat. Well I didn't sweat at the time and that was. yes, I didn't sweat at the time because I had suffered what I would describe as an overdose of adrenalin in the Falklands war when I was shot at, er and I simply it was almost impossible for me to sweat.

25.22
HOST: Prince Andrew's response has been widely questioned. There are pictures of him from the same period where he appears to be sweating.
[camera zooms in on his armpit]



Virginia Roberts says her night out with the prince took a darker turn when they left the club. He's not with us, he's with the security guards.

## PANORAMA -- BBC TRANSCRIPT CLEAN
2019.12.02 - (Incl D Boies)

And then in the car, Ghislaine tells me that I have to do for Andrew what I do for Jeffrey. And that made me sick. I just didn't expect it from Royalty. I didn't expect it from someone that people look up to and admire, you know, in the Royal Family.

[CUT TO EXTERIOR OF G'S HOUSE. IT IS RAINING {!}]
26:38
HOST: When they got back to the house, she says she asked Epstein to take a picture to show her family. She then carried out the instructions to entertain the prince.

26.56
VRGI: There was a bath and it started there. And then it led into the bedroom. It didn't last very long, the whole entire procedure. It was disgusting. He wasn't mean or anything. But he got up and he said thanks and walked out and I sat there in bed just horrified and ashamed and felt dirty and I had to get up and go have a shower. And the next day, Ghislaine tells me I did a really good job and she pats me on the back and says you made him really happy. [Pause. VRGI closes eyes, sighs, crying]
It was a wicked time in my life. It was a really scary time in my life. I had just been abused by a member of the Royal Family. So when you talk about these chains, you know, yeah I wasn't chained to a sink but these powerful people were my chains. I didn't know what happened. I didn't I couldn't comprehend how on the highest levels of the government; very powerful people were allowing this to happen not only allowing it to happen but participating in it. [Crying hard now].

HOST: Do you want to stop for a second?
VRGI If you don't mind just for a second for a tissue. I'm sorry.

28.24
HRH to Emily Maitlis: I can absolutely categorically tell you it never happened.

**Emily Maitlis**, News Night: Do you recall any kind of sexual contact with Virginia Roberts then?

HRH: None

Emily Maitlis: or at any other time?

2.49
HRH: None. Whatsoever.

28.38
HOST: Prince Andrew says it couldn't have happened because he has an alibi for the 10th March.

V28.44

PANORAMA – BBC TRANSCRIPT CLEAN
2019.12.02 - (Incl D Boies)

HRH: I was home, I was with the children. I had taken Beatrice to a Pizza Express in Woking for a party at I suppose 4 or 5 in the afternoon. And then, because the Duchess was away, we have a simple rule in the family that when one's away, the other one is there.

29.11 EXTERIOR LONDON NIGHT RAINING

HOST: Prince Andrew says he deplores the exploitation of any human being and would not condone, participate in or encourage any such behavior. He says he can't remember ever meeting Virginia Roberts. So what about the photo?  [now outside 44 Kinnerton] The photograph was taken on the first floor of the house. Prince Andrew says he's been here but says he's never been up the stairs.  The photo was first published in 2011 after a newspaper tracked Virginia Roberts down. They paid her $160,000 for her story. This year Palace sources started suggesting for the first time that the photo was a fake. But Prince Andrew stopped just short of that.

30.12
HRH: From the investigations that we've done, you can't prove whether or not that photograph is a fake or not because it is a photograph of a photograph of a photograph. That's me but whether that's my hand or whether that's the position. I . I , but I don't, I have simply no recollection of the photograph ever being taken.

30.36
DAVID BOIES [LAWYER FOR VICTIMS]: They have had this photograph for years. They just figured out that they think it's a forgery? If it wasn't a real photograph, what's the first thing they would have said years ago? Well that's not real.

30.50 External at Kinnerton – Again it's raining. We've spoken to the original photographer who copied the original photo in 2011. He has no doubt it's genuine. And we found evidence that backs that up. This is an affidavit from a man Virginia Roberts was dating in 2001.
Q. Did you see a photograph of her with Prince Andrew- -
A. Yes.

HOST: He says he saw the photograph back then.
And then in 2011, it was in a bundle of 20 photos Virginia Roberts gave the FBI. They were scanned front and back but only 19 were made public. The photo of Prince Andrew and Virginia Roberts was removed and so were the reference numbers. We've been told these missing numbers are for the Prince Andrew photo.

PANORAMA – BBC TRANSCRIPT CLEAN
2019.12.02 - (Incl D Boies)



31.49
HOST: Virginia Roberts says there's a date stamped on the back of the photo from when it was printed – the 13th March, 2001, two days after she left London.

32.04
VRGI: I think the world is getting sick of these ridiculous excuses. It's a real photo. I've given it to the FBI for their investigation and it's an authentic photo -- with a date on the back of it from when it was er printed um, it's a real photo.

32.26
HOST: Virginia Roberts reported the events of that night in London to the Metropolitan Police force in 2015.

32.34
VRGI: I gave them all the details about that night with Prince Andrew and how the trafficking took place and what it looked like and they said ok well that's fantastic, thank you for letting us know. I said well what are you guys going to be able to do about it?

32.51:
HOST: She made an allegation that she was forcibly trafficked for sex with Prince Andrew. But the Met didn't investigate.

33.03:
DAI DAVIES – Former head of royal protection, Met Police: Scotland Yard should follow any available evidence which is credible or at least purports to he credible, against anyone involved to be sexually abusing and trafficking young ladies. None of us are above the law. If you and I were alleged to have committed this, I think the Metropolitan Police would have been knocking on our doors.

33.29
HOST: The Met says it always takes allegations of sexual exploitation seriously, but following legal advice, it decided it was not the appropriate authority to conduct enquiries focused outside

13

PANORAMA – BBC TRANSCRIPT CLEAN
2019.12.02 - (Incl D Boies)

the United Kingdom. The Met reviewed its decision after Epstein's death and it's position remains unchanged.

33.56
HOST: All told, how many times did you have sex in the circumstances that you describe with Prince Andrew?

34.02
VRGI There's 3 times

HOST: Where was that?

34.07
VRGI: Ghislaine's townhouse in London; Jeffrey's mansion in New York and Jeffrey's Island in the Caribbean.

34.24
HOST: This is Little Saint James [over video of the island], one of Jeffrey Epstein's two private islands in the Caribbean.  Virginia Roberts says she was forced to take part in an orgy with Prince Andrew here in 2001. The prince admits visiting the Island, but he categorically denies any sexual contact

HOST CONTINUES:
34.51 [over picture of a young ▮▮▮▮▮▮▮▮ with black hair]: Five years later, ▮▮▮▮▮▮▮▮ was taken to the island. She thought Epstein was a benefactor who would support her though college.

35.04
▮▮▮▮▮▮▮▮ TO CAMERA: Great, going to a private island, private plane, this is something out of another world. This is something that the average person would never have the opportunity in their life ever, to experience.

35.17
HOST: It was her first big trip with Epstein. She says she was on his private jet when she realized a very different World.

35.35
▮▮▮▮▮▮▮▮: On the plane he started having full erotic sex in front of the entire plane. I thought that I was the mad one because everyone else found it completely normal. It was like making a cup of tea.

35.50
HOST: His home was stranger still.

35.54

14

PANORAMA – BBC TRANSCRIPT CLEAN
2019.12.02 - (Incl D Boies)

████████████: There were very strange, the perspex box was full of condoms and it was very much set for orgies. The first few hours it was always being softened up and being shown how to massage properly. And then I noticed girls disappearing and I didn't really understand what was going on. You know it's not a very openly spoken about thing; and then it was my turn and then I was called into his room um where there was a massage table. Ummm he asked me to lie on the massage table and um he was going to give me a full body massage to show me how he liked it and because he's like it's all about doing a massage professionally and getting those knots out. And yeah, he started massaging me which is when he took out that this big vibrator and that's when he started um abusing me with um, sexual apparatus. And um yeah he raped me.

37.17
HOST: ████████ stayed with Epstein for six months she says she was under his control. It was on the island [CUT TO PHOTO OF GM WITH JEAN-LUC BRUNEL WHOSE FACE IS BOCKED OUT] that she met Ghislaine Maxwell for the first time.

37.32
████████████: So I'm just told that this woman is arriving, this is who she is, and you better stay well clear and do exactly what she asks you to do, exactly. I've never met someone that has been so dismissive of other human beings in my life - basically treated us like we were shit on her shoe.
The way she spoke to us, the way she bullied us right from the start.

38.01
HOST: In court documents ████████ says it got so bad she wanted to escape the island but the couple had taken her passport.

38.11
████████████: I was definitely going to swim off. I didn't care how who why what when, I was going to get off that island, but you can't there's no way off. [CUT TO PHOTO OF ████████ & VRGI HOLDING EACH OTHER ON A SOFA]

38.27
HOST: There's no doubt ████████ and Virginia Roberts are victims of Epstein. But there are inconsistencies in both women's accounts of how they were abused by Epstein's friends. ████████ told a paper she had videos of Bill Clinton on the island, She then admitted this wasn't true. Virginia Roberts once claimed to have met Prince Andrew in New Mexico rather than on Epstein's island and and she hasn't always mentioned an orgy involving the prince. In 2015 Virginia Roberts claimed she had been forced to have sex with Alan Dershowitz too.

39.14
ALAN DERSHOWITZ:_ADER_ There's never been a #METOO case where the accuser and the accused didn't know each other. In my case it's the only one where there isn't a scintilla of evidence that I ever met this woman ever [emphasized] and overwhelming evidence that I couldn't have met her.

15

PANORAMA -- BBC TRANSCRIPT CLEAN
2019.12.02 - (Incl D Boies)

39.29
HOST: Alan Dershowitz points to this email - it was sent to Virginia Roberts four years before she accused him. It's from a journalist who is advising her about a book deal. It says, 'don't forget Alan Dershowitz, JE's buddy and lawyer. good name for your pitch. you probably met him.'

HOST [TALKING TO DAVID BOIES]: There was an email exchange between a newspaper reporter and Virginie Roberts where it seemed the newspaper reporter is suggesting that Dershowitz be included as a potential offender.

40:07
DAVID BOIES: You have to ask the newspaper reporter why she would be suggesting that if she was suggesting it. I don't think she was suggesting that. I think she was reminding Virginia of something that Virginia had said previously. The real issues here are -was there a sex trafficking operation? Was Virginia a victim of that? Absolutely. Was she trafficked to a variety of people? Absolutely. There's never been any inconsistency about those central issues.

40.41
HOST: Alan Dershowitz says he only had one massage at Epstein's home and he kept his underwear on.

40.48
ALAN DERSHOWITZ [looking over his schedule]: I was in New York; I had dinner at Chung Lee Dynasty

HOST: He says he has detailed records that prove he wasn't in the places where the abuse was alleged.

41.02
ALAN DERSHOWITZ: One thing is crystal clear - the allegations against ME are totally made up. I never met these people I never touched them, I never had sex with them. I've never had sex with anyone other than my wife from the day I met Jeffrey Epstein. Totally, totally, totally false story.

41.21
HOST TALKING TO VRGI: People who say you are not telling the truth they point to inconsistencies in your tale, how do you account for those?

41.27
VRGI: You are left with a foggy memory sometimes you really are. So yeah, you know I might be wrong on dates, absolutely. I might be wrong on places even, sometimes, but one thing that I can tell you is you never forget the face of someone who has heaved over you.

41.55
HOST: Jeffrey Epstein abused girls and young women at all of his luxury homes. Many of his crimes were committed here in New York. Just imagine some young girl, some young woman

PANORAMA – BBC TRANSCRIPT CLEAN
2019.12.02 - (Incl D Boies)

coming to New York for the first time into this world. And falling into the orbit of someone like Jeffrey Epstein. This is Epstein's house off Fifth Avenue. Virginia Roberts says that she met Prince Andrew here too. During the visit she says Ghislaine Maxwell brought out a Spitting Image puppet of the prince. This woman [Shows pic of ▮▮▮▮▮▮▮; ] ▮▮▮▮▮▮▮, has also said she was also there that night.



42.48
VRGI: Prince Andrew put the puppet on ▮▮▮▮ breast. Ghislaine was like, I want to take a picture of that; and they did, they took a picture and they were laughing about it. Like I said, it just goes to show how we were not even dignified as humans to them, we were just, we were there as toys, to be passed around.
43:13
HOST: In a court statement, ▮▮▮▮▮▮▮, confirms the puppet story but she has a slightly different version of events, [SHOWING EXTRACT OF ▮▮▮▮▮▮▮ DEPOSITION] She says ' I sat on Andrew's lap, and they took the puppet's hands and put it on Virginia's breast, and so Andrew put his on mine.



Virginia Roberts says she was ordered to have sex with the prince later that evening – a claim he denies.

43.46
HRH talking to Emily Maitlis: I'm staying with the Consul- General which is further down the street on Fifth, so I wasn't, I wasn't staying there. I may have visited, but [shaking head], but no. Definitely no, no no activity.

44.10

# PANORAMA -- BBC TRANSCRIPT CLEAN
2019.12.02 - (Incl D Boies)

VOICE OF PALM BEACH POLICE over Palm Beach police footage: This is exit photographs, it is now 2.15pm.

44.19
HOST: In 2005, Epstein's prolific abuse finally caught up with him. This is footage from a police search of Epstein's Palm Beach home – a house Prince Andrew admits he visited four times. Some walls are decorated with pictures of naked young women. The police also found hidden cameras and recording equipment. Epstein was being investigated for "Unlawful sex acts with 4 minors", but it wasn't made public.  In July 2006, Prince Andrew invited him to Windsor Castle again, Epstein was a guests at Beatrice's 18th birthday party. Palm Beach police were waiting to arrest him when he returned, but the charge had been reduced to solicitation of prostitution.

45.44
ALAN DERSHOWITZ: Well he called me and said he needed me to be his lawyer, I said what for and he told me and I said oh my God, did you do that?? And he then told me that he had had massages. He underplayed the story very, very much, but that was the first hint or inkling that he had done anything wrong.

46.04
HOST: Epstein's arrest was made public but that doesn't seem to have put Prince Andrew off. Six weeks later, flight logs show the prince and Ghislaine Maxwell flew to Edinburgh in Epstein's private jet. By 2008, Epstein was being accused of sex crimes by dozens of underage girls. Alan Dershowitz would help negotiate a secret plea deal. Epstein pleaded guilty to two prostitution charges and served just 13 months in prison.

46.42
SPENCER KUVIN, [LAWYER FOR VICTIMS]:  We could never understand why the US Attorney's office gave him such a sweetheart deal. At the end of the day I don't think it was just his money and power because people who are powerful and have a lot of money are prosecuted regularly here in the United States if they have done something wrong. This was something else it just didn't make sense.

47.03
HOST:  The plea deal also barred the prosecution of anybody who'd helped Epstein. It was later found to be unlawful because it violated the rights of his victims.
By December 2010, Epstein was free, and Prince Andrew attended the convicted sex offender's 'welcome home dinner party. The prince stayed at Epstein's New York mansion for five days.

47.47
DAI DAVIES, FORMER HEAD OF ROYAL PROTECTION, MET POLICE: I would hope that if Prince Andrew was taking advice from anyone, somebody would've warned him of the consequence and his reputation, and if anyone knew that he was continuing to associate with a known convicted pedophile surely common sense would've said 'stop it'.
The prince and the pedophile took a walk in Central Park and a second infamous photo was taken.  At the time the prince's former wife, Sarah Ferguson, suggested the prince was sorting out a 15,000 pound loan for her. The prince now says he went to New York because he thought

18

PANORAMA -- BBC TRANSCRIPT CLEAN
2019.12.02 - (Incl D Boies)

he should end his friendship with Epstein in person. But why did he stay with a convicted sex offender for five days?

48:50
HRH TALKING TO EMILY MAITLIS: It was a convenient place to stay. At the end of the day with the benefit of all hindsight that one could have, it was definitely the wrong thing to do. But at the time I felt it was the honorable and right thing to do and I, I admit fully that my judgment was probably colored by my tendency to be too honorable but that's just the way it is.

49.22
HOST: Prince Andrew also kept in contact with Ghislaine Maxwell. She was first publicly named as a sex abuser in court documents back in 2009, but the prince didn't end their friendship. Our evidence suggests he even asked for her help in dealing with Virginia Roberts claims. We found an email the prince sent to Ghislaine Maxwell in 2015. It was buried in thousands of pages of legal documents that have been filed in America. The email is short but significant. The prince tells Ghislaine Maxwell 'let me know when we can talk got some specific questions to ask you about Virginia Roberts'. She replies 'have some info - call me when you have a moment'. Three days later Ghislaine Maxwell sent Alan Dershowitz what she calls a dossier of inconsistencies and inaccuracies and articles about Virginia Roberts. She repeatedly comments on stories about the prince and that visit to her London home.
You'd expect Ghislaine Maxwell to simply say it never happened, the prince never met Virginia Roberts. The photo is a fake. But she doesn't do that. She never disputes that Virginia Roberts was in her house and took a photo with Prince Andrew. In April this year, [2019] new sex abuse allegations were made against Epstein and Ghislaine Maxwell. The story was widely reported but in June, Prince Andrew met his old friend Ghislaine Maxwell once again.

51.19
EMILY MAITLIS TO HRH: Did you discuss Epstein at all then?

HRH: No. Actually, funnily enough, no, not at all. There wasn't anything to discuss about him because he wasn't in the news, it was just we'd moved on.

51.42
HOST: In July Jeffrey Epstein was arrested and charged with sex trafficking. A month later, he'd killed himself. Ghislaine Maxwell is now herself being investigated by the FBI. They are interviewing Epstein's victims about her. 9 women have also made complaints against her in civil court cases.
52.17
▒▒▒▒▒▒▒▒▒▒: Ghislaine controlled the girls - she was like the Madam - she was like the nuts and bolts of the sex trafficking operation. She'd always visit Jeffrey on the island – make sure the girls were doing what they were supposed to be doing.

52:37
VRGI: Jeffrey had a sickness, right, he had a sickness that could not be cured, and he does not belong in society at all. But Ghislaine had a viciousness to her, she had a really mean streak about her so the more pain you went through, the more pain she got off.

PANORAMA – BBC TRANSCRIPT CLEAN
2019.12.02 - (Incl D Boies)


52:57
HOST: Another of Prince Andrew's friends could now face sex trafficking charges.

53.04
DAVID BOIES: I must say I think she is very culpable. She was a central part of the Epstein sex trafficking operation. Er she played a important role in recruiting, grooming, manipulating.

53.20
HOST: She denies all of this of course.

53.22-53.24 SILENCE
DAVID BOIES [STARES AT CAMERA]: Um
53.24-53.34 SILENCE STARING AGAIN AT CAMERA
53.34 –
DVID BOIES: If you say so.

HOST: Am I miss characterizing her response?

53.37
DAVID BOIES: Well no, I think, I think I think that's probably fair in some respects. Um er, there was a um a deposition, multiple depositions that were tak, that were er um, she gave in the case we bought against her. Er those depositions are sealed.

54.01
HOST: Some of those sealed court statements may soon be made public. In the documents that are already public Ghislaine Maxwell says the allegations are lies. She denies abusing or trafficking any women. If Ghislaine Maxwell is prosecuted prince, Andrew could be a crucial witness. He's already been asked twice by the victims 'lawyers for an interview, but he hasn't replied to the letters.

54.35
DAVID BOIES: One of the things that we've tried and actually tried in in in quite a respectful way, um, to do, is to interview Prince Andrew and try to get what his explanation is! He was a frequent visitor, he ought to submit to an interview. He ought to talk about it.

55.07
HOST: We have discovered that five more women want Prince Andrew to testify in court. They say he witnessed how young women were giving massages at Epstein's homes. Subpoenas have been prepared in all five cases; and that means that the next time Prince Andrew visits the States, he faces being ordered to give evidence whether he likes it or not.

55.45
SPENCER KUVIN: I have no doubt if he comes here to United States that he likely will have to answer to someone whether it be the US attorney's office or under subpoena by another attorney here.

PANORAMA – BBC TRANSCRIPT CLEAN
2019.12.02 - (Incl D Boies)

55.54
HOST: The prince told Panorama he's willing to help any appropriate law-enforcement agency with their investigations if required.  He says Epstein's suicide has left many unanswered questions, particularly for his victims. He says he deeply sympathize with those affected and hopes that in time they will be able to rebuild their lives. And it is emphatically denied that he had any form of sexual contact or relationship with Virginie Roberts.

56.41
HOST CONTINUES: One of America's most prolific sex offenders was never brought to justice.

56.50
EMILMAITLIS:  Do you regret the whole friendship with Epstein?

HRH: Now, still not. For the reason being is that the people that I met and the opportunities that I was given to learn either by him or because of him, were actually very useful.

57.13
DAVID BOIES: With respect to Prince Andrew. I think he needs to come clean and I think the facts need to be revealed. No one is above the law, not the president of the United States, not a prince of the United Kingdom.

57.31
HOST: Prince Andrew now says he unequivocally regrets his ill-judged association with Jeffrey Epstein.

57.45
VRGI:  The people on the inside are going to keep coming up with these ridiculous excuses like the photo is doctored or he came to New York to break up with Jeffrey Epstein. I mean come on, I'm calling BS on this because that's what it is. He knows what happened I know what happened and there's only one of us telling the truth and I know that's me.

58.13
HOST: The next time Prince Andrew tells his story, it may be as a witness under oath. The sex life and honesty of a Senior Royal will be under scrutiny as never before.

E N D

# EXHIBIT 65

DAVID BOIES TALKING TO PIERS MORGAN ON TALK TV -  Feb 20, 2023
Discussing HRH, VRG, GM and AD - -  TRANSCRIPT -

DAVID BOIES TALKING TO PIERS MORGAN ON TALK TV -
Discussing inter alia, The Photo…. Feb 20 2023

Piers Morgan Interviews Virginia Giuffre's Lawyer David Boies About Prince Andrew
Settlement   TRANSCRIPT  FEB 20, 2023



FEB 20 2023

PIERS MORGAN (PM) I'm joined now by David Boies,  you are one of America's
greatest lawyers and I don't say that lightly. And I realize that in the general scheme of
things probably this case actually isn't that big a deal, certainly not as big a deal as it
has been for us back in the UK .

00.18
DAVID BOIES (DB): Yeah,  I think that's probably right although it's still a pretty big deal.

0.23
PIERS MORGAN (PM): And it gets a lot of attention because It involves a senior
member of our Royal family, obviously. It's been a year since Prince Andrew settled his,
his civil case with Virginia Giuffre, your client.  At the time that it was settled, he had until
that point repeatedly said I'm going to clear my name I'm gonna go all the way I'm

1

DAVID BOIES TALKING TO PIERS MORGAN ON TALK TV - Feb 20, 2023
Discussing HRH, VRG, GM and AD - -  TRANSCRIPT -

gonna go to court and I'm gonna have my day and I'm gonna clear my name; and at the last minute he caved and paid a large check were you surprised?
.......

DAVID BOIES   07.28
And as far as Prince Andrew is concerned, um er, we've got the photograph, um we've got the photograph of Prince Andrew, Maxwell and Virginia there at exactly the time um Virginia said and the date of that photograph because it was what the Daily Mail found out was that it was processed at Walgreens shortly after Virginia said she came back from that trip. So all of the evidence with respect to the legitimacy of that photograph,  I think demonstrates that that photograph is real.

07.59
PM: With all your experience of these things, if you established that Prince Andrew was lying about the photograph that he had met her, that he had put his arm around her, it was with Ghislaine Maxwell at her home, would that in itself have been enough do you think to get a conviction?

08.18
DB:I think it probably would've been because um you have her testimony and you have his complete denial so the question is, um, is he credible or not and once the jury concludes that he's not credible about having never met her, I think the jury probably concludes he's not credible about claiming that he did not have sex with her.

08.37
PM: And do you think that's why in the end he settled?

08.39
DB: Well I think it was partly that but I also think that he recognized and I think his lawyers recognized that it would be a disaster for him to appear for a deposition. I mean remember as you say, I deposed Ghislaine Maxwell and she was indicted for perjury as a result of that deposition and um I think he would have been taking a terrible criminal risk to appear for a deposition where he'd have to answer these questions under oath

PM: Right

DB: And if he did not answer those questions truthfully under oath, he could then expose himself to real criminal liability.

# EXHIBIT 66

2d 220, 229-30 (D.D.C. 2011). Thus, the FBI's search for responsive records was reasonable.

## V.    The FBI Properly Withheld Responsive Records and Information Pursuant to FOIA Exemption 7(A)

As indicated in the *Vaughn* index submitted by the FBI, *see* Seidel Decl. Ex. EE, all of the records that were withheld by the FBI in full or in part that fall within the scope of FOIA Exemption 7(A).[2] Exemption 7(A) exempts from disclosure "records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information . . . could reasonably be expected to interfere with enforcement proceedings." 5 U.S.C. § 552 (b)(7)(A). In enacting Exemption 7(A), "Congress recognized that law enforcement agencies had legitimate needs to keep certain records confidential, lest the agencies be hindered in their investigations." *NLRB v. Robbins Tire & Rubber Co.*, 437 U.S. 214, 224 (1978). Most importantly, Congress sought "to prevent harm to the Government's case in court" by preventing litigants from obtaining "earlier or greater access to agency investigatory files than they would otherwise have." *Id.* (internal quotation omitted).[3]

"To fit within Exemption 7(A), the government must show that (1) a law enforcement proceeding is pending or prospective and (2) release of the information could reasonably be expected to cause some articulable harm." *Amnesty Int'l USA v. CIA*, 728 F. Supp. 2d 479, 525 (S.D.N.Y. 2010) (internal quotation marks omitted). The government's burden under the second prong is not high; the government need only show that "disclosure of particular kinds of investigatory records . . . would generally interfere with enforcement proceedings." *Robbins*

---

[2] For those records or parts of records withheld in full pursuant to Exemption 7(A), the Court need not reach the applicability of other exemptions if it concludes that FBI's withholdings under Exemption 7(A) were proper.

[3] Exemption 7(A) also protects records that, if released, could interfere with post-trial criminal proceedings, such as an appeal. *See, e.g., Kidder v. FBI,* 517 F. Supp. 2d 17, 27-28 (D.D.C. 2007); *Kansi v. U.S. Dep't of Justice,* 11 F. Supp. 2d 42, 44 (D.D.C. 1998).

*Tire*, 437 U.S. at 236 (quotation marks omitted); *Radcliffe v. IRS*, 536 F. Supp. 2d 423, 437 (S.D.N.Y. 2008). In doing so, the government must demonstrate a "rational link" between the requested public disclosure and interference with the government's ongoing or prospective investigations or proceedings. *See Crooker v. Bureau of Alcohol, Tobacco, and Firearms*, 789 F.2d 64, 67 (D.C. Cir. 1986); *New York Times Co. v. Dep't of Justice*, No. 14 Civ. 03776 (AT) (SN), 2016 WL 5946711, at *7 (S.D.N.Y. Aug. 18, 2016).

The government is not required to make a specific factual showing with respect to each withheld document that disclosure would actually interfere with a particular enforcement proceeding. *See Robbins Tire*, 437 U.S. at 236. Rather, the showing of harm under Exemption 7(A) may be made on a categorical basis. *Id.* That is, federal courts may make generic determinations that disclosure of particular types of records could reasonably be expected to interfere with the type of enforcement proceeding at issue. *Radcliffe*, 536 F. Supp. 2d at 437 (quoting *Barney v. I.R.S.*, 618 F.2d 1268, 1273 (8th Cir.1980)).

## A. The Withheld Records Were Compiled for Law Enforcement Purposes

As a threshold matter, all of the records withheld by FBI pursuant to Exemption 7(A) were "compiled for law enforcement purposes," and thus satisfy the threshold requirement of Exemption 7. 5 U.S.C. § 552(b)(7). The government has the burden of proving that records were compiled for law enforcement purposes. *Ferguson v. FBI*, 957 F.2d 1059, 1070 (2d Cir. 1992). Documents are compiled for law enforcement purposes within the meaning of the statute both where the documents, when originally created, were generated for a law enforcement purpose, and where the documents, although originally created for a non-law enforcement purposes, are later assembled as part of a law enforcement investigation. *John Doe Agency v. John Doe Corp.*, 493 U.S. 146, 154-55 (1989).

The withheld records were either generated or compiled in furtherance of the FBI's

7

EXHIBIT 67

**COHEN & GRESSER LLP**

800 Third Avenue
New York, NY 10022
+1 212 957 7600 phone
www.cohengresser.com

Mark S. Cohen
+1 (212) 957-7600
mcohen@cohengresser.com

Christian R. Everdell
+1 (212) 957-7600
ceverdell@cohengresser.com

August 10, 2020

**VIA ECF**

The Honorable Alison J. Nathan
United States District Court
Southern District of New York
United States Courthouse
40 Foley Square
New York, New York 10007

### Re: *United States v. Ghislaine Maxwell*, 20 Cr. 330 (AJN)

Dear Judge Nathan:

On behalf of our client, Ghislaine Maxwell, we respectfully submit this letter motion seeking the Court's assistance with two critical issues that greatly impact Ms. Maxwell's ability to receive a fair trial on the schedule set by the Court. First, we request that the Court enter an order directing the government to disclose to defense counsel the identities of the three alleged victims referenced in the indictment ("Victims 1-3"), subject to the restrictions of the protective order entered by the Court, so that Ms. Maxwell and defense counsel can meaningfully investigate the alleged conduct, which is now over 25 years old. Second, we request that the Court enter an order directing the Bureau of Prisons ("BOP") to release Ms. Maxwell into the general population and provide Ms. Maxwell with increased access to the discovery materials while she is detained so that she can meaningfully participate in the preparation of her defense.

### 1. Disclosure of Victim Identities

The Court should order the government to disclose the identities of Victims 1-3 to defense counsel, subject to the restrictions of the protective order, because Ms. Maxwell cannot prepare for or receive a fair trial without this information. Moreover, the requested disclosure is authorized under the law in this Circuit, and is narrowly-tailored and reasonable under the circumstances of this case.

Here, it is clear from the face of the indictment that the government's case is based on the accounts of Victims 1-3, the three individuals specifically referenced in the indictment. It is therefore critical for the defense to know the names of these individuals as soon as possible, so

The Honorable Alison J. Nathan
August 10, 2020
Page 2

that we can mount an effective defense investigation and adequately prepare for trial. This is especially true in this case where the alleged misconduct took place on unspecified dates roughly 25 years ago in multiple locations—namely, New York, Florida, New Mexico, and the United Kingdom—and where the central figure, Jeffrey Epstein, is alleged to have engaged in misconduct with dozens, if not hundreds, of alleged victims. The defense should not have to speculate which of these individuals are Victims 1-3 referenced in the indictment.

It is now almost six weeks since Ms. Maxwell's arrest, and the government is just now beginning to produce Rule 16 discovery, despite confirming to the Court that discovery would begin as soon as the Court entered a protective order. Moreover, the government still has not confirmed to the defense the identities of Victims 1-3. Ms. Maxwell was arrested on July 2, 2020. On July 14, 2020, during her arraignment and bail hearing, the government indicated that it had "begun preparing an initial production" and would be "prepared to produce a first batch of discovery as soon as a protective order [was] entered by the Court."[1] The Court entered the protective order on July 30, 2020. (Dkt. 36). The following day, July 31, 2020, defense counsel contacted the government and requested disclosure of the identities of Victims 1-3. The government refused to do so, stating that it would only disclose the identities of alleged victims through its production of Rule 16 discovery, or as part of its production of Jencks Act material closer to trial. That same day, per the government's request, the defense provided a hard drive to load the Rule 16 discovery. However, the government did not make its first production until after 2:00 p.m. on Wednesday, August 5, 2020.

The government's initial production was a subset of non-electronic discovery materials, totaling nearly 13,000 pages, which the defense expeditiously reviewed for high-level content. Upon initial review, the materials contain certain records related to one specific individual. However, nothing in the production specifically identifies this individual as Victim 1, 2, or 3. The defense should not be required to speculate whether this individual is one of the three alleged Victims, and if so, which one. Moreover, the initial production does not appear to contain any materials identifying the other two alleged Victims. Although the government has indicated that it will provide additional discovery on a rolling basis, if the initial production is any guide, it seems unlikely that later productions will sufficiently identify the remaining alleged Victims. Furthermore, the defense should not be forced to wait almost two additional weeks until August 21, 2020 (the deadline for the production of initial non-electronic discovery) or potentially months until November 9, 2020 (deadline for the completion of all discovery) before learning information that is vital to the defense. Ms. Maxwell's right to a fair trial depends on the defense's ability to adequately investigate the charges against her, and that investigation will be significantly impaired until we know for certain the names of Victims 1-3.

---

[1] July 14, 2020 Tr. at 12:14-17; *see also id.* at 12:25-13:3 ("Following the entry of [the] protective order . . . the government is prepared to make a substantial production of discovery.").

The Honorable Alison J. Nathan
August 10, 2020
Page 3

District courts have the inherent authority to compel pretrial disclosure of the identities of government witnesses. *See United States v. Cannone*, 528 F.2d 296, 301 (2d Cir. 1975). Such disclosure is warranted when there is a specific showing that the disclosure is material to the preparation of the defense and reasonable in light of the circumstances surrounding the case. *See id.* at 302; *United States v. Rueb*, No. 00 CR. 91 (RWS), 2001 WL 96177, at *9 (S.D.N.Y. Feb. 5, 2001) (ordering disclosure of government witness list where defendant "ha[d] met his burden to show a particularized need that outweighs the possible dangers of disclosure").[2] This principle has been applied in sex crimes cases, where the right of the defendant to prepare a defense can outweigh the privacy interests of alleged victims referenced in the indictment and warrant the disclosure of their identities. *See United States v. Warme*, No. 09CR19A, 2009 WL 427111, at *2 (W.D.N.Y. Feb. 20, 2009) (ordering government to disclose identity of sex crime victim where "defendant's ability to adequately prepare a defense against this charge is significantly compromised without being advised of the identity of the alleged victim"); *see also id.* ("Absent knowing the identity of Victim 1, the defendant is precluded from investigating the facts surrounding the crime charged.").

The defense's narrowly-tailored request, which only seeks the disclosure of the identity of Victims 1-3, and not the government's entire witness list, is also reasonable in light of the circumstances of this case. And because the protective order prohibits Ms. Maxwell, defense counsel, and others on the defense team from disclosing or disseminating the identity of any alleged victim or potential witness referenced in the discovery materials (Dkt. 36 ¶ 5), the disclosure will have no impact on the privacy interests of Victims 1-3. Nor is there any basis for the government to claim that there is a risk that witnesses will face intimidation or refuse to testify.[3] To the contrary, many alleged victims have already chosen to speak on the record in criminal proceedings in the Epstein case and in this case; to file civil suits against Mr. Epstein, Ms. Maxwell and others, and to provide deposition testimony and discovery in those suits; and to give interviews to the press and other television and film productions. Moreover, Victims 1-3 are no longer minors, but are now adults in their late 30s or early 40s, which provides additional assurance that they will be willing to appear for trial. Disclosure is therefore warranted here.

---

[2] In determining whether to order pretrial disclosure of the identity of witnesses, some district courts have considered the following factors: (1) Did the offense alleged in the indictment involve a crime of violence? (2) Have the defendants been arrested or convicted for crimes involving violence? (3) Will the evidence in the case largely consist of testimony relating to documents (which by their nature are not easily altered)? (4) Is there a realistic possibility that supplying the witnesses' names prior to trial will increase the likelihood that the prosecution's witnesses will not appear at trial, or will be unwilling to testify at trial? (5) Does the indictment allege offenses occurring over an extended period of time, making preparation of the defendants' defense complex and difficult? (6) Do the defendants have limited funds with which to investigate and prepare their defense? *Rueb*, 2001 WL 96177, at *7-8 (citation omitted). The Second Circuit, however, has not adopted these factors, nor do they constitute an exhaustive list of factors that the Court may consider in determining whether to disclose the identities of alleged victims.

[3] Notably, the government did not argue at the bail hearing that Ms. Maxwell posed a danger to the community. (*See* 7/14/2020 Tr. at 37:15-21).

The Honorable Alison J. Nathan
August 10, 2020
Page 4

*See Warme*, 2009 WL 427111, at \*2 (ordering government to disclose identity of sex crime victim where "the government has not demonstrated that disclosing the identity to the defendant would subject the victim to a significant risk, or to increase the likelihood that victim will refuse to appear or testify").

With each day that passes without knowing the identities of Victims 1-3, the defense is losing crucial time to conduct a meaningful investigation and prepare its defense so that Ms. Maxwell can receive a fair trial on the schedule set by the Court. For these reasons, we respectfully request the Court to order the government to disclose the identities of Victims 1-3 to defense counsel, consistent with the provisions of the protective order.

## 2. Ms. Maxwell's Conditions of Confinement and Access to Discovery

We also seek the Court's assistance to improve Ms. Maxwell's conditions of confinement at the Metropolitan Detention Center ("MDC"), and her access to the discovery in this case, so that she can meaningfully participate in her defense. As discussed below, Ms. Maxwell has been treated less favorably than a typical pretrial detainee, and this has impacted her ability to assist in her defense.

It has become apparent that the BOP's treatment of Ms. Maxwell is a reaction to the circumstances surrounding the pretrial detention and death of Mr. Epstein. On July 6, 2019, Mr. Epstein was arrested and detained at the Metropolitan Correctional Center ("MCC") on sex trafficking charges, and was subsequently assigned to the MCC's Special Housing Unit ("SHU") due to risk factors for suicide and safety concerns. After an apparent suicide attempt on July 23, 2019, Mr. Epstein was transferred to suicide watch and then psychological observation. On August 10, 2019, Mr. Epstein's body was discovered in his cell. Thereafter, the government indicted the two correctional officers who were assigned to the SHU at the time of Mr. Epstein's death.

As a result of what occurred with Mr. Epstein, Ms. Maxwell is being treated worse than other similarly situated pretrial detainees, which significantly impacts her ability to prepare a defense and be ready for trial on the schedule set by the Court. Since arriving at the MDC over a month ago, on July 6, 2020, Ms. Maxwell has been held under uniquely onerous conditions. Ms. Maxwell has been confined alone in an area outside of the general population for the entire 36-day period (40 days if we include her confinement in New Hampshire), which is over three weeks longer than the 14-day quarantine period required for all new arrivals to the MDC under current COVID-19 protocols, and there is no indication that this will change. She continues to be surveilled 24 hours a day by security cameras and by multiple prison guards, many of whom do not appear to be regular MDC personnel. These prison guards constantly observe Ms. Maxwell and take notes on her every activity, including her phone conversations with defense counsel. Until recently, Ms. Maxwell was subjected to suicide watch protocols, including being woken up every few hours during the night and being forced to wear special clothing, despite the

The Honorable Alison J. Nathan
August 10, 2020
Page 5

fact that she, unlike Mr. Epstein, has never been suicidal and was never diagnosed as exhibiting risk factors for suicide. Her cell is searched multiple times a day and she has been forced to undergo numerous body scans. In addition, Ms. Maxwell's access to the standard prison resources available to other pretrial detainees in the general population has been extensively curtailed or eliminated altogether.

This treatment threatens Ms. Maxwell's Sixth Amendment right to participate in her defense. This case will require time-consuming review of voluminous discovery materials. Ms. Maxwell must therefore have adequate time to review the materials, to confidentially take notes on them, and to discuss them with her attorneys. But there currently is no such structure in place. Indeed, although the government agreed that Ms. Maxwell would have access to a hard drive containing the discovery in the MDC, it is our understanding that the hard drive containing the first production has not yet been made available to Ms. Maxwell.

Defense counsel understands that the BOP has proposed (but not yet implemented) a procedure that would permit Ms. Maxwell to use a computer on her floor to review discovery materials during the three-hour period each day that she is not confined to her cell. But there are two significant flaws in this proposal:

- The three-hour period is specifically designated to be used by Ms. Maxwell for recreation, exercise, and personal hygiene, including showers. The BOP should not be permitted to force Ms. Maxwell to choose between maintenance of her physical and mental health and participating in her own defense.

- Even if Ms. Maxwell were to forgo personal maintenance altogether, three hours a day is on its face an insufficient amount of time for reviewing documents in a complex case with voluminous document discovery, such as this one. As an illustration, the government's first set of production materials consists of nearly 13,000 pages of documents. Assuming it takes Ms. Maxwell an average of one minute to review each page of those materials, based on the BOP's proposed cap of three hours per day of review, Ms. Maxwell would conceivably finish reviewing this first set of documents at the earliest by mid-November 2020. This is entirely unworkable under the schedule set by the Court.

Ms. Maxwell does not seek special treatment at the MDC; but she does ask that she not be specially disfavored in her treatment in detention, especially when it comes to preparing her defense to conduct that allegedly took place over 25 years ago. In light of the voluminous discovery that we expect to receive, Ms. Maxwell would normally be spending 40 hours a week or more reviewing the discovery. Ms. Maxwell should be granted a comparable amount of time

The Honorable Alison J. Nathan
August 10, 2020
Page 6

to review the discovery in the MDC so that she can engage in her defense full-time. We therefore request that Ms. Maxwell:

- Be released to the general population and be granted the privileges given to other pretrial detainees.

- Be given significantly increased access to a computer terminal in order to review the discovery in this case.

\*       \*       \*

For the reasons set forth above, we respectfully submit that the Court should grant Ms. Maxwell's motion.

Respectfully submitted,

_/s/ Christian R. Everdell_

Mark S. Cohen
Christian R. Everdell
**COHEN & GRESSER LLP**
800 Third Avenue, 21st Floor
New York, New York 10022
(212) 957-7600

cc:  All counsel of record (via ECF)

# EXHIBIT 68

UNITED STATES OF AMERICA, v.
GHISLAINE MAXWELL,

**TRIAL** sealed
November 30, 2021

| LBUCmax3 | Visoski - cross | Page 260 |
|---|---|---|

1  A. No.
2  Q. There were house managers that did that on a day-to-day
3     basis?
4  A. That's correct.
5  Q. Now, your recollection is that Ghislaine generally worked
6     out of Epstein's offices in New York; isn't that right?
7  A. Yes.
8  Q. And you testified there was a room in Epstein's offices
9     that had about five desks in it that was sort of off to the
10    right of his office?
11 A. That's correct.
12 Q. And that's what you called the personal assistants' room;
13    right?
14 A. There was no official name for it, but it was my best
15    description of who was in that room.
16 Q. And Ghislaine was one of the personal assistants who had a
17    desk in that room?
18 A. That's correct.
19 Q. Now, when you first met Ghislaine in 1991, she seemed to
20    you to be just an employee of Epstein; isn't that right?
21 A. It might in the first introduction.
22 Q. So at that point early on, I'm talking '91, '92 when you
23    first started working, it didn't seem to you like she had a
24    personal relationship with Epstein; right?
25 A. No. I believe when Mr. Epstein introduced her, that he

| LBUCmax3 | Visoski - cross | Page 261 |
|---|---|---|

1  needed help because he was expanding, getting bigger, you know,
2  first time he had his own private jet, that he needed help to
3  handle everything else in his life so that he could focus on
4  his business. And when you start buying homes and properties,
5  he --
6  Q. I'm sorry to interrupt.
7  A. He knew he was going to get busy. So Ghislaine was his
8  go-to person to handle everything else that was not
9  business-related with his company.
10 Q. So I think you said at some point, though, in the mid '90s,
11    it may have appeared to you that Ghislaine was involved in a
12    personal relationship with Epstein; isn't that right?
13 A. Yeah, I thought they were a couple in the mid '90s. It's
14    just my own take on it.
15 Q. And that was based on your observations of them together at
16    the time and how they interacted with each other?
17 A. Sure. Yes.
18 Q. They made travel plans together, they talked to each other,
19    things like that?
20 A. Yes.
21 Q. But I think you testified that it wasn't totally clear to
22    you that Epstein and Ghislaine had a romantic relationship;
23    right?
24 A. Yeah, I don't know what the definition of a romantic
25    relationship is as opposed to just relationship. To me,

| LBUCmax3 | Visoski - cross | Page 262 |
|---|---|---|

1  romantic would mean a more involved relationship. I wasn't
2  aware of anything more than a couple.
3  Q. You never saw them kiss you said; right?
4  A. No.
5  Q. You never saw them hold hands?
6  A. No.
7  Q. Now, it's fair to say, isn't it, that a lot of women were
8     flying on the plane with Epstein in the mid '90s; isn't that
9     right?
10 A. That's correct.
11 Q. It's fair to say that there were plenty of times that
12    Epstein was flying on the plane with these women without
13    Ghislaine?
14 A. There has been times, sure.
15 Q. It appeared to you that these women were adult women?
16 A. Oh, yes.
17 Q. So from your vantage point, whether Ghislaine or any one of
18    these other women was somebody romantically involved or
19    something else, is a little blurry; right?
20 A. Yes.
21 Q. In fact, I think the only person you really considered to
22    be a girlfriend of Epstein was Eva Dubin; is that right?
23 A. That's the way she was introduced, as one of Mr. Epstein's
24    original first girlfriends, correct.
25 Q. By the time you started, she was an ex-girlfriend; right?

| LBUCmax3 | Visoski - cross | Page 263 |
|---|---|---|

1  A. Exactly.
2  Q. She was with him in the 1980s?
3  A. Yes, before my time.
4  Q. Now, Eva Dubin, before she was married, went by Eva
5     Anderson?
6  A. That's correct.
7  Q. She was a former Ms. Sweden?
8  A. That's what I heard.
9  Q. She later married Glenn Dubin; is that right?
10 A. That's correct.
11 Q. Glenn Dubin is a billionaire hedge fund manager; is that
12    right?
13 A. From my understanding, yes.
14 Q. He was one of Epstein's clients; isn't that right?
15 A. I don't know if he was a client. I know he was a friend.
16 Q. But during the period when Ghislaine and Epstein appeared
17    to you to have some sort of a personal relationship, she
18    continued to work for him as an employee; isn't that right?
19 A. Who's that, Ms. Maxwell?
20 Q. Ms. Maxwell, yes.
21 A. Yes.
22 Q. Ghislaine. I'm talking Ghislaine still took care of the
23    houses?
24 A. Yes. Yes.
25 Q. She still shopped for him?