# EXHIBIT 69

Tuesday, Nov 18th 2025 4PM 59°F

# The photo that changed the course of history: The Mail on Sunday's Sharon Churcher on her painstaking investigation that helped end Andrew's royal reign

By SHARON CHURCHER IN NEW YORK

Published: 19:29 EST, 1 November 2025 , Updated: 02:42 EST, 2 November 2025

Without that photograph, handed to me by **Virginia Giuffre** and published by The Mail on Sunday in 2011, none of the events of last week, which are earth-shattering by royal standards, would have happened. When 17-year-old **Virginia** asked paedophile **Jeffrey Epstein** to take the snap of her and Prince Andrew on a disposable Kodak FunSaver camera it was, she told me, to prove to her mother she had met a royal. Instead, it was the picture that, ultimately, led to Andrew being stripped of his titles and banished from royal life.

While Andrew has always denied the charges Virginia made against him, I, for one, have never doubted the story she told me when I became the first journalist to interview her.

She greeted me at the door of her modest bungalow on Australia's Central Coast, nervously clutching the envelope in which she had kept the dog-eared snap for nearly a decade.

'I'm not sure that I should be showing this to you. He's a British Prince,' stammered the 27-year-old mother-of-three.

The photo, in which Andrew's arm circles her bare waist in front of a smirking **Ghislaine Maxwell**, has been reproduced countless times around the world since its revelation by this paper.

It provided evidence to the **FBI** of Virginia's life as a 'sex slave' to Epstein and Maxwell, and prompted the criminal investigations that led to his suicide in prison and Maxwell's 20-year sentence for sex trafficking.




View gallery

But when King Charles finally took action last week, it came too late for Virginia. Her suicide in April is blamed by some relatives on the break-up of her marriage.

But she told me she was haunted by horrific memories of the years she spent in Epstein and Maxwell's depraved world, in which she claimed to have had three sexual encounters with Andrew

'I've gone from pain, to hurt, to anger,' she said as we sipped coffee in her garden.

'Epstein was a monster. He and Andrew were shameless. They have no remorse, no guilt for anything they have done. Andrew knew how young I was.'

He has vehemently and repeatedly denied her claims and paid a reported £12 million to settle a lawsuit she filed with no admission of wrongdoing.

He has claimed that Virginia sucked me into a plot to discredit him and that the photo we published was created by some kind of digital trickery.

He told Newsnight's Emily Maitlis: 'I have absolutely no memory of that photograph. I'm afraid to say that I don't believe that photograph was taken in the way that has been suggested.'

In my opinion, it is a ludicrous suggestion, for if it were a hoax, Buckingham Palace failed to contact me to say so. Nor did Virginia seek me out. I found her after spending weeks digging into a lawsuit she'd filed against Epstein under the pseudonym 'Jane Doe 102'.

I was intrigued because the documents said she had been 'sexually exploited by Epstein's adult male peers including royalty'.

The filing revealed she had been head-hunted by Maxwell from Donald Trump's Mar-a-Lago club in Palm Beach, Florida, where she was a $9-an-hour changing room assistant.

The club employed scores of workers in similar positions, but I accumulated clues.

One source recalled that her maiden name was Virginia Roberts. I learned she continued to date her high-school sweetheart, Tony Figueroa, even while working for Maxwell.

I located Tony in a small town in Georgia. Epstein had approved of him continuing his relationship with Virginia.

Tony said: 'I would give her rides to his house. I would hang out there, sit by the pool, talk to the chef. Jeffrey treated me like a friend.' Then the bombshell.

When Virginia returned from London, she showed Tony the photo of herself with Andrew.

He said: 'She told me Jeffrey was hanging out with Andrew and she had hung out with him. It was supposedly just massages.'

He said he was sickened because he had come to understand that, in Epstein's warped circle, 'massage' was a euphemism for sex.

'I tried to get her to stop the trips with Jeffrey but she didn't. I think she was scared,' he added.

Tony and Virginia had long separated by the time I met him, but he gave me the next lead to Virginia's whereabouts.

Her father's name was Sky Roberts. I left a message on his answerphone saying I was investigating Jeffrey Epstein.

And on February 4, 2011, the email that would change my life – and Andrew's – landed in my inbox.

Virginia wrote: 'Hi Sharon, my father, Sky Roberts, informed me of your call and I thought I'd send you my contact details so we can get in touch '

Her voice was shaking when she took my call and confirmed that Andrew was the royal in her lawsuit.

She had fled the trafficking ring and was happily married, but she decided to break her silence because, weeks before I contacted her, she had seen a photo of Epstein strolling with Andrew through New York's Central Park

A police probe had revealed the financier paid children in Florida for sex. After a slap-on-the-wrist 2008 jail sentence, Epstein resumed his activities.


'I'm appalled Andrew is still hanging out with him,' Virginia said. 'To me, it's saying, "We are above the law".'

After our meeting in Australia, I was contacted by a US prosecutor who said she had been tipped off that I had found Virginia.

'The FBI would like to fly to Sydney to interview her,' she said. Virginia wept when I passed on the message. Would Epstein have her killed, she asked me, if she cooperated with the FBI?

She told me that she was terrified of retaliation from a well-known politician who she had been ordered to meet at a cabana on Epstein's New Mexico ranch.

'He repeatedly choked me and got aroused when I begged for my life,' she said. Yet she wanted to do the right thing. She agreed to meet two US federal agents.

Mail photographer Michael Thomas and I drove her and her husband to the US Consulate in Sydney.

We weren't allowed to accompany her inside but she told us she gave them the photograph of herself with Andrew.

They made a scan of the front, and of a time stamp on the back that the FBI agents believed proved that it was legitimate. It showed it was developed on March 13, 2001, by a one-hour photo service close to her Florida home.

When this newspaper sent the picture to Andrew, prior to publication, he did not deny its authenticity on the spot.

And for me, an email obtained last month by The Mail on Sunday, in which he suggested at the time that he had employed his personal protection officer to dig up dirt on Virginia, is proof that he knew the picture was real.

But the story doesn't end with him. There are other powerful men who must be held accountable for their role in the crimes of Epstein and Maxwell.

As events unfolded last week, I thought back to that brave young woman I met all those years ago.

When Virginia handed me that photograph, neither she, nor I, could possibly have imagined the juggernaut it would become.

I will always remember her courage. And I am proud to have played my part in telling her story – and of obtaining the photograph that changed the course of history.

# EXHIBIT  70

# JEGE, INC.

## PASSENGER MANIFEST

Registration Number: **N908JE**    Type: **B-727-31**

Pilots: **Bill Hammond  Dave Rodgers,  Larry Visoski**
Flight Engineer:    **Larry Morrison**

DATE: _1 - 12_, 200__    FROM _KEWR_    TO _TIST_

Departure Time _3:47_ AM ~~PM~~    Arrival Time _7:52_ ~~AM~~ PM    Trip Number _417_

**PASSENGERS**

1. Jeffrey Epstein
2. ███████████████
3. ███████████████
4. _LANCE Calloway_
5. _IGOR ZINOVIEW_
6. _John AMERLING_
7. _J P_
8. _WALTER CRONKITE_
9.
10.
11.
12.
13.
14.
15.
16.
17.
18.
19.

**FROM Identifier Defined**

City _NEWARK_

State or Country _NJ_

**TO Identifier Defined**

City _ST. Thomas_

State or Country _USVI_

Nautical Miles _1484_

Statute Miles _1706_

Gallons _3977_    **AIRFRAME**

Pounds _25738_    _33363.8_

Flight Time _3+04_    _31_

Altitude FL _390_    _33366.9_

20.    Night _1.5_

21.    T/L _1.1_

22.    IMC _.2_

23.    Approach _P_

24.

25.

26.

**N908JE   JEGE, Inc.  Passenger Manifest**
Crew: LV    DR

**Date:** 11 / 28 / 2014_____        **Trip:** __520__

**Depart:** PBI_____     **Time:** 7 : 56  AM / (PM) local

**City:** WEST Palm Bch  **State:** FL_____

**Arrive:** TIST_____    **Time:** 11 : 04  AM / (PM) local

**City:** ST. thomas   **State:** USVI_____

**1 Passenger:** Jeffery Epstein   **7 Passenger:** _____

**2 Passenger:** ███████████   **8 Passenger:** _____

**3 Passenger:** ███████████   **9 Passenger:** _____

**4 Passenger:** Joi Ito_____   **10 Passenger:** _____

**5 Passenger:** ReiD Hoffman   **11 Passenger:** _____

**6 Passenger:** _____   **12 Passenger:** _____

**Gallons purchased:** 336_____    **Fuel Burn lbs.** 18000_____

**Flight Level:** F370_____    **Flight Time:** 2+08_____

**Airframe Time: Start:** 33650.7

**Today's flight:**    +    2.1

**Total Airframe Time =** 33652.8

**Night:** 2.1  **T/O**_____  **Approach** ILS **Min**_____**Flex**_____**VOR**_____
**Comments:**_____

# N212JE  JEGE, LLC  Passenger Manifest

Crew: LV ___  DR ___  NM ___  BD

**Date:** 9 / 19 / 2013 _____    **Trip:** ___ 8 _____

**Depart:** TEB _____    **Time:** 11 : 00 (AM) PM local

City: TETERBORO _____    State: N.J. New Jersey

**Arrive:** ISLIP _____    **Time:** 11 : 30 (AM) PM local

City: RONKONKAMO    State: NEW YORK _____

1 Passenger: ERIC Roth _____    7 Passenger: _____

2 Passenger: MIGUEL _____    8 Passenger: _____

3 Passenger: DAVE RODGERS _____    9 Passenger: _____

4 Passenger: _____    10 Passenger: _____

5 Passenger: _____    11 Passenger: _____

6 Passenger: _____    12 Passenger: _____

Gallons purchased: 200 _____    Fuel Burn lbs. 2015 _____

Flight Level: _____    Flight Time: _____ + 30

Airframe Time: Start: 8577 . 4 _____

Today's flight:    + _____ . 5 _____

Total Airframe Time = 8577 . 9 _____

Night: _____ T/O _____ Approach _____ Min _____ Flex _____ VOR _____
Comments: _____

TEST FLIGHT

## N212JE  JEGE, LLC  Passenger Manifest

Crew: LV     DR     NM

Date: __I__ / __I__ / 201●4 _____          Trip: __36__

Depart: __PBI__          Time: __12__ : __06__  AM / (PM) local

City: __WEST PALM BEACH__ State: __FL__ _____

Arrive: __TEB__          Time: __2__ : __26__  AM / (PM) local

City: __TETGRBORO__     State: __NJ__ _____

1 Passenger: __JEFFREY EPSTEIN__    7 Passenger: _____

2 Passenger: ▮▮▮▮▮▮▮▮    8 Passenger: _____

3 Passenger: ▮▮▮▮▮▮▮▮    9 Passenger: _____

4 Passenger: __WOODY ALLEN__    10 Passenger: _____

5 Passenger: __SOON-YI PREVIN__    11 Passenger: _____

6 Passenger: _____    12 Passenger: _____

Gallons purchased: __1200__        Fuel Burn lbs. __7539__

Flight Level: __410__        Flight Time: __2 + 19__

Airframe Time: Start: __8636__ . __3__

Today's flight:        + __2__ . __3__

Total Airframe Time = __8638__ . __6__

Night: _____  T/O _____  Approach _____  Min _____  Flex _____  VOR _____

Comments: _____

# N212JE  JEGE, LLC  Passenger Manifest

Crew: LV    DR    NM

Date: _10 / 25 / 2013_    Trip: _18_

Depart: _ISP_    Time: _2 : 18_    AM /(PM) local

City: _ISLIP_    State: _NY_

Arrive: _TEB_    Time: _2 : 51_    AM (PM) local

City: _TETERBORO_    State: _N.J._

1 Passenger: _ERIC Roth_    7 Passenger: _____

2 Passenger: _DAN GAROFALO_    8 Passenger: _____

3 Passenger: _____    9 Passenger: _____

4 Passenger: _____    10 Passenger: _____

5 Passenger: _____    11 Passenger: _____

6 Passenger: _____    12 Passenger: _____

Gallons purchased: _____    Fuel Burn lbs. _2167_

Flight Level: _____    Flight Time: _+ 33_

Airframe Time: Start: _8595.2_

Today's flight: + _____.5_

Total Airframe Time = _8595.7_

Night: _____ T/O _____ Approach _____ Min _____ Flex _____ VOR _____
Comments: _____

(N JE)

# N212JE   JEGE, LLC.  Passenger Manifest
### Crew: LV    DR

**Date:** / / 26 / 2014_____    **Trip:** 4/_____

**Depart:** PBI_____    **Time:** 12 : 16    AM /(PM) local

**City:** WEST Palm Bch    **State:** FL_____

**Arrive:** TPA_____    **Time:** 12 : 51    AM (PM) local

**City:** TAMPA    **State:** FL_____

1 Passenger: JEFFREY EPSTEIN    7 Passenger: ▮▮▮▮▮▮▮▮

2 Passenger: Ehud BARACK    8 Passenger: Security 1

3 Passenger: MRS BARACK    9 Passenger: Security 2

4 Passenger: ▮▮▮▮▮▮▮▮    10 Passenger: Steve HANSEN

5 Passenger: ▮▮▮▮▮▮▮▮    11 Passenger:_____

6 Passenger: ▮▮▮▮▮▮▮▮    12 Passenger:_____

Gallons purchased: 1600_____    Fuel Burn lbs. 2906_____

Flight Level: FL 240_____    Flight Time: + 33_____

Airframe Time: Start: 8649 . 3

Today's flight: +_____ . 5

Total Airframe Time = 8649 . 8

Night:_____ T/O_____ Approach_____ Min_____ Flex_____ VOR_____
Comments:_____

# N212JE  JEGE, LLC  Passenger Manifest

Crew: LV    DR    NM

Date: _11_ / _8_ / 2014_____        Trip: __121__

Depart: _TIST_____   Time: __8__ : _43_ (AM) PM local

City: _ST. Thomas____   State: __USVI._____

Arrive: _TEB_____   Time: _11_ : _30_ (AM) PM local

City: _TETERBORO_   State: __NJ_____

1 Passenger: _JEFFREY EPSTEIN_    7 Passenger: _____

2 Passenger: ███████████████    8 Passenger: _____

3 Passenger: _GREGORY Riches_    9 Passenger: _____

4 Passenger: _____    10 Passenger: _____

5 Passenger: _____    11 Passenger: _____

6 Passenger: _____    12 Passenger: _____

Gallons purchased: _1634 TWA_    Fuel Burn lbs. __11692__

Flight Level: _FL450____    Flight Time: __3 + 46__

Airframe Time: Start: __8850 . 4__

Today's flight: + ___3' . 8__

Total Airframe Time = _8854 . 2_

Night: _____ T/O_____ Approach_____ Min_____ Flex_____ VOR_____

Comments: _____

# N212JE  JEGE, LLC  Passenger Manifest

Crew: LV    DR    NM

Date: / / 21 / 2015_____          Trip: /29_____

Depart: PBI_____    Time: 2 : 43  AM / (PM) local

City: WEST PALM Bch  State: FL_____

Arrive: TEB_____    Time: 5 : 03  AM / (PM) local

City: TETERBORO_____  State: N.J._____

1 Passenger: JEFFREY EPSTEIN  7 Passenger:_____

2 Passenger: ▮▮▮▮▮▮▮▮▮  8 Passenger:_____

3 Passenger: Steve HANSEN  9 Passenger:_____

4 Passenger: 1 female  10 Passenger:_____

5 Passenger:_____  11 Passenger:_____

6 Passenger:_____  12 Passenger:_____

Gallons purchased: /200_____    Fuel Burn lbs. 7397_____

Flight Level: FL450_____    Flight Time: 2 + 19_____

Airframe Time: Start:    8873 . O

Today's flight:    +    2 . 3

Total Airframe Time =  8875 . 3

Night: /. O  T/O / l NW Approach 7 LS  Min____ Flex____ VOR_____

Comments:_____

# HYPERION AIR, INC.

## PASSENGER MANIFEST

Registration Number: N909JE    Type: G-1159B    Pilots: ~~Bill Hammond~~ JIM WORDEN
                                                          ~~Dave Rodgers~~, ~~Larry Visoski~~

DATE: 9 . 1 , 2006    FROM EGGW    TO EGPH

Departure Time 11 : 39 (AM) PM    Arrival Time 12 : 30 AM (PM)    Trip Number 1902

**PASSENGERS**

1. ~~Jeffrey Epstein~~ NOT ON BOARD
2. GHISLAINE MAXWELL
3. PRINCE ANDREW
4. ███████████████
5. CRASNASKY
6. _____
7. _____
8. _____
9. _____
10. _____
11. _____
12. _____
13. _____

**COMMENTS**

**FROM Identifier Defined**

City LUTON

State or Country ENGLAND

**TO Identifier Defined**

City EDINBURGH

State or Country SCOTLAND

Nautical Miles _____

Statute Miles _____
LITRES 3700
Gallons _____    **AIRFRAME**

Pounds 4910    10021.2

Flight Time +51    8

Altitude FL _____    10022.0

**TAKE-OFF POWER**    Night _____

Flex Take-Off _____    T/L ___ / ___

Min Take-Off _____    IMC 1

Condition _____    Approach ILS

# HYPERION AIR, INC.

## PASSENGER MANIFEST

Registration Number: **N909JE**      Type: **G-1159B**          Pilots: **Dave Rodgers, Larry Visoski**

DATE: **5** - **6** , 2005      FROM *TEB*          TO *PBI*

Departure Time **9** : **10** AM / (PM)      Arrival Time **11 27** AM / (PM)      Trip Number *1775*

**PASSENGERS**

1. Jeffrey Epstein
2. ▮▮▮▮▮▮▮▮▮
3. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮
4. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮
5. *1 FEMALE*
6. *DAVID MULLEN*
7. *Larry Morrison*
8. _____
9. _____
10. _____
11. _____
12. _____
13. _____

**COMMENTS**

_____

_____

_____

| | |
|---|---|
| **FROM Identifier Defined** | |
| City | *TETERBORO* |
| State or Country | *N.J.* |
| **TO Identifier Defined** | |
| City | *WEST PALM BEACH* |
| State or Country | *FL.* |
| Nautical Miles | *900* |
| Statute Miles | *1035* |
| Gallons | *500* |

**AIRFRAME**

Pounds *8926*    *97573*

Flight Time *2 +16*    *23*

Altitude FL *F430*    *97596*

**TAKE-OFF POWER**    Night *23*

Flex Take-Off _____.    T/L *L/L*

Min Take-Off _____.    IMC _____.

Condition _____    Approach _____

# HYPERION AIR, INC.

# PASSENGER MANIFEST

Registration Number: **N909JE**      Type: **G-1159B**      Pilots: ~~Dave Rodgers~~, *B. HAMMOND*  **Larry Visoski**

DATE: *2 22*, 2005      FROM *PBI*      TO *TEB*

Departure Time *10:37* (AM/**PM**)      Arrival Time *12:56* (**AM**/PM)      Trip Number *1757*

## PASSENGERS

1. Jeffrey Epstein
2. [redacted]
3. [redacted]
4. *JAMES STANLEY*
5. [redacted]
6. [redacted]
7. *STANLEY*
8. *DAVID MULLEN*
9. 
10. 
11. 
12. 
13. 

## COMMENTS

**FROM Identifier Defined**

City *WEST PALM BEACH*

State or Country *FL*

**TO Identifier Defined**

City *TETERBORO*

State or Country *N.J.*

Nautical Miles *900*

Statute Miles *1035*

Gallons *1700*      **AIRFRAME**

Pounds *8895*  *9727.7*

Flight Time *2+18*  *'23*

Altitude FL *FL410*  *9720.0*

**TAKE-OFF POWER**    Night _____

Flex Take-Off _____    T/L ___/_____

Min Take-Off _____    IMC _____

Condition _____    Approach _____

# HYPERION AIR, INC.
# PASSENGER MANIFEST

Registration Number: **N909JE**     Type: **G-1159B**     Pilots: **Dave Rodgers,   Larry Visoski**

DATE: 5 26 , 2005     FROM _TEB_     TO _TIST_

Departure Time 7 : 28 AM/**PM**     Arrival Time 11 : 00 AM/**PM**     Trip Number _1779_

**PASSENGERS**

1. Jeffrey Epstein
2. Ghislaine Maxwell
3. ▓▓▓▓ 1 FEMALE
4. ▓▓▓▓▓▓▓▓▓▓
5. ▓▓▓
6. DAVID MULLEN
7. _____
8. _____
9. _____
10. _____
11. _____
12. _____
13. _____

**COMMENTS**

_____

_____

**FROM Identifier Defined**

City _TETERBORO_

State or Country _N.J._

**TO Identifier Defined**

City _ST. THOMAS_

State or Country _U.S.V.I._

Nautical Miles _1426_

Statute Miles _1639_

Gallons _1900_     **AIRFRAME**

Pounds _12330_   _9766.6_

Flight Time _3 32_   _3 5_

Altitude FL _FL440_   _9770_  _1_

**TAKE-OFF POWER**   Night _3 0_

Flex Take-Off ____.____   T/L _1 1_

Min Take-Off ____.____   IMC ____.____

Condition _____   Approach _____

# HYPERION AIR, INC.

## PASSENGER MANIFEST

Registration Number: **N909JE**     Type: **G-1159B**     Pilots: **Dave Rodgers,   Larry Visoski**

DATE: **8** - **18**, 2005     FROM **TEB**     TO **PBI**

Departure Time: **1 : 11** AM/**PM**     Arrival Time: **3 : 19** AM/**PM**     Trip Number **1804**

**PASSENGERS**

1. Jeffrey Epstein
2. ▉▉▉▉▉▉▉▉▉▉▉
3. ▉▉▉▉▉▉▉
4. ▉▉▉▉▉▉▉▉▉
5. ▉▉▉▉▉▉▉▉
6. ▉▉▉▉▉▉▉▉▉
7. _____
8. _____
9. _____
10. _____
11. _____
12. _____
13. _____

**COMMENTS**

_____
_____
_____

**FROM Identifier Defined**

City **TETERBORO**

State or Country **NJ**

**TO Identifier Defined**

City **WEST PALM BEACH**

State or Country **FL**

Nautical Miles **900**

Statute Miles **1035**

Gallons **1400**     **AIRFRAME**

Pounds **9064**     **9827 0**

Flight Time **2 +07**     **2 1**

Altitude FL **450**     **9829 1**

**TAKE-OFF POWER**     Night _____

Flex Take-Off _____     T/L _____

Min Take-Off _____     IMC _____

Condition _____     Approach _____

# HYPERION AIR, INC.

# PASSENGER MANIFEST

Pilots: ~~Dave Rodgers~~,   Larry Visoski   *Bill Hammond*

Registration Number: **N909JE**     Type: **G-1159B**

DATE: **9** - **3** , 2005     FROM **TIST**     TO **KPBI**

Departure Time **11** : **48** AM/PM (AM)

Arrival Time **2** : **12** AM/PM (PM)

Trip Number **1813**

**PASSENGERS**

1. Jeffrey Epstein

2. *DAVID MULLEN*

3. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮

4. ▮▮▮▮▮▮▮▮▮▮

5. *Alex*

6. ▮▮▮▮▮

7. _____

8. _____

9. _____

10. _____

11. _____

12. _____

13. _____

**COMMENTS**

_____

_____

**FROM Identifier Defined**

City **ST THOMAS**

State or Country **USVI**

**TO Identifier Defined**

City **WEST PALM BEACH**

State or Country **FL**

Nautical Miles **985**

Statute Miles **1132**

Gallons **1300**

Pounds

Flight Time **2:23**

Altitude FL **430**

**TAKE-OFF POWER**

Flex Take-Off _____

Min Take-Off _____

Condition _____

**AIRFRAME**

**98412**

**24**

**9843 6**

Night _____

T/L **1 1**

IMC **3**

Approach _____

# HYPERION AIR, INC.

# PASSENGER MANIFEST

Registration Number: **N909JE**    Type: **G-1159B**    Pilots: Dave Rodgers, ~~Larry Visoski~~    **Bill Hammond**

DATE: **9 - 14**, 2005    FROM **BED**    TO **HPN**

Departure Time **6 : 30** AM ~~PM~~    Arrival Time **7 : 06** AM ~~PM~~    Trip Number **1819**

**PASSENGERS**

1. Jeffrey Epstein
2. ████████████████████
3. ████████████████████
4. **LARRY SUMMERS**
5. **Guest**
6. _____
7. _____
8. _____
9. _____
10. _____
11. _____
12. _____
13. _____

**COMMENTS**

_____
_____

**FROM Identifier Defined**

City **BEDford**

State or Country **MA**

**TO Identifier Defined**

City **White Plains**

State or Country **NY**

Nautical Miles **150**

Statute Miles **167**

Gallons **300**        **AIRFRAME**

Pounds **3559**    **98546**

Flight Time **0 + 36**        **6**

Altitude FL **16000**    **98652**

**TAKE-OFF POWER**    Night **2**

Flex Take-Off ____.___    T/L **/./**

Min Take-Off ____.___    IMC **2**

Condition _____    Approach **P**

_____
_____

# HYPERION AIR, INC.
## PASSENGER MANIFEST

Registration Number: N909JE     Type: G-1159B     Pilots: **Bill Hammond** Dave Rodgers, ~~████████~~

DATE: 11 - 12 , 2005     FROM TEB     TO TIST

Departure Time 5:20 AM (PM)     Arrival Time 9:35 AM (PM)     Trip Number **1840**

## PASSENGERS

1. Jeffrey Epstein
2. ████████████
3. ████████████
4. IGOR ZINOVIEW
5. VALDSON COTRIN
6. MARK TAYFa
7. _____
8. _____
9. _____
10. _____
11. _____
12. _____
13. _____

## COMMENTS

_____
_____
_____

**FROM Identifier Defined**

City TETERBORO

State or Country NJ

**TO Identifier Defined**

City ST. THOMAS

State or Country USVI

Nautical Miles *1879*

Statute Miles _____

Gallons 2200          **AIRFRAME**

Pounds 13217     9885  3

Flight Time 3 +14     3  2

Altitude FL 410     9888  5

**TAKE-OFF POWER**     Night 3 2

Flex Take-Off 2·15     T/L 1 / 1

Min Take-Off _____     IMC _____

Condition _____     Approach _____

# HYPERION AIR, INC.

## PASSENGER MANIFEST

Registration Number: **N909JE**     Type: **G-1159B**     Pilots: ~~Bill Hammond~~ **Dave Rodgers, Larry Visoski**

DATE: _11 - 16_ 2005     FROM _TIST_     TO _TEB_

Departure Time _6 54_ (AM) PM     Arrival Time _9 44_ (AM) PM     Trip Number _2841_

### PASSENGERS

1. Jeffrey Epstein
2. ████████████████████████
3. ████████████████████████
4. MARK ~~TABBA~~A (Chef)
5. IGor ZINOViEW
6. _____
7. _____
8. _____
9. _____
10. _____
11. _____
12. _____
13. _____

### COMMENTS

_____
_____
_____
_____

**FROM Identifier Defined**

City _ST. THOMAS_

State or Country _U.S.V.I._

**TO Identifier Defined**

City _TeterBoro_

State or Country _N.J._

Nautical Miles _1879_

Statute Miles _____

Gallons _1800_          **AIRFRAME**

Pounds _14450_   _98885_

Flight Time _3 + 49_      _3 8_

Altitude FL _FL430_   _98923_

**TAKE-OFF POWER**     Night _____

Flex Take-Off ____      T/L ___ / ___

Min Take-Off ____      IMC _____

Condition _____      Approach _____

# HYPERION AIR, INC.
# PASSENGER MANIFEST

Registration Number: **N909JE**        Type: **G-1159B**

Pilots: **Bill Hammond**
~~Dave Rodgers~~, Larry Visoski

DATE: _12 - 11_, 2005        FROM _TIST_        TO _KTEB_

Departure Time _1:00_ AM ~~PM~~        Arrival Time _4:48_ AM ~~PM~~        Trip Number _1849_

## PASSENGERS

1. Jeffrey Epstein
2. IGOR ZINOVIEW
3. ▮▮▮▮▮▮▮▮▮
4. ▮▮▮▮▮▮▮▮▮
5. _____
6. _____
7. _____
8. _____
9. _____
10. _____
11. _____
12. _____
13. _____

## COMMENTS

_____
_____
_____
_____

**FROM Identifier Defined**

City _ST. THOMAS_

State or Country _USVI_

**TO Identifier Defined**

City _TETERBORO_

State or Country _NJ_

Nautical Miles _1879_

Statute Miles _2161_

|  |  | AIRFRAME |
|---|---|---|
| Gallons | _2100_ |  |
| Pounds | _15760_ | _9899.8_ |
| Flight Time | _3+48_ | _3.8_ |
| Altitude FL | _430_ | _9903.6_ |

**TAKE-OFF POWER**        Night _2_

Flex Take-Off _____        T/L _1/1_

Min Take-Off _____        IMC _____

Condition _____        Approach _P_

**From:** ▮@aol.com 📎
**Subject:** Charlotte Amalie Census Subdistrict-20130304-00381.jpg
**Date:** March 4, 2013 9:20:38 AM EST
**To:** "Lesley Groff" ▮▮▮▮▮▮
**Reply-To:** ▮@aol.com

1 Attachment, 955 KB

Sent via BlackBerry by AT&T

# N909JE Hyperion Air, Inc Passenger Manifest

Crew: Larry Visoski    David Rodgers    NM

Date: _3_ / _1_ / 2013 ___        Trip: _2250_

Depart: _TEB_    Time: _12_ : _16_    AM (PM) local

City: _NEW Jersey_    State: _NJ._

Arrive: _PBI_    Time: _2_ : _47_    AM (PM) local

City: _WEST PAlm Bch_ State: _FL_

1 Passenger: _Jeffroy EPstein_  7 Passenger: _____

2 Passenger: _Bill GAtes_    8 Passenger: _____

3 Passenger: ███████████    9 Passenger: _____

4 Passenger: _____    10 Passenger: _____

5 Passenger: _____    11 Passenger: _____

6 Passenger: _____    12 Passenger: _____

Gallons purchased: _1100_    Fuel Burn lbs. _10483_

Flight Level: _FL450_    Flight Time: _2+31_

Airframe Time: Start: _10918.1_

Today's flight: + _2.5_

Total Airframe Time = _10920.6_

Night:_____ T/O_____ Approach_____ Min____Flex____VOR_____
Comments:_____

# N909JE JEGE, Inc Passenger Manifest

Crew: Larry Visoski    David Rodgers    NM

Date: 2 / 18 / 2013    Trip: 2246

Depart: PBI    Time: 3 : 27 AM / (PM) ocal

City: WEST PAlm Bch    State: 7L

Arrive: TEB    Time: 5 : 58 AM / (PM) ocal

City: TETERBORO    State: N.J

1 Passenger: Jeffrey Epstein          7 Passenger: ▮▮▮▮▮▮

2 Passenger: ▮▮▮▮▮▮          8 Passenger: ▮▮▮▮▮▮

3 Passenger: ▮▮▮▮▮▮          7 Passenger:

4 Passenger: WOODy AllEN          8 Passenger:

5 Passenger: MRS AllEN          9 Passenger:

6 Passenger: ▮▮▮▮▮▮          10 Passenger:

Gallons purchased: 1400    Fuel Burn lbs. 11224

Flight Level: FL410    Flight Time: 2 +31

Airframe Time: Start: 10904.8

Today's flight: + 2.5

Total Airframe Time = 10907.3

Night: 1    T/O 1 L    Approach VOR    Min    Flex X    VOR

Comments:

# HYPERION AIR, INC.

## PASSENGER MANIFEST

Registration Number: N909JE    Type: G-1159B    Pilots: ~~Bill Hammond~~ JIM WORDEN  Dave Rodgers,  ~~Larry Visoski~~

DATE:  9 - 1 , 2006    FROM EGGW    TO EGPH

Departure Time  11 : 39 (AM) PM    Arrival Time  12 : 30  AM (PM)    Trip Number  1902

**PASSENGERS**

1. ~~Jeffrey Epstein~~ NOT ON BOARD
2. GHISLAINE MAXWELL
3. PRINCE ANDREW
4. ███████████
5. CRASNASKY
6. _____
7. _____
8. _____
9. _____
10. _____
11. _____
12. _____
13. _____

**COMMENTS**

_____
_____
_____

FROM Identifier Defined

City  LUTON

State or Country  ENGLAND

TO Identifier Defined

City  EDINBURGH

State or Country  SCOTLAND

Nautical Miles _____

Statute Miles _____
LITRES 3700
Gallons _____    **AIRFRAME**

Pounds  4910   10021  2

Flight Time  +51    8

Altitude FL   10022  0

TAKE-OFF POWER    Night _____

Flex Take-Off _____    T/L   /

Min Take-Off _____    IMC    1

Condition _____    Approach  ILS

HOUSE OVERSIGHT 006404

JEGE, INC.
AIR TRIP ANALYSIS
2003

| TRIP NO. | DATE | FROM | TO | DEPART. | ARRIVAL | STATUTE MILES | ADDITIONAL PASSENGER/COMMENTS |
|---|---|---|---|---|---|---|---|
| 230 | 11/09/03 | VHHH | ZUUU | 11:22 PM | 1:40 PM | 838 | JE, GHISLAINE MAXWELL, DOUG BANDS, PRESIDENT CLINTONG, JUSTIN, IRA, SAMUEL, JOE, ROBERT, JO... MICHAEL FANGAN, SCOTT |
| 231 | 11/09/03 | ZUUU | ZBAA | 7:36 PM | 9:35 PM | 966 | JE, GHISLAINE MAXWELL, , DOUG BANDS, PRES. CLINTO..., 4 PAX |
| 232 | 11/11/03 | ZBAA | PANC | 2:34 PM | 5:05 AM | 3,958 | JE, |
| 233 | 11/11/03 | PANC | JFK | 6:16 AM | 4:19 PM | 3,383 | JE, |
| 234 | 11/14/03 | JFK | PBI | 8:41 PM | 10:54 PM | 1,027 | JE, BRENT TINDALL, |
| 235 | 11/18/03 | PBI | JFK | 3:47 PM | 6:00 PM | 1,027 | JE, BRENT TINDALL, |
| 236 | 11/21/03 | JFK | CMH | 2:50 PM | 4:03 AM | 483 | JE, |
| 237 | 11/21/03 | CMH | TIST | 7:46 PM | 12:10 AM | 1,834 | JE, |
| 238 | 11/22/03 | TIST | PBI | 6:02 PM | 7:33 PM | 1,122 | JE, NICK LAMBROS, CHRIS LAMBROS, TOM PAYETTE |
| 239 | 11/23/03 | PBI | JFK | 5:44 PM | 7:53 PM | 1,027 | JE, |
| 240 | 11/25/03 | JFK | PBI | 8:12 PM | 10:25 PM | 1,027 | JE, CHISLAINE MAXWELL, , ROGER, GLEN, EVA..., MORAN, COCO BROWN, BREN..., TINDALL |

TOTAL 105,658

**Passengers 2004**

January 3, 2004          Flight 1687


January 3, 2004          Flight 1688


January 20, 2004         Flight 243

January 23, 2004         Flight 244

February 22, 2004        Flight 250
Two Brazilians

February 27, 2004        Flight 252
Matt Groening (Simpson Guy)

March 11, 2004           Flight 1700

Boyfriend

March 13, 2004           Flight 1701

March 25, 2004           Flight 1704

March 31, 2004           Flight 256

April 2, 2004            Flight 257

April 6, 2004            Flight 1705


# HYPERION AIR, INC.

## PASSENGER MANIFEST

Registration Number: N909JE    Type: G-1159B    Pilots: ~~Bill Hammond~~ JIM WORDEN  Dave Rodgers,  ~~Larry Visceli~~

DATE: 9 - 1 , 2006    FROM EGGW    TO EGPH

Departure Time 11 : 39 (AM) PM    Arrival Time 12 : 30 AM (PM)    Trip Number 1902

**PASSENGERS**

1. ~~Jeffrey Epstein~~ NOT ON BOARD
2. GHISLAINE MAXWELL
3. PRINCE ANDREW
4. ▓▓▓▓▓▓▓▓▓▓
5. CRASNASKY
6. _____
7. _____
8. _____
9. _____
10. _____
11. _____
12. _____
13. _____

**FROM Identifier Defined**

City LUTON

State or Country ENGLAND

**TO Identifier Defined**

City EDINBURGH

State or Country SCOTLAND

Nautical Miles _____

Statute Miles _____
LITRES 3700

Gallons _____    AIRFRAME

Pounds 4910    10021 2

Flight Time +51    8

Altitude FL _____ 10022 0

**TAKE-OFF POWER**    Night _____

Flex Take-Off _____    T/L ____/____

Min Take-Off _____    IMC ____1____

Condition _____    Approach ILS

**COMMENTS**

_____

_____

_____

_____

# HYPERION AIR, INC.

## PASSENGER MANIFEST

Registration Number: N909JE    Type: G-1159B    Pilots: ~~Bill Hammond~~ JIM WORDEN ~~Dave Rodgers,~~ ~~Larry Visoski~~

DATE: 9 - 1, 2006    FROM EGGW    TO EGPH

Departure Time 11:39 (AM) PM    Arrival Time 12:30 AM (PM)    Trip Number 1902

**PASSENGERS**

1. ~~Jeffrey Epstein~~ NOT ON BOARD
2. GHISLAINE MAXWELL
3. PRINCE ANDREW
4. ▓▓▓▓▓▓▓▓▓▓
5. CRASNASKY
6. _____
7. _____
8. _____
9. _____
10. _____
11. _____
12. _____
13. _____

**COMMENTS**

_____
_____
_____

**FROM Identifier Defined**

City LUTON

State or Country ENGLAND

**TO Identifier Defined**

City EDINBURGH

State or Country SCOTLAND

Nautical Miles _____

Statute Miles _____

LITRES 3700

Gallons _____    **AIRFRAME**

Pounds 4910    10021 2

Flight Time +51    8

Altitude FL _____    10022 0

**TAKE-OFF POWER**    Night _____

Flex Take-Off _____    T/L _____/_____

Min Take-Off _____    IMC 1

Condition _____    Approach ILS

HOUSE OVERSIGHT 007146

# JEGE, INC.

## PASSENGER MANIFEST

Registration Number: **N908JE**     Type: **B-727-31**

Pilots: ~~Dave Rodgers~~, **Bill Hammond**  **Larry Visoski**
Flight Engineer:     **Larry Morrison**

DATE: **3** . **3** , 2006     FROM **EGGW**     TO **JFK**

Departure Time **4** : **04** ~~AM~~ (PM)     Arrival Time **5** . **51** ~~AM~~ (PM)     Trip Number **364**

### PASSENGERS

1. Jeffrey Epstein
2. ███████████
3. ███████████
4. JEAN LUK BRUNNEL
5. Jimmy CAYNE
6. ███████████
7. THEODORE SERURE
8. ███████████
9. John PhelAN
10. BRIAN HIGGINS
11. ███████████
12. CRAIG OVERLANDER
13. ███████████
14. _____
15. _____
16. _____
17. _____
18. _____
19. _____

**FROM Identifier Defined**

City **LUTON LONDON**
State or Country **ENGLAND**

**TO Identifier Defined**

City **NEW YORK**
State or Country **N.Y.**
Nautical Miles **3088**
Statute Miles _____
Gallons **7819**     **AIRFRAME**
Pounds **56739** **33170 6**
Flight Time **6 + 47**     **6 7**
Altitude FL **FL 360** **33177 3**

20. _____     Night _____
21. _____     T/L _____/__
22. _____     IMC _____.__
23. _____     Approach _____
24. _____     _____
25. _____     _____
26. _____     _____

HOUSE OVERSIGHT 007243

# JEGE, INC.

# PASSENGER MANIFEST

Registration Number: N908JE       Type: B-727-31

Pilots: ~~Dave Rodgers,~~  **Bill Hammond**  Larry Visoski
Flight Engineer:       Larry Morrison

DATE: **3 - 3** 2006     FROM *EGGu*     TO *JFK*

Departure Time **4 : 04** (AM) **PM**     Arrival Time **5 : 51** (AM) **PM**     Trip Number **364**

**PASSENGERS**

1. Jeffrey Epstein
2. ███████████
3. ███████████
4. *JEAN LUK BRUNNEL*
5. *JIMMY CAYNE*
6. ███████████
7. *THEODORE SERURE*
8. ███████████
9. *John Phelan*
10. *BRIAN HIGGINS*
11. ███████████
12. *CRAIG OVERLANDER*
13. ███████████
14.
15.
16.
17.
18.
19.

**FROM Identifier Defined**

City *LUTON LONDON*

State or Country *ENGLAND*

**TO Identifier Defined**

City *NEW YORK*

State or Country *N.Y.*

Nautical Miles *3088*

Statute Miles

Gallons *7819*     **AIRFRAME**

Pounds *56739*   *33170  6*

Flight Time *6 +47*       *6  7*

Altitude FL *FL360*   *33177  3*

20. _____   Night _____
21. _____   T/L _____
22. _____   IMC _____
23. _____   Approach _____
24. _____
25. _____
26. _____

# Flight Options, Inc.

*Passengers Itinerary*

| Owner | Air Ghislaine, Inc. | Trip # | 335859 |
|---|---|---|---|
| Acct# | 467N | Trip Date | Tuesday, October 22, 2002 |
| Team | E | Plane Type | BE400N |
| 24 Hr Toll Free # | 877-357-1263 | Leg # | 1 |
| | | Flight Time | 2.7 |

| DEPART | 7:30 PM | KTEB | ARRIVE | 10:02 PM | KSRQ |
|---|---|---|---|---|---|
| | 1930 ET | | | 2202 ET | |
| Airport | TETERBORO (LOCKER) | | Airport | SARASOTA BRADENTON | |
| | TETERBORO | NJ | | SARASOTA | FL |
| FBO | *ATLANTIC AVIATION*(LOCKER) | | FBO | *DOLPHIN AVIATION* | |
| PHONE # | 201-288-1740 | | PHONE # | 941-355-2902 x3 | |
| FAX | 201-288-7503 | | FAX | 941-351-7197 | |

**CATERING:**

RUDY'S INFLIGHT CATERING (Crew Menu)

None requested per Helen...nsm/e  3 CREW DINNERS ORD W/GENE AT RUDYS FOR DLV TO ATLANTIC AT TEB AT 1800 ON
10/22/02.....NT

**TRANSPORTATION:**

KSRQ: DROPPING OFF 1 PAX...mm/e

**PASSENGERS:**

1 MAXWELL, GHISLAINE
2 BANDS, DOUG

**LEG REMARKS :**

| Signature | | Date | |
|---|---|---|---|

Printed: 6:04:58 PM

HOUSE OVERSIGHT 007517

**Air Ghislaine, Inc.**

Attn:    Cimberly Foley
Phone:  (212) 750-9895
Fax:    (212) 371-8042
Trip Id: AIR411226

## Flight Itinerary

Phone: (888)-U-FLY-RTA ((888)-835-9782)
Local: 316-676-3928
Fax:  316-676-3723

We are looking forward to your upcoming trip. The following is the itinerary we have for this trip. Please look over the itinerary and advise us of any changes or discrepancies at your earliest convenience. Out of respect to the other owners of this aircraft, we request that you DO NOT SMOKE during flight. However, if you must, please keep it to a minimum. NO PIPES OR CIGARS PLEASE. Thank you for your consideration.

### Leg # 1

A/C Type: Beechjet 400A     Captain: TBA            Estimated Time en Route: 02:01
Tail #:    TBA                Co-Pilot: TBA         Distance – Nautical Miles: 790

Depart:   KLIT – Little Rock, AR            Arrive:  KPBI – West Palm Beach, FL
FBO:      Central Flying Svc, Inc - (501) 375-3245    FBO:    Jet Aviation-Avitat - (800) 538-0724
          Adams Field                          Palm Beach Intl
          Wednesday, December 26, 2001         Wednesday, December 26, 2001
          10:00 AM (CST)                   1:01 PM  (EST)

2 passenger(s) - General Wesley Clark, Gertrude Clark

Catering:  Evian water for (2)             Contact: Cimberly Foley
         Coffee for (2)                      (212) 750-9895 (Office)
         Assorted juices for (2)              General Wesley Clark
         Whole milk for (2)                Please provide a local contact number.

Ground          None required
Transportation:

Baggage:  (2) Bags

Note: Due to the landing performance of the Beechjet and the Hawker, any runway less than 5700 feet may be too short if the runway is wet. If the runway is wet and an alternate airport is required, your Flight Coordinator will help you find the most convenient airport.
    **December 20th and 21st are our next "Peak Days". We anticipate these will be among the most popular travel days of the year. In order to accommodate all flight requests, we are entitled to advance your flight to an earlier departure time or delay your flight to a later time by up to three hours. In addition, we must be notified of new trips or changes to your existing itinerary at least 48 hours prior to departure.
    **The lead passenger on each flight will be required to show photo identification to one of your assigned pilots.

Please don't hesitate to call if there is anything we can do to ensure a pleasant trip. Our phone number is 888-U-FLY-RTA (888-835-9782).

Best Regards,

AIR411226                  December 18, 2001  /  4:06 PM

EXHIBIT 71

UNITED STATES OF AMERICA, v.
GHISLAINE MAXWELL,

SEALED
December 8, 2021

| LC8VMAX4 | Rodgers - direct | Page 1818 |
|---|---|---|

1  own?
2  A. From '91, the first one was a Hawker Siddeley 125 aircraft.
3  The next aircraft was a Gulfstream G2B. After that we had a
4  smaller aircraft, a twin engine, light twin Cessna 421. Then
5  we purchased the Boeing 727.
6  Q. Is that it for that period, '91 to 2004?
7  A. Yes, that's it for that period.
8  Q. On the Gulfstream G2B, what, if any, divider was there
9  between the pilot and the passengers?
10 A. As you walked up the airstairs and made a right to go back
11 to the passenger cabin, you passed through a door that
12 contained a passenger cabin. So that door was always closed
13 from the cockpit or from the flight deck.
14 Q. But during the flights that you piloted on that plane, were
15 you able to observe what the passengers were doing?
16 A. No.
17 Q. And how about on the Boeing, what divider, if any, was
18 there between the pilots and the passengers during flight?
19 A. We had two there. As you walked up the airstairs, if you
20 looked left to the flight deck, the door was closed -- there
21 was a door there that was always closed. And then as you made
22 a right to go back to the forward lounge area, there was
23 another door that you would pass through. So there were
24 literally two doors on that one.
25 Q. Were you able to observe what the passengers were doing on

| LC8VMAX4 | Rodgers - direct | Page 1819 |
|---|---|---|

1  the Boeing during the flights you piloted?
2  A. No.
3  Q. During your time working as a pilot for Mr. Epstein, what,
4  if any, records did you keep about the flights that you
5  piloted?
6  A. We kept a passenger manifest which we filled out after
7  every flight. And then at the end of the day, we had an
8  aircraft log that we put down flight times that we flew on that
9  particular day. And then I also kept a personal logbook.
10 Q. Walking through each of those, starting with the flight log
11 for the plane, what information went into that log?
12 A. Okay. On the passenger manifest you'd have the date, you
13 would have the trip number, you would have the departure, the
14 destination. We had who the passengers were on there, the
15 flight time, I think we also had the amount of fuel we would
16 purchase on there. And then on the aircraft log, it was really
17 for maintenance procedures. It had about engine times,
18 aircraft landings, APU times, stuff like that.
19 Q. What happened to the passenger manifests that you filled
20 out for Jeffrey Epstein's planes?
21 A. Those -- I had those and turned those over to an attorney
22 of Jeffrey's.
23 Q. One of Jeffrey Epstein's attorneys?
24 A. Yes.
25 Q. Did you keep a copy?

| LC8VMAX4 | Rodgers - direct | Page 1820 |
|---|---|---|

1  A. No.
2  Q. Now, you also mentioned a set of records that you kept
3  separately. What was that?
4  A. My logbook.
5  Q. What's a logbook?
6  A. It just shows you the day you flew, the destination you
7  went to, the flight time that you flew on that.
8  Q. What other information about each flight you piloted did
9  you keep in your logbook?
10 A. I kept passenger names also.
11 Q. Now, did that logbook include every flight that each of
12 Mr. Epstein's planes took or only the flights where you were a
13 crew member?
14 A. It was only the flights that I was a crew member.
15 Q. Over the course of your employment for Mr. Epstein, how
16 often were you away from work?
17 A. On average, about five weeks a year, between vacation and
18 training.
19 Q. I'd now like to ask you to please pull out the binder in
20 front of you and take a look at what's been marked for
21 identification as Government Exhibit 662.
22 A. Okay. I have it.
23 Q. Do you recognize that?
24 A. Yes.
25 Q. What is it?

| LC8VMAX4 | Rodgers - direct | Page 1821 |
|---|---|---|

1  A. That's a copy of my logbook.
2  Q. Did you review this before coming to testify here today to
3  make sure that this exhibit is an accurate copy of your
4  logbook?
5  A. Yes, I did.
6  Q. Was each entry in this logbook made at or near the time of
7  the flight reflected in each row?
8  A. Yes, it would have been made at the time that flight was
9  over, probably within 30 minutes of the passengers leaving.
10 Q. Did you keep these records in the course of your regularly
11 conducted activity as a pilot?
12 A. Yes.
13 Q. And was maintaining this logbook a regular practice of that
14 activity?
15 A. Yes.
16        MS. COMEY: Your Honor, the government offers Exhibit
17 662 under seal; and a redacted version, 662-R, for the public.
18 The sealing is for witness and third-party reasons.
19        MR. EVERDELL: No objection.
20        THE COURT: All right. 662 is admitted under seal for
21 the reasons indicated. 662-R is admitted, which is a redacted
22 version.
23        (Government's Exhibits 662, 662-R received in
24 evidence)
25        MS. COMEY: Thank you, your Honor.

**In The Matter Of:**
*UNITED STATES OF AMERICA, v.*
*GHISLAINE MAXWELL,*

*SEALED*
*December 8, 2021*

*Southern District Court Reporters*

Original File XLC8CMAXF SEALED.txt
Min-U-Script® with Word Index

# EXHIBIT 72

1 (Trial resumed; jury not present) 2 THE COURT:
All right. Matters to take up. 3 MS. COMEY: There
were just a couple issues that we 4 wanted to put on the
record, your Honor. 5 First, I've conferred with defense
counsel, and they 6 have indicated that they are releasing
Carolyn from recall. So 7 I understand that any sequestration
order no longer applies to 8 her.

9 MR. PAGLIUCA: That's correct, your Honor.10
THE COURT: All right. Thank you. 11 MS.
COMEY: And then I also conferred with defense12 counsel
about Kimberly Meder and whether she would be permitted13 to
be in the courtroom for the remainder of trial. I'm told by14
defense counsel that they have no objection; though, of
course,15 they may end up seeking to recall her in the defense
case, but16 that they have no objection to her being in the
courtroom.17 MR. EVERDELL: That's correct, your
Honor.18 THE COURT: Okay.

19 MS. COMEY: And then with respect to redacted 296.20
which was the video of the Palm Beach residence,
defense21 counsel has been reviewing the redacted version
that we sent22 them on Tuesday. Once they have their
position on its23 admissibility, we will formally offer
it.

24 MR. PAGLIUCA: Also correct, your Honor.25
THE COURT: Great. Okay. Thank you.

1 THE COURT: Okay. Thank you. 2 MR.
EVERDELL: I have a copy which I can hand up to

3 the Court now.

4 THE COURT: Sure. Thank you. 5 MR.
EVERDELL: Your Honor, on that same score, we'd

6 like to be able to put folders under the jurors' chairs with

7 that exhibit in them that they would only be asked to open if

8 it's admitted.
9 MS. COMEY: No objection, your Honor.

10 THE COURT: Okay. Thank you. 11 MR.
EVERDELL: I will take care of that.

12 Thank you, your Honor.

13 MS. MENNINGER: Good morning, your Honor.

14 THE COURT: Good morning, Ms. Menninger.

15 MS. MENNINGER: A couple of issues.

16 I've conferred with the government, and I believe we

17 have agreement. I would like to just put them on the record

18 prior to the testimony of Annie Farmer. She is not
testifying19 anonymously, your Honor. Therefore, my plan
is to use the

20 counsel screen as one normally would in these
situations,

21 rather than so much of the paper. But we have binders in the

22 event someone wants to look at the whole set, for the
Court.

23 the government for any impeachment materials, and for
the24 witness.

25 THE COURT: Correct to assume that none of the

UNITED STATES OF AMERICA, v. GHISLAINE MAXWELL,

TRIAL December 9, 2021

LC9VMAXT Page 1978

1 documents you'll show her have the full or real names of the 2 other witnesses testifying under pseudonym? 3 MS. MENNINGER: Right, your Honor. I don't think they 4 had any interaction with one another. I don't believe there's 5 anything in here that references anyone else. 6 THE COURT: Okay.

7 MS. MENNINGER: Your Honor, there is a substantial 8 amount of hearsay, both within the record and also in the 9 public domain as between Annie Farmer and her sister Maria10 Farmer. I've conferred with the government that there won't be11 hearsay being offered from Maria Farmer, with the exception of12 at least one place I know where it's in effect on the listener13 that Annie traveled to New York because her sister told her to 14 come there. But outside of that, we have agreed that we're not15 having — there's no other hearsay exception that applies to16 Maria Farmer's statements.

17 Within that subset, your Honor, there has been a18 contention by Maria Farmer that nude photographs or provocative19 photographs were stolen from her. None were found when20 Mr. Epstein's home was searched. That, again, would be hearsay21 from Maria and is not planning to be a part of the government's22 case or the defense's cross.

23 And lastly, your Honor, because Ms. Farmer is herself24 a practicing therapist, psychologist, she has made a number of25 statements publicly about her opinions on the topic of

LC9VMAXT Page 1980 1 As we explained to the defense this morning, we

2 anticipate calling Special Agent Michael Buscemi as a summary 3 witness, as is common in this district. His testimony will be

4 limited to his analysis of exhibits; he won't be analyzing

5 testimony of other witnesses.
6 There are a number of exhibits in this case which have 7 not yet been published or reviewed during the course of this

8 case; and so we anticipate fairly brief testimony from Special

9 Agent Buscemi about his review of several exhibits.

10 In short, the testimony will concern, among other

11 things, the message pads, the majority of which have not been

12 published or viewed by the jury at this point. And the purpose

13 of the testimony is to connect up several exhibits and review

14 them in a way to make those exhibits clear to the jury and

15 publish them to show, for example, the continuity of certain

16 phone numbers and names, where they change over time, where17 they are in the message books in order to make that clear for

18 the jury.

19 I anticipate that the testimony from Special Agent

20 Buscemi would be likely something like 15 to 20 minutes, maybe

21 slightly more, again, just talking about exhibits and the

22 similarity of phone numbers and names between a variety of23 different exhibits. That's the scope of his testimony.

24 Our view is that's consistent with the way summary

25 witnesses are called in many trials in this district

and

LC9VMAXT Page 1979

1  grooming. As she was not endorsed, obviously, under 702,
I 2  expect that she will not use that word or give anything
that 3  sounds like an opinion along those lines. She's here as
a fact 4  witness, your Honor. And the government has agreed
they don't 5  intend to offer any opinion testimony from
her.
6  THE COURT: Great. Thank you.  7  MS.
POMERANTZ: That all sounds accurate, your Honor. 8  THE
COURT: Thank you, Ms. Pomerantz.  9  What else to
take up?
10  MR. PAGLIUCA: Your Honor, if I might, I don't know if I 11
the Court wants to take this up now, but I'll just give this
as 12  a preview for later.
13  The government has endorsed Mr. Buscemi as a, as I 14
understand it, summary witness. This is a 1006 issue. As
I 15  understand it, I don't believe that this is an
appropriate 16  summary witness under 1006. As I understand
it, the purpose is 17  to talk about testimony or pieces of
evidence that have been 18  admitted, specifically not to
analyze any complex records or 19  other business
transactions or phone records or things like 20  that. So I
just wanted to give the Court a heads-up on that.
21  I'm not exactly sure precisely what he's being offered
to 22  testify about, but I expect that there will be an
objection to 23  that testimony before it happens.
24  THE COURT: Who will I hear from? 25  MS.
MOE: Yes, your Honor.

LC9VMAXT Page 1981 1  doesn't exceed the scope of the

ordinary practice.

2  THE COURT: Let's take the specific example that

3  you've given on message pads. So just give me an example of

4  the kind of testimony he would provide there.

5  MS. MOE: Yes, your Honor.
6  So, for example, within the message pads, we published 7
yesterday, I think, just either two or three specific messages

8  that had a first and last name of someone and a phone
number.  9  But elsewhere throughout the message pads, there
appear entries 10  that only have a first name, and sometimes
that entry is, for

11  example, Carolyn and sometimes it's Caroline. But when
you

12  compare the phone numbers -- and there are a variety
of 13  different phone numbers throughout the book -- it becomes
clear

14  that Caroline is the same Carolyn, first and last name, as
some

15  of the other messages, because there's continuity between
the

16  phone numbers.

17  And there are a variety of different phone numbers

18  throughout the exhibits with different names like
Carolyn,

19  Caroline, and Carolyn with a last name. And reviewing them and

20  analyzing them makes it clear throughout the books and across
a

21  variety of different dates that we're talking about the
same

22  person. And so that facilitates both publishing the
exhibits

23  so that the jury can see them for the first time, and
doing 24  that in a way that sort of connects up those
different 25  exhibits. And so that's the purpose of that
testimony.

UNITED STATES OF AMERICA, v. GHISLAINE MAXWELL,                    TRIAL December 9, 2021

LC9VMAXT Page 1982

1 THE COURT: Let's take that example, Mr. Pagliuca. 2 MR. PAGLIUCA: Your Honor, the problem, I think, is 3 that it is simply highlighting a specific piece of evidence; 4 that this is summation, essentially, and not witness testimony. 5 The witness has no personal knowledge of the phone calls. The 6 witness is simply comparing this to that, which is what should 7 be done in summation or should have been done with the witness 8 who actually was the testifying witness with the exhibit. 9 So this could have been done, you know, with 10 Ms. Hesse, for example. You have that message pad? Yes. 11 Compare that message pad with this particular record. Are 12 those the same phone numbers? I suppose that could happen. 13 Or with Carolyn, could have been asked, Is that your 14 phone number? Does that match the record? 15 This is simply an FBI agent who's going to take those 16 pieces of evidence selectively and then talk about them; this 17 matches this, this matches that. I don't believe that's 18 appropriate under 1006, which is, you know, the rule that 19 allows for summary exhibits, for example, but does not allow 20 for summary testimony of things that have already been admitted 21 into evidence. 22 Certainly in the government's closing argument they 23 can do this and they can make whatever arguments they want. 24 But this is simply a closing argument through a summary witness 25 in the middle of a trial before a very long break, and I just

LC9VMAXT Page 1984 1 closing.

2 MS. MOE: Your Honor, we often call summary witnesses

3 who are not involved in the investigation who are just talking

4 about their analysis of records. The purpose here isn't to

5 have the summary witness talk through the investigation or

6 investigative steps, but to talk about a review of exhibits.

7 And I have called agents to do just that.

8 THE COURT: But for the purposes of doing what 1006

9 permits, that's not what this is. I've seen it in two

10 contexts: One, 1006 you've got a complicated, extensive set of

11 records that are being summarized via a witness. And then

12 you've got investigative summary witnesses who talk through

13 factually what they did in a sense. And you're not doing

14 either of those; you're providing essentially a closing 15 argument or mini closing argument via a witness who has no

16 personal involvement in the investigation and doing so, sounds

17 like, with materials that don't require the type of 1006

18 summary.

19 So you've created, I think, a little bit of a hybrid

20 of certainly what I've seen those two exemplars, for them to be

21 used. And so it just does sound like argument, summation, and 22 the kind of thing that -- I mean, it's certainly true you could

23 have done it with the witnesses. At some point I might have

24 said, Save it for summation, counsel. But I can't say I've

25 ever seen a version like this.

1   don't think it's appropriate under these circumstances. 2 THE COURT: This agent, what was his role in the 3 investigation?

4 MS. MOE: Your Honor, this agent's role was limited to 5 analyzing these records in preparation for trial. 6 Your Honor, in particular because these exhibits 7 contain identifying phone numbers and names, we feel more 8 comfortable publishing these exhibits with an agent, as opposed 9 to asking lay witnesses to review government exhibits for us in10 order to facilitate that testimony. Our preference is to

11 publish this with an agent to do this carefully and12 thoughtfully so that we're able to publish the exhibits before13 the jury without exposing any identifying information.14 It's very streamlined testimony, your Honor. We're15 talking about exhibits the jury hasn't yet seen that haven't16 been published. It's not duplicative of anything that's17 already happened at the trial. And in particular, because18 closings will be maybe as long as two weeks from now, we think19 the jury should see these exhibits now; they have not yet been20 published.

21 THE COURT: That's a little bit of the problem.22 Typically, in my experience, the summary agent witness23 is the agent who talks about what he did in the investigation,24 and that helps draw out complicated document comparators and25 the like, not somebody who's just effectively doing a mini

2 I have in trials in this district called summary

3 witnesses who helped publish and connect up facts across 4 exhibits without creating summary charts under Rule 1006. I

5 think this testimony --
   6 THE COURT: You're not offering him under 1006?

7 MS. MOE: That's correct, your Honor.

8 THE COURT: And he isn't involved in the

9 investigation.

10 MS. MOE: That's correct, your Honor.

11 We'd just like an opportunity to publish these

12 exhibits in a way that facilitates the jury seeing them without

13 doing this through lay witnesses where there are complications

14 about reading things out loud, so that it's streamlined and

15 efficient so the jury can see the evidence that's been

16 admitted. We think that's appropriate.

17 THE COURT: Why not just do it in closing?

18 MS. MOE: Your Honor, I think to rest our case and

19 have the jury not see some of the evidence in this case, our

20 preference would be --
21 THE COURT: The one thing I've seen that it sounds

22 like you're saying is actually not with a witness, but a bunch

23 of documents come in, and then the government spends a little

24 bit of time just publishing, publish this and publish that.

25 Again, I've never seen -- never seen -- an agent, a

Southern District Court Reporters (3) Pages 1982 - 1985

UNITED STATES OF AMERICA, v. GHISLAINE          TRIAL December 9, 2021
MAXWELL,

LC9VMAXT Page 1986

1 law enforcement agent, who had no involvement in
the 2 investigation of the case and who isn't providing
testimony 3 essentially pursuant to 1006.

4 MS. MOE: Your Honor, if the Court's preference is for 5
us to, without a person on the stand, just ask the jury to turn 6
from one exhibit to another to another, we can do that. I 7
think that is slightly more awkward than facilitating that 8
through a witness and pointing out the connections between two
9 things.

10 THE COURT: Right. But the witness is providing11
testimony over which they have no personal knowledge.
You're12 simply asking them to do the work of the
government in the13 closing.

14 So, Mr. Pagliuca, do you have any objection to the15
government publishing a few documents, going to a few
points,16 and then we move on, without a witness? 17
MR. PAGLIUCA: I don't understand that process. I18
guess, your Honor. We're simply going to -- is this with
a19 witness or without a witness?

20 THE COURT: Without a witness. 21 MR.
PAGLIUCA: We're simply going to say, The22
government would like the jury to look at this and then look
at23 that?

24 THE COURT: Yes.

25 MR. PAGLIUCA: I do object to that process, your

LC9VMAXT Page 1988 1 THE COURT: Right. It's a
streamlined version of the

2 closing argument. And again, I'm not aware -- I'm not aware --

3 certainly seen summary with investigative officers. That's
not 4 this. And I've seen officers who are analyzing
complicated

5 data under 1006 provide that to the jury. That's not this.

6 And I've seen, when the evidence comes in, the government
spend

7 a fair amount of time -- as you've done with some exhibits
--

8 going through piece by piece in order to highlight and draw

9 certain connections.

10 I'm not going to let you do it through a witness who

11 has no personal experience. I think you do it in
closing.

12 That's what this is, it's closing argument.

13 MS. MOE: Understood, your Honor. 14
THE COURT: Okay. What else?

15 MR. PAGLIUCA: I think the only open issue that I'm

16 aware of, your Honor, is the Exhibit 52 issue. 17
THE COURT: Yes. I got the briefing at 9:45, so 15

18 minutes early finished, I appreciate it. And I am still

19 dotting my i's and crossing my t's. I think we don't need
it20 till the government is prepared to rest; is that
right?21 MS. COMEY: That's correct, your Honor.

22 THE COURT: You agree with that?

23 MR. PAGLIUCA: Yes, your Honor. 24 THE
COURT: Anything else to take up now?25 MR.
PAGLIUCA: Not from the defense, your Honor.

1 Honor. This is classically what someone would do in a closing 2 argument. You can put this in a Power Point and put up a 3 screen that shows this, and then put up a screen that shows 4 that, and then make an argument about it.

5 And if they wanted to elicit this testimony, it should 6 have been done, I believe, with a witness that then could be 7 cross-examined substantively about what was being discussed. 8 This witness, Mr. -- if I'm saying it correctly,

9 Mr. Buscemi, can't be cross-examined substantively about10 anything; all he's going to be able to say would be, I looked11 at this, and I looked at that, and I looked at this, I looked12 at that, and those are the exhibits.

13 So I guess I'm a little confused about the process,14 where one would just look at a jury and say, Look at this and15 then look at that. And I don't understand why that isn't, sort16 of, impermissibly highlighting certain pieces of evidence. And17 then, you know, am I allowed to get up and say, Why don't you18 look at this and why don't you look at that? It just seems19 rather awkward to me to be doing it in that fashion.

20 MS. MOE: Your Honor, that's why we propose doing this21 with a witness, to avoid any, sort of, awkwardness. But I22 don't understand the objection to publishing items that are in23 evidence that the jury has not yet seen. Again, our hope was24 for this to be very streamlined; but I understand the Court's25 concerns.

needless to say, I didn't

2 send you a draft of the charge last night. I think my thinking

3 is if the government rests today or tomorrow, which sounds like

4 what we anticipate, I'll use the remainder of tomorrow, one, to 5 hear the defense motions; and two, for me to work on the charge

6 on my own, having already received your drafts.

7 And then I'll send it to you at some point in advance

8 of a charging conference, which we'll do next week. And again,

9 I'm open to you telling me whether you want to do it in the

10 evenings after testimony or on Saturday. I think really the

11 analysis there depends on what the defense now anticipates as

12 the length of its case.

13 So are you in a position to give any additional

14 estimate as to that?

15 MR. PAGLIUCA: We don't, your Honor.

16 I think we're hoping to take this evening and tomorrow

17 to put those pieces together, and then provide the Court and

18 the government with that analysis.

19 THE COURT: Okay. Ms. Sternheim.

20 MS. STERNHEIM: May I just say, I think it is our

21 thinking at the moment that if we are going to be using the

22 trial days, that our preference would be to Saturday for a

23 charge conference. It seems that it would just be a more

24 focused time.

25 THE COURT: I think really the only reason not to do

Southern District Court Reporters (4) Pages 1986 - 1989

UNITED STATES OF AMERICA, v. GHISLAINE                    TRIAL December 9, 2021
MAXWELL,

LC9VMAXT Page 1990

1 that -- and, as I said, I wanted to have agreement from
both 2 sides on it. But the reason not to do that would be
if we 3 might get to closings before the following Monday.
And that's 4 why it's really -- because if we will get to
closings before 5 the following Monday, the charge needs to
be done before then. 6 MS. STERNHEIM: Of course. And
we will update the 7 government and the Court with
regard to scheduling. 8 THE COURT: Okay.

9 So I think if there's a chance that the defense either10
won't put on a case or would rest before Friday, then we
should11 do the charge conference Thursday night. So
that's the12 question.

13 MR. PAGLIUCA: Understood, your Honor. 14
THE COURT: Okay.

15 Does the government have any preference or views on16
that?

17 MR. ROHRBACH: The government has no preference. That18
makes sense to us. Thank you, your Honor. 19 THE
COURT: Okay. Great. Yes. 20 MS. COMEY: Your
Honor, in connection with the defense21 case, I do think there's
still the outstanding issue of the22 subpoena to Mr.
Glassman.

23 THE COURT: Yes. I was looking at that last night as24
well. And I have a question and a little bit of a proposal,25
see if we can get back to a magical moment. It's a difficult

LC9VMAXT Page 1992 1 MR. ROHRBACH: Yes, your Honor.

The government has a

2 few proposed redactions to its letter; so we will propose those

3 redactions and docket a version that implements those

4 redactions subject to the Court's ruling on them.

5 THE COURT: Okay. Remember, my basic view is get it

6 on the docket and then propose your redactions so that I'm

7 not -- put it on the docket with your proposed redactions and

8 I'll let you know if it should be redacted less. 9
MR. ROHRBACH: Yes, your Honor. And we will do that

10 today.

11 THE COURT: Okay. And same for -- I think you were

12 just waiting to see if the government had proposed
redactions.13 is that --
14 MR. PAGLIUCA: That's correct, your Honor.15 I
think we can mirror the government's redactions. I

16 have to just think about whether the Exhibit A, I think it
was,17 that was attached and then responded to, I think we
need to

18 think about how that gets redacted. And I think likely my
view19 would be the entirety of it gets redacted. 20
THE COURT: Okay. I will consider that.

21 Anything else?

22 MR. ROHRBACH: Nothing from the government.23
MR. EVERDELL: No, your Honor.

24 THE COURT: All right. We're missing a couple jurors,

25 but I suspect they'll be here soon.

1 issue and it's close, I'll admit, based on where I am now. I 2 think it's close.

3 But what I'm wondering is if what the defense 4 essentially needs to make the arguments it wants to make is 5 testimony from Mr. Glassman that he told the government that he 6 told Jane that some form of cooperation or testimony would help 7 her case. That question might have some evidentiary issues.

8 but it's not an attorney-client privilege issue. 9 I think the answer to that question basically gets the 10 defense what it's looking for without infringing on 11 attorney-client privilege. And so I'd like you to consider a 12 proposal in which the testimony that you're seeking is limited 13 to that and, depending on the parties' views and Mr. Glassman's 14 views, if that is the limit of the testimony, whether it could 15 be through stipulation.

16 So you'll consider that.

17 MS. COMEY: Yes, your Honor. 18 MR. PAGLIUCA: We will, your Honor. 19 THE COURT: Okay. All right. 20 Anything else I can take up? 21 We're checking on our jurors.

22 MR. EVERDELL: Nothing from the defense, your Honor. 23 THE COURT: I'm sorry.

24 So you put in the letters to me last night on 52. 25 You'll docket those today?

1 We'll take a break and start as soon as they're here.

2 Thank you.

3 (Recess)

4 THE COURT: Anything to take up before we bring in the 5 jury?

6 MR. ROHRBACH: Nothing from the government, your 7 Honor.

8 MR. EVERDELL: Nothing from the defense, your Honor. 9 THE COURT: Okay. We'll bring in the jury please.

10 (Jury present)

11 THE COURT: Good morning, members of the jury.

12 Hope you had a good of evening. Thank you again for 13 your continued diligence, punctuality, and patience.

14 Mr. Rohrbach, the government may call its next 15 witness.

16 MR. ROHRBACH: The government calls Tracy Chapell. 17 THE COURT: Tracy Chapell may come forward. 18 TRACY CHAPELL, 19 called as a witness by the Government, 20 having been duly sworn, testified as follows: 21 THE COURT: Thank you, Ms. Chapell. 22 Mr. Rohrbach, you may inquire.

23 DIRECT EXAMINATION 24 BY MR. ROHRBACH:

25 Q. Good morning, Ms. Chapell.

Southern District Court Reporters (5) Pages 1990 - 1993

UNITED STATES OF AMERICA, v. GHISLAINE          TRIAL December 9, 2021
MAXWELL,

1 A. Good morning.
2 Q. Ms. Chapell, where do you work? 3 A.
Federal Express Corporation.
4 Q. How long have you worked there? 5 A.
One year.
6 Q. What's your position at Federal Express? 7 A.
Senior paralegal.
8 THE COURT: Mr. Rohrbach, could you pull the mic up a 9
little please. Thank you.
10 MR. ROHRBACH: Of course. I apologize, your Honor. 11
THE COURT: Thank you.
12 Q. And what are your duties and responsibilities as a
senior 13 paralegal at FedEx?
14 A. To respond to subpoenas and produce the records of
Federal 15 Express.
16 Q. And as part of your job, are you familiar with
Federal 17 Express's recordkeeping practices? 18 A.
Yes.
19 Q. In particular, are you familiar with the business
practices 20 regarding billing invoices?
21 A. Yes.
22 Q. How are billing invoices generated? 23 A.
They are generated through the scanning events and then 24
populated through the revenue service department. 25
Q. Can you explain what you mean by scanning events?

1 pseudonym-protected witnesses, and Government Exhibit 801-R
not 2 under seal.
3 MR. EVERDELL: No objection. 4 THE
COURT: All right GX-801 is admitted under seal 5 for the
reason indicated. And 801-R is admitted as a public 6
exhibit.
7 (Government's Exhibits 801, 801-R received in 8
evidence)

9 BY MR. ROHRBACH:
10 Q. Ms. Chapell, would you turn to Government Exhibit 802,

11 what's been marked for identification as Government Exhibit
802 12 in your binder.

13 A. Okay.
14 Q. And do you recognize this?

15 A. Yes.
16 Q. What is it?

17 A. Invoice on Jeffrey E. Epstein's account. 18
Q. Have you reviewed this before today? 19 A.
Yes.

20 Q. And is it a fair and accurate copy of the version held
by 21 FedEx?
22 A. Yes.
    23 MR. ROHRBACH: Your Honor, the government offers

24 Government Exhibit 802 under seal for the same reasons, and

25 Government Exhibit 802-R without any

    sealing.

LC9VMAXT Chapell - direct Page 1995

1 A. Well, each movement of the package is scanned so it can
be 2 tracked through the system as to where the package is.
Once it 3 meets the final delivery spot, then that final
scan will 4 generate an invoice.

5 Q. What sort of information is contained in an
invoice? 6 A. The account number, the invoice number, the
invoice date, 7 the account holder information, and the amount of
the shipment. 8 Q. Does FedEx keep billing invoices in the
ordinary course of 9 business?

10 A. Yes.

11 Q. And is making invoices a regular practice of
FedEx? 12 A. Yes.

13 Q. Ms. Chapell, in the binder next to you, would you
please 14 look at what's been marked for identification as
Government 15 Exhibit 801.

16 Do you recognize this?

17 A. Yes.

18 Q. What is it?

19 A. It's a invoice on Jeffrey E. Epstein's account.

20 Q. Have you reviewed this before today? 21 A.
Yes.

22 Q. Is it a fair and accurate copy of an invoice held by
FedEx? 23 A. Yes.

24 MR. ROHRBACH: Your Honor, the government offers 25
Government Exhibit 801 under seal to protect third-party and

LC9VMAXT Chapell - direct Page 1997 1 MR. EVERDELL:

No objection.

2 THE COURT: All right. 802 is admitted under seal for

3 the reason indicated. 802-R is admitted as a public exhibit.

4 (Government's Exhibits 802, 802-R received in 5
evidence)

6 BY MR. ROHRBACH:

7 Q. And finally, Ms. Chapell, would you turn to what's been

8 marked for identification as Government Exhibit 803.

9 A. Okay.

10 Q. Do you recognize this?

11 A. Yes.

12 Q. And what is it?

13 A. Invoice on Jeffrey E. Epstein's account.

14 Q. Have you reviewed it before today?

15 A. Yes.

16 Q. And is this a fair and accurate copy of the version held
by 17 Federal Express?

18 A. Yes.

19 MR. ROHRBACH: Your Honor, the government offers 20
Government Exhibit 803 under seal for the same reasons,
and 21 Government Exhibit 803-R to the public. 22
MR. EVERDELL: No objection.

23 THE COURT: GX-803 is admitted under seal; 803-R is 24
admitted as a public exhibit.

25 (Government's Exhibits 803, 803-R received in

Southern District Court Reporters (6) Pages 1994 - 1997

UNITED STATES OF AMERICA, v. GHISLAINE    TRIAL December 9, 2021
MAXWELL,

1 evidence)

2 MR. ROHRBACH: With your Honor's permission, may I 3 publish the documents?

4 THE COURT: Yes, you may publish the R versions. 5 MR. ROHRBACH: Yes.

6 Ms. Drescher, will you please pull up Government 7 Exhibit 801-R for everyone.

8 BY MR. ROHRBACH:

9 Q. Ms. Chapell, would you please turn to Government Exhibit10 801 in your binder.

11 MR. ROHRBACH: And with the Court's permission, I12 would ask that the jury be instructed to turn to Exhibit 801 in13 their binders.

14 THE COURT: Okay. Is it the large binder?15 MR. ROHRBACH: My understanding, there's one binder 16 THE COURT: Okay. The only binder, 801 -- GX-801,17 please.

18 Q. Now that we're looking at it, Ms. Chapell, who is the19 account holder on this invoice? 20 A. Jeffrey E. Epstein.

21 Q. And turning now to page 5 of the invoice and looking at the22 top row of the invoice.

23 A. Okay.

24 Q. Who is the sender of this package? 25 A. S. Kellen, and underneath it's Jeffrey E. Epstein.

1 like to turn to Government Exhibit 802 and to the eighth page. 2 And looking at the middle row, does the recipient have the same

3 address as the recipient we were just looking at? 4 A. Yes.

5 MR. ROHRBACH: Your Honor, if they haven't already 6 done so, we'd ask the jury to turn to Government Exhibit 802.

7 THE COURT: Okay. Please turn to GX-802. 8 Q. Ms. Chapell, directing your attention to the middle row on 9 this page, who is the sender of this package?

10 A. J. Epstein.

11 Q. And what is the address?

12 A. 457 Madison Avenue, New York, New York.

13 Q. And would you spell the first name of the recipient here?14 A. C-A-R-D-I-N-E.

15 Q. And what is the city and state?

16 A. West Palm Beach, Florida.

17 Q. On what date was this package sent? 18 A. December 12th, 2002.

19 MR. ROHRBACH: And finally, your Honor, I would like20 to turn the jurors' attention to Government Exhibit 803.21 THE COURT: Okay. You may turn to 803, please.

22 Q. And Ms. Chapell, if you would please do the same. And23 turning to page 6 of this document and directing your attention24 to the bottom row, Ms. Chapell, who is the sender of this25 package?

LC9VMAXT Chapell - direct Page 1999

1 Q. And what is the sender address? 2 A. It is 457 Madison Avenue, New York, New York, 10022. 3 Q. And without saying any names, without saying the last name 4 of the recipient, what is the first name of the recipient? 5 A. Carolyn.

6 Q. And where is the city and state of the delivery? 7 A. West Palm Beach, Florida.

8 Q. Thank you.

9 MR. ROHRBACH: And with the Court's permission, I 10 would ask the jurors to hold their place here and turn to 11 Government Exhibit 11 for a moment, which is in evidence. 12 MR. EVERDELL: No objection.

13 THE COURT: All right.

14 Please look at GX-11, and then turn back to this page. 15 MR. ROHRBACH: And on GX-11 we would direct the jury's 16 attention to the date of birth.

17 THE COURT: Okay. Okay.

18 So you've looked at GX-11.

19 And then you'll go back to GX-803. 20 MR. ROHRBACH: 801, your Honor. 21 THE COURT: I'm sorry. 801. Apologies. 22 BY MR. ROHRBACH:

23 Q. Ms. Chapell, what is the date that this package was sent? 24 A. It was picked up to be shipped on December 3rd, 2002. 25 Q. Keeping in mind the recipient's address, Ms. Chapell, I'd

LC9VMAXT Chapell - cross Page 2001

1 A. Cecilia Steen.

2 Q. Are there any other names listed?

3 A. Yes, Jeffrey E. Epstein.

4 Q. What is the shipping address?

5 A. 457 Madison Avenue, New York, New York. 6 Q. Without saying the last name, what is the first name of the

7 recipient?

8 A. Caroline.

9 Q. What is the city and state of the recipient?

10 A. West Palm Beach, Florida.

11 Q. What is the date of this package?

12 A. October 7th, 2002.

13 Q. Thank you.

14 MR. ROHRBACH: No further questions, your Honor.

15 THE COURT: Okay. Mr. Everdell.

16 MR. EVERDELL: Thank you, your Honor. 17 THE COURT: You may put your binders down. Thank you. 18 MR. EVERDELL: May I inquire, your Honor? 19 THE COURT: You may.

20 CROSS-EXAMINATION 21 BY MR. EVERDELL:

22 Q. Good morning, Ms. Chapell.

23 A. Good morning.

24 Q. You just testified about a few invoices from Federal

25 Express that were provided to you by the government; is

that

Southern District Court Reporters (7) Pages 1998 - 2001

UNITED STATES OF AMERICA, v. GHISLAINE MAXWELL,    TRIAL December 9, 2021

1 right?

2 A. Correct.

3 Q. And you testified that they were associated with a FedEx 4 account of Jeffrey Epstein, right? 5 A. Yes.

6 Q. And all of those -- three of those invoices that we just 7 looked at, Government's Exhibit 801, 802, and 803, were from 8 the last few months of 2002; is that right? 9 A. Yes.

10 Q. And those invoices each showed shipments for roughly a few11 week to a month period of time, right? 12 A. Correct.

13 Q. I just want to look at a few of those invoices that we14 looked at. I'm going to start with Government's Exhibit 803.15 and I'm going to direct your attention to page 6 of 9.16 MR. EVERDELL: With the Court's permission, I'll have 17 the jurors look in the same binder at Government's 803.18 THE COURT: Yes.

19 Members of the jury, please look at GX-803.20 MR. EVERDELL: And just directing the jurors'21 attention to page 6 of 9.

22 THE COURT: Page 6. Okay. 803, page 6.23 MR. EVERDELL: Actually, I apologize. If we can just24 first start with page 1 just so we can orient ourselves.25 THE COURT: Okay.

1 side under the heading "Sender"? 2 A. Yes.

3 Q. That information says Cecilia Steen; is that right?

4 A. Yes.

5 Q. And it has then Jeffrey E. Epstein and the address 457 6 Madison Avenue, right?

7 A. Yes.

8 Q. And that is the information that is present on the FedEx 9 slip that goes with the package, right? 10 A. Correct.

11 Q. So whatever information is filled out on the slip that gets12 attached to the FedEx package is what appears under "Sender,"13 right?

14 A. Correct.

15 Q. Okay. And you see that this, the recipient here -- and I'm 16 not asking you to say her full name, but the first name of the 17 recipient here is Caroline; is that right?

18 A. Correct.

19 Q. And I think you mentioned the city and state, is that 20 right, of where this was going?

21 MR. EVERDELL: May I confer? 22 THE COURT: Yes.

23 (Counsel conferred)

24 Q. You said that this was going to West Palm Beach, Florida, 25 right?

1 BY MR. EVERDELL:

2 Q. So, Ms. Chapell, if you look at page 1. So we're looking 3 here on Government's Exhibit 803-R at the invoice dated October 4 14th, 2002, right?

5 A. Correct.

6 Q. And as you said before, this is an invoice that's 7 associated with an account, the FedEx account of Jeffrey 8 Epstein, right?

9 A. Yes.

10 Q. And if you look up at that top left-hand corner, you see 11 the billing account shipping address, right? 12 A. Yes.

13 Q. And it says Jeffrey E. Epstein, 457 Madison Avenue, New 14 York, New York, 10022, right? 15 A. Yes.

16 Q. That's the address associated with this account for billing 17 purposes, right?

18 A. Correct.

19 Q. Now, I want you to skip to the page I mentioned before, 20 page 6 of 9. All right. Now, I think if you look down at the 21 last transaction on that page, that's a shipment that was sent 22 out or was picked up for shipment on October 7th of 2002, 23 right?

24 A. Yes.

25 Q. And do you see the information that's over on the left-hand

1 A. Correct.

2 Q. Okay. And I just want to refer back to the sender though, 3 okay. That sender says that the package was sent by Cecilia 4 Steen; correct?

5 A. Correct.

6 Q. It goes without saying that Cecilia Steen is not Ghislaine 7 Maxwell; correct?

8 A. Correct.

9 Q. Okay. And that is the only transaction on this invoice 10 that the government showed you to discuss in your direct 11 testimony, right?

12 A. Correct.

13 Q. I want to show you another transaction on this invoice. If 14 you can go to page 7 of 9.

15 A. Okay.

16 Q. And I want to show you the transaction in the middle of the 17 page, the middle of the three. Do you see that one? 18 A. Yes.

19 Q. That is also a shipment that was picked up for shipment the 20 same day, October 7th of 2002, right?

21 A. Correct.

22 Q. And that is the same day as the package we just looked at 23 that was sent by Cecilia Steen on the page before, isn't it? 24 A. Yes.

25 Q. All right. Well, looking at this one, you see the

Southern District Court Reporters (8) Pages 2002 - 2005

UNITED STATES OF AMERICA, v. GHISLAINE MAXWELL,

TRIAL December 9, 2021

1 recipient there is one named Casey Wasserman,
right? 2  A. Correct.
3  Q. And you see the sender information on this
shipment; 4  correct?
5  A. Correct.
6  Q. And the sender there is listed as Ghislaine Maxwell;
is 7  that right?
8  A. Correct.
9  Q. And then, of course, there's the information below,
Jeffrey10  Epstein, 457 Madison Avenue.
11  A. Yes.
12  Q. Okay. It goes without saying that -- well, I shouldn't
say13  "goes without saying."
14  There is no other transaction or there is no15
transaction on this invoice we're looking at where
someone16  named Ghislaine Maxwell is sending a package to
anyone named17  Carolyn; correct?
18  A. Correct.
19  Q. Okay. Let's look at the next one. This is
government's20  801. And I'm doing this because I
believe this goes21  chronologically in order, right. The one
we just looked at was22  October, right?
23  A. Yes.
24  Q. So let's look at 801.
25  MR. EVERDELL: And the jurors can do the same, with

2  Q. And here the recipient -- again, I'm just going to
use 3  first names here. The recipient is Carolyn,
right?

4  A. Correct.
5  Q. That was going to West Palm Beach, Florida, as
well? 6  A. Yes.

7  Q. All right. But you see over at the sender
information; 8  correct?
9  A. Yes.

10  Q. The sender is listed as S. Kellen, right? 11
A. Correct.
12  Q. Do you know who S. Kellen is?

13  A. No.
14  Q. Okay. Safe to say that S. Kellen is not Ghislaine Maxwell,

15  right?

16  A. No.

17  Q. Okay. Now, you were shown this transaction by
the18  government, right?
19  A. Correct.

20  Q. I want to point you to a different transaction in the same

21  invoice.

22  MR. EVERDELL: If we can go to page 6, the next page.23
Q. And I want you to look at the bottom of that page, the
last24  transaction.
25  A. Okay.

1 the Court's permission.

2 THE COURT: Yes.

3 Q. And we'll go to the first page of 801-R. 4 So, Ms. Chapell, do you have that? 5 A. Yes.

6 Q. So this is an invoice from December 16th of 2002, right? 7 A. Yes.

8 Q. So that's just roughly two months after the invoice we just 9 saw?

10 A. Yes.

11 Q. And it's the same billing information, it's the same 12 account we're looking at?

13 A. Yes.

14 Q. That's the account of Jeffrey Epstein at 457 Madison 15 Avenue, right?

16 A. Correct.

17 Q. All right. Let's take a look at page 5. 18 Do you have that page, Ms. Chapell? 19 A. Yes.

20 Q. All right. This is the transaction that you were shown by 21 the government to discuss, right? 22 A. Yes.

23 Q. And this shows a shipment that was picked up for shipment, 24 FedEx package that was picked up for shipment on December 3rd 25 of 2002, right?

1 Q. That is a shipment, a FedEx package that was picked up for 2 shipment on December 9th, 2002, right? 3 A. Correct.

4 Q. And you see that the recipient of that package is someone 5 named Lisa Anasrons is how it's spelled?

6 A. Yes.

7 Q. And the sender of that is G. Maxwell; correct? 8 A. Correct.

9 Q. And safe to say that this is not a package going to anybody 10 named Carolyn, right?

11 A. It is not.

12 Q. It's going to Lisa Anasrons, whoever that may be, right? 13 A. Correct.

14 Q. Okay. Let's look at another one from this invoice, page 8.

15 I'll ask you to look at both of these transactions, if we 16 could. These are both FedEx packages that were picked up for 17 shipment on December 10th of 2002; correct? 18 A. Correct.

19 Q. And if we look at the first one, the recipient there is 20 listed there as Isabel Maxwell?

21 A. Yes.

22 Q. And the sender is G. Maxwell? 23 A. Yes.

24 Q. And if you look down at the next one, the recipient there

25 is Ron Burckle, right?

Min-U-Script® **Southern District Court Reporters (9) Pages 2006 - 2009**

UNITED STATES OF AMERICA, v. GHISLAINE          TRIAL
MAXWELL,                                                    December 9, 2021

1 A. Yes.

2 Q. And again, sender of that package same day is G.
Maxwell, 3 right?

4 A. Correct.

5 Q. And in both the sender -- again, we have that information.
6 Jeffrey Epstein, 457 Madison Avenue, right? 7 A.
Yes.

8 Q. So the first package looks like it's going to
Isabel 9 Maxwell, and the second going to Ron
Burckle, right?10 A. Yes.

11 Q. Neither one of those is named Carolyn;
correct?12 A. Correct.

13 Q. And, in fact, there is no shipment or transaction
reflected14 in this invoice where someone named Ghislaine
Maxwell is15 sending a package to someone named
Carolyn, right?16 A. Correct.

17 Q. All right. And let's just look at the last invoice
you18 were shown by the government, that's Government's
802.19 MR. EVERDELL: If you can pull that up. 20
A. Okay.

21 THE COURT: Jurors may turn to 802. 22 MR.
EVERDELL: Thank you, your Honor.23 Q. All right.
Ms. Chapell, do you have that in front of you?24 A. Yes.

25 Q. All right. So looking at the first page, this is the

1 that same invoice that you weren't shown by the
government. 2 And I want to stay on the same page and I want
to look at the

3 first transaction on the page.

4 Okay. Now, I want to be careful about this. I don't 5
want to use any names when we discuss this transaction, okay?

6 A. Okay.

7 Q. All right. That is a package that was picked up for
8 shipment on the same day as the one we just looked at,
December

9 12th, 2002; correct?

10 A. Yes.

11 Q. And I'm not going to name who the recipient is, but
I'm

12 going to refer to that person as "Jane,"
okay?13 A. Okay.

14 Q. So the recipient there is Jane.

15 A. Yes.

16 Q. The sender is someone named J. Epstein;
correct?17 A. Correct.

18 Q. Okay. Again, that is not Ghislaine Maxwell or G. Maxwell,

19 right?

20 A. No.

21 Q. Okay. Let's look at just a few others. 22 Page 4
of the same invoice, and we'll look at the

23 middle transaction here.

24 All right. Now, that is a FedEx package that was25
picked up for shipment on December 9th of 2002, right?

LC9VMAXT Chapell - cross Page 2011

1 invoice dated December 23rd, 2002;
correct? 2  A. Yes.
3  Q. All right. Again, same account we're looking at of Jeffrey 4 Epstein?
5  A. Correct.
6  Q. All right. Let's flip to page 8. I want you to take a
7  look at the middle of the three transactions there. We'll pull
8  that up. This was the transaction that you were shown by the
9  government on your direct, right?
10  A. Correct.
11  Q. And that is a FedEx package picked up for shipment on 12 December 12th, 2002; correct?
13  A. Correct.
14  Q. All right. And the recipient there, I'm, again, not
going 15 to use full names, but the first name there is listed as 16 Cardine; correct?
17  A. Correct.
18  Q. And the address is West Palm Beach, Florida, right? 19  A. Yes.
20  Q. The sender there is J. Epstein, right? 21 A. Yes.
22  Q. Safe to say that J. Epstein is not Ghislaine Maxwell, 23 right?
24  A. Right.
25  Q. Okay. Now, I want to show you some other transactions on

LC9VMAXT Chapell - cross Page 2013 1  A. Yes.

2  Q. That was just a few days before the shipments we just 3 looked at on December 12th, right?

4  A. Correct.
5  Q. And you see the recipient here is listed as someone named 6 Laura Casey Wasserman, right?

7  A. Yes.

8  Q. And the sender is G. Maxwell?

9  A. Yes.
10  Q. This obviously is -- the recipient is not anyone named 11 Carolyn or Cardine, right?

12  A. Correct.
13  Q. And again, let's look at page 5, the next page. And look 14 at the first transaction on this invoice. That is a FedEx

15  package picked up for shipment on December 10th of 2002, right?

16  A. Yes.
17  Q. And the recipient there is someone named Danny Hillis? 18  A. Yes.

19  Q. And the sender is G. Maxwell? 20 A. Correct.
21  Q. Danny Hillis is not named Carolyn or Cardine or anything 22 like that, right?

23  A. Correct.
24  Q. Okay. And again, on this invoice there is no transaction 25 reflected on this invoice where someone named Ghislaine Maxwell

Southern District Court Reporters (10) Pages 2010 - 2013

UNITED STATES OF AMERICA, v. GHISLAINE     TRIAL
MAXWELL,                                          December 9, 2021

LC9VMAXT Chapell - cross Page 2014

1  or G. Maxwell is sending any packages to anybody named Carolyn 2  or Cardine or anything like that?  3  A. Correct.

4  Q. You can put those down.

5  MR. EVERDELL: And the jurors, with the Court's 6 permission, can do the same.

7  THE COURT: Yes. Thank you.  8  Q. Ms. Chapell, I'll just wait a moment.  9  Before you came to testify today, you had some phone10  calls with the government; is that right? 11  A. Yes.

12  Q. And that was to prepare your testimony today; correct?13  A. Yes.

14  Q. And before you spoke to them, they sent you those three15  invoices that we were just talking about, is that right?16  A. Yes.

17  Q. And you looked at them to verify that they were true and18   accurate records that FedEx had in their system, right?19  A. Yes.

20  Q. And those were the only invoices they sent you to verify;21  is that right?

22  A. Yes.

23  Q. Those three that we were looking at? 24 A. Yes.

25  Q. Okay. And I think they were so old at that point that you

LC9VMAXT Chapell - cross Page 2016 1  belonged to Jeffrey Epstein, right?

2  A. Yes.

3  Q. And can you explain just how you were able to verify them? 4  A. I went back to the paper copies and verified the invoices 5  one by one.

6  Q. Okay.

7  MR. EVERDELL: Your Honor, I'm going to do this in 8 paper, if I could. May I approach?  9  THE COURT: You may.

10  MR. EVERDELL: Okay.

11  THE COURT: Showing the witness what's been marked as12 Defendant's TC-1; is that correct?

13  MR. EVERDELL: Correct, your Honor. 14 THE COURT: Okay.

15  BY MR. EVERDELL:

16  Q. All right. Ms. Chapell, do you have in front of you what's17  been marked for identification as Defendant's Exhibit TC-1?

18  A. Yes.

19  Q. Now, do you recognize what those are? 20 A. Yes.

21  Q. What are they?

22  A. Jeffrey Epstein invoices.

23  Q. Are those some of the records that were provided to you by24  the defense?

25  A. Yes.

1  actually had to go back and look at archived copies to verify 2 that they were true records, right? 3 A. Correct.

4  Q. They weren't still in your system; you had to go back to 5 the boxes in the warehouse, right? 6 A. Correct.

7  Q. But you were able to do that? 8 A. Yes.

9  Q. Okay. Now, do you recall at any point where the defense10 sent you some invoices to verify? 11 A. Yes.

12  Q. And do you remember how many roughly you were sent by the13 defense?

14  A. There were several hundred.

15  Q. And were they from the same account or different accounts?16 A. Two different accounts.

17  Q. Were those accounts associated with Jeffrey Epstein?18 A. Yes, they were both his.

19  Q. And what were you asked to do with those records?20 A. Just verify the records.

21  Q. Were you able to take those records and verify them with22 the records in the boxes, that they were accurate business23 records?

24  A. Yes.

25  Q. Okay. And these were all records for accounts that

the several hundred records or just a

2  subset of those records?

3  A. Just a few.

4  Q. And how many roughly are there?

5  A. In this stack?

6  Q. Yes.

7  A. About 50.

8  Q. And what year or years do those invoices come from? 9 A. 2002.

10  Q. And how is it that you recognize that that's what those11 are?

12  A. Because I verified it with the originals that we produced.

13  Q. But how do you know that it's the same invoices that you14 were asked to look at?

15  A. I initialed at the bottom.

16  Q. Now, were those records that you're looking at in Defense17 Exhibit TC-1 made at or near the time of the shipping records

18  that are reflected in the invoice? 19 A. Yes.

20  Q. And are they based on information that was available at the21 time that those shipments were made?

22  A. Yes.

23  Q. And is it the regular practice of Federal Express to make24 invoices like this?

25  A. Yes.

Southern District Court Reporters (11) Pages 2014 - 2017

UNITED STATES OF AMERICA, v. GHISLAINE MAXWELL,                TRIAL December 9, 2021

LC9VMAXT Chapell - cross Page 2018

1 Q. And were these invoices kept in the regular course
of 2 FedEx's business?

3 A. Yes.

4 MR. EVERDELL: Your Honor, at this time the defense 5 offers Defense Exhibit TC-1 under temporary seal. We have not 6 yet had the chance to make the appropriate redactions, but we 7 will do so as soon as we can.

8 MR. ROHRBACH: No objection. 9 THE COURT: Thank you. Defendant's TC-1 is admitted 10 under temporary seal until narrow redactions can be offered. 11 (Defendant's Exhibit TC-1 received in evidence) 12 MR. EVERDELL: Absolutely, your Honor. 13 And if the jurors would like to take a look, with the 14 Court's permission, there is a folder underneath their chairs 15 with this exhibit.

16 THE COURT: Yes, please. You can open the folder to 17 Defendant's Exhibit TC-1.

18 BY MR. EVERDELL:

19 Q. Ms. Chapell, I'm not going to go through these records with 20 you -- and the jurors are free to review it if they like -- but 21 I have no further questions for this witness.

22 THE COURT: Okay.

23 MR. ROHRBACH: Nothing further, your Honor. 24 THE COURT: Okay. Ms. Chapell, thank you. 25 You are excused. You may step down.

LC9VMAXT Page 2025 1 (In open court)

2 THE COURT: Bring in the jury. 3 MR. EVERDELL: Your Honor? 4 MS. MENNINGER: Our client is not here.

5 THE COURT: I'm going to step off.

6 (Recess)

7 THE COURT: We'll bring in the jury. 8 (Jury present)

9 THE COURT: Thank you, members of the jury.

10 I've been informed there's an attorney in the case

11 who's ill, and that attorney needs to get care. We have no

12 reason to believe it's COVID-related, but we do need that

13 attorney for what was anticipated to happen today. So we need

14 to break.

15 My assumption is we'll resume tomorrow morning at our 16 normal time. And I'll give you any additional information, it

17 I have that information. But we want to make sure the attorney 18 is taken care of. And rather than pause and delay, we're going 19 to break for the day.

20 So all of my instructions apply.

21 Thank you for your time and attention. 22 We'll see you tomorrow morning. Thank you. 23 (Jury not present)

24 THE COURT: Counsel, is there anything we can take up

25 now or wait until we get further word?

1 (Witness excused)

2 MS. MOE: Your Honor, could I have just a moment to 3 confer with the defense?

4 THE COURT: You may.

5 (Counsel conferred)

6 THE COURT: Members of the jury, you may put the 7 folder back under your seats.

8 MS. COMEY: Your Honor with the defense's consent, 9 we'd ask to be heard in the robing room please. 10 THE COURT: Okay. You anticipate an extended sidebar?11 MS. COMEY: We just need to be in the robing room.12 your Honor.

13 THE COURT: Okay. Why don't I send the jury back to14 the jury room for a break and then -- 15 MS. MOE: Thank you, your Honor. 16 THE COURT: Yes, to the regular room. 17 (Jury not present)

18 THE COURT: All right. I'll hear you in the robing19 room. This is an extended discussion? 20 MS. MOE: I'm not sure, your Honor, but our joint21 preference would be to be heard in the robing room.22 THE COURT: Okay. All right. 23 (Pages 2020 to 2024 SEALED) 24 (Continued on next page) 25

1 MS. COMEY: I don't believe there's anything we can 2 take up now, your Honor. We will keep the Court and the

3 defense informed.

4 THE COURT: Okay.

5 MR. EVERDELL: Nothing from the defense, your Honor. 6 THE COURT: All right. Thank you, everyone.

7 We're adjourned till tomorrow. 8 MS. MOE: Thank you, your Honor.

9 (Adjourned to December 10, 2021 at 8:45 a.m.)10

11

12
13

14
15
16
17
18

19
20

21

22
23
24
25

Min-U-Script® **Southern District Court Reporters (12) Pages 2018 - 2026**

UNITED STATES OF AMERICA, v. GHISLAINE                    TRIAL December 9, 2021
MAXWELL,

```
 1  INDEX OF EXAMINATION   2  Examination of: Page  3
TRACY CHAPELL   4  Direct By Mr. Rohrbach . . . . . .
. . . . . .1993  5  Cross By Mr. Everdell . . . . . .
. . . . . .2001  6  GOVERNMENT EXHIBITS   7  Exhibit
No. Received  8  801, 801-R . . . . . . . . . . . . .
. . . .1996  9  802, 802-R . . . . . . . . . . . . .
. . . .1997 10  803, 803-R . . . . . . . . . . . . .
. . . .1997 11  DEFENDANT EXHIBITS  12  Exhibit No.
Received 13  TC-1 . . . . . . . . . . . . . . . . .
.2018 14   15
   16
   17
   18
   19
   20
   21
   22
   23
   24
   25
```

# EXHIBIT 73

UNITED STATES OF AMERICA, v.
GHISLAINE MAXWELL,

December 10, 2021

---

LCACmax1                                                    Page 2028

```
 1    UNITED STATES DISTRICT COURT
      SOUTHERN DISTRICT OF NEW YORK
 2    ------------------------------x
 3    UNITED STATES OF AMERICA,
 4            v.                        20 CR 330 (AJN)
 5    GHISLAINE MAXWELL,
 6            Defendant.                Jury Trial
      ------------------------------x
 7                                      New York, N.Y.
                                        December 10, 2021
 8                                      8:55 a.m.
 9    Before:
              HON. ALISON J. NATHAN,
10                                      District Judge
11                  APPEARANCES
12    DAMIAN WILLIAMS
           United States Attorney for the
13         Southern District of New York
      BY:  MAURENE COMEY
14         ALISON MOE
           LARA POMERANTZ
15         ANDREW ROHRBACH
           Assistant United States Attorneys
16
      HADDON MORGAN AND FOREMAN
17         Attorneys for Defendant
      BY:  JEFFREY S. PAGLIUCA
18         LAURA A. MENNINGER
                -and-
19    BOBBI C. STERNHEIM
                -and-
20    COHEN & GRESSER
      BY:  CHRISTIAN R. EVERDELL
21
      Also Present:   Amanda Young, FBI
22                    Paul Byrne, NYPD
                      Sunny Drescher,
23                    Paralegal, U.S. Attorney's Office
                      Ann Lundberg,
24                    Paralegal, Haddon Morgan and Foreman
25
```

---

LCACmax1                                                    Page 2029

1    THE COURT: Good morning, everyone. Good to see
2  everyone. Matters to take up, counsel?
3    MS. MOE: Yes, your Honor. Thank you. Just a
4  housekeeping matter with respect to Government Exhibit 52. We
5  just wanted to clarify, before we offered the excerpts, that we
6  would be offering Government Exhibit 52 and its subparts
7  pursuant to a stipulation that they are true and accurate
8  photocopies. I just wanted to make sure we clarified that
9  before we offered it at the beginning of the court day.
10    MR. PAGLIUCA: I'm not sure if we're saying the same
11  thing. I understood that 52 was being offered foundationally,
12  which is the entire document, and that then there are the
13  excerpts that were being offered into evidence for the jury.
14  That was my understanding of the process that we were doing.
15    THE COURT: Ms. Moe, it's your exhibit.
16    MS. MOE: Thank you, your Honor. I think the way in
17  which we're proposing handling this would be similar in the way
18  we handled the message pads, which is part of the
19  authentication, involves the message pads themselves. So those
20  exhibits were offered and also the subparts as marked
21  exhibit --
22    THE COURT: I think you are then saying the same
23  thing.
24    MR. PAGLIUCA: Okay. So you'll move 52 in its
25  entirety. There is a stipulation as to the accuracy of the

---

LCACmax1                                                    Page 2030

1  copies on the subset of exhibits by letter, and you'll move
2  those, as well.
3    MS. MOE: Yes, your Honor.
4    MR. PAGLIUCA: I guess my question, your Honor, is
5  what's going --
6    THE COURT: Hang on a second.
7    MR. PAGLIUCA: -- to the jury is really the question.
8  My belief, when we address this with the witness, was the
9  government was not offering the entirety of 52, the government
10  was offering the photocopies of the various pages, and that was
11  the exhibit that was being admitted to the jury, and that's, I
12  think, a significant distinction here.
13    THE COURT: So you're opposing movement of the --
14  obviously, you've objected. To any event, I've overruled, but
15  even after that, you have an objection to moving the whole
16  thing to the jury or you just think it's inconsistent with how
17  it's been discussed or I suppose inconsistent with how it was
18  discussed at the time it was moved?
19    MR. PAGLIUCA: Yes. We had this colloquy. The
20  government simply moved to admit the -- I think it's five
21  pages. That was the extent of the admission. My suggestion,
22  because we were dealing with the foundation issues, was that we
23  would have that exhibit, we would agree to the copies being
24  admitted per the government's request, but I wanted the actual
25  exhibit as part of the record for any necessary appellate

---

LCACmax1                                                    Page 2031

1  issues. And that's how I understood this was being addressed.
2    THE COURT: Well, you want all of 52 as an exhibit for
3  the appellate record, but you don't want the jury to get all of
4  52?
5    MR. PAGLIUCA: I think there are a couple of problems.
6  Certainly, we didn't cross examine on the entirety of 52,
7  because I understood that 52, in its entirety, was not being
8  admitted. So I think that's problem number 1.
9    There are also problems, I think, simply with
10  relevance related to the rest of the exhibit, and there were
11  discrete portions that the government said the government was
12  contending were relevant and not the other portions. So the
13  book is however many pages it is, but I think it's outside of
14  what was appropriate for cross examination at the time.
15    THE COURT: My clerk is sending me the portion of the
16  transcript.
17    I can't tell if you're in disagreement yet or not,
18  Ms. Moe.
19    MS. MOE: Yes, your Honor. I think the issue is more
20  that because the weight and authenticity of this exhibit has
21  now been put in dispute, I don't know how the jurors would
22  evaluate the testimony about its contents, the format, in order
23  to evaluate its authenticity or weight without the object
24  itself. That's what we wanted to clarify about whether that
25  would be part of the record.

---

| LCAVMAX4 | A. Farmer - cross | Page 2137 |
|---|---|---|

1 Q. Okay. And you even said you were in a pretty happy place
2  at the time you wrote this entry; correct?
3 A. I did say that.
4 Q. And you were excited for the future, right?
5 A. Yes.
6 Q. And for the avoidance of all doubt, there is no entry in
7  any of your journals that relate to Ghislaine Maxwell?
8 A. That's correct.
9 Q. And that is true with respect to a journal you wrote in
10  Thailand after you claimed the New Mexico event happened;
11  correct?
12 A. That's correct.
13 Q. And that's true if you had other journals from your senior
14  year; no mention of Ghislaine Maxwell, right?
15 A. Correct.
16 Q. 604 that we looked at with the government is the last
17  journal entry that you gave to the government for this case;
18  correct?
19 A. Sorry. Should I pull up the binder?
20     MS. MENNINGER: Actually, if Ms. Drescher could pull
21  up 604. I just don't have that version in our computer.
22     THE COURT: Okay. It is admitted, so you may publish,
23  please, Ms. Drescher. Thank you.
24     MS. MENNINGER: If we could go to the next page.
25  Thank you, Ms. Drescher. And then is the back cover admitted?

| LCAVMAX4 | A. Farmer - cross | Page 2138 |
|---|---|---|

1     Sorry, your Honor.
2 BY MS. MENNINGER:
3 Q. Is this page that you see here in front of you from 604 the
4  last page of your journal that you gave to the government in
5  connection with this case?
6 A. I don't recall, but if it's entered that way, then yes, I'm
7  assuming it is.
8 Q. Okay.
9     MS. MENNINGER: We could pull up AF-1, page 7, just
10  for counsel and the witness.
11     THE COURT: That's fine.
12     MS. MENNINGER: I believe it's noncontroversial. And
13  the government has a copy of it now.
14     MS. POMERANTZ: Yes, your Honor, we have a copy.
15 Q. So this is the back of the journal, right?
16 A. Correct.
17 Q. And you gave a copy of this picture of the back of this
18  journal to the government?
19 A. Right.
20 Q. And so that's what we have.
21 A. Oh, yeah. Okay.
22 Q. We've covered everything that you gave to the government in
23  relationship to this journal?
24 A. Okay. Yes.
25 Q. Correct?

| LCAVMAX4 | A. Farmer - cross | Page 2139 |
|---|---|---|

1 A. Correct.
2 Q. So we have photocopied pages from within the journal?
3 A. Yes.
4 Q. We have a picture of the front of the journal, right?
5 A. Yes.
6 Q. And a picture of the back of the journal?
7 A. Yes.
8 Q. Just to be clear, the government has never received a
9  physical copy of the journal; correct?
10 A. Correct.
11 Q. You have never given that to them?
12 A. Correct.
13 Q. So since you -- these are all the pages we have; you do not
14  have a journal entry that reflects your trip to New Mexico?
15 A. That's correct.
16 Q. We don't have "I'm excited about going to New Mexico,"
17  right?
18 A. Correct.
19 Q. We don't have "I'm excited to go to New Mexico to see
20  Maria's boss" or something like that?
21 A. Right.
22 Q. We don't have how we felt when you got home from New
23  Mexico?
24 A. There's no journal entries about New Mexico.
25 Q. And where is the physical journal right now?

| LCAVMAX4 | A. Farmer - cross | Page 2140 |
|---|---|---|

1 A. It's in the City of New York.
2 Q. Without a journal entry from the New Mexico trip, we can't
3  confirm with a piece of paper who invited you there, right?
4 A. With a piece of paper? No.
5 Q. Or why you were going, right?
6 A. Yes, there's no journal and record of any of that.
7 Q. There's no piece of paper that you know of, right?
8 A. Correct.
9 Q. Journal or otherwise, right?
10 A. Correct.
11 Q. We don't have a document that tells us when you went,
12  right?
13 A. Correct.
14 Q. And because we don't have an entry from after the trip to
15  New Mexico, we can't tell with a piece of paper what happened
16  to you while you were there; correct?
17 A. Correct.
18 Q. Or who was there, right?
19 A. Correct.
20 Q. Or what you talked about while you were there?
21 A. That's right.
22 Q. How you felt about the trip?
23 A. Right.
24 Q. Right?
25     And because we don't have a piece of paper or a

UNITED STATES OF AMERICA, v.
GHISLAINE MAXWELL,

December 10, 2021

LCAVMAX6          A. Farmer - cross          Page 2209

1  A. The question is whether it gives me more credibility to be
2  a victim?
3  Q. It gives you more credibility with future clients if you
4  mention your experience during your media appearances; correct?
5  A. My personal experience or my professional experience?
6  Q. Your personal experiences.
7  A. I guess I would say that that is probably not -- people
8  have different opinions about that, about whether that would
9  give you credibility or not.
10 Q. You certainly have not shied away from telling in your
11 public appearances the fact that you are, yourself, trained as
12 a psychologist, right?
13 A. I have shared that.
14 Q. We've talked previously about the fact that you spoke with
15 the FBI in 2006, right?
16 A. Yes.
17 Q. That was with Agent Nesbitt Kuyrkendall, right?
18 A. Right.
19 Q. You did not tell Agent Kuyrkendall in 2006 that you wanted
20 Mr. Epstein prosecuted; correct?
21     MS. POMERANTZ: Objection, your Honor.
22     THE COURT: Sustained.
23     I'll hear from you, if you'd like.
24     MS. MENNINGER: Yes. Please. I'm not clear.
25     THE COURT: Sure.

LCAVMAX6          A. Farmer - cross          Page 2210

1     (At sidebar)
2     THE COURT: State your ground.
3     MS. POMERANTZ: Your Honor, I don't understand the
4  relevance of this question. It seems just like a wholly
5  improper question, what she was asking, whether she asked the
6  FBI to prosecute Jeffrey Epstein at this time. I just don't
7  even understand the question.
8     MS. MENNINGER: Your Honor, Agent Kuyrkendall signed a
9  declaration in 2017 and she said that she spoke to a number of
10 victims between '06 and '08, and none of them expressed an
11 opinion that they wanted Epstein prosecuted. Now, she clearly,
12 in 2019, did want Epstein prosecuted.
13     THE COURT: She's the witness.
14     MS. MENNINGER: What's that?
15     THE COURT: She's the witness subpoenaed to testify.
16 Her motivation --
17     MS. MENNINGER: I'm asking what she said to --
18     THE COURT: Right, but --
19     MS. MENNINGER: Okay. You want me to ask the
20 motivation? I see.
21     THE COURT: Well, I don't understand -- well, I'll
22 sustain the objection to the question asked --
23     MS. MENNINGER: Okay.
24     THE COURT: -- about what she told an agent --
25     MS. MENNINGER: Okay.

LCAVMAX6          A. Farmer - cross          Page 2211

1     THE COURT: -- in 2006.
2     What's the next question?
3     MS. MENNINGER: It would just be, You did not want
4  Epstein prosecuted in 2006?
5     THE COURT: You want to ask her if she wanted Epstein
6  prosecuted in 2006?
7     MS. MENNINGER: Yes.
8     THE COURT: What is the relevance of that?
9     MS. MENNINGER: Because she's changed her mind about
10 wanting people prosecuted in connection with this case. She
11 has a different bias today than she did in 2006; that she
12 brought up her lawsuit in connection with applying to the fund
13 and filing a civil lawsuit. When she didn't have those
14 motivations in 2006, she didn't want to prosecute. It's a
15 clear distinction in two different periods of time, 15 years
16 apart. It goes to our money theme, your Honor, that we opened
17 on.
18     MS. POMERANTZ: Your Honor, I just don't see the
19 relevance or basis for this line of questioning.
20     THE COURT: You're going to ask her if she wanted
21 Epstein prosecuted in 2006. And if she says yes, then what?
22     MS. MENNINGER: Agent Kuyrkendall is under subpoena,
23 your Honor, and testified that none of the victims she talked
24 to in '06 to '08 wanted them prosecuted.
25     THE COURT: You're not doing that. I've ruled on

LCAVMAX6          A. Farmer - cross          Page 2212

1  that.
2     MS. MENNINGER: What she told the agent about
3  prosecution.
4     MS. MOE: Your Honor, I think we're confusing two
5  issues: Whether or not she told the FBI she wanted him
6  prosecuted and asked them to do that and whether she, in fact,
7  wanted that to happen. I think what she's proposing is
8  impeaching her in the absence of a statement to the FBI.
9     THE COURT: I think that's right. You can ask her, I
10 suppose, if she wanted him prosecuted in 2006. I'm not going
11 to allow --
12     MS. MENNINGER: I know with this witness I'm not. If
13 we get into --
14     THE COURT: We'll get into that when we get into that.
15     MS. MENNINGER: That's right.
16     THE COURT: But not what you told.
17     MS. MENNINGER: I understand.
18     MS. MOE: We're now about an hour and 15 minutes.
19     THE COURT: There have been a lot of objections.
20     (Continued on next page)

LCACmax5          A. Farmer - cross          Page 2169

1  Q. And you said that you reclaimed them after the government
2     and you spoke in 2006?
3  A. That's right.
4  Q. So in 2006, you knew that the boots were evidence of your
5     interactions with Mr. Epstein; right?
6  A. That's right.
7  Q. And the government didn't ask you for them then?
8  A. They asked if I had them.
9  Q. And what did you tell them?
10 A. I wasn't sure.
11 Q. And you later found them?
12 A. I did.
13 Q. And you did not send them to the FBI when you found them;
14    right?
15 A. No. At the time I had them, it didn't seem there was
16    further -- the case did not seem to be developing.
17 Q. So you did not --
18 A. I did not send them to them.
19 Q. And you chose to wear the evidence of your contact with
20    Mr. Epstein; right?
21 A. I did.
22 Q. And the first time you've told anyone about this reclaiming
23    of the boots is in court today; correct?
24 A. No.
25 Q. Well, you've met with the government, I think you said five

LCACmax5          A. Farmer - cross          Page 2170

1     or six times; right?
2  A. Yes.
3  Q. And you've never told the government that you reclaimed the
4     boots by wearing them after 2006; right?
5  A. I believe that we have spoken about that. I mean -- I
6     don't know if I used the term "reclaim," but that I explained
7     why they were not used previously and then I did wear them.
8         MS. MENNINGER: I'll raise this under Rule 16 later,
9     your Honor.
10 Q. So you believe you've told that to the government?
11 A. I believe that I -- that part that I just said, yes, that I
12    did not wear the boots and then I did wear the boots.
13 Q. And you wore them a lot?
14 A. I mean, because that's the general term. I didn't wear
15    them to work or things, but I did wear them when I would go
16    two-stepping.
17 Q. So you went dancing in the boots that Mr. Epstein bought
18    for you?
19 A. That's correct.
20 Q. To the point where the heels are worn down and the toes are
21    scuffed; right?
22 A. Yes.
23 Q. You can put that back in the bag. If it's in your way, I
24    can come move it. If it's okay up --
25 A. No, it's --

LCACmax5          A. Farmer - cross          Page 2171

1  Q. Thank you. We talked a little bit about this conversation
2     you had with the agents in 2006, and I believe you testified
3     that you recall having Christmas lights up?
4  A. I said holiday decorations. I was selling some holiday
5     products and I remember having them out when the agents came.
6         MS. MENNINGER: Just one moment. Your Honor, after
7     the government has had a chance to look at it, I would like to
8     show the witness what's been marked as AF10.
9         THE COURT: Okay.
10        MS. MENNINGER: Has the government had a chance?
11        MS. POMERANTZ: Yes, your Honor, and we object to
12    this.
13        THE COURT: I'll hear from you.
14        (Continued on next page)
15
16
17
18
19
20
21
22
23
24
25

LCACmax5          A. Farmer - cross          Page 2172

1         (At the sidebar)
2         THE COURT: I think what I'm looking at is an email
3     from August of 2019, in which she recounts to the New York
4     Times reporter that she thinks when they came — meaning the FBI
5     agents — it was in spring-summer of 2007. Grounds.
6         MS. POMERANTZ: Your Honor, this is a collateral
7     matter. She's been testifying about the interview itself, but
8     there is no grounds to bring in extrinsic evidence on this
9     matter with the date of the interview itself.
10        MS. MENNINGER: Your Honor, my point is simply that
11    she refreshed her memory about when the meeting was by talking
12    to her husband and thinking about other points, like it was hot
13    and sunny. She did testify that it was --
14        THE COURT: But what's in issue is her memory of when
15    she met with the FBI agents? What does that matter?
16        MS. MENNINGER: It's her memories now of things that
17    she -- yes, about things that happened a decade ago, which, by
18    inference, goes to the strength of her memory about things that
19    happened in '96.
20        THE COURT: So the theory is anything testing her
21    memory from years ago is relevant.
22        MS. MENNINGER: I wouldn't go that far, your Honor.
23        THE COURT: This is two steps removed and I'll
24    sustain.
25        (Continued on next page)

LCACmax3          A. Farmer - cross          Page 2121

1          MS. MENNINGER: Is that 603? Sorry. 601. If we
2   could show that to counsel and the witness.
3   Q. This is the cover of one of your journals from high school;
4   correct?
5   A. Yes.
6   Q. It's the one that contains the pages that we've been
7   looking at; right?
8   A. Yes.
9   Q. Now, you had several journals during high school; right?
10  A. Yes, I did have other journals in high school.
11  Q. You kept a journal throughout high school?
12  A. I know, like, I journaled when I went to Thailand in a
13  separate journal on that trip. And I've had journals starting
14  in elementary school, off and on, but again, I'm not very
15  consistent, so I don't know that I journaled throughout high
16  school. I think there were chunks of time that I would do it
17  and then I would put it aside for a while.
18  Q. And when you spoke to the government in September of 2019,
19  you said throughout high school, you maintained a journal;
20  right?
21  A. Yeah. I'm trying to elaborate on that, yeah.
22  Q. So you had this journal from around the time you went to
23  New York?
24  A. Right.
25  Q. And then you had another journal from the time you went to

LCACmax3          A. Farmer - cross          Page 2122

1   Thailand in the summer?
2   A. Yeah. That was only about that trip. Yes.
3   Q. And then you had other journals thereafter; right?
4   A. I don't recall if I journaled again in my senior year, but
5   I know I journaled again in college and other times.
6   Q. And this particular journal that we've been looking at and
7   the government had you read from, you actually read from it
8   during some of your media appearances; right?
9   A. I did.
10  Q. On a documentary or a 2020 special or something; right?
11  A. I did.
12          MS. MENNINGER: And if I could ask to turn to page 2
13  of 603, I believe it is. I'm sorry. It's not.
14          Let me back up. I would like to introduce Defendant's
15  Exhibit AF1, which I think there was a page omitted from the
16  government's exhibit. If I could confer with counsel.
17          THE COURT: You want to indicate the identification
18  mark and then pull it up for me, please.
19          MS. MENNINGER: Yes, your Honor. And I apologize,
20  your Honor, if I may approach, I do have a paper binder I could
21  give to the Court and the witness because it's multiple pages.
22  There is just a different page than the government's exhibit.
23          THE COURT: Okay. When you get back, the tab number
24  and then, again, just the mark for identification.
25          MS. MENNINGER: AF1, your Honor.

LCACmax3          A. Farmer - cross          Page 2123

1          THE COURT: And that's behind tab 1?
2          MS. MENNINGER: I think we have the 3500 material
3   first, your Honor. So it's about halfway through the binder is
4   when the AF exhibits start.
5          THE COURT: I see. Thank you.
6          MS. MENNINGER: Your Honor, I've marked for
7   identification AF1. What I would like to do is to draw the
8   witness's attention --
9          THE COURT: You want to direct the witness to a page?
10         MS. MENNINGER: Page 2, exactly, of that entry.
11         THE COURT: Of AF1?
12         MS. MENNINGER: Yes.
13  BY MS. MENNINGER:
14  Q. Do you see that entry?
15  A. Yes.
16  Q. Do you recognize this was another entry in the same
17  journal?
18  A. Yes.
19         MS. MENNINGER: And I don't believe it was in the
20  government's exhibit, and that's why I'm asking to introduce
21  this page, and I can work out with the government later if
22  there is any redactions. I don't think any are appropriate,
23  but --
24         MS. POMERANTZ: No objection, your Honor.
25         THE COURT: AF1 is admitted temporarily under seal so

LCACmax3          A. Farmer - cross          Page 2124

1   the government can propose any redactions.
2          (Defendant's Exhibit AF1 received in evidence)
3   BY MS. MENNINGER:
4   Q. Thank you. This page 2 is actually is an entry that you
5   made before you went to New York; right?
6   A. Right.
7   Q. And it doesn't have a date on it?
8   A. Right.
9   Q. But you're describing your excitement at going to see your
10  sister in New York; right?
11  A. Yeah.
12  Q. And you're describing your excitement about meeting
13  Epstein; correct?
14  A. Right. Maria, I'm excited about getting this ticket that
15  he bought me, yeah.
16  Q. And you refer to him --
17         MS. MENNINGER: Could we publish to the jury that
18  page. Is that a problem?
19         MS. POMERANTZ: No, not at all.
20         MS. MENNINGER: If we could publish to the jury that
21  page, your Honor?
22         THE COURT: Do you have it on paper?
23         MS. MENNINGER: I don't think that the government
24  thinks that there is any proposed redactions to this page.
25         THE COURT: Let's just give them a minute.

UNITED STATES OF AMERICA, v.
GHISLAINE MAXWELL,
December 10, 2021

---

LCAVMAX4          A. Farmer - cross          Page 2149

1  A. Right.
2        MS. MENNINGER: Can I have one moment, your Honor?
3        THE COURT: You may.
4        (Counsel conferred)
5  BY MS. MENNINGER:
6  Q. You talked on direct about the fact that you -- let me make
7  sure I've got my quote accurate. You talked generally about
8  once you got to New Mexico, that Ghislaine did not seem
9  surprised to see you there.
10 A. Right.
11 Q. And that you felt more comfortable because she was there.
12 A. Yes.
13 Q. Originally, your sister Maria was going to accompany you on
14 this trip to New Mexico; correct?
15 A. I don't remember that.
16 Q. Well, do you remember meeting with the FBI in 2006?
17 A. I do remember that meeting.
18 Q. Okay. And just as a side note, you, I think, testified on
19 direct that you believed the meeting with the FBI was in either
20 2006 or 2007?
21 A. Yeah. I had holiday decorations up, so I remember it was
22 that late in the year.
23 Q. Well, earlier you have said that you remembered it was 2007
24 because you remembered it being hot out. Do you remember that
25 statement?

---

LCAVMAX4          A. Farmer - cross          Page 2150

1        MS. POMERANTZ: Objection, your Honor.
2        THE COURT: Time frame.
3        You're talking about her testimony on direct?
4        MS. MENNINGER: Well, no, your Honor, I apologize.
5        THE COURT: Sustained.
6        MS. MENNINGER: Let me be more clear.
7  BY MS. MENNINGER:
8  Q. In past interviews, you were trying to reconstruct the date
9  of your interview with the FBI, do you remember that? You were
10 asked to talk about when that meeting was?
11 A. Do you remember what interview -- what --
12 Q. Let me come back to it just to make sure I'm accurate.
13 But, in any event, you spoke to them in 2006 or 2007 is your
14 memory now?
15 A. Right.
16        MS. MENNINGER: And so if I could have the witness
17 look at 3514-001.
18 Q. And if you look at this document, does that refresh your
19 memory about when your first meeting with the FBI was?
20 A. Yes.
21 Q. And that was in November of 2006?
22 A. Yes.
23 Q. And the actual interview was on November 15th, 2006 at the
24 bottom of the page; correct?
25        THE COURT: Can you make it larger please?

---

LCAVMAX4          A. Farmer - cross          Page 2151

1        MS. MENNINGER: Yes.
2  Q. The interview was on November 15th of 2006 at your home in
3  Austin, Texas; correct?
4  A. That's correct.
5  Q. And then the date of the report was a couple of weeks
6  later. If we could look at the top of the page. November
7  28th.
8  A. Yes.
9  Q. And so on page 2 of that document, in the second full
10 paragraph, the last sentence of that paragraph, what you told
11 the FBI in November of 2006 is that originally Maria was going
12 to accompany Annie to New Mexico; correct?
13 A. I see it says that.
14 Q. And that's what you told the FBI in November of 2006;
15 correct?
16 A. I don't recall that, but I see that that's written here.
17        MS. POMERANTZ: Your Honor, I would ask that the next
18 sentence be read. It's for completeness of the record.
19        MS. MENNINGER: Your Honor, that's what redirect is
20 for.
21        THE COURT: You can ask your next question.
22 BY MS. MENNINGER:
23 Q. You don't recall telling the FBI in November of 2006 that
24 originally Maria was going to accompany you to New Mexico;
25 correct?

---

LCAVMAX4          A. Farmer - cross          Page 2152

1  A. That's correct.
2        MS. MENNINGER: We can take it down.
3  Q. You did meet with agents at your home in November of 2006;
4  correct?
5  A. Correct.
6  Q. Agent Kuyrkendall and Slater?
7  A. That's correct.
8  Q. And they sat down and talked to you for some time; correct?
9  A. They did.
10 Q. They were taking notes when they talked to you?
11 A. They were.
12 Q. And they are FBI agents; correct?
13 A. Yes.
14 Q. They represented themselves to be.
15 A. They did.
16 Q. And they apparently wrote a report about the interview,
17 right?
18 A. Right.
19 Q. And they wrote in their report that originally Maria was
20 going to accompany you, right?
21 A. They wrote that, yes.
22        THE COURT: We're going to break for lunch shortly, if
23 this is a breaking point.
24        MS. MENNINGER: It's fine, your Honor.
25        THE COURT: Members of the jury, we'll break for about

---

# EXHIBIT 74

LBTVMAX1

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x
    UNITED STATES OF AMERICA,
3
              v.                          20 CR 330 (AJN)
4
    GHISLAINE MAXWELL,
5
              Defendant.                  Jury Trial
6   ------------------------------x
                                          New York, N.Y.
7                                         November 29, 2021
                                          8:40 a.m.
8
    Before:
9            HON. ALISON J. NATHAN,

10                                        District Judge

11                     APPEARANCES

12  DAMIAN WILLIAMS
         United States Attorney for the
13       Southern District of New York
    BY:  MAURENE COMEY
14       ALISON MOE
         LARA POMERANTZ
15       ANDREW ROHRBACH
         Assistant United States Attorneys
16
    HADDON MORGAN AND FOREMAN
17       Attorneys for Defendant
    BY:  JEFFREY S. PAGLIUCA
18       CHRISTIAN R. EVERDELL
         LAURA A. MENNINGER
19          -and-
    BOBBI C. STERNHEIM
20          -and-
    RENATO STABILE
21
    Also Present:  Amanda Young, FBI
22                 Paul Byrne, NYPD
                   Sunny Drescher,
23                  Paralegal, U.S. Attorney's Office
                   Ann Lundberg,
24                  Paralegal, Haddon Morgan and Foreman

25

LBTCMAX2 Opening - Ms. Pomerantz
1
second in command. She was involved in every detail of
2
Epstein's life. During the ten years the defendant and Epstein
3
committed these crimes together, the defendant was the lady of
4
the house. She ran Epstein's various properties, hiring and
5
firing employees. She imposed rules, instructing employees to
6
not speak directly with Epstein or talking with other people
7
visiting Epstein's homes. When she took charge of those homes,
8
the rules for staff were strict. Employees were to see
9
nothing, hear nothing, say nothing. There was a culture of
10
silence. That was by design, the defendant's design, because
11
behind closed doors, the defendant and Epstein were committing
12
heinous crimes. They were sexually abusing teenage girls.
13
The defendant and Epstein were partners in crime.
14
They had a playbook. First, they got access to young girls,
15
then they gained their trust. They learned about each girl's
16
hopes and dreams. They learned about each girl's families,
17
often targeting the daughters of single mothers. The defendant
18
and Epstein promised these girls the world. Some of the girls
19
had difficult home lives and came from families that were
20
struggling to make ends meet. The defendant and Epstein were
21
wealthy, powerful, and well connected, and they flaunted it.
22
They made sure everybody knew. The defendant and Epstein made
23
young girls believe that their dreams could come true. They
24
figured out what the girls dreamed of becoming when they grew
25
up and they promised to help, promised to help pay for school,
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

EXHIBIT 76

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF YORK
-------------------------------------------------------------- X
                                                               :
RADAR ONLINE LLC and JAMES                                     :
ROBERSON,                                                      :
                                                               :
                            Plaintiffs,                        :
                                                               :
                                                               :
            -v-                                                :          17 Civ. 3956 (PGG)
                                                               :
                                                               :
FEDERAL BUREAU OF INVESTIGATIONS,                              :
                                                               :
                            Defendant.                         :
                                                               :
-------------------------------------------------------------- X

## MEMORANDUM OF LAW IN SUPPORT OF THE FEDERAL BUREAU OF INVESTIGATION'S MOTION FOR SUMMARY JUDGMENT

AUDREY STRAUSS
United States Attorney
Southern District of New York
86 Chambers Street, Third Floor
New York, New York 10007
Telephone: (212) 637-2751

KIRTI VAIDYA REDDY
Assistant United States Attorney
 – Of Counsel –

i

or procedure, Exemption 7(E) protects the details of how such techniques and procedures are used in particular cases). Exemption 7(E) sets a "low bar for the agency to justify withholding," *Blackwell v. FBI*, 646 F.3d 37, 42 (D.C. Cir. 2011).

The FBI has invoked Exemption 7(E) to withhold seven categories of information: (1) collection and analysis of information that would reveal investigative techniques; (2) sensitive file numbers; (3) the dates and types of investigations, such as "preliminary" or "full", (4) the target, dates and scope of surveillance, (5) information located within the FBI's FD-515 forms used to report investigative accomplishments, such as an arrest; (6) database identifiers or printouts; and (7) monetary payments or funding needed for investigative purposes. The Seidel Declaration explains how each of these categories of information pertains to "how law enforcement officials go about investigating a crime." *Lowenstein*, 626 F.3d at 682; *see* Seidel Decl. ¶¶ 98-112. Although not required to do so, the FBI has also described for each category how release of such information could reasonably be expected to create a risk of circumvention of the law. *Id.*

Courts have been unequivocal that information from the type of databases described in the Seidel declaration fall squarely within Exemption 7(E). *See, e.g., Lowenstein*, 626 F.3d at 682 ("[F]ocusing on [particular] targets constitutes a 'technique or procedure.'"); *Gonzalez v. USCIS*, 475 F. Supp. 3d 334, 352 (S.D.N.Y. 2020) (affirming withholdings under Exemption 7(E) for identification codes, law enforcement event numbers, law enforcement case numbers and categories, FBI numbers and URLs for internal law enforcement database web addressed); *Shapiro v. DOJ*, -- F. Supp. 3d --, 2017 WL 908179, at *11 (D.D.C. Mar. 6, 2017) (holding that sensitive case file numbers are not merely administrative, but serve a law enforcement purpose and disclosure risks circumvention of law); *Ford v. DOJ*, 208 F. Supp. 3d 237, 253 (D.D.C. 2016) (information related to dates and types of FBI investigations, including whether they are

23

full or preliminary in nature, as well as internal email addresses and intranet information, properly exempted); *Levinthal v. Fed. Election Comm'n*, 219 F. Supp. 3d 1, 8 (D.D.C. 2016) (citing cases holding that "information connected to law enforcement databases," including metadata and codes facilitating access, navigation, and data retrieval, "qualifies for exemption under 7(E)"). Other information implicated by the Request, such as details concerning when and how the FBI utilizes surveillance tactics and devices, is also squarely protected by the exemption. *See McCoy v. Moschella*, 1991 WL 212208, at *5 (D.D.C. Sept. 30, 1991) (disclosure "would permit a sophisticated requester . . . to avoid specific identifying patterns of activity, thus making the FBI's task of identifying logical subjects more difficult"). The FBI therefore meets the "low bar" for justifying its withholdings under Exemption 7(E). *Blackwell*, 646 F.3d at 42.

## VII.   FBI Has Satisfied Its Duty to Segregate and Release Any Non-Exempt Information

FOIA requires that "[a]ny reasonably segregable portion of a record shall be provided to any person requesting such record after deletion of the portions which are exempt under this subsection." 5 U.S.C. § 552(b). "An agency withholding documents under Exemption 7(A) does not need to justify its segregability determination document by document, as the exemption allows agencies to justify withholding based on categories of documents." *New York Times v. United States Dep't of Justice*, 390 F. Supp. 3d 499, 518-19 (S.D.N.Y. 2019). Instead, the government satisfies its obligation by explaining why the categories of records do not contain reasonably segregable non-exempt information. *Robbins, Geller, Rudman & Dowd, LLP v. United States Sec. & Exch. Comm'n*, No. 3:14-CV-2197, 2016 WL 950995, at *9 (M.D. Tenn. Mar. 12, 2016).

Moreover, nonexempt portions of documents may "be withheld if they are inextricably intertwined with the exempt portions." *Conti v. U.S. Dep't of Homeland Sec.*, No. 12 Civ. 5827

(AT), 2014 WL 1274517, at *25 (S.D.N.Y. Mar. 24, 2014) (quotation marks omitted). "The agency is entitled to a presumption that it complied with its obligation to disclose reasonably segregable material." *Id.*

In the present case, FBI has already produced 1,232 pages of records, with appropriate redactions, in response to the Radar Online's FOIA requests. Seidel Decl. ¶ 114. The records withheld in full by FBI do not contain any reasonably segregable non-exempt information. *Id.* With regard to the records withheld in full under Exemption 7(A), the Comey Declaration explains why each category of records is exempt from disclosure, and further states that, to the extent there is non-exempt information contained in the records withheld under Exemption 7(A), that information is intertwined with exempt information and cannot reasonably be segregated without risking interference with the Maxwell prosecution. Comey Decl. ¶ 23. The public speculation and unfounded theories about Maxwell's involvement make segregation particularly difficult because the provision of information related to Epstein without complete context risks compounding the unfounded speculation. As to the remaining records withheld in full, either the records are privileged in their entirety or any non-exempt information in the documents is inextricably intertwined with exempt information, such that segregating any non-exempt information would be of little to no informational value. *See* Seidel Decl. ¶ 47. Accordingly, FBI has satisfied its obligation to reasonably segregate any non-exempt portions of the records withheld in full.

## CONCLUSION

For the foregoing reasons, the Court should grant the government's motion for summary judgment.

25

# EXHIBIT 78

BEN SAAS COMMENTS to New Dir of BoP in Sen Judic Committee – TRANSCRIPT – Nov 19, 2019 _YOUTUBE

**Transcript Ben Saas, Nov 19, 2019_ Sen Judiciary Committee**
https://www.youtube.com/watch?v=kigQd_ODv7U&t=153s

0:00 BEN SAAS
DR. Swire can you think of any other incidents in the history of the Bo P that have caused as much crisis for public trust for your institution as Epstein's death?

0.10
DR. SWIRE: I can only speak for the since 1976 when I joined the bureau. I don't know prior to that but I would say it's probably gotten the most public attention there are lots of taxpayers and citizens who've never thought about the BoP and you have lots of good patriotic hard-working folks there

0:28
BEN SAAS:
I get that but in terms of a crisis of public trust in general but also in terms of your workforce this death happened in the middle of August early August it's Thanksgiving and you're here to testify today and you say you're not allowed to speak about this incident I think that's crazy. Can you distinguish among types of investigations at least for us because I'm aware of at least three Epstein investigations you get a whole bunch of women who were raped by this guy this is a sex trafficking ring in the United States this guy had evidence he's got co-conspirators and their victims out there who want to know where the evidence has gone can you tell us a little bit more about the different investigations. I understand there's at least one that you're directed by main justice not to speak about but there are at least three investigations, can you unpack them please.

1:09
Dr Swire: There are there are two investigations that are ongoing one is the FBI's investigation and the other is the Inspector General's in vessels inside BoP
1:20
Ben SAAS: But there's a third one outside which is why Epstein was in your institution to begin with
Dr. Swire: yeah and that's completely out of my
1:22
BEN SAAS: I get that there's there's a lot here where the BoP has failed there's a lot here that Bo p is failed let's just be clear so we have a level set for everybody in this room you're  in your job because of this crisis right you come here today and you say you can't testify about it  but the reason you're director now is because the last guy got fired

1:41 Dr. Swire: what I don't know I have received no information from the FBI investigation yet nor no information from the Inspector General once those entities go into one of our facilities  we are forbidden from talking to anybody in the institution we can send in a team and look at wherever there might have been a security flaw or something, but we are not allowed to talk to anybody in our institutions about anything that happened over the

2:04
BEN SAAS: With all due respect you still have an obligation to speak to the girls who were raped by this guy today you may not have to speak about every particular of the guards that were

arrested last night but the fact that there is an ongoing attempt by the United States government to find out if there's still any evidence about the co-conspirators you do have an obligation to speak to those girls who are raped today you may not speak about this specific of the charges again the specifics of the charges against those two guards this morning who were taken into custody but more broadly you should be able to unpack have we changed any processes about how cases like this are handled it's been more than 90 days and you said I think your quote was we treat every inmate the same we believe in America that every individual has equal dignity but not every inmate has equal value for future criminal investigations Jeffrey Epstein was still to testify in a case somebody who's already been convicted who may be on suicide watch there are lots of good reasons to not want that guy to be able to kill himself this is different because it isn't just about the individual inmate who might kill themselves it's about the fact that that bastard wasn't able to testify against his other co-conspirators so it is wrong as a management matter for you to say we treat everybody the same we should be treating people who are yet to testify against other felons against other rapists they have a lot more priority for your institution don't they

3:25 Dr SWIRE:
Senator all of our pretty much all of our inmates that are any of our jail but jail facilities are pretrial there they're still yet to testify to be involved to share information on other cases I don't know what evidence you're asking of me if you're saying was there any evidence in his room in his possession at the time no that was in his brain and in the cameras and in the tapes that the American public well understands appear to not be urgent enough for the Department of Justice

3:50 Dr. SWIRE:
No, it's very urgent for the Department of Justice and it's all been confiscated by the FBI and it's all part of their investigation that's why none of that is shared with the director of the Bureau of Prisons or anyone in the bureau until the investigations are completed once those are completed I'd be very happy to come up here and talk with any of one of you the one here everything about we glean from those investigations but until I have that information there's nothing I can tell you if I don't have the information I cannot share anything with you

4:16
BEN SAAS: then how widespread is the problem of sleeping on the job there are lots of people in the public who think this seems a very convenient excuse and so tell us is it a systemic problem do we have a lot of people who sleep on the job when they're supposed to be guarding federal inmates ?

4:30 Dr. SWIRE:
We have a few sir and we we have been monitoring the cameras that are in every one of our institutions to determine how well and how effectively our inmates are I mean our staff members are doing their rounds and counts in the institutions we have found a couple of other instances and we have immediately referred those to the inspector general's office and I'm encouraging that if people just chose not to do their job we're hoping the US Attorney's Office will pick up those cases and prosecute them for us because we don't want those people in the Bureau of Prisons they are dangerous to everybody the inmates and the staff and so we are zealously going about trying to determine which of our employees are good employees and who do their job and that is the vast majority of the prison staff but we do have some I know out there who obviously choose not to follow policy choose not to do their job and we want them gone I do not want them in our institutions and I am exploring those very very carefully to identify them and get them out of our system. now if it's a

5:24
training problem and they didn't know what they were supposed to do that's our
5:27
Problem that's management's problem we have to do a better job training our staff but if someone
is well-trained well experienced and chooses not to do their job we want them gone I assure you
of that I'm at time so I'll just give you a preview of something I would ask you for the record after
the event you made a really important statement about drone drops of different kinds of
contraband into your institutions that's obviously a new and hard problem that's a problem
against which we have to play defense but there's also new opportunities for offense and

5:59 BEN SAAS¨
So what's your long-term strategy is inside the institution about cameras is something that I think
a lot of us would like to hear more and I'll send you a letter with some questions because
Epstein's hallway should have still been monitored by cameras even if his guards were asleep
and we don't have information about whether or not there were adequate cameras there and so I
think a lot of us would like to understand where technology dollars are going.

Dr. SWIRE: Yep thank you doctor thank you Senator

EXHIBIT 80

# In The Matter Of:

*UNITED STATES OF AMERICA, v.*
*GHISLAINE MAXWELL,*

---

*December 17, 2021*

---

*Southern District Court Reporters*

Original File LCHVMAXF.txt
Min-U-Script® with Word Index

UNITED STATES OF AMERICA, v.
GHISLAINE MAXWELL,                                          December 17, 2021

---

LCFCmax1                                        Page 2562

1  repeatedly relied on rule 613(a), which uses different language
2  and is about impeachment by prior inconsistent statement on
3  cross examination, not introduction of a prior statement as
4  extrinsic evidence as it seeks to do here.
5        So the opportunity to explain the statement should
6  consist of something more than just the opportunity to admit or
7  deny making the statement. That's right in Miller, 28 Federal
8  Practice and Procedure Evidence, Section 6205, Note 1, Second
9  Edition 2021. Citing a Seventh Circuit case and an Eleventh
10  Circuit case.
11        Now I'm going to quote from Gulani again. A trial
12  court has discretion to require satisfaction of the latter
13  requirement before the extrinsic evidence is offered or
14  alternatively to permit it to be satisfied by recalling the
15  witness after the extrinsic evidence is received.
16        In a case called Surdow, S-u-r-d-o-w, the Second
17  Circuit stated that the district court has broad discretion to
18  exclude extrinsic impeachment evidence that was not revealed
19  while the witness was on the stand or at least before the
20  witness was permitted to leave the court. That's United States
21  v. Surdow, 121 F.Appx. 898 (2d Cir. 2005), collecting
22  authorities.
23        Therefore, the Court will sustain the government's
24  objection as to all proposed prior inconsistent statements to
25  which the witness was not presented with the statement to

---

LCFCmax1                                        Page 2563

1  explain or deny it.
2        Next at issue is the first step of whether the
3  witness's testimony and the prior statement are inconsistent.
4  I provide the following guidance before we turn to the
5  specifics.
6        First, if the statement was presented to the witness
7  and the witness admitted to making the statement, then
8  extrinsic evidence is inappropriate, and the parties apparently
9  agree on this point in their last two letters as do circuit
10  courts who have decided the issue. That's true for the Fifth
11  Circuit, Sixth Circuit, and Tenth Circuit.
12        Second, the prior inconsistent statement must actually
13  be the witness's statement to show an inconsistency. United
14  States v. Almonte, 956 F.2d 27, (2d Cir. 1992).
15        Where the defense relies on a third party's
16  characterization of the witness's words rather than a verbatim
17  transcript, then the witness must have subscribed to that
18  characterization. On that basis, notes taken in law
19  enforcement interviews will generally not prove an
20  inconsistency for purposes of rule 613(b). See, for example,
21  United States v. Leonardi, 623 F.2d 746, the Gulani case and
22  others.
23        Of course, that infirmity is solved by calling the
24  interviewing officer as a witness or to avoid calling another
25  witness, the government stipulates to the accuracy of the

---

LCFCmax1                                        Page 2564

1  notes.
2        Third, as I previously explained, testimony that a
3  witness does not recall making a statement may be but is not
4  necessarily a basis for inconsistency.
5        Finally, I'll apply 403, consistent with my prior
6  rulings of prior inconsistent statement has already been read
7  in full into the record. I'll sustain the government's
8  objection to admitting the statement as extrinsic evidence.
9  See, for example, United States v. King, 560 F.2d 122
10  (2d Cir. 1977). Stating where evidence is admissible under
11  613, it could be excluded under 403.
12        With that, we can turn to the list of the prior
13  statements and I'll do my best to apply that guidance I've just
14  given in light of the arguments raised by the parties and my
15  review of the transcript.
16        So beginning with Jane, transcript at 447, I will
17  overrule. Jane denied the statement in the handwritten notes,
18  which is an inconsistency, even if the later 302 corroborates
19  Jane's testimony. I will overrule that government objection.
20        Transcript at 455, I'll sustain the government's
21  objection for two reasons. The full statement was read into
22  the record and Jane responded it was, quote, correct, I guess,
23  admitting the statement.
24        Transcript at 470 to 71, overruled. Here the defense
25  has adequately identified the statement at issue.

---

LCFCmax1                                        Page 2565

1        Transcript at 471, sustained. As I said at the time,
2  the timeframe of that question was too unclear to create an
3  inconsistency and no statement was presented to Jane to explain
4  or deny it.
5        Transcript at 473 to 74, overruled. That's provided
6  admissible evidence either via stipulation or a witness is used
7  to prove the notes.
8        Transcript at 475, sustained. Jane's prior statement
9  was that she was not sure where the incident happened, so there
10  is no inconsistency. She also answered "I don't recall" to
11  each question, so there is no inconsistency.
12        Transcript 475 to 76, I'll sustain. The defense's
13  questions did not track the 302 report, does not refer to
14  whether the defendant touched Jane or not. The defense
15  referred Jane to the December 2019 interview document, but then
16  asked questions about the February 2020 interview. So there is
17  an inadequate basis for inconsistency.
18        Transcript at 476, lines 2 through 4, sustained.
19  Again, the defense referred Jane to the incorrect interview and
20  for the statement it now seeks to admit in Jane's statement
21  that she doesn't recall, she said she was not sure is not an
22  inconsistency.
23        Transcript at 476, lines 8 through 10, sustained. The
24  question follows the above entry and again fails to properly
25  orient Jane, and Jane said "I don't recall," which is not

---

UNITED STATES OF AMERICA, v.
GHISLAINE MAXWELL,                                                December 17, 2021

---

LCFCmax1                                                          Page 2566

1  inconsistent.
2        Transcript at 476, lines 14 through 16, sustained for
3  the same reasons as the last two.
4        Transcript at 476, line 17 through 19, sustained for
5  the same reasons.
6        Transcript at 477, sustained for the same reasons.
7        Transcript at 478, overruled.
8        Transcript at 479 to 80, overruled.
9        Transcript at 480, sustained. There is no
10 inconsistency, because Jane's answer that she doesn't remember
11 and her prior statement that she did not know whether
12 Ms. Maxwell was present, there is no inconsistency.
13       Transcript at 499, 507 to 508, I will overrule.
14       Transcript at 506 to 7, sustained. Jane admitted to
15 making the prior statement.
16       Transcript at 512 to 13, sustained. Jane's prior
17 statement that they hiked is not inconsistent with her
18 testimony. Also not material.
19       Transcript at 513, overruled.
20       Transcript at 514, overruled.
21       Transcript at 514 to 15, sustained. Jane's prior
22 statement about abuse in New York not being, quote, a group
23 thing, is not inconsistent with her testimony.
24       Transcript at 521 to 22, sustained. Jane agreed with
25 virtually all of the details of this event, except for the

---

LCFCmax1                                                          Page 2567

1  timeline, which she said she does not remember and is not a
2  basis for inconsistency and it goes to a collateral matter.
3        532, sustained. Statement was read aloud.
4        596, sustained, the statement was read aloud.
5        That's, I believe, all of the Jane statements; is that
6  correct?
7        MS. COMEY: Yes, your Honor.
8        MS. MENNINGER: Yes, your Honor. The parties had
9  agreed to a few either being in or out before we submitted
10 this, so those are part of the record your Honor just gave, but
11 the parties know what they are.
12       MS. COMEY: Yes, your Honor.
13       THE COURT: Thank you, Ms. Menninger, for that
14 clarification.
15       Next, Annie.
16       Transcript at 2151, sustained. She acknowledged the
17 statement but said she didn't recall making it. So there is no
18 inference of inconsistency.
19       Transcript at 2160 to 61, sustained. Annie said --
20 there is not an inconsistency. Annie said she didn't recall a
21 chef, but, quote, that makes sense to me that there was a chef
22 there, quote. It also goes only to a collateral issue.
23       Transcript at 2165 to 66, sustained. Statement was
24 already read out loud, testimony is not inconsistent, and the
25 amount of horseback riding is collateral.

---

LCFCmax1                                                          Page 2568

1        Transcript at 2174 to 76 and 2194 to 95, I'll sustain.
2  I sustained two objections to continuing question on this
3  issue. Statement was read aloud and the defense made and can
4  make its impeachment argument.
5        2182 to 83, sustained. The statement was read aloud.
6        2185 to 86, sustained. The statement was read aloud
7  and there is no inconsistency as I previously ruled at 2186.
8        2195, sustained for the same reasons I just indicated.
9        2197 and 98, sustained. Annie did not earlier
10 characterize Ms. Maxwell as, quote, disinterested, but that's
11 not an inconsistency. Further, Annie had no opportunity to
12 explain or deny the statement or lack thereof.
13       2209 to 13, sustained. There isn't an inconsistency
14 and Annie answered, "I don't recall."
15       2224, sustained.
16       I think that's it. And just on that last one, it was
17 read aloud and I don't see an inference of inconsistency.
18       Anything else on that?
19       MS. COMEY: No, your Honor.
20       THE COURT: Ms. Menninger?
21       MS. MENNINGER: No, your Honor.
22       THE COURT: Again, recognizing that the parties had
23 agreed on others.
24       MS. MENNINGER: Yes, your Honor. Just with respect to
25 one thing your Honor just said, because the statement was read

---

LCFCmax1                                                          Page 2569

1  aloud, I believe the phrase you just used was the defense can
2  make the impeachment argument. Because the quote was read
3  aloud, even if the witness doesn't recall making the statement
4  does not prohibit us from making an argument to the jury that
5  the statement was, in fact, made to law enforcement and
6  impeaches the witness's testimony; correct?
7        THE COURT: If it's in the record, that inference is
8  available to argue. Any disagreement?
9        MS. COMEY: No objection, your Honor.
10       MS. MENNINGER: I just want to make sure in closing
11 arguments --
12       THE COURT: I totally appreciate that. And anything
13 to avoid objections during closing argument.
14       MS. COMEY: Obviously it's not for the truth, it's for
15 impeachment, but no objection to that argument.
16       MS. MENNINGER: I think impeachment is for the truth,
17 your Honor.
18       THE COURT: That is way more metaphysical than I can
19 handle at this moment.
20       MS. MENNINGER: Thank you.
21       THE COURT: Thank you.
22       MS. COMEY: Your Honor, I would note that in light of
23 the rulings on the Annie Farmer statements, it appears that
24 there is no longer any relevance for calling AUSA Rossmiller as
25 a witness, and I just want to confirm that he is released from

---

UNITED STATES OF AMERICA, v.
GHISLAINE MAXWELL,

December 17, 2021

1  circumstances.
2       In that case, law enforcement had received a tip that
3  the defendant was innocent because another individual shot the
4  victim. The Second Circuit stated that cross-examination of
5  the lead investigating officer on that tip was probative
6  because the jury could conclude that law enforcement had
7  prematurely concluded the defendant was the shooter and it
8  failed to investigate diligently the possibility that it was
9  the other individual. That was the Watson case.
10      I think we want to make these points, your Honor,
11  because I think the point to the jury is the government
12  credited the witnesses, the accusers in this case, without
13  following up on the information that they provided to see if it
14  was wrong. Not following up on that information is probative
15  of the defendant's guilt or innocence in this case; because had
16  they followed up, we believe they would have heard that that
17  was not true from these witnesses. And so that goes to the
18  guilt or innocence of this defendant.
19      I do intend to get into that on the stand and talk to
20  them about. You spoke to Jane on X date. And on that date she
21  told you about group sexualized massages involving this person
22  and that person; isn't that right? Yes. Spoke to her on
23  another date; she mentioned a few other names. Spoke to her on
24  a third date; she mentioned names again, and she gave physical
25  descriptions of these people. She said certain details about

1  these people which I will elicit.
2       You were aware of someone named Michelle in this case.
3  You were aware, for example, of this Michelle -- and I'm going
4  to have to use her full name, because we lost the anonymity
5  issue, but you're aware that there was a Michelle Healy who
6  worked in the office. You never spoke to Michelle Healy, did
7  you? So I would like to be able to do that. Under your
8  Honor's ruling, I believe, that's appropriate under the Watson
9  case.
10      THE COURT: Mr. Rohrbach.
11      MR. ROHRBACH: Your Honor, I disagree with almost
12  every premise of what Mr. Everdell just said. But the core
13  legal issue is one the Court has already analyzed which is the
14  Watson case is a Brady case. It doesn't stand for anything, as
15  the Second Circuit has held, about exactly what sorts of
16  evidence can and can't come in. The Court has explained that
17  the challenges of the thoroughness of the investigation can
18  come in in lots of ways, including cross-examination. The
19  defense counsel could and did ask Jane when she testified who
20  was in the room during the massages. They can put on evidence
21  of witnesses who they believe are the other people in the room.
22  But what they can't do is in their direct case, call a case
23  agent and say, You didn't take this investigative step; you
24  didn't take that investigative step. That is precisely the
25  challenge to the thoroughness of the investigation that's

1  precluded.
2       THE COURT: I've relitigated so many issues in this
3  case, so I suppose this is just going out with the same
4  pattern. But I said in my ruling, in its brief, the defense
5  seeks to affirmatively -- and I'll quote from the brief --
6  "call FBI case agents as witnesses" to ask who they talked to,
7  what documents they subpoenaed, and when.
8       But as the Second Circuit explained in Saldarriaga,
9  the government's use or nonuse of certain investigative
10  techniques does not tend to show the defendant's innocence of
11  the charges. That's transcript at page 20. And I also said I
12  would permit the defense to cross-examine law enforcement
13  officers about the investigative steps that were taken if the
14  government puts the thoroughness of the investigation into
15  issue, as this too would be permissible impeachment on cross,
16  and they did not.
17      I suppose words have meaning in the eyes of the
18  beholder, but what you're suggesting is directly contrary to my
19  ruling.
20      MR. EVERDELL: Your Honor, I did see that. I'm not
21  trying to be contrary. I just went back to the premise of your
22  ruling when I was looking at the transcript cites and the cases
23  that you cited as premise for your ruling. And because this
24  issue became a live issue when we had Jane's testimony, I
25  thought it appropriate to see if we could revisit this to see

1  if this was now appropriate line of cross.
2       THE COURT: No.
3       MR. EVERDELL: Understood, your Honor. Okay.
4       Then there are two other issues then. I did want to
5  get into this with this witness, that the investigation of the
6  allegations against Ms. Maxwell started with the first three of
7  the accusers, and that time period was focused, so that's Jane,
8  Annie Farmer, and Kate. And that time period was focused on
9  '94 to '97. And then they got an indictment based on those
10  charges. And then later, they talked to Carolyn and they
11  amended the indictment, and those allegations relate to a later
12  time period. 2001 to 2004, and that those are the subject of
13  the last two counts in the indictment, Counts Five and Six.
14      The purpose of this, your Honor, is just to be able to
15  show the jury that there are -- there's a difference between
16  those counts and who the witnesses are, information whose
17  evidence is related to those counts. And I think that's
18  relevant to be able to explain that to the jury without
19  getting -- it doesn't really talk about investigative steps;
20  it's just simply saying, You talked to Carolyn after you spoke
21  to these three first. These are the three who you originally
22  had evidence from against Ms. Maxwell. Carolyn came to you
23  later. You spoke to her first in 2019; she wanted to talk to
24  you with a lawyer. You didn't speak to her again until a year
25  later. At that point you did meet with her. You took her

UNITED STATES OF AMERICA, v.
GHISLAINE MAXWELL,                                                          December 17, 2021

---

LCHVMAX6                                                          Page 2710

1   the date on which Jeffrey Epstein began living at 9 East 71st
2   Street. Jane contended that she went to only one home over the
3   years, she was 14, 15, and 16. Those are the years 1994
4   through 1996.
5          We ask the Court to take judicial notice of several
6   documents under Federal Rule of Evidence 201. These relate to
7   a case in this district, in this courthouse, United States
8   District Court for the Southern District of New York. The case
9   number is 96 CV 8307, Denny Chin was the presiding judge, now
10  Second Circuit justice. It was United States of America --
11         THE COURT: Just a judge. Second Circuit judge.
12  You've given him an early promotion.
13         MS. MENNINGER: If you could let him know.
14         United States of America v. Jeffrey Epstein and Ivan
15  Fisher. It was an action brought by the U.S. Attorney's Office
16  for the Southern District of New York. They were the party in
17  interest -- they were the lawyers representing the United
18  States of America in that proceeding, so the same Southern
19  District of New York office.
20         In that proceeding, the questions -- Mr. Epstein's
21  prior residence at East 69th Street was leased from the U.S.
22  Government, who had taken possession of it after -- from the
23  government of Iran. And he began a lease in that residence in
24  1992.
25         The contention in the litigation was that he had

---

LCHVMAX6                                                          Page 2711

1   abandoned living in East 69th in or about January of 1996.
2   Then he leased it to Mr. Fisher, who was a codefendant in the
3   case. And then the U.S. Government sought to evict Mr. Fisher.
4   So both Mr. Epstein and Mr. Fisher were the defendants in the
5   action.
6          There were, on behalf of Mr. Epstein, two answers
7   filed in the case, answer to cross-claims. These are docket
8   entry numbers 15 and 45 from that action. In the first
9   paragraph of those two answers, Mr. Epstein admitted that in or
10  about January 1996, he vacated the premises, the premises being
11  East 69th Street. And then subsequent to that, other events
12  happened.
13         In an opinion in docket entry 46, Judge Chin issued an
14  opinion, and he made a finding of fact that Epstein and his
15  family continued to reside at the premises, East 69th, until
16  January of 1996, at which time Epstein abandoned. So that is
17  an opinion and two answers that we seek to admit under Federal
18  Rule of Evidence 201, judicial notice.
19         Under the terms of that, your Honor, it is, I believe,
20  a fact that can be judicially noticed. 201(f) describes what
21  instructions are given to the jury in the event that it is
22  criminally noticed; and in a criminal case, the jury is to be
23  instructed that it may or may not accept the noticed fact as
24  conclusive. I'm not intending or offering the full documents
25  that I just cited to your Honor, but the fact of Mr. Epstein's

---

LCHVMAX6                                                          Page 2712

1   admission that he vacated East 69th in or about January '96,
2   and then Judge Chin's decision making that finding of fact.
3          There is one other document from that docket that we
4   seek to admit, but under a separate rule of evidence,
5   804(b)(1). There was actually a deposition transcript from
6   Mr. Epstein in which he is asked -- and it was taken by the
7   U.S. Attorney's Office for the Southern District of New York.
8   And he was asked in that deposition, Is it correct that you
9   moved from the premises -- meaning East 69th -- to 9 East 71st
10  Street in or around the beginning of '96?
11         And Mr. Epstein responded, You asked me that question
12  three times. I believe it is around then, but I don't know
13  exactly when.
14         This deposition excerpt was appended to a pleading
15  that was submitted by the U.S. Attorney's Office in support of
16  their case at docket number 52. So I believe that one is
17  admissible under 804(b)(1), the deposition transcript.
18         THE COURT: Okay. One at a time, Mr. Rohrbach.
19         MR. ROHRBACH: Yes, your Honor.
20         I will go through each of the documents, but just as a
21  substantive point, this is very much like the 44 Kinnerton
22  Street issues we've been talking about.
23         And substantively --
24         THE COURT: Microphone.
25         MR. ROHRBACH: This is very much like the 44 Kinnerton

---

LCHVMAX6                                                          Page 2713

1   Street documents we've been talking about, in that the legal
2   documents describing when Mr. Epstein abandoned this property
3   does not reflect where Mr. Epstein was living. As the defense
4   knows, one of the defense witnesses, who they ultimately
5   decided not to call, would have testified that Epstein was
6   living on East 71st Street prior to 1996.
7          And so if the Court admits this -- this is the reason
8   this has to go first in the remaining issues. If the Court
9   admits this, the government would put on rebuttal evidence
10  showing that, in fact, Mr. Epstein lived on 71st Street before
11  he says he abandoned the property in 1996.
12         So that's sort of a substantive background point.
13         Moving through the documents, your Honor, Judge Chin's
14  opinion is a summary judgment opinion. So I think it's quite
15  clear actually that the facts can reasonably be disputed. The
16  summary judgment standard, as the Court well knows, is that the
17  Court -- is that Judge Chin had to take all facts in the light
18  most favorable to the nonmoving party, which in this case was
19  not the United States. So I think it very much can be
20  controverted that the fact in -- the statement in the
21  background section of Judge Chin's opinion is not a factual
22  finding about when Mr. Epstein abandoned --
23         THE COURT: Can I see it?
24         MS. MENNINGER: What's that, your Honor?
25         THE COURT: Can I see the document?

---

UNITED STATES OF AMERICA, v.
GHISLAINE MAXWELL,

December 17, 2021

---

LCHVMAX6                                    Page 2714

1     MS. MENNINGER: Oh, yes, your Honor. I apologize. I
2  have copies for the Court, and I gave a copy to the government.
3     THE COURT: Okay.
4     MR. ROHRBACH: Judge Chin sets out the summary
5  judgment standard on page 12.
6     THE COURT: Yes.
7        Do you want to respond to the summary judgment point?
8        So 201(b), the Court may judicially notice a fact that
9  is not subject to reasonable dispute.
10    MS. MENNINGER: This was the government's motion for
11 summary judgment; and it was Mr. Epstein's admission that
12 that's when he vacated the premises. So I don't think that --
13 in terms of that's why I think that you need to take both the
14 answers and the summary judgment together, rather than trying
15 to introduce one or the other. It was the government's
16 position that he abandoned in January of '96, and he admitted
17 that.
18    MR. ROHRBACH: The defense is not offering any of
19 these documents which contain the government's position, your
20 Honor.
21    MS. MENNINGER: That's not true.
22       Docket entry 52 is a submission by the government.
23    MR. ROHRBACH: I apologize. I'm talking about the
24 summary judgment opinion and the answers, but not the
25 government's claims, which is not a document -- I'll speak --

---

LCHVMAX6                                    Page 2715

1  the letter, I think, is a sort of separate matter than the
2  summary judgment opinion and the answers. Those are ones where
3  all we have is a summary judgment opinion. We don't know what
4  the basis was for it. And we have some answers to cross-claims
5  in which Mr. Epstein asserts some facts to which we don't know
6  what the question was.
7        And I suppose this brings me to the broader point
8  which applies to the letter and Epstein deposition as well,
9  which is that this was not a material fact in that litigation;
10 and so there was no reason for the government to litigate when
11 Mr. Epstein, in fact, lived in and was occupying the particular
12 residences.
13       What mattered in that litigation is that at some point
14 in early 1996, Mr. Epstein made an attempt to do an illegal
15 sublet of the property; and so the government was suing for
16 ejectment and back rent from Mr. Epstein. But it did not
17 matter to the government whether Mr. Epstein abandoned the
18 property in January 1996, December 1995, November 1995. There
19 was no reason for that to be litigated in the course of that
20 litigation. It just mattered that he abandoned the property
21 before he tried to do the illegal sublet. That's why it's in
22 the background section of Judge Chin's opinion; that's why it's
23 not a significant portion of any of the other documents. There
24 is absolutely no reason to take judicial notice of it. And
25 actually for the same reason, it's not subject to the 804

---

LCHVMAX6                                    Page 2716

1  hearsay exception.
2     MS. MENNINGER: That's not true, your Honor.
3        In this litigation, one of the central issues that the
4  government -- this same office -- put forth is that
5  Mr. Epstein's abandoning that property was in violation of the
6  lease, which kept him -- which he needed to reside in the
7  residence under the terms of the lease. So it was a central
8  fact. It was admitted by Mr. Epstein. It was put forth in
9  their claims against him, and that is all covered in the
10 summary judgment motion. It was admitted on an answer. It was
11 the only admission on that point. And then it was testified to
12 in a deposition. So I don't think that saying it was not an
13 issue in the case can possibly withstand scrutiny when you look
14 at all of these.
15       Also, the factual background about the witness that
16 they said that they would call to dispute this, we've
17 interviewed this witness, and his testimony is not at all in
18 contradiction to this. He was hired in December of '95. He
19 said Mr. Epstein wasn't living there for the first three weeks
20 that he was hired in December of '95, and took possession in
21 early '96. So I don't think there is a basis to call a
22 rebuttal witness to dispute these documents, all of which are
23 covered both by 201, as well as 804(b)(1).
24    MR. ROHRBACH: That's not accurate about this witness.
25       But as a general point, there's no question that if

---

LCHVMAX6                                    Page 2717

1  they offered evidence like this, the government can and will
2  call rebuttal witnesses to testify about occupancy.
3        As to the point about whether this is a material fact,
4  it was material that Mr. Epstein stopped living at some point
5  in the 69th Street home. It was not material the precise date
6  on which he stopped living there, much less whether he had
7  started spending his nights living on 71st Street at some point
8  prior to that.
9     THE COURT: All right.
10       Do you want to indicate which documents by mark you're
11 seeking admission?
12    MS. MENNINGER: Yes, your Honor.
13    THE COURT: Forgive me if you said them before, I'm
14 not sure.
15    MS. MENNINGER: That's okay.
16       Z-9 is the first answer. That was docket entry number
17 15.
18    THE COURT: Okay.
19    MS. MENNINGER: And it would be the first paragraph.
20       The same is true of Z-10, first paragraph.
21       With respect to Z-7, that's the opinion. The fact is
22 contained on page 4 in the first full paragraph, first
23 sentence.
24       And then with respect to Z-8, your Honor, it's towards
25 the back of the document. It's paginated page 45 of 53, that's

---

UNITED STATES OF AMERICA, v.
GHISLAINE MAXWELL,

December 17, 2021

LCHVMAX6                                        Page 2718

1  where the deposition excerpt was contained.
2        THE COURT: Okay.
3        MS. MENNINGER: And it's on that page 45. It's the
4  first question on that page.
5        THE COURT: All right.
6        I'm sustaining the objection. 201(a) has not been
7  sufficiently established, in light of the posture of the
8  litigation and what was materially in dispute.
9        What's next?
10       MS. MENNINGER: With respect to 804(b)(1), your Honor,
11  for the deposition excerpt for Mr. Epstein.
12       THE COURT: Okay. Okay. Mr. Rohrbach.
13       MR. ROHRBACH: It is the same objection here, your
14  Honor. Since this is a question about a fact that was
15  precise -- sorry, let me --
16       THE COURT: It's not the same.
17       MR. ROHRBACH: It's not exactly the same. But let's
18  look at the language of 804, which is, in order for it to be
19  offered against a party, the party has to have had an
20  opportunity and similar motive to develop it.
21       The government's motive in developing this fact is
22  completely different than it was in the civil litigation. The
23  government's motive here is to determine where Mr. Epstein
24  personally lived. The government's motive in this deposition
25  was to determine whether he had moved -- whatever that means --

LCHVMAX6                                        Page 2719

1  from one residence to another one by a certain date in order to
2  advance their claims about ejectment and back rent.
3        MS. MENNINGER: In the answer itself, Mr. Epstein
4  says, You asked me that question three times. And the question
5  was, Is it correct that you moved from the premises to 9 East
6  71st in or around the beginning of 1996?
7        That's the exact question --
8        THE COURT: What was the response?
9        MS. MENNINGER: You asked me that question three
10  times. I believe it is around then, but I don't know exactly
11  when.
12       And the position of Jane was that he was living there
13  in 1994. So I think under 401, it is a question of whether
14  that's relevant. It is certainly different than the
15  testimony --
16       THE COURT: The fact that it was asked three times is
17  the argument that it -- contrary to my immediately prior
18  ruling, that there was a motive to develop it?
19       MS. MENNINGER: There was motive to develop it, your
20  Honor. That was the whole point of this litigation. I mean, I
21  can offer the complaint as well, but it's in the summary
22  judgment ruling.
23       THE COURT: Okay.
24       For the same reason, it's sustained.
25       What else?

LCHVMAX6                                        Page 2720

1        MR. ROHRBACH: Nothing else on this from the
2  government, your Honor.
3        MS. COMEY: In that case, your Honor, I think that we
4  have a number of stipulations to finalize, and then I think we
5  will be ready to bring the jury back out, and it should take
6  about 10 or 15 minutes, at which point I think the presentation
7  of evidence will be complete.
8        THE COURT: Okay. So I got the note, just for the
9  record, the withdrawal of the request to issue an arrest
10  warrant for the witness Kelly, who hasn't responded to the
11  subpoena.
12       MS. MENNINGER: Yes, your Honor. Part of the
13  discussions are that we would wrap up today.
14       THE COURT: I know. But you sent my chambers an
15  email. Is that application withdrawn?
16       MS. MENNINGER: Yes, your Honor.
17       THE COURT: To be clear, which application is that?
18       MS. MENNINGER: The application to have the marshals
19  arrest Kelly Bovino for nonappearance on her subpoena.
20       THE COURT: Okay. We are working out a resolution of
21  issues that would also not necessitate the witness from London
22  on Monday?
23       MS. COMEY: That's exactly right, your Honor.
24       THE COURT: Okay.
25       MS. COMEY: And it would mean that there would be no

LCHVMAX6                                        Page 2721

1  government rebuttal case as well.
2        THE COURT: And no government rebuttal.
3        MS. COMEY: No government rebuttal case.
4        THE COURT: Okay.
5        MS. COMEY: The parties have reached consensus to end
6  the case.
7        THE COURT: Okay. All right.
8        While you're working, Ms. Sternheim, are you ready for
9  the allocution?
10       MS. STERNHEIM: I am.
11       THE COURT: Okay.
12       I'll ask Ms. Maxwell and Ms. Sternheim to stand.
13       Ms. Maxwell, I want to make sure you understand that
14  you have the right to testify in your own defense. You also
15  have the right not to testify.
16       If you decide not to testify, I will instruct the jury
17  that they may not draw any inference against you based on that
18  decision, and that fact may not enter into their deliberations.
19       I want to make sure that you know that the decision
20  whether to testify or not is your decision. You are entitled
21  to the best advice of your attorneys in making this decision,
22  but the decision is yours.
23       Ms. Maxwell, do you understand that?
24       THE DEFENDANT: Your Honor, the government has not
25  proven its case beyond a reasonable doubt; and so there is no

| | |
|---|---|
| LCHVMAX6 Page 2722 | LCHVMAX6 Page 2724 |

**Page 2722**

1    need for me to testify.

2       THE COURT: All right.

3       Ms. Sternheim, have you discussed the issue with your

4    client?

5       MS. STERNHEIM: Yes, we have.

6       THE COURT: And you've advised her that it is her

7    decision?

8       MS. STERNHEIM: Yes, we have.

9       THE COURT: She's just indicated that her decision is

10   not to testify; is that correct?

11       MS. STERNHEIM: That is correct.

12       THE COURT: Ms. Maxwell, that is correct?

13       THE DEFENDANT: Your Honor, that is correct.

14       THE COURT: Thank you.

15   You may be seated.

16       MS. STERNHEIM: Thank you.

17       THE COURT: All right. Five minutes?

18       MS. COMEY: Yes, please, your Honor.

19       THE COURT: Okay.

20    (Recess)

21       THE COURT: Counsel, are you ready?

22       MS. COMEY: Yes, your Honor.

23       THE COURT: On the defense?

24       MR. EVERDELL: Yes, your Honor.

25       THE COURT: Okay. One thought for Monday. I'm going

**Page 2723**

1   to tell the jury to be here at 9, rather than 9:30. We'll take

2   as much advantage of the day as we can.

3       MS. STERNHEIM: Your Honor, the government and I had

4   spoken about this. And if it's amenable to the Court -- they

5   haven't spoken yet, but we can talk about this after.

6       THE COURT: Okay. Fair enough. Thank you.

7   All right. We'll bring in the jury.

8       MS. COMEY: Yes. Thank you, your Honor.

9       MS. STERNHEIM: We were going to suggest also

10   beginning at 9. And whether the Court would inquire of the

11   jury if they would be willing to stay a little later so that we

12   can complete everything on Monday.

13       THE COURT: Okay. You don't mean extended time for

14   deliberations, you mean the closings.

15       MS. STERNHEIM: No, I mean to do the closing

16   arguments.

17       THE COURT: You pushed it off. Yes.

18       MS. STERNHEIM: Closing arguments, rebuttal, charge.

19       THE COURT: And what's your best estimate?

20   We'll do a shortened lunch too, because we presumably

21   won't have issues to work through.

22       MS. COMEY: Your Honor, we estimate that the summation

23   argument for Ms. Moe will be between two and three hours. My

24   rebuttal, it's hard to estimate. I doubt it would be more than

25   45 minutes at most.

**Page 2724**

1       THE COURT: And the defense.

2       MS. STERNHEIM: It would not exceed the government's

3   main closing argument, and hopefully would be shorter.

4       THE COURT: Okay. It will be tight.

5   So I'll tell them that we'll start at 9, and that they

6   should prepare for the possibility of being kept until 5:30?

7       MS. STERNHEIM: We had proposed 6 o'clock.

8       THE COURT: Okay.

9       MS. COMEY: Obviously, your Honor, we will strive for

10   efficiency in our arguments.

11       THE COURT: Yes. Okay.

12   I will say that. I need to give them an opportunity

13   to let Ms. Williams know if that's not possible. I don't know

14   if somebody has childcare responsibilities or the like.

15       MS. STERNHEIM: Understood.

16   That's why we wanted to raise it with you now.

17       MS. COMEY: Yes, your Honor.

18       THE COURT: All right. Thank you.

19   Bring in the jury.

20    (Jury present)

21       THE COURT: Members of the jury, thank you so much for

22   your patience. I greatly appreciate it.

23   Mr. Everdell, you may proceed.

24       MR. EVERDELL: Thank you, your Honor.

25   Your Honor, at this time the parties have a number of

**Page 2725**

1   stipulations that we would like to read for the jury.

2       THE COURT: Go ahead.

3       MR. EVERDELL: The first is an oral stipulation

4   between the parties, and I would like to have Ms. Comey read

5   that one out to the jury.

6       THE COURT: Okay.

7       MS. COMEY: Thank you, your Honor.

8   The parties have hereby stipulated and agreed that

9   Government Exhibits 52-K, 52-J, and 52-L are redacted excerpts

10   of what has been marked for identification as Government

11   Exhibit 52. And the government would offer those three

12   exhibits, 52-K, J, and L under seal to protect the privacy of

13   third parties.

14       MR. EVERDELL: And without waiving our prior

15   objections, no objection, your Honor.

16       THE COURT: All right. 52-K, 52-J, and 52-L are

17   admitted under temporary seal for me to consider limited

18   redactions.

19       MS. COMEY: Yes, your Honor. Thank you.

20    (Government's Exhibits 52-J, 52-K, 52-L received in

21   evidence)

22       MR. EVERDELL: Your Honor, we have another oral

23   stipulation agreed to by the parties.

24   The parties hereby stipulate and agree that Annie

25   Farmer's boots were seized by the FBI on June 29th, 2021.

# EXHIBIT 81

*Place in file*

IN RE:
INVESTIGATION OF
JEFFREY EPSTEIN
_____/

## NON-PROSECUTION AGREEMENT

IT APPEARING that the City of Palm Beach Police Department and the State Attorney's Office for the 15th Judicial Circuit in and for Palm Beach County (hereinafter, the "State Attorney's Office") have conducted an investigation into the conduct of Jeffrey Epstein (hereinafter "Epstein");

IT APPEARING that the State Attorney's Office has charged Epstein by indictment with solicitation of prostitution, in violation of Florida Statutes Section 796.07;

IT APPEARING that the United States Attorney's Office and the Federal Bureau of Investigation have conducted their own investigation into Epstein's background and any offenses that may have been committed by Epstein against the United States from in or around 2001 through in or around September 2007, including:

(1)   knowingly and willfully conspiring with others known and unknown to commit an offense against the United States, that is, to use a facility or means of interstate or foreign commerce to knowingly persuade, induce, or entice minor females to engage in prostitution, in violation of Title 18, United States Code, Section 2422(b); all in violation of Title 18, United States Code, Section 371;

(2)   knowingly and willfully conspiring with others known and unknown to travel in interstate commerce for the purpose of engaging in illicit sexual conduct, as defined in 18 U.S.C. § 2423(f), with minor females, in violation of Title 18, United States Code, Section 2423(b); all in violation of Title 18, United States Code, Section 2423(e);

(3)   using a facility or means of interstate or foreign commerce to knowingly persuade, induce, or entice minor females to engage in prostitution; in violation of Title 18, United States Code, Sections 2422(b) and 2;

(4)   traveling in interstate commerce for the purpose of engaging in illicit sexual conduct, as defined in 18 U.S.C. § 2423(f), with minor females; in violation

Page 1 of 7

of Title 18, United States Code, Section 2423(b); and

(5)    knowingly, in and affecting interstate and foreign commerce, recruiting, enticing, and obtaining by any means a person, knowing that the person had not attained the age of 18 years and would be caused to engage in a commercial sex act as defined in 18 U.S.C. § 1591(c)(1); in violation of Title 18, United States Code, Sections 1591(a)(1) and 2; and

IT APPEARING that Epstein seeks to resolve globally his state and federal criminal liability and Epstein understands and acknowledges that, in exchange for the benefits provided by this agreement, he agrees to comply with its terms, including undertaking certain actions with the State Attorney's Office;

IT APPEARING, after an investigation of the offenses and Epstein's background by both State and Federal law enforcement agencies, and after due consultation with the State Attorney's Office, that the interests of the United States, the State of Florida, and the Defendant will be served by the following procedure;

THEREFORE, on the authority of R. Alexander Acosta, United States Attorney for the Southern District of Florida, prosecution in this District for these offenses shall be deferred in favor of prosecution by the State of Florida, provided that Epstein abides by the following conditions and the requirements of this Agreement set forth below.

If the United States Attorney should determine, based on reliable evidence, that, during the period of the Agreement, Epstein willfully violated any of the conditions of this Agreement, then the United States Attorney may, within ninety (90) days following the expiration of the term of home confinement discussed below, provide Epstein with timely notice specifying the condition(s) of the Agreement that he has violated, and shall initiate its prosecution on any offense within sixty (60) days' of giving notice of the violation. Any notice provided to Epstein pursuant to this paragraph shall be provided within 60 days of the United States learning of facts which may provide a basis for a determination of a breach of the Agreement.

After timely fulfilling all the terms and conditions of the Agreement, no prosecution for the offenses set out on pages 1 and 2 of this Agreement, nor any other offenses that have been the subject of the joint investigation by the Federal Bureau of Investigation and the United States Attorney's Office, nor any offenses that arose from the Federal Grand Jury investigation will be instituted in this District, and the charges against Epstein if any, will be dismissed.

Terms of the Agreement:

1.  Epstein shall plead guilty (not nolo contendere) to the Indictment as currently pending against him in the 15th Judicial Circuit in and for Palm Beach County (Case No. 2006-cf-009495AXXXMB) charging one (1) count of solicitation of prostitution, in violation of Fl. Stat. § 796.07. In addition, Epstein shall plead guilty to an Information filed by the State Attorney's Office charging Epstein with an offense that requires him to register as a sex offender, that is, the solicitation of minors to engage in prostitution, in violation of Florida Statutes Section 796.03;

2.  Epstein shall make a binding recommendation that the Court impose a thirty (30) month sentence to be divided as follows:

    (a)  Epstein shall be sentenced to consecutive terms of twelve (12) months and six (6) months in county jail for all charges, without any opportunity for withholding adjudication or sentencing, and without probation or community control in lieu of imprisonment; and

    (b)  Epstein shall be sentenced to a term of twelve (12) months of community control consecutive to his two terms in county jail as described in Term 2(a), *supra*.

3.  This agreement is contingent upon a Judge of the 15th Judicial Circuit accepting and executing the sentence agreed upon between the State Attorney's Office and Epstein, the details of which are set forth in this agreement.

4.  The terms contained in paragraphs 1 and 2, *supra*, do not foreclose Epstein and the State Attorney's Office from agreeing to recommend any additional charge(s) or any additional term(s) of probation and/or incarceration.

5.  Epstein shall waive all challenges to the Information filed by the State Attorney's Office and shall waive the right to appeal his conviction and sentence, except a sentence that exceeds what is set forth in paragraph (2), *supra*.

6.  Epstein shall provide to the U.S. Attorney's Office copies of all

proposed agreements with the State Attorney's Office prior to entering into those agreements.

7.  The United States shall provide Epstein's attorneys with a list of individuals whom it has identified as victims, as defined in 18 U.S.C. § 2255, after Epstein has signed this agreement and been sentenced. Upon the execution of this agreement, the United States, in consultation with and subject to the good faith approval of Epstein's counsel, shall select an attorney representative for these persons, who shall be paid for by Epstein. Epstein's counsel may contact the identified individuals through that representative.

8.  If any of the individuals referred to in paragraph (7), *supra*, elects to file suit pursuant to 18 U.S.C. § 2255, Epstein will not contest the jurisdiction of the United States District Court for the Southern District of Florida over his person and/or the subject matter, and Epstein waives his right to contest liability and also waives his right to contest damages up to an amount as agreed to between the identified individual and Epstein, so long as the identified individual elects to proceed exclusively under 18 U.S.C. § 2255, and agrees to waive any other claim for damages, whether pursuant to state, federal, or common law. Notwithstanding this waiver, as to those individuals whose names appear on the list provided by the United States, Epstein's signature on this agreement, his waivers and failures to contest liability and such damages in any suit are not to be construed as an admission of any criminal or civil liability.

9.  Epstein's signature on this agreement also is not to be construed as an admission of civil or criminal liability or a waiver of any jurisdictional or other defense as to any person whose name does not appear on the list provided by the United States.

10. Except as to those individuals who elect to proceed exclusively under 18 U.S.C. § 2255, as set forth in paragraph (8), *supra*, neither Epstein's signature on this agreement, nor its terms, nor any resulting waivers or settlements by Epstein are to be construed as admissions or evidence of civil or criminal liability or a waiver of any jurisdictional or other defense as to any person, whether or not her name appears on the list provided by the United States.

11. Epstein shall use his best efforts to enter his guilty plea and be

sentenced not later than October 26, 2007. The United States has no objection to Epstein self-reporting to begin serving his sentence not later than January 4, 2008.

12.   Epstein agrees that he will not be afforded any benefits with respect to gain time, other than the rights, opportunities, and benefits as any other inmate, including but not limited to, eligibility for gain time credit based on standard rules and regulations that apply in the State of Florida. At the United States' request, Epstein agrees to provide an accounting of the gain time he earned during his period of incarceration.

13.   The parties anticipate that this agreement will not be made part of any public record. If the United States receives a Freedom of Information Act request or any compulsory process commanding the disclosure of the agreement, it will provide notice to Epstein before making that disclosure.

Epstein understands that the United States Attorney has no authority to require the State Attorney's Office to abide by any terms of this agreement. Epstein understands that it is his obligation to undertake discussions with the State Attorney's Office and to use his best efforts to ensure compliance with these procedures, which compliance will be necessary to satisfy the United States' interest. Epstein also understands that it is his obligation to use his best efforts to convince the Judge of the 15th Judicial Circuit to accept Epstein's binding recommendation regarding the sentence to be imposed, and understands that the failure to do so will be a breach of the agreement.

In consideration of Epstein's agreement to plead guilty and to provide compensation in the manner described above, if Epstein successfully fulfills all of the terms and conditions of this agreement, the United States also agrees that it will not institute any criminal charges against any potential co-conspirators of Epstein, including but not limited to Sarah Kellen, Adriana Ross, Lesley Groff, or Nadia Marcinkova. Further, upon execution of this agreement and a plea agreement with the State Attorney's Office, the federal Grand Jury investigation will be suspended, and all pending federal Grand Jury subpoenas will be held in abeyance unless and until the defendant violates any term of this agreement. The defendant likewise agrees to withdraw his pending motion to intervene and to quash certain grand jury subpoenas. Both parties agree to maintain their evidence, specifically evidence requested by or directly related to the grand jury subpoenas that have been issued, and including certain computer equipment, inviolate until all of the terms of this agreement have been satisfied. Upon the successful completion of the terms of this agreement, all outstanding grand jury subpoenas shall be deemed withdrawn.

By signing this agreement, Epstein asserts and certifies that each of these terms is material to this agreement and is supported by independent consideration and that a breach of any one of these conditions allows the United States to elect to terminate the agreement and to investigate and prosecute Epstein and any other individual or entity for any and all federal offenses.

By signing this agreement, Epstein asserts and certifies that he is aware of the fact that the Sixth Amendment to the Constitution of the United States provides that in all criminal prosecutions the accused shall enjoy the right to a speedy and public trial. Epstein further is aware that Rule 48(b) of the Federal Rules of Criminal Procedure provides that the Court may dismiss an indictment, information, or complaint for unnecessary delay in presenting a charge to the Grand Jury, filing an information, or in bringing a defendant to trial. Epstein hereby requests that the United States Attorney for the Southern District of Florida defer such prosecution. Epstein agrees and consents that any delay from the date of this Agreement to the date of initiation of prosecution, as provided for in the terms expressed herein, shall be deemed to be a necessary delay at his own request, and he hereby waives any defense to such prosecution on the ground that such delay operated to deny him rights under Rule 48(b) of the Federal Rules of Criminal Procedure and the Sixth Amendment to the Constitution of the United States to a speedy trial or to bar the prosecution by reason of the running of the statute of limitations for a period of months equal to the period between the signing of this agreement and the breach of this agreement as to those offenses that were the subject of the grand jury's investigation. Epstein further asserts and certifies that he understands that the Fifth Amendment and Rule 7(a) of the Federal Rules of Criminal Procedure provide that all felonies must be charged in an indictment presented to a grand jury. Epstein hereby agrees and consents that, if a prosecution against him is instituted for any offense that was the subject of the grand jury's investigation, it may be by way of an Information signed and filed by the United States Attorney, and hereby waives his right to be indicted by a grand jury as to any such offense.

/ / /

/ / /

/ / /

By signing this agreement, Epstein asserts and certifies that the above has been read and explained to him. Epstein hereby states that he understands the conditions of this Non-Prosecution Agreement and agrees to comply with them.

R. ALEXANDER ACOSTA
UNITED STATES ATTORNEY

Dated: _____        By: _____

A. MARIE VILLAFAÑA
ASSISTANT U.S. ATTORNEY

Dated: _8/24/07_            _____

JEFFREY EPSTEIN

Dated: _____        _____

GERALD LEFCOURT, ESQ.
COUNSEL TO JEFFREY EPSTEIN

Dated: _____        _____

LILLY ANN SANCHEZ, ESQ.
ATTORNEY FOR JEFFREY EPSTEIN

Page 7 of 7

By signing this agreement, Epstein asserts and certifies that the above has been read and explained to him. Epstein hereby states that he understands the conditions of this Non-Prosecution Agreement and agrees to comply with them.

R. ALEXANDER ACOSTA
UNITED STATES ATTORNEY

Dated: _____        By: _____
                                 A. MARIE VILLAFAÑA
                                 ASSISTANT U.S. ATTORNEY

Dated: _____            _____
                                 JEFFREY EPSTEIN

Dated: 9/24/07               _____
                                 GERALD LEFCOURT, ESQ.
                                 COUNSEL TO JEFFREY EPSTEIN

Dated: _____            _____
                                 LILLY ANN SANCHEZ, ESQ.
                                 ATTORNEY FOR JEFFREY EPSTEIN

Page 7 of 7

By signing this agreement, Epstein asserts and certifies that the above has been read and explained to him. Epstein hereby states that he understands the conditions of this Non-Prosecution Agreement and agrees to comply with them.

R. ALEXANDER ACOSTA
UNITED STATES ATTORNEY

Dated: _____     By: _____

A. MARIE VILLAFAÑA
ASSISTANT U.S. ATTORNEY

Dated: _____     _____

JEFFREY EPSTEIN

Dated: _____     _____

GERALD LEFCOURT, ESQ.
COUNSEL TO JEFFREY EPSTEIN

Dated: 9-24-07     _____

LILLY ANN SANCHEZ, ESQ.
ATTORNEY FOR JEFFREY EPSTEIN

Page 7 of 7

IN RE:

INVESTIGATION OF

JEFFREY EPSTEIN

_____/

## ADDENDUM TO THE NON-PROSECUTION AGREEMENT

IT APPEARING that the parties seek to clarify certain provisions of page 4, paragraph 7 of the Non-Prosecution Agreement (hereinafter "paragraph 7"), that agreement is modified as follows:

7A.    The United States has the right to assign to an independent third-party the responsibility for consulting with and, subject to the good faith approval of Epstein's counsel, selecting the attorney representative for the individuals identified under the Agreement. If the United States elects to assign this responsibility to an independent third-party, both the United States and Epstein retain the right to make good faith objections to the attorney representative suggested by the independent third-party prior to the final designation of the attorney representative.

7B.    The parties will jointly prepare a short written submission to the independent third-party regarding the role of the attorney representative and regarding Epstein's Agreement to pay such attorney representative his or her regular customary hourly rate for representing such victims subject to the provisions of paragraph C, infra.

7C.    Pursuant to additional paragraph 7A, Epstein has agreed to pay the fees of the attorney representative selected by the independent third party. This provision, however, shall not obligate Epstein to pay the fees and costs of contested litigation filed against him. Thus, if after consideration of potential settlements, an attorney representative elects to file a contested lawsuit pursuant to 18 U.S.C. s 2255 or elects to pursue any other contested remedy, the paragraph 7 obligation of the Agreement to pay the costs of the attorney representative, as opposed to any statutory or other obligations to pay reasonable attorneys fees and costs such as those contained in s 2255 to bear the costs of the attorney representative, shall cease.

By signing this Addendum, Epstein asserts and certifies that the above has been read and explained to him. Epstein hereby states that he understands the clarifications to the Non-Prosecution Agreement and agrees to comply with them.

R. ALEXANDER ACOSTA
UNITED STATES ATTORNEY

Dated: _____          By: _____
                               A. MARIE VILLAFAÑA
                               ASSISTANT U.S. ATTORNEY

Dated: 1/28/57                  _____
                               JEFFREY EPSTEIN

Dated: _____              _____
                               GERALD LEFCOURT, ESQ.
                               COUNSEL TO JEFFREY EPSTEIN

Dated: _____              _____
                               LILLY ANN SANCHEZ, ESQ.
                               ATTORNEY FOR JEFFREY EPSTEIN

By signing this Addendum, Epstein asserts and certifies that the above has been read and explained to him. Epstein hereby states that he understands the clarifications to the Non-Prosecution Agreement and agrees to comply with them.

R. ALEXANDER ACOSTA
UNITED STATES ATTORNEY

Dated: _____        By:  _____
                               A. MARIE VILLAFAÑA
                               ASSISTANT U.S. ATTORNEY


Dated: _____               _____
                               JEFFREY EPSTEIN

Dated: 10/29/07                _____
                               GERALD LEFCOURT, ESQ.
                               COUNSEL TO JEFFREY EPSTEIN


Dated: _____               _____
                               LILLY ANN SANCHEZ, ESQ.
                               ATTORNEY FOR JEFFREY EPSTEIN

By signing this Addendum, Epstein asserts and certifies that the above has been read and explained to him. Epstein hereby states that he understands the clarifications to the Non-Prosecution Agreement and agrees to comply with them.

R. ALEXANDER ACOSTA
UNITED STATES ATTORNEY

Dated: _____     By: _____
                              A. MARIE VILLAFAÑA
                              ASSISTANT U.S. ATTORNEY

Dated: _____          _____
                              JEFFREY EPSTEIN

Dated: _____          _____
                              GERALD LEFCOURT, ESQ.
                              COUNSEL TO JEFFREY EPSTEIN

Dated: 10-29-07               _____
                              LILLY ANN SANCHEZ, ESQ.
                              ATTORNEY FOR JEFFREY EPSTEIN

## Affirmation

I, Jeffrey E. Epstein do hereby re-affirm the Non-Prosecution Agreement and Addendum to same dated October 30, 2007.

_____                    12/7/07
Jeffrey E. Epstein                                  Date

# EXHIBIT 82

# 22-1426-cr

## United States Court of Appeals

*for the*

## Second Circuit

UNITED STATES OF AMERICA,

*Appellee,*

– v. –

GHISLAINE MAXWELL, AKA Sealed Defendant 1,

*Defendant-Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

ARTHUR L. AIDALA
DIANA FABI SAMSON
JOHN M. LEVENTHAL
AIDALA BERTUNA & KAMINS PC
*Attorneys for Defendant-Appellant*
546 Fifth Avenue, 6th Floor
New York, New York 10036
(212) 486-0011

2NS CIRCUIT APPEAL HEARING MARCH 12, 2024
TRANSCRIPT WP/im - DEFENSE TRANSCRIPT

DIANA FABI SAMSON: Good afternoon good afternoon you honors may I please the court my name is Diana Fabi Samson and I represent Ghislaine Maxwell. Your honors, the government negotiated in 2007, the government negotiated an agreement with a criminal defendant, and the defendant fulfilled all the conditions to the enforcement of the agreement, including a State guilty plea. The supreme court has held that when a plea rests in any significant degree on a promise or agreement of the prosecutor, so that it can be said to be the part of the inducement, or consideration, such promise must be fulfilled.

That promise was fulfilled for many years until 2018 when certain articles in the Miami Herald brought renewed interest to the case. The result of that was that the justice department looked into the matter and the Southern District of New York, decided to take another shot. In the end Miss Maxwell was prosecuted for crimes that she has a third-party beneficiary to the plea agreement in Florida, should not have been prosecuted.

JUDGE RAYMOND LOHIER:So you are relying  on one provision of the NON prosecution agreement that refers to any potential CO conspirators of Epstein and that names four people, presumably  co conspirators, but does not refer to Miss Maxwell, is that correct?

DIANA SAMSON: I am relying on that provision, but I am reading it in the context of the entire agreement, that casts clarity on the scope of the immunity, both in terms of what is covered, and where the immunity lies, and that would include , the Southern District of New York.

JUDGE: Was there any evidence about, at any point about why your client was not listed among the four who are named specifically in that clause?

a bottle thank you will therefore hear from Mr. Warbeck
thank you on the court. I'd like to begin where we left off
with my friend on the other side, about how to read the
non-prosecution agreement. The non-prosecution agreement
begins after its recitals by saying that it is on the
authority of Alex Acosta, US attorney for the southern
district of Florida, the central promise in the
nonprosecution agreement is a promise by the southern
district of Florida, not to prosecute Epstein in that
district the prosecution agreement, concludes with the
signature of an assisting attorney from the southern
district of Florida  Again on the authority and on behalf
of the US attorney for the southern district of Florida
Alex Acosta.

This is a document intended to bind, entered into by the US
attorney's office for the southern of Florida intended to
the southern of Florida, and that district alone, the main
affirmative appearance that the defense points to suggest
that this agreement was intended to speak, more broadly to
be a national immunity for conspirators is the conspirator
provision, and the fact that that provision uses the words
United States, that's not the only reference the United
States in this agreement, but it's one of the places that
agreement uses the phrase United States is held in brown
and held Gonzalez the phrase United States in a premed like
this is just a generic reference to the US attorneys office
that enters into the agreement and is not on its own enough
to establish an affirmative appearance of a non prosecution
agreement  in the country that port that intentionally
signed to bind the entire United States government. I've
discussed this with my council on this case, none of us
were an agreement. I've heard that agreement might be doing
certain kinds of cases you're on, but I've never seen one
or maybe division case but you're not aware , the other
phrase in the agreement that the defense relies on to
suggest that there's an appearance is the recital that the

prosecution was intended to be a global agreement but that
recital says it is Epstein was hoping to resolve his
federal and state liability, global, so it is a limitation
to Epstein and it is about his federal and state liability,
which is precisely what this non prosecution agreement
does. It says nothing about the national scope of the non
prosecution agreement.

Turning then to see a few words about the office of
professional responsibility report. There is evidence in
the office of professional responsibility report about the
intent of the speed provision, specifically footnote to 237
sites on the reply breed that the USAA in her supervisor
entered into this agreement, did not expect the provision
to bind did not expect the non prosecution agreement other
district, so there is some specific evidence on this point,
but in general, the report provides no evidence, and no
support for a suggestion that there is any any of
affirmative intent to buy the southern district of New
York, or any other district donation  Investigation
involved Maxwell in the office proceeding is not my
understanding is they were not aware of a proceeding in the
other US attorney's office, just the state proceedings that
were parallel to there matter unless the other questions
I'll be happy, addressing any of the other issues.
Otherwise, we asked the firm the firm the judgment below
That the OPR makes very clear that the prosecutors that
were questioned, had no recollection of what they were
thinking when they agreed and actually edited this
conspirator clause. One thing they did say, though was that
Mr. Epstein's council informed them that he wanted he
wanted this conspirator clause so that no one else would
take the blame for what he did and they also said they had
no interest in anyone else. No interest in prosecuting
anyone else the other point I would make is that everyone
who is interviewed says this is a weird agreement weird
unusual very unusual so the idea that this is done often is
actually more reason to accord it the  Fair reading of its

unique words in terms and distinctions. The last thing I'd like to mention your honors is even applying a lobby by its terms and knobby does make the point that in a situation aside from when you're dealing with precluded preclusive effect that is aside from double jeopardy  if the new charges are not sufficiently distinct the Anabi, the Abba Monte Alessi rules should not apply. that is the Anabi rule. This case, count six is a count that is covered by the plea agreement in time in charge, and by the particular person who is interviewed in the Florida investigation by knobby terms that charge should be precluded by the nonprosecution agreement, and should be dismissed , this is denying the viability of this agreement strikes a dagger in the heart of the trust between the government and citizens regarding the agreements thank you thank you so much reserve here are

DIANA FABI SAMSON: Well, your Honor, there was no hearing before.

JUDGE: What I asked is at any point.

DIAN FABI Samson: No there was not because this was a non prosecution agreement so there is not and Miss Maxwell doesn't have that much discovery regarding this, although there was some indication in the discovery that she did receive, and certainly in the in the justice department's report that they did speak with two of the complaining witnesses who testified in the trial in New York for this case, so they certainly had her, they had, they had interviews where her name was mentioned, at least, with regard to Annie Farmer one of the 10 testifying witnesses.

JUDGE: I mean there are two separate issues right, whether she's a beneficiary and whether in any event, the agreement is binding only on the Southern District of Florida, or also binding on the Southern District of New York but I you know

2NS CIRCUIT APPEAL HEARING MARCH 12, 2024
TRANSCRIPT WP/im - DEFENSE TRANSCRIPT

DIANA SAMSON: That's true your Honor but in fact there are
three but I would say regarding the issue of whether she's
covered by this, the who of this, this is de novo review I
realize, the District Court did have no trouble finding
that Miss Maxwell was within the category of person sought
to be covered by this agreement as she is clearly a
potential co conspirator of Epstein as evidenced by this
case, and also found that as a third-party beneficiary to
the agreement she had standing to enforce the agreement to
the extent the agreement gave her immunity.

JUDGE: And you agree that that's er, that is subject to de
novo review by us.

DIANA SAMSON: Yes, your Honor.
So, the next issue then is what, whether the scope of the
immunity precluded this other district of New York from
bringing prosecution in this case, and the government
elects to site the United States v Annabi for the
proposition that plea agreement only the office of the
United States attorney

JUDGE: "elects to cite" that seems to be the elephant in
the room that's, that's necessarily part of the discussion.
So distinguish Annabi for me other than the fact that that
it involves I guess a plea agreement as opposed to a non
prosecution agreement, talking about

DIANA SAMSON: A non prosecution agreement is also a plea
agreement.

JUDGE: OK.

DIANA SAMSON:  It's also distinguishable on the facts
because Annabi involved an oral agreement in the Eastern
District, it actually wasn't, it was a plea and the only
thing was that was said was the government is moving to
dismiss counts 2 and 3 and the defendant is pleading guilty

to count one. So there was no contemplation of, you know, immunity beyond what is inherently involved in a plea and that's why Annabi is mostly about double jeopardy.  But our position is that Annabi does not apply here. There are reasons it doesn't, but even if we apply Annabi by its own rule, the plea agreement applies to preclude this prosecution, and the reason is because there are many affirmative appearances of intent to bind other districts, and those appearances begin with the agreement itself, it's not simply as the government would have it, that the language of the clause that protects Miss Maxwell uses the noun "United States".

It is also reading that clause in conjunction with the immunity clause that refers to Epstein, that the clause that refers to Epstein uses the language "in this district".  So it's, it's not just, does the United States attorney in this sentence or that sentence, call itself "the government", "the United States", the United States Attorney - that's a bit of a red herring because the reality is,  All US attorneys have actual authority to bind other districts. The question is intent to bind, and in this, in this document

JUDGE: You know, I read the DOJ Manual on entering into non prosecution agreements, er and um it suggests the opposite of what you just said,  in other words that the presumption is that a United States attorney cannot bind any other office, except  his her own office. So  what, how

DIANA SAMSON: Your Honor

JUDGE: How does the DOJ manual play into this if at all?

DIANA SAMSON: Your Honor, I think the DOJ manual is evidence that US attorneys have the actual authority to bind other districts. That's why the internal rules of the

2NS CIRCUIT APPEAL HEARING MARCH 12, 2024
TRANSCRIPT WP/im - DEFENSE TRANSCRIPT

justice department are that US attorneys ought to be
careful about it.  The justice manual is not

JUDGE: That's why, that's why I use the word presumption,
the strong presumption based on any reading of this
provision of the DOJ Manual is that attorneys for the
government contemplating such an agreement will not have
the power to bind other other offices and so as I
understand it you also have the burden to show that the
southern district of New York is is bound by the NPA so
tell me how to read this non prosecution agreement manual
or what, how to think about it in a way that in enures to
your client benefit.

DIANA SAMSON: Your Honor, the manual is not a shield to
allow the government to get out of its promises that it
makes to criminal defendants who waive their constitutional
rights and plead guilty. It is an internal rule of how the
office would like its various US attorneys to proceed. If
those US attorneys don't proceed that way that is not a
protection from, from full performance of an agreement the
government enters into. You know, even leaving aside that
issue though Judge, the actual agreement itself indicates
that it is a global agreement, and it shows different
language for the immunity clause for Epstein and the one
for the co conspirators. The agreement itself says that it
is signed on the authority of the US attorney for the
southern district of Florida. He is certainly a high-level
US attorney that has  actual authority to bind the other
districts and in fact their own report, the office of
Professional Responsibility report begins by saying that
the US attorney Acosta had "Plenary authority to enter into
this agreement" but there's more.

The actual Justice Department report, and this is their own
report about a matter that they are investigating at the
very same time their Southern District of New York
prosecutors are breaching the agreement. So they are, they

7

are, one of the things they're looking into is, was there
any corruption in this plea agreement of so long ago.
That's what they're doing while the other district
prosecutors are prosecuting Epstein, are prosecuting
Maxwell , and just before the superseding indictment in
this case they finally came out with their report. But
that, that document shows that there were upper levels of,
and this is all we have, we don't have any discovery,
because the judge did not order a hearing, and one other
important thing, the defense attorneys for Mr. Epstein were
never interviewed for that report.  So all we have is a
report of the justice department interviewing their own and
whatever documents they chose to reveal in the report. And
even with that limited peak, we see upper levels of the
justice department

JUDGE: Is there anything in that report that would
definitively, in a way that's consistent with your burden,
er, tell me or shows me that the main justice determined
that the NPA was meant to bind every US attorney in the
country, every United States attorneys office in the
country?

D1ANA SAMSON: I think there is a lot of, so the five AUSAs
that were actually the subject of the investigation have
'no recollection', but the actual iterations of the draft
plea agreements made the rounds to the Chief CEOs

JUDGE: No no, I very much appreciate that answer but that's
not quite the answer to my question.

DIANA SAMSON: Well they don't remember.

JUDGE: Is there anything in the OPR report that you're
relying on and I appreciate why, that says that the parties
intended for this non-prosecution agreement to apply to
United States as a whole and to all United States attorneys
offices, including the Southern District of New York?

DIANA SAMSON: I think the fact that the US attorney added the language that it was a global agreement at the same time that he signed off on the co conspirator clause is, is evidence that there was an intent to bind another district.

JUDGE: That's, that's Mr. Acosta. Is there anything in the OPR report?

DIANA SAMSON: No your honor but I don't think that's necessary and I think that the, this is the idea that someone from the upper echelons of the Justice Department had to sign off on this, is, is just not the law. It might be the way and in fact that the, there was affirmative acknowledgment that Mr. Acosta had the right to do this agreement. And also, if there had to be that affirmative statement in order for a criminal defendant to rely on his reasonable understanding of the actual words in an agreement,  that would flip the rule on its head.

JUDGE: I didn't mean to suggest by my question which, innocent question believe it or not er to make that suggestion, but OK.  Well we've we've kept you past your time, we have reserved some time for rebuttal,

DIANA SAMSON: Thank you.

GOVERNMENT RESPONSE  -

JUDGE RAYMOND LOHIER: Therefore we will hear from Mr. Rochback.


ROCHBACK(SPELLING?) Thank you, your honor and may it please the court, . I'd like to begin where we left off with my friend on the other side, about how to read the non-prosecution agreement. The non-prosecution agreement begins

9

after its recitals by saying that it is on the authority of
Alex Acosta, US attorney for the southern district of
Florida. The central promise in the non prosecution
agreement is a promise by the southern district of Florida
not to prosecute Epstein in that district.  The non
prosecution agreement concludes with the signature of an
assistant US attorney from the southern district of
Florida,  again on the authority and on behalf of the US
attorney for the southern district of Florida, Alex Acosta.


This is a document intended to bind, entered into by the US
attorneys office for the southern of Florida, intended to
bind the southern of Florida, and that district alone.

The main affirmative appearance the defense points to
suggest that this agreement was intended to speak, more
broadly to be a national immunity for co conspirators is
the conspirator provision, and the fact that that provision
uses the words "United States". That's not the only
reference the United States in this agreement, but it's one
of the places that agreement uses the phrase "United
States". And as this court held in Brown and as this court
held in Gonzalez, the phrase "United States" in a plea deal
like this is just a generic reference to the US attorneys
office that enters into the agreement, and is not on its
own enough to establish an affirmative appearance

JUDGE: Are you aware of a non prosecution agreement  in, I
might as well ask it, in the country that purports,  that

intentionally is designed to  bind the entire United States
government?

ROCHBACK:  I've discussed this with my co council on this
case, none of us have entered into such an agreement. I've
heard that agreement might be entered into in  certain
kinds of cases your Honor,  but I've never seen one or


JUDGE: Or maybe an antitrust division case, but you're not
aware?


ROCHBACK: That's right, your Honor.  The er other phrase in
the agreement that the defense relies on to suggest that
there's an affirmative appearance is the recital that the
non prosecution agreement was intended to be a global
agreement but that recital says it is Epstein was hoping to
resolve **his** federal and state liability, global, so it is a
limitation to Epstein and it is about his federal and state
liability, which is precisely what this non prosecution
agreement does. It says nothing about the national scope of
the non prosecution agreement.


Turning then, just to say a few words about the Office of
Professional Responsibility report. The, there is evidence
in the office of professional responsibility report about
the intent of the co conspirator provision, specifically
footnote to n237  which the defense cites in their  Reply
Brief, suggests that the two USAAs, ,that the line USA and

her immediate supervisor entered into this agreement, did
not expect the co conspirator provision to bind, did not
expect the non prosecution agreement to bind other
districts, so there is some specific evidence on this
point. But in general, the report provides no evidence, and
no support for a suggestion that there is any affirmative
intent to buy the southern district of New York, or any
other district in the nation.


JUDGE CABRANES? May I ask a question?  At the time this
agreement was made with the southern district of Florida,
was there anything in the record to suggest that there was
an ongoing investigation about related matters that
involved either Ms Maxwell or Mr. Epstein?  In other words,
in Florida, in the office of Mr. Accosta, were they aware
of any other proceedings before other Attorneys offices?


ROCHBACK: My understanding is they were not aware of a
proceeding in any other US attorneys office, just the State
proceedings that were parallel to their matter. Unless the
parties have any other questions, I'll be happy to address
any the other issues. Otherwise, we ask that the court
affirm the judgment below.

JUDGE:  Any other questions? OK, that's it.


DIANA SAMSON: Your Honor, I would just like to say that
the OPR makes very clear that the prosecutors that were

questioned had no recollection of what they were thinking
when they agreed and actually edited this co conspirator
clause. One thing they did say, though was that Mr.
Epstein's council informed them that he wanted, he wanted
this co conspirator clause so that no one else would take
the blame for what he did; and they also said they had no
interest in anyone else. No interest in prosecuting anyone
else.  The other point I would make is that everyone who is
interviewed says this is a weird agreement.  "Weird,
unusual, very unusual".  So the idea that this isn't done
often, is actually more reason to accord it the fair
reading of its unique words in terms and distinctions.


The last thing I'd like to mention your honors is even
applying Annabi by its terms, Anabbi does  make the point
that in a situation aside from when you're dealing with a
preclusive effect,  that is aside from double jeopardy,  if
the new charges are not sufficiently distinct the Annabi,
the Abamonte  [SPELLING??] rule should  not apply. That is
the Annabi rule. This case, Count six is a count that is
covered by that  plea agreement in time, in charge, and by
the particular person who was interviewed in the Florida
investigation.  By Annabi's terms that charge should be
precluded by the non prosecution agreement and should be
dismissed.

Denying the viability of this agreement strikes a dagger in
the heart of the trust between the government and its
citizens regarding plea agreements. Thank you.

2NS CIRCUIT APPEAL HEARING MARCH 12, 2024
TRANSCRIPT WP/im - DEFENSE TRANSCRIPT


JUDGE:   Thank you so much. We will reserve decision.    END

# EXHIBIT 83

HLN Investigates SEX RING SECRETS - EXPOSING JEFFREY EPSTEIN
TRANSCRIPT_Jul 29, 2022- WP/im

https://deadline.com/202
2/08/ghislaine-maxwell-jeffrey-
epstein-sherri-papini-gabby-petito-hln-investigates-specials--123-508-1207/

HLN investigates  -

-45.35
BRAD EDWARDS V/O: Police executed the search warrant  [over police film raid
of 200-5] - Jeffrey had been tipped off to the search warrant before they executed
it. But even still, even after Jeffrey Epstein's version of sanitizing his house,
knowing that the police were coming, there were still, incriminating docs and
evidence that he didn't even know any more how deeply he needed to sanitize
his house. So he left these things on the wall which were er, of some underage
and some just barely young unwilling participants in sexual acts,  nude out on the
wall, were laying out there on the wall or along side him with very powerful
people like I mentioned, him with Ghislaine Maxwell and the Pope. His house
was just lined with pictures of very young naked women.

-44.40
MALE NARRATOR V/O: While evidence was mounting and what seemed to be
an open and shut case, a shocking turn of events. Local prosecutors did not
press charges.
-44.29
BRAD EDWARDS: The Palm Beach police investigated the case from about 200-5-2006. The
State Attorney he,  for whatever reason is convinced by Epstein's legal team, not to prosecute
Jeffrey Epstein.

-44.13
MALE NARRATOR V/O: When local prosecutors didn't act, police alerted the FBI to Epstein's
web of sex abuse.

1

# EXHIBIT 84

# ABC News Interview: Marina Lacerda Survivor – First Interview

**Host:** Linsey Davis
**Interviewee:** Marina Lacerda
**Date:** September 2025

# Transcript

**00:00:07 HOST:** Talking with us.

**00:00:08 MARINA LACERDA:** Thank you for having me.

**00:00:09 HOST:** What made you decide you were ready to speak out now?

**00:00:13 MARINA LACERDA:** Well, you know, listening to the girls, the victims, speak on my first therapy session that we all had together. And unfortunately, only five women or six women came when there's almost a thousand women. I was just like, these women are so strong. Their voices are strong, their voices are loud. And I think it's important for all women that have been abused, raped or any kind of abuse to speak up. And I think maybe if I speak, some of the girls that I know will maybe speak too, because there's a lot of us.

**00:00:57 HOST:** Let's go back and forgive me, because I'm going to try to ask you some of these things from the past that you may not remember, but let's just start with your childhood. I know you were born in Brazil, then you moved to Astoria. Yes. And what was your upbringing like?

**00:01:17 MARINA LACERDA:** So in Brazil? It was great. I came to New York when I was nine years old. My mother came before me. But when I came, my mother had met my stepfather at the time, and I would say, I don't know, 2 or 3 months after that, I started to get sexually abused by my stepfather. I couldn't have any friends. If I did have friends that came over like my girlfriends, they were getting abused by him and somebody came up to me and was like, hey, like your stepfather also sexually harassed me. Do you want to go to the cops? So I went with this young lady, and the cops never believed me. And, you know, at the time, I guess I didn't want to speak the whole truth. From eight till 13 or 12. It really sucked my life.

**00:02:10 HOST:** And on top of that, there were financial constraints.

**00:02:14 MARINA LACERDA:** Well, after my stepfather left and got arrested. Then we basically lived in one room, me and my mom and my sister. And my mom couldn't get a job or whatever the case was. So I started working. And I think that's what kind of led me to Jeffrey Epstein. You know, a girl saw me that, you know, I was struggling and I needed to make ends meet. And she was like, hey, I have a gig for you.

**00:02:46 HOST:** What did she say the gig was?

**00:02:48 MARINA LACERDA:** She had said that I was going to massage somebody, and there wasn't much specifics, but I wasn't expecting what led on to that day, because I think with Jeffrey Epstein, it starts somewhere, but then it ends with either you having sex with him whether you like it or not.

**00:03:12 HOST:** So tell us about the first day you walk into his house. You've described it as, like, looking like something out of a movie.

**00:03:19 MARINA LACERDA:** It was. It really was. He had a theme. He had a whole library, like, based on Beauty and the Beast, you know, he had weird, weird taste. When I got there, I waited in the office room, or I guess it would be called the living room, where he had all the pictures with all these elite people. And I was like, wow, why does this guy want a massage with me? Like, this is crazy.

**00:03:49 HOST:** And how old are you at the time?

**00:03:52 MARINA LACERDA:** I just turned 14 and my girlfriend was like, listen, don't worry. He's really cool. You don't have nothing to worry about. We're going to go upstairs, give him a massage. He's going to give us $300 each and we'll be out of here. And when we got up there, you know, it started with a massage. And then he wanted us to take our tops off. But obviously she had done that before. And I'm in a room where there's no windows. It's so dark you can't see the door. It's so dark in there. You just feel like peer pressure, you know, and you feel like you just walked into this important person's house. You don't know who he is. You see all these pictures with elite people. You're like, who is this person? I guess I'm just going to do what she's doing.

**00:04:44 HOST:** After you went the first time, you gave the massage. Who gives you $300?

**00:04:49 MARINA LACERDA:** The first time the girl did, he handed it to her and she gave it to me. I went there a couple more times with her, but then I decided I was, then I went on my own because he asked me to come. So I would go see him as much as I could. As terrible as it sounds, I really thought there were higher hopes for me, and coming already from a broken house where I needed to support my sister and my mother, because somehow that became my job. I mean, it wasn't like it wasn't said, but I knew it was my job because somehow I felt like it was my fault that my stepfather went to jail. Right? And I just had to work. I had to work. I had to bring money to the house so he would see me, I'd say, 2 or 3 times a week in the beginning, because when he has somebody new in his life, he likes to see them a lot. So I went there a whole bunch of times and, you know, it led to unfortunately, he forced me to have sex with him. Basically. I really had no, you.

**00:06:04 HOST:** Describe it as rape.

**00:06:06 MARINA LACERDA:** You know, it's weird because it wasn't like he raped me, but he like.

**00:06:10 HOST:** But you were 14.

**00:06:13 HOST:** What was Jeffrey like as a person? Charming, funny, serious?

**00:06:19 MARINA LACERDA:** There was nothing charismatic about him. He was very selfish. He knew exactly how to own you, you know, like, you can't go too far. You can't be going out. You can't be drinking. You can't be doing drugs. You can't be talking to people too much. He would always remind us of that. That was always a constant reminder with him,

because he would brag about everything, right? All that he would do, and that he was a brain surgeon and he had connections with, you know, Victoria's Secret. So I thought that if I just played along that I wouldn't be this immigrant from Brazil, you know, and that I would have something to look forward to. You know, it never happened, obviously, because it came to a point when I was, I'd say 16 and a half or 17, he didn't want me anymore. He was just like, you're too old.

**00:07:18 HOST:** Over time, how much money would you say you got from Jeffrey Epstein?

**00:07:22 MARINA LACERDA:** I used to see him 2 or 3 times a week. You know, that's almost $900, $1,000, right?

**00:07:28 HOST:** So did he ever ask you to bring your friends or recruit?

**00:07:34 MARINA LACERDA:** He did. Eventually he did.

**00:07:35 HOST:** What's been the hardest part for you in all of this?

**00:07:39 MARINA LACERDA:** Processing it all? Because I feel like this could have been stopped in 2008. If they let me talk, I would have told everything, I would have told you this all happened, and so many girls could have been saved. It took the government almost eleven years to come speak to me again. They showed up at my door and at first, I was terrified. I called Jeffrey, and he hired a lawyer for me. But the lawyer would not answer any of my questions. He was not my lawyer, he was Jeffrey's lawyer. I never understood what really happened back then, and then suddenly, I'm told, just don't say anything. Everything will go away. But it didn't go away for me. And when I was finally able to actually talk, to be heard, it was too late for so many others.

**00:08:00 HOST:** Do you remember the first time you were called by the government to come forward?

**00:08:03 MARINA LACERDA:** Yes, in 2008, the FBI came to my door. I was so afraid, not just for myself, but for my mother and sister. I thought something bad might happen to them. I never saw any justice. Even as an adult, it didn't feel like I could get closure until much later. I sometimes feel that, if I had been listened to, or if the system worked the way it should, things would be different. Now, with all the coverage and victims being public, all I want is for all the girls to have the files, to see the truth, and for nobody to have to hide anymore.

**00:08:31 HOST:** What would it mean, do you think, for more government transparency or for those files to be released today?

**00:08:35 MARINA LACERDA:** It would mean healing, not just for me, but for everyone who went through it. There are documents – with my name and the stories – and nobody has ever let us see them. Those files could help me put the pieces together. They could help all us girls know we aren't crazy. Our memories, the hard things, they're real, and the government has the proof.

**00:08:53 HOST:** Is there anything you want other survivors, or anyone hearing your story, to take away from this?

**00:08:57 MARINA LACERDA:** I want them to know: you are not alone. Even if it feels like nobody cares, or that you won't be believed, there are others. And your story and your voice count. Don't ever think it's your fault.

**00:09:07 HOST:** You said you sometimes feel fear. Are you still afraid now, after going public?

**00:09:10 MARINA LACERDA:** Not as much. I used to feel fear all the time—like someone could show up, something could happen to my family, or that people wouldn't believe me. Now, I feel stronger, even if it means putting a target on my back. I want my story out there, and I want accountability for what happened, not just for me but for all the women.

**00:09:27 HOST:** What would justice look like for you at this point?

**00:09:29 MARINA LACERDA:** Justice would mean transparency, the government giving all the files to the survivors, and seeing the people who helped him held responsible. I want to see the names—the men who were involved, the people who protected him. I want it all out in the open so it can never happen again.

**00:09:47 HOST:** Would you do anything differently if you could go back?

**00:09:49 MARINA LACERDA:** It's hard to say. I was so young and scared, but I wish I had found an adult I could trust, somehow, or that someone had kept asking questions and not just stopped with "no." I wish I had more support. But really, the people I wish had done things differently are those with power who let him get away with it.

**00:10:07 HOST:** Is there anything else you want to say?

**00:10:09 MARINA LACERDA:** Just that the truth matters, and telling these stories matters. If you're out there and this happened to you, you are not alone. I hope someone listens and learns from my experience, and that it helps someone feel less alone, or more able to speak out and heal.

**00:10:15 HOST:** How does it feel now to be recognized as someone who helped bring attention to this and contributed evidence to the case?

**00:10:18 MARINA LACERDA:** It's strange sometimes. I never wanted to be in the spotlight for this. But if my story helped put Jeffrey Epstein in jail, or made other girls feel strong enough to speak, I'm proud. What matters most to me is that nobody else goes through what we did. As hard as it is to talk, I know silence allows abuse to go on. I want to break that cycle.

**00:10:39 HOST:** Do you stay in contact with other survivors?

**00:10:40 MARINA LACERDA:** I stay in touch with a few. Some of the girls from therapy, and a couple I met as an adult. But a lot of people want to put it behind them and not talk about it. And I respect that. Some need to move forward in their own way. But for me, coming forward and connecting with others was healing.

**00:11:01 HOST:** Is there any message you have for law enforcement or people in power?

**00:11:03 MARINA LACERDA:** Listen to us. Believe us the first time. Do the work. If people in power had responded when girls first tried to speak out, so much harm could have been prevented. I want law enforcement to never forget that someone coming forward is taking a big risk. Take every story seriously.

**00:11:24 HOST:** Thank you so much for talking with us today and for your courage.

**00:11:26 MARINA LACERDA:** Thank you. I hope this helps others, even just one person, to know they aren't alone.

*End of interview*

# EXHIBIT 85

UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF NEW YORK

Danielle Bensky and Jane Doe 3,      )
individually and on behalf of all    )
others similarly situated            )        **CLASS ACTION COMPLAINT**
                                     )
                                     )
            Plaintiffs,              )        JURY TRIAL DEMANDED
                                     )
                                     )
v.                                   )        Case No.:
                                     )
Darren K. Indyke and Richard D.      )
Kahn,                                )
                                     )
            Defendants.              )
_____)

## INDIVIDUAL AND CLASS ACTION COMPLAINT

Plaintiffs Danielle Bensky and Jane Doe 3 file this individual and civil class

action complaint against Defendants Darren K. Indyke's and Richard D. Kahn for

damages and other relief under (among other provisions of law): the Trafficking

Victim Protection Act, 18 U.S.C. § 1591, *et seq.* ("TVPA"); common law causes of

action as described below; the New York Adult Survivors Act, N.Y. CPLR §214-j;

and the Victims of Gender-Motivated Violence Protection Act ("GMVPA"), New

York City Administrative Code § 10-11.

Danielle Bensky and Jane Doe 3 make the following allegations on

information and belief and believe that substantial additional evidentiary support

will exist for the claims set forth herein after a reasonable opportunity for discovery.

1

## I. NATURE OF THE CASE

1. Beginning in the early 1990s, Jeffrey Epstein created a complex, sophisticated sex-trafficking venture (the "Epstein Enterprise") with the help of many influential individuals and entities who both knew he was sexually abusing and sexually trafficking young women and girls, and knowingly provided support to facilitate the Epstein Enterprise. Epstein's co-conspirators not only facilitated his sex trafficking and abuse, but were also integral in allowing Epstein to escape justice for years by concealing his litany of crimes.

2. The manner of operation for the Epstein Enterprise has been widely publicized. Epstein would lure young girls or women to one of his luxurious mansions under the guise of being a wealthy philanthropist, able to advance careers, education, or provide other life necessities, and once inside he would force his would-be victim into providing a massage that would turn sexual, and from there he would cause each of his unsuspecting victims to engage in a variety of commercial sex acts.

3. From its inception until Epstein's arrest by the FBI for sex trafficking in 2019 (and his subsequent death on August 10, 2019, by apparent suicide), the Epstein Enterprise operated both (1) to lure young women and girls into a position where Epstein could coerce them to engage in commercial sex acts and commit sexual offenses against them and (2) to conceal its sex trafficking from law

2

enforcement organizations. The Epstein Enterprise provided financial and other benefits to those who assisted and enabled both of the Epstein Enterprise's purposes.

4.     The Epstein Enterprise would not have existed for the duration it did and at its scope and scale, without the collaboration and support of others. No one, except perhaps Ghislaine Maxwell, was as essential and central to Epstein's operation as these Defendants.

5.     Darren Indyke and Richard Kahn were Epstein's personal lawyer and accountant, respectively. They personally participated in the Epstein Enterprise from approximately 1995 onward. After Epstein's death, they were executors of Epstein's estate.

6.     Indyke and Kahn were personally essential to the Epstein Enterprise's success—among other things, they helped structure Epstein's bank accounts and cash withdrawals to give Epstein and his associates access to large amounts of cash in furtherance of sex trafficking.

7.     Indyke and Kahn also personally assisted with creating the Epstein Enterprise's complex financial infrastructure, which involved dozens of bank accounts at various banking institutions, many of which were held in the name of corporate entities with no legitimate business purpose and that appear to have been created to simply facilitate the illegal sex-trafficking venture.

8.     Defendants were well aware of the Epstein Enterprise's purposes,

3

effects, and operations. Defendants were on Epstein's payroll for years, and they knowingly and intentionally personally benefited and received things of value from Epstein and his sex-trafficking operation.

9. Knowing that they would earn millions of dollars in exchange for facilitating Epstein's sex abuse and trafficking, Indyke and Kahn chose money and power over following the law. Indyke and Kahn chose participating in and facilitating the Epstein Enterprise for many years, all for their own financial gain. At each step, Defendants denied and concealed their personal involvement in the Epstein Enterprise to evade prosecution and civil liability from individuals such as Danielle Bensky and Jane Doe 3.

10. Indyke and Kahn's knowing facilitation, participation, and concealment of Epstein's illegal conduct allowed Epstein to successfully rape, sexually assault, and coercively sex traffic Danielle Bensky and Jane Doe 3 and the numerous other members of the Class alleged below (the "Class").

11. For many years, Indyke and Kahn intentionally concealed the extent of their personal involvement in the sex-trafficking venture including specific false denials of their role in the Epstein Enterprise, making themselves out to be mere outside advisors to Epstein—but as further described below, Indyke and Kahn have since been exposed as part of Epstein's inner most circle, and key facilitators of sex trafficking.

4

12.     As further detailed below, Indyke and Kahn worked closely with Epstein through every step of the sex trafficking operation's expansion and growth. Defendants hid their integral involvement with the Epstein Enterprise from Bensky, Jane Doe 3, and the Class through concealments, false denials, and other efforts.

## II.     JURISDICTION, VENUE, AND TIMELINESS

13.     This action is brought pursuant to various federal and state statues, including the federal TVPA, 18 U.S.C. § 1589 through § 1595. This Court has federal question subject-matter jurisdiction pursuant to 28 U.S.C. § 1331 because Danielle Bensky and Jane Doe 3—individually and on behalf of the other Class members—proceed under the federal TVPA statute.

14.     This Court also has supplemental jurisdiction over the state law claims recounted below pursuant to 28 U.S.C. § 1367(a) because all claims alleged herein are part of a uniform pattern and practice and form part of the same case or controversy.

15.     This Court is "an appropriate district court of the United States" in accordance with 18 U.S.C. § 1595, in which to bring this action.  Venue is proper in this District under 28 U.S.C. § 1391(b)(2), because Epstein, his co-conspirators, and Defendants all conducted substantial activities in this District and knowingly aided and abetted, facilitated, and directly participated in Epstein's illegal venture through actions that originated in this District.  In addition, Epstein sexually abused and

trafficked Danielle Bensky and Jane Doe 3 and members of the Class in this District.

16.     Often these acts of sexual abuse and commercial sex acts, committed by Jeffrey Epstein and certain select friends of his, took place in Jeffrey Epstein's New York mansion, located within this District at 9 East 71st Street in New York City. Epstein also used his New York mansion and numerous apartment units he owned at 301 East 66th Street in New York City to harbor his victims and as a base from which to transport them to other locations outside of New York.

17.     A substantial part of the acts, events, and omissions giving rise to this cause of action occurred in this District.

18.     This action has been timely filed pursuant to 18 U.S.C. § 1595(c)(1), which provides that a plaintiff shall have ten years after the cause of action arose to file suit against any person who knowingly benefits, financially or by receiving anything of value from participation in a venture which that person knew or should have known violated the laws against sex trafficking. This action is also timely because the conspiracy, including the conspiracy to conceal the illegal conduct and Defendants' role in it, continued until and after Jeffrey Epstein's death in 2019. This action is also timely under New York's Adult Survivors Act, N.Y. CPLR § 214-j.

### III.     PARTIES

19.     Danielle Bensky is a U.S. citizen and was at all relevant times a resident of and domiciled in the State of New York.

6

20.     Jane Doe 3 is a citizen of the European Union, but at relevant times was abused in the State of New York.

21.     Jane Doe 3 is using a pseudonym to protect her identity because of the sensitive and highly personal nature of this matter, which involves sexual assault.

22.     Jane Doe 3 is also at serious risk of retaliatory harm because the co-conspirators who participated in the Epstein sex-trafficking venture had—and continue to possess—tremendous wealth and power and have demonstrated a clear ability to cause her serious harm.

23.     Jane Doe 3's safety, right to privacy, and security outweigh the public interest in her identification.

24.     Jane Doe 3's legitimate concerns outweigh any prejudice to Defendants by allowing her to proceed anonymously.

25.     Defendant Darren K. Indyke is co-executor of the Estate of Jeffrey E. Epstein and Administrator of The 1953 Trust and was a participant in Epstein's sex-trafficking operation. Darren K. Indyke was Jeffrey Epstein's advisor and personal lawyer for many years, handling all of his personal affairs and business operations relating to his sex-trafficking operation. Epstein referred to Indyke as his in-house counsel. For many years, Indyke hid the extent of his personal involvement in the sex-trafficking operation. Indyke is domiciled in Florida.

26.     Defendant Richard D. Kahn is co-executor of the Estate of Jeffrey E.

7

Epstein and Administrator of The 1953 Trust and was a participant in Epstein's sex-trafficking operation. Richard D. Kahn was Jeffrey Epstein's advisor and personal accountant who handled all of his personal accounting and financial services relating to his sex-trafficking operation. For many years, Kahn hid the extent of his personal involvement in the sex-trafficking operation. Kahn is domiciled in New York.

27. Defendants' financial activities, including the events alleged herein, were in and affecting interstate and foreign commerce. In connection with the acts alleged in this complaint, Defendants, directly and indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of national securities markets.

## IV.    FACTUAL ALLEGATIONS

### A.    The Epstein Sex-Trafficking Enterprise and Conspiracy

28. During all times relevant to this complaint, Jeffrey Epstein was an extraordinarily wealthy man with multiple residences in the United States, including a New York City mansion, a Palm Beach mansion, an apartment in France, and an island in the U.S. Virgin Islands.

29. Beginning in and around 1995 and continuing through the summer of 2019, Jeffrey Epstein knowingly established and ran a sex-trafficking venture and

8

conspiracy in violation of 18 U.S.C. §§ 1591–95. As part of the Epstein Enterprise, Epstein used means of force, threats of force, fraud, coercion, abuse of legal process, and a combination of these means to cause young women and girls from many different states, and all over the world, to engage in commercial sex acts and to sexually abuse them.

30.     Epstein recruited, solicited, enticed, harbored, obtained, provided, and transported his victims to cause them to engage in commercial sex acts in ways that were in and affecting interstate and foreign commerce, including using means of interstate communications (such as cell phones) and means of interstate and foreign travel (such as aircraft that he owned and controlled).

31.     For example, the Epstein Enterprise owned multiple private planes that it used to transport victims around the world and to Epstein's various homes. On these planes, and through other means, the Epstein Enterprise transported victims across state boundaries between New York, Florida, New Mexico, New Jersey, Massachusetts, the U.S. Virgin Islands, and elsewhere, and in foreign commerce between the United States and Europe, especially Eastern Europe.

*(i) The Enterprise's Key Conspirators*

32.     In creating and maintaining this network of victims to sexually abuse and exploit, Epstein worked and conspired with others, including employees and associates who facilitated his conduct by, among other things, securing the cash to

9

finance the venture's operations; concealing the venture's operations; recruiting victims; housing and caring for victims; coercing victims, and scheduling their sexual abuse by Epstein at his New York mansion, his Palm Beach mansion, and his island in the U.S. Virgin Islands. Epstein and these other individuals also conspired to violate 18 U.S.C. § 1591.

33.    By (at the latest) 1995, Epstein's sex trafficking venture had crystalized into criminal conspiracy. By 1995, each victim was being forced to recruit other vulnerable victims and being paid, typically in cash, for each recruitment, creating a pyramid scheme of abuse. A Florida criminal investigation uncovered that the number of victims of Epstein's sex-trafficking conspiracy grew exponentially in and around the early 2000s.

34.    At all times relevant to this complaint, the Epstein sex-trafficking enterprise was a group of two or more individuals associated in fact, even if they were not a formal legal entity. Indeed, members of the Epstein sex-trafficking enterprise referred to it as "The Organization."

35.    Some of the key members of the Epstein Enterprise included Ghislaine Maxwell, who recruited girls for Epstein for many years, resulting in her later federal conviction, and Defendants Indyke and Kahn, Epstein's trusted attorney and accountant. Other members included Sarah Kellen, who also recruited girls for Epstein for many years and was in charge of scheduling young girls for Epstein's

10

massages and arranging for their travel; Lesley Groff, Epstein's secretary who made travel arrangements for the girls, tended to their living needs, and scheduled massage sessions; and Jean-Luc Brunel, a French modeling agent who assisted Epstein in procuring young girls from overseas by promising the girls, often from poor backgrounds, modeling opportunities.

*(ii) The Epstein Enterprise's Recruitment Methods*

36.     Epstein and his co-conspirators used Epstein's vast (yet mysterious) wealth and connections to other rich and powerful individuals to lure victims into his home for seemingly innocuous activity. Victims were initially recruited to speak with an allegedly philanthropic Epstein and provide "massages" to him.

37.     As part of the scheme, a female "recruiter" would approach a young female and strike up a conversation in an effort to quickly learn about the young female's background and any vulnerabilities they could expose. The recruiter would then manipulate the young female into coming back to one of Epstein's residences by offering the young female something she needed. At times, the recruiter's lure would be a modeling opportunity, money for education, help for the young female's family, and a whole host of other related offers depending on their target's situation.

38.     Once in the residence, the recruiter and Epstein would work in concert to impress and intimidate the young female with displays of vast wealth, including having employees that were butlers and maids formally dressed around the house.

11

They would also strategically place photographs of very powerful political and social figures amongst photographs and paintings displaying nude females in an effort to normalize the sexual abuse.

39.     Epstein and his co-conspirators would normalize the sexual abuse by placing a massage table and spa related products around the massage area in an effort to legitimize the area where the abuse was set to occur.

40.     Once at the home and trapped in Epstein's bedroom, the victims would be instructed to remove their clothing. Epstein would then force the massages to become increasingly sexual in nature, typically including one or more forced sex acts. Epstein would use means of force, threats of force, and fraud to coerce and induce the victims to participate in these sex acts and to cause them to return and continue to engage in commercial sex acts with him.

41.     In this District and at his various residences, Epstein perpetuated this pattern of abuse in similar ways, hundreds, perhaps thousands, of times.

42.     Epstein actively coerced his victims to become recruiters themselves, forcing them to recruit additional girls to be similarly sexually abused and causing the number of victims to grow exponentially. Epstein incentivized his victims to become recruiters by paying these victim-recruiters hundreds of dollars for each girl that they brought to Epstein. In so doing, Epstein, through this system of paying victims to recruit others whom he would in turn pay to recruit others, maintained a

12

steady supply of new victims to exploit.

43.  This scheme of paying victims to recruit other victims worked effectively for Epstein, allowing expansion through the recruitment of other victims in a pyramid scheme or spiderweb fashion.

*(iii)*  *The Enterprise's Coercion Methods*

44.  Once in his presence, each victim knew there was no option to disobey Epstein.  It was well known and understood that he was one of the most powerful and connected people in the United States, able to help any of these young victims and capable and willing to seriously harm any of his victims if they disobeyed him.

45.  Epstein was skilled at ascertaining his victim's greatest fears and aspirations and targeted those fears and aspirations to coerce and trap his victims into performing commercial sex acts and to be subject to sexual abuse.

46.  Epstein masterfully assessed the specific needs and vulnerability of each of his targeted victims.  He then closed the trap on his victims with false offers of money, food, shelter, medical care for them or family members, travel, schooling, and career opportunities.

47.  Epstein groomed the young women and girls, indoctrinating them to believe that the sexual abuse was normal.  For example, Epstein constantly exposed the girls to nudity and sex to normalize his perverse sexual preferences. The walls of his homes were lined with photographs and paintings displaying nude females.

13

A search of his Palm Beach mansion revealed that Epstein kept soap in the shape of penises and vaginas in multiple bathrooms.   The Palm Beach police also found numerous sex toys in the trash and around the mansion as well as an Amazon receipt for the purchase of three sex slave books about erotic servitude that Epstein likely kept in plain view for the girls to see.

48.   Epstein fraudulently represented to the victims that he would take care of them in various ways, which ultimately allowed Epstein to cause them to engage in commercial sex acts with himself and, on occasion, select others, as well as to create the opportunity for Epstein to sexually abuse them.  Victims were told that they should always act grateful and often received rewards and gifts for making Epstein orgasm, but were also scolded and threatened if they did not.

49.   Epstein and his associates paid his victims hundreds of dollars in cash for each sexual encounter.  Epstein also promised his victims with other things of value, including educational and career advancement, a place to live, and promises that Epstein would provide various forms of assistance.  Epstein provided things of value to his victims in order to coerce them to engage in sex acts with him and on occasion his friends, co-conspirators, or other victims.

50.   As another means of coercing victims to engage in commercial sex acts, Epstein and his co-conspirators fraudulently promised to further victims' educational or career aspirations if they would comply with his sexual demands.

14

These promises were a quid pro quo for the sex acts that occurred.

51.     Epstein and his co-conspirators also dangled coveted opportunities in front of their victims to keep them compliant.  Once they understood their victims' pasts and future aspirations, they would use that knowledge to get the girls to submit the sexual desires of Epstein and others.  Epstein provided housing to many young girls and aspiring models in a building on East 66th Street in Manhattan, along with car services and cell phones so he could track their every move.

52.     As one means of coercing victims to engage in commercial sex acts, Epstein and his co-conspirators would give his victims money to stay quiet about the assault or as a "finder's fee" for bringing other young women.  Epstein would also provide them with living accommodations, clothing, education, or other necessities, exploiting the vulnerabilities of his often poor and underprivileged victims.

53.     As another means of coercing victims to engage in commercial sex acts, Epstein and his co-conspirators often directly threatened the safety and livelihoods of their victims and any witnesses to their crimes.  Epstein's co-conspirators threatened any victim who attempted to cooperate with law enforcement.  Epstein and his lawyers would gather information about the girls to use against them if they ever disobeyed him.  His homes were also under constant surveillance, and his New York mansion had a room in which men that Epstein hired monitored what was happening in the home.

54.     Epstein also utilized his deep connections to powerful and politically connected individuals to intimidate and manipulate his victims of sexual abuse into compliance and silence. Epstein and his co-conspirators constantly bragged to the girls about his friendships with powerful people to remind them of his power and the consequences of disobeying him.

*(iv)       The Government's Failed Attempts at Ending the Enterprise*

55.     In 2005, the Palm Beach Police Department ("PBPD") received a complaint from parents of a 14-year-old girl involving sexual abuse by Jeffrey Epstein. After an investigation, the PBPD identified approximately 20 girls between the ages of 14 and 17 who Epstein sexually abused at his Palm Beach mansion.

56.     During that investigation, the government concluded that Epstein and his co-conspirators had committed federal criminal acts constituting violations of the TVPA and other federal laws, including 18 U.S.C §§ 2422(b), 2423(f), 2423(b), 2424 (e); 18 U.S.C § 371; 18 U.S.C §§ 1591(c)(1), 1591(a)(1), 1591(a)(2); as well as state crimes in violation of Florida Statutes §§ 796.07 and 796.03, against dozens of young women.

57.     As a consequence of the Florida investigation, Epstein pled guilty to soliciting a minor for prostitution, a second-degree felony, and to felony solicitation of prostitution, a third-degree felony; was permanently labeled a "Registered Sex Offender"; and agreed to serve 18 months in the county jail with work release for 12

hours a day, six days a week. Epstein entered into a non-prosecution agreement with the U.S. Attorney's Office for the Southern District of Florida barring his prosecution (and prosecution of his co-conspirators) for violations of the TVPA and other sex offenses in Florida.

58.     Epstein's criminal case in Florida and the many related news reports made clear Jeffrey Epstein's extraordinary penchant for sex abuse and trafficking of young females. For instance, it was reported that up until the time of his Florida arrest in July 2006, Epstein had been sexually abusing during that year and the previous year *three to four young females per day.*

59.     Beginning with his 2006 Florida arrest and for years moving forward, Epstein was embroiled in dozens of public lawsuits detailing his sexual abuse of females, and thousands of news stories circulated worldwide about his illegal sexual proclivities. These public allegations further made clear that Epstein was operating a sex-trafficking enterprise.

60.     In one publicly filed 2008 complaint in Palm Beach County Circuit Court, the plaintiff alleged:

> The Defendant, Jeffrey Epstein, developed a plan, scheme, and criminal enterprise that included an elaborate system wherein the then minor Plaintiff was brought to the Defendant, Jeffrey Epstein's residence by the Defendant's employees, recruiters, and assistants. When the assistants and employees left the then minor Plaintiff and other minor girls alone in a room at the Defendant's mansion, the Defendant, Jeffrey Epstein, himself would appear, remove his clothing, and direct the then minor Plaintiff to remove her clothing. He would then perform one or

17

more lewd, lascivious, and sexual acts, including, but not limited to, masturbation, touching of the then minor Plaintiff's sexual organs, coercing or forcing the then minor Plaintiff to perform oral sex on him, using vibrators or sexual toys on the then minor Plaintiff, coercing the then minor Plaintiff into sexual acts with himself or others, and digitally penetrating the then minor Plaintiff. He would then pay the Plaintiff for engaging in this sexual activity.

61.     In another complaint publicly filed in the United States District Court

for the Southern District of Florida in 2010, the plaintiff alleged:

Defendant's plan and scheme reflected a particular pattern and method. Defendant coerced and enticed impressionable, vulnerable, and relatively economically less fortunate minor girls to participate in various acts of sexual misconduct that he committed upon them. Defendant's scheme involved the use of underage girls, as well as other individuals, to recruit underage girls. Defendant and/or an authorized agent would call and alert Defendant's assistants shortly before or after he arrived at his Palm Beach residence. His assistants would call economically disadvantaged and underage girls from West Palm Beach and surrounding areas who would be enticed by the money being offered and who Defendant and/or his assistants perceived as less likely to complain to authorities or have credibility issues if allegations of improper conduct were made. The then minor Plaintiff and other minor girls, some as young as 14 years old, were transported to Defendant's Palm Beach mansion by Defendant's employees, agents, and/or assistants in order to provide Defendant with "massages."

62.     Epstein paid millions of dollars to settle sexual abuse lawsuits filed

against him by many victims.  And while he was paying to settle these claims,

Epstein continued to abuse new victims—all facts known to Defendants, Epstein's

trusted advisors.

63.     In addition to the many civil lawsuits seeking damages for sexual abuse,

Epstein's victims also filed a public lawsuit against the Unites States under 18 U.S.C.

§ 3771, the Crime Victim's Rights Act ("CVRA"), further exposing Epstein's sexual crimes as well as his secret Non-Prosecution Agreement with the Federal Government.

64.     Epstein's aptitude as a sex-trafficker and appetite as a sexual abuser did not suffer because of his Florida incarceration in 2008. Even while he was in jail in Florida, Epstein brazenly continued to sexually abuse young girls and women from his work-release office.

65.     Once out of jail and off work release, Epstein continued to collect young women and lure them through force, fraud, and coercion into one of his mansions, primarily his townhouse located at 9 East 71 Street, New York, NY, where he would sexually abuse each one.

66.     After his guilty plea in Florida, Epstein began to focus on procuring and abusing women from Eastern Europe. These women's immigration status and language barriers made them more isolated, dependent, and vulnerable to Epstein's abuse and manipulation.

67.     On July 2, 2019, the United States Attorney's Office for the Southern District of New York filed a sealed, two-count Indictment against Epstein, including one count of sex trafficking conspiracy and one count of sex trafficking for violations of 18 U.S.C. § 1591, in part due to Epstein's criminal activities in his New York Mansion located at 9 East 71st Street. *See United States v. Jeffrey Epstein*, Case No.

19

1:19-cr-00490 (S.D.N.Y.).

68. On July 8, 2019, Epstein was arrested pursuant to the New York Indictment.

69. On August 10, 2019, prison guards found Epstein unresponsive in his Metropolitan Correctional Center jail cell, where was awaiting trial on the federal sex trafficking charges. He was later pronounced dead from apparent suicide.

70. In July 2020, Epstein's co-conspirator in the sex-trafficking venture, Maxwell, was arrested on federal sex-trafficking charges filed in the Southern District of New York. The charges alleged that she had assisted, facilitated, and contributed to Epstein's abuse of sex-trafficking victims, helping Epstein to recruit, groom, and ultimately abuse his victims, including in New York City. *See United States v. Maxwell*, Case No. 1:20-cr-00330 (S.D.N.Y.).

71. On December 29, 2021, after a weeks-long jury trial during which witnesses testified about Epstein's sex-trafficking operation in some detail, Maxwell was found guilty on five federal sex-trafficking counts and is now serving nearly 20 years in federal prison for these crimes.

**B. Danielle Bensky's Abuse**

72. Danielle Bensky was an aspiring dancer in New York City at the time she was first recruited by Epstein's sex-trafficking venture in 2004.

73. A woman she knew approached Bensky and asked her to provide a

20

massage to a man in exchange for $300 dollars. That woman portrayed the massage a legitimate one at the time.

74.     Bensky contacted that man's assistant, who set up an appointment to massage him at his New York mansion. That man was Jeffrey Epstein.

75.     After being escorted through the mansion into a room with a massage table, Bensky began giving Epstein a massage with another woman. Epstein then demanded that Bensky take her clothes off, turned over, and began masturbating. Epstein then told Bensky to leave and, after the massage, paid her $300 in cash.

76.     Afterwards, Bensky was called several times by Epstein's employees and associates to return for additional massages. Having been in awe of Epstein's mansion and Epstein's wealth and power, Bensky was terrified of what would happen to her if she refused.

77.     Bensky returned several times. Each time she went to Epstein's mansion, he asked her to undress into her bra and underwear. Epstein masturbated during the massages, and also committed sexual assault on Bensky's body. Epstein fondled her breasts and other intimate parts of her body, and forced her to pinch his nipples.

78.     After each massage, Epstein or one of his assistants would pay Bensky between $300 and $500 in cash.

79.     At some point after Bensky first met Epstein, her mother was diagnosed

21

with a brain tumor. Because Epstein constantly asked Bensky personal questions, she told him about her mother's diagnosis. Epstein told Bensky that he was familiar with neurology, and asked her to bring in her mother's brain scans. Bensky did as Epstein asked, and she and Epstein looked at her mother's brain scans in his office. Epstein told Bensky that he knew the best surgeons in New York, but that if Bensky wanted Epstein to help her mother, then she would have to recruit other girls for him. Bensky refused. Epstein continued to tell Bensky that her mother would not receive key care unless Bensky did exactly as Epstein demanded.

80.    After Epstein knew about Bensky's mother's illness, he became more aggressive with her, recognizing that she was particularly vulnerable. On one occasion, Epstein demanded that Bensky get completely naked, and take off her bra and underwear. He then grabbed Bensky, used a vibrator on her vagina very forcefully causing great pain, and told her to "pretend" that she was enjoying it.

81.    On another occasion, Epstein grabbed Bensky and pressed her breasts into his leg, and asked him to massage his legs in that position.

82.    During and before the massages, Epstein asked Bensky questions about her career, what her goals were, and other personal questions. Knowing that Bensky was a ballerina, Epstein would brag about famous ballet dancers that he knew. He even falsely told Bensky that he had a dance studio in the New York mansion, and that if she was good and complied with all of his demands, he would let her practice

22

her ballet in the studio.

83.     Bensky was abused by Epstein for approximately one year.

84.     Epstein made very clear to Bensky that he was incredibly wealthy, powerful, and regularly in contact with world leaders.

85.     During the massages, Epstein would talk about his connections to powerful people, and would often claim that he was talking on the phone with those people in front of Bensky.  On one occasion, Epstein told Bensky that he was on the phone with Kevin Spacey.  Epstein also told Bensky that he had friends in high places, but he "knew how they liked to party" so they would never betray him.

86.     Further, in his New York mansion Epstein had photographs displayed of significant political figures to ensure that Bensky knew that he had extensive connections.

87.     Epstein was not to be disobeyed and he made clear by his words and actions that there would be consequences if Bensky did not comply with his demands.  She knew that reporting what had happened to her while Epstein was alive would have had severe consequences with regards to her physical safety, her family, and her career.  She knew that she could not come forward until Epstein was dead.

88.     In 2008, the FBI showed up at Bensky's home to speak with her about Epstein.  Bensky was terrified to speak to them because she feared Epstein would hurt her if he found out she had spoken to the FBI.  Bensky experienced incidents

that made her believe that Epstein was following her and could harm her.

89.     Bensky was deeply affected by the assault and she suffers severe emotional distress from an experience that has affected her for her entire life.

90.     Epstein's sexual assault and battery of Bensky continues to cause her significant distress and harm.

91.     Epstein and his co-conspirators had a long history of grooming, indoctrinating, controlling, and ultimately committing sexual offenses against young, vulnerable women like Bensky. Epstein and his co-conspirators constantly reminded Bensky how powerful and important Epstein was. Bensky was chastised if she refused Epstein's sexual demands and told she should be grateful that Epstein was willing to help her with her career and education. She came to believe what she was told.

92.     The well-oiled Epstein sex abuse and trafficking venture included frequent statements to Bensky and other victims by Epstein and his co-conspirators that: (1) Epstein possessed extraordinary wealth, power and influence; (2) Epstein's business and political friends, including world leaders, also included some of the most powerful people in the world; (3) Epstein had the ability to advance or destroy nearly anyone financially, reputationally, and otherwise; (4) medical and other life necessities would be denied victims if they, including Bensky, failed to perform commercial sex acts for Epstein; and (5) Epstein could take away Bensky's and other

24

victims' life necessities such as shelter or housing if she or they failed to perform those acts.

93.    Epstein's sex-trafficking venture targeted vulnerable young women and Bensky was soon indoctrinated and unable to extricate herself. Having been conditioned that the sexual abuse was "normal" and knowing that everyone surrounding Epstein, including accountants (such as Defendant Kahn), lawyers (such as Defendant Indyke), and other important people, were aware of the sex abuse, Bensky was coerced into a cult-like life controlled and manipulated by Epstein and others doing Epstein's bidding.

94.    Epstein's sexual abuse against Bensky was in direct violation of Article 130 of New York's Penal Law and the GMVPA.

95.    Epstein used means of force, threats of force, fraud, coercion, abuse of process, and a combination of such means to cause Bensky to engage in commercial sex acts.

96.    Epstein recruited Bensky to cause and force her to engage in commercial sex acts in ways that were in and affecting interstate and foreign commerce, including use of cell phones and means of interstate transportation (such as aircraft that he owned or controlled).

97.    Bensky wanted to escape from the Epstein sex-trafficking venture, yet Epstein and his supporting team of co-conspirators used fraud, force, and coercion

25

to cause her to remain compliant in fulfilling Epstein's sexual demands.

98.    Jeffrey Epstein controlled Bensky financially, emotionally, and psychologically. He used his knowledge of Bensky's aspirations, fears, and problems to manipulate her until she was completely controlled by and dependent upon him.

99.    Epstein and his co-conspirators, including Defendants, withdrew large sums of cash to make payments to victims, including Bensky, in furtherance of the sex-trafficking operation.

100.    Bensky was regularly paid cash by Epstein or one of his co-conspirators that was withdrawn from one of Epstein's accounts Defendant Indyke was a signatory on.

101.    Over the next year, Epstein threatened Bensky in many ways including threatening that if she did not abide by his demands, her mother would not get the medical treatment she needed for her brain tumor.

**C.    Jane Doe 3's Abuse**

102.    Under the ruse that he was interested in helping her, Epstein paid for Jane Doe 3 to fly from Europe to New York, where he instructed her to stay in one of his 301 East 66th Street apartments.

103.    While in New York, she was constantly badgered by Epstein and his employees to "loosen up" and "relax" when she declined to talk explicitly about sex.

26

104. On one occasion while in Epstein's New York home, Jane Doe 3 was riding in an elevator with Epstein and another woman. When they got out of the elevator and entered into Epstein's massage room, Epstein had the other girl perform oral sex on him while forcing Jane Doe 3 to watch in close proximity. Epstein kept trying to get Jane Doe 3 to join in on the oral sex and kiss the other girl. When Jane Doe 3 refused, Epstein started to forcibly touch Jane Doe 3 without her consent on her breasts and below the waist.

105. On another occasion, Epstein and Jane Doe 3 were in one of the rooms in Epstein's New York home. Suddenly, Epstein pushed Jane Doe 3 down and forced her to perform oral sex on him. Epstein also touched her below the waist and digitally penetrated her without her consent.

106. On another occasion, Epstein and Jane Doe 3 were riding in Epstein's car in New York. Suddenly, Epstein touched Jane Doe 3 below the waist and digitally penetrated her without her consent.

107. While in New York, Jane Doe 3 was directed to go to Epstein's office in New York to receive cash from Epstein's employees on more than one occasion.

108. Epstein would frequently become angry with Jane Doe 3 when she would refuse his sexual advances.

109. In 2014, Epstein lured Jane Doe 3 to travel with him to several locations where either he or Ghislaine Maxwell had homes.

27

110. On one occasion, Jane Doe 3 agreed to watch a movie with Epstein and another woman. Epstein began touching the other woman's breasts and then started touching Jane Doe 3's breasts without her consent.

111. Epstein also lured Jane Doe 3 to a secluded location and instructed Jane Doe 3 to allow Epstein to be her "sex mentor." When Jane Doe 3 declined, Epstein held her down and pressed a sex toy on her genitals while she cried, refusing to stop until he was satisfied she had orgasmed.

112. On another trip, Epstein snuck into Jane Doe 3's room at night while she was sleeping and forced his fingers inside her genitals.

113. Later, Epstein again lured Jane Doe 3 to meet him abroad. During that trip, Epstein again snuck into Jane Doe 3's room at night while she was sleeping and raped her, forcing her to perform oral and vaginal sex.

114. After this final abuse, Jane Doe 3 cut off contact with him and his co-conspirators.

115. Epstein and his co-conspirators had a long history of grooming, indoctrinating, controlling, and ultimately committing sexual offenses against young, vulnerable women like Jane Doe 3. Epstein and his co-conspirators constantly reminded Jane Doe 3 how powerful and important Epstein was. Jane Doe 3 was chastised if she refused Epstein's sexual demands and told she should be grateful that Epstein was willing to help her. She came to believe what she was told.

28

116.    The well-oiled Epstein sex abuse and trafficking venture included frequent statements to Jane Doe 3 and other victims by Epstein and his co-conspirators that: (1) Epstein possessed extraordinary wealth, power and influence; (2) Epstein's business and political friends, including world leaders, also included some of the most powerful people in the world; (3) Epstein had the ability to advance or destroy nearly anyone financially, reputationally, and otherwise; (4) life necessities would be denied victims if they, including Jane Doe 3, failed to perform commercial sex acts for Epstein; and (5) Epstein could take away Jane Doe 3's and other victims' life necessities such as shelter or housing if she or they failed to perform those acts.

117.    Epstein's sex-trafficking venture targeted vulnerable young women and Jane Doe 3 was soon indoctrinated and unable to extricate herself.  Having been conditioned that the sexual abuse was "normal" and knowing that everyone surrounding Epstein, including accountants (such as Defendant Kahn), lawyers (such as Defendant Indyke), and other important people, were aware of the sex abuse, Jane Doe 3 was coerced into a cult-like life controlled and manipulated by Epstein and others doing Epstein's bidding.

118.    Epstein's sexual abuse against Jane Doe 3 was in direct violation of Article 130 of New York's Penal Law and the GMVPA.

119.    Epstein used means of force, threats of force, fraud, coercion, abuse of

29

process, and a combination of such means to cause Jane Doe 3 to engage in commercial sex acts.

120. Epstein recruited Jane Doe 3 to cause and force her to engage in commercial sex acts in ways that were in and affecting interstate and foreign commerce, including use of cell phones and means of interstate transportation (such as aircraft that he owned or controlled).

121. Jane Doe 3 wanted to escape from the Epstein sex-trafficking enterprise, yet Epstein and his supporting team of co-conspirators used fraud, force, and coercion to cause her to remain compliant in fulfilling Epstein's sexual demands.

122. Jeffrey Epstein controlled Jane Doe 3 financially, emotionally, and psychologically. He used his knowledge of Jane Doe 3's aspirations, fears, and problems to manipulate her until she was completely controlled by and dependent upon him.

123. Epstein and his co-conspirators, including Defendants, withdrew large sums of cash to make payments to victims, including Jane Doe 3, in furtherance of the sex-trafficking operation.

124. Jane Doe 3 was paid cash by Epstein or one of his co-conspirators that was withdrawn from one of Epstein's accounts Defendant Indyke was a signatory on.

125. Jane Doe 3 was deeply affected by the assault and she suffers severe

30

emotional distress from an experience that has affected her for her entire life.

### D. Defendants' Roles in the Epstein Sex-Trafficking Enterprise

*(i) Access to Cash*

126. One of the functions of Indyke and Kahn was to ensure that Epstein always had reliable access to resources from banks—including cash—to recruit, lure, coerce, and entice young women and girls to cause them to engage in commercial sex acts and other degradations, and to pay off persons who might otherwise reveal what was going on.

127. Indyke and Kahn themselves repeatedly obtained large stacks of cash for Epstein—including through ATMs, checks, or by converting currency—which, funded Epstein's cash payments for his sex-trafficking enterprise.

128. A 2020 Consent Order from the New York State Department of Financial Services ("DFS Consent Order") highlighted Defendants' role as to Epstein's bank accounts. The DFS Consent Order included various specific findings about the conduct of two individuals referred to "ACCOUNTANT-1" and "ATTORNEY-1." Plaintiffs believe ACCOUNTANT-1 is either Defendant Kahn or another accountant working under Kahn's direction at his small accounting firm, and ATTORNEY-1 is Defendant Indyke.

129. As described by the DFS Consent Order:

Mr. Epstein's personal attorney (herein, 'ATTORNEY-1'), was active in withdrawing cash for Mr. Epstein. ATTORNEY-1, on behalf of Mr.

Epstein, made a total of 97 withdrawals from the Bank's Park Avenue (New York City) Branch from 2013 to 2017 from personal accounts belonging to Mr. Epstein. The transactions in question occurred roughly two to three times per month, all in the amount of $7,500 per withdrawal, the Bank's limit for third-party withdrawals (i.e., withdrawals made by an authorized user who is not a primary account holder). When Bank personnel asked ATTORNEY-1 why Epstein needed cash, ATTORNEY-1 replied Epstein used it for travel, tipping and expenses.

130. Between 2014 to 2016 alone, Indyke made over 40 separate check-cashing withdrawals at a pace of two to three per month, each for the amount of $7,500, which was the bank's limit for third-party withdrawals.

131. On January 17, 2018, Indyke cashed a check for $100,000, and Kahn coordinated with the bank to make sure to have cash ready for pick up. As described by the DFS Consent Order:

> In 2018, just prior to the Bank's closing of the Park Avenue Branch, which was located nearby Mr. Epstein's house, ATTORNEY-1 withdrew $100,000.00 in cash on behalf of Mr. Epstein. When later questioned why ATTORNEY-1 withdrew these sums from the Bank, ATTORNEY-1 reported that Mr. Epstein needed the funds for tipping and household expenses. . . . In total, in a roughly four-year period, ATTORNEY-1 withdrew on Mr. Epstein's behalf more than $800,000 in cash from Mr. Epstein's personal accounts.

132. In addition, from June 2018 to February 2019, there was a series of at least 97 separate withdrawals of $1,000 made from an Epstein account for which Indyke was a signatory, all taken from an ATM a short walk from Indyke's law office at the time. From this same account, Indyke wrote 11 checks, between April 2016 and April 2019, for the purpose of converting U.S. dollars to Euros totaling

32

over $126,000.

133.   Without exorbitantly large amounts of cash procured by Defendants, Epstein's operation could not effectively operate.   Newly recruited victims were each paid hundreds of dollars in cash immediately after Epstein sexually abused them, as hush money.   Each victim was also informed that she would be paid hundreds of dollars in cash for each additional victim she recruited, and Epstein made good on those promises of large cash payments to keep his victims quiet and complicit.

134.   If Epstein paid every victim with wire transfers or checks and left a documented money trail, his illegal sexual abuse and sex trafficking operation would have been easily uncovered; however, with access to unlimited amounts of cash procured by Defendants, Epstein was able to commit the most egregious sexual crimes many times a day without leaving a paper trail.

*(ii)Evading Law Enforcement*

135.   Indyke and Kahn also assisted Epstein in concealing Epstein's illegal activity and avoiding detection by law enforcement, including by repeatedly structuring their cash withdrawals for Epstein to evade banking reporting requirements. Defendants' concealment was knowingly and explicitly to permit the continuing expansion of Epstein's sex trafficking.

136.   The DFS Consent Order highlighted Defendants' role in seeking to

33

avoid detection by law enforcement of his illegal activities.

137.    On July 20, 2016, Indyke brought two checks to a branch teller window for withdrawal, one for $7,500 drawn on Epstein's personal account and one for $4,000 drawn on Defendant Indyke's business account.  However, Defendant Indyke only cashed the $7,500 check that day and returned the next day to cash the $4,000 check, to avoid reporting paperwork.

138.    On another occasion, and despite numerous publications describing Epstein's sex trafficking, ACCOUNTANT-1 provided false reasons for massive cash withdrawals from Epstein's accounts:

> In a May 2018 email, a compliance officer submitted an inquiry to RELATIONSHIP MANAGER-2 about payments to the accounts of women with Eastern European surnames at a Russian bank, and asking for an explanation of the purpose of the wire transactions and Epstein's relationship with the counterparties. After submitting the questions to ACCOUNTANT-1, RELATIONSHIP MANAGER-2 forwarded ACCOUNTANT-1's response to the compliance officer, which read "SENT TO A FRIEND FOR TUITION FOR SCHOOL.

139.    The DFS Consent Order documents how ATTORNEY-1 probed the bank's policy on how closely it monitored cash withdrawals:

> In May 2014, ATTORNEY-1 inquired into how often he could withdraw cash on behalf of Mr. Epstein without triggering an alert." Then, "[i]n 2017, ATTORNEY-1 again inquired about triggering an alert. Specifically, in July 2017, ATTORNEY-1 had, among other things, asked a teller whether a withdrawal transaction in excess of $10,000 would require reporting and, upon being advised that it would, broke up the withdrawal transaction over two days.

140.    When Epstein was terminated from one of his banking institutions due

to the widespread allegations of sex trafficking against him, Indyke conspired to get the bank to write Epstein a reference letter for Epstein's next banking institution and to falsely claim that there were no issues detected with Epstein's account. Defendants were integral to ensuring that Epstein always had access to large amounts of cash.

141. Indyke and Kahn also conspired to assist Epstein in evading banks running diligence reports on him for the purpose and effect of concealing Epstein's sex trafficking and permitting that sex trafficking to continue. As described in the DFS Consent Order, in one instance, ACCOUNTANT-1 withdrew Epstein's name from a non-profit's brokerage account to avoid a due diligence report being run on Epstein:

> On January 4, 2016, an accountant representing Mr. Epstein (herein, 'ACCOUNTANT-1') requested that the Bank open a brokerage account for Gratitude America, Mr. Epstein's private charity. COVERAGE TEAM MEMBER-1 escalated the request to AML OFFICER-2, who directed the inquiry to the Secretary for the ARRC. The Secretary of the ARRC conferred with a member of the ARRC and ordered that an external due diligence report be prepared on Mr. Epstein. In response to the request for additional information, ACCOUNTANT-1 informed the Bank of Mr. Epstein's resignation from Gratitude America and withdrew the request to open the account. As a result, no due diligence report was run on Mr. Epstein.

142. These specific instances illustrate Defendants' practice of facilitating and protecting Epstein's ability to use his various bank accounts (under various sham entities) to continue his sex-trafficking enterprise.

143. Indyke and Kahn conspired to assist Epstein in settling with many victims who he harmed over the years to keep the sex-trafficking operation quiet.

*(iii)     Facilitation of Payments*

144. Defendants also directed, approved, enabled, and justified millions of dollars in payments that fueled the Epstein sex-trafficking enterprise, including payments to women who were forced to have sex with Epstein and/or recruited others to be victimized, recruiters, and, Plaintiffs believe, to maintain the immigration status of victims of the Epstein sex-trafficking enterprise.

145. Defendants (at least one of them, but often both) had power of attorney or signatory authority over virtually all of the accounts held by Epstein, which allowed them to personally authorize and sign off on payments totaling hundreds of thousands of dollars to Epstein's victims, including but not limited to recruiting compensation, legal fees, apartment rent, and tuition.

146. At least one Defendant was a signatory on over 130 different bank accounts for Epstein and Epstein-owned entities, many of which existed only to transfer payments to other entities and other expenses.

147. Between 2016 and 2019, Indyke made wire transfers from Epstein's personal accounts to victims and entities to facilitate the Epstein sex-trafficking enterprise.

148. Defendants oversaw over $2,500,000 in payments from a single

36

account (and millions more from other accounts) in which Defendant Indyke was a
signatory to dozens of women with Eastern European surnames, purportedly for
hotel expenses, rent, and other expenses, and to an immigration lawyer who was
involved in forced marriages arranged among Epstein's victims to secure victims'
immigration status.

149.   Indyke and Kahn signed checks for LSJE, LLC—an entity for which
they were authorized signatories—for combined value of almost $300,000 made out
personally to young women or, as further described below, to the immigration
lawyer in New York who was involved in one or more forced marriages arranged
among Epstein's victims to secure a victim's immigration status.

*(iv)     Control over Corporate Entities*

150.   Defendants organized, controlled, and directed almost every aspect of
the Epstein sex-trafficking enterprise. They were officers of virtually every
corporate entity that Epstein created to fund and conceal his activities and had
signatory authority as to those entities. They were deeply involved in the financial
activities of the Epstein-owned entities, and were paid for their loyalty and
assistance.

151.   Indeed, Epstein paid for Indyke to go to law school and obtain a license
to practice law for the sole purpose of obtaining his assistance with carrying out the
Epstein Enterprise.

37

152.  Corporate filings indicate that one, and frequently both, Defendants were involved in the creation and/or management of several of Epstein's sham entities, including the C.O.U.Q. Foundation, Gratitude America Ltd., the J. Epstein Virgin Islands Foundation; FT Real Estate Inc.; Hyperion Air, Inc.; Jeepers, Inc.; Mort, Inc.; and Zorro Development Corporation.  Just as Epstein himself had no discernible profession, none of these sham entities had any real business purpose other than facilitating sex trafficking.

153.  Indyke and Kahn were also officers of the corporate entities that held the real estate on which Epstein abused countless victims:

   a.  Nautilus, Inc., is the corporate entity that owned Epstein's private island "Little St. James" in the U.S. Virgin Islands, where countless of Epstein's victims were transported, harbored, and abused. Epstein engaged in a pattern and practice of trafficking and sexually abusing victims on this private, secluded island where Epstein and his associates could avoid detection of their illegal activity and prevent victims from leaving freely and escaping the abuse. Thus, Nautilus, Inc. participated in carrying out, facilitating and concealing Epstein's crimes. At all relevant times, Indyke and Kahn were the secretary and treasurer of Nautilus, Inc., respectively.

   b.  Poplar, Inc., is a corporate entity that had signatory authority over

38

Great St. Jim, LLC, which held title to another set of properties that Epstein owned in the U.S. Virgin Islands, which were the islands closest to Little St. James. Epstein purchased these properties to further shield his conduct on Little St. James from view, prevent his detection by law enforcement or the public, and allow him to continue and conceal his criminal enterprise. Thus, Poplar, Inc. participated in carrying out, facilitating and concealing Epstein's crimes. At all relevant times, Indyke and Kahn were the secretary and treasurer of Poplar, Inc., respectively.

c. Cypress Inc., is a corporate entity that owned the property 49 Zorro Ranch Road in Stanley, New Mexico, which the Epstein New Mexico property at which he transported, harbored, and abused countless victims. Thus, Cyrpus, Inc. participated in carrying out, facilitating and concealing Epstein's crimes. At all relevant times, Indyke and Kahn were listed, respectively, as Vice President/Secretary/Director and Treasurer/Director of Cypress, Inc.

d. Maple, Inc., is a corporate entity that owned the property at 9 East 71st Street in New York—Epstein's New York townhome at which he transported, harbored, and abused countless victims. Thus,

Maple, Inc. participated in carrying out, facilitating and concealing Epstein's crimes. At all relevant times, Indyke and Kahn were listed, respectively, as Vice President/Secretary/Director and Treasurer/Director of Maple, Inc.

e. Laurel, Inc., is a corporate entity that owned the property at 358 Brillo Way in Palm Beach, Florida—Epstein's Palm Beach mansion at which he transported, harbored, and abused countless victims. Thus, Laurel, Inc. participated in carrying out, facilitating and concealing Epstein's crimes. At all relevant times, Indyke and Kahn were listed, respectively, as Vice President/Secretary/Director and Treasurer/Director of Laurel, Inc.

f. Indyke and Kahn were also the secretary/director and treasurer/director of Southern Trust Company, Inc. Epstein used Southern Trust Company to open many of his bank accounts with his bank institutions, which Indyke and Kahn also controlled.

154. Kahn oversaw the accounting and tax reporting for many entities affiliated with the Epstein sex-trafficking enterprise and was aware of their purpose.

155. Defendants were appointed as officers in various 501(c)(3) organizations affiliated with the Epstein sex-trafficking enterprise. Defendants used the 501(c)(3) organizations to make payments to support the Epstein sex-trafficking

40

enterprise – payments that were designed to service the criminal activities of Epstein and that were inconsistent with the charitable purpose of any such foundations.

156. Defendants controlled entities that were funded entirely by money transferred from Epstein's personal bank accounts. Such entities were then utilized to facilitate the Epstein sex-trafficking enterprise by putting victims on the payroll and providing false reasons for the compensation to obscure the existence of the Epstein sex-trafficking enterprise. Additionally, entities were used to pay for immigration legal fees and to pay various costs associated with the forced marriages used to keep victims available for Epstein's ongoing abuse.

157. Defendants are also in sole control of Epstein's estate, and have been since his death. On August 8, 2019, two days before his death and after his arrest, Epstein executed a last will and testament appointing his long-time co-conspirators Indyke and Kahn as the executors of his estate. On August 15, 2019, five days after Epstein's death, Indyke and Kahn executed oaths of willingness to serve as executors of Epstein's estate. As executors, Indyke and Kahn have approved the release of estate funds to pay for the legal fees and costs of other co-conspirators.

158. Indyke and Kahn are also administrators and co-trustees of The 1953 Trust. The 1953 Trust was created by Epstein, who "amended and restated" its terms only two days before his suicide—the same day on which he revised his last will and testament. Epstein's last will and testament transferred all of his "property, real and

41

personal, wherever situated" to The 1953 Trust. Indyke and Kahn, filed a Certificate of Trust in the Superior Court of the Virgin Islands for The Trust on August 26, 2019. Plaintiffs believe that Indyke and Kahn are compensated for their role as co-trustees of The 1953 Trust.

159. The Butterfly Trust was a trust created for the benefit of numerous persons who performed work for Epstein, including known co-conspirator Ghislaine Maxwell, young women with Eastern European surnames, and Defendants themselves. In addition to themselves being beneficiaries of the Butterfly Trust, Defendants were authorized signatories on the Butterfly Trust's checking account, a privilege they used to sign for checks totaling over $1,000,000 made out to young women, or their associated entities.

*(v) Arranging Sham Marriages*

160. Defendants participated with Epstein in coercing and inducing his sex-trafficking victims, in at least three cases, to enter into arranged and forced sham marriages in order to obtain immigration status for the foreign women so that they could continue to be available to Epstein for his abuse.

161. For example, Indyke assisted in placing one victim—who was repeatedly abused by Epstein and was forced to have sex with Epstein's friends—into an arranged marriage to another victim to prevent the other victim from being deported. Indyke and an immigration lawyer prepared the victim for

42

communications with U.S. immigration officials almost immediately after the wedding. Kahn provided a letter of reference for the immigration proceeding. When the victim inquired about getting divorced and leaving Epstein, Indyke tried to talk her out of a divorce and threatened that she would lose Epstein's protection.

162. Various other victims were similarly forced into sham marriages to foreign victims to prevent their deportation. In each instance, Indyke and Kahn facilitated these sham marriages with their legal and accounting work.

*(vi)*      *Concealment of the Venture After Epstein's Death*

163. The Epstein sex-trafficking enterprise operated throughout the world from in and around (at least) 1995 through (at least) in and around August 10, 2019, when Epstein died by apparent suicide. Through at least July 2020, and thereafter to and including the date of this complaint, members of the Epstein Enterprise, including Defendants, continued to further the Epstein Enterprise by concealing the activities and extent of the Epstein Enterprise from Bensky, Jane Doe 3, and the Class.

164. For many years, Bensky, Jane Doe 3, and the Class did not know the extent of Defendants' personal involvement in the sex-trafficking operation, including due to the intentionally complex web of entities and conspirators that Epstein and Defendants used to obfuscate his operation. Moreover, Defendants publicly and privately denied their role in the Epstein Enterprise, including in March

43

of 2020, when Defendants publicly, and falsely, denied allegations that they were an integral part of the Epstein Enterprise. These false denials, and Defendants' other efforts and concealments, were made with the purpose and effect of being conveyed to and affecting, persons like Bensky, Jane Doe 3, and the Class, to conceal from such persons Defendants' complicity and liability. Defendants' false denials included denials that were made, and conspired to be made, under oath. Bensky, Jane Doe 3, and the Class learned of Defendants' personal involvement only through substantial additional litigation against Epstein's banking institutions.

### E.    Defendants' Knowledge of the Epstein Sex-Trafficking Enterprise

165.    There can be no doubt that Indyke and Kahn knew about the Epstein Enterprise and Epstein's sex-trafficking activities.

166.    At all relevant times, Epstein maintained numerous apartment units at 301 East 66th Street in New York City, where Epstein's co-conspirators often stayed and which operated as stash houses where numerous victims were kept over the years.

167.    Defendants knew of the 301 East 66th Street Epstein properties and knew that these units operated as victim stash houses. Defendants were frequent visitors to Epstein's various properties at all relevant times.

168.    Indyke and Kahn also traveled on Epstein's private plane, on which he also often flew young victims. As recent as 2018, air traffic controllers and other

44

airport personnel reported seeing Epstein leave his plane with young girls some of whom appeared to be between the age of 11 and 18 years.

169. As Epstein's lawyer and accountant, Defendants were personally aware that the majority of the corporate entities he had them create were shams created for the purposes of facilitating his sex-trafficking enterprise. As individuals who created and/or managed several of those entities, and oversaw withdrawals and payments from their accounts, Defendants knew that there were no legitimate business reasons for those transactions.

170. Not only did Defendants witness the trafficking firsthand, their constant proximity to Epstein, his residences, and his co-conspirators, together with the flood of public information concerning his illegal activities, make clear that they were well aware of Epstein's crimes.

171. Moreover, in 2006 Epstein was publicly exposed for sexually abusing dozens of young women and girls, several as young as 14 years old. There were hundreds of pages of police reports and news articles revealing that Epstein was a serial sexual abuser and trafficker, and that his operation depended on his accessing nearly unlimited cash to use as payments to his victims.

172. With respect to the specific discoveries, the authorities found that some of the victims "went to Mr. Epstein's house only once, some went there as much as 100 times or more."

45

173.   It was publicly revealed in the investigation that Epstein was sexually abusing three to four young females every single day of his life and that he was paying each victim hundreds of dollars in hush money, usually in cash.

174.   At this point (and earlier), Defendants knew that Epstein was an international sex trafficker.

175.   Defendants knew about Epstein's arrest in 2006 and his subsequent guilty plea for sex-related offenses and had been assisting with his trafficking operation prior to his arrest.

176.   During Epstein's imprisonment, Indyke visited Epstein nearly 40 times.

177.   After his arrest, dozens of public lawsuits were filed against Epstein, revealing greater details of Epstein's sexual abuse of young women.  The lawsuits detailed millions in payments that Epstein was making to recruiters, co-conspirators, and his victims.

178.   Through the civil lawsuits, evidence (such as the previously referenced message pads) taken from Epstein's trash by police or through prior search warrants, as well as flight logs and black books began to publicly surface, shedding further public light on the expansiveness of Epstein's sex-trafficking operation.

179.   Defendants (acting as Epstein's lawyer and accountant) were also personally involved in Epstein's civil settlements with victims.

180.   In the summer of 2008, Epstein's Non-Prosecution Agreement

46

("NPA") with the U.S. Department of Justice was made public when it was unsealed in connection with a challenge to the NPA by two of his victims. Among other things, the agreement outlined the possible federal sex offense charges that could have resulted from the investigation, including TVPA charges.

181. Epstein's victims' court challenge against Epstein's federal NPA also continued between 2008 and 2013 (and beyond) and attracted significant media attention. Indeed, between around 2006 and 2013, hundreds of press reports outlined the allegations underlying the NPA and to varying degrees detailed the involvement of Epstein's alleged co-conspirators.

182. Additionally, press reports during this time noted allegations that Epstein was involved with Eastern European women in particular and that a modeling agency he helped develop with his friend and known sexual abuser, Jean Luc Brunel, brought "young girls . . . often from Eastern Europe" to the U.S. on Epstein's private jets.

183. Defendants also assisted Epstein in hiding his sex-trafficking scheme from authorities, demonstrating their knowledge of Epstein's illegal activities. For example, in addition to himself withdrawing massive amounts of cash for Epstein, Indyke helped Epstein structure those cash withdrawals from Epstein's banks so that Indyke could withdraw cash for Epstein to pay his victims without triggering the bank's duty to report the highly suspicious activity to authorities.

47

184. As DFS found, ATTORNEY-1—believed to be Indyke—was not only extremely active in making cash withdrawals for Epstein in rapid succession, but he also "inquired into how often he could withdraw cash on behalf of Mr. Epstein without triggering an alert" on multiple occasions, and provided Deutsche Bank with knowingly false explanations for the many cash transactions when bank employees inquired.

**F.  Defendants' Financial Incentives for Participating in the Epstein Enterprise**

185. From about 1995, Defendant Indyke financially benefited from his participation in Epstein sex-trafficking operation. From about 2005, Defendant Kahn financially benefited from his participation in Epstein sex-trafficking operation. Both Defendants were on Epstein's payroll for years, earning large sums of money for their assistance in carrying out the operation. Defendants chose to assist in carrying out and concealing the operation because they were getting paid by Epstein to do so.

186. Defendants were paid through multiple entities, including but not limited to HBRK Associates, Inc. (Kahn), Coatue Enterprises, LLC (Kahn), Birch Tree BR, LLC (Indyke), Harlequin Dane, LLC (Indyke), and Darren K Indyke, PLLC.

187. Even after Epstein died, Defendants have continued to enrich themselves for their participation in the Epstein sex-trafficking enterprise, having

48

approved the release of Epstein Estate funds through their role as Executors to pay their legal fees and costs. Just last year, the U.S. Virgin Islands alleged that Defendants received $13 million to the Butterfly Trust—more fully described above—in April 2020 after the liquidation of another investment fund in which Epstein had a stake.

188.   Indyke and Kahn are each also entitled to compensation for serving as executors of Epstein's estate, pursuant to Epstein's last will and testament.   In addition, Indyke and Kahn have fraudulently and improperly used their control of Epstein's estate to attempt to conceal their participation in the Epstein Enterprise and to protect themselves, including from civil lawsuits.

## V.    CLASS ACTION ALLEGATIONS

189.   Danielle Bensky and Jane Doe 3 bring this action pursuant to Federal Rule of Civil Procedure 23(b)(3) and 23(c)(4) on behalf of herself and the following Class:

> All women who were sexually abused or trafficked by Jeffrey Epstein between January 1, 1995 and August 10, 2019, both dates inclusive (the "Class Period").

190.   Danielle Bensky and Jane Doe 3 reserves the right to seek leave to modify this definition, including the addition of one or more subclasses, after having the opportunity to conduct discovery.

191.   <u>Numerosity</u>: The Class consists of dozens of women, making joinder

49

impracticable, in satisfaction of Fed. R. Civ. P. 23(a)(1). The exact size of the Class and the identities of the individual Class members are ascertainable through records maintained by the Epstein Estate and Defendants.

192. Typicality: Danielle Bensky and Jane Doe 3's claims are typical of the claims of the other Class members they seek to represent. The claims of Danielle Bensky and Jane Doe 3 and the other Class members are based on the same legal theories and arise from the same unlawful pattern and practice of Defendants' participation in, conspiring to join in and assisting the sexual abuse and Epstein's sex-trafficking enterprise.

193. Commonality: There are many questions of law and fact common to the claims of Danielle Bensky and Jane Doe 3 and the other Class members, and those questions predominate over any questions that may affect only individual Class members, within the meaning of Fed. R. Civ. P. 23(a)(2) and (b)(3). Class treatment of common issues under Fed. R. Civ. P. 23(c)(4) will materially advance the litigation.

194. Common questions of fact and law affecting Class members include, but are not limited to, the following:

     a. Whether Epstein ran a sex-trafficking venture;

     b. Whether Defendants knew (or recklessly disregarded) that such a venture existed;

c. Whether Defendants participated in, and facilitated and conspired to facilitate, Epstein's sex trafficking;

d. Whether Defendants benefited financially or by receiving things of value from their participation in the venture;

e. Whether Defendants obstructed the enforcement of the TVPA with respect to Epstein's sex-trafficking venture;

f. Whether Defendants concealed and conspired to conceal Epstein's sex trafficking and their participation in it;

g. Whether Defendants owed a duty of care to Epstein's victims; and

h. Whether Defendants breached their duty of care to Epstein's victims.

195. Absent a class action, most of the Class members would find the cost of litigating their claims to be cost-prohibitive and will have no effective remedy. The class treatment of common questions of law and fact is also superior to multiple individual actions or piecemeal litigation, in that it conserves the resources of the courts and the litigants and promotes consistency and efficiency of adjudication.

196. <u>Adequacy</u>: Danielle Bensky and Jane Doe 3 will fairly and adequately represent and protect the interests of the other Class members they seek to represent. Bensky and Jane Doe 3 have retained counsel with substantial experience in prosecuting complex litigation and class actions, including class actions against others alleged to have facilitated Epstein's sex-trafficking enterprise. Danielle

51

Bensky and Jane Doe 3 and their counsel are committed to vigorously prosecuting this action on behalf of the other Class members and have the financial resources to do so. Neither Danielle Bensky and Jane Doe 3 nor their counsel have any interests adverse to those of the other Class members.

197. This action has been brought and may properly be maintained as a class action against Defendants pursuant to Rule 23 of the Federal Rules of Civil Procedure because there is a well-defined community of interest in the litigation and the proposed Class is easily ascertainable from Defendants' records.

198. Superiority: A class action is superior to all other available methods for the fair and efficient adjudication of this controversy because:

   a. Joinder of all Class Members is impracticable;

   b. The prosecution of individual remedies by members of the Class will tend to establish inconsistent standards of conduct for Defendants and result in the impairment of Class Member's rights and the disposition of their interests through actions to which they were not parties;

   c. Class action treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of effort and expense that numerous individual actions would engender;

   d. Absent a class action, Class Members will continue to suffer losses and

52

be aggrieved and Defendants will escape liability for their criminal and tortious conduct and be able to continue to violate New York and federal law without remedy;

e. Class treatment of this action will cause an orderly and expeditious administration of class claims, economies of time, effort and expense will be fostered, and uniformity of decisions will be ensured;

f. Danielle Bensky and Jane Doe 3 and their counsel are unaware of any class action brought against Defendants by victims for the violations alleged in this action;

g. The forum is desirable because Danielle Bensky and Jane Doe 3 conducted the subject business with Jeffrey Epstein in this District and Class Members were consequently trafficked in this District; and,

h. This action presents no difficulty that would impede its management by the Court as a class action.

## VI.    CAUSES OF ACTION

## COUNT I: AIDING, ABETTING, AND FACILITATING BATTERY

199.   Plaintiffs Danielle Bensky and Jane Doe 3 reallege and incorporate by reference paragraphs 1 – 198, as if fully set forth in this Count.

200.   Danielle Bensky and Jane Doe 3 bring this Count individually and on behalf of the other Class Members they respectively seek to represent.

53

201.   Between about 1995 and 2019, in this District in New York, Jeffrey Epstein intentionally committed batteries and other intentional tortious conduct, including crimes in violation of New York Penal Law Chapter 130 such as New York Penal Law §§ 130.20, 130.35, 130.50, 130.52, and 130.66 (hereinafter "Chapter 130 crimes"), against Danielle Bensky and Jane Doe 3 and the Class Members. Epstein committed the intentional tortious conduct and crimes against Danielle Bensky and Jane Doe 3 and Class Members. As described throughout this complaint, Epstein intentionally and non-consensually touched Danielle Bensky and Jane Doe 3 and the Class Members in a harmful and offensive manner that resulted in substantial injuries, including damages from physical and psychological injury, extreme emotional distress, humiliation, fear, psychological trauma, loss of dignity and self-esteem, and invasion of privacy.

202.   The resulting injuries that Danielle Bensky and Jane Doe 3 and the Class Members suffered include injuries directly and proximately suffered as a result of sex offenses committed by Epstein and other co-conspirators and criminalized under article 130 of the New York Penal Laws. The offenses included sexual intercourse without consent and oral sexual conduct without consent, forbidden by New York Penal Law § 130.20. The offenses included forcible touching of sexual or other intimate parts without consent, forbidden by New York Penal Law §§ 130.20, 130.35, 130.50, 130.52, and 130.66.

203.  Regardless of when the tortious conduct (*e.g.*, battery) and Chapter 130 Crimes were committed by Epstein, the conduct and crimes are now civilly actionable, regardless of any statute of limitations to the contrary, because they are covered by the one-year "look back" window in New York Adult Survivors Act. *See* N.Y. C.P.L.R. § 214-j.

204.  Between about 1995 and 2019, Defendant Indyke, and between 2005 and 2019, Defendant Kahn, knowingly and intentionally aided, abetted, and facilitated Epstein's intentional tortious conduct (*e.g.*, battery), through Chapter 130 Crimes recounted in the preceding paragraphs of this Count.  Because Defendants criminally aided, abetted, and facilitated Epstein's conduct and crimes in violation of Chapter 130, they are vicariously and otherwise liable for damages caused by the conduct and crimes.

205.  Defendants were well aware of their important, personal, and substantial role as a part of Epstein's intentionally tortious and illegal activity in committing Chapter 130 Crimes.

206.  As a direct and proximate result of Epstein's tortious conduct and crimes, which Defendants knowingly and intentionally aided, abetted, and facilitated, Danielle Bensky and Jane Doe 3 and the Class Members have in the past suffered, and in the future will continue to suffer, substantial damages, including damages from physical and psychological injury, extreme emotional distress,

humiliation, fear, psychological trauma, loss of dignity and self-esteem, and invasion of her privacy.

207. At the time of Epstein's batteries, intentionally tortious conduct, and crimes against Danielle Bensky and Jane Doe 3 and the Class Members, Defendants were well aware of Epstein's sex-trafficking venture and that its concrete steps in furtherance of the venture were aiding, abetting, and facilitating his batteries, tortious conduct, and crimes.

208. At the time of Epstein's crimes against Danielle Bensky and Jane Doe 3 and the Class Members, Defendants knowingly provided substantial assistance in Epstein's tortious conduct and crimes. That knowing substantial assistance went beyond mere knowledge and approval of Epstein's wrongdoing. For example, Defendants had offices in structures where Epstein housed and abused his victims. Additionally, Defendants were responsible both directly and indirectly for providing cash to victims, arranging legal and financial structures to obscure elements of the Epstein sex-trafficking venture, and arranging sham marriages and other immigration scrutiny avoidance tactics. Without that support, Epstein could not have committed his tortious conduct and crimes—a fact that Defendants knew and for which they were richly compensated.

209. In aiding, abetting, and facilitating Epstein's intentional tortious conduct and crimes, Defendants could readily foresee direct and proximate injury to

56

Danielle Bensky and Jane Doe 3 and the Class Members. Defendants should have foreseen direct and proximate injury from its actions and inactions to Danielle Bensky, Jane Doe 3, and the Class Members. Indeed, Defendants did foresee injury to Epstein's victims, including Bensky, Jane Doe 3, and the Class Members.

210. In aiding, abetting, and facilitating Epstein's tortious conduct and crimes, Defendants committed intentional torts directed against Danielle Bensky and Jane Doe 3 and the Class Members. Defendants' aiding, abetting, and facilitating Epstein's tortious conduct and crimes were its own wrongful acts and omissions. Defendants had a duty not to commit tortious conduct and crimes—specifically aiding, abetting, and facilitating New York sex crimes as described above— directed against Danielle Bensky and Jane Doe 3 and the Class Members.

211. As a result of the foregoing, Defendants are liable civilly for damages they directly, tortiously, and criminally caused to Danielle Bensky and Jane Doe 3 and the Class Members. Danielle Bensky and Jane Doe 3 and the Class Members according are entitled to bring a cause of action for damages for physical, psychological, or other injury or condition suffered as a direct and proximate result of Defendants' aiding, abetting, and facilitating Epstein's tortious conduct and crimes described above and for damages for physical, psychological, or other injury or condition suffered as a direct and proximate result of Epstein's tortious conduct and crimes.

57

212.  By virtue of acting intentionally, outrageously, and with a high degree of moral turpitude and demonstrating such wanton dishonesty as to imply a criminal indifference to civil obligations, Defendants are liable to Danielle Bensky and Jane Doe 3 and the Class for punitive damages.

## COUNT II: INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

213.  Plaintiffs Danielle Bensky and Jane Doe 3 reallege and incorporate by reference paragraphs 1 – 198, as if fully set forth in this Count.

214.  Danielle Bensky and Jane Doe 3 bring this Count individually and on behalf of the other Class Members they respectively seek to represent.

215.  As a direct and proximate result of aiding, abetting, and facilitating Epstein's tortious conduct and sex crimes in violation of Chapter 130, Defendants intentionally inflicted emotional distress against Danielle Bensky and Jane Doe 3 and the Class Members.

216.  Defendants' actions, described above, constitute extreme and outrageous conduct that shocks the conscience.  For example, Defendants intentionally and knowingly participated in Epstein's sex-trafficking venture, as outlined above.  Defendants had a legal duty not to participate in, facilitate, or aid and abet Epstein's sex-trafficking venture and Epstein's Chapter 130 Crimes.

217.  Defendants' conduct was especially extreme and outrageous due to Danielle Bensky and Jane Doe 3 and the Class Members' particular vulnerabilities

58

as targets of a sex-trafficking venture.

218. Defendants intended to cause, and did cause, Danielle Bensky and Jane Doe 3 and the Class Members severe emotional distress. Indeed, by having offices in structures where the abuse occurred and physically providing cash to victims, Defendants were especially aware of the severe emotional distress their conduct caused.

219. At the very least, Defendants recklessly disregarded a substantial probability that their actions in aiding, abetting, and facilitating Epstein's sex crimes would cause Danielle Bensky and Jane Doe 3 and the Class Members severe emotional distress.

220. Because Defendants intentionally inflicted extreme emotional distress on Danielle Bensky and Jane Doe 3 and the Class Members, they are liable to Danielle Bensky and Jane Doe 3 and the Class Members for damages they suffered as a direct and proximate result.

221. As a direct and proximate result of Defendants' conduct, Danielle Bensky and Jane Doe 3 and the Class Members have in the past and will in the future continue to suffer substantial damages from psychological and physical injury, including extreme emotional distress, humiliation, fear, psychological trauma, loss of dignity and self-esteem, and invasion of privacy. Defendants' aiding, abetting, and facilitating Epstein's sex crimes in violation of Chapter 130 directly and

proximately caused Epstein's sex crimes.

222. By virtue of acting intentionally, outrageously, and with a high degree of moral turpitude and demonstrating such wanton dishonesty as to imply a criminal indifference to civil obligations, Defendants are liable to Danielle Bensky and Jane Doe 3 and the Class for punitive damages.

## COUNT III: NEGLIGENCE

223. Plaintiffs Danielle Bensky and Jane Doe 3 reallege and incorporate by reference paragraphs 1 – 198, as if fully set forth in this Count.

224. Danielle Bensky and Jane Doe 3 bring this Count individually and on behalf of the other Class Members they respectively seek to represent.

225. Defendants owed a duty to Danielle Bensky and Jane Doe 3 and the Class Members to exercise reasonable care to avoid conduct that created a risk of physical harm to them. Defendants' duties included a duty to exercise reasonable care to avoid conduct that would combine with Epstein's crimes, and permit Epstein's crimes, in violation of Chapter 130.

226. Defendants' own conduct in providing legal, accounting services, business-related services, and other support for Epstein's sex trafficking venture set forces in motion that directly and proximately injured and caused physical harm to Danielle Bensky and Jane Doe 3 and the Class Members. These forces that Defendants set in motion caused Epstein's intentional tortious conduct and Chapter

60

130 Crimes against Danielle Bensky and Jane Doe 3 and the Class Members, causing physical harm and in themselves constituted physical harm to Danielle Bensky and Jane Doe 3 and the Class Members. Defendants owed Danielle Bensky and Jane Doe 3 and the Class Members a duty not to set those forces in motion because they unreasonably created a risk of physical harm.

227. Defendants reasonably could foresee, and did in fact foresee, that their negligent failure to prevent physical harm would result in physical harm to Danielle Bensky and Jane Doe 3 and the Class Members. Defendants owed a duty to prevent that physical harm.

228. Defendants failed to act objectively reasonably in failing to take precautions to prevent Epstein's intentional tortious conduct and sex-trafficking and sex crimes in violation of Chapter 130, which were committed against Danielle Bensky and Jane Doe 3 and the Class Members. If Defendants had acted reasonably to prevent physical harm, they would not have supported and allowed Epstein's tortious conduct and sex-trafficking and sex crimes to occur. Defendants owed Danielle Bensky and Jane Doe 3 and the Class members a duty to act objectively reasonably.

229. At the time of Defendants' own negligent conduct, Defendants both realized and should have realized the likelihood that they were creating an opportunity for Epstein to commit intentional tortious conduct and Chapter 130

61

Crimes against Danielle Bensky and Jane Doe 3 and the Class Members. Indeed, Defendants knew that their own conduct was necessary to create Epstein's opportunities to engage in that conduct and commit those crimes. Defendants owed Danielle Bensky and Jane Doe 3 and the Class Members a duty not to create those opportunities for Epstein.

230. Defendants' breaches of their legal duties were the direct—*i.e.*, the but-for—cause of physical and psychological injuries to Danielle Bensky and Jane Doe 3 and the Class Members. Without Defendants' breaches of legal duties, those injuries would not have occurred. The injuries that occurred were readily foreseeable to Defendants.

231. Danielle Bensky and Jane Doe 3 and the Class Members were easily within the zone of foreseeable harm from the Defendants' negligent acts and omissions. Defendants' negligent acts and omissions foreseeably created substantial risk of Jeffrey Epstein and his co-conspirators committing sex crimes against young women with whom he was in contact. Tragically, Danielle Bensky and Jane Doe 3 and the Class Members fell within that zone.

232. Because of Defendants' negligent failure to prevent physical harm to Danielle Bensky and Jane Doe 3 and the Class Members, they are liable to Danielle Bensky and Jane Doe 3 and the Class Members for damages suffered as a direct and proximate result.

233.  As a direct and proximate result of Defendants' negligent failure to prevent physical harm, Danielle Bensky and Jane Doe 3 and the Class Members have in the past and will in the future continue to suffer substantial damages from psychological and physical injury, including extreme emotional distress, humiliation, fear, psychological trauma, loss of dignity and self-esteem, and invasion of privacy. Defendants' aiding, abetting, and facilitating Epstein's tortious conduct and sex crimes in violation of Chapter 130 directly and proximately caused Epstein's sex crimes.

234.  By virtue of acting intentionally, outrageously, and with a high degree of moral turpitude and demonstrating such wanton dishonesty as to imply a criminal indifference to civil obligations, Defendants are liable to Danielle Bensky and Jane Doe 3 and the Class for punitive damages.

## COUNT IV: PARTICIPATION IN A SEX-TRAFFICKING VENTURE IN VIOLATION OF THE TRAFFICKING VICTIMS PROTECTION ACT, 18 U.S.C. §§ 1591(a)(2), 1595

235.  Plaintiffs Danielle Bensky and Jane Doe 3 reallege and incorporate by reference paragraphs 1 – 198, as if fully set forth in this Count.

236.  Danielle Bensky and Jane Doe 3 bring this Count individually and on behalf of the other Class Members they respectively seek to represent.

237.  Defendants knowingly and intentionally benefitted, financially and by receiving things of value, from participating in, assisting, supporting, and facilitating

63

an illegal coercive sex-trafficking venture that was in and affecting interstate and foreign commerce, together and with others, in violation of 18 U.S.C. § 1591(a)(2).

238.   Defendants took many concrete steps to aid and participate in Epstein's sex-trafficking venture.   Among the concrete steps that Defendants took to aid Epstein was providing legal, accounting services, and business-related services and support, which made the sex-trafficking venture possible.   Defendants' willingness to provide their legal, accounting and business services was a quid pro quo for them receiving financial benefit from Epstein.

239.   The services that Defendants provided was necessary for Epstein to coerce Danielle Bensky and Jane Doe 3 as well as other Class Members to engage in commercial sex acts.   The services directly formed part of the commercial nature of the sex acts.   The services were also a necessary and required part of Epstein's recruitment of Danielle Bensky and Jane Doe 3 and other victims of his sex-trafficking venture.   By providing legal, accounting and business services that Defendants knew would be used to facilitate the sex trafficking venture, Defendants actively participated in the recruitment of victims of the venture.

240.   The services that Defendants provided went far beyond providing routine legal, accounting and business services for a client.

241.   Defendants providing services like, for example, assisting in creating sham marriages, creating sham companies to hide cash for the trafficking, assisting

64

with the withdraw of large sums of cash to facilitate the trafficking, and arranging payments for tuition for young girls all were entirely inconsistent with the ordinary duties of a lawyer and accountant.

242.    The reason that Defendants ignored the trafficking conduct was to receive financial benefits from Epstein and his sex-trafficking venture.

243.    Among the concrete steps that Defendants took to aid and participate in the Epstein sex-trafficking venture were opening numerous bank accounts and entities for Epstein, his related entities, and associates.  By opening these accounts and entities, Defendants received many benefits from participating in Epstein's venture.  The opening of these accounts and entities was affirmative conduct that caused Defendants to receive those benefits.

244.    By taking the concrete steps outlined above (along with the others alleged in this complaint), Defendants knowingly participated in sex trafficking and furthered the Epstein sex-trafficking venture.  The concrete steps above constituted taking part in the sex-trafficking venture and were necessary for its success.  The concrete steps above constituted active engagement by Defendants in Epstein's sex-trafficking venture.

245.    Defendants knowingly and intentionally benefited financially from, and received value for, their participation in the sex-trafficking venture, in which Epstein, with Defendants' knowledge, or its reckless disregard of the fact, that

65

Epstein would use means of force, threats of force, fraud, coercion, and a combination of such means to cause Danielle Bensky and Jane Doe 3, as well as other Class Members, some of whom were under the age of eighteen, to engage in commercial sex acts.

246. Defendants knew, and were in reckless disregard of the fact, that it was Epstein's pattern and practice to use the channels and instrumentalities of interstate and foreign commerce, to entice, recruit, solicit, harbor, provide, obtain, and transport young women and underage girls for purposes of causing commercial sex acts, in violation of 18 U.S.C. § 1591(a)(1).

247. Despite such knowledge, Defendants intentionally paid for, facilitated, and participated in Epstein's violations of 18 U.S.C. § 1591(a)(1), which Defendants knew, and were in reckless disregard of the fact that, Epstein would coerce, defraud, and force Danielle Bensky and Jane Doe 3, as well as other Class Members, to engage in commercial sex acts.

248. Defendants' affirmative conduct was committed knowingly, and in reckless disregard of the facts, that Epstein would use cash procured by Defendants, legal and accounting advice provided by Defendants, and other support provided by Defendants as a means of defrauding, forcing, and coercing sex acts from Danielle Bensky and Jane Doe 3 as well as other Class Members. Defendants' conduct was outrageous and intentional.

66

249. In addition to actual knowledge that they were participating in and facilitating the Epstein sex-trafficking venture, Defendants also should have known that they were participating in and facilitating a venture that had engaged in coercive sex trafficking, as covered by 18 U.S.C. § 1595(a).

250. Defendants' knowing and intentional conduct has caused Danielle Bensky and Jane Doe 3 and the other Class Members serious harm including, without limitation, physical, psychological, emotional, financial, and reputational harm.

251. Defendants' knowing and intentional conduct has caused Danielle Bensky and Jane Doe 3 and the other Class Members harm that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing commercial sexual activity, in order to avoid incurring that harm.

252. This case does not involve mere fraud. Instead, Defendants' criminal conduct in violating the TVPA was outrageous and intentional because it was in deliberate furtherance of a widespread and dangerous criminal sex trafficking organization. Defendants' criminal conduct also evinced a high degree of moral turpitude and demonstrated such wanton dishonesty as to imply a criminal indifference to civil obligations. Defendants' criminal conduct was directed specifically at Danielle Bensky and Jane Doe 3 and other members of the Class, who

67

were the victims of Epstein's sexual abuse and sex trafficking organization.

253. Defendants' outrageous and intentional conduct in this case is part of a pattern and practice of Defendants profiting by undertaking illegal "high risk, high reward" clients.

254. By virtue of these knowing and intentional violations of 18 U.S.C. §§ 1591(a)(2), 1595, Defendants are liable to Danielle Bensky and Jane Doe 3 and the Class for the damages they sustained and reasonable attorneys' fees.

255. By virtue of these intentional and outrageous violations of 18 U.S.C. §§ 1591(a)(2), 1595, Defendants are liable to Danielle Bensky and Jane Doe 3 and the Class for punitive damages.

## COUNT V: OBSTRUCTION OF THE ENFORCEMENT OF THE TRAFFICKING VICTIM PROTECTION ACT, 18 U.S.C. § 1591(d)

256. Plaintiffs Danielle Bensky and Jane Doe 3 reallege and incorporate by reference paragraphs 1 – 198, as if fully set forth in this Count.

257. Danielle Bensky and Jane Doe 3 bring this Count individually and on behalf of the other Class Members they respectively seek to represent.

258. Defendants knowingly and intentionally obstructed, attempted to obstruct, interfered with, and prevented the enforcement of 18 U.S.C. §§ 1591(a)(1) & (a)(2), all in violation of 18 U.S.C. § 1591(d). This activity is hereinafter referred to collectively simply as "obstruction."

259. Defendants' obstruction of the enforcement of 18 U.S.C. §§ 1591(a)(1)

68

and (a)(2) was forbidden by 18 U.S.C. § 1591(d), and Defendants thereby violated Chapter 77, Title 18. Defendants' obstruction described here and in the preceding paragraph directly, proximately, and foreseeably harmed Danielle Bensky and Jane Doe 3, as well as other members of the Class, by directly resulting in them coercively being caused to engage in commercial sex acts and in other ways.

260. As outlined above, the United States Department of Justice (including the U.S. Attorney's Office for the Southern District of New York and the U.S. Attorney's Office for the Southern District of Florida) was investigating Epstein's federal criminal liability for violating (among other laws) the TVPA up to and following the return of an indictment against Epstein on or about July 8, 2019. On or about that date, the U.S. Attorney's Office for the Southern District of New York indicted Epstein (and unnamed "associates") for violating the TVPA. Later, on about June 29, 2020, the same Office indicted Epstein's co-conspirator, Ghislaine Maxwell, for conspiracy to entice minor victims to travel to be abused by Epstein. The federal criminal investigation of Maxwell included investigation of possible violations of the TVPA.

261. Defendants obstructed, interfered with, and prevented the federal government's enforcement of the TVPA against Epstein. To the extent that the federal government was able to ultimately charge Epstein with TVPA violations, the filing of those charges was delayed by Defendants' actions. Because of that delay,

69

Bensky and Jane Doe 3 as well as other members of the Class, were coercively caused to engage in commercial sex acts.

262.  As one example of how Defendants obstructed, attempted to obstruct, interfered with, and prevented the federal government's enforcement of the TVPA, Defendants structured withdrawals of large amounts of cash to Epstein and his associates so that the coercive commercial sex acts would escape the detection of federal law enforcement and prosecuting agencies.  Defendants provided large amounts of cash to further the Epstein sex-trafficking venture and with the purpose of helping Epstein evade criminal liability for violating the TVPA.

263.  By procuring large amounts of cash to Epstein and his associates, Defendants intended and knew that Epstein's coercive commercial sex acts would escape the detection of federal law enforcement and prosecuting agencies for some period of time.  Defendants provided large amounts of cash to further the Epstein sex-trafficking venture and with the purpose of helping Epstein evade criminal liability for violating the TVPA.

264.  As another example, Defendants provided legal and accounting advice that created sham marriages and corporate structures that helped Epstein escape scrutiny.  But for Defendants' egregious, creative assistance of Epstein, he would not have been able to escape detection liability for violating the TVPA.

265.  Defendants' obstruction, attempted obstruction, interference with, and

70

prevention of the enforcement of the TVPA were all done intentionally and knowingly. For example, Defendants helped Epstein set up the Butterfly Trust to facilitate his abuse of women from Eastern Europe—specifically, to escape the increased scrutiny Epstein faced for U.S. based victims after his previous arrest and conviction, which made Epstein high risk to violate the TVPA through continuing criminal sex trafficking activities.

266.   Defendants were well aware that Epstein had pleaded guilty and served prison time for engaging in sex with a minor—a crime closely connected with sex trafficking in violation of the TVPA. Defendants were also well aware that there were public allegations that his illegal conduct was facilitated by several named co-conspirators. Defendants continued their affirmative conduct supporting the Epstein sex-trafficking venture to continue receiving personal financial enrichment. Defendants' intentional conduct obstructed, attempted to obstruct, in many ways interfered with, and prevented the enforcement of the TVPA by federal investigators and prosecuting agencies.

267.   Defendants' obstruction of the federal government's TVPA and other law enforcement efforts was intentional and willful and, therefore, Defendants intentionally and willfully caused Epstein's commission of the forcible commercial sex acts with Danielle Bensky and Jane Doe 3 and other Class Members through its obstruction supporting the concealment of Epstein's sex-trafficking venture.

71

Defendants knew that Epstein and his other co-conspirators would use means of force, threats of force fraud, coercion, and a combination of such means to cause Danielle Bensky and Jane Doe 3 and Class Members to engage in commercial sex acts.

268.   Defendants knew, acted in reckless disregard of the fact, and should have known, that their obstruction in violation of 18 U.S.C. § 1591(d) would directly and proximately lead to unlawful coercive commercial sex acts by Epstein with young women and girls, including Danielle Bensky and Jane Doe 3 and other Class Members.

269.   Defendants' obstruction has caused Danielle Bensky and Jane Doe 3 and other Class Members serious harm, including, without limitation, physical, psychological, financial, and reputational harm.   That harm was directly and proximately caused by the obstruction and the harm resulting from obstruction was foreseeable.

270.   Defendants' obstruction has caused Danielle Bensky and Jane Doe 3 harm that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing commercial sexual activity in order to avoid incurring that harm.

271.   This case does not involve mere fraud.   Instead, Defendants' criminal

72

conduct in obstructing enforcement of the TVPA was outrageous and intentional, because it was in deliberate furtherance of a widespread and dangerous criminal sex trafficking organization. Defendants' obstruction also evinced a high degree of moral turpitude and demonstrated such wanton dishonesty as to imply a criminal indifference to civil obligations. Defendants' obstruction was directed specifically at Danielle Bensky and Jane Doe 3 and other members of the Class, who were the victims of Epstein's sex trafficking organization.

272.    By virtue of these violations of 18 U.S.C. § 1591(d), Defendants are liable to Danielle Bensky and Jane Doe 3 and the Class for the damages they sustained and reasonable attorneys' fees by operation of 18 U.S.C. § 1595. Defendants perpetrated an obstruction of the TVPA, and therefore perpetrated a violation of Chapter 77, Title 18.

273.    By virtue of its intentional and outrageous obstruction to prevent enforcement of the TVPA, in violation 18 U.S.C. § 1591(d), Defendants are liable to Danielle Bensky and Jane Doe 3 and the Class for punitive damages by operation of 18 U.S.C. § 1595.

## COUNT VI: CONSPIRACY TO COMMIT VIOLATIONS OF THE TRAFFICKING VICTIM PROTECTION ACT, 18 U.S.C. §§ 1594(c), 1591, 1595

274.    Plaintiffs Danielle Bensky and Jane Doe 3 reallege and incorporate by reference paragraphs 1 – 198, as if fully set forth in this Count.

73

275.   Danielle Bensky and Jane Doe 3 bring this Count individually and on behalf of the other Class Members they respectively seek to represent.

276.   Defendants intentionally conspired with others, by agreement and understanding, to violate 18 U.S.C. § 1591(a)(1) & (a)(2) & 1591(d), and to further Epstein's and his co-conspirators' sex-trafficking venture to coerce commercial sex acts from Danielle Bensky and Jane Doe 3 and other Class Members, all in violation of 18 U.S.C. § 1594(c).   Defendants directly conspired with Epstein himself to further the sex trafficking venture.

277.   Defendants' conspiracy to violate 18 U.S.C. 1591(a)(1) & (a)(2) was forbidden by 18 U.S.C. § 1594(c), and Defendants thereby violated Chapter 77, Title 18. Defendants' conspiracy directly, proximately, and foreseeably harmed Danielle Bensky and Jane Doe 3, as well as other members of the Class, by directly leading to their forcibly being caused to engage in commercial sex acts and in other ways. Defendants' conspiracy victimized Danielle Bensky and Jane Doe 3 and the other members of the Class.

278.   Defendants' conspiracy to violate 18 U.S.C. 1591(d) was forbidden by 18 U.S.C. § 1594(c), thereby violated Chapter 77, Title 18. Defendants' conspiracy directly, proximately, and foreseeably harmed Danielle Bensky and Jane Doe 3, as well as other members of the Class, by directly leading to their forcibly being caused to engage in commercial sex acts and in other ways. Defendants' conspiracy

74

victimized Danielle Bensky and Jane Doe 3 and the other members of the Class.

279.  Defendants conspired with Epstein and his co-conspirators to further the Epstein sex-trafficking venture and with the purpose of facilitating Epstein's illegal sex trafficking. Defendants had actual knowledge of Epstein's sex-trafficking venture. Defendants acted with the specific intent to violate 18 U.S.C. §§ 1591(a)(1) & (a)(2), that is, with consciousness of the nature of Epstein's sex-trafficking venture and with the specific intent to further venture. Defendants and Epstein had a meeting of the minds as to the essential nature of the plan.

280.  The Epstein sex-trafficking conspirators had a shared and common purpose—securing young women and girls for Epstein to sexually abuse and to commercially sex traffic. Defendants and other members of Epstein's sex-trafficking venture associated together for this common purpose. As quid pro quo, in exchange for working toward this common purpose, Epstein rewarded Defendants.

281.  The Epstein sex-trafficking conspiracy was an ongoing organization with the same hierarchy and regularity of function. Epstein was at the top of the hierarchy and effectively served as the CEO of the organization. Defendant Indyke served as Epstein's personal lawyer and accountant, handling all of his personal affairs and business operations relating to his sex trafficking organization. Defendant Kahn was Epstein's personal accountant who handled all of his personal

75

accounting and financial services relating to the organization. The sex-trafficking conspiracy was itself in and affecting interstate and foreign commerce and involved overt acts that were in and affecting interstate and foreign commerce.

282. In or around 1995, Defendant Indyke purposefully joined Epstein's previously operation, and on-going, sex-trafficking conspiracy. In or around 2005, Defendant Kahn purposefully joined Epstein's previously operation, and on-going, sex-trafficking conspiracy. In so joining, each Defendant quickly ratified the previous actions, conduct, intentional torts, and crimes of the conspiracy, by joining the conspiracy, adopting its goals, and taking actions and committing overt acts in furtherance of it.

283. Defendants' conspiracy with Epstein was part of their participation in his sex-trafficking venture. Without Defendants agreeing to facilitate the venture (by, for example, masterminding a scheme of bank accounts, immigration scrutiny evasion, and payment systems), Epstein would not have been a position to move forward with his sex-trafficking venture.

284. Defendants also conspired with Epstein to obstruct, attempt to obstruct, to interfere with, and to prevent the enforcement of the TVPA, violating 18 U.S.C. § 1591(d). The conspiracy included an agreement to keep Epstein's sex-trafficking venture secret or, at least, concealed to the greatest extent possible. Among the means for keeping the venture secret were paying for the commercial sex acts in

76

cash, structuring cash withdrawals in a way to avoid detection, and providing legal and accounting advice that created sham marriages and corporate structures that helped Epstein escape scrutiny.

285.   Further actions regarding Defendants' conspiracy to obstruct TVPA enforcement are outlined in Count V (obstruction) above.

286.   Within this District, Defendants intentionally committed overt acts in furtherance of the conspiracy, agreement, and understanding to violate 18 U.S.C. § 1591(a) by knowingly playing an active role in assisting, supporting, and facilitating the recruiting, enticing, coercing, harboring, transporting, and inducing and forcibly causing Danielle Bensky and Jane Doe 3 and other Class Members to engage in commercial sex acts, through providing financial support for the Epstein sex-trafficking venture.

287.   Among the many overt acts intentionally committed by Defendants in furtherance of the long-running Epstein sex-trafficking venture were providing the financial underpinnings for Epstein to have ready and reliable access to resources—including cash—to recruit, lure, coerce, and entice young women and girls to cause them to engage in commercial sex acts and other degradations within this District. Indeed, Defendants organized, controlled, and directed almost every aspect of the Epstein sex-trafficking venture.   Defendants approved, enabled, and justified millions of dollars in payments that fueled the Epstein sex-trafficking venture,

77

including payments to women who were forced to have sec with Epstein and/or recruited others to be victimized.

288. Acting within this District and in furtherance of the Epstein sex-trafficking venture, Defendants facilitated arranging sham marriages to keep Epstein victims available for his ongoing abuse. As officers and signatories of the key entities in the Epstein sex-trafficking enterprise, Defendants facilitated cash payments for immigration legal fees and recruitment compensation.

289. In furtherance of the Epstein sex-trafficking venture, Defendants were officers in virtually every corporate entity that Epstein created to fund and conceal his activities. They were deeply involved in the financial activities of the Epstein-owned entities. In addition to being officer and directors of companies implicated in the Epstein sex-trafficking enterprise, Defendants (at least one of them, but often both) also had signatory authority over virtually all of the accounts held by Epstein, which allowed them to personally authorize and sign off on payments totaling hundreds of thousands of dollars to Epstein's victims, including but not limited to recruiting compensation, legal fees, apartment rent, and tuition.

290. In furtherance of the Epstein sex-trafficking venture, Defendants routinely withdrew cash from Epstein accounts in various ways, including ATMs, checks, or by converting currency. In many instances, Defendants structured these transactions to evade banking reporting requirements. Defendants also worked

together to make large cash withdrawals.

291. Even after Epstein died, Defendants have continued to enrich themselves for their participation in the Epstein sex-trafficking conspiracy, having approved the release of Epstein Estate funds through their role as Executors to pay their legal fees and costs.

292. Defendants' actions in furtherance of Epstein's conspiracy were intertwined with Epstein's sex-trafficking venture, as the funding for the sex-trafficking venture (and particularly cash for the venture) were essential tools for Epstein to commit coercive commercial sex acts.

293. It was part of the conspiracy that Defendants would financially benefit from providing financial support for the Epstein sex-trafficking venture. Defendants did financially benefit from its participation in the venture, including receiving millions of dollars in compensation for their legal, accounting, business, and other services. Defendants were paid through multiple entities, including but not limited to HBRK Associates, Inc. (Kahn), Coatue Enterprises, LLC (Kahn), Birch Tree BR, LLC (Indyke) Harlequin Dane, LLC (Indyke) and Darren K Indyke, PLLC.

294. Defendants' participation in furthering Epstein's sex-trafficking venture was intentional and willful and, therefore, Defendants intentionally and willfully caused Epstein's commission of the forcible commercial sex acts with Danielle Bensky and Jane Doe 3 and other Class Members through its affirmative

and overt acts supporting Epstein.

295. Defendants knew, acted in reckless disregard of the fact, and should have known, that its conspiracy would directly and proximately lead to unlawful coercive commercial sex acts by Epstein with young women and girls, including Danielle Bensky and Jane Doe 3 and other Class Members.

296. The conspiracy that Defendants joined had specific knowledge that Danielle Bensky and Jane Doe 3, as well as other Class Members, were being coercively sex trafficked by Epstein. The conspiracy's knowledge extended to the names of Epstein's victims, because Epstein and his co-conspirators knew the names of the victims.

297. Defendants conspired to violate 18 U.S.C. § 1591(a) with Epstein and through its affirmative acts and substantial support to Epstein committed, perpetrated, and directly and proximately caused Danielle Bensky and Jane Doe 3 and other Class Members to engage in commercial sex acts through means of force, threats of force, fraud, coercion, and a combination of such means.

298. In addition to acting with knowledge that they were conspiring to support the Epstein sex-trafficking venture, Defendants benefited financially from conspiring to participate in the Epstein sex-trafficking venture, which Defendants knew and should have known that had engaged in coercive sex trafficking in violation of 18 U.S.C. § 1591(a)(1) & (a)(2).

299. Defendants' conspiracy has caused Danielle Bensky and Jane Doe 3 and other Class Members serious harm, including, without limitation, physical, psychological, financial, and reputational harm. That harm was directly and proximately caused by the conspiracy and the harm resulting from conspiracy was foreseeable.

300. Defendants' conspiracy has caused Danielle Bensky and Jane Doe 3 harm that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing commercial sexual activity in order to avoid incurring that harm.

301. This case does not involve mere fraud. Instead, Defendants' criminal conduct in conspiring to violate the TVPA was outrageous and intentional, because it was in deliberate furtherance of a widespread and dangerous criminal sex trafficking organization. Defendants' conspiracy also evinced a high degree of moral turpitude and demonstrated such wanton dishonesty as to imply a criminal indifference to civil obligations. Defendants' conspiracy was directed specifically at Danielle Bensky and Jane Doe 3 and other Class Members, who were the victims of Epstein's sex trafficking organization.

302. By virtue of these violations of 18 U.S.C. §§ 1594(c), 1595, Defendants are liable to Danielle Bensky and Jane Doe 3 and the other Class Members for the

damages they sustained and reasonable attorneys' fees.

303. By virtue of its intentional and outrageous conspiracy to violate 18 U.S.C. §§ 1594(c), 1595, Defendants are liable to Danielle Bensky and Jane Doe 3 and other Class Members for punitive damages.

## COUNT VII: GENDER-MOTIVATED VIOLENCE PROTECTION ACT, ADMINISTRATIVE CODE OF CITY OF N.Y. §10-1101 *et seq.*

304. Plaintiffs Danielle Bensky and Jane Doe 3 reallege and incorporate by reference paragraphs 1 – 198, as if fully set forth in this Count.

305. The above-described conduct of Defendants constitutes a "crime of violence" and a "crime of violence motivated by gender" against Danielle Bensky and Jane Doe 3 and other Class Members as defined by the New York City Gender-Motivated Violence Protection Act, N.Y.C. Admin. Code § 8-903 (2017).

306. The above-described conduct of Defendants constitutes a "crime of violence" against Danielle Bensky and Jane Doe 3 and other Class Members motivated: (i) by gender; (ii) on the basis of gender; and/or (iii) due, at least in part, to an animus based on gender.

307. Defendants committed a "crime of violence" against Danielle Bensky and Jane Doe 3 and other Class Members because they are women and, at least in part, because Defendants willingly participated, enabled, and conspired in the Epstein Enterprise – an illegal operation steeped in unlawful animus towards women and engaged in violent sexual acts against Bensky, Jane Doe 3, and the Class in New

82

York, including but not limited to rape; forced oral sex, digital penetration, and forcible touching; and sex trafficking. Defendants' conduct as a part of the Epstein Enterprise show their gender-motivated animus towards women, as they knowingly, individually, and personally facilitated a decades-long international sex-trafficking operation.

308. As a direct and proximate result of the aforementioned gender-motivated violence Danielle Bensky and Jane Doe 3 and other Class Members have sustained in the past and will continue to sustain, monetary damages, physical injury, pain and suffering, and serious psychological and emotional distress, entitling the Class to an award of compensatory damages.

309. Defendants' egregious and intentional gender-motivated violence against Danielle Bensky and Jane Doe 3 and other Class Members entitles the Class to punitive damages and an award of attorneys' fees and costs.

## VII. REQUEST FOR RELIEF

Danielle Bensky and Jane Doe 3 respectfully request that the Court enter judgment in her favor, and against Defendants, as follows:

a. That the Court certify the Class, name Danielle Bensky and Jane Doe 3 as Class Representative, and appoint her lawyers as Class Counsel;

b. That the Court award Plaintiffs and the other members of the Class compensatory, consequential, general, nominal, and punitive damages

against Defendants in an amount to be determined at trial;

c.  That the Court award punitive and exemplary damages against Defendants in an amount to be determined at trial;

d.  That the Court award to Plaintiffs the costs and disbursements of the action, along with reasonable attorneys' fees, costs, and expenses;

e.  That the Court award pre- and post-judgment interest at the maximum legal rate; and

f.  That the Court grant all such other and further relief as it deems just and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury on all claims so triable.

Dated: February 16, 2024

Respectfully Submitted,

*/s/* David Boies

David Boies
Boies Schiller Flexner LLP
55 Hudson Yards
New York, NY
Telephone: (212) 446-2300
Fax: (212) 446-2350
Email: dboies@bsfllp.com

Sigrid McCawley
Boies Schiller Flexner LLP
401 E. Las Olas Blvd. Suite 1200

84

Fort Lauderdale, FL 33316
Telephone: (954) 356-0011
Fax: (954) 356-0022
Email: smccawley@bsfllp.com

# EXHIBIT  86

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
┌─────────────────────────┐
│ USDC SDNY               │
│ DOCUMENT                │
│ ELECTRONICALLY FILED    │
│ DOC #:                  │
│ DATE FILED: 4/16/21     │
└─────────────────────────┘
```

United States of America,

    —v—

Ghislaine Maxwell,

          Defendant.

20-cr-330 (AJN)

OPINION & ORDER

ALISON J. NATHAN, District Judge:

In June 2020, a grand jury returned a six-count indictment charging Ghislaine Maxwell with facilitating the late financier Jeffrey Epstein's sexual abuse of minor victims from around 1994 to 1997. The Government filed a first (S1) superseding indictment shortly thereafter, which contained only small, ministerial corrections. The S1 superseding indictment included two counts of enticement or transportation of minors to engage in illegal sex acts in violation of the Mann Act and two counts of conspiracy to commit those offenses. It also included two counts of perjury in connection with Maxwell's testimony in a civil deposition. Trial is set to begin on July 12, 2021.

Maxwell filed twelve pretrial motions seeking to dismiss portions of the S1 superseding indictment, suppress evidence, and compel discovery. After the parties fully briefed those motions, a grand jury returned a second (S2) superseding indictment adding a sex trafficking count and another related conspiracy count.

This Opinion resolves all of Maxwell's currently pending pretrial motions other than those seeking to suppress evidence, which the Court will resolve in due course. The motions, and this Opinion, deal exclusively with the S1 superseding indictment and do not resolve any issues

related to the newly added sex trafficking charges. For the reasons that follow, the Court denies

Maxwell's motions to dismiss the S1 superseding indictment in whole or in part. It grants her

motion to sever the perjury charges for a separate trial. It denies her motion to further expedite

discovery.

The Court provides a brief summary of its conclusions here and its reasoning on the

pages that follow:

- Maxwell moves to dismiss all counts based on a non-prosecution agreement between Jeffrey Epstein and the U.S. Attorney for the Southern District of Florida. The Court concludes that the agreement does not apply in this District or to the charged offenses.

- Maxwell moves to dismiss all counts as untimely. The Court concludes that the Government brought the charges within the statute of limitations and did not unfairly delay in bringing them.

- Maxwell moves to dismiss the Mann Act counts because they are too vague, or in the alternative to require the Government to describe the charges in greater detail. The Court concludes that the charges are specific enough.

- Maxwell moves to dismiss the perjury counts because, in her view, her testimony responded to ambiguous questioning and was not material. The Court concludes that these issues are best left for the jury.

- Maxwell moves to sever the perjury counts from the Mann Act counts so that they can proceed in a separate trial. The Court concludes that severance is appropriate and will try the perjury counts separately.

- Maxwell moves to strike language from the indictment that she believes is superfluous and to dismiss conspiracy counts she believes are redundant. The Court concludes that these motions are premature before trial.

- Maxwell moves to compel the Government to immediately disclose certain categories of evidence. The Court concludes that she is not entitled to do so, but the Court will order Maxwell and the Government to confer on a discovery schedule.

- Maxwell moves to dismiss all counts because a grand jury in White Plains, rather than Manhattan, returned the S1 superseding indictment. Because a jury in Manhattan returned the S2 superseding indictment, the motion appears moot.

I.     **Jeffrey Epstein's non-prosecution agreement does not bar this prosecution**

In September 2007, under investigation by both federal and state authorities, Jeffrey

Epstein entered into a non-prosecution agreement ("NPA") with the Office of the United States

Attorney for the Southern District of Florida. Dkt. No. 142 at 1-2. Epstein agreed in the NPA to

plead guilty in Florida state court to soliciting minors for prostitution and to serve eighteen

months in a county jail. *Id.* In exchange, the U.S. Attorney's Office agreed not to charge him

with federal crimes in the Southern District of Florida stemming from its investigation of his

conduct between 2001 and 2007. *Id.* It also agreed not to bring criminal charges against any of

his "potential co-conspirators." *Id.*

As a recent report from the Department of Justice's Office of Professional Responsibility

observed, the NPA was unusual in many respects, including its breadth, leniency, and secrecy.

OPR Report, Gov. Ex. 3, Dkt. No. 204-3, at x, 80, 175, 179, 260–61. The U.S. Attorney's

promise not to prosecute unidentified co-conspirators marks a stark departure from normal

practice for federal plea agreements. This provision appears to have been added "with little

discussion or consideration by the prosecutors." *Id.* at 169, 185. The report concluded that the

U.S. Attorney's negotiation and approval of the NPA did not amount to professional misconduct,

but nonetheless reflected "poor judgment." *Id.* at 169.

Only the NPA's effect, and not its wisdom, is presently before the Court. Maxwell

contends that the NPA bars this prosecution, because she is charged as a co-conspirator of

Jeffrey Epstein and the NPA's co-conspirator provision lacks any geographical or temporal

limitations. The Court disagrees for two independent reasons. First, under controlling Second

Circuit precedent, the NPA does not bind the U.S. Attorney for the Southern District of New

York. Second, it does not cover the offenses charged in the S1 superseding indictment.

## A. The non-prosecution agreement does not bind the U.S. Attorney for the Southern District of New York

United States Attorneys speak for the United States. When a U.S. Attorney makes a promise as part of a plea bargain, both contract principles and due process require the federal government to fulfill it. *See Santobello v. New York*, 404 U.S. 257, 262 (1971); *United States v. Ready*, 82 F.3d 551, 558 (2d Cir. 1996). The question here is not whether the U.S. Attorney for the Southern District of Florida had the power to bind the U.S. Attorney for the Southern District of New York. The question is whether the terms of the NPA did so. Applying Second Circuit precedent and principles of contract interpretation, the Court concludes that they did not.

In *United States v. Annabi*, the Second Circuit held: "A plea agreement binds only the office of the United States Attorney for the district in which the plea is entered unless it affirmatively appears that the agreement contemplates a broader restriction." 771 F.2d 670, 672 (2d Cir. 1985) (per curiam). This is something akin to a clear statement rule. Single-district plea agreements are the norm. Nationwide, unlimited agreements are the rare exception. Applying *Annabi*, panels of the Second Circuit have stated that courts cannot infer intent to depart from this ordinary practice from an agreement's use of phrases like "the government" or "the United States." *United States v. Salameh*, 152 F.3d 88, 120 (2d Cir. 1998) (per curiam); *United States v. Gonzalez*, 93 F. App'x 268, 270 (2d Cir. 2004). Those are common shorthand. A plea agreement need not painstakingly spell out "the Office of the United States Attorney for Such-and-Such District" in every instance to make clear that it applies only in the district where signed.

Maxwell asks this Court to draw the opposite conclusion. The provision of the NPA dealing with co-conspirators does not expressly state that it binds U.S. Attorneys in other districts. It does not expressly state that it applies in other districts. The relevant language, in

4

its entirety, reads as follows: "the United States also agrees that it will not institute any criminal charges against any potential co-conspirators of Epstein." Dkt. No. 142-1 at 5. Under *Annabi, Salameh, and Gonzalez,* a statement that "the United States" agrees not to prosecute implies no restriction on prosecutions in other districts.

Two provisions of the NPA refer specifically to prosecution in the Southern District of Florida. The first states that the U.S. Attorney for the Southern District of Florida will defer "prosecution in this District" if Epstein complies with the agreement. Dkt. No. 142-1 at 2. The second states that no prosecution "will be instituted in this District, and the charges against Epstein if any, will be dismissed" after he fulfills the agreement's conditions. Maxwell contends that the lack of similar language in the co-conspirator provision must mean that it lacks any geographical limitation. If anything, that language reflects that the NPA's scope was expressly limited to the Southern District of Florida. It is not plausible—let alone "affirmatively apparent", *Annabi,* 771 F.2d at 672,—that the parties intended to drastically expand the agreement's geographic scope in the single sentence on the prosecution of co-conspirators without clearly so saying.

Without an affirmative statement in the NPA's text, Maxwell turns to its negotiation history. Under Second Circuit precedent she may offer evidence that negotiations of the NPA between the defendant and the prosecutors included a promise to bind other districts. *See United States v. Russo,* 801 F.2d 624, 626 (2d Cir. 1986). She alleges that officials in the U.S. Attorney's Office for the Southern District of Florida sought and obtained approval for the NPA from the Office of the Deputy Attorney General and communicated with attorneys in other districts. Any involvement of attorneys outside the Southern District of Florida appears to have been minimal. Maxwell has already received access to an unusually large amount of information

about the NPA's negotiation history in the form of the OPR report and yet identifies no evidence

that the Department of Justice made any promises not contained in the NPA. The OPR report

reflects that the Office of the Deputy Attorney General reviewed the NPA, but only after it was

signed when Epstein tried to get out of it. OPR Report at 103. Other documents show that

attorneys in the Southern District of Florida reached out to other districts for investigatory

assistance but not for help negotiating the NPA. Dkt. No. 204-2. Nor would direct approval of

the NPA by the Office of the Deputy Attorney General change the meaning of its terms. No

evidence suggests anyone promised Epstein that the NPA would bar the prosecution of his co-

conspirators in other districts. Absent such a promise, it does not matter who did or did not

approve it.

Second Circuit precedent creates a strong presumption that a plea agreement binds only

the U.S. Attorney's office for the district where it was signed. Maxwell identifies nothing in the

NPA's text or negotiation history to disturb this presumption. The Court thus concludes that the

NPA does not bind the U.S. Attorney for the Southern District of New York.

### B. The non-prosecution agreement does not cover the charged offenses

The NPA would provide Maxwell no defense to the charges in the S1 superseding

indictment even against an office bound to follow it. The NPA bars prosecution, following

Epstein's fulfillment of its conditions, only for three specific categories of offenses:

> (1) "the offenses set out on pages 1 and 2" of the NPA; namely, "any offenses that
> may have been committed by Epstein against the United States from in or around
> 2001 through in or around September 2007" including five enumerated offenses;
>
> (2) "any other offenses that have been the subject of the joint investigation by the
> Federal Bureau of Investigation and the United States Attorney's Office"; and
>
> (3) "any offenses that arose from the Federal Grand Jury investigation."

Dkt. No. 142-1 at 2. The NPA makes clear that the covered charges are those relating to and deriving from a specific investigation of conduct that occurred between 2001 and 2007.

Maxwell contends that the NPA's co-conspirator provision lacks any limitation on the offenses covered. The Court disagrees with this improbable interpretation. The phrase "potential co-conspirator" means nothing without answering the question "co-conspirator in what?" The most natural reading of the co-conspirator provision is that it covers those who conspired with Epstein in the offenses covered by the NPA for their involvement in those offenses. Thus, it would cover any involvement of Maxwell in offenses committed by Epstein from 2001 to 2007, other offenses that were the subject of the FBI and U.S. Attorney's Office investigation, and any offenses that arose from the related grand jury investigation.

The Court has no trouble concluding that the perjury counts are not covered by the NPA. Those charges do not relate to conduct in which Maxwell conspired with Epstein and stem from depositions in 2016, more than eight years after Epstein signed the NPA. Maxwell now concedes as much, though her motion sought to dismiss the S1 superseding indictment in its entirety, perjury counts and all.

The Mann Act counts, too, fall comfortably outside the NPA's scope. The S1 superseding indictment charges conduct occurring exclusively between 1994 and 1997, some four years before the period covered by the Southern District of Florida investigation and the NPA. The NPA does not purport to immunize Epstein from liability for crimes committed before the period that was the subject of the FBI and U.S. Attorney's Office investigation. Maxwell's protection is no broader. The Court thus concludes that the NPA does not cover the offenses charged in the S1 superseding indictment.

### C. Maxwell is not entitled to an evidentiary hearing

In the alternative to dismissing the indictment, Maxwell requests that the Court conduct an evidentiary hearing as to the parties' intent in the NPA. The Court finds no basis to do so.

The cases Maxwell cites where courts held hearings on the scope of a plea agreement mostly involved oral agreements where there was no written record of the full set of terms reached by the parties. All of them involved defendants with first-hand knowledge of negotiations who claimed prosecutors breached an oral promise. "An oral agreement greatly increases the potential for disputes such as . . . a failure to agree on the existence, let alone the terms, of the deal." *United States v. Aleman*, 286 F.3d 86, 90 (2d Cir. 2002). Thus, an evidentiary hearing may be necessary to determine the terms of an agreement never committed to writing. This is no such case. The NPA's terms are clear. Beyond the NPA itself, an extensive OPR report details its negotiation history. No record evidence suggests that prosecutors promised Epstein anything beyond what was spelled out in writing. The Court agrees with the Government that Maxwell's request for a hearing rests on mere conjecture.

For the same reason, the Court will not order the discovery on the NPA. In any case, it appears that the Government has already produced two of the documents Maxwell seeks in her motion—the OPR report and notes mentioned in a privilege log. Of course, the Government's disclosure obligations would require it to disclose to Maxwell any exculpatory evidence or evidence material to preparing the defense, including any evidence supporting a defense under the NPA. The Government shall confirm in writing within one week whether it views any evidence supporting Maxwell's interpretation of the NPA as material it is required to disclose, and, if so, whether it has disclosed any and all such evidence in its possession.

8

## II.    The indictment is timely

### A. The indictment complies with the statute of limitations

Federal law imposes a five-year limitations period for most non-capital offenses. 18 U.S.C. § 3282(a). Recognizing the difficulty of promptly prosecuting crimes against children, Congress has provided a longer limitations period for "offense[s] involving the sexual or physical abuse, or kidnaping" of a minor. 18 U.S.C. § 3283. Until 2003, the operative version of § 3283 allowed prosecution of these offenses until the victim reached the age of twenty-five. Congress further extended the limitations period in the PROTECT Act of 2003, Pub. L. No. 108-21, 117 Stat. 650, to allow prosecution any time during the life of the victim.

The parties agree that the Mann Act charges are timely if subject to the PROTECT Act, but untimely under the general statute of limitations for non-capital offenses or the pre-2003 version of § 3283. Maxwell contends that the charged offenses do not qualify as offenses involving the sexual or physical abuse or kidnapping of a minor and are thus governed by the general statute of limitations. Alternatively, she contends that the pre-2003 version of § 3283 applies because the charged conduct occurred prior to 2003. The Court concludes that statute of limitations in the PROTECT Act applies and that the charges are timely.

#### 1. The Mann Act charges are offenses involving the sexual abuse of minors

Maxwell does not dispute that the facts alleged in the S1 superseding indictment involve the sexual abuse of minors. The indictment charges that Epstein sexually abused each of the alleged minor victims and that Maxwell allegedly enticed them to travel or transported them for that purpose. Instead, Maxwell contends that charged offenses do not qualify as offenses involving the sexual abuse of minors because sexual abuse is not an essential ingredient of each statutory offense. *See Bridges v. United States*, 346 U.S. 209, 221 (1953). In Maxwell's view,

9

for example, it is possible to transport a minor with intent to engage in criminal sexual activity and not follow through with the planned sexual abuse, and so sexual abuse is not an essential ingredient of the offense. Maxwell makes the same argument for the enticement and related conspiracy charges.

This approach is analogous to the "categorical approach" employed by courts to evaluate prior convictions for immigration and sentencing purposes. *See Taylor v. United States*, 495 U.S. 575, 602 (1990). Generally speaking, the "categorical approach" requires that courts "look only to the statutory definitions—i.e., the elements" of the relevant offense to determine if the provision applies "and not to the particular facts underlying those convictions." *Descamps v. United States*, 570 U.S. 254, 261 (2013) (internal quotation marks omitted). Whether a statute requires a categorical or case-specific approach is a question of statutory interpretation. To determine whether Congress used the word "offense" in a statute to refer to an offense in the abstract or to the facts of each individual case, the Court must examine the statute's "text, context, and history." *United States v. Davis*, 139 S. Ct. 2319, 2327 (2019).

Though it has not authoritatively settled the question, the Second Circuit has strongly suggested that Maxwell's approach is the wrong one. In *Weingarten v. United States*, 865 F.3d 48, 58–60 (2d Cir. 2017), the Second Circuit discussed at length how the text, context, and history of § 3283 show that Congress intended courts to apply the statute using a case-specific approach. The Third Circuit reached the same conclusion in *United States v. Schneider*, 801 F.3d 186, 196 (3d Cir. 2015).

The Court sees no reason to depart from the reasoning in *Weingarten*. First, "[t]he Supreme Court's modern categorical approach jurisprudence is confined to the post-conviction contexts of criminal sentencing and immigration deportation cases." *Weingarten*, 865 F.3d at 58.

10

To the extent that the categorical approach is ever appropriate in other contexts, it is
inappropriate here.

The Court begins with the statute's text. Statutes that call for application of the
categorical approach typically deal with the elements of an offense in a prior criminal conviction.
*Id.* at 59. "The language of § 3283, by contrast, reaches beyond the offense and its legal
elements to the conduct 'involv[ed]' in the offense. That linguistic expansion indicates Congress
intended courts to look beyond the bare legal charges in deciding whether § 3283 applied." *Id.* at
59–60 (alteration in original) (quoting § 3283). Maxwell cites one case holding otherwise, but
that case involved a venue statute presenting significantly different concerns. *See United States
v. Morgan*, 393 F.3d 192, 200 (D.C. Cir. 2004). The Supreme Court has likewise held that a
statute which uses the language "an *offense that . . . involves* fraud or deceit in which the loss to
the victim or victims exceeds $10,000" is "consistent with a circumstance-specific approach."
*Nijhawan v. Holder*, 557 U.S. 29, 32, 38 (2009) (emphasis added). Thus, the word "involves"
generally means that courts should look to the circumstances of an offense as committed in each
case. This reading accords with a robust legislative history indicating that Congress intended to
apply § 3283 to a wide range of crimes against children. *See Weingarten*, 865 F.3d at 60;
*Schneider*, 801 F.3d at 196.

The purposes underlying the categorical approach do not apply here either. For statutes
dealing with prior convictions, "[t]he categorical approach serves 'practical' purposes: It
promotes judicial and administrative efficiency by precluding the relitigation of past convictions
in minitrials conducted long after the fact." *Moncrieffe v. Holder*, 569 U.S. 184, 200–01 (2013).
In the context of § 3283, there is no prior conviction to assess, and the jury will determine in the
first instance whether "the defendant engaged in the applicable abusive conduct." *Weingarten*,

11

865 F.3d at 60. Maxwell nonetheless contends that using a case-specific approach for § 3283 would be impractical because the Government would need to prove conduct beyond the elements of the offense. It may be true that this approach requires the Government to prove some additional facts, but any statute-of-limitations defense presents factual issues (including, at least, when the alleged conduct took place). This is not a serious practical problem and does not justify setting aside the statute's language and apparent purpose.

Maxwell relies primarily on *Bridges v. United States*, 346 U.S. 209 (1953), to urge this Court to cast *Weingarten* aside. The Supreme Court in *Bridges* addressed a statute that extended the limitations period for defrauding the United States during the Second World War. In that case, the Supreme Court first concluded that making false statements at an immigration hearing was not subject to the extended limitations period because it lacked any pecuniary element as required by the statute. *Id.* at 221. Then, as an alternative basis for its holding, it explained that the offense did not require fraud as an "essential ingredient." *Id.* at 222. It reached that conclusion in large part because the statute's legislative history made clear that Congress intended it to apply only to a narrow class of war frauds causing pecuniary loss. *Id.* at 216.

As the Second Circuit explained in *Weingarten*, Congress had the opposite intent in the enacting in the PROTECT Act. *Weingarten*, 865 F.3d at 59 & n. 10. "In passing recent statutes related to child sex abuse, including extensions of the § 3283 limitations period, Congress 'evinced a general intention to "'cast a wide net to ensnare as many offenses against children as possible.'"" *Id.* at 60 (quoting *Schneider*, 801 F.3d at 196 (quoting *United States v. Dodge*, 597 F.3d 1347, 1355 (11th Cir. 2010) (en banc))). The primary basis for *Bridges'* holding— legislative history supporting a narrow interpretation—does not exist here. Instead, both the statute's plan meaning and its legislative history suggest it should apply more broadly.

12

Based on the statute's text, context, and history, the Court follows *Weingarten* and concludes that the appropriate inquiry is whether the charged offenses involved the sexual abuse of a minor on the facts alleged in this case. There is no question that they did. The Court thus concludes that § 3283 governs the limitations period for the charges here.

### 2. The 2003 amendment to the statute of limitations applies to these offenses

Maxwell next contends that because the charged conduct took place before the PROTECT Act's enactment, that statute did not lengthen the statute of limitations applicable to her alleged offenses. Here too, the Second Circuit has provided guidance in its decision in *Weingarten*. Although the court did not provide a definitive answer there, it explained that the view Maxwell now takes conflicts with established principles of retroactivity and the decisions of at least two other circuit courts. *Weingarten*, 865 F.3d at 58 & n.8; *see Cruz v. Maypa*, 773 F.3d 138, 145 (4th Cir. 2014); *United States v. Leo Sure Chief*, 438 F.3d 920, 924 (9th Cir. 2006).

The Supreme Court has set out a two-step framework to determine whether a federal statute applies to past conduct. *See Landgraf v. USI Film Products*, 511 U.S. 244, 280 (1994). Courts look first to the language of the statute. If the statute states that it applies to past conduct, courts must so apply it. *Weingarten*, 865 F.3d at 54. Otherwise, the statute applies to past conduct unless doing so would create impermissible retroactive effects. *Id.*

The Court begins with *Landgraf*'s first step. To assess a statute's meaning here, courts must consider the text of the statute along with other indicia of congressional intent, including the statute's history and structure. *See Enter. Mortg. Acceptance Co., LLC, Sec. Litig. v. Enter. Mortg. Acceptance Co.*, 391 F.3d 401, 406 (2d Cir. 2004).

13

Section 3283, as amended by the PROTECT Act, broadly states that "[n]o statute of limitations that would otherwise preclude prosecution for an offense involving the sexual or physical abuse, or kidnaping, of a child under the age of 18 years shall preclude such prosecution during the life of the child." The statute lacks an express retroactivity clause, but courts have held that no such clause is necessary, including for this particular statute. *See Leo Sure Chief*, 438 F.3d at 923. The statute's plain language unambiguously requires that it apply to prosecutions for offenses committed before the date of enactment. Instead of simply providing a new limitations period for future conduct, Congress stated that *no* statute of limitations that *would otherwise preclude* prosecution of these offenses will apply. That is, it prevents the application of any statute of limitations that would otherwise apply to past conduct.

Courts have reached the same conclusion for other statutes employing similar language. The Eighth Circuit has held that the 1994 amendments to § 3283, which allowed prosecution of sex crimes against children until the victim reached age twenty-five, applied to past conduct. *See United States v. Jeffries*, 405 F.3d 682, 684–85 (8th Cir. 2005). The Second Circuit has observed that the Higher Education Technical Amendments of 1991, Pub. L. No. 102-26, 105 Stat. 123, illustrates language that requires a statute's application to past conduct. *See Enter. Mortg. Acceptance Co., LLC, Sec. Litig.*, 391 F.3d at 407. That statute eliminated the statute of limitations for claims on defaulted student loans by stating that "no limitation shall terminate the period within which suit may be filed." *Id.* The PROTECT Act's language is quite similar.

The history of § 3283 confirms Congress's intent to apply the extended limitations period as broadly as the Constitution allows. With each successive amendment to the statute, Congress further extended the limitations period, recognizing that sex crimes against children "may be difficult to detect quickly" because children often delay or decline to report sexual abuse.

14

*Weingarten*, 865 F.3d at 54. Congress enacted the limitations provision of the PROTECT Act because it found the prior statute of limitations was "inadequate in many cases." H.R. Conf. Rep. No. 108-63, at 54 (2003). For example, a person who abducted and raped a child could not be prosecuted beyond this extended limit—even if DNA matching conclusively identified him as the perpetrator one day after the victim turned 25." *Id.*

Maxwell makes no argument based on the statute's text. Instead, she contends that because the House version of the bill included an express retroactivity provision absent from its final form, the Court should infer that Congress did not intend the statute to apply to past conduct. However, the legislative history makes clear that Congress abandoned the retroactivity provision in the House bill only because it would have produced unconstitutional results. The Supreme Court has explained that a law that revives a time-barred prosecution violates the Ex Post Facto Clause of the Constitution, but a law that extends an un-expired statute of limitations does not. *Stogner v. California*, 539 U.S. 607, 632–33 (2003). Senator Leahy, who co-sponsored the PROTECT Act, expressed concerns in a committee report that the proposed retroactivity provision was "of doubtful constitutionality" because it "would have revived the government's authority to prosecute crimes that were previously time-barred." 149 Cong. Rec. S5137, S5147 (Apr. 10, 2003) (statement of Sen. Leahy). Congress removed the provision shortly thereafter for this reason. The removal of the express retroactivity provision shows only that Congress intended to limit the PROTECT Act to its constitutional applications, including past conduct—like Maxwell's—on which the statute of limitations had not yet expired.

Both the text and history of the PROTECT Act's amendment to § 3283 reflect that it applies Maxwell's conduct charged in the S1 superseding indictment. The Court could stop here.

15

However, it also concludes that even if the statute were ambiguous, it would properly apply to these charges.

At *Lanfgraf*'s second step, the Court asks whether application of the statute to past conduct would have impermissible retroactive effects. "[A] statute has presumptively impermissible retroactive effects when it 'takes away or impairs vested rights acquired under existing laws, or creates a new obligation, imposes a new duty, or attaches a new disability, in respect to transactions or considerations already past.'" *Weingarten*, 865 F.3d at 56 (quoting *Landgraf*, 511 U.S. at 290). Thus, applying a new statute of limitations to previously time-barred claims has an impermissible retroactive effect. *Enter. Mortg. Acceptance Co., LLC, Sec. Litig.*, 391 F.3d at 407. Applying it to conduct for which the statute of limitations has not yet expired does not. *Vernon v. Cassadaga Valley Cent. Sch. Dist.*, 49 F.3d 886, 890 (2d Cir. 1995).

Maxwell concedes that these offenses were within the statute of limitations when Congress enacted the PROTECT Act. Thus, the Act did not deprive her of any vested rights. Maxwell contends that it is unfair to allow the Government to prosecute her now for conduct that occurred more than twenty years ago, but there is no dispute that Congress has the power to set a lengthy limitations period or no limitations period at all. It has done so here, judging that the difficulty of prosecuting these offenses and the harm they work on children outweighs a defendant's interest in repose. Maxwell's fairness argument is a gripe with Congress's policy judgment, not an impermissibly retroactive application of the statute. The Court concludes that § 3283 allows her prosecution now.

### B. The Government's delay in bringing charges did not violate due process

"As the Supreme Court stated in *United States v. Marian*, the statute of limitations is 'the primary guarantee against bringing overly stale criminal charges.'" *United States v. Cornielle*,

16

171 F.3d 748, 751 (2d Cir. 1999) (cleaned up) (quoting *United States v. Marion*, 404 U.S. 307, 322 (1971)). There is a strong presumption that an indictment filed within the statute of limitations is valid. To prevail on a claim that pre-indictment delay violates due process, a defendant must show both that the Government intentionally delayed bringing charges for an improper purpose and that the delay seriously damaged the defendant's ability defend against the charges. *See id.* This is a stringent standard. "Thus, while the [Supreme] Court may not have shut the door firmly on a contention that at some point the Due Process Clause forecloses prosecution of a claim because it is too old, at most the door is barely ajar." *DeMichele v. Greenburgh Cent. Sch. Dist. No. 7*, 167 F.3d 784, 790–91 (2d Cir. 1999).

The Court sees no evidence that the Government's delay in bringing these charges was designed to thwart Maxwell's ability to prepare a defense. However, it is enough to say that Maxwell does not make the strong showing of prejudice required to support this sort of claim. Maxwell contends that the Government's delay in bringing charges has prejudiced her interests because potential witnesses have died, others have forgotten, and records have been lost or destroyed. It is highly speculative that any of these factors would make a substantial difference in her case.

Maxwell first points to several potential witnesses who have passed away. These include Jeffrey Epstein and his mother, one individual Maxwell believes worked with one of the alleged victims in this case, and a police detective who investigated Epstein in Florida. She contends they all would have provided exculpatory testimony were they alive today. Courts have generally found that vague assertions that a deceased witness might have provided favorable testimony do not justify dismissing an indictment for delay. *See, e.g.*, *United States v. Scala*, 388 F. Supp. 2d 396, 399–400 (S.D.N.Y. 2005). The Court agrees with this approach. Maxwell

17

provides no indication of what many of these potential witnesses might have testified to. The testimony she suggests the detective might have offered—that witnesses in the Palm Beach investigation did not identify Maxwell by name—is propensity evidence that does nothing to establish her innocence of the charged offenses. There are also serious doubts under all of the relevant circumstances that a jury would have found testimony from Epstein credible even if he had waived his right against self-incrimination and testified on her behalf. *See United States v. Spears*, 159 F.3d 1081, 1085 (7th Cir. 1999).

Maxwell's arguments that the indictment should be dismissed because of the possibility of missing witnesses, failing memories, or lost records fail for similar reasons. These are difficulties that arise in any case where there is extended delay in bringing a prosecution, and they do not justify dismissing an indictment. *United States v. Marion*, 404 U.S. 307, 325–26 (1971); *see United States v. Elsbery*, 602 F.2d 1054, 1059 (2d Cir. 1979).

Finally, the Court finds no substantial prejudice from the pretrial publicity this case has garnered. Maxwell contends that lengthy public interest in this case has transformed her reputation from that of Epstein's friend to a co-conspirator. And she also alleges—without evidence—that her accusers fabricated their stories based on media allegations. The Court will not dismiss the indictment on Maxwell's bare assertion that numerous witnesses are engaged in a perjurious conspiracy against her. And the Court will take all appropriate steps to ensure that the pretrial publicity in this case does not compromise Maxwell's right to a fair and impartial jury.

The Court thus concludes that Maxwell has failed to establish actual prejudice from the Government's delay in bringing charges. She may renew her motion if the factual record at trial shows otherwise. On the present record, neither the applicable statute of limitations nor due process bars the charges here.

18

## III.   The indictment describes the charged offenses with specificity

Maxwell seeks to dismiss the Mann Act counts for lack of specificity or in the alternative to compel the Government to submit a bill of particulars providing greater detail of the charges. The Court concludes that the charges in the S1 superseding indictment are clear enough.

Under Federal Rule of Criminal Procedure 7, an indictment must contain "a plain, concise, and definite written statement of the essential facts constituting the offense charged." The indictment must be specific enough to inform the defendant of the charges and allow the defendant to plead double jeopardy in a later prosecution based on the same events. *United States v. Stavroulakis*, 952 F.2d 686, 693 (2d Cir. 1992). "Under this test, an indictment need do little more than to track the language of the statute charged and state the time and place (in approximate terms) of the alleged crime." *United States. v. Tramunti*, 513 F.2d 1087, 1113 (2d Cir. 1975). In addition to dismissal, "Rule 7(f) of the Federal Rules of Criminal Procedure permits a defendant to seek a bill of particulars in order to identify with sufficient particularity the nature of the charge pending against him, thereby enabling defendant to prepare for trial, to prevent surprise, and to interpose a plea of double jeopardy should he be prosecuted a second time for the same offense." *United States v. Bortnovsky*, 820 F.2d 572, 574 (2d Cir. 1987).

The S1 superseding indictment sets out the elements of each charged crime and the facts supporting each element. Nonetheless, Maxwell contends that the indictment is too vague because it refers to open-ended time periods, describes conduct like "grooming" and "befriending" that is not inherently criminal, and does not identify the alleged victims by name.

Maxwell's first argument fails because the Government need only describe the time and place of charged conduct "in approximate terms." *Tramunti*, 513 F.2d at 1113. The details are subject to proof at trial. "[T]he Second Circuit routinely upholds the 'on or about' language used

19

to describe the window of when a violation occurred." *United States v. Kidd*, 386 F. Supp. 3d 364, 369 (S.D.N.Y. 2019) (quoting *United States v. Nersesian*, 824 F.2d 1294, 1323 (2d Cir. 1987)). "This is especially true in cases of sexual abuse of children: allegations of sexual abuse of underage victims often proceed without specific dates of the offenses." *United States v. Young*, No. 08-cr-285 (KMK), 2008 WL 4178190, at *2 (S.D.N.Y. Sept. 4, 2008) (collecting cases). As here, these cases frequently involve alleged abuse spanning a lengthy period of time, and witnesses who were victimized as children may struggle to recall the precise dates when abuse occurred. The indictment adequately describes the time and place of the charged conduct.

Maxwell next contends that allegations of noncriminal conduct render the charges impermissibly vague. The Court disagrees. Rule 7 requires only that the language of the indictment track the language of the statute and provide a rough account of the time and place of the crime. *Tramunti*, 513 F.2d at 1113. The language of the S1 superseding indictment does so. The Government's decision to provide more details than those strictly required does not hamper Maxwell's ability to prepare a defense. Maxwell's argument that some of the conduct alleged is not inherently criminal goes to the merits of the Government's case, not the specificity of the charges.

Finally, Maxwell argues that the indictment is vague because the government does not provide the names of the alleged victims. The Court sees no basis to require that the alleged victims' names be included the indictment. The names of victims, even if important, generally need not appear there unless their omission would seriously prejudice the defendant. *See United States v. Stringer*, 730 F.3d 120, 127 (2d Cir. 2013); *United States v. Kidd*, 386 F. Supp. 3d 364, 369 (S.D.N.Y. 2019). Maxwell likely knows the identity of the alleged victims described in the indictment at this point because the Government has provided extensive discovery on them.

20

Moreover, the Government has agreed to disclose their names in advance of trial. There is thus no unfairness here. *See Stringer*, 730 F.3d at 126. As discussed below, the Court will require the parties to negotiate and propose a full schedule for all remaining pretrial disclosures.

**IV.    The perjury charges are legally tenable**

The Court turns next to Maxwell's motion to dismiss the perjury counts stemming from her answers to questions in a deposition in a civil case. She contends that these charges are legally deficient because the questions posed were fundamentally ambiguous and the questions were not material to the subject of the deposition. The Court concludes that the charges are legally tenable and Maxwell's defenses are appropriately left to the jury.

The applicable perjury statute imposes criminal penalties on anyone who "in any proceeding before or ancillary to any court . . . knowingly makes any false material declaration." 18 U.S.C. § 1623(a). Testimony is perjurious only if it is knowingly false and is material to the proceeding in which the defendant offered it.

**A. The questions posed were not too ambiguous to support a perjury charge**

The requirement of knowing falsity requires that a witness believe that their testimony is false. *United States v. Lighte*, 782 F.2d 367, 372 (2d Cir. 1986). As a general matter, "[a] jury is best equipped to determine the meaning that a defendant assigns to a specific question." *Id.* Courts have acknowledged a narrow exception for questions that are so fundamentally ambiguous or imprecise that the answer to them cannot legally be false. *Id.* at 372, 375; *see also United States v. Wolfson*, 437 F.2d 862, 878 (2d Cir. 1970). A question is fundamentally ambiguous only if reasonable people could not agree on its meaning in context. *Lighte*, 782 F.2d at 375. The existence of some arguable ambiguity does not foreclose a perjury charge against a witness who understood the question.

21

At a minimum, Maxwell's motion is premature. Courts typically evaluate whether a question was fundamentally ambiguous only after the development of a full factual record at trial. *See, e.g., United States v. Markiewicz*, 978 F.2d 786, 808 (2d Cir. 1992). The evidence at trial may shed further light on whether the questions posed were objectively ambiguous in context or whether Maxwell subjectively understood them. In any event, the Court has closely considered each of the categories of questions that Maxwell argues are ambiguous. None of the alleged ambiguities Maxwell identifies rise to the level supporting dismissal of the charges. The context of the questions and answers, in conjunction with the Government's evidence, could lead a reasonable juror to conclude that the statements were perjurious. Truth and falsity are questions for the jury in all but the most extreme cases. The Court declines to usurp the jury's role on the limited pretrial record.

### B. A reasonable juror could conclude that Maxwell's statements were material

Maxwell also argues that the perjury counts should be dismissed because none of the allegedly false statements were material to the defamation action. In a civil deposition, a statement is material if it has a natural tendency to influence the court or if a truthful answer might reasonably lead to the discovery of admissible evidence. *United States v. Gaudin*, 515 U.S. 506, 509 (1995); *United States v. Kross*, 14 F.3d 751, 753–54 (2d Cir. 1994). Like knowing falsity, materiality is an element of the offense and thus ordinarily must be "decided by the jury, not the court." *Johnson v. United States*, 520 U.S. 461, 465 (1997). Only the most extraordinary circumstances justify departure from this general rule. *United States v. Forde*, 740 F. Supp. 2d 406, 412 (S.D.N.Y. 2010) (citing *Gaudin*, 515 U.S. at 522–23).

The charged statements do not fall within this narrow exception. Maxwell contends that the questions did not relate to the sex trafficking and sexual abuse allegations at the center of the

22

civil case, but that is not the legal standard. The Government may prevail if it proves that

Maxwell's answers could have led to the discovery of other evidence or could influence the

factfinder in the civil case. *See Gaudin*, 515 U.S. at 509; *Kross*, 14 F.3d at 753–54. At trial, a

reasonable juror could conclude that truthful answers to the questions may have permitted the

plaintiff to locate other victims or witnesses who could have corroborated the plaintiff's

testimony. The factual disputes relating to materiality are at least enough to preclude pretrial

resolution. In criminal cases, courts must guard against "invading the 'inviolable function of the

jury' in our criminal justice system," and if the "defense raises a factual dispute that is

inextricably intertwined with a defendant's potential culpability, a judge cannot resolve that

dispute on a Rule 12(b) motion." *United States v. Sampson*, 898 F.3d 270, 281 (2d Cir. 2018).

The Court concludes that the perjury charges are legally tenable and appropriately

presented to the jury.

## V.    **The perjury charges must be severed and tried separately**

Although the perjury charges are legally tenable, the Court concludes that the interests of

justice require severing those counts and trying them separately. Trying the perjury counts

together with the Mann Act counts would require admitting evidence of other acts likely to be

unduly prejudicial. It would also risk disqualifying Maxwell's chosen counsel based on their

involvement in the earlier civil case.

Rule 14(a) of the Federal Rules of Criminal Procedure allows a court to order separate

trials if joining all offenses in a single trial would prejudice the defendant. A defendant seeking

severance must show significant unfairness to outweigh the burden on the court of conducting

multiple trials. *United States v. Walker*, 142 F.3d 103, 110 (2d Cir. 1998). The harm to the

defendant must be more than "solely the adverse effect of being tried for two crimes rather than

23

one." *United States v. Werner*, 620 F.2d 922, 929 (2d Cir. 1980). Though this standard is demanding, the Court concludes that, due to unique features of the perjury counts, Maxwell meets it here. Trying all counts together would compromise Maxwell's right to the counsel of her choice and risk an unfair trial.

Trying the perjury counts together with the Mann Act counts would risk an unfair trial on each set of counts. First, it would introduce unrelated allegations of sexual abuse, which would potentially expose the jury to evidence that might otherwise not be admissible. In particular, a joint trial would potentially expose the jury to a wider swath of information regarding civil litigation against Epstein that is remote from Maxwell's charged conduct. This presents a significant risk that the jury will cumulate the evidence of the various crimes charged and find guilt when, if considered separately, it would not do so. *See United States v. Halper*, 590 F.2d 422, 430 (2d Cir. 1978). Second, the evidence presented on the Mann Act counts may prejudice the jury's ability to fairly evaluate Maxwell's truthfulness in her deposition, a critical element of the perjury counts. The Court has concerns that a limiting instruction may be inadequate to mitigate these risks given the nature of the allegations involved.

Importantly, a joint trial is also likely to require disqualification of at least one of Maxwell's attorneys from participating as an advocate on her behalf. The perjury counts likely implicate the performance and credibility of her lawyers in the civil action—two of whom represent her in this case. The New York Rules of Professional Conduct generally forbid a lawyer from representing a client in a proceeding in which the lawyer is likely also to be a witness. N.Y. R. Prof'l Conduct § 3.7(a). Maxwell's counsel in the civil action and the deposition may be important fact witnesses on the perjury counts. Even if counsel were not required to testify, trying all counts together could force Maxwell to choose between having her

24

counsel testify on her behalf on the perjury charges and having them assist her in defending the Mann Act charges.

The Second Circuit has recognized that witness testimony offered by a party's attorney presents serious risks to the fairness of a trial. *See Murray v. Metro. Life Ins. Co.*, 583 F.3d 173, 178 (2d Cir. 2009). The lawyer might appear to vouch for their own credibility, jurors might perceive the lawyer as distorting the truth to benefit their client, and blurred lines between argument and evidence might confuse the jury. *Id.* Disqualification of counsel also implicates Maxwell's Sixth Amendment right to be represented by the counsel of her choice. *See, e.g.*, *United States v. Kincade*, No. 15-cr-00071 (JAD) (GWF), 2016 WL 6154901, at *6 (D. Nev. Oct. 21, 2016). The prejudice to Maxwell is especially pronounced because the attorneys who represented her in the civil case have worked with her for years and are particularly familiar with the facts surrounding the criminal prosecution. *See United States v. Cunningham*, 672 F.2d 1064, 1070–71 (2d Cir. 1982).

The Court is of course cognizant of the burden separate trials may impose on all trial participants. But much of the proof relevant to the perjury counts and the Mann Act counts does not overlap. In particular, materiality for statements made in a civil deposition is broad, and evidence on that question is unlikely to bear on the other charges here. *See Kross*, 14 F.3d at 753–54; *Gaudin*, 515 U.S. at 509. Although some allegations of sexual abuse are relevant to both sets of charges, many are not. At a minimum, this will expand the scope of the trial far beyond the narrower issues presented. And while the Court agrees with the Government that at least some of Maxwell's concerns are overstated, there is little question that the jury's consideration of the nature of the defamation action will require a significant investment of time and resources to provide the requisite context.

25

The balance of these considerations favors severance. "Motions to sever are committed to the sound discretion of the trial judge." *United States v. Casamento*, 887 F.2d 1141, 1149 (2d Cir. 1989). In its discretion, the Court concludes that trying the perjury counts separately will best ensure a fair and expeditious resolution of all charges in this case.

## VI.    Maxwell's motion to strike surplusage is premature

Maxwell moves to strike allegations related to one of the alleged victims from the S1 superseding indictment as surplusage. The Court declines to do so at this juncture.

Federal Rule of Criminal Procedure 7(d) allows a court to strike surplusage from an indictment on a defendant's motion. "Motions to strike surplusage from an indictment will be granted only where the challenged allegations are not relevant to the crime charged and are inflammatory and prejudicial." *United States v. Hernandez*, 85 F.3d 1023, 1030 (2d Cir. 1996) (cleaned up). Courts in this District generally delay ruling on any motion to strike until after the presentation of the Government's evidence at trial, because that evidence may affect how specific allegations relate to the overall charges. *See, e.g., United States v. Nejad*, No. 18-cr-224 (AJN), 2019 WL 6702361, at *18 (S.D.N.Y. Dec. 6, 2019); *United States v. Mostafa*, 965 F. Supp. 2d 451, 467 (S.D.N.Y. 2013).

Maxwell contends that the allegations related to "Minor Victim-3" are surplusage because the indictment does not charge that Minor Victim-3 traveled in interstate commerce or was below the age of consent in England where the alleged activities took place. Thus, she argues, these allegations do not relate to the charged conspiracy and instead reflect an attempt to introduce Minor Victim-3's testimony for impermissible purposes.

The Court will not strike any language from the S1 superseding indictment at this juncture. The standard under Rule 7(d) is "exacting" and requires the defendant to demonstrate

26

clearly that the allegations are irrelevant to the crimes charged. *United States v. Napolitano*, 552

F. Supp. 465, 480 (S.D.N.Y. 1982). The indictment does not allege that the alleged victim

traveled in interstate commerce or was underage during sexual encounters with Epstein. But the

Court cannot rule out that the allegations may reflect conduct undertaken in furtherance of the

charged conspiracy or be relevant to prove facts such as Maxwell's state of mind. *See United

States v. Concepcion*, 983 F.2d 369, 392 (2d Cir. 1992). The Court will follow the well-worn

path of others in this District and reserve the issue for trial. Maxwell may renew her motion

then.

**VII.    Maxwell's motion to dismiss multiplicitous charges is premature**

Maxwell's motion to dismiss either the first or third count of the S1 superseding

indictment as multiplicitous is also premature. Maxwell contends that the Government has

alleged the same conspiracy twice in the indictment. "An indictment is multiplicitous when it

charges a single offense as an offense multiple times, in separate counts, when, in law and fact,

only one crime has been committed." *United States v. Chacko*, 169 F.3d 140, 145 (2d Cir. 1999).

"The multiplicity doctrine is based upon the double jeopardy clause of the Fifth Amendment,

which assures that the court does not exceed its legislative authorization by imposing multiple

punishments for the same offense." *United States v. Nakashian*, 820 F.2d 549, 552 (2d Cir. 1987)

(cleaned up).

"Where there has been no prior conviction or acquittal, the Double Jeopardy Clause does

not protect against simultaneous prosecutions for the same offense, so long as no more than one

punishment is eventually imposed." *United States v. Josephberg*, 459 F.3d 350, 355 (2d Cir.

2006). "Since *Josephberg*, courts in this Circuit have routinely denied pre-trial motions to

dismiss potentially multiplicitous counts as premature." *United States v. Medina*, No. 13-cr-272

27

(PGG), 2014 WL 3057917, at *3 (S.D.N.Y. July 7, 2014) (collecting cases). The Court therefore denies Maxwell's motion to dismiss multiplicitous counts without prejudice.

## VIII. The parties shall negotiate all remaining disclosures

Maxwell moves to compel the Government to produce certain documents she believes it has in its possession and has failed to produce. She also seeks accelerated disclosure of the Government's witness list, Jencks Act material, *Brady* and *Giglio* material, co-conspirator statements, and Rule 404(b) material. Based on the Government's response in briefing and letters the parties have since submitted to the Court, it appears that most of these requests have been overtaken by events. Accordingly, although the Court concludes that Maxwell is not entitled to expedite this discovery based on the arguments in her motion papers, the Court will require the parties to confer on an overall schedule for all remaining pretrial disclosures.

### A. The Court accepts the Government's representations that it has disclosed all *Brady* and *Giglio* Material

The Supreme Court's decisions in *Brady v. Maryland*, 373 U.S. 83 (1963) and *Giglio v. United States*, 405 U.S. 150 (1972) require the Government to disclose to defendants certain evidence that will aid their defense. *Brady* requires disclosure of exculpatory evidence. Under *Giglio*, the Government has a duty to produce "not only exculpatory material, but also information that could be used to impeach a key government witness." *United States v. Coppa*, 267 F.3d 132, 135 (2d Cir. 2001) (citing *Giglio*, 405 U.S. at 154). As a general rule, "*Brady* and its progeny do not require immediate disclosure of all exculpatory and impeachment material upon request by a defendant." *Id.* at 146. "[A]s long as a defendant possesses *Brady* evidence in time for its effective use, the government has not deprived the defendant of due process of law simply because it did not produce the evidence sooner." *Id.* at 144.

28

Maxwell requests an order directing immediate disclosure of all *Brady* and *Giglio* material and also requests a few specific documents she contends the Government has failed to disclose. The Court begins with the specific requests. The requested materials include (1) records of witness interviews in connection with an ex parte declaration in support of a response to a motion to quash subpoenas; (2) an unredacted copy of two FBI reports; (3) pages from a personal diary that is in the custody of a civilian third party; and (4) copies of all subpoenas the Government has issued for Maxwell's records as part of its investigation in this case.

The Government represents that it is cognizant of its *Brady* obligations, that is has reviewed the witness interviews and one of the FBI reports, and that neither set of documents includes exculpatory information not previously disclosed. The Court has no reason to doubt the Government's representation in this case that it is aware of its Brady obligations and that it has complied and will continue to comply with them. And because the witness statements are covered by the Jencks Act, the Court cannot compel production of such statements under the terms of the statute. *See* 18 U.S.C. § 3500; *Coppa*, 267 F.3d at 145. Next, the Government represents that it has already produced an unredacted copy of the other requested FBI report, and so that request is moot. The diary pages she requests are within the control of a civilian third party, not the Government, and so the Government need not (and perhaps cannot) produce them. *See United States v. Collins*, 409 F. Supp. 3d 228, 239 (S.D.N.Y. 2019). Finally, Maxwell's request for copies of all subpoenas the Government has issued is overly broad and lacks a legal basis. Maxwell is not entitled to compel production of these documents.

The Court also will not issue an order requiring the immediate disclosure of *Brady* and *Giglio* material. The Government has represented that it recognizes its obligations under Brady and that it has complied, and will continue to comply, with such obligations. The Court has no

29

reason to doubt these representations given its expansive approach to document production thus far in this case. The Government has agreed in its recent letter to produce *Giglio* material six weeks in advance of trial. The parties shall negotiate the specific timing, but assuming a schedule along those lines is met, the Court concludes that Maxwell will be able to effectively prepare for trial. *See Coppa*, 267 F.3d at 144.

### B. Jencks Act material and co-conspirator statements

Maxwell also seeks to expedite discovery of Jencks Act material and non-exculpatory statements of co-conspirators that the government may offer at trial. The Jencks Act, 18 U.S.C. § 3500, "provides that no prior statement made by a government witness shall be the subject of discovery until that witness has testified on direct examination." *Coppa*, 267 F.3d at 145. The statute therefore prohibits a district court in most cases from ordering the pretrial disclosure of witness statements unless those statements are exculpatory. "A coconspirator who testifies on behalf of the government is a witness under the Act." *In re United States*, 834 F.2d 283, 286 (2d Cir. 1987). The Court therefore lacks the inherent power to expedite these disclosures. In any case, the Government has agreed to produce all Jencks Act material at least six weeks in advance of trial.

The Court also rejects Maxwell's alternative request for a hearing to determine the admissibility of co-conspirator declarations. Co-conspirator statements may often be admitted at trial on a conditional basis. If the Court determines that the Government has not met its burden to show that the conditionally admitted statements were made in furtherance of the charged conspiracy, the Court should provide a limiting instruction or, in extreme cases declare a mistrial. *United States v. Tracy*, 12 F.3d 1186, 1199 (2d Cir. 1993). Although conditional admissions can pose a problem, a pretrial hearing is unnecessary here because the Government

30

has committed to producing co-conspirator statements at least six weeks in advance of trial to allow Maxwell to raise any objections. Maxwell will have adequate time to object to any proffered co-conspirator testimony following the Government's Jencks Act disclosures.

### C. Witness list

As a general matter, "district courts have authority to compel pretrial disclosure of the identity of government witnesses." *United States v. Cannone*, 528 F.2d 296, 300 (2d Cir. 1975). In deciding whether to order accelerated disclosure of a witness list, courts consider whether a defendant has made a specific showing that disclosure is "both material to the preparation of the defense and reasonable in light of the circumstances surrounding the case." *United States v. Bejasa*, 904 F.2d 137, 139–140 (2d Cir. 1990) (cleaned up).

Maxwell has made a particularized showing that the Government must produce a witness list reasonably in advance of trial. The nature of the allegations in this case—decades-old allegations spanning multiple locations—present considerable challenges for the preparation of the defense. However, the Government's proposed disclosure schedule—which will afford Maxwell at least six weeks to investigate testifying witness statements—allows Maxwell significantly more time to review disclosures than schedules adopted in most cases in this District. *See, e.g., United States v. Rueb*, No. 00-CR-91 (RWS), 2001 WL 96177, at *9 (S.D.N.Y. Feb. 5, 2001) (thirty days before trial); *United States v. Nachamie*, 91 F. Supp. 2d 565, 580 (S.D.N.Y. 2000) (fourteen days before trial). In addition, on April 13, 2021, the Government produced over 20,000 pages of interview notes, reports and other materials related to non-testifying witnesses. After considering the circumstances, including the complexity of the issues in this case and what the defense has already received and likely learned in the course of discovery, the Court concludes that the Government's proposal is generally reasonable.

31

### D. Rule 404(b) material

Maxwell's final discovery request is for early disclosure of evidence the Government seeks to offer under Federal Rule of Evidence 404(b). Under Rule 404(b), if the prosecutor in a criminal case intends to use "evidence of a crime, wrong, or other act" against a defendant, the prosecutor must "provide reasonable notice of the general nature of any such evidence that the prosecutor intends to offer at trial" and must "do so in writing before trial—or in any form during trial if the court, for good cause, excuses lack of pretrial notice." The Government represents that it will notify the defense of its intent to use 404(b) evidence at least 45 days in advance of trial to allow Maxwell to file any motions in limine to be considered at the final pretrial conference. The Government's proposal will give Maxwell an opportunity to challenge admission of that evidence and to bring to the Court's attention any issues that require resolution before trial. "This is all that Rule 404(b) requires." *United States v. Thompson*, No. 13-cr-378 (AJN), 2013 WL 6246489, at *9 (S.D.N.Y. Dec. 3, 2013). The Court concludes this schedule is generally reasonable, although additional time to enable briefing and resolution in advance of trial is strongly encouraged.

The Court's denial of Maxwell's requests to compel pretrial disclosures does not preclude the parties from negotiating in good faith for an expedited discovery timeline that will account for Maxwell's specific concerns. "[I]n most criminal cases, pretrial disclosure will redound to the benefit of all parties, counsel, and the court." *United States v. Percevault*, 490 F.2d 126, 132 (2d Cir. 1974). In general, the Court will require the parties to negotiate a final, omnibus schedule to propose to the Court. The Court concludes that the disclosure of all of the above materials approximately six to eight weeks in advance of trial is appropriate and sufficient.

32

Given the complexities of the case and the addition of two counts via the S2 indictment, the Court encourages the parties to agree to approximately eight weeks.

## IX.    The S2 superseding indictment moots Maxwell's grand jury challenge

The Court has not received supplemental briefing on the motions in light of the return of the S2 superseding indictment and so does resolve any such issues here.[1]  However, Maxwell's motion seeking to dismiss the S1 superseding indictment because it was returned by a grand jury sitting at the White Plains courthouse appears moot.  Maxwell argued that the use of a grand jury drawn from the White Plains Division in this District did not represent a fair cross-section of the community, because her trial would proceed in the Manhattan Division.  A grand jury sitting in Manhattan returned the S2 superseding indictment.  By April 21, 2021, Maxwell shall show cause why her grand jury motion should not be dismissed on that basis.

### Conclusion

The Court DENIES Maxwell's motions to dismiss the indictment as barred by Epstein's non-prosecution agreement (Dkt. No. 141), to dismiss the Mann Act counts as barred by the statute of limitations (Dkt. No. 143), to dismiss the indictment for pre-indictment delay (Dkt. No. 137), to dismiss the Mann Act counts for lack of specificity (Dkt. No. 123), to dismiss the perjury counts as legally untenable (Dkt. No. 135), to strike surplusage (Dkt. No. 145), to dismiss count one or count three as multiplicitous (Dkt. No. 121), and to expedite pretrial disclosures (Dkt. No. 147).  The Court GRANTS Maxwell's motion to sever the perjury counts for a separate trial (Dkt. No. 119).

---

[1] The parties shall negotiate and propose a schedule for any available additional or supplement rulings in light of the filing of the S2 indictment.

33

The Court ORDERS the Government to confirm within one week whether it considers any evidence related to negotiation of the non-prosecution agreement to constitute *Brady* or Rule 16 material and, if so, to confirm that it has or will disclose such evidence.

The Court further ORDERS the parties to negotiate a final schedule for all pretrial disclosures that remain outstanding, including: *Brady*, *Giglio*, and Jenks Act materials, including co-conspirator statements; non-testifying witness statements; testifying witness statements; the identity of victims alleged in the indictment; 404(b) material; and the Government's witness list. The Court also requires the parties to negotiate a schedule for any additional or supplemental motions briefing in light of the S2 indictment. The Court ORDERS a joint proposal to be submitted by April 21, 2021. If agreement is not reached, the parties shall submit their respective proposals.

The Court further ORDERS Maxwell to show cause by April 21, 2021 why her motion to dismiss the S1 superseding indictment under the Sixth Amendment (Dkt. No. 125) should not be denied as moot.

SO ORDERED.

Dated: April 16, 2021
       New York, New York

ALISON J. NATHAN
United States District Judge

34

# EXHIBIT 87

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

April 23, 2021

**BY ECF**

The Honorable Alison J. Nathan
United States District Court
Southern District of New York
United States Courthouse
40 Foley Square
New York, New York 10007

      **Re:** *United States v. Ghislaine Maxwell*, **20 Cr. 330 (AJN)**

Dear Judge Nathan:

      The Government respectfully submits this letter in response to the Court's Order dated April 16, 2021, which directed the Government to confirm that it has complied with its discovery obligations with respect to the non-prosecution agreement ("NPA") between Jeffrey Epstein and the U.S. Attorney's Office for the Southern District of Florida ("SDFL"). (Dkt. No. 207).

**A. Overview**

      The Government takes its discovery and disclosure obligations seriously, and it has endeavored to take an expansive approach with respect to those obligations throughout the pendency of this case. In particular, the Government carefully formulated its discovery and disclosure plan in this case to ensure that it not only satisfies its Rule 16, *Brady*, *Giglio*, and Jencks Act obligations with respect to the materials already in the possession of the prosecution team, but that it also makes reasonable efforts to identify other potentially disclosable material within the files of other investigative agencies who are not part of this prosecution team. This approach was formulated in close consultation with multiple layers of supervisors within the U.S. Attorney's Office for the Southern District of New York. The Government set forth its intentions with respect

to those other agency files in an October 7, 2020 letter, (Dkt. 63), and restates certain information

here in order to provide context for what, and how the Government has reviewed files for material

related to the NPA.

In sum, the Government has not identified any materials within its possession that would

constitute potential *Brady* material with respect to the NPA, that is, "exculpatory evidence" as to

which "there is a reasonable probability that, had the evidence been disclosed to the defense, the

result of the proceeding would have been different." *Youngblood v. West Virginia*, 547 U.S. 867,

870 (2006). With this definition in mind, the Government would view any evidence that the NPA

was intended to (i) bind other U.S. Attorneys in other districts; or (ii) cover Maxwell specifically,

as "evidence supporting Maxwell's interpretation of the NPA" that it would be required to disclose.

(*See* April 16, 2021 Opinion, Dkt. No. 207, at 8, 3-7 (discussing the bases for Maxwell's motion

under the NPA)). As set forth in more detail below, the Government has not identified any such

evidence in its possession.

The Government does not, however, view any other materials that are simply *related* to the

NPA as materials it is required to disclose in this case, either under Rule 16 or *Brady*.

Nevertheless, and as the Court recognized, the defendant already has access to a large swath of

information that the Department of Justice's Office of Professional Responsibility ("OPR")

compiled as a result of their thorough investigation into the circumstances surrounding the

negotiation of the NPA, and the Government has not sought to, nor would it be obligated to, redo

OPR's work. (Dkt. No. 207, at 8 (noting the "extensive OPR report" and that "No record evidence

suggests that prosecutors promised Epstein anything beyond what was spelled out in writing.").

In the interest of clarity, the Government sets forth below a description of the materials it has

compiled and reviewed, and will continue to review, for potential *Brady* material in this case, while

also noting what the Government has not done and does not believe it is obligated to do with respect to materials that are potentially related to the NPA.

## B. The Prosecution Team's Files

As the Court is aware, the charges in this case arose from an investigation opened in 2018 and conducted by the United States Attorney's Office for the Southern District of New York ("SDNY"), the Federal Bureau of Investigation ("FBI") New York Office, and the New York Police Department ("NYPD"; collectively, the "Prosecution Team"). (Dkt. No. 63 at 1). The Government has obtained the full investigative file from the FBI's Palm Beach Resident Agency (the "FBI Florida Office"), which conducted a separate investigation and prosecution of Jeffrey Epstein between 2005 and 2010 (the "FBI Florida File"), and whose file also contained the investigative file for the Palm Beach Police Department ("PBPD") related to that same investigation (the "Florida Investigation"). The Government has reviewed and produced all Rule 16 materials, including potential *Brady* material, contained within the Prosecution Team's Files, including the FBI Florida File and the PBPD file. The Government has not identified anything within the files of the Prosecution Team, the FBI Florida File, or the PBPD file that constitutes *Brady* material with respect to the NPA.

## C. The Government's Collection and Review of Other Agencies' Files

On October 7, 2020, the Government submitted a letter to the Court setting forth its plan for collecting and reviewing certain files from other agencies with potential relevance to this case. (Dkt. No. 63). Although Second Circuit law did not require the Government to do so because those other agencies were not part of the Prosecution Team, the Government endeavored to collect and review certain of those materials as part of its commitment to go above and beyond its disclosure obligations. (*Id.* at 4). In particular, the Government noted its intention to collect: (i)

the FBI Florida File and the PBPD file, from which the Government has made Rule 16 productions, and which the Government is continuing to review for *Giglio* and Jencks Act material, (ii) the Palm Beach State Attorney's office file, from which the Government has made Rule 16 productions, and which the Government is continuing to review for *Giglio* and Jencks Act material; (iii) the file from the SDFL, discussed further below; (iv) the inbox for the primary line Assistant U.S. Attorney at SDFL responsible for that office's investigation of Jeffrey Epstein between 2005 and 2010 ("Attorney-1") that was previously gathered by OPR, discussed further below; and (v) certain potentially relevant materials, to the extent they existed, from a United States Attorney's Office in Georgia, which consist of a small amount of witness statements.

   With respect to the SDFL file, based on an initial review,[1] the Government has not identified any materials that would be subject to disclosure under Rule 16. This is unsurprising because discoverable materials such as subpoena returns and search warrant materials appear to have been maintained in the FBI Florida Office's file. Although the Government did identify materials that are broadly related to the NPA, the Government has not identified any items that would constitute *Brady* material. The Government is continuing to review the SDFL file for *Giglio* and Jencks Act material. And of course, to the extent the Government identifies potential *Brady* material or material discoverable under Rule 16 that is not duplicative of prior productions, it will promptly produce it.

---

[1] In the fall of 2020, SDFL agreed to provide SDNY with a copy of all of its files relating to Jeffrey Epstein so that SDNY could review those files for disclosures. Those files consist of 28 boxes, which contain material relating both to the investigation of Epstein and a civil lawsuit filed by victims challenging the NPA under the Crime Victims' Rights Act. The Government hired a vendor to scan the files in these boxes, but technical difficulties with that vendor prevented those scans from being loaded into a document review platform until several weeks ago. Before those scans were loaded into the document review platform, the Government conducted an initial review of the scans in their native form.

With respect to Attorney-1's inbox, the Government previewed in its October 7, 2020 letter that it planned to review the inbox—which is voluminous[2]—using search terms to identify witness statements and *Giglio* material. Those search terms did not include search terms relevant to the NPA, and the Government has not searched Attorney-1's inbox for communications relating to the NPA. Instead, because the Government obtained these materials with an eye towards identifying any additional witness statements or *Giglio* material that might not otherwise be contained in the FBI Florida File, the Government ran search terms specific to this case, focusing on the names of victims, Government witnesses, and Ghislaine Maxwell. The Government's review of the emails responsive to its search terms remains ongoing, and the Government will produce any non-duplicative documents that warrant disclosure. The Government expects this to be a limited set of documents that will be produced along with other Jencks Act and *Giglio* material. Of course, should the Government identify any exculpatory material during this review, including with respect to the NPA, it will promptly produce such material.

As the foregoing illustrates, the Government has taken an expansive approach to discovery and is close to completing its review of files from other agencies for Jencks Act and *Giglio* material. Thus far, the Government has not identified potential *Brady* material with respect to the NPA during its review. To the extent the Government identifies potential *Brady* material with respect to the NPA, that is, material that supports Maxwell's reading of the NPA as discussed above, or any other exculpatory material, the Government will promptly produce it. However,

---

[2] More specifically, it appears that OPR obtained an entire snapshot of Attorney-1's inbox, spanning several years, and encompassing all of Attorney-1's emails during that time period. In other words, the inbox is not specific to the Epstein investigation, and it contains a high volume of communications relating to other cases and other internal SDFL matters. The snapshot provided by OPR contains emails and their attachments, both inbound and outbound, totaling more than 300,000 documents.

based on the Government's review to date and the OPR report, the Government has no reason to believe that a document supporting the above-described defenses under the NPA in this case exists. Indeed, as the Court noted in its April 16, 2021 Opinion, OPR thoroughly investigated the circumstances of the negotiation of the NPA and issued extensive findings from its investigation. Nothing in the OPR report supports the defendant's assertion that the NPA bars this prosecution. (April 16, 2021 Opinion, Dkt. No. 207 at 5-6 ("Maxwell has already received access to an unusually large amount of information about the NPA's negotiation history in the form of the OPR report and yet identifies no evidence that the Department of Justice made any promises not contained in the NPA."); at 8 ("No record evidence suggests that prosecutors promised anything beyond what was spelled out in writing.")). The Government does not intend to seek any additional materials from other offices or agencies relating to the NPA, and the Court has already denied the defense's request for discovery relating to the NPA.

Respectfully submitted,

AUDREY STRAUSS
United States Attorney

By: ___/s_____
Alison Moe / Maurene Comey
Lara Pomerantz / Andrew Rohrbach
Assistant United States Attorneys
Southern District of New York

Cc: All Counsel of Record (By ECF)

EXHIBIT 88

TRANSCRIPT OF PODCAST OF ADAM KLASFELD WITH
SIGRID MCCAWLEY LOOKING TOWARDS 2023 - WP/im
https://lawandcrime.com/objections-podcast/what-a-prominent-attorney-for-jeffrey
-epstein-survivors-believes-2023-may-hold-for-the-sex-trafficking-investigation/

"Objections PODCAST" EPISODE 72 - 28 DECEMBER, 2022 HOST: Adam

Klasfeld (AK) With Sigrid Macaulay (SM). and Kenya David (KD)

ADAM KLASFELD: Welcome back to Objections, a podcast. I'm your host Adam
Klasfeld reporting for Law & Crime. There has been no indication that the affair of
Epstein and Maxwell has closed. Are you aware of anything else going on in that
investigation and do you think anyone else will be indicted?

SIGRID MCCAWLEY: [laughing] Well I always say, wait and see


00.31

AK: Almost exactly one year ago from the date of this broadcast, a federal jury
convicted Ghislaine Maxwell of sex trafficking minors for Jeffrey Epstein's
predation and other charges. She received a 20 year sentence this past year. No
other accused co-conspirator has been charged criminally since that time, but
that isn't to say the Epstein docket has gone stale. The UK's Prince Andrew,
settled a lawsuit brought against him by prominent Epstein survivor Virginia
Giuffre reportedly for the equivalent of 16 million in US dollars. In a separate
lawsuit to free said she may have been mistaken in bringing her claims against
former Harvard law professor Alan Dershowitz. Making no mistake, Giuffre and
her lawyers have been crucial figures in the Epstein saga. It was her lawsuits
against Epstein and Maxwell that arguably sparked their prosecutions by
producing the records brought to light through investigative journalism. In our last
podcast of 2022, we are joined by Giuffre's long-time lawyer, Sigrid Mccawley,
and a partner at her firm, Kenya Davis. (KD)

1

We spoke a little about the legacy of the Maxwell case and a lot about a New York law that makes it easier to bring the kind of sexual abuse lawsuits that have brought such massive influence. Known as the Adult survivors' Act, the statute temporarily suspends its statue of limitation on historic sexual abuse claims. Since it's passage, it has been used against former President Donald Trump, hedge fund honcho, Leon Black, ex For News Host, Ed Henry and two major banks, JP Morgan Chase, and Deutche Bank which stand accused of complicity with Epstein's crimes. It's similar to another New York law called the Child Victims' Act which focussed on sexual abuse of minors specifically. The first lawsuit to go to trial under the act to go to trial against Kevin Spacey failed after a jury found against Spacey's accuser. In the interviews coming up ahead I ask Macawley and Davis about the challenges are bringing older, sometimes even historic cases of sexual abuse and the significance of high profile cases pursued by their powerhouse law firm Boies, Schiller Flexner.

03.09

AK continues: Thank you very much Sigrid Macaulay and Kenny Davis for joining us on Objections. You and your law firm have both been deeply involved in representing sexual assault survivors, perhaps most famously in the case of Jeffrey Epstein. Was your law firm involved in advocating for the New York Adult Survivors Act that has just recently gone into effect?

03.33
SIGRID MCCAWLEY SM -

Yes, so Boies Schiller has a long history of doing work in this space which is really wonderful. The bulk of that work has been a pro bono per our firm; I'm

literally spending hundreds and hundreds of hours of attorney time and resources

2

to help survivors of abuse. And with that comes the privilege of getting to focus on changes in law, as we are seeing with the Adult Survivors' Act, working toward those changes, so yes our our work has gone hand-in-hand with those new changes in in a variety of ways. I mean we have also been involved in trying to advocate for changes in the in the tracking act. We are seeing as I will probably get into a little bit today, many states that are embarking on this journey as well, looking at the changes in the legal landscape.

04.32

AK: In both the New York Adult Survivors Act and the law that came before it, the Child Victims Rights Act, there was this look back period that would suspend the statute of limitations so that folks could bring cases that would otherwise have been barred. Can you explain that and what that's meant for your clients?

SM: Sure, Kenya, do you want to take that one?

KD: Sure so thankfully through lots of advocacy and many years of training that's been needed to understand how victims actually respond to having been assaulted, there's been an understanding that for some victims there may not even appreciate their abuse or understand that it's happened to them. And also it has so many countervailing interests in terms of not being able to report right away when they are assaulted, that it may take a few years for them to get comfortable or get to a point in their lives where they actually can report. And for many victims up until the passage of these types of acts. They were just out of luck in terms of getting any type of civil remedy and thankfully now because of

this act, they can reach back, both child victims that was passed earlier but now with the adult act, they can reach back and really start to address the conduct of

3

their abusers that happened to them, and for some of them they never thought they would have this opportunity and it's going to provide a level of closure that they never thought they would have an opportunity to have and so it is really is a testament to the progress in our society that both legislators but also practitioners in other arenas in terms of counselors and law enforcement and everybody else that's involved with these victims, now understand the trauma response and what it requires. It's much much more complex than what people thought even five years ago

06.47

AK: Yeah I want to drill down on one of the things you just said Kenya, a little bit earlier Sigrid said that the firm has been involved in some of the advocacy, what was some of the process of leading lawmakers informing lawmakers about the trauma process that many survivors won't come to terms with their abuse to bring claims until maybe the Statute of Limitations has expired. Is there any interaction with lawmakers that stands out in your mind?

07.19

SM: Certainly. I mean we have one of our Alums from our firm is Senator Kirsten Kildegrand who has been an advocate in this space. We are constantly trained to raise awareness. And some of that is really we use the weapon that we have in our arsenal which is civil litigation to be able to raise that awareness. So sometimes you know, our prosecutors for whatever reason, haven't acted , um the legislature hasn't acted and so part of what we were able to furnish was our, our strategic ability to bring those claims in a unique way that really brought

awareness to those issues. So I really am grateful for the firm's investment for so many years in this fight, because it did bring to light so much of the information that then caused lawmakers, as Kenya said, you know our law enforcement

4

agency to start to pay attention in order to effectuate change, that's what you need. So it doesn't always come in um, the path that you think it will. We certainly saw that here and it's continued to proliferate in other states. You know, catching onto New York is really a trend setter here in many ways. And so we're seeing that now across the nation as States are varying certainly in the way that they are tackling it. But yes I think that certainly the work we've done on the civil side has impacted that. And Kenya before coming to us, had a beautiful, long-term experience with the government where she was really an advocate in thia space so she's seen it from both sides, both you know the government side and what they're paying attention to, and now on on the civil side of a private practice.

09.15

KD: And That point of one of the challenges as a prosecutor, especially in the are of human trafficking and sexual assault, is we have a burden of beyond a reasonable doubt, and for many victims and cases that's a very high burden to reach. So if we don't have partners in the civil space like Sigrid and David, who really push for novel ways of looking at cases, uh to get us to

a place where we have evidence, for instance in the Epstein and Maxwell matter where the government just was not able to garner all the evidence that it needed in that case to really be able to prove beyond a reasonable doubt and reach that very high burden. And if you don't have those civil actors out there doing that work, you will miss an opportunity to hold abusers accountable. So, my experience is in the law enforcement side of this and the prosecution side of this

where the burden is just so much higher and resources are limited, er, it really is a welcome change to have a civil remedy in place for these women.

5

10.33

AK: Your firm has obviously brought some very high profile cases under the child victims act, have you brought any cases yet under the Adult Survivors Act ? If not are any on the way?

10.48

SM: [laughs] There certainly are some on the way but without revealing any privileges we are definitely very active in this space. We are so proud to get to represent women who have had these experiences and are willing to step up and challenge their abusers. I will tell you one of the things I struggled with in the Epstein work is that oftentimes you would have an individual who was 17 ½ and treated one way in the law, and somebody who is 18 and a day when they were abused and would be treated a different way and that's really, really difficult as a practitioner even though there are reasons for those dividing lines certainly, that was something I definitely struggled with . And so to see where we are now as is really positive with the opening of this window and I am already seeing it that you are going to see I just think, an explosion of activity in New York because it does allow those individuals who suffered trauma many years ago, you know at 18, 19, 20 and even older, to be able to finally bring those claims.

11.55

AK:Can you give any sort of the guesstimate as to when we might see that explosion of activity

SM: Well I think it's already starting. I think a lot of people are already in preliminary conversations with individuals. Oftentimes there are pre suit discussions in advance of filing so I think that is probably pretty active now that

6

the law is opening, the window has opened. Um, and I think we are just going to see activity throughout the year.

12.25

KD: It does have to happen quickly though because there is only a year that is open so I think as to timing you will see a ramp up pretty pretty quickly especially after the year.

12.39

AK: Going back to the Child Victim Act, one of your most famous clients in that case, Virginia Giuffre, filed a couple of lawsuits under that act, what do you say the legacy of the Lookback period was for her?

12.56

SM: I think it's really significant you know, her case was so difficult and it really does highlight the reason why these laws have such great value because when we first started representing her back in 2014, she did had a statute of limitations problem so she was barred from bringing any kind of a claim and it was only when one of her abusers defamed her Ghislaine Maxwell, that she was there an able, we brought on her behalf, a civil defamation suit and the, the bulk of that was deciding whether the statement was true or false, which brought to light all of the abuse. So it was really a way to get at that abuse angle without having something like the Child Victims Act, But oftentimes survivors may not be that

lucky. Their abusers may not be public, they may not have a situation where their their abusers may be speaking out. There could be a number of things that hold back their ability to go after their abusers, and, as we touched on earlier, I mean for many individuals, the average age for coming to terms with their abuse is mid life - it's in their 50s, early 50s. So you can imagine carrying that trauma and that

7

hurt your entire life and then finally feeling that your in a position where you are strong enough to do something about it and the law just precludes that. So I think that this law is, is tremendous in so many ways because it does allow people to finally, if they're ready and able and to bring those claims.

14.14

AK: And of course Ms Giuffre's first lawsuit against him and Maxwell as part of the reason that sparked her eventual prosecution. The other two that were under the Child Victim Act there were two that had pretty different results. The Pr Andrew case was a landmark settlement and the one against Alan Dershowitz seems to have dissipated. Do you think that the different outcomes in those two cases speak to the challenges of cases that happened so long ago?

15.03

SM: I'm not at liberty to discuss those those two cases in that context but I appreciate the question. (laughter) And I think just to talk a little bit more about where the difficulty is, certainly one of the claims for many years and battling against these kinds of acts was that evidence would dissipate and the problem on the defense side to the person being accused of the abuse. But we're in a much different time and a place from an electronic and evidentiary standpoint that we were seeing 20,30 years ago. Now virtually everything is recorded in some way,

we can get email traffic back as we saw in the Giuffre case back from the early 2000s in emails between Epstein and Maxwell etc. So It is a much different space from an evidentiary perspective that really eviscerated that argument by the alleged abusers that they shouldn't be able to be brought into court under these kinds of laws. So I think that gives us confidence that we will be seeing more of this in other states and hopefully some more federal legislation to assist victims of abuse.

16.17

AK: Now I know you might not be at liberty to answer this word either but I have to ask, but do you think that Ms. Giuffre will be filing other cases?

SM: You are right, I am not at liberty to discuss that.

AK: Understood.

SM: It's a great question. LAUGHTER

16.34

AK: So, going to the point that you said and then I think it's a very well argued response so it. As you know, a lot of people have said that it becomes difficult to either bring a case or defend against the case when so much time has passed. The first child victim act case to go to trial was according to Anthony Rapp, the plaintiff in the case, was against Kevin Spacey - and that case ended with Spacey winning, can you speak to the legacy of that case? Is that speaking

to a cultural shift is in speaking to the challenges of something else can you do you [Kenya] wanna take that one?

SM: Kenya do you want to take that one?

KD: Yes, the key thing you said was the cultural shift. Having tried these cases in front of several juries, at the criminal level, what you will find is that as society gets more comfortable with the idea of really hearing victims and understanding trauma and how trauma responds to abuse, that starts to change how it is that the jury will receive the facts in these cases. So you go from, you know, cases that were tried 10, 12 years ago, where all that happened was victim blaming. Iit was why were you where are you were why did you have one what you had on, why were you around the defendant, Didn't you know that was going to happened to you? These were questions that were allowed in a court room. 20 years ago we didn't have ratio laws that kepd defendants from bringing in prior sexual history. So you would have questions like well, how many boyfriends do you have? and how many people have you had sex with? right , all of those things were culturally acceptable and they were acceptable by the law. But as culture changes and as law changes hand-in-hand with it, then it becomes unacceptable. And you had jurors who walk into those jury boxes with a very different view of victims and the hope is that as the advocacy that has happened through cases like the ones that have been handled by our firm, and the victims and survivors speaking out on their own behalf; and in really educating the public about how this crime happens and how they respond to this crime in a way that is normal - it's not what you see on TV, it is not what you see in movies - the bogeyman is not jumping from behind the bushes, and fending him off. It's about coercive control, it's about getting comfortable with the person until it gets to a point where, you know this actually is not something I'm comfortable with.. All of those lines are now lies that we all are being taught about and educated about in a way that, that is very different cultural way than it was just a few years ago. And so I think the changes that we see are going to be rapid I think the more these cases that are brought especially this year under the Adult Survivors Act, the more educated the public will be about what this crime looks like - What it really looks like right

and What it really looks like right and how we should respond as a society.

20.05
AK: Sigrid, I remember seeing you in the courtroom frequently during the GM trial, now that she's been sentenced, what do you think the lesson and the legacy of that trial is? What was the lesson and legacy of that case?

20.21

SM: I think the lesson and legacy of the GM case is that nobody is above the law in the US and I think that was particularly poignant and powerful in that case because you had individuals who had extreme wealth, individuals who had access to every politician and legislator that they needed; they ran in circles of the highest and most wealthy and powerful people in our country; and yet, when the government focused in on their crimes, and brought the charges and these wonderful survivors bravely stood up in court and explained what happened to them as children, she was held to account and I think that is just er a great lesson for our society because for many, many years as we all know, there's a common understanding that you know, the law and justice can be bought. And I think this was just a great example of that going in the other direction.

AK: And Kenya, same question, what do you think the legacy of that case is?

21.40

KD: Um, I of course agree with my colleague but I also think that the legacy is that we now hae a better understanding as a society as to what victimhood is. These were not pristine victims, you know in order to be a victim of a crime you had to be flawless. You had to be flawless, you cannot have any addictions, you can't have any mis rememberings you could not have gone along voluntarily in any part of the crime. What we now understand is that victimhood is much more

complex than that. When you talk to the victims in this case, but also in the clergy cases, in the gymnastic cases they all tell you that there was a point where they

.

11

didn't even fully appreciate what had happened to them. There were points where they were quote un quote consenting. But now society understands that a child cannot consent and in many ways, if an adult is put in a type of situation, coercive control situation for instance. Many of my cases were human trafficking situations you know. Their trafficker was holding their children over them. The trafficker was threatening them, the trafficker held all the resources. That is not , that means that there are not consensual encounters that are happening. In fact the victim may have in the traditional sense, looked as if they were consenting, but either they were not in a position to consent because of their age or they weren't in a position to consent because of their circumstances. Right now, under the Adult Survivors' Act, we are seeing a group of cases being brought - I think Benjamin Crump is leading the charge on these cases. But we actually, when I was at another firm, we brought a civil rights case on behalf of women who had been assaulted by correctional officers, right. These women are in a position where even if they on the surface look as if they consent, a particular power dynamic is in place which means they can't consent. The law now recognizes that they cannot consent to sexual contact with police officers, with correctional officers who control everything about their lives -what they eat, how they move in and out of their cells, all of that. So I think the legacy will be that we also understand victimhood in a very different way than we did in the past.


24.38

AK: And of course there is very recently a Senate Report on the sexual abuses of women in prisons across the United States that found that it was happening in about ⅔ of Federal facilities with some staggering numbers reported. Going back

to the GM trial since her conviction there has been no indication that the JE investigation is closed. Is there anything else going on and do you tihnk anyone else will be indicted?

12

25.13

SM: LAUGHS. Well I always say wait and see. So, certainly the goal from our perspective with that case was to stop the abusers and particularly my very first client, her whole goal was to stop them from harming somebody else. And we've seen some of that. I mean Jean-Luc Brunel during Covid, with Virginia coming over from Australia to testify in Paris. He was held in prison, ultimately he died in prison. And now we have GM serving a 20 year sentence in federal prison. So slowly but surely we have seen that system being taken down but there were many people that participated, they could not do it alone. And as you heard in the trial, I mean even the house staff talked about how sophisticated a system it was, and how it worked, what they were allowed to do and what they weren't allowed to do. So many, many people were exposed and involved in that. So it remains to be seen what the next chapter looks like, um, in the Epstein saga.

26.27

AK: And recent development of course, the Virgin Islands prosecutor has reached a settlement that will see the sale of the Island and apparently the executors are cooperating with ongoing investigations. Will that add some momentum to whatever is next in that probe?

26.48

SM: Um I tink certainly. "We've seen a lot of activity in the U.S. Virgin Islands, and they obviously have been litigating that for a while and have crafted that

resolution. I think there will be potentially other matters arising out of that, that, you know, we'll see here in the near future.

13

AK: And in terms of the networks that make it possible, another lawsuit by victims of JE, another lawsuit targeted at JP Morgan and also Deutsche Bank, how will that help show a piece of the puzzle?

27.20

SM: Well what we are seeing here and there has been some of this newer law out in California we had a Federal Judge out there issue an opinion in the Mindk? Case at least getting past motion dismissed under the trafficking act for facilitating some of the funding. So that is what you are seeing here in our lawsuit that has been filed in New York. Two different suits with respect to, again the networks accountable so not o0nly those actually conducting the abuse but those who are facilitating the crimes by knowingly funding them etc. And I think you are going to see a lot in that space because the law allows for it and that is certainly something where in this instance, without the funding Epstein could not have done what he did. Without the ability to willingly access cash, all of those things, be able to set up different accounts, etc. he would not have been able to facilitate these crimes for over 20 years. So that case is new and that cases was filed the day the window opened.

28.37

AK: and correct me if i'm wrong but that will see a speedy trial this upcoming year>

Correct. We'll see the first case in August and next in

September. AK: And will those be the next Epstein trials to watch

in 2023?

14

SM: I certainly hope so!

AK: Thank you very much

END

# EXHIBIT  89

Exb: f
Ex B: II

page 1/2

**Former lead prosecutor tried to 'prosecute Jeffrey Epstein to the fullest extent of the law': Lawyer**

The former lead federal prosecutor's attorney issued a statement on Thursday. By
James Hill and Pete Madden
August 8, 2019, 7:28 PM
**Jeffrey Epstein's sex-trafficking trial set for next year**
The trial is tentatively set for 2020, and is expected to last four to six weeks.

A federal prosecutor in Florida who served more than a decade ago as the lead
prosecutor during in an expansive federal investigation of disgraced financier Jeffrey
Epstein's alleged sex crimes against children is confident that an ongoing internal
investigation will reveal her efforts to prosecute Epstein "to the fullest extent of the law
and to accord his victims their rights under the law," her attorney told ABC News on
Thursday. Earlier this year, the Justice Department's Office of Professional
Responsibility opened a probe into the handling of the case amid renewed scrutiny of
the plea deal Epstein reached with the U.S. Attorney's Office in Miami in 2007, led by
then-U.S. Attorney Alexander Acosta. A non-prosecution agreement allowed Epstein,
who was recently indicted on sex trafficking charges in New York, to plead guilty to two
state charges and avoid federal charges for an allegedly broad pattern of similar sexual
misconduct. He would serve just 13 months of an 18-month sentence in county jail in
Florida.

Assistant U.S. Attorney A. Marie Villafana, who plans to leave her position with the
Department of Justice after 18 years for a supervisory post in another government
agency, is eager for the public to review the internal investigation's findings, said her
attorney, Jonathan Biran of the Tennessee-based law firm Baker Donelson, in a

"We hope and expect that the Department will publicly release its report concerning the
Epstein investigation," Biran said. "~~We~~ ~~look forward to the day when the~~
~~public will fully understand her role and that of her superiors in the Epstein~~
~~investigation.~~"

Villafaña's superior during the Epstein investigation was Acosta, who recently resigned
as President Donald Trump's Labor Secretary after facing questions about his role in
the much-criticized plea deal. Earlier this year, a federal judge in Florida ruled that
Acosta's office had violated the rights of Epstein's alleged victims for failing to confer
with them in advance of the signing of the non-prosecution agreement with Epstein.

— 1 —

In a press conference prior to his resignation, Acosta defended the deal, saying he believes he and his office "proceeded appropriately." "The goal here was straightforward," Acosta said. "Put Epstein behind bars, ensure he registered as a sexual offender, provide victims with a means to seek restitution, and protect the public by putting them on notice that a sexual predator was within their midst."

Yet, even as Villafaña's role in the case has come under scrutiny, advocates for Epstein's alleged victims have publicly defended her.
Brad Edwards, a Fort Lauderdale attorney who represents a number of Epstein's alleged victims in a lawsuit against the DOJ challenging the Epstein deal, told ABC News in an interview that Villafaña appeared determined to prosecute Epstein and others who may have facilitated his alleged crimes. She was "putting together a solid prosecution," he said, that included a 53-page draft indictment and an 82-page prosecution memo.

"I ~~honestly~~," Edwards told ABC News, "[she] was ~~carrying out directives from~~ levels ~~above her~~."

Villafaña has to date declined to speak publicly on her own behalf, even as she has faced public criticism. She respects the rules "regarding refraining from commenting on ongoing litigation," ~~her attorney said, contending that there are specific pieces of evidence that she believes would cast her role in a new light. "She also has respected the Office's decision to assert the attorney-client privilege, the executive privilege, and the Privacy Act, which have prohibited the disclosure of internal communications showing Ms. Villafaña's efforts to prosecute Jeffrey Epstein to the fullest extent of the~~ law and to accord his victims their rights under the law, as well as providing them with support and compassion," ~~Biran said in the statement.~~

"Ms. Villafaña is confident that, when DOJ's internal investigation has been concluded, the Department will find that she acted properly in all respects as the lead prosecutor in the federal investigation of Jeffrey Epstein," the statement added. The date of Villafaña's departure has not yet been determined, but Biran said that her transfer out of the Department of Justice is unrelated to the controversy over the Epstein ordeal. "This change has been in the works for many months," Biran said. "It has nothing to do with the Epstein investigation. Nobody at the U.S. Attorney's Office has asked AUSA Villafaña to resign; to the contrary, her superiors have asked Ms. Villafaña to stay on."

# EXHIBIT 90

LCKCmax3          Summation - Ms. Moe          Page 2878

1  Epstein had been doing for years at this point — trips with
2  Jane when she was 14, 15, 16; spending a weekend in New Mexico
3  with Annie when she was 16.
4        And we're about to talk in a few minutes about just
5  how many flight records there are that show that Virginia
6  Roberts flew with Maxwell and Epstein when she was 17 years
7  old. This was Maxwell's playbook for years, and she tried to
8  get Carolyn to travel, too.
9        What happened to Carolyn in the years that she was
10 abused in that house in Palm Beach is hard to talk about. You
11 remember her testimony. She told you about being paid to give
12 sexualized massages to Epstein, how he touched her breasts, put
13 a vibrator on her vagina, and how every massage ended with
14 Epstein ejaculating. Ladies and gentlemen, that's what
15 happened to Jane, too. It's one of the many ways that you know
16 that Carolyn is telling the truth.
17       Now, remember when Carolyn told you that Epstein sent
18 her packages, that he sent her lingerie? You know that's true
19 because you saw FedEx records that proved that Epstein sent her
20 packages.
21       This is Government Exhibit 803. It's a record of a
22 package sent to Carolyn in October of 2002, when she was 15.
23 It's a package from New York from Epstein's office, and it
24 wasn't the only package. Here's another, Government Exhibit
25 801. Again, Carolyn was 15. And here's another, Government

LCKCmax3          Summation - Ms. Moe          Page 2879

1  Exhibit 802. Again, Carolyn was 15. Carolyn told you that she
2  got packages from Epstein from New York, and she did. You can
3  see that here in black and white. That's Government Exhibits
4  801, 802, and 803.
5        Who else was sending packages from Epstein's office
6  from this very same time period? Maxwell. She used the same
7  account to send packages. You see Maxwell's name on each of
8  these FedEx account invoices. Maxwell was a part of the
9  operation just like Carolyn told you.
10       You also learned about phone messages that Carolyn
11 left in the Palm Beach house on those message pads. Those
12 phone messages corroborate Carolyn's testimony. They prove to
13 you that she was there.
14       So let's talk about two of them.
15       First, this is Government Exhibit 608. Carolyn
16 testified that this was her mother's phone number. She wrote
17 it down so she wouldn't have to say it out loud at trial, and
18 we marked it as an exhibit. That same phone number is all over
19 the message pads from the Palm Beach house, phone message after
20 message.
21       This is Government Exhibit 1-B. It's the same phone
22 number, and that's Carolyn's full name, first and last. It's
23 from 2004. And remember, we were just looking at FedEx records
24 from 2002. What's the message here? That she wants to work
25 for Epstein today. What you were looking at is a phone message

LCKCmax3          Summation - Ms. Moe          Page 2880

1  from an underage girl who needs money and is being exploited.
2        This is Government Exhibit 3-E. It's the same phone
3  number and that's Carolyn's full name. What's the message?
4  It's that Kim wants to work. Just like Carolyn told you, she
5  brought other friends to the house to give massages.
6        Ladies and gentlemen, Carolyn's testimony was
7  extensively corroborated in this case. Her name is on FedEx
8  records and phone messages. She has been on the record since
9  2009 about Maxwell calling her for appointments. And her
10 exboyfriend, Sean, confirmed that Carolyn went to that house to
11 make money for years and that she interacted with Maxwell at
12 that house.
13       You know that Carolyn told you the truth. That's what
14 the evidence tells you. Her testimony was backed up by the
15 other evidence in this case and it was corroborated by what
16 Annie and Kate and Jane told you about Maxwell and how she
17 operated for years. What Carolyn told you is powerful evidence
18 that Maxwell was conspiring with Epstein to abuse underage
19 girls. Maxwell sent a teenage girl into a massage room with an
20 adult man. She knew exactly what she was doing. If you
21 believe Carolyn's testimony, the defendant is guilty on counts
22 One, Three, Five, and Six. And I'll talk about those counts
23 later on.
24       That brings us to reason six. The sixth way that you
25 know Maxwell is guilty is because Maxwell and Epstein kept a

LCKCmax3          Summation - Ms. Moe          Page 2881

1  little black book with their victims' names in it. It is a
2  powerfully incriminating document.
3        So I want to start by going back to the household
4  manual. And what the manual shows you is that Maxwell and
5  Epstein had a phone directory, and they kept several copies of
6  it in the house. There was a copy in the pool area, there was
7  a copy in their cars, there was a copy of it in the master
8  bedroom, and most importantly, there was a copy right on
9  Maxwell's desk.
10       Here's the part of the manual that tells you that.
11 There was a copy on her desk. And they're not just any
12 directories. In the manual, they're the JE and GM telephone
13 directories. Jeffrey Epstein and Ghislaine Maxwell. When Juan
14 Alessi testified, he was asked about a little black book and he
15 testified that he recognized it as one of those books.
16       So let's take a look at Government Exhibit 52-G, which
17 is a page from that book. Here it is. So the section on this
18 page is titled "Massage Florida." I'm going to highlight a few
19 specific entries in a moment, but first let's just start with
20 the basics. You'll notice just how many names there are. Who
21 needs that many masseuses? That's the first sign that
22 something is off here. And a second thing that you're going to
23 notice is that all of the names here are female.
24       The third thing that you're going to notice is that
25 there are notes next to some of the names, things like mom,

1 dad, or parents. Use your common sense, ladies and gentlemen.
2 When you contact a professional masseuse, you don't need to
3 call her mom or dad. Just looking at this page tells you that
4 none of this was legitimate. These were millionaires who could
5 hire the top massage therapists in the whole world, but Maxwell
6 had a book with dozens of entries in a massage section that
7 makes absolutely clear that these were not real massages by
8 professional masseuses. In fact, this book makes clear that
9 some of the entries were for kids.
10      So let's talk about one of those entries. The entry
11 here on the left is Virginia, parents. I want you to take a
12 look at the phone number, ladies and gentlemen. You've seen it
13 somewhere else in this trial, and here it is. This is
14 Government Exhibit 823. It's the employment record for Sky
15 Roberts. You saw Virginia Roberts' birth certificate, so you
16 know that Sky Roberts is Virginia's dad. He was an employee at
17 Mar-a-Lago, which, as Juan Alessi testified, is the place where
18 Maxwell met Virginia Roberts. Take a look at the phone number
19 listed for Sky Roberts on this document. It's the same number
20 on Government Exhibit 52-G, the contact book.
21      And Virginia is also, by the way, on flight records
22 with Maxwell when she was 17 years old. Let's take a look, and
23 as we do, you're going to see the initials "G.M." for Ghislaine
24 Maxwell on every single one.
25      Here's the first one. Two flights, JE, GM, ET,

1 Virginia. JE, GM, AT, Virginia. It's from 2000. She was 17
2 years old. Here's another page. JE, GM, ET, Virginia Roberts.
3 Here's another, JE, GM, ET, Virginia Roberts. There is another
4 one, JE, GM, ET, Virginia Roberts. This is 2001 when Virginia
5 Roberts was 17. They were flying around with a 17-year-old
6 girl.
7      But back to the black book, there is more to talk
8 about. Remember Sean, Carolyn's boyfriend? There is an entry
9 for him, too, under an entry for Carolyn, Carolyn's boyfriend's
10 house. That entry has Carolyn's first and last name. That
11 same phone number that you're looking at here is on three
12 messages from the message pads, and here they are. It's
13 Government Exhibits 2-U, 2-P, and 2-O. And if you take a look
14 at the date on the two messages on the left, they're from 2003
15 when Carolyn was 16. There's the phone number. It's the same.
16 In fact, the message in the middle is from just a month past
17 Carolyn's 16th birthday. There is more. There is an entry in
18 here for Carolyn with her full name. That number is on phone
19 messages from 2003, too. Here they are. One says Carolyn, two
20 say Caroline, but you know it's the same person, you know it's
21 Carolyn because the phone number is the same.
22      Who else is in this book? Remember how Sean told you
23 that he would bring a 16-year-old girl named Melissa to the
24 house with Carolyn? It's this girl in the photograph with
25 Carolyn. She's the one right next to Carolyn. That's

1 Melissa's birth certificate. Sean told you this is the girl.
2 And sure enough, there are two entries under massage for
3 Melissa, Carolyn's friend. Here they are.
4      Again, remember how you learned that, by this point,
5 things operated like a pyramid scheme. Virginia brought
6 Carolyn, Carolyn brought Melissa and other girls. One girl
7 would bring another, who would bring another.
8      Ladies and gentlemen, this book, Maxwell's book, it
9 proves to you that Maxwell is guilty. What you'll see in this
10 book corroborates the witnesses who testified in this trial.
11 She had victim names written in a little black book. This
12 document is powerful evidence of the defendant's knowledge and
13 intent. These were not real massages. What was happening was
14 sexual abuse with underage girls. Maxwell knew it, she was
15 part of it, she was responsible for it, and the fact that she
16 had a little black book with her victims' names in it proves to
17 you that she is guilty.
18      That brings us to the seventh reason that you know
19 Maxwell is guilty. It's the money. Now, we've already talked
20 about Epstein's luxurious lifestyle and all of the perks that
21 Maxwell got from being his partner in crime, but it wasn't just
22 getting to live in the mansions and flying on the private jets,
23 maxwell got millions of dollars from Epstein. You learned that
24 between 1999 and 2007, Jeffrey Epstein gave Maxwell about $30
25 million, and you know exactly what that money was for.

1      First, in 1999, Epstein sent Maxwell $18.3 million.
2 $18.3 million — here's the transaction. And then, in 2002,
3 Epstein paid Maxwell $5 million — here's the transaction. And
4 last but not least, in 2007, Epstein paid Maxwell $7.4 million.
5 $18.3 million, $5 million, $7.4 million. It's a total of
6 $30.7 million.
7      At this point, you got to ask yourselves, what was
8 Maxwell doing for Epstein that was worth more than $30 million?
9 Your common sense tells you that you don't give someone
10 $30 million unless they're giving you exactly what you want,
11 and what Epstein wanted was to touch underage girls. When
12 Maxwell took that money, she knew what it was for and now you
13 do, too. It was payment for committing terrible crimes with
14 Jeffrey Epstein.
15      That brings us to reason number 8 that you know that
16 Maxwell is guilty. When you zoom out and look at the big
17 picture, the timeline over the years, it's obvious that Maxwell
18 spent a decade aiding and abetting Jeffrey Epstein's crimes,
19 that they were coconspirators, partners crime.
20      Let's talk about the timeline the big picture.
21      In 1994, Maxwell met Jane. In that same year, Maxwell
22 and Epstein started sexually abusing Jane, and that often
23 happened in the context of massages. That same year, in 1994,
24 Maxwell met Kate, too, and Epstein initiated sexual contact
25 with Kate also in the context of massages, massages in which

UNITED STATES OF AMERICA, v.
GHISLAINE MAXWELL,

December 20, 2021

| LCKVMAX4 | Page 2910 |
| --- | --- |

1 in 2004 during the sex trafficking conspiracy.

2     THE COURT: All right. Overruled.

3     Anything else?

4     MR. PAGLIUCA: Yes, your Honor.

5     This relates to Exhibit 52, which are the pages from

6 the book that were admitted. The Court admitted those over our

7 hearsay objection with the limiting instruction. And the

8 government assured the Court, when the Court was making this

9 decision, that they weren't going to argue the truth of the

10 matter contained in any of the books.

11     And what we heard in closing argument was exactly

12 that, that there are names in the books. And you can then

13 infer from those names that those might be the people that were

14 being discussed by Jane as having the sexualized massages; that

15 they were reading the words mom, dad, phone numbers, and

16 suggesting that's how Ms. Maxwell had to have known that

17 these individuals were minors. Again, that's the truth of the

18 matter asserted; it's not for the limited purpose that the

19 Court instructed the jury.

20     My request, your Honor, my application, first, is that

21 the Court declare a mistrial based on the misuse of that

22 evidence. If the Court is not inclined to do that, I believe

23 the Court should reinstruct the jurors about the limited

24 purpose, instruct the jurors that they can't infer what the

25 government was suggesting they could infer from that argument.

| LCKVMAX4 | Page 2911 |
| --- | --- |

1 And then we go from there.

2     I also object to the use of what I thought the Court

3 prohibited, which was the grooming-by-proxy argument, which was

4 re-raised in closing argument, suggesting that somehow Ms.

5 Maxwell was grooming these women for Mr. Epstein, which I

6 thought had been precluded.

7     THE COURT: That's easy to overrule.

8     My precise conclusion was the expert couldn't testify

9 to it in part because -- well, not in part. The expert

10 couldn't testify to it; but, of course, counsel could make

11 arguments along that regard from the facts in the evidence.

12     MR. PAGLIUCA: Understood, your Honor.

13     Those are my remarks and requests about the closing.

14     THE COURT: Exhibit 52.

15     MS. MOE: Yes, your Honor.

16     The government's arguments with respect to Government

17 Exhibit 52 were entirely consistent with the Court's ruling.

18 In particular, the arguments were about knowledge and intent,

19 how it would be obvious, looking at a document, that none of

20 this was legitimate, that they weren't real masseuses, things

21 like mom and dad, we have that effect. And when a document is

22 offered not for its truth, that is certainly a proper

23 inference.

24     When we compare the numbers in Government Exhibit 52

25 against the message pads, the language was the number here is

| LCKVMAX4 | Page 2912 |
| --- | --- |

1 the same number on this document. That's certainly permissible

2 and a matter of common sense. We just showed two documents and

3 showed they were the same phone numbers.

4     What I didn't say is, This is Carolyn's phone number,

5 you know, it's the real phone number. It was a common sense

6 inference between two phone numbers that were the same.

7     THE COURT: I deny the request for mistrial. I

8 overrule the objection. It is consistent with my -- both my

9 conclusion in allowing it with respect to the limited purpose

10 for which the document was entered as indicated in my limiting

11 instruction at the time. And for those reasons, the motion

12 is -- the application is denied.

13     Anything else?

14     MS. STERNHEIM: No, thank you.

15     MS. MOE: Not from the government, your Honor.

16     THE COURT: All right. See you in about 15 -- I want

17 to make sure everybody has enough time for a quick lunch, but

18 my plan is to resume in 20 minutes. Thank you.

19     (Luncheon recess)

20     MS. MENNINGER: We have technical difficulty, your

21 Honor. The screen is not working.

22     However, we're working on it.

23     THE COURT: Be seated please.

24     How about a laptop?

25     (Pause)

| LCKVMAX4 | Page 2913 |
| --- | --- |

1     THE COURT: Let the record reflect my suggestion was

2 paper.

3     (Pause)

4     THE COURT: I'll ask Ms. Williams to line up the jury.

5     Ms. Menninger, are you ready now?

6     MS. MENNINGER: Yes. We are now.

7     Thank you, your Honor.

8     THE COURT: Okay. Bring in the jury.

9     Ms. Menninger, please do stay close to the mic

10 throughout, if you can. I know sometimes it starts that way

11 and then you back up. One backs up.

12     MS. MENNINGER: One does.

13     THE COURT: One does. Thank you.

14     MS. MENNINGER: One will try not to.

15     THE COURT: Thank you. Bring in the jury.

16     (Jury present)

17     THE COURT: Everyone may be seated.

18     All right. Thank you, members of the jury. I hope it

19 was a good -- even if speedy -- lunch.

20     I'll ask you to now please give your full attention to

21 Ms. Menninger, who will deliver the closing argument on behalf

22 of Ms. Maxwell.

23     Go ahead, Ms. Menninger.

24     (Continued on next page)

25

# EXHIBIT 91



**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

October 7, 2020

**VIA ECF**

The Honorable Alison J. Nathan
United States District Court
Southern District of New York
United States Courthouse
40 Foley Square
New York, New York 10007

      **Re:** *United States v. Ghislaine Maxwell*, **20 Cr. 330 (AJN)**

Dear Judge Nathan:

      The Government respectfully submits this letter to provide additional information in response to the Court's prior inquiry regarding the Government's plan to obtain and review other investigative files, created and maintained by other offices, which are related to the above-referenced case. In particular, at the initial conference in this matter on July 14, 2020, the Court asked the Government about its plan to ensure timely review the files of other agencies for potential disclosures in this case and highlighted the Court's expectation that the Government would be thoughtful and probing in its assessment of such a review. Consistent with the Government's commitment to take a thorough and transparent approach to its disclosure obligations, this letter outlines the relevant investigative files of which the Government is currently aware and describes the Government's approach as to each.

**I.    Background Regarding the Government's Rule 16 Discovery Productions**

      The charges in this case arise out of an investigation conducted by the United States Attorney's Office for the Southern District of New York ("USAO-SDNY"), the Federal Bureau of Investigation ("FBI") New York Office, and the New York Police Department (the "NYPD") (collectively, the "Prosecution Team"). That investigation was opened in 2018 and remains ongoing. The Government has copies of the full investigative files for this case from the USAO-SDNY, the FBI New York Office, and the NYPD (the "Prosecution Team Files"). The bulk of the productions to date have come from the Prosecution Team Files. The Government is continuing to review the Prosecution Team Files for any additional materials that warrant disclosure.

      Specifically, to date, the Government has produced approximately 328,863 pages of discovery to the defense in this case. Those materials include, among other things, photographs, documents seized during searches, search warrants, search warrant applications, financial records, travel records, property records, phone records, law enforcement reports, and other subpoena

Honorable Alison J. Nathan
October 7, 2020
Page 2

returns. The Government is continuing the process of reviewing and preparing productions of electronic discovery materials, which include extractions of data from numerous electronic devices. The Government expects that it will meet the November 9, 2020 deadline for the completion of electronic discovery productions. Additionally, the Government recognizes that its disclosure obligations are ongoing, and the Government will continue to review the Prosecution Team Files for any additional discoverable or exculpatory materials. In particular, the Government is aware of its obligations under *Brady v. Maryland*, 373 U.S. 83 (1963) and its progeny, and will promptly produce any exculpatory material of which it becomes aware.

The Government's Rule 16 discovery productions do not include witness statements or material under *Giglio v. United States*, 405 U.S. 150 (1972) and its progeny, consistent with the common practice and law within this Circuit. As indicated in a prior letter, the Government intends to produce all such materials to the defense well in advance of trial.[1] Specifically, although the parties have not yet conferred regarding a schedule for disclosure of witness statements, the Government is prepared to produce all statements and impeachment material for witnesses it expects to call at trial as early as four weeks prior to trial. Additionally, the Government is prepared to produce any statements by witnesses who it does not expect to call at trial as early as eight weeks prior to trial, subject to restrictions to protect those individuals' privacy to be negotiated by the parties.

## II. Applicable Law Governing Disclosure of Other Investigative Files

The disclosure obligations set forth in Federal Rule of Criminal Procedure 16, *Brady*, and *Giglio* apply to materials in the Government's "possession." As a general matter, though "[a]n individual prosecutor is presumed . . . to have knowledge of all information gathered in connection with his office's investigation of the case[,] . . . knowledge on the part of persons employed by a different office of the government does not in all instances warrant the imputation of knowledge to the prosecutor . . . ." *United States v. Avellino*, 136 F.3d 249, 255 (2d Cir. 1998) (citations omitted); *see alsa United States v. Locascio*, 6 F.3d 924, 948-49 (2d Cir. 1993) (declining to "infer the prosecutors' knowledge simply because some other government agents knew about" additional evidence where federal prosecutors were unaware of documents in possession of FBI agents who were "uninvolved in the investigation or trial of the defendants"); *United States v. Quinn*, 445 F.2d 940, 944 (2d Cir. 1971) (declining to impute knowledge of prosecutor in Florida to prosecutor in New York and noting that the "Department of Justice alone has thousands of employees"). The imposition of such "an unlimited duty on a prosecutor to inquire of other offices not working with the prosecutor's office on the case in question would inappropriately require [courts] to adopt 'a monolithic view of government' that would 'condemn the prosecution of criminal cases to a state of paralysis.'" *Avellino*, 136 F.3d at 255 (quoting *United States v. Gambino*, 835 F. Supp. 74, 95 (E.D.N.Y. 1993)). Thus, discovery and disclosure obligations only extend to "information known

[1] The Government recognizes that its *Brady* obligations include the disclosure of witness statements containing exculpatory information. To date, the Government is not aware of any exculpatory material contained in any witness statements, but it will continued to review its files, including witness statements, for such material. If the Government becomes aware of any *Brady* material from any source, it will promptly disclose such material to the defense.

Honorable Alison J. Nathan
October 7, 2020
Page 3

to persons who are a part of the 'prosecution team' . . . who perform investigative duties or make strategic decisions about the prosecution of the case," including "police officers and federal agents who submit to the direction of the prosecutor and participate in the investigation." *United States v. Barcelo*, 628 F. App'x 36, 38 (2d Cir. 2015) (quoting *United States v. Stewart*, 433 F.3d 273, 298 (2d Cir. 2006)).

In considering whether Rule 16 and *Brady* apply to records in the possession of another government agency, a prosecutor's duty extends to reviewing such evidence only where the Government conducts a "joint investigation" with that agency or branch of government. *See United States v. Middendorf*, No. 18 Cr. 36 (JPO), 2018 WL 3956494, at *4-5 (S.D.N.Y. Aug. 17, 2018) (no joint investigation between Government, Public Company Accounting Oversight Board ("PCAOB") and Securities and Exchange Commission ("SEC") where PCAOB was not involved in witness interviews or developing prosecutorial strategy, and SEC was not involved in the grand jury presentation, reviewing the fruits of the Government's investigation, or developing prosecutorial strategy); *United States v. Collins*, 409 F. Supp. 3d 228, 241-43 (S.D.N.Y. 2019) (no joint investigation between U.S. Attorney's Office and SEC where the two entities conducted a small number of joint interviews and engaged in limited sharing of information with each other); *United States v. Finnerty*, 411 F. Supp. 2d 428, 433 (S.D.N.Y. 2006) (no joint investigation between Government and New York Stock Exchange ("NYSE") where documents sought were "the product of an investigation that was undertaken by the NYSE of its own practices, and there [wa]s no suggestion that the Government participated in that investigation").

Moreover, the involvement of agents from one component of an agency in an investigation does not render the entirety of that agency part of the prosecution team. *See, e.g., United States v. Stein*, 424 F. Supp. 2d 720, 723 (S.D.N.Y. 2006) ("While the prosecution's disclosure obligation in some circumstances may extend to materials beyond the knowledge of the individual prosecutors assigned to a case, it does not extend to the collective knowledge of the entire United States government or even to the entire government agency concerned."); *see also Locascio*, 6 F.3d at 949 (refusing to impute to AUSAs knowledge of reports prepared by FBI agents who were "uninvolved in the investigation or trial of the defendants"); *cf. United States v. Ghailani*, 687 F. Supp. 2d 365, 372 (S.D.N.Y. 2010) (holding that, in the context of a speedy trial motion, other members of the Department of Justice who were involved in making decisions about timing and progress of the case were part of the "government" for Rule 16 purposes).

As the foregoing precedents recognize, the factors relevant in determining whether an agency or a component of an agency are part of the prosecution team, and therefore their records are in the "possession" of the Government include whether the agency or component: "(1) participated in the prosecution's witness interviews, (2) was involved in presenting the case to the grand jury, (3) reviewed documents gathered by or shared documents with the prosecution, (4) played a role in the development of prosecutorial strategy, or (5) accompanied the prosecution to court proceedings." *Middendorf*, 2018 WL 3956494, at *4.

Honorable Alison J. Nathan
October 7, 2020
Page 4

## III. The Government's Plan to Review Certain Files from the Florida Investigation

### A. Relevant Background Regarding the Florida Investigation (2005-2010)

Between approximately 2005 and 2010, and as detailed further below, members of the Palm Beach Police Department, the Palm Beach State's Attorney's Office, the U.S Attorney's Office for the Southern District of Florida ("USAO-SDFL"), and the FBI's Palm Beach Resident Agency (the "FBI Florida Office") conducted a separate investigation and prosecution of Jeffrey Epstein for his sexual abuse of minors in Florida (the "Florida Investigative Team" and the "Florida Investigation," respectively). The Prosecution Team in this case had no involvement in the Florida Investigation, which predated the instant investigation by approximately eight years.[2] Similarly, the Florida Prosecution Team and the agencies involved in the Florida Investigation have had no involvement in the investigative, charging, or prosecutorial strategy decisions of the Prosecution Team in this case. Accordingly, under the governing law of this Circuit as discussed above, there is no basis for deeming the Florida Prosecution Team a part of the current Prosecution Team, and the Government does not believe it has any legal obligation to obtain or review the investigative files of those agencies. As discussed below, however, the Government is nevertheless prepared to go significantly above and beyond its disclosure obligations by requesting files from the Florida Investigation that have at least some potential to contain materials that could be relevant to the instant case, and by reviewing and producing those materials as appropriate in this case.[3]

---

[2] As detailed herein, during the course of its investigation, the Prosecution Team has gathered some documents related to the Florida Investigation, principally consisting of the FBI Florida Office's case file for the Florida Investigation. Those materials are being treated as a part of the Prosecution Team's files and will be produced, to the extent covered by Rule 16 or any other disclosure obligation, to the defendant in this case.

[3] In addition to the Florida Investigation, the Government is aware, through public reporting among other means, of a number of other investigations into matters relating to Jeffrey Epstein. For example, it has been publicly reported that local agencies in the U.S. Virgin Islands, Paris, and London have conducted and may still be conducting investigations into Epstein, which may include investigation into his sexual abuse of minors. There has also been public reporting regarding investigations into Epstein's finances, including an investigation by the U.S. Attorney's Office in the U.S. Virgin Islands, and into the conditions of Epstein's confinement while serving his sentence following the Florida Investigation. Additionally, the USAO-SDNY conducted an investigation into Epstein's suicide and is currently prosecuting two corrections officers as a result of that investigation. *See United States v. Noel and Thomas*, 19 Cr. 830 (AT). Separately, the FBI Florida Office investigated and ultimately prosecuted an employee of Epstein's named Alfredo Rodriguez for obstruction of justice, *see United States v. Alfredo Rodriguez*, 10 Cr. 80015 (KAM), and the Prosecution Team has received some files from that case. The Government does not intend to further seek out or review the investigative files of any such cases, which are completely unrelated to the subject matter of the instant prosecution and/or have been conducted by entities that are not part of this Prosecution Team and, in some instances, the Department of Justice.

Honorable Alison J. Nathan
October 7, 2020
Page 5

### B. The Government's Plan for Obtaining and Reviewing Certain Files from the Florida Investigation

As an initial matter, beginning during the course of its investigation, the Government has obtained the entirety of the FBI Florida Office's case file from the Florida Investigation. The Government has already made productions from that file, is continuing to review that file, and intends to produce at the appropriate point any additional material in that file warranting disclosure in this case. That file includes, among other things, any FBI-302 of any relevant witness interview; any relevant materials obtained pursuant to federal grand jury subpoena as part of that investigation; and any relevant material seized during a search of Epstein's Palm Beach residence conducted as part of that investigation. The Government believes the FBI file contains substantially all of the prior witness statements made during the Florida Investigation, including, if applicable, any prior statements made by witnesses the Government intends to call at trial in this case.

In total, the Government has identified six potential sources of material related to the Florida Investigation, and has been requesting and reviewing materials from those sources as follows:

*First*, the Palm Beach Police Department ("PBPD") opened its investigation into Jeffrey Epstein in or about 2005. During the course of that investigation, the PBPD, among other things, conducted numerous witness interviews, issued multiple subpoenas for documents,[4] and executed a search warrant at Epstein's Palm Beach Residence. In or about 2006, the PBPD referred its investigation to the FBI Florida Office. It is the Government's understanding that the PBPD provided its entire investigative file to the FBI Florida Office. As discussed above, the Prosecution Team already has a copy of the full FBI Florida Office file and, as such, has been reviewing and will continue to review the PBPD file for any material that warrants disclosure in this case. Additionally, the Government has contacted the Records Specialist at the PBPD, who informed the Government that the PBPD has no additional investigative files beyond what it already provided to the FBI Florida Office. Out of an abundance of caution, however, the Government asked the Records Specialist to provide the Prosecution Team with a copy of the files still in PBPD's possession related to the Florida Investigation. In response, the PBPD Records Specialist provided the Government with 60 pages of documents, which the Prosecution Team reviewed for any material that is non-duplicative and warrants disclosure in this case. The Prosecution Team has identified five of those pages as non-duplicative and intends to produce those five pages as part of its next discovery production to the defense.

*Second*, the Palm Beach State's Attorney's Office (the "PBSA"), working with the PBPD, among other agencies, handled the Florida state investigation and prosecution of Jeffrey Epstein between approximately 2005 and 2010 (when Epstein completed his sentence). As a result of that investigation and prosecution, Epstein pled guilty to procuring an underage girl for prostitution and soliciting a prostitute. Prior to September 14, 2020, the Prosecution Team had never received any documents directly from the PBSA and did not have the PBSA's full investigative file.

---

[4] As detailed below, these subpoenas were issued by the Palm Beach State's Attorney's Office.

Honorable Alison J. Nathan
October 7, 2020
Page 6

Although the PBSA is not part of the Prosecution Team, the Government has nevertheless communicated with the PBSA and requested that the PBSA provide the Prosecution Team with its entire investigative file, to the extent it still exists. In response, on September 14, 2020, the PBSA provided the Prosecution Team with an electronic copy of its entire case file regarding the Florida Investigation, which consists of 4,421 pages of documents, 43 audio files, and 6 video files. The Government is reviewing that file for any material that is non-duplicative of other material previously obtained and that warrants disclosure in this case.

*Third*, the FBI Florida Office conducted a prior federal investigation into Jeffrey Epstein between approximately 2006 and 2010. As noted above, the electronic files from the FBI Florida Office are accessible by the FBI New York Office, which has provided the Government with a complete set of FBI electronic files from both its Florida Office and its New York Office for this case. The Government has reviewed those files for discoverable materials. The physical files from the FBI Florida Office, which are contained in approximately 24 boxes, have all been transferred to the FBI New York Office and are in the possession of the Prosecution Team. Those files have been scanned and put into an electronic review platform. The Government has previously reviewed those files and is continuing to do so for discoverable materials. In addition, and as noted above, some items from the FBI Florida Office file have already been produced as part of prior discovery productions in this case.

*Fourth*, the USAO-SDFL participated in the federal investigation of Jeffrey Epstein between approximately 2006 and 2010. Before today, the Prosecution Team had never received any documents from the USAO-SDFL and did not have the USAO-SDFL's investigative file. Indeed, aside from notifying the SDFL at an executive level that the SDNY was opening its own Epstein investigation in 2018, the Prosecution Team had no substantive communications with the USAO-SDFL about the Prosecution Team's investigation or prosecution until after indicting this case. However, after the initiation of this prosecution, the Government communicated with the USAO-SDFL and requested that the USAO-SDFL provide the Prosecution Team with a copy of its entire investigative file, so that the Prosecution Team could review the files for material that warrants disclosure in this case. The USAO-SDFL agreed to provide its entire file, which is contained in approximately 28 boxes, to the Prosecution Team. Accordingly, the Government hired a vendor to copy the entire USAO-SDFL file and load that file into an electronic review platform. The Government received the electronic copy of the USAO-SDFL file from the vendor today and intends to review that file for materials that warrant disclosure in this case.

*Fifth*, internal Department of Justice emails relating to the prior Florida Investigation have been gathered by the Department of Justice's Office of Professional Responsibility ("OPR"), as part of its unrelated investigation into the resolution of the prior Florida Investigation.[5] In particular, during the course of its investigation, OPR gathered a significant volume of emails, to the extent they had been preserved and remained accessible, from a number of USAO-SDFL attorneys, including a number of supervisors in that office and the primary line Assistant U.S. Attorney who worked on the Florida Investigation ("Attorney-1").

---

[5] This OPR investigation has been publicly acknowledged by the Department of Justice.

Although the Government does not believe it has any obligation to gather or review emails sent or received by attorneys at the USAO-SDFL as part of their separate, prior investigation, the Government nonetheless intends to gather and review the emails sent to or from Attorney-1 to the extent those emails were preserved and gathered by OPR. As noted, Attorney-1 was the primary line assistant on that investigation, and Attorney-1's emails are thus the most likely to contain communications with or regarding potential witnesses. The Government has already obtained Attorney-1's emails from OPR, and given the volume, the Government intends to load those emails into an electronic review platform and then conduct targeted searches of those emails for terms relevant to this case, including the defendant's name and the names of victims and witnesses. Based on our understanding of the USAO-SDFL investigation, we do not believe that there are a substantial number of overlapping victims or witnesses between that investigation and this prosecution. But to the extent searches of Attorney-1's emails reveal non-duplicative *Giglio* or 3500 material for any such victims or witnesses, the Government will produce any such identified material consistent with any schedule for pre-trial disclosures set by the Court. The Government does not intend to request or review emails for any other USAO-SDFL or Department of Justice attorney or otherwise perform a comprehensive review of the internal e-mails of that prosecutor's office from its wholly separate investigation, including by asking for any other material gathered by OPR as part of its investigation.

*Sixth*, beginning in or about 2019, attorneys with the United States Attorney's Office for the Southern District of Georgia ("USAO-SDGA") were designated to participate in the representation of the United States in civil litigation brought by Epstein victims for violations of the Crime Victim Rights Act ("CVRA") by the USAO-SDFL in connection with the Florida Investigation after the USAO-SDFL was recused from that civil litigation. The Government intends to contact the USAO-SDGA and ask whether it (a) had any substantive communications with witnesses relevant to this prosecution during its participation in the CVRA civil litigation, or (b) gathered any information regarding the defendant, Ghislaine Maxwell. If so, the Government will request any and all records regarding those topics and will review those records for materials that warrant disclosure in this case. Otherwise, the Government does not intend to request or review any materials from the USAO-SDGA.

\* \* \*

As noted above, none of these other offices or agencies has played any role in the investigation or prosecution of this case. In particular, none of these offices and agencies has participated in witness interviews or taken any other investigative steps with the Prosecution Team. Nor did any representative of these other offices or agencies play any role in developing strategy, making charging decisions, or presenting this case to the grand jury. Accordingly, although the Government maintains that none of these agencies is part of the Prosecution Team in this case, given the similarity of the nature of the conduct investigated in this case and the conduct investigated by those other offices and agencies, the Government is prepared to undertake the extensive efforts described above to obtain and review additional material. The Government will continue to produce any portion of those materials that warrants disclosure in this case, including in connection with its production of *Giglio* and 3500 material.

Honorable Alison J. Nathan
October 7, 2020
Page 8

### IV. Conclusion

Consistent with its representations to the Court at the initial conference in this matter, the
Government is committed to maintaining a thorough, careful, and comprehensive approach to its
disclosure obligations. The Government is prepared to address any questions the Court may have
or to provide any additional information upon request.

Respectfully submitted,

AUDREY STRAUSS
Acting United States Attorney

By: _____
Maurene Comey / Alison Moe / Lara Pomerantz
Assistant United States Attorneys
Southern District of New York
Tel: (212) 637-2324

Cc:    *All counsel of record*, via ECF

EXHIBIT 92

UNITED STATES OF AMERICA, v.
GHISLAINE MAXWELL,

December 20, 2021

| LCKCmax3 | Summation - Ms. Moe | Page 2882 |
|---|---|---|

1 dad, or parents. Use your common sense, ladies and gentlemen.
2 When you contact a professional masseuse, you don't need to
3 call her mom or dad. Just looking at this page tells you that
4 none of this was legitimate. These were millionaires who could
5 hire the top massage therapists in the whole world, but Maxwell
6 had a book with dozens of entries in a massage section that
7 makes absolutely clear that these were not real massages by
8 professional masseuses. In fact, this book makes clear that
9 some of the entries were for kids.
10    So let's talk about one of those entries. The entry
11 here on the left is Virginia, parents. I want you to take a
12 look at the phone number, ladies and gentlemen. You've seen it
13 somewhere else at this trial, and here it is. This is
14 Government Exhibit 823. It's the employment record for Sky
15 Roberts. You saw Virginia Roberts' birth certificate, so you
16 know that Sky Roberts is Virginia's dad. He was an employee at
17 Mar-a-Lago, which, as Juan Alessi testified, is the place where
18 Maxwell met Virginia Roberts. Take a look at the phone number
19 listed for Sky Roberts on this document. It's the same number
20 on Government Exhibit 52-G, the contact book.
21    And Virginia is also, by the way, on flight records
22 with Maxwell when she was 17 years old. Let's take a look, and
23 as we do, you're going to see the initials "G.M." for Ghislaine
24 Maxwell on every single one.
25    Here's the first one. Two flights, JE, GM, ET,

| LCKCmax3 | Summation - Ms. Moe | Page 2884 |
|---|---|---|

1 Melissa's birth certificate. Sean told you this is the girl.
2 And sure enough, there are two entries under massage for
3 Melissa, Carolyn's friend. Here they are.
4    Again, remember how you learned that, by this point,
5 things operated like a pyramid scheme. Virginia brought
6 Carolyn, Carolyn brought Melissa and other girls. One girl
7 would bring another, who would bring another.
8    Ladies and gentlemen, this book, Maxwell's book, it
9 proves to you that Maxwell is guilty. What you'll see in this
10 book corroborates the witnesses who testified at this trial.
11 She had victim names written in a little black book. This
12 document is powerful evidence of the defendant's knowledge and
13 intent. These were not real massages. What was happening was
14 sexual abuse with underage girls. Maxwell knew it, she was
15 part of it, she was responsible for it, and the fact that she
16 had a little black book with her victims' names in it proves to
17 you that she is guilty.
18    That brings us to the seventh reason that you know
19 Maxwell is guilty. It's the money. Now, we've already talked
20 about Epstein's luxurious lifestyle and all of the perks that
21 Maxwell got from being his partner in crime, but it wasn't just
22 getting to live in the mansions and flying on the private jets,
23 maxwell got millions of dollars from Epstein. You learned that
24 between 1999 and 2007, Jeffrey Epstein gave Maxwell about $30
25 million, and you know exactly what that money was for.

| LCKCmax3 | Summation - Ms. Moe | Page 2883 |
|---|---|---|

1 Virginia. JE, GM, AT, Virginia. It's from 2000. She was 17
2 years old. Here's another page. JE, GM, ET, Virginia Roberts.
3 Here's another, JE, GM, ET, Virginia Roberts. There is another
4 one, JE, GM, ET, Virginia Roberts. This is 2001 when Virginia
5 Roberts was 17. They were flying around with a 17-year-old
6 girl.
7    But back to the black book, there is more to talk
8 about. Remember Sean, Carolyn's boyfriend? There is an entry
9 for him, too, under an entry for Carolyn, Carolyn's boyfriend's
10 house. That entry has Carolyn's first and last name. That
11 same phone number that you're looking at here is on three
12 messages from the message pads, and here they are. It's
13 Government Exhibits 2-U, 2-P, and 2-O. And if you take a look
14 at the date on the two messages on the left, they're from 2003
15 when Carolyn was 16. There's the phone number. It's the same.
16 In fact, the message in the middle is from just a month past
17 Carolyn's 16th birthday. There is more. There is an entry in
18 here for Carolyn with her full name. That number is on phone
19 messages from 2003, too. Here they are. One says Carolyn, two
20 say Caroline, but you know it's the same person, you know it's
21 Carolyn because the phone number is the same.
22    Who else is in this book? Remember how Sean told you
23 that he would bring a 16-year-old girl named Melissa to the
24 house with Carolyn? It's this girl in the photograph with
25 Carolyn. She's the one right next to Carolyn. That's

| LCKCmax3 | Summation - Ms. Moe | Page 2885 |
|---|---|---|

1    First, in 1999, Epstein sent Maxwell $18.3 million.
2 $18.3 million — here's the transaction. And then, in 2002,
3 Epstein paid Maxwell $5 million — here's the transaction. And
4 last but not least, in 2007, Epstein paid Maxwell $7.4 million.
5 $18.3 million, $5 million, $7.4 million. It's a total of
6 $30.7 million.
7    At this point, you got to ask yourselves, what was
8 Maxwell doing for Epstein that was worth more than $30 million?
9 Your common sense tells you that you don't give someone
10 $30 million unless they're giving you exactly what you want,
11 and what Epstein wanted was to touch underage girls. When
12 Maxwell took that money, she knew what it was for and now you
13 do, too. It was payment for committing terrible crimes with
14 Jeffrey Epstein.
15    That brings us to reason number 8 that you know that
16 Maxwell is guilty. When you zoom out and look at the big
17 picture, the timeline over the years, it's obvious that Maxwell
18 spent a decade aiding and abetting Jeffrey Epstein's crimes,
19 that they were coconspirators, partners crime.
20    Let's talk about the timeline the big picture.
21    In 1994, Maxwell met Jane. In that same year, Maxwell
22 and Epstein started sexually abusing Jane, and that often
23 happened in the context of massages. That same year, in 1994,
24 Maxwell met Kate, too, and Epstein initiated sexual contact
25 with Kate also in the context of massages, massages in which

UNITED STATES OF AMERICA, v.
GHISLAINE MAXWELL,

December 20, 2021

| LCKCmax3 | Summation - Ms. Moe | Page 2882 |
| --- | --- | --- |

1 dad, or parents. Use your common sense, ladies and gentlemen.
2 When you contact a professional masseuse, you don't need to
3 call her mom or dad. Just looking at this page tells you that
4 none of this was legitimate. These were millionaires who could
5 hire the top massage therapists in the whole world, but Maxwell
6 had a book with dozens of entries in a massage section that
7 makes absolutely clear that these were not real massages by
8 professional masseuses. In fact, this book makes clear that
9 some of the entries were for kids.
10    So let's talk about one of those entries. The entry
11 here on the left is Virginia, parents. I want you to take a
12 look at the phone number, ladies and gentlemen. You've seen it
13 somewhere else at this trial, and here it is. This is
14 Government Exhibit 823. It's the employment record for Sky
15 Roberts. You saw Virginia Roberts' birth certificate, so you
16 know that Sky Roberts is Virginia's dad. He was an employee at
17 Mar-a-Lago, which, as Juan Alessi testified, is the place where
18 Maxwell met Virginia Roberts. Take a look at the phone number
19 listed for Sky Roberts on this document. It's the same number
20 on Government Exhibit 52-G, the contact book.
21    And Virginia is also, by the way, on flight records
22 with Maxwell when she was 17 years old. Let's take a look, and
23 as we do, you're going to see the initials "G.M." for Ghislaine
24 Maxwell on every single one.
25    Here's the first one. Two flights, JE, GM, ET,

| LCKCmax3 | Summation - Ms. Moe | Page 2883 |
| --- | --- | --- |

1 Virginia. JE, GM, AT, Virginia. It's from 2000. She was 17
2 years old. Here's another page. JE, GM, ET, Virginia Roberts.
3 Here's another, JE, GM, ET, Virginia Roberts. There is another
4 one, JE, GM, ET, Virginia Roberts. This is 2001 when Virginia
5 Roberts was 17. They were flying around with a 17-year-old
6 girl.
7    But back to the black book, there is more to talk
8 about. Remember Sean, Carolyn's boyfriend? There is an entry
9 for him, too, under an entry for Carolyn, Carolyn's boyfriend's
10 house. That entry has Carolyn's first and last name. That
11 same phone number that you're looking at here is on three
12 messages from the message pads, and here they are. It's
13 Government Exhibits 2-U, 2-P, and 2-O. And if you take a look
14 at the date on the two messages on the left, they're from 2003
15 when Carolyn was 16. There's the phone number. It's the same.
16 In fact, the message in the middle is from just a month past
17 Carolyn's 16th birthday. There is more. There is an entry in
18 here for Carolyn with her full name. That number is on phone
19 messages from 2003, too. Here they are. One says Carolyn, two
20 say Caroline, but you know it's the same person, you know it's
21 Carolyn because the phone number is the same.
22    Who else is in this book? Remember how Sean told you
23 that he would bring a 16-year-old girl named Melissa to the
24 house with Carolyn? It's this girl in the photograph with
25 Carolyn. She's the one right next to Carolyn. That's

| LCKCmax3 | Summation - Ms. Moe | Page 2884 |
| --- | --- | --- |

1 Melissa's birth certificate. Sean told you this is the girl.
2 And sure enough, there are two entries under massage for
3 Melissa, Carolyn's friend. Here they are.
4    Again, remember how you learned that, by this point,
5 things operated like a pyramid scheme. Virginia brought
6 Carolyn, Carolyn brought Melissa and other girls. One girl
7 would bring another, who would bring another.
8    Ladies and gentlemen, this book, Maxwell's book, it
9 proves to you that Maxwell is guilty. What you'll see in this
10 book corroborates the witnesses who testified at this trial.
11 She had victim names written in a little black book. This
12 document is powerful evidence of the defendant's knowledge and
13 intent. These were not real massages. What was happening was
14 sexual abuse with underage girls. Maxwell knew it, she was
15 part of it, she was responsible for it, and the fact that she
16 had a little black book with her victims' names in it proves to
17 you that she is guilty.
18    That brings us to the seventh reason that you know
19 Maxwell is guilty. It's the money. Now, we've already talked
20 about Epstein's luxurious lifestyle and all of the perks that
21 Maxwell got from being his partner in crime, but it wasn't just
22 getting to live in the mansions and flying on the private jets,
23 maxwell got millions of dollars from Epstein. You learned that
24 between 1999 and 2007, Jeffrey Epstein gave Maxwell about $30
25 million, and you know exactly what that money was for.

| LCKCmax3 | Summation - Ms. Moe | Page 2885 |
| --- | --- | --- |

1    First, in 1999, Epstein sent Maxwell $18.3 million.
2 $18.3 million — here's the transaction. And then, in 2002,
3 Epstein paid Maxwell $5 million — here's the transaction. And
4 last but not least, in 2007, Epstein paid Maxwell $7.4 million.
5 $18.3 million, $5 million, $7.4 million. It's a total of
6 $30.7 million.
7    At this point, you got to ask yourselves, what was
8 Maxwell doing for Epstein that was worth more than $30 million?
9 Your common sense tells you that you don't give someone
10 $30 million unless they're giving you exactly what you want,
11 and what Epstein wanted was to touch underage girls. When
12 Maxwell took that money, she knew what it was for and now you
13 do, too. It was payment for committing terrible crimes with
14 Jeffrey Epstein.
15    That brings us to reason number 8 that you know that
16 Maxwell is guilty. When you zoom out and look at the big
17 picture, the timeline over the years, it's obvious that Maxwell
18 spent a decade aiding and abetting Jeffrey Epstein's crimes,
19 that they were coconspirators, partners crime.
20    Let's talk about the timeline the big picture.
21    In 1994, Maxwell met Jane. In that same year, Maxwell
22 and Epstein started sexually abusing Jane, and that often
23 happened in the context of massages. That same year, in 1994,
24 Maxwell met Kate, too, and Epstein initiated sexual contact
25 with Kate also in the context of massages, massages in which

**In The Matter Of:**

*UNITED STATES OF AMERICA, v.*
*GHISLAINE MAXWELL,*

---

*December 20, 2021*

---

*Southern District Court Reporters*

Original File LCKVMAXF.txt
Min-U-Script® with Word Index

EXHIBIT 93

**In The Matter Of:**

*UNITED STATES OF AMERICA, v.*
*GHISLAINE MAXWELL,*

*TRIAL*
*December 2, 2021*

*Southern District Court Reporters*

Original File LC2VMAXF.txt
Min-U-Script® with Word Index

LC2VMAX4        Alessi - Direct        Page 821

1    VOIR DIRE EXAMINATION
2    BY MR. PAGLIUCA:
3    Q. Good afternoon, Mr. Alessi.
4    A. Good afternoon, sir.
5    Q. You left Mr. Epstein's employment in 2001; correct?
6    A. 2002.
7    Q. December of 2001; correct?
8    A. No, December 2002.
9    Q. Okay. And when you left --
10        THE COURT: You can take your mask off.
11        MR. PAGLIUCA: Thank you, your Honor.
12       It's becoming a habit wearing it.
13   Q. When you left in 2002, you didn't have in your possession
14   Government Exhibit 606, which is dated different dates, but
15   beginning in February of 2005; is that correct?
16   A. No. I -- I had it in my possession, a booklet with the
17   dates. It didn't have dates when I was given to it.
18   Q. Okay. But you left, you say, in 2002?
19   A. That's correct.
20   Q. So if something was made after 2002, you would not have had
21   it; correct?
22   A. Absolutely, no.
23   Q. All right. Okay.
24       And so whatever you had in 2002 was not Government
25   Exhibit 606, which was created, at least by the date on it,

LC2VMAX4        Alessi - Direct        Page 822

1    after that date; correct?
2        MS. COMEY: Objection. Compound.
3        MR. PAGLIUCA: I don't think that's a compound
4    question.
5        THE COURT: Overruled.
6    Q. You wouldn't have had 606 because assuming the date on 606
7    is even accurate, it's after you left; correct?
8    A. Yes.
9    Q. Okay. And so you, Mr. Alessi, don't have any personal
10   knowledge about, first of all, how 606, this exhibit, came into
11   existence; correct? Because this is not whatever it was that
12   you had?
13   A. No, I did not have it.
14   Q. Right. Okay.
15       And you, Mr. Alessi, didn't have this Exhibit 606 with
16   you after you left. You threw whatever was given to you away,
17   as I understand it; correct?
18   A. Yes, I did.
19   Q. Because you didn't agree with whatever was given to you?
20       MS. COMEY: Objection, your Honor. This is voir dire.
21       THE COURT: Just a moment.
22       I'll sustain with respect to the last question.
23       MR. PAGLIUCA: Okay.
24   Q. But so we're clear, whatever you were given, you threw it
25   away and didn't keep it after you left in 2002?

LC2VMAX4        Alessi - Direct        Page 823

1    A. There was no reason to keep it.
2    Q. I understand. And so you don't have any personal knowledge
3    about how this document, assuming it's accurate, was maintained
4    after you left Mr. Epstein's employment in 2002; correct?
5    A. I have no personal knowledge.
6    Q. Okay.
7        MR. PAGLIUCA: I object, your Honor.
8        Lack of foundation.
9        MS. COMEY: Your Honor, I believe we've established a
10   foundation certainly as to the pages that Mr. Alessi
11   recognizes. I think the rest of the document, based on its
12   context --
13       THE COURT: Okay. Ms. Comey, not the place for that.
14       I'm overruling the objection. 606 is admitted.
15       (Government's Exhibit 606 received in evidence)
16       MS. COMEY: May we publish, your Honor?
17       THE COURT: You may.
18   BY MS. COMEY:
19   Q. Mr. Alessi, taking a look at the very first page of this,
20   do you recognize the address at the bottom -- going back, the
21   address at the bottom of the page?
22   A. Yes.
23   Q. What is that address?
24   A. That is the address of Mr. Epstein's residence.
25   Q. Let's turn now to the second page, please, the page that

LC2VMAX4        Alessi - Direct        Page 824

1    has page 1 on it. I'm circling a bullet point close to the
2    middle of the page. Would you please read that aloud for us.
3    A. Daily duties while Mr. Epstein, Ms. Maxwell, and guests are
4    on residence.
5    Q. And what is listed below that?
6    A. Morning preparation, pool area, the cabana, the kitchen,
7    downstairs areas, master bedroom, master bathroom,
8    Ms. Maxwell's bathroom, guest rooms, early evening, before you
9    leave at night.
10   Q. What was your understanding of what you were supposed to do
11   with all of those places based on the instructions you received
12   from Ms. Maxwell?
13   A. That I was supposed to do these duties, perform these
14   duties.
15   Q. Let's turn to the next page please. And now let's turn to
16   page -- the page marked page 3. Would you please read this
17   aloud for us, Mr. Alessi.
18   A. Yes.
19       This manual is designed to give you the proper
20   guidance and assistance to perform your duties to the best of
21   your ability, while ensuring a consistently high level of
22   service. Gathering as much information as possible will help
23   you with the day-to-day running of the home.
24       By using your communications skills, listening and
25   observing, you will be able to anticipate the needs of

LC2VMAX4        Alessi - Direct            Page 825

1    Mr. Epstein, Ms. Maxwell, and their guests.
2         Checklists will assist you in making sure that all
3    tasks have been completed and that not even the smallest
4    details have been overlooked.
5         (Continued on next page)
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

LC2Qmax5        Alessi - Direct            Page 826

1    BY MS. COMEY: (Continued)
2    Q.  Thank you, let's please go to the page marked page 4. I'd
3    like you to first please read the first bullet point on this
4    page?
5    A.  Try to anticipate the needs of Mr. Epstein, Ms. Maxwell,
6    and their guests.
7    Q.  Would you please now read the fourth bullet point on this
8    page?
9    A.  Do not discuss personal problems with guests.
10   Q.  What did you understand this instruction to mean when
11   Ms. Maxwell gave you this booklet?
12   A.  Well, this instruction told me that any personal problem I
13   have, I was not supposed to discuss with anybody.
14   Q.  Thank you.
15        I'd like to now go to the seventh bullet point on this
16   page.  Would you please read that allowed?
17   A.  Remember that you see nothing, hear nothing, say nothing,
18   except to answer a question directed to you.  Respect their
19   privacy.
20   Q.  Mr. Alessi, when Ms. Maxwell gave you this booklet, what
21   did you understand this rule to mean?
22   A.  It means a kind of warning that I was supposed to be blind,
23   deaf and dumb to say nothing of their lies.
24   Q.  Let's go now please to the page marked 8.  Thank you.
25        Would you please read the first bullet point on this

LC2Qmax5        Alessi - Direct            Page 827

1    page?
2    A.  Unless otherwise instructed, never disclose Mr. Epstein or
3    Ms. Maxwell's activity or whereabouts to anyone.  If the caller
4    is insistent, you simply ask to take a message, a time, a
5    number where the caller can be reached.  Do not -- do not be
6    bullied and do not show any reaction or impatience, simply be
7    firm.
8    Q.  Can we please go now to the page marked page 10.
9         Mr. Alessi, what are we looking at on this page?
10   A.  This is a list of things that have to be done before the
11   arrival of Mr. Epstein or Ms. Maxwell.
12   Q.  There's a reference on this page to JE and GM telephone
13   directories.
14   A.  Yes.
15   Q.  What were those?
16   A.  These were booklets with JE and GM.  I think they were in
17   the front or in the binding of the --
18        THE COURT:  Mr. Alessi, could you talk into the
19   microphone please.
20   Q.  Mr. Alessi, what were these directories, JE and GM
21   telephone directories to your understanding?
22   A.  This would mean Jeffrey Epstein and Ghislaine Maxwell.
23   Q.  What are the directories?
24   A.  The directories were books with hundreds and hundreds of
25   names and their telephone numbers and contacts, directions,

LC2Qmax5        Alessi - Direct            Page 828

1    addresses.
2    Q.  What did the books look like?
3    A.  The book -- the books, they were type of hard binding,
4    either blue or black.  I can't remember which one was blue,
5    which one was black, but they were thick, I would say two
6    inches thick, and the size of a large telephone.
7    Q.  What was inside?
8    A.  Inside was a list by alphabetical order of all the people,
9    friends and families and business with Mr. Epstein and
10   Ms. Maxwell.
11   Q.  I'd like to go now, please, to page 13.  What do we see on
12   this page?
13   A.  Same thing, instructions for Ms. Maxwell's bathroom.
14   Q.  Is this a list of things you were supposed to do for
15   Ms. Maxwell's bathroom?
16   A.  Yes.
17   Q.  When were you supposed to do these things?
18   A.  Before their arrival, and after that every day they were
19   in.
20   Q.  Every day who was in?
21   A.  Mr. Epstein and Ms. Maxwell.
22   Q.  Let's go now to page 14, please.  I'm sorry, I meant page
23   20, excuse me.  Let's go to page 20.
24        Could you read the bullet point that's the second from
25   the bottom on this page, please.  Could you read that aloud for

UNITED STATES OF AMERICA, v.                                                   **TRIAL**
GHISLAINE MAXWELL,                                                         **December 2, 2021**

| LC2Qmax5 | Alessi - Direct | Page 829 |

1  us, please?
2  A. Check the fence for holes where Max can get out.
3  Q. Who is Max?
4  A. Max was this little dog that Ms. Maxwell owned. Her name
5  was Max. It was a little Yorkie.
6  Q. When do you remember first seeing Max?
7  A. I remember seeing Max probably when she came the first
8  time, but I'm not sure.
9  Q. When who came the first time?
10 A. Ms. Maxwell came to Palm Beach.
11 Q. Remind us about what year that was.
12 A. '91.
13 Q. 1991?
14 A. Yes.
15 Q. Did Ms. Maxwell still have this dog Max when you left
16 Mr. Epstein's employment in 2002?
17 A. Yes.
18 Q. Do you know whether Max traveled with Ms. Maxwell or stayed
19 in Palm Beach?
20 A. No, she traveled with Ms. Maxwell all the time.
21 Q. How do you know that?
22 A. Because I took Max, she had to have a bath before she
23 leave, and every time they -- there was wheels up, the poor dog
24 shake like crazy because she didn't like to be in the plane.
25 Q. Let's turn now, please, to page 23. I'd like to look at

| LC2Qmax5 | Alessi - Direct | Page 830 |

1  the center portion of this page, please.
2        This says Ms. Maxwell's desk. What is that referring
3  to?
4  A. The DSL computer --
5  Q. What do you understand Ms. Maxwell's desk to refer to?
6  A. The desk that she use all the time down on the first floor.
7  Q. What room was that in?
8  A. That was in the garden room.
9  Q. And the fourth bullet point, would you please read that for
10 us?
11 A. JE and GM telephone directories placed to the right of the
12 telephone.
13 Q. Is that the same telephone directories that we were talking
14 about earlier?
15 A. Yes.
16 Q. Let's turn now, please, to page 24. I want to look at the
17 section titled stationery. Would you read this aloud for us,
18 please?
19 A. The whole list?
20 Q. Yes, please.
21 A. Three sizes of Jeffrey Epstein notepads. Two sizes of
22 Ghislaine Maxwell and Lady Ghislaine notepads. Letterhead,
23 stationery and envelopes. One pack from each of Mr. Epstein's
24 residences and businesses. Mr. Epstein's personal stationery
25 (writing paper, notepads, envelopes, compliment slips).

| LC2Qmax5 | Alessi - Direct | Page 831 |

1  Jeffrey Epstein and Ghislaine Maxwell cards and envelopes.
2  Q. What was your understanding of what you were supposed to do
3  with respect to stationery?
4  A. With respect to stationery, there was different sizes of
5  pads for Mr. Epstein and Ms. Maxwell, and also there was
6  engraving on those pages with her name and his name on top of
7  it.
8  Q. Let's turn now, please, to page 55. Could you explain to
9  us what's on this page?
10 A. This was instructions for serving breakfast for Mr. Epstein
11 and Ms. Maxwell, and breakfast for the guests.
12 Q. Other than for Ms. Maxwell and Mr. Epstein, did you ever
13 have special instructions for how to prepare breakfast for
14 anyone else at the Palm Beach residence?
15 A. No.
16 Q. We can take that down. Thank you, Ms. Drescher.
17        Mr. Alessi, during the time that you worked for
18 Mr. Epstein, who else, if anyone, worked for Mr. Epstein, to
19 your knowledge?
20 A. Can you repeat the question, please?
21 Q. Who were the other of Mr. Epstein's employees that
22 overlapped with you?
23 A. It was Emmy Tayler. She used to travel with them
24 constantly.
25 Q. What was her job, to your understanding?

| LC2Qmax5 | Alessi - Direct | Page 832 |

1  A. My understanding she was Ms. Maxwell's assistant.
2  Q. Anyone else you remember?
3  A. There were a couple chefs. They were cam -- they came with
4  him, they travel with him and Ms. Maxwell.
5  Q. Let me pause you there.
6        If there were chefs who traveled with Mr. Epstein and
7  Ms. Maxwell, why would you need to prepare breakfast?
8  A. Sometimes I needed to prepare breakfast even when the chefs
9  were there because they were -- had the privilege to sleep
10 late, and I have to prepare breakfast at 5:00 in the morning
11 for Mr. Epstein.
12 Q. Other than chefs and Emmy Tayler, any other employees you
13 remember?
14 A. Well, my wife worked for me during that time.
15 Q. Were there any other assistants you remember working for
16 Mr. Epstein or Ms. Maxwell?
17 A. At the very end, I saw Sarah Kellen at the very end of my
18 stay there.
19 Q. About how long before you left in December of 2002 do you
20 remember Sarah Kellen starting to work for Mr. Epstein?
21 A. Couple weeks. I have very little interaction with Sarah.
22 Q. Can we pull up what's already in evidence as Government
23 Exhibit 327, Ms. Drescher?
24        Do you recognize the person in this photograph,
25 Mr. Alessi?

UNITED STATES OF AMERICA, v.
GHISLAINE MAXWELL,

TRIAL
December 2, 2021

| LC2Qmax5 | Alessi - Direct | Page 833 |
|---|---|---|

1 A. That was Sarah Kellen.
2 Q. What were Sarah's responsibilities during the brief time
3    you overlapped?
4 A. I don't know her job responsibility, but she immediately
5    took over the telephone, answering the phone, and I guess -- I
6    think she did the scheduling of the massages.
7 Q. You can take that down. Thank you.
8        Do you know who Mr. Epstein's pilots were?
9 A. Yes, I do.
10 Q. Who were they?
11 A. It was Larry Visoski and David Rodgers.
12 Q. Mr. Alessi, during the time that you worked for
13    Mr. Epstein, how many, if any, young females do you remember
14    seeing at Mr. Epstein's Palm Beach house?
15 A. I don't know what young you refer to, but underage you're
16    talking?
17 Q. Who appeared to be underage to you?
18 A. Who appeared to be, there were just two females.
19 Q. Who appeared to be underage to you?
20 A. They appeared to be underage to me.
21 Q. Without saying their names, do you know their names?
22 A. Yes, I do.
23 Q. I'd like to ask you to please turn in the binder next to
24    you to Government Exhibit 12.
25        MS. COMEY: And, your Honor, I would ask that the jury

| LC2Qmax5 | Alessi - Direct | Page 834 |
|---|---|---|

1    also be permitted to take out their binders and turn to
2    Government Exhibit 12.
3        THE COURT: Just a moment, jury.
4        Any objection?
5        MR. PAGLIUCA: No, your Honor.
6        THE COURT: The small binder or large binder?
7        MS. COMEY: I think it's the large binder.
8        THE COURT: Large binder. GX-12, please.
9 BY MS. COMEY:
10 Q. Do you have Government Exhibit 12 in front of you?
11 A. Yes, I do.
12 Q. Without saying the name out loud, I'd like you to look at
13    the portion of this exhibit that says child's name. Is that
14    the first and last name of one of the two underage females you
15    remember seeing at Mr. Epstein's Palm Beach residence?
16 A. Yes, I do.
17 Q. I'm going to refer to her as Jane, and I would ask that you
18    do the same, please. Okay?
19 A. Okay.
20 Q. You can set that aside. Thank you. We won't need the
21    binders again for the jurors for this witness.
22        Mr. Alessi, other than Jane, what was the name of the
23    second young female you remember seeing at Mr. Epstein's Palm
24    Beach house?
25 A. Her name was Virginia Roberts.

| LC2Qmax5 | Alessi - Direct | Page 835 |
|---|---|---|

1 Q. Who did you meet first, Jane or Virginia?
2 A. Jane.
3 Q. How did you meet Jane?
4 A. I met Jane the first time when she came to the house in
5    Palm Beach with her mother, and she was introduced her to
6    Ms. Maxwell, and they stay with her mother talking in the
7    living room.
8 Q. When you first met Jane, about how old was she?
9 A. I don't know exactly how old she was, but she appeared to
10    be young.
11 Q. About how old did she appear to you?
12 A. I would say 14, 15.
13 Q. Could you describe what Jane looked like when you first met
14    her?
15 A. She was strikingly beautiful girl. Beautiful eyes. Long
16    hair. Long brunette hair. Tall. Very pleasant.
17 Q. About how many times do you remember seeing Jane at
18    Mr. Epstein's Palm Beach house with her mother?
19 A. I remember at least three times she was there with her
20    mother.
21 Q. After those visits with her mother, do you remember seeing
22    Jane at Mr. Epstein's home without her mother?
23 A. Yes, I do.
24 Q. Do you remember exactly how many times you saw her at
25    Mr. Epstein's home without her mother?

| LC2Qmax5 | Alessi - Direct | Page 836 |
|---|---|---|

1 A. I don't remember exactly how many times, but it was four,
2    five times after.
3 Q. Who did you observe Jane spending time with when she came
4    without her mother to the house?
5 A. Ms. Maxwell and Mr. Epstein.
6 Q. To your knowledge, how did Jane get to Mr. Epstein's house
7    when she would visit without her mother?
8 A. I was -- I was told to pick her up. Either Ms. Maxwell or
9    Mr. Epstein instruct me to pick her up couple times.
10 Q. I want to be clear here. Did Mr. Epstein instruct you to
11    pick her up?
12 A. Either him or Ms. Maxwell.
13 Q. You remember Ms. Maxwell instructing you to pick her up?
14 A. Yes, I do.
15 Q. And do you also remember Mr. Epstein instructing you --
16 A. Yes, I do.
17 Q. -- to pick her up?
18 A. Yes, I do.
19 Q. Where do you remember picking Jane up?
20 A. I remember picking Jane at the School of the Arts one time,
21    only one time in West Palm Beach. That was the old Palm Beach
22    Lakes High School, and they turn it into a School of the Arts,
23    and I pick her up outside the school one time and brought her
24    to Palm Beach.
25 Q. Other than school, where else did you pick up Jane?

LC2Qmax5          Alessi - Direct          Page 837

1  A. I picked up Jane at her house that she live with her mother
2     and siblings.
3  Q. Why couldn't Jane drive herself?
4  A. I don't think she had the license.
5  Q. Who else that you know of picked Jane up to bring her to
6     Mr. Epstein's house?
7  A. My wife pick her up couple times.
8  Q. When you picked Jane up, where in the car did she sit?
9  A. It was a rule that sit in the back of the car.
10 Q. Who told you that rule?
11 A. The back seat. It was by Ms. Maxwell. Everybody should
12    sit in the back.
13 Q. Other than Jane, did you drive other people for Ms. Maxwell
14    and Mr. Epstein?
15 A. Can you repeat the question, please?
16 Q. Did you drive other people other than Jane for Ms. Maxwell
17    and Mr. Epstein?
18 A. Oh absolutely, yes.
19 Q. How many?
20 A. Dozens and dozens.
21 Q. So do you have a clear memory of every single time you
22    picked up a passenger?
23 A. Not a clear memory, no, but I remember driving to Miami to
24    airports and homes to pick people up.
25 Q. Other than Mr. Epstein's house, where else, to your

LC2Qmax5          Alessi - Direct          Page 838

1  knowledge, would Jane go with Mr. Epstein and Ms. Maxwell?
2        MR. PAGLIUCA: Objection. Lack of foundation, your
3  Honor.
4        THE COURT: Sustained.
5  Q. Did you ever see Jane with luggage?
6  A. Yes, I did.
7  Q. After you -- where did you see Jane with luggage?
8  A. She came maybe twice with a small luggage, and they left
9     with Mr. Epstein in their plane.
10 Q. Let me break that down a little bit. Where did you see
11    Jane with luggage on these approximately two occasions?
12 A. I saw her at the house in Palm Beach bringing the luggage.
13 Q. Mr. Epstein's house?
14 A. Mr. Epstein's house.
15 Q. Do you know how Jane got to the airport?
16 A. Yes. I was introduced to be -- I was the driver also.
17 Q. So did you drive Jane to the airport?
18 A. Jane with Mr. Epstein and Ms. Maxwell, Max, the little dog,
19    and other guests.
20 Q. And when you drove them to the airport, did you drive all
21    the way up onto the tarmac?
22 A. All the way up to the plane.
23 Q. Were you able to see Jane get on the plane?
24 A. Yes.
25 Q. And who did she get onto the plane with?

LC2Qmax5          Alessi - Direct          Page 839

1  A. Ms. Maxwell, Mr. Epstein. I don't remember I think it was
2     Emmy Tayler, the chefs and Max.
3  Q. Do you remember about what year you met Jane?
4  A. I think it was 1994, '94.
5  Q. When Jane came over to Mr. Epstein's house, do you know if
6     she ever went to the movies?
7  A. Yes, they went to the movies.
8  Q. Who went to the movies?
9  A. Mr. Epstein, Ms. Maxwell, the guest and Emmy. Basically
10    they went almost every night to the movies.
11 Q. Did Jane sometimes go with them?
12 A. Yes.
13 Q. When Jane visited Mr. Epstein's house, were there ever
14    other females around?
15 A. Yes.
16 Q. Who are the fe -- let me back up. Do you remember the name
17    of every single female who was at Mr. Epstein's Palm Beach
18    house when Jane came over?
19 A. No.
20 Q. Do you remember some of the names?
21 A. Yes.
22 Q. What are some of the names you remember?
23 A. Emmy Tayler, Gwendolyn Beck. I don't think I can recall
24    anybody else.
25 Q. When Jane would first arrive at Mr. Epstein's house, where

LC2Qmax5          Alessi - Direct          Page 840

1  did you see her go?
2  A. She went through the kitchen, I will introduce her to
3     Ms. Maxwell at her desk, and that's it. That's as far as I saw
4     her going to. She talked to Ms. Maxwell. From then, I was --
5     that was not my job to see where they were.
6  Q. During the time that you worked for Mr. Epstein, who, if
7     anyone, would tell you about Mr. Epstein's upcoming travel
8     plans?
9  A. Either Ms. Maxwell, sometimes the secretaries from the
10    office. If I remember correctly, was Fiona secretary, also
11    Kimberly, a secretary from New York, and sometimes the pilots
12    told me, "We're on our way and we have to rush."
13 Q. Other than Jane, what was the name of the other female who
14    appeared to be underage that you remember seeing at
15    Mr. Epstein's house?
16 A. The other young person that I saw there was Virginia
17    Roberts.
18 Q. How did you first come to see Virginia Roberts?
19 A. I saw Virginia Roberts at Mar-a-Lago one afternoon with
20    Ms. Maxwell --
21 Q. Let me stop you there. What were you doing at Mar-a-Lago
22    with Ms. Maxwell?
23 A. She went to check the spa. She went to see the spa at
24    Mar-a-Lago.
25 Q. What had you and Ms. Maxwell been doing that day?

UNITED STATES OF AMERICA, v.
GHISLAINE MAXWELL,

TRIAL
December 2, 2021

---

LC2Qmax5          Alessi - Direct          Page 841

1  A. That day we went from all the main expensive -- luxury spas
2     and country clubs in Palm Beach County.
3  Q. Did you go inside each those?
4  A. No.
5  Q. What were you doing?
6  A. I wait in the car like a driver.
7  Q. What happened when you got to Mar-a-Lago that day with
8     Ms. Maxwell?
9  A. I dropped Ms. Maxwell, I park in the spaces where I was
10    supposed to park, wait in the car. I remember it was a very
11    hot day, and we have a convertible. And Ms. Maxwell come out,
12    got in the car and we were going up the ramp, small ramp going
13    out of Mar-a-Lago --
14 Q. As you were driving up that ramp, what did Ms. Maxwell say
15    to you?
16 A. She told me to stop, "John, stop."
17 Q. And after she told you to stop the car, did you stop the
18    car?
19 A. I stopped the car, and she opened the door and she went
20    towards this girl as she was coming down the ramp.
21 Q. Let me break that down. After Ms. Maxwell told you to
22    stop, what did you see Ms. Maxwell do?
23 A. She went to talk to this girl.
24 Q. And where was this girl?
25 A. She was coming down the ramp from the main gate towards the

---

LC2Qmax5          Alessi - Direct          Page 842

1     spa.
2  Q. What did this girl look like?
3  A. She look -- she look young. She have blond hair, and she
4     had a long white uniform, like a nurse's uniform.
5  Q. What did you see Ms. Maxwell do after she got out of the
6     car?
7  A. They talk briefly, and they went back to the spa.
8  Q. Who talked?
9  A. Ms. Maxwell and Ms. Roberts.
10 Q. Is that the girl?
11 A. Yes.
12 Q. And then where did you see Ms. Maxwell and the girl go?
13 A. They went inside the spa. And couple minutes later
14    Ms. Maxwell come out, got in the car, and we left.
15 Q. When was the next time you saw that girl from the
16    Mar-a-Lago parking lot?
17 A. The next time I saw her was late that afternoon, around
18    5:00, 6:00 in the afternoon.
19 Q. Where did you see her?
20 A. At the house in Palm Beach.
21 Q. And when she arrived, where did she go?
22 A. She went -- I introduce her to Ms. Maxwell at her desk.
23 Q. Did you learn her name?
24 A. No.
25 Q. At some point did you learn her name?

---

LC2Qmax5          Alessi - Direct          Page 843

1  A. No.
2  Q. The girl's name?
3  A. I didn't know her name -- her name or her last name.
4  Q. Did you eventually learn her name? You told us her name.
5     Yes?
6  A. Yes. Oh, eventually I learned her name.
7  Q. Okay. What is her name?
8  A. It was Virginia Roberts.
9  Q. I'd like to pull up, please, what's been marked for
10    identification as Government Exhibits 113 and Government
11    Exhibit 114, just for the witness, the Court and the parties,
12    Ms. Drescher.
13       Mr. Alessi, do you recognize these exhibits?
14 A. Yes, they are both pictures of Virginia.
15 Q. Are these both fair and accurate depictions of Virginia
16    Roberts?
17 A. Yes.
18       MS. COMEY: Your Honor, the government offers these in
19    evidence.
20       MR. PAGLIUCA: No objection.
21       THE COURT: GX-113 and 114 are admitted. And you may
22    publish.
23       MS. COMEY: Thank you, your Honor.
24       (Government's Exhibits 113 and 114 received in
25    evidence)

---

LC2Qmax5          Alessi - Direct          Page 844

1  Q. Ms. Drescher, I'd ask you to publish these for the jury.
2       After that first visit, about how often do you
3     remember seeing Virginia at Mr. Epstein's Palm Beach home?
4  A. After the first time very often she came to the house while
5     Mr. Epstein and Ms. Maxwell were at the Palm Beach house.
6  Q. What was your understanding of why Virginia was at Mr.
7     Epstein's house?
8       MR. PAGLIUCA: Objection. Lack of foundation.
9       THE COURT: Sustained.
10 Q. Did Ms. Maxwell ever tell you why Virginia was at the
11    house?
12 A. No.
13 Q. About how old was Virginia when you saw her coming over to
14    Mr. Epstein's Palm Beach home?
15       MR. PAGLIUCA: Objection. Lack of foundation.
16       THE COURT: Sustained.
17 Q. About how old did Virginia appear to you when you first met
18    her?
19 A. Probably 14, 15.
20 Q. Do you know how Virginia got to Mr. Epstein's Palm Beach
21    home when she would visit?
22 A. When she visit the first time?
23 Q. After the first time.
24 A. After the first time. She came with her boyfriend couple
25    times, and I was told to pick her up couple times from her

---

| | |
|---|---|
| LC2Qmax5    Alessi - Direct    Page 845 | LC2Qmax5    Alessi - Direct    Page 847 |

**Page 845**

1  house. She live with her boyfriend in Royal Palm Beach.
2  Q. Who instructed you to pick Virginia up?
3  A. Either Mr. Epstein or Ms. Maxwell.
4  Q. Let's break that down. Did Ms. Maxwell ever instruct you
5  to pick up Virginia Roberts?
6  A. Yes.
7  Q. Did Mr. Epstein ever instruct you to pick up Virginia
8  Roberts?
9  A. Yes, he did.
10  Q. Who else, if anyone, did you see Virginia bring to Jeffrey
11  Epstein's Palm Beach home?
12  A. On one occasion, she bring her boyfriend and he came to the
13  kitchen. However, I was told by Ms. Maxwell to get him out of
14  the kitchen, and he has to wait in the car.
15  Q. What, if any, females do you remember Virginia bringing to
16  Mr. Epstein's Palm Beach house?
17  A. At the end of my stay there, I saw her bringing two other
18  girls. I even never saw their faces. They walk through the
19  kitchen right away, and they went directly to Ms. Maxwell's
20  desk.
21  Q. When Virginia was at Mr. Epstein's Palm Beach home, who did
22  you see her interact with?
23  A. Ms. Maxwell and Mr. Epstein.
24  Q. Did you ever see Virginia at Mr. Epstein's Palm Beach house
25  with luggage?

**Page 847**

1  Q. Was it the same person massaging Epstein at each
2  appointment or a different person?
3  A. They were different persons.
4  Q. Who scheduled Mr. Epstein's massages?
5  A. Ms. Maxwell, Mr. Epstein, or sometimes even the office
6  people in New York, they would call me and ask me to schedule
7  the massages.
8  Q. When you scheduled the massages, what did you do?
9  A. I went to my office, and I had a Rolodex with all the
10  massage therapists, and whoever they told me to call, I would
11  call that person, and I will ask if they're available for this
12  time. It was a different times of the day. And if they said
13  yes, I would confirm with Ms. Maxwell or Mr. Epstein that she
14  was coming.
15  Q. And who do you remember telling you which person to call to
16  come give Mr. Epstein a massage?
17  A. Either was Ms. Maxwell, Mr. Epstein, or the office.
18  Q. Other than you, who else, if anyone, would call to schedule
19  massages?
20  A. At the end, Ms. Kellen.
21  Q. Now, you said that closer to the end, Mr. Epstein was
22  getting three massages a day?
23  A. Yes.
24  Q. What time of day typically were those massages?
25  A. It was all different times of day. It was a massage in the

| | |
|---|---|
| LC2Qmax5    Alessi - Direct    Page 846 | LC2Qmax5    Alessi - Direct    Page 848 |

**Page 846**

1  A. Yes, I did.
2  Q. About how many times?
3  A. Two, three times.
4  Q. And on those times, did you then drive Virginia somewhere?
5  A. I drove from her house in Royal Palm Beach to the house in
6  Palm Beach.
7  Q. How about on the times she had luggage, do you know where
8  she went from there with her luggage?
9  A. They went with Mr. Epstein and Ms. Maxwell to the plane.
10  Q. How do you know that?
11  A. Because I brought them. I was the driver.
12  Q. Did you drive right onto the tarmac?
13  A. Up to the tarmac.
14  Q. Who did you see get on the plane?
15  A. Mr. Epstein, Ms. Maxwell, the chefs, Ms. Tayler, little
16  Max, they went on the plane.
17  Q. Did you also see Virginia go on the plane?
18  A. Yes.
19  Q. Do you remember approximately when you first met Virginia?
20  A. Not exactly, but I would say it's 2001.
21  Q. We can take these exhibits down. Thank you, Ms. Drescher.
22        Mr. Alessi, about how often did Mr. Epstein receive
23  massages at the Palm Beach residence while you worked for him?
24  A. In the beginning, he receive around one. At the end of my
25  stay, he received up to three massages per day.

**Page 848**

1  morning, a massage in the afternoon, and some of the massages
2  after dinner, after the movies. They were scheduled to come
3  after the movies, 10:00, 11:00 at night.
4  Q. You mentioned the phone books that we saw in Government
5  Exhibit 606. Do you remember that?
6  A. Yes.
7  Q. Did that have contact information for people to massage
8  Mr. Epstein?
9  A. Yes, there was a page with the massages -- massage
10  therapists for Palm Beach.
11  Q. Was Jane's contact information in that book?
12  A. Who?
13  Q. Jane.
14  A. No. Oh, excuse me. Can you repeat that?
15  Q. The person we're referring to as Jane.
16  A. Yes. Yes, it was. It was her on the contact information.
17  Q. I want to make sure the record is clear here. Do you
18  remember looking earlier at Government Exhibit 12 and telling
19  us that you recognized that name?
20  A. Yes.
21  Q. And we're calling that person Jane?
22  A. Yes.
23  Q. That person, do you remember seeing her true name in this
24  directory?
25  A. Yes.

| LC2Qmax5 | Alessi - Direct | Page 849 |
|---|---|---|

1  Q. About when do you remember first seeing this directory?
2  A. Probably 1995, '96.
3  Q. Were there different versions of this directory?
4  A. Those directories were updated.
5  Q. How often were they updated?
6  A. I think it was once a year or maybe twice a year.
7  Q. When they were updated, what did you do with the old ones?
8  A. We just throw it away.
9  Q. Did you look at different versions of the directory over
10   the years you worked for Mr. Epstein?
11  A. Yes.
12  Q. And when you got an updated version, were there new
13   contacts added?
14  A. Yes.
15  Q. Did you ever notice contacts being removed?
16  A. I don't recall being removed.
17  Q. Who did you see using these directories?
18  A. Ms. Maxwell, Mr. Epstein.
19  Q. Where were you supposed to keep copies of this directory?
20  A. We were supposed to keep the copies, one in the kitchen
21   desk, it was a little tiny desk at the kitchen next to the
22   telephone, it was at Ms. Maxwell's desk, Mr. Epstein's three
23   desks he had in the house, Ms. Maxwell's each side of her night
24   table or Mr. Epstein's night table.
25        MS. COMEY: Your Honor, may I approach the witness

| LC2Qmax5 | Alessi - Direct | Page 850 |
|---|---|---|

1   with a physical exhibit?
2        THE COURT: I'm sorry?
3        MS. COMEY: I have a physical exhibit that I would
4   like to approach and give to the witness.
5        THE COURT: Please identify it for the record.
6        MS. COMEY: Government Exhibit 52, which I will show
7   to defense counsel before I bring it up.
8        THE COURT: Marked for identification GX-52?
9        MS. COMEY: Yes. Thank you, your Honor.
10        THE COURT: Before the witness, may I see it?
11        MS. COMEY: Yes, your Honor.
12        THE COURT: Okay.
13        MS. COMEY: Thank you, your Honor. May I approach the
14   witness?
15        THE COURT: You may.
16  BY MS. COMEY:
17  Q. Mr. Alessi, I've just handed you what is marked for
18   identification as Government Exhibit 52. Would you please take
19   a look at that, and then tell us if you recognize it?
20  A. Yes, I recognize it. The type of book, it was the same.
21  Q. Hold on one second. What does this appear to be to you?
22  A. This appear to be the direct -- these were the directories
23   of Ms. Maxwell and Mr. Epstein.
24  Q. Did you review this directory last night?
25  A. Yes, I did.

| LC2Qmax5 | Alessi - Direct | Page 851 |
|---|---|---|

1  Q. I want to ask you some questions about this directory.
2   Starting with the cover, what do you recognize about the cover?
3  A. This was exactly the same cover of the directories that I
4   saw.
5  Q. Is it the same binding?
6  A. The same binding, binding.
7  Q. Turning to the pages, what do you recognize about the
8   layout on the pages?
9  A. It was exactly as the books that I recall.
10  Q. Did you review every page of this exhibit last night?
11  A. Yes.
12  Q. When you reviewed this exhibit, did you see entries that
13   you recognized from the book you saw when you worked for
14   Mr. Epstein?
15  A. Yes, I did.
16  Q. Do you remember about how many?
17  A. There were many, many, many, many names.
18  Q. Were some of those entries for massage in Palm Beach?
19  A. Yes.
20  Q. Is there a difference in the size of the font in this
21   book--
22  A. Yes.
23  Q. -- from the one that you remember?
24  A. Yes, these are much smaller font. My books, the books when
25   I was there, they were a lot thicker, and the font was larger,

| LC2Qmax5 | Alessi - Direct | Page 852 |
|---|---|---|

1   but the format was the same.
2  Q. Format was the same. And are there some of the same
3   contacts that you remember from when you worked for
4   Mr. Epstein?
5  A. Yes.
6  Q. Based on your review of this book last night, do you think
7   this is the same book that you saw when you were employed, or a
8   later version from after you left working for Mr. Epstein?
9        MR. PAGLIUCA: Objection, your Honor. Lack of
10   foundation.
11        THE COURT: Overruled. You may answer.
12  A. Yes, it was the same book.
13  Q. Hold on. Do you think this was a later version after you
14   left?
15  A. This was a later version, yes, ma'am.
16        MR. PAGLIUCA: Objection.
17        THE COURT: Just a second. I'm going to sustain.
18   The jury will disregard the last answer.
19   You may rephrase.
20  Q. Mr. Alessi, based on your review of this book, do you
21   believe that this is the same book you saw when you worked for
22   Mr. Epstein or a later version from after you left?
23  A. This was a later version of book after I -- that it was
24   printed probably after I left.
25  Q. What makes you say that?

# EXHIBIT 94

LCRVMAXT

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x
UNITED STATES OF AMERICA,

            v.                          20 CR 330 (AJN)

GHISLAINE MAXWELL,

                Defendant.              Jury Trial
------------------------------x
                                        New York, N.Y.
                                        December 27, 2021
                                        10:30 a.m.

Before:
                HON. ALISON J. NATHAN,

                                        District Judge

                        APPEARANCES

DAMIAN WILLIAMS
        United States Attorney for the
        Southern District of New York
BY:  MAURENE COMEY
     ALISON MOE
     LARA POMERANTZ
     ANDREW ROHRBACH
     Assistant United States Attorneys

HADDON MORGAN AND FOREMAN
        Attorneys for Defendant
BY:  JEFFREY S. PAGLIUCA
     LAURA A. MENNINGER
        -and-
BOBBI C. STERNHEIM
        -and-
COHEN & GRESSER
BY:  CHRISTIAN R. EVERDELL

Also Present:  Amanda Young, FBI
               Paul Byrne, NYPD
               Sunny Drescher,
                Paralegal, U.S. Attorney's Office
               Ann Lundberg,
                Paralegal, Haddon Morgan and Foreman

                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

LCRVMAXT

1    which is the substantive transportation count, which, as we

2    know, has to deal with the violation of New York law.  And they

3    are talking about flights to New Mexico; and can she be found

4    guilty on the second element of Count Four regarding these

5    flights to New Mexico.

6          So I think we may have to respond to the jury on that

7    score as well, which is the fact that they have to be

8    considering New York events for Count Four, rather than -- or

9    violations of New York law, which wouldn't occur in New Mexico

10   for there to be a conviction on Count Four.

11         MS. MOE:  Your Honor, I think that's exactly why we

12   proposed directing the jurors to the entirety of the

13   instruction, which says just that.  The second paragraph of

14   that same instruction reminds the jury, as the instruction does

15   throughout, that we're talking about New York Penal Law,

16   Section 130.55.  And so I think our proposal remains the same

17   that they be referred to the entirety of the instruction, which

18   includes that language, among other aspects of this particular

19   element.

20         THE COURT:  Yes.

21         MS. STERNHEIM:  Judge, may I be heard for a moment?

22         THE COURT:  Sure.

23         MS. STERNHEIM:  I think the fact that the jury has

24   mentioned New Mexico regarding a count that pertains to New

25   York is not just cleared up by referring them to the

LCRVMAXT

```
1    instruction.  Clearly they are making an error concerning which

2    state begins with "New."  And I suggest that if the Court

3    wishes to refer them to the charge, the Court also clears up

4    the fact that Count Four requires a violation of New York law,

5    not New Mexico law.

6             THE COURT:  That's certainly why we should refer them

7    to the whole charge.  That's what lines 7 through 10 make

8    clear.

9             MS. MOE:  Yes, your Honor.

10             The only illegal sexual activity identified in the

11    entirety of the jury charge is a statute in New York.  There

12    cannot be any risk of confusion on that score.  This particular

13    charge reminds the jury of that and includes that language as

14    well.  The jury has not been charged about any laws in New

15    Mexico; so there can't be any risk of confusion for exactly

16    that reason.

17             MR. EVERDELL:  I just don't understand the confidence

18    about how there can be no possible confusion --

19             THE COURT:  This conversation is stopping.

20             My decision is to refer them back to this charge,

21    because it is a proper instruction on the second element to

22    Count Four.  I do not know what this question means.  It's too

23    difficult to parse factually and legally what they're asking.

24    So the only option in those circumstances is to direct them

25    back to the count.
```

# EXHIBIT  95

# EXHIBIT 4

Page 1

```
 1                 UNITED STATES DISTRICT COURT
                   SOUTHERN DISTRICT OF FLORIDA
 2
 3    JANE DOE NO. 2,           Case No: 08-CV-80119
 4          Plaintiff,
 5    Vs
 6    JEFFREY EPSTEIN,
 7          Defendant.
                            /
 8
      JANE DOE NO. 3,           Case NO: 08-CV-80232
 9
            Plaintiff,
10    Vs
11    JEFFREY EPSTEIN,
12          Defendant.
                            /
13
      JANE DOE NO. 4,           Case No: 08-CV-80380
14
            Plaintiff,
15
      Vs.
16
      JEFFREY EPSTEIN,
17
            Defendant.
18    _____/
19    JANE DOE NO. 5,           Case No: 08-CV-80381
20          Plaintiff,
21    Vs
22    JEFFREY EPSTEIN,
23          Defendant.
                            /
24
25
```

Kress Court Reporting, Inc. 305-866-7688
7115 Rue Notre Dame, Miami Beach, FL 33141

**NON PARTY (VR) 000247**

GIUFFRE000935

**Page 2**

```
 1   JANE DOE NO. 6,         Case No: 08-CV-80994
 2       Plaintiff,
 3   Vs
 4   JEFFREY EPSTEIN,
 5       Defendant.
              _____/
 6
     JANE DOE NO. 7,         Case No. 08-CV-80993
 7
         Plaintiff,
 8
     Vs
 9
     JEFFREY EPSTEIN,
10
         Defendant.
11            _____/
12   C.M.A.,                 Case No: 08-CV-80811
13       Plaintiff,
14   Vs
15   JEFFREY EPSTEIN,
16       Defendant.
              _____/
17
     JANE DOE,               Case No. 08-CV-80893
18
         Plaintiff,
19
     Vs
20
     JEFFREY EPSTEIN,
21
         Defendant.
22            _____/
23
24
25
```

**Page 3**

```
 1   JANE DOE NO. II,        Case No: 08-CV-80469
 2       Plaintiff,
 3   Vs
 4   JEFFREY EPSTEIN,
 5       Defendant.
 6
     JANE DOE NO. 101,       Case No: 09-CV-80591
 7
         Plaintiff,
 8
     Vs
 9
     JEFFREY EPSTEIN,
10
         Defendant.
11            _____/
12   JANE DOE NO. 102,       Case No: 09-CV-80656
13       Plaintiff,
14   Vs
15   JEFFREY EPSTEIN,
16       Defendant.
              _____/
17
18
19
20        1031 Ives Dairy Road
          Suite 228
21        North Miami, Florida
          July 29, 2009
22        11:00 a.m. to 5:30 p.m.
23
24
25
```

**Page 4**

```
 1          V I D E O T A P E D
 2          D E P O S I T I O N
 3                  of
 4          ALFREDO RODRIGUEZ
 5
 6       taken on behalf of the Plaintiffs pursuant
 7   to a Re-Notice of Taking Deposition (Duces Tecum)
 8
 9                 . . .
10   APPEARANCES:
11
12          MERMELSTEIN & HOROWITZ, P.A.
            BY: STUART MERMELSTEIN, ESQ.
13          18205 Biscayne Boulevard
            Suite 2218
14          Miami, Florida 33160
            Attorney for Jane Doe 2, 3, 4, 5,
15          6, and 7.
16          ROTHSTEIN ROSENFELDT ADLER
            BY: BRAD J. EDWARDS, ESQ., and
17          CARA HOLMES, ESQ.
            Las Olas City Centre
18          Suite 1650
            401 East Las Olas Boulevard
19          Fort Lauderdale, Florida 33301
            Attorney for Jane Doe and E.W.
20          And L.M.
21
            PODHURST ORSECK
22          BY: KATHERINE W. EZELL
            25 West Flagler Street
23          Suite 800
            Miami, Florida 33130
24          Attorney for Jane Doe 101 and 102.
25
```

**Page 5**

```
 1
     APPEARANCES:
 2
 3          LEOPOLD-KUVIN
            ADAM J. LANGINO, ESQ.
 4          2925 PGA Boulevard
            Suite 200
 5          Palm Beach Gardens, Florida 33419
            Attorney for B.B.
 6
 7          RICHARD WILLITS, ESQ.
            2290 10th Avenue North
 8          Suite 404
            Lake Worth, Florida 33461
 9          Attorney for C.M.A.
10
            BURMAN, CRITTON, LUTTIER &
11          COLEMAN, LLP
            BY: ROBERT CRITTON, ESQ.
12          515 North Flagler Drive
            Suite 400
13          West Palm Beach, Florida 33401
            Attorney for Jeffrey Epstein.
14
15
16
     ALSO PRESENT:
17
     JOE LANGSAM, VIDEOGRAPHER
18
19                . . .
20
21
22
23
24
25
```

2 (Pages 2 to 5)

NON PARTY (VR) 000248

GIUFFRE000936

Page 94

1    A.  I don't remember, sir.
2    Q.  The next page is a message in the upper
3  left dated January 13, 2005, from C.W. Correct?
4    A.  Yes.
5    Q.  That's the same C. that we've been
6  talking about.  Correct?
7    A.  Yes.
8    Q.  That was at 7:30 p.m.  Correct?
9    A.  Yes.
10    Q.  And you don't recall what that particular
11  call was about.  Right?
12    A.  No, sir.
13    Q.  The message dated January 20, 2005, from
14  Marla.  Do you see that on the bottom right?
15    A.  Yes.
16    Q.  Do you know who that is?
17    A.  I think I have a different page.
18    Q.  You're a little ahead of me.  January 20,
19  2005.
20        MR. CRITTON:  I think that's page 31.
21        THE WITNESS:  I don't remember who she
22    was, sir.
23  BY MR. MERMELSTEIN:
24    Q.  You don't recall what that message was
25  about?

Page 95

1    A.  No, sir.
2    Q.  What about the next page there is a
3  message that Eva called?
4    A.  Yes.
5    Q.  Dated January 21, 2005?
6    A.  Yes.
7    Q.  Do you know who Eva is?
8    A.  Yes.
9    Q.  Who is Eva?
10    A.  The assistant comptroller from the New
11  York office.
12    Q.  Do you remember her last name?
13    A.  Polish last name I guess.  She was
14  Russian.  She is Russian actually.
15    Q.  Did you ever travel to any other
16  residences that Mr. Epstein had?
17    A.  No.
18    Q.  Are you aware he had a residence in the
19  Virgin Islands?
20        MR. CRITTON:  Form.
21        THE WITNESS:  Yes.
22  BY MR. MERMELSTEIN:
23    Q.  And would he sometimes travel to that
24  residence from Palm Beach?
25    A.  Yes.

Page 96

1    Q.  Okay.  Do you recall on any occasion who
2  would travel with him to the Virgin Islands?
3        MR. CRITTON:  Form.
4        THE WITNESS:  No, sir.
5  BY MR. MERMELSTEIN:
6    Q.  I think we were talking about the money
7  before, the household account, sometimes you gave
8  gifts?
9    A.  Yes, I was told to buy some gifts.
10    Q.  For whom?
11    A.  For the guests.
12    Q.  Okay.  And what kind of gifts?
13    A.  Shoes, sweaters, clothes.
14    Q.  So were you instructed to buy something
15  in particular at a particular store?
16    A.  They would go to the store, if they like
17  something I will go after and pay them and
18  retrieve it.
19    Q.  Okay.  So would this be a girl who was
20  staying at the house?
21    A.  Yes.
22    Q.  Okay.  This was one of the girls who
23  travelled with Mr. Epstein to Palm Beach.
24  Correct?
25    A.  Yes.

Page 97

1    Q.  And so Mr. Epstein would instruct you to
2  go shopping with this girl?
3    A.  Yes.
4    Q.  And instructed you to pay for whatever it
5  is she wanted to buy?
6    A.  Yes.
7    Q.  Was there a price limit or anything of
8  that nature?
9    A.  No, sir.
10    Q.  So when the girl decided what she wanted
11  you would --
12    A.  I would write them a check.
13    Q.  In that instance you would pay by check?
14    A.  Yes.
15    Q.  Any other instances where you gave gifts
16  to girls at the instruction of Mr. Epstein?
17    A.  No.  I was just told, you know, when they
18  told me I will buy the item.
19    Q.  I'm sorry?
20    A.  You know, when I was told to purchase
21  this item for them, you know, I will do that, but
22  not on any other occasions.
23    Q.  What do you mean not in any locations?
24    A.  Any other occasions.
25    Q.  Not any other occasions.  Okay.  Did you

25 (Pages 94 to 97)

NON PARTY (VR) 000271

GIUFFRE000959

Page 98

1   ever buy flowers for a girl?
2       A.  Yes, sir.
3       Q.  Tell me about that.
4       A.  I was told to buy flowers and roses for a
5   girl performing in high school.
6       Q.  Which girl was that?
7       A.  I don't remember the name, sir.
8       Q.  What was Mr. Epstein's relationship to
9   this girl?
10          MR. CRITTON:  Form.
11          THE WITNESS:  I think she was an
12      acquaintance, friend.
13  BY MR. MERMELSTEIN:
14      Q.  She was a friend?
15      A.  Yes, sir.
16      Q.  Now, she was performing at the high
17  school in what capacity?
18      A.  There was like a -- like a play in the
19  graduation for high school.
20      Q.  A play for graduation?
21      A.  Yes, in the high school theatre there was
22  some kind of performance.
23      Q.  Was it like a theatre production?
24      A.  Yeah, something like that.  I didn't go
25  inside so I didn't know what was going on inside.

Page 99

1       Q.  Why do you say it was for graduation?
2       A.  Because everybody was the graduation
3   outside, there were parents, there were a lot of
4   people at the school.
5       Q.  Okay.  A lot of high schools have theatre
6   production companies and they put on plays.
7   Correct?
8           MR. CRITTON:  Form.
9           THE WITNESS:  It was towards the end of
10      the year.  Well, I think I overheard that
11      there was a graduation performance of some
12      kind.
13  BY MR. MERMELSTEIN:
14      Q.  But you didn't go in so you don't know?
15      A.  No, sir.
16      Q.  But this was a high school student you
17  were bringing the flowers to.  Is that correct?
18      A.  Yes.
19      Q.  Had you seen this girl before at the El
20  Brillo Way property?
21      A.  Yes, sir.
22      Q.  You had seen her a number of times?
23      A.  Yes, sir.
24      Q.  Do you recall her name?
25      A.  I don't remember her name, sir.

Page 100

1       Q.  Now, you said you never went inside the
2   theatre?
3       A.  No, sir.
4       Q.  Okay.  How did you get to the flower
5   store?
6       A.  I called the girl to her cell and she
7   will come to the back door and I give her the
8   flowers.
9       Q.  Was anyone else around at the time?
10      A.  No, sir.
11      Q.  And you mentioned this was a girl you had
12  seen before?
13      A.  Yes.
14      Q.  Was this girl who had come to give
15  massages to Mr. Epstein?
16          MR. CRITTON:  Form.
17          THE WITNESS:  I don't know if she was
18      doing massages but she was at the house.
19  BY MR. MERMELSTEIN:
20      Q.  What would she have been there for?
21      A.  To visit him.
22      Q.  This was a high school girl who was
23  coming to visit Mr. Epstein at the house?
24      A.  She came to the house, I open the door
25  and I left, you know.

Page 101

1       Q.  Did you take her to the kitchen like you
2   did --
3       A.  Yes.
4       Q.  So you brought her to the kitchen just
5   like you did for the girls who gave him massages.
6   Correct?
7       A.  Yes, sir.
8       Q.  Did you ever pay her?
9       A.  I don't remember, sir, but probably I
10  did.
11          MR. CRITTON:  Form, move to strike,
12      speculation.
13  BY MR. MERMELSTEIN:
14      Q.  Why do you say you probably did?
15      A.  Because I was the only one paying --
16  well, not the only one but, you know, but chances
17  are I paid her but I don't remember that
18  particular instance that I gave her money.
19      Q.  Is it fair to say that the girls who came
20  to the Palm Beach residence, these are not the
21  girls who are staying there, the girls who came --
22  were there to give massages.  Correct?
23          MR. CRITTON:  Form.
24          THE WITNESS:  Yes.
25  BY MR. MERMELSTEIN:

26 (Pages 98 to 101)

**NON PARTY (VR) 000272**

GIUFFRE000961

Page 166

1  written down anywhere?
2      A.  No.
3      Q.  It's my understanding that C. and T.
4  either came to his house alone to visit with Mr.
5  Epstein or brought other girls in their age group
6  to Mr. Epstein.
7      Were you familiar with that type of
8  recruitment process of girls bringing other girls?
9      MR. CRITTON:  Form.
10     THE WITNESS:  Yes.
11 BY MR. EDWARDS:
12     Q.  Can you tell me more about what you know
13 about girls bringing other girls that are
14 relatively the same age to come to Jeffrey
15 Epstein's house and to use your words, have a good
16 time?
17     MR. CRITTON:  Form.
18     THE WITNESS:  It's hard to know who they
19     knew.  But I think that was -- they feel
20     better themselves when they're in a group
21     than going by themselves, but I don't know
22     somebody recruiting.
23 BY MR. EDWARDS:
24     Q.  Okay.  And you've talked about, at least
25 referred to yourself I believe to the police and

Page 167

1  as well today as a human ATM machine.  Right?
2      MR. CRITTON:  Form.
3      THE WITNESS:  Something like that.  I was
4      supposed to carry cash at all times.
5  BY MR. EDWARDS:
6      Q.  One of the primary reasons why you
7  carried cash was to pay the girls in this age
8  group of C. and T. for whatever happened at the
9  house.  Right?
10     MR. CRITTON:  Form.
11     THE WITNESS:  Yes.
12 BY MR. EDWARDS:
13     Q.  That's a fair statement.  Right?
14     MR. CRITTON:  Form.
15     THE WITNESS:  Yes.
16 BY MR. EDWARDS:
17     Q.  Okay.  And when C., let's use her for
18 example, would bring somebody else to the house,
19 did you pay C. as well as whomever she brought to
20 the house, pay them both?
21     A.  No, I pay only one person.
22     Q.  Okay.  My understanding, and tell me if
23 this is wrong or you can corroborate this, is that
24 Mr. Epstein would pay the girl that was actually
25 performing whatever was happening in the room --

Page 168

1  for now we'll call it a massage -- as well as
2  anybody who brought that person over to the house,
3  they would both get paid cash.  Are you familiar
4  with that?
5      MR. CRITTON:  Form.
6      THE WITNESS:  No.
7  BY MR. EDWARDS:
8      Q.  If C. brought another girl over to the
9  house and C. stayed downstairs but this other girl
10 went upstairs with Mr. Epstein, which one would
11 you pay?
12     A.  I don't know because I was told who to
13 pay.
14     Q.  And Sarah Kellen always told you?
15     A.  Sarah told me pay so and so.
16     Q.  So if we were going to ask anybody else
17 about the exact method in terms of who would get
18 paid and for what, who would the people be?  I
19 mean, other than Mr. Epstein who else could we ask
20 these questions?
21     A.  Sarah.
22     Q.  Sarah Kellen?
23     A.  Yes.
24     Q.  She would know this?
25     A.  Yes.

Page 169

1      Q.  What about Ghislaine Maxwell?
2      MR. CRITTON:  Form.
3      THE WITNESS:  You're talking about the
4      boss.  I don't know.
5  BY MR. EDWARDS:
6      Q.  To your knowledge was Ghislaine Maxwell
7  aware of these girls that are in the age group of
8  C. and T. coming to Jeffrey Epstein's house to
9  have a good time?
10     MR. CRITTON:  Form.
11     THE WITNESS:  I have to say something.
12     Mrs. Maxwell called me and told me not to
13     ever discuss or contact her again in a
14     threaten way.
15 BY MR. EDWARDS:
16     Q.  When was this?
17     A.  Right after I left because I call one of
18 the friends for a job and she told me this, but,
19 you know, I feel intimidated and so I want to keep
20 her out.
21     Q.  What exactly did she say?  First of all,
22 was this a telephone call?
23     A.  Yes, she was in New York.
24     Q.  She called you on your cell phone?
25     A.  Yes.

43 (Pages 166 to 169)

NON PARTY (VR) 000289

GIUFFRE000978

Page 170

1    Q. Is this the cell phone that was issued to
2  you by Mr. Epstein?
3    A. No, it was my personal phone. I was
4  already --
5    Q. Gone?
6    A. Yeah, this is three, four months down the
7  road.
8    Q. So if you left in --
9    A. February, March -- it was May or June.
10   Q. Of 2005?
11   A. Yes.
12   Q. And you got a call from Ghislaine Maxwell
13 out of the blue?
14   A. Yes.
15   Q. And do you know what prompted that
16 telephone call?
17   A. Because I contact somebody in New York to
18 get a job.
19   Q. Who was that person?
20   A. I contact Jean-Luc and I contact Eva, the
21 Swedish girl, she used to be very good friends
22 with Mr. Epstein because she asked me she need
23 somebody in New York.
24   Q. What does Eva do?
25   A. Eva was a model many years ago and he

Page 171

1  married -- Eva is the mother of the girl who was
2  on the wall.
3    Q. Who is on the wall of Mr. Epstein's
4  house?
5    A. Yeah.
6    Q. All right. There is a younger girl model
7  that's on the wall of Mr. Epstein's house and this
8  lady Eva is her mother?
9    A. Yes.
10   Q. And at some point in time you called her
11 in New York to get a job?
12   A. That's right.
13   Q. And you also called Jean-Luc Bernell?
14 That's his name. Right?
15   A. Jean-Luc, yeah, I don't remember his last
16 name.
17   Q. Does that sound familiar to you, Jean-Luc
18 Bernell?
19   A. Yeah.
20   Q. What did Eva and/or Jean-Luc say about
21 employing you?
22   A. No, they said they're going to find out
23 and obviously the first thing they did was talk to
24 Mrs. Maxwell.
25   Q. She made a telephone call to you and what

Page 172

1  precisely did she say?
2    A. She said I forbid you that you're going
3  to be -- that I will be sorry if I contact any of
4  her friends again.
5    Q. Okay. Other than you will be sorry if
6  you contact any of my friends again did she say
7  anything else about what you know about Mr.
8  Epstein and/or what goes on at his house?
9    A. She said something like don't open your
10 mouth or something like that. But you have to
11 understand, I'm a civil humble, I came as an
12 immigrant to service people, and right now you
13 feel a little -- I'm 55 and I'm afraid. First of
14 all, I don't have a job, but I'm glad this is on
15 tape because I don't want nothing to happen to me.
16 This is the way they treat you, better do this and
17 you shut up and don't talk to nobody and --
18   Q. When you say this is the way they treat,
19 who specifically are you talking about when you
20 say the word they?
21   A. Maxwell.
22   Q. And usually when you say the word they,
23 you're not only talking about one person --
24   A. Wealthy people.
25   Q. Are you also putting Jeffrey Epstein in

Page 173

1  that category?
2        MR. CRITTON: Form.
3        THE WITNESS: I didn't talk to him
4     directly most of the time.
5  BY MR. EDWARDS:
6    Q. What's the reason why if you were his
7  head of security that you wouldn't have more
8  direct contact with him? Why is that?
9        MR. CRITTON: Form.
10       THE WITNESS: He wanted that way, you
11    know, so, yeah, I have to talk to Sarah,
12    Sarah is not available talk to Lesley in New
13    York. He didn't want to be disturbed.
14 BY MR. EDWARDS:
15   Q. Even while you were in the same house
16 with him he still had other people you could talk
17 to directly but he was not one of them?
18   A. Yeah.
19   Q. When you were fired you were not fired
20 directly by him?
21   A. No.
22   Q. It was through somebody else?
23   A. Ms. Maxwell.
24   Q. Okay. But it was for upsetting him for
25 taking the wrong car?

44 (Pages 170 to 173)

NON PARTY (VR) 000290

GIUFFRE000979

Page 174

1  A.  Yes.
2  Q.  Okay.  Ever since this communication that
3  Ms. Maxwell made to you where she called you
4  sometime in May or June of 2005, and have you felt
5  threatened?
6  A.  Yes.
7     MR. CRITTON:  Form.
8  BY MR. EDWARDS:
9  Q.  Have you felt reluctant to come forward
10 and give truthful, honest, and full disclosure of
11 all information that you know about this case?
12    MR. CRITTON:  Form.
13    THE WITNESS:  I said this off the record
14 but I will say it on the record, being in
15 the Epstein case for me resulted in two
16 years I have -- I won't bring the names but
17 I was in the third interview to get hired as
18 a household manager in Palm Beach and they
19 told me you are the Jeffrey Epstein guy.
20 Not in the sense I did something wrong
21 because of the scandal, so they shun the job
22 away from me.  And so I was afraid that --
23 this is very powerful people and one phone
24 call and you finish, so I'm the little guy.
25 Even I'm wearing a tie I'm a -- I'm talking

Page 175

1  from my heart.  This is the way it is.
2  BY MR. EDWARDS:
3  Q.  I feel for you, I'm sorry that you have
4  to be in this position.
5     MR. CRITTON:  Move to strike this.
6  BY MR. EDWARDS:
7  Q.  Well, when you applied for these jobs and
8  they turned you down and gave you the reason that
9  you're the person involved in the Jeffrey Epstein
10 scandal, was it that they are associated or
11 friends with Jeffrey Epstein or is it that you
12 have information and you have this confidentiality
13 but you're revealing some certain information that
14 Mr. Epstein would not like?
15    MR. CRITTON:  Form.
16    THE WITNESS:  Both.
17 BY MR. EDWARDS:
18 Q.  Both?
19 A.  Both.
20 Q.  And since then given what you just told
21 us about these people being very powerful, are you
22 afraid for your life given the fact that you're
23 involved to some extent in this case?
24    MR. CRITTON:  Form.
25    THE WITNESS:  I just start thinking about

Page 176

1  this.  Because I went through -- the first
2  time I went to the deposition I was in Palm
3  Beach and I did my duty, I mean, I tell what
4  I know, but now I know there is more
5  digging, all I want is this to be to get on
6  with my normal life and stuff.
7  BY MR. EDWARDS:
8  Q.  So when you come here today to testify,
9  your main objective is to get back to your normal
10 life and get out of the spotlight of this case.
11 Yes?
12 A.  Yes.
13 Q.  And in doing so have you held back some
14 of the details that you know about that happened
15 in this case to remove yourself from the
16 spotlight?
17    MR. CRITTON:  Form.
18    THE WITNESS:  No, sir.
19 BY MR. EDWARDS:
20 Q.  Okay.  Have you ever talked to Ghislaine
21 Maxwell after that telephone call where she called
22 you and you felt threatened?
23 A.  No.
24 Q.  Okay.  So going back to where we started
25 here was, does Ghislaine Maxwell have knowledge of

Page 177

1  the girls that would come over to Jeffrey
2  Epstein's house that are in roughly the same age
3  group as C. and T. and to have a good time as you
4  put it?
5     MR. CRITTON:  Form.
6     THE WITNESS:  Yes.
7  BY MR. EDWARDS:
8  Q.  And what was her involvement and/or
9  knowledge about that?
10    MR. CRITTON:  Form.
11    THE WITNESS:  She knew what was going on.
12 BY MR. EDWARDS:
13 Q.  You referred to her at one point in time
14 as Jeffrey Epstein's companion.  But then later on
15 you said that if she flew she flew on a different
16 airplane and oftentimes or sometimes she slept in
17 a different bed from Mr. Epstein.  Did that seem
18 unusual to you?
19    MR. CRITTON:  Form.
20    THE WITNESS:  It was odd but, I mean, and
21 again, everything is odd in Palm Beach.
22 BY MR. EDWARDS:
23 Q.  Okay, I don't mean to laugh.
24 A.  Mr. Epstein fly to Jet Aviation, she fly
25 to Galaxy Aviation, but they never flew the same

45 (Pages 174 to 177)

NON PARTY (VR) 000291

GIUFFRE000980

Page 266

1  BY MR. LANGINO:
2    Q.  Are you currently in fear of Mr. Epstein?
3    A.  Not at this particular moment but it's
4  something I have to be worry about, yes.
5    Q.  Are you personally afraid of criminal
6  prosecution?
7    A.  No.
8    Q.  Do you believe that you did anything
9  illegal?
10   A.  Illegal, no.
11       MR. LANGINO:  I have no further
12  questions.  Thank you.
13       MR. CRITTON:  We're going to break in
14  about 15 minutes.  Do you want to start and
15  go for 15 minutes or do you want to -- it's
16  up to you.
17       MS. EZELL:  I'll start.
18       MR. WILLITS:  When are we going to quit,
19  folks?
20       MR. CRITTON:  In 15 minutes.
21       THE VIDEOGRAPHER:  Might as well change
22  tapes.
23       MR. EDWARDS:  Bob has to get back so
24  we've agreed we're going to come back some
25  other time.

Page 267

1        MR. WILLITS:  Why don't we just stop now?
2        MS. EZELL:  Okay.
3        MR. EDWARDS:  Rather than you start.
4        MS. EZELL:  Yeah, I won't get very far.
5        MR. EDWARDS:  Sorry to do this with you,
6  we didn't finish.
7        MR. CRITTON:  So we're stopped?
8        MR. EDWARDS:  We're stopped.
9        THE VIDEOGRAPHER:  Off the record.
10       (Thereupon, the videotaped deposition was
11  adjourned at 5:30 p.m.)
12              - - -
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 268

1    THE STATE OF FLORIDA,      )
2    COUNTY OF DADE.            )
3
4
5        I, the undersigned authority, certify
6  that ALFREDO RODRIGUEZ personally appeared before
7  me on the 29th day of July, 2009 and was duly
8  sworn.
9
10       WITNESS my hand and official seal this
11  31st day of July, 2009.
12
13
14
15
                    _____
16              MICHELLE PAYNE, Court Reporter
                Notary Public - State of Florida
17
18
19
20
21
22
23
24
25

Page 269

1              CERTIFICATE
2
   The State Of Florida,     )
3  County Of Dade.           )
4
5      I, MICHELLE PAYNE, Court Reporter and
   Notary Public in and for the State of Florida at
6  large, do hereby certify that I was authorized to
   and did stenographically report the videotaped
7  deposition of ALFREDO RODRIGUEZ; that a review of
   the transcript was requested; and that the
8  foregoing pages, numbered from 1 to 269,
   inclusive, are a true and correct transcription of
9  my stenographic notes of said deposition.
       I further certify that said videotaped
10 deposition was taken at the time and place
   hereinabove set forth and that the taking of said
11 videotaped deposition was commenced and completed
   as hereinabove set out.
12     I further certify that I am not an
13 attorney or counsel of any of the parties, nor am
   I a relative or employee of any attorney or
14 counsel of party connected with the action, nor am
15 I financially interested in the action.
       The foregoing certification of this
16 transcript does not apply to any reproduction of
   the same by any means unless under the direct
17 control and/or direction of the certifying
   reporter.
18     DATED this 31st day of July, 2009.
19
20
21
       _____
22     MICHELLE PAYNE, Court Reporter
23
24
25

68 (Pages 266 to 269)

**NON PARTY (VR) 000314**

GIUFFRE001003

# EXHIBIT 97

Page 1

```
 1                    UNITED STATES DISTRICT COURT
                      SOUTHERN DISTRICT OF FLORIDA
 2
                        Case No. 10-80015-CR-MARRA
 3
     UNITED STATES OF AMERICA,     )
 4                                 )
           GOVERNMENT,             )
 5                                 )
           -v-                     )
 6                                 )
     ALFREDO RODRIGUEZ,            )
 7                                 )
           DEFENDANT.              )      West Palm Beach, Florida
 8                                 )      June 18, 2010
     _____)
 9

10              TRANSCRIPT OF SENTENCING PROCEEDINGS

11            BEFORE THE HONORABLE KENNETH A. MARRA

12                  UNITED STATES DISTRICT JUDGE

13

14   Appearances:

15   FOR THE GOVERNMENT          Ann Marie C. Villafana, AUSA
                                 500 East Broward Boulevard,
16                               7th Floor,
                                 Fort Lauderdale, FL 33394
17

18   FOR THE DEFENDANT          Dave Lee Brannon, AFPD
                                450 Australian Avenue,
19                              Suite 500,
                                West Palm Beach, FL 33401
20

21   Reporter                   Stephen W. Franklin, RMR, CRR, CPE
     (561)514-3768              Official Court Reporter
22                              701 Clematis Street, Suite 417
                                West Palm Beach, Florida  33401
23

24

25
```

Page 2

```
 1        (Call to the order of the Court.)
 2            THE COURT:  Good morning, please be seated.
 3            We're here in the case of the United States of
 4    America versus Alfredo Rodriguez, Case
 5    Number 10-80015-CR-MARRA.
 6            May I have counsel state their appearances, please.
 7            MS. VILLAFANA:  Good morning, Your Honor.  Marie
 8    Villafana, for the United States.  With me is special agent
 9    Christina Prior (phonetic), from the FBI.
10            THE COURT:  Good morning.
11            MR. BRANNON:  Good morning, Judge.  Dave Lee Brannon,
12    Assistant Federal Public Defender, on behalf of Alfredo
13    Rodriguez, who's present in court.  We also have some members
14    of his family present in court that I'll mention later.
15            THE COURT:  All right.  Good morning.
16            We are here for sentencing.  Have both sides reviewed
17    the presentence investigation report?
18            MS. VILLAFANA:  Yes, Your Honor.
19            MR. BRANNON:  Yes, sir.
20            THE COURT:  Has the Defendant reviewed it with
21    counsel?
22            MR. BRANNON:  Yes, sir.
23            THE COURT:  Okay.  And all the objections were
24    resolved; is that correct?
25            MR. BRANNON:  Yes, sir.
```

Page 3

1       THE COURT:  So I will adopt the findings of the
2    presentence report as the findings of the Court.

3       Ms. Villafana, what's the Government's position
4    regarding sentencing?

5       MS. VILLAFANA:  Your Honor, we would ask that the
6    Court impose a sentence at the low end of the advisory
7    guideline range.  I think in accordance with the 3553(a)
8    factors that is an appropriate sentence.

9       In particular, the Court is required to consider the
10   type of the offense, the facts and circumstances of the
11   offense.  In this case, the Defendant obstructed a very
12   significant investigation into the exploitation of young women
13   here in Palm Beach County, and he knew about the significance
14   of the evidence that he had, and he made a decision that
15   although he knew he was required to turn it over, he wanted to
16   get money for that document rather than turn it over to law
17   enforcement or to turn it over in response to civil subpoenas.

18      The Court is required to consider how to promote
19   respect for the law and how to deter others.  Since you are
20   involved in the civil litigation, I know that you are well
21   aware of the facts of the case, and obstruction was a
22   significant consideration in this case.  There was great
23   difficulty getting witnesses to assist and come forward in the
24   case and respond to requests of law enforcement for evidence.
25      In this case, we do believe that 24 months is an

Page 4

1  appropriate sentence. The Defendant, after entering his
2  guilty plea in this case, went on to commit additional crimes
3  which are the subject of a separate indictment and which will
4  be the subject of a separate sentencing, but I do believe that
5  the Court should consider them in determining what sentence is
6  appropriate for this defendant.

7  THE COURT: What is the status of the other case?

8  MS. VILLAFANA: My understanding from talking to the
9  AUSA down there is that the Defendant does intend to enter a
10 guilty plea within the next couple weeks in that case.

11 THE COURT: Thank you.

12 Mr. Brannon?

13 MR. BRANNON: Thank you, Judge.

14 First, I would note to the Court that I provided some
15 submissions for sentencing yesterday, a number of family
16 letters.

17 THE COURT: I read them.

18 MR. BRANNON: Thank you, sir.

19 We have present in court today showing their love and
20 support for Mr. Rodriguez his wife, Patricia Dunn, who has a
21 letter she's going to read to the Court in just a minute, his
22 daughter, Christina Rodriguez, who provided a letter already
23 to the Court and will not be speaking, and his stepson,
24 Christopher Dunn, who didn't provide a letter but will very
25 briefly address the Court.

Page 5

1          With the Court's permission, I'll have them go ahead

2     and come on up and speak to the Court, and then I'll go into

3     my allocution.

4          THE COURT:  All right.  Certainly.

5          MR. BRANNON:  Okay.  Mr. Dunn, would you come

6     forward.

7          THE WITNESS:  Good morning.

8          THE COURT:  Your name, please?

9          THE WITNESS:  Christopher Dunn.

10         I just wanted to say a few words about my stepfather.

11    I've actually been here before when I was studying law back in

12    high school, but I never thought I'd be here in these

13    circumstances.  It's just -- it's -- I don't know how to say

14    this.  It's not in character for my stepfather.  This was the

15    man that, more than after maybe myself, was the biggest moral

16    anchor in my life.  He would always say things like, you need

17    to do the right thing no matter what.  There was no

18    explanation, it was just to be done, and that things had to be

19    done by the book.  That, you know, you had to put other people

20    first and worry about other people.

21         And this isn't -- this isn't -- this scene isn't

22    where he belongs.  He's -- I don't know if you can call

23    anybody perfect, but he -- I can call him a good man.  And he

24    may be desperate at times, even ignorant of things at times

25    and not always right, but he's good at heart.

Page 6

1            You know, I don't know if this helps or hurts, but a
2    few months ago, actually months ago, I was -- I actually --
3    I've been reading more.  I've -- I pray for my family, and I
4    pray for a lot of things, and I'm thankful for a lot, but I
5    don't know if I should regret this, but I prayed a long time
6    ago before, before any of this, that as good as Alfredo was, I
7    wanted to make him a better man, as good as one can be, and I
8    actually prayed that something would come about to where he
9    could see the light and become closer with God.

10            And I knew what -- I mean, I'm not a fool.  I know a
11    lot of people don't change until they're traumatized, you
12    know, for the better, and I knew what I was praying for was a
13    trauma.  I even thought it to myself.  I didn't know.  I guess
14    mysterious ways indeed.  I didn't know what I was praying for
15    specifically, but I knew he needed something to jolt him to
16    become even better than he already was.  And as also this has
17    been passing and all these things have been happening, the
18    silver lining is really that I've seen him become more of a
19    Bible man, you know.  He listens to the Word more.  He's been
20    quoting me.  He's been quoting to me the words, and I've seen
21    a good man transform into an even better man.

22            Thank you.

23            THE COURT:  Thank you.

24            MR. BRANNON:  And Ms. Dunn, I believe you have a
25    letter you want to read to the Judge?

1        THE WITNESS:  Yes.

2        THE COURT:  Good morning.

3        Your name, please?

4        THE WITNESS:  Good morning.

5        THE COURT:  Your name?

6        THE WITNESS:  Patricia Dunn.

7        THE COURT:  Patricia?

8        THE WITNESS:  Yes, Dunn, D-u-n-n.

9        THE COURT:  Can you spell your first name?

10       THE WITNESS:  Patricia, P-a-t-r-i-c-i-a.

11       THE COURT:  Thank you.

12       THE WITNESS:  Your Honor, it was difficult for me to

13  write something on behalf of Alfredo Rodriguez because he's

14  the least person that I could think would ever need your

15  mercy.  Alfredo has always been respectful, determined,

16  honest, caring, helpful, a great father, a great husband and a

17  great friend.  I have shared my life with Alfredo for the past

18  17 years.  After my first husband pass away, he helped me

19  raise my two children as well as his three children.  He gave

20  all of them nothing but love, commitment and great example.

21  Alfredo has been taught all his life to be good, to be a good

22  citizen and excel at whatever he did.  He proudly taught this

23  to all our children.

24       Alfredo has the honor to say that his grandfather was

25  the only Bolivian lawyer to be seated at the House of Lords in

Page 8

1    England where he was serving as an ambassador to Bolivia. His

2    grandfather was a great example for Alfredo and our siblings.

3              Alfredo attended the Bolivian air force academy and

4    later attended the United States Air Force. He has --

5              THE COURT: Ms. Dunn, can you slow down, please?

6    Because the court reporter is having trouble.

7              THE WITNESS: I'm sorry.

8              THE COURT: That's all right. Just relax and speak a

9    little more slowly.

10             THE WITNESS: You want me to repeat the last

11   sentence?

12             THE COURT: Yes, please.

13             THE WITNESS: Alfredo attended the Bolivian air force

14   academy, and later he attended the United States Air Force.

15   He has lived in this country for more than 30 years. And even

16   though sometimes times were difficult, he always kept his

17   straight path without breaking the law.

18             What he's going through right now, it is out of

19   character for him. He always told all of our children to do

20   good, not to turn away from their goals, to go to school and

21   to help others. He wanted to inject the good in our

22   children's DNA.

23             We as a family need Alfredo. He's our pillar.

24   Please do not let the moment of weakness or need or mostly

25   ignorance to ruin his life and most of our lives. Please,

Page 9

1    sir, give him the opportunity to be free and to be with us.
2    We need him.

3           Thank you.

4           THE COURT:  Thank you.

5           MR. BRANNON:  Your Honor, this is not our normal
6    case.  I don't really feel I can comment too much about the
7    Miami matter since that is pending, even though I
8    understand -- my understanding of the resolution is the same
9    as the Government's.

10          Mr. Rodriguez had made a good living as a house man
11   to the wealthy, and that's reflected in several paragraphs in
12   the PSI.  I think one of the things that a lot of people don't
13   understand is that his having any connection at all to
14   Mr. Epstein, once that particular story became well-known,
15   entirely finished that line of work for him.  Frankly, none of
16   the wealthy wanted to be associated with anybody that had
17   anything to do with what happened at Mr. Epstein's house.  So
18   even though Alfredo did good work and a lot of people had
19   thought a lot of him and he had worked for a lot of other
20   people in the past, once that fact became known and once they
21   could do a background check or a Google search on
22   Mr. Rodriguez and see his name tied to Mr. Epstein, they were
23   not interested.  They didn't want to have him working with
24   them.  So he hit some real economic hard times.

25          One thing I don't think any of us are real clear

1    at -- and you know that the central point in this obstruction
2    charge is the book that has been mentioned. I don't know at
3    what point Mr. Rodriguez became aware that he actually had the
4    book. One of the things that Mr. Rodriguez did was he lived
5    at Mr. Epstein's estate. And when he left Mr. Epstein's
6    employment, a lot of stuff got packed up and put away. One of
7    those things was a copy of the book, of which there were many
8    copies, and Mr. Rodriguez had one as Mr. Epstein's house man.

9          There came a point at which he was aware that he had
10   the book. I can imagine if I was packing up my office, I'm
11   not sure how long I would know that I had everything that I
12   had in the boxes until I started going through them and see
13   them.

14         He did cooperate in the early stages of the
15   investigation. He's mentioned in news reports where he had
16   given information and papers over to the Palm Beach Police
17   Department when they investigated.

18         He has been a good family man. That's been reflected
19   in the letters. We are cooperating with the Government now
20   and will continue to cooperate with the Government.

21         I think one of the things that we do have to consider
22   in deciding what is an appropriate sentence in this case is
23   what happened to Mr. Epstein. It is difficult for me to
24   justify Mr. Rodriguez getting a sentence greater than
25   Mr. Epstein received, and Mr. Epstein received a sentence of

```
 1    18 months in the stockade on some very serious charges.  I can
 2    introduce a copy of the nonprosecution agreement into the
 3    record if the Court wishes me to.
 4              THE COURT:  I'm familiar with it.
 5              MR. BRANNON:  Okay.  I don't want to necessarily put
 6    that in the record unless we need to have it in the record.
 7              So I would ask the Court to consider that as an
 8    appropriate sentence in this case.  I know that's a sentence
 9    below the guideline range, but I think when we look at how
10    society views results, I think there's just something that
11    doesn't look quite right for Mr. Epstein's house man to get a
12    greater sentence for what he's done than Mr. Epstein did for
13    what he's done, which is substantially worse.
14              So I would ask the Court to sentence Mr. Rodriguez to
15    a sentence of 18 months.
16              THE COURT:  All right.  Thank you.
17              Does Mr. Rodriguez wish to say anything?
18              THE DEFENDANT:  Your Honor, I'm not going to make
19    this long, but like my wife and my kids, I always told them to
20    do the right thing, and I sent them to college to push to
21    higher education.  But I'm really sorry for what I did, and I
22    just pray that the Court to be merciful to me, sir.
23              THE COURT:  Thank you.
24              THE DEFENDANT:  Thank you, sir.
25              THE COURT:  Ms. Villafana, what do you have to say
```

1   about the somewhat logical argument that maybe Mr. Rodriguez
2   shouldn't get worse than Mr. Epstein did in his plea agreement
3   with the State?

4             MS. VILLAFANA:  I certainly understand the logic.  I
5   know that if he had gotten the two-level reduction for
6   acceptance, he would have been at that same sentence of 18
7   months at the low end.  He didn't get the two-level reduction
8   for acceptance because the day of his change of plea, he went
9   and drove down to Miami and conducted a purchase of various
10  firearms with an undercover officer, which is why the two
11  levels were added.  So that's certainly a difference.

12            Another difference is that while I can't -- I
13  obviously don't have a crystal ball, and I can't say what
14  would have happened if this evidence had come to light during
15  the pendency of the grand jury investigation, what I can say
16  is that there were significant issues related to federal
17  prosecution of the Epstein case in terms of the interstate
18  nexus between the crimes that were under investigation.  Some
19  of the information contained in the book that Mr. Rodriguez
20  had, as well as other information that he was able to provide
21  once he was cooperating post-arrest, would have answered the
22  questions that were raised regarding that interstate nexus.
23  So would that have meant that there definitely would have been
24  a federal prosecution?  I can't say for certain.  Would that
25  significantly have advanced the ball?  Yes.

Page 13

 1             THE COURT:  Mr. Brannon mentioned that there were
 2   other copies of this book.  I thought he said there were many
 3   copies of this book.  Is that true as far as you're concerned?
 4   And how and when did these other copies come to light?
 5             MS. VILLAFANA:  No other copies have come to the
 6   light of any federal investigator, but our understanding from
 7   interviewing Mr. Rodriguez was that multiple copies of that
 8   book were made and were kept at Mr. Epstein's homes throughout
 9   the world, but none of them were ever either found during the
10   search of Mr. Epstein's home in Palm Beach, and obviously no
11   other search warrants were ever executed on his islands or any
12   of his other residences.  So this is the only copy that's
13   known to law enforcement.
14             THE COURT:  Oh, but he contends that there were other
15   copies?
16             MS. VILLAFANA:  Yes.  And I think from seeing the
17   book, I think that that's true.
18             THE COURT:  Okay.  So he lost his two points for
19   acceptance because of the gun charge?
20             MS. VILLAFANA:  Yes.
21             MR. BRANNON:  Actually, Judge, I think it was three
22   points for acceptance, because we're at an offense level 17.
23   It would be 16 or greater.  He would have gotten a three-level
24   reduction for acceptance.  His guidelines with acceptance
25   would have been 15 to 21 months.

Page 14

1          MS. VILLAFANA:  Okay.  Right.  So -- but he's at a 17

2    now, which is 24 to 30, and he would have been at a 14, which

3    would have been, right, 15 to 21.

4          THE COURT:  All right.  So he would have gotten 15?

5    You would have been recommending 15 if he hadn't been involved

6    in the gun charge?

7          MS. VILLAFANA:  That's correct.

8          THE COURT:  And he's obviously going to get punished

9    for the gun charge separate and apart from what happens here

10   if he pleads guilty and is convicted one way or the other.

11         MS. VILLAFANA:  Correct.

12         THE COURT:  All right.  Anything else?

13         MR. BRANNON:  No, sir.

14         THE COURT:  All right.  The Court has considered the

15   statements of all the parties, the presentence report, which

16   contains the advisory guidelines, as well as the statutory

17   factors set forth in 18 U.S.C., Section 3553(a)(1) through

18   (7).

19         It is the finding of the Court the Defendant is not

20   able to pay a fine.

21         Now, in imposing sentence, the Court has to consider

22   the statutory factors of 3553, which require the Court to

23   consider the nature and circumstances of the offense, which in

24   this case are significant because of the impact it had on the

25   investigation of Mr. Epstein.  And much has been said and

Page 15

1   written about the sentence that Mr. Epstein received for the
2   crimes to which he's pled guilty, and if this book had been
3   produced when requested things may have been different.  So in
4   one sense when we compare the sentence that's going to be
5   imposed in this case to what Mr. Epstein got, if this book had
6   been produced, Mr. Epstein's sentence might have been
7   significantly different.  But he got what he got, and I think
8   that's a factor to be considered in this case.

9           The history and characteristics of this defendant up
10  until this incident and this gun incident, he's had an
11  exemplary life.  And I don't know what has brought about this
12  change in his behavior, but two incidents so close together is
13  somewhat troubling.

14          The Court has to consider the need for the sentence
15  imposed to reflect the seriousness of the offense, to promote
16  respect for the law and to provide just punishment.

17          The Court has to consider the need to protect the
18  public from further crimes of the Defendant, which I really
19  don't think is too much of a concern.  I don't think
20  Mr. Rodriguez is going to be in any more trouble after he
21  finishes his sentence for this case and whatever sentence, if
22  any, may be imposed for the gun case.

23          Also, the Court has to consider the need to afford
24  adequate deterrence to criminal conduct by others and has to
25  consider the need to avoid unwarranted sentencing disparities

Page 16

1    among defendants with similar records who have been found
2    guilty of similar conduct.

3              So if you look at this particular incident, his
4    guidelines would be 15 to, what is it, 18 months, or 21?

5              MR. BRANNON:  Fifteen to 21, Judge.

6              THE COURT:  Fifteen to 21 months if he hadn't been
7    involved in the gun charge.  He's going to get, if he's going
8    to plead guilty, which I'm told he probably will -- and
9    whether he pleads guilty or not, from what I understand of the
10   case, it's likely he's going to get convicted one way or the
11   other anyway.  So he's going to get punished for that gun
12   charge separate and apart from what happens here, so I don't
13   know that it makes sense to have to increase his punishment
14   here because of a gun charge that he's going to get punished
15   for independently.

16             And there is some logic to the argument that
17   Mr. Rodriguez here shouldn't be punished more severely than
18   Mr. Epstein, who did significantly more egregious things than
19   Mr. Rodriguez did.  Although, as I said, if this information
20   had come to light sooner, maybe Mr. Epstein situation would
21   have turned out differently.

22             But taking into consideration the fact that he is
23   going to be punished for his gun charge separately, and that
24   would have affected his guideline, and Mr. Epstein's sentence
25   was less than his guidelines here, I think a sentence below

Page 17

1   the advisory guideline range would be sufficient but not
2   greater than necessary to comply with the factors under 3553.
3   So I am going to impose a sentence below the advisory
4   guideline range.

5          Pursuant to the Sentencing Reform Act of 1984, it is
6   the judgment of the Court that the Defendant, Alfredo
7   Rodriguez, is hereby committed to the custody of the Bureau of
8   Prisons to be imprisoned for a term of 18 months. Upon
9   release from imprisonment, the Defendant shall be placed on
10  supervised release for a term of two years.

11         Within 72 hours of his release, the Defendant shall
12  report in person to the probation office in the district where
13  he's released.

14         While on supervised release, the Defendant shall not
15  commit any crimes, he shall be prohibited from possessing a
16  firearm or other dangerous devices, and he shall not possess a
17  controlled substance.

18         He shall cooperate in the collection of DNA and shall
19  comply with the standard conditions of supervised release that
20  have been adopted by this court, as well as the following
21  special conditions:  Financial disclosure requirement and
22  permissible search, as noted in Part G of the presentence
23  report.

24         The Defendant shall also immediately pay to the
25  United States a special assessment of $100.

Page 18

1        Total sentence is 18 months' imprisonment, two years'
2   supervised release and a $100 special assessment.
3        Now that sentence has been imposed, does the
4   Defendant or his counsel object to the Court's findings of
5   fact or the manner in which sentence was pronounced?
6        MR. BRANNON:  No, sir.  We do have one request of the
7   Court.
8        THE COURT:  Yes.
9        MR. BRANNON:  We would ask the Court to recommend the
10   Miami area as the place of incarceration.
11        THE COURT:  I'll make that recommendation.
12        Any objection from the Government?
13        MS. VILLAFANA:  No, Your Honor.
14        THE COURT:  Mr. Rodriguez, you have the right to
15   appeal the sentence that's been imposed.  If you wish to file
16   an appeal, you must file your notice of appeal within 14 days
17   from the date judgment's entered in this case.  And if you are
18   unable to pay for the cost of the appeal, you may seek leave
19   to file the appeal in forma pauperis.
20        Good luck to you, sir.  Thank you.
21      (Proceedings concluded.)
22
23
24
25

```
 1                              *  *  *  *  *  *

 2                            CERTIFICATE

 3        I, Stephen W. Franklin, Registered Merit Reporter, and

 4   Certified Realtime Reporter, certify that the foregoing is a

 5   correct transcript from the record of proceedings in the

 6   above-entitled matter.

 7        Dated this 22nd day of JUNE, 2010.

 8

 9        /s/Stephen W. Franklin

10        Stephen W. Franklin, RMR, CRR

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

AO 91 (Rev. 5/85) Criminal Complaint   AUSA VILLAFAÑA

# *United States District Court*

## SOUTHERN DISTRICT OF FLORIDA

UNITED STATES OF AMERICA

vs.

ALFREDO RODRIGUEZ,

Defendant.

_____/

FILED by _____ D.C.

DEC - 1 2009

STEVEN M LARIMORE
CLERK U S. DIST CT
S D OF FLA   W P B

## CRIMINAL COMPLAINT

**CASE NUMBER: 09-8308-LRJ**

*[handwritten notes]*

I, the undersigned complainant, being duly sworn, state the following is true and correct to the best of my knowledge and belief.

From at least as early as January 18, 2007, through on or about November 3, 2009, in Palm Beach County, in the Southern District of Florida, and elsewhere, the defendant,

### **ALFREDO RODRIGUEZ,**

did corruptly conceal a record, document, or other object, with the intent to impair the object's availability for use in an official proceeding and otherwise corruptly obstructed or impeded an official proceeding, in violation of Title __18__, United States Code, Section ___1512(c)___ .

I further state that I am a ___Special Agent with the Federal Bureau of Investigation___, and that this Complaint is based on the following facts:

Please see attached Affidavit

Continued on the attached and made a part hereof.

Christina J. Pryor, Special Agent
Federal Bureau of Investigation

Sworn to before me, and subscribed in my presence, upon my finding of probable cause.

| December / , 2009 | at | West Palm Beach, Florida |
|---|---|---|
| Date | | City and State |

LINNEA R. JOHNSON
UNITED STATES MAGISTRATE JUDGE

Signature of Judicial Officer

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 10 - 80015 - CR - MARRA / HOPKINS

18 U.S.C. § 1512(c)

UNITED STATES OF AMERICA

v.

ALFREDO RODRIGUEZ,

        Defendant.

_____/

FILED by _____ D.C.

JAN 2 9 2010

STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S.D. OF FLA. - W.P.B.

## INFORMATION

The United States Attorney charges that:

From at least as early as January 18, 2007, through on or about November 3, 2009, in Palm

Beach County, in the Southern District of Florida, and elsewhere, the defendant,

## ALFREDO RODRIGUEZ,

did corruptly conceal a record, document, or other object, with the intent to impair the object's

availability for use in an official proceeding, that is proceedings before a federal grand jury, and

otherwise corruptly obstructed and impeded said official proceeding; in violation of Title 18, United

States Code, Section 1512(c).

JEFFREY H. SLOMAN
UNITED STATES ATTORNEY

A. MARIE VILLAFAÑA
ASSISTANT UNITED STATES ATTORNEY

## AFFIDAVIT

I, Christina J. Pryor, being duly sworn, do state and attest as follows:

1.    I am a Special Agent with the Federal Bureau of Investigation (FBI) and have been so employed for three (3) months. I am currently assigned to the Safe Streets Task Force, Miami Field Division, FBI Squad PB-2. Prior to joining the Miami Field Division, I attended the FBI Academy in Quantico, Virginia, for five (5) months where I received training in federal criminal laws and investigation techniques, including the laws related to obstruction of justice.

2.    This affidavit is based upon my own personal knowledge of the facts and circumstances surrounding the investigation, and information provided to me by other law enforcement officers. This affidavit does not purport to contain all the information known to me about this case but addresses only that information necessary to support a finding of probable cause for the issuance of a criminal complaint charging Alfredo Rodriguez with obstruction of official proceedings, in violation of Title 18, United States Code, Section 1512(c).

3.    On October 27, 2009, agents of the FBI met with and interviewed a cooperating witness ("CW"). The CW reported that, while conducting discovery in a pending civil case before the United States District Court for the Southern District of Florida, he came into contact with Alfredo Rodriguez ("Rodriguez"), who was a subpoenaed witness in the civil case.

4.    Rodriguez had been interviewed by FBI agents on January 18, 2007, in connection with a federal criminal investigation into the sexual exploitation of minors. Prior

## AFFIDAVIT

I, Christina J. Pryor, being duly sworn, do state and attest as follows:

1.     I am a Special Agent with the Federal Bureau of Investigation (FBI) and have been so employed for three (3) months. I am currently assigned to the Safe Streets Task Force, Miami Field Division, FBI Squad PB-2. Prior to joining the Miami Field Division, I attended the FBI Academy in Quantico, Virginia, for five (5) months where I received training in federal criminal laws and investigation techniques, including the laws related to obstruction of justice.

2.     This affidavit is based upon my own personal knowledge of the facts and circumstances surrounding the investigation, and information provided to me by other law enforcement officers. This affidavit does not purport to contain all the information known to me about this case but addresses only that information necessary to support a finding of probable cause for the issuance of a criminal complaint charging Alfredo Rodriguez with obstruction of official proceedings, in violation of Title 18, United States Code, Section 1512(c).

3.     On October 27, 2009, agents of the FBI met with and interviewed a cooperating witness ("CW"). The CW reported that, while conducting discovery in a pending civil case before the United States District Court for the Southern District of Florida, he came into contact with Alfredo Rodriguez ("Rodriguez"), who was a subpoenaed witness in the civil case.

4.     Rodriguez had been interviewed by FBI agents on January 18, 2007, in connection with a federal criminal investigation into the sexual exploitation of minors. Prior

Ex B

to being interviewed by FBI, Rodriguez had also been contacted and interviewed by local police detectives, and had been asked to produce documents related to the criminal investigation. The civil litigation involving the CW related to civil damages claims made by victims of the criminal activity that formed the basis of the state and federal criminal investigations.

5. The CW explained to agents that Rodriguez had been deposed under oath on two occasions. The first deposition occurred on July 27, 2009, and the second deposition was conducted on August 9, 2009. In connection with those depositions, Rodriguez was served with a subpoena duces tecum that called for the production of several types of documentary evidence. The CW was present for both depositions and Rodriguez testified that he had no documents responsive to the subpoena duces tecum.

6. In August 2009, after the conclusion of the second deposition, the CW received a phone call from Rodriguez. Rodriguez informed the CW that he had additional information that he had not previously disclosed to any law enforcement agency or any of the civil attorneys. Rodriguez described the information as, the Holy Grail or Golden Nugget and explained that he had compiled lists of additional victims in the case and their contact information. Rodriguez explained that the information contained hundreds of additional victims and their phone numbers from diverse geographic locations, including New York, New Mexico, and Paris, France.

7. Rodriguez asked the CW to pay him $50,000.00 and, in return, Rodriguez would turn over the documents relating to the victims. In his initial and subsequent

2

communications with Rodriguez, the CW explained to Rodriguez that he was under subpoena to turn over such information and that it would be illegal for Rodriguez to demand money for turning over the information. Rodriguez persisted that he would only turn over the information in his possession in exchange for $50,000.00.

8.    On October 28, 2009, in a consensually-monitored phone call, the CW telephoned Rodriguez. Rodriguez again indicated that he would not turn over the information relating to the additional victims without monetary compensation. Rodriguez was told that an associate of the CW would be in touch with him regarding the information and exchange. The associate that the CW referred to was, in fact, an undercover employee (UCE) of the FBI.

9.    On October 29, 2009, the FBI UCE contacted Rodriguez via telephone. Rodriguez again explained that he would only turn over the information in exchange for monetary compensation. The UCE advised Rodriguez that it would take several days to acquire the funds and that once the funds were obtained, he/she would contact Rodriguez. During the conversation, Rodriguez admitted that he knew that the information was relevant to the FBI's criminal investigation and was called for by the investigation. Rodriguez explained that he had not turned over the information to the FBI because: (1) it was his "property" and he should be compensated for it; and (2) he was afraid that the target of the investigation would make him "disappear" or otherwise harm him, and the information was his "insurance policy."

10.    On November 2, 2009, the UCE made contact with Rodriguez via telephone.

3

In that conversation, Rodriguez and the UCE continued the discussion regarding the purchase of the documents and scheduled a meeting for the following day.

11.     On November 3, 2009, Rodriguez met with the UCE at a predetermined location. During the meeting, Rodriguez produced a small bound book and several sheets of legal pad paper containing hand written notes. Rodriguez explained that he had taken the bound book from his former employer's residence while employed there in 2004 to 2005 and that the book had been created by persons working for his former employer. Rodriguez discussed in detail the information contained within the book, and identified important information to the UCE. In addition, Rodriguez admitted he had previously lied to FBI. Rodriguez asked the UCE about the $50,000.00, took possession of the money, and began counting it.

12.     Rodriguez was then detained for Obstruction of Official Proceedings, Title 18, U.S. Code, Section 1512(c), and questioned. After *Miranda* warnings were administered by agents, Rodriguez waived his rights and signed a written waiver of those rights. Rodriguez admitted that he had the documents and book in his possession and had never turned them over to local law enforcement or the FBI. In addition, Rodriguez advised he had witnessed nude girls whom he believed were underage at the pool area of his former employer's home, knew that his former employer was engaging in sexual contact with underage girls, and had viewed pornographic images of underage girls on computers in his employer's home. Rodriguez was then released from custody for further investigation.

13.     The items that Rodriguez had attempted to sell to the UC for $50,000.00

4

# EXHIBIT  98

UNITED STATES OF AMERICA, v.
GHISLAINE MAXWELL,

SEALED
December 6, 2021

LC6Cmax1        Kate - direct        Page 1169

1  DIRECT EXAMINATION
2  BY MS. POMERANTZ:
3  Q. Good morning. If you could pull up to the microphone so we
4    can hear you.
5  A. That's fine?
6  Q. Yes. Thank you. To be clear, are you testifying under the
7    name Kate today?
8  A. Yes.
9  Q. Is Kate your real name?
10 A. No.
11 Q. Leading up to this trial, did you ask to testify under a
12   pseudonym to protect your privacy?
13 A. I did.
14 Q. Kate, can you take a look, there should be a binder next to
15   you.
16       MS. POMERANTZ: Your Honor, at this time, I would
17   request that the jurors be permitted to take out their binders
18   and turn to Government Exhibit 16, which is in evidence under
19   seal.
20       THE COURT: It is in evidence already. Let me just
21   confirm.
22       MS. POMERANTZ: Thank you, your Honor.
23       THE COURT: Without objection, Ms. Sternheim?
24       MS. STERNHEIM: Without objection.
25       THE COURT: Members of the jury, you may pick up your

LC6Cmax1        Kate - direct        Page 1170

1  binders, please, the large binders, and turn to GX16, which is
2    in evidence.
3  Q. Kate, you can pull the microphone closer to you. Thank
4    you.
5        Kate, can you please let me know when you're at
6    Government Exhibit 16?
7  A. Yes, I am.
8  Q. Do you recognize that?
9  A. Yes, I do.
10 Q. What is that?
11 A. It's my birth certificate.
12 Q. Is that the name that you were born with?
13 A. Yes.
14       MS. POMERANTZ: Your Honor, at this time, I would ask
15   just the witness, not the jurors, to turn to what has been
16   marked for identification as Government Exhibit 18.
17       THE COURT: Members of the jury, please don't -- why
18   don't you close your binders for the moment. Thank you.
19       The witness may turn, please, to GX18.
20       Again, members of the jury, please don't go there yet
21   until the document has been admitted.
22 BY MS. POMERANTZ:
23 Q. Kate, do you recognize that?
24 A. Yes.
25 Q. What is that?

LC6Cmax1        Kate - direct        Page 1171

1  A. It's my driver's license.
2  Q. Is that your current legal name?
3  A. Yes.
4        MS. POMERANTZ: Your Honor, the government offers
5    Government Exhibit 18 under seal.
6        MS. STERNHEIM: No objection.
7        THE COURT: GX18 is admitted under seal consistent
8    with my ruling to protect this witness's anonymity.
9        (Government's Exhibit 18 received in evidence)
10       Ms. Pomerantz, do you wish to publish to the jury?
11       MS. POMERANTZ: Yes, your Honor, if we can now publish
12   to the jury, please.
13       THE COURT: Members of the jury, you may open your
14   binder and look at GX18, please.
15 BY MS. POMERANTZ:
16 Q. Kate, how far did you go in school?
17       THE COURT: I'll ask the members of the jury to put
18   their binders away, please.
19       MS. POMERANTZ: Thank you, your Honor.
20 Q. Kate, how far did you go in school?
21 A. I finished some high school.
22 Q. What kind of work do you do now?
23 A. I work with mainly women who suffer with trauma and
24   substance use disorder.
25 Q. What kind of work did you do before that?

LC6Cmax1        Kate - direct        Page 1172

1  A. I was a working musician, singer, and songwriter.
2  Q. When you were approximately 17 years old, where were you
3    living?
4  A. I was living in England, London.
5  Q. What neighborhood in London did you live?
6  A. Belgravia.
7  Q. Who did you live with at the time?
8  A. My mother.
9  Q. What was your life like at home with your mother at that
10   time?
11 A. Well, my mother was having a difficult time and she had
12   been quite ill. So it was a bit stressful and I was alone
13   quite a lot.
14 Q. Did there come a time when you met Ghislaine Maxwell?
15 A. Yes.
16 Q. How did you meet Maxwell?
17 A. I had been dating a man and we took a trip to Paris, and he
18   introduced me to Ghislaine Maxwell in Paris.
19 Q. Approximately how old were you at the time you met Maxwell
20   in Paris?
21 A. Approximately 17.
22 Q. And approximately what year were you 17 years old?
23 A. God, I can't do the math. So that was '94.
24 Q. Is that 1994?
25 A. Yes.

UNITED STATES OF AMERICA, v.
GHISLAINE MAXWELL,

SEALED
December 6, 2021

LC6Cmax1          Kate - direct          Page 1173

1  Q. And you mentioned that you met her through a friend. About
2  how old was the friend?
3  A. He was about 35.
4  Q. And what was the nature of your relationship with the
5  friend?
6  A. We were dating.
7  Q. Did you speak with Maxwell the night you met her?
8  A. Yes.
9  Q. What, if anything, did you and Maxwell speak about?
10  A. We spoke about -- we spoke about the evening and where we
11  were, you know, we were headed to -- out for the evening. And
12  we spoke about where I lived, we spoke about the man that I was
13  dating. She was asking me things about myself.
14  Q. What did Maxwell look like when you met her?
15  A. She was very sophisticated and very elegant. And she had
16  short -- quite short dark brown hair. She just -- she was very
17  impressive.
18  Q. About how old did she seem?
19  A. In her 30s.
20      MS. POMERANTZ: Ms. Drescher, can we please pull up
21  what's in evidence as Government Exhibit 115.
22  Q. Do you recognize the person in this photograph?
23  A. Yes.
24  Q. Who is it?
25  A. It's Ghislaine Maxwell.

LC6Cmax1          Kate - direct          Page 1174

1      MS. POMERANTZ: We can take that down, Ms. Drescher.
2      Your Honor, at this time, I'd like to ask the witness
3  to look at what's been marked for identification as Government
4  Exhibit 109 in her binder.
5      THE COURT: Okay. The witness may look at GX109,
6  please.
7  Q. Kate, are you at Government Exhibit 109?
8  A. Yes.
9  Q. Do you recognize this?
10  A. Yes.
11  Q. What is it?
12  A. It's a picture of me.
13  Q. Is this a fair and accurate depiction of your physical
14  appearance around the time you met Maxwell?
15  A. Yes.
16      MS. POMERANTZ: Your Honor, the government offers
17  Government Exhibit 109 under seal.
18      MS. STERNHEIM: No objection.
19      THE COURT: Thank you. GX109 is admitted under seal
20  consistent with my ruling regarding pseudonyms.
21      (Government's Exhibit 109 received in evidence)
22      MS. POMERANTZ: I request the jurors be permitted to
23  open their binders and turn to Government Exhibit 109, your
24  Honor.
25      THE COURT: Jurors, you may look at your binders

LC6Cmax1          Kate - direct          Page 1175

1  please and look at GX109.
2      BY MS. POMERANTZ:
3  Q. About how old were you at the time this photograph was
4  taken?
5  A. About 17.
6  Q. And where was this photograph taken?
7  A. It was in the backyard of our home where I lived with my
8  mother.
9      MS. POMERANTZ: Your Honor, I believe that the jurors
10  can put the binder down now.
11      THE COURT: Jurors, you may return your binders to the
12  floor, please. Thank you.
13  Q. When you and Maxwell were in Paris, did you and Maxwell
14  stay in touch?
15  A. Yes.
16  Q. How did you stay in touch?
17  A. Well, I gave her my phone number on a piece of paper and
18  she called me.
19  Q. Where did you give her your phone number?
20  A. In Paris.
21  Q. When was the next time you saw Maxwell?
22  A. A few weeks later.
23  Q. How did that meeting come about?
24  A. She called me and invited me to go to tea at her house.
25  Q. Did you go to Maxwell's house for tea?

LC6Cmax1          Kate - direct          Page 1176

1  A. Yes.
2  Q. Why did you go to Maxwell's house for tea?
3  A. Well, I was quite excited to be friends with her and she
4  was friends with the man that I had been dating and she seemed
5  very exciting and she seemed to be everything that I wanted to
6  be. And she seemed to -- she seemed to like me, so I was
7  excited to go.
8  Q. Can you please describe for the jury Maxwell's house.
9  A. Yes. Her house was like a townhouse with a white front and
10  a red door.
11      You want me to describe the inside?
12  Q. Why don't we pause there.
13      MS. POMERANTZ: Ms. Drescher, would you pull up for
14  just the witness, the parties, and the Court what has been
15  marked for identification as Government Exhibit 702.
16  Q. Kate, do you recognize this?
17  A. Yes.
18  Q. What is it?
19  A. It's Ghislaine Maxwell's house.
20  Q. Is this a fair and accurate depiction of the outside of
21  Maxwell's house?
22  A. Yes.
23      MS. POMERANTZ: Your Honor, the government offers
24  Government Exhibit 702.
25      MS. STERNHEIM: No objection.

LC6Cmax1            Kate - direct            Page 1177

1      THE COURT: Thank you. GX702 is admitted. You may
2   publish.
3      (Government's Exhibit 702 received in evidence)
4      MS. POMERANTZ: Thank you, your Honor.
5   Q. Kate, in what neighborhood was this townhouse?
6   A. In the same neighborhood I lived in, in Belgravia.
7      MS. POMERANTZ: Ms. Drescher, we can pull that down.
8   Thank you.
9   Q. What, if any, photographs did you see inside Maxwell's
10  house?
11  A. There were -- there were lots of photographs and many of
12  them were of Ghislaine Maxwell with an older man with slightly
13  peppered hair, graying hair. And in lots of the photographs,
14  he was looking at the camera and she was looking at him.
15  Q. Did there come a time when you learned who the man in the
16  photographs was?
17  A. Yes.
18  Q. And who was the man in the photographs?
19  A. Jeffrey Epstein.
20  Q. Can you describe the rest of the townhouse for the jury,
21  please.
22  A. Yes. When I walked in, it was carpeted in pale carpet. It
23  was very nicely decorated, the constable and nice beautiful
24  chairs. There was a lot of silver-framed pictures that were
25  out. And in that visit, I was just in the living room, which

LC6Cmax1            Kate - direct            Page 1178

1   is the first room which I was in, and there was a staircase
2   going up.
3   Q. So focusing on the first time that you went to Maxwell's
4   townhouse, can you describe for the jury what happened when you
5   went to her townhouse.
6   A. Yes. I had a really lovely time and I felt really special.
7   And I felt -- I felt that I had found a new connection that
8   could be really meaningful to me. I had just moved back from
9   France to England and left the school that I was -- that I was
10  at and all my friends. And I was really happy that we had
11  connected and that she seemed as excited as I was to have a new
12  friend. And it was just -- I felt that feeling exhilarated,
13  like somebody wanted me, like somebody wanted to be my friend.
14  Q. What, if any, conversations do you remember having with
15  Maxwell about your family?
16  A. I told her that things were quite difficult at my house and
17  that I lived alone with my mother and that she had been unwell
18  and struggling and that she would get very bad migraines, and I
19  would often try and take care of her and give her massages and
20  bring her cups of tea.
21  Q. What, if any, conversations do you recall having with
22  Maxwell about what you wanted to do with your life?
23  A. Well, I had been offered a place at Oxford University to
24  study law, and she shared that she had been to that university.
25  And that I shared with her that I also was really interested in

LC6Cmax1            Kate - direct            Page 1179

1   music and I loved music and I was interested in pursuing that,
2   but I was worried to tell my parents because they really wanted
3   me to go to law school, as most parents would. And I was quite
4   athletic, although I was very thin, and I told her that I was
5   interested in martial arts, as well.
6   Q. What, if any, conversations do you remember having with
7   Maxwell during tea about her personal life and relationships?
8   A. She told me lots of amazing things about her boyfriend and
9   she said that he was a philanthropist and that he liked to help
10  young people, and that, at some point, it would be really
11  wonderful for me to get to meet him and that we shared so many
12  things in common and that -- yeah, just that it would be great
13  for me to get to meet him at some point.
14  Q. What, if anything, did Maxwell say about how Epstein would
15  respond to you?
16  A. Oh, she said that he was going to love me and that I was
17  exactly the kind of person he would like to help. She seemed
18  very genuinely excited about it, and I was excited, too.
19  Q. What was your reaction to the attention that Maxwell was
20  paying you?
21  A. I mean, I was 17 and I liked to have attention. And I
22  was -- I was lonely and I had not found a group of friends yet.
23  So I was really glad to have found somebody who was also older
24  than me who I felt could maybe guide me as she seemed to have a
25  lot of connections and opportunities to guide me and be very

LC6Cmax1            Kate - direct            Page 1180

1   willing to do so.
2   Q. Did there come a time when you met Epstein?
3   A. Yes.
4   Q. About how long after you had tea at Maxwell's townhouse did
5   you meet Jeffrey Epstein?
6   A. A few weeks later.
7   Q. Where did you meet Epstein?
8   A. At Ghislaine Maxwell's house.
9   Q. When you first met Epstein, approximately how old was he?
10  A. He seemed to be in his 40s.
11  Q. How did you come to meet Epstein at Maxwell's townhouse?
12  A. Ghislaine called me and she was -- called me to tell me
13  that he was in town and she would really love if I could come
14  over to meet him and that it was -- there was a sense of
15  urgency, that it was like very important that I take this
16  opportunity.
17  Q. What was Maxwell's demeanor like during that conversation
18  on the phone?
19  A. I would say she was very activated, very excited, and there
20  was a sense of urgency.
21  Q. Now focusing on the time when you met Epstein at Maxwell's
22  house, who was at the house when you arrived?
23  A. Ghislaine Maxwell and Jeffrey Epstein.
24  Q. When you arrived, what was Jeffrey Epstein wearing?
25  A. He was wearing sweatpants and a hoodie.

UNITED STATES OF AMERICA, v.
GHISLAINE MAXWELL,

SEALED
December 6, 2021

---

LC6Cmax1     Kate - direct     Page 1181

1 Q. And what was Epstein doing when you arrived?
2 A. He was sitting in a chair and he was on the phone talking
3 quite loudly.
4 Q. Did Epstein stay on the phone the entire time you were at
5 Maxwell's townhouse?
6 A. No.
7 Q. Did there come a time when Epstein got off the phone?
8 A. Yes.
9 Q. What, if anything, did Maxwell say to Epstein about you
10 during that visit?
11 A. She said this is the girl that I told you about and she
12 listed some of my accolades and said, you know, about me going
13 to -- possibly going to Oxford, but that I was also a really
14 talented singer, that I was really athletic, and that I was
15 strangely strong for my size.
16 Q. You mentioned your size. What was your size at the time?
17 A. I was about 95 pounds.
18 Q. What happened next?
19 A. Next, after she said that I was very strong, she said why
20 don't you give his feet a little squeeze to show him how strong
21 you are.
22 Q. Did you give his feet a little squeeze?
23 A. Yes.
24 Q. When you say that you gave his feet a little squeeze, what
25 does that mean?

---

LC6Cmax1     Kate - direct     Page 1182

1 A. I massaged them.
2 Q. And what happened next?
3 A. And then he seemed to be very approving and he said, oh,
4 you can go ahead and do my shoulders.
5 Q. Did you massage Epstein's shoulder?
6 A. Yes.
7 Q. What happened next?
8 A. He said that I was very strong and he said that he likes
9 that I was very -- seemed to be -- know what I wanted. And
10 they talked about something that I couldn't quite hear what
11 they were saying about like a music producer. And then his
12 phone rang again.
13 Q. After his phone rang, did you stay at Maxwell's house?
14 A. No.
15 Q. How did you end up leaving?
16 A. He didn't say anything. He just answered the phone and
17 started talking on the phone and then Ghislaine sort of ushered
18 me out.
19 Q. And did you leave Maxwell's house?
20 A. Yes.
21 Q. After you left Maxwell's house, did you hear from her
22 again?
23 A. Yes.
24 Q. Approximately how long after you met Epstein at Maxwell's
25 house did you hear from Maxwell?

---

LC6Cmax1     Kate - direct     Page 1183

1 A. Few weeks, couple of weeks.
2 Q. How did you communicate with Maxwell?
3 A. She called me.
4 Q. What, if anything, did Maxwell say when she called you?
5 A. She said that the -- Jeffrey was going to get a massage,
6 but the massage therapist had canceled and could I please do
7 her a favor and help her by coming over because I had such
8 strong hands.
9 Q. Were you a massage therapist at the time?
10 A. No.
11 Q. Have you ever been a massage therapist?
12 A. No.
13 Q. Did you go to Maxwell's house?
14 A. Yes.
15 Q. Who was at Maxwell's house when you arrived?
16 A. Ghislaine and Jeffrey.
17 Q. What, if anything, did Maxwell say when you arrived at her
18 house?
19 A. She said thank you so much for coming and I'm really
20 excited that you're here.
21 Q. Did she comment about how often Epstein needed massages?
22     MS. STERNHEIM: Objection to leading.
23     THE COURT: Sustained.
24 Q. What, if anything, did Maxwell say about Epstein and his
25 need for massages?

---

LC6Cmax1     Kate - direct     Page 1184

1     MS. STERNHEIM: Objection. Leading.
2     THE COURT: I'll allow it. You may answer.
3 A. Could you repeat the question, please.
4 Q. What, if anything, did Maxwell say about Epstein's need for
5 massages?
6 A. She said that he needed massages all the time and it was
7 very difficult to keep up.
8 Q. Where did you and Maxwell go after that conversation?
9 A. She led me up the stairs and opened the door to a room that
10 had a massage table in it.
11     (Continued on next page)
12
13
14
15
16
17
18
19
20
21
22
23
24
25

---

LC6VMAX2          Kate - direct          Page 1185

1 BY MS. POMERANTZ:
2 Q. Can you describe the room for the jury.
3 A. Yes. It was dimly lit. It was a small room. There was a
4 massage table, some towels, and Jeffrey was in the room.
5 Q. What was Epstein wearing?
6 A. He was wearing a robe.
7 Q. What, if anything, did he do with the robe?
8 A. He took off the robe.
9 Q. What, if anything, was Epstein wearing under the robe?
10 A. He was naked.
11 Q. Where was he when he removed the robe?
12 A. Standing facing the door.
13 Q. Where was Maxwell when Epstein removed the robe?
14 A. In the doorway facing him.
15 Q. What, if anything, did Maxwell give you?
16 A. She gave me some massage oil.
17 Q. Did you enter the room?
18 A. Yes.
19 Q. Did someone close the door?
20 A. Yes.
21 Q. Who closed the door?
22 A. Ghislaine Maxwell closed the door.
23 Q. After the door was closed, did you give Epstein a massage?
24 A. Yes.
25 Q. Without telling the jury the details, during the massage,

LC6VMAX2          Kate - direct          Page 1186

1 did Epstein initiate sexual contact with you?
2 A. Yes.
3 Q. Did Epstein engage in a sex act with you during the
4 massage?
5 A. Yes.
6 Q. I'd like to move forward to the end of the massage. After
7 it ended, where did you go?
8 A. I left the room and started walking down the stairs.
9 Q. And who, if anyone, did you see?
10 A. I saw Ghislaine Maxwell.
11 Q. What, if anything, did Maxwell say?
12 A. She said -- she said, How did it go? Did you have fun?
13 Was it good?
14 Q. Can you describe Maxwell's tone when she made those
15 statements.
16 A. She seemed very excited and happy. She thanked me again.
17 Q. Did you leave Maxwell's house?
18 A. Yes.
19 Q. Did there come a time when you saw Epstein again in London?
20 A. Yes.
21 Q. About how long after the massage you just testified about
22 did you see Epstein again?
23 A. A few days later.
24 Q. Where did you see Epstein again?
25 A. In Ghislaine Maxwell's house.

LC6VMAX2          Kate - direct          Page 1187

1 Q. Who invited you to her house?
2 A. Ghislaine.
3 Q. How did she invite you to her house?
4 A. She called me.
5 Q. When you arrived, what, if anything, did Maxwell say?
6 A. She said, I'm so glad you're here. You did such a good job
7 last time. He wanted you to come back.
8 Q. Where did you and Maxwell go?
9 A. We went upstairs to the same room.
10 Q. And when you went upstairs, was the door to the room open
11 or closed?
12 A. Closed.
13 Q. Who opened the door?
14 A. Ghislaine.
15 Q. Who, if anyone, did you see when Maxwell opened the door to
16 the room?
17 A. Jeffrey.
18 Q. What was Epstein wearing?
19 A. He was naked.
20 Q. Where was Epstein standing?
21 A. Next to the massage table facing the door.
22 Q. Where was Maxwell when you saw Epstein naked?
23 A. In the doorway facing him.
24 Q. What, if anything, did Maxwell say?
25 A. She said, Have a good time.

LC6VMAX2          Kate - direct          Page 1188

1 Q. Did Maxwell leave the room?
2 A. Yes.
3 Q. Was the door closed?
4 A. Yes.
5 Q. Who closed the door?
6 A. Ghislaine Maxwell.
7 Q. Did you give Epstein a massage in the room?
8 A. Yes.
9 Q. And without telling the jury the details, during the
10 massage, did Epstein initiate sexual contact with you?
11 A. Yes.
12 Q. Did Epstein engage in a sex act with you during the
13 massage?
14 A. Yes.
15 Q. I want to move forward to the end of the massage.
16    After it ended, where did you go?
17 A. I went downstairs again.
18 Q. And who, if anyone, did you see?
19 A. I saw Ghislaine Maxwell.
20 Q. What, if anything, did Maxwell say to you after the
21 massage?
22 A. She said, Did you have fun? You're such a good girl. And
23 I'm so happy you were able to come. This is really great. And
24 he obviously likes you a lot.
25 Q. Can you describe Maxwell's tone when she made those

LC6VMAX2          Kate - direct          Page 1189

1   statements.
2   A. She sounded really pleased. And I was really pleased that
3   she was pleased.
4   Q. Did you leave Maxwell's house?
5   A. Yes.
6   Q. Other than the three times that you saw Epstein at
7   Maxwell's townhouse in London, did you see anyone else at her
8   house?
9   A. Can you repeat it?
10  Q. Other than the three times you saw Epstein at Maxwell's
11  townhouse in London, did you see anyone else at her house?
12  A. Yes.
13  Q. Who did you see?
14  A. I saw a girl.
15  Q. What did the girl look like?
16  A. She was blond and slim and around my age.
17  Q. Approximately how old were you when you saw the girl?
18  A. Seventeen.
19  Q. And what did you see the girl doing at Maxwell's townhouse?
20  A. She was having tea with Ghislaine and telling -- telling
21  Ghislaine about the things that she was interested in.
22  Q. What, if anything, did Maxwell say to you about what she
23  thought Epstein would think of the girl?
24  A. Can you repeat it please.
25  Q. What, if anything, did Maxwell say to you about what she

LC6VMAX2          Kate - direct          Page 1190

1   thought Epstein would think of the girl?
2   A. She said, I think she would be a good fit for him.
3   Q. After Epstein engaged in sex acts with you during massages
4   in Maxwell's house in London, did you ever see Epstein and
5   Maxwell again?
6   A. Yes.
7   Q. Over the next few years, how frequently did you see them?
8   A. I saw them -- do you mean how many individual occasions or
9   how many -- can you be specific?
10  Q. Sure. Over the next few years, about how many times a year
11  did you see them?
12  A. How many times per year? It was sporadic. The first
13  couple of years, more; probably five times the first couple of
14  years.
15  Q. And on the times that you would see them, would you see
16  them just one time or would you see them multiple times?
17  A. Multiple times.
18  Q. Do you remember the exact details and dates of every single
19  time you saw Epstein and Maxwell?
20  A. No.
21  Q. Do some details and events stand out more in your mind than
22  others?
23  A. Yes.
24  Q. I want to talk to you about the time period from when you
25  were 17 years old to your early twenties.

LC6VMAX2          Kate - direct          Page 1191

1   Q.         Were you in contact with Maxwell during that time
2   period?
3   A. Yes.
4   Q. How did you typically communicate with Maxwell during that
5   period?
6   A. By phone.
7   Q. When you spoke with Maxwell on the phone, what topics did
8   Maxwell talk to you about?
9   A. She asked me what I was up to, if things were going well,
10  if I was dating anybody, if I wanted to visit, and if anything
11  exciting was happening.
12  Q. When you spoke with Maxwell on the phone, what, if
13  anything, did Maxwell ask you to do for Epstein?
14  A. She asked me to come and visit them.
15  Q. What, if any, sexual topics did Maxwell bring up on the
16  phone?
17  A. She didn't bring up sexual topics on the phone.
18  Q. When you saw Maxwell in person, did there come a time when
19  she brought sexual topics up with you?
20  A. Yes.
21  Q. What, if any, sexual topics did Maxwell bring up?
22  A. She would talk a lot about the nature of -- she would say
23  boys, and boys and their willies, which was a euphemism for
24  penis. How demanding Jeffrey was. And she would ask me if I
25  knew anybody who could come and give Jeffrey a blow job because

LC6VMAX2          Kate - direct          Page 1192

1   it was -- it was a lot for her to do.
2   Q. What, if anything, did Maxwell tell you about the girls for
3   Epstein?
4            MS. STERNHEIM: Objection. Leading.
5            THE COURT: Just a moment.
6            I'll allow it. You may answer.
7            THE WITNESS: Thank you.
8   A. She said, You know what he likes, cute, young, pretty, like
9   you.
10  Q. About how long after you met Maxwell do you remember having
11  conversations about those topics?
12  A. Within a few weeks.
13  Q. Approximately how many times did that -- did those sexual
14  topics come up?
15  A. All the time.
16  Q. Did you tell Maxwell about any other girls for Epstein?
17  A. No.
18  Q. Did you connect Maxwell with any girls for Epstein?
19  A. No.
20  Q. What, if anything, did Maxwell say about how often Epstein
21  needed to have sex?
22  A. She said that he needed to have sex about three times a
23  day.
24  Q. Approximately when did she make those statements?
25  A. In the first couple of months.

LC6VMAX2          Kate - direct          Page 1193

1 Q. What was Maxwell's demeanor like when she would talk to you
2   about sexual topics?
3 A. Her demeanor was very -- I would say that it was almost
4   like a schoolgirl. And I almost felt like she was younger --
5   like, talking like she was younger than me, like -- which was
6   odd. And everything was fun and everything was silly and
7   everything was just very exciting. And just everything seemed
8   to be like a fun, silly joke.
9 Q. Within the first few months of meeting Maxwell, what, if
10  anything, did Maxwell ask you about your sex life?
11 A. She asked me if I liked sex. She asked me, you know, if I
12  was dating somebody or --
13 Q. You testified earlier that when you went to tea at
14  Maxwell's house in London, you told her about your family. Did
15  you continue to tell Maxwell about your family?
16 A. Yes.
17 Q. What, if anything, did you tell her about your family?
18 A. I just continued to tell her that, you know, my mother was
19  struggling, and that it was difficult; and that I was -- I was
20  alone a lot.
21 Q. When you first met Maxwell and Epstein, what was your
22  understanding of their relationship?
23 A. I understood that Jeffrey was her boyfriend.
24 Q. In the first few years you knew Maxwell, what did you
25  understand to be Maxwell's job?

LC6VMAX2          Kate - direct          Page 1194

1 A. I understood that her job was to take care of Jeffrey's
2   needs.
3 Q. What, if any, involvement did Maxwell have in managing
4   properties?
5 A. She seemed to be pretty involved in managing properties and
6   making sure that everything was the way that Jeffrey liked it
7   to be. And there seemed to be a lot of rules around that.
8 Q. Did Maxwell ever tell you what, if any, properties she
9   owned?
10 A. Yes.
11 Q. What did she tell you?
12 A. She told me that she owned her house in London; and that at
13  a later time she told me that she owned her house in New York
14  City, and that Jeffrey had got it for her.
15 Q. Did you ever have any conversations with Maxwell about her
16  social circle?
17 A. Yes.
18 Q. What do you recall her telling you about her social circle?
19 A. Well, she seemed to know everybody. And she told me that
20  she was friends with Prince Andrew, friends with Donald Trump,
21  friends with lots of famous people. And sometimes their names
22  would just come up in conversations or she might be talking on
23  the phone about them with me present.
24 Q. I want to switch gears just for a moment.
25     You mentioned Oxford earlier. Did you end up going to

LC6VMAX2          Kate - direct          Page 1195

1   Oxford?
2 A. No.
3 Q. During your late teens and early twenties, what did you do
4   for a living?
5 A. In my late teens and early twenties I -- I became a
6   musician and a model.
7 Q. You testified earlier that Epstein initiated sexual
8   activity with you when you were 17 years old. Approximately
9   when did he stop initiating sexual activity with you?
10 A. Approximately in my early thirties.
11 Q. When you spent time with Epstein in that time period, about
12  how often did he initiate sexual activity with you?
13 A. Sorry. Can you repeat that?
14 Q. When you spent time with Epstein, how often did he initiate
15  sexual activity with you?
16 A. Every time.
17 Q. When Epstein initiated sexual activity with you, was that
18  always in the context of massage?
19 A. No.
20 Q. When you spent time with Epstein, did you provide him with
21  sexualized massages?
22 A. Yes.
23 Q. In what locations did these sexualized massages with
24  Epstein take place?
25 A. In London, in Palm Beach, and on his island.

LC6VMAX2          Kate - direct          Page 1196

1 Q. We'll talk about those places in a bit.
2     Apart from the first massage in London where you
3   rubbed Epstein's feet and shoulders, were there ever any
4   massages you provided Epstein in which nothing sexual happened?
5 A. No.
6 Q. Was anyone in the room with you and Epstein while you were
7   giving him the massages?
8 A. No.
9 Q. You mentioned that after the first two massages you gave
10  Epstein when you were 17, you saw Maxwell right after. Did
11  anything like that happen with any other sexualized massages
12  you gave Epstein?
13 A. Yes.
14 Q. What do you remember about those interactions?
15 A. Mostly she would ask me if -- if it went well, if I had
16  fun.
17 Q. What, if any, gifts did you receive from Maxwell?
18 A. I received a small black Prada handbag.
19 Q. Where did you receive that gift?
20 A. In London.
21 Q. And how did you know that was a gift from Maxwell?
22 A. There was a note that said "from Ghislaine and Jeffrey."
23 Q. And what was that a gift for?
24 A. For my birthday.
25 Q. What birthday?

UNITED STATES OF AMERICA, v.
GHISLAINE MAXWELL,

SEALED
December 6, 2021

---

LC6VMAX2    Kate - direct    Page 1197

1  A. I believe my 18th.
2  Q. Did you receive this gift before or after the two times
3     Epstein engaged in sex acts with you during massages at
4     Maxwell's house?
5  A. After.
6  Q. What, if any, conversations do you remember having with
7     Maxwell about travel?
8  A. I remember that she was always very accommodating and told
9     me that whenever I wanted to come and visit, that she would
10    take care of everything; that they would take care of
11    everything.
12 Q. Did those conversations about travel happen before or after
13    she gave you the handbag?
14 A. Before.
15 Q. Did there come a time when you traveled to meet Epstein and
16    Maxwell?
17 A. Yes.
18 Q. Approximately how many times did you travel to meet them?
19 A. To meet both of them?
20 Q. Yes.
21 A. Four or five times.
22 Q. Do you remember approximately how old you were when you
23    first traveled to meet Maxwell and Epstein?
24 A. Approximately 18.
25 Q. And do you remember approximately how old you were when you

---

LC6VMAX2    Kate - direct    Page 1198

1     last traveled to meet both Maxwell and Epstein?
2  A. Approximately 24.
3  Q. During that time period, where did you travel to meet
4     Maxwell and Epstein?
5  A. I traveled to Palm Beach, to New York, and to the island.
6  Q. When you traveled to meet Maxwell and Epstein, how did you
7     travel?
8  A. I traveled on commercial planes.
9  Q. Who booked your travel?
10 A. I'm not always sure who booked it, but usually Ghislaine
11    informed me about it. Sometimes one of the assistants would
12    book it, maybe Lesley Groff.
13 Q. Generally speaking, where did you stay when you visited
14    Epstein and Maxwell?
15 A. I generally stayed with them.
16 Q. And when you say you stayed with them, where did you stay?
17 A. At their house.
18 Q. Who owned the properties?
19 A. Jeffrey, I think.
20 Q. How did Maxwell talk about the properties that Epstein
21    owned?
22 A. She talked -- she talked about them as -- as their homes.
23 Q. Who worked at Epstein's homes?
24 A. I would see staff sometimes, but I didn't know their names
25    and I didn't have much interaction with them.

---

LC6VMAX2    Kate - direct    Page 1199

1  Q. What, if anything, did you observe about Maxwell and her
2     interactions with the staff?
3  A. I noticed that she was the one who mainly communicated with
4     the staff. She seemed to be telling them -- giving them a lot
5     of direction around doing things the way that Jeffrey wanted
6     them done, detailed instructions around food and -- and just
7     quite aggressive communication with them.
8  Q. You testified earlier about travel to Palm Beach. I want
9     to talk about that for a minute.
10        Who did you travel to see in Palm Beach?
11 A. Ghislaine and Jeffrey.
12 Q. How many times did you visit Maxwell and Epstein in Palm
13    Beach?
14 A. One time.
15 Q. Do you remember exactly when you went to Palm Beach?
16 A. No.
17 Q. Approximately how old were you when you went to Palm Beach?
18 A. Approximately 18.
19 Q. Is it possible that you were older when you went to Palm
20    Beach?
21 A. Possible.
22 Q. Where did you stay when you visited Epstein and Maxwell in
23    Palm Beach?
24 A. I stayed in the house with them.
25 Q. Can you describe for the jury the Palm Beach house.

---

LC6VMAX2    Kate - direct    Page 1200

1  A. Yes. The house had a beautiful swimming pool. And there
2     were doors that opened up from the house onto the swimming
3     pool. And Jeffrey had a desk that would face out onto outside
4     so he could see out. And there was a kitchen downstairs, a
5     small dining area, and there were bedrooms upstairs.
6  Q. What, if any, photographs did you see in Epstein's house in
7     Palm Beach?
8  A. There were lots of photographs of young girls.
9  Q. What do you remember about those photographs?
10 A. I remember that they were shocking.
11 Q. Were the young girls clothed or unclothed in the
12    photographs?
13 A. Unclothed.
14 Q. Where did you see those photographs in Epstein's house in
15    Palm Beach?
16 A. They were in almost every room.
17 Q. Did there come a time that you were given clothing to wear
18    when you were staying at Epstein's Palm Beach house?
19 A. Yes.
20 Q. What were you given to wear?
21 A. I was given a schoolgirl outfit.
22 Q. Can you please describe the schoolgirl outfit for the jury.
23 A. It was a short -- a short pleated skirt, white socks, white
24    panties, and a shirt.
25 Q. Where did you find the schoolgirl outfit?

---

UNITED STATES OF AMERICA, v.
GHISLAINE MAXWELL,

SEALED
December 6, 2021

LC6VMAX2          Kate - direct          Page 1201

1  A. On my bed.
2  Q. What did you do after finding the schoolgirl outfit?
3  A. I went downstairs to find Ghislaine.
4  Q. What, if anything, did Ghislaine say?
5  A. I asked her what -- what was happening with the -- there
6     were clothes in my room. And she said, I thought it would be
7     fun for you to take Jeffrey his tea in this outfit.
8  Q. Did you put on the schoolgirl outfit?
9  A. Yes.
10 Q. Why did you put on the schoolgirl outfit?
11 A. I didn't know -- I didn't know how to say no to that. I
12    was -- I didn't know anybody in Florida. I'd never been to
13    Palm Beach or Florida before. I had no idea even where the
14    house was or how -- and I wasn't sure if I said no, if -- if I
15    would have to leave or what kind of consequence there might be
16    for not doing it.
17 Q. What did you do after you put on the schoolgirl outfit?
18 A. Ghislaine gave me a tray and told me to go and walk to
19    where Jeffrey was and bring -- bring him the tray.
20 Q. Did you go and find Epstein?
21 A. Yes.
22 Q. Where did you find him?
23 A. He was next to the pool house and he was working out.
24 Q. Was Epstein alone?
25 A. No.

LC6VMAX2          Kate - direct          Page 1202

1  Q. Who was he with?
2  A. He was with -- there was some kind of trainer with him.
3  Q. Did the trainer stay with him?
4  A. No.
5  Q. After the trainer left, without getting into the details,
6     did Epstein initiate sexual contact with you?
7  A. Yes.
8  Q. Did Epstein engage in a sex act with you?
9  A. Yes.
10 Q. What if later --
11       MS. POMERANTZ: Withdrawn, your Honor.
12 Q. What, if anything, did Maxwell say to you later that day?
13 A. She asked me if I had fun, and told me that I was such a
14    good girl, and that I was one of his favorites. And that's it.
15 Q. Did Epstein engage in sexual activity with you again during
16    that trip?
17 A. Yes.
18 Q. One time or multiple times?
19 A. Multiple times.
20 Q. You testified earlier that you went to the island. What is
21    the island?
22 A. The island was an island that Jeffrey owned.
23 Q. What was the name of the island?
24 A. Well, he called it Little St. Jeff.
25 Q. When you went to the island, who invited you there?

LC6VMAX2          Kate - direct          Page 1203

1  A. Ghislaine.
2  Q. Approximately when did you go to the island?
3  A. When I was approximately 23 or 24.
4  Q. When Maxwell invited you to the island, what, if anything,
5     did she ask you to do?
6  A. She asked me to massage Jeffrey.
7  Q. Did sexualized massages with Epstein take place on the
8     island?
9  A. Yes.
10 Q. Do you recall seeing anyone other than Epstein and Maxwell
11    when you visited the island?
12 A. Yes.
13 Q. Who do you remember seeing?
14 A. I remember seeing a blond, slim girl who seemed far younger
15    than me, very young.
16       MS. POMERANTZ: Your Honor, may I have just a moment?
17       THE COURT: You may.
18       MS. POMERANTZ: Thank you.
19       (Counsel conferred)
20 Q. Kate, at the beginning, why did you start spending time
21    with Maxwell and Epstein?
22 A. At the beginning, it was a combination. In the beginning,
23    I wanted to maintain a relationship with Ghislaine. And I
24    thought that they were going to be -- I thought she was going
25    to be my friend.

LC6VMAX2          Kate - direct          Page 1204

1  Q. Did that change over time?
2  A. Yes.
3  Q. Through your twenties and early thirties, did you continue
4     to communicate with Epstein?
5  A. Yes.
6  Q. Without using any words from the communications, what was
7     the tone of your communications with Epstein generally?
8  A. My tone was friendly.
9        MS. STERNHEIM: I'm sorry, I couldn't hear.
10       THE COURT: Friendly.
11       THE WITNESS: Friendly.
12 Q. Why did you keep communicating with Epstein through your
13    twenties and early thirties?
14 A. I was -- I did not want to admit what had happened to me.
15    And I felt that by ceasing communication, I would have to
16    acknowledge the events that had taken place and I would have to
17    say something. I was also fearful of disengaging because I had
18    witnessed how connected they both were and I was fearful.
19 Q. Did there come a time when you stopped communicating with
20    Epstein?
21 A. Yes.
22 Q. Approximately when?
23 A. In my early thirties.
24 Q. And approximately when did you stop spending time with
25    Epstein?

UNITED STATES OF AMERICA, v.
GHISLAINE MAXWELL,

SEALED
December 6, 2021

| LC6VMAX2 | Kate - direct | Page 1205 |
|---|---|---|

1  A. Also in my thirties.
2  Q. Approximately when did you stop spending time with Maxwell?
3  A. My late twenties -- sorry, spending time or communicating?
4  Q. Spending time.
5  A. Oh, around 24.
6  Q. I want to switch gears.
7       When you were a teenager and in your twenties, were
8  you addicted to any substances?
9  A. Yes.
10 Q. What were you addicted to?
11 A. I was addicted to alcohol, cocaine, and sleeping pills.
12 Q. How often did you use cocaine, alcohol, and sleeping pills?
13 A. Sporadically, but mostly weekly.
14 Q. When was the last time you used those substances that you
15 just mentioned?
16 A. May 1st, 2003.
17 Q. Why did you stop using those substances then?
18 A. When I first started using substances, they helped me to
19 cope with the way that I was feeling. And then the substance
20 use got out of control and started to destroy my relationships
21 and my health and my peace of mind. And I felt that I was
22 going to die if I continued.
23 Q. Has your prior drug and alcohol use affected the memories
24 you have?
25 A. No.

| LC6VMAX2 | Kate - direct | Page 1206 |
|---|---|---|

1  Q. Can you explain?
2  A. The memories I have of significant events in my life have
3  never changed. My memory -- there are things that I have
4  missed that happened that sometimes I later recall. The
5  memories I have are the memories I have.
6  Q. Directing your attention to August 2019, did there come a
7  time when you were interviewed by the government?
8  A. Yes.
9  Q. Was FBI present for the interview?
10 A. Yes.
11 Q. Before that day, had you ever talked to law enforcement
12 about your experiences with Maxwell and Epstein?
13 A. No.
14 Q. That same day did you speak publicly about some of the
15 experiences that you testified about here today?
16 A. Did I speak publicly? Yes.
17 Q. And when you did that, did you talk about all of the
18 details that you shared with the government?
19 A. No.
20 Q. Why not?
21 A. I have a huge amount of humiliation and shame and -- around
22 the events that took place. I was not ready to share that in
23 detail on a public level.
24 Q. If you have spoken publicly before, why did you ask to
25 testify under a pseudonym here today?

| LC6VMAX2 | Kate - direct | Page 1207 |
|---|---|---|

1  A. I asked to testify under a pseudonym because I have a
2  child. And I do not wish for her to be associated with or
3  exposed to any negative connotation that this might bring.
4  Q. You testified earlier that you first spoke with the
5  government in August 2019. About how many meetings have you
6  had with the government since that time?
7  A. About ten meetings.
8  Q. What is your immigration status?
9  A. I am in status in this country on an O-1 visa.
10 Q. And what is that?
11 A. It's a visa of extraordinary ability.
12 Q. What does that mean?
13 A. It can be extraordinary ability in many different areas.
14 Initially, I was a singer/songwriter, but it extends to any
15 artist.
16 Q. Did there come a time when you asked the government to
17 sponsor you for a visa?
18 A. Yes.
19 Q. At the time you made the request, approximately how many
20 meetings had you had with the government?
21 A. Approximately seven.
22 Q. Approximately how long had you been meeting with the
23 government at the time you raised your immigration status?
24 A. About a year and a half.
25 Q. Has the government made any promises to you about your

| LC6VMAX2 | Kate - direct | Page 1208 |
|---|---|---|

1  immigration visa?
2  A. No.
3  Q. I'm going to switch gears.
4       Have you participated in a compensation fund called
5  the Epstein's Victims' Compensation Program?
6  A. Yes.
7  Q. What did you do as part of that fund?
8  A. I had an interview with a forensic psychologist and I
9  submitted a claim form.
10 Q. How much money did the fund pay you?
11 A. $3.25 million.
12 Q. Did that money come from the Estate of Jeffrey Epstein?
13 A. Yes.
14 Q. Has that money been wired to you already?
15 A. Not that total amount.
16 Q. But a portion of that has been?
17 A. Yes.
18 Q. As part of receiving that money, did you have to sign a
19 waiver agreeing not to sue any of Epstein's employees?
20 A. Yes.
21 Q. You mentioned that you didn't -- you weren't wired the
22 total amount. What happened to the rest of it?
23 A. The rest went to my attorneys.
24 Q. Have you ever sued Maxwell?
25 A. No.

UNITED STATES OF AMERICA, v.
GHISLAINE MAXWELL,

| LC6VMAX2 | Kate - direct | Page 1209 |
|---|---|---|

1  Q. Do you plan to sue Maxwell?

2  A. No.

3  Q. Are you hoping or expecting to get any more money for what

4  happened to you with Epstein and Maxwell?

5  A. No.

6  Q. Based on your understanding, will the jury's verdict in

7  this case affect the award that you received from the fund?

8  A. No.

9  Q. Just to be clear, do you have any financial stake in the

10  outcome of this trial?

11  A. I do not.

12      MS. POMERANTZ: Your Honor, may I have just one

13  moment?

14      THE COURT: You may.

15      (Counsel conferred)

16      MS. POMERANTZ: No further questions, your Honor.

17      THE COURT: All right. Thank you.

18      We'll take our morning break.

19      Members of the jury, we'll break for about 10 to 15

20  minutes. See you soon. Thank you.

21      (Jury not present)

22      THE COURT: The witness may step down and out for the

23  break. Thank you.

24      Everyone may be seated.

25      (Witness not present)

| LC6VMAX2 | Kate - direct | Page 1210 |
|---|---|---|

1      THE COURT: Counsel, are there matters to take up?

2      MS. STERNHEIM: Yes.

3      THE COURT: Okay. Just a moment.

4      Ms. Sternheim.

5      MS. STERNHEIM: Judge, in light of this witness's

6  anonymity status, I think it's appropriate to do it at a

7  sidebar. If the Court feels otherwise, then we can come into

8  open court.

9      THE COURT: Okay.

10      (Pages 1211 to 1231 SEALED)

11      (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

| LC6VMAX2 | Kate - direct | Page 1211 |
|---|---|---|

1      (At sidebar)



| LC6VMAX2 | Kate - direct | Page 1212 |
|---|---|---|



| LC6VMAX2 | Kate - direct | Page 1217 |
|---|---|---|

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

| LC6VMAX2 | Kate - direct | Page 1219 |
|---|---|---|

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

| LC6VMAX2 | Kate - direct | Page 1218 |
|---|---|---|

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

| LC6VMAX2 | Kate - direct | Page 1220 |
|---|---|---|

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

UNITED STATES OF AMERICA, v.
GHISLAINE MAXWELL,

LC6VMAX2          Kate - direct          Page 1221

```
 1
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

LC6VMAX2          Kate - direct          Page 1223

```
 1
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

LC6VMAX2          Kate - direct          Page 1222

```
 1
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

LC6VMAX2          Kate - direct          Page 1224

```
 1
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

UNITED STATES OF AMERICA, v.
GHISLAINE MAXWELL,

SEALED
December 6, 2021



| LC6VMAX2 | Kate - direct | Page 1225 |
| LC6VMAX2 | Kate - direct | Page 1227 |
| LC6VMAX2 | Kate - direct | Page 1226 |
| LC6VMAX2 | Kate - direct | Page 1228 |

UNITED STATES OF AMERICA, v.
GHISLAINE MAXWELL,

SEALED
December 6, 2021



| LC6VMAX2 | Kate - direct | Page 1229 |
| LC6VMAX2 | Kate - direct | Page 1231 |
| LC6VMAX2 | Kate - direct | Page 1230 |
| LC6Cmax3 | | Page 1232 |

UNITED STATES OF AMERICA, v.
GHISLAINE MAXWELL,

SEALED
December 6, 2021

---

LC6Cmax3                                          Page 1233



---

LC6Cmax3                 Kate - cross         Page 1235

1 A. Yes.
2 Q. Your mother and your stepfather, and in turn, you and your
3   brother lived a comfortable life at some point, didn't you?
4 A. Yes.
5 Q. You lived in the Belgravia section of London. That's a
6   very tony area of London, isn't it?
7 A. Yes.
8 Q. And you lived quite close to Kinnerton Street, which is
9   where Ghislaine lived; correct?
10 A. Yes.
11 Q. In fact, Ghislaine lived on the street that also is the
12   street of the Nags Head Pub; correct?
13 A. Yes.
14 Q. And that pub is a rather famous pub in London, isn't it?
15 A. I don't know.
16 Q. But it was right across the street, nonetheless, from
17   Ghislaine's home at 44 Kinnerton, wasn't it?
18 A. Yes.
19 Q. Now, going back to your mother for a moment, you would
20   watch and see the attention that your mother got because of her
21   beauty, didn't you?
22 A. I thought she was beautiful.
23 Q. And didn't you say that you wanted to garner that same kind
24   of attention because you liked the way people looked at her?
25       MS. POMERANTZ: Objection, your Honor.

---

LC6Cmax3                 Kate - cross         Page 1234

1      (Jury present)
2      THE COURT: Thank you so much, members of the jury.
3 Sorry for the slightly -- we took the extended break that
4 allowed me to work through some things with the lawyers to
5 facilitate overall the efficiency of the process. So thank you
6 for your patience.
7      Ms. Sternheim, you may begin your cross examination of
8 the witness testifying under the name of Kate.
9      Kate, I remind you, you are under oath.
10      Go ahead, Ms. Sternheim.
11      MS. STERNHEIM: Thank you.
12 CROSS-EXAMINATION
13 BY MS. STERNHEIM:
14 Q. Good morning, Kate. I have some questions to ask you.
15      During your direct examination, you had stated that
16 Ghislaine was everything you wanted to be; correct?
17 A. She appeared to be.
18 Q. Now, you had a very beautiful mother, didn't you?
19 A. Yes.
20 Q. She was a debutante; correct?
21 A. I'm not sure.
22 Q. She was married to a wealthy -- well, your stepfather is a
23 wealthy man; correct?
24 A. He was.
25 Q. He had his own plane; correct?

---

LC6Cmax3                 Kate - cross         Page 1236

1      THE COURT: Overruled. You may answer.
2 A. To clarify, didn't I say when?
3 Q. Well, you've spoken to a number of tabloids and magazines
4   throughout the year, haven't you?
5 A. Yes.
6 Q. You have been featured in a number of magazines and news
7   articles, haven't you?
8 A. Yes.
9 Q. You have spoken about your life on a number of occasions,
10   haven't you?
11 A. Yes.
12 Q. And your picture has been in a number of magazines, as
13   well; correct?
14 A. Yes.
15 Q. During the period of time that you testified meeting
16   Ghislaine and Epstein, you were an international model?
17 A. I was a model.
18 Q. You met Ghislaine in Paris when you had traveled there with
19   the older prominent gentleman with whom you had been dating at
20   the time; correct?
21 A. Yes.
22 Q. And you learned that that individual was an Oxford
23   classmate of Ghislaine; correct?
24 A. Yes.
25 Q. Now, through the relationship that you had with that older

---

# EXHIBIT 100

# Jizzies... A highly excited and distracted state of mind





not a Cloud in the sky

peek-a-boo...who's watching who?

To a collector of more than "beautiful minds"

He whom appreciates architecture; undulating landscapes, "beauty marks" and....

I understood years ago after Ghislaine came to the Palm Beach Horse Show looking for what I thought was a horse that she was on a mission.

For a collection of breast photos. A compilation, of course, for you.

I came to see you some months later you told me to take off my top. With the usual Epstein smile you looked at my breasts and said "yeah, I was right." Memory served you correctly. The beauty mark was on the right breast. One quotable memory.

To a true friend with whom I have shared many complicities... I love you and wish you the best next 50 years.







p.s. I know from the phone exchange some years back...

...you like my boo-s!



is Jeffrey, which word out of this text do you not understand?

Just a beauty mark..................... ●

HOUSE_OVERSIGHT_000203

# EXHIBIT 101

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 8/13/21
```

United States of America,

    –v–

Ghislaine Maxwell,

        Defendant.

20-cr-330 (AJN)

OPINION & ORDER

ALISON J. NATHAN, District Judge:

On April 16, 2021, the Court issued an Opinion & Order granting in part and denying in part Ghislaine Maxwell's various pretrial motions seeking to dismiss portions of the Government's (S1) superseding indictment and compel discovery. Prior to the issuance of that Opinion & Order but after the motions were fully briefed, a grand jury returned a second (S2) superseding indictment adding a sex trafficking count and sex trafficking conspiracy count. The Court did not address the new charges in the April 16, 2021 Opinion & Order. On May 25, 2021, Maxwell filed another round of pretrial motions seeking to dismiss the S2 indictment in whole or in part and to compel discovery. Dkt. No. 292, 293. For appeal preservation purposes or otherwise, the arguments largely, though not entirely, rehash the positions rejected by the Court in its April 16, 2021 Opinion & Order. To the extent new arguments are made, they are addressed below. All pending motions are DENIED. The Court provides a brief summary of its conclusions here and its reasoning on the pages that follow:

- Maxwell moves to dismiss counts one, three, five, and six as barred by Jeffrey Epstein's non-prosecution agreement. The Court again concludes, as it did in its April 16, 2021 Opinion & Order, that the agreement does not bind the United States Attorney for the Southern District of New York.

- Maxwell moves to dismiss counts five and six on the grounds that prosecuting her on those counts would violate her rights under the Double Jeopardy Clause. The Court concludes that Maxwell has not previously been put in jeopardy for these offenses and therefore her prosecution on these counts does not violate the Double Jeopardy Clause.

- Maxwell moves to dismiss counts five and six as untimely. The Court again concludes, as it did in its April 16, 2021 Opinion & Order, that the Government brought the charges within the applicable statute of limitations.

- Maxwell moves to dismiss count five and either count one or count three as multiplicitous. The Court again determines, as it did in its April 16, 2021 Opinion & Order, that this motion is premature and denies it without prejudice for renewal at trial.

- Maxwell moves to dismiss the S2 indictment for pre-indictment delay. The Court again concludes, as it did in its April 16, 2021 Opinion & Order, that Maxwell has not established that she suffered prejudice and therefore any delay has not violated her rights to due process.

- Maxwell moves for a bill of particulars related to counts five and six because they are too vague, and in particular do not provide specific dates. The Court again concludes, as it did in its April 16, 2021 Opinion & Order, that the charges are sufficiently specific.

- Maxwell moves to compel the Government to produce the statements of "Minor-Victim 4" in the S2 indictment as *Brady* material. The Court concludes that the current disclosure schedule gives Maxwell sufficient time to make effective use of any such statements and therefore immediate disclosure is not warranted.

## I.  Jeffrey Epstein's non-prosecution agreement does not bar the charges in the S2 indictment

In its April 16, 2021 Opinion & Order on Maxwell's first set of pretrial motions, the

Court held that the non-prosecution agreement ("NPA") between Jeffrey Epstein and the U.S.

Attorney's Office for the Southern District of Florida did not bar the charges against Maxwell in

the S1 superseding indictment. *See United States v. Maxwell*, No. 20-cr-330 (AJN), 2021 WL

1518675, at *2 (S.D.N.Y. Apr. 16, 2021). Maxwell now renews those arguments for the charges

in the S2 superseding indictment. The Court understands the primary purpose of Maxwell's

renewed motion to be to preserve these arguments for appellate review, and the Court denies the

2

renewed motion for substantially the same reasons set forth in its April 16 opinion. The Court will proceed to briefly explain why neither the new charges in the S2 superseding indictment nor the supplemental authority Maxwell cites change the Court's conclusion that the NPA does not bar the charges against her.

As the Court explained in its April 16, 2021 Opinion & Order, the Second Circuit held in *United States v. Annabi* that "[a] plea agreement binds only the office of the United States Attorney for the district in which the plea is entered unless it affirmatively appears that the agreement contemplates a broader restriction." 771 F.2d 670, 672 (2d Cir. 1985) (per curiam). The Second Circuit's opinion in *Annabi* is clear, and that court has followed it steadfastly since. *See, e.g.*, *United States v. Gonzalez*, 93 F. App'x 268, 270 (2d Cir. 2004); *United States v. Brown*, No. 99-1230(L), 2002 WL 34244994, at *2 (2d Cir. Apr. 26, 2002); *United States v. Salameh*, 152 F.3d 88, 120 (2d Cir. 1998) (per curiam); *United States v. Rivera*, 844 F.2d 916, 923 (2d Cir. 1988). The Second Circuit has held that language nearly identical to that in Epstein's NPA is not enough to overcome the presumption in favor of single-district plea agreements. *See Salameh*, 152 F.3d at 120. Adhering to this binding authority, this Court thus concluded (and continues to conclude) that the NPA does not bind the U.S. Attorney's Office for the Southern District of New York. It thus provides Maxwell no defense in this case even if it would otherwise cover the conduct charged in the new counts in the S2 superseding indictment.

Maxwell advances two new arguments for why the Court should depart from this reasoning—the first in her renewed motion and the second in a letter of supplemental authority. *See* Dkt. Nos. 293, 310. In her renewed motion, she contends that *Annabi* contains an exception for out-of-district prosecutions for charges that are "identical to the dismissed charges." And in the letter of supplemental authority, she contends that the opinion of the Pennsylvania Supreme

3

Court in *Commonwealth v. Cosby*, No. 39 MAP 2020, 2021 WL 2674380 (Pa. June 30, 2021), requires dismissal. Neither argument is persuasive.

     *Annabi* contains no exception for out-of-district prosecutions for charges that are "identical to the dismissed charges." In the language Maxwell cites from *Annabi*, the Second Circuit discussed (and rejected) a claim based on the Double Jeopardy Clause, not a claim based on the plea agreement in that case. *See Annabi*, 771 F.2d at 672. In that section of the opinion, the Second Circuit held that even if the charges had been identical to the dismissed charges, the defendants' double jeopardy claims would fail because they were never in jeopardy on the charges that were dismissed under the plea agreement. Nothing in *Annabi* suggests that the presumption in favor of single-district plea agreements does not apply if later charges in another district are sufficiently "identical" to the dismissed ones, and no subsequent Second Circuit case applying *Annabi* has so held. *Annabi* applies squarely to the facts of this case and binds this Court.

     The Court also disagrees that *Cosby* mandates a different result. To begin with, this Court must follow the precedential opinions of the Second Circuit on questions of federal law, not those of a state court. Thus, nothing in *Cosby* could change this Court's view that Second Circuit precedent in *Annabi* forecloses Maxwell's arguments related to the NPA. In any event, the state court in *Cosby* did not purport to decide the same federal question at issue here. In *Cosby*, the court held that it was unfair for a district attorney to proceed with charges against Bill Cosby after the district attorney's office had, in that court's view of the facts, unequivocally promised that it would not charge him. *Cosby*, 2021 WL 2674380, at *34. That case did not involve a question of whether one office's promise bound another, much less whether a plea agreement in one federal district should be construed to apply in another district. Instead, the

4

case focused on whether prosecutors were required to honor a promise that the court found to be clear in the absence of a formal plea agreement. Even if this Court agreed with the analysis in *Cosby*, that opinion sheds no light on the proper interpretation of the NPA in this case.

After considering the arguments in Maxwell's renewed motion and letter of supplemental authority, the Court's view remains unchanged from its April 16, 2021 Opinion & Order. Under Second Circuit precedent, the NPA does not bind the U.S. Attorney for the Southern District of New York. It thus does not bar the charges in the S2 superseding indictment.

## II. This prosecution does not violate the prohibition against double jeopardy

The Double Jeopardy Clause provides that "[n]o person shall be . . . subject for the same offence to be twice put in jeopardy of life or limb." U.S. Const. amend. V. "This protection applies both to successive punishments and to successive prosecutions for the same criminal offense." *United States v. Dixon*, 509 U.S. 688, 696 (1993). "A defendant may only raise a Double Jeopardy claim if he has been put in jeopardy (*i.e.* jeopardy has 'attached') sometime before the alleged 'second' prosecution." *United States v. Podde*, 105 F.3d 813, 816 (2d Cir. 1997). A defendant is put in jeopardy when the jury in their case is empaneled or upon the defendant's entry of a guilty plea. *Crist v. Bretz*, 437 U.S. 28, 35 (1978); *Morris v. Reynolds*, 264 F.3d 38, 49 (2d Cir. 2001). Until then, a defendant has not been put in jeopardy and the Government is free to commence a prosecution.

Maxwell has not previously been put in jeopardy for the offenses charged in this case. She concededly has not been punished or prosecuted for any prior offense. She was never charged in the Southern District of Florida in connection with the Epstein investigation. She agreed to nothing in Epstein's NPA, because she was not a party to it. She suffered no criminal consequences as a result of Epstein's guilty plea in Florida state court. To the contrary, there is

5

no indication that Maxwell was even a subject of the Florida investigation. The Double Jeopardy Clause bars only successive prosecution or punishment for the same offense, and Maxwell has endured neither. Thus, the Double Jeopardy Clause does not bar the charges against her.

Despite facing no prior prosecution or punishment herself, Maxwell contends that she is immune from prosecution because Epstein was already punished for the same conspiracy. The cases she cites, however, deal with successive prosecutions of a particular defendant for the same conspiracy, not separate prosecutions of individual co-conspirators. *See, e.g.*, *United States v. Lopez*, 356 F.3d 463, 469 (2d Cir. 2004). The Double Jeopardy Clause does not require all co-conspirators be tried together for related offenses. *See Zafiro v. United States*, 506 U.S. 534, 539 (1993); *United States v. Hinton*, 543 F.2d 1002, 1014 (2d Cir. 1976). Whether the Government could have charged Epstein again in this case has nothing to do with Maxwell's rights under the Double Jeopardy Clause.

Maxwell finally points to one case in which the Second Circuit held that a subsequent prosecution might not be permissible against a defendant whose charges were dismissed after her husband pleaded guilty. Dkt. No. 293 at 19 (citing *United States v. Cambindo Valencia*, 609 F.2d 603 (2d Cir. 1979)). However, the Court agrees with the Government that the result in *Cambindo Valencia* rested on the terms of the husband's plea agreement, not the Double Jeopardy Clause. *See Cambindo Valencia*, 609 F.2d at 638. No precedent stands for the proposition that an uncharged co-conspirator is put in jeopardy when another co-conspirator accepts a non-prosecution agreement. This is the first case in which Maxwell will be put in jeopardy for these offenses, and so this prosecution does not put her in jeopardy a second time.

### III.    Counts five and six are not time-barred

For most non-capital offenses, the statute of limitations under federal law is five years.
18 U.S.C. § 3282(a).  Congress has enacted longer limitations periods for certain crimes, in
particular for "offense[s] involving the sexual or physical abuse, or kidnapping" of a minor in 18
U.S.C. § 3283.  Prior to 2003, the limitations period in § 3283 lasted until the victim reached the
age of 25, and then Congress extended the limitations period to the life of the victim with the
PROTECT Act of 2003, Pub. L. No. 108-21, 117 Stat 60.  In 2006, Congress enacted 18 U.S.C.
§ 3299, which eliminated the statute of limitations for the sex trafficking of minors in violation
of 18 U.S.C. § 1591 and for some other sex crimes.  *See* 18 U.S.C. § 3299 ("Notwithstanding
any other law, an indictment may be found or an information instituted at any time without
limitation for any offense under . . . section 1591.").

In her previous motion, Maxwell argued that the Mann Act charges against her in the
indictment were time-barred on the grounds that the extended limitations period § 3283 was not
applicable.  The Court denied that motion in its April 16, 2021 Opinion & Order.  *Maxwell*, 2021
WL 1518675, at *5.  Maxwell now argues that the new charges the Government has brought
against her in the S2 indictment, Sex Trafficking Conspiracy (18 U.S.C. § 371) and Sex
Trafficking (18 U.S.C. § 1591), are time-barred as well because § 3283 does not apply to those
offenses either.  She renews her contention from her previous motion that the limitations period
in § 3283 only applies to offenses which "necessarily entail" the sexual abuse of a minor and
argues that a violation of 18 U.S.C. § 1591 does not.  Thus, according to Maxwell's reasoning,
the general five-year statute of limitations period in 18 U.S.C. § 3282(a) applies to the sex
trafficking counts and, because the alleged conduct occurred from 2001 to 2004, the Government
is now time-barred for prosecuting her for these offenses.

7

The Court denies this motion for substantially similar reasons as those discussed in its April 16, 2021 Opinion & Order. As an initial matter, the Court reiterates that Maxwell's analysis of § 3283 is incorrect. As the Court explained, § 3283 does not call for a "categorical approach" nor an "essential ingredient" test, but instead requires that the defendant's conduct in that particular case involved the sexual abuse of a minor. *Maxwell*, 2021 WL 1518675 at *5-7. Here, there is no question that Maxwell is alleged to have engaged in activity that constitutes the sexual abuse of a minor with respect to the sex trafficking counts.

But in any event, as the Government pointed out in its brief – and as Maxwell did not contest in her reply – § 3283 is not the only statute of limitations that applies to the sex trafficking counts. As discussed above, in 2006, Congress enacted § 3299 to eliminate altogether the limitations period for the offense of sex trafficking children in violation of § 1591. *See* 18 U.S.C. § 3299.

Moreover, while the alleged sex trafficking in the S2 indictment is alleged to have occurred prior to the enactment of § 3299 in 2006, the Court holds that the provision nonetheless applies retroactively to cover that conduct. In its April 16, 2021 Opinion & Order, the Court analyzed § 3283 under the *Landgraf v. USA Film Products*, 511 U.S. 244, 280 (1994) framework and concluded that the limitations period applied retroactively so long as the previous limitations period had not yet expired. *Maxwell*, 2021 WL 1518675, at *7-8. Similar to § 3283, which states that "[n]o statute of limitations that would otherwise preclude prosecution" shall apply, the language of § 3299 provides that an indictment may be instituted at any time for certain offenses "[n]otwithstanding any other law." As discussed in the Court's previous opinion with respect to § 3283, this kind of language unambiguously requires that the limitations period apply retroactively to prosecutions for offenses committed before the date of enactment so long as the

8

applicable limitations period has not yet run – offenses that *by definition* are those for which

"other law[s]" of limitation would otherwise bar prosecution. *See* 18 U.S.C. § 3299. Moreover,

as the Court also explained, not only does this kind of language unambiguously require

retroactivity, it also does not result in any impermissible retroactive effects so long as it does not

revive time-barred claims. *Maxwell*, 2021 WL 1518675, at *7-8. The Court therefore joins

multiple other district courts in concluding that, like § 3283, § 3299 applies retroactively to

offenses for which the previous limitations period has not yet run. *See United States v. Nader*,

425 F. Supp. 3d 619, 629 (E.D. Va. 2019); *United States v. Pierre-Louis*, No. 16 CR 541 (CM),

2018 WL 4043140, at *6 (S.D.N.Y. Aug. 9, 2018); *United States v. Vickers*, No. 13-CR-128-A,

2014 WL 1838255, at *8 (W.D.N.Y. May 8, 2014); *United States v. Sensi*, No. 3:08-CR-253

(WWE), 2010 WL 2351484, at *3 (D. Conn. June 7, 2010).

The sex trafficking charges are therefore not time-barred. Regardless of whether it was

the general five-year limitations period in § 3282(a) or the extended limitations period for sexual

abuse of minors in § 3283 that was applicable to Maxwell's alleged conduct *prior* to the

enactment of § 3299 in 2006, neither had expired by that date. Thus, as Maxwell does not

contest, § 3299 applies retroactively to the sex trafficking offenses in the indictment and the

Government is permitted to bring those charges without time limitation.

## IV. Maxwell's motion to dismiss count five and either count one or count three as multiplicitous is premature

In her previous motions, Maxwell argued that either count one or count three of the S1

indictment, the Mann Act conspiracy charges, must be dismissed because the counts are

multiplicitous. In the Court's April 16, 2021 Opinion & Order, the Court joined many other

courts in this Circuit holding that pretrial motions of this sort are premature in light of *United

States v. Josephberg*, 459 F.3d 350, 355 (2d Cir. 2006), and the Court dismissed without

9

prejudice. *Maxwell*, 2021 WL 1518675, at *14. In the instant motion, Maxwell similarly argues that count five of the S2 indictment, the sex trafficking conspiracy charge, is duplicative of either counts one or three. Maxwell's motion is denied without prejudice for the reasons stated in the Court's April 16, 2021 Opinion & Order.

## V.   The Government's delay in bringing the charges did not violate due process

Maxwell also renews her motion to dismiss the S2 indictment based on alleged improper pretrial delay. In its April 16, 2021 Opinion & Order, the Court denied Maxwell's motion, concluding that her efforts to show actual and substantial prejudice fell far short of the "stringent standard" necessary to prevail on such a claim. *Maxwell*, 2021 WL 1518675, at *9. Maxwell's motion to dismiss the S2 on these grounds fails for the same reasons. As before, nothing in the record indicates that the Government's delay in bringing these charges was designed to thwart Maxwell's ability to prepare a defense. However, it is sufficient to conclude that Maxwell does not make the strong showing of prejudice required to support this sort of claim. Maxwell contends that the Government's delay in bringing charges has prejudiced her interests because potential witnesses have died, others have forgotten, and records have been lost or destroyed. It is highly speculative that any of these factors would make a substantial difference in her case.

The Court thus again concludes for the reasons stated in the April 16, 2021 Opinion & Order, that Maxwell has failed to establish actual prejudice from the Government's delay in bringing charges. She may renew her motion if the factual record at trial shows otherwise. On the present record, neither the applicable statute of limitations nor due process bars the charges here.

10

## VI.     No bill of particulars is warranted

Maxwell moves for a bill of particulars as to counts five and six. Federal Rule of

Criminal Procedure 7 requires that an indictment contain "a plain, concise, and definite written

statement of the essential facts constituting the offense charged[.]" The indictment must be

specific enough to inform the defendant of the charges and allow the defendant to plead double

jeopardy in a later prosecution based on the same events. *See United States v. Stavroulakis*, 952

F.2d 686, 693 (2d Cir. 1992). "Under this test, an indictment need do little more than to track the

language of the statute charged and state the time and place (in approximate terms) of the alleged

crime." *United States. v. Tramunti*, 513 F.2d 1087, 1113 (2d Cir. 1975).

"Rule 7(f) of the Federal Rules of Criminal Procedure permits a defendant to seek a bill

of particulars in order to identify with sufficient particularity the nature of the charge pending

against him, thereby enabling defendant to prepare for trial, to prevent surprise, and to interpose

a plea of double jeopardy should he be prosecuted a second time for the same offense." *United

States v. Bortnovsky*, 820 F.2d 572, 574 (2d Cir. 1987). "The purpose of a bill of particulars is to

supplement the allegations in the indictment when necessary to (1) enable the defendant to

prepare his defense, (2) avoid unfair surprise to the defendant at trial, and (3) preclude a second

prosecution of the same offense." *United States v. Mandell*, 710 F. Supp. 2d 368, 384 (S.D.N.Y.

2010)). On the other hand, the Court must balance these interests against the harm to the

Government from restricting its proof at trial. *See United States v. Rajaratnam*, No. 09-cr-1184

(RJH), 2010 WL 2788168, at *1 (S.D.N.Y. Jul. 13, 2010).

In her previous motions, Maxwell argued that the Mann Act counts in the indictment

should be dismissed for lack of specificity or that, in the alternative, the Court should compel the

Government to submit a bill of particulars providing greater detail of the charges. Maxwell

11

contended specifically that the indictment is too vague because it refers to open-ended time periods for the Mann Act counts. The Court disagreed in light of Circuit precedent requiring only that an indictment describe the time and place of the charged conduct in "approximate terms" and permitting the use of "on or about" language to describe the window of when a violation occurred. *Maxwell*, 2021 WL 1518675, at *10 (citing *Tramunti*, 513 F.2d at 1113; *United States v. Nersesian*, 824 F.2d 1294, 1323 (2d Cir. 1987)). The Court explained that approximate time periods are particularly appropriate if the allegations involved ongoing conduct and especially if the indictment alleges sexual abuse against minor victims. *Id.* (citing *United States v. Young*, No. 08-cr-285 (KMK), 2008 WL 4178190, at *2 (S.D.N.Y. Sept. 4, 2008)).

Maxwell now again moves for a bill of particulars. Maxwell primarily argues that the S2 indictment does not provide specific dates for the conduct alleged with respect to the sex trafficking counts. Instead, the S2 indictment provides a four-year time period from 2001 to 2004 in which the alleged sex trafficking and sex trafficking conspiracy occurred. Maxwell's motion in this respect is denied for the same reasons stated in the Court's April 16, 2021 Opinion & Order. The indictment alleges ongoing conduct that involve the sexual abuse of minors with respect to counts five and six and therefore the approximate time period provided is sufficient. Accordingly, the motion for a bill of particulars is denied.[1]

## VII.  The current disclosure schedule for impeachment material is adequate

Finally, Maxwell moves to compel the immediate disclosure of any of Minor Victim's prior statements in which she did not mention Maxwell, including prior statements made to the

---

[1] Additionally, Maxwell includes in her motion for a bill of particulars a request to require the government to identify the unnamed co-conspirators who allegedly participated in the conspiracies charged in the S2 indictment. Maxwell also made this request in the parties' joint May 21, 2021 letter to the Court regarding the disclosure schedule. Dkt. No. 291. In both her motion and the May 21, 2021 letter, Maxwell requests that this information be disclosed to the defense at the same time that the Government discloses Jencks Act material. The Government has not opposed this request. In the absence

12

FBI. The Court has ordered the Government to disclose all Jencks Act and *Giglio* material by October 11, 2021. Dkt. No. 297 at 1. That date is seven weeks in advance of trial. The Court sees no reason to depart from the rule in this district that impeachment material of anticipated witnesses does not warrant an order compelling immediate disclosure. *See United States v. Campo Flores*, No. 15 Cr. 765 (PAC), 2016 WL 5946472, at *11 (S.D.N.Y. Oct. 12, 2016). Seven weeks in advance of trial is far more time than is standard in this district and no showing has been made that it will be insufficient for Maxwell to make effective use of the information in preparation of her defense.

To the extent Maxwell argues that the Government is in possession of prior statements that are exculpatory under *Brady* (for example, if a witness denied Maxwell's involvement), rather than useful only for standard impeachment purposes, it is of course the Government's obligation to "disclose such information to the defense promptly after its existence becomes known to the Government so that the defense may make effective use of the information in the preparation of its case." Dkt. 68 at 1. The context of questions and answers surely matters as to whether a statement (or omission) is exculpatory, impeaching, or neither. It is for the Government to make these assessments *ex ante* and fully meet its disclosure obligations so that the defense may make effective use of any such information in preparation for trial. *See United States v. Coppa*, 267 F.3d 132, 144-46 (2d Cir. 2001). The Government has repeatedly confirmed that it understands those obligations, and that it has met them and will continue to meet them. Accordingly, the motion to compel the immediate disclosure of any of Minor Victim-4's prior statements in which she did not mention Maxwell is denied.

---

of objection, the Court presumes the Government intends to disclose this information to Maxwell at the same time that as it discloses Jencks Act material.

## Conclusion

For the reasons above and in this Court's April 16, 2021 Opinion & Order, the Court

DENIES Maxwell's motion to obtain relief specified in her supplemental pre-trial motions

relating to the S2 indictment. This resolves Dkt. No. 292.

SO ORDERED.

Dated: August 13, 2021
New York, New York

Alia Q. Natter

ALISON J. NATHAN
United States District Judge

# EXHIBIT  102

LBUCmax1

1    Honor already made, that this is overly prejudicial and the

2    jury will draw the wrong conclusion from it, so we need to

3    exclude it.  I don't see the difference.

4           MS. COMEY:  Your Honor, I think the difference here is

5    that, in Mr. Everdell's -- in the photograph that your Honor

6    excluded, the photograph was on the floor.  It was unclear

7    where it had been positioned originally.  It was unclear where

8    it had been positioned when the search was conducted.

9           Here, this is a photograph I expect the witness will

10   testify to, showing the exact placement, and the reason we need

11   that closeup is because the photograph of the zoomed-out

12   bookshelf, you cannot actually see the image.  You can see the

13   frame and you can tell that it's the same circular frame, but

14   you cannot see the image without a closeup, so we will show the

15   two in succession.

16          MR. EVERDELL:  Your Honor, that's the point.  If you

17   zoom out, you will see this photograph in the context of other

18   photographs that are nonsexual.  This I don't think is sexual,

19   but that are not with underage girls, that are with other

20   photos, including people with adults.  It's shown in context in

21   a series of photos along a bookshelf where people tend to keep

22   photos, lots of different photos, and it will show a panoply of

23   photos that is not one photo of a clearly minor child with him

24   looking like he's about to bite her backside.  At least there

25   you have a full context of other photos and it is not a zoom-in

LBUCmax1

1   on the one photo showing details of what's going on there,

2   where the jury, again, will draw an improper conclusion from.

3            MS. COMEY:  Your Honor, I'm not sure I understand

4   Mr. Everdell's point about context, because those photos in the

5   bookshelf include a photo of Jane, they include photos of nude

6   and partially nude females.  I don't understand the argument

7   about the context.  The context had sexualized images of

8   females around his desk.

9            MR. EVERDELL:  Jane testified she was 19 when those

10  headshots were taken.  So that's the point, your Honor.

11           MS. COMEY:  Your Honor, I don't think that's the

12  testimony.  I believe she testified she was 15.

13           THE COURT:  I'm going to overrule the objection.

14  Context, again, matters and distinguishes from the pretrial

15  rulings.  You'll craft a limiting instruction and run it by the

16  defense.

17           MR. EVERDELL:  Understood, your Honor.  There is one

18  last issue with this witness, which is his testimony --

19           THE COURT:  This is Mr. Parkinson?

20           MR. EVERDELL:  Mr. Parkinson.  So everything we've

21  been discussing so far, I believe, is going to be introduced

22  through Mr. Parkinson.  We have the video, the photos, and now

23  his testimony.

24           I understand from the government and from the

25  materials we've been given that Mr. Parkinson is going to

LBUCmax1

1       testify that he found or he saw at least a green massage table

2       when they did the video sweep and that he was able to look at

3       that table when he was there in the house, and then he saw what

4       appeared to him to be semen on the table.

5               I don't think that that testimony is appropriate

6       because, for example, on both 401 and 403 grounds, this table

7       was found a full year after the last year of the conspiracy

8       charged here, so that's 2004.  The search was October 20th,

9       2005, a full year later.

10              Him seeing something that appeared to be semen, first,

11      they never tested it, it's in a room with lotions for massage.

12      How he knows this appears to be semen, I don't know, but

13      regardless of that fact, it's done a year after the fact.  Any

14      number of ways that could have been on there, if it is, in

15      fact, semen, I don't see how it's probative of a conspiracy

16      that ends in 2004, unless they can show that the semen was on

17      the table during the time period of the conspiracy.

18              Given that, if we have an agent talking about semen in

19      front of the jury, that's just going to be a salacious detail

20      that is going to be prejudicial of the client.  So we object on

21      401, 403.

22              MS. COMEY:  Your Honor, I expect this testimony would

23      be very brief and very clinical.  He would describe seeing a

24      white stain that he saw and thought was consistent with the

25      appearance of semen, and I think that is entirely --

LBUCmax1

1           THE COURT:  It wasn't tested?

2           MS. COMEY:  It was not tested.

3           THE COURT:  Or preserved in any way?

4           MS. COMEY:  It was not, your Honor.  It was

5    corroborative of the testimony already received and testimony I

6    expect will come later in this trial.

7           THE COURT:  What about the timeframe issue?

8           MS. COMEY:  Your Honor, I think it's still

9    corroborative that these massages were sexual.  The fact that

10   Jeffrey Epstein's massages were sexual, even if it was just a

11   year after the end of the conspiracy, is still probative of

12   whether or not these massages were just massages, as I expect

13   the defense will argue the defendant believed, or were, in

14   fact, sexual.  We think it is highly probative.

15          THE COURT:  I would permit lab tests that indicated it

16   was semen, but in light of the essentially lay description in

17   combination with the timeframe issue, I'll sustain this

18   objection.

19          MS. COMEY:  Understood, your Honor.

20          MR. EVERDELL:  Thank you, your Honor.  I think that's

21   everything we have for Parkinson.

22          MS. COMEY:  There was one logistical issue, which is

23   we will be offering this video under seal because it contains

24   images of witnesses who your Honor has permitted to testify

25   under pseudonym and nude images of third parties.  We will need

LBUCmax1

1  to play it on the jurors' screens, and I think that because the

2  video moves pretty quickly through any images, we don't have

3  concerns about the public being able to just glimpse something

4  from a juror's screen, it moves pretty quickly from the house,

5  but what we would ask is that the public television be turned

6  off before the video is played so there is not a big screen

7  showing it.

8          THE COURT:  If it's under seal, I guess maybe we can't

9  do both, just the jurors' screens, including nude images of a

10  prepubescent third party, that privacy should be protected.

11  You'll work with the tech folks to make sure and maybe consider

12  positioning the jurors' screens.  Any objection to that?

13         MR. EVERDELL:  No, just in terms of obscuring the

14  video --

15         THE COURT:  The material coming in under seal to

16  protect privacy interests.

17         MR. EVERDELL:  No, Judge.

18         THE COURT:  What else?

19         MR. EVERDELL:  We're done with Parkinson?

20         MS. COMEY:  That's right.

21         MR. EVERDELL:  There is another witness after

22  Parkinson, and that's Mr. Dawson, and there is a witness after

23  that is Kelly Maguire; is that right?

24         MS. COMEY:  That's correct, your Honor.

25         MR. EVERDELL:  I have issues --

LC9VMAXT Page 1974

1 UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

2 ------------------------------x  UNITED STATES OF

AMERICA,

3

v. 20 CR 330 (AJN)  4    GHISLAINE MAXWELL,

5

Defendant. Jury Trial 6

------------------------------x New York, N.Y. 7

December 9, 2021 9:00 a.m.  8   Before:

9 HON. ALISON J. NATHAN, 10 District Judge 11

APPEARANCES 12 DAMIAN WILLIAMS United States

Attorney for the 13 Southern District of New York

BY: MAURENE COMEY  14 ALISON MOE   LARA POMERANTZ

15 ANDREW ROHRBACH Assistant United States

Attorneys 16  HADDON MORGAN AND FOREMAN

17 Attorneys for Defendant  BY: JEFFREY S. PAGLIUCA

18 LAURA A. MENNINGER -and 19 BOBBI C. STERNHEIM -and

20 COHEN & GRESSER  BY: CHRISTIAN R. EVERDELL

21

Also Present: Amanda Young, FBI 22 Paul Byrne, NYPD

Sunny Drescher, 23 Paralegal, U.S. Attorney's Office

Ann Lundberg, 24 Paralegal, Haddon Morgan and Foreman

25

---

LC9VMAXT Page 1976

1 MR. EVERDELL: Just a few procedural things from the 2 defense.

3 I believe the next witness from the government is

4 going to be Tracy Chapell from Federal Express. And I have 5 some documents I can hand up to the Court. I have one exhibit 6 that I intend to introduce through Ms. Chapel which I've given

7 to the government; I can give the Court a copy. It's going to

8 be done in paper.

9 These are Federal Express invoices. 10 I'm going to offer them -- assuming they are allowed 11 to be admitted, I will offer them under temporary seal because 12 we haven't had the chance to go through and do all the 13 redactions. But we will do that as soon as we can and get the 14 Court a redacted copy so that that could be published publicly. 15 But for the moment, we'll have to do this under seal. 16 THE COURT: Is there going to be a lot of walking the 17 witness through the document?

18 MR. EVERDELL: No. Actually I'm just going to admit 19 them; no walking through, it's going to be for the jury's eyes 20 if they want to see it.

21 THE COURT: Okay. And so a redacted version for the 22 public by when?

23 MR. EVERDELL: If we could do it over the weekend, 24 because there's a decent number of records, and have them ready 25 by Monday, we could do that.

# EXHIBIT 103

LC6Cmax3          Kate - cross          Page 1245

1  Q. And it was launched in 2019 and it no longer exists;
2  correct?
3  A. I think it was in 2019, but I don't know the exact date,
4  but you are correct, it no longer exists.
5  Q. And after you received your settlement money in connection
6  with the Epstein victim compensation fund, you no longer were
7  involved in that foundation; correct?
8  A. I was still -- the foundation shut down first.
9  Q. But it shut down around the time that you began cooperating
10  with the government; correct?
11  A. It shut down before the -- I had received any kind of
12  settlement.
13  Q. You received your settlement a year ago this week; correct?
14  A. If you say so. I would say that's probably about accurate.
15  Q. Earlier, the government had asked you about having made a
16  public statement at some point in 2019 concerning Mr. Epstein.
17  Do you remember that?
18  A. Sorry. Could you repeat that.
19  Q. On direct examination, you were asked about having made a
20  public statement in connection with Jeffrey Epstein?
21  A. Yes.
22  Q. And you made a public statement in this very courthouse;
23  correct?
24  A. Yes.
25  Q. And you made that public statement using your true name;

LC6Cmax3          Kate - cross          Page 1246

1  correct?
2  A. Yes.
3  Q. And you testified earlier that the reason why you're not
4  using your true name is to protect your child; correct?
5  A. Yes.
6  Q. You had a child at that point, didn't you?
7  A. Yes.
8  Q. And your lawyer also introduced you using your true name at
9  that public hearing; correct?
10  A. Yes.
11  Q. And you were represented by a lawyer named Brad Edwards;
12  correct?
13  A. Yes.
14  Q. And Mr. Edwards has represented you in connection with the
15  claim that you made against the Epstein Victim Compensation
16  Fund; correct?
17  A. Yes.
18  Q. In fact, Mr. Edwards was instrumental in setting up that
19  fund, wasn't he?
20  A. I'm not sure.
21  Q. Is he here with you today?
22  A. Yes, he's here.
23  Q. He's in the courtroom; correct?
24  A. Um --
25  Q. And you have consulted with him concerning your appearance

LC6Cmax3          Kate - cross          Page 1247

1  here?
2      MS. POMERANTZ: Objection, your Honor.
3      THE COURT: Sustained.
4  Q. That statement that you made in this courthouse was after
5  Epstein died; correct?
6  A. Yes.
7  Q. And you and a number of other people accusing Epstein of
8  abuse were invited by a judge in this courthouse, named Judge
9  Berman, to speak publicly; correct?
10  A. Yes.
11  Q. And you took that opportunity to speak publicly?
12  A. Yes.
13  Q. And you spoke publicly with regard to Jeffrey Epstein;
14  correct?
15  A. Yes.
16  Q. You did not speak with regard to Ghislaine Maxwell?
17  A. I did not.
18  Q. And right after that very day that you made that statement
19  was the first time that you sat down with the government in
20  connection with things that you were testifying to today;
21  correct?
22  A. Yes.
23  Q. And right after you sat down with the government, which was
24  right after you had spoken publicly, you appeared on television
25  with regard to your allegations; correct?

LC6Cmax3          Kate - cross          Page 1248

1  A. Yes.
2  Q. And you appeared on television with other women who had
3  been present during that public court appearance; correct?
4  A. Yes.
5  Q. And there were about six of you who were featured on a
6  television show; correct?
7  A. Yes.
8  Q. Talking about your allegations against Jeffrey Epstein;
9  correct?
10  A. Yes.
11  Q. And you all appeared as a sisterhood of accusers against
12  Jeffrey Epstein?
13  A. Sorry, is it a question?
14  Q. Yes.
15  A. Did we appear as a sisterhood?
16  Q. Yes.
17  A. I don't know how it came across to other people.
18  Q. Well, you were somewhat affectionate to one another on the
19  show, weren't you?
20  A. I suppose so.
21  Q. You were supportive of one another on the show; correct?
22  A. Yeah. I had just met them, so --
23  Q. Well, you had met them for the very first time that day?
24  A. I think it may have been at the court appearance which may
25  have been the day before.

LC6Cmax3          Kate - cross          Page 1249

1  Q. And you continued maintaining contact with some of them;
2  correct?
3  A. Yes.
4  Q. You would be on chat groups with them for a period of time?
5  A. I actually was only on the chat group for a very small
6  amount of time. I left the chat group.
7  Q. But nonetheless, for at least a small period of time, you
8  were involved in the chat group with other individuals, other
9  women who claimed they had been abused by Jeffrey Epstein;
10  correct?
11  A. Yes.
12  Q. And you had also maintained contact with an individual
13  named Virginia Roberts; correct?
14  A. Yes.
15  Q. And you and Virginia Roberts are represented by the same
16  attorney, Bradley Edwards?
17  A. I don't -- I don't know who represents Virginia.
18  Q. You never have spoken to her about that at all?
19      MS. POMERANTZ: Objection, your Honor.
20      THE COURT: Grounds?
21      MS. POMERANTZ: Hearsay.
22      THE COURT: Sustained.
23  Q. You're aware that your attorney wrote a book about your
24  case and the case of others while he has been representing you;
25  correct?

LC6Cmax3          Kate - cross          Page 1250

1  A. Yes.
2  Q. And you read that book, didn't you?
3  A. I have not read the book.
4  Q. But you knew that you were going to be included in that
5  book; correct?
6  A. To my knowledge, those only -- I think there was only one
7  sentence about me. I don't think there's anything about any
8  details of anything .
9  Q. Did you give permission to your attorney to be referenced
10  or written about in that book?
11  A. Yes.
12  Q. So before it was published, you knew that some of your
13  story was going to be in that book; correct?
14  A. I don't believe any of my story is in the book.
15  Q. Do you have a private practice where you are a music
16  therapist?
17  A. Sorry. Could you repeat.
18  Q. Do you have a private practice where you are a music
19  therapist?
20  A. I see people on an hourly basis.
21  Q. And you do that in California?
22  A. I do.
23  Q. And are you required to be licensed to hold yourself out as
24  a music therapist?
25  A. No.

LC6Cmax3          Kate - cross          Page 1251

1  Q. Do you collect monies from insurance by your clients?
2  A. No.
3  Q. It is all cash or check?
4  A. Yes.
5  Q. Now, you've testified that there was a period of time, I
6  think upwards of ten years, that you used drugs; correct?
7  A. Yes.
8  Q. You used cocaine; correct?
9  A. Yes.
10  Q. You used sleeping pills; correct?
11  A. Yes.
12  Q. And you also used alcohol; correct?
13  A. Yes.
14  Q. And it is your testimony that you abused those substances;
15  correct?
16  A. Yes.
17  Q. To the point where, after approximately ten years of use,
18  you decided you no longer wanted to engage in that; correct?
19  A. Yes.
20  Q. And you have lived a sober life since then; correct?
21  A. Yes, I have.
22  Q. And that, in part, is what you were promoting with your
23  foundation, weren't you?
24  A. I would say it's what we're attracting, not what we're
25  promoting.

LC6Cmax3          Kate - cross          Page 1252

1  Q. I apologize. I don't mean promoting. I mean
2  sobriety and support for women who had also had addictions?
3  A. I think it's what we offer or what we offered when the
4  foundation was still going.
5  Q. Understood.
6  A. Yes.
7  Q. Fair to say that using and abusing those substances over a
8  ten-year period has had an impact on memory; correct?
9  A. It has not had an impact on the memories that I have always
10  had.
11  Q. The memories that you have always had are your personal
12  memories; correct?
13  A. Yes.
14  Q. And memories based upon your perception of experiences;
15  correct?
16  A. Well, they're just based on my experience.
17  Q. But you have testified today about experiences during a
18  period of time where you were abusing drugs; correct?
19  A. The memories that I testified to were at periods when I was
20  always sober because I was always required to not take drugs
21  and not be drunk around Ghislaine and Jeffrey.
22  Q. Because you knew that they did not tolerate drug use;
23  correct?
24  A. That was what was required.
25  Q. You knew that they did not tolerate drug use; correct?

UNITED STATES OF AMERICA, v.
GHISLAINE MAXWELL,

December 10, 2021

| LCAVMAX6 | A. Farmer - cross | Page 2201 |
| --- | --- | --- |

1  A. Yes.
2  Q. She has attended prior trial testimony in this case at this
3     courthouse; correct?
4  A. Yes.
5  Q. She has sat in the overflow room for that portion; correct?
6  A. She did.
7  Q. And she's listened to the testimony of other witnesses;
8     correct?
9  A. Yes.
10        MS. POMERANTZ: Objection, your Honor.
11        THE COURT: Sustained.
12  Q. You talked on direct about your lawyers representing you
13     pro bono; correct?
14  A. That's right.
15  Q. You do not know your lawyers' arrangements with other of
16     their clients; correct?
17        MS. POMERANTZ: Objection.
18        THE COURT: Sustained.
19  Q. Do you know how much money your lawyers have made in
20     connection with Epstein claims?
21        MS. POMERANTZ: Objection.
22        THE COURT: Grounds.
23        MS. POMERANTZ: Foundation.
24        Beyond the scope of her knowledge, your Honor.
25        THE COURT: I'll sustain on foundation.

| LCAVMAX6 | A. Farmer - cross | Page 2202 |
| --- | --- | --- |

1  Q. Have you read anywhere in the press how much money your
2     lawyers have made in connection with representing Epstein
3     accusers?
4        MS. POMERANTZ: Objection. Hearsay.
5        THE COURT: Sustained.
6  Q. You know that Virginia Roberts was also represented by your
7     attorneys; correct?
8        MS. POMERANTZ: Objection.
9        MS. MENNINGER: I can lay a foundation.
10        THE COURT: You may inquire.
11        MS. POMERANTZ: Relevance and hearsay.
12  Q. You were preparing to testify in a civil case?
13        THE COURT: Just a minute.
14        MS. MENNINGER: Oh, I'm sorry.
15        THE COURT: If there's an objection, you have to give
16     me a minute to rule.
17        MS. MENNINGER: I thought you had, your Honor.
18        I apologize.
19        THE COURT: I had on the prior ones.
20        Overruled. You may inquire.
21  BY MS. MENNINGER:
22  Q. You were preparing to testify in a civil case in or around
23     2016 or 2017; correct?
24  A. Correct.
25  Q. And the lawyers you were interacting with in that case, the

| LCAVMAX6 | A. Farmer - cross | Page 2203 |
| --- | --- | --- |

1     civil case, were the same lawyers from Boies Schiller; correct?
2  A. In part.
3  Q. And also Mr. Edwards; correct?
4  A. Correct.
5  Q. And you know that in connection with that civil case, your
6     lawyers, Ms. McCawley and Mr. Edwards, represent Virginia
7     Roberts; correct?
8        MS. POMERANTZ: Objection, your Honor.
9        THE COURT: Foundation objection?
10        MS. POMERANTZ: Relevance.
11        THE COURT: Ms. Pomerantz, you inquired as to pro bono
12     representation; correct?  Is that correct?
13        MS. POMERANTZ: Yes, your Honor.
14        THE COURT: All right. I'll overrule.
15  A. Can you repeat the question?
16  Q. You know that Ms. McCawley and Mr. Edwards represent
17     Virginia Roberts?
18  A. Yes.
19  Q. Correct?
20  A. Yes.
21  Q. In connection with civil litigation?
22  A. Yes.
23  Q. And you were prepared to testify in that civil litigation;
24     correct?
25  A. I was.

| LCAVMAX6 | A. Farmer - cross | Page 2204 |
| --- | --- | --- |

1  Q. And you know that Mr. Edwards is representing other people
2     in this criminal case; correct?
3        MS. POMERANTZ: Objection, your Honor.
4        THE COURT: Just a moment. Overruled.
5  A. I do know that.
6  Q. And you know that your attorney represents other
7     individuals who have accused Epstein; correct?
8        MS. POMERANTZ: Objection.
9        THE COURT: Just a moment. Overruled.
10  A. Yes.
11  Q. You've been in touch with a number of other Epstein
12     accusers in many different forms and fashion; correct?
13        MS. POMERANTZ: Objection. Vague. Confusing.
14        THE COURT: Okay. You can specify please.
15  Q. Okay. Are you a part of a WhatsApp group of Epstein
16     accusers?
17  A. Yes.
18  Q. You communicated with other Epstein accusers on the
19     WhatsApp for those accusers?
20  A. Correct.
21  Q. You've emailed with other accusers; correct?
22  A. I have.
23  Q. You directly emailed with Virginia Roberts; correct?
24  A. I have.
25  Q. You have been with other Epstein accusers in connection

UNITED STATES OF AMERICA, v.
GHISLAINE MAXWELL,

December 10, 2021

| LCAVMAX6 | A. Farmer - cross | Page 2205 |
|---|---|---|

1  with your media appearances, right?
2  A. You mean when they were at the courtroom and filming
3  everyone?
4  Q. Right.
5  A. Yes.
6  Q. You know that your attorneys from Boies Schiller were a
7  part of setting up the Epstein Victims Compensation Fund;
8  correct?
9          MS. POMERANTZ: Objection, your Honor.
10         THE COURT: Just a moment.
11         One-word grounds.
12         MS. POMERANTZ: Hearsay and privilege.
13         THE COURT: You can inquire as to foundation.
14 Q. I'm not trying to ask you about things that you've learned
15 in connection with your --
16         THE COURT: Just ask.
17 Q. -- communications --
18         THE COURT: I'll deal with that, but just ask the
19 question. I'll either sustain or overrule.
20 Q. You are aware it's a matter of public record that your
21 attorneys --
22         MS. POMERANTZ: Objection, your Honor.
23         THE COURT: Foundation. Ask the foundation question
24 first and then we'll see.
25         MS. MENNINGER: Okay.

| LCAVMAX6 | A. Farmer - cross | Page 2206 |
|---|---|---|

1  Q. It's in the newspapers that your attorneys helped set up
2  the Epstein Victims Compensation Fund?
3          MS. POMERANTZ: Objection, your Honor.
4          THE COURT: Is the question is she aware of that? Is
5  that the question?
6          MS. MENNINGER: Yes, your Honor.
7          THE COURT: Okay.
8  A. Yes.
9  Q. And so you are aware that it is a matter of public
10 knowledge that your attorneys helped set up the Epstein Victims
11 Compensation Program?
12         MS. POMERANTZ: Your Honor, objection to this entire
13 line of questioning.
14         THE COURT: Yes, I gather.
15         MS. POMERANTZ: This calls for hearsay.
16         THE COURT: I asked for foundation. We got the
17 foundation. And now on this question, one question at a time.
18         I sustain.
19 BY MS. MENNINGER:
20 Q. You participated in that fund; correct?
21 A. I did.
22 Q. You accepted an offer from that fund?
23 A. I did.
24 Q. You were paid one and a half million dollars?
25 A. I was.

| LCAVMAX6 | A. Farmer - cross | Page 2207 |
|---|---|---|

1  Q. And was based on the same things that you've testified in
2  this courtroom today; correct?
3  A. That's correct.
4  Q. The sexual abuse in a movie theater, right, is one of those
5  things?
6  A. As one of the things, yes.
7  Q. Right.
8          MS. MENNINGER: Your Honor, at this time I would
9  offer -- I would ask to show, excuse me, the witness AF-14.
10 And I'll provide a copy to the government.
11         MS. POMERANTZ: No objection, your Honor.
12         THE COURT: Okay.
13         MS. MENNINGER: If I could show the witness page 2 of
14 that document as well, and page 3, and the last page.
15 Q. That's your signature, Ms. Farmer; correct?
16 A. Yes.
17 Q. That was in October of 2020?
18 A. That's correct.
19 Q. This form is the release form that you signed in connection
20 with accepting the offer from the victims compensation program,
21 right?
22 A. That's right.
23 Q. And it details the one and a half million dollars that you
24 received, right?
25 A. That's right.

| LCAVMAX6 | A. Farmer - cross | Page 2208 |
|---|---|---|

1          MS. MENNINGER: I would move for the admission of
2  AF-14, your Honor.
3          MS. POMERANTZ: No objection, your Honor.
4          THE COURT: AF-14 is admitted.
5          (Defendant's Exhibit AF-14 received in evidence)
6          THE COURT: No redaction requests here?
7          MS. POMERANTZ: No, your Honor.
8          THE COURT: 14 is admitted.
9          MS. MENNINGER: We can take it down now, Ms. Lundberg.
10 BY MS. MENNINGER:
11 Q. In connection with some of your public appearances, you
12 have described the fact that you are a psychologist; correct?
13 A. That's correct.
14 Q. And you have described the fact that you work with victims
15 of sexual trauma; correct?
16 A. Amongst other types of, yeah, clients, I do.
17 Q. And you know that it gives you more credibility with future
18 clients --
19         MS. POMERANTZ: Objection.
20 Q. -- if you mention your profession in connection with your
21 media appearances, right?
22         THE COURT: Just a moment.
23         There's an objection to that question?
24         MS. POMERANTZ: That's fine, your Honor. Withdrawn.
25         THE COURT: Go ahead.

UNITED STATES OF AMERICA, v.
GHISLAINE MAXWELL,
December 10, 2021

| LCAVMAX6 | A. Farmer - cross | Page 2209 |
|---|---|---|

1  A. The question is whether it gives me more credibility to be
2  a victim?
3  Q. It gives you more credibility with future clients if you
4  mention your experience during your media appearances; correct?
5  A. My personal experience or my professional experience?
6  Q. Your personal experiences.
7  A. I guess I would say that that is probably not -- people
8  have different opinions about that, about whether that would
9  give you credibility or not.
10  Q. You certainly have not shied away from telling in your
11  public appearances the fact that you are, yourself, trained as
12  a psychologist, right?
13  A. I have shared that.
14  Q. We've talked previously about the fact that you spoke with
15  the FBI in 2006, right?
16  A. Yes.
17  Q. That was with Agent Nesbitt Kuyrkendall, right?
18  A. Right.
19  Q. You did not tell Agent Kuyrkendall in 2006 that you wanted
20  Mr. Epstein prosecuted; correct?
21      MS. POMERANTZ: Objection, your Honor.
22      THE COURT: Sustained.
23      I'll hear from you, if you'd like.
24      MS. MENNINGER: Yes. Please. I'm not clear.
25      THE COURT: Sure.

| LCAVMAX6 | A. Farmer - cross | Page 2210 |
|---|---|---|

1      (At sidebar)
2      THE COURT: State your ground.
3      MS. POMERANTZ: Your Honor, I don't understand the
4  relevance of this question. It seems just like a wholly
5  improper question, what she was asking, whether she asked the
6  FBI to prosecute Jeffrey Epstein at this time. I just don't
7  even understand the question.
8      MS. MENNINGER: Your Honor, Agent Kuyrkendall signed a
9  declaration in 2017 and she said that she spoke to a number of
10  victims between '06 and '08, and none of them expressed an
11  opinion that they wanted Epstein prosecuted. Now, she clearly,
12  in 2019, did want Epstein prosecuted.
13      THE COURT: She's the witness.
14      MS. MENNINGER: What's that?
15      THE COURT: She's the witness subpoenaed to testify.
16  Her motivation --
17      MS. MENNINGER: I'm asking what she said to --
18      THE COURT: Right, but --
19      MS. MENNINGER: Okay. You want me to ask the
20  motivation? I see.
21      THE COURT: Well, I don't understand -- well, I'll
22  sustain the objection to the question asked --
23      MS. MENNINGER: Okay.
24      THE COURT: -- about what she told an agent --
25      MS. MENNINGER: Okay.

| LCAVMAX6 | A. Farmer - cross | Page 2211 |
|---|---|---|

1      THE COURT: -- in 2006.
2      What's the next question?
3      MS. MENNINGER: It would just be, You did not want
4  Epstein prosecuted in 2006?
5      THE COURT: You want to ask her if she wanted Epstein
6  prosecuted in 2006?
7      MS. MENNINGER: Yes.
8      THE COURT: What is the relevance of that?
9      MS. MENNINGER: Because she's changed her mind about
10  wanting people prosecuted in connection with this case. She
11  has a different bias today than she did in 2006; that she
12  brought up her lawsuit in connection with applying to the fund
13  and filing a civil lawsuit. When she didn't have those
14  motivations in 2006, she didn't want to prosecute. It's a
15  clear distinction in two different periods of time, 15 years
16  apart. It goes to our money theme, your Honor, that we opened
17  on.
18      MS. POMERANTZ: Your Honor, I just don't see the
19  relevance or basis for this line of questioning.
20      THE COURT: You're going to ask her if she wanted
21  Epstein prosecuted in 2006. And if she says yes, then what?
22      MS. MENNINGER: Agent Kuyrkendall is under subpoena,
23  your Honor, and testified that none of the victims she talked
24  to in '06 to '08 wanted them prosecuted.
25      THE COURT: You're not doing that. I've ruled on

| LCAVMAX6 | A. Farmer - cross | Page 2212 |
|---|---|---|

1  that.
2      MS. MENNINGER: What she told the agent about
3  prosecution.
4      MS. MOE: Your Honor, I think we're confusing two
5  issues: Whether or not she told the FBI she wanted him
6  prosecuted and asked them to do that and whether she, in fact,
7  wanted that to happen. I think what she's proposing is
8  impeaching her in the absence of a statement to the FBI.
9      THE COURT: I think that's right. You can ask her, I
10  suppose, if she wanted him prosecuted in 2006. I'm not going
11  to allow --
12      MS. MENNINGER: I know with this witness I'm not. If
13  we get into --
14      THE COURT: We'll get into that when we get into that.
15      MS. MENNINGER: That's right.
16      THE COURT: But not what you told.
17      MS. MENNINGER: I understand.
18      MS. MOE: We're now about an hour and 15 minutes.
19      THE COURT: There have been a lot of objections.
20      (Continued on next page)

| LCAVMAX6 | A. Farmer - redirect | Page 2213 |
| --- | --- | --- |

1    (In open court)
2    BY MS. MENNINGER:
3    Q. Ms. Farmer, in 2006, you did not want Jeffrey Epstein
4    prosecuted; correct?
5    A. I don't recall that being the case.
6    Q. You didn't want him prosecuted because no crime had been
7    committed; correct?
8        MS. POMERANTZ: Objection.
9        THE COURT: Sustained.
10       MS. MENNINGER: If I may have one moment to confer
11   with my client, your Honor?
12       THE COURT: You may.
13       (Counsel conferred with defendant)
14       MS. MENNINGER: No further questions at this time,
15   your Honor.
16       THE COURT: Ms. Pomerantz?
17       MS. POMERANTZ: Your Honor, may I just have one moment
18   please?
19   REDIRECT EXAMINATION
20   BY MS. POMERANTZ:
21   Q. Good afternoon, Annie.
22   A. Good afternoon.
23   Q. How, if at all, have you struggled to process your
24   experiences with Maxwell and Epstein?
25   A. I think it's been -- it was a very upsetting and confusing

| LCAVMAX6 | A. Farmer - redirect | Page 2214 |
| --- | --- | --- |

1    situation. And I think for a long time I just really didn't
2    want to think about it. And then, you know, of course, it has
3    come up again and again, and so with, you know -- I have
4    thought a lot more about it and it -- it's just -- it causes
5    discomfort, and yeah. I don't know what to say.
6    Q. You were asked questions on cross-examination about your
7    journal. Do you remember that?
8    A. Yes.
9    Q. Did you give the government every entry from your journal
10   that has anything to do with this case?
11   A. Yes.
12   Q. What's the subject matter of the rest of your -- of that
13   journal from when you were 16 years old?
14   A. Very high school kind of things. There's a journal entry
15   about the day that --
16   Q. I should say, without sharing any details, just generally,
17   what was the subject matter of the rest of your teenage
18   journal?
19   A. A favorite musician died, and I wrote that I was very sad
20   about it. Going -- like social things, friend things, things
21   like that.
22   Q. Did you write about private matters?
23   A. Yes.
24   Q. Do you recall being asked about your first interview with
25   the FBI in 2006?

| LCAVMAX6 | A. Farmer - redirect | Page 2215 |
| --- | --- | --- |

1    A. Yes.
2    Q. When you spoke with the FBI in 2006, did you have a lawyer?
3    A. I did not.
4    Q. When you spoke with the FBI in 2006, did you tell the FBI
5    about Maxwell massaging your breasts?
6    A. Yes.
7    Q. When you spoke with the FBI in 2006, did you tell the FBI
8    about Epstein getting into bed with you?
9        MS. MENNINGER: Objection. Leading, your Honor.
10       THE COURT: Sustained.
11   Q. Do you recall Ms. Menninger asking you about a particular
12   statement you made in connection with the 2006 interview
13   conducted by the FBI?
14   A. Yes.
15   Q. I believe she showed you a particular document to refresh
16   your recollection.
17       MS. POMERANTZ: Can we pull up 3514-001.
18   Q. And I want to direct your attention to the second full
19   paragraph on page 2.
20   A. Yes.
21   Q. And directing your attention to the last sentence. She
22   directed you to the first half of the sentence, but I would
23   like to direct you to the full sentence.
24   A. Yes.
25   Q. After you told the FBI that Maria was supposed to go on the

| LCAVMAX6 | A. Farmer - redirect | Page 2216 |
| --- | --- | --- |

1    trip to New Mexico, what's the very next thing you said to the
2    FBI?
3        MS. MENNINGER: Objection.
4        Hearsay. Foundation, your Honor.
5        THE COURT: Overruled.
6        This was the sentence Ms. Pomerantz asked you to read
7    in context. And I believe your words were, That's what
8    redirect is for.
9        MS. MENNINGER: And for objections on redirect,
10   including foundation.
11       THE COURT: Understood. Overruled.
12   A. That Epstein or Maxwell was the one that was responsible
13   for canceling Maria's trip at the last minute.
14   Q. I want to direct your attention to a -- the last paragraph
15   on that same page.
16       MS. POMERANTZ: Can we pull that up, Ms. Drescher.
17   Q. And do you recall when you were asked questions on
18   cross-examination, Ms. Menninger read the sentences about
19   horseback riding in this paragraph to you?
20   A. Yes.
21       (Continued on next page)
22
23
24
25

UNITED STATES OF AMERICA, v.
GHISLAINE MAXWELL,                                              December 10, 2021

| LCACmax7 | A. Farmer - redirect | Page 2217 |
|---|---|---|

1   BY MS. POMERANTZ:
2   Q. Can you read the rest of the paragraph to yourself.
3   A. Yes.
4   Q. Does that refresh your recollection that you told the FBI
5   in 2006 that Maxwell --
6       MS. MENNINGER: Objection. Leading, your Honor. And
7   there was no denial of a recollection to refresh.
8       THE COURT: Sustained.
9       MS. POMERANTZ: Prior consistent statements.
10      THE COURT: You can ask the question. Leading.
11  Sustained.
12  Q. What do you recall telling the FBI --
13      MS. POMERANTZ: Your Honor, may I have just one
14  moment?
15      THE COURT: You may.
16  Q. Annie, did you tell the FBI about a foot massage in 2006?
17  A. I did.
18  Q. What did you tell the FBI about a foot massage?
19  A. That Maxwell showed me how to rub Epstein's feet and that,
20  eventually --
21      MS. MENNINGER: Your Honor, I believe the witness is
22  reading from a document.
23      THE COURT: We can take it down.
24  A. -- that I began doing that on my own after she had shown me
25  how to do it.

| LCACmax7 | A. Farmer - redirect | Page 2218 |
|---|---|---|

1       MS. POMERANTZ: If we can bring up 3514-001 on page 3.
2   Blow up the top paragraph.
3       MS. MENNINGER: Your Honor, I'm not sure what the
4   witness is being shown the document for.
5       THE COURT: I'll allow it. I will see, but I presume
6   prior consistent statements following impeachment of prior
7   inconsistent statements.
8       MS. MENNINGER: Yes, your Honor. But either the
9   witness recalls it from memory or needs to be refreshed, and
10  that's the part that's not a matter of record in this
11  procedure.
12      THE COURT: Fair enough. You'll ask the specific
13  question and then we can take it from there.
14      You can take it down.
15  BY MS. POMERANTZ:
16  Q. Annie, do you recall what you told the FBI in 2006 about
17  the massage that Maxwell had given you?
18  A. I recall the parts that I've described.
19  Q. Can you explain?
20  A. Yes. Again, that she had me lay on the table, that she was
21  eager for me to experience the massage and asked me to, you
22  know, lay on the table, to undress, to lay under the sheets,
23  and then she began rubbing my body. Eventually, she pulled
24  back the sheet --
25      MS. MENNINGER: Objection. Narrative, your Honor.

| LCACmax7 | A. Farmer - redirect | Page 2219 |
|---|---|---|

1       THE COURT: Overruled.
2   A. -- and rubbed my breasts, as I described.
3   Q. And you talked about your experience with Epstein and
4   Maxwell in New Mexico. Did you include the details of your
5   experience with Epstein and Maxwell in your submission to the
6   Epstein Victim Compensation Fund?
7   A. Yes.
8   Q. Do you recall being asked questions on cross examination
9   about your time in New Mexico?
10  A. Yes.
11  Q. Do you recall being asked questions about the movie that
12  you saw in New Mexico?
13  A. Yes.
14  Q. What was that movie again?
15  A. Primal Fear.
16  Q. Why does that movie stand out in your memory?
17  A. In the movie, there's a priest that's sexually abusing --
18  it's a theme around sexual abuse. So there is sexual
19  misconduct on the screen with the actors.
20  Q. You were asked questions on cross examination about public
21  interviews you gave. Do you remember that?
22  A. Yes.
23  Q. About how many interviews have you given publicly?
24  A. I think maybe four or five.
25  Q. And are your public interviews consistent or inconsistent

| LCACmax7 | A. Farmer - redirect | Page 2220 |
|---|---|---|

1   with what you have testified about here today?
2       MS. MENNINGER: Objection, your Honor.
3       THE COURT: Sustained.
4   Q. When you spoke publicly in interviews, did you tell the
5   truth?
6   A. Yes.
7   Q. Was it important to tell the truth when you spoke publicly?
8       MS. MENNINGER: Objection, your Honor.
9       THE COURT: Sustained.
10  Q. Annie, have you coordinated your testimony with any other
11  witnesses at this trial?
12  A. I have not.
13  Q. Has anyone ever told you what to say?
14  A. No.
15  Q. Have you conformed your testimony to anyone else?
16  A. No.
17  Q. What are you here to do today?
18  A. I'm here to be a part of hoping that Ghislaine Maxwell's
19  held accountable for the harm that she's caused.
20  Q. You were asked questions about your claim to the Epstein
21  Victim Compensation Fund. Do you recall that?
22  A. Yes.
23  Q. And to be clear, approximately when and what year did you
24  submit your application to the Epstein Victim Compensation
25  Fund?

UNITED STATES OF AMERICA, v.
GHISLAINE MAXWELL,                                                    December 10, 2021

| LCACmax7 | A. Farmer - redirect | Page 2221 |
|---|---|---|

1  A. In 2020.
2  Q. And just to take a step back, can you remind the jury, when
3  was the first time that you spoke with the FBI?
4  A. 2006.
5  Q. And just to remind the jury, when you spoke with the FBI in
6  2006, did you have a lawyer?
7  A. I did not.
8  Q. You were asked questions about the award that you received
9  from the Epstein Victim Compensation Fund?
10  A. Yes.
11  Q. Can you tell the jury what the money means to you?
12      MS. MENNINGER: Objection. Relevance, your Honor.
13      THE COURT: Overruled.
14  A. It's a very significant chunk of money. It's a security
15  for myself and my family, and it's already been helpful in
16  providing that.
17  Q. To be clear, do you have a financial stake in the outcome
18  of this trial?
19  A. I do not.
20      MS. MENNINGER: Objection. Asked and answered, your
21  Honor.
22      THE COURT: Sustained.
23      MS. POMERANTZ: Your Honor, may I have just one
24  moment, please?
25      THE COURT: You may.

| LCACmax7 | A. Farmer - redirect | Page 2222 |
|---|---|---|

1  BY MS. POMERANTZ:
2  Q. Annie, do you recall being asked questions on cross
3  examination about your memory?
4  A. Yes.
5  Q. Do you remember Maxwell touching your breasts?
6  A. Yes.
7  Q. Do you need a journal entry or a piece of paper to remember
8  Maxwell touching your breasts?
9  A. No.
10      MS. MENNINGER: Objection.
11      THE COURT: I'm sorry. There is an objection.
12      MS. POMERANTZ: Sorry, your Honor.
13      MS. MENNINGER: Leading to the last question.
14      THE COURT: I'll allow the question and then pause
15  after the next one.
16      MS. POMERANTZ: Apologies, your Honor. I'm sorry. I
17  just want to know which question I should back up to.
18      THE COURT: The question was, do you need a journal
19  entry or a piece of paper.
20  BY MS. POMERANTZ:
21  Q. Annie, do you need a journal entry or a piece of paper to
22  remember Maxwell touching your breasts during a massage?
23  A. No, I do not.
24  Q. Why does that stand out?
25  A. Because it was a very distressing event, and those are the

| LCACmax7 | A. Farmer - redirect | Page 2223 |
|---|---|---|

1  things that we remember.
2  Q. Can you explain to the jury --
3      MS. POMERANTZ: Withdrawn.
4  Q. Do you recall being asked about Jeffrey Epstein's penis
5  several times on cross examination?
6  A. I do.
7  Q. In your own words, can you explain what Epstein did when he
8  got into bed with you?
9      MS. MENNINGER: Objection, your Honor. Asked and
10  answered. And I was not allowed to ask the question.
11      THE COURT: I believe the objection I sustained with
12  you was the asked and answered question, wasn't it?
13      MS. MENNINGER: No, your Honor.
14      THE COURT: Give me a moment. Overruled.
15  BY MS. POMERANTZ:
16  Q. Annie, I believe the question I had asked was: In your own
17  words, can you explain what Epstein did when he got into bed
18  with you?
19      MS. MENNINGER: Objection. Calls for a narrative,
20  your Honor.
21      THE COURT: I'll give her some room to lead, if you'd
22  like. I don't know what the answer will be, so how can you --
23  she can either lead or she can ask a non-leading question. So
24  if it's --
25      MS. MENNINGER: It's a broad question. That's my

| LCACmax7 | A. Farmer - redirect | Page 2224 |
|---|---|---|

1  complaint.
2      THE COURT: Overruled.
3  A. When he crawled into bed with me, he put his arms around me
4  and he pressed his body into mine and, you know, sort of -- he
5  had rubbing up against me with his arms around my front.
6  Q. You testified about your experiences with Epstein and
7  Maxwell, about them being sexualized experiences. Can you
8  explain in your own words what you mean by that?
9      MS. MENNINGER: Objection, your Honor.
10      THE COURT: Overruled.
11  A. I think this was all a pattern of them working on confusing
12  my boundaries, making me question myself about what was right
13  and what was not right and with the ultimate goal of sexually
14  abusing me.
15      MS. MENNINGER: Objection. 702, your Honor.
16      THE COURT: Overruled. Door opened. Overruled.
17  Q. Can you explain to the jury in your own words how you
18  experienced Maxwell touching your breasts during the massage in
19  New Mexico?
20      MS. MENNINGER: Objection. Misstates the witness's
21  testimony.
22      THE COURT: Just a moment. Overruled.
23  A. I was very uncomfortable and fearful and wanted to get off
24  of the table, that massage table, and wanted it to be over
25  with.

LC6Cmax1          Kate - direct                    Page 1169

1  DIRECT EXAMINATION
2  BY MS. POMERANTZ:
3  Q. Good morning. If you could pull up to the microphone so we
4  can hear you.
5  A. That's fine?
6  Q. Yes. Thank you. To be clear, are you testifying under the
7  name Kate today?
8  A. Yes.
9  Q. Is Kate your real name?
10 A. No.
11 Q. Leading up to this trial, did you ask to testify under a
12 pseudonym to protect your privacy?
13 A. I did.
14 Q. Kate, can you take a look, there should be a binder next to
15 you.
16      MS. POMERANTZ: Your Honor, at this time, I would
17 request that the jurors be permitted to take out their binders
18 and turn to Government Exhibit 16, which is in evidence under
19 seal.
20      THE COURT: It is in evidence already. Let me just
21 confirm.
22      MS. POMERANTZ: Thank you, your Honor.
23      THE COURT: Without objection, Ms. Sternheim?
24      MS. STERNHEIM: Without objection.
25      THE COURT: Members of the jury, you may pick up your

LC6Cmax1          Kate - direct                    Page 1170

1  binders, please, the large binders, and turn to GX16, which is
2  in evidence.
3  Q. Kate, you can pull the microphone closer to you. Thank
4  you.
5      Kate, can you please let me know when you're at
6  Government Exhibit 16?
7  A. Yes, I am.
8  Q. Do you recognize that?
9  A. Yes, I do.
10 Q. What is that?
11 A. It's my birth certificate.
12 Q. Is that the name that you were born with?
13 A. Yes.
14      MS. POMERANTZ: Your Honor, at this time, I would ask
15 just the witness, not the jurors, to turn to what has been
16 marked for identification as Government Exhibit 18.
17      THE COURT: Members of the jury, please don't -- why
18 don't you close your binders for the moment. Thank you.
19      The witness may turn, please, to GX18.
20      Again, members of the jury, please don't go there yet
21 until the document has been admitted.
22 BY MS. POMERANTZ:
23 Q. Kate, do you recognize that?
24 A. Yes.
25 Q. What is that?

LC6Cmax1          Kate - direct                    Page 1171

1  A. It's my driver's license.
2  Q. Is that your current legal name?
3  A. Yes.
4      MS. POMERANTZ: Your Honor, the government offers
5  Government Exhibit 18 under seal.
6      MS. STERNHEIM: No objection.
7      THE COURT: GX18 is admitted under seal consistent
8  with my ruling to protect this witness's anonymity.
9      (Government's Exhibit 18 received in evidence)
10      Ms. Pomerantz, do you wish to publish to the jury?
11      MS. POMERANTZ: Yes, your Honor, if we can now publish
12 to the jury, please.
13      THE COURT: Members of the jury, you may open your
14 binder and look at GX18, please.
15 BY MS. POMERANTZ:
16 Q. Kate, how far did you go in school?
17      THE COURT: I'll ask the members of the jury to put
18 their binders away, please.
19      MS. POMERANTZ: Thank you, your Honor.
20 Q. Kate, how far did you go in school?
21 A. I finished some high school.
22 Q. What kind of work do you do now?
23 A. I work with mainly women who suffer with trauma and
24 substance use disorder.
25 Q. What kind of work did you do before that?

LC6Cmax1          Kate - direct                    Page 1172

1  A. I was a working musician, singer, and songwriter.
2  Q. When you were approximately 17 years old, where were you
3  living?
4  A. I was living in England, London.
5  Q. What neighborhood in London did you live?
6  A. Belgravia.
7  Q. Who did you live with at the time?
8  A. My mother.
9  Q. What was your life like at home with your mother at that
10 time?
11 A. Well, my mother was having a difficult time and she had
12 been quite ill. So it was a bit stressful and I was alone
13 quite a lot.
14 Q. Did there come a time when you met Ghislaine Maxwell?
15 A. Yes.
16 Q. How did you meet Maxwell?
17 A. I had been dating a man and we took a trip to Paris, and he
18 introduced me to Ghislaine Maxwell in Paris.
19 Q. Approximately how old were you at the time you met Maxwell
20 in Paris?
21 A. Approximately 17.
22 Q. And approximately what year were you 17 years old?
23 A. God, I can't do the math. So that was '94.
24 Q. Is that 1994?
25 A. Yes.

UNITED STATES OF AMERICA, v.
GHISLAINE MAXWELL,

SEALED
December 6, 2021

LC6Cmax1          Kate - direct          Page 1173

1  Q. And you mentioned that you met her through a friend. About
2  how old was the friend?
3  A. He was about 35.
4  Q. And what was the nature of your relationship with the
5  friend?
6  A. We were dating.
7  Q. Did you speak with Maxwell the night you met her?
8  A. Yes.
9  Q. What, if anything, did you and Maxwell speak about?
10  A. We spoke about -- we spoke about the evening and where we
11  were, you know, we were headed to -- out for the evening. And
12  we spoke about where I lived, we spoke about the man that I was
13  dating. She was asking me things about myself.
14  Q. What did Maxwell look like when you met her?
15  A. She was very sophisticated and very elegant. And she had
16  short -- quite short dark brown hair. She just -- she was very
17  impressive.
18  Q. About how old did she seem?
19  A. In her 30s.
20       MS. POMERANTZ: Ms. Drescher, can we please pull up
21  what's in evidence as Government Exhibit 115.
22  Q. Do you recognize the person in this photograph?
23  A. Yes.
24  Q. Who is it?
25  A. It's Ghislaine Maxwell.

LC6Cmax1          Kate - direct          Page 1174

1       MS. POMERANTZ: We can take that down, Ms. Drescher.
2  Your Honor, at this time, I'd like to ask the witness
3  to look at what's been marked for identification as Government
4  Exhibit 109 in her binder.
5       THE COURT: Okay. The witness may look at GX109,
6  please.
7  Q. Kate, are you at Government Exhibit 109?
8  A. Yes.
9  Q. Do you recognize this?
10  A. Yes.
11  Q. What is it?
12  A. It's a picture of me.
13  Q. Is this a fair and accurate depiction of your physical
14  appearance around the time you met Maxwell?
15  A. Yes.
16       MS. POMERANTZ: Your Honor, the government offers
17  Government Exhibit 109 under seal.
18       MS. STERNHEIM: No objection.
19       THE COURT: Thank you. GX109 is admitted under seal
20  consistent with my ruling regarding pseudonyms.
21       (Government's Exhibit 109 received in evidence)
22       MS. POMERANTZ: I request the jurors be permitted to
23  open their binders and turn to Government Exhibit 109, your
24  Honor.
25       THE COURT: Jurors, you may look at your binders

LC6Cmax1          Kate - direct          Page 1175

1  please and look at GX109.
2       BY MS. POMERANTZ:
3  Q. About how old were you at the time this photograph was
4  taken?
5  A. About 17.
6  Q. And where was this photograph taken?
7  A. It was in the backyard of our home where I lived with my
8  mother.
9       MS. POMERANTZ: Your Honor, I believe that the jurors
10  can put the binder down now.
11       THE COURT: Jurors, you may return your binders to the
12  floor, please. Thank you.
13  Q. When you and Maxwell were in Paris, did you and Maxwell
14  stay in touch?
15  A. Yes.
16  Q. How did you stay in touch?
17  A. Well, I gave her my phone number on a piece of paper and
18  she called me.
19  Q. Where did you give her your phone number?
20  A. In Paris.
21  Q. When was the next time you saw Maxwell?
22  A. A few weeks later.
23  Q. How did that meeting come about?
24  A. She called me and invited me to go to tea at her house.
25  Q. Did you go to Maxwell's house for tea?

LC6Cmax1          Kate - direct          Page 1176

1  A. Yes.
2  Q. Why did you go to Maxwell's house for tea?
3  A. Well, I was quite excited to be friends with her and she
4  was friends with the man that I had been dating and she seemed
5  very exciting and she seemed to be everything that I wanted to
6  be. And she seemed to -- she seemed to like me, so I was
7  excited to go.
8  Q. Can you please describe for the jury Maxwell's house.
9  A. Yes. Her house was like a townhouse with a white front and
10  a red door.
11       You want me to describe the inside?
12  Q. Why don't we pause there.
13       MS. POMERANTZ: Ms. Drescher, would you pull up for
14  just the witness, the parties, and the Court what has been
15  marked for identification as Government Exhibit 702.
16  Q. Kate, do you recognize this?
17  A. Yes.
18  Q. What is it?
19  A. It's Ghislaine Maxwell's house.
20  Q. Is this a fair and accurate depiction of the outside of
21  Maxwell's house?
22  A. Yes.
23       MS. POMERANTZ: Your Honor, the government offers
24  Government Exhibit 702.
25       MS. STERNHEIM: No objection.

UNITED STATES OF AMERICA, v.
GHISLAINE MAXWELL,

**SEALED**
December 6, 2021

LC6Cmax1          Kate - direct          Page 1177

1    THE COURT: Thank you. GX702 is admitted. You may
2  publish.
3    (Government's Exhibit 702 received in evidence)
4    MS. POMERANTZ: Thank you, your Honor.
5  Q. Kate, in what neighborhood was this townhouse?
6  A. In the same neighborhood I lived in, in Belgravia.
7    MS. POMERANTZ: Ms. Drescher, we can pull that down.
8  Thank you.
9  Q. What, if any, photographs did you see inside Maxwell's
10  house?
11  A. There were -- there were lots of photographs and many of
12  them were of Ghislaine Maxwell with an older man with slightly
13  peppered hair, graying hair. And in lots of the photographs,
14  he was looking at the camera and she was looking at him.
15  Q. Did there come a time when you learned who the man in the
16  photographs was?
17  A. Yes.
18  Q. And who was the man in the photographs?
19  A. Jeffrey Epstein.
20  Q. Can you describe the rest of the townhouse for the jury,
21  please.
22  A. Yes. When I walked in, it was carpeted in pale carpet. It
23  was very nicely decorated, the constable and nice beautiful
24  chairs. There was a lot of silver-framed pictures that were
25  out. And in that visit, I was just in the living room, which

LC6Cmax1          Kate - direct          Page 1178

1  is the first room which I was in, and there was a staircase
2  going up.
3  Q. So focusing on the first time that you went to Maxwell's
4  townhouse, can you describe for the jury what happened when you
5  went to her townhouse.
6  A. Yes. I had a really lovely time and I felt really special.
7  And I felt -- I felt that I had found a new connection that
8  could be really meaningful to me. I had just moved back from
9  France to England and left the school that I was -- that I was
10  at and all my friends. And I was really happy that we had
11  connected and that she seemed as excited as I was to have a new
12  friend. And it was just -- I left that feeling exhilarated,
13  like somebody wanted me, like somebody wanted to be my friend.
14  Q. What, if any, conversations do you remember having with
15  Maxwell about your family?
16  A. I told her that things were quite difficult at my house and
17  that I lived alone with my mother and that she had been unwell
18  and struggling and that she would get very bad migraines, and I
19  would often try and take care of her and give her massages and
20  bring her cups of tea.
21  Q. What, if any, conversations do you recall having with
22  Maxwell about what you wanted to do with your life?
23  A. Well, I had been offered a place at Oxford University to
24  study law, and she shared that she had been to that university.
25  And that I shared with her that I also was really interested in

LC6Cmax1          Kate - direct          Page 1179

1  music and I loved music and I was interested in pursuing that,
2  but I was worried to tell my parents because they really wanted
3  me to go to law school, as most parents would. And I was quite
4  athletic, although I was very thin, and I told her that I was
5  interested in martial arts, as well.
6  Q. What, if any, conversations do you remember having with
7  Maxwell during tea about her personal life and relationships?
8  A. She told me lots of amazing things about her boyfriend and
9  she said that he was a philanthropist and that he liked to help
10  young people, and that, at some point, it would be really
11  wonderful for me to get to meet him and that we shared so many
12  things in common and that -- yeah, just that it would be great
13  for me to get to meet him at some point.
14  Q. What, if anything, did Maxwell say about how Epstein would
15  respond to you?
16  A. Oh, she said that he was going to love me and that I was
17  exactly the kind of person he would like to help. She seemed
18  very genuinely excited about it, and I was excited, too.
19  Q. What was your reaction to the attention that Maxwell was
20  paying you?
21  A. I mean, I was 17 and I liked to have attention. And I
22  was -- I was lonely and I had not found a group of friends yet.
23  So I was really glad to have found somebody who was also older
24  than me who I felt could maybe guide me as she seemed to have a
25  lot of connections and opportunities to guide me and be very

LC6Cmax1          Kate - direct          Page 1180

1  willing to do so.
2  Q. Did there come a time when you met Epstein?
3  A. Yes.
4  Q. About how long after you had tea at Maxwell's townhouse did
5  you meet Jeffrey Epstein?
6  A. A few weeks later.
7  Q. Where did you meet Epstein?
8  A. At Ghislaine Maxwell's house.
9  Q. When you first met Epstein, approximately how old was he?
10  A. He seemed to be in his 40s.
11  Q. How did you come to meet Epstein at Maxwell's townhouse?
12  A. Ghislaine called me and she was -- called me to tell me
13  that he was in town and she would really love if I could come
14  over to meet him and that it was -- there was a sense of
15  urgency, that it was like very important that I take this
16  opportunity.
17  Q. What was Maxwell's demeanor like during that conversation
18  on the phone?
19  A. I would say she was very activated, very excited, and there
20  was a sense of urgency.
21  Q. Now focusing on the time when you met Epstein at Maxwell's
22  house, who was at the house when you arrived?
23  A. Ghislaine Maxwell and Jeffrey Epstein.
24  Q. When you arrived, what was Jeffrey Epstein wearing?
25  A. He was wearing sweatpants and a hoodie.

| LC6Cmax1 | Kate - direct | Page 1181 |
| --- | --- | --- |

1 Q. And what was Epstein doing when you arrived?
2 A. He was sitting in a chair and he was on the phone talking
3 quite loudly.
4 Q. Did Epstein stay on the phone the entire time you were at
5 Maxwell's townhouse?
6 A. No.
7 Q. Did there come a time when Epstein got off the phone?
8 A. Yes.
9 Q. What, if anything, did Maxwell say to Epstein about you
10 during that visit?
11 A. She said this is the girl that I told you about and she
12 listed some of my accolades and said, you know, about me going
13 to -- possibly going to Oxford, but that I was also a really
14 talented singer, that I was really athletic, and that I was
15 strangely strong for my size.
16 Q. You mentioned your size. What was your size at the time?
17 A. I was about 95 pounds.
18 Q. What happened next?
19 A. Next, after she said that I was very strong, she said why
20 don't you give his feet a little squeeze to show him how strong
21 you are.
22 Q. Did you give his feet a little squeeze?
23 A. Yes.
24 Q. When you say that you gave his feet a little squeeze, what
25 does that mean?

| LC6Cmax1 | Kate - direct | Page 1182 |
| --- | --- | --- |

1 A. I massaged them.
2 Q. And what happened next?
3 A. And then he seemed to be very approving and he said, oh,
4 you can go ahead and do my shoulders.
5 Q. Did you massage Epstein's shoulder?
6 A. Yes.
7 Q. What happened next?
8 A. He said that I was very strong and he said that he likes
9 that I was very -- seemed to be -- know what I wanted. And
10 they talked about something that I couldn't quite hear what
11 they were saying about like a music producer. And then his
12 phone rang again.
13 Q. After his phone rang, did you stay at Maxwell's house?
14 A. No.
15 Q. How did you end up leaving?
16 A. He didn't say anything. He just answered the phone and
17 started talking on the phone and then Ghislaine sort of ushered
18 me out.
19 Q. And did you leave Maxwell's house?
20 A. Yes.
21 Q. After you left Maxwell's house, did you hear from her
22 again?
23 A. Yes.
24 Q. Approximately how long after you met Epstein at Maxwell's
25 house did you hear from Maxwell?

| LC6Cmax1 | Kate - direct | Page 1183 |
| --- | --- | --- |

1 A. Few weeks, couple of weeks.
2 Q. How did you communicate with Maxwell?
3 A. She called me.
4 Q. What, if anything, did Maxwell say when she called you?
5 A. She said that the -- Jeffrey was going to get a massage,
6 but the massage therapist had canceled and could I please do
7 her a favor and help her by coming over because I had such
8 strong hands.
9 Q. Were you a massage therapist at the time?
10 A. No.
11 Q. Have you ever been a massage therapist?
12 A. No.
13 Q. Did you go to Maxwell's house?
14 A. Yes.
15 Q. Who was at Maxwell's house when you arrived?
16 A. Ghislaine and Jeffrey.
17 Q. What, if anything, did Maxwell say when you arrived at her
18 house?
19 A. She said thank you so much for coming and I'm really
20 excited that you're here.
21 Q. Did she comment about how often Epstein needed massages?
22     MS. STERNHEIM: Objection to leading.
23     THE COURT: Sustained.
24 Q. What, if anything, did Maxwell say about Epstein and his
25 need for massages?

| LC6Cmax1 | Kate - direct | Page 1184 |
| --- | --- | --- |

1     MS. STERNHEIM: Objection. Leading.
2     THE COURT: I'll allow it. You may answer.
3 A. Could you repeat the question, please.
4 Q. What, if anything, did Maxwell say about Epstein's need for
5 massages?
6 A. She said that he needed massages all the time and it was
7 very difficult to keep up.
8 Q. Where did you and Maxwell go after that conversation?
9 A. She led me up the stairs and opened the door to a room that
10 had a massage table in it.
11     (Continued on next page)

UNITED STATES OF AMERICA, v.                                    **SEALED**
GHISLAINE MAXWELL,                                              **December 6, 2021**

| LC6VMAX2 | Kate - direct | Page 1185 |
|---|---|---|

1    BY MS. POMERANTZ:
2    Q. Can you describe the room for the jury.
3    A. Yes. It was dimly lit. It was a small room. There was a
4    massage table, some towels, and Jeffrey was in the room.
5    Q. What was Epstein wearing?
6    A. He was wearing a robe.
7    Q. What, if anything, did he do with the robe?
8    A. He took off the robe.
9    Q. What, if anything, was Epstein wearing under the robe?
10   A. He was naked.
11   Q. Where was he when he removed the robe?
12   A. Standing facing the door.
13   Q. Where was Maxwell when Epstein removed the robe?
14   A. In the doorway facing him.
15   Q. What, if anything, did Maxwell give you?
16   A. She gave me some massage oil.
17   Q. Did you enter the room?
18   A. Yes.
19   Q. Did someone close the door?
20   A. Yes.
21   Q. Who closed the door?
22   A. Ghislaine Maxwell closed the door.
23   Q. After the door was closed, did you give Epstein a massage?
24   A. Yes.
25   Q. Without telling the jury the details, during the massage,

| LC6VMAX2 | Kate - direct | Page 1187 |
|---|---|---|

1    Q. Who invited you to her house?
2    A. Ghislaine.
3    Q. How did she invite you to her house?
4    A. She called me.
5    Q. When you arrived, what, if anything, did Maxwell say?
6    A. She said, I'm so glad you're here. You did such a good job
7    last time. He wanted you to come back.
8    Q. Where did you and Maxwell go?
9    A. We went upstairs to the same room.
10   Q. And when you went upstairs, was the door to the room open
11   or closed?
12   A. Closed.
13   Q. Who opened the door?
14   A. Ghislaine.
15   Q. Who, if anyone, did you see when Maxwell opened the door to
16   the room?
17   A. Jeffrey.
18   Q. What was Epstein wearing?
19   A. He was naked.
20   Q. Where was Epstein standing?
21   A. Next to the massage table facing the door.
22   Q. Where was Maxwell when you saw Epstein naked?
23   A. In the doorway facing him.
24   Q. What, if anything, did Maxwell say?
25   A. She said, Have a good time.

| LC6VMAX2 | Kate - direct | Page 1186 |
|---|---|---|

1    did Epstein initiate sexual contact with you?
2    A. Yes.
3    Q. Did Epstein engage in a sex act with you during the
4    massage?
5    A. Yes.
6    Q. I'd like to move forward to the end of the massage. After
7    it ended, where did you go?
8    A. I left the room and started walking down the stairs.
9    Q. And who, if anyone, did you see?
10   A. I saw Ghislaine Maxwell.
11   Q. What, if anything, did Maxwell say?
12   A. She said -- she said, How did it go? Did you have fun?
13   Was it good?
14   Q. Can you describe Maxwell's tone when she made those
15   statements.
16   A. She seemed very excited and happy. She thanked me again.
17   Q. Did you leave Maxwell's house?
18   A. Yes.
19   Q. Did there come a time when you saw Epstein again in London?
20   A. Yes.
21   Q. About how long after the massage you just testified about
22   did you see Epstein again?
23   A. A few days later.
24   Q. Where did you see Epstein again?
25   A. In Ghislaine Maxwell's house.

| LC6VMAX2 | Kate - direct | Page 1188 |
|---|---|---|

1    Q. Did Maxwell leave the room?
2    A. Yes.
3    Q. Was the door closed?
4    A. Yes.
5    Q. Who closed the door?
6    A. Ghislaine Maxwell.
7    Q. Did you give Epstein a massage in the room?
8    A. Yes.
9    Q. And without telling the jury the details, during the
10   massage, did Epstein initiate sexual contact with you?
11   A. Yes.
12   Q. Did Epstein engage in a sex act with you during the
13   massage?
14   A. Yes.
15   Q. I want to move forward to the end of the massage.
16         After it ended, where did you go?
17   A. I went downstairs again.
18   Q. And who, if anyone, did you see?
19   A. I saw Ghislaine Maxwell.
20   Q. What, if anything, did Maxwell say to you after the
21   massage?
22   A. She said, Did you have fun? You're such a good girl. And
23   I'm so happy you were able to come. This is really great. And
24   he obviously likes you a lot.
25   Q. Can you describe Maxwell's tone when she made those

UNITED STATES OF AMERICA, v.
GHISLAINE MAXWELL,
SEALED
December 6, 2021

LC6VMAX2        Kate - direct        Page 1189

1    statements.
2    A. She sounded really pleased. And I was really pleased that
3    she was pleased.
4    Q. Did you leave Maxwell's house?
5    A. Yes.
6    Q. Other than the three times that you saw Epstein at
7    Maxwell's townhouse in London, did you see anyone else at her
8    house?
9    A. Can you repeat it?
10   Q. Other than the three times you saw Epstein at Maxwell's
11   townhouse in London, did you see anyone else at her house?
12   A. Yes.
13   Q. Who did you see?
14   A. I saw a girl.
15   Q. What did the girl look like?
16   A. She was blond and slim and around my age.
17   Q. Approximately how old were you when you saw the girl?
18   A. Seventeen.
19   Q. And what did you see the girl doing at Maxwell's townhouse?
20   A. She was having tea with Ghislaine and telling -- telling
21   Ghislaine about the things that she was interested in.
22   Q. What, if anything, did Maxwell say to you about what she
23   thought Epstein would think of the girl?
24   A. Can you repeat it please.
25   Q. What, if anything, did Maxwell say to you about what she

LC6VMAX2        Kate - direct        Page 1190

1    thought Epstein would think of the girl?
2    A. She said, I think she would be a good fit for him.
3    Q. After Epstein engaged in sex acts with you during massages
4    in Maxwell's house in London, did you ever see Epstein and
5    Maxwell again?
6    A. Yes.
7    Q. Over the next few years, how frequently did you see them?
8    A. I saw them -- do you mean how many individual occasions or
9    how many -- can you be specific?
10   Q. Sure. Over the next few years, about how many times a year
11   did you see them?
12   A. How many times per year? It was sporadic. The first
13   couple of years, more; probably five times the first couple of
14   years.
15   Q. And on the times that you would see them, would you see
16   them just one time or would you see them multiple times?
17   A. Multiple times.
18   Q. Do you remember the exact details and dates of every single
19   time you saw Epstein and Maxwell?
20   A. No.
21   Q. Do some details and events stand out more in your mind than
22   others?
23   A. Yes.
24   Q. I want to talk to you about the time period from when you
25   were 17 years old to your early twenties.

LC6VMAX2        Kate - direct        Page 1191

1    Were you in contact with Maxwell during that time
2    period?
3    A. Yes.
4    Q. How did you typically communicate with Maxwell during that
5    period?
6    A. By phone.
7    Q. When you spoke with Maxwell on the phone, what topics did
8    Maxwell talk to you about?
9    A. She asked me what I was up to, if things were going well,
10   if I was dating anybody, if I wanted to visit, and if anything
11   exciting was happening.
12   Q. When you spoke with Maxwell on the phone, what, if
13   anything, did Maxwell ask you to do for Epstein?
14   A. She asked me to come and visit them.
15   Q. What, if any, sexual topics did Maxwell bring up on the
16   phone?
17   A. She didn't bring up sexual topics on the phone.
18   Q. When you saw Maxwell in person, did there come a time when
19   she brought sexual topics up with you?
20   A. Yes.
21   Q. What, if any, sexual topics did Maxwell bring up?
22   A. She would talk a lot about the nature of -- she would say
23   boys, and boys and their willies, which was a euphemism for
24   penis. How demanding Jeffrey was. And she would ask me if I
25   knew anybody who could come and give Jeffrey a blow job because

LC6VMAX2        Kate - direct        Page 1192

1    it was -- it was a lot for her to do.
2    Q. What, if anything, did Maxwell tell you about the girls for
3    Epstein?
4         MS. STERNHEIM: Objection. Leading.
5         THE COURT: Just a moment.
6         I'll allow it. You may answer.
7         THE WITNESS: Thank you.
8    A. She said, You know what he likes, cute, young, pretty, like
9    you.
10   Q. About how long after you met Maxwell do you remember having
11   conversations about those topics?
12   A. Within a few weeks.
13   Q. Approximately how many times did that -- did those sexual
14   topics come up?
15   A. All the time.
16   Q. Did you tell Maxwell about any other girls for Epstein?
17   A. No.
18   Q. Did you connect Maxwell with any girls for Epstein?
19   A. No.
20   Q. What, if anything, did Maxwell say about how often Epstein
21   needed to have sex?
22   A. She said that he needed to have sex about three times a
23   day.
24   Q. Approximately when did she make those statements?
25   A. In the first couple of months.

LC6VMAX2          Kate - direct          Page 1193

1 Q. What was Maxwell's demeanor like when she would talk to you
2   about sexual topics?
3 A. Her demeanor was very -- I would say that it was almost
4   like a schoolgirl. And I almost felt like she was younger --
5   like, talking like she was younger than me, like -- which was
6   odd. And everything was fun and everything was silly and
7   everything was just very exciting. And just everything seemed
8   to be like a fun, silly joke.
9 Q. Within the first few months of meeting Maxwell, what, if
10   anything, did Maxwell ask you about your sex life?
11 A. She asked me if I liked sex. She asked me, you know, if I
12   was dating somebody or --
13 Q. You testified earlier that when you went to tea at
14   Maxwell's house in London, you told her about your family. Did
15   you continue to tell Maxwell about your family?
16 A. Yes.
17 Q. What, if anything, did you tell her about your family?
18 A. I just continued to tell her that, you know, my mother was
19   struggling, and that it was difficult; and that I was -- I was
20   alone a lot.
21 Q. When you first met Maxwell and Epstein, what was your
22   understanding of their relationship?
23 A. I understood that Jeffrey was her boyfriend.
24 Q. In the first few years you knew Maxwell, what did you
25   understand to be Maxwell's job?

LC6VMAX2          Kate - direct          Page 1194

1 A. I understood that her job was to take care of Jeffrey's
2   needs.
3 Q. What, if any, involvement did Maxwell have in managing
4   properties?
5 A. She seemed to be pretty involved in managing properties and
6   making sure that everything was the way that Jeffrey liked it
7   to be. And there seemed to be a lot of rules around that.
8 Q. Did Maxwell ever tell you what, if any, properties she
9   owned?
10 A. Yes.
11 Q. What did she tell you?
12 A. She told me that she owned her house in London; and that at
13   a later time she told me that she owned her house in New York
14   City, and that Jeffrey had got it for her.
15 Q. Did you ever have any conversations with Maxwell about her
16   social circle?
17 A. Yes.
18 Q. What do you recall her telling you about her social circle?
19 A. Well, she seemed to know everybody. And she told me that
20   she was friends with Prince Andrew, friends with Donald Trump,
21   friends with lots of famous people. And sometimes their names
22   would just come up in conversations or she might be talking on
23   the phone about them with me present.
24 Q. I want to switch gears just for a moment.
25     You mentioned Oxford earlier. Did you end up going to

LC6VMAX2          Kate - direct          Page 1195

1   Oxford?
2 A. No.
3 Q. During your late teens and early twenties, what did you do
4   for a living?
5 A. In my late teens and early twenties I -- I became a
6   musician and a model.
7 Q. You testified earlier that Epstein initiated sexual
8   activity with you when you were 17 years old. Approximately
9   when did he stop initiating sexual activity with you?
10 A. Approximately in my early thirties.
11 Q. When you spent time with Epstein in that time period, about
12   how often did he initiate sexual activity with you?
13 A. Sorry. Can you repeat that?
14 Q. When you spent time with Epstein, how often did he initiate
15   sexual activity with you?
16 A. Every time.
17 Q. When Epstein initiated sexual activity with you, was that
18   always in the context of massage?
19 A. No.
20 Q. When you spent time with Epstein, did you provide him with
21   sexualized massages?
22 A. Yes.
23 Q. In what locations did these sexualized massages with
24   Epstein take place?
25 A. In London, in Palm Beach, and on his island.

LC6VMAX2          Kate - direct          Page 1196

1 Q. We'll talk about those places in a bit.
2   Apart from the first massage in London where you
3   rubbed Epstein's feet and shoulders, were there ever any
4   massages you provided Epstein in which nothing sexual happened?
5 A. No.
6 Q. Was anyone in the room with you and Epstein while you were
7   giving him the massages?
8 A. No.
9 Q. You mentioned that after the first two massages you gave
10   Epstein when you were 17, you saw Maxwell right after. Did
11   anything like that happen with any other sexualized massages
12   you gave Epstein?
13 A. Yes.
14 Q. What do you remember about those interactions?
15 A. Mostly she would ask me if -- if it went well, if I had
16   fun.
17 Q. What, if any, gifts did you receive from Maxwell?
18 A. I received a small black Prada handbag.
19 Q. Where did you receive that gift?
20 A. In London.
21 Q. And how did you know that was a gift from Maxwell?
22 A. There was a note that said "from Ghislaine and Jeffrey."
23 Q. And what was that a gift for?
24 A. For my birthday.
25 Q. What birthday?

| LC6VMAX2 | Kate - direct | Page 1197 |
|---|---|---|

1  A. I believe my 18th.
2  Q. Did you receive this gift before or after the two times
3  Epstein engaged in sex acts with you during massages at
4  Maxwell's house?
5  A. After.
6  Q. What, if any, conversations do you remember having with
7  Maxwell about travel?
8  A. I remember that she was always very accommodating and told
9  me that whenever I wanted to come and visit, that she would
10 take care of everything; that they would take care of
11 everything.
12 Q. Did those conversations about travel happen before or after
13 she gave you the handbag?
14 A. Before.
15 Q. Did there come a time when you traveled to meet Epstein and
16 Maxwell?
17 A. Yes.
18 Q. Approximately how many times did you travel to meet them?
19 A. To meet both of them?
20 Q. Yes.
21 A. Four or five times.
22 Q. Do you remember approximately how old you were when you
23 first traveled to meet Maxwell and Epstein?
24 A. Approximately 18.
25 Q. And do you remember approximately how old you were when you

| LC6VMAX2 | Kate - direct | Page 1198 |
|---|---|---|

1  last traveled to meet both Maxwell and Epstein?
2  A. Approximately 24.
3  Q. During that time period, where did you travel to meet
4  Maxwell and Epstein?
5  A. I traveled to Palm Beach, to New York, and to the island.
6  Q. When you traveled to meet Maxwell and Epstein, how did you
7  travel?
8  A. I traveled on commercial planes.
9  Q. Who booked your travel?
10 A. I'm not always sure who booked it, but usually Ghislaine
11 informed me about it. Sometimes one of the assistants would
12 book it, maybe Lesley Groff.
13 Q. Generally speaking, where did you stay when you visited
14 Epstein and Maxwell?
15 A. I generally stayed with them.
16 Q. And when you say you stayed with them, where did you stay?
17 A. At their house.
18 Q. Who owned the properties?
19 A. Jeffrey, I think.
20 Q. How did Maxwell talk about the properties that Epstein
21 owned?
22 A. She talked -- she talked about them as -- as their homes.
23 Q. Who worked at Epstein's homes?
24 A. I would see staff sometimes, but I didn't know their names
25 and I didn't have much interaction with them.

| LC6VMAX2 | Kate - direct | Page 1199 |
|---|---|---|

1  Q. What, if anything, did you observe about Maxwell and her
2  interactions with the staff?
3  A. I noticed that she was the one who mainly communicated with
4  the staff. She seemed to be telling them -- giving them a lot
5  of direction around doing things the way that Jeffrey wanted
6  them done, detailed instructions around food and -- and just
7  quite aggressive communication with them.
8  Q. You testified earlier about travel to Palm Beach. I want
9  to talk about that for a minute.
10 Who did you travel to see in Palm Beach?
11 A. Ghislaine and Jeffrey.
12 Q. How many times did you visit Maxwell and Epstein in Palm
13 Beach?
14 A. One time.
15 Q. Do you remember exactly when you went to Palm Beach?
16 A. No.
17 Q. Approximately how old were you when you went to Palm Beach?
18 A. Approximately 18.
19 Q. Is it possible that you were older when you went to Palm
20 Beach?
21 A. Possible.
22 Q. Where did you stay when you visited Epstein and Maxwell in
23 Palm Beach?
24 A. I stayed in the house with them.
25 Q. Can you describe for the jury the Palm Beach house.

| LC6VMAX2 | Kate - direct | Page 1200 |
|---|---|---|

1  A. Yes. The house had a beautiful swimming pool. And there
2  were doors that opened up from the house onto the swimming
3  pool. And Jeffrey had a desk that would face out onto outside
4  so he could see out. And there was a kitchen downstairs, a
5  small dining area, and there were bedrooms upstairs.
6  Q. What, if any, photographs did you see in Epstein's house in
7  Palm Beach?
8  A. There were lots of photographs of young girls.
9  Q. What do you remember about those photographs?
10 A. I remember that they were shocking.
11 Q. Were the young girls clothed or unclothed in the
12 photographs?
13 A. Unclothed.
14 Q. Where did you see those photographs in Epstein's house in
15 Palm Beach?
16 A. They were in almost every room.
17 Q. Did there come a time that you were given clothing to wear
18 when you were staying at Epstein's Palm Beach house?
19 A. Yes.
20 Q. What were you given to wear?
21 A. I was given a schoolgirl outfit.
22 Q. Can you please describe the schoolgirl outfit for the jury.
23 A. It was a short -- a short pleated skirt, white socks, white
24 panties, and a shirt.
25 Q. Where did you find the schoolgirl outfit?

UNITED STATES OF AMERICA, v.
GHISLAINE MAXWELL,

SEALED
December 6, 2021

LC6VMAX2          Kate - direct          Page 1201

1  A. On my bed.
2  Q. What did you do after finding the schoolgirl outfit?
3  A. I went downstairs to find Ghislaine.
4  Q. What, if anything, did Ghislaine say?
5  A. I asked her what -- what was happening with the -- there
6  were clothes in my room. And she said, I thought it would be
7  fun for you to take Jeffrey his tea in this outfit.
8  Q. Did you put on the schoolgirl outfit?
9  A. Yes.
10 Q. Why did you put on the schoolgirl outfit?
11 A. I didn't know -- I didn't know how to say no to that. I
12 was -- I didn't know anybody in Florida. I'd never been to
13 Palm Beach or Florida before. I had no idea even where the
14 house was or how -- and I wasn't sure if I said no, if -- if I
15 would have to leave or what kind of consequence there might be
16 for not doing it.
17 Q. What did you do after you put on the schoolgirl outfit?
18 A. Ghislaine gave me a tray and told me to go and walk to
19 where Jeffrey was and bring -- bring him the tray.
20 Q. Did you go and find Epstein?
21 A. Yes.
22 Q. Where did you find him?
23 A. He was next to the pool house and he was working out.
24 Q. Was Epstein alone?
25 A. No.

LC6VMAX2          Kate - direct          Page 1202

1  Q. Who was he with?
2  A. He was with -- there was some kind of trainer with him.
3  Q. Did the trainer stay with him?
4  A. No.
5  Q. After the trainer left, without getting into the details,
6  did Epstein initiate sexual contact with you?
7  A. Yes.
8  Q. Did Epstein engage in a sex act with you?
9  A. Yes.
10 Q. What if later --
11        MS. POMERANTZ: Withdrawn, your Honor.
12 Q. What, if anything, did Maxwell say to you later that day?
13 A. She asked me if I had fun, and told me that I was such a
14 good girl, and that I was one of his favorites. And that's it.
15 Q. Did Epstein engage in sexual activity with you again during
16 that trip?
17 A. Yes.
18 Q. One time or multiple times?
19 A. Multiple times.
20 Q. You testified earlier that you went to the island. What is
21 the island?
22 A. The island was an island that Jeffrey owned.
23 Q. What was the name of the island?
24 A. Well, he called it Little St. Jeff.
25 Q. When you went to the island, who invited you there?

LC6VMAX2          Kate - direct          Page 1203

1  A. Ghislaine.
2  Q. Approximately when did you go to the island?
3  A. When I was approximately 23 or 24.
4  Q. When Maxwell invited you to the island, what, if anything,
5  did she ask you to do?
6  A. She asked me to massage Jeffrey.
7  Q. Did sexualized massages with Epstein take place on the
8  island?
9  A. Yes.
10 Q. Do you recall seeing anyone other than Epstein and Maxwell
11 when you visited the island?
12 A. Yes.
13 Q. Who do you remember seeing?
14 A. I remember seeing a blond, slim girl who seemed far younger
15 than me, very young.
16        MS. POMERANTZ: Your Honor, may I have just a moment?
17        THE COURT: You may.
18        MS. POMERANTZ: Thank you.
19        (Counsel conferred)
20 Q. Kate, at the beginning, why did you start spending time
21 with Maxwell and Epstein?
22 A. At the beginning, it was a combination. In the beginning,
23 I wanted to maintain a relationship with Ghislaine. And I
24 thought that they were going to be -- I thought she was going
25 to be my friend.

LC6VMAX2          Kate - direct          Page 1204

1  Q. Did that change over time?
2  A. Yes.
3  Q. Through your twenties and early thirties, did you continue
4  to communicate with Epstein?
5  A. Yes.
6  Q. Without using any words from the communications, what was
7  the tone of your communications with Epstein generally?
8  A. My tone was friendly.
9        MS. STERNHEIM: I'm sorry, I couldn't hear.
10       THE COURT: Friendly.
11       THE WITNESS: Friendly.
12 Q. Why did you keep communicating with Epstein through your
13 twenties and early thirties?
14 A. I was -- I did not want to admit what had happened to me.
15 And I felt that by ceasing communication, I would have to
16 acknowledge the events that had taken place and I would have to
17 say something. I was also fearful of disengaging because I had
18 witnessed how connected they both were and I was fearful.
19 Q. Did there come a time when you stopped communicating with
20 Epstein?
21 A. Yes.
22 Q. Approximately when?
23 A. In my early thirties.
24 Q. And approximately when did you stop spending time with
25 Epstein?

UNITED STATES OF AMERICA, v.                                      **SEALED**
GHISLAINE MAXWELL,                                          December 6, 2021

| LC6VMAX2          Kate - direct          Page 1205 |
|---|

1  A. Also in my thirties.
2  Q. Approximately when did you stop spending time with Maxwell?
3  A. My late twenties -- sorry, spending time or communicating?
4  Q. Spending time.
5  A. Oh, around 24.
6  Q. I want to switch gears.
7       When you were a teenager and in your twenties, were
8  you addicted to any substances?
9  A. Yes.
10  Q. What were you addicted to?
11  A. I was addicted to alcohol, cocaine, and sleeping pills.
12  Q. How often did you use cocaine, alcohol, and sleeping pills?
13  A. Sporadically, but mostly weekly.
14  Q. When was the last time you used those substances that you
15  just mentioned?
16  A. May 1st, 2003.
17  Q. Why did you stop using those substances then?
18  A. When I first started using substances, they helped me to
19  cope with the way that I was feeling. And then the substance
20  use got out of control and started to destroy my relationships
21  and my health and my peace of mind. And I felt that I was
22  going to die if I continued.
23  Q. Has your prior drug and alcohol use affected the memories
24  you have?
25  A. No.

| LC6VMAX2          Kate - direct          Page 1206 |
|---|

1  Q. Can you explain?
2  A. The memories I have of significant events in my life have
3  never changed. My memory -- there are things that I have
4  missed that happened that sometimes I later recall. The
5  memories I have are the memories I have.
6  Q. Directing your attention to August 2019, did there come a
7  time when you were interviewed by the government?
8  A. Yes.
9  Q. Was FBI present for the interview?
10  A. Yes.
11  Q. Before that day, had you ever talked to law enforcement
12  about your experiences with Maxwell and Epstein?
13  A. No.
14  Q. That same day did you speak publicly about some of the
15  experiences that you testified about here today?
16  A. Did I speak publicly? Yes.
17  Q. And when you did that, did you talk about all of the
18  details that you shared with the government?
19  A. No.
20  Q. Why not?
21  A. I have a huge amount of humiliation and shame and -- around
22  the events that took place. I was not ready to share that in
23  detail on a public level.
24  Q. If you have spoken publicly before, why did you ask to
25  testify under a pseudonym here today?

| LC6VMAX2          Kate - direct          Page 1207 |
|---|

1  A. I asked to testify under a pseudonym because I have a
2  child. And I do not wish for her to be associated with or
3  exposed to any negative connotation that this might bring.
4  Q. You testified earlier that you first spoke with the
5  government in August 2019. About how many meetings have you
6  had with the government since that time?
7  A. About ten meetings.
8  Q. What is your immigration status?
9  A. I am in status in this country on an O-1 visa.
10  Q. And what is that?
11  A. It's a visa of extraordinary ability.
12  Q. What does that mean?
13  A. It can be extraordinary ability in many different areas.
14  Initially, I was a singer/songwriter, but it extends to any
15  artist.
16  Q. Did there come a time when you asked the government to
17  sponsor you for a visa?
18  A. Yes.
19  Q. At the time you made the request, approximately how many
20  meetings had you had with the government?
21  A. Approximately seven.
22  Q. Approximately how long had you been meeting with the
23  government at the time you raised your immigration status?
24  A. About a year and a half.
25  Q. Has the government made any promises to you about your

| LC6VMAX2          Kate - direct          Page 1208 |
|---|

1  immigration visa?
2  A. No.
3  Q. I'm going to switch gears.
4       Have you participated in a compensation fund called
5  the Epstein's Victims' Compensation Program?
6  A. Yes.
7  Q. What did you do as part of that fund?
8  A. I had an interview with a forensic psychologist and I
9  submitted a claim form.
10  Q. How much money did the fund pay you?
11  A. $3.25 million.
12  Q. Did that money come from the Estate of Jeffrey Epstein?
13  A. Yes.
14  Q. Has that money been wired to you already?
15  A. Not that total amount.
16  Q. But a portion of that has been?
17  A. Yes.
18  Q. As part of receiving that money, did you have to sign a
19  waiver agreeing not to sue any of Epstein's employees?
20  A. Yes.
21  Q. You mentioned that you didn't -- you weren't wired the
22  total amount. What happened to the rest of it?
23  A. The rest went to my attorneys.
24  Q. Have you ever sued Maxwell?
25  A. No.

UNITED STATES OF AMERICA, v.                                                SEALED
GHISLAINE MAXWELL,                                                      December 6, 2021

| LC6VMAX2 | Kate - direct | Page 1209 |
| --- | --- | --- |

1  Q. Do you plan to sue Maxwell?
2  A. No.
3  Q. Are you hoping or expecting to get any more money for what
4  happened to you with Epstein and Maxwell?
5  A. No.
6  Q. Based on your understanding, will the jury's verdict in
7  this case affect the award that you received from the fund?
8  A. No.
9  Q. Just to be clear, do you have any financial stake in the
10  outcome of this trial?
11  A. I do not.
12       MS. POMERANTZ: Your Honor, may I have just one
13  moment?
14       THE COURT: You may.
15       (Counsel conferred)
16       MS. POMERANTZ: No further questions, your Honor.
17       THE COURT: All right. Thank you.
18       We'll take our morning break.
19       Members of the jury, we'll break for about 10 to 15
20  minutes. See you soon. Thank you.
21       (Jury not present)
22       THE COURT: The witness may step down and out for the
23  break. Thank you.
24       Everyone may be seated.
25       (Witness not present)

| LC6VMAX2 | Kate - direct | Page 1210 |
| --- | --- | --- |

1       THE COURT: Counsel, are there matters to take up?
2       MS. STERNHEIM: Yes.
3       THE COURT: Okay. Just a moment.
4       Ms. Sternheim.
5       MS. STERNHEIM: Judge, in light of this witness's
6  anonymity status, I think it's appropriate to do it at a
7  sidebar. If the Court feels otherwise, then we can come into
8  open court.
9       THE COURT: Okay.
10       (Pages 1211 to 1231 SEALED)
11       (Continued on next page)
12
13
14
15
16
17
18
19
20
21
22
23
24
25

| LC6VMAX2 | Kate - direct | Page 1211 |
| --- | --- | --- |

1       (At sidebar)



| LC6VMAX2 | Kate - direct | Page 1212 |
| --- | --- | --- |

UNITED STATES OF AMERICA, v.
GHISLAINE MAXWELL,

| LC6VMAX2 | Kate - direct | Page 1213 |
|---|---|---|

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

| LC6VMAX2 | Kate - direct | Page 1215 |
|---|---|---|

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

| LC6VMAX2 | Kate - direct | Page 1214 |
|---|---|---|

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

| LC6VMAX2 | Kate - direct | Page 1216 |
|---|---|---|

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

UNITED STATES OF AMERICA, v.
GHISLAINE MAXWELL,

| LC6VMAX2 | Kate - direct | Page 1217 |
|---|---|---|

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

| LC6VMAX2 | Kate - direct | Page 1219 |
|---|---|---|

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

| LC6VMAX2 | Kate - direct | Page 1218 |
|---|---|---|

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

| LC6VMAX2 | Kate - direct | Page 1220 |
|---|---|---|

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

UNITED STATES OF AMERICA, v.
GHISLAINE MAXWELL,

SEALED
December 6, 2021

| LC6VMAX2 | Kate - direct | Page 1221 |
|---|---|---|

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

| LC6VMAX2 | Kate - direct | Page 1223 |
|---|---|---|

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

| LC6VMAX2 | Kate - direct | Page 1222 |
|---|---|---|

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

| LC6VMAX2 | Kate - direct | Page 1224 |
|---|---|---|

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

| LC6VMAX2 | Kate - direct | Page 1225 |
|---|---|---|

| LC6VMAX2 | Kate - direct | Page 1227 |
|---|---|---|

| LC6VMAX2 | Kate - direct | Page 1226 |
|---|---|---|

| LC6VMAX2 | Kate - direct | Page 1228 |
|---|---|---|

LC6VMAX2      Kate - direct      Page 1229

LC6VMAX2      Kate - direct      Page 1230

LC6VMAX2      Kate - direct      Page 1231

LC6Cmax3      Page 1232

UNITED STATES OF AMERICA, v.
GHISLAINE MAXWELL,

| LC6Cmax3 | Page 1233 |
|---|---|

```
 1
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

| LC6Cmax3 | Kate - cross | Page 1235 |
|---|---|---|

1  A. Yes.
2  Q. Your mother and your stepfather, and in turn, you and your
3    brother lived a comfortable life at some point, didn't you?
4  A. Yes.
5  Q. You lived in the Belgravia section of London. That's a
6    very tony area of London, isn't it?
7  A. Yes.
8  Q. And you lived quite close to Kinnerton Street, which is
9    where Ghislaine lived; correct?
10 A. Yes.
11 Q. In fact, Ghislaine lived on the street that also is the
12    street of the Nags Head Pub; correct?
13 A. Yes.
14 Q. And that pub is a rather famous pub in London, isn't it?
15 A. I don't know.
16 Q. But it was right across the street, nonetheless, from
17    Ghislaine's home at 44 Kinnerton, wasn't it?
18 A. Yes.
19 Q. Now, going back to your mother for a moment, you would
20    watch and see the attention that your mother got because of her
21    beauty, didn't you?
22 A. I thought she was beautiful.
23 Q. And didn't you say that you wanted to garner that same kind
24    of attention because you liked the way people looked at her?
25        MS. POMERANTZ: Objection, your Honor.

| LC6Cmax3 | Kate - cross | Page 1234 |
|---|---|---|

1      (Jury present)
2        THE COURT: Thank you so much, members of the jury.
3  Sorry for the slightly -- we took the extended break that
4  allowed me to work through some things with the lawyers to
5  facilitate overall the efficiency of the process. So thank you
6  for your patience.
7        Ms. Sternheim, you may begin your cross examination of
8  the witness testifying under the name of Kate.
9        Kate, I remind you, you are under oath.
10       Go ahead, Ms. Sternheim.
11       MS. STERNHEIM: Thank you.
12 CROSS-EXAMINATION
13 BY MS. STERNHEIM:
14 Q. Good morning, Kate. I have some questions to ask you.
15      During your direct examination, you had stated that
16 Ghislaine was everything you wanted to be; correct?
17 A. She appeared to be.
18 Q. Now, you had a very beautiful mother, didn't you?
19 A. Yes.
20 Q. She was a debutante; correct?
21 A. I'm not sure.
22 Q. She was married to a wealthy -- well, your stepfather is a
23 wealthy man; correct?
24 A. He was.
25 Q. He had his own plane; correct?

| LC6Cmax3 | Kate - cross | Page 1236 |
|---|---|---|

1        THE COURT: Overruled. You may answer.
2  A. To clarify, didn't I say when?
3  Q. Well, you've spoken to a number of tabloids and magazines
4    throughout the year, haven't you?
5  A. Yes.
6  Q. You have been featured in a number of magazines and news
7    articles, haven't you?
8  A. Yes.
9  Q. You have spoken about your life on a number of occasions,
10   haven't you?
11 A. Yes.
12 Q. And your picture has been in a number of magazines, as
13   well; correct?
14 A. Yes.
15 Q. During the period of time that you testified meeting
16   Ghislaine and Epstein, you were an international model?
17 A. I was a model.
18 Q. You met Ghislaine in Paris when you had traveled there with
19   the older prominent gentleman with whom you had been dating at
20   the time; correct?
21 A. Yes.
22 Q. And you learned that that individual was an Oxford
23   classmate of Ghislaine; correct?
24 A. Yes.
25 Q. Now, through the relationship that you had with that older

# EXHIBIT 103

**In The Matter Of:**

*UNITED STATES OF AMERICA, v.*
*GHISLAINE MAXWELL,*

---

*December 10, 2021*

---

*Southern District Court Reporters*

Original File LCAVMAXF - PUBLIC VERSION.txt
Min-U-Script® with Word Index

UNITED STATES OF AMERICA, v.
GHISLAINE MAXWELL,

December 10, 2021

LCAVMAX6          A. Farmer - cross          Page 2201

1  A. Yes.
2  Q. She has attended prior trial testimony in this case at this
3  courthouse; correct?
4  A. Yes.
5  Q. She has sat in the overflow room for that portion; correct?
6  A. She did.
7  Q. And she's listened to the testimony of other witnesses;
8  correct?
9  A. Yes.
10      MS. POMERANTZ: Objection, your Honor.
11      THE COURT: Sustained.
12  Q. You talked on direct about your lawyers representing you
13  pro bono; correct?
14  A. That's right.
15  Q. You do not know your lawyers' arrangements with other of
16  their clients; correct?
17      MS. POMERANTZ: Objection.
18      THE COURT: Sustained.
19  Q. Do you know how much money your lawyers have made in
20  connection with Epstein claims?
21      MS. POMERANTZ: Objection.
22      THE COURT: Grounds.
23      MS. POMERANTZ: Foundation.
24      Beyond the scope of her knowledge, your Honor.
25      THE COURT: I'll sustain on foundation.

LCAVMAX6          A. Farmer - cross          Page 2202

1  Q. Have you read anywhere in the press how much money your
2  lawyers have made in connection with representing Epstein
3  accusers?
4      MS. POMERANTZ: Objection. Hearsay.
5      THE COURT: Sustained.
6  Q. You know that Virginia Roberts was also represented by your
7  attorneys; correct?
8      MS. POMERANTZ: Objection.
9      MS. MENNINGER: I can lay a foundation.
10      THE COURT: You may inquire.
11      MS. POMERANTZ: Relevance and hearsay.
12  Q. You were preparing to testify in a civil case?
13      THE COURT: Just a minute.
14      MS. MENNINGER: Oh, I'm sorry.
15      THE COURT: If there's an objection, you have to give
16  me a minute to rule.
17      MS. MENNINGER: I thought you had, your Honor.
18      I apologize.
19      THE COURT: I had on the prior ones.
20      Overruled. You may inquire.
21  BY MS. MENNINGER:
22  Q. You were preparing to testify in a civil case in or around
23  2016 or 2017; correct?
24  A. Correct.
25  Q. And the lawyers you were interacting with in that case, the

LCAVMAX6          A. Farmer - cross          Page 2203

1  civil case, were the same lawyers from Boies Schiller; correct?
2  A. In part.
3  Q. And also Mr. Edwards; correct?
4  A. Correct.
5  Q. And you know that in connection with that civil case, your
6  lawyers, Ms. McCawley and Mr. Edwards, represent Virginia
7  Roberts; correct?
8      MS. POMERANTZ: Objection, your Honor.
9      THE COURT: Foundation objection?
10      MS. POMERANTZ: Relevance.
11      THE COURT: Ms. Pomerantz, you inquired as to pro bono
12  representation; correct? Is that correct?
13      MS. POMERANTZ: Yes, your Honor.
14      THE COURT: All right. I'll overrule.
15  A. Can you repeat the question?
16  Q. You know that Ms. McCawley and Mr. Edwards represent
17  Virginia Roberts?
18  A. Yes.
19  Q. Correct?
20  A. Yes.
21  Q. In connection with civil litigation?
22  A. Yes.
23  Q. And you were prepared to testify in that civil litigation;
24  correct?
25  A. I was.

LCAVMAX6          A. Farmer - cross          Page 2204

1  Q. And you know that Mr. Edwards is representing other people
2  in this criminal case; correct?
3      MS. POMERANTZ: Objection, your Honor.
4      THE COURT: Just a moment. Overruled.
5  A. I do know that.
6  Q. And you know that your attorney represents other
7  individuals who have accused Epstein; correct?
8      MS. POMERANTZ: Objection.
9      THE COURT: Just a moment. Overruled.
10  A. Yes.
11  Q. You've been in touch with a number of other Epstein
12  accusers in many different forms and fashion; correct?
13      MS. POMERANTZ: Objection. Vague. Confusing.
14      THE COURT: Okay. You can specify please.
15  Q. Okay. Are you a part of a WhatsApp group of Epstein
16  accusers?
17  A. Yes.
18  Q. You communicated with other Epstein accusers on the
19  WhatsApp for those accusers?
20  A. Correct.
21  Q. You've emailed with other accusers; correct?
22  A. I have.
23  Q. You directly emailed with Virginia Roberts; correct?
24  A. I have.
25  Q. You have been with other Epstein accusers in connection

UNITED STATES OF AMERICA, v.
GHISLAINE MAXWELL,

December 10, 2021

| LCAVMAX6 | A. Farmer - cross | Page 2205 |
|---|---|---|

1 with your media appearances, right?
2 A. You mean when they were at the courtroom and filming
3 everyone?
4 Q. Right.
5 A. Yes.
6 Q. You know that your attorneys from Boies Schiller were a
7 part of setting up the Epstein Victims Compensation Fund;
8 correct?
9     MS. POMERANTZ: Objection, your Honor.
10     THE COURT: Just a moment.
11     One-word grounds.
12     MS. POMERANTZ: Hearsay and privilege.
13     THE COURT: You can inquire as to foundation.
14 Q. I'm not trying to ask you about things that you've learned
15 in connection with your --
16     THE COURT: Just ask.
17 Q. -- communications --
18     THE COURT: I'll deal with that, but just ask the
19 question. I'll either sustain or overrule.
20 Q. You are aware it's a matter of public record that your
21 attorneys --
22     MS. POMERANTZ: Objection, your Honor.
23     THE COURT: Foundation. Ask the foundation question
24 first and then we'll see.
25     MS. MENNINGER: Okay.

| LCAVMAX6 | A. Farmer - cross | Page 2206 |
|---|---|---|

1 Q. It's in the newspapers that your attorneys helped set up
2 the Epstein Victims Compensation Fund?
3     MS. POMERANTZ: Objection, your Honor.
4     THE COURT: Is the question is she aware of that? Is
5 that the question?
6     MS. MENNINGER: Yes, your Honor.
7     THE COURT: Okay.
8 A. Yes.
9 Q. And so you are aware that it is a matter of public
10 knowledge that your attorneys helped set up the Epstein Victims
11 Compensation Program?
12     MS. POMERANTZ: Your Honor, objection to this entire
13 line of questioning.
14     THE COURT: Yes, I gather.
15     MS. POMERANTZ: This calls for hearsay.
16     THE COURT: I asked for foundation. We got the
17 foundation. And now on this question, one question at a time.
18     I sustain.
19 BY MS. MENNINGER:
20 Q. You participated in that fund; correct?
21 A. I did.
22 Q. You accepted an offer from that fund?
23 A. I did.
24 Q. You were paid one and a half million dollars?
25 A. I was.

| LCAVMAX6 | A. Farmer - cross | Page 2207 |
|---|---|---|

1 Q. And was based on the same things that you've testified in
2 this courtroom today; correct?
3 A. That's correct.
4 Q. The sexual abuse in a movie theater, right, is one of those
5 things?
6 A. As one of the things, yes.
7 Q. Right.
8     MS. MENNINGER: Your Honor, at this time I would
9 offer -- I would ask to show, excuse me, the witness AF-14.
10 And I'll provide a copy to the government.
11     MS. POMERANTZ: No objection, your Honor.
12     THE COURT: Okay.
13     MS. MENNINGER: If I could show the witness page 2 of
14 that document as well, and page 3, and the last page.
15 Q. That's your signature, Ms. Farmer; correct?
16 A. Yes.
17 Q. That was in October of 2020?
18 A. That's correct.
19 Q. This form is the release form that you signed in connection
20 with accepting the offer from the victims compensation program,
21 right?
22 A. That's right.
23 Q. And it details the one and a half million dollars that you
24 received, right?
25 A. That's right.

| LCAVMAX6 | A. Farmer - cross | Page 2208 |
|---|---|---|

1     MS. MENNINGER: I would move for the admission of
2 AF-14, your Honor.
3     MS. POMERANTZ: No objection, your Honor.
4     THE COURT: AF-14 is admitted.
5     (Defendant's Exhibit AF-14 received in evidence)
6     THE COURT: No redaction requests here?
7     MS. POMERANTZ: No, your Honor.
8     THE COURT: 14 is admitted.
9     MS. MENNINGER: We can take it down now, Ms. Lundberg.
10 BY MS. MENNINGER:
11 Q. In connection with some of your public appearances, you
12 have described the fact that you are a psychologist; correct?
13 A. That's correct.
14 Q. And you have described the fact that you work with victims
15 of sexual trauma; correct?
16 A. Amongst other types of, yeah, clients, I do.
17 Q. And you know that it gives you more credibility with future
18 clients --
19     MS. POMERANTZ: Objection.
20 Q. -- if you mention your profession in connection with your
21 media appearances, right?
22     THE COURT: Just a moment.
23     There's an objection to that question?
24     MS. POMERANTZ: That's fine, your Honor. Withdrawn.
25     THE COURT: Go ahead.

LC6Cmax3        Kate - cross        Page 1245

1  Q. And it was launched in 2019 and it no longer exists;
2  correct?
3  A. I think it was in 2019, but I don't know the exact date,
4  but you are correct, it no longer exists.
5  Q. And after you received your settlement money in connection
6  with the Epstein victim compensation fund, you no longer were
7  involved in that foundation; correct?
8  A. I was still -- the foundation shut down first.
9  Q. But it shut down around the time that you began cooperating
10  with the government; correct?
11  A. It shut down before the -- I had received any kind of
12  settlement.
13  Q. You received your settlement a year ago this week; correct?
14  A. If you say so. I would say that's probably about accurate.
15  Q. Earlier, the government had asked you about having made a
16  public statement at some point in 2019 concerning Mr. Epstein.
17  Do you remember that?
18  A. Sorry. Could you repeat that.
19  Q. On direct examination, you were asked about having made a
20  public statement in connection with Jeffrey Epstein?
21  A. Yes.
22  Q. And you made a public statement in this very courthouse;
23  correct?
24  A. Yes.
25  Q. And you made that public statement using your true name;

LC6Cmax3        Kate - cross        Page 1246

1  correct?
2  A. Yes.
3  Q. And you testified earlier that the reason why you're not
4  using your true name is to protect your child; correct?
5  A. Yes.
6  Q. You had a child at that point, didn't you?
7  A. Yes.
8  Q. And your lawyer also introduced you using your true name at
9  that public hearing; correct?
10  A. Yes.
11  Q. And you were represented by a lawyer named Brad Edwards;
12  correct?
13  A. Yes.
14  Q. And Mr. Edwards has represented you in connection with the
15  claim that you made against the Epstein Victim Compensation
16  Fund; correct?
17  A. Yes.
18  Q. In fact, Mr. Edwards was instrumental in setting up that
19  fund, wasn't he?
20  A. I'm not sure.
21  Q. Is he here with you today?
22  A. Yes, he's here.
23  Q. He's in the courtroom; correct?
24  A. Um --
25  Q. And you have consulted with him concerning your appearance

LC6Cmax3        Kate - cross        Page 1247

1  here?
2        MS. POMERANTZ: Objection, your Honor.
3        THE COURT: Sustained.
4  Q. That statement that you made in this courthouse was after
5  Epstein died; correct?
6  A. Yes.
7  Q. And you and a number of other people accusing Epstein of
8  abuse were invited by a judge in this courthouse, named Judge
9  Berman, to speak publicly; correct?
10  A. Yes.
11  Q. And you took that opportunity to speak publicly?
12  A. Yes.
13  Q. And you spoke publicly with regard to Jeffrey Epstein;
14  correct?
15  A. Yes.
16  Q. You did not speak with regard to Ghislaine Maxwell?
17  A. I did not.
18  Q. And right after that very day that you made that statement
19  was the first time that you sat down with the government in
20  connection with things that you were testifying to today;
21  correct?
22  A. Yes.
23  Q. And right after you sat down with the government, which was
24  right after you had spoken publicly, you appeared on television
25  with regard to your allegations; correct?

LC6Cmax3        Kate - cross        Page 1248

1  A. Yes.
2  Q. And you appeared on television with other women who had
3  been present during that public court appearance; correct?
4  A. Yes.
5  Q. And there were about six of you who were featured on a
6  television show; correct?
7  A. Yes.
8  Q. Talking about your allegations against Jeffrey Epstein;
9  correct?
10  A. Yes.
11  Q. And you all appeared as a sisterhood of accusers against
12  Jeffrey Epstein?
13  A. Sorry, is it a question?
14  Q. Yes.
15  A. Did we appear as a sisterhood?
16  Q. Yes.
17  A. I don't know how it came across to other people.
18  Q. Well, you were somewhat affectionate to one another on the
19  show, weren't you?
20  A. I suppose so.
21  Q. You were supportive of one another on the show; correct?
22  A. Yeah. I had just met them, so --
23  Q. Well, you had met them for the very first time that day?
24  A. I think it may have been at the court appearance which may
25  have been the day before.

# EXHIBIT  105





**SHARON R. BOCK**
Clerk & Comptroller
Palm Beach County

CIRCUIT COURT
CRIMINAL DIVISION
P.O. Box 2906
West Palm Beach, FL 33402-2906





CONFIDENTIAL

3501.226-037
Page 18 of 46

# ELECTRONIC COURT REPORTING WITNESS LOG

CASE NO. _____

STATE V. _CRIMES AGAINST CHILDREN INVESTIGATION_ ——— ASA: LANNA ___

| DATE | ST or DFS | WITNESS | DIRECT | CROSS | REDIRECT | RE-CROSS | REDIRECT CONTINUED |
|------|-----------|---------|--------|-------|----------|----------|--------------------|
| 7/19/02 | TT | ▓▓▓▓▓▓ | 9:14:18 | | 10:00:28 | | 11:58:?? |
| 7/19/02 | TT | ▓▓▓▓▓▓ | 10:11:15 | | | | |
| 7/19/02 | TT | ▓▓▓▓▓▓ | : ; | | | | |
| 7/19/02 | TT | ▓▓▓▓▓▓ | 1:21:04 | | | | |
| 7/19/02 | TT | ▓▓▓▓▓▓ | 11:34:80 | | | | |
| 7/19/02 | TT | ▓▓▓▓▓▓ | 11:56:34 | | | | |
| | | CONTINUING INVESTIGATION / REVIEW OF GRAND JURY DIRECTIVES DATED 7/25/0_ | | | | | |
| 7/19/02 | TT | ▓▓▓▓▓▓ | 1:17:22 | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

**B: Bench Conference**          Defense Attorney[s]: _____

**\*: Motion to Strike**          Asst. State Atty[s]: _LANNA BELCHER_  _MARY ANN DUSSAN_

Forms/Witness Log – 2005

CONFIDENTIAL

3501.226-037
Page 20 of 46

# ELECTRONIC COURT REPORTING WITNESS LOG

CASE NO. _____  —  ASA : LANNA BELOHLAVEK  Page ___ of ___

...NST CHILDREN INVESTIGATION

| WITNESS | DIRECT | CROSS | REDIRECT | RE-CROSS | REDIRECT CONTINUED | RE-CROSS CONTINUED | END | TTL |
|---|---|---|---|---|---|---|---|---|
| | 9:14:18 | | 10:00:29 | | 11:28:08 | | 9:20:47 | 10:58:28 |
| | 11:11:15 | | | | | | 11:31:37 | |
| | : : | | | | | | : : | |
| | 9:21:04 | | | | | | 10:00:02 | |
| | 11:34:39 | | | | | | 11:56:47 | |
| | 11:56:54 | | | | | | 12:14:54 | |
| | REVIEW OF GRAND JURY DIRECTIVES DATED 1/25/06 — ASA : MARY ANN DUGGAN | | | | | | | |
| | 1:17:22 | | | | | | 1:39:51 | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |

11:34:12

Defense Attorney(s): _____

Asst. State Atty(s): LANNA BELOHLAVEK    MARY ANN DUGGAN

CONFIDENTIAL



3501.226-037
Page 21 of 46

CONFIDENTIAL

CONFIDENTIAL

CONFIDENTIAL

Page 5    7/2/06



CONFIDENTIAL

CONFIDENTIAL

CONFIDENTIAL

3501.226-037
Page 28 of 46

CONFIDENTIAL



CONFIDENTIAL

EXHIBIT 106

LBUCmax1

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x
     UNITED STATES OF AMERICA,
 3
                v.                        20 CR 330 (AJN)
 4
     GHISLAINE MAXWELL,
 5
                    Defendant.            Jury Trial
 6   ------------------------------x
                                          New York, N.Y.
 7                                        December 3, 2021
                                          8:48 a.m.
 8
     Before:
 9             HON. ALISON J. NATHAN,

10                                        District Judge

11                         APPEARANCES

12   DAMIAN WILLIAMS
          United States Attorney for the
13        Southern District of New York
     BY:  MAURENE COMEY
14        ALISON MOE
          LARA POMERANTZ
15        ANDREW ROHRBACH
          Assistant United States Attorneys
16
     HADDON MORGAN AND FOREMAN
17        Attorneys for Defendant
     BY:  JEFFREY S. PAGLIUCA
18        CHRISTIAN R. EVERDELL
          LAURA A. MENNINGER
19            -and-
     BOBBI C. STERNHEIM
20            -and-
     RENATO STABILE
21
     Also Present:   Amanda Young, FBI
22                    Paul Byrne, NYPD
                      Sunny Drescher,
23                     Paralegal, U.S. Attorney's Office
                      Ann Lundberg,
24                     Paralegal, Haddon Morgan and Foreman

25
```

LC3Cmax3                              Alessi - cross

1    Q.  A mandate from Mr. Epstein?

2    A.  Absolutely.

3    Q.  And a secret between you and Mr. Epstein about the other

4    women coming; correct?

5    A.  A secret from me and Mr. Epstein?  He have no secrets with

6    me, sir.  He never share anything of his personal life with me.

7    Q.  It was a secret between you and Mr. Epstein that was kept

8    from Ms. Maxwell; correct?

9    A.  Sir, he never told me, this is a secret, don't tell

10   Ghislaine about this.  He never suggest it, imply, or told me

11   about that.

12   Q.  Why did you think you were taking her pictures down,

13   Mr. Alessi?

14   A.  I have no idea, sir.

15   Q.  Towards the end of your stay with Mr. Epstein, working for

16   Mr. Epstein, that was about the same time that you met Virginia

17   Roberts; correct?

18   A.  I'm not clear about these dates.  I have difficult to

19   remember exactly what years or what you're talking about, what

20   years or what timeframe.  I left at the end of the year at

21   2002, sir.

22   Q.  And that's the same time that you -- around the same time

23   that you recall meeting Ms. Roberts; is that right?

24   A.  Probably was 2002, probably was 2001.  I'm not sure.

25   Q.  Okay.  And that's around the same time that there were more

1    and tell us if you recognize it.

2    A.  I do.

3    Q.  Could you please return to the witness box.

4            THE COURT:  You can remove your mask, Mr. Parkinson.

5    Thank you.

6            THE WITNESS:  Thank you, your Honor.

7    Q.  Mr. Parkinson, do you recognize what's been marked for

8    identification as Government Exhibit 51?

9    A.  I do.

10   Q.  What is it?

11   A.  It is a massage table.

12   Q.  From where?

13   A.  It's from the second floor south bathroom, where the shower

14   was.

15   Q.  How do you recognize it?

16   A.  It has the evidence brown-stringed label that was attached

17   to it with a property number and a barcode number.

18   Q.  Is this the green massage table that you remember seizing

19   from 358 El Brillo Way on October 20, 2005?

20   A.  True.

21           MS. COMEY:  Your Honor, the government offers this

22   exhibit in evidence.

23           MR. EVERDELL:  No objection.

24           THE COURT:  I couldn't hear if that was "objection" or

25   "no objection."

LBUCmax1

1          THE COURT:  Matters to take up?

2          MR. EVERDELL:  Your Honor, from the defense, I think

3     after Mr. Alessi, there is going to be a series of law

4     enforcement agents to talk about items that were recovered

5     during various searches, and I have some objections to the

6     exhibits that I want to raise now, which we've conferred with

7     the government, we've reached agreement on some things, but

8     there are others to raise.

9          THE COURT:  Okay.

10         MR. EVERDELL:  The first witness -- and this relates

11    to the Florida -- the search of the Palm Beach residence.  I

12    believe Mr. Parkinson, who I believe is going to testify after

13    Mr. Alessi, is the agent who went through during the search, of

14    October 20th of 2005, of that residence.  He did the video

15    walk-through of the residence.  So there is video and he was

16    present.  I believe he's going to say he was present when

17    photographs were taken of various rooms and things in the

18    house.  Those are going to be offered through him.

19         So there are three things to talk about here with

20    Mr. Parkinson.  There is the exhibits — the photographs — the

21    video, and the certain testimony.

22         We'll start with the exhibits, the photographs.

23         We already moved in limine to exclude one of the

24    photographs, that was Government Exhibit 288.  That was a

25    photograph, if you recall, your Honor, of a younger girl sort

LBUCmax1

 1    of pulling down her underwear exposing her buttocks.  That was

 2    excluded by your Honor on motions in limine.  There is a

 3    similar photo, it's the same photo.  The one we excluded was

 4    that photograph which was hanging on the wall, it was on the

 5    floor, but Government Exhibit 270 was the same photograph on

 6    the wall.  There is consent to that one.  Yes, we agreed that

 7    that would not be offered.  So 270 is not going to be offered.

 8            There was one that we didn't reach agreement on, which

 9    is Government Exhibit 250.  In the motions in limine, your

10    Honor, you excluded Government Exhibit 251, which, if you

11    recall, was a photograph of a toddler, an infant walking

12    forward towards the camera with an adult in the back, naked,

13    and excluded it on 401 and 403 grounds.

14            There is another photo, which is Government Exhibit

15    250, which shows -- maybe we can pull that up if we can see it.

16    Is it on your screen, your Honor?

17            THE COURT:  Yes.

18            MR. EVERDELL:  That, as you can see, depicts Jeffrey

19    Epstein with a slightly older girl.  At this point, I believe

20    it is the same girl with her lying across his lap with her

21    bottom -- although with underwear on, but he's got his head

22    down close to the bottom.

23            I think, for similar reasons, this is not relevant and

24    is prejudicial.  It shows him with a prepubescent girl.  There

25    is no allegations that he or Ms. Maxwell, for that matter, were

EXHIBIT 107

# In The Matter Of:

*UNITED STATES OF AMERICA, v.*
*GHISLAINE MAXWELL,*

---

*TRIAL*
*December 1, 2021*

---

*Southern District Court Reporters*

Original File LC1VMAXF.txt
**Min-U-Script® with Word Index**

UNITED STATES OF AMERICA, v.
GHISLAINE MAXWELL,

TRIAL
December 1, 2021

LC1VMAX3          Jane - cross          Page 516

1    MS. MENNINGER: Okay.
2 Q. Isn't it true you told the government you do not remember
3    any specific abuse that occurred in New Mexico on the trips
4    that you took there?
5 A. I don't recall.
6 Q. And yesterday you testified about an incident in New Mexico
7    that you now specifically remember two years later.
8 A. That's right.
9 Q. Today you remember it; in 2020 you did not.
10 A. I don't recall saying any of what's written here.
11 Q. I'm going to ask you about the homes that you testified you
12    visited for Epstein in the mid 1990s, okay, between the ages of
13    14 and 16.
14        You recall in Palm Beach that you went to a pool
15    house; correct?
16 A. That's correct.
17 Q. And you only went to one house for Epstein in Palm Beach
18    ever; correct?
19 A. Yes.
20 Q. You remember the whole house in Florida was light-colored
21    and beachy; correct?
22 A. I think so; correct.
23 Q. You remember a winding staircase with pictures on the wall;
24    correct?
25 A. Correct.

LC1VMAX3          Jane - cross          Page 517

1 Q. You recall a massage room that was attached to the
2    bathroom; correct?
3 A. That's my memory, yes.
4 Q. And that's the description that you gave the government;
5    correct?
6 A. Yes.
7 Q. In New York, you described an eight-story mansion on the
8    Upper East Side; correct?
9 A. Yes.
10 Q. You started staying there when you were 14; correct?
11 A. Correct.
12 Q. That's the only home in New York that you visited of
13    Epstein's; correct?
14 A. No.
15 Q. You stayed in some apartments where he did not live;
16    correct?
17 A. Correct.
18 Q. And you stayed in this eight-story mansion beginning at the
19    age of 14; correct?
20 A. Correct.
21 Q. And you stayed on the eighth floor of this mansion, right?
22 A. I believe so.
23 Q. And Ghislaine didn't live in that mansion, right?
24 A. I don't know.
25 Q. You didn't see her living there; correct?

LC1VMAX3          Jane - cross          Page 518

1 A. I don't know.
2 Q. And you started staying there at the age of 14, right?
3 A. Yes.
4 Q. You recall a massage table being black in that home;
5    correct?
6 A. Correct.
7 Q. And then you remember going to New Mexico where there was a
8    giant ranch; correct?
9 A. Correct.
10 Q. An impressive, huge house, right?
11 A. Like all of them.
12 Q. What's that?
13 A. I said like all of the homes, yes.
14 Q. Right. And there were other guests around in New Mexico;
15    correct?
16 A. No.
17 Q. Do you remember telling the government that Jeffrey's
18    brother Mark Epstein went with you on a trip to New Mexico?
19 A. I don't recall saying that.
20 Q. Do you remember telling the government that Chef Adam Perry
21    Ling went on a trip to New Mexico with you?
22 A. I don't recall.
23 Q. And you don't remember a massage room in the New Mexico
24    home; correct?
25 A. I don't recall.

LC1VMAX3          Jane - cross          Page 519

1 Q. In your time with Epstein, you never saw any other underage
2    girls around him; correct?
3 A. I wouldn't know that, if they were.
4 Q. Well, you told the government in 2019 that you thought you
5    were the only one; correct?
6 A. Correct.
7 Q. And you only learned otherwise, you said, when you saw the
8    news about Mr. Epstein's arrest in 2007 or 8; correct?
9 A. Correct.
10 Q. So none of the other participants in these orgies, I think
11    you called them, were underage; correct?
12 A. I wouldn't know that.
13 Q. That you thought you were the only one, right?
14 A. Yes.
15 Q. And you were never asked to go recruit other girls for
16    Epstein; correct?
17 A. Correct.
18 Q. You were not asked to have sexual contact with any of
19    Epstein's friends?
20 A. No.
21 Q. Epstein did introduce you to a number of people associated
22    with the arts, right?
23 A. Not really, no.
24 Q. He introduced you to the dean of Interlochen at a cocktail
25    party, right?

LC1Qmax6        Jane - Redirect           Page 604

1   the last few months, was your attorney present?
2   A. No.
3   Q. In general, who was in the room?
4   A. Just me and you guys.
5   Q. You were asked some questions on cross-examination about
6   your living situation when you were in middle school and high
7   school living in Palm Beach. Do you remember those questions?
8   A. Yes.
9   Q. So I just want to ask you about where you were living at
10  the time. In the summer of 1994, when you first met Maxwell
11  and Epstein, where were you living?
12       MS. MENNINGER: Objection. Leading, your Honor.
13       THE COURT: Overruled. You may answer.
14  A. That summer we were still living on Palma Way at my
15  mother's friend, Joan, in her pool house in her back yard, and
16  we -- when we came home from camp that summer, we were still
17  living in that place.
18  Q. Did your family struggle financially during the years that
19  you were in high school?
20  A. Yes.
21  Q. Was there ever a time when you and your brothers had a hard
22  time paying for lunch at school?
23       MS. MENNINGER: Objection, your Honor. 403.
24       THE COURT: Overruled. You may answer.
25  A. Yes.

LC1Qmax6        Jane - Redirect           Page 605

1   Q. Can you tell the jury what you remember about that?
2   A. I mean, I remember my mother never had any money. She
3   didn't work, so she didn't have money to really pay for
4   anything. We had food stamps that she refused to use because
5   her pride was too big, and she would sort of, you know,
6   scrounge for quarters, and sometimes I would give my brothers
7   my lunch money and pretend like I had some so that they could
8   eat.
9   Q. Did your family's financial circumstances improve after you
10  met Maxwell and Epstein?
11  A. But -- no.
12  Q. Did Jeffrey Epstein help your family financially?
13  A. In some ways, yes.
14  Q. Can you describe for the jury the ways that Jeffrey Epstein
15  helped your family financially?
16  A. Well, he -- he handed me cash. He gave us a computer. He
17  paid for some school stuff. He -- he paid for Interlochen Arts
18  Camp for the next two summers. He paid for my younger
19  brother's Interlochen Arts Academy his entire year at boarding
20  school. Gave us gifts. And, you know, so on and so forth.
21  Q. Did there come a time when your family moved out of the
22  pool house?
23  A. Yes.
24  Q. And where did you move to?
25  A. That's when we moved to that second house that was first

LC1Qmax6        Jane - Redirect           Page 606

1   discussed, that three-bedroom house. My sister was the one who
2   rented it for us.
3   Q. Approximately when did you move out of the pool house and
4   into the three-bedroom house?
5   A. We moved out of the pool house in, I think, spring of '96.
6   Wait. Sorry. I'm tired. The spring of '95. Sorry.
7   Q. Do you recall being asked some questions on
8   cross-examination about whether you traveled internationally
9   when you were in high school?
10  A. Yes.
11  Q. Just to be clear, did those trips have anything to do with
12  Maxwell and Epstein?
13  A. No.
14  Q. Without discussing any specifics about your family members,
15  do you have some family members who live abroad?
16  A. Yes, that's -- the country that we would travel to, that's
17  where we were from, and any time those dates that were
18  discussed earlier, that would be a family trip home.
19  Q. Do you recall being asked on cross-examination questions
20  about whether you had ever talked to a reporter?
21  A. Yes.
22  Q. And you were asked about whether you made a statement to a
23  tabloid about what had happened to you with Jeffrey Epstein.
24  Do you remember being asked about that?
25  A. Yes.

LC1Qmax6        Jane - Redirect           Page 607

1   Q. Can you please explain for the jury what were the
2   circumstances under which a reporter approached you?
3   A. Well, it was a reporter who called me and said --
4        MS. MENNINGER: Objection. Hearsay, your Honor.
5   A. Okay. Sorry.
6        MS. MOE: I'm happy to rephrase, your Honor.
7        THE COURT: Go ahead.
8   Q. When you had that conversation with the reporter, did you
9   want to have that conversation?
10  A. No.
11  Q. Why did you agree to speak to that reporter?
12  A. Because he basically blackmailed me.
13       MS. MENNINGER: Objection, your Honor. Hearsay.
14       THE COURT: Overruled. Go ahead.
15  A. He said that he -- that court documents with my name on it
16  were unredacted, and that the Epstein's little black book was
17  out, and my name was in it, and he was going to print --
18       MS. MENNINGER: Objection, your Honor. Hearsay.
19       THE COURT: We'll limit what the witness has testified
20  to as not being offered for the truth of what was stated by
21  someone else but the effect on the listener.
22       And let's re-narrow the question.
23       MS. MOE: Yes, your Honor. May I ask a leading
24  question to navigate through this?
25       THE COURT: Let me hear the question.

# EXHIBIT 110

952

LC3Cmax1                    Alessi - cross

1    Q.  Isn't it true that you met Jane in 1998 or 2000?

2    A.  No, that's not true.

3           MR. PAGLIUCA:  If we can show the witness 3504-030,

4    page 20, deposition page 79, line 18.

5           THE COURT:  Just caution about not stating the real

6    name of Jane.

7           MR. PAGLIUCA:  I understand, your Honor.  I completely

8    blacked it out on all of my copies.

9           (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

953

LC3KMAX2                          Alessi - Cross

1            THE COURT:  For the witness, too.

2            MR. PAGLIUCA:  Understood.

3            THE COURT:  Thank you.  What line am I looking at?

4            MR. PAGLIUCA:  That's a good question, your Honor.

5    I'm having trouble seeing it here.  We're at page 19 and 20 of

6    3504-030.

7            THE COURT:  That's page 79 of the deposition?

8            MR. PAGLIUCA:  Yes, your Honor, that's correct.

9            THE COURT:  That's the single page on the screen.

10   BY MR. PAGLIUCA:

11   Q.  If we go down to line 20, do you remember this question,

12   Mr. Alessi:  Do you know the year ████████ met --

13   A.  You mentioned the name, sir.

14           MR. PAGLIUCA:  I'm sorry.

15           MS. MOE:  Your Honor, I do have a concern about this.

16           MR. PAGLIUCA:  I move to strike that, your Honor.  I

17   withdraw it.

18           THE COURT:  It will be struck.  You are admonished to

19   carefully abide by my ruling.

20           MS. COMEY:  Your Honor, may we approach?

21           THE COURT:  You may.

22           (Continued on next page)

23

24

25

LC3KMAX2                    Alessi - Cross

1              (At the sidebar)

2              MR. PAGLIUCA:  I apologize, your Honor.  It was

3       completely unintentional.  I apologize.

4              MS. COMEY:  Your Honor, given that Mr. Pagliuca

5       represented that he had prepared to cross-examine this witness

6       on this testimony, I think we need to have a plan going forward

7       for how to make sure this does not happen again because,

8       clearly, Mr. Pagliuca had not prepared enough.

9              THE COURT:  The witness herself did the same thing.

10      It happens.  My perception was that it was an accident.

11             MR. PAGLIUCA:  Completely.

12             THE COURT:  I agree, we need a plan, but --

13             MS. COMEY:  Your Honor, I would propose that to the

14      extent Mr. Pagliuca intends to use some sort of prior

15      inconsistent statement, that he can discuss it with me before

16      reading it into the record, and we can confer about how he

17      should read it.

18             MR. PAGLIUCA:  I understand how to read, your Honor.

19      It won't happen again.

20             THE COURT:  All right.  It won't happen again.

21             MR. PAGLIUCA:  It will not.

22             THE COURT:  If it happens again, we're going to need a

23      different approach.

24             MR. PAGLIUCA:  I understand.  It will not happen

25      again.

LC3KMAX2                    Alessi - Cross

1            (In open court)

2            MR. PAGLIUCA:  May I resume, your Honor?

3            THE COURT:  Just a moment.

4            (Pause)

5            THE COURT:  You may.

6            MR. PAGLIUCA:  Thank you.

7    BY MR. PAGLIUCA:

8    Q.  You were asked the question:

9    "Q.  Do you know what year Jane met Jeffrey Epstein and Glen

10   Maxwell?"

11           And your answer was:  "I would say we left it in 2002.

12   I would say '99 or 2000 maybe."

13           Do you recall that question and answer?

14   A.  I don't recall the question, but I imagine I made the

15   mistake between the two girls that I met, Jane and I made -- I

16   confuse the first girl with the second girl.  The first girl

17   that I met, underage, was Jane.  And I think it was 1994, sir.

18   The other girl that I met, it was 2002 or 2001, I'm not sure.

19   Q.  Okay.  Well, let's continue, Mr. Alessi, because the

20   questioner was Mr. Edwards.

21           Do you recall Mr. Edwards being the person who

22   questioned you?

23   A.  It was one of the lawyers.

24           THE COURT:  Microphone.

25   Q.  The person who was questioning you in this deposition was

LC3KMAX2                    Alessi - Cross

1   Virginia Roberts' lawyer, Brad Edwards.

2            Do you recall that?

3   A.  I don't recall him, but it was one of the lawyers, he asked

4   me questions.

5   Q.  And you were in Fort Lauderdale at an office when you were

6   answering these questions?

7   A.  Yes, sir.

8   Q.  Okay.

9            And Mr. Edwards then says to you at line 22 --

10           THE COURT:  And I will caution --

11           MR. PAGLIUCA:  Right.

12  Q.  -- "If Jane believes that the year was 1994 or 1995" -- and

13  then you say, no.

14           Do you see that?

15  A.  Again, I think in this testimony, I mistake the two, I

16  confused the two girls.

17  Q.  I understand that's what you're saying today, Mr. Alessi --

18  A.  Yes.

19  Q.  -- but in 2016, when you testified, you were specifically

20  directed to the name Jane and what Jane, according to this

21  lawyer, believed, and you answered no.

22           Do you see that?

23  A.  Could have been.

24  Q.  Okay.

25           And then the question from Mr. Edwards is:  You don't

LC3KMAX2                    Alessi - Cross

1   remember that way?

2            And then you say, at the next page, page 80, lines 1

3   and 2, you say:  That is not true.  I don't think it was that

4   early.

5            Do you remember giving that testimony under oath?

6   A.  I don't remember, but I could have been confused again.

7   Q.  And then the question is:  Okay, but you remember going and

8   picking her up from the school?

9            And the answer is:  Yes.

10           Correct?

11  A.  Yes.

12  Q.  And then you're asked another question, and then you say:

13  I would -- I would say it's 1999, '98 maybe.

14           Correct?

15  A.  Yes, sir.

16  Q.  And then you're asked some specific questions about Jane

17  and whether Jane is driving or not?

18  A.  Yes, sir.

19  Q.  And then you say:  I never saw Jane driving a car.

20           Right?

21  A.  Yes, sir.

22  Q.  And those were all questions and answers about Jane,

23  correct?

24  A.  I'm not sure those are all the questions about Jane.

25  Q.  Yesterday you also testified that Jane would go to see

LC3KMAX2                    Alessi - Cross

1  Epstein without her mother.

2          Do you recall that?

3  A.  Yes, sir.

4          MR. PAGLIUCA:  If we can go to 3304-22, which is a

5  different exhibit.  3504-22.

6          Your Honor, I neglected to move for the admission of

7  that prior inconsistent testimony.  I will do so now.

8          THE COURT:  It was read into the record and admitted.

9          MR. PAGLIUCA:  Thank you.

10          THE COURT:  If it's read into the record, it's

11  admitted.

12          MR. PAGLIUCA:  No need to move for admission?

13          THE COURT:  Correct.

14          MR. PAGLIUCA:  Thank you.

15  BY MR. PAGLIUCA:

16  Q.  Mr. Alessi, we're at 3504-22.  Do you see that?

17  A.  Yes.  Not legible.

18          THE COURT:  Needs to be bigger, please.

19          MR. PAGLIUCA:  Can we enlarge, please.

20  Q.  At page 26 of this exhibit, deposition page 183, lines 9

21  through 13 -- are you there, Mr. Alessi?

22  A.  Yes, sir.

23          MS. COMEY:  Your Honor, before Mr. Pagliuca reads this

24  into the record, I don't believe it's inconsistent with any

25  testimony that's been given.

LC3KMAX2                    Alessi - Cross

1           THE COURT:  I need to see earlier portions of the
2     transcript.
3           MR. PAGLIUCA:  Your Honor, are you talking about
4     yesterday's testimony?
5           THE COURT:  Well, I think it's two things.  It's
6     yesterday's testimony -- and give me the line.  And then I need
7     to have context for who is being spoken about in the depo.
8           MR. PAGLIUCA:  Sure.
9           Yesterday's testimony, we're talking about page 835,
10    836, 837, which was where this was referenced.  And for
11    purposes of this transcript, I think if the Court starts at
12    line 6, you will get the context of the question.
13          If you go to the page before, 182, you start at line
14    15, that will give you the complete context.
15          If we can blow up for the Court and the witness 182,
16    beginning at line 15.
17          THE COURT:  Just a minute.
18          (Pause)
19          THE COURT:  Transcript 835, line 19?
20          MR. PAGLIUCA:  19 through 20; 836, lines 1 and 2; and
21    836, I think, line 5.
22          THE COURT:  Can you go back to the line in the
23    deposition, please?  Now I have 182.
24          MR. PAGLIUCA:  Yes, your Honor.
25          MS. COMEY:  Your Honor, I just want to make sure that

LC3KMAX2                      Alessi - Cross

1   your Honor has also reviewed page 835 --

2           THE COURT:  Yes, I have the testimony in mind.

3           Now I need to see what you're contending is

4   inconsistent.

5           MR. PAGLIUCA:  Right.  I'm at lines 10 through 12,

6   your Honor.

7           THE COURT:  Of what page?  I have page 182.

8           MR. PAGLIUCA:  It's 183, lines 9 through 12.  182 is

9   for context.

10          (Pause)

11          THE COURT:  Sustained.

12  BY MR. PAGLIUCA:

13  Q.  Mr. Alessi, do you recall that the lawyer for Jane, a

14  lawyer for Jane, contacted you in July of 2020, two thousand

15  twenty?

16  A.  No.

17  Q.  Do you recall that in July of 2020, you authored a

18  declaration, which is a sworn statement, under oath,

19  declaration of Juan P. Alessi?

20  A.  I don't know.  I don't know what you talking about.  At

21  2020?

22  Q.  Yes.

23          MR. PAGLIUCA:  Can we show the witness Defendant's

24  Exhibit JA-1, please.

25          MS. COMEY:  Your Honor, I do not have a copy of this.

LC3KMAX2                    Alessi - Cross

 1              THE COURT:  You will be provided one before we show
 2    the witness.
 3              MS. COMEY:  Thank you, your Honor.
 4              MR. PAGLIUCA:  Does the witness have JA-1?
 5              THE COURT:  Not yet.
 6              Ms. Comey, are you ready?
 7              MS. COMEY:  Yes, thank you, your Honor.
 8              THE COURT:  Go ahead.
 9    BY MR. PAGLIUCA:
10    Q.  Do you see JA-1, Mr. Alessi?
11              THE COURT:  Mr. Alessi, could you reposition the mic,
12    please.  Thank you.
13    A.  Yes, I am reading.
14              I can't remember where this was done.  Where?
15    Q.  Mr. Alessi, I'm just going to ask you a couple of
16    questions.
17              First, is that your signature?
18    A.  Yes, it is.
19    Q.  It's dated July 9, 2020; is that correct?
20    A.  That's correct.
21              MS. COMEY:  Your Honor, before this is read, I would
22    make the same objection.  I don't believe this is inconsistent.
23              THE COURT:  Which paragraph are you focused on?
24              MR. PAGLIUCA:  Your Honor, I was going to move for the
25    introduction of the entire exhibit.

LC3KMAX2                    Alessi - Cross

1          THE COURT:  So paragraph 1, sustained.

2          Paragraph 2, sustained.

3          You want to focus me?

4          MR. PAGLIUCA:  Paragraphs 3 and 4, your Honor, are the

5   inconsistencies.

6          THE COURT:  Okay.  Just a moment.

7          (Pause)

8          THE COURT:  Sustained.

9          MR. PAGLIUCA:  May we be heard on this, your Honor?

10         THE COURT:  Yes.

11         (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

LC3KMAX2                         Alessi - Cross

1                    (At the sidebar)

2                    THE COURT:  Let's just set the stage.  The testimony

3       yesterday said "multiple occasions with her mother, some

4       occasions without the mother; in those instances, he would pick

5       her up and drive her."

6                    MR. PAGLIUCA:  Okay.

7                    THE COURT:  You agree that is the testimony?

8                    MR. PAGLIUCA:  Generally, yes.

9                    On line 9, we have:  "I personally observed Jane along

10      with her mother on three occasions, not multiple occasions."

11                   THE COURT:  "Three" is not "multiple"?

12                   MR. PAGLIUCA:  Not in my view, your Honor.  It is

13      inconsistent with "multiple."

14                   At Mr. Epstein's --

15                   THE COURT:  I don't understand --

16                   MR. PAGLIUCA:  It is more than one.

17                   THE COURT:  So is "multiple."

18                   MR. PAGLIUCA:  Yes, I understand.

19                   THE COURT:  I mean, unless we're speaking a different

20      language.

21                   MR. PAGLIUCA:  We may be, but this is quantifying the

22      number.  It's not multiple, it's three.

23                   "At Mr. Epstein's home in Palm Beach.  I don't recall

24      the year," which is also inconsistent with his testimony

25      yesterday.

LC3KMAX2                          Alessi - Cross

 1          THE COURT:  Well, he said he doesn't recall exactly

 2     the year, and you impeached on the earlier one.

 3          MR. PAGLIUCA:  Yesterday, he said it was 1994, and

 4     this is impeaching that testimony as well.

 5          MS. COMEY:  Your Honor, if I may on that point, I

 6     believe the testimony was 1994 or 1995 yesterday, and then

 7     today on cross-examination I think he expanded it to between

 8     1993 and 1996.  I think it's clear in the record that he's not

 9     sure exactly what year it was.

10          THE COURT:  Yes, I agree with that.

11          MR. PAGLIUCA:  Respectfully, I disagree, your Honor.

12          "During those occasions, I observed Mr. Epstein and

13     Ms. Maxwell and her mother talking."

14          We're limiting it to those occasions, and it's not

15     expanding on any of those occasions.  Yesterday he testified to

16     multiple occasions, more than three, many more than three.

17          Paragraph 4:  "In addition to seeing Jane at

18     Mr. Epstein's home, I was also instructed on one occasion by

19     Mr. Epstein to pick Ms. Jane up from what I presume was her

20     home address in West Palm Beach."

21          He discussed yesterday more than one occasion being

22     instructed to pick her up at West Palm Beach.

23          THE COURT:  You can ask him if he recalls saying one

24     occasion.

25          MS. COMEY:  Your Honor, if I may, the fact that he

LC3KMAX2                    Alessi - Cross

1   remembers one occasion does not preclude that there were other

2   occasions.  He's just saying in the declaration --

3          THE COURT:  I agree, and I presume that will be the

4   testimony.

5          MS. COMEY:  But then, your Honor, it's not

6   inconsistent.  I just don't see the basis to put this in front

7   of the jury if it's not inconsistent on its face.  There's just

8   not a basis.

9          THE COURT:  Well, on this one, I think he said

10  multiple occasions, this says one.  He can explain the

11  difference, and the jury will decide.

12         So I'll permit you to ask about that one.

13         MR. PAGLIUCA:  Thank you.

14         (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

LC3KMAX2                        Alessi - Cross

1              (In open court)

2              MR. PAGLIUCA:  Thank you, your Honor.

3              THE COURT:  Okay.

4    BY MR. PAGLIUCA:

5    Q.  Mr. Alessi, do you recall in 2020, in this declaration,

6    saying, I was also instructed on one occasion by Mr. Epstein to

7    pick Ms. Jane up from what I presumed was her home address in

8    West Palm Beach, Florida and drive her to Mr. Epstein's home?

9    Do you recall that statement in your under-oath declaration?

10   A.  First of all, I would like to know where this declaration

11   was taken place.  I think this -- if I remember correctly, this

12   was sent to me by mail.  By somebody.  I don't recall making

13   this declaration with anybody.

14   Q.  Well, Mr. Alessi, we've established that that's your

15   signature on July 9 --

16   A.  Yeah, it is my signature, but I don't recall being in a

17   place and declare this.

18   Q.  Okay.  Are you denying making the declaration?

19              MS. COMEY:  Your Honor, I think there may be some

20   confusion about terminology here.

21              THE COURT:  Yes.

22              I think the question is not, were you deposed, but,

23   did you sign this statement?

24              THE WITNESS:  Yes.  It definitely is my signature.

25   Q.  And is that what you said, you were instructed by

LC3KMAX2                    Alessi - Cross

1   Mr. Epstein on one occasion to pick Ms. Jane up from what I

2   presume was her home address in West Palm Beach, Florida and

3   drive her to Mr. Epstein's house, is that correct?

4   A.  That's correct.  It might have been more than one occasion,

5   too.

6   Q.  That's not what you said in this declaration, correct?

7   A.  No, in this declaration it says once.

8   Q.  Right.

9           Mr. Alessi, I want to talk a little bit now about the

10  renovations to the Palm Beach house, okay?

11  A.  Yes.

12          MR. PAGLIUCA:  If we can show the witness what's been

13  admitted as Government Exhibit 297, please.

14          MS. COMEY:  Your Honor, could this be published to the

15  parties and the public as well?

16          THE COURT:  It's admitted, so GX 297 may be published.

17          MR. PAGLIUCA:  Thank you, your Honor.

18  BY MR. PAGLIUCA:

19  Q.  Mr. Alessi, you talked about this exhibit yesterday.

20          Do you recall that?

21  A.  Yes, sir.

22          MR. PAGLIUCA:  First, I would like to zoom in on the

23  lower right corner of the exhibit, and highlight that, please.

24  Q.  Do you see the date here 4/4/94, Mr. Alessi?

25  A.  Yes, sir.