# EXHIBIT 111

FARRER & CO

Doc 1 (IM) 19.11.96

6.02. pm.
19/12
form. A.
Donny /
Commonds

**DATED** 19 December 1996

## J G O'NEILL AND MRS N O'NEILL

and

## GHISLAINE MAXWELL

---

### AGREEMENT FOR SALE

- of -

44 Kinnerton Street  London  SW1

---

FARRER & CO.
66 Lincoln's Inn Fields
London WC2A 3LH

GR863240.558

## AGREEMENT FOR SALE OF PROPERTY

**THIS** AGREEMENT is made the    19    day of December   1996

### 1. Definitions:

| | | | |
|---|---|---|---|
| 1.1 | Vendor | : | JOHN GERARD O'NEILL of The Willows Farmhouse Stratton Audley Bicester Oxfordshire OX6 9BA and NESSA O'NEILL of 41 Kinnerton Street London SW1 |
| 1.2 | Purchaser | : | NOELLE MARION GHISLAINE/MAXWELL c/o M C Grumbridge Esq The Hogarth Group Airedale Avenue London W4 2NW |
| 1.3 | The Property | : | 44 Kinnerton Street London SW1 for the unexpired term of the Lease |
| 1.4 | Sale Price | : | £290,000 |
| 1.5 | Vendor sells | : | with limited title guarantee modified as in Clauses 2.3.2 and 2.3.3 |
| 1.6 | Title No | : | NGL 343662 |
| 1.7 | Completion Date | : | 22 January 1997 |
| 1.8 | Vendor's Solicitors | : | Farrer & Co 66 Lincoln's Inn Fields London WC2A 3LH Ref: JM |

| 1.9 | Purchaser's Solicitors | : | The Hogarth Group  Airedale Avenue  London W4 2NW<br>Ref:  M C Grumbridge Esq |

| 1.10 | Rate of Interest | : | 4% above the base rate for the time being of National Westminster Bank plc |

| 1.11 | The Lease | : | The Lease dated 22nd December 1978 made between the Trustees of the Will of the Most Noble the Second Duke of Westminster Deceased (1) and Bryan Alan Leybourne Popham and Joan Phyllis Popham (2) |

1.12  The Licences

1.  A Licence dated 21st December 1979 made between the Trustees of the Most Noble the Second Duke of Westminster Deceased (1) and Izoa Holdings SA (2)

2.  A Licence dated 16th June 1988 made between Eaton Square Properties Ltd (1) and the Vendor (2)

3.  A Licence dated 8th July 1996 made between Eaton Square Properties Ltd (1) and the Vendor (2)

## 2.    Special Conditions

2.1    The Vendor shall sell and the Purchaser shall purchase the Property for the Sale Price

2.2    A deposit of Ten per centum (10%) of the Sale Price shall be paid on or before the signing hereof by way of Banker's Draft  Building Society cheque or Purchaser's Solicitors' Client Account cheque only such deposit to be held by the Vendor's Solicitors as Stakeholders

2.3.1    Title to the Property shall be deduced in accordance with Section 110 of the Land Registration Act 1925

2.3.2    For the purposes of s6(2)(a) Law of Property (Miscellaneous Provisions) Act 1994 all matters recorded in registers open to public inspection are considered within the actual knowledge of the Purchaser

2.3.3    The covenant set out in s3(1) Law of Property (Miscellaneous Provisions) Act 1994 does not extend to any charge encumbrance or other right of which the Vendor is not aware

2.3.4    The Transfer to the Purchaser shall contain certain declarations to give effect to sub-clauses 2.3.2 and 2.3.3

2.4     Vacant possession of the Property shall be given on completion of the purchase

2.5.1    The Property is sold subject to:

2.5.1.1 all Local Land Charges whether registered or not before the date hereof and all matters capable of registration as Local Land Charges

2.5.1.2 all notices served and orders demands proposals or requirements made by any Local or other Public Authority whether before or after the date hereof

2.5.1.3 all actual or proposed orders directions notices charges restrictions conditions agreements or other matters arising under the Town and Country Planning Acts

2.5.1.4 all those matters (other than any charges to secure moneys) contained or referred to in the entries contained in the Property and Charges Registers of the Title Number copies of which have been supplied to the Purchaser's Solicitors prior to the signing hereof insofar as the same are still subsisting and capable of being enforced and relate to the Property

2.5.1.5 the rents reserved by the Lease and to the covenants conditions exceptions reservations and all other provisions contained or referred to therein

2.5.1.6 the covenants conditions and all other provisions contained or referred to in the Licences and the additional rents payable thereunder

2.5.2   The Purchaser's Solicitors having been supplied with copies of the entries contained in the said Registers of the Title Number and the filed plan and copies of the Lease and the Licences prior to the signing hereof the Purchaser shall be deemed to purchase with full knowledge of the contents thereof and shall raise no objection or requisition thereto

2.6     The Vendor and the Purchaser respectively acknowledge that this Agreement shall constitute and form the entire Contract between the Vendor and the Purchaser to the exclusion of any antecedent statement or representation whether oral written or implied or whether contained in any advertisement particulars or other matters issued or in any correspondence entered into by the Vendor or their servants or agents (save for written replies made by the Vendor's Solicitors on behalf of the Vendor to enquiries made by the Purchaser's Solicitors) and the Purchaser hereby acknowledges that he has not entered into this Agreement in reliance upon any such statement or representation

2.7     The purchase shall be completed and the balance of the Sale Price paid in the offices of the Vendor's Solicitors on the Completion Date

2.8     If for any reason other than the wilful default of the Vendor the purchase is not completed prior to 1.00.p.m. on the Completion Date the Purchaser shall be liable to pay on completion interest on the balance of the Sale Price at the prescribed rate as hereinbefore defined calculated on a day to day basis in respect of the period commencing on the Completion Date and including the day on which completion actually takes place  In the event of completion taking place after 1.00.p.m. on a day immediately preceding a day on which the Principal Clearing Banks are not open for business the Purchaser shall also pay on completion interest as aforesaid in respect of any day following the day on which completion takes place and preceding the next following day on which the said Banks are so open)

2.9     The Purchaser shall in the Assurance of the Property to the Purchaser

        2.9.1   covenant for himself/his successors in title and assigns with the Vendor and their successors in title and assigns at all times thereafter to observe and perform the covenants and obligations on the part of the Lessee contained in the Lease and at all times thereafter to indemnify and keep the Vendor and their estates and effects indemnified from and against all liability in respect of any breach or non-observance or non-performance thereof or any of them

GR963240.669

2.9.2 join in a declaration that it shall not be implied by virtue of the Vendor transferring the Lease that the covenants or any of them contained in the Lease relating to repair and decoration and condition of the Property have been performed up to the date thereof

2.10 Notwithstanding the completion of the sale and purchase hereby agreed anything herein contained to which effect has not been given by the Transfer to the Purchaser and which is capable of taking effect after completion shall remain in full force and effect

2.11 The National Conditions of Sale (20th Edition) shall (subject as hereinafter mentioned) be incorporated herein so far as they are applicable to a sale by private treaty and are not inconsistent with the other terms hereof

SAVE THAT:

Conditions 8(3) 15(2) and (3) and 21(2) and (3) thereof shall not apply and in Condition 6(3) the words "beneficial occupation" shall be deleted and the words "actual occupation" substituted therefor

2.12 This Agreement and the benefit and burden thereof are non-assignable and the Vendor shall not be liable to convey assign or transfer the Property the subject of this Agreement to any person firm or company other than the Purchaser

2.13 If the deposit paid on exchange of Contracts shall be less than Ten per centum (10%) then notwithstanding the payment of that lesser amount the balance of the Ten per centum (10%) shall at all times remain due and owing to the Vendor and in the event of rescission or failure to complete through no fault of the Vendor such balance shall be the liability of the Purchaser to pay to the Vendor

2.14 In this Agreement

2.14.1 The masculine gender shall include the feminine and the singular number the plural and vice versa and person includes firm company or corporation



2.14.2 If the Vendor or the Purchaser comprises more than one person the expression in question shall mean all of those persons and any one or more of them and all the obligations of the Vendor or the Purchaser (as the case may be) express or implied shall be joint and several obligations

**AS WITNESS** the hands of the parties hereto on the date first before written

SIGNED ......................................................

For the Purchaser

GR053240.658

# EXHIBIT 112

# EXHIBIT NN

United States District Court
Southern District Of New York

-----------------------------------------------X

Virginia L. Giuffre,

    Plaintiff,

v.                                                                    15-cv-07433-RWS

Ghislaine Maxwell,

    Defendant.

-----------------------------------------------X

### DEFENDANT GHISLAINE MAXWELL'S
### INITIAL F.R.C.P. 26(a)(1)(A) DISCLOSURES

Pursuant to F.R.C.P. 26(a)(1)(A), Defendant Ghislaine Maxwell makes the following

disclosures:

## I. IDENTITIES OF INDIVIDUALS LIKELY TO HAVE DISCOVERABLE INFORMATION RELEVANT TO DISPUTED FACTS ALLEGED WITH PARTICULARITY IN THE PLEADINGS

1. Ghislaine Maxwell
   c/o Laura A. Menninger, Esq.
   Haddon, Morgan & Foreman, P.C.
   150 E. 10th Ave.
   Denver, CO 80203
   303-831-7364
   LMenninger@HMFLaw.com

   Ms. Maxwell is the Defendant and may have knowledge concerning matters at issue, including the events of 1999-2002 and the publication of statements in the press in 2011-2015.

2. Virginia Lee Roberts Giuffre
   c/o Sigrid S. McCawley, Esq.
   Boies, Schiller & Flexner LLP
   401 East Las Olas Boulevard, Suite 1200

Miami, Florida 33301
(954) 356-0011
smccawley@bsfllp.com

Ms. Giuffre is the Plaintiff and has knowledge concerning the matters at issue in
her Complaint, including the events of 1996-2015 and the publication of
statements in the press in 2011-2015.

3. Philip Barden
   Devonshires Solicitors LLP
   30 Finsbury Circus
   London, United Kingdom
   EC2M 7DT
   DX: 33856 Finsbury Square
   (020) 7628-7576
   Philip.Barden@devonshires.co.uk

   Mr. Barden has knowledge concerning press statements by Plaintiff and
   Defendant in 2011-2015 at issue in this matter.

4. Paul Cassell
   College of Law, University of Utah
   383 South University Street
   Salt Lake City, UT 84112
   801-585-5202
   paul.cassell@law.utah.edu

   Mr. Cassell has knowledge concerning press statements by Plaintiff, Plaintiff's
   court pleadings, and Plaintiff's sworn testimony.

5. Alan Dershowitz
   c/o Richard A. Simpson, Esq.
   WILEY REIN, LLP
   1776 K Street NW
   Washington, D.C. 20006
   (202) 719-7000

   Mr. Dershowitz has knowledge concerning Plaintiff's false statements to the
   press, in court pleadings, and in sworn testimony, at issue in this matter.

6. Bradley Edwards
   Farmer, Jaffe, Weissing, Edwards, Fistos & Lehrman, P.L.
   425 N. Andrews Ave., Suite 2
   Ft. Lauderdale, FL 33301
   (954) 524-2820
   brad@pathtojustice.com

Dated: February 24, 2016.

Respectfully submitted,

*s/ Laura A. Menninger*
Laura A. Menninger (LM-1374)
HADDON, MORGAN AND FOREMAN, P.C.
150 East 10th Avenue
Denver, CO 80203
Phone:   303.831.7364
Fax:        303.832.2628
lmenninger@hmflaw.com

*Attorney for Ghislaine Maxwell*

## CERTIFICATE OF SERVICE

I certify that on February 24, 2016, I electronically served this *DEFENDANT GHISLAINE MAXWELL'S INITIAL F.R.C.P. 26(A)(1) DISCLOSURES* via e-mail on the following:

Sigrid S. McCawley
BOIES, SCHILLER & FLEXNER, LLP
401 East Las Olas Boulevard, Ste. 1200
Ft. Lauderdale, FL 33301
smccawley@bsfllp.com

*s/ Laura A. Menninger*
Laura A. Menninger

7

EXHIBIT 112

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x
                                        :
UNITED STATES OF AMERICA,               :
                                        :        20 Cr. 330 (AJN)
        v.                              :
                                        :
GHISLAINE MAXWELL,                      :
                                        :
                Defendant.              :
                                        :
------------------------------------------------------------x

## REPLY MEMORANDUM OF GHISLAINE MAXWELL
## IN SUPPORT OF MOTION TO STRIKE SURPLUSAGE
## FROM SUPERSEDING INDICTMENT

Christian R. Everdell
COHEN & GRESSER LLP
800 Third Avenue New
York, NY 10022
Phone: 212-957-7600

Jeffrey S. Pagliuca
Laura A. Menninger
HADDON, MORGAN & FOREMAN P.C.
150 East 10th Avenue
Denver, CO 80203
Phone: 303-831-7364

Bobbi C. Sternheim
Law Offices of Bobbi C. Sternheim
33 West 19th Street - 4th Floor
New York, NY 10011
Phone: 212-243-1100

*Attorneys for Ghislaine Maxwell*

## TABLE OF CONTENTS

**Page**

I.    The Allegations Regarding Accuser-3 Are Irrelevant to the Alleged Conspiracies. .......... 2

II.   The Allegations Regarding Accuser-3 Are Unduly Prejudicial to Ms. Maxwell. .............. 6

III.  At Minimum, the Government Must Demonstrate the Admissibility of Evidence Regarding Accuser-3 Pursuant to Fed. R. Evid. 404(b). ...................................................... 9

CONCLUSION .......................................................................................................................... 10

i

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Esquivel-Quintana v. Sessions,*
137 S.Ct. 1562 (2017) .............................................................................................................. 6

*United States v. DeFabritus,*
605 F. Supp. 1538 (S.D.N.Y. 1985) .......................................................................................... 8

*United States v. Greebel,*
No. 15-cr-637 (KAM), 2017 WL 3610570 (E.D.N.Y. Aug. 4, 2017) ........................................ 8

*United States v. Hitt,*
249 F.3d 1010 (D.C. Cir. 2001) ............................................................................................... 4

*United States v. Hsia,*
24 F. Supp. 2d 14 (D.D.C. 1998) ............................................................................................. 5

*United States v. Scarpa,*
913 F.2d 993 (2d Cir. 1990) ..................................................................................................... 8

*United States v. Sharpe,*
438 F.3d 1257 (11th Cir. 2006) ............................................................................................... 4

**Statutes**

18 U.S.C. § 2422(a) ............................................................................................................. 1, 2

18 U.S.C. § 2423(a) ............................................................................................................. 1, 2

**Rules**

Fed. R. Evid. 404(b) ................................................................................................................ 2, 9

**Other Authorities**

"Sexual abuse," Merriam-Webster.com Legal Dictionary, Merriam-Webster,
https://www.merriam-webster.com/legal/sexual%20abuse, accessed 11 Mar. 2021. ................ 6

Ghislaine Maxwell respectfully submits this Reply Memorandum in Support of her Motion to Strike Surplusage from the Indictment ("Motion").

In its opposition ("Opp.") to Ms. Maxwell's Motion, the government concedes it cannot charge Ms. Maxwell with a substantive offense against Accuser-3[1] under either 18 U.S.C. § 2422(a) or 18 U.S.C. § 2423(a). It concedes that any such charge as to Accuser-3 would be time-barred. (Opp. 164). It concedes that it cannot show that either Ms. Maxwell or Jeffrey Epstein ever engaged, or sought to engage, in unlawful sexual activity with Accuser-3, who at all relevant times was above the legal age of consent in England, where all alleged activity as to Accuser-3 occurred. (Opp. 162 n.57.) And it concedes that it cannot establish that either Ms. Maxwell or Epstein ever caused, or sought to cause, Accuser-3 to travel while she was a minor. (Opp. 163 n.58.)

Yet the government argues that Ms. Maxwell and Epstein's alleged lawful interactions with Accuser-3 were somehow "part of" and "in furtherance of" a conspiracy to entice or cause underage girls to travel to engage in unlawful sexual activity with Epstein. Opp. 161, 163. The government's argument defies logic. The government does not and cannot explain how purported lawful, consensual sexual activity in England was part of an alleged conspiracy to cause minors to travel in the United States. Its eleventh-hour effort to salvage its allegations regarding Accuser-3 by proffering evidence that she ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮—evidence that the grand jury did not include in the Superseding Indictment ("Indictment") —does not establish the relevance of those allegations, given the government's inability to show that Accuser-3 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.

---

[1] Accuser-3 is identified in the Superseding Indictment as "Minor Victim-3." Similarly, the individuals identified in the Superseding Indictment as "Minor Victim-1" and "Minor Victim-2" are referred to herein as Accuser-1 and Accuser-2, respectively.

Even more incomprehensible is the government's argument that the allegations regarding Accuser-3 are not prejudicial. The government concedes that it has characterized Accuser-3's lawful, consensual sexual encounters with Epstein as "sexual[] abuse[]," based solely on Accuser-3's "subjective experience" of those encounters. By characterizing those encounters as "sexual[] abuse[]," the government has falsely accused Ms. Maxwell of a crime that it now admits she did not commit, improperly broadening the charges against her by implying that she participated in the sexual abuse of three minors rather than two. The allegations as to Accuser-3 are thus irrelevant and prejudicial and should be stricken. At minimum, the allegation that Ms. Maxwell was complicit in the purported sexual abuse of Accuser-3 should be stricken.

Finally, the government effectively concedes that the admissibility of evidence regarding Accuser-3 must be litigated under Fed. R. Evid. 404(b). While the government's effort to establish the admissibility of such evidence in its opposition suffers from the same infirmities as its inclusion of the allegations regarding Accuser-3 in the Indictment, Ms. Maxwell will respond to the government's admissibility arguments more fully at the appropriate time.

**I.      The Allegations Regarding Accuser-3 Are Irrelevant to the Alleged Conspiracies.**

The Indictment alleges that Ms. Maxwell conspired with Epstein to (i) violate 18 U.S.C. § 2422(a), with the objective of enticing one or more individuals to travel in interstate and foreign commerce for the purpose of engaging in unlawful sexual activity (Indictment ¶¶ 9-10); and (ii) violate 18 U.S.C. § 2423(a), with the objective of transporting an individual under age 18 with the intent that the individual engage in unlawful sexual activity (*Id.* ¶¶ 15-16). As an overt act in furtherance of these conspiracies, the government alleges that Ms. Maxwell "encouraged [Accuser-3] to provide massages to Epstein in London, England, knowing that Epstein intended to *sexually abuse* [Accuser-3] during those massages." *Id.* ¶¶ 11d, 17d (emphasis added). The Indictment further alleges that Epstein "sexually abused" Accuser-3. *Id.* ¶ 7c.

2

The government does not and cannot dispute that Accuser-3 was above the legal age of consent in England at all relevant times, and that it cannot establish that Accuser-3's alleged sexual encounters with Epstein were anything other than consensual and lawful. Nor can the government dispute that the Indictment does not contain a single allegation that Ms. Maxwell, Epstein, or anyone else ever transported Accuser-3 or enticed her to travel—let alone with the intent that she engage in unlawful sexual activity. The Indictment offers no conceivable scenario in which Ms. Maxwell's alleged encouragement of Accuser-3 to engage in lawful sexual activity with Epstein in England "furthered" an alleged conspiracy to cause minors to travel for the purpose of engaging in *unlawful* sexual activity.

The government's argument that Ms. Maxwell and Epstein's alleged interactions with Accuser-3 were "part of" such a conspiracy uses bizarre logic. *See* Opp. 161. The government does not claim that any alleged interactions between Ms. Maxwell or Epstein and Accuser-3 in any way caused, or attempted to cause, *any* minor to travel, let alone for the purpose of the minor's involvement in unlawful sexual activity. Instead, the government argues that because it has alleged that Ms. Maxwell "groomed" two *other* minor individuals who traveled and engaged in illegal sex acts with Epstein, it somehow "follows" that encouraging an individual of legal age to engage in entirely lawful sexual activity with Epstein—unaccompanied by any alleged travel or intended travel—was "part of" conspiracies to cause underage individuals to travel. Opp. 161.

Apparently recognizing the tenuous connection between its allegations regarding Accuser-3 and the alleged conspiracies, the government attempts to bolster its allegations after the fact by proffering Accuser-3's testimony that she ███████████████████████████

████████████████████████████████████ To the extent that it is appropriate for the Court to

3

consider such a proffer in the context of a motion to strike,[2] the proffered testimony, even if credited, adds nothing to the analysis. By the government's own admission, Accuser-3 will not testify, and the government cannot prove, that Accuser-3 ███████████████████████████

███████████████████████████████████ ▪

████████████████████████████████████████████████████ Thus,

even if Accuser-3 testifies in accordance with the proffer, the government will be unable to establish that she was transported or enticed to travel for the purpose of engaging in unlawful sexual activity.[4]

The government argues that it "does not matter" whether Accuser-3 was an adult when invited to travel (Opp. 162), because even evidence that she was invited to travel *as an adult* would be "probative" of Ms. Maxwell's "intent, in her initial interactions with [Accuser-3], to entice [Accuser-3] to travel and be transported for the purpose of engaging in sexual acts." Opp. 163. But there is nothing unlawful about "entic[ing]" an adult to "travel and be transported for the purpose of engaging in sexual acts" if those acts themselves are entirely lawful. Nor does Ms. Maxwell's alleged role in Accuser-3's purported lawful sexual activity with Epstein in England, while Accuser-3 was allegedly under age 18, evince an intent to entice Accuser-3 to travel before she turned 18.

_____

[2] In addressing the sufficiency of allegations in the similar context of a motion to dismiss, courts have recognized that they are limited to consideration of the language of the indictment. *See, e.g., United States v. Sharpe,* 438 F.3d 1257, 1263 (11th Cir. 2006) ("a district court is limited to reviewing the *face* of the indictment") (emphasis in original); *United States v. Hitt,* 249 F.3d 1010, 1016 (D.C. Cir. 2001) ("Adherence to the language of the indictment is essential because the Fifth Amendment requires that criminal prosecutions be limited to the unique allegations of the indictments returned by the grand jury.").

[3] The government concedes that it cannot establish that Accuser-3 ████████████████████
██████████████████ Opp. 163 n.58 (admitting that Accuser-3 is ████████████████████
████████).

[4] It bears mention that Accuser-3's proffered testimony appears to be uncorroborated by documentary evidence. ██
████████████████████████████████████████████
███████████████████████████

4

The government also improperly stretches the scope of the alleged conspiracies in a failing attempt to make its allegations regarding Accuser-3 fit within those charges. For example, the government asserts that Ms. Maxwell's alleged role in purported lawful sexual activity involving Epstein and Accuser-3 in England is "evidence of the defendant's agreements with Epstein to identify minor girls to entice and transport for purposes of illegal sex acts." (Opp. 162.) But the Indictment does not allege that Ms. Maxwell conspired with Epstein to "entice" minor girls to commit illegal sex acts, let alone to "identify minor girls" for such an enticement. Nor could it, since mere "enticement" to commit illegal sex acts is insufficient to establish a Mann Act violation. The alleged conspiracies were conspiracies to entice or cause minors to *travel* for purposes of engaging in illegal sex acts, and the Indictment does not allege that Accuser-3 ever traveled or engaged in illegal sex acts.

The government commits a similar Freudian slip in its attempt to distinguish *United States v. Hsia*, 24 F. Supp. 2d 14 (D.D.C. 1998), when it states that "the allegations regarding [Accuser-3] involve conduct that falls within the heartland of the conspiracy:  grooming a minor girl to engage in sex acts with Jeffrey Epstein." Opp. 164 n.59. The "heartland of the conspiracy" is actual or contemplated *interstate travel* of minor girls to engage in *unlawful* sexual acts with Epstein, which the government cannot establish with respect to Accuser-3. The government's opposition repeatedly treats interstate travel, the linchpin of federal court jurisdiction over the alleged conduct and the necessary object of the conspiracies alleged, as a throwaway element of its case.

In short, neither the allegations regarding Accuser-3 nor the government's proffer establish an intent that Accuser-3 (i) engage in "illegal sex acts" or (ii) travel while a minor. The

5

government's allegations regarding Accuser-3 are thus not in furtherance of, and are irrelevant to, any alleged conspiracy to cause minors to travel to engage in unlawful sex acts.

**II.    The Allegations Regarding Accuser-3 Are Unduly Prejudicial to Ms. Maxwell.**

The government now concedes that when it alleges that Epstein "sexually abused" Accuser-3 with Ms. Maxwell's knowledge and assistance, the purported "sexual abuse" to which the government refers was entirely lawful conduct—and that the sole basis for the government's characterization of that lawful conduct as "sexual abuse" was Accuser-3's "subjective experience" of consensual sex acts. Opp. 162 n.57. Such a characterization is, to say the least, grossly misleading. As the government argued in a 2017 Supreme Court case, the term "sexual abuse" implies a crime. *See Esquivel-Quintana v. Sessions,* 137 S.Ct. 1562, 1569 (2017) ("'Sexual abuse of a minor,' the Government accordingly contends, '*most naturally connotes* conduct that (1) is *illegal*, (2) involves sexual activity, and (3) is directed at a person younger than 18 years old.'") (quoting government's brief) (emphases added). Merriam-Webster's legal dictionary defines "sexual abuse" as (i) "the infliction of sexual contact upon a person by forcible compulsion," (ii) "engaging in sexual contact with a person who is below a specified age or who is incapable of giving consent because of age or mental or physical incapacity," or (iii) "the crime of engaging in or inflicting sexual abuse." "Sexual abuse," Merriam-Webster.com Legal Dictionary, Merriam-Webster, https://www.merriam-webster.com/legal/sexual%20abuse, accessed 11 Mar. 2021.

Although the government concedes its inability to establish that Accuser-3's alleged interactions with Ms. Maxwell and Epstein were anything other than consensual and lawful, it insists that it has "accurately" characterized those allegations and that "it is neither misleading nor prejudicial to imply that this activity involved illegal conduct." Opp. 165. The government's rationale is baseless and untenable: Since the government has alleged that lawful

conduct involving Accuser-3 was an overt act in furtherance of a conspiracy, it argues that it is entitled to imply that the conduct itself was unlawful. The obvious flaws in this logic are at least threefold. *First,* the Indictment does not merely imply that the alleged conduct involving Accuser-3 was unlawful; it specifically and falsely characterizes the conduct as "sexual[] abuse[]." *Second,* as the government points out repeatedly, an overt act in furtherance of a conspiracy need not itself be unlawful. *See, e.g.,* Opp. 161 ("It is axiomatic that a conspiracy does not require a completed substantive crime."). And *third,* the government's reasoning is circular: It argues simultaneously that Accuser-3's lawful sexual encounters with Epstein demonstrate the existence of a conspiracy, and that the existence of a conspiracy makes those sexual encounters unlawful.

Since the government concedes that Epstein's alleged sexual contact with Accuser-3 was consensual and lawful, and that Accuser-3 was above the legal age of consent, the government's allegation that Ms. Maxwell was complicit in the "sexual[] abuse[]" of Accuser-3 amounts to a knowingly false accusation that she committed a crime. It is hard to conceive of a more inflammatory or prejudicial allegation.

Also troubling is the government's statement that Accuser-3 will testify to her "subjective experience" of her admittedly lawful sexual encounters with Epstein "as traumatic, exploitative, and abusive." *See* Opp. 162 n.57 (emphasis added). To the extent that evidence regarding Accuser-3's involvement in lawful sexual activity in England while she was above the age of legal consent has any relevance whatsoever to an alleged conspiracy to cause underage girls to travel in the United States to engage in illegal sex acts, that relevance certainly does not encompass Accuser-3's "subjective experience" of her lawful, consensual encounters. The government's intention to present such testimony further demonstrates that Accuser-3's function

7

in this case is not to provide evidence probative of any alleged conspiracy to cause underage girls to travel, but rather to prejudice the jury by creating a cumulative impression of Ms. Maxwell as a serial "abuser."

Finally, the government's argument that its allegations regarding Accuser-3 are "no more inflammatory or prejudicial than those describing the experiences of [Accuser-1] and [Accuser-2]" has no legal basis. Because this Motion does not challenge the relevance of the government's allegations regarding Accuser-1 and Accuser-2, the inflammatory and prejudicial nature of those allegations alone would not provide a basis to strike them. *See United States v. Scarpa*, 913 F.2d 993, 1013 (2d Cir. 1990) (noting that if evidence of allegation is relevant, allegation may not be stricken regardless of how prejudicial it is). However, the government's suggestion that Ms. Maxwell is not prejudiced by the inclusion of false, irrelevant allegations that Ms. Maxwell was complicit in a crime against Accuser-3 is contrary to case law striking allegations that broaden the charges against a defendant. *See, e.g., United States v. Greebel*, No. 15-cr-637 (KAM), 2017 WL 3610570, at *2 (E.D.N.Y. Aug. 4, 2017) ("An unsupported . . . allegation that Mr. Greebel was involved in orchestrating all four schemes [instead of the two with which he was charged] broadens the actual charges against him, and creates a significant risk of jury confusion and prejudice."); *United States v. DeFabritus*, 605 F. Supp. 1538, 1547 (S.D.N.Y. 1985) (striking "among other things" language as prejudicial where it "would lead the jury to draw improper inferences regarding other crimes not charged in the indictment").

The government's allegation that Ms. Maxwell was complicit in the "sexual abuse" of Accuser-3 is both untrue and highly prejudicial. The government is simply trying to bolster a weak case by including irrelevant, prejudicial allegations from a third accuser that have no bearing on the charged crimes. The allegations regarding Accuser-3 should be stricken.

8

**III.**   **At Minimum, the Government Must Demonstrate the Admissibility of Evidence Regarding Accuser-3 Pursuant to Fed. R. Evid. 404(b).**

The government apparently does not dispute its obligation to demonstrate the admissibility of Accuser-3's testimony as "other act" evidence under Fed. R. Evid. 404(b). Litigation of the admissibility of this evidence is premature, and Ms. Maxwell reserves the right to challenge it at the appropriate juncture. Ms. Maxwell notes, however, that the government's argument that such evidence is admissible under Fed. R. Evid. 404(b) suffers from the same flaws as its argument that Ms. Maxwell's interactions regarding Accuser-3 constitute an overt act.

The government claims Accuser-3's testimony is admissible to show Ms. Maxwell's "knowledge, intent, and *modus operandi*." Opp. 158 (emphasis in original). The government's very use of those terms, however, betrays an implication that Ms. Maxwell's interactions with Accuser-3 were somehow unlawful. Any knowledge or intent on Ms. Maxwell's part that Epstein would engage in consensual sexual activity with Accuser-3, or any method by which she purportedly persuaded Accuser-3 to engage in such lawful conduct, has no bearing on whether Ms. Maxwell knew or intended Accuser-1 or Accuser-2 to engage in *unlawful* sexual activity. And Accuser-3's proffered testimony about her "subjective experience" of her lawful, consensual activity with Epstein certainly would not inform the jury as to *Ms. Maxwell's* state of mind or conduct with respect to Accuser-1 or Accuser-2. Ms. Maxwell is prepared to brief these issues more fully in connection with her evidentiary motions.

## **CONCLUSION**

For the foregoing reasons, Ms. Maxwell respectfully requests that the Court strike all

references to Accuser-3 from Paragraph 7 of the indictment, and that the Court strike Paragraphs

7c, 11d, and 17d in their entirety.

Dated: March 15, 2021
      New York, New York

                    Respectfully submitted,

                    */s/ Christian R. Everdell*
                    Christian R. Everdell
                    COHEN & GRESSER LLP
                    800 Third Avenue
                    New York, NY 10022
                    Phone: 212-957-7600

                    Jeffrey S. Pagliuca
                    Laura A. Menninger
                    HADDON, MORGAN & FOREMAN P.C.
                    150 East 10th Avenue
                    Denver, Colorado 80203
                    Phone: 303-831-7364

                    Bobbi C. Sternheim
                    Law Offices of Bobbi C. Sternheim
                    33 West 19th Street - 4th Floor
                    New York, NY 10011
                    Phone: 212-243-1100

                    *Attorneys for Ghislaine Maxwell*

## CERTIFICATE OF SERVICE

I hereby certify that on March 15, 2021, I served by email, pursuant Rule 2(B) of the Court's individual practices in criminal cases, the within memorandum and any accompanying exhibits upon the following:

Maurene Comey
Alison Moe
Lara Pomerantz
Andrew Rohrbach
U.S. Attorney's Office, SDNY
One Saint Andrew's Plaza
New York, NY 10007
Maurene.comey@usdoj.gov
Alison.moe@usdoj.gov
Lara.Pomerantz@usdoj.gov
Andrew.Rohrbach@usdoj.gov

*/s/ Christian Everdell*

# EXHIBIT 113

Sigrid S. McCawley
Telephone: (954) 377-4223
Email: smccawley@bsfllp.com

April 5, 2021

**VIA EMAIL (FILED UNDER TEMPORARY SEAL)**

The Honorable Alison J. Nathan
United States District Court
Southern District of New York
40 Foley Square
New York, New York 10007

**Re: *United States v. Ghislaine Maxwell*, 20 Cr. 330 (AJN)**
**Rule 17 Subpoena to Boies Schiller Flexner LLP**

Dear Judge Nathan:

I write on behalf of Boies Schiller Flexner LLP ("BSF") in further support of its objections to Defendant Ghislaine Maxwell's motion for an order authorizing a subpoena to BSF pursuant to Rule 17(c) of the Federal Rules of Criminal Procedure (the "Subpoena").[1] As the Defendant's response makes clear, she seeks to serve a Rule 17 subpoena on BSF because she is dissatisfied with the Government's discovery efforts thus far. Thus, she is using Rule 17 to attempt to obtain discovery that she has been unable to obtain from the Government under Rule 16 and *Brady*, including discovery that is subject to a pending motion before the Court. This is an improper use of a Rule 17 subpoena. If the Defendant believes that the Government has not fulfilled its discovery obligations under Rule 16, *Brady*, or *Giglio*, she must address that issue with the Government and the Court rather than serving overbroad and burdensome subpoenas on third parties. And if the Defendant is not entitled to the discovery she seeks from the Government, then

[1] The Defendant refers to BSF's objections as a "motion to quash," but the Court has not yet granted Defendant's motion to authorize the Subpoena to BSF. BSF thus requests that the Defendant's motion to authorize the Subpoena be denied.

The Honorable Alison J. Nathan
April 5, 2021
Page **2** of **17**

she may not use Rule 17 to circumvent Rule 16. For this reason and the additional reasons

explained below, the Court should deny the Defendant's motion to authorize the Subpoena to BSF.

## I.    Requests 1–5: Communications About the Defendant and ▮▮▮▮▮▮▮▮

### A.    The Requests Are Not Specific.

The Defendant has failed to meet her burden of demonstrating that Requests 1 through 5—

for a broad range of communications between BSF and others about the Defendant and ▮▮▮▮▮▮▮

▮▮▮▮—clear *Nixon*'s hurdles of relevancy, admissibility, and specificity. *See United States v.*

*Nixon,* 418 U.S. 683, 700 (1974). As to specificity, Maxwell first argues that Requests 1 through

5 are sufficiently specific because they "are specific as to date and limited by the identified

individuals and subject matter." Resp. Ltr. at 2. But the specificity hurdle requires more. "In order

to avoid speculation that the moving party is using Rule 17(c) to circumvent normal discovery

requirements, the party's Rule 17(c) subpoena must be able to reasonably specify the information

contained or believed to be contained in the documents sought rather than merely hope that

something useful will turn up." *United States v. Mendinueta-Ibarro*, 956 F. Supp. 2d 511, 513

(S.D.N.Y. 2013) (internal quotation marks omitted). Accordingly, "[r]equests for any and all

communications, even if tied to specific documents and topics, are potentially 'fishing expeditions'

for unspecified materials and insufficiently specific under *United States v. Nixon*." *United States*

*v. Bergstein*, No. 16-CR-746 (PKC), 2018 WL 9539775, at *1 (S.D.N.Y. Feb. 1, 2018).

The Defendant's broad requests for all of BSF's communications with certain individuals

and entities about general topics over a years-long time period do not meet the specificity

requirement, just like numerous of the defendant's requests in *Avenatti* failed the specificity

requirement. For example, Judge Gardephe held that Mr. Avenatti's "request for all audio

recordings (and transcripts thereof) (1) involving [eight designated individuals]; (2) that contain a

The Honorable Alison J. Nathan
April 5, 2021
Page 3 of 17

discussion of corruption in amateur basketball; and (3) that took place within a thirty-nine month

period" failed the specificity requirement, even though the request was limited by time, subject

matter, and identified individuals. *United States v. Avenatti*, No. (S1) 19 CR. 373 (PGG), 2020

WL 86768, at *6 (S.D.N.Y. Jan. 6, 2020) (holding that request "reads like a request under the

Federal Rules of Civil Procedure" and that "[b]lanket requests of this sort violate the specificity

requirement set forth in *Nixon*"). Judge Gardephe similarly held that Mr. Avenatti's request for

"email and text message communications between Franklin and Auerbach that (1) mention

Avenatti, and (2) were transmitted after Avenatti's March 25, 2019 arrest" failed *Nixon*'s

specificity requirement, even though that request was also limited by time, subject matter, and

identified individuals. *United States v. Avenatti*, No. (S1) 19 CR. 373 (PGG), 2020 WL 508682,

at *5 (S.D.N.Y. Jan. 31, 2020). Thus, there mere fact that the Defendant's requests here are

tethered to a broad time period of five years and broad subject matters (the Defendant and ▓▓▓

▓▓▓▓▓▓, for example) cannot save her Requests.[2]

     The Defendant attempts to distinguish these Requests from those that courts have

characterized as improper "any and all" requests by pointing to the fact that the Requests do not

literally contain the words "any" or "all." Resp. Ltr. at 3. But this does not change the fact that

---

[2]     *See also, e.g., Bergstein*, 2018 WL 9539775, at *1 (finding that requests seeking "all communications between Parmar and Bergstein, Albert Hallac, Jeffrey Hallac, or Keith Wellner related to the negotiations of, documentation of, and performance or non-performance under three agreements governing the acquisition of the medical billing business described in the indictment" and "all communications between Parmar and any of the same four individuals related to payments, reimbursement, advances, or loans for Parmar's direct or indirect benefit in connection with the same agreements" failed *Nixon*'s specificity requirement); *United States v. Seabrook*, No. 16-CR-467, 2017 WL 4838311, at *3 (S.D.N.Y. Oct. 23, 2017) ("Cooley Request 2 is quashed on specificity and admissibility grounds. Cooley Request 2 seeks documents concerning or comprising communications between Cooley and the Government relating to any of the allegations in the Indictment.").

The Honorable Alison J. Nathan
April 5, 2021
Page 4 of 17

the Requests themselves ask for "communications" between BSF and a designated party about a

general topic over a five-year period, and then define communications as "all forms of

correspondence." Request 2, for example, is for "Communications between You and the United

States Attorney between 2015 and the date of this subpoena about ███████████," defining

"communications" as "all forms of correspondence"; defining "BSF" as "any owner, shareholder,

partner or employee of" BSF; and defining "the United States Attorney" as "any employee of the

office of the United States Attorney for the Southern District of New York." This Request cannot

be read as anything but "*all* communications in any form between anyone who has ever worked at

BSF in any capacity and anyone who has ever worked at the S.D.N.Y. United States Attorney's

office in any capacity between 2015 and the date of this subpoena about ███████████." Thus,

due to their expansive definitions, the Defendant's requests are *even broader* than those that Judge

Gardephe rejected in *Avenatti*, which were limited to identified individuals.[3] Requests 1 through

5 of the subpoena thus fail *Nixon*'s specificity requirement.

---

[3]     The Defendant contends that Requests 1 through 5 are similar to those approved by the
court in *United States v. Wey*, 252 F. Supp. 3d 237 (S.D.N.Y. 2017). Resp. Ltr. at 6. But in *Wey*,
the court originally denied the defendant's motion for the issuance of a Rule 17 subpoena because
it requested: "All emails and records related to the listing applications and approvals for
[SmartHeat], [Deer], and [CleanTech], including in particular, any communications regarding, or
interpretation or application of, the 300 round-lot shareholder requirement." *Id.* at 243. The court
found that the defendant "had not identified the documents sought with the requisite specificity
and had failed to make the necessary showing that all requested documents would be admissible
at trial," but granted the defendant leave to renew is motion and show that Rule 17's requirements
were met. *Id.* The defendant then submitted a new set of requests that, unlike the Requests at
issue here, limited the request to communications between a certain, specified set of individuals
and narrow time periods of approximately a year or less. *Id.* The defendant's renewed motion also,
unlike the Defendant's response here, "set forth anticipated bases for admission of the documents
at trial through several specific exceptions to the hearsay rule." *Id.* Thus, the court granted the
renewed motion. *Id.*

Case 1:20-cr-00330-PAE Document 578-8 Filed 02/28/24 Page 34 of 445
Case 1:20-cr-00330-PAE Document 656-8 Filed 02/28/24 Page 34 of 445

The Honorable Alison J. Nathan
April 5, 2021
Page **5** of **17**

The Defendant argues that Requests 1 through 5 are not a fishing expedition merely because the government has admitted "that there were, in fact meetings and communications between these individuals and the USAO-SDNY about Ms. Maxwell and ██████████" and because Virginia Giuffre logged a number of communications on a privilege log in 2016. Resp. Ltr. at 2, 3. This does not get the Requests over *Nixon*'s hurdles—the Defendant is still attempting to fish through BSF's communications in the hopes that something relevant and admissible turns up, without setting forth the relevance and admissibility as to each document she seeks. Further the privilege log does not, as the Defendant insinuates, reference communications between BSF and the U.S. Attorney as defined in the Subpoena, as the log references only an unspecified "law enforcement agency." *Id.* at 4.

B. The Defendant Has Not Demonstrated Relevance and Admissibility.

The Court's analysis does not stop at specificity—Requests 1 through 5 independently fail because the Defendant has not demonstrated that all of the communications she seeks are relevant and admissible. The Defendant's sole basis for contending that the wide array of communications she seeks are all relevant to her defense is that the communications are relevant to "two motions to suppress based on misrepresentations made by the government to Chief Judge McMahon and a motion to dismiss the indictment for prejudicial delay" because they "would establish the substance and frequency of the communications between BSF and the government prior to the government's end run around *Martindell*." Resp. Ltr. at 6–7. But the Defendant has not met her burden of demonstrating relevance and admissibility.

*First*, because Rule 17's "purpose is trial-focused," a Rule 17(c) subpoena "may be used only to obtain materials admissible as evidence *at trial*." *United States v. Louis*, No. 04 Cr. 203 (LTS), 2005 WL 180885, at *3 (S.D.N.Y. Jan. 27, 2005) (emphasis added); *see also United States*

*v. Rajaratnam*, 753 F. Supp. 2d 317, 320 (S.D.N.Y. 2011) (Rule 17(c) "was not intended to provide a means of discovery for criminal cases"; rather, "its chief innovation was *to expedite the trial* by providing a time and place before trial for the inspection of subpoenaed materials" (emphasis added)). The Defendant has failed to explain how the communications sought in Requests 1 through 5 will be relevant and admissible at trial, and only points to three pending pre-trial motions.

*Second*, although BSF cannot fully respond to the Defendant's relevance arguments as to the Defendant's two motions to suppress because it has not been provided unredacted versions of those motions and because it has not been provided a copy of the Defendant's *ex parte* motion,[4] one thing is clear—it is not conceivable that every communication the Defendant requests in Requests 1 through 5 would be relevant and admissible at an evidentiary hearing on her motions. A defendant must demonstrate that all of the evidence it seeks pursuant to a Rule 17 subpoena would be relevant and admissible, not just that the defendant is likely to find something relevant and admissible in the nonparty's production. *See, e.g., United States v. Pena*, No. 15 Cr. 551 (AJN), 2016 WL 8735699, at *2 (S.D.N.Y. Feb. 12, 2016) ("Pena has failed to make the requisite showing regarding the admissibility of 'any and all' other records regarding the cooperators that might exist at the MDC, MCC, or DOC.").

For example, it is entirely unclear how communications regarding ▆▆▆▆▆▆▆ would be relevant to any of the Defendant's pretrial motions; her two motions to suppress relate to evidence obtained by the Government by means of a grand jury subpoena to what appears to be

---

[4]    If the Court is inclined to grant the Defendants' motion as to Requests 1 through 5, BSF requests that it first be provided with an opportunity to fully respond to the Defendant's relevance arguments after being provided with unredacted versions of the two pretrial motions that the Defendant cites in her response and a copy of her *ex parte* motion, in which she presumably attempts to explain the relevance of her Requests in a more fulsome way than her barebones response letter.

BSF, and her motion to dismiss for pre-indictment delay is based on the time that has passed between the time at which the Government first learned of the allegations against the Defendant and the Defendant's indictment. ECF No. 134, 138, 140. The public versions of those filings do not mention ██████ at all. Even the relevance of *all* communications between BSF and the Government relating to the Defendant herself is dubious as it relates to these three motions. At base, it is not BSF's burden to "to cull the good from the bad" among its communications about the Defendant and to determine what would relevant at trial or at an evidentiary hearing. *See Bowman Dairy Co. v. United States*, 341 U.S. 214, 220 (1951).

*Third*, the Defendant has not even attempted to demonstrate that all of the evidence she seeks would be admissible. Although the lack of specificity in Requests 1 through 5 makes it impossible to meaningfully debate the admissibility of each piece of evidence she seeks, certainly many of the communications requested will constitute inadmissible hearsay. This is precisely the purpose of *Nixon*'s specificity requirement—to ensure that Rule 17 subpoenas are narrowly tailored to obtain *only* relevant and admissible evidence, not to obtain discovery in the hopes that something relevant and admissible might turn up, and to allow the recipient to lodge relevance and admissibility objections as to the precise documents being requested. *See Avenatti*, 2020 WL 508682, at *4 ("While the specificity requirement is intended to provide the subpoenaed party or other party having standing with enough knowledge about what documents are being requested so as to lodge any objections on relevancy or admissibility, this requirement also ensures that a Rule 17(c) subpoena will not be used as a fishing expedition to see what may turn up." (internal quotation marks omitted)).

The Defendant's criticism of BSF for not meeting its "burden of justifying the application of the work product doctrine" is also due only to the Defendant's overbroad and nonspecific

The Honorable Alison J. Nathan
April 5, 2021
Page **8** of **17**

Requests themselves. Resp. Ltr. at 7. In Requests 3 through 5, the Defendant seeks *all* communications between BSF and its co-counsel in a civil litigation against Maxwell (*Giuffre v. Maxwell*, 15-cv-07433-LAP) "between 2015 and the date of this subpoena about any meeting with the United States Attorney concerning Ghislaine Maxwell or ▮▮▮▮▮▮▮▮." Certainly, some of these communications, if they exist, may fall under the work product umbrella if they were internal discussions with co-counsel. Moreover, BSF and its co-counsel have a common interest protection in their communications. The Defendant's overbroad Requests make it impossible for BSF to determine how many responsive communications would be protected and why. Again, it is the Defendant's burden to demonstrate that all of the communications she seeks would be relevant and admissible, and it is not BSF's burden to review broad swaths of material to determine what the Defendant is entitled to under Rule 17.

## C. Communications Between BSF and the Government Are Procurable from the Government.

Even if Requests 1 through 5 could overcome *Nixon*'s three hurdles, however, Requests 1 and 2 would still fail to the extent that they ask for communications with the Government, which the Defendant can procure from the Government. The Defendant *admits* that the Government has the communications she is seeking, but complains that the Government "has failed to produce, or even look for these communications and Ms. Maxwell has no other means to obtain them." Resp. Ltr. at 8. In fact, this dispute is currently pending before the Court—the Defendant filed a Motion for a Bill of Particulars and Pretrial Disclosures in which she seeks an order compelling the Government to disclose the very communications with BSF she seeks in the Subpoena and to immediately disclose all *Brady* and *Giglio* materials. ECF Nos. 148, 148-5 (motion requesting documents relating to the Defendant's two motions to suppress evidence obtained from what

appears to be BSF, including all communications between the Government and BSF attorneys David Boies, Sigrid McCawley, and Peter Skinner, and requesting immediate disclosure of *Brady* and *Giglio* materials).

The Defendant cannot use Rule 17 to circumvent resolution of an outstanding discovery dispute with the Government, especially when that dispute is currently pending before the Court. If the Defendant is entitled to the communications with the Government she requests in Requests 1 and 2 pursuant to Rule 16, then presumably the Court will order the Government to produce them and she may not use Rule 17 to obtain them from a nonparty instead. *See, e.g., Nixon*, 418 U.S. at 699 (documents requested pursuant to Rule 17(c) must not be "otherwise procurable" from another source); *United States v. Cole*, No. 19 CR. 869 (ER), 2021 WL 912425, at *6 (S.D.N.Y. Mar. 10, 2021) (explaining that "Rule 17(c) is not the proper method for obtaining" materials that the Government has an obligation to disclose under the Jencks Act, *Brady*, and *Giglio*). If the Defendant is *not* entitled to obtain the communications she seeks from the Government under Rule 16, then they are not discoverable under Rule 17 from a nonparty. *See United States v. Boyle*, No. 08 Cr. 523 (CM), 2009 WL 484436, at *2 (S.D.N.Y. Feb. 24, 2009) ("Defendants may not seek material under Rule 17 that they are prohibited from obtaining under Rule 16."); *United States v. Barnes*, No. S9 04 CR 186 SCR, 2008 WL 9359654, at *2 (S.D.N.Y. Apr. 2, 2008) ("[I]f the item is not discoverable under Rule 16, a party cannot make it discoverable simply by subpoenaing it under Rule 17."); *United States v. Cherry*, 876 F. Supp. 547, 552 (S.D.N.Y. 1995) ("Courts must be careful that Rule 17(c) is not turned into a broad discovery device, thereby undercutting the strict limitation of discovery in criminal cases found in Fed. R. Crim. P. 16."). Either way, if the Government has the communications that the Defendant seeks and if she is legally entitled to them, she must get them from the Government.

The Honorable Alison J. Nathan
April 5, 2021
Page **10** of **17**

## II.    Requests 6 and 7: Engagement Letters

The Defendant provides no explanation at all as to how engagement agreements between BSF and Annie and Maria Farmer would be relevant and admissible at trial, and thus cannot clear the *Nixon* hurdles. She states in a conclusory manner that "[t]he scope and dates of these engagements are relevant to Ms. Maxwell's pending motions" and that "these agreements are exculpatory evidence." Resp. Ltr. at 8. But it is entirely unclear how the fact that the Farmers are represented by BSF and the dates of the engagement letter could possibly be exculpatory, and the Defendant does not attempt to explain that proposition.

Nor are the engagement letters relevant to any of the Defendant's pretrial motions. The Defendant's motions to suppress appear to be based on a theory that the Government improperly obtained evidence from BSF while it was representing Virginia Giuffre (not the Farmers) in *Giuffre v. Maxwell*. ECF Nos. 134, 140. The only relevance of Annie Farmer to the Defendant's motion for dismissal based on pre-indictment delay appears to be based on Maxwell's statement that Ms. Farmer was interviewed by the FBI in 2006. ECF No. 138 at 2. But the Defendant has not explained how an engagement letter between Annie Farmer and BSF is of any consequence to her theory. The Defendant also points out in her motion for dismissal based on pre-indictment delay that Annie Farmer may have cooperated with the Government in the criminal investigation of her abuser—an unremarkable proposition. *Id.* at 18. Not only is it unclear how this theory supports the Defendant's arguments about pre-indictment delay, but the Defendant again has not explained how an engagement letter with BSF is relevant to this theory.

As to Maria Farmer, she is only relevant to the motion for dismissal based on pre-indictment delay insofar as the Defendant argues that the Government knew about the allegations against the Defendant when Maria Farmer reported them to the NYPD years ago. ECF

No. 138 at 2 n.2. Again, however, the Defendant does not explain why Maria Farmer's engagement letter with BSF is relevant to support this proposition or is otherwise relevant to the motion. The Defendant's conclusory arguments that the engagement letters between BSF and the Farmers are relevant to something other impeachment are unpersuasive and demonstrate that she cannot clear *Nixon*'s relevance hurdle as to Requests 6 and 7.

### III.    Request 8: Grand Jury Subpoena to BSF

Request 8 fails for the same reason that Requests 1 and 2 fail. If the Defendant is entitled to this information, then she must obtain it from the Government. And if she is not entitled to this information, she cannot use Rule 17 to circumvent Rule 16's limitations. *See supra* Part I.C.

### IV.    Request 9: Annie Farmer's Journal[5]

As to the Defendant's request for an original copy of Annie Farmer's entire journal from when she was a teenager, the Defendant contends that the journal is exculpatory because the relevant passages do not mention the Defendant—but this is information that she already has, and she does not explain why she needs the entire journal prior to trial if she already has the allegedly exculpatory information in the journal. The Defendant already has copies of all of the relevant pages of the journal. She does not explain why she needs to inspect the entire journal "to establish whether the journal is authentic and complete and whether or not spoliation has occurred." Resp. Ltr. at 9. This purported need to inspect the journal for authenticity would carry more weight if the journal was inculpatory, and thus she sought to examine the authenticity of the pages containing allegations against her, but she contends it is instead exculpatory. If the Defendant seriously contends that the journal is relevant because it is exculpatory, and that it is exculpatory because

---

[5]      BSF also points the Court to the objections that Ms. Farmer has herself posed in response to the Defendant's proposed Rule 17 subpoena to her, in which the Defendant requests the same journal from Ms. Farmer.

The Honorable Alison J. Nathan
April 5, 2021
Page **12** of **17**

the relevant pages do not mention her, she needs no more than the relevant pages that she already has.

It is thus clear that the Defendant's purported need for the entire, original journal is not based on the allegedly exculpatory information that it contains (because she already has that information). Rather, the Defendant seeks the entire journal so that she can fish for other passages that she can use to attempt to impeach Ms. Farmer's credibility. Such a fishing expedition for potential impeachment material goes beyond the permissible bounds of a Rule 17 subpoena. *See Nixon*, 418 U.S. at 701 ("Generally, the need for evidence to impeach witnesses is insufficient to require its production in advance of trial."). And if the Defendant does not seek the remainder of the journal passages for impeachment, she does not explain how they would otherwise be relevant and admissible at trial. The Court should not require production of the entire journal—which contains personal, private information about Ms. Farmer when she was a minor—if Defendant is unable to demonstrate that the overbroad Request meets the relevance and admissibility requirements and if it will yield no material evidence.[6]

---

[6]    Even in civil cases, where much broader discovery is permitted under the Federal Rules of Civil Procedure than under Rule 17(c), courts have refused to order disclosure of an entire diary or journal when the journal contains personal or sensitive entries and the party seeking disclosure cannot demonstrate that anything relevant has been withheld. *See, e.g., Dubay v. King*, No. 3:17-CV-348-J-20MCR, 2018 WL 3619636, at *1 (M.D. Fla. July 13, 2018) ("Plaintiff failed to show how the production of Mr. King's private journal entries–containing information about Mr. King's private life and daily musings–relate to the subject matter of the claims in this lawsuit."); *Combe v. Cinemark USA, Inc.*, No. 1:08-CV-00142-TS-DN, 2009 WL 2578853, at *2 (D. Utah Aug. 19, 2009) ("Without any limit on relevancy, the entire journal is not discoverable. A plaintiff does not expose her entire private life to adverse scrutiny by filing suit."); *Quiroz v. Hartgrove Hosp.*, No. 97 C 6515, 1998 WL 341812, at *1-2 (N.D. Ill. June 12, 1998) (plaintiff in a sexual harassment suit was only required to turn over portions of her diary that pertained to her claim); *Ayala v. Tapia*, CIV. A. 90–1345(RCL), 1991 WL 241873, at *2 (D.D.C. Nov. 1, 1991) (denying motion to compel all personal diary entries because "most of the material demanded will be irrelevant to this case, but of intimate importance to the plaintiff"); *Carolan v. New York Telephone Co.*, No. 83

The Honorable Alison J. Nathan
April 5, 2021
Page 13 of 17

## V.     Requests 10 and 11: Boots and Photographs

As to Requests 10 and 11, for boots that Epstein and the Defendant purchased for Annie

Farmer and various photographs, the Defendant complains that "the government has scrupulously

avoided actually obtaining" this evidence. Resp. Ltr. at 11. But, as explained above, Rule 17 is

not a tool that can be used to circumvent discovery disputes with the Government. BSF is a private

entity with no *Brady* or other constitutional obligations to the Defendant, and a subpoena to BSF

cannot be used to replace discovery appropriately aimed at the Government under Rule 16 or to

avoid resolving discovery disputes with the Government.

In any event, the photographs are not "admittedly relevant" and the Defendant has not

explained how they would be relevant and admissible as trial. Resp. Ltr. at 11. The photographs

do not portray any event described in the indictment. Instead, the photographs depicted in Exhibit

C to the Subpoena that the Defendant seeks are as follows:

| AFARMER00010470; AFARMER00011691; AFARMER00011692 | Photographs of Annie Farmer prior to a high school dance, produced in *Farmer v. Indyke et al.*, 19-cv-10475 (LGS-DCF). |
|---|---|
| AFARMER00011339 | Photograph of Annie Farmer, Maria Farmer, and their younger sister, produced in *Farmer v. Indyke et al.*, 19-cv-10475 (LGS-DCF). |
| AFARMER00011688; AFARMER00011690 | Photographs of Annie Farmer in Thailand, produced in *Farmer v. Indyke et al.*, 19-cv-10475 (LGS-DCF). |
| AFARMER00011689; AFARMER00011693; AFARMER00011694 | Photographs of Annie Farmer and a friend in high school, produced in *Farmer v. Indyke et al.*, 19-cv-10475 (LGS-DCF). |
| AFARMER00012106; AFARMER00012107 | Photographs of Maria Farmer on Leslie Wexner's property in Ohio, produced in *Farmer v. Indyke et al.*, 19-cv-10475 (LGS-DCF). |
| GIUFFRE007164– GIUFFRE007182 | Photographs that Virginia Giuffre provided to the FBI of Jeffery Epstein's various properties, of herself at those properties, and of herself, the Defendant, and Prince Andrew in London, produced in *Giuffre v. Maxwell*, 15-cv-07433-LAP and *Farmer v. Indyke et al.*, 19-cv-10475 (LGS-DCF). |

Civ. 8308, 1984 WL 368, at \*5 (S.D.N.Y. May 17, 1984) (requiring the plaintiff to turn over the
portions of her diary that pertained to her claims, but to withhold portions she deemed irrelevant).

The Honorable Alison J. Nathan
April 5, 2021
Page **14** of **17**

The Defendant has not explained how *any* of the photographs are relevant to her defense and would "help in establishing her innocence" or why "the dates of creation" or "other specifics" about these photographs are relevant to her defense. Resp. Ltr. at 11.

## VI.    **Request 12: EVCP Material**

### A. The Request is Not Specific.

The Defendant does not even address the lack of specificity of her Request for "any submission to the Epstein Victim's Compensation Program made by You, including any claims on behalf of persons who have accused Jeffrey Epstein or Ghislaine Maxwell of any misconduct, any releases signed by You or Your Clients, and any compensation received by You or Your Clients." This Request on its face includes *all* claims that BSF has submitted on behalf of *all of its clients*, including all of the supporting documents (including sensitive medical and therapy records) that each client submitted with those claims. As BSF explained in its objections, the Defendant cannot merely request every piece of highly confidential information that BSF's clients submitted to the Program in the hopes that something relevant and admissible turns up. The Defendant offered to narrow this Request to EVCP Material submitted on behalf of victims who ultimately testify in this action. This "narrowing" does not change the improper nature of Request 12—even the narrower request would call for broad swaths of material that are both irrelevant to the charges against the Defendant and that are highly sensitive in nature.

### B.    The Defendant Has Not Demonstrated Relevance, Other Than Potential Impeachment.

Request 12 independently fails because the Defendant seeks the EVCP Material only for impeach purposes. The Defendant argues that the EVCP Material is not "mere impeachment material" because it is also "*Brady* material." Resp. Ltr. at 13. This argument does not make this Request proper under Rule 17. First, the Defendant does not explain how the EVCP Material is

The Honorable Alison J. Nathan
April 5, 2021
Page **15** of 17

exculpatory. Although BSF does not have the benefit of the *ex parte* submission that the Defendant

cites, she appears to contend that the EVCP Material will contradict the Government's theory as

to the Defendant's motive for committing the crimes of which she has been indicted: procuring

underage girls for Epstein. Resp. Ltr. at 13. But the Defendant does not explain how the EVCP

Material—consisting of claims submitted by victims to an independent claims administration

program, materials supporting those claims (such as medical and therapy records), and

compensation determinations for those claims—could possibly contradict the Government's

theory that she committed crimes with the motive of procuring young girls for Epstein.[7]

Second, deeming the EVCP Material "*Brady* materials" does not render the Request

appropriate under Rule 17, even if such a characterization were correct. Although the Government

has a constitutional duty to produce *Brady* materials, BSF has no such obligation. Thus, even if

the Requests in the Subpoena, including the Request for EVCP Material, *might* encompass some

*Brady* materials, the Subpoena must still satisfy the *Nixon* requirements. *See, e.g.*, *Mendinueta-*

*Ibarro*, 956 F. Supp. 2d at 513 (rejecting the defendant's argument that under Rule 17 "the

stringent requirements of *Nixon* do not apply when a defendant needs the requested information

for a fair trial, especially if that material is required to be turned over under *Brady* or *Giglio*");

*United States v. Jackson*, No. 02 CR. 756 (LMM), 2006 WL 1993251, at *2 (S.D.N.Y. July 14,

2006) (explaining "that the materials may contain *Giglio* material does not mean that they can be

subpoenaed under Rule 17" and quashing subpoena for failing *Nixon*'s admissibility requirement);

*United States v. Scaduto*, No. 94 CR. 311 (WK), 1995 WL 130511, at *2 (S.D.N.Y. Mar. 27, 1995)

---

[7]     Again, if the Court is inclined to grant the Defendant's motion as to Request 12, BSF
requests access to the Defendant's *ex parte* submission so it can more fully and fairly respond to
the Defendant's theory of relevance.

The Honorable Alison J. Nathan
April 5, 2021
Page **16** of **17**

("A general assertion that certain material 'might contain exculpatory information' is insufficient to prevail against a motion to quash under Rule 17(c)."). BSF has no duty to cull through broad sets of documents to determine whether any *Brady* materials might exist and whether those materials would be relevant and admissible when the Defendant has failed to meet her burden of satisfying *Nixon*'s requirements.

Similarly, the Defendant, likely realizing that she has no viable argument as to the relevance of all of the EVC Material, argues that even if the EVCP Material was relevant only to impeachment, impeachment evidence is discoverable in advance of trial. Resp. Ltr. at 13. This is a mischaracterization of the law. Each of the cases the Defendant cites relates to the *Government's* obligations under *Brady* and *Giglio*. *See Poventud v. City of New York*, No. 07 CIV. 3998 DAB, 2015 WL 1062186, at *8 (S.D.N.Y. Mar. 9, 2015) (civil § 1983 case in which criminal defendant contended that government violated *Brady* obligations); *United States v. Petrillo*, 821 F.2d 85, 90 (2d Cir. 1987) (affirming denial of a motion for a new trial based on government's failure to produce *Brady* and Jencks Act materials); *Grant v. Alldredge*, 498 F.2d 376, 383 (2d Cir. 1974) (vacating judgment of conviction based on *Brady* violation by government); *U.S. ex rel. Meers v. Wilkins*, 326 F.2d 135, 136 (2d Cir. 1964) (affirming grant of habeas corpus petition based on *Brady* violation by government). Not one of the cases that the Defendant cites concerns a Rule 17 subpoena to a nonparty because it is well-settled law that a criminal defendant may not use a Rule 17 subpoena to obtain potential impeachment evidence from a nonparty. *Pena*, 2016 WL 8735699, at *2 (Nathan, J.) ("Rule 17(c) subpoenas may not issue prior to trial to obtain materials usable only to impeach.").

For all of the foregoing reasons, the Defendant's motion to authorize service of the Subpoena on BSF should be denied.

The Honorable Alison J. Nathan
April 5, 2021
Page **17** of **17**

Respectfully submitted,

/s/ Sigrid S. McCawley
Sigrid S. McCawley

# EXHIBIT 114

**Secrets of Prince Andrew_ Part 1_Transcript WP/im**

**Secrets of Prince Andrew_ Part 1_Transcript WP/im**
**A&E Aired Aug 21, 2022**    PART 1 OF MM4 TAPE - Feb 7, 2024 at 8_35_25
AM

00.01
V/O Now The following program contains allegations and accounts of sexual abuse
which may be triggering to some of you
[OPENING TITLE SEQUENCE STARTS HERE]

EMILY MAITLISS [EM] V/O: I knew that if they said yes, it would be the most
extraordinary piece of television that I had ever made.

00.20
SAM MCALLISTER [SM]: The atmosphere was electric. With anticipation. With fear.

EM: I was terrified and I felt sick. And you could hear a pin drop.

SM: Remember, Prince Andrew was living an extraordinary gilded existence.

FILE NEWS FILM & V/O: Not a week passes without some new rumored conquest by
the man who Fleet Street calls 'Randy Andy'.

00.45
SM: At the beginning of it all, he was perceived as having done some dodgy things,
having some dodgy friends.

FILE NEWS FOOTAGE OF HRH GOING FROM CAR TO A DOOR, REPORTER V/O:
Are you going to resign Prince Andrew? Are you an embarrassment, Sir?

00.53
SM: At the end of it all, he was accused of heinous crimes and an association with a sex
predator.

01.00
SM: It's all on the line to him. We know the risks, he knows the risks

01.06
The second the camera came on, everything went out the window and he was just a
loose cannon and he got worse and worse and worse - on every possible scale it was
the scoop of scoops.

1

**Secrets of Prince Andrew_ Part 1_Transcript WP/im**

01.19

NEWS FILE V/Os: Backlash facing Prince Andrew this morning. It's rare you see interviews with the Royal Family in any circumstance, let alone on something like this.

The headlines have been scathing. Prince Andrew ...La BBC....Prince Andrew called a train wreck and a catastrophic....a train crashing into an oil tanker causing tsunami kind of bad

[MONTAGE VIDEO OF FACES OF HERVEY, MCCAWLEY, VICKY WARD,"My God" AND WITHRIDGE: No I don't believe a word of it. He [Virginia Roberts outside USDNY court steps Aug 2019 talking to the press] knows exactly what he's done and uh, I hope he comes clean about it .

01.52

FILE FILM INTERVIEW WITH LISA BLOOM, ATTY: That interview could be used in court against Prince Andrew, If he was found guilty, he could spend many years in prison.

02.01

FILE FILM OF QUEEN IN LIMO V/O: For the Queen it must be both upsetting and unwelcome.

V/O CBS Female Reporter: It feels like dangerous times at Buckingham Palace.

02.07

EM: One question everyone asks, is why on earth did he do that interview?"

GRAPHIC : SECRETS OF PRINCE ANDREW
            2018 - LONDON

02:26

EM, NEWSNIGHT PRESENTER, 2006-2021: Noone was thinking about Prince Andrew. Noone was thinking about Epstein. I would say that any link that had been made between Andrew and Epstein was very shady, clouded. It wasn't at the front of my head. At all. There was so much noise around. [OVER FILE FOOTAGE OF VARIOUS BREXIT, TRUMP ETC] We had a lot of Brexit. The stories around Trump..

FILE FOOTAGE OF TRUMP SAYING: I wanna make America great again. We have a last shot

EM CONTINUES: We had plenty of news.

## Secrets of Prince Andrew_ Part 1_Transcript WP/im

GRAPHIC : BBC HEADQUARTERS

03.33 AND GRAPHIC:
SM NEWSNIGHT PRODUCER, 2008-21
What is so interesting about the Prince Andrew story is, he really wasn't in that much trouble when I first had the contact in 2018 from the PR agency you suggested that we might want to do something around his Pitch at Palace, that kind of entrepreneurial charity that he had [CONTINUING OVER FILE FOOTAGE OF HRH AT HIS CHARITY EVENTS] I think he was looking to improve his public profile. That's often the motivation for people doing things like NewsNight. I expect what he was thinking was that a nice interview with someone brilliant like Emily Maitlis might give him a little bit more heft and bring him back to public consciousness.

04.19
EM: At the bottom of all this was a really serious question of paedophilia, of sexual abuse, of a monstrous man - I'm talking about Epstein now - and the ramifications for the Prince who was his friend. I wasn't looking for a, for a one line scoop. I was looking to hear that whole conversation.

EM CONTINUES OVER FILE FOOTAGE OF NEWSNIGHT INTERVIEWING BILL CLINTON, TRUMP, WEINSTEIN'S LAWYERS:
Newsnight is the pinnacle of current affairs. I've interviewed Clinton, I've interviewed Trump. I've interviewed Weinstein's lawyer. I wanted to do an interview with Prince Andrew, and try and get answers to the question that women were asking.
I knew that if the Palace said yes, it would be the most extraordinary piece of television that I have ever made, and possibly that he had too.

05.25 SM: I spoke to Buckingham Palace on the phone but it was clear they weren't going to let us ask all the news questions that at that stage would have been important to us as a program. He wanted to talk about all the fantastic work he was doing, what we would call a puff piece in the trade, and nobody asked him a difficult question. We don't do those, so we turned down that interview. He wanted to control the narrative. Imagine you had spent 59 years with people blowing smoke up you telling you you are amazing. They never contradict you. He's never had somebody say the word "no".

GRAPHIC CALENDAR YEAR BACK 2018 - 1960
1960 NEWS REEL FILE, GRAPHIC QUEEN - IT'S A BOY

06.27
DICKIE ARBITER, FORMER BUCKINGHAM PALACE PRESS SECRETARY: Andrew

**Secrets of Prince Andrew_ Part 1_Transcript WP/lm**

was born February 19, 1960. We are talking about 8 years after the Queen acceded to the throne. By that time the family had settled down. Charles and Anne were born 1948 and 1950 respectively.

Andrew was the second generation.

NEWSREEL FILE FOOTAGE OF BABY ANDREW AND YOUNG ANDREW:
06.44 V/O: This young man who is destined to be familiar with the camera all his life, certainly isn't camera shy. What a lovely smile.
06.54
ANNETTE WITHERIDGE, JOURNALIST: The Queen was very young when she had her two eldest children. All of a sudden, Andrew appeared. It was like, wow, this is motherhood. Whereas before it was like duty come first. She was learning, she was learning to be queen. And now it was ok, I can sit back a bit. I can be a mom. I can read him bedtime stories. She had time to enjoy Andrew. The Queen adored him more than anybody else. He was the Queen's favorite.

07.23
VALENTINE LOW, ROYAL CORRESPONDENT, THE TIMES: She was a very indulgent mother at that period when she'd been the slightly absent mother for Charles and Anne. And it's extraordinary to consider the formality the Royal Family behaved with their children sometimes, there's famous footage of the Queen and Prince Philip returning from a long overseas tour and a very young Charles meets them at the station [FILE FOOTAGE OF QUEEN GIVING CHARLES A CURSORY PECK ON THE CHEEK] It's not a sort of Diana type hug, it's quite extraordinary.

07.52
DICKIE ARBITER: Andrew's birth was celebrated because in those days the male became the next in line and even though Anne was older than Andrew, the time when Andrew was born [OVER GRAPHIC SHOWING LINE OF SUCCESSION] he was second in line. He was the spare. So if something happened and Charles died, then Andrew would be in direct line.

08.15
ANDREW LOWNIE, ROYAL BIOGRAPHER: The great difference between Charles and Andrew as 'the spare', was that Charles' future was ordained. You could see this is clearly setting up tensions between the brothers. Prince Charles looking down at his brother seeing he's had an easier ride in life. Andrew was indulged in a way that the others weren't, and the boundaries were therefore not set for him.

08.38

**Secrets of Prince Andrew_ Part 1_Transcript WP/im**

DICKIE ARBITER
Andrew's nature was that he was always pushing himself out in front. He was always the noisiest. And always the one full of jolly laughter and being told what a terrific guy he is.
CONTINUES OVER NEWS FILE FOOTAGE OF "BOND'S CAR FOR ANDREW".

08.53
ANDREW LOWNIE, ROYAL BIOGRAPHER: Andrew was given a miniature James Bond car, not sure there were many children who were given such presents, laughs.
FILE FOOTAGE OF THE MINIATURE JAMES BOND CAR SHOWING OFF AND DESCRIBING ALL ITS GADGETS.
09.07
The car cost £4,000 at the time and was built specially for him because, I suspect, you know, he liked James Bond. He used to love his practical jokes, if the footmen were laying the table, he'd tie the cutlery or he'd try to tie the sentry's bootlaces together. He put foam into the swimming pool at Buckingham Palace, he turned the mast on the television, the antennae, so that the Queen couldn't watch her favorite racing. He was a complete pain in the neck. Laughing. MORE FILE FOOTAGE, 1969, OF THE ROYAL FAMILY PUTTING UP A XMAS TREE. MORE FILE FOOTAGE OF SCHOOL BOYS RUNNING AND SCHOOL SCENES.

10.05
ANDREW LOWIE CONTINUES: From the age of 13, Andrew was sent to Gordonstone where his father had been to school. He was the outward charming, gregarious, boisterous, one of the lads. And then we have this other picture [FILE B&W PHOTO OF ANDREW LOOKING ALONE AND PENSIVE] spending time alone, not opening up about his emotions, not having many close friends - the loner. I think we get a clear sense of this dual personality. Everyone talks about him not growing up, this Peter Pan figure who still emotionally has been stunted.

10.41
DICKIE ARBITER: One of the things in the Royal Family that dominates everybody, is you don't show emotion in public. There's a very famous saying 'do not wear private grief on a public sleeve'

GRAPHIC 1981

FILE NEWS FOOTAGE OF DIANA-CHARLES WEDDING - Just after half past 10 from Clarence House came the glass coach and our first chance to see Lady Diana... Prince Charles came next in a smaller procession.

**Secrets of Prince Andrew_ Part 1_Transcript WP/im**

11.19

DICKIE CONTINUES: When Charles and Diana got married in 1981, Andrew had just turned 21, but what it signified to Andrew and his place within the royal family was marriage means children and children means that he would be dropping down the line of accession. Psychologically he felt it, his status as 'the spare' was unmistakable.

11.50

ANDREW LOWIE: We know from what Harry said that the princes's strong sense of resentment and jealousy against the one who seems to have all the advantages. Andrew thought he was master of the universe. It turned out he wasn't. He was an accident waiting to happen for years.

GRAPHIC 1982

13.32

DICKIE ARBITER: By the time we got to the 1980s, Andrew had joined the Royal Navy. He was at the start of his career. It was important to him that he succeeds in the navy. He wasn't a great success at school, so there was actually nothing for him to do other than be a full time naval officer.

NEWS FILE FOOTAGE OF ANDREW GRADUATED TOP OF HIS CLASS AND RECEIVED HIS WINGS FROM HIS FATHER.

The royal treatment ended really the moment he stepped on board.

14.01

THOMAS ARNULL, LEADING AIRCREWMAN, ROYAL NAVY: My name is Thomas Arnull. I was a leading aircrewman. When I first met Prince Andrew, he was a nice young man. He was a sub-lieutenant. He had a ready smile. He wanted to learn and he wanted to be treated exactly the same as everybody else. His mother just happened to be the Queen.

14.23

FILE INTERVIEW WITH HRH: You are one of the boys, you've actually got a job to do and the fact that I have a title, anyone could have as title, anybody could have come from anywhere, and it would not have made a halfpenny's worth of difference.

FILE NEWS FOOTAGE AND COMMENTARY OF MARGARET THATCHER DECLARING THAT BRITISH SOVEREIGN TERRITORY [THE FALKLANDS] HAD BEEN INVADED BY A FOREIGN POWER. THE CONFRONTATION BETWEEN BRITAIN AND ARGENTINA OVER THE FALKLAND ISLANDS IS ESCALATING QUICKLY.

**Secrets of Prince Andrew_ Part 1_Transcript WP/im**

14.52

RALPH WYKES SNEYD, COMMANDING OFFICER (Rtd) ROYAL NAVY: My name is Ralph Wykes Sneyd, I was Prince Andrew's commanding officer. Inevitably there was discussion as to whether Prince Andrew should sail with the task force. To my mind, there was no doubt that he should.. He was not the heir to the throne. He was the spare.

15.16

THOMAS ARNULL: You are focused 100% on getting back alive. It was decided that I and two other guys would fly with Prince Andrew. I went into battle with him. I found him to be nothing but a good pilot.

15.40

COMMANDER SNEYD: Flying helicopters off ships is a dangerous game, not just for yourself but for the people you are with.

15.48

DICKIE ARBITER: Andrew was a decoy helicopter pilot. In order to safeguard ships from exocet missiles and it was his job to put himself between the missile and the ship, its target. He would take the impact. It takes a lot of courage.

RALPH WYKES SNEYD, COMMANDING OFFICER (Rtd) ROYAL NAVY: It was the future of this operation set against risking one prince and his aircraft. Not a difficult call.

16.14

PRINCE ANDREW, FILE INTERVIEW: I was the junior of the junior . I was as a junior. I was cannon fodder.

16.22

THOMAS ARNULL: We landed on the back of a destroyer called The Glamorgan that was hit by an exocet missile. While we picked up the wounded, that was not a good place to be. There was two men sat just behind Prince Andrew and they were badly burned people. You could literally see steam coming out of their flesh. It was like looking at a roasted joint come out of the oven, And steam was coming off, and the skin was lifting, peeling from them. He saw that.

16.53

It was an experience I shall never forget. And it's still a vivid memory. It's imprinted on my mind, my brain as it were and I think it will be there for a long time. It er. Horrific.

## Secrets of Prince Andrew_ Part 1_Transcript WP/im

THOMAS ARNULL: And he developed empathy for them. No doubt about it. That only comes about through hardship because you have to see other people go through it. He grew as a person, we all grew as people. We knew we were fallible. Prince Andrew knew he was fallible. And we knew that things wouldn't be quite the same again because of our experiences.

17.38 GRAPHIC 1982 FILE FILM
V/O: Crowds gathered outside Buckingham Palace throughout the evening. Then at 10.25 their patience was rewarded with notice of the birth [of Prince William]. When Prince Charles emerged they roared their congratulations.

17.57
DICKIE ARBITER OVER MORE FILE FILM OF PRINCES DI AND BABY: Meanwhile, back in the United Kingdom, William was born, 1982, which meant that Andrew was no longer number two in line to the throne, he was now number 3 [GRAPHIC OF THE SUCCESSION SHOWING ANDREW AT 3RD POSITION] Two years after that Harry was born which meant Andrew dropped down another place and became number 4 in line. [NEW GRAPHIC SHOWING THE CHANGE] So his line of succession was receding quite dramatically.
Andrew's role as a SPARE faded into the distance. But Andrew's makeup was one of enjoying life and the way to enjoy life was to have lots of girls on tap adoring you because you are a prince of the United Kingdom, and he was a hero.

18.42
FILE FOOTAGE OF ANDREW COMING HOME CHEERS, FLAGS
RALPH WYKES SNEYD, COMMANDING OFFICER (Rtd) ROYAL NAVY: He got immense credit from the public and rightly so. I did say to him that I though he needed to look after his image. At the time his response was, 'No boss, image is not important. It's who I am that really counts.' I said, "I'm not too sure I agree with you but we'll leave it at that. Some years later, he did say to me, you were right.

19/19
NEWS FILE V/O: Prince Andrew the last available eligible son of Queen Elizabeth is back home after the Falkland Islands War and apparently ready for a little relaxation. But his choice of relaxation is making the headlines. Ever since Prince Andrew returned from the Falklands, the popular press has been in a wild scramble to cover his love life. Not a week passes without some new rumored conquest by the man Fleet Street calls "Randy Andy". The gossip columns make no serious mentions of romance at the moment, probably because the list of temporary romances is so long.

## Secrets of Prince Andrew_ Part 1_Transcript WP/im

19:58

ANNETTE WITHERIDGE, JOURNALIST: Prince Andrew is the same age as me. I arrived in London to work for the Fleet Street Newspapers. And he had just arrived back from the Falklands. I was 23, so was he. Andrew was this dashing hero and he went out with very beautiful women.

CONTINUED FILE FOOTAGE OF ANDREW AND GIRLFRIENDS: V/O: The Andrew watch kept track of girlfriends. There was Carolyn Seward, former beauty queen. Caroline Herbert, a Di look-alike; Broadway star Finola Hughes. Model Katie Rabbit. The list constantly updated by a watchful British press, goes on and on.

20.35

ANNETTE WITHRIDGE: He was the go-to Prince.

FILE FOOTAGE REPORTING V/O: The rumor that the prince would partner the American model and actress Brook Shields, was never more than a rumor.

FILE FOOTAGE: V/O to young woman: Would you like to meet Prince Andrew? Yes, very much. Do you think you have a chance today? "I hope so."

.

20.50

CAPTION OF SPINNING DATE 1985- 2019

20.59

EMILY MAITLISS [OVER FILE FILM OF ANDREW AT VARIOUS GATHERINGS SPEAKING AND LAUGHING AND ENGAGING]: Prince Andrew was a big presence. You know, he's a big chap. And…very sort of booming, deep voice. And very charming. And he was confident of what he had. This is a man who thought he was innocent of all the allegations about having trafficked sex, having befriended a pedophile. And he wanted to convince the world that he was innocent. But I do understand that one of the many difficulties of being Royal is that you don't get a right of reply. You don't get to tweet out if you don't like a story. So I could see why he would want to talk to us.

21.47

SAM MCALLISTER: And in May, lo and behold, I get another email. 'Oh Sam, could you give us a call? Um the chief of staff for Prince Andrew is interested in meeting you. He's open to a wider conversation. Can you come to Buckingham Palace? They never, ever usually get back in touch. But his stock wasn't that high at that stage. In news terms, he's a minor royal. We all understood the profile of now-King Charles and what he was

9

## Secrets of Prince Andrew_ Part 1_Transcript WP/im

doing, and obviously we understood the profile of some of the younger Royals [over file film of Harry and Megan] who were making a lot of headlines. So, I would imagine if I were him, I might be looking to improve my public profile. I don't know what is on the table, but I'm back in. I've got to be honest, I'm feeling pretty good at this stage.

22.39
EMILY MAITLIS: When Sam said they're sounding quite interested, we've got to put a list together of what we want to talk about, of areas that we want to talk about - -and we put everything down. And it was, yup we want to talk about the UK in a post-Brexit world. We want to talk about Megan and Harry. We want to talk about Kate and Wills. We want to talk about Succession. And, we want to talk about Epstein. And that was where NewsNight was really tough because there's, there's no point being a current affairs show that sort of says, oh, we'll do all the current affairs except the ones that people don't want to talk about, right? I just wanted him sitting opposite me for an hour to talk about all the allegations that were circling.

23.23
SAM MCALLISTER: They felt that if it was going to be an interview, it had to be with a woman. Emily's the best in the business. And I do think it slightly changes the dynamic, for sure, because imagine what it would look like, two men discussing these allegations. That is, the optics on that are horrific.

23.42
EMILY MAITLIS: Would he think of me as a soft touch? Maybe, or would he think if I'm talking about, you know, abused women, is it better to be having that conversation with a woman? Maybe. Or was it just that we'd asked? Maybe.

23.59
SAM MCALLISTER: I don't know who else had an in. I don't know what anyone else was doing. I don't know if anyone else was trying to get the interview. But I get to go to Buckingham Palace. I've never been. I mean, you know, it sounds glib, but what a treat! And [OVER FILM FILE FOOTAGE OF BUCKINGHAM PALACE] what a huge and exciting experience to see what they had to say. Maybe to get our first ever interview with a member of the Royal Family.

END OF PART 1 OF MM4 TAPE - Feb 7, 2024 at 8_35_25 AM

**Secrets of Prince Andrew_ Part 1_Transcript WP/im**

CAPTION 1985

23.45 - 1.05.04
OVER FILE FOOTAGE OF INTERVIEW OF PRINCE ANDREW WITH JOURNALIST
SELINA SCOTT, A BEAUTIFUL INTERVIEW HOST - :Well hello and good evening.

ANDREW LOWNIE, ROYAL BIOGRAPHER: I think one of the great pieces of British
Television is Selina Scott, who was then a big household name here, interviewing him
[Prince Andrew].
SELINA SCOTT: Is it very difficult for you to meet a girl and to, I mean, ask for her
telephone number, for example, and know that that person perhaps is terrified of all the
press attention that you get.
ANDREW: Yes to a certain extent I think they probably are. Um, but if you remember, I
didn't get your telephone number [audience laughter] .

ANDREW LOWNIE CONTINUES: It's an amazing piece of footage, one doesn't
normally see such an obvious flirtation from a member of the Royal Family. But it gives
some indication of the sort of easy boyish charm that he had in those early days.

BACK TO FILE INTERVIEW -
SELINA SCOTT: This nick name, this nick name you have
ANDREW: I'm listening. Which nickname? [Audience Laughter] Then More Laughter.

SELINA SCOTT: Randy Andy [Audience laughter].

ANDREW: I'll tell you exactly where that originated from . My second day at public
school.

SELINA: when you were 14/15 years old?

ANDREW: I'm afraid so.

SELINA. I don't believe it.

ANDREW: It's absolutely true. I was unfortunately caught going through a door in the
girls' house saying hello to some of them, um, and it stuck.] Not many people use it
nowadays but uh, I don't think that it actually fits, today, anyway. [AUDIENCE AND
SELINA LAUGHTER].

FILE FILM OF KOO STARK

**Secrets of Prince Andrew_ Part 1_Transcript WP/im**

REPORTER: Koo Stark emerged from customs, but she wasn't answering our questions or anybody's questions, especially not about her relationship with Prince Andrew. That of course didn't prevent reporters from asking or Koo from appearing to enjoy the attention. Most of the time.

25.46
DICKIE ARBITER: One of his early relationships was Koo Stark. They were very very fond of each other, I think they were probably in love with each other. Andrew's first real girlfriend. She's actually a very nice lady. And it's a pity that the great British media got their claws into her because that would have probably been a very good match.

26.05
REPORTER FILE NEW FOOTAGE: It would appear that this newscast or many other newscasts would be incomplete without the latest on Britain's Prince Andrew and his current girlfriend, film actress, Koo Stark.

26.19
FILE FILM CLIP OF KOO STARK ACTING A LOVE SCENE - ,

26.27
DAISY GOODWIN, WRITER AND TV PRODUCER: Basically Koo Stark was slut-shamed in a way that I think now we look back, and we are really shocked by, in fact. And I think it was very difficult for the palace. Very difficult for her. I don't know who broke it off. Maybe she left him, but maybe he wasn't prepared to set aside the public disapproval [OVER PAPER HEADLINES 'THE QUEEN BANS KOO STARK'] and stay with her.

26.50
ANDREW LOWNIE ROYAL BIOGRAPHER: He was very disappointed in that relationship, it was not allowed to continue. He was beginning to want to settle down. But here he was, because his royal position, not being allowed to marry the woman that he loved.

FILE FILM REPORTER V/O: The prince has cut short his vacation in Barbados he is heading home for London without Koo Stark. Since Andy's ardor for Koo paled some months ago, the big question for those who care about such things here has been, who will be next?

27.20
REPORTER V/O: There's growing evidence that Prince Andrew is in love with a new

## Secrets of Prince Andrew_ Part 1_Transcript WP/im

girl . [OVER FILE FOOTAGE OF FERGIE]. She's Sarah Ferguson, daughter of Prince Charles' polo manager, and a friend of the Princess of Wales.

27.33
DAISY GOODWIN, WRITER AND TV PRODUCER: And then of course, Andrew meets Sarah Ferguson, this vivacious redhead with an easy smile. If I suspect head with an easy smile, and at the time, she was sold as the kind of down to earth Wife of Bath, kind of buxom, lusty young woman. There was this kind of instant tabloid heaven, much like Megan and Kate had been in recent years. But the Queen liked her a lot because she was a sort of hunting/shooting/fishing girl. She rode. She was a country woman in the way that Diana wasn't.

28.11
ANDREW LOWNIE: Ironically Diana Spencer had been the person who had been ear-marked for Andrew, and in fact she'd often come to stay at Sandringham with her older sister, who was more the age of Charles. And you know, she was exactly the same age as Andrew. She was seen as the appropriate sort of bride for him. But Diana was friendly with Sarah Ferguson, and Diana thinks that Andrew and Sarah Ferguson may get on well. She's invited to a party at Ascot in June 1985. And the two of them get on.

28.45
DAISY GOODWIN, WRITER AND TV PRODUCER: She wasn't from the aristocracy. She wasn't a princess, but she was familiar with Royal life. She wasn't like Megan. She knew about curtsying. She knew the drill.

28.59
FILM FOOTAGE OF ANDREW AND FERGIE AT THEIR ENGAGEMENT LAUGHING AROUND
AND FILE FILM OF THEIR MARRIAGE

29.29
DICKIE ARBITER: The Queen loved the idea that her son got married.
[FILE FILM OF ANDREW & FERGIE AND ROYAL FAMILY AT BALCONY OF BUCK PALACE]
They had the kiss on the balcony. They had to milk it. Spectators were saying kiss, kiss, kiss! Giver her a kiss! They couldn't do that, Fergie leant forward, sort of copper her ear, as if to encourage them to shout louder. REPORTER: This was what the crowd was waiting for. [they finally kiss]. A royal pucker from the swinging bachelor once known as Randy Andy.

**Secrets of Prince Andrew_ Part 1_Transcript WP/im**

29.33
DICKIE ARBITER: People loved it. At the time we thought it was great. It was terrific. [Cheers and Applause] Reporter: And the wave to see them off.


30.05
ANNETTE WITHERIDGE: At the time, it was, awww! You know, good old Andrew, you know? He's fallen in love. He's gonna live happily ever after. As we know, that wasn't the case.

30.16 CAPTION  1986 - SPINS TO 2019
FILE FILM OF OUTSIDE AERIAL VIEW OF BUCKINGHAM PALACE

30.23
SAM MCALLISTER: i have an invitation to meet Prince Andrew's Chief of Staff at Buckingham Palace. So obviously leap at the chance and maybe, our first royal interview. When you arrive at Buckingham Palace, what an exquisite building. And, I'd never been inside. I've stood at those gates, you know. All the tourists are pushing themself up against the bars. And a member of the royal palace takes me inside. And there's all palace life buzzing. [FILE FOOTAGE OF THE CEILINGS INSIDE BLA BLA]. SO I suddenly become something I don't become very often, and that's nervous. 'Cos now I've got something to lose. I went up the stairs and I was taken to quite a small room, dark wood, table in the middle. But everywhere pictures of him, the family, different stages of their life, kind of like a shine to Prince Andrew and his family.

The Chief of Staff for Prince Andrew came into the room. I just had to really sit and listen and hear what they were suggesting and what they wanted to do. She wanted to do a conversation with the BBC that would show, I think, reading between the lines, more of the personality of the man.

31.59
The kinds of things we wanted to discuss. All of them were back on the table. I've got to be honest, I'm feeling pretty good at this stage. I've under promised, I'm about to seriously, seriously over deliver. But then the Chief of Staff goes, by the way, there is just one thing… Now that always puts like dread in your heart when you are a negotiator because you know whatever that one thing is, it's gonna be make or break.

## Secrets of Prince Andrew_ Part 1_Transcript WP/im

32.35
CAPTION 2019
over the period of the two or three hours that I was at Buckingham Palace every single piece of news that I wanted to discuss with them were back on the table by the time we got almost to the end of the negotiation. Things are going extremely well. And then, of course, a red line.

33.07
So Prince Andrew's chief of staff says, by the way, as if it's nothing, but of course I know straight away my heart's pounding - - I know what it's gonna be, and of course, the Epstein issue was a red line and we were not to ask about it if we did the interview. And that is when I knew, game over. I felt I had nothing before I went to the palace and I had nothing when I left. But I had a feeling that this conversation was just the beginning of something more important.

33.43
STEWART, DEPUTY EDITOR OF NEWSNIGHT: In 2019, I was deputy editor of Newsnight. Sam and I we agreed between us that really, we at the BBC can have no red lines . And it has to be the same rules for everybody..that it often pays to be quite strategic about how you go about things. This contact with the Office of Prince Andrew might suddenly be something really important. So I said to Sam let's make sure we keep in touch with the Palace because who knows where this story is going to go.

34.14
SAM MCALLISTER: Every time a story moves, I get back in touch, it's a slightly different tactic each time. You know, you just kind of keep the relationship going so they don't forget you exist. And then, when things start to move cataclysmically with the Epstein story, and it all started going so hugely wrong for Andrew... Here I am, stayed in touch with the most important person, decision-maker in his world. I've got an in.

34.31
CAPTION 2019 SPINS BACK TO 1988
FILE FOOTAGE OF FERGIE AND ANDREW WITH THEIR FIRST CHILD
34.49
DAISY GOODWIN, WRITER & TV PRODUCER: Then Sarah Ferguson has her first child, Beatrice. And I remember at Portland Hospital, there was rejoicing on lots of levels. And for a few years in the 80s, they seemed to be a good thing.

## Secrets of Prince Andrew_ Part 1_Transcript WP/im

REPORTER: The royal couple then decided it was time to leave, but as the Duke headed for the car, the Duchess suddenly made her way towards the crowd. The Duke was clearly concerned by this clearly concerned by this unexpected break in plan. The Duchess slipped on the road but she quickly recovered herself collected a bouquet of flowers and then returned the car .

35.24 DAISY GOODWIN: For me, the family is instantly put under strain by the fact that he was sent off to be on a ship somewhere and she was left behind. And then she gets an absolute pasting in the Tabloids because when Beatrice was quite young, she decides to go and see Andrew without the baby.
FILE FOOTAGE , REPORTER: Sarah was asked repeatedly along the way about baby Beatrice. Now she told one young admirer she wasn't missing mum at all, she spends her days waiting to be fed.
35.58
FILE HEADLINES: YOU'RE A TERRIBLE MUM, FERGIE
[DAISY CONTINUES]: She suddenly becomes bad mother because Diana, when they've gone on a royal visit to Australia, had taken William.

FILE FOOTAGE OF FERGIE SPEAKING:
36.10
FERGIE - At last I have the turn to talk. [audience laughter] All these men around here. [MAN: Love you!] [Audience applause and laughter]. I'll see you later.

36.20
ANDREW LOWNEY, ROYAL BIOGRAPHER: There is a famous occasion in the States where someone shouts out some endearing remark to her and she says, 'see you later'. This sort of repartee was not what the Queen did. In that sense perhaps she doesn't care what she does and it would also seem that she doesn't care what she says… Fergie was just a little too vulgar, a little too enthusiastic. And the sense was that this had destroyed the dignity of the Royal Family. Very very quickly, attitudes changed.

FILE INTERVIEW WITH FERGIE:
FERGIE: I'm very practical person, I say. Good, this is the job. I knew it when I married Andrew, I knew what I had to do. And I knew what I took on. Therefore I never complained about it. Just get on, do the job, and see him when I can. And I am very lucky, he's the most wonderful husband."

37.16
LOWNEY CONTINUES: But behind the scenes, relations were not good. He was focused on his naval career. She claims she saw him 40 days in the year. He described

## Secrets of Prince Andrew_ Part 1_Transcript WP/im

himself once as a naval officer second. I'm a prince first, a naval officer second, and a husband third. So in some ways, the marriage was never going to be easy on that basis. He could only see Sarah as the person that he had met and married, rather than the woman that she was becoming. She's a woman of great energy and, uh, wide interests and talents, and I think maybe she felt constrained within her marriage.

### 37.55
ANNETTE WITHRIDGE: Fergie, fed up that she was supposed to stay and be the dutiful wife, she ends up having an affair or two. That ends up all over the newspapers when she's caught having her toes sucked in the south of France by her financial advisor, Johnny Bryan.

### 38.13
[REPORTER FILE]: One picture showed him kissing the Duchess' foot. Another showed the Duchess rubbing sun tan oil into Bryan's balding head. Several feature the pair in intimate embrace.

### 38.24
DAISY GOODWIN: Fergie was at Balmoral with the Queen and her daughters when this happened. And Prince Philip banished her and never, never um, wanted to be in the same room with her. Ever again. So she was cast out of the royal family.

ANNETTE WITHRIDGE: I mean I just remember everybody being shocked. And the daughters were in the background in the pictures. And just saying, oh my gosh, how could she do this?

### 38.51
ANDREW LOWNIE: I think the idea of that John Brian was in a sense, behaving like the father figure in the picture, I think was deeply upsetting to Andrew. But I think he himself had also been having affairs during this time and I think that's what upset her. She's certainly quoted as saying that she's spent weekends with a video while he spent them with 27 concubines.

### 39.17
DAISY GOODWIN: I think the real crime, um, was that she was found out, and that those pictures brought shame on the royal family, which they did. I think to some extent, Fergie was sacrificed on the altar of tabloid greed, um, in order to kind of protect the other members of the royal family. Andrew and Sarah, because they were quite a long way from the line of succession, were really fair game, because if there was dirt on them, it wasn't going to kind of bring down the monarchy.

**Secrets of Prince Andrew_ Part 1_Transcript WP/im**

SAM MCALLISTER V/O: 39.54 But it was going to get much worse for Andrew and Fergie.

40.33 CAPTION 1992
FILE NEW FOOTAGE: Reporter: There's a royal flap over more royal photos showing Fergie without her royal shirt on.. Different Reporter: There's speculation that the duchess could be stripped of her title by the Queen. Her 2 daughters, princess Eugenie and princess Beatrice were with her. No longer the luxury or privilege of the aircraft of the Queen's flight, for the Duchess, just an ordinary scheduled flight to Heathrow.

40.55
ALLAN STARKIE: My name is Allan Starkie. I was very good friends with both of them, particularly the Duchess. She referred to me as her best friend and brother. I was the CEO of a company owned by John Bryan. Shortly after I became friends with her, they were photographed in those notorious south of France photos where he was dubbed "The Toe Sucker".

41.16
REPORTER: A reconciliation with her husband now looks less and less likely. And friends expect her to move out of the family home. His wife left the family home crouched in the back of an unmarked police car, her red hair just visible in the back window.

41.30
ALLAN STARKY: One time he invited me to have tea with him and said, ' if you can convince her to move back in Sunninghill Park she could have her own entrance and her own suite. She can still see the Texan - that's what he used to refer John to as, as a Texan. I won't mind but I just would like her very much to consider coming back. I tried to act as a go-between, but you know, Sarah was too far gone at that point.

What I'm getting at is, this is a very long period of time that I witnessed this intense loyalty and love of his wife, even when they were separated and ultimately divorced.

42.09
[Reporter]: Buckingham Palace is still indicating that a formal separation is underway.

**Secrets of Prince Andrew_ Part 1_Transcript WP/im**

42.15
ALLAN STARKY: She felt suffocated by the gray men. The gray men with the courtiers in the palace. They were constantly putting her down. She told me once that by the time the flowers from her head dress from her wedding ceremony wilted, she was already feeling as wilted as a flower by these gray men just never giving her any peace. I would say that she primarily divorced the royal family and not the Duke.

42.52 BBC NEWS FILE- Good evening. The Duke and Duchess of York have agreed to divorce. The fast-tracked procedure is already underway. There will be a brief court hearing tomorrow joke Track procedure is already on the way I'll be a brief court hearing tomorrow and the marriage will be officially ended next month.

43.03
VALENTINE LOW, ROYAL CORRESPONDENT, THE TIMES: The royal family, obviously, would like to do everything it can to avoid scandals like that . When it comes to things like divorce and marriage, the Queen can't really tell someone to get divorced or stay together. It's up to them.

[Reporter]: It's been an open secret that up until recently at least, the Duke would've liked a reconciliation. He'll remain at the former marital home in Sunninghill Park near Windsor, while the Duchess and their daughters stay in the house she rents for an estimated £72,000 a year in Surrey.
CAPTION 1996

43.36
ANDREW LOWNIE: During the marriage, they begun to develop a taste for rather more luxurious living than perhaps their siblings and other members of the royal family had. They also were mixing with a sort of jet set. Not quite the jet set that would come later with Epstein, but Billy Connolly, Michael Caine, and they wanted to keep their end up. They wanted to be able to go on nice holidays, and this of course was to create huge problems for them. Fergie was spending more than she had. She was getting into debt. She didn't have a very generous divorce settlement in the way that Diana had.

44.14: [Reporter] Although no financial details have been made public, it's thought the settlement could be worth a relatively modest £2 million. Of that only 500,000 would be paid directly to the Duchess with the rest placed in trust for the two young princesses.

44.27
ALLAN STARKY: We established an operating company because she really needed to earn an income after she was separated and she made me the managing director of

## Secrets of Prince Andrew_ Part 1_Transcript WP/im

that. For the next 3 1/2 years I escorted her everywhere. We researched books together, helped her write a book about the travels of Queen Victoria. We had some success stories. Uh, John Bryan was able to convert her Budgie the Little Helicopter books into cartoons and that generated a substantial amount of money. That was probably the single biggest success.

44.56:
ANNETTE WITHRIDGE: She would almost not quite, flog things on the Home Shopping Network, but it was one step below that. I mean she was very successful for a while with Weight Watchers.

FILE FILM OF FERGIE DOING A WEIGHT WATCHER AD... It's harder than having a thinner mother....

45.25
DAISY: After their divorce, Andrew is back on the market. He's free and single again. So he's surrounded by young women, he's not going to be indifferent to their charms.

45.48
MICHAEL WYNNE-PARKER, FRIEND OF PRINCE ANDREW: I don't boast of this, but I have been very lucky all my life to meet various Royals. Delighted to welcome you all to this humble abode of mine here in Hingham. This is the library. I would say Andrew is a prince, a gentleman. When I met him he was a divorced chap.. I was also at the time.
And we were gentlemen about the town. Every night when you were in London, you had dinner somewhere; and after dinner you would go to one of these night clubs, something like Annabelles, or Tramp. Meet your pals, have some drinks. And those who were single, meet some lovely girls, hope for the best, and maybe one day you'll be the right one. I mean [laughs].

46.49
He was always impeccably dressed, perfectly mannered, and behaved as you would expect somebody of his rank to do. Many women might think, ah, he's divorced, he's a prince and he'd be a good catch.

47.07
LADY VICTORIA HERVEY, FRIEND OF PRINCE ANDREW: He was Prince Andrew, laughs. I mean, it's you know, I think, every girl's fantasy is to be a princess. We met through mutual friends. We had a couple of dinner dates. I would have been like early 20s. He was attractive and interesting. I'm into helicopters, so he flew helicopters. I like

## Secrets of Prince Andrew_ Part 1_Transcript WP/im

dogs, he likes dogs. He had like, quite a good sense of humor as well. He actually can take people kind of making fun of him a little bit which I remember being surprised about. Anybody would've thought that he was a catch. You know, he's still the second son of the Queen. I mean who isn't going to want to date women? I mean what's he supposed to do? Just live like a monk at home? If you are single and you are a prince of England, of course you are going to go out and have fun.

The scene in England is very small. Everybody is sort of connected. Back then I'll be in Tramp's nightclub. I'd bump in to somebody and then go be at Battersea Heliport tomorrow at 11.00, and then I'd be on a jet to Corfu. You know, this is like, this is how we rolled.

48.28
VALENTINE LOW: One of Andrew's biggest problems is he doesn't have much money. There was a sort of imbalance between the sort of money that Andrew had and his sense of entitlement to the sort of life which he thought he should lead. Andrew had an allowance from the Queen which I think was £249,000 a year? But whatever it was, he had a lot less money than Charles. Charles, when he was Prince of Wales, had the Duchy of Cornwall, which gave him an income of about £20 million a year or so, and that obviously was the cause of great problems later on because it led to Andrew sort of consorting with people who had lots of money. Sort of Kazakh billionaires. Jeffrey Epstein and Ghislaine Maxwell. That was Andrew's downfall.

CAPTION 2000
[MUSIC] FILE PHOTOS OF GM AND HRH

49.27
VICKY WARD: Prince Andrew and Ghislaine Maxwell were very good friends. And I'm sure they dated at one point. She knew many more wealthy, interesting powerful people [photo of GM, Naomi Campbell, Trump and Melania] around the world than Prince Andrew did and she opens up this world to him. And so he meets Jeffrey Epstein who sells himself as this absolutely brilliant financial genius. I was the journalist investigating Jeffrey Epstein. He was this very mysterious Gatsby-like figure who famously lived an extraordinarily lavish lifestyle. This huge house, the biggest private residence in New York that had once been a school. The plane. The 'Lolita Express'. The Island. These are all far away from prying eyes. Prince Andrew has always been obsessed by money. So Jeffrey Epstein, this is the world Prince Andrew thinks he belongs to rightfully and yet has been denied. Jeffrey Epstein in turn then introduces prince Andrew to

**Secrets of Prince Andrew_ Part 1_Transcript WP/im**

interesting people like Bill Clinton. I think that Jeffrey Epstein sort of gave him was a - - was a court, with the courtiers that perhaps he didn't really have in real life.
HRH 6 - LISA PHILLIPS STORY The really interesting thing in hindsight is the mystery about him was not about the women or the girls. There was talk that they were always, you know girls floating around, but not talk they were under age. What was really unusual about him was that he had all this wealth and yet there was no footprint of him in the markets.

51.45 I was able to show that Jeffrey Epstein had absolutely been involved in illegally moving insurance bonds out of Illinois to New York and we know that Jeffrey Epstein put a lot of his money off shore. You know, chasing money that's been hidden is very hard to do. And this really infuriates me because without his money the sexual crimes could never have happened. When I was reporting that piece he phoned me pretty much every day because he's really terrified of what I was going to uncover. As we now know, I didn't uncover the half of it.

CAPTION 2000 [MUSIC] SPINS TO 2019

52.41
EMILY MAITLIS: The Epstein name was one that everyone had heard of, but few had followed or fully understood and I think I was in that category as well. It was only when you put it in the context of he's America's Jimmy Saville, essentially, you know, he has been doing this prolifically you know, prolific abuse on a sort of unimaginable scale and intensity for years, decades. That I suddenly thought, oh god, I've got to check up on that, I've got to work out what actually happened. So I thought, even if this interview never happens - -and frankly, most of them don't ever happen - - you've got to start doing the legwork now. So I downloaded, I read, I watched, I investigated. I got all the clippings. We don't want to do a hatchet job. We don't want to get things wrong. It was forensic you know, it had to be forensic.

53.41
I think on a simple level, he became this personification of evil. He was an abuser of young women and a prolific abuser. But I also think it's because of the people he befriended. And those photos where you see him with presidents, and with businessmen and with princes. I mean he was somebody who was intensely serious about getting right into the heart of the establishment. They show a mind at work which is clearly thought long and hard not just about the abuse, but about the cover up. There were questions that needed answering or denying from Prince Andrew. You know, why did you befriend a pedophile?

## Secrets of Prince Andrew_ Part 1_Transcript WP/im

I was aware it could have huge ramifications. Whenever the BBC and the Royals meet, someone always gets fired. I didn't think it would be him.

CAPTION 2019 [music] file footage at the Island.
SPINS BACK TO 2000
WOMAN COMES INTO SHOT SITS DOWN-

54.49
LISA PHILLIPS: I decided to do this interview, it's so important to me just because I feel like my story with Jeffrey started with Prince Andrew and it ended with him. In the year 2000 I was a model and I booked a really big job, shooting in Tortola which was in the British West Indies [sic!]. The other model was kind of a friend of mine at the time. And we were shooting and we had so much fun and after the second day of shooting she said, you know I have a friend who owns an Island not far from here and um, I think we can go. And I was like well who's this friend , and she was like oh, he just does amazing things for models, he's just a really great guy.
CAPTION LITTLE ST. JAMES US VIRGIN ISLANDS [ MUSIC]
We went over to his island, had dinner and we were sitting with a bunch of other young women I thought were the same age as me, early 20s late teens. And then I was introduced to Jeffrey. A really charming man who asked me so many questions and paid so much attention to me. Made me feel very very comfortable. At that moment, a man walked in and said hello to me and the other woman. And you know, I just said hello, and then he quickly left. Later on, the model had said to me, 'did you know that was prince Andrew?' And I don't think I was supposed to even see him. He walked up at that moment to say goodbye. He was leaving. Jeffrey pursued me very heavily after that, to be in his world. And knowing that Jeffrey introduced me to a prince, he didn't want anybody knowing about it. And so he did little things for me. Actually they were big things for me. Because he would ask me what I was, wanted to do with my life and what was important to me. And he would bring people into your life to make that happen. You know, agents, or parts in movies, or whatever it is that the person wanted, he was able to get for them. Then, when I was leaving, he was like, oh, you know, time for a massage. So it's just like, okay, this is how this works.
I was completely like groomed by this man and doing everything he wanted. We were so naive. It was sexual abuse. Like under the umbrella of a "massage".

HRH 7
CAPTION 2000 FILE PHOTO OF ANDREW AND GM AND JE ETC AT ASCOT
57.38
ANDREW LOWNIE, ROYAL BIOGRAPHER: Andrew and Epstein became extremely

**Secrets of Prince Andrew_ Part 1_Transcript WP/im**

close. You know, real best buddies. There were seven different numbers for Andrew in Epstein's little black book. You know, he had the most intimate details of Andrew's life. Epstein said that there's only one person I know who likes sex more than me, and that's Andrew. There is no doubt that they were seeing each other almost every month. He's entertaining Epstein and Ghislaine Maxwell at Balmoral. The plus one, I think it's described, of Epstein. Whether she's the girlfriend or he becomes her sugar daddy is not clear. They stayed at Balmoral. They were at Sandringham. They were invited to personal birthday parties at Windsor. They met other members of the royal family. Epstein and Ghislaine were invited to the heart of the British monarchy.

58.28

DICKIE ARBITER: The fact that he was invited as a guest of Andrew would have been to private events, so Andrew would have sought permission from the Queen to invite him. The Queen would believe, believe her children, you know, that if they were okay, they were okay. Who'd heard of Epstein in, in, in the 1990s? It's almost as if Andrew fell under his spell. He could provide exotic holidays, he could provide yachts, he could provide girls.

59.01

ANDREW LOWNIE, ROYAL BIOGRAPHER: Either deliberately someone leaked information or paparazzi got to hear about the trip, but there were lots of sightings of him cavorting around the Far East having a good time. And the photographs ran across The Mirror. Didn't look very good for a senior royal to be on rich peoples' yachts with topless girls who were young enough to be his daughter. This didn't really reflect very well on the royal family. There is a sense of what are we going to do with him. Andrew leaves the navy in 2001, and so he was given this job as a trade envoy for British industry and commerce. It was pushed very much by the British Government.

59.43

VALENTINE LOW, ROYAL CORRESPONDENT, TIMES: Basically Andrew was given this job without any real sense of how he'd do it or what good he could do. His office worked out that as a member of the royal family, there were parts of the world such as the Middle East, and places like Kazakhstan and so on, where the standing of the royal family was very high. And if you were a royal you could perhaps achieve things which a politician could not achieve.

1.00.09

SIMON WILSON: My name is Simon Wilson and in uh 2002 I was Deputy Ambassador in Bahrain. During my time, Prince Andrew came out on three occasions, and initially it sounded like a very good appointment. [OVER FILE PHOTOS OF HRH IN THE GULF]

## Secrets of Prince Andrew_ Part 1_Transcript WP/im

When he was in the gilded palaces of the Gulf sheikhs, he was very at ease, diplomatic and as nice as pie. They were similar bedfellows and Prince Andrew would be on very good form. I couldn't have been further mistaken because he had this sort of split personality. He had an on and off switch which he could deploy very effectively. He always refused to stay at ambassadors' residences. He'd only want to stay in the royal suite at the best hotel. Problem was he traveled with a large entourage which would often include 2 private detectives, an equerry, a private secretary, a lady clark whose sole purpose was to write thank you letters, and a valet. There was a very memorable occasion when he arrived at the Ritz Carlton hotel in Bahrain of the valet trying to negotiate a 6 foot ironing board through the revolving doors of this hotel. When I asked the valet what on earth is going on here, he said, well no one else can iron his royal highness's trousers like I can.

The other point of contention that I know about was on that first visit in 2002, his private secretary had let slip that they might be raising the issue of the sale of his house at Windsor in the margins of the visit. I said this sounded rather unethical but I was told that he's been hawking it around the Gulf. He never raised it in my hearing, but there were private meetings that took place.

1:02.23
ANNETTE WITHRIDGE: The house that the Queen had built for Fergie and Andrew, modern place in Sunninghill and people said it looked like Southfork, which was , Dallas was a big TV show at the time and it was put on the market. It stayed on the market for something like three years, and nobody wanted it. And then suddenly it was sold to an oligarch for 3 million over the asking price. What was that all about?

1.02.57
SIMON WILSON: One of the main shocks to me was to realize that he was completely unaccountable. He was technically employed by the Department of Trade, he was the Trade Envoy in conjunction with the Foreign Office. Because, who was his line manager? I suppose his line manager was Her Majesty the Queen. Nothing was done to reign him in. His own staff were petrified of him.

1.03.29
RICHARD QUEST, [INTERVIEWER] Your schedule is relentless when you are on these trips, do you get bored?
HRH: No. But you are are being shown factories, you are meeting
HRH: people, they are fascinating. Everyone is interesting. What I am doing is normal to me.
It's abnormal to everybody else.

## Secrets of Prince Andrew_ Part 1_Transcript WP/im

HRH: Yeah, I know it's abnormal to everybody else, but I don't have everybody else's experience. Do you understand that? So I just get on and do it.

1.04.05
When Andrew becomes a trade envoy one of the people also taken on these tax payer funded trips, was Epstein, who clearly took advantage of him and his contacts.

10.04.16
VICKY WARD: It's become apparent to me from my reporting that Jeffrey Epstein was incredibly skilled at reading people and manipulating people. He was brilliant at summing up people very, very quickly at figuring out what it was that they needed. Prince Andrew was not the only person to be fooled by Jeffrey Epstein. I was fooled by Jeffrey Epstein. Jeffrey Epstein was an absolutely brilliant manipulative, deceptive con artist.

2008 CAPTION

FILE FOOTAGE OF JE IN PALM BEACH COURTHOUSE, 2008 - Newscaster: ..going to jail just before 10am this morning. He pleaded guilty in open court. He agree to serve a total of 18 months in the Palm Beach Detention Facility. 12 for felony solicitation of prostitutes and an additional 6 for procuring persons under 18 for prostitution.

1.05.19
VICKY WARD: This was not mainstream news. This was news in the local Palm Beach press. And it was news in finance because he was a financier. The conviction stemmed from several incidents from August of 2004 to October of 2005. We didn't know the extent of his sexual crimes. I had absolutely no idea that there had been a non-prosecution agreement and that what he was getting was a slap on the wrist. But we did know he'd gone to jail for underage sex. What Prince Andrew needed to do was shake off Jeffrey Epstein, because his friend is a pedophile.

CAPTION 2010 [MUSIC]
1.06.03
ANNETTE WITHRIDGE: December 2010. Bitterly cold December day. The News of the World phones me up says Annette, we've had a tip off that Prince Andrew is in New York. Can you find him? So I said, I'll go and try Ghislaine Maxwell. I then knew where she lived. It was an exquisite townhouse on the Upper East side. And then a car turned up it was a limousine and driver and then she suddenly appeared. There's no Andrew. So we gave up. 11 o'clock at night and we thought, where else can he be? The only other person I could think of, was Jeffrey Epstein. So off I toddle at 8am in the morning

## Secrets of Prince Andrew_ Part 1_Transcript WP/im

and I get to Epstein's road and I immediately see the British Royal protection squad. I immediately call Jay Donnelley the photographer and said, I think we got him. We then sat there and sat there and sat there. Oooh it felt like 3 days. During this time there were young girls going in and out, like every hour and a half, two hours. Two would come in, one would go out. And apart from the girls coming in and out, there was nothing.

So we all agreed to meet back again the next day. So the next day it was just after 1 o'clock. I got the window open slightly. I heard one of the English guys say, what happens if they go walkabout. Seconds later, whuff, the front door opened. Two very grey men, Epstein and Andrew walked out. I was like, oh my god. So I ran around to the driver's seat, Jay jumped in the passenger seat and we took off.

1.08.46
As we got to 5th Avenue, Central Park, they turned right which was against the traffic. Jay jumped out, boff and just ran. [VARIOUS PHOTOS OF JE AND HRH SHOWN IN MONTAGE. CLICK. CLICK] Of course, Jay got the pictures. There were clear shots of Andrew and Epstein walking and talking in Central Park. It was like Wow. [HEADLINE PRINCE AND PERVERT]. Prince and the Pervert. That picture sasys everything. Why would Andrew be stupid as to be staying at the home of a convicted sex offender? Particularly a man who had abused young girls. Who was advising Prince Andrew? Clearly nobody.
[VIDEO OF ANDREW WAVING GOODBYE TO A GIRL LEAVING JE'S HOME AT OPEN DOOR]
Without that picture we could never have proved he was in there. So that was like the start of the pack of cards going down.

1.10.03
VICKY WARD: Were it not for that photograph [of HRH and JE in Central Park], I'm not sure that anyone would have paid attention to Jeffrey Epstein. The great irony of the story is that the person who really made Jeffrey Epstein a household name was Prince Andrew.

1.10.20
DICKIE ARBITER: If the Queen had known, and known all the details about Jeffrey Epstein having just come out of 18 months prison sentence, she would have told him not to go. And he would have listened. Unfortunately the late Queen was a bit soft on her children. But given all the facts that she would've hardened and would've said no. He always listened to his mother. Always.
The problem is, Andrew would do things without telling anybody.

**Secrets of Prince Andrew_ Part 1_Transcript WP/im**

CAPTION 2011
THE PHOTO OF VRG W HRH AND GM
[REPORTER] The girl who's got Prince Andrew's arm around her waist is a teenage masseuse who has claimed to have sex with Epstein on numerous occasions. Though there is no suggestion that the Duke of York did anything improper.

1.11.10
ANNETTE WITHRIDGE: It was happenstance. Funnily enough it was taken by Jeffrey Epstein. Now, initially, the Mail on Sunday didn't say that Andrew and Virginia had slept together. It was almost too hot a potato. Virginia hadn't wanted to talk, she wanted to get on with her life you know. But when the picture of Andrew and Epstein came out, she was furious. Great. Now he's still consorting with Prince Andrew. So she then agreed to talk to the Mail on Sunday.

MONTAGE OF BAD HEADLINES [reporter] Hardly the kind of headlines Britain's trade envoy should or would want to be making.
Reporter - Andrew are you going to resign prince Andrew ? Are you an embarrassment Sir?

1.11.59
LADY VICTORIA HERVEY: That photo is fake. The only supposed evidence that he was with her, is a photo that doesn't look real. If you look at a close up of his fingers, two fingers are like the same length on his hands, so that hand is not his hand he can prove that.

1.12.25
ALLAN SPARKY, FORMER BUSINESS PARTNER: He's convicted based on innuendo [shaking his head]. He's a war hero for god's sakes.. We have a photograph that looks really like an uncomfortable Prince Andrew with his arm which someone posed reluctantly around this woman which might even not be a real photo. Based on that and Virginia's word, we're supposed to believe that she was trafficked?
[picture also shown of ███████████ ]

CAPTION 2019
1.13.06
EMILY MAITLIS: I'm not a photographic expert. I would have no idea whether that photograph was fake. It seemed to me that it was evidence that he had met Virginia Giuffre. He refutes ever having met her and therefore I guess has to refute the truth of the photo. I don't know what to make of that, right?

28

## Secrets of Prince Andrew_ Part 1_Transcript WP/im

01.13.40
So we called Digital specialists and print specialis and people who knew more about this stuff than we did. We said, does anything on that photo look odd or curious 'Cos we don't want to get things wrong. It was a completely acceptable part of our research to go and follow all the things that they were talking about. As far as we could ascertain, we didn't get a sense that it had been digitally altered or reproduced. There were no concerns from any of the experts we talked to that it was a fake. That's that the most I can give you.

CAPTION 2019 SPINNING TO 2018
[REPORTER] - Some supporters of Prince Andrew believe he's the victim of a media witch hunt. But as officials here know all too well, each new story makes it more difficult for him to keep his job.

1.14.41
ANNETTE WITHRIDGE: So almost immediately it was like, stop him being a trade envoy. He cannot do that anymore. He cannot represent Britain. And then it seems to like, get worse and worse

1.14.53
[REPORTER] And now there are reports that Epstein help to pay some money owed to the Duchess of York's former personal assistant. REPORTER FILE FOOTAGE. Former wife Sarah Fergusson accepted £15,000 from Epstein to help clear her debts.

1.15.12
VICKY WARD; It emerged that Jeffrey Epstein had paid a former employee of Sarah Ferguson's who was owned money, I think around 70,000. Jeffrey Epstein had come in and paid this man thereby leaving Sarah Ferguson sort of financially in the clear.

01.15.36
ALLAN SPARKY: It wasn't great judgment. Probably Jeff was looked at as another uh potential savior to all of their financial difficulties. Epstein was trying to bail them out of some difficulties. You could see the attraction in befriending him. Regardless of his bizarre predilection for young women

[REPORTER] OVER HEADLINES RE FERGIE APOLOGIZING ETC ] She apologized today today saying once again her actions have impacted on the man she admires most.

01.16.08

## Secrets of Prince Andrew_ Part 1_Transcript WP/im

ANDREW LOWNIE, ROYAL BIOGRAPHER: By March 2011, there are criticisms in Parliament, there are a number of senior MPs saying that he is really not fit for purpose for this job. He's an embarrassment. [FILE FOOTAGE OF SPEECHES INSIDE PARLIAMENT SAYING ANDREW MUST BE DISPENSED WITH HIS SERVICES] He's constantly surprised by the reaction of the public and indeed by his own family. He's got away with so much over his life that he thinks he can still get away with it.

[REPORTER] Charities and organizations are lining up to sever their ties with Prince Andrew.

ANDREW LOWNIE: Andrew is baffled, he can't understand why this is a problem.

[REPORTER] The prince has also been criticized for his lack of judgment.. Entertaining the son in law of hte ousted tunisian president - -
ANDREW LOWNIE: This is a guy who doesn't realize when the game is up.


1.16.58


FILE NEWS REPORT: Prince Andrew has stepped down from his role as the UK's roving business ambassador. It follows over controversy of links to a sex offender, allegations of lavish trips abroad and connections with key figures in repressive regimes.

1.17.12
NEWS: He had resisted the pressure. But now he's accepted that his position as Britain's trade envoy in untenable.


1.17.20
ANDREW LOWNIE: I think the extraordinary thing is that even though he's lost his job, he continues to carry on doing many of the same functions, still paid for by the tax payer. He is, you know, removed from certain things but he still keeps all the privileges and I don't think he realizes that frankly, he's finished. He still thinks that he can restore his reputation What store is reputation.

CAPTION 2015
01.17.42
File News Report: We turn next to a controversy shaking Britain's royal family. Prince Andrew accused in a lawsuit of inappropriate relations with an underage girl. The

## Secrets of Prince Andrew_ Part 1_Transcript WP/im

allegations surfacing in a Florida Lawsuit against this man, Jeffrey Epstein. Allegations that Andrew had sex with a 17 year old girl.

FILE FOOTAGE OF VRG WITH HER PHOTO - This is a real photo. And that's right before I was abused by him.



SIGRID MCCAWLEY, ATTORNEY FOR VIRGINIA GIUFFRE: In 2015 Virginia Giuffre finally made a decision that she wanted Jeffrey Epstein behind bars. We were looking at all of the individuals who had injured Virginia. Prince Andrew was one of many. Virginia was brought by Jeffrey Epstein and Ghislaine Maxwell over to London. It was actually on their private plane. In London, um Ghislaine Maxwell informed her that she was going to have to do what she did for Jeffrey, for a prince. So they went um, out that evening. They ended up going to a club [PHOTO FILE OF TRAMP SIGN] and doing 01.19.41 some dancing. And then they came back to Ghislaine Maxwell's home. And at the home that's when you see the infamous picture now, um, that was taken. And Virginia will tell you that right after that picture was taken, she was forced to have sex with Prince Andrew. I mean, there - - this was -- nothing voluntary here. And Virginia was required to get and be with Prince Andrew.


1.19.55

And the second allegation is in New York. In New York, she was, um, told again that he was going to be there


1.20.08

The third allegation is when Virginia was down in the US Virgin Islands. Jeffrey had his own island. They used to call it Little St. Jeff. And that was a period of time where again,

## Secrets of Prince Andrew_ Part 1_Transcript WP/im

she was instructed that she had to , um, have sex with Prince Andrew while she was on the Island. It's shocking what she had to go through.Fact that she had no control, no choice in it. At any time, she could be directed to go with another individual. [ FILE PHOTO OF VRG ]

1.20.46

MCCAWLEY CONTINUES: Virginia experience trauma from a very young age.



And as we've seen with many abuse victims, they may find themselves in the hands of another abuser as their life goes on. [CUT TO PHOTO OF JE AND GM] Ultimately she wound up with Ghislaine Maxwell and Jeffrey Epstein, probably the worst combination any individual in that circumstance could fall into. This was a horrible 20 + years sex trafficking scheme that many, many people participated in. And they're all responsible for their part. [CUT TO PIC OF ANDREW]. And Prince Andrew is responsible for his part in this.

1.21.23

NEWS FILE FOR CBS OUTSIDE BUCK PALACE, MARK PHILIPS REPORTER: Well, Prince Andrew may be only fifth in line for the throne, but he's first for lurid headlines these days.

## Secrets of Prince Andrew_ Part 1_Transcript WP/im

1.21.33
VALENTINE LOW: The way royals normally behave is they don't' normally answer every accusation that's put to them. But the tradition of never explain, never complain only holds up for so long.
REPORTER: When there's scandal at the palace, it usually goes quiet. Not this time though. - 'STATEMENT FROM BUCKINGHAM PALACE:
It's emphatically denied that His Royal Highness the Duke of York, had any form of sexual contact or relationship with Virginia Roberts.
The palace stands resolutely behind Andrew tonight. He so far remains silent. But as the seriousness of these allegations sinks in, he may soon be forced to confront them publicly.

1.22.13 FILE FOOTAGE FROM DAVOS - [Reporter] Can you recover from this Sir?....
HRH: For the record, to refer to the events that have taken place in the last few weeks. I just wish to reiterate and to reaffirm the statements that have already been made on my behalf by Buckingham Palace. My focus is on my work.


1.22.47
ANNETTE WITTHRIDGE: He talks about the support of the wider family by which I assume is the Queen,, and then the immediate family i.e. his ex wife. And those daughters as well. You know, by that time, they were actually the sort of age that the girls that were being abused by Epstein, which is hard to get over.

1.23.10
NEWSREEL : A judge in America has ruled that sex allegations made against Prince Andrew should be removed from the court records. [Reporter] The court in Florida has ruled that what it called "the lurid details" of Ms Robert's allegations against Prince Andrew are irrelevant. Her underlying complaint is against the man on the right here [showing Photo in Central Park of HRH and JE] , her former employer, Jeffrey Epstein. Less pleasing for Andrew though, is the fact that the judge made no determination at all as to the veracity or otherwise of Ms. Robert's allegations. And those allegations have not been abandoned.

1.23.47
VICKY WARD: Soon after that, Jeffrey Epstein's lawsuit in Florida, the class action suit, comes to this sudden end.

1.23.54
MATT SCZESNY @WPTV FILE REPORTING: Jeffrey Epstein did not want any of

## Secrets of Prince Andrew_ Part 1_Transcript WP/im

those allegations coming out in court, or even any of his accusers testifying. And this settlement made sure of it.

1.24.04
VICKY WARD; The ridiculous thing about this whole story is that even after this case has been settled, the story disappeared after that for three years. And Jeffrey Epstein goes back to try to rehabilitate himself in New York Society.

1.24.29
DAISY GOODWIN : The only thing Prince Andrew has got at this point in his life, is his title, you know? He's the Duke of York. He's his Royal Highness. But what does that mean?

1.24.38
VALENTINE COLE: With the younger royals getting such media attention, they were now the star members of the royal family. [OVER PICS OF WILLIAM, KATE, CHILDREN].

1.24.45
He was central to the monarchy. He was one of the senior royals. Over the years [GRAPHIC] he's been pushed further and further down the line of succession until he's no longer regarded as a senior royal, but as someone who can be quietly tucked away, and it doesn't matter.

2019 CAPTION OUTSIDE THE BBC
1.25.11
STEWART Dep Producer NewsNight: In the early summer of 2019, the heat was not on the story of Jeffrey Epstein. It felt like quite an old story at that point. And prince Andrew had largely kind of got on with his life. He wasn't in the foreground of my thinking, er until the moment when Jeffrey Epstein was arrested in that summer.

1.25.36 FOX NEWS REPORT - There is a major development tonight involving billionaire financier Jeffrey Epstein. A wealthy money manager whose friends have included presidents and a prince, is behind bars in Manhattan tonight. Jeffrey Epstein is accused of sex trafficking and molesting under age girls.

1.25.53
ANNETTE WITHRIDGE: The story just re exploded back into the headlines again. This

## Secrets of Prince Andrew_ Part 1_Transcript WP/im

man Epstein who has now done this, this, this and this. It was headlines every single day.

1.26.04
SAM MCALLISTER: Everything has changed for Epstein. And everything has changed for Prince Andrew. You've got extremely brave victims making huge allegations, and allegations against Prince Andrew personally. He's not just a bit player. There are specific allegations against him. [FILE FOOTAGE OF GEOFFREY BURMAN SPEAKING AT PRESS CONFERENCE [Reporter] -- Prince Andrew, British Royal Family, can you provide any information? You know, he's a long time friend of Mr. Epstein. SDNY: No comment.

1.26.35
SAM MCALLISTER: His world had changed. He was on his knees. I said, people don't believe him. Perhaps he'll do an interview.

1.26.47 NEWSFLASH; Jeffrey Epstein Commits Suicide. Jeffrey Epstein has died. PBS Reporter: Any co conspirators should not rest easy.

1.26.52
LISA PHILIPS: I wanna see him pay for what he's done.

Reporter to Andrew FILE FILM clip from Davos - Are you going to recover from this, Sir?

1.26.56
EMILLY MAITLIS: The Queen had given us her seal of approval.

SAM MCALLISTER: The atmosphere was electric. It just felt like we all had a collective intake of breath.

1.27.06 [REPORTERS] THE PRINCE ANDREW INTERVIEW - Backlash facing Prince Andrew this morning. The headlines have been scathing. It's being called a train wreck and a catastrophic error. It feels like dangerous times at Buckingham Palace.

END OF PART 1.

Secrets of Prince Andrew_ Part 1_Transcript WP/im

SECRETS OF PRINCE ANDREW - PART 2 S1 E2 - WP/IM  AIRED
TRANSCRIPT

SECRETS OF PRINCE ANDREW - PART 2  S1 E2

SAM MCALISTER, PRODUCER
00.19
Prince Andrew was kind of the forgotten prince, in a sense. I expect what he was
thinking was a nice interview with someone like Emily Maitlis might bring him back to
public consciousness.

1985 CAPTION
FILE FILM OF ANDREW, RECAP WITH SELINA : This nickname, Randy Andy.
FILE NEWS REPORT: Not a week passes without some new rumored conquest.

Andrew meets Sarah Ferguson and for a few years,, they seem to be a good thing.
1986 Prince Andrew and Sarah Ferguson formally announced today they are getting
divorced.

00.47
DAISY: And then Andrew's free and single again.

ANDREW LOUNIE: Mixing with the jet set

00.51
VALENTINE LOWE:  But one of Andrew's biggest problems is that he doesn't have
much money. There was a sort of imbalance between the sort of money that Andrew
had and the sort of life that he thought he should lead.

01.01:
ANDREW LOWNIE: It was his desire for rich living that brought him into the worlds of
Ghislaine Maxwell and Jeffrey Epstein [over file exhib pic of GM and JE from the Trial].

01.07
DICKIE ARBITER: Epstein, who provided exotic holidays. He could provide yachts, he
could provide girls.

01.13
EMILY MAITLIS: The Epstein name was one that everyone had heard of, but few had
followed or fully understood. And I think I was in that category as well.

01.23
FILE NEWS FOOTAGE, 2008 OF JEFFREY EPSTEIN IN PALM BEACH COURT.

SECRETS OF PRINCE ANDREW - PART 2  S1 E2 - WP/IM  AIRED
TRANSCRIPT

[REPORTER] Jeffrey Epstein went to jail just before 10.00 this morning. He pleaded guilty in open court.


01.28
VICKY WARD: We didn't know the extent of his sexual crimes, but we did know he'd gone to jail for underage sex, you know, soliciting a minor. From that moment he is a convicted pedophile.

CAPTION DECEMBER 2010

01.42
ANNETTE WITHERIDGE, JOURNALIST: We've had a tip off that prince Andrew is in New York. Can you find him? The Prince and the Pervert. That picture [FILE OF PHOTO OF HRH AND JE IN CENTRAL PARK]. That picture says everything. Why would Andrew be stupid as to be staying at the home of a convicted sex offender? Without that picture of Andrew, we could never have proved he was in there. [OVER FILE FILM OF ANDREW WAVING TO A WOMAN GOING OUT FROM BEHIND EPSTEIN'S FRONT DOOR. ] So that was like the start of the pack of cards going down.

2015 CAPTION

02.05
FILE REPORT NEWS CASTERS: We turn next to a controversy shaking Britain's royal family. Prince Andrew accused in a lawsuit of inappropriate relations with an underage girl. The girl was forced to have sexual relations with the prince when she was a minor at parties around the world, including on Epstein's private Carribean Island.  He so far has remained silent. But as the seriousness of these allegations sinks in, he may soon be forced to confront them publicly.

02.31
SIGRID MCCAWLEY:  This was a horrible 20-plus year sex trafficking scheme that many many people participated in, and they're all responsible for their part and he's responsible for his part in this.

 CAPTION 2019
02.42
SAM MCCALLISTER:  The Epstein issue was a residual story which we would have of course, asked about.  That was a red line. That was closed as an issue as far as the Palace was concerned. So, I wished them a lovely day and said, if the position

2

SECRETS OF PRINCE ANDREW - PART 2  S1 E2  - WP/IM  AIRED
TRANSCRIPT

changed, please get back in touch.  They never ever usually get back in touch.  And
then it all started going so hugely wrong for Andrew.

OPENING CREDITS: Secrets of Prince Andrew A&E S1/E2 [music],  Part Two
CAPTIONS: JULY 6, 2019 OVER SKYLINE OF NEW YORK
03.30 Four months before the interview

FILE FILM NEWS REPORT OF JE'S JET LANDING AT TETERBORO AIRPORT
[REPORTER]:  A wealthy money manager whose friends have included presidents and
a prince is behind bars in Manhattan tonight. Jeffrey Epstein is accused of sex
trafficking and molesting underage girls.
[MALE REPORTER, MOLA]: Federal agents searched Epstein's New York home last
night. He's scheduled to be in court Monday, where we'll learn whether Epstein will be
granted bond.Also the indictment which led to his arrest will be unsealed , revealing
more details about the case against him.

04.11
SIGRID MCCAWLEY:  I'll never forget the day when Epstein was arrested.  I got the call
from the prosecutors and it was monumental. He had no notice, he had flown in on the
plane into Teterboro. At the same time he was getting served, they were breaking into
his Manhattan huge town home. They got into the safe. They found a tremendous
amount of information. I mean, Saudi passports, an escape plan he had. The pictures of
many, many young individuals.

04.46
DAVID BOIES: Up until the arrest, if you go back and look, there's still relatively little
attention being paid to this sex trafficking operation involving hundreds of girls over
decades.

05.04
SIGRID MCCAWLEY: He would lure in these young individuals with a promise of
something they needed. Oftentimes it was financial. Sometimes it was career focused,
something that they needed in their life. And he would use that carrot to get them in, as
the lure, right, to bring them into the scheme. And then of course they would be subject
to sexual abuse at that point.

05.26
DAVID BOIES: One of the things that's most astounding is how long the Jeffrey Epstein
sex trafficking scheme went on um, in plain sight  without any intervention.  People
knew about it. People joked about.  But nobody did anything about it.  We went to the

SECRETS OF PRINCE ANDREW - PART 2  S1 E2  - WP/IM  AIRED
TRANSCRIPT

media with the story years before anybody was prepared to publish it. And people just weren't interested.  And then all the sudden, everything changed.

06.08 FILE FILM OF FBI PRESS CONFERENCE,
GEOFFREY BERMAN, ATTORNEY FOR THE SDNY: Good morning. Today we announce the unsealing of sex trafficking charges against Jeffrey Epstein. The charges allege that Epstein sexually abused young girls by enticing them to engage in sex acts for money.

[FBI MAN]: Today, I'm asking everyone to take a good look at this man. If you have been victimized in any way or if you are somebody who has any additional information about his alleged illegal behavior, we want to hear from you.

06.35
GEOFFREY BERMAN, SDNY ATTY: We will continue to devote significant resources to investigating these crimes, protecting young people from sexual predators. OK we're going to take some questions, but first let me preface it by saying that there's been a lot of speculation in the media about individuals affiliated or associated with Jeffrey Epstein. As you know, Justice Department guidelines prohibit us from talking about such individuals.

REPORTER: Is there any would you like to see if Prince Andrew from the British Royal Family if he can provide you with any information?

GEOFFREY BERMAN:  No Comment.

07.14
DAVID BOIES: The arrest really exploded the story and now people are beginning to look at Prince Andrew in a different way.

07.28 FILE NEWS FILM:  There are shocking  new details tonight in the case against accused sex trafficker, Jeffrey Epstein. Newly unsealed documents reveal the accounts of an accuser who says she was ordered to have sex with several well-known men.

[Reporter] But the new documents name more names. Prince Andrew of Great Britain.
[Reporter]: Pictured here in 2001 with Epstein's alleged victim, Virginia Giuffre and Maxwell.

SECRETS OF PRINCE ANDREW - PART 2  S1 E2  - WP/IM  AIRED
TRANSCRIPT

07.51
DAVID BOIES: Virginia said that she was trafficked to Prince Andrew by Ghislaine
Maxwell and Jeffrey Epstein for sex.

08.01
[Reporter] Nearly 2,000 pages of court documents released today reveal new, lurid
details about the allegations against accused sex trafficker Jeffrey Epstein and his
long-time associate, Ghislaine Maxwell, a British socialite who allegedly took part in
recruiting girls for the billionaire.

08.19
EMILY MAITLIS: Epstein was suddenly front page news. And there were headlines
appearing and there were pictures appearing. You know, he has been doing this
prolifically for, on an unimaginable scale and intensity for years, decades.  There's
photos where you see him with presidents and with princes. I mean, he was somebody
who was intensely serious about getting right into the heart of the establishment.

08.52
SAM MCALISTER: I think that basically you sometimes have sort of sleeper stories that
we've all kind of know about, and they're in the ether, but they haven't really hit the
prominence and they don't dominate the headlines. In this  particular case,  you had
someone who's been arrested for terrible, terrible crimes with associations with some of
the most powerful people in the world. You hear the name Bill Clinton, you know, you
have the name, Bill Gates.  You hear the name Prince Andrew.  And obviously, talking
about a prince being involved in something of this nature does add an extra element to
it. People are particularly interested in the royal family.

09.33
PBS NEWSHOUR FILE INTERVIEW to Eli Honig: Host: How would we learn if any of
these individuals, others he's associated with, could get caught up in this case?
ELI HONIG: Good question. So when a case goes to trial,  all the evidence comes out .
Names get named and we will learn everything, we could see other people charged,
and we certainly will know who they are.

09.49
CAPTION: AUGUST 10, 2019
Three months before the interview
[siren wailing over new york skyline] [music]

SECRETS OF PRINCE ANDREW - PART 2  S1 E2  - WP/IM  AIRED
TRANSCRIPT

10.00
MORE NEWS FILE FILM [Anchor] ABC News: Thanks for joining us. We are coming on the air with breaking news. Sources telling ABC News that Jeffrey Epstein has died. That is according to three law enforcement sources who gave that information to ABC News.
[DIFFERENT REPORTER] The 66 year old is believed to have taken his own life while awaiting trial on new charges of trafficking dozens of underage girls for sex.

[DIFFERENT REPORTER] He knew celebrity and royalty, Presidents Trump and Clinton. And what everyone is asking, given the publicity surrounding this case, given the nature of these allegations, how could Jeffrey Epstein have been found dead in his cell?

10.45
DIFFERENT REPORTER] : Attorney General William Barr has said he's appalled byh the suicide.

Different Reporter:  He should have been under 24 hour armed guard and I would suspect that heads will roll.

GRAPHICS OF VARIOUS TWEETS:
TWEET FROM JOHN HARWOOD @johnJharwood
How in the hell did the prison make it possible for Jeffrey Epstein to commit suicide?
2.15pm Aug 10, 2019

3,943 Retweets   528 Quotes   20.9 Likes   25 Bookmarks

JOHN MCAFEE @officialmcafee
I was stunned by Epstein's suicide, though probably not as much as Epstein himself.
4:02pm Aug 10, 2019

Love 76.2K    Read 1.6K replies

11.04
VICKY WARD @VickyPJWard
Let me assure you: Jeffrey Epstein's death is not the end of this story. There is more yet to come. Stay tuned.

3.34pm AUG 10, 2019

SECRETS OF PRINCE ANDREW - PART 2  S1 E2  - WP/IM  AIRED
TRANSCRIPT

2,532 RETWEETS   166 QUOTES   12.5 LIKES, 28 BOOKMARKS

11.06
NEWS FILE FOOTAGE: Anchor:  On the line now is Vicky Ward. She is a former
investigative reporter for Vanity Fair who wrote a profile of Jeffrey Epstein.

TWEET: VICKY WARD  @VickyPJWard

I tried to warn you about Jeffrey Epstein back in 2003.

Anchor: Good morning Vicky, you just tweeted this:
"I tried to warn you about Jeffrey Epstein back in 2003." What is your reaction to the
news now?

11.23
VICKY WARD [by phone]:  Among my sources there was considerable concern and fear
that this is exactly what would happen. I think that what's always been fascinating about
having Jeffrey Epstein incarcerated is, who else could he potentially bring down?
12.21
VICKY WARD INTERVIEW: Back in 2002, Jeffrey Epstein, he was this enigma. Noone
could do the jigsaw puzzle. The mystery about him was not about the women or the
girls. You know, there was talk that there were always girls floating around but not talk
that they were underage. What was really unusual about him was that he had all this
wealth, and yet there was no footprint of him in the markets. When I was reporting that
piece, he phoned me pretty much every day because in hindsight, he was really terrified
of what I was going to uncover. And as we now know, I didn't uncover the half of it. I
take great pride in the fact that my Vanity Fair Story completely exposed him and his
cover story as a fraud. And I was able to show that Jeffrey Epstein had absolutely been
involved in illegally moving insurance bonds out of Illinois to New York and yet 20 years
later, we still do not know where his money came from . And without his money, the
sexual crimes could never have happened. The great irony of the story is that the
person who really made Jefrey Epstein a household name was Prince Andrew. Were it
not for that photograph, were it not then for all the headlines, Jeffrey Epstein had helped
out Sarah Ferguson financially. Were it not for the fact that Sarah Ferguson then
completely distanced herself from Jeffrey Epstein, said, I don't want anything to do with
a pedofile. Were it not for all that, I'm not sure that anyone would have paid attention to
Jeffrey Epstein during his life. In death, he's become an international obsession.
Now,you  know, the mood certainly is that people have got to be held to account. That
it's absolutely outrageous that these terrible sexual crimes could have happened and
that no one has been made to pay the price.

SECRETS OF PRINCE ANDREW - PART 2  S1 E2  - WP/IM  AIRED
TRANSCRIPT


15.01
CAPTION AUGUST 17, 2019 - ONE WEEK AFTER EPSTEIN'S DEATH
[Reporter] What was Prince Andrew doing at the home of a convicted pedophile in New York in 2010?
REPORTER: Newly released video showing Andrew inside Epstein's New York mansion.
Reporter" Reportedly shot an hour after Epstein left the house with another young woman.  This allegedly took place about a year and a half after Epstein finished a 13-month prison term for soliciting child prostitution.

15.29
EMILY MAITLIS;  Within days of Epstein's death, the momentum was starting to build. It was getting uncomfortable, quite frankly, for Prince Andrew, because all this coverage was starting to emerge. The difficulty with being Royal, you don't get that right of reply. You don't get to tweet out if you don't like a story normally.

15.49 [OVER REPEAT FILE FILM OF ANDREW WAVING GOODBYE TO A WOMAN LEAVING EPSTEIN'S HOME FROM INSIDE THE HOME.
[REPORTER]: The prince even appears to check that no one was looking, but cameras were.

15.57
CAPTION: AUGUST 19, 2019
NINE DAYS AFTER EPSTEIN'S DEATH

16.01
NEWS FILE CBS THIS MORNING: This morning, Britain's Prince Andrew's responding to sexual abuse allegations against Jeffrey Epstein for the first time. Queen Elizabeth's middle son says in a statement through Buckingham Palace that he is appalled by Epstein's alleged crimes. Charlie, is his statement unusual do you think?

16.14
REPORTER CHARLIE OUTSIDE BUCKINGHAM PALACE: It is highly unusual. And the very fact that the palace decided to release a statement at all just shows you how seriously they are now taking the situation.

16.28
SAM MCALISTER: So you've now got a hugely heady mix. You've got a member of the royal family accused of an association with someone who's arrested, then dead. You've

SECRETS OF PRINCE ANDREW - PART 2  S1 E2  - WP/IM  AIRED
TRANSCRIPT

got extremely brave victims making huge allegations. You've got Maxwell, Ghislaine
Maxwell on the loose. She's still at large. And that's the point at which you start with
something that is not news, and now it's the biggest story in town.

16.55
FILE FILM OF PRESIDENT TRUMP
[Reporter] Mr President, do you still think Jeffrey Epstein is a terrific guy?
PRESIDENT TRUMP: Okay, Anybody else?
REPORTER" Mr. President, do you still think that Jeffrey Epstein is a terrific guy?
PRESIDENT TRUMP: Well I knew him like everybody in Palm Beach knew him. I mean,
the people in Palm Beach knew him. He was a fixture in Palm Beach.
[REPORTER OVER HRH PHOTO W GIUFFRE & GM] One alleged victim said Jeffrey
Epstein instructed her to have sex with at least half a dozen prominent men.
[REPORTER]: On Epstein's private jet known as the lolita Express.
17.16
FILE FILM OF PRESIDENT TRUMP: I had a falling out with him a long time ago. I don't
think I've spoken to him for 15 years.
[Reporter outside Buckingham Palace]:  Prince Andrew and his friendship with Jeffrey
Epstein are back on the front pages [holding up mail/standard papers to show].

17.25
ANCHOR PBS NEWSHOUR FILE FOOTAGE: "Any co conspirators should not rest
easy.

FILE FILM OF PRESIDENT TRUMP:  I was not a fan of his. That I can tell you. I was
not a fan of his.

17.34
SAM MCALISTER: Every time the story moves, of course, I'm thinking straight away,
perhaps he'll do an interview. But I send another rejection and I get rejected again.

CAPTION : AUGUST 27, 2019
ELEVEN WEEKS BEFORE THE INTERVIEW

NEWS FILE REPORT [reporter]: Today 16 women spent two and a half hours in a
federal court room in New York City, telling of abuse at Epstein's hands.
[Reporter]: Epstein's death does not mean the end to the federal sex trafficking
investigation that led to his indictment.

18.11

SECRETS OF PRINCE ANDREW - PART 2  S1 E2 - WP/IM  AIRED
TRANSCRIPT

SIGRID MCCAWLEY:  I believe that the survivors definitely felt like justice was snapped out of their hands. That hearing was a moment where the survivors got to come together and we were all in court together. And they got to speak about their pain and their truth, and what had happened. None of them wanted him dead.  None of them wanted him dead. They all wanted to see him suffer in prison, suffer the way they had suffered.

18.38
[REPORTER AS VRG IS WALKING OUTSIDE THE COURT WITH SIGRID ET AL]:
Virginia Roberts Giuffre alleges that she was forced to have sex wtih Prince Andrew when she was 17.
[Reporter]: Ms Giuffre can I just ask you, you've spoken about Jeffrey Epstein today, have you got anything to say about Prince Andrew?
VRG: Not at the moment.

18.55 SIGRID MCCAWLEY;  Virginia was forced to have sex with Prince Andrew. I mean, this was nothing voluntary here. So she was being trafficked by two adults throughout not only the United States, but also internationally. And when they made demands on her to, to take action, with respect to intercourse with an individual, she had to fulfill those demands and unfortunately, she had to do that, you know, very regularly.

FILE FILM ON AUG 27 OUTSIDE COURTHOUSE STEPS WITH VRG BEING SHEPHERDED TOWARDS PRESS MICS AT THE STEPS:
19.19
VIRGINIA GIUFFRE:  I want to start by saying it's not how Jeffrey died but it's how he lived and we need to get to the bottom of everybody who is involved with that starting with Ghislaine Maxwell and going along the lines there. I was  recruited at a very young age from Mar-a-Lago and entrapped in a world that I didn't understand and I have been fighting that very world to this day and I won't stop fighting, I will never be silenced until these people are bought to justice.

REPORTER: Any Comments on that [re Prince Andrew] you said you won't be silenced

VIRGINIA GIUFFRE: He knows exactly what he's done and I hope he comes clean about it.  Thank you.

20.06
SAM MCALISTER: So in the period between May and August, everything has changed for Epstein. And everything has changed for Prince Andrew. Suddenly the email goes

SECRETS OF PRINCE ANDREW - PART 2  S1 E2  - WP/IM  AIRED
TRANSCRIPT

from "No thank you, have a nice day." to "OKay, let's have a chat next week."  I had to
read it twice.

GRAPHIC SHOWING HALF A MESSAGE:

Amanda Thirsk
DOY BBC Newsnight Interview

Dear Sam,
We have now reached a point
Prince Andrew to make a public chat, one that wouldn't  have any parameters.
Can we schedule a meeting to discuss the interview?
Best,


20.07
SAM MCALISTER: I don't know what's on the table but I'm back in.
This is the biggest news story in, frankly the world, as far as I'm concerned at that
juncture.  So on that occasion I asked someone to come with me. The star power, the
Maitlis magic. I mean, that's got to be brilliantly helpful, right?

20.47
EMILY MAITLISS: I knew that if they said yes it would be the most extraordinary piece
of television that I'd ever made. And possibly that he had too. Sam then got in touch
with the palace, and then we waited. We Waited.

CAPTION OCTOBER 2019
TWO WEEKS BEFORE THE INTERVIEW.

21.16
EMILY MAITLIS: Sam and I went off to the palace. And that in itself was sort of
extraordinary. You know, I thought oh gosh, this will be one to tell the grandchildren.

21.25:
SAM MCALISTER: What we were going to try to do was tell them that their position was
impossible, that the public conversation around this was a fait accompli. He was being
seen as at best, as dodgy and at worst, guilty. And if they wanted to change that
conversation, to change the narrative, as we would say pretentiously in the business, it
would be up to them to do something about it.

21.52
EMILY MAITLIS:  And I thought how could we be in a setting with its stateliness and its
majesty and its grandeur, about to talk about pedophilia?

22.03
SAM MCALISTER [OVER DRAMA FOOTAGE OF HER AND EMILY WALKING AWAY

SECRETS OF PRINCE ANDREW - PART 2  S1 E2 - WP/IM  AIRED
TRANSCRIPT

FROM CAMERA IN BUCKINGHAM PALACE] So your nerves are building. We know
that we potentially might have maybe just one in a billion chance, but it's still a chance
of something huge.

22.15
EMILY MAITLIS [DRAMATIC FILM OF THE WOMEN WAITING IN SOME OUTER
OFFICE TO BE CALLED IN]: Every person that came in, we kept jumping up and
thinking, this is the moment ....

SAM MCALISTERA: And we are greeted by Amanda Thirsk.

22.30
EMILY MAITLIS: You leave the grandeur behind very quickly. Actually you are then
quite quickly in a working quite cramped office space.

SAM MCALISTER: You're very close quarters so that's quite unusual. Normally if you're
doing a negotiation, there's professional distance if you like.

22.47
EMILY MAITLIS:  She vetted us essentially, you know.  She was asking what kind of
journalists we would be.  We knew we had one chance to make that pitch, and actually
our pitch was just that we're not going to pre-judge, we're going to give the one thing
that NewsNight can do brilliantly, is time and breadth. You know, we will do a solid hour.

23.13
SAM MCALISTER: So we've gone from, we won't talk about Epstein. We're now in the
room knowing that if we do an interview with Prince Andrew, that is the only thing we're
going to be talking about.  So we get to the end of the negotiation and I do something
on I never usually do. I said to Amanda,  So are you going to do an interview? And she
says 'Yes. But just one.'  You hold your breath and I fell Emily was holding her breath
too. It felt quite strange. He is going to say something on the record and we are in the
game.

We left through the bowels of the palace. There was the changing of the guard that day
which I'd never seen. So we had to leave through the basement.

24.09
EMILY MAITLIS:  I suddenly saw the underbelly of Buckingham Palace, a whole sort of
city, you know, at work. And you sort of think it's a big organization. It was an
extraordinary position to be there at all. The interview was there. They were considering
it.

24.34

SECRETS OF PRINCE ANDREW - PART 2  S1 E2  - WP/IM  AIRED
TRANSCRIPT

SAM MCALISTER:  I never think he's going to do an on-camera interview about sexual
impropriety with Emily Maitlis, one of the best interrogators in the country if not the
world. Who in their right mind would do that? Well now, I  know someone might.

24.58 CAPTION NEW YORK- LISA PHILLIPS WALKING AWAY FROM CAMERA ITS
RAINING , UMBRELLA UP…
CAPTION: EPSTEIN'S TOWN HOUSE UPPER EAST SIDE, NEW YORK

LISA PHILIPS, FORMER MODEL [staring up at the home]: I haven't been here in so
many years. It feels kind of like eerie. Actually I'd never thought of, being back here,
how I would feel.

[NOW BACK IN INTERVIEW INSIDE] I think during the time, Jeffrey, to us, wasn't a bad
guy.  I looked up to him. I just, I really enjoyed being in his presence. I felt like he cared
because he would ask me what I was - wanted to do with my life and what was
important to me. And he would bring people into your life to make that happen.  But
there was always this massage that he wanted.  Like, when you look back on it, there
was - it's abuse, you know? But I think during the time, sometimes you just think, oh,
it's, you know, oh, it's just Jeffrey. You don't know what it's like when you are groomed
and manipulated by somebody who's so powerful. Like you listen and hang on to every
word they say. You know, that was abuse that was going on. And we didn't even really
think of it at that way at the time. You know, but when you're older, you're like, wait a
second. I was completely like, groomed by this man and doing everything that he
wanted. It was so hard for me to handle that truth. [getting teary].

[back out on the pavement and continuing talking in v/o:]
26.28
I have a long list of friends  that will not ever speak bad about him. I'm one of the only
ones that will come out and talk about it. And I understand why they don't want to,
because I suppressed it,

[BACK TO CAMERA AGAIN] I mean, like over 15  years. And when I started talking
about it, it was so traumatic for me. I almost wish that I had just been like them,
suppressed it.

[reporter] Do you regret speaking out?

LISA PHILIPS: Sometimes. Sometimes I'm just like, I wish I had just never talked about
it. When you start to realize it, then you start to feel ashamed. Like, why did I do that?
You know? Like, why did - Why did I listen to her?
And why did I do that? Why didn't I stand up for myself? And why wasn't I powerful
enough to be like,, screw you, you know. You know I'm not touching you or doing
anything with you. Leave me alone.

SECRETS OF PRINCE ANDREW - PART 2  S1 E2  - WP/IM  AIRED
TRANSCRIPT

27.13 LISA PHILIPS CONTINUES:  [over file photo of young women on JE's island with faces blanked out]  A lot of abuse has happened with these men, and they have gotten away with it.

[Reporter] Did you watch the Prince Andrew interview?

27.18
LISA PHILIPS: Yeah I did watch that interview. [smiling], it was a train wreck.
[Reporter] : Is there any way that what he is saying, his denial of this could be true? That it didn't happen?

27.28
LISA PHILIPS: No.  No. It happened from there. No. It happened. Of course you are going to deny it, though..I just can't believe he's going to ever admit it. Why would you admit that you were, you know, friends with Epstein and having sex with young women? The main reason why I am speaking out is because I had a dear friend who - - something tragic happened to her. You know, I was over her house one night and she just broke down crying. And I was like, what is wrong?  And she said that Jeffrey told her when she was at his house to go into the room with Prince Andrew and she did it. She went in the room, had sex with him, that was it. Just walked out.

[Reporter] Consensually or?

28.16
LISA PHILIPS: Well, consensually. Yeah. Essentially yeah, I mea, Jeffrey told her to do it. I guess it's consensual. It wasn't a sexual assault. She was over age. Maybe she was 19 or 20 at the time, probably 19. I don't really know what's consensual or not in that situation. I don't know how to define it. It just was traumatizing. She was a completely different person after. Her life went completely out of control.

28.41
[Reporter] And it was that encounter with Prince Andrew that triggered her?

LISA PHILIPS: Yeah. Mm-hmmm. It triggered it for me too. I stopped speaking to Jeffrey after that, too. I was done. The last time I saw Jeffrey I went to go talk to him about it, about what was going on. He said something like, it's good to have things on people. He had a lot of secrets on a lot of high powered men.

29.04
Reporter: Some people have said that Prince Andrew in some ways was being manipulated by Epstein, and maybe you know, wasn't as guilty as some of the other men.

29.14
LISA PHILIP: Prince Andrew wasn't as guilty? He's a grown man and he can make decisions. And if you are a good person, you're not going to just abuse young women.

SECRETS OF PRINCE ANDREW - PART 2  S1 E2  - WP/IM  AIRED
TRANSCRIPT

Knowing that a young woman goes into your room and just leaves right after? Like, what woman wants that? How's that special or nice? Or feels good for any woman? No, I want to see him, you know, pay for what he's done. I do. Along with a lot of the other men that were involved in the whole circle.

30.43
CAPTION: SEPTEMBER 9, 2019
TWO MONTHS BEFORE THE INTERVIEW  [music]

30.52
PAUL TWEED, MEDIA LAWYER, comes in sits down says to camera:
My name is Paul Tweed, I am a media lawyer, primarily. I'm doing the interview with the knowledge and agreement of the family , simply as a friend of the family and not in any official or professional capacity.

Reporter: So Prince Andrew has given you his blessing to do this interview.

31.08
PAUL TWEED:  He' aware that I'm- - Yes, he's aware. Prince Andrew is aware I'm doing this interview, as is Sarah. And I've told them but they have not pushed me to find out what I intend to say.  You know, they would be aware that I've got my own views. I told them I would try to get some balance and I'm talking from a human perspective. It's horrendous, horrendously difficult position for them all, regardless of whatever else you think.

31.18
FILE FOOTAGE [REPORTER]: After a stormy few weeks, the tranquility of the golf course is where Prince Andrew will be spending the next few days. No surprise that he should be here. He's also a member of Royal Portrush Golf Club. But being seen alongside this man may be worthy of note. Paul Tweed is one of the country's top libel lawyers who has represented the Duke's ex-wife, Sarah, in the past, along with a number of A-list celebrity clients.

30.49
30.52
PAUL TWEED, MEDIA LAWYER: Prince Andrew was coming over to Port Rush. I live in Northern Ireland. And he invited me up and said, "Look, do you fancy coming for a cup of tea in the morning beforehand?

30.59
[Reporter] Buckingham Palace say the Prince is a friend, not a client, but it may become important given the fallout from another friendship which is causing him problems.

31.09
PAUL TWEED:  I left him out on the golf course. A month later, it was raised that he was considering doing an interview with Emily Maitlis on Newsnight. Newsnight, I thought,

SECRETS OF PRINCE ANDREW - PART 2  S1 E2  - WP/IM  AIRED
TRANSCRIPT

you know, it would be a cross-examination in a situation that,you know, he has not been
-- He doesn't have the experience of dealing with either the media in this situation or
generally in terms of the normal walk of life. He would be very trusting in terms of the
way he approaches people.  Very naïve.  And I said "Look, that would not be a good
idea Sir".  Because he believed that, you know, he had not been guilty of any
inappropriate contact, he felt that he could explain that position.  But I certainly left no
doubt as to what my views were as to whether he should do it or not. I told him
absolutely not.

[Producer] Don't do it?
PAUL TWEED CONTINUES: -Nope, don't do it. Anyway, there was no comment left at
that stage, so I left. I didn't believe that the Newsnight interview was going ahead.

[MUSIC over drone view of Buckingham Palace]

32.20
EMILY MAITLIS: About 10 days later, we got a call in from Amanda saying HRH wants
to meet you.

32.38
SAM MCALISTER, NEWSNIGHT PRODUCER: It felt really weird.  It's usually the case
when you're doing these kinds of negotiations that you deal with a second in command.
We were going to be there, see him face-to-face, meet him,  discuss these issues with
him which were delicate and difficult.  And we were going to do it in his home effectively
on his terms negotiating for something that was beyond belief.

32.58
EMILY MAITLIS [INSIDE PALACE]: We were back under the eaves of the palace, right
at the top. [PLAQUE SAYING THE DUKE OF YORK. PRIVATE SECRETARY'S
OFFICE].

33.05
SAM MCALISTER: And round the corner he bounds. He's like, "Oh hello, lovely to see
you, I hope you don't mind. I've brought some with me."
And in my head I'm thinking lawyer because that would've been quite sensible frankly.
Game over. And instead around the corner comes his daughter, Princess Beatrice.
That was really quite a curveball of curveballs. Can you imagine being in Buckingham
Palace, about to talk to a member of the royal family about sexual offenses? That's
pretty tricky. And now I've got to do it in front of his daughter.

33.48
EMILY MAITLIS: It's the first time the thought crossed my mind that maybe he was
doing it for her. Your life has been hellish.  You've had to read these headlines.  You are
trying to get married. I'm gonna do this to - - to make it better for you. I don't know if
that's true, but it crossed my mind.

16

SECRETS OF PRINCE ANDREW - PART 2  S1 E2  - WP/IM  AIRED
TRANSCRIPT

34.07:
SAM MCALISTER: I take risks when I negotiate, so I say to him, I said, "Sir,  I know two things about you. "Air Miles Andy and Randy Andy, and the latter does not speak well to your current situation. So if you want the public to change their view of you, you are gonna have to speak. He found it amusing. He didn't find it difficult. I knew I was taking a risk, but it was all or nothing at that stage. He, through the process of the conversation revealed quite a lot to us.

34.43:
EMILY MAITLIS: He wanted to deny any knowledge of Virginia Giuffre or the allegations that were circling. He said, "Should I tell you why I can't sweat?" And I said "Yes". This was in the pre-interview. And he said, "Do you know anything about adrenaline?" And I said, genuinely, my face lit up. I said "I'm fascinated by adrenaline. You know, I'm an election night junkie and a long distance runner.  He said,  "Well the thing about adrenaline was, you know, after I was working in the Falklands, I lost the ability to sweat. And so actually what she says is completely not true." And I remember thinking, 'wow, you know if he says that, that's - - that's slightly more detail than I'd looked for."

35.23
SAM MCALISTER: You hear all of these things in that room. You don't know if you have an interview, but you know if he says those things on camera, this is like winning the jackpot because he's not given those explanations on camera ever before.

35.40
EMILY MAITLIS: So we all sat around wondering where does it go from here. And then he said this curious phrase - -  I've got to, you know, seek approval from higher up." Of course, he's talking about the Queen. You ask your mum if it's a good idea. This is a decision that's going right to the top.

36.09
SAM MCALISTER: We did the negotiation on Monday in the afternoon and we found out on Tuesday morning,  it's a yes.

36.15
EMILY MAITLIS: The queen had given us her seal of approval. Two days before the interview.

CAPTION: NOVEMBER 12, 2019
I bring a lot of self doubt to my work. My panic is not being prepared.
You have to just start working really, really hard.  So I watched everything. I downloaded everything. I read everything. I went, started making my first draft of questions. The most important thing for me was to make sure that I knew that I knew exactly what the foundations of the interview were. Can I establish you were there? Can I establish that you were friends? Can I establish that you did get in contact with him afterwards? I have to prepare for the toughest interview. We want to know that whatever they say back to

SECRETS OF PRINCE ANDREW - PART 2  S1 E2  - WP/IM  AIRED
TRANSCRIPT

you , you know where you're going. It's chess. It's a game of chess.  So you have to have somebody opposite you who's willing to play real hardball. And that was Esme for me.

[MOCK INTERVIEW FOR EMILY WITH "ESME WREN"
37.28
ESME WREN, NEWSNIGHT EDITOR:  You have to prepare yourself for how he's gonna play it. He was a senior, very senior member of the royal family. He had that sort of cloak of an institution very safely around him. How are you gonna put questions of this nature to somebody who has never faced those questions before?

37.46
EMILY MAITLIS: Esme was playing Prince Andrew. And every question that I threw her, she would sort of, flatten.

37.58
ESME WREN: I think it was probably right to assume or safe to at least game the ida that he would push back hard, that he would try to knock Emily off her course, that he would try to play the respect and the power of the BBC to unsettle Emily. It was just cutting her down, cutting in, interrupting, saying I've had enough. This isn't working. This is not what we agreed to. This is beneath the BBC.

38.24
EMILY Maitlis: This is not what I expected. And I'd take it and I go [gasps] that could happen. That sounded horrible. What's my comeback? I knew that I had to do an interview that could hold up in a court of law.  Once we knew we had the chance, there couldn't be a misstep.

CAPTION: NOVEMBER 14, 2019 [Music Drone shot over Buckingham Palace]. The day of the interview.

39.06
SAM MAITLIS: I arrived at the front of Buckingham Palace. I walked in.
I haven't slept. I haven't eaten. I'm a bundle of nerves.

39.23
EMILY MAITLIS: I remember carrying this huge great gym bag. And it was bursting with bits of clothing and shoes and jackets. And you know, it's the sort of Girl Guide side of me is like, you never know, you know, what if that tears? What if a button falls off that? I ended up wearing this sort of military style jacket . I remember thinking, he'll like a military coat. You know, he's a man of the armed forces. He'll appreciate that. And I start to feel actually just really sick. And so I sort of dived into the loo. I wanted to have two seconds of going [gasps] where am I, right? What's going on? Where is my head?

SECRETS OF PRINCE ANDREW - PART 2  S1 E2 - WP/IM  AIRED
TRANSCRIPT

I was terrified about everything. I was terrified that I would get the tone wrong, that I'd either be too ingratiating or too rude. And I was terrified he wouldn't want to talk about any of the things we discussed, and he would sort of blank the whole issue.

40.40
[PRODUCER]:  How would you describe the atmosphere in the room?

SAM MCALISTER:  It just felt like we all had a collective in-take of breath, whoever you were in that room, whatever you had a stake,  you had something at stake, and we were all in it together in that sense.

41.08
EMILY MAITLIS: I felt sick. I was thinking "how do I not mess this up?" I just remember hearing this very large carriage clock. The whole thing was kind of crazy.

41.32
SAM MCALISTER; The atmosphere was electric. With anticipation, with fear.. That whatever it was, everybody was feeling something electric. And we all kind of [deep breath] expectation, and then we wait to see what happens when the dominoes fall.

42.06
EMILY MAITLIS: Your Royal Highness, we've come to Buckingham Place in highly unusual circumstances. Normally, we'd be discussing your work, your duty and we'll come onto that but today you've chosen to speak out for the first time. Why have you decided to talk now?

42.25
HRH: Because there is no good time to talk about Mr Epstein and all things associated and we've been talking to Newsnight for about six months about doing something around the work that I was doing and unfortunately we've just not been able to fit it into either your schedule or my schedule until now. And actually it's a very good opportunity and I'm delighted to be able to see you today.

42.46
EMILY MAITLISS: I remember just feeling this huge, like, flood of relief. It's like, oh, thank God you know, he's not gonna pretend none of this happened. It was gonna be the interview that he had promised me, that we had talked about. [CLOCK TICKING]

43.02
[PRODUCER] Did you watch the Newsnight interview?

SECRETS OF PRINCE ANDREW - PART 2  S1 E2  - WP/IM  AIRED
TRANSCRIPT

43.05
VICKY WARD: Absolutely [laughing]

43.08
LADY VICTORIA HERVEY: The interview, um ah, ,I think everyone can say that was a bit of a disaster.

43.18
ANNETTE WITHERIDGE, JOURNALIAST: At one point, I had stuffed my fist in my mouth. I was like, "Ah!".

43.21
[PRODUCER TO] LADY VICTORIA HERVEY:  Can I play--should we play a couple of clips and then just see your interpretation, because it -- Sure.

43.25
ANNETTE WITHRIDGE:  [blowing her nose in a kleenex] Oh, thank you.
[Producer] I'm gonna-- Do you have the laptop?

43.34
[PRODUCER PLAYING AN EXCERPT to Lisa Philips]: I'm gonna play this to you.

EMILY MAITLIS V/O: How did you first become friends? How did you meet?
HRH V/O: Well I met through his girlfriend back in 1999 who...and I'd known her since she was at university in the UK

CUT TO LADY VICTORIA HERVEY SAYING: Right, Right, [nodding her head]. He knew Ghislaine since university. Yeah.

EMILY MAITLISS:  Am I right in thinking you threw a birthday party for Epstein's girlfriend, Ghislaine Maxwell, at Sandringham?

HRH: No, it was a shooting weekend.

EMILY MAITLIS: A shooting weekend?
Just a straight forward,

HRH: straightforward shooting weekend.

VICKY WARD [SHAKING HER HEAD] :  MY GOD.

20

SECRETS OF PRINCE ANDREW - PART 2 S1 E2 - WP/IM AIRED
TRANSCRIPT

44.06
LADY VICTORIA HERVEY: A shooting weekend's very different to a birthday. You see they're
trying to put things in his mouth, which is completely incorrect. And he's correcting her.

44.14: VICKY WARD : I mean he's more concerned with protocol and whether or not it was a
shooting weekend or a dinner party than he is about the nature of the crime.

44.25: MICHAEL WYNNE-PARKER, Friend of Prince Andrew: [Producer] Did you watch the
interview, the Newsnight interview?  Of course.  [Producer] May I play you a couple of clips?
Yes please, yes, yeah.

44.32 EMILY MAITLISS: But during these times that he was a guest at Windsor
Castle, at Sandringham, the shooting weekend...

HRH: Yeah, yeah,

EMILY MAITLIS: we now know that he was and had been procuring young
girls for sex trafficking.

HRH: We now know that, at the time there was no indication to me or anybody else [REACTION
SHOT OF ANNETTE WITHRIDGE LISTENING TO SAME CLIP]  that that was what he was
doing

45.00: MICHAEL WYNNE-PARKER, Friend of Prince Andrew: He speaks very well. I'd forgotten
how well he did speak.

45.05
HRH: and certainly when I saw him either in the United States...oh no when I saw him in the
United States or when I was staying in his houses in the United States, there was no indication,
absolutely no indication.

45.19
ANNETTE WITHRIDGE: In the two days, two and a half days, I sat outside his house in
Manhattan , what did he think all those young girls were doing in there? They were in and out,
you know, every two hours. Two would come in, one would go out.

45.33
MICHAEL WYNNE-PARKER, Friend of Prince Andrew: If you were staying at a vast house with
several doors, and entrances and people coming and going, how on earth, and after all, um,
some happened to be beautiful young women.

45.46:
ANNETTE WITHRIDGE: I saw what happened. I wrote about what happened. Why on earth
would he not be questioning why all these young girls were coming through the house? Why

21

SECRETS OF PRINCE ANDREW - PART 2  S1 E2  - WP/IM  AIRED
TRANSCRIPT

would you not say, "Hey, Jeffrey, you know, these girls are a bit young". I don't know. "Isn't that odd?"

EMILY MAITLISS:  In in 2006 in May an arrest warrant was issued for Epstein for sexual assault of a minor.

HRH: Yes.

EMILY MAITLIS:  In 2008 he was convicted of soliciting and procuring a minor for prostitution, ........[misses out a bunch of content here] He was released in July, within months by December of 2010 you went to stay with him at his New York mansion, why? Why were you staying with a convicted sex offender?

HRH: Well now, I [this part of HRH reply is CUT: Right, I have always...ever since this has happened and since this has become, as it were, public knowledge that I was there, I've questioned myself as to why did I go and what was I doing and was it the right thing to do?]

 Now, I went there with the sole purpose of saying to him that because he had been convicted, it was inappropriate for us to be seen together. And I had a number of people counsel me in both directions, either to go and see him or not to go and see
Him. [THIS PART OF HIS ANSWER WAS CUT: and I took the judgment call that because this was serious and ]
I felt that doing it over the telephone was the chicken's way of doing it.

CUT TO CLIP OF VICKY WARD SAYING "MY GOD".
HRH CONTINUES: I had to go and see him and talk to him.

46.58
MICHAEL WYNNE-PARKER, Friend of Prince Andrew: So that was a very diplomatic move.

47.01
ANNETTE WITHRIDGE: No, I don't believe a word of that.

47.03
EMILLY MAITLIS:  He threw a party to celebrate his release [HRH IS LOOKING PUZZLED IN CUTAWAY] and you were invited as the guest of honor.

HRH: No, I didn't go. [THIS CONTENT WAS CUT: Oh, in 2010, there certainly wasn't a party to celebrate his release in December]
Because it was a small dinner party, there were only 8 or 10 of us I think at the dinner. If there was a party then I'd know nothing about that.

EMILY MAITLIS:  You were invited to that dinner as a guest of honor.

SECRETS OF PRINCE ANDREW - PART 2  S1 E2  - WP/IM  AIRED
TRANSCRIPT

47.22
HRH: Well I was there so there was a dinner, I don't think it was quite as you might put it but yeah, okay I was there for...I was there at a dinner, yep.

47.30
EMILY MAITLIS: I'm just trying to work this out because you said you went to break up the relationship and yet you stayed at that New York mansion several days. I'm wondering how Long?

HRH: But I was doing a number of other things while I was there.

EMILY MAITLIS: But you were staying at the house of a convicted sex offender.

HRH: [sighs] It was a convenient place to stay.
47.47
VICKY WARD: Oh my God.  CUT INTO WHILE HRH IS STILL ANSWERING: I mean I've gone [THE REST OF HIS ANSWER IS CUT: through this in my mind so many times. At the end of the day, with the benefit of all the hindsight that one can have, it was definitely the wrong thing to do. But at the time I felt it was the honorable and right thing to do and I admit fully that my judgment was probably coloured by my tendency to be too honorable but that's just the way it is.]

47.51
ANNETTE WITHRIDGE: That makes him sound like a backpacker, crashing on somebody's sofa.

47.55
LADY VICTORIA HERVEY: That was like not a good thing to say, just that bit.

48.14:
EMILY MAITLIS:  I wasn't judging how the interview was going. I was trying to make sure that I wasn't going to be tripped up by dates. That was my biggest concern. It felt like a trial. And in a way, it was for both of us.

48.29
SAM MCALISTER: I'm behind Prince Andrew's chair, so I'm up against the wall of this very impressive room, so I can see his physical self, but I can't see his face. So I'm thinking things are not starting well for him. He's used too many words. He hasn't apologized yet. He hasn't regretted the friendship and he's rambling. Every answer is just going into me. And each time i can feel my blood pressure increasing because, oh my gosh, this is dynamite.
It was very strange sitting there behind him because nobody else in the room really knows what's going on yet, right, because obviously he's still in it, Emily is still in it. Everybody else is in a slightly different space with it, to me. And I'm sitting there just going, "I can't believe he said that". It's just like this tidal wave of bad answers.

SECRETS OF PRINCE ANDREW - PART 2  S1 E2  - WP/IM  AIRED
TRANSCRIPT

49.43
SIGRID MCCAWLEY, ATTORNEY FOR VIRGINIA:
[Producer] Did you watch the interview?  I did watch the interview. I couldn't believe anybody let him do it.

49.48
DAVID BOIES: I didn't watch it at the time, I didn't watch it at the time I got a copy of it and definitely watched it.

49.56
ALAN STARKIE: That's why agreed to do this.  I think he's - - the poor man is being crucified. Flimsy evidence at best.

49.59
LISA PHILIPS: He wasn't able to save himself. Or he didn't do a good job of it.

[Producer] I would like to play you just a clip [ TO SIGRID MCCAWLEY AND DAVID BOIES] Sure, sure, absolutely.   [Producer] It's a 3 minutes clip.  Yeah.   Ok.

EMILY MAITLISS: July of this year, Epstein was arrested on charges of sex trafficking and abusing dozens of underage girls. One of the Epstein's accusers, Virginia Roberts...

HRH: Yeah.

EMILY MAITLIS: ...has made allegations against you. She says she met you in 2001, she says she dined with you, danced with you at Tramp Nightclub in London. She went on to have sex with you in a house in Belgravia belonging to Ghislaine Maxwell, your friend. Your response?

50.42
HRH: I have no recollection of ever meeting this lady, none whatsoever. [CUT OUT THIS CONTENT:  EMILY MAITLIS: You don't remember meeting her?  HRH: NO. ]

50.45
EMILY MAITLIS: Do you remember dancing at TRAMP?

50.47
HRH: No,  That couldn't of happened because the date that was being suggested I was at home for children.

EMILY MAITLIS: You know that you were at home with the children? Was it a memorable night?

24

SECRETS OF PRINCE ANDREW - PART 2  S1 E2  - WP/IM  AIRED
TRANSCRIPT

51.00
HRH:  I was at home. I was with the children. I taken Beatrice to a pizza Xpress in Working
[CUT TO PICTURE OF SMILING DAVID BOIES] for a party sort of 4.00 or 5.00 in the afternoon.

51.15:
EMILY MAITLIS: Why would you remember that so specifically?  Why would you remember a
pizza express birthday and being at home?

51.20
HRH because going to pizza express in Working is an unusual thing for me to do.

51.26
DAVID BOIES: When you stake out a position like that and you can't prove it,  you've gone into
a hole. You've dug yourself a hole.

51.33
SIGRID MCCAWLEY: He's Prince Andrew.  He could have had 5, 10, 20 security people with
lists of where he was putting him in those places.  There's none of that you haven't heard any of
that right?

51.43
EMILY MAITLIS: So you are absolutely sure that you're at home on the 10th.

HRH:  Yes

51.47
EMILY MAITLIS: She was very specific about that night.  She described dancing with you

HRH: [SHAKING HEAD], NO.

EMILY MAITLIS: and you profusely sweating and that [CUT AWAY TO LISA PHILIPS
LAUGHING] she went on to have  bath possibly.

51.58
HRH: There's a slight problem with the sweating because I have a peculiar medical condition
which is that I don't sweat or I didn't sweat at the time and that was...was it...yes, I didn't sweat
at the time because I had suffered what I would describe as an overdose of adrenalin in the
Falklands War when I was shot at [CUTAWAY TO A DISBELIEVING SIGRID MCCAWLEY] and
I simply...it was almost impossible for me to sweat. And it's only because I have done a number
of things in the recent past that I am starting to be able to do that again. So I'm afraid to say that
there's a medical condition that says that I didn't do it so therefore...

SECRETS OF PRINCE ANDREW - PART 2 S1 E2 - WP/IM AIRED
TRANSCRIPT

52.45
LISA PHILIPS: He said that the medical condition states that I couldn't have been there. Like, [big laughter] who says that? This is funny.

52.51
SIGRID MCCAWLEY: That's really one of the most pathetic parts. You know, he clearly intentionally works in his military background. He makes a very bold statement about not sweating so that everything he does in this interview is provably false, right?

53.02
ALAN STARKI: Andrew doesn't sweat. I've seen him. I've wrestled with him in the -- underneath the bowels of his minesweeping ship, where there was no air conditioning. And I was drenched. And he wasn't. No perspiration. I remarked about it many times.

53.16:
SIGRID MCCAWLEY; I think that he clearly was not prepared for it, clearly was not prepped for it. And he made a number of missteps. That's just one of many.

53.24
EMILYL MAITLIS: She was a 17 year old girl meeting a senior member
of the royal family. [ANDREW IS SHAKING HIS HEAD FIRMLY] HIS ANSWER IS CUT OUT - "It never happened".]

EMILYL MAITLIS: She provided a photo of the two of you together.

HRH: Yes, yes.

EMILY: Your arm was around her waist.

HRH: Yes.

EMILY: You've seen the photo.
HRH: I've seen the photograph.
EMILY: How do you explain that?
HRH: I can't because I don't...I have no...again I have absolutely no memory of that photograph ever being taken.

[THIS CONTENT WAS ALSO CUT OUT: EMILY: Do you recognise yourself in the photo?
HRH: Yes, it's pretty difficult not to recognise yourself. EMILY MAITLIS: Your friends suggested that the photo is fake. HRH: I think it's...from the investigations that we've done, you can't prove whether or not that photograph is faked or not because it is a photograph of a photograph of a photograph. So it's very difficult to be able to prove it but I don't remember that photograph ever being taken.]

SECRETS OF PRINCE ANDREW - PART 2  S1 E2  - WP/IM  AIRED
TRANSCRIPT

53.50
EMILY: But it's possible that it was you with your arm around her
waist?

HRH:  That's me [NEW CONTENT NOT IN THE ORIGINAL NEWSNIGHT VERSION] in that
picture, but I can't - - we can't be certain as to whether or not that's my hand on her, [CUTAWAY
TO SIGRID AGAIN] whatever it is, Left, left side.

54.02
SIGRID MCCAWLEY:  I mean ridiculous.  Just ridiculous.  Now you're going to try to run against
away from hard photographic evidence, like what more do we need?  we got flight logs we got
emails we got photographs we got witnesses, what more do we need right?  I mean it's just at
that point it becomes silly.

54.17
VICKY WARD:  You know, why on earth did he not say,  'well look, there's a photograph of me, I
must've met her.  I don't really remember it,  but you know, what she's been through is
completely horrendous, and I'm going to do everything I can to help her.  This whole story is
about power and about the abuse of power.  Prince Andrew is in a very powerful position and he
seems to be spectacularly oblivious to the position and the power that he holds and
spectacularly unapologetic for it .

55.04:
EMILY MAITLIS:  This interview has been exceptionally rare, you might not speak on this
subject again, is there anything you feel has been left unsaid that you would like to say now?

HRH: No, I don't think so. I think you've probably dragged out most of what is required and I'm
truly grateful for the opportunity that you've given me to be able to discuss this with you.
[MUSIC]

55.33
SAM MCALISTER: There was nothing in his body language or in the way he behaved that gave
any impression other than he thought it had gone well.

55.43
EMILY MAITLIS; This is how I know he was happy with the interview because he stayed
chatting. He seemed very jolly.

55.53
SAM MCALISTER: And I turned to his team. I say, 'So how do you think it went?' And she says,
"Wonderful." Wasn't he wonderful?" And in all sincerity, I replied, "Yes. Yes, he was".

56.14
I sort of caught Stewart's eye, and I was trying to motion to him, we've got to go because we

SECRETS OF PRINCE ANDREW - PART 2  S1 E2 - WP/IM  AIRED
TRANSCRIPT

have to turn this around, And we gathered everyone together and the most scared person in that room without a shadow of a doubt, was Jake.

SAM MCALISTER: Jake was holding the little tiny cards that had the scoop of the century. It was like [holding fingers 1 inch apart] this big. You know, is he going to drop it, Are we going to lose it? Has it been corrupted? Is somebody going to stop us? Is a lawyer going to arrive? There are so many variables for why this should never make it to air and I just wanted to get out of the palace as quick as possible. We crammed into a Taxi and we were all kind of eyeballing each other.

57.32
EMILY MAITLIS:  We sort of didn't know whether to , I don't know, sort of laugh or cry.  And I just remember the intensity of that moment. We couldn't quite believe it, we were still pinching ourselves. And we got back to Newsnight, piled into the office. Esme was waiting for us and we shut the door. And we had got an Interview the likes of which had never been seen before.

1.00.05
CAPTION: NOVEMBER 17, 2019 THE DAY OF THE BROADCAST  [MUSIC]
[Reporter News]: Backlash facing Prince Andrew this morning after a rare interview where he discussed his friendship with accused rapist, Jeffrey Epstein.
[FEMALE REPORTER]: Pressure building on Prince Andrew since his ill fated interview with the BBC
[STEPHANIE GOSK, Different Reporter]: One royal watcher described it as a plane crashing into an oil tanker causing a tsunami kind of bad.

1.00.50
SAM MCALISTER: The next couple of days were an absolute blur. On every possibile scale it was the scoop of scoops.

CAPTION OF HEADLINES: [REPORTER]: The headlines have been scathing. "A Car Crash"; "Toe Curling"; "Insane" were some of the quotes.
CBS: This interview is being called a train wreck and a catastrophic error.
BLOOMBERG: There is so much I want to ask you about [Emily Maitliss on Air] how to conduct an interview of this scale and this magnitude.
CBS: Why do you think the Prince agreed to do it?

1.01.15
EMILY MAITLIS: It was weird, just being in the office. It was everywhere.
[Reporter on Piers Morgan]: It is widely being described now as Prince Andrew's disastrous BBC interview.

SECRETS OF PRINCE ANDREW - PART 2  S1 E2  - WP/IM  AIRED
TRANSCRIPT

EMILY MAITLIS:  I was hearing from friends in America, reports that were coming in Italian and Spanish and Greek.

Reporters various: A new chapter in the Epstein case. [speaking foreign languages].

1.01.40
ANNETTE WITHRIDGE:  The interview was ratings gold. Everyone was talking about it for weeks afterwards. We are still talking about it. To the viewing public, it was a nuclear reactor. And at that moment, it exploded.

 [MONTAGE OF MULTIPLE REPORTERS/COMMENTATORS/SOCIAL MEDIA  YOU NAME IT]
- PRINCE ANDREW, PRINCE ANDREW, PRINCE ANDREW....

ALAN STARKIE: The interview was horrendous. I wish he hadn't done it, but I think the reaction is ridiculously disproportionate. He's a war hero for God's sakes.

MONTAGE OF MORE HORRENDOUS COMMENTS ABOUT PRINCE ANDREW

1.02.35
SIGRID MCCAWLEY:  As a lawyer litigating against Prince Andrew, I was thrilled with that interview. I couldn't have been, you could've handed me a better present because he said so many provable false things. So it was just a roadmap to tear him apart.

Lawyers for the Australian woman suing Prince Andrew for sexual assault are seeking proof from the royal that he does not sweat.

1.02.58
[PRODUCER] How would you describe the impact on him?
EMILY MAITLIS: I think it changed his life more profoundly than he'd ever anticipated.

1.03.13
CAPTION:  NOVEMBER 21,  2019, Five days after the broadcast  [music]

1.03.20
[REPORTER]:  Today charities and organizations lined up to sever their ties with Prince Andrew.

SAM MCALISTER: He'd hoped it would draw a line under the story. But instead four days after NewsNight broadcast its interview with Prince Andrew, he's made this announcement.

1.03.36
[Reporter] The royal is stepping down from public duties, saying his association with Jeffrey Epstein has created a major disruption to his family's work.

SECRETS OF PRINCE ANDREW - PART 2  S1 E2 - WP/IM  AIRED
TRANSCRIPT

[Reporter]: The scandal even making its way into Britain's General Election. [FILE FILM Debate between Boris Johnson and Jeremy Corbyn] CORBYN: Before we discuss Prince Andrew I think we should discuss the victims that are there because of what Epstein was doing. [Applause]

1.03.55
SAM MCALISTER: I found it very strange watching the fall - and I'll be honest with you, I didn't expect it to go that quickly and to be that brutal.

1.04.05
[Reporter]:  For the Queen fulfilling royal duties tonight, on this her 72nd wedding anniversary - - it must be both upsetting and unwelcome.

[Reporter]: Ensuring the monarchy remains beyond reproach and leaving the Queen untainted will be behind the decision to step out of public life.

1.04.23
SAM MCALISTER: Just nine days. Just nine days after that negotiation, where we skipped into Buckingham Palace and met him for the first time, a member of the royal family gone from public service in just nine days.

[Reporter]: The challenge now for the prince will be whether he can restore his reputation within the royal family and the wider public.

Music
1.04.50
FILE FILM FOOTAGE AT WHITE HOUSE PRESS ASKING TRUMP QUESTIONS:
Mr. President, do you have a comment on Prince Andrew stepping down from Royal duties?

TRUMP: Who??  No I don't know Prince Andrew.  But it's a - - It's a tough story, it's a very tough story. I don't know him.  Okay, Anybody else?  [CUT TO PHOTO OF HRH WITH MELANIA AND TRUMP] [MUSIC].

1.05.14
DECEMBER3, 2019 Three weeks after the broadcast

[REPORTER]: Could be new fallout for Prince Andrew as his accuser is set to speak out in a BBC interview airing Monday, just weeks after the Prince denied meeting her in his own explosive interview about his friendship with Jeffrey Epstein.

1.05.31
DAVID BOIES: Virginia had always said that her campaign was against a sin not the sinner. She wasn't interested in bringing down rich and powerful people like Prince Andrew. She was interested in stopping the evil of sex trafficking.

30

SECRETS OF PRINCE ANDREW - PART 2  S1 E2 - WP/IM  AIRED
TRANSCRIPT

1.05.50
SIGRID MCCAWLEY: She wanted to put both Ghislaine Maxwell and Jeffrey Epstein behind bars, but as for the other participants, she only went after those individuals who came after her publicly. But it wasn't until he went through his interview that our client Virginia decided that she was going to go after him.

[Reporter]: Tonight on Panorama, we hear from the woman who says she was trafficked to a prince for sex.

1.06.20
VIRGINIA ROBERTS GIUFFRE: He got up and he said "thanks". And I sat there in bed, just horrified and ashamed, and felt dirty.

1.06.29
[Reporter] Prince Andrew insists it isn't true.

1.06.32
VIRGINIA ROBERTS GIUFFRE: I'm calling BS on this, because that's what it is. He knows what happened. I know what happened. And there's only one of us telling the truth, and I know that's me.

1.06.47
SIGRID MCCAWLEY: Nobody in the United States is above the law - not a prince, not a president, not anyone privileged. The after effect of that interview was a lot of pressure building to get the real story as to what happened between Prince Andrew and Virginia. Once the prosecutors really started to investigate, Prince Andrew was already in their sights.

1.07.15
GEOFFREY BERMAN, SDNY Atty: As many of you know several months ago, our office brought sex trafficking charges against Jeffrey Epstein a serial predator, and while Epstein committed suicide before he could face trial, our investigation into his co-conspirators continues. The Southern District of New York and the FBI have contacted Prince Andrews' attorneys and requested to interview Prince Andrew. And to date, Prince Andrew has provided zero cooperation.

[Reporter]: US authorities have issued a formal request to the UK government to speak to Prince Andrew. US Attorney Geoffrey Berman has issued a statement saying "If Prince Andrew is serious about cooperating with the ongoing federal investigation, our doors remain open and we await word of when we should expect him".

1.08.16 CAPTION: FEBRUARY 2020 [MUSIC]
Three months after the broadcast

SECRETS OF PRINCE ANDREW - PART 2  S1 E2  - WP/IM  AIRED
TRANSCRIPT

[Reporter] Billionaire Jeffrey Epstein killed himself in jail awaiting trial for multiple sex offenses.
One of his alleged victims claims she was forced to have sex with Prince Andrew after a night at
Tramp's Nightclub.

[Reporter]: Since his television interview the Prince has kept a low profile. And so far has not
answered calls to come to America and help investigators.

1.08.45
PIERS MORGAN, GMB: Clearly he's taking legal advice at the moment not to co operate with
the FBI for reasons that only he knows.
Guest: The victims need to be remembered . They need to know the truth. They need to have a
proper, full investigation.

1.08.59
NEWS ANCHOR REPORTER: To other news, a yellow US style bus has driven up and down
the mall in London.  The bus drove past Buckingham Palace in a move designed to press the
Prince to help authorities investigate Jeffrey Epstein.

1.09.12
News Reporter: Celebrity lawyer Gloria Allred is demanding answers and she is targeting Prince
Andrew in this very public way.

1.09.21
GLORIA ALRED: His birthday was this week, 60th birthday, and I sent him a post birthday
message on a yellow school bus.  We have no information that he has yet excepted The Justice
Department's request that he speak to the FBI. So I ask what more is necessary before he does
it.  If he thinks we're going away and forgetting that he has not yet spoken to the FBI, he's
wrong. Just two words from Buckingham Palace: "No Comment".

1.10.03
LISA BLOOM, EPSTEIN VICTIMS' ATTORNEY:  WALKS IN AND SITS DOWN TO CAMERA:
OK I'm ready. I'm Lisa Bloom. I'm a trial attorney. I represent victims of discrimination,
harassment and abuse.

[Producer] Did you watch the interview?  I did.  He had to of been stunningly arrogant to sit
down for that interview.  He had to have thought , I will just answer questions reveal myself and
everyone will see how wonderful I am; and in fact it was exactly the opposite. Virginia Giuffre
alleged that he sexually abused her when she was under age -those are  serious crimes. If he
was found guilty, he could spend many years in prison.

That interview could be used in court against Prince Andrew and it was a disaster for him
because now, the FBI have him on video making some claims that they could probably
disprove.

SECRETS OF PRINCE ANDREW - PART 2 S1 E2 - WP/IM AIRED
TRANSCRIPT

1.11.12
[Reporter] Today, they were fresh details about claims by one eyewitness she saw the prince
that night at Tramps nightclub.

1.11.20
LISA BLOOMS' 'PRESS CONFERENCE': Good morning I'm attorney Lisa Bloom and I'm very
proud to represent five women who allege that Jeffrey Epstein sexually assaulted them. I also
represent a sixth woman who alleges that she was a witness to Prince Andrew and Virginia
Roberts being present together at the Tramp Night Club in 2001 in London.  My client has
shown tremendous courage and I have relayed the details of her story to the FBI. My client is
also willing to speak to the FBI directly whenever they are ready.

1.11.06
[Reporter] One of Epstein's other victims called on the Queen to persuade her son to come to
America and help investigators.

[ALLEGED VICTIM, KIKI DOE]: I really feel empathetic for the Queen. I can't imagine what she
is going through. It's shameful. But I think that they should pressure him to do the right thing
because that seem to be what they stand for.

1.12.17
LISA BLOOM: As far as I know, he never talked to the FBI because he lawyered up and the FBI,
for whatever reason, clearly decided it was not going to have to go after Prince Andrew. And
that's a decision that had to be made at the highest level. We are talking about Prince Andrew.
Was this a diplomatic issue? We didn't want to strain our relations with the UK? Maybe.
I do believe if this were somebody who is not a Royal, just a regular person, yes, the
investigation would've gone forward. They would have spoken to my client and any other
witnesses, and if they found they had enough evidence, they would have extradited him to the
US to face justice. Absolutely.

1.13.02
SIGRID MCCAWLEY: I think any individual who participate in these crimes has to take
responsibility for it so I don't give him a pass at all. I don't give any of them a pass.  This was a
horrible 20+ years sex trafficking scheme that many many people participated in and they're all
responsible for their part and he's responsible for his part in this. So at that moment, we started
to really dig into the matter and we ended up sending Prince Andrews' lawyers a letter offering
to talk to them. He ignored it which is probably one of his biggest mistakes besides the interview
and then we sued him.

CAPTION: SUMMER 2021
EIGHTEEN MONTHS AFTER THE BROADCAST [MUSIC]

1.13.48
[REPORTER]: This morning, Prince Andrew back in Scotland visiting his mother, the Queen.

33

SECRETS OF PRINCE ANDREW – PART 2  S1 E2  - WP/IM  AIRED
TRANSCRIPT

Lawyers for his accuser Virginia Roberts say he's trying to evade the civil suit they filed against him.

1.13.58
DAVID BOIES: Once we had filed our lawsuit, um you  have to serve them with a subpoena, serve them with process.  Everybody would tell you if you're gonna get served, accept it. Don't make it look like you are hiding.

[Reporter] On the 26th August, a legal courrier took the papers to Prince Andrew's residence at Royal Lodge  but the papers were refused.

DAVID BOIES: We would send a process server to his palace, and they would say "He's not here". And so we'd wait out there, and then he'd come out of there slouched down in the car and try to skid away. And then he'd go from palace to palace with us following him with these subpoenas.

1.14.50
[Reporter} There's been a lot of procedures back and forth, a lot of attempts have been made. At one stage papers from Giuffre's legal team were actually left at the gates  with a security detail.

1.15.00
DAVID BOIES: And so what you had was this cat and mouse game.  And we both had to know how it was going to end.

1.15.10
[REPORTER]:  This morning Prince Andrew served with legal papers informing him of a civil sexual assault case against him.   We have no comment yet from Prince Andrew's legal team but he has 21 days essentially, to respond to these papers  being served.


1.15.57
CAPTION: JANUARY 2022 [MUSIC]
TWO YEARS AFTER THE BROADCAST [over drone of statue of liberty]

[Reporter]: Just days after the conviction of Epstein associate Ghislaine Maxwell, this is a critical week for Britain's Prince Andrew.

[Reporter]: If the trial goes ahead, the prince faces a deposition. Ghislaine Maxwell could be called as a witness, all of it promising more dirty royal laundry.

1.16.17
LISA BLOOM: Prince Andrew's team was throwing everything but the kitchen sink at the Judge, trying to get the case dismissed - whether it was allegedly faulty service of process, that the law

SECRETS OF PRINCE ANDREW - PART 2  S1 E2  - WP/IM  AIRED
TRANSCRIPT

should be thrown out entirely, that Prince Andrew should have immunity because of the Jeffrey Epstein deal. I mean anything they could come up with.

1.16.38
DAVID BOIES:  I never understood their approach.  They did everything possible to make Prince Andrew look guilty.  He ended up much worse off than he had to be.

CAPTION:  JANUARY 12, 2022
16.54
[REPORTER]: Prince Andrew's future is tonight hanging in the balance as a judge decides whether the royal must stand trial. The judge must decide whether the civil suit bought by Virginia Giuffre can't proceed due to a legal technicality.

1.17.16
[Reporter]: Let's get the latest on that civil case against Prince Andrew in the US.

[SKY NEWS]: The judge has rejected his attempt to have the sexual assault lawsuit against him thrown out.

REPORTER]: A New York Judge has delivered a devastating blow to the Queen's son.
The judge has resoundly rejected the motion to dismiss the case.

1.17.40
LISA BLOOM: The ruling on the motion to dismiss was hugely significant. Up until that point, Prince Andrew had  probably hoped, maybe I'll get the whole thing thrown out. This will all go away. When the judge said, that's not going to happen, Virginia's going to get her dead in court, I think the royal family had to get very real about what was going on . He was going to face a trial on sexual abuse charges.

1.18.05
DAISY GOODWIN, WRITER AND TV PRODUCER:  I think it must have been very difficult for the Queen. But you gotta remember she was what? 94, 95? She was in very poor health. The rest of her family are giving her a really hard time. In the end, I think she probably lost the sort of strength to kind of keep fighting his corner.

1.18.25
REPORTER NEWS: A stunning turn in the Prince Andrew  Jeffrey Epstein scandal.  Queen Elizabeth today stripped her son of all of his military titles and real duties.

[REPORTER]: The drastic demotion comes just 24 hours after a US judge ruled his sex assault trial will go ahead.

1.18.42
DAISY GOODWIN:  I would imagine the other men in the family said, look, this is what's going

SECRETS OF PRINCE ANDREW - PART 2  S1 E2  - WP/IM  AIRED
TRANSCRIPT

to happen, this is the way it's got to be. They're not a normal family. They are not going to sort of, cluster around him because he is their brother.  Damage control. Damage control is all they can do.

[Reporter]: Stripped of his military affiliations, his Royal patronages and his Royal HIghness title, the Queen officially distanced the monarchy from  Prince Andrew.

1.19.07
DAISY GOODWIN: I think that must have been quite a blow to him. I mean you know, he's had a lot of public humiliation. I mean obviously, he's still living in circumstances of, unimaginable luxury for most people in this country.   But he's dependent on handouts from his mum.

1.19.27
LISA BLOOM:  The early rulings were all going against him.  He could not endure the wave after wave of revulsion at him.  I'm sure his legal team could see which way the wind was blowing. This was terrible for the royal family.  He just had to end it.


CAPTION: ONE MONTH LATER
1.19.46  NEWS ANCHOR: It was the case that shook the monarchy to its very core. But tonight it's over.  Prince Andrew will not face trial  over sexual assault claims, reaching an out of court settlement with his accuser,  Virginia Giuffre.  The Royal has reportedly forked out around 20 Million dollars to close the case. The cost to his family however, beyond measure.

1.20.11
[REPORTER]: This morning that bombshell reversal from Prince Andrew agreeing to an out of court settlement with his accuser, Virginia Roberts Giuffre, after years of denying her claims against him.

1.20.23
DAVID BOIES: I think it was an omission of guilt. I think everybody's got to interpret it themselves but clearly it was an admission of some guilt.

1.20.32
DAISY GOODWIN: I think the rest of the firm must have said, "You know what, we've got to draw a  line under this."  The Queen must have coughed up a lot of money.  The deal he must have done with the royal family is, you know, you're gonna keep shtum forever in return for us bailing you out.

1.20.47
LISA BLOOM: He did lose the case. He lost the case in a very big way and I believe that he lost the case because he sexually abused Virginia. He wants to talk about everything else but he doesn't want to talk about that.  And that is the center of the case. My understanding is that the

SECRETS OF PRINCE ANDREW - PART 2 S1 E2 - WP/IM AIRED
TRANSCRIPT

Queen encouraged him to settle. No one's going to handover many millions of dollars if they are not guilty. I just don't see it.

The Final fall for the duke, stripped of his royal and military titles, Andrew was due to give evidence under oath in the civil case next month. Today's settlement avoiding further embarrassment for the monarchy though many say the damage is done.

1.22.10
ROYAL TELEVISION SOCIETY/2020
Welcome to the RTS Television Journalism Awards, 2020. The interview of the year is, and I hope they haven't sat down, the Prince Andrew interview, NewsNight for BBC Two.

1.22.29
EMILLY MAITLIS: I'm very proud of the interview itself, actually. Actually I'm really proud of the team, of what we did and how we got it and of what we put on air.

1.22.32
SAM MCALISTER: I still can't really believe it. It is extraordinary. You don't expect to see somebody step back from being effectively a working member of the royal family because of the work you've done as part of a team of journalists. It really is a most unexpected and quite an extraordinary outcome.

1.22.53
EMILY MAITLIS: It's kind of a reminder that journalism, at its most profound, carries a huge weight of responsibility. Yes, you know, you can change peoples' lives for better or for worse. And I think that has to be something that, you know, sits with me that we recognize.

1.23.20
CAPTION: SEPTEMBER 8, 2022 [bell tolling]

Life Live Buckingham Palace in London

This is BBC News from London. Buckingham Palace has announced the death of Her Majesty, Queen Elizabeth II.

[Reporter] We have to pause for a moment here. We have got some breaking news. Queen Elizabeth II has died at the age of 96. Many who wanted a focus for their grief gathered at the gates of Buckingham Palace, some weeping openly.

1.23.58
DAISY GOODWIN: The death of the Queen was almost unimaginable. When it came, it was an incredible shock. It really was. It was just like, [gasps]. I think the whole nation sort of thought she would carry on forever. I suppose the thing about the royal family is that it's sort of about succession. I mean the most important thing is the Queen's dead. Long Live the King. So

SECRETS OF PRINCE ANDREW - PART 2  S1 E2  - WP/IM  AIRED
TRANSCRIPT

there's no question about who's coming next. And I nobody gets a chance to go, 'Well, do we really need royals?" You know?

1.24.48
FUNERAL OF QUEEN ELIZABETH FILE FILM
[REPORTER]: Queen Elizabeth's four children walk behind their mother's hearse.

1.24.52
DAISY GOODWIN: I think undoubtedly Prince Andrew's life is going to be much harder now that the Queen is dead because she was his champion. She was the person who found him irresistible. And you know, his brother clearly finds him unsympathetic. I don't think he's got a lot of friends left in the royal family.

[Reporter]: It's a situation with Prince Andrew. All of those conversations about his future role and whether there may be one at all are kind of parked because this is a family moment. And he is a member of the family and was the Queen's son.

[Reporter] A 22 year old man was arrested for heckling Prince Andrew over his ties to the late convicted sex offender, Jeffrey Epstein. The man was heard shouting, "You're a sick old man". Who was he yelling it at? Prince Andrew.

1.24.25
SAM MCALISTER: I think his future looks bleak. I think that you know at the time that the Queen was still alive, he was afforded the protection of being, you know, so we are led to believe, her most popular child. And so now that she's sadly no longer with us, he's he's exposed. King Charles has spoken about paring down the monarchy. You can't help but think every time he says that that he means Prince Andrew. And I can only imagine that he will be reduced more and more and more to the point that he's really not any way involved in the workings of the royal family. That would be my view.

[REPORTER]: Prince Andrew has been forced to leave Buckingham Palace after being told by the king and his brother that he can no longer live in the allocated suites.

1.25.29
EMILY MAITLIS:  He lost a lot from doing the interview. My intention was not to ruin his life. That was not on my radar.

1.25.42
PAUL TWEED Family Friend and Media Lawyer: It amazes me that the family have been able to mentally survive all this. The actual fact of it, the impact of it. His mechanisms to cope with it? I don't know.

1.25.57
DAVID BOIES: It was too bad. It didn't have to happen. If he had simply said, I was involved

38

SECRETS OF PRINCE ANDREW - PART 2  S1 E2  - WP/IM  AIRED
TRANSCRIPT

with having sex in situations that embarrass me today. I never thought anybody was underage. And I always believed it was entirely consensual. But that was something that I should be and am, ashamed of. I think that he would not have been absolved,  but I think it would have been understood

[PRODUCER]: You played a big role in bringing down a member of the royal family, what's your reflections on the whole thing?

1.26.31
SIGRID MCCAWLEY:  I really don't spend much time thinking about him,  I mean where I really spend my energy is on helping other  survivors of abuse, that's what this work is about.

1.26.41
LISA BLOOM: To me, this has always been a story about victims of sexual abuse. it's also a story about very wealthy and powerful people who are able to use their wealth and their power for many years to evade justice. In Prince Andrew's case, he didn't have to go to trial and the criminal authorities didn't prosecute him. So he has escaped justice for the most part.

1.27.04
ANNETTE WITHRIDGE:  I don't feel sorry for him because I think of those girls. I think about Virginia and all the other girls who were very frightened, who were abused by Epstein and Epstein's wealthy friends. I can't feel sorry for Prince Andrew.

PRODUCER SPEAKING TO PAUL TWEED: Why wasn't the interview stopped?

1.27.18
PAUL TWEED:  I would like an answer to that question as well.
[Producer]: You would like to?
PAUL TWEED: I'd like an answer to that question. I don't know. I can't answer that.   [MUSIC]

CAPTION GRAPHIC: Prince Andrew was asked to comment on the matters raised in this series, but he did not respond.

END

SECRETS OF PRINCE ANDREW - PART 2  S1 E2  - WP/IM  AIRED
TRANSCRIPT

EXHIBIT 116



**Bruce A Green**

Email: ████████████

June 7, 2022

Office of the United States Attorney for the Southern District of New York
One Saint Andrews Plaza
New York, NY 10007
Attn: AUSAs ████████████████████

Re:    United States v. Maxwell

Dear Counsel:

      I have been retained on behalf of Professor Alan Dershowitz to provide my opinions as a legal ethics expert regarding prosecutors' candor obligations relating to ████████████ submissions at Ghislaine Maxwell's upcoming sentencing.

      The relevant facts, provided for my consideration, are, in brief, as follows. Although Ms. ████████ was not a witness at Ms. Maxwell's trial, she has been notified of her right to make a victim's impact statement in connection with Ms. Maxwell's sentencing. She may submit a written statement or testify at the hearing. The presentence report may incorporate her submission, the prosecution might refer to it, and even if not, the District Judge might rely on it in imposing sentence. Professor Dershowitz has informed the U.S. Attorney's Office ("Office") that Ms. ████████ recent civil deposition testimony in their pending case before District Judge Preska establishes Ms. ████████ serious lack of credibility with respect to the Epstein-Maxwell matter and would cast doubt on the reliability of her submission at the upcoming sentencing. Professor Dershowitz has further advised that although the deposition transcript is sealed, it is available for the Government's review before the sentencing. I have been asked whether, under these circumstances, the Office has a professional responsibility to review the transcript and, if it agrees that Ms. ████████ statement lacks credibility, to so advise the Court.

      My qualifications to render an expert opinion on questions of prosecutorial ethics such as this one are set forth more fully in my curriculum vitae, which is available here: https://www.fordham.edu/download/downloads/id/1503/bruce_green.pdf.     I assume my qualifications would not be disputed, given that I provided advice to the Office in the 1980s when I served as Deputy Chief and Chief Appellate Attorney and have done so more recently as a consultant on legal ethics questions. Of particular significance, for the past three decades I have taught a seminar on Ethics in Criminal Advocacy using self-produced course materials that I regularly update; I have written extensively on prosecutors' ethics, including on questions of prosecutors' candor to the court (*see* Bruce A. Green, *Candor in Criminal Advocacy*, 44 HOFSTRA L. REV. 429 (2016)); and as a member and chair of the ABA Criminal Justice Standards

1

SDNY_GM_02775899

SUBJECT TO PROTECTIVE ORDER PARAGRAPHS 7, 8, 9, 10, 15, and 17

Committee. I oversaw the drafting of the current version of the Prosecution Function Standards and participated in drafting and discussing prosecutors' candor obligations in particular.

In general, as "ministers of justice," prosecutors have more demanding candor obligations than other lawyers. Prosecution Function Standards, Standard 3-1.4(a) states: "In light of the prosecutor's public responsibilities, broad authority and discretion, the prosecutor has a heightened duty of candor to the courts . . . ." Prosecutors' candor obligations are not fully incorporated in the professional conduct rules or in courts' sanctions decisions. To a significant extent, courts expect candor from prosecutors regardless of whether the expectations are fully incorporated in enforceable law or whether a lack of candor is sanctionable. In rendering this opinion, I address what courts should expect of prosecutors as "ministers of justice" – expectations that are not fully codified in professional conduct rules and sanctions decisions.

If the Government were to call Ms. ███████ as its witness in connection with the sentencing, then it would have the ordinary obligation first to satisfy itself of the truthfulness of her testimony and then to disclose impeachment material. *See, e.g.,* NY Rules of Professional Conduct, Rule 3.8(b); ABA Prosecution Function Standards, Standard 3-1.4(b) ("The prosecutor should not make a statement of fact or law, or offer evidence, that the prosecutor does not reasonably believe to be true . . ..") *id.,* Standard 3-5.4(c) ("a prosecutor should make timely disclosure to the defense of information [that tends to impeach the government's witnesses] that is known to the prosecutor, regardless of whether the prosecutor believes it is likely to change the result of the proceeding.").

I assume that the Government does *not* intend to make Ms. ██████ its witness, and that insofar as Ms. ██████ makes a presentation to the court, she will do so pursuant to her statutory right as a putative victim. Even if so, in my judgment, equivalent candor obligations arise if the Government were to rely on Ms. ██████ statement in its submissions to the court, thereby essentially making her its witness. Before asking the court to credit Ms. ██████ information, the Government should consider available evidence bearing on to her credibility, including deposition testimony that, it has been told, raises serious questions concerning the credibility of her relevant testimony. The prosecutors should not rely on Ms. ██████ information unless, in the language of Standard 3-1.4(b), they "reasonably believe [it] to be true." Their belief in Ms. ██████ reliability would not be reasonable unless they consider readily available information that, they have been told, discredits her and, given the totality of the circumstances, reasonably find her account truthful.

Finally, even assuming the Government does not intend to advance or rely on Ms. ██████ statement or testimony, its duty of candor to the court may be implicated, because prosecutors bear some responsibility to protect the sentencing court from relying on false information. As I have previously written: "Since the judge has no independent investigative authority, the sentencing judge must rely in large part on the prosecution for the relevant facts about the offense. If any lawyer must make full and frank disclosure of factual matters relevant to the sentencing court's decision-making, it is surely the prosecutor." Green, *Candor in Criminal Advocacy, supra,* at 446; *cf. United States v. E.V.,* 500 F.3d 747, 754 n.12 (8th Cir. 2007) (referring to "prosecutors' obligation to apprise the court of facts relevant to sentencing"). Consequently, the Office cannot consciously disregard Ms. ██████ deposition testimony bearing on the credibility of her submission to the court; further, if the Office concludes that Ms. ██████ submission is unreliable,

2

SDNY_GM_02775900

SUBJECT TO PROTECTIVE ORDER PARAGRAPHS 7, 8, 9, 10, 15, and 17

it has a candor obligation to raise this concern with the court, to protect it from relying on false information.

I would be happy to discuss my opinion with the Office, if doing so might assist its consideration.

Very truly yours,

Bruce A. Green

3

SDNY_GM_02775901

SUBJECT TO PROTECTIVE ORDER PARAGRAPHS 7, 8, 9, 10, 15, and 17

LAW OFFICES OF

*Aidala, Bertuna & Kamins, P.C.*

ARTHUR L. AIDALA*
MARIANNE E. BERTUNA*
HON. BARRY KAMINS (RET.)
HON. JOHN M. LEVENTHAL (RET.)
JOHN S. ESPOSITO*
MICHAEL T. JACCARINO
IMRAN H. ANSARI
DIANA FABI SAMSON**
ANDREA M. ARRIGO*
LIMO J. DE MASI
MICHAEL F. DIBENEDETTO*
TAYLOR M. FRIEDMAN+

548 FIFTH AVENUE
NEW YORK, NY 10036

TELEPHONE
FACSIMILE
WWW.AIDALALAW.COM

8118 - 13TH AVENUE
BROOKLYN, NEW YORK 11228
TEL. (718) 238-9898
FAX (718) 921 3292

OF COUNSEL
JOSEPH A. BARATTA
ANTOINETTE LANTERI
WILLIAM R. SANTO
PETER S. THOMAS
LAWRENCE SPASOJEVICH

SENIOR COUNSEL
LOUIS R. AIDALA
JOSEPH P. BARATTA

*ALSO ADMITTED IN NEW JERSEY
**ALSO ADMITTED IN CONNECTICUT
+ALSO ADMITTED IN TEXAS

June 16, 2022

**VIA E-MAIL:** ▮▮▮▮▮▮▮▮▮▮

Office of the United States Attorney
Southern District of New York
One Saint Andrews Plaza
New York, NY 10007
Attn: AUSAs ▮▮▮▮▮▮▮▮▮▮

Re:   United States v. Maxwell

Dear Counsel:

We are attorneys for Alan Dershowitz ("Professor Dershowitz") in the civil matter of ▮▮▮▮▮▮▮ *v. Alan Dershowitz* pending before Hon. Loretta Preska in the Southern District of New York, ▮▮▮▮▮▮▮▮▮ lack of credibility, and actual conduct in recruiting young girls for Jeffrey Epstein, are critical issues in the above-mentioned litigation.

We write to notify you that ▮▮▮▮▮ gave approximately nine hours of deposition testimony across the span of two days on April 13th and 14th, 2022, in Washington, D.C. Her lawyers have designated the entire transcript to date as confidential under the applicable protective order.

Our efforts to have the transcripts unsealed and made public have been denied by Judge Preska. Also denied was our request to provide the transcript to your office so that you could determine, on an informed basis, whether it would be appropriate or ethical for you to allow Ms. ▮▮▮▮▮ to give a victim impact statement during the sentencing phase of the Ghislaine Maxwell trial and therein vouch in that proceeding for her credibility.

Both the Court, and ▮▮▮▮▮▮▮ counsel, have made clear that they agree that we may notify you of the existence of the transcripts so that you can have the opportunity to review her testimony before she is allowed to provide a victim impact statement at the upcoming sentencing of Ghislaine Maxwell. We urge you, respectfully, to require her to produce it to you for your

SDNY_GM_0277S902

SUBJECT TO PROTECTIVE ORDER PARAGRAPHS 7, 8, 9, 10, 15, and 17



review and careful consideration before permitting her to make a victim impact statement. In furtherance of this request, we enclose for your consideration a letter from Professor Bruce Green regarding the ethical considerations applicable to this matter.

Please let me know if you have any questions or would like to discuss this matter further. We are copying ▮▮▮▮▮ counsel here to help facilitate your request for her transcripts.

Yours, etc.

Imran H. Ansari

Arthur L. Aidala

Barry Kamins

John M. Leventhal

encl:   Bruce Green Letter

cc:     Todd & Weld, LLP
        *Attorneys for Alan Dershowitz*
        Howard M. Cooper
        Christian G. Kiely
        Kristine C. Oren

        Cooper & Kirk, PLLC
        *Attorneys for Virginia Giuffre*
        Charles J. Cooper
        Michael W. Kirk
        Nicole J. Moss
        Haley N. Proctor

- 2 -

SDNY_GM_02775903

SUBJECT TO PROTECTIVE ORDER PARAGRAPHS 7, 8, 9, 10, 15, and 17

# EXHIBIT 118

UNITED STATES OF AMERICA, v.
GHISLAINE MAXWELL,

**TRIAL**
December 1, 2021

| LC1Qmax6 | Jane - Redirect | Page 604 |
|---|---|---|

1  the last few months, was your attorney present?
2  A. No.
3  Q. In general, who was in the room?
4  A. Just me and you guys.
5  Q. You were asked some questions on cross-examination about
6  your living situation when you were in middle school and high
7  school living in Palm Beach. Do you remember those questions?
8  A. Yes.
9  Q. So I just want to ask you about where you were living at
10  the time. In the summer of 1994, when you first met Maxwell
11  and Epstein, where were you living?
12        MS. MENNINGER: Objection. Leading, your Honor.
13        THE COURT: Overruled. You may answer.
14  A. That summer we were still living on Palma Way at my
15  mother's friend, Joan, in her pool house in her back yard, and
16  we -- when we came home from camp that summer, we were still
17  living in that place.
18  Q. Did your family struggle financially during the years that
19  you were in high school?
20  A. Yes.
21  Q. Was there ever a time when you and your brothers had a hard
22  time paying for lunch at school?
23        MS. MENNINGER: Objection, your Honor. 403.
24        THE COURT: Overruled. You may answer.
25  A. Yes.

| LC1Qmax6 | Jane - Redirect | Page 605 |
|---|---|---|

1  Q. Can you tell the jury what you remember about that?
2  A. I mean, I remember my mother never had any money. She
3  didn't work, so she didn't have money to really pay for
4  anything. We had food stamps that she refused to use because
5  her pride was too big, and she would sort of, you know,
6  scrounge for quarters, and sometimes I would give my brothers
7  my lunch money and pretend like I had some so that they could
8  eat.
9  Q. Did your family's financial circumstances improve after you
10  met Maxwell and Epstein?
11  A. But -- no.
12  Q. Did Jeffrey Epstein help your family financially?
13  A. In some ways, yes.
14  Q. Can you describe for the jury the ways that Jeffrey Epstein
15  helped your family financially?
16  A. Well, he -- he handed me cash. He gave us a computer. He
17  paid for some school stuff. He -- he paid for Interlochen Arts
18  Camp for the next two summers. He paid for my younger
19  brother's Interlochen Arts Academy his entire year at boarding
20  school. Gave us gifts. And, you know, so on and so forth.
21  Q. Did there come a time when your family moved out of the
22  pool house?
23  A. Yes.
24  Q. And where did you move to?
25  A. That's when we moved to that second house that was first

| LC1Qmax6 | Jane - Redirect | Page 606 |
|---|---|---|

1  discussed, that three-bedroom house. My sister was the one who
2  rented it for us.
3  Q. Approximately when did you move out of the pool house and
4  into the three-bedroom house?
5  A. We moved out of the pool house in, I think, spring of '96.
6  Wait. Sorry. I'm tired. The spring of '95. Sorry.
7  Q. Do you recall being asked some questions on
8  cross-examination about whether you traveled internationally
9  when you were in high school?
10  A. Yes.
11  Q. Just to be clear, did those trips have anything to do with
12  Maxwell and Epstein?
13  A. No.
14  Q. Without discussing any specifics about your family members,
15  do you have some family members who live abroad?
16  A. Yes, that's -- the country that we would travel to, that's
17  where we were from, and any time those dates that were
18  discussed earlier, that would be a family trip home.
19  Q. Do you recall being asked on cross-examination questions
20  about whether you had ever talked to a reporter?
21  A. Yes.
22  Q. And you were asked about whether you made a statement to a
23  tabloid about what had happened to you with Jeffrey Epstein.
24  Do you remember being asked about that?
25  A. Yes.

| LC1Qmax6 | Jane - Redirect | Page 607 |
|---|---|---|

1  Q. Can you please explain for the jury what were the
2  circumstances under which a reporter approached you?
3  A. Well, it was a reporter who called me and said --
4        MS. MENNINGER: Objection. Hearsay, your Honor.
5  A. Okay. Sorry.
6        MS. MOE: I'm happy to rephrase, your Honor.
7        THE COURT: Go ahead.
8  Q. When you had that conversation with the reporter, did you
9  want to have that conversation?
10  A. No.
11  Q. Why did you agree to speak to that reporter?
12  A. Because he basically blackmailed me.
13        MS. MENNINGER: Objection, your Honor. Hearsay.
14        THE COURT: Overruled. Go ahead.
15  A. He said that he -- that court documents with my name on it
16  were unredacted, and that the Epstein's little black book was
17  out, and my name was in it, and he was going to print --
18        MS. MENNINGER: Objection, your Honor. Hearsay.
19        THE COURT: We'll limit what the witness has testified
20  to as not being offered for the truth of what was stated by
21  someone else but the effect on the listener.
22        And let's re-narrow the question.
23        MS. MOE: Yes, your Honor. May I ask a leading
24  question to navigate through this?
25        THE COURT: Let me hear the question.

FD-1057 (Rev. 5-8-10)

(Overall Document Classification Required)

# FEDERAL BUREAU OF INVESTIGATION
### Electronic Communication

**Title:** (U//FOUO) TO REQUEST HAND DELIVERY OF          **Date:** 12/04/2018
VICTIM NOTIFICATION

**Approved By:** ███████████████████

**Drafted By:** ███████████████████

**Case ID #:** 31E-MM-NEW          (U) EPSTEIN, JEFFREY ███████████

**Details:**    Precedence: ROUTINE Date: 10/07/2008 To: ███████ Attn:
ALAT ███████████████ Attn: ███████████████ From: Miami Squad PB-
2, PBCRA Contact: SA ███████████████████ Approved
By: ███████████ Drafted By: ███████████████ Case ID #:
31E-MM-108062 (Pending) Title: JEFFREY EPSTEIN; ███████████ ;
███████████ ; GHISLAINE MAXWELL; WSTA - CHILD PROSTITUTION Synopsis: To
request hand delivery of Victim Notification Letters from the United
States Attorney's Office to victims residing ███████. Enclosure(s):
1) Enclosed for ███████████ a letter addressed to Ms. ███████████████ , C
/O Asst ███████      2) Enclosed for ███████ a letter addressed to Ms. ███████
███████ C/O ███████████████████      Details: Per the request of the United States
Attorney's Office, the above referenced letters need to be hand
delivered to Ms. ███████████████ , dob ███████ , of
███████████ and ███████████ , dob ███████ of ███████
███████ The letters reference the outcome of a Non-Prosecution
Agreement entered into by the US Government and Mr. Epstein. The
letters provide the victims with the terms of the Agreement and
contact information should the victims have any questions. Mr. Epstein
is currently incarcerated at the Palm Beach County Stockade serving an
18 month prison sentence, followed by a year of house arrest. Mr.
Epstein will also be a life time registered sex offender. LEAD(s): Set
Lead 1: (Action) ███████████████████ Please deliver the
enclosed USAO letter to Ms. ███████████████ dob ███████
███████ Her telephone numbers are as follows: ███████████ and ███████
███████████ Set Lead 2: (Action) ███████████ Please
deliver the enclosed USAO letter to Ms. ███████████ dob ███████
███████ **

(Overall Document Classification Required)

CONFIDENTIAL

# EXHIBIT 120

Case 1:20-cr-00330-AJN Document 655-8   Filed 12/25/26   Page 134 of 445   37
k7e2MaxC kjc

```
 1    yet does not offer to post a single penny in security for the

 2    bond she proposes.

 3            Your Honor, the defendant is the very definition of a

 4    flight risk.  She has three passports, large sums of money,

 5    extensive international connections, and absolutely no reason

 6    to stay in the United States to face a potential significant

 7    term of incarceration.

 8            The government respectfully submits that the defendant

 9    can't meet her burden of overcoming the statutory presumption

10    in favor of detention in this case.  There are no conditions of

11    bail that would assure the defendant's presence in court

12    proceedings in this case, and we respectfully request that the

13    court detain the defendant pending trial.

14            Thank you, your Honor.

15            THE COURT:  Thank you, Ms. Moe.

16            Just to make explicit what is clear by the

17    government's written presentation and oral presentation, you

18    are not resting your argument for detention on dangerousness to

19    the community at all.  It is resting on risk of flight,

20    correct?

21            MS. MOE:  That's correct, your Honor.

22            THE COURT:  All right.  Thank you.

23            Ms. Moe, you have indicated that you have heard from

24    victims who are entitled, under federal law, to be heard at

25    this proceeding.  Could you indicate -- I think you indicated
```

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

EXHIBIT 121

# In The Matter Of:

*UNITED STATES OF AMERICA, v.*
*GHISLAINE MAXWELL,*

---

*December 20, 2021*

---

*Southern District Court Reporters*

UNITED STATES OF AMERICA, v.
GHISLAINE MAXWELL,

December 20, 2021

---

LCKVMAX4                                                    Page 2910

1 in 2004 during the sex trafficking conspiracy.
2        THE COURT: All right. Overruled.
3        Anything else?
4        MR. PAGLIUCA: Yes, your Honor.
5        This relates to Exhibit 52, which are the pages from
6 the book that were admitted. The Court admitted those over our
7 hearsay objection with the limiting instruction. And the
8 government assured the Court, when the Court was making this
9 decision, that they weren't going to argue the truth of the
10 matter contained in any of the books.
11        And what we heard in closing argument was exactly
12 that, that there are names in the books. And you can then
13 infer from those names that those might be the people that were
14 being discussed by Jane as having the sexualized massages; that
15 they were reading the words mom, dad, phone numbers, and
16 suggesting that that's how Ms. Maxwell had to have known that
17 these individuals were minors. Again, that's the truth of the
18 matter asserted; it's not for the limited purpose that the
19 Court instructed the jury.
20        My request, your Honor, my application, first, is that
21 the Court declare a mistrial based on the misuse of that
22 evidence. If the Court is not inclined to do that, I believe
23 the Court should reinstruct the jurors about the limited
24 purpose, instruct the jurors they can't infer what the
25 government was suggesting they could infer from that argument.

---

LCKVMAX4                                                    Page 2911

1 And then we go from there.
2        I also object to the use of what I thought the Court
3 prohibited, which was the grooming-by-proxy argument, which was
4 re-raised in closing argument, suggesting that somehow Ms.
5 Maxwell was grooming these women for Mr. Epstein, which I
6 thought had been precluded.
7        THE COURT: That's easy to overrule.
8        My precise conclusion was the expert couldn't testify
9 to it in part because -- well, not in part. The expert
10 couldn't testify to it; but, of course, counsel could make
11 arguments along that regard from the facts in the evidence.
12        MR. PAGLIUCA: Understood, your Honor.
13        Those are my remarks and requests about the closing.
14        THE COURT: Exhibit 52.
15        MS. MOE: Yes, your Honor.
16        The government's arguments with respect to Government
17 Exhibit 52 were entirely consistent with the Court's ruling.
18 In particular, the arguments were about knowledge and intent,
19 how it would be obvious, looking at a document, that none of
20 this was legitimate, that they weren't real masseuses, things
21 like mom and dad, we have that effect. And when a document is
22 offered not for its truth, that is certainly a proper
23 inference.
24        When we compare the numbers in Government Exhibit 52
25 against the message pads, the language was the number here is

---

LCKVMAX4                                                    Page 2912

1 the same number on this document. That's certainly permissible
2 and a matter of common sense. We just showed two documents and
3 showed they were the same phone numbers.
4        What I didn't say is, This is Carolyn's phone number,
5 you know, it's the real phone number. It was a common sense
6 inference between two phone numbers that were the same.
7        THE COURT: I deny the request for mistrial. I
8 overrule the objection. It is consistent with my -- both my
9 conclusion in allowing it with respect to the limited purpose
10 for which the document was entered as indicated in my limiting
11 instruction at the time. And for those reasons, the motion
12 is -- the application is denied.
13        Anything else?
14        MS. STERNHEIM: No, thank you.
15        MS. MOE: Not from the government, your Honor.
16        THE COURT: All right. See you in about 15 -- I want
17 to make sure everybody has enough time for a quick lunch, but
18 my plan is to resume in 20 minutes. Thank you.
19        (Luncheon recess)
20        MS. MENNINGER: We have technical difficulty, your
21 Honor. The screen is not working.
22        However, we're working on it.
23        THE COURT: Be seated please.
24        How about a laptop?
25        (Pause)

---

LCKVMAX4                                                    Page 2913

1        THE COURT: Let the record reflect my suggestion was
2 paper.
3        (Pause)
4        THE COURT: I'll ask Ms. Williams to line up the jury.
5        Ms. Menninger, are you ready now?
6        MS. MENNINGER: Yes. We are now.
7        Thank you, your Honor.
8        THE COURT: Okay. Bring in the jury.
9        Ms. Menninger, please do stay close to the mic
10 throughout, if you can. I know sometimes it starts that way
11 and then you back up. One backs up.
12        MS. MENNINGER: One does.
13        THE COURT: One does. Thank you.
14        MS. MENNINGER: One will try not to.
15        THE COURT: Thank you. Bring in the jury.
16        (Jury present)
17        THE COURT: Everyone may be seated.
18        All right. Thank you, members of the jury. I hope it
19 was a good -- even if speedy -- lunch.
20        I'll ask you to now please give your full attention to
21 Ms. Menninger, who will deliver the closing argument on behalf
22 of Ms. Maxwell.
23        Go ahead, Ms. Menninger.
24        (Continued on next page)
25

---

EXHIBIT 122

Daily Mail Jan 5, 2022   Juror 50, Scotty David   Interview

Daily Mail Jan 5, 2022   Juror 50 Interview

## EXCLUSIVE: 'Ghislaine was a predator as guilty as Epstein': Maxwell juror describes moment he 'locked eyes' with sex trafficker and reveals his own abuse ordeal

- Scotty David , a juror in the Ghislaine Maxwell trial, was one of the 12 men and women who convicted Maxwell on five of the six counts of sex-trafficking last week
- Scotty says he went into the trial firmly believing that Maxwell was 'innocent until proven guilty' but 'After all I've learned, she's just as guilty as Epstein. I don't want to call her a monster, but a predator is the right word'
- During the trial Scotty, who works in finance, was seated in the third row of the jury box, in the back corner. From his vantage point, he said, he had a vista of the entire court and the 'perfect view' of Maxwell herself
- Scotty said that Maxwell's manner in court was discussed during deliberations. He said, 'We did discuss that we thought she was a little standoffish and not necessarily cold, more like she was paying attention'
- Scotty revealed that he was not the only juror to share a story of sexual abuse and that it did not affect his ability to view Maxwell as innocent until proven guilty
- Scotty is completely satisfied that they reached the right verdict and that, with Maxwell's conviction, justice has been done. He says that he believes she will spend the rest of her life in prison unless a deal is done
- He said, 'It satisfies me to know that we did our due diligence and that we brought justice for these victims, for these girls who are now women'

By LAURA COLLINS CHIEF INVESTIGATIVE REPORTER FOR DAILYMAIL.COM and DANIEL BATES FOR DAILYMAIL.COM
PUBLISHED: 00:26 EST, 5 January 2022 | UPDATED: 09:04 EST, 5 January 2022

A juror in the Ghislaine Maxwell trial has revealed how he viewed her as a 'predator', describing the moment he 'locked eyes' with Jeffrey Epstein's accomplice - and revealed his own child sex abuse ordeal to the jury.

Scotty David said he had helped the other members of the jury understand things from a victim's point of view and explained how 'you can't remember all the details' of traumatic memories - this was a crucial line of attack by Maxwell's lawyers who called a 'false memory' expert witness.

1

Daily Mail Jan 5, 2022   Juror 50, Scotty David  Interview

David also claimed that the five guilty verdicts returned in New York last week, possibly condemning Maxwell to spend the rest of life behind bars, were for 'all the victims'.

Legal experts said that if David failed to disclose his past experiences before the jury deliberations, Maxwell could have grounds to claim a mistrial and have her convictions quashed.

However, the question of whether a potential juror was a victim of sexual abuse or a relative or friend of a victim was asked in the 50-question survey completed by each juror ahead of selection.

David said he went into the trial firmly believing that Maxwell was 'innocent until proven guilty' and viewing the victims with a skeptical eye.

But, he said, 'After all I've learned, she's just as guilty as Epstein. I don't want to call her a monster, but a predator is the right word.

'She knew what was happening. She knew what Epstein was doing and she allowed it to happen. She participated in getting these girls comfortable so that he could have his way with them.

'And, to me, them returning repeatedly for the money has nothing to do with anything because these girls were minors, and it doesn't matter what incentivized them. It matters what happened to them.'



Ghislaine Maxwell juror speaks out after guilty verdict

During the trial Scotty, who works in finance, was seated in the third row of the jury box, in the back corner. From his vantage point, he said, he had a vista of the entire court and the 'perfect view' of Maxwell herself

Daily Mail Jan 5, 2022   Juror 50, Scotty David  Interview

**Ghislaine Maxwell** could lodge a claim of mistrial after it emerged one of the jurors who convicted her was a victim of child sex abuse.

Scotty David said he had helped the other members of the jury understand things from a victim's point of view.

He also claimed the five guilty verdicts returned last week, possibly condemning Maxwell to spend the rest of her life behind bars, were for 'all the victims'.

David said that after he revealed his ordeal, another juror came forward with to share that they too had been sexually abused.

Legal experts said that if David failed to disclose his past experiences before the jury deliberations, Maxwell could have grounds to claim a mistrial and have her convictions quashed.

Moira Penza, a former federal prosecutor in New York, said: 'I certainly hope the juror disclosed this fully on his questionnaire.

'A little strange the defence didn't strike him. It could definitely be an issue.

'In the first instance it would likely form the basis for a motion to Judge [Alison] Nathan for a new trial.'

However, the question of whether a potential juror was a victim of sexual abuse or a relative or friend of a victim was asked in the 50-question questionnaire completed by each juror ahead of selection.

Scotty could not remember that question when asked by DailyMail.com but was certain that he had answered all questions honestly.

During the trial Scotty, who works in finance, was seated in the third row of the jury box, in the back corner. From his vantage point, he said, he had a vista of the entire court and the 'perfect view' of Maxwell herself.

He recalled, 'I could literally see her [all the time]. There were times when it felt like she was staring right at me and we would lock eyes…it didn't feel real.'

3

Daily Mail Jan 5, 2022   Juror 50, Scotty David  Interview

'She was constantly taking notes, and constantly passing post-it notes over to her attorneys especially when they were on cross examination.'

At times, he said, 'I felt like she was watching what we were doing because there were times when some jurors, not during when the victims presented their testimony, but when certain other people presented on things that maybe they didn't feel mattered...some people would nod off.'

Scotty said that Maxwell's manner in court was discussed during deliberations. He said, 'We did discuss that we thought she was a little standoffish and not necessarily cold, more like she was paying attention.'

In an insight that will surely come as a gut blow to Maxwell herself, who reportedly wanted to testify but was advised against it, Scotty revealed that if she had taken the stand, 'It would have shown maybe that she was a little more human.

'Maybe if she gave her version of the story, who knows, maybe if she gave us a story of how she was manipulated...I don't know. But then that would have been an admission I feel like of guilt.'

Jurors were instructed not to draw any inference of guilt or otherwise from Maxwell's decision not to testify and, Scotty said, it was simply set to one side and not discussed during deliberations.

Asked if, at any stage, he had experienced any sympathy for Maxwell he said, 'Absolutely. Because this is the rest of her life, right? We were deciding what happens based off the evidence provided.

'We took that very seriously because we took at as, this could be our sister, our sister could be on trial here. We have to really comb through the evidence and make sure we have enough proof to say that she's either guilty or not.'

David told The Independent he found all the accusers to be credible, despite the defence's attacks on their stories and memories.

'They were all believable. Nothing they said felt to me like a lie,' he said.

'I know what happened when I was sexually abused. I remember the color of the carpet, the walls. Some of it can be replayed like a video,' he said, and he explained this to fellow jurors.

4

Daily Mail Jan 5, 2022   Juror 50, Scotty David  Interview

'But I can't remember all the details, there are some things that run together.'

Scotty said when he chose to share his own experience of sexual abuse the room 'went silent'.

It has since been speculated that the fact that a juror was a victim of sexual abuse could be used by Maxwell as grounds of appeal.

Scotty recalled looking directly at Maxwell, 'I could literally see her [all the time]. There were times when it felt like she was staring right at me and we would lock eyes...it didn't feel real'

Scotty is completely satisfied that they reached the right verdict and that, with Maxwell's conviction, justice has been done. He says that he believes she will spend the rest of her life in prison unless a deal is done

Scotty said that Maxwell's manner in court was discussed during deliberations. He said, 'We did discuss that we thought she was a little standoffish and not necessarily cold, more like she was paying attention'

However, the question of whether a potential juror was a victim of sexual abuse or a relative or friend of a victim was asked in the 50-question questionnaire completed by each juror ahead of selection.

Scotty could not remember that question when asked by DailyMail.com but was certain that he had answered all questions honestly.

He also revealed that he was not the only juror to share a story of sexual abuse and that it did not affect his ability to view Maxwell as innocent until proven guilty.

It did, however, he believes give him access to a better understanding of the testimony of victims.

To that end, he said, the defense's tactic of 'going hard' on the victims did not play well with him or other jurors.

5

Scotty pointed to defense attorney Laura Menninger's use of air-quotes when questioning Jane about her story of 'escaping' Epstein at one point.

He said, 'Everything, her tone, using air-quotes with escape … I think she was acting in order to convince us that this girl's lying and lying for money.'

Instead, he said, all it did was convince jurors that the defense team were showing a complete lack of respect for the victims.

He said, 'I just felt terrible I'm like, 'I can't believe you're treating this woman like this.' Like even if she's lying there's better ways to go about it…I don't feel attacking them that way or degrading her based on what she said was the way to go.'

The jury was sent out with a daunting 80 pages of instructions after a trial that was often dizzying in detail with lengthy testimony from the victims alone, and six counts to consider.

At first, Scotty admitted, jurors struggled to know where to start or how to make any progress at all.

He said that they did not take an initial vote of opinions but instead, on the first day they were sent out simply chose a foreperson and began by reading the instructions page by page.

He said, 'It was overwhelming. I mean 80 pages of how you interpret the law on each count, and it flips back and forth between different pages, and you have to flip 20 pages in order to get a definition of something else that can apply to one specific count.'

Maxwell faced six counts relating to sex trafficking which centered on the stories of four victims.

A fifth victim, Kate, was called only to show a pattern of grooming behavior and was not directly implicated in any of the counts.

At first jurors struggled to agree, Scotty said, over the legal definitions of terms such as 'enticing.'

He said, 'It was super confusing. It didn't get heated. It was just confusing, and when people are confused, tones can get raised. Nobody ever yelled at other people. People would just speak, sounding frustrated.

6

'So, we [realized] we had to come up with a new game plan and that game plan was, we're going to talk to each other with compassion.'

According to Scotty once the jurors had found a way to 'understand' each other they worked methodically through each count starting with count 2.

This was the only charge on which they did not convict Maxwell and related to the charge of 'enticing' Jane to travel for sexual exploitation.

An initial vote saw 7 jurors vote guilty and 5 not guilty. Those 'not guilty' votes turned to 'not sure' on further discussion. Ultimately, he said, it was not a question of Jane's credibility but rather the fact that they simply did not feel the evidence was there to meet the necessary bar of beyond reasonable doubt.

Working through each charge jurors wrote out lists of evidence on a white board and attached post-it notes as they built the case for each as they saw it and deliberated towards consensus.

On counts two and four – both relating to Jane – there was a 7/5 split of guilty/not sure. On counts one, three and five – all conspiracy charges – there was a 10/2 guilty/not sure split and on count six, the sex trafficking charge relating to Carolyn, all voted guilty from the start.

Scotty said he never felt pressure from either the judge or the rest of the jurors to reach a verdict. In fact, he said, when the judge sent a note on Wednesday 29 December informing them that if they had not reached a verdict she would recall them the following day, they were about to send her a note saying they had reached consensus on all counts.

Maxwell (pictured with Epstein) faced six counts relating to sex trafficking which centered on the stories of four victims

Scotty revealed that he was not the only juror to share a story of sexual abuse and that it did not affect his ability to view Maxwell as innocent until proven guilty

Today Scotty is completely satisfied that they reached the right verdict and that, with Maxwell's conviction, justice has been done.

He says that he believes she will spend the rest of her life in prison unless a deal is done to reduce her sentence. But said that he had no idea of the

severity of the potential sentence until after the verdict was reached and that it would not have influenced anything if he had.

He said, 'It satisfies me to know that we did our due diligence and that we brought justice for these victims, for these girls who are now women.'

He said that, ultimately, he and the rest of the jurors were convinced that Epstein and Maxwell's lives were so 'intertwined' that it was inconceivable that she was not fully aware of his crimes.

She aided and abetted, he said. And with her conviction she wasn't paying or being held accountable for Epstein's crimes as her attorneys have argued, Scotty said, instead she was answering to her own guilt because she was 'every bit as culpable' as he.

According to Scotty, 'The prosecution proved their case beyond reasonable doubt.'

EXHIBIT 123

1

2

3

4

5

6

7

8

9           Transcript of Audio File:

10   New Recording 30 (Tony Lyons - Sharon Churcher)

11            Audio Runtime:   1:17:53

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1          (Beginning of audio recording.)

 2          TONY LYONS:  Hey, how are you?

 3          SHARON CHURCHER:  Hi.  I didn't know your mom was

 4    an artist.

 5          TONY LYONS:  Yes.

 6          SHARON CHURCHER:  Wow.

 7          TONY LYONS:  She -- she died about two and a half

 8    years ago.

 9          SHARON CHURCHER:  Oh, I'm sorry.  But incredible.

10    I mean -- wow.

11          TONY LYONS:  Still figuring out what to do with

12    all of her paintings.

13          SHARON CHURCHER:  I assume -- did she have -- did

14    she sell --

15          TONY LYONS:  She sold --

16          SHARON CHURCHER:  (Inaudible) surely.

17          TONY LYONS:  She had a lot of shows, but she

18    didn't sell a ton.

19          SHARON CHURCHER:  Really?

20          TONY LYONS:  But she sold some.

21          SHARON CHURCHER:  Because they're stunning.  I

22    mean, I'm not an art critic, but --

23          TONY LYONS:  We've been selling more since she --

24    since she died than we did before.  Come on.  Just one

25    second.  Hey, could you add in the quantities that
```

1     Bill needed for Garth?  That was the customer.  So

2     that's where the list was.  If each of them had like a

3     number next to them, like 300 or 500.

4          MALE VOICE:  So where do you want me to add that?

5          TONY LYONS:  Just in this notes section.

6          MALE VOICE:  Okay.  All right.

7          TONY LYONS:  That's great.  It'll give me a

8     better sense of what to print.

9          SHARON CHURCHER:  I saw your Alan Dershowitz

10    announcement.

11         TONY LYONS:  Yeah.  Yeah, what did you think of

12    that?

13         SHARON CHURCHER:  It's a pretty good idea.  I

14    mean, I was stuck in the middle of it.  You know, I

15    broke that whole Virginia Roberts --

16         TONY LYONS:  Yeah, so what is the whole -- the

17    whole --

18         SHARON CHURCHER:  I can't tell you what I know.

19    I'm sure Alan will have a subpoena out soon.

20         TONY LYONS:  What is the -- so -- so you broke

21    the story in --

22         SHARON CHURCHER:  The Mail.

23         TONY LYONS:  In the --

24         SHARON CHURCHER:  I (inaudible) here in the U.S.

25    That's -- isn't that Mail online.

1          TONY LYONS:  Yeah, yeah.

2          SHARON CHURCHER:  The Mail, if you ever look at

3    that.

4          TONY LYONS:  Oh, so that's not like Radar Online

5    --

6          SHARON CHURCHER:  I worked for them afterwards.

7    It was quite a falling out with them after I wrote

8    that story because they are part of the British

9    establishment, and they ran it without thinking about

10   the fact that the editor-in-chief is a friend of the

11   royal family's.  I got laid off (inaudible).

12         TONY LYONS:  So that's a big kind of -- yeah.

13         SHARON CHURCHER:  So, no, I read that story.

14   I've been intrigued by who Jane Doe 102 was in the

15   court papers.  And I had another assignment down

16   south, which is -- I knew roughly she was from -- I

17   knew she was from Florida, the girl.  And the other

18   assignment didn't work, and I managed to take a week

19   just looking around, and found out this woman's name

20   and found her down in Australia.

21         TONY LYONS:  Wow.

22         SHARON CHURCHER:  That was when newspapers still

23   had budgets.

24         TONY LYONS:  Yeah.  To send you to Australia?

25         SHARON CHURCHER:  Yeah.

Case 1:20-cr-00330-PAE Document 855-8 Filed 02/25/26 Page 152 of 445
Case 1:19-cr-00387-LAP Document 210-2 Filed 12/26/20 Page 6 of 11

Page 5

1          TONY LYONS:  Wow.

2          SHARON CHURCHER:  And to pay her quite a bit of

3     money.  That's been public now.  She got paid.  It was

4     checkbook journalism.

5          TONY LYONS:  Yeah.

6          SHARON CHURCHER:  But Alan in the middle of it?

7     I mean, I have my views.  I mean -- I -- I don't

8     believe her in that.

9          TONY LYONS:  Yeah.

10          SHARON CHURCHER:  And I know he'd love to know

11     what I know, and I don't really know anything.

12          TONY LYONS:  Yeah.

13          SHARON CHURCHER:  His name is not in my stories,

14     which enough to really speak for itself so.

15          TONY LYONS:  Yeah.  So I was thinking about -- I

16     mean, so isn't -- I mean, I -- I thought -- and I

17     looked for some of the correspondence that you and I

18     had, and I -- I -- I couldn't find it.

19          SHARON CHURCHER:  Okay.

20          TONY LYONS:  It was --

21          SHARON CHURCHER:  I made kind of a little --

22          TONY LYONS:  -- from when --

23          SHARON CHURCHER:  -- book of ideas since I knew,

24     and I'm lazy --

25          TONY LYONS:  Right, right, right.

Case 1:20-cr-00330-PAE    Document 855-8    Filed 02/25/26    Page 153 of 445
Case 1:19-cv-03377-LAP    Document 218-2    Filed 11/20/20    Page 7 of 111

Page 6

1         SHARON CHURCHER:  -- and I don't particularly
2    want to go around the publishing industry.  So I
3    thought of -- I thought (inaudible) was ridiculous.  I
4    thought it was a satirical book.
5         TONY LYONS:  Yeah, yeah.
6         SHARON CHURCHER:  But in a way --
7         TONY LYONS:  But I actually see --
8         (Overlapping voices)
9         SHARON CHURCHER:  -- agent has said you'll be
10   blacklisted, and so I just dropped it.  So I sort of -
11   - it was just an idea I had.  I don't know if there's
12   something there.  Now you've got Alan doing his own
13   book.
14        TONY LYONS:  See, I would -- I would think that
15   it's -- it's a better book as -- sorry.  Thanks a lot.
16        MALE VOICE:  No problem.
17        SHARON CHURCHER:  I think --
18        TONY LYONS:  That was fast.
19        SHARON CHURCHER:  (inaudible) wasn't going to
20   work.  I actually did try it, and I couldn't make it
21   work.
22        TONY LYONS:  I -- I was thinking that doing it as
23   a -- as satire just doesn't really work.
24        SHARON CHURCHER:  It doesn't work.
25        TONY LYONS:  Because it --

1          SHARON CHURCHER:  I tried, you know.

2          TONY LYONS:  -- because it's got to be perfect,

3   and you're just going to piss off people because

4   you're not going to get it perfect.

5          SHARON CHURCHER:  And also P.J. O'Rourke, you

6   know, sort of did a very funny book --

7          TONY LYONS:  Managed to fuck over people without

8   letting them know it.

9          SHARON CHURCHER:  I mean, and you couldn't do

10  better than P.J. really.

11         TONY LYONS:  Yeah.

12         SHARON CHURCHER:  I know him, and I did ask him,

13  and he just said, look, yeah, it's not going to work.

14         TONY LYONS:  So I -- I was thinking it was better

15  as an actual guide to how to act.  You know, just like

16  a little -- a little handbook.  Like 5 by 7, that's

17  sort of like -- you know, because I -- I do think a

18  lot of people don't -- don't really know how to act.

19  And you can see it even around here, like, nobody's

20  going to comment on the way anybody's dressed.

21  Nobody's going to ask people, like -- you know, like a

22  lot of the things you -- you say here.  Nobody's going

23  to -- so -- yeah, let's -- let's see.  Like some of

24  the --

25         SHARON CHURCHER:  You're thinking of something

Page 8

1   you'd sell right at the grocery store --

2        TONY LYONS:  Like point of purchase.  Airport.  I

3   mean, I -- I mean, so the only problem with airport

4   stores is the co-op costs so much money.  So basically

5   what the airport stores do is they're basically

6   selling you the space.  And so it doesn't really work

7   for like a 12.95 handbook.

8        But it does seem like -- like there would be a

9   big market.  Maybe even like HR departments would want

10  to hand it out to people who --

11       SHARON CHURCHER:  You're worse than I am.

12       TONY LYONS:  No, really, I mean, it's --

13       SHARON CHURCHER:  No, I think it's a wonderful

14  idea.

15       TONY LYONS:  Right, I mean --

16       SHARON CHURCHER:  I like it.

17       TONY LYONS:  I mean, so --

18       SHARON CHURCHER:  You know there's dating

19  (inaudible).

20       TONY LYONS:  -- a bunch of case studies.  What's

21  that?

22       SHARON CHURCHER:  I did actually look online --

23       TONY LYONS:  What?

24       SHARON CHURCHER:  -- before coming to see you.

25  There's now a consent app.  A dating app.

Case 2:19-cv-30937/LAP Document 52-8-2 Filed 02/25/20 Page 106 of 11

1   TONY LYONS:  Oh, really.

2   SHARON CHURCHER:  What you do is put down all the

3   things, you know.

4   TONY LYONS:  Yeah.

5   SHARON CHURCHER:  Yeah.

6   TONY LYONS:  So somebody has to like click?

7   SHARON CHURCHER:  You have to consent to various

8   things you might do with the woman or man or --

9   TONY LYONS:  See, I mean --

10  SHARON CHURCHER:  -- dog, sheep.

11  TONY LYONS:  Biggest problem there from a

12  theoretical standpoint is that you're -- you're --

13  you're, of course, at liberty to withhold your consent

14  at any point.

15  SHARON CHURCHER:  I know, they said that.

16  Apparently, the app is going to allow you to change

17  your mind.

18  TONY LYONS:  Yeah, but then you have to go on the

19  app.  Like, it's got to do it in real -- it's got to

20  be like -- like tape recording you where you say,

21  okay, withheld.

22  SHARON CHURCHER:  (Inaudible) difficult.

23  TONY LYONS:  Yes, yes, yes, no.  Not with --

24  SHARON CHURCHER:  Just (inaudible) it's easy.

25  TONY LYONS:  This is -- yeah, it seems like --

Case 1:20-cv-00369-PAE Document 855-8 Filed 02/25/26 Page 157 of 445
Case 1:19-cv-00937-LAP Document 216-2 Filed 11/20/20 Page 11 of 111

Page 10

```
 1              SHARON CHURCHER:  I (inaudible) the idea.  You'd
 2     have to really think about it carefully.  I mean, you
 3     know --
 4              TONY LYONS:  I would say a really serious book
 5     but --
 6              SHARON CHURCHER:  Does it need a name on it?
 7     Does it need to be done -- (inaudible) someone's name
 8     on?
 9              TONY LYONS:  Yeah, but I actually think that your
10     -- your name helps because you've been kind of in the
11     middle of some of this stuff.
12              SHARON CHURCHER:  You mean the Dershowitz thing?
13              TONY LYONS:  Yeah.
14              SHARON CHURCHER:  Yeah.  He wouldn't (inaudible)
15     would he?
16              TONY LYONS:  What's that?
17              SHARON CHURCHER:  I don't suppose we could
18     suppose him to co-author it, could we?
19              TONY LYONS:  I don't know.
20              SHARON CHURCHER:  Because I'll tell you what, I
21     knew him when I was Penthouse.  I was Guccione's -- he
22     may remember me.  I did U.S.A. Confidential --
23              TONY LYONS:  Yeah, yeah, yeah.
24              SHARON CHURCHER:  -- after I had done New York
25     Confidential, the book.  Bob Guccione had me to do a
```

```
 1    (inaudible) because he wanted to get sued.  He said
 2    (inaudible) being sued.  And Alan was doing a column
 3    at the time.   I mean, I can't tell you what the sex
 4    slave didn't tell me, but --
 5         TONY LYONS:  Yeah.
 6         SHARON CHURCHER:  -- I mean, forgetting all of
 7    that, it could be very -- it could be quite commercial
 8    there, I think.
 9         TONY LYONS:  Yeah.
10         SHARON CHURCHER:  You know, but --
11         TONY LYONS:  Because then it's --
12         SHARON CHURCHER:  -- journalist --
13         TONY LYONS:  It's by sort of like a lawyer and a
14    journalist, and you were -- you were part of it.
15         SHARON CHURCHER:  Yeah.  I mean, we just tell
16    people --
17         TONY LYONS:  I don't know.
18         SHARON CHURCHER:  -- how to do it.  What about
19    the two-way street?  If you -- see, that's one thing.
20    If you are going to do it, you've got to talk about
21    how you handle the casting couch now.  Because a lot
22    of us used it, you see.  So the problem is what if you
23    still want to use it.
24         TONY LYONS:  Yeah.
25         SHARON CHURCHER:  So you could put in some quite
```

1  pointed stuff on that because Me Too -- you know, most

2  of these people did it for a reason.

3      TONY LYONS:  Yeah.

4      SHARON CHURCHER:  Like I know Weinstein's woman

5  who I know who was published by Harvey.

6      TONY LYONS:  Yeah.

7      SHARON CHURCHER:  And it was incredible at her

8  book party, it was Georgina Chapman, the wife, my

9  friend's mother, and Harvey making out with my friend,

10  whose books he published.

11     TONY LYONS:  Wow.

12     SHARON CHURCHER:  I mean, this was definitely a

13  two-way street.  So what happens now if consensually -

14  -

15     TONY LYONS:  Yeah.

16     SHARON CHURCHER:  -- you could have a little bit

17  on that.

18     TONY LYONS:  Yeah.

19     SHARON CHURCHER:  But dressing, I hadn't thought

20  about that.  Also, it's how you talk to people.

21     TONY LYONS:  Yeah.

22     SHARON CHURCHER:  You know, sweetheart, hun.

23     TONY LYONS:  Yeah, you can't do it.  Yeah.  I

24  mean -- I mean, I didn't ever do any of that stuff,

25  but it was so prevalent in New York when I was in my

1    20s.  Like -- or even before that in the 70s in New

2    York.  I mean, it was -- you know, it was the whole

3    population basically.  Men whistling.

4          SHARON CHURCHER:  I know --

5          TONY LYONS:  Calling people names.

6          SHARON CHURCHER:  Yeah, I know, the problem is if

7    they don't whistle now -- I was telling a friend of

8    mine, you know, we really miss it as we get older.

9    The whistling was quite appreciated.  It was quite

10   funny.  The whole women's movement, the big

11   difference, of course, was the women's movement march

12   to now everyone's suing.  So it has changed, hasn't

13   it?

14         TONY LYONS:  Hmm.

15         SHARON CHURCHER:  And the big thing is, what do

16   you do if you don't want to end up in the middle of

17   it, right?  My husband was asking me last night, he

18   said I think I'm absolutely fine.  I said are you

19   sure.

20         TONY LYONS:  Yeah.

21         SHARON CHURCHER:  You know, I mean --

22         TONY LYONS:  Well, I mean, I think that's --

23   that's what Alan's point is.

24         SHARON CHURCHER:  You should have someone

25   investigate.  What could happen on that one is we

Page 14

```
 1    could suggest people hire reputation companies like --
 2    you know, the political candidates do it.
 3          TONY LYONS:  Yeah.
 4          SHARON CHURCHER:  You know if you running you
 5    hire someone to look at you.
 6          TONY LYONS:  Yeah.
 7          SHARON CHURCHER:  That's the new thing.  Well,
 8    you could do that now.
 9          TONY LYONS:  And you can see --
10          SHARON CHURCHER:  (Inaudible).
11          TONY LYONS:  -- is there anybody out there.
12          SHARON CHURCHER:  There must be companies who
13    will do it for you, just reputation companies look at
14    your own past.
15          TONY LYONS:  Yeah.
16          SHARON CHURCHER:  Yeah.  Say you're going -- you
17    know, you're going to do an IPO or something, you
18    might want to do that just --
19          TONY LYONS:  But then again, nowadays, like --
20    you know, so Alan says that he never met her.  And --
21          SHARON CHURCHER:  I don't know if he -- he
22    definitely doesn't know if he met her.  That's that I
23    suspect.
24          TONY LYONS:  And she probably doesn't know if she
25    met him.
```

```
 1          SHARON CHURCHER:  (Inaudible).  I don't know.  I
 2    mean, Alan says that those emails clear him.  One of
 3    the emails, she says to me, you know, I -- I'd hate to
 4    say it, but I don't remember that email, and I wonder
 5    about some of these emails, too, that she's produced.
 6    Because of course you can change emails.
 7          TONY LYONS:  Yeah.
 8          SHARON CHURCHER:  And I'm supposed to have said
 9    in one email of course we all think Alan's a pedo and
10    it's a word I've never heard of.  I never used that
11    word.
12          TONY LYONS:  Yeah.
13          SHARON CHURCHER:  I don't actually know that
14    word.  I never used that word.
15          TONY LYONS:  But even if you did say that --
16          SHARON CHURCHER:  I didn't.  I didn't.  But I'm
17    not going to be in the middle of that one.
18          TONY LYONS:  Right, right, right.
19          SHARON CHURCHER:  No, I think he --
20          TONY LYONS:  But I mean --
21          SHARON CHURCHER:  -- probably met her --
22          TONY LYONS:  -- even if you did, that's just your
23    --
24          SHARON CHURCHER:  Yeah, opinion.  Well, no, he's
25    saying also that if -- if she's asking did I ever
```

1  meet, who did I meet, not her.  I don't know.  I don't

2  think for one minute -- it's not in my stories.  I

3  mean, there was some men I didn't name because they

4  were threatening.

5        TONY LYONS:  Yeah.

6        SHARON CHURCHER:  It was Ehud Barak was one.

7        TONY LYONS:  Right.

8        SHARON CHURCHER:  And he definitely was -- you

9  know, documentation.  He was a bit of a --

10        TONY LYONS:  But how did -- how did she -- she go

11  from not remembering him to saying specifically?

12  Like, nobody forgets trauma.  It's like -- I mean, I -

13  - I even recognize that in -- in my own life.  That

14  when -- when something big happened 35 years ago, I --

15  I remember it for the rest of my life, you know.

16        SHARON CHURCHER:  Oh, I think --

17        TONY LYONS:  And then --

18        SHARON CHURCHER:  I think the (inaudible).

19        TONY LYONS:  But the other stuff --

20        SHARON CHURCHER:  I think he's absolutely right.

21  I think Brad Edwards, you know, one of her lawyers,

22  hates him because --

23        TONY LYONS:  Hates Alan?

24        SHARON CHURCHER:  -- he went after him on the

25  Ponzi scheme stuff.  Apparently Edwards was using --

| 1 | TONY LYONS: Oh, I didn't really know about that. |

1     TONY LYONS:  Oh, I didn't really know about that.

2     SHARON CHURCHER:  He was selling settlement for -

3   - that's the thing lawyers do?

4     TONY LYONS:  Yeah.

5     SHARON CHURCHER:  And it wasn't Alan

6   specifically.  But Epstein's legal team went after

7   Edwards.  It became very expensive litigation.  And

8   Edwards hated Dershowitz.  And I think he put her up

9   to it is my theory.

10     TONY LYONS:  Wow.

11     SHARON CHURCHER:  Pure and simple.  Dershowitz is

12   right.  Because wouldn't she have named him to me in

13   my --

14     TONY LYONS:  Yeah.

15     SHARON CHURCHER:  So she named a lot of people,

16   and now the court's unsealed everything, all the names

17   are out there like George Mitchell --

18     TONY LYONS:  I mean, if --

19     SHARON CHURCHER:  -- all these people --

20     TONY LYONS:  -- she really had sex with him twice

21   -- right, like wouldn't she --

22     SHARON CHURCHER:  She would have named him.

23     TONY LYONS:  -- have just said it?

24     SHARON CHURCHER:  I mean, you know, here we are,

25   sitting down.  It's no secret it's a big financial

```
 1   agreement.  She's under contract.

 2        TONY LYONS:  Yeah.

 3        SHARON CHURCHER:  Supposed to tell the truth.

 4        TONY LYONS:  Yeah.

 5        SHARON CHURCHER:  Wouldn't you name the lawyer?

 6        TONY LYONS:  Sure.  Especially somebody --

 7        SHARON CHURCHER:  It's not in my article --

 8        TONY LYONS:  -- as high profile as --

 9        SHARON CHURCHER:  -- she's named -- she's named

10   Prince Andrew.  Okay, Alan is not Prince Andrew, but

11   big name.

12        TONY LYONS:  But he's Epstein's lawyer, too.

13        SHARON CHURCHER:  Exactly.  And --

14        TONY LYONS:  So --

15        SHARON CHURCHER:  -- also, von Bulow.

16        TONY LYONS:  Yeah.

17        SHARON CHURCHER:  He's a name in the mass market

18   --

19        TONY LYONS:  Yeah.

20        SHARON CHURCHER:  -- von Bulow case.  So yeah, I

21   think Brad Edwards and his team just made it up.  If I

22   were Alan, I wouldn't bother so much with it, but I

23   know it's pissing him off, isn't it?  I mean --

24        TONY LYONS:  Well, I mean -- I mean, I think in

25   his case, he's had such a distinguished career.  He's
```

1    81 years old --

2         SHARON CHURCHER:  Is he 81?  No, Christ.

3         TONY LYONS:  So he doesn't want to --

4         SHARON CHURCHER:  (Inaudible).

5         TONY LYONS:  -- you know, it's like this is his

6    legacy.  Like, he -- he doesn't want that to show up.

7    I don't -- I don't think -- I mean, he didn't say

8    this.  But I don't think that he wants to, you know,

9    have this be part of his life story.

10        SHARON CHURCHER:  She never --

11        TONY LYONS:  Like after he dies.

12        SHARON CHURCHER:  -- I have a whole list of

13   names, you know, and -- I mean, I was told to ask my

14   original sources to put him on the list and said, you

15   know, ask about these names.  Because law enforcement

16   had been after -- it's real absence of malice

17   (inaudible) story, you know.  The journalist gets set

18   up.

19        TONY LYONS:  Yeah.

20        SHARON CHURCHER:  And you know, I had a list of

21   names, easy peasy.

22        TONY LYONS:  Yeah.

23        SHARON CHURCHER:  To give her.  And photographs.

24   And, no, I mean, she never named Alan.  Doesn't mean

25   she -- doesn't mean she's made it up, but wouldn't you

```
 1   name a famous lawyer?  I agree.

 2        TONY LYONS:  Yeah.  Especially if she remembers

 3   in such detail later.

 4        SHARON CHURCHER:  She -- the thing is, also, I

 5   agree with him.  I think she confused him with this

 6   other Harvard professor.  I think that too.  I think

 7   she confused him with someone else.

 8        TONY LYONS:  So there's another Harvard professor

 9   who was --

10        SHARON CHURCHER:  Oh, there was, yeah.

11        TONY LYONS:  -- friends with Epstein?

12        SHARON CHURCHER:  Alan said that, that it was

13   someone else --

14        TONY LYONS:  Oh, okay.

15        SHARON CHURCHER:  -- because when -- and also in

16   the unsealed (inaudible) my stuff.  Because what had

17   happened originally was I couldn't believe what she

18   did.  She subpoenaed me.  She had sued Ghislaine

19   Maxwell for liable.  Ghislaine said you're lying.  So

20   then the sex slave sues Ghislaine Maxwell's daughter.

21   And then she tries to subpoena all my files.  So

22   (inaudible) and the stuff you see coming out now is a

23   judge ordered them unsealed because I had to produce a

24   lot of stuff, but we produced it under seal.

25        TONY LYONS:  Wow.
```

Case 1:20-cr-00330-AP   Document 85-82   Filed 02/29/20   Page 220 of 445

1      SHARON CHURCHER:  So most of it's out there now,

2  and Alan's name hasn't surfaced.  Some other

3  distinguished ones have.

4      TONY LYONS:  Yeah, I mean, so the question for

5  your book would be --

6      SHARON CHURCHER:  (Inaudible) small --

7      TONY LYONS:  But if it's a small book and you can

8  say sort of like you were right in the middle of it,

9  what are the rules, how do people bring things to --

10  to light, but then part of your platform is the fact

11  that you were in the middle of it.

12      SHARON CHURCHER:  Oh, sure.  No, I agree.

13      TONY LYONS:  And if somehow you could coordinate

14  with Alan because you say you agree with him anyway,

15  maybe -- I mean --

16      SHARON CHURCHER:  Well, I don't know if we can

17  come out and say -- well, we can say the name wasn't

18  in my articles.

19      TONY LYONS:  Yeah, yeah, yeah.

20      SHARON CHURCHER:  I suspect by then Alan would

21  have had tried to get my files.  I don't know.  He's

22  said publicly he feels what's come out exonerated him.

23  And anyway, we're not talking about that case.  We're

24  talking about how to avoid being in the middle of such

25  a case.

```
 1        TONY LYONS:  Right, right.

 2        SHARON CHURCHER:  Which is totally different.

 3        TONY LYONS:  But -- but what we're talking about

 4   there is -- is -- is a possibility of a story that

 5   then launches it.  Like what -- what makes this

 6   different.  Because most of it is -- it's relatively

 7   simple stuff, right?  Like the stuff that you can't

 8   do.  And I would say it should be really short.  Like

 9   96 pages on kind of nice paper with rounded edges.

10   This is like a handbook like how do you navigate --

11        SHARON CHURCHER:  (Inaudible) carry in the

12   falling rain, it won't get wet.

13        TONY LYONS:  Yeah, and then sort of like --

14        SHARON CHURCHER:  So it's a social roadmap,

15   really.

16        TONY LYONS:  But also like you were saying, like,

17   I don't -- I don't know what that app is, but you

18   know, there are probably going to be more and more.

19        SHARON CHURCHER:  There's the dating app.

20   There's a company that's set up now to give companies,

21   you know, sort of the A to Z of -- of fraternizing,

22   it's called in the workplace.

23        TONY LYONS:  Yeah.

24        SHARON CHURCHER:  What is and isn't appropriate.

25        TONY LYONS:  But that could be part of it.
```

```
 1          SHARON CHURCHER:  Also, my husband -- he's a
 2    safety consultant for huge engineering companies, and
 3    he showed me an OSHA -- you know, what that is, the
 4    government agency --
 5          TONY LYONS:  Yeah, yeah, yeah.
 6          SHARON CHURCHER:  -- website.  It's hysterical,
 7    some of the stuff on that.  It's even government
 8    regulations, which would (inaudible) no copyright on
 9    government stuff.  You just --
10          TONY LYONS:  Yeah, I know.  That's all fine.
11          SHARON CHURCHER:  Oh, yeah.  So it's -- I mean,
12    the other thing --
13          TONY LYONS:  It's OSHA.
14          SHARON CHURCHER:  -- he wanted to make money off
15    Me Too.  I think there should be a little section on
16    how to make money off it.  I mean, I think it's a huge
17    business opportunity, seriously, isn't it.
18          TONY LYONS:  So like --
19          SHARON CHURCHER:  Because of that dating app.
20          TONY LYONS:  -- consulting.
21          SHARON CHURCHER:  Consulting.  Your law firm
22    branches out, like, you know, the sex slaves -- David
23    Boies who used to be this -- I'm sure you've heard
24    about him from Alan.
25          TONY LYONS:  Yeah.  I mean, David --
```

```
 1        SHARON CHURCHER:  He used to be this respectful
 2   lawyer.  He's gone into business now with Brad
 3   Edwards, the sex slave's lawyer.
 4        TONY LYONS:  Who is -- yeah.
 5        SHARON CHURCHER:  And what they're doing is --
 6        TONY LYONS:  But wasn't Boies like this --
 7        SHARON CHURCHER:  High --
 8        TONY LYONS:  -- incredible --
 9        SHARON CHURCHER:  -- Clinton.
10        TONY LYONS:  Yeah.
11        SHARON CHURCHER:  He was -- and we all respected
12   so much.  We were afraid to talk to him.  He was so
13   upstanding.  And now they've got --
14        TONY LYONS:  So why did he --
15        SHARON CHURCHER:  -- like these 800 or maybe 877
16   numbers where you can call him up and say, my God, I
17   just remembered --
18        TONY LYONS:  Why did he do that, though?  Does he
19   need the money?
20        SHARON CHURCHER:  (Inaudible) money.
21        TONY LYONS:  Boies must be really wealthy, right?
22        SHARON CHURCHER:  I know, but if you can make
23   more money in New York City -- in New York City for
24   Christ's sake.
25        TONY LYONS:  Does he live here?
```

1          SHARON CHURCHER:  I assume he does.

2          TONY LYONS:  Boies?

3          SHARON CHURCHER:  He's based here.

4          TONY LYONS:  I don't know.

5          SHARON CHURCHER:  No, he's based here.  And as I

6     say, he was really upstanding, and I know a lawyer who

7     knows him, and they're all just flabbergasted he's

8     doing --

9          TONY LYONS:  I had always thought of him as this,

10    you know, famous, really upstanding sort of almost

11    snooty, you know, because he was so upstanding.  And

12    then -- so it doesn't -- it doesn't seem to make any

13    sense that he would have --

14         SHARON CHURCHER:  Again, it's -- it's money.  I

15    mean, and also these lawyers, remember, they do

16    everything on contingency.

17         TONY LYONS:  Right.

18         SHARON CHURCHER:  So why you -- where we all

19    think they're making money -- I suppose David's worked

20    for human rights and stuff where he didn't make much

21    money.

22         TONY LYONS:  No.

23         SHARON CHURCHER:  And they all have these

24    fantastic offices, as you know.  I mean --

25         TONY LYONS:  Maybe he has some big expenses we

1    don't know about.

2         SHARON CHURCHER:  Yeah.  But definitely, I was

3    absolutely astounded because I wanted to call Brad

4    Edwards, and his number had changed.  And when I

5    looked online, I was Edwards Boies or Boies Edwards.

6    I couldn't believe it.  You know, they're all getting

7    into it.  It's a huge -- well, you heard the ads on

8    the radio.  Do you ever --

9         TONY LYONS:  No.

10        SHARON CHURCHER:  -- when you drive -- I live in

11   the suburbs --

12        TONY LYONS:  I don't drive at all.

13        SHARON CHURCHER:  And there's all these ads now,

14   you know.  There's a one year in which you can say you

15   just remembered you were abused, you know.

16        TONY LYONS:  Yeah.

17        SHARON CHURCHER:  Call us.  And they're about

18   every half-hour on W --

19        TONY LYONS:  But there are all kinds of things

20   like -- like this.  My friend is a -- is a patent,

21   trademark, and copyright lawyer at a -- at a big law

22   firm.  And he got a call from a client who he does all

23   their work for, and -- and that client got a call from

24   somebody who -- from a law firm that goes after people

25   for going on porn websites, right?

```
 1      SHARON CHURCHER:  Okay.

 2      TONY LYONS:  So they're basically threatening to

 3   shame people.

 4      SHARON CHURCHER:  How do they find out?

 5      TONY LYONS:  And they -- there's some sort of

 6   like technology that they have now where they can

 7   pinpoint with -- using the IP address --

 8      SHARON CHURCHER:  Wow.

 9      TONY LYONS:  -- so they can find --

10      SHARON CHURCHER:  Wow.

11      TONY LYONS:  -- out what the actual person was

12   looking at and it's certain, like, software.

13      SHARON CHURCHER:  Wow.  So technology can track -

14   -

15      TONY LYONS:  He can give us details about that.

16      SHARON CHURCHER:  Yeah.

17      TONY LYONS:  So -- so what he said was that this

18   guy's really, really wealthy.  He said they pick -- so

19   they find out, you know, a whole bunch of people.

20   Because there are probably millions of people going to

21   these kinds of sites, right?  And they're not even

22   accusing them of anything bad, really.  They're just

23   accusing them in a way that they're threatened to be

24   outed in some --

25      SHARON CHURCHER:  Wow.
```

1       TONY LYONS:  -- sort of a shameful way.  And --

2       SHARON CHURCHER:  That is so (inaudible).

3       TONY LYONS:  -- they try to get them to pay a

4    small amount of -- you know, relatively small amount

5    of money.

6       (Overlapping voices)

7       TONY LYONS:  Right.  So it's like $10,000 or

8    something, and then you're out of it.

9       SHARON CHURCHER:  What are they going to do

10   (inaudible)?

11      TONY LYONS:  But if they do it thousands of

12   times, nobody's going to -- right.  And it's not

13   technically blackmail because they actually did go to

14   that site and you know, there's something wrong with

15   it.  I don't know.

16      SHARON CHURCHER:  Child porn or something, you

17   see it is, but -- there's a lot of stuff that is

18   illegal to access.

19      TONY LYONS:  Yeah, yeah.  So I'm not exactly sure

20   what the story is, but we could get that --

21      SHARON CHURCHER:  But the fact they've made -- I

22   like that.  I think that's (inaudible) --

23      TONY LYONS:  We could definitely get that.

24   Because he is representing somebody.

25      SHARON CHURCHER:  So basically, your life is

```
 1   going to have to become pretty circumscribed, isn't
 2   it?
 3        TONY LYONS:  Yeah.
 4        SHARON CHURCHER:  I mean, the dating thing is
 5   fascinating, isn't it?  How on earth do you ask
 6   somebody out?  How on earth?
 7        TONY LYONS:  Yeah.
 8        SHARON CHURCHER:  There was a famous piece, Tony,
 9   if (inaudible) about some poor actor.  And this woman
10   wrote a whole piece about how she went out for a date
11   with him, and it was the ultimate Me Too piece because
12   he chose the wine.  He didn't ask her what wine she
13   wanted.  And then when she said she'd go back to his
14   apartment, she did take her clothes off, but she
15   didn't want to have sex.  And she wrote this entire
16   piece about this.  And it was taken up by (inaudible)
17   as an example of bad male behavior.
18        TONY LYONS:  Right.
19        SHARON CHURCHER:  It became -- it was one of the
20   first pieces that someone wrote.
21        TONY LYONS:  Yeah.
22        SHARON CHURCHER:  So it starts at the beginning
23   that you don't say, Sharon, this looks like a nice
24   wine.
25        TONY LYONS:  Right.
```

1        SHARON CHURCHER:  Apparently that's immediately

2    you're asserting power.

3        TONY LYONS:  Right.

4        SHARON CHURCHER:  Over the person.

5        TONY LYONS:  There's not supposed to be any undue

6    influence.

7        SHARON CHURCHER:  But I like the idea of how do

8    you go on with what's always go on on the casting

9    couch because so many people have made their way in

10   Hollywood and the arts and everywhere, right?  And I'm

11   sure in big companies too.  So how do you negotiate

12   that one if you do actually want to offer yourself up?

13       TONY LYONS:  Yeah.

14       SHARON CHURCHER:  To your boss.

15       TONY LYONS:  Yeah.

16       SHARON CHURCHER:  I think there should be

17   something on that.

18       TONY LYONS:  Sure, right.  You can sort of come

19   up with a document, and you're like --

20       SHARON CHURCHER:  You document --

21       TONY LYONS:  -- okay, this is signed.

22       SHARON CHURCHER:  Okay, I'm having sex with you,

23   and then next day, you're going to make me whatever,

24   right?

25       TONY LYONS:  Right, right, right.

```
 1          SHARON CHURCHER:  Actually, it's a good way to do
 2     it because at least it's spelled out.
 3          TONY LYONS:  It's an actual deal.
 4          SHARON CHURCHER:  It's a real deal, right.
 5          TONY LYONS:  But then again --
 6          SHARON CHURCHER:  (Inaudible).
 7          TONY LYONS:  -- but lots of these people made
 8     deals, and then they just go back on the deal because
 9     they get a better offer.
10          SHARON CHURCHER:  (Inaudible).
11          TONY LYONS:  It doesn't seem like courts are
12     really holding people to those kinds of deals.
13          SHARON CHURCHER:  I think it's a nice idea if you
14     think you can make any money.
15          TONY LYONS:  I think it would be something new.
16     Like --
17          SHARON CHURCHER:  I think it might get some
18     attention in the media.
19          TONY LYONS:  -- it would be -- be a story.
20          SHARON CHURCHER:  I think it's a story, too,
21     yeah, I agree with you, and I -- I have no reason to
22     believe that he raped the sex slave.  Let's put it
23     that way.
24          TONY LYONS:  Right.  But the --
25          SHARON CHURCHER:  (Inaudible).
```

```
 1          TONY LYONS:  -- so the -- the connection between
 2     you and Epstein and that story then becomes sort of
 3     like a launch of -- of -- of this book.
 4          SHARON CHURCHER:  Yeah, no.  I think it's
 5     perfect.  I agree with you.
 6          TONY LYONS:  But the question there is what can
 7     you say and what can you not say?  Like, what --
 8     what's holding you back from sort of --
 9          SHARON CHURCHER:  Oh, I see.  We'd have to just
10     find out, get legal advice.  I think that the only
11     danger, if I say -- well, I don't know if he didn't
12     have sex her, remember.
13          TONY LYONS:  Right, right, right.
14          SHARON CHURCHER:  Even though she never told me
15     he did.
16          TONY LYONS:  Right, right, right.
17          SHARON CHURCHER:  And I see no reason -- I think
18     my only --
19          TONY LYONS:  But nobody ever knows about other
20     people.
21          SHARON CHURCHER:  I think my lawyer, Laura
22     Hammond, who he probably knows, anyway -- they all
23     know each other -- I think she's actually said
24     publicly that she never told Sharon that she had sex
25     with Dershowitz.  I think she said that in public.
```

```
 1          TONY LYONS:  Okay.

 2          SHARON CHURCHER:  So --

 3          TONY LYONS:  I thought I even read that

 4     somewhere.

 5          SHARON CHURCHER:  I've read it, yeah.  I've just

 6     been told right now not to comment, just because

 7     everything was under seal.  But now it's not sealed.

 8          TONY LYONS:  Yeah.

 9          SHARON CHURCHER:  You know.  No, I mean, you

10     know, I just -- but at the same time, it raises the

11     whole issue, doesn't it, of how the hell do you sit

12     around pretty women and not get accused of having sex

13     with them and the other way around.  I mean, it is a

14     problem for guys, obviously.

15          TONY LYONS:  Yeah.

16          SHARON CHURCHER:  I mean, more for men.  You know

17     that women are not getting hired, of course, too.

18          TONY LYONS:  Not getting hired?

19          SHARON CHURCHER:  Companies are hiring men, not

20     women.

21          TONY LYONS:  Why?

22          SHARON CHURCHER:  Under advice.  Women can cause

23     a lot of trouble now.

24          TONY LYONS:  Wow.

25          SHARON CHURCHER:  So I mean, hiring practices
```

Case 1:20-cr-00330-PAEP Document 855-82 Filed 02/26/26 Page 181 of 445

1  have really changed. But, no --

2      TONY LYONS: That's definitely not true in the --

3      SHARON CHURCHER: -- (inaudible) because I think

4  the whole thing is just -- as I said to you, I -- I

5  have -- I just don't -- this whole movement is just

6  absurd, and I think to do something but not satire is

7  a good idea. It is sort of edgy.

8      TONY LYONS: I think it's just too --

9      SHARON CHURCHER: But would it --

10     TONY LYONS: -- too scary to try to do satire.

11     SHARON CHURCHER: But it's not scary. It is an

12 edgy idea for a book.

13     TONY LYONS: Right, right, right. No, this --

14     SHARON CHURCHER: Because a lot of the things

15 people are going to have to do to stay safe are

16 totally absurd.

17     TONY LYONS: Yeah.

18     SHARON CHURCHER: I mean, but that is what has

19 been brought down on this.

20     TONY LYONS: Yeah, it's sort of like -- but then

21 again, I mean, anybody can accuse anybody of stuff

22 that happened --

23     SHARON CHURCHER: Until you don't have to say

24 anything. All you have to do is just post it on

25 social media, don't you?

```
 1          TONY LYONS:  Yeah.

 2          SHARON CHURCHER:  I know.  That's all you do.

 3          TONY LYONS:  Yeah.  So there's got to be --

 4          SHARON CHURCHER:  Striking back, of course, there

 5     is liable.

 6          TONY LYONS:  Yeah.

 7          SHARON CHURCHER:  You know.  And it's surprising

 8     at this stage (inaudible) isn't it?

 9          TONY LYONS:  Yeah.

10          SHARON CHURCHER:  And it's --

11          TONY LYONS:  Although, I guess it's sort of like

12     -- it just costs a lot of money (inaudible).

13          SHARON CHURCHER:  Unless you can't -- (inaudible)

14     prove anything.  It's like recovered memory, isn't it?

15     Oh, all of a sudden, I remember --

16          TONY LYONS:  Yeah.

17          SHARON CHURCHER:  -- that this happened to me

18     too.

19          TONY LYONS:  Yeah.

20          SHARON CHURCHER:  It was --

21          TONY LYONS:  But there's also sort of like --

22     like a lot of people in -- on college campuses for,

23     you know, the last -- you know, probably for all of

24     time would get drunk and not even remember what they

25     did.
```

```
 1          SHARON CHURCHER:  I know.  Did you see --
 2          TONY LYONS:  So people can't even really say that
 3     they didn't do something in college in a lot of cases.
 4          SHARON CHURCHER:  But that's why I said -- I
 5     think one thing we should do -- I'm sure there's
 6     people will do it.  The companies investigate
 7     politicians.  If you really are about to do an IPO or
 8     something where it's very important that you don't get
 9     embarrassed -- or you're about to get married, even,
10     you know, just have someone investigate your own past.
11          TONY LYONS:  Yeah.
12          SHARON CHURCHER:  Just to make sure.
13          TONY LYONS:  And also --
14          SHARON CHURCHER:  (Inaudible) -- sorry, make
15     amends appropriately.
16          TONY LYONS:  But also take like a lie detector
17     test and --
18          SHARON CHURCHER:  Yeah, of course.  I like that,
19     actually, yes.
20          TONY LYONS:  Sort of like what is -- what is your
21     line of defense?  You take a test to prove that you're
22     being honest.  You make an affirmative statement that,
23     to the best of your knowledge, you know, that there
24     were drunken nights that you don't recall, but to the
25     best of your knowledge, you have never done any of the
```

1    following things.  It could be a list.

2         SHARON CHURCHER:  You know it would annoy people,

3    don't you?

4         TONY LYONS:  I think that it's not necessarily a

5    bad time to have that kind of book come out.

6         SHARON CHURCHER:  As I said from the beginning

7    when I first heard about it just really -- I would

8    like to do something.  I just --

9         TONY LYONS:  Because it has, you know -- it is

10   sort of -- I mean, Alan's right in the sense that it

11   can't be okay that you can just accuse somebody

12   without a shred of proof.

13        SHARON CHURCHER:  No, of course.

14        TONY LYONS:  And you can change their whole life.

15        SHARON CHURCHER:  I know.  It can't be.

16   Unfortunately, it is.  I mean, the only defense is,

17   you know, the courts.  There is nothing one can do

18   about that, unfortunately.

19        TONY LYONS:  Yeah.

20        SHARON CHURCHER:  Because right now, it makes you

21   a hero if you do it.

22        TONY LYONS:  If you come out and you talk about

23   it.

24        SHARON CHURCHER:  I know.  That's --

25   unfortunately, that's the way it is.  But that's why

1  taking it on is the thing to do, I think, because --

2      TONY LYONS:  But then also maybe there's a

3  section in the book about, you know, steps you would

4  take if you had been accused.

5      SHARON CHURCHER:  Actually, that's not a bad

6  idea.  (Inaudible).

7      TONY LYONS:  So what are the steps?  Like we

8  said, maybe that's like -- I mean, it would be better

9  to do it preemptively.  Maybe there would be -- I

10  mean, it's possible that there would be services, like

11  you said, that would come up where they would check

12  your background.  You would -- you would take all

13  kinds of tests --

14      SHARON CHURCHER:  There definitely are.  And I

15  read it during the last presidential -- or the one

16  before -- campaign.  One of the candidates had done

17  it.  (Inaudible).

18      TONY LYONS:  Because you wouldn't want to --

19  nobody would want to give money to a candidate if

20  there's long-hanging fruit there.  So you would want

21  to have --

22      SHARON CHURCHER:  (Inaudible) I forget which

23  candidate it was.  But I remember Politico or

24  something, one of their reporters had done a book, and

25  in the footnotes, there's this reference to this

1    person, whichever candidate it was --

2         TONY LYONS:  Yeah.

3         SHARON CHURCHER:  -- having himself investigated.

4         TONY LYONS:  Yeah.  I mean, wouldn't Biden want

5    to know if there's any possibility that somebody's

6    going to come out of the woodwork, and wouldn't people

7    who are going to back him and fund him, wouldn't the

8    Democratic party want --

9         SHARON CHURCHER:  (Inaudible) they are doing it.

10   (Inaudible).  Ordinary people aren't doing it.

11        TONY LYONS:  Right.

12        SHARON CHURCHER:  You and me --

13        TONY LYONS:  They would -- they would have to do

14   it because they don't want to have all their eggs in

15   that basket --

16        SHARON CHURCHER:  Oh, exactly.

17        TONY LYONS:  -- if it's going to go to hell.

18        SHARON CHURCHER:  No, it's pretty common.  What

19   it used to just be was the -- you know, the

20   (inaudible) rival, but now they're sort of doing it to

21   themselves to see if they're vulnerable.

22        TONY LYONS:  Yeah.

23        SHARON CHURCHER:  And I can ferret one or two

24   people who would know how that would work.

25        TONY LYONS:  Okay, why don't we get a couple of

1   other people in here?  I want to ask a woman here who

2   would probably work on it because I don't think we

3   would want a guy to edit a book like this.

4        SHARON CHURCHER:  Why?

5        TONY LYONS:  I just think -- I think we even want

6   to --

7        SHARON CHURCHER:  I think you should do both.

8        TONY LYONS:  Oh, you mean on the authorship side.

9   Oh --

10        SHARON CHURCHER:  No, no, even on the editing --

11        TONY LYONS:  Oh the editorial side, okay.

12        SHARON CHURCHER:  I really do, actually, because

13   otherwise, you get -- I don't think you want to get

14   stuck in (inaudible).

15        TONY LYONS:  Let me think of a couple of people.

16        SHARON CHURCHER:  (Inaudible).

17        HECTOR:  (Inaudible).

18        TONY LYONS:  Hector, can you stop in for a

19   second?

20        HECTOR:  Sure.

21        TONY LYONS:  Thanks a lot.

22        SHARON CHURCHER:  (Inaudible) Alan would do it.

23   Because I from the beginning --

24        TONY LYONS:  I have -- I have no idea whether he

25   would.

```
 1          SHARON CHURCHER:  It would be fantastic.
 2          TONY LYONS:  Maybe if he wrote like the
 3   introduction.  Like, it would only be three pages or
 4   something.  I mean, that would be enough that the two
 5   of you could get on --
 6          SHARON CHURCHER:  Like, it would.
 7          TONY LYONS:  -- a TV show.
 8          SHARON CHURCHER:  Yeah, I think it would make
 9   perfect --
10          TONY LYONS:  Because that would make a story.
11          SHARON CHURCHER:  -- idea.  Perfect.
12          TONY LYONS:  That would really be --
13          SHARON CHURCHER:  I'd love to do it.  I think -
14          TONY LYONS:  But that would be a national story,
15   wouldn't it?
16          SHARON CHURCHER:  To make this -- oh, yeah.  And
17   to make this work, you do need a name.  I said to you,
18   well, what about Richard Johnson.  No, that doesn't
19   really work.  You need something very --
20          REBECCA:  Hey.
21          TONY LYONS:  Hey, can you stop in for a second?
22          REBECCA:  Yeah, of course.
23          SHARON CHURCHER:  Yeah, because that way, we've
24   got the victim and the prosecutor, as it were.
25          TONY LYONS:  Yeah.
```

```
 1        SHARON CHURCHER:  Though I never went after Alan,
 2   as I said.
 3        TONY LYONS:  Right.
 4        SHARON CHURCHER:  All I can say is his name is
 5   not in my stories.
 6        TONY LYONS:  Yeah.  I mean, it would be -- yeah.
 7   It would be good, maybe, even to have somebody who was
 8   a victim write like an afterword or something.
 9        SHARON CHURCHER:  I suppose you could do that.
10        TONY LYONS:  You know, because then, you've got a
11   victim -- you've got somebody who is accused, and then
12   you've got you being kind of in the middle.
13        Rebecca, this is Sharon.
14        SHARON CHURCHER:  Rebecca, hi.  Nice to meet you.
15        REBECCA:  So nice to meet you.
16        TONY LYONS:  And this is Hector.
17        HECTOR:  Hello, Sharon.  Good to me.
18        TONY LYONS:  Hector, sit down.
19        SHARON CHURCHER:  (Inaudible).
20        (Overlapping voices)
21        TONY LYONS:  Yeah, so we're kind of thinking of a
22   -- of a Me Too handbook of how to act.
23        REBECCA:  Okay.
24        TONY LYONS:  Really small.  That would tell you
25   sort of all the things you would need to know, and it
```

```
 1    would also tell about some of the -- like there's a
 2    new technology Sharon was just telling me about that -
 3    - that is a consent technology.
 4         SHARON CHURCHER:  It's an app.
 5         TONY LYONS:  It's an app?
 6         SHARON CHURCHER:  It's a dating app that someone
 7    -- I don't think it's on the market yet, but I found
 8    it online.  It's -- yeah, you consent to everything.
 9    You've got to be pretty --
10         TONY LYONS:  You better be pretty sure if you do
11    that --
12         SHARON CHURCHER:  They can change their mind in
13    the app.
14         TONY LYONS:  There could be all kinds of crazy
15    liability problems.  Like what if you click consent
16    and then somebody, as soon as you click that, they
17    totally change.
18         SHARON CHURCHER:  I know.
19         TONY LYONS:  Three seconds later, right?
20         SHARON CHURCHER:  We're not saying it isn't.
21         TONY LYONS:  Yeah, yeah, yeah.
22         HECTOR:  Is that released already to the general
23    public?
24         SHARON CHURCHER:  It's -- no, I found it online -
25    -
```

Page 44

```
1          HECTOR:  I can see that at universities.

2          SHARON CHURCHER:  It may be a Swedish developer.

3   I'm not sure.  But it's -- there was a piece I found -

4   - because I sort of just Googled how is dating

5   changing in the age of Me Too.  Out popped this piece

6   on a website.  And it talked about the app and had a

7   link through to it.  It was either Sweden or somewhere

8   that it was going to be released in this country,

9   supposedly.  Yep, it's here.

10          REBECCA:  (Inaudible).

11          SHARON CHURCHER:  And then Tony raised the fact,

12   by the way, that everything you do can be monitored,

13   including your online activity.

14          TONY LYONS:  Yeah.

15          SHARON CHURCHER:  He knows a law firm that uses

16   that technology to go out and (inaudible) a few

17   clients.

18          TONY LYONS:  Yeah.  So -- no, no, no, what

19   they're actually doing is --

20          SHARON CHURCHER:  IP addresses.

21          TONY LYONS:  -- it's this -- it's some company

22   that is connected to porn sites.  And they're going

23   after really wealthy people by tracking their IP

24   addresses, finding out that they've been on these, you

25   know, kind of like pretty out-there porn sites.  And
```

```
 1   then basically extorting them but doing it legally.

 2   So basically saying -- I mean, I'm not even sure how

 3   they're doing it.  But my friend has a client and --

 4        REBECCA:  Wow, yeah.

 5        TONY LYONS:  -- so he can actually come in here

 6   and he can tell us that story.  It's Jonathan.

 7        HECTOR:  Jonathan, yeah.

 8        SHARON CHURCHER:  We could have a section, you

 9   know, profiting from Me Too, you know, how to make

10   money, you know.

11        TONY LYONS:  Right.  Because somebody can be

12   totally shamed.  So even if it's -- I mean, I don't --

13   I don't know what the sites are, specifically.  So

14   maybe they are really bad sites.  But theoretically

15   speaking --

16        (Overlapping voices)

17        SHARON CHURCHER:  (Inaudible) we're not judging

18   people.

19        TONY LYONS:  But theoretically speaking, it could

20   be, you know, the head of a big corporation, and he

21   goes to some -- he or she goes to some softcore porn

22   site, and it's not all that big a deal.  But if that

23   story came out and was in -- in the New York Post,

24   it's sort of like hurts the company, like the $10-

25   billion company is then worth $8 billion the next day.
```

```
 1        (Overlapping voices)
 2        TONY LYONS:  So I'm going to pay $25,000 to have
 3   that not happen.
 4        SHARON CHURCHER:  (Inaudible) all those names
 5   would -- people who went to Ashley Madison, I think it
 6   was called, the dating site.
 7        TONY LYONS:  Right, right.
 8        REBECCA:  They leaked all of those, yeah.
 9        SHARON CHURCHER:  And I notice now that there's
10   companies begun to advertise tours to meet ladies in
11   Ukraine.  So if you Google how to date in the age of
12   Me Too, there's one or two companies now they're
13   offering offshore --
14        TONY LYONS:  There's like so much stuff happens
15   in the Ukraine.  All the scandals take place there.
16        REBECCA:  All coming out, yeah.
17        SHARON CHURCHER:  It's all coming out now.
18   Ladies (inaudible) I don't know.
19        REBECCA:  It's very interesting.
20        HECTOR:  It's (inaudible).
21        SHARON CHURCHER:  So Tony was just thinking with
22   the Alan Dershowitz -- sort of got him to do a preface
23   to it all.
24        TONY LYONS:  I mean, it would just be wild --
25        SHARON CHURCHER:  Because (inaudible) Epstein
```

1    thing.

2         REBECCA:  Yeah.

3         TONY LYONS:  It would be wild to the extent that

4    it would be newsworthy, right?

5         SHARON CHURCHER:  Yeah, and also, it's legit.

6         TONY LYONS:  Yeah.

7         SHARON CHURCHER:  Because I told him Alan and I

8    both worked for, all of people, Bob Guccione, though

9    respectfully, we used to say.  We were the respectful

10   face of porn.

11        REBECCA:  Yeah, yeah, yeah.

12        SHARON CHURCHER:  I had an investigative column,

13   and I forget what Alan wrote about.

14        TONY LYONS:  So he was actually writing?

15        SHARON CHURCHER:  Yeah, Alan did a column there.

16   Yeah.

17        TONY LYONS:  Wow.

18        SHARON CHURCHER:  That's when I met him years

19   ago.

20        TONY LYONS:  I didn't know that.

21        SHARON CHURCHER:  Guccione used to -- actually,

22   he was a great mentor to journalists.  I mean, you

23   know, he -- the porn was on one side of his stuff.

24        TONY LYONS:  Yeah, yeah.

25        SHARON CHURCHER:  That was the trouble

1    (inaudible) articles.

2         HECTOR:  He was a maverick, Bob Guccione.

3         SHARON CHURCHER:  He was a maverick.  He was

4    great, though.  He was -- because the thing was, he

5    didn't mind about lawsuits.  Really, if you've got a

6    story, run with it.  And I forget what Alan -- Alan

7    did a monthly column.  So -- and I was telling Tony I

8    have no qualms because in my stories about all of

9    this, she named all sorts of people, but she didn't

10   name Alan.  And my lawyer said that publicly.

11        TONY LYONS:  Yeah.

12        SHARON CHURCHER:  So --

13        TONY LYONS:  And the then, the question is why

14   would she have not named Alan, like, if it was --

15        SHARON CHURCHER:  Oh, I think you know.

16        TONY LYONS:  -- if it was part of the story, she

17   would have named him.

18        SHARON CHURCHER:  She named everybody else, but,

19   I mean, that's to not say that she (inaudible), she

20   didn't know (inaudible) Senator George Mitchell.

21   That's come out now that you unseal these documents.

22        TONY LYONS:  Yeah.

23        REBECCA:  Yeah.

24        SHARON CHURCHER:  It is an incredible operation,

25   actually.

1     SHARON CHURCHER:  Because I think she's

2     blackmailing --

3          TONY LYONS:  It's crazy.

4          SHARON CHURCHER:  -- everyone of course.  That's

5     why Epstein --

6          TONY LYONS:  So you think that's where all the

7     money came from?

8          SHARON CHURCHER:  I don't know.  I've never been

9     able to prove it, but we -- we do know for sure that

10    everything was videotaped.  And if you look at some of

11    the people, I mean, she even said that.  He was

12    collecting information.  But that's -- (inaudible)

13    Wall Street.

14         TONY LYONS:  So where are all those videotapes

15    now?

16         SHARON CHURCHER:  FBI, and then, the Palm Beach

17    Police had some of them.  But the FBI, presumably, got

18    some of them.

19         TONY LYONS:  And the FBI is --

20         SHARON CHURCHER:  Because remember they raided

21    his place.

22         TONY LYONS:  -- deep sixing them all?

23         SHARON CHURCHER:  Probably.  Given who --

24         HECTOR:  Or they're waiting for a new Hoover to

25    take --

```
 1        SHARON CHURCHER:  She's changed her story about
 2   Trump, too.  It's interesting because I've written
 3   what she told me about Trump.  She's now saying she
 4   never said it, so Trump's obviously been on to her
 5   because she told me she'd lie around half naked at
 6   Mara Lago, and he say to Jeffrey, you have the life.
 7   Trump would.  And that was a very distinct quote.  I
 8   always remembered it.  We ran it, and she (inaudible)
 9   me at the time, but now, she's saying she never said
10   it.
11        TONY LYONS:  Right.
12        REBECCA:  (Inaudible), yeah.
13        SHARON CHURCHER:  Yeah, I guess, if he's
14   referenced to whatever.  Yeah, I guess he's -- so.
15        TONY LYONS:  But you were -- you were saying,
16   too, that you don't ever use the word pedo so that
17   that's --
18        SHARON CHURCHER:  No, I know, I --
19        TONY LYONS:  -- probably --
20        SHARON CHURCHER:  -- I mean, maybe I had had too
21   much to drink that night.  You know, I have no idea.
22        TONY LYONS:  Yeah, it's hard to tell.
23        SHARON CHURCHER:  I don't know, I mean --
24        TONY LYONS:  It's always hard to remember things,
25   too, but --
```

Page 51

```
 1          SHARON CHURCHER:  I don't -- that's a weird word
 2     to me.
 3          TONY LYONS:  Yeah, I would never use that.
 4          SHARON CHURCHER:  I've never heard the word, and
 5     I --
 6          TONY LYONS:  I mean, I've -- I mean, I've heard
 7     it recently, but --
 8          SHARON CHURCHER:  Or -- or --
 9          TONY LYONS:  -- I would never have said pedo.
10          SHARON CHURCHER:  -- (inaudible) it's just, yeah,
11     yeah, I don't remember speaking like that, so you know
12     --
13          TONY LYONS:  Yeah.
14          SHARON CHURCHER:  Who knows, maybe (inaudible)
15     around or something.
16          TONY LYONS:  Yeah, yeah.
17          SHARON CHURCHER:  And then picked it up from her.
18          TONY LYONS:  Yeah.  But also, you were -- you
19     were being a journalist.  You were trying to get a
20     story, and some --
21          SHARON CHURCHER:  Yeah.
22          TONY LYONS:  -- time when you're trying to get a
23     story, you want to lead things a little bit and see
24     what happens.
25          SHARON CHURCHER:  Well, some people -- some
```

1    journalists posted a lot of stuff about Alan, but it

2    was never with under-aged girls.  I don't -- you

3    probably know about that from him.  Someone posted

4    something online about him, you know, being a

5    womanizer, which, of course, men have a right to do.

6         TONY LYONS:  Yeah, I mean --

7         SHARON CHURCHER:  -- but, I mean, I -- that's

8    something --

9         TONY LYONS:  What does that even mean?

10        SHARON CHURCHER:  -- that I remember.  I remember

11   --

12        TONY LYONS:  I mean, other there's an allegation

13   of wrongdoing or there isn't.

14        SHARON CHURCHER:  -- (inaudible) big on that one.

15   They were trying to get every journalist in the

16   country to pick up on that.

17        TONY LYONS:  Right.

18        SHARON CHURCHER:  But that's all I remember.  I

19   never remember any rumors.  I just don't remember, you

20   know.

21        TONY LYONS:  Yeah.

22        SHARON CHURCHER:  I don't know.  It's -- I wonder

23   why they did it if they -- the other thing is it's a

24   weird tactic if it was made up because where does it

25   get you in the end?

```
 1            TONY LYONS:  Because they're not going to make a
 2   ton of money from Alan, right?
 3            SHARON CHURCHER:  No.  She's not going to get --
 4   yeah, so --
 5            TONY LYONS:  But she wasn't even suing Alan,
 6   right, so --
 7            SHARON CHURCHER:  Not yet.
 8            REBECCA:  But now she is.
 9            TONY LYONS:  Well, she's suing him for --
10            REBECCA:  (Inaudible).
11            TONY LYONS:  -- for defamation, yeah.
12            SHARON CHURCHER:  I mean, she -- the only danger
13   all of this is one -- I presume you've got a lawyer, I
14   just want to make very, very sure she can't make any
15   trouble.  I don't see she could.  But (inaudible) made
16   trouble out of the most bizarre little things, so just
17   want to be careful it was (inaudible), just in case
18   there's anything she might (inaudible) --
19            TONY LYONS:  Yeah.
20            SHARON CHURCHER:  -- she can sue.
21            TONY LYONS:  But then again, maybe she -- maybe
22   she's not really making any of these decisions by
23   herself.
24            SHARON CHURCHER:  No, I think -- I think --
25            TONY LYONS:  You know, because if it's just all
```

```
 1    about money, then --

 2         SHARON CHURCHER:  -- (inaudible) lawyers make the

 3    decisions, don't they?

 4         TONY LYONS:  She just, yeah.

 5         SHARON CHURCHER:  She's collected millions, you

 6    know, I think.  Because the last one was settled, the

 7    one with the (inaudible).

 8         TONY LYONS:  And so you just never know.

 9         SHARON CHURCHER:  Trump (inaudible).

10         TONY LYONS:  So you think Trump settled with her,

11    too?

12         SHARON CHURCHER:  I don't know.  I found it very

13    strange that she changed her story about Trump.

14         TONY LYONS:  Yeah.

15         SHARON CHURCHER:  But who can prove it, you know?

16         TONY LYONS:  So who else do you -- do you think

17    she would have settled with?  Are there other people

18    who've fallen off the radar?

19         SHARON CHURCHER:  I don't know.  I -- I've no

20    idea.  I found Trump (inaudible) just intimidation.  I

21    don't know.  But her lawyers are very adamant with

22    anyone who asks that Trump was a gentleman at the Mara

23    Lago (inaudible) to quote one of them, was a perfect

24    gentleman.  They sent a journalist this -- that he

25    sent --
```

1    TONY LYONS:  Maybe boys he used to go there.

2    Maybe they're pictures of him.

3        SHARON CHURCHER:  We should actually have that.

4        TONY LYONS:  Maybe there are pictures of him

5    coming in and out?

6        SHARON CHURCHER:  We have to get Mara Lago into

7    this, somehow, just to be vicious, nasty at Mara Lago.

8        TONY LYONS:  But so that would be sort of satire

9    --

10       SHARON CHURCHER:  Because --

11       TONY LYONS:  -- once again, though, like, would

12   you call the -- the Mara Lago Me Too etiquette

13   handbook.

14       SHARON CHURCHER:  It's actually clever --

15       REBECCA:  No.

16       SHARON CHURCHER:  -- (inaudible) in country some

17   kind of thing about --

18       REBECCA:  The Gentlemen's Guide to Me Too.

19       SHARON CHURCHER:  The Gentlemen's Guide to Me

20   Too.  Originally, I thought that satire would

21   translate -- people really want to know, but it's got

22   to be a little quirky, hasn't it?  Because it's so

23   absurd that it's almost impossible --

24       TONY LYONS:  Yeah.

25       SHARON CHURCHER:  -- not to get --

1      TONY LYONS:  I would put in little kind of

2   vignettes, like little stories of sort of what's the

3   scene, you know.  You're in Mara Lago, you know.

4      SHARON CHURCHER:  Yeah --

5      REBECCA:  (Inaudible).

6      TONY LYONS:  But I would -- I would not make it

7   tongue in cheek at all.

8      SHARON CHURCHER:  If you're at Mara Lago and

9   Donald walks up and presents you with a naked woman,

10  what do you do?

11     TONY LYONS:  Right.

12     SHARON CHURCHER:  I think we should do it, yes.

13     TONY LYONS:  You say there's an app here.  I'd

14  like you just to sign right here, feel free to use

15  your finger or the back of a pen.

16     REBECCA:  That's pretty (inaudible).

17     TONY LYONS:  But you know, until that's done, I

18  don't even see you.  Is there a person there?

19     SHARON CHURCHER:  I think it has to have a sense

20  of humor to it, doesn't it?  Because people are so fed

21  up with the thing, I think --

22     TONY LYONS:  But I would --

23     SHARON CHURCHER:  -- except for people who are

24  making money off (inaudible).

25     TONY LYONS:  But the -- but the humor of it has

```
 1    to be kind of deadpan, like --

 2          SHARON CHURCHER:  Yes, totally, totally.

 3          TONY LYONS:  -- like, it has to be -- you're just

 4    telling the story and then, people are laughing, but

 5    you're -- you're not --

 6          SHARON CHURCHER:  We could always hire Alan.

 7          TONY LYONS:  -- trying to make him --

 8          SHARON CHURCHER:  You could always actually hire

 9    Alan to represent you.

10          TONY LYONS:  To represent me if somebody sues.

11          SHARON CHURCHER:  We could put in, you know, list

12    of lawyers --

13          REBECCA:  (Inaudible).

14          TONY LYONS:  Alan -- Alan hasn't been on that

15    side of --

16          SHARON CHURCHER:  Yeah, but maybe there's a new

17    business here.

18          TONY LYONS:  I mean, I'm --

19          SHARON CHURCHER:  David Boies has got into it,

20    and Alan, of course, is well thought of.  She knows

21    him.

22          TONY LYONS:  Yeah.

23          SHARON CHURCHER:  Harvard lawyer, I mean, given

24    that other lawyers are getting into this.

25          TONY LYONS:  Yeah.
```

1          SHARON CHURCHER:  I mean, we can maybe have a

2    list at the end of, you know, decorating books, which

3    I'm sure you've occasionally done, in the back --

4          TONY LYONS:  Yeah.

5          SHARON CHURCHER:  -- you know, by your

6    (inaudible).

7          TONY LYONS:  Right, right.

8          SHARON CHURCHER:  We could do a list --

9          TONY LYONS:  Like the ten (inaudible) lawyers.

10         SHARON CHURCHER:  (Inaudible) we guarantee your

11   law firm, but, yeah, the ten best lawyers, yeah.

12         TONY LYONS:  Yeah.

13         SHARON CHURCHER:  Yeah.

14         HECTOR:  (Inaudible).

15         SHARON CHURCHER:  And you're going to print this

16   on proper paper, are you, like invitations, you print

17   it on nice paper, are you?

18         TONY LYONS:  Oh, sure.  I think it should --

19   should be, yeah, I don't know.  But I -- I think it

20   could be a really important book right now.

21         SHARON CHURCHER:  I think when you got the

22   demonstrators outside this building.

23         TONY LYONS:  I mean, I don't think that would be

24   something people would really care about.  This is

25   really just telling people how to act.  This is --

1        SHARON CHURCHER:  Yeah, exactly.

2        TONY LYONS:  -- this is sort of, like, it's a

3   document of the progress that's been -- been made,

4   where are we now.

5        SHARON CHURCHER:  Yeah.

6        TONY LYONS:  You know.

7        REBECCA:  That'll be (inaudible).

8        TONY LYONS:  I don't see how that would piss off

9   anybody.  I mean, maybe the -- you and Alan sort of

10  like combination there would -- but so the beauty of

11  that, if -- if he would even do it, would be that it

12  would be just a story.

13       SHARON CHURCHER:  Oh, yeah, of course.

14       TONY LYONS:  It would be covered in a hundred

15  places, right?

16       SHARON CHURCHER:  Oh, yeah, they can't not cover

17  it.

18       TONY LYONS:  Yeah.

19       SHARON CHURCHER:  I know it's like --

20       TONY LYONS:  And you would be the hero.

21       SHARON CHURCHER:  Oh, I always like being

22  (inaudible) heroine.

23       TONY LYONS:  Oh, sorry.  That's going to have to

24  be in the book.

25       SHARON CHURCHER:  We have to do language

1    (inaudible).

2         TONY LYONS:  Right, right.

3         SHARON CHURCHER:  You have no idea anymore, do

4    you?  None whatsoever.

5         TONY LYONS:  We were going to do a book on

6    personal pronouns and how that all works because it's

7    -- it's kind of complicated about what you're supposed

8    to say.

9         SHARON CHURCHER:  Well, you know about Berkley

10   now?

11        TONY LYONS:  No.

12        SHARON CHURCHER:  They're eliminating man.

13        REBECCA:  At Berkley?

14        SHARON CHURCHER:  Yeah.  They're eliminating

15   gender.  Have you not heard this?  There'll be no more

16   man.

17        TONY LYONS:  So I was at my --

18        REBECCA:  I mean, seriously, that doesn?t

19   surprise me.

20        SHARON CHURCHER:  (Inaudible) two months ago.

21        TONY LYONS:  I was at my daughter's school the

22   other day, and you know, regular New York school, and

23   they have gender-neutral bathrooms.

24        REBECCA:  Yeah.

25        TONY LYONS:  So they're co-ed bathrooms, which I

Case 1:19-cv-03377-LAP Document 631-2 Filed 12/23/20 Page 208 of 445
Case 1:20-cr-00330-PAE-AP Document 855-2 Filed 04/25/20 Page 208 of 445

Page 61

 1    -- I'd never seen that before.

 2         SHARON CHURCHER:  And I think they -- well, yeah,

 3    New York in the drug era, in the swinging era, all the

 4    nightclubs had --

 5         TONY LYONS:  Right, right, right.  That's --

 6    that's true.

 7         SHARON CHURCHER:  For other reasons.

 8         TONY LYONS:  Well, they didn't even have -- it

 9    didn't say gender neutral.  It just said bathroom.

10         SHARON CHURCHER:  Exactly.

11         TONY LYONS:  Nobody really cared, and if they --

12         SHARON CHURCHER:  My life was just like

13    (inaudible).

14         TONY LYONS:  It was Limelight --

15         SHARON CHURCHER:  (inaudible).  I remember

16    looking at Limelight (inaudible).

17         TONY LYONS:  I've walked into Limelight once in

18    about 1985.  And I was dressed in a suit and tie,

19    coming from another nightclub that I was working at,

20    and I was the only there with clothes on.  It was this

21    really weird scene.

22         SHARON CHURCHER:  It was always beautiful

23    (inaudible) boys, wasn't it?

24         TONY LYONS:  It was just, yeah, it was just like

25    a sea of people with either no -- no clothes or almost

Case 1:19-cv-03377-LAP Document 210-2 Filed 11/29/20 Page 63 of 114
Case 1:20-cr-00330-PAE Document 655-8 Filed 02/25/26 Page 209 of 445

Page 62

1    no clothes on.  That was a different world.

2        SHARON CHURCHER:  Well, I'm on board if you think

3    you can do it.

4        TONY LYONS:  Yeah, so the question is what we do

5    next?

6        SHARON CHURCHER:  Do you want to talk to Alan and

7    then, I suppose --

8        TONY LYONS:  I could call Alan.  I -- you know, I

9    don't know if he would think it was funny or if we

10   would hang up the phone on me.  I mean, I'll ask him.

11       SHARON CHURCHER:  I think it needs someone like

12   that to make it work.

13       TONY LYONS:  Yeah.

14       SHARON CHURCHER:  I really do, to, you know --

15       TONY LYONS:  I then I think it does really have

16   to be --

17       SHARON CHURCHER:  I thought it needed a name.

18   That's what I said.  It needs a name to make it work.

19       TONY LYONS:  Yeah.

20       SHARON CHURCHER:  And but my position on this

21   thing is probably like his, I just think Me Too is --

22   I just think it's absurd, and I think it's time

23   someone did this.

24       TONY LYONS:  Yeah, but I mean --

25       SHARON CHURCHER:  The people are defenseless, not

1    knowing what to do, and also, I'm sure, can you

2    imagine, though, if you are an 18-year-old kid.

3         TONY LYONS:  Yeah.  But at the same time, it's --

4    it's like -- it's a book that has -- ought to have

5    respect for all the people who really did go through

6    something horrible.

7         SHARON CHURCHER:  Yeah, I know.

8         TONY LYONS:  And that's a different thing.

9         SHARON CHURCHER:  (Inaudible) piece, then, that's

10    --

11         TONY LYONS:  That's not really about --

12         SHARON CHURCHER:  Me Too has gone way beyond that

13    now, isn't it?

14         TONY LYONS:  Yeah.

15         SHARON CHURCHER:  I think it's gone to -- and you

16    could also put that in the preface.

17         REBECCA:  Yeah, if you --

18         TONY LYONS:  Yeah.

19         REBECCA:   -- address it (inaudible).

20         SHARON CHURCHER:  You say that, you know, we

21    understand, you know --

22         TONY LYONS:  Has a big bold statement that --

23         REBECCA:  Yeah, yeah, and then, you get into what

24    you're trying to --

25         TONY LYONS:  But that the world is where -- where

1    it is now.

2         SHARON CHURCHER:  See, it used to be you slapped

3    the guy's face.  Now, you --

4         TONY LYONS:  Yeah.

5         SHARON CHURCHER:  -- post it on social media and

6    --

7         TONY LYONS:  Yeah.

8         SHARON CHURCHER:  -- (inaudible) Boies and

9    Edwards.

10        TONY LYONS:  Yeah.

11        SHARON CHURCHER:  It really has changed.  And --

12   and a lot of women have begun to -- (inaudible)

13   probably never written and said, well, this makes us

14   seem like we weaklings.

15        TONY LYONS:  Yeah.

16        SHARON CHURCHER:  So given society's changing, I

17   just think it is short and to the point and has some

18   vignettes which some of them could be real.

19        TONY LYONS:  Yeah.  Yeah, I mean -- I mean, some

20   of them could just be sort of like you're at a college

21   party, you know, X, Y, and Z, you know, you're at a

22   professional party or you're at a work party.

23        SHARON CHURCHER:  It must be pretty impossible

24   you there right now.

25        REBECCA:  It's -- it's definitely -- I think

1  people are watching what they say more than ever.

2       HECTOR:  Yeah.

3       SHARON CHURCHER:  Yeah, anyone can turn around.

4       REBECCA:  Yeah.

5       SHARON CHURCHER:  Anyone you meet on the street

6  can turn around.

7       HECTOR:  Yeah, you've done it yourself.

8       SHARON CHURCHER:  And there are things that

9  definitely happening, you know, it's -- it's for real,

10  this company's now doing fraternization policies for

11  companies.

12       REBECCA:  Um-hum.

13       TONY LYONS:  Yeah.

14       SHARON CHURCHER:  They're out there on the

15  internet.  It's obviously --

16       TONY LYONS:  We haven't done that, but it's -- I

17  mean, it hasn't felt necessary here, but --

18       SHARON CHURCHER:  We got this huge engineering

19  company that he runs a lot of this stuff, and he used

20  to just be in charge because engineer real safety, but

21  now, they're very, very worried about this.  And I was

22  -- there's all these OSHA regulations now on the

23  subject.  They're just --

24       TONY LYONS:  Yeah, so that we should -- could you

25  look at up because that's all public domain, so --

```
 1          SHARON CHURCHER:  My husband actually (inaudible)
 2    he showed it to me and it's just --
 3          TONY LYONS:  Okay.  Could you give us, like, send
 4    us a link to that?
 5          SHARON CHURCHER:  Sure, I can.
 6          TONY LYONS:  That would just be a good place to
 7    start.
 8          SHARON CHURCHER:  (Inaudible) link to the dating
 9    app too.
10          REBECCA:  Yeah.
11          TONY LYONS:  And I will find what the lawsuit
12    that my friend is working on.
13          SHARON CHURCHER:  Yeah, yeah, yeah.
14          TONY LYONS:  He's all about -- because that's a
15    pretty good vignette, sort of, you know, you, you
16    know, you have to be careful about texting, websites,
17    everything.
18          SHARON CHURCHER:  Um-hum.
19          TONY LYONS:  But then, you know, definitely a
20    good statement at the start of what progress has been
21    made and how this is going to be great for so many
22    people.  Like, I have a 14 and a 16-year-old daughter,
23    like, maybe they're not going to have to go through a
24    lot of things that millions of people have to go
25    through.
```

```
1              SHARON CHURCHER:  I think as we said, it's really
2    about that, fine, but then, it's always been --
3    there's always been problems in the workplace for us.
4              TONY LYONS:  Sure.
5              SHARON CHURCHER:  That's, you know, it's not new.
6    What's new is the fact that you can now just post --
7              TONY LYONS:  Right.
8              SHARON CHURCHER:  -- I mean, there has always
9    been that, and what I was saying --
10             TONY LYONS:  And now, there's clearly less than
11   there ever was.
12             SHARON CHURCHER:  -- (inaudible), too.
13             REBECCA:  Um-hum.
14             SHARON CHURCHER:  Like some of Weinstein's
15   accusers, one of them, she's not an accuser, but she's
16   someone (inaudible) coming for a long time, very
17   definitely gave herself to Harvey so she could get
18   something back.
19             TONY LYONS:  Yeah.
20             REBECCA:  Um-hum, um-hum.
21             SHARON CHURCHER:  I mean, that was quite --
22             TONY LYONS:  And that's called prostitution.
23             SHARON CHURCHER:  Yeah, right.  It's called a
24   casting couch in Hollywood, but yeah, that's gone on
25   forever, you know.
```

```
 1        TONY LYONS:  Yeah.

 2        SHARON CHURCHER:  And -- and so it's not -- not

 3   everyone is a victim and how is that going to be

 4   handled.

 5        TONY LYONS:  Who is that -- who is that French

 6   movie star who commented on that?

 7        SHARON CHURCHER:  Yeah, she did, she wrote a

 8   (inaudible) on it, didn't she?

 9        TONY LYONS:  I'm trying to think, yeah.

10        HECTOR:  It was a letter by -- signed by, I

11   think, 100 of the --

12        TONY LYONS:  Oh, really?  Okay.

13        HECTOR:  Some French politicians and such -- sort

14   of, like, against the Me Too or just saying --

15        TONY LYONS:  Well, the esthetic in France is

16   totally different.  Like, if a politician in France

17   sleeps with a whole bunch of people, nobody cares at

18   all.  It's not even news.

19        SHARON CHURCHER:  But it hasn't been in this

20   country, really, until now.

21        REBECCA:  Yeah.

22        SHARON CHURCHER:  It really hasn't, has it?  It's

23   --

24        REBECCA:  No.

25        SHARON CHURCHER:  I mean, you used to just -- if
```

Page 69

1    it went too far, you'd slap the guy's face.

2         TONY LYONS:  Yeah.

3         SHARON CHURCHER:  Call his wife up, you know.

4         TONY LYONS:  Yeah.

5         HECTOR:  In France, it's -- it's -- you have --

6    it's a cultural thing, the art of flirtation, you know

7    --

8         SHARON CHURCHER:  Oh, sure, no --

9         TONY LYONS:  But that's a different thing.  I

10   mean, that's -- that's different from the question of

11   consent.

12        SHARON CHURCHER:  Yeah.

13        REBECCA:  Um-hum.

14        TONY LYONS:  You know.

15        SHARON CHURCHER:  Me Too is supposed to be about

16   exploitation.

17        TONY LYONS:  Right.

18        SHARON CHURCHER:  You know, we've been exploited

19   forever, finally, we're free.

20        TONY LYONS:  But there's always been a little bit

21   of it here where if a politician has just slept with

22   somebody or is, you know, cheating on his or her

23   spouse, that that's sort of like a good enough reason

24   for them not to be a candidate or --

25        REBECCA:  Um-hum.

```
 1        TONY LYONS:  -- whereas in France, I don't think
 2   --
 3        SHARON CHURCHER:  Oh, I see your point, yeah.
 4        TONY LYONS:  -- anybody cares.  It doesn't --
 5        SHARON CHURCHER:  It has -- you're right.
 6        TONY LYONS:  Separately from consent or age.
 7        SHARON CHURCHER:  It's changed now with our
 8   current great leader.
 9        TONY LYONS:  Just sex.  Right.
10        SHARON CHURCHER:  Well, I mean, that's the other
11   thing.  People aren't getting away with it now quite
12   by being more open.  In a weird way the way to get
13   away with it, I suppose we could use Trump as an
14   example is you just --
15        REBECCA:  (Inaudible).
16        SHARON CHURCHER:  -- very out there with it.
17        REBECCA:  Yeah.
18        SHARON CHURCHER:  Totally out there, which is
19   what he is, isn't it?  You know, just tweet something.
20   It's going to civil war (inaudible).
21        TONY LYONS:  Right, right.  That was kind of a
22   crazy statement.
23        HECTOR:  Yeah.
24        SHARON CHURCHER:  We hope.
25        HECTOR:  It originated from a preacher, from a --
```

```
 1        TONY LYONS:  Oh, really?

 2        SHARON CHURCHER:  It did?

 3        TONY LYONS:  Oh, so he was just -- he was

 4   retweeting something?

 5        HECTOR:  Yeah, it was just --

 6        TONY LYONS:  Oh, okay.

 7        HECTOR:  -- a fundamentalist guy that goes into

 8   the White House all the time.  He's a spiritual

 9   advisor.

10        SHARON CHURCHER:  (Inaudible).  He did?

11   (Inaudible).

12        HECTOR:  (Inaudible).

13        SHARON CHURCHER:  (Inaudible).

14        TONY LYONS:  I don't know.

15        SHARON CHURCHER:  Was (inaudible) -- I mean, the

16   only agent I've talked to about this, I think I told

17   you, said, you know, it was against it was Frank Wyman

18   -- do you guys get along or not?

19        TONY LYONS:  Wyman?

20        SHARON CHURCHER:  I don't really have --

21        TONY LYONS:  I'm trying to think what my last

22   contact with Wyman is.

23        SHARON CHURCHER:  I'm not really formally

24   represented right now.

25        TONY LYONS:  We have definitely done deals with
```

1    Wyman.  Let me see when the last --

2         SHARON CHURCHER:  The other agent I've been doing

3    just about a novel, Irene Goodman.  But Frank, I did

4    talk to a year ago about this idea, and that's when he

5    got very hostile to it after initially liking it.

6         TONY LYONS:  Yeah, I haven't been in touch with

7    Wyman --

8         SHARON CHURCHER:  He's changed.  He (inaudible)

9    literary.

10        TONY LYONS:  Yeah.

11        SHARON CHURCHER:  (Inaudible).

12        TONY LYONS:  But last time I was in touch with

13   Wyman was three years ago.

14        SHARON CHURCHER:  Once you know where (inaudible)

15   someone like that talk to you.

16        TONY LYONS:  Yeah.

17        SHARON CHURCHER:  Since you might (inaudible).

18        TONY LYONS:  So --

19        SHARON CHURCHER:  I last talked to Dylan about

20   your imprints.

21        TONY LYONS:  Oh, yeah.

22        SHARON CHURCHER:  Dylan (inaudible).

23        TONY LYONS:  Yeah.

24        SHARON CHURCHER:  He had a very generous offer to

25   me.

Case 1:20-cr-00330-PAE   Document 833-8   Filed 01/25/26   Page 220 of 445

1    TONY LYONS:  What did he say?

2    SHARON CHURCHER:  The very generous offer was I

3    was going to indemnify him.  Him.

4    TONY LYONS:  Oh, yeah.

5    SHARON CHURCHER:  You know his idea was he was

6    going to use all these on National Enquire

7    (inaudible).

8    TONY LYONS:  Yeah.

9    SHARON CHURCHER:  And he suddenly must have got

10   worried because we were talking about it, and then he

11   sent me a contract from his company, whatever it is.

12   And I suddenly noticed it said that I would indemnify

13   him.

14   TONY LYONS:  We had that problem once.

15   SHARON CHURCHER:  I said, Dylan, you're giving me

16   material to use to write this.  I can't indemnify you.

17   I don't know where you got it from.

18   TONY LYONS:  Yeah.  It seems like --

19   SHARON CHURCHER:  It's a good idea, though.

20   TONY LYONS:  We had that same kind of problem

21   with -- a couple of years ago in that that was our

22   standard contract.  So to change that meant that we

23   had to send it out to some lawyer.

24   SHARON CHURCHER:  Here, he was giving people -- I

25   think it's pretty standard.  You are not going to rip

1   people off.  But, no, remember Dylan was going to give

2   the writers the files to write from.  So if you're --

3        TONY LYONS:  So if he's giving them all of the

4   information versus --

5        SHARON CHURCHER:  How can he -- I don't know

6   where his stuff is coming from.

7        TONY LYONS:  -- so you wouldn't be researching

8   it?  You would just be using --

9        SHARON CHURCHER:  His ideas.

10        TONY LYONS:  His --

11        SHARON CHURCHER:  To write it.  Which actually

12   wouldn't be me anyway.  Is he still doing his -- the

13   other book about the Enquirer or is that not coming

14   off?  He showed me the cover.

15        TONY LYONS:  Which one?  The --

16        SHARON CHURCHER:  The one where he was going to

17   talk about -- oh, what do they call it, paying

18   everyone off, yeah.

19        TONY LYONS:  Catch and kill?

20        SHARON CHURCHER:  Catch and kill.  Yeah, yeah.

21        TONY LYONS:  I'm not sure about that one.

22        SHARON CHURCHER:  He showed me a cover.

23        TONY LYONS:  Yeah.  There was a cover.

24        SHARON CHURCHER:  I kept it quiet.

25        TONY LYONS:  Yeah.

```
 1        SHARON CHURCHER:  The Wall Street Journal kept
 2   calling me up and wanting to talk about the Enquirer.
 3   He's so tempted.
 4        TONY LYONS:  Yeah, there's nothing there, but --
 5        SHARON CHURCHER:  You're not doing catch and
 6   kill, then?
 7        TONY LYONS:  Well, yeah --
 8        REBECCA:  There's a book called Catch and Kill
 9   coming out soon.
10        SHARON CHURCHER:  With you guys.
11        TONY LYONS:  No, yeah.
12        REBECCA:  (Inaudible).
13        SHARON CHURCHER:  No, Dylan was going to write
14   one, he said.
15        TONY LYONS:  Yeah, yeah, yeah.
16        (Overlapping voices)
17        SHARON CHURCHER:  Oh, Ronin.
18        REBECCA:  Yeah, he's coming out.
19        SHARON CHURCHER:  I'm sure he'll lie.  He made
20   (inaudible).
21        TONY LYONS:  But there's a --
22        SHARON CHURCHER:  It's really something.
23        TONY LYONS:  There's an Epstein book coming out.
24        SHARON CHURCHER:  Oh there is?
25        REBECCA:  Yeah.
```

```
 1          SHARON CHURCHER:  By who?

 2          TONY LYONS:  The -- by Dylan.

 3          SHARON CHURCHER:  Dylan's doing Epstein?

 4          HECTOR:  (Inaudible).

 5          SHARON CHURCHER:  Dylan Howard, you mean?

 6          TONY LYONS:  Yeah.

 7          SHARON CHURCHER:  Huh.

 8          TONY LYONS:  Wait.  Let me just see --

 9          SHARON CHURCHER:  For you?

10          TONY LYONS:  Yeah.

11          SHARON CHURCHER:  This might be a crime thing.

12          TONY LYONS:  Yeah.

13          SHARON CHURCHER:  Crime thing.  Oh, okay, very

14     nice.

15          TONY LYONS:  Let me see.  Wait, where is that?

16          (Overlapping voices)

17          HECTOR:  They gave us the wrong resolution --

18          REBECCA:  (Inaudible).

19          SHARON CHURCHER:  I think it will be great fun.

20          REBECCA:  I think it will be --

21          (Overlapping voices)

22          SHARON CHURCHER:  But I think it does need

23     someone like Alan on it.  If it's not Alan, it has to

24     be someone, I think.

25          REBECCA:  Yeah.
```

```
1          TONY LYONS:  It's definitely got to be somebody.

2          REBECCA:  Yeah, but I think it's nice having

3    (inaudible).

4          SHARON CHURCHER:  Oh, yeah.

5          REBECCA:  We'll --

6          TONY LYONS:  Oh, yeah.  Here it is.  Okay.

7          SHARON CHURCHER:  I've done a ton over the years,

8    too, so I'm assuming (inaudible).

9          REBECCA:  Yeah.  Yeah.

10         SHARON CHURCHER:  I broke the story of

11   (inaudible) when I was at Penthouse.  Do you remember

12   that Strom Thurmond.  He had a secret love child?

13         TONY LYONS:  Yeah.

14         SHARON CHURCHER:  That was mine.  So I mean, I've

15   got a history of --

16         TONY LYONS:  That was a good story.

17         SHARON CHURCHER:  So if one is doing --

18         TONY LYONS:  I liked that story.

19         SHARON CHURCHER:  -- there's a ton of that stuff

20   out there.

21         REBECCA:  Yeah.

22         TONY LYONS:  Okay, so this is it.  Dead Man Tell

23   No Tales.  It's a -- it's a tie in with a seven-part

24   podcast.  Okay.

25         REBECCA:  Bye.  It's nice meeting you.  We'll
```

 1   talk soon.

 2       SHARON CHURCHER:  That's a great title.  I like

 3   it.

 4       TONY LYONS:  Yeah, do do you know who they are?

 5       SHARON CHURCHER:  (Inaudible) used to run Radar

 6   for him, right?

 7       TONY LYONS:  Okay, yeah.

 8       SHARON CHURCHER:  And James Robertson used to --

 9   does still work for the Enquirer, right?

10       TONY LYONS:  I'm not really sure.

11       SHARON CHURCHER:  British guy.

12       HECTOR:  Yeah, he's now running a number of their

13   (inaudible).

14       TONY LYONS:  Okay.  Yeah, I don't know if it says

15   that, but.

16       SHARON CHURCHER:  I don't know if Dylan is still

17   with the company or not, do you?

18       TONY LYONS:  I don't know.

19       SHARON CHURCHER:  It's very tangled, isn't it?

20       HECTOR:  (Inaudible).

21       TONY LYONS:  I'm not sure what the current status

22   is, and I haven't really asked him about it.

23       SHARON CHURCHER:  So he's basically just

24   enlisting people, isn't he, to do this stuff.

25       TONY LYONS:  Yeah.

```
 1        SHARON CHURCHER:  Melissa sort of vanished.  I
 2   didn't know what happened to her.  She's very bright.
 3   I think she's sort of a Yaley or something, but she's
 4   a very smart woman.
 5        TONY LYONS:  I have never met her.  And I haven't
 6   -- I mean, I'm not sure if I've met James.  Was James
 7   at the Diana party?
 8        HECTOR:  I don't think so.
 9        TONY LYONS:  No?
10        HECTOR:  He's 27 years old, 28 years old.
11        SHARON CHURCHER:  He used to work for a guy
12   called Mark Cohen, who you may not know, but it's one
13   of the big Hollywood (inaudible) running around for
14   them.  Melissa's very smart.  But I guess for you
15   (inaudible) --
16        TONY LYONS:  It's kind of a nice.
17        SHARON CHURCHER:  -- be very careful.  Yeah,
18   sure, people just bringing stuff in.
19        TONY LYONS:  Yeah.  I mean, yeah.  I don't know
20   how it's all working, but --
21        SHARON CHURCHER:  You know who did Epstein before
22   is James Patterson.
23        TONY LYONS:  Yeah, yeah.
24        HECTOR:  (Inaudible).
25        TONY LYONS:  Yeah, that was --
```

Case 2:19-cv-00330-PAE-P Document 55-2 Filed 02/25/26 Page 227 of 445

```
 1        SHARON CHURCHER:  And of course it did well just
 2   because it was Patterson.
 3        TONY LYONS:  But that was fiction, right?
 4        SHARON CHURCHER:  Oh, it was fiction, but it was
 5   not sold as fiction.
 6        TONY LYONS:  Sort of.
 7        HECTOR:  No.
 8        SHARON CHURCHER:  No, it was not fiction.  It was
 9   sold as nonfiction.
10        TONY LYONS:  Really?
11        HECTOR:  (Inaudible).
12        SHARON CHURCHER:  John Connelly, do you know John
13   Connelly?
14        TONY LYONS:  Yeah.
15        SHARON CHURCHER:  John did it for him.
16        HECTOR:  It sold 87,000 copies.
17        SHARON CHURCHER:  (Inaudible) as you know.
18        TONY LYONS:  Yeah, Patterson doesn't do any of
19   his writing now, right?
20        SHARON CHURCHER:  No, he has a writing
21   (inaudible).
22        TONY LYONS:  But it's sort of like his own
23   publishing empire.
24        SHARON CHURCHER:  Yeah, yeah.  Totally.  No, it
25   was interesting because --
```

1        TONY LYONS:  Filthy rich (inaudible).

2        SHARON CHURCHER:  -- they asked if they could buy

3    my files.  I remember.  Because that was their idea.

4        TONY LYONS:  (Inaudible).

5        SHARON CHURCHER:  (Inaudible) buy anything.  Just

6    took a bunch of stuff and cut and pasted.

7        TONY LYONS:  When did this even come out?

8        SHARON CHURCHER:  (Inaudible).  You should get

9    Patterson to do the --

10       TONY LYONS:  That was in 2016.

11       SHARON CHURCHER:  Wow.  It's that long ago now.

12       TONY LYONS:  Yeah.

13       SHARON CHURCHER:  It wasn't a very good book.

14       TONY LYONS:  Got a --

15       SHARON CHURCHER:  It was Patterson.

16       TONY LYONS:  Got a blurb from Lee Child.

17       SHARON CHURCHER:  I think -- I think this is

18   going to depend on whether you can find someone as

19   controversial as Dershowitz to be part of it.  I think

20   you need that for this.  You need -- you really -- it

21   needs a bit of gravitas.  It needs -- it doesn't just

22   need a journalist doing a book like this.

23       TONY LYONS:  Yeah.  That would be great.

24       SHARON CHURCHER:  I said that from the beginning.

25   Because I had an idea of doing it a year or two ago

 1    and couldn't make it work.  I was going to do a
 2    satire, but I couldn't make it work regardless.  I
 3    felt it needed a name.
 4         TONY LYONS:  Yeah, I don't think the satire
 5    works.
 6         SHARON CHURCHER:  I was at the Wall Street
 7    Journal with John Cooney, and he used to do books
 8    about the economy, and he would just go out there and
 9    find an economist, and that would be the first name.
10    After that he --
11         TONY LYONS:  There's a lot of publishing like
12    that now.  There's a company in California that does a
13    lot of really quick books.  And they just come up with
14    a list of topics, and they hire a bunch of writers.
15    They don't pay anything upfront but they give a really
16    good royalty.
17         HECTOR:  (Inaudible).
18         TONY LYONS:  And they don't risk anything.
19         HECTOR:  Forwards or --
20         TONY LYONS:  No.  No, they just use people who
21    are close to the subject matter.
22         SHARON CHURCHER:  The fact is (inaudible) I
23    think.
24         TONY LYONS:  I think so too.
25         SHARON CHURCHER:  I mean, honestly, I think we're

```
 1   wasting our time (inaudible).

 2        TONY LYONS:  Yeah.

 3        SHARON CHURCHER:  And then the problem is Alan's

 4   going to want much more money.  So much money I won't

 5   get any of this.  So you'll have to --

 6        TONY LYONS:  I don't know because maybe -- maybe

 7   --

 8        (Overlapping voices)

 9        TONY LYONS:  -- he would want to do it.  Who

10   knows?

11        SHARON CHURCHER:  He might not want to do it, but

12   the -- I was thinking back over the names of exposed

13   (inaudible).

14        TONY LYONS:  Yeah.

15        SHARON CHURCHER:  I may have done some Clinton.

16   I did Barak Obama's mistress, but that's too dangerous

17   because she's sued.

18        TONY LYONS:  Yeah, yeah.

19        SHARON CHURCHER:  He had a look alike for

20   Michelle that he was having an affair with, and she

21   was on his payroll.  (Inaudible), his campaign

22   payroll.

23        HECTOR:  Wow.

24        TONY LYONS:  But so -- yeah, so you guys like

25   somebody who has uncovered these kinds of things.
```

1    Alan, who is a victim of it.

2         SHARON CHURCHER:  Yeah, and he really is a

3    victim.  I've got no qualms.

4         TONY LYONS:  Yeah.

5         SHARON CHURCHER:  Because again, I got

6    represented by a lawyer who said it publicly.  She

7    said that --

8         TONY LYONS:  Yeah.

9         SHARON CHURCHER:  She never told Sharon this.

10        TONY LYONS:  Yeah, it's just weird that it's

11   still kind of spinning around.

12        SHARON CHURCHER:  It's spinning around because

13   the woman is suing everybody, you see.

14        TONY LYONS:  Yeah.

15        SHARON CHURCHER:  So she's now suing Alan.  I

16   don't know if you knew that.

17        TONY LYONS:  Yeah.  No, no, no, I --

18        SHARON CHURCHER:  She sues him for (inaudible).

19        TONY LYONS:  I saw that, yeah.  So --

20        SHARON CHURCHER:  The idea is that he will then

21   pay her off.  It's just openly -- this really is

22   blackmail.

23        TONY LYONS:  Well, because what's happening, it's

24   going to cost him so much money that he gets put in

25   the position where he's better off --

1      SHARON CHURCHER:  Just giving her --

2      TONY LYONS:  I don't think he's going to do that

3  because he's not willing to have his legacy sort of

4  tarnished by this, you know.  He's 81 years old --

5      SHARON CHURCHER:  And she'll just move on to

6  other people if she gets away with that one too.

7      TONY LYONS:  She has plenty of people to go

8  after, right?

9      SHARON CHURCHER:  Well, apparently.  She's a big

10  spender.  She's spent so much money.  Because you see,

11  Epstein paid her off.

12      TONY LYONS:  Oh, okay.

13      SHARON CHURCHER:  She had settled with Epstein,

14  and amazingly, there's a legal opinion that I could do

15  my stuff, even though she'd taken all this money.

16  She'd taken half a million, I think it was.

17      TONY LYONS:  Wow.

18      SHARON CHURCHER:  Amazingly, she could break her

19  no talking agreement because of the First Amendment.

20  You can't really settle with anyone.

21      TONY LYONS:  Right, right.  So --

22      SHARON CHURCHER:  A lot of people don't realize

23  that.

24      TONY LYONS:  Basically -- yeah, lots of people

25  don't recognize that you can't ever sign away your

1   constitutional rights.

2        SHARON CHURCHER:  Yeah.

3        TONY LYONS:  So you can sign documents all day

4   long.

5        SHARON CHURCHER:  So paying these people off is a

6   waste of money --

7        TONY LYONS:  It's your constitutional right.

8   Then you always have it.

9        SHARON CHURCHER:  Actually, that should be part

10  of that.  You should never pay off.  It's a waste of

11  money.

12       TONY LYONS:  Although, you know, it's hard to say

13  because a lot of people probably have gotten out of a

14  lot of trouble by -- by doing that.

15       SHARON CHURCHER:  Yeah, I think (inaudible).

16       TONY LYONS:  But nowadays, I think people do just

17  come back time after time.

18       SHARON CHURCHER:  Time again, yeah.

19       TONY LYONS:  Because why not?

20       SHARON CHURCHER:  Yeah.

21       TONY LYONS:  And -- and in this climate, nobody's

22  going to look down on that.  It just looks like

23  bravery.

24       SHARON CHURCHER:  Well, as I said --

25       (Overlapping voices)

1    SHARON CHURCHER:  I think I've got respect for

2  him, anyway, just from all those years ago.  People I

3  know who respect him, so.   You know, it's an Epstein,

4  to be very honest, (inaudible) sometimes, and these

5  girls were hookers.

6    TONY LYONS:  I don't know.

7    SHARON CHURCHER:  I'm afraid.  They weren't

8  children.

9    TONY LYONS:  Well, it seems like she was older,

10 right?

11    SHARON CHURCHER:  (Inaudible) story was more

12 about someone who gets huge amounts of money from

13 British public chumming around, you know, and have sex

14 with someone.

15    TONY LYONS:  Yeah.

16    SHARON CHURCHER:  In the end, people sort of

17 seeing, you know, these are not children.

18    TONY LYONS:  Yeah.

19    SHARON CHURCHER:  I don't know what Alan's told

20 you, but --

21    TONY LYONS:  I have no idea.

22    SHARON CHURCHER:  You may not have discussed it

23 with him, but Epstein's women were -- he basically he

24 had prostitutes.  He didn't really have -- where he

25 really misbehaved was with the children down in the

```
 1   Florida, the schoolgirls.

 2        TONY LYONS:  Yeah.

 3        SHARON CHURCHER:  It was two sides to his

 4   operation -- the women he was pimping out like

 5   Virginia Roberts, who were women like in their late

 6   teens.

 7        TONY LYONS:  How old was she, really?

 8        SHARON CHURCHER:  Well, she lied.  She told me

 9   that she -- she took a year off.  She -- she

10   apparently was 16, not 15, when she was recruited.

11   But she'd be on the game for about a year then.

12        TONY LYONS:  So she started off as 15 and then --

13        SHARON CHURCHER:  She -- it turned out she was 16

14   when she was recruited by Epstein.  So she --

15        (Overlapping voices)

16        SHARON CHURCHER:  He had two operations.  He was

17   a very sick man in terms of -- he loved these

18   schoolgirls giving him erotic massages.  Then he had

19   this totally separate thing going where he was

20   basically pimping out beautiful young women to very

21   powerful men.

22        TONY LYONS:  So then Roberts would have been 17

23   for --

24        SHARON CHURCHER:  By the time with ████████ --

25   by the time she was flown to London -- and that's the
```

```
1    current federal investigation.
2         TONY LYONS:  Yeah.
3         SHARON CHURCHER:  In London, she was the age of
4    consent.  But she was flown out of Florida, where she
5    was under the age of consent.  So it's one of those
6    wonderful investigations --
7         TONY LYONS:  Transportation across --
8         (Overlapping voices)
9         SHARON CHURCHER:  -- not probably go very far.
10        TONY LYONS:  Yeah.
11        SHARON CHURCHER:  But apparently they're now
12   looking for "other victims".  I don't know if you saw
13   that in the New York Post.
14        TONY LYONS:  No.
15        SHARON CHURCHER:  It's --
16        TONY LYONS:  I just haven't had enough time to
17   read.
18        SHARON CHURCHER:  I just think it's the timing --
19        TONY LYONS:  Keep track of it all.
20        SHARON CHURCHER:  (Inaudible).  It's good that
21   you're doing the current book.  Dershowitz is writing
22   his own thing about how (inaudible).
23        TONY LYONS:  Yeah, yeah.  Dershowitz, you know --
24        SHARON CHURCHER:  (Inaudible).
25        TONY LYONS:  Doesn't have a cowriter.
```

```
 1          SHARON CHURCHER:  Is (inaudible) doing that still
 2     or can he not do it?
 3          TONY LYONS:  What?
 4          SHARON CHURCHER:  Roger Stone told me he was
 5     going to do a book for you.  Because I know Roger.
 6          TONY LYONS:  About?
 7          SHARON CHURCHER:  Oh, it's ruined his life.  The
 8     whole Trump thing.
 9          TONY LYONS:  Oh, yeah.
10          SHARON CHURCHER:  (Inaudible) victim.  Is he not
11     doing it now, I guess?
12          TONY LYONS:  He -- as far as I know, we're not
13     going to be doing it, but --
14          SHARON CHURCHER:  Yeah.  No, he's going to go to
15     prison isn't he, probably.
16          TONY LYONS:  That's happening.  I mean, his case
17     is coming up soon, right?
18          SHARON CHURCHER:  Yeah, yeah, yeah.  I've known
19     Stone forever.  It's --
20          TONY LYONS:  Wait, let me just see -- what's that
21     other one I was going to look up?
22          HECTOR:  Dershowitz.
23          TONY LYONS:  No.
24          HECTOR:  Just talking about it.
25          SHARON CHURCHER:  You were talking James
```

1   Patterson's done Epstein.

2        TONY LYONS:  Yeah.

3        SHARON CHURCHER:  No one's done a how-to yet for

4   Me Too.  Once you start talking about it, it's pretty

5   obvious, I suppose.

6        TONY LYONS:  Yeah.  I don't think there could be

7   --

8        (Overlapping voices)

9        SHARON CHURCHER:  -- you really have to have a

10  name.  I wouldn't do it otherwise.  A waste of time.

11       TONY LYONS:  Let me talk to Alan about it.  It'll

12  be a fascinating conversation.

13       SHARON CHURCHER:  And one would have to give him,

14  I assume, some kind of writing approval (inaudible) or

15  something.

16       TONY LYONS:  Yeah.

17       SHARON CHURCHER:  I think he's going to want

18  that, if I were him, anyway.

19       TONY LYONS:  Yeah.

20       SHARON CHURCHER:  Doesn't bother me.  As long as

21  he doesn't (inaudible).

22       TONY LYONS:  Alan writes and thinks very, very

23  quickly.  This -- this book that he wrote now, I

24  think, took him about a month.

25       SHARON CHURCHER:  It's great -- it's good that

1    he's done it.  I thought it was --

2         TONY LYONS:  Yeah.

3         SHARON CHURCHER:  I think it should do well,

4    shouldn't it?

5         TONY LYONS:  I have no idea.  I mean, we've just

6    announced it now, basically.

7         SHARON CHURCHER:  It was nice --

8         TONY LYONS:  It's not even up yet.

9         SHARON CHURCHER:  It was nice it was done that

10   way because it could have gone two ways that people

11   just not wanting, you know, he's the bad boy or

12   something.

13        TONY LYONS:  Yeah.

14        SHARON CHURCHER:  It is pretty extraordinary,

15   isn't it, the whole thing with him.

16        TONY LYONS:  Yeah.  But it would be -- it would

17   be great if -- if he could really be exonerated, you

18   know --

19        SHARON CHURCHER:  He can't be.  By definition --

20   the whole problem is you can't be.

21        TONY LYONS:  Right.

22        SHARON CHURCHER:  I mean, that's the whole

23   problem with all this.  There is no way.  How do you

24   do it?

25        TONY LYONS:  Right.

```
 1        SHARON CHURCHER:  You can't prove --

 2        TONY LYONS:  You can't prove a negative, right?

 3        SHARON CHURCHER:  It's --

 4        TONY LYONS:  Yeah.

 5        SHARON CHURCHER:  It's just --

 6        TONY LYONS:  How do you prove that you didn't do

 7   something when there's no proof that you did.

 8        SHARON CHURCHER:  The fact that she had to ask me

 9   --

10        TONY LYONS:  Nothing is --

11        SHARON CHURCHER:  The fact that she had to ask me

12   who to name, I mean, I think he's right.  But I'm not

13   positive I remember this email.  But then I can't

14   prove that either, you see.

15        TONY LYONS:  Right.  So she might have that

16   email.

17        SHARON CHURCHER:  (Inaudible).  I talked to my

18   lawyers.  I said, you know --

19        TONY LYONS:  That's on --

20        HECTOR:  (Inaudible).

21        SHARON CHURCHER:  (Inaudible) I changed it.

22        TONY LYONS:  No, that's on --

23        HECTOR:  (inaudible).

24        SHARON CHURCHER:  If you open your laptop --

25        TONY LYONS:  I think so.
```

1          SHARON CHURCHER:  -- you can edit emails.  I
2      wanted to try it, and you can do it.
3          TONY LYONS:  Oh really?
4          SHARON CHURCHER:  Oh, yeah.
5          TONY LYONS:  So then how do you even --
6          SHARON CHURCHER:  But how do you prove that?
7          TONY LYONS:  Yeah, yeah, see look.  It's here.
8      Actually here now.
9          HECTOR:  Yeah.
10         TONY LYONS:  Let's see if it's moving at all.  So
11     Kindle is there.
12         HECTOR:  It's number one on what?
13         TONY LYONS:  It was just because of the post.  So
14     it's not --
15         SHARON CHURCHER:  That's nice, though.  I guess
16     Kindle doesn't make money or --
17         TONY LYONS:  Kindle -- Kindle ranking -- I mean,
18     it's not coming out for a month and a half.  But at
19     least it's sort of like started now.
20         SHARON CHURCHER:  Something like this, you could
21     get a sale.  You think something like this if you put
22     it in the right places to sell it -- yeah, people
23     would look it up, wouldn't they?  You're right.
24         TONY LYONS:  I think it's -- wait a second.
25         SHARON CHURCHER:  (Inaudible) pick up something

```
 1   like this.

 2        TONY LYONS:  This is the wrong cover.

 3        HECTOR:  Oh.

 4        TONY LYONS:  We should get that fixed right away.

 5        HECTOR:  Okay.

 6        TONY LYONS:  What is Brian's -- that's

 7   (inaudible).  Brian -- stuff is endless.  Oh, today's

 8   Wednesday.  He's not here.

 9        HECTOR:  (Inaudible).

10        TONY LYONS:  Yeah, Orin is 200?

11        ORIN:  Hello?

12        TONY LYONS:  Yeah, could you call Brian and tell

13   him that he fed out the wrong cover?

14        ORIN:  Yeah, absolutely.  Which one is that out?

15        TONY LYONS:  The one that says Me Too and

16   Epstein.

17        ORIN:  Gotcha.  Okay.

18        TONY LYONS:  Because it has nothing to do with

19   Epstein.

20        ORIN:  I'll get it pushed through, the right one.

21        TONY LYONS:  Yeah.

22        SHARON CHURCHER:  I saw that, yeah.

23        TONY LYONS:  Yeah, that's --

24        SHARON CHURCHER:  That's totally wrong, isn't it?

25        TONY LYONS:  Let's see.  Oh, yeah, it's weird.
```

```
 1    Thanks a lot.

 2         ORIN:  Yeah, no problem.  See you.

 3         TONY LYONS:  Wait, Orin?

 4         ORIN:  Yeah, Tony?

 5         TONY LYONS:  So it's right on -- on one spot, and

 6    when you click on the Kindle, it's wrong.

 7         ORIN:  Okay.  If you have it up on your computer,

 8    can you send me a quick link, and I'll get it to

 9    Brian, as well?

10         TONY LYONS:  I don't know how to do that.

11         ORIN:  Okay, no worries.  I'll find it on Amazon.

12         TONY LYONS:  Sorry about that.

13         ORIN:  It's not a huge deal.

14         TONY LYONS:  All right.

15         ORIN:  Okay.

16         SHARON CHURCHER:  So I can --

17         TONY LYONS:  Showing my age.

18         SHARON CHURCHER:  -- my husband pulled out that

19    OSHA stuff --

20         TONY LYONS:  That's great.

21         SHARON CHURCHER:  I've got the dating app stuff,

22    and I found that fraternization stuff.  There's loads

23    of stuff around.  So the end, it's going to be being a

24    bit creative and throwing in some big names, isn't it,

25    (inaudible).
```

```
 1        TONY LYONS:  Yeah.  But just for the vignettes

 2   and --

 3        SHARON CHURCHER:  It has to have (inaudible)

 4   probably or something.

 5        TONY LYONS:  Yeah.

 6        SHARON CHURCHER:  Just change the type face,

 7   right?

 8        TONY LYONS:  I would -- I would say we -- you

 9   know, we get quotes from a whole bunch of lawyers on

10   all sides of it and --

11        SHARON CHURCHER:  I quite like that, actually,

12   yeah.

13        TONY LYONS:  Really just try to -- you know,

14   maybe even some politicians, what do politicians have

15   to say about it.

16        SHARON CHURCHER:  Yeah, some might play along,

17   right?  But you'd use -- you know, I'd use those at

18   the beginning of little sections --

19        TONY LYONS:  Yeah.  I would make it relatively

20   short.  You know, like 5 -- 5 by 7 or something like

21   that.  What is it, 5 1/4 by 7 1/2, something like

22   that.  With rounded corners and just like a real

23   handbook.

24        SHARON CHURCHER:  Are you going to make it

25   illustrated or not?  P.J. O'Rourke on his one on
```

1    manner did, but I don't know on this one.

2         TONY LYONS:  I don't think so because I think it

3    kind of just makes it comic.

4         SHARON CHURCHER:  Yeah, yeah.  So the idea is

5    we're going to keep this just on the side of being --

6    you know, maybe ridiculous.  But it started out,

7    obviously, as people suffered.  But it's become a --

8         TONY LYONS:  Yeah.  But this is -- this is sort

9    of like what the rules are.  So some people could view

10   it as how to protect yourself, but I think it's better

11   to just say where has the world gotten to now.  And

12   you know, so then nobody is pissed off because on the

13   one hand, it's -- it's sort of codifying what's been

14   accomplished that the rules in -- in work, the rules

15   in social contexts have all changed.

16        SHARON CHURCHER:  We're talking about the way it

17   is, you mean.  We're not passing judgment.

18        TONY LYONS:  Right.

19        SHARON CHURCHER:  Just talking about the way it

20   is.

21        TONY LYONS:  So there's no judgment, and what are

22   the things that --

23        SHARON CHURCHER:  So if we did a dating app --

24        TONY LYONS:  -- you do to protect yourself.

25        SHARON CHURCHER:  (Inaudible).

```
 1          TONY LYONS:  Yeah.

 2          SHARON CHURCHER:  Download this app.

 3          TONY LYONS:  Right.

 4          SHARON CHURCHER:  Yeah.

 5          TONY LYONS:  Right.  And maybe we -- I mean, if

 6   we want to be really mercenary, we can try to make a

 7   deal with that app.

 8          SHARON CHURCHER:  You mean put out an app to --

 9          TONY LYONS:  Well, where we give them a free

10   advertisement in the book, and we get them to help us

11   promote it.

12          SHARON CHURCHER:  I have a friend who drives

13   Porsches (inaudible) he got Porsche to sponsor one of

14   his books.  He got a car out of it.

15          TONY LYONS:  Yeah.

16          SHARON CHURCHER:  They just had --

17          TONY LYONS:  I think that's great.

18          SHARON CHURCHER:  -- (inaudible) all the way

19   through.

20          TONY LYONS:  Yeah.  I mean, that's what they do -

21   - isn't Netflix starting to do that sort of thing?

22   Because there's --

23          HECTOR:  (Inaudible).

24          TONY LYONS:  Yeah, because they're not doing well

25   or they're having --
```

```
 1          SHARON CHURCHER:  So do I get a (inaudible)
 2     budget for my wardrobe?
 3          TONY LYONS:  I don't know.  Subject to
 4     negotiation.  But if we can get --
 5          SHARON CHURCHER:  We have to get someone to
 6     sponsor it.  They just provide it.
 7          TONY LYONS:  Right, right, right.
 8          SHARON CHURCHER:  The cover up.
 9          TONY LYONS:  So if we got -- yeah.
10          SHARON CHURCHER:  But I think it has to be
11     totally factual, I agree --
12          TONY LYONS:  Yeah.
13          SHARON CHURCHER:  -- and not passing judgment.
14     You just have to take it very seriously.
15          TONY LYONS:  Yeah.
16          SHARON CHURCHER:  It would be nice, wouldn't it,
17     to -- you are right -- get one or two legal opinions
18     or --
19          TONY LYONS:  I mean -- it would be great to have
20     like a section on clothing.  But -- so clothing is
21     sort of like --
22          SHARON CHURCHER:  I don't know if that's changed,
23     though.
24          TONY LYONS:  So part of the problem with clothing
25     is that it becomes sort of like -- like you're
```

```
 1    punishing people.  You know --
 2         SHARON CHURCHER:  But again --
 3         TONY LYONS:  Because you're blaming the victim
 4    for how they're dressed, right?
 5         SHARON CHURCHER:  Oh, I see.
 6         TONY LYONS:  So you don't want to do that.  But
 7    maybe you can get around that by saying, well, that's
 8    what people will say if you have a clothing section.
 9    So you have a boxed thing saying this is no way is
10    about blaming people for how they dress.  This is
11    about --
12         SHARON CHURCHER:  You're wearing -- you can't do
13    that.  You're worrying too much.  You're either going
14    to do this or you're not.
15         TONY LYONS:  I think -- I think you answer all
16    the accusations.
17         SHARON CHURCHER:  You have to just keep a
18    straight face with all this.  It's the way things are.
19    You've said that.
20         TONY LYONS:  Right.
21         SHARON CHURCHER:  If people have been, you know,
22    basically intimidated into this --
23         TONY LYONS:  Yeah.
24         SHARON CHURCHER:  -- it's not our problem.  We
25    didn't do it.
```

```
 1          TONY LYONS:  Yeah.  Okay.

 2          SHARON CHURCHER:  You have to have a hashtag for

 3     it, too, though.

 4          TONY LYONS:  Hashtag --

 5          SHARON CHURCHER:  (Inaudible).

 6          HECTOR:  (Inaudible) section on alcohol.  I mean,

 7     (inaudible) behavior both from the victim and from --

 8          SHARON CHURCHER:  Oh, I know, you're right.

 9     Drinking and drugging, yeah, totally.  I'd love that

10     section (inaudible) where it said it was teaching

11     children the metric system.  The drug use (inaudible)

12     I thought it was really clever.

13          TONY LYONS:  Right.  We could say hashtag

14     Definitely Not Me.  After this book.  What's up?

15          FEMALE VOICE:  (Inaudible).

16          TONY LYONS:  Okay.

17          FEMALE VOICE:  You want me to reschedule her?

18          TONY LYONS:  No, that's okay.  I think we've made

19     lots of --

20          SHARON CHURCHER:  I'll look (inaudible) and then

21     if you want to see if Alan would be interested, if

22     not, we'll have to find another poor person to --

23          TONY LYONS:  Yeah.  I will --

24          SHARON CHURCHER:  But he'll be fantastic.  I

25     don't care if he just wants to put his name on it.
```

 1    But I think the combination might be quite good.

 2         TONY LYONS:  Yeah, Alan is not the type who would

 3    ever put his name on anything.

 4         SHARON CHURCHER:  But (inaudible) got all these

 5    stories.  They're not Alan, of course.

 6         TONY LYONS:  Yeah.

 7         SHARON CHURCHER:  But call it The Other Men.

 8         TONY LYONS:  Yeah.

 9         SHARON CHURCHER:  I mean, Strom Thurmond's big

10    mistake, you know, was --

11         TONY LYONS:  But I think that's a great opening

12    chapter that you're the person who went out and -- and

13    got a lot of these people.  And that's part of this

14    whole movement.

15         SHARON CHURCHER:  Yeah.  (Inaudible) --

16         (Overlapping voices)

17         TONY LYONS:  -- at the forefront of it.

18         SHARON CHURCHER:  -- and then he became

19    victimized by it.  Yes.

20         TONY LYONS:  Yeah.  So that's like --

21         SHARON CHURCHER:  There's actually -- no

22    journalist caught him doing anything.

23         TONY LYONS:  Right, but that's the whole -- the

24    whole gamut of it is starting out years ago going

25    after certain people.  And then it goes all the way to

1    the point where maybe it's gone too far.

2         SHARON CHURCHER:  Well, it started with what's

3    his name?  Donna Rice, was it, remember?  Was it Donna

4    Rice?  Those pictures on the boat.  It's the first

5    time the media went after a politician for having

6    mistresses.  Who was it?  One of the Democratic

7    candidates.

8         TONY LYONS:  That was Clinton, right?

9         SHARON CHURCHER:  No, way before Clinton.

10        HECTOR:  Before.

11        SHARON CHURCHER:  It was Donna Rice was the

12   woman.

13        HECTOR:  Edward?

14        TONY LYONS:  John Edwards?

15        SHARON CHURCHER:  No, John Edwards had the love

16   child who was being paid for by --

17        HECTOR:  Before him.

18        SHARON CHURCHER:  It was Donna Rice.  That was

19   when it started because until then, it was taboo to

20   write about a politician's personal life.

21        HECTOR:  Who's the guy who went on the boat with

22   the woman?

23        SHARON CHURCHER:  That's right.  And there were

24   all the pictures of the -- it was called -- it had a

25   funny name, too, the boat.  Remember?

1    HECTOR:  Right.  I forgot his name.

2    SHARON CHURCHER:  I forget too.  But that's when

3  -- after that, it became -- here we go.  Cheating

4  ordeal.  Where's Donna Rice now?  Gary Hart.

5    HECTOR:  That's it.

6    TONY LYONS:  Oh, Gary Hart.  Right, right, right.

7    SHARON CHURCHER:  Until Gary Hart.  And I suppose

8  that is the kind of context you could set him in.  We

9  could always have Donna or someone do the -- the

10  afterword.

11    TONY LYONS:  Somebody like that.

12    SHARON CHURCHER:  Apparently she's around, it

13  says.

14    TONY LYONS:  That could be great.

15    SHARON CHURCHER:  It says -- yeah, so she's still

16  around.

17    TONY LYONS:  So I have these two people waiting

18  who are going to get pissed off, so --

19    SHARON CHURCHER:  (Inaudible).  Anyway, thanks

20  for giving me time.

21    TONY LYONS:  Yeah.  I thought that was great.

22  And it was a lot of fun, and I really hope we can do

23  it.

24    SHARON CHURCHER:  Yeah, let's --

25    TONY LYONS:  So the question is if Alan doesn't

1   want to do it, then the question is --

2        SHARON CHURCHER:  Find someone else.

3        TONY LYONS:  -- who else do we have.  But Alan

4   would be great.

5        SHARON CHURCHER:  Alan would be perfect.  And it

6   would be a way for him to get a little bit more of a -

7   - I mean, I just think it's incredible.  (Inaudible) -

8   -

9        TONY LYONS:  It might be a little bit of a

10  vindication, too, that -- that he's basically saying

11  there were these serious problems, there are these

12  serious problems.  Here's a book that tells my story,

13  the one that he just wrote.  And here's a book that

14  tells people how they should act.

15       SHARON CHURCHER:  Yeah, exactly.  In an age in

16  which people -- it's just very unfair if you've got to

17  deal with an unfair society and you say that in the

18  preface.

19       TONY LYONS:  Yeah.  But basically --

20       SHARON CHURCHER:  (Inaudible) situation where

21  it's not a level playing field.

22       TONY LYONS:  Yeah.  Basically lots of people who

23  know that it's unfair to some extent to say, yeah,

24  well, we've had 1,000 years of it being unfair in the

25  other direction.  So you know, this is payback.

```
1        SHARON CHURCHER:  (Inaudible) right.
2        TONY LYONS:  But the problem is that that's not
3   the way progress can really be made.  That's the way
4   you have a terrible --
5        SHARON CHURCHER:  (Inaudible) justice --
6        TONY LYONS:  It's not justice, and it leads to a
7   -- to a backlash that then takes away a lot of the
8   gains.
9        SHARON CHURCHER:  As I say because apparently the
10  hiring is really changed.  Companies are now hiring
11  men in the whole because they really don't want the
12  problem of dealing with young women, in particular --
13       TONY LYONS:  I don't think it's like that in
14  publishing.  I mean, we have eight out of ten people
15  here are female.  But -- which I think is true at
16  every publishing company.  It might not be eight, but
17  it might be seven.  Even at Random House.  It's like
18  you walk around Random House, it's hard to find guys.
19       SHARON CHURCHER:  Is that because you make more
20  on Wall Street, do you think?
21       TONY LYONS:  I don't know.  I don't know what
22  that is.  Maybe men don't read as much.
23       SHARON CHURCHER:  I don't know.
24       TONY LYONS:  (Inaudible).
25       SHARON CHURCHER:  There's obviously differences
```

1   between the sexes, too, even if you don't like to
2   think it.  I mean, there are, what we do in life,
3   aren't there, and how we behave, and all these things.
4        TONY LYONS:  Maybe.
5        SHARON CHURCHER:  And perhaps we work for less
6   money.
7        TONY LYONS:  Maybe.
8        SHARON CHURCHER:  Maybe the women -- no, it's
9   true, though, the women -- there's still some of that,
10  isn't there, a lot of young women thing they're going
11  to go off and have a family soon, so they'll do a job
12  that's fun.  The guy is thinking still --
13       TONY LYONS:  Make as much money as he can
14  possibly make.
15       SHARON CHURCHER:  The girls haven't changed as
16  much as people think.  Especially out in the suburbs
17  where I live.  It's very traditional.
18       TONY LYONS:  But that, I think, is a good sort of
19  part of the book, too, is where are we really now.
20  Like, where do people think we are, and we are we
21  really.  But -- all right, I should go.
22       SHARON CHURCHER:  Okay.
23       TONY LYONS:  I don't want to --
24       SHARON CHURCHER:  I like your library.
25       TONY LYONS:  Thanks.  Can I give you a book?

1   (End of audio recording.)

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                            CERTIFICATE

2
            I, Wendy Sawyer, do hereby certify that I was
3
    authorized to and transcribed the foregoing recorded
4
    proceedings and that the transcript is a true record, to
5
    the best of my ability.
6

7

8
            DATED this 11th day of September, 2020.
9

10

11
                    WENDY SAWYER, CDLT
12

13

14

15

16

17

18

19

20

21

22

23

24

25

EXHIBIT 124

# In The Matter Of:

## UNITED STATES OF AMERICA, v.
## GHISLAINE MAXWELL,

---

### TRIAL  sealed
### November 30, 2021

---

### Southern District Court Reporters

Original File XLBUVMAXF.txt
Min-U-Script® with Word Index

LBUCmax3        Visoski - cross        Page 260

1  A. No.
2  Q. There were house managers that did that on a day-to-day
3  basis?
4  A. That's correct.
5  Q. Now, your recollection is that Ghislaine generally worked
6  out of Epstein's offices in New York; isn't that right?
7  A. Yes.
8  Q. And you testified there was a room in Epstein's offices
9  that had about five desks in it that was sort of off to the
10  right of his office?
11  A. That's correct.
12  Q. And that's what you called the personal assistants' room;
13  right?
14  A. There was no official name for it, but it was my best
15  description of who was in that room.
16  Q. And Ghislaine was one of the personal assistants who had a
17  desk in that room?
18  A. That's correct.
19  Q. Now, when you first met Ghislaine in 1991, she seemed to
20  you to be just an employee of Epstein; isn't that right?
21  A. It might in the first introduction.
22  Q. So at that point early on, I'm talking '91, '92 when you
23  first started working, it didn't seem to you like she had a
24  personal relationship with Epstein; right?
25  A. No. I believe when Mr. Epstein introduced her, that he

LBUCmax3        Visoski - cross        Page 261

1  needed help because he was expanding, getting bigger, you know,
2  first time he had his own private jet, that he needed help to
3  handle everything else in his life so that he could focus on
4  his business. And when you start buying homes and properties,
5  he --
6  Q. I'm sorry to interrupt.
7  A. He knew he was going to get busy. So Ghislaine was his
8  go-to person to handle everything else that was not
9  business-related with his company.
10  Q. So I think you said at some point, though, in the mid '90s,
11  it may have appeared to you that Ghislaine was involved in a
12  personal relationship with Epstein; isn't that right?
13  A. Yeah, I thought they were a couple in the mid '90s. It's
14  just my own take on it.
15  Q. And that was based on your observations of them together at
16  the time and how they interacted with each other?
17  A. Sure. Yes.
18  Q. They made travel plans together, they talked to each other,
19  things like that?
20  A. Yes.
21  Q. But I think you testified that it wasn't totally clear to
22  you that Epstein and Ghislaine had a romantic relationship;
23  right?
24  A. Yeah, I don't know what the definition of a romantic
25  relationship is as opposed to just relationship. To me,

LBUCmax3        Visoski - cross        Page 262

1  romantic would mean a more involved relationship. I wasn't
2  aware of anything more than a couple.
3  Q. You never saw them kiss you said; right?
4  A. No.
5  Q. You never saw them hold hands?
6  A. No.
7  Q. Now, it's fair to say, isn't it, that a lot of women were
8  flying on the plane with Epstein in the mid '90s; isn't that
9  right?
10  A. That's correct.
11  Q. It's fair to say that there were plenty of times that
12  Epstein was flying on the plane with these women without
13  Ghislaine?
14  A. There has been times, sure.
15  Q. It appeared to you that these women were adult women?
16  A. Oh, yes.
17  Q. So from your vantage point, whether Ghislaine or any one of
18  these other women was somebody romantically involved or
19  something else, is a little blurry; right?
20  A. Yes.
21  Q. In fact, I think the only person you really considered to
22  be a girlfriend of Epstein was Eva Dubin; is that right?
23  A. That's the way she was introduced, as one of Mr. Epstein's
24  original first girlfriends, correct.
25  Q. By the time you started, she was an ex-girlfriend; right?

LBUCmax3        Visoski - cross        Page 263

1  A. Exactly.
2  Q. She was with him in the 1980s?
3  A. Yes, before my time.
4  Q. Now, Eva Dubin, before she was married, went by Eva
5  Anderson?
6  A. That's correct.
7  Q. She was a former Ms. Sweden?
8  A. That's what I heard.
9  Q. She later married Glenn Dubin; is that right?
10  A. That's correct.
11  Q. Glenn Dubin is a billionaire hedge fund manager; is that
12  right?
13  A. From my understanding, yes.
14  Q. He was one of Epstein's clients; isn't that right?
15  A. I don't know if he was a client. I know he was a friend.
16  Q. But during the period when Ghislaine and Epstein appeared
17  to you to have some sort of a personal relationship, she
18  continued to work for him as an employee; isn't that right?
19  A. Who's that, Ms. Maxwell?
20  Q. Ms. Maxwell, yes.
21  A. Yes.
22  Q. Ghislaine. I'm talking Ghislaine still took care of the
23  houses?
24  A. Yes. Yes.
25  Q. She still shopped for him?

| LBUCmax3 | Visoski - cross | Page 232 |
|---|---|---|

1 as LV4; all right?
2 A. Yes.
3 Q. I'm going to refer to the person there as Kate, okay?
4 A. Okay.
5 Q. Now, LV4 has a true name on that exhibit; is that right?
6 A. Correct.
7 Q. Do you recognize Kate's true name, the one that's on the
8 paper of LV4?
9 A. Not really.
10 Q. Do you recall meeting or seeing anyone with Kate's true
11 name on any of the flights?
12 A. Not to my knowledge. It's not jumping out at me at all.
13 Q. To your knowledge, there is no record with Kate's true name
14 ever flying on any of Epstein's flights?
15 A. I don't recall any of them.
16 Q. Now please look at LV5. That has a full name on it, too,
17 doesn't it?
18 A. Yes.
19 Q. And that person's first name is Carolyn; correct?
20 A. Correct.
21 Q. I'm going to refer to that person by her first name,
22 Carolyn, okay?
23 A. Okay.
24 Q. Do you recognize Carolyn's full name that's on the paper.
25 LV5?

| LBUCmax3 | Visoski - cross | Page 233 |
|---|---|---|

1 A. I do not.
2 Q. Do you recall meeting or seeing anyone with Carolyn's full
3 name on any flights?
4 A. I do not.
5 Q. And to your knowledge, there is no record of anyone with
6 Carolyn's full name flying on any of Epstein's flights?
7 A. Not to my knowledge. I don't have any memory at all.
8 Q. Mr. Visoski, during your testimony so far, you've mentioned
9 the names of some pretty important people; isn't that fair to
10 say?
11 A. Yes.
12 Q. You already said that former president Bill Clinton flew on
13 some of the flights?
14 A. Yes, he did.
15 Q. And Prince Andrew on some of the flights?
16 A. Yes.
17 Q. Itzhak Perlman, the famous violinist, on some of the
18 flights?
19 A. Yes.
20 Q. Donald Trump, before he was president, also flew on
21 Epstein's flights; isn't that right?
22 A. Yes, he did.
23 Q. He flew on them a number of times; right?
24 A. There was more than once I believe, yes.
25 Q. Sometimes he flew with his family members, too; right?

| LBUCmax3 | Visoski - cross | Page 234 |
|---|---|---|

1 A. I don't know -- I don't remember that. I certainly
2 remember President Trump, but not nearly the other people
3 associated with him. Like I said, if it was something special
4 that would get embranded in my head, I certainly remember the
5 president.
6 Q. Did Robert Kennedy Jr. also fly on his plane?
7 A. I don't remember. I'm not remembering that one.
8 Q. What about Senator John Glenn, the former astronaut?
9 A. I do remember Senator Glenn, yes.
10 Q. Former Senator George Mitchell also flew on his plane?
11 A. I do remember.
12 Q. The actors Kevin Spacey and Chris Tucker also flew on his
13 plane?
14 A. I remember them, as well.
15 Q. It's fair to say that these are all pretty high profile
16 people; is that right?
17 A. Correct.
18 Q. And these are people who the public at large would be
19 interested in?
20 A. Sure.
21 Q. And these are all people who are subject to a great deal of
22 media attention and scrutiny; is that right?
23 A. I would assume so, yes.
24 Q. And these are all people who might have legitimate privacy
25 concerns about their goings on?

| LBUCmax3 | Visoski - cross | Page 235 |
|---|---|---|

1 A. Correct. Yes.
2 Q. Mr. Visoski, I think you were asked as part of your
3 employment to sign a nondisclosure agreement?
4 A. That is correct.
5 Q. Now, when you were asked to sign a nondisclosure agreement.
6 you didn't think it was unusual, did you?
7 A. Not at all.
8 Q. And you certainly didn't take it to mean that you needed to
9 sign it so you wouldn't disclose some kind of illegal activity
10 that was happening on the plane, did you?
11 A. No, of course not.
12 Q. You never saw anything that came close to that; right?
13 A. Correct.
14 Q. You just took it to mean you couldn't write a book about
15 the stuff and the people you were interacting with; right?
16 A. That's correct. Several of my colleagues have signed the
17 same or similar documents in my profession. It's a fairly
18 normal request.
19 Q. So for people who fly private jets, this is a fairly common
20 occurrence?
21 A. That is correct, sure.
22 Q. You have a lot of people, high profile people we just
23 mentioned, who don't want necessarily all their business
24 written about in a book; right?
25 A. Exactly.

| LBUCmax5 | Jane - direct | Page 324 |
|---|---|---|

1  Q. Can you describe to the jury what happened.
2  A. Well, I had traveled with them and I had to fly back to
3  Palm Beach to go to school on a Monday, and I traveled with
4  them on a private jet. Then, to get back, I was taking a
5  commercial flight, but I was only 15, so I didn't have a
6  driver's license or any ID, I didn't have a learner's permit
7  yet. So I had no ID to get on the airplane.
8  Q. What happened next after you couldn't get on the airplane?
9  A. I remember calling and freaking out, saying how am I going
10  to get on this plane. And Ghislaine made it happen for me.
11  She sort of called somebody and helped me get on that flight.
12  Q. Approximately how old were you when that happened?
13  A. I was 15.
14  Q. Earlier, you testified that Maxwell assisted with your
15  travel arrangements on these trips when you were 14, 15, and
16  16. Could you explain to the jury how Maxwell assisted with
17  your travel during these trips?
18  A. Well, sometimes it would be -- Jeffrey would ask her, hey,
19  can you get -- not Jane, you know, tickets and the times and
20  whatnot and make the arrangements to be picked up.
21  Q. You testified that this began when you were 14. Can you
22  explain to the jury how old you were when you moved away from
23  Palm Beach?
24  A. 17.
25  Q. Can you describe for the jury what you looked like when you

| LBUCmax5 | Jane - direct | Page 325 |
|---|---|---|

1  were ages 14, 15, 16, and 17.
2  A. What I looked like?
3  Q. Can you describe what your physical appearance was like.
4  A. Oh, I was -- I was kind of short. I was very thin. I was
5  flat-chested until I was almost 16.
6  Q. If you could please take a look at the binder in front of
7  you on the witness stand. I'd ask you to just turn to what's
8  been marked for identification as Government Exhibit 107.
9      Do you recognize that?
10  A. Yes.
11  Q. What is Government Exhibit 107?
12  A. That is a picture of myself at 15 years old when I thought
13  it was a really good idea to bleach my own hair at home, which
14  was not a good idea.
15      MS. MOE: Your Honor, the government offers Government
16  Exhibit 107 under seal.
17      THE COURT: Government Exhibit 107 is admitted under
18  seal consistent with my ruling allowing this witness to testify
19  under a pseudonym to protect her privacy.
20      (Government's Exhibit 107 received in evidence)
21      MS. MOE: Thank you, your Honor.
22  Q. Jane, if you could please take a look at the binder in
23  front of you and turn to what's been marked for identification
24  as Government Exhibit 108.
25      Do you recognize that?

| LBUCmax5 | Jane - direct | Page 326 |
|---|---|---|

1  A. Yes.
2  Q. What is Government Exhibit 108?
3  A. That's a picture of me.
4  Q. Approximately, how old were you when that picture was
5  taken?
6  A. 17.
7      MS. MOE: Your Honor, the government offers Government
8  Exhibit 108 under seal.
9      MS. MENNINGER: No objection.
10      THE COURT: Thank you. Government Exhibit 108 is
11  admitted under seal consistent with my ruling, allowing this
12  witness to testify using a pseudonym.
13      (Government's Exhibit 108 received in evidence)
14      MS. MOE: Thank you, your Honor. May the jurors turn
15  to Government Exhibits 107 and 108 in their binders.
16      THE COURT: Yes, please. Pick up your binders and
17  look at GX107 and GX108.
18      MS. MOE: Thank you. Just give the jurors a moment to
19  turn to that.
20  BY MS. MOE:
21  Q. So again, just to be clear, now that we're all looking at
22  Government Exhibit 107, approximately how old were you when
23  that photograph was taken?
24  A. 15.
25  Q. Turning to Government Exhibit 108, approximately how old

| LBUCmax5 | Jane - direct | Page 327 |
|---|---|---|

1  were you when that photograph was taken?
2  A. 17.
3  Q. I want to step back and ask you a little bit about your
4  home life during the years we've been talking about. When you
5  were 14 to 17 and living in Florida, can you describe for the
6  jury what your home life was like during those years?
7  A. Well, it was -- it was not great. My father had just
8  passed away, sort of suddenly, and we found ourselves losing
9  our home and moving into a pool house and not being allowed to
10  grieve the loss of my father and having a very depressed mom at
11  home.
12  Q. I think you mentioned that you felt like you weren't
13  allowed to grieve your father. Can you explain to the jury
14  what you meant by that?
15      MS. MENNINGER: Objection, your Honor. Relevance.
16      THE COURT: Overruled. You may answer.
17  A. Well, I grew up with a mother who didn't allow us to talk
18  about our feelings because that was a sign of weakness. So
19  grieving would be a part of that because she was very concerned
20  about appearance and what we would look like and that you
21  always sort of put a pretty face on. So we really didn't
22  discuss those kinds of things at home and weren't allowed to
23  discuss it with anyone else. So, being a kid and losing your
24  dad and not being allowed to talk about it, not having anyone
25  to talk to about it, it was really difficult.

UNITED STATES OF AMERICA, v.
GHISLAINE MAXWELL,

| LBUCmax3 | Visoski - cross | Page 216 |
|---|---|---|

1 document, but I don't see Ms. Maxwell's name on there. It's
2 just --
3     MS. COMEY: Your Honor, objection.
4     THE COURT: Sustained. I'll have the jury disregarded
5 observations of the document that are not in evidence other
6 than to refresh his recollection, which we've moved beyond.
7     MR. EVERDELL: Understood, your Honor. That's fine.
8 Thank you, Mr. Visoski. We can take that down.
9 BY MR. EVERDELL:
10 Q. Mr. Visoski, I think you also flew Mr. Epstein a number of
11 times to Columbus, Ohio; isn't that right?
12 A. That's correct.
13 Q. Columbus, Ohio is where Les Wexner lives?
14 A. That's correct.
15 Q. Les Wexner is the billionaire owner of the Limited?
16 A. That's correct.
17 Q. That's the clothing company?
18 A. Yes.
19 Q. It owns Victoria's Secret and Abercrombie & Fitch, among
20 other companies?
21 A. That's correct, yes.
22 Q. And Les Wexner was a friend of Jeffrey Epstein's?
23 A. I believe they were friends.
24 Q. He was one of Epstein's clients, wasn't he?
25 A. To my knowledge, Mr. Epstein would call him a client, yes.

| LBUCmax3 | Visoski - cross | Page 217 |
|---|---|---|

1 Q. And Epstein had a home and an office in Columbus, Ohio
2 where Les Wexner's home was; isn't that right?
3 A. That is correct.
4 Q. So he had a few reasons to go to Columbus, Ohio?
5 A. That's correct.
6 Q. Now, you were asked a few questions by the government about
7 a woman we are referring to as Jane?
8 A. Yes.
9 Q. Do you recall that?
10 A. Yes.
11 Q. Just to be clear, Jane is not her real name; right?
12 A. Correct.
13 Q. But you do know what her real name is?
14 A. Yes.
15 Q. It's been shown to you?
16 A. That's correct.
17 Q. Now, you recall seeing Jane on Epstein's plane on one
18 occasion; is that right?
19 A. One occasion for sure at the time that I had met her.
20 Q. That's the only time you actually have a recollection?
21 A. That I have a recollection of, correct.
22 Q. And you recall this I think being in the 1990s; right?
23 A. Yes.
24 Q. Now you said, I believe, that you remember meeting her; is
25 that right?

| LBUCmax3 | Visoski - cross | Page 218 |
|---|---|---|

1 A. Yes.
2 Q. And that she was a singer; right?
3 A. Yes. That's the way Mr. Epstein introduced her as.
4 Q. And you said that I think she had striking blue eyes; is
5 that right?
6 A. Correct.
7 Q. You'll forgive the question, Mr. Visoski, but I think you
8 also remembered that at the time you saw her, you remembered
9 she had large breasts; isn't that right?
10 A. She was a mature woman, in my opinion.
11 Q. Well, she looked to you like she was in her 20s, as we said
12 before?
13 A. Sure, yes.
14 Q. Now, you remember that this meeting took place I think you
15 said in Palm Beach?
16 A. It was on the ramp in West Palm Beach, correct.
17 Q. Now, it was sometimes the case that Epstein would invite
18 people onto the plane before takeoff to show them the plane;
19 isn't that right?
20 A. Correct.
21 Q. And sometimes Epstein brought them into the cockpit to meet
22 the pilots?
23 A. That's correct, yes.
24 Q. And these people didn't always fly on the planes; isn't
25 that right?

| LBUCmax3 | Visoski - cross | Page 219 |
|---|---|---|

1 A. That's correct. He would bring passengers on just to show
2 them the interior and the cockpit, correct.
3 Q. Sometimes he would show them around, they would look
4 around, maybe meet the pilots, and then leave before takeoff?
5 A. That's correct, yes.
6 Q. Sitting here today, you don't know whether the woman you
7 met, Jane, actually flew on that flight that you recall meeting
8 her in the plane?
9 A. I wouldn't be able to swear that she actually flew on it.
10 I know I met her in the cockpit.
11 Q. And you don't remember where that flight was going?
12 A. No, I don't.
13 Q. And you don't remember anybody else who was on that flight?
14 A. I do not.
15 Q. And again, you don't recall seeing Jane specifically,
16 seeing Jane on the plane or any plane at any other time except
17 that one time in Palm Beach that you recall?
18 A. I can't visualize her sitting in the passenger compartment
19 like I would, say, president Clinton. It was so long ago, but
20 to answer your question, I can't visually see her sitting in
21 the -- I see her standing in between the two pilot seats.
22 That's my recollection of her.
23 Q. On that one occasion?
24 A. On that one occasion, yes, sir.
25 Q. Now, you met, I believe, with the government on several

EXHIBIT 125



UNCLASSIFIED

**FEDERAL BUREAU OF INVESTIGATION**

Precedence: IMMEDIATE                    Date: 03/11/2011

To: Miami                                Attn:

From: Miami
 PD-3/PBCRA
 Contact:

Approved By:

Drafted By:

Case ID #:

Title: JEFFREY EPSTEIN;
 GHISLAINE MAXWELL;
 MSTR - CHILD PROSTITUTION

Synopsis: Update case file as to interview conducted by
on March 9, 2011.

Details: On March 7, 2011,                    concurred with two requests from
            to have            join her in a telephone
call to            in          on March 7, 2011 and accompany
            to an interview on March 9, 2011 with
                     and

On the evening of March 7, 2011,                         and
      placed a telephone call to                  indicated she
is willing to cooperate fully with any FBI investigation
involving JEFFREY EPSTEIN and others. She has requested to meet
with FBI Agents in                     along with the
    for the debriefing.

On March 9, 2011,
          and        Private Investigator
          and        met for the interview at the United
States Attorney's Office in Fort Lauderdale, Florida.

UNCLASSIFIED

UNCLASSIFIED

To: Miami    From: Miami
Re: ██    ██████████    03/11/2011

██████, ██████ and ██████ provided information about
crimes uncovered during the lengthy civil investigation of
██████ by the ██████ office. These allegations include
possible perjury charges against ██████, which is outlined in
the February 17, 2010 deposition transcript; possible allegations
of human trafficking of underage females by ██████ to high-level
public officials and others; and obstruction of justice.

██████ has also made contact with ██████ about her
relationship with ██████, to include allegations of ██████
trafficking and child exploitation, not previously known by
investigators and prosecutors. ██████ explained that ██████
would like to make a formal statement to the Federal Bureau of
Investigation and cooperate in any criminal investigation.

██████████████████ provided ██████ ██████ during the civil
██████████████████ ██████ ██████ in ██████ ██████ ██████

A CD containing:
1. Deposition of ██████
2. Deposition of ██████
3. Deposition of ██████ ██████ (Vol I and II)
4. Deposition of ██████ (Vol I only)
5. Deposition of David Rogers (no transcript)
6. Deposition of ██████
7. Deposition of ██████ (both parts)
8. Deposition of ██████
9. Deposition of ██████
10. Deposition of ██████ (Vol I, II and III)
11. Deposition of ██████ (Vol II only)
12. Statement of ██████
13. Confidentiality agreement with Ghislaine Maxwell
14. Jeffrey Epstein Probation File

Hard copies of the following documents:
1. Complete flight logs from Jeffrey Epstein plane
3. Non-Prosecution Agreement
4. Transcript of Jeffrey Epstein Deposition taken on February 17, 2010 ██████ vs. Epstein)
5. Court Reporter Affidavit (not signed)

UNCLASSIFIED

2

UNCLASSIFIED

To: Miami From: Miami
Re: 7?███████████, 03/11/2011

5. Copy of portion of Jeffrey Epstein probation
   file showing Jean Luc Brunel staying at
   Jeffrey Epstein residence
6. Violation of Probation of Jeffrey Epstein

Two DVDs containing the videotaped Deposition of
██████ Epstein on February 17, 2010

Evidence obtained during interview will be turned over
to case agent SA ████████████

UNCLASSIFIED

3

CONFIDENTIAL

UNCLASSIFIED

To: Miami    From: Miami
Re: 77████████████████  03/11/2011

LEAD(s):

Set Lead 1:    (Info)

  MIAMI

    ██ ██████, ███████

    Read and clear.

Set Lead 2:    (Action)

  MIAMI

    AT WEST PALM BEACH, FLORIDA (WB-3)

        Determine if follow-up interview of ████████████████ in
████████████████ is warranted.  Contact Legat ████████████ in
████ for interview if appropriate.

UNCLASSIFIED

4

EXHIBIT 127



█████████ LAST NAME
UNKNOWN, who had red hair but is now deceased• Possibly some friends
█████████ knew before she dated █████████

█████████ also thought █████████ brought █████████ whose last name he did
not recall, not █████████ but a different █████████ also
recalled █████████ bringing █████████ whose last name he did not recall.
recalled parents calling parents and things tumbled down from there.
█████████ and █████████ all got lawyers when EPSTEIN was
arrested. Lawsuits were settled and the girls received money.

█████████ sister, █████████ who was 19 years old, went to EPSTEIN's home. There
was a lot of talk about it because █████████ could not go there anymore because she was
too old. █████████ told █████████ that EPSTEIN had told her █████████ was not
allowed back.

█████████ stopped going to EPSTEIN's home in approximately █████████
█████████ and █████████ was born █████████ and █████████ had
stopped going to EPSTEIN's home when she was pregnant. █████████ and
█████████ moved away together. █████████ thought █████████ had started seeing
EPSTEIN when she was around 15 years old and stopped seeing EPSTEIN when she
was 16 going on 17 years old.

50D-NY-3027571 Continuation of FD-302 of (U) Interview of █████████
On 01/13/2021 , Page 3 of 6

3516-002 Page 3 of 6

SUBJECT TO PROTECTIVE ORDER PARAGRAPHS 7, 8, 9, 10, 15, and 17

FD-302a (Rev. 5-8-10)

█████████ was arrested █████████ in or around 2008 and was put in the
stockade. EPSTEIN was also in the stockade at this time. EPSTEIN saw █████████
and called him over to the fence. EPSTEIN asked █████████ if
remembered him and asked if his lawyers could contact █████████ EPSTEIN gave
█████████ his lawyers' card. █████████ thought this was regarding a lawsuit some of
the girls had brought at the time. █████████ later met with EPSTEIN's lawyers at a
"Darth Vader building" but did not really say anything.

Sometimes, █████████ interacted with the landscapers at EPSTEIN's home.

█████████ recalled █████████ coming out of EPSTEIN's home and telling him she
felt uncomfortable. When █████████ asked her what she meant, █████████ told
him there was another girl there and whenever she was there she wanted █████████
to do things. █████████ came to find out this was GHISLAINE MAXWELL.

202
3-316-002
Settled



██████████ had described MAXWELL to ██████████ as someone who had black hair and was British. ██████████ also described MAXWELL as an aggressive, rude, and nasty woman. ██████████ remembered ██████████ mentioning the name "MAXWELL". ██████████ did not want to be there when MAXWELL was there.

MAXWELL was supposed to be a massage therapist and/or teacher. MAXWELL was friends with EPSTEIN. MAXWELL was supposed to show ██████████ what EPSTEIN liked. A few times MAXWELL was at EPSTEIN's home and ██████████ was uncomfortable. ██████████ recalled ██████████ saying something like, "this woman is supposed to be teaching me is just mean/rude". ██████████ knew ██████████ was extremely bothered by MAXWELL. MAXWELL was supposed to be teaching ██████████ how to massage EPSTEIN.

██████████ had described ██████████ to ██████████ as someone he would like.

Sometimes when ██████████ went to EPSTEIN's home, she would come out with $400-$500. This was when ██████████ would have brought a girl. ██████████ went up to the room with her girlfriends.

██████████ was "kinda seeing" ██████████ told ██████████ that ██████████ was not just doing what ██████████ thought and told him it was not just massages that she was doing. When ██████████ asked ██████████ about it, she told him that EPSTEIN wanted "handjobs" but that she did not do that and that's why she brought girls. ██████████ told ██████████ that EPSTEIN had a "weird shaped penis" with a "peehole on the side of his dick".

50D-NY-3027571 Continuation of FD-302 of (U) Interview of ██████████, On 01/13/2021 , Page 4 of 6

3516-002 Page 4 of 6

SUBJECT TO PROTECTIVE ORDER PARAGRAPHS 7, 8, 9, 10, 15, and 17

FD-302a (Rev. 5-8-10)

The money would be sitting there on the table and EPSTEIN would excuse himself to clean up.

██████████ did not know if ██████████ massaged anyone else.

For ██████████ birthday, EPSTEIN asked her what she wanted. EPSTEIN gave ██████████ tickets to see INCUBUS. EPSTEIN had asked ██████████ who her favorite singer was and she told him MICHAEL JACKSON. EPSTEIN had JACKSON call ██████████ on her birthday. ██████████ got off the phone and told ██████████ it was JACKSON who called. ██████████ and ██████████ were living together at this time with her mother. This was when they were living in ██████████ together.

EXHIBIT 128

Attachment C

(Rev. 06-04-2007)

# FEDERAL BUREAU OF INVESTIGATION

**Precedence:** ROUTINE                    **Date:** 03/27/2008

**To:** Miami                    **Attn:** PB-2/PBCRA ██████████

**From:** New York
        C-20
        Contact: ████████████████████

**Approved By:** ████████████████████████

**Drafted By:** ████████████████████

**Case ID #:** ████████████ (Pending)

**Title:** JEFFREY EPSTEIN;
        ██████████████
        GHISLAINE M. MAXWELL;
        WSTA - CHILD PROSTITUTION;

**Synopsis:** To cover lead set by the Miami Division, serial 134 lead 1.

**Enclosure(s):** For the Miami Division the following documents have been enclosed:

        1. One original and two copies of FD-302 reflecting interview with ███████████████ dated 03/20/2008 with original notes in a 1-A envelope.

        2. One original and two copies of FD-302 reflecting interview with ████████████ dated 03/25/2008 with original notes in a 1-A envelope.

**Details:** █████████████████████ was interviewed at the NYO FBI office on 03/20/2008. ████████████ then contacted writer telephonically after the first interview to provide additional information on 03/25/2008.

        Some of most salient facts that were discovered during these interviews are as follows:

        1. ██████████ met Geoffrey Epstein in the summer of 2004, which would make her 17 years of age at the time of the first meeting.

        2. ██████████ was paid $300.00 for each massage she gave Jeffrey Epstein. When she referred another friend, ██████████

MM12-31E-MM-108062 SEC 002 SER 71-175-000327

3501.018-017
Page 1 of 3

CONFIDENTIAL

EC - ⬛ ⬛spd



| SEARCHED | INDEXED |
|----------|---------|
| SERIALIZED | FILED |

MAR 2 7 2008  @

FBI NEW YORK

To: Miami  From: New York
Re:. ▮▮▮▮▮▮▮▮▮        03/27/2008

to Jeffrey she was paid $400.00 on that occasion. Moreover she
was offered $200.00 by Jeffrey to refer more friends to him.  She
claimed she only referred ▮▮▮▮▮▮▮

    3. Jeffrey attempted to ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮ provided by ▮▮▮▮▮▮   When she voiced that she was
uncomfortable he told her to leave and paid her $300.00.  After
this day, she did not massage him by herself.  She would
accompany ▮▮▮▮▮▮ to Jeffrey's house and get paid $300.00..

    4. ▮▮▮▮▮▮▮▮▮ was introduced to Jeffrey by a female known
to her as ▮▮▮▮▮▮▮▮▮▮▮▮▮ who was 14-15 years
old when they first met. According to ▮▮▮▮▮▮▮▮▮▮▮ and
another female minor, ▮▮▮▮▮▮▮▮ not only provided Jeffrey with
massages ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

    5. ▮▮▮▮▮▮▮ might have traveled with Jeffrey to West
Palm Beach, FL during the 2004-2005 time frame.

    The NYO considers this lead covered. However, given
the fact that there is the possibility that other minors are
involved in the NY territory, investigation continues in this
matter.

♦♦

2

EXHIBIT 129

IN THE CIRCUIT COURT
OF THE FIFTEENTH JUDICIAL CIRCUIT
IN AND FOR PALM BEACH COUNTY, FLORIDA

Case No. 50-2019-CA-014681-AG

CA FLORIDA HOLDINGS, LLC,
Publisher of *THE PALM BEACH POST*,

    Plaintiff,

vs.

JOSEPH ABRUZZO, as Clerk and Comptroller
of Palm Beach County, Florida,

    Defendants.

_____/

## ORDER GRANTING PLAINTIFF'S MOTION FOR RECONSIDERATION OF THE TRIAL COURT'S FEBRUARY 29, 2024 ORDER AND CANCELING JULY 8, 2024 HEARING

**THIS CAUSE**, having come before the Court on The Palm Beach Post's Motion for

Reconsideration of The Trial Court's February 29, 2024 Order, filed on June 12, 2024, and the

Court, having considered the Motion, being advised of the arguments of the parties, and being

otherwise advised of the premises, the Court Grants the Motion for Reconsideration and adjudicates

the following:

### Procedural History

In 2019, The Palm Beach Post commenced this action seeking a declaration authorizing

the release of testimony and related evidence presented to the Palm Beach County grand jury in

2006 during the first Jeffrey Epstein ("Epstein") sex abuse investigation.

On December 21, 2021, the trial court entered a Final Judgment dismissing The Palm Beach Post's First Amended Complaint on the grounds that the Court lacked the statutory authority, under Florida Statute 905.27, to order the release of the Epstein grand jury materials.

On May 10, 2023, the Fourth District Court of Appeal remanded the case to the Circuit Court to conduct an in camera inspection of the Epstein grand jury materials to determine whether public disclosure would be "furthering justice" as defined by Florida Statute 905.27.

The Court ultimately determined the request did not further justice under the law as it existed at the time. The Court stated that it must follow the law and cannot create new law. Law making is a process that belongs exclusively to the people of Florida when they speak through their legislature and the executive branches. This concept is rudimentary and basic civics. The Courts interpret law - THE COURTS DO NOT MAKE LAW.

It is also important to note, that without an amendment to the statute, Grand Jury proceedings are generally always kept secret and are closed to the public. This is generally to protect jurors, witnesses, those accused, and the integrity of the case. Secrecy allows people to serve as jurors and witnesses to testify without fear of outside influence or retaliation. In some cases, it also ensures the protection of an innocent suspect's reputation. Secrecy also makes it less likely that a defendant will abscond after learning they are being investigated. While those do not apply to Epstein, the law at the time did not carve out an exception.

During this time, among others, the Clerk of Court, Mr. Joseph Abruzzo, a former state legislator with vast experience in the legislative process, advocated to state legislators to amend the law. Their efforts were successful. Florida's Legislature unanimously passed Bill HB 117.

Once the bill passed both of the legislative houses, the Governor of Florida Ron DeSantis very quickly signed CS/HB117 amending Florida Statute 905.27 effective July 1, 2024. **This amendment significantly modified the definition of "furthering justice" to expressly include furthering a public interest** when the disclosure is requested pursuant to paragraph 905.27(2)(c). It cannot be understated that the amendment to the law very clearly allows what previously was not legally permissible.

The Court's Order denying the release of the records also gave leave of Court for The Palm Beach Post to file a motion for reconsideration after July 1, 2024 - under the new statute.

On June 12, 2024, The Palm Beach Post moved for reconsideration of the Trial Court's order based on the Florida Statute 905.27, as amended on July 1, 2024.

It cannot be disputed that the 2024 amendments to Florida Statute 905.27 were intended to remove the prior statutory hurdles to disclosure of the Epstein grand jury materials. In fact, the Court notes the bill was often called the "Epstein Grand Jury Bill" recognizing the prior statutory construction did not allow release of these records.

In the official press release, Gov. DeSantis explained his reasons for signing of CS/HB 117 into law. Gov. DeSantis stated, "The public deserves to know who participated in the Jeffery Epstein sex trafficking. Nobody should be protected from facing justice due to their wealth, or status, and those who harm children should be exposed and punished to the fullest extent of the law."

## Conclusions of Fact and Law

Florida Statute 905.27(2)(c) now reads as follows:

> When a court orders the disclosure of such testimony pursuant to subsection (1) in
> response to a request by the media or an interested person, regardless of whether
> that purpose is for use in a criminal or civil case, it may be disclosed so long as the
> subject of the grand jury inquiry is deceased, the grand jury inquiry related to
> criminal or sexual activity between the subject of the grand jury investigation and
> a person who was a minor at the time of the alleged criminal or sexual activity, the
> testimony was previously disclosed by a court order, and the state attorney is
> provided notice of the request. This paragraph does not limit the court's ability to
> limit the disclosure of testimony, including, but not limited to, redaction.

With that new legal mechanism in place, the Court makes the following Findings.

The Court finds that the request involves a matter of public interest. The criminal

prosecutions of the most infamous pedophile in American history began in Palm Beach County –

with much controversy. For almost 20 years, the story of how Jeffrey Epstein victimized some of

Palm Beach County's most vulnerable has been the subject of much anger and has at times

diminished the public's perception of the criminal justice system.

Adding to the public interest, Epstein is indeed notorious and infamous and is widely

reported to have flaunted his wealth while cavorting with politicians, billionaires, and even British

Royalty. It is understandable that given those reports the public has a great curiosity about what

was widely reported by news agency as "special treatment" regarding his prosecution. This matter

is clearly the subject of public interest.

The Court finds that this request is made by the news media, specifically The Palm Beach

Post. The Palm Beach Post is a daily newspaper that was founded in 1916 as a local publication

in West Palm Beach. For decades, the Palm Beach Post was printed and published daily in Palm

Beach County. The Court finds that despite its many changes, The Palm Beach Post has a long and

rich history documenting our local community. Many local residents still rely on The Palm Beach

Post to obtain information on national, state, and local events. The Palm Beach Post remains a newspaper of record in our county.

The Court finds Epstein is also widely reported to have been deceased since August 10, 2019, under controversial and "newsworthy" circumstances, while under "supervision" at Metropolitan Correctional Center in the state of New York. This adds to the public interest.

Having reviewed the testimony, the Court also finds the testimony relates to sexual activity between Epstein and child victims of sex trafficking. Again, it is widely accepted that Epstein is a notorious and serial pedophile. The testimony taken by the Grand Jury concerns activity ranging from grossly unacceptable to rape – all of the conduct at issue is sexually deviant, disgusting, and criminal.

The details in the record will be outrageous to decent people. It is also important to note that some of the testimony in the records of Epstein's pedophilia involved other people, but **there is nothing in this record that was outside the knowledge of law enforcement or Prosecutors – there is no new information.**

Tragically, the record reveals that Epstein used children to find more victims. The record also shows that some of the children knew the type of people they could be exposed to and the infamous nature of such "notable" people.

The Court also notes the testimony was previously disclosed to law enforcement agencies. Furthermore, the State Attorney was properly noticed and long ago withdrew any objections to release the records and early on even did his best to disclose the information in his office's possession without delay via an internet portal. As a result, he was eventually dropped as a named party in this action after much inconvenience and expense.

**IT IS ORDERED AND ADJUDGED,**

The Motion for Reconsideration is **GRANTED**.

**IT IS FURTHER ORDERED AND ADJUDED,**

The hearing scheduled for July 8, 2024 is moot and is canceled.

**IT IS FURTHER ORDERED AND ADJUDED,**

The Palm Beach Post's petition to release the Grand Jury proceedings regarding Jeffery

Epstein under Florida Statute 905.27 as amended July 1, 2024 is also **GRANTED**.

With only a few **redactions made by the Court to protect the identity of the minors**,

The Court hereby authorizes the Clerk of Court to release the redacted Clerks Notes and transcripts

of the testimony in their entirety (attached as Exhibit "A"). The Court is not aware of anything

more to review and disclose.

**DONE and ORDERED** at West Palm Beach, Palm Beach County, Florida.

502019CA014681XXXXMB    07/01/2024 CIRCUIT
                                    Luis Delgado   Circuit Judge

502019CA014681XXXXMB    07/01/2024
Luis Delgado
Circuit Judge



```
 1

 2                           I N D E X

 3
                                                      PAGE
 4     WITNESS:

 5     ███████████                                        3

 6     ████████████████                                   10

 7     ███████████ (Recalled)                             50

 8     ██████ ████████                                   102

 9     ██ █████████ ecalled)                             119

10     ████████████                                      121

11     ███████████                                       140

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                         BE IT REMEMBERED that the following

 2      proceedings were had at the Palm Beach County

 3      Courthouse, located in the City of West Palm

 4      Beach, State of Florida on Wednesday, July 19,

 5      2006 beginning at 9:14 a.m. with appearances as

 6      hereinbefore noted, to wit:

 7      THEREUPON:

 8                         MS. DUGGAN:  Everybody ready?

 9                         (WITNESS          )

10                         MS. DUGGAN:  Would you raise your

11              right hand.  Do you swear or affirm that

12              the testimony you're about to give today

13              will be the truth, the whole truth, and

14              nothing but the truth, so help you God?

15                    THE WITNESS:  I do.

16                    MS. DUGGAN:  Please have a seat.

17                    THE WITNESS:  Thank you.

18                         EXAMINATION

19      BY MS. BELOHLAVEK:

20          Q.  Good morning.

21          A.  Good morning.

22          Q.  Detective          could you introduce

23      yourself, please?

24          A.  My name is Detective            with Palm

25      Beach Police Department.
```

```
1        Q.   Okay.  What is your position there?
2        A.   I am a detective in the special
3   investigations unit.
4        Q.   What do you investigate in special
5   investigations?
6        A.   Long term investigations, financial crimes,
7   white-collar crimes, just about any -- any kind of
8   crimes.
9        Q.   Okay.  Ones that are going on for a long
10  period of time though, usually?
11       A.   Correct, long period.
12       Q.   Not a murder that happened last night?
13       A.   Right.
14       Q.   Okay.  Did you become involved in an
15  investigation under case number 0500368?
16       A.   That is correct.
17       Q.   When did you become involved in this?
18       A.   In Sep -- in September of 2005.
19       Q.   Okay.  Was there another detective
20  investigating this case before then?
21       A.   That is correct.  Her name was
22
23       Q.   Okay.  And she, at some point, turned it
24  over to you?
25       A.   Correct.
```

```
 1          Q.  Have you familiarized yourself, either
 2     speaking with Detective ███ or going through her
 3     reports, as to what was done when she was the
 4     detective on the case?
 5          A.  Yes, I have.
 6          Q.  Okay.  How did this case come to the
 7     attention of the Palm Beach Police Department?
 8          A.  On March 14, 2005 a phone call was received
 9     from ███████, who felt that there was a --
10     some sexual activity had occurred with the -- her
11     daughter.
12          Q.  Okay.  And ████████ name is ███
13     ██████
14          A.  ████████
15          Q.  Okay.  And who was her daughter?
16          A.  Her stepdaughter is ████████.
17          Q.  What did ████████ think was going on?
18          A.  What had occurred was that ████ had gotten
19     into a fight at ████████████ School.  And
20     subsequent, after the fight, they discovered $300
21     in her purse.
22              When questioning the $300, she had told 'em
23     that she had received it from a man in Palm Beach.
24          Q.  Okay.  Did ████████ also overhear a
25     conversation where they were talking about sex?
```

```
1    That ███ might have accepted money for having

2    sex with the man?

3         A.   Um, yes, that is correct.  She had some

4    kind of sexual activity with a man in Palm Beach.

5         Q.   And was paid for it?

6         A.   Correct.

7         Q.   Okay.  Was Detective ███ able to find out

8    the circumstances about why the fight occurred?

9         A.   It was rumored that she had slept with a

10   man in Palm Beach, in -- at ███████████████

11   School.

12        Q.   She, being ███████?

13        A.   ██████.

14        Q.   Okay.

15        A.   Correct.

16        Q.   And she heard the rumor that she was a

17   prostitute, and that's what started the fight?

18        A.   Correct.

19        Q.   Who did she have the fight with?

20        A.   A girl by the name of ██████████.

21        Q.   Okay.  Where -- the fight occurred at

22   school?

23        A.   Yes.

24        Q.   Who actually found the money in ███████

25   purse?
```

```
 1          A.   The Freshman Assistant Principal.
 2          Q.   Okay.  How much money was in the purse?
 3          A.   300.
 4          Q.   Was Detective ████ able to interview
 5     ████?
 6          A.   Yes.
 7          Q.   Where did that occur?
 8          A.   That occurred at the Palm Beach Police
 9     Department.
10          Q.   Okay.  Did ████ initially -- was ████
11     initially honest with Detective ████
12          A.   Originally she did not tell everything that
13     occurred.  It was through a subsequent interview
14     that the -- further information was developed.
15          Q.   What did ████ tell Detective ████
16     initially?
17          A.   Initially, that she had gone to the house
18     with a girl by the name of ██████████ to pick up
19     monies that were owed to her.
20               When she -- Detective ████ further
21     questioned her, she explained that -- that she was
22     taken to the house to provide a massage to a
23     wealthy man in Palm Beach.
24          Q.   Okay.  She initially denied that though,
25     and said there was no act on her part between this
```

1    man and herself?

2        A.    Correct.

3        Q.    Okay.  But she ultimately told them that

4    she went for a massage?

5        A.    Correct.

6        Q.    To give him a massage?

7        A.    Correct.

8        Q.    Okay.  Did ████ discuss with Detective

9    ████ that -- what ████ had told her about going

10   to the house?

11           Like, did you know ████ was going to bring

12   you here to do a massage and that you were going

13   to get money?

14       A.    Yes.

15       Q.    What did ████ say ████ explained to her?

16       A.    Originally -- let me -- if I can read this.

17           Originally, the first interview was done,

18   I'm sorry, at ████████████████ School.

19           She was going to the house to provide the

20   massage.  It was offered to her by ████████ to

21   provide the massage to this man who was later

22   identified as Jeffrey Epstein.

23       Q.    Okay.  Did ████ admit to Detective ████

24   knowing that ████ worked for this man in

25   exchange for doing sexual favors?

```
1         A.   Yes.

2         Q.   Did she say that she was offered the

3    opportunity to do those, and that's why she went

4    there?

5         A.   Yes.

6         Q.   Okay.  Did Detective ████ ask ████ if she

7    ever discussed with ████ about letting this man

8    know her age?

9         A.   Um, it was discussed in the ride over that

10   if she -- she would asked her age, to say that she

11   was 18.

12        Q.   Okay.  And ████ and ████ agreed that she

13   was going to do that, if asked?

14        A.   Yes.

15        Q.   Okay.

16             MS. BELOHLAVEK:  At this point we're

17        going to ask ████ to testify.  Okay?

18             THE WITNESS:  Okay.

19             MS. BELOHLAVEK:  Please hang around.

20        You're going to testify again in a little

21        bit.

22             THE WITNESS:  Yes.

23             MS. BELOHLAVEK:  Thank you.

24             (Witness excused.)

25
```

```
 1                    (WITNESS ███████████)
 2              MS. DUGGAN:  Come on in.  We're going
 3         to have you sit over here.
 4              Could you raise your right hand for
 5         me?
 6              Do you swear or affirm that the
 7         testimony you're about to give today will
 8         be the truth, the whole truth, and nothing
 9         but the truth, so help you God?
10              THE WITNESS:  I do.
11              MS. DUGGAN:  When you're here
12         testifying everything's recorded with a
13         microphone system, so you have to -- you
14         can put your hand down -- you have to
15         answer as you did, verbally, or -- you
16         can't shake your head, because that won't
17         be recorded in the system that's going on.
18         So you have to say yes or no, you can't
19         shake your head.
20              And one important thing is, you're
21         here today before the grand jury, and it is
22         a crime to lie to the grand jury.  And in
23         our terms we call it perjury, but in
24         regular peoples' terms it's lying to the
25         grand jury.
```

```
1                       So there's one important rule here
2            today.  You must tell them the truth,
3            100 percent the truth.  There is -- cause
4            you cannot -- there's no penalty for
5            telling the truth.
6                       It's the opposite.  If it can be
7            shown -- proven that you lied to the grand
8            jury, there is a crime of perjury.
9                       Do you understand that?
10                 THE WITNESS:  Mm-hmm.
11                 MS. DUGGAN:  Is that a yes?
12                 THE WITNESS:  Yes.
13                 MS. DUGGAN:  Okay.  So move up to the
14           microphone a little bit.  And be sure that
15           you speak yes or no, and so that even the
16           folks in the top of this room can hear your
17           answers.  Okay?
18                 THE WITNESS:  Okay.
19                      EXAMINATION
20      BY MS. BELOHLAVEK:
21      Q.   All right.  Could you tell us who you are?
22      A.   I'm ███████████.
23      Q.   How old are you, █████?
24      A.   16.
25      Q.   What's your birthday?
```

NOT A CERTIFIED COPY

```
·1        A.  ████, ████

 2        Q.  How old were you in February of ███?

 3        A.  I was 14 still.

 4        Q.  14 or 15?

 5        A.  I was 14 still.  Well, this happened when I

 6   was 14, so.

 7        Q.  You turned --

 8        A.  15, in ███ of that year.

 9        Q.  And you just turned 16?

10        A.  Yeah.

11        Q.  Okay.  So you were just short of 15?

12        A.  Mm-hmm.

13        Q.  All right.  Where do you live?

14        A.  I live in ██████████.

15        Q.  Where do you go to school?

16        A.  I'm going to be starting school at ████████

17   ████████ School.

18        Q.  Okay.  That's ████████ school --

19        A.  Mm-hmm.

20        Q.  -- out in --

21        A.  In --

22        Q.  Go ahead.

23        A.  -- ████████.

24        Q.  Okay.  Where did you go to high school in

25   ███?
```

```
1      A.   ██████████.
2      Q.   Where is that?
3      A.   In ██████████.
4      Q.   On what road?
5      A.   I --
6      Q.   ████████████████████?
7      A.   Yeah, probably.
8      Q.   What grade were you in in ████ when you
9   were at ██████████████ School?
10     A.   I was in 9th grade.
11     Q.   Did you know someone named ████████████?
12     A.   Yes.
13     Q.   How did you know ████████████?
14     A.   I used to date ████████.
15     Q.   All right.  How old's ████?
16     A.   At the time I think she was 18 or 19.  I
17  think.
18     Q.   Who was ████████ that you dated?
19     A.   ████████.
20     Q.   Was ████ going to school at ████████ or
21  did you know her from outside the school?
22     A.   I knew her from outside the school.
23     Q.   How much contact did you have with ████?
24     A.   I met her about -- I met her the night
25  before I went to Jeffrey's house.
```

```
 1          Q.   Okay.  Tell us about the night when you met
 2      ████ ?
 3          A.   Um, I was with my boyfriend ████ at my
 4      house. ████████████████████████████████████
 5      ██████████████████████. So we went to say hi to
 6      ████████ and stuff, and ████ was there.
 7               And I was introduced --
 8          Q.   Had you met her before that night?
 9          A.   Um, at like a family football thing.  Like,
10      they had a family get-together for a football
11      game, and she was there.
12          Q.   Okay.
13          A.   But I just said hi to her.
14          Q.   All right.
15          A.   Like, I never knew, like, who she was.
16          Q.   Not a lot -- not a lot of conversations --
17          A.   Yeah.
18          Q.   -- or --
19          A.   It was just kind of like, hi, nice to meet
20      you.
21          Q.   Okay.  That night you go down there, you
22      meet her.  What happens?
23          A.   Yeah.  And then it was just kind of like a
24      regular night, and we were hanging out, watching
25      TV.  And then, like, it was like 11:30-ish or 10,
```

NOT A CERTIFIED COPY

```
 1    something like that.  And she was like, what are
 2    you doing tomorrow?
 3            And I -- I said, nothing.
 4            And then she was like, oh well, do you want
 5    to make, like, $200?
 6            And I was like, yeah, sure.
 7            And then -- and she was like, well, you're
 8    going to have to, like, meet my friend Jeffrey.
 9    And he lives in a big humongous mansion.  And,
10    like, he lives on the water and all this stuff.
11            And then I was like -- like, that's really
12    cool.
13            And then she's like, but you have to give
14    him a massage for like 40 minutes.  And that's all
15    you have to do.  And you get, like, $200 for it.
16    And it's really easy.
17            And I was like, okay.  Like, whatever.
18    It's just a massage.
19            And then ▓▓▓▓ was like -- he was wondering
20    what happened.  And then we were just -- told him.
21    And he was, like, arguing with ▓▓▓▓.  And then
22    him and ▓▓▓▓ went to the bathroom for like a
23    couple minutes to argue.
24            And ▓▓▓▓ had, like, her boyfriend there.
25    So me and him were stuck in, like, the living room
```

```
 1    watching TV, listening to them argue for a couple

 2    minutes.  And then they came back out.

 3          Then we went outside and ████ had called

 4    Jeffrey on the phone.  And Jeffrey's assistant

 5    lady; I don't remember her name; she answered the

 6    phone.  And she said that she had somebody that

 7    could give Jeffrey a massage tomorrow.

 8          And the lady asked how old I was.  And who

 9    I was -- like, what my name was.

10          But ████ said that, like, I had to be 18.

11    So she told the lady I was 18, and that I went to

12    ███████████, and I was a senior and everything.

13          And so the little assistant lady said,

14    like, okay, that's fine.  Come in tomorrow.

15          So then I went home.  I --

16    Q.   Okay.  Let me stop you there.  Couple

17    things.

18    A.   Okay.

19    Q.   Do you know if ████ and ████ were -- what

20    they were arguing about?

21    A.   Yeah.  Because ████ didn't want me to go.

22    Because I guess he knew about -- like my -- his

23    ████ kind of did that already.  And --

24    Q.   Did that concern you, that ████ didn't want

25    you to go and you were agreeing to go anyway?
```

```
1          A.  Well, yeah.  Cause -- well, he was -- I was
2     like -- I guess cause I was 14 and he was, like,
3     16 and stuff.  And he was just like, don't go.
4     Don't go.  Don't go.
5          And I was like, well, it's $200.  And I was
6     14, and I was like, $200.  So I didn't really care
7     what he said.
8          Q.  Okay.  And from listening to ████████ end of
9     that phone conversation, the person at Jeffrey's·
10    house was trying to verify that you were at least
11    18?
12         A.  Mm-hmm.
13         Q.  Okay.  Is that a yes?
14         A.  Yes.  Sorry.
15         Q.  Okay.
16         A.  And -- but, like, after she hung up the
17    phone with the lady she explained to me that --
18    what -- we went back inside the house and she
19    explained to me that I was going to have to, like,
20    tell the lady -- like, make up a lie about my
21    whole life.  Like, that I went -- I'm graduating
22    from ████████ already, that I'm 18 and all this
23    stuff.  And that I've known ████ for a long time.
24    Like, just to make it look like I was older.
25         And so I agreed to do all that stuff.  And
```

```
 1        then I went home for the night.

 2               And then the next morning ████ and another

 3        lady -- like, another teenager girl; I don't

 4        remember her name; she was in the truck with her.

 5        And, like, we were leaving my house, and -- but my

 6        dad saw.  And he -- I told him we were going to

 7        the mall in Palm Beach.

 8               And my dad's like, okay.  He didn't have a

 9        problem.  And since it was ████ -- or ████

10           ████  he didn't care that I was going with

11        ████.

12               But he met -- like, we were leaving and my

13        dad was coming in the office, they were, like,

14        pulling into my driveway.  And he saw ████, and

15        ████ asked my dad for $5 for gas.  So my dad

16        said, like, yeah, sure, $5, whatever.  And then we

17        left.

18               And then when we got to, um, Jeffrey's

19        house, um --

20        Q.   Do you know Jeffrey's full name?

21        A.   Jeffrey Epstein or Epstein or -- whatever.

22        Q.   Where was the house?

23        A.   Um, I -- it's in Palm Beach, whatever.

24               But then when we pull up in the driveway,

25        nobody was there.  Like, ████ like, he's not
```

1    home.

2              So we walked up anyways.  We all got out of

3    the car.  And there was like a gate that you have

4    to walk into to go to the back door.  And there

5    was like a security guard or whatever.  And he has

6    like a little office or -- in the back.

7              And he saw us so he came up to the gate.

8    And he asked us what we were there for.

9              And ████ said, Jeffrey.

10             And so the guy was like, uh, okay.  And he

11   opened the gate.

12             All three of us went in, like, to the back

13   door towards the kitchen.  Cause I guess the

14   kitchen's right there when you open the door.

15             So we were sitting, like, in a bar like

16   this, and we were waiting for about 15 minutes.

17   And then Jeffrey and the assistant walked in

18   through the back door also.  And that's when I

19   first met Jeffrey.  And we shook hands.  And then

20   the lady also introduced herself too.  And then

21   the lady was talking to ████ and the other girl

22   for a couple seconds.

23             And then Jeffrey said, who's going to go

24   first or whatever.

25             And ████ and the other girl's like, I

```
1      don't care.

2             And then Jeffrey's like, how about you?
3      Pointing to me.

4             And I was like, okay.

5             And then I was, like, looking back at ████
6      and laughing.  And then she was just like scooted
7      her hand to go.  And she was laughing too.  And I
8      was like, okay.

9             So then we -- in the kitchen it was like a
10     little hallway, not really, but it's like a
11     stairway to go upstairs.  And we were walking up
12     there.  And the assistant lady walked me up there
13     and as Jeffrey was talking to them after.

14            And then she was pointing out like all
15     these pictures and all this stuff and then leading
16     me up to, like, a bathroom.  It was, like, really
17     big though.  And, like, there was two closets.

18            And then she went into the one closet and
19     pulled out the massage table and set it out in
20     front of, like, this couch.  And then she put,
21     like, a -- a little blanket or whatever over the
22     massage table.

23            And then she opened up a drawer.  And there
24     was like a whole bunch of different, like, lotions
25     for getting massages.  And she just picked, like,
```

1    a couple of 'em out and just set 'em on the vanity

2    table.  There was a big, big mirror on the other

3    wall opposite to the massage table.

4              And then -- and then she told me to get

5    un -- well, not undressed, but, like, put -- keep

6    your bra and your panties on.

7              And I was like, okay.

8              And then she said --

9    Q.   Had [redacted] told you about that before?

10   A.   No.  I thought, like, it was going to be a

11   massage, like, you keep your clothing on.

12             And that -- when I got in the room, that's

13   when the lady, like, explained what I would have

14   to do.  Just to get undressed and keep my bra and

15   my panties on.  And then --

16   Q.   And did you do that?

17   A.   Mm-hmm.

18   Q.   Is that a yes?

19   A.   Yes.  And then to stay in the room for a

20   couple seconds, and then Jeffrey would be coming

21   in the room any minute.

22             And then Jeffrey did come in the room.  And

23   he said, hi, and he shook my hand again.  But then

24   he went out of the room and he got undressed, but

25   he had a towel on.  And then he came into the room

```
 1    again and laid belly-down on the massage table.
 2         Q.   Okay.  Stop a minute.
 3              What did this man look like?  This Jeffrey
 4    Epstein?
 5         A.   Old.
 6         Q.   How old?
 7         A.   Um, he looked like 50-ish maybe.
 8         Q.   Okay.
 9         A.   40.
10         Q.   How was he dressed when you initially met
11    him?
12         A.   Like he was going golfing.  He just had,
13    like, a polo T-shirt on and khaki pants.
14         Q.   Okay.  And how were you met(sic) when you
15    first went to his -- dressed when you first went
16    to his house?
17         A.   Um, I was wearing a regular T-shirt, my
18    Hollister shirt, and just some jeans.
19         Q.   Okay.  What kind of underwear did you have
20    on?
21         A.   A thong.
22         Q.   And the bra, what type of bra?
23         A.   It was a bra.
24         Q.   Okay.  No special --
25         A.   Uh-uh.
```

1    Q.  -- certain type.  But thong underwear.

2         Were you uncomfortable getting down to your

3    bra and underwear?

4    A.  Uh-huh.  Like, at -- I was kind of

5    hesitant.  I was, like, sitting in the room for --

6    until Jeffrey came in, like, thinking like, to

7    myself, well, like, what's going on?

8         Like, I don't know.  I was kind of

9    hesitant.  But then I just didn't care cause I

10   wanted $200, cause I wanted to spend it.  So I

11   just didn't care.  I just --

12   Q.  Okay.  All right.  So he comes out and he's

13   in a towel.  Start from there.

14   A.  And then he, like, laid on the massage

15   table, got on his stomach.  And then he told me,

16   like, to grab any of the three lotions that she

17   had put down on the table.  And so I just grabbed

18   one of 'em.

19        And then I just gave -- like, I sat --

20   first I wasn't sitting on the table, because he

21   was sitting on the table and it was kind of

22   like -- I just stood up.  And then I started to

23   give him a massage.  And then he's making

24   conversation, asking me exactly what ▬▬▬ was

25   going to tell me to do.  Like, if -- what high

```
 1    school do you go to, and all this stuff, so.
 2         Q.  Did he ask you how old you were?
 3         A.  Uh-huh.  And I --
 4         Q.  And what did you tell him?
 5         A.  I told him I was 18.
 6              And, um, he asked me, like, what do I like
 7    to do for my spare time.
 8              And I said, I dance, and all this stuff.
 9    And just asking me small talk.
10              And then he's like, oh, well, you don't
11    have to stand up, you can sit on the table.
12              And so I sat on the table and I was giving
13    him a massage.  And I think the massage -- it was
14    a couple minutes, like 15 or 20 minutes.  And this
15    whole time we were just conversating about
16    anything.
17              And he was telling me how he had another
18    house in New York, and just a whole bunch of stuff
19    that I was, like, amused by.  And then after like
20    20 minutes of giving him a massage, or 30 minutes
21    or something -- it was around that time, he asked
22    me if I wanted to make an extra hundred dollars.
23    And all -- that he'd have to use --
24         Q.  Before we get there, let me just ask you a
25    couple things.  You said that the assistant had
```

1      you undress?

2          A.   Mm-hmm.

3          Q.   Is that yes?

4          A.   Yeah.

5          Q.   Do you remember telling Detective ███

6      that it was Jeffrey Epstein that asked you to

7      undress?

8          A.   No.  I'm, like, positive it wasn't Jeffrey.

9      Cause he didn't come in the room till after I was

10     already in my underwear and my bra.

11         Q.   Okay.  So if that's in her report, that's

12     incorrect?

13         A.   Yes.

14         Q.   All right.  When you talk about getting on

15     the table, do you recall telling Detective ███

16     that you were actually straddling him and your --

17         A.   That's -- yeah.  That's what -- when I got

18     on the table.  Like, after he -- after a couple

19     minutes.

20         Q.   Okay.  And you were straddling him with

21     your bare buttocks to his bare buttocks?

22         A.   Yeah.  Well, kind of.  There was towel

23     that -- like, it was kind of covering his butt but

24     not really covering his butt.  It was like not

25     really covering his butt.

```
 1              But I was laying, like, on his lower back
 2      near his butt.  But, like, I wasn't on his butt.
 3          Q.  So, if she wrote, you stated you exposed --
 4      your bare buttocks were touching his bare
 5      buttocks --
 6          A.  That'd be kind of correct.
 7          Q.  Okay.
 8          A.  And then -- yeah.  I guess.
 9          Q.  All right.
10          A.  You could say that.
11          Q.  So how long did that go on when you are
12      sitting on top of him?
13          A.  The -- until, like, the massage part was
14      over.  And then he, like, asked, well, would you
15      like to make an extra hundred dollars?
16              And then I said, sure.
17              And then he's like, but I, um, have to --
18      like, you're not going to be giving the massage
19      anymore, it's going to be something different.
20              And I was like, well, what is it?
21              And then he's like, um, can I use a
22      vibrator on you?
23              And I said, um, okay.
24              And then -- so then he got up and he went
25      into the -- his, like, other room for a couple
```

NOT A CERTIFIED COPY

1    seconds; like literally a couple seconds; and then
2    came back in the room.

3         And next to the little vanity, big mirror,
4    and all this big table there was, like, on the
5    floor, there was just like the vibrator.  Or
6    what -- it looked like a vibrator to me.

7         Q.  What did it look like?

8         A.  It was, like, purple.  And it was like --
9    it was kind of like a massager but not really.
10   Like, it looked like a massager, but it wasn't
11   really a massager.  And --

12        Q.  What was it shaped like.

13        A.  Um, like circular in the top, and then it
14   was like a handle on the bottom.

15        Q.  Okay.  All right.

16        A.  And then, um, after he grabbed that he laid
17   back on the table, and -- except this time he was
18   on his back.  And I was partially on the table,
19   like, half of my butt cheek and my leg was on the
20   table, and the one leg was on the floor.  And,
21   like, sometimes I'd put it on the couch.  Like,
22   cause the couch was right here and the table was
23   right there, so it was kind of close.

24        And I -- he told me to keep giving him a
25   massage, but to give a massage on his chest.

```
 1          Q.  So you're sitting on the table now and he's

 2     standing up?

 3          A.  No, no, no.  He was laying back on the

 4     table, but like I was kind of on the table.  Like,

 5     half my butt and my leg was on the table, and the

 6     other half was, like, par -- like, on the couch.

 7     Like, I was holding --

 8          Q.  Okay.  But he's laying down?

 9          A.  Uh-huh.

10          Q.  Okay.

11          A.  And, um, then I was giving a massage on his

12     chest and he was still talking for a couple

13     minutes.  And then he used the vibrator.  And,

14     like, that was for like 10 minutes maybe or so, I

15     think.  And then --

16          Q.  Now, he -- I have to be detailed here.

17     Where was he using the vibrator?

18          A.  Can I say -- along my vagina.

19          Q.  Okay.

20          A.  I don't know what else to say.

21          Q.  All right.  Go ahead.

22          A.  Okay.  And then -- and then after -- for a

23     couple minutes that's what he was doing.  And then

24     he jerked off for like a couple minutes.

25          Like, I was still on the table.  And ████
```

```
 1      told me that if -- if you -- like, if he does
 2      that, then you have to get more money, because
 3      that's like -- he gives you extra money if he
 4      jerks off anyways.  Cause I guess it's some --
 5      like his (indiscernible) or whatever.  And --
 6          Q.  And        had told you that before?
 7          A.  Mm-hmm.  She -- I -- she told me that,
 8      like, the night that I, like, had this whole
 9      conversation with her, and she told me about it.
10          Q.  Okay.  So she just didn't tell you you were
11      going for a massage, she told you that there --
12      you might have to take your clothes off?
13          A.  No.  She didn't tell me that I would had to
14      take my clothes off, but she said that if he jerks
15      off in front of you, then you can get more money.
16          Q.  Okay.  So when he offered you the extra
17      hundred dollars, you had a pretty good idea what
18      was coming next?
19          A.  Yeah.
20          Q.  Okay.
21          A.  And, um --
22          Q.  And when you say "jerked off" what do you
23      mean?
24          A.  He put his hand on his penis, and started
25      going up and down kind of fast.
```

1    Q.   Okay.  Could you see his penis at that

2    point?

3    A.   Uh-huh.

4    Q.   Is that a yes?

5    A.   Yes.

6    Q.   All right.  Go ahead.

7         That went on for how long?

8    A.   A couple seconds maybe.  Like -- yeah,

9    like, 40 seconds.  And then -- and then after

10   that, like, the massage was over.

11        And he went into the -- out of the door

12   back to wherever he goes.  I couldn't see where he

13   was going cause the door was this way and he

14   walked out.  And I guess he had like a -- his

15   money behind the door, cause it only took a couple

16   of seconds for him to come back in the room.

17        And then he opened his money, like, his

18   wad, and gave me three hundred dollar bills.  And

19   told me, thank you.  And I --

20        And then he's like -- there was a note pad

21   there next to the couch -- and told me to write my

22   name and my number; cause I had a cell phone at

23   the time.  And he told me to write my cell phone

24   number down, and how he could get hold of me and

25   all this stuff.

1          So I wrote my number down, and wrote my

2    name.  And then after that he just left the room

3    and told me I could get dressed again and that it

4    was done.  I was over.

5          Q.  Did you actually see him ejaculate?

6          A.  No.

7          Q.  Okay.  Did he not ejaculate or you didn't

8    see that?

9          A.  If he did, I didn't see.

10         Q.  Okay.  Do you recall telling Detective

11    ███████ it happened in a different sequence?

12         A.  No.

13         Q.  And that he masturbated first before he put

14    the vibrator on your vagina?

15         A.  Mmm, maybe.  This was like two and a half

16    years ago, so --

17         Q.  Okay.

18         A.  -- that could have happened.

19         Q.  Do you recall not telling her about the

20    vibrator at all --

21         A.  Yeah.

22         Q.  -- the first time you talked to her?

23         A.  Yeah I remember that.  Because I was

24    scared.

25         Q.  Okay.  Why were you scared about that and

1    not scared about telling her that he ejaculated in

2    front of you -- or masturbated in front of you?

3        A.   Cause that's his body, and the vibrator's

4    on my body.

5        Q.   So you didn't want to admit that you had

6    allowed him to touch you?

7        A.   Yeah.

8        Q.   Okay.  And he gave you $300?

9        A.   Uh-huh.

10       Q.   You left your number so he could contact

11   you again?

12       A.   Yes.

13       Q.   Okay.  When he left the room, what

14   happened?

15            You got dressed.  Did he take you

16   downstairs, you go downstairs by yourself?

17       A.   I just went downstairs by myself.

18       Q.   Who was down there?  Was ▓▓▓▓ still down

19   there?

20       A.   Uh-huh.  The -- ▓▓▓▓ was there, and the

21   other girl was there.  And the assistant lady, she

22   might have been there, but I don't know.  I can't

23   remember.

24            But then after that, we left.  Like, they

25   didn't do anything.  They didn't -- she got money

1    but she didn't do anything.

2        Q.    ████ -- who?  Who is "she"?

3        A.    ██████ did.

4        Q.    Okay.  Do you know how much money ██████

5    got?

6        A.    I think it was $300 too.

7        Q.    Okay.

8        A.    Or maybe 200.  300.

9        Q.    Do you know what that was for?

10        A.    No.  At the time I -- I thought maybe she

11    did something with somebody else in the house.

12    But then I was, like, thinking there was only

13    Jeffrey and the lady there.  Like, I didn't think

14    anything of it.  And I --

15        Q.    But did you learn that she got money for

16    bringing you there?

17        A.    Yeah.  I kind of figured that when I got

18    back home.  Like, I was thinking about it for a

19    while.  And I realized, well, it's probably cause

20    she brought me.

21        Q.    Okay.  Did you discuss with ██████ what

22    happened up in that room?

23        A.    Yes.  Then when we got in the -- the, um --

24    back in her truck, um, at first we were all like,

25    um, oh let's go.  Let's go spend our money.

1          Then she was like, oh, what happened?  What

2     did you do?  How much money did you get?

3          And I was like, I got $300.  And I was

4     like, kind -- I was excited.  $300.

5          And then she was like, you got 300?  What

6     did you have to do with him?

7          And then she told -- or I told him -- or

8     her what I did.

9          And then she's like, oh, yeah.  Um, I've

10    done that too, blah, blah.

11         And like, you could -- she was -- then she

12    told me, like, what -- what -- like if you do this

13    it's -- you get that; if you do this, and then get

14    that.  And she was telling me, like, all this

15    stuff.

16         And then I was, like, laughing about it.

17    Cause I was like, yeah, thanks, you know, for

18    telling me that I'd have to get in my bra.

19         And she's like, oh, sorry.  And she's

20    laughing.  And then the other girl starts laughing

21    too.  And then we all laughed together.

22         And then -- then we went to T.J.Maxx and

23    she got a purse.  And I didn't spend any of my

24    money.  I kept it in my -- I wanted to spend it,

25    but I didn't want to spend it at T.J.Maxx.  I

1          wanted to go to the mall or something.  So then I

2          kept it in my -- my house.  Like, my purse and

3          stuff.  And --

4              Q.  Let me stop you there.

5                  When you're in the car back with ▮▮▮▮,

6          going back, did you and ▮▮▮▮ discuss doing this

7          again so you could earn more money?

8              A.  Yeah.

9              Q.  Okay.

10             A.  I think --

11             Q.  Um --

12             A.  -- we had.  She -- we didn't plan a -- like

13         any certain date, she was just like -- we didn't,

14         like, plan this or -- like, again, we didn't plan,

15         plan it.  I was just like -- she was like, oh,

16         well, if you ever need money again you can always

17         call me and you can come with me.

18                 And I said, okay.

19             Q.  You don't recall telling Detective ▮▮▮▮

20         that you made plans to do this every Saturday so

21         you could get rich?

22             A.  Oh, yeah.  Oh yeah.  Well, it wasn't like a

23         plan, plan.  It was kind of like an imaginary kind

24         of -- every Saturday.  Like --

25             Q.  Okay.

1        A.    -- it wasn't for sure.

2        Q.    Did you go back to Jeffrey Epstein's house

3    to give him other massages?

4        A.    I did not.

5        Q.    Okay.

6        A.    When I was on the phone with the detective,

7    we pretended for ███; cause she was on the other

8    line; we pretended that I was going to go back,

9    but -- just so she could say something.    But I

10   never did.

11       Q.    Okay.    So you did a controlled phone call

12   with ███?

13       A.    Uh-huh.

14       Q.    Trying to get her to make admissions?

15       A.    Yes.

16       Q.    Is that a yes?

17       A.    Yeah.

18       Q.    Okay.

19             All right.    Was there another reason you

20   sort of didn't go back?    That some people might

21   have found out about it or were talking about you?

22       A.    Yeah.    Um, that's what I was going to get

23   to.

24             At school, um, I had, like, my best friend.

25   And I told her in dance class; cause that's my

1    first period, that was my first period class.

2    And, like, right when I got back to school I had

3    the $300 on -- in my purse with me.

4         And I told her, like, if you ever want to

5    make $300, you can come with me, and ▇▇▇ will

6    take you.  And I didn't say her name, I said like,

7    my friend will take you.  And all you have to do

8    is give him a massage and stuff.  And I told her

9    what I did.

10         I didn't tell her everything, I didn't tell

11    her the -- the vibrator part; I just left that

12    out.  But I told her everything else.

13         And, um, she kind of laughed and giggled.

14    And she's like, okay.  I'll keep that in mind.

15    And then, um --

16    Q.   Who was this person that you told?

17    A.   ▇▇▇▇▇▇▇ and ▇▇▇▇ -- well, she was in

18    the conversation, but she's, like, didn't say

19    anything to anybody.

20    Q.   ▇▇▇▇?

21    A.   ▇▇▇▇▇▇▇.  She didn't -- she didn't

22    say anything at first until everybody else found

23    out.

24         And then -- well, after I told ▇▇▇▇, the

25    rest of the day goes by.  And she was telling

```
 1    people, and, like, telling everybody in school.
 2          And then I was like -- I saw her in my gym
 3    class that same day and I just confronted her.
 4          I was like, well, why are you telling
 5    people?  And that's kind of my business.  And I
 6    kind of told you to be nice and not to, like, go
 7    around telling people.  You're supposed to be my
 8    best friend.  And then she just laughed about it.
 9    So then we got in an altercation in the gym room.
10       Q.  Was that a fight?
11       A.  Yes.
12       Q.  You had a fight?
13       A.  I -- we got into a fight.  And, um, that's
14    when I had to go to the Principal's office.
15          And ████████ told why she got in the fight
16    with me.  And I told her why she -- why we got in
17    a fight.  And I kind of -- we -- at first we both
18    kind of lied about why, cause -- or I did.
19          And then -- and then I was -- just told the
20    Principal she was spreading rumors about me.
21          And then ████████, I guess, told the
22    Principal why, like, for real.
23          And so then the Principal, when I had to go
24    in the room, she was like, let me see in your
25    purse.
```

```
 1              And I said, why?

 2              And she's like -- asked me if I had any

 3    money.

 4              And I said, no, I don't have any money on

 5    me.

 6              And then she said, like, you don't have to

 7    lie.  You're not going to be in trouble.  Give me

 8    your purse.

 9              And then I gave her my purse.  And she

10    found the $300.  And she asked me how I got it.

11              And I say, I work at              ; cause at

12    the time I really did work at              .

13              And, um --

14       Q.   Why did you lie to the Assistant Principal?

15       A.   Cause I didn't think it was, like, any of

16    her business, like, why we were arguing or

17    anything.

18              And I thought, why would I tell on myself

19    if I'm -- if she doesn't really know anything yet?

20              But then she really did know, cause

21    told her.

22              And then she -- after she showed -- like,

23    after she took my purse and she looked at the

24    $300, and she -- she didn't believe what I said,

25    like, at all.
```

40

1          And I just kept lying and, like, saying,
2     no, I got it from ███████. My work, my work.
3          And then she said, you don't have to lie.
4     I know -- I know what happened.
5          And she called my step mom.  And my step
6     mom came to the school.  And my step mom said,
7     like, you didn't get $300 from your paycheck.
8     You're lying.  And then that's when -- that's
9     when, like, I don't know, everything kind of came
10    out.
11         And then I --
12    Q.   You didn't tell your parents at first so
13    did you lie to them too?
14    A.   I said I was doing drugs, and I was dealing
15    them.  Like, I made up any kind of lie.  I didn't
16    want to tell 'em what happened.
17    Q.   Did there come a time when Detective ████
18    got some messages on your phone?
19    A.   From --
20    Q.   From ████?
21    A.   -- ████?
22         Yeah.  She -- oh.  Well, after that whole
23    thing, my cell phone was taken away.  So, yeah,
24    she had my cell phone from that day until she --
25    until I moved to ████.

```
 1            And she -- like, my mom, I think she still
 2       has it, or the Court or whatever has my cell
 3       phone.
 4            Q.   You talked about telling your mom you were
 5       doing drugs -- or selling drugs?
 6            A.   Yeah.  I just --
 7            Q.   Which one?
 8            A.   My -- just -- both.  I just kind of -- my
 9       dad's arguing with me, and I just kind of told
10       'em, well, I'm a drug dealer.
11            Q.   Okay.  So you -- you've had a problems with
12       drugs though, haven't you?
13            A.   I did.
14                 Not a problem, I experimented.
15            Q.   Didn't your parents actually send you away
16       to a rehabilitation center because of it?
17            A.   To a family help center --
18            Q.   Okay.
19            A.   -- to be specific or whatever.
20                 It was because of that, but it was also
21       because I had a lot of family, like, getting-along
22       problems.  Like, I argued with my parents a lot.
23            Q.   Were you doing drugs during the time that
24       you went to Jeffrey Epstein's house?
25            A.   Um, no.  Well, the only -- the only drug
```

1    that I did that time was pot.  Like, I smoked it

2    sometimes.  I didn't do, like, drug drugs, like

3    bad kind of drugs.

4         Q.  Do you still do pot?

5         A.  No.

6         Q.  Do you have a MySpace.com account?

7         A.  Yes.  I have a MySpace.

8         Q.  On there you talk about doing drugs?

9         A.  No, I don't talk about it.

10        There's like a -- like, a little thing

11   where it says create, like, your own thingy.

12        And it asks questions, like a -- a survey;

13   that's the word I'm looking for; a survey about --

14   like, they just ask questions.  And it says, have

15   you ever done drugs?

16        And I said, yeah.

17        Have you -- it says, have you ever done

18   drugs.

19        Q.  Okay.  It asks a lot of questions about

20   you, right?

21        A.  Yes.  But I also did delete that MySpace

22   and I did a good one.  I --

23        Q.  Okay.

24        A.  I delete -- cause my parents found out.

25        Q.  So you had one that wasn't real good?

```
 1        A.   Yes.

 2        Q.   That you'd lied about your age on, said

 3   were you 18 on?

 4        A.   No.  I didn't say I was 18.

 5        Q.   This your account?

 6        A.   No.

 7        Q.   Here with, ████? Female, 18 years old.

 8   Lives in ███████?

 9        A.   Yes, but I didn't do this one.

10             All mines have, like, cool things in the

11   back.  Like, mine -- I would never make an ugly

12   one.

13        Q.   ████████████ do have more fun.

14        A.   Yeah.

15        Q.   You're a ████?

16        A.   Yeah.  But -- and I have that ex -- like,

17   those exact same things on my old one.

18             It had, like, not in -- what it says about

19   me, in that little sentence --

20        Q.   Okay.

21        A.   -- that's not -- I didn't make that.

22        Q.   So when you're talking about that survey

23   you answered, it says your -- your choice of

24   alcohol.  And you put beer?

25        A.   Yeah.
```

```
 1          Q.  Do you drink beer?

 2          A.  At parties.

 3          Q.  Okay.  It says you have █████ piercings?

 4          A.  Not anymore.  Now I only -- well, I used to

 5     have my █████████ pierced.

 6          Q.  It takes -- you have to be 18 in the state

 7     of Florida to have body piercings other than your

 8     ears?  How --

 9          A.  My dad --

10          Q.  How did you get those?

11          A.  My dad took me to get my ████████

12     pierced for my 14th birthday.  Cause, like,

13     everybody was getting one, so I begged for it.

14              And then I just got my ████ pierced, so.

15          Q.  Did you have to provide identification for

16     your ████, just prove you were 18?

17          A.  No, my dad -- my dad let me.

18          Q.  Your dad, okay.

19              So you didn't have false identification at

20     that time?

21          A.  No.

22          Q.  Okay.  So you said yes to drinking and

23     smoking?  Smoking pot?

24          A.  Yeah.

25          Q.  There's a question, do you shoplift?
```

```
 1              Do you recall what you put for that?
 2         A.   I did.
 3         Q.   What -- you did shoplift?
 4         A.   Like, yeah, a couple times.
 5         Q.   Did you recall putting, lots of times, on
 6    your site?
 7         A.   Maybe.
 8              This was a long time ago, so.
 9         Q.   Okay.  You reported income of $250,000 --
10         A.   As a joke.
11         Q.   -- on that site?
12         A.   Yeah.  It's a joke.
13              Like, all my friends do that, cause it's
14    kind of funny and random and stupid.
15         Q.   Okay.  So it's not that you're making money
16    elsewhere --
17         A.   No.  It --
18         Q.   -- doing similar activity?
19         A.   -- was just kind of stupid.
20              It's like a joke.
21         Q.   Okay.  Did you ever make arrangements with
22         ████ to go back to Jeffrey Epstein's house in
23    April of ███?
24         A.   Not when I was with her.
25              Maybe on a phone conversation, like, with
```

1    that detective, but not ever when I was with her.

2        Q.  Did you ever talk to ▮▮▮▮ about going back

3    in April of ▮▮▮▮

4        A.  I really don't think so.

5        Q.  Okay.

6            All right.  At this point I'm going to ask

7    the grand jurors if they have any questions for

8    you.

9        A.  Okay.

10       Q.  Okay?

11                   A JUROR:  Where do you live now?

12                   THE WITNESS:  I live in ▮▮▮▮▮▮▮▮.

13                   A JUROR:  Where?

14                   THE WITNESS:  ▮▮▮▮▮▮▮.

15                   A JUROR:  Did you say that before you

16       lived up in ▮▮▮▮?

17                   THE WITNESS:  Yes.  I moved to

18       ▮▮▮▮▮ in ▮▮▮ with my mother.

19                   MS. BELOHLAVEK:  Your mother -- your

20       stepmother and father sent you up there to

21       get away from the activities down here?

22                   THE WITNESS:  No.  I moved with my

23       mom.

24                   When I was with my dad, like, after

25       this all happened, my mom and my dad were

```
 1          arguing.  And I didn't like my dad anymore.
 2          I -- I just felt like living back with mom.
 3          So then I moved with my mom.
 4                And that's when I went to the family
 5          center; like, ███████ is what it's
 6          called.  And then after that, my mom had
 7          planned on moving to ██████.  She's been
 8          planning for, like, 2 years before any of
 9          this ever happened.  And they finally found
10          a house in ██████.  So we moved, and I
11          moved with them.
12                A JUROR:  Do you have any idea deep
13          down inside of you that you -- what your
14          doing is wrong?
15                THE WITNESS:  Yeah.  I did.
16                A JUROR:  Oh, do you?
17                Have you --
18                THE WITNESS:  Oh I --
19                A JUROR:  Have you set the goals of
20          to not do it anymore?
21                THE WITNESS:  Yes.  I don't --
22          haven't talked to any of those people since
23          that day.
24                A JUROR:  And you're well aware
25          that -- what you're doing to your own
```

```
1              reputation.

2                   THE WITNESS:  Yes.  I do.

3                   MS. BELOHLAVEK:  You aware that you

4              committed a crime?

5                   THE WITNESS:  Now I am.  I didn't

6              know it was a crime when I was doing it.

7                   Like, I -- I don't know.  Now I -- I

8              guess it's prostitution or something like

9              that.

10                  MS. BELOHLAVEK:  Any other questions?

11                  A JUROR:  One more.

12                  You said you worked at              .

13             You were 14, you were working at

14                            ?

15                  THE WITNESS:  Yeah, in            .

16             That's when they, like, first let you work,

17             when you're 14.

18                  A JUROR:  Okay.  Now you're work --

19             you're living back now with your father in

20             the meantime?

21                  THE WITNESS:  (No audible response).

22                  MS. BELOHLAVEK:  Anybody else in the

23             front row?

24                  Second row.  Yes, sir.

25                  A JUROR:  Um, you kept saying
```

```
 1              Jeffrey's assistant.  Do you know her name?
 2                   THE WITNESS:  No.  I know that she
 3              was blond haired, and she was tall and
 4              skinny.  I don't remember her name.
 5                   A JUROR:  Okay.
 6                   MS. BELOHLAVEK:  Yes, sir.  In the
 7              back row.
 8                   A JUROR:  Yes.
 9                   Miss          , did you ever go back
10              to Mr. Epstein's on your own?
11                   THE WITNESS:  No, sir, I didn't.
12                   A JUROR:  Did he ever contact you
13              with your cell phone?
14                   He never called you?
15                   THE WITNESS:  No.  Because I got my
16              phone taken away.  Like --
17                   A JUROR:  Did you --
18                   THE WITNESS:  -- right when I was in
19              trouble.
20                   A JUROR:  -- ever feel that his
21              behavior was a little strange?
22                   THE WITNESS:  That's what we all
23              joked about in the car.
24                   A JUROR:  Yeah, but did it ever occur
25              to you that he could have hacked you up?
```

```
 1                    THE WITNESS:  I -- now I think about
 2          it.  And a lot of things could have
 3          happened.  I thought about it a lot.
 4                    And a lot --
 5                    A JUROR:  Should give it a little
 6          further thought.
 7                    THE WITNESS:  -- different things
 8          could have happened.
 9                    MS. BELOHLAVEK:  Any other questions
10          for Miss ███████?
11                    All right.  Thank you very much.
12                    THE WITNESS:  Thank you.
13                    (Witness excused.)
14                    (WITNESS ██  ███████ RECALLED)
15                    MS. DUGGAN:  I'll go ahead.
16                    And for the record, this is Detective
17          Joe ███████
18                    I don't need to re-swear you in.
19          We'll just remind you, you're under oath.
20                    THE WITNESS:  Okay.
21                    MS. DUGGAN:  Okay.
22                    CONTINUED EXAMINATION
23     BY MS. BELOHLAVEK:
24          Q.  Detective ███████ let's go back to the
25     investigation before you took over; it's still
```

1      Detective ■■■■    There's mention in her report of

2      trash pulls.

3              What's a trash pull?

4          A.    A trash pull is when you make arrangements

5      with the supervisor of sanitation to have the

6      trash man go onto the property, remove the trash,

7      and place it in the empty well of the trash truck.

8      And you follow 'em to a different location, then

9      you retrieve the bags from the truck.

10         Q.    How is it that you can take things off

11     someone's property without a search warrant in

12     that way?  Is it permissible because it's been

13     discarded?

14         A.    It's discarded.  It's trash.

15              It was in the truck.  We just take

16     possession of it from the truck.

17         Q.    Okay.  April 1, 2005, was there a trash

18     pull at Jeffrey Epstein's house?

19         A.    Correct.

20         Q.    Okay.  Do you know what was found when they

21     examined the trash from his home?

22         A.    Several messages with phone numbers written

23     on it with girls' names, and different messages.

24         Q.    Did any of the messages that you've had a

25     chance to look at talk about any of the girls you

```
 1    found out through your investigation had gone to
 2    Jeffrey Epstein's house?
 3        A.   That is correct.  The names and phone
 4    numbers were of girls that have gone to the house
 5    and left little messages.  I have girls for him.
 6    You know, for a good time call me type of thing.
 7        Q.   Okay.  Was there a message indicating that
 8    ▆▆▆▆ had an appointment in April?
 9        A.   Yes.
10        Q.   And what time did ▆▆▆▆ have an appointment
11    in April?
12        A.   11 a.m.
13        Q.   Okay.  Do you know if Detective ▆▆▆▆ had
14    taken voice mails from ▆▆▆▆▆ phone where ▆▆▆▆
15    was confirming meeting with ▆▆▆▆ --
16        A.   Right.
17        Q.   -- to go there at 11:00?
18        A.   There were controlled phone calls
19    between -- ▆▆▆▆ was making phone calls to ▆▆▆▆
20    for us, as part of the investigation.  ▆▆▆▆ made
21    the appointment to bring ▆▆▆▆ over at 11 a.m. for
22    April 1.
23        Q.   But ▆▆▆▆ never went there?
24        A.   No.
25        Q.   Okay.  Now were there any messages
```

1    indicating that someone named ███ or someone

2    named ███ has appointments to go to Mr. Epstein's

3    house?

4        A.  Yes.  There was several mentions of ███

5    and ███.

6        Q.  Were you able to identify who ███ and

7    ███ were?

8        A.  Yes, I did.  Later on in the investigation

9    we discovered that ███ was actually ███

10   ███, another ███████████ School

11   student who still attends.  And ███████ was the

12   other girl that was frequenting Epstein's house.

13       Q.  How old was ██████ at that time?

14       A.  I believe she was 16.

15       Q.  And how old was ██████?

16       A.  ██████.  Through the investigation I

17   found out she started going to the house when she

18   was 16 or had just turned 16.

19       Q.  And how long of a time did she continue to

20   go there?

21       A.  Till she turned 18.

22       Q.  Okay.  Was there a trash pull on

23   September 21st of 2005?

24       I guess this is after you've taken over the

25   investigation.

```
 1        A.   Correct.

 2        Q.   Okay.  Was there a trash pull that day?

 3        A.   Yes.

 4        Q.   Did you find anything interesting in that

 5   trash pull?

 6        A.   Um, I'm trying to get to --

 7        Q.   Maybe page 24, 25 of your report.

 8             Page 24.

 9        A.   The date was September?

10        Q.   September 21st.

11        A.   Okay.

12             Yes.

13        Q.   What did you find in that trash pull?

14        A.   I had notes with the name ██████, with her

15   phone number.  As well as ████████; for a good time

16   call ████████.  And --

17        Q.   Were you able to identify ████████?

18        A.   Yes.

19        Q.   Who is ████████?

20        A.   ██████ is ████████████████.

21        Q.   And what about ████████?  Were you able to

22   identify ████████?

23        A.   Yes.  Through the investigation I was able

24   to find out that ████████ is actually ████████

25   ██████.
```

1    Q.   Can you spell ████?

2    A.   ██████████.

3    Q.   And how old was she at the time?

4    A.   17.

5    Q.   Okay.  Another trash pull on October 3,

6    2005?

7    A.   Correct.

8    Q.   Anything interesting found in that trash

9    pull?

10   A.   October 3rd.

11        What page are you on?

12   Q.   Page 26.  Page 26 is a report dictated by

13   Officer ██████.

14   A.   ██████  ████████, correct.

15   Q.   Okay.

16   A.   That's why.

17   Q.   In there he indicates that in the trash

18   pull they located a hard plastic or clear acrylic

19   stick which was shaped with small ridges.  This

20   device is commonly used as a sexual toy which is

21   inserted into the vagina or anus for stimulation.

22   Was that type of item actually found?

23   A.   Um, the device was actually found.  But

24   later on in the search warrant it was discovered

25   that it was actually the handle of the --

1      Q.  For the silverware?

2      A.  -- for forks -- for forks and knives.

3      Q.  Okay.  So it wasn't something we would call

4  a vibrator or a dildo?

5      A.  No.

6      Q.  Okay.  It appeared that way to him, but you

7  were able to confirm later it was not?

8      A.  Right.

9      Q.  Okay.

10      All right.  You are aware, from your

11  investigation and talking to Detective       that

12  ████████████████ said she was initiated into going

13  to Jeffrey Epstein's house by someone named ██████

14  ████████?

15      A.  Correct.

16      Q.  Were you ever able to talk to ████████████?

17      A.  Yes, I did.

18      Q.  When was that?

19      A.  October 3, 2005.

20      Q.  Where did that take place?

21      A.  Sergeant ██████ and I went to her house out

22  in ███████████, knocked on the door, and asked her

23  to come back to the station for further

24  questioning reference this investigation.

25      Q.  How old was █████?

```
 1        A.    ████  had just graduated from high school,

 2   from ███████████████  School.

 3        Q.   Okay.  Was she a minor at the time or an

 4   adult?  Do you recall?

 5        A.   Well, in the -- at the time she would have

 6   been a -- an adult.

 7        Q.   When --

 8        A.   At the time of the interview.

 9        Q.   When you talked to her.  Okay.

10             Did she talk to you that day at her house?

11        A.   No, she came back with us to the police

12   department for further questioning.

13        Q.   She was uncomfortable talking at her house?

14   She told you she wanted to do it elsewhere?

15        A.   Um, no.  We just -- I wanted to go over

16   documents that I didn't have with me, with her --

17        Q.   Okay.

18        A.    -- at the --

19        Q.   So when did she come to the police

20   department?

21        A.   That same day.

22        Q.   What did ███████████  tell you?

23        A.   During a sworn taped statement she stated

24   that she became in contact with Mr. Jeffrey

25   Epstein when she was 17, when she was approached
```

1    by a friend with an opportunity to make money.

2    She was taken to the Epstein's residence.  She was

3    told that she would have to provide a massage, and

4    make $200.

5          She was taken to the house, she was

6    introduced to his -- Epstein's assistant by the

7    name of [REDACTED].  [REDACTED] then would escort her

8    upstairs, prepare the room for the massage by

9    putting out the ointments and the different oils.

10         Mr. Epstein came into the room.  He

11   demanded she remove her clothing.  She did so.

12   She started giving the massage, rubbing his back,

13   his calves and thighs.  He turned onto his back,

14   asked her to rub his chest.  As he did so he tried

15   to touch her, touch her buttocks.  She pulled

16   away, she said I'm uncomfortable with you touching

17   me.  I'll give you the massage but I'm

18   uncomfortable with you touching me.

19         It was at which time he said, I know you're

20   uncomfortable.  If you bring me girls I will pay

21   you to bring me girls.

22   Q.   So he didn't make her do anything she was

23   uncomfortable with?

24   A.   Right.

25   Q.   Okay.  How did she indicate that she first

1    met anybody that knew Jeffrey Epstein?

2       A.  She was approached by one of her friends in

3    █████████ by the name of █████, unknown last

4    name.  I was never --

5       Q.  You never --

6       A.  -- able to identify --

7       Q.  -- determine --

8       A.  -- who █████ was, who actually took her to

9    Epstein's house and introduced her into the

10   household.

11      Q.  Okay.  Were you able to determine the

12   approximate date when she met this █████ who took

13   her to Epstein's house?

14      A.  Sometime when she turned 17, she told me.

15      Q.  Okay.  So she was 17 when she first went

16   there?

17      A.  Mm-hmm.

18      Q.  All right.  When he talked to her about

19   bringing other girls to him, since she's

20   uncomfortable, what was her response to him?

21      A.  She agreed to bring the girls to him.  And

22   he told her, the younger, the better.

23        She brought a 23-year old to massage him,

24   and he told her that she was too old and he wanted

25   someone younger.

```
 1              Knowing that she went to ▓▓▓▓▓▓▓▓▓▓▓
 2      ▓▓▓▓ School, he recommended that she ask her
 3      friends.
 4              During the statement she gave me
 5      approximately six names that she can remember that
 6      she took to the house that all went to ▓▓▓▓▓▓▓
 7      ▓▓▓▓▓▓▓▓ School.
 8         Q.   Who did ▓▓▓▓ tell you she took to the
 9      house?
10         A.   Um, ▓▓▓▓▓▓▓▓▓, ▓▓▓▓▓▓▓▓▓, ▓▓▓▓▓▓
11      ▓▓▓▓▓▓, ▓▓▓▓▓▓▓▓, ▓▓▓▓▓▓▓▓▓, and the 14
12      year old victim, ▓▓▓▓▓▓▓▓▓▓.
13         Q.   ▓▓▓▓▓▓▓▓▓▓▓▓, okay.
14              Did you ask ▓▓▓▓ if she told these people
15      what to expect when she took them to Jeffrey
16      Epstein's house?
17         A.   She explained that all the girls knew what
18      was to be expected.  The more you did, the more
19      money you made.  She explained that there was
20      going to be a massage or some possible touching,
21      and you would have to provide the massage either
22      topless or naked.
23         Q.   And she told you that she told ▓▓▓▓ that?
24         A.   She said that she told all the girls that.
25         Q.   Okay.  During your conversations with
```

1          ▮▮▮▮, did she refer to herself as somebody

2     famous?

3          A.   On the ride back, back to her house, she

4     had stated that she was the -- she was like Heidi

5     Fleiss, the Hollywood Madam that provided girls to

6     clients.

7          Q.   Did ▮▮▮▮ -- you may have told me this

8     earlier, and I apologize if I didn't hear it --

9     did ▮▮▮▮ undress when she provided the massage?

10         A.   Yes.  She provided the massage naked, under

11    the direction of --

12         Q.   Not just down to her underwear?

13         A.   No.  I believe it was naked.

14         Q.   Okay.  Did -- was there ever any indication

15    of a vibrator like ▮▮▮▮ described, with ▮▮▮▮?

16         A.   No.  But she -- she was aware of the

17    vibrator.

18         Q.   From ▮▮▮▮?

19         A.   Vibrator slash, massager.

20         Q.   Okay.

21              Was ▮▮▮▮ paid money, did she tell you, for

22    bringing these other girls?

23         A.   Yes.

24         Q.   How much money?

25         A.   She was paid approximately $200 for every

```
1    girl she brought.

2         Q.   Just one time per girl or every time she

3    brought a girl did she get another $200?

4         A.   Every time she brought a girl she got $200.

5         Q.   Even if it was the same girl over and over?

6         A.   Correct.

7         Q.   Okay.

8              All right.  You found the card that says,

9    for a good time call ███████.  You were able to

10   identify her as ████████████?

11        A.   Correct.

12        Q.   Did you get a statement from ██████████?

13        A.   Yes, I did.  At that time ███████ was

14   already attending college, she had started ████

15   ██████████.

16             She stated that nothing inappropriate had

17   occurred originally, and then explained that, you

18   know, he had -- Epstein had tried to touch her on

19   several occasions.

20        Q.   Did she change her statement at some point

21   to you?

22        A.   Well, originally she started off saying

23   that nothing had -- nothing inappropriate had

24   occurred.  Further questioning, she had changed,

25   that there was additional things that had
```

1    happened.

2        Q.  Okay.  What did she say the additional

3    things were that happened?

4        A.  There was attempted touching.  He had

5    caressed her buttocks cheeks.

6            All the while he had -- he had introduced

7    the vibrator, but did not -- she did not allow a

8    vibrator to be used on her.

9            She described the vibrator having a huge

10   head on the tip of the vibrator, white in color.

11       Q.  Now was this -- it progressed in the first

12   time she was there to just massage to touching to

13   vibrator, or were there numerous times she went to

14   his house?

15       A.  Numerous times that she went to his house.

16   This all progressed as more times she came to the

17   house, more things started to occur.

18       Q.  How many times did she go to Jeffrey

19   Epstein's house?

20       A.  Off the top of my head, I -- she stated

21   that she had been there many times.

22       Q.  All right.  The last known time that she

23   told you about was when?

24       A.  Was in October.  The last time Mr. Epstein

25   was in town, October 3rd or 4th of ███.

1          Q.   Okay.   Do you know of any of the girls that

2     say they went to his house after 2005?

3          A.   No.   I don't believe Mr. Epstein has been

4     back.   He learned of the investigation in October.

5          Q.   Okay.   Was she paid by Jeffrey Epstein?

6          A.   Yes.

7          Q.   Do you know how much she was paid?

8          A.   She was paid between 200 and $300.

·9          Q.   Each time?

10          A.   Each time that she went.

11          Q.   Did she get any other compensation other

12     than money from him?

13          A.   She also received a rental car, which as of

14     this date I think that she's still driving it,

15     from Dollar Rent a Car.

16          Q.   Okay.   Were you able to confirm through the

17     rental car that it was rented by Mr. Epstein or

18     someone in his --

19          A.   It was --

20          Q.   -- employ?

21          A.   -- rented by -- it was rented by Mr. -- his

22     houseman, Janusz Banasiak, with a credit card of

23     Mr. Epstein's.

24          Q.   Okay.   Were you able to get a statement

25     from the person you identified as ▆▆▆▆▆▆?

1     A.   That is correct.

2     Q.   When did that occur?

3     A.   On October 10th I had made telephone

4     contact with her; she was up in ███████████,

5     Florida.  And I had explained to her that I was

6     conducting this investigation.

7          Miss ████ began to cry.  Explained that she

8     had been to the house hundreds of times.  Started

9     going there at the age of 16, when she was still

10    attending ███████████████████ School.  Where she

11    was offered to -- $200 for 30 minutes of work.

12    Q.   How was she introduced to him?

13    A.   She was taken to him by a friend of hers

14    who also had gone to ████████████████ School,

15    ███████.  ████████████.

16    Q.   Okay.

17    A.   She was taken to the house.  She would have

18    to perform this massage naked.

19    Q.   She knew that before she went?

20    A.   That was explained to her by ████████.

21    Q.   Okay.  What did she describe about that

22    first visit to Jeffrey Epstein's house?

23    A.   She recalled that the appointment was set

24    up for that same day.  They contacted

25    Mr. Epstein's assistant, ████████ later identified

1    as ███████████    where the appointment was made.

2    She was taken.  She remembered it was on the

3    weekends because she only worked on the weekends,

4    as she was still going to high school.

5         She was taken upstairs to the master

6    bedroom.  She could observe in the spiral

7    staircase up to the bedroom area there were

8    photographs of naked women throughout the house.

9    Q.  Adult women?

10   A.  I believe so.

11   Q.  Okay.  She goes upstairs, what happens

12   upstairs?

13   A.  She's taken into the room.  The room is set

14   up, the massage tables are set up, ointments are

15   put out by ███████████    Epstein enters the room

16   and introduces himself to her.  He lays on the

17   massage table and asks her to get comfortable.

18        She stated that she couldn't remember if

19   she provided the massage naked, but knows that she

20   removed -- she had -- I'm sorry -- she had rubbed

21   his legs, thighs, and feet.

22        All during this time Epstein turned on to

23   his back so that she could rub his chest, and he

24   started to masturbate.

25   Q.  Okay.

1          A.  Which was another thing, one of the other

2     girls -- every time there was a massage, Epstein

3     would masturbate himself.

4          Q.  Was she able to see his penis or was it

5     under the towel he had come out in?

6          A.  He had exposed his penis to her.  Removed

7     the towel which made it visible.

8          Q.  How long did that go on?

9          A.  She had been to his house over, in a 2-year

10    period that she stated, hundreds of times.

11         Q.  I meant the masturbation?

12         A.  Oh, oh.  It was for several minutes.

13         Q.  Okay.  Did he touch her at all that first

14    time?

15         A.  Um, I believe he did use the vibrator on

16    her, if I recall.

17         Q.  I'm going to direct you to page 39, second

18    full paragraph halfway down.

19         A.  Okay.

20         Q.  I believe your report says Epstein touched

21    her breast?

22         A.  Yes.

23         Q.  Okay.  So at that point he touched her

24    breast.  Do you recall --

25         A.  Right.

```
1          Q.  -- if the vibrator was uses that first time

2     or if it was just the touching --

3          A.  Yes.

4          Q.  -- of her breast?

5          A.  No.  He did touch her breasts as he

6     masturbated.

7          Q.  Was she paid money for that visit?

8          A.  $200.

9          Q.  Did she go back to his house?

10         A.  Yes, she did.

11         Q.  And I guess you've told us, for about

12    2 years she went back.

13              Is that a yes?

14         A.  Yes.  Correct.

15         Q.  She estimates over a hundred times?

16         A.  Yes.  She does.

17         Q.  Did the situation with ████████ progress?

18         A.  It did.  During the time frame that she was

19    attending there, over the 2-year period, she

20    stated that every time she went there it didn't

21    have to be involving the massage or any kind of

22    sexual encounter.  At times that she would go, she

23    would end up just having dinner or talking with

24    Epstein.

25              At one point Epstein introduced his other
```

1    assistant, ███████████.

2            She explained that he had brought her from

3    ███████████ to the United States to be his sex

4    slave.

5        Q.  Were you ever able to confirm that?

6        A.  I know that she is here on a visa, a

7    modeling visa.

8        Q.  You don't know the purpose she's here,

9    other than you were able to confirm the visa?

10       A.  Yes.

11       Q.  Okay.

12       A.  She's here for a visa.

13       Q.  What did ███ describe as the progression

14   of sex acts?

15       A.  He introduced ███ into their routine.

16       Q.  So it became a threesome at some point?

17       A.  Right.

18       Q.  Okay.

19       A.  He had asked ███ to perform oral sex on

20   ███. ███ originally had refused.  He enticed

21   her by giving her additional monies to perform

22   this act for 5 minutes.

23       Q.  How much additional money?

24       A.  200 -- $200 extra.

25       Q.  And then she agreed?

```
 1          A.   At which point she agreed.

 2          Q.   Okay.  Was it always just the masturbating

 3     in front of ████ and sex acts with ████    or were

 4     there additional sex acts with Jeff Epstein?

 5          A.   It was explained that at one point towards

 6     the end, prior to ████ turning 18 or just after,

 7     it was -- it had been previously spoken that there

 8     would be no vaginal penetration by Mr. Epstein.

 9          She had stated that Mr. Epstein had a

10     deformed penis and did not want to have any kind

11     of intercourse with him.

12          It was after one of the -- where they had

13     purchased sex toys.  They introduced the sex toys

14     with ████ and ████ as Epstein would watch on and

15     masturbate to.

16          At one point he grabbed ████ and placed her

17     head onto the head -- on the massage table and

18     inserted his penis in her vagina.

19          Q.   Okay.  You said they introduced sex toys,

20     purchased sex toys.  Who purchased sex toys?

21          A.   ████

22          Q.   Was ████ with her when they were purchased?

23          A.   It is -- yes.

24          Q.   Okay.

25          A.   It was for Epstein's --
```

```
 1        Q.   So ████ and ████ went to purchase the sex
 2   toys?
 3        A.   For Epstein's birthday.  Correct.
 4        Q.   Okay.  And during the time that he
 5   penetrated her vagina she was either 17 or 18,
 6   you're not clear -- clear which?
 7        A.   Right.
 8        Q.   Okay.
 9        A.   It was -- this was towards the end.
10   Because after that she stopped going to his res --
11   his house.
12        Q.   How many -- okay, a hundred times, did she
13   indicate how much money she made during this
14   2-year period that she was going to see him?
15        A.   Well she received between 200 and a
16   thousand dollars.
17        Q.   Each time?
18        A.   Each time that she went.
19             The day that he forcibly entered himself
20   into her, he paid her a thousand dollars.
21             Also, she had received a rental car from
22   Dollar Rental Car, a blue Dodge Neon, that the
23   previous houseman had rented for her.
24        Q.   Did she ever make a report of sexual
25   battery after what she told you about him
```

```
1        inserting his penis inside her?

2           A.  What do you mean, sexual battery?

3           Q.  Did she -- at that time that he forced his

4        penis inside her, you said?

5           A.  Oh, at that --

6           Q.  Did she make --

7           A.  -- the day that that occurred?

8              No.

9           Q.  -- did she make -- did she call and say --

10          A.  No, the day it occurred.  No, she did not.

11          Q.  That day she took a thousand dollars.

12             Let's say it's only $200 for a hundred

13       times; she's -- we're talking a lot of money she

14       got, at a minimum; plus a car?

15             Is that a yes?

16          A.  Yes.

17          Q.  Okay.  Did you ask her what she did with

18       all that money?

19          A.  I did ask her.  And she didn't want to tell

20       me.

21          Q.  What'd she say?

22          A.  She said that that was too personal.

23          Q.  After you -- she's just described all these

24       sex acts to you.

25             Okay.  Did you interview somebody named
```

NOT A CERTIFIED COPY

1        ███████████████ ?

2        A.   Yes, I did.

3        Q.   Who is ███████████████ ?

4        A.   Um --

5        Q.   Page 51.

6        A.   Thank you.

7             Okay, November 4th.   She provided a sworn

8        taped statement that she had been taken to

9        Epstein's house by the -- a friend from █████████

10       ████████ School, █████████████.

11       Q.   This same person that took ██████████ ?

12       A.   Correct.

13       Q.   Okay.

14       A.   She was told as well that she would have to

15       provide the massage and would be paid 300 for the

16       massage.

17       Q.   How old was she at the time?

18       A.   17, I believe.

19       Q.   Okay.   What did she describe happening when

20       she went there the first time?

21       A.   She was taken to the house and introduced

22       to Epstein's assistant.   Pretty much --

23       Q.   Which one, ██████ --

24       A.   -- consistent --

25       Q.   -- or ██████ ?

1      A.     ███.

2      Q.     Okay.

3      A.     It was pretty much consistent with all the

4      girls.  They would be introduced to the assistant,

5      who would then lead her upstairs and prepare the

6      room for the massage in the master bathroom area.

7      She would lay -- put a blanket over the massage

8      tables and provide the ointments that Mr. Epstein

9      would like to have used.

10            She rubbed his calves and his back area and

11     was paid $300 for her services.

12     Q.     Was that a one-time thing with ███████

13     ██████  or did she go back?

14     A.     She stated she had gone back four or five

15     times.

16     Q.     Similar acts each time she went back?

17     A.     Correct.

18     Q.     Similar amounts of money each time?

19     A.     It -- it started to escalate.  I mean, each

20     time that she went, further things started to

21     happen.  It was the same monies though provided.

22     Q.     Okay.  So the sex acts became more

23     involved?

24     A.     Correct.

25     Q.     Okay.  She was what, you said 17?

```
1         A.   Correct.

2         Q.   Did she tell Jeff Epstein that she was 17?

3         A.   May have, I believe so.

4         Q.   Take a minute and look at your report and

5    see if you can find that there.

6         A.   Okay.  She was 16 when she first went to

7    the house.

8         Q.   Okay.  She was 16.  But does she ever tell

9    him she's 16 or 17?

10        A.   No.

11        Q.   Did any of the girls ever tell him that

12   they were under 18?

13        A.   Well, he knew that they went to ███████████

14   ██████████ School.

15        Q.   That was not my question to you.

16        A.   Okay.

17        Q.   Did any of the girls ever tell Jeff Epstein

18   that they were under 18?

19        A.   Not to my knowledge.

20        Q.   And some of them affirmatively lied and

21   said they were 18 when they were not, didn't they?

22        A.   Correct.

23        Q.   But he was aware that they were going to

24   high school?

25        A.   Correct.
```

1      Q.   Okay.  How much money did ████████ make?

2      A.   $300 for each massage.

3      Q.   Was she ever given anything other than cash

4   money?

5      A.   She was also given a Western Union wire

6   from New York, for a Christmas bonus.

7      Q.   How much was the Christmas bonus?

8      A.   $200.

9      Q.   All right.  At some point you spoke with

10  someone named Alfredo Rodriguez --

11     A.   Correct.

12     Q.   Who is he?

13     A.   He's a former houseman of Jeffrey Epstein.

14     Q.   What did he describe his duties when he was

15  at -- employed by Mr. Epstein?

16     A.   He was basically everything.  He was the

17  butler, the driver, in charge of his security.  He

18  was basically the -- everything for the house.

19     Q.   Okay.  Do it all.  He did anything,

20  (indiscernible) wanted to?

21     A.   Right.

22     Q.   Okay.  Did he -- did Alfredo Rodriguez give

23  you any information regarding your investigation?

24     A.   He explained that he knew something was

25  amiss during his employ with Mr. Epstein.

1          He would see girls as young as his daughter

2     come in and say that they're his masseuses.

3          And when asked, how young?

4          He said, very young.  Too young to be a

5     masseuse.

6     Q.   Did he give you any other information?

7     A.   He also stated that he had kept a folder

8     for his protection.  Some notes that were made

9     during his employ with Mr. Epstein.

10    Q.   What -- so he kept like a journal?

11    A.   Basically, yes.  Like a folder with

12    different sheets of papers inside.

13    Q.   And he would write notes himself or he

14    would put notes in that journal?

15    A.   He would put notes inside.

16    Q.   Okay.

17    A.   Notes that were given to him on Epstein's

18    stationary.

19    Q.   Was there any note that he provided to you

20    in that folder that indicated something -- any

21    type of relationship between Jeffrey Epstein and

22    any of the girls we've discussed?

23    A.   Yes.  He provided two sheets.  One was to

24    extend the rental car for ████, as the contract

25    was up the 2nd of February.

1          Q.   The 2nd of February what year?

2          A.   I was unable to determine that.

3               I researched the information through Dollar

4     Rent A Car and they were unable to locate the car

5     that he rented.

6          Q.   Okay.  But did ▇▇▇ confirm that she had

7     gotten a car?

8          A.   Yes.

9          Q.   Okay.

10         A.   She even explained -- described the car as

11    a blue Dodge Neon, four door.  She explained the

12    whole car to me.

13              Additionally there was another notation

14    of -- to take a bucket of roses at 9 p.m. to ▇▇▇

15    ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ for ▇▇▇.  And give the

16    flowers to ▇▇▇ after her ▇▇▇ performance, as

17    she was in ▇▇▇▇▇▇▇▇▇▇ and had a ▇▇▇▇▇▇▇

18    that night.

19         Q.   Okay.  And do you know when that was?

20         A.   It was while ▇▇▇ was still in ▇▇▇▇▇▇

21    ▇▇▇▇▇▇▇▇▇▇▇▇.  It was during his employ,

22    prior to Janusz.

23         Q.   Do you know if that was when ▇▇▇ was 16 or

24    when she was 17 or when she was 18?

25         A.   When she was 17.

1          Q.   Okay.  Did you -- any of these girls we've

2     talked about, any of them a licensed massage

3     therapist?

4          A.   No.  No formal training in any massages.

5          Q.   Did you ever speak to licensed massage

6     therapists that provided services to Jeffrey

7     Epstein.

8          A.   Through the trash pulls we did locate two

9     girls that were licensed masseuses that I

10    interviewed.

11         Q.   Who were they?

12         A.   One was ███████████████, and the other one

13    was ███████████████.

14         Q.   Okay.  Did you talk to ███████████?

15         A.   Yes, I did.

16         Q.   What did she tell you?

17         A.   She had been going to Epstein's house for

18    quite some time.  However, she was not a masseuse

19    at that time when she first started going to his

20    house.  He also provided her a vehicle to get to

21    his house, because her scooter had broken down.

22    She was --

23         Q.   She started going to his house in a similar

24    capacity as these other girls?

25         A.   That is correct.

1          Q.   Okay.  But she later became a massage

2     therapist?

3          A.   Yes.

4          Q.   What kind of relationship did ████████

5     ████████ and Jeffrey Epstein have?

6          A.   She stated that it was a consensual sexual

7     encounters that they've had.

8          Q.   How old was she at the time?

9          A.   Over 18 at that time.  I think she was 18.

10         Q.   Was she -- did she describe being paid

11    money for --

12         A.   Paid money.

13         Q.   -- the services she provided?

14         A.   And additionally, I believe he paid her

15    tuition at ██████████████████████████████.

16         Q.   Is that where she got her massage therapy

17    training?

18         A.   No.  She got into the ██████████████████

19    ██.

20         Q.   Okay.  All right.  What -- you mentioned a

21    ██████████████████.  She's a licensed massage

22    therapist?

23         A.   That is correct.

24         Q.   Did she provide massage services to Jeff

25    Epstein?

1     A.   Yes.

2     Q.   What kind of services did she provide?

3     A.   She does a Swedish deep tissue massage.

4     Q.   Did the massages by ████████████ go

5  beyond a normal massage to the other acts we've

6  heard about today?

7     A.   No.  No, her job was strictly to come in,

8  provide the massage.  She got paid a hundred

9  dollars and she left.

10    Q.   Okay.  So the licensed massage therapist

11 gets a hundred dollars, the other girls get much

12 more?

13    A.   Right.

14    Q.   Okay.  When you were -- you've met most of

15 these girls.  Was there anything different about

16 ████████████ that you noticed that made her

17 stand apart from the other girls that were going?

18    A.   ████████ was not the petite little girl.

19 She was a bigger girl, with plenty of tattoos on

20 her forearms, very visible on her neck.  Very

21 visible tattoos.

22    Q.   If you were to say Mr. Epstein had a type,

23 she would not fit that type?

24    A.   Oh, absolutely.

25    Q.   Were you ever able to find any intelligence

1     from the Palm Beach County Police Department that

2     confirmed any of these girls being in his house,

3     other than girls saying so?

4          A.   Through physical surveillance.

5               I had researched all the intelligence that

6     the police have gathered during the past couple

7     years.  And in 2004 Mr. Rodriguez, the former

8     houseman, had called the police because he had

9     seen a suspicious vehicle that he did not

10    recognize in the driveway of Mr. Epstein's house.

11              Mr. Rodriguez was pulling in from Publix

12    and didn't recognize the vehicle, so he left and

13    drove straight to the police department and

14    notified 'em there was a strange vehicle in the

15    driveway.

16              When that vehicle was approached by the

17    police officers they found ▮▮▮▮▮▮▮ sitting in

18    this -- the car with her friend.

19         Q.   Does it identify who the friend is?

20         A.   Uh --

21         Q.   And when you look at that report, what is

22    the date that ▮▮▮▮▮▮ was there in 2004?

23         A.   November 28, 2004.

24              And at which point her cell phone rang.

25    And the officer felt that it must have been her

1     mother because she says, I can't talk, I'm in

2     school.

3          Q.  Okay.  Did the officer note why ████████

4     was there?

5          A.  She stated that she was there to pick up

6     monies that were owed to her.  That she is a

7     massage therapist for Mr. Epstein.

8          Q.  Okay.  The girls you talked to, how did

9     they all typically tend to know each other, of

10    those that do?  Were they all in school together?

11         A.  They were all -- they all knew each other

12    from ████████████████████School.

13         All except ████.

14         Q.  Because she was -- knew ████ from outside

15    of school?

16         A.  Correct.  She knew ████ because she was

17    dating ████████ ████.

18         Q.  Okay.  At some point did you obtain a

19    search warrant for Jeffrey Epstein's home?

20         A.  Correct.  I did.

21         Q.  When was that?

22         A.  That was in October.

23         Q.  Page 42.

24         A.  October 12, 2005 -- oops, I'm sorry.  That

25    was the -- nope, that was in another interview.

```
 1        Q.   October 20th?

 2        A.   October 20th.

 3        Q.   You got the warrant on October 18th and

 4   executed it on October 20th?

 5        A.   Correct.

 6        Q.   Okay.  Who was present with you when you

 7   executed that warrant?

 8        A.   Various members of the police department.

 9   Detective ████, Sergeant ███ Detective ██,

10   Detective ████, Detective █████, myself, crime

11   Scene Manager ████ ████████.

12        Q.   Okay.

13        A.   There was a lot of people in the -- from

14   the police department.

15        Q.   All right.  And ████ ████████ is outside?

16        A.   Yes.

17        Q.   Okay.  During the execution of that warrant

18   there was an item found that's identified as a

19   twin torpedo?

20        A.   Yes.

21        Q.   What is that item?

22        A.   That is a -- it is known as a dildo.

23        Q.   Okay.  A sexual toy that you buy --

24        A.   A sexual toy.

25        Q.   Okay.  Where was that found?
```

1      A.   That was found in the bedroom of -- I want

2   to say ███ bedroom.

3      Q.   Okay.  Is that the bedroom that the girls

4   were taken to when they performed the messages, as

5   described by -- to you?

6      A.   The main -- the main massages occurred in

7   Epstein's master bedroom/bathroom area.

8      Q.   Not ███ --

9      A.   No.

10      Q.   -- bedroom/bathroom area?

11      A.   No.

12      Q.   Okay.  So that was found in a different

13   place?

14      A.   Correct.

15      Q.   Was -- were there sexual devices, dildos,

16   vibrators found, anything, that matched the

17   descriptions as given by the girls?  Either a

18   purple vibrator or a white vibrator with a large

19   head?

20      A.   No.

21                MS. BELOHLAVEK:  At this point,

22          Detective ███████  I'm going to see if the

23          grand jurors have any questions for you.

24                THE WITNESS:  Okay.

25                A JUROR:  I'd like to ask you a

```
 1            question first.  What constitutes a sexual
 2            act under the law?
 3                 MS. BELOHLAVEK:  Sexual activity
 4            means oral, anal, or vaginal penetration by
 5            or union with the sexual organ of another;
 6            anal or vaginal penetration of another by
 7            any other object; or the handling or the
 8            fondling of the sexual organ of another for
 9            the purpose of masturbation.  However, the
10            term does not include acts for bona fide
11            medical purposes.
12                 You'll all get a copy of this.
13                 Yes, ma'am?
14                 A JUROR:  Do you know the location of
15            Jeffrey Epstein at present?
16                 You say that he hasn't been back
17            since October.
18                 THE WITNESS:  He has various homes.
19            One in New York.  He has a ranch in New
20            Mexico.  He has a private island right
21            outside St. Thomas.  Has a home in Paris
22            and one in England.
23                 A JUROR:  So can you get in touch
24            with him?  You would have a way to do that?
25                 THE WITNESS:  He has various counsels
```

1    representing him.

2              MS. BELOHLAVEK:  Yes, ma'am.

3              A JUROR:  Was ███ the only one of

4    these girls that he actually had

5    intercourse with?

6              THE WITNESS:  No.

7              A JUROR:  Okay.

8              THE WITNESS:  There was a total of

9    five victims altogether.

10             But as far as intercourse you mean?

11             A JUROR:  Mm-hmm.

12             THE WITNESS:  As far as penile

13    intercourse?

14             A JUROR:  Right.

15             THE WITNESS:  I believe it was two.

16             A JUROR:  Okay.

17             MS. BELOHLAVEK:  Yes, sir.

18             A JUROR:  As far as ███, it does

19    not appear from what I'm hearing, it's not

20    like ███ was the center focal point who

21    coordinated all this for Epstein.

22             It seemed like Epstein had multiple

23    sources to have access to some of these

24    young girls.  Is that correct?

25             THE WITNESS:  All these girls were in

```
1              a tight clique together.  ████ being the
2              first one from that clique to go to the
3              house.
4                        A JUROR:  Okay.
5                        THE WITNESS:  Basically was the --
6              she brought ████, ████ brought ████.
7              ████ brought --
8                        A JUROR:  Right.
9                        THE WITNESS:  So it was like a
10             trickling effect.
11                       A JUROR:  Right.  So this -- I mean,
12             it just kind of seems like this little
13             micro-economy got spawned here.
14                       And it does not -- I mean, do any of
15             these girls provide those types of services
16             for money for anyone else?  Do they do
17             this --
18                       THE WITNESS:  No.
19                       A JUROR:  -- on a common basis or --
20                       THE WITNESS:  No.
21                       A JUROR:  -- does it just so happen
22             that Epstein is the source by which they're
23             attracted to here?
24                       THE WITNESS:  Epstein was the source.
25                       A JUROR:  Okay.
```

NOT A CERTIFIED COPY

1          MS. BELOHLAVEK:  Do you know ███

2     ███████ present occupation, Detective?

3          THE WITNESS:  She is a -- an exotic

4     dancer.

5          MS. BELOHLAVEK:  A stripper?

6          THE WITNESS:  A stripper.

7          MS. BELOHLAVEK:  Okay.

8          A JUROR:  Who is that one?

9          THE WITNESS:  ███.

10          MS. BELOHLAVEK:  ████████████.

11     Yes, sir?

12          A JUROR:  When Jeffrey entered ███,

13     did she ask him to stop at all?

14          THE WITNESS:  She screamed no.

15     She didn't -- she --

16          A JUROR:  And he continued?

17          THE WITNESS:  -- said no.

18          He apologized.  Offered her a

19     thousand dollars.  Subsequently then --

20          A JUROR:  So he stopped.

21          THE WITNESS:  After that, yes.

22          A JUROR:  Okay.

23          And the second question.  You had

24     made comment that Dollar Rental Car wasn't

25     able to find the --

```
 1                    THE WITNESS:  The Dollar --
 2                    A JUROR:  -- car rental.
 3                    Have you been able to confirm the
 4          actual --
 5                    THE WITNESS:  Subpoenas have been
 6          issued to Dollar Rent A Car.
 7                    I have their techs researching it.
 8          They were acquired by another company, so
 9          some of the business records were not up to
10          par.  So they're -- they're hopefully -- I
11          keep reminding them to --
12                    A JUROR:  There's more than one car
13          then that --
14                    THE WITNESS:  That's correct.
15                    They still rent -- they rented the
16          car for ███████████, which -- I believe
17          she's still driving it.
18                    A JUROR:  Okay.
19                    MS. BELOHLAVEK:  Yes, ma'am?
20                    A JUROR:  How many of the girls had
21          relationships with him over a year while
22          they were still in high school?
23                    THE WITNESS:  I'm sorry?
24                    A JUROR:  How many of the girls
25          had -- were seeing him for more than a year
```

```
 1              while -- and he knew they were still in

 2              high school?

 3                   THE WITNESS:  I know that all of them

 4              were in high school when they first started

 5              seeing him.    ████ being 16.

 6                   The age of graduation is 18.  I would

 7              say they all, because they all met him

 8              through ████████████████ School.

 9                   MS. BELOHLAVEK:  The question is the

10              length period.  This doesn't -- it's one

11              time.

12                   Like with ████ it was numerous --

13              hundreds of time for 2 years.

14                   THE WITNESS:  Over 2 years.

15                   MS. BELOHLAVEK:  ████████, 15 or

16       more times.

17                   THE WITNESS:  Right.

18                   MS. BELOHLAVEK:  So this is

19       longstanding with --

20                   THE WITNESS:  Right.

21                   MS. BELOHLAVEK:  -- many of these

22       girls?

23                   THE WITNESS:  Yes.

24                   A JUROR:  Can you name the two girls

25              that the vaginal penetration took place
```

1    with?

2          THE WITNESS:  It would be ▮▮▮▮

3    ▮▮▮▮ and ▮▮▮▮▮.

4          A JUROR:  And how many then would, in

5    your opinion, defined by the sexual act --

6    how many other girls would fall under that

7    category?  Can you give me some type of

8    count?

9          THE WITNESS:  Under -- well, there

10   was the -- that age --

11         MS. BELOHLAVEK:  There's the

12   masturbation in front of how many girls?

13         THE WITNESS:  Oh.  There was --

14   all of --

15         MS. BELOHLAVEK:  Most --

16         THE WITNESS:  -- them.

17         MS. BELOHLAVEK:  -- of the girls.

18         THE WITNESS:  I would say all of

19   them.

20         MS. BELOHLAVEK:  Okay.

21         THE WITNESS:  Except for maybe the

22   legitimate masseuse, ▮▮▮▮▮▮▮▮▮.

23         MS. BELOHLAVEK:  But the only one

24   that was under 16 at the time was ▮▮▮▮.

25         THE WITNESS:  Right.  She was 14.

```
1              Correct.

2                   MS. BELOHLAVEK:  Okay.

3                   A JUROR:  Other than ████████

4       stepmother coming to the police, she

5       obviously found out from the Principal.

6       But the other girls, none of their parents

7       knew about it or intervened in any way?

8                   THE WITNESS:  It wasn't until ████████

9       parents discovered what she was doing.  It

10      was at that time that she had stopped.

11                  And to this day she still gets phone

12      calls.  She had to change her cell phone

13      number, they have changed the -- changed

14      the house number, from ████████████    and

15      Epstein.

16                  A JUROR:  Cause here these girls are

17      bringing home this money, they're obviously

18      shopping, bringing home items; and none of

19      the parents got involved in any way?

20                  THE WITNESS:  A lot of these parents,

21      they had no idea what was going on.

22                  A JUROR:  I can't believe that.  I

23      mean --

24                  MS. BELOHLAVEK:  You have to ask

25      questions.  Not comments.
```

```
 1              Yes, ma'am.  Do you have your hand
 2       up?
 3              A JUROR:  Let's see, you mentioned
 4       ████ was from ████ --
 5              THE WITNESS:  ████, yes.
 6              A JUROR:  ████ was from ████
 7       ████.
 8              THE WITNESS:  No.  Actually these --
 9       all the girls lived in the ████
10       area, ████ area.
11              A JUROR:  Okay.  Any suspicion that
12       there perhaps were other groups of girls
13       from other ████ schools or other areas that
14       he would bring into that -- his home?
15              THE WITNESS:  Not that I'm aware of.
16       The common link here was ████
17       ████ School.
18              And there was actually comments made
19       from people that says that there's nobody
20       in ████ School that does
21       not know about Jeffrey Epstein.
22              MS. BELOHLAVEK:  Yes, sir?
23              A JUROR:  The girl that brought these
24       girls got $200, was that ████?
25              MS. BELOHLAVEK:  Yes.  She was one of
```

1    the girls.

2              A JUROR:  Then --

3              MS. BELOHLAVEK:  There was another

4    girl that brought them.

5              A JUROR:  Okay.  Then after he got

6    some of their cell phone numbers, did he

7    make his own appointments, did he still pay

8    ████?

9              THE WITNESS:  That is correct.

10             A JUROR:  Okay.

11             THE WITNESS:  And eventually they did

12   cut out ████ and would contact these girls

13   directly.

14             A JUROR:  Oh that's -- okay.

15             MS. BELOHLAVEK:  Did Jeffrey Epstein

16   make the appointments or was it done

17   through ████████?

18             THE WITNESS:  Through ████████

19   his -- his assistant.

20             MS. BELOHLAVEK:  So we don't have any

21   of the girls actually making an appointment

22   with Jeffrey Epstein himself?

23             THE WITNESS:  Correct.

24             MS. BELOHLAVEK:  Were you able to

25   talk with ████████?

1        THE WITNESS:  No.  The Defense did

2    not allow.

3        A JUROR:  So ▅▅▅ claimed to make it

4    clear to Epstein that for the 2 years she

5    was going she was in high school.  She --

6    he knew that?

7        THE WITNESS:  He knew that based on

8    the sending the flowers to her school for

9    her high school play that she was in.

10       MS. BELOHLAVEK:  Anyone else?

11       A JUROR:  What -- what year, when she

12    received the flowers, what class was she

13    in?  Was it a Senior?  A Junior?

14       THE WITNESS:  I want to say Senior,

15    but I'm not a hundred percent positive on

16    that.

17       A JUROR:  Why I ask that is that, you

18    know, usually a Senior can be 18 years old,

19    whereas a Junior is, you know, that was --

20       THE WITNESS:  Right.

21       A JUROR:  That would give him some

22    knowledge of knowing how old she was.

23       MS. BELOHLAVEK:  Yes, ma'am?

24       A JUROR:  The two girls that received

25    rental cars, their parents never asked them

1       where they got these cars that they were

2       driving?

3              THE WITNESS:  The one girl, ███████

4       ██████, who's still driving the car; she's

5       attending college at ████████████████████

6       ██████████.  Her parents live up here in -- in

7       ███████████ area.

8              When she does frequent her parents,

9       the car is a friend's car or is borrowed.

10             MS. BELOHLAVEK:  Yes, sir?

11             A JUROR:  (Indiscernible) confirm, I

12      believe it was ████████ had indicated that the

13      conversation with Jeffrey Epstein was

14      that -- to make sure that the girls were

15      young.

16             THE WITNESS:  The younger the better.

17             A JUROR:  And the younger the better,

18      right?  That was a --

19             THE WITNESS:  Younger the better was

20      the quote.

21             A JUROR:  And in that conversation,

22      was that in reference to specifically your

23      friends from your school or --

24             THE WITNESS:  That came later.

25      Because she brought a 23-year old to

```
 1                provide a massage, and he told her she was
 2                too old.
 3                     A JUROR:  Right.  Okay.
 4                     MS. BELOHLAVEK:  Okay.
 5                     A JUROR:  Can I ask you a legal
 6                question?
 7                     MS. BELOHLAVEK:  Mm-hmm.
 8                     A JUROR:  Is there (inaudible).
 9                     MS. BELOHLAVEK:  Yes.  But we can
10                discuss that when the detective's not here.
11                     Yes, sir?
12                     A JUROR:  Are all these girls
13                available to be called if the case went to
14                court?
15                     THE WITNESS:  If we went to trial?
16                     Yes.
17                     MS. BELOHLAVEK:  Any other questions?
18                     Yes, sir.
19                     A JUROR:  Have you been able to
20                verify Mr. Epstein's age?
21                     THE WITNESS:  Mr. Epstein was born in
22                1951, I believe.  51 or 53.  January of
23                1953.  January 20, 1953.  Which would have
24                made him 52, 53 years of age.
25                     MS. BELOHLAVEK:  And 51 -- 50, 51
```

NOT A CERTIFIED COPY

```
 1              during the times of these events?
 2                      THE WITNESS:  Correct.
 3                      MS. BELOHLAVEK:  Okay.  All right.
 4                      Thank you very much.
 5                      A JUROR:  One more.
 6                      THE WITNESS:  I think there's another
 7      question.
 8                      MS. BELOHLAVEK:  Oops.  Sorry.
 9                      A JUROR:  Is there any other evidence
10      that the girls were in his house besides
11      the one tape, besides what they're saying?
12                      THE WITNESS:  He did have two
13      cameras, two covert hidden cameras inside
14      his house for security purposes.  We did
15      locate that computer.
16                      I reviewed the images in the
17      computer, and within that computer there
18      are photographs of girls that I had
19      previous interviewed that appears to be
20      them.
21                      However, because it's so grainy, so
22      snowy, a positive rec -- a positive
23      identification is -- you know, it's hard
24      to -- unless you show it to the girl, is
25      this you?
```

NOT A CERTIFIED COPY

```
 1              Which I haven't done, because I --
 2         too much information was being leaked back
 3         to him.  So that's why I pretty much
 4         stopped giving them information as far as
 5         this investigation.
 6              MS. BELOHLAVEK:  So you can't say
 7         specifically then the pictures are of the
 8         girls involved?
 9              THE WITNESS:  I cannot say
10         positively.  I can say that this girl
11         appeared to be like -- just like ███.
12         Same hairstyle, same mannerisms of walking,
13         same clothes that -- typical that I've seen
14         her wear, but I can't say for a hundred
15         percent that this is her.
16              This appears to be her.  The same
17         body style, face, that type of --
18              MS. BELOHLAVEK:  And the girls are
19         still in touch with him, telling him about
20         your investigation.
21              THE WITNESS:  I know for a fact that
22         ████ --
23              MS. BELOHLAVEK:  Or telling ████ or
24         ████
25              THE WITNESS:  Right.  I know that
```

```
 1                    ████████ has called.  And other girls that
 2               I've interviewed or approached to be
 3               interviewed have called him.  And --
 4                    MS. BELOHLAVEK:  And there are other
 5               girls that refuse to talk to you?
 6                    THE WITNESS:  Right.
 7                    MS. BELOHLAVEK:  I love Jeffrey, I'm
 8               not testifying against him.
 9                    THE WITNESS:  Right.
10                    A JUROR:  One question.  Didn't you
11               say that the place in Palm Beach has the
12               residence under surveillance?
13                    THE WITNESS:  When the -- when I took
14               over the investigation I had our TAC team
15               conduct physical surveillance.  And they
16               observed these girls coming to the
17               residence in their vehicles, in their dad's
18               car, in their mom's cars, coming to the
19               house seeing Epstein.  The --
20                    A JUROR:  So you do have witnesses
21               that can put these girls in --
22                    THE WITNESS:  Absolutely.
23                    A JUROR:  -- that particular --
24                    THE WITNESS:  Absolutely.
25                    A JUROR:  There's one other thing.  I
```

1       forgot.

2           MS. BELOHLAVEK:  In or at his home.

3       Not in sex acts though.

4           THE WITNESS:  No, not in sex acts.

5       They were conducting surveillance from the

6       outside.

7           A JUROR:  I know.  Did you do any

8       telephone research or was everything done

9       over cell phones?

10          THE WITNESS:  Everything was done

11      over cell phones.

12          MS. BELOHLAVEK:  All right.

13          Thank you very much Detective

14      ███████

15      (Witness excused.)

16      (WITNESS ███████    ████████

17          MS. DUGGAN:  Okay.  Would you raise

18      your right hand?

19          THE WITNESS:  Yes.

20          MS. DUGGAN:  Do you swear or affirm

21      the testimony you're about to give today

22      will be the truth, the whole truth, and

23      nothing but the truth, so help you got?

24          THE WITNESS:  Yes, I do.

25                 EXAMINATION

```
 1    BY MS. BELOHLAVEK:
 2        Q.  Okay.  Would you introduce yourself to the
 3    grand jurors, please?
 4        A.  Good morning, ladies and gentlemen.
 5            My name is ███████  ████████
 6        Q.  How -- how long have you been employed as a
 7    law enforcement officer?
 8        A.  I have been in business 40 years now.  I
 9    started on ███████  ███████  1966.
10        Q.  And where were you working then?
11        A.  I worked for the West Palm Beach Police
12    Department, where I served for 34 years, until I
13    retired on ██████ of the year 2000.
14            I had the 4th of July off and went to work
15    the next day as an investigator for the State
16    Attorney's Office where I worked for 3 years.
17            I left on ████████ of 2003, had the
18    weekend off, and then took over a management
19    position with the Town of Palm Beach Police
20    Department, where I am still currently employed.
21        Q.  What is your position with Palm Beach
22    Police Department?
23        A.  I hold the rank of police officer, but I
24    also hold the title of civilian where I am in
25    charge of the crime scene investigation unit, the
```

```
 1    photography unit, the evidence holding unit, and
 2    the fingerprint unit.
 3        Q.   In your capacity as the crime scene head
 4    did you take part in the search warrant executed
 5    on Jeffrey Epstein's house on August --
 6    October 20, 2005?
 7        A.   Yes, I did.
 8        Q.   Tell us how you go about executing a search
 9    warrant in general.
10        A.   Once the warrant is signed and brought back
11    to headquarters, I am not aware of this at that
12    time.
13            On this morning, which was a Thursday
14    morning, when I went to the morning briefing, at
15    that time I was informed that a search warrant
16    would be executed and that it would be at a
17    residence.
18            My responsibility is to then assemble a
19    team of evidence specialists and crime scene
20    processors that will respond to this unannounced
21    scene.  We don't even know where we're going until
22    we are in a -- what looks like a funeral
23    procession or a parade; all the cars are ready to
24    go.  We follow the lead car.  And only then, when
25    we arrive, do we know the location.
```

1          Q.   Why is that done?

2          A.   It's -- it's an issue of security, it's an

3     issue of privacy, and it's an issue of officer

4     safety, so that there is a guarantee that there

5     can be no leak of any information, even as simple

6     as an address, from my office.

7               And we prefer to operate in that manner.

8     So we don't know until we get there.

9               All we really need to know is what are we

10    going to be going into, so that we know the volume

11    of bags, the volume of boxes, the volume of gloves

12    or masks or processing gowns or lab coats; whether

13    we would need head cover to protect -- or to

14    prevent contamination of a scene or shoe covers,

15    which will also prevent contamination of the

16    scene.

17              We don't need to know a lot about the

18    scene, we only need to know what type of evidence

19    we're going to be looking for, and the potential

20    volume or size of the area.

21              Knowing this, we are then prepared to go to

22    the scene and do whatever's necessary to fulfill

23    the requirements of the search warrant, and that

24    is searching for specific items.

25         Q.   Mr. ██████, so that would -- in addition

1          to officer safety; so that someone's not waiting

2          there to ambush you; also, nobody at the place to

3          be searched knows you're coming so they can just

4          dispose of things?

5              A.   That is correct.

6              Q.   Okay.  On this date, October 20th, where

7          did you go?

8              A.   I went to a residence located on the island

9          of Palm Beach, Palm Beach County, Florida.  With

10         an address of 358 El Brillo.

11              The 300 block is the block just immediately

12         west of the Intracoastal Waterway.

13             Q.   East of the Intracoastal Waterway?

14             A.   It is on the east side of the Intracoastal

15         Waterway.  In fact, this particular residence is

16         on the Intracoastal Waterway.

17             Q.   Okay.  Describe to us how the house is

18         entered?

19             A.   The residence had staff or personnel

20         present at the time of our arrival.  Detective

21         ███████ went in ahead of me.

22              And understanding that once you enter the

23         property there is a heightened danger factor with

24         persons or personnel on the scene.  And the first

25         thing that must be done, for everyone's safety, is

1    to go in and not search for items, but clear the

2    residence of living human beings, so that there

3    can be no access to weapons or any endangerment to

4    them.  This was done.  And I took part in the

5    search of the second floor on the west end of the

6    residence.

7         All the living persons -- and there were no

8    dead persons there -- so all of the persons,

9    non-police persons, were escorted out to the south

10   side of the residence into a patio area.

11        Q.  Were they allowed to take any items out of

12   the home with them?

13        A.  No.  Nor did the police look, touch, or

14   move anything; other than opening doors, closets,

15   to make sure there were no other persons inside.

16        It was not a search in the sense of the

17   search warrant at this time.  It was a search of

18   the residence to clear it and neutralize any

19   element of danger.

20        This was done.  This was accomplished.

21        At this time officer -- Detective ███████

22   would read out loud, word for word, the search

23   warrant to those persons that were removed from

24   the house.

25        My responsibility at this time was to video

1      and audio record the reading of that search

2      warrant to these persons.  That I did.  And

3      recorded it until the conclusion of the reading of

4      the search warrant.

5          Q.  Okay.  Were you requested by myself to

6      prepare a diagram of the upper floor of the home

7      searched?

8          A.  Yes, I was.

9          Q.  What rooms are on that upper floor?

10         A.  There are several rooms that are located on

11     the second floor.  It is basically an L-shaped

12     appearance where the main body of the house is

13     aligned east and west.  There is an L-shaped short

14     leg which protrudes to the north.  That actually

15     sits -- that L-leg sits over a three car garage.

16             The second floor contains a -- on the west

17     end, a large master bedroom, which is aligned

18     north and south.  And then off of the south side

19     there is a large master bedroom and large closet.

20     Coming back through the bedroom to the north side

21     there is another bathroom.

22             And these are quite large bathrooms.

23     They're not like our --

24         Q.  Okay.

25         A.  -- you know, not like my house.

1    Q.   Is this the diagram you prepared?

2    A.   Yes, it is.

3    Q.   Okay.  Can I ask you to step down and --

4    A.   Yes.

5    Q.   -- indicate to the grand jurors what the

6    upstairs looks like, what rooms we're seeing here.

7    A.   To orient you -- bear in mind you're

8    looking at the second floor here, and this is a

9    spiral staircase which goes from the second floor

10   down to the first floor.

11        And this, coincidentally, is a double door

12   main entrance to the front of the house.  And once

13   inside -- oops.

14        A JUROR:  Broke the stairway.

15   A.   I did.  I broke the stairway.

16        Once entering the front door and coming up

17   the stairway you entered a landing.  Once inside

18   the landing, it is basically a very long hallway.

19   This hallway has a double door set here and a

20   double door set here.  They open inward on the

21   east side; they open inward on the west side.

22        Once coming through this hallway you then

23   reach a normal size door which gives you access to

24   the master bedroom.  Which, this is the master

25   bedroom.  This is the large bathroom on the south

```
 1    side.  And this is the large walk-in closet of
 2    which there are two doors that you can enter and
 3    walk in all the way through and back out to the
 4    other.
 5            And, again, moving back through the
 6    bedroom, past the hallway you then enter another
 7    large bathroom which has a sink, closets, and a
 8    large bathtub.
 9            And it was right in here, what looked very
10    similar to a dentist's chair, without the big
11    light.  It has all kinds of tubes and things on
12    it.  I don't know really what that thing would do.
13        Q.  And that wasn't related to the
14    investigation?
15        A.  No.  It was just part of the furniture
16    there, like a -- similar to, a bed was here and a
17    credenza over here.
18        Q.  Are there toilet facilities here or is it
19    just sinks in these bathrooms?
20        A.  I believe that there were toilets also
21    there in the hall.
22        Q.  All right.  Did you find a massage table?
23        A.  Yes.  There was massage table in this
24    clos -- bathroom.
25        Q.  Okay.  How about massage oils?  Were there
```

1    massage oils up in that bathroom?

2        A.   I believe there were.  I know that we got

3    some kind of a jar of material out of this master

4    bedroom, one of -- out of the dresser.

5        Q.   What about out of the actual room where the

6    massage table was?

7        A.   That, I'm not sure.

8             I was involved in the actual search and

9    photography of that.  Other investigators would

10   have to comment on it.

11       Q.   Okay.  Do you have the reports --

12       A.   Yes, I do.

13       Q.   -- from those investigators?

14       A.   I -- well, I have the evidence sheets --

15       Q.   Okay.

16       A.   -- of where things were found.

17       Q.   Okay.  Could you see if there were any

18   massage oils found within the same room where the

19   massage table was.

20       A.   I don't have a listing of that in the

21   packet that I have here.

22       Q.   Okay.  And items that would be taken into

23   custody by the police department would be itemized

24   on the property receipt like that?

25       A.   That's true.

```
 1          Q.   Okay.  But -- and so there was a massage
 2     oil found by the master bedroom, this room?
 3          A.   Yes.  And I actually had that pointed out
 4     to me by Detective ████████   And it was called a
 5     bottle -- or a Joy Jelly.  And it was from the
 6     master bedroom on the -- in the credenza which was
 7     right here.
 8          Q.   Okay.  You can have a seat again.
 9          A.   Thank you.
10          Q.   Thank you.
11               You've had a chance to go over those
12     receipts of all the property that was contained?
13          A.   Yes.
14          Q.   Did any of the officers find a purple
15     vibrator in the home?
16          A.   I have Item 24, which -- which may be that.
17     I have not actually seen it, but it's called a
18     twin torpedo.
19          Q.   All right.  The twin torpedo was not found
20     in the master bedroom though, wasn't it found in
21     the other bedroom?
22               I think Detective ████████ testified it was
23     found in Ghislaine Max -- or ████████ bedroom?
24          A.   I don't know.  I don't have a listing right
25     here on this particular document as to where it
```

1    was found on the evidence sheet.  That would be

2    covered in Detective ▮▮▮▮▮▮ report.

3        Q.  Nothing listed as a purple vibrator though?

4        A.  Not on the sheets that I have.

5        Q.  What about a white vibrator?

6        A.  I don't remember seeing a white vibrator.

7    That may have been something that was recovered by

8    them and photographed by CSI ▮▮▮▮▮▮

9        Q.  But you have the property receipts in this

10   case, and it's not listed?

11       A.  I don't see it listed here.  No.

12       Q.  Okay.

13               MS. BELOHLAVEK:  At this point I'm

14           going to see if the grand jurors have any

15           further questions for you.

16               THE WITNESS:  I'm at your service.

17           Yes, sir?

18               A JUROR:  Do you have any sexual

19           toys, other than the double-headed torpedo

20           on your list of --

21               THE WITNESS:  Not on the list that I

22           have here, sir.

23               A JUROR:  That's the only sexual toy

24           you have?

25               THE WITNESS:  Pardon?

```
 1                    A JUROR:  That's the only sexual toy
 2            you have that was confiscated in this --
 3            search?
 4                    THE WITNESS:  I believe, to my
 5            knowledge, it is.  I haven't seen the white
 6            or purple, so I can't --
 7                    A JUROR:  Or any other type of sexual
 8            toy, period.
 9                    THE WITNESS:  Right.  Personally I
10            have not seen those.
11                    A JUROR:  Okay.
12                    THE WITNESS:  But that is not
13            uncommon either, because of the nature of
14            this investigation.
15                    Detective ████████ would be the one
16            that has the knowledge on all those
17            specific items.
18                    Other than filming the room itself --
19            or I'm sorry -- the residence itself prior
20            to the search, recording the reading of the
21            search warrant.  And then, folks, also
22            after the search I go through and re-video
23            to show that the police did not do any
24            damage.  And then the door is finally
25            locked and secured.
```

NOT A CERTIFIED COPY

1              So there would be areas, while I was
2       in it I photographed it from a video
3       standpoint, I would not have direct
4       knowledge of the -- some of the items that
5       were found, but Detective ████ would.
6              MS. BELOHLAVEK:  And you obtained
7       copies of all the evidence sheets of
8       evidence checked in; correct?
9              THE WITNESS:  As -- I think so.  Yes.
10             MS. BELOHLAVEK:  Yes?
11             THE WITNESS:  Yes.
12             MS BELOHLAVEK:  And only that twin
13      torpedo is the only sexual item listed?
14             THE WITNESS:  As best I can tell you.
15      Correct.
16             MS. BELOHLAVEK:  Okay.
17             Yes, sir?
18             THE WITNESS:  Yes, sir?
19             A JUROR:  Is that report just from
20      the master bedroom or from all the bedrooms
21      on the second floor?
22             THE WITNESS:  Actually, it represents
23      the entire residence, plus the two -- the
24      servants quarters, barracks; and on the
25      southwest corner, the fitness and exercise

```
 1              room.  I believe this encompasses --
 2                      A JUROR:  Can you --
 3                      THE WITNESS:  -- everything.
 4                      A JUROR:  Can you point out on that
 5              what -- the room was that this woman ███
 6              was in?
 7                      MS. BELOHLAVEK:  Are you familiar
 8              with which bedroom was ██████?
 9                      THE WITNESS:  I am not.
10                      MS. BELOHLAVEK:  Detective ███ --
11              ███  we can --
12                      THE WITNESS:  Right.
13                      MS. BELOHLAVEK:  -- bring him back to
14              show that.  Okay.
15                      THE WITNESS:  Right.
16                      MS. BELOHLAVEK:  Any other questions?
17                      Yes, sir.  In the back.
18                      A JUROR:  Was the suspect at the
19              house at the time that you served the
20              warrant, sir?
21                      THE WITNESS:  No, sir.  He was not.
22                      A JUROR:  Thank you.
23                      MS. BELOHLAVEK:  Yes, sir?
24                      A JUROR:  Do your warrant s have
25              anything listed for like computer equipment
```

```
1              or things like that or is it --
2                   THE WITNESS:  It did.
3                   A JUROR:  It did?
4                   THE WITNESS:  Yes.
5              And we did take computer equipment.
6                   A JUROR:  And is -- can you say
7         what's on it or --
8                   THE WITNESS:  That was handled by the
9         special investigations unit.
10             And while I saw -- actually
11        physically saw the computers, and saw them
12        disconnected and removed, I never saw
13        anything that was on those computers.
14                  A JUROR:  And did they confiscate
15        passports or anything from anyone in the
16        home or --
17                  THE WITNESS:  No, sir.  Not
18        passports.
19             And there were weapons in the house,
20        rifles --
21                  A JUROR:  And they left them.
22                  THE WITNESS:  -- that -- yes, sir.
23             They were left behind because that
24        was never part of what we were looking for,
25        so those were all left behind.
```

1              MS. BELOHLAVEK:  Yes, sir?

2              THE WITNESS:  Yes, sir?

3              A JUROR:  Could you tell us, the

4       people that -- that you found there, who

5       they were?

6              THE WITNESS:  Do I know who they

7       were?

8              A JUROR:  The people -- yeah.  Who

9       they were.

10             THE WITNESS:  I understand one was

11      the property management -- manager.  I

12      think he was either Germanic or possibly

13      Polish, he has an Eastern European accent.

14             A JUROR:  That was the only person?

15             THE WITNESS:  No.  There were, I

16      think, three other people.

17             A JUROR:  Who were they?

18             THE WITNESS:  I don't know who they

19      were, sir.

20             MS. BELOHLAVEK:  We can ask Detective

21      ███████

22             THE WITNESS:  Right.  Detective

23      ███████ would know who they were.

24             A JUROR:  Do you know that the

25      gentlemen that owned the house was out --

```
 1              did they tell you he was out of town?
 2                   THE WITNESS:  Yes.  We knew he was
 3              out of town.  Yes.
 4                   MS. BELOHLAVEK:  All right.  Thank
 5              you.
 6                   THE WITNESS:  Thank you all very
 7              much.
 8                   (Witness excused.)
 9                   (WITNESS ████████████ RECALLED)
10                   CONTINUED EXAMINATION
11    BY MS. BELOHLAVEK:
12         Q.  You're still under oath.
13              Who was in the home when the search warrant
14    was executed?
15         A.  Several designers from New York City, and
16    Janusz Banasiek, his current houseman.
17         Q.  Okay.  And where were those people located
18    in the mansion?
19         A.  In the kitchen area.  And there were some
20    that were in the main living room area.
21         Q.  Downstairs --
22         A.  Downstairs, first floor.
23         Q.  Okay.  Computers were seized?
24         A.  One computer -- two computers were seized.
25    One was the covert cameras, and the other one was
```

```
 1          Mr. Banasiak's personal computer.
 2            Q.  On either the cameras or the personal
 3        computer, did you find any evidence documenting
 4        the sexual activity of these girls
 5        (indiscernible)?
 6            A.  No.
 7            Q.  You spoke earlier about a twin torpedo that
 8        was found in        bedroom?
 9            A.  Correct.
10            Q.  Using the diagram prepared by Investigator
11                      , can you indicate where -- which bedroom
12        that was in the house?
13            A.  It would have been down towards this
14        bedroom here, I believe.
15            Q.  And where was the massage table?
16            A.  The massage -- well, each room has various
17        massage tables.  And this was -- this was the
18        master bedroom with his master bath.  And there
19        was massage tables here, here, and -- as well as
20        photographs all through here.
21            Q.  Okay.  And the massage table the girls
22        described, was it in this room?
23            A.  Correct.  It was in the master bathroom
24        here.
25            Q.  Okay.  And other than the twin torpedo,
```

1    there were no other sexual toys found in the

2    house, other than the jelly from bedside?

3        A.   The Joy Jelly.  That's it.

4                 MS. BELOHLAVEK:  Any other questions

5            for Detective █████████

6                 A JUROR:  What is Jeffrey Epstein's

7            occupation?  Just for the record.

8                 THE WITNESS:  He is a investor.  He

9            invests billionaires' monies.

10                MS. BELOHLAVEK:  All right.

11                Thank you very much.

12                A JUROR:  Is he a -- one more.

13                MS. BELOHLAVEK:  Sorry.

14                A JUROR:  Is he a United States

15           citizen?

16                THE WITNESS:  Yes.

17                A JUROR:  Born here?

18                THE WITNESS:  Yes, sir.

19                MS. BELOHLAVEK:  All right.

20                Thank you, Detective Recarey.

21                (Witness excused.)

22                (WITNESS ██████████████)

23                MS. BELOHLAVEK:  I'm going to ask you

24           to stand up for a second and raise your

25           right hand.

EXHIBIT 130

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

---

MAURENE COMEY,

                    Plaintiff,

     v.

UNITED STATES DEPARTMENT OF JUSTICE
950 Pennsylvania Avenue, NW
Washington, D.C. 20530

            and

EXECUTIVE OFFICE OF THE PRESIDENT
1600 Pennsylvania Avenue, N.W.
Washington, D.C. 20500

            and

FRANCEY HAKES
in her official capacity as the Director of the Executive
Office for United States Attorneys
950 Pennsylvania Avenue, NW
Washington, D.C. 20530

            and

PAMELA J. BONDI
in her official capacity as Attorney General of the
UNITED STATES DEPARTMENT OF JUSTICE
950 Pennsylvania Avenue, NW
Washington, D.C. 20530

            and

EXECUTIVE OFFICE FOR UNITED STATES
ATTORNEYS
950 Pennsylvania Avenue, NW
Washington, D.C. 20530

            and

OFFICE OF PERSONNEL MANAGEMENT
1900 E Street, NW
Washington, D.C, 20415

Civil Action No: 25-_____

**JURY TRIAL DEMANDED**

and

THE UNITED STATES OF AMERICA
Washington, D.C. 20500,

          Defendants.

## COMPLAINT

## PRELIMINARY STATEMENT

1.     Plaintiff Maurene Comey was an exemplary, dedicated, and highly decorated public servant who spent nearly ten years prosecuting crime and corruption, without fear or favor, as an Assistant United States Attorney for the Southern District of New York.

2.     During Ms. Comey's tenure, acting in accord with Department of Justice policy and pursuant to direction from Department of Justice and United States Attorney's Office leaders, she helped protect the American public by securing hundreds of criminal convictions and participating in dozens of complex cases, including prosecutions of homicides, racketeering, and public corruption. Based on her outstanding record, she was assigned to prosecute high-profile defendants including Sean "Diddy" Combs, Robert Hadden, Jeffrey Epstein, and Ghislaine Maxwell. In recognition of her work, the Department of Justice repeatedly promoted and honored Ms. Comey.

3.     Despite her exemplary performance, Ms. Comey was abruptly fired on July 16, 2025, the day after the U.S. Attorney's Office had asked her to take the lead on a major public corruption case and just three months after her latest receipt of an "Outstanding" review. Defendants did not identify any cause or provide Ms. Comey any due process for her removal. She simply received an email with an attachment stating that she was being terminated "[p]ursuant to Article II of the United States Constitution and the laws of the United States."

2

4.      Ms. Comey's termination—without cause, without advance notice, and without any opportunity to contest it—was unlawful and unconstitutional. In addition to her fundamental constitutional rights, Ms. Comey had statutory protections under the Civil Service Reform Act ("CSRA") that governed how and why she could be terminated, including specific prohibitions against termination for discriminatory reasons such as political affiliation. Her termination violated every one of those protections.

5.      Defendants have not provided any explanation whatsoever for terminating Ms. Comey. In truth, there is no legitimate explanation. Rather, Defendants fired Ms. Comey solely or substantially because her father is former FBI Director James B. Comey, or because of her perceived political affiliation and beliefs, or both.

6.      James Comey served as the Director of the Federal Bureau of Investigation from 2013 until President Trump fired him in 2017. For the past nine years, President Trump has publicly criticized Mr. Comey for his actions while serving as FBI Director,[1] and because after he was fired, Mr. Comey (i) wrote a memoir critical of President Trump, (ii) continued to publicly criticize President Trump and his Administration, and (iii) in May 2025 posted a message on social media that President Trump and others in the Trump Administration claimed to perceive as threatening.[2]

---

[1] According to a website that compiles President Trump's posts on the social media platforms X and Truth Social, President Trump has posted (or reposted) approximately 259 times about Mr. Comey from October 16, 2016, to the date of this filing, including repeatedly calling him the "worst" FBI Director in history. *See generally,* https://rollcall.com/factbase-twitter/?q=Comey&platform=all&sort=date&sort_order=desc&page=6 ("Roll Call," full Trump social media compilation filtered for the search term "Comey"); *see also id.* at May 24, 2024, May 9, 2019, June 15, 2018, April 18, 2018, April 15, 2018, April 13, 2018, December 3, 2017.

[2] https://www.foxnews.com/media/trump-says-comey-knew-assassination-meaning-behind-deleted-social-media-post?msockid=012137d09fd26ab63f8427e89efb6ba6

7.     Following Mr. Comey's May 2025 social media post and other critical statements, President Trump's supporters called for Ms. Comey's firing. Notable among those supporters is Laura Loomer, a social media influencer who, on information and belief, has political influence in the Trump Administration, including influence over the termination of federal employees.[3] President Trump has publicly stated: "If you're Loomered you're in deep trouble. That's the end of your career in a sense."[4]

8.     On May 18, 2025, Ms. Loomer called for Mr. Comey's "liberal daughter" and her "Democrat husband" to be "FIRED from the DOJ immediately" "for being a national security risk via their proximity to a criminal [i.e., Mr. Comey] who just committed a felony by threatening to assassinate the President."[5] Ms. Loomer also declared that, "under [Attorney General Pamela] Blondi [sic], every Deep State Operator is being emboldened," and she "question[ed] the impartiality of Maurene and Lucas [Maurene's husband] in their prosecutorial roles, especially in high-profile cases, due to the undeniable bias and influence stemming from James Comey's public criticism of Trump and the ongoing investigation into his Instagram post."[6] After Ms. Comey's termination, Ms. Loomer boasted that the decision "c[a]me[] 2

---

[3] See, e.g., https://apnews.com/article/laura-loomer-trump-influence-appointees-fired-83ab8898477427da4dc1824c6ff3b560; https://www.nytimes.com/2025/07/08/us/politics/laura-loomer-trump.html.

[4] https://x.com/WarlordDilley/status/1775672492830462118

[5] https://x.com/LauraLoomer/status/1924195103842984073; see also https://www.msn.com/en-za/news/other/laura-loomer-takes-victory-lap-over-firing-of-ex-fbi-chief-comey-s-daughter-after-pressing-pam-blondi/ar-AA1IKfqn?ocid=BingNewsSerp

[6] https://x.com/LauraLoomer/status/1924195103842984073. Ms. Comey's husband Lucas Issacharoff voluntarily resigned from the Department of Justice several days earlier on May 9, 2025.

months after my pressure campaign on Pam Blondi [sic] to fire Comey's daughter and Comey's son-in-law from the DOJ."[7]

9.      The politically motivated termination of Ms. Comey—ostensibly under "Article II of the Constitution"—upends bedrock principles of our democracy and justice system. Assistant United States Attorneys like Ms. Comey must do their jobs without fearing or favoring any political party or perspective, guided solely by the law, the facts, and the pursuit of justice. Congress recognized this essential proposition and, pursuant to its Article I powers, enacted the CSRA to place guardrails on the removal of AUSAs and other federal employees and ensure continuity and impartiality in government service. The executive branch cannot use Article II to overrule Congress and remove career civil servants for perceived disloyalty. Such an act violates the Constitution's fundamental Separation of Powers. It also violates the Bill of Rights, depriving Ms. Comey of protection under the First and Fifth Amendments.

10.     To challenge her illegal termination and assert her rights under the United States Constitution and federal law, Ms. Comey brings this action against the U.S. Department of Justice; the Executive Office of the President; Director of the Executive Office for United States Attorneys Francey Hakes, in her official capacity; U.S. Attorney General Pamela Bondi, in her official capacity; the Executive Office for United States Attorneys; the Office of Personnel Management; and the United States of America, for the purposes of seeking relief under the Administrative Procedure Act, 5 U.S.C. § 701 *et seq.*, the Federal Declaratory Judgment Act, 28 U.S.C. § 2201, the All Writs Act, and the Constitution of the United States, including the First and Fifth Amendments thereto.

---

[7] https://x.com/LauraLoomer/status/1945613578477711461.

5

## THE PARTIES

11.     Plaintiff Maurene Comey served as an Assistant United States Attorney ("AUSA") in the United States Attorney's Office for the Southern District of New York ("SDNY") from November 16, 2015, until July 16, 2025, when Defendants terminated her employment unlawfully without advance notice or legal cause, and in contravention of statutorily prohibited personnel practices, the Administrative Procedures Act, and the United States Constitution, including the First and Fifth Amendments thereto. She is the daughter of James B. Comey.

12.     Defendant the United States Department of Justice ("DOJ") is headquartered in Washington, D.C. and is an agency of the United States as defined by 5 U.S.C. § 701. The DOJ controls its components, including Defendant the Executive Office for United States Attorneys, and on information and belief, authorized the unlawful and unconstitutional actions taken against Ms. Comey.

13.     Defendant Executive Office of the President is headquartered in Washington, D.C. and, on information and belief, authorized the unlawful and unconstitutional actions taken against Ms. Comey.

14.     Defendant Francey Hakes is sued in her official capacity as the Director of the Executive Office for United States Attorneys. Ms. Hakes signed the "Memorandum for Maurene R. Comey," dated July 16, 2025, terminating Ms. Comey from federal service and thereby authorizing the unlawful and unconstitutional actions taken against Ms. Comey.

15.     Defendant Pamela J. Bondi is sued in her official capacity as the Attorney General of the United States. In January 2025, she was nominated by President Donald J. Trump to serve in that position, subject to the advice and consent of the Senate. On information and belief,

6

Attorney General Bondi authorized the unlawful and unconstitutional actions taken against Ms. Comey.

      16.     Defendant Executive Office for United States Attorneys ("EOUSA") is headquartered in Washington, D.C., a component of DOJ, and an agency of the United States as defined by 5 U.S.C. § 701. EOUSA carried out, and on information and belief, authorized the unlawful and unconstitutional actions taken against Ms. Comey.

      17.     Defendant Office of Personnel Management ("OPM") is headquartered in Washington, D.C. and is an agency of the United States as defined by 5 U.S.C. § 701. On information and belief, OPM authorized the unlawful and unconstitutional actions taken against Ms. Comey.

      18.     Defendant United States of America is responsible for the exercise of state action by the other named Defendants that Plaintiff is challenging in this action.

## JURISDICTION AND VENUE

      19.     The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because Plaintiff's causes of action arise under the Constitution and laws of the United States.

      20.     Venue is appropriate in this judicial district under 28 U.S.C. § 1391(b)(2) and 5 U.S.C. § 703.

      21.     Sovereign immunity is waived under 5 U.S.C. § 702, which entitles Plaintiff to relief where Defendants acted unconstitutionally and beyond statutory authority.

## FACTUAL ALLEGATIONS

*Ms. Comey Served as an Exemplary Assistant United States Attorney in the Southern District of New York*

22.     Ms. Comey graduated from the College of William & Mary *summa cum laude* in 2010, and from Harvard Law School, where she served on the *Harvard Law Review*, in 2013.

23.     After graduating from law school, Ms. Comey worked for a year as an associate at Debevoise & Plimpton LLP in New York City. She moved into the public sector after that, serving as a law clerk to U.S. District Judge Loretta A. Preska, then-Chief Judge of the Southern District of New York.

24.     Ms. Comey completed her clerkship and decided to build a career in public service. She applied to serve as an Assistant United States Attorney in the Southern District of New York in March 2015, and after a rigorous interview process with Assistant U.S. Attorneys in the Civil and Criminal Divisions of the Office as well as the Executive Staff, she was hired by Preet Bharara, then-United States Attorney for the Southern District of New York. She began her employment as an AUSA in November 2015.

25.     Ms. Comey's ensuing decade of service was exemplary. In her tenure at SDNY, she personally handled eleven criminal trials, secured over 200 convictions, briefed and argued multiple appeals before the Court of Appeals for the Second Circuit, and supervised numerous additional federal investigations, trials, and convictions. Her performance consistently earned her accolades and promotions, as well as "Outstanding" ratings in her annual reviews along with glowing commentary—including, for example:

- Ms. Comey "is highly respected and is a leader in the office. She is a brilliant lawyer and a gifted supervisor," and "is the lawyer the office turns to when legal excellence is a must."

- Ms. Comey has "handled the highest profile cases in the office because her judgment, work product, and courtroom advocacy are among the finest in the country."

- Ms. Comey "is a highly accomplished AUSA and manager" and is "an outstanding AUSA in every respect."

- Ms. Comey "routinely demonstrates creativity, perseverance, initiative, and dedication, [and] considers novel legal theories and investigative techniques."

- Ms. Comey "demonstrates the foresight and organizational skills necessary to manage lengthy and difficult trials."

- Ms. Comey's "supervision of the investigations and prosecutions in her unit is superb."

- Ms. Comey "works tirelessly to manage the people and cases under her supervision," and "ensure[s] that cases are prosecuted efficiently and with good results."

- Ms. Comey "works extremely hard, and is available at all hours to discuss issues with the unit and with the executive staff, and she promptly responds to any issues."

- Ms. Comey "invariably demonstrates sound judgment in conducting investigations and making [] decisions," and "represents the Department of Justice and the court of law in a professional manner."

- Ms. Comey "took the lead on two of our most sensitive cases, both involving high-profile targets and numerous victims of sexual abuse, and throughout her work has consistently shown exceptional judgment, diligence, and professionalism."

- Ms. Comey "demonstrates excellent courtroom presence, speaks persuasively and with authority, and upholds government positions."

26. As further testament to her dedication and exceptional work, SDNY leadership repeatedly asked Ms. Comey to conduct the prosecution of some of the most significant criminal cases in the Office's recent history—which she also won. Notably, in her almost ten years as an AUSA, Ms. Comey served with distinction through Democratic and Republican administrations,

earning the support and confidence of supervisors, United States Attorneys, and DOJ officials serving under Presidents Obama, Trump, and Biden.

27.    Ms. Comey spent the first eighteen months of her AUSA career in SDNY's White Plains Division, where she pursued violence, narcotics, fraud, and sexual exploitation cases.

28.    During this time, Ms. Comey investigated and began prosecuting Nicholas Tartaglione, a former police officer and the perpetrator of a gruesome quadruple homicide.[8] After many years building the case, and a four-week trial in 2023, Ms. Comey and her team secured a conviction against Tartaglione on all seventeen counts, and he was sentenced to four consecutive life sentences.[9]

29.    In recognition of her excellent work on the *Tartaglione* case, U.S. Attorney Preet Bharara awarded Ms. Comey an award "for Outstanding efforts and exceptionally high quality work" in December 2016.

30.    Ms. Comey moved to the Manhattan office in 2017 and joined the Violent and Organized Crime Unit, where she prosecuted dozens of defendants for violence offenses, including racketeering and murder.

31.    In September 2019, Ms. Comey moved to the Public Corruption Unit, where she prosecuted bribery and other cases involving abuse of public trust.

32.    With her significant experience prosecuting matters involving violence and sexual exploitation, her SDNY supervisors assigned Ms. Comey to work on the investigation of Jeffrey

---

[8] *See* https://www.justice.gov/usao-sdny/pr/former-police-officer-charged-white-plains-federal-court-quadruple-homicide

[9] *See* https://www.justice.gov/usao-sdny/pr/former-police-officer-sentenced-four-consecutive-life-sentences-2016-quadruple-murder

Epstein in the spring of 2019. She was part of the team that conducted grand jury proceedings and secured an indictment against Mr. Epstein for sex trafficking and conspiracy; Mr. Epstein was arrested on July 6, 2019.[10] Ms. Comey was one of three prosecutors who then represented the United States in Mr. Epstein's criminal case, successfully defeating his request for bail pending trial. Mr. Epstein died in federal jail on August 10, 2019, while awaiting trial; as a result, the charges against him were ultimately dismissed. Geoffrey Berman—then-U.S. Attorney for the Southern District of New York, serving in the first Trump Administration—supervised Ms. Comey's work on the investigation and prosecution of Mr. Epstein at all times.

33.     At the direction and under the supervision of SDNY leadership, Ms. Comey and her team continued to investigate Mr. Epstein's criminal operation after Mr. Epstein died. They uncovered details that implicated Mr. Epstein's former girlfriend and collaborator, Ghislaine Maxwell. On or about July 2, 2020, the SDNY, through Ms. Comey and her team, obtained an indictment charging Ms. Maxwell with enticing a minor to travel to engage in criminal sexual activity, transporting a minor with the intent to engage in criminal sexual activity, conspiracy to commit both of those offenses, and perjury in connection with two sworn depositions.[11] Ms. Comey and her team subsequently obtained a superseding indictment additionally charging Ms. Maxwell with conspiracy to commit sex trafficking of a minor and sex trafficking of a minor.

34.     At the direction and under the supervision of SDNY leadership, Ms. Comey successfully led the investigation and prosecution of Ms. Maxwell, including serving as one of the lead trial lawyers in a month-long trial, and secured justice for many victims of Mr. Epstein and Ms. Maxwell. On December 29, 2021, a jury convicted Ms. Maxwell on five counts,

---

[10] *See* https://www.justice.gov/usao-sdny/press-release/file/1180481/dl

[11] *See* https://www.justice.gov/usao-sdny/press-release/file/1291491/dl?inline

11

including sex trafficking of a minor, conspiracy, and transportation of a minor for illegal sexual activity. Ms. Maxwell was sentenced in June 2022 to 20 years in prison for her role in the sex trafficking scheme.[12] U.S Attorney Berman and later Acting U.S. Attorney Audrey Strauss—both serving in the first Trump Administration—were deeply involved in supervising the investigation and prosecution of Ms. Maxwell during their tenures.

35.    In addition, also at the direction and under the supervision of SDNY leadership, Ms. Comey handled the investigation and indictment of Dr. Robert Hadden, a gynecologist who criminally sexually abused dozens of patients for decades at Columbia University and New York-Presbyterian Hospital.[13]  Dr. Hadden was sentenced to 20 years in prison for his depraved crimes.[14]

36.    Ms. Comey carried a substantial caseload beyond the high profile matters she handled. Those other cases featured a large volume of violence and drug-related cases, including the prosecutions of over 40 defendants charged with murder, over 80 additional defendants charged with racketeering conspiracy, and over 80 additional defendants charged with narcotics offenses. In addition, Ms. Comey handled white collar cases such as the prosecutions of multiple correctional officers for accepting bribes from inmates in exchange for smuggling contraband, a union president and volunteer fire department treasurer for embezzlement, and a senior advisor at the Treasury Department's Financial Crimes Enforcement Network for unlawfully disclosing Suspicious Activity Reports.

---

[12] *See* https://www.justice.gov/usao-sdny/pr/ghislaine-maxwell-sentenced-20-years-prison-conspiring-jeffrey-epstein-sexually-abuse

[13] *See* https://www.justice.gov/usao-sdny/press-release/file/1314401/dl?inline

[14] *See* https://www.justice.gov/usao-sdny/pr/former-obstetriciangynecologist-robert-hadden-sentenced-20-years-prison-sexually

37.     In February 2021, in recognition of her work and with the approval of the
Department of Justice, Ms. Comey was promoted to Deputy Chief of the Violent and Organized
Crime Unit. She was promoted, again, in June 2021, to Co-Chief of the Violent and Organized
Crime Unit, and then once again, in January 2023, to Co-Chief of the Public Corruption Unit.
All three times, the United States Attorney for the Southern District of New York approved her
promotions: Audrey Strauss (the first two) and then Damian Williams (the third).

38.     In addition, in May 2023, the Director of the Executive Office for United States
Attorneys awarded Ms. Comey and her team the prestigious Director's Award for "Superior
Performance by a Litigative Team" with respect to the *Maxwell* trial.

39.     Ms. Comey's outstanding work continued over the next two years, during which
she successfully prosecuted and supervised several more prominent cases.

40.     For example, at the direction and under the supervision of SDNY leadership, Ms.
Comey oversaw the team that indicted and tried former New Jersey Senator Robert Menendez
(and his wife and three other business associates) on federal bribery charges in September
2023.[15] Ms. Comey and her Co-Chief closely supervised the nine-week trial after which a jury
found Mr. Menendez guilty on all 16 counts, including bribery and conspiracy to act as a foreign
agent. He subsequently resigned from the Senate, and in January 2025, he was sentenced to 11
years in prison.[16]

---

[15] *See* https://www.justice.gov/usao-sdny/pr/us-senator-robert-menendez-his-wife-and-three-new-jersey-businessmen-charged-bribery

[16] *See* https://www.justice.gov/usao-sdny/pr/former-us-senator-robert-menendez-sentenced-11-years-prison-bribery-foreign-agent-and

13

41.    Further, at the direction and under the supervision of SDNY leadership, in February 2024, Ms. Comey and her Co-Chief oversaw the team that charged 70 current and former employees of the New York City Housing Authority ("NYCHA") with bribery and extortion for accepting cash payments from contractors in exchange for awarding NYCHA contracts—the largest number of federal bribery charges brought on a single day.[17]

42.    After serving as a supervisor for several years, Ms. Comey requested then-U.S. Attorney Damian Williams to permit her to return full time to trial work, which he granted, appointing Ms. Comey as Senior Trial Counsel in the Public Corruption Unit in August 2024.

43.    Most recently, Ms. Comey joined the prosecution team that tried Sean "Diddy" Combs. Mr. Combs was indicted and arrested in September 2024 and charged with racketeering, sex trafficking, and transportation to engage in prostitution.[18] Ms. Comey's SDNY supervisors asked her to join the team after Mr. Combs was charged, and she served as a lead prosecutor in the two-month trial against him from May through July 2025. Mr. Combs was convicted of transportation with intent to commit prostitution and now awaits sentencing; he faces up to 20 years in prison.

44.    Notwithstanding Ms. Comey's demonstrated leadership capabilities and significant prosecutorial experience, she spent her entire career as an Assistant United States Attorney at the end of a long line of supervisors within the Department of Justice. Even at her ostensibly "highest" position as a unit Co-Chief, approval authority for certain prosecutorial functions—most notably, approval of all indictments—ultimately rested with the SDNY

---

[17] *See* https://www.justice.gov/usao-sdny/pr/70-current-and-former-nycha-employees-charged-bribery-and-extortion-offenses

[18] *See* https://www.justice.gov/usao-sdny/media/1368556/dl

Criminal Division Deputy Chiefs, Criminal Division Chief, and the United States Attorney.  She
had no authority to set DOJ policy; instead, she implemented the policies set by her superiors.
Moreover, certain prosecutorial functions in many of Ms. Comey's cases could not be performed
without express approval of Department of Justice officials outside of SDNY's own leadership
chain.  For example, violent crime cases that involved the use of electronic surveillance (a
"wiretap") required the approval of senior DOJ leaders who oversaw the Electronic Surveillance
Unit at DOJ Headquarters.  Additionally, racketeering charges required the approval of senior
DOJ leaders within the Violent Crime and Racketeering Section at DOJ Headquarters, and
certain cases implicating national security required approval of senior DOJ leaders within the
National Security Division at DOJ Headquarters.  Similarly, cases involving the investigation of
current or former United States politicians required the approval of senior DOJ leaders within the
Public Integrity Section at DOJ Headquarters.  In these and similar instances, Ms. Comey's work
as a prosecuting attorney and unit supervisor involved implementing decisions made by a chain
of supervisors and approval authorities stretching from the SDNY Criminal Division to the
Office of the Attorney General.

***Ms. Comey is Terminated without Advance Notice or Cause on July 16, 2025***

45.    On July 15, 2025, Ms. Comey met with the Co-Chiefs of the SDNY Public
Corruption Unit, who asked her to join the trial team for another of the SDNY's major cases.

46.    The next day, July 16, 2025, Ms. Comey agreed to take on the case and went to
speak with a colleague about joining the trial team.

47.    While in her colleague's office, Ms. Comey received an e-mail at 4:57 p.m. from
DOJ's Justice Management Division, Director of Human Resources, with an attachment titled
"Memorandum for Maurene R. Comey."  The memorandum, dated July 16, 2025, and signed by

15

Francey Hakes, the Director of the Executive Office for United States Attorneys—the same title

of the official who awarded Ms. Comey the prestigious Director's Award for her work on the

*Maxwell* trial—stated as follows:

> Subject:       Notice of Removal from Federal Service
>
> This memorandum provides official notice that you are removed from your position of
> Assistant United States Attorney, AD-0905-29, Criminal Division, Southern District of
> New York, Offices of the United States Attorneys, and from the federal service, effective
> immediately.
>
> Pursuant to Article II of the United States Constitution and the laws of the United States,
> your employment with the Department of Justice is hereby terminated, and you are
> removed from federal service effective immediately.
>
> If applicable, you may have a right to file an appeal of this removal with the U.S. Merits
> Systems Protection Board (MSPB) within 30 days of the effective date of this removal
> action. For more information on how to file an appeal with the MSPB, please visit
> www.mspb.gov.

(Attached hereto as Exhibit A, the "Termination Memorandum.")

48.     Before receiving the Termination Memorandum, Ms. Comey received no notice

or reason for the termination decision, and she was provided with no opportunity to respond.

49.     Ms. Comey then walked into the office of one of the Co-Chiefs of the Public

Corruption Unit to inform her supervisors that she had been terminated. Those supervisors were

visibly shocked and upset by the news.

50.     Immediately, Jay Clayton, then-interim United States Attorney for the Southern

District of New York, and Sean Buckley, Deputy United States Attorney for the Southern

District of New York, came to the Co-Chief's office to speak with Ms. Comey and her

supervisors. Ms. Comey asked the basis for the termination. U.S. Attorney Clayton responded,

in sum and substance: "All I can say is it came from Washington. I can't tell you anything else."

No other explanation was ever provided to Ms. Comey regarding the reason for her termination.

51.     The White House also has not provided a substantive explanation for Ms. Comey's termination; the White House Press Secretary claimed that the termination "was a decision that was made by the Department of Justice."[19]

***Ms. Comey's Termination was Illegal Because it was Based on Her Affiliation with James B. Comey, or Her Perceived Political Affiliation and Beliefs, or Both***

52.     OPM issued a Standard Form ("SF") 50, "Notification of Personnel Action," to Ms. Comey shortly after her receipt of the July 16, 2025 memorandum. (Attached hereto as Exhibit B, the "SF-50," redacted.) Section 5-D of Ms. Comey's SF-50 is titled "Legal Authority." This section states: ART II CONSTITUTION.

53.     Section 45 of Ms. Comey's SF-50 is titled "Remarks." This section states: REASON(S) FOR REMOVAL: ARTICLE II OF THE CONSTITUTION.

54.     The July 16 memorandum terminating Ms. Comey indicated twice that she was being "removed from federal service." This term was not defined in the letter. However, 5 U.S.C. § 2101 defines the "civil service" as "consist[ing] of all appointive positions in the executive, judicial, and legislative branches of the Government of the United States, except positions in the uniformed services."

55.     Defendants did not assert that Ms. Comey was being terminated for cause or for any reason related to her performance as an AUSA. Nor would such an assertion have been remotely plausible. Ms. Comey was a highly regarded AUSA who had consistently received "Outstanding" reviews and glowing feedback from her superiors. In fact, on April 25, 2025, fewer than three months before her termination, Ms. Comey received another review of "Outstanding," which was approved and signed by Jay Clayton, U.S. Attorney for the Southern

_____

[19] https://www.youtube.com/watch?v=qZ9IdCcB1Dk

17

District of New York. Also, as of the date of her termination, she was counsel of record on hundreds of cases and expected to handle sentencing in the *Combs* case, to brief the appeal in the *Tartaglione* case, and to handle another significant trial slated for February 2026, which her supervisors had asked her to lead just one day earlier. Nor could the explanation plausibly be that she mishandled her high-profile cases; she received accolades related to her work on some of those high-profile cases, and, on information and belief, among the at least fourteen AUSAs who participated in the prosecutions of *Epstein*, *Maxwell*, *Hadden*, and *Combs*, Ms. Comey was the only one who was terminated.

56.     On information and belief, Ms. Comey's termination was designed to retaliate against her based on her familial relation as the daughter of James B. Comey, or because of her perceived political affiliation and beliefs, or both. No other plausible explanation exists for her termination—and certainly none was provided.

57.     President Trump has publicly criticized Mr. Comey for nearly a decade, beginning with President Trump's disapproval of actions Mr. Comey took when he served as Director of the FBI. According to a website that compiles President Trump's posts on the social media platforms X and Truth Social, President Trump has thus far posted (or reposted) approximately 259 times about Mr. Comey, including describing him repeatedly as the "worst" FBI Director in history.[20]

58.     During his first presidential campaign, then-Candidate Trump called on the FBI to bring criminal charges against Democratic Presidential Nominee Hillary Clinton. After Mr. Comey announced that the FBI would not recommend that the Justice Department bring charges,

---

[20] *See generally,* Roll Call; *see also, e.g., id.* at May 24, 2024, May 9, 2019, June 15, 2018, April 18, 2018, April 15, 2018, April 13, 2018, December 3, 2017.

President-Elect Trump reposted that Mr. Comey "stood in the way" of the investigation and claimed that he "was the best thing that ever happened to Hillary Clinton in that he gave her a free pass for many bad deeds."[21] After he was elected, President Trump's criticism of Mr. Comey continued, including for the FBI's investigation into Russia's role in the 2016 presidential election, which President Trump has repeatedly criticized as a "hoax" and a "witch hunt."[22]

59.     On May 9, 2017, President Trump terminated Mr. Comey. In the following years, President Trump and Mr. Comey publicly commented about and criticized each other.[23] President Trump has also continued to refer to the Russia and Hillary Clinton investigations as hoaxes, witch hunts, and "rigged" probes,[24] and claimed that Mr. Comey was a "liar"[25] and that

---

[21] *See* Roll Call at October 17, 2016, May 2, 2017.

[22] *See, e.g.,* Roll Call at August 1, 2018.

[23] *See, e.g.,* https://www.cnn.com/2017/06/07/politics/james-comey-testimony-released (Mr. Comey testified to Congress about conversations he had with President Trump); Roll Call at December 3, 2017 (President Trump's post stating that this was "another Comey lie"); https://www.npr.org/2018/04/12/602029560/5-insights-from-comeys-memoir-ex-fbi-chief-blasts-trump-as-mob-like (Mr. Comey published a memoir in April 2018 describing President Trump as "unethical[] and untethered to the truth and institutional values"); Roll Call at June 17, 2018, April 18, 2018, April 16, 2018, April 13, 2018 (President Trump's posts stating that Mr. Comey is "slippery," "a proven LEAKER & LIAR," and that he has "committed many crimes"); https://www.youtube.com/watch?v=oKcsEuD3fnw (interview with James Comey in which he stated, "The president of the United States [is] saying that private citizens should be in jail….That's not normal").

[24] *See, e.g.,* Roll Call at July 12, 2025, July 10, 2025, July 25, 2023, December 6, 2022, October 19, 2022, September 10, 2020, July 9, 2020, February 14, 2019, January 12, 2019, December 7, 2018, August 17, 2018, August 1, 2018, June 28, 2018, June 18, 2018, June 17, 2018, June 16, 2018, May 19, 2018, April 19, 2018, September 1, 2017, May 31, 2017.

[25] *See, e.g.,* Roll Call at September 30, 2020, August 11, 2020, September 2, 2029, April 13, 2018.

he and Hillary Clinton, among others, "should be in jail."[26]  President Trump continues to criticize Mr. Comey, posting about Mr. Comey on Truth Social as recently as August 13 and 14, 2025.[27]

60.    On information and belief, and as reported by the Press, while in office during his first term, President Trump told his White House Chief of Staff that he wanted a number of his perceived political enemies to be investigated by the IRS.[28]  On information and belief, and also as reported by the Press, in 2019, Mr. Comey was notified that the IRS would audit him.[29]

61.    More recently, in May 2025, Mr. Comey posted on social media an image showing seashells arranged to read "8647."  President Trump and others within the Trump Administration claimed to interpret the "86" as a slang term for "eliminate" and "47" as referencing President Trump as the 47th president, describing it as a call for violence against President Trump.[30]  Mr. Comey described the post as a "political message" that was not associated with "violence," but deleted the post.[31]

---

[26] Roll Call at September 21, 2020.

[27] *See* Roll Call at August 14, 2025, August 13, 2025.

[28] *See* https://www.nytimes.com/2022/11/13/us/politics/trump-irs-investigations.html

[29] *See* https://www.nytimes.com/2022/07/06/us/politics/comey-mccabe-irs-audits.html

[30] *See, e.g.,* https://www.politico.com/news/2025/05/15/james-comey-sparks-republican-outrage-with-trump-social-media-post-00353141; *see also* https://x.com/DonaldJTrumpJr/status/1923118680658862260 (Donald Trump Junior reposting Mr. Comey's post and stating "Just James Comey causally [sic] calling for my dad to be murdered").

[31] *See* https://www.cbsnews.com/news/james-comey-under-investigation-posting-deleting-86-47-instagram-noem-says

62.     On May 16, 2025, President Trump appeared on Fox news and called Mr. Comey

a "dirty cop" and accused him of publishing an "assassination message."[32] The Department of

Homeland Security and United States Secret Service reportedly investigated Mr. Comey in

connection with his now-deleted post.[33]

63.     Following Mr. Comey's May 2025 social media post and other critical statements,

President Trump's supporters, including Laura Loomer, called for the termination of Ms. Comey.

Ms. Loomer has met with President Trump in the Oval Office and, upon information and belief,

has political influence in the Trump Administration with respect to the firing of federal

employees.[34] President Trump has publicly stated: "You don't want to be Loomered; if you're

Loomered you're in deep trouble. That's the end of your career in a sense."[35]

64.     Specifically, on May 18, 2025, Ms. Loomer, who has over 1.7 million followers

on X, called for the firing of Mr. Comey's "liberal daughter" and "Democrat son-in-law," stating

as follows:

> Pam Blondi [sic] Is Allowing James Comey's Daughter and his Son In Law to Work at
> the Trump DOJ

---

[32] https://www.yahoo.com/news/trump-melts-down-over-comey-171103635.html

[33] *See* https://www.cbsnews.com/news/james-comey-under-investigation-posting-deleting-86-47-instagram-noem-says

[34] *See, e.g.,* https://www.nytimes.com/2025/04/03/us/politics/trump-meeting-laura-loomer.html
("Trump Fires 6 N.S.C. Officials After Oval Office Meeting With Laura Loomer");
https://apnews.com/article/laura-loomer-trump-influence-appointees-fired-83ab8898477427da4dc1824c6ff3b560 (reporting that "the list of administration officials who
have drawn Loomer's ire and swiftly thereafter gotten the axe from Trump has been growing");
*see also* https://www.nytimes.com/2025/07/08/us/politics/laura-loomer-trump.html ("Laura
Loomer, Trump's Blunt Instrument").

[35] https://x.com/WarlordDilley/status/1775672492830462118

Did you know that Maurene Comey, the daughter of former FBI Director James Comey, serves as an Assistant U.S. Attorney in the Southern District of New York (SDNY), where she heads the Violent and Organized Crime Unit?

She has been with the SDNY since 2015 and has prosecuted high-profile cases, including those involving Jeffrey Epstein, Ghislaine Maxwell, and currently Sean "Diddy" Combs. Her husband is Lucas Issacharoff. He also works at the current Trump DOJ, despite a long history being a Trump hater.

He is the Assistant U.S. Attorney in SDNY, working in the Civil Division since 2019. Their roles involve significant responsibilities in federal prosecutions and civil litigation, respectively, under the Department of Justice (DOJ), which is currently led by the ever incompetent Attorney General Pam Blondi [sic] @AGPamBondi....

Donald Trump campaigned on DRAINING THE SWAMP and taking a bulldozer to the FBI and DOJ, which has been weaponized against him and his supporters. And now, under Pam Blondi [sic], James@Comey is getting away with putting assassination hits on President Trump, and our tax dollars are paying for the salaries of James Comey's liberal daughter and her Democrat husband.

If Blondi [sic] was a serious person, she would FIRE them both for being a national security risk via their proximity to a criminal who just committed a felony by threatening to assassinate the President.

Under Blondi [sic], every single Deep State operator is being emboldened. James Comey is under investigation by the Department of Homeland Security and US Secret Service. Maurene Comey and Lucas Issacharoff's continued employment at the DOJ, is unacceptable.[36]

I question the impartiality of Maurene and Lucas in their prosecutorial roles, especially in high-profile cases, due to the undeniable bias and influence stemming from James Comey's public criticism of Trump and the ongoing investigation into his Instagram post.

Both Maurene Comey and Lucas Issacharoff need to be FIRED from the DOJ immediately. ....

---

[36] Upon information and belief, these comments echo similar comments made on various social media and other internet platforms; according to the Press, the commentators seem to connect Ms. Comey's involvement in the *Epstein* and *Combs* prosecutions to her perceived political affiliation. *See, e.g.*, https://www.pbs.org/newshour/politics/what-to-know-about-the-maga-faithfuls-anger-over-trump-and-the-epstein-case.

Has Pam Blondi [sic] told President Trump that James Comey's daughter still works at the DOJ? Has anyone told Trump? How on Earth does something like that slip through the cracks?[37]

65.     Ms. Loomer also posted on her Facebook account, two days earlier on May 16, as

follows:

If Comey doesn't get arrested & Pam Blondi [sic] doesn't fire James@Comey's daughter from the DOJ, then you'll know all of the talk about accountability from the DOJ is nothing more than a Fox News talking point. If we care about law & order, now is the time for Blondi [sic] to prove it.[38]

66.     And, once more, on May 16, Ms. Loomer posted on X:

This is Patrice Comey, the wife of former FBI Director James @Comey who was just interviewed by @SecretService for threatening to assassinate President Trump.

Their daughter is Maurene Comey, who still works at the Trump DOJ because Pam Blondi [sic] won't fire her.

Don't expect anything good to happen at the DOJ if Blondi [sic] can't even bring herself to fire Comey's rat daughter.[39]

67.     Then, on the day Ms. Comey was terminated—July 16, 2025—Ms. Loomer

celebrated Ms. Comey's termination, posting on X:

Today, the DOJ FIRED Maurene Comey from the United States Attorney's office for the Southern District of New York. She is the daughter of former disgraced FBI Director James @Comey.

---

[37] https://x.com/LauraLoomer/status/1924195103842984073.  As of the date of this filing, this post received approximately 892,000 views and 14,000 likes, and was re-shared approximately 8,100 times.

[38]  https://www.facebook.com/groups/267428837831289/posts/1415851112989050/.  As of the date of this filing, this post received approximately 169,000 views.

[39] https://x.com/LauraLoomer/status/1923555086837613012. As of the date of this filing, this post received approximately 642,600 views and 11,000 likes, and was re-shared approximately 5,700 times.

This comes 2 months after my pressure campaign on Pam Blondi [sic] to fire Comey's daughter and Comey's son in law from the DOJ.

Mauren Comey's husband is Lucas Issacharoff. As I previously reported, he works at the current Trump DOJ, despite a long history being a Trump hater.

He is the Assistant U.S. Attorney in SDNY, working in the Civil Division since 2019.

No word yet on whether or not he was also fired today, but he should be!

+1 for Blondi today![40]

68.     On information and belief, Ms. Loomer has also influenced the recent termination of another long-time Assistant United States Attorney based in Los Angeles—Adam Schliefer— who was abruptly fired an hour after Ms. Loomer posted the following about him: "Fire him. He supported the impeachment of President Trump and said he wanted to repeal Trump's tax plan...We need to purge the US Attorney's office of all leftist Trump haters."[41]

69.     The facts and circumstances reflect that Ms. Comey was terminated not because of her performance or for any cause, but in retaliation for her association with her father James Comey and his constitutionally protected speech, or because of her perceived political affiliation and viewpoint, or both. Her termination violates the United States Constitution, the First and Fifth Amendments thereto, and federal law, including the Civil Service Reform Act.

***Ms. Comey's Termination Violates the Civil Service Reform Act of 1978***

70.     Neither the President nor the Department of Justice have unlimited authority to remove Assistant United States Attorneys. Specifically, the Civil Service Reform Act of 1978,

---

[40] https://x.com/LauraLoomer/status/1945613578477711461.  Lucas Isaacharoff voluntarily resigned from the Department of Justice on May 9, 2025.

[41] https://www.nbcnews.com/politics/justice-department/white-house-firing-career-prosecutor-pulls-justice-department-ever-clo-rcna198864

Pub.L. No. 95–454, 92 Stat. 1111 (codified as amended in scattered sections of 5 U.S.C.),

provides crucial guardrails that protect these federal employees from arbitrary or unlawful

termination.

71.     Accordingly, the Government may not terminate federal employees like Ms.

Comey unless doing so comports with statutorily defined "merit system principles" and does not

constitute statutorily defined "prohibited personnel practices," and even then, the Government

may terminate federal employees like Ms. Comey only after following established pre- and post-

removal procedures.  5 U.S.C. § 2301, 5 U.S.C. § 2302(b).

72.     OPM is explicitly charged with administering the federal civil service, which

encompasses all federal employees.  5 U.S.C. § 1103(a)(5).  OPM's duties include managing the

federal work force consistent with the nine merit system principles, which dictate that all

employees should receive, *inter alia*, "fair and equitable treatment…without regard to political

affiliation…and with proper regard for their privacy and constitutional rights," and that

personnel actions (including removals) must be based on merit and fitness, and must not be

arbitrary, capricious, or discriminatory.  *Id.* § 2301.  These principles explicitly require that

"[e]mployees should be protected against arbitrary action, personal favoritism, or coercion for

partisan political purposes."  *Id.* § 2301(b)(8)(A).  Relatedly, agencies may take a "major adverse

action" against an employee only "for such cause as will promote the efficiency of the service."

*Id.* § 7513(a).

73.     OPM also oversees conduct relating to the prohibited personnel practices as

outlined in 5 U.S.C. § 2302(b).  These statutory prohibitions prevent agencies from taking, or

failing to take, personnel actions against members of the civil service for certain reasons.  For

example, agencies cannot "take, direct others to take, recommend, or approve any personnel

action" that "discriminate[s] for or against any employee or applicant for employment on the basis of conduct that does not adversely affect performance" or "on the basis of their... political affiliation." 5 U.S.C §§ 2302(b)(10) (prohibiting discrimination based on conduct not adversely affecting performance); 2302(b)(1)(E) (prohibiting discrimination based on protected characteristics, including political affiliation).

74.     Federal employees against whom an action—including removal—is proposed are also entitled to "at least 30 days' advance written notice" of the action, to "a reasonable time, but not less than 7 days, to answer orally and in writing," to "be represented by an attorney or other representative," and to "a written decision and the specific reasons therefor at the earliest practicable date." 5 U.S.C § 7513(b).

75.     As an employee covered by 5 U.S.C. § 7511(a)(1), Ms. Comey was entitled to these protections under the CSRA.  Her termination violated multiple provisions of the CSRA. Her termination was not for cause because it was not based on any of her own conduct, let alone conduct that adversely affected her performance.  Her termination violated the merit system principles and amounted to a prohibited personnel practice under the CSRA; it was arbitrary, capricious, discriminatory (based on her connection to her father, or her perceived political affiliation and beliefs, or both), and the result of "personal favoritism" towards her critics. Moreover, she was not provided with any advance notice, opportunity to be heard, or written decision explaining the reason for her termination, in further violation of the due process protections under the CSRA.

*Unavailability and Futility of the Merit Systems Protection Board*

76.    In a normal course of proceedings, Plaintiff would be able to seek recourse through the Merit Systems Protection Board ("MSPB"). However, any complaint filed before the MSPB will be futile.[42]

77.    Congress enacted the CSRA in 1978 to create a uniform scheme for administrative and judicial review of covered federal employee personnel actions, in order to ensure a non-political career civil service for the good of the American public. In the CSRA and as outlined above, Congress set forth protections and remedies available to such federal employees who face adverse employment actions, as well as a procedural process to vindicate their rights. Generally, when federal employees seek relief from an action covered by the CSRA, they follow a prescribed scheme of administrative and judicial review and generally may not bring an initial claim in federal court.

78.    The CSRA established the MSPB as an independent agency consisting of three members, each appointed by the President with the advice and consent of the Senate to serve seven-year terms. 5 U.S.C. §§ 1201, 1202(a)–(c). The MSPB is a quasi-judicial body, adjudicating conflicts between civil servants and their employing agencies. It was designed to resolve disputes including federal employees' allegations that their government employers discriminated against them, retaliated against them for whistleblowing, violated protections for veterans, or otherwise subjected them to an unlawful adverse employment action or prohibited personnel practice. 5 U.S.C. §§ 1204(a)(1), 1221, 2302(b)(1), (8)–(9), 3330a(d), and 7512.

---

[42] To preserve her rights and remedies, Ms. Comey has filed a timely appeal with the MSPB challenging her termination.

79.     By statute, no more than two members of the MSPB are permitted to be from the
same political party, to ensure that federal employees are "protected against arbitrary action,
personal favoritism, or coercion for partisan political purposes." 5 U.S.C. §§ 1201, 2301. MSPB
members serve seven-year terms—a term limit longer than that guaranteed to the appointing
President. *Id.* § 1202(a). Pursuant to its duties under the Appointments Clause, Senate consent
is required for confirmation of any MSPB member. *Id.* § 1201.

80.     Thus, an action to remove employees covered by the CSRA through termination,
such as in this matter, generally proceeds before the MSPB. *See id.* §§ 7511–15. The statute
provides that a covered employee "against whom an action is proposed is entitled to[:]" a
minimum of "30 days' advance written notice[;]" the opportunity to respond orally and in
writing; representation; and "a written decision and the specific reasons therefor at the earliest
practicable date." *Id.* § 7513(b). Decisions are appealable, first to the MSPB and then in most
cases to the United States Court of Appeals for the Federal Circuit. *Id.* § 7513(d).

81.     However, the MSPB currently cannot and does not function as intended.

82.     MSPB member Raymond Limon retired on February 28, 2025.[43]

83.     MSPB member Cathy Harris's term was set to expire on March 1, 2028, but
President Trump terminated her position three years early, on February 10, 2025. On March 4,
2025, the U.S. District Court for the District of Columbia held that Harris' removal was illegal
and issued a permanent injunction that permitted Ms. Harris to return to her MSPB position.
However, the U.S. Supreme Court has stayed that injunction pending appeal, and thus Ms. Harris
is not currently serving as an MSPB member.

---

[43] *See*
https://www.mspb.gov/publicaffairs/press_releases/Ray_Limon_Farewell_Press_Release.pdf

84.     Accordingly, as of this filing, there is only one remaining member of the MSPB, which thus lacks a quorum to vote on any petitions for review (PFRs).[44] Likewise, the Board does not have the ability to issue final decisions until a quorum is restored.[45] As a result, MSPB administrative judges have become overwhelmed. Available statistics published on the MSPB's website show that there were approximately 100 or fewer cases filed per week from September 2024 to January 2025. Yet in February 2025, the number of filed cases ballooned dramatically, peaking at 2,188 cases filed between February 23, 2025 and March 1, 2025.[46] As of September 1, 2025, 891 PFRs are pending.[47] Finally, on information and belief, in recent cases, the Government itself has argued before the MSPB that the CSRA is unconstitutional because it violates the President's alleged Article II prerogatives, and that the MSPB has no jurisdiction over a challenge to an Article II removal. The MSPB, for its part, has previously ruled that it does not have the authority to adjudicate the constitutionality of statutes.[48] On information and belief, the MSPB is currently treating agencies' Article II-based challenges to its authority consistent with this precedent, which is to say, it is declining to rule on the issue.

85.     To be clear, Plaintiff disputes that the Constitution authorizes the President to ignore or disobey the civil service laws passed by Congress and signed into law by former Presidents. But at present, the Government not only disputes the constitutionality of the CSRA,

---

[44] *See* https://www.mspb.gov/FAQs_Absence_of_Board_Quorum_4-9-25.pdf

[45] *Id.* at 2; *see also* https://www.mspb.gov/Pending%20PFR%20Data%20as%20of%209_1_2025.pdf

[46] *See* https://www.mspb.gov/Recent%20ROFO%20Case%20Receipts.pdf

[47] *See* https://www.mspb.gov/Pending%20PFR%20Data%20as%20of%209_1_2025.pdf

[48] *See Davis-Clewis v. Dep't of Veterans Affs.*, 2024 M.S.P.B. 5, ¶ 9 (Mar 20, 2024); *Malone v. Dep't of Justice*, 14 M.S.P.R. 403, 406 (1983).

but has taken action to render the MSPB ineffective by removing the member of the Board
necessary to ensure a quorum exists and removing the one member who was from a political
party other than the President's. As a result, Plaintiff need not exhaust her administrative
remedies before the very agency that the Government both argues is without administrative
power or authority, and has taken steps to strip of its power and authority.

86.     Therefore, (a) there is no quorum at the MSPB to issue final decisions, and thus
the MSPB cannot perform its duty to process and resolve Ms. Comey's claims, and (b)
Defendants assert that the MSPB has no jurisdiction over what Defendants characterize as an
"Article II removal," and in fact have taken steps to defeat the effective exercise of such
jurisdiction. The framework of the CSRA accordingly has been thwarted, and this Court may
and should exercise jurisdiction over the presented Constitutional and statutory challenges
because proceeding before the MSPB would be futile.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
**Violation of the United States Constitution (Articles I and II and Separation of Powers)**
**(Against All Defendants)**

87.     Plaintiff repeats and realleges all of the foregoing paragraphs as if fully set forth
herein.

88.     The removal of Ms. Comey "[p]ursuant to Article II of the Constitution and the
laws of the United States" is invalid.

89.     *First*, Article II of the Constitution provides authority for the President, and the
President alone, to appoint principal officers, concomitant with the power to remove them "at
will." Ms. Comey was not a principal officer, and neither the Department of Justice nor Ms.

Hakes—who signed the Termination Memorandum and ostensibly terminated Ms. Comey—is
the President.

90.    *Second*, under Article I, Section 8, of the Constitution, Congress has the power
"[t]o make all Laws which shall be necessary and proper for carrying into Execution the
foregoing Powers, and all other Powers vested by this Constitution in the Government of the
United States, or in any Department or Officer thereof," and under Article II, Section 2,
"Congress may by Law vest the Appointment of []inferior Officers, as they think proper, in the
President alone, in the Courts of Law, or in the Heads of Departments." The Constitution thus
empowers Congress to regulate and restrict the removal of inferior officers and federal
employees. *See United States v. Perkins*, 116 U.S. 483, 485 (1886) ("We have no doubt that
when congress, by law, vests the appointment of inferior officers in the heads of departments, it
may limit and restrict the power of removal as it deems best for the public interest."); *Kennedy v.
Braidwood Mgmt., Inc.*, 145 S. Ct. 2427, 2449 (2025) (Congress can "insulate officers from at-
will removal" if it speaks clearly in legislation so doing). Congress has exercised this power by
creating the Civil Service Reform Act. Defendants' removal of Ms. Comey under a purported
Article II authority thus violates authorities vested in Congress by Articles I and II of the
Constitution, including the power to place limitations on the removal of inferior officers and
federal employees without due process or without cause.

### SECOND CAUSE OF ACTION
**Violation of the Administrative Procedure Act**
**5 U.S.C. §§ 706(1) and 706(2)**
**(Against All Defendants)**

91.    Plaintiff repeats and realleges all of the foregoing paragraphs as if fully set forth
herein.

92.     Defendants, in authorizing and signing Plaintiff's Termination Memorandum on

July 16, 2025, unlawfully withheld the due process owed to Plaintiff, and implemented a final

agency decision that was "arbitrary, capricious, an abuse of discretion, or otherwise not in

accordance with the law," "contrary to constitutional right, power, privilege, or immunity," "in

excess of statutory jurisdiction, authority, or limitations, or short of statutory right," "without

observance of procedure required by law," "unsupported by substantial evidence," and/or

"unwarranted by the facts." 5 U.S.C. § 706.

93.     Plaintiff has suffered adverse and harmful effects, including, but not limited to,

lost or jeopardized present or future financial opportunities and reputational harm. As such, she

is entitled to reinstatement, an award of backpay, and any other available damages.

### THIRD CAUSE OF ACTION
### Violation of the Administrative Procedure Act
### (*Ultra Vires* in Violation of Statutory Authority)
### (Against All Defendants)

94.     Plaintiff repeats and realleges all of the foregoing paragraphs as if fully set forth

herein.

95.     Defendants had no lawful authority to terminate Plaintiff from federal service

without adhering to the statutory protections afforded to her. Her termination was therefore *ultra*

*vires* and without legal force or effect.

96.     Plaintiff has suffered adverse and harmful effects, including, but not limited to,

lost or jeopardized present or future financial opportunities and reputational harm. As such, she

is entitled to reinstatement, an award of backpay, and any other available damages.

## FOURTH CAUSE OF ACTION
### Violation of the First Amendment (Freedom of Speech and Association)
### (Against All Defendants)

97.     Plaintiff repeats and realleges all of the foregoing paragraphs as if fully set forth herein.

98.     Plaintiff has a constitutional right to free speech and free association under the First Amendment of the United States Constitution.  Neither Article II of the Constitution, nor any other provision or law, can override or diminish that Constitutional right.

99.     Defendants violated Plaintiff's constitutionally protected rights by terminating her because of her association with her father and in retaliation for her father's protected speech, or because of her presumed political affiliation and beliefs, or both.

100.     Plaintiff has suffered adverse and harmful effects, including, but not limited to, lost or jeopardized present or future financial opportunities and reputational harm.  As such, she is entitled to reinstatement, an award of backpay, and any other available damages.

## FIFTH CAUSE OF ACTION
### Violation of the Fifth Amendment (Procedural Due Process)
### (Against All Defendants)

101.     Plaintiff repeats and realleges all of the foregoing paragraphs as if fully set forth herein.

102.     The Due Process Clause of the Fifth Amendment to the U.S. Constitution guarantees that "no person shall . . . be deprived of life, liberty, or property, without due process of law."  Plaintiff has protected property and liberty interests under the Due Process Clause in her continued employment with the DOJ and consideration for employment in "the federal service" under the Fifth Amendment of the United States Constitution.

33

103.     Defendants' use of Article II to terminate Plaintiff and circumvent legislatively-mandated due process, which Congress was properly empowered to enact under Articles I and II, is improper and has unlawfully deprived her of these protected interests.

104.     Plaintiff has suffered adverse and harmful effects, including, but not limited to, lost or jeopardized present or future financial opportunities and reputational harm. As such, she is entitled to reinstatement, an award of backpay, and any other available damages.

## SIXTH CAUSE OF ACTION
### Violation of the Fifth Amendment (Property Interest)
### (Against All Defendants)

105.     Plaintiff repeats and realleges all of the foregoing paragraphs as if fully set forth herein.

106.     Plaintiff has a protected property interest in her continued employment with the DOJ under the Fifth Amendment of the United States Constitution.

107.     Defendants' actions to terminate Plaintiff without due process unlawfully deprived her of that property interest.

108.     Plaintiff has suffered adverse and harmful effects from the deprivation of her property interest in her employment, including, but not limited to, loss of income and lost or jeopardized present or future financial opportunities and reputational harm. As such, she is entitled to reinstatement, an award of backpay, and any other available damages.

## SEVENTH CAUSE OF ACTION
### Violation of the Fifth Amendment (Liberty Interest)
### (Against All Defendants)

109.     Plaintiff repeats and realleges all of the foregoing paragraphs as if fully set forth herein.

34

110.     The Fifth Amendment's protection against deprivation of liberty without due process of law protects against reputational harm caused by government actors when that harm is accompanied by other harm. Here, the Defendants' actions harmed Plaintiff's reputational interests by terminating her without cause and implicitly ratifying stigmatizing allegations. In addition, Defendants' actions have caused the loss of Plaintiff's present government employment and have harmed her future employment prospects.

111.     As a DOJ employee within the federal civil service, Plaintiff was entitled by statutes, regulations, and the Fifth Amendment to protections against deprivation of her liberty interest without the process required by law. The lack of any due process accorded to Plaintiff deprived her of the ability to challenge the accuracy of any evidence that allegedly serves as the basis for her removal, if any even exists, as well as to protect her reputation.

112.     Defendants' action has prevented Plaintiff from participating in her chosen profession or line of work. Should Plaintiff apply to work for a federal agency or a private civilian employer for a position that requires even the most rudimentary background investigation, the Defendants may disseminate information that includes inaccurate and false information that will adversely impact her reputation and chances for additional employment opportunities. As a result, Defendants have effectively stigmatized Plaintiff's reputation and imparted a "status change" upon her that has implicated her liberty interests.

113.     Plaintiff has suffered adverse harmful effects, including, but not limited to, lost or jeopardized present or future financial opportunities and reputational harm. As such, she is entitled to reinstatement, an award of backpay, and any other available damages.

35

## EIGHTH CAUSE OF ACTION
### Violation of the Fifth Amendment (Reputational Harm)
### (Against All Defendants)

114.   Plaintiff repeats and realleges all of the foregoing paragraphs as if fully set forth herein.

115.   Defendants' actions violate Plaintiff's substantive Due Process rights, which arise from her protected interest in her stellar reputation following a distinguished yearslong career at SDNY.

116.   The Fifth Amendment protects "reputation plus" harm caused by government actors. Here, Defendants' actions harm Plaintiff's interest beyond her reputation, with the loss of her present government employment.

117.   As set forth above, Plaintiff was unlawfully terminated because of her association with James Comey and in retaliation for his protected speech, or because of her perceived political affiliation and beliefs, or both.

118.   Plaintiff has suffered adverse harmful effects, including, but not limited to, lost or jeopardized present or future financial opportunities and reputational harm. As such, she is entitled to reinstatement, an award of backpay, and any other available damages.

## NINTH CAUSE OF ACTION
### Declaratory Judgment – 28 U.S.C. §§ 2201 and 2202
### (Against All Defendants)

119.   Plaintiff repeats and realleges all of the foregoing paragraphs as if fully set forth herein.

120.   Plaintiff is entitled to declaratory relief on the basis of all claims identified. There is a substantial and ongoing controversy between Plaintiff and Defendants, and a declaration of rights under the Declaratory Judgment Act is both necessary and appropriate to establish that the

Defendants do not have authority to remove Plaintiff without affording her all rights and protections set forth by applicable statutes and regulations.

121.    Plaintiff has suffered adverse harmful effects, including, but not limited to, lost or jeopardized present or future financial opportunities and reputational harm. As such, she is entitled to reinstatement, an award of backpay, and any other available damages.

### TENTH CAUSE OF ACTION
### Relief in the Nature of Mandamus
### (Against All Defendants)

122.    Plaintiff repeats and realleges all of the foregoing paragraphs as if fully set forth herein.

123.    In the alternative, Plaintiff is entitled to relief in the nature of mandamus commanding Defendants to return her to her office and not remove her from federal service without following lawful procedures. Defendants have a legal duty not to terminate Plaintiff without affording her the protections prescribed by law.

124.    The provisions of 28 U.S.C. § 1361 provide for an independent cause of action in cases seeking relief in the nature of mandamus against federal officers, employees, and agencies in the absence of any other available remedies. To the extent relief is unavailable under either the CSRA, APA, common law equity, or any other law to enjoin unlawful government action, mandamus lies here.

### JURY DEMAND

125.    Plaintiff demands a jury trial on all triable issues.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Maurene Comey respectfully requests the following relief:

a.      A declaration that Defendants violated the Separation of Powers;

b.      A declaration that Defendants' reliance on Article II as a removal authority was invalid;

c.      A declaration that Defendants violated the Administrative Procedure Act;

d.      A declaration that Defendants' actions, including their reliance on Article II of the Constitution as a basis for summary termination, violated Plaintiff's Fifth Amendment due process and statutory rights and order for appropriate relief;

e.      A declaration that Defendants violated Plaintiff's First Amendment free speech and free association rights and order for appropriate relief;

f.      An order requiring Defendants to immediately reinstate Plaintiff and enjoin Defendants from taking any further adverse personnel action against Plaintiff without providing appropriate procedural and substantive due process as required by law including the CSRA and the Fifth Amendment;

g.      An award of backpay and other monetary and administrative relief as appropriate;

h.      An award of the costs of this action and reasonable attorney fees under the Equal Access to Justice Act or any other applicable law; and

i.      A grant of any other further relief as the Court may deem just and proper.

Dated: September 15, 2025                    CLARICK GUERON REISBAUM LLP
       New York, New York

                                             By:  /s/ Ellen Blain
                                             Nicole Gueron
                                             Ellen Blain
                                             Deepa Vanamali
                                             41 Madison Avenue
                                             New York, NY 10010
                                             Phone: (212) 633-4310

                                             /s/ Margaret M. Donovan
                                             Margaret M. Donovan (*pro hac vice
                                             forthcoming)*
                                             Koskoff Koskoff & Bieder, PC
                                             350 Fairfield Ave.
                                             Bridgeport, CT 06604
                                             Tel: (203) 336-4421
                                             Fax: (203) 368-3244
                                             mdonovan@koskoff.com

                                             *Attorneys for Plaintiff Maurene Comey*

EXHIBIT 131

Southern District of New York | Ghislaine Maxwell Charged In Manhattan Federal Court For Conspiring ... Abuse Minors | United States Department of Justice    12/3/25, 8:10 AM

Case 1:20-cr-00330-PAE    Document 855-8    Filed 02/25/26    Page 444 of 445



PRESS RELEASE

# Ghislaine Maxwell Charged In Manhattan Federal Court For Conspiring With Jeffrey Epstein To Sexually Abuse Minors

—

Thursday, July 2, 2020

**For Immediate Release**

U.S. Attorney's Office, Southern District of New York

## Maxwell is Alleged to Have Facilitated, Participated in Acts of Abuse

### Additionally Charged With Perjury in Connection With 2016 Depositions

Audrey Strauss, the Acting United States Attorney for the Southern District of New York, William F. Sweeney Jr., the Assistant Director-in-Charge of the New York Field Office of the Federal Bureau of Investigation ("FBI"), and Dermot Shea, Commissioner of the New York City Police Department ("NYPD"), announced that GHISLANE MAXWELL was arrested this morning and charged with enticing a minor to travel to engage in criminal sexual activity, transporting a minor with the intent to engage in criminal sexual activity, conspiracy to commit both of those offenses, and perjury in connection with a sworn deposition. The Indictment unsealed today alleges that between at least in or about 1994 through 1997, MAXWELL and co-conspirator Jeffrey Epstein exploited girls as young as 14, including by enticing them to travel and transporting them for the purpose of engaging in illegal sex acts. As alleged, knowing that Epstein had a preference for young girls, MAXWELL played a critical role in the grooming and abuse of minor victims that took place in locations including New York, Florida, and New Mexico. In addition, as alleged, MAXWELL made several false statements in sworn depositions in 2016. MAXWELL is expected to be presented this afternoon in the in federal court in New Hampshire. This case is assigned to U.S. District Judge Alison J. Nathan.

Acting U.S. Attorney Audrey Strauss said: "As alleged, Ghislaine Maxwell facilitated, aided, and participated in acts of sexual abuse of minors. Maxwell enticed minor girls, got them to trust her, and then delivered them into the trap that she and Jeffrey Epstein had set. She pretended to be a woman they could trust. All the while, she was setting them up to be abused sexually by Epstein and, in some cases, Maxwell herself. Today, after many years, Ghislaine Maxwell finally stands charged for her role in these crimes."

FBI Assistant Director William F. Sweeney Jr. said: "Preserving the innocence of children is among the most important responsibilities we carry as adults. Like Epstein, Ms. Maxwell chose to blatantly disregard the law and her responsibility as an adult, using whatever means she had at her disposal to lure vulnerable youth into behavior they should never have been exposed to, creating the potential for lasting harm. We know the quest for justice has been met with great disappointment for the victims, and that reliving these events is traumatic. The example set by the women involved has been a powerful one. They persevered against the rich and connected, and they did so without a badge, a gun, or a subpoena - and they stood together. I have no doubt the bravery exhibited by the women involved here has empowered others to speak up about the crimes of which they've been subjected."

NYPD Commissioner Dermot Shea said: "The heinous crimes these charges allege are, and always will be abhorrent for the lasting trauma they inflict on victims. I commend our investigators, and law enforcement partners, for their continuing commitment to bringing justice to the survivors of sexual assault, everywhere."

**If you believe you are a victim of the sexual abuse perpetrated by Jeffrey Epstein, please contact the FBI at 1-800-CALL FBI,**

Southern District of New York | Ghislaine Maxwell Charged in Manhattan Federal Court for Conspiring with Jeffrey Epstein to Sexually Abuse Minors | United States Departm... 12/3/25, 8:10 AM

Case 1:20-cr-00330-PAE    Document 855-8    Filed 02/25/26    Page 445 of 445

**and reference this case.**

According to the Indictment[1] unsealed today in Manhattan federal court:

From at least 1994 through at least 1997, GHISLAINE MAXWELL assisted, facilitated, and participated in Jeffrey Epstein's abuse of minor girls by, among other things, helping Jeffrey Epstein to recruit, groom, and ultimately abuse victims known to MAXWELL and Epstein to be under the age of 18. The victims were as young as 14 years old when they were groomed and abused by MAXWELL and Epstein, both of whom knew that their victims were in fact minors. As a part and in furtherance of their scheme to abuse minor victims, MAXWELL and Epstein enticed and caused minor victims to travel to Epstein's residences in different states, which MAXWELL knew and intended would result in their grooming for and subjection to sexual abuse.

As alleged, MAXWELL enticed and groomed minor girls to be abused in multiple ways. For example, MAXWELL attempted to befriend certain victims by asking them about their lives, taking them to the movies or taking them on shopping trips, and encouraging their interactions with Epstein. MAXWELL also acclimated victims to Epstein's conduct simply by being present for victim interactions with Epstein, which put victims at ease by providing the assurance and comfort of an adult woman who seemingly approved of Epstein's behavior. Additionally, to make victims feel indebted to Epstein, MAXWELL would encourage victims to accept offers of financial assistance from Epstein, including offers to pay for travel or educational expenses. MAXWELL also normalized and facilitated sexual abuse by discussing sexual topics with victims, encouraging them to massage Epstein, and undressing in front of a victim.

As MAXWELL and Epstein intended, these grooming behaviors left minor victims vulnerable and susceptible to sexual abuse by Epstein. MAXWELL was then present for certain sexual encounters between minor victims and Epstein, such as interactions where a minor victim was undressed, and ultimately MAXWELL was present for sex acts perpetrated by Epstein on minor victims. That abuse included sexualized massages during which a minor victim was fully or partially nude, as well as group sexualized massages of Epstein involving a minor victim where MAXWELL was present.

As alleged, minor victims were subjected to sexual abuse that included, among other things, the touching of a victim's breasts or genitals, placing a sex toy such a vibrator on a victim's genitals, directing a victim to touch Epstein while he masturbated, and directing a victim to touch Epstein's genitals. MAXWELL and Epstein's victims were groomed or abused at Epstein's residences in New York, Florida, and New Mexico, as well as MAXWELL's residence in London, England.

Additionally, in 2016, while testifying under oath in a civil proceeding, MAXWELL repeatedly made false statements, including about certain specific acts and events alleged in the Indictment.

\*           \*           \*

GHISLAINE MAXWELL, 58, is charged with one count of enticing a minor to travel to engage in illegal sex acts, which carries a maximum sentence of five years in prison, one count of conspiracy to entice a minor to travel to engage in illegal sex acts, which carries a maximum sentence of five years in prison, one count of transporting a minor with the intent to engage in criminal sexual activity, which carries a maximum sentence of 10 years in prison, one count of conspiracy to transport a minor with the intent to engage in criminal sexual activity, which carries a maximum sentence of five years in prison, and two counts of perjury, each of which carries a maximum sentence of five years in prison.

The statutory maximum penalties are prescribed by Congress and are provided here for informational purposes only, as any sentencing of the defendant would be determined by the judge.

Ms. Strauss praised the outstanding investigative work of the FBI and the NYPD.

This case is being handled by the Office's Public Corruption Unit. Assistant U.S. Attorneys Alex Rossmiller, Alison Moe, and Maurene Comey are in charge of the prosecution.

The charges contained in the Indictment are merely accusations. The defendant is presumed innocent unless and until proven guilty.

[1] As the introductory phrase signifies, the entirety of the text of the Indictment, and the description of the Indictment set forth herein, constitute only allegations, and every fact described therein should be treated as an allegation. The defendant is presumed innocent unless and until proven guilty.