# EXHIBIT 132

# In The Matter Of:
### *UNITED STATES OF AMERICA, v.*
### *GHISLAINE MAXWELL,*

---

*December 7, 2021*

---

*Southern District Court Reporters*

Original File LC7VMAXF_PUBLIC.txt
Min-U-Script® with Word Index

UNITED STATES OF AMERICA, v.
GHISLAINE MAXWELL,

December 7, 2021

---

LC7VMAX1        Page 1423

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x
 3   UNITED STATES OF AMERICA,
 4              v.                        20 CR 330 (AJN)
 5   GHISLAINE MAXWELL,
                Defendant.              Jury Trial
 6   ------------------------------x
                                        New York, N.Y.
 7                                      December 7, 2021
                                             9:05 a.m.
 8   Before:
 9              HON. ALISON J. NATHAN,
10                                      District Judge
11                      APPEARANCES
12   DAMIAN WILLIAMS
             United States Attorney for the
13           Southern District of New York
     BY:  MAURENE COMEY
14        ALISON MOE
          LARA POMERANTZ
15        ANDREW ROHRBACH
          Assistant United States Attorneys
16
     HADDON MORGAN AND FOREMAN
17        Attorneys for Defendant
     BY:  JEFFREY S. PAGLIUCA
18        LAURA A. MENNINGER
              -and-
19   BOBBI C. STERNHEIM
              -and-
20   COHEN & GRESSER
     BY:  CHRISTIAN R. EVERDELL
21
     Also Present:  Amanda Young, FBI
22                  Paul Byrne, NYPD
                    Sunny Drescher
23                  Paralegal, U.S. Attorney's Office
                    Ann Lundberg,
24                  Paralegal, Haddon Morgan and Foreman
25
```

---

LC7VMAX1        Page 1424

1  (Trial resumed; jury not present)

2  THE COURT: Matters to take up.

3  MS. MENNINGER: Yes, your Honor.

4  THE COURT: Go ahead, Ms. Menninger.

5  MS. MENNINGER: We learned early this morning through
6  a disclosure by the government that they have spoken with
7  witness Brian.

8  THE COURT: I'm sorry, could you pull up the mic
9  closer please. Thank you.

10  MS. MENNINGER: That they had spoken with witness
11  Brian, who was anticipated to testify today. Brian is the
12  brother of witness Jane.

13  THE COURT: Correct.

14  MS. MENNINGER: You may recall, your Honor, we had
15  litigation around prior consistent statements; and that Brian
16  is being offered in part to report supposedly prior consistent
17  statements with Jane. We had discussions about whether Jane
18  would be subject to recall in order to be questioned about
19  those particular prior consistent statements, should they be
20  admitted.

21  What we learned from the government early this morning
22  is that after her testimony, Jane called Brian and discussed
23  with Brian her testimony in court, in violation of the Court's
24  sequestration order. She disclosed to him a document that she
25  was shown on the stand during cross-examination; she gave her

---

LC7VMAX1        Page 1425

1  characterization of the defense attorney who cross-examined
2  her, using an expletive that rhymes with "front." And that was
3  told to this witness, who is anticipated to be testifying
4  today, who is obviously also subject to the Court's
5  sequestration order.

6  I am very troubled and disturbed that witnesses who
7  are still subject to recall are calling other witnesses that
8  they know will be called to testify; that will be called to
9  testify about their memories of events that happened years ago;
10  and that they are disclosing to witnesses -- this witness --
11  what they experienced on the witness stand, including a
12  document that they were shown, your Honor.

13  I am asking the Court to forbid the witness Brian from
14  being called, given this violation. At a minimum, your Honor,
15  I would ask that there is a hearing outside the presence of the
16  jury in which Brian is subject to examination by the Court as
17  to exactly what happened during this phone call. Those are the
18  two pieces of information that he reported to the government
19  and was reported to us via some handwritten notes at about 2
20  this morning. That's my request, your Honor.

21  THE COURT: Okay.

22  MS. MOE: Your Honor, there are only two legal
23  principles at play here. The first is Rule 615 about excluding
24  witnesses from a courtroom. Neither Brian nor Jane has been in
25  the courtroom while other witnesses have testified. That rule

---

LC7VMAX1        Page 1426

1  has been fully complied with.

2  The other legal principle is that the government
3  cannot have substantive communications with Jane because she is
4  subject to recross about prior consistent statements. We have
5  not violated that legal principle either.

6  With respect to communications between Jane and Brian,
7  we have disclosed our awareness of that and defense counsel is
8  free to cross-examine Brian about those communications; that's
9  all the law requires. There is no sequestration order that
10  prevents family members from talking to one another; of course,
11  it's not best practice.

12  THE COURT: Did the government give any guidance?

13  Just on the first point, witnesses sequestered, so not
14  in the courtroom, could they be provided by another witness or
15  an attorney the transcript of the trial testimony?

16  MS. MOE: I have no awareness of whether that's
17  occurred, your Honor.

18  THE COURT: No, it's just to test the boundaries of
19  what you suggested in the first point, which is the only
20  question is whether they observed trial or not. And I don't
21  think -- I think that strikes me, I haven't looked at the law
22  on this, as an overstatement.

23  For example, I don't think a witness could be
24  provided, consistent with a sequestration order, the transcript
25  of trial testimony; and I wondered if the government agreed

---

UNITED STATES OF AMERICA, v.
GHISLAINE MAXWELL,

December 7, 2021

LC7VMAX1                                                    Page 1427

1  with that proposition.
2      MS. MOE: Your Honor, I haven't looked at the law on
3  that particular issue. That would strike me as sort of
4  consistent with being in a courtroom to see the testimony. And
5  I'm not aware of that occurring in this case; we certainly
6  haven't been providing trial witnesses with transcripts of
7  testimony. I'm not aware of any attorney doing that either.
8      I think what we're talking about is a conversation
9  between two siblings in which one sibling shared that her
10 experience in court was unpleasant.
11     THE COURT: Pull up the mic please.
12     MS. MOE: Apologies, your Honor.
13     I think what we're talking about here, your Honor, is
14 a conversation between two siblings in which one sibling said
15 she had an unpleasant experience in court; and that she was
16 shown a document on the stand that was -- I don't know all the
17 details of this conversation, just what's been relayed to me.
18     THE COURT: Can I back up and ask if the government
19 gave any direction in advance about not discussing trial
20 testimony with other witnesses, which I think probably would
21 constitute best practices.
22     MS. MOE: Yes, your Honor.
23     Following Jane's testimony, I spoke with her attorney.
24 I don't want to make a representation that's not accurate. My
25 memory of that conversation is that I told him and reminded him

LC7VMAX1                                                    Page 1428

1  that she was potentially subject to recall and recross. And so
2  my understanding is that he understood the rules about that;
3  and that we couldn't speak with her; and that she was still a
4  trial witness subject to recall. I don't remember whether I
5  repeated, sort of, the ground rules about trial witnesses.
6  That's all I remember from that conversation, your Honor.
7      THE COURT: And did the government prior to that
8  give -- was there any direction given on this issue -- since
9  this witness is being provided for prior consistent statements,
10 did the government give any direction either to the witnesses
11 or to their counsel that they ought not to confer in light of
12 the reason that the witness is being offered?
13     MS. MOE: Yes, your Honor.
14     Off the top of my head, I can't point to a particular
15 date or a particular conversation; but it's our practice -- and
16 what we did in this case -- is to tell every witness that their
17 memory should be their memories and they shouldn't be talking
18 to other witnesses before the trial. So I'm confident we did
19 that in this case; I just can't remember a particular date of a
20 particular conversation, but we've been having those
21 conversations with all of our witnesses.
22     THE COURT: And how did the government learn about
23 this conversation?
24     MS. MOE: Last night we had a meeting with Brian. And
25 he, unprompted, mentioned that he had heard from Jane that she

LC7VMAX1                                                    Page 1429

1  had called him after her testimony and relayed that her
2  experience wasn't pleasant.
3      THE COURT: It sounds like maybe more than that it
4  wasn't pleasant; sounds like part of what was relayed -- that's
5  not the part that concerns me. Needless to say, the point
6  that's concerning is whether she coached him on her responses
7  so that his testimony regarding prior consistent statements
8  would show consistency. That's, I think, the only --
9      MS. MOE: Yes, your Honor.
10     THE COURT: I'm not sure there's any relevance --
11 although it's concerning, I'm not sure there's any relevance to
12 a description of the process is unpleasant or that they did or
13 didn't like the lawyers and how they were treated.
14     MS. MOE: Yes, your Honor.
15     On the subject of the prior consistent statement, I
16 would note -- and the 3500 material reflects this -- that Brian
17 had relayed the substance of his testimony to the government
18 and it's memorialized in 3500 long before this conversation
19 happened. He has been on our witness list for some time; he's
20 met with the government long before this trial began.
21     And so to the extent there is any suggestion that his
22 testimony is prompted by a recent conversation with Jane during
23 the trial, that's belied by the record here, which is that he
24 has relayed to us those prior consistent statements
25 substantially in advance of the trial.

LC7VMAX1                                                    Page 1430

1      With respect to his communications with Jane, we
2  memorialized what Brian told us about that in our notes and
3  provided them to defense; and so we've been transparent about
4  that.
5      I don't think those notes or that conversation in any
6  way suggests that witnesses are doing something improper or
7  that anyone is coaching anyone to say something in particular.
8  And again, this witness has been on the record with the
9  government about this issue long before the trial.
10     THE COURT: Well, obviously if I allow the testimony,
11 it's fair grounds for cross, needless to say.
12     MS. MOE: Of course, your Honor.
13     THE COURT: And where is he in the order of things
14 today?
15     MS. MOE: He would be the next witness after the
16 witness who's currently on the stand.
17     THE COURT: Ms. Menninger, so given the timing of
18 where we are, do you have any authority to support the
19 proposition that -- other than obviously it being fair grounds
20 for cross, that this is a violation of order or law that would
21 suggest a quite substantial remedy of excluding testimony?
22     MS. MENNINGER: Your Honor, I have not had time to
23 research this. I think that the disclosure came in around 3
24 o'clock in the morning. And without revealing what time I got
25 up, I have not had time to research that question between when

UNITED STATES OF AMERICA, v.
GHISLAINE MAXWELL,

December 7, 2021

LC7VMAX1                                    Page 1431

1  I got up and when I came to court this morning. I have checked
2  the Westlaw headnotes and there certainly are cases where
3  witnesses are excluded for far more minor infractions than
4  this.
5        THE COURT: But infractions of what?
6        MS. MENNINGER: A sequestration order like walked into
7  a courtroom briefly, you know, or an agent was in the room and
8  heard some of the confidential informant's testimony. That's
9  what I've briefly learned from looking at headnotes, your
10 Honor.
11      Part of my concern is that what you've just heard from
12 the government is those are the two things that Brian
13 volunteered to them. They said they don't know exactly what
14 happened in this conversation. And for all we know, there's
15 more to the conversation than what Brian volunteered, because
16 they may have said, Oh, whoa, don't tell us anymore about that.
17      So that's one of the reasons why my request is to find
18 out exactly what was communicated to him by Jane before he gets
19 on the stand; and that, I would submit, is something that the
20 Court could ask him about under oath outside the presence of
21 the jury to determine exactly what the scope of the violation here.
22 Because we only know of one document that she told him she had
23 been shown on the stand. I don't know if she told --
24      THE COURT: Do we know what document?
25      MS. MENNINGER: Yes, your Honor.

LC7VMAX1                                    Page 1432

1        He volunteered that it was the Interlochen application
2  that she was shown and was asked, as you know, questions about
3  on the stand. So whether there were other disclosures in that
4  conversation, they weren't written down in the notes. And I
5  suggest that maybe it is important to learn that information
6  before the Court makes a determination about exactly the
7  magnitude of the violation here, your Honor.
8        MS. MOE: Your Honor, I would direct the Court's
9  attention to our note on this, which is marked 3510-020.
10       THE COURT: Can I have it?
11       While Ms. Drescher is getting that, go ahead, Ms. Moe.
12       MS. MOE: Thank you, your Honor.
13       The note reflects --
14       MS. MENNINGER: Your Honor, I have a paper copy, if
15 you'd like.
16       THE COURT: Okay. Thank you.
17       Go ahead, Ms. Moe.
18       MS. MOE: Thank you, your Honor.
19       The note reflects in the middle of the page that Brian
20 told the government, after Jane testified, she called Brian.
21 Jane did not discuss her testimony. She just told Brian that
22 he should know that the defense attorney is a expletive; and he
23 should know that's what this will be like. Jane mentioned she
24 was shown an Interlochen application.
25       And on that score, your Honor, I would note that the

LC7VMAX1                                    Page 1433

1  Interlochen application is not the basis of any prior
2  consistent statement. I don't anticipate asking him on direct
3  about his Interlochen application at all.
4        MS. MENNINGER: The point is we don't know if that's
5  the only thing she told him; that's just what he volunteered to
6  the government.
7        THE COURT: All right. Let's do this. We'll have
8  Brian not testify till after lunch. I think the first task is
9  the government to fully inquire what Brian learned from Jane or
10 anyone else about testimony that's taken place.
11       MS. MOE: Yes, your Honor.
12       We'd be happy to have that conversation.
13       With respect to scheduling issues, just in terms of
14 the sequencing today, I would note that we anticipate
15 calling -- your Honor, if I could have just one moment.
16       THE COURT: Sure.
17       (Counsel conferred)
18       MS. MOE: Thank you, your Honor.
19       I just wanted to think through a scheduling issue
20 because we have a witness who will be testifying beginning
21 probably later this morning, and that testimony may be fairly
22 long. And for scheduling reasons, Brian had planned to fly
23 home tomorrow; and so it may be, just depending on the
24 sequencing of this issue, that we might request to call him out
25 of order to accommodate that. But we can see how the timing

LC7VMAX1                                    Page 1434

1  goes today and flag that later on.
2        THE COURT: Well, we're not going to speed up Brian
3  because he's planning to fly home today. The question is when
4  we have sufficient time to inquire whether there's been an
5  effective violation of the sequestration order and, if so, what
6  the appropriate remedy for that is. So that's going to require
7  a factual investigation by the government, and then legal
8  analysis from both sides as to what an appropriate remedy is in
9  light of what we learn factually.
10       MS. MOE: Of course, your Honor. I just wanted to
11 flag a scheduling concern. I certainly don't mean to expedite
12 the issue. We'll thoroughly examine it.
13       THE COURT: Okay. Ms. Menninger, is that --
14       MS. MENNINGER: Yes, your Honor.
15       THE COURT: -- sufficient in light of where we are at
16 the moment?
17       MS. MENNINGER: Yes, your Honor.
18       THE COURT: Okay. Other issues?
19       MS. MENNINGER: Yes, your Honor.
20       I also conferred with the government this morning in
21 light of the briefing last night on Mr. Flatley's testimony.
22 Because the letter that we received from the government is
23 different from what I was told during a conferral on Friday on
24 this topic. So I've tried to narrow the issues as I understand
25 them to be.

UNITED STATES OF AMERICA, v.
GHISLAINE MAXWELL,

December 7, 2021

LC7VMAX1                                                Page 1435

1    Your Honor, with respect to any testimony that was in
2 the November 26 disclosure, which I believe is not what was
3 disclosed earlier in September, but most of it is what I would
4 agree is factual testimony. If a document has metadata, any
5 old person can right-click on it, look at the properties, and
6 read what those properties are.
7    There's only one portion of the November 26 disclosure
8 that I believe treads into opinion expert land, and that is on
9 the second page of the November 26 disclosure where Mr. Flatley
10 will testify that he verified the accuracy of metadata by
11 running a particular program. He will explain what metadata
12 is, such as the file name and when the file was created, and
13 where it can be stored in a computer system.
14    Your Honor, if those are the only things that
15 Mr. Flatley intends to testify about, then I think we're fine.
16 It's the things that came in the disclosures on November --
17 there were more on November 26 that were not in this letter and
18 there were things on December 3rd that were disclosed. If he
19 is limited to those things that were put in the September 26
20 disclosure, I'm fine with that, your Honor.
21    He also was not ever disclosed as a fact or expert
22 witness with regard to CDs. The original notice and the
23 supplemental notice all refer to his review of devices. So I
24 believe that the government does not intend to put on evidence
25 about CDs through him, but those are the two areas that I think

LC7VMAX1                                                Page 1436

1 we're down to, your Honor.
2    THE COURT: Okay.
3    MR. ROHRBACH: Your Honor, as I think our letter
4 indicated, we're quite surprised to receive the defendant's --
5    THE COURT: Mr. Rohrbach, let's just get to the issue.
6 It sounds like it's narrowed to two things. Every letter I
7 get, it starts with, We're so surprised or this has already
8 been litigated. Let's just get to the issue.
9    MR. ROHRBACH: So, your Honor, I think we're in a
10 pretty good place then. Mr. Flatley is not going to go into
11 very much -- we obviously don't know exactly what Mr. Flatley
12 will say on the stand, but the questions and what we expect to
13 elicit should track the government's November 26 letter. And
14 so it sounds like if defense counsel doesn't have a problem
15 with what's in this letter, then there is no issue here for the
16 Court.
17    I'm not exactly sure what Ms. Menninger is referencing
18 with regard to CDs, but I think that we expect Mr. Flatley to
19 give purely fact testimony regarding CDs, and there's no expert
20 opinion at all involved there. To the extent that it's a late
21 disclosure of anything, it's just a factual view of Mr. Flatley
22 that is in the 3500 material that he may testify to.
23    MS. MENNINGER: Your Honor, on the CDs, apparently
24 Mr. Flatley intends to testify that a created date is the same
25 thing as a modified date. And also about once a file is burned

LC7VMAX1                                                Page 1437

1 onto a CD, it can't be unburned. Those are, I think, what the
2 government represented in their letter of last night he
3 intended to talk about, which have never been disclosed to us
4 as his intended testimony.
5    MR. ROHRBACH: Your Honor, as we said in our letter
6 last night, we don't intend to elicit those things on direct;
7 but also those are factual pieces of knowledge that you can
8 understand without having any specialized training or
9 experience if you just have used a CD burner before.
10    MS. MENNINGER: If it's not coming out on direct, your
11 Honor, then I don't think it matters.
12    THE COURT: Okay.
13    MS. MENNINGER: But as to the other ones, I will just
14 make an objection if there's something that's not in the
15 November 26 letter. I think the government knows what their
16 witness is going to say because they are going to ask him
17 questions. And if it's a question that calls for things that
18 weren't disclosed, then I'll bring it to the Court's attention.
19    THE COURT: Okay.
20    MR. ROHRBACH: That's fine, your Honor.
21    THE COURT: I do want to press a little bit on the CD
22 bit; because I want to know what in the government's mind would
23 happen on cross that would lead the government to redirect with
24 respect to the created date is the same as the modified date or
25 once burned on CD, can't be unburned. I don't want to have the

LC7VMAX1                                                Page 1438

1 government being too cute here and saying we're not going to do
2 it on direct, but you know full well you're going to do it on
3 redirect.
4    MR. ROHRBACH: Understood, your Honor.
5    If I could confer with Ms. Pomerantz, she's putting is
6 ou; but I suspect it really is unlikely to come out on redirect
7 at all.
8    THE COURT: Okay.
9    (Counsel conferred)
10    MR. ROHRBACH: Your Honor, the government is not
11 planning to talk with Mr. Flatley on direct about CDs. So it's
12 hard to imagine what exactly would happen on cross that would
13 make this an issue; but, of course, the government doesn't want
14 to limit itself by promising under no circumstances will it
15 elicit this information.
16    THE COURT: Okay.
17    So if you're not going to ask about CDs on direct, if
18 he's not crossed on CDs, that's the end of the matter.
19    MR. ROHRBACH: Yes, your Honor.
20    THE COURT: Ms. Menninger, does that get us where we
21 need?
22    MS. MENNINGER: That's fine, your Honor. Thank you.
23    THE COURT: Okay. Great. Thank you both.
24    All right. Well, it sounds like all that work we did
25 on Flatley last night will just go in the can for future use.

UNITED STATES OF AMERICA, v.
GHISLAINE MAXWELL,

December 7, 2021

| LC7VMAX1 | Page 1439 |
|---|---|

1    I think the only outstanding issue from yesterday is
2  the objection to Exhibit 309. I'm sustaining that objection on
3  401/403 grounds.
4    What else do we need?
5    MS. MENNINGER: Nothing else from the defense, your
6  Honor.
7    MS. MOE: Your Honor, may we briefly be heard at
8  sidebar about an issue relating to potential cross-examination
9  of Brian that implicates a privacy interest?
10    THE COURT: Okay. So this will be sealed; correct?
11    MS. MOE: Yes, your Honor.
12    THE COURT: I do have a request for lengthy sealed
13  proceedings that we do them in the robing room because of the
14  physical taxing on the court reporter. So if you think it will
15  be short, we can do it here; if it will be more than five
16  minutes, we should do it in the robing room.
17    MS. MOE: Yes, your Honor.
18    I believe this will be brief.
19    THE COURT: Okay. All right.
20    (Pages 1440 to 1443 SEALED)
21    (Continued on next page)
22
23
24
25

| LC7VMAX1 | Meder - direct | Page 1444 |
|---|---|---|

1    (In open court)
2    THE COURT: All right. Just waiting to hear from
3  Ms. Williams, if we have all our jurors.
4    Bring in the jury.
5    Can we have the witness back on the stand.
6    MS. POMERANTZ: Yes, your Honor.
7    THE COURT: Thank you.
8    (Jury present)
9    THE COURT: Good morning, members of the jury. Nice
10  to see you. Thank you again for being here right on time so we
11  can get started. I appreciate it.
12    Ms. Meder, you may remove your mask. And I remind you
13  you are under oath.
14    Ms. Comey, you may continue with your direct
15  examination.
16    MS. COMEY: Thank you, your Honor.
17  KIMBERLY MEDER,
18    called as a witness by the Government,
19    having been previously duly sworn, testified as follows:
20  DIRECT EXAMINATION (continued)
21  BY MS. COMEY:
22  Q. Good morning.
23  A. Good morning.
24  Q. I'd like to pick up where we left off yesterday.
25    I think you had Government Exhibit 1101 in front of

| LC7VMAX1 | Meder - direct | Page 1445 |
|---|---|---|

1  you to use as an aid. Do you have that in front of you now?
2  A. Yes.
3  Q. And then we were talking about what was marked for
4  identification as Government Exhibit 304.
5    MS. COMEY: Ms. Drescher, will you please pull that up
6  for the witness, the parties, and the Court.
7  Q. Ms. Meder, do you recognize this?
8  A. Yes.
9  Q. What is it?
10  A. It's a photo from a CD I reviewed from the Epstein and
11  Maxwell investigation.
12  Q. And what was the 1B number that that CD was contained
13  under?
14    THE COURT: I'm sorry, could you pull the microphone a
15  little bit closer. Thank you. Go ahead.
16  A. 1B26.
17  Q. And have you familiarized yourself with the physical
18  appearance of Ghislaine Maxwell and Jeffrey Epstein during this
19  investigation?
20  A. Yes.
21  Q. Who do we see in this photograph?
22  A. Ghislaine Maxwell and Jeffrey Epstein.
23    MS. COMEY: Your Honor, the government offers Exhibit
24  304.
25    MS. MENNINGER: Subject to the prior objections, your

| LC7VMAX1 | Meder - direct | Page 1446 |
|---|---|---|

1  Honor, no further objection.
2    THE COURT: Okay. Thank you.
3    GX-304 is admitted. You may publish.
4    (Government's Exhibit 304 received in evidence)
5    MS. COMEY: Thank you, your Honor.
6  Q. And while this is published for the jury, could you please
7  tell us who's on the left and who's on the right?
8  A. On the left, Ghislaine Maxwell; on the right, Jeffrey
9  Epstein.
10    MS. COMEY: We can take that down.
11    Thank you, Ms. Drescher.
12    Can we now please pull up for the witness, the
13  parties, and the Court Government Exhibit 306.
14  Q. Do you recognize this?
15  A. Yes.
16  Q. What is it?
17  A. It's a photo from a CD I reviewed from the Epstein and
18  Maxwell investigation.
19  Q. And under what 1B number was that CD logged?
20  A. 1B26.
21  Q. Who's in this photograph?
22  A. Ghislaine Maxwell.
23    MS. COMEY: Your Honor, the government offers this in
24  evidence.
25    MS. MENNINGER: No further objection.

UNITED STATES OF AMERICA, v.
GHISLAINE MAXWELL,

December 7, 2021

| LC7VMAX1 | Meder - direct | Page 1447 |
|---|---|---|

1    THE COURT: Thank you.
2    GX-306 is admitted. You may publish.
3    (Government's Exhibit 306 received in evidence)
4    MS. MENNINGER: And your Honor I will have the same
5    for the rest of these just to save everyone's time.
6    THE COURT: Understand.
7    And your objections are preserved.
8    MS. COMEY: May we publish, your Honor?
9    THE COURT: You may.
10    MS. COMEY: Thank you.
11    We can take that down. Thank you, Ms. Drescher.
12    Let's go now please to what's been marked for
13    identification as Government Exhibit 307. Ms. Drescher, will
14    you please pull that up for the witness, the Court, and the
15    parties.
16    Q. Do you recognize this?
17    A. Yes.
18    Q. What is it?
19    A. It's a photo from a CD I reviewed from the Epstein and
20    Maxwell investigation.
21    Q. What 1B number was that CD logged under?
22    A. 1B26.
23    Q. And who do we see in this photograph?
24    A. Jeffrey Epstein and Ghislaine Maxwell.
25    MS. COMEY: The government offers this in evidence.

| LC7VMAX1 | Meder - direct | Page 1448 |
|---|---|---|

1    THE COURT: GX-307 is admitted.
2    (Government's Exhibit 307 received in evidence)
3    MS. COMEY: May we publish?
4    THE COURT: You may.
5    MS. COMEY: Thank you, your Honor.
6    Q. Who do we see on the left and the right?
7    A. On the left, Jeffrey Epstein; on the right, Ghislaine
8    Maxwell.
9    MS. COMEY: Ms. Drescher, would you now please pull up
10    what's been marked for identification as Government Exhibit 320
11    just for the Court, the parties, and the witness.
12    Q. Do you recognize this?
13    A. Yes.
14    Q. What is it?
15    A. It's a photo from a CD I reviewed from the Epstein and
16    Maxwell investigation.
17    Q. And under what 1B number was that CD?
18    A. 1B75.
19    Q. Who's in this photograph?
20    A. Jeffrey Epstein and Ghislaine Maxwell.
21    MS. COMEY: Your Honor, the government offers this in
22    evidence.
23    THE COURT: Without further objection, GX-320 is
24    admitted.
25    (Government's Exhibit 320 received in evidence)

| LC7VMAX1 | Meder - direct | Page 1449 |
|---|---|---|

1    MS. COMEY: May we publish?
2    THE COURT: You may.
3    MS. COMEY: Thank you, your Honor.
4    Q. Who do we see on the left and the right in this photograph?
5    A. On the left, Jeffrey Epstein; on the right, Ghislaine
6    Maxwell.
7    MS. COMEY: We can take that down. Thank you.
8    Let's go now, please, to Government Exhibit 321.
9    Ms. Drescher, would you please pull that up for the
10    witness, the parties, and the Court.
11    Q. Do you recognize this?
12    A. Yes.
13    Q. What is it?
14    A. It's a photo from a CD I reviewed from the Epstein and
15    Maxwell investigation.
16    Q. What 1B number was that CD logged under?
17    A. 1B75.
18    Q. Who's in this photograph?
19    A. Ghislaine Maxwell and Jeffrey Epstein.
20    MS. COMEY: The government offers this in evidence,
21    your Honor.
22    THE COURT: Consistent with the Court's rulings,
23    GX-321 is admitted.
24    (Government's Exhibit 321 received in evidence)
25    MS. COMEY: May we publish please, your Honor.

| LC7VMAX1 | Meder - direct | Page 1450 |
|---|---|---|

1    THE COURT: You may.
2    MS. COMEY: Thank you.
3    Q. Who do we see on the left and who do we see on the right?
4    A. On the left, Ghislaine Maxwell; on the right, Jeffrey
5    Epstein.
6    MS. COMEY: Ms. Drescher, let's go now, please, to
7    Government Exhibit 322 for the witness, the parties, and the
8    Court.
9    Q. Do you recognize this?
10    A. Yes.
11    Q. What is it?
12    A. It's a photo from a CD I reviewed from the Epstein and
13    Maxwell investigation.
14    Q. What 1B number was that CD logged under?
15    A. 1B78.
16    Q. Who's in this photograph?
17    A. Jeffrey Epstein and Ghislaine Maxwell.
18    MS. COMEY: Your Honor, the government offers this in
19    evidence.
20    THE COURT: Okay. And I've ruled. GX-322 may be
21    admitted.
22    (Government's Exhibit 322 received in evidence)
23    THE COURT: And you may publish.
24    MS. COMEY: Thank you, your Honor.
25    Q. Who's on the left and who is on the right?

UNITED STATES OF AMERICA, v.
GHISLAINE MAXWELL,

December 7, 2021

| LC7VMAX1 | Meder - direct | Page 1451 |
|---|---|---|

1  A. On the left, Jeffrey Epstein; on the right, Ghislaine
2  Maxwell.
3       MS. COMEY: Ms. Drescher, let's go now please to
4  Government Exhibit 324 just for the witness, the parties, and
5  the Court.
6  Q. Do you recognize this?
7  A. Yes.
8  Q. What is it?
9  A. It's a photo from a CD I reviewed from the Epstein and
10  Maxwell investigation.
11  Q. Under what 1B number was that CD logged?
12  A. 1B19.
13  Q. Who's in this photograph?
14  A. Jeffrey Epstein and Ghislaine Maxwell.
15       MS. COMEY: Your Honor, the government offers this in
16  evidence.
17       THE COURT: Consistent with my ruling, GX-324 is
18  admitted. You may publish.
19       (Government's Exhibit 324 received in evidence)
20       MS. COMEY: Thank you, your Honor.
21  Q. Who's on the left and who's on the right?
22  A. On the left, Jeffrey Epstein; on the right, Ghislaine
23  Maxwell.
24       MS. COMEY: Ms. Drescher, let's go now to Government
25  Exhibit 325, please, for the Court, the parties, and the

| LC7VMAX1 | Meder - direct | Page 1452 |
|---|---|---|

1  witness.
2  Q. Do you recognize this?
3  A. Yes.
4  Q. What is it?
5  A. It's a photo from a CD I reviewed from the Epstein and
6  Maxwell investigation.
7  Q. Under what 1B number was that CD logged?
8  A. 1B75.
9  Q. Who's in this photograph?
10  A. Ghislaine Maxwell and Jeffrey Epstein.
11       MS. COMEY: Your Honor, the government offers this in
12  evidence.
13       THE COURT: GX-325 is admitted. You may publish.
14       (Government's Exhibit 325 received in evidence)
15       MS. COMEY: Thank you, your Honor.
16  Q. Who is on the left and who is on the right?
17  A. On the left, Ghislaine Maxwell; on the right, Jeffrey
18  Epstein.
19       MS. COMEY: Ms. Drescher, we can now pull up what's
20  been marked for identification as Government Exhibit 333,
21  please, for the parties, the Court, and the witness.
22  Q. Do you recognize this?
23  A. Yes.
24  Q. What is it?
25  A. It's a photo from a CD I reviewed from the Epstein and

| LC7VMAX1 | Meder - direct | Page 1453 |
|---|---|---|

1  Maxwell investigation.
2  Q. Under what 1B number was the CD logged?
3  A. 1B78.
4  Q. Who is in this photograph?
5  A. Jeffrey Epstein and Ghislaine Maxwell.
6       MS. COMEY: Your Honor, the government offers this in
7  evidence.
8       THE COURT: And again, consistent with my rulings,
9  GX-333 is admitted. You may publish.
10       (Government's Exhibit 333 received in evidence)
11       MS. COMEY: Thank you, your Honor.
12  Q. Who is on the left and who is on the right?
13  A. On the left, Jeffrey Epstein; on the right, Ghislaine
14  Maxwell.
15       MS. COMEY: Ms. Drescher, let's now pull up, please,
16  Government Exhibit 337 for the Court, the witness, and the
17  parties.
18  Q. Do you recognize this?
19  A. Yes.
20  Q. What is it?
21  A. It's a photo from a CD I reviewed from the Epstein and
22  Maxwell investigation.
23  Q. Under what 1B number was this CD logged?
24  A. 1B63.
25  Q. Who's in this photograph?

| LC7VMAX1 | Meder - direct | Page 1454 |
|---|---|---|

1  A. Ghislaine Maxwell.
2       MS. COMEY: Your Honor, the government offers this in
3  evidence.
4       THE COURT: And again, GX-337 is admitted consistent
5  with my rulings. You may publish.
6       (Government's Exhibit 337 received in evidence)
7       MS. COMEY: Thank you, your Honor.
8       Ms. Drescher, let's go now, please, to Government
9  Exhibit 340 for the witness, the parties, and the Court.
10  Q. Do you recognize this?
11  A. Yes.
12  Q. What is it?
13  A. It's a photo from a CD I reviewed from the Epstein and
14  Maxwell investigation.
15  Q. Under what 1B number was that CD logged?
16  A. 1B63.
17  Q. Who is in this photograph?
18  A. Ghislaine Maxwell.
19       MS. COMEY: Your Honor, the government offers this in
20  evidence.
21       THE COURT: Consistent with my rulings, GX-340 is
22  admitted. You may publish.
23       (Government's Exhibit 340 received in evidence)
24       MS. COMEY: Thank you, your Honor.
25       Ms. Drescher, let's go now, please, to Government

UNITED STATES OF AMERICA, v.
GHISLAINE MAXWELL,

December 7, 2021

| LC7VMAX1 | Meder - direct | Page 1455 |
| --- | --- | --- |

1  Exhibit 341 for the witness, the Court, and the parties.
2  Q. Do you recognize this?
3  A. Yes.
4  Q. What is it?
5  A. It's a photo from a CD I reviewed from the Epstein and
6  Maxwell investigation.
7  Q. Under what 1B number was that CD logged?
8  A. 1B63.
9  Q. And who are the people we see on the left and in the center
10  in this photograph?
11  A. On the left, Ghislaine Maxwell; in the center, Jeffrey
12  Epstein.
13      MS. COMEY: Your Honor, the government offers this in
14  evidence.
15      THE COURT: Consistent with my rulings, GX-341 is
16  admitted.
17      (Government's Exhibit 341 received in evidence)
18      MS. COMEY: May we publish, your Honor?
19      THE COURT: You may.
20  Q. And will you tell us one more time who's on the left?
21  A. Ghislaine Maxwell.
22  Q. And who's in the center?
23  A. Jeffrey Epstein.
24      MS. COMEY: Let's go now, please, Ms. Drescher, to
25  Government Exhibit 342 for the witness, the parties, and the

| LC7VMAX1 | Meder - direct | Page 1456 |
| --- | --- | --- |

1  Court.
2  Q. Do you recognize this?
3  A. Yes.
4  Q. What is it?
5  A. It's a photo from a CD I reviewed from the Epstein and
6  Maxwell investigation.
7  Q. Under what 1B number was that CD logged?
8  A. 1B63.
9  Q. Who is in this photograph?
10  A. Ghislaine Maxwell and Jeffrey Epstein.
11      MS. COMEY: Your Honor, the government offers this in
12  evidence.
13      THE COURT: I don't think we discussed this one
14  yesterday, so if you want to --
15      MS. MENNINGER: Subject to the same objection, your
16  Honor.
17      THE COURT: Understood. GX-342 is admitted.
18      (Plaintiff's Exhibit 342 received in evidence)
19      THE COURT: You may publish.
20  Q. Who is on the left?
21  A. Ghislaine Maxwell.
22  Q. Who is on the right?
23  A. Jeffrey Epstein.
24      MS. COMEY: Ms. Drescher, let's go now, please, to
25  Government Exhibit 343 for the witness, the Court, and the

| LC7VMAX1 | Meder - direct | Page 1457 |
| --- | --- | --- |

1  parties.
2  Q. Do you recognize this?
3  A. Yes.
4  Q. What is it?
5  A. It's a photo from a CD I reviewed from the Epstein and
6  Maxwell investigation.
7  Q. Under what 1B number was that CD logged?
8  A. 1B63.
9  Q. Who is in this photograph?
10  A. Ghislaine Maxwell and Jeffrey Epstein.
11      MS. COMEY: Your Honor, the government offers this in
12  evidence.
13      MS. MENNINGER: Same objection and cumulative, your
14  Honor.
15      THE COURT: Understood. GX-343 is admitted.
16      (Government's Exhibit 343 received in evidence)
17      THE COURT: Let me just ask, Ms. Comey, are there
18  other ones I didn't see yesterday?
19      MS. COMEY: I don't believe so, your Honor. I didn't
20  realize we had not discussed these yesterday.
21      THE COURT: My presumption is that there won't be, and
22  so we'll move on.
23      MS. COMEY: May we publish, your Honor?
24      THE COURT: Yes, you may.
25      MS. COMEY: Thank you.

| LC7VMAX1 | Meder - direct | Page 1458 |
| --- | --- | --- |

1  BY MS. COMEY:
2  Q. Who is on the left and who is on the right?
3  A. On the left, Ghislaine Maxwell; on the right, Jeffrey
4  Epstein.
5      MS. COMEY: Let's go now to what's been marked for
6  identification as Government Exhibit 347, please.
7  Q. Do you recognize this?
8  A. Yes.
9  Q. What is it?
10  A. It's a photo from a CD I reviewed from the Epstein and
11  Maxwell investigation.
12  Q. Under what 1B number was this CD logged?
13  A. 1B19.
14  Q. Who is in this photograph?
15  A. Jeffrey Epstein and Ghislaine Maxwell.
16      MS. COMEY: Your Honor, the government offers this in
17  evidence.
18      THE COURT: Consistent with my ruling, GX-347 is
19  admitted. You may publish.
20      (Government's Exhibit 347 received in evidence)
21      MS. COMEY: Thank you, your Honor.
22  Q. Who is on the left and who is on the right?
23  A. On the left, Jeffrey Epstein; on the right, Ghislaine
24  Maxwell.
25      MS. COMEY: Let's go now, please, to what's been

UNITED STATES OF AMERICA, v.
GHISLAINE MAXWELL,

December 7, 2021

| LC7VMAX1 | Meder - direct | Page 1459 |
|---|---|---|

1  marked for identification as Government Exhibit 348.
2  Q. Do you recognize this?
3  A. Yes.
4  Q. What is it?
5  A. It's a photo from a CD I reviewed from the Epstein and
6  Maxwell investigation.
7  Q. Under what 1B number was that CD logged?
8  A. 1B19.
9  Q. Who is in this photograph?
10  A. Ghislaine Maxwell and Jeffrey Epstein.
11  MS. COMEY: Your Honor, the government offers this in
12  evidence.
13  THE COURT: Consistent with my ruling, GX-348 is
14  admitted. You may publish.
15  (Government's Exhibit 348 received in evidence)
16  BY MS. COMEY:
17  Q. Who is on the left and who is on the right?
18  A. On the left, Ghislaine Maxwell; on the right, Jeffrey
19  Epstein.
20  MS. COMEY: Let's go now please to Government Exhibit
21  314 for the witness, the Court, and the parties, Ms. Drescher.
22  Q. Do you recognize this?
23  A. Yes.
24  Q. What is it?
25  A. It's a photo from a CD I reviewed from the Epstein and

| LC7VMAX1 | Meder - direct | Page 1460 |
|---|---|---|

1  Maxwell investigation.
2  Q. Under what 1B number was the CD logged?
3  A. 1B75.
4  Q. Who is in this photograph?
5  A. Ghislaine Maxwell and Jeffrey Epstein.
6  MS. COMEY: The government offers this in evidence,
7  your Honor.
8  THE COURT: Consistent with my ruling, GX-314 is
9  admitted. You may publish.
10  (Government's Exhibit 314 received in evidence)
11  Q. Who is on the left, who's on the right?
12  A. On the left, Ghislaine Maxwell; on the right, Jeffrey
13  Epstein.
14  MS. COMEY: Let's go now, please, Ms. Drescher, to
15  Government Exhibit 317 for the witness, the Court, and the
16  parties.
17  Q. Do you recognize this?
18  A. Yes.
19  Q. What is it?
20  A. It's a photo from a CD I reviewed from the Epstein and
21  Maxwell investigation.
22  Q. Under what 1B number was the CD logged?
23  A. 1B75.
24  Q. Who is in this photograph?
25  A. Ghislaine Maxwell and Jeffrey Epstein.

| LC7VMAX1 | Meder - direct | Page 1461 |
|---|---|---|

1  MS. COMEY: The government offers this in evidence,
2  your Honor.
3  THE COURT: Consistent with my ruling, GX-317 is
4  admitted. You may publish.
5  (Government's Exhibit 317 received in evidence)
6  Q. Who is on the left and who is on the right?
7  A. On the left, Ghislaine Maxwell; on the right, Jeffrey
8  Epstein.
9  MS. COMEY: Let's go now, please, Ms. Drescher, to
10  Government Exhibit 318.
11  Q. Do you recognize this?
12  A. Yes.
13  Q. What is it?
14  A. It's a photo from a CD I reviewed from the Epstein and
15  Maxwell investigation.
16  Q. Under what 1B number was that CD logged?
17  A. 1B75.
18  Q. Who is in this photograph?
19  A. Ghislaine Maxwell and Jeffrey Epstein.
20  MS. COMEY: Your Honor, the government offers this in
21  evidence.
22  THE COURT: Consistent with my ruling, GX-318 is
23  admitted. You may publish.
24  (Government's Exhibit 318 received in evidence)
25  MS. COMEY: Thank you, your Honor.

| LC7VMAX1 | Meder - direct | Page 1462 |
|---|---|---|

1  Q. Once that's published, would you please tell us who's on
2  the left and who's on the right.
3  A. On the left, Ghislaine Maxwell; on the right, Jeffrey
4  Epstein.
5  MS. COMEY: Thank you, Ms. Drescher. We can take that
6  down.
7  Q. The last two exhibits I want to talk about are in the
8  binder up by you at the podium, Ms. Meder. I want to start
9  with what's been marked for identification as Government
10  Exhibit 313. Would you please turn to that in your binder.
11  A. Yes.
12  Q. Do you recognize that?
13  A. Yes.
14  Q. What is it?
15  A. It's a photo from a CD I reviewed from the Epstein and
16  Maxwell investigation.
17  Q. Under what 1B number was the CD logged?
18  A. 1B75.
19  Q. And who is in this photograph?
20  A. Ghislaine Maxwell and Jeffrey Epstein.
21  MS. COMEY: Your Honor, the government offers this
22  exhibit under seal to protect the privacy of a party.
23  THE COURT: No objection?
24  MS. MENNINGER: No further objection.
25  THE COURT: No further objection.

# EXHIBIT 133

# In The Matter Of:

*UNITED STATES OF AMERICA, v.*

*GHISLAINE MAXWELL,*

---

*SEALED*

*December 8, 2021*

---

*Southern District Court Reporters*

Original File XLC8CMAXF SEALED.txt

Min-U-Script® with Word Index

| LC8VMAX2 | Shawn - direct | Page 1746 |
|---|---|---|

1 Q. In Palm Beach?

2 A. Correct.

3 Q. Did you ever go inside Jeffrey Epstein's home?

4 A. No, ma'am.

5 Q. Did you see the outside?

6 A. Yes, I did.

7 Q. When you first went to Jeffrey Epstein's house, do you

8 remember what it looked like on the outside?

9 A. It was pink.

10 Q. Did you go there multiple times after that first time?

11 A. Yes.

12 Q. Did the color later change?

13 A. It did.

14 Q. To what?

15 A. White.

16 Q. That first time you went to Jeffrey Epstein's house, who,

17 if anyone, went inside the house?

18 A. Virginia and Carolyn.

19 Q. About how long were they inside?

20 A. An hour, hour and five minutes.

21 Q. After Carolyn and Virginia came back outside, what, if

22 anything, did they have with them?

23 A. Money.

24 Q. In what denomination?

25 A. Hundred dollar bills.

| LC8VMAX2 | Shawn - direct | Page 1748 |
|---|---|---|

1 A. Sarah was one.

2 Q. Other than Sarah, do you know the names of any others?

3    MR. PAGLIUCA: Your Honor, I'm going to object to this

4 under 602 and 801.

5    THE COURT: Just a moment.

6    MS. COMEY: I'm happy to rephrase the question, your

7 Honor.

8    THE COURT: Okay.

9 BY MS. COMEY:

10 Q. The other two callers, did they tell you their names when

11 calling you?

12 A. No, ma'am.

13 Q. Do you remember anything about the voices of the other two

14 callers?

15 A. They were foreign.

16 Q. Can you tell --

17 A. To me. They were foreign to me.

18 Q. Can you tell us about their voices?

19 A. One was English and one sounded almost French. English

20 being proper English.

21 Q. When these three women called, what did they say to you

22 about Carolyn?

23 A. That Jeffrey was requesting her to work.

24 Q. And how did you respond each time you received one of these

25 calls?

| LC8VMAX2 | Shawn - direct | Page 1747 |
|---|---|---|

1 Q. After that first time, did you go with Carolyn to Jeffrey

2 Epstein's house again?

3 A. I did.

4 Q. About how often did you go with Carolyn to Jeffrey

5 Epstein's house?

6 A. About every two weeks.

7 Q. To the best of your knowledge, about when did Carolyn stop

8 going over to Jeffrey Epstein's house in Palm Beach?

9 A. When we left and went to Georgia.

10 Q. Do you remember about how old Carolyn was when you went to

11 Georgia?

12 A. Sixteen.

13 Q. Are you and Carolyn still together now?

14 A. No, ma'am.

15 Q. About when did you break up?

16 A. 2005.

17 Q. During the period when Carolyn was going to Jeffrey

18 Epstein's house with you, do you know how she would schedule

19 times to go there?

20 A. Somebody would call my phone.

21 Q. How many people do you remember calling your phone?

22 A. Three.

23 Q. Were they male or female?

24 A. Female.

25 Q. Do you know any of their names?

| LC8VMAX2 | Shawn - direct | Page 1749 |
|---|---|---|

1 A. I would tell Carolyn and set the appointment for her.

2 Q. Do you remember what your phone number was at the time?

3 A. No.

4 Q. Other than calling you, did you observe anyone else

5 receiving calls to schedule Carolyn to see Jeffrey Epstein?

6 A. Her mother.

7 Q. And when her mother received those calls, what did you see

8 her do?

9 A. She would agree and tell them that she would let Carolyn

10 know.

11 Q. When you went with Carolyn, how did you two get to Jeffrey

12 Epstein's house?

13 A. At first it was cabs.

14 Q. At some point did that change?

15 A. Yeah. We got a car from her mother.

16 Q. And then who would drive?

17 A. I would.

18 Q. Why couldn't Carolyn drive herself?

19 A. She was too young.

20 Q. You mentioned cabs. Where would the cabs pick you up,

21 without giving a specific address?

22 A. West Gate, West Palm Beach.

23 Q. At whose house?

24 A. Carolyn's.

25 Q. Each time you went with Carolyn to Jeffrey Epstein's house,

EXHIBIT 134

LCIAMAX2ps

1  raise something before the charge is given based on the

2  closing, they can.

3          THE COURT:  I think this is what I typically use, so

4  we'll stick with that.  And obviously closings will not cross

5  the line as to what I've forbidden, or that may become

6  necessary.

7          MR. EVERDELL:  Yes, your Honor.

8          MR. ROHRBACH:  Understood, your Honor.  I think that,

9  just to sort of complete the point, the government's particular

10  concern is the argument about the empty chair and the

11  government's motivations for this prosecution, which is

12  somewhat different than the particular investigative techniques

13  point that's elsewhere in this instruction, which is why we

14  thought the additional sentence is necessary.

15          THE COURT:  I didn't permit and there will be no

16  argument about the government's motivation.

17          MR. EVERDELL:  That's clear, your Honor.

18          MR. ROHRBACH:  Thank you, your Honor.

19          MR. EVERDELL:  All right.  Your Honor, we're all set.

20  Page 73.

21          THE COURT:  Anything before that?

22          MR. ROHRBACH:  No.  That was the last edit from the

23  government, actually.

24          THE COURT:  OK.  73.

25          MR. EVERDELL:  This is the preparation of witnesses

EXHIBIT 135

# EXHIBIT 135

# Some Ghislaine Maxwell jurors initially doubted accusers, juror says

By **Luc Cohen**

January 5, 2022 11:33 AM PST · Updated January 5, 2022

  



[1/3] Jeffrey Epstein associate Ghislaine Maxwell sits as the guilty verdict in her sex abuse trial is read in a courtroom sketch in New York City, U.S., December 29, 2021. REUTERS/Jane Rosenberg Purchase Licensing Rights   

NEW YORK, Jan 5 (Reuters) - During jury deliberations after the trial of British socialite

Ghislaine Maxwell, some jurors initially doubted the accounts of two of her accusers, one member of the jury said on Tuesday night.

This juror, who asked to be identified only by his first and middle names, said some of the jurors had issues with the credibility of witnesses known as Jane and Carolyn, two of the four women who testified that Maxwell set them up with the late financier Jeffrey Epstein as teenagers.

Read about innovative ideas and the people working on solutions to global crises with the Reuters Beacon newsletter. Sign up here.

Advertisement · Scroll to continue

He said that after some of the jurors questioned the accuracy of the two women's memories, he decided to share his own experience of being sexually abused as a child. He said that he remembered most important elements of what happened to him, but not every single detail. That swayed some jurors, he said.

"When I shared that, they were able to sort of come around on, they were able to come around on the memory aspect of the sexual abuse," Scotty David, a 35-year-old Manhattan resident, told Reuters in a phone interview. He gave an earlier interview to The Independent.

He added that coming to a unanimous verdict "wasn't easy, to be honest."



Advertisement · Scroll to continue



$315



Understand data
everywhere.

Secure AI and data.

Recover and rollback
with precision.

Unleash the value of
data for AI.

LEARN MORE

"There's a room of 12 people and we all have to be on the same page and we all have to understand what's going on," he said. "And then we have to agree. So that's partly why it took so long."

Maxwell, 60, was convicted on Dec. 29 of recruiting and grooming teenage girls for sexual encounters with Epstein. The conviction followed five full days of deliberations.

During jury selection, hundreds of prospective jurors were given questionnaires asking, among other things, if they or anyone in their families had experienced sexual abuse, court records show.

For those who answered yes, the judge in the case asked during follow-up questioning if it would affect their ability to serve as a fair or impartial juror, the records show.

Scotty David said he did not recall being asked about his experience during follow-up questioning, known as voir dire. He said he "flew through" the initial questionnaire and also did not recall being asked on the form about personal experiences with sexual abuse, but that he would have answered honestly.



Exclusive news, data and analytics for financial market professionals    **LSEG**

**Reuters**    World ⌄    Business ⌄    Markets ⌄    Sustainability ⌄    Legal ⌄    My News    🔍    👤    Subscribe - $1/wk

anyone of their choosing, some of the statements, as related in the media, merit attention by the court.  Continue to read more ⌄

Maxwell's defense attorneys did not respond to requests for comment about Scotty David's account of the jury deliberations or his responses to questions during jury selection.

Jurors were not identified by name during the trial. Scotty David shared with Reuters a photograph of an instruction sheet from the court telling him to return on Nov. 29 for the final day of jury selection. His juror number, which is listed on the sheet, was among the 18 chosen as jurors or alternates.

## Sponsored Content

Dianomi Advertise Here ▷





Play Podcast

**Differentiated insights on the forces shaping the future of markets.**

Barclays Investment Bank

Listen Now

**The AI Trends 750 Ecommerce Leaders Expect to Drive Holiday 2025**

Sponsored by Mercury | Online Banking

**Toggling Tabs to Trade? Customize Workspace With New Power E*TRADE Pro**

Sponsored by E*TRADE from Morgan Stanley

Maxwell's defense lawyers argued that the women's memories had been corrupted over the years and that they were motivated by money to implicate Maxwell.

Scotty David said several jurors initially were not sure whether to convict Maxwell on the sex trafficking count, which is backed up by the testimony of a woman named Carolyn who said she was 14 when Epstein began abusing her in 2002.

But he said some jurors changed their minds after hearing the personal story of one juror who said she grew up poor. Carolyn said she dropped out of school in seventh grade and was paid $300 - sometimes by Maxwell - each time she gave Epstein an erotic massage. Carolyn said she used the cash to buy drugs.

"For Carolyn, it took one of the jurors sharing their story of growing up in the same socioeconomic background," he said. "She grew up poor, and said had there been an Epstein or Ghislaine in her neighborhood, some of the girls would have fallen prey to them as well."

Scotty David said he was skeptical of the defense's argument that Maxwell was being treated as a scapegoat for Epstein, who died by suicide at age 66 in a Manhattan jail cell while awaiting trial on sex abuse charges.

"She participated, she was complicit, she did nothing to stop it," he said.

Reporting by Luc Cohen in New York Editing by Noeleen Walder and Amy Stevens

Our Standards: **The Thomson Reuters Trust Principles.** [↗]

Suggested Topics: ( **United States** )

        **Purchase Licensing Rights**

  **Luc Cohen**
Thomson Reuters                                   

Reports on the New York federal courts. Previously worked as a correspondent in Venezuela and Argentina.

## Read Next     

**Reuters** Plus

**Inside Experian's Innovation Engine: Virtual Assistants, Responsible AI and the Future of Finance**
Sponsored by Experian



  



**Legal**

**Obamacare health subsidy to end as US Senate rejects dueling remedies**

**World**

**Trump orders reviews of proxy advisers in latest pressure on financial industry**

**World**

**Trump threatens funding for states over AI regulations**

The next-generation human interface for financial professionals.

## Sponsored Content

Dianomi Advertise Here ▷



**Toggling Tabs to Trade? Customize Workspace With New Power E*TRADE Pro**

Sponsored by
E*TRADE from Morgan Stanley



**ICE: Access the neutral, end-to-end technology ecosystem for mortgage**

Sponsored by
ICE

Play Podcast

**Differentiated insights on the forces shaping the future**

## Sponsored Content

Dianomi Advertise Here ▷

**New Power E*TRADE Pro: Get 120+ Technical Studies & 30+ Drawing Tools.**
Sponsored by E*TRADE from Morgan Stanley



**What's an expense ratio, and how can it affect your long-term returns?**
Sponsored by Fidelity Investments



**Buy the Dip: These Big Dividends Have Gotten Way Too Cheap**
Sponsored by Seeking Alpha



**Learn 8 Crucial Steps to Stay Cyber-Secure in Any Cloud Environment**



**The private markets landscape is evolving. Are you ready?**
Sponsored by BNY



**Real Estate Investing: 5 Mistakes to Avoid**
Sponsored by Charles Schwab



## World >

Daily Mail Jan 5, 2022   Juror 50, Scotty David  Interview

Daily Mail Jan 5, 2022   Juror 50 Interview

## EXCLUSIVE: 'Ghislaine was a predator as guilty as Epstein': Maxwell juror describes moment he 'locked eyes' with sex trafficker and reveals his own abuse ordeal

- Scotty David , a juror in the Ghislaine Maxwell trial, was one of the 12 men and women who convicted Maxwell on five of the six counts of sex-trafficking last week
- Scotty says he went into the trial firmly believing that Maxwell was 'innocent until proven guilty' but 'After all I've learned, she's just as guilty as Epstein. I don't want to call her a monster, but a predator is the right word'
- During the trial Scotty, who works in finance, was seated in the third row of the jury box, in the back corner. From his vantage point, he said, he had a vista of the entire court and the 'perfect view' of Maxwell herself
- Scotty said that Maxwell's manner in court was discussed during deliberations. He said, 'We did discuss that we thought she was a little standoffish and not necessarily cold, more like she was paying attention'
- Scotty revealed that he was not the only juror to share a story of sexual abuse and that it did not affect his ability to view Maxwell as innocent until proven guilty
- Scotty is completely satisfied that they reached the right verdict and that, with Maxwell's conviction, justice has been done. He says that he believes she will spend the rest of her life in prison unless a deal is done
- He said, 'It satisfies me to know that we did our due diligence and that we brought justice for these victims, for these girls who are now women'

By LAURA COLLINS CHIEF INVESTIGATIVE REPORTER FOR DAILYMAIL.COM and DANIEL BATES FOR DAILYMAIL.COM

PUBLISHED: 00:26 EST, 5 January 2022 | UPDATED: 09:04 EST, 5 January 2022

A juror in the Ghislaine Maxwell trial has revealed how he viewed her as a 'predator', describing the moment he 'locked eyes' with Jeffrey Epstein's accomplice - and revealed his own child sex abuse ordeal to the jury.

Scotty David said he had helped the other members of the jury understand things from a victim's point of view and explained how 'you can't remember all the details' of traumatic memories - this was a crucial line of attack by Maxwell's lawyers who called a 'false memory' expert witness.

1

Daily Mail Jan 5, 2022   Juror 50, Scotty David  Interview

David also claimed that the five guilty verdicts returned in New York last week, possibly condemning Maxwell to spend the rest of life behind bars, were for 'all the victims'.

Legal experts said that if David failed to disclose his past experiences before the jury deliberations, Maxwell could have grounds to claim a mistrial and have her convictions quashed.

However, the question of whether a potential juror was a victim of sexual abuse or a relative or friend of a victim was asked in the 50-question survey completed by each juror ahead of selection.

David said he went into the trial firmly believing that Maxwell was 'innocent until proven guilty' and viewing the victims with a skeptical eye.

But, he said, 'After all I've learned, she's just as guilty as Epstein. I don't want to call her a monster, but a predator is the right word.

'She knew what was happening. She knew what Epstein was doing and she allowed it to happen. She participated in getting these girls comfortable so that he could have his way with them.

'And, to me, them returning repeatedly for the money has nothing to do with anything because these girls were minors, and it doesn't matter what incentivized them. It matters what happened to them.'



Ghislaine Maxwell juror speaks out after guilty verdict

During the trial Scotty, who works in finance, was seated in the third row of the jury box, in the back corner. From his vantage point, he said, he had a vista of the entire court and the 'perfect view' of Maxwell herself

Daily Mail Jan 5, 2022   Juror 50, Scotty David  Interview

**Ghislaine Maxwell** could lodge a claim of mistrial after it emerged one of the jurors who convicted her was a victim of child sex abuse.

Scotty David said he had helped the other members of the jury understand things from a victim's point of view.

He also claimed the five guilty verdicts returned last week, possibly condemning Maxwell to spend the rest of her life behind bars, were for 'all the victims'.

David said that after he revealed his ordeal, another juror came forward with to share that they too had been sexually abused.

Legal experts said that if David failed to disclose his past experiences before the jury deliberations, Maxwell could have grounds to claim a mistrial and have her convictions quashed.

Moira Penza, a former federal prosecutor in New York, said: 'I certainly hope the juror disclosed this fully on his questionnaire.

'A little strange the defence didn't strike him. It could definitely be an issue.

'In the first instance it would likely form the basis for a motion to Judge [Alison] Nathan for a new trial.'

However, the question of whether a potential juror was a victim of sexual abuse or a relative or friend of a victim was asked in the 50-question questionnaire completed by each juror ahead of selection.

Scotty could not remember that question when asked by DailyMail.com but was certain that he had answered all questions honestly.

During the trial Scotty, who works in finance, was seated in the third row of the jury box, in the back corner. From his vantage point, he said, he had a vista of the entire court and the 'perfect view' of Maxwell herself.

He recalled, 'I could literally see her [all the time]. There were times when it felt like she was staring right at me and we would lock eyes…it didn't feel real.'

Daily Mail Jan 5, 2022   Juror 50, Scotty David  Interview

'She was constantly taking notes, and constantly passing post-it notes over to her attorneys especially when they were on cross examination.'

At times, he said, 'I felt like she was watching what we were doing because there were times when some jurors, not during when the victims presented their testimony, but when certain other people presented on things that maybe they didn't feel mattered...some people would nod off.'

Scotty said that Maxwell's manner in court was discussed during deliberations. He said, 'We did discuss that we thought she was a little standoffish and not necessarily cold, more like she was paying attention.'

In an insight that will surely come as a gut blow to Maxwell herself, who reportedly wanted to testify but was advised against it, Scotty revealed that if she had taken the stand, 'It would have shown maybe that she was a little more human.

'Maybe if she gave her version of the story, who knows, maybe if she gave us a story of how she was manipulated...I don't know. But then that would have been an admission I feel like of guilt.'

Jurors were instructed not to draw any inference of guilt or otherwise from Maxwell's decision not to testify and, Scotty said, it was simply set to one side and not discussed during deliberations.

Asked if, at any stage, he had experienced any sympathy for Maxwell he said, 'Absolutely. Because this is the rest of her life, right? We were deciding what happens based off the evidence provided.

'We took that very seriously because we took at as, this could be our sister, our sister could be on trial here. We have to really comb through the evidence and make sure we have enough proof to say that she's either guilty or not.'

David told The Independent he found all the accusers to be credible, despite the defence's attacks on their stories and memories.

'They were all believable. Nothing they said felt to me like a lie,' he said.

'I know what happened when I was sexually abused. I remember the color of the carpet, the walls. Some of it can be replayed like a video,' he said, and he explained this to fellow jurors.

4

Daily Mail Jan 5, 2022   Juror 50, Scotty David  Interview

'But I can't remember all the details, there are some things that run together.'

Scotty said when he chose to share his own experience of sexual abuse the room 'went silent'.

It has since been speculated that the fact that a juror was a victim of sexual abuse could be used by Maxwell as grounds of appeal.

Scotty recalled looking directly at Maxwell, 'I could literally see her [all the time]. There were times when it felt like she was staring right at me and we would lock eyes…it didn't feel real'

Scotty is completely satisfied that they reached the right verdict and that, with Maxwell's conviction, justice has been done. He says that he believes she will spend the rest of her life in prison unless a deal is done

Scotty said that Maxwell's manner in court was discussed during deliberations. He said, 'We did discuss that we thought she was a little standoffish and not necessarily cold, more like she was paying attention'

However, the question of whether a potential juror was a victim of sexual abuse or a relative or friend of a victim was asked in the 50-question questionnaire completed by each juror ahead of selection.

Scotty could not remember that question when asked by DailyMail.com but was certain that he had answered all questions honestly.

He also revealed that he was not the only juror to share a story of sexual abuse and that it did not affect his ability to view Maxwell as innocent until proven guilty.

It did, however, he believes give him access to a better understanding of the testimony of victims.

To that end, he said, the defense's tactic of 'going hard' on the victims did not play well with him or other jurors.

5

Daily Mail Jan 5, 2022   Juror 50, Scotty David  Interview

Scotty pointed to defense attorney Laura Menninger's use of air-quotes when questioning Jane about her story of 'escaping' Epstein at one point.

He said, 'Everything, her tone, using air-quotes with escape … I think she was acting in order to convince us that this girl's lying and lying for money.'

Instead, he said, all it did was convince jurors that the defense team were showing a complete lack of respect for the victims.

He said, 'I just felt terrible I'm like, 'I can't believe you're treating this woman like this.' Like even if she's lying there's better ways to go about it…I don't feel attacking them that way or degrading her based on what she said was the way to go.'

The jury was sent out with a daunting 80 pages of instructions after a trial that was often dizzying in detail with lengthy testimony from the victims alone, and six counts to consider.

At first, Scotty admitted, jurors struggled to know where to start or how to make any progress at all.

He said that they did not take an initial vote of opinions but instead, on the first day they were sent out simply chose a foreperson and began by reading the instructions page by page.

He said, 'It was overwhelming. I mean 80 pages of how you interpret the law on each count, and it flips back and forth between different pages, and you have to flip 20 pages in order to get a definition of something else that can apply to one specific count.'

Maxwell faced six counts relating to sex trafficking which centered on the stories of four victims.

A fifth victim, Kate, was called only to show a pattern of grooming behavior and was not directly implicated in any of the counts.

At first jurors struggled to agree, Scotty said, over the legal definitions of terms such as 'enticing.'

He said, 'It was super confusing. It didn't get heated. It was just confusing, and when people are confused, tones can get raised. Nobody ever yelled at other people. People would just speak, sounding frustrated.

6

Daily Mail Jan 5, 2022   Juror 50, Scotty David  Interview

'So, we [realized] we had to come up with a new game plan and that game plan was, we're going to talk to each other with compassion.'

According to Scotty once the jurors had found a way to 'understand' each other they worked methodically through each count starting with count 2.

This was the only charge on which they did not convict Maxwell and related to the charge of 'enticing' Jane to travel for sexual exploitation.

An initial vote saw 7 jurors vote guilty and 5 not guilty. Those 'not guilty' votes turned to 'not sure' on further discussion. Ultimately, he said, it was not a question of Jane's credibility but rather the fact that they simply did not feel the evidence was there to meet the necessary bar of beyond reasonable doubt.

Working through each charge jurors wrote out lists of evidence on a white board and attached post-it notes as they built the case for each as they saw it and deliberated towards consensus.

On counts two and four – both relating to Jane – there was a 7/5 split of guilty/not sure. On counts one, three and five – all conspiracy charges – there was a 10/2 guilty/not sure split and on count six, the sex trafficking charge relating to Carolyn, all voted guilty from the start.

Scotty said he never felt pressure from either the judge or the rest of the jurors to reach a verdict. In fact, he said, when the judge sent a note on Wednesday 29 December informing them that if they had not reached a verdict she would recall them the following day, they were about to send her a note saying they had reached consensus on all counts.

Maxwell (pictured with Epstein) faced six counts relating to sex trafficking which centered on the stories of four victims

Scotty revealed that he was not the only juror to share a story of sexual abuse and that it did not affect his ability to view Maxwell as innocent until proven guilty

Today Scotty is completely satisfied that they reached the right verdict and that, with Maxwell's conviction, justice has been done.

He says that he believes she will spend the rest of her life in prison unless a deal is done to reduce her sentence. But said that he had no idea of the

Daily Mail Jan 5, 2022   Juror 50, Scotty David  Interview

severity of the potential sentence until after the verdict was reached and that it would not have influenced anything if he had.

He said, 'It satisfies me to know that we did our due diligence and that we brought justice for these victims, for these girls who are now women.'

He said that, ultimately, he and the rest of the jurors were convinced that Epstein and Maxwell's lives were so 'intertwined' that it was inconceivable that she was not fully aware of his crimes.

She aided and abetted, he said. And with her conviction she wasn't paying or being held accountable for Epstein's crimes as her attorneys have argued, Scotty said, instead she was answering to her own guilt because she was 'every bit as culpable' as he.

According to Scotty, 'The prosecution proved their case beyond reasonable doubt.'

# EXHIBIT 136

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 2/4/22
```

United States of America,

      –v–

Ghislaine Maxwell,

          Defendant.

20-CR-330 (AJN)

ORDER

ALISON J. NATHAN, District Judge:

As a post-trial house-keeping matter, attached to this Order are the Court Exhibits.  The

parties have proposed redactions to several exhibits and the sealing of Court Exhibit 4.  The

Court concludes that the proposed redactions are consistent with the three-part test articulated by

the Second Circuit in *Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d 110 (2d Cir. 2006), and

narrowly tailored. The redactions serve the purpose of protecting the anonymity of jurors and of

victim-witnesses subject to the Court's anonymity order.  With respect to Court Exhibit 4, rather

than seal the entire document, the Court has redacted the information that would potentially

identify the victim-witness who testified pursuant to the Court's anonymity order.  Unredacted

copies of the Court Exhibits will be filed under seal.

      SO ORDERED.

Dated: February 4, 2022
      New York, New York

_____
ALISON J. NATHAN
United States District Judge

20cr330, *U.S. v. Maxwell*
Jurors to Proceed to Voir Dire

COURT EXHIBIT # __1__

DATE: __11/15/2021__
TIME: _____
CASE: __US v. Maxwell__
      __20 CR 330 (AJN)__

1.  2
2.  7
3.  8
4.  12
5.  13
6.  14
7.  20
8.  21
9.  22
10. 26
11. 27
12. 28
13. 29
14. 30
15. 32
16. 33
17. 37
18. 43
19. 47
20. 48
21. 49
22. 50
23. 54
24. 55
25. 58
26. 62
27. 63
28. 70
29. 79
30. 82
31. 87
32. 89
33. 93
34. 96
35. 98
36. 108
37. 112
38. 113
39. 117
40. 119

20cr330, *U.S. v. Maxwell*
Jurors to Proceed to Voir Dire

    41. 120
    42. 123
    43. 124
    44. 125
    45. 126
    46. 129
    47. 131
    48. 132
    49. 147
    50. 149
    51. 151
    52. 152
    53. 153
    54. 162
    55. 164
    56. 166
    57. 167
    58. 169
    59. 170
    60. 172
    61. 174
    62. 176
    63. 181
    64. 182
    65. 186
    66. 188
    67. 189
    68. 195
    69. 196
    70. 198
    71. 199
    72. 200
    73. 204
    74. 206
    75. 207
    76. 216
    77. 220
    78. 228
    79. 235
    80. 239

20cr330, *U.S. v. Maxwell*
Jurors to Proceed to Voir Dire

81. 240
82. 241
83. 248
84. 251
85. 260
86. 261
87. 263
88. 270
89. 271
90. 273
91. 275
92. 277
93. 279
94. 280
95. 282
96. 286
97. 290
98. 292
99. 297
100. 299
101. 304
102. 311
103. 312
104. 313
105. 314
106. 315
107. 326
108. 334
109. 340
110. 341
111. 345
112. 347
113. 349
114. 354
115. 363
116. 366
117. 367
118. 372
119. 374
120. 378

20cr330, *U.S. v. Maxwell*
Jurors to Proceed to Voir Dire

121. 379
122. 384
123. 385
124. 387
125. 388
126. 391
127. 394
128. 396
129. 398
130. 403
131. 407
132. 409
133. 411
134. 413
135. 418
136. 419
137. 424
138. 425
139. 426
140. 428
141. 429
142. 430
143. 432
144. 433
145. 434
146. 437
147. 439
148. 440
149. 442
150. 444
151. 445
152. 450
153. 451
154. 452
155. 456
156. 457
157. 459
158. 460
159. 461
160. 465

4

20cr330, *U.S. v. Maxwell*
Jurors to Proceed to Voir Dire

```
161. 467
162. 475
163. 477
164. 480
165. 481
166. 485
167. 486
168. 487
169. 489
170. 498
171. 501
172. 504
173. 505
174. 506
175. 509
176. 514
177. 516
178. 517
179. 520
180. 541
181. 543
182. 544
183. 545
184. 549
185. 551
186. 555
187. 556
188. 562
189. 563
190. 565
191. 566
192. 570
193. 573
194. 578
195. 581
196. 582
197. 583
198. 586
199. 589
200. 593
```

20cr330, *U.S. v. Maxwell*
Jurors to Proceed to Voir Dire

201. 594
202. 595
203. 596
204. 602
205. 604
206. 608
207. 611
208. 612
209. 615
210. 621
211. 622
212. 623
213. 630
214. 637
215. 642
216. 647
217. 651
218. 655
219. 661
220. 667
221. 668
222. 669
223. 670
224. 676
225. 677
226. 680
227. 683
228. 685
229. 690
230. 691
231. 694

COURT EXHIBIT #    2

DATE: 11/16/21
TIME:
CASE: 20cr330

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

United States of America,

—v—

Ghislaine Maxwell,

                    Defendant.

20-CR-330 (AJN)

Names for Voir Dire

1. Juan Alessi

2. Maria Alessi

3. Carolyn Andriano

4. Janusz Banasiak

5. ▮▮▮▮▮▮▮▮

6. Daniel Besselsen

7. ▮▮▮▮▮▮▮▮

8. ▮▮▮▮▮▮▮▮

9. ▮▮▮▮▮▮▮▮

10. Michael Buscemi

11. Paul Byrne

12. Tracy Chappell

13. Michael Dawson

14. Dr. Park Dietz

15. Eva Anderson Dubin

16. Glen Dubin

17. ▮▮▮▮▮▮▮▮

1

18. Bennett Gershman

19. Lesley Groff

20. Dr. Ryan Hall

21. Annie Farmer

22. Maria Farmer

23. Janice Farmer

24. Jordana Feldman

25. Tony Figueroa

26. Stephen Flatley

27. Dorothy ███████

28. ████████

29. Shawn ██████

30. Nicole Hesse

31. Paul Kane

32. Robert Kelso

33. Sarah Kellen Vickers

34. Elizabeth Nesbitt Kuyrkendall

35. Gerald LaPorte

36. Amanda Lazlo

37. Dr. Elizabeth Loftus

38. John Lopez

39. Nadia Marcinkova

40. Kelly Maguire

2

41. Pat McHugh

42. Tatum ▮▮▮▮

43. David Mulligan

44. Jennifer Naso

45. Greg Parkinson

46. Joseph Recarey

47. Virginia Roberts Giuffre

48. David Rodgers

49. Alfredo Rodriguez

50. Dr. Lisa Rocchio

51. Adriana Ross Salazar

52. Susan Shelling

53. Timothy Slater

54. Emmy Taylor

55. Melissa ▮▮▮▮

56. Lawrence Visoski

57. Les Wexner

58. Amanda Young

COURT EXHIBIT # 3

DATE: 11/16/21
TIME:
CASE: 20 cr 330

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

United States of America,

      –v–

Ghislaine Maxwell,

        Defendant.

20-CR-330 (AJN)

Locations and Entities for
Voir Dire

**List of Locations:**

   A. 358 El Brillo Way, Palm Beach, Florida

   B. Zorro Ranch, 39 Zorro Ranch Road, Stanley, New Mexico

   C. 9 East 71st Street, New York, New York

   D. 116 East 65th Street, New York, New York

   E. 457 Madison Avenue, New York, New York

   F. Little St. James Island, U.S. Virgin Islands

   G. 44 Kinnerton Street, London

   H. Interlochen Arts Camp, Traverse City, Michigan

**List of Entities:**

   I. Interlochen Arts Camp

   J. Professional Children's School

   K. Survivor's Charter School

   L. West Palm Beach School of the Arts

   M. Mar-a-Lago

COURT EXHIBIT # _4_

DATE: 11/16/21
TIME:
CASE: 20cr-330

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

United States of America,

   –v–

Ghislaine Maxwell,

    Defendant.

20-CR-330 (AJN)

Locations and Entities for
Voir Dire

**Please answer *only* <u>yes</u> or <u>no (and do not state out loud the name of the</u>**

**<u>program</u>):**

  **Do you have specific familiarity with this television program, other than having**

  **heard the name of the program?**

████████████

We're leaving

@ 5:30

Thanks

COURT EXHIBIT # _5_

DATE: 12/20/2021
TIME:
CASE: 20 CR 330 CAJN

We would like the (transcripts) of

Jane, Annie and Carolyn.

#26    12/21/2021

COURT EXHIBIT # 6

DATE: 12 | 21 | 2021
TIME:
CASE: U S v. Maxwell
20 CR 330 (AJN)

COURT EXHIBIT # ___7___

DATE: __12/21/2021__
TIME: __2:56 pm__
CASE: __US v. Maxwell__
         __20 cr 330 (AJN)__

Hello You- Honor,

We would like the

FBI deposition (3505-005)

referred to by the defense ~~witness~~

during the cross examination of Carolyn

Thank You

████████████████████

#26

12/21/2021

Hello Judge Nathan

We would like to end today
at 5 PM, deliberate from 9-4:30
tomorrow and have lunch at
12 noon, if possible.

Thank you

#26

12/21/2021

COURT EXHIBIT # ___8___

DATE: 12/21/2021
TIME: 4:06 pm.
CASE: US v. Maxwell
      20 CR 330 (AJN)

Hello Judge Nutnan

Can we consider Annie's

testimony as conspiracy to commit

a crime in Counts One and Three?

Thank you

#26

12/21/2021

COURT EXHIBIT # 9

DATE: 12/21/2021
TIME:
CASE: US v. Maxwell
20 CR 330 (AJN).

Hello Judge Nathan,

May we please have the following

testimonies in a binder:

Jane (being returned) (P)

Juan

Kate

Thank You,

███████████

#26

12/22/2021

COURT EXHIBIT # 10

DATE: 12/22/21
TIME: 3:45pm
CASE: 20 cr 330

COURT EXHIBIT # _11_

DATE: 12/22/21
TIME:
CASE: USv. Maxwell
20 cr 330 (AJN)

Hello Jury —

If your deliberations are
not completed today, do you
wish to deliberate tomorrow (Thurs. Dec 23)?

☐ yes           ☒ * No - thank you

(please check yes or no)

If yes, what time would
you like to deliberate?

From  ___ : ___ A.m. ~~■~~ to  ___ : ___ P.m.

Thank you —
Judge Nathan

* Jurors have made plans for tomorrow

Good Morning Judge Natnan,

May we please have the following?
items:
: Different colored Post-its
. White paper board
. Highlighters (different colored)
. Matt's transcript

Also, May we have a definition of
enticement.

Thank You 

#26

COURT EXHIBIT # 12

DATE: 12/27/2021
TIME:
CASE: US v. Maxwell
20 CR 330 (AJN)

Hello Judge Nathan,

May we also have Parkinson's transcript.

Thank you

█████████████

#26

COURT EXHIBIT # 13

DATE: 12/27/2021
TIME:
CASE: US v. Maxwell
20 CR 330 (AJN)

Hello Judge Nathan,

May we please have the
transcript of David Rogers?
Thank You

#26
12/27/2021

COURT EXHIBIT # ___14___

DATE: 12/27/2021
TIME:
CASE: US v. Maxwell
20 CR 330 (AJN)

DATE: 12/27/2021
TIME:
CASE: US v. Maxwell
20 CR 330 (AJN)

Hello Judge Natnun.

Under Count Four (4), If the defendant aided in the transportation of Jane's return flight, but not the flight to New Mexico where/t the intent was for Jane to engage in sexual activity, Can she be found guilty under the second element?

Thank u

#26

Hello Judge Nathan,

We would like to end

deliberations at 5PM today.

Thank You

████████  ████████

#26

12/27/2021

COURT EXHIBIT # ___16___

DATE: 12/27/2021
TIME: _____
CASE: US v. Maxwell
        20 CR 330 (AJN)

COURT EXHIBIT # ___17___

DATE: __12/28/2021__
TIME: _____
CASE: __US v. Maxwell__
20 CR 330 (AJN)

Hello Judge Nothan,

Our deliberations are moving along and we are making progress. We are at a good point and would like to end today at 5PM and continue tomorrow morning at 9AM.

Thank You

#26

12/28/2021

Good Morning Judge Nathan,

May we please have the following transcripts:

COURT EXHIBIT # _18_

DATE: _12/29/21_

TIME: _____

CASE: _US v. Maxwell_

20 CR 330 (AJN)

· Sean ███
· Cimberly Espensona (sp)
· Elizabeth , H3 morrie (sp)
· Amanda Young
· Ju son Richards

Also, may we have clarification regarding our schedule, going forward. Are we required to continue deliberations every day, including 12/31 and 1/1/2022 until we reach a verdict? We ask in order to plan our schedules accordingly.

Thank You

12/29/2021   ███████   #2

Hello Judge Nathan,

We are requesting the transcripts of the expert Whitness on memory.

Thank you ██████████

12/29/2021

COURT EXHIBIT # ___19___

DATE: _12/29/21_
TIME:
CASE: _US v. Maxwell_
20 CR 330 (AJN)

Hello Judge Nathan,

May we please have the
Larry Visoski transcript.

Thank You,

█████████████

12/29/2021    #26

COURT EXHIBIT # ___20___

DATE: _12/29/2021_
TIME:
CASE: _US v. Maxwell_
      20 CR 330 (AJN)

FINAL

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

    -v.-

                      S2 20 Cr. 330 (AJN)

GHISLAINE MAXWELL,

        Defendant.

HONORABLE ALISON J. NATHAN:

## VERDICT SHEET

Please indicate your verdict with a check mark (✓).

**COUNT ONE:**    **Conspiracy to Entice Individuals Under the Age of 17 to Travel in Interstate Commerce with Intent to Engage in Illegal Sexual Activity**

    Guilty __✓__        Not Guilty _____

**COUNT TWO:**    **Enticement of an Individual Under the Age of 17 (Jane only) to Travel with Intent to Engage in Illegal Sexual Activity**

    Guilty _____        Not Guilty __✓__

**COUNT THREE:**    **Conspiracy to Transport Individuals Under the Age of 17 to Travel in Interstate Commerce with Intent to Engage in Illegal Sexual Activity**

    Guilty __✓__        Not Guilty _____

COURT EXHIBIT # __21__

DATE: _12/29/2021_
TIME: _____
CASE: _US v. Maxwell_
      _20 CR 330 (AJN)_

**COUNT FOUR:**  **Transportation of an Individual Under the Age of 17 (Jane only) with Intent to Engage in Illegal Sexual Activity**

Guilty __✓__        Not Guilty _____

**COUNT FIVE:**  **Conspiracy to Commit Sex Trafficking of Individuals Under the Age of 18**

Guilty __✓__        Not Guilty _____

**COUNT SIX:**  **Sex Trafficking of an Individual Under the Age of 18 (Carolyn only)**

Guilty __✓__        Not Guilty _____

#26
_____
Juror Number of Foreperson

12/29/2021    4:44 PM
_____
Date and Time

2

EXHIBIT 137

LCRVMAXT

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------x
UNITED STATES OF AMERICA,

        v.                       20 CR 330 (AJN)

GHISLAINE MAXWELL,

           Defendant.       Jury Trial
--------------------------------x
                         New York, N.Y.
                         December 27, 2021
                         10:30 a.m.

Before:

               HON. ALISON J. NATHAN,

                            District Judge

                   APPEARANCES

DAMIAN WILLIAMS
     United States Attorney for the
     Southern District of New York
BY:  MAURENE COMEY
     ALISON MOE
     LARA POMERANTZ
     ANDREW ROHRBACH
     Assistant United States Attorneys

HADDON MORGAN AND FOREMAN
     Attorneys for Defendant
BY:  JEFFREY S. PAGLIUCA
     LAURA A. MENNINGER
        -and-
BOBBI C. STERNHEIM
        -and-
COHEN & GRESSER
BY:  CHRISTIAN R. EVERDELL

Also Present:  Amanda Young, FBI
              Paul Byrne, NYPD
              Sunny Drescher,
               Paralegal, U.S. Attorney's Office
              Ann Lundberg,
               Paralegal, Haddon Morgan and Foreman

LCRVMAXT

```
 1    mind of their own.  Because last week the Court invited them to
 2    sit the extra day and they declined that.  So an inquiry may be
 3    appropriate, but I don't think telling them what they should do
 4    is necessarily the right thing to do.
 5            THE COURT:  Well, I have told them previously that
 6    they are here till at least 5.  I think the question is
 7    whether, in light of the circumstances we find ourselves, we
 8    should encourage longer, if it's available to them.  But you
 9    think about it.  I'll hear from you.  I'm not intending to do
10    anything just yet.  I presume we will hear from them as to this
11    evening, but think about the indication of at least some
12    extension of hours tomorrow if they have not completed the
13    task.
14            All right?  Thank you.
15            (Recess pending verdict)
16            THE COURT:  I have a note.
17            Under Count Four, if the defendant aided in the
18    transportation of Jane's return flight, but not the flight to
19    New Mexico, where/if the intent was for Jane to engage in
20    sexual activity, can she be found guilty under the second
21    element?
22            I'm going to let you take a -- if you want to just
23    take a look at the note.  Counsel, you're welcome to take a
24    photo of it, if that helps.
25            MS. STERNHEIM:  Thank you.
```

LCRVMAXT

1              THE COURT:  Mark the note as Court Exhibit 14.

2              THE DEPUTY CLERK:  15.

3              THE COURT:  15.

4              Counsel, soon I'll look for your proposals.

5              Another note from the jury.  This one says:  We would

6    like to end deliberations at 5 p.m. today.

7              So we'll take up extending deliberations after we

8    resolve the response to this question.

9              (Counsel conferred)

10             THE COURT:  All right.  Let me get a proposal.

11             MR. EVERDELL:  Happy to talk, your Honor.

12             THE COURT:  Counsel, are you ready?

13             MS. MOE:  I apologize, your Honor.  Can we just have

14   one more moment to confer with our supervisor?

15             THE COURT:  Okay.

16             MS. MOE:  Thank you.

17             (Counsel conferred)

18             MS. MOE:  Thank you, your Honor.

19             Apologies for the delay.

20             THE COURT:  Defense counsel, are you ready?

21             MS. STERNHEIM:  Yes.

22             THE COURT:  Okay.  Go ahead, Ms. Moe.

23             MS. MOE:  Your Honor, our proposal would be to refer

24   the jurors to instruction number 21 on page 28 of the Court's

25   instructions, which pertains to comprehensive instruction with

LCRVMAXT

1    respect to the second element.  Beyond that, we're not able to

2    parse the question because we find it confusing; so we think

3    the safest course is to refer the jurors to the comprehensive

4    instruction with respect to the second element.

5            THE COURT:  Mr. Everdell.

6            MR. EVERDELL:  Your Honor, I think the answer to this

7    question is no, and I'll tell you the rationale for this.

8            As to the jurors' note, they've clearly separated out

9    in their minds the flight to New Mexico versus the flight back

10   from New Mexico.  And in their minds, there still is a

11   question, it would seem, that the flight -- whatever the

12   purpose of the flight to New Mexico was, whether it was for

13   illicit sexual activity or not, that is different from the

14   purpose of the flight back from New Mexico.  And they are

15   asking can she be found guilty solely on if there's some aiding

16   and abetting, some helping of that flight from New Mexico,

17   which presumably the flight home they're saying.

18           THE COURT:  So the flight from New Mexico to where?

19           MR. EVERDELL:  Well, there is no record of a flight

20   from New Mexico.  But what they are saying, I think, in this

21   note is they are separating out in their minds the flight to

22   New Mexico versus whatever flight she may have taken from New

23   Mexico.  And I would say based on the instructions in the

24   Court's instructions which the government pointed to, there has

25   to be -- the significant or motivating purpose of the travel

EXHIBIT 138

# LAW OFFICES OF BOBBI C. STERNHE

212-243-1100 • Main
917-306-6666 • Cell
888-587-4737 • Fax

33 West 19th Stre
New York, Ne
bc@ste

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 4/27/21

April 26, 2021

Honorable Alison J. Nathan
United States District Judge
United States Courthouse
40 Foley Square
New York, NY 10007

4/27/21

SO ORDERED.
ALISON J. NATHAN, U.S.D.J.

Re: *United States v. Ghislaine Maxwell*
S2 20 Cr. 330 (AJN)

MDC legal counsel is hereby
ORDERED to show cause by April 28,
2021 why an order directing the MDC to
provide the information requested in this
letter to the Defendant's counsel ought
not issue. MDC legal counsel shall
either docket it on ECF or email the
letter to the Court so that the Court can
docket it on ECF. Chambers will email
a copy of this Order directly to legal
counsel for the MDC.
SO ORDERED.

Dear Judge Nathan:

I write to report an incident stemming from an attorney-client conference with Ghislaine
Maxwell: Guards on Ms. Maxwell's security detail wrongfully seized and reviewed her
confidential legal documents and then intimidated Ms. Maxwell by standing over her as she used
the bathroom after threatening her with a disciplinary infraction. This incident has further
compromised Ms. Maxwell's ability to prepare for trial, to confer with counsel, and to retain
confidential legal documents. In addition, intimidation and humiliation by guards has further
exacerbated Ms. Maxwell's feelings of insecurity due to officious power exerted upon her by
guards.

On Saturday, April 24, 2021, Leah Saffian, Esq. and I attended a pre-scheduled in-person
legal conference with Ms. Maxwell in the MDC. The entire 2.5-hour conference was conducted
under the constant watch of four to five guards, including a lieutenant, with a camera on a tripod
focused on Ms. Maxwell and counsel while recording audio and video, and captured on
surveillance cameras affixed within the visiting room. After counsel left the facility, Ms.
Maxwell called me to report that her legal papers were confiscated.

Later that day, I received an email from Sophia Papapetru, MDC legal counsel, which
stated:

> *It has been brought to my attention by the staff of MDC Brooklyn that Ms. Maxwell
> received paperwork that was not in her possession upon entering the legal visiting
> area. As you are aware, the policies set forth for MDC Brooklyn legal visits do not allow
> for passing of any material during a legal visit. Due to our policy and procedures, the
> additional documents that were provided to Ms. Maxwell were confiscated. Those
> materials were put in an envelope and will be returned to you tomorrow upon your
> arrival to the institution. Please note, that you may put these documents in the legal
> mailbox in the lobby of the east building.*

*See Exhibit A.*

I emailed the following response to Ms. Papapetru:

*Your accusation is inaccurate as is the information reported to you by your staff. Nothing in Ms. Maxwell 's legal papers was given to her by me or by Leah Saffian, Esq. Both Ms. Saffian and I dispute these allegations in the strongest terms. Today, Ms. Saffian and I met with Ghislaine Maxwell for a scheduled legal visit- under the gaze of 5 guards and a portable camera recording audio and video.*

*After the legal visit concluded and Ms. Saffian and I left the visiting area, guards accused Ms. Maxwell of possessing documents obtained from counsel. The guards seized confidential documents from her, including documents she had previously received in legal mail delivered to the MDC and given to her by MDC staff. After seizing "highly confidential" documents (subject to a protective order that your staff is not authorized to review) and work product, the guards began reading the documents and have not returned them to Ms. Maxwell.*

*At no time did the guards, who were assiduously watching and filming the legal conference, bring any concern to my attention, so it is quite telling that you have been contacted when counsel are told that legal staff are unavailable during the weekend.*

*No documents were given to Ms. Maxwell for her retention. Demand is hereby made for an immediate identification of the documents you claim were not in Ms. Maxwell's possession upon entering the legal visiting area in advance of the arrival of counsel, a list of all guards present during the visit, and a copy of the video recording.*

*Please immediately return the confiscated legal documents to Ms. Maxwell. They are her documents, not mine. The confiscation of these documents has deprived Ms. Maxwell of her time and seriously impaired her ability to review legal documents and prepare for an upcoming trial, adding to an already difficult situation.*

*This matter is being reported to the Court and legal action will be initiated.*

*See Exhibit B.*

A notice and demand to preserve items of evidence has been send to Ms. Papapetru. *See* Exhibit C.

**Confiscation and Review of Confidential Legal Documents**

In advance of previous in-person legal visits, guards have gone through Ms. Maxwell's legal papers. In a break from such protocol, the guards did not do so prior to commencement of the legal visit on Saturday.

After the legal conference and departure of counsel, the guards seized all of Ms. Maxwell's legal papers, consisting of multiple letter-sized manilla folders containing documents and a composition notebook within a Redweld folder. The guards told Ms. Maxwell they believed she improperly retained documents given to her by her attorneys and that this was a

2

very serious offense. Ms. Maxwell observed three guards going through the Redweld, reading papers and pages of the notebook, dividing papers into two stacks, and leaving the room with the papers. The lieutenant took the papers out of Ms. Maxwell's sight. Ms. Maxwell asked the guards what documents were being taken; the guards refused to respond. While Ms. Maxwell could not see with specificity which documents were seized and removed to another room, she does know that documents contained in the folders and reviewed by the guards were subject to the protective order, attorney-client privileged communication, and defense work-product.

Guards confronted Ms. Maxwell and stated in sum and substance:

*We want you to know that what you did was a very serious infraction. It was so serious that it is worthy of an incident report and a disciplinary. It has been decided this time you will receive a caution.*

**Intimidation and Humiliation Off-Camera**

After the confiscation of her papers, Ms. Maxwell requested and was given permission to use the bathroom. But unlike any other occasion, the guard team leader stood knee to knee with Ms. Maxwell while Ms. Maxwell sat on the commode in the small area containing one toilet and a sink. In addition to denying Ms. Maxwell any privacy, the guard confronted her in a confined space off-camera.

Although Ms. Maxwell was ultimately informed that she would not receive a disciplinary infraction for the incident, being falsely accused of "a very serious offense" and having a guard standing over her while she used the commode caused Ms. Maxwell to feel intimidated and humiliated.

**A Further Chill on Attorney-Client Communication, Confidentiality, And Capacity to Prepare for Trial**

Being falsely accused of an infraction, being threatened with discipline, and having her legal papers confiscated has caused Ms. Maxwell to feel heightened insecurity under the control of her officious handlers. Further, this incident has put a chill on attorney-client communication because Ms. Maxwell no longer feels that she can bring legal materials to legal conferences. At the in-person legal conference on Sunday, Ms. Maxwell specifically chose not to bring documents that if confiscated and reviewed by MDC staff would compromise her defense. Documents seized on Saturday were given to Ms. Saffian, but it is unknown whether any seized documents were retained or copied by the MDC. The documents returned to Ms. Saffian had been sent as "legal mail" to Ms. Maxwell by other counsel sometime prior to the Saturday visit and had never been possessed by me or Ms. Saffian.

Ms. Maxwell's reaction and concerns are well-founded. The guards took undue advantage of her. If they believed that counsel had given documents to Ms. Maxwell for her retention, they should have addressed the issue in the presence of counsel. The conduct of which both Ms. Maxwell and counsel have been accused did not happen; and the conduct on the part of the guards was reprehensible.

Ms. Maxwell no longer feels that her legal papers are safe and believes that the confidentiality required to prepare her defense for trial has been irreparably breached. She is justifiably concerned that her defense documents and their contents have been improperly reviewed and disseminated. The fact that the guards did not confront counsel but chose to confiscate legal documents after Ms. Maxwell's lawyers left the visiting area further validates her suspicion and that of her counsel. In addition, Ms. Maxwell is fearful that she will be subject to retaliation, baseless allegations, and unwarranted and unprovoked discipline.

Ms. Maxwell is an indicted pre-trial detainee who has asserted her right to counsel. Once the right to counsel has attached and is asserted, as is the case here, the government must honor it. This means more than that the government "cannot prevent the accused from obtaining the assistance of counsel. The Sixth Amendment also imposes on the government an affirmative obligation to respect and preserve the accused's choice to seek this assistance." *Maine v. Moulton*, 474 U.S. 159, 170–71 (1985).

The actions by the MDC guards violated Ms. Maxwell's Sixth Amendment right to effective assistance of counsel. Without any justifiable cause they seized and inspected legal materials, failed to identify the materials seized, and withheld the materials for improper purposes. Ms. Maxwell does not know if the materials were duplicated in some fashion, *i.e.,* photocopied, scanned, or photographed. She does not know whether the MDC plans to give any of these privileged and confidential materials or the information contained therein to the prosecution or leak them to the press. And, given the prior treatment of Ms. Maxwell's HIPPA-protected medical information, these concerns are warranted.

Ms. Maxwell requests that the Court enter an order directing that the MDC, through its legal counsel and/or warden, to provide to Ms. Maxwell's attorneys, *only*, the following information:

- the identity of the person or persons who seized the legal material;
- an inventory of the items seized;
- a statement, subject to penalty of perjury, regarding whether the materials were duplicated in any fashion; and
- whether any disciplinary or corrective action was taken against any of the offending guards.

Very truly yours,

BOBBI C. STERNHEIM

Encs.
cc: All counsel of record

4



**From:** **Sophia Papapetru** spapapetru@bop.gov
**Subject:** Legal Visit 04.24.21
**Date:** April 24, 2021 at 4:07 PM
**To:** bcsternheim@mac.com
**Cc:** Nicole McFarland nmcfarland@bop.gov

Good afternoon Bobbi:

It had been brought to my attention by the staff of MDC Brooklyn that Ms. Maxwell received paperwork that was not in her possession upon entering the legal visiting area. As you are aware, the policies set forth for MDC Brooklyn legal visits do not allow for passing of any material during a legal visit. Due to our policy and procedures, the additional documents that were provided to Ms. Maxwell were confiscated. Those materials were put in an envelope and will be returned to you tomorrow upon your arrival to the institution. Please note, that you may put these documents in the legal mail box in the lobby of the east building.

Thank you for understanding.

Best,
Sophia

EXHIBIT A

**From:** **BOBBI C STERNHEIM** bcsternheim@mac.com
**Subject:** Ghislaine Maxwell 02879-509 Legal Visit 04.24.21
**Date:** April 24, 2021 at 5:37 PM
**To:** Sophia Papapetru spapapetru@bop.gov
**Cc:** Leah Saffian leahsaffian@hostednet.net, Christian Everdell CEverdell@cohengresser.com, Laura Menninger lmenninger@hmflaw.com, Jeff Pagliuca jpagliuca@hmflaw.com



Sophia-
Your accusation is inaccurate as is the information reported to you by your staff. Nothing in Ms. Maxwell 's legal papers was given to her by me or by Leah Saffian, Esq. Both Ms. Saffian end I dispute these allegations in the strongest terms.

Today, Ms. Saffian and I met with Ghislaine Maxwell for a scheduled legal visit- under the gaze of 5 guards and a portable camera recording audio and video.

After the legal visit concluded and Ms. Saffian and I left the visiting area, guards accused Ms. Maxwell of possessing documents obtained from counsel. The guards seized confidential documents from her, including documents she had previously received in legal mail delivered to the MDC and given to her by MDC staff. After seizing "highly confidential" documents (subject to a protective order that your staff is not authorized to review) and work product, the guards began reading the documents and have not returned them to Ms. Maxwell.

At no time did the guards, who were assiduously watching and filming the legal conference, bring any concern to my attention, so it is quite telling that you have been contacted when counsel are told that legal staff are unavailable during the weekend.

No documents were given to Ms.
Maxwell for her retention. Demand is hereby made for an immediate identification of the documents you claim were not in Ms. Maxwell's possession upon entering the legal visiting area in advance of the arrival of counsel, a list of all guards present during the visit, and a copy of the video recording.

Please immediately return the confiscated legal documents to Ms. Maxwell. They are her documents, not mine. The confiscation of these documents has deprived Ms. Maxwell of her time and seriously impaired her ability to review legal documents and prepare for an upcoming trial, adding to an already difficult situation.

This matter is being reported to the Court and legal action will be initiated.

Regarding tomorrow- I have recieved 15 different confirmations and cancellations regarding the scheduled visit for tomorrow, which will be attended by Ms. Saffian alone.
I am sorting through these emails to determine what time period is permitted for tomorrow's visit.
Bobbi

**BOBBI C. STERNHEIM, ESQ.**
**Law Offices of Bobbi C. Sternheim**
**33 West 19th Street - 4th Floor**
**New York, NY 10011**

**Main:** 212-243-1100
**Cell:** 917-912-9698
**Fax:** 888-587-4737

bcsternheim@mac.com

*This message and any attached documents contain information from the Law Offices of Bobbi C. Sternheim*
*that may be confidential and/or privileged.*
*If you are not the intended recipient, you may not read, copy, distribute, or use this information.*
*If you have received this transmission in error, please notify the sender immediately by reply e-mail and then delete this message.*
*Thank you.*

On Apr 24, 2021, at 4:07 PM, Sophia Papapetru <spapapetru@bop.gov> wrote:

Good afternoon Bobbi:

It had been brought to my attention by the staff of MDC Brooklyn that Ms. Maxwell received paperwork that was not in her possession upon entering the legal visiting area. As you are aware, the policies set forth for MDC Brooklyn legal visits do not allow for passing of any material during a legal visit. Due to our policy and procedures, the additional documents that were provided to Ms. Maxwell were confiscated. Those materials were put in an envelope and will be returned to you tomorrow upon your arrival to the institution. Please note that you may put these documents in the legal mail box in the lobby of the post building

**EXHIBIT B**

the institution. Please note, that you may put these documents in the legal mail box in the lobby of the east building.

Thank you for understanding.

Best,
Sophia

# LAW OFFICES OF BOBBI C. STERNHEIM

212-243-1100 • Main
917-306-6666 • Cell
888-587-4737 • Fax

33 West 19th Street - 4th Floor
New York, New York 10011
bc@sternheimlaw.com

April 26, 2021

**VIA EMAIL AND U.S. MAIL**

Sophia Papapetru, Esq.
Legal Counsel
Metropolitan Detention Center
80 29th Street
Brooklyn, NY 11232
*spapapetru@bop.gov*

### NOTICE AND DEMAND TO PRESERVE ITEMS OF EVIDENCE

#### Re: Ghislaine Maxwell 02879-509

Dear Ms. Papapetru:

As counsel for Ghislaine Maxwell, 02879-054, I am notifying you, as legal counsel for the Metropolitan Detention Center, of the MDC's obligation to preserve documents and evidence related to (i) allegations made against Ms. Maxwell and her counsel regarding legal paperwork allegedly passed to Ms. Maxwell during an attorney-client conference on April 24, 2021 and (ii) the confiscation and review of Ms. Maxwell's documents by MDC staff.

As stated in my April 24th email, material relevant to this dispute includes, but is not limited to:

- Any images, data files, or video recordings of the legal conference as captured on the hand-held camera focused on Ms. Maxwell and counsel during the entirety of the legal conference.

- Any images, data files, or video recordings of the legal conference as captured on surveillance cameras focused on Ms. Maxwell and counsel during the entirety of the legal conference.

- The full names of all guards, including the lieutenant, present in the visiting room during the legal conference.

- Any written or recorded communications, whether stored in electronic, digital or paper format, obtained in connection with the incident identified above.

- A list of all documents claimed to be in Ms. Maxwell's possession upon entering the visiting room. This request includes copies of any such documents or notes regarding same.

EXHIBIT C

- A list of all documents claimed have been given to Ms. Maxwell by counsel for her retention during the legal conference.

- Any written correspondence, or recorded communications, whether stored in electronic, digital or paper format, created by the guards, staff and other employees of the MDC and BOP.

Please take adequate steps to preserve all documents and data compilations, including electronically stored information ("ESI"), copies and backups, along with any paper files maintained by the MDC relevant to this dispute. ESI should be stored and maintained in its native format.

Counsel for Ms. Maxwell will be seeking electronic data in the custody and control of the individuals and entities identified in demand letter that is relevant to this incident, including without limitation, emails and other information contained on computer systems and any electronic storage systems.

Counsel for Ms. Maxwell consider the electronic data and paper files and video recordings to be valuable and irreplaceable sources of discoverable information in this matter.

Please take all necessary steps to prevent the deletion or destruction of any electronic communications, such as emails, voice mails, or electronic files relating to the above items.

Very truly yours,

*Bobbi C. Sternheim*

BOBBI C. STERNHEIM

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 4/29/21

United States of America,

    –v–

Ghislaine Maxwell,

                Defendant.

20-CR-330 (AJN)

ORDER

ALISON J. NATHAN, District Judge:

On April 26, 2021, defense counsel advised the Court of an incident that took place on

April 24, 2021 in which Defendant Ghislaine Maxwell's legal materials were seized by staff at

the Metropolitan Detention Center. Dkt. No. 248. In the letter, defense counsel requested that

the Court order MDC staff to provide them with more information regarding the incident. The

Court ordered legal counsel for the MDC to show cause why the requested order should not

issue. Dkt. No. 249. The MDC filed its response with the Court. Dkt No. 254. In reply,

Maxwell made additional requests. Dkt. No. 253. Defense counsel's requests are GRANTED in

part and DENIED in part.

IT IS ORDERED that by April 30, 2021, legal counsel to the MDC must provide the

following information:

1. If known, an inventory of the items seized from Ms. Maxwell in the incident that

    occurred on April 24, 2021 shall be provided by email to defense counsel only; and

2. A representation to this Court, to be filed on ECF, indicating:

    a. Whether any of the materials seized from Ms. Maxwell were duplicated in any

        fashion and what investigation was undertaken in order to determine this

        information;

        b.   Whether Ms. Maxwell is permitted to bring confidential legal materials to in-

           person meetings with defense counsel without those materials being seized;

        c.   What steps have been or will be taken to ensure the confidentiality of Ms.

           Maxwell's lawyer-client communications.

Defense counsel's requests are denied in all other respects.

        SO ORDERED.

Dated: April 29, 2021
       New York, New York

ALISON J. NATHAN
United States District Judge

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 5/3/21

United States of America,

        −v−

Ghislaine Maxwell,

             Defendant.

20-CR-330 (AJN)

ORDER

ALISON J. NATHAN, District Judge:

    The Court has received an exchange of letters that pertain to an incident that took place

on April 24, 2021. Dkt. Nos. 248, 253, 254, 258, 259. Legal counsel for MDC, where Ms.

Maxwell is detained pretrial, alleges that her lawyers violated Bureau of Prisons rules by

providing Ms. Maxwell materials at an in-person attorney-client visit. Dkt. Nos. 254, 259. Ms.

Maxwell's lawyers categorically deny the allegations and threaten separate legal action against

MDC staff based on the incident and the accusation. Dkt. Nos. 253, 258. The Court intimates

no views as to whether some other action or process is appropriate or proper in light of either

side's allegations. This Court's obligation in this case, and any other, is to ensure that the

defendant is given an opportunity to meet with her lawyers, engage in confidential attorney-

client communications, and prepare for trial.

    Mindful of that obligation, the Court declines to take further action at this time. After

receiving the defense's first letter motion, the Court ordered MDC legal counsel to show cause

why the Court should not grant the requested relief. Dkt. No. 249. The Court then granted in

part defense counsel's original request and ordered MDC legal counsel to respond to certain

questions about the April 24, 2021 incident and the procedures in place to ensure the

confidentiality of Ms. Maxwell's lawyer-client communications. Dkt. No. 255. Defense

counsel's current application is that this Court order MDC to turn over copies of video tapes of the in-person attorney-client visit. Dkt. No. 258. Those video tapes must be preserved in light of defense counsel's preservation letter. Dkt. No. 248, Ex. C. If Ms. Maxwell or defense counsel are entitled to view or receive copies of those materials as a matter of law, they should be provided. To the extent defense counsel is seeking entitlement to those materials from this Court, that application is denied.

The Court has ensured and will continue to ensure that Ms. Maxwell has the opportunity to meet meaningfully and confidentially with her lawyers in light of all relevant circumstances and consistent with the treatment of all other detained inmates in BOP custody. The isolated incident that took place on April 24, 2021, and the serious allegations leveled by MDC legal counsel and defense counsel in no way undermine the Court's conclusion that Ms. Maxwell and her lawyers are fully able to prepare for trial. The Court is confident that all parties recognize the importance of this going forward and in advance of the upcoming trial.

In furtherance of this, counsel for the Government are ORDERED to confer with legal counsel for MDC to ensure that Ms. Maxwell continues to have access to confidential attorney-client communications as she prepares for trial. If any additional incidents arise, defense counsel shall promptly confer with counsel for the Government regarding those incidents and seek to resolve any such issues swiftly, responsibly, reasonably, and amicably. If that fails, the parties may write to the Court jointly indicating their views, identifying and justifying any specific application being made.

SO ORDERED.

Dated: May 3, 2021
      New York, New York

_____
ALISON J. NATHAN
United States District Judge

# EXHIBIT 139

# LAW OFFICES OF BOBBI C. STERNHEIM

212-243-1100 • Main
917-306-6666 • Cell
888-587-4737 • Fax

33 West 19th Street - 4th Floor
New York, New York 10011
bc@sternheimlaw.com

April 29, 2021

Honorable Alison J. Nathan
United States District Judge
United States Courthouse
40 Foley Square
New York, NY 10007

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 4/29/21
```

Re: *United States v. Ghislaine Maxwell*
S2 20 Cr. 330 (AJN)

Dear Judge Nathan:

During oral argument of Ghislaine Maxwell's bail appeal before the Circuit, Ms. Maxwell's appellate counsel expressed concern that she was improperly deprived of sleep while detained in the MDC, an issue that has been raised in filings before this Court. In its brief denial of her appeal, the Circuit stated: "To the extent Appellant seeks relief specific to her sleeping conditions, such request should be addressed to the District Court." *See* Exhibit A. We press our concerns regarding disruption of Ms. Maxwell's sleep and the deleterious effect sleep deprivation is having on her health, well-being, and ability to prepare for and withstand trial.

Ms. Maxwell continues to be disrupted throughout the night by guards shining a flash/strobe light into her cell, claiming that her breathing must be checked. The myth that Ms. Maxwell's conditions of confinement are related to her being a suicide risk was laid to rest during the oral argument: There is nothing to support that contrived claim. In fact, Ms. Maxwell is classified with the standard CC1-Mh designation: inmate with no significant mental health care. (*See* Dkt. 159 at 3.)

Contrary to the report that Ms. Maxwell "wears an eye mask when she sleeps" (Dkt. 196 at 4), an item neither available for purchase through MDC commissary nor provided to her, she resorts to using a sock or towel to cover her eyes in an awkward attempt to shield them from disrupting illumination every 15 minutes. Last night, she was confronted by MDC staff due a visible bruise over her left eye. The "black eye" is depicted in Exhibit B. Despite 24/7 camera surveillance (except when guards elect to exert authority in an intimidating way off-camera, as they did in Saturday's bathroom incident), no guard addressed the bruise until Ms. Maxwell, who has no mirror, caught a reflection of her aching eye in the glean of a nail clipper. At that point, MDC staff confronted Ms. Maxwell regarding the source of the bruise, threatening to place her in the SHU if she did not reveal how she got it. While Ms. Maxwell is unaware of the cause of the bruise, as reported to medical and psych staff, she has grown increasingly reluctant to report information to the guards for fear of retaliation, discipline, and punitive chores. However, there is concern that the bruise may be related to the need for Ms. Maxwell to shield her eyes from the lights projected into her cell throughout the night.

LAW OFFICES OF BOBBI C. STERNHEIM

The MDC routinely places inmates in the SHU if they have engaged in physical altercation with other inmates or to protect inmates who are the subject of abuse. It would be ironic if the MDC follows through with its threat to place Ms. Maxwell in the SHU: It would signal that Ms. Maxwell needs protection from the very staff so intent on protecting her, since she has no contact with anyone but staff.

As suggested by the Circuit, we ask the Court to address Ms. Maxwell's sleeping conditions by directing the MDC to cease 15-minute light surveillance of Ms. Maxwell or justify the need for the disruptive flashlight surveillance.

Very truly yours,

*Bobbi C. Sternheim*

BOBBI C. STERNHEIM

Encs.
cc: All counsel of record

By May 5, 2021, the Government is ORDERED to confer with MDC legal counsel and provide the Court responses to the following questions:

1. Is Ms. Maxwell being subjected to flashlight surveillance every 15 minutes at night? Or any other atypical flashlight surveillance?

2. If so, what is the basis for doing so?

3. And if so, can she be provided with appropriate eye covering?

The Government is further ORDERED to share its response with defense counsel before filing it on ECF so that defense counsel can indicate whether they believe any private medical information needs to be redacted before public filing.
SO ORDERED.

4/29/21

SO ORDERED.
ALISON J. NATHAN, U.S.D.J.

EXHIBIT 140

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

October 15, 2021

**BY ECF**

The Honorable Alison J. Nathan
United States District Court
Southern District of New York
United States Courthouse
40 Foley Square
New York, New York 10007

> USDC SDNY
> DOCUMENT
> ELECTRONICALLY FILED
> DOC #:
> DATE FILED: 10/15/21

Re:    *United States v. Ghislaine Maxwell*, **20 Cr. 330 (AJN)**

Dear Judge Nathan:

The Government respectfully submits this letter in response to the Court's Order dated October 15, 2021 (Dkt. No. 348) ordering the Government to respond to the defendant's October 14, 2021 letter regarding delivery of the defendant's legal mail at the Metropolitan Detention Center ("MDC") (Dkt. No. 346).

The Government conferred with legal counsel at the MDC in response to the Court's Order and was informed of the following: As a general matter, legal mail from a defendant's counsel is delivered to the defendant within one business day of receipt at the MDC. Legal mail sent to a defendant from the Government via FedEx goes to the MDC's warehouse. Staff at the MDC's warehouse process and log the mail in a tracking system and then contact the relevant department—in this case, the legal department—about the mail. The legal department has to then go to the warehouse to retrieve the mail, log the mail, assign the mail an internal number for tracking purposes, and fill out a form authorizing the delivery of the mail to the inmate before delivering the mail to the inmate.

Legal counsel at the MDC has explained to the Government that these are the MDC's

standard procedures for legal mail, and these protocols apply to each one of the approximately 1,700 inmates at the MDC. Legal counsel at the MDC has further explained that defense counsel's request that the MDC be ordered to provide the defendant with all legal mail within one day of receipt by the MDC would be extremely burdensome and is not practicable in light of the various responsibilities of the MDC's legal department, which is responsible for issues relating to the approximately 1,700 inmates at the MDC. The Government respectfully submits that there are no circumstances that merit special expedited delivery for this defendant, and that the delivery of the defendant's mail should not receive priority over the services the legal department's staff provides to other inmates.

As noted in the defense's letter, the Government sent a hard drive containing Court-ordered disclosures to the defendant via FedEx on October 11, 2021. The hard drive was received by the MDC on October 12, 2021. Legal counsel at the MDC informed the Government that there was an institutional emergency impacting the safety and security of the MDC on October 13, 2021, such that no inmate at the MDC received any legal mail from the warehouse that day. On the morning of October 14, 2021, legal counsel at the MDC personally delivered the hard drive to the defendant.

The Government has made best efforts to obtain accurate information and respond to the Court's Order within a short time frame. Should the Court have any questions or require any additional details regarding this topic, the Government will confer with legal counsel at the MDC and provide additional information.

Page 3

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney

By: ___s/_____
Alison Moe
Lara Pomerantz
Andrew Rohrbach
Assistant United States Attorneys
Southern District of New York

Cc: Defense Counsel (By ECF)

---

Based on the information in this letter, the Court will not enter the Defendant's requested order. *See* Dkt. No. 346. However, it is the Court's firm expectation that a defendant in a pre-trial posture like Ms. Maxwell will in most circumstances receive legal mail within approximately 1 business day. Going forward, if another delay occurs, the Defendant may renew the request for a specific order requiring delivery within that time frame. With this understanding and in light of the unusually early pre-trial disclosure schedule set by the Court, the Court remains confident that Ms. Maxwell and her attorneys are fully able to prepare for trial. This resolves Dkt. No. 346. SO ORDERED.

10/15/21

EXHIBIT 141

UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| Danielle Bensky and Jane Doe 3, individually and on behalf of all others similarly situated | ) ) ) | **CLASS ACTION COMPLAINT** |
| Plaintiffs, | ) ) ) ) | JURY TRIAL DEMANDED |
| v. | ) ) ) | Case No.: |
| Darren K. Indyke and Richard D. Kahn, | ) ) ) | |
| Defendants. | ) ) | |

## INDIVIDUAL AND CLASS ACTION COMPLAINT

Plaintiffs Danielle Bensky and Jane Doe 3 file this individual and civil class action complaint against Defendants Darren K. Indyke's and Richard D. Kahn for damages and other relief under (among other provisions of law): the Trafficking Victim Protection Act, 18 U.S.C. § 1591, *et seq.* ("TVPA"); common law causes of action as described below; the New York Adult Survivors Act, N.Y. CPLR §214-j; and the Victims of Gender-Motivated Violence Protection Act ("GMVPA"), New York City Administrative Code § 10-11.

Danielle Bensky and Jane Doe 3 make the following allegations on information and belief and believe that substantial additional evidentiary support will exist for the claims set forth herein after a reasonable opportunity for discovery.

1

## I. NATURE OF THE CASE

1.     Beginning in the early 1990s, Jeffrey Epstein created a complex, sophisticated sex-trafficking venture (the "Epstein Enterprise") with the help of many influential individuals and entities who both knew he was sexually abusing and sexually trafficking young women and girls, and knowingly provided support to facilitate the Epstein Enterprise.  Epstein's co-conspirators not only facilitated his sex trafficking and abuse, but were also integral in allowing Epstein to escape justice for years by concealing his litany of crimes.

2.     The manner of operation for the Epstein Enterprise has been widely publicized.  Epstein would lure young girls or women to one of his luxurious mansions under the guise of being a wealthy philanthropist, able to advance careers, education, or provide other life necessities, and once inside he would force his would-be victim into providing a massage that would turn sexual, and from there he would cause each of his unsuspecting victims to engage in a variety of commercial sex acts.

3.     From its inception until Epstein's arrest by the FBI for sex trafficking in 2019 (and his subsequent death on August 10, 2019, by apparent suicide), the Epstein Enterprise operated both (1) to lure young women and girls into a position where Epstein could coerce them to engage in commercial sex acts and commit sexual offenses against them and (2) to conceal its sex trafficking from law

2

enforcement organizations. The Epstein Enterprise provided financial and other benefits to those who assisted and enabled both of the Epstein Enterprise's purposes.

4.     The Epstein Enterprise would not have existed for the duration it did and at its scope and scale, without the collaboration and support of others. No one, except perhaps Ghislaine Maxwell, was as essential and central to Epstein's operation as these Defendants.

5.     Darren Indyke and Richard Kahn were Epstein's personal lawyer and accountant, respectively. They personally participated in the Epstein Enterprise from approximately 1995 onward. After Epstein's death, they were executors of Epstein's estate.

6.     Indyke and Kahn were personally essential to the Epstein Enterprise's success—among other things, they helped structure Epstein's bank accounts and cash withdrawals to give Epstein and his associates access to large amounts of cash in furtherance of sex trafficking.

7.     Indyke and Kahn also personally assisted with creating the Epstein Enterprise's complex financial infrastructure, which involved dozens of bank accounts at various banking institutions, many of which were held in the name of corporate entities with no legitimate business purpose and that appear to have been created to simply facilitate the illegal sex-trafficking venture.

8.     Defendants were well aware of the Epstein Enterprise's purposes,

3

effects, and operations. Defendants were on Epstein's payroll for years, and they knowingly and intentionally personally benefited and received things of value from Epstein and his sex-trafficking operation.

9.     Knowing that they would earn millions of dollars in exchange for facilitating Epstein's sex abuse and trafficking, Indyke and Kahn chose money and power over following the law.  Indyke and Kahn chose participating in and facilitating the Epstein Enterprise for many years, all for their own financial gain. At each step, Defendants denied and concealed their personal involvement in the Epstein Enterprise to evade prosecution and civil liability from individuals such as Danielle Bensky and Jane Doe 3.

10.     Indyke  and  Kahn's  knowing  facilitation,  participation,  and concealment of Epstein's illegal conduct allowed Epstein to successfully rape, sexually assault, and coercively sex traffic Danielle Bensky and Jane Doe 3 and the numerous other members of the Class alleged below (the "Class").

11.     For many years, Indyke and Kahn intentionally concealed the extent of their personal involvement in the sex-trafficking venture including specific false denials of their role in the Epstein Enterprise, making themselves out to be mere outside advisors to Epstein—but as further described below, Indyke and Kahn have since been exposed as part of Epstein's inner most circle, and key facilitators of sex trafficking.

4

12. As further detailed below, Indyke and Kahn worked closely with Epstein through every step of the sex trafficking operation's expansion and growth. Defendants hid their integral involvement with the Epstein Enterprise from Bensky, Jane Doe 3, and the Class through concealments, false denials, and other efforts.

## II. JURISDICTION, VENUE, AND TIMELINESS

13. This action is brought pursuant to various federal and state statues, including the federal TVPA, 18 U.S.C. § 1589 through § 1595. This Court has federal question subject-matter jurisdiction pursuant to 28 U.S.C. § 1331 because Danielle Bensky and Jane Doe 3—individually and on behalf of the other Class members—proceed under the federal TVPA statute.

14. This Court also has supplemental jurisdiction over the state law claims recounted below pursuant to 28 U.S.C. § 1367(a) because all claims alleged herein are part of a uniform pattern and practice and form part of the same case or controversy.

15. This Court is "an appropriate district court of the United States" in accordance with 18 U.S.C. § 1595, in which to bring this action. Venue is proper in this District under 28 U.S.C. § 1391(b)(2), because Epstein, his co-conspirators, and Defendants all conducted substantial activities in this District and knowingly aided and abetted, facilitated, and directly participated in Epstein's illegal venture through actions that originated in this District. In addition, Epstein sexually abused and

trafficked Danielle Bensky and Jane Doe 3 and members of the Class in this District.

16.     Often these acts of sexual abuse and commercial sex acts, committed by Jeffrey Epstein and certain select friends of his, took place in Jeffrey Epstein's New York mansion, located within this District at 9 East 71st Street in New York City. Epstein also used his New York mansion and numerous apartment units he owned at 301 East 66th Street in New York City to harbor his victims and as a base from which to transport them to other locations outside of New York.

17.     A substantial part of the acts, events, and omissions giving rise to this cause of action occurred in this District.

18.     This action has been timely filed pursuant to 18 U.S.C. § 1595(c)(1), which provides that a plaintiff shall have ten years after the cause of action arose to file suit against any person who knowingly benefits, financially or by receiving anything of value from participation in a venture which that person knew or should have known violated the laws against sex trafficking. This action is also timely because the conspiracy, including the conspiracy to conceal the illegal conduct and Defendants' role in it, continued until and after Jeffrey Epstein's death in 2019. This action is also timely under New York's Adult Survivors Act, N.Y. CPLR § 214-j.

### III.     PARTIES

19.     Danielle Bensky is a U.S. citizen and was at all relevant times a resident of and domiciled in the State of New York.

20.    Jane Doe 3 is a citizen of the European Union, but at relevant times was abused in the State of New York.

21.    Jane Doe 3 is using a pseudonym to protect her identity because of the sensitive and highly personal nature of this matter, which involves sexual assault.

22.    Jane Doe 3 is also at serious risk of retaliatory harm because the co-conspirators who participated in the Epstein sex-trafficking venture had—and continue to possess—tremendous wealth and power and have demonstrated a clear ability to cause her serious harm.

23.    Jane Doe 3's safety, right to privacy, and security outweigh the public interest in her identification.

24.    Jane Doe 3's legitimate concerns outweigh any prejudice to Defendants by allowing her to proceed anonymously.

25.    Defendant Darren K. Indyke is co-executor of the Estate of Jeffrey E. Epstein and Administrator of The 1953 Trust and was a participant in Epstein's sex-trafficking operation.  Darren K. Indyke was Jeffrey Epstein's advisor and personal lawyer for many years, handling all of his personal affairs and business operations relating to his sex-trafficking operation.  Epstein referred to Indyke as his in-house counsel.  For many years, Indyke hid the extent of his personal involvement in the sex-trafficking operation.  Indyke is domiciled in Florida.

26.    Defendant Richard D. Kahn is co-executor of the Estate of Jeffrey E.

7

Epstein and Administrator of The 1953 Trust and was a participant in Epstein's sex-trafficking operation. Richard D. Kahn was Jeffrey Epstein's advisor and personal accountant who handled all of his personal accounting and financial services relating to his sex-trafficking operation. For many years, Kahn hid the extent of his personal involvement in the sex-trafficking operation. Kahn is domiciled in New York.

27.     Defendants' financial activities, including the events alleged herein, were in and affecting interstate and foreign commerce. In connection with the acts alleged in this complaint, Defendants, directly and indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of national securities markets.

## IV.    FACTUAL ALLEGATIONS

### A.    The Epstein Sex-Trafficking Enterprise and Conspiracy

28.     During all times relevant to this complaint, Jeffrey Epstein was an extraordinarily wealthy man with multiple residences in the United States, including a New York City mansion, a Palm Beach mansion, an apartment in France, and an island in the U.S. Virgin Islands.

29.     Beginning in and around 1995 and continuing through the summer of 2019, Jeffrey Epstein knowingly established and ran a sex-trafficking venture and

conspiracy in violation of 18 U.S.C. §§ 1591–95. As part of the Epstein Enterprise, Epstein used means of force, threats of force, fraud, coercion, abuse of legal process, and a combination of these means to cause young women and girls from many different states, and all over the world, to engage in commercial sex acts and to sexually abuse them.

30.    Epstein recruited, solicited, enticed, harbored, obtained, provided, and transported his victims to cause them to engage in commercial sex acts in ways that were in and affecting interstate and foreign commerce, including using means of interstate communications (such as cell phones) and means of interstate and foreign travel (such as aircraft that he owned and controlled).

31.    For example, the Epstein Enterprise owned multiple private planes that it used to transport victims around the world and to Epstein's various homes. On these planes, and through other means, the Epstein Enterprise transported victims across state boundaries between New York, Florida, New Mexico, New Jersey, Massachusetts, the U.S. Virgin Islands, and elsewhere, and in foreign commerce between the United States and Europe, especially Eastern Europe.

*(i) The Enterprise's Key Conspirators*

32.    In creating and maintaining this network of victims to sexually abuse and exploit, Epstein worked and conspired with others, including employees and associates who facilitated his conduct by, among other things, securing the cash to

9

finance the venture's operations; concealing the venture's operations; recruiting victims; housing and caring for victims; coercing victims, and scheduling their sexual abuse by Epstein at his New York mansion, his Palm Beach mansion, and his island in the U.S. Virgin Islands. Epstein and these other individuals also conspired to violate 18 U.S.C. § 1591.

33.     By (at the latest) 1995, Epstein's sex trafficking venture had crystalized into criminal conspiracy. By 1995, each victim was being forced to recruit other vulnerable victims and being paid, typically in cash, for each recruitment, creating a pyramid scheme of abuse. A Florida criminal investigation uncovered that the number of victims of Epstein's sex-trafficking conspiracy grew exponentially in and around the early 2000s.

34.     At all times relevant to this complaint, the Epstein sex-trafficking enterprise was a group of two or more individuals associated in fact, even if they were not a formal legal entity. Indeed, members of the Epstein sex-trafficking enterprise referred to it as "The Organization."

35.     Some of the key members of the Epstein Enterprise included Ghislaine Maxwell, who recruited girls for Epstein for many years, resulting in her later federal conviction, and Defendants Indyke and Kahn, Epstein's trusted attorney and accountant. Other members included Sarah Kellen, who also recruited girls for Epstein for many years and was in charge of scheduling young girls for Epstein's

10

massages and arranging for their travel; Lesley Groff, Epstein's secretary who made travel arrangements for the girls, tended to their living needs, and scheduled massage sessions; and Jean-Luc Brunel, a French modeling agent who assisted Epstein in procuring young girls from overseas by promising the girls, often from poor backgrounds, modeling opportunities.

*(ii) The Epstein Enterprise's Recruitment Methods*

36. Epstein and his co-conspirators used Epstein's vast (yet mysterious) wealth and connections to other rich and powerful individuals to lure victims into his home for seemingly innocuous activity. Victims were initially recruited to speak with an allegedly philanthropic Epstein and provide "massages" to him.

37. As part of the scheme, a female "recruiter" would approach a young female and strike up a conversation in an effort to quickly learn about the young female's background and any vulnerabilities they could expose. The recruiter would then manipulate the young female into coming back to one of Epstein's residences by offering the young female something she needed. At times, the recruiter's lure would be a modeling opportunity, money for education, help for the young female's family, and a whole host of other related offers depending on their target's situation.

38. Once in the residence, the recruiter and Epstein would work in concert to impress and intimidate the young female with displays of vast wealth, including having employees that were butlers and maids formally dressed around the house.

11

They would also strategically place photographs of very powerful political and social figures amongst photographs and paintings displaying nude females in an effort to normalize the sexual abuse.

39. Epstein and his co-conspirators would normalize the sexual abuse by placing a massage table and spa related products around the massage area in an effort to legitimize the area where the abuse was set to occur.

40. Once at the home and trapped in Epstein's bedroom, the victims would be instructed to remove their clothing. Epstein would then force the massages to become increasingly sexual in nature, typically including one or more forced sex acts. Epstein would use means of force, threats of force, and fraud to coerce and induce the victims to participate in these sex acts and to cause them to return and continue to engage in commercial sex acts with him.

41. In this District and at his various residences, Epstein perpetuated this pattern of abuse in similar ways, hundreds, perhaps thousands, of times.

42. Epstein actively coerced his victims to become recruiters themselves, forcing them to recruit additional girls to be similarly sexually abused and causing the number of victims to grow exponentially. Epstein incentivized his victims to become recruiters by paying these victim-recruiters hundreds of dollars for each girl that they brought to Epstein. In so doing, Epstein, through this system of paying victims to recruit others whom he would in turn pay to recruit others, maintained a

steady supply of new victims to exploit.

43.     This scheme of paying victims to recruit other victims worked effectively for Epstein, allowing expansion through the recruitment of other victims in a pyramid scheme or spiderweb fashion.

  (iii)     *The Enterprise's Coercion Methods*

44.     Once in his presence, each victim knew there was no option to disobey Epstein. It was well known and understood that he was one of the most powerful and connected people in the United States, able to help any of these young victims and capable and willing to seriously harm any of his victims if they disobeyed him.

45.     Epstein was skilled at ascertaining his victim's greatest fears and aspirations and targeted those fears and aspirations to coerce and trap his victims into performing commercial sex acts and to be subject to sexual abuse.

46.     Epstein masterfully assessed the specific needs and vulnerability of each of his targeted victims. He then closed the trap on his victims with false offers of money, food, shelter, medical care for them or family members, travel, schooling, and career opportunities.

47.     Epstein groomed the young women and girls, indoctrinating them to believe that the sexual abuse was normal. For example, Epstein constantly exposed the girls to nudity and sex to normalize his perverse sexual preferences. The walls of his homes were lined with photographs and paintings displaying nude females.

13

A search of his Palm Beach mansion revealed that Epstein kept soap in the shape of penises and vaginas in multiple bathrooms. The Palm Beach police also found numerous sex toys in the trash and around the mansion as well as an Amazon receipt for the purchase of three sex slave books about erotic servitude that Epstein likely kept in plain view for the girls to see.

48. Epstein fraudulently represented to the victims that he would take care of them in various ways, which ultimately allowed Epstein to cause them to engage in commercial sex acts with himself and, on occasion, select others, as well as to create the opportunity for Epstein to sexually abuse them. Victims were told that they should always act grateful and often received rewards and gifts for making Epstein orgasm, but were also scolded and threatened if they did not.

49. Epstein and his associates paid his victims hundreds of dollars in cash for each sexual encounter. Epstein also promised his victims with other things of value, including educational and career advancement, a place to live, and promises that Epstein would provide various forms of assistance. Epstein provided things of value to his victims in order to coerce them to engage in sex acts with him and on occasion his friends, co-conspirators, or other victims.

50. As another means of coercing victims to engage in commercial sex acts, Epstein and his co-conspirators fraudulently promised to further victims' educational or career aspirations if they would comply with his sexual demands.

14

These promises were a quid pro quo for the sex acts that occurred.

51.     Epstein and his co-conspirators also dangled coveted opportunities in front of their victims to keep them compliant.  Once they understood their victims' pasts and future aspirations, they would use that knowledge to get the girls to submit the sexual desires of Epstein and others.  Epstein provided housing to many young girls and aspiring models in a building on East 66th Street in Manhattan, along with car services and cell phones so he could track their every move.

52.     As one means of coercing victims to engage in commercial sex acts, Epstein and his co-conspirators would give his victims money to stay quiet about the assault or as a "finder's fee" for bringing other young women.  Epstein would also provide them with living accommodations, clothing, education, or other necessities, exploiting the vulnerabilities of his often poor and underprivileged victims.

53.     As another means of coercing victims to engage in commercial sex acts, Epstein and his co-conspirators often directly threatened the safety and livelihoods of their victims and any witnesses to their crimes.  Epstein's co-conspirators threatened any victim who attempted to cooperate with law enforcement.  Epstein and his lawyers would gather information about the girls to use against them if they ever disobeyed him.  His homes were also under constant surveillance, and his New York mansion had a room in which men that Epstein hired monitored what was happening in the home.

15

54.     Epstein also utilized his deep connections to powerful and politically connected individuals to intimidate and manipulate his victims of sexual abuse into compliance and silence. Epstein and his co-conspirators constantly bragged to the girls about his friendships with powerful people to remind them of his power and the consequences of disobeying him.

*(iv)     The Government's Failed Attempts at Ending the Enterprise*

55.     In 2005, the Palm Beach Police Department ("PBPD") received a complaint from parents of a 14-year-old girl involving sexual abuse by Jeffrey Epstein. After an investigation, the PBPD identified approximately 20 girls between the ages of 14 and 17 who Epstein sexually abused at his Palm Beach mansion.

56.     During that investigation, the government concluded that Epstein and his co-conspirators had committed federal criminal acts constituting violations of the TVPA and other federal laws, including 18 U.S.C §§ 2422(b), 2423(f), 2423(b), 2424 (e); 18 U.S.C § 371; 18 U.S.C §§ 1591(c)(1), 1591(a)(1), 1591(a)(2); as well as state crimes in violation of Florida Statutes §§ 796.07 and 796.03, against dozens of young women.

57.     As a consequence of the Florida investigation, Epstein pled guilty to soliciting a minor for prostitution, a second-degree felony, and to felony solicitation of prostitution, a third-degree felony; was permanently labeled a "Registered Sex Offender"; and agreed to serve 18 months in the county jail with work release for 12

16

hours a day, six days a week. Epstein entered into a non-prosecution agreement with the U.S. Attorney's Office for the Southern District of Florida barring his prosecution (and prosecution of his co-conspirators) for violations of the TVPA and other sex offenses in Florida.

58.     Epstein's criminal case in Florida and the many related news reports made clear Jeffrey Epstein's extraordinary penchant for sex abuse and trafficking of young females. For instance, it was reported that up until the time of his Florida arrest in July 2006, Epstein had been sexually abusing during that year and the previous year *three to four young females per day*.

59.     Beginning with his 2006 Florida arrest and for years moving forward, Epstein was embroiled in dozens of public lawsuits detailing his sexual abuse of females, and thousands of news stories circulated worldwide about his illegal sexual proclivities. These public allegations further made clear that Epstein was operating a sex-trafficking enterprise.

60.     In one publicly filed 2008 complaint in Palm Beach County Circuit Court, the plaintiff alleged:

> The Defendant, Jeffrey Epstein, developed a plan, scheme, and criminal enterprise that included an elaborate system wherein the then minor Plaintiff was brought to the Defendant, Jeffrey Epstein's residence by the Defendant's employees, recruiters, and assistants. When the assistants and employees left the then minor Plaintiff and other minor girls alone in a room at the Defendant's mansion, the Defendant, Jeffrey Epstein, himself would appear, remove his clothing, and direct the then minor Plaintiff to remove her clothing. He would then perform one or

17

more lewd, lascivious, and sexual acts, including, but not limited to, masturbation, touching of the then minor Plaintiff's sexual organs, coercing or forcing the then minor Plaintiff to perform oral sex on him, using vibrators or sexual toys on the then minor Plaintiff, coercing the then minor Plaintiff into sexual acts with himself or others, and digitally penetrating the then minor Plaintiff. He would then pay the Plaintiff for engaging in this sexual activity.

61.　In another complaint publicly filed in the United States District Court for the Southern District of Florida in 2010, the plaintiff alleged:

> Defendant's plan and scheme reflected a particular pattern and method. Defendant coerced and enticed impressionable, vulnerable, and relatively economically less fortunate minor girls to participate in various acts of sexual misconduct that he committed upon them. Defendant's scheme involved the use of underage girls, as well as other individuals, to recruit underage girls. Defendant and/or an authorized agent would call and alert Defendant's assistants shortly before or after he arrived at his Palm Beach residence. His assistants would call economically disadvantaged and underage girls from West Palm Beach and surrounding areas who would be enticed by the money being offered and who Defendant and/or his assistants perceived as less likely to complain to authorities or have credibility issues if allegations of improper conduct were made. The then minor Plaintiff and other minor girls, some as young as 14 years old, were transported to Defendant's Palm Beach mansion by Defendant's employees, agents, and/or assistants in order to provide Defendant with "massages."

62.　Epstein paid millions of dollars to settle sexual abuse lawsuits filed against him by many victims. And while he was paying to settle these claims, Epstein continued to abuse new victims—all facts known to Defendants, Epstein's trusted advisors.

63.　In addition to the many civil lawsuits seeking damages for sexual abuse, Epstein's victims also filed a public lawsuit against the Unites States under 18 U.S.C.

§ 3771, the Crime Victim's Rights Act ("CVRA"), further exposing Epstein's sexual crimes as well as his secret Non-Prosecution Agreement with the Federal Government.

64.     Epstein's aptitude as a sex-trafficker and appetite as a sexual abuser did not suffer because of his Florida incarceration in 2008. Even while he was in jail in Florida, Epstein brazenly continued to sexually abuse young girls and women from his work-release office.

65.     Once out of jail and off work release, Epstein continued to collect young women and lure them through force, fraud, and coercion into one of his mansions, primarily his townhouse located at 9 East 71 Street, New York, NY, where he would sexually abuse each one.

66.     After his guilty plea in Florida, Epstein began to focus on procuring and abusing women from Eastern Europe. These women's immigration status and language barriers made them more isolated, dependent, and vulnerable to Epstein's abuse and manipulation.

67.     On July 2, 2019, the United States Attorney's Office for the Southern District of New York filed a sealed, two-count Indictment against Epstein, including one count of sex trafficking conspiracy and one count of sex trafficking for violations of 18 U.S.C. § 1591, in part due to Epstein's criminal activities in his New York Mansion located at 9 East 71st Street. *See United States v. Jeffrey Epstein*, Case No.

19

1:19-cr-00490 (S.D.N.Y.).

68.     On July 8, 2019, Epstein was arrested pursuant to the New York Indictment.

69.     On August 10, 2019, prison guards found Epstein unresponsive in his Metropolitan Correctional Center jail cell, where was awaiting trial on the federal sex trafficking charges.  He was later pronounced dead from apparent suicide.

70.     In July 2020, Epstein's co-conspirator in the sex-trafficking venture, Maxwell, was arrested on federal sex-trafficking charges filed in the Southern District of New York.  The charges alleged that she had assisted, facilitated, and contributed to Epstein's abuse of sex-trafficking victims, helping Epstein to recruit, groom, and ultimately abuse his victims, including in New York City.  *See United States v. Maxwell*, Case No. 1:20-cr-00330 (S.D.N.Y.).

71.     On December 29, 2021, after a weeks-long jury trial during which witnesses testified about Epstein's sex-trafficking operation in some detail, Maxwell was found guilty on five federal sex-trafficking counts and is now serving nearly 20 years in federal prison for these crimes.

### B.    **Danielle Bensky's Abuse**

72.     Danielle Bensky was an aspiring dancer in New York City at the time she was first recruited by Epstein's sex-trafficking venture in 2004.

73.     A woman she knew approached Bensky and asked her to provide a

20

massage to a man in exchange for $300 dollars. That woman portrayed the massage a legitimate one at the time.

74. Bensky contacted that man's assistant, who set up an appointment to massage him at his New York mansion. That man was Jeffrey Epstein.

75. After being escorted through the mansion into a room with a massage table, Bensky began giving Epstein a massage with another woman. Epstein then demanded that Bensky take her clothes off, turned over, and began masturbating. Epstein then told Bensky to leave and, after the massage, paid her $300 in cash.

76. Afterwards, Bensky was called several times by Epstein's employees and associates to return for additional massages. Having been in awe of Epstein's mansion and Epstein's wealth and power, Bensky was terrified of what would happen to her if she refused.

77. Bensky returned several times. Each time she went to Epstein's mansion, he asked her to undress into her bra and underwear. Epstein masturbated during the massages, and also committed sexual assault on Bensky's body. Epstein fondled her breasts and other intimate parts of her body, and forced her to pinch his nipples.

78. After each massage, Epstein or one of his assistants would pay Bensky between $300 and $500 in cash.

79. At some point after Bensky first met Epstein, her mother was diagnosed

21

with a brain tumor. Because Epstein constantly asked Bensky personal questions, she told him about her mother's diagnosis. Epstein told Bensky that he was familiar with neurology, and asked her to bring in her mother's brain scans. Bensky did as Epstein asked, and she and Epstein looked at her mother's brain scans in his office. Epstein told Bensky that he knew the best surgeons in New York, but that if Bensky wanted Epstein to help her mother, then she would have to recruit other girls for him. Bensky refused. Epstein continued to tell Bensky that her mother would not receive key care unless Bensky did exactly as Epstein demanded.

80.    After Epstein knew about Bensky's mother's illness, he became more aggressive with her, recognizing that she was particularly vulnerable. On one occasion, Epstein demanded that Bensky get completely naked, and take off her bra and underwear. He then grabbed Bensky, used a vibrator on her vagina very forcefully causing great pain, and told her to "pretend" that she was enjoying it.

81.    On another occasion, Epstein grabbed Bensky and pressed her breasts into his leg, and asked him to massage his legs in that position.

82.    During and before the massages, Epstein asked Bensky questions about her career, what her goals were, and other personal questions. Knowing that Bensky was a ballerina, Epstein would brag about famous ballet dancers that he knew. He even falsely told Bensky that he had a dance studio in the New York mansion, and that if she was good and complied with all of his demands, he would let her practice

22

her ballet in the studio.

83. Bensky was abused by Epstein for approximately one year.

84. Epstein made very clear to Bensky that he was incredibly wealthy, powerful, and regularly in contact with world leaders.

85. During the massages, Epstein would talk about his connections to powerful people, and would often claim that he was talking on the phone with those people in front of Bensky. On one occasion, Epstein told Bensky that he was on the phone with Kevin Spacey. Epstein also told Bensky that he had friends in high places, but he "knew how they liked to party" so they would never betray him.

86. Further, in his New York mansion Epstein had photographs displayed of significant political figures to ensure that Bensky knew that he had extensive connections.

87. Epstein was not to be disobeyed and he made clear by his words and actions that there would be consequences if Bensky did not comply with his demands. She knew that reporting what had happened to her while Epstein was alive would have had severe consequences with regards to her physical safety, her family, and her career. She knew that she could not come forward until Epstein was dead.

88. In 2008, the FBI showed up at Bensky's home to speak with her about Epstein. Bensky was terrified to speak to them because she feared Epstein would hurt her if he found out she had spoken to the FBI. Bensky experienced incidents

23

that made her believe that Epstein was following her and could harm her.

89.     Bensky was deeply affected by the assault and she suffers severe emotional distress from an experience that has affected her for her entire life.

90.     Epstein's sexual assault and battery of Bensky continues to cause her significant distress and harm.

91.     Epstein and his co-conspirators had a long history of grooming, indoctrinating, controlling, and ultimately committing sexual offenses against young, vulnerable women like Bensky. Epstein and his co-conspirators constantly reminded Bensky how powerful and important Epstein was. Bensky was chastised if she refused Epstein's sexual demands and told she should be grateful that Epstein was willing to help her with her career and education. She came to believe what she was told.

92.     The well-oiled Epstein sex abuse and trafficking venture included frequent statements to Bensky and other victims by Epstein and his co-conspirators that: (1) Epstein possessed extraordinary wealth, power and influence; (2) Epstein's business and political friends, including world leaders, also included some of the most powerful people in the world; (3) Epstein had the ability to advance or destroy nearly anyone financially, reputationally, and otherwise; (4) medical and other life necessities would be denied victims if they, including Bensky, failed to perform commercial sex acts for Epstein; and (5) Epstein could take away Bensky's and other

victims' life necessities such as shelter or housing if she or they failed to perform those acts.

93.    Epstein's sex-trafficking venture targeted vulnerable young women and Bensky was soon indoctrinated and unable to extricate herself.   Having been conditioned that the sexual abuse was "normal" and knowing that everyone surrounding Epstein, including accountants (such as Defendant Kahn), lawyers (such as Defendant Indyke), and other important people, were aware of the sex abuse, Bensky was coerced into a cult-like life controlled and manipulated by Epstein and others doing Epstein's bidding.

94.    Epstein's sexual abuse against Bensky was in direct violation of Article 130 of New York's Penal Law and the GMVPA.

95.    Epstein used means of force, threats of force, fraud, coercion, abuse of process, and a combination of such means to cause Bensky to engage in commercial sex acts.

96.    Epstein recruited Bensky to cause and force her to engage in commercial sex acts in ways that were in and affecting interstate and foreign commerce, including use of cell phones and means of interstate transportation (such as aircraft that he owned or controlled).

97.    Bensky wanted to escape from the Epstein sex-trafficking venture, yet Epstein and his supporting team of co-conspirators used fraud, force, and coercion

to cause her to remain compliant in fulfilling Epstein's sexual demands.

98.     Jeffrey Epstein controlled Bensky financially, emotionally, and psychologically.  He used his knowledge of Bensky's aspirations, fears, and problems to manipulate her until she was completely controlled by and dependent upon him.

99.     Epstein and his co-conspirators, including Defendants, withdrew large sums of cash to make payments to victims, including Bensky, in furtherance of the sex-trafficking operation.

100.    Bensky was regularly paid cash by Epstein or one of his co-conspirators that was withdrawn from one of Epstein's accounts Defendant Indyke was a signatory on.

101.    Over the next year, Epstein threatened Bensky in many ways including threatening that if she did not abide by his demands, her mother would not get the medical treatment she needed for her brain tumor.

**C.      Jane Doe 3's Abuse**

102.    Under the ruse that he was interested in helping her, Epstein paid for Jane Doe 3 to fly from Europe to New York, where he instructed her to stay in one of his 301 East 66th Street apartments.

103.    While in New York, she was constantly badgered by Epstein and his employees to "loosen up" and "relax" when she declined to talk explicitly about sex.

104.   On one occasion while in Epstein's New York home, Jane Doe 3 was riding in an elevator with Epstein and another woman.   When they got out of the elevator and entered into Epstein's massage room, Epstein had the other girl perform oral sex on him while forcing Jane Doe 3 to watch in close proximity.   Epstein kept trying to get Jane Doe 3 to join in on the oral sex and kiss the other girl.   When Jane Doe 3 refused, Epstein started to forcibly touch Jane Doe 3 without her consent on her breasts and below the waist.

105.   On another occasion, Epstein and Jane Doe 3 were in one of the rooms in Epstein's New York home.   Suddenly, Epstein pushed Jane Doe 3 down and forced her to perform oral sex on him.   Epstein also touched her below the waist and digitally penetrated her without her consent.

106.   On another occasion, Epstein and Jane Doe 3 were riding in Epstein's car in New York.   Suddenly, Epstein touched Jane Doe 3 below the waist and digitally penetrated her without her consent.

107.   While in New York, Jane Doe 3 was directed to go to Epstein's office in New York to receive cash from Epstein's employees on more than one occasion.

108.   Epstein would frequently become angry with Jane Doe 3 when she would refuse his sexual advances.

109.   In 2014, Epstein lured Jane Doe 3 to travel with him to several locations where either he or Ghislaine Maxwell had homes.

27

110. On one occasion, Jane Doe 3 agreed to watch a movie with Epstein and another woman. Epstein began touching the other woman's breasts and then started touching Jane Doe 3's breasts without her consent.

111. Epstein also lured Jane Doe 3 to a secluded location and instructed Jane Doe 3 to allow Epstein to be her "sex mentor." When Jane Doe 3 declined, Epstein held her down and pressed a sex toy on her genitals while she cried, refusing to stop until he was satisfied she had orgasmed.

112. On another trip, Epstein snuck into Jane Doe 3's room at night while she was sleeping and forced his fingers inside her genitals.

113. Later, Epstein again lured Jane Doe 3 to meet him abroad. During that trip, Epstein again snuck into Jane Doe 3's room at night while she was sleeping and raped her, forcing her to perform oral and vaginal sex.

114. After this final abuse, Jane Doe 3 cut off contact with him and his co-conspirators.

115. Epstein and his co-conspirators had a long history of grooming, indoctrinating, controlling, and ultimately committing sexual offenses against young, vulnerable women like Jane Doe 3. Epstein and his co-conspirators constantly reminded Jane Doe 3 how powerful and important Epstein was. Jane Doe 3 was chastised if she refused Epstein's sexual demands and told she should be grateful that Epstein was willing to help her. She came to believe what she was told.

28

116. The well-oiled Epstein sex abuse and trafficking venture included frequent statements to Jane Doe 3 and other victims by Epstein and his co-conspirators that: (1) Epstein possessed extraordinary wealth, power and influence; (2) Epstein's business and political friends, including world leaders, also included some of the most powerful people in the world; (3) Epstein had the ability to advance or destroy nearly anyone financially, reputationally, and otherwise; (4) life necessities would be denied victims if they, including Jane Doe 3, failed to perform commercial sex acts for Epstein; and (5) Epstein could take away Jane Doe 3's and other victims' life necessities such as shelter or housing if she or they failed to perform those acts.

117. Epstein's sex-trafficking venture targeted vulnerable young women and Jane Doe 3 was soon indoctrinated and unable to extricate herself. Having been conditioned that the sexual abuse was "normal" and knowing that everyone surrounding Epstein, including accountants (such as Defendant Kahn), lawyers (such as Defendant Indyke), and other important people, were aware of the sex abuse, Jane Doe 3 was coerced into a cult-like life controlled and manipulated by Epstein and others doing Epstein's bidding.

118. Epstein's sexual abuse against Jane Doe 3 was in direct violation of Article 130 of New York's Penal Law and the GMVPA.

119. Epstein used means of force, threats of force, fraud, coercion, abuse of

29

process, and a combination of such means to cause Jane Doe 3 to engage in commercial sex acts.

120. Epstein recruited Jane Doe 3 to cause and force her to engage in commercial sex acts in ways that were in and affecting interstate and foreign commerce, including use of cell phones and means of interstate transportation (such as aircraft that he owned or controlled).

121. Jane Doe 3 wanted to escape from the Epstein sex-trafficking enterprise, yet Epstein and his supporting team of co-conspirators used fraud, force, and coercion to cause her to remain compliant in fulfilling Epstein's sexual demands.

122. Jeffrey Epstein controlled Jane Doe 3 financially, emotionally, and psychologically. He used his knowledge of Jane Doe 3's aspirations, fears, and problems to manipulate her until she was completely controlled by and dependent upon him.

123. Epstein and his co-conspirators, including Defendants, withdrew large sums of cash to make payments to victims, including Jane Doe 3, in furtherance of the sex-trafficking operation.

124. Jane Doe 3 was paid cash by Epstein or one of his co-conspirators that was withdrawn from one of Epstein's accounts Defendant Indyke was a signatory on.

125. Jane Doe 3 was deeply affected by the assault and she suffers severe

30

emotional distress from an experience that has affected her for her entire life.

### D. Defendants' Roles in the Epstein Sex-Trafficking Enterprise

*(i) Access to Cash*

126. One of the functions of Indyke and Kahn was to ensure that Epstein always had reliable access to resources from banks—including cash—to recruit, lure, coerce, and entice young women and girls to cause them to engage in commercial sex acts and other degradations, and to pay off persons who might otherwise reveal what was going on.

127. Indyke and Kahn themselves repeatedly obtained large stacks of cash for Epstein—including through ATMs, checks, or by converting currency—which, funded Epstein's cash payments for his sex-trafficking enterprise.

128. A 2020 Consent Order from the New York State Department of Financial Services ("DFS Consent Order") highlighted Defendants' role as to Epstein's bank accounts. The DFS Consent Order included various specific findings about the conduct of two individuals referred to "ACCOUNTANT-1" and "ATTORNEY-1." Plaintiffs believe ACCOUNTANT-1 is either Defendant Kahn or another accountant working under Kahn's direction at his small accounting firm, and ATTORNEY-1 is Defendant Indyke.

129. As described by the DFS Consent Order:

Mr. Epstein's personal attorney (herein, 'ATTORNEY-1'), was active in withdrawing cash for Mr. Epstein. ATTORNEY-1, on behalf of Mr.

31

Epstein, made a total of 97 withdrawals from the Bank's Park Avenue (New York City) Branch from 2013 to 2017 from personal accounts belonging to Mr. Epstein. The transactions in question occurred roughly two to three times per month, all in the amount of $7,500 per withdrawal, the Bank's limit for third-party withdrawals (i.e., withdrawals made by an authorized user who is not a primary account holder). When Bank personnel asked ATTORNEY-1 why Epstein needed cash, ATTORNEY-1 replied Epstein used it for travel, tipping and expenses.

130. Between 2014 to 2016 alone, Indyke made over 40 separate check-cashing withdrawals at a pace of two to three per month, each for the amount of $7,500, which was the bank's limit for third-party withdrawals.

131. On January 17, 2018, Indyke cashed a check for $100,000, and Kahn coordinated with the bank to make sure to have cash ready for pick up. As described by the DFS Consent Order:

In 2018, just prior to the Bank's closing of the Park Avenue Branch, which was located nearby Mr. Epstein's house, ATTORNEY-1 withdrew $100,000.00 in cash on behalf of Mr. Epstein. When later questioned why ATTORNEY-1 withdrew these sums from the Bank, ATTORNEY-1 reported that Mr. Epstein needed the funds for tipping and household expenses. . . . In total, in a roughly four-year period, ATTORNEY-1 withdrew on Mr. Epstein's behalf more than $800,000 in cash from Mr. Epstein's personal accounts.

132. In addition, from June 2018 to February 2019, there was a series of at least 97 separate withdrawals of $1,000 made from an Epstein account for which Indyke was a signatory, all taken from an ATM a short walk from Indyke's law office at the time. From this same account, Indyke wrote 11 checks, between April 2016 and April 2019, for the purpose of converting U.S. dollars to Euros totaling

32

over $126,000.

133. Without exorbitantly large amounts of cash procured by Defendants, Epstein's operation could not effectively operate. Newly recruited victims were each paid hundreds of dollars in cash immediately after Epstein sexually abused them, as hush money. Each victim was also informed that she would be paid hundreds of dollars in cash for each additional victim she recruited, and Epstein made good on those promises of large cash payments to keep his victims quiet and complicit.

134. If Epstein paid every victim with wire transfers or checks and left a documented money trail, his illegal sexual abuse and sex trafficking operation would have been easily uncovered; however, with access to unlimited amounts of cash procured by Defendants, Epstein was able to commit the most egregious sexual crimes many times a day without leaving a paper trail.

*(ii) Evading Law Enforcement*

135. Indyke and Kahn also assisted Epstein in concealing Epstein's illegal activity and avoiding detection by law enforcement, including by repeatedly structuring their cash withdrawals for Epstein to evade banking reporting requirements. Defendants' concealment was knowingly and explicitly to permit the continuing expansion of Epstein's sex trafficking.

136. The DFS Consent Order highlighted Defendants' role in seeking to

avoid detection by law enforcement of his illegal activities.

137. On July 20, 2016, Indyke brought two checks to a branch teller window for withdrawal, one for $7,500 drawn on Epstein's personal account and one for $4,000 drawn on Defendant Indyke's business account. However, Defendant Indyke only cashed the $7,500 check that day and returned the next day to cash the $4,000 check, to avoid reporting paperwork.

138. On another occasion, and despite numerous publications describing Epstein's sex trafficking, ACCOUNTANT-1 provided false reasons for massive cash withdrawals from Epstein's accounts:

> In a May 2018 email, a compliance officer submitted an inquiry to RELATIONSHIP MANAGER-2 about payments to the accounts of women with Eastern European surnames at a Russian bank, and asking for an explanation of the purpose of the wire transactions and Epstein's relationship with the counterparties. After submitting the questions to ACCOUNTANT-1, RELATIONSHIP MANAGER-2 forwarded ACCOUNTANT-1's response to the compliance officer, which read "SENT TO A FRIEND FOR TUITION FOR SCHOOL.

139. The DFS Consent Order documents how ATTORNEY-1 probed the bank's policy on how closely it monitored cash withdrawals:

> In May 2014, ATTORNEY-1 inquired into how often he could withdraw cash on behalf of Mr. Epstein without triggering an alert." Then, "[i]n 2017, ATTORNEY-1 again inquired about triggering an alert. Specifically, in July 2017, ATTORNEY-1 had, among other things, asked a teller whether a withdrawal transaction in excess of $10,000 would require reporting and, upon being advised that it would, broke up the withdrawal transaction over two days.

140. When Epstein was terminated from one of his banking institutions due

to the widespread allegations of sex trafficking against him, Indyke conspired to get the bank to write Epstein a reference letter for Epstein's next banking institution and to falsely claim that there were no issues detected with Epstein's account. Defendants were integral to ensuring that Epstein always had access to large amounts of cash.

141.    Indyke and Kahn also conspired to assist Epstein in evading banks running diligence reports on him for the purpose and effect of concealing Epstein's sex trafficking and permitting that sex trafficking to continue. As described in the DFS Consent Order, in one instance, ACCOUNTANT-1 withdrew Epstein's name from a non-profit's brokerage account to avoid a due diligence report being run on Epstein:

> On January 4, 2016, an accountant representing Mr. Epstein (herein, 'ACCOUNTANT-1') requested that the Bank open a brokerage account for Gratitude America, Mr. Epstein's private charity. COVERAGE TEAM MEMBER-1 escalated the request to AML OFFICER-2, who directed the inquiry to the Secretary for the ARRC. The Secretary of the ARRC conferred with a member of the ARRC and ordered that an external due diligence report be prepared on Mr. Epstein. In response to the request for additional information, ACCOUNTANT-1 informed the Bank of Mr. Epstein's resignation from Gratitude America and withdrew the request to open the account. As a result, no due diligence report was run on Mr. Epstein.

142.    These specific instances illustrate Defendants' practice of facilitating and protecting Epstein's ability to use his various bank accounts (under various sham entities) to continue his sex-trafficking enterprise.

143. Indyke and Kahn conspired to assist Epstein in settling with many victims who he harmed over the years to keep the sex-trafficking operation quiet.

*(iii)      Facilitation of Payments*

144. Defendants also directed, approved, enabled, and justified millions of dollars in payments that fueled the Epstein sex-trafficking enterprise, including payments to women who were forced to have sex with Epstein and/or recruited others to be victimized, recruiters, and, Plaintiffs believe, to maintain the immigration status of victims of the Epstein sex-trafficking enterprise.

145. Defendants (at least one of them, but often both) had power of attorney or signatory authority over virtually all of the accounts held by Epstein, which allowed them to personally authorize and sign off on payments totaling hundreds of thousands of dollars to Epstein's victims, including but not limited to recruiting compensation, legal fees, apartment rent, and tuition.

146. At least one Defendant was a signatory on over 130 different bank accounts for Epstein and Epstein-owned entities, many of which existed only to transfer payments to other entities and other expenses.

147. Between 2016 and 2019, Indyke made wire transfers from Epstein's personal accounts to victims and entities to facilitate the Epstein sex-trafficking enterprise.

148. Defendants oversaw over $2,500,000 in payments from a single

account (and millions more from other accounts) in which Defendant Indyke was a signatory to dozens of women with Eastern European surnames, purportedly for hotel expenses, rent, and other expenses, and to an immigration lawyer who was involved in forced marriages arranged among Epstein's victims to secure victims' immigration status.

149. Indyke and Kahn signed checks for LSJE, LLC—an entity for which they were authorized signatories—for combined value of almost $300,000 made out personally to young women or, as further described below, to the immigration lawyer in New York who was involved in one or more forced marriages arranged among Epstein's victims to secure a victim's immigration status.

*(iv)* *Control over Corporate Entities*

150. Defendants organized, controlled, and directed almost every aspect of the Epstein sex-trafficking enterprise. They were officers of virtually every corporate entity that Epstein created to fund and conceal his activities and had signatory authority as to those entities. They were deeply involved in the financial activities of the Epstein-owned entities, and were paid for their loyalty and assistance.

151. Indeed, Epstein paid for Indyke to go to law school and obtain a license to practice law for the sole purpose of obtaining his assistance with carrying out the Epstein Enterprise.

152. Corporate filings indicate that one, and frequently both, Defendants were involved in the creation and/or management of several of Epstein's sham entities, including the C.O.U.Q. Foundation, Gratitude America Ltd., the J. Epstein Virgin Islands Foundation; FT Real Estate Inc.; Hyperion Air, Inc.; Jeepers, Inc.; Mort, Inc.; and Zorro Development Corporation. Just as Epstein himself had no discernible profession, none of these sham entities had any real business purpose other than facilitating sex trafficking.

153. Indyke and Kahn were also officers of the corporate entities that held the real estate on which Epstein abused countless victims:

     a. Nautilus, Inc., is the corporate entity that owned Epstein's private island "Little St. James" in the U.S. Virgin Islands, where countless of Epstein's victims were transported, harbored, and abused. Epstein engaged in a pattern and practice of trafficking and sexually abusing victims on this private, secluded island where Epstein and his associates could avoid detection of their illegal activity and prevent victims from leaving freely and escaping the abuse. Thus, Nautilus, Inc. participated in carrying out, facilitating and concealing Epstein's crimes. At all relevant times, Indyke and Kahn were the secretary and treasurer of Nautilus, Inc., respectively.

     b. Poplar, Inc., is a corporate entity that had signatory authority over

Great St. Jim, LLC, which held title to another set of properties that Epstein owned in the U.S. Virgin Islands, which were the islands closest to Little St. James. Epstein purchased these properties to further shield his conduct on Little St. James from view, prevent his detection by law enforcement or the public, and allow him to continue and conceal his criminal enterprise. Thus, Poplar, Inc. participated in carrying out, facilitating and concealing Epstein's crimes. At all relevant times, Indyke and Kahn were the secretary and treasurer of Poplar, Inc., respectively.

c. Cypress Inc., is a corporate entity that owned the property 49 Zorro Ranch Road in Stanley, New Mexico, which the Epstein New Mexico property at which he transported, harbored, and abused countless victims. Thus, Cyrpus, Inc. participated in carrying out, facilitating and concealing Epstein's crimes. At all relevant times, Indyke and Kahn were listed, respectively, as Vice President/Secretary/Director and Treasurer/Director of Cypress, Inc.

d. Maple, Inc., is a corporate entity that owned the property at 9 East 71st Street in New York—Epstein's New York townhome at which he transported, harbored, and abused countless victims. Thus,

39

Maple, Inc. participated in carrying out, facilitating and concealing Epstein's crimes. At all relevant times, Indyke and Kahn were listed, respectively, as Vice President/Secretary/Director and Treasurer/Director of Maple, Inc.

e. Laurel, Inc., is a corporate entity that owned the property at 358 Brillo Way in Palm Beach, Florida—Epstein's Palm Beach mansion at which he transported, harbored, and abused countless victims. Thus, Laurel, Inc. participated in carrying out, facilitating and concealing Epstein's crimes. At all relevant times, Indyke and Kahn were listed, respectively, as Vice President/Secretary/Director and Treasurer/Director of Laurel, Inc.

f. Indyke and Kahn were also the secretary/director and treasurer/director of Southern Trust Company, Inc. Epstein used Southern Trust Company to open many of his bank accounts with his bank institutions, which Indyke and Kahn also controlled.

154. Kahn oversaw the accounting and tax reporting for many entities affiliated with the Epstein sex-trafficking enterprise and was aware of their purpose.

155. Defendants were appointed as officers in various 501(c)(3) organizations affiliated with the Epstein sex-trafficking enterprise. Defendants used the 501(c)(3) organizations to make payments to support the Epstein sex-trafficking

enterprise – payments that were designed to service the criminal activities of Epstein and that were inconsistent with the charitable purpose of any such foundations.

156.  Defendants controlled entities that were funded entirely by money transferred from Epstein's personal bank accounts.  Such entities were then utilized to facilitate the Epstein sex-trafficking enterprise by putting victims on the payroll and providing false reasons for the compensation to obscure the existence of the Epstein sex-trafficking enterprise.  Additionally, entities were used to pay for immigration legal fees and to pay various costs associated with the forced marriages used to keep victims available for Epstein's ongoing abuse.

157.  Defendants are also in sole control of Epstein's estate, and have been since his death.  On August 8, 2019, two days before his death and after his arrest, Epstein executed a last will and testament appointing his long-time co-conspirators Indyke and Kahn as the executors of his estate.  On August 15, 2019, five days after Epstein's death, Indyke and Kahn executed oaths of willingness to serve as executors of Epstein's estate.  As executors, Indyke and Kahn have approved the release of estate funds to pay for the legal fees and costs of other co-conspirators.

158.  Indyke and Kahn are also administrators and co-trustees of The 1953 Trust.  The 1953 Trust was created by Epstein, who "amended and restated" its terms only two days before his suicide—the same day on which he revised his last will and testament. Epstein's last will and testament transferred all of his "property, real and

41

personal, wherever situated" to The 1953 Trust. Indyke and Kahn, filed a Certificate of Trust in the Superior Court of the Virgin Islands for The Trust on August 26, 2019. Plaintiffs believe that Indyke and Kahn are compensated for their role as co-trustees of The 1953 Trust.

159. The Butterfly Trust was a trust created for the benefit of numerous persons who performed work for Epstein, including known co-conspirator Ghislaine Maxwell, young women with Eastern European surnames, and Defendants themselves. In addition to themselves being beneficiaries of the Butterfly Trust, Defendants were authorized signatories on the Butterfly Trust's checking account, a privilege they used to sign for checks totaling over $1,000,000 made out to young women, or their associated entities.

*(v) Arranging Sham Marriages*

160. Defendants participated with Epstein in coercing and inducing his sex-trafficking victims, in at least three cases, to enter into arranged and forced sham marriages in order to obtain immigration status for the foreign women so that they could continue to be available to Epstein for his abuse.

161. For example, Indyke assisted in placing one victim—who was repeatedly abused by Epstein and was forced to have sex with Epstein's friends—into an arranged marriage to another victim to prevent the other victim from being deported. Indyke and an immigration lawyer prepared the victim for

42

communications with U.S. immigration officials almost immediately after the wedding. Kahn provided a letter of reference for the immigration proceeding. When the victim inquired about getting divorced and leaving Epstein, Indyke tried to talk her out of a divorce and threatened that she would lose Epstein's protection.

162.  Various other victims were similarly forced into sham marriages to foreign victims to prevent their deportation. In each instance, Indyke and Kahn facilitated these sham marriages with their legal and accounting work.

*(vi)     Concealment of the Venture After Epstein's Death*

163.  The Epstein sex-trafficking enterprise operated throughout the world from in and around (at least) 1995 through (at least) in and around August 10, 2019, when Epstein died by apparent suicide. Through at least July 2020, and thereafter to and including the date of this complaint, members of the Epstein Enterprise, including Defendants, continued to further the Epstein Enterprise by concealing the activities and extent of the Epstein Enterprise from Bensky, Jane Doe 3, and the Class.

164.  For many years, Bensky, Jane Doe 3, and the Class did not know the extent of Defendants' personal involvement in the sex-trafficking operation, including due to the intentionally complex web of entities and conspirators that Epstein and Defendants used to obfuscate his operation. Moreover, Defendants publicly and privately denied their role in the Epstein Enterprise, including in March

43

of 2020, when Defendants publicly, and falsely, denied allegations that they were an integral part of the Epstein Enterprise. These false denials, and Defendants' other efforts and concealments, were made with the purpose and effect of being conveyed to and affecting, persons like Bensky, Jane Doe 3, and the Class, to conceal from such persons Defendants' complicity and liability. Defendants' false denials included denials that were made, and conspired to be made, under oath. Bensky, Jane Doe 3, and the Class learned of Defendants' personal involvement only through substantial additional litigation against Epstein's banking institutions.

### E. Defendants' Knowledge of the Epstein Sex-Trafficking Enterprise

165. There can be no doubt that Indyke and Kahn knew about the Epstein Enterprise and Epstein's sex-trafficking activities.

166. At all relevant times, Epstein maintained numerous apartment units at 301 East 66th Street in New York City, where Epstein's co-conspirators often stayed and which operated as stash houses where numerous victims were kept over the years.

167. Defendants knew of the 301 East 66th Street Epstein properties and knew that these units operated as victim stash houses. Defendants were frequent visitors to Epstein's various properties at all relevant times.

168. Indyke and Kahn also traveled on Epstein's private plane, on which he also often flew young victims. As recent as 2018, air traffic controllers and other

airport personnel reported seeing Epstein leave his plane with young girls some of whom appeared to be between the age of 11 and 18 years.

169.   As Epstein's lawyer and accountant, Defendants were personally aware that the majority of the corporate entities he had them create were shams created for the purposes of facilitating his sex-trafficking enterprise.  As individuals who created and/or managed several of those entities, and oversaw withdrawals and payments from their accounts, Defendants knew that there were no legitimate business reasons for those transactions.

170.   Not only did Defendants witness the trafficking firsthand, their constant proximity to Epstein, his residences, and his co-conspirators, together with the flood of public information concerning his illegal activities, make clear that they were well aware of Epstein's crimes.

171.   Moreover, in 2006 Epstein was publicly exposed for sexually abusing dozens of young women and girls, several as young as 14 years old.  There were hundreds of pages of police reports and news articles revealing that Epstein was a serial sexual abuser and trafficker, and that his operation depended on his accessing nearly unlimited cash to use as payments to his victims.

172.   With respect to the specific discoveries, the authorities found that some of the victims "went to Mr. Epstein's house only once, some went there as much as 100 times or more."

173. It was publicly revealed in the investigation that Epstein was sexually abusing three to four young females every single day of his life and that he was paying each victim hundreds of dollars in hush money, usually in cash.

174. At this point (and earlier), Defendants knew that Epstein was an international sex trafficker.

175. Defendants knew about Epstein's arrest in 2006 and his subsequent guilty plea for sex-related offenses and had been assisting with his trafficking operation prior to his arrest.

176. During Epstein's imprisonment, Indyke visited Epstein nearly 40 times.

177. After his arrest, dozens of public lawsuits were filed against Epstein, revealing greater details of Epstein's sexual abuse of young women. The lawsuits detailed millions in payments that Epstein was making to recruiters, co-conspirators, and his victims.

178. Through the civil lawsuits, evidence (such as the previously referenced message pads) taken from Epstein's trash by police or through prior search warrants, as well as flight logs and black books began to publicly surface, shedding further public light on the expansiveness of Epstein's sex-trafficking operation.

179. Defendants (acting as Epstein's lawyer and accountant) were also personally involved in Epstein's civil settlements with victims.

180. In the summer of 2008, Epstein's Non-Prosecution Agreement

46

("NPA") with the U.S. Department of Justice was made public when it was unsealed in connection with a challenge to the NPA by two of his victims. Among other things, the agreement outlined the possible federal sex offense charges that could have resulted from the investigation, including TVPA charges.

181. Epstein's victims' court challenge against Epstein's federal NPA also continued between 2008 and 2013 (and beyond) and attracted significant media attention. Indeed, between around 2006 and 2013, hundreds of press reports outlined the allegations underlying the NPA and to varying degrees detailed the involvement of Epstein's alleged co-conspirators.

182. Additionally, press reports during this time noted allegations that Epstein was involved with Eastern European women in particular and that a modeling agency he helped develop with his friend and known sexual abuser, Jean Luc Brunel, brought "young girls . . . often from Eastern Europe" to the U.S. on Epstein's private jets.

183. Defendants also assisted Epstein in hiding his sex-trafficking scheme from authorities, demonstrating their knowledge of Epstein's illegal activities. For example, in addition to himself withdrawing massive amounts of cash for Epstein, Indyke helped Epstein structure those cash withdrawals from Epstein's banks so that Indyke could withdraw cash for Epstein to pay his victims without triggering the bank's duty to report the highly suspicious activity to authorities.

184. As DFS found, ATTORNEY-1—believed to be Indyke—was not only extremely active in making cash withdrawals for Epstein in rapid succession, but he also "inquired into how often he could withdraw cash on behalf of Mr. Epstein without triggering an alert" on multiple occasions, and provided Deutsche Bank with knowingly false explanations for the many cash transactions when bank employees inquired.

**F.**    **Defendants' Financial Incentives for Participating in the Epstein Enterprise**

185. From about 1995, Defendant Indyke financially benefited from his participation in Epstein sex-trafficking operation. From about 2005, Defendant Kahn financially benefited from his participation in Epstein sex-trafficking operation. Both Defendants were on Epstein's payroll for years, earning large sums of money for their assistance in carrying out the operation. Defendants chose to assist in carrying out and concealing the operation because they were getting paid by Epstein to do so.

186. Defendants were paid through multiple entities, including but not limited to HBRK Associates, Inc. (Kahn), Coatue Enterprises, LLC (Kahn), Birch Tree BR, LLC (Indyke), Harlequin Dane, LLC (Indyke), and Darren K Indyke, PLLC.

187. Even after Epstein died, Defendants have continued to enrich themselves for their participation in the Epstein sex-trafficking enterprise, having

approved the release of Epstein Estate funds through their role as Executors to pay their legal fees and costs. Just last year, the U.S. Virgin Islands alleged that Defendants received $13 million to the Butterfly Trust—more fully described above—in April 2020 after the liquidation of another investment fund in which Epstein had a stake.

188. Indyke and Kahn are each also entitled to compensation for serving as executors of Epstein's estate, pursuant to Epstein's last will and testament. In addition, Indyke and Kahn have fraudulently and improperly used their control of Epstein's estate to attempt to conceal their participation in the Epstein Enterprise and to protect themselves, including from civil lawsuits.

## V.    CLASS ACTION ALLEGATIONS

189. Danielle Bensky and Jane Doe 3 bring this action pursuant to Federal Rule of Civil Procedure 23(b)(3) and 23(c)(4) on behalf of herself and the following Class:

> All women who were sexually abused or trafficked by Jeffrey Epstein between January 1, 1995 and August 10, 2019, both dates inclusive (the "Class Period").

190. Danielle Bensky and Jane Doe 3 reserves the right to seek leave to modify this definition, including the addition of one or more subclasses, after having the opportunity to conduct discovery.

191. Numerosity: The Class consists of dozens of women, making joinder

impracticable, in satisfaction of Fed. R. Civ. P. 23(a)(1). The exact size of the Class and the identities of the individual Class members are ascertainable through records maintained by the Epstein Estate and Defendants.

192. Typicality: Danielle Bensky and Jane Doe 3's claims are typical of the claims of the other Class members they seek to represent. The claims of Danielle Bensky and Jane Doe 3 and the other Class members are based on the same legal theories and arise from the same unlawful pattern and practice of Defendants' participation in, conspiring to join in and assisting the sexual abuse and Epstein's sex-trafficking enterprise.

193. Commonality: There are many questions of law and fact common to the claims of Danielle Bensky and Jane Doe 3 and the other Class members. and those questions predominate over any questions that may affect only individual Class members, within the meaning of Fed. R. Civ. P. 23(a)(2) and (b)(3). Class treatment of common issues under Fed. R. Civ. P. 23(c)(4) will materially advance the litigation.

194. Common questions of fact and law affecting Class members include, but are not limited to, the following:

    a. Whether Epstein ran a sex-trafficking venture;

    b. Whether Defendants knew (or recklessly disregarded) that such a venture existed;

    c. Whether Defendants participated in, and facilitated and conspired to facilitate, Epstein's sex trafficking;

    d. Whether Defendants benefited financially or by receiving things of value from their participation in the venture;

    e. Whether Defendants obstructed the enforcement of the TVPA with respect to Epstein's sex-trafficking venture;

    f. Whether Defendants concealed and conspired to conceal Epstein's sex trafficking and their participation in it;

    g. Whether Defendants owed a duty of care to Epstein's victims; and

    h. Whether Defendants breached their duty of care to Epstein's victims.

195. Absent a class action, most of the Class members would find the cost of litigating their claims to be cost-prohibitive and will have no effective remedy. The class treatment of common questions of law and fact is also superior to multiple individual actions or piecemeal litigation, in that it conserves the resources of the courts and the litigants and promotes consistency and efficiency of adjudication.

196. Adequacy: Danielle Bensky and Jane Doe 3 will fairly and adequately represent and protect the interests of the other Class members they seek to represent. Bensky and Jane Doe 3 have retained counsel with substantial experience in prosecuting complex litigation and class actions, including class actions against others alleged to have facilitated Epstein's sex-trafficking enterprise. Danielle

Bensky and Jane Doe 3 and their counsel are committed to vigorously prosecuting this action on behalf of the other Class members and have the financial resources to do so. Neither Danielle Bensky and Jane Doe 3 nor their counsel have any interests adverse to those of the other Class members.

197. This action has been brought and may properly be maintained as a class action against Defendants pursuant to Rule 23 of the Federal Rules of Civil Procedure because there is a well-defined community of interest in the litigation and the proposed Class is easily ascertainable from Defendants' records.

198. Superiority: A class action is superior to all other available methods for the fair and efficient adjudication of this controversy because:

    a. Joinder of all Class Members is impracticable;

    b. The prosecution of individual remedies by members of the Class will tend to establish inconsistent standards of conduct for Defendants and result in the impairment of Class Member's rights and the disposition of their interests through actions to which they were not parties;

    c. Class action treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of effort and expense that numerous individual actions would engender;

    d. Absent a class action, Class Members will continue to suffer losses and

be aggrieved and Defendants will escape liability for their criminal and tortious conduct and be able to continue to violate New York and federal law without remedy;

e. Class treatment of this action will cause an orderly and expeditious administration of class claims, economies of time, effort and expense will be fostered, and uniformity of decisions will be ensured;

f. Danielle Bensky and Jane Doe 3 and their counsel are unaware of any class action brought against Defendants by victims for the violations alleged in this action;

g. The forum is desirable because Danielle Bensky and Jane Doe 3 conducted the subject business with Jeffrey Epstein in this District and Class Members were consequently trafficked in this District; and,

h. This action presents no difficulty that would impede its management by the Court as a class action.

## VI. CAUSES OF ACTION

## COUNT I: AIDING, ABETTING, AND FACILITATING BATTERY

199. Plaintiffs Danielle Bensky and Jane Doe 3 reallege and incorporate by reference paragraphs 1 – 198, as if fully set forth in this Count.

200. Danielle Bensky and Jane Doe 3 bring this Count individually and on behalf of the other Class Members they respectively seek to represent.

53

130 Crimes against Danielle Bensky and Jane Doe 3 and the Class Members, causing physical harm and in themselves constituted physical harm to Danielle Bensky and Jane Doe 3 and the Class Members. Defendants owed Danielle Bensky and Jane Doe 3 and the Class Members a duty not to set those forces in motion because they unreasonably created a risk of physical harm.

227. Defendants reasonably could foresee, and did in fact foresee, that their negligent failure to prevent physical harm would result in physical harm to Danielle Bensky and Jane Doe 3 and the Class Members. Defendants owed a duty to prevent that physical harm.

228. Defendants failed to act objectively reasonably in failing to take precautions to prevent Epstein's intentional tortious conduct and sex-trafficking and sex crimes in violation of Chapter 130, which were committed against Danielle Bensky and Jane Doe 3 and the Class Members. If Defendants had acted reasonably to prevent physical harm, they would not have supported and allowed Epstein's tortious conduct and sex-trafficking and sex crimes to occur. Defendants owed Danielle Bensky and Jane Doe 3 and the Class members a duty to act objectively reasonably.

229. At the time of Defendants' own negligent conduct, Defendants both realized and should have realized the likelihood that they were creating an opportunity for Epstein to commit intentional tortious conduct and Chapter 130

61

Crimes against Danielle Bensky and Jane Doe 3 and the Class Members. Indeed, Defendants knew that their own conduct was necessary to create Epstein's opportunities to engage in that conduct and commit those crimes. Defendants owed Danielle Bensky and Jane Doe 3 and the Class Members a duty not to create those opportunities for Epstein.

230. Defendants' breaches of their legal duties were the direct—*i.e.*, the but-for—cause of physical and psychological injuries to Danielle Bensky and Jane Doe 3 and the Class Members. Without Defendants' breaches of legal duties, those injuries would not have occurred. The injuries that occurred were readily foreseeable to Defendants.

231. Danielle Bensky and Jane Doe 3 and the Class Members were easily within the zone of foreseeable harm from the Defendants' negligent acts and omissions. Defendants' negligent acts and omissions foreseeably created substantial risk of Jeffrey Epstein and his co-conspirators committing sex crimes against young women with whom he was in contact. Tragically, Danielle Bensky and Jane Doe 3 and the Class Members fell within that zone.

232. Because of Defendants' negligent failure to prevent physical harm to Danielle Bensky and Jane Doe 3 and the Class Members, they are liable to Danielle Bensky and Jane Doe 3 and the Class Members for damages suffered as a direct and proximate result.

233. As a direct and proximate result of Defendants' negligent failure to prevent physical harm, Danielle Bensky and Jane Doe 3 and the Class Members have in the past and will in the future continue to suffer substantial damages from psychological and physical injury, including extreme emotional distress, humiliation, fear, psychological trauma, loss of dignity and self-esteem, and invasion of privacy. Defendants' aiding, abetting, and facilitating Epstein's tortious conduct and sex crimes in violation of Chapter 130 directly and proximately caused Epstein's sex crimes.

234. By virtue of acting intentionally, outrageously, and with a high degree of moral turpitude and demonstrating such wanton dishonesty as to imply a criminal indifference to civil obligations, Defendants are liable to Danielle Bensky and Jane Doe 3 and the Class for punitive damages.

## COUNT IV: PARTICIPATION IN A SEX-TRAFFICKING VENTURE IN VIOLATION OF THE TRAFFICKING VICTIMS PROTECTION ACT, 18 U.S.C. §§ 1591(a)(2), 1595

235. Plaintiffs Danielle Bensky and Jane Doe 3 reallege and incorporate by reference paragraphs 1 – 198, as if fully set forth in this Count.

236. Danielle Bensky and Jane Doe 3 bring this Count individually and on behalf of the other Class Members they respectively seek to represent.

237. Defendants knowingly and intentionally benefitted, financially and by receiving things of value, from participating in, assisting, supporting, and facilitating

an illegal coercive sex-trafficking venture that was in and affecting interstate and foreign commerce, together and with others, in violation of 18 U.S.C. § 1591(a)(2).

238. Defendants took many concrete steps to aid and participate in Epstein's sex-trafficking venture. Among the concrete steps that Defendants took to aid Epstein was providing legal, accounting services, and business-related services and support, which made the sex-trafficking venture possible. Defendants' willingness to provide their legal, accounting and business services was a quid pro quo for them receiving financial benefit from Epstein.

239. The services that Defendants provided was necessary for Epstein to coerce Danielle Bensky and Jane Doe 3 as well as other Class Members to engage in commercial sex acts. The services directly formed part of the commercial nature of the sex acts. The services were also a necessary and required part of Epstein's recruitment of Danielle Bensky and Jane Doe 3 and other victims of his sex-trafficking venture. By providing legal, accounting and business services that Defendants knew would be used to facilitate the sex trafficking venture, Defendants actively participated in the recruitment of victims of the venture.

240. The services that Defendants provided went far beyond providing routine legal, accounting and business services for a client.

241. Defendants providing services like, for example, assisting in creating sham marriages, creating sham companies to hide cash for the trafficking, assisting

64

with the withdraw of large sums of cash to facilitate the trafficking, and arranging payments for tuition for young girls all were entirely inconsistent with the ordinary duties of a lawyer and accountant.

242. The reason that Defendants ignored the trafficking conduct was to receive financial benefits from Epstein and his sex-trafficking venture.

243. Among the concrete steps that Defendants took to aid and participate in the Epstein sex-trafficking venture were opening numerous bank accounts and entities for Epstein, his related entities, and associates. By opening these accounts and entities, Defendants received many benefits from participating in Epstein's venture. The opening of these accounts and entities was affirmative conduct that caused Defendants to receive those benefits.

244. By taking the concrete steps outlined above (along with the others alleged in this complaint), Defendants knowingly participated in sex trafficking and furthered the Epstein sex-trafficking venture. The concrete steps above constituted taking part in the sex-trafficking venture and were necessary for its success. The concrete steps above constituted active engagement by Defendants in Epstein's sex-trafficking venture.

245. Defendants knowingly and intentionally benefited financially from, and received value for, their participation in the sex-trafficking venture, in which Epstein, with Defendants' knowledge, or its reckless disregard of the fact, that

65

Epstein would use means of force, threats of force, fraud, coercion, and a combination of such means to cause Danielle Bensky and Jane Doe 3, as well as other Class Members, some of whom were under the age of eighteen, to engage in commercial sex acts.

246. Defendants knew, and were in reckless disregard of the fact, that it was Epstein's pattern and practice to use the channels and instrumentalities of interstate and foreign commerce, to entice, recruit, solicit, harbor, provide, obtain, and transport young women and underage girls for purposes of causing commercial sex acts, in violation of 18 U.S.C. § 1591(a)(1).

247. Despite such knowledge, Defendants intentionally paid for, facilitated, and participated in Epstein's violations of 18 U.S.C. § 1591(a)(1), which Defendants knew, and were in reckless disregard of the fact that, Epstein would coerce, defraud, and force Danielle Bensky and Jane Doe 3, as well as other Class Members, to engage in commercial sex acts.

248. Defendants' affirmative conduct was committed knowingly, and in reckless disregard of the facts, that Epstein would use cash procured by Defendants, legal and accounting advice provided by Defendants, and other support provided by Defendants as a means of defrauding, forcing, and coercing sex acts from Danielle Bensky and Jane Doe 3 as well as other Class Members. Defendants' conduct was outrageous and intentional.

66

249. In addition to actual knowledge that they were participating in and facilitating the Epstein sex-trafficking venture, Defendants also should have known that they were participating in and facilitating a venture that had engaged in coercive sex trafficking, as covered by 18 U.S.C. § 1595(a).

250. Defendants' knowing and intentional conduct has caused Danielle Bensky and Jane Doe 3 and the other Class Members serious harm including, without limitation, physical, psychological, emotional, financial, and reputational harm.

251. Defendants' knowing and intentional conduct has caused Danielle Bensky and Jane Doe 3 and the other Class Members harm that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing commercial sexual activity, in order to avoid incurring that harm.

252. This case does not involve mere fraud. Instead, Defendants' criminal conduct in violating the TVPA was outrageous and intentional because it was in deliberate furtherance of a widespread and dangerous criminal sex trafficking organization. Defendants' criminal conduct also evinced a high degree of moral turpitude and demonstrated such wanton dishonesty as to imply a criminal indifference to civil obligations. Defendants' criminal conduct was directed specifically at Danielle Bensky and Jane Doe 3 and other members of the Class, who

were the victims of Epstein's sexual abuse and sex trafficking organization.

253. Defendants' outrageous and intentional conduct in this case is part of a pattern and practice of Defendants profiting by undertaking illegal "high risk, high reward" clients.

254. By virtue of these knowing and intentional violations of 18 U.S.C. §§ 1591(a)(2), 1595, Defendants are liable to Danielle Bensky and Jane Doe 3 and the Class for the damages they sustained and reasonable attorneys' fees.

255. By virtue of these intentional and outrageous violations of 18 U.S.C. §§ 1591(a)(2), 1595, Defendants are liable to Danielle Bensky and Jane Doe 3 and the Class for punitive damages.

## COUNT V: OBSTRUCTION OF THE ENFORCEMENT OF THE TRAFFICKING VICTIM PROTECTION ACT, 18 U.S.C. § 1591(d)

256. Plaintiffs Danielle Bensky and Jane Doe 3 reallege and incorporate by reference paragraphs 1 – 198, as if fully set forth in this Count.

257. Danielle Bensky and Jane Doe 3 bring this Count individually and on behalf of the other Class Members they respectively seek to represent.

258. Defendants knowingly and intentionally obstructed, attempted to obstruct, interfered with, and prevented the enforcement of 18 U.S.C. §§ 1591(a)(1) & (a)(2), all in violation of 18 U.S.C. § 1591(d). This activity is hereinafter referred to collectively simply as "obstruction."

259. Defendants' obstruction of the enforcement of 18 U.S.C. §§ 1591(a)(1)

68

and (a)(2) was forbidden by 18 U.S.C. § 1591(d), and Defendants thereby violated Chapter 77, Title 18. Defendants' obstruction described here and in the preceding paragraph directly, proximately, and foreseeably harmed Danielle Bensky and Jane Doe 3, as well as other members of the Class, by directly resulting in them coercively being caused to engage in commercial sex acts and in other ways.

260. As outlined above, the United States Department of Justice (including the U.S. Attorney's Office for the Southern District of New York and the U.S. Attorney's Office for the Southern District of Florida) was investigating Epstein's federal criminal liability for violating (among other laws) the TVPA up to and following the return of an indictment against Epstein on or about July 8, 2019. On or about that date, the U.S. Attorney's Office for the Southern District of New York indicted Epstein (and unnamed "associates") for violating the TVPA. Later, on about June 29, 2020, the same Office indicted Epstein's co-conspirator, Ghislaine Maxwell, for conspiracy to entice minor victims to travel to be abused by Epstein. The federal criminal investigation of Maxwell included investigation of possible violations of the TVPA.

261. Defendants obstructed, interfered with, and prevented the federal government's enforcement of the TVPA against Epstein. To the extent that the federal government was able to ultimately charge Epstein with TVPA violations, the filing of those charges was delayed by Defendants' actions. Because of that delay,

Bensky and Jane Doe 3 as well as other members of the Class, were coercively caused to engage in commercial sex acts.

262.  As one example of how Defendants obstructed, attempted to obstruct, interfered with, and prevented the federal government's enforcement of the TVPA, Defendants structured withdrawals of large amounts of cash to Epstein and his associates so that the coercive commercial sex acts would escape the detection of federal law enforcement and prosecuting agencies.  Defendants provided large amounts of cash to further the Epstein sex-trafficking venture and with the purpose of helping Epstein evade criminal liability for violating the TVPA.

263.  By procuring large amounts of cash to Epstein and his associates, Defendants intended and knew that Epstein's coercive commercial sex acts would escape the detection of federal law enforcement and prosecuting agencies for some period of time.  Defendants provided large amounts of cash to further the Epstein sex-trafficking venture and with the purpose of helping Epstein evade criminal liability for violating the TVPA.

264.  As another example, Defendants provided legal and accounting advice that created sham marriages and corporate structures that helped Epstein escape scrutiny.  But for Defendants' egregious, creative assistance of Epstein, he would not have been able to escape detection liability for violating the TVPA.

265.  Defendants' obstruction, attempted obstruction, interference with, and

prevention of the enforcement of the TVPA were all done intentionally and knowingly. For example, Defendants helped Epstein set up the Butterfly Trust to facilitate his abuse of women from Eastern Europe—specifically, to escape the increased scrutiny Epstein faced for U.S. based victims after his previous arrest and conviction, which made Epstein high risk to violate the TVPA through continuing criminal sex trafficking activities.

266.   Defendants were well aware that Epstein had pleaded guilty and served prison time for engaging in sex with a minor—a crime closely connected with sex trafficking in violation of the TVPA. Defendants were also well aware that there were public allegations that his illegal conduct was facilitated by several named co-conspirators. Defendants continued their affirmative conduct supporting the Epstein sex-trafficking venture to continue receiving personal financial enrichment. Defendants' intentional conduct obstructed, attempted to obstruct, in many ways interfered with, and prevented the enforcement of the TVPA by federal investigators and prosecuting agencies.

267.   Defendants' obstruction of the federal government's TVPA and other law enforcement efforts was intentional and willful and, therefore, Defendants intentionally and willfully caused Epstein's commission of the forcible commercial sex acts with Danielle Bensky and Jane Doe 3 and other Class Members through its obstruction supporting the concealment of Epstein's sex-trafficking venture.

71

Defendants knew that Epstein and his other co-conspirators would use means of force, threats of force fraud, coercion, and a combination of such means to cause Danielle Bensky and Jane Doe 3 and Class Members to engage in commercial sex acts.

268.  Defendants knew, acted in reckless disregard of the fact, and should have known, that their obstruction in violation of 18 U.S.C. § 1591(d) would directly and proximately lead to unlawful coercive commercial sex acts by Epstein with young women and girls, including Danielle Bensky and Jane Doe 3 and other Class Members.

269.  Defendants' obstruction has caused Danielle Bensky and Jane Doe 3 and other Class Members serious harm, including, without limitation, physical, psychological, financial, and reputational harm.  That harm was directly and proximately caused by the obstruction and the harm resulting from obstruction was foreseeable.

270.  Defendants' obstruction has caused Danielle Bensky and Jane Doe 3 harm that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing commercial sexual activity in order to avoid incurring that harm.

271.  This case does not involve mere fraud.  Instead, Defendants' criminal

conduct in obstructing enforcement of the TVPA was outrageous and intentional, because it was in deliberate furtherance of a widespread and dangerous criminal sex trafficking organization. Defendants' obstruction also evinced a high degree of moral turpitude and demonstrated such wanton dishonesty as to imply a criminal indifference to civil obligations. Defendants' obstruction was directed specifically at Danielle Bensky and Jane Doe 3 and other members of the Class, who were the victims of Epstein's sex trafficking organization.

272. By virtue of these violations of 18 U.S.C. § 1591(d), Defendants are liable to Danielle Bensky and Jane Doe 3 and the Class for the damages they sustained and reasonable attorneys' fees by operation of 18 U.S.C. § 1595. Defendants perpetrated an obstruction of the TVPA, and therefore perpetrated a violation of Chapter 77, Title 18.

273. By virtue of its intentional and outrageous obstruction to prevent enforcement of the TVPA, in violation 18 U.S.C. § 1591(d), Defendants are liable to Danielle Bensky and Jane Doe 3 and the Class for punitive damages by operation of 18 U.S.C. § 1595.

## COUNT VI: CONSPIRACY TO COMMIT VIOLATIONS OF THE TRAFFICKING VICTIM PROTECTION ACT, 18 U.S.C. §§ 1594(c), 1591, 1595

274. Plaintiffs Danielle Bensky and Jane Doe 3 reallege and incorporate by reference paragraphs 1 – 198, as if fully set forth in this Count.

73

275.  Danielle Bensky and Jane Doe 3 bring this Count individually and on behalf of the other Class Members they respectively seek to represent.

276.  Defendants intentionally conspired with others, by agreement and understanding, to violate 18 U.S.C. § 1591(a)(1) & (a)(2) & 1591(d), and to further Epstein's and his co-conspirators' sex-trafficking venture to coerce commercial sex acts from Danielle Bensky and Jane Doe 3 and other Class Members, all in violation of 18 U.S.C. § 1594(c).  Defendants directly conspired with Epstein himself to further the sex trafficking venture.

277.  Defendants' conspiracy to violate 18 U.S.C. 1591(a)(1) & (a)(2) was forbidden by 18 U.S.C. § 1594(c), and Defendants thereby violated Chapter 77, Title 18. Defendants' conspiracy directly, proximately, and foreseeably harmed Danielle Bensky and Jane Doe 3, as well as other members of the Class, by directly leading to their forcibly being caused to engage in commercial sex acts and in other ways. Defendants' conspiracy victimized Danielle Bensky and Jane Doe 3 and the other members of the Class.

278.  Defendants' conspiracy to violate 18 U.S.C. 1591(d) was forbidden by 18 U.S.C. § 1594(c), thereby violated Chapter 77, Title 18. Defendants' conspiracy directly, proximately, and foreseeably harmed Danielle Bensky and Jane Doe 3, as well as other members of the Class, by directly leading to their forcibly being caused to engage in commercial sex acts and in other ways. Defendants' conspiracy

74

victimized Danielle Bensky and Jane Doe 3 and the other members of the Class.

279. Defendants conspired with Epstein and his co-conspirators to further the Epstein sex-trafficking venture and with the purpose of facilitating Epstein's illegal sex trafficking. Defendants had actual knowledge of Epstein's sex-trafficking venture. Defendants acted with the specific intent to violate 18 U.S.C. §§ 1591(a)(1) & (a)(2), that is, with consciousness of the nature of Epstein's sex-trafficking venture and with the specific intent to further venture. Defendants and Epstein had a meeting of the minds as to the essential nature of the plan.

280. The Epstein sex-trafficking conspirators had a shared and common purpose—securing young women and girls for Epstein to sexually abuse and to commercially sex traffic. Defendants and other members of Epstein's sex-trafficking venture associated together for this common purpose. As quid pro quo, in exchange for working toward this common purpose, Epstein rewarded Defendants.

281. The Epstein sex-trafficking conspiracy was an ongoing organization with the same hierarchy and regularity of function. Epstein was at the top of the hierarchy and effectively served as the CEO of the organization. Defendant Indyke served as Epstein's personal lawyer and accountant, handling all of his personal affairs and business operations relating to his sex trafficking organization. Defendant Kahn was Epstein's personal accountant who handled all of his personal

75

accounting and financial services relating to the organization. The sex-trafficking conspiracy was itself in and affecting interstate and foreign commerce and involved overt acts that were in and affecting interstate and foreign commerce.

282. In or around 1995, Defendant Indyke purposefully joined Epstein's previously operation, and on-going, sex-trafficking conspiracy. In or around 2005, Defendant Kahn purposefully joined Epstein's previously operation, and on-going, sex-trafficking conspiracy. In so joining, each Defendant quickly ratified the previous actions, conduct, intentional torts, and crimes of the conspiracy, by joining the conspiracy, adopting its goals, and taking actions and committing overt acts in furtherance of it.

283. Defendants' conspiracy with Epstein was part of their participation in his sex-trafficking venture. Without Defendants agreeing to facilitate the venture (by, for example, masterminding a scheme of bank accounts, immigration scrutiny evasion, and payment systems), Epstein would not have been a position to move forward with his sex-trafficking venture.

284. Defendants also conspired with Epstein to obstruct, attempt to obstruct, to interfere with, and to prevent the enforcement of the TVPA, violating 18 U.S.C. § 1591(d). The conspiracy included an agreement to keep Epstein's sex-trafficking venture secret or, at least, concealed to the greatest extent possible. Among the means for keeping the venture secret were paying for the commercial sex acts in

cash, structuring cash withdrawals in a way to avoid detection, and providing legal and accounting advice that created sham marriages and corporate structures that helped Epstein escape scrutiny.

285.   Further actions regarding Defendants' conspiracy to obstruct TVPA enforcement are outlined in Count V (obstruction) above.

286.   Within this District, Defendants intentionally committed overt acts in furtherance of the conspiracy, agreement, and understanding to violate 18 U.S.C. § 1591(a) by knowingly playing an active role in assisting, supporting, and facilitating the recruiting, enticing, coercing, harboring, transporting, and inducing and forcibly causing Danielle Bensky and Jane Doe 3 and other Class Members to engage in commercial sex acts, through providing financial support for the Epstein sex-trafficking venture.

287.   Among the many overt acts intentionally committed by Defendants in furtherance of the long-running Epstein sex-trafficking venture were providing the financial underpinnings for Epstein to have ready and reliable access to resources—including cash—to recruit, lure, coerce, and entice young women and girls to cause them to engage in commercial sex acts and other degradations within this District. Indeed, Defendants organized, controlled, and directed almost every aspect of the Epstein sex-trafficking venture.   Defendants approved, enabled, and justified millions of dollars in payments that fueled the Epstein sex-trafficking venture,

77

including payments to women who were forced to have sec with Epstein and/or recruited others to be victimized.

288. Acting within this District and in furtherance of the Epstein sex-trafficking venture, Defendants facilitated arranging sham marriages to keep Epstein victims available for his ongoing abuse. As officers and signatories of the key entities in the Epstein sex-trafficking enterprise, Defendants facilitated cash payments for immigration legal fees and recruitment compensation.

289. In furtherance of the Epstein sex-trafficking venture, Defendants were officers in virtually every corporate entity that Epstein created to fund and conceal his activities. They were deeply involved in the financial activities of the Epstein-owned entities. In addition to being officer and directors of companies implicated in the Epstein sex-trafficking enterprise, Defendants (at least one of them, but often both) also had signatory authority over virtually all of the accounts held by Epstein, which allowed them to personally authorize and sign off on payments totaling hundreds of thousands of dollars to Epstein's victims, including but not limited to recruiting compensation, legal fees, apartment rent, and tuition.

290. In furtherance of the Epstein sex-trafficking venture, Defendants routinely withdrew cash from Epstein accounts in various ways, including ATMs, checks, or by converting currency. In many instances, Defendants structured these transactions to evade banking reporting requirements. Defendants also worked

together to make large cash withdrawals.

291. Even after Epstein died, Defendants have continued to enrich themselves for their participation in the Epstein sex-trafficking conspiracy, having approved the release of Epstein Estate funds through their role as Executors to pay their legal fees and costs.

292. Defendants' actions in furtherance of Epstein's conspiracy were intertwined with Epstein's sex-trafficking venture, as the funding for the sex-trafficking venture (and particularly cash for the venture) were essential tools for Epstein to commit coercive commercial sex acts.

293. It was part of the conspiracy that Defendants would financially benefit from providing financial support for the Epstein sex-trafficking venture. Defendants did financially benefit from its participation in the venture, including receiving millions of dollars in compensation for their legal, accounting, business, and other services. Defendants were paid through multiple entities, including but not limited to HBRK Associates, Inc. (Kahn), Coatue Enterprises, LLC (Kahn), Birch Tree BR, LLC (Indyke) Harlequin Dane, LLC (Indyke) and Darren K Indyke, PLLC.

294. Defendants' participation in furthering Epstein's sex-trafficking venture was intentional and willful and, therefore, Defendants intentionally and willfully caused Epstein's commission of the forcible commercial sex acts with Danielle Bensky and Jane Doe 3 and other Class Members through its affirmative

79

and overt acts supporting Epstein.

295. Defendants knew, acted in reckless disregard of the fact, and should have known, that its conspiracy would directly and proximately lead to unlawful coercive commercial sex acts by Epstein with young women and girls, including Danielle Bensky and Jane Doe 3 and other Class Members.

296. The conspiracy that Defendants joined had specific knowledge that Danielle Bensky and Jane Doe 3, as well as other Class Members, were being coercively sex trafficked by Epstein. The conspiracy's knowledge extended to the names of Epstein's victims, because Epstein and his co-conspirators knew the names of the victims.

297. Defendants conspired to violate 18 U.S.C. § 1591(a) with Epstein and through its affirmative acts and substantial support to Epstein committed, perpetrated, and directly and proximately caused Danielle Bensky and Jane Doe 3 and other Class Members to engage in commercial sex acts through means of force, threats of force, fraud, coercion, and a combination of such means.

298. In addition to acting with knowledge that they were conspiring to support the Epstein sex-trafficking venture, Defendants benefited financially from conspiring to participate in the Epstein sex-trafficking venture, which Defendants knew and should have known that had engaged in coercive sex trafficking in violation of 18 U.S.C. § 1591(a)(1) & (a)(2).

80

299.   Defendants' conspiracy has caused Danielle Bensky and Jane Doe 3 and other Class Members serious harm, including, without limitation, physical, psychological, financial, and reputational harm. That harm was directly and proximately caused by the conspiracy and the harm resulting from conspiracy was foreseeable.

300.   Defendants' conspiracy has caused Danielle Bensky and Jane Doe 3 harm that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing commercial sexual activity in order to avoid incurring that harm.

301.   This case does not involve mere fraud. Instead, Defendants' criminal conduct in conspiring to violate the TVPA was outrageous and intentional, because it was in deliberate furtherance of a widespread and dangerous criminal sex trafficking organization. Defendants' conspiracy also evinced a high degree of moral turpitude and demonstrated such wanton dishonesty as to imply a criminal indifference to civil obligations. Defendants' conspiracy was directed specifically at Danielle Bensky and Jane Doe 3 and other Class Members, who were the victims of Epstein's sex trafficking organization.

302.   By virtue of these violations of 18 U.S.C. §§ 1594(c), 1595, Defendants are liable to Danielle Bensky and Jane Doe 3 and the other Class Members for the

damages they sustained and reasonable attorneys' fees.

303.  By virtue of its intentional and outrageous conspiracy to violate 18 U.S.C. §§ 1594(c), 1595, Defendants are liable to Danielle Bensky and Jane Doe 3 and other Class Members for punitive damages.

## COUNT VII: GENDER-MOTIVATED VIOLENCE PROTECTION ACT, ADMINISTRATIVE CODE OF CITY OF N.Y. §10-1101 *et seq.*

304.  Plaintiffs Danielle Bensky and Jane Doe 3 reallege and incorporate by reference paragraphs 1 – 198, as if fully set forth in this Count.

305.  The above-described conduct of Defendants constitutes a "crime of violence" and a "crime of violence motivated by gender" against Danielle Bensky and Jane Doe 3 and other Class Members as defined by the New York City Gender-Motivated Violence Protection Act, N.Y.C. Admin. Code § 8-903 (2017).

306.  The above-described conduct of Defendants constitutes a "crime of violence" against Danielle Bensky and Jane Doe 3 and other Class Members motivated: (i) by gender; (ii) on the basis of gender; and/or (iii) due, at least in part, to an animus based on gender.

307.  Defendants committed a "crime of violence" against Danielle Bensky and Jane Doe 3 and other Class Members because they are women and, at least in part, because Defendants willingly participated, enabled, and conspired in the Epstein Enterprise – an illegal operation steeped in unlawful animus towards women and engaged in violent sexual acts against Bensky, Jane Doe 3, and the Class in New

York, including but not limited to rape; forced oral sex, digital penetration, and forcible touching; and sex trafficking. Defendants' conduct as a part of the Epstein Enterprise show their gender-motivated animus towards women, as they knowingly, individually, and personally facilitated a decades-long international sex-trafficking operation.

308. As a direct and proximate result of the aforementioned gender-motivated violence Danielle Bensky and Jane Doe 3 and other Class Members have sustained in the past and will continue to sustain, monetary damages, physical injury, pain and suffering, and serious psychological and emotional distress, entitling the Class to an award of compensatory damages.

309. Defendants' egregious and intentional gender-motivated violence against Danielle Bensky and Jane Doe 3 and other Class Members entitles the Class to punitive damages and an award of attorneys' fees and costs.

## VII.   REQUEST FOR RELIEF

Danielle Bensky and Jane Doe 3 respectfully request that the Court enter judgment in her favor, and against Defendants, as follows:

a. That the Court certify the Class, name Danielle Bensky and Jane Doe 3 as Class Representative, and appoint her lawyers as Class Counsel;

b. That the Court award Plaintiffs and the other members of the Class compensatory, consequential, general, nominal, and punitive damages

against Defendants in an amount to be determined at trial;

c. That the Court award punitive and exemplary damages against Defendants in an amount to be determined at trial;

d. That the Court award to Plaintiffs the costs and disbursements of the action, along with reasonable attorneys' fees, costs, and expenses;

e. That the Court award pre- and post-judgment interest at the maximum legal rate; and

f. That the Court grant all such other and further relief as it deems just and proper.

## **JURY DEMAND**

Plaintiffs demand a trial by jury on all claims so triable.

Dated: February 16, 2024

Respectfully Submitted,

/s/ David Boies

David Boies
Boies Schiller Flexner LLP
55 Hudson Yards
New York, NY
Telephone: (212) 446-2300
Fax: (212) 446-2350
Email: dboies@bsfllp.com

Sigrid McCawley
Boies Schiller Flexner LLP
401 E. Las Olas Blvd. Suite 1200

84

Fort Lauderdale, FL 33316
Telephone: (954) 356-0011
Fax: (954) 356-0022
Email: smccawley@bsfllp.com

EXHIBIT 142

Reid Weingarten
1114 Avenue of the Americas
New York, NY 10036
212 506 3900 main
212 506 3955 direct
www.steptoe.com
rweingarten@steptoe.com



July 11, 2019

**VIA ECF**
The Honorable Richard M. Berman
United States District Court
Southern District of New York
United States Courthouse
(212) 805-6715
500 Pearl Street
New York, NY 10007

   RE: *United States v. Jeffrey Epstein*, **Criminal No. 19-490**

Dear Judge Berman:

   We write to outline the grounds entitling Jeffrey Epstein to pretrial release, proposing a stringent set of conditions that will effectively guarantee his appearance and abate any conceivable danger he's claimed to present.

   In essence, the government seeks to remand a self-made New York native and lifelong American resident based on dated allegations for which he was already convicted and punished – conduct the relitigation of which is barred by a prior federal nonprosecution agreement (the "NPA"). The government makes this drastic demand even though Mr. Epstein has never once attempted to flee the United States – despite a Florida federal judge's stated belief that he could void the NPA in appropriate circumstances, possibly threatening new charges there, and notwithstanding legally erroneous government assertions in ancillary litigation that Mr. Epstein was subject to potential prosecution in other federal judicial districts, including this one specifically. Indeed, Mr. Epstein feared the toxic political climate might tempt the government to try and end-run the NPA – yet continually returned home from travel abroad, fully prepared to vindicate his rights under the agreement and otherwise mount a full-throated defense. Finally, the government takes its extreme position in the teeth of Mr. Epstein's perfect compliance with onerous sex offender registration requirements – pinpointing his exact nightly whereabouts – across multiple jurisdictions over a 10-year period.

1

Nonetheless, it is fundamental that pretrial detention is reserved for "a small but identifiable group of particularly dangerous defendants as to whom neither the imposition of strict release conditions nor the prospect of revocation of release can reasonably assure the safety of the community or other persons." S. Rep. No. 98-225, at 6-7 (1984), *reprinted in* 1984 U.S.C.C.A.N. 3182, 3189. And that's true no matter how much rhetoric and hyperbole the government and media pile on a presumptively innocent citizen. Popular condemnation aside, compelling legal issues stand between Mr. Epstein and any possible conviction on the allegations of conduct from 14 to 17 years ago pressed in the indictment. Importantly, the Bail Reform Act, 18 U.S.C. § 3141 *et seq.*, authorizes release for even wealthy defendants facing serious charges who travel and own property abroad.

The government's indictment labels this a "Sex Trafficking" case. Yes, the government may have witnesses who will testify to participating in sexual massages – most over 18; some under; some who told the police they lied about their age to gain admission to Mr. Epstein's residence; some who will testify that Mr. Epstein knew they were not yet 18.[1] But their anticipated testimony only punctuates the alleged offenses' purely local nature. (All occurred within a single New York residence or, if the Florida conduct is ultimately ruled admissible despite the NPA, then within two residences.) There are no allegations in the indictment that Mr. Epstein trafficked anybody for commercial profit; that he forced, coerced, defrauded, or enslaved anybody; or that he engaged in any of the other paradigmatic sex trafficking activity that 18 U.S.C. § 1591 aims to eradicate. No one seeks to minimize the gravity of the alleged conduct, but it is clear that the conduct falls within the heartland of classic state or local sex offenses – and at or outside the margins of federal criminal law.

Mr. Epstein, 66, is a U.S. citizen who's lived his entire life in this country. Born and bred in Coney Island, he worked his way up from humble origins – his father was a New York City municipal employee in the Parks Department – and earned every penny he's made with nothing more than a high school diploma. He speaks only English and knows no other languages. He owns no foreign businesses and holds no foreign bank accounts. Five of the six residences he maintains are located here in America. His brother, niece, and nephew all live here too.

Until his arrest in this case, Mr. Epstein's only notable brush with the law resulted in the 2007 NPA (Exhibit 1) and a 2008 state-court guilty plea required by the NPA for conduct substantially overlapping the conduct charged in the pending indictment. As a result of the state guilty plea, Mr. Epstein received a 30-month sentence, 18 months of incarceration, and 12 months' probation under conditions including home confinement. Mr. Epstein served 13 months in custody, 12 months on probation and, as a condition of the NPA and his state sentence, was required to register as a sex offender in the locations of his residences. He is currently registered



[1] New York's age of consent was 17 at the time of the alleged conduct and remains so today. *See* N.Y. Penal Law § 130.05.

2

in the U.S. Virgin Islands, his principal residence, Florida, and New York. Mr. Epstein has scrupulously fulfilled his obligations in every jurisdiction in which he was required to register throughout the 10-year hiatus between his release and present arrest. All of his travel has been meticulously reported to the registration authorities so that they have been aware of his precise location every single day for the past 10 years. Better still, the pending charges date back 14-17 years, from 2002 to 2005. Yet, tellingly, they allege no recurrence of the conduct underlying the NPA and Florida state conviction at any time in the ensuing decade and a half (2005-2019). Together, these unique factors are powerful indicia that Mr. Epstein is no longer a danger to anyone and will faithfully obey all conditions of release if ordered.

In sum, Mr. Epstein has substantial grounds to challenge the allegations charged by the government in its indictment, and he has every intention of doing so in a lawful, professional, and principled manner. He intends to fight the current charges on their merits and, more, to contest their legality given the inextricable intertwining of the current investigation and his NPA which promised him immunity and a global settlement for offenses including those brought under 18 U.S.C. § 1591. Any perception that Mr. Epstein poses any conceivable danger or flight risk may be readily dispelled by a slate of highly restrictive conditions, which amply suffice to secure his release:

1. Home detention in Mr. Epstein's Manhattan residence, with permission to leave only for medical appointments as approved by Pretrial Services, including (at the Court's discretion) the installation of surveillance cameras at the front and rear entrances to ensure compliance.
2. Electronic monitoring with a Global Positioning System.[2]
3. An agreement not to seek or obtain any new passport during the pendency of this matter.[3]

---

[2] "A radio frequency ('RF') bracelet is the more conventional 'ankle bracelet' that has been used over time. GPS monitoring is a more recent phenomenon that is distinct from RF monitoring. While both units are placed on the ankle, the former tracks an offender's movements in real time, while the latter is contingent upon proximity to a base unit connected to a landline at an offender's home. Statistically, GPS monitoring is more effective than RF monitoring at preventing recidivism." *United States v. Paulino*, 335 F. Supp. 3d 600, 617 n.5 (S.D.N.Y. 2018) (citations omitted).

[3] Mr. Epstein has only one active passport permitting current travel – not three, as the government fancies. That one active U.S. passport has now been surrendered. Mr. Epstein has no foreign passports.

3

4. Consent to U.S. extradition from any country and waiver of all rights against such extradition.[4]

5. A substantial personal recognizance bond in an amount set by the Court after reviewing additional information regarding Mr. Epstein's finances, which Mr. Epstein will seek the Court's permission to provide via sealed supplemental disclosure.

6. The bond shall be secured by a mortgage on the Manhattan residence, valued at roughly $77 million. Mr. Epstein's private jet can be pledged as further collateral.

7. Mr. Epstein's brother Mark will serve as a co-surety of the bond, which shall be further secured by a mortgage on Mark's home in West Palm Beach, Florida. Mr. Epstein's friend David Mitchell will also serve as a co-surety and pledge his investment interests in two properties to secure the bond.

8. Mr. Epstein shall deregister or otherwise ground his private jet.[5]

9. He shall demobilize, ground, and/or deregister all vehicles or any other means of transportation in the New York area, providing particularized information as to each vehicle's location.

10. Mr. Epstein will provide Pretrial Services and/or the government random access to his residence.

11. No person shall enter the residence, other than Mr. Epstein and his attorneys, without prior approval from Pretrial Services and/or the Court.

12. Mr. Epstein will report daily by telephone to Pretrial Services (or on any other schedule the Court deems appropriate).

13. A Trustee or Trustees will be appointed to live in Mr. Epstein's residence and report any violation to Pretrial Services and/or the Court.

14. Any other condition the Court deems necessary to reasonably assure Mr. Epstein's appearance.

I.     Applicable law

Echoing and reinforcing the presumption of innocence, our justice system's bedrock, there is a "strong presumption against [pretrial] detention." *United States v. Hanson*, 613 F. Supp. 2d 85, 87 (D.D.C. 2009). A person facing trial generally must be released so long as some "condition, or combination of conditions . . . [can] reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. § 3142(c). "Only in rare circumstances should release be denied." *United States v. Motamedi*, 767 F.2d 1403, 1405 (9th Cir. 1985). Any doubts as to the propriety of release are resolved in the defendant's favor. *See United States v. Chen*, 820 F. Supp. 1205, 1207 (N.D. Cal. 1992).

---

[4] Mr. Epstein's lone foreign residence is in Paris; France has an extradition treaty with the United States.

[5] Mr. Epstein owns one private jet. He sold the other jet in June 2019.

4

Though the Bail Reform Act contains a rebuttable presumption in favor of detention based on the crimes charged, the presumption shifts only the burden of *production*, not persuasion. *See United States v. Martir*, 782 F.2d 1141, 1144 (2d Cir. 1986). Accordingly, the statutory demand on defendants "is fairly easily met." *United States v. Conway*, No. 4-11-70756, 2011 WL 3421321, at *2 (N.D. Cal. Aug. 3, 2011). To rebut the presumption, a defendant need only "show that the specific nature of the crimes charged, or that something about their individual circumstances, suggests that 'what is true in general is not true in the particular case . . . '" *United States v. Dominguez*, 783 F.2d 702, 707 (7th Cir. 1986) (quoting *United States v. Jessup*, 757 F.2d 378, 384 (1st Cir.1985)). "The quantum of evidence required to rebut the presumption is not high." *United States v. Thompson*, No. 16-CR-00019, 2018 WL 447331, at *2 (M.D. Pa. Jan. 17, 2018) (citation omitted). "Any evidence favorable to a defendant that comes within a category listed in § 3142(g) can affect the operation of [the presumption], including evidence of their marital, family and employment status, ties to and role in the community, clean criminal record and other types of evidence encompassed in § 3142(g)(3)." *Dominguez*, 783 F.2d at 707 (clean record plus socioeconomic stability sufficed to rebut presumption).

In short, evidence that the defendant is unlikely to flee or commit crimes rebuts the presumption, forcing the government to persuade the court that detention is warranted. *See Conway*, 2011 WL 3421321, at *5 (§ 1591 defendant released pending trial). While not disappearing entirely, the presumption thus recedes to one factor among many in determining whether there are sufficient conditions to "reasonably assure" both presence and safety. *See Martir*, 782 F.2d at 1144; *see also United States v. Orta*, 760 F.2d 887, 891 (8th Cir. 1985) ("[R]easonably assure" doesn't mean "guarantee."). Even in a presumption case, then, "the government retains the ultimate burden of persuasion by clear and convincing evidence that the defendant presents a danger to the community," and by a "preponderance" that he poses a flight "risk." *United States v. English*, 629 F.3d 311, 319 (2d Cir. 2011) (citation and internal quotation marks omitted).

## II.   Mr. Epstein's 14-year record of law-abiding behavior rebuts any presumption in favor of pretrial detention

In this case, any danger presumption attending the § 1591 charges evaporates against Mr. Epstein's meticulous obedience, from 2005 to date, to both the law's commands and his rigorous registration and reporting obligations as a convicted sex offender. The indictment does not allege that Mr. Epstein committed any crime in the 14-year interval between the end of the alleged conduct and the initiation of this case. The dangerousness prong of the Bail Reform Act is predictive, asking whether it's likely that Mr. Epstein will reoffend if released. A spotless 14-year record of walking the straight and narrow, complemented by an exemplary 10-year history of diligent sex offender registration and reporting, is compelling proof he was able, once the prior investigation commenced, to conform his conduct to the law's dictates. The time lag between the offenses charged and today is particularly compelling in terms of a prediction of

5

future danger when viewed in the context of the unparalleled global media attention the case has garnered, including the creation of a website by the government requesting witnesses claiming abuse to come forward. Accordingly, any danger that Mr. Epstein may have once posed to the community has long since abated. At the very least, this enormous gap in time precludes a finding by clear and convincing evidence that no conditions of release can reasonably assure the community's safety.[6]

The rebuttable presumption of a risk of flight is negated by the evidence that the government had stated it believed it could prosecute Mr. Epstein for the very same conduct for which he was immunized, albeit in a second jurisdiction, despite the protections conferred upon him under the NPA. Mr. Epstein's continuous presence in the United States even while he had a residence out of the country reinforces the point. As detailed below, Mr. Epstein understood the NPA as a global resolution of any charges arising from the alleged conduct at issue here, including conduct in New York. Indeed, the government, in a Southern District of Florida filing

---

[6] The government vastly overreaches in painting Mr. Epstein as dangerous based on musty plea discussions. The government's argument that Mr. Epstein's release would risk obstructive behavior, at pages 8-9 of its submission, rests primarily upon statements made between Mr. Epstein's prior counsel and an Assistant U.S. Attorney while they searched for a federal offense, at the government's behest, with a one-year statutory maximum or guideline during the give-and-take of those of plea negotiations. The communication from prior counsel about a potential proffer for a federal charge was met with the response that there was no sufficient evidence to charge such an offense. These purported facts were mere allegations that did not ultimately manifest themselves in any agreement by Mr. Epstein – nor in any agreement that probable cause existed to support any obstruction or assault charge. And the documents from the Southern District of Florida litigation referenced by the government in support of its argument on this point expressly acknowledge this lack of substantiation. *See Jane Doe #1 and Jane Doe #2 v. United States*, 08-CV-80736 (S.D. Fla.), Dkt. 361-10 (prosecutor stating, "[o]n the obstruction charges, many of the facts that I included in that first proffer were hypothesized based upon our discussions and the agents' observations of [redacted]. We will need to interview her to confirm the accuracy of those facts. . . ."), Dkt. 361-11 (prosecutor stating, "I know that someone mentioned there being activity on an airplane. I just wanted to make sure that there is factual basis for the plea that the agents can confirm"), Dkt. 361-9 (prosecutor stating, "I don't know the factual basis for the alleged [redacted] because we have no independent evidence of that"). In short, these were suggested hypotheses not facts, and the government itself ultimately did not believe there was factual support for the allegations. They do not provide a sufficiently reliable factual basis for any finding by clear and convincing evidence. As to the suggestion by the prosecutor that a charge could be predicated on a prior incident where it was alleged that an investigator forced a family member of a witness off the road, the defense is without knowledge as to the basis for this allegation and the conduct, if it occurred, was not attributable to or authorized by Mr. Epstein.

that was unsealed and became public in July 2013, specifically noted that "a number of districts outside the Southern District of Florida (*e.g.*, the Southern District of New York and the District of New Jersey) share jurisdiction and venue with the Southern District of Florida over potential federal criminal charges based on the alleged sexual acts committed by Epstein against the Petitioners. Epstein is thus subject to potential prosecution for such acts in those districts." Exhibit 2, *Jane Doe #1 and Jane Doe #2 v. United States*, 08-CV-80736 (S.D. Fla. July 5, 2013), Dkt. 205-2, at 9. The government went so far as to invite the alleged victims "to contact the United States Attorney's Office in those districts and seek to confer with government attorneys in those offices about investigating and potentially prosecuting Epstein based on the alleged federal crimes committed against them." *Id.* at 10. The Florida U.S. Attorney's Office even offered to share the evidence gathered in its investigation with prosecutors and grand juries in the other relevant jurisdictions. *See id.* at 10 n.9.

The defense strongly disagrees with the premise that the government can offer and execute an immunity or nonprosecution agreement with a citizen in the location of one of two venues where an interstate telephone call (or flight or any form of wire or mail communication) occurs and then circumvent the consequences of that immunity grant by having the very same prosecution office promote and motivate a prosecution by another office at the second venue of what in fact was a single criminal transaction. What is significant for bail purposes is that notwithstanding this notice of the government's illegal position, and his knowledge of the substantial penalties that he would face if charged and convicted, Mr. Epstein made no attempt to flee in the approximately six years preceding his arrest. During that time, as noted by the government, he engaged in substantial international travel, always returning to his residences in the United States. Mr. Epstein never sought to obtain dual citizenship or took any other steps indicative of an intent to flee. This fact significantly undermines the government's contentions regarding risk of flight and indicates Mr. Epstein's good-faith intent to contest the charges pending against him.

On September 24, 2007, after a year-long investigation, the Department of Justice, through the United States Attorney for the Southern District of Florida ("USAO-SDFL"), entered into the NPA with Mr. Epstein. The NPA immunized Mr. Epstein from five distinct potential federal charges that "may have been committed by Epstein . . . from in or around 2001 through in or around September 2007." Exhibit 1, NPA, at 1-2. One of the federal charges was 18 U.S.C. § 1591, the statute charged in this SDNY case. The time period covered by the NPA subsumes the entire time period charged in this SDNY case. The USAO-SDFL acknowledged in the NPA that the very premise for Mr. Epstein to enter into it was "to resolve *globally* his state and federal criminal liability . . . " *Id.* at 2 (emphasis added). Senior officials at the Department of Justice reviewed the NPA and either authorized or helped negotiate the resolution of the matter. *See, e.g.*, United States' Second Supplemental Privilege Log filed as Dkt. 329-1 in *Jane Doe #1 and Jane Doe #2 v. United States*, No. 08-CV-80736 (S.D. Fla.) (the "CVRA litigation") (illustrating the number of prosecutors involved in the decision-making over the NPA).

The NPA required Mr. Epstein to plead guilty to a state felony charge (Fla. Stat. § 796.07), then pending in the State of Florida and to an additional state felony charge (not previously charged or required by the State) of violating Fla. Stat. § 796.03 (Case No. 2008-CF-9381AXX), a charge requiring registration as a sex offender. Mr. Epstein complied with all of his obligations under the NPA.

Contrary to the government's argument, the NPA was not limited to a "list of several dozen victims identified in the prior investigation . . . ." Gov't Bail Letter at 6-7. Indeed, the NPA contains no "list of several dozen victims" and regardless, the NPA immunized Mr. Epstein from prosecution "for the *offenses* set out on pages 1 and 2 of this Agreement," allegedly committed between 2001-07, as well as "any offenses that arose from the Federal Grand Jury investigation." NPA at 2 (emphasis added). Moreover, the government's interpretation that the NPA "pertained exclusively to the SDFL investigation" and "did not purport to bind any other Office or District" will be the subject of a major dispute in this case. This is especially so because Mr. Epstein's alleged conduct at his Palm Beach residence features prominently in the conspiracy count (Count 1, ¶¶ 14-19, ¶ 22.a, d, f) and is incorporated by reference in the substantive charge (Count 2, ¶ 23).

Beyond that, Mr. Epstein intends to raise and litigate significant due process issues about the Department of Justice's conduct in this case. Namely, there is irrefutable evidence from the pending CVRA litigation in the Southern District of Florida that, after Mr. Epstein had fully complied with his obligations under the NPA, the USAO-SDFL affirmatively encouraged alleged victims to pursue prosecution of Mr. Epstein in other districts, in violation of the DOJ's commitment to a "global" resolution. *See* Exhibit 2, at 8-12. The United States Attorney for the Southern District of Florida, along with supervisory and line prosecutors from the USAO-SDFL, corresponded on multiple occasions with, and personally conferred with, alleged victims and their lawyers to entertain discussions about the alleged victims' desire to have Mr. Epstein prosecuted on federal charges. *See id.* at 9. Further, the Southern District of New York is likely relying upon physical evidence seized in connection with the prior investigation, *see* Gov't Bail Letter at 6 (discussing "corroborating evidence," including "contemporaneous notes, messages . . . , and call records"). In short, there will be evidence that the current New York case is not truly independent of the prior immunized conduct. The evidence will show that Mr. Epstein's reasonable expectation that the NPA would "resolve globally [Mr. Epstein's] state and federal criminal liability" in exchange for Mr. Epstein's compliance with the duties and obligations in the NPA – which he fully performed – has been unconstitutionally undermined by the government's efforts to minimize the potential consequences of a CVRA conferral violation (one that neither the government nor defense believes occurred but that was found to have occurred in the CVRA litigation which is pending a decision on remedies) by returning an inextricably intertwined second federal prosecution just as the District Court in Florida is receiving submissions on remedy.

8

Finally, the government fails to consider the doctrine of pre-indictment delay, inasmuch as the statute of limitations does not fully define a defendant's rights with respect to delays that occurred prior to the indictment. *See generally United States v. Marion*, 404 U.S. 307 (1971). Here, the delays of 14 years from the last alleged act and 12 years since Mr. Epstein signed the NPA are extraordinary. If the government is correct that the defendant, if released, will appear. The conditions proposed above, including electronic GPS monitoring, surrender of Mr. Epstein's passport, deregistration and/or grounding of Mr. Epstein's private plane, and a substantial personal bond (including posting of personal residence(s) and/or private jet as security to guarantee appearance) would extinguish any plausible risks. Mr. Epstein's current notoriety minimizes any conceivable risk of flight even further. The location where he could be detained – his residence on East 71st Street in New York has entrances (one on the street, one in the back) that can be easily monitored by video. With all of his financial resources in the United States (other than his Paris residence) and with his New York residence at risk due to the government's forfeiture allegation, Mr. Epstein would be sacrificing virtually everything he has worked for – including any collateral the Court requires he post to secure his appearance – if he were to flee and to disentitle himself to the defense of his property whether it would be at risk to forfeiture or for a bail violation.

preclude a prosecution in this district, then the government will have to explain why it purposefully delayed a prosecution of someone like Mr. Epstein, who registered as a sex offender 10 years ago and was certainly no stranger to law enforcement. There is no legitimate explanation for the delay.

## III.  The government fails to meet its burden of proving that no combination of conditions will assure Mr. Epstein's appearance and public safety

An analysis of the relevant statutory factors and case law supports pretrial release. Even should the Court conclude, despite substantial evidence to the contrary, that the defendant presents a risk of flight, the foregoing combination of conditions virtually guarantees his appearance as required. Crucially, while it is always possible to hypothesize risks, the statutory standard requires only a *reasonable* assurance that the defendant, if released, will appear. The conditions proposed above, including electronic GPS monitoring, surrender of Mr. Epstein's passport, deregistration and/or grounding of Mr. Epstein's private plane, and a substantial personal bond (including posting of personal residence(s) and/or private jet as security to guarantee appearance) would extinguish any plausible risks. Mr. Epstein's current notoriety minimizes any conceivable risk of flight even further. The location where he could be detained – his residence on East 71st Street in New York has entrances (one on the street, one in the back) that can be easily monitored by video. With all of his financial resources in the United States (other than his Paris residence) and with his New York residence at risk due to the government's forfeiture allegation, Mr. Epstein would be sacrificing virtually everything he has worked for – including any collateral the Court requires he post to secure his appearance – if he were to flee and to disentitle himself to the defense of his property whether it would be at risk to forfeiture or for a bail violation.

To the extent there is any doubt regarding the proposed conditions, there is tremendous moral suasion provided by the posting of real and personal property of Mr. Epstein's brother, and his close personal friend of decades, who have offered to co-sign a surety bond to ensure Mr. Epstein's appearance in Court as required. Indeed, Mr. Epstein's brother has agreed to pledge his family home, that he shares half the year with his 14-year-old daughter and 17-year-old son, in order to secure the bond. It is particularly telling that Mr. Epstein's brother, his only living immediate family member, as well as his close personal friend, are both willing to guarantee his appearance, notwithstanding the widespread negative publicity of Mr. Epstein that has dominated the news cycle since his arrest.

To reiterate, the Bail Reform Act requires pretrial release on the "*least restrictive*" conditions that will assure both appearance and public safety. 18 U.S.C. § 3142(c)(1)(B) (emphasis added). Home confinement monitored by 24-hour private security guards – a lesser restriction than pretrial detention – has proven effective in meeting those goals in many prominent cases prosecuted in our Circuit, including cases against defendants as infamous as Bernie Madoff, Marc Dreier and David Brooks.

To be clear, defense counsel are fully confident Mr. Epstein will appear as required without resort to this measure. And we understand and appreciate Your Honor's opposition to it. *See United States v. Zarrab*, No. 15-CR-867, 2016 WL 3681423 (S.D.N.Y. June 16, 2016). Still, Mr. Epstein stands ready and willing to pay for 24-hour armed guards should the Court deem it necessary or appropriate.

More precisely, we realize that Your Honor objects to the measure as more akin to custody than release, finding it inequitable for wealthier defendants to "buy their way out" of jail pending trial. *Id.* at *2, *9-10, *13 (citation omitted). Nonetheless, a band of other courts in our area have endorsed the procedure,[7] and the Second Circuit has affirmed its use.[8]

For reasons explained elsewhere, round-the-clock, privately funded security guards will virtually *guarantee* – not just reasonably assure – Mr. Epstein's presence in the circumstances of this case. Accordingly, and given the division of authority surrounding the practice, we respectfully propose it here as a fallback, asking the Court to revisit its propriety despite the reservations expressed in *Zarrab*. Those reservations, though admirably motivated and sincerely held, raise substantial equal protection concerns. They impair the statutory right to release on the *least restrictive conditions in the circumstances presented* – an inherently individualized determination – based largely on socioeconomic status, a suspect if not invidious classification. Avoiding "inequity and unequal treatment" rooted in such dubious socioeconomic distinctions – doing "equal right to the poor" and "rich" alike – are imperatives that run both ways. *Id.* (bolding deleted) (citation, footnote and internal quotation marks omitted).

---

[7] *See, e.g.*, *United States v. Esposito*, 354 F. Supp. 3d 354 (S.D.N.Y. 2019); *United States v. Esposito*, 309 F. Supp. 3d 24 (S.D.N.Y. 2018); *United States v. Seng*, No. 15-CR-706, 2017 WL 2693625 (S.D.N.Y. Oct. 23, 2015); *United States v. Dreier*, 596 F. Supp. 2d 831 (S.D.N.Y. 2009); *United States v. Madoff*, 586 F. Supp. 2d 240 (S.D.N.Y. 2009); *United States v. Schlegel*, No. 06-CR-550, 2008 WL 11338900, at *1 (E.D.N.Y. June 13, 2008), *modification denied*, 2008 WL 11339654 (E.D.N.Y. July 2, 2008).

[8] *See United States v. Esposito*, 749 F. App'x 20 (2d Cir. 2018); *United States v. Sabhnani*, 493 F.3d 63 (2d Cir. 2007).

10

Other than his 2008 guilty plea predicated on conduct substantially overlapping the same conduct charged here, Mr. Epstein has no criminal history. Congress specifically listed these factors as considerations for the Court, and their absence therefore should weigh in favor of Mr. Epstein's pretrial release. Mr. Epstein comes from a stable and humble family background. All of his remaining family members, his brother, niece, and nephew, reside in the United States. Through his business and the five residences he maintains in the United States, Mr. Epstein employs people, many of whom have been with him for more than a decade, and feels personally responsible for their livelihoods. Mr. Epstein is admittedly wealthy with all of his financial resources (other than his Paris residence) in the United States (including the U.S. Virgin Islands) and will provide the Court with more specific information regarding his assets in a sealed supplemental disclosure prior to the upcoming bail hearing if the Court grants leave to file such a sealed supplement. Mr. Epstein has, to this point, not provided a complete financial disclosure on advice of counsel, motivated by a desire to ensure the accuracy of the information provided to the Court. During the years since his release from incarceration in connection with his Florida guilty plea, Mr. Epstein has been a law-abiding citizen without a single allegation of criminal misconduct during that period and has focused his efforts on business and philanthropy. At the Court's request, Mr. Epstein will provide a sealed list of his philanthropic donations.

Crucially, the government has failed to proffer any evidence that Mr. Epstein has ever indicated an intent to flee from this investigation or any other criminal matter, which several courts have observed is a critical factor in evaluating whether pretrial release is appropriate. *See Hanson*, 613 F. Supp. 2d at 90 ("In this case, . . . there is no strong circumstantial evidence indicating that Mrs. Hanson intends to flee the United States"); *United States v. Vortis*, 785 F.2d 327 (D.C. Cir.1986) (serious intent to flee is an important factor); *United States v. Cole*, 715 F. Supp. 677, 679 (E.D. Pa.1988) (defendant told undercover agents he would flee if arrested). In fact, Mr. Epstein has displayed long-term, consistent compliance with Court orders and other legal requirements. As a result of his 2008 guilty plea and corresponding sex-offender designation, Mr. Epstein is required to (1) register for life as a sex offender; (2) regularly verify his address with Virgin Islands, Florida, and New York authorities; (3) annually update his registry photograph; and (4) provide registration authorities with detailed itineraries for all travel (both domestic and international) in which he engages. Mr. Epstein has strictly complied with these requirements, without exception, for approximately ten years.

The Court inquired about the relationship of the New York State registration classification and the requirements of the Bail Reform Act. And while it is true that the New York Appellate Division held that Mr. Epstein was appropriately classified as a level-three sex offender, this inquiry was entirely backward-looking and based on the allegations contained in a Florida probable cause affidavit describing conduct ending in 2005 that were neither admitted-to nor within the scope of Mr. Epstein's guilty plea. *See People v. Epstein*, 89 A.D. 3d 570, 571 (N.Y. App. Div. 2011). While Mr. Epstein has made no subsequent attempt to challenge the continuing nature of his designation, his law-abiding behavior for the ensuing decade plus

11

significantly undercuts any suggestion of current dangerousness based on any regulatory classification. Moreover, as discussed above, Mr. Epstein's strict compliance with the various monitoring requirements associated with his sex-offender registration actually decrease any danger that he might otherwise pose. It is also worth noting that Mr. Epstein is classified as a tier-one sex offender, the lowest classification available, in the U.S. Virgin Islands, where he maintains his primary residence. The defense respectfully suggests that Mr. Epstein's Virgin Islands designation is more consistent with the circumstances of the actual offenses for which he was convicted, and certainly more consistent with the predictive factor of whether there is a danger of recidivism which the defense contends there is not.

Mr. Epstein's financial means and past international travel do not extinguish this Court's congressional mandate to order pretrial release in every case where reasonable conditions can assure the appearance of the defendant as required.[9] Indeed, numerous courts have rejected government requests for detention, and instead ordered pretrial release, in cases where the charged defendant was either a non-citizen (unlike Mr. Epstein) or a naturalized citizen with substantial if not weightier contacts with foreign jurisdictions, including the following decisions:

- *United States v. Sabhnani*, 493 F.3d 63 (2d Cir. 2007) (reversing district court order of detention of defendants, who were natives of Indonesia, and ordering release despite defendants' "strong motive to flee" because of serious charges and "strong" evidence of guilt, despite finding that defendants faced "lengthy term of incarceration" if convicted, despite finding defendants possessed "ample means to finance flight," despite finding that defendants "maintained strong family ties to their native countries as well as personal and professional ties to various locations in Europe and the Middle East," and despite finding that defendants "could, with relatively little disruption, continue to operate their highly lucrative business from any number of overseas locations");

- *United States v. Hansen*, 108 F. App'x 331 (6th Cir. 2004) (affirming district court order of pretrial release of defendant, a resident and citizen of Denmark-from where defendant could not be extradited-charged with bulk cash smuggling and forfeiture, noting that the

---

[9] This Court's opinion in *Zarrab* stands only for the proposition that wealthy defendants should not be provided an unfair advantage. It does not, of course, suggest that wealthy defendants should bear a special disadvantage. The facts supporting the Court's ruling of pretrial detention in *Zarrab* are easily distinguishable. The present case does not have national security implications, Mr. Epstein is a United States citizen (and does not possess any dual citizenship), the only foreign country in which Mr. Epstein maintains a residence (France) has an extradition treaty with the United States, Mr. Epstein's assets are almost all located in the United States (with the exception of his Paris residence), and Mr. Epstein has provided only truthful information to Pretrial Services.

12

"bail statute does not . . . require that foreign defendants be detained simply because their return cannot be guaranteed through extradition");

- *United States v. Karni*, 298 F. Supp. 2d 129 (D.D.C. 2004) (ordering release of defendant, an Israeli national who had resided in South Africa for the 18 years preceding his arrest when he landed in Colorado for a family ski trip based on allegations he violated the Export Administration Act and the International Economic Emergency Powers Act by acquiring products capable of triggering nuclear weapons and exported them to Pakistan, despite defendant's lack of any ties to the United States, despite finding that defendant had "no ties to the United States or the Washington, D.C. area," despite finding that "no evidence [was] presented establishing that Defendant has ever lived in this country, owned property here, or that he has any family or community ties in the United States," despite finding that defendant "was only in this country in order to participate in a ski vacation with his wife and daughter," and despite finding that "the weight of the evidence against Defendant is substantial");

- *United States v. Hanson*, 613 F. Supp. 2d 85 (D.D.C. 2009) (ordering release of defendant, a naturalized citizen of the United States, despite finding defendant "has strong ties to [her home country of] China," finding that the defendant owned property in China, that the defendant spent almost all of her ten years of marriage living abroad with her husband, that during 2008 the defendant spent only 22 days in the United States, that the charges against the defendant (violations of International Emergency Economic Powers Act and the Export Administration Regulations) "were serious and carried a potential for a significant period of incarceration" and that the "government has strong evidence against" the defendant "including her own statement to investigators that she smuggled the UAV autopilot components out of the United States and knew there were licensing requirements for such items").

The fact that the government will potentially seek a significant sentence if Mr. Epstein is convicted on all counts similarly does not preclude pretrial release in this case – several courts have ordered pretrial release despite finding that the defendant faced serious charges carrying significant potential sentences. *See, e.g., Sabhnani*, 493 F.3d 63 (reversing district court order of detention despite finding that defendants, natives of Indonesia, faced "lengthy term of incarceration" and "strong" evidence of guilt existed); *Karni*, 298 F. Supp. 2d 129 (ordering release of defendant, an Israeli national who had resided in South Africa for the 18 years preceding his arrest, despite finding that "the weight of the evidence against Defendant is substantial"); *Hanson*, 613 F. Supp. 2d 85 (noting that charges "were serious and carried a potential for a significant period of incarceration" and that the "government has strong evidence against" the defendant "including her own statement to investigators that she smuggled the UAV autopilot components out of the United States and knew there were licensing requirements for such items"). As the government concedes, the increases in sentencing exposure enacted after

13

the alleged conduct at issue here do not apply retroactively to Mr. Epstein's case (including a maximum sentence of life imprisonment and a mandatory minimum sentence of 10 years). Mr. Epstein would, moreover, be subject to prosecution if he fled, which he now knows carries a maximum penalty of up to 10 additional years of imprisonment, 18 U.S.C. § 3146(b)(1)(A)(1), and/or the real risk of an enhanced sentence by the Court in this matter if not acquitted.

It must further be emphasized that the allegations outlined within the indictment are just that – allegations – and the defendant anticipates substantial factual and legal challenges to the government case. For one thing, Epstein has potent legal defenses to prosecution under 18 U.S.C. § 1591, the sex trafficking statute driving the pending indictment. We front and briefly outline one of those defenses for the limited purpose of seeking bail. We will amplify it later, along with various other arguments, in full-blown dismissal motions.

Section 1591 was passed as part of the Trafficking Victims Protection Act of 2000 ("TVPA"), Pub. L. No. 106-386, 114 Stat. 1464 (October 28, 2000). In enacting the TVPA, Congress recognized that human trafficking, particularly of women and children in the sex industry, "is a modern form of slavery, and it is the largest manifestation of slavery today." 22 U.S.C. § 7101(b)(1); *see also id.* at § 7101(b)(2), (4). "The TVPA criminalizes and attempts to prevent slavery, involuntary servitude, and human trafficking for commercial gain." *United States v. Evans*, 476 F.3d 1176, 1179 (11th Cir. 2007). Importantly, "the entire language and design of the statute as a whole indicates that it is meant to punish those who are the providers or pimps of children, *not the purchasers or the johns.*" *Fierro v. Taylor*, No. 11-CV8573, 2012 WL 13042630, at *3 (S.D.N.Y. July 2, 2012) (quoting *United States v. Bonestroo*, No. 11-CR-40016, 2012 WL 13704, at *4 (D.S.D. Jan. 4, 2012)) (emphasis added). In *Fierro*, the district court found § 1591 inapplicable to consumers or purchasers of sex acts. Here, the principal conduct underlying the indictment is Mr. Epstein's payment of money for massages that purportedly escalated to alleged sex acts. Mr. Epstein's conduct, however, is akin to consumer or purchaser behavior and should be outside the ambit of 18 U.S.C. § 1591. *See Fierro*, 2012 WL 13042630, at *4 ("[T]he TVPA is inapplicable to individual purchasers of sex from trafficking victims...").[10]

---

[10] While *Fiero* represents the law in this district, Mr. Epstein notes that there is a division of authority on the scope of § 1591. *See United States v. Jungers*, 702 F.3d 1066, 1068 (8th Cir. 2013). The defense respectfully submits that the *Fiero* court's approach to this issue is more persuasive and more consistent with the Congressional purpose to target commercial sex trafficking.

## IV.    Sixth Amendment

Finally, in a case such as this one, which will likely involve voluminous discovery and is predicated on events allegedly occurring 14 or more years ago, it is critical to counsel's ability to provide effective assistance, as well as the defendant's ability to meaningfully contribute to his defense, that Mr. Epstein be permitted pretrial release. The Sixth Amendment "does not provide merely that a defense shall be made for the accused; it grants to the accused personally the right to make his defense. It is the accused, not counsel, who must be 'informed of the nature and cause of the accusation,' and who must be 'confronted with the witnesses against him,' and who must be accorded 'compulsory process for obtaining witnesses in his favor.'" *Faretta v. California*, 422 U.S. 806, 819 (1975). Given the unique circumstances of this case, Mr. Epstein's exercise of these important Constitutional rights would be materially impaired by his pretrial detention.

## V.    Conclusion

Wherefore, for all of the foregoing reasons, Mr. Epstein respectfully submits that his conduct over the past 14 years proves that he poses no risk of flight or threat to the safety of the community. Even if the Court should have concerns to the contrary, there clearly exist a combination of conditions that would be sufficient to assure his presence as required and/or the safety of the community, including but not limited to some or all of the conditions proposed *supra*, or any other conditions the Court deems necessary and appropriate.

Yours truly,

Reid Weingarten
Steptoe & Johnson, LLP (NYC)
1114 Avenue of the Americas
New York, NY 10036
(202)-506-3900
Fax: (212)-506-3950
rweingarten@steptoe.com

Martin G. Weinberg (application for admission *pro hac vice* forthcoming)
Martin G. Weinberg, P.C.
20 Park Plaza, Suite 1000
Boston, MA 02116
(617) 227-3700
Fax: (617) 338-9538
owlmgw@att.net

15

Marc Allan Fernich
Law Office of Marc Fernich
810 Seventh Ave
Suite 620
New York, NY 10019
(212) 446-2346
Fax: (212) 446 2330
maf@fernichlaw.com

EXHIBIT 143

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 08-80736-CIV-MARRA/JOHNSON

JANE DOE #1 AND JANE DOE #2,

        Petitioners,

vs.

UNITED STATES,

        Respondent.

_____/

**UNITED STATES' SEALED MOTION TO DISMISS
FOR LACK OF SUBJECT MATTER JURISDICTION**

    The United States hereby requests that this Court enter an order dismissing these proceedings and the *Petition for Enforcement of Crime Victim's Rights Act, 18 U.S.C. Section 3771* (DE 1, the "Petition"), through which Petitioners Jane Doe #1 and Jane Doe #2 have advanced claims pursuant to the Crime Victims' Rights Act ("CVRA"), for lack of subject matter jurisdiction.[1]  This Court lacks subject matter jurisdiction over the Petition because

---

[1] *See, e.g., Grupo Dataflux v. Atlas Global Group, L.P.*, 541 U.S. 567, 571 (2004) ("Challenges to subject-matter jurisdiction can of course be raised at any time prior to final judgment."); *United States v. Giraldo-Prado*, 150 F.3d 1328, 1329 (11th Cir. 1998) (recognizing that "a party may raise jurisdiction at any time during the pendency of the proceedings"); *Harrell & Sumner Contracting Co. v. Peabody Petersen Co.*, 546 F.2d 1227, 1229 (5th Cir. 1977) ("[U]nder Rule 12(h)(3), Fed.R.Civ.P., the defense of lack of subject matter jurisdiction may be raised at any time by motion of a party or otherwise."); *see also* Fed. R. Civ. P. 12(h)(3).  In the present motion, the United States seeks dismissal of Petitioners' claims based on both a legal and factual challenge to the Court's subject matter jurisdiction.  This Court may properly consider and weigh evidence beyond Petitioners' allegations when evaluating such a challenge to the Court's subject matter jurisdiction:

> Factual attacks [on a Court's subject matter jurisdiction] . . . "challenge subject matter jurisdiction in fact, irrespective of the pleadings."  In resolving a factual attack, the district court "may consider extrinsic evidence such as testimony and affidavits."  Since such a motion implicates the fundamental question of a trial

1

Petitioners lack Article III standing and because the claims raised by Petitioners in these proceedings are not constitutionally ripe.

**I. The Claims Raised in the Petition Must Be Dismissed for Lack of Subject Matter Jurisdiction Because the Petitioners Lack Standing to Bring Those Claims.**

These proceedings pursuant to the CVRA must be dismissed for lack of subject matter jurisdiction because Petitioners lack standing to pursue the remedies that they are seeking for alleged CVRA violations. As the Supreme Court has explained,

> to satisfy Article III's standing requirements, a plaintiff must show (1) it has suffered an "injury in fact" that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.*, 528 U.S. 167, 180-81 (2000); *see also, e.g.*, *Young Apartments. Inc. v. Town of Jupiter*, 529 F.3d 1027, 1038 (11th Cir. 2008) (quoting *Harris v. Evans*, 20 F.3d 1118, 1121 (11th Cir. 1994) (en banc)). Moreover, "a plaintiff must demonstrate standing separately for each form of relief sought." *Friends of the Earth*, 528 U.S. at 185.

Here, the record incontrovertibly demonstrates that Petitioners cannot satisfy the third prong of the standing test, and the Petition and these proceedings must accordingly be dismissed for lack of subject matter jurisdiction.[2] *E.g.*, *Florida Wildlife Federation, Inc. v. South Florida*

---

> court's jurisdiction, a "trial court is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case" without presuming the truthfulness of the plaintiff's allegations.

*Makro Capital of America, Inc. v. UBS AG*, 543 F.3d 1254, 1258 (11th Cir. 2008) (citations omitted); *see also, e.g.*, *McMaster v. United States*, 177 F.3d 936, 940 (11th Cir. 1999) ("[W]e determine whether this lawsuit survives the government's factual attack [on subject matter jurisdiction] by looking to matters outside the pleadings, and we do not accord any presumptive truthfulness to the allegations in the complaint."); *Scarfo v. Ginsberg*, 175 F.3d 957, 960-61 (11th Cir. 1999).

[2] Although Petitioners also fail to satisfy the first and second prongs of the standing test,

*Water Management Dist.*, 647 F.3d 1296, 1302 (11th Cir. 2011) ("If at any point in the litigation the plaintiff ceases to meet all three requirements for constitutional standing, the case no longer presents a live case or controversy, and the federal court must dismiss the case for lack of subject matter jurisdiction."); *Phoenix of Broward, Inc. v. McDonald's Corp.*, 489 F.3d 1156, 1161 (11th Cir. 2007) ("[T]he issue of constitutional standing is jurisdictional . . . ."); *National Parks Conservation Ass'n v. Norton*, 324 F.3d 1229, 1242 (11th Cir. 2003) ("[B]ecause the constitutional standing doctrine stems directly from Article III's 'case or controversy' requirement, this issue implicates our subject matter jurisdiction, and accordingly must be addressed as a threshold matter regardless of whether it is raised by the parties.") (citation omitted).

In these proceedings, the only identified legal relief that Petitioners have sought pursuant to the CVRA is the setting aside of the Non-Prosecution Agreement that was entered into between Jeffrey Epstein and the U.S. Attorney's Office for the Southern District of Florida ("USAO-SDFL"). *See, e.g.*, DE 99 at 6 (recognizing that the relief Petitioners seek "is to invalidate the non-prosecution agreement"). But even assuming *arguendo* that Petitioners' rights under the CVRA were violated when Epstein and the USAO-SDFL entered into the Non-Prosecution Agreement, constitutional due process guarantees do not allow either the Non-Prosecution Agreement – which by its terms induced Epstein to, *inter alia*, plead guilty to state criminal charges and serve an 18-month sentence of state incarceration[3] – or the governmental

---

this Court need not reach or address those issues because an analysis of the third prong of the standing test incontrovertibly establishes the Petitioners' lack of standing. Nonetheless, the circumstances which demonstrate Petitioners' lack of a concrete injury traceable to government conduct are explored *infra* in Section II of this memorandum, which addresses how Petitioners' claims and these proceedings lack constitutional ripeness.

[3] *See also* July 11, 2008 Hr'g Tr. at 20-21 (Petitioners' acknowledgement that Epstein's reliance on promises in Non-Prosecution Agreement led to his guilty plea to state charges and his

obligations undertaken therein to be set aside.[4] *See, e.g., Santobello v. New York*, 404 U.S. 257, 262 (1971) ("[W]hen a plea rests in any significant degree on a promise or agreement of the prosecutor, so that it can be said to be part of the inducement or consideration, such promise must be fulfilled."); *United States v. Harvey*, 869 F.2d 1439, 1443 (11th Cir. 1989) ("Due process requires the government to adhere to the terms of any plea bargain or immunity agreement it makes."). Indeed, even if this Court were somehow to set aside the Non-Prosecution Agreement on the authority of the CVRA, and even if after consultation with Petitioners the United States determined that it would be proper and desirable to institute a criminal prosecution in the Southern District of Florida against Epstein on the criminal charges contemplated in the Non-Prosecution Agreement, the United States would still be constitutionally required to adhere to the negotiated terms of the Non-Prosecution Agreement. *See, e.g., Santobello*, 404 U.S. at 262; *Harvey*, 869 F.2d at 1443.

Due process considerations further bar this Court from setting aside a non-prosecution agreement that grants contractual rights to a contracting party (Epstein) who has not been made a party to the proceedings before the Court. *See, e.g., School Dist. of City of Pontiac v. Secretary of U.S. Dept. of Educ.*, 584 F.3d 253, 303 (6th Cir. 2009) ("It is hornbook law that all parties to a contract are necessary in an action challenging its validity . . . ."); *Dawavendewa v. Salt River Project Agr. Imp. & Power Dist.*, 276 F.3d 1150, 1157 (9th Cir. 2002) ("[A] party to a contract is necessary, and if not susceptible to joinder, indispensable to litigation seeking to decimate that

---

subsequent 18-month state incarceration).

[4] To the extent that the Petitioners' requested invalidation of the Non-Prosecution Agreement would implicitly reject and nullify the correctness of both the state court's acceptance of Epstein's guilty plea and the resulting judgment of conviction –which were induced in part by the Non-Prosecution Agreement – such judicial action might raise additional questions about this Court's jurisdiction under the *Rooker/Feldman* doctrine. *See, e.g., Casale v. Tillman*, 558 F.3d 1258, 1260-61 (11th Cir. 2009); *Powell v. Powell*, 80 F.3d 464, 466-68 (11th Cir. 1996).

contract."); *Lomayaktewa v. Hathaway*, 520 F.2d 1324, 1325 (9th Cir. 1975) ("No procedural principle is more deeply imbedded in the common law than that, in an action to set aside a lease or a contract, all parties who may be affected by the determination of the action are indispensable."); *see also National Licorice Co. v. NLRB*, 309 U.S. 350, 362 (1940) ("It is elementary that it is not within the power of any tribunal to make a binding adjudication of the rights in personam of parties not brought before it by due process of law.").[5]

Additionally, a "favorable ruling" from this Court will not provide Petitioners with anything for the alleged CVRA violations that is not already available to them. For the due process reasons already discussed above, the United States must legally abide by the terms of the Non-Prosecution Agreement even if this Court should somehow set the agreement aside for Petitioners to consult further with the government attorney handling the case. Moreover, as will be explained in greater detail below, *see infra* at 8-12, Petitioners already have the present ability to confer with an attorney for the government about a federal criminal case against Epstein – whether or not the Non-Prosecution Agreement is set aside – because the investigation and potential federal prosecution of Epstein for crimes committed against the Petitioners and others remains a legally viable possibility.[6]

The present proceedings under the CVRA must accordingly be dismissed for lack of standing because Petitioners simply have no injury that is likely to be redressed by a favorable ruling in these proceedings. *See, e.g.*, *Scott v. Taylor*, 470 F.3d 1014, 1018 (11th Cir. 2006) (holding that there was no standing where it was speculative that remedy that Plaintiff sought

---

[5]  Significantly, it is *Epstein's contractual rights* under the non-prosecution agreement that Petitioners seek to void through these proceedings.

[6]  Petitioners' present, as well as past, ability to confer with an attorney for the government also demonstrates that Petitioners fail to satisfy the first two prongs of the standing test: Petitioners have simply not suffered a concrete injury that is fairly traceable to the challenged government conduct.

would redress claimed injury).

## II.   The Claims Raised in the Petition Are Not Constitutionally Ripe, and These Proceedings Must Thus Be Dismissed for Lack of Subject Matter Jurisdiction.

This Court must also dismiss these proceedings for lack of subject matter jurisdiction because the Petitioners' claims are not constitutionally ripe.

Ripeness, like standing, "originate[s] from the Constitution's Article III requirement that the jurisdiction of the federal courts be limited to actual cases and controversies." *Elend v. Basham*, 471 F.3d 1199, 1204-05 (11th Cir. 2006). "'The ripeness doctrine keeps federal courts from deciding cases prematurely,' *Beaulieu v. City of Alabaster*, 454 F.3d 1219, 1227 (11th Cir. 2006), and 'protects [them] from engaging in speculation or wasting their resources through the review of potential or abstract disputes,' *Digital Props., Inc. v. City of Plantation*, 121 F.3d 586, 589 (11th Cir.1997)." *United States v. Rivera*, 613 F.3d 1046, 1050 (11th Cir. 2010); *see also Pittman v. Cole*, 267 F.3d 1269, 1278 (11th Cir. 2001) ("'The ripeness doctrine prevent[s] the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements . . . .'") (quoting *Coalition for the Abolition of Marijuana Prohibition v. City of Atlanta*, 219 F.3d 1301, 1315 (11th Cir. 2000) (citations and quotations omitted))). Under the ripeness doctrine, a court must therefore determine "'whether there is sufficient injury to meet Article III's requirement of a case or controversy and, if so, whether the claim is sufficiently mature, and the issues sufficiently defined and concrete, to permit effective decisionmaking by the court.'" *In re Jacks*, 642 F.3d 1323, 1332 (11th Cir. 2011) (quoting *Cheffer v. Reno*, 55 F.3d 1517, 1524 (11th Cir. 1995)).

When evaluating whether a claim is ripe, a court considers: "'(1) the fitness of the issues for judicial decision, and (2) the hardship to the parties of withholding court consideration.'" *Id.* (quoting *Cheffer*, 55 F.3d at 1524 (citing *Abbott Labs. v. Gardner*, 387 U.S. 136, 149 (1967)));

6

*see also, e.g., Association For Children for Enforcement of Support, Inc. v. Conger*, 899 F.2d 1164, 1165 (11th Cir. 1990). Under the doctrine, "[a] claim is not ripe when it is based on speculative possibilities," *In re Jacks*, 642 F.3d 1323, 1332 (11th Cir. 2011), such as if the claim "'rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all,'" *Atlanta Gas Light Co. v. FERC*, 140 F.3d 1392, 1404 (11th Cir. 1998) (quoting *Texas v. United States*, 523 U.S. 296, 300 (1998)). Indeed, "[t]he ripeness doctrine is designed to prevent federal courts from engaging in such speculation and prematurely and perhaps unnecessarily reaching constitutional issues." *Pittman*, 267 F.3d at 1280.

In these proceedings, the Petitioners have sought to set aside the Non-Prosecution Agreement between Epstein and the USAO-SDFL so that Petitioners can "confer with the attorney for the Government" about the possible filing of federal criminal charges against Epstein and the potential disposition of any such charges. *See, e.g.*, July 11, 2008 Hr'g Tr. at 6-7 (seeking an "[o]rder that the [non-prosecution] agreement that was negotiated is invalid" so that Petitioners can exercise the right to confer with the government); *id.* at 19-20, 24; 18 U.S.C. § 3771(a)(5); *see also* DE 1 at 2 ¶ 5 (claiming that Petitioner was "denied her rights" under the CVRA because she "received no consultation with the attorney for the government regarding the possible disposition of the charges").

Notwithstanding the Non-Prosecution Agreement, Petitioners are and have been free to confer with attorneys for the government about the investigation and potential prosecution of Epstein. At least one attorney for the government (Assistant United States Attorney Villafaña from the USAO-SDFL) had spoken to Petitioners about the offenses committed against them by Epstein prior to the signing of the Non-Prosecution Agreement, *see, e.g.*, July 11, 2008 Hr'g Tr. at 22 (acknowledging that prosecutors spoke to Petitioners "about what happened" to them); DE

7

48 at 6 ¶ 8; *see also* DE 99 at 3, and government attorneys have on multiple occasions offered to confer with Petitioners, *see, e.g.*, July 11, 2008 Hr'g Tr. at 13 ("I will always confer, sit down with Jane Doe 1 and 2, with the two agents and Ms. Villafana. We'll be happy to sit down with them."). Indeed, on December 10, 2010, the United States Attorney for the Southern District of Florida, accompanied by supervisory and line prosecutors from the USAO-SDFL, *personally* conferred with Petitioners' counsel and with Petitioner Jane Doe #1 and entertained discussion about Petitioners' desires to see Epstein criminally prosecuted on federal charges.[7] The United States Attorney and prosecutors in the USAO-SDFL have also corresponded with Petitioners' counsel on multiple occasions about Petitioners' desires to have Epstein criminally prosecuted on federal charges.[8]

Additionally, ███████████████████████████████████

██████████ a number of districts outside the Southern District of Florida (*e.g.*, the Southern District of New York and the District of New Jersey) share jurisdiction and venue with the Southern District of Florida over potential federal criminal charges based on the alleged sexual acts committed by Epstein against the Petitioners. Epstein is thus subject to potential prosecution for such acts in those districts. Furthermore, because of the nature of the allegations against Epstein, the filing of such potential charges against Epstein still remains temporally viable; charges for such sexual activities involving minors are not barred by the applicable

---

[7] The United States Attorney also offered to confer with Jane Doe #2, but Jane Doe #2 declined the invitation and did not attend the meeting that was scheduled with the United States Attorney.

[8] Since that time, the USAO-SDFL has been recused by the Department of Justice from prospective responsibility for any criminal investigation or potential prosecution relating to Epstein's alleged sexual activities with minor females. The Department of Justice has reassigned responsibility for the investigation and potential prosecution of such criminal matters in the Southern District of Florida to the United States Attorney's Office for the Middle District of Florida for consideration of any prosecutorial action that may be authorized and appropriate.

statutes of limitations. *See* 18 U.S.C. §§ 3283, 3299. Petitioners are free to contact the United States Attorney's Office in those districts and seek to confer with government attorneys in those offices about investigating and potentially prosecuting Epstein based on the alleged federal crimes committed against them.[9]

Petitioners nonetheless have appeared to contend throughout these proceedings that the many opportunities that they have been given to consult with the attorneys for the government about Epstein's offenses and the potential charges against Epstein – opportunities which continue to be available to Petitioners – are not meaningful under the CVRA due to the existence of the Non-Prosecution Agreement. According to Petitioners, the Non-Prosecution Agreement has given Epstein a "free pass" on federal criminal charges for the offenses he committed against Petitioners and others. *See, e.g.*, DE 9 at 15 (characterizing Non-Prosecution Agreement as "a 'free pass' from the federal government"), 2 (contending that the Non-Prosecution Agreement "allowed [Epstein] . . . to escape all federal prosecution for dozens of serious federal sex offenses against minors"), 7 ("the wealthy defendant has escaped all federal punishment"), 12 ("[T]he agreement prevents federal prosecution of the defendant for numerous sex offenses."); DE 77 at 2 (describing Non-Prosecution Agreement as "an agreement that blocked federal prosecution of Epstein for the multitude of sex offenses he committed again [sic] the victims"), 17 ("The [Non-

---

[9] The USAO-SDFL has no present knowledge about whether the United States Attorney's Offices in those districts have opened any investigations into the allegations that have been made against Epstein, whether those offices are even aware of those allegations or the evidence supporting them, or what investigative or prosecutorial actions, if any, those offices might take in the future. Nonetheless, should any investigation be underway or should any investigation be initiated involving such allegations, the evidence gathered        in the Southern District of Florida could be disclosed to federal prosecutors and federal grand juries in New York or New Jersey. *See*

9

Prosecution Agreement] barred prosecution of the federal sexual offenses that Epstein had committed *against Jane Doe #1 and Jane Doe #2 . . . .*").[10] That is simply not so.

Contrary to Petitioners' contentions, there has been no disposition by the government of any federal criminal charges against Epstein. No federal charges involving Petitioners have ever been brought against Epstein, and no such federal charges have been resolved. The Non-Prosecution Agreement about which Petitioners complain disposes of **no** federal criminal charges against Epstein, and that agreement does not bar the United States from bringing federal criminal charges against Epstein. Instead, when addressing potential federal criminal charges against Epstein, the USAO-SDFL merely agreed in the Non-Prosecution Agreement that:

> on the authority of R. Alexander Acosta, United States Attorney for the Southern District of Florida, prosecution *in this District* for these offenses shall be deferred in favor of prosecution by the State of Florida, provided that Epstein abides by the following conditions and the requirements of this Agreement set forth below.

and that

> After timely fulfilling all the terms and conditions of the Agreement, no prosecution for the offenses set out on pages 1 and 2 of this Agreement, nor any other offenses that have been the subject of the joint investigation by the Federal Bureau of Investigation and the United States Attorney's Office, nor any offenses that arose from the Federal Grand Jury investigation will be instituted *in this District*, and the charges against Epstein if any, will be dismissed.

Non-Prosecution Agreement at 2 (emphasis added).

Thus, the Non-Prosecution Agreement simply obligated the government not to prosecute

Epstein *in the Southern District of Florida* for the offenses set forth in the Non-Prosecution

---

[10] This Court has also previously described the Non-Prosecution Agreement as "an agreement under which . . . the U.S. Attorney's Office would agree not to prosecute Epstein for federal offenses." DE 99 at 2-3. That description of the Non-Prosecution Agreement, however, was not based on the Court's interpretation of the terms of the Non-Prosecution Agreement, but was instead based on "allegations" by Petitioners that the Court concluded were "not yet supported by evidence" but upon which the Court nonetheless relied "solely to provide the context for the threshold issues addressed in" its September 26, 2011 Order. *Id.* at 2 n.2.

Agreement. The Non-Prosecution Agreement does not bar the United States from bringing federal criminal charges against Epstein for the offenses set forth in the Non-Prosecution Agreement in any other district in the nation.[11] *See, e.g., United States v. Cain*, 587 F.2d 678, 680 (5th Cir. 1979) ("Where . . . the prosecutor is not found to have made promises relating to nonprosecution of charges in another district and the [defendant] is not found to have relied on such alleged promises, this Court will affirm the trial court's denial of a motion to dismiss the subsequent prosecutions."). Neither does the Non-Prosecution Agreement bar prosecution in any district for offenses not identified in the agreement.

Petitioners contend that the CVRA gives a victim the right to confer with the attorney for the government before there is a disposition of contemplated, but-not-yet-filed federal criminal charges arising from offenses against the victim. But, although the government disputes that the CVRA creates such a right,[12] the Petitioners have never been denied any such right. The Petitioners have had *and still have* the ability confer to with the attorney for the government about potential federal criminal charges against Epstein and about the potential disposition of any such charges, should they be filed. In fact, Petitioners are free to approach the United States Attorney's Offices in districts such as the Southern District of New York and the District of New Jersey – whose authority to institute criminal charges against Epstein in their districts has not

---

[11] Significantly, under the governing provision of the United States Attorney's Manual, the USAO-SDFL did not have the authority to unilaterally bar Epstein's prosecution in any other district in the country:

> No district or division shall make any agreement, including any agreement not to prosecute, which purports to bind any other district(s) or division without the express written approval of the United States Attorney(s) in each affected district and/or the Assistant Attorney General of the Criminal Division.

USAM 9-27.641 (Multi-District (Global) Agreement Requests).

[12] The government acknowledges that this Court has nonetheless ruled that "as a matter of law the CVRA can apply before formal charges are filed," DE 99 at 10; *see also id.* at 6-9, but has not yet determined "whether the particular rights asserted here attached," *id.* at 10.

11

been curtailed by the Non-Prosecution Agreement – to discuss the possibility of pursuing federal criminal charges against Epstein.[13] Nothing precludes Petitioners from doing so, and there is **nothing** to indicate that Petitioners' wishes to confer with government attorneys in those districts would be rebuffed in any way. Indeed, it would be rank speculation by Petitioners to contend otherwise.

Here, Petitioners have acknowledged that the best relief they can hope to obtain through these proceedings is the ability to confer with the attorneys for the government. *See, e.g.*, July 11, 2008 Hr'g Tr. at 7 (agreeing that "the best [Petitioners] can get" is the "right to confer"). Yet, under the circumstances, a claim that Petitioners have been denied the opportunity to confer with the attorney for the government about the filing and disposition of criminal charges against Epstein is premature and constitutionally unripe. "This is plainly the type of hypothetical case that [a court] should avoid deciding." *Association for Children for Enforcement of Support, Inc. v. Conger*, 899 F.2d 1164, 1166 (11th Cir. 1990). Any speculation by Petitioners that they might prospectively be denied the opportunity to confer with the government about still-legally-viable federal charges against Epstein simply cannot ripen Petitioners' claims. *See id.* (recognizing that courts "do not generally decide cases based on a party's predicted conduct").

For these reasons, Petitioners' claims in these proceedings should be dismissed for lack of subject matter jurisdiction. *See, e.g.*, *In re Jacks*, 642 F.3d 1323, 1332 (11th Cir. 2011) (holding that claims that are "based on events that may take place in the future" are to be "dismissed for lack of jurisdiction") (citing *Greenbriar, Ltd. v. City of Alabaster*, 881 F.2d 1570, 1574 n.7 (11th Cir. 1989) ("[R]ipeness goes to whether the district court had subject matter

---

[13] Petitioners could also approach the United States Attorney's Office for the Middle District of Florida, but, due to that office's recusal-based derivative prosecutorial responsibilities in the Southern District of Florida, *see supra* note 8, the Non-Prosecution Agreement would constrain the possible filing of federal charges by that office in the Southern District of Florida.

jurisdiction to hear the case.")); *Reahard v. Lee County*, 30 F.3d 1412, 1415 (11th Cir. 1994)

("The question of ripeness 'goes to whether the district court had subject matter jurisdiction.'")

(quoting *Greenbriar*, 881 F.2d at 1573); *see also Jacksonville Property Rights Ass'n, Inc. v. City

of Jacksonville*, 635 F.3d 1266, 1276 (11th Cir. 2011) (concluding that when plaintiffs ask a

court "to issue a declaration on an issue that might never impact their substantive rights," they

are "asking th[e] court either to issue an impermissible advisory opinion, or to decide a case that

is not yet ripe for decision"), *reh'g & reh'g en banc denied*, Case No. 09-15629, __ Fed. App'x

__ (11th Cir. Jun. 29, 2011) (Table).

## Conclusion

For the reasons set forth above, the United States respectfully requests that this Court

enter an order dismissing the Petitioners' claims and these proceedings for lack of subject matter

jurisdiction.

Respectfully submitted,

WIFREDO A. FERRER
UNITED STATES ATTORNEY

By: _____

Dexter A. Lee
Assistant United States Attorney
Florida Bar No. 0936693
99 N.E. 4th Street
Miami, Florida 33132
Tel: (305) 961-9320; Fax: (305) 530-7139
Email: dexter.lee@usdoj.gov

Eduardo I. Sánchez
Assistant United States Attorney
Florida Bar No. 877875
99 N.E. 4th Street
Miami, Florida 33132
Tel: (305) 961-9057; Fax: (305) 536-4676
Email: eduardo.i.sanchez@usdoj.gov

A. Marie Villafaña
Assistant United States Attorney
Florida Bar No. 0018255
500 S. Australian Avenue, Suite 400
West Palm Beach, FL 33401
Tel: (561) 820-8711; Fax: (561) 820-8777
Email: ann.marie.c.villafana@usdoj.gov

Attorneys for Respondent

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing *United States' Sealed Motion to Dismiss for Lack of Subject Matter Jurisdiction* was served via United States Mail this 7th day of November, 2011, upon Counsel for Petitioners Jane Doe #1 and Jane Doe #2, accompanied by a copy of the November 7, 2011 *Sealed Order Granting Government's Motion for Limited Disclosure of Grand Jury Matter*. Pursuant to the Order regarding the disclosure of Grand Jury Information, a copy was not served upon the proposed intervenors.

Assistant United States Attorney

## SERVICE LIST

*Jane Does 1 and 2 v. United States,*
Case No. 08-80736-CIV-MARRA/JOHNSON
United States District Court, Southern District of Florida


Brad Edwards, Esq.,
The Law Offices of Brad Edwards & Associates, LLC
2028 Harrison Street, Suite 202
Hollywood, Florida 33020
(954) 414-8033
Fax: (954) 924-1530

Paul G. Cassell
S.J. Quinney College of Law at the
University of Utah
332 S. 1400 E.
Salt Lake City, Utah 84112
(801) 585-5202
Fax: (801) 585-6833
E-mail: casselp@law.utah.edu
Attorneys for Jane Doe # 1 and Jane Doe # 2

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

IN RE:

**GRAND JURY PROCEEDINGS**
**FEDERAL GRAND JURY 05-02(WPB) AND**
**FEDERAL GRAND JURY 07-103(WPB)**

_____/

**Sealed Order Granting**
**Government's Motion for Limited Disclosure of Grand Jury Matter**

# UNDER SEAL

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA



IN RE:

GRAND JURY PROCEEDINGS
FEDERAL GRAND JURY 05-02(WPB) AND
FEDERAL GRAND JURY 07-103(WPB)

_____/

### Sealed Order Granting
### Government's Motion for Limited Disclosure of Grand Jury Matter

This cause comes before the Court on the Government's *Sealed Ex Parte Motion for
Limited Disclosure of Grand Jury Matter Pursuant to Fed. R. Crim. P. 6(e)(3)(E)(i)*. After
careful consideration of the grounds raised in said motions, and the Court being otherwise
advised in the premises,

IT IS HEREBY ORDERED that the Government's *Motion for Limited Disclosure of
Grand Jury Matter Pursuant to Fed. R. Crim. P. 6(e)(3)(E)(i)* is GRANTED. The Government
is authorized to disclose in *Jone Doe No. 1 and Jane Doe No. 2 v. United States*, Case No. 08-
80736-Civ-Marra (S.D. Fla.),



IT IS FURTHER ORDERED that disclosure pursuant to Fed. R. Crim. P. 6(e)(3)(E)(i)
shall be conditioned on the following:

(1) the disclosure of the aforementioned grand jury information shall be limited to filings made under seal in Case No. 08-80736-Civ-Marra;

(2) the service of filings containing the aforementioned grand jury information shall be limited to counsel for Petitioners Jane Doe No. 1 and Jane Doe No. 2 and for the government in Case No. 08-80736-Civ-Marra, and shall be accompanied by a copy of this Order; and

(3) further dissemination by any person or entity receiving disclosure of the grand jury information authorized to be disclosed by this Order shall be limited to the individual Petitioners in Case No. 08-80736-Civ-Marra, and any dissemination of such grand jury information shall be accompanied by a copy of this Order.

DONE AND ORDERED in Chambers at West Palm Beach, Florida, this ___7___ day of

November, 2011.

DONALD M. MIDDLEBROOKS
UNITED STATES DISTRICT JUDGE

EXHIBIT 144

# In The Matter Of:

*UNITED STATES OF AMERICA, v.*

*GHISLAINE MAXWELL,*

*December 16, 2021*

*Southern District Court Reporters*

UNITED STATES OF AMERICA, v.
GHISLAINE MAXWELL,

December 16, 2021

---

LCGCmax6          Aznaran - direct          Page 2516

1 A. Yes.
2 Q. Let's take a look at a few of Kate's entries. So flip to
3 page 7 of what's marked on the bottom right as page 7.
4 A. Yes.
5 Q. You see the entry there is November 1st of 1997; is that
6 right?
7 A. Yes.
8 Q. Is that the earliest border entry in the TECS system for
9 Kate?
10 A. Yes.
11 Q. And you see her date of birth over to the left?
12 A. Yes.
13 Q. Based on her date of birth, she would have been 20 years
14 old when that flight took place; is that right?
15 A. Yes.
16 Q. So does this report reflect that Kate had any border
17 crossings in 1994?
18 A. No.
19 Q. Does it reflect any border crossings for Kate in 1995?
20 A. No.
21 Q. Does it reflect any border crossing records for Kate in
22 1996?
23 A. No.
24 Q. First one was that one in November 1st, 1997, when she's
25 20?

---

LCGCmax6          Aznaran - cross          Page 2517

1 A. Yes.
2 Q. Now I want you to flip to the last page. Those are the
3 records for Annie Farmer?
4 A. Yes.
5 Q. Why don't you look at that last entry. That's a flight on
6 July 20th, 1997; correct?
7 A. Yes.
8 Q. What city did this flight depart from?
9 A. DUS, which is Düsseldorf, Germany.
10 Q. Where did it arrive?
11 A. EWR, which is Newark Airport, New Jersey.
12 Q. Is this the earliest border entry in the TECS system for
13 Annie Farmer?
14 A. Yes.
15 Q. Does this report show any border crossings for Annie Farmer
16 in 1996?
17 A. No.
18      MR. EVERDELL: One moment, your Honor.
19      THE COURT: Okay.
20      MR. EVERDELL: No further questions, your Honor.
21      THE COURT: Ms. Pomerantz.
22      MS. POMERANTZ: Thank you, your Honor.
23 CROSS-EXAMINATION
24 BY MS. POMERANTZ:
25 Q. Good afternoon.

---

LCGCmax6          Aznaran - cross          Page 2518

1 A. Good afternoon.
2 Q. You've been testifying about CBP records of international
3 flights from the 1990s and 2000s; right?
4 A. Yes.
5 Q. In your work as a CBP officer, do you have experience
6 reviewing flight records from before September 11th, 2001?
7 A. Yes.
8 Q. In your work as a CBP officer, do you have experience
9 reviewing flight records from after 9/11?
10 A. Yes.
11 Q. Based on your review of CBP records in your experience as a
12 CBP officer, have you noticed a difference between CBP records
13 from before 9/11 and after 9/11?
14 A. Yes.
15 Q. What difference have you noticed?
16 A. Well, so if you -- if you look at the records, not
17 necessarily these, but just in general, from my experience,
18 what I have noticed is the farther back you go from the present
19 time, the more likelihood that you are not going to get an
20 on-board or not-on-board status for those records.
21      (Continued on next page)
22
23
24
25

---

LCGVMAX7          Aznaran - cross          Page 2519

1 BY MS. POMERANTZ:
2 Q. As a CBP officer, is it important to your job to understand
3 whether the CBP records you are reviewing are thorough and
4 accurate?
5 A. Yes.
6 Q. And in your day-to-day work as a CBP officer, do you rely
7 on CBP records from before 9/11 to be complete?
8 A. We'd like to rely on or hope that the records are complete,
9 but not necessarily all the time, no.
10 Q. And why is that the case that records before 9/11 are not
11 necessarily complete?
12 A. Prior to 9/11, there was a little bit of a difference
13 between how the records were submitted to CBP systems and the
14 reliability of the airlines was not as good as it is now or
15 after 9/11.
16 Q. And when did that start to change in terms of when did the
17 records start to be more complete and thorough?
18 A. After 9/11, there were several acts put into place by the
19 U.S. Government. The Department of Homeland Security was
20 created. And basically, the airline industry was at one point
21 mandated now to submit more complete records to CBP. I feel
22 comfortable saying -- as far as the status indicators, I feel
23 comfortable saying roughly 2009, 2010, based on the records
24 that I have ran in my experience, you would see more onboard or
25 not onboard status.

---

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 08-80736-CIV-MARRA

JANE DOE 1 AND JANE DOE 2,

Petitioners,

vs.

UNITED STATES,

Respondent.

_____/

## OPINION AND ORDER

This cause is before the Court upon Jane Doe 1 and Jane Doe 2's Motion for Partial
Summary Judgment (DE 361); the United States's Cross-Motion for Summary Judgment (DE
408); Jane Doe 1 and Jane Doe 2's Motion to Compel Answers (DE 348) and Jane Doe 1 and
Jane Doe 2's Motion for Finding Waiver of Work Product and Similar Protections by
Government and for Production of Documents (DE 414). The Motions are fully briefed and ripe
for review. The Court has carefully considered the Motions and is otherwise fully advised in the
premises.

### I. Background

The facts, as culled from affidavits, exhibits, depositions, answers to interrogatories and
reasonably inferred, for the purpose of these motions, are as follows:

From between about 1999 and 2007, Jeffrey Epstein sexually abused more than 30 minor
girls, including Petitioners Jane Doe 1 and Jane Doe 2 (hereinafter, "Petitioners"), at his mansion
in Palm Beach, Florida, and elsewhere in the United States and overseas. (Government Resp. to
Petitioner's Statement of Undisputed Material Facts (hereinafter, "DE 407" at ¶ 1.) Because

Epstein and his co-conspirators knowingly traveled in interstate and international commerce to sexually abuse Jane Doe 1, Jane Doe 2 and others, they committed violations of not only Florida law, but also federal law. (DE 407 at ¶ 2.) In addition to his own sexual abuse of the victims, Epstein directed other persons to abuse the girls sexually. (DE 407 at ¶ 3.) Epstein used paid employees to find and bring minor girls to him. Epstein worked in concert with others to obtain minors not only for his own sexual gratification, but also for the sexual gratification of others. (DE 407 at ¶ 8.)

In 2005, the Town of Palm Beach Police Department ("PBPD") received a complaint from the parents of a 14 year old girl about her sexual abuse by Jeffery Epstein. The PBPD ultimately identified approximately 20 girls between the ages of 14 and 17 who were sexually abused by Epstein. (DE 407 at ¶ 4.) In 2006, at the request of the PBPD, the Federal Bureau of Investigation ("FBI") opened an investigation into allegations that Epstein and his personal assistants used the facilities of interstate commerce to induce girls between the ages of 14 and 17 to engage in illegal sexual activities. (DE 407 at ¶ 5.) The FBI ultimately determined that both Jane Doe 1 and Jane Doe 2 were victims of sexual abuse by Epstein while they were minors. Jane Doe 1 provided information about her abuse and Jane Doe 2's abuse to the FBI on August 7, 2007. (DE 407 at ¶ 6.)

From January of 2007 through September of 2007, discussions took place between the U.S. Attorney's Office for the Southern District of Florida ("the Office") and Jeffrey Epstein's attorneys. (DE 407 at ¶ 9.) On February 1, 2007, Epstein's defense team sent a 24-page letter to the Office going over what they intended to present during a meeting at the Office the same day. (DE 407 at ¶ 10.)

2

By March 15, 2007, the Office was sending letters to victims informing them of their rights pursuant to the Crime Victims' Rights Act ("CVRA"). (DE 407 at ¶ 11.) By May of 2007, the Office had drafted an 82-page prosecution memorandum and a 53-page indictment outlining numerous federal sexual offenses committed by Epstein. (DE 407 at ¶ 12.) On or about June 7, 2007, FBI agents had delivered to Jane Doe 1 a standard CVRA victim notification letter.[1] The notification letter promised that the Justice Department would make its "best efforts" to protect Jane Doe 1's rights, including "the reasonable right to confer with the attorney for the United States in the case" and " to be reasonably heard at any public proceeding in the district court involving [a] . . . plea." The notification further stated that, "[a]t this time, your case is under investigation." (DE 407 at ¶ 13.) Jane Doe 1 relied on those representations and believed that the Government would protect those rights and keep her informed about the progress of her case. (DE 407 at ¶ 14.)

On July 6, 2007, Epstein's lawyers sent a 23-page letter lodging numerous arguments to persuade the Office that no federal crimes had been committed by him. (DE 407 at ¶ 15.) By August 3, 2007, the Government had rejected Epstein's various arguments against federal

---

[1] On or about August 11, 2006, Jane Doe 2 received the same CVRA letter. (DE 407 at ¶ 7.)

Initially, Jane Doe 2 was unwilling to provide any information to the FBI or the Office unless she was assured her statements would not be used against her. She also described Epstein as "an awesome man" and stated that she hoped "nothing happens to" him. (DE 415 at ¶¶ 14-15.) This was during the time period where Jane Doe 2 had obtained counsel paid for by Epstein. (Jane Doe 2 Decl. ¶¶ 5-7.)

Assistant United States Attorney ("AUSA") A. Marie Villafaña ("line prosecutor" "Villafaña") testified that both Jane Doe 1 and Jane Doe 2 received letters describing their rights under the CVRA. Although Jane Doe 1 and 2 were given Ms. Villafaña's and the FBI agent's name and phone number, neither contacted either of them. (Villafaña Decl. ¶ 5, DE 403-19.)

charges and sent a letter to Epstein's counsel stating, "[w]e would reiterate that the agreement to Section 2255 [a civil restitution provision] liability applies to all of the minor girls identified during the federal investigation, not just the 12 that form the basis of an initial planned charging instrument." (DE 407 at ¶ 17.) On September 10, 2007, multiple drafts of a non-prosecution agreement ("NPA") had been exchanged between Epstein's counsel and the Office. (DE 407 at ¶ 18.)

On September 12, 2007, while attempting to create alternative charges against Epstein, the Office expressed concern about "the effect of taking the position that Mr. Epstein's house is in the special maritime and territorial jurisdiction of the United States" because the Government had "no evidence of any assaults occurring either on Mr. Epstein's plane or offshore from his residence." (DE 407 at ¶ 19.) On September 13, 2007, the line prosecutor emailed Epstein's counsel indicating an effort to come up with a solution to the aforementioned concern and she stated that she had been "spending some quality time with Title 18 looking for misdemeanors." The line prosecutor further indicated, "I know that someone mentioned there being activity on an airplane. I just want to make sure that there is a factual basis for the plea that the agents can confirm." Epstein's counsel responded, "[a]lready thinking about the same statutes." (DE 407 at ¶ 20.)

On September 14, 2007, after having spoken on the telephone about the subject matter of the September 13 emails, Epstein's counsel and the line prosecutor exchanged emails including a proposed plea agreement for Epstein to plead guilty to assaulting one of his coconspirators. (DE 407 at ¶ 21.) On September 15, 2007, the line prosecutor sent an email to the Epstein defense team raising concerns about a resolution that would not involve one of

4

Epstein's minor victims and stating:

> I have gotten some negative reaction to the assault charge with [a co-conspirator] as the victim, since she is considered one of the main perpetrators of the offenses that we planned to charge in the indictment. Can you talk to Mr. Epstein about a young woman named [Jane Doe]? We have hearsay evidence that she traveled on Mr. Epstein's airplane when she was under 18, in around the 2000 or 2001 time frame.

(DE 407 at ¶ 22.)

On September 16, 2007, the line prosecutor corresponded with Epstein's counsel about having Epstein plead guilty to obstruction of justice for pressuring one of his co-conspirators not to turn over evidence or complying with a previously-served grand jury subpoena. (DE 407 at ¶ 23.) The Office also stated, "On an 'avoid the press' note, I believe that Mr. Epstein's airplane was in Miami on the day of the [co-conspirator] telephone call. If he was in Miami-Dade County at the time, then I can file the charge in the District Court in Miami, which will hopefully cut the press coverage significantly." They also discussed having Epstein plead guilty to a second charge of assaulting a different co-conspirator. (DE 407 at ¶ 24.)

On September 16, 2007, the line prosecutor wrote to Epstein's counsel indicating that the Office did not like the factual basis for the proposed charges as the Office was "not investigating Mr. Epstein [for] abusing his girlfriend." (DE 407 at ¶ 25.) The correspondence further stated:

> Andy [i.e., AUSA Andrew Laurie] recommended that some of the timing issues be addressed only in the state agreement, so that it isn't obvious to the judge that we are trying to create federal jurisdiction for prison purposes.
>
> I will include our standard language regarding resolving all criminal liability and I will mention 'co-conspirators,' but I would prefer not to highlight for the judge all of the other crimes and all of the other persons that we could charge. Also, we do not

5

have the power to bind Immigration . . . there is no plan to try to proceed on any immigration charges against either Ms. [co-conspirator] or Ms. [coconspirator]

(Ex. 7, DE 361-7.)

In the same email, the line prosecutor wrote to defense counsel about a meeting outside the U.S. Attorney's Office: "Maybe we can set a time to meet. If you want to meet 'off campus' somewhere, that is fine." (DE 407 at ¶ 27.) On about September 16, 2007, Epstein's counsel provided a proposed NPA to the Government that extended immunity from federal prosecution not only to Epstein, but also to certain co-conspirators. (DE 407 at ¶ 28.)

On September 17, 2007, the line prosecutor wrote to defense counsel Jay Lefkowitz: "Please send [a document] to my home e-mail address – [redacted] and give me a call on my cell [redacted] so I can be ready for some discussions tomorrow." (DE 407 at ¶ 29.) On September 17, 2007, Lefkowitz responded: "[D]o you have another obstruction proffer I can review that you have drafted? Also, if we go that route, would you intend to make the deferred prosecution agreement public?" (DE 407 at ¶ 30.)

On September 18, 2007, the Office responded: "A non-prosecution agreement would not be made public or filed with the Court, but it would remain part of our case file. It probably would be subject to a FOIA request, but it is not something that we would distribute without compulsory process." (DE 407 at ¶ 31.) On September 20, 2007, the U.S. Attorney's Office wrote: "On the issue about 18 USC 2255, we seem to be miles apart. Your most recent version not only bad me binding the girls to a trust fund administered by the state court, but also promising that they will give up their 2255 rights.... In the context of a non-prosecution agreement, the office may be more willing to be specific about not pursuing charges against others." (DE 407 at ¶ 32.)

6

On September 21, 2007, Palm Beach County State Attorney Barry Krischer wrote the line prosecutor about the proposed agreement and added: "Glad we could get this worked out for reasons I won't put in writing. After this is resolved I would love to buy you a cup at Starbucks and have a conversation." (DE 407 at ¶ 33.) On September 21, 2007, the line prosecutor emailed Epstein's counsel stating, "I think that the attached addresses the concerns about having an unlimited number of claimed victims, without me trying to *bind* girls whom I do not represent." (DE 407 at ¶ 34.) On September 23, 2007, the U.S. Attorney's Office sent an email to Lefkowitz stating: "It is factually accurate that the list we are going to give you are persons we have identified as victims. If we did not think they were victims, they would have no right to bring suit." (DE 407 at ¶ 35.)

On September 24, 2007, the line prosecutor sent an e-mail to a prospective representative for the Epstein victims, entitled "Conflict Check." The email confirmed the girls' status as victims, stating: "Please keep this confidential because these are minor victims. This is a preliminary list." Later on September 24, 2007, the line prosecutor sent an email to Lefkowitz stating: "I have compiled a list of 34 confirmed minors." (DE 407 at ¶ 36.) As correspondence continued on September 24, 2007, and the NPA was being executed, Lefkowitz sent an email to the line prosecutor stating: "Marie – Please do whatever you can to keep this [i.e., the NPA] from becoming public." (DE 407 at ¶ 37.)

On September 24, 2007, Epstein and the Office formally reached an agreement whereby the United States would defer federal prosecution in favor of prosecution by the State of Florida. Epstein and the Office accordingly entered into a NPA reflecting such an agreement. (DE 407 at ¶ 38.) The NPA provided that "the United States, in consultation with and subject to the good faith approval of Epstein's counsel, shall select an attorney representative for [the victims], who shall be

7

paid for by Epstein." The NPA also provided that if any of the victims elected to bring suit under 18 U.S.C. § 2255, they must agree to waive any other claim for damages. As part of the NPA, Epstein would not contest the jurisdiction of the United States District Court and waived his right to contest liability and damages. (NPA, DE 361-62.)

Among other provisions, the NPA expanded immunity to any "potential coconspirator" of Epstein's: "In consideration of Epstein's agreement to plead guilty and to provide compensation in the manner described above, if Epstein successfully fulfills all of the terms and conditions of this agreement, the United States also agrees that it will not institute any criminal charges against any potential co-conspirators of Epstein, including but not limited to Sarah Kellen, Adriana Ross, Lesley Groff, or Nadia Marcinkova." (DE 407 at ¶ 40.) The NPA also provided that: "The parties anticipate that this agreement will not be made part of any public record. If the United States receives a Freedom of Information Act request or any compulsory process commanding the disclosure of the agreement, it will provide notice to Epstein before making that disclosure." (DE 407 at ¶ 41.)

From the time the FBI began investigating Epstein until September 24, 2007—when the NPA was concluded—the Office never conferred with the victims about a NPA or told the victims that such an agreement was under consideration. (Marie Villafaña Decl. ¶ 7, DE 361-64; DE 407 at ¶ 43.) Many, if not all, other similarly-situated victims received standard CVRA victim notification letters substantively identical to those sent to Jane Doe 1 and Jane Doe 2. (DE 407 at ¶ 44.) The Office did not consult or confer with any of the victims about the NPA before it was signed. (DE 407 at ¶¶ 45-46.)

Epstein's counsel was aware that the Office was deliberately keeping the NPA secret from the victims and, indeed, had sought assurances to that effect. (DE 407 at ¶ 48.) After the NPA was

8

signed, Epstein's counsel and the Office began negotiations about whether the victims would be told

about the NPA. (DE 407 at ¶ 49.) It was a deviation from the Government's standard practice to

negotiate with defense counsel about the extent of crime victim notifications. (DE 407 at ¶ 50.)

On September 24, 2007, the Office sent an email to Lefkowitz:

Thank you, Jay. I have forwarded your message only to [United States Attorney] Alex [Acosta], Andy, and Roland. I don't anticipate it going any further than that. When I receive the originals, I will sign and return one copy to you. The other will be placed in the case file, which will be kept confidential since it also contains identifying information about the girls.

When we reach an agreement about the attorney representative for the girls, we can discuss what I can tell him and the girls about the agreement. I know that Andy promised Chief Reiter an update when a resolution was achieved.... Rolando is calling, but Rolando knows not to tell Chief Reiter about the money issue, just about what crimes Mr. Epstein is pleading guilty to and the amount of time that has been agreed to. Rolando also is telling Chief Reiter not to disclose the outcome to anyone.

(DE 407 at ¶ 52.)

On September 25, 2007, the line prosecutor sent an e-mail to Lefkowitz stating: "And

can we have a conference call to discuss what I may disclose to . . . the girls regarding the

agreement." (DE 407 at ¶ 53.) Also on September 25, 2007, the line prosecutor sent an email to

Lefkowitz which stated in part: "They [Ted Babbitt, Stuart Grossman, Chris Searcy, [L]ake

Lytal] are all very good personal injury lawyers, but I have concerns about whether there would

be an inherent tension because they may feel that THEY might make more money (and get a lot

more press coverage) if they proceed outside the Terms of the plea agreement. (Sorry – I just

have a bias against plaintiffs' attorneys.) One nice thing about Bert is that he is in Miami where

there has been almost no coverage of this case." (DE 407 at ¶ 54.)

On September 26, 2007, the line prosecutor sent an e-mail to Lefkowitz in which she

9

stated: "Hi Jay – Can you give me a call at 561-[xxx-xxxx] this morning? I am meeting with the agents and want to give them their marching orders regarding what they can tell the girls." (DE 407 at ¶ 55.) On September 27, 2007, the attorney representative for the victims emailed the Office and asked whether he could get a copy of the indictment or plea agreement to find out "exactly what Epstein concedes to in the civil case." (Sept. 27, 2007 email, DE 362-2.) Upon inquiry from the Office, Lefkowitz responded by stating that the attorney representative "certainly [] should not get a copy of any indictment." (DE 407 at ¶ 57.) That same day, the line prosecutor informed Epstein's counsel of concerns raised by the attorney representative for the girls. Specifically, "[t]he concern is, if all 40 girls decide they want to sue, they don't want to be in a situation where Mr. Epstein says this is getting too expensive, we won't pay anymore attorneys' fees." (DE 407 at ¶ 58.)

Also on that same day, the line prosecutor sent an email to state prosecutors Lanna Belohlavek and Barry Krischer: "Can you let me know when Mr. Epstein is going to enter his guilty plea and what judge that will be in front of? I know the agents and I would really like to be there, 'incognito.'" (DE 407 at ¶ 59.)

On October 3, 2007, the Office sent a proposed letter that would have gone to a special master for selecting an attorney representative for the victims under the NPA's compensation procedure. The letter described the facts of the Epstein case as follows: "Mr. Epstein, through his assistants, would recruit underage females to travel to his home in Palm Beach to engage in lewd conduct in exchange for money. Based upon the investigation, the United States has identified 40 young women who can be characterized as victims pursuant to 18 U.S.C. § 2255. Some of those women went to Mr. Epstein's home only once, some went there as many as 100 times or more. Some

of the women's conduct was limited to performing a topless or nude massage while Mr. Epstein masturbated himself. For other women, the conduct escalated to full sexual intercourse." (DE 407 at ¶ 60.)

On October 10, 2007, Lefkowitz sent a letter to U.S. Attorney Alex Acosta stating, in pertinent part: "Neither federal agents nor anyone from your Office should contact the identified individuals to inform them of the resolution of the case, including appointment of the attorney representative and the settlement process. Not only would that violate the confidentiality of the agreement, but Mr. Epstein also will have no control over what is communicated to the identified individuals at this most critical stage. We believe it is essential that we participate in crafting mutually acceptable communication to the identified individuals." The letter further proposed that the attorney representative for the victims be instructed that "[t]he details regarding the United States's investigation of this matter and its resolution with Mr. Epstein is confidential. You may not make public statements regarding this matter." (DE 407 at ¶ 61.)

U.S. Attorney Acosta then met with Lefkowitz for breakfast and Lefkowitz followed up with a letter stating, "I also want to thank you for the commitment you made to me during our October 12 meeting in which you . . . assured me that your Office would not . . . contact any of the identified individuals, potential witnesses, or potential civil claimants and their respective counsel in this matter." (DE 407 at ¶ 63.)

On October 24, 2007, AUSA Jeff Sloman sent a letter to Jay Lefkowitz, proposing an addendum to the NPA clarifying the procedures for the third-party representative for the victims under the NPA's compensation provisions. (DE 407 at ¶ 64.) On October 25, 2007, AUSA Sloman sent a letter to Retired Judge Davis about selecting an attorney to represent the victims under the

11

NPA's compensation procedure. (DE 407 at ¶ 65.)

On about October 26 or 27, 2007, Special Agents E. Nesbitt Kuyrkendall and Jason Richards met in person with Jane Doe 1. They explained that Epstein would plead guilty to state charges, he would be required to register as a sex offender for life, and he had made certain concessions related to the payment of damages. (DE 407 at ¶ 70.) According to Jane Doe 1, the Agents did not explain that the NPA had already been signed. (Jane Doe 1 Decl. ¶ 5, DE 361-26.) Jane Doe 1's understanding was that the federal investigation would continue. (Jane Doe 1 Decl. ¶ 6.) In contrast, Special Agent Kuyrkendall stated that the meeting with Jane Doe 1 was to advise her of the main terms of the NPA.[2] (Kuykendall Decl. ¶ 8, DE 403-18.) After the meeting, Special Agent Kuyrkendall became concerned about what would happen if Epstein breached the NPA, and thought that if the victims were aware of the NPA, the provision about monetary damages could be grounds for impeachment of the victims and herself. (Kuykendall Decl. ¶ 9.) According to Special Agent Kuyrkendall, the investigation of Epstein continued through 2008. (Kuykendall Decl. ¶ 11.)

In addition to Jane Doe 1, FBI agents only talked to two other victims out of the 34 identified victims about the "general terms" of the NPA, including the provision providing a federal civil remedy to the victims. (DE 407 at ¶ 76.) After these meetings with three victims, Epstein's defense team complained. (DE 407 at ¶ 77.)

On about November 27, 2007, AUSA Sloman sent an e-mail to Lefkowitz, (with a copy to U.S. Attorney Acosta) stating that the Office had a statutory obligation to notify the victims about Epstein's plea to state charges that was part of the NPA:

---

[2] Special Agent Kuyrkendal also stated that on August 7, 2007, Jane Doe 1 never asked to confer with anyone from the government about charging decisions or any resolution of the matter. (Kuykendall Decl. ¶ 7.)

The United States has a statutory obligation (Justice for All Act of 2004) to notify the victims of the anticipated upcoming events and their rights associated with the agreement entered into by the United States and Mr. Epstein in a timely fashion. Tomorrow will make one full week since you were formally notified of the selection. I must insist that the vetting process come to an end. Therefore, unless you provide me with a good faith objection to Judge Davis's selection [as special master for selecting legal counsel for victims pursuing claims against Epstein] by COB tomorrow, November 28, 2007, I will authorize the notification of the victims. Should you give me the go-head on [victim representative] . . . selection by COB tomorrow, I will simultaneously send you a draft of the letter. I intend to notify the victims by letter after COB Thursday, November 29th.

(DE 407 at ¶ 79.)

On November 28, 2007, the Government sent an email to Lefkowitz attaching a letter dated November 29, 2007 (the apparent date upon which it was intended to be mailed) and explained that "I am writing to inform you that the federal investigation of Jeffrey Epstein has been completed, and Mr. Epstein and the U.S. Attorney's Office have reached an agreement containing the following terms." The proposed letter then spelled out a number of the provisions in the NPA, including that because Epstein's plea of guilty to state charges was "part of the resolution of the federal investigation," the victims were "entitled to be present and to make a statement under oath at the state sentencing." (DE 407 at ¶ 80.)

On November 29, 2007, Lefkowitz sent a letter to U.S. Attorney Acosta objecting to the proposed victim notification letter, stating that it is inappropriate for any letter to be sent to the victims before Epstein entered his plea or had been sentenced. Lefkowitz also told the Government that the victims should not be invited to the state sentencing, that they should not be encouraged to contact law enforcement officials, and that encouraging the attorney representative to do anything other than get paid by Epstein to settle the cases was to encourage an ethical conflict. (DE 407 at ¶

82.)

On about November 30, 2007, U.S. Attorney Acosta sent a letter to one of Epstein's defense attorneys, Kenneth Starr, stating: "I am directing our prosecutors not to issue victim notification letters until this Friday at 5 p.m., to provide you with time to review these options with your client." The letter also explained that the line prosecutor had informed U.S. Attorney Acosta "that the victims were not told of the availability of Section 2255 relief during the investigation phase of this matter" despite the fact that the "[r]ule of law . . . now requires this District to consider the victims' rights under this statute in negotiating this Agreement." (DE 407 at ¶ 83.) On December 5, 2007, Starr sent a letter to U.S. Attorney Acosta (with copy to AUSA Sloman) asking about issuance of victim notification letters and stating: "While we believe that it is wholly inappropriate for your Office to send this letter under any circumstances, it is certainly inappropriate to issue this letter without affording us the right to review it." (DE 407 at ¶ 85.)

On about December 6, 2007, AUSA Sloman sent a letter to Lefkowitz stating in part:

[E]ach of the listed individuals are persons whom the Office identified as victims. [T]he Office is prepared to indict Mr. Epstein based upon Mr. Epstein's 'interactions' with these individuals. This conclusion is based upon a thorough and proper investigation - one in which none of the victims was informed of any right to receive damages of any amount prior to the investigation of her claim.

[T]he Office can say, without hesitation, that the evidence demonstrates that each person on the list was a victim of Mr. Epstein's criminal behavior.

Finally, let me address your objections to the draft Victim Notification Letter. You write that you don't understand the basis for the Office's belief that it is appropriate to notify the victims. Pursuant to the 'Justice for All Act of 2004,' crime victims are entitled to: 'The right to reasonable, accurate, and timely notice of any public court proceeding ... involving the crime' and the 'right not to be excluded from any such public court proceeding....' 18 U.S.C. § 3771(a)(2) & (3). Section 3771 also commands that 'employees of the Department of Justice ... engaged in the detection, investigation, or prosecution of crime shall make their best efforts to see that crime

14

> victims are notified of, and accorded, the rights described in subsection (a).' 18 U.S.C. § 3771(c)(1)....
>
> With respect to notification of the other information that we propose to disclose, the statute requires that we provide a victim with the earliest possible notice of: the status of the investigation, the filing of charges against a suspected offender, and the acceptance of a plea. 42 U.S.C. 10607(c)(3). Just as in 18 U.S.C. 3771, these sections are not limited to proceedings in a federal district court. Our Non-Prosecution Agreement resolves the federal investigation by allowing Mr. Epstein to plead to a state offense. The victims identified through the federal investigation should be appropriately informed, and our Non-Prosecution Agreement does not require the U.S. Attorney's Office to forego its legal obligations. [T]he Office believes that it has proof beyond a reasonable doubt that each listed individual was a victim of Mr. Epstein's criminal conduct while the victim was a minor. The law requires us to treat all victims "with fairness and with respect for the victim's dignity and privacy." 18 U.S.C. 3771(a)(8).

The letter included a footnote stating: "Unlike the State's investigation, the federal investigation shows criminal conduct by Mr. Epstein at least as early as 2001, so all of the victims were minors at the time of the offense." (DE 407 at ¶ 83.)

On December 7, 2007, defense attorney Lilly Ann Sanchez sent a letter to AUSA Sloman, requesting "that the Office hold off on sending any victim notification letters." No letters were sent in December of 2007. (DE 407 at ¶ 88.) On December 13, 2007, the line prosecutor sent a letter to Lefkowitz stating that "You raised objections to any victim notification, and no further notifications were done." (DE 407 at ¶ 89.) On December 19, 2007, U.S. Attorney Acosta sent a letter to Lilly Ann Sanchez stating, "I understand that the defense objects to the victims being given notice of time and place of Mr. Epstein's state court sentencing hearing. We intend to provide victims with notice of the federal resolution, as required by law. We will defer to the discretion of the State Attorney regarding whether he wishes to provide victims with notices of the state proceedings. (DE 407 at ¶ 90.)

In January of 2008, any requirement that Epstein carry out his obligations under the NPA was delayed while he sought higher level review within the Justice Department. (DE 407 at ¶ 92.) On January 10, 2008, Jane Doe 1 and Jane Doe 2 were sent victim notification letters from the FBI advising them that "[t]his case is currently under investigation. This can be a lengthy process and we request your continued patience while we conduct a thorough investigation." (DE 407 at ¶ 93.) The January 10, 2008 notification letters did not disclose that the Jane Doe 1 and Jane Doe 2 case in the Southern District of Florida was the subject of the NPA entered into by Epstein and the Office, or that there had been any potentially binding resolution. (DE 407 at ¶ 94.) Other victims received the same letters as sent to Jane Doe 1 and Jane Doe 2. (DE 407 at ¶ 95.)

According to the declaration of Jane Doe 1, she believed that criminal prosecution of Epstein was important and she wanted to be consulted by prosecutors before any resolution. Based on the letters received, she believed the Government would contact her before reaching any final resolution. (Jane Doe 1 Decl. ¶ 9.) On January 31, 2008, Jane Doe 1 met with FBI Agents and an AUSA from the U.S. Attorney's Office. She provided additional details of Epstein's sexual abuse of her. The AUSA did not disclose to Jane Doe 1 at this meeting that they had already negotiated a NPA with Epstein. (DE 407 at ¶ 97.) According to the declaration of Jane Doe 2, while she recognizes she did not initially help the investigation, she later tried to cooperate with the investigation but was never given an opportunity to cooperate with the investigation.[3] (Jane Doe 2

---

[3] The Government believed that a negotiated resolution was in the best interest of the Office and the victims as a whole based on information obtained from the victims and the agents assigned to the case. (Villafaña Decl. ¶ 19.) The Government also believed that Epstein was trying to set aside the NPA and therefore the Government needed to be prepared for a prosecution. (Villafaña Decl. ¶ 34.) Petitioners object to this evidence, claiming the Government previously claimed work product and similar protections over internal materials. Given that the Court is ruling in favor of Petitioners on the present motions, the Court need not address this

Decl. ¶¶ 13-14, DE 361-27.)

On March 19, 2008, the line prosecutor sent a lengthy email to a prospective pro bono attorney for one of Epstein's victims who had been subpoenaed to appear at a deposition. The email listed the attorneys representing Epstein, the targets of the investigation, and recounted in detail the investigation that had been conducted to that point. The email did not reveal the fact that Epstein had signed the NPA in September 2007. (DE 407 at ¶ 98.)

On May 30, 2008, Jane Doe 5, who was recognized as an Epstein victim by the Office, received a letter from the FBI advising her that "[t]his case is currently under investigation. This can be a lengthy process and we request your continued patience while we conduct a thorough investigation." (DE 407 at ¶ 99.) The May 30, 2008 victim letter to Jane Doe 5 also acknowledged the victims' rights under the CVRA . (DE 407 at ¶ 100.)

In mid-June of 2008, Mr. Bradley Edwards, the attorney for Petitioners, contacted the line prosecutor to inform her that he represented Jane Doe 1 and, later, Jane Doe 2. Edwards asked to meet to provide information about the federal crimes committed by Epstein against these victims. The line prosecutor and Edwards discussed the possibility of federal charges being filed in the future. Edwards was led to believe federal charges could still be filed, with no mention whatsoever of the existence of the NPA or any other possible resolution to the case. (DE 407 at ¶ 101.)

At the end of the call, the line prosecutor asked Edwards to send any information that he wanted considered by the Office in determining whether to file federal charges. The line prosecutor did not inform Edwards about the NPA. (DE 407 at ¶ 102.) On June 19, 2008, Edwards

---

issue. To the extent it might have an impact on future rulings, Petitioners may reassert this argument if and when appropriate.

sent an email to the line prosecutor requesting to meet and discuss plans. (DE 407 at ¶ 103.)

On June 23, 2008, the line prosecutor sent an email to Lefkowitz stating that the Deputy Attorney General had completed his review of the Epstein matter and "determined that federal prosecution of Mr. Epstein's case [wa]s appropriate. Accordingly, Mr. Epstein ha[d] until the close of business on Monday, June 30, 2008, to comply with the terms and conditions of the agreement between the United States and Mr. Epstein." (DE 407 at ¶ 105.)

On or about June 27, 2008, the Office called Edwards to provide notice to his clients regarding the entry of Epstein's guilty plea in state court. (DE 407 at ¶ 107.) According to Edwards, the line prosecutor only told him that Epstein was pleading guilty to state solicitation of prosecution. He was not told that the state plea was related to the federal investigation or that the state plea would resolve the federal crimes. Edwards claims he was not told his clients could address the state court. (Edwards Decl. ¶¶17-18, DE 416-1.) In contrast, the line prosecutor claims she told Edwards that his clients could address the state court. (Villafaña Decl. ¶ 38, DE 403-19.)

On or before June 30, 2008, the Office prepared a draft victim notification to be sent to the victims. The notification was designed to inform the victims of the provisions of the deferral of federal prosecution in favor of state charges. The notification letter began by describing Epstein's guilty plea in the past tense: "On June 30, 2008, Jeffrey Epstein … entered a plea of guilty to violations of Florida statutes forbidding the solicitation of minors to engage in prostitution and felony solicitation of prostitution." Later, a substantively identical letter was prepared for Epstein's and his counsel's review. (DE 407 at ¶ 110.)

On June 30, 2008, the Office sent an e-mail to Epstein's counsel: "The FBI has received several calls regarding the Non-Prosecution Agreement. I do not know whether the title of the

18

document was disclosed when the Agreement was filed under seal, but the FBI and our office are declining comment if asked." (DE 407 at ¶ 111.) That same day, Epstein pled guilty to state law solicitation of prostitution charges. (DE 407 at ¶ 112.) Immediately following the June 30, 2008 hearing, the line prosecutor told one of the victims' attorneys that Epstein had "pled guilty today in state court." (DE 407 at ¶ 113.) Also after the plea, the line prosecutor emailed the assistant state attorney a copy of the NPA to be filed under seal. (July 1, 2008 email, DE 362-38.)

On June 30, 2008, based on what she had been told by the Government, Jane Doe 1 thought that the Office was still investigating and pursuing her case. She did not receive notice that Epstein's state guilty plea affected her rights in any way. If she had been told that the state plea had some connection to blocking the prosecution of her case, she would have attended and tried to object to the judge to prevent that plea from going forward. (Jane Doe 1 Decl. ¶ 13.) According to the line prosecutor, Edwards did not tell her that Jane Doe 1 wanted to meet with her before a resolution was reached. (Villafaña Decl. ¶ 37, DE 403-19.)

On July 3, 2008, as specifically directed by the Office, Edwards sent a letter to the Office communicating the wishes of Jane Doe 1, Jane Doe 2, and Jane Doe 5 that federal charges be filed against Epstein: "We urge the Attorney General and our United States Attorney to consider the fundamental import of the vigorous enforcement of our Federal laws. We urge you to move forward with the traditional indictments and criminal prosecution commensurate with the crimes Mr. Epstein has committed, and we further urge you to take the steps necessary to protect our children from this very dangerous sexual predator." (DE 407 at ¶ 118.)

On July 7, 2008, the line prosecutor corresponded with Epstein's counsel seeking his signed agreement concerning a notification letter to the victims before beginning the distribution of that

19

letter. (DE 407 at ¶ 120.) That same day, Jane Doe 1 filed an emergency petition for enforcement

of her rights under the CVRA. (DE 407 at ¶ 126.) On July 9, 2008, Edwards saw the first reference

to the NPA when the Government filed its responsive pleading to Jane Doe's emergency petition.

(Edwards Decl. ¶ 21.)

On July 8, 2008, the line prosecutor sent a letter to Epstein's counsel stating that

victims would be informed about the civil compensation provision of the NPA the next day:

> In accordance with the terms of the Non-Prosecution Agreement, on June 30,
> 2008, the United States Attorney's Office provided you with a list of thirty-one
> individuals "whom it was prepared to name in an Indictment as victims of an
> enumerated offense by Mr. Epstein." . . . In deference to your vacation, we
> allowed you a week to provide us with any objections or requested modifications
> of the list and/or the Notification language. Yesterday, I contacted you via
> telephone and e-mail, but received no response. Accordingly, the United States
> hereby notifies you that it will distribute the victim notifications tomorrow, July 9,
> 2008, to each of the thirty-two identified victims, either directly or via their
> counsel.

(DE 407 at ¶ 127.)

On July 9, 2008, Epstein's counsel sent a letter to the line prosecutor raising concerns

about the notifications, and suggesting modifications to the notification letter. Epstein's counsel

also objected to the victim notification letters containing certain information about the NPA. (DE

407 at ¶ 128.) The line prosecutor responded: "Without such an express Acknowledgment by

Mr. Epstein that the notice contains the substance of that Agreement, I believe that the victims

will have justification to petition for the entire agreement, which is contrary to the confidentiality

clause that the parties have signed." (DE 407 at ¶ 129.) That same day, the U.S. Attorney's

Office sent victim notification letters to Jane Doe 1 and Jane Doe 5, via their attorney, Edwards,

and to other identified victims of Epstein. That notification contained a written explanation of

some of the civil compensation provisions of the NPA. The notification did not provide the full terms of the NPA.

On July 10, 2008, Epstein's counsel continued to protest victim notification as evidenced by an email to the line prosecutor stating, "we respectfully request a reasonable opportunity to review and comment on a draft of the modified notification letter you intend to mail before you send it." (DE 407 at ¶ 131.)

On August 10, 2008, Jane Doe 1 and Jane Doe 2 filed a motion seeking release of the NPA. (DE 407 at ¶ 136.) On August 14, 2008, the line prosecutor emailed Epstein's counsel stating that the court has "ordered us to make the Agreement available to the plaintiffs." (DE 407 at ¶ 141.)

On August 18, 2008, Lefkowitz wrote the line prosecutor that Epstein objected to disclosure of the terms of the NPA, but that Epstein would "cooperate with the government to reach an agreement as to substance of the notification to be sent to the government's list of individuals. Based on the Agreement, the information contained in the notification should be limited to (1) the language provided in the Agreement dealing with civil restitution (paragraphs 7-10) and (2) the contact information of the selected attorney representative. We object to the inclusion of additional information about the investigation of Mr. Epstein, the terms of the Agreement other than paragraphs 7-10 and the identity of other identified individuals." (DE 407 at ¶ 143.) On August 21, 2008, the Government sent a letter to Epstein's counsel stating that, "[c]opies of the victim notifications will continue to be provided to counsel for Mr. Epstein."

Jane Doe 2 was not informed of the contents of the NPA until August 28, 2008, when the line prosecutor provided a copy to Edwards. (DE 407 at ¶ 146.) On September 2, 2008, the line

21

prosecutor sent an email to Epstein's counsel stating, "I will start sending out the victim notifications today. In accordance with your request, I have changed the language regarding the victims' right to receive a copy of the Agreement." (DE 407 at ¶ 147.) On September 2 and 3, 2008, the Office sent to Jane Doe 1 and other identified victims amended notification letters, stating "the United States has agreed to defer federal prosecution in favor of this state plea and sentence." (Sept. 3, 2008 letter, DE 363-66; (DE 407 at ¶ 148.)

On September 16, 2008, attorney Jeffrey Herman, who represented several Epstein victims, wrote to the line prosecutor to object to the restitution procedures established in the NPA after learning that another attorney, established through the NPA, would be making unsolicited contacts to the victims. Mr. Herman explained that the notification letters were "misleading" because they referred generally to a waiver of "any other claim for damages," without informing them that this waiver might include a valuable punitive damages claim against an alleged billionaire. (DE 407 at ¶ 152.) On September 17, 2008, the line prosecutor sent an email to State Attorney Barry Krischer, explaining that the NPA "contain[ed] a confidentiality provision that require[ed] us to inform Mr. Epstein's counsel before making any disclosure." (DE 407 at ¶ 153.)

Around this same time period, Jane Doe 1 and Jane Doe 2 filed actions in Palm Beach County, seeking money damages from Epstein from sexually abusing them. (Petitioners' Resp. to Gov't's Statement of Undisputed Material Facts (hereinafter "DE 415") at ¶ ¶ 8-9.) Eventually, they received monetary settlements of their lawsuits. (DE 415 at ¶ 12.)

In moving for summary judgment, the Petitioners make the following arguments in support of their contention that the Government violated their CVRA rights. The Government

22

violated Petitioners' right to confer under the CVRA: (1) when the Government was negotiating and signing the NPA; (2) when the Government sent letters telling Petitioners to be patient while the Government completed its investigation and (3) when the Government did not tell the victims that the state plea would extinguish the federal case. Petitioners also claim the Government violated their right to be treated with fairness under the CVRA by concealing the negotiations of the NPA. Additionally, Petitioners contend the Government violated their rights to reasonable and accurate notice when it concealed that the NPA and the federal investigation were implicated in the state court proceeding.

In moving for and responding to summary judgment, the Government contends that there is no right to notice or conferral about a NPA; it was reasonable for the Government to send letters to victims while continuing to investigate the case because the Government could not assume that Epstein would plead guilty; and the line prosecutor contacted Petitioners' attorneys about the state court plea hearing. The Government also claims it did not violate the right to reasonable, accurate and timely notice because the CVRA does not create any right to notice of state court proceedings and, in any event, the Government gave notice. The Government asserts it did not treat the victims unfairly and used its best efforts to comply with the CVRA, including complying with the Attorney General's guidelines for victim assistance. Furthermore, the Government argues that Petitioners are equitably estopped from challenging the NPA because they relied upon the NPA in their state court civil actions against Epstein. Lastly, the Government contends that Petitioners are judicially estopped from challenging the validity of the NPA because they have asserted mutually inconsistent positions; namely, that the NPA is invalid in federal court but was binding on Epstein in state court.

23

### II. Summary Judgment Standard

The Court may grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The stringent burden of establishing the absence of a genuine issue of material fact lies with the moving party. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). The Court should not grant summary judgment unless it is clear that a trial is unnecessary, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986), and any doubts in this regard should be resolved against the moving party. Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970).

The movant "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp., 477 U.S. at 323. To discharge this burden, the movant must point out to the Court that there is an absence of evidence to support the nonmoving party's case. Id. at 325.

After the movant has met its burden under Rule 56(a), the burden of production shifts and the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Electronic Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by citing to particular parts of materials in the record . . . or showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A) and (B).

Essentially, so long as the non-moving party has had an ample opportunity to conduct discovery, it must come forward with affirmative evidence to support its claim. Anderson, 477

U.S. at 257. "A mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." Walker v. Darby, 911 F.2d 1573, 1577 (11th Cir. 1990). If the evidence advanced by the non-moving party "is merely colorable, or is not significantly probative, then summary judgment may be granted." Anderson, 477 U.S. 242, 249-50.

### III. Discussion

The CVRA was designed to protect victims' rights and ensure their involvement in the criminal justice process. United States v. Moussaoui, 483 F.3d 220, 234 (4th Cir. 2007); Kenna v. U.S. Dist. Court, 435 F.3d 1011, 1016 (9th Cir. 2006) ("The [CVRA] was enacted to make crime victims full participants in the criminal justice system."). The statute enumerates the following ten rights:

(1) The right to be reasonably protected from the accused.

(2) The right to reasonable, accurate, and timely notice of any public court proceeding, or any parole proceeding, involving the crime or of any release or escape of the accused.

(3) The right not to be excluded from any such public court proceeding, unless the court, after receiving clear and convincing evidence, determines that testimony by the victim would be materially altered if the victim heard other testimony at that proceeding.

(4) The right to be reasonably heard at any public proceeding in the district court involving release, plea, sentencing, or any parole proceeding.

(5) The reasonable right to confer with the attorney for the Government in the case.

(6) The right to full and timely restitution as provided in law.

(7) The right to proceedings free from unreasonable delay.

(8) The right to be treated with fairness and with respect for the victim's dignity and

privacy.

(9) The right to be informed in a timely manner of any plea bargain or deferred prosecution agreement.

(10) The right to be informed of the rights under this section and the services described in section 503(c) of the Victims' Rights and Restitution Act of 1990 (42 U.S.C. 10607(c)) and provided contact information for the Office of the Victims' Rights Ombudsman of the Department of Justice.

18 U.S.C. § 3771(a).

This Court previously held the following with respect to the CVRA: First, the rights under the CVRA attach before the Government brings formal charges against a defendant. Does v. United States, 817 F. Supp. 2d 1337, 1341 (S.D. Fla. 2011). Second, the CVRA authorizes the rescission or "reopening" of a prosecutorial agreement, including a non-prosecution agreement, reached in violation of a prosecutor's conferral obligations under the statute. Doe v. United States, 950 F. Supp. 2d 1262, 1267 (S.D. Fla. 2013). Third, section 3771(d)(5) of the CVRA authorizes the setting aside of pre-charge prosecutorial agreements, despite the fact that the particular statutory enforcement provision expressly refers to the reopening of a plea or sentence. Id. at 1267. Fourth, the "reasonable right to confer . . . in the case" extends to the pre-charge state of criminal investigations and proceedings. Id. Fifth, the federal sex offense crimes involving minors allegedly committed by Epstein renders these Petitioners crime victims under the CVRA. Id. at 1269. Sixth, "questions pertaining to [the] equitable defense[s] are properly left for resolution after development of a full evidentiary record." Id. at 1269 n. 6.

Here, it is undisputed that the Government entered into a NPA with Epstein without conferring with Petitioners during its negotiation and signing. Instead, the Government sent letters to the victims requesting their "patience" with the investigation even after the Government

26

entered into the NPA. At a bare minimum, the CVRA required the Government to inform

Petitioners that it intended to enter into an agreement not to prosecute Epstein. Although the

binding effect of the NPA was contingent upon Epstein pleading guilty to the state charges, that

contingency was out of the control of the Government. The Government's hands were

permanently tied if Epstein fulfilled his obligations under the NPA. Thus, Petitioners and the

other victims should have been notified of the Government's intention to take that course of

action before it bound itself under the NPA. Had the Petitioners been informed about the

Government's intention to forego federal prosecution of Epstein in deference to him pleading

guilty to state charges, Petitioners could have conferred with the attorney for the Government and

provided input. In re Dean, 527 F.3d 391, 394 (5th Cir. 2008) (there are rights under the CVRA

including the "reasonable right to confer with the attorney for the Government"). Hence, the

Government would have been able to "ascertain the victims' views on the possible details of the

[non-prosecution agreement]." Id. Indeed, it is this type of communication between prosecutors

and victims that was intended by the passage of the CVRA. See United States v. Heaton, 458 F.

Supp. 2d 1271 (D. Utah 2006)(government motion to dismiss charge of using facility of

interstate commerce to entice minors to engage in unlawful sexual activity would not be granted

until government consulted with victim); United States v. Ingrassia, No. CR-04-0455ADSJO,

2005 WL 2875220, at *17 n. 11 (E.D.N.Y. Sept. 7, 2005) (Senate debate supports the view that

the contemplated mechanism for victims to obtain information on which to base their input was

conferral with the prosecutor concerning any critical stage or disposition of the case).

　　　　Particularly problematic was the Government's decision to conceal the existence of the

27

NPA and mislead the victims to believe that federal prosecution was still a possibility.[4] When the Government gives information to victims, it cannot be misleading. While the Government spent untold hours negotiating the terms and implications of the NPA with Epstein's attorneys, scant information was shared with victims. Instead, the victims were told to be "patient" while the investigation proceeded.

The Government, however, interprets the CVRA as only obligating the prosecutor to answer inquiries by a crime victim and does not impose a duty on the prosecutor to give notice about case developments, other than what is required in section 3771(a)(2). Such an interpretation is in direct contravention of the intent of the CVRA. See Ingrassia, 2005 WL 2875220, at *17 n.11 (Senate debate explaining the right to confer is "intended to be expansive" including the right of victim to confer "concerning any critical state of disposition of the case"). In any event, no meaningful conferral could take place as long as the Government chose to conceal the existence of the NPA from the victims.[5]

Nor does the Court agree with the Government that the 2015 amendment to the CVRA, section 3771(a)(9), which gave victims the "right to be informed in a timely manner of any plea

---

[4] Even if the Court accepted the Government's version of the facts relative to the Agent having told Jane Doe 1 the "main terms" of the NPA (which is left undefined), the victims were not told about it until *after* it was signed and the Government was bound. This precluded the Government from obtaining any input from the victims.

[5] The Government devotes time to distinguishing between the words "confer" and "notice" and suggesting that "confer" is more limited in scope than "notice." Nothing about the definition of confer, however, suggests it is limited to one party bearing the burden of communication. See Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary (last visited January 7, 2019) ("to compare views or take counsel"); Blacks Law Dictionary (10th ed. 2014) ("to hold a conference, to consult with one another").

28

bargain or deferred prosecution agreement" specifically excluded the right of victims to be informed of a non-prosecution agreement. Prior to this amendment, this Court held that the right to confer extended to the pre-charge state of criminal investigations and proceedings. Doe, 950 F. Supp. 2d at 1267; see also 157 Cong. Rec. S7060-01, 157 Cong. Rec. S7060-01, S7060 (CVRA co-sponsor Senator Jon Kyl's 2011 letter to the Attorney General, explaining that "Congress intended the CVRA to broadly protect crime victims throughout the criminal justice process-from the investigative phases to the final conclusion of a case.")

The 2015 amendment did not serve to repeal or restrict the obligations of the Government to confer with victims in the early stages of a case. Instead, the 2015 amendment clarified that certain events, such as plea agreements or deferred prosecution agreements, must be conveyed to the crime victim. Put another way, the 2015 amendment codified what the courts had been interpreting the CVRA to require, such as entitlement to notice of a plea bargain. See In re Dean, 527 F.3d at 394 ("the government should have fashioned a reasonable way to inform the victims of the likelihood of criminal charges and to ascertain the victims' views on the possible details of a plea bargain"); United States v. Okun, No. CRIM. 3:08CR132, 2009 WL 790042, at *2 (E.D. Va. Mar. 24, 2009) (the statutory language of the CVRA gives the victims' rights before the accepting of plea agreements).

To the extent the Government relies upon the "interpretive canon, *expressio unius est exclusio alterius*, 'expressing one item of [an] associated group or series excludes another left unmentioned'" the Court is not persuaded. Chevron U.S.A. Inc. v. Echazabal, 536 U.S. 73, 80 (2002) (quoting United States v. Vonn, 535 U.S. 55, 65 (2002)). "The force of any negative implication . . . depends on context." Marx v. General Revenue Corp., 568 U.S. 371, 381 (2013).

"[T]he *expressio unius* canon does not apply unless it is fair to suppose that Congress considered the unnamed possibility and meant to say no to it, and that the canon can be overcome by contrary indications that adopting a particular rule or statute was probably not meant to signal any exclusion." Id. (internal citations and quotation marks omitted).

The expansive context of the CVRA lends itself to only one interpretation; namely, that victims should be notified of significant events resulting in resolution of their case without a trial. See Kenna v. U.S. Dist. Court for C.D.Cal., 435 F.3d 1011, 1016 (9th Cir. 2006) ("[t]he statute was enacted to make crime victims full participants in the criminal justice system"); Heaton, 458 F. Supp. 2d at 1273 (the right to confer is "not limited to particular proceedings" but is "expansive" and applies broadly to "any critical stage or disposition of the case"). Reading into the statute a negative implication that victims need not be informed of non-prosecution agreements, and only informed of the more common events of plea bargains or deferred prosecution agreements, would be inconsistent with the goal of the CVRA.[6] In the context of plea agreements, the CVRA provides victims with rights prior to the acceptance of plea agreements. See In re Dean, 527 F.3d at 394; United States v. Okun, No. CRIM. 3:08CR132, 2009 WL 790042, at *2 (E.D. Va. Mar. 24, 2009). Furthermore, victims obtain rights under the CVRA even before prosecution. Okun, 2009 WL 790042, at *2 (citing In re Dean, 527 F.3d at 394). Based on this authority, the Court concludes that the CVRA must extend to conferral about non-prosecution agreements.

---

[6] A NPA entered into without notice has a more damaging impact on the victims than a plea agreement entered into without notice. When a plea agreement is entered into without notice, the victims will at least have an opportunity to provide input to a judge at sentencing. Once a NPA is entered into without notice, the matter is closed and the victims have no opportunity to be heard regarding any aspect of the case.

30

Next, the Government claims it did not violate the right to confer when, in January of 2008, it sent letters to the victims counseling patience because, at that time, Epstein's attorneys were seeking review of the NPA at higher levels within the Department of Justice. As indicated previously, however, at this point, the Government had bound itself to the terms of the NPA unless Epstein failed to comply with its terms. It was a material omission for the Government to suggest to the victims that they have patience relative to an investigation about which it had already bound itself not to prosecute. While Epstein was within his rights to attempt to persuade higher authorities within the Department of Justice to overrule the prosecutorial decisions of the U. S. Attorney's Office in the Southern District of Florida, the CVRA was designed to give the victims the same opportunity to attempt to affect prosecutorial decisions before they became final. Instead, the Office engaged in lengthy negotiations with Epstein that included repeated assurances that the NPA would not be "made public or filed with the Court." (DE 407 at ¶ 31.)

Nor did the Justice Department guidelines create an exemption from the CRVA's statutory requirements. Although the Government points to guidelines that conflicted with the requirements of the CVRA (by restricting CVRA rights until after a formal indictment), the Court is not persuaded that the guidelines were the basis for the Government's decision to withhold information about the NPA from the victims. If that had been the case, the Government would not have sent the victim letters telling them that they had rights protected under the CVRA. Nor would they have told Epstein's attorneys that it had obligations to notify the victims. In any event, an agency's own "'interpretation' of a statute cannot supersede the language chosen by Congress." Mohasco Corp. v. Silver, 447 U.S. 807, 825 (1980).

Next, the Court rejects the Government's contention that Jane Doe 2 is not protected by

31

the CVRA because she made statements favorable to Epstein early in the investigation.[7]  There is

no dispute that Epstein sexually abused Jane Doe 2 while she was a minor.  Therefore, regardless

of her comments to the prosecutor, she was a victim.  See 18 U.S.C. § 3771(e) (the CVRA

defines a victim as "a person directly and proximately harmed as a result of the commission of a

Federal offense"); In re Stewart, 552 F.3d 1285, 1288 (11th Cir. 2008) ("to determine a crime

victim, then, first, we identify the behavior constituting 'commission of a Federal offense.'

Second, we identify the direct and proximate effects of that behavior on parties other than the

United States. If the criminal behavior causes a party direct and proximate harmful effects, the

party is a victim under the CVRA.").

    The Court need not resolve the factual questions surrounding what and when the victims

were told about the state court proceeding and whether a state court proceeding is covered by the

CVRA. Under the facts of this case, once the Government failed to advise the victims about its

intention to enter into the NPA, a violation of the CVRA occurred.

    Nor does the Court need to consider the Government's estoppel arguments at this time.

These arguments relate only to the remedy, and not the determination of whether there was a

CVRA violation.  Therefore, the Court will address this issue at the appropriate juncture.

    Lastly, the Court will address the Government's argument that its prosecutorial discretion

permitted it to enter into the NPA. The Government correctly notes that the CVRA provides that

"[n]othing in this chapter shall be construed to impair the prosecutorial discretion of the Attorney

General or any officer under his direction." 18 U.S.C.A. § 3771(d)(6).  The Court is not ruling

---

[7] In fact, the Office considered Jane Doe 2 a victim as early as August of 2006 when it
sent her a CVRA letter.

32

that the decision not to prosecute was improper. The Court is simply ruling that, under the facts of this case, there was a violation of the victims rights under the CVRA.

### IV. Conclusion

Accordingly, it is hereby **ORDERED AND ADJUDGED** as follows:

1) Jane Doe 1 and Jane Doe 2's Motion for Partial Summary Judgment (DE 361) is **GRANTED** to the extent that Petitioners' right to conferral under the CVRA was violated.

2) The United States's Cross-Motion for Summary Judgment (DE 408) is **DENIED.**

3) Jane Doe 1 and Jane Doe 2's Motion to Compel Answers (DE 348) is **DENIED WITHOUT PREJUDICE.**

4) Jane Doe 1 and Jane Doe 2's Motion for Finding Waiver of Work Product and Similar Protections by Government and for Production of Documents (DE 414) is **DENIED WITHOUT PREJUDICE.**

5) The parties should confer and inform the Court **within 15 days of the date of entry of this Order** how they wish to proceed on determining the issue of what remedy, if any, should be applied in view of the violation.

**DONE AND ORDERED** in Chambers at West Palm Beach, Palm Beach County, Florida, this 21st day of February, 2019.

KENNETH A. MARRA
United States District Judge

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
┌─────────────────────────────┐
│ USDC SDNY                    │
│ DOCUMENT                     │
│ ELECTRONICALLY FILED         │
│ DOC #:_____                │
│ DATE FILED: 11/1/21          │
└─────────────────────────────┘
```

United States of America,

        –v–

Ghislaine Maxwell,

               Defendant.

20-CR-330 (AJN)

ORDER

ALISON J. NATHAN, District Judge:

The Court is in receipt of the parties' proposed redactions to the parties' motions *in limine*, responses in opposition, replies in support, and related exhibits. As the Court indicated at today's conference, some of the parties' proposed redactions are overbroad considering the three-part test articulated by the Second Circuit in *Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d 110 (2d Cir. 2006). In particular, for the reasons stated at today's conference, the Court denies the Government's request to redact section ten of the Government's motion *in limine*. *See* Dkt. No. 380. The Court will also not permit redactions pertaining to the general description of evidence or anticipated testimony as such redactions are unnecessary to protect the privacy interests of the individuals implicated. Accordingly, the parties must propose more tailored redactions consistent with the Court's discussion at today's conference.

The parties are ORDERED to submit the proposals to the Court via email by November 4, 2021. In order to facilitate the Court's review of the requests, the Court requires the parties to submit the proposed redactions as a single document and with the proposed redactions highlighted. The Defendant's proposed redactions should be highlighted in one color, and the Government's a different color.

The Court will rule on the proposed redactions expeditiously.

1

SO ORDERED.

Dated: November 1, 2021
      New York, New York

_____

ALISON J. NATHAN
United States District Judge

EXHIBIT 145

| LCGCmax6 | Aznaran - direct | Page 2516 |
|---|---|---|

1  A. Yes.
2  Q. Let's take a look at a few of Kate's entries. So flip to
3  page 7 of what's marked on the bottom right as page 7.
4  A. Yes.
5  Q. You see the entry there is November 1st of 1997; is that
6  right?
7  A. Yes.
8  Q. Is that the earliest border entry in the TECS system for
9  Kate?
10  A. Yes.
11  Q. And you see her date of birth over to the left?
12  A. Yes.
13  Q. Based on her date of birth, she would have been 20 years
14  old when that flight took place; is that right?
15  A. Yes.
16  Q. So does this report reflect that Kate had any border
17  crossings in 1994?
18  A. No.
19  Q. Does it reflect any border crossings for Kate in 1995?
20  A. No.
21  Q. Does it reflect any border crossing records for Kate in
22  1996?
23  A. No.
24  Q. First one was that one in November 1st, 1997, when she's
25  20?

| LCGCmax6 | Aznaran - cross | Page 2517 |
|---|---|---|

1  A. Yes.
2  Q. Now I want you to flip to the last page. Those are the
3  records for Annie Farmer?
4  A. Yes.
5  Q. Why don't you look at that last entry. That's a flight on
6  July 20th, 1997; correct?
7  A. Yes.
8  Q. What city did this flight depart from?
9  A. DUS, which is Düsseldorf, Germany.
10  Q. Where did it arrive?
11  A. EWR, which is Newark Airport, New Jersey.
12  Q. Is this the earliest border entry in the TECS system for
13  Annie Farmer?
14  A. Yes.
15  Q. Does this report show any border crossings for Annie Farmer
16  in 1996?
17  A. No.
18       MR. EVERDELL: One moment, your Honor.
19       THE COURT: Okay.
20       MR. EVERDELL: No further questions, your Honor.
21       THE COURT: Ms. Pomerantz.
22       MS. POMERANTZ: Thank you, your Honor.
23  CROSS-EXAMINATION
24  BY MS. POMERANTZ:
25  Q. Good afternoon.

| LCGCmax6 | Aznaran - cross | Page 2518 |
|---|---|---|

1  A. Good afternoon.
2  Q. You've been testifying about CBP records of international
3  flights from the 1990s and 2000s; right?
4  A. Yes.
5  Q. In your work as a CBP officer, do you have experience
6  reviewing flight records from before September 11th, 2001?
7  A. Yes.
8  Q. In your work as a CBP officer, do you have experience
9  reviewing flight records from after 9/11?
10  A. Yes.
11  Q. Based on your review of CBP records in your experience as a
12  CBP officer, have you noticed a difference between CBP records
13  from before 9/11 and after 9/11?
14  A. Yes.
15  Q. What difference have you noticed?
16  A. Well, so if you -- if you look at the records, not
17  necessarily these, but just in general, from my experience,
18  what I have noticed is the farther back you go from the present
19  time, the more likelihood that you are not going to get an
20  on-board or not-on-board status for those records.
21       (Continued on next page)
22
23
24
25

| LCGVMAX7 | Aznaran - cross | Page 2519 |
|---|---|---|

1  BY MS. POMERANTZ:
2  Q. As a CBP officer, is it important to your job to understand
3  whether the CBP records you are reviewing are thorough and
4  accurate?
5  A. Yes.
6  Q. And in your day-to-day work as a CBP officer, do you rely
7  on CBP records from before 9/11 to be complete?
8  A. We'd like to rely on or hope that the records are complete,
9  but not necessarily all the time, no.
10  Q. And why is that the case that records before 9/11 are not
11  necessarily complete?
12  A. Prior to 9/11, there was a little bit of a difference
13  between how the records were submitted to CBP systems and the
14  reliability of the airlines was not as good as it is now or
15  after 9/11.
16  Q. And when did that start to change in terms of when did the
17  records start to be more complete and thorough?
18  A. After 9/11, there were several acts put into place by the
19  U.S. Government. The Department of Homeland Security was
20  created. And basically, the airline industry was at one point
21  mandated now to submit more complete records to CBP. I feel
22  comfortable saying -- as far as the status indicators, I feel
23  comfortable saying roughly 2009, 2010, based on the records
24  that I have ran in my experience, you would see more onboard or
25  not onboard status.

EXHIBIT 146

EPSTEIN seemed like he wanted to be a father figure. EPSTEIN made false promises. ████████ never discussed her age with EPSTEIN. She did tell him that she dropped out of high school. EPSTEIN seemed disappointed with ████████ about that. He tells her that if she goes back or gets her GED that he would help her to get into college and get her massage degree.

████████ would always meet EPSTEIN around 3:30-4 PM. She would average about 3-4 times on a good week but would at least go twice a week. She would not go more than 4 times a week. This went on for about 2 ½ years. She knows it was 2 ½ years ██████████████████████████
████████

About 5-6 months into going to see EPSTEIN, ████████ mother questioned her about the situation. She tells ████████ that as long as he was not touching her that it was fine but she would have to pay her mother $50 every time she went. ████████ was paid $300 every time she went. ████████████████
████████

████████ described MAXWELL as having short hair which was never blonde. She had a weird tan, it was a red complexion that looked like her skin was hot. Her face was always red and she had rosy cheeks. MAXWELL was younger at the time, maybe in her 30's. She was older than ████████ MAXWELL was very skinny.

████████ lawyer for about the past 13 years is ████████████████

[Agent note: Not all subject matter was covered during the course of this interview.]

50D-NY-3027571 Continuation of FD-302 of (U) Interview of ████████████
On 02/24/2021 , Page 4 of 4

3501.492-003 Page 4 of 4

<u>SUBJECT TO PROTECTIVE ORDER PARAGRAPHS 7, 8, 9, 10, 15, and 17</u>

EXHIBIT 147

Case 1:19-cr-00690-PAE   Document 53   Filed 09/05/19   Page 16 of 66   16
Case 1:20-cr-00330-PAE   Document 355-9   Filed 02/23/20   Page 250 of 266
J8RsEPS1

1   client at or around the time of his death, and obviously the

2   attorney-client privilege survives death and we are not going

3   to forfeit the privilege, but we will report to the court, with

4   as much specificity as the court may want, that at or around

5   the time of his death, we did not see a despairing, despondent

6   suicidal person.  Details to follow, if the court wishes.

7           The 800-pound gorilla, for us, of course, are the

8   video surveillance tapes.  Obviously we assume there is a tape

9   that leads directly to the door where Jeffrey Epstein was

10   housed.  If that tape reports for 12 hours before his death

11   that no one went in and out of that room, then the suggestion

12   that there was something other than a suicide seems

13   preposterous.

14           But there is no such evidence that has surfaced to

15   date.  Just the opposite.  We have heard, and we actually read

16   in the press, that the tapes were either corrupted or not

17   functioning.  Talk about a yikes.  If, in fact, the system was

18   broken for six months before Jeffrey Epstein was housed, I

19   mean, that would be stunning incompetence.  If it was allowed

20   to continue to be inoperative when Jeffrey Epstein was housed,

21   it would be incompetence times ten.  But what if the tapes only

22   broke down or were inoperative or were corrupted on the day he

23   was killed or the day he died?  Then we're in a completely

24   different situation.

25           So where does this lead?  I think where it leads,

J8RsEPS1

```
 1    Judge, is there are incredibly important questions that remain
 2    open.  The public interest in this matter is obvious from this
 3    courtroom.  There are conspiracy theories galore.  We are all
 4    for finding the truth.  We believe this court has an
 5    indispensable role to play.
 6            Whether or not this indictment is dismissed, I think
 7    this court has the inherent authority to find out what happened
 8    on its watch.  Obviously, when the court detained Jeffrey
 9    Epstein, the court did not anticipate that weeks later he would
10    be dead in his cell.  I think given the inherent authority of
11    the court, the court should make inquiry.
12            This could come in many forms.  Obviously the court
13    made inquiry as to what happened in the first incident.  When
14    there was an allegation of an attempted suicide, the court made
15    inquiry.  The court obviously was interested.
16            I recall your language.  You talked about that being
17    one of the several open questions indicating an interest on the
18    court for the others as well.  Obviously, the ultimate question
19    is what happened to the client.
20            THE COURT:  You're talking about the July 23, 2019
21    incident?
22            MR. WEINGARTEN:  Yes.
23            The court obviously could hold hearings.  The court
24    could assign a lawyer to help the court.  I think this is an
25    area where there is intense public interest.  We have complete
```

EXHIBIT 147

Case 9:08-cv-80736-KAM    Document 1    Entered on FLSD Docket 07/07/2008    Page 1 of 10    D.C.

ELECTRONIC

**JULY 7, 2008**

STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S.D. OF FLA. - MIAMI

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

**08-80736-Civ-MARRA/JOHNSON**

CASE NO.:_____

IN RE: JANE DOE,

    Petitioner.

_____

*Emergency* **VICTIM'S PETITION FOR ENFORCEMENT OF
CRIME VICTIM'S RIGHTS ACT, 18 U.S.C . SECTION 3771**

COMES NOW the Petitioner, JANE DOE (hereinafter "Petitioner"), by and through her

undersigned attorneys, pursuant to the Crime Victim's Rights Act, 18 U.S.C. Section 3771

("CVRA"), and files this Petition for Enforcement in the above styled action as follows:

1.    Petitioner, an adult, as a minor child was a victim of federal crimes committed by

JEFFREY EPSTEIN (hereinafter "Defendant").  These crimes included sex trafficking of

children by fraud, in violation of 18 U.S.C. § 1591, use of a means of interstate commerce to

entice a minor to commit prostitution, in violation of 18 U.S.C. § 2422, as well as wire fraud, in

violation of 18 U.S.C. § 1343.  The Defendant committed these crimes within the jurisdiction of

the Southern District of Florida in Palm Beach County, Florida.

2.    Upon information and belief, the Defendant is the subject of a federal criminal

investigation conducted by the United States of America in the Southern District of Florida.  The

Defendant has recently been prosecuted and pleaded guilty, on June 30, 2008, in the Circuit

Court for Palm Beach County to various similar state offenses including solicitation of minors

for prostitution.

3.    Upon information and belief, the Defendant is engaged in plea negotiations with

the Office of the United States Attorney for the Southern District of Florida concerning federal

1

crimes which he is alleged to have committed against minor children, including the Petitioner. Such negotiations may likely result in a disposition of the charges in the next several days.

4.      Under the CVRA, before any charges are filed against the Defendant, the Petitioner has the rights (among others) to notice of her rights under the CVRA, to confer with the prosecutors, and to be treated with fairness. As soon as charges are filed, the Petitioner has the rights (among others) to timely notice of court proceedings, the right not to be excluded from such proceedings, the right to be heard at such public proceedings regarding conditions of release, any plea, and any sentence, the right to confer with the attorney for the government, the right to restitution, and the right to be treated with fairness and with respect for her dignity and privacy.

5.      The Petitioner has been denied her rights in that she has received no consultation with the attorney for the government regarding the possible disposition of the charges, no notice of any public court proceedings, no information regarding her right to restitution, and no notice of rights under the CVRA, as required under law.

6.      The Petitioner is in jeopardy of losing her rights, as described above, if the government is able to negotiate a plea or agreement with the Defendant without her participation and knowledge.

WHEREFORE, for the reasons outlined above, the Petitioner respectfully requests this Court to grant her Petition, and to order the United States Attorney to comply with the provisions of the CVRA prior to and including any plea or other agreement with the Defendant and any attendant proceedings.

2

## MEMORANDUM

### I.   THE CRIME VICTIMS' RIGHTS ACT MAKES CRIME VICTIMS INDEPENDENT PARTICIPANTS THROUGHOUT THE CRIMINAL JUSTICE PROCESS.

In October 2004, Congress passed and the President signed into law the Crime Victims'
Rights Act, Pub. L. No. 108-405, 118 Stat. 2251 (codified at 18 U.S.C. § 3771). Because this
appears to be the first case involving the Act to come before this Court, a bit of background may
be in order.

#### A.   The CVRA Gives Crime Victims Rights to Participate in the Criminal Justice Process.

Congress passed the CVRA "to give crime victims enforceable rights to participate in
federal criminal proceedings." Opinion at 14. Congress was concerned that in the federal system
crime victims were "treated as non-participants in a critical event in their lives. They were kept
in the dark by prosecutors too busy to care enough ... and by a court system that simply did not
have a place for them." 150 CONG. REC. S4262 (Apr. 22, 2004) (statement of Sen. Feinstein).
To remedy this problem, Congress gave victims "the simple right to know what is going on, to
participate in the process where the information that victims and their families can provide may
be material and relevant ... ." *Id.*

The CVRA gives victims of federal crimes a series of rights, including the right to notice
of court proceedings, to be heard at plea and sentencing hearings, and to reasonably "confer with
the attorney for the Government in the case." 18 U.S.C. § 3771(a). Victims also have a "right
of access to the terms of a plea agreement ... ." *In re Interested Party I*, 530 F.Supp. 2d 136,
2008 WL 134233 at *7 (D.D.C. 2008). The CVRA also assures victims broadly that they will
"be treated with fairness." 18 U.S.C. § 3771(a)(8).

3

Of course, these rights would be of little use to most crime victims unless they were told

about them.  To ensure that victims are notified of their rights, the CVRA directs employees of

the Justice Department "and other departments and agencies of the United States engaged in the

detection, investigation, or prosecution of crime" to use their "best efforts to see that crime

victims are notified of ... the rights described [in the CVRA]."  18 U.S.C. § 3771(c)(1) (emphasis

added).1

### B.    The CVRA Gives Victims Rights During the Investigation of a Crime.

The CVRA gives victims rights during the investigation of a crime.  The Fifth Circuit

recently reached this conclusion, holding:

> The district court acknowledged that "[t]here are clearly rights
> under the CVRA that apply before any prosecution is underway."
> BP Prods., 2008 WL 501321 at *11, 2008 U.S. Dist. LEXIS 12893,
> at *36. Logically, this includes the CVRA's establishment of
> victims' "reasonable right to confer with the attorney for the
> Government." 18 U.S.C. § 3771(a)(5). At least in the posture of
> this case (and we do not speculate on the applicability to other
> situations), the government should have fashioned a reasonable
> way to inform the victims of the likelihood of criminal charges and
> to ascertain the victims' views on the possible details of a plea
> bargain.

*In re Dean*, 527 F.3d 391, 394 (5th Cir. 2008).

The position that CVRA rights apply before charges have been filed is consistent with the

Justice Department regulations under the CVRA, which explain that government officials "must

advise a victim [about their rights under the CVRA] ... at the earliest opportunity at which it may

be done without interfering with an investigation."  A.G. GUIDELINES FOR VICTIM AND WITNESS

---

1 Further supporting this requirement is another statute, 42 U.S.C. § 10607(c)(3), which directs government officials
to provide victims with "the earliest possible notice of," among other things, "the filing of charges against a
suspected offender."

ASSISTANCE 23 (May 2005). And the plain language of the CVRA undergirds this conclusion, as it applies not simply to prosecutors but to government agencies "engaged in the detection [and] investigation ... of crime ... ." 18 U.S.C. § 3771(c)(1). Indeed, if there were any doubt, the plain language of the CVRA extends victims' right to situations "in which no prosecution is underway." 18 U.S.C. § 3771(d)(3).

## II.    PETITIONER IS A "VICTIM PROTECTED BY THE CVRA.

Under the CVRA the crime victim is defined as "a person directly and proximately harmed as a result of the commission of a Federal offense ... ." 18 U.S.C. Section 3771(e).    In particular, Defendant called Petitioner when she was a minor over a telephone (a means of interstate communication) requesting that she perform a massage in exchange for payment. As Defendant well knew, that request was fraudulent, as he not only intended to receive a massage, but also intended to have her perform sexual acts in exchange for a cash payment to Petitioner. Only when Petitioner arrived at a Defendant's mansion as directed by Defendant, did Defendant reveal his true purpose of obtaining sexual favors in exchange for payment.  This conduct violated 18 U.S.C. § 2422, which forbids using a means of interstate commerce to knowingly "induce" or "entice" a minor "to engage in prostitution." In addition, this conduct was both a use of "fraud" to obtain a commercial sex act, in violation of 18 U.S.C § 1591, and use of wire communications to perpetrate a "scheme and artifice to defraud," in violation of 18 U.S.C. § 1343.

It appears obvious that Petitioner was "directly and proximately" harmed by these crimes, thereby making her a victim under the CVRA.  It should be emphasized that the CVRA "was designed to be a 'broad and encompassing' statutory victims' bill of rights." *United States v.*

*Degenhardt*, 405 F.Supp.2d 1341, 1342 (D. Utah 2005) (quoting 150 Cong. Rec. S4261 (daily ed. Apr. 22, 2004) (statement of Sen. Feinstein)). Congress intended the CVRA to dramatically rework the federal criminal justice system. In the course of construing the CVRA generously, the Ninth Circuit observed: "The criminal justice system has long functioned on the assumption that crime victims should behave like good Victorian children -- seen but not heard. The Crime Victims' Rights Act sought to change this by making victims independent participants in the criminal justice process." *Kenna v. U.S. Dist. Court for C.D. Cal.*, 435 F.3d 1011, 1013 (9th Cir. 2006). Accordingly, because the CVRA is remedial legislation, courts should interpret it "liberally to facilitate and accomplish its purposes and intent." *Elliott Industries Ltd. Partnership v. BP America Production Co.*, 407 F.3d 1091, 1118 (10th Cir. 2005) (noting remedial legislation should be "interpreted liberally to facilitate and accomplish its purposes and intent"). The CVRA itself suggests this conclusion by requiring that courts must treat crime victims with "fairness." *United States v. Patkar*, 2008 WL 233062 at *3 (D. Haw. 2008) (citing *United States v. Turner*, 367 F.Supp.2d 319, 335 (E.D.N.Y. 2005)).

Not only must the CVRA as a whole be interpreted liberally, but its definition of "crime victim" requires a generous construction. After reciting the direct-and-proximate-harm language at issue here, one of the Act's two co-sponsors -- Senator Kyl -- explained that "[t]his is an intentionally broad definition because all victims of crime deserve to have their rights protected ... ." 150 Cong. Rec. S10912 (Oct. 9, 2004) (emphasis added). The description of the victim definition as "intentionally broad" was in the course of floor colloquy with the other primary sponsor of the CVRA and therefore deserves significant weight. *See Kenna*, 435 F.3d at 1015-16 (discussing significance of CVRA sponsors= floor statements).

6

The definition of "crime victims" must thus be construed broadly in favor of Petitioner. She obviously qualifies as a "victim" under the CVRA.

### III.    PETITIONER IS ENTITLED TO NOTICE OF HER RIGHTS, AN OPPORTUNITY TO CONFER WITH THE PROSECUTORS AND TO BE TREATED WITH FAIRNESS.

Because Petitioner is a "victim" under the CVRA, she has certain protected rights under the Act. Most important, the Act promises that she will have an opportunity to "confer with the attorney for the Government in the case." To date, Petitioner has not been given that right. This raises that very real possibility that the Government may negotiate and conclude a plea agreement with the Defendant without giving Petitioner her protected rights.2

Petitioner is entitled to have this conference with prosecutors before any final plea agreement is reached. The Fifth Circuit reached exactly this conclusion in a very recent case. In *In re Dean*, 527 F.3d 391 (5th Cir. 2008), the Government negotiated a plea agreement with the well-heeled corporate defendant without conferring with the victims. When the Government's failure was challenged in the Fifth Circuit, the Fifth Circuit concluded that the Government had indeed violated the CVRA. The Fifth Circuit observed: "In passing the [CVRA], Congress made the policy decision-which we are bound to enforce-that the victims have a right to inform the plea negotiation process by conferring with prosecutors before a plea agreement is reached." *Id.* at 394.

This Court is obligated to protect the rights of Petitioner. The CVRA directs that "[i]n any court proceeding involving an offense against a crime victim, the court shall ensure that the

---

2 On information and belief, roughly the same crimes were committed against several other young females. These victims, too, are in danger of losing their right to confer under the CVRA.

7

crime victim is afforded the rights described in [the CVRA]." 18 U.S.C. § 3771(b)(1). The

CVRA also confers on crime victims the right to "assert the rights described in [the CVRA]." 18

U.S.C. § 3771(d)(1). Therefore, this Court has its own independent obligation to intercede and

ensure that the Government respects the rights of Petitioner under the CVRA.

## CONCLUSION

The Petitioner requests the intervention of this Court to ensure that her rights are

respected and accorded, as promised in the Crime Victims' Rights Act.

DATED this 7th day of July, 2008.

Respectfully Submitted,

THE LAW OFFICE OF BRAD EDWARDS &
ASSOCIATES, LLC

Brad Edwards, Esquire
Attorney for Petitioner
Florida Bar #542075
2028 Harrison Street
Suite 202
Hollywood, Florida 33020
Telephone:     954-414-8033
Facsimile:      954-924-1530

8

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the above and foregoing has been provided by United States mail and via facsimile to:  ANN MARIE C. VILLAFANA, AUSA, United States Attorney's Office, 500 South Australian Avenue, Suite 400, West Palm Beach, Florida  33401, this 7th day of July, 2008.

Brad Edwards, Esquire
Attorney for Petitioner
Florida Bar No. 542075

9

08-80736-Civ-MARRA/JOHNSON

Case 9:08-cv-80736-KAM   Document 1   Entered on FLSD Docket 07/07/2008   Page 10 of 10    D.C.

JS 44 (Rev. 2/08)

## CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)   NOTICE: Attorneys MUST Indicate All Re-filed

**ELECTRONIC**
**JULY 7, 2008**

STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S.D. OF FLA. - MIAMI

### I. (a) PLAINTIFFS

*In re: Jane Doe*

### DEFENDANTS

*United States of*

(b) County of Residence of First Listed Plaintiff  *Palm Bch.*
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant
(IN U.S. PLAINTIFF CASES ONLY)

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT LAND INVOLVED.

(c) Attorney's (Firm Name, Address and Telephone Number)
*Law office of Brad Edwards + Associates*
*2028 Harrison Street*
*Suite 202*
*Hollywood, FC  33020*

Attorneys (If Known)
*Ann Marie C. Villafaña, U.S. attys*
*office*

(d) Check County Where Action Arose:  ☐ MIAMI-DADE  ☐ MONROE  ☐ BROWARD  ☒ PALM BEACH  ☐ MARTIN  ☐ ST. LUCIE  ☐ INDIAN RIVER  ☐ OKEECHOBEE  HIGHLANDS

### II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

☐ 1  U.S. Government Plaintiff
☐ 3  Federal Question (U.S. Government Not a Party)
☒ 2  U.S. Government Defendant
☐ 4  Diversity (Indicate Citizenship of Parties in Item III)

### III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

*08CV80736 MARRA JOHNSON*

### IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - Med. Malpractice | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 365 Personal Injury - Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 | | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | **PERSONAL PROPERTY** | ☐ 650 Airline Regs. | ☐ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | ☐ 370 Other Fraud | ☐ 660 Occupational Safety/Health | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | ☐ 690 Other | | ☐ 490 Cable/Sat TV |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | **LABOR** | **SOCIAL SECURITY** | ☐ 810 Selective Service |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 850 Securities/Commodities/Exchange |
| ☐ 195 Contract Product Liability | | | ☐ 720 Labor/Mgmt. Relations | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 196 Franchise | | | ☐ 730 Labor/Mgmt.Reporting & Disclosure Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence | ☐ 790 Other Labor Litigation | ☐ 865 RSI (405(g)) | ☐ 892 Economic Stabilization Act |
| ☐ 220 Foreclosure | ☐ 442 Employment | **Habeas Corpus:** | ☐ 791 Empl. Ret. Inc. Security Act | **FEDERAL TAX SUITS** | ☐ 893 Environmental Matters |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations | ☐ 530 General | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 240 Torts to Land | ☐ 444 Welfare | ☐ 535 Death Penalty | **IMMIGRATION** | ☐ 871 IRS - Third Party 26 USC 7609 | ☐ 895 Freedom of Information Act |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/ Disabilities - Employment | ☐ 540 Mandamus & Other | ☐ 462 Naturalization Application | | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/ Disabilities - Other | ☐ 550 Civil Rights | ☐ 463 Habeas Corpus-Alien Detainee | | ☐ 950 Constitutionality of State Statutes |
| | ☒ 440 Other Civil Rights | ☐ 555 Prison Condition | ☐ 465 Other Immigration Actions | | |

### V. ORIGIN (Place an "X" in One Box Only)

☒ 1 Original Proceeding
☐ 2 Removed from State Court
☐ 3 Re-filed- (see VI below)
☐ 4 Reinstated or Reopened
☐ 5 Transferred from another district (specify)
☐ 6 Multidistrict Litigation
☐ 7 Appeal to District Judge from Magistrate Judgment

### VI. RELATED/RE-FILED CASE(S).

(See instructions second page)   a) Re-filed Case  ☐ YES  ☐ NO    b) Related Cases  ☐ YES  ☐ NO

JUDGE                              DOCKET NUMBER

### VII. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing and Write a Brief Statement of Cause (Do not cite jurisdictional statutes unless diversity):
*Crime Victim's Rights Act    18 USC § 3771*
*Petition on behalf of victim of sex offenses to be*
*accorded her rights under the CVRA*

LENGTH OF TRIAL via  *1*  days estimated (for both sides to try entire case)

### VIII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:  ☐ Yes  ☐ No

ABOVE INFORMATION IS TRUE & CORRECT TO THE BEST OF MY KNOWLEDGE

SIGNATURE OF ATTORNEY OF RECORD

DATE  *7-7-08*

**FOR OFFICE USE ONLY**
AMOUNT *350.00*    RECEIPT # *124403*  IFP

10 of 10

EXHIBIT 148

1     refusing to cooperate with the investigation.  We have heard
2     allegations that people at the time who had responsibility for
3     protecting our client falsified information.  We understand
4     that there were orders out there that Jeffrey Epstein was never
5     to be left alone and that the orders were ignored by many of
6     the employees of the prison.

7          In a word, yikes.  In addition, obviously we followed
8     the medical examiner's report, or we haven't followed the
9     report, we haven't seen it, but heard conclusions, initially
10    not enough evidence to come to a conclusion, wanted to see
11    more.  We assumed she was talking about the videotapes, but
12    then came to the conclusion that it was suicide.

13         We report to the court that --

14         THE COURT:  Suicide by hanging --

15         MR. WEINGARTEN:  Yes.

16         THE COURT:  -- was her conclusion?

17         MR. WEINGARTEN:  Yes.

18         And we report to the court that we had a doctor there
19    at the time, and we also have been in receipt of a tremendous
20    amount of medical and scientific evidence volunteered to us
21    opining that the injuries suffered, as reported, were far more
22    consistent with assault than with suicide, and we are happy to
23    supply the court with all the information that we have.

24         Now, in addition, as the court noted, we were underway
25    with our pretrial motions, and as the court obviously

1   understands, the NPA and the role of the NPA was going to be

2   critically important.  And I would simply like to report that

3   we went pretty far along.

4           We interviewed all of the relevant lawyers on the

5   defense side who participated in the NPA, and we were satisfied

6   that we had a very strong argument that every one of those

7   lawyers believed with an objective basis that the deal was

8   global.  That is, at the time --

9           THE COURT:  I'm sorry, that?

10          MR. WEINGARTEN:  The deal of the NPA was global.  That

11  is, more specifically, at the time, the Florida prosecutors and

12  agents knew of conduct in New York, and that no competent

13  defense counsel negotiating in good faith with the prosecutors

14  would have ever agreed to a deal back then that allowed New

15  York prosecutors to indict for precisely the same conduct in

16  the future, which, of course, is what happened.

17          In addition, we have come up with very powerful

18  evidence, we believe, that Florida prosecutors, who

19  participated in the deal, steered the victims and the alleged

20  victims to New York on more than one occasion because they did

21  not want to suffer the sleights of attacks against them.  So we

22  have advanced the ball on this very subject and we are prepared

23  to completely report to the court as to where we are and what

24  we've done.

25          Another point.  We obviously had contact with our

Case 1:19-cr-00490-RMB   Document 53   Filed 09/03/19   Page 16 of 86   16
Case 1:20-cr-00330-PAE   Document 355-9   Filed 02/23/24   Page 266 of 266
J8RsEPS1

1   client at or around the time of his death, and obviously the

2   attorney-client privilege survives death and we are not going

3   to forfeit the privilege, but we will report to the court, with

4   as much specificity as the court may want, that at or around

5   the time of his death, we did not see a despairing, despondent

6   suicidal person.  Details to follow, if the court wishes.

7           The 800-pound gorilla, for us, of course, are the

8   video surveillance tapes.  Obviously we assume there is a tape

9   that leads directly to the door where Jeffrey Epstein was

10  housed.  If that tape reports for 12 hours before his death

11  that no one went in and out of that room, then the suggestion

12  that there was something other than a suicide seems

13  preposterous.

14          But there is no such evidence that has surfaced to

15  date.  Just the opposite.  We have heard, and we actually read

16  in the press, that the tapes were either corrupted or not

17  functioning.  Talk about a yikes.  If, in fact, the system was

18  broken for six months before Jeffrey Epstein was housed, I

19  mean, that would be stunning incompetence.  If it was allowed

20  to continue to be inoperative when Jeffrey Epstein was housed,

21  it would be incompetence times ten.  But what if the tapes only

22  broke down or were inoperative or were corrupted on the day he

23  was killed or the day he died?  Then we're in a completely

24  different situation.

25          So where does this lead?  I think where it leads,

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300