UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,
  Plaintiff,

v.

GHISLAINE MAXWELL,
  Defendant.

Case No. 20-CR-330 (PAE)

# EXHIBIT A15

and were delaying for strategic reasons; (13) repeatedly ceding our discretion to the defense, for example, agreeing that they could review and comment on victim notification letters and decide whether or not we could provide notice; (14) even after the NPA was signed, continuing to water it down, with the Addendum, the 12/19/07 Acosta letter, and then later offering Epstein the option of not having to provide the attorney-representative for the victims; (15) refusing to allow the agents and I to notify the victims about the terms of the NPA and about the change of plea; (16) allowing Epstein to continue to enjoy the benefits of the NPA even after he failed to promptly perform its terms and filed specious delays in order to try to negotiate better terms or win a battle of attrition; (17) refusing to defend me from the false allegations of prosecutorial misconduct; (18) refusing to step in and protect the victims from harassment from Epstein's attorneys when Epstein was "appealing" to DC; and (19) allowing Epstein to repeatedly breach the NPA and then claim that he just got bad advice from his lawyers and "cure" the breaches.

At various times during the investigation, negotiations, etc., I spoke with a number of people about my disagreements with the Office, including my supervisor, ██████████ my co-counsel ██████████████████████████████████████████████ On several occasions, I drafted emails about re-assigning the case because the Office's handling of the matter was so contrary to my methods. I shared at least one of these with ██████████ (Exhibit C-4). She counseled against sending it. The agents asked me not to leave the case because they believed that, if I left, the case would simply disappear. I couldn't disagree with them.

██████████████████████████████ response to my email in July 2007 was, in my mind, inappropriate and meant to intimidate. It is, quite frankly, unheard of, for a Criminal Chief to engage in plea negotiations without the line AUSA's knowledge, much less blessing. And the offer that was made was inexplicable. To this day, I do not understand the NPA – 24 months/18 months – it is a completely random amount of time. Allowing a federal defendant to plead guilty to state charges also is completely unheard of. No one has ever explained to me where the idea originated from. For ██████████ to suggest that my judgment was questionable or that I was unable to handle "major" cases was obviously meant to "put me in my place." In my July 13, 2007 response to ██████████, I wrote:

> With respect to your questions regarding my judgment, I will simply say that disagreements about strategy and raising concerns about the forgotten voices of the victims in this case should not be classified as a lapse in judgment. This Office should seek to foster spirited debate about the law and the use of prosecutorial discretion. I know of other instances where disagreements about the application of the law to different defendants and defense attorneys has resulted in a call for the resignation of the AUSA who dared to challenge the Executive Office's conclusions. I find that very disheartening. However, my first and only concern in this case (and my other child exploitation cases) is the victims. If our personality differences threaten their access to justice, then please put someone on the case whom you trust more, and who will also protect their rights.

After my response to ██████████ I know that he spoke with ██████████ who was Chief of Appeals at the time, about moving me to the Appellate Section.

The results of the disagreements catalogued above were communicated to me (orally or via e-mail) as decisions of the Executive Division. They sometimes followed extensive debate. They

EFTA00225539

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,
  Plaintiff,

v.

GHISLAINE MAXWELL,
  Defendant.

Case No. 20-CR-330 (PAE)


# EXHIBIT A16

Assistant ████████████████████████ where I traveled to Miami and told them about the case. I recall that I explained the case and how the PBPD believed that Epstein had used political or other pressure to avoid serious punishment in Palm Beach County state court. That possibility troubled me greatly; hence, my request to meet with executive management. ████████████ ██████ had the same reaction that I had the first time that ████████ told me about Mr. Epstein – if I have never heard of him, how much influence could this person have? I remember specifically saying to them that I expected the case would be time and resource-intensive and I did not want to invest the time and the FBI's resources if the Office would just back down to pressure at the end. ████████████████████ assured me that, if there was sufficient evidence to support the case, Mr. Epstein would be charged appropriately.[8]

> 2. **Describe in detail your role, and the role of each other person in the USAO, the Federal Bureau of Investigation (FBI), and elsewhere within the Department of Justice – collectively herein "the government" – who was involved in the assessment of the viability and strength of the federal case against Mr. Epstein and in the decision to negotiate a pre-indictment resolution of the case.**

### My Role

I was the line AUSA assigned to the case. In conjunction with the case agents, I handled all aspects of the grand jury investigation – deciding what subpoenas to issue; whom to interview; whom to call to testify before the grand jury; what lines of inquiry to pursue to support various legal theories; I conducted legal research to support charges; I reached out to others throughout the Department and the federal government for information on previous investigations of Mr. Epstein, and for legal guidance on various aspects of the case (e.g., OEO, CEOS, SEC, SDNY, and AFMLS); along with the FBI agents and the FBI Victim-Witness Coordinator, I had direct contact with victims via interviews, meetings, and consultations regarding safety/privacy/mental health concerns; and I handled all court proceedings related to the investigation. When I felt that sufficient evidence had been collected to prove Mr. Epstein's guilt beyond a reasonable doubt, I drafted a prosecution memorandum, indictment, and related documents. I revised those documents in response to comments from those in the supervisory chain of command and, as explained below, after additional evidence was secured. I participated in some (but not all) of the meetings between members of the USAO and counsel for Jeffrey Epstein. I prepared briefing materials for management in preparation for those meetings and in response to issues raised during those meetings.

Normally the assigned line AUSA handles plea negotiations, and I recommended that I enter into negotiations that would result in a joint federal and state resolution (i.e., a plea to federal

---

[8] I do not have a contemporaneous memorandum and cannot find the date of the meeting. In a July 13, 2007 email exchange between myself and Criminal ████████████████ I describe the meeting as follows: "I summarized the case and the State Attorney's Office's handling of it. I acknowledged that we needed to do work to collect the evidence establishing a federal nexus, and I noted the time and money that would be required for an investigation. I said that I was willing to invest that time and the FBI was willing to invest the money, but I didn't want to get to the end and then have the Office be intimidated by the high-powered lawyers. I was assured that that would not happen." (See Exhibit 3.)

EFTA00225489

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,
  Plaintiff,

v.

GHISLAINE MAXWELL,
  Defendant.

Case No. 20-CR-330 (PAE)

# EXHIBIT A20

**U.S. Department of Justice**

*United States Attorney*
*Southern District of Florida*

*500 South Australian Ave., Suite 400*
*West Palm Beach, FL  33401*
*(561) 820-8711*
*Facsimile:  (561) 820-8777*

April 9, 2008

VIA FACSIMILE
Richard H. Willets, Esq.
Mr. Michael Danchuk
2290 10th Avenue North, Suite 404
Lake Worth, FL 33461

      Re: ███████████

Dear Messrs. Willits and Danchuk:

    Thank you for your letter of March 28, 2008, regarding ████████ ███████. Pursuant to the strict rules of grand jury secrecy, I am not able to provide you with the information that you have requested. I believe that some of the information you are seeking is available from public sources on the internet. We also do not have any photographs of Ms. ███████.

    I regret that I cannot be of more assistance. I would appreciate it if you would keep me updated on the course of the civil litigation.

           Sincerely,

           ████████████

           United States Attorney

By: ████████████

           Assistant United States

Attorney

cc:  E. ███████████

                                   EXHIBIT B-42

EFTA00225643

# EXHIBIT A 21

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
### Case No. 08-80736-Civ-Marra/Matthewman

JANE DOE #1 AND JANE DOE #2,

     Petitioners,

v.

UNITED STATES OF AMERICA,

     Respondent.

_____/

## UNITED STATES' NOTICE OF FILING THIRD SUPPLEMENTAL PRIVILEGE LOG

Pursuant to the Court's June 18, 2013 Omnibus Order (DE 190), the Respondent, United States of America, by and through the undersigned Assistant United States Attorney, hereby gives notice of its filing of its Third Supplemental Privilege Log. The index has been marked with Bates Numbers P-014924 thru P-015267.

The documents referenced in the Third Supplemental Privilege Log will be delivered tomorrow to the Chambers of U.S. District Judge Kenneth A. Marra for *ex parte in camera* review, pursuant to the Court's Omnibus Order.

Respectfully submitted,

WIFREDO A. FERRER
UNITED STATES ATTORNEY

By: ███████████████

    Assistant United States Attorney
    Florida Bar No, ███████
    500 South Australian Ave, Suite 400
    West Palm Beach, FL 33401
    Telephone: ███████
    Facsimile: ███████
    ███████

EFTA00190318

# EXHIBIT A 22

agreement or deferred prosecution in favor of state prosecution in the way that the Epstein case was handled. I believed that the fairest course was to consult with the victims before the execution of any agreement.

The second significant departure from my regular practice was the victim notification procedure. Never before or since have I shared "drafts" of victim notifications with counsel for the defendants. The CVRA places the entire burden of complying with the Act on the government and the court and provides that a "person accused of the crime may not obtain any form of relief under this Chapter." 18 U.S.C. § 3771(d)(1) (2004). But, in this case, I was required to provide draft victim notification letters, rewrite them due to objections from defense counsel, and refrain from sending them altogether. My protestations appear in my emails, and were shared with the agents, my legal assistant, and my supervisors.

With regard to FBI policies and practices, I understood that the FBI had its own victim notification procedures. I had previously worked with Twiler Smith on other cases (and worked with her on other cases after the Epstein investigation). I did not know the details of what FBI included in its letters or when they were sent. I did not instruct FBI on what to send or when to send it. My general rule is to tell agencies to follow their regular procedures. I don't remember saying anything different in this case. I did not see any FBI letters in this case prior to collecting the FBI letters to Brad Edwards' clients in connection with the *Jane Doe █ United States* litigation. I did not instruct the FBI to include the language about the case being under investigation and that they should be patient.

2. **Identify all victims in this case to whom written or oral notifications were made, when and how each notification was made, and the contents of the notifications. Explain why notifications were made to some victims, and not to others, and who was responsible for those decisions.**

On the attached chart (Exhibit B-1), I listed all of the individuals identified as victims during the state investigation, the federal investigation, or after Epstein entered his state guilty plea, but who were brought to my attention by various attorneys. The chart lays out how and when each was contacted. Due to the passage of time, it is impossible for me to give exact dates and the exact content of each conversation. Also, there are some victims that I specifically remember meeting with. There are some that I know I did not meet with. There are others that I believe I met with, but I am not certain. I have qualified my answers on the chart accordingly.

On August 4, 2006, I prepared 24 Victim Notification Letters for victims who had been identified during the state investigation. (Exhibit 12.) These were provided to Special Agent ████████ to hand-deliver to victims during interviews. I decided to prepare these letters and I decided on the content of those letters.

On August 11, 2006, 18 amended letters were prepared. (Exhibit 13.) These letters clarified that the recipients were victims and/or witnesses, since we had not yet been able to confirm that they were minors during the time of their encounters with Epstein and we were still working to confirm federal jurisdiction. People who had already received the August 4, 2006

responsible officials remain obliged to ensure that all such delegated responsibilities are discharged. The Attorney General designates the following responsible officials: . . . For cases in which charges have been filed – the U.S. Attorney in whose district the prosecution is pending."))

EFTA00225523

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,
  Plaintiff,

v.

GHISLAINE MAXWELL,
  Defendant.

Case No. 20-CR-330 (PAE)

# EXHIBIT A23

his 14-year-old girlfriend and later digitally penetrated her. The SDFL has prosecuted numerous violations of 18 U.S.C. § 2422 where the "facility of interstate commerce" – generally the internet and telephones – are used by a defendant and an undercover pretending to be the parent of a minor, to arrange for a meeting that the defendant hopes will result in sexual activity. There is nothing extraordinary about Epstein's case except the large number of victims involved.

Epstein's counsel neglected to inform you that the age range of the victims includes girls as young as 14, and glosses over the fact that Epstein did not simply engage in "solo self-pleasuring" in front of the victims. Instead, with each visit, he pressured the victims to allow him to engage in more and more sexual activity – fondling breasts and vaginas, digital penetration, use of a vibrator on their vaginas, performing oral sex on them, having them perform oral sex on his adult girlfriend, and engaging in sexual intercourse. Counsel also neglected to inform you that many girls did affirmatively tell Epstein their true ages and he told several that he "did not care about age."

Epstein's conduct was not "purely local." He and his assistants called and sent text messages to victims in Palm Beach County from other states to arrange "appointments" for his upcoming visits to Palm Beach. And, while in Palm Beach, Epstein and his assistants called victims in New York to arrange "appointments" for his return to New York. Epstein wired money to some victims and sent gifts through the mails. This case falls squarely within federal jurisdiction.

Epstein also falsely claims that certain facts related to the resolution of the case were hidden and later discovered by his lawyers. For example, they complain about the proposed use of a guardian ad litem, stating that "Mr. Epstein's counsel later established that all but one of these individuals were adults, not minors." It was AUSA Villafaña who told Epstein's counsel that all of the victims but one had already reached the age of majority, which was one reason why the guardian ad litem procedure proposed by Epstein's counsel would not work. Likewise, AUSA Villafaña disclosed to Epstein's counsel that one of the five attorney-representatives that she recommended for consideration by Epstein's counsel was a "good friend" of a "good friend." Despite the disclosure of this relationship, Epstein's counsel selected that person, before the SDFL, on its own, decided to use an independent Special Master to make the selection.

Epstein's counsel states that the "USAO eventually asserted that it could not vouch for the veracity of any of the claims that these women might make," but neglects to disclose that the SDFL made that statement *at Epstein's request* to avoid the suggestion that the SDFL was involving itself in the outcome of civil litigation.

Epstein's counsel have repeatedly attacked the SDFL and the FBI for classifying the victims as "victims." As you know, all Justice Department employees have the obligation to identify victims and to notify them of their rights. "Victims" are defined by law, not by self-selection. The girls whom have been identified by the FBI and the SDFL fall within the legal definition – they were all minors who engaged in illicit sexual activity with Jeffrey Epstein, at his request, in exchange for money. From interviewing them, the FBI Special Agents, the FBI Victim-Witness Coordinator, and AUSA Villafaña all feel confident that they suffered harm, in a

14

EFTA00190465

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,
    Plaintiff,

v.

GHISLAINE MAXWELL,
    Defendant.

Case No. 20-CR-330 (PAE)


# EXHIBIT A32

**Villafana, Ann Marie C. (USAFLS)**

| | |
|---|---|
| **From:** | Senior, Robert (USAFLS) <RSenior@usa.doj.gov> |
| **Sent:** | Monday, June 23, 2008 10:06 AM |
| **To:** | Villafana, Ann Marie C. (USAFLS); Kuyrkendall, E N. (MM) (FBI); Richards, Jason R. (MM) (FBI) |
| **Cc:** | Atkinson, Karen (USAFLS) |
| **Subject:** | RE: Trip to New York, etc. |

21

Ok. Marie, hoping to hear from DAG's office today giving the green light. Let's talk when that decision is made.

---

**From:** Villafana, Ann Marie C. (USAFLS)
**Sent:** Monday, June 23, 2008 9:15 AM
**To:** Kuyrkendall, E N. (FBI); Richards, Jason R. (FBI)
**Cc:** Atkinson, Karen (USAFLS); Senior, Robert (USAFLS)
**Subject:** Trip to New York, etc.

We will not be interviewing ▇▇▇ in New York. Her attorney gave a copy of the grand jury subpoena to Epstein's lawyers. They, in turn, promptly sent it on to Washington complaining, yet again, about me. So, I do not want to do an interview with him present, and we will have to put her in the grand jury.

Given that, let's take the New York section out of the indictment so we can present the indictment Tuesday morning. Then we can do ▇▇▇ interview in the afternoon with plans to supersede. It probably makes sense to wait on the rest of the interviews until we hear what ▇▇▇ has to say, so let's plan to do the New York trip in a few weeks.

Bob – I will revise everything accordingly and send it down to you. We have another girl from Florida, so I will replace our New York Jane Doe with her.

*A. Marie Villafaña*

Assistant U.S. Attorney

500 S. Australian Ave, Suite 400

West Palm Beach, FL 33401

Phone 561 209-1047

Fax 561 820-8777

EFTA00190477

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,
  Plaintiff,

v.

GHISLAINE MAXWELL,
  Defendant.

Case No. 20-CR-330 (PAE)


# EXHIBIT A33

Page 298

recommendation. So, best efforts kind of became a sticking point in enforcement, didn't it? Because what does it mean? What does best efforts mean?

A    So, I think it's fair to say that one of the issues that came up after this was entered into was the U.S. Attorney's Office, at least from my perspective, was in a little bit of a bind because we had agreed to this, yet he wasn't turning himself in. And so, how do we deal with that? And so, that's not a phrase that I focused on at the time. I understand your point.

Q    All right. I'm going to move on from those. Is there anything else on those NPA clauses?

A    And finally, let me -- let me just say you didn't ask, we had incredibly experienced attorneys in the office. I assumed, rightly or wrongly, that this language had been thought through and vetted, and you know, sitting here 12 years later, I understand the issues that have arisen from it, but at the time, these were not issues that were focused on.

Q    to your knowledge, who was involved in the drafting, other than ▆▆ ▆▆▆ on your side --

A    Right.

Q    -- and ▆▆ Lourie, and you, to some extent?

A    So, I can't say 12 years after the fact, but again, ▆▆ Lourie, very experienced head of the Palm Beach Office

EFTA00009114

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,
  Plaintiff,

v.

GHISLAINE MAXWELL,
  Defendant.

Case No. 20-CR-330 (PAE)


# EXHIBIT A34

In that conversation, Rodriguez and the UCE continued the discussion regarding the purchase of the documents and scheduled a meeting for the following day.

11.    On November 3, 2009, Rodriguez met with the UCE at a predetermined location. During the meeting, Rodriguez produced a small bound book and several sheets of legal pad paper containing hand written notes. Rodriguez explained that he had taken the bound book from his former employer's residence while employed there in 2004 to 2005 and that the book had been created by persons working for his former employer. Rodriguez discussed in detail the information contained within the book, and identified important information to the UCE. In addition, Rodriguez admitted he had previously lied to FBI. Rodriguez asked the UCE about the $50,000.00, took possession of the money, and began counting it.

12.    Rodriguez was then detained for Obstruction of Official Proceedings, Title 18, U.S. Code, Section 1512(c), and questioned. After *Miranda* warnings were administered by agents, Rodriguez waived his rights and signed a written waiver of those rights. Rodriguez admitted that he had the documents and book in his possession and had never turned them over to local law enforcement or the FBI. In addition, Rodriguez advised he had witnessed nude girls whom he believed were underage at the pool area of his former employer's home, knew that his former employer was engaging in sexual contact with underage girls, and had viewed pornographic images of underage girls on computers in his employer's home. Rodriguez was then released from custody for further investigation.

13.    The items that Rodriguez had attempted to sell to the UC for $50,000.00

4

EFTA00608040

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,
  Plaintiff,

v.

GHISLAINE MAXWELL,
  Defendant.

Case No. 20-CR-330 (PAE)


# EXHIBIT A36

**Villafana, Ann Marie C. (USAFLS)**

| | |
|---|---|
| **From:** | Kuyrkendall, E N. (FBI) <E.Kuyrkendall@ic.fbi.gov> |
| **Sent:** | Wednesday, May 28, 2008 6:33 PM |
| **To:** | Villafana, Ann Marie C. (USAFLS) |
| **Subject:** | Re: Epstein |

Hey we emailed Jeff MOST:) of your comments re any further delays and added a few of our own. The US Atty Gen was here today in MM. I would love to know if Epstein came up. Jeff and Acosta were going to present to the DAG reasons not to delay any further. Hopefully they were successful and we r still on for Tues. We interviewed ▮ today. She told Epstein her true age, she belvd was 14 or 15. Phone records show contact @ age 16. She said Epstein told her he did not care about age. She also said that E told her he had f\*\*\*d ▮, ▮ brought ▮. Anyways, I'll fill u in later. NY getting close to locating ▮. We have cell and good address. Keep your fingers crossed. Talk to u soon.

----- Original Message -----
From: Villafana, Ann Marie C. (USAFLS) <Ann.Marie.C.Villafana@usdoj.gov>
To: Richards, Jason R.; Atkinson, Karen (USAFLS); Kuyrkendall, E N.
Sent: Tue May 27 23:45:06 2008
Subject: Re: Epstein

Aaaargh.
The statute of limitations issue is the state statute of limitations. I think joe says it is two years. The issue is implicated in two ways. First, because of the state's leniency for the first set of girls, the second set have been presented only to us for prosecution. If we cannot go forward, then there will be no prosecution of those crimes. (In response to the argument that joe should just present them now, we believe that some of the victims are unknown to the defense and disclosing them further weakens our case by allowing them to depose and harass those victims.)
Second, our "state resolution" of the case requires epstein to plead to something that hasn't been charged yet so further delay will allow him to escape one of the terms of the deal he signed several months ago. (There also is a sol on the private cause of action under 2255 pursuant to which he must pay damages to the girls. The delay will allow him to escape responsibility for that term, too.)

Other reasons:
The victims are getting older. Clearly one of epstein's arguments will be that he did not know they were minors. The older they are when they testify the more plausible epstein's argument becomes.

The grand jury we are using will expire soon. We have already presented more than a dozen hours of testimony and the grand jury is invested and wants to indict.

We promised the girls swift justice so they could move on with their lives. ▮ is a perfect example of why this is needed. The delay so far has led many to reach out to private lawyers which, in turn, let's e argue that they are only in it for money.

Why give him more time? He has had more than a year's delay already for no reason other than the names of the attorneys he can afford to hire. This is not a white collar or other non-violent crime. This is a child exploitation crime with more than 20 known child victims. We are mandated by statute and doj policy to prosecute those cases vigorously and in a timely fashion - whether the children were prostitutes or unwilling victims. Why is this case being treated so differently?

----- Original Message -----
From: Richards, Jason R. (FBI)
To: Villafana, Ann Marie C. (USAFLS)
Cc: Kuyrkendall, E N. (FBI)
Sent: Tue May 27 18:45:37 2008
Subject: RE: Epstein

Hey Marie,

Sorry to bother you on your vacation. Apparently the DAG is inclined to allow Epstein's counsel to present further arguments. Jeff Sloman has requested Nesbitt and I to prepare, in email format, arguments to present to the DAG supporting why the case should not be stalled any further. Sloman mentioned statute of limitation issues. I don't know what the specific statute of limitations are (if there

EFTA00190427

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,
  Plaintiff,

v.

GHISLAINE MAXWELL,
  Defendant.

Case No. 20-CR-330 (PAE)

# EXHIBIT A39

**From:** ▮▮▮▮▮▮▮▮▮ ) ◂▮▮▮▮▮▮▮▮▮ ▸
**Sent:** Wednesday, November 11, 2020 12:19 PM
**To:** Kathleen E. Cassidy ◂▮▮▮▮▮▮ ▸
**Cc:** ▮▮▮▮▮▮ ) ◂▮▮▮▮▮▮ ▸; ▮▮▮▮▮▮ (USANYS)
◂▮▮▮▮▮▮ ▸; Susan Necheles ◂▮▮▮▮▮ ▸; ▮▮▮▮▮▮
**Subject:** Re: Draft Statement

Thanks very much for sending. Our team has reviewed your draft and is prepared to go forward with the call at 12:30pm today.

Best,

▮▮▮▮

On Nov 11, 2020, at 12:08 PM, Kathleen E. Cassidy ◂▮▮▮▮▮▮ ▸ wrote:

All:

We want to give you a draft of our suggested changes (attached) before our conversation this afternoon. We realize the time is short before our scheduled call, so if you do not have sufficient time to review it in advance of our call, we are happy to push the time for our call back until after you have had a chance to review it.

We have tried to work within the framework you provided. There are some allegations which we do not believe are accurate. Given the long passage of time, however, we understand that there might be different recollections about what occurred. We have tried to set forth both views of what occurred. We understand that you do not want a Fatico hearing and are willing to agree that we will not ask for a Fatico hearing to attempt to resolve the different recollections.

With respect to the specific allegations about ▮▮▮ being present during massages when girls were sexually assaulted, ▮▮▮ does not believe she was ever present during any of these incidents and believes that the girls misremember the circumstances. We note that these events occurred a long time ago and were emotionally charged, a circumstance which can cause people to have faulty memories.

Indeed, we think that some of the evidence seems to contradict the victim's claims that ▮▮▮ was present when they, as minors, were sexually molested by Epstein.

Specifically, based on allegations in a lawsuit, one of the victims referred to in the statement of facts states that she was abused on Epstein's ranch when she was a minor and that ▮▮▮ was present. But flight logs reflect that the first time that the victim was on a flight to or from the ranch where she states the abuse occurred was in April 2003, after the victim was 18 years old. Moreover, the victim's attorney has also stated that a photo of the victim and Epstein in which the victim is smiling, taken in December 2002, was taken before the victim knew that Epstein would sexually abuse her. This appears to contradict the victim's allegation that in the summer of 2002 she was flown to the ranch and abused by Epstein in the presence of ▮▮▮.

To be clear, we are not asserting that this victim is lying about Epstein abusing her. Our point is simply that this occurred 18 years ago and that she appears to be confused about the timing of events and who was present.

Another victim claims that that ▮▮▮ walked in on an incident where the victim was performing ▮▮▮ on Epstein in his New York townhouse. This victim has named ▮▮▮ as a defendant in her civil suit and has alleged that this incident occurred in 2005. During this time period, ▮▮▮ worked out of Maxwell's home and spent little time in Epstein's townhouse. Staff, including ▮▮▮, were never allowed to roam the halls or go into private areas of Epstein's Manhattan home unless they were summoned there. ▮▮▮ never walked in on someone when that person was giving Epstein ▮▮▮ and believes that this victim must be confusing her with someone else.

EFTA00023223

███ does not doubt that Epstein abused these women, as he did with almost all young women and girls he came into contact with, but the available evidence does not support the assertion that ███ was present for or witnessed any sexual abuse of these victims while they were minors. Accordingly, we do not object to allowing these women telling their stories but we cannot agree that the allegations in their stories concerning ███ are correct.

Let us know what would work best for a call.

Thanks,
Kate

_____

Kate Cassidy
Necheles Cassidy LLP
████████████████
████████████
████████
Mobile ████████

<2020.10.11 Defense edited SOF.docx>

<2019.11.20 Complaint -████ v. Indyke (Estate of Epstein) 19cv10758.pdf>

EFTA00023224

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,
  Plaintiff,

v.

GHISLAINE MAXWELL,
  Defendant.

Case No. 20-CR-330 (PAE)

# EXHIBIT A38

PRIVILEGED - ATTORNEY WORK PRODUCT/DELIBERATIVE PROCESS
CONFIDENTIAL - SUBJECT TO FED. R. CRIM. P. 6(e)

belonged to Wexner, but the Wexners had moved out of it in 1995. Epstein also sold himself a private plane that previously belonged to Wexner at a deeply discounted price.

In the 1990s, Epstein told Wexner that he had other clients and that Wexner did not need to pay Epstein because Epstein was having fun and they would settle up later. Epstein introduced Wexner to a number of other people as his clients, and Wexner interacted with other prominent people who knew Epstein, such as Prince Andrew, professors at Harvard, and a sultan in Dubai. Epstein had no formal role in L Brands or Victoria's Secret. At some point, Wexner heard a rumor that Epstein might be holding himself out as connected to Victoria's Secret, but when Wexner asked Epstein about it, Epstein denied doing so.

Epstein handled Wexner's personal business affairs until 2007, when Wexner learned that Epstein had stolen or otherwise misappropriated several hundred million dollars from Wexner. Around that time, Epstein told Wexner that he was having legal problems involving an overly aggressive police chief and some sort of massage. Epstein said he was being blackmailed and it could get messy, so it would be best for Wexner's wife to take over the family finances. In response, Wexner's wife looked into the state of their finances and discovered that Epstein had misappropriated a significant amount of the family's funds. For example, Epstein frequently bought property on behalf of the Wexners and then sold it to himself for a fraction of the cost. The Wexners then decided to cut off Epstein. When confronted, Epstein tried to convince Wexner's wife that she did not understand the financials and insisted that he had the Wexners' best interests at heart. The Wexners did not want to bring unnecessary public attention to the issue, so they withdrew the power of attorney, and hired counsel to negotiate a private settlement with Epstein. As a result of those negotiations, Epstein agreed to return $100 million to the Wexners, which he did in January of 2008. At that point, Wexner severed all ties with Epstein, and he has not seen or spoken to Epstein since.

Wexner knows nothing about the ███ ████ claim from ███ and explained that at the time, Epstein owned a property adjacent to the Wexners about a half mile way from the Wexners's property. The Wexners's security team is not aware of any inappropriate incident taking place on the Wexners's property, and the Wexners first heard about ███ ███ allegations from public reporting this year.

2. Search Warrants

In July and August 2019, we obtained and the FBI executed search warrants for Epstein's residences in New York and the Virgin Islands. We subsequently obtained warrants to search all electronic devices, drives, and discs seized from those residences. The FBI is continuing to review the extraordinarily large amount of data contained on those devices and is working with our filter team to complete a privilege review of that data. In addition, we have reviewed the materials obtained during the Palm Beach Police Department's October 2005 search of Epstein's Palm Beach residence.

66

EFTA_00022526

EFTA02731147

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,
  Plaintiff,

v.

GHISLAINE MAXWELL,
  Defendant.

Case No. 20-CR-330 (PAE)


# EXHIBIT A39

**From:** ██████████ ) ◄ ██████████ >
**Sent:** Wednesday, November 11, 2020 12:19 PM
**To:** Kathleen E. Cassidy ◄ ██████████ >
**Cc:** ██████████ ) ◄ ██████████ >; ██████████ (USANYS)
◄ ██████████ >; Susan Necheles ◄ ██████████ >; ██████████
**Subject:** Re: Draft Statement

Thanks very much for sending. Our team has reviewed your draft and is prepared to go forward with the call at 12:30pm today.
Best,

████████

On Nov 11, 2020, at 12:08 PM, Kathleen E. Cassidy ◄ ██████████ > wrote:

All:

We want to give you a draft of our suggested changes (attached) before our conversation this afternoon. We realize the time is short before our scheduled call, so if you do not have sufficient time to review it in advance of our call, we are happy to push the time for our call back until after you have had a chance to review it.

We have tried to work within the framework you provided. There are some allegations which we do not believe are accurate. Given the long passage of time, however, we understand that there might be different recollections about what occurred. We have tried to set forth both views of what occurred. We understand that you do not want a Fatico hearing and are willing to agree that we will not ask for a Fatico hearing to attempt to resolve the different recollections.

With respect to the specific allegations about ████ being present during massages when girls were sexually assaulted, ████ does not believe she was ever present during any of these incidents and believes that the girls misremember the circumstances. We note that these events occurred a long time ago and were emotionally charged, a circumstance which can cause people to have faulty memories.

Indeed, we think that some of the evidence seems to contradict the victim's claims that ████ was present when they, as minors, were sexually molested by Epstein.

Specifically, based on allegations in a lawsuit, one of the victims referred to in the statement of facts states that she was abused on Epstein's ranch when she was a minor and that ████ was present. But flight logs reflect that the first time that the victim was on a flight to or from the ranch where she states the abuse occurred was in April 2003, after the victim was 18 years old. Moreover, the victim's attorney has also stated that a photo of the victim and Epstein in which the victim is smiling, taken in December 2002, was taken before the victim knew that Epstein would sexually abuse her. This appears to contradict the victim's allegation that in the summer of 2002 she was flown to the ranch and abused by Epstein in the presence of ████.

To be clear, we are not asserting that this victim is lying about Epstein abusing her. Our point is simply that this occurred 18 years ago and that she appears to be confused about the timing of events and who was present.

Another victim claims that that ████ walked in on an incident where the victim was performing ████ on Epstein in his New York townhouse. This victim has named ████ as a defendant in her civil suit and has alleged that this incident occurred in 2005. During this time period, ████ worked out of Maxwell's home and spent little time in Epstein's townhouse. Staff, including ████, were never allowed to roam the halls or go into private areas of Epstein's Manhattan home unless they were summoned there. ████ never walked in on someone when that person was giving Epstein ████ and believes that this victim must be confusing her with someone else.

EFTA00023223

███ does not doubt that Epstein abused these women, as he did with almost all young women and girls he came into contact with, but the available evidence does not support the assertion that ███ was present for or witnessed any sexual abuse of these victims while they were minors. Accordingly, we do not object to allowing these women telling their stories but we cannot agree that the allegations in their stories concerning ███ are correct.

Let us know what would work best for a call.

Thanks,
Kate

Kate Cassidy
Necheles Cassidy LLP
████████████
████████
███████

Mobile ██████
<2020.10.11 Defense edited SOF.docx>

<2019.11.20 Complaint - ██████ v. Indyke (Estate of Epstein) 19cv10758.pdf>

EFTA00023224

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,
   Plaintiff,

v.

GHISLAINE MAXWELL,
   Defendant.

Case No. 20-CR-330 (PAE)


# EXHIBIT A38

*PRIVILEGED - ATTORNEY WORK PRODUCT/DELIBERATIVE PROCESS*
*CONFIDENTIAL - SUBJECT TO FED. R. CRIM. P. 6(e)*

belonged to Wexner, but the Wexners had moved out of it in 1995. Epstein also sold himself a private plane that previously belonged to Wexner at a deeply discounted price.

In the 1990s, Epstein told Wexner that he had other clients and that Wexner did not need to pay Epstein because Epstein was having fun and they would settle up later. Epstein introduced Wexner to a number of other people as his clients, and Wexner interacted with other prominent people who knew Epstein, such as Prince Andrew, professors at Harvard, and a sultan in Dubai. Epstein had no formal role in L Brands or Victoria's Secret. At some point, Wexner heard a rumor that Epstein might be holding himself out as connected to Victoria's Secret, but when Wexner asked Epstein about it, Epstein denied doing so.

Epstein handled Wexner's personal business affairs until 2007, when Wexner learned that Epstein had stolen or otherwise misappropriated several hundred million dollars from Wexner. Around that time, Epstein told Wexner that he was having legal problems involving an overly aggressive police chief and some sort of massage. Epstein said he was being blackmailed and it could get messy, so it would be best for Wexner's wife to take over the family finances. In response, Wexner's wife looked into the state of their finances and discovered that Epstein had misappropriated a significant amount of the family's funds. For example, Epstein frequently bought property on behalf of the Wexners and then sold it to himself for a fraction of the cost. The Wexners then decided to cut off Epstein. When confronted, Epstein tried to convince Wexner's wife that she did not understand the financials and insisted that he had the Wexners' best interests at heart. The Wexners did not want to bring unnecessary public attention to the issue, so they withdrew the power of attorney, and hired counsel to negotiate a private settlement with Epstein. As a result of those negotiations, Epstein agreed to return $100 million to the Wexners, which he did in January of 2008. At that point, Wexner severed all ties with Epstein, and he has not seen or spoken to Epstein since.

Wexner knows nothing about the ████ ████ claim from ████ and explained that at the time, Epstein owned a property adjacent to the Wexners about a half mile way from the Wexners's property. The Wexners's security team is not aware of any inappropriate incident taking place on the Wexners's property, and the Wexners first heard about ████ ████ allegations from public reporting this year.

2. Search Warrants

In July and August 2019, we obtained and the FBI executed search warrants for Epstein's residences in New York and the Virgin Islands. We subsequently obtained warrants to search all electronic devices, drives, and discs seized from those residences. The FBI is continuing to review the extraordinarily large amount of data contained on those devices and is working with our filter team to complete a privilege review of that data. In addition, we have reviewed the materials obtained during the Palm Beach Police Department's October 2005 search of Epstein's Palm Beach residence.

EFTA_00022526

EFTA02731147

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,
   Plaintiff,

v.

GHISLAINE MAXWELL,
   Defendant.

Case No. 20-CR-330 (PAE)

# EXHIBIT A39

**From:** ▮▮▮▮▮▮▮▮▮▮ < ▮▮▮▮▮▮▮▮▮▮ >
**Sent:** Wednesday, November 11, 2020 12:19 PM
**To:** Kathleen E. Cassidy < ▮▮▮▮▮▮▮▮ >
**Cc:** ▮▮▮▮▮▮▮ < ▮▮▮▮▮▮▮▮ >; ▮▮▮▮▮▮▮ (USANYS)
< ▮▮▮▮▮▮▮▮ >; Susan Necheles < ▮▮▮▮▮▮▮▮ >; ▮▮▮▮▮▮▮▮
**Subject:** Re: Draft Statement

Thanks very much for sending. Our team has reviewed your draft and is prepared to go forward with the call at 12:30pm today.

Best,

▮▮▮▮▮

On Nov 11, 2020, at 12:08 PM, Kathleen E. Cassidy < ▮▮▮▮▮▮▮▮ > wrote:

All:

We want to give you a draft of our suggested changes (attached) before our conversation this afternoon. We realize the time is short before our scheduled call, so if you do not have sufficient time to review it in advance of our call, we are happy to push the time for our call back until after you have had a chance to review it.

We have tried to work within the framework you provided. There are some allegations which we do not believe are accurate. Given the long passage of time, however, we understand that there might be different recollections about what occurred. We have tried to set forth both views of what occurred. We understand that you do not want a Fatico hearing and are willing to agree that we will not ask for a Fatico hearing to attempt to resolve the different recollections.

With respect to the specific allegations about ▮▮▮ being present during massages when girls were sexually assaulted, ▮▮▮ does not believe she was ever present during any of these incidents and believes that the girls misremember the circumstances. We note that these events occurred a long time ago and were emotionally charged, a circumstance which can cause people to have faulty memories.

Indeed, we think that some of the evidence seems to contradict the victim's claims that ▮▮▮ was present when they, as minors, were sexually molested by Epstein.

Specifically, based on allegations in a lawsuit, one of the victims referred to in the statement of facts states that she was abused on Epstein's ranch when she was a minor and that ▮▮▮ was present. But flight logs reflect that the first time that the victim was on a flight to or from the ranch where she states the abuse occurred was in April 2003, after the victim was 18 years old. Moreover, the victim's attorney has also stated that a photo of the victim and Epstein in which the victim is smiling, taken in December 2002, was taken before the victim knew that Epstein would sexually abuse her. This appears to contradict the victim's allegation that in the summer of 2002 she was flown to the ranch and abused by Epstein in the presence of ▮▮▮.

To be clear, we are not asserting that this victim is lying about Epstein abusing her. Our point is simply that this occurred 18 years ago and that she appears to be confused about the timing of events and who was present.

Another victim claims that that ▮▮▮ walked in on an incident where the victim was performing ▮▮▮ on Epstein in his New York townhouse. This victim has named ▮▮▮ as a defendant in her civil suit and has alleged that this incident occurred in 2005. During this time period, ▮▮▮ worked out of Maxwell's home and spent little time in Epstein's townhouse. Staff, including ▮▮▮, were never allowed to roam the halls or go into private areas of Epstein's Manhattan home unless they were summoned there. ▮▮▮ never walked in on someone when that person was giving Epstein ▮▮▮ and believes that this victim must be confusing her with someone else.

EFTA00023223

███ does not doubt that Epstein abused these women, as he did with almost all young women and girls he came into contact with, but the available evidence does not support the assertion that ███ was present for or witnessed any sexual abuse of these victims while they were minors. Accordingly, we do not object to allowing these women telling their stories but we cannot agree that the allegations in their stories concerning ███ are correct.

Let us know what would work best for a call.

Thanks,
Kate

_____

Kate Cassidy
Necheles Cassidy LLP
████████████████████
████████████████
████████████
Mobile ████████████

<2020.10.11 Defense edited SOF.docx>

<2019.11.20 Complaint - ████████ v. Indyke (Estate of Epstein) 19cv10758.pdf>

EFTA00023224

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,
    Plaintiff,

v.

GHISLAINE MAXWELL,
    Defendant.

Case No. 20-CR-330 (PAE)

# EXHIBIT A40

FD-302 (Rev. 5-8-10)

-1 of 9-

**FEDERAL BUREAU OF INVESTIGATION**


OFFICIAL RECORD

Date of entry    09/24/2021

LESLEY GROFF, date of birth (DOB) ████████, was interviewed pursuant to a proffer agreement at 39 Broadway Suite 1610, New York, New York. Present for the proffer was GROFF's attorney Michael Bachner.  Also present for the proffer was Assistant United States Attorneys ████████ and ████████, along with Special Agent ████████.  After being advised of the identity of the above listed individuals and the nature of the interview, GROFF provided the following information:

GROFF is in retirement along with her husband.  GROFF has a ████████ son.  GROFF enjoys exercising and listening to books on tape.  GROFF resigned in July 2019 from working for JEFFREY EPSTEIN (EPSTEIN).  GROFF had started working for EPSTEIN in February 2001.

GROFF attended college in North Texas and is a UTD graduate.  GROFF lived in Texas then met a man who lived in New Jersey which caused her to move to the area.  GROFF worked for nine years at an office supply company.  GROFF then divorced.  GROFF then worked at Nordstrom.  GROFF met her current husband at a triathlon; GROFF was still working at Nordstrom at the time. GROFF wanted to be an event planner and thought Wall Street would be a great place to work.

A headhunter, RUSSELL, found her resume on Monster.  GROFF was looking at a job to work for the Knicks, but it was taken.  GROFF met with RUSSELL and he told her that there was a job to organize one man's life.  This man was EPSTEIN, a Manhattan socialite.  GROFF had never heard of EPSTEIN before this.  GROFF interviewed for the position.  GROFF interviewed with ████████ (████████), who was GHISLAINE MAXWELL's (MAXWELL) assistant at the time.  Then GROFF interviewed with MAXWELL before interviewing with EPSTEIN the next day when he was in town.  GROFF interviewed at 457 Madison on the 4 th floor; this location was part of a palace.  GROFF was in the front office before going to EPSTEIN's office.  GROFF met with all three people on the

Investigation on  07/23/2021  at  New York, New York, United States (, Other (Video))

File #  50D-NY-3027571                                    Date drafted  08/03/2021

by  ████████

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

3501.098-015
Page 1 of 9

**SUBJECT TO PROTECTIVE ORDER PARAGRAPHS 7, 8, 9, 10, 15, and 17**

EFTA_00092061

EFTA01246216

FD-302a (Rev. 5-8-10)

50D-NY-3027571

Continuation of FD-302 of (U) Proffer of LESLEY GROFF                     , On 07/23/2021 , Page  2 of 9

same day; it was a normal interview about being an executive assistant. During the interview, the phone kept ringing. EPSTEIN would talk then hang up. It seemed to be a very vibrant office.

GROFF had to sign a non-disclosure agreement. If GROFF spoke about business people, which GROFF thought included LES WEXNER (WEXNER), she would owe him $100,000. GROFF had never seen anything like the non-disclosure agreement before working for EPSTEIN.

GROFF had her own office in the back. Others that worked at the office were two attorneys, an assistant, a trader, a travel assistant ███████ ██████ ( ████ ), and ████████. MAXWELL came in and out of the office. EPSTEIN did not work a 9-5 schedule. EPSTEIN gave GROFF pages including a call list, who he wanted to see, and appointments. GROFF had to reorganize and shift things. At the time, GROFF made all phone calls, including calling the driver, chef, and other people. GROFF had two phones on her desk; it was hectic. GROFF was told that mistakes were not tolerated. It was challenging; GROFF liked that. Sometimes, GROFF went home in tears; sometimes for messing up his day. GROFF felt it was pretty incredible to see all the people EPSTEIN dealt with in politics, television, etcetera. GROFF felt "wow"; prior to working for EPSTEIN, she never knew people who owned a plane, etcetera. GROFF found out about MAXWELL's father and life. GROFF felt like their (EPSTEIN and MAXWELL) lives were the lifestyle of the rich and famous.

GROFF described getting into the office she would have to go in through the palace and go straight through the hotel portion. The left side was where EPSTEIN's office was located. GROFF thought on the fourth floor was where the office was located. There were other businesses in the building. They had a view of the 5th Avenue Cathedral. Once off of the elevator, there was a desk for the receptionist - GROFF could not remember if this was there the day she left. After going straight, there would be a large office for two accountants and the trader. The accountant was ERIC GAINEY (GAINEY), who had an assistant accountant BELLA KLEIN (BELLA). The trader was HARRY BELLER (BELLER). The person who was EPSTEIN's assistant would be at the receptionist desk; someone was always there and it changed over time. There was ███████ ( ███ ), ████████████ ( ████ ), and ███████ ( ██████ ). The controller was EMAD HANNA (HANNA). When GAINEY left, he was replaced by RICH KAHN (KAHN). To the right of the office were

3501.098-015
Page 2 of 9

## SUBJECT TO PROTECTIVE ORDER PARAGRAPHS 7, 8, 9, 10, 15, and 17

EFTA_00092062

EFTA01246217

FD-302a (Rev. 5-8-10)

50D-NY-3027571

Continuation of FD-302 of (U) Proffer of LESLEY GROFF , On 07/23/2021 , Page 3 of 9

the attorneys, DARREN INDYKE (INDYKE) and JEFF SCHANTZ (SCHANTZ). Straight back was GROFF's office. Towards the left was EPSTEIN's office and towards the right was a desk for MAXWELL and her assistant ███████. LAUREN QUITNER (QUITNER) was an assistant to the attorneys. There was a desk for ██████, which changed to ███████████ (███████) when ██████ left.

EPSTEIN wanted an estate manager, which kept turning over. There were a lot of people in the office. They first started building MAXWELL's house. After her house was built, she moved her and her assistant to her house. MAXWELL was maybe at the office once a week and brought her dog Max.

Full-time employees included the attorneys, QUITNER, ███████, and the people in the front office. GROFF worked 9-5 Monday through Friday for the first couple years. GROFF then became pregnant and had a son and was off for about 3-4 months. ██████ took over while GROFF was on maternity leave. Approximately a year and a half later, MAXWELL's assistant left and ██ moved back to being her assistant.

GROFF started a job share where she worked Tuesday, Wednesday, and Thursday and ██ worked Monday and Friday. EPSTEIN would leave New York Friday and return Monday night. EPSTEIN wanted GROFF there to do the call list. EPSTEIN called in the morning to schedule business meetings, architects, designers. When GROFF would think he was done, he'd decide he'd want to do it all over again. GROFF remembered seeing an invoice of a carpet for an airplane that was more than she made.

Back then, GROFF did not use email. EPSTEIN called constantly. EPSTEIN told her to call a certain individual then he would want an immediate call back. GROFF relayed messages, make and break appointments, and contact houses. GROFF would have JOJO sit outside certain locations. GROFF made appointments for lunch dates, but he did not like; people would come eat but he would not eat. EPSTEIN did not like wasting time.

The first time EPSTEIN laid into GROFF was when she moved an appointment and forgot to tell the other person. EPSTEIN did not let it go; GROFF ruined his whole day saying he can't get that time back.

GROFF would tell the pilot when EPSTEIN wanted to leave. For example, GROFF would tell the pilot he would want to "leave tomorrow at 4pm to Palm Beach". GROFF did not make airline reservations at the time; ███████ made

3501.098-015
Page 3 of 9

SUBJECT TO PROTECTIVE ORDER PARAGRAPHS 7, 8, 9, 10, 15, and 17

EFTA_00092063

EFTA01246218

FD-302a (Rev. 5-8-10)

50D-NY-3027571

Continuation of FD-302 of  (U) - Proffer of LESLEY GROFF                          .On  07/23/2021  .Page  4 of 9

those reservations then.  EPSTEIN told GROFF to tell ▓▓▓▓▓ to make the reservations.  A lot of people traveled on EPSTEIN's plane.  EPSTEIN might tell GROFF.  The lingo he used was "do you need a ride".  GROFF would call and ask if he wanted friends then GROFF would call them.  The pilot, LARRY, needed to know.  GROFF would ask EPSTEIN then she would relay that information to LARRY.  Sometimes, EPSTEIN told GROFF who was traveling with him and other times he told LARRY himself.  GROFF talked with EPSTEIN when he was away.  EPSTEIN often traveled with MAXWELL.  The first year ▓▓▓▓▓ traveled often with them as well then ▓▓▓▓▓ traveled with them.  The assistants traveled with EPSTEIN.  TED MEISTER (MEISTER) was on the plane a lot; he liked to go to Palm Beach.  MAXWELL and ▓▓▓▓▓ were usually on the plane with EPSTEIN.

MAXWELL traveled quite a bit.  GROFF thought MAXWELL did her own things as well.  GROFF was not MAXWELL's assistant and did not see her as much.  MAXWELL was a big part of EPSTEIN's life.  MAXWELL introduced EPSTEIN to a lot of people in her circle.  This was GROFF's perception because GROFF knew her background.  GROFF's impression was that she knew that was how EPSTEIN met royalty - through MAXWELL.  MAXWELL did not talk to GROFF.  GROFF never had normal conversations with MAXWELL or EPSTEIN.  MAXWELL told GROFF she was not to engage in frivolous conversation with EPSTEIN.  If GROFF bought movie tickets for EPSTEIN, she was not allowed to ask if he liked the movie the next day.

GROFF did not have a lot to do with the CLINTON trip.  MAXWELL dealt with the details.  GROFF's perception was that MAXWELL knew CLINTON first but GROFF did not know for sure.

GROFF recalled a conversation with MAXWELL in the very beginning, probably around GROFF's first week.  MAXWELL told her, "You're here to work."  MAXWELL told her that EPSTEIN did not need extra conversation and that she was not allowed to fraternize on the phone, that the people she spoke to were EPSTEIN's friends not GROFF's friends.  GROFF found this similar to Wall Street in that she could not fraternize.

GROFF was asked to go to a party.  This was probably within the first month of working for EPSTEIN.  GROFF went to the party with her husband, who knew other Wall Street people.  EPSTEIN found out and "torched" her the following Monday.  EPSTEIN told GROFF he was going to fire her but put her

SUBJECT TO PROTECTIVE ORDER PARAGRAPHS 7, 8, 9, 10, 15, and 17

EFTA_00092064

EFTA01246219

FD-302a (Rev. 5-8-10)

50D-NY-3027571

Continuation of FD-302 of (U) Proffer of LESLEY GROFF                              , On  07/23/2021  , Page  5 of 9

on probation instead. GROFF had to keep herself totally separate. It made sense to GROFF, so she never did it again.

From the beginning, massage was a part of EPSTEIN's day; they were normal appointments. GROFF thought MAXWELL told her EPSTEIN had to have a massage every day. ▮▮▮▮ and ▮ trained GROFF too, but GROFF thought MAXWELL told her that. It was presented like it was totally normal. ▮▮▮▮ and ▮ had been there prior to GROFF and no one seemed like it was out of the ordinary. GROFF's job was to make appointments. To GROFF, making massage appointments was just another appointment she had to make for EPSTEIN. EPSTEIN would call GROFF in the morning and say something like, "Call ▮▮▮ and see if she can do a massage at 4." EPSTEIN would then call GROFF every 15 minutes. If GROFF told EPSTEIN she could not get "▮▮▮" he would tell GROFF to call someone else instead.

There was a directory of contacts, not just massage people. Anyone could go in and update the list; everyone had access. It was kept on the computer in an old antiquated system. GROFF thought it was just a file on the computer; they used PCs not Apple computers. They had a message sheet and directory. There was an IT guy who came every so often if they had computer problems. When GROFF was told to call someone, she would pull the phone number from the directory. EPSTEIN gave GROFF a name and phone number, but if the person had been around for a while, the number would be in the computer.

For massages in New York at EPSTEIN's residence, GROFF scheduled for New York. GROFF thought she may have scheduled massages for EPSTEIN's Palm Beach residence, but it was not as much. When EPSTEIN left New York and took an assistant with him, the assistant took over the daily things in Palm Beach, New Mexico, and Paris.

GROFF had a call list everyday of people she had to call for EPSTEIN. Outside New York, GROFF did not know who scheduled the massage appointments. GROFF did not recall specifically making appointments outside of New York, but stated that it was possible. GROFF definitely made appointments in New York.

GROFF thought MAXWELL made an extra book. GROFF described the book as super thick that was printed in a larger type to see. It was a little black

3501.098-015
Page 5 of 9

SUBJECT TO PROTECTIVE ORDER PARAGRAPHS 7, 8, 9, 10, 15, and 17

EFTA_00092065

EFTA01246220

FD-302a (Rev. 5-8-10)

50D-NY-3027571

Continuation of FD-302 of  (U) Proffer of LESLEY GROFF                          , On  07/23/2021  , Page  6 of 9

book. MAXWELL had them printed and bound. GROFF thought she wanted to have
them on the plane or next to the phones. GROFF recalled seeing one on her
(GROFF) desk. The black books were around. There was one on GROFF's desk
when she first started working there. They were next to EPSTEIN's phones on
the desk. GROFF did not know why she associated the books to MAXWELL; they
were there before GROFF worked there. GROFF thought the books had been
updated. GROFF did not know where they were printed. GROFF did not use the
books; she used the computer. GROFF thought the books were everywhere, but
maybe not in the accounting office. The books were at his homes. They were
on the desk in rooms. There were a lot of important people in the books
with their phone numbers, including politicians, actors, Wall Street
individuals, and royalty. GROFF was not supposed to take the book home.
GROFF thought the book fizzled out. It made sense that EPSTEIN wanted them
next to the phone. It was just a tool for contacts. The book went away, but
GROFF did not know when this happened. They changed over to Mac Computers.

EPSTEIN wanted to keep things simple. EPSTEIN wanted a list of dentists,
scientists, etcetera. GROFF did not think she was there when the directory
was first made, but was not sure. MAXWELL was an office manager and had
stationary made. MAXWELL may have asked ████████ to have them made. GROFF
thought maybe she was assuming that MAXWELL made them.

[Agent note: At this point in the interview, GROFF was shown a document with
a list of names and contact information. This document is attached in a 1A.
] GROFF advised, "This looks like people he'd contact." GROFF did not
recognize this specific document, but it looked like something GROFF could
have typed up. GROFF recognized the names on the document. It seemed
typical of when EPSTEIN would travel. A word document possibly could have
been GROFF who copied and pasted from the directory to word. Using a Mac
computer GROFF could copy and paste but she did not think she could copy and
paste to word using the older computers. The list of people's names and
numbers was constant.

[Agent note:  GROFF was shown a document titled "Masseuses". This document
is attached in a 1A.] GROFF advised that this document looked like
something that would definitely be in the office that EPSTEIN asked to be
put together. There were other documents made for architects, etcetera.
GROFF advised this document did not look familiar. GROFF did not recall
making this document but stated she was not saying she did not create it.

3501.098-015
Page 6 of 9

SUBJECT TO PROTECTIVE ORDER PARAGRAPHS 7, 8, 9, 10, 15, and 17

EFTA_00092066

EFTA01246221

FD-302a (Rev. 5-8-10)

50D-NY-3027571

Continuation of FD-302 of (U) Proffer of LESLEY GROFF                          ,On  07/23/2021  ,Page  7 of 9

GROFF advised the document looked old.  GROFF recognized the names.  To GROFF, this was just another list.  GROFF recalled having to make a list of all the Ted speakers when she started.  The lists printed out would be more for EPSTEIN to take with him.  GROFF used the directory more.

**[Agent note: GROFF was shown a document with title "Masseuses from JAN". This document is attached in a 1A.]**  GROFF's first thought was that "JAN" meant January.  "New user" on the document was not significant to GROFF. The document stated, "Last saved by Lesley Groff".  GROFF advised this looked like a list she could have put together.  This was definitely something EPSTEIN would have wanted.  It looks like something GROFF could have done but she could not recall this specific list.  GROFF made a lot of lists.

If EPSTEIN traveled out of town he would want to see people.  Sometimes, he would tell GROFF to add new people.  If he went to Harvard, he would want a list of professors he would want to talk with while there.

When GROFF would call to schedule massage appointments, she would say something like, "Hi ████, how are you?  Mr. Epstein is in New York and he's wanting to know if you can give him a massage at 4."  The phone calls were short and to the point.  A lot of times when GROFF called, the females were at casting calls and they would not know how long they would be there so they would have to call GROFF back.  When EPSTEIN would call back for his messages, he would tell GROFF to forget that one and call "████".  GROFF would call someone else and sometimes have to leave a message.  Sometimes GROFF heard street noises in the background.  GROFF called females and one male masseuse.  GROFF distinctly remembered females being on casting calls because it was annoying because she wanted to get on with her day and could not because she had to schedule a massage appointment.  Scheduling massage appointments was around 1% of GROFF's job.  GROFF left a lot of messages; people would not answer their phones.  Sometimes, people called GROFF asking to see EPSTEIN for a massage.  Everyone wanted to see him.  Anytime GROFF called someone, not just massage people, people just jumped to meet with EPSTEIN.

GROFF thought EPSTEIN was a money manager.  His biggest client was WEXNER.  GROFF knew this from the beginning because of the non-disclosure agreement she had to sign.  GROFF thought EPSTEIN had other clients.  GROFF

## SUBJECT TO PROTECTIVE ORDER PARAGRAPHS 7, 8, 9, 10, 15, and 17

EFTA_00092067

EFTA01246222

FD-302a (Rev. 5-8-10)

50D-NY-3027571

Continuation of FD-302 of (U) Proffer of LESLEY GROFF                    , On 07/23/2021 , Page 8 of 9

thought EPSTEIN was doing some trades. EPSTEIN would tell GROFF to get someone - he did not have the number of a trader. GROFF had anxiety trying to get a trader. EPSTEIN did a lot with politics. EPSTEIN was a generous person, who gave to charity tables and wanted to be anonymous. EPSTEIN seemed very busy. EPSTEIN had an interest in decorating. GROFF was floored by the contacts he had all over the world; GROFF was impressed by that. GROFF had to learn how to dial overseas numbers.

MAXWELL was an office manager. This was how GROFF was introduced to MAXWELL. MAXWELL was EPSTEIN's best friend. GROFF saw EPSTEIN torch MAXWELL at times; he was angry with her. EPSTEIN got mad at his attorneys in the office. Sometimes MAXWELL left with her head down. GROFF did not like hearing EPSTEIN yell at SCHANTZ; but he did not walk out defeated. EPSTEIN and MAXWELL were confidants. GROFF knew EPSTEIN built MAXWELL her house; GROFF thought ▇▇▇▇ told her this. It was just bought and under construction. GROFF thought EPSTEIN and MAXWELL were boyfriend/girlfriend. They were very carefree. They did not spend every moment together. GROFF thought EPSTEIN cared for MAXWELL and she cared for him. EPSTEIN and MAXWELL did not live together. GROFF did not know where MAXWELL was living while her house was being built.

When GROFF first started, MAXWELL helped with the rules. MAXWELL told her that when EPSTEIN calls GROFF to give requirements, if GROFF did not understand something, to stop him then and do not wait until the end because it will make EPSTEIN mad. EPSTEIN was famous for talking under his breath and mumbling. GROFF did not have normal conversations with MAXWELL. GROFF did not talk to MAXWELL about her wedding or when she was pregnant. MAXWELL would come and go from the office and bring her dog into the office. MAXWELL had her own driver. There was a guy who was the driver and a girl who was the maid. Looking back, GROFF did not know how much managing MAXWELL actually did. When MAXWELL's house was being built, that was her priority. MAXWELL was in the office next to GROFF.

[Agent note: At this point in the interview, GROFF was shown a black book. This book is 1A-9 in case file 72-MM-113327.] GROFF advised this book did not look like the one she saw. The one GROFF saw had larger writing. It was the same size but the one she remembered had a thicker binding. GROFF thought it was probably the same information inside. This information would have been in the directory. To GROFF's recollection, it looked the same.

3501.098-015
Page 8 of 9

SUBJECT TO PROTECTIVE ORDER PARAGRAPHS 7, 8, 9, 10, 15, and 17

EFTA_00092068

EFTA01246223

FD-302a (Rev. 5-8-10)

50D-NY-3027571

Continuation of FD-302 of (U) Proffer of LESLEY GROFF _____ , On 07/23/2021 , Page 9 of 9

GROFF recalled the directory was alphabetical.

GROFF did not have conversations with MAXWELL about massages. GROFF worked 9-5; EPSTEIN did not contact GROFF on the weekends.

GROFF remembered MAXWELL called BELLA, who was from Russia, about the KGB. MAXWELL had to check every invoice. MAXWELL smiled and was happy, except when EPSTEIN got upset with her. MAXWELL talked to everybody; it seemed business related. ▮▮▮▮ traveled with MAXWELL on EPSTEIN's plane.

EPSTEIN and MAXWELL were volatile. One moment EPSTEIN would be screaming and the next he was down to business. MAXWELL tended to carry it and leave.

GROFF thought the whole office seemed happy, like the employees were happy, and it was a nice place to work.

Sometimes GROFF was asked to messenger money for massages and sometimes JOJO took money for the massages to give to people. EPSTEIN sent everything by messenger. EPSTEIN sent things FedEx. GROFF got the money from accounting and would pay someone around $100. GROFF would type a message to BELLA; GROFF thought BELLA had the petty cash box. BELLA put money in an envelope. Then it would be put in a messenger box. JOJO or a messenger would pick it up. This did not happen all of the time, but rather some of the time. No one ever came to the office to pick up money, except JOJO or a messenger.

GROFF never went to EPSTEIN's house until 2013. GROFF went to EPSTEIN's island. GROFF was at a wedding on Tortola. EPSTEIN told GROFF she should go to the island. EPSTEIN was not on the island when she went. MILES ALEXANDER and KATHY ALEXANDER fed GROFF and her husband lunch then they went back. GROFF went on a trip with her husband to London. EPSTEIN said they could stay at his guest room in Paris. They stayed there a couple of nights then went back to London. GROFF did not go to the New Mexico Ranch. GROFF did not travel with EPSTEIN.

3501.098-015
Page 9 of 9

SUBJECT TO PROTECTIVE ORDER PARAGRAPHS 7, 8, 9, 10, 15, and 17

EFTA_00092069

EFTA01246224

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,
  Plaintiff,

v.

GHISLAINE MAXWELL,
  Defendant.

Case No. 20-CR-330 (PAE)

# EXHIBIT A41



Google Earth Image

October 5th link: Google Earth

October 5, 1997 (Pre-Major Construction)

- Undeveloped high desert terrain; sparse natural scrub vegetation typical of Santa Fe County at ~6,000 ft elevation

- No main residence structure present

 access road or dirt track visible

- No outbuildings, pools, or formal landscaping

- Raw land essentially in its natural state



Google Earth Image July

July 31 image link: Google Earth

July 31, 2005 (Post-Construction)

- Large main residence compound fully built (~10,000 sq ft main house)

- Guest structures / outbuildings visible

- Formal driveway and access roads established

- Landscaping, cleared areas, and possible water feature/pool visible

- Significantly altered ground footprint relative to 1997

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,
  Plaintiff,

v.

GHISLAINE MAXWELL,
  Defendant.

Case No. 20-CR-330 (PAE)


# EXHIBIT A42

**PRIVILEGED - ATTORNEY WORK PRODUCT/DELIBERATIVE PROCESS**
**CONFIDENTIAL - SUBJECT TO FED. R. CRIM. P. 6(e)**

Epstein and other young women. While on the island, ▮ provided Epstein with a massage during which he attempted to force her into more sexual activity than she was comfortable with. ▮ became upset, and she was sent home. She never saw Epstein again.

### C.    Interviews of Witnesses Who Were Not Sexually Abused

#### 1.  Juan Alessi

Juan Alessi was interviewed on July 13, 2019 in Florida. Juan Alessi ("Mr. Alessi") worked for Epstein as the house manager at his Palm Beach residence from the early 1990s until the end of 2002. Additionally, his wife, Maria Alessi, ("Ms. Alessi") also worked at Epstein's Palm Beach residence. Mr. Alessi recalled that in or about 1993, Ghislaine Maxwell took charge of managing Epstein's residences in Palm Beach, New York, New Mexico, the Virgin Islands, and Ohio. Around that time, Epstein specifically instructed Mr. Alessi to go to Maxwell for orders. Mr. Alessi described Maxwell as extremely demanding and compared working under her to "slavery."

Mr. Alessi recalled that his relationship with Epstein began to deteriorate beginning in approximately 2000, when Maxwell instructed Mr. Alessi and other house staff not to make eye contact or be in the same room with Epstein. Around this same period, Mr. Alessi recalled that Epstein received approximately three massages per day when he was staying at his Palm Beach residence. Mr. Alessi understood most of the masseuses to be professional massage therapists from around the Palm Beach area, several of whom provided massages for Epstein's guests, including business partners and prominent people, at the Palm Beach residence. At first, Mr. Alessi was responsible for scheduling Epstein's frequent massage appointments, but during the last several weeks of his employment, ▮ ▮ was hired as Epstein's personal assistant and began scheduling the appointments instead.

Closer to the end of his tenure, Maxwell asked Mr. Alessi to compile a list of all hotels and spas around the area of Palm Beach. After Mr. Alessi compiled the list, Maxwell instructed him to drive her around to each location. Maxwell would enter each location, then return with business cards of massage therapists. Mr. Alessi recalls one such incident in or around the summer of 2002 when he drove Maxwell to Mar-a-Lago and waited for her to receive a massage there. After Maxwell returned to the car, she observed a young girl, whom Mr. Alessi later learned was named ▮ ▮ and instructed Mr. Alessi to stop the car. Maxwell got out of the car and went to speak with ▮ for about 20 to 25 minutes before returning. Later that same day, Mr. Alessi saw ▮ come to Epstein's Palm Beach residence. Over the next several months, ▮ returned just about every day to the Palm Beach residence to give Epstein massages. Mr. Alessi recalls learning that ▮ was also traveling with Epstein to other locations, and he recalls ▮ bringing other girls about her age to the Palm Beach residence to massage Epstein. Mr. Alessi understood that ▮ was under the age of 18 but did not know what ▮ was doing in the "massages" with Epstein.

37

EFTA_00022497

EFTA02731118

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,
  Plaintiff,

v.

GHISLAINE MAXWELL,
  Defendant.

Case No. 20-CR-330 (PAE)


# EXHIBIT A43

FD-302 (Rev. 5-8-10)

-1 of 9-

**FEDERAL BUREAU OF INVESTIGATION**

OFFICIAL RECORD

Date of entry ___09/24/2021___

LESLEY GROFF, date of birth (DOB) ███████, was interviewed pursuant to a proffer agreement at 39 Broadway Suite 1610, New York, New York. Present for the proffer was GROFF's attorney Michael Bachner. Also present for the proffer was Assistant United States Attorneys ███████ and ███████, along with Special Agent ███████. After being advised of the identity of the above listed individuals and the nature of the interview, GROFF provided the following information:

GROFF is in retirement along with her husband. GROFF has a ███████ son. GROFF enjoys exercising and listening to books on tape. GROFF resigned in July 2019 from working for JEFFREY EPSTEIN (EPSTEIN). GROFF had started working for EPSTEIN in February 2001.

GROFF attended college in North Texas and is a UTD graduate. GROFF lived in Texas then met a man who lived in New Jersey which caused her to move to the area. GROFF worked for nine years at an office supply company. GROFF then divorced. GROFF then worked at Nordstrom. GROFF met her current husband at a triathlon; GROFF was still working at Nordstrom at the time. GROFF wanted to be an event planner and thought Wall Street would be a great place to work.

A headhunter, RUSSELL, found her resume on Monster. GROFF was looking at a job to work for the Knicks, but it was taken. GROFF met with RUSSELL and he told her that there was a job to organize one man's life. This man was EPSTEIN, a Manhattan socialite. GROFF had never heard of EPSTEIN before this. GROFF interviewed for the position. GROFF interviewed with ███████ ███████ (███████), who was GHISLAINE MAXWELL's (MAXWELL) assistant at the time. Then GROFF interviewed with MAXWELL before interviewing with EPSTEIN the next day when he was in town. GROFF interviewed at 457 Madison on the 4th floor; this location was part of a palace. GROFF was in the front office before going to EPSTEIN's office. GROFF met with all three people on the

Investigation on __07/23/2021__ at New York, New York, United States (, Other (Video))

File # 50D-NY-3027571                                   Date drafted __08/03/2021__

by ███████

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

3501.098-015
Page 1 of 9

SUBJECT TO PROTECTIVE ORDER PARAGRAPHS 7, 8, 9, 10, 15, and 17

EFTA_00092061

EFTA01246216

FD-302a (Rev. 5-8-10)

50D-NY-3027571

Continuation of FD-302 of (U) Proffer of LESLEY GROFF                    , On 07/23/2021 , Page 2 of 9

same day; it was a normal interview about being an executive assistant. During the interview, the phone kept ringing. EPSTEIN would talk then hang up. It seemed to be a very vibrant office.

GROFF had to sign a non-disclosure agreement. If GROFF spoke about business people, which GROFF thought included LES WEXNER (WEXNER), she would owe him $100,000. GROFF had never seen anything like the non-disclosure agreement before working for EPSTEIN.

GROFF had her own office in the back. Others that worked at the office were two attorneys, an assistant, a trader, a travel assistant ███ ████ ( ██ ), and ████████. MAXWELL came in and out of the office. EPSTEIN did not work a 9-5 schedule. EPSTEIN gave GROFF pages including a call list, who he wanted to see, and appointments. GROFF had to reorganize and shift things. At the time, GROFF made all phone calls, including calling the driver, chef, and other people. GROFF had two phones on her desk; it was hectic. GROFF was told that mistakes were not tolerated. It was challenging; GROFF liked that. Sometimes, GROFF went home in tears; sometimes for messing up his day. GROFF felt it was pretty incredible to see all the people EPSTEIN dealt with in politics, television, etcetera. GROFF felt "wow"; prior to working for EPSTEIN, she never knew people who owned a plane, etcetera. GROFF found out about MAXWELL's father and life. GROFF felt like their (EPSTEIN and MAXWELL) lives were the lifestyle of the rich and famous.

GROFF described getting into the office she would have to go in through the palace and go straight through the hotel portion. The left side was where EPSTEIN's office was located. GROFF thought on the fourth floor was where the office was located. There were other businesses in the building. They had a view of the 5th Avenue Cathedral. Once off of the elevator, there was a desk for the receptionist - GROFF could not remember if this was there the day she left. After going straight, there would be a large office for two accountants and the trader. The accountant was ERIC GAINEY (GAINEY), who had an assistant accountant BELLA KLEIN (BELLA). The trader was HARRY BELLER (BELLER). The person who was EPSTEIN's assistant would be at the receptionist desk; someone was always there and it changed over time. There was ████████ ( ██ ), ██████████ ( ██ ), and ██████ ████████ ( ████████ ). The controller was EMAD HANNA (HANNA). When GAINEY left, he was replaced by RICH KAHN (KAHN). To the right of the office were

3501.098-015
Page 2 of 9

**SUBJECT TO PROTECTIVE ORDER PARAGRAPHS 7, 8, 9, 10, 15, and 17**

EFTA_00092062

EFTA01246217

FD-302a (Rev. 5-8-10)

50D-NY-3027571

Continuation of FD-302 of (U) Proffer of LESLEY GROFF                    , On 07/23/2021 , Page 3 of 9

the attorneys, DARREN INDYKE (INDYKE) and JEFF SCHANTZ (SCHANTZ).  Straight back was GROFF's office.  Towards the left was EPSTEIN's office and towards the right was a desk for MAXWELL and her assistant ████████.  LAUREN QUITNER (QUITNER) was an assistant to the attorneys.  There was a desk for ████████, which changed to ████████ (████) when ████ left.

EPSTEIN wanted an estate manager, which kept turning over.  There were a lot of people in the office.  They first started building MAXWELL's house.  After her house was built, she moved her and her assistant to her house.  MAXWELL was maybe at the office once a week and brought her dog Max.

Full-time employees included the attorneys, QUITNER, ████████, and the people in the front office.  GROFF worked 9-5 Monday through Friday for the first couple years.  GROFF then became pregnant and had a son and was off for about 3-4 months.  ████ took over while GROFF was on maternity leave.  Approximately a year and a half later, MAXWELL's assistant left and ██ moved back to being her assistant.

GROFF started a job share where she worked Tuesday, Wednesday, and Thursday and ██ worked Monday and Friday.  EPSTEIN would leave New York Friday and return Monday night.  EPSTEIN wanted GROFF there to do the call list.  EPSTEIN called in the morning to schedule business meetings, architects, designers.  When GROFF would think he was done, he'd decide he'd want to do it all over again.  GROFF remembered seeing an invoice of a carpet for an airplane that was more than she made.

Back then, GROFF did not use email.  EPSTEIN called constantly.  EPSTEIN told her to call a certain individual then he would want an immediate call back.  GROFF relayed messages, make and break appointments, and contact houses.  GROFF would have JOJO sit outside certain locations.  GROFF made appointments for lunch dates, but he did not like; people would come eat but he would not eat.  EPSTEIN did not like wasting time.

The first time EPSTEIN laid into GROFF was when she moved an appointment and forgot to tell the other person.  EPSTEIN did not let it go; GROFF ruined his whole day saying he can't get that time back.

GROFF would tell the pilot when EPSTEIN wanted to leave.  For example, GROFF would tell the pilot he would want to "leave tomorrow at 4pm to Palm Beach".  GROFF did not make airline reservations at the time; ████████ made

3501.098-015
Page 3 of 9

SUBJECT TO PROTECTIVE ORDER PARAGRAPHS 7, 8, 9, 10, 15, and 17

EFTA_00092063

EFTA01246218

FD-302a (Rev. 5-8-10)

50D-NY-3027571

Continuation of FD-302 of (U) Proffer of LESLEY GROFF                    , On 07/23/2021 , Page 4 of 9

those reservations then. EPSTEIN told GROFF to tell ▮▮▮▮ to make the reservations. A lot of people traveled on EPSTEIN's plane. EPSTEIN might tell GROFF. The lingo he used was "do you need a ride". GROFF would call and ask if he wanted friends then GROFF would call them. The pilot, LARRY, needed to know. GROFF would ask EPSTEIN then she would relay that information to LARRY. Sometimes, EPSTEIN told GROFF who was traveling with him and other times he told LARRY himself. GROFF talked with EPSTEIN when he was away. EPSTEIN often traveled with MAXWELL. The first year ▮▮▮▮ traveled often with them as well then ▮▮▮▮ traveled with them. The assistants traveled with EPSTEIN. TED MEISTER (MEISTER) was on the plane a lot; he liked to go to Palm Beach. MAXWELL and ▮▮▮▮ were usually on the plane with EPSTEIN.

MAXWELL traveled quite a bit. GROFF thought MAXWELL did her own things as well. GROFF was not MAXWELL's assistant and did not see her as much. MAXWELL was a big part of EPSTEIN's life. MAXWELL introduced EPSTEIN to a lot of people in her circle. This was GROFF's perception because GROFF knew her background. GROFF's impression was that she knew that was how EPSTEIN met royalty - through MAXWELL. MAXWELL did not talk to GROFF. GROFF never had normal conversations with MAXWELL or EPSTEIN. MAXWELL told GROFF she was not to engage in frivolous conversation with EPSTEIN. If GROFF bought movie tickets for EPSTEIN, she was not allowed to ask if he liked the movie the next day.

GROFF did not have a lot to do with the CLINTON trip. MAXWELL dealt with the details. GROFF's perception was that MAXWELL knew CLINTON first but GROFF did not know for sure. .

GROFF recalled a conversation with MAXWELL in the very beginning, probably around GROFF's first week. MAXWELL told her, "You're here to work." MAXWELL told her that EPSTEIN did not need extra conversation and that she was not allowed to fraternize on the phone, that the people she spoke to were EPSTEIN's friends not GROFF's friends. GROFF found this similar to Wall Street in that she could not fraternize.

GROFF was asked to go to a party. This was probably within the first month of working for EPSTEIN. GROFF went to the party with her husband, who knew other Wall Street people. EPSTEIN found out and "torched" her the following Monday. EPSTEIN told GROFF he was going to fire her but put her

3501.098-015
Page 4 of 9

SUBJECT TO PROTECTIVE ORDER PARAGRAPHS 7, 8, 9, 10, 15, and 17

EFTA_00092064

EFTA01246219

FD-302a (Rev. 5-8-10)

50D-NY-3027571

Continuation of FD-302 of (U) Proffer of LESLEY GROFF                      , On  07/23/2021  , Page  5 of 9

on probation instead.  GROFF had to keep herself totally separate.  It made sense to GROFF, so she never did it again.

From the beginning, massage was a part of EPSTEIN's day; they were normal appointments.  GROFF thought MAXWELL told her EPSTEIN had to have a massage every day.  ██████ and ██ trained GROFF too, but GROFF thought MAXWELL told her that.  It was presented like it was totally normal.  ██████ and ██ had been there prior to GROFF and no one seemed like it was out of the ordinary.  GROFF's job was to make appointments.  To GROFF, making massage appointments was just another appointment she had to make for EPSTEIN. EPSTEIN would call GROFF in the morning and say something like, "Call ████ and see if she can do a massage at 4."  EPSTEIN would then call GROFF every 15 minutes.  If GROFF told EPSTEIN she could not get "████" he would tell GROFF to call someone else instead.

There was a directory of contacts, not just massage people.  Anyone could go in and update the list; everyone had access.  It was kept on the computer in an old antiquated system.  GROFF thought it was just a file on the computer; they used PCs not Apple computers.  They had a message sheet and directory.  There was an IT guy who came every so often if they had computer problems.  When GROFF was told to call someone, she would pull the phone number from the directory.  EPSTEIN gave GROFF a name and phone number, but if the person had been around for a while, the number would be in the computer.

For massages in New York at EPSTEIN's residence, GROFF scheduled for New York.  GROFF thought she may have scheduled massages for EPSTEIN's Palm Beach residence, but it was not as much.  When EPSTEIN left New York and took an assistant with him, the assistant took over the daily things in Palm Beach, New Mexico, and Paris.

GROFF had a call list everyday of people she had to call for EPSTEIN. Outside New York, GROFF did not know who scheduled the massage appointments.  GROFF did not recall specifically making appointments outside of New York, but stated that it was possible.  GROFF definitely made appointments in New York.

GROFF thought MAXWELL made an extra book.  GROFF described the book as super thick that was printed in a larger type to see.  It was a little black

3501.098-015
Page 5 of 9

## SUBJECT TO PROTECTIVE ORDER PARAGRAPHS 7, 8, 9, 10, 15, and 17

EFTA_00092065

EFTA01246220

FD-302a (Rev. 5-8-10)

50D-NY-3027571

Continuation of FD-302 of (U) Proffer of LESLEY GROFF , On 07/23/2021 , Page 6 of 9

book. MAXWELL had them printed and bound. GROFF thought she wanted to have them on the plane or next to the phones. GROFF recalled seeing one on her (GROFF) desk. The black books were around. There was one on GROFF's desk when she first started working there. They were next to EPSTEIN's phones on the desk. GROFF did not know why she associated the books to MAXWELL; they were there before GROFF worked there. GROFF thought the books had been updated. GROFF did not know where they were printed. GROFF did not use the books; she used the computer. GROFF thought the books were everywhere, but maybe not in the accounting office. The books were at his homes. They were on the desk in rooms. There were a lot of important people in the books with their phone numbers, including politicians, actors, Wall Street individuals, and royalty. GROFF was not supposed to take the book home. GROFF thought the book fizzled out. It made sense that EPSTEIN wanted them next to the phone. It was just a tool for contacts. The book went away, but GROFF did not know when this happened. They changed over to Mac Computers.

EPSTEIN wanted to keep things simple. EPSTEIN wanted a list of dentists, scientists, etcetera. GROFF did not think she was there when the directory was first made, but was not sure. MAXWELL was an office manager and had stationary made. MAXWELL may have asked ▓▓▓▓ to have them made. GROFF thought maybe she was assuming that MAXWELL made them.

[Agent note: At this point in the interview, GROFF was shown a document with a list of names and contact information. This document is attached in a 1A.] GROFF advised, "This looks like people he'd contact." GROFF did not recognize this specific document, but it looked like something GROFF could have typed up. GROFF recognized the names on the document. It seemed typical of when EPSTEIN would travel. A word document possibly could have been GROFF who copied and pasted from the directory to word. Using a Mac computer GROFF could copy and paste but she did not think she could copy and paste to word using the older computers. The list of people's names and numbers was constant.

[Agent note: GROFF was shown a document titled "Masseuses". This document is attached in a 1A.] GROFF advised that this document looked like something that would definitely be in the office that EPSTEIN asked to be put together. There were other documents made for architects, etcetera. GROFF advised this document did not look familiar. GROFF did not recall making this document but stated she was not saying she did not create it.

3501.098-015
Page 6 of 9

## SUBJECT TO PROTECTIVE ORDER PARAGRAPHS 7, 8, 9, 10, 15, and 17

EFTA_00092066

EFTA01246221

FD-302a (Rev. 5-8-10)

50D-NY-3027571

Continuation of FD-302 of (U) Proffer of LESLEY GROFF , On 07/23/2021 , Page 7 of 9

GROFF advised the document looked old.  GROFF recognized the names.  To GROFF, this was just another list.  GROFF recalled having to make a list of all the Ted speakers when she started.  The lists printed out would be more for EPSTEIN to take with him.  GROFF used the directory more.

**[Agent note: GROFF was shown a document with title "Masseuses from JAN". This document is attached in a 1A.]**  GROFF's first thought was that "JAN" meant January.  "New user" on the document was not significant to GROFF. The document stated, "Last saved by Lesley Groff".  GROFF advised this looked like a list she could have put together.  This was definitely something EPSTEIN would have wanted.  It looks like something GROFF could have done but she could not recall this specific list.  GROFF made a lot of lists.

If EPSTEIN traveled out of town he would want to see people.  Sometimes, he would tell GROFF to add new people.  If he went to Harvard, he would want a list of professors he would want to talk with while there.

When GROFF would call to schedule massage appointments, she would say something like, "Hi ███, how are you?  Mr. Epstein is in New York and he's wanting to know if you can give him a massage at 4."  The phone calls were short and to the point.  A lot of times when GROFF called, the females were at casting calls and they would not know how long they would be there so they would have to call GROFF back.  When EPSTEIN would call back for his messages, he would tell GROFF to forget that one and call "███".  GROFF would call someone else and sometimes have to leave a message.  Sometimes GROFF heard street noises in the background.  GROFF called females and one male masseuse.  GROFF distinctly remembered females being on casting calls because it was annoying because she wanted to get on with her day and could not because she had to schedule a massage appointment.  Scheduling massage appointments was around 1% of GROFF's job.  GROFF left a lot of messages; people would not answer their phones.  Sometimes, people called GROFF asking to see EPSTEIN for a massage.  Everyone wanted to see him.  Anytime GROFF called someone, not just massage people, people just jumped to meet with EPSTEIN.

GROFF thought EPSTEIN was a money manager.  His biggest client was WEXNER.  GROFF knew this from the beginning because of the non-disclosure agreement she had to sign.  GROFF thought EPSTEIN had other clients.  GROFF

SUBJECT TO PROTECTIVE ORDER PARAGRAPHS 7, 8, 9, 10, 15, and 17

EFTA_00092067

EFTA01246222

FD-302a (Rev. 5-8-10)

50D-NY-3027571

Continuation of FD-302 of  (U) Proffer of LESLEY GROFF _____ , On  07/23/2021  , Page  8 of 9

thought EPSTEIN was doing some trades.  EPSTEIN would tell GROFF to get
someone - he did not have the number of a trader.  GROFF had anxiety trying
to get a trader.  EPSTEIN did a lot with politics.  EPSTEIN was a generous
person, who gave to charity tables and wanted to be anonymous.  EPSTEIN
seemed very busy.  EPSTEIN had an interest in decorating.  GROFF was floored
by the contacts he had all over the world; GROFF was impressed by that.
GROFF had to learn how to dial overseas numbers.

MAXWELL was an office manager.  This was how GROFF was introduced to
MAXWELL.  MAXWELL was EPSTEIN's best friend.  GROFF saw EPSTEIN torch
MAXWELL at times; he was angry with her.  EPSTEIN got mad at his attorneys
in the office.  Sometimes MAXWELL left with her head down.  GROFF did not
like hearing EPSTEIN yell at SCHANTZ; but he did not walk out defeated.
EPSTEIN and MAXWELL were confidants.  GROFF knew EPSTEIN built MAXWELL her
house; GROFF thought ██████ told her this.  It was just bought and under
construction.  GROFF thought EPSTEIN and MAXWELL were boyfriend/girlfriend.
They were very carefree.  They did not spend every moment together.  GROFF
thought EPSTEIN cared for MAXWELL and she cared for him.  EPSTEIN and
MAXWELL did not live together.  GROFF did not know where MAXWELL was living
while her house was being built.

When GROFF first started, MAXWELL helped with the rules.  MAXWELL told
her that when EPSTEIN calls GROFF to give requirements, if GROFF did not
understand something, to stop him then and do not wait until the end because
it will make EPSTEIN mad.  EPSTEIN was famous for talking under his breath
and mumbling.  GROFF did not have normal conversations with MAXWELL.  GROFF
did not talk to MAXWELL about her wedding or when she was pregnant.  MAXWELL
would come and go from the office and bring her dog into the office.
MAXWELL had her own driver.  There was a guy who was the driver and a girl
who was the maid.  Looking back, GROFF did not know how much managing
MAXWELL actually did.  When MAXWELL's house was being built, that was her
priority.  MAXWELL was in the office next to GROFF.

**[Agent note: At this point in the interview, GROFF was shown a black book.
This book is 1A-9 in case file 72-MM-113327.]**  GROFF advised this book did
not look like the one she saw.  The one GROFF saw had larger writing.  It
was the same size but the one she remembered had a thicker binding.  GROFF
thought it was probably the same information inside.  This information would
have been in the directory.  To GROFF's recollection, it looked the same.

3501.098-015
Page 8 of 9

SUBJECT TO PROTECTIVE ORDER PARAGRAPHS 7, 8, 9, 10, 15, and 17

EFTA_00092068

EFTA01246223

FD-302a (Rev. 5-8-10)

50D-NY-3027571

Continuation of FD-302 of (U) Proffer of LESLEY GROFF _____ , On 07/23/2021 , Page 9 of 9

GROFF recalled the directory was alphabetical.

GROFF did not have conversations with MAXWELL about massages. GROFF worked 9-5; EPSTEIN did not contact GROFF on the weekends.

GROFF remembered MAXWELL called BELLA, who was from Russia, about the KGB. MAXWELL had to check every invoice. MAXWELL smiled and was happy, except when EPSTEIN got upset with her. MAXWELL talked to everybody; it seemed business related. ▮▮▮▮ traveled with MAXWELL on EPSTEIN's plane.

EPSTEIN and MAXWELL were volatile. One moment EPSTEIN would be screaming and the next he was down to business. MAXWELL tended to carry it and leave.

GROFF thought the whole office seemed happy, like the employees were happy, and it was a nice place to work.

Sometimes GROFF was asked to messenger money for massages and sometimes JOJO took money for the massages to give to people. EPSTEIN sent everything by messenger. EPSTEIN sent things FedEx. GROFF got the money from accounting and would pay someone around $100. GROFF would type a message to BELLA; GROFF thought BELLA had the petty cash box. BELLA put money in an envelope. Then it would be put in a messenger box. JOJO or a messenger would pick it up. This did not happen all of the time, but rather some of the time. No one ever came to the office to pick up money, except JOJO or a messenger.

GROFF never went to EPSTEIN's house until 2013. GROFF went to EPSTEIN's island. GROFF was at a wedding on Tortola. EPSTEIN told GROFF she should go to the island. EPSTEIN was not on the island when she went. MILES ALEXANDER and KATHY ALEXANDER fed GROFF and her husband lunch then they went back. GROFF went on a trip with her husband to London. EPSTEIN said they could stay at his guest room in Paris. They stayed there a couple of nights then went back to London. GROFF did not go to the New Mexico Ranch. GROFF did not travel with EPSTEIN.

3501.098-015
Page 9 of 9

SUBJECT TO PROTECTIVE ORDER PARAGRAPHS 7, 8, 9, 10, 15, and 17

EFTA_00092069

EFTA01246224

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,
  Plaintiff,

v.

GHISLAINE MAXWELL,
  Defendant.

Case No. 20-CR-330 (PAE)

# EXHIBIT A44

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,
  Plaintiff,

v.

GHISLAINE MAXWELL,
  Defendant.

Case No. 20-CR-330 (PAE)


# EXHIBIT A45

**From:** "█████████ (NY) (FBI)" <███████████>
**To:** "█████████ (NY) (FBI)" <███████████>
**Subject:** Epstein updates
**Date:** Sun, 25 Aug 2019 16:34:51 +0000
**Importance:** Normal

10-4

SSA █████████
FBI New York

On Aug 25, 2019 11:46 AM, "█████████ (NY) (FBI)" <███████████> wrote:
All,
After much engagement with HQ over the past 48 hours, and our efforts to both consolidate and limit the reporting requirements, HQ is now requesting updates in a conference call to be held daily at 1530. You should all receive the bridge line information tomorrow. Trust me, nothing you're thinking right now hasn't already been communicated to the highest levels. IMO, this is largely driven by DOJ. Is it inconvenient? Yes. Regardless, we'll need to support the calls because those you all deal with in CID are in the exact same position as you. We should support each other and push through.

Based on all my calls with HQ, here are some of my thoughts on how we should go forward:
Many questions I'm receiving are driven by media reporting (e.g. Maxwell, NM residence search, etc.). If you see sustained reporting on one aspect, get ahead of it. For example...media has been all over the location and role of Maxwell as a co-conspirator. I advised that based on the volume and quality of evidence we have, the team is currently focused on charges for a different co-conspirator. However, we're engaged with Counsel for all co-conspirators. Kill the rumor before it gets legs in the minds of senior leadership.

With regard to interviews or other investigative techniques, stay general unless we have significant information. You could say, "we conducted interviews of 14 MCC Corrections Officers and continued with the financial analysis but don't have anything signficant to report." Only give names of an interviewee if there was something significant.

If we don't have significant results to report, it's ok to say so. Be mindful that most, if not all, of what you say will be pushed to the seventh floor.

████ - Tuesday is a big day with the hearing so be prepared to talk it on Monday and beyond. You can provide the approximate number of victims expected to attend and any efforts we have in making that happen (coordinating transportation, etc.). On Tuesday you'll give the read out of the hearing. In your reporting over the next few days/weeks, stay focused on the investigation of the co-conspirators and stay tight with SDNY on conversations they're having with Counsel and the direction we're headed towards charges.

████ and on Wednesday ████ - I've continually expressed to HQ how C-19 and C-2 are tight on the drug/sex case. You guys can speak together about that case. Clearly we're focused on analysis of the phones as well as the nature and timing of likely charges.

████ - I talked to ████ and know that you guys have a couple big interviews to do that will determine if the PC case has any legs or if gets shut down. I would focus on advising of the timing of those interviews.

EFTA00037556

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,
  Plaintiff,

v.

GHISLAINE MAXWELL,
  Defendant.

Case No. 20-CR-330 (PAE)


# EXHIBIT A46



GRAND JURY
EXHIBIT
GSX-3 PM

UNITED STATES GRAND JURY

SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA        :

            -v-                 : November 19, 2019 Additional

GHISLAINE MAXWELL
(2018R01618)                    :
- - - - - - - - - - - - - - - -x

                                        United States Courthouse
                                        300 Quaroppas Street
                                        White Plains, New York

                                        June 29, 2020
                                        10:04 a.m.

APPEARANCES:

                        Assistant United States Attorney

                        Assistant United States Attorney

                        Acting Grand Jury Reporter

FREE STATE REPORTING, INC.
Court Reporting Transcription
D.C. Area 301-261-1902
Balt. & Annap. 410-974-0947

GM_GJ_SDNY_00000392

EFTA00008920

EX A 46

06/29/20    2

(Colloquy Precedes)

(Witness Enters Room)

(Time Noted:  10:16 a.m.)

██████████  called as a witness, having been duly sworn by the Foreperson of the Grand Jury, was examined and testified as follows:

BY MS. ██:

Q.    Good morning.

A.    Morning.

Q.    Can you please state your full name for the record?

A.    ██████████ .

Q.    So I recognize that you are wearing a mask and behind Plexiglas.  There's a microphone in front of you, if you could just make an effort to speak into the mic and keep your voice up that would be great.

A.    No problem.

Q.    Where do you currently work?

A.    The Federal Bureau of Investigation.

Q.    What is your title?

A.    Special agent.

Q.    How long have you worked as a special agent?

A.    About three years, three years now.

Q.    Where are you currently assigned?

A.    I work for the -- on the Violent Crimes against

FREE STATE REPORTING, INC.
Court Reporting  Transcription
D.C. Area 301-261-1902
Balt. & Annap. 410-974-0947

GM_GJ_SDNY_00000393

EFTA00008921

06/29/20    3

Children squad.

Q.    What are your duties and responsibilities as a special agent on that squad?

A.    We investigate crimes that have to do with child sexual abuse material, sextortion, exploitation, and enticement of minors, sex trafficking.

GRAND JUROR.    Maybe if she could take the mask off.  I'm having -- is anybody having difficulty understanding her?

MS. ██    Thanks for letting me know.  Would that be okay with you if the witness took her mask off?

GRAND JUROR.    We're okay with the Plexiglas, right?

GRAND JUROR.    Yeah.

MS. ██.    Thanks very much.  Thank you.

BY MS. ██:

Q.    All right.  So I'm just going to go back and ask a few of those questions again just to make sure that everyone can hear.  You testified earlier that you're a special agent with the FBI.  Is that correct?

A.    Yes.

Q.    Where are you currently assigned?

A.    I work on the Violent Crimes against Children squad.

Q.    And what are your duties and responsibilities as a

GM_GJ_SDNY_00000394

EFTA00008922

██████████                                        06/29/20    4

special agent on that squad?

A. We investigate crimes that involve child sexual abuse material, sextortion, enticement, and exploitation of minors, sex trafficking, international parental kidnappings.

MS. ██. Let me just pause here. Can everyone hear the witness?

GRAND JUROR. Yes.

MS. ██ Okay. Thank you. And Special Agent ██, if you could just try to keep your voice up, I really appreciate it. It's a little difficult under the circumstances.

BY MS. ██:

Q. Have you participated in an investigation of Ghislaine Maxwell?

A. Yes, I have.

Q. Have you spoken to other people, including other law enforcement officers, about this investigation?

A. Yes.

Q. Have you reviewed reports and documents prepared by others regarding this case?

A. Yes.

Q. Is your testimony today based in part on those conversations with other law enforcement officers and documents that you have reviewed?

A. Yes.

FREE STATE REPORTING, INC.
Court Reporting Transcription
D.C. Area 301-261-1902
Balt. & Annap. 410-974-0947

GM_GJ_SDNY_00000395

EFTA00008923

06/29/20    5

MS. ████.    Ladies and gentlemen, let me just give you a brief instruction.  Some of the testimony that you'll hear today will include what's called hearsay.  As you know, that means that the witness will not be testifying solely from her own observations, but that she'll also be reporting to you what others have told her and what she's read in reports and documents prepared by other people.

Hearsay evidence is admissible in these grand jury proceedings, and you're free to rely on it in determining whether there's probable cause to indict the proposed defendant.

If, however, you would like to hear the testimony of any other witness, you have the right to request it and we will make reasonable efforts to bring that witness before you.

BY MS. ████:

Q.    Special Agent ████, we placed on the desk in front of you a PowerPoint that is Grand Jury Exhibit 2, which we're entering into the record.  Do you recognize this?

A.    Yes.

Q.    What is it?

A.    It's a PowerPoint presentation to assist in testifying today.

Q.    Did you participate in preparing this exhibit in

GM_GJ_SDNY_00000396

EFTA00008924

██████████                                              06/29/20    6

connection with your testimony today?

A. Yes, I did.

Q. If you could please turn to the first slide. Who are the individuals depicted in these photographs?

A. The picture on the left is Ghislaine Maxwell, and the picture on the right is Jeffrey Epstein with Ghislaine Maxwell.

Q. Based on your participation in this investigation and your review of public source materials, have Maxwell and Epstein been photographed together many times over the years?

A. Yes.

Q. Based on your participation in this investigation and your review of public materials, where is Maxwell from?

A. Maxwell was born in France. She grew up in the United Kingdom, was educated in Oxford, and is from a wealthy family.

Q. Is she a citizen of France, the United Kingdom, and the United States?

A. Yes.

Q. How old is she currently?

A. 58.

Q. Has the FBI investigated Maxwell and Epstein's conduct with minors during the 1990's?

A. Yes

GM_GJ_SDNY_00000397

EFTA00008925

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,
  Plaintiff,

v.

GHISLAINE MAXWELL,
  Defendant.

Case No. 20-CR-330 (PAE)

# EXHIBIT A47

. . .

Q.  Other than yourself and the blond and brunette
    that you have identified as having been involved
    in three-way sexual activities, with whom did Mr.
    Epstein have sexual activities?

A.  I wasn't aware that he was having sexual
    activities with anyone when I was with him other
    than myself.

Q.  I want to be sure that I'm clear.  Is it your
    testimony that in the 1990s and 2000s, you were
    not aware that Mr. Epstein was having sexual
    activities with anyone other than yourself and
    the blond and brunette on those few occasions
    when they were involved with you?

A.  That is my testimony, that is correct.


. . .


Q.  Is it your testimony that you've never given
    anybody a massage?

A.  I have not given anyone a massage.

Q.  You never gave Mr. Epstein a massage, is that
    your testimony?

A.  That is my testimony.

Q.  You never gave [Minor Victim-2] a massage is your
    testimony?

A.  I never gave [Minor Victim-2] a massage.

(Title 18, United States Code, Section 1623.)


FOREPERSON                      _Audry Strauss_
                                AUDREY STRAUSS
                                Acting United States Attorney


17

GM_GJ_SDNY_00000362

EFTA00008890

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,
  Plaintiff,

v.

GHISLAINE MAXWELL,
  Defendant.

Case No. 20-CR-330 (PAE)

# EXHIBIT A48

abused in New Mexico?

A.    She couldn't recall.    She couldn't remember.

Q.    In general, how would ▇▇▇ get to the airport in Florida when she would fly on Epstein's jet?    What did she describe to you?

A.    Usually a driver -- one of Epstein's drivers would pick her up from her house and take her to the airport.

Q.    Now, you testified earlier that you reviewed flight records for Epstein's private jet.    Is that correct?

A.    Yes.

Q.    And have you reviewed records from the 1990's to see if that there -- whether there's a person named ▇▇▇ listed on the records?

A.    Yes.

Q.    Turning to the next slide.    Is this an excerpt from those records?

A.    Yes, it is.

Q.    And does the red arrow point to -- just one moment.    Does the red arrow point to a November 11th, 1996 flight?

A.    Yes, it does.

Q.    And is this a -- does this flight log reflect that it was a flight from Palm Beach, Florida to Teterboro, New Jersey?

A.    Yes.

GM_GJ_SDN
Searchir
EFTA00008948

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,
  Plaintiff,

v.

GHISLAINE MAXWELL,
  Defendant.

Case No. 20-CR-330 (PAE)

# EXHIBIT A52

*PRIVILEGED - ATTORNEY WORK PRODUCT/DELIBERATIVE PROCESS*
*CONFIDENTIAL - SUBJECT TO FED. R. CRIM. P. 6(e)*

Mr. Alessi also recalled that a young girl named ████████ used to come to the Palm Beach residence regularly. He recalled that ████ was ████████████████ and that she and her mother visited Epstein's Palm Beach residence multiple times. Mr. Alessi and his wife both picked ████ up ████████ and understood that ████ was a friend of Epstein's. Mr. Alessi recalled that ████ travelled with Epstein at least one time and eventually moved to ████████ with Epstein's help. Mr. Alessi observed Epstein kiss ████ on the cheek and pat her on the bottom.

In total, Mr. Alessi saw "hundreds" of girls at Epstein's Palm Beach residence, but he believed the majority to be in their 20s. Toward the last few months of his employment, Mr. Alessi began seeing younger girls, most of whom were brought to the residence by ████ Maxwell instructed Mr. Alessi not to ask these girls their ages or speak to them. Mr. Alessi recalls that Maxwell hired younger girls to come to the Palm Beach residence, including two girls whom Mr. Alessi knew to be in high school, but whose names he could not recall. Mr. Alessi believed most of the young women who came to the house to be professional masseuses, but he also recalled cleaning up after massages and finding sex toys in the room, which he then washed. Mr. Alessi also recalled that Maxwell kept a basket filled with sex toys in her room and that Maxwell was occasionally inside the massage room with the young women who came to the house.

Mr. Alessi also recalled more generally that many young women would be topless or naked by the pool. At the very end of his tenure, Mr. Alessi told Epstein that he should slow down, that "these girls" would get him in trouble. Epstein remarked that it was fine, and that "these girls only care about money." When Mr. Alessi left Epstein's employment, Epstein told him: "I hope you keep your mouth shut."

2. Maria Alessi

Maria Alessi was interviewed on July 13, 2019 in Florida. Ms. Alessi worked for Epstein at his Palm Beach residence from the mid 1990s until the end of 2002. Ms. Alessi primarily worked outside of the house, often shopping and running errands, so she was not able to observe most of the visitors to the house. When asked who, if anyone, she specifically recalls coming to the Palm Beach residence, Ms. Alessi recalled Ghislaine Maxwell frequently visiting the residence with Epstein. Ms. Alessi believed that Maxwell was Epstein's personal assistant. She also recalled seeing ████████ at the Palm Beach residence. She also recalled seeing girls in their 20s or 30s around the house.

3. Gregory Bledsoe

Dr. Gregory Bledsoe was interviewed by telephone on July 22, 2019. Bledsoe is a doctor who was hired by the Secret Service to provide backup medical services for Bill Clinton during a trip to Africa in 2002 on Epstein's private jet. Bledsoe recalled that Ghislaine Maxwell and four

38

EFTA_00022498

EFTA02731119

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,
  Plaintiff,

v.

GHISLAINE MAXWELL,
  Defendant.

Case No. 20-CR-330 (PAE)

# EXHIBIT A6

| Date | To | From | Re: | Exhibit # |
|------|-----|------|-----|-----------|
| 6/30/2008 | ▮▮▮ | ▮▮▮ | Email chain regarding Epstein sentencing | |
| 6/30/2008 | | | Email chain regarding news article | |
| 6/30/2008 | | | Email chain with response to 6/30/08 email from ▮▮▮ with contact information | |
| 6/30/2008 | | | Emails between ▮▮▮ and attorney for grand jury witness withdrawing subpoena | B-135 |
| 6/30/2008 | | | Epstein enters guilty plea in state court in accordance with NPA. JD# ▮▮▮ and counsel do not appear. ASA and counsel for Epstein disclose to state court judge existence of NPA, which is later incorporated into state court record. | |
| 6/30/2008 | | | Notes from calls to Michael Danchuk and Richard Willets, Jeff Herman, Brad Edwards, Ted Leopold, and Mike Dutko | B-55 |
| 6/30/2008 | | | Research re State Work Release | |
| 6/30/2008 | | | Draft notification of identified victims letters to Guy Lewis, Jack Goldberger, and Roy Black | B-56 |
| 6/30/2008 | | | Email regarding Epstein guilty plea and sentencing | 71 |
| 6/30/2008 | | | 2008-2009 Epstein serves prison term | |
| 7/1/2008 | | | Email response stating that ▮▮▮ handled Epstein case but did not come up with the 18-month deal | |
| 7/1/2008 | | | Email regarding Epstein plea | |
| 7/1/2008 | | | Email chain regarding Epstein case | |
| 7/3/2008 | | | Email re Epstein work release with attachment | |
| 7/3/2008 | | | Email re victim's lawyer | |
| 7/3/2008 | | Brad Edwards and Jay Howell | Letter advising of representation of Epstein victims | |
| 7/3/2008 | | Ted Leopold | Email advising client names | |

EFTA00225465

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,
  Plaintiff,

v.

GHISLAINE MAXWELL,
  Defendant.

Case No. 20-CR-330 (PAE)


# EXHIBIT A7

that the state offered, including work release. Because of this, I had to withdraw the Notice of Breach and could only write a letter to the Sheriff's Office pointing out all of the false statements contained in Epstein's application for work release and letters to the victims informing them that Epstein was in work release status. The Sheriff's Office never responded to or acknowledged my letter.

On June 9, 2009, I prepared what I believe was the last Memorandum requesting authorization to issue a Notice of Breach and to indict Epstein. The Office authorized issuance of the Notice of Breach, and the Indictment Packages was re-reviewed, approved, and signed, with arrest warrants for Jeffrey Epstein, ████████, and ████████████ The Notice of Breach was served on June 12, 2009 at a hearing on Epstein's Motion to Dismiss one of the civil suits filed by one of the victims identified during the federal investigation. Once again, Epstein was allowed to "cure" his breach, and we were not allowed to file the indictment.

There were strong internal disagreements on a number of subjects, including: the handling of the meetings with Epstein's counsel; plea negotiations; the NPA generally; the failure to consult with the victims; continuing plea negotiations in the face of Epstein's clear bad faith; the refusal to defend me against personal attacks from Epstein's attorneys; the agreement to put off seeking Epstein's computer equipment; the consultations with Epstein's attorneys regarding victim notifications; the handling of the "appeals" to Washington; allowing delays during those "appeals," while Epstein's attorneys were harassing the victims and their family members; attempts by Epstein to renegotiate the term of imprisonment; attempts by Epstein to renegotiate the payment of damages to the victims and attorneys' fees to their attorney representative; allowing Epstein to participate in the work release program after specifically discussing it during plea negotiations; and repeatedly allowing Epstein to "cure" intentional breaches of the NPA. These were kept internal as I tried to deal professionally with opposing counsel.

In the midst of all of the post-NPA back-and-forth with Epstein, was the *Jane Doe* ▮ *United States* litigation.[4] Despite the Office's request to be recused from the case, the Justice Department decided that there was no conflict of interest and I was tasked with serving as co-counsel. The Office asserted attorney-client, executive, work product, and deliberative process privileges, so all of the internal disagreements, pros memos, and indictments were not disclosed while all of my communications with opposing counsel (often at the behest of supervisors) were disclosed. After an initial flurry of filings, Brad Edwards, as counsel for the named plaintiffs, stated on the record that he believed that setting aside the NPA would not benefit his clients, and he sued Epstein on behalf of a number of victims under the NPA. I did what I could to assist Mr. Edwards, other attorneys, including Mr. Josefsberg, the attorney selected by the Special Master, and the Court, to locate victims, provide signed copies of the NPA, and answer questions. After all of the civil suits between Epstein and the victims were settled through the spectre of breaching the NPA, Mr. Edwards re-initiated the *Jane Doe* ▮ *United States* litigation, asserting that his clients wanted to

---

[4] A few days after Jeffrey Epstein entered his guilty plea in state court, attorney Brad Edwards filed suit on behalf of one of the victims identified in the federal investigation (later expanded to include a second victim who had been identified in the state investigation), alleging violations of the Crime Victims' Rights Act. The suit, which is still pending, is captioned *Jane* ████████████ *United States*, 08-80736-CV-KAM.

EFTA00225485