| | |
|---|---|
| **From:** | Ghislaine Maxwell ████████████████ |
| **Sent:** | Tuesday, June 9, 2026 10:58 PM |
| **To:** | Pro Se Filing |
| **Subject:** | Reply Ghislaine Maxwell |
| **Attachments:** | FINAL REPLY TO UPLOAD TO PRO SE.pdf |

**CAUTION - EXTERNAL:**

Attached herewith Reply and Cover letter

**CAUTION - EXTERNAL EMAIL:** This email originated outside the Judiciary. Exercise caution when opening attachments or clicking on links.

1

To: Pro Se Clerk

United States District Court, Southern District of New York

500 Pearl Street New York, NY 10007

Email:

Re: United States v. Ghislaine Maxwell, Case No. 20-CR-330 (AJN)

Subject: Pro Se Reply to Governments Opposition to Motion to Vacate, Set Aside, or Correct

Sentence Pursuant to 28 U.S.C. § 2255

Dear Clerk:

Please find enclosed for filing in the above-referenced matter the  Pro Se Reply to Governments

Opposition to Petition for Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2255). This motion is

submitted pro se by Petitioner Ghislaine Maxwell (Reg. No. 02879-509, FCP Bryan, Texas).

Kindly docket the motion and exhibits accordingly and transmit confirmation of filing to the

undersigned petitioner.

Respectfully submitted,

/s/ Ghislaine Maxwell

Ghislaine Maxwell, Pro Se

Reg. No. 02879-509

Federal Correctional Institution – Bryan

1100 Ursuline Ave

Bryan, TX 77803

Dated: June 9 2026

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,        Plaintiff,

v.

GHISLAINE MAXWELL,        Defendant.

Case No. 20-CR-330 (AJN)


PETITIONER'S REPLY TO MEMORANDUM OF LAW OF THE UNITED STATES OF
AMERICA
IN OPPOSITION TO THE DEFENDANT'S MOTION UNDER 28 U.S.C. § 2255 TO
VACATE, SET ASIDE, OR CORRECT HER CONVICTION AND SENTENCE PETITION
FOR WRIT OF HABEAS CORPUS PURSUANT
TO 28 U.S.C. § 2255

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,        Plaintiff,

v.

GHISLAINE MAXWELL,        Defendant.

Case No. 20-CR-330 (AJN)


PETITIONER'S REPLY TO MEMORANDUM OF LAW OF THE UNITED STATES OF AMERICA IN OPPOSITION TO THE DEFENDANT'S MOTION UNDER 28 U.S.C. § 2255 TO VACATE, SET ASIDE, OR CORRECT HER CONVICTION AND SENTENCE PETITION FOR WRIT OF HABEAS CORPUS PURSUANT TO 28 U.S.C. § 2255

1

TABLE OF CONTENTS

## Table of Contents

**PRELIMINARY STATEMENT** ................................................................................ **7**

**POINT I** ................................................................................................................**10**

**THE GOVERNMENT'S OPPOSITION DEPENDS UPON THE PREMISE THAT THE PRESENT RECORD IS SUFFICIENT TO RESOLVE THE MERITS OF PETITIONER'S CLAIMS WITHOUT FURTHER FACTUAL DEVELOPMENT**............................................................**10**

**POINT II**...............................................................................................................**12**

**THE GOVERNMENT'S PROCEDURAL-DEFAULT ARGUMENT DEPENDS UPON THE PREMISE THAT THE FACTUAL PREDICATES OF PETITIONER'S CLAIMS WERE AVAILABLE DURING TRIAL, DIRECT APPEAL, OR PRIOR COLLATERAL PROCEEDINGS** ................................................................................................................**12**

**THE GOVERNMENT'S DELAY RESULTED IN THE LOSS OF EVIDENCE, WITNESS MEMORY, AND INVESTIGATIVE MATERIALS THAT CAN NO LONGER BE RECONSTRUCTED** .................................................................................................**16**

**POINT III** .............................................................................................................**17**

**THE GOVERNMENT'S ANALYSIS OF THE NPA, OPR, ACOSTA, PARKINSON, AND EFTA MATERIALS DEPENDS UPON THE PREMISE THAT THE HISTORICAL RECORD IS SUBSTANTIALLY COMPLETE** ...................................................................................**17**

**A. THE NEWLY DISCLOSED NPA MATERIALS REFLECT CONTINUING DEPARTMENT REVIEW AND RAISE UNRESOLVED QUESTIONS CONCERNING THE SCOPE, IMPLEMENTATION, AND UNDERSTANDING OF THE AGREEMENT** ................................**21**

**B. THE NEWLY DISCLOSED RECORD RAISES QUESTIONS CONCERNING THE COMPLETENESS OF PRIOR DEPARTMENT REVIEWS**.......................................................**24**

**C. THE NEWLY DISCLOSED RECORD RAISES QUESTIONS CONCERNING AGENCY RELATIONSHIPS, INFORMATION SHARING, AND THE PRACTICAL AVAILABILITY OF INFORMATION** ...................................................................................................**27**

**D. THE NEWLY DISCLOSED RECORD RAISES QUESTIONS CONCERNING THE IDENTIFICATION, PRESERVATION, AND DISCLOSURE OF POTENTIALLY FAVORABLE EVIDENCE** ......................................................................................................**29**

**E. THE GOVERNMENT'S MATERIALITY ANALYSIS DOES NOT ACCOUNT FOR THE CUMULATIVE EFFECT OF THE NEWLY DISCLOSED RECORD** ......................................**31**

**POINT IV** ..................................................................................................................**33**

**THE GOVERNMENT'S POSSESSION ANALYSIS DEPENDS UPON INSTITUTIONAL BOUNDARIES THAT THE NEWLY DISCLOSED RECORD DOES NOT CONCLUSIVELY SUPPORT** ....................................................................................................................**33**

**POINT V** ....................................................................................................................**34**

**THE GOVERNMENT'S ANALYSIS OF THE VILLAFAÑA MATERIALS IS DIFFICULT TO RECONCILE WITH THE CHRONOLOGY REFLECTED IN THE NEWLY DISCLOSED RECORD** .....................................................................................................................**34**

**POINT VI** ..................................................................................................................**36**

**THE GOVERNMENT'S POSSESSION ANALYSIS DOES NOT FULLY ACCOUNT FOR THE PRACTICAL AVAILABILITY OF INFORMATION REFLECTED IN THE NEWLY DISCLOSED RECORD** .....................................................................................................................**36**

**POINT VII** .................................................................................................................**38**

**THE GOVERNMENT'S ANALYSIS OF THE NEWLY DISCLOSED RECORD DOES NOT ACCOUNT FOR THE EFFECT OF DELAYED DISCLOSURE ON THE DEFENSE'S ABILITY TO INVESTIGATE, LITIGATE, AND PRESENT ITS CLAIMS** ................................................**38**

**POINT VIII** ...............................................................................................................**40**

**THE GOVERNMENT'S ANALYSIS DOES NOT ACCOUNT FOR THE CUMULATIVE EFFECT OF EVIDENCE BEARING UPON WITNESS CREDIBILITY, INVESTIGATIVE CHRONOLOGY, INFORMATION SHARING, AND THE RELIABILITY OF THE HISTORICAL RECORD** .....................................................................................................................**40**

**POINT IX** ..................................................................................................................**41**

**THE GOVERNMENT'S POSITION CANNOT BE RECONCILED WITH ITS CONTENTION THAT THE PRESENT RECORD CONCLUSIVELY FORECLOSES RELIEF** ..........................41

**POINT X** ...............................................................................................................43

**THE NEWLY DISCLOSED RECORD REFLECTS CONTINUING FEDERAL AWARENESS, REVIEW, AND PARTICIPATION THAT WAS NOT APPARENT FROM THE RECORD AVAILABLE DURING THE UNDERLYING PROCEEDINGS**................................................43

**POINT XI**..............................................................................................................44

**THE GOVERNMENT'S ANALYSIS OF THE POST-TRIAL DISCLOSURES IS INCONSISTENT WITH THE REQUIREMENT THAT FAVORABLE EVIDENCE BE EVALUATED FROM THE PERSPECTIVE OF THE DEFENSE AND IN LIGHT OF THE ENTIRE RECORD**...................44

**POINT XII** ............................................................................................................49

**THE GOVERNMENT'S POSITION DOES NOT ACCOUNT FOR THE EFFECT OF THE NEWLY DISCLOSED RECORD ON THE RELIABILITY OF THE FACTUAL FOUNDATIONS UNDERLYING THE CONVICTION AND SUBSEQUENT REVIEW**.......................................49

**POINT XIII** ...........................................................................................................51

**THE GOVERNMENT'S ANALYSIS OF THE NPA-RELATED CLAIMS DEPENDS UPON FACTUAL ASSUMPTIONS THAT THE POST-TRIAL DISCLOSURES PLACE IN DISPUTE** ..51

**POINT XIV** ...........................................................................................................53

**THE GOVERNMENT'S ANALYSIS OF THE JUROR-RELATED CLAIMS DEPENDS UPON A RECORD THAT HAS BEEN MATERIALLY EXPANDED BY POST-TRIAL DISCLOSURES** ...53

**B. THE POST-TRIAL JUROR EVIDENCE INDEPENDENTLY WARRANTS FURTHER FACTUAL DEVELOPMENT** ...........................................................................................54

**C. THE POST-TRIAL RECORD RAISES QUESTIONS CONCERNING WHETHER THE JUROR-DISCLOSURE ISSUES WERE BROADER THAN PREVIOUSLY UNDERSTOOD**......55

**E. THE JUROR-RELATED EVIDENCE INDEPENDENTLY PRECLUDES SUMMARY DISMISSAL** ...........................................................................................................56

**POINT XV**......................................................................................................**57**

**THE DENIAL OF ACCESS TO THE EFTA MATERIALS CAUSED ACTUAL INJURY AND FURTHER SUPPORTS DISCOVERY, EXPANSION OF THE RECORD, AND APPELLATE REVIEW**.............................................................................................................**57**

**POINT XVI** ....................................................................................................**59**

**THE COMBINED EFFECT OF THE POST-TRIAL DISCLOSURES REQUIRES DISCOVERY, RULE 7 EXPANSION OF THE RECORD, AND AN EVIDENTIARY HEARING**......................**59**

**POINT XVII** ...................................................................................................**61**

**AT A MINIMUM, THE ISSUES PRESENTED WARRANT A CERTIFICATE OF APPEALABILITY AND PRESERVATION OF PETITIONER'S APPELLATE RIGHTS**............**61**

**CONCLUSION** ................................................................................................**62**

TABLE OF AUTHORITIES

**CASES**

Banks v. Dretke, 540 U.S. 668 (2004) ........................................................................... 1

Brady ............................................................................................................................... 1

**Brady v. Maryland, 373 U.S. 83 (1963)** ..................................................................... 1

*DiSimone v. Phillips*, 461 F.3d 181 (2d Cir. 2006 ......................................................... 1

**Giglio v. United States, 405 U.S. 150 (1972)** ............................................................. 1

Kyles v. Whitley ............................................................................................................... 1

*Leka v. Portuondo*, 257 F.3d 89 (2d Cir. 2001). ........................................................... 1

Strickler v. Greene, 527 U.S. 263 (1999) ....................................................................... 1

**STATUTES**

28 U.S.C. § 2253(c). ....................................................................................................... 1

28 U.S.C. § 2255(b). ....................................................................................................... 1

Section 2255(b .................................................................................................................. 1

**RULES**

Rule 5(f) and the Due Process Protections Act ............................................................... 1

Rule 6 discovery .............................................................................................................. 1

Rule 7 expansion of the record ....................................................................................... 1

REPLY

## PRELIMINARY STATEMENT

The Government's opposition proceeds from the premise that Petitioner's claims may be resolved on the existing paper record without discovery, expansion of the record, or an evidentiary hearing. The post-trial disclosures now before the Court demonstrate that the matter is not so readily resolved.

This proceeding arises against the backdrop of disclosures made pursuant to the Epstein Files Transparency Act ("EFTA"), which resulted in the production of investigative, prosecutorial, administrative, and Department of Justice records that were unavailable during trial, unavailable on direct appeal, and unavailable when related issues were previously litigated. Those disclosures include Office of Professional Responsibility ("OPR") materials, Southern District of Florida records, Villafaña files, Parkinson-related materials, Main Justice communications, Child Exploitation and Obscenity Section ("CEOS") records, records concerning the negotiation and implementation of the Non-Prosecution Agreement ("NPA"), preservation materials, records concerning New York victims, and records reflecting missing, incomplete, or subsequently recovered investigative files.

The significance of these disclosures lies not in any individual document. Rather, the newly available materials bear upon a series of interrelated issues, including Brady obligations, witness credibility, investigative coordination, agency relationships, federal knowledge, NPA interpretation, juror misconduct, record preservation, and the completeness of the evidentiary record presented at trial. Collectively, the disclosures present a materially different factual record than the one available to trial counsel, appellate counsel, and this Court during the underlying proceedings.

The newly disclosed record also raises questions concerning the completeness of prior institutional reviews. Materials produced through the EFTA process reflect information that was not previously available to the defense and, in certain instances, appears inconsistent with factual assumptions underlying earlier Department analyses. The disclosures further reveal evidence concerning litigation-hold issues, subsequently recovered records, preservation concerns, and gaps within categories of investigative materials. Whether those matters ultimately establish constitutional error is not the present question. Their existence, however, bears directly upon whether the current record may fairly be regarded as complete.

A substantial portion of Petitioner's claims concerns the Government's identification, review, and disclosure of NPA-related materials. Prior to trial, the Court entered an order pursuant to Rule 5(f) and the Due Process Protections Act reminding the Government of its continuing obligations under Brady v. Maryland **Brady v. Maryland, 373 U.S. 83 (1963)**and Giglio v. United States **Giglio v. United States, 405 U.S. 150 (1972)** and directing the Government to seek favorable information from participants involved in the investigation and prosecution. Dkt. 68.

Against that backdrop, the Government subsequently acknowledged that its disclosure review did not include search terms directed to NPA-related materials and that relevant repositories had

7

not been searched for communications relating to the NPA. Dkt. 239 at 5. That admission bears directly upon Petitioner's contention that potentially favorable NPA-related evidence may never have been systematically identified or evaluated during the disclosure process.

Many of the materials presently before the Court became available only after Petitioner's conviction became final. Many were unavailable not only during trial, but throughout direct appeal and earlier post-conviction proceedings. In addition, Petitioner's request for direct access to EFTA materials was denied, requiring litigation of substantial issues without the opportunity personally to review the underlying records. Nevertheless, the disclosures continue to illuminate investigative relationships, prosecutorial decision-making, witness-development efforts, agency coordination, preservation issues, and institutional involvement that were previously unavailable to the defense. The Government failed to disclose to defense that they stopped the State of New Mexico from conducting its own investigation because they feared conflicting witness statements. 60 Minutes Australia transcript of former Governor HECTOR BALDERAS

The Government's opposition rests substantially upon four propositions. First, that many of the materials identified by Petitioner either did not exist, were unavailable, or fell outside the possession, custody, or control of the prosecution team. Second, that records maintained by other districts, agencies, or participants fall outside Brady because they remained beyond the reach of the prosecutors who tried this case. Third, that any undisclosed evidence was immaterial. Fourth, that many of Petitioner's claims are procedurally defaulted.

The post-trial disclosures raise substantial questions concerning each proposition. The newly available materials reflect evidence unavailable during the underlying proceedings. They reflect communication among investigators, prosecutors, Department components, and other participants involved in the broader investigative effort. They raise questions concerning access, possession, disclosure obligations, witness development, investigative coordination, agency relationships, and the scope of federal involvement in matters previously characterized as isolated or local. They also provide avenues of impeachment and factual development unavailable to the defense at trial.

Most importantly, the present inquiry is not whether Petitioner has already established entitlement to ultimate relief. The question before the Court is whether the motion, files, and records of the case conclusively demonstrate that no relief is available. Where newly disclosed evidence raises unresolved factual questions concerning matters outside the original trial record, further factual development may be required before the merits can be adjudicated.

The Government frequently evaluates the newly disclosed materials in isolation, asking whether a particular document, communication, witness statement, investigative record, or category of evidence would independently have altered the verdict. That approach is inconsistent with the governing Brady framework. Materiality is not assessed item by item. Rather, the Court must evaluate the cumulative effect of favorable evidence and determine whether the suppressed or previously unavailable information, considered collectively, undermines confidence in the outcome of the proceedings.

8

The cumulative significance of the newly disclosed record extends beyond any single category of evidence. The disclosures bear upon witness credibility, investigative chronology, agency relationships, Brady possession, information-sharing practices, witness development, juror misconduct, preservation obligations, missing investigative records, and the negotiation, implementation, and interpretation of the NPA. Several disclosures further raise questions concerning the completeness of earlier institutional reviews and the factual assumptions upon which those reviews were based. Other materials concern records that were subsequently recovered, records that appear to have been missing, and records whose preservation remains subject to legitimate factual inquiry. Considered collectively, these disclosures present a materially different evidentiary picture than the one available during trial, direct appeal, or earlier post-conviction proceedings.

The Government's response frequently asks the Court to resolve disputed factual issues in its favor at the threshold stage of the litigation. In doing so, it proceeds from its own interpretation of disputed documents, disputed chronology evidence, disputed agency relationships, disputed possession issues, disputed witness-development evidence, and disputed investigative records. Petitioner disputes those interpretations. More importantly, the newly disclosed materials provide evidentiary support for factual contentions that could not previously be tested because the underlying records had not yet been disclosed.

That distinction is particularly important here because many of the issues raised by the Petition concern matters occurring outside the trial record. Questions concerning investigative coordination, agency relationships, disclosure practices, preservation efforts, witness-development activities, institutional review processes, and the existence of additional investigative materials cannot be resolved solely by reference to the trial transcript. The post-trial disclosures provide evidence bearing directly upon those issues and, in several instances, reveal factual disputes that were not previously apparent.

The Government further contends that many of Petitioner's claims are procedurally defaulted because they were not raised on direct appeal. That argument necessarily assumes that the relevant factual predicate was available to appellate counsel. The newly disclosed record raises substantial questions concerning that assumption. Many of the materials upon which Petitioner now relies were unavailable during trial, unavailable on appeal, and unavailable when related issues were previously litigated. Whether analyzed through the framework of Brady, cause and prejudice, or the Court's authority to permit further factual development under Rules 6 and 7, the emergence of substantial post-trial evidence bears directly upon the procedural posture of the Petition.

The Court is not presently asked to determine the ultimate merits of every constitutional claim asserted in the Petition. Nor is the Court asked at this stage to decide every disputed question concerning Brady, Giglio, Napue, due process, juror misconduct, or the scope and effect of the NPA. The immediate question is narrower. The Court must determine whether the motion, files, and records of the case conclusively establish that Petitioner is entitled to no relief notwithstanding the substantial body of evidence that has emerged since trial and direct appeal.

Petitioner respectfully submits that the present record does not permit such a conclusion. The post-trial disclosures reveal unresolved factual questions concerning possession, access, agency relationships, investigative coordination, witness development, preservation practices, record completeness, juror issues, federal knowledge, and the implementation and interpretation of the NPA. Those questions cannot fairly be resolved through competing attorney submissions alone. At a minimum, the newly disclosed record warrants expansion of the record pursuant to Rule 7, targeted discovery pursuant to Rule 6, and an evidentiary hearing pursuant to 28 U.S.C. § 2255(b).

Accordingly, the Court should deny the Government's request for summary dismissal and permit Petitioner's claims to be evaluated on a complete factual record.

POINT I

THE GOVERNMENT'S OPPOSITION DEPENDS UPON THE PREMISE THAT THE PRESENT RECORD IS SUFFICIENT TO RESOLVE THE MERITS OF PETITIONER'S CLAIMS WITHOUT FURTHER FACTUAL DEVELOPMENT

The Government's opposition proceeds from the premise that the Court may resolve the merits of Petitioner's constitutional claims on the existing record and without further factual development. The post-trial disclosures now before the Court do not permit that conclusion.

The threshold issue presented by this proceeding is not whether Petitioner has already established every alleged Brady violation, Giglio violation, due process violation, juror-misconduct claim, or basis for collateral relief identified in the Petition. Nor is the issue whether the writ should ultimately issue. The question presently before the Court is whether the motion, files, and records of the case conclusively demonstrate that Petitioner is entitled to no relief. 28 U.S.C. § 2255(b).

That distinction is particularly significant because many of Petitioner's claims arise from evidence that was unavailable during trial, unavailable on direct appeal, and unavailable when related issues were previously litigated. The Court is therefore presented with a factual record that differs materially from the record that existed during the underlying proceedings.

The Government's analysis depends upon interpretations of disputed records, disputed chronology evidence, disputed agency relationships, disputed possession issues, disputed witness-development evidence, and disputed investigative materials. Those interpretations are contested by Petitioner and, more importantly, have not been subjected to factual development. The existence of such disputes does not support summary disposition; it underscores the need for a more complete record.

The EFTA disclosures illustrate the point. Those materials did not form part of the trial record. They did not form part of the appellate record. They were unavailable to trial counsel, appellate counsel, and prior reviewing courts. Yet they bear directly upon issues raised in the Petition,

10

including federal knowledge, institutional participation, Brady possession, NPA implementation, witness development, preservation practices, and the completeness of investigative records.

The newly disclosed record also raises questions concerning the completeness of prior institutional reviews. Materials now available through the EFTA process reflect information that was not previously available to the defense and, in certain instances, appears inconsistent with assumptions underlying earlier Department analyses. Additional disclosures concern preservation issues, litigation-hold evidence, subsequently recovered records, and gaps within categories of investigative materials. These matters do not resolve themselves on the existing record; they warrant factual development.

The Government's position further depends upon the assumption that disputed factual issues may be resolved through competing interpretations of documentary materials alone. The present record does not support that approach.

Several categories of newly disclosed evidence concern matters occurring outside the trial record and outside the evidentiary record previously available to the defense. These include issues relating to investigative coordination, agency relationships, witness-development activities, preservation efforts, information sharing among participants, institutional review processes, and the existence of additional investigative materials. The newly disclosed records bear directly upon those subjects and, in several instances, reveal factual disputes that were not apparent during the underlying proceedings.

The Government's analysis of possession and access provides one example. Throughout the opposition, the Government proceeds from a particular understanding of the relationships among prosecutors, investigators, Department components, and other participants involved in the broader Epstein investigation. The newly disclosed record contains evidence bearing directly upon those relationships, including communications among Department components, evidence of institutional participation extending beyond a single district, and records reflecting the dissemination and review of information among multiple participants. Whether those materials ultimately establish Brady possession is not the issue presently before the Court. The issue is whether the newly disclosed evidence raises factual questions requiring further development. It does.

The same is true with respect to the NPA-related materials. The Government's analysis proceeds from the premise that the historical record concerning the negotiation, implementation, and interpretation of the NPA is substantially complete. The post-trial disclosures raise substantial questions concerning that premise. The newly disclosed record includes evidence of continuing Department review, previously unavailable communications, records concerning federal awareness of conduct extending beyond Florida, and materials bearing upon the understanding of participants involved in reviewing and implementing the agreement. Those disclosures warrant factual development regardless of how the Court ultimately resolves the underlying legal issues.

The preservation and record-completeness issues provide a further example. The newly disclosed record includes evidence concerning litigation-hold practices, records that were subsequently recovered after previously being considered unavailable, and gaps within categories of

11

investigative materials. The significance of these disclosures lies not merely in the contents of individual documents, but in what they reveal concerning the completeness of the historical record itself. Where the record contains evidence of missing materials, recovered materials, and unresolved preservation questions, summary resolution becomes particularly difficult.

The same principle applies to the evidence bearing upon prior institutional reviews. Certain newly disclosed materials appear inconsistent with assumptions reflected in earlier Department analyses concerning the scope of information available to particular participants. Whether those inconsistencies ultimately affect the conclusions reached in those reviews is a question for later determination. At this stage, their significance lies in demonstrating that the factual foundation underlying earlier evaluations may not have been as complete as previously understood.

The Government's position therefore depends upon a degree of factual certainty that the present record does not provide. The post-trial disclosures have expanded the evidentiary landscape in ways that neither the trial record nor the appellate record contemplated. Under those circumstances, the question is not whether Petitioner has already proven entitlement to relief. The question is whether the present record conclusively forecloses relief notwithstanding the emergence of substantial new evidence. On the current record, that conclusion cannot be reached.

Section 2255(b) reflects Congress's recognition that some claims cannot be fairly resolved without further factual development. This case falls within that category. The newly disclosed materials raise substantial questions concerning possession, access, investigative coordination, agency relationships, witness development, preservation practices, record completeness, juror issues, and the implementation and interpretation of the NPA. Those questions are neither peripheral nor speculative. They arise from documentary evidence that was unavailable during the underlying proceedings and that has never been subjected to meaningful factual development.

Accordingly, the Court should reject the Government's contention that the present record is sufficient to resolve the merits of Petitioner's claims and should permit further factual development through Rule 7 expansion of the record, Rule 6 discovery, and an evidentiary hearing pursuant to 28 U.S.C. § 2255(b).

## POINT II

## THE GOVERNMENT'S PROCEDURAL-DEFAULT ARGUMENT DEPENDS UPON THE PREMISE THAT THE FACTUAL PREDICATES OF PETITIONER'S CLAIMS WERE AVAILABLE DURING TRIAL, DIRECT APPEAL, OR PRIOR COLLATERAL PROCEEDINGS

The Government contends that many of Petitioner's claims are procedurally defaulted because they were not raised on direct appeal. That argument depends upon the premise that the factual predicates underlying those claims were available to the defense during the relevant proceedings. The post-trial disclosures substantially undermine that premise.

12

Many of Petitioner's claims do not arise solely from the trial record. Nor do they arise solely from materials available to appellate counsel during direct review. Rather, they arise from a substantial body of evidence disclosed only after trial, after direct appeal, and, in many instances, after related issues had already been litigated. The EFTA disclosures include records concerning the NPA, OPR reviews, Main Justice participation, CEOS involvement, Villafaña materials, Parkinson-related records, preservation issues, and additional investigative materials that were not previously available to the defense.

The Government's procedural-default analysis frequently treats the present record as though it existed in substantially the same form during trial and direct appeal. The post-trial disclosures demonstrate otherwise. The record presently before the Court differs materially from the record available to trial counsel, appellate counsel, and prior reviewing courts.

Suppression Of Favorable Evidence Constitutes Cause.  The Supreme Court's decisions in Strickler v. Greene, Strickler v. Greene, 527 U.S. 263 (1999)  and Banks v. Dretke Banks v. Dretke, 540 U.S. 668 (2004) recognize that the Government cannot simultaneously suppress favorable evidence and then fault a defendant for failing to raise claims based upon that evidence. The rationale is straightforward. A defendant cannot reasonably be expected to assert constitutional claims based upon facts that remain concealed. Nor can appellate counsel raise arguments premised upon records that were never disclosed. The Government's procedural-default argument frequently ignores this principle. Throughout its opposition, the Government repeatedly argues that Petitioner's claims should have been raised earlier. The newly disclosed record demonstrates why many of those claims could not have been raised earlier. The claims depend upon evidence that was not available. The evidence was not available because it had not been disclosed. That is cause.

The EFTA Disclosures Independently Establish Cause.  Even apart from traditional Brady principles, the EFTA disclosures independently establish cause sufficient to excuse procedural default. The records produced pursuant to the Epstein Files Transparency Act did not form part of the trial record. They did not form part of the appellate record. They were unavailable to trial counsel. They were unavailable to appellate counsel. They were unavailable when earlier courts considered related issues. Indeed, many of the records now relied upon by Petitioner emerged only after Congress mandated a transparency process resulting in the release of substantial quantities of investigative and Department of Justice materials. The significance of this fact cannot be overstated. The Government repeatedly argues that Petitioner's claims should have been asserted years earlier. Yet many of the records supporting those claims did not become available until years later. A petitioner cannot be faulted for failing to raise claims based upon evidence that had not yet been disclosed. Nor can appellate counsel be faulted for failing to rely upon records that were unavailable during direct review. The EFTA disclosures therefore provide an independent basis for finding cause.

The Supreme Court has long recognized that procedural-default principles must be applied in light of the information actually available to the defense. A defendant cannot reasonably be expected to raise claims based upon evidence that has not been disclosed, records that remain

13

unavailable, or information whose existence is unknown. Where the factual basis of a claim emerges only after the conclusion of direct review, the premise underlying a procedural-default argument necessarily becomes more difficult to sustain.

That principle has particular significance here because the newly disclosed record bears directly upon issues that were central to the prosecution and defense alike. The disclosures concern matters including federal knowledge, institutional participation, witness development, investigative coordination, agency relationships, preservation practices, Brady possession, and the negotiation and implementation of the NPA. The defense did not possess these materials during trial. Appellate counsel did not possess these materials during direct review. Earlier courts did not evaluate these materials when considering related issues.

The newly disclosed record also raises questions concerning the completeness of prior institutional reviews. Certain EFTA materials appear inconsistent with assumptions reflected in earlier Department analyses regarding the scope of information available to particular participants. For example, prior reviews proceeded on understandings concerning the sources of information available to certain individuals that are difficult to reconcile with records subsequently disclosed through the EFTA process, including materials relating to Acosta, the Ragsdale correspondence, and other non-public information. These disclosures bear directly upon the factual foundations underlying earlier evaluations and further illustrate why the present record differs from the record available during prior proceedings.

The Government's position likewise depends upon the assumption that the relevant evidence could have been discovered through ordinary diligence. The post-trial disclosures substantially complicate that assumption. Many of the records now before the Court originated within Department repositories, OPR files, CEOS records, Main Justice communications, Villafaña materials, Parkinson-related records, preservation files, and other sources unavailable to the defense. Their eventual production occurred through a transparency process that did not exist during trial or direct appeal. The disclosures therefore raise substantial questions concerning whether the information was reasonably available at an earlier stage of the proceedings.

The Government's procedural-default argument also fails because the newly disclosed record bears directly upon both cause and prejudice.

With respect to cause, the issue is not whether Petitioner could have raised additional legal theories during trial or direct appeal. The issue is whether the factual predicates necessary to support those theories were available to the defense. The post-trial disclosures raise substantial questions concerning that premise. A claim cannot reasonably be expected to appear in the absence of the evidence necessary to identify, investigate, and support it.

The significance of the EFTA disclosures lies not merely in the production of additional documents. The disclosures reveal categories of information that were unavailable during the underlying proceedings, including records concerning Department review of the NPA, OPR investigations, Main Justice participation, CEOS involvement, Villafaña materials, preservation issues, and additional investigative activity. The emergence of those materials materially alters the factual context in which Petitioner's claims must be evaluated.

14

The newly disclosed record further reflects evidence concerning litigation-hold practices, subsequently recovered materials, and gaps within categories of investigative records. EFTA00066352 reflects litigation-hold evidence bearing upon preservation issues. Additional disclosures reflect records that were subsequently recovered notwithstanding prior assumptions concerning their availability, including Recarey-related materials. The record also reflects gaps within portions of the EFTA production sequence, raising additional questions concerning record completeness. These matters bear directly upon the practical ability of the defense to identify and litigate claims during the underlying proceedings.

The same principle applies to records bearing upon prior institutional reviews. The newly disclosed materials raise questions concerning the completeness of factual assumptions underlying portions of OPR's analysis. OPR III proceeded in part from the understanding that certain participants possessed only publicly available information. Materials subsequently disclosed through the EFTA process appear difficult to reconcile with that premise and reflect access to information that was not publicly available, including materials relating to Acosta and the Ragsdale correspondence. Whether those disclosures ultimately affect the conclusions reached by OPR is not the immediate issue. Their significance lies in demonstrating that important factual information was unavailable to the defense and, in certain respects, unavailable to prior reviewers.

The Government's procedural-default theory also assumes that the passage of time has not materially affected Petitioner's ability to investigate the newly disclosed evidence. The record suggests otherwise. Several categories of evidence concern events that occurred many years ago. Witnesses are no longer available. Memories have faded. Records have been lost, recovered, reconstructed, or remain incomplete. Certain investigative opportunities that would have existed had the information been disclosed contemporaneously can no longer be recreated. The prejudice resulting from delayed disclosure therefore extends beyond the contents of individual documents and includes the loss of investigative opportunities that accompanied the passage of time.

That prejudice is particularly significant where the newly disclosed evidence bears upon witness credibility, investigative chronology, agency relationships, federal knowledge, preservation practices, Brady possession, and the implementation and interpretation of the NPA. Had those materials been available during the underlying proceedings, they would have informed investigative decisions, witness examinations, evidentiary litigation, impeachment strategies, and appellate arguments. The Court need not determine at this stage precisely how those proceedings would have unfolded. It is sufficient that the newly disclosed record raises substantial questions regarding how the defense would have approached the case had the information been available.

The Government's procedural-default analysis ultimately depends upon a view of the record that no longer exists. The Court now possesses evidence that was unavailable to the defense, unavailable to appellate counsel, and unavailable to prior reviewing courts. The existence of that evidence bears directly upon both cause and prejudice and substantially undermines the premise upon which the Government's procedural-default argument depends.

15

THE GOVERNMENT'S DELAY RESULTED IN THE LOSS OF EVIDENCE, WITNESS MEMORY, AND INVESTIGATIVE MATERIALS THAT CAN NO LONGER BE RECONSTRUCTED

The Government repeatedly analyzes the newly disclosed EFTA materials as though the only prejudice suffered by Petitioner consists of the contents of the records that ultimately emerged. That approach ignores the most significant consequence of delayed disclosure. The prejudice resulting from delayed disclosure includes not only evidence eventually produced, but also evidence that has been lost, destroyed, rendered unavailable, or made impossible to reconstruct because disclosure occurred years after it should have occurred.

The newly disclosed record demonstrates a recurring pattern of unavailable records, missing investigative memoranda, faded witness recollections, incomplete files, and evidentiary gaps that did not exist when the underlying events occurred. Had the information now disclosed through the EFTA process been available during the original proceedings, Petitioner could have pursued investigative avenues that are now permanently foreclosed.

The Parkinson materials provide a significant example. The newly disclosed record establishes that Parkinson-related investigative activity formed part of the broader historical record. By the time the relevant information became available, however, years had passed. Witnesses had died, memories had faded, records had become more difficult to locate, and contemporaneous investigative opportunities had been lost.

The Acosta materials provide a second example. EFTA00009224 reflects efforts to locate, reconstruct, and review records relating to the NPA and associated Department activity. Those materials are significant because they bear directly upon the scope of immunity contemplated by participants in the negotiation process, including evidence concerning what multiple records describe as blanket transactional immunity extending to alleged co-conspirators. The passage of time has deprived Petitioner of investigative opportunities that existed years earlier but may now be impossible to recreate.

The Villafaña materials reveal similar prejudice. EFTA00225084 reflects Villafaña's inability to identify or account for all victim-related meetings associated with the investigation. The Government itself acknowledges the existence of at least one meeting for which no notes, FD-302, or comparable memorialization has been identified. The significance of this omission extends beyond the missing document itself. Because disclosure occurred years later, Petitioner has been deprived of any meaningful opportunity to investigate the circumstances of the meeting while memories remained fresh and supporting documentation remained available.

The newly disclosed record further reveals investigative activity for which corresponding records appear to be missing. EFTA00191203 reflects a meeting involving Jane Doe 1 on October 26, 2007. Yet no corresponding FD-302 appears within Petitioner's discovery. Likewise, HO012162 reflects a communication involving Wexner for which no corresponding notes or investigative memorandum have been identified. These omissions are not isolated. Rather, they form part of a broader pattern demonstrating that investigative activity occurred outside the universe of materials disclosed to the defense.

16

The prejudice is compounded by evidence relating to ▮▮▮▮ The Government does not dispute that ▮▮▮▮ reached a settlement with Epstein. Villafaña interviewed ▮▮▮▮ and maintained victim-specific files relating to the Jane Does. EFTA00194822, EFTA00194824, EFTA00194830, and EFTA00194831 reflect the existence of such files. Significant portions of those materials were not disclosed to the defense. The delayed disclosure deprived Petitioner of the opportunity to investigate prior statements, evaluate inconsistencies, develop impeachment evidence, and challenge witness credibility at a time when such investigation remained possible.

The prejudice resulting from delayed disclosure therefore extends beyond the contents of individual documents. It includes the loss of investigative opportunities, the degradation of witness memory, the disappearance of records, and the inability to reconstruct historical events that could have been examined had disclosure occurred when constitutionally required. The cumulative effect of the delay is profound. The Government now asks the Court to evaluate Petitioner's claims based upon a record shaped by years of suppression, missing documents, unavailable witnesses, faded memories, incomplete files, and the death of a central participant. Brady does not permit the Government to benefit from the consequences of delayed disclosure. Under Leka, DiSimone, *DiSimone v. Phillips*,461 F.3d 181 (2d Cir. 2006 Banks, Strickler, and Kyles v. Whitely, Kyles v. Whitley,
514 U.S. 419 (1995), prejudice includes the investigative opportunities lost because favorable evidence was not disclosed when it could still be effectively used.

Kyles Rejects the Government's Compartmentalized Approach.  The Government's position is particularly difficult to reconcile with Kyles v. Whitley. Kyles recognizes that prosecutors have a duty to learn of favorable evidence known to others acting on the Government's behalf in the case. That principle reflects practical reality. Modern criminal investigations are rarely conducted by a single prosecutor working in isolation. Investigations involve agents, analysts, supervisors, cooperating offices, specialized units, and other participants who collectively contribute to the development of evidence. The newly disclosed record demonstrates precisely such cooperation. The EFTA materials reveal participation by CEOS personnel, Main Justice officials, OPR investigators, Southern District of Florida participants, Villafaña, Parkinson-related investigators, and numerous others. The Government nevertheless attempts to treat each participant as though he or she operated within an isolated informational silo. Kyles rejects that approach.

## POINT III

## THE GOVERNMENT'S ANALYSIS OF THE NPA, OPR, ACOSTA, PARKINSON, AND EFTA MATERIALS DEPENDS UPON THE PREMISE THAT THE HISTORICAL RECORD IS SUBSTANTIALLY COMPLETE

The Government's analysis of the newly disclosed materials proceeds from the premise that the historical record concerning the Epstein investigation, the NPA, and subsequent Department

17

review is substantially complete. The post-trial disclosures raise substantial questions concerning that premise.

The significance of the newly disclosed record does not depend upon any single document. Rather, the disclosures collectively reveal a historical record that is more extensive, more interconnected, and less complete than previously understood. The materials include records concerning Department review of the NPA, OPR investigations, Main Justice participation, CEOS involvement, Villafaña materials, Parkinson-related records, preservation issues, litigation-hold evidence, and additional investigative activity that was unavailable during trial and direct appeal.

Several disclosures bear directly upon the completeness of prior institutional reviews. OPR materials now available through the EFTA process appear difficult to reconcile with factual assumptions reflected in portions of earlier Department analysis. For example, OPR III proceeded from the understanding that certain participants possessed only publicly available information. Materials subsequently disclosed through the EFTA process reflect access to information that was not publicly available, including records concerning Acosta, the Ragsdale correspondence, and related matters. These disclosures do not merely supplement the historical record. They raise questions concerning the factual foundation upon which earlier evaluations were conducted.

The newly disclosed materials likewise bear upon the completeness of the documentary record itself. EFTA00066352 reflects litigation-hold evidence relevant to preservation issues. Additional disclosures concern records that were subsequently recovered notwithstanding prior assumptions concerning their availability, including Recarey-related materials reflected in EFTA01249718. Other portions of the production reflect gaps within categories of investigative records and gaps within portions of the EFTA sequence itself. Considered collectively, these disclosures raise questions concerning record preservation, record retention, and the completeness of the materials available to investigators, reviewers, and the defense.

The newly disclosed record further raises questions concerning the completeness of investigative files relied upon during subsequent Department review. Several EFTA disclosures reflect investigative activity, victim meetings, witness contacts, and communications for which corresponding investigative memoranda, FD-302s, interview notes, or supporting documentation have not been identified.

EFTA00191203 is particularly significant. That record reflects a meeting involving Jane Doe 1 on October 26, 2007. Yet Petitioner has not identified a corresponding FD-302, interview memorandum, or equivalent investigative record documenting the substance of the meeting. The significance of this omission extends beyond the absence of a single document. It raises questions concerning the completeness of investigative files available to later reviewers and the extent to which all relevant victim-related materials were preserved.

The newly disclosed record contains similar examples. HO012162 reflects a communication involving Leslie Wexner for which no corresponding investigative memorandum, FD-302, or formal interview record has been identified. The absence of documentation relating to

18

investigative activity involving an individual of such significance further illustrates Petitioner's concern that the historical record available to later reviewers may not have been complete.

The ██████ files raise related concerns. EFTA00194822, EFTA00194824, EFTA00194830, and EFTA00194831 reflect the existence of victim-specific materials relating to ██████ and associated investigative activity. The existence of those files demonstrates that additional victim-related information existed outside the universe of materials disclosed to the defense. The significance of these materials is amplified by the fact that ██████ reached a settlement with Epstein and was interviewed by Villafaña. Those circumstances bear directly upon witness credibility, witness development, investigative chronology, and impeachment.

The significance of the ██████ materials extends beyond the existence of additional files. ██████ occupied a unique position within the broader Epstein chronology because she entered into a settlement with Epstein, maintained interactions with investigators, and was interviewed by Villafaña. Those circumstances made her files particularly relevant to issues of witness development, witness credibility, prior statements, investigative chronology, and impeachment.

The newly disclosed materials demonstrate that victim-specific information existed outside the universe of records disclosed to the defense. Had these materials been available during the Maxwell proceedings, the defense could have investigated the extent of ██████ interactions with federal personnel, evaluated prior statements, explored inconsistencies, examined the impact of settlements and related communications, and assessed the manner in which witness narratives developed over time.

The significance of these materials is magnified when considered together with the therapist-related disclosures, the Villafaña materials, and the broader evidence concerning witness-development efforts reflected throughout the EFTA production. Viewed collectively, the ██████ files contribute to a materially different understanding of the historical record than the one available to the defense during trial and direct appeal.



The newly disclosed record also raises questions concerning witness development and the completeness of information available to the defense regarding witness ██████████. The newly available evidence indicates that information, assistance, or evidentiary support was provided to ██████ in exchange for consideration offered by the Government, yet the defense was not provided with the full extent of that information during the Maxwell proceedings. Further the evidence regarding ██████████ supports the Affidavit of ██████ ██████ in which she states ██████████ evidence was coerced.

The significance of these disclosures extends beyond impeachment. Evidence reflecting benefits, consideration, inducements, or assistance provided to a witness bears directly upon credibility, motive, bias, and the jury's assessment of reliability. Such information is particularly significant where the witness's account formed part of the broader evidentiary narrative presented to the jury.

The newly disclosed materials also bear upon the chronology of the investigation itself. The Government has previously maintained that the relevant investigation commenced in November

19

2018. The newly available evidence supports a materially different timeline and indicates that investigative activity began in or about January 2018. This discrepancy is significant because investigative chronology informs the Court's analysis of witness development, information gathering, federal knowledge, and the sequence through which evidence was assembled and presented.

The Court has not previously evaluated these disclosures as part of a complete factual record. Considered together, the evidence relating to ████████████ raises additional questions concerning witness development, investigative chronology, disclosure obligations, and the completeness of the historical record relied upon during later Department review.

The newly disclosed record further includes Government admissions made during the CVRA litigation concerning Jane Doe 1 and Jane Doe 2. EFTA00191203 reflects four admissions made by the Government in that litigation that were not disclosed to the defense during the Maxwell proceedings. The significance of those admissions extends beyond the CVRA litigation itself. They demonstrate that relevant information concerning individuals central to the broader Epstein investigation existed outside the record available to the defense and outside the evidentiary framework through which the Maxwell prosecution was litigated.

The significance of these disclosures is not limited to any single missing memorandum, interview report, or investigative file. The newly disclosed record reveals a recurring pattern in which investigative activity is reflected in one source, while the corresponding documentation is absent, incomplete, reconstructed years later, or otherwise unavailable.

This pattern appears in the Jane Doe materials, the ████████ files, the Wexner communications, the Acosta reconstruction records, and the recovered Recarey materials. Considered individually, each omission might be characterized as an isolated recordkeeping issue. Considered collectively, however, the disclosures raise a broader question concerning the completeness of the historical record available to investigators, Department reviewers, appellate counsel, and the defense.

The Government frequently evaluates these omissions in isolation. The Court's inquiry is broader. The relevant question is whether the cumulative effect of missing records, reconstructed records, recovered evidence, absent memorializations, and newly disclosed files supports confidence that the historical record is complete. The newly disclosed materials raise substantial questions concerning that premise.

Viewed collectively, the missing interview memoranda, absent FD-302s, victim-specific files, Wexner-related communications, and undisclosed Government admissions raise substantial questions concerning the completeness of the historical record available to investigators, Department reviewers, appellate counsel, and the defense.

The Wexner-related materials provide an additional illustration of the record-completeness concerns presented by the newly disclosed evidence. HO012162 reflects a communication involving Leslie Wexner that appears to have generated no corresponding FD-302, investigative memorandum, interview report, or comparable memorialization.

The significance of this omission lies not in the substance of any single communication, but in what it reveals about the limitations of the historical record. The Court is confronted with evidence that investigative activity occurred, communications took place, and information was exchanged, yet the corresponding investigative documentation is absent. Such omissions make it difficult to determine what information investigators possessed, how that information was evaluated, and whether it was incorporated into subsequent reviews.

The concern is not limited to HO012162. The newly disclosed record contains multiple examples in which investigative activity is reflected in one document but corresponding memorialization has not been identified. The Jane Doe 1 meeting reflected in EFTA00191203 provides one example. The Wexner communication provides another. These omissions reinforce Petitioner's contention that the historical record available to later reviewers may not have been complete.

Additional Wexner-related materials, including HO012188, HO012576, and HO012593, further demonstrate that relevant information existed outside the universe of records available to the defense. Considered collectively, these materials raise substantial questions concerning record preservation, record retention, investigative documentation, and the completeness of the factual record underlying later Department reviews.

The Government's analysis frequently assumes that the absence of a record establishes the absence of the underlying event. The newly disclosed materials caution against that assumption. Several disclosures reflect investigative activity, communications, meetings, and review processes that were not apparent from the record available during the underlying proceedings. The significance of those disclosures lies not merely in the contents of newly located documents, but in what they reveal about the limitations of the historical record previously available to the defense and the Court.

A. THE NEWLY DISCLOSED NPA MATERIALS REFLECT CONTINUING DEPARTMENT REVIEW AND RAISE UNRESOLVED QUESTIONS CONCERNING THE SCOPE, IMPLEMENTATION, AND UNDERSTANDING OF THE AGREEMENT

The Government's analysis of the NPA largely proceeds from the premise that the relevant facts concerning the agreement are already known and that subsequent disclosures add little of significance to the historical record. The post-trial disclosures raise substantial questions concerning that premise.

The Villafaña materials provide multiple examples of continuing interaction between federal personnel and attorneys representing victims. Those interactions are relevant not merely because they demonstrate communication, but because they bear directly upon the practical availability

of information and the extent to which information flowed among participants involved in the broader effort to challenge the NPA and pursue related litigation.

EFTA00224991, EFTA00225084, and EFTA00225483-EFTA00225540 reflect the Ragsdale correspondence and provide evidence bearing upon Villafaña's understanding of the NPA, her reluctance to support or sign the agreement, and her cooperation with attorneys representing victims in efforts directed toward challenging it. These materials demonstrate that interactions between federal personnel and plaintiffs' counsel extended beyond isolated communications and instead formed part of a continuing pattern of engagement concerning the consequences and implementation of the agreement.

EFTA00211693 provides additional evidence of the familiarity and working relationship between Villafaña and plaintiffs' counsel. Although the document concerns the so-called stolen globe incident, its significance lies in what it reveals about the nature of the relationship itself. The disclosure reflects a level of cooperation and continuing interaction inconsistent with the Government's effort to characterize these relationships as episodic, incidental, or institutionally remote.

These disclosures must be considered together with evidence that Villafaña assisted plaintiffs' counsel in locating victims, EFTA00225046; communicated regarding efforts to seek federal charges, EFTA02759069; participated in communications giving rise to concerns regarding allegations of misconduct, EFTA00190473; and engaged in continuing interactions involving Sharon Churcher and related participants. Considered collectively, the newly disclosed record reflects a level of interaction and information sharing that bears directly upon the Court's analysis of practical availability, agency relationships, and Brady possession.

The newly disclosed materials reflect that the NPA continued to receive attention at multiple levels of the Department long after its execution. The disclosures include records concerning OPR review, Main Justice participation, CEOS involvement, Acosta-related materials, Parkinson-related records, and additional communications bearing upon the Department's understanding of the agreement and its consequences. Collectively, these materials reveal a level of continuing institutional review that was not apparent from the record available during the underlying proceedings.

The significance of these disclosures is not limited to the legal interpretation of the NPA. Rather, the materials bear upon how Department personnel understood the agreement, how they evaluated its implementation, what information was available during subsequent reviews, and what investigative activity occurred following execution of the agreement. Those questions are relevant because the Government's current position depends in substantial part upon assumptions regarding federal knowledge, institutional understanding, and the completeness of the historical record.

The post-trial disclosures further demonstrate that review of the NPA was not confined to a single office or district. The materials reflect the involvement of multiple Department

components and reveal communications among participants who were evaluating the agreement, its consequences, and related investigative issues. These disclosures bear directly upon Petitioner's contention that information concerning the NPA, its implementation, and its practical effect cannot be analyzed solely through the lens of the trial record.

The newly disclosed Acosta materials are particularly significant in this regard. They provide information concerning matters that were unavailable to the defense during the underlying proceedings and bear upon the factual assumptions underlying later Department reviews. Whether those materials ultimately support Petitioner's interpretation of the NPA is not the immediate question. Their significance lies in demonstrating that important evidence bearing upon the agreement remained unavailable while the relevant claims were being litigated.

The Acosta materials are significant for an additional reason. EFTA00009224 reflects efforts undertaken years later to locate, reconstruct, review, and account for records relating to the NPA and associated Department activity. The existence of reconstruction efforts is itself probative. Reconstruction becomes necessary only where the underlying historical record is incomplete, unavailable, or no longer capable of being reviewed in its original form.

The significance of these materials extends beyond record preservation. The Acosta files bear directly upon the scope of immunity contemplated during the NPA negotiations and the extent to which participants understood the agreement to provide broad protection extending beyond Epstein himself. Multiple records within the broader Acosta universe reference what participants described as blanket transactional immunity for alleged co-conspirators. Whether that understanding ultimately reflects the correct legal interpretation of the agreement is not the issue presently before the Court. The significance of the records lies in demonstrating that important evidence concerning the contemporaneous understanding of the NPA existed outside the record available to the defense during trial and direct appeal.

The reconstruction effort reflected in EFTA00009224 also underscores a broader point. The Government's opposition frequently proceeds as though the historical record concerning the NPA is fixed, complete, and fully understood. The newly disclosed Acosta materials suggest otherwise. The need to reconstruct portions of the record years later demonstrates that the historical record has continued to evolve and that assumptions concerning completeness should be approached with caution.

The newly disclosed record further includes evidence concerning positions taken by the Government during the CVRA litigation that were not disclosed to the defense during the Maxwell proceedings. EFTA00191203 reflects four admissions made by the Government concerning Jane Doe 1 and Jane Doe 2 in the course of that litigation.

The significance of these admissions extends beyond the CVRA proceedings themselves. The admissions concern individuals central to the broader Epstein investigation and therefore bear directly upon the historical record surrounding the NPA, victim-related issues, federal knowledge, and subsequent Department review. Had these admissions been available during the Maxwell proceedings, the defense would have been entitled to evaluate their significance,

23

investigate the underlying facts, and determine their relevance to witness credibility, investigative chronology, and the Government's understanding of the relevant events.

The Government's present position assumes that the historical record available to the defense was substantially complete. EFTA00191203 undermines that premise. The existence of undisclosed Government admissions in related litigation demonstrates that relevant factual information existed outside the record available to trial counsel, appellate counsel, and the Court.

The significance of these admissions is magnified when considered alongside the other newly disclosed materials, including Acosta records, OPR materials, Parkinson-related records, Villafaña files, and the Ragsdale correspondence. Collectively, these disclosures reveal that substantial categories of information relevant to the broader Epstein investigation existed beyond the evidentiary universe available to the defense.

The same is true of the Parkinson-related materials. The newly disclosed record reflects continuing Department attention to issues arising from the NPA and related investigative activity. Those disclosures contribute to a broader evidentiary picture in which the historical record appears substantially more extensive than previously understood.

Viewed collectively, the NPA-related disclosures do not present a closed historical record. They reveal continuing review, continuing institutional involvement, and continuing questions concerning the scope, implementation, and understanding of the agreement. At a minimum, those materials warrant further factual development before the Court accepts the Government's contention that the relevant facts concerning the NPA are already settled.

## B. THE NEWLY DISCLOSED RECORD RAISES QUESTIONS CONCERNING THE COMPLETENESS OF PRIOR DEPARTMENT REVIEWS

The Government's analysis frequently relies upon conclusions reached during prior Department reviews as though the factual foundations underlying those reviews were fixed and complete. The post-trial disclosures raise substantial questions concerning that premise.

The significance of the newly disclosed record lies not merely in the existence of additional documents. Rather, the disclosures provide information bearing upon what reviewers knew, what information was available to them, what assumptions guided their analyses, and whether the factual record upon which they relied was complete. Those issues are particularly important where the Government relies upon prior institutional reviews to support its current position.

The OPR materials illustrate the point. OPR III proceeded, at least in part, from the understanding that certain participants possessed only publicly available information. The newly disclosed record appears difficult to reconcile with that premise. Materials now available through the EFTA process reflect access to information that was not publicly available, including records relating to Acosta, the Ragsdale correspondence, and other information unavailable to the public.

24

These disclosures do not merely add detail to the historical record. They raise questions concerning the factual assumptions upon which portions of the prior review were conducted.

The significance of this issue extends beyond any individual participant. If a review proceeds from an incomplete understanding of the information available to key actors, the reliability of conclusions drawn from that understanding necessarily warrants further examination. The newly disclosed materials therefore bear not only upon the underlying events themselves but also upon the completeness of subsequent efforts to evaluate those events.

The same concerns arise from the newly disclosed Acosta, Parkinson, and related Department materials. Collectively, those records reveal a broader and more extensive pattern of review than was apparent from the record available during the underlying proceedings. They further reflect the involvement of multiple Department components and the consideration of issues extending beyond the materials previously available to the defense.

The newly disclosed record also raises questions concerning preservation practices and record completeness. EFTA00066352 reflects evidence relating to litigation-hold issues. Additional disclosures concern records that were subsequently recovered notwithstanding prior assumptions concerning their availability, including Recarey-related materials reflected in EFTA01249718. These disclosures are significant not only because of their contents but because they demonstrate that the historical record itself has continued to evolve.

The Reiter materials raise similar concerns. Those disclosures reflect information that was not available during the underlying proceedings and bear upon issues that later became the subject of Department review. Their existence further illustrates the extent to which important evidence remained outside the record available to the defense, appellate counsel, and prior reviewing courts.

Questions concerning record completeness are reinforced by gaps within categories of investigative materials and gaps appearing within portions of the EFTA production sequence. The existence of such gaps does not establish misconduct, nor does Petitioner contend otherwise. It does, however, undermine any suggestion that the historical record has reached a point of completeness sufficient to permit confident resolution of every factual dispute raised by the Petition.

Taken together, the newly disclosed materials reveal a historical record that is broader, more complex, and less complete than previously understood. They raise questions concerning the factual foundations underlying prior Department reviews, the completeness of investigative materials, the preservation of records, and the availability of information to both reviewers and the defense. Those questions bear directly upon the reliability of the Government's current analysis and support further factual development before the Court resolves the merits of Petitioner's claims.

The newly disclosed record also raises questions concerning preservation practices and record completeness. EFTA00066352 reflects litigation-hold evidence bearing upon the preservation of records relevant to later Department review. Additional disclosures concern evidence recovered

25

after prior assumptions concerning its availability had proven inaccurate. Most notably, Reiter materials reflect the recovery of evidence from Recarey's apartment after Recarey's death. EFTA01249718. The significance of that disclosure lies not merely in the contents of the recovered evidence, but in what it demonstrates regarding the evolving nature of the historical record itself. Materials previously believed unavailable were later located and recovered, thereby calling into question assumptions regarding the completeness of the record available to investigators, reviewers, the defense, and prior courts.

Questions concerning record completeness are further reinforced by gaps within categories of investigative materials and gaps appearing within portions of the EFTA production sequence, including EFTA02742044-EFTA02742183. The existence of such gaps does not itself establish misconduct. It does, however, caution against treating the present record as complete and supports Petitioner's contention that further factual development remains necessary.

The newly disclosed record raises a related concern. Several Department reviews proceeded from assumptions regarding what information was available to particular participants and what sources informed their understanding of relevant events. The post-trial disclosures call some of those assumptions into question.

OPR III proceeded, at least in part, from the understanding that JKB possessed only publicly available information. The newly disclosed record raises questions concerning that premise. See Original Petition at 8 n.7. Materials produced through the EFTA process reflect access to non-public information, including the Ragsdale correspondence, EFTA00225483-EFTA00225540, together with Acosta-related materials and other records unavailable to the public. These disclosures bear directly upon the factual assumptions underlying portions of OPR's analysis and raise questions concerning whether reviewers possessed a complete understanding of the information available to relevant participants.

The significance of this issue extends beyond any individual document. If a review proceeds from an incomplete understanding of the information available to key actors, the reliability of conclusions drawn from that understanding necessarily warrants further examination. The question presented is not whether OPR ultimately reached correct or incorrect conclusions. Rather, the question is whether the factual record upon which those conclusions rested was as complete as later disclosures suggest it should have been.

The newly disclosed Acosta, Parkinson, OPR, CEOS, and Main Justice materials similarly reveal a broader pattern of institutional review than was apparent from the record available during the underlying proceedings. Collectively, these materials reflect continuing Department attention to issues arising from the NPA, subsequent investigative activity, and the handling of information relating to Epstein and associated investigations. The disclosures therefore bear not only upon the underlying events themselves but also upon the scope and completeness of later efforts to evaluate those events.

The Government's analysis depends in substantial part upon the reliability of prior Department reviews. The post-trial disclosures do not require the Court to reject those reviews. They do, however, provide a basis for questioning whether the factual record available to those reviewers

26

was complete. That question assumes particular importance where newly disclosed records reveal non-public information, recovered evidence, preservation issues, and additional investigative materials that were unavailable to both the defense and prior reviewing bodies.

## C. THE NEWLY DISCLOSED RECORD RAISES QUESTIONS CONCERNING AGENCY RELATIONSHIPS, INFORMATION SHARING, AND THE PRACTICAL AVAILABILITY OF INFORMATION

The Government's analysis of possession, access, and disclosure obligations depends substantially upon the premise that information held by various participants remained institutionally separate and therefore outside the practical reach of the prosecution team. The newly disclosed record raises substantial questions concerning that premise.

The post-trial disclosures reflect relationships among federal prosecutors, investigators, Department personnel, therapists, victims' counsel, and other participants extending across multiple years and multiple jurisdictions. These materials bear directly upon the practical flow of information among individuals involved in the broader investigative effort and therefore inform the Court's analysis of possession, access, and disclosure obligations.

Particularly significant are records reflecting continuing interactions involving therapists, federal personnel, and plaintiffs' attorneys over an extended period of time. See EFTA00190574; EFTA01650808; EFTA00153657; EFTA01650809. These disclosures do not establish the ultimate scope of any particular relationship. They do, however, reflect channels of communication and continuing interactions that are difficult to reconcile with an analysis premised upon rigid institutional separation. The therapist-related materials are significant not merely because they reflect communications among participants. They bear upon the development of witness narratives, the flow of information among participants, and the continuity of relationships extending across multiple years, multiple jurisdictions, and multiple proceedings.

The newly disclosed record includes therapist-related communications reflected in EFTA00190574, EFTA01650808, EFTA00153657, and EFTA01650809. These materials suggest continuing interaction among federal personnel, therapists, victims' counsel, and other participants involved in matters relating to Epstein and associated litigation. The significance of these disclosures lies not in any single communication but in the broader pattern they reveal.

When considered alongside the Villafaña materials, the Ragsdale correspondence, the Sharon Churcher communications, and the evidence concerning plaintiffs' counsel, the therapist records support Petitioner's contention that information moved through a network of participants whose relationships were more extensive and more enduring than the Government's opposition suggests. These disclosures therefore bear directly upon practical availability, information sharing, witness development, and the Court's analysis of Brady possession.

The newly disclosed record further reflects that Villafaña's involvement extended beyond traditional investigative functions. The EFTA materials reveal continuing interaction with attorneys representing victims, participation in matters relating to the CVRA litigation,

27

communications concerning efforts to pursue federal charges, and involvement in activities directed toward challenging or revisiting the consequences of the NPA.

The newly disclosed record also includes evidence bearing upon the relationship between plaintiffs' counsel and potential witnesses. EFTA00145606-EFTA00145607 reflects an article authored by ███████████ in which she states that attorney David Boies agreed to represent her only if she provided a deposition for ███████████████.

The significance of this disclosure does not depend upon the ultimate accuracy of every assertion contained within the article. Rather, the record bears upon issues of witness development, incentives, litigation strategy, and the relationships among participants involved in the broader effort to pursue claims arising from the Epstein matter. From the perspective of the present Petition, the disclosure is relevant because it reflects information bearing upon witness-related issues that was unavailable to the defense during the Maxwell proceedings.

When considered together with the Villafaña materials, the therapist communications, the Ragsdale correspondence, the Sharon Churcher evidence, and the records concerning plaintiffs' counsel, EFTA00145606-EFTA00145607 contributes to a broader factual picture concerning the interaction of participants whose activities intersected across multiple proceedings and over an extended period of time.

The significance of this evidence does not depend upon any allegation of misconduct. Rather, it bears upon the practical realities of information sharing, the flow of information among participants, and the extent to which relevant information remained available to individuals involved in the broader effort to revisit issues arising from the NPA. The record reflected in EFTA00190604, EFTA02759069, EFTA00190473, EFTA00224991, EFTA00225084, EFTA00225483-EFTA00225540, EFTA00225046, EFTA00206277, EFTA00206285, and EFTA00211693 demonstrates continuing interaction among participants whose activities cannot be understood solely through formal organizational boundaries.

These disclosures are significant because the Government's opposition frequently relies upon formal distinctions among agencies, offices, and participants. The newly disclosed record reflects a more integrated factual picture in which information, participants, and investigative efforts repeatedly intersected over an extended period of time.

The significance of these disclosures is heightened by the chronology reflected in the record. The materials span a period extending from approximately 2008 through 2021 and involve participants associated with SDNY, SDFL, and attorneys representing victims in related civil litigation. The record therefore reflects continuing interaction among individuals and institutions whose relationships bear directly upon questions of information sharing, investigative coordination, witness development, and practical access to information.

The newly disclosed Villafaña materials provide additional context. Those records reflect communications and interactions involving federal personnel and attorneys representing victims in civil litigation. See, e.g., EFTA00190604; EFTA02759069; EFTA00190473; EFTA02766464; EFTA00206183; EFTA00225046; EFTA00206294-EFTA00206296; EFTA00206277; EFTA00206285. The significance of these disclosures lies not in any single communication. Rather, the materials collectively reflect a degree of interaction and coordination that bears directly upon the Government's characterization of institutional boundaries and access to information.

For example, the record reflects communications concerning the filing of proceedings relating to the NPA, communications regarding requests that federal charges be pursued, communications reflecting concern regarding potential allegations of misconduct, assistance provided in locating witnesses, and interactions occurring in temporal proximity to investigative activity undertaken by federal authorities. The Court need not resolve the significance of each communication at this stage. It is sufficient that the newly disclosed record reveals relationships and interactions that warrant further factual development.

The Government's position depends in substantial part upon the proposition that records maintained by other districts, agencies, participants, or associated actors remained beyond the practical reach of the prosecution team. The newly disclosed materials do not conclusively establish the opposite proposition. They do, however, raise substantial questions concerning the extent of information sharing, coordination, and practical access among participants involved in the broader investigative effort.

Those questions are particularly important because Brady obligations are not determined solely by organizational charts or formal lines of authority. The inquiry necessarily requires consideration of how information actually moved among participants, what information was available in practice, and the extent to which investigators, prosecutors, and related actors operated with access to shared information. The newly disclosed record bears directly upon those issues and further demonstrates why the Government's possession analysis cannot be resolved solely through abstract descriptions of institutional structure.

Accordingly, the post-trial disclosures provide additional support for Petitioner's request for further factual development concerning agency relationships, information sharing, investigative coordination, and the practical availability of information relevant to the prosecution and defense.

## D. THE NEWLY DISCLOSED RECORD RAISES QUESTIONS CONCERNING THE IDENTIFICATION, PRESERVATION, AND DISCLOSURE OF POTENTIALLY FAVORABLE EVIDENCE

The Government's opposition depends in substantial part upon the premise that potentially favorable information was adequately identified, preserved, reviewed, and disclosed during the underlying proceedings. The post-trial disclosures raise substantial questions concerning that premise.

29

A recurring theme throughout the newly disclosed record concerns the completeness of the Government's review process. Prior to trial, the Court entered an order pursuant to Rule 5(f) and the Due Process Protections Act reminding the Government of its continuing Brady obligations and directing the Government to seek favorable information from participants involved in the investigation and prosecution. Notwithstanding those obligations, the Government subsequently acknowledged that its disclosure review did not include search terms directed to NPA-related materials and that repositories had not been searched for communications concerning the NPA. Dkt. 239 at 5.

The significance of that admission is not limited to the NPA itself. Rather, it bears upon the methodology employed to identify potentially favorable evidence. If categories of information were not searched for, the Court cannot simply assume that potentially favorable materials within those categories were identified, reviewed, and evaluated during the disclosure process.

The newly disclosed record further raises questions concerning preservation and record retention. EFTA00066352 reflects litigation-hold evidence bearing upon preservation issues relevant to later Department review. The significance of that disclosure extends beyond the contents of any individual document. Preservation obligations exist precisely because the integrity of later review depends upon the availability of underlying records. Evidence bearing upon litigation-hold practices therefore informs the Court's evaluation of record completeness and disclosure reliability.

The post-trial disclosures likewise include evidence recovered after prior assumptions concerning availability had proven inaccurate. Reiter materials reflect the recovery of evidence from Recarey's apartment after Recarey's death. EFTA01249718. The significance of that disclosure lies not merely in the recovered evidence itself, but in what it demonstrates concerning the evolving nature of the historical record. Materials previously believed unavailable were later located and recovered, thereby undermining assumptions regarding the completeness of the record available to investigators, reviewers, the defense, and prior courts.

Questions concerning record completeness are reinforced by gaps appearing within categories of investigative materials and within portions of the EFTA production sequence itself, including EFTA02742044-EFTA02742183. Petitioner does not contend that the existence of such gaps independently establishes misconduct. The gaps are significant because they caution against treating the current record as complete while simultaneously arguing that no further factual development is warranted.

The newly disclosed record also reflects information that was unavailable during earlier Department reviews and unavailable to the defense during trial and direct appeal. Materials concerning OPR review, Acosta, the Ragsdale correspondence (EFTA00225483-EFTA00225540), Main Justice participation, CEOS involvement, Villafaña communications, and related investigative activity collectively demonstrate that important categories of information continued to emerge long after the conclusion of the underlying proceedings.

The newly disclosed record further includes the Ragsdale correspondence reflected in EFTA00224991, EFTA00225084, and EFTA00225483-EFTA00225540. These materials bear

30

upon Villafaña's understanding of the NPA, her reluctance to support or sign the agreement, and her cooperation with attorneys representing victims in efforts directed toward challenging the NPA. The significance of these disclosures lies not merely in the views expressed by individual participants, but in what they reveal concerning continuing interaction between federal personnel and plaintiffs' counsel concerning the agreement and its consequences. The correspondence further bears upon factual assumptions underlying subsequent Department reviews and demonstrates that important non-public information existed outside the record available to the defense during the Maxwell proceedings.

The Government's position ultimately depends upon confidence in the completeness of the disclosure process and the historical record upon which that process operated. The post-trial disclosures do not support such confidence. Instead, they reveal litigation-hold issues, recovered evidence, previously unavailable records, gaps within categories of materials, and additional information bearing upon matters central to the Petition. Those disclosures do not resolve the merits of Petitioner's claims. They do, however, provide substantial support for further factual development concerning what information existed, what information was preserved, what information was reviewed, and what information was disclosed.

For these reasons, the newly disclosed record raises substantial questions concerning the adequacy of the identification, preservation, and disclosure processes underlying the Government's current analysis and further demonstrates why summary resolution of Petitioner's claims is inappropriate.

## E. THE GOVERNMENT'S MATERIALITY ANALYSIS DOES NOT ACCOUNT FOR THE CUMULATIVE EFFECT OF THE NEWLY DISCLOSED RECORD

The Government's materiality analysis depends upon evaluating categories of evidence in isolation and asking whether any particular disclosure, standing alone, would have altered the outcome of the proceedings. That approach does not reflect the governing Brady inquiry.

The newly disclosed record does not consist of a single witness statement, a single document, or a single investigative report. Rather, the disclosures concern multiple categories of evidence bearing upon different aspects of the prosecution, the investigation, and subsequent Department review. Those categories include NPA-related materials, OPR records, Acosta materials, Parkinson-related records, Main Justice communications, CEOS involvement, Villafaña materials, therapist-related communications, preservation evidence, recovered records, missing records, and evidence bearing upon the practical availability of information among participants involved in the broader investigative effort.

Viewed individually, the Government characterizes many of these disclosures as immaterial. The difficulty with that approach is that the significance of the newly disclosed record does not arise from any single category of evidence. The significance arises from the manner in which the disclosures reinforce, corroborate, and provide context for one another.

For example, the NPA-related materials do not exist in isolation from the OPR materials. The OPR materials do not exist in isolation from the Acosta and Parkinson records. The Villafaña

31

communications do not exist in isolation from evidence bearing upon investigative coordination and information sharing. Preservation evidence, litigation-hold issues (EFTA00066352), recovered evidence from Recarey's apartment reflected in the Reiter materials (EFTA01249718), and gaps within portions of the EFTA production sequence (EFTA02742044-EFTA02742183) do not merely raise separate questions concerning record retention. They also inform the Court's evaluation of the completeness of the historical record upon which the Government's analysis depends.

Similarly, the disclosures concerning continuing interactions among federal personnel, therapists, and plaintiffs' attorneys reflected in EFTA00190574, EFTA01650808, EFTA00153657, and EFTA01650809 do not merely bear upon agency relationships. They also inform questions concerning information sharing, witness development, practical access to information, and the scope of investigative coordination. Those issues, in turn, bear directly upon the Government's analysis of possession, disclosure obligations, and materiality.

The same cumulative principle applies to the newly disclosed information bearing upon prior Department reviews. OPR III proceeded in part from assumptions concerning the information available to particular participants. The post-trial disclosures, including the Ragsdale correspondence (EFTA00225483-EFTA00225540) and related non-public materials, raise questions concerning those assumptions. Those disclosures are significant not merely because they affect the interpretation of individual documents, but because they bear upon the reliability of the factual framework underlying later institutional review.

The Government's analysis frequently treats each disclosure as though it must independently justify relief. Brady requires a different inquiry. The question is whether the newly disclosed evidence, considered collectively and in light of the entire record, undermines confidence in the reliability of the proceedings. The Court's task therefore is not to evaluate each disclosure in isolation, but to consider the cumulative force of a record that is substantially different from the record available during trial, direct appeal, and prior collateral review.

When viewed collectively, the post-trial disclosures reveal a record reflecting continuing Department review of the NPA, broader institutional participation than previously understood, non-public information unavailable to the defense, evidence bearing upon preservation and record completeness, recovered investigative materials, questions concerning agency relationships and information sharing, and factual issues that were not previously apparent from the trial record. Whether those disclosures ultimately warrant relief is a question for later adjudication. At this stage, however, they substantially undermine the Government's contention that the present record conclusively forecloses relief.

Accordingly, the Court should evaluate the newly disclosed evidence cumulatively rather than category by category and should reject the Government's invitation to resolve disputed factual questions on a fragmented record.

POINT IV

THE GOVERNMENT'S POSSESSION ANALYSIS DEPENDS UPON INSTITUTIONAL BOUNDARIES THAT THE NEWLY DISCLOSED RECORD DOES NOT CONCLUSIVELY SUPPORT

The Government's Brady analysis depends substantially upon the proposition that information maintained by other districts, other Department components, investigators, victims' counsel, or related participants remained outside the possession, custody, or control of the prosecution team. The newly disclosed record raises substantial questions concerning that proposition.

The issue is not whether every participant identified by Petitioner should automatically be deemed part of the prosecution team. Nor is the issue whether every document maintained by another office must automatically be attributed to the prosecutors who tried this case. The issue is whether the institutional boundaries upon which the Government's analysis depends accurately reflect the manner in which information was actually shared, reviewed, and utilized throughout the broader investigative effort.

The post-trial disclosures reveal a more interconnected factual record than the Government's analysis suggests. Communications reflected in the Villafaña materials demonstrate continuing interaction among federal personnel, victims' counsel, investigators, and other participants over an extended period of time. See EFTA00190604; EFTA02759069; EFTA00190473; EFTA02766464; EFTA00206183; EFTA00225046; EFTA00206294-EFTA00206296; EFTA00206277; EFTA00206285.

Those materials include evidence that Villafaña and attorneys representing victims worked together over a period extending back to approximately 2008; communications concerning efforts to challenge the NPA; communications concerning requests that federal charges be pursued; records reflecting concern regarding potential allegations of misconduct; assistance in locating witnesses; and interactions occurring in proximity to investigative activity undertaken by federal authorities. Whether any particular communication ultimately proves Petitioner's claims is not the immediate issue. The significance of the disclosures lies in what they reveal concerning the practical flow of information among participants involved in related investigative and litigation activity.

The therapist-related materials further reinforce that conclusion. EFTA00190574; EFTA01650808; EFTA00153657; and EFTA01650809 reflect continuing interactions involving therapists, federal personnel, and plaintiffs' attorneys across multiple years and multiple jurisdictions. These disclosures bear directly upon questions concerning witness development, information sharing, and the practical availability of information. They are difficult to reconcile with a framework that treats each participant as operating within a wholly separate informational sphere.

The newly disclosed record likewise reflects continuing involvement by multiple Department components, including OPR, CEOS, Main Justice, SDNY, and SDFL. The significance of these

33

disclosures is not that they automatically establish Brady possession. Rather, they undermine any assumption that the relevant information existed exclusively within isolated institutional compartments. The post-trial record instead reflects communication, review, and participation extending across offices, districts, and Department components.

The Government's position ultimately depends upon a formal conception of access that may not correspond to the practical realities reflected in the newly disclosed record. Brady obligations are not evaluated solely by reference to organizational charts. Courts have repeatedly recognized that practical access to information, joint investigative activity, coordinated efforts, and the actual flow of information may bear upon the possession inquiry. The newly disclosed record raises substantial questions concerning each of those considerations.

Those questions are particularly significant because the Government simultaneously relies upon the conclusions of multiple Department reviews, communications among multiple participants, and investigative activity extending beyond a single district while maintaining that information held by related participants remained categorically beyond its reach. The newly disclosed record makes that proposition considerably more difficult to accept without further factual development.

Accordingly, the Court should reject the Government's contention that the possession inquiry may be resolved solely through formal descriptions of institutional structure and should permit further factual development concerning information sharing, agency relationships, practical access, and the flow of information among participants involved in the broader investigative effort.

POINT V

THE GOVERNMENT'S ANALYSIS OF THE VILLAFAÑA MATERIALS IS DIFFICULT TO RECONCILE WITH THE CHRONOLOGY REFLECTED IN THE NEWLY DISCLOSED RECORD

The Government's analysis of the Villafaña materials depends upon treating the disclosed communications and interactions as isolated events of limited significance. The chronology reflected in the newly disclosed record presents a more complex picture.

The Villafaña materials reflect continuing interactions among federal personnel, attorneys representing victims, and other participants extending over a period of years. Those interactions bear directly upon questions concerning information sharing, investigative coordination, witness development, and the practical availability of information relevant to the broader Epstein investigation.

The chronology begins well before the events immediately preceding Petitioner's prosecution. The newly disclosed materials reflect a working relationship between Villafaña and attorneys representing victims dating back to approximately 2008. That history provides important context for later communications reflected in the record.

34

The disclosures further reflect communications concerning efforts to challenge the NPA through proceedings brought under the Crime Victims' Rights Act. EFTA00190604 reflects evidence relevant to the Government's hearsay argument concerning those events. On the same day, additional communications reflected in EFTA02759069 concern requests that federal charges be pursued. The significance of these disclosures lies not merely in the contents of individual communications, but in the contemporaneous interaction among participants pursuing related objectives.

The record also reflects communications demonstrating awareness of the potential implications of those interactions. EFTA00190473 reflects concern regarding allegations of misconduct arising from communications between federal personnel and attorneys representing victims. That concern is significant because it demonstrates contemporaneous recognition that the relationships reflected in the record warranted careful consideration.

Additional disclosures reflect the role of federal personnel in identifying and locating witnesses. EFTA00225046 reflects assistance provided in locating victims. EFTA02766464 further reflects communications concerning the selection of counsel. These materials bear directly upon issues of witness development and investigative coordination.

The chronology reflected in the record becomes particularly significant during the period preceding renewed investigative activity. EFTA00206294-EFTA00206296 reflect meetings involving Villafaña, attorneys representing victims, and journalist Sharon Churcher concerning allegations made by ███████████. EFTA00206277 reflects the opening of an investigation before ██████ subsequent FBI interview. EFTA00206285 reflects the relationship between that investigative activity and issues relevant to ongoing civil litigation.

The newly disclosed record also reflects efforts by attorneys representing victims to obtain information through civil proceedings. EFTA00206183 reflects litigation activity undertaken in connection with discovery efforts involving Epstein-related claims. When viewed together with the remaining Villafaña materials, these disclosures reveal a chronology involving parallel investigative, civil, and advocacy efforts rather than a series of isolated events.

The newly disclosed record also bears upon the understanding and implementation of the NPA by participants involved in subsequent efforts to challenge or revisit the agreement. EFTA00224991 reflects the Ragsdale correspondence and provides evidence that Villafaña did not share the Government's present characterization of the NPA. The record further reflects Villafaña's reluctance to sign the NPA and her cooperation with attorneys representing victims in efforts directed toward challenging the agreement. These disclosures are significant not because they resolve the legal meaning of the NPA, but because they bear directly upon the factual assumptions underlying the Government's contention that the relevant understanding of the agreement is settled and undisputed.

The chronology reflected in the Villafaña materials further includes evidence bearing upon Villafaña's understanding of the NPA and her interactions with attorneys representing victims. EFTA00224991 reflects communications associated with the Ragsdale correspondence and bears upon Villafaña's view of the agreement, her reluctance to sign it, and her cooperation with

35

plaintiffs' counsel concerning efforts to challenge the NPA. These disclosures are relevant because they further demonstrate that the relationships reflected in the newly disclosed record extended beyond isolated communications and instead formed part of a continuing sequence of interactions bearing upon the implementation and interpretation of the agreement.

The Government's approach also conflicts with the Second Circuit's decision in *Leka v. Portuondo*, 257 F.3d 89 (2d Cir. 2001). There, the Court recognized that the value of favorable evidence frequently lies not only in the information itself, but in the opportunities for investigation, witness development, impeachment, and trial preparation that flow from timely disclosure. Brady is not satisfied by a formalistic inquiry into whether a document physically resided within a particular file. Rather, the constitutional inquiry focuses upon whether favorable information was effectively available to the defense in time for meaningful use. The newly disclosed EFTA materials demonstrate that substantial categories of information concerning witness development, investigative activity, agency participation, and NPA-related communications were unavailable to the defense during trial and direct appeal, thereby depriving counsel of the opportunity to pursue investigative leads and litigation strategies that only became apparent after disclosure.

The Court need not determine at this stage the ultimate significance of each communication reflected in the Villafaña materials. The significance of the chronology lies elsewhere. The disclosures collectively reveal continuing interaction among federal personnel, attorneys representing victims, journalists, witnesses, and other participants over an extended period of time. That chronology bears directly upon the Government's characterization of institutional boundaries, information sharing, witness development, and practical access to information.

The Government's position depends upon treating many of these relationships as legally and institutionally distinct. The newly disclosed record does not conclusively establish the opposite proposition. It does, however, reveal a factual record substantially more interconnected than the Government's analysis suggests. At a minimum, the chronology reflected in the Villafaña materials warrants further factual development before the Court resolves questions concerning possession, access, agency relationships, and disclosure obligations.

Accordingly, the Villafaña materials provide additional support for Petitioner's request for discovery, expansion of the record, and an evidentiary hearing concerning the practical flow of information among participants involved in the broader investigative effort.

## POINT VI

## THE GOVERNMENT'S POSSESSION ANALYSIS DOES NOT FULLY ACCOUNT FOR THE PRACTICAL AVAILABILITY OF INFORMATION REFLECTED IN THE NEWLY DISCLOSED RECORD

The Government's Brady analysis proceeds from the proposition that records maintained by other participants, districts, agencies, or Department components necessarily remained outside

36

the possession of the prosecution team. The newly disclosed record raises substantial questions concerning that proposition.

The possession inquiry is not resolved solely by identifying the office in which a document happened to reside. Nor is the inquiry controlled exclusively by formal organizational boundaries. Courts evaluating Brady obligations have repeatedly recognized the relevance of practical access, coordinated activity, information sharing, and the actual relationship among participants involved in a broader investigative effort.

The newly disclosed record bears directly upon those considerations.

As discussed above, the Villafaña materials reflect continuing interactions among federal personnel, attorneys representing victims, journalists, investigators, and witnesses over an extended period of time. EFTA00190604; EFTA02759069; EFTA00190473; EFTA02766464; EFTA00206183; EFTA00225046; EFTA00206294-EFTA00206296; EFTA00206277; EFTA00206285. The significance of these materials lies not merely in the individual communications themselves, but in what they reveal concerning the practical movement of information among participants involved in related investigative activity.

The therapist-related materials similarly bear upon questions of information sharing and witness development. EFTA00190574; EFTA01650808; EFTA00153657; EFTA01650809. These disclosures reflect continuing interactions extending across multiple years and involving participants associated with SDNY, SDFL, federal personnel, therapists, and attorneys representing victims. The existence of such interactions does not itself resolve the possession inquiry. It does, however, bear directly upon the Government's assumption that relevant information remained confined within discrete institutional boundaries.

The newly disclosed record further reflects continuing involvement by multiple Department components, including OPR, CEOS, Main Justice, SDNY, and SDFL. The Government's analysis frequently treats these entities as though their knowledge and records existed in isolation from one another. The post-trial disclosures reveal a more nuanced factual picture. The materials reflect continuing review, communication, and participation extending across multiple offices and multiple stages of the broader investigative effort.

The significance of these disclosures becomes particularly apparent when considered alongside the Government's own reliance upon the conclusions of those same institutional actors. The Government asks the Court to rely upon OPR findings, Department reviews, prosecutorial decisions, and investigative conclusions arising from multiple offices and multiple participants. At the same time, the Government maintains that information possessed by those participants remained categorically outside the reach of the prosecution team. The newly disclosed record raises substantial questions concerning whether those positions can be reconciled.

The Court need not determine at this stage the ultimate scope of Brady possession. Nor must the Court resolve every disputed question concerning agency relationships or practical access to information. The question presently before the Court is narrower. The Court must determine

37

whether the newly disclosed record raises factual issues requiring further development before the possession inquiry can be resolved. The post-trial disclosures demonstrate that it does.

Indeed, the disclosures reveal continuing interaction among participants involved in related investigative activity, continuing Department review of matters arising from the NPA, continuing communication among federal actors and non-government participants, and evidence bearing upon the practical flow of information throughout the broader Epstein investigation. These materials provide a factual basis for further inquiry into the extent to which information held by various participants may have been practically available to those responsible for the prosecution.

Accordingly, the Court should reject the Government's invitation to resolve the possession inquiry solely through formal descriptions of institutional structure and should permit further factual development concerning agency relationships, information sharing, coordinated activity, and practical access to information.

POINT VII

THE GOVERNMENT'S ANALYSIS OF THE NEWLY DISCLOSED RECORD DOES NOT ACCOUNT FOR THE EFFECT OF DELAYED DISCLOSURE ON THE DEFENSE'S ABILITY TO INVESTIGATE, LITIGATE, AND PRESENT ITS CLAIMS

The Government's analysis frequently evaluates the newly disclosed materials as though they could be assessed in isolation from the circumstances of their disclosure. The post-trial record demonstrates that the timing of disclosure is itself significant.

The newly disclosed materials did not emerge during trial. They did not emerge during direct appeal. Many did not emerge during earlier collateral proceedings. Instead, substantial categories of information became available only years after the underlying events, years after witness testimony, years after investigative decisions were made, and years after strategic choices necessarily had been fixed.

The significance of delayed disclosure extends beyond the contents of individual documents. The defense's ability to investigate, test, contextualize, and utilize information necessarily changes over time. Witnesses become unavailable. Memories fade. Records are lost, destroyed, misplaced, recovered, or reconstructed. Investigative opportunities that would have existed at the time of trial may no longer be available years later.

The newly disclosed record reflects precisely those concerns. EFTA00066352 bears upon litigation-hold and preservation issues. Reiter materials reflect the recovery of evidence from Recarey's apartment after Recarey's death. EFTA01249718. Additional disclosures reflect records that emerged only after prior assumptions regarding their availability had proven inaccurate. The record also reflects gaps within categories of investigative materials, including EFTA02742044-EFTA02742183. These disclosures bear directly upon the practical

38

consequences of delayed disclosure and the difficulty of reconstructing events long after they occurred.

The same principle applies to the newly disclosed OPR, Acosta, Parkinson, Villafaña, CEOS, Main Justice, therapist, and NPA-related materials. Had these records been available during trial, they could have informed investigative decisions, witness interviews, evidentiary litigation, impeachment strategies, preservation requests, appellate arguments, and broader defense strategy. The Court need not determine precisely how those proceedings would have unfolded. The point is that the opportunity to make those decisions contemporaneously no longer exists.

The newly disclosed record also reflects evidence bearing upon relationships among participants, the practical availability of information, the completeness of prior Department reviews, and the existence of additional investigative activity. Those issues are inherently more difficult to investigate years later than they would have been when the underlying events were fresh and the relevant participants readily available.

The Government's analysis often proceeds as though prejudice may be measured solely by asking whether a particular document would have altered the verdict. The Supreme Court's Brady jurisprudence does not impose such a narrow inquiry. Delayed disclosure may affect the defense's ability to investigate leads, identify witnesses, challenge factual assumptions, develop impeachment evidence, preserve testimony, and present alternative theories of the case. Those consequences are particularly significant where the newly disclosed materials concern matters occurring outside the trial record.

The prejudice resulting from delayed disclosure is therefore not limited to what appears on the face of the documents themselves. It includes the loss of investigative opportunities, the erosion of evidence over time, the unavailability of witnesses, the disappearance of records, and the practical inability to recreate the circumstances that would have existed had the information been disclosed when it should have been.

The Court is not presently required to determine the full extent of that prejudice. The immediate question is whether the newly disclosed record raises substantial issues warranting further factual development. The combination of delayed disclosure, recovered evidence, preservation concerns, missing records, and newly available Department materials demonstrates that it does.

Accordingly, the Government's effort to evaluate the newly disclosed evidence without accounting for the consequences of delayed disclosure provides an additional reason why summary resolution of Petitioner's claims would be inappropriate.

POINT VIII

THE GOVERNMENT'S ANALYSIS DOES NOT ACCOUNT FOR THE CUMULATIVE EFFECT OF EVIDENCE BEARING UPON WITNESS CREDIBILITY, INVESTIGATIVE CHRONOLOGY, INFORMATION SHARING, AND THE RELIABILITY OF THE HISTORICAL RECORD

The Government's analysis frequently evaluates the newly disclosed materials by category and then asks whether any individual category of evidence independently warrants relief. The cumulative record presents a different question.

The newly disclosed evidence does not concern a single witness, a single event, a single document, or a single investigative decision. Rather, the disclosures bear upon multiple aspects of the prosecution and the broader investigative effort, including witness development, investigative chronology, agency relationships, information sharing, Department review, preservation practices, record completeness, Brady possession, and the implementation and interpretation of the NPA.

Viewed individually, particular disclosures may appear limited in scope. Viewed collectively, however, the record reveals a pattern of facts that was unavailable to the defense during trial, unavailable on direct appeal, and unavailable during prior collateral proceedings.

The OPR, Acosta, Parkinson, CEOS, and Main Justice materials bear upon the scope of Department review and the completeness of prior institutional evaluations. The Villafaña materials bear upon relationships among federal personnel, victims' counsel, witnesses, and related participants. The therapist-related disclosures reflected in EFTA00190574, EFTA01650808, EFTA00153657, and EFTA01650809 bear upon witness development, information sharing, and continuing interaction among participants over an extended period of time. The preservation materials, including EFTA00066352, bear upon the maintenance and retention of records. The Reiter materials reflecting recovery of evidence from Recarey's apartment after Recarey's death, EFTA01249718, bear upon assumptions regarding record availability and completeness. The production gaps reflected in EFTA02742044-EFTA02742183 further bear upon the reliability and completeness of the historical record.

Each category reinforces the significance of the others.

Evidence bearing upon information sharing informs the possession inquiry. Evidence bearing upon possession informs the Brady analysis. Evidence bearing upon preservation practices informs the Court's evaluation of record completeness. Evidence bearing upon record completeness informs the reliability of prior Department reviews. Evidence bearing upon the completeness of prior reviews informs the Court's assessment of the factual assumptions underlying the Government's present position. Considered together, these disclosures reveal a record substantially different from the one available during the underlying proceedings.

40

The cumulative significance of the newly disclosed materials is particularly evident with respect to chronology. The post-trial disclosures reveal continuing interactions among participants across multiple years, multiple districts, and multiple Department components. They reveal investigative activity, communications, reviews, and relationships that were not apparent from the record previously available to the defense. Those disclosures do not merely add new facts. They alter the context within which existing facts must be understood.

The Government's analysis frequently treats the newly disclosed record as though it merely supplements an otherwise complete historical account. The post-trial disclosures support a different conclusion. The materials reveal a record that continues to evolve through the production of previously unavailable documents, the recovery of evidence previously believed unavailable, the disclosure of non-public information, and the emergence of facts bearing upon issues central to the Petition.

The Court need not determine at this stage whether any particular category of evidence ultimately warrants relief. The relevant inquiry is whether the cumulative effect of the newly disclosed record raises substantial questions concerning the reliability of the factual assumptions underlying the Government's position. The post-trial disclosures demonstrate that it does.

Accordingly, the Court should evaluate the newly disclosed evidence collectively rather than in isolation and should reject the Government's effort to fragment the record into discrete categories divorced from their broader evidentiary significance.

## POINT IX

## THE GOVERNMENT'S POSITION CANNOT BE RECONCILED WITH ITS CONTENTION THAT THE PRESENT RECORD CONCLUSIVELY FORECLOSES RELIEF

The Government's opposition ultimately depends upon the proposition that the motion, files, and records of the case conclusively demonstrate that Petitioner is entitled to no relief. The post-trial disclosures make that conclusion difficult to sustain.

Throughout its opposition, the Government disputes Petitioner's interpretation of the newly disclosed record. It disputes the significance of the NPA materials. It disputes the significance of the OPR disclosures. It disputes the significance of the Villafaña communications, therapist-related records, preservation evidence, recovered materials, agency relationships, and information-sharing evidence. The existence of those disputes, however, does not support summary disposition. It demonstrates why further factual development is necessary.

The newly disclosed record raises substantial questions concerning the completeness of prior Department reviews. It raises questions concerning the factual assumptions underlying portions of those reviews. It raises questions concerning preservation practices, litigation-hold issues, the recovery of evidence previously believed unavailable, and gaps within categories of investigative materials. It raises questions concerning information sharing, agency relationships, practical

41

access to information, witness development, and the movement of information among participants involved in the broader investigative effort.

The Government offers alternative interpretations of those disclosures. It is entitled to do so. What the Government cannot do is transform the existence of competing interpretations into proof that the record conclusively forecloses relief.

The Court is presently confronted with evidence that was unavailable during trial, unavailable on direct appeal, and unavailable during prior collateral proceedings. The Court is also confronted with evidence that bears directly upon matters outside the original trial record, including Department review processes, preservation practices, agency relationships, witness-development activity, and the practical availability of information. These are not issues that can be resolved solely by comparing competing legal memoranda.

The Government's analysis frequently assumes the correctness of its interpretation of disputed records and then treats those assumptions as a basis for denying discovery, expansion of the record, and an evidentiary hearing. Section 2255(b) contemplates the opposite approach. Where newly disclosed evidence raises unresolved factual questions concerning matters material to a petitioner's claims, further factual development may be necessary before the merits can be adjudicated.

That principle has particular force here because the newly disclosed materials do not concern peripheral issues. They bear upon central aspects of Petitioner's claims, including Brady obligations, possession and access to information, the completeness of Department review, the implementation and understanding of the NPA, witness development, investigative chronology, preservation practices, and the reliability of the historical record itself.

The Government's position also depends upon treating the newly disclosed materials as though they merely supplement an otherwise complete evidentiary record. The post-trial disclosures support a different conclusion. The materials reveal non-public information unavailable during the underlying proceedings, evidence recovered after prior assumptions regarding availability proved inaccurate, records bearing upon preservation practices, and information that was unavailable to both the defense and prior reviewing courts. The cumulative effect of those disclosures is to demonstrate that the factual record presently before the Court differs materially from the record that existed during trial and direct appeal.

The Court need not determine in this proceeding whether Petitioner will ultimately prevail on every claim asserted in the Petition. Nor must the Court determine the ultimate significance of every newly disclosed document. The immediate question is whether the present record conclusively forecloses relief notwithstanding the emergence of substantial new evidence bearing upon issues central to Petitioner's claims.

On the present record, that question should be answered in the negative.

Accordingly, the Court should deny the Government's request for summary dismissal and permit further factual development through Rule 7 expansion of the record, Rule 6 discovery, and an evidentiary hearing pursuant to 28 U.S.C. § 2255(b).

POINT X

THE NEWLY DISCLOSED RECORD REFLECTS CONTINUING FEDERAL AWARENESS, REVIEW, AND PARTICIPATION THAT WAS NOT APPARENT FROM THE RECORD AVAILABLE DURING THE UNDERLYING PROCEEDINGS

The Government's analysis frequently treats many of the events underlying Petitioner's claims as discrete episodes capable of being evaluated independently. The post-trial disclosures reflect a more interconnected record.

The newly disclosed materials reveal continuing federal review of issues arising from the Epstein investigation, the NPA, subsequent investigative activity, and related matters extending across multiple years and multiple Department components. The disclosures include OPR materials, Acosta-related records, Parkinson materials, Main Justice communications, CEOS records, Villafaña materials, and related investigative documents that were unavailable during trial and direct appeal.

The significance of these disclosures lies not merely in the existence of additional records. Rather, the materials reveal a continuing pattern of federal review, reassessment, communication, and participation that was not apparent from the record previously available to the defense.

The OPR materials illustrate the point. Those records demonstrate that issues arising from the NPA and related investigative activity remained the subject of continuing Department attention. The newly disclosed record further reveals information that was unavailable to both the defense and earlier reviewers, including materials bearing upon Acosta, the Ragsdale correspondence (EFTA00225483-EFTA00225540), and related matters. These disclosures raise questions not only concerning the underlying events but also concerning the completeness of the factual record available during prior reviews.

The Parkinson materials and related disclosures similarly reflect continuing federal attention to matters arising from the Epstein investigation and subsequent Department review. When considered together with the OPR, Main Justice, and CEOS materials, the disclosures reveal a broader pattern of institutional involvement than was previously apparent.

The Villafaña materials provide additional support for that conclusion. As discussed above, those records reflect continuing interaction among federal personnel, victims' counsel, journalists, witnesses, and investigators across multiple years. EFTA00190604; EFTA02759069; EFTA00190473; EFTA02766464; EFTA00206183; EFTA00225046; EFTA00206294-EFTA00206296; EFTA00206277; EFTA00206285. The chronology reflected in those

43

disclosures is difficult to reconcile with a framework that treats relevant information as compartmentalized within isolated institutions.

The therapist-related materials reflected in EFTA00190574, EFTA01650808, EFTA00153657, and EFTA01650809 reinforce the same conclusion. These disclosures reflect continuing interactions among participants associated with federal investigations, victim representation, and related activity over an extended period of time. They therefore bear directly upon questions concerning information sharing, witness development, and practical access to information.

The Government's analysis frequently evaluates each category of evidence separately. The post-trial disclosures reveal a different picture. Viewed collectively, the materials reflect continuing federal awareness of issues arising from the Epstein investigation, continuing review by multiple Department components, continuing interaction among participants involved in related activity, and continuing development of the factual record itself.

That broader context is important because many of Petitioner's claims depend upon questions of knowledge, access, review, and the practical availability of information. The newly disclosed record bears directly upon those issues. At a minimum, it demonstrates that the factual landscape is substantially more complex than the Government's opposition suggests.

Accordingly, the post-trial disclosures provide additional support for Petitioner's request for discovery, expansion of the record, and an evidentiary hearing concerning the extent of federal awareness, review, participation, and access to information relevant to the claims presented in the Petition.

POINT XI

THE GOVERNMENT'S ANALYSIS OF THE POST-TRIAL DISCLOSURES IS INCONSISTENT WITH THE REQUIREMENT THAT FAVORABLE EVIDENCE BE EVALUATED FROM THE PERSPECTIVE OF THE DEFENSE AND IN LIGHT OF THE ENTIRE RECORD

The Government's analysis frequently evaluates the newly disclosed materials from the perspective of the prosecution and asks whether individual disclosures would independently have altered the verdict. That approach does not reflect the governing Brady inquiry.

The Supreme Court has repeatedly recognized that favorable evidence must be evaluated collectively and from the perspective of its potential value to the defense. The question is not whether prosecutors regarded a particular disclosure as significant. Nor is the question whether a single document, viewed in isolation, would necessarily have produced a different result. Rather, the relevant inquiry is whether favorable information, considered cumulatively and in light of the entire record, could reasonably have affected the defense's investigation, preparation, presentation, impeachment strategy, or evaluation of the case.

The newly disclosed record bears directly upon those considerations.

The OPR materials, Acosta records, Parkinson-related disclosures, Main Justice communications, CEOS records, Villafaña materials, therapist-related communications, preservation evidence, recovered records, and NPA-related materials all provide information that was unavailable to the defense during the underlying proceedings. The significance of these disclosures is not limited to whether any particular document would have been admitted into evidence. The disclosures bear upon how the defense would have investigated the case, what witnesses would have been pursued, what impeachment avenues would have been available, what evidentiary arguments could have been advanced, and how the defense would have understood the broader factual landscape.

The Villafaña materials provide a useful example. EFTA00190604; EFTA02759069; EFTA00190473; EFTA02766464; EFTA00206183; EFTA00225046; EFTA00206294-EFTA00206296; EFTA00206277; and EFTA00206285 reveal interactions among federal personnel, victims' counsel, journalists, witnesses, and investigators extending across multiple years. Whether any individual communication would have been admissible at trial is not the dispositive question. The significance of the disclosures lies in their value to the defense's understanding of investigative chronology, witness development, information sharing, and institutional relationships.

The same principle applies to the therapist-related materials reflected in EFTA00190574, EFTA01650808, EFTA00153657, and EFTA01650809. These disclosures bear upon witness development, participant interactions, and the practical movement of information among individuals involved in related investigative and litigation activity. Their significance cannot be measured solely by examining the face of a particular document.

The newly disclosed OPR materials similarly illustrate why Brady analysis cannot be reduced to document-by-document review. OPR III proceeded in part from assumptions concerning the information available to particular participants. The newly disclosed record raises questions concerning those assumptions, including through the disclosure of the Ragsdale correspondence, EFTA00225483-EFTA00225540, and other non-public materials unavailable during the underlying proceedings. The value of such disclosures lies not merely in their contents but in their ability to inform broader challenges to factual assumptions underlying prior reviews and subsequent Government positions.

The preservation materials likewise bear upon matters that a reasonable defense attorney would regard as significant. EFTA00066352 reflects litigation-hold evidence. The Reiter materials reflecting recovery of evidence from Recarey's apartment after Recarey's death, EFTA01249718, bear upon assumptions regarding record availability and completeness. Gaps within portions of the EFTA production sequence, including EFTA02742044-EFTA02742183, similarly inform the defense's evaluation of record completeness, preservation practices, and the reliability of subsequent review processes.

The Government's analysis frequently evaluates each of these disclosures independently and then concludes that none is sufficiently significant standing alone. Brady requires a different inquiry. The Court must consider the disclosures collectively and from the perspective of a reasonable

45

defense attorney confronting the case before trial, before appeal, and before the factual record presently available had emerged.

The same principle applies to EFTA00026788-EFTA00026791. These materials include a letter from Jeffrey Epstein to Vicky Ward referencing the existence of evidence that had been provided to Ward and that bears upon allegations involving ███████. The significance of these materials is not whether the Court ultimately accepts the contents of the referenced evidence. Rather, the question is whether a reasonable defense attorney would have considered such information important in preparing cross-examination, investigating witness credibility, evaluating prior statements, and developing impeachment material.

The same analysis applies to EFTA00300483. That record reflects that the Government possessed flight-manifest evidence that was not disclosed to the defense during the Maxwell proceedings.

The significance of flight-manifest evidence extends beyond the contents of any individual record. Flight manifests may bear upon witness chronology, witness credibility, travel patterns, corroboration, impeachment, investigative leads, and the factual accuracy of allegations presented during trial. A reasonable defense attorney would unquestionably regard such information as important in evaluating witness accounts and preparing cross-examination.

The same analysis applies to EFTA00300497. That record reflects that the Government possessed documents relating to the purchase, ownership, and sale of the East 71st Street property. Those records bore directly upon the chronology of ownership and occupancy and therefore upon the timing of events described by witnesses.

The Government's opposition frequently treats chronology evidence as collateral. The newly disclosed record demonstrates otherwise. Chronology evidence is often among the most powerful forms of impeachment because it permits contemporaneous documentary records to be compared against witness recollections formed years later.

The newly disclosed EFTA materials include flight manifests, property records, investigative chronology evidence, witness-development records, and other contemporaneous documents capable of testing the accuracy of witness accounts. Such evidence may corroborate testimony, contradict testimony, narrow relevant time periods, identify inconsistencies, or reveal that assumptions underlying witness recollections are incorrect.

A reasonable defense attorney would regard chronology evidence as particularly important in a case involving allegations spanning multiple years, multiple locations, and events reconstructed long after they allegedly occurred. The significance of such evidence therefore cannot be dismissed as merely cumulative or collateral. Documentary records bearing upon dates, travel, ownership, occupancy, and investigative activity frequently provide the foundation upon which effective cross-examination is built.

The same analysis applies to EFTA00300526-EFTA00300527. These records reflect file-box materials demonstrating that the Government possessed records concerning claimant settlements

46

and settlement agreements that were not disclosed to the defense during the Maxwell proceedings.

The significance of these materials extends beyond the existence of the agreements themselves. Information concerning settlements, financial arrangements, compensation, benefits, or related understandings may bear directly upon witness credibility, bias, motive, impeachment, and the manner in which a reasonable defense attorney would evaluate witness testimony. Such information may also generate additional investigative leads concerning the development of witness accounts and the circumstances surrounding participation in related litigation.

The Government's materiality analysis improperly focuses upon whether any single settlement document would independently alter the outcome of trial. A reasonable defense attorney would approach the issue differently. Information concerning settlements and related agreements would be evaluated together with other evidence bearing upon credibility, witness development, prior statements, and potential bias. From that perspective, the existence of undisclosed settlement records is plainly significant.

EFTA00300526-EFTA00300527 therefore provides an additional example of information that could have informed defense investigation, witness examination, impeachment strategy, and trial preparation but was unavailable to the defense during the Maxwell proceedings.

The significance of these materials is readily apparent from the perspective of a reasonable defense attorney. Documentary evidence establishing ownership dates and transaction chronology could have been used to test witness recollections, challenge assumptions concerning timing, investigate inconsistencies, and conduct cross-examination regarding allegations tied to specific periods of ownership or occupancy. Where a witness attributes an event to a time period during which the property remained owned by another individual, the documentary chronology assumes obvious impeachment value.

The Government's materiality analysis improperly minimizes the significance of chronology evidence. A reasonable defense attorney would regard contemporaneous documentary records concerning ownership, transfers, and occupancy as important tools for evaluating the accuracy of witness accounts. EFTA00300497 therefore constitutes an additional example of evidence that could have generated investigative leads, impeachment opportunities, and cross-examination material unavailable to the defense during the Maxwell proceedings.

The Government's materiality analysis improperly evaluates disclosures in isolation and with the benefit of hindsight. The relevant inquiry is whether the defense would have considered the information useful in investigating the facts, testing witness testimony, developing alternative explanations, and preparing trial strategy. From that perspective, evidence demonstrating that the Government possessed undisclosed flight-manifest records is plainly significant.

47

EFTA00300483 therefore constitutes an additional example of information that could have generated investigative leads, impeachment material, and factual development opportunities unavailable to the defense during the Maxwell proceedings.

The same analysis applies to the newly disclosed materials concerning ████ Jane Doe 1, ██████████, the Wexner communications, the Acosta reconstruction records, and the Government's admissions reflected in the CVRA litigation. The Government's opposition repeatedly evaluates each disclosure in isolation and asks whether a particular document would independently have altered the verdict. That is not the governing inquiry.

A reasonable defense attorney would not evaluate evidence in that manner. Rather, counsel would consider how newly disclosed information could generate investigative leads, identify additional witnesses, reveal inconsistencies, alter cross-examination strategy, expose bias or motive, challenge chronology evidence, and place other evidence in a different context. Information concerning witness development, undisclosed Government admissions, missing investigative memoranda, settlements, therapist communications, and investigative chronology would necessarily be evaluated together rather than in isolation.

The newly disclosed EFTA materials therefore must be analyzed as components of a larger evidentiary picture. Their significance lies not merely in the contents of individual records, but in the investigative opportunities, impeachment avenues, and factual development that they collectively would have afforded the defense had they been available during the Maxwell proceedings.

The Government's materiality analysis frequently proceeds as though the Court may evaluate each disclosure in isolation and determine whether any single item would independently have altered the verdict. Brady requires a different inquiry. Information bearing upon the credibility of a Government witness, particularly information capable of generating additional investigative leads or impeachment opportunities, must be evaluated from the perspective of the defense at the time of trial rather than through hindsight.

The significance of EFTA00026788-EFTA00026791 therefore lies not merely in the contents of the letter itself, but in what it reveals regarding the existence of potentially relevant evidence, investigative avenues, and cross-examination material that were unavailable to the defense during the Maxwell proceedings.

Viewed through that lens, the newly disclosed record bears upon investigative strategy, witness examination, impeachment, evidentiary litigation, preservation issues, agency relationships, information sharing, institutional review, and the reliability of the historical record itself. Those are matters that a reasonable defense attorney would regard as significant.

48

The Government's analysis therefore understates the significance of the post-trial disclosures by evaluating them individually, retrospectively, and largely from the perspective of the prosecution. The governing Brady inquiry requires the opposite approach. When the newly disclosed materials are evaluated collectively and from the perspective of the defense, they provide substantial support for Petitioner's request for further factual development and preclude any conclusion that the present record conclusively forecloses relief.

POINT XII

THE GOVERNMENT'S POSITION DOES NOT ACCOUNT FOR THE EFFECT OF THE NEWLY DISCLOSED RECORD ON THE RELIABILITY OF THE FACTUAL FOUNDATIONS UNDERLYING THE CONVICTION AND SUBSEQUENT REVIEW

The Government's opposition proceeds from the premise that the factual foundations underlying the conviction, direct appeal, and subsequent review remain substantially unchanged notwithstanding the post-trial disclosures. The newly disclosed record raises substantial questions concerning that premise.

The significance of the post-trial disclosures does not arise solely from the existence of additional documents. Rather, the disclosures bear upon the factual assumptions that informed investigative decisions, prosecutorial decisions, Department reviews, appellate litigation, and collateral proceedings. When newly disclosed evidence calls those assumptions into question, the significance of the disclosures extends beyond the individual documents themselves.

The newly disclosed record raises questions concerning the completeness of prior Department reviews. OPR III proceeded in part from assumptions concerning the information available to particular participants. The post-trial disclosures, including the Ragsdale correspondence (EFTA00225483-EFTA00225540), together with additional non-public materials unavailable during the underlying proceedings, raise questions concerning those assumptions. The significance of these disclosures lies not merely in the information they contain, but in their bearing upon the factual premises underlying subsequent analysis.

The newly disclosed record similarly raises questions concerning the completeness of the historical record available to investigators, reviewers, and the defense. EFTA00066352 reflects litigation-hold evidence bearing upon preservation issues. Reiter materials reflect the recovery of evidence from Recarey's apartment after Recarey's death. EFTA01249718. Additional disclosures reveal gaps within categories of investigative materials, including EFTA02742044-EFTA02742183. Collectively, these materials demonstrate that assumptions regarding record completeness are themselves subject to legitimate factual inquiry.

The record includes litigation-hold evidence reflected in EFTA00066352; the Ragsdale correspondence reflected in EFTA00224991, EFTA00225084, and EFTA00225483-EFTA00225540; therapist-related materials reflected in EFTA00190574, EFTA01650808, EFTA00153657, and EFTA01650809; recovered evidence from Recarey's apartment reflected in EFTA01249718; evidence concerning witness ███████ and investigative chronology;

49

missing and incomplete investigative records relating to Jane Doe 1, ███████ and other victims, including EFTA00191203, EFTA00194822, EFTA00194824, EFTA00194830, and EFTA00194831; Wexner-related communications reflected in HO012162, HO012188, HO012576, and HO012593; evidence reflecting cooperation and continuing interaction between Villafaña and plaintiffs' counsel, including EFTA00211693; communications concerning evidence provided to Vicky Ward bearing upon ███████████ and potential impeachment material reflected in EFTA00026788-EFTA00026791; and gaps within portions of the EFTA production sequence, including EFTA02742044-EFTA02742183.

Considered individually, the Government attempts to minimize each category of evidence. Considered collectively, however, these disclosures reveal a substantially different evidentiary landscape than the one available to the defense during trial, direct appeal, or prior collateral proceedings.

The Villafaña materials likewise bear upon the factual foundations underlying the Government's present analysis. EFTA00190604; EFTA02759069; EFTA00190473; EFTA02766464; EFTA00206183; EFTA00225046; EFTA00206294-EFTA00206296; EFTA00206277; and EFTA00206285 collectively reveal interactions among federal personnel, victims' counsel, journalists, investigators, and witnesses extending across multiple years. These disclosures inform questions concerning investigative chronology, information sharing, witness development, and the practical availability of information. Those questions, in turn, bear directly upon assumptions underlying the Government's possession analysis and Brady arguments.

The therapist-related materials reflected in EFTA00190574, EFTA01650808, EFTA00153657, and EFTA01650809 reinforce the same conclusion. The disclosures reveal continuing interactions among participants associated with federal investigations, victim representation, and related activities. The significance of these materials lies not merely in any individual communication but in what they reveal concerning relationships, information sharing, and the movement of information across institutional boundaries.

The newly disclosed OPR, Acosta, Parkinson, Main Justice, and CEOS materials similarly bear upon assumptions concerning federal knowledge, institutional participation, and continuing review of matters arising from the Epstein investigation and the NPA. Considered collectively, these disclosures reveal a record that is broader and more interconnected than the record available during the underlying proceedings.

The newly disclosed record repeatedly demonstrates that assumptions previously treated as settled were based upon an incomplete factual record. OPR's understanding concerning the information available to key participants, the existence of non-public records, the scope of communications among participants, and the completeness of investigative files must now be evaluated against a substantially expanded evidentiary record.

The Acosta reconstruction materials, the Ragsdale correspondence, the Villafaña files, the therapist communications, the ███████ materials, the Jane Doe files, the Wexner

50

communications, the ███████ evidence, and the subsequently recovered Recarey materials each demonstrate that relevant information existed outside the record available to prior reviewers. The significance of these disclosures does not depend upon proving that every prior conclusion was incorrect. Rather, they demonstrate that the factual foundation upon which those conclusions rested was less complete than previously understood.

This distinction is critical. Petitioner's argument is not that the Court should disregard prior reviews. Petitioner's argument is that those reviews should not be treated as dispositive when substantial categories of evidence were unavailable to reviewers, unavailable to the defense, and unavailable to the Court when the relevant conclusions were reached.

The Government's opposition frequently treats the newly disclosed materials as additions to an otherwise settled historical record. The post-trial disclosures support a different conclusion. The materials raise questions concerning the completeness of prior reviews, the completeness of investigative records, the availability of information to participants, the preservation of evidence, the recovery of previously unavailable materials, and the factual assumptions underlying subsequent Government analysis.

The Court is not presently required to determine the ultimate significance of every newly disclosed record. The question is whether the emergence of these materials affects the reliability of factual premises that underlie the Government's contention that relief is conclusively foreclosed. The post-trial disclosures demonstrate that it does.

At a minimum, the newly disclosed record reveals substantial factual questions concerning the completeness of the historical record, the reliability of prior assumptions, the practical availability of information, the preservation of evidence, and the scope of institutional review. Those questions cannot be resolved solely through competing interpretations of documentary materials. They warrant further factual development through discovery, expansion of the record, and an evidentiary hearing.

Accordingly, the Court should decline the Government's invitation to treat the factual foundations underlying the conviction and subsequent review as fixed and undisputed and should instead permit development of a record sufficient to evaluate Petitioner's claims in light of the evidence that has now emerged.

POINT XIII

THE GOVERNMENT'S ANALYSIS OF THE NPA-RELATED CLAIMS DEPENDS UPON FACTUAL ASSUMPTIONS THAT THE POST-TRIAL DISCLOSURES PLACE IN DISPUTE

The Government's opposition frequently treats questions concerning the NPA as matters that have already been conclusively resolved. The post-trial disclosures raise substantial questions concerning that premise.

51

Petitioner's position does not depend upon any single interpretation of the NPA. Nor does it depend upon any single document. Rather, Petitioner's position is that the factual record relevant to the NPA, its implementation, its interpretation, and subsequent Department review is materially different from the record available during trial, direct appeal, and prior collateral proceedings.

The newly disclosed record reflects continuing Department review of issues arising from the NPA through OPR materials, Acosta-related records, Parkinson materials, Main Justice communications, CEOS records, and related disclosures. These materials reveal continuing institutional attention to issues arising from the agreement and provide information that was unavailable to the defense during the underlying proceedings.

The significance of these disclosures extends beyond the legal text of the NPA itself. The materials bear upon how participants understood the agreement, how federal personnel evaluated its scope, what information was available during subsequent reviews, and what investigative activity continued after execution of the agreement. Those issues bear directly upon the factual assumptions underlying the Government's present analysis.

The newly disclosed OPR materials are particularly significant because they reveal that later reviews proceeded upon factual assumptions that are themselves subject to legitimate inquiry. As discussed above, OPR III proceeded in part from assumptions concerning the information available to certain participants. The subsequent disclosure of non-public materials, including the Ragsdale correspondence (EFTA00225483-EFTA00225540), raises questions concerning the completeness of the factual record available during those reviews.

The Acosta-related materials likewise bear upon issues central to Petitioner's claims. Their significance lies not merely in the specific contents of individual records but in what they reveal concerning continuing Department review of matters arising from the NPA and the factual context within which subsequent decisions were made.

The Government's analysis frequently proceeds from the proposition that the relevant facts concerning the NPA are already known. The post-trial disclosures support a different conclusion. The record continues to evolve through the production of previously unavailable documents, the disclosure of non-public information, the recovery of records previously believed unavailable, and the emergence of evidence bearing upon subsequent Department review.

That evolving record is particularly important because the Government's opposition repeatedly relies upon the completeness of historical understanding concerning the NPA. The newly disclosed materials raise substantial questions concerning whether that understanding was based upon a complete record. At a minimum, the disclosures reveal factual issues that have never been subjected to meaningful adversarial testing.

The Court need not resolve the ultimate scope of the NPA at this stage. Nor must it determine the ultimate significance of every newly disclosed NPA-related document. The present question is whether the post-trial disclosures raise factual issues warranting further development before the Court accepts the Government's contention that the relevant facts are settled.

52

The newly disclosed record demonstrates that they do.

Accordingly, the Court should reject the Government's invitation to treat the NPA-related issues as conclusively resolved and should permit further factual development concerning the scope, implementation, understanding, and subsequent review of the agreement.

POINT XIV

THE GOVERNMENT'S ANALYSIS OF THE JUROR-RELATED CLAIMS DEPENDS UPON A RECORD THAT HAS BEEN MATERIALLY EXPANDED BY POST-TRIAL DISCLOSURES

The Government's opposition treats Petitioner's juror-related claims as though they may be resolved solely by reference to the information available during voir dire, trial, and the proceedings immediately following the verdict. The post-trial record raises substantial questions concerning that premise.

Petitioner's juror-related claims do not arise solely from the original voir dire record or from information available to the parties during trial. Rather, they arise from evidence that became available only after conviction, after direct appeal, and after subsequent investigation into issues concerning juror disclosures, juror communications, media interactions, juror exposure to extraneous information, and matters bearing upon juror impartiality.

The significance of the newly available juror evidence is not limited to whether any individual juror ultimately engaged in misconduct. The threshold issue is whether the post-trial disclosures reveal factual questions that have not previously been evaluated on a complete record. They do.

The Government's analysis depends upon the assumption that the original voir dire process, the contemporaneous trial record, and the information available to the parties at the time sufficiently resolved all material questions concerning juror impartiality. The post-trial record substantially undermines that assumption. Information that was unavailable during the underlying proceedings necessarily could not have been investigated, litigated, subjected to adversarial testing, or evaluated by the Court at the time.

This principle applies with particular force where newly available evidence bears upon juror disclosures, juror communications, juror exposure to extraneous information, the completeness of responses provided during jury selection, or the accuracy of representations made during later proceedings. Such issues implicate the integrity of the adjudicative process itself and warrant careful factual development before summary dismissal may properly be considered.

The newly available evidence includes information concerning Juror 50, Juror One, post-trial juror disclosures, media interactions, and information that was unavailable to trial counsel, appellate counsel, and the Court during the underlying proceedings. Because this evidence did not exist within the record available during trial or direct review, it necessarily could not have been subjected to contemporaneous investigation or judicial evaluation.

53

The Court need not determine at this stage whether any particular juror-related allegation ultimately warrants relief. The immediate question is whether the post-trial record raises factual issues requiring further development before those claims can be resolved. The newly available evidence demonstrates that it does.

The Government's position ultimately depends upon the assumption that the Court already possesses all material facts necessary to evaluate Petitioner's juror-related claims. The post-trial disclosures substantially undermine that premise. Accordingly, the Court should permit further factual development concerning the juror-related evidence and should decline to resolve those claims on the existing record alone.

## B. THE POST-TRIAL JUROR EVIDENCE INDEPENDENTLY WARRANTS FURTHER FACTUAL DEVELOPMENT

The newly available juror evidence provides an independent basis for denying summary dismissal. The Government's analysis proceeds from the premise that the relevant juror issues were fully investigated and resolved during the underlying proceedings. The post-trial record raises substantial questions concerning that premise.

The newly developed record includes materials reflected in Lucia Osborne-Crowley's 2024 book, *Lasting Harm*, documentary evidence concerning Juror 50, evidence concerning Juror One, and related post-trial disclosures bearing upon juror candor, juror bias, juror disclosures, and the accuracy of testimony provided during prior proceedings.

Particularly significant are Osborne-Crowley's descriptions of her interactions with Juror 50. At page 214 of *Lasting Harm*, Osborne-Crowley identifies the date upon which she first spoke with Juror 50. At page 219, she further states that she was speaking with Juror 50 when he first realized that he had failed to disclose his own abuse in the juror questionnaire. These disclosures bear directly upon issues previously litigated concerning juror candor and the completeness of information provided during jury selection.

The significance of these disclosures extends beyond Juror 50 alone. At page 193 of *Lasting Harm*, Osborne-Crowley states that she spoke with additional jurors who likewise failed to disclose personal experiences of abuse. That account is consistent with statements later discussed in her article, *My Part in Triggering Ghislaine Maxwell's Appeal That Could Overturn Her Conviction*, published in *The Independent* on February 4, 2024. Considered together, these disclosures raise questions concerning whether the juror-disclosure issues were broader than previously understood.

The Government places substantial emphasis upon what it characterizes as the "bombshell interview." The chronology reflected in the post-trial record is important. The interview occurred after the verdict had already been rendered and therefore could not have been presented during trial. Moreover, because the interview was not part of the record before the Court of Appeals, it could not be relied upon during direct review. The fact that the interview emerged after trial does not diminish its significance; it explains why the issues it raised were not previously litigated on a complete factual record.

54

The newly available evidence also bears directly upon the issue of actual bias. Juror 50 reportedly described his own abuse as identical to the abuse alleged in the Maxwell prosecution. Had the Court possessed the evidence now available, it would have been in a position to evaluate whether that characterization was consistent with findings previously made regarding the nature and extent of the juror's personal experiences. The newly developed record therefore bears directly upon factual assumptions that informed earlier proceedings.

The Court has never evaluated much of this evidence. Nor has the Court conducted an evidentiary proceeding addressing many of the factual issues raised by the post-trial disclosures. The Government nevertheless asks the Court to reject the juror-related claims as a matter of law. That position depends upon the premise that the existing record is sufficiently complete to resolve those claims without further factual development.

The post-trial record does not support that conclusion. At a minimum, the newly available juror evidence raises substantial factual questions concerning juror disclosures, juror candor, actual bias, and the completeness of information available during jury selection and subsequent proceedings. Those questions warrant further factual development through discovery, expansion of the record, and an evidentiary hearing.

## C. THE POST-TRIAL RECORD RAISES QUESTIONS CONCERNING WHETHER THE JUROR-DISCLOSURE ISSUES WERE BROADER THAN PREVIOUSLY UNDERSTOOD

The Government's analysis frequently treats the Juror 50 issue as an isolated event whose factual contours were fully developed during prior proceedings. The post-trial record raises substantial questions concerning that assumption.

As reflected in *Lasting Harm*, Osborne-Crowley describes communications not only with Juror 50 but also with additional jurors. At page 193, Osborne-Crowley states that she spoke with other jurors who likewise failed to disclose personal experiences of abuse. Those disclosures are significant because they suggest that the issues surrounding juror disclosures may not have been limited to a single juror.

The significance of this evidence is not that it establishes misconduct by any particular juror. Rather, it raises questions concerning the completeness of the factual record previously available to the Court. If additional jurors possessed undisclosed experiences materially similar to issues presented at trial, the Court has not yet had an opportunity to evaluate those circumstances through adversarial proceedings.

The Government's position depends upon the premise that the Court already possesses all material facts necessary to evaluate the juror-related claims. The disclosures reflected in *Lasting Harm* challenge that premise. The post-trial record now contains information suggesting that additional jurors may have had experiences relevant to the voir dire process that were not previously disclosed or explored.

These disclosures also bear upon the reliability of assumptions underlying earlier proceedings. The Court's prior analysis necessarily proceeded upon the record then available. The newly

55

developed record is different. It includes information that emerged only after trial, after direct appeal, and after the factual record had effectively closed.

The Court need not determine at this stage whether any additional juror failed to answer voir dire questions accurately. Nor must the Court determine whether any such circumstance ultimately affected the verdict. The present question is whether the newly available evidence raises factual issues warranting further inquiry. The post-trial record demonstrates that it does.

The Government's request for summary dismissal therefore depends upon factual assumptions that have not been tested against the full body of evidence now available. At a minimum, the disclosures reflected in *Lasting Harm* support further factual development concerning the scope of the juror-disclosure issues, the completeness of information provided during jury selection, and the extent to which those matters were understood during the underlying proceedings.

## E. THE JUROR-RELATED EVIDENCE INDEPENDENTLY PRECLUDES SUMMARY DISMISSAL

The Government's opposition ultimately depends upon the proposition that the existing record conclusively resolves the juror-related claims. The post-trial record does not support that conclusion.

The newly available evidence reflected in *Lasting Harm*, the post-trial disclosures concerning Juror 50, evidence concerning additional jurors, subsequent public statements, and related materials did not form part of the record available during trial. Nor did these materials form part of the record available during direct appeal. Much of this evidence emerged only after the underlying proceedings had concluded.

The significance of this chronology cannot be overstated. Prior proceedings necessarily evaluated juror-related issues based upon the information then available. The newly developed record includes evidence that was never presented to the jury, never presented to the trial court, and never evaluated by the Court of Appeals. The emergence of that evidence necessarily affects the Court's assessment of whether the factual record is complete.

The Government's analysis frequently assumes that the Court may resolve the juror-related claims solely through reference to prior rulings. That position overlooks the central feature of the present record: the factual landscape has materially changed. The Court now possesses information concerning Juror 50, information concerning additional jurors, disclosures reflected in *Lasting Harm*, and related post-trial evidence that did not exist within the record previously before the Court.

The Court need not determine at this stage whether the newly available juror evidence ultimately warrants relief. Nor must the Court determine the credibility or significance of every post-trial disclosure. The immediate question is whether the present record conclusively forecloses relief notwithstanding the emergence of substantial new evidence bearing upon juror candor, juror disclosures, juror bias, and the completeness of information available during jury selection.

56

The answer to that question is no.

At a minimum, the newly available evidence raises substantial factual questions concerning the accuracy and completeness of juror disclosures, the scope of information available during prior proceedings, the existence of additional undisclosed juror experiences, and the factual foundations underlying earlier determinations concerning actual bias. Those issues cannot be resolved solely through competing attorney submissions.

Accordingly, the juror-related evidence independently warrants discovery, expansion of the record, and an evidentiary hearing pursuant to 28 U.S.C. § 2255(b).

POINT XV

THE DENIAL OF ACCESS TO THE EFTA MATERIALS CAUSED ACTUAL INJURY AND FURTHER SUPPORTS DISCOVERY, EXPANSION OF THE RECORD, AND APPELLATE REVIEW

The Government's opposition proceeds from the premise that Petitioner has had a meaningful opportunity to investigate, develop, and present the claims asserted in the Petition. The procedural history concerning access to the EFTA materials raises substantial questions concerning that premise.

Many of Petitioner's claims arise from records disclosed pursuant to the Epstein Files Transparency Act. Those disclosures include OPR materials, Acosta records, Parkinson materials, Main Justice communications, CEOS records, Villafaña materials, preservation evidence, therapist-related communications, recovered investigative materials, and records bearing upon the NPA and subsequent Department review. Collectively, these materials form a substantial portion of the factual foundation underlying the present Petition.

Notwithstanding the central importance of those materials, Petitioner was denied direct access to the EFTA production. As a consequence, Petitioner has been required to litigate claims arising from a body of evidence that Petitioner has not been permitted personally to review. That circumstance bears directly upon Petitioner's ability to identify claims, evaluate documents, assess relationships among records, locate additional evidence, and present arguments concerning the significance of newly disclosed materials.

The significance of this issue extends beyond ordinary discovery concerns. Access-to-courts principles protect the ability of litigants to identify and present non-frivolous claims. Where a litigant is denied access to a body of records forming the basis of potential claims, the resulting injury is not limited to the inability to cite particular documents. The injury includes the inability to determine what additional claims may exist, what factual relationships may be reflected in the record, and what avenues of investigation remain available.

The present record illustrates that concern. The EFTA disclosures have already revealed litigation-hold evidence (EFTA00066352), the Ragsdale correspondence (EFTA00225483-

57

EFTA00225540), therapist-related materials (EFTA00190574; EFTA01650808; EFTA00153657; EFTA01650809), recovered evidence from Recarey's apartment reflected in the Reiter materials (EFTA01249718), gaps within portions of the EFTA production sequence (EFTA02742044-EFTA02742183), Villafaña communications (EFTA00190604; EFTA02759069; EFTA00190473; EFTA02766464; EFTA00206183; EFTA00225046; EFTA00206294-EFTA00206296; EFTA00206277; EFTA00206285), and additional materials bearing upon OPR review, Acosta, Parkinson, Main Justice, CEOS, and the NPA. The emergence of these disclosures demonstrates the practical significance of access to the underlying record.

The procedural history of this Petition illustrates the practical consequences of denying direct access to the EFTA materials. As additional records have been reviewed and analyzed, new categories of evidence have continued to emerge, including Government admissions made in related litigation, missing investigative memoranda, victim-specific files, therapist communications, evidence concerning witness development, Acosta reconstruction materials, Wexner communications, recovered evidence, and records bearing upon the relationships among federal personnel, plaintiffs' counsel, therapists, and other participants.

The significance of these disclosures extends beyond the contents of individual documents. Each newly identified record has required further investigation, additional factual development, and reassessment of prior assumptions concerning the historical record. The continuing emergence of such evidence demonstrates the practical injury resulting from denial of direct access. A litigant cannot reasonably identify, investigate, or present claims arising from records that he or she has not been permitted personally to review.

The Court need not speculate regarding prejudice. The evolving nature of the EFTA record demonstrates that meaningful access to the underlying materials affects the ability to identify claims, develop facts, evaluate relationships among documents, and present constitutional arguments. The continued emergence of significant records throughout these proceedings provides concrete evidence that the injury is real rather than theoretical.

The Government's position frequently assumes that the Court may evaluate the significance of the EFTA materials through the limited record presently before it. The difficulty with that assumption is that Petitioner has never been afforded the opportunity personally to examine the full body of disclosed materials. Under such circumstances, it is impossible to conclude with confidence that all relevant claims, all relevant factual relationships, and all relevant avenues of investigation have been identified.

This issue bears directly upon the Court's Rule 6 and Rule 7 analysis. Discovery and expansion of the record are particularly appropriate where newly disclosed evidence reveals substantial factual issues and where the litigant seeking relief has not been afforded direct access to the underlying materials from which those issues arise. The denial of access therefore provides an additional reason why summary dismissal would be inappropriate.

The issue likewise bears upon the necessity of an evidentiary hearing. The Court is presently confronted with a record that continues to evolve through post-trial disclosures, recovered

58

evidence, preservation-related materials, and newly available Department records. The inability of Petitioner personally to review the complete EFTA production further demonstrates why the factual record cannot reasonably be regarded as complete.

Finally, because the denial of access to the EFTA materials substantially affects Petitioner's ability to identify, investigate, and litigate constitutional claims, the issue independently warrants appellate review. Petitioner respectfully requests that the Court preserve the issue for review and grant such relief as may be appropriate to permit meaningful consideration of the access issue by the Court of Appeals.

Accordingly, the denial of direct access to the EFTA materials constitutes an additional reason why the Court should permit discovery, expansion of the record, and an evidentiary hearing and should decline the Government's request for summary dismissal. The continuing identification of new EFTA evidence demonstrates actual injury from denial of direct access.

## POINT XVI

### THE COMBINED EFFECT OF THE POST-TRIAL DISCLOSURES REQUIRES DISCOVERY, RULE 7 EXPANSION OF THE RECORD, AND AN EVIDENTIARY HEARING

The Government's opposition repeatedly invites the Court to resolve Petitioner's claims on the existing record and without further factual development. The post-trial disclosures demonstrate why that approach is inappropriate.

The record presently before the Court differs materially from the record available during trial, direct appeal, and prior collateral proceedings. Since those proceedings concluded, substantial categories of evidence have emerged through the EFTA process and related post-trial disclosures. Those materials include OPR records, Acosta materials, Parkinson-related records, Main Justice communications, CEOS records, Villafaña materials, therapist-related communications, preservation evidence, recovered investigative materials, juror-related evidence, and records bearing upon the NPA and subsequent Department review.

The significance of these disclosures does not arise from any single document. Rather, the significance lies in the cumulative effect of a record that is substantially different from the one upon which prior proceedings were conducted.

The newly disclosed materials raise questions concerning the completeness of prior Department reviews. They raise questions concerning the factual assumptions underlying portions of those reviews. They raise questions concerning information sharing, witness development, agency relationships, practical access to information, preservation practices, record completeness, and the recovery of evidence previously believed unavailable.

The record includes litigation-hold evidence reflected in EFTA00066352; the Ragsdale correspondence, EFTA00225483-EFTA00225540; therapist-related materials reflected in

59

EFTA00190574, EFTA01650808, EFTA00153657, and EFTA01650809; recovered evidence from Recarey's apartment reflected in the Reiter materials, EFTA01249718; gaps within portions of the EFTA production sequence, including EFTA02742044-EFTA02742183; and Villafaña communications reflected in EFTA00190604, EFTA02759069, EFTA00190473, EFTA02766464, EFTA00206183, EFTA00225046, EFTA00206294-EFTA00206296, EFTA00206277, and EFTA00206285.

The post-trial record further includes juror-related evidence that was unavailable during trial and unavailable during direct review. That evidence includes disclosures reflected in *Lasting Harm*, evidence concerning Juror 50, evidence concerning additional jurors, and related materials bearing upon juror candor, juror bias, juror disclosures, and the factual assumptions underlying prior proceedings.

Considered collectively, these disclosures reveal a factual record that is broader, more interconnected, and less complete than previously understood. They reveal non-public information unavailable during the underlying proceedings. They reveal evidence recovered after prior assumptions regarding availability proved inaccurate. They reveal preservation issues, additional investigative activity, continuing Department review, and factual disputes that have never been subjected to meaningful adversarial testing.

Rule 6 exists to permit factual development where specific allegations provide reason to believe that additional inquiry may reveal facts supporting relief. Rule 7 exists to permit expansion of the record where the existing record is insufficient to resolve material issues. Section 2255(b) requires a hearing unless the motion and record conclusively demonstrate that the petitioner is entitled to no relief. The present record satisfies the standards for all three forms of relief.

The Government's position ultimately depends upon the proposition that the Court already possesses all material facts necessary to resolve Petitioner's claims. The post-trial disclosures demonstrate otherwise. The newly available evidence raises substantial factual questions concerning matters central to the Petition. Those questions cannot be resolved solely through competing interpretations of documentary materials and attorney submissions.

The Court need not determine at this stage whether Petitioner will ultimately prevail on every claim asserted in the Petition. Nor must the Court determine the ultimate significance of every newly disclosed record. The present question is considerably narrower. The Court must determine whether the motion, files, and records conclusively foreclose relief notwithstanding the emergence of substantial new evidence bearing upon issues central to Petitioner's claims.

On the present record, that standard cannot be satisfied.

Accordingly, the Court should deny the Government's request for summary dismissal, permit discovery pursuant to Rule 6, permit expansion of the record pursuant to Rule 7, conduct an evidentiary hearing pursuant to 28 U.S.C. § 2255(b), and grant such further relief as justice requires.

60

The issues presented here are not routine. The Petition involves a substantial body of post-trial evidence disclosed years after conviction through a statutory transparency process that did not exist during the underlying proceedings. Reasonable jurists could disagree concerning the significance of those disclosures, the completeness of prior Department reviews, the practical availability of information, the scope of Brady obligations, the effect of delayed disclosure upon procedural default, the necessity of discovery and an evidentiary hearing, and the consequences of denying direct access to the EFTA materials themselves.

The breadth of the newly disclosed record distinguishes this case from ordinary collateral review proceedings. At a minimum, the issues presented are adequate to deserve encouragement to proceed further.

POINT XVII

AT A MINIMUM, THE ISSUES PRESENTED WARRANT A CERTIFICATE OF APPEALABILITY AND PRESERVATION OF PETITIONER'S APPELLATE RIGHTS

Should the Court deny any portion of the relief requested, Petitioner respectfully submits that a Certificate of Appealability should issue pursuant to 28 U.S.C. § 2253(c).

A Certificate of Appealability may issue whenever reasonable jurists could debate whether the petition should have been resolved differently or whether the issues presented deserve encouragement to proceed further. That standard is satisfied here.

The Petition presents substantial questions concerning Brady obligations, the practical availability of information, possession and access to evidence, the completeness of prior Department reviews, the implementation and understanding of the NPA, preservation practices, recovered evidence, juror-related disclosures, access-to-courts principles, and the effect of extensive post-trial disclosures that were unavailable during trial and direct appeal.

The Court has not merely been presented with disagreements concerning the interpretation of evidence previously available during the underlying proceedings. Rather, the Court has been presented with a materially expanded factual record that includes OPR materials, Acosta records, Parkinson-related disclosures, Main Justice communications, CEOS materials, Villafaña records, therapist-related communications, preservation evidence, recovered investigative materials, juror-related evidence, and substantial disclosures arising from the Epstein Files Transparency Act.

Reasonable jurists could disagree concerning the significance of those disclosures, the extent to which they affect the Brady analysis, the extent to which they bear upon procedural default, the necessity of discovery, the propriety of Rule 7 expansion of the record, and whether an evidentiary hearing is required under 28 U.S.C. § 2255(b).

The same is true of the Court's denial of direct access to the EFTA materials. As discussed above, Petitioner has been required to litigate claims arising from a body of evidence that

61

Petitioner has not been permitted personally to review. That issue independently presents substantial questions concerning meaningful access to the courts, the ability to investigate non-frivolous claims, and the practical ability to litigate constitutional issues arising from the newly disclosed record.

Accordingly, should any portion of the requested relief be denied, Petitioner respectfully requests that the Court issue a Certificate of Appealability as to all issues upon which reasonable jurists could disagree, including but not limited to the issues concerning Brady obligations, EFTA disclosures, access to EFTA materials, Rule 6 discovery, Rule 7 expansion of the record, the necessity of an evidentiary hearing, juror-related claims, and the cumulative effect of the post-trial disclosures.

CONCLUSION

For the foregoing reasons, Petitioner respectfully requests that the Court:

(1) deny the Government's request for summary dismissal;

(2) permit discovery pursuant to Rule 6 of the Rules Governing Section 2255 Proceedings;

(3) permit expansion of the record pursuant to Rule 7;

(4) conduct an evidentiary hearing pursuant to 28 U.S.C. § 2255(b);

(5) grant such relief as may be necessary to permit meaningful access to the EFTA materials and meaningful litigation of claims arising from those disclosures;

(6) preserve for appellate review the issues arising from the denial of access to the EFTA materials and related rulings affecting Petitioner's ability to investigate and present constitutional claims;

(7) issue a Certificate of Appealability as to all issues upon which reasonable jurists could disagree; and

(8) grant such other and further relief as the Court deems just and proper.

Dated: /s/Ghislaine Maxwell

Respectfully submitted,

---

Petitioner
Pro Se

62