1

| | |
|---|---|
| **From:** | Ghislaine Maxwell ███████████████ |
| **Sent:** | Tuesday, June 9, 2026 11:37 PM |
| **To:** | Pro Se Filing |
| **Subject:** | Exhibits 1/4 to Reply |
| **Attachments:** | compressEXHIBITS 1 EFTA.pdf; compressEXHIBITS 2 EFTA.pdf |

**CAUTION - EXTERNAL:**

**CAUTION - EXTERNAL EMAIL:** This email originated outside the Judiciary. Exercise caution when opening attachments or clicking on links.

1

**Box 5:**

████████ (green file folder)

Motion to Quash (file folder)

Motion to Quash ████ Subpoenas (red file folder)

Stolen Globe – ████ (red file folder)

Lefcourt Cases (file folder)

████████ Research (green file folder)

Westlaw case printouts

**Box 6:**

Jane Does Litigation (redwell) with 2 email printouts, Sealed Document Tracking Form with Motion to Seal Opposition to Petitioner's Motion Requesting an Order Directing the Government to File Redacted Pleadings in the Public Court File, and Red File Folder with documents filed in Jane Doe case

Jane Does 1 & 2 v. U.S. (redwell) with CD inside mailing from ████████ and original redacted documents from ████████

Clipped research with Attachment to Subpoena NES, LLC; article titled "Working for Top Bosses on Wall St. Has Its Perks"; Jean-Luc Brunel research; Robert Maxwell; Jeffrey Epstein

Leslie Wexner (file folder)

Kastigar Letters (file folder)

2703 Motion & Order-Cingular (red file folder)

Grand Jury Transcripts (redwell) with folders ████████████████████

Pros Memo (file folder) labeled Duplicate

Proposed Jury Instructions for Violations of 18 USC 2423(b) [Travel in Interstate or Foreign Commerce to Engage in Illicit Sexual Conduct]

Pages 1-6 (of 7 pages) of Non-Prosecution Agreement with highlighted portions

Brown file folder with 6/23/08 letter from John Roth (DAG) to Lefkowitz and Starr; 11/2/2010 Privileged Communication letter re Litigation Hold; clipped Non-Prosecution Agreement

Doe ( ██ ) v. Epstein, 08-80893-CV-KAM (red file folder)

Inside Epstein's Zorro Ranch: the FBI cover-up exposed | 60 Minutes Australia
Apr 26, ,2026    HECTOR BALDERAS FORMER ATTY GENERAL OF NEW MEXICO
@ 12.21 MINS-15.00 MINS.

60 Minutes Australia  with Tara Brown
https://www.youtube.com/watch?v=ZPy40PK_ztY

Transcript

Zorro. 60 Minutes Australia - TRANSCRIPT
0:00.  Coming up on 60 Minutes. What did go on at Zoro? So twisted and so dark.

0:06 Jeffrey Epstein's mansion of horrors. In the middle of nowhere,
some of the most heinous things that anyone could imagine. Place so evil.

0:16 V/O OF CHAUNTAI DAVIES
Both died by strangulation during rough fetish sex. No one could hear his victim's screams. He
destroyed my life.

0:25. That's next on 60 Minutes.
0:29 **TARA BROWN:** The Zoro Ranch in New Mexico sounds like it could be a desert
Disneyland. After all, it was named after the fictional masked crusader. But the reality couldn't
be starker. The remote property was in fact one of sex predator Jeffrey Epstein's lair. And with
the release of the damning Epstein files, we're learning much more about the horrors that went on
there. Not only was it the alleged scene of sexual abuse against minors and young women, it was
where the maniacal Epstein dreamt of developing a designer baby farm. Shockingly, there are
even suggestions of bodies buried at the ranch. So, what did the authorities know about this place
and when?

1:14
**TARA BROWN , HOST 60 MINS - TO CHAUNTAI DAVIES, 'SURVIVOR'** - Where did he
take you and where did he abuse you?

1:18
**CHAUNTAI**: So, the first abuse happened on the island and then at Zora Ranch, New York,
Paris, Palm Beach, St. Tropez.
1:37
**TARA BROWN:**
Out of all those places that you've just named, was there a particular spot that was more sinister,
more scary than the others for you?

**CHAUNTAE:** Of all the locations, I would say Zora Ranch was probably themost eerie. Um, just giant and quiet and literally in the middle of nowhere and miles and miles of just mountains and dirt for miles.

2:11

These are the desert plains and snow tipped mountains of Santa Fe County in New Mexico. It's a harsh and remote place where the sexual predator Jeffrey Epstein built the opulent and oversized lair he named Zoro Ranch. a hideaway in the middle of nowhere. It is finally being forced to give up its terrible secrets of sex abuse, human trafficking, and maybe even murder. Epstein's survivor, Chantae Davies, is deeply haunted by Zoro, where no matter how loud you screamed, no one could hear you.

2:51

**CHAUNTAE:** There was a lot of time spent in my room at Zoro, feeling very much like a mouse trapped in its cage, just kind of waiting until someone would come to my door and say, "Jeffrey's ready for his massage now."

3:04

TARA BROWN: What did that really mean?

3:07

CHAUNTAI: Rape. Yeah, it was full on forced on sexual um rape.

3:18

Time is up. Fighting for survivors like Shante is Democrat Congresswoman Melanie Stanbury.

3:25

We are fighting for gentle lady's time is expired. Members are reminded to direct their remarks we chair and not a perceived viewing audience to refrain from engaging in personalities against the president. Pursuant to clause 12A of rule one, the chair declares she is one of a rare number of people to have seen the unredacted version of the Epstein files and what she has seen and read has propelled her to action.

3:50 **CONGRESS WOMAN _____:** There's certainly hundreds of allegations of women who experienced those really dark experiences. And so I think we're really dedicated to getting to the bottom of the truth of what happened in New Mexico and on that property.

4:04

2

TARA BROWN V/O: Authorities are now searching a ranch in New Mexico once owned by Epstein. Of all the Epstein properties, Zoro has been the forgotten strand in his evil web. But while the ranch has long beenoverlooked, it's feared it's where Epstein's worst crimes were committed.

4:22.
TARA BROWN: What was it that affected you so much?

4:26
CHAUNTAI DAVIES: I think that for me personally to read the firsthand accounts of the violence that was committed against survivors and detailed descriptions of the assaults that happened to them by both Epstein and Ghislaine Maxwell was truly chilling and dark. The darkest revelation, the ultimate act of violence was uncovered in this email alleging the death of two young women on the ranch. It's claimed to have been written by a former staffer there. A distressing tip off forwarded to the FBI in 2019 that was seemingly never investigated. The email reads, "Did you know somewhere in the hills outside of the Zoro, two foreign girls were buried on orders of Jeffrey and Madam G? Both died by strangulation during rough fetish sex."

5:24
TARA BROWN: Not nice to read.

5:28
CONGRESS WOMAN_____ " No, I was so alarmed by that particular tipthat came into the FBI that I immediately contacted the New MexicoAttorney General to reopen a criminal investigation. And the way that tip was reported matched the pattern of other abuse and transport and trafficking of women. And that's why it raised alarm bells for me. It's a dark world where a tip off like that could be considered real.

5:59
V/O ANDREA ROMANO, STATE SENATOR NM: Yes, absolutely. The news that came through the release of the files that there had been bodies buried at Zoro Ranch was all news to us. And that really sent a shock wave of concern through our communities that how has this never been resolved? How do we know whether or not this had ever been investigated or closed?

TARA BROWN: In response to the discovery of the disturbing email, New Mexico State Representative Andrea Romero is spearheading a specially formed truth commission to investigate the startling allegations as well as why the FBI kept them secret back in 2019. And they never prosecuted anything in New Mexico. They never did an investigation at the time that he was in operations here. It's hard for me to see that any justice was done. If the FBI didn't do it,

3

what what can we know? Um, so absolutely we're trying to pick up the pieces here in New Mexico. The first step has been to look for the bodies and to finally search the Zoro Ranch. Inexplicably, it's the one Epstein property federal agencies failed to raid upon his death. They have at this time conducted a complete and thorough investigation physically of the property, including imaging of all 7,500 acres of the property. They're right now doing a technical analysis of that imaging data to understand if it reveals anything. Um, one of the things that's very odd is that there was still letters, there was handwritten documents, there were books, there were other things that were still on the property.

**TARA BROWN:** And is it believed that that is evidence that could lead to further prosecutions?

7:54
**ANDREA ROMANO:** Well, what I can tell you is that New Mexico's Department of Justice is deeply committed to turning the Epstein files
into Epstein trials.

TARA BROWN: First recruited into the Epstein world by Ghislaine Maxwell,
Chauntae Davies was abused by the predator from 2001 to 2005.
She remembers the rumors about the burial of the two unknown girls at Zoro. But there were also other terrifying and bizarre accounts shared with her by other victims. girls waking up in sort of like a dark room with like a female doctor standing over them, feeling like maybe there is some kind of procedure that had happened that they weren't aware of.

**CHAUNTAI:** And I believe this is in the files. I'm sure there's something in there about a baby actually being born um and then just just disappearing like Ghislaine taking it. Um, I personally never witnessed anything like that, but I do remember overhearing conversations about trying to create the perfect baby, the perfect baby, the perfect gene pool. And I know that there was sort of a hunt, if you will, for the perfect gene pool.

9:11
**TARA BROWN:** Zoro was a wacky hideaway for Epstein and his cronies and a place to enact their most freakish fantasies, including at one point a plan for a controversial designer baby and human cloning project in which emails from the files show the maniacal Epstein was prepared to invest in as long as he remained anonymous.

9:35
CONGRESSWOMAN_____We were hearing some of the most horrible and heinous things that anyone could imagine. Um, the allegations span everything from the harvesting of sex organs to allegations of women having forced abortions or forced pregnancies

4

um or coerced pregnancies. I think when we think about the stories in the span of stories, it it sounds fictional. It sounds like a horror film. And as the Epstein files reveal, men and boys were not spared with Epstein accused of multiple rapes.

A man actually claims that he met Jeffrey Epstein, was brought to the ranch, he was drugged, and he describes in detail a scene in which multiple young men were raped at the ranch in front of him after he was drugged.

**TARA BROWN:** You hear about Jeffrey Epstein's uh penchant for minorsum and for young women, but not men. We haven't heard that before.

10:36

**CHAUNTAE:** Yeah. I mean, Jeffrey Epstein and Ghislaine Maxwell were serial abusers. So, they really were super predators and it's clear that they they this was just how they live their lives. I just can't imagine to have a desire todo such evil things so badly. Like what what is inside somebody that's so twisted and so dark that they would spend their lives having a fully working vessel of abuse.

11:15

**TARA BROWN:** But perhaps even more chilling is the revelation in the Epstein files that federal authorities knew years ago but did nothing about these suspected crimes. As you'll see, in an absolute blind side, the FBI claimed to take over the investigation into Epstein only to secretly shut it down.

11:39

He was very close to being investigated and arrested and convicted like any other sex abuser uh in the world.

11:56

Strikingly remote and epic, Zoro Ranch, Jeffrey Epstein's former hangout in New Mexico is undeniably impressive. Unless you don't want to be here, there's nowhere to run or hide. It is the perfect play pen for a pedophile and sexual predator. This abuse was horrific, but so was the cover up.

12:21

TARA BROWN: **Hector Balderas** is the former attorney general of New Mexico. He's heading to the ranch to visit the roadside shrine honoring Epstein's many victims. In 2019, Hector and his state authorities were pursuing allegations made by underage girls, but he was forced to hand over his investigation to the federal authorities who said they would handle it. Instead, they did nothing

5

12:49

**HECTOR BALDERAS** _ and will probably be a tactical mistake that I'll live with for the rest of my life. We began really ratcheting up in early 2019. We began to interview a survivor and set up uh additional interviews and we were immediately contacted by the Department of Justice in New York. They asked us to hold back on the interview and to stand down because they were concerned that we were going to secure a parallel interview in which a survivor could contradict themselves and that it might put uh the federal case at risk.

13:26

TARA BROWN: So legally it made sense for you to hand over your investigation to the feds.

13:33

**HECTOR BALDERAS:** Legally at that point it was in the interest of the survivors that we were working with. Yes.

13:39    TARA BROWN: But thanks to the Epstein files, Hector has only just learned in 2019 the FBI knew but did nothing about the extraordinary allegation two young women had been killed and buried near the Zoro ranch.

13:55

Hector Balderas: To see that they sat on so many tips and didn't involve us to strengthen their investigation is very concerning. When there's a tip about dead bodies, um the feds completely did a disservice by not sharing that information with us in light of the fact that we had an agreement and in light of the fact that we have communication um indicating that we want to aggressively co-prosecute. And even in my first 2019 letter, I indicate that we are willing to co-prosecute co-conspirators.

14:31

TARA BROWN: It seems the death of Jeffrey Epstein in August 2019 spelt the end of the federal investigation into his crimes in New Mexico. In stark contrast, Hector was urging prosecutors to seize and search the Zoro Ranch, but they were stalling.

14:49

Hector Balderas: It's alarming and severely unprofessional. They kept all of these conversations secret. Um, I've never seen these conversations. Internal emails reveal they raised doubts they had reasonable grounds or probable cause to believe a crime had been committed.

6

15.00 TARA BROWN: If there are tips that there are women buried on the property or near the property, then is that not probable cause to actually search the place?

15:17
ANDREA : Yes. Yes, it is concerning that they would say in uh the fall of '19 that they don't have probable cause to enter his property in New Mexico. And I I for the life of me, I can't understand why you would leave New Mexico out.

15:34  TARA BROWN: It beggars belief, doesn't it? When you consider that, you know, in Manhattan, the mansion was raided on the island. The mansion was raided in Florida. I assume in Paris, why not in New Mexico?

15:50
ANDREA: That's at the top of mind of so many people at this point, it's an outrage that with all of these allegations um piled up, how could this never have been even searched, even in any sort of basic inquiry? So, our state government had asked to seize the ranch even while there was still evidence to preserve, and the federal government never did that.

16:16

TARA BROWN: New Mexico State Representative Andrea Romero is the head of the specially formed Truth Commission. Alongside the Attorney General's office, her team is hunting Epstein's co-conspirators, something the federal authorities have so far turned a blind eye to.
16:34
16 minutes, 34 seconds
TARA BROWN: Do you expect this investigation, the two-pronged investigation in New Mexico to lead to further prosecutions?
16:41
16 minutes, 41 seconds
ANDREA ROMERO: Yes, you committed a crime here. We are looking to you and we will find you.

TARA BROWN ASKS CHAUNTAE DAVIES: Do you have much faith?

16:50
CHAUNTAE: I really wish I could say yes. I would love to have faith and hope in anything at this point, but um No. No, I don't. I mean, whoever it is that is covering up whatever it is that they're covering up has gone to great lengths to make sure it stays covered up.

7

No, I don't think there will ever be a full disclosure of of it all.

**TARA BROWN**: So that opportunity in your view has been lost?
17:16
17 minutes, 16 seconds
**CHAUNTAE**: Yes.

17:18
**TARA BROWN**: Shantae Davies says she was trafficked to the ranch and abused there by Epstein many times between 2001 and 2005. Like many survivors, Shantae stayed as long as she did, both manipulated and terrorized in equal measure.

17:37
**Chauntai**: I definitely was too afraid to escape on my own. Um, I I thought I would literally be the only one going against him if I did that because everybody I met had nothing but good things to say about him. I met women who had been sent to medical school, women who had been sent to law school. All these women praised him. So, in my head, I'm thinking, "This man's abusing me, but I must be the problem because all these women and all these men, they all love him." I was only 17.
18:13

**TARA BROWN:** 18 minutes, 13 seconds
Chantae could only make the break when she learned her younger sister, Tila Davies, was also being abused. Epstein tried to make her stay, though, with promises of money and desirable jobs.

18:26
**CHAUNTAE:**
And I said to him, I don't want anything more from you. I I know what's been happening with my sister and I don't want anything more to do with you guys anymore. Um, and he said to me, Shante,
'life is about reality. It's not about dreams and if you think you'll ever get anywhere in this life without me, you are very wrong'. And he hung up on me. And um, that was the last we spoke or had any communication.

18:58
CHAUNTAE SNIFFLING - Sorry.

TARA BROWN: Are you okay?

8

19:05
Yeah.

19:16 seconds
TARA BROWN: Why does that aspect of it upset you?

19:16
CHAUNTAE: Because at that time, I thought he is so wrong. He has no idea.
and I was still so sure of myself that I was going to make my dreams come true.
Um, I think back to that conversation and it just, just makes me angry all over again because in a way
he was right. He destroyed my life and I didn't see it then. and I see it now.

19:59
It's heartbreaking accounts like Chaunte's that drive the law enforcement teams of New Mexico
to pursue further restitution from Epstein's estate to potentially lay more charges against
Ghislaine Maxwell and to round up co-conspirators.

20:18
What an incredible opportunity to get it right. Um, but certainly as an opportunity for New Mexico to
tell the world that we're not going to be messing around when it comes to the rule of law, that nobody
is above the law in our state, that we take this very seriously. Um, if folks were, you know, abused in
any way, shape, or form, that we will go after them. Um, and that's what we believe in. And no one is
going to be able to tell you to stand down. Absolutely not.

20:53
On this week's 60 Minutes podcast, Extra Minutes, why the Zoro Ranch was the perfect location for
Jeffrey Epstein's evil.
21:02
It strikes sort of fear into your heart when you see it's in the middle of nowhere. Just surrounded by
desert. So,
21:09
if you're taken there and you don't want to be there, it's a terrifying place.

21:21
Hello, I'm Nick McKenzie. Thanks for watching 60 Minutes Australia. Subscribe to our channel now
for brand new stories and exclusive clips every week

9

A    Not to my recollection.  I think there's a fulsome record, and not to my recollection.

Q    All right, and is there any particular gap that you've discerned in the records that we've provided to you?

A    Not that I recall.  Do you have the e-mails that I sent, out of curiosity?

Q    We do.

A    Okay.  So, you have the sent, but not received.

Q    Yes.

A    Just checking.

Q    And likewise, we retrieved from the federal records center --

A    Right.

Q    -- records that were boxed up and sent there, hard copy documents, after your term ended, and there is nothing that relates to the Epstein case.  There were records that were maintained that were kept in the main office --

A    Right.

Q    -- after you left, because it was an ongoing matter, but it -- do you have any idea why there are not any in the records of yours --

A    So --

Q    -- that were sent?

A    So, I have a recollection that when I left, there were some binders that I passed along to ██████, because it was

agreement or deferred prosecution in favor of state prosecution in the way that the Epstein case was handled. I believed that the fairest course was to consult with the victims before the execution of any agreement.

The second significant departure from my regular practice was the victim notification procedure. Never before or since have I shared "drafts" of victim notifications with counsel for the defendants. The CVRA places the entire burden of complying with the Act on the government and the court and provides that a "person accused of the crime may not obtain any form of relief under this Chapter." 18 U.S.C. § 3771(d)(1) (2004). But, in this case, I was required to provide draft victim notification letters, rewrite them due to objections from defense counsel, and refrain from sending them altogether. My protestations appear in my emails, and were shared with the agents, my legal assistant, and my supervisors.

With regard to FBI policies and practices, I understood that the FBI had its own victim notification procedures. I had previously worked with ▮▮▮ ▮▮▮ on other cases (and worked with her on other cases after the Epstein investigation). I did not know the details of what FBI included in its letters or when they were sent. I did not instruct FBI on what to send or when to send it. My general rule is to tell agencies to follow their regular procedures. I don't remember saying anything different in this case. I did not see any FBI letters in this case prior to collecting the FBI letters to Brad Edwards' clients in connection with the *Jane Doe v. United States* litigation. I did not instruct the FBI to include the language about the case being under investigation and that they should be patient.

2. **Identify all victims in this case to whom written or oral notifications were made, when and how each notification was made, and the contents of the notifications. Explain why notifications were made to some victims, and not to others, and who was responsible for those decisions.**

On the attached chart (Exhibit B-1), I listed all of the individuals identified as victims during the state investigation, the federal investigation, or after Epstein entered his state guilty plea, but who were brought to my attention by various attorneys. The chart lays out how and when each was contacted. Due to the passage of time, it is impossible for me to give exact dates and the exact content of each conversation. Also, there are some victims that I specifically remember meeting with. There are some that I know I did not meet with. There are others that I believe I met with, but I am not certain. I have qualified my answers on the chart accordingly.

On August 4, 2006, I prepared 24 Victim Notification Letters for victims who had been identified during the state investigation. (Exhibit 12.) These were provided to Special Agent ▮▮▮▮▮ to hand-deliver to victims during interviews. I decided to prepare these letters and I decided on the content of those letters.

On August 11, 2006, 18 amended letters were prepared. (Exhibit 13.) These letters clarified that the recipients were victims and/or witnesses, since we had not yet been able to confirm that they were minors during the time of their encounters with Epstein and we were still working to confirm federal jurisdiction. People who had already received the August 4, 2006

responsible officials remain obliged to ensure that all such delegated responsibilities are discharged. The Attorney General designates the following responsible officials: . . . For cases in which charges have been filed—the U.S. Attorney in whose district the prosecution is pending."))

EFTA00225084

(b) Admitted.

(c) Denied.

(d) Denied.

(e) The government admits that, during the period from September 24, 2007 through June 2008, the USAO did not notify Jane Doe #2 of the existence of the non-prosecution agreement. The government further admits that, although FBI agents notified Jane Doe #1 of the existence and substance of the agreement at the request of the USAO on or about October 27, 2007, no employee of the USAO personally notified Jane Doe #1 of the existence of the non-prosecution agreement during the period from September 24, 2007 through June 2008. Except as otherwise admitted above, the government denies Request No. 9(e).

10. (a) Admitted. Because Request No. 10 appears directed solely to the communications between FBI agents and Jane Doe #1 during their meeting on or about October 26, 2007, the government responses to Requests No. 10(b) through 10(g) address only that meeting.

(b) The government admits that, on or about October 26, 2007, FBI agents explained to Jane Doe #1 that Epstein would plead guilty to state charges for procuring minors to engage in prostitution; that Epstein would be required to register as a sex offender; that Jane Doe #1 would be entitled to seek damages from Epstein; and that, if she desired, Jane Doe #1 would be entitled to use the services of an attorney at no expense to her in seeking those damages from Epstein. The government denies that the FBI agents explained that the state charges "involv[ed] another victim."

5

EFTA00191203

his 14-year-old girlfriend and later digitally penetrated her. The SDFL has prosecuted numerous violations of 18 U.S.C. § 2422 where the "facility of interstate commerce" – generally the internet and telephones – are used by a defendant and an undercover pretending to be the parent of a minor, to arrange for a meeting that the defendant hopes will result in sexual activity. There is nothing extraordinary about Epstein's case except the large number of victims involved.

Epstein's counsel neglected to inform you that the age range of the victims includes girls as young as 14, and glosses over the fact that Epstein did not simply engage in "solo self-pleasuring" in front of the victims. Instead, with each visit, he pressured the victims to allow him to engage in more and more sexual activity – fondling breasts and vaginas, digital penetration, use of a vibrator on their vaginas, performing oral sex on them, having them perform oral sex on his adult girlfriend, and engaging in sexual intercourse. Counsel also neglected to inform you that many girls did affirmatively tell Epstein their true ages and he told several that he "did not care about age."

Epstein's conduct was not "purely local." He and his assistants called and sent text messages to victims in Palm Beach County from other states to arrange "appointments" for his upcoming visits to Palm Beach. And, while in Palm Beach, Epstein and his assistants called victims in New York to arrange "appointments" for his return to New York. Epstein wired money to some victims and sent gifts through the mails. This case falls squarely within federal jurisdiction.

Epstein also falsely claims that certain facts related to the resolution of the case were hidden and later discovered by his lawyers. For example, they complain about the proposed use of a guardian ad litem, stating that "Mr. Epstein's counsel later established that all but one of these individuals were adults, not minors." It was AUSA Villafaña who told Epstein's counsel that all of the victims but one had already reached the age of majority, which was one reason why the guardian ad litem procedure proposed by Epstein's counsel would not work. Likewise, AUSA Villafaña disclosed to Epstein's counsel that one of the five attorney-representatives that she recommended for consideration by Epstein's counsel was a "good friend" of a "good friend." Despite the disclosure of this relationship, Epstein's counsel selected that person, before the SDFL, on its own, decided to use an independent Special Master to make the selection.

Epstein's counsel states that the "USAO eventually asserted that it could not vouch for the veracity of any of the claims that these women might make," but neglects to disclose that the SDFL made that statement *at Epstein's request* to avoid the suggestion that the SDFL was involving itself in the outcome of civil litigation.

Epstein's counsel have repeatedly attacked the SDFL and the FBI for classifying the victims as "victims." As you know, all Justice Department employees have the obligation to identify victims and to notify them of their rights. "Victims" are defined by law, not by self-selection. The girls whom have been identified by the FBI and the SDFL fall within the legal definition – they were all minors who engaged in illicit sexual activity with Jeffrey Epstein, at his request, in exchange for money. From interviewing them, the FBI Special Agents, the FBI Victim-Witness Coordinator, and AUSA Villafaña all feel confident that they suffered harm, in a

14

EFTA00190465

## PURCHASE OF G4

-Correspondence

-Attorneys Notes

-Memoranda

-Letter of Intent

-Aircraft PurchaseAgreement

-FAA Registration

-Warranty Bill of Sale

-FAA Bill of Sale

-Delivery Receipt

-Preliminary Acceptance Certificate

-Title Searches

-Wire Transfers

## SALE OF 9 EAST 71st STREET

-Correspondence

-Attorney Notes

-Research

-Memoranda

-General Ledger 9/30/98

-Purchase Agreement Drafts

-Guaranty Drafts

-Assignment & Assumption Agreement Drafts

-Promissory Note Drafts

EFTA00300497

-Police Report
-Letter from Lefcourt to ███ & ███ . Feb. 1, 2007
-Letter from Lefcourt to ███ . Feb. 23, 2007
-Letter from Lefcourt to ███ , ███ , ███ & ███ . June 25, 2007
-Letter from Lefcourt to ███ , ███ , ███ & ███ . July 6, 2007

## MISCELLANEOUS JE CASE DOCUMENTS

-Letter to ███████ , Chief, Criminal Division US Attorneys Office
From Lilly Sanchez, Aug.2, 2007

-Letter To Lilly Sanchez From Alexander Acosta, Dec. 19, 2007

-Letter to Mike Tein from ███████ , July 17, 2008

-Notification of Identified Victim (to Edwards from ██████ ) (Victim
Info 2008)

-Epstein-Responses-Confidential (Final Aug. 16. 2007)

-Compilation DVD Made by ███████

-Video Depositions (Could use in Brad Edwards Case)

## Bill Riley Investigations Sent to Mike Tein and Roy Black

### MERRIE SPAETH COMMUNICATIONS, INC.
MERRIE SPAETH CONFIDENTIALITY AGREEMENT
PBL INVOICES
CIVIL CASES
NON-PROSECUTION AGREEMENT
AMERICAN HOME ASSURANCE
VOLUMES I & II BACKUP BINDERS

### PALM BEACH LITIGATION
-Non-Prosecution Agreement and Addendum
-June 12, 2008 Draft DOJ Letter
-Letter to Filip from Starr and Whitley (5-27-08)
-March 28, 2008 Letter to DOJ
-DOJ Submission (Summary)
-DOJ Submission (Attachment Letter)

EFTA00300514

-April 8, 2009 Submission to Hon. Mandelker
-April 28, 2008 Submission to Hon. Mandelker
-Letter from DOJ
-May 19, 2008 Letter to Hon. Filip
-Correspondence
-Correspondence sent to Roy Black (June 12, 2008)
-Submission to Hon. ████████ Asst. Attorney General
-Kirkland & Ellis 4-8-08 Letter to DOJ ████ Misconduct
-Letter to ████ Asst. US Attorney 2-23-07
-Letter to ████ Asst US Attorney 2-1-07
-Submission To the US Dept. of Justice in the Matter of JEE
-November DOJ
-Presentation Outline August 31, 2007
-JEE Case Analysis Chart
--Mathew Freidrich Biography
-Sentence (June 30, 2008)
-Cover Sheet from ████ re JE's Tax Returns
-Charges and Sentence
-Investigative Management Group


## PB CRIMINAL LITIGATION FILE

Gun Possession

Correspondence from JEE to DKI

████ email to Gauger re Work Release

████ letter to Captain Sleeth re Work Release, Dec. 11, 08

Non-Prosecution Agreement

Addendum to Non-Prosecution Agreement (**MISSING WHEN DARREN RTRND Jan.2011**)

Plea Agreement

Transfer of Community Control

Kreusler-Walsh, Compiani & Vargas Signed Representation Letter

Community Control Order (in JE's Criminal Case)

Summary of Arguments Regarding Work Release (by Kirkland & Ellis)

EFTA00300515

Letter to Jay Lefkowitz from US Attorney, July 7, 2009

Kreusler-Walsh Summary of Law RE Stays Pending Appeal

Indictment

Drafts & Misc JEE Criminal Matter

Sentence

Order on Motion

Research Re Restoration of Civil Rights

Denial of Restoration of Civil Rights by PB Parole Boar


**PALM BEACH LITIGATION**

GRAND JURY SUBPOENA MOTION

NOTICE OF HEARING DATES

POLICE REPORT

LETTER FROM LEFCOURT TO ▮▮▮▮ FEB. 1, 2007 (& ANDRE ▮▮▮▮ )

LETTER FROM LEFCOURT TO ▮▮▮▮ FEB 23,2007

LETTER FROM LEFCOURT TO ▮▮▮▮ , ▮▮▮▮ , ▮▮▮▮ & ▮▮▮▮ JUNE 25, 2007

LETTER FROM LEFCOURT TO ▮▮▮▮ , ▮▮▮▮ , ▮▮▮▮ & VILLAFANAJULY 6, 2007

Palm Beach Litigation Invoices

1. Critton Retainer Agreementn (DKI Summary of Critton Retainer)
2. Burman, Critton, Luttier & Coleman
3. Bruce E. Reinhart
4. ▮▮▮▮ Firm
5. William (Bill) Riley
6. Riley Kiraly

**DOCUMENT PRODUCTIONS REC'D FROM CRITTON**

EFTA00300516

CONFIDENTIAL SUBMISSION TO CHILD EXPLOITATIONAND OBSCENITY SECTION

**MISC. PALM BEACH BINDER**

**PB Matters 2012**
Chronology of Relevant Doc's in PB Matter (CD)


## GRM#004750684

**FORM TRUST AGREEMENTS**

**Wexner Miscellaneous**
1. YLK Charitable Fund
2. Annual Inv for Statutory Representation for Buckeye, LLC
3. 1099-DIV for the RHREI Trust


**LSW CLIPPINGS (LESLIE WEXNER)**

**PB MARINE CONTRACTORS**

**BRIAN MOSELEY  PROGRESS PRINT, SEPT 28, 2005 LSJ**

**MOLYNEUX LSJ SET OF DRAWINGS MARCH 6, 2008**

**MCGUIRE GROUP, APRIL 12, 2007, WATER DEMAND MATRIX, UTILITIES MASTER PLAN REPORT JUNE 26, 2006, CONSTRUCTION PHASE DRAWING CP1, DRAWING L1 LANDSCAPE REVISED 1/5/07, Mech Building Sketch**

**ZORRO RANCH WATER RIGHST ABSTRACT REPORT BINDER, SEPT. 1, 2005**


**ZORRO RANCH KING BROTHERS LAND STORAGE**

**PURCHASE OF EXECUJET**

EFTA00300526

CLOSING BINDER FOR PURCHASE OF ZORRO RANCH BY ZORRO TRUST, MARCH 8, 1993

ORGANIZATIONAL INFORMATION OF ENTITIES JEE, SEPT 15, 2008

LAUREN KWINTER'S OLD SPIRAL NOTEBOOK

CONTENT TO CHANGE ATTORNEY –RADAR MAGAZINE


GRM#004750685

LEFCOURT CRIMINAL FILES


GRM#004750686

LEFCOURT OCT. 19, 2006 PB BINDER

▮▮▮▮▮ CORRESPONDENCE POST 6/30/08

NATHAN DERSHOWITZ APPLICABLE FEDERAL LAW BINDER

PALM BEACH MATTERS: EPSTEIN BACKUP BINDER 1 OF 2

PALM BEACH MATTERS: EPSTEIN BACKUP BINDER 2 OF2

SEX OFFENDER REGISTRY

LEFCOURT INVESTIGATION OF ▮▮▮▮▮

CIVIL CASES CD

INDEXES OF COMPUTER FILES


GRM#004750687

EFTA00300527

Purchase of Island Global/AYH Ownership

## GRM#004740697 (Took From Storage June 13, 2013)

CMA vs. JEE and ███████
Correspondence
Summons and Complaint JEE
Summons and Complaint ███████
Motion, Notice and Order of Dismissal

Rosenfeldt vs. Rothstein

**Doe 1  Case # 6596** ███████

**Doe II   Case # 20614  Document Production**

**Doe II  Case # 20614** ███████

**Jane Doe 8  Case # 80802** ███████

**Jane Doe 102  Case # 80656** ███████

**CMA  Case# 80811** ███████

**AC  Case # 25129** ███████

**DRAWER TWO:**

Josefsberg Invoices and Disc

**81092**

**Doe 2  Case # 80119** ███████

**Doe 3  Case#  80232** ███████

**DRAWER THREE**

EFTA00300530

Doe 4  Case # 80380 ███████

Doe 5  Case # 80381 ██████████ / ████████

## DRAWER FOUR

Doe 6  Case # 80994 ███████

Doe 7  Case # ██████

Jane Doe 101  Case # 80591 ███████

## FIFTH DRAWER

Jane Doe  Case # 80893 ████████

Jane Doe II  Case # 80469 ██████

LM  Case # 28051 ██████

LM CASE #20851 PETITION FOR WRIT OF CERTIORARI AND APPENDIX TO PETITION FOR WRIT OF CERTIORARI **(LOCATED IN A REDWELD ON ITS OWN!)**
    EDWARDS

EW  Case # 28058 ███████

BB  Case # 37319 ██████

Case # 80736

Case# 4D09-2254

## ON THE FLOOR

Video-Conferenced and Videotaped Deposition of Jane Doe 4, Tues. Oct. 27, 2009 (Volume I of III, Volume II of III and Volume III of III) Video-Taped Compulsory Medical Evaluation of Jane Doe 4 Volume I and II

Video-Conferenced and Videotaped Deposition of ████████████, Dec. 4, 2009 (Volume I of II and Volume II of II)

EFTA00300531

Page 298

recommendation.  So, best efforts kind of became a sticking point in enforcement, didn't it?  Because what does it mean?  What does best efforts mean?

A    So, I think it's fair to say that one of the issues that came up after this was entered into was the U.S. Attorney's Office, at least from my perspective, was in a little bit of a bind because we had agreed to this, yet he wasn't turning himself in.  And so, how do we deal with that?  And so, that's not a phrase that I focused on at the time.  I understand your point.

Q    All right.  I'm going to move on from those.  Is there anything else on those NPA clauses?

A    And finally, let me -- let me just say you didn't ask, we had incredibly experienced attorneys in the office.  I assumed, rightly or wrongly, that this language had been thought through and vetted, and you know, sitting here 12 years later, I understand the issues that have arisen from it, but at the time, these were not issues that were focused on.

Q    to your knowledge, who was involved in the drafting, other than ███ █████████ on your side --

A    Right.

Q    -- and ███ Lourie, and you, to some extent?

A    So, I can't say 12 years after the fact, but again, ███ Lourie, very experienced head of the Palm Beach Office

EFTA00009114

Page 299

has prosecuted any number of cases.

Q    In -- again, just to keep --

A    Right.

Q    -- perspective and context, the final week that this was being negotiated, ▮ Lourie was in Washington, and bouncing back and forth on the weekends, because he was in transition to the front office here in the criminal division in this building. That's a factor in terms of being able to give attention to some details. Would you agree with that? It could be a factor?

A    So, it could be a factor. On the other hand, I'd say that ▮ wasn't leaving the department. He is professional. He knows his stuff, and you would expect a professional -- if they're reviewing a document, whether they're on vacation, whether they're looking to move from one part of the department to another, that you would expect them to review it, you know, fulfilling their -- their responsibility to sort of focus in and make sure that -- that it's -- that it encompasses what it should. And that's not a criticism of ▮. That -- that's saying that, well, that might be a factor. That doesn't lessen from my perspective reliance on his expertise.

Q    Mm-hmm. Understood. After the NPA was signed --

A    Right.

Q    -- and ▮ came back --

EFTA00009115

Page 285

A    I -- I don't recall focusing on the coconspirator provision. To the extent I reviewed this coconspirator provision, I can speculate that my thinking would have been the focus is on Epstein's -- Epstein's going to jail. Whether some of his employees go to jail, or other, lesser involved, is not the focus of this.

Q    All right. This particular provision, as you know, has been --

A    It has --

Q    -- enormously --

A    -- generated --

Q    -- criticized.

A    Enormous, yes.

Q    For a number of reasons. One of which is that it is blanket transactional immunity. It gives blanket immunity to unnamed, unidentified --

A    Yes.

Q    -- potential coconspirators. People who, even in the future, if evidence is developed against them, as long as they could be considered coconspirators of Epstein in this conduct, they have a get out of jail free card. Do you have any idea where that came from?

A    I don't, and I don't want to characterize it as giving -- I understand how it could be read that way in the record. I don't want to characterize it, but I don't know

EFTA00009101

One such condition to which Epstein has agreed is the following:

> "Any person, who while a minor, was a victim of a violation of an offense enumerated in Title 18, United States Code, Section 2255, will have the same rights to proceed under Section 2255 as she would have had, if Mr. Epstein had been tried federally and convicted of an enumerated offense. For purposes of implementing this paragraph, the United States shall provide Mr. Epstein's attorneys with a list of individuals whom it was prepared to name in an Indictment as victims of an enumerated offense by Mr. Epstein. Any judicial authority interpreting this provision, including any authority determining which evidentiary burdens if any a plaintiff must meet, shall consider that it is the intent of the parties to place these identified victims in the same position as they would have been had Mr. Epstein been convicted at trial. No more; no less."

On July 9, 2008, Jack Goldberger wrote me a letter with some objections to the Proposed Notification. Although he had several requests for changes, he stated: "Rather, *a simple one page notification directed only to the recipient, and limited to the information currently on the first page of your draft memorandum would suffice.*"

This, to me, is a written assent that the quoted language is, in fact, one of the conditions to which Epstein has agreed. So, I think that we do have a written, binding agreement comprised of the three documents that, as far as I know, were filed with the state court with Jack Goldberger's approval. (I am waiting to hear back from the ASA.)

Here again is what I provided to the State Attorney's Office, for your records.

<<Epstein Agrmt001.pdf>>

I am concerned that we were adamant before Epstein's plea that we had a complete agreement and nothing more was necessary and now taking the position that we do not have an operative document (or set of documents).

Alex, does the Black and Goldberger correspondence described above allay your concerns? Or would you still like me to raise this issue with Roy whenever he gets back to me?

Thank you, sorry for the lengthy e-mail.

A. ██████ *Villafaña*

Assistant U.S. Attorney

500 S. Australian Ave, Suite 400

West Palm Beach, FL 33401

Phone ██████

Fax ██████

From: ██████ ██ ██ C. (USAFLS)

EFTA00190614

███ , ██ ██   C. (USAFLS)

| | |
|---|---|
| **From:** | Acosta, Alex (USAFLS) <AAcosta@usa.doj.gov> |
| **Sent:** | Wednesday, August 13, 2008 6:03 PM |
| **To:** | ███ ██ (USAFLS); ██ ██ (USAFLS); ██ ██ (USAFLS); Lee, Dexter (USAFLS) |
| **Cc:** | ███ , ██ C. (USAFLS) |
| **Subject:** | Re: Epstein |

3C

This is why we need to get agreement on the final version of the agreement.

----- Original Message -----
From: ███ , ██ (USAFLS)
To: Acosta, Alex (USAFLS); ██ ██ (USAFLS); ██ ██ (USAFLS); Lee, Dexter (USAFLS)
Cc: ███ ██ ██ C. (USAFLS)
Sent: Wed Aug 13 17:39:51 2008
Subject: Epstein

███ and I just got off the phone with Jay-he is not on the civil case. After discussing the hearing for tomorrow and being told that if we had to supply the agreement it would be all three documents he again said that we should talk because that was not their view of the agreement. He said a unilateral change in the agreement in the letter from Alex (although he knew that Alex did not want to hurt Jeffery) could not change the terms of the agreement and put Jeffery in a worse position. ███ pointed out that the letter sent to the victims and approved by Goldberger and others quoted from that letter. He said he had not seen it so ███ is sending him the paperwork. It seems clear that they want all the advantages in subsequent agreements and none of the disadvantages. He thinks this is like a Chinese menu family style—pick and chose what you want from columns A & B. Back to wiretaps!!

320

EFTA00190632

# EPSTEIN INVESTIGATION TIMELINE

| Date | To | From | Re: | Exhibit # |
|---|---|---|---|---|
| 5/1/2006 | State Attorney Barry E. Krischer | Michael S. Reiter, Chief of Police for Town of Palm Beach | Letter urging State Attorney to proceed with probable cause affidavits and case filing packages or to recuse himself | 1 |
| 5/23/2006 | | | File Opening Documents for Operation Leap Year | 2 |
| 7/24/2006 | | Michael S. Reiter, Chief of Police for Town of Palm Beach | Letter noting that Palm Beach Police Chief was unhappy with State Attorney's handling of case and was referring matter to the FBI for investigation | 6 |
| 7/26/2006 | | | South Florida Sun-Sentinel Article Regarding Chief Reiter's referral of case to FBI | 7 |
| 8/2/2006 | | | Subpoena to Colonial Bank (return date 8/18/06) | |
| 8/2/2006 | | | Subpoena to Washington Mutual (return date 8/18/06) | |
| 8/2/2006 | | | Subpoena to Capital One (return date 8/18/06) | |
| 8/2/2006 | | | Subpoena to Chase (return date 8/18/06) | |
| 8/2/2006 | | | Subpoena to Hyperion Air, Inc. (return date 8/18/06) | |
| 8/2/2006 | | | Subpoena to JEGE, Inc. (return date 8/18/06) | |
| 8/2/2006 | | | Subpoena to David Neville Rodgers (return date 8/18/06) | |
| 8/2/2006 | | | Subpoena to DTG Operations d/b/a Dollar Rent-a-car (return date 8/18/06) | |
| 8/2/2006 | | | Subpoena to Royal Palm Beach Community High School (return date 8/18/06) | |
| 8/2/2006 | | | Subpoena to Custodian of Records 15th Judicial District (return date 8/18/06) | |
| 8/4/2006 | | | Victim Notification letters to Individuals #6, #9, #10, #11, #13, #15, #17, #18, #20, #23, #24, #25, #26, #27, #28, #29, #30, #31, #32, #38, #39, #41, #42, and #44 | 12 |
| 8/11/2006 | | | Victim Notification letters to Individuals #4, #5, #6, #9, #12, #13, #15, #19, #26, #28, #29, #31, #32, #34, #38, #39, #43, and #44 | 13 |
| 8/15/2006 | | | Subpoena to ████████ (withdrawn) (return date 8/25/06) | |

Contains 6(e) Material
EXHIBIT A-1
EFTA00224943

| Date | To | From | Re: | Exhibit # |
|---|---|---|---|---|
| 7/19/2008 | | | Emails with other AUSAs in other districts and documents regarding disclosing identifying information about victims | |
| 7/21/2008 | Goldberger | Villafaña | Letter with 11 additional victim notification letters | |
| 7/21/2008 | Villafaña | Goldberger | Letter with attached Motion for Return of Property | |
| 7/21/2008 | Villafaña | Kuyrkendall | Email with list of victims that Twiler still needs to make contact with | B-69 |
| 7/21/2008 | Villafaña | Tein | Letter in response to 7/17/08 letter from Villafaña | |
| 7/21/2008 | | | Victim Notification letters to Individuals #1, #2, #4, #13, #9, #14, #21, #23, #30, #32, and #38 | B-70 |
| 7/21/2008 | Villafaña; cc: Senior | Sloman | Email response to Villafaña's 7/21/08 email regarding Motion for Return of Property in State Court | |
| 7/22/2008 | Villafaña | Kuyrkendall | Email chain regarding victim addresses | |
| 7/22/2008 | | | Emails between A. M. Villafaña, A. Acosta, J. Sloman, R. Senior, K. Atkinson, E. Nesbitt Kuyrkendall, and J. Richards regarding 7/21/2008 letter from M. Tein announcing plan to stay the civil suits against J. Epstein and notification that B. Reinhart is counsel of record for ▇▇▇▇ in civil suits | |
| 7/23/2008 | | | Emails between A. M. Villafaña and D. Lee regarding correspondence with counsel for J. Epstein and notice of breach | |
| 7/25/2008 | | | Emails between A. M. Villafaña and K. Atkinson regarding extension of grand jury to allow for continued representation of J. Epstein case | |
| 7/30/2008 | Villafaña | Atkinson | Email regarding contact with Roy Black | |
| 7/30/2008 | Villafaña | Roy Black | Email chain regarding call relating to the performance of the criminal Non-Prosecution Agreement | |
| 8/1/2008 | Lee, Acosta; cc: Villafaña, Jacobus, Senior | Sloman | Email chain regarding Jane Doe litigation | |
| 8/2/2008 | Lee, Villafaña | Acosta | Email re: Letter from Brad Edwards | |
| 8/5/2008 | A. Acosta, J. Sloman, R. Senior, and K. Atkinson | A. Marie Villafaña | Email regarding analysis of Jeffrey Epstein agreement, with attached 6/24/2008 email from A. M. Villafaña to R. Black and J. Goldberger and attached Epstein agreement | B-71 |

EFTA00224983

**From:** ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

**To:** ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

**Cc:** ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

**Subject:** Epstein issue with State Attorney's Office

**Date:** Tue, 04 Aug 2009 17:16:38 +0000

**Importance:** Normal

---

It is Tuesday, so there must be a new issue with Epstein. This one potentially involves the Palm Beach County State Attorney's Office so I included poor ▬▬▬▬ on the email chain.

Here are the two issues:

First, I have heard from several sources that Epstein is trying to convince (or perhaps has already convinced) the SAO to give him "cooperation credit" to shorten the length of his home confinement based upon "cooperation" that he is giving to the Feds in the Bernie Madoff case. As you probably remember, a couple of weeks ago some newspapers reported that Epstein is cooperating with FBI in the Madoff prosecution and that was the real reason for him receiving such a light sentence. After those newspaper reports came out, the AUSA prosecuting the Madoff case called me asking who Epstein was and stating in no uncertain terms that Epstein is not cooperating. Nonetheless, I can imagine our good friends (Goldberger, Lefkowitz, and others) telling the SAO that Epstein actually is cooperating and that the USAO agrees that he should have his sentence reduced. Now, this could all be rumor, but ▬▬▬▬ and I have heard it from so many different places (Town of Palm Beach PD, plaintiffs' attorneys, etc.), that it seems like someone should reach out to the SAO to make sure that they aren't being told any lies. I, of course, am happy to do so, but I didn't know if you felt that the contact should be made by ▬▬▬▬ or ▬▬▬▬

I also just pulled the state docket sheet and found another motion to "correct" Epstein's sentence that we were never told about. Docket entry 7 in the procurement of child prostitution case reads: "Agreed Order that the Order of Community Control is Corrected to Delete Special Condition #26 and #27." Something tells me that there was no "correction," this was a "change" that takes out things we considered important. ▬▬▬▬ – Can you get this from the courthouse and fax it to me? Case number is 502008CF009381AXXXMB.

Second, if new allegations or new victims come to light, are we allowed to investigate their claims? If we cannot, or if there is jurisdiction in another district, can we refer to allegations to another USAO to investigate? There are two very specific items that I would like to investigate further that relate to the S.D.Fl.. Also, as you recall, we never were able to advance our investigation regarding the New York victims, and none of them were included in our list of identified victims. The prosecutors on the Madoff case have asked if they can use some of our evidence – or at least speak with me and the FBI agents -- to prosecute Epstein regarding conduct in New York.

Thank you.

▬▬▬▬▬▬▬▬

Assistant U.S. Attorney
Southern District of Florida
500 East Broward Boulevard, 7th Floor
Ft. Lauderdale, FL 33394

▬▬▬▬▬▬

EFTA00014175

EFTA00014176

agreement or deferred prosecution in favor of state prosecution in the way that the Epstein case was handled. I believed that the fairest course was to consult with the victims before the execution of any agreement.

The second significant departure from my regular practice was the victim notification procedure. Never before or since have I shared "drafts" of victim notifications with counsel for the defendants. The CVRA places the entire burden of complying with the Act on the government and the court and provides that a "person accused of the crime may not obtain any form of relief under this Chapter." 18 U.S.C. § 3771(d)(1) (2004). But, in this case, I was required to provide draft victim notification letters, rewrite them due to objections from defense counsel, and refrain from sending them altogether. My protestations appear in my emails, and were shared with the agents, my legal assistant, and my supervisors.

With regard to FBI policies and practices, I understood that the FBI had its own victim notification procedures. I had previously worked with ▇▇▇ ▇▇▇ on other cases (and worked with her on other cases after the Epstein investigation). I did not know the details of what FBI included in its letters or when they were sent. I did not instruct FBI on what to send or when to send it. My general rule is to tell agencies to follow their regular procedures. I don't remember saying anything different in this case. I did not see any FBI letters in this case prior to collecting the FBI letters to Brad Edwards' clients in connection with the *Jane Doe v. United States* litigation. I did not instruct the FBI to include the language about the case being under investigation and that they should be patient.

2. **Identify all victims in this case to whom written or oral notifications were made, when and how each notification was made, and the contents of the notifications. Explain why notifications were made to some victims, and not to others, and who was responsible for those decisions.**

On the attached chart (Exhibit B-1), I listed all of the individuals identified as victims during the state investigation, the federal investigation, or after Epstein entered his state guilty plea, but who were brought to my attention by various attorneys. The chart lays out how and when each was contacted. Due to the passage of time, it is impossible for me to give exact dates and the exact content of each conversation. Also, there are some victims that I specifically remember meeting with. There are some that I know I did not meet with. There are others that I believe I met with, but I am not certain. I have qualified my answers on the chart accordingly.

On August 4, 2006, I prepared 24 Victim Notification Letters for victims who had been identified during the state investigation. (Exhibit 12.) These were provided to Special Agent ▇▇▇▇▇ to hand-deliver to victims during interviews. I decided to prepare these letters and I decided on the content of those letters.

On August 11, 2006, 18 amended letters were prepared. (Exhibit 13.) These letters clarified that the recipients were victims and/or witnesses, since we had not yet been able to confirm that they were minors during the time of their encounters with Epstein and we were still working to confirm federal jurisdiction. People who had already received the August 4, 2006

responsible officials remain obliged to ensure that all such delegated responsibilities are discharged. The Attorney General designates the following responsible officials: . . . For cases in which charges have been filed—the U.S. Attorney in whose district the prosecution is pending."))

EFTA00225084

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 08-80736-CIV-Marra/Matthewman

JANE DOE #1 and JANE DOE #2,

    Petitioners,

v.

UNITED STATES OF AMERICA,

    Respondent.

_____/

**UNITED STATES' RESPONSE TO
PETITIONERS' FIRST REQUEST FOR ADMISSIONS TO THE GOVERNMENT**

The United States (hereinafter the "government") hereby responds to *Jane Doe #1 and Jane Doe #2's First Request for Admissions to the Government Regarding Questions Relevant to Their Pending Action Concerning the Crime Victims Rights Act* (hereinafter the "*Request for Admissions*"), and states as follows:*

1.  The government admits that the FBI and the U.S. Attorney's Office for the Southern District of Florida ("USAO") conducted an investigation into Jeffrey Epstein ("Epstein") and developed evidence and information in contemplation of a potential federal prosecution against Epstein for many federal sex offenses.   Except as otherwise admitted above, the government denies Request No. 1.

_____

* The government's response is confined to Request No. 1 through Request No. 26 in the "Discovery Requested" section of the *Request for Admissions* and does not intend to respond to assertions in any other section of the *Request for Admissions* (including the "Background" section), none of which appear to separately state any matter calling for an admission. Nonetheless, the government denies the assertion that the government has declined the request of Jane Doe #1 and Jane Doe #2 to stipulate to undisputed facts in this case.

1

EFTA00191199

2. (a) The government admits that, after Epstein's attorneys learned of the notification that the government planned to provide to Jane Doe #2, who claimed that she was not a victim, Epstein's attorneys contacted the USAO and objected to the procedures for notification and the legal bases therefor. The government further admits that the USAO considered those objections when evaluating what notification to provide to victims. Except as otherwise admitted above, the government denies Request No. 2(a).

(b) Admitted.

(c) The government admits that, as a result of objections lodged by Epstein's attorneys, the government reevaluated the notifications that it had intended to provide to victims and, as a result of that reevaluation, the USAO altered the scope, nature, and timing of notifications that it had contemplated providing to victims. With regard to Jane Doe #2, the government further admits that, as a result of representations made by Jane Doe #2 that she was not a victim and objections lodged by Epstein's attorneys, the USAO stopped making notifications to Jane Doe #2. Except as otherwise admitted above, the government denies Request No. 2(c).

(d) The government admits that, after the USAO received objections to victim notifications from Epstein's counsel and reevaluated its victim notification obligations, the USAO altered the language that was ultimately contained in the July 9, 2008 notification letter to Jane Doe #1 in care of Bradley Edwards. Except as otherwise admitted above, the government denies Request No. 2(d).

2

(e) The government admits that, at least in part as a result of objections lodged by Epstein's lawyers to victim notifications, the USAO reevaluated its obligations to provide notifications to victims, and Jane Doe #1 was thus not told that the USAO had entered into a non-prosecution agreement with Epstein until after the agreement was signed. The government further admits that Jane Doe #2 was not told that the USAO had entered into a non-prosecution agreement with Epstein until after the agreement was signed, but denies that the USAO did not inform Jane Doe #2 as a result of any negotiations involving Epstein or any objections lodged by Epstein's lawyers; the USAO did not consider Jane Doe #2 a victim after she informed the USAO and the FBI that she was not a victim of any offense committed by Epstein, and, as a result, the USAO did not consider informing Jane Doe #2 about the non-prosecution agreement. Except as otherwise admitted above, the government denies Request No. 2(e).

3. Denied.

4. Denied.

5. The government admits that, during the negotiations with Jeffrey Epstein regarding the non-prosecution agreement, at least one experienced attorney within the USAO subscribed to the position that the CVRA required notifications to the victims in this case and that position was communicated to Epstein's counsel. To the extent that Request No. 5 seeks admissions regarding the positions held by attorneys within the USAO that were not communicated to non-government personnel regarding whether or not the CVRA ultimately required notifications to the victims in this case, the government objects to Request No. 5 as violative of the deliberative process privilege.

3

EFTA00191201

6.  (a) Denied.

(b) Denied.

(c) Admitted.

(d) Admitted.

(e) Admitted to the extent that the reference to "Lillian Sanchez" was meant to refer to Lilly Ann Sanchez.

(f) Admitted.

(g) Admitted.

7.  The government admits that, on about January 10, 2008, when Jane Doe #1 and Jane Doe #2 were sent letters advising them that "this case is currently under investigation," the U.S. Attorney's Office had already signed a non-prosecution agreement with Jeffrey Epstein, but that, on that date, the non-prosecution agreement nonetheless remained in a state of some flux and was subject to being set aside as Epstein was challenging the propriety of the non-prosecution agreement and seeking further review from the Department of Justice.

8.  Denied.

9.  (a) The government admits that, at Epstein's insistence, the USAO agreed to a provision in the non-prosecution agreement that provided as follows: "The parties anticipate that this agreement will not be made part of any public record. If the United States receives a Freedom of Information Act request or any compulsory process commanding the disclosure of the agreement, it will provide notice to Epstein before making that disclosure." Except as otherwise admitted above, the government denies Request No. 9(a).

4

EFTA00191202

(b) Admitted.

(c) Denied.

(d) Denied.

(e) The government admits that, during the period from September 24, 2007 through June 2008, the USAO did not notify Jane Doe #2 of the existence of the non-prosecution agreement. The government further admits that, although FBI agents notified Jane Doe #1 of the existence and substance of the agreement at the request of the USAO on or about October 27, 2007, no employee of the USAO personally notified Jane Doe #1 of the existence of the non-prosecution agreement during the period from September 24, 2007 through June 2008. Except as otherwise admitted above, the government denies Request No. 9(e).

10. (a) Admitted. Because Request No. 10 appears directed solely to the communications between FBI agents and Jane Doe #1 during their meeting on or about October 26, 2007, the government responses to Requests No. 10(b) through 10(g) address only that meeting.

(b) The government admits that, on or about October 26, 2007, FBI agents explained to Jane Doe #1 that Epstein would plead guilty to state charges for procuring minors to engage in prostitution; that Epstein would be required to register as a sex offender; that Jane Doe #1 would be entitled to seek damages from Epstein; and that, if she desired, Jane Doe #1 would be entitled to use the services of an attorney at no expense to her in seeking those damages from Epstein. The government denies that the FBI agents explained that the state charges "involv[ed] another victim."

5

EFTA00191203

## EPSTEIN INVESTIGATION TIMELINE

| Date | To | From | Re: | Exhibit # |
|---|---|---|---|---|
| 9/14/2007 | J. Sloman, A. Acosta, A. Lourie, R. Garcia, K. Atkinson, J. McMillan, S. Ball | A. Marie Villafaña | Email re plea negotiations | 46 |
| 9/14/2007 | Lefkowitz | Villafaña | Email - 1 page with two plea agreements attached, nine pages total | 49 |
| 9/14/2007 | Villafaña, Acosta, Garcia, Lourie | Sloman | Proposed plea agreement and information - Lourie will help finalize | 46 |
| 9/14/2007 | | | 8:47 am draft Information | |
| 9/14/2007 | — | | 8:53 am draft Plea Agreement | |
| 9/14/2007 | | | 9:38 am draft Information | |
| 9/14/2007 | | | 9:48 am draft Plea Agreement | |
| 9/15/2007 | | | 2:29 pm draft Information | |
| 9/15/2007 | | | 2:46 pm draft Plea Agreement | |
| 9/15/2007 | Lefkowitz | Villafaña | Email with attached Information and Plea Agreement | 49 |
| 9/16/2007 | Lefkowitz | Villafaña | Email re 11th Circuit cases on simple assault and found language with attached Epstein Plea Offer | 49 |
| 9/16/2007 | Villafaña | Lefkowitz | Email with attached 5 page Agreement | 49 |
| 9/16/2007 | | | Email chain between Lefkowitz and Villafaña regarding changing the documents to 1512 and language in the plea agreement | 46 |
| 9/16/2007 | | | 12:00 pm draft Information | |
| 9/16/2007 | | | 12:09 pm draft Plea Agreement | |
| 9/16/2007 | | | 12:21 pm Lefkowitz proposed Agreement | |
| 9/16/2007 | | | 4:42 pm draft Plea Agreement | |
| 9/17/2007 | A. Acosta | A. Marie Villafaña | Email re negotiation | 46 |
| 9/17/2007 | A. Marie Villafaña | Alex Acosta | Please make sure Lefkowitz understands that the Non-Prosecution agreement provided is only a draft and will still need final approval. | 46 |

EFTA00224958

Case 1:20-cr-00330-PAE     Document 862-2     Filed 06/24/26     Page 40 of 108

EPSTEIN INVESTIGATION TIMELINE

| Date | To | From | Re: | Exhibit # |
|---|---|---|---|---|
| 9/17/2007 | R. Garcia, A. Lourie | A. Marie Villafaña | Email re negotiation strategy | 46 |
| 9/17/2007 | | | 11:39 am draft Non-Prosecution Agreement | |
| 9/17/2007 | | | 11:42 am draft Non-Prosecution Agreement | |
| 9/17/2007 | Rolando Garcia and Andrew Lourie | A. Marie Villafaña | Email re Epstein providing update re plea negotiations | 46 |
| 9/17/2007 | | | 9/17/2007-9/19/2007 Emails between Marie Villafaña, Rolando Garcia, Andrew Lourie, Alex Acosta, Karen Atkinson, and John McMillan regarding negotiations of a federal plea and a non-prosecution agreement | 46 |
| 9/18/2007 | A. Acosta, A. Lourie, R. Garcia, K. Atkinson, J. McMillan | A. Marie Villafaña | Email re negotiating strategy | 46 |
| 9/18/2007 | A. Marie Villafaña | Acosta, Lourie, Garcia | Epstein negotiations - you spent 12 hours working on drafts and you are advising that the end of negotiation is nearing | 46 |
| 9/18/2007 | A. Marie Villafaña | Jay Lefkowitz | Email chain regarding draft agreements. Lefkowitz suggests plead to one count of 1512, serve 12 months plus 1 year home confinement/supervised release, followed by 2 years of probation with 6 months being community control. Villafaña advises that USAO will not go below 18 months of prison/jail time. | 49 |
| 9/18/2007 | | | Rescheduled date for hearing on motion to quash subpoena for computer equipment (initially set for 9/13/2007) | |
| 9/18/2007 | Andrew Lourie, Rolando Garcia, Karen Atkinson | A. Marie Villafaña | Email re Draft Agreements with email from Jay Lefkowitz (9/18/07) attached | 49 |
| 9/18/2007 | | | 10:45 am draft Plea Agreement | |
| 9/18/2007 | | | 12:07 pm draft Plea Agreement | |

EFTA00224960

Case 1:20-cr-00330-PAE    Document 862-2    Filed 06/24/26    Page 41 of 108

## EPSTEIN INVESTIGATION TIMELINE

| Date | To | From | Re: | Exhibit # |
|---|---|---|---|---|
| 9/18/2007 | | | 12:22 pm draft Plea Agreement | |
| 9/18/2007 | | | 1:37pm draft Information | |
| 9/18/2007 | Garcia, Villafaña | Lourie | Email stating new terms that Lourie negotiated with Lefkowitz | |
| 9/19/2007 | A. Lourie, R. Garcia, K. Atkinson | A. Marie Villafaña | Email re negotiating strategy with attached correspondence | 46 |
| 9/19/2007 | A. Marie Villafaña | A. Lourie | Email re Epstein with internal U.S. Attorney's Office emails attached | 46 |
| 9/19/2007 | A. Marie Villafaña | Jay Lefkowitz | Forwarded to Lourie and R. Garcia - draft plea agreement issues | 46 |
| 9/19/2007 | Andrew Lourie, Rolando Garcia, Karen Atkinson | A. Marie Villafaña | Email re Draft Plea Agreement with email from Lefkowitz to Villafaña (9/19/07) and Lefkowitz to Villafaña (9/19/07) attached | 46 |
| 9/19/2007 | | | Research re Federal Bureau of Prisons Designations | |
| 9/19/2007 | | | 11:46 am draft Information | |
| 9/20/2007 | Belohlavek, Krischer | Villafaña | Email chain discussing proposed joint meeting with Epstein's counsel to finalize all agreements | |
| 9/20/2007 | Lourie | Villafaña | Email forwarding federal plea agreement incorporating Acosta and Lourie comments | |
| 9/20/2017 | Lourie | Villafaña | Email chain discussing factual proffer in support of federal plea | |
| 9/20/2017 | Acosta, Lourie | Villafaña | Email summarizing call with Lefkowitz in response to Lefkowitz call to Acosta | |
| 9/20/2007 | | | 1:17pm draft Plea Agreement | |
| 9/20/2007 | | | 3:52 pm draft Plea Agreement | |
| 9/20/2007 | Villafaña | Lourie | Email stating that Lefkowitz wants to remove registration requirement | |
| 9/20/2007 | Villafaña | Lourie | Email asking Villafaña to call Lefkowitz and inform him that Epstein must plead to registrable offense | |

EFTA00224961

Case 1:20-cr-00330-PAE    Document 862-2    Filed 06/24/26    Page 42 of 108

## EPSTEIN INVESTIGATION TIMELINE

| Date | To | From | Re: | Exhibit # |
|------|-----|------|-----|-----------|
| 9/21/2007 | Lourie, Garcia | Villafaña | Email informing Lourie of conversation with Lefkowitz about sex offender registration issue | |
| 9/21/2007 | Villafaña, Belohlavek | Krischer | Email summarizing SAO negotiations with Goldberger, including Goldberger's request that Epstein not have to register as a sex offender | |
| 9/21/2007 | Lourie, Garcia | Villafaña | Email containing revised agreement incorporating some of Lefkowitz's language and highlighting 2255 negotiations | |
| 9/21/2007 | | | Research re Florida Statutory Authorities and Bibliography | 50 |
| 9/21/2007 | | | 2:05 pm draft Non-Prosecution Agreement | |
| 9/21/2007 | Villafaña, Garcia | Lourie | Response to email about Lefkowitz's proposed language regarding immigration proceedings | |
| 9/21/2007 | | | 4:47 pm Epstein state plea jpl edits (Lefkowitz) | |
| 9/23/2007 | Acosta, Lourie, Sloman, Villafaña | Lefkowitz | Email admitting that defense based their agreement to plead to 796.03 on a "mistaken assumption" and requesting that Epstein not have to register as a sex offender | 51 |
| 9/23/2007 | Lefkowitz, Lourie, Villafaña | Acosta | Email response to Lefkowitz instructing Lefkowitz to deal directly with Lourie and Villafaña in negotiating agreement | 51 |
| 9/23/2007 | | | 3:56 pm draft Non-Prosecution Agreement | |
| 9/23/2007 | | | 6:50 pm draft Non-Prosecution Agreement | |
| 9/23/2007 | | | 8:49 pm draft Non-Prosecution Agreement | |
| 9/24/2007 | Sloman, Lourie, Garcia, Villafaña | Acosta | Email containing Acosta edits to Agreement | |
| 9/24/2007 | Villafaña | Lefkowitz | Email - 1 page with nine page NPA (3 signature pages) attached | 49 |
| 9/24/2007 | Weinberg, Lourie, Garcia | Villafaña | Email containing Acosta's final edits and asking to discuss potential victim representative | |
| 9/24/2007 | Acosta, Sloman, Lourie, Garcia, Atkinson | Villafaña | Email containing final agreement as approved by both parties | |

Privileged Confidential

Contains 6(e) Material

EFTA00224962

**EPSTEIN INVESTIGATION TIMELINE**

| Date | To | From | Re: | Exhibit # |
|---|---|---|---|---|
| 9/24/2007 | | | 9:04 am draft Non-Prosecution Agreement | |
| 9/24/2007 | | | 10:12 am draft Non-Prosecution Agreement | |
| 9/24/2007 | | | 2:14 pm draft Non-Prosecution Agreement | |
| 9/24/2007 | | | 4:20 pm draft Non-Prosecution Agreement | |
| 9/24/2007 | | | NPA signed | 52 |
| 9/24/2007 | Acosta, Garcia, Lourie | Villafaña | Email containing signed agreement | |
| 9/25/2007 | | | Scheduled date for Federal Indictment | |
| 9/30/2007 | | | 9/30/2007-10/1/2007 Email chain between Villafaña and Lefkowitz re telephone call with attached emails from 9/23/07, 9/16/07, and 9/15/07 | |
| 10/1/2007 | | | Folder entitled "(Victims) Additional 302's" containing reports of interviews conducted in June 2007, October 2007, and March 2008 | |
| 10/1/2007 | | | 10/1/2007-10/31/2007 Additional negotiations regarding selection of Special Master | |
| 10/1/2007 | | | 10/1/2007-10/31/2007 JD#1 Notified regarding signing of NPA | |
| 10/1/2007 | | | 10/1/2007-10/31/2007 Investigation continues to try to identify addl victims | |
| 10/2/2007 | | | Add'l client of Brad Edwards interviewed. She refuses to provide information. (She provides information on a later date). | |
| 10/3/2007 | Lefkowitz | Villafaña | Email - 2 pages with one page attachment, Proposal for Selection of Attorney to Represent Victims | C-6 |
| 10/5/2007 | Villafaña | Lefkowitz | Email - 3 pages with four page unsigned letter from Lefkowitz to Villafaña | C-6 |
| 10/5/2007 | Sloman | Villafaña | Email forwarding letter from Lefkowitz re special master process | C-6 |
| 10/7/2007 | Villafaña | Sloman | Email chain including correspondence between Sloman and Sanchez | |
| 10/8/2007 | Sloman | Lilly Ann Sanchez | Letter - 3 pages | |
| 10/9/2007 | Villafaña | Sloman | Email attaching correspondence from Sanchez regarding Special Master Process | |
| 10/9/2007 | Lilly Ann Sanchez | Villafaña | Email - 1 page with two page letter from Villafaña to Sanchez attached | |

EFTA00224963

**EPSTEIN BOX INVENTORY**

<u>Box A:</u>

Redwell with different files for each Jane Doe ▇. Epstein case

Cd's with Documents on 2nd Supplemental Privilege Log (2) and Bates #s 002111-002266

Redwell with printout of Documents in the 2nd Supplemental Privilege Log

6001 Orders

6001 Immunity Request

▇▇▇▇▇ folder

Jane Doe ▇. U.S. 6/23/15 production (redwell) with documents

2nd Supplemental Privilege Log Box 4

2nd Supplemental Privilege Log Letter 6-23-15 to ▇▇▇▇

<u>Box B:</u>

Data Demonstratives Kirkland & Ellis LLP – 6 bound copies and 1 color copy

Plea Negotiations (redwell) – folders: Non Prosecution Agreement – Final; Attorney Notes re Revised Indictment; Research re Boehm case; Research re possible misdemeanors; Notes re Plea Negotiations; Plea Agreement drafts; Draft Non Prosecution Agreements; Information Packet drafts

▇▇▇▇▇▇ (file folder)

▇▇▇▇▇ (green file folder)

▇▇▇ . Re: Epstein Corp. Records (green file folder)

Non Pros Agrmt & Addendum (file folder)

Mtg w/ Ken Starr, RAA, JS, Drew (file folder)

▇ Target Letter (file folder)

Notes re Post Agreement Communications (file folder)

▇▇▇ (file folder)

6/19/08 ▇ Submission to the DAG (file folder)

6/3/08 ▇ Submission to the DAG (file folder)

5/27/08 ▇ Submission to the DAG (file folder)

5/15/08 ▇▇▇ Ltr (file folder)

EFTA00194822

███ file folder with 6/23/08 letter from ███████ (DAG) to ████ and ██ ; 11/2/2010 Privileged Communication letter re Litigation Hold; clipped Non-Prosecution Agreement

Doe (██.) █. Epstein, 08-80893-CV-KAM (red file folder)

**Box █:** (labeled GJ Presentation Materials)

Federal Criminal Code and Rules 2006 Edition with multiple post-its

File folder with ██████ Testimony 5/8/07; ███████ Testimony 4/24/07; ██████ Testimony 5/8/07; ███████ Testimony 2/6/07; ██████ 2/27/07 (post it says All About ███); ██████ Testimony 4/24/07; ██████ Testimony 5/15/07; ██████ Testimony 3/20/07; ██████ Testimony 5/22/07

US Attorneys' Bulletin: Crafting Helpful Indictments

**Box H:**

Green file folder with Grand Jury Subpoena Log – Operation Stolen Globe

12/19/07 ██████-██████ letter with post it – to be produced after stay is lifted

Op Stolen Globe (redwell)

4/29/2008 Grand Jury Presentation for Operation Leap Year with Indictment

██ cd

Jane Does █. U.S. Bates Nos 000670-002110 cd

Jane Does █. U.S. 0001-1652 cd

Orange Composition notebook with ███████ notes

Redwell with documents provided to ██████ on cd (000670-002110)

Redwell with correspondence between Epstein's attorney's and USAO

10/21/2009 letter to ██████ from ██████

12/9/2009 ███ Ltr re ██████ Complaints (green file folder)

Epstein redwell with correspondence

Printout of ██████████s arrest

Yellow Notepad with ██████ notes

Enforcing Victim's Rights – April 26, 2012

Index of Victim Notification Letters

EFTA00194825

Relevant Privileged Docs (████ redwell) – 2 copies clipped with Bates Numbers P-003713-P-003746; P-008516; P-009105-P-009111; P-012624-P-012642; P-012646; P-014011-P-014025; P-014059-P-014061; P-014440; P-014444; P-014521-P-014522; P-014559-P-014562; P-014569-P-014573; P-014666-P-014693; P-014712-P-014716; P-014866-P-014883

Privilege Logs (████ redwell) – all privilege logs clipped together

Jane Does Intervenors at Mediation (file folder) – includes notes and Westlaw printouts

Victim List (file folder) – includes 7/10/2008 Final Notification of Identified Victims

Victim List (file folder) – includes 7/5/2016 letter to Wells Fargo, 6/16/2016 email from ████████ to ████████, and 7/10/2008 Notification of Identified Victims to ██ ████████

████ Declarations (file folder) – includes 3 printouts of Declaration of A. ████ ████ in Suppport of United States' Response to Victim's Emergency Petition for Enforcement of Crime Victim Rights Act, 18 U.S.C. 3771

Yellow envelope from ████████ to ████████ with Jane Doe #1 and Jane Doe #2's Supplemental Request for Production to the Government Regarding "Victim" Status

Jane Doe case (Redwell) – includes Draft letters and settlement agreements, Jane Doe Mediation (file folder), and Jane Does Settlement Agreement and Apology Letter (file folder)

Jane Doe Document Production (redwell) – includes 3 cds, and documents

Order Closing Case & Timeline (file folder)

Jane Does – Writ Ad Test (file fodler) includes Westlaw printout of U.S. █. Louis Rinchack

**Box Q:**

6/2/2017 ████ Declaration (████ redwell)

Second Declaration of ████████ (file folder)

Jane Doe █. U.S. Summary Judgment prep (████ redwell) – light green file folder with ████ notes, bright green file folder with notes and documents, and rubber-banded exhibits

Motion to Disclose Grand Jury Material (████ redwell) – with Copy of Motion, light green file folder with signed sealed Orders, and light green file folder with Exhibits to Motion to Unseal Grand Jury Materials

White binder with Jane Doe 1 and Jane Doe 2's Consolidated Statement of Undisputed Material Facts and Motion for Partial Summary Judgment with Incorporated Memorandum of Law

**Box R:**

████ re Subpoenas (file folder)

EFTA00194830

File folders for individual subpoenas: ███-01 through ███-81

Ritz Compact Flash SW (file folder)

PNY Technologies Compact Flash SW (flash drive)

JE Corporations (green file folder)

Capital One (green file folder)

DTG Operations/Dollar Rent-a-Car (green file folder)

JP Morgan Chase (green file folder)

Washington Mutual (green file folder)

Redwell with folders – Computer Search; Attorney Notes from Doc Review; Notes from FedEx Records

Colonial Bank Records (redwell) with folders: JEGE, Inc.; NES, LLC

Epstein Corporate Records ███-51, ███-52, ███-53, ███-54 (red folder)

Colonial Bank (green file folder)

JEGE & Hyperion from ██████████ ███-46 & ███-47 (file folder)


**Box S:**

Research re JE websites (file folder)

Victim Civil Suits (file folder)

███████ (NY AUSA) – (file folder)

███████ (file folder)

█████████ Interview (file folder)

Research re Travel for Prostitution (file folder)

████ Transcript (empty file folder)

████ ███ (green file folder)

PBPD Investigative File (redwell)

██████ (redwell)

FedEx (file folder) subpoena response with Certification

████ ██████ Documents 53909-004 (green file folder)

State of Delaware records (file folder)

Jet Blue records (file folder)

EFTA00194831

IN THE CIRCUIT COURT OF THE FIFTEENTH JUDICIAL CIRCUIT
IN AND FOR PALM BEACH COUNTY, FLORIDA

STATE OF FLORIDA                           Case Number(s): ▮▮▮▮▮▮▮▮▮
vs.

▮▮▮▮▮▮▮▮▮                                               **FILED**

Defendant ▮▮▮▮▮▮▮                          Circuit Criminal Department

### WAIVER OF RIGHTS SHEET                   **DEC 15 2017**

By placing my initials beside the following paragraphs, I state that I understand the content of each item either by having read each item or by having each item read and explained to me by my attorney and qualified interpreter applicable; and that each item so initialed is true and correct as it applies to me.



1. ▮▮▮▮  I am the defendant in the above-mentioned matter(s), and I am represented by the attorney indicated below. I understand I have the right to be represented by an attorney at all stages of the proceeding until the case is terminated, and if I cannot afford an attorney, one will be appointed free of charge.

2. ▮▮  I understand I am giving up my right to a trial and to have my case decided by a jury or a judge.

3. ▮▮  I understand I am giving up my right to confront, cross-examine and ask questions of the State's witnesses.

4. ▮▮  I understand I am giving up my right to call witnesses and make them come to court and testify.

5. ▮▮  I understand I am giving up my right to testify at a trial before a jury or a judge.

6. ▮▮  I understand I am giving up my right to make the State prove guilt a) by presenting evidence beyond a reasonable doubt that I am guilty or b) by presenting evidence that by a preponderance of the evidence I am in Violation of Probation.

7. ▮▮  I understand that by entering this plea, I waive my right to direct appeal of any matters relating to judgment, including the issue of guilt or innocence, unless I plead no contest, specifically reserving my right to appeal.

8. ▮▮  I understand that if I were to be convicted of another charge in the future, any state or federal court could use the conviction in this case against me to enhance a charge, increase the sentence or impose a possible mandatory sentence even if adjudication of guilt in the present case is withheld.

9. ▮▮  I agree that there is a factual basis for the charges to which I am pleading guilty or no contest. I understand that once the plea is accepted by the court, there will not be a trial or further determination of my guilt or innocence of these charges.

10. ▮▮  I understand that by entering this plea, if I am sentenced to incarceration, and if this offense is found to be a sexually motivated offense or if I have been previously convicted of a sexually motivated offense, I may subject myself to involuntary civil commitment as a sexually violent predator both for this case and if I should become incarcerated in the future.

11. ▮▮  No one has forced me, pressured me, intimidated me or has made any threats against me to get me to give up these rights and enter this plea. No one has made any promises or representations to me, other than those in the written plea agreement, to get me to give up these rights. The only promises or representations made to me are those listed in the plea agreement.

12. ▮▮  I have discussed this case with my attorney, including the nature of the charges. My attorney has done everything I have asked him/her to do and I am fully satisfied with the representation I have received. I understand that for the crime(s) for which I am charged, the maximum sentence is ___20yrs___, and the minimum sentence is ___0___.

Revised                              Page 1 of 2                           Form# 004
July 2015

EX R-

Waiver of Rights Sheet
Case Number(s): ██████████
Page -2-

13. ██████ ____ I understand if I am not a United States citizen, this plea may be used by the United States Government as a basis to deport me, prevent me from becoming a U.S. citizen, prevent me from obtaining or retaining my alien status or prevent me from obtaining or retaining a Permanent Resident Card (Green Card), whether or not I am adjudicated guilty or whether adjudication of guilt is withheld, and whether the crime is a misdemeanor or a felony. Should this plea result in my deportation it would not change my decision to plead guilty/no contest in this case.

14. ██████ ____ I understand that no one can assure me of how much gain time or any other form of early release credit I will receive on a prison sentence, nor my eligibility for any form of early release. Any representations regarding those issues are not binding on the Court. I understand that I should assume I will serve every day of any jail or prison sentence imposed.

15. _____ I understand that by pleading guilty or no contest that I am also giving up my right to contest any motion to suppress any evidence seized by law enforcement or any statement I made to law enforcement or any other pretrial motions filed in this matter unless I plead no contest, specifically reserving my right to appeal.

12/15/17
_____              _____              _____
IT'– SIGNATURE                   DEFENDANT – PRINT                DATE

I certify that as an interpreter fluent in the _____ language, that I have interpreted this document in its entirety to the Defendant who understands the _____ language. The Defendant states he/she fully understands the contents of this document and that he/she signed it freely and voluntarily.


_____              _____              _____
INTERPRETER – SIGNATURE          INTERPRETER – PRINT              DATE


**DEFENDANT'S ATTORNEY ONLY:**
I am attorney of record. I have explained each of the above rights to the defendant. I have complied with my responsibilities under Fl. R. Crim. Proc. 3.171(c). I further stipulate that this document may be received by the Court as evidence of defendant's intelligent waiver of these rights and that it shall be filed by the Clerk as permanent record of that waiver. I am not aware of any physical evidence for which DNA testing may exonerate the Defendant.

_____              _____              _____
ATTORNEY FOR THE DEFENDANT - SIGNATURE      FL BAR NO.            DATE

_____
ATTORNEY FOR THE DEFENDANT - PRINT


The State of Florida is not aware of any physical evidence for which DNA testing may exonerate the Defendant.


_____              _____              _____
ASSISTANT STATE ATTORNEY– SIGNATURE    ASSISTANT STATE ATTORNEY– PRINT    DATE

Revised                          Page 2 of 2                      Form# 4.1
July 2015

FD-302 (Rev. 5-8-10)

50D-NY-3027571-GJ Serial 44

-1 of 1-

## FEDERAL BUREAU OF INVESTIGATION

Date of entry: 01/04/2021

The following investigation was conducted by SA ███████████ and Palm Beach County Sheriff's Office (PBSO) Detective ███████████ at ███████████ on December 18, 2020:

███████████ explained the purpose of the meeting to ███████ and served him with a Grand Jury subpoena issued from the Southern District of New York (SDNY) commanding him to appear at the US Courthouse at 40 Foley Square, Room 220, in New York City, New York on January 14, 2021 at 10:00 AM.

When advised about the subpoena and the fact that FBI New York wished to speak with him, ███████ replied that he "knew what they wanted to talk to him about." ███████ told SA ███████ that he was willing to speak with Agents and Detectives in New York and cooperate with this investigation. SA ███████ told ███████ that NYPD Detective ███████████ would contact him by phone on the evening of December 18, 2020.

A copy of the GJ subpoena served to ███████ will be attached herein.

| | |
|---|---|
| Investigation on 12/18/2020 at ███████████ | United States (In Person) Date drafted 12/23/2020 |

File # 50D-NY-3027571-GJ

by ███████████

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

3516-001
Page 1 of 1

SUBJECT TO PROTECTIVE ORDER PARAGRAPHS 7, 8, 9, 10, 15, and 17



# Electronically Certified Court Record

This is to certify that this is a true and correct copy of the original document, which may have redactions as required by law.

## DOCUMENT INFORMATION

| | |
|---|---|
| **Agency Name:** | Clerk of the Circuit Court & Comptroller, Palm Beach County |
| **Clerk of the Circuit Court:** | The Honorable Michael A. Caruso |
| **Date Issued:** | 6/8/2026 8:47:02 PM |
| **Unique Reference Number:** | ███████████████████ |
| **Case Number:** | ███████████████████ |
| **Case Docket:** | ORDER OF REVOCATION |
| **Requesting Party Code:** | 517 |

## CERTIFICATION

Pursuant to Sections 90.955(1) and 90.902(1), Florida Statutes, and Federal Rules of Evidence 901(a), 901(b)(7), and 902(1), the attached document is electronically certified by The Honorable Michael A. Caruso, Clerk of the Circuit Court & Comptroller, Palm Beach County, to be a true and correct copy of an official record or document authorized by law to be recorded or filed and actually recorded or filed in the office of the Clerk of the Circuit Court & Comptroller, Palm Beach County. The document may have redactions as required by law.

## HOW TO VERIFY THIS DOCUMENT

This electronically certified document contains a unique electronic reference number for identification printed on each page. This document is delivered in PDF format and contains a digital signature identifying the certifier and tamper-evident seal validating this document as a true and accurate copy of the original recorded. To view the tamper-evident seal and verify the certifier's digital signature, open this document with Adobe Reader software. Instructions for verifying this instrument are available for customers in the USA and Canada and for customers in other countries.

**The web address shown above contains an embedded link to the verification page for this particular document.



| Officer | Sabrina Yams |
|---|---|
| Office Location | 15-0 |
| Judge/Division | Schosberg Feuer / X |

STATE OF FLORIDA

VS

_____
Defendant

IN THE CIRCUIT COURT

PALM BEACH COUNTY, FLORIDA

DC No. ▉▉▉

Docket/UC No. ▉▉▉

## ORDER OF REVOCATION OF PROBATION

THIS CAUSE was considered on a violation of Probation charge brought by the State. The defendant was placed on Probation on December 15, 2017 for the offense of CT. 3 DRIVING UNDER THE INFLUENCE in the Circuit Court of Palm Beach County, for a term of Twelve (12) Months in accordance with the provisions of Chapter 948 Florida Statutes. The defendant has not properly conducted himself and violated the conditions of Probation in a material respect by

THE OFFENDER'S PROBATION WAS TERMINATED THE SAME DAY OF PLEA BY THE COURTS.

PLEASE SEE ATTACHED PLEA AGREEMENT.

Therefore, it is ORDERED AND ADJUDGED that the defendant's Probation is revoked in accordance with Section 948.06 Florida Statutes. The defendant is remanded to the custody of the sheriff of Palm Beach County for the imposition of sentence in accordance with the requirements of law.

DONE AND ORDERED ON    3 | 1 | 18
NUNC PRO TUNC DECEMBER 15, 2017

_____
Samantha Schosberg Feuer
Circuit Court Judge



DC3-259 (Revised 5-02)

Original:    Clerk of Court
Copy:    DC Offender File

I HEREBY CERTIFY THAT THIS DOCUMENT IS A TRUE AND CORRECT COPY OF A DOCUMENT THAT WAS FILED AS A COURT RECORD WITH THE CLERK OF THE CIRCUIT COURT & COMPTROLLER, PALM BEACH COUNTY.

VISIT https://www.mypalmbeachclerk.com/Services/CountyService/Helper/VerifyImage.html TO VALIDATE THIS DOCUMENT

Digitally signed by Michael A Caruso
Date: 2026.06.08 20:47:04 -04:00
Clerk of the Circuit Court & Comptroller, Palm Beach County
Location: 205 N. Dixie Highway, West Palm Beach, FL 33401

FD-302 (Rev. 5-8-10)

- 1 of 4 -

**FEDERAL BUREAU OF INVESTIGATION**


OFFICIAL RECORD

Date of entry    04/23/2020



███████ ██████, date of birth ███████ was interviewed at ███████. Present for this interview was Detective ██ ██ and Special Agent ███ ███. Prior to beginning this interview, █████ was served with a subpoena requesting his participation in this interview and that he turn over materials in his possession pertaining to this investigation. █████ then turned over to agents two (2) boxes containing case related materials that █████ states he recovered from deceased case detective ███████ home. After being advised of the identities of the interviewing Agents and the nature of the interview, █████ provided the following information:

█████ stated that in one of the boxes was an imaged copy of JEFFREY EPSTEIN's kitchen counter laptop that had phone messages that █████ hadn't seen before.

An employee was stealing from EPSTEIN and EPSTEIN called the Palm Beach Police Department (PBPD). This was how █████ met EPSTEIN.

EPSTEIN donated $40,000 to PBPD to help purchase a machine to help PBPD review security footage. He also wrote a check for $90,000 to help them purchase a finger print machine (AFIS terminal). This was around the same time that EPSTEIN's first victim had come forward to the PBPD. █████ did not cash this check. It was very common for PBPD to receive donations from the wealthy like this.

EPSTEIN donated to the police scholarship fund for children. He donated more than others. █████ asked ███████ who EPSTEIN is. █████ said that EPSTEIN supports law enforcement and is an important guy. PBPD checked him out and saw a New Yorker article about him.

█████ became the police chief in 2001. In the early 2000's, maybe 2003, a call came into the tip line that attractive women were coming in and out

Investigation on  10/18/2019  at  ███████████████████  (In Person)

File #  50D-NY-3027571                                  Date drafted  04/03/2020

by  ███ ██ ███████ ███

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

3501.401-001
Page 1 of 4

SUBJECT TO PROTECTIVE ORDER PARAGRAPHS 7, 8, 9, 10, 15, and 17

EFTA_00109606

EFTA01249718

FD-302a (Rev. 5-8-10)

50D-NY-3027571

Continuation of FD-302 of (U) Interview of  , On 10/18/2019 , Page 2 of 4

of EPSTEIN's house. PBPD did surveillance on EPSTEIN's house and 2 separate women were stopped. They were both students of ███████████████ both adults, and said that they were working for him.

The stepmother of the first victim, whose name ████ thought was ████ was the one who made her come forward. [Agent note: ████ last name was ██████. The stepmother called and said her daughter was having sex with a man in Palm Beach. They were brought in to the precinct and she said, "I'm not the only one, there are other girls doing it". This case was assigned to ████████ who interviewed ████ a few days later. The case started to grow rapidly. ███████ experience inside the house was then corroborated. More surveillance was done on EPSTEIN's house. Some kids were observed, prepubescent with braces and backpacks coming from school. Aviation personnel spoke with PBPD about who was coming and going. One employee said there were dozens of girls in one day. The PBPD then put together a case and brought it to the State's Attorney's office. At this point, ████ believed they were already in communications with the defense.

████ spoke with the states attorney whom he had a good relationship with. ████ was to get a detective and speak with the sex crimes unit on who to use. When the states attorney asked who the case was about ████ said it was about EPSTEIN. The states attorney told ████ that he had never heard of him. Then after he spoke with the defense, the states attorney told ████ to write EPSTEIN a notice to appear for a misdemeanor (lewd and lascivious behavior). ████ debated on whether to arrest EPSTEIN on probable cause but said it would be problematic with the state's attorney.

PBPD tried to keep the case very tight. They would type up their reports and put them on a hard drive which they would put in a safe. They would not input these reports into the computer. They had sexual battery cases against the co-conspirators. When PBPD presented it they wouldn't approve it. The state's attorneys said the victims were not credible and would show their MYSPACE pages and such. They would refute minute details in the probable cause affidavit. ████ thought it was leaked by the attorney's office. ████ thought the defense attorneys thought they weren't doing enough to talk them out of it. This case died at the state level. ████ then wrote a letter to the State Attorney asking him to recuse himself.

3501.401-001
Page 2 of 4

SUBJECT TO PROTECTIVE ORDER PARAGRAPHS 7, 8, 9, 10, 15, and 17

EFTA_00109607

EFTA01249719



FD-302a (Rev. 5-8-10)

50D-NY-3027571

Continuation of FD-302 of (U) Interview of ███████ ███████ , On 10/18/2019 , Page 3 of 4

After this, private investigators began harassing and playing games with ████. EPSTEIN had ███████████ go to ████ and tell him "these girls are just prostitutes, these are just happy endings, these are minor cases". Private investigators began pulling the police officers' trash.

About 6 months after ████ retired, he was contacted by a private investigator who was represented by attorney ███████. He told ████ that he had some safety concerns for him. ████ was told that IGOR (EPSTEIN's trainer) recently purchased a townhouse ████████████ ████.

████ received a call about a target letter that he had received. This individual told ████ that he doesn't have to worry because EPSTEIN is not in Palm Beach anymore and that he sold his house. ████ stated this was not true and it was a weird call.

PBPD referred this case to the FBI and introduced the victims to the FBI. Everyone was very motivated. Eventually there was a lack of communication. ████ heard there was a discussion of a plea deal or a non-prosecution. ████ asked to speak to the United States Attorney, ALEXANDER ACOSTA. ████ asked him if he was going to own up to what he promised when he was sworn in. ACOSTA said the defense had him very frustrated with the case. He said that there was a lot of interest from higher up. The state did not want to take it back. It took months to convince them to take it back. It was very disappointing that the system failed in this case. ████ was told that the non-prosecution would include a fund for counseling and medical. There was a hurry to make this case go away.

After giving the $90,000 check, EPSTEIN came back to ████ office. He talked about Harvard donations. EPSTEIN just wanted to know about ████; it was like he was sizing ████ up. Afterwards, ████ walked with EPSTEIN to the lobby and ███████ was there. She was like a statue.

Palm Beach Country Club is a Jewish country club. A lot of wealthy people are there and they flock together. Mar-A-Lago is a mixture of everyone. DONALD TRUMP told ████ that he threw EPSTEIN out of his club. TRUMP called the PBPD to tell him "thank goodness you're stopping him, everyone has known he's been doing this". TRUMP told him people in New York

3501.401-001
Page 3 of 4

SUBJECT TO PROTECTIVE ORDER PARAGRAPHS 7, 8, 9, 10, 15, and 17

EFTA_00109608

EFTA01249720

FD-302a (Rev. 5-8-10)

50D-NY-3027571

Continuation of FD-302 of (U) Interview of ███████ ████████          On 10/18/2019 , Page 4 of 4

knew EPSTEIN was disgusting. TRUMP said MAXWELL was EPSTEIN's operative, "she is evil and to focus on her". TRUMP told ██████ that he was around EPSTEIN once when teenagers were present and TRUMP "got the hell out of there". TRUMP was one of the very first people to call when people found out that they were investigating EPSTEIN.

No one could explain how EPSTEIN made his money. They knew he worked for BEAR STEARNS. ██████ was told that EPSTEIN was kind of a technical guy that would make it happen but you didn't want to know how.

None of the victims that PBPD spoke with said they had sexual contact with men other than EPSTEIN while in EPSTEIN's orbit. ████████████ had one time went out screaming.

PRINCE ANDREW was a fixture in Palm Beach and he had no protection while there.

██████ has done interviews in the past with ████████████████ People/victims thought that PBPD was paid off by EPSTEIN which was why ██████ went and did these interviews. He felt he needed to defend PBPD.

An interior designer told the PBPD that rooms in the Virgin Islands had been decorated for teenage girls. ██████ contacted the Virgin Island Police Department, but they were not helpful.

In the end when EPSTEIN had turned himself in to plea to the misdemeanor, ██████ was not notified and found out from the newspaper.

3501.401-001
Page 4 of 4

SUBJECT TO PROTECTIVE ORDER PARAGRAPHS 7, 8, 9, 10, 15, and 17

EFTA_00109609

EFTA01249721

## GROUP R – H.O. SERIES

HO.012162
HO.012183
HO.012188
HO.012576
HO.012593
HO.012602

C12593

By signing this agreement, Epstein asserts and certifies that each of these terms is material to this agreement and is supported by independent consideration and that a breach of any one of these conditions allows the United States to elect to terminate the agreement and to investigate and prosecute Epstein and any other individual or entity for any and all federal offenses.

By signing this agreement, Epstein asserts and certifies that he is aware of the fact that the Sixth Amendment to the Constitution of the United States provides that in all criminal prosecutions the accused shall enjoy the right to a speedy and public trial. Epstein further is aware that Rule 48(b) of the Federal Rules of Criminal Procedure provides that the Court may dismiss an indictment, information, or complaint for unnecessary delay in presenting a charge to the Grand Jury, filing an information, or in bringing a defendant to trial. Epstein hereby requests that the United States Attorney for the Southern District of Florida defer such prosecution. Epstein agrees and consents that any delay from the date of this Agreement to the date of initiation of prosecution, as provided for in the terms expressed herein, shall be deemed to be a necessary delay at his own request, and he hereby waives any defense to such prosecution on the ground that such delay operated to deny him rights under Rule 48(b) of the Federal Rules of Criminal Procedure and the Sixth Amendment to the Constitution of the United States to a speedy trial or to bar the prosecution by reason of the running of the statute of limitations for a period of months equal to the period between the signing of this agreement and the breach of this agreement as to those offenses that were the subject of the grand jury's investigation. Epstein further asserts and certifies that he understands that the Fifth Amendment and Rule 7(a) of the Federal Rules of Criminal Procedure provide that all felonies must be charged in an indictment presented to a grand jury. Epstein hereby agrees and consents that, if a prosecution against him is instituted for any offense that was the subject of the grand jury's investigation, it may be by way of an Information signed and filed by the United States Attorney, and hereby waives his right to be indicted by a grand jury as to any such offense.

//l

///

///

Page 6 of 7

*HOUSE OVERSIGHT 012594*

By signing this agreement, Epstein asserts and certifies that the above has been read and explained to him. Epstein hereby states that he understands the conditions of this Non-Prosecution Agreement and agrees to comply with them.

R. ALEXANDER ACOSTA

UNITED STATES ATTORNEY

Dated:_____ By:

Dated: 77a,

Dated:

Dated:

A. MARIE VILLAFARA

ASSISTANT U.S. ATTORNEY

GERALD LEFCOURT, ESQ.

COUNSEL TO JEFFREY EPSTEIN

LILLY ANN SANCHEZ, ESQ.

ATTORNEY FOR JEFFREY EPSTEIN

Page 7 of 7

HOUSE OVERSIGHT 012595

By signing this agreement, Epstein asserts and certifies that the above has been read and explained to him. Epstein hereby states that he understands the conditions of this Non-Prosecution Agreement and agrees to comply with them.

R. ALEXANDER ACOSTA

UNITED STATES ATTORNEY

Dated:_____ By:

A. MARIE VILLAFARA

ASSISTANT U.S. ATTORNEY

Dated:

Dated:

Dated:

JEFFREY EPSTEIN',

RALD EFCOUR ESQ.

COUNSEL TO JEFFREY EPSTEIN

LILLY ANN SANCHEZ, ESQ.

ATTORNEY FOR JEFFREY EPSTEIN

Page 7 of 7

HOUSE OVERSIGHT 012596

By signing this agreement, Epstein asserts and certifies that the above has been read and explained to him. Epstein hereby states that he understands the conditions of this Non-Prosecution Agreement and agrees to comply with them.

R. ALEXANDER ACOSTA

UNI1Ell STATES ATTORNEY

Dated:_____ By:

A. MARIE VILLAFANA

ASSISTANT U.S. ATTORNEY

Dated:

JEFFREY EPSTEIN

Dated:

GERALD LEFCOURT, ESQ.

COUNSEL TO JEFFREY EPSTEIN

Dated: q--cA1J0.?"--

Z, ESQ.

ATTORNEY FOR JEk FREY EPSTEIN

Page 7 of 7

*HOUSE OVERSIGHT 012597*

## TAB 22

*HOUSE OVERSIGHT 012598*

08/31/2007 13:03 FAX 5618021787

USA0 WFB FL

Q002

US_ Department of Justice

United States Attorney

Southern District of Florida

500 4outh Australian Ave., Suite 400

Tfesr Palm Redd, FL 33401

(561) 6264711

August 31, 2007

DELIVERY BY FACSIMILE

Ms.

In care of Bruce Lyons, Esq.

Lyons and Sanders

600 Northeast 3rd Avenue

Fort Lauderdale; FL 33304

Re: Grand Jury Investigation—Confidential

Dear

This letter is an invitation for you to testify before a federal Grand Jury, and is supplied in order to provide helpful background information about the Grand Jury. The Grand Jury consists of from sixteen to twenty-three persons from the Southern District of Florida. It is their responsibility to inquire into federal crimes which may have been committed in this District.

As a Grand Jury witness you will be asked to testify and answer questions under oath, and to produce records and documents. Only the members of the Grand Jury, attorneys for the United States and a stenographer- are permitted in the Grand Jury roorn while you testify. . The U.S. Department of Justice encourages prosecutors to notify an individual in appropriate cases that he or she is a target of a grand jury investigation. Accordingly, you are hereby notified that you are a target of a federal grand jury investigation in the Southern

District of Florida concerning suspected violations of federal law, including but not limited to, possible violations of Title 18, United- States Code, Sections 2, 371, 1512, 1591, 1952, 1956, 1960, 2421, 2422, and 2423.

You are advised that the destruction or alteration of any document required to be produced:before the grand jury constitutes serious violation of federal law, including but.not limited to Obstraction of justice.

A "target" is a person as to whom the prosecutors or the Grand Jury have substantial

*HOUSE OVERSIGHT 012599*

08/31/2607 13;04 FAX 5618021787 USA() WPB FL

Ms.

August 31, 2007

Page 2

epos

evidence linking him or her to the commission of a crime and who, in the judgment of the prosecutors, is a putative defendant.

This letter constitutes an invitation to you to testify on your own behalf before the grand jury about matters under investigation. Of course, you are not required to appear before the grand jury. The decision whether to do so is a voluntary matter which is entirely up to you. The grand jury, if in fact it learns of this opportunity afforded to you, will be instructed not to draw any adverse inference from your failure to appear should you decide not to accept this invitation. You mustfurther understand that should you decide to testify, your testimony could be used against you if any criminal charges should be flied against you.

Should you decide to appear before the grand jury, you will have the same rights and obligations as any non-immonized grand jury witness. Specifically,

You may refuse to answer any question if a truthful answer to the question would tend to incriminate you.

You have the right to stop answering questions at any time.

Anything you say maybe used against you at the grand jury or in a subsequent legal proceeding.

The grand jury will permit. you a reasonable opportunity to ..stop . outside the grand jury room to consult with your attorney, if you so desire, at any point during the testimony you give,

Please be further advised that the giving of false testimony before the grand jur3r will subject -you to a prosecution for perjury in addition to the violations set forth above.

As a target of a grand jury investigation who has been asked to appear before the grand jury, you may wish to retain the services of an attorney. If you =not afford the services of independent counsel, the Court may be able to appoint Counsel to represent you. If you would like the United States to ask the Court to appoint an attorney to represent you, please contact the undersigned at 561 209-1047, The United States is investigating other

individuals, and you may be interested in cooperating with the United States against those other targets. If you hire an attorney, or if the Court appoints one to represent you, that counsel can contact me to discuss that possibility.

*HOUSE OVERSIGHT 012600*

08/31/2007 13:04 FAX 5618021787 USAO WPB FL

Ms.

August 31,2007

Page 3

0004

Please advise me whether you wish to testify before the grand jury by close of business -Wednesday, September 12, 2007. If I do not receive notification from you or your counsel by this date, I will assume that you do not wish to testify before the grand jury.

By:

Sincerely,

R. ALEXANDER ACOSTA

UNITED STATES ATTORNEY

A. Marie Villafana

Assistant United States Attorney.

*HOUSE OVERSIGHT 012601*

## TAB 23

**HOUSE OVERSIGHT 012602**

08/16/2007 17:05 FAX 5618021787

IJSA0 WPB FL

.

U.S. Department of Justice

United States Attorney

Southern District of Florida

rip 002

SOO South Australian Ave., Suite 400

West Palm Beach, Ft 33401

(561) 820-8711 .

Facsimile: (561) 820-8777

August 16, 2007

VIA FACSIMILE

Gerald Lefcourt, Esq.

Gerald R Lefcourt, P.C.

148 East 78th Street

New York, NY 10021

Re: Subpoena to Custodian of Records-NES. LLC

Dear Mr. Lelbouri:

I write in response to your letter of July 18, 2007 regarding the grand jury subpoena issued to the Custodian ofRecords for NES, LLC. Ihave attached an identical subpoena containing areturn date of September 11, 2007, and subpoenas for two NES employees, Eric Gany and Harry Beller. If you will not be representing Messrs. Gany and Beller, please let me know.

First, as I mentioned in my earlier correspondence, a properly executed declaration from. the Custodian of Records is needed, and, if no documents responsive to a particular request exist, the Custodian should certify that under penalty of perjury.

Second, you write that NES has no documents responsive to Requests 1 through 5. 'know that NES has several credit card accounts for the benefit of the persons who manage Mr. Epstein's properties, including Janusz Banasiak and Alfredo Rodriguez. I also know that NES regularly receives money from an account that is used to pay expenses at 358 El Milo Way and also wires money to that same account Those wire transfers fall within the time period called for by the subpoena and number in the hundreds of thousands of dollars. IfNES does not maintain records of its banking activities, then I would like to see a copy of its document retention policy, so I have added that to the Attachment to the Subpoena.

Third, Mr. Manche's con:unent to you about potential money laundering charges related only to a resolution ofthe case. In other words, if the sex offense case is resolved, the Office would close its investigation into other areas as well The matter has not been, and it does not appear that it will be, resolved so the money laundering investigation continues, and Request Number 6 will not be withdrawn. The request is not overbroad and is stated with particularity, so please comply with the request by the new deadline.

HOUSE OVERSIGHT 012603

68/16/2007 17:06 FAX $618021787

USA() WPB FL 0003

GERALD LEMUR% ESQ.

AuGUST 16,2007

PAGE 2 07 2

With respect to paragraph 7, the information provided regarding the pilots came from the corporate records of Hypezion and TEGE, Inc., not NES. However, I have provided a shorter list in the new subpoena attachment

I also have enclosed another certification for the Custodian of Records' signature.

Thank you again for your assistance.

Sincerely,

R. Alexander Acosta

United States Attorney

By:

cc: E. Nesbitt Kuyrkendall, FBI (with enclosures)

A. Marie Villafafia

Assistant United States Attorney

*HOUSE OVERSIGHT 012604*

4/1642007 17:06 FAX 5618021787

US.A0 WPB FL tOO4

TO: Custodian of Records

NES, LLC

United States District Court

SOOTIMRNDISTRTCT OF FLORIDA

SUBPOENA TO TESTIFY

BEFORE GRAND JURY

FGJ 07-103(WPB)/No. OLY-6,5/2

SUBPOENA FOR:

Fcl PERSON )M DOCUMENTS OR OBJECT[SI

YOU ARE HEREBY COMMANDED to wear a:ad testifybefore the Grand Jury ofthe United States District

Court at the place, date and lime specified below.

.

· PLACE'

United States District Courthouse

701 Clematis Street

West Palm Beaob, Florida 33401

ROM-

Grand Jury Room

DATE AND TIME:

September 11, 2007

1:00 pm*

YOU ARE ALSO COMMANDED to bring with you the following document(s) or object(s):

THE DOCUMENTS AND OBJECTS LISTED ON ATTACHMENT A.

*Please coordinate your compliance with this subpoena and confirm the date, time, and location of your appearance with S/A Nesbitt Xnyrkendall, Federal Bureau of Investigation, Telephone: (561) 827-5946. This subpoena shall remain in effect until you are granted leave to depart by the court or by an officer acting

on behalf of the court.

plot

August 16, 2007

This subpoena is issued upon application

of &el/njied States of America

Name, Address and Phone Number of Assistant U.S. Attorney

Arm Marie C. Villaffia, Assistant U.S. Attorney

500 So. Australian Avemie, Suite 400

West Palm Beach, FL 33401-6235

Tel: (561) 820-8711 x3047

Fs= ($61) 802-1787

*it not applitable, ma "nom."

Tunh,i of A0110

FORM ORD-227

JAN.86

*HOUSE OVERSIGHT 012605*

08/16/2007 17:06 FAX 5618021787 USA° WPB FL 005

ATTACIEVIENT TO SUBPOENA OLY-65/2

YES, LLC

.

1. · For the period of January 1, 2003 to the present, all calendars, agendas, daily diaries, or other records of appointments, travel, meetings and the lac, kept by or on behalf of Jeffrey Epstein, Lesley 'Groff, and/or

_____ This request includes information that is kept in physical "hard copy" and/or electronic form, whether stored on a personal computer, database server, cellular telephone, "Blacicberrj" unit, personal digital assistant ("PDA") or other handheld electronic device, or in any other electronic form, and all metadata included within the electronic/physical files.

2. For the period of January 1, 2003 to the present, all address books, contact lists, or other records of names, telephone numbers, addresses, and/or e-mail addresses kept by or on behalf of Jeffrey Epstein, Lesley Grog

and/or_____ This request includes information that is kept in physical "hard copy" and/or electronic form, whether stored on a personal computer, database server, cellular telephone, "Blackberry" unit, personal digital assistant ("PDA") or other handheld electronic device, or in any other electronic form; and all metadata included within the electronic/physical files.

3. For the period of January 1, 2003 to the present, all e-mails, instant messages, text messages, meeting invitations, and any other electronic Communication sent by Jeffrey Epstein, Lesley Groff; and/or

to Jeffrey Epstein, Lesley Groff, and/or

This request includes information that is kept in physical "hard copy" and/or electronic form, whether stored on a personal computer, -database server, cellular telephone, "Blackberry" unit, personal digital assistant ("PDA") orother handheld electronic device, or in any other electronic form, and all metadata included within the electronic/physical files.

4. For the period of January 1, 2003 to the present, all documents and information

referring or relating to the transfer of funds to or from any account owned by NES, LLC to or from any bank account used for the maintenance of the property located at 358 El Brill° Way, Palm Beach, Florida, or for the payment of any person working at 358 El Brillo Way, Palm Beach, Florida.

Page 1 of 2

HOUSE OVERSIGHT 012606

. .08/16/2007 17:07 FAX 5618021787

U521.0 WPB FL Q006

5. For the period of January 1, 2003 to the present, all documents and information referring or relating to the transfer of funds to or from any account owned by NES, LLC to or from any bank account on which Janusz Banasiak and/or Alfredo Rodriguez had or has check-writing authority and/or access to via debit/ATM card.

6. For the period of January 1, 2003 to the present, all documents and information referring or relating to the transfer of fund to or from any account owned by NPS, LLC to or from any account owned by JEGE, Inc., Jeffrey E. Epstein, Hyperion Air, Inc., Financial Trust Co., New York Strategy Group, Inc., J. Epstein Virgin Islands Foundations, Inc., and/or Epstein Interests.

7. For the period of January 1, 2003 to the present, the names of all employees and all corporate directors, board members, and shareholders.

8. For the period of January 1, 2003 to the present, copies of all W-2s and/or 1099s for the following persons: Jeffrey Epstein, Lesley Grog Janusz Banasiak, Alfredo Rodriguez, Harry Beller, and Erie T. Gany.

Any and all document retention and/or destruction policies_

.

Page 2 of 2

;

HOUSE OVERSIGHT 012607

O8/161Z007 17:07 FAX 5618021787

USA() WPB FL 0007

UNITED STATES DISTRICT COURT

SOO:0ERN DISTRICT OF FLORIDA

IN RE FEDERAL GRAND JURY SUBPOENA

OLY-65/2

ADDRESSED TO NES, .LLC

•-•- ••• •• • • •

CERTIFICATION REGARDING DOMESTIC RECORDS OF REGULARLY CONDUCTED ACTIVITY

tb.e undersigted, ... -- declare that I am employed by

combat
child prostitution. For this, I was awarded an Assistant Attorney General's Award for Outstanding
Victim/Witness Service. Likewise, I was awarded a subsequent Assistant Attorney General's
Award
for Special Initiative in connection with a nationwide sex tourism prosecution initiative I helped to
develop.
I say all this not for any boastful purpose, but, rather, to make clear that I am fully cognizant
of victim issues, and that I am no pushover in terms of prosecution standards. I am also very well
aware of the good work of CEOS, and the outstanding credentials of those who toil in that office.
With all due respect to CEOS, however (and recognizing that their review of this case was
quite limited), given the facts and circumstances of this investigation, a federal prosecution of Mr.
Epstein simply should not be countenanced. In my view, such prosecution would be counter to
the
important mandate of the Department of Justice as emblazoned on its seal, "Qui Pro
DominaJustitia
Sequitur," referring to the Attorney General"who prosecutes on behalf of justice."
As you well know, it is fundamental to that mandate that, as the representative of the people
of the United States, the duty of a federal prosecutor is not simply to seek conviction as at any
cost,
but, rather, to seek justice. Berger v. United States, 295 U.S. 78, 88 (1935). ("The United States
Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty
whose
obligation to govern impartially is as compelling as its obligation to govern at all.") While it is true
that Berger was decided at the post-trial, as opposed to the pre-indictment, stage of the case, the
bedrock principle contained in the above quote should transcend the entire investigation and

prosecution process. Indeed, it is arguably most imperative at the investigation stage, at which
point
law enforcement is dealing with a presumptively innocent citizen.
In summary, we understand the allegations against Mr. Epstein to be that Mr. Epstein paid
individuals to find friends and acquaintances, certain of whom were under the age of 18, to
provide
topless massages to him at his Palm Beach home in exchange for money. Mr. Epstein's
assistants
allegedly scheduled these massages for him over the telephone at the direction of Mr. Epstein,
allegedly including some scheduling calls to underage women. However, the evidence contradicts
these allegations. First, Mr. Epstein did not ask that the masseuses be under the aca To the
contrary, he specifically asked that they be 18 or older. As one witness commented, said tell
HOUSE OVERSIGHT 012184
ALLEN GUTHRIE MCHUGH & THOMAS, PLLC

HOUSE OVERSIGHT 012188
ALLEN GUTHRIE MCHUGH & THOMAS, PLLC
Mr. John Roth
June 19, 2008
Page 7
considered the extent of exculpatory evidence, including a psychosexual evaluation of Mr. Epstein
and a polygraph examination demonstrating that Mr. Epstein genuinely believed at the time of the
alleged conduct that the State's key witness was over the age of 18. Then, after
months of negotiations, the State reached what it believed was an appropriate resolution of the
case.
Importantly, this resolution was consistent with that of cases involving other defendants who had
engaged in similar conduct. Implementation of the State resolution of the case was held in
abeyance,
however, due to the unexpected commencement of the successive federal criminal investigation.
While it is true, as CEOS points out, (CEOS letter at p. 3) that many criminal prosecutions
turn on issues of credibility of witnesses, to which many members of the defense team can attest
(having had decades of federal criminal litigation experience among us), this does not serve to
divest
the prosecutor of his/her duty to make a searching inquiry of the facts before using the power of
prosecution, and the weight of the United States government, to level serious accusations. CEOS
likewise acknowledges as much, "the prosecutors are in the best position to assess the
witnesses'

credibility. (CEOS letter at p. 3).

Since the CEOS letter also singles me out as someone who should be familiar with witness issues, I feel compelled to note that, of course, I am well aware that it is not uncommon for witnesses to give conflicting statements. I am also fully aware that the credibility of key government witnesses may be strongly impacted by the $50 million incentive provided via the civil lawsuits at play, and encouraged by the government here. 3 I have also read many of the conflicts between witness testimony and Detective ReCarey's own rendition of that testimony in his reports and/or search warrant affidavit. Detective ReCarey apparently formed a view early on as to the purported criminality of Mr. Epstein's conduct regardless of the mountain of evidence to the contrary. For a prosecutor that has had an opportunity to review the full facts, and to meet with the witnesses, however, "conflicting statements" cross the line to a "lack of credibility" that simply can not sustain a prosecution. That is where an appropriate application of prosecutorial discretion must be brought to bear.

Again, CEOS was not itself in the position to exercise such discretion. By its own admission, CEOS did not make a full review of the witness statements here, and CEOS certainly did not sit down across the table and speak to these witnesses. We understand that was apparently not its perceived role. But, CEOS should recognize that at least one prosecutor in this case — the Chief of the SAO Sex Crimes Division has done so. Lana Belohlavek not only met with and interviewed these witnesses during the course of the 15-month state investigation prior to any federal involvement, but she again sat across the table from many of them in connection with recent civil

3 It is important to note here that this investigation was launched not upon the complaint of any alleged victim, but, rather, upon the complaint of ather, , and her stepmother, More notable still is the fact that has been convicted of federal bank fraud, an has a state conviction for identify fraud. Hardly pillars of credibili. Yet, the USAO did not supply this information to the defense. Even more telling is the fact that filed a $50million lawsuit purportedly on behalf of his daughter without her authority or knowledge.

3

HOUSE OVERSIGHT 012162
KIRKLAND &ELLIS LLP

12. In August 2007, in a clear attempt to coerce a state settlement, Ms. Villafana threatened to broaden the investigation to include a money laundering violation (18 U.S.C. § 1956), though all the funds expended were simply Mr. Epstein's, and a violation for operating an unlicensed money-transmitting business (18 U.S.C. § 1960), though Mr. Epstein never had such a business. See Tab 22, August 31, 2007 Letter from M. Villafana to Ross (reciting, in a target letter to one of Epstein's employees, that the investigation concerns "suspected violations of federal law, including but not limited to, possible violations of Title 18, United States Code, Sections . . . 1591, . . . 1956, 1960 . . . .") (emphasis added).

13. On the very same day that the grand jury issued subpoenas to the records-custodian and employees of Epstein's businesses for all financial transactions from 2003 forward, Ms. Villafana (who we were told was not authorized to act in this regard without supervisory approval) promised to close the money-laundering investigation "if the sex offense case is resolved." See Tab 23, August 16, 2007 Letter from M. Villafana to G. Lefcourt ("In other words, if the sex offense case is resolved, the Office would close its investigation into other areas as well. The matter has not been, and it does not appear that it will be.

resolved so the money laundering investigation continues, and Request Number 6 [seeking records of every financial transaction conducted by Epstein and his six businesses from "January 1, 2003 to the present"] will not be withdrawn.").

14. Two weeks later, when Mr. Epstein continued to oppose federal prosecution during negotiations and Mr. Epstein's counsel sought a meeting with the United States Attorney, AUSA Villafana then classified all of Mr. Epstein's assistants as targets (sending a target letter to one of them and promising the attorney of the other two that additional target letters would be served on them as well), dispatched FBI agents to the homes of two of his secretaries, and personally telephoned Mr. Epstein's largest business client to advise him of the nature of the investigation. See Tab 22, August 31, 2007 Letter from M. Villafana to

FAUSA Sloman Forces Mr. Epstein's Lawyers to Convince the State Prosecutors To Impose a More Severe Sentence Than They Believe Is Appropriate

15. Throughout the plea negotiations with the USAO, Mr. Sloman and Ms. Villafana continually insisted that the only way they would agree not to bring a federal indictment was if Epstein's lawyers, not the state prosecutors as required under the Petite Policy, convinced the state prosecutors to impose a more severe punishment than the state believed was appropriate under the circumstances.

16. FAUSA Sloman's version of the history with respect to the sentence he required Mr. Epstein's lawyers to seek from the State contradicts his later assertion, which is patently false—that "the SDFL indicated a willingness to defer to the State the length of incarceration" and "considered a plea to federal charges that limited Epstein's sentencing exposure . . ." See Tab 1, May 19, 2008 Letter from J. Sloman. In fact, by a email dated August 3, 2007, Criminal Division Chief Matthew Menchel advised the defense that the federal government required a minimum term of two years of incarceration. See Tab 40, August 3, 2007 Email from M. Menchel. Subsequently, Ms.

4

HOUSE OVERSIGHT 012163

KIRKLAND &ELLIS LLP

Villafana emailed the defense stating that United States Attorney Acosta would accept no less than 18 months of incarceration, following by a one-year term of house arrest.

Federal Prosecutors Misrepresented the Number of Alleged "Victims."

U.S. Department of Justice

United States Attorney

Southern District of Florida

DELIVERY BY ELECTRONIC MAIL

Jay P. Lefkowitz, Esq.

Kirkland & Ellis LLP

Citigroup Center

153 East 53rd Street

New York, New York 10022-4675

Re: Jeffrey Epstein

Dear Jay:

500 S. Australian Ave, Ste 400

West Palm Beach, FL 33401

(561) 820-8711

Facsimile: (561) 820-8777

December 13, 2007

I am writing not to respond to your asserted "policy concerns" regarding Mr. Epstein's Non-Prosecution Agreement, which will be addressed by the United States Attorney, but the time has come for me to respond to the ever-increasing attacks on my role in the investigation and negotiations.

It is an understatement to say that I am surprised by your allegations regarding my role because I thought that we had worked very well together in resolving this dispute. I also am surprised because I feel that I bent over backwards to keep in mind the effect that the agreement would have on Mr. Epstein and to make sure that you (and he) understood the repercussions of the agreement. For example, I brought to your attention that one potential plea could result in no gain

time for your client; I corrected one of your calculations of the Sentencing Guidelines that would have resulted in Mr. Epstein spending far more time in prison than you projected; I contacted the Bureau of Prisons to see whether Mr. Epstein would be eligible for the prison camp that you desired; and I told you my suspicions about the source of the press "leak" and suggested ways to avoid the press. Importantly, I continued to work with you in a professional manner even after I learned that you had been proceeding in bad faith for several weeks — thinking that I had incorrectly concluded that solicitation of minors to engage in prostitution was a registrable offense and that you would "fool" our Office into letting Mr. Epstein plead to a non-registrable offense. Even now, when it is

clear that neither you nor your client ever intended to abide by the terms of the agreement that he signed, I have never alleged misconduct on your part.

The first allegation that you raise is that I "assiduously" hid from you the fact that Bert Ocariz is a friend of my boyfriend and that I have a "longstanding relationship" with Mr. Ocariz.

HOUSE OVERSIGHT 012577

HOUSE OVERSIGHT 012578

By signing this agreement, Epstein asserts and certifies that each of these terms is material to this agreement and is supported by independent consideration and that a breach of any one of these conditions allows the United States to elect to terminate the agreement and to investigate and prosecute Epstein and any other individual or entity for any and all federal offenses.

By signing this agreement, Epstein asserts and certifies that he is aware of the fact that the Sixth Amendment to the Constitution of the United States provides that in all criminal prosecutions the accused shall enjoy the right to a speedy and public trial. Epstein further is aware that Rule 48(b) of the Federal Rules of Criminal Procedure provides that the Court may dismiss an indictment, information, or complaint for unnecessary delay in presenting a charge to the Grand Jury, filing an information, or in bringing a defendant to trial. Epstein hereby requests that the United States Attorney for the Southern District of Florida defer such prosecution. Epstein agrees and consents that any delay from the date of this Agreement to the date of initiation of prosecution, as provided for in the terms expressed herein, shall be deemed to be a necessary delay at his own request, and he hereby waives any defense to such

prosecution on the ground that such delay operated to deny him rights under Rule 48(b) of the Federal Rules of Criminal Procedure and the Sixth Amendment to the Constitution of the United States to a speedy trial or to bar the prosecution by reason of the running of the statute of limitations for a period of months equal to the period between the signing of this agreement and the breach of this agreement as to those offenses that were the subject of the grand jury's investigation. Epstein further asserts and certifies that he understands that the Fifth Amendment and Rule 7(a) of the Federal Rules of Criminal Procedure provide that all felonies must be charged in an indictment presented to a grand jury. Epstein hereby agrees and consents that, if a prosecution against him is instituted for any offense that was the subject of the grand jury's investigation, it may be by way of an Information signed and filed by the United States Attorney, and hereby waives his right to be indicted by a grand jury as to any such offense.

//\

///

///

Page 6 of 7

HOUSE OVERSIGHT 012594

HOUSE OVERSIGHT 012602

08/16/2007 17:05 FAX 5618021787

IJSA0 WPB FL

•

U.S. Department of Justice

United States Attorney

Southern District of Florida

rip 002

SOO South Australian Ave., Suite 400

West Palm Beach, Fl 33401

(561) 820-8711 .

Facsimile: (561) 820-8777

August 16, 2007

VIA FACSIMILE

Gerald Lefcourt, Esq.

Gerald R Lefcourt, P.C.

148 East 78th Street

New York, NY 10021

Re: Subpoena to Custodian of Records-NES. LLC

Dear Mr. Lelbouri:

I write in response to your letter of July 18, 2007 regarding the grand jury subpoena issued to the Custodian of Records for NES, LLC. I have attached an identical subpoena containing a return date of September 11, 2007, and subpoenas for two NES employees, Eric Gany and Harry Beller. If you will not be representing Messrs. Gany and Beller, please let me know.

First, as I mentioned in my earlier correspondence, a properly executed declaration from the Custodian of Records is needed, and, if no documents responsive to a particular request exist, the

Custodian should certify that under penalty of perjury.

work performed on Mr. Epstein's behalf

TOTAL P.05

*HOUSE OVERSIGHT 012575*

---

## TAB 18

HOUSE OVERSIGHT 012576

U.S. Department of Justice

United States Attorney

Southern District of Florida

DELIVERY BY ELECTRONIC MAIL

Jay P. Lefkowitz, Esq.

Kirkland & Ellis LLP

Citigroup Center

153 East 53rd Street

New York, New York 10022-4675

Re: Jeffrey Epstein

Dear Jay:

500 S. Australian Ave, Ste 400

West Palm Beach, FL 33401

(561) 820-8711

Facsimile: (561) 820-8777

*012575*

December 13, 2007

I am writing not to respond to your asserted "policy concerns" regarding Mr. Epstein's Non-Prosecution Agreement, which will be addressed by the United States Attorney, but the time has come for me to respond to the ever-increasing attacks on my role in the investigation and negotiations.

It is an understatement to say that I am surprised by your allegations regarding my role because I thought that we had worked very well together in resolving this dispute. I also am surprised because I feel that I bent over backwards to keep in mind the effect that the agreement would have on Mr. Epstein and to make sure that you (and he) understood the repercussions of the agreement. For example, I brought to your attention that one potential plea could result in no gain time for your client; I corrected one of your calculations of the Sentencing Guidelines that would have resulted in Mr. Epstein spending far more time in prison than you projected; I contacted the Bureau of Prisons to see whether Mr. Epstein would be eligible for the prison camp that you desired; and I told you my suspicions about the source of the press "leak" and suggested ways to avoid the press. Importantly, I continued to work with you in a professional manner even after I learned that you had been proceeding in bad faith for several weeks — thinking that I had incorrectly concluded that solicitation of minors to engage in prostitution was a registrable offense and that you would "fool" our Office into letting Mr. Epstein plead to a non-registrable offense. Even now, when it is

clear that neither you nor your client ever intended to abide by the terms of the agreement that he signed, I have never alleged misconduct on your part.

The first allegation that you raise is that I "assiduously" hid from you the fact that Bert Ocariz is a friend of my boyfriend and that I have a "longstanding relationship" with Mr. Ocariz.

HOUSE OVERSIGHT 012577

JAY P. LEFKOWITZ, ESQ.
DECEMBER 13, 2007
PAGE 2 OF 5

I informed you that I selected Mr. Ocariz because he was a friend and classmate of two people whom I respected, and that I had never met or spoken with Mr. Ocariz prior to contacting him about this case. All of those facts are true. I still have never met Mr. Ocariz, and, at the time that he and I spoke about this case, he did not know about my relationship with his friend. You suggest that I should have explicitly informed you that one of the referrals came from my "boyfriend" rather than simply a "friend," which is the term I used, but it is not my nature to discuss my personal relationships with opposing counsel. Your attacks on me and on the victims establish why I wanted to find someone whom I could trust with safeguarding the victims' best interests in the face of intense pressure from an unlimited number of highly skilled and well paid attorneys. Mr. Ocariz was that person.

One of your letters suggests a business relationship between Mr. Ocariz and my boyfriend. This is patently untrue and neither my boyfriend nor I would have received any financial benefit from Mr. Ocariz's appointment. Furthermore, after Mr. Ocariz learned more about Mr. Epstein's actions (as described below), he expressed a willingness to handle the case pro bono, with no financial benefit even to himself. Furthermore, you were given several other options to choose from, including the Podhurst firm, which was later selected by Judge Davis. You rejected those other options.

You also allege that I improperly disclosed information about the case to Mr. Ocariz. I provided Mr. Ocariz with a bare bones summary of the agreement's terms related to his appointment to help him decide whether the case was something he and his firm would be willing to undertake. I did not provide Mr. Ocariz with facts related to the investigation because they were confidential and instead recommended that he "Google" Mr. Epstein's name for background information. When Mr. Ocariz asked for additional information to assist his firm in addressing conflicts issues, I forwarded those questions to you, and you raised objections for the first time. I did not share any further information about Mr. Epstein or the case. Since Mr. Ocariz had been told that you concurred in his selection, out of professional courtesy, I informed Mr. Ocariz of the Office's decision to use a Special Master to make the selection and told him that the Office had made contact with Judge Davis. We have had no further contact since then and I have never had contact with Judge Davis. I understand from you that Mr. Ocariz contacted Judge Davis. You criticize his decision to do so, yet you feel that you and your co-counsel were entitled to contact Judge Davis to try to "lobby" him to select someone to your liking, despite the fact that the Non-Prosecution

Agreement vested the Office with the exclusive right to select the attorney representative. Another reason for my surprise about your allegations regarding misconduct related to the Section 2255 litigation is your earlier desire to have me perform the role of "facilitator" to convince the victims that the lawyer representative was selected by the Office to represent their interests alone and that the out-of-court settlement of their claims was in their best interests. You now state that doing the same things that you had asked me to do earlier is improper meddling in civil litigation. Much of your letter reiterates the challenges to Detective Recarey's investigation that have

HOUSE OVERSIGHT 012578

JAY P. LEFKOWITZ, ESQ.
DECEMBER 13, 2007
PAGE 3 OF 5

already been submitted to the Office on several occasions and you suggest that I have kept that information from those who reviewed the proposed indictment package. Contrary to your suggestion, those submissions were attached to and incorporated in the proposed indictment package, so your suggestion that I tried to hide something from the reviewers is false. I also take issue with the duplicity of stating that we must accept as true those parts of the Recarey reports and witness statements that you like and we must accept as false those parts that you do not like. You and your co-counsel also impressed upon me from the beginning the need to undertake an independent investigation. It seems inappropriate now to complain because our independent investigation uncovered facts that are unfavorable to your client.

You complain that I "forced" your client and the State Attorney's Office to proceed on charges that they do not believe in, yet you do not want our Office to inform the State Attorney's Office of facts that support the additional charge nor do you want any of the victims of that charge to contact Ms. Belohlavek or the Court. Ms. Belohlavek's opinion may change if she knows the full scope of your client's actions. You and I spent several weeks trying to identify and put together a plea to federal charges that your client was willing to accept. Yet your letter now accuses me of "manufacturing" charges of obstruction of justice, making obscene phone calls, and violating child privacy laws. When Mr. Lourie told you that those charges would "embarrass the Office," he meant that the Office was unwilling to bend the facts to satisfy Mr. Epstein's desired prison sentence — a statement with which I agree.

I hope that you understand how your accusations that I imposed "ultimatums" and "forced" you and your client to agree to unconscionable contract terms cannot square with the true facts of this case. As explained in letters from Messrs. Acosta and Sloman, the indictment was postponed for more than five months to allow you and Mr. Epstein's other attorneys to make presentations to the Office to convince the Office not to prosecute. Those presentations were unsuccessful. As you mention in your letter, I — a simple line AUSA — handled the primary negotiations for the Office, and conducted those negotiations with you, Ms. Sanchez, Mr. Lewis, and a host of other highly skilled and experienced practitioners. As you put it, your group has a "combined 250 years experience" to my fourteen. The agreement itself was signed by Mr. Epstein, Ms. Sanchez, and Mr. Lefcaut,

whose experience speaks for itself. You and I spent hours negotiating the terms, including when to use "a" versus "the" and other minutiae. When you and I could not reach agreement, you repeatedly went over my head, involving Messrs. Lourie, Menchel, Sloman, and Acosta in the negotiations at various times. In any and all plea negotiations the defendant understands that his options are to plead or to continue with the investigation and proceed to trial. Those were the same options that were proposed to Mr. Epstein, and they are not "persecution or intimidation tactics." Mr. Epstein chose to sign the agreement with the advice of a multitude of extremely noteworthy counsel. You also make much of the fact that the names of the victims were not released to Mr. Epstein prior to signing the Agreement. You never asked for such a term. During an earlier meeting, where Mr. Black was present, he raised the concern that you now voice. Mr. Black and I did not have a chance to discuss the issue, but I had already conceived of a way to resolve that

HOUSE OVERSIGHT 012579

JAY P. LEFKOWITZ, ESQ.
DECEMBER 13, 2007
PAGE 4 OF 5

issue if it were raised during negotiations. As I stated, it was not, leading me to believe that it was not a matter of concern to the defense. Since the signing of the Non-Prosecution Agreement, the agents and I have vetted the list of victims more than once. In one instance, we decided to remove a name because, although the minor victim was touched inappropriately by Mr. Epstein, we decided that the link to a payment was insufficient to call it "prostitution." I have always remained open to a challenge to the list, so your suggestion that Mr. Epstein was forced to write a blank check is simply unfounded.

Your last set of allegations relates to the investigation of the matter. For instance, you claim that some of the victims were informed of their right to collect damages prior to a thorough investigation of their allegations against Mr. Epstein. This also is false. None of the victims was informed of the right to sue under Section 2255 prior to the investigation of the claims. Three victims were notified shortly after the signing of the Non-Prosecution Agreement of the general terms of that Agreement. You raised objections to any victim notification, and no further notifications were done. Throughout this process you have seen that I have prepared this case as though it would proceed to trial. Notifying the witnesses of the possibility of damages claims prior to concluding the matter by plea or trial would only undermine my case. If my reassurances are insufficient, the fact that not a single victim has threatened to sue Mr. Epstein should assure you of the integrity of the investigation.'

There are numerous other unfounded allegations in your letter about document demands, the money laundering investigation, contacting potential witnesses, speaking with the press, and the like. For the most part, these allegations have been raised and disproven earlier and need not be readdressed. However, with respect to the subpoena served upon the private investigator, contrary to your assertion, and as your co-counsel has already been told, I did consult with the Justice Department prior to issuing the subpoena and I was told that because I was not subpoenaing an

attorney's office or an office physically located within an attorney's office, and because the business did private investigation work for individuals (rather than working exclusively for Mr. Black), I could issue a grand jury subpoena in the normal course, which is what I did. I also did not "threaten" the State Attorney's Office with a grand jury subpoena, as the correspondence with their grand jury coordinator makes perfectly clear.

With regard to your allegation of my filing the Palm Beach Police Department's probable cause affidavit "with the court knowing that the public could access it," I do not know to what you are referring. All documents related to the grand jury investigation have been filed under seal, and the Palm Beach Police Department's probable cause affidavit has never been filed with the Court. If, in fact, you are referring to the Ex Parte Declaration of Joseph Recarey that was filed in response to the motion to quash the grand jury subpoena, it was filed both under seal and ex parte, so no one should have access to it except the Court and myself. Those documents are still in the Court file only because you have violated one of the terms of the Agreement by failing to "withdraw [Epstein's] pending motion to intervene and to quash certain grand jury subpoenas."

*HOUSE OVERSIGHT 012580*

JAY P. LEFKOWITZ, ESQ.
DECEMBER 13, 2007
PAGE 5 OF 5

With respect to Ms. ███ I contacted her attorney - who was paid for by Mr. Epstein and was directed by counsel for Mr. Epstein to demand immunity - and asked only whether he still represented Ms. ███ and if he wanted me to send the victim notification letter to him. He asked what the letter would say and I told him that the letter would be forthcoming in about a week and that I could not provide him with the terms. With respect to Ms. ███ status as a victim, you again want us to accept as true only facts that are beneficial to your client and to reject as false anything detrimental to him. Ms. ███ made a number of statements that are contradicted by documentary evidence and a review of her recorded statement shows her lack of credibility with respect to a number of statements. Based upon all of the evidence collected, Ms. ███ is classified as a victim as defined by statute. Of course, that does not mean that Ms. ███ considers herself a victim or that she would seek damages from Mr. Epstein. I believe that a number of the identified victims will not seek damages, but that does not negate their legal status as victims.

I hope that you now understand that your accusations against myself and the agents are unfounded. In the future, I recommend that you address your accusations to me so that I can correct any misunderstandings before you make false allegations to others in the Department. I hope that we can move forward with a professional resolution of this matter, whether that be by your client's adherence to the contract that he signed, or by virtue of a trial.

Sincerely,

R. Alexander Acosta
United States Attorney
By: s/A. Marie Villafana

A. Marie Villafaria

Assistant United States Attorney

cc: R. Alexander Acosta, U.S. Attorney

Jeffrey Sloman, First Assistant U.S. Attorney

You also accuse me of " broaden [ing] the scope of the investigation without any foundation for doing so by adding charges of money laundering and violations of a money transmitting business to the investigation." Again, I consulted with the Justice Department's Money Laundering Section about my analysis before expanding that scope. The duty attorney agreed with my analysis.

*HOUSE OVERSIGHT 012581*

## TAB 19

*HOUSE OVERSIGHT 012582*

vaA0110 (Rev. 04/07) Subpoena In Tcstify Before Grand Jury

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF FLORIDA

TO:

SUBPOENA TO TESTIFY

BEFORE GRAND JURY

FGJ 07-10-3(WPB)-Tues. No. OLY-85/1

SUBPOENA FOR:

ft PERSON IEr DOCUMENT(S) OR OBJECT(S)

YOU ARE HEREBY COMMANDED to appear and testify before the Grand Jury of the United States District

Court at the place, date, and time specified below.

-pLiNicg

United States District Court

701 Clematis Street

West Palm Beach, Florida 33401

.COLRTR 00 M • "

Grand Jury Room

tiATEAND TIME

7/1/2008 10:30 am

YOU ARE ALSO COMMANDED to bring with you the following document(s) or object(s):.

ALL DOCUMENTS AND INFORMATION REFERENCED IN THE ATTACHMENT TO THIS SUBPOENA.

0 Please see additional Information on ret,-,t

This subpoena shall remain in elf

behalf of the court.

(By) Deputy clod(

This subpoena is issued on application

of the- CA a'

· lmol applicable. enla "none".

p.rikbythe couk or by an-officet acting on.

NAME; ADDRESS' AND PHONE NUMBER or ASSISTANT US. ATTORNEY

Ann Marie C. Villafarla, Assistant U.S. Attorney

500 South Australian Avenue, Suite 400

West Palm Beach, Florida 33401-6235

Tel: (561) 820-8711, ext 3047

*HOUSE OVERSIGHT 012583*

ATTACHMENT TO GRAND JURY SUBPOENA OLY-85/1

ADDRESSED TO

PLEASE BRING THE FOLLOWING DOCUMENTS, ITEMS, AND INFORMATION WITH YOU
TO YOUR GRAND JURY APPEARANCE:

1. Any and all notes, letters, cards, gifts, payments, photographs, or other items that you
have received from Jeffrey Epstein,_____
Lesley Groff, Ghislaine Maxwell, and/or any other employee or associate of Jeffrey Epstein.

2. Any and all photographs, whether printed or digital, of Jeffrey Epstein,
Lesley Groff, Ghislaine Maxwell, and/or any
other employee or associate of Jeffrey Epstein.

3. Any and all c-mails, instant messages, chats, text messages, voicemails or telephone
messages that you have sent to and/or received from Jeffrey Epstein,
Lesley Groff, Ghislaine Maxwell, and/or any other
employee or associate of Jeffrey Epstein.

4. A list of all telephone numbers (cellular and "land line"), e-mail addresses, screen
names, addresses, and any other contact information that you have for the following persons during
the period of January 1, 2003 to the present:

a. yourself;

b. Jeffrey Epstein;

C.

d.

e.

f.

g. Lesley Groff;

h. Ghislaine Maxwell;

i. any person(s) who introduced you to Jeffrey Epstein and/or Ghislaine
Maxwell;

j. any person(s) whom you introduced to Jeffrey Epstein and/or Ghislaine
Maxwell;

k. any person(s) who communicated with you to arrange appointments to meet with Jeffrey Epstein and/or Ghislaine Maxwell.

5. Any billing statements for telephone service (cellular and "land line") for any telephone you used during the period of January 1, 2003 to the present.

*HOUSE OVERSIGHT 012584*

---

## TAB 20

*HOUSE OVERSIGHT 012585*

CONFIDENTIAL PLEA NEGOTIATIONS

TERMS OF EPSTEIN NON-PROSECUTION AGREEMENT

· Epstein pleads guilty (not nob o contendere) to an Information filed by the Palm Beach County State Attorney's Office charging him with:

(a) lewd and lascivious battery on a child, in violation of Fl. Stat. 800.04(4);

(b) solicitation of minors to engage in prostitution, in violation of Fl. Stat. 796.03; and

(c) engaging in sexual activity with minors at least sixteen years of age, in violation of Fl. Stat. 794.05.

· Epstein and the State Attorney's Office make a joint, binding recommendation that Epstein serve at least two years in prison without any opportu

·

nity loi withholding acjudtcition ir sentencing, arid v 1 agrees to waive all challenges to the information filed by the State and the right to appeal.

· Epstein agrees that, if any of the victims identified in the federal investigation file suit pursuant to 18 U.S.C. § 2255, Epstein will not contest the jurisdiction of the U.S. District Court for the Southern District of Florida over his person and the subject matter. Epstein will not contest that the identified victims are persons who, while minors, were victims of violations of Title 18, United States Code, Sections(s) 2422 and/or 2423.

· After Epstein enters his state court plea and is sentenced, the FBI and the U.S. Attorney's Office will close their investigations into violations of 18 U.S.C. §§ 1591, 2422, and 2423.

*HOUSE OVERSIGHT 012586*

FEDERAL SENTENCING GUIDELIN'ES CALCULATION

(Using1NOvernher 1, 2004 Guidelines Manual):

aôh count of §4 101, 24n(b) and 2423(b):

Base Oftense Level under 761; 3 24

CiffensOmAwd::zexmltOtitadt:

20.

Counts do not4i!..OWS:0-.005.1.0-vels...fOr.more than 5 .Ittiltai pursuantto..31DIA.

Offense Level 3.1

Apply Repeat and D·angerous S Qx Offender against Minors enhanoetnent 2.:t 4B1.5

Total Offense Level 36

Asturning,criminalliisfory, Category 1, advisory guideline range is Y88 - 25 months with

lifetime. superViaed-reload,

*HOUSE OVERSIGHT 012587*

---

## TAB 21

*HOUSE OVERSIGHT 012588*

IN RE:

INVESTIGATION OF

JEFFREY EPSTEIN

NON-PROSECUTION AGREEMENT

IT APPEARING that the City of Palm Beach Police Department and the State Attorney's Office for the 15th Judicial Circuit in and for Palm Beach County (hereinafter, the "State Attorney's Office") have conducted an investigation into the conduct of Jeffrey Epstein (hereinafter "Epstein");

IT APPEARING that the State Attorney's Office has charged Epstein by indictment with solicitation of prostitution, in violation of Florida Statutes Section 796.07;

IT APPEARING that the United States Attorney's Office and the Federal Bureau of Investigation have conducted their own investigation into Epstein's background and any offenses that may have been committed by Epstein against the United States from in or around 2001 through in or around September 2007, including:

(1) knowingly and willfully conspiring with others known and unknown to commit an offense against the United States, that is, to use a facility or means of interstate or foreign commerce to knowingly persuade, induce, or entice minor females to engage in prostitution, in violation of Title 18, United States Code, Section 2422(b); all in violation of Title 18, United States Code, Section 371;

(2) knowingly and willfully conspiring with others known and unknown to travel in interstate commerce for the purpose of engaging in illicit sexual conduct, as defined in 18 U.S.C. § 2423(f), with minor females, in violation of Title 18, United States Code, Section 2423(b); all in violation of Title 18, United States Code, Section 2423(e);

(3)

using a facility or means of interstate or foreign commerce to knowingly persuade, induce, or entice minor females to engage in prostitution; in

violation of Title 18, United States Code, Sections 2422(b) and 2;

(4) traveling in interstate commerce for the purpose of engaging in illicit sexual conduct, as defmed in 18 U.S.C. § 2423(f), with minor females; in violation

Page 1 of 7

HOUSE OVERSIGHT 012589

of Title 18, United States Code, Section 2423(b); and

(5)

knowingly, in and affecting interstate and foreign commerce, recruiting, enticing, and obtaining by any means a person, knowing that the person had not attained the age of 18 years and would be caused to engage in a commercial sex act as defined in 18 U.S.C. § 1591(c)(1); in violation of Title 18, United States Code, Sections 1591(a)(1) and 2; and

IT APPEARING that Epstein seeks to resolve globally his state and federal criminal liability and Epstein understands and acknowledges that, in exchange for the benefits provided by this agreement, he agrees to comply with its terms, including undertaking certain actions with the State Attorney's Office;

IT APPEARING, after an investigation of the offenses and Epstein's background by both State and Federal law enforcement agencies, and after due consultation with the State Attorney's Office, that the interests of the United States, the State of Florida, and the Defendant will be served by the following procedure;

THEREFORE, on the authority of R. Alexander Acosta, United States Attorney for the Southern District of Florida, prosecution in this District for these offenses shall be deferred in favor of prosecution by the State of Florida, provided that Epstein abides by the following conditions and the requirements of this Agreement set forth below.

If the United States Attorney should determine, based on reliable evidence, that, during the period of the Agreement, Epstein willfully violated any of the conditions of this Agreement, then the United States Attorney may, within ninety (90) days following the expiration of the term of home confinement discussed below, provide Epstein with timely notice specifying the condition(s) of the Agreement that he has violated, and shall initiate its prosecution on any offense within sixty (60) days' of giving notice of the violation. Any notice provided to Epstein pursuant to this paragraph shall be provided within 60 days of the United States learning of facts which may provide a basis for a determination of a breach of the Agreement.

After timely fulfilling all the terms and conditions of the Agreement, no prosecution for the offenses set out on pages 1 and 2 of this Agreement, nor any other offenses that have been the subject of the joint investigation by the Federal Bureau of Investigation and the United States Attorney's Office, nor any offenses that arose from the Federal Grand Jury investigation will be instituted in this District, and the charges against Epstein if any, will be dismissed.

Page 2 of 7

HOUSE OVERSIGHT 012590

Terms of the Agreement:

1. Epstein shall plead guilty (not nob contendere) to the Indictment as currently pending against him in the 15th Judicial Circuit in and for Palm Beach County (Case No. 2006-cf-009495AXXXMB) charging one (1) count of solicitation of prostitution, in violation of Fl. Stat. § 796.07. In addition, Epstein shall plead guilty to an Information filed by the State Attorney's Office charging Epstein with an offense that requires him to register as a sex offender, that is, the .solicitation of 'mum 0 9-iigne m..prpstg-t#1,444 in violation of Florida Statutes Section 796.03;

2. Epstein shall make a binding recommendation that the Court impose a thirty (30) month sentence to be divided as follows:

(a) Epstein shall be sentenced to consecutive terms of twelve (12) months, and six (6) months in c'iintv 'ail for all charges, without any opportumt for withholding idjudication!..6ii0 without rO.ation on community controJ in lieu·of

(b)
Epstein shall be sentenced to a term of twelve (12) months of community control consecutive to his two terms in county jail as described in Term 2(a), supra.

3. This agreement is contingent upon a Judge of the 15th Judicial Circuit accepting and executing the sentence agreed upon between the State Attorney's Office and Epstein, the details of which are set forth in this agreement.

4. The terms contained in paragraphs 1 and 2, supra, do not foreclose Epstein and the State Attorney's Office from agreeing to recommend any additional charge(s) or any additional term(s) of probation and/or incarceration.

5. Epstein shall waive all challenges to the Information tiled by the State Attorney's Office and shall waive the right to appeal his conviction and sentence, except a sentence that exceeds what is set forth in paragraph (2), supra.

6. Epstein shall provide to the U.S. Attorney's Office copies of all

Page 3 of 7

HOUSE OVERSIGHT 012591

proposed agreements with the State Attorney's Office prior to entering into those agreements.

CONFIDENTIAL SUBMISSION TO
THE OFFICE OF THE DEPUTY
ATTORNEY GENERAL
RE J. EPSTEIN
HOUSE OVERSIGHT 012135
KIRKLAND & ELLIS LLP
AND AFFILIATED PARTNERSHIPS
Kenneth W. Starr
To Call Writer Directly: Facsimile:
777 South Figueroa Street
Los Angeles, California 90017
www.kirkland.com
June 19, 2008
John Roth, Esq.
Principal Associate Deputy Attorney General
Office of the Deputy Attorney General
United States Department of Justice
950 Pennsylvania Avenue, N.W., Room 4115
Washington, D.C. 20530
Dear Mr. Roth:
Dir. Fax:
I again want to thank you for this opportunity to explain why we believe that a federal
prosecution of Jeffrey Epstein is unwarranted. I appreciate your having informed us that you
already have our May 19 and May 27 communications to the Deputy Attorney General, as well
as our prior written submissions to CEOS and to the Southern District of Florida.
In light of the significant volume of our prior submissions and to facilitate your review,
we have drafted four supplemental submissions that will provide a roadmap for your
investigation of this matter. Given the bulk of these documents and their appended supporting
attachments, you will receive this packet by messenger tomorrow. A brief description of each of
the four submissions follows. First, I have included a succinct summary of the facts, law and
policy issues at hand. This document sets forth a basic overview of the issues and summarizes
our principal contentions as to why federal prosecution of this matter is neither appropriate nor
warranted.
The three other submissions include: a summary of the irregularities and misconduct that
occurred during the federal investigation; a letter from former CEOS attorney Stephanie Thacker
that responds to CEOS's assessment of its limited review of Mr. Epstein's case; and a point-by-
point rebuttal to First Assistant United States Attorney Jeffrey Sloman's recent letter which we
believe contains factual inaccuracies typical of our correspondence from the United States
Attorney's Office in Miami (the "USAO"). Also, for your reference, the package you receive
tomorrow will contain a binder including all documentation to which we refer in our
submissions. Finally, we will be providing a detailed checklist of each submission or substantive
communication to the USAO. Our intention is that you have copies of each such document to
enhance your review. If there are any that you have not received from the USA() or CEOS,
please advise and we will fedex them to you without delay.
Chicago Hong Kong London Munich New York San Francisco Washington, D.C.
HOUSE OVERSIGHT 012136
KIRKLAND & ELLIS LLP
John Roth, Esq.
June 19, 2008
Page 2
As you are likely aware, the Department's prior review of this matter was incomplete
and, by its own admission, not "de novo." See Tab 38, May 15, 2008 Letter from A. Oosterbaan.

to broaden the investigation to include a money laundering violation (18 U.S.C. § 1956), though all the funds expended were simply Mr. Epstein's, and a violation for operating an unlicensed money-transmitting business (18 U.S.C. § 1960), though Mr. Epstein never had such a business. See Tab 22, August 31, 2007 Letter from M. Villafana to Ross (reciting, in a target letter to one of Epstein's employees, that the investigation concerns "suspected violations of federal law, including but not limited to, possible violations of Title 18, United States Code, Sections . . . 1591, . . . 1956, 1960 . . . .") (emphasis added).

13. On the very same day that the grand jury issued subpoenas to the records-custodian and employees of Epstein's businesses for all financial transactions from 2003 forward, Ms. Villafana (who we were told was not authorized to act in this regard without supervisory approval) promised to close the money-laundering investigation "if the sex offense case is resolved." See Tab 23, August 16, 2007 Letter from M. Villafana to G. Lefcourt ("In other words, if the sex offense case is resolved, the Office would close its investigation into other areas as well. The matter has not been, and it does not appear that it will be, resolved so the money laundering investigation continues, and Request Number 6 [seeking records of every financial transaction conducted by Epstein and his six businesses from "January 1, 2003 to the present"] will not be withdrawn.").

14. Two weeks later, when Mr. Epstein continued to oppose federal prosecution during negotiations and Mr. Epstein's counsel sought a meeting with the United States Attorney, AUSA Villafana then classified all of Mr. Epstein's assistants as targets (sending a target letter to one of them and promising the attorney of the other two that additional target letters would be served on them as well), dispatched FBI agents to the homes of two of his secretaries, and personally telephoned Mr. Epstein's largest business client to advise him of the nature of the investigation. See Tab 22, August 31, 2007 Letter from M. Villafana to

FAUSA Sloman Forces Mr. Epstein's Lawyers to Convince the State Prosecutors To Impose a More Severe Sentence Than They Believe Is Appropriate

15. Throughout the plea negotiations with the USAO, Mr. Sloman and Ms. Villafana continually insisted that the only way they would agree not to bring a federal indictment was if Epstein's lawyers, not the state prosecutors as required under the Petite Policy, convinced the state prosecutors to impose a more severe punishment than the state believed was appropriate under the circumstances.

16. FAUSA Sloman's version of the history with respect to the sentence he required Mr. Epstein's lawyers to seek from the State contradicts his later assertion, which is patently false—that "the SDFL indicated a willingness to defer to the State the length of incarceration" and "considered a plea to federal charges that limited Epstein's sentencing exposure . . . " See Tab 1, May 19, 2008 Letter from J. Sloman. In fact, by a email dated August 3, 2007, Criminal Division Chief Matthew Menchel advised the defense that the federal government required a minimum term of two years of incarceration. See Tab 40, August 3, 2007 Email from M. Menchel. Subsequently, Ms.

4

HOUSE OVERSIGHT 012163
KIRKLAND &ELLIS LLP

Villafana emailed the defense stating that United States Attorney Acosta would accept no less than 18 months of incarceration, following by a one-year term of house arrest.

Federal Prosecutors Misrepresented the Number of Alleged "Victims."

17. In September 2007, in order to add additional pressure on Mr. Epstein to execute a deferred prosecution agreement, AUSA Villafana claimed that there were "40" minors on the government's list of purported § 2255 victims. To compound that misleading characterization, she continued to insist that a guardian-ad-litem be appointed to represent these purported "minors" in the proceedings. See Tab 24, September 19, 2007 Email

material

misrepresentations, including gross misstatements of witness statements and other evidence. Second, we

(Continued...)

2

HOUSE OVERSIGHT 012161

KIRKLAND & ELLIS LLP

Mr. Epstein is Required to Agree to Civil Liability In Order to Avoid a Federal Indictment

10. On July 31, 2007, during negotiations over a possible federal plea agreement, FAUSA Sloman and AUSA Villafana demanded that Mr. Epstein agree to the imposition of civil liability under 18 U.S.C. § 2255 as a pre-condition to deferral of federal prosecution. To the best of our knowledge, the inclusion of such a term in a deferred prosecution agreement of this kind is absolutely unprecedented.3 Specifically, Ms. Villafana demanded that Mr. Epstein waive the right to contest civil liability to a list of individuals she said were "victims" of § 2255, whose names, however, she refused to disclose, and agree to pay damages of a minimum of $150,000 to each and every one of such undisclosed individuals, and hire an attorney to represent them if they decided to sue him. See Tab 20, July 31, 2007 Draft of Deferred Prosecution Agreement.

11. FAUSA Sloman and AUSA Villafana insisted that the identities of the individuals on the list not be disclosed to Mr. Epstein or his counsel until after Mr. Epstein was already sentenced in the state case.

(a) Over the next two months, Mr. Sloman refused to negotiate these terms. They ultimately became incorporated into the final deferred prosecution agreement. See Tab 21, September 24, 2007 Non-Prosecution Agreement, T117-11.

(b) It was not until seven months later, in February 2008, that Epstein's lawyers were able to take their first official statement from one of the women FAUSA Sloman alleged were minor victims of federal offenses.

(c) This statement, a deposition of the initial complainant in the state case, taken in the presence of her lawyer, proved that none of the necessary elements for any federal charge could be satisfied based on brief contact with Mr. Epstein. The witness also admitted lying to Mr. Epstein, testifying that she told him that she was an adult  and wanted him to believe that she was an adult. See Tab 13,_____(deposition), p. 35 ("Q. So you told Jeff that you were 18 years old, correct? A. Yes."), 37 ("Q. You wanted Mr. Epstein to believe that you really were 18, right? A. Correct.").

(d) Shortly after this deposition, the defense was able to obtain statements from other women on Mr. Sloman's so called "list of § 2255 victims" and, so far, all such statements also continue to demonstrate that Mr. Sloman's repeated representations to the defense about the existence of federal jurisdiction were false.

understand that Villafana was recently reprimanded at a special hearing convened by a United States District

Judge in the West Palm Beach Division of the Southern District of Florida, for making misrepresentations

during a prior sentencing proceeding.

3 In fact, Stephanie Thacker, a former deputy to CEOS Chief Drew Oosterbaan, has stated that she knew of no

other case like this being prosecuted by CEOS.

3

HOUSE OVERSIGHT 012162

KIRKLAND &ELLIS LLP

12. In August 2007, in a clear attempt to coerce a state settlement, Ms. Villafana threatened

←  HOUSE_OVERSIGHT_012135.txt.pdf

CONFIDENTIAL SUBMISSION TO
THE OFFICE OF THE DEPUTY
ATTORNEY GENERAL
RE J. EPSTEIN
HOUSE OVERSIGHT 012135
KIRKLAND & ELLIS LLP
AND AFFILIATED PARTNERSHIPS
Kenneth W. Starr
To Call Writer Directly: Facsimile:
777 South Figueroa Street
Los Angeles, California 90017
www.kirkland.com
June 19, 2008
John Roth, Esq.
Principal Associate Deputy Attorney General
Office of the Deputy Attorney General
United States Department of Justice
950 Pennsylvania Avenue, N.W., Room 4115
Washington, D.C. 20530
Dear Mr. Roth:
Dir. Fax:
I again want to thank you for this opportunity to explain why we believe that a federal
prosecution of Jeffrey Epstein is unwarranted. I appreciate your having informed us that you
already have our May 19 and May 27 communications to the Deputy Attorney General, as well
as our prior written submissions to CEOS and to the Southern District of Florida.
In light of the significant volume of our prior submissions and to facilitate your review,
we have drafted four supplemental submissions that will provide a roadmap for your
investigation of this matter. Given the bulk of these documents and their appended supporting
attachments, you will receive this packet by messenger tomorrow. A brief description of each of
the four submissions follows. First, I have included a succinct summary of the facts, law and
policy issues at hand. This document sets forth a basic overview of the issues and summarizes
our principal contentions as to why federal prosecution of this matter is neither appropriate nor
warranted.
The three other submissions include:    Page   1 / 48    llarities and misconduct that
occurred during the federal investigat_                    CEOS attorney Stephanie Thacker
that responds to CEOS's assessment of its limited review of Mr. Epstein's case; and a point-by-

  

 HOUSE_OVERSIGHT_012197.txt.pdf

First Assistant U.S. Attorney
DELIVERY BY FACSIMILE
Jay P. Lefkowitz, Esq.
Kirkland & Ellis LLP
Citigroup Center
153 East 53rd Street •
New York, New York 10022-4675
Re: Jeffrey Epstein
U.S. Department of Justice
United States Attorney
Southern District of Florida
99 PIE, 4 Street
Miami, FL 33132
(305) 961-9100
May 19, 2008
Dear Mr. Lefkowitz,

I am in receipt of your e-mail dated May 19, 2008 to the United States Attorney. The U.S. Attorney would like me to advise you that all communications and inquiries related to the Epstein matter, will be handled by AUSA Marie Villafana and/or her supervisor, Karen Atkinson, so he does not intend to respond to your e-mail or calls unless AUSA Villafana and/or her supervisors advise him otherwise. Furthermore, you make reference to "our July 8 deadline." Respectfully, the United States Attorney's Office for the Southern District of Florida ("SDFL") has never agreed to any such deadline. Should you decide to provide the SDFL with any additional information, please do so through AUSA Villafana, and, in her absence, AUSA Atkinson.

On September 24, 2007, your client, Jeffrey Epstein, in consultation with Gerald Lefcourt, Esq. and Lilly Ann Sanchez, Esq., as well as numerous other nationally-renowned lawyers, including but not limited to Harvard Law Professor Alan Dershowitz, former Independent Counsel and Solicitor General of the United States Kenneth Starr, just to name a few, entered into a global resolution of state and federal liabilities faced by your client ("the Agreement") with the SDFL. Although you and other members of the defense team have since claimed that the Agreement was the product of adhesion, the following facts demonstrate that Epstein knowingly and voluntarily entered into the Agreement in order to avoid a federal indictment regarding his sexual conduct involving minor victims. Despite the fact that by signing the Agreement, Epstein gave up the right to object to its provisions, the SDFL bent over backwards to exhaustively consider and re-consider your objections. Since these objections have finally been exhausted and Epstein has previously expressed his intent to not comply with several of the terms and conditions of the Agreement as set forth below, the SDFL hereby notifies you that unless he complies with all of the terms and conditions of the Agreement, as modified by the United States Attorney's December 19,2007 letter to Ms. Sanchez by close of business on Monday, June 2, 2008, the SDFL will elect to terminate the Agreement.

HOUSE OVERSIGHT 012198
JAY P. LEFKOWITZ, ESQ.
May 19, 2008
PAGE 2 OF 6
Background

The Agreement was the product of months of negotiations. Specifically, you requested and received numerous meetings, at the highest levels of the SDFL and DOJ's Child Exploitation and Obscenity Section (CEOS) concerning claims that (a) the investigation merely produced evidence of relatively innocuous sexual conduct with some minors who, unbeknownst to Epstein, misrepresented their ages; (b) the authorities investigating Epstein engaged in misconduct; (c) the contemplated federal statutes have no applicability to this matter; and (d) the federal authorities disregarded the fundamental policy against federal intervention with state criminal proceedings. After careful review, the SDFL ultimately rejected those claims. Subsequent to its decision, however, but before proceeding any further, the SDFL provided ⟨...⟩ decision to the Assistant Attorney General of the United States, Ali⟨...⟩ o forego an appeal to AAG Fisher, and instead pursued a negot⟨...⟩ sulted in the execution of the Agreement.

The Negotiation Phase

1 Citations to the May 15, 2008 correspondence will be referenced herein as "CEOS letter at p. .'

HOUSE OVERSIGHT 012183

ALLEN GUTHRIE MCHUGH & THOMAS, PLLC

Mr. John Roth

June 19, 2008

Page 2

Act. Later, while at the Department of Justice, I co-authored the Department's Federal Child Support Prosecution Handbook.

My work at CEOS permitted me to continue my efforts on behalf of vulnerable victims of crime. While there, for example, I was part of the prosecution team in United States v. Dwight York,

428 F.3d 1325 (1 1thCir. 2005), cert denied. 548 U.S. 908 (2006). York was the leader of a pseudo

religious organization, and systematically molested countless children, some as young as six years

old. The case went to trial and York was sentenced to 135 years in prison. As part of that trial team,

I was awarded the Attorney General's Award for Distinguished Service. Additionally, at CEOS I was one of the architects of the Innocence Lost Initiative, a nationwide initiative designed to combat

child prostitution. For this, I was awarded an Assistant Attorney General's Award for Outstanding Victim/Witness Service. Likewise, I was awarded a subsequent Assistant Attorney General's Award

for Special Initiative in connection with a nationwide sex tourism prosecution initiative I helped to develop.

I say all this not for any boastful purpose, but, rather, to make clear that I am fully cognizant of victim issues, and that I am no pushover in terms of prosecution standards. I am also very well aware of the good work of CEOS, and the outstanding credentials of those who toil in that office. With all due respect to CEOS, however (and recognizing that their review of this case was quite limited), given the facts and circumstances of this investigation, a federal prosecution of Mr. Epstein simply should not be countenanced. In my view, such prosecution would be counter to the

important mandate of the Department of Justice as emblazoned on its seal, "Qui Pro DominaJustitia

Sequitur," referring to the Attorney General "who prosecutes on behalf of justice."

As you well know, it is fundamental to that mandate that, as the representative of the people of the United States, the duty of a federal prosecutor is not simply to seek conviction as at any cost,

but, rather, to seek justice. Berger v. United States, 295 U.S. 78, 88 (1935). ("The United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose

obligation to govern impartially is as compelling as its obligation to govern at all.") While it is true that Berger was decided at the post-trial, as opposed to the pre-indictment, stage of the case, the bedrock principle contained in the above quote should transcend the entire investigation and

prosecution process. Indeed, it is arguably most imperative at the investigation stage, at which point

law enforcement is dealing with a presumptively innocent citizen.

In summary, we understand the allegations against Mr. Epstein to be that Mr. Epstein paid individuals to find friends and acquaintances, certain of whom were under the age of 18, to provide

topless massages to him at his Palm Beach home in exchange for money. Mr. Epstein's assistants

allegedly scheduled these massages for him over the telephone at the direction of Mr. Epstein, allegedly including some scheduling calls to underage women. However, the evidence contradicts these allegations. First, Mr. Epstein did not ask that the masseuses be under the aca To the contrary, he specifically asked that they be 18 or older. As one witness commented, said tell

HOUSE OVERSIGHT 012184

ALLEN GUTHRIE MCHUGH & THOMAS, PLLC

**From: Christine Malina** ▮▮▮▮▮▮▮▮▮ ✏
**Subject:** House Over sightpart images per your request. and
**Date:** June 9, 2026 at 12:34
**To:** leah saffian ▮▮▮▮▮▮▮▮▮
**Cc:** Isabel Maxwell Mobile ▮▮▮▮▮▮▮▮▮▮▮▮

CM

8 attachments and one snips document

**HOUSE_OVERSIGHT_012135.txt.pdf  main document of 2 main documents**

https://journaliststudio.google.com/pinpoint/document-view?
collection=7185d6ee2381569d&p=1&docid=3aff3f0a2500fc3e_7185d6ee2381569d_0&dapvm=1

**HOUSE_OVERSIGHT_012135.txt.pdf_HO_012162**

**HOUSE_OVERSIGHT_012135.txt.pdf_HO_012188**

**HOUSE_OVERSIGHT_012135.txt.pdf_HO.012183**
=======================================

**HOUSE_OVERSIGHT_012197.txt.pdf  second main document of two main documents**
https://journaliststudio.google.com/pinpoint/document-view?
collection=7185d6ee2381569d&p=1&docid=8f42e8d7b11a9a9c_7185d6ee2381569d_0&dapvm=1

**HOUSE_OVERSIGHT_012197.txt.pdf_HO_012576**

**HOUSE_OVERSIGHT_012197.txt.pdf_HO_012593**

**HOUSE_OVERSIGHT_012197.txt.pdf_HO_012602**

CHRISTINE MALINA MAXWELL
=============================

▮▮▮▮▮▮▮▮▮▮▮▮▮▮

USA

Cell: USA    ▮▮▮▮▮▮▮▮

=============================

 Virus-free.www.avast.com

 **HOUSE_OVERSIGHT_012135_8x11**
**.pdf**
204 KB


**HOUSE_OVERSIGHT_012197_8x11**
**.pdf**
705 KB


HOUSE OVERSIGHT 012188
ALLEN GUTHRIE MCHUGH & THOMAS, PLLC
Mr. John Roth
June 19, 2008
Page 7
considered the extent of exculpatory evidence, including a psychosexual evaluation of Mr. Epstein
and a polygraph examination demonstrating that Mr. Epstein genuinely believed at the time of the
alleged conduct that the State's key witness was over the age of 18. Then, after
months of negotiations, the State reached what it believed was an appropriate resolution of the
case.
Importantly, this resolution was consistent with that of cases involving other defendants who had
engaged in similar conduct. Implementation of the State resolution of the case was held in
abeyance,
however, due to the unexpected commencement of the successive federal criminal investigation.
While it is true, as CEOS points out, (CEOS letter at p. 3) that many criminal prosecutions

turn on issues of credibility of witnesses, to which many members of the defense team can attest (having had decades of federal criminal litigation experience among us), this does not serve to divest

the prosecutor of his/her duty to make a searching inquiry of the facts before using the power of prosecution, and the weight of the United States government, to level serious accusations. CEOS likewise acknowledges as much, "the prosecutors are in the best position to assess the witnesses'

credibility." (CEOS letter at p. 3).

Since the CEOS letter also singles me out as someone who should be familiar with witness issues, I feel compelled to note that, of course, I am well aware that it is not uncommon for witnesses

to give conflicting statements. I am also fully aware that the credibility of key government witnesses

may be strongly impacted by the $50 million incentive provided via the civil lawsuits at play, and encouraged by the government here. 3 I have also read many of the conflicts between witness testimony and Detective ReCarey's own rendition of that testimony in his reports and/or search warrant affidavit. Detective ReCarey apparently formed a view early on as to the purported criminality of Mr. Epstein's conduct regardless of the mountain of evidence to the contrary. For a prosecutor that has had an opportunity to review the full facts, and to meet with the witnesses, however, "conflicting statements" cross the line to a "lack of credibility" that simply can not sustain a prosecution. That is where an appropriate application of prosecutorial discretion must be brought

to bear.

Again, CEOS was not itself in the position to exercise such discretion. By its own admission, CEOS did not make a full review of the witness statements here, and CEOS certainly did not sit down across the table and speak to these witnesses. We understand that was apparently not its perceived role. But, CEOS should recognize that at least one prosecutor in this case — the Chief of

the SAO Sex Crimes Division has done so. Lana Belohlavek not only met with and interviewed these witnesses during the course of the 15-month state investigation prior to any federal involvement, but she again sat across the table from many of them in connection with recent civil

3 It is important to note here that this investigation was launched not upon the complaint of any alleged victim, but,

rather, upon the complaint of ather, , and her stepmother, More

notable still is the fact that has been convicted of federal bank fraud, an has a state conviction for identify fraud. Hardly pillars of credibili. Yet, the USAO did not supply this information to the

defense. Even more telling is the fact that filed a $50million lawsuit purportedly on behalf of his daughter without her authority or knowledge.

1 Citations to the May 5, 2008 correspondence will be referenced herein as "CEOS letter at p. ."

HOUSE OVERSIGHT 012183

ALLEN GUTHRIE MCHUGH & THOMAS, PLLC

Mr. John Roth

June 19, 2008

Page 2

Act. Later, while at the Department of Justice, I co-authored the Department's Federal Child Support Prosecution Handbook.

My work at CEOS permitted me to continue my efforts on behalf of vulnerable victims of crime. While there, for example, I was part of the prosecution team in United States v. Dwight York,

428 F.3d 1325 (11thCir. 2005), cert denied, 548 U.S. 908 (2006). York was the leader of a pseudo

religious organization, and systematically molested countless children, some as young as six years

old. The case went to trial and York was sentenced to 135 years in prison. As part of that trial team,

I was awarded the Attorney General's Award for Distinguished Service. Additionally, at CEOS I was one of the architects of the Innocence Lost Initiative, a nationwide initiative designed to combat

child prostitution. For this, I was awarded an Assistant Attorney General's Award for Outstanding

victim/witness Service. Likewise, I was awarded a subsequent Assistant Attorney General's Award
for Special Initiative in connection with a nationwide sex tourism prosecution initiative I helped to develop.

I say all this not for any boastful purpose, but, rather, to make clear that I am fully cognizant of victim issues, and that I am no pushover in terms of prosecution standards. I am also very well aware of the good work of CEOS, and the outstanding credentials of those who toil in that office. With all due respect to CEOS, however (and recognizing that their review of this case was quite limited), given the facts and circumstances of this investigation, a federal prosecution of Mr. Epstein simply should not be countenanced. In my view, such prosecution would be counter to the
important mandate of the Department of Justice as emblazoned on its seal, "Qui Pro DominaJustitia
Sequitur," referring to the Attorney General"who prosecutes on behalf of justice."
As you well know, it is fundamental to that mandate that, as the representative of the people of the United States, the duty of a federal prosecutor is not simply to seek conviction as at any cost,
but, rather, to seek justice. Berger v. United States, 295 U.S. 78, 88 (1935). ("The United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose
obligation to govern impartially is as compelling as its obligation to govern at all.") While it is true that Berger was decided at the post-trial, as opposed to the pre-indictment, stage of the case, the bedrock principle contained in the above quote should transcend the entire investigation and

prosecution process. Indeed, it is arguably most imperative at the investigation stage, at which point
law enforcement is dealing with a presumptively innocent citizen.
In summary, we understand the allegations against Mr. Epstein to be that Mr. Epstein paid individuals to find friends and acquaintances, certain of whom were under the age of 18, to provide
topless massages to him at his Palm Beach home in exchange for money. Mr. Epstein's assistants
allegedly scheduled these massages for him over the telephone at the direction of Mr. Epstein, allegedly including some scheduling calls to underage women. However, the evidence contradicts these allegations. First, Mr. Epstein did not ask that the masseuses be under the aca To the contrary, he specifically asked that they be 18 or older. As one witness commented, said tell
HOUSE OVERSIGHT 012184
ALLEN GUTHRIE MCHUGH & THOMAS, PLLC
3
HOUSE OVERSIGHT 012162
KIRKLAND &ELLIS LLP
12. In August 2007, in a clear attempt to coerce a state settlement, Ms. Villafana threatened

to broaden the investigation to include a money laundering violation (18 U.S.C. § 1956), though all the funds expended were simply Mr. Epstein's, and a violation for operating an unlicensed money-transmitting business (18 U.S.C. § 1960), though Mr. Epstein never had such a business. See Tab 22, August 31, 2007 Letter from M. Villafana to Ross (reciting, in a target letter to one of Epstein's employees, that the investigation concerns "suspected violations of federal law, including but not limited to, possible violations of Title 18, United States Code, Sections . . . 1591, . . . 1956, 1960 . . . .") (emphasis added).
13. On the very same day that the grand jury issued subpoenas to the records-custodian and employees of Epstein's businesses for all financial transactions from 2003 forward, Ms. Villafana (who we were told was not authorized to act in this regard without supervisory approval) promised to close the money-laundering investigation "if the sex offense case is resolved." See Tab 23, August 16, 2007 Letter from M. Villafana to G. Lefcourt ("In other words, if the sex offense case is resolved, the Office would close its investigation

into other areas as well. The matter has not been, and it does not appear that it will be, resolved so the money laundering investigation continues, and Request Number 6 [seeking records of every financial transaction conducted by Epstein and his six businesses from "January 1, 2003 to the present"] will not be withdrawn.").

14. Two weeks later, when Mr. Epstein continued to oppose federal prosecution during negotiations and Mr. Epstein's counsel sought a meeting with the United States Attorney, AUSA Villafana then classified all of Mr. Epstein's assistants as targets (sending a target letter to one of them and promising the attorney of the other two that additional target letters would be served on them as well), dispatched FBI agents to the homes of two of his secretaries, and personally telephoned Mr. Epstein's largest business client to advise him of the nature of the investigation. See Tab 22, August 31, 2007 Letter from M. Villafana to

**FAUSA Sloman Forces Mr. Epstein's Lawyers to Convince the State Prosecutors To Impose a More Severe Sentence Than They Believe Is Appropriate**

15. Throughout the plea negotiations with the USAO, Mr. Sloman and Ms. Villafana continually insisted that the only way they would agree not to bring a federal indictment was if Epstein's lawyers, not the state prosecutors as required under the Petite Policy, convinced the state prosecutors to impose a more severe punishment than the state believed was appropriate under the circumstances.

16. FAUSA Sloman's version of the history with respect to the sentence he required Mr. Epstein's lawyers to seek from the State contradicts his later assertion, which is patently false—that "the SDFL indicated a willingness to defer to the State the length of incarceration" and "considered a plea to federal charges that limited Epstein's sentencing exposure . . ." See Tab 1, May 19, 2008 Letter from J. Sloman. In fact, by a email dated August 3, 2007, Criminal Division Chief Matthew Menchel advised the defense that the federal government required a minimum term of two years of incarceration. See Tab 40, August 3, 2007 Email from M. Menchel. Subsequently, Ms.

4

HOUSE OVERSIGHT 012163
KIRKLAND &ELLIS LLP

Villafana emailed the defense stating that United States Attorney Acosta would accept no less than 18 months of incarceration, following by a one-year term of house arrest.

**Federal Prosecutors Misrepresented the Number of Alleged "Victims."**

HOUSE OVERSIGHT 012602

08/16/2007 17:05 FAX 5618021787

IJSA0 WPB FL

•

U.S. Department of Justice

United States Attorney

Southern District of Florida

rip 002

SOO South Australian Ave., Suite 400

West Palm Beach, Fl 33401

(561) 820-8711 .

Facsimile: (561) 820-8777

August 16, 2007

VIA FACSIMILE

Gerald Lefcourt, Esq.

Gerald R Lefcourt, P.C.

148 East 78th Street

New York, NY 10021

Re: Subpoena to Custodian of Records-NES. LLC

Dear Mr. Lelbouri:

I write in response to your letter of July 18, 2007 regarding the grand jury subpoena issued to the Custodian of Records for NES, LLC. I have attached an identical subpoena containing a return date of September 11, 2007, and subpoenas for two NES employees, Eric Gany and Harry Beller. If you will not be representing Messrs. Gany and Beller, please let me know.

First, as I mentioned in my earlier correspondence, a properly executed declaration from the Custodian of Records is needed, and, if no documents responsive to a particular request exist, the Custodian should certify that under penalty of perjury.

Second, you write that NES has no documents responsive to Requests 1 through 5. 'know that NES has several credit card accounts for the benefit of the persons who manage Mr. Epstein's properties, including Janusz Banasiak and Alfredo Rodriguez. I also know that NES regularly receives money from an account that is used to pay expenses at 358 El Milo Way and also wires money to that same account Those wire transfers fall within the time period called for by the subpoena and number in the hundreds of thousands of dollars. IfNES does not maintain records of its banking activities, then I would like to see a copy of its document retention policy, so I have added that to the Attachment to the Subpoena.

Third, Mr. Manche's con:unent to you about potential money laundering charges related only to a resolution ofthe case. In other words, if the sex offense case is resolved, the Office would close its investigation into other areas as well The matter has not been, and it does not appear that it will be, resolved so the money laundering investigation continues, and Request Number 6 will not be withdrawn. The request is not overbroad and is stated with particularity, so please comply with the request by the new deadline.

HOUSE OVERSIGHT 012603

HOUSE OVERSIGHT 012593

By signing this agreement, Epstein asserts and certifies that each of these terms is material to this agreement and is supported by independent consideration and that a breach of any one of these conditions allows the United States to elect to terminate the agreement and to investigate and prosecute Epstein and any other individual or entity for any and all federal offenses.

By signing this agreement, Epstein asserts and certifies that he is aware of the fact that the Sixth Amendment to the Constitution of the United States provides that in all criminal prosecutions the accused shall enjoy the right to a speedy and public trial. Epstein further is aware that Rule 48(b) of the Federal Rules of Criminal Procedure provides that the Court may dismiss an indictment, information, or complaint for unnecessary delay in presenting a charge to the Grand Jury, filing an information, or in bringing a defendant to trial. Epstein hereby requests that the United States Attorney forthe Southern District of Florida defer such prosecution. Epstein agrees and consents that any delay from the date of this Agreement to the date of initiation of prosecution, as provided for in the terms expressed herein, shall be deemed to be a necessary delay at his own request, and he hereby waives any defense to such

prosecution on the ground that such delay operated to deny him rights under Rule 48(b) of the Federal Rules of Criminal Procedure and the Sixth Amendment to the Constitution of the United States to a speedy trial or to bar the prosecution by reason of the running of the statute of limitations for a period of months equal to the period between the signing of this agreement and the breach of this agreement as to those offenses that were the subject of the grand jury's investigation. Epstein further asserts and certifies that he understands that the Fifth Amendment and Rule 7(a) of the Federal Rules of Criminal Procedure provide that all felonies must be charged in an indictment presented to a grand jury. Epstein hereby agrees and consents that, if a prosecution against him is instituted for any offense that was the subject of the grand jury's investigation. it may be by way of an Information signed and filed by the United States Attorney, and hereby waives his right to be indicted by a grand jury as to any such offense.

///
///
///

Page 6 of 7

HOUSE OVERSIGHT 012594

HOUSE OVERSIGHT 012678

U.S. Department of Justice
United States Attorney
Southern District of Florida
DELIVERY BY ELECTRONIC MAIL
Jay P. Lefkowitz, Esq.
Kirkland & Ellis LLP
Citigroup Center
153 East 53rd Street
New York, New York 10022-4675
Re: Jeffrey Epstein
Dear Jay:
500 S. Australian Ave, Ste 400
West Palm Beach, FL 33401
(561) 820-8711
Facsimile: (561) 820-8777
December 13, 2007
I am writing not to respond to your asserted "policy concerns" regarding Mr. Epstein's Non-Prosecution Agreement, which will be addressed by the United States Attorney, but the time has come for me to respond to the ever-increasing attacks on my role in the investigation and negotiations.

It is an understatement to say that I am surprised by your allegations regarding my role because I thought that we had worked very well together in resolving this dispute. I also am surprised because I feel that I bent over backwards to keep in mind the effect that the agreement would have on Mr. Epstein and to make sure that you (and he) understood the repercussions of the agreement. For example, I brought to your attention that one potential plea could result in no gain time for your client; I corrected one of your calculations of the Sentencing Guidelines that would have resulted in Mr. Epstein spending far more time in prison than you projected; I contacted the Bureau of Prisons to see whether Mr. Epstein would be eligible for the prison camp that you desired; and I told you my suspicions about the source of the press "leak" and suggested ways to avoid the press. Importantly, I continued to work with you in a professional manner even after I learned that you had been proceeding in bad faith for several weeks — thinking that I had incorrectly concluded that solicitation of minors to engage in prostitution was a registrable offense and that you would "fool" our Office into letting Mr. Epstein plead to a non-registrable offense. Even now, when it is

clear that neither you nor your client ever intended to abide by the terms of the agreement that he
signed, I have never alleged misconduct on your part.
The first allegation that you raise is that I "assiduously" hid from you the fact that Bert
Ocariz is a friend of my boyfriend and that I have a "longstanding relationship" with Mr. Ocariz.

HOUSE OVERSIGHT 012577

**From:** Christine Malina ▮▮▮▮▮▮▮▮▮ 📎
**Subject:** House Over sightpart images per your request. and
**Date:** June 9, 2026 at 12:34
**To:** leah saffian ▮▮▮▮▮▮▮▮▮
**Cc:** Isabel Maxwell Mobile ▮▮▮▮▮▮▮▮▮

8 attachments and one snips document

**HOUSE_OVERSIGHT_012135.txt.pdf  main document of 2 main documents**

https://journaliststudio.google.com/pinpoint/document-view?
collection=7185d6ee2381569d&p=1&docid=3aff3f0a2500fc3e_7185d6ee2381569d_0&dapvm=1

**HOUSE_OVERSIGHT_012135.txt.pdf_HO_012162**

**HOUSE_OVERSIGHT_012135.txt.pdf_HO_012188**

**HOUSE_OVERSIGHT_012135.txt.pdf_HO.012183**
=========================================

**HOUSE_OVERSIGHT_012197.txt.pdf  second main document of two main documents**
https://journaliststudio.google.com/pinpoint/document-view?
collection=7185d6ee2381569d&p=1&docid=8f42e8d7b11a9a9c_7185d6ee2381569d_0&dapvm=1

**HOUSE_OVERSIGHT_012197.txt.pdf_HO_012576**

**HOUSE_OVERSIGHT_012197.txt.pdf_HO_012593**

**HOUSE_OVERSIGHT_012197.txt.pdf_HO_012602**

CHRISTINE MALINA MAXWELL
==============================

▮▮▮▮▮▮▮▮▮

USA

Cell: USA    ▮▮▮▮▮▮

==============================

 Virus-free.www.avast.com

 HOUSE_OVERSIGHT_012135_8x11
.pdf
204 KB

HOUSE_OVERSIGHT_012197_8x11
.pdf
705 KB

HOUSE OVERSIGHT 012188
ALLEN GUTHRIE MCHUGH & THOMAS, PLLC
Mr. John Roth
June 19, 2008
Page 7
considered the extent of exculpatory evidence, including a psychosexual evaluation of Mr. Epstein
and a polygraph examination demonstrating that Mr. Epstein genuinely believed at the time of the
alleged conduct that the State's key witness was over the age of 18. Then, after
months of negotiations, the State reached what it believed was an appropriate resolution of the
case.
Importantly, this resolution was consistent with that of cases involving other defendants who had
engaged in similar conduct. Implementation of the State resolution of the case was held in
abeyance,
however, due to the unexpected commencement of the successive federal criminal investigation.
While it is true, as CEOS points out, (CEOS letter at p. 3) that many criminal prosecutions

turn on issues of credibility of witnesses, to which many members of the defense team can attest (having had decades of federal criminal litigation experience among us), this does not serve to divest
the prosecutor of his/her duty to make a searching inquiry of the facts before using the power of prosecution, and the weight of the United States government, to level serious accusations. CEOS likewise acknowledges as much, "the prosecutors are in the best position to assess the witnesses'
credibility." (CEOS letter at p. 3).
Since the CEOS letter also singles me out as someone who should be familiar with witness issues, I feel compelled to note that, of course, I am well aware that it is not uncommon for witnesses
to give conflicting statements. I am also fully aware that the credibility of key government witnesses
may be strongly impacted by the $50 million incentive provided via the civil lawsuits at play, and encouraged by the government here. 3 I have also read many of the conflicts between witness testimony and Detective ReCarey's own rendition of that testimony in his reports and/or search warrant affidavit. Detective ReCarey apparently formed a view early on as to the purported criminality of Mr. Epstein's conduct regardless of the mountain of evidence to the contrary. For a prosecutor that has had an opportunity to review the full facts, and to meet with the witnesses, however, "conflicting statements" cross the line to a "lack of credibility" that simply can not sustain a prosecution. That is where an appropriate application of prosecutorial discretion must be brought
to bear.

Again, CEOS was not itself in the position to exercise such discretion. By its own admission, CEOS did not make a full review of the witness statements here, and CEOS certainly did not sit down across the table and speak to these witnesses. We understand that was apparently not its perceived role. But, CEOS should recognize that at least one prosecutor in this case — the Chief of
the SAO Sex Crimes Division has done so. Lana Belohlavek not only met with and interviewed these witnesses during the course of the 15-month state investigation prior to any federal involvement, but she again sat across the table from many of them in connection with recent civil
3 It is important to note here that this investigation was launched not upon the complaint of any alleged victim, but,
rather, upon the complaint of ather, , and her stepmother, More
notable still is the fact that has been convicted of federal bank fraud, an has a state conviction for identify fraud. Hardly pillars of credibili. Yet, the USAO did not supply this information to the
defense. Even more telling is the fact that filed a $50million lawsuit purportedly on behalf of his daughter without her authority or knowledge.
1 Citations to the May 15, 2008 correspondence will be referenced herein as "CEOS letter at p. "
HOUSE OVERSIGHT 012183
ALLEN GUTHRIE MCHUGH & THOMAS, PLLC
Mr. John Roth
June 19, 2008
Page 2
Act. Later, while at the Department of Justice, I co-authored the Department's Federal Child Support Prosecution Handbook.
My work at CEOS permitted me to continue my efforts on behalf of vulnerable victims of crime. While there, for example, I was part of the prosecution team in United States v. Dwight York,
428 F.3d 1325 (11thCir. 2005), cert denied, 549 U.S. 908 (2006). York was the leader of a pseudo
religious organization, and systematically molested countless children, some as young as six years
old. The case went to trial and York was sentenced to 135 years in prison. As part of that trial team,
I was awarded the Attorney General's Award for Distinguished Service. Additionally, at CEOS I was one of the architects of the Innocence Lost Initiative, a nationwide initiative designed to combat
child prostitution. For this, I was awarded an Assistant Attorney General's Award for Outstanding

victim/witness Service. Likewise, I was awarded a subsequent Assistant Attorney General's Award

for Special Initiative in connection with a nationwide sex tourism prosecution initiative I helped to develop.

I say all this not for any boastful purpose, but, rather, to make clear that I am fully cognizant of victim issues, and that I am no pushover in terms of prosecution standards. I am also very well aware of the good work of CEOS, and the outstanding credentials of those who toil in that office. With all due respect to CEOS, however (and recognizing that their review of this case was quite limited), given the facts and circumstances of this investigation, a federal prosecution of Mr. Epstein simply should not be countenanced. In my view, such prosecution would be counter to the

important mandate of the Department of Justice as emblazoned on its seal, "Qui Pro DominaJustitia

Sequitur," referring to the Attorney General"who prosecutes on behalf of justice."

As you well know, it is fundamental to that mandate that, as the representative of the people of the United States, the duty of a federal prosecutor is not simply to seek conviction as at any cost,

but, rather, to seek justice. Berger v. United States, 295 U.S. 78, 88 (1935). ("The United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose

obligation to govern impartially is as compelling as its obligation to govern at all.") While it is true that Berger was decided at the post-trial, as opposed to the pre-indictment, stage of the case, the bedrock principle contained in the above quote should transcend the entire investigation and

prosecution process. Indeed, it is arguably most imperative at the investigation stage, at which point

law enforcement is dealing with a presumptively innocent citizen.

In summary, we understand the allegations against Mr. Epstein to be that Mr. Epstein paid individuals to find friends and acquaintances, certain of whom were under the age of 18, to provide

topless massages to him at his Palm Beach home in exchange for money. Mr. Epstein's assistants

allegedly scheduled these massages for him over the telephone at the direction of Mr. Epstein. allegedly including some scheduling calls to underage women. However, the evidence contradicts these allegations. First, Mr. Epstein did not ask that the masseuses be under the aca To the contrary, he specifically asked that they be 18 or older. As one witness commented, said tell HOUSE OVERSIGHT 012184

ALLEN GUTHRIE MCHUGH & THOMAS, PLLC

3

HOUSE OVERSIGHT 012162

KIRKLAND &ELLIS LLP

12. In August 2007, in a clear attempt to coerce a state settlement, Ms. Villafana threatened

to broaden the investigation to include a money laundering violation (18 U.S.C. § 1956), though all the funds expended were simply Mr. Epstein's, and a violation for operating an unlicensed money-transmitting business (18 U.S.C. § 1960), though Mr. Epstein never had such a business. See Tab 22, August 31, 2007 Letter from M. Villafana to Ross (reciting, in a target letter to one of Epstein's employees, that the investigation concerns "suspected violations of federal law, including but not limited to, possible violations of Title 18, United States Code, Sections . . . 1591, . . . 1956, 1960 . . . .") (emphasis added).

13. On the very same day that the grand jury issued subpoenas to the records-custodian and employees of Epstein's businesses for all financial transactions from 2003 forward, Ms. Villafana (who we were told was not authorized to act in this regard without supervisory approval) promised to close the money-laundering investigation "if the sex offense case is resolved." See Tab 23, August 16, 2007 Letter from M. Villafana to G. Lefcourt ("In other words, if the sex offense case is resolved, the Office would close its investigation

into other areas as well. The matter has not been, and it does not appear that it will be, resolved so the money laundering investigation continues, and Request Number 6 [seeking records of every financial transaction conducted by Epstein and his six businesses from "January 1, 2003 to the present"] will not be withdrawn.").

14. Two weeks later, when Mr. Epstein continued to oppose federal prosecution during negotiations and Mr. Epstein's counsel sought a meeting with the United States Attorney, AUSA Villafana then classified all of Mr. Epstein's assistants as targets (sending a target letter to one of them and promising the attorney of the other two that additional target letters would be served on them as well), dispatched FBI agents to the homes of two of his secretaries, and personally telephoned Mr. Epstein's largest business client to advise him of the nature of the investigation. See Tab 22, August 31, 2007 Letter from M. Villafana to

FAUSA Sloman Forces Mr. Epstein's Lawyers to Convince the State Prosecutors To Impose a More Severe Sentence Than They Believe Is Appropriate

15. Throughout the plea negotiations with the USAO, Mr. Sloman and Ms. Villafana continually insisted that the only way they would agree not to bring a federal indictment was if Epstein's lawyers, not the state prosecutors as required under the Petite Policy, convinced the state prosecutors to impose a more severe punishment than the state believed was appropriate under the circumstances.

16. FAUSA Sloman's version of the history with respect to the sentence he required Mr. Epstein's lawyers to seek from the State contradicts his later assertion, which is patently false—that "the SDFL indicated a willingness to defer to the State the length of incarceration" and "considered a plea to federal charges that limited Epstein's sentencing exposure . . ." See Tab 1, May 19, 2008 Letter from J. Sloman. In fact, by a email dated August 3, 2007, Criminal Division Chief Matthew Menchel advised the defense that the federal government required a minimum term of two years of incarceration. See Tab 40, August 3, 2007 Email from M. Menchel. Subsequently, Ms.

4

HOUSE OVERSIGHT 012163

KIRKLAND &ELLIS LLP

Villafana emailed the defense stating that United States Attorney Acosta would accept no less than 18 months of incarceration, following by a one-year term of house arrest.

Federal Prosecutors Misrepresented the Number of Alleged "Victims."

HOUSE OVERSIGHT 012602

08/16/2007 17:05 FAX 5618021787

IJSA0 WPB FL

.

U.S. Department of Justice

United States Attorney

Southern District of Florida

rip 002

SOO South Australian Ave., Suite 400

West Palm Beach, Ft 33401

(561) 820-8711 .

Facsimile: (561) 820-8777

August 16, 2007

VIA FACSIMILE

Gerald Lefcourt, Esq.

Gerald R Lefcourt, P.C.

148 East 78th Street

New York, NY 10021

Re: Subpoena to Custodian of Records-NES. LLC

Dear Mr. Lelbouri:

I write in response to your letter of July 18, 2007 regarding the grand jury subpoena issued to the Custodian of Records for NES, LLC. I have attached an identical subpoena containing a return date of September 11, 2007, and subpoenas for two NES employees, Eric Gany and Harry Beller. If you will not be representing Messrs. Gany and Beller, please let me know.

First, as I mentioned in my earlier correspondence, a properly executed declaration from the Custodian of Records is needed, and. if no documents responsive to a particular request exist, the Custodian should certify that under penalty of perjury.

Second, you write that NES has no documents responsive to Requests 1 through 5. 'know that NES has several credit card accounts for the benefit of the persons who manage Mr. Epstein's properties, including Janusz Banasiak and Alfredo Rodriguez. I also know that NES regularly receives money from an account that is used to pay expenses at 358 El Milo Way and also wires money to that same account Those wire transfers fall within the time period called for by the subpoena and number in the hundreds of thousands of dollars. IfNES does not maintain records of its banking activities, then I would like to see a copy of its document retention policy, so I have added that to the Attachment to the Subpoena.

Third, Mr. Manche's con:unent to you about potential money laundering charges related only to a resolution ofthe case. In other words, if the sex offense case is resolved, the Office would close its investigation into other areas as well The matter has not been, and it does not appear that it will be, resolved so the money laundering investigation continues, and Request Number 6 will not be withdrawn. The request is not overbroad and is stated with particularity, so please comply with the request by the new deadline.

HOUSE OVERSIGHT 012603

HOUSE OVERSIGHT 012593

By signing this agreement, Epstein asserts and certifies that each of these terms is material to this agreement and is supported by independent consideration and that a breach of any one of these conditions allows the United States to elect to terminate the agreement and to investigate and prosecute Epstein and any other individual or entity for any and all federal offenses.

By signing this agreement, Epstein asserts and certifies that he is aware of the fact that the Sixth Amendment to the Constitution of the United States provides that in all criminal prosecutions the accused shall enjoy the right to a speedy and public trial. Epstein further is aware that Rule 48(b) of the Federal Rules of Criminal Procedure provides that the Court may dismiss an indictment, information, or complaint for unnecessary delay in presenting a charge to the Grand Jury, filing an information, or in bringing a defendant to trial. Epstein hereby requests that the United States Attorney forthe Southern District of Florida defer such prosecution. Epstein agrees and consents that any delay from the date of this Agreement to the date of initiation of prosecution, as provided for in the terms expressed herein, shall be deemed to be a necessary delay at his own request, and he hereby waives any defense to such

prosecution on the ground that such delay operated to deny him rights under Rule 48(b) of the Federal Rules of Criminal Procedure and the Sixth Amendment to the Constitution of the United States to a speedy trial or to bar the prosecution by reason of the running of the statute of limitations for a period of months equal to the period between the signing of this agreement and the breach of this agreement as to those offenses that were the subject of the grand jury's investigation. Epstein further asserts and certifies that he understands that the Fifth Amendment and Rule 7(a) of the Federal Rules of Criminal Procedure provide that all felonies must be charged in an indictment presented to a grand jury. Epstein hereby agrees and consents that, if a prosecution against him is instituted for any offense that was the subject of the grand jury's investigation, it may be by way of an Information signed and filed by the United States Attorney, and hereby waives his right to be indicted by a grand jury as to any such offense.

///

///

///

Page 6 of 7

HOUSE OVERSIGHT 012594

---

HOUSE OVERSIGHT 012576

U.S. Department of Justice

United States Attorney

Southern District of Florida

DELIVERY BY ELECTRONIC MAIL

Jay P. Lefkowitz, Esq.

Kirkland & Ellis LLP

Citigroup Center

153 East 53rd Street

New York, New York 10022-4675

Re: Jeffrey Epstein

Dear Jay:

500 S. Australian Ave, Ste 400

West Palm Beach, FL 33401

(561) 820-8711

Facsimile: (561) 820-8777

December 13, 2007

I am writing not to respond to your asserted "policy concerns" regarding Mr. Epstein's Non-Prosecution Agreement, which will be addressed by the United States Attorney, but the time has come for me to respond to the ever-increasing attacks on my role in the investigation and negotiations.

It is an understatement to say that I am surprised by your allegations regarding my role because I thought that we had worked very well together in resolving this dispute. I also am surprised because I feel that I bent over backwards to keep in mind the effect that the agreement would have on Mr. Epstein and to make sure that you (and he) understood the repercussions of the agreement. For example, I brought to your attention that one potential plea could result in no gain time for your client; I corrected one of your calculations of the Sentencing Guidelines that would have resulted in Mr. Epstein spending far more time in prison than you projected; I contacted the Bureau of Prisons to see whether Mr. Epstein would be eligible for the prison camp that you desired; and I told you my suspicions about the source of the press "leak" and suggested ways to avoid the press. Importantly, I continued to work with you in a professional manner even after I learned that you had been proceeding in bad faith for several weeks — thinking that I had incorrectly concluded that solicitation of minors to engage in prostitution was a registrable offense and that you would "fool" our Office into letting Mr. Epstein plead to a non-registrable offense. Even now, when it is

clear that neither you nor your client ever intended to abide by the terms of the agreement that he
signed, I have never alleged misconduct on your part.
The first allegation that you raise is that I "assiduously" hid from you the fact that Bert
Ocariz is a friend of my boyfriend and that I have a "longstanding relationship" with Mr. Ocariz.

HOUSE OVERSIGHT 012577

**From: Christine Malina** ⬛⬛⬛⬛⬛⬛ 🔗
**Subject:** House Over sightpart images per your request. and
**Date:** June 9, 2026 at 12:34
**To:** leah saffian ⬛⬛⬛⬛⬛⬛
**Cc:** Isabel Maxwell Mobile ⬛⬛⬛⬛⬛

CM

8 attachments and one snips document

**HOUSE_OVERSIGHT_012135.txt.pdf** main document of 2 main documents

https://journaliststudio.google.com/pinpoint/document-view?
collection=7185d6ee2381569d&p=1&docid=3aff3f0a2500fc3e_7185d6ee2381569d_0&dapvm=1

**HOUSE_OVERSIGHT_012135.txt.pdf_HO_012162**

**HOUSE_OVERSIGHT_012135.txt.pdf_HO_012188**

**HOUSE_OVERSIGHT_012135.txt.pdf_HO.012183**
==============================================

**HOUSE_OVERSIGHT_012197.txt.pdf** second main document of two main documents
https://journaliststudio.google.com/pinpoint/document-view?
collection=7185d6ee2381569d&p=1&docid=8f42e8d7b11a9a9c_7185d6ee2381569d_0&dapvm=1

**HOUSE_OVERSIGHT_012197.txt.pdf_HO_012576**

**HOUSE_OVERSIGHT_012197.txt.pdf_HO_012593**

**HOUSE_OVERSIGHT_012197.txt.pdf_HO_012602**

CHRISTINE MALINA MAXWELL
==============================
⬛⬛⬛⬛⬛⬛
USA
Cell: USA ⬛⬛⬛⬛
==============================

 Virus-free.www.avast.com

HOUSE_OVERSIGHT_012135_8x11 🗑
.pdf
204 KB

HOUSE_OVERSIGHT_012197_8x11 🗑
.pdf
706 KB

HOUSE OVERSIGHT 012188
ALLEN GUTHRIE MCHUGH & THOMAS, PLLC
Mr. John Roth
June 19, 2008
Page 7
considered the extent of exculpatory evidence, including a psychosexual evaluation of Mr. Epstein
and a polygraph examination demonstrating that Mr. Epstein genuinely believed at the time of the
alleged conduct that the State's key witness was over the age of 18. Then, after
months of negotiations, the State reached what it believed was an appropriate resolution of the
case.
Importantly, this resolution was consistent with that of cases involving other defendants who had
engaged in similar conduct. Implementation of the State resolution of the case was held in
abeyance,
however, due to the unexpected commencement of the successive federal criminal investigation.
While it is true, as CEOS points out, (CEOS letter at p. 3) that many criminal prosecutions

turn on issues of credibility of witnesses, to which many members of the defense team can attest (having had decades of federal criminal litigation experience among us), this does not serve to divest the prosecutor of his/her duty to make a searching inquiry of the facts before using the power of prosecution, and the weight of the United States government, to level serious accusations. CEOS likewise acknowledges as much, "the prosecutors are in the best position to assess the witnesses' credibility." (CEOS letter at p. 3).

Since the CEOS letter also singles me out as someone who should be familiar with witness issues, I feel compelled to note that, of course, I am well aware that it is not uncommon for witnesses to give conflicting statements. I am also fully aware that the credibility of key government witnesses may be strongly impacted by the $50 million incentive provided via the civil lawsuits at play, and encouraged by the government here. 3 I have also read many of the conflicts between witness testimony and Detective ReCarey's own rendition of that testimony in his reports and/or search warrant affidavit. Detective ReCarey apparently formed a view early on as to the purported criminality of Mr. Epstein's conduct regardless of the mountain of evidence to the contrary. For a prosecutor that has had an opportunity to review the full facts, and to meet with the witnesses, however, "conflicting statements" cross the line to a "lack of credibility" that simply can not sustain a prosecution. That is where an appropriate application of prosecutorial discretion must be brought to bear.

Again, CEOS was not itself in the position to exercise such discretion. By its own admission, CEOS did not make a full review of the witness statements here, and CEOS certainly did not sit down across the table and speak to these witnesses. We understand that was apparently not its perceived role. But, CEOS should recognize that at least one prosecutor in this case — the Chief of the SAO Sex Crimes Division has done so. Lana Belohlavek not only met with and interviewed these witnesses during the course of the 15-month state investigation prior to any federal involvement, but she again sat across the table from many of them in connection with recent civil

3 It is important to note here that this investigation was launched not upon the complaint of any alleged victim, but, rather, upon the complaint of ather, , and her stepmother, More notable still is the fact that has been convicted of federal bank fraud, an has a state conviction for identify fraud. Hardly pillars of credibili. Yet, the USAO did not supply this information to the defense. Even more telling is the fact that filed a $50million lawsuit purportedly on behalf of his daughter without her authority or knowledge.

1 Citations to the May 15, 2008 correspondence will be referenced herein as "CEOS letter at p. "

HOUSE OVERSIGHT 012183
ALLEN GUTHRIE MCHUGH & THOMAS. PLLC
Mr. John Roth
June 19, 2008
Page 2

Act. Later, while at the Department of Justice, I co-authored the Department's Federal Child Support Prosecution Handbook.

My work at CEOS permitted me to continue my efforts on behalf of vulnerable victims of crime. While there, for example, I was part of the prosecution team in United States v. Dwight York, 428 F.3d 1325 (11thCir. 2005), cert denied, 548 U.S. 908 (2006). York was the leader of a pseudo religious organization, and systematically molested countless children, some as young as six years old. The case went to trial and York was sentenced to 135 years in prison. As part of that trial team, I was awarded the Attorney General's Award for Distinguished Service. Additionally, at CEOS I was one of the architects of the Innocence Lost Initiative, a nationwide initiative designed to combat child prostitution. For this, I was awarded an Assistant Attorney General's Award for Outstanding Victim/Witness Service. Likewise, I was awarded a subsequent Assistant Attorney General's

Victim/Witness Service. Likewise, I was awarded a subsequent Assistant Attorney General's Award

for Special Initiative in connection with a nationwide sex tourism prosecution initiative I helped to develop.

I say all this not for any boastful purpose, but, rather, to make clear that I am fully cognizant of victim issues, and that I am no pushover in terms of prosecution standards. I am also very well aware of the good work of CEOS, and the outstanding credentials of those who toil in that office. With all due respect to CEOS, however (and recognizing that their review of this case was quite limited), given the facts and circumstances of this investigation, a federal prosecution of Mr. Epstein simply should not be countenanced. In my view, such prosecution would be counter to the

important mandate of the Department of Justice as emblazoned on its seal, "Qui Pro DominaJustitia

Sequitur," referring to the Attorney General"who prosecutes on behalf of justice."

As you well know, it is fundamental to that mandate that, as the representative of the people of the United States, the duty of a federal prosecutor is not simply to seek conviction as at any cost,

but, rather, to seek justice. Berger v. United States, 295 U.S. 78, 88 (1935). ("The United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose

obligation to govern impartially is as compelling as its obligation to govern at all.") While it is true that Berger was decided at the post-trial, as opposed to the pre-indictment, stage of the case, the bedrock principle contained in the above quote should transcend the entire investigation and

prosecution process. Indeed, it is arguably most imperative at the investigation stage, at which point

law enforcement is dealing with a presumptively innocent citizen.

In summary, we understand the allegations against Mr. Epstein to be that Mr. Epstein paid individuals to find friends and acquaintances, certain of whom were under the age of 18, to provide

topless massages to him at his Palm Beach home in exchange for money. Mr. Epstein's assistants

allegedly scheduled these massages for him over the telephone at the direction of Mr. Epstein, allegedly including some scheduling calls to underage women. However, the evidence contradicts these allegations. First, Mr. Epstein did not ask that the masseuses be under the aca To the contrary, he specifically asked that they be 18 or older. As one witness commented, said tell HOUSE OVERSIGHT 012184
ALLEN GUTHRIE MCHUGH & THOMAS, PLLC
3
HOUSE OVERSIGHT 012162
KIRKLAND &ELLIS LLP

12. In August 2007, in a clear attempt to coerce a state settlement, Ms. Villafana threatened

to broaden the investigation to include a money laundering violation (18 U.S.C. § 1956), though all the funds expended were simply Mr. Epstein's, and a violation for operating an unlicensed money-transmitting business (18 U.S.C. § 1960), though Mr. Epstein never had such a business. See Tab 22, August 31, 2007 Letter from M. Villafana to Ross (reciting, in a target letter to one of Epstein's employees, that the investigation concerns "suspected violations of federal law, including but not limited to, possible violations of Title 18, United States Code, Sections . . . 1591, . . . 1956, 1960 . . . .") (emphasis added).

13. On the very same day that the grand jury issued subpoenas to the records-custodian and employees of Epstein's businesses for all financial transactions from 2003 forward, Ms. Villafana (who we were told was not authorized to act in this regard without supervisory approval) promised to close the money-laundering investigation "if the sex offense case is resolved." See Tab 23, August 16, 2007 Letter from M. Villafana to G. Lefcourt ("In other words, if the sex offense case is resolved, the Office would close its investigation

into other areas as well. The matter has not been, and it does not appear that it will be, resolved so the money laundering investigation continues, and Request Number 6 [seeking records of every financial transaction conducted by Epstein and his six businesses from "January 1, 2003 to the present"] will not be withdrawn.").

14. Two weeks later, when Mr. Epstein continued to oppose federal prosecution during negotiations and Mr. Epstein's counsel sought a meeting with the United States Attorney, AUSA Villafana then classified all of Mr. Epstein's assistants as targets (sending a target letter to one of them and promising the attorney of the other two that additional target letters would be served on them as well), dispatched FBI agents to the homes of two of his secretaries, and personally telephoned Mr. Epstein's largest business client to advise him of the nature of the investigation. See Tab 22, August 31, 2007 Letter from M. Villafana to

FAUSA Sloman Forces Mr. Epstein's Lawyers to Convince the State Prosecutors To Impose a More Severe Sentence Than They Believe Is Appropriate

15. Throughout the plea negotiations with the USAO, Mr. Sloman and Ms. Villafana continually insisted that the only way they would agree not to bring a federal indictment was if Epstein's lawyers, not the state prosecutors as required under the Petite Policy, convinced the state prosecutors to impose a more severe punishment than the state believed was appropriate under the circumstances.

16. FAUSA Sloman's version of the history with respect to the sentence he required Mr. Epstein's lawyers to seek from the State contradicts his later assertion, which is patently false—that "the SDFL indicated a willingness to defer to the State the length of incarceration" and "considered a plea to federal charges that limited Epstein's sentencing exposure . . ." See Tab 1, May 19, 2008 Letter from J. Sloman. In fact, by a email dated August 3, 2007, Criminal Division Chief Matthew Menchel advised the defense that the federal government required a minimum term of two years of incarceration. See Tab 40, August 3, 2007 Email from M. Menchel. Subsequently, Ms.

4

HOUSE OVERSIGHT 012163
KIRKLAND &ELLIS LLP

Villafana emailed the defense stating that United States Attorney Acosta would accept no less than 18 months of incarceration, following by a one-year term of house arrest.

Federal Prosecutors Misrepresented the Number of Alleged "Victims."

HOUSE OVERSIGHT 012602

08/16/2007 17:05 FAX 5618021787

IJSA0 WPB FL

.

U.S. Department of Justice

United States Attorney

Southern District of Florida

rip 002

SOO South Australian Ave., Suite 400

West Palm Beach, Ft 33401

(561) 820-8711 .

Facsimile: (561) 820-8777

August 16, 2007

VIA FACSIMILE

Gerald Lefcourt, Esq.

Gerald R Lefcourt, P.C.

148 East 78th Street

New York, NY 10021

Re: Subpoena to Custodian of Records-NES. LLC

Dear Mr. Lelbouri:

I write in response to your letter of July 18, 2007 regarding the grand jury subpoena issued to the Custodian of Records for NES. LLC. I have attached an identical subpoena containing a return date of September 11, 2007, and subpoenas for two NES employees, Eric Gany and Harry Beller. If you will not be representing Messrs. Gany and Beller, please let me know.

First, as I mentioned in my earlier correspondence, a properly executed declaration from. the Custodian of Records is needed, and, if no documents responsive to a particular request exist, the Custodian should certify that under penalty of perjury.

Second, you write that NES has no documents responsive to Requests 1 through 5. 'know that NES has several credit card accounts for the benefit of the persons who manage Mr. Epstein's properties, including Janusz Banasiak and Alfredo Rodriguez. I also know that NES regularly receives money from an account that is used to pay expenses at 358 El Milo Way and also wires money to that same account Those wire transfers fall within the time period called for by the subpoena and number in the hundreds of thousands of dollars. IfNES does not maintain records of its banking activities, then I would like to see a copy of its document retention policy, so I have added that to the Attachment to the Subpoena.

Third, Mr. Manche's con:unent to you about potential money laundering charges related only to a resolution ofthe case. In other words, if the sex offense case is resolved, the Office would close its investigation into other areas as well The matter has not been, and it does not appear that it will be, resolved so the money laundering investigation continues, and Request Number 6 will not be withdrawn. The request is not overbroad and is stated with particularity, so please comply with the request by the new deadline.

HOUSE OVERSIGHT 012603

HOUSE OVERSIGHT 012593

By signing this agreement, Epstein asserts and certifies that each of these terms is material to this agreement and is supported by independent consideration and that a breach of any one of these conditions allows the United States to elect to terminate the agreement and to investigate and prosecute Epstein and any other individual or entity for any and all federal offenses.

By signing this agreement, Epstein asserts and certifies that he is aware of the fact that the Sixth Amendment to the Constitution of the United States provides that in all criminal prosecutions the accused shall enjoy the right to a speedy and public trial. Epstein further is aware that Rule 48(b) of the Federal Rules of Criminal Procedure provides that the Court may dismiss an indictment, information, or complaint for unnecessary delay in presenting a charge to the Grand Jury, filing an information, or in bringing a defendant to trial. Epstein hereby requests that the United States Attorney forthe Southern District of Florida defer such prosecution. Epstein agrees and consents that any delay from the date of this Agreement to the date of initiation of prosecution, as provided for in the terms expressed herein, shall be deemed to be a necessary delay at his own request. and he hereby waives any defense to such