**From:** Ghislaine Maxwell <span style="background:black"> </span>
**Sent:** Tuesday, June 9, 2026 11:37 PM
**To:** Pro Se Filing
**Subject:** Exhibits to reply 2/4
**Attachments:** compressEXHIBITS 4 EFTA.pdf; compressEXHIBITS 3 EFTA.pdf

**CAUTION - EXTERNAL:**

**CAUTION - EXTERNAL EMAIL:** This email originated outside the Judiciary. Exercise caution when opening attachments or clicking on links.

1

prosecution on the ground that such delay operated to deny him rights under Rule 48(b) of the Federal Rules of Criminal Procedure and the Sixth Amendment to the Constitution of the United States to a speedy trial or to bar the prosecution by reason of the running of the statute of limitations for a period of months equal to the period between the signing of this agreement and the breach of this agreement as to those offenses that were the subject of the grand jury's investigation. Epstein further asserts and certifies that he understands that the Fifth Amendment and Rule 7(a) of the Federal Rules of Criminal Procedure provide that all felonies must be charged in an indictment presented to a grand jury. Epstein hereby agrees and consents that, if a prosecution against him is instituted for any offense that was the subject of the grand jury's investigation, it may be by way of an Information signed and filed by the United States Attorney, and hereby waives his right to be indicted by a grand jury as to any such offense.

/\

///

///

Page 6 of 7

HOUSE OVERSIGHT 012594

HOUSE OVERSIGHT 012576

U.S. Department of Justice

United States Attorney

Southern District of Florida

DELIVERY BY ELECTRONIC MAIL

Jay P. Lefkowitz, Esq.

Kirkland & Ellis LLP

Citigroup Center

153 East 53rd Street

New York, New York 10022-4675

Re: Jeffrey Epstein

Dear Jay:

500 S. Australian Ave, Ste 400

West Palm Beach, FL 33401

(561) 820-8711

Facsimile: (561) 820-8777

December 13, 2007

I am writing not to respond to your asserted "policy concerns" regarding Mr. Epstein's Non-Prosecution Agreement, which will be addressed by the United States Attorney, but the time has come for me to respond to the ever-increasing attacks on my role in the investigation and negotiations.

It is an understatement to say that I am surprised by your allegations regarding my role because I thought that we had worked very well together in resolving this dispute. I also am surprised because I feel that I bent over backwards to keep in mind the effect that the agreement would have on Mr. Epstein and to make sure that you (and he) understood the repercussions of the agreement. For example, I brought to your attention that one potential plea could result in no gain time for your client; I corrected one of your calculations of the Sentencing Guidelines that would have resulted in Mr. Epstein spending far more time in prison than you projected; I contacted the Bureau of Prisons to see whether Mr. Epstein would be eligible for the prison camp that you desired; and I told you my suspicions about the source of the press "leak" and suggested ways to avoid the press. Importantly, I continued to work with you in a professional manner even after I learned that you had been proceeding in bad faith for several weeks — thinking that I had incorrectly concluded that solicitation of minors to engage in prostitution was a registrable offense and that you would "fool" our Office into letting Mr. Epstein plead to a non-registrable offense. Even now, when it is

clear that neither you nor your client ever intended to abide by the terms of the agreement that he signed, I have never alleged misconduct on your part.

The first allegation that you raise is that I "assiduously" hid from you the fact that Bert Ocariz is a friend of my boyfriend and that I have a "longstanding relationship" with Mr. Ocariz.

HOUSE OVERSIGHT 012577

# EPSTEIN INVESTIGATION TIMELINE

| Date | To | From | Re: | Exhibit # |
|------|-----|------|-----|-----------|
| 6/15/2009 | Villafaña | Lefkowitz | Letter re Josefsberg's fees | |
| 6/16/2009 | Villafaña | Katherine W. Ezell | Email with attachment | |
| 6/17/2009 | Lefkowitz | Villafaña | Letter in response to Lefkowitz's 6/15/09 letter | 89 |
| 6/19/2009 | Villafaña | Lefkowitz | Letter re discussion regarding ongoing obligations per NPA | |
| 7/6/2009 | Villafaña | Spencer Kuvin | Letter requesting copy of NPA | |
| 7/7/2009 | Lefkowitz | Villafaña | Letter in response to 6/19/09 letter | |
| 7/8/2009 | Villafaña | Critton | Letter re NPA with attached Defendant Epstein's Motion to Dismiss Plaintiff's Complaint (Jane Doe #8) | |
| 7/31/2009 | Villafaña | Spencer Kuvin | Letter with follow up request for NPA | |
| 8/4/2009 | Spencer Kuvin | Villafaña | Letter in response to request for NPA | |
| 8/5/2009 | | | Respondent BB's Motion to Supplement the Record (4D09-2554) | |
| 8/20/2009 | | | Jeffrey Epstein's Response to Motion to Supplement the Record (4D09-2554) | |
| 9/1/2009 | Roy Black | A. Marie Villafaña | Draft of letter regarding breach of Non Prosecution Agreement with handwritten attorney (Villafaña) notes | |
| 9/1/2009 | Sloman | Roy Black | Letter re Epstein wanting to transfer his supervision from State of Florida to the Virgin Islands | 90 |
| 9/17/2008 | | | Draft of letter regarding transfer of supervision to the Virgin Islands with attorney | |
| 9/18/2009 | Black | Villafaña | Letter in response to transfer of supervision to the Virgin Islands (Villafaña) notes | 91 |
| 9/29/2009 | Hon. Jeffrey Colbath | Adam Horowitz | Letter that Epstein violated his No-Contact Order on 9/16/09 by coming within 10 feet of Horowitz's client, Individual #44, Jane Doe No. 4. | |
| 10/21/2009 | Villafaña | Roy Black | Response to 9/18/09 letter | |
| 10/29/2009 | | | Open file and request USAO# (2009R02690, Operation Stolen Globe) | |

EFTA00224991

**STATEMENT OF** ▮▮▮▮▮▮▮▮ **IN RESPONSE TO**
**APRIL 2, 2019 LETTER FROM JEFFREY R. RAGSDALE**

To the extent possible, I have provided all information relevant to your inquiry, including applicable documents. Due to the passage of time, updates to various software and hardware, and the crash of my work laptop several years ago, I no longer have every piece of relevant material and my memory may be imperfect.[1] I have organized the response to conform with the April 2, 2019 letter from Jeffrey R. Ragsdale to ▮▮▮▮▮▮▮. Please note that there were numerous oral and written communications between others at the U.S. Attorney's Office and the Justice Department with counsel for Mr. Epstein. While in some cases I was told of the communications or cc'ed on emails or letters summarizing the communications, for many conversations, meetings, and emails, I do not have knowledge of what occurred.

### Introduction

The investigation of Jeffrey Epstein and a series of co-conspirators, named "Operation Leap Year," officially began in May 2006. In theory, it was supposed to conclude on September 24, 2007 with the signing of a "Non-Prosecution Agreement" ("NPA").[2] As will be discussed below, the investigation presented several issues of first impression and challenges related to obtaining evidence and securing the cooperation of witnesses. Nonetheless, I felt certain that the agents, my co-counsel, and I had built a very strong case against Mr. Epstein and three of his personal assistants – ▮▮▮▮▮▮▮▮▮▮▮▮" and ▮▮▮▮▮▮.

The case was presented for federal investigation by the Palm Beach Police Department after they felt that Jeffrey Epstein's legal team had put inappropriate pressure on the Palm Beach County State Attorney's Office to file only misdemeanor charges. Allegations of misconduct had been leveled against the local detective and the Police Chief and they reported being followed and harassed. As described below, the defense attorneys employed the same tactics at the federal level against myself and the FBI.

---

[1] With regard to the exhibits, whenever possible, I have used copies of original documents or "scanned" originals that were made at the time. In some cases, all that I have are the electronic documents (i.e., the Word Perfect letter that was printed, signed, and mailed or faxed). Because our computers no longer have Word Perfect, I have used "Quick Print" which has distorted the formatting. If I am providing something that I know is a "draft," I note that either in the text or in the exhibit list. The fact that something does not contain a signature does not mean that it is a draft, it just means that it was printed from the electronic version and I no longer have (or never had) a copy of the original. For example, I often drafted letters for the signatures of Andrew Lourie, Jeff Sloman, and Alex Acosta. Their assistants would have maintained the signed originals. In some cases, I would be provided with copies and sometimes I would not. I would usually notate my electronic files with "final" to know which was the final version, or the last-modified version.

[2] For reasons set forth below, the investigation continued due to Epstein's post-NPA conduct.

EFTA00225483

**From:** "███████████. (USAFLS)" </O=USA/OU=FLS/CN=RECIPIENTS/CN=AVILLAFANA>
**To:** "████████. (MM) (FBI)" <████████████>, "███████. (MM) (FBI)" <████████████>
**Subject:** Inquiry regarding an old case
**Date:** Wed, 27 Apr 2016 21:19:44 +0000
**Importance:** Normal

---

Hi ███ and ███ – We are trying to settle the "Jane Doe" litigation and the attorneys in the case are trying to get a copy of the undercover recording in "Operation Stolen Globe," which was the investigation of Epstein's former butler (Alfredo Rodriguez) who tried to sell the piece of evidence that he stole from Epstein's house. I explained that we can't turn over that evidence; the attorney would have to make a FOIA request to the FBI; but I agreed to find out whether the tape still exists. Can you find out whether FBI still has custody of the tape? If you do have it, please maintain it until a FOIA request is made and FOIA counsel can determine whether or not it needs to be produced.

Thank you so much!

███████████
Assistant U.S. Attorney
Southern District of Florida
██████████
██████████

EFTA00211693

**STATEMENT OF A. ▮▮▮▮ ▮▮▮▮ IN RESPONSE TO**
**APRIL 2, 2019 LETTER FROM ▮▮▮▮▮**

To the extent possible, I have provided all information relevant to your inquiry, including applicable documents. Due to the passage of time, updates to various software and hardware, and the crash of my work laptop several years ago, I no longer have every piece of relevant material and my memory may be imperfect.[1] I have organized the response to conform with the April 2, 2019 letter from ▮▮▮▮▮ to Jonathan Biran. Please note that there were numerous oral and written communications between others at the U.S. Attorney's Office and the Justice Department with counsel for Mr. Epstein. While in some cases I was told of the communications or cc'ed on emails or letters summarizing the communications, for many conversations, meetings, and emails, I do not have knowledge of what occurred.

### Introduction

The investigation of Jeffrey Epstein and a series of co-conspirators, named "Operation Leap Year," officially began in May 2006. In theory, it was supposed to conclude on September 24, 2007 with the signing of a "Non-Prosecution Agreement" ("NPA").[2] As will be discussed below, the investigation presented several issues of first impression and challenges related to obtaining evidence and securing the cooperation of witnesses. Nonetheless, I felt certain that the agents, my co-counsel, and I had built a very strong case against Mr. Epstein and three of his personal assistants – ▮▮▮ ▮▮▮, ▮▮▮▮, a/k/a ▮▮▮▮▮' and ▮▮ ▮▮▮.

The case was presented for federal investigation by the Palm Beach Police Department after they felt that Jeffrey Epstein's legal team had put inappropriate pressure on the Palm Beach County State Attorney's Office to file only misdemeanor charges. Allegations of misconduct had been leveled against the local detective and the Police Chief and they reported being followed and harassed. As described below, the defense attorneys employed the same tactics at the federal level against myself and the FBI.

---

[1] With regard to the exhibits, whenever possible, I have used copies of original documents or "scanned" originals that were made at the time. In some cases, all that I have are the electronic documents (i.e., the Word Perfect letter that was printed, signed, and mailed or faxed). Because our computers no longer have Word Perfect, I have used "Quick Print" which has distorted the formatting. If I am providing something that I know is a "draft," I note that either in the text or in the exhibit list. The fact that something does not contain a signature does not mean that it is a draft, it just means that it was printed from the electronic version and I no longer have (or never had) a copy of the original. For example, I often drafted letters for the signatures of ▮▮▮▮, Jeff ▮▮▮, and Alex Acosta. Their assistants would have maintained the signed originals. In some cases, I would be provided with copies and sometimes I would not. I would usually notate my electronic files with "final" to know which was the final version, or the last-modified version.

[2] For reasons set forth below, the investigation continued due to Epstein's post-NPA conduct.

EFTA00225044

Once the USAO opened the file, Epstein took the same approach that had been used with the State – at each level of review, he hired an attorney with a personal connection to the AUSA/USA/DOJ Attorney who was conducting the review. The attorneys raised a series of challenges to the veracity of the victims and the veracity of the state investigators, as well as quasi-*Petite*-policy arguments. When those failed, more formal legal analysis and federalism policy arguments were presented.

Throughout this process, I wanted to keep my investigation as confidential as possible. For example, I did not see the benefit of telling Epstein's counsel that we had uncovered additional victims, that we had been able to corroborate victims' accounts, or the legal theories that we were pursuing. My objections to making these disclosures were all overruled. Also, unbeknownst to me, at least one supervisory AUSA was engaging in plea discussions with counsel for Epstein without consulting with me, the agents, or the victims. These discussions led to the creation of the NPA – an agreement that allowed Epstein to plead guilty to state charges in exchange for immunity for federal prosecution by the USAO for the Southern District of Florida.

After the NPA was signed on September 24, 2007, when I attempted to notify the victims and enforce the agreement, the attacks became more personal. Epstein's attorneys raised the same policy arguments – which could have been raised prior to signing the NPA – as high as the DAG's Office, and coupled them with claims of prosecutorial misconduct. As these attacks occurred, the USAO – U.S. Attorney Alex Acosta and later First Assistant U.S. Attorney ▮▮▮▮ offered Epstein the option of simply "unwinding"[3] the NPA – after all, he had never performed any part of it. In my mind it was unfathomable that Epstein would be allowed to spend months attacking not just the validity of our investigation and the validity of the NPA, but also making false allegations of prosecutorial misconduct against myself and FAUSA ▮▮▮▮ and *still* be allowed the benefit of what was, in my opinion, an unreasonably favorable agreement. Since everyone from the U.S. Attorney down to me agreed that the case was headed for a trial, the investigation continued, including identifying additional victims, conducting interviews, issuing grand jury subpoenas, drafting revised indictment packages, and presenting testimony to the grand jury. Epstein's clear intent to go to trial was on display during this period as he deposed victims identified only through the federal investigation in the guise of taking discovery in the state case.

On June 23, 2008, ▮▮▮▮ in the DAG's Office issued his letter denying Epstein's final appeal. While USA Acosta allowed Epstein the benefit of the NPA, Epstein still tried to avoid several key parts of the NPA's terms, and would have escaped them but for my insistence.

On June 30, 2008, Epstein entered his guilty plea in state court and was sentenced to 18 months' in the county jail in accordance with the terms of his state plea agreement and the NPA. Not long thereafter, I learned that Epstein had applied for work release and the Palm Beach County Sheriff's Office had granted the application. Prior to Epstein's guilty plea, the issue of work release had been specifically discussed with Epstein's counsel and they informed us that Epstein would not seek work release. The agents and I also met with the Sheriff's Office in advance of the plea and had been told that Epstein would not be eligible for work release. Accordingly, I provided my Notice of Breach, but was told by defense attorney Roy Black that, despite those specific conversations, USA Acosta himself agreed that Epstein would be eligible for any program

---

[3] "Unwinding" was USA Acosta's term for mutual rescission – the USAO could file its charges and Epstein would have no obligations to plead guilty in state or federal court.

EFTA00225045

that the state offered, including work release. Because of this, I had to withdraw the Notice of Breach and could only write a letter to the Sheriff's Office pointing out all of the false statements contained in Epstein's application for work release and letters to the victims informing them that Epstein was in work release status. The Sheriff's Office never responded to or acknowledged my letter.

On June 9, 2009, I prepared what I believe was the last Memorandum requesting authorization to issue a Notice of Breach and to indict Epstein. The Office authorized issuance of the Notice of Breach, and the Indictment Packages was re-reviewed, approved, and signed, with arrest warrants for Jeffrey Epstein, ███ ███, and ███ ██████. The Notice of Breach was served on June 12, 2009 at a hearing on Epstein's Motion to Dismiss one of the civil suits filed by one of the victims identified during the federal investigation. Once again, Epstein was allowed to "cure" his breach, and we were not allowed to file the indictment.

There were strong internal disagreements on a number of subjects, including: the handling of the meetings with Epstein's counsel; plea negotiations; the NPA generally; the failure to consult with the victims; continuing plea negotiations in the face of Epstein's clear bad faith; the refusal to defend me against personal attacks from Epstein's attorneys; the agreement to put off seeking Epstein's computer equipment; the consultations with Epstein's attorneys regarding victim notifications; the handling of the "appeals" to Washington; allowing delays during those "appeals," while Epstein's attorneys were harassing the victims and their family members; attempts by Epstein to renegotiate the term of imprisonment; attempts by Epstein to renegotiate the payment of damages to the victims and attorneys' fees to their attorney representative; allowing Epstein to participate in the work release program after specifically discussing it during plea negotiations; and repeatedly allowing Epstein to "cure" intentional breaches of the NPA. These were kept internal as I tried to deal professionally with opposing counsel.

In the midst of all of the post-NPA back-and-forth with Epstein, was the *Jane Doe v. United States* litigation.[4] Despite the Office's request to be recused from the case, the Justice Department decided that there was no conflict of interest and I was tasked with serving as co-counsel. The Office asserted attorney-client, executive, work product, and deliberative process privileges, so all of the internal disagreements, pros memos, and indictments were not disclosed while all of my communications with opposing counsel (often at the behest of supervisors) were disclosed. After an initial flurry of filings, Brad Edwards, as counsel for the named plaintiffs, stated on the record that he believed that setting aside the NPA would not benefit his clients, and he sued Epstein on behalf of a number of victims under the NPA. I did what I could to assist Mr. Edwards, other attorneys, including Mr. Josefsberg, the attorney selected by the Special Master, and the Court, to locate victims, provide signed copies of the NPA, and answer questions. After all of the civil suits between Epstein and the victims were settled through the spectre of breaching the NPA, Mr. Edwards re-initiated the *Jane Doe v. United States* litigation, asserting that his clients wanted to

---

[4] A few days after Jeffrey Epstein entered his guilty plea in state court, attorney Brad Edwards filed suit on behalf of one of the victims identified in the federal investigation (later expanded to include a second victim who had been identified in the state investigation), alleging violations of the Crime Victims' Rights Act. The suit, which is still pending, is captioned *Jane Doe 1 and Jane Doe 2 v. United States*, 08-80736-CV-KAM.

EFTA00225046

set aside the NPA and see Mr. Epstein federally charged due to violations of the Crime Victims' Rights Act.

In response to your questions, I have attempted to distill the past 13 years of emails, letters, research, pleadings, and conversations into a coherent document and attach the most relevant items. Given the sheer volume of materials involved here and the passage of time, while I have worked diligently to answer your questions as fully as possible, I certainly could have missed something amongst the thousands of pages of emails, drafts, and hard copy and electronic documents. If there are additional items or topics that need further explanation or more documentation, I can delve further.

## A. The Non-Prosecution Agreement

1. **Describe the circumstances under which the investigation of Jeffrey Epstein was referred to the USAO, including when, why, how, and by whom the referral was made. Explain why the USAO decided to initiate a federal grand jury investigation into this matter, including what federal interests were perceived to be involved, and identify the individuals participating in the decision.**

Some time in early 2006, FBI Special Agent ███████ ███████ approached me about an investigation being conducted by the Town of Palm Beach Police Department ("PBPD"). I do not know how or when S/A ███████ was first contacted about the matter.

The first mentions of the investigation were just passing comments during meetings on other matters. S/A ███████ and I were working on a number of different child exploitation matters at the time, along with ICE Special Agent David Malone. I remember generally that S/A ███████ mentioned an investigation of a wealthy man who lived on Palm Beach and recruited minors for sexual activity. During these casual conversations, I do not believe that Mr. Epstein's name was mentioned. If it was mentioned, it held no significance for me. I recall that S/A ███████ mentioned that PBPD had reached out to her because the Palm Beach County State Attorney's Office was leaning towards not charging the case at all or letting the defendant plead to a misdemeanor charge of solicitation of prostitution. At some point I told S/A ███████ that, if PBPD wanted to look into federal charges, I would need more information about the allegations and I encouraged her to set up a meeting. I recall S/A ███████ telling me that PBPD wanted to give the State Attorney's Office the opportunity to properly charge the case before presenting it for federal investigation and prosecution.

In May 2006, I met with S/A ███████ and PBPD Detective ███████ in the 4th Floor Conference Room at the U.S. Attorney's Office in West Palm Beach. I do not recall whether S/A ███████ was present. Detective ███████ summarized the investigation into state criminal sexual conduct involving Epstein and his personal assistants. Briefly, Epstein, through his personal assistants, recruited girls and young women[5] – mainly from a local high school – to travel to his residence on Palm Beach to perform erotic massages. Although they had no massage training, the

---

[5] I use these terms deliberately. "Girls" refers to females under the age of 18 and "young women" refers to females over the age of 18. When I refer to both groups jointly, I will use the term "females."

EFTA00225047

girls and young women were coached to massage Mr. Epstein in various states of undress. The sexual activity varied and included: Mr. Epstein masturbating himself at the end of the massage; having the females masturbate him; Mr. Epstein fondling the females' breasts and genitalia; using sex toys on the females; digital penetration of the females; sexual intercourse with Mr. Epstein; and Mr. Epstein observing while one of the girls had sex with one of his assistants. At the end of each "massage" session, Mr. Epstein or one of his assistants would pay the female involved. If the female involved in the massage was brought to Mr. Epstein's residence by a "recruiter," then the "recruiter" also would be paid.

Detective ███ did not have any information regarding any of the females traveling interstate or internationally to engage in sexual activity, but Det. ███ reported that Mr. Epstein and his assistants traveled in and out of the Palm Beach International Airport on Epstein's private airplane. Det. ███ stated that flight logs he had seen sometimes referred to passengers as "females," without names or ages, so it was possible that girls could have been on board, but Det. ███ had not been able to confirm that. Det. ███ stated that a search warrant had been executed on Mr. Epstein's residence and evidence had been seized, including message pads showing calls from females confirming that they would be coming to "work," which was the euphemism used for giving a "massage" – another euphemism for engaging in sexual activity for money. Det. ███ also reported that it had appeared that Mr. Epstein had been "tipped off" about the coming search warrant because all of the computer CPUs had been removed from the residence – the keyboards and screens were still in place, just the CPUs had been taken. Det. ███ also reported that some surveillance cameras were in place but they had only recovered a limited amount of surveillance video. Det. ███ stated that between 20 and 30 females had been identified [NB: I believe that he told me the exact number, I just don't recall that number now].

S/A ███ and Det. ███ asked me whether there were federal criminal charges that could be pursued. I remember getting up from the conference room, walking to my office, and getting my code book and walking back. I looked through 18 U.S.C. §§ 2422 (enticement of minors into prostitution/illegal sexual activity) and 2423 (travel for purposes of engaging in illegal sexual conduct).[6] We talked through those statutes and the additional investigation that would be required to prove that they had been violated, but I told them that, if the evidence was there, it was a case that could be prosecuted federally.

Det. ███ then told me that his boss – PBPD Chief ███ – was still pressing the State Attorney's Office to arrest Epstein. Det. ███ had prepared a series of probable cause affidavits for the arrests of Jeffrey Epstein, ███, and ███ charging a large number of state criminal violations. Chief ███ had asked the Palm Beach County State Attorney, ███, to authorize the arrests and he had refused. According to Det. ███, pressure had been brought to bear on SA ███ by Epstein's attorneys, who included Guy Fronstin and Jack Goldberger (two personal friends of ███), and Alan Dershowitz. Det. ███ stated that he and Chief ███ were concerned that Epstein would be charged only with a misdemeanor or perhaps would not be charged at all.

---

[6] As the investigation progressed, I looked into other federal crimes, but at that first meeting, I only remember looking at §§ 2422 and 2423.

EFTA00225048

I recommended that we begin the process of investigating whether there was a jurisdictional basis for federal charges, and S/A ▮▮▮▮▮ and Det. ▮▮▮▮ concurred. Det. ▮▮▮▮ asked that Chief ▮▮▮ be given an additional opportunity to convince the State Attorney to charge Epstein.[7] I explained that opening a case file and beginning a federal investigation would not preclude the State Attorney from charging Epstein.

I then prepared the paperwork to open a file. The investigation was dubbed "Operation Leap Year" because there were approximately 29 young women and girls who had been identified through the State investigation.

There were several aspects of the case that involved federal interests. First, as to the substantive crimes that Epstein was accused of committing, they involved the victimization of minor females through the use of facilities of interstate commerce (telephones and airports); and Epstein was traveling interstate and internationally to come to the Southern District of Florida to commit those offenses. During the course of the investigation, I often said that, if there were a trial, I would tell the jury that Jeffrey Epstein traveled to Florida to use Royal Palm Beach High School as his personal brothel. Second, the removal of the computer equipment from Epstein's home prior to the execution of the search warrant suggested possible public corruption at the Palm Beach County courthouse (where the search warrant application was signed) and also raised the possibility that Epstein may have been involved in the manufacture and/or possession of child pornography. Eradication of child pornography was a particular focus of Project Safe Childhood; its production and storage on computer equipment involved the use of items produced in interstate and foreign commerce; and child pornography was often distributed through facilities of interstate and foreign commerce. Third, Det. ▮▮▮▮ was suggesting that political or other pressure was being placed on an elected official (the State Attorney) to avoid or minimize criminal exposure for a person who committed numerous state crimes related to the exploitation of girls and young women. Setting aside the issue of prostitution, the sexual activity involving girls under the age of 16 could be charged as sex battery in the state. Ignoring those crimes suggested possible public corruption or, at the least, a miscarriage of justice.

With regard to the logistics of opening the case file, the opening of files in West Palm Beach is relatively informal. In instances where an agent approaches a line AUSA directly (either because it is a duty matter or because the investigation is within the AUSA's area of expertise), the line AUSA will give his or her assistant the details of the case for the LIONS file-opening paperwork and then give a brief oral explanation of the case to his/her supervisor along with the paperwork. If the supervisor agrees that a file should be opened, he or she will normally sign the LIONS form on the spot and hand the file back to the AUSA. In this case, I prepared a file jacket; my assistant did the LIONS paperwork; I signed the conflict form; briefed my supervisor, ▮▮▮▮▮▮ ; and she signed the LIONS paperwork assigning the case to me. This all occurred either on the day of the meeting with Detective ▮▮▮▮ and S/A ▮▮▮▮▮ or within a few days thereafter. Attached hereto as Exhibit 2 is the file opening paperwork and file jacket showing that the case was opened in LIONS on May 23, 2006.

I do recall that at some time relatively soon after the file was opened, I did something that I had never done before or since. I initiated a meeting with the U.S. Attorney and the First

---

[7] Although I did not know it at the time, on May 1, 2006, Chief ▮▮▮▮ sent a letter to State Attorney ▮▮▮▮ asking ▮▮▮▮ to consider recusing himself from the case. (Exhibit 1.)

EFTA00225049

Assistant, Alex Acosta and ████████, where I traveled to Miami and told them about the case. I recall that I explained the case and how the PBPD believed that Epstein had used political or other pressure to avoid serious punishment in Palm Beach County state court. That possibility troubled me greatly; hence, my request to meet with executive management. Messrs. Acosta and ████████ had the same reaction that I had the first time that Det. ████████ told me about Mr. Epstein – if I have never heard of him, how much influence could this person have? I remember specifically saying to them that I expected the case would be time and resource-intensive and I did not want to invest the time and the FBI's resources if the Office would just back down to pressure at the end. Messrs. Acosta and ████████ assured me that, if there was sufficient evidence to support the case, Mr. Epstein would be charged appropriately.[8]

> **2. Describe in detail your role, and the role of each other person in the USAO, the Federal Bureau of Investigation (FBI), and elsewhere within the Department of Justice – collectively herein "the government" – who was involved in the assessment of the viability and strength of the federal case against Mr. Epstein and in the decision to negotiate a pre-indictment resolution of the case.**

### My Role

I was the line AUSA assigned to the case. In conjunction with the case agents, I handled all aspects of the grand jury investigation – deciding what subpoenas to issue; whom to interview; whom to call to testify before the grand jury; what lines of inquiry to pursue to support various legal theories; I conducted legal research to support charges; I reached out to others throughout the Department and the federal government for information on previous investigations of Mr. Epstein, and for legal guidance on various aspects of the case (e.g., OEO, CEOS, SEC, SDNY, and AFMLS); along with the FBI agents and the FBI Victim-Witness Coordinator, I had direct contact with victims via interviews, meetings, and consultations regarding safety/privacy/mental health concerns; and I handled all court proceedings related to the investigation. When I felt that sufficient evidence had been collected to prove Mr. Epstein's guilt beyond a reasonable doubt, I drafted a prosecution memorandum, indictment, and related documents. I revised those documents in response to comments from those in the supervisory chain of command and, as explained below, after additional evidence was secured. I participated in some (but not all) of the meetings between members of the USAO and counsel for Jeffrey Epstein. I prepared briefing materials for management in preparation for those meetings and in response to issues raised during those meetings.

Normally the assigned line AUSA handles plea negotiations, and I recommended that I enter into negotiations that would result in a joint federal and state resolution (i.e., a plea to federal charges in federal court and a plea to state charges in state court). I was reprimanded for doing so.

---

[8] I do not have a contemporaneous memorandum and cannot find the date of the meeting. In a July 13, 2007 email exchange between myself and Criminal Chief ████ ████████, I describe the meeting as follows: "I summarized the case and the State Attorney's Office's handling of it. I acknowledged that we needed to do work to collect the evidence establishing a federal nexus, and I noted the time and money that would be required for an investigation. I said that I was willing to invest that time and the FBI was willing to invest the money, but I didn't want to get to the end and then have the Office be intimidated by the high-powered lawyers. I was assured that that would not happen." (*See* Exhibit 3.)

EFTA00225050

Thus, as will be discussed in more detail below, I played no role in the decision to enter into a Non-Prosecution Agreement in exchange for Jeffrey Epstein's entry of a guilty plea to a state charge requiring a sentence of 18 months' imprisonment or Epstein's plea to federal charges resulting in a maximum sentence of 18 months' imprisonment (as will be explained below, Epstein's counsel repeatedly changed their minds about whether to take the federal route or the state route). Although I was tasked with drafting the agreements and Information, all of the documents were repeatedly and substantively revised by various supervisors, and I was responsible for incorporating those edits. I also was asked to sign the Non-Prosecution Agreement.

When Epstein sought to have the Non-Prosecution Agreement set aside by "appealing" the matter to CEOS, the AAG, and the DAG, I handled the continued investigation of Epstein, including working with the FBI to identify additional victims, issue additional grand jury subpoenas, and prepare an updated indictment package. At the request of the U.S. Attorney, I also responded to inquiries from CEOS, the AAG, and the DAG's Office and drafted submissions on behalf of the USAO in response to arguments raised by Epstein's attorneys.

I believe that I prepared a first draft of the Addendum to the Non-Prosecution Agreement, but others took the laboring oar on that document. I drafted numerous victim notification letters and responded to defense objections to those letters. I drafted the letter to the Special Master with the USAO's recommendations for the qualities to look for in the attorney representative for the victims. I monitored Epstein's compliance with the Non-Prosecution Agreement and served several breach notices.

### U.S. Attorney's Office Personnel

**AUSA** ▇▇ ▇▇ **(now retired):** ▇▇ ▇▇ was my direct supervisor. She reviewed indictment packages and other court-related matters and provided guidance and served as a "sounding board" for many of my concerns. As will be explained below, AUSA ▇▇ did not participate in many of the meetings between the USAO and Epstein's counsel because Epstein's counsel "skipped her" in the chain of command, directing their communications to MAUSA[9] ▇▇ ▇▇, Criminal Chief ▇▇ ▇▇, First Assistant ▇▇, and U.S. Attorney Alex Acosta. AUSA ▇▇ did participate in meetings with the Palm Beach Sheriff's Office about Epstein's work release and several conference calls with defendant attorney Roy Black and others about Epstein's breaches of the Non-Prosecution Agreement.

**MAUSA** ▇▇ ▇▇ **(now in private practice):** MAUSA ▇▇ was my second-line supervisor and head of the West Palm Beach office. Over the objection of myself and my co-counsel, he granted the request of Epstein's attorneys to meet to allow Epstein's attorneys to argue that the USAO should decline the matter. That began the series of meetings between all levels of the USAO and Epstein's counsel. MAUSA ▇▇ reviewed my work; asked me to conduct some specific research; and reviewed drafts of our responses to legal arguments raised by Epstein's counsel. MAUSA ▇▇ also participated in

---

[9] The Managing Assistant U.S. Attorney ("MAUSA") is the head of the West Palm Beach Office.

EFTA00225051

conversations with the State Attorney, and directly participated in negotiations of the language to be used in the Non-Prosecution Agreement, federal Plea Agreement, and Information. He had numerous conversations with counsel for Epstein outside of my presence when they objected to my refusal to agree with their changes. MAUSA ▆ also communicated with the U.S. Attorney about the negotiations. He would then communicate changes from the defense and the U.S. Attorney to me to incorporate. Later, when Epstein's attorneys appealed to AAG Alice Fisher, Mr. ▆ was on detail as AAG Fisher's Chief of Staff and facilitated the meeting between Epstein's counsel and the AAG. AAG Fisher's written response was issued while MAUSA ▆ was still her Chief of Staff. I do not know who drafted the written response.

**Acting MAUSA** ▆ ▆ **(still with the USAO):** When MAUSA ▆ was on detail with AAG Fisher's Office, ▆ ▆ was named the Acting MAUSA. He participated in at least one meeting with Epstein's attorneys and the State Attorney. Mr. ▆ also was involved in some of the negotiations regarding the language of the Non-Prosecution Agreement. He later reviewed at least one of the iterations of the indictment package and signed the indictment that was supposed to be presented to the grand jury in June 2009.

**Criminal Chief** ▆ **(now in private practice):** Criminal Chief ▆ was the third line supervisor of the matter. Generally, West Palm Beach indictments are reviewed and approved by the MAUSA and are not reviewed by Miami. However, unusual or especially significant indictments are reviewed by the Criminal Chief. Criminal Chief ▆ reviewed and commented on the first proposed indictment package. His comments were incorporated into a revised indictment, and he possibly reviewed those changes. Criminal Chief ▆ participated in numerous meetings on the case, and had private conversations regarding resolution of the matter with Lilly Ann Sanchez, counsel to Mr. Epstein. Ms. Sanchez had formerly served as Deputy Chief in the Major Crimes Section at the USAO while Mr. ▆ was Chief of Major Crimes. As discussed below, on July 26, 2007, Criminal Chief ▆ announced to the investigative team that U.S. Attorney Acosta had decided to offer a two-year plea to Mr. Epstein. On August 3, 2007, Mr. ▆ sent a letter to Ms. Sanchez regarding that plea offer. Mr. ▆ left the U.S. Attorney's Office on that date to become a partner at Kobre & Kim in New York.

**First Assistant** ▆ **(now in private practice):** FAUSA ▆ (later U.S. Attorney ▆) was involved in telephone calls and meetings with counsel for Mr. Epstein; when Epstein's attorneys were dissatisfied with my proposed language for the Non-Prosecution Agreement, victim notification letters, letters to the Special Master, etc., they would frequently contact FAUSA ▆ directly to complain. FAUSA ▆ handled the bulk of the negotiations of the Addendum to the NPA. Epstein's attorneys later complained that FAUSA ▆ was biased because his daughter had been the victim of a crime. One of Epstein's attorneys also falsely accused FAUSA ▆ (and me) of promising money to a victim in exchange for her willingness to accuse Epstein.

EFTA00225052

**U.S. Attorney R. Alexander Acosta (now Secretary of the U.S. Department of Labor):** USA Acosta served as the head of the U.S. Attorney's Office throughout the investigation of Jeffrey Epstein, including the decision to enter into a Non-Prosecution Agreement, negotiation of its terms, and attempts to enforce its terms. When Epstein's attorneys were dissatisfied with answers they received from me, MAUSA ████, and FAUSA ████, they would frequently contact USA Acosta directly. USA Acosta was directly involved in reviewing and revising the documents, including sending exact wording that he wanted incorporated into the agreement. There were some communications between USA Acosta and counsel for Epstein that I was not aware of at the time. For example, I did not know, until after I had sent a breach notice, that USA Acosta agreed that Epstein could be considered for work release. At some point after the NPA was signed, USA Acosta was recused from the Epstein matter.



**AUSA ████ ████ (still at USAO):** Early in the investigation, I asked AUSA ████ if he would serve as co-counsel on the case. Before I joined the West Palm Beach Office, AUSA ████ had handled the bulk of the child exploitation cases in West Palm Beach. He and I discussed how to structure the investigation and he joined me in opposing meeting with Epstein's attorneys prior to the completion of the investigation. He attended some of the meetings with Epstein's attorneys. When the Office overruled our positions and when it appeared that the case was not going to be charged, AUSA ████ decided that he should focus on other cases.



**AUSA ████ (now U.S. Magistrate Judge):** AUSA ████ was my office neighbor and colleague. At one point early in the investigation (I believe before I asked AUSA ████ to serve as co-counsel), I sought AUSA ████ counsel on strategies for how to handle Epstein's personal assistants – whether they should be charged or if we should seek immunity for them. Not long thereafter, AUSA ████ came to me and said that he was best friends with one of Epstein's attorneys, Jack Goldberger, and accordingly could not discuss the Epstein case with me any further. AUSA ████ left the U.S. Attorney's Office for private practice and later represented one of Epstein's assistants in the civil suits filed by Epstein's victims.



**AUSA ████ (now retired):** Asset Forfeiture AUSA assigned to the Epstein case. I had a few brief meetings with AUSA ████ to talk about the asset forfeiture aspects of the case. We discussed the charges under consideration and Epstein's assets that could be subject to forfeiture. AUSA ████ had direct contact with the agents and the FBI's asset forfeiture coordinator about information/evidence that she needed to pursue forfeiture. AUSA ████ provided the asset forfeiture language in the proposed indictments.



**SLC ████ (still at USAO):** SLC ██ was not directly involved in the Epstein investigation or negotiation of the NPA, but he has been lead counsel in the *Jane Doe v. United States* litigation. SLC ██ had contact with USA Acosta regarding his recusal, and

EFTA00225053

with FAUSA ███ and myself regarding self-reports to OPR about accusations of misconduct raised by Epstein's counsel. I also had contact with SLC ██ regarding a Florida Bar Complaint filed by a civil attorney for some of the victims who complained that my victim notification letters amounted to inappropriate business referrals to the attorney selected by the Special Master.[10]

**Appellate SLC** ███ ███ ███ **(still at USAO):** SLC ███ was not directly involved in the Epstein investigation or negotiation of the NPA. It is my understanding that USA Acosta asked SLC ███ to check my legal analysis. I also understand that Criminal Chief ██ ███ contacted SLC ███ about moving me to Appeals after I pointed out actions that I considered to be in violation of the Ashcroft memo and victims' rights legislation. I also understand that SLC ███ may have knowledge of USA Acosta providing my prosecution memorandum to Criminal Appellate Chief ████ Main Justice.

███ ██ **(still at USAO):** My legal assistant during most of the Epstein investigation and its aftermath. She assisted with preparing indictment packages, victim notification letters, grand jury subpoenas, travel, expert witness contracts, and other items.

███████ **(both still at USAO):** Executive assistants to ███ Acosta and FAUSA ███. They compiled correspondence between the USAO and counsel for Epstein; scheduled meetings; and dealt with inquiries from the press and DOJ. They may have information related to correspondence or communications between the Executive Division and Epstein's counsel that I am unaware of.

**FBI Personnel**

████ ██████ **(retired from FBI):** Lead case agent on Operation Leap Year. She presented the case to the USAO, handled the bulk of the interviews, served subpoenas, and testified before the grand jury. She communicated directly with victims and hand-delivered the original victim notification letters. S/A ███████ also participated in meetings with some of the senior members of the USAO and counsel for Epstein.

S/A ███████ **(still at FBI):** Co-case agent with S/A ███████. Became lead case agent during the post-guilty plea period (i.e., the interview of ███ ███, responding to FOIA requests, etc.). He conducted interviews, prepared reports, analyzed

---

[10] The Florida Bar determined that my victim notification letters, which are included in the exhibits and advised the victims that they had the absolute right to select another attorney if they so desired, were not inappropriate solicitations and did not violate the Florida Bar Rules. The attorney who filed the complaint, Jeff Herman, later resigned from the Florida Bar due to disciplinary action taken against him.

EFTA00225054

records, and communicated directly with victims. S/A ███████ also participated in meetings with some of the senior members of the USAO and counsel for Epstein.

S/A ███████ (still at FBI): Co-case agent with S/A ███████ until he was transferred to DC. He conducted interviews, including the original telephone interview with ███████ where she asked that the FBI have no further contact with her. He also prepared reports and analyzed records.

Group Supervisor ███████ (still at FBI): GS ███ supervised S/As ███████, ███████, and ███████ He also participated in meetings with some of the senior members of the USAO and counsel for Epstein.

ASAC ███████ (still at FBI): ASAC ███████ She attended the July 26, 2007 meeting where Criminal Chief ███ announced the two-year plea offer.

S/A ███████: S/A ███ participated in the interview of ███████ in Australia.

S/A ███████ (still at FBI): S/A ███████ was the case agent on Operation Stolen Globe, which involved the investigation of Alfredo Rodriguez (Jeffrey Epstein's butler), who tried to sell evidence to Brad Edwards.

Group Supervisor ███████ retired from FBI): ███████ replaced GS ███ s head of the violent crime group during the post-guilty plea period. He supervised S/As ███████

Victim-Witness Coordinator ███████: Ms. ███ sent letters to victims, met with them in person, and assisted in finding counseling and other services for them.

**Justice Department Personnel**

CEOS Deputy Chief ███████ (still at DOJ): Ms. ███ was part of the team that reviewed the case and the NPA when Epstein "appealed" to DOJ. Ms. ███ also is familiar with my work from a prior case that she and I worked on together as well as other PSC cases where I have consulted with her.

CEOS Chief ███████ (now private in-house counsel): Mr. ███████ reviewed and opined on the case and the NPA when Epstein "appealed" to DOJ. He also attended meetings in the SDFL with myself, the case agents, USAO supervisory staff, and counsel for Epstein. I conferred with Mr. ███████ about charging, staffing, and victim-related issues.

EFTA00225055

**CEOS Trial Attorney** ███ ███ **(now at a non-profit):** I first had contact with Ms. ███ when conducting research regarding some of the legal issues raised by the case (she was the CEOS Duty Attorney on the day that I called). After AUSA ███ left the case, I contacted Mr. ███ about having a CEOS Trial Attorney co-chair the case and asked if Ms. ███ was available. She participated in interviews, discussed case strategy, and reviewed pros memos and indictments.

**Criminal Appellate Chief** ███ **(still at DOJ):** At various times, I have heard that USA Acosta provided my pros memo to Chief ███ and asked her to review my legal analysis. I have never asked Chief ███ whether this actually occurred. SLC ███ ███ may know whether this occurred.

**AAG Alice Fisher (now in private practice):** After CEOS rejected the "appeal" from Mr. Epstein's attorneys, they asked for further review by ███ She met with the attorneys and prepared a written opinion rejecting Epstein's arguments.

**Senior Associate Deputy Attorney General** ███ **(now private in-house counsel):** Following AAG Fisher's rejection, Epstein's attorneys asked for review by the DAG. I do not know whether Epstein's counsel met with the DAG, but they did present arguments to Mr. Roth, who was Chief of Staff/Sr. Associate Deputy Attorney General. ███ wrote a letter rejecting Epstein's arguments.

**Deputy Attorney General Mark Filip (now in private practice):** Mark Filip was the Deputy Attorney General to whom Mr. Epstein's arguments were addressed. As noted above, I do not know if Mr. Filip met with Epstein's counsel, or if the meetings were only held with Mr. Roth.

**Others Whose Counsel I Sought During the Case:**

**Assistant U.S. Attorney** ███ **(still an** ███ **in Seattle):** AUSA ███ was not involved in the Epstein investigation. During the pendency of the Epstein investigation, she began investigating ███ who was a friend of Epstein, and we conferred with each other about strategy. I informed AUSA ███ of the difficulties in convincing the Office to prosecute Epstein.

**Attorney Advisor** ███ is a friend from my days at Dorsey & Whitney. She joined the Justice Department before I did and we have stayed in contact over the years. She had experience with USA Acosta when he was the head of the Civil Rights Section at Main Justice so I turned to her for advice in handling the Epstein situation.

**Assistant U.S. Attorney** ███. ███ **(still at DOJ):** Mr. ███ and I were dating at the time of the Epstein investigation. (We are now married.) He was a more senior AUSA who

EFTA00225056

was familiar with some of Epstein's counsel. I sought his advice on some of the issues – legal and non-legal – that arose during the case.

**Assistant U.S. Attorney** ███ ████████ **(still at the USAO): Ms.** ████████ **and I** are friends from my time in Miami. She was a supervisor in Miami although not in my chain of command. I would often speak or email with her just for advice.

3. **Explain fully the process and circumstances leading to the decision to resolve the case through a non-prosecution agreement (sometimes referred to by defense counsel and the government as a deferred prosecution agreement, but described herein as the non-prosecution agreement). Explain why the government initially prepared to resolve the case through a federal plea agreement, but ultimately did not require Mr. Epstein to enter a plea in federal court. The explanation should identify the parties involved in the decision, the individual(s) responsible for all final decisions regarding the non-prosecution agreement and its terms, and the basis for the decision to resolve the case through a non-prosecution agreement.**

Let me preface with some background on how I normally handle investigations and prosecutions. When undertaking investigations, my normal practice is to meet with agents, confer with them about an investigative plan, and work together until the case is ready for indictment. I update my supervisors along the way, seek advice or guidance from supervisors and colleagues if an issue is especially complex or novel, and get approval for actions as required by the USAM, but I have always focused on learning as much as possible about the subject area, the defendant, and the facts related to the alleged crime – I want to be the subject matter expert in the courtroom. Then, once all of those items are completed, I prepare a comprehensive prosecution memo and proposed indictment, which are submitted for review.

I believe strongly that investigations – especially child exploitation investigations – should be conducted as covertly as possible in order to protect the victims' privacy; to avoid harm to the accused's reputation if the accusation is determined to be false; and to maintain the sanctity of the investigation. In Mr. Epstein's case, these concerns were heightened for several reasons. First, victims identified during the state investigation had expressed fears of Epstein and building trust with them would require assurances that Epstein would not find out that they were talking with federal investigators. Second, the victims were between the ages of approximately 15 and 20[11] – ages when women and girls might minimize or deny sexual abuse to avoid being labeled as "sluts." Third, Epstein had made allegations in the state case that the victims were only after money and that investigators were only after fame. Maintaining the investigation's confidentiality would delegitimize both of those allegations. It also would avoid interference/intimidation by Epstein and his counsel.

My confidentiality rule extends to pre-indictment communications with defendants and their attorneys. In cases where defendants are considered a flight risk, I generally have no contact pre-indictment. If proven, the crimes under investigation created a statutory presumption that the

---

[11] They had been 14 to 17 years old at the time of the sexual activity, but time had passed.

EFTA00225057

defendant was a risk of flight and a danger to the community, and Epstein had virtually unlimited resources to flee.[12]

Our effort to maintain the confidentiality of the investigation was thwarted almost immediately by PBPD Chief ███. On July 24, 2006, Chief ███ sent letters to some of the victims identified in the state investigation informing them that the State Attorney's Office had decided to proceed on a single charge of solicitation of prostitution. (Exhibit 6.) Chief ███ encouraged the victims to contact the State Attorney's Office with any complaints about the handling of the matter. Chief ███ then felt the need to disclose that he did "not feel that justice has been sufficiently served by the indictment that has been issued. Therefore, please know that his [sic] matter has been referred to the Federal Bureau of Investigation to determine if violations of federal law have occurred." (Id.). While Chief ███ did not mention the USAO, Epstein's counsel certainly understood that engaging the FBI meant engaging the USAO. Chief ███ actions were published in the local newspaper. (Exhibit 7.)

Because the federal investigation had been exposed by Chief ███, there was no ability to operate covertly, so we began serving subpoenas on persons and entities affiliated with Epstein. Beginning on August 2, 2006, a number of grand jury subpoenas were issued for bank information, information related to travel on Epstein's airplanes, school attendance records, rental car information, and other information that would corroborate statements made by victims (see Exhibit A-1). A subpoena also was issued for all of the evidence collected by the PBPD (see id.). Victim notification letters also were prepared that contained my contact information for the federal agents to provide to the victims identified during the PBPD investigation. (Exhibits 12 & 13.) As victims were interviewed by the federal agents, they would be provided with a copy of the notification letter. As additional victims were identified throughout the investigation, more letters were prepared. (Exhibits 19 & 30.) Subpoenas also were prepared for testimony and evidence from some victims who were believed to possess physical evidence that could corroborate contact with Epstein. (See Exhibit A-1.)

One of the subpoenaed victims was Individual #28, who is referred to as Jane Doe #2 in the *Jane Doe v. United States* litigation. When approached for an interview, Individual #28 refused to speak with the agents, and I remember S/A ███ telling me that she felt that Individual #28 had tried to run over her foot as Individual #28 drove away. Individual #28 contacted Epstein when she received the letter and subpoena; Epstein put her in touch with his attorney, Jack Goldberger; and Goldberger had his friend, Jim Eisenberg, serve as Individual #28's lawyer while Epstein paid Eisenberg's fees. Individual #28 later told Brad Edwards that someone (Epstein, Goldberger, or Eisenberg) told her that "the government" planned to take away her baby. I don't know if that is true, but Eisenberg insisted that Individual #28 would not speak to us without 6001 immunity. (Exhibit 9.) Once it was granted, Individual #28 spoke of Epstein in glowing terms and in a way contradicted by other witnesses and evidence. The hiring of Eisenberg, the insistence on 6001 immunity – something that I had never faced before or since for a child victim – and the false exculpatory statements – all showed me how the defense would be approaching this case.

---

[12] To minimize the risk of flight, I conducted research on extradition and the FBI placed a travel watch Epstein, but especially in light of Epstein's ownership of an airplane capable of intercontinental travel and his foreign residences, the investigative team considered Epstein to be a substantial flight risk.

EFTA00225058

The subpoenas and interviews apparently concerned Epstein because soon after I began trying to set up Individual #28's testimony, Epstein hired former U.S. Attorney Guy Lewis, who began contacting me by phone and email, asking to meet with me. I declined to meet because it is my policy not to meet during the pendency of a child exploitation investigation. Mr. Lewis expressed his client's willingness to cooperate with the investigation. (Exhibit 10.)

When Mr. Lewis was unable to set a meeting, Epstein hired Lilly Ann Sanchez, another former AUSA from the Miami USAO. Ms. Sanchez began calling and emailing me in early November 2006. (Exhibit 11). Ms. Sanchez also expressed Epstein's interest in "cooperating" with the investigation. I knew that feigned cooperation would be used to ask for pre-trial release, so I tested the veracity of the offer of cooperation by asking for documents that would disprove many of Epstein's defenses.[13] Sure enough, Ms. Sanchez objected to the requests as "overbroad." I politely declined the request for a meeting and then delayed setting up the requested meeting so that I would have time to complete the investigation. My co-counsel, ███ █████, and I agreed that a meeting at this early stage offered no benefit for us and only benefitted the defense.

When Ms. Sanchez could not set a meeting with me, she skipped my immediate supervisor and contacted MAUSA ███ ███ whom she knew from their time together in Miami. MAUSA ███ told AUSA ███ and me that he had agreed to meet with Ms. Sanchez and Gerald Lefcourt. AUSA ███ and I told MAUSA ███ that we had made a conscious decision not to meet with Epstein's attorneys and that we were opposed to a meeting. It was the first of many disagreements between management and the line AUSAs. MAUSA ███ told us that we were "non-strategic thinkers" (his words) and that the meeting would result in convincing Sanchez and Gerald Lefcourt to bring Epstein in for an interview. It was condescending and, in our opinion, showed a lack of understanding of sex offenders generally and a lack of knowledge of *this* case. Gerald Lefcourt has represented Martha Stewart – the last thing he would do is bring his client in to face a possible "perjury trap."

In the middle of this period, which started in November 2006 and ran through January 2007, USA Acosta and I traveled to Washington, DC at the beginning of December 2006 for the inaugural Project Safe Childhood Conference. Although I did not attach much significance to this at the time, in preparing this response, I began wondering whether the following event was orchestrated by Epstein and his counsel. During one of the first presentations at the conference, I was in a large auditorium and the speaker asked the audience a question. A man in the row in front of me introduced himself as the State Attorney from Palm Beach County (Barry ███) and answered the question. I had never met Mr. ███. After the seminar ended, USA Acosta came over and we all introduced ourselves. Mr. ███ proceeded to deride PBPD Chief ███ and the victims in the Epstein case – referring to them by name and talking about how some were paid thousands of dollars, used alcohol and drugs, and looked over 18. I tried to guide the two out of the auditorium to a more private area because I did not think it was a conversation meant for public consumption but they would not move. As the PSC Coordinator, I had overseen the invitations

---

[13] For example, Epstein claimed that the massages were legitimate "medical" massages, so I wanted to see if he was taking tax deductions for medical expenses and getting other complementary medical treatment. Epstein also claimed that he was traveling to Florida to visit family and to maintain Florida residency. I asked for calendars and other documentation.

EFTA00225059

for the law enforcement representatives from the S.D. Fla., and Mr. ▮▮▮▮ had not been on the list. So I now wonder whether this "random" meeting was staged by Epstein.

As you will see from the timeline (Exhibit A-1), in late January 2007, I created a file folder entitled "Research re NPAs and 6001 immunity." (Exhibit 15.) This was not research related to Non-Prosecution Agreements in connection with resolving the case against Epstein. In November and December 2006, subpoenas were served on two other Epstein employees – Janusz Banasiak and ▮▮▮▮▮▮▮▮ Both initially asked for immunity. After speaking with Banasiak's attorney, Mr. Banasiak was satisfied with a standard *Kastigar* letter, but Ms. ▮▮▮▮'s attorney was insistent on formal immunity, and as noted above, so was Individual #28. I don't believe that, prior to this investigation, I had ever prepared a request for 6001 immunity, so I was researching the process.

The meeting with Ms. Sanchez and Mr. Lefcourt was set for February 1, 2007. As noted above, despite Ms. Sanchez' statements of Epstein's willingness to cooperate, she complained that my document requests were "overbroad," so MAUSA ▮▮▮▮ and I drafted a more specific list (Exhibit 14).[14] Ms. Sanchez also asserted that Epstein had hired attorneys for *all* of his current and prior employees, but refused to provide me with a list of those employees and attorneys, wanting me to give her essentially a roadmap of my investigation. I refused (Exhibits 14 and A-1). Instead, the agents and I continued to press forward with our investigation and I continued my extensive legal research in preparation for the meeting with Sanchez and Lefcourt.

Although materials were supposed to be provided in advance, the "talking points" for the meeting with Sanchez and Lefcourt did not arrive until the morning of the February 1, 2007 meeting (Exhibit 14 at 8-32). The main themes were:

1. the PBPD investigation was biased;
2. the conduct at issue was "entirely local";
3. Epstein did not know the victims were under 18;
4. none of the girls traveled in interstate commerce;
5. Epstein's travel was not for the purposes of engaging in illegal sexual activity;
6. victim and witness credibility issues weighed against filing charges; and
7. the *Petite* policy precluded prosecution (*id.*).

While the letter covered all of these topics, I recall the meeting was focused primarily on challenges to the victims' credibility (e.g., one victim's MySpace page showed her smoking marijuana and posing provocatively); allegations of police overreaching; and the lack of evidence that Epstein knew the victims were under the age of 18.

MAUSA ▮▮▮▮, AUSA ▮▮▮▮▮▮, and I were unpersuaded by the letter and the presentation, but I agreed that I should carefully review transcripts of the recorded statements given to PBPD for *Brady* issues.[15] Since witness credibility was clearly at the fore, I undertook efforts

---

[14] The requested documents and items were never provided.

[15] As the investigation continued and we located and identified more victims, we eventually made a strategic decision that the initial indictment should exclude the group identified by the PBPD and save them for a superseding indictment, if needed. At this point, however, the investigation was focused mainly on the same group.

EFTA00225060

to corroborate our victim statements and to undermine Epstein's potential defenses through subpoenas for a wide variety of documents (*see* Exhibit A-1). Subpoenas also were issued to some victims for photographs, gifts, and other records of direct or indirect contact with Epstein (*see id.*). Presentation of background information to the grand jury began in February 2007 (Exhibits 17, 18, and 20).

I continued to research potential charges against Epstein. Again, knowing how Epstein's attorneys would likely approach any trial in this matter, I wanted to prepare both a strong offense – by including all relevant charges for jury consideration and possible plea negotiations – and a strong defense – by including charges that would allow the admission of the widest range of relevant evidence. With that mindset, I researched money laundering and racketeering offenses in Chapter 95 because I knew that prostitution was a racketeering offense (*see* Exhibit 56). In addition to the IRS, I conferred with an attorney at the Asset Forfeiture and Money Laundering Section in DC who opined that Epstein's conduct could be a violation of 18 U.S.C. § 1960 and 2 or another currency offense because he caused the interstate transmission of funds related to prostitution (*see* Exhibit 57).[16]

The investigation continued at a brisk pace with Epstein's attorneys frequently seeking reviews from Messrs. ▮ and ▮ (*see, e.g.*, Exhibit 58). [NB: They completely excluded my immediate supervisor, ▮, throughout the process.] Because of this, and because the grand jury was very interested in the case, I tried to keep the Miami office up to date on what was happening. There also had been little feedback from Miami to the proposed indictment that had been provided in late April/early May. So, for example, on May 14, 2007, I emailed ▮ and ▮ about Epstein's travel and asked whether I would be permitted to present the indictment the following day or proceed by way of criminal complaint (Exhibit 26 at 1). Mr. ▮ made clear that neither would be allowed (*id.*).

That Friday, May 18, 2007, I emailed Chief ▮ again, notifying him that we had learned that the computers missing from Epstein's home at the time of the execution of the state search warrant were removed by a private investigator working for attorney Roy Black. After conferring with CCIPS, the Witness Immunity Unit at OEO, and my immediate supervisor, I planned to issue a grand jury subpoena for the equipment (*id.* at 2). I explained why the request was different than a subpoena to an attorney and how I would avoid seeking privileged information (*id.*). I specifically asked Mr. ▮ if he had any comments or concerns but received no response (*id.*).[17]

On Monday, May 21, 2007, I wrote to Chief ▮ and FAUSA ▮ for "guidance" and "a sense of the direction where we are headed" (*id.* at 3). Again, no response. On that day, having heard nothing in response to my 5/18/2007 email, I issued the subpoena to the private investigator (Exhibit 59).

---

[16] I mention this because my efforts to collect financial documents to support potential money laundering charges –and also to corroborate victim statements – were later used as evidence of my "overreaching."

[17] Again, I mention this because it would later be used – by Epstein's counsel *and* Chief ▮ – as evidence of overreaching.

EFTA00225061

The following day, May 22, 2007, Mr. Lefcourt sent a letter to MAUSA  stating:

I understand from you that in the next month or two a decision will be made by your office whether to seek an indictment of Mr. Epstein. This will confirm that, prior to any such decision being made, I and other attorneys on behalf of Mr. Epstein will be given an opportunity to meet with you.

Additionally, . . . if our meeting does not resolve the matter, we would like an opportunity to make a presentation first to ▓▓▓▓▓▓▓▓▓▓, Chief of the Criminal Division, and ▓▓▓▓▓▓▓▓, First Assistant United States Attorney, and then, again, if no resolution is reached, the opportunity to meet with United States Attorney Alexander Acosta.

(Exhibit 28.)

AUSA ▓▓▓▓▓ and I were not part of the conversation where MAUSA ▓▓▓▓ disclosed the timeline to Mr. Lefcourt, so I was surprised by the letter, which sought multiple opportunities to meet with members of the Executive Division. Mr. ▓▓▓▓ responded, again, without meeting with AUSA ▓▓▓▓ or me, stating: "I think we are on the same page . . . I did say that if you want to meet with me again, I am ready to do so. The wording of your letter, however, suggests implicitly that I agreed to contact you before a decision is made to seek an indictment of Mr. Epstein. If that was your understanding, then please allow me to clarify. Our investigation is ongoing and if we decide to seek an indictment, we don't intend to call Mr. Epstein's representatives to let him know that. Of course, in the interim, if you would like to make a presentation to us, we are willing to listen. . . ." (Id.).

I strenuously objected and drafted an email setting forth the reasons why (id.). I shared it with my supervisor and she advised me not to send it. I orally advised MAUSA ▓▓▓▓ that I objected to meetings, delays, and strategic disclosures in a case like this one – a child exploitation case with a large number of victims. Nevertheless, the meeting was set for June 26, 2007. As I predicted, the defense asked Mr. ▓▓▓▓ for a list of our legal theories. I told him that I did not want to share them, and Mr. ▓▓▓▓ directed me to give the defense the list anyway. On June 18, 2007, I sent a letter to Gerald Lefcourt listing all the charges under investigation (Exhibit 53).

On June 14, 2007, I emailed the supervisory chain an addendum to the prosecution memo, asked about whether they wanted me to revise the indictment, and asked what materials they wanted prepared in advance of the June 26, 2007 meeting (Exhibit 31 at 1). I don't believe I received any responses.

On June 21, 2007, I emailed Chief ▓▓▓▓ again asking who would be attending the June 26, 2007 meeting and how I could best prepare (id. at 3-4). I noted that he had been communicating directly with Ms. Sanchez about the meeting (id.).

On June 25, 2007, Gerald Lefcourt provided written arguments for why Epstein should not be charged federally (Exhibit 32). The following day, Alan Dershowitz, Roy Black, Gerald Lefcourt, and Lilly Ann Sanchez presented their arguments to FAUSA ▓▓▓▓ and Chief ▓▓▓▓. S/A ▓▓▓▓, her supervisor, and I also attended (Exhibit 5). At some point during the meeting, Chief ▓▓▓▓ told the defense attorneys that they needn't address the money laundering statutes. I think he referred to them as "silly," without even having the benefit of my conversations

EFTA00225062

with IRS and AFMLS and my legal research.[18]   So Epstein's counsel focused on the child exploitation statutes. They falsely insisted that the use of the internet was needed for a 2422(b) charge and that some sort of force, fraud, or coercion was required for a 1591 charge because 16- and 17-year-old girls were "adults." They stated that there was no federal law prohibiting sex with children and one would be unconstitutional.

After the meeting, MAUSA ▇▇ and I analyzed the materials (Exhibit 32). We both concluded that the defense had overstated the strength of their position (*id.*). MAUSA ▇▇ felt that the 2422(b) charges were stronger than the 2423(b) charges because we would need proof that having a sexual massage was a motivation for Epstein's travel (*id.*). My research showed that different circuits had different standards of proof on the "purpose of travel" element (*id.*). I never received any feedback from Chief ▇▇ or FAUSA ▇▇ regarding Lefcourt's written presentation, but after the June 26, 2007 meeting, I was left with the impression that we were continuing towards indictment.

On July 3, 2007, at 6:26 a.m., I sent an email to ▇▇, ▇▇ ▇▇, and ▇▇ ▇▇ advising them about calls I had received from Lilly Ann Sanchez seeking to delay subpoena responses and their plans to present our Office with additional analysis as well as their planned resolution with the State Attorney's Office (Exhibit 3). I informed everyone of my proposed response regarding the subpoenas and that I intended to invite Lilly Ann Sanchez to call me to discuss a resolution of the federal investigation that could include concurrent time, i.e., a plea to a federal charge with a recommendation that the federal sentence would run concurrently with the state sentence (*See id.*) I asked whether anyone had had different conversations with any attorneys for Epstein so that there would not be any miscommunication.

Later that afternoon, ▇▇ ▇▇ sent me an email (using ▇▇ Blackberry) that read, "I told Lily that a state plea with jail time and sex offender status may satisfy the usa. It was a non-starter for them ▇▇". (*Id.*) Because I was in trial, I did not see Mr. ▇▇ email, so my proposed email to Ms. Sanchez went out on July 4th at 4:07p.m. (*Id.*) After my email to Ms. Sanchez went out, I saw Mr. ▇▇ email, and I responded with a vehement objection, telling him that I believed his plea offer was "completely unacceptable to the FBI, ICE, the victims, and me [and that these] plea negotiations violate the Ashcroft memo, the U.S. Attorney's Manual, and all of the various iterations of the victims' rights legislation." (*Id.*) I asked for the opportunity to make a presentation addressing the strengths of the case and the points raised by Epstein's attorneys – I felt that it was unfair that Epstein had been given numerous opportunities to meet with the management of the USAO and the victims had never had a similar chance (*Id.*)

Mr. ▇▇ responded by reprimanding me, stating, "[a]s you well know, the US Attorney has not even decided whether to go forward with a prosecution in this matter, thus you should have respected his position before engaging in plea negotiations." (*Id.*) I had not engaged in any plea negotiations, Mr. ▇▇ had. Mr. ▇▇ also wrote, directly contrary to what USA Acosta and FAUSA ▇▇ told me at the initial meeting in Miami, "it was made clear to you by the US Attorney and the First Assistant from the time when you were first authorized to investigate Mr. Epstein that the office had concerns about taking this case because of petit [*sic*] policy and a number of legal issues. Despite being told these things, you prepared a pros memo and indictment that included a definitive date for indictment." (*Id.*) Mr. ▇▇ also told me that my arguments

---

[18] Epstein's lawyers seized on this later.

EFTA00225063

that he had violated the Ashcroft memo, the USAM and other policies were not well taken because, as "Chief of the Criminal Division, I am the person designated by the US Attorney to exercise appropriate discretion in deciding whether certain pleas are appropriate and consistent with the Ashcroft memo and the USAM – not you." (*Id.*) Mr. ███ also told me that I could not dictate a meeting. (*Id.*)

On July 6, 2007, Gerald Lefcourt sent another letter further explaining why Epstein should not be charged with violations of § 2422(b) (Exhibit 33). Most of the letter raised policy arguments and the letter ended by expounding on Mr. Epstein's good works (*id.*).

On July 13, 2007, after I finished my trial, I responded to Mr. ███ reprimand, noting my frustration over the Office's failure to provide me with any guidance on its position on the matter.[19] I pointed out that I had handled this case the same as I had handled all of my other cases, by working with the agents to gather evidence and preparing an indictment package that established not just probable cause but proof beyond a reasonable doubt. I re-iterated that I was "asking to have the same courtesy that was extended to the defense attorneys extended to the FBI and an Assistant in the Office. . . . [And,] my first and only concern in this case . . . is the victims. If our personality differences threaten their access to justice, then please put someone on the case whom you trust more, and who will also protect their rights." (*Id.*) Mr. ███ never responded; nor did he allow me to make my requested presentation to USA Acosta. I do not know whether he shared my request with FAUSA ███ or USA Acosta.

Also on July 13, 2007, I received a letter from Roy Black complaining about the grand jury subpoena seeking Epstein's computer equipment (Exhibit 34). I shared the letter with MAUSA ███ (his handwritten notes appear on the Exhibit) and together we drafted a letter in response (Exhibit 32 at 4). On July 16, 2007, Lilly Ann Sanchez sent my letter to Mr. ███, writing that "Gerald Lefcourt and I would like to speak to you further regarding [my letter] since we do not believe that ███ letter was responsive to the issues raised by Roy Black." (Exhibit 32 at 1). Mr. ███ and I had a conference call with Ms. Sanchez and Mr. Lefcourt and informed them that they would have to file a motion to quash the subpoena. We then advised Mr. ███ of the history (Exhibit 62).

On July 19, 2007, I sent an email to MAUSA ███ and Chief ███ asking for permission to serve target letters on three of Epstein's personal assistants and for guidance on language to be used in the target letters (Exhibit 63). Mr. ███ responded that he was out of the District "but let's hold off on these until we decide what course of action we are going to take on epstein which should happen next week" (*id.*).

After these exchanges and being reprimanded by Criminal Chief ███ for raising those objections, I was not consulted again about a pre-indictment plea. On July 26, 2007, agents and supervisory personnel from the FBI and I traveled to a scheduled meeting with Chief ███ in

---

[19] For example, on May 21, 2007, I wrote to Chief ███ and FAUSA ███: "I have time set aside with the grand jury tomorrow, and I am wondering if you have a sense of the direction where we are headed – i.e., approval of an indictment something like the current draft, a complaint to allow for pre-indictment negotiations, an indictment drastically different from the current draft? I am concerned about confusing the grand jury, which is never a good thing. Any guidance?" (Exhibit 54). I did not receive a response.

EFTA00225064

Miami. That morning, before departing for Miami, I sent an email to Mr. ▮▮▮ and MAUSA ▮▮▮ that read, "in advance of our meeting this afternoon, I wanted to let you know my thoughts about some of the recommended changes [to the indictment] that we had discussed the last time I was in Miami . . ." (Exhibit 64). The FBI agents, their supervisor, their ASAIC, and I met with Mr. ▮▮▮. Criminal Chief ▮▮▮ entered the meeting and announced to us that "Alex [Acosta] has decided to offer a two-year state plea." We were not asked our opinions and the meeting ended soon thereafter (see Exhibit 5). I remember feeling stunned. I don't remember saying anything at the meeting.

In an attempt to provide some benefits to the victims and protections to the public, I asked that two terms be added to this two-year deal: (1) that the victims be provided compensation via 18 U.S.C. § 2255 as a substitute for restitution because Epstein was pleading to state charges; and (2) that Epstein be required to plead guilty to an offense requiring sex offender registration. The Office agreed to add these two terms. On July 31, 2007, I finalized a term sheet, entitled "CONFIDENTIAL PLEA NEGOTIATIONS: TERMS OF EPSTEIN NON-PROSECUTION AGREEMENT." (Exhibit 4.) On the same date, it was provided to counsel for Epstein. Present at the meeting for the government were FAUSA ▮▮▮, Criminal Chief ▮▮▮ ▮▮▮, MAUSA ▮▮▮ ▮▮▮, S/A ▮▮▮ ▮▮▮, S/A ▮▮▮ ▮▮▮, and myself, and for Epstein were Roy Black, Gerald Lefcourt, and Lilly Ann Sanchez. (See Exhibit 5.) At the meeting, counsel for Epstein stated that their client would not consider a plea that required state jail time. During the meeting, ▮▮▮ ▮▮▮ suggested a plea to a federal charge that would allow Epstein the opportunity to serve his sentence in a federal facility.

I was told that USA Acosta did not want to do a federal plea that bound the court to a two-year prison term, so I would have to find a charge or charges that resulted in a two-year statutory maximum. On August 1, 2007, Mr. ▮▮▮ advised that the counter-offer that Epstein's attorneys had promised did not arrive, and I told him that I had found a federal charge that could result in a 2-1/2 year statutory maximum (Exhibit 65).

On August 2, 2007, Lilly Ann Sanchez sent a counter-proposal directly to Criminal Chief ▮▮▮ ▮▮▮ and, in her email, stated that a copy would also be hand-delivered to USA Acosta (Exhibit 8.) The counter-proposal essentially called for home confinement, no sex offender registration, and an agreement to pay damages via 18 U.S.C. § 2255 (Exhibit 40). Ms. Sanchez also asked for a meeting with the U.S. Attorney (id.).

On August 3, 2007, Mr. ▮▮▮ sent a letter rejecting the counter-proposal, advising that a minimum of two years' imprisonment was needed to vindicate the federal interest, and that USA Acosta was not inclined to have a meeting (Exhibit 41). Mr. ▮▮▮ provided a deadline for August 17, 2007 to accept the plea offer (id.). That was Mr. ▮▮▮ last day of employment with the USAO before he entered private practice in New York.

Mr. Epstein's attorneys were incensed that USA Acosta had set a deadline of August 17, 2007 and would not meet with them, so they demanded a meeting with CEOS Chief ▮▮▮ ▮▮▮ (Exhibit 43). Mr. ▮▮▮ agreed to travel to Florida to meet with USA Acosta and Epstein's attorneys (id.). Mr. ▮▮▮ also traveled to West Palm Beach to meet with the agents and myself to go through the evidence and our analysis of the statutes (Exhibit 5). Before he came to West Palm Beach, I advised Mr. ▮▮▮ that I had worked with CEOS Trial Attorney ▮▮▮ ▮▮▮ on some of the legal issues and that, if there were a trial, I was hoping she might be able to assist (Exhibit 43).

EFTA00225065

In preparation for the planned meeting on September 7, 2007, FAUSA █████ emailed me to ask what the status of the plea negotiations were. I wrote:

> Here is the term sheet and guidelines calculation that we provided at the last meeting. You and █████ and I had also discussed a possible federal plea to an Information charging a 371 conspiracy, with a Rule 11 plea with a two-year cap, but I think █████ must have asked Alex about it and it was nixed. Just to be prepared for tomorrow, I was just starting to draft a Rule 11 Plea agreement in case Alex changes his mind and a formal non-prosecution agreement containing the state plea terms. . . . There are three concerns that I hope we can address tomorrow. . . . [including] that the agents and I have not reached out to the victims to get their approval, which as █████ politely reminded me, is required under the law.

(Exhibit 44).

On September 7, 2007, USA Acosta, FAUSA █████, CEOS Chief █████, AUSA █████, and I met with Kenneth Starr, Jay Lefkowitz, and Lilly Ann Sanchez (Exhibit 5). At the meeting, Mr. Starr focused primarily on federalism/policy arguments, and Mr. Epstein's background. I remember Mr. Starr thanking me for bringing § 2255 to their attention and that it would allow a state resolution that still provided the equivalent of federal restitution.

Following the meeting, there were communications between Gerald Lefcourt, USA Acosta, and MAUSA █████ that I was not privy to. The fact of the conversations was mentioned in later emails. Based upon those communications, on September 10, 2007, I was asked to send Mr. Lefcourt an office response to Lefcourt's counterproposal (*see* Exhibit 47 ("Gerry: As per your discussion with U.S. Attorney Acosta, I have attached the Office's written counterproposal.")). I sent Mr. Lefcourt a Non-Prosecution Agreement that required Epstein, *inter alia*, to:

(1) plead guilty to three state felony offenses, including lewd and lascivious battery on a child; solicitation of minors to engage in prostitution; and engaging in sexual activity with minors at least sixteen years of age;

(2) make a binding recommendation (with the State Attorney's Office) for the Court to impose a thirty-month sentence consisting of 20 months in prison followed by 10 months of community control;

(3) waive his right to appeal his conviction and sentence;

(4) concede that victims identified by the United States were victims for purposes of 18 U.S.C. § 2255; and

(5) plead guilty by September 28, 2007 and be sentenced by October 15, 2007.

(Exhibit 66).

The following day, FAUSA █████ forwarded to me USA Acosta's email with USA Acosta's revisions to the NPA (Exhibit 46). At FAUSA █████ request, I incorporated the changes and sent the new version to Mr. Lefcourt (Exhibits 47 and 67). On September 12, 2007, MAUSA █████, █████, and I met at the State Attorney's Office with State Attorney █████, ASA █████ Jay Lefkowitz, Gerry Lefcourt, and Jack Goldberger (Exhibit 5). The purpose of the meeting was to finalize and coordinate the terms of the state and federal agreements. Mr. Lefkowitz still expressed some interest in having Epstein serve his time in a federal facility,

Page 23 of 58

EFTA00225066

rather than a state one, and I remember Mr. Goldberger saying that because Mr. Epstein's home was on Palm Beach Island and touching the Intracoastal Waterway, it was somehow in "international waters" and federal jurisdiction. Other items that were discussed were: (1) that the state crime that Epstein agreed to plead guilty to was one requiring sex offender registration; and (2) that Epstein would be incarcerated 24-7 during the 20-month period of imprisonment. We left the meeting with an understanding that Epstein's counsel would contact us about whether Epstein wanted to plead to federal charges pursuant to a plea agreement or proceed with the Non-Prosecution Agreement. With that in mind, on September 13, 2007, I sent an email to USA Acosta, FAUSA ███████, MAUSA ███████, ███████ ███████, and ███████ ███████ advising them that I had researched three potential federal charges that could be used for Epstein, but they would all result in a 24-month maximum. If Epstein's counsel rejected those charges because of the 24-month exposure, I recommended reconsidering a binding Rule 11 plea "rather than try to create violations out of whole cloth" (Exhibit 46 at 19). I provided a proposed plea agreement and information containing two counts of violations of 18 U.S.C. § 403.

Mr. ███████ wrote to me later on September 13, 2007, "He is going to give us an assault on the plane or we can do conspiracy"[20] (Exhibit 46 at 21). I responded, "It would still have to be a conspiracy to commit an assault on a plane. I just want to make sure that we have something that is factually accurate. Just trying to plan ahead" (id.). At Jay Lefkowitz's request, MAUSA ███████ and I scheduled a conference call with him for early on the morning of September 14, 2007 (id. at 25). Mr. ███████ did not attend the conference call, and on the call, Jay Lefkowitz asked me to consider allowing Epstein to plead to charges that required only 12 months' imprisonment. I recommended 24 months' imprisonment. Lefkowitz said his client would plead to obstruction of a witness and one count of assault on an airplane (id. at 29). Despite Mr. ███████ earlier agreement to the assault on an airplane charge, he then decided that the "assault sounds like a stretch and factually sort of silly" (id. at 31).

I then went back to Mr. Lefkowitz with four options: (1) a plea only to state charges with 18 months' imprisonment; (2) federal and state pleas with a recommendation for concurrent time so that Epstein could serve his time in a federal facility; (3) a § 371 plea with a binding recommendation of 20 months' imprisonment (if USA Acosta approved it); or (4) an agreement that had a plea to one federal charge followed by one state charge (id. at 33). We continued to negotiate issues about how to provide restitution to the victims, and each iteration of the agreements seemed to move us further apart. As shown in Exhibit 46, each time Mr. Lefkowitz tried to reduce the period of incarceration; he tried to replace the state charge with one that did not require sex offender registration; and he kept changing the damages/restitution provisions to make it more difficult for the victims to obtain compensation; he removed the appeal waiver; he included an agreement that we would recommend an incorrect calculation of the guidelines. It was simply bad faith negotiations. I would point out how terms that were specifically rejected were re-inserted, and the Office would just send me back to the table.

The agreement was finally completed and signed on September 24, 2007.

4. **Explain fully the process and circumstances leading to the development of the following terms of the non-prosecution agreement:**

---

[20] This somehow resulted in 18 months' imprisonment. I do not recall how the prison term was decreased from 20 months on September 11, 2007 to 18 months on September 13, 2007.

EFTA00225067

a. **an 18-month period of incarceration in a state facility, including the basis for the determination that it sufficiently satisfied the federal interest in the case;**

As noted above, the only information that I received was from Mr. ███████ announcement that USA Acosta had decided to offer a two-year state deal. I do not know how Messrs. ███████ and Acosta determined that two years' incarceration sufficiently satisfied the federal interest in the case. During one meeting, Epstein's attorneys raised the possibility of a state-court plea with home confinement. USA Acosta specifically rejected the suggestion, noting that confinement in Mr. Epstein's home was not equivalent to incarceration. As discussed above, the 24-month term was reduced to 20 months and then, finally, to 18 months.

b. **victim restitution, including why and how to address victims' rights through 18 U.S.C. § 2255;**

The federal crimes that were under investigation all called for mandatory or discretionary restitution under 18 U.S.C. §§ 3663 and 3663A.[21] ███████████████████ from CEOS are experts in this area, but as PSC Coordinator, I knew that restitution in child exploitation cases was a hot-button issue at the time.

The District of Alaska USAO had a multi-victim child exploitation case with a wealthy defendant (Boehm) where they had set up a trust fund with a bank and a trustee. With ██████ ████████ help, I explored setting up a similar situation in the Epstein case (Exhibit 48), in connection with using a guardian ad litem ("GAL") for the victims,[22] if there had been a plea to federal charges. In cases like the Epstein cases, using a GAL seemed the most prudent course because, to the extent that the victims' interests ever diverged from the government's, the GAL could advocate on behalf of the victims. Thus, there are several emails between myself and Jay Lefkowitz about the appointment of a GAL and the possibility of a restitution trust fund similar to the *Boehm* case out of Alaska. I obtained the trust fund agreement and spoke with the AUSA in Alaska. The trust fund agreement was very complex and required a bank to agree to serve as the holder of the corpus and a trustee to oversee the administration of the trust, as well as the Court to

---

[21] Mandatory restitution under § 3663A requires a conviction for a "crime of violence, as defined in [18 U.S.C. §] 16." At the time, these cases would have been considered crimes of violence because sex trafficking, even via fraud or coercion, would likely be considered to "involve[] a substantial risk that physical force against the person . . . or another may be used in the course of committing the offense." 18 U.S.C. § 16(b). Post-*Johnson v. United States*, ___ U.S. ___, 135 S. Ct. 2551 (2015), a court might decide differently. *See, e.g., Menendez v. Whitaker*, 908 F.3d 467 (9th Cir. 2018). Even if not a crime of violence, a Court has the authority to impose an order of restitution when sentencing a defendant convicted of any offense under title 18 for any losses sustained by a victim as a result of the offense. 18 U.S.C. § 3663(a)(1)(A), (B)(i)(I). And the court also can order restitution to persons other than the victim of the charged offense if the parties so agree. 18 U.S.C. § 3663(a)(1)(A).

[22] I had been the first prosecutor in the S.D. Fla. to apply to the court for guardians ad litem for victims in child exploitation cases, so I was familiar with the procedure.

EFTA00225068

enter an order setting up the trust and a mechanism for resolving disputes amongst beneficiaries or between a beneficiary and the trustee.

In light of the amount of details and the number of victims involved, and the simple fact that, if there was only a state plea, there would be no federal judge to undertake the process, I knew that there was no way to accomplish a trust fund like *Boehm* within the confines of the NPA. In the *Boehm* case, there was a much smaller number of victims and, if I remember correctly, the victims were younger. The Alaska AUSA was able to confer with Boehm's victims and obtain their consent to the trust agreement procedure in advance of entering into the plea agreement. The Alaska AUSA also obtained the defendant's agreement to proceed *ex parte*. Our situation was quite different. There were more victims with disparate interests. In my emails, I made it clear that I could not bind the victims to such a procedure because I did not represent them. For example, how would the USAO decide on the size of the corpus of the trust? Would the USAO hire expert psychologists to evaluate the victims and economists to quantify their losses? If the USAO picked a number, would that preclude a victim from bringing a state tort claim? Would every victim receive the same amount? This is not how criminal restitution works – normally after a guilty plea, the Court's Probation Office works with victims to calculate losses, and issues are litigated at sentencing or within 90 days after sentencing. Lefkowitz was asking the USAO to pick a number virtually out of thin air to use as the corpus of the trust for a group of victims who were not clients of the USAO. We also would have to locate an independent bank to serve as the hold of the corpus. Given how difficult negotiating simple plea terms had been, I believed that creating an agreement of this sort was legally and logistically impossible.

When Epstein's attorneys approached USA Acosta in December 2007 and suggested that I rejected the Trust proposal for nefarious reasons, I outlined all of the concerns that I had previously expressed to Mr. Lefkowitz (Exhibit 55).

Once I was instructed that Epstein would be allowed to plead to state charges, I wanted to do what I could to place the victims and the community in the same position where they would have been in Epstein had pled to a federal offense. If Epstein had pled to one of the federal offenses under investigation, he would have been required to register as a sex offender and pay restitution to all victims of the federal offense. With regard to the restitution piece, I knew that the state investigation had not included all of the girls and young women whom we had identified and I was concerned that Epstein would avoid his restitution obligations if not forced to pay.[23]

As part of my duties as PSC Coordinator, on September 26, 2006, I had prepared a memo to management summarizing the Adam Walsh Child Protection and Safety Act of 2006 (the "Adam Walsh Act") (Exhibit 16). One of the provisions of the Adam Walsh Act that I noted was an amendment to 18 U.S.C. § 2255: "Section 2255 has been expanded to allow a person who, while a minor, was a victim of various child exploitation offenses, to pursue a civil action for personal injury damages – regardless of when the personal injury occurred. It also raises the presumptive damage amount to $150,000." (*Id.* at 7.) Although this was an amendment, I was unaware of § 2255 prior to preparing this September 2006 memo. The first few times I brought it

---

[23] In fact, the State Attorney's Office did not seek or obtain restitution for *any* victims in the state case, not even the two victims that were the basis of the state charges.

EFTA00225069

to the attention of others, they thought I was mis-citing 28 U.S.C. § 2255 and I had to explain that there actually was an 18 U.S.C. § 2255, which was a civil provision within the criminal code.

I do not know when I first discussed the possibility of using § 2255 as a replacement for the victims' lost restitution benefits, but I know that I conducted research on § 2255 cases on July 27, 2007 (Exhibit 37). That was the day after the meeting where Criminal Chief ██████ had announced that USA Acosta had decided to offer Epstein a two-year state plea (Exhibit 5).

Language regarding § 2255 was included in the plea agreement term sheet provided to Epstein's counsel on July 31, 2007 (Exhibit 38). The issue must have been raised in advance of the meeting, because that was the first meeting attended by Ken Starr, and he specifically thanked me for bringing § 2255 to their attention. On August 2, 2007, Lilly Ann Sanchez sent a letter to Criminal Chief ██████ making a series of counterproposals including: "Application of 18 U.S.C. § 2255" (Exhibit 40 at 2). Ms. Sanchez went on to explain:

> 18 U.S.C. 2255 provides that any minor who suffers injury as a result of the commission of certain offenses shall recover actual damages and the cost of any suit. It is important to note that Mr. Epstein is prepared to fully fund the identified group of victims which are the focus of the Office – that is, the 12 individuals noted at the meeting on July 31, 2007. This would allow the victims to be able to promptly put this behind them and go forward with their lives. If given the opportunity to opine as to the appropriateness of Mr. Epstein's proposal, in my extensive experience in these types of cases, the victims prefer a quick resolution with compensation for damages and will always support any disposition that eliminates the need for trial (*id.* at n.1).

Thus, the use of § 2255 as a replacement for restitution was not controversial – it was promoted by Epstein's own attorneys, including Mr. Starr. At one point during negotiations, Mr. Lefkowitz started advocating for a trust fund like the one used in *Boehm*, mostly, I believe, to try to place a cap on his damages exposure. I offered some potential solutions, including asking the federal court to appoint a guardian ad litem who could work with Epstein's counsel to see if the victims would be willing to agree to a Trust Fund, and I would facilitate those efforts, but I simply would not agree to something that I legally could not promise – a binding resolution for victims whom I did not represent.

Eventually, Mr. Lefkowitz made some changes to the § 2255 language but it remained quite close to the original proposal contained in the July 31, 2007 term sheet.

### c. immunity for co-conspirators, including unidentified co-conspirators; and

In looking through the drafts of the agreements, the immunity provision does not appear in any of the federal plea agreements that I drafted. Its first appearance is in a version of the NPA proposed by Jay Lefkowitz along with a proposed promise that the government would not seek immigration sanctions against any of the co-conspirators. It was initially rejected, and then after several iterations, Lefkowitz revised it to the language that appeared in the final NPA.

The final language was: "In consideration of Epstein's agreement to plead guilty and to provide compensation in the manner described above, if Epstein successfully fulfills all of the terms and conditions of this agreement, the United States also agrees that it will not institute any

EFTA00225070

criminal charges against any potential co-conspirators of Epstein, including but not limited to ▮▮▮ ▮▮, ▮▮▮ ▮▮, Lesley Groff, or ▮▮ ▮▮▮▮" (Exhibit 52 at 5). To the extent that there was a "criminal organization," the Office and the investigators considered Epstein to be the head of that organization. He was certainly the most culpable individual, and we did not foresee any scenario where we would defer prosecution against Epstein but proceed to prosecute his subordinates. Also, while the agreement included the language "including but not limited to," at the time that the NPA was signed, with the possible exception of Ghislaine Maxwell, the investigation had not disclosed any co-conspirators other than those listed.

I recall that there was extensive discussion of Lefkowitz's proposed immigration language, but I do not recall much discussion of this language for the reasons stated above.

### d. the October 2007 addendum, including its purpose.

During the negotiation of the NPA, I had been admitted to the hospital for surgery. After the surgery, I returned to the office almost immediately to try to complete the negotiations. When the NPA was signed, I sought permission to take a leave of absence to address my health concerns. While I was away, the Addendum was negotiated. While I conducted some of the drafting, I believe that FAUSA ▮▮▮ handled the bulk of the negotiations and drafting.

My understanding was that the USAO wanted to formally assign its right to select the attorney representative for the victims to a Special Master. The NPA stated that the USAO would select the attorney representative in consultation with and subject to the good faith approval of Epstein's counsel. I had provided Epstein's counsel with a list of attorneys, none of whom I had ever met, that I had culled from consulting with one of the district judges[24] and some AUSAs, including Mr. ▮▮▮, who I was dating at the time. After getting that list of names, I did my own research to determine who would be good fits for the type of litigation that I expected they would face – both in terms of the tactics of Epstein's lawyers and the special challenges of dealing with emotionally fragile victims. I provided that culled list to Jay Lefkowitz and disclosed that, although I had no financial interest, the list included a friend of a good friend of mine (I did not describe Mr. ▮▮▮ as my "boyfriend"). Even with that disclosure, Mr. Lefkowitz selected Mr. ▮▮▮ friend. Before the matter went any further, FAUSA ▮▮▮ decided that the Office should use a Special Master to make the selection, rather than pick anyone – even a panel of attorneys leaving the final selection to Epstein's counsel. Despite that, Mr. Lefkowitz and Guy Lewis – who knew both Mr. ▮▮▮ and his friend – claimed that there was a financial interest and that I had tried to create the procedure for financial gain.[25]

---

[24] Epstein's lawyers suggested that I had *ex parte* communications with a judge. I simply asked for recommendations from a judge that I was friendly with; I did not disclose anything about the background of the case.

[25] Mr. Lewis knew that Mr. ▮▮▮ also was an ▮▮▮ and, therefore, was not partners with another lawyer. When that was patently obvious, Epstein's lawyers falsely claimed that they were "law school roommates." Both had graduated from law school more than fifteen years before, and had not been roommates. Ironically, one of the reasons why Epstein's legal team approved the selection of Robert Josefsberg was that Josefsberg and Alan Dershowitz were law school classmates – somehow there was no "financial interest" attributed to them.

EFTA00225071

Rather than simply elect to use a Special Master to exercise its right to make the attorney representative selection, the USAO believed that it should formalize the assignment in writing.

5. **To the extent not evidenced in e-mails or other correspondence, identify and describe all interactions with defense counsel – such as phone conversations, meetings, or communications by private e-mail – that you or any other member of the government had regarding the investigation, potential prosecution, or negotiation of a resolution of this case. If at any point you became concerned about the nature of any member of the government's interaction with defense counsel, describe the interaction and explain when and why you became concerned.**

My communications with opposing counsel occurred primarily via email. Most of those communications were via office email, and some were from my home email. All of my home emails were collected and produced as part of the *Jane Doe* litigation. Negotiations were occurring at nights, on weekend, and while I was recuperating from surgery, and this occurred during a time when out of office access to email was very limited. I believe that only supervisors had Blackberry devices at that time.

The meetings that I attended are catalogued on the meeting timeline (Exhibit 5). I believe there was one other meeting soon after Epstein entered his guilty plea, when I went to Jack Goldberger's office and met with him and Mike Tein (Guy Lewis' law partner) about the victim list. Other than that, I do not recall any in-person meetings.

I had a couple of telephone conversations with Lilly Ann Sanchez and Guy Lewis at the start of the investigation that were very brief. Jeff ███ and/or ███ ███ was on some of these. I had telephone conversations later during the investigation with Lilly Ann Sanchez, Gerry Lefcourt, Roy Black, and Nate Dershowitz about subpoena responses. ███ ███ and ███ ███ were on some of those calls. I had telephone conversations with Jay Lefkowitz about plea negotiations and scheduling meetings. ███ ███, ███ ███, and ███ ███ were on some of those calls. I had numerous calls with Roy Black and Jack Goldberger about breaches of the NPA. ███ ███ was on most of those telephone calls.

From emails and conversations, I know that Messrs. Acosta, ███, ███, and ███ had numerous emails and conversations (mostly via telephone and possibly some in person) with members of the defense team. USA Acosta had contact with Ken Starr, Jay Lefkowitz, Gerry Lefcourt, and Alan Dershowitz. FAUSA ███ had contact with Alan Dershowitz, Gerry Lefcourt, and Lilly Ann Sanchez. Criminal Chief ███ had contact with Lilly Ann Sanchez and Gerry Lefcourt. There may have been other meetings that I was unaware of. I was concerned about the level of contact and the lack of consideration of the sanctity of the investigation. It was imperative to keep the investigation confidential to protect not just the victims' privacy rights, but to keep them from the harassment of overly aggressive lawyers. I felt that there were leaks of case-related facts and strategy, as well as personal matters that undermined my ability to deal with the defense and that ultimately was used by the defense to defame me and Mr. ███ with senior members of the Department of Justice.

EFTA00225072

6. **Provide a detailed description of all settlement negotiations conducted in this matter in which you took part or of which you were otherwise aware, including all terms of settlement that were discussed, considered, and rejected during the negotiations. Identify all individuals who participated in those negotiations, including government personnel and defense counsel. In each case, identify all participants and describe the discussions that occurred.**

Please see my response to Question A.3.

7. **Describe the interactions by you, or anyone else within the USAO, with any employees of the Palm Beach County State Attorney's Office concerning the federal or state investigation of Mr. Epstein, the terms of a proposed resolution of the case, and the terms of the federal non-prosecution agreement, including the terms of Mr. Epstein's incarceration.**

As noted above, my first interaction with anyone from the Palm Beach County State Attorney's Office about the Epstein case was at the Project Safe Childhood Conference in Washington, DC, when State Attorney Barry ▇▇▇▇ introduced himself to USA Acosta and me and started railing against the victims and the case.

My next interaction was with ASA ▇▇▇▇▇▇ at some later date. I was in her office, I believe on another matter, and I mentioned the case. She said that she "hated" the case and that she "hated" prostitution cases. She stated that some of the girls were not really victims because they had been paid "thousands of dollars." I was a bit taken aback because Ms. ▇▇▇▇ was the supervisor of the division charged with prosecuting child sex offenses, including child prostitution cases and, by definition, child prostitutes receive money.

Although not personal interactions, I also had collected and reviewed the state grand jury transcript, indictment, and the state investigative materials. I had conferred with former ASAs about the use of the grand jury in the case, which was very unusual. In Florida, only capital cases need to be presented to a grand jury – all other cases can proceed by Information – and one ASA in Palm Beach County handles the presentation of all of the cases to the grand jury. This case was unusual because it was presented to a grand jury unnecessarily and it was not presented by the regular grand jury ASA. The State Attorney also had told the press that a variety of charges had been presented to the grand jury and the jurors had selected the lowest charge of solicitation of prostitution (with no designation of age). The transcript gave no indication that multiple charging options were presented, and the jurors were only provided with evidence about one victim, not all of the victims who had been the subjects of the investigation.

I believe that the next interaction was on September 12, 2007, when I attended a meeting at the State Attorney's Office with ▇▇▇ ▇▇▇ and ▇▇▇▇ ▇▇▇▇. Jay Lefkowitz, Gerald Lefcourt, and Jack Goldberger attended on behalf of Mr. Epstein, and State Attorney ▇▇▇▇ and ASA ▇▇▇▇▇▇ were present. At some point in the past, one of Epstein's attorneys had falsely told State Attorney ▇▇▇▇ that a person from the USAO had referred to the SAO as "a joke." Messrs. ▇▇▇ and ▇▇▇ and I had to spend the first several minutes of the meeting convincing State Attorney ▇▇▇▇ that no one had ever said such a thing. After crossing that hurdle, we got to the core of the meeting, which was whether the SAO was in agreement with filing charges and seeking a sentence consisting with the terms of the NPA – that is, a plea to an

EFTA00225073

offense that required sex offender registration – namely, procuring a minor for prostitution in violation of Fl. Stat. 796.03; and a sentence totaling 18 or 20 months' imprisonment.[26] I recall that either Mr. ███ or I asked Ms. ███████ to confirm that § 796.03 required sex offender registration, and she said that it did. Epstein's attorneys also said that it did. We also specifically discussed that Epstein would be confined for the term of imprisonment. State Attorney ████ said that a term of imprisonment of longer than one year usually required placement in a state penitentiary, but there was a way to structure the sentence as a split sentence so that Epstein would be housed at the Palm Beach County Jail. And we again confirmed that Epstein would remain in custody at the jail, not home confinement or any other type of release and we were told that he would be in jail. We also discussed wrapping the matter up quickly because of the extensive delays.

On September 23, 2007, Jay Lefkowitz sent an email to Alex Acosta essentially admitting that, during the meeting on September 12, 2007, Epstein's attorneys and Ms. ███████ all believed that a conviction for Fl. Stat. 796.03, procurement of minors for prostitution, did *not* require sex offender registration – despite our specific inquiries (*see* Exhibit 51 ("I write to follow up on our conversation on Friday and to ask you to reconsider your decision to require that Mr. Epstein plead guilty to a registerable state charge. It appears that there was a *misunderstanding* at the meeting I had with Messrs. ███, ███, Goldberger, Lefcourt, Ms. ███ and Ms. ███████ . . . *Before the meeting*, Mr. ████, and Ms. ███████, a sex prosecutor for 13 years, told us that solicitation of a minor, under 796.03, is *not* a registerable offense. However, as it turned out, 796.03 is a registerable offense and our discussion at the meeting was based on a mistaken assumption." (emphasis added)).

On December 6, 2007, ASA ██████ contacted me to draft a factual proffer and advised that Epstein would be entering a guilty plea on December 21, 2007 (Exhibit 73). I did some research on 796.03 and prepared a draft that I shared with FAUSA █████, but he decided not to share the information with Ms. ███████ (*see id.*).

While drafting this response, I searched my electronic files for Mr. ████ name and discovered a document entitled "071214 Acosta Ltr to ███████" (Exhibit 69). I do not recall drafting this letter, although I located a cover email stating that I drafted this and two other letters for USA Acosta's signature that were directed to the State Attorney's Office (Exhibit 75). I do not know if any of the letters were ever sent to Mr. ████.

In May 2008, ███████ had a discussion with State Attorney █████ and █████ advised that he and Jack Goldberger had reached a new agreement for Epstein of 90 days in jail (Exhibit B-39).

On June 17, 2008, ███████ and I spoke with State Attorney █████. He complained that we had not been communicating with him, and we told him that Epstein's counsel had blocked the channels of communication (Exhibit 78). █████ said that he and Jack Goldberger had reached a new agreement where Epstein would plead guilty to "attempted lewd conduct" and be sentenced to 60 days in the County Jail followed by two years of community confinement (*id.*).

---

[26] As noted above, I do not recall the exact date when USA Acosta agreed that 18 months' imprisonment was sufficient.

EFTA00225074

On June 19, 2008, I sent an email to State Attorney ███████ advising him that we had spoken with Roy Black about wrapping up both the state and federal cases (Exhibit 68). I reminded State Attorney ███████ that the signed NPA required a plea to the current state indictment and to an information charging an offense that requires sex offender registration, namely procuring minors to engage in prostitution, with a sentence of at least 18 months' imprisonment (*id.*).

I attended the change of plea on June 30, 2008 but did not have any contact with any member of the SAO that day. Later, when the issue arose regarding whether or not Epstein was taking the position that the NPA included USA Acosta's December 2007 letter, I contacted Ms. ███████ and SA ███████ to obtain a copy of what Epstein's counsel had filed in state court.

In September 2008, I had communications with Mr. ███████ about a suit filed in state court to unseal the NPA (Exhibit 70).

At some point, Mr. ███████ sent me an email about wanting to buy me a cup of coffee. I was not able to find the email while preparing this response, but with additional time, I can probably locate it. I don't believe I ever answered Mr. ███████. I know I never met him for coffee.

I recall that in many of Epstein's letters to the Justice Department, there were complaints of a lack of coordination between the USAO and the SAO. That lack of coordination was not caused by the government agencies, but, rather, by the tactics of Epstein's counsel. For example, Epstein's counsel insisted that I should conduct a completely independent review of the evidence so that I would not be tainted by bias from the PBPD or the SAO. When I did so and reached a conclusion that they did not like, Epstein's attorneys insisted that Criminal Chief ███████ and that CEOS conduct similarly sterile reviews free from the "taint" of me and the federal agents. If Ms. ███████ and I or the agents and I reached out to the SAO to discuss how the NPA should be worded to insure that we were getting correct information from Epstein's attorneys, we were accused of "infringing on the SAO's discretion." Yet, that "lack of coordination" that Epstein's attorneys caused, was later held up to the DAAG, the AAG, and DAG, as violations of the *Petite* policy's state-federal coordination requirement.

8. **Describe any research conducted by you, or anyone else within the USAO, into law or policy regarding any of the following issues:**

   a. **The propriety of permitting a person to plead guilty to state court charges in exchange for an agreement by the USAO to refrain from federal prosecution. In your response, you should identify any USAO or Department policies that were considered by the USAO, and any effort by the USAO to obtain guidance or approval from the Department to use a non-prosecution agreement to resolve this case.**

I did not do any research on this point. I do not know whether USA Acosta or Criminal Chief ███████ conducted any research or obtained any guidance or approval from the Department.

EFTA00225075

**b. The propriety of including in a non-prosecution agreement with Mr. Epstein a provision that the federal government would forgo prosecution of any potential co-conspirators of Mr. Epstein, including unidentified co-conspirators.**

I do not recall doing any research on this particular point, other than discussing with MAUSA ███ that we would not pursue an investigation into Epstein's subordinates after closing the investigation of Epstein.

**c. The propriety of including in the non-prosecution agreement a provision incorporating 18 U.S.C. § 2255.**

As noted above, I became familiar with § 2255 through my work as the PSC Coordinator. I also was aware, as set forth in the victim notification letters that I prepared, that, under the CVRA, I was obligated to use my "best efforts" to protect the victims' rights to "full and timely restitution as provided in law." 18 U.S.C. § 3771(a)(6). As I discussed above, restitution in child exploitation cases was an issue of growing concern, so I was mindful that this plea mechanism that Criminal Chief ███ had devised with Lilly Ann Sanchez would extinguish the victims' right to restitution. That was one of the reasons why, on July 4, 2007, I wrote to Mr. ███ that I believed the plea proposal violated the victims' rights legislation.

When Mr. ███ announced in late July that USA Acosta was going forward with the two-year state plea offer despite those concerns, I undertook my best efforts to still afford those restitution rights to the victims identified through the federal investigation. Immediately after the meeting where Mr. ███ announced to me and the investigative team that USA Acosta intended to offer a state plea, I delved further into the requirements for claims under § 2255 (Exhibit 37). While § 2255 is a civil damages statute, not a criminal restitution provision, the criminal restitution statutory scheme recognizes that there is some overlap. *See* 18 U.S.C. § 3664(j)(2)(A), (l). Section 2255 also provides for attorneys' fees, just as courts can use court funds to appoint guardians ad litem for minor victims in criminal cases who can advocate for restitution for the victims. My review of the legislative history led me to conclude that the inclusion of a provision under § 2255 would be the best way to protect the victims' right to restitution. CEOS Chief ███ described the agreement as "a very significant result that will serve the victims well" (Exhibit 71).

I should note that a plea to one of the federal crimes under investigation – with a 24-month binding sentencing recommendation – would have achieved USA Acosta's desired outcomes (24 months' imprisonment[27] and sex offender registration); would have provided federally mandated restitution for the victims; and would have provided victims with court-funded representation via the guardian ad litem program for those who needed it. All of these contortions were brought about by the decision to use a state plea to resolve a federal investigation.

---

[27] As noted above, I was never told the source of the 24-month figure. In my opinion, a straight § 371 plea, with a five-year statutory maximum, was a significant concession.

EFTA00225076

    d.  **How the Florida state judicial system would address issues pertaining to the terms of Mr. Epstein's incarceration, including designation of an appropriate facility, the availability of work release (or any similar release condition), and the availability of other privileges. Identify whether such research was conducted before or after the non-prosecution agreement was signed, and whether it was conducted before or after Mr. Epstein entered his state court plea. Describe any communications you or other USAO personnel had with representatives of the Palm Beach County State Attorney's Office, other law enforcement, or local corrections officials regarding these matters.**

One of my concerns about using a state forum to resolve this case was that it left our Office with no control over the process. We also did not have any members of our team who had experience with the Palm Beach County state courts – Criminal Chief ████ had been a state prosecutor in New York before joining the USAO; I had been in private practice. Similarly, no one else involved in the process had been an ASA or even a criminal defense attorney in Palm Beach County. The defense team, on the other hand, included Roy Black and Jack Goldberger, who had extensive state court criminal experience in Palm Beach County. Any litigator will tell you that knowing the Court is a key component of success, so we were placed at a distinct disadvantage. It was exacerbated by defense counsel's tactics of prohibiting coordination between the USAO and the SAO – which somehow was successful.[28] It also required the USAO to place an inordinate amount of trust in the SAO, when one of the reasons for opening the federal investigation was the concerns that undue influence had been brought to bear on the State Attorney.[29]

The loss of control did not just end with the Court proceedings, it included how the sentence would be executed. Federal sentences are executed by the U.S. Marshals and the Bureau of Prisons. All are housed within the Department of Justice and have clearly written rules and regulations. BOP is used to housing wealthy, politically-connected offenders and would be less likely to be unduly influenced by Epstein.

I attempted to build some certainty back into the agreement through several provisions. First, I selected the state statutes that Epstein would have to plead guilty to and conducted my own research to confirm that they required sex offender registration. Second, I included language that

---

[28] Epstein's team was equally successful in DC, where they dictated who could and could not participate in the "independent review" at CEOS. For example, ████ ████, who had not yet joined the Leap Year team, was excluded from consideration because she had disagreed with Lilly Ann Sanchez about the handling of an obscenity case while Ms. Sanchez was an AUSA.

[29] According to PBPD Chief ████, the State Attorney initially planned to file no charges against Epstein. Following complaints, the SAO planned to charge Epstein with a misdemeanor solicitation of adult prostitution charge. Then, after the police chief complained further, the State Attorney assertedly presented "multiple charges" to the grand jury, and they "elected" to return an indictment charging one felony count of soliciting adult prostitution. The State Attorney did not intend to charge an offense requiring sex offender registration and was only seeking a sentence of probation.

EFTA00225077

he would have to plead guilty, not nolo contendere. Third, I researched different terms that Florida courts would use that appeared to impose a term of incarceration, but really imposed something else, and prohibited those sentences ("Epstein shall be sentenced to consecutive terms of twelve (12) months and six (6) months in county jail for all charges, *without any opportunity for withholding adjudication or sentencing, and without probation or community control is lieu of imprisonment*" (Exhibit 52 at 3 (emphasis added)). Fourth, I included a waiver of the right to challenge the Information and an appeal waiver. Fifth, I included a requirement that Epstein would have to provide the USAO with a copy of his plea agreement with the SAO before he signed it. Sixth, I required Epstein to use his best efforts to enter his guilty plea within approximately 30 days and an agreement that that term (like all others) was material. Seventh, I included an agreement that Epstein would not be afforded any gain time benefits different from any other inmate, and that he would provide an accounting of gain time if asked. Finally, "breach of any one of these conditions allows the United States to elect to terminate the agreement and to investigate and prosecute Epstein and any other individual or entity for any and all federal offenses" (*id.* at 6).

In addition to the terms of the NPA, the agents and I also did our best to make sure that Epstein would be serving jail time like anyone else. Prior to the September 12, 2007 meeting at the State Attorney's Office, I spoke with ███ ███ and emailed ██████ about research I had conducted on Florida sentencing practices to avoid "trucks up the sleeves of the defense" (Exhibit 46 at 1.) Normally a defendant who is sentenced to a term of prison in excess of 12 months must go to a state prison. The Office did not object to "splitting" Epstein's sentence into two pieces – 12 months followed by 6 months – so that he would be eligible to be housed at the Palm Beach County Jail. All of us were, however, insistent that Mr. Epstein would actually serve out his term at the jail like any other prisoner. At the September 12, 2007 meeting with the State Attorney's Office, this issue was specifically addressed, and State Attorney ██████ assured us that Epstein would be at the Palm Beach County Jail (it is referred to as "Gun Club" because it is located on Gun Club Road). I remember that they discussed that Epstein would be kept in solitary confinement "for his own safety."

After that meeting, the case agents went to meet with the jail about the issue of work release. I do not recall the exact date. On November 14, 2007, I sought FAUSA ██████ permission to meet with State Attorney ██████ after ASA ██████ stood up the agents a few times. The purpose of my meeting was "to clear up the issue regarding sex offender registration/work release and also should be able to tell us whether a plea and sentencing can be scheduled this month" (Exhibit 72). FAUSA ███ and Acting MAUSA ███ ███ had conversations with the State Attorney and Jay Lefkowitz who both confirmed that Epstein would "be a sex offender and he'll be treated like any other sex offender" (Exhibit 76 at 2). On November 16, 2007, the case agents met with ASA ██████ who said that Epstein would be housed at the Palm Beach County Jail, so the Palm Beach Sheriff's Office would be in charge of whether Epstein would be eligible for work release (*id.* at 1). Special Agent ██████ confirmed on November 16, 2007 that Epstein would not qualify for work release as a sex offender unless the judge specially ordered it (*id.*).

As noted above, when we learned that Epstein's attorneys were negotiating a new deal with the State Attorney's Office, ███ ███ and I firmly informed Epstein's attorneys and the State Attorney's Office that there was a signed agreement. While they were free to negotiate whatever they wanted, the terms they were discussing violated the NPA.

EFTA00225078

In June 2008, when Epstein had exhausted his appeals to the DAG, in accordance with the NPA, I asked to see the plea agreement that his attorneys had negotiated with the State Attorney's Office to insure that it was consistent with the NPA (Exhibit 77). After a number of requests to Roy Black and Jack Goldberger, I finally received the document (*id.*). After conferring with an AUSA who had previously worked at the Palm Beach County SAO, and with FAUSA ███, I informed Messrs. Goldberger and Black that the agreement was insufficient because it did not specify that the defendant was supposed to serve his sentence in a custodial setting (*id.*). After providing the written notice, Mr. Goldberger agreed to make the change (*id.*) Goldberger also called me and "'swore' [his word] that Epstein would be in custody 24-hours-a-day during the community confinement portion of the sentence" (Exhibit 79).

The agents also confirmed with local officers that the language in the state plea agreement suggested that Epstein would be at the Palm Beach County Detention Center, a/k/a the Palm Beach County Jail, and that, during their meeting with PBSO Col. ███ several months before, he had assured them that Epstein would be ineligible for work release (Exhibit 80). Nonetheless, we decided that we would go meet with the Colonel together. ███ ███ joined us, and we learned that, despite the language in the agreement, Epstein was housed at the stockade rather than the jail (a lower security "camp-style" facility) (Exhibit 81). ███ also told us that Epstein would be eligible for work release and will be placed on work release – directly contradicting what he had told the agents a few months before (*id.*).[30] We asked Col. ███ to let us know if Epstein did, in fact, apply for work release.

We never received any notice of Epstein's application. Instead, on November 20, 2008, when ███ stopped by to see ███ ███ on another matter, he told her that Epstein had been on work release for the past few weeks (Exhibit 82). S/A ███ spoke with the work release coordinator who told her that he was led to believe that the USAO and FBI knew that Epstein had applied for the program. He also said that he had been threatened with being sued if he didn't allow Epstein to participate (*id.*) I reviewed my emails and notes of conversations with Black, Goldberger, and other defense counsel about Epstein being incarcerated for the full 18 months (except for credit for "gain time"). Criminal Chief ███ advised me to determine if there was sufficient support to show a breach. After correspondence with Roy Black and a telephone conference with Mr. Black and Jay Lefkowitz, we were advised that USA Acosta had informed Mr. Lefkowitz[31] that Epstein could be considered for any program that was available to other prisoners. At that point, I was unable to press forward with a breach, so I conducted an in-depth review of Epstein's application and found numerous false statements that, in my opinion, should have made the Sheriff's Office reverse its position regarding work release. I drafted a letter cataloguing all of the misstatements and conflicts of interest (e.g., Epstein's work release supervisor was one of his employees who lived in New Jersey) and submitted it to the Sheriff's Office (Exhibits 83 and 84). I never received a response from the Sheriff's Office.

---

[30] ███ also said that Jack Goldberger had threatened that "Ken Starr and the whole crew" would sue the jail if Epstein received less favorable treatment than others (*id.*).

[31] I do not recall whether Alan Dershowitz or Ken Starr also was present for this meeting, but no one else from the USAO was present.

EFTA00225079

9. **Describe all efforts made by you, or by anyone else within the USAO, to ensure that Mr. Epstein complied with the terms of the non-prosecution agreement (including its addendum) that he signed. Include in your response a discussion of all breaches of the agreement by Mr. Epstein of which the USAO was aware, and explain why the USAO decided not to rescind the agreement as a consequence of such non-compliance, who was involved in that decision, and how the decision was made.**

Many instances of notices of breach have been catalogued throughout this letter, as well as my efforts to force Epstein to abide by the terms of the NPA prior to declaring a breach (e.g., resisting efforts to change the state plea to one that did not require sex offender registration; requiring Epstein's counsel to provide us with copies of the state plea agreement before the plea; requiring the appointment of the attorney-representative who representative the victims; etc.). The attempt to declare a breach in connection with Epstein's application for work release is discussed above.

In June 2009, Epstein and his lawyers tried to dismiss a lawsuit filed in the Southern District of Florida by the attorney-representative on behalf of one of the identified victims that raised a single claim under 18 U.S.C. § 2255. I prepared a lengthy memorandum analyzing why Epstein's actions were a breach and seeking permission to serve a breach letter (Exhibit 85). The Office approved the request to serve the breach letter. At the same time, the indictment package was re-reviewed and approved (Exhibit 86). The notice of breach letter was served on June 12, 2009 (Exhibit 87). Epstein promptly "cured" the breach, but I took the opportunity to catalogue his past breaches and advised that continuing on that course of conduct would no longer be tolerated (Exhibit 88). Perhaps sensing that the Office's patience had waned, perhaps having gained a greater understanding (through the civil litigation) of the strength of the potential criminal case, Epstein's counsel expressed a greater interest in avoiding problems. While I demurred on their request that I essentially offer "advisory opinions," I suggested that Mr. Epstein should "take all of his obligations seriously and elect to err on the side of caution in making decisions that relate to the performance of his duties" (Exhibit 89).

In consideration of my warnings, Mr. Black contacted the USAO to advise us in advance that Mr. Epstein was seeking to transfer his community control to the Virgin Islands and wanted our position (Exhibit 90). Having the experience of all of the false statements on Epstein's application for work release, I immediately sought the application from Mr. Goldberger, but it was never provided. I became concerned that Epstein's attorneys would use the delay engendered by Mr. Goldberger's failure to provide me with the application as a bar to any objection, so I provided a letter with preliminary objections (Exhibit 91). I noted that: "Throughout the negotiation of the NPA, representations were repeatedly made by you and your colleagues that Mr. Epstein would serve his complete sentence, including community control, in Palm Beach County. During his change of plea and sentencing, Mr. Epstein told the Court that he intended to remain in Palm Beach County during his period of community control – a fact that was important to Judge Pucillo in making her decision whether or not to accept the plea agreement. Mr. Epstein's presence in Palm Beach County was important to the Court, our Office, and, presumably, the State Attorney's Office, because it allowed all of these entities to monitor Mr. Epstein's performance of his obligations. Relocating to the Virgin Islands, where Mr. Epstein lives on a private island without any independent law enforcement presence, would eliminate that ability" (*id.*). Following my letter, Mr. Epstein did not follow through on his application to transfer to the Virgin Islands.

EFTA00225080

10. **Identify any cases in which you have been involved as an AUSA, or of which you were otherwise aware, that were resolved through a non-prosecution agreement.**

I have not been involved in, nor am I aware of, any other cases that have been resolved via a non-prosecution agreement. On one occasion, in my eighteen years with the Justice Department, I recommended a Pre-Trial Diversion agreement for a doctor who wrote and filled a small number of fraudulent opioid prescriptions that she took herself for her post-cancer pain. The recommendation was vetted and approved through the chain of command in accordance with Department policy (the USAM) and the USAO's Criminal Circular.

## B. CVRA Compliance

1. **Describe your understanding of any USAO, Department, or FBI policy or practice regarding victim notification rights, obligations, or procedures that were in effect from the time the federal investigation of Mr. Epstein began to the time that he entered his state plea, including the applicability of the CVRA to cases resolved through non-prosecution agreements, and identify the source(s) of such understanding. Explain when and how you became aware of such policy or practice. Describe your prior experience notifying victims under the CVRA. Explain whether and how victim notifications in the Epstein case departed from the USAO's general practice.**

My understanding of USAO/DOJ victim notifications policies that were in effect in 2006-2007 had come from my own work on PSC cases. I do not recall receiving any training from the USAO on the CVRA or the AG's Guidelines on Victims' Rights prior to the Epstein case. I was familiar with the CVRA, the Victims' Rights and Restitution Act, and other pieces of victims' rights legislation, primarily from two prior cases that I had handled. In *United States v. O'Neil*, I had litigated the Office's first case where a defendant objected to a victim impact statement. It was a case where a 41-year-old man gave a lethal overdose of heroin to his 23-year-old girlfriend. The victim's mother, other family members, and the owner of the rehab center where the defendant had recruited the victim all asked to address the Court. I cited the CVRA and other statutes to support the Court's authority to hear from them. The second case was *United States v. Oliver*, which was the Office's first case seeking the appointment of a guardian ad litem (GAL). Through these cases, I researched statutes, cases, the USAM, and the AG Guidelines. I recall that the Guidelines were often described themselves as a floor, not a ceiling. *See, e.g., Attorney General Guideline for Victim and Witness Assistance* (May 2005) at 8 ("A strong presumption exists in favor of providing rather than withholding assistance and services to victims and witnesses of crime."). Like most PSC prosecutors and investigators, the agents and I treated the AG's Guidelines as a floor and tried to provide a higher standard of contact.

That is why, during the Epstein investigation, victim rights notification letters were provided at the first meeting between the agents and victims encouraging victims to contact me directly with questions and concerns. Throughout the investigation, I tried to meet in person with as many victims as possible and talk through their concerns. Many were afraid of Mr. Epstein; many were afraid that their reputations would be ruined; almost all wanted to just put the episode(s) behind them. Some had not even told their parents about what had happened and did not want

EFTA00225081

their parents to know. Several girls needed counseling and at least one attempted suicide. S/As ████████ and ████████, Victim-Witness Specialist ████, and I all worked to find counseling for those who wanted it through Palm Beach County Victim Services, and I reported the issues to ████ ██████, ██ ████ (when he was still in West Palm Beach), and ████████. I also recall sending and receiving emails regarding the emotional toll on the victims when agents and I enquired into the status of the indictment review.

With regard to specific office procedures at the time of the Epstein investigation, there was no victim-witness coordinator in West Palm Beach and no standardized way to do any victim notifications prior to indictment. Our Office's procedure – which was still being developed at the time of the Epstein investigation – required a victim list to be submitted along with the indictment package. That victim list would be used to notify victims of upcoming court proceedings – to the extent that those upcoming court dates appeared in the case tracking system used at the time. Conferring with victims regarding plea negotiations could not happen through that victim notification system, so my practice, when possible, was to ask agents to work with me to contact victims about a potential plea. I also asked agents to work with me to notify victims of court dates because I knew there was a delay with the victim notification system. For example, often a defendant will decide the day before or the day of calendar call or trial to plead guilty. If it is a case with victims, like a bank robbery case, the agents and I will do our best to contact the victims to advise and confer, and to invite the victims to appear at the change of plea if they wish. The victims also are informed that they will have the opportunity to give a victim impact statement for purposes of sentencing.

In child exploitations cases where there has been a lot of contact with the victims, these last-minute interactions are less likely. I usually discuss potential plea scenarios with the parents/victims/GALs in advance and the judges aren't as rushed. The exception is child pornography possession/distribution cases, where the victims often are not identified prior to the plea.[32] Especially during the time of the Epstein investigation, the procedures for identifying victims in child pornography cases were in their infancy. Now, victims from many child pornography "series" have been identified and have attorney contact information for purposes of restitution. CEOS' ████████████ is the national expert in this area.

To summarize, my understanding of my obligation was: to do my best to notify victims of upcoming court proceedings and to make them feel welcome to – but not obligated to – participate (unless subpoenaed, of course); to guard their privacy and help them navigate the process to come out as unscathed as possible; to insure their safety from interference from the defendant; to listen to their desires in terms of prosecution, plea, and sentencing and balance that with the other factors that go into prosecutorial discretion[33] in making decisions about the case; and to be mindful that decisions that I and the Office made would impact them. I understood that conferring with the victims did not mean that I had to agree with them or that they could override an Office decision. For example, in the *Oliver* case, we had a plea offer for a lengthy sentence. The victim's father believed that we should take the case to trial. The GAL and I did not believe that, given the age

---

[32] These are cases where the defendant is not believed to be involved in the production of the child pornography.

[33] Those other factors include the need to do justice, to deter the defendant and others, and to consider the impact of the prosecution on the local and national community.

EFTA00225082

of the defendant, it made sense to put the victim, who was, I believe, 9 years' old at the time, through the stress of a trial. After conferring with my supervisor, we decided to go forward with the change of plea. The victim's father and the GAL made victim-impact statements and, in the end, the judge imposed a sentence of 140 years' imprisonment followed by lifetime supervised release.

With regard to the Epstein investigation in particular, the handling of victim notifications varied from my understanding and my practice in two significant ways. First, it never occurred to me that this was not a situation where conferring with the victims was required. I specifically informed the Office in writing on two occasions and orally on other occasions, that I thought the victims should be consulted before entering into the Non-Prosecution Agreement.[34] The first of these written reminders was in July 2007 when I learned that Criminal Chief ███████ had engaged in plea discussions with Lilly Ann Sanchez. (Exhibit 3.) The second was in early September 2007 after my discussion with CEOS Chief ██████████ regarding this subject. (Exhibit 44.) Later, I believe after the NPA was already signed, ██████ told me that the Office had taken the position in other cases that there is no obligation to confer in the absence of the filing of a federal case, but I don't recall discussing that at the time.[35] I had never before used a non-prosecution

---

[34] As I noted in my filings in the *Jane Doe v. United States* litigation, I had concerns about informing the victims that part of the negotiations involved securing for them the right to obtain damages from Epstein until we knew that Epstein would, in fact, enter into and perform his obligations under the NPA. As stated above, during the State investigation, Epstein's counsel had frequently accused the victims of faking or exaggerating their statements for purposes of civil damages claims. In a deposition for one of the civil suits, one of Epstein's lawyers later falsely accused ███████ and me of telling a victim that she could get damages from Epstein if she told the FBI that Epstein had assaulted her. (I can locate and redact this transcript.) I nevertheless believed that we could and should have discussed other aspects of the NPA with them – that is, the state guilty plea, sex offender registration, and the sentence. The AG Guidelines specifically take into account situations like this, so I could have discussed jail time, sex offender registration, avoiding trial, the right to address the court at sentencing, but, applying my discretion, decided not to tell them about the monetary portion of the agreement. *See 2005 AG Guidelines* at 30 ("In determining what is reasonable [in notifying identified victims about prospective plea negotiations] the responsible official should consider factors relevant to the wisdom and practicality of giving notice and considering views in the context of the particular case, including, but not limited to, . . . [w]hether the victim is a possible witness in the case and the effect that relating any information may have on the defendant's right to a fair trial.").

[35] Regardless of that position, as noted earlier, the decision to resolve the case through a non-prosecution agreement was made by Chief ███████, and his email of July 5, 2007 informed me that he was the person vested with the discretion to vary from any Department policy and that he had undertaken his actions with USA Acosta's knowledge. I relied upon their knowledge of the CVRA and exercise of discretion on this issue. (*See* Exhibit 3; *see also 2005 AG Guidelines* at 10-11 ("Pursuant to 42 U.S.C. § 10607(a), the Attorney General is request to designate persons in the Department of Justice who will be responsible for identifying the victims of crime and performing the services described in that section. These persons are referred to as 'responsible officials' in the statute and throughout these *AG Guidelines*. . . . Responsible officials may delegate their responsibilities under these *AG Guidelines* to subordinates in appropriate circumstances, but

EFTA00225083

agreement or deferred prosecution in favor of state prosecution in the way that the Epstein case was handled. I believed that the fairest course was to consult with the victims before the execution of any agreement.

The second significant departure from my regular practice was the victim notification procedure. Never before or since have I shared "drafts" of victim notifications with counsel for the defendants. The CVRA places the entire burden of complying with the Act on the government and the court and provides that a "person accused of the crime may not obtain any form of relief under this Chapter." 18 U.S.C. § 3771(d)(1) (2004). But, in this case, I was required to provide draft victim notification letters, rewrite them due to objections from defense counsel, and refrain from sending them altogether. My protestations appear in my emails, and were shared with the agents, my legal assistant, and my supervisors.

With regard to FBI policies and practices, I understood that the FBI had its own victim notification procedures. I had previously worked with ██████ ████ on other cases (and worked with her on other cases after the Epstein investigation). I did not know the details of what FBI included in its letters or when they were sent. I did not instruct FBI on what to send or when to send it. My general rule is to tell agencies to follow their regular procedures. I don't remember saying anything different in this case. I did not see any FBI letters in this case prior to collecting the FBI letters to Brad Edwards' clients in connection with the *Jane Doe v. United States* litigation. I did not instruct the FBI to include the language about the case being under investigation and that they should be patient.

> **2. Identify all victims in this case to whom written or oral notifications were made, when and how each notification was made, and the contents of the notifications. Explain why notifications were made to some victims, and not to others, and who was responsible for those decisions.**

On the attached chart (Exhibit B-1), I listed all of the individuals identified as victims during the state investigation, the federal investigation, or after Epstein entered his state guilty plea, but who were brought to my attention by various attorneys. The chart lays out how and when each was contacted. Due to the passage of time, it is impossible for me to give exact dates and the exact content of each conversation. Also, there are some victims that I specifically remember meeting with. There are some that I know I did not meet with. There are others that I believe I met with, but I am not certain. I have qualified my answers on the chart accordingly.

On August 4, 2006, I prepared 24 Victim Notification Letters for victims who had been identified during the state investigation. (Exhibit 12.) These were provided to Special Agent ████████ to hand-deliver to victims during interviews. I decided to prepare these letters and I decided on the content of those letters.

On August 11, 2006, 18 amended letters were prepared. (Exhibit 13.) These letters clarified that the recipients were victims and/or witnesses, since we had not yet been able to confirm that they were minors during the time of their encounters with Epstein and we were still working to confirm federal jurisdiction. People who had already received the August 4, 2006

---

responsible officials remain obliged to ensure that all such delegated responsibilities are discharged. The Attorney General designates the following responsible officials: . . . For cases in which charges have been filed—the U.S. Attorney in whose district the prosecution is pending.")

EFTA00225084

letters did not receive August 11, 2006 letters. If an August 11, 2006 letter was prepared, I believe that meant that the agents had not yet made contact with the person and the agents discarded the August 4, 2006 letter. We included letters for witnesses who we knew were over the age of 18 to advise them to contact us if they felt they were being harassed because the agents had learned of potential harassment during the early set of interviews. I decided to prepare these letters after discussing the issue with Special Agent ████████ and I decided on the content of those letters.

Although I do not have a clear recollection of this, I believe that a new letter was issued for Individual #4 because the agents had difficulty interviewing her and did not want to provide her with a letter that was several months old. On June 7, 2007, I simply printed the same letter with a new date and signed it. (Exhibit 30.) I do not believe that the August 11, 2006 letter was ever provided to her. The same explanation applies for the June 7, 2007 letters for Individuals 9, 31, 38, and 43. (Exhibit 30.) Individuals 3 and 40 were not identified until several months into the federal investigation. Victim notification letters were prepared for them on June 7, 2007. (Exhibit 30.) I decided to prepare these letters after discussing the issue with Special Agent ████████ and I decided on the content of the letters.

As discussed above, in July 2007 and September 2007, I raised in writing the need to confer with the victims regarding the proposed agreement with Epstein. I also raised the issue in internal conversations with supervisors, agents, and others. I was told that I could not discuss the matter with the victims. (*See* Exhibits 3 and 44.)

After the Non-Prosecution Agreement was signed, I drafted a notification letter to inform the victims of the terms of the agreement and the date of the state court proceedings. After several delays, the state plea and sentencing date was set for December 9, 2007. On November 19, 2007, I prepared the draft notification that appears at Exhibit B-2 based upon my reading of the NPA and research I had conducted on state law. (*See* Exhibit B-7.) Several blanks appeared because we were still waiting for Epstein's counsel to confirm that Epstein would pay the fees of the attorney-representative selected by the Special Master.

A second draft of the plea notification letter was prepared on November 27, 2007 at 7:11 p.m. for ████████ review. (Exhibit B-3.)[36] On November 28, 2007 at 9:42 p.m. a third draft was prepared for ████████ review. (Exhibit B-4). This version was shared with counsel for Epstein. (Exhibits B-8). On November 29, 2007, Jay Lefkowitz, counsel for Epstein, objected to the victim notification letter in a letter to USA Acosta. (Exhibit B-9). USA Acosta asked Mr. Lefkowitz to discuss the matter with ████████ and me. (Exhibit B-10).

On December 5, 2007, Kenneth Starr and Jay Lefkowitz wrote a letter to USA Acosta requesting an updated victim notification letter incorporating their objections. (Exhibit B-11). On December 6, 2007, ████████ sent a letter to Jay Lefkowitz, which attached another proposed victim notification letter. (Exhibit B-12). There was significant internal correspondence regarding my concerns that the Government needed to meet its obligation to inform the victims of the upcoming plea. (Exhibit B-13). After providing a final draft to the Miami office on December 7,

---

[36] This document was converted from Word Perfect, which caused the formatting problems.

EFTA00225085

2007, (Exhibit B-6[37]), later that day, my legal assistant and I prepared 32 victim notification letters and envelopes to send. (Exhibit B-14). At 5:08 pm, I received an email from ███████ that said, "Hold the letter" (Exhibit B-54).

On December 10, 2007, I contacted Jim Eisenberg, counsel for Individual # 28, who is Jane Doe #2 in the *Jane Doe v. United States* suit. As noted on the attached chart, Mr. Eisenberg was paid for by Mr. Epstein. I told Mr. Eisenberg that I was preparing victim notification letters and needed to know if he was still representing Individual #28. He said that he was and instructed me to send the letter to him. My continued designation of Individual #28 as a victim, based upon the statements of other witnesses and the documentary evidence collected by federal and state agents, was one of the main bases that Epstein's counsel used to support their allegations of prosecutorial misconduct with officials at the Department of Justice. (*See* Exhibit B-20.) Based upon those attacks, which relied upon the videotaped statement given by Individual #28, I was instructed by either ███████ or Alex Acosta, not to consider Individual #28 as a victim for purposes of the NPA because she was not someone whom the Office was prepare to include in an indictment.

On December 7, 2007, Lilly Ann Sanchez sent a letter to ███████ finally providing the USAO with the date and time of the change of plea for Mr. Epstein. (Exhibit B-15). Based upon that information, on December 14, 2007, I prepared another version of the victim notification letter. (Exhibit B-16[38]). I provided a copy via email to Alex Acosta, ████████, ███████, and ████████. (Exhibit B-17). On December 17, 2007, I sent an email to ███████ inquiring about the status of the case and informing him that the agents also were expressing their concerns about the delays in victim notifications. (Exhibit B-18). Over my objection, my request to send the victim notification letter was not approved, and on December 19, 2007, USA Acosta sent a letter to Lilly Ann Sanchez stating, "I understand that the defense objects to the victims being given notice of [the] time and place of Mr. Epstein's state court sentencing hearing. I have reviewed the proposed victim notification letter and the statute. . . . We will defer to the discretion of the State Attorney to determine if he wishes to provide victims with notice of the state proceedings, although we will provide him with the information necessary to do so if he wishes." (Exhibit B-19.) Although I did not know it at the time, in preparing this response, I noticed that, in FAUSA ███████ June 3, 2008 letter to DAG Filip, he stated that the quoted language was proposed by USA Acosta "in consultation with DAAG ███████." (Exhibit B-123 at 7.)

On December 21, 2007, attorney Jay Lefkowitz expounded on a new challenge – that Mr. Epstein had not been provided with a list of the victims and an opportunity to challenge the list prior to signing the NPA. I made clear verbally and in writing that I would not expose the victims to further harassment while Epstein was clearly trying to wheedle his way out of pleading guilty and going to prison. As I told Mr. Lefkowitz, I had devised a system to address this concern prior to the signing of the NPA; since Epstein's team of attorney's had not requested the right to see and challenge the list, I had not offered it. A few days later, Lefkowitz again wrote to the U.S. Attorney stating that he did not think our Office should provide *any* notifications; they should come only

---

[37] This document was converted from Word Perfect, which caused the formatting problems.

[38] This document was converted from Word Perfect, which caused the formatting problems.

EFTA00225086

from the State Attorney's Office. Lefkowitz insisted on the right to review the letters. (Exhibit B-22).[39]

The matter was tabled while Epstein was allowed time to raise his federal jurisdiction, sufficiency, and prosecutorial misconduct challenges with CEOS, the DAAG, and the AAG. While everything was supposed to be "on hold" pending those reviews, I learned that Epstein was trying to contact some of the victims – victims who would have been represented if Epstein had performed his obligations under the terms of the NPA. I then worked to find pro bono counsel for those victims (Exhibit B-23).

On May 15, 2008, CEOS, DAAG ████████, and AAG Fisher completed their review, finding that our case against Epstein was neither improper nor inappropriate (Exhibit B-24). By that time, a revised indictment package had already been reviewed and approved (Exhibits B-25 through B-28). Additional victims also had been identified through the continued investigation (Exhibits B-29 through B-31).

On May 19, 2008, FAUSA ████ wrote to counsel for Epstein giving Epstein two weeks to enter his guilty plea in state court in accordance with the terms of the NPA (Exhibit B-32).

Rather than performing, Epstein sought continued review, again alleging prosecutorial misconduct and challenging both the sufficiency of the evidence and the federal interest in the case. At this point, Epstein sought review from Deputy Attorney General Mark Filip (Exhibit B-33), and he hired Joe Whitley to join his defense team. I was informed that Epstein's deadline to enter his guilty plea would be extended again, and we continued preparing for indictment (Exhibits B-34 through B-37). So, on May 27, 2008, ████████ who took ████ ████ place as Criminal Chief, ████████, who had taken over for USA Acosta due to his recusal from the Epstein matter, ████ ████, and I all had an email exchange agreeing that there would be no further negotiations and that the case would be indicted (Exhibit B-38).

At the same time, the agents heard that Epstein was trying to strike a new deal with the State Attorney's Office – one that would require less jail time (Exhibit B-39) (discussed below).

While the DAG completed his review, I was told that the grand jury presentation would be delayed again (Exhibit B-40). I was then tasked with drafting the USAO's letter to DAG Filip in response to Epstein's challenges.

While the case was being investigating and prepared for indictment, I did not prepare or send any victim notification letters – there simply was nothing to update. I did not receive any victim calls during this time. I did receive communications from two attorneys. In March 2008, I received a letter from attorney Richard Willits, advising me that he represented Individual #3 and that he had filed suit on her behalf against Epstein in Palm Beach County Circuit Court (Exhibit B-41). I responded, acknowledging his representation (Exhibit B-42). On June 18, 2008, I received a call from attorney Brad Edwards, who told me that he represented Individual #43, who is also Jane Doe #1 in the *Jane Doe v. United States* lawsuit. Mr. Edwards expressed an interest in assisting with the case. We were still waiting to hear about whether we would be moving

---

[39] On the State side, Lefkowitz has consistently taken the position that there were only two victims related to the state offenses. Thus, if only the State provided notifications, only two victims would receive notices of the hearing and Epstein would avoid a full sentencing hearing.

EFTA00225087

forward to indictment. I invited him to send whatever information he could and expressed that time was of the essence (Exhibit B-43). Given the uncertainty of the situation – Epstein was still challenging our ability to prosecute him federally, pressing allegations of prosecutorial misconduct, and trying to negotiate better plea terms, while the agents, my supervisors, and I were all moving towards indictment – I did not feel comfortable sharing any information about the case. It also is my practice not to talk about status before the grand jury. For those reasons, and because I had never met Mr. Edwards, I listened more than I spoke.

Early on June 23, 2008, FAUSA ▮▮▮▮ emailed Criminal Chief Senior saying that, if the USAO received the go-ahead from the DAG's Office, I should immediately notify Epstein's attorneys that Epstein would only have until June 30th to comply with the September 24th agreement or be held in breach. Later that day, Mr. Senior responded, cc'ing me, instructing me to send out that notification (Exhibit B-49). On June 23, 2008, DAG Filip completed his review, and ▮▮ Roth sent a letter to Attorneys Starr and Lefkowitz stating their finding that there was no abuse of discretion and no misconduct (Exhibit B-44). I immediately sent an email to Jay Lefkowitz in accordance with Mr. Senior's instructions (Ex. B-49). The following day, Roy Black and Jack Goldberger, as local counsel for Epstein, contacted me to wrap up the details of performing pursuant to the terms of the NPA (Exhibit B-45). On June 25 and 26, 2008, there were a series of internal communications regarding victim notification letters and providing Epstein with a final list of victims (Exhibits B-46, B-47, B-48). I provided my draft victim notification letter to FAUSA ▮▮▮▮ and USA Acosta (Exhibits B-47, B-48).[40] Since Mr. Acosta had agreed in December 2007 that we would not provide written notice of the state change of plea, the written victim notifications were prepared to be sent immediately following Epstein's guilty plea. The FBI was working on finalizing the victim list to disclose to Epstein (Exhibit B-50). I requested permission to make oral notifications to the victims regarding the upcoming change of plea, but the Office decided that victim notifications could only come from a state investigator, and ▮▮▮▮ ▮▮▮▮ asked PBPD Chief ▮▮▮▮ to assist (Exhibit B-52).

On Friday, June 27, 2008, we received notification that Epstein's change of plea and sentencing would occur the following Monday, June 30, 2008 (Exhibit B-51). I made two calls to try to spread the word about the state change of plea. Following up on FAUSA ▮▮▮▮ call from the previous day, I called Chief ▮▮▮▮ and asked him to notify the victims (Exhibit B-53). I also called Brad Edwards as counsel for Individuals 35 and 43,[41] and strongly encouraged him and his clients to attend. He said that someone would try to be there. I had not been authorized by the Office to disclose the terms of the NPA, so I could not be more explicit in my conversation with him (Exhibit B-54).

After the change of plea on June 30, 2008, I made calls to the attorneys whom I knew represented identified victims in civil suits to confirm that they wanted me to send their clients' victim notification letters to the attorneys (Exhibit B-55). Also, as directed by my Office, I

---

[40] Exhibits B-47 and B-48 consist of emails with draft victim notification letters attached. Due to changes in word processing systems, some of the attachments, as well as other drafts, have formatting issues when they were printed. My original draft was prepared on 6/25/2008 at 3:57 pm. I revised it at 5:23 p.m. that same day. I received a revised version from USA Acosta and FAUSA ▮▮▮▮ at 6:00 p.m. on June 25th.

[41] Mr. Edwards also was representing Individual #28 at the time, but I did not know that.

EFTA00225088

provided a draft of the proposed victim notification letter to counsel for Epstein (Exhibit B-56). I was concerned that Epstein and his counsel were again creating a potential problem. USA Acosta had taken the position that the final NPA consisted of three documents – the 9/24/2007 NPA, the 10/29/2007 Addendum, and the 12/19/07 letter from USA Acosta to Lilly Ann Sanchez. I prepared victim notifications (and, later, a Declaration in the *Jane Doe* litigation) based upon this understanding. When Epstein entered his guilty plea, Judge McSorley required him to file his federal Non-Prosecution Agreement with the Court since that formed part of the consideration for the state plea. I wanted to confirm that Epstein was taking a consistent position with the State Attorney's Office, Judge McSorley, and the USAO, so I asked for a copy of what was filed in the State Court. This led to multiple letters with counsel for Epstein before I could finalize the victim notification letters (Exhibits B-57 through B-65). On July 9, 2008, I finally sent the first two victim notification letters to two of Brad Edwards' clients, Individuals 35 and 43 (Exhibit B-66). Whenever I sent a victim notification letter, a redacted version of the letter also was sent to Jack Goldberger, counsel for Jeffrey Epstein. I was not authorized to send a victim notification letter to Individual # 28 or to include her on the list of persons provided to Epstein because she was not a person that the Office was prepared to name in an indictment.[42]

On July 10, 2008, I sent victim notification letters to a number of other represented victims, Individuals 3, 8, 17, 25, 26, 37, and 44 (Exhibit B-67). The FBI also asked for some assistance of language to use in its own victim notifications (Exhibit B-68), and I was waiting for contact information for the unrepresented victims (Exhibit B-69). On July 21, 2008, I sent victim notification letters to a group of unrepresented victims, Individuals 1, 2, 4, 9, 13, 14, 21, 23, 30, 32, and 38 (Exhibit B-70). There were some unrepresented victims who did not receive notification letters on July 21, 2008 because the FBI had not been able to confirm mailing addresses by that time – Individuals 10, 11, 16, 18, 20, 24, 31, 33, 36, 39, 40, and 42.

In August 2008, the issue of "which version of the NPA controls" finally came to a head. On August 5, 2008, in the context of a Notice of Breach, I pressed my Office to clarify the issue (Exhibit B-71). The decision was made to require Epstein to elect either the 12/19/07 letter or not, but to make it clear in writing (Exhibits B-73 through B-82). On August 15, 2008, I wrote to Roy Black and Jay Lefkowitz confirming their position that the final agreement consisted only of the NPA and Addendum (Exhibit B-83). By discarding USA Acosta's December 2007 modification, the original terms providing for the attorney representative for the victims came back into effect, and the victim notification letters for the unrepresented victims were even more important. Mr. Lefkowitz responded on August 18, 2008 with "objections" in advance to the language of the victim notifications (Exhibit B-84). On August 21, 2008, I responded to Mr. Lefkowitz with a draft victim notification letter corresponding to the language contained in the NPA and Addendum and noted the importance of promptly providing corrected information to the victims (Exhibit B-85). The following day, Mr. Lefkowitz sent a letter with indeterminate objections to the letter (Exhibit B-86). I responded by pointing out that the language in the victim notification letter was taken verbatim from the NPA and Addendum (Exhibit B-87).

On September 2, 2008, Mr. Lefkowitz finally confirmed that Mr. Goldberger would be the designated recipient for victim notifications and that Mr. Epstein would pay the attorney representative's fees (Exhibit B-88). I immediately started distributing victim notification letters.

---

[42] That decision was made by USA Acosta and/or FAUSA ███████. I do not know which.

EFTA00225089

On that date, Notification Letters were sent directly to Individuals 1, 2, 4, 9, 10, 11,[43] 13, 14, 16, 20,[44] 21, 23, 24, 30, 31, 32,[45] 33, and 38, and via counsel to Individuals 3, 8, 17, 25, 26, 37, and 44 (Exhibit B-89). On September 3, 2008, Notification Letters were sent via counsel to Individuals 35 and 43, and via FBI Legal Attaches to Individuals 36 and 42 (Exhibit B-90). On September 12, 2008, I sent a Notification Letter to Individual 39 (Exhibit B-91). On September 15, 2008, I sent Notification Letters to Individuals 18 and 32 (Exhibit B-92).

Soon thereafter, I received a letter from Jeffrey Herman, one of the civil attorneys who represented a number of victims, notifying me that he had complained to the Florida Bar that the Victim Notification Letters violated the Florida Bar rules against solicitation. He had filed complaints against myself and against Robert Josefsberg – the attorney-representative selected by the Special Master. On September 18, 2008, I wrote to the Florida Bar asking for an Ethics opinion (Exhibit B-93). I did not feel that I could send out any additional notifications until I received a response to that inquiry. The Florida Bar eventually issued a letter reviewing the relevant rules that (a) contacts with represented and unrepresented persons required by law are permitted and (b) business solicitation prohibitions are limited to those motivated by pecuniary gain. Thereafter, I issued notification letters to Individuals 20 and 40 on November 14, 2008 (Exhibit B-94).

I only issued one other set of victim notifications: when I learned that Epstein had been allowed out on work release. While it technically was not required, I knew that the State Attorney's Office had not provided the notice, so I wanted to provide the victims with at least the option to take advantage of "exclusionary zones."[46] On December 4, 2008, I drafted a work release notice, which was approved by my office (Exhibit B-95). The following day, I sent work release notices to attorneys for Individuals 1, 2, 3, 8, 13, 14, 17, 20, 21, 25, 26, 28, 31, 32, 35, 35, 43, and 44 (Exhibit B-96). On December 8, 2008, I sent work release notices to attorneys for Individuals 7, 9, 17, and 37, and I sent notices directly to Individuals 11, 39, and 40 (Exhibit B-97). On December 9, 2008, I mailed work release notices directly to Individuals 4, 10, 16, 18, 23, 24, 30, 33, and 38 (Exhibit B-98). On December 11, 2008, I followed up with the attorneys about whether any of their clients wanted to take advantage of the "Exclusionary Zone" option in Epstein's GPS unit (Exhibit B-99). There was a bit of correspondence and telephone calls about this, but ultimately none of the victims elected to participate in this. On December 12, 2008, I send the work release notice to Individual #42 (Exhibit B-100).

I am not aware of any other notices provided to victims in connection with this case.

---

[43] The letter was returned on September 12, 2008, and Individual #11 was contacted by phone. She came to the office and picked up the letter in person on September 16, 2008.

[44] The letter was returned on September 15, 2008. A new letter was sent on November 14, 2008 to a corrected address.

[45] The letter was returned on September 11, 2008. A new letter was sent on September 15, 2008. At Individual #32's request, a copy was sent to her and with a copy to Jeffrey Herman, Esq.

[46] "Exclusionary zones" can be programmed into a GPS tracking unit to send an alarm if a prisoner on work release enters into a prohibited area – e.g., a four-block radius of a victim's residence.

EFTA00225090

3. **Identify all individuals within the USAO and FBI who had a role in determining whether, when, how, and to which victims to provide victim notifications in the Epstein case and explain what decisions were made and the basis for them.**

Greater detail is provided in the answer to Item B-2, above, and the exhibits referenced therein. Normally the line AUSA is the person who handles deciding who should receive victim notifications. Prior to indictment, the line AUSA has responsibility for those notifications, in conjunction with the case agents. Post-indictment, a victim list is provided to the victim-witness coordinator who is supposed to issue letters (again, I do not know how automated that was in 2006-2008). In this matter, I made the decision to make contact with victims early and I decided on the content of the introductory letters as well as the recipients of those letters. At the time of plea negotiations, Criminal Chief ▇▇▇▇ made the decision that he had the authority to vary from the general policy of conferring with victims before entering into a plea. I do not know the basis for that decision (*see* Exhibit 3). His email to me said that the decision was made with USA Acosta's concurrence. I do not know the veracity of that statement. I know that, even after Chief ▇▇▇▇ left the USAO, as the plea negotiations continued, when I re-raised the issue of conferring with the victims after discussing it with CEOS Chief ▇▇▇▇▇▇ (*see* Exhibit 44), the Office still did not confer. I do not know the basis for this decision.

Regarding providing notifications of the date of the change of plea, I drafted several iterations of a notification letter and also asked to provide oral notifications. USA Acosta decided that the USAO should not provide any notifications of a state court proceeding. From the correspondence that he drafted, the basis for doing so was that it was a state proceeding, not a federal one, so the notice should come from the State Attorney's Office.

With regard to the FBI, my understanding is that ▇▇▇ ▇▇▇, the victim specialist, in conjunction with ▇▇▇ ▇▇▇▇▇, the case agent, had primary responsibility for making victim notifications and the content of those. I do not know if anyone else within the FBI played any role in those decisions, and, with regard to their standard victim notification letters, I do not believe that anyone from the USAO played any role. I know that the FBI deferred to the USAO, and to USA Acosta's decision not to confer with the victims in advance of signing the NPA. I also know that the FBI also deferred to USA Acosta's decision not to inform the victims of the state court plea.

4. **Identify any effort made by the government to notify the victims, either in writing or through other means, that it intended to enter into a non-prosecution agreement with Mr. Epstein, or had entered into such an agreement. For all such efforts, identify the victims notified, when, and by whom. If some or all of the victims were not notified about the non-prosecution agreement, explain why and identify the individuals responsible for the decision.**

Greater detail is provided in the answer to Item B-2, above, and the exhibits referenced therein. In short, while I requested permission to confer with the victims in advance of entering into the NPA, that permission was denied. So no one notified the victims that the government intended to enter into a non-prosecution agreement. Immediately after the government entered into the NPA, I prepared notification letters, but the U.S. Attorney decided that these letters also should not be sent out. The case agents made oral notifications to two identified victims in October

EFTA00225091

2007, but they became concerned that it appeared that Epstein was going to renege on the NPA. The agents suspected that, at trial, Epstein would allege that the agents had told the victims that they could get money from Epstein. So they decided to suspend the notifications until Epstein was indicted or his "challenges" to the NPA and the investigation were settled.

> 5. **Explain why victims who received victim notification letters after the non-prosecution agreement was first signed in September 2007 were notified in the letters that the federal investigation of Jeffrey Epstein "is currently under investigation." Explain whether you, or other government personnel, considered whether the statement was accurate in light of the non-prosecution agreement; describe the process leading to the decision to so advise the victims; and describe any discussions among government personnel concerning the statement and its accuracy, occurring before or after it was made.**

The letters containing the quoted language were prepared by FBI victim-witness specialist ███████ ████ and I was unaware of them until they were collected in connection with the *Jane Doe v. United States* litigation. I do not recall ever discussing the wording of the FBI's letters prior to their distribution. The decision to issue the letters and the wording of those letters were exclusively FBI decisions.

Even though I was unaware of the language at the time, there is no doubt that from the perspective of the agents and myself the matter was, in fact, "currently under investigation." The NPA was signed on September 24, 2007. The letters that Judge Marra referred to in his order were dated January 10, 2008 and May 30, 2008. During the period that the letters were sent, Epstein was asserting that: (a) there was insufficient evidence to charge him with any offense; (b) there was no basis for federal prosecution and that federal prosecution violated the *Petite* policy; (c) I had engaged in prosecutorial misconduct during the investigation and resolution of the matter; (d) ███████ had engaged in prosecutorial misconduct during the investigation and resolution of the matter; (e) Special Agent ███████ had engaged in misconduct during the investigation of the matter; and (f) the NPA violated public policy because of its inclusion of the provision for § 2255 damages in lieu of mandatory restitution. Setting aside items (a) through (e), if the Department agreed with item (f) or if Epstein accepted USA Acosta's invitation to "unwind" the NPA and proceed to trial, we were faced with a target who had committed numerous identified crimes and had unlimited resources to flee the jurisdiction. The investigative team wanted to be prepared to arrest him as quickly as possible with the strongest criminal case at the ready. I also believed that either the U.S. Attorney or someone at DOJ would stop allowing Epstein to use the NPA as both a sword and a shield – attacking terms that Ken Starr had once thanked me for recommending while keeping the USAO from indicting Epstein.

On December 12, 2007, Criminal Chief ███████ and I finalized a revised indictment package to present to the grand jury (Exhibit B-101). On January 7, 2008, I sent an email to my entire advisory chain – up to the U.S. Attorney – laying out a series of steps in furtherance of the investigation (Exhibit B-102). Next, I secured the assignment of a CEOS attorney, ███████ ███████, as co-counsel, and she immediately traveled to West Palm Beach to participate in interviews to familiarize herself with the case and to re-connect with the victims to prepare them for potential trial testimony (Exhibits B-103, B-104). On January 14, 2008, Ms. ███████ and I went over charging and investigative strategy, as well as her next trip to West Palm Beach (Exhibit B-105). I also asked the agents to compile the evidence so that it would be more manageable for

EFTA00225092

Chief ████ s ongoing indictment review (Exhibit B-106). Ms. ████, the agents, and I continued working on the best way to charge the case, and collecting evidence to corroborate witness statements (*see* Exhibit B-107). On January 31, 2008, another group of grand jury subpoenas was prepared and served (Exhibit B-108). On January 31 and February 1, 2008, Ms. ████, the agents and I re-interviewed a series of victims (Exhibit B-109). As you can see from Exhibit B-109, it wasn't simply the agents and I who thought that the investigation was ongoing, the supervisory chain (up to and including the U.S. Attorney and the Chief of CEOS) was aware that: (1) victim and witness interviews were occurring; (2) grand jury subpoenas were being issued; and (3) an indictment package was being revised and reviewed.

In February 2008, I was focused on working with the agents and Ms. ████ to finalize a revised indictment package and having it reviewed and signed by my supervisors (Exhibit B-110). On February 20, 2008, I sent an email to USA Acosta, FAUSA ████, CEOS Chief ████ Criminal Chief ████, and others in the supervisory chain letting them know that I had provided the final indictment package to my immediate supervisor the previous day (Exhibit B-111). I also informed Ms. ████ that I reserved time with the grand jury on March 11, 2008 and asked her to attend on that date (*id.*). On February 25, 2008, I conferred with my immediate supervisor and with one of our Senior Litigation Counsel, who also was one of our Professional Responsibility Officers, about whether there was any reason to re-present the case to a different grand jury (Exhibit B-112). I provided the result of my inquiry to FAUSA ████, Criminal Chief ████ the West Palm Beach supervisors, and Ms. ████ Exhibit B-113). My supervisor completed her review the following day (*see* Exhibit B-114).

Also on February 26, 2008, FAUSA ████ informed me that he had told attorney Jay Lefkowitz that, if CEOS rejected Epstein's position, Epstein would be allowed "one week to abide by the terms and conditions of the September 24, 2007 Agreement" (Exhibit B-115). I wrote to FAUSA ████ telling him that I could not understand why Epstein would be allowed to plead to the same terms in light of Epstein's false allegations and in light of the new evidence we had uncovered, including six confirmed additional victims and three potential new victims in New York (*id.*). I don't recall receiving any response.

Despite that communication to Epstein's counsel, the Office continued towards indictment. On February 27 and 28, 2008, FAUSA ████, Criminal Chief ████, Civil Rights Chief ████, and I communicated about the USAM requirement that DOJ's Civil Rights Section be consulted when violations of 18 U.S.C. § 1591 are included in an indictment (Exhibit B-116). I continued reviewing records received in response to grand jury subpoenas and the agents continued working towards identifying additional witnesses and victims (Exhibit B-117). The following day, I advised the same gentlemen about identifying another New York witness/potential victim and her upcoming planned interview and inquired about the status of CEOS' review (Exhibit B-118).

In March 2008, there were several developments in the investigation. The case agent and I decided to present search warrants for memory cards that the Palm Beach Police Department had collected. They had been reviewed by the PBPD near the time they were collected and no images of child pornography had been seen, but a forensic examiner had recently opined that forensic examination might result in the recovery of deleted images. I advised that a new forensic examination would require search warrants, so they were prepared and executed (Exhibits B-119, B-120).

EFTA00225093

On March 5, 2008, I updated the Office supervisory chain and CEOS Chief ▇▇▇▇ on a number of case developments (Exhibit B-121). In that email, I noted that, if we were not going to proceed, we needed to be mindful of the state statute of limitations, to allow the PBPD to present charges to the Palm Beach State Attorney's Office (*id.*). I also reported on the status of indictment review and my plan to start presenting to the grand jury on March 18, 2008, so that the grand jury would have sufficient time to hear all of the evidence and reflect on it before voting on an indictment (*id.*). On March 14, 2008, the head of the West Palm Beach office completed his review of the indictment package and it was forwarded to Criminal Chief ▇▇▇ for final review and approval (Exhibits B-25, B-122). On March 18, 2008, I began my grand jury presentation (Exhibit B-26). The planned continued presentation to the grand jury was postponed while we awaited CEOS' review. I expressed my concerns about the impact on the ongoing investigation (Exhibit B-124).

In mid-May, 2008, CEOS completed its review, finding that a federal prosecution of Epstein's conduct was factually and legally sound (Exhibit B-24). The agents and I immediately prepared to go back to the grand jury (Exhibit B-125). My supervisors also immediately prepared to review and finalize an indictment incorporating the results of the continued investigation (Exhibit B-38). The agents continued locating and interviewing more victims (*see, e.g.,* Exhibit B-126). When DAG Filip agreed to consider Epstein's challenges, the planned grand jury presentation was canceled (Exhibit B-40).

Even after that delay, the agents and I pressed on. In June 2008, even as I was assisting with the USAO's submissions to DAG Filip (Exhibits B-123, B-127, and B-128), the agents and I were working on additional grand jury subpoenas and obtaining 6001 immunity for a witness (Exhibit B-129). On June 17, 2008, I applied for, and received permission to seek DOJ approval for 6001 immunity (Exhibit B-130). On June 24, DAAG ▇▇▇▇ designee granted the application (Exhibit B-131). I also received permission to travel to New York with the agents to conduct additional witness interviews (B-132). Time with the grand jury was scheduled and the supervisory chain was informed of those plans as well as the status of the application for 6001 immunity (Exhibit B-133). I also was corresponding with counsel for the witness about her travel for the grand jury appearance, which was scheduled for July 1, 2008 (Exhibit B-134). Even when the witness' attorney told me that Epstein would be pleading guilty on June 30, 2008, I would not release the witness (*id.*). I formally withdrew the subpoena on June 30, 2008, following Jeffrey Epstein's entry of his guilty plea in state court (Exhibit B-135).

These activities took us up to the time of Jeffrey Epstein's June 30, 2008 guilty plea. From September 2007 until the end of June 2008, the agents and I: collected additional evidence; reviewed that evidence; interviewed new victims and witnesses; re-interviewed previously identified victims and witnesses; identified new crimes and charges; developed new charging strategies; drafted supplemental pros memos; revised the indictment package; and presented new evidence and testimony to the grand jury. Although I did not know that Victim-Witness Specialist ▇▇▇▇ letters contained the language that the Epstein case was "currently under investigation," from my perspective, that language was absolutely true and, despite being fully advised of our ongoing investigative activities, no one in my supervisory chain ever told me that the case was not under investigation.

EFTA00225094

## C. General

1. **As to all of the foregoing matters, identify any disagreements or concerns expressed by government personnel as to these matters, the parties involved, how the disagreements were resolved, and any concerns you had about any such resolution and the individuals, if any, with whom you discussed your concerns.**

I raised a multitude of concerns during the investigation, negotiations, and enforcement periods. They ranged from the explicit – my July 2007 email exchange with ▮▮ ▮▮ about his violations of the USAM, CVRA, and Ashcroft Memo (Exhibit 3) – to the subtle – repeated requests to just meet with the victims. Here is one especially poignant request from January 31, 2008:

> Hi ▮ and Alex - We just finished interviewing three of the girls. I wish you could have been there to see how much this has affected them.
>
> One girl broke down sobbing so that we had to stop the interview twice within a 20 minute span. She regained her composure enough to continue a short time, but she said that she was having nightmares about Epstein coming after her and she started to break down again, so we stopped the interview.
>
> The second girl, who has a baby girl of her own, told us that she was very upset about the 18 month deal she had read about in the paper. She said that 18 months was nothing and that she had heard that the girls could get restitution, but she would rather not get any money and have Epstein spend a significant time in jail.
>
> The FBI's victim-witness coordinator attended and she has arranged for counseling for several of the girls.
>
> Please reach out to Alice to make her decision. These girls deserve so much better than they have received so far, and I hate feeling that there is nothing I can do to help them.
>
> We have four more girls coming in tomorrow. Can I persuade you to attend?

(Exhibit C-1.)

Many of the disagreements have been catalogued above, but I will try to collect them into general categories in chronological order.

a. I did not want to meet with counsel for Epstein (Lilly Ann Sanchez and Gerald Lefcourt) prior to completing my investigation. My co-counsel (▮▮ agreed with me. Our supervisor, ▮▮ ▮▮, overruled us.

b. AUSA ▮▮ and I did not want to have a subsequent meeting with another set of attorneys for Epstein, including Lilly Ann Sanchez, Gerald Lefcourt, Alan Dershowitz, and Roy Black, that would also include Criminal Chief ▮▮ ▮▮. Over my objections, Mr. ▮▮ also instructed me to provide defense counsel with a list of the federal statutes that we had under consideration. Mr. ▮▮ asked me to provide *all* of my evidence to the defense and only withdrew that instruction when I reminded him that federal statutes

Page 52 of 58

EFTA00225095

protected child victims' identities. I told my supervisor, ████ ████, my concerns and that I thought I should ask to have the case reassigned, and she counseled against it (Exhibit C-4).

c. Ms. ████, the agents, and I all tried to impress upon the others that, due to the nature of the crimes under investigation, time was of the essence – Epstein was accused of committing sexual offenses against dozens of minor girls. Our expert witness, as well as our own experience, led us to believe that Epstein would not cease his criminal behavior voluntarily. We also knew that Epstein was continuing to travel extensively using his private airplanes, and that he would have the ability to flee to a jurisdiction that did not extradite if he knew that charges were coming. At one point in May 2007, after the indictment had been reviewed on several levels, we knew where Epstein would be and I asked to arrest him on a criminal complaint. Criminal Chief ████ responded that he was "having trouble understanding – given how long this case has been pending – what the rush is." (Exhibit C-5). There was another instance a month or two later where we knew that Epstein was traveling to serve as a judge for a beauty contest and I again asked for permission to prepare a criminal complaint. Criminal Chief ████ denial of the request was even more emphatic.

d. In July 2007, Mr. ████ and I exchanged strong words when he reported that he had engaged in plea negotiations without the input or knowledge of the agents, victims, or myself (Exhibit 3). My objections included:

i. The failure to meet and consult with the victims, agents, and me before deciding what plea offer to extend.

ii. Offering a plea to a state offense. There was never any explanation of why a federal investigation would be resolved with a state plea, and I understood that a state plea would remove all control over the plea and sentencing procedure.

iii. Starting the negotiations at only 24 months' imprisonment, which was unreasonably low and not in keeping with any of the federal crimes under investigation.[47]

iv. Sending the message to defense counsel that plea negotiations would be handled by the executive division rather than the line prosecutor and the West Palm Beach supervisory team.

e. From the beginning of the federal investigation, the agents and I had pushed to get the computer equipment that Epstein had removed from his home prior to the execution of the state search warrant. When Epstein's counsel had stated that Epstein wanted to "cooperate" with the federal investigation, we asked that they turn it over voluntarily; they never did. We sought it via grand jury subpoena and they moved to quash the subpoena. Every time the matter was set for a hearing, Epstein's counsel would ask the Office to agree

---

[47] Mr. ████ responsive email in July 2007, suggested that, in light of the statement by Ms. Sanchez that 24 months' imprisonment was a "non-starter," we would be able to re-set plea negotiations at a higher number, but that never happened.

EFTA00225096

to "continue" the hearing pending our "plea negotiations." I repeatedly recommended moving forward on the computer equipment because it was obvious that they did not want to turn it over and the equipment likely contained hard evidence of travel, contact with victims, obstruction of justice, and possibly child pornography offenses. Instead, the Office continuously agreed to put off the hearing and even when Epstein's attorneys tried to use the existence of the pending motion to quash as a basis to stay some of the victims' civil suits.

f. Once I was informed that I had to devise a plea agreement with a sentencing cap of 24 months' imprisonment, I drafted a plea to a conspiracy to violate 18 U.S.C. § 2422, in violation of 18 U.S.C. § 371 – one of the crimes that had been the subject of the investigation and that was included in the indictment. That crime was a felony with a five-year statutory maximum, and the guidelines would have exceeded the five-year max, so the plea agreement would have had to be a binding plea pursuant to Fed. R. Crim. P. 11(c)(1)(C), which is what I drafted. I was informed by Mr. ███ that USA Acosta did not want to do a (c)(1)(C) plea, so I had to find charges that would result in a two-year statutory maximum. This resulted in me having to research misdemeanors and find facts that would fit those misdemeanors. I thought it was totally inappropriate. Luckily, ███ ███ finally stepped in and told Lefkowitz that we would not agree to a misdemeanor charge unrelated to the crimes that we had investigated.

g. Throughout the drafting of the NPA, every time Jay Lefkowitz and I reached an impasse, he and/or Ken Starr would appeal to ███ ███ ████, or Alex Acosta, making it impossible to hold a firm line or keep a singular negotiating strategy. I tried to work from the Office's standard plea agreement language, but even after language was agreed to, it would be rewritten by Mr. Acosta.

  i. I strenuously objected to the reduction of the prison term from 24 months to 18 months.

  ii. I objected to the clear efforts at delay for no reason other than delay (for example, going back and forth from a federal plea to a state plea and back to a federal plea – all the while asking me to provide copious drafts).

  iii. At various points, it was apparent that Epstein was not engaging in good faith plea negotiations and I asked to terminate the negotiations and proceed to indictment. Every time, Mr. Acosta refused. For example, near the end of the negotiations, Mr. Lefkowitz tried to "slip in" a citation to a different state crime that did not require sex offender registration. When I brought this to Mr. Lefkowitz's attention, he admitted that, despite their explicit agreement that Mr. Epstein would plead guilty to a crime that required sex offender registration, they originally believed that the crimes listed in the NPA did not require registration. When they realized their error – and the Epstein would, indeed, have to register, they tried to replace the statute with a different one. This was the clearest example of bad faith amongst many, yet I was told that I had to continue working with Mr. Lefkowitz to finalize the agreement. USA Acosta told me that he did not want to punish Epstein for the bad behavior of his attorneys – even though Epstein clearly was directing every aspect of his defense.

EFTA00225097

iv. I told FAUSA ▆▆▆ and USA Acosta that I did not want to sign the NPA because I did not think that it was "my" agreement. USA Acosta asked me to sign it.

h. After the NPA was signed, USA Acosta continued to concede points that had already been decided. For example, he agreed to the preparation of the Addendum. He then made a number of concessions regarding the letter to the Special Master, including a statement that we would not vouch for the veracity of the victims, despite the fact that these were victims that we intended to include in an indictment. These were all areas that were the subject of a signed, binding agreement. On October 5, 2007, and October 23, 2007, I against asked for permission to proceed to indictment (Exhibits C-6, C-7).

i. After the Addendum was signed, USA Acosta wrote in the 12/19/2007 letter to Lilly Ann Sanchez that he had "considered defense counsel arguments regarding the Section 2255 portions of the Agreement. . . . During the course of negotiations [our] intent was reduced to writing in Paragraphs 7 and 8, which as I wrote previously, appear far from simple to understand." (Exhibit B-19). I raised concerns about undermining an Agreement entered into by our Office and giving away one of the protections that had been negotiated for the victims – representation by an attorney selected by the Special Master.

j. I raised concerns about delays in entering Epstein's guilty plea and sentencing. These were portrayed as "professional courtesies" but it quickly became obvious that the NPA was signed with no intention of actual performance – it was simply a way for Epstein to buy time to avoid indictment and intimidate victims.

k. I raised objections to the multiple "appeals" to DC and the delays that those entailed. USA Acosta explained that "every defendant" has the right to appeal to DC and raise federalism concerns. I explained that the objections should have been raised prior to signing the NPA, not after, and, if they were legitimate "policy questions," Epstein should agree that he would not use the time to harass and intimidate victims.

l. As detailed above, after the NPA was signed, the agents and I repeatedly raised concerns about the Office's deference to the defense's objections to providing notification to the victims of the resolution of the investigation and the date and time of the Epstein's plea and sentencing.

m. On February 26, 2008, I learned that, if CEOS conducted its review and concluded the federal prosecution of Epstein was appropriate, the Office was going to allow Epstein to plead guilty pursuant to the NPA with no additional terms or conditions, despite the fact that additional victims had been located during the ongoing investigation. I wrote to FAUSA ▆▆▆ and expressed my view that this was an unjust result (Exhibit B-115). I re-raised this objection every time the Office allowed Epstein another opportunity to maintain the benefits of the NPA even as he was attacking the NPA's legitimacy.

n. On March 19, 2008, I informed the supervisory chain up to FAUSA ▆▆▆ of the toll that the delay was taking on the victims and the grand jury. In particular, one of the grand jurors had told another that he was concerned that we were going to "whitewash" the case and not charge it. Epstein was using the delay to harass the victims, and one of the victims tried to commit suicide. I wrote how the "FBI's victim-witness coordinator is doing her

EFTA00225098

best to get counseling for all of our needy victims, but I just can't stress enough how important it is for these girls to have a resolution in this case. The 'please be patient' answer is really wearing thin, especially when Epstein's group is still on the attack while we are forced to wait on the sidelines. Your guidance is needed." (Exhibit C-2) I followed up on March 19 and 22, 2008 to let everyone know that Epstein was subpoenaing victims and was using particularly aggressive means of service – having the Sheriff's Office serve the subpoenas at the places of work, calling them into the Dean's Office at their colleges, etc. I explained that Epstein was issuing these subpoenas in the context of the state criminal case – even though these victims were not named victims in the state criminal case, and I asked FAUSA ███████ to try to have Epstein's attorneys stop this contact as it was inconsistent with Epstein's alleged interest in resolving the matter (Exhibit C-3). I do not believe that anyone contacted Epstein's attorneys about this. I worked to secure pro bono counsel for as many victims as possible so that Epstein would only be able to contact them through counsel (*id.*). My concerns about the victims' mental health were brought to the attention of management in emails and telephone calls throughout the entire period from 2006 through 2008 and probably into 2009.

o. Even after Epstein enter his guilty plea and was sentenced, there were a number of material breaches. Every time I tried to enforce the agreement and enforce the Office's authority to proceed to indictment, the Office would accept Epstein's excuse that he received "bad advice" from his attorneys and then he would "cure" the breach. With regard to the work release, either Roy Black or Jay Lefkowitz informed me that USA Acosta had agreed, after the NPA was signed, that Epstein would be allowed to participate in work release like any other state prisoner – in direct contravention of discussions and communications that ███████ ███████ and I had with the defense. I was not allowed to invoke this as a breach.

**2. Identify any occasion during which you were or felt pressured, intimidated, threatened, coerced, or in any other manner inappropriately influenced to take a position or action in the Epstein case with which you disagreed or which caused you concern, and the individuals, if any, with whom you discussed such concerns.**

Throughout this memo, I have listed a number of disagreements. In broad categories, I disagreed with: (1) meeting with defense counsel before the investigation was completed and disclosing to them our charging strategy; (2) members of the Executive Division engaging in plea and strategy discussions outside the presence of the prosecution team and encouraging defense counsel to avoid the prosecution team; (3) entering into pre-indictment plea negotiations; (4) agreeing to delay the litigation regarding Epstein's computer equipment while pursuing plea negotiations; (5) entering into an agreement deferring federal prosecution; (6) entering into any agreement that required a sentence of only 18 months' (or even 24 months') imprisonment; (7) agreeing to a length of a sentence and then trying to find a charge with a statutory max to match; (8) reaching an agreement without conferring with the victims, the agents, or even the prosecution team; (9) refusing to hear from/meet with the victims even after meeting repeatedly with Epstein's representatives; (10) during the drafting of the NPA, allowing Epstein's attorneys to complain directing to the First Assistant and U.S. Attorney when they were dissatisfied with answers from the line AUSA and West Palm Beach supervisors; (11) repeatedly overruling my efforts to hold Epstein to the original terms, including reducing the term of imprisonment from 24 months down to 18; (12) dismissing my repeated warnings that the attorneys were not negotiating in good faith

EFTA00225099

and were delaying for strategic reasons; (13) repeatedly ceding our discretion to the defense, for example, agreeing that they could review and comment on victim notification letters and decide whether or not we could provide notice; (14) even after the NPA was signed, continuing to water it down, with the Addendum, the 12/19/07 Acosta letter, and then later offering Epstein the option of not having to provide the attorney-representative for the victims; (15) refusing to allow the agents and I to notify the victims about the terms of the NPA and about the change of plea; (16) allowing Epstein to continue to enjoy the benefits of the NPA even after he failed to promptly perform its terms and filed specious delays in order to try to negotiate better terms or win a battle of attrition; (17) refusing to defend me from the false allegations of prosecutorial misconduct; (18) refusing to step in and protect the victims from harassment from Epstein's attorneys when Epstein was "appealing" to DC; and (19) allowing Epstein to repeatedly breach the NPA and then claim that he just got bad advice from his lawyers and "cure" the breaches.

At various times during the investigation, negotiations, etc., I spoke with a number of people about my disagreements with the Office, including my supervisor, ███████ ███, my co-counsel, ███ ████████ Special Agents ████████ and ████ ██████ AUSAs ██████ ████████. ████████ ███ ███, and DOJ Trial Attorneys ████████████████████████ On several occasions, I drafted emails about re-assigning the case because the Office's handling of the matter was so contrary to my methods. I shared at least one of these with Ms. ████████ (Exhibit C-4). She counseled against sending it. The agents asked me not to leave the case because they believed that, if I left, the case would simply disappear. I couldn't disagree with them.

Criminal Chief ████████ response to my email in July 2007 was, in my mind, inappropriate and meant to intimidate. It is, quite frankly, unheard of, for a Criminal Chief to engage in plea negotiations without the line AUSA's knowledge, much less blessing. And the offer that was made was inexplicable. To this day, I do not understand the NPA – 24 months/18 months – it is a completely random amount of time. Allowing a federal defendant to plead guilty to state charges also is completely unheard of. No one has ever explained to me where the idea originated from. For Mr. ████████ to suggest that my judgment was questionable or that I was unable to handle "major" cases was obviously meant to "put me in my place." In my July 13, 2007 response to Mr. ████████, I wrote:

> With respect to your questions regarding my judgment, I will simply say that disagreements about strategy and raising concerns about the forgotten voices of the victims in this case should not be classified as a lapse in judgment. This Office should seek to foster spirited debate about the law and the use of prosecutorial discretion. I know of other instances where disagreements about the application of the law to different defendants and defense attorneys has resulted in a call for the resignation of the AUSA who dared to challenge the Executive Office's conclusions. I find that very disheartening. However, my first and only concern in this case (and my other child exploitation cases) is the victims. If our personality differences threaten their access to justice, then please put someone on the case whom you trust more, and who will also protect their rights.

After my response to Mr. ████████, I know that he spoke with ███ ███ ████████, who was Chief of Appeals at the time, about moving me to the Appellate Section.

The results of the disagreements catalogued above were communicated to me (orally or via e-mail) as decisions of the Executive Division. They sometimes followed extensive debate. They

EFTA00225100

sometimes followed no debate. I was sometimes heard on the issue; other times I knew nothing about it until I received the directive. There were times that I learned of communications between defense counsel and the Executive Division where concessions were made only after the decision was made. Many of these decisions were incorrect, in my opinion, but I did not believe that they were illegal. As a line AUSA, I was duty bound to follow the directives of the U.S. Attorney, which I did. I do not know that following a direct order from the Executive Division would qualify as coercion – even if it follows very strong objections.

I felt strongly that we should have conferred with the victims before entering into the NPA and that we should have informed them of the change of plea and sentencing. I felt strongly that Epstein's attorneys were given unprecedented access to members of the Executive Division, and that the victims were given no access -- I could not even talk with them about plea negotiations or notify them about the plea hearing. At one point, my assistant and I had letters and envelopes ready to be stuffed and put through the franking machine and we received notice from Miami that they could not go out. While I felt that conferring was the right thing to do, as noted above, the AG Guidelines vest discretion in the U.S. Attorney, so I could not say that USA Acosta's decision was illegal. I also believed that, because the resolution of the federal case rested on Epstein's state guilty plea, the federal victims were entitled to notice of the state hearing. But I could not say that USA Acosta's decision that the CVRA was limited to notice of *federal* proceedings was illegal.

I think that pressure was brought in more subtle ways. For example, I believe that one of the reasons why USA Acosta did not take an aggressive stance against the prosecutorial misconduct claims against me was because he disliked my insistence on pushing the case forward.

After the NPA was signed, USA Acosta recommended that I transfer to the Civil Division. I agreed to meet with them and talk about their work. Despite USA Acosta's recommendation, I decided not to follow his recommendation, and I stayed in the criminal division.

Please advise if further information is needed.

Sincerely,

s/

EFTA00225101

██████ ▌ █████     **C. (USAFLS)**

**From:** ████ , ██ ███     C. (USAFLS) <AVillafana@usa.doj.gov>
**Sent:** Thursday, June 19, 2008 1:23 PM
**To:** ████ , E N. (MM) (FBI); Richards, Jason R. (MM) (FBI)
**Subject:** FW: ██ Epstein

20

Hi Guys – This is ████ attorney. He seems like a very good guy – much better than the others, but I am concerned about allegations of misconduct. What do you think? Maybe we could meet with him and with

████

A. ████
Assistant U.S. Attorney
500 S. Australian Ave, Suite 400
West Palm Beach, FL 33401
Phone ████
Fax ████

**From:** Brad Edwards [mailto:be@bradedwardslaw.com]
**Sent:** Thursday, June 19, 2008 11:34 AM
**To:** ████ ▌ ███ C. (USAFLS)
**Subject:** ██ Epstein

Hi ██ .

I have information and concerns that I would like to share. While I understand that you are limited in what you can discuss, I would like to meet with you and discuss my plans. This would be beneficial to you and me. Let me know if you are interested in meeting and talking. My schedule is free next Monday, Tuesday, and Wednesday, July 23-25. If any of those days are open for you, then I will go to you and can meet you at any time convenient for you. I am scheduling to meet with my client again next week in your area anyway, so it would be no problem for me to meet you on the same day. I look forward to hearing back from you.

Sincerely,

Brad Edwards, Esquire
Law Office of Brad Edwards & Associates
2028 ████ Street
Suite 202
Hollywood, Florida 33020
Telephone:     954-414-8033 (Broward)
                    305-935-2011 (Miami-Dade)
Facsimile:     954-924-1530(Broward)
                    305/935-4227 (Miami-Dade)
e-mail:          be@bradedwardslaw.com

**PRIVILEGED AND CONFIDENTIAL:** The information contained in this e-mail message is intended for the use of the individual or entity to which it is addressed and may contain information that is proprietary, privileged, confidential, and exempt from disclosure under applicable laws. If the reader of this message is not the intended recipient, or the employee or agent responsible for delivery to the intended recipient, you are hereby notified that any use, printing,

66

EFTA00190473

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

JANE DOE NO. 2,                          CASE NO.: 08-CV-80119-MARRA/███████

       Plaintiff,

vs.

JEFFREY EPSTEIN,

       Defendant.

_____/

JANE DOE NO. 3,                          CASE NO.: 08-CV-80232-MARRA/███████

       Plaintiff,

vs.

JEFFREY EPSTEIN,

       Defendant.

_____/

JANE DOE NO. 4,                          CASE NO.: 08-CV-80380-MARRA/███████

       Plaintiff,

vs.

JEFFREY EPSTEIN,

       Defendant.

_____/

JANE DOE NO. 5,                          CASE NO.: 08-CV-80381-MARRA/███████

       Plaintiff,

vs.

JEFFREY EPSTEIN,

       Defendant.

_____/

JANE DOE NO. 6,                          CASE NO.: 08-CV-80994-MARRA/███████

EFTA02742043

                              Plaintiff,

        vs.

        JEFFREY EPSTEIN,

                        Defendant.
        _____/


        JANE DOE NO. 7,                          CASE NO.: 08- 80993-CIV-MARRA/▇▇▇▇

                        Plaintiff,
        vs.

        JEFFREY EPSTEIN,

                        Defendant.
        _____/

                                        **ORDER**

            Upon Plaintiffs' Unopposed Motion for Enlargement to Time to File Memorandum in

        Opposition to Motions to Compel Plaintiffs to Respond to Defendant's First Request to Produce and

        First Set of Interrogatories, et al., and good cause being shown, it is hereby

            ORDERED that Plaintiffs' Motion is granted. Plaintiffs shall have an enlargement of time of

        until April 29, 2009, to respond to the Defendant's Motions to Compel, et al.

            DONE AND ORDERED in ▇▇▇▇▇, in Ft. Lauderdale, Broward County, Florida, this

        _____ day of _____, 2009.


                                                _____
                                                DISTRICT COURT JUDGE


EFTA02742044

1

**From:** Ghislaine Maxwell ███████████████████
**Sent:** Wednesday, June 10, 2026 12:11 AM
**To:** Pro Se Filing
**Subject:** Exhibits to Reply 5/5
**Attachments:** COMPRESS EXHIBITS 5EFTA.pdf

**CAUTION - EXTERNAL:**

**CAUTION - EXTERNAL EMAIL:** This email originated outside the Judiciary. Exercise caution when opening attachments or clicking on links.

1



████ ▌ ██ C. (USAFLS)

**From:** ████ ██ C. (USAFLS) <AVillafana@usa.doj.gov>
**Sent:** Monday, July 21, 2008 12:31 PM
**To:** ██████ E N. (MM) (FBI)
**Subject:** RE: Addresses

Are there any girls who have not been contacted yet?

A. ████ ████
Assistant U.S. Attorney
500 S. Australian Ave, Suite 400
West Palm Beach, FL 33401
Phone ████
Fax ████

**From:** ██████ E N. (FBI)
**Sent:** Monday, July 21, 2008 11:23 AM
**To:** ████ ██ ██ C. (USAFLS)
**Subject:** Addresses

████

Here is a copy of the most up-to-date addresses.  Twiler told me that Randy was telling her that Edwards has been talking to some of the victims that she is counseling and that he is encouraging them that 18 months is not long enough of a sentence for Epstein.  I am not sure who she is referring to but that Randy is having to provide additional counseling.  If you have any questions regarding this you might want to speak directly to Twiler.

Talk to you soon.

████

247

EFTA00190574

**From:** "Jackson, Angela (NY) (FBI)" ▮
**To:** "Allen, Amanda L. (DO) (FBI)" ▮
**Subject:** Re: Re: New Victim for treatment
**Date:** Fri, 08 May 2020 14:37:49 +0000
**Importance:** Normal

Thank you

-

On May 8, 2020 10:35 AM, "Allen, Amanda L. (DO) (FBI)" ▮ wrote:
Good to go. I added it in SP.

**From:** Jackson, Angela (NY) (FBI) ▮
**Sent:** Friday, May 8, 2020 10:34 AM
**To:** Allen, Amanda L. (DO) (FBI) ▮
**Subject:** Fwd: Re: New Victim for treatment

Amanda see below.

-

---------- Forwarded message ----------
**From:** "Young, Amanda N. (NY) (FBI)" ▮
**Date:** Apr 24, 2020 1:51 PM
**Subject:** Re: New Victim for treatment
**To:** "Jackson, Angela (NY) (FBI)" < ▮
**Cc:** "Allen, Amanda L. (DO) (FBI)" ▮
Yes, she is a known victim. We met with her last year in person with Brad present. She spoke with a VS in FL as well.

**From:** Jackson, Angela (NY) (FBI) ▮
**Sent:** Friday, April 24, 2020 1:49:27 PM
**To:** Young, Amanda N. (NY) (FBI) ▮
**Cc:** Allen, Amanda L. (DO) (FBI) ▮
**Subject:** Fwd: New Victim for treatment

Hi Mandy - please see below. Has she met with you?
Thanks
Angela

-

---------- Forwarded message ----------
**From:** Randee Kogan ▮
**Date:** Apr 24, 2020 1:27 PM
**Subject:** New Victim for treatment
**To:** "Jackson, Angela (NY) (FBI)" ▮ 'Allen, Amanda L. (DO) (FBI)"
▮ "Collicelli, Lynn M. (DO) (FBI)" ▮ Beth Carrus

EFTA01650808

Cc: ▮▮▮▮▮▮▮▮▮▮

Good afternoon everyone,

I hope you and your families are all safe. I wanted to inform you that ▮▮▮▮▮▮ requested a therapy appointment as a result of her victimization by Mr. Epstein. I wanted to get your approval for the 12 sessions prior to her appointment next week. I believe she had met and interviewed with the FBI already. If you need any further information or have any questions, please do not hesitate to reach out. Thank you so much for your assistance and support!

Randee Kogan, M.S., L.M.H.C.
Licensed Psychotherapist

EFTA01650809



**From:** Brittany Henderson <▮▮▮▮▮▮▮>
**To:** "▮▮▮▮▮▮▮▮▮▮▮▮▮▮"
**Cc:** Brad Edwards <brad@epllc.com>, "▮▮▮▮▮▮▮▮▮▮▮▮▮",
"▮▮▮▮▮▮▮▮▮▮▮▮▮
**Subject:** Re: Jeffrey Epstein
**Date:** Thu, 30 Apr 2020 02:29:20 +0000
**Importance:** Normal
**Inline-Images:** image001.png

---

Thank you for the info!! I will definitely call you tomorrow.

Hope you are all staying safe up there!

Brittany Henderson, Esq.
Edwards Pottinger LLC
425 North Andrews Ave, Suite 2
Fort Lauderdale, FL 33301
www.epllc.com

On Apr 29, 2020, at 10:20 PM, ▮▮▮▮▮▮▮▮▮▮▮▮▮ > wrote:

Hi Brittany - OVS is only available for victims that their crimes were committed in New York State. We can ask for the 12 sessions through HQ but Randee will need to request per the new procedures we have set in place with her.

Call me tomorrow if you have any questions. I also wanted to make sure that you got my message about OVS for victims that we have not interviewed; that we will be unable to provide a formal police report/FBI crime verification form for them. I did give OVS the case number but if they decide they need the verification form to open up a claim we will need to speak to them. I have discussed with Mandy whis copied here.

Let me know if you have questions.
Stay well!
▮▮▮▮

-

On Apr 29, 2020 3:42 PM, Brittany Henderson <▮▮▮▮▮▮▮▮▮▮▮ > wrote:
▮▮▮▮,

I have attached the OVS application for ▮▮▮▮▮▮▮. Please let me know if you need anything else. If she is approved, she is going to treat with Randee Kogan.

Thank you so much!

<image001.png>

**Brittany Henderson**
**Trial Attorney**

425 North Andrews Avenue, Suite 2
Fort Lauderdale, Florida 33301

█████████████    ██████████████

███████████ | **www.epllc.com**



EDWARDS
POTTINGER LLC

EFTA00153658

**Epstein and Maxwell Rape and Sex Traffick Survivor -** ███ ███ **–
Former Client of David Boies, Sigrid McCawley, Stanley Pottinger and
Brad Edwards.**

**06 September 2022**

When I was seeking legal representation to advocate for my rights as a sex trafficked
victim of Epstein, Maxwell and their co-conspirators, David Boies and his firm
informed me that they would represent me only if I provided a deposition in support
of one of his other clients, ███ ███ , for use in her civil case.

I did not want to provide the deposition as I knew I would have to disclose very
personal details that I did not feel ready to tell at that stage. However, I wanted to
secure legal representation, so I agreed. Boies and his firm promised me that the
deposition would remain sealed entirely and confidential. The deposition transcript,
which I can produce, is clearly labelled "HIGHLY CONFIDENTIAL".

I was asked to do the deposition on **17 February 2017**. Still, according to my
records, I did not sign a retainer with Boies Schiller until **24 February 2017**, which
shows that they were waiting for me to do the deposition before representing me.
They filed my civil claim on **26th January 2017** – before they were even formally
my lawyers.

On **January 10, 2017**, I wrote an email to Stan. "Stan Can you please give me a call
please thank you █"

On **January 13, 2017**, Stan wrote back to me. "Hi ███ , When can we talk?
Important that we do so Friday. Send Proton, please. Stan"

On **January 14th, 2017**, I wrote to Stan and Brad. "Stan, Can you please give me an
update on what this deposition relates to, i.e. Which case? Also, did you manage to
talk with the 1 party you contacted and the other you were trying to contact? Thank
you"

On **January 14th 2017** Stan wrote,

"The other side has been notified that we will be taking your deposition in the next
three weeks. Only the time needs to be worked out. I mention this, as I did in our
telcon call today, so that you can be on your toes in case they try to call you, email
you, or contact you in any way. Do not talk to them in any fashion. Hang Up. Do not
reply to emails. Do not be frightened by anything. Once you are in the open, so to
speak, you are safer than ever. They cannot harass you because your name is now
part of the United court system. They are not allowed to tamper with you, and if they
try, they are subject to legal sanctions by the court. Let me know if you get any
strange calls or efforts to contact you. You will be fine, but we want to know of any
funny business by the other side. Best, Stan".

On **14th January 2017**, Stan wrote,

1

EFTA00145606

"Hi, ▮▮▮ The deposition will be taken in connection with ▮▮▮▮ case against Maxwell, which will go to trial in March. The subjects covered are those we talked about with you in person, including Epstein and ▮▮▮. I will talk to you on the phone regarding the scope of the deposition and the related questions you raise, including your own lawsuit against Epstein"

On the **21st of February 2017**, four days after the deposition, I wrote to Stan, "Stan, when are you able to call me please."

On **21st February 2017**, Stan replies, "What about"

On **21st February 2017**, I replied, "Stan, I think you know what it's about. Now that you guys have what you want from me, you have left me high and dry. You obviously don't need me anymore. Your last conversation was a disgrace, and you have let me down and gone back on your word. Our time is finished."

Three days later, on the **24th of February 2017**, after they had already filed my own lawsuit **26th January 2017**, I eventually signed the retainer for Boise Shiller. When I was asked to do the deposition for ▮▮▮, ▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ was frightened, and indeed Jeffrey was trying to find me whilst in hiding.

On **13 January 2017**, Jeffrey contacted another sex trafficked victim ▮▮▮ ▮▮▮. Epstein wrote,

"hi, was ▮▮▮ ▮▮▮ a friend of yours?"

Doing that deposition jeopardised my safety, and it wasn't even for my own case but for another of his clients. I had already been tracked down in ▮▮▮, and they knew this, which is why I went into hiding in the first place.
I made it very clear at the start of the deposition that I was afraid for my and my family's safety and that I had been followed. During the deposition, I was then harassed and intimidated to repeatedly give the address where I was in hiding, including my loved one contact details.

This made me very uncomfortable and even more frightened as Ghislaine appeared by telephone for the deposition duration. I don't know who else was listening and remember hearing a male cough at one point during the deposition. I found this incredibly intimidating.

I would like to point out that in Brad Edwards's book, **"Relentless Pursuit" pg 302 and 303**, he said that after my two-day briefing in ▮▮▮ on his way back to Miami had two near-death experiences **"In one day, I discovered twice that I was lucky to be alive."**

2

EFTA00145607

So, if Brad has experienced **two** near-death experiences, why on earth would they put me on a plane whilst in hiding with Jeffrey trying to locate me to do ███ deposition a month later!!

This shows that Boies and Co had absolutely no regard for me and my then partner ███ safety, who flew with me and was always about their other client ███. This, of course, was not mentioned to me and had the delight of reading about it in his book years after the incidents occurred.

If I had known about Brad's experiences, I would **never ever** have flown to New York to do that deposition for ███, but sadly if I had known, I would have had little choice otherwise; they wouldn't have proceeded with my own litigation against Epstein and Co. They could have arranged to do the deposition in ███ to protect me. Perhaps **I'm the one that's lucky to be alive?!**

What is even worse, whilst I was in New York for ███ deposition, they helped me reach out to another fellow survivor who was on the island with me. She was the young ballerina I tried to protect from Epstein and Maxwell and the co-conspirators.

We were both raped repeatedly by Epstein whilst on the island together. I wanted to reach out to her to see if she was still alive and tell her I loved her and that I was sorry I didn't take her with me when I fled for my life in ███ from Epstein and Maxwell. I couldn't. For years I blamed myself for not saving her.

On **28th February 2017**, ███ (the other rape victim) wrote to me,

"Hi ███, it's ███. It was so nice hearing from you, and I can't wait to see you and catch up!"

On **28th February 2017**, I wrote to Stan and Brad, "I'm just going to forward any correspondence I have with her."

On the **1st of March 2017**, Stan wrote to me saying that he had managed to contact her,

"I sent an email to her inviting her to a risk-free chat. This would be an ideal time for you to send her an email encouraging her to meet and assuring her that she can trust me. She has absolutely nothing to lose and potentially a lot to gain. Tnx."

It breaks my heart that whilst I was trying to connect with a long-lost friend and fellow survivor of Epstein, I led her straight into the lion's den. I won't forgive myself for that. ███ was also a key witness in my own litigation because she would corroborate my story and whom we met on the island, for example, Epstein and Maxwell's long-time friends Sergey Brin (Co-Founder of Google) and his then fiancé Ann Wojcicki (Co-Founder of 23&ME) on **1st January 2007.**

3

EFTA00145608

On about July 3, 2008, Jane Doe #1 and Jane Doe #2 learned, through telephones conversations had between Mr. Edwards and AUSA Villafaña, that the U.S. Attorney's Office and Epstein might be in the process of finalizing some sort of plea arrangement. Accordingly, they filed an emergency motion seeking to protect their rights under the CVRA, including in particular their right to confer about the proposed plea arrangement.

Mr. Edwards – and thus his clients -- first learned of the Non-Prosecution Agreement on or after July 9, 2008, when the Government filed its responsive pleading to Jane Doe's emergency petition. That pleading was the first public mention of the non-prosecution agreement and the first disclosure to Mr. Edwards and his clients. Epstein, through his attorneys, knew that the victims had not been informed about the plea arrangement.

On July 9, 2008, AUSA Villafaña sent a victim notification to Jane Doe #1 via her attorney, Mr. Edwards, which is attached as Exhibit 6 to the Villafaña Declaration. That notification contains a written explanation of some of the terms of the Non-Prosecution Agreement between Epstein and the U.S. Attorney's Office. A full copy of the terms was not provided. This was the first time that Jane Doe #1 was told that the arrangement blocked any possibility of federal criminal charges being filed against Epstein. A notification was not provided to Jane Doe #2 because the agreement limited Epstein's liability to victims whom the United States was prepared to name in an indictment.

On July 11, 2008, the Court held a hearing on the victims' emergency motion. During the hearing, the Government discussed in open court various provisions of the Non-Prosecution Agreement. At the conclusion of the hearing, victims' counsel and the Government agreed to

8

EFTA00190604

Cc: ████████ (USAFLS)
Subject: RE: Jeffrey Epstein/████████

HI Nick.
Thank you for your email. This is always the best way to get me. I am hardly ever at my desk, but always have my blackberry on me.

As to your question, I will not be able to help you. We cannot comment, confirm or deny the existence of any investigation or on our intention to open or close a matter.
Sorry
Thanks
████.

-----Original Message-----
From: ████████ [mailto: ████████]
Sent: Friday, March 04, 2011 3:16 PM
To: ████, ████ (USAFLS)
Subject: Jeffrey Epstein/████████

Dear ████.

I work for the Mail on Sunday newspaper in London, England. The Mail on Sunday last week published an interview with ████████ about her time working for Jeffrey Epstein. We plan to publish more revelations this week.

I have been led to believe that the FBI is interested in pursuing the allegations published in the Mail on Sunday - and that Epstein may have committed offences not covered by the non prosecution agreement.

Can you give me any guidance as to whether my information is correct?

You may contact me by email or on ████████.

Regards,

Nick Pryer
Assistant Features Editor
Mail on Sunday

This e-mail and any attached files are intended for the named addressee only. It contains information which may be confidential and legally privileged and also protected by copyright. Unless you are the named addressee (or authorised to receive for the addressee) you may not copy or use it, or disclose it to anyone else. If you received it in error please notify the sender immediately and then delete it from your system. Please be advised that the views and opinions expressed in this e-mail may not reflect the views and opinions of Associated Newspapers Limited or any of its subsidiary companies. We make every effort to keep our network free from viruses. However, you do need to check this e-mail and any attachments to it for viruses as we can take no responsibility for any computer virus which may be transferred by way of this e-mail. Use of this or any other e-mail facility signifies consent to any interception we might lawfully carry out to prevent abuse of these facilities.
Associated Newspapers Ltd. Registered Office: ████████

This e-mail and any attached files are intended for the named addressee only. It contains information, which may be confidential and legally privileged and also protected by copyright. Unless you are the named addressee (or authorised to

EFTA00206277

deposition by then-Palm Beach Chief of Police Michael Reiter, in which he stated that Epstein, a billionaire with many powerful friends, had received special treatment in both his plea deal and the terms of his incarceration. Although federal investigators at one point produced a draft 53-page indictment against Epstein, he was eventually allowed to plead guilty to only two relatively minor state charges and receive a short term of incarceration: 13 months in the county jail, during which he went to the office every day, and one year of community control, during which he traveled frequently to New York and his private island in the Virgin Islands.

The Daily Beast has now discovered another instance in which Epstein apparently received special consideration: As a convicted sex offender, he is required by law to undergo an impartial psychological evaluation prior to sentencing and to receive psychiatric treatment during and after incarceration. This is because child molesters tend to be repeat offenders with high rates of recidivism. According to a source in law enforcement, however, Epstein was allowed to submit a report by his private psychologist, Dr. Stephen Alexander of Palm Beach, Florida, whose phone has since been disconnected with no forwarding information.

The Daily Beast's second article provided details about Epstein's systematic abuse of underage girls at his Palm Beach mansion, where members of his staff allegedly recruited and paid a parade of teenagers, most of them 16 or younger, to perform daily massages that devolved into masturbation, groping, and sometimes full-blown sexual contact. It also revealed a monetary relationship between Epstein and Jean Luc Brunel, a frequent visitor to whom he gave $1 million around the same time that Brunel was starting his MC2 modeling agency. Some of the young girls MC2 recruited from overseas —often from Eastern Europe and South America—are known to have been passengers on Epstein's private jets.

The U.S. Attorney General's Office in Florida says that it is against policy to confirm or deny the existence of an investigation. Jeffrey Epstein's lawyer, Jack Goldberger, says he has no knowledge of an ongoing probe, and he told The Daily Beast, "Jeffrey Epstein has fully complied with all state and federal requirements that arise from the prior proceedings in Palm Beach. There are no pending civil lawsuits. There are not and should not be any pending criminal investigations, given Mr. Epstein's complete fulfillment of all the terms of his non-prosecution agreement with the federal government."

Read more: http://www.businessinsider.com/hedge-funder-joseph-epstein-investigated-for-child-trafficking-2010-7#ixzz1FxAJrdFa

| From: | ███████████. (USAFLS) <████████████> |
|---|---|
| Sent: | Monday, March 14, 2011 11:27 AM |
| To: | ███████████. (USAFLS); ██████████ (USAFLS); ██████████ (USAFLS); ██████ (USAFLS); ████████ (USAFLS) |
| Subject: | FW: Cassell or Edwards commenting to press re Jane Doe suit |
| Attachments: | Duke of York to face fresh questions as Epstein case takes new twist - Telegraph.pdf.zip |

Thought you should see this. Don't know if we need to file anything with the court about disclosing matters before the court to the press? Or whether it appears that Edwards may be trying to use the new criminal investigation to assist him in his defense of Epstein's civil suit against him (or in Edwards' counterclaim for defamation)?

The agents fly to ██████ today to interview the witness.

EFTA00206285

# Privilege Log – Dated 2-23-2011
## ███, Jaffe, Weissing, ███, Fistos & Lehrman

| ███ | DATE | TO | FROM | DESCRIPTION | OBJECTION |
|---|---|---|---|---|---|
| 11240-11245 | 06/22/2009 | Katherine Ezell | ███ | Article:Bear Stearns | Joint W/P Priv. |
| 11248-11250 | 06/22/2009 | Amy Ederi | ███ | Article:Bear Stearns | Joint W/P Priv. |
| 11255-11259 | 06/23/2009 | Katherine Ezell | ███ | USAO Chose ███ conversation | Joint W/P Priv. |
| 11269-11281 | 06/30/2009 | Stuart Mermelstein | ███ | RE:Epstein Depo;possible deponents | Joint W/P Priv. |
| 11316-11319 | 06/28/2009 | Katherine Ezell | ███ | Discussion about possible witness from Switzerland | Joint W/P Priv. |
| 11332-11336 | 08/04/2009 | Spencer Kuvin | ███ | FW:Transcript of Alfrefo Rodriguez Depo and Copperfeild and Clinton's whereabouts | Joint W/P Priv. |
| 11340-11341 | 08/05/2009 | Mercedes ███ | ███ | RE:Epstein vs Jane Doe No.101 & 102 | Joint W/P Priv. |
| 11348-11358 | 08/06/2009 | Adam Horowitz | ███ | RE:Motion for protective order/discussion | Joint W/P Priv. |
| 11430-11434 | 08/27/2009 | Spencer Kuvin | ███ Edwards | Discussion RE:Wexner involvement | Joint W/P Priv. |
| 11443 | 09/17/2009 | Katherine Ezell | ███ Edwards | Wexner served subpoena ███ | Joint W/P Priv. |
| 11541-11542 | 09/29/2009 | Katherine Ezell | Bradley ███ | RE:Leslie Wexner & Bob | Joint W/P Priv. |
| 11551-11559 | 10/01/2009 | Spencer Kuvin | ███ | RE:Meeting w.Stanely Arkin | Joint W/P Priv. |
| 11585-11586 | 10/14/2009 | Adam Horowitz | ███ | RE:Epstein;Larry Visoski confirmed | Joint W/P Priv. |
| 11675-11676 | 10/29/2009 | Stuart Mermelstein | ███ | RE:Leslie Wexner attorney info | Joint W/P Priv. |

3

EFTA02766464

most reluctant to do what Cassell asks, since negotiating the non-prosecution agreement was clearly within the prerogatives granted to the Executive Branch.   Whether the bargain struck with Epstein was wise or not should not be the issue.

I will be in the office all day Monday.   Thanks for your assistance.

███

**From:** ███████. (SMO)
**Sent:** Saturday, February 26, 2011 3:40 PM
**To:** ███ (USAFLS); ██████ (USAEO)
**Cc:** ██████. (USAFLS); ████████ (USAFLS)
**Subject:** Re: Jane Does 1 and 2 ▮ United States - CVRA Lawsuit (S.D.Fla.)

███: Thanks. Perhaps we should try and find a time to talk on Monday. This scenario raises a variety of policy issues that extend well beyond the question of "when do the rights attach." Frankly, I don't think the court should even reach that question given the posture of the case as you describe it.

███ ███

**From:** ██████ (USAFLS)
**Sent:** Saturday, February 26, 2011 02:23 PM
**To:** ██████. (SMO); ██████ (USAEO)
**Cc:** ██████. (USAFLS); ████████ (USAFLS)
**Subject:** Jane Does 1 and 2 ▮ United States - CVRA Lawsuit (S.D.Fla.)

Ms. ████ and Mr. ████,

Our office is currently litigating a Crime Victims Rights Act (CVRA) lawsuit filed by Jane Does 1 and 2, who were victims of sexual abuse by Jeffrey Epstein, a multi-millionaire investor living in Palm Beach, Florida.   Jane Does 1 and 2 v. United States, Case No. 08-80736-CIV-MARRA (S.D.Fla.).   We are seeking your advice and guidance on a proposal from the victims' attorneys, that the government take no position on whether the CVRA granted rights to the victims, when the U.S. Attorney's Office negotiated a non-prosecution agreement with Epstein.

In 2006, the Palm Beach Police Department began investigating allegations that Jeffrey Epstein was enticing underage girls into prostitution.   Epstein was alleged to have paid underage girls to provide him with massages, while the young girls were unclothed.   The case was referred to the FBI and U.S. Attorney's Office, and the FBI began its own investigation.   Epstein hired a number of highly-paid attorneys, including Alan Dershowitz and Kenneth Starr, to attempt to stave off criminal charges.

Ultimately, in 2007, Epstein was charged in state court with soliciting minors for prostitution.   In September 2007, the U.S. Attorney's Office entered into a Non-Prosecution Agreement with Epstein, in which he agreed to plead guilty to the state criminal charge, and serve a sentence of 18 months.

EFTA00206182

Epstein also agreed that, in any civil action under 18 U.S.C. 2255 by the underage victims, he would not raise the lack of a federal sex offense as a defense.    In July 2008, Epstein plead guilty, and was sentenced to serve six months at the Palm Beach County Detention Facility, followed by 12 months in home detention.

In July 2008, after the Non-Prosecution Agreement had been executed, two victims, ██ and ██, filed an action under the CVRA, 18 U.S.C. 3771.    They claimed that the government was obligated, under 18 U.S.C. 3771(a)(5), to speak with the victims prior to the execution of the Non-Prosecution Agreement.    An emergency hearing was held on July 11, 2008, before U.S. District Judge Kenneth Marra.    Since Epstein had entered his state court plea and been sentenced already, the court found there was no emergency.    He directed the parties to meet and determine if there were any factual disputes and whether an evidentiary hearing would be necessary.

Attorney Brad Edwards initially represented the victims.    Soon, he was joined by Paul Cassell, a University of Utah law professor, and former federal judge who served in the District of Utah from 2002-2007.    Cassell is a victims' rights advocate who has appeared in many cases throughout the United States.    The victims' rights suit was inactive for the next two years, with Edwards and Cassell using the civil suit as a means to attempt to gain access to information helpful in their civil actions for damages against Epstein.    They were able to obtain a copy of the Non-Prosecution Agreement through the civil litigation.

In August 2010, the district court, noting that the last civil suit had been settled, entered an order closing the case.    Edwards and Cassell immediately filed documents with the court, advising that the case should not be closed or dismissed, and they wanted to pursue final action by the court.    Since September 2010, AUSA ██████████ and I have been dealing with Cassell and Edwards on how to resolve the case.    They claim the victims had a right to be consulted prior to the execution of the Non-Prosecution Agreement, and that we violated the CVRA by not consulting them.    The remedy they seek is a set aside by the court of the Non-Prosecution Agreement, and a prosecution of Epstein.

On December 10, 2010, United States Attorney Wifredo A. ████, ████████ ██ ████████, ██████████, and I, met with Cassell, Edwards, and ██, one of the victims.    We discussed the posture of the case, and ██ told us her views of what occurred and her desire to see Epstein receive justice for what he did.  Cassell presented U.S. Attorney ████ a four-page letter, requesting an investigation of the Jeffrey Epstein prosecution.    He claims there may have been improper influence exercising by Epstein, noting that Epstein is a "politically-connected billionaire."    Cassell cites to an alleged tip off to Epstein that a search warrant on his residence was to be executed; that a former AUSA, ██████████, left the West Palm Beach office and soon began appearing on behalf of individuals aligned with Epstein; and an unprecedented level of secrecy between the FBI and the U.S. Attorney's Office, where the FBI was purportedly kept in the dark about the impending Non-Prosecution Agreement.    He also claims that the victims were deceived regarding the existence of the Non-Prosecution Agreement.

Cassell's request for an investigation was referred to DOJ OPR on December 16, 2010.    ████ ████████ has requested various documents from our office, presumably to determine whether an investigation should be opened.    Cassell and Edwards had planned to file a motion for summary judgment on December 17, 2010.    Due to concerns that the U.S. Attorney's Office might have to be recused, due to the allegations of misconduct, Cassell agreed to defer filing their motion.    We have since been advised by EOUSA General Counsel's Office that there is no need for our office to recuse itself, since we are only litigating the legal issue of whether rights under the CVRA attached.

After the new year began, Cassell inquired about the status of the OPR complaint and the recusal issue.

EFTA00206183

On Thursday, February 10, 2011, Deputy Chief ██ ██████, AUSA ████████, and I spoke with Cassell and Edwards regarding the status of the case. I told them Cassell's letter request for an investigation of the Non-Prosecution Agreement had been referred to OPR, and OPR had requested various documents from our office. I also told them the EOUSA General Counsel's office advised that our office could go ahead and represent the United States in the CVRA lawsuit. I suggested that the parties were ready to move forward with filing documents with the court so it could resolve this case.

I asked whether it might be useful to engage in mediation in an attempt to resolve the case. Cassell told us they wanted the Non-Prosecution Agreement to be set aside. I told him that was not likely to happen. Cassell then suggested that the United States Government should step aside and allow them to "go after" Epstein to get the agreement set aside. I asked him how he expected that would be done, since the only parties to the Non-Prosecution Agreement were Epstein and the Government. Cassell said they would file their summary judgment motion, and the government would take no position on their motion. Presumably, Epstein would either intervene, or be brought in as a necessary party, and defend the Non-Prosecution Agreement. I told them this would have to be approved by the U.S. Attorney and Main Justice.

I have serious misgivings about not defending the Executive Branch's prerogative to engage in a Non-Prosecution Agreement, free from supervision or oversight by the judiciary. If we stand by the sidelines, Cassell will be arguing the Government was obligated to consult with the victims, and because we failed to do so, the agreement is a nullity. Whatever we may think of the Agreement, it was the prerogative of the U.S. Attorney's Office to enter into it with Epstein, and we should be willing to defend what we did. The DOJ's position is that the rights in the CVRA do not attach until there is a federal court proceeding. Since Epstein was never charged in federal court, we were not obligated to consult with the victims before entering into the Non-Prosecution Agreement.

We wanted to seek your views on Cassell's suggestion before we responded to him. We are currently scheduled to have a conference call with Cassell and Edwards on Tuesday, March 1. I can be reached at ████████. Thanks.

██ ██

----------
From:           ███████. (USAFLS) <████████>
Sent:           Friday, February 25, 2011 3:52 PM
To:             ███████ (CRM); ██████ (USAFLS); ████████ (USAFLS)
Cc:             ████████ (CRM)
Subject:        RE: Epstein matter

Thank you, ██████!

██████ – As per our conversation this afternoon, I will leave you to call ████ and ███. I have a call in to ███ at the Appellate Section.

████████

Assistant U.S. Attorney

EFTA00206184

Nick Pryer
Assistant Features Editor
Mail on Sunday

This e-mail and any attached files are intended for the named addressee
only. It contains information which may be confidential and legally
privileged and also protected by copyright. Unless you are the named
addressee (or authorised to receive for the addressee) you may not copy or
use it, or disclose it to anyone else. If you received it in error please
notify the sender immediately and then delete it from your system. Please
be advised that the views and opinions expressed in this e-mail may not
reflect the views and opinions of Associated Newspapers Limited or any of
its subsidiary companies. We make every effort to keep our network free
from viruses. However, you do need to check this e-mail and any attachments
to it for viruses as we can take no responsibility for any computer virus
which may be transferred by way of this e-mail. Use of this or any other
e-mail facility signifies consent to any interception we might lawfully
carry out to prevent abuse of these facilities.
Associated Newspapers Ltd. Registered Office: ███████████

This e-mail and any attached files are intended for the named addressee only. It contains information, which may be
confidential and legally privileged and also protected by copyright. Unless you are the named addressee (or authorised to
receive for the addressee) you may not copy or use it, or disclose it to anyone else. If you received it in error please notify
the sender immediately and then delete it from your system. Please be advised that the views and opinions expressed in
this e-mail may not reflect the views and opinions of Associated Newspapers Limited or any of its subsidiary companies.
We make every effort to keep our network free from viruses. However, you do need to check this e-mail and any
attachments to it for viruses as we can take no responsibility for any computer virus which may be transferred by way of
this e-mail. Use of this or any other e-mail facility signifies consent to any interception we might lawfully carry out to prevent
abuse of these facilit!

ies.
Associated Newspapers Ltd. Registered Office: ███████████████
████████

| | |
|---|---|
| From: | ████████████. (USAFLS) ‹████████████› |
| Sent: | Wednesday, March 09, 2011 4:33 PM |
| To: | ████████████ (USAFLS); ████████ (USAFLS); ████████ (USAFLS); ████ ████ (USAFLS); ████████ (USAFLS) |
| Cc: | ████████████. (FBI) |
| Subject: | Highly Confidential -- Preliminary Investigation of Additional Crimes of Jeffrey Epstein and Others |

| | |
|---|---|
| Importance: | High |

As all of you know, there has been much in the press lately about revelations by ████████████ regarding her
relationship with Jeffrey Epstein and his introduction of her to a number of highly placed world and business
leaders. Ms. ████████ was one of the victims identified in our initial investigation of Jeffrey Epstein, although at
the time we were only able to speak to her briefly on the telephone, and the agency and the office were unwilling
to spend the funds to fly a group to ████████ to interview her without an assurance that she would provide
complete information.

Through speaking with the press, Ms. ████████ made contact with Brad Edwards and his investigator, ████
Fisten, who in turn, reached out to me, and I to Special Agent ████████, regarding these new allegations. (They

EFTA00206294

are not allegations that we had heard from Ms. ███ during the initial investigation.) Special Agent ███ and I spoke briefly with Ms. ███ on Monday to arrange with her to do a formal interview, with FBI LegAt and ███████████ involvement, at the American embassy in ███ We are trying to set up that interview for Monday or Tuesday.

Today, Special Agent ███ and I met with Brad Edwards, ███ Fisten, and one of Brad Edwards' law partners, Steve Jaffe, regarding Ms. ███' allegations and other potential crimes uncovered during the course of Edwards' and Fisten's lengthy investigation of Epstein during their prosecution of several civil suits against him. I mean to provide you all with a lengthy legal memo discussing the potential charges against Epstein and the effect of the Non-Prosecution Agreement on any prosecution, but the things we learned today were of such significance, that I did not want to wait any longer.

███ Fisten provided us with the following information regarding ███████████. Ms. ███ has reported that she was flown all over the United States and Europe to have sex with a number of prominent men and one woman. All of the trips were on Epstein's private plane and after each encounter she was paid by Epstein. Ms. ███ also reports that the encounters were videotaped by Epstein and, at the end of each encounter, Epstein would "debrief" Ms. ███ and take notes. These allegations are consistent with information received during our investigation that Epstein made his millions by "getting dirt" on important people and blackmailing them. Ms. ███ also reported that Epstein gave her Xanax to keep her emotionally malleable.

The important people who were listed are: Governor Bill Richardson; Prince Andrew; Alan Dershowitz (oral sex when Ms. ███ was 16); Senator George Mitchell; (former) Israeli Prime Minister Ehud Barak; Les Wexner (CEO of The Limited Group/Victorias Secret); Ghislaine Maxwell; Glenn Dubin (founder of Highbridge Capital); and a Nobel Prize winning scientist from Harvard. Ms. ███ has allegedly seen some of the videos and she may have pictures or other documentation, but we will need to get that from her. She also said that there were a lot of other people that she was forced to have sex with, but she would need to see pictures to identify them. Ms. ███ also reported that President Bill Clinton came to Epstein's house several times and received "erotic massages," although not from her, and at least one of these happened while he was still president. Some of these encounters occurred in Palm Beach, some in New Mexico, some in the U.S. Virgin Islands, and some in Europe (all at Epstein's residences or on his plane). [Please note that the newspapers say "there is no allegation that there was any sexual contact with Prince Andrew" due to the libel laws in England that don't allow the un-corroborated statements to be published, but she did report having sex with all of the above-listed men to the reporter, according to Fister.]

Ms. ███ identified at least two other girls who were prostituted by Epstein to this high-profile men.

In addition to these crimes, Brad Edwards and ███ Fisten provided a lot of information regarding their own investigation of Epstein that relate to obstruction of justice, including: Epstein's perjury during a deposition in one of the civil cases that led the court reporter to approach Edwards and say "that is the clearest case of perjury I have ever seen and I will be happy to testify about it for you;" evidence of Epstein and his probation officer falsifying records showing that Epstein was at home while Epstein was in South Beach or outside the state; and Epstein sending a lawyer to see a victim who had been subpoenaed and telling her that the government was going to take away her baby if she cooperated.

And, last but certainly not least, there was a long discussion of Epstein's involvement with a modeling agency based in New York and Miami that was used as a front to bring in underage girls to service Epstein and his friends. There are a number of potential targets related to these allegations but, in short, the agency would submit fraudulent visa applications saying that the girls were here to model, but they were really brought in to prostitute – a classic human trafficking case. Epstein's partner has previously been discredited in connection with a former modeling agency he owned where he used promises of modeling contracts to sexually abuse young girls.

Edwards and Fister also have been in contact with a "source" who Epstein has contacted to discuss developing a new "system" to obtain large amounts of girls. They are going to provide Wende's card to this "source" to see if

EFTA00206295

he is willing to cooperate.

As mentioned, I will write up a formal memo with analysis and a proposed course of conduct.

██████████

Assistant U.S. Attorney

███████████████████

███████████████

████████

Fax ████████

---------

**From:** ████████████ (USAFLS) <████████████>
**Sent:** Monday, February 28, 2011 1:35 PM
**To:** ████████. (USAFLS)
**Subject:** RE: Jane Does 1 and 2 v. United States - CVRA Lawsuit (S.D.Fla.)

Sure – who is ██████ ████ by the way?

**From:** ████████████. (USAFLS)
**Sent:** Monday, February 28, 2011 1:29 PM
**To:** ██████████ (USAFLS); ████████ (USAFLS)
**Subject:** RE: Jane Does 1 and 2 v. United States - CVRA Lawsuit (S.D.Fla.)

Maybe after we finish with DOJ, the four of us (you two and ████ and I) can stay on and discuss a bit further? After my discussion with the person at Appellate and some case law research, I have some ideas.

██████████

Assistant U.S. Attorney

███████████████████

███████████████

████████

Fax ████████

EFTA00206296

Jeffrey Epstein
457 Madison Avenue
New York, NY 10022

Vicky Ward
Vanity Fair
4 Times Square
New York, NY  10036

Dear Ms. Ward,

Thank you for your letter of December 19th further documenting your reporting style. First with respect to my house. If you recall you asked me on numerous occasions, whether I had purchased #9 outright. You followed up with a similar question to Mr. ▉▉▉▉ on at least 2 occasions, I have told you repeatedly that, yes, in fact I did purchase it outright and you tirelessly repeated "then why were there no transfer taxes paid?" I explained in writing that transfer taxes are in most instances not made public. After sending you documentation on #9's transfer taxes, you then continued on #11. Also in writing, I told Graydon that I never owned #11. Add that to the fact that Graydon has told me that #11 is not part of the story and once again, like a Gospel choir, you chant: "but what about the transfer taxes?" Enclosed please find a copy of the transfer taxes paid, given to you off the record, confirming that I was only a trustee and once again requiring me to spend more time on questions whose relevance you have yet to describe.

In regard your question in your latest letter regarding refuting the claims of ▉▉▉ ▉▉▉. Why don't you detail those claims to me so that I and the State Trooper can respond to any factual claims? I hope the copy of this letter, also given to you off the record, will be given to Vanity Fair's lawyers, who should at last understand there is cause for concern. I think you will agree that the only quote "claim" that you describe to me was that ▉▉▉ ▉▉▉ had felt "uncomfortable" and asked her father to immediately come and get her. Are you now asking me to refute how "▉▉▉ ▉▉▉ felt"? A typical tabloid-like question. Or are you asking me whether she left? You certainly did not ask me who paid for her move or when or how

EFTA00026788

did she leave. (I paid.) The facts and circumstances surrounding ███ behavior, attitude and actions which include hundreds of dollars of unauthorized country club charges for massages, misrepresentations and erratic outbursts are easily verified by the former State Trooper, a highly reputable source, who lived on the property the entire time ███ was in residence. The trooper is a witness to what occurred during his stay in ███ He could testify to what he saw, but certainly cannot testify to what she felt. You have, at least until today, made no attempt whatsoever to contact this person that I made known to Graydon in writing, who will attest to these incidents and more. I can only believe the reason you have not is that knowing his version would contradict your article. In addition, you have already seen the letter ███ sent after she left ███ suggesting the idea of repaying her theft with paintings. Please find printouts of my message sheet from July 1996. Specifically it refers to ███ message confirming ███ massage at the country club and the fact that she did not immediately leave ███ You will also find country club bills detailing her financial misdeeds. With respect to ███ ███, you will recall that you specifically told me that there had been no allegations with respect ███. I was shocked then, to say the least, when the fact checker then faxed Ghislaine with the allegations regarding ███, in a fax dated only last Friday. You must admit that you had made no mention of this at any previous time. I have already sent documentation from ███ ███ comprising a postcard written from ███ after her ranch visit confirming her hardly disturbed attitude. Enclosed please find additional correspondence from ███ and ███ who helped her research student programs after her ranch visit. These are also given to you off the record.

I would like to point out to you that your statement the quotes were read to me in context, could be best exemplified by your question, "have you ever upgraded your friends to first class and why?" The context as you put it was only made clear when Erin Gladney faxed me the question: "we are also wondering if at any time you put upgrade stickers on airline tickets for any employees or friends of yours, if so can you explain how they work". Not exactly a quote read to me in context is it? If you truly believe that my quotes were read to me in context, I see no reason why you would not now send them to me in writing.

Please pay me the minimum courtesy and deny to me in writing the fact, or as you wrote it, the allegation contained in my letter to Graydon, the fact that on numerous occasions you have tirelessly repeated the sentence: "I am only a journalist hired by my editor to do a story and then required to publish what I hear". I am sure you now understand that this sentence

EFTA00026789

denigrates both you, your magazine and your profession. So if you did not on numerous occasions repeat this sentence to me I will accept your denial in writing.

Last, is the sentence in your letter that illustrates the lack of care and inattention to detail that you have so consistently portrayed. I know you can do better. You state that you "have simply been investigating these matters with people with knowledgeable sources". I am unqualified to comment on the sentence's grammar, but can only assume this will in future allow you to fall back on the idea that the inaccuracies and negligence weren't yours, they weren't even your sources, they could only be attributable to the lack of care of the so called people whose own sources must have misled them. For the record, I would also suggest to you that you repeatedly gave me inaccurate accounts of your deadline to, I believe, give me the false impression that time did not allow me to adequately research and respond.

Sincerely,

Jeffrey Epstein

P.S. In one of your last calls you referred to Michael Stroll as one of my clients. This was never true.

Reminder, this letter with its enclosures are all given to you off the record as it's sole purpose is to correct inaccuracies in your story.

Dictated but not read
Enclosure: 7 pages

EFTA00026790

On the basis of what I provided you off the record, you now understand that ██████ ██████ alleged feelings of uncomfortablness grew out of her own financial misdeeds. It is impossible to accurately tell this story without including these financial facts that would be deeply embarrassing to ████. However if you choose to include this highly subjective and undocumented material relating to her feelings you would have an obligation to tell the whole story including her financial misdeeds based on her own admissions, so long as you can do so without attributing the documents to me

EFTA00026791

Correspondence
Letter of Intent

Acquisition of Execujet
1. Correspondence
2. Memorandum
3. Purchase Agreement
4. Assets
5. Wire Instructions
6. Corporate Documents of Hairoun
7. Lease agreement and Amendment b/w VI Port Authority and Hairoun
8. Assignment of Lease between Port Authority and Hairoun
9. Terms of Leasehold with VIPA and Hairoun
10. Spill Prevention Plan and Addendum
11. Small Business Administration Loan Eric Williams
12. Due Diligence ( ALSO SEE BINDER)
13. Hairoun Complaint

GRM# 004740710

**Robert Couturier**

Dates, Meetings, Backup
Letter to Robert dated July 14, 2010
Couturier Correspondence Binder

**2008 FLIGHT LOGS/2009 & 2010 FLIGHT LOGS BINDER**

**Hyperion Manifest 1999 & 2000**

**Hyperion Manifest 2001 & 2002**

**Hyperion Manifest 2003-2004**

**JEGE Manifest 2001-2002**

**Financial Trust Company Inc. Corporate Binder**

GRM# 004740711

EFTA00300483

-Vorys Reviews

-Draft Contract of Sale

-Nominee Agreement

-Acknowledgement, Consent & Waiver

-NES, LLC Articles of Organization

-Lease Agreement

-Biennial Statement

-Non-Foreign Affidavit

-Purchase & Sale Agreement

-NYS TP 584

-NYC RPT

-Bill of Sale

-Lead Based Paint Disclosure Form

-Protect Your Family from Lead in Your Home

-Promissory Note

-Guaranty

-Assignment & Assumption Agreement

-Stock Power

-Stock Certificate

-Affidavit of Compliance Smoke Detector

-Certificate of Non-Foreign Status

-Miscellaneous Checks

-LHW Resignation of LHW as Director

-Minutes

-Settlement Statement

EFTA00300498

CLOSING BINDER FOR PURCHASE OF ZORRO RANCH BY ZORRO TRUST, MARCH 8, 1993

ORGANIZATIONAL INFORMATION OF ENTITIES JEE, SEPT 15, 2008

LAUREN KWINTER'S OLD SPIRAL NOTEBOOK

CONTENT TO CHANGE ATTORNEY –RADAR MAGAZINE


GRM#004750685

LEFCOURT CRIMINAL FILES


GRM#004750686

LEFCOURT OCT. 19, 2006 PB BINDER

██████████ CORRESPONDENCE POST 6/30/08

NATHAN DERSHOWITZ APPLICABLE FEDERAL LAW BINDER

PALM BEACH MATTERS: EPSTEIN BACKUP BINDER 1 OF 2

PALM BEACH MATTERS: EPSTEIN BACKUP BINDER 2 OF2

SEX OFFENDER REGISTRY

LEFCOURT INVESTIGATION OF ████████████

CIVIL CASES CD

INDEXES OF COMPUTER FILES


GRM#004750687

EFTA00300527

CONFIDENTIAL SUBMISSION TO CHILD EXPLOITATIONAND OBSCENITY SECTION

MISC. PALM BEACH BINDER

PB Matters 2012
Chronology of Relevant Doc's in PB Matter (CD)

GRM#004750684

FORM TRUST AGREEMENTS

Wexner Miscellaneous
1. YLK Charitable Fund
2. Annual Inv for Statutory Representation for Buckeye, LLC
3. 1099-DIV for the RHREI Trust

LSW CLIPPINGS (LESLIE WEXNER)

PB MARINE CONTRACTORS

BRIAN MOSELEY  PROGRESS PRINT, SEPT 28, 2005 LSJ

MOLYNEUX LSJ SET OF DRAWINGS MARCH 6, 2008

MCGUIRE GROUP. APRIL 12, 2007, WATER DEMAND MATRIX, UTILITIES MASTER PLAN REPORT JUNE 26, 2006, CONSTRUCTION PHASE DRAWING CP1, DRAWING L1 LANDSCAPE REVISED 1/5/07, Mech Building Sketch

ZORRO RANCH WATER RIGHST ABSTRACT REPORT BINDER, SEPT. 1, 2005

ZORRO RANCH KING BROTHERS LAND STORAGE

PURCHASE OF EXECUJET

EFTA00300526