UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

GHISLAINE MAXWELL,

     Movant,

  - v. -

UNITED STATES OF AMERICA,

     Respondent.

S2 20 Cr. 330 (PAE)

25 Civ. 10468 (PAE)

**MEMORANDUM OF LAW OF THE UNITED STATES OF AMERICA
IN OPPOSITION TO THE DEFENDANT'S MOTION UNDER 28 U.S.C. § 2255 TO
VACATE, SET ASIDE, OR CORRECT HER CONVICTION AND SENTENCE**

       JAY CLAYTON
       United States Attorney
       Southern District of New York
       Attorney for United States of America

Lara Pomerantz
Assistant United States Attorney
– Of Counsel –

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ........................................................................................... 1

STATEMENT OF FACTS .................................................................................................. 2

    A.    The Indictment ............................................................................................. 2

    B.    The Trial......................................................................................................... 2

        1.   The Government's Case .................................................................... 2

        2.   The Defense Case ............................................................................. 5

    C.    The Verdict ................................................................................................... 5

    D.    Post-Verdict Motion..................................................................................... 5

    E.    The Sentencing.............................................................................................. 6

    F.    The Appeal..................................................................................................... 6

    G.    The 2255 Motion and Amended 2255 Motion ........................................ 7

ARGUMENT...................................................................................................................... 7

    I.    Generally Applicable Law .......................................................................... 7

        A.  Section 2255 Motions .................................................................... 7

        B.  The Bar on Relitigating Issues Already Resolved in a Direct Appeal...................... 9

        C.  The Bar on Raising Claims in a Section 2255 Motion That Could Have Been Raised on Direct Appeal ................................... 9

    II.   Several of the Defendant's Claims Are Procedurally Barred, Because They Were Already Raised on Direct Appeal, and In Any Event Are Meritless ..................... 11

        A.  The Defendant's Claims Related to Alleged Juror Misconduct Are Both Barred and Meritless....................................................... 11

            1.   Relevant Facts ........................................................ 12

            2.   Discussion ................................................................ 14

        B.  The Defendant's Claims Related to Epstein's Non-Prosecution Agreement Are Both Barred and Meritless ................................. 20

            1.   Relevant Facts ........................................................ 20

            2.   Discussion ................................................................ 23

        C.  The Defendant's Claims Related to Alleged Constructive Amendment of the Indictment Are Both Barred and Meritless............................. 31

            1.   Relevant Facts ........................................................ 32

            2.   Discussion ................................................................ 34

    III.  The Majority of the Defendant's Remaining Claims Are Procedurally Barred, as She Failed to Raise Them on Appeal, and In Any Event Are Meritless............... 35

A.    The Defendant's Claims Related to the Victims, Their Lawyers, and Other Attacks on the Prosecution Are Barred and Meritless ........................................................ 35

    1.    Discussion ................................................................................................. 35

        a.    The Defendant's Claims Related to the Victims' Lawyers Are Barred and Meritless .............................................................................................. 35

        b.    The Defendant's Claims Related to the Victims Are Barred and Meritless 39

        c.    The Defendant's Miscellaneous Attacks on Her Conviction Are Barred and Meritless .............................................................................................. 42

        d.    The Defendant's Selective Prosecution Claim Is Barred and Meritless ...... 45

B.    The Defendant's Claims Related to Government Exhibit 52, The Defendant's and Epstein's Contact Book, Are Barred and Meritless ................................................. 48

    1.    Relevant Facts ........................................................................................... 49

    2.    Discussion ................................................................................................. 52

C.    The Defendant's Claims Related to Financial Evidence Are Barred and Meritless 56

    1.    Relevant Facts ........................................................................................... 56

    2.    Discussion ................................................................................................. 56

D.    The Defendant's Claims Related to Pre-Indictment Delay Are Barred and Meritless ........................................................................................................................... 58

    1.    Relevant Facts ........................................................................................... 59

    2.    Discussion ................................................................................................. 61

E.    The Defendant's Claims Related to Her Sentence Are Barred and Meritless ......... 69

    1.    Discussion ................................................................................................. 69

IV.    The Defendant's Claims Related to Government Exhibit 51, The Green Massage Table, Are Meritless ..................................................................................................... 77

A.    Relevant Facts ................................................................................................... 78

B.    Applicable Law .................................................................................................. 80

C.    Discussion .......................................................................................................... 81

V.    The Defendant's Additional EFTA-Related Claims Are Barred and Meritless ...... 88

VI.    The Defendant Is Not Entitled to a Hearing .......................................................... 91

CONCLUSION ................................................................................................................. 93

## TABLE OF AUTHORITIES

**Cases**

*Beniquez v. Johnson*, No. 21 Civ. 1467 (PAE), 2023 WL 3948738 (S.D.N.Y. June 12, 2023) .. 93

*Boisen v. United States*, 181 F. Supp. 349 (S.D.N.Y. 1960) ........................................ 88

*Bousley v. United States*, 523 U.S. 614 (1998) ........................................... 7, 10, 11, 61

*Brady v. Maryland*, 373 U.S. 83 (1963) ................................................... 23, 77

*Brudi v. United States*, No. Civ. 962 (JPO), 2014 WL 6390302 (S.D.N.Y. Nov. 17, 2014) ....... 92

*Chang v. United States*, 250 F.3d 79 (2d Cir. 2001) .................................. 92-93

*Chin v. United States*, 622 F.2d 1090 (2d Cir. 1980) .............................. 9, 23

*Cobb v. Pozzi*, 363 F.3d 89 (2d Cir. 2003) ........................................ 46

*Coleman v. Thompson*, 501 U.S. 722 (1991) ................................ 10

*Gonzalez v. United States*, 722 F.3d 118 (2d Cir. 2013) ....................... 91, 92

*Green v. United States*, 260 F.3d 78 (2d Cir. 2001) ...................... 8

*Herrera v. Collins*, 506 U.S. 390 (1993) ................................... 11

*Lamberti v. United States*, 22 F. Supp. 2d 60 (S.D.N.Y. 1998) ............................ 25, 88

*Maxwell v. United States*, 146 S. Ct. 93 (2025) ...................................... 1, 7

*McCleskey v. Zant*, 499 U.S. 467 (1991) ................................ 10, 11, 36, 53, 56, 57, 58

*McDonough Power Equip. v. Greenwood*, 464 U.S. 548 (1984) ............................. 13

*McLean v. United States*, No. 12 Civ. 1954 (RJS), 2016 WL 3910664 (S.D.N.Y. July 13, 2016) ................................................................................................. 91

*Mui v. United States*, 614 F.3d 50 (2d Cir. 2010) ................................... 8, 93

*Orbach v. United States*, No. 11 Cr. 111 (NRB), 2017 WL 5632815 (S.D.N.Y. Nov. 7, 2017).. 92

*Puglisi v. United States*, 586 F.3d 209 (2d Cir. 2009) ............................ 92

*Rahmankulov v. United States*, Nos. 23 Civ. 3206 (RA), 20 Cr. 653 (RA), 2023 WL 3303949 (S.D.N.Y. May 8, 2023) ........................................................................ 8

*Reed v. Ross*, 468 U.S. 1 (1984) ................................................ 10

*Reese v. United States*, 329 F. App'x 324 (2d Cir. 2009) ............................ 9

*Restrepo v. United States*, 533 F. Supp. 2d 359 (S.D.N.Y. 2008) ........................ 25, 26

*Riascos-Prado v. United States*, 66 F.3d 30 (2d Cir. 1995) ...................................................... 8-9

*Salazar-Espinosa v. United States*, No. 11 Civ. 0247 (LAK), 2011 WL 2946166 (S.D.N.Y. July 11, 2011) ................................................................................................................................ 88

*Simmons v. Abruzzo*, 49 F.3d 83 (2d Cir. 1995) ........................................................................ 8

*Strickler v. Greene*, 527 U.S. 263 (1999) ........................................................................... 11, 25

*United States v. Aiello*, 814 F.2d 109 (2d Cir. 1987) ............................................................... 92

*United States v. Al-Moayad*, 545 F.3d 139 (2d Cir. 2008) ................................................. 84-85

*United States v. Alameh*, 341 F.3d 167 (2d Cir. 2003) ............................................................ 46

*United States v. Annabi*, 771 F.2d 670, 672 (2d Cir. 1985) ................................................ 22-23

*United States v. Armstrong*, 517 U.S. 456 (1996) .................................................................... 46

*United States v. Avellino*, 136 F.3d 249 (2d Cir. 1998) ..................................................... 80, 81

*United States v. Barcelo*, 628 F. App'x 36 (2d Cir. 2015) ................................................. 39, 81

*United States v. Birney*, 686 F.2d 102 (2d Cir. 1982) .............................................................. 63

*United States v. Blaszczak*, 308 F. Supp. 3d 736 (S.D.N.Y. 2018) ......................................... 39

*United States v. Bokun*, 73 F.3d 8 (2d Cir. 1995) ..................................................................... 8

*United States v. Brennerman*, No. 17 Cr. 337 (RJS), 2023 WL 2242051 (S.D.N.Y. Feb. 27, 2023) ........................................................................................................................................ 9, 23

*United States v. Collins*, 409 F. Supp. 3d 228 (S.D.N.Y. 2019) .......................................... 43, 81

*United States v. Dhinsa*, 243 F.3d 635 (2d Cir. 2001) ............................................................ 85

*United States v. Fares*, 978 F.2d 52 (2d Cir. 1992) ................................................................. 46

*United States v. Finnerty*, 411 F. Supp. 2d 428 (S.D.N.Y. 2006) ........................................... 81

*United States v. Frady*, 456 U.S. 152 (1982) ........................................................ 7, 8, 10, 36, 53

*United States v. Gagliardi*, 506 F.3d 140 (2d Cir. 2007) ........................................................ 85

*United States v. Garcia*, 509 F. App'x 40 (2d Cir. 2013) ....................................................... 39

*United States v. Gomez*, 580 F.3d 94 (2d Cir. 2009) ............................................................... 74

*United States v. Gonzalez*, 33 F.R.D. 280 (S.D.N.Y. 1960) ............................................... 55, 87

*United States v. Graham*, 484 F.3d 413 (6th Cir. 2007) .......................................................... 39

*United States v. Greer*, 285 F.3d 158 (2d Cir. 2000) .............................................................. 17

*United States v. Josleyn*, 206 F.3d 144 (1st Cir. 2000) ................................................................ 38

*United States v. Lewis*, 517 F.3d 20 (1st Cir. 2008) ................................................................ 47

*United States v. Lighte*, 782 F.2d 367 (2d Cir. 1986) ................................................................ 87

*United States v. Locascio*, 6 F.3d 924 (2d Cir. 1993) ................................................................ 80

*United States v. Long*, 697 F. Supp. 651 (S.D.N.Y. 1988) ........................................................... 63

*United States v. Lopez-Cabrera*, Nos. 11 Cr. 1032-14 (PAE), 21 Civ. 7804 (PAE), 2023 WL 2612582 (S.D.N.Y. Mar. 23, 2023) ....................................................................................... 92

*United States v. Madori*, 419 F.3d 159 (2d Cir. 2005) ................................................................ 25

*United States v. Malpeso*, 17 F. App'x 23 (2d Cir. 2001) ........................................................... 84

*United States v. Maxwell*, 118 F.4th 256 (2d Cir. 2024)  ... 1, 12, 13, 14, 22, 24, 28, 30, 33, 34, 75

*United States v. Maxwell*, 534 F. Supp. 3d 299 (S.D.N.Y. 2021)........................................... passim

*United States v. Maxwell*, 545 F. Supp. 3d 72 (S.D.N.Y. 2021) ..................................... 37, 44, 45

*United States v. Maxwell*, No. 20 Cr. 330 (AJN), 2022 WL 576306 (S.D.N.Y. Feb. 25, 2022)… ...................................................................................................................................... 18-19

*United States v. Maxwell*, No. 20 Cr. 330 (AJN), 2021 WL 3591801 (S.D.N.Y. Aug. 13, 2021) ...................................................................................................... 22, 60, 65, 66, 67

*United States v. Maxwell*, No. 20 Cr. 330 (AJN), 2022 WL 986298 (S.D.N.Y. Apr. 1, 2022) ...................................................................................... 5, 13, 14, 16, 17, 20, 21

*United States v. Maxwell*, No. 20 Cr. 330 (AJN), 2022 WL 1294433 (S.D.N.Y. Apr. 29, 2022) ...................................................................................... 6, 33, 60, 61, 62, 67, 68, 70

*United States v. Middendorf*, No. 18 Cr. 36 (JPO), 2018 WL 3956494 (S.D.N.Y. Aug. 17, 2018) .................................................................................................................... 39, 81, 82

*United States v. Olvis*, 97 F.3d 739 (4th Cir. 1996) ................................................................ 47

*United States v. Payne*, 63 F.3d 1200 (2d Cir. 1995) ................................................................ 25

*United States v. Pitcher*, 559 F.3d 120 (2d Cir. 2009) ................................................................ 34

*United States v. Quinn*, 445 F.2d 940 (2d Cir. 1971) ................................................................ 80

*United States v. Re*, 401 F.3d 828 (7th Cir. 2005) ................................................................ 48

*United States v. Reese*, 933 F. Supp. 2d 579 (S.D.N.Y. 2013) ................................................... 48

*United States v. Regan*, 103 F.3d 1072 (2d Cir. 1997) ............................................................ 48

*United States v. Robinson*, No. 20 Cr. 415 (KMW), 2025 WL 1603916 (S.D.N.Y. June 6, 2025) ................................................................................................................................... 92

*United States v. Sanchez*, 969 F.2d 1409 (2d Cir. 1992) ............................................................. 87

*United States v. Sanin*, 252 F.3d 79 (2d Cir. 2001) ...................................................... 9, 75, 76

*United States v. Siddiqi*, 959 F.2d 1167 (2d Cir. 1992) ........................................................ 84, 87

*United States v. Sisti*, 91 F.3d 305 (2d Cir. 1996) ...................................................................... 74

*United States v. Sun Myung Moon*, 718 F.2d 1210 (2d Cir. 1983) ............................................. 46

*United States v. Terry*, 17 F.3d 575 (2d Cir. 1994) .................................................................... 38

*United States v. Thorn*, 659 F.3d 227 (2d Cir. 2011) ................................... 9, 35, 56, 61, 70, 71, 72

*United States v. Torres*, 128 F.3d 38 (2d Cir. 1997) ................................................................... 17

*Wayte v. United States*, 470 U.S. 598 (1985) ............................................................................. 46

*Young v. United States ex rel. Vuitton et Fils S.A.*, 481 U.S. 787 (1987) .................................... 38

*Youngblood v. West Virginia*, 547 U.S. 867, 870 (2006) .............................................................25

*Zhang v. United States*, 506 F.3d 162 (2d Cir. 2007) ...................................................... 9, 35, 56

**Rules**

Fed. R. Crim. P. 16 ............................................................................................................... 80, 81

Fed. R. Evid. 901 ....................................................................................................................... 85

**Statutes**

18 U.S.C. § 371 ............................................................................................................................ 2

18 U.S.C. § 1591 .......................................................................................................................... 2

18 U.S.C. § 1623 .......................................................................................................................... 2

18 U.S.C. § 2422 .......................................................................................................................... 2

18 U.S.C. § 2423 .......................................................................................................................... 2

28 U.S.C. § 1915 ........................................................................................................................ 93

28 U.S.C. § 2255 .................................................................................................................. passim

N.Y. Penal Law § 130.55 ............................................................................................................ 33

**PRELIMINARY STATEMENT**

The Government respectfully submits this memorandum in opposition to the *pro se* motion (the "Motion" or "Mot.") and the amended *pro se* motion (the "Amended Motion" or "Am. Mot.", together with the Motion, the "Motions") filed by defendant Ghislaine Maxwell pursuant to 28 U.S.C. § 2255. Through the Motions, the defendant seeks to sweep away the judgment of conviction representing the solemn verdict of a jury following a four-and-a-half week trial, convicting her for her instrumental role in the horrific sexual abuse of multiple young teenage girls, and the considered 240-month sentence imposed for that conduct by then-United States District Judge Alison J. Nathan. The defendant seeks to undo this judgment after it was affirmed by the United States Court of Appeals for the Second Circuit, *see United States v. Maxwell*, 118 F.4th 256 (2d Cir. 2024), and after certiorari was denied by the United States Supreme Court, *see Maxwell v. United States*, 146 S. Ct. 93 (2025).

None of the defendant's claims has any merit. The majority are procedurally defaulted, and thus barred at this belated stage. Many were raised in her direct appeal and rejected by the Second Circuit. Nearly all the remainder could have been raised on appeal but were not. The law does not permit them to be raised now (even if they had merit, which they do not).

What remains are the defendant's arguments that, since the conclusion of her trial, supposedly newly available evidence has emerged purportedly demonstrating constitutional violations that undermined the fairness of her trial and that allegedly would have caused no reasonable juror to convict her. It is not so. The supposedly new evidence the defendant cites, including documents released by the Department of Justice under the Epstein Files Transparency Act ("EFTA"), Pub. L. 119-38, 139 Stat. 656 (Nov. 19, 2025), affords her no relief. At bottom, the defendant's claims—to the extent not barred, and nearly all are—are speculative (at best); rest on a misreading or mischaracterization of the record; fail to establish even potential prejudice,

much less the required actual prejudice; and/or rely on a misunderstanding or misstatement of the law.  In short, the defendant—for multiple, independent reasons—utterly fails to carry her burden to overturn her proper conviction and just sentence.

## STATEMENT OF FACTS

### A.  The Indictment

Superseding Indictment S2 20 Cr. 330 (AJN) (the "Indictment") was filed on March 29, 2021, in eight counts.  Count One charged the defendant with conspiracy to entice minors to travel to engage in illegal sex acts, in violation of 18 U.S.C. § 371.  Count Two charged the defendant with enticement of a minor, in violation of 18 U.S.C. §§ 2422 and 2.  Count Three charged the defendant with conspiracy to transport minors to engage in illegal sexual activity, in violation of 18 U.S.C. § 371.  Count Four charged the defendant with transportation of a minor with intent to engage in illegal sexual activity, in violation of 18 U.S.C. §§ 2423(a) and 2.  Count Five charged the defendant with sex trafficking conspiracy, in violation of 18 U.S.C. § 371.  Count Six charged the defendant with sex trafficking of a minor, in violation of 18 U.S.C. §§ 1591(a) & (b)(2) and 2.  Counts Seven and Eight charged the defendant with perjury, in violation of 18 U.S.C. § 1623.

### B.  The Trial

Trial on Counts One through Six commenced on November 29, 2021 and ended on December 29, 2021.[1]

#### 1.  The Government's Case

The Government's evidence at trial established that over the course of a decade, the defendant facilitated and participated in the sexual abuse of multiple young girls.  From 1994 to

---

[1] On April 16, 2021, Judge Nathan severed the perjury counts for a separate trial.  *United States v. Maxwell*, 534 F. Supp. 3d 299, 320-21 (S.D.N.Y. 2021).

2004, the defendant and Jeffrey Epstein worked together to identify girls, groom them, and then entice them to travel and transport them to Epstein's properties in New York, Florida, New Mexico, and elsewhere. The girls—some of whom were as young as 14 years old—were then sexually abused, often under the guise of a "massage."

The evidence at trial included, among other things, the testimony of four women who described the sexual abuse they suffered at the hands of the defendant and Epstein; the testimony of former employees of Epstein and the defendant; the testimony of law enforcement officers; corroborating physical evidence, including photographs of and evidence recovered from searches of Epstein's residences and the defendant's and Epstein's black address book; and other corroborating records, such as flight logs of Epstein's private planes and FedEx records.

Beginning in approximately 1991, the defendant had a close and intimate relationship with Epstein. (Tr. 1494-96; GX 422).[2] The defendant was Epstein's girlfriend for many years, until the early 2000s, after which the defendant and Epstein remained close friends. (Tr. 1494-96; GX 422). For over a decade, the defendant traveled with Epstein, a multi-millionaire, on his private planes and mingled with rich and famous people, while enjoying a life of extraordinary luxury. (Tr. 96-99, 233-34, 303-04, 1194). The defendant and Epstein spent time together in Epstein's various properties, including his mansion on the Upper East Side in Manhattan, his villa in Palm Beach, his ranch in New Mexico, his apartment in Paris, and his private island in the U.S. Virgin Islands. (Tr. 99). The defendant also received a townhouse that Epstein bought for her in New

---

[2] "Tr." refers to the trial transcript; "GX" refers to a Government exhibit at trial; "[Date] Tr." refers to the transcript of court proceedings on the identified date; "Dkt." refers to an entry on the docket for this case; and "PSR" refers to the Presentence Investigation Report prepared by the United States Probation Office in connection with the defendant's sentencing and amended on July 1, 2022. Unless otherwise noted, case quotations omit internal quotation marks, citations, alterations, and footnotes.

York City, and Epstein transferred more than $23 million to the defendant during the timeframe of the conspiracy.  (Tr. 1194, 1310-17).

In addition to her role as Epstein's girlfriend, the defendant also supervised Epstein's households as "the lady of the house."  (Tr. 95, 783-84).  When she took charge of Epstein's homes, she imposed strict rules for staff, some of which were included in a household manual dictating the operation of the Palm Beach residence.  (Tr. 807-08, 823-31).

To protect her criminal activities from exposure, the defendant fostered a culture of silence at Epstein's homes.  (Tr. 784, 826).  The household manual made clear that staff were to "see nothing, hear nothing, say nothing, except to answer a question directed at" that staff member.  (Tr. 826).  The defendant directed Juan Alessi, the former manager of Epstein's Palm Beach villa, to speak to Epstein only when spoken to and not to look Epstein in the eyes.  (Tr. 784).

This culture of silence provided cover for the defendant and Epstein to sexually abuse young girls.  In the early phase of the conspiracy, between 1994 and 2001, the defendant and Epstein identified vulnerable girls, typically from single-mother households and difficult financial circumstances.  (Tr. 295, 1178, 2051-52).  They then isolated the girls, spending time with them away from their family and friends.  (Tr. 296-99, 1175-82, 2069-70, 2077-79).  During that time, they groomed the girls through techniques such as giving them gifts, pretending to be friends, and building trust.  (Tr. 298-303, 348, 2079-81).  The defendant and Epstein then normalized sexual situations and sexual touching.  (Tr. 300-01, 2081-84).  Finally, they transitioned to sexual abuse, often through the pretext of giving Epstein a massage.  (Tr. 306-15, 319-23, 1183-88, 2084-88).[3]

---

[3] These techniques were the textbook methods of child predators.  At trial, Dr. Lisa Rocchio, an expert in psychology with a specialized expertise in traumatic stress and interpersonal violence, explained that children are most frequently sexually abused through grooming and coercion in the context of a relationship.  (Tr. 713).  Dr. Rocchio explained that abusers use a series of deceptive tactics to engage a child in sexual abuse.  (Tr. 715-20).

In the later phase of the scheme, from 2001 through 2004, the defendant and Epstein developed a stream of girls who recruited each other to visit Epstein at his Palm Beach residence. (Tr. 1518-25, 1543-46).  The defendant and Epstein paid young girls hundreds of dollars in cash in exchange for meeting Epstein to be sexually abused, under the pretext of giving Epstein a massage.  (Tr. 1518-25, 1540-41, 1544-46).  Once a girl was introduced to these sexualized massages, she was offered more money if she brought other girls to engage in sexualized massages. (Tr. 1544-45).

The trial evidence focused on six girls who suffered abusive sexual contact as a result of the defendant's criminal actions: Jane, Kate, Annie, Carolyn, Virginia, and Melissa.  *See United States v. Maxwell*, No. 22-1426, ECF No. 79 at 6-12 (detailing sexual abuse of six girls).

### 2.  The Defense Case

The defendant called nine witnesses in her defense case, including former employees and associates, as well as an expert on memory.  (Tr. 2327-2531, 2595-2684).

### C.  The Verdict

Trial on Counts One through Six commenced on November 29, 2021, and ended on December 29, 2021, when the jury found the defendant guilty on Counts One and Three through Six, and acquitted the defendant on Count Two.

### D.  Post-Verdict Motion

On April 1, 2022, Judge Nathan denied the defendant's motion for a new trial pursuant to Federal Rule of Criminal Procedure 33 based on a juror's provision of inaccurate information during jury selection.  *United States v. Maxwell*, No. 20 Cr. 330 (AJN), 2022 WL 986298 (S.D.N.Y. Apr. 1, 2022).  On April 29, 2022, Judge Nathan denied all but one of the defendant's remaining post-trial motions.  *United States v. Maxwell*, No. 20 Cr. 330 (AJN), 2022 WL 1294433

5

(S.D.N.Y. Apr. 29, 2022).  Judge Nathan found that the three conspiracy counts (Counts One, Three, and Five) were multiplicitous and that she would, therefore, enter judgment on Count Three alone among the conspiracy counts.  *Id.* at *1.  Judge Nathan explained, "This legal conclusion in no way calls into question the factual findings made by the jury.  Rather, it underscores that the jury unanimously found—three times over—that the Defendant is guilty of conspiring with Epstein to entice, transport, and traffic underage girls for sexual abuse."  *Id.*

### E.  The Sentencing

On June 28, 2022, Judge Nathan sentenced the defendant to 60 months' imprisonment on Count Three, 120 months' imprisonment on Count Four, and 240 months' imprisonment on Count Six, all to run concurrently, to be followed by five years' supervised release, and imposed a $750,000 fine and a $300 mandatory special assessment.

### F.  The Appeal

On July 7, 2022, the defendant filed a notice of appeal.  (Dkt. 697).  On February 28, 2023, the defendant filed a brief arguing that, as relevant here: (1) the non-prosecution agreement that the U.S. Attorney's Office for the Southern District of Florida entered into with Epstein barred the defendant's prosecution in the Southern District of New York; (2) the defendant was denied her right to a fair and impartial jury because a juror failed to disclose during voir dire that he was sexually abused as a child, and therefore incorrectly answered three questions on his written questionnaire; (3) Judge Nathan's response to a jury note resulted in a constructive amendment of, or prejudicial variance from, the allegations in the Indictment; and (4) the defendant's sentence was procedurally unreasonable because Judge Nathan erred by applying a four-level leadership enhancement under § 3B1.1 of the United States Sentencing Guidelines ("U.S.S.G." or the "Guidelines").  *See United States v. Maxwell*, No. 22-1426, ECF No. 59.

6

The Second Circuit rejected the defendant's arguments and affirmed the judgment of the District Court. *See Maxwell*, 118 F.4th 256. The Supreme Court then denied certiorari. *See Maxwell*, 146 S. Ct. 93.

### G. The 2255 Motion and Amended 2255 Motion

On December 17, 2025, the defendant filed her *pro se* motion seeking to vacate, set aside, or correct her conviction and sentence pursuant to 28 U.S.C. § 2255(a) (referred to herein as the Motion). (Dkt. 855-1). The defendant generally argued that since the conclusion of her trial, supposedly newly available evidence emerged that demonstrated constitutional violations that undermined the fairness of her proceedings. She raised nine principal grounds for relief which she claimed are supported by newly discovered or previously suppressed evidence.

On or about April 20, 2026, the defendant filed an amended *pro se* motion pursuant to 28 U.S.C. § 2255(a) (referred to herein as the Amended Motion). The defendant argued that based on supposedly newly available evidence, derived from, among other things, EFTA, no reasonable juror would have convicted her. The defendant cited additional documents—mostly derived from EFTA—in support of her nine principal grounds for relief.

### ARGUMENT

## I.    Generally Applicable Law

### A. Section 2255 Motions

Title 28, United States Code, Section 2255 provides a mechanism to "vacate, set aside, or correct" a sentence imposed in violation of the laws or Constitution of the United States. "Habeas review is an extraordinary remedy and will not be allowed to do service for an appeal." *Bousley v. United States*, 523 U.S. 614, 621 (1998); *United States v. Frady*, 456 U.S. 152, 165 (1982) ("[W]e have long and consistently affirmed that a collateral challenge may not do service for an

7

appeal."). Society's interest in the finality of criminal judgments animates this procedural rule and compels its vigorous enforcement. *See Mui v. United States*, 614 F.3d 50, 53 (2d Cir. 2010). To obtain relief under Section 2255, a defendant must establish "a constitutional error, a lack of jurisdiction in the sentencing court, or an error of law or fact that constitutes 'a fundamental defect which inherently results in a complete miscarriage of justice.'" *United States v. Bokun*, 73 F.3d 8, 12 (2d Cir. 1995) (quoting *Hill v. United States*, 368 U.S. 424, 428 (1962)). This is a "significantly higher hurdle than would exist on direct appeal." *Frady*, 456 U.S. at 166.

Where a defendant proceeds *pro se*, her submissions will be "liberally construed in [her] favor," *Simmons v. Abruzzo*, 49 F.3d 83, 87 (2d Cir. 1995), and will be read "to raise the strongest arguments that they suggest." *Green v. United States*, 260 F.3d 78, 83 (2d Cir. 2001); *see also Rahmankulov v. United States*, Nos. 23 Civ. 3206 (RA), 20 Cr. 653 (RA), 2023 WL 3303949, at *1 (S.D.N.Y. May 8, 2023). "Nevertheless, a *pro se* litigant is not exempt 'from compliance with relevant rules of procedural and substantive law.'" *Rahmankulov*, 2023 WL 3303949, at *1 (quoting *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 477 (2d Cir. 2006)).[4]

---

[4] The defendant states that she is proceeding *pro se*. The Government notes, however, that the Government received both the Motion and the Amended Motion and their corresponding voluminous exhibits on USB drives in FedEx envelopes sent by Leah Saffian, Esq., an attorney who in 2025 represented herself to be the defendant's lawyer. Indeed, on November 14, 2025—a month *before* the Motion was filed—Saffian released a document titled, "STATEMENT BY LEAH SAFFIAN, Counsel to Ghislaine Maxwell" that refers to the defendant's "privileged client-attorney email correspondence" with Saffian and makes arguments about the defendant's not-yet-filed 2255 motion—arguments that mirror those made in the Motion. *See* https://s3.documentcloud.org/documents/26278869/statement-from-maxwells-lawyer.pdf. Saffian also represented herself to be counsel for the defendant in the Deputy Attorney General's July 2025 interview of the defendant. *See* https://www.justice.gov/storage/audio-files/Interview%20Transcript/Interview%20Transcript%20-%20Maxwell%202025.07.24%20(Redacted).pdf.

### B. The Bar on Relitigating Issues Already Resolved in a Direct Appeal

If an issue has been "raised and considered on direct appeal" a motion under Section 2255 may not be employed to relitigate that issue. *Riascos-Prado v. United States*, 66 F.3d 30, 33 (2d Cir. 1995); *see, e.g., United States v. Pitcher*, 559 F.3d 120, 123 (2d Cir. 2009) ("'It is well established that a § 2255 petition cannot be used to relitigate questions which were raised and considered on direct appeal.'" (quoting *United States v. Sanin*, 252 F.3d 79, 83 (2d Cir. 2001)); *see also Chin v. United States*, 622 F.2d 1090, 1092 (2d Cir. 1980) ("[I]t is well-settled that once a matter had been decided adversely to a defendant on direct appeal it cannot be relitigated in a collateral attack.").

A district court may revisit questions decided by the Court of Appeals on direct appeal "only where there has been an intervening change in the law and the new law would have exonerated [the] defendant had it been in force before the conviction was affirmed on direct appeal." *Chin*, 622 F.2d at 1092. The defendant bears the burden to affirmatively "show that there is new law which, when applied to [her] claims, would result in a different disposition," *id.*; absent such a showing, the defendant is, "as a threshold matter, . . . collaterally estopped from relitigating [such] issue[s]," *Sanin*, 252 F.3d at 83; *accord Reese v. United States*, 329 F. App'x 324, 326-27 (2d Cir. 2009) (applying *Sanin* and *Chin*); *United States v. Brennerman*, No. 17 Cr. 337 (RJS), 2023 WL 2242051, at *2 (S.D.N.Y. Feb. 27, 2023) (same).

### C. The Bar on Raising Claims in a Section 2255 Motion That Could Have Been Raised on Direct Appeal

Defendants seeking post-conviction relief also cannot use a Section 2255 motion to litigate questions that could have been raised on direct appeal but were not. *See Zhang v. United States*, 506 F.3d 162, 166 (2d Cir. 2007); *see also United States v. Thorn*, 659 F.3d 227, 231 (2d Cir. 2011) ("In general, a defendant is barred from collaterally challenging a conviction under § 2255 on a

9

ground that he failed to raise on direct appeal.").  Where a defendant has procedurally defaulted a claim by failing to raise it on direct appeal, a court may reach the merits only if the defendant "can first demonstrate either cause and actual prejudice, or that he is actually innocent."  *Bousley*, 523 U.S. at 622.

The Supreme Court has made clear that "cause" is measured by a stringent standard of diligence.  *See, e.g.*, *Coleman v. Thompson*, 501 U.S. 722, 752 (1991) ("Cause" is "something *external* to the petitioner" which "cannot be fairly attributed to him.") (emphasis in original). "Cause" to excuse a procedural default may exist where a claim "is so novel that its legal basis [was] not reasonably available to counsel." *Reed v. Ross*, 468 U.S. 1, 16 (1984).  Novelty, however, "cannot constitute cause if it means simply that a claim was unacceptable to that particular court at that particular time." *Bousley*, 523 U.S. at 623.  "For cause to exist, . . . the reasonable unavailability of the factual basis for the claim [] must have prevented petitioner from raising the claim." *McCleskey v. Zant*, 499 U.S. 467, 497-98 (1991).  A claim is "reasonably available" if at the time of the default, it was being raised by litigants and addressed by the courts.  *See Bousley*, 523 U.S. at 622-23 (claim not "novel" where judicial decisions show that the legal basis for the claim was "reasonably available").

In addition to showing "cause," a defendant seeking post-conviction relief despite her procedural default is also required to demonstrate "prejudice" that ensues from the default.  That burden also is substantial.  A defaulting defendant "must shoulder the burden of showing, not merely that the errors at his trial created a *possibility* of prejudice, but that they worked to his *actual* and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *Frady*, 456 U.S. at 170 (emphasis in original).  This burden "is even greater than the showing required to establish plain error on direct appeal." *Id.* at 166.  The Supreme Court has

10

further explained that a defendant who has defaulted her claim "must convince us that there is a reasonable probability that the result of the trial would have been different" absent the error. *Strickler v. Greene*, 527 U.S. 263, 289 (1999).

If a defendant cannot demonstrate "cause" for her procedural default, she can attempt to obtain review for her claim by establishing "that a fundamental miscarriage of justice would result from a failure to entertain the claim." *McCleskey*, 499 U.S. at 494-95. The Supreme Court has repeatedly emphasized that by the term "fundamental miscarriage of justice," it means the "actual innocence" of the defendant. *See Herrera v. Collins*, 506 U.S. 390, 404 (1993). "[A]ctual innocence means factual innocence, not mere legal insufficiency." *Bousley*, 523 U.S. at 623.

## II.     Several of the Defendant's Claims Are Procedurally Barred, Because They Were Already Raised on Direct Appeal, and In Any Event Are Meritless

The defendant's attempt to use Section 2255 to relitigate several issues that were raised, considered, and rejected on direct appeal (or at the very least could have been so raised) is barred under settled law. Even if she were permitted to raise such claims at this late stage—and she is not—they are meritless. And to the extent that the defendant contends that supposedly newly available evidence warrants revisiting these same claims, she is demonstrably wrong.

### A.  The Defendant's Claims Related to Alleged Juror Misconduct Are Both Barred and Meritless

The defendant first argues that her conviction must be vacated because Juror 50 allegedly "gave false answers during voir dire, concealing a history of sexual abuse directly relevant to issues at trial." (Mot. 2). In support of her argument, the defendant claims that "[s]ubsequent interviews, new evidence and sworn statements confirm intentional concealment and actual bias," which allegedly deprived her of her Sixth Amendment right to an impartial jury and her Fifth Amendment right to due process. (*Id.*). The record and law are to the contrary.

11

After a post-trial hearing, Judge Nathan concluded that the juror's error in answering certain questions was inadvertent, and in any event, Judge Nathan would not have struck the juror for cause had he answered the pertinent questions accurately because he was not biased in any way against the defendant and was qualified to serve as a juror. Judge Nathan accordingly found that the defendant failed to meet the high bar for a new trial and denied her motion. The Second Circuit affirmed that careful fact-bound determination. The defendant is barred from relitigating this claim—and none of the supposedly "new evidence" cited by the defendant seeking to effect an end-run around the relitigation bar remotely warrants overturning the considered judgements of both Judge Nathan and the Second Circuit.

### 1. Relevant Facts

In advance of trial, prospective jurors completed a "lengthy" written questionnaire, with "several questions raising issues relevant to the trial." *Maxwell*, 118 F.4th at 262. Based on the completed questionnaires, the parties selected prospective jurors to proceed to in-person voir dire. *Id.* Judge Nathan ultimately empaneled a jury. *Id.*

Following the December 29, 2021 verdict, Juror 50 gave press interviews during which he stated that he was a survivor of child sexual abuse. *Id.* In his answers to the written jury questionnaire, however, Juror 50 had answered "no" to three questions asking whether he or a friend or family member had ever been the victim of a crime; whether he or a friend or family member had ever been the victim of sexual harassment, sexual abuse, or sexual assault; and whether he or a friend or family member had ever been accused of sexual harassment, sexual abuse, or sexual assault. *Id.*[5]

---

[5] In his questionnaire, Juror 50 repeatedly made clear that he could be fair and impartial. (*See, e.g.*, Dkt. 638 at 7 (indicating that Juror 50 could decide the case "based solely on the evidence or lack of evidence presented in Court, and not on the basis of conjecture, suspicion, bias, sympathy, or prejudice."); *id.* at 6 (accepting the principle that the law provides that a defendant in a criminal

12

Upon learning of the interviews, the Government filed a letter on January 5, 2022, alerting Judge Nathan to the interviews and requesting a hearing. (Dkt. 568). The defendant then moved for a new trial under Federal Rule of Criminal Procedure 33. (Dkt. 613, 642).

On March 8, 2022, Judge Nathan held a hearing and Juror 50 testified—under a grant of immunity—that "his answers to three questions related to sexual abuse in the jury questionnaire were not accurate but that the answers were an inadvertent mistake and that his experiences did not affect his ability to be fair and impartial." *Maxwell*, 118 F.4th at 262-63.

On April 1, 2022, Judge Nathan denied the defendant's motion for a new trial in a written order, concluding that Juror 50's responses at the hearing were "credible" and established that he "could serve fairly and impartially," and that Juror 50 "was not biased and would not have been stricken for cause even if he had answered each question on the questionnaire accurately." *Maxwell*, 2022 WL 986298, at *2, *11.

The Second Circuit affirmed. *Maxwell*, 118 F.4th at 266-67. A Rule 33 motion based on a juror's alleged erroneous response during voir dire is governed by *McDonough Power Equipment, Inc. v. Greenwood*, 464 U.S. 548 (1984). "Under *McDonough*, a party seeking a new trial 'must first demonstrate that a juror failed to answer honestly a material question on *voir dire*, and then further show that a correct response would have provided a valid basis for a challenge for cause.'" *Maxwell*, 118 F.4th at 267 (quoting *McDonough*, 464 U.S. at 556). The Second Circuit explained that Judge Nathan "applied the *McDonough* standard, found Juror 50's testimony credible, and determined that Juror 50's erroneous responses during *voir dire* were 'not deliberately incorrect'

---

case is presumed innocent and the Government is required to prove guilt beyond a reasonable doubt); *id.* at 20 (indicating that there was nothing about the nature of the case and the accusations as summarized in the questionnaire that might make it difficult for him to be fair and impartial)). Juror 50 repeated these assurances at oral voir dire. (Nov. 16, 2021 Tr. 128-34).

13

and that 'he would *not* have been struck for cause if he had provided accurate responses to the questionnaire.' In fact, as [Judge Nathan] noted, Maxwell did not challenge the inclusion of other jurors who disclosed past experience with sexual abuse, assault, or harassment." *Id.*

### 2. Discussion

As explained above, the defendant's argument that she was denied her right to a fair and impartial jury because of Juror 50's failure to disclose sexual abuse as a child during voir dire was raised, considered, and rejected by both Judge Nathan and the Second Circuit. The defendant is barred from relitigating the same issue under Section 2255. And the supposedly "new evidence" she cites to attempt to get around this relitigation bar, to the extent it is new at all, is irrelevant. It does nothing to disturb Judge Nathan's considered factual determination that Juror 50's hearing testimony established that he "could serve fairly and impartially," *Maxwell*, 2022 WL 986298, at *2, much less does it make out the stringent standard required of a defendant seeking a new trial under Section 2255.

In her Motion, the defendant claims that "[n]ew reporting contradicts the courts [sic] findings and establishes actual bias." (Mot. 2-3 (citing Exs. 3, 4, and 8)). But the exhibits cited by the defendant in support of that claim make plain that the evidence on which she relies is not new. Instead, the exhibits relate to statements made by Lucia Osborne-Crowley, a reporter who interviewed Juror 50 regarding his jury service following the verdict. Osborne-Crowley's reporting was originally published by *The Independent* on January 5, 2022 (*see* Dkt. 643-1), and indeed, was cited by the Government in its January 5, 2022 letter alerting Judge Nathan to Juror 50's interviews (Dkt. 568 at 1 n.1). The defendant specifically claims that Juror 50's testimony at the March 8, 2022 hearing is contradicted by statements of Osborne-Crowley, including during a January 7, 2022 podcast, but that podcast aired two months before the hearing (*see* Ex. 4). The

14

defendant cannot use years old material, much less material predating her appeal, to file a Section 2255 based on "new evidence" that is indisputably not new.  That is precisely the point of the relitigation bar.  The defendant also cites pages of a book published in 2024 by that same reporter in which she recounted her contact with Juror 50 (*see* Ex. 3), and a February 2024 article in which the same reporter described how her 2022 reporting "may be the evidence that contributes to a retrial" for the defendant (*see* Ex. 8 at 1).  But self-evidently, publications relating to the reporter's contact with Juror 50 in 2022 are not "new" evidence and, in any event, they were already considered (or are cumulative of what was already considered) by Judge Nathan.  As explained above, the hearing—which took place *after* Juror 50's interview in 2022, and which interview Judge Nathan was aware of—established that Juror 50 harbored no bias, approached his jury service with an open mind, and was committed to deciding the case based on the evidence and Judge Nathan's legal instructions. The defendant's supposedly new exhibits do nothing to undermine Judge Nathan's finding, after conducting a thorough inquiry, that this case did not present the extraordinary circumstances that justify overturning a jury's verdict based on an inadvertent error during voir dire.

No more is required to reject the defendant's attempt to relitigate what was already thoroughly litigated.  But it bears noting that the defendant's description of the supposedly new evidence is also inaccurate.  As just one example, the defendant claims that Juror 50's testimony at the 2022 hearing that he learned of the pertinent questionnaire questions *during* his interview with the *Daily Mail* (Mot. 2 (citing Dkt. 645 at 15))[6] is contradicted by Osborne-Crowley's 2024 book (Mot. 3 (citing Ex. 3)).  As an initial matter, the portions of the book to which the defendant

---

[6]  The *Daily Mail* article is available at https://www.dailymail.co.uk/news/article-10370193/GhislaineMaxwell-juror-says-evidence-convinced-panel-predator.html.  (*See also* Dkt. 643-2).

cites do not provide "new" evidence or information, but instead recount the reporter's 2022 contact with Juror 50—contact that preceded the March 2022 hearing. The defendant also ignores a video recording of Juror 50's interview with the *Daily Mail*, which the defendant herself entered into the record before the District Court, in which Juror 50 "appears genuinely and completely surprised to learn that the questionnaire" asked about his history of sexual abuse. *Maxwell*, 2022 WL 986298, at *9. Judge Nathan explained that "moment of surprise" was "consistent with Juror 50's hearing testimony." *Id.; see also* Dkt. 643-1 at 4 (Osborne-Crowley's January 2022 article in *The Independent* stating that Juror 50, "[s]peaking separately to MailOnline, [] said he could not remember the details of the 50 question pre-trial questionnaire"). In short, none of what the defendant cites is really "new," much less does it assist her.

The defendant also argues that a "bombshell" interview of Juror 50 in a docuseries that aired in early April 2022 supports her claim that Juror 50 was biased (Mot. 3-4 (citing Ex. 7)). But even assuming *arguendo* that the defendant were right on the merits—and she is wrong, as explained below—this interview also is not remotely new. The docuseries aired in April 2022, over four months *before* her sentencing and over ten months *before* she filed her appellate brief.

Indeed, on April 1, 2022, after the hearing, the defendant requested that Judge Nathan stay her ruling pending the release of the docuseries. (Dkt. 651 (citing trailer that purportedly announced a "bombshell revelation")). In short, the defendant was well-aware of the supposedly "new" evidence years ago and well before she appealed her conviction. Judge Nathan denied the request that same day, finding that the defendant "provide[d] no basis to conclude that the interview would affect [her] analysis or conclusion having held an evidentiary hearing." *Maxwell*, 2022 WL 986298, at *6 n.2. That was for good reason, as Judge Nathan conducted a thorough hearing during which she asked Juror 50 detailed questions about all subjects relevant to the pending motion and

16

had completed the fact-finding process. The defendant was entitled to disagree with Judge Nathan's decision. She is not entitled to wait years, long after the conviction is final, and then to challenge it using evidence she knew of at the time, in the guise of a Section 2255 motion.

In any event, on the merits (which the Court need not reach), the supposed "bombshell" interview affords her no relief. In arguing to the contrary, the defendant ignores that Judge Nathan considered and rejected the very kinds of arguments the defendant presses based on this interview. *See Maxwell*, 2022 WL 986298, at *16 ("But the Defendant overlooks the important differences [between Juror 50's abuse and the abuse of the trial witnesses]."); *see also id.* at *2 ("[T]he key question is not simply whether an individual has had experiences similar to the issues that will be explored at trial, but whether the individual can serve fairly and impartially."); *see also* Dkt. 645 at 8-9, 11-13. In short, Judge Nathan found, "[t]o imply or infer that Juror 50 was biased—simply because he was himself a victim of sexual abuse in a trial related to sexual abuse and sex trafficking, and despite his own credible testimony under the penalty of perjury, establishing that he could be an even-handed and impartial juror—would be tantamount to concluding that an individual with a history of sexual abuse can never serve as a fair and impartial juror in such a trial. That is not the law, nor should it be." *Id.* at *14. These findings—which were well within Judge Nathan's broad discretion, *see United States v. Torres*, 128 F.3d 38, 44 (2d Cir. 1997); *United States v. Greer*, 285 F.3d 158, 172 (2d Cir. 2002)—were affirmed by the Second Circuit. And they are irreconcilable with the defendant's current claim.

The defendant also asserts that she is entitled to relief under Section 2255 because "at least 2 additional jurors concealed their sexual abuse from the Court in voir dire." (Mot. 4). This claim too is barred. Judge Nathan rejected the defendant's requests for a broader inquiry of the other

members of the jury based on a substantially similar claim.  The defendant elected not to raise this issue on appeal.  She cannot use Section 2555 to now seek to litigate the issue.

And again, what the defendant claims is "new" is not, and even if this Court were to consider the merits of the defendant's claim, the claim fails.  According to the defendant, Osborne-Crowley "confirmed 2 additional jurors discussed their abuse in deliberations" citing a February 2024 article by Osborne-Crowley, in support of her claim.  (Mot. 4 (citing Ex. 8)).[7]  But that article—which notably was published before the Second Circuit rendered its decision—states that "[a]s a result of [her] interview [with Juror 50 after the trial], it was revealed that two other jurors also failed to disclose similar information to the court" (Ex. 8 at 1), which is not the same thing as what the defendant asserts occurred, *i.e.*, that alleged abuse was discussed "in deliberations."

In any event, the claim that one or more other jurors, beyond Juror 50, also needed to be questioned by Judge Nathan for alleged failure to disclose prior abuse, because an article supposedly suggested this occurred, was raised by the defendant and rejected by Judge Nathan.  In particular, years ago, the defendant requested that Judge Nathan conduct a hearing of the other eleven members of the jury (that is, those beyond Juror 50) based on a sentence in a newspaper article, which reported an anonymous "second juror described in an interview with The New York Times having been sexually abused as a child."  (Dkt. 643 at 37-40 (Government brief explaining that a sentence in a newspaper article, without details, did not warrant a hearing)).  Judge Nathan rejected the defendant's request for such a hearing on the ground that the "evidence of this allegation [was] inadequate to meet the exacting standard for a hearing."  *United States v. Maxwell*,

---

[7] The defendant also cites Osborne-Crowley's book as proof that Osborne-Crowley spoke to additional jurors, but the defendant, who bears the burden, fails to attach the supposedly relevant page of the book or to explain cogently how it supposedly assists her.  (*See* Mot. 4 (citing page 193 of Ex. 8)).

No. 20 Cr. 330 (AJN), 2022 WL 576306, at *6 (S.D.N.Y. Feb. 25, 2022); *see id.* at *6-*9.  The

defendant also argued that even if the article was insufficient to order a hearing, "Juror 50's post-

trial statements corroborate that another juror discussed sexual abuse during deliberations."  *Id.* at

*6.  Judge Nathan also rejected this argument, explaining that Federal Rule of Evidence 606 barred

her "from considering Juror 50's statements as evidence of another juror's statements purportedly

made during deliberations."  *Id.* at *7.  The article cited by the defendant in her Motion is no more

of a basis to launch an inquiry than the article cited by the defendant years ago.

The defendant also appears to claim that the same two supposed jurors who allegedly

discussed their abuse in deliberations wrote to Judge Nathan, who, she claims, did not disclose to

the defendant the content of those communications.  (Mot. 4).  That claim is both recycled and

false.  In particular, after a reporter contacted a juror who wished to remain anonymous, Judge

Nathan's chambers staff emailed the jurors about the development because the contact had been

uninvited.  *Maxwell*, 2022 WL 576306, at *6 n.5.  In response to the email from her chambers, one

juror "wrote regarding news reports about the issue with Juror 50."  *Id.*  Judge Nathan "informed

the parties of the juror communications" in January 2022.  *Id.*  The defendant requested the

communications on the grounds that the communications "could shed light on the identity of the

second juror referred to by the *New York Times*."  *Id.*  Judge Nathan explained, "Such a request is

nothing but unfounded speculation.  A juror's communication expressing fear about the media

reports and the parties' responses to Juror 50's interviews are not relevant to the current inquiry."

*Id.*  Nevertheless, Judge Nathan transmitted to the parties under seal the "concerned juror's

19

communications." *Id.* In short, the defendant received the very communications that she now says were denied to her.[8]

Finally, the defendant asks the Court to vacate the judgment or grant an evidentiary hearing because she claims that Juror 50's misrepresentations establish both "intentional concealment and actual bias." (Mot. 4). But again, a hearing on this very claim was held—years ago. And Judge Nathan found after that hearing that "Juror 50 was not biased" and his incorrect answers on the questionnaire were "not motivated by intentional deception." *Maxwell*, 2022 WL 986298, at *2. That the defendant does not like Judge Nathan's findings—which were affirmed by the Second Circuit—is not an exception to the strict bar against relitigating claims raised and considered on direct appeal. Rather, the defendant must be treated like every other defendant who raised a claim on appeal and lost. She is not entitled to raise the same meritless arguments again and again.

## B. The Defendant's Claims Related to Epstein's Non-Prosecution Agreement Are Both Barred and Meritless

Similarly, notwithstanding that both Judge Nathan and the Second Circuit considered and rejected the defendant's claim that Epstein's non-prosecution agreement barred her prosecution in the Southern District of New York, the defendant attempts to litigate this issue yet again. That attempt is barred. And the defendant's argument is meritless in any event.

### 1. Relevant Facts

In 2005, the Palm Beach Police Department ("PBPD") in Florida opened an investigation into Epstein on the complaint of the parents of a fourteen-year-old girl. The PBPD ultimately brought the investigation to the Federal Bureau of Investigation ("FBI") in West Palm Beach, which in turn opened an investigation with the U.S. Attorney's Office for the Southern District of

---

[8] The defendant's renewed request for discovery of juror communications with Judge Nathan in her Amended Motion (Am. Mot. 2) should be rejected for the same reasons.

Florida ("USAO-SDFL"). (Dkt. 204-3 ("OPR Report") at i). That investigation culminated in a draft sixty-page indictment proposing to charge Epstein for the sexual abuse of multiple victims. (*Id.*).

In 2007, USAO-SDFL and Epstein entered into a non-prosecution agreement ("NPA"). (No. 10 Civ. 21586 (ASG), ECF No. 1-3 (S.D. Fla. May 17, 2010)). The agreement was signed "on the authority of R. Alexander Acosta, United States Attorney for the Southern District of Florida." (*Id.* at 2). Under the terms of the NPA, Epstein agreed to plead guilty in a pending Florida state case and to receive a sentence of at least eighteen months' imprisonment and twelve months' community control. (*Id.* at 3). He also consented to jurisdiction in the Southern District of Florida for civil suits involving victims specified by USAO-SDFL, among other terms. (*Id.* at 4). In exchange, USAO-SDFL agreed to defer "prosecution in this District." (*Id.* at 2). Once Epstein completed his half of the bargain, the NPA provided that "no prosecution" for the offenses then under investigation by "the Federal Bureau of Investigation and the U.S. Attorney's Office . . . will be instituted in this District." (*Id.*).

The NPA also provided that, if Epstein complied with the agreement, "the United States also agrees that it will not institute any criminal charges against any potential co-conspirators of Epstein, including but not limited to" four named individuals, none of whom was the defendant. (*Id.* at 5). Indeed, the defendant was neither a party to the agreement nor involved in negotiating its terms. This provision "appears to have been added 'with little discussion or consideration by the prosecutors.'" *Maxwell*, 534 F. Supp. 3d at 309 (citing OPR Report at 169, 185)). The NPA continues that, "upon execution of this agreement, and a plea agreement with the State Attorney's Office, the federal Grand Jury investigation will be suspended." (NPA at 5). The agreement was executed on September 24, 2007 (*id.* at 7; OPR Report at i, 84), and Epstein pleaded guilty in state

21

court on June 30, 2008 (OPR Report at 111).  In 2019, the Department of Justice Office of Professional Responsibility ("OPR") conducted an investigation into the negotiations around the NPA and issued a 290-page report containing detailed factual findings (the "OPR Report").

After the U.S. Attorney's Office for the Southern District of New York ("USAO-SDNY") charged the defendant in this case in the Southern District of New York, she twice moved to dismiss the charges on the ground that they were barred by the NPA.  Judge Nathan denied the motions, concluding that "the NPA does not bind the [USAO-SDNY]."  *Maxwell*, 534 F. Supp. 3d at 309-10; *United States v. Maxwell*, No. 20 Cr. 330 (AJN), 2021 WL 3591801, at *1-*3 (S.D.N.Y. Aug. 13, 2021).

The Second Circuit affirmed, holding that the NPA "did not bar Maxwell's prosecution by USAO-SDNY as the NPA does not bind USAO-SDNY."  *Maxwell*, 118 F.4th at 261.  The Second Circuit explained that "[i]t is well established in our Circuit that '[a] plea agreement binds only the office of the United States Attorney for the district in which the plea is entered unless it affirmatively appears that the agreement contemplates a broader restriction.'"  *Id.* at 263 (quoting *United States v. Annabi*, 771 F.2d 670, 672 (2d Cir. 1985)).  Rejecting the defendant's contention that *Annabi* should not be applied, the Second Circuit concluded that the NPA did not bar the defendant's prosecution as "[t]here is nothing in the NPA that affirmatively shows that the NPA was intended to bind multiple districts.  Instead, where the NPA is not silent, the agreement's scope is *expressly limited* to the Southern District of Florida."  *Id*. (emphasis in original).  The Court further noted that "the negotiation history of an NPA can support an inference that an NPA 'affirmatively' binds other districts," but determined that "the actions of USAO-SDFL do not indicate that the NPA was intended to bind other districts."  *Id.* at 264 (citing, *inter alia*, operable United States Attorneys' Manual (now known as the Justice Manual) requirement that no district

shall make any agreement which purports to bind any other district without the "express written approval" of the United States Attorney(s) in the affected district and finding "[n]othing" in the record indicating that USAO-SDNY "had been notified or had approved of" the NPA "and intended to be bound by it"). The Second Circuit explained that "*Annabi* controls the result here," holding that "[n]othing in the text of the NPA or its negotiation history suggests that the NPA precluded USAO-SDNY from prosecuting Maxwell for the charges in the Indictment." *Id.* at 265. The Second Circuit concluded that Judge Nathan correctly denied the defendant's motion without an evidentiary hearing. *Id.*

### 2. Discussion

The defendant's claims regarding the NPA have already been considered and rejected and thus are barred from being brought again years later. The defendant has not even attempted to show that "there has been an intervening change in the law and the new law would have exonerated [her]." *Chin*, 622 F.2d at 1092. That is because she cannot. "[T]his Court is not permitted to review opinions of the Second Circuit, and the Supreme Court has already denied [the defendant's] certiorari petition challenging the Second Circuit's ruling" with respect to the NPA. *Brennerman*, 2023 WL 2242051, at *2.

In an attempt to resurrect this claim, the defendant appears to attempt to assert, as best as the Government understands from the defendant's convoluted argument, that she is entitled to relief because the Government allegedly violated *Brady v. Maryland*, 373 U.S. 83 (1963), by supposedly failing to disclose OPR findings and refusing to search for material for discovery relevant to the NPA. (Mot. 22; *see also id.* at 26-29). The defendant's claim that the Government failed to disclose the OPR findings is nonsense. The Government produced the OPR Report— which was then publicly available and accessible through multiple websites—to the defendant in

discovery on or about February 2, 2021.  *See also Maxwell*, 534 F. Supp. 3d at 310 (referring to defendant's access to OPR Report).

The defendant's argument that the Government refused to search for material relevant to the NPA in connection with her trial (Mot. 22) is similarly both barred and wrong.  On direct appeal, the defendant argued that Judge Nathan erred by construing the NPA without discovery or a hearing.  *See United States v. Maxwell*, No. 22-1426, ECF No. 59 at 2.  The Second Circuit rejected the defendant's arguments.  *Maxwell*, 118 F.4th at 263-65.  The defendant is not entitled to re-raise those arguments.

In any event, the defendant's claim of a supposed discovery error is refuted by the extensive record before Judge Nathan.  The Government explained to Judge Nathan and defense counsel its plan for collecting and reviewing certain files from other agencies with potential relevance to the case.  (*See* Dkt. 63).  The Government explained that although Second Circuit law did not require the Government to do so because those other agencies were not part of the prosecution team, the Government endeavored to collect and review certain of those materials, including the inbox for Marie Villafaña, the primary line Assistant U.S. Attorney responsible for USAO-SDFL's investigation, by conducting targeted searches of her emails for terms relevant to the case.  (*Id.* at 7).  After Judge Nathan denied the defendant's motion to dismiss the Indictment as barred by the NPA, *see Maxwell*, 534 F. Supp. 3d at 308-12, the Government confirmed that it had "not identified any materials within its possession that would constitute potential *Brady* material with respect to the NPA, that is, 'exculpatory evidence' as to which 'there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" (Dkt. 239 at 2 (quoting *Youngblood v. West Virginia*, 547 U.S. 867, 870 (2006))).  The Government further explained that "[w]ith this definition in mind, the Government would view any evidence

24

that the NPA was intended to (i) bind other U.S. Attorneys in other districts; or (ii) cover Maxwell specifically, as 'evidence supporting Maxwell's interpretation of the NPA' that it would be required to disclose." (*Id.*).

It is thus apparent that the Government well-understood, and did not violate, its *Brady* obligations. The *Brady* doctrine "does not require a prosecutor to deliver his entire file to defense counsel, but only to produce information that is material to the defendant's guilt or punishment." *Restrepo v. United States*, 533 F. Supp. 2d 359, 365 (S.D.N.Y. 2008). There are three components of a *Brady* violation: the material evidence "must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed . . . either willfully or inadvertently; and prejudice must have ensued." *Strickler*, 527 U.S. at 281-82; *see United States v. Madori*, 419 F.3d 159, 169 (2d Cir. 2005). Notably, "[a] defendant cannot satisfy the suppression requirement if the defendant, directly or through counsel, either knew, or should have known, of the essential facts permitting him to take advantage of [that] evidence." *Lamberti v. United States*, 22 F. Supp. 2d 60, 66 (S.D.N.Y. 1998), *aff'd, Badalamenti v. United States*, 201 F.3d 430 (2d Cir. 1999).

Even if a defendant proves that favorable information was suppressed, there can be no *Brady* violation unless the information at issue is "material," which in this context means that "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Madori*, 419 F.3d at 169. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*; *see United States v. Payne*, 63 F.3d 1200, 1209 (2d Cir. 1995) ("[H]ence, the undisclosed evidence will be deemed material only if it could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict."); *cf. Restrepo*, 533 F. Supp. 2d at 365 ("The test for reasonable

25

probability is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence.").

There was no *Brady* violation in this case. The defendant cannot establish any of the three prerequisites to a *Brady* violation, inasmuch as the "evidence" that the defendant now relies on was not suppressed, exculpatory, or material. She posits that something in the drafts of the NPA or the negotiation history could change the Second Circuit's analysis (which is not the relevant legal standard to surmount the relitigation bar), but that vague speculation is belied by the OPR Report and the civil lawsuit related to the NPA—all of which she has known of for years.[9] Indeed, as Judge Nathan explained in rejecting her pretrial claims related to the NPA, the defendant "received access to an unusually large amount of information about the NPA's negotiation history in the form of the OPR [R]eport." *Maxwell*, 534 F. Supp. 3d at 310.

---

[9] Both the OPR Report and the civil litigation relating to the circumstances of the NPA support Judge Nathan's and the Second Circuit's analysis of the NPA. (*See, e.g.*, Ex. 143 (Gov't Brief, No. 08 Civ. 80736 (KAM), ECF No. 205-2 at 10-11 (S.D. Fla. July 5, 2013))) (the NPA "simply obligated the government not to prosecute Epstein *in the Southern District of Florida* for the offenses set forth in the [NPA]. The [NPA] does not bar the United States from bringing federal criminal charges against Epstein for the offenses set forth in the [NPA] in any other district in the nation. Neither does the [NPA] bar prosecution in any district for offenses not identified in the agreement.") (emphasis in original); OPR Report at 81 n.125 (observing that a supervisor at USAO-SDFL "pointed out that the NPA was not a 'global resolution' and other co-conspirators could have been prosecuted 'by any other [U.S. Attorney's] office in the country.'"); *see also id.* at 70 ("Villafaña told OPR that she was willing to include a non-prosecution provision for Epstein's co-conspirators, who at the time she understood to be the four women named in the proposed agreement, because [USAO-SDFL] was not interested in prosecuting those individuals if Epstein entered a plea. Villafaña told OPR, '[W]e considered Epstein to be the top of the food chain, and we wouldn't have been interested in prosecuting anyone else.' She did not consider the possibility that Epstein might be trying to protect other, unnamed individuals, and no one, including the FBI case agents, raised that concern."); *id.* at 81 ("Villafaña told OPR that, apart from the women named in the NPA, the investigation had not developed evidence of 'any other potential co-conspirators.'"); *id.* at 80-81 (reflecting that a supervisor at USAO-SDFL told OPR "that it never occurred to him that the reference to potential co-conspirators was directed toward any of the high-profile individuals who were at the time or subsequently linked with Epstein.")).

26

To be sure, in her Amended Motion, the defendant points to a document that she may not have had before her trial.  But it does not come close to making out a *Brady* violation for multiple reasons.  In particular, the defendant cites a document released under EFTA as evidence of the Government supposedly "failing in its obligations."  (Am. Mot. 6 (citing EFTA00190632)).[10]  She cites that document apparently in support of her claim that "[a]t no point did the Prosecution inform [her] that there were ongoing negotiations while Epstein was incarcerated and after the signature of the NPA."  (Am. Mot. 6).  She is wrong.  First, EFTA00190632 is internal USAO-SDFL correspondence from August 2008—correspondence exchanged nearly 11 months after the NPA was executed and a month-and-a-half after Epstein pleaded guilty in state court.  This document has no bearing on the NPA's text or negotiation history.  Second, the defendant ignores that the apparent subject matter of the correspondence—providing a copy of the NPA in connection with the civil litigation—was discussed in the OPR Report.  (*See* OPR Report at 239-40).  In short, the one alleged example the defendant cites has no bearing on the conclusions of Judge Nathan and the Second Circuit.

The defendant also claims that new evidence, from after her trial, supports her claim that she should not be prosecuted in light of the NPA.  (Mot. 23).  But that new evidence also does not entitle her to any relief (and it plainly cannot be the basis for a *Brady* violation). She repeatedly cites the September 2025 House of Representatives Committee on Oversight and Government Reform's interview of Acosta, the U.S. Attorney of USAO-SDFL at the time the NPA was negotiated.  (Mot. 23-24 (citing Ex. 54)).[11]  But the defendant fails to explain how or why that

---

[10] The defendant cites EFTA00190632, but attaches Exhibit A22, which is EFTA00225523.

[11] The defendant's arguments related to former Attorney General William Barr's 2025 deposition by the House Committee on Oversight and Government Reform also are meritless and irrelevant. (*See* Mot. 23, 26).  She claims that Barr's deposition "accepted" that the "terms of the co-conspirator clause of the NPA were ambiguous" and "was not understood conclusively by its terms

interview disturbs the fact-finding done by OPR, which was part of the record before the Second Circuit, or how anything in Acosta's interview contradicts the Second Circuit's conclusion that "[n]othing in the text of the NPA or its negotiation history suggests that the NPA precluded USAO-SDNY from prosecuting Maxwell for the charges in the Indictment." *Maxwell*, 118 F.4th at 265. For example, the defendant argues that, contrary to Acosta's interview, USAO-SDNY "said there was no contact with the DOJ prior to Epstein signing the NPA." (Mot. 26 (citing Ex. 20 (Dkt. 204 (Government brief)))). That claim is belied by the very Government brief the defendant cites and the OPR Report that was produced to the defendant. (*See, e.g.*, Dkt. 204 at 11-12 (describing OPR Report noting that USAO-SDFL periodically consulted with the Chief of the Department of Justice Child Exploitation and Obscenity Section ("CEOS") during the investigation and plea discussions, and that the CEOS Chief attended a meeting with defense counsel, during which defense counsel made a pitch that Epstein should not be prosecuted, and SDFL line prosecutor sending a draft of the NPA to the CEOS Chief, who told OPR that he had no involvement with the NPA)). In any event, any contacts between USAO-SDFL and Main Justice would not, without more, establish that USAO-SDFL intended to bind other districts, much less that USAO-SDFL communicated a promise to Epstein that the NPA would extend beyond USAO-SDFL.

The defendant similarly claims that this "new evidence reveals that the New York investigation was the driver and motivation for the NPA and the co-conspirator clause." (Mot. 25).

---

to be restricted to SDFL" and that the Government "merely had a 'good legal argument' that allowed the SDNY to prosecute" the defendant." (Mot. 23 (quoting Ex. 25)). But what Barr said was that he "vaguely recall[ed] some discussion" about what charges could be brought that did not "run afoul" of the NPA and that he thought "it was a question of everyone agreeing on that we had a good legal argument." (Ex. 25 at 86-87). The deposition testimony cited by the defendant is a far cry from accepting that the NPA's co-conspirator clause was "ambiguous." (Mot. 23). And, in any event, the Government's "good legal argument" was endorsed by Judge Nathan and affirmed by the Second Circuit.

But again, the supposedly "new" evidence does not support her claim. The defendant asserts that Acosta testified in 2025 that "he was personally responsible for the terms of the NPA," but simultaneously acknowledges his representation that he did not know of her invented "expanding multidistrict investigation" (Mot. 25). The defendant then argues that Exhibit 128 "reveals that New York continued investigating Epstein separate and apart from the SDFL." (Mot. 25). This exhibit is far from new. As indicated on the face of the exhibit, the defendant received this exhibit in non-testifying witness material produced in advance of trial. She also received this document in discovery. In any event, as the exhibit makes clear, New York FBI agents conducted an interview to "cover lead set by the Miami Division." (Ex. 128 at 1).[12] That FBI agents working with USAO-SDFL interviewed witnesses in other states—including New York—during their investigation is entirely unremarkable, since federal investigations frequently involve gathering evidence in other states.

In sum, the supposedly new evidence cited by the defendant, even if assumed, contrary to the record, to be fully new, does not show that USAO-SDFL acted on behalf of the entire federal government when entering into the NPA, that USAO-SDFL promised Epstein that U.S. Attorney's offices in other states would be bound by the NPA, or that Epstein understood USAO-SDFL to be doing so. They do not establish in any way the substantive involvement of any other district in the prior investigation. (*See* Dkt. 204 at 9). That is for good reason, since there was no investigation by USAO-SDNY until late 2018 and the NPA was negotiated by USAO-SDFL in connection with

---

[12] The defendant asserts that the "details of the expanding investigation into New York" were concealed from her. (Mot. 24). She also argues that two "complainants from New York . . . revealed that they were interviewed in New York as part of Epstein's original investigation." (Mot. 25). Not so. The interviews conducted of witnesses in New York in connection with USAO-SDFL's investigation were disclosed to the defendant both in discovery and in non-testifying witness material produced in advance of trial.

29

its investigation. (*See also* Ex. 143 at 9 n.9 (USAO-SDFL brief stating that "USAO-SDFL has no present knowledge about whether the United States Attorney's Offices in [the Southern District of New York and the District of New Jersey] have opened any investigations into the allegations that have been made against Epstein, whether those offices are even aware of those allegations or the evidence supporting them, or what investigative or prosecutorial actions, if any, those offices might take in the future.")).

Similarly, the defendant's citation to Exhibit A23 in her Amended Motion is baseless. (Am. Mot. 6).[13] That a USAO-SDFL draft letter referred to the prosecution of Epstein as "not purely local" (Ex. A23) is hardly surprising given the information outlined in the Indictment, discovery produced to the defendant, and the facts established at the defendant's trial. In short, the key inquiry is not whether Acosta or other members of USAO-SDFL knew of a New York nexus, but whether there was any indication that USAO-SDNY "had been notified or had approved of Epstein's NPA with USAO-SDFL and intended to be bound by it." *Maxwell*, 118 F.4th at 265. Nothing the defendant cites disturbs the Second Circuit's conclusion.

Finally, in the Amended Motion, the defendant, citing materials produced through EFTA, claims that the Government "deliberately mislead [sic]" Judge Nathan, the Second Circuit, and the Supreme Court when it said there was no evidence of "DOJ Main reviewing the NPA." (Am. Mot. 6). The exhibits to which she cites appear to relate to activities *after the NPA was signed*, in which Justice Department officials in Washington refused to relieve Epstein of his obligations under the NPA. This is consistent with the OPR Report, which "reflects that the Office of the Deputy Attorney General reviewed the NPA, but only after it was signed when Epstein tried to get out of

---

[13] Exhibit A23 appears to be one page of a draft letter from USAO-SDFL to the Office of the Deputy Attorney General. (*See* EFTA00190451 through EFTA00190467).

it." *Maxwell*, 534 F. Supp. 3d at 310.  Even then, however, those officials did not "approve" the NPA.  (OPR Report at 95 (statement by the Assistant Attorney General that she "did not review or approve the agreement either before or after it was signed"), 103 ("The Department, however, only reviewed the issue of federal jurisdiction and never reviewed the NPA or any specific provisions.")).  The defendant "identifies no evidence that the Department of Justice made any promises not contained in the NPA." *Maxwell*, 534 F. Supp. 3d at 310.  In any event, as Judge Nathan explained in denying the defendant's motion to dismiss the Indictment: "Nor would direct approval of the NPA by the Office of the Deputy Attorney General change the meaning of its terms. No evidence suggests anyone promised Epstein that the NPA would bar the prosecution of his co-conspirators in other districts.  Absent such a promise, it does not matter who did or did not approve it." *Id.*[14]

In sum, even if supposedly newly discovered evidence were sufficient to get around the strict relitigation bar (and it is not, because it is not substantively new), the evidence the defendant cites does not undermine Judge Nathan's decision about the NPA, which was affirmed by the Second Circuit and for which the Supreme Court has denied certiorari.

### C. The Defendant's Claims Related to Alleged Constructive Amendment of the Indictment Are Both Barred and Meritless

At all times the Government consistently argued that the defendant enticed and transported the victim known as Jane to New York with the intent that Jane engage in illegal sexual activity,

---

[14] The defendant, who bears the burden, makes no attempt to reconcile her conclusory assertion that isolated materials obtained under EFTA or that post-date her trial support her claim with the fact that she received the OPR Report before trial and that it was part of the record before Judge Nathan and the Second Circuit, which report was thorough and based on, among other things, OPR's review of hundreds of thousands of records (including emails, letters, memoranda, and investigative materials) from USAO-SDFL, the FBI, and other Department of Justice Components, including the Office of the Deputy Attorney General, the Criminal Division, and the Executive Office for U.S. Attorneys.  (OPR Report at vi).

31

and that the defendant conspired to do so regarding Jane and the other victims.  That is the issue Judge Nathan instructed the jury to resolve, and that was the criminal conduct charged in Counts Three and Four of the Indictment.  Accordingly, over the defendant's objection, as Judge Nathan held, and the Second Circuit affirmed, no constructive amendment occurred.  As with her above-discussed claims, under settled law, for good reason, the defendant cannot use Section 2255 to seek to relitigate this same issue yet again, years later.

### 1.  Relevant Facts

Counts Three and Four charged the defendant with arranging for Jane's transportation to New York with the intent that Jane would engage in sex acts with Epstein, in violation of New York state law, and with a conspiracy to transport minors to New York for the same purpose.  (Dkt. 187).  At trial, the Government marshalled evidence that the defendant transported Jane to New York, and aided and abetted Epstein in doing so, with the intent that Jane engage in sexual activity there.  That evidence included detailed testimony from Jane about Epstein's New York residence (Tr. 316-19) and specific sexual acts that took place in New York while Jane was a minor (Tr. 319-20; *see also* Tr. 2891, 2895-96 (Government summation discussing charges as encompassing conduct directed at New York)).  Jane also testified that she traveled with the defendant (who assisted Jane in making travel arrangements) and Epstein to Epstein's ranch in New Mexico, where she was sexually abused. (Tr. 316-17, 321-3).

During trial, Judge Nathan granted defense requests for limiting instructions at the time evidence came in to make clear that the charges focused on the intent that sexual activity take place in New York.  (*See* Tr. 1167-68, 2048-49).  At the conclusion of trial, Judge Nathan instructed the jury that Count Four alleged that the defendant knowingly transported Jane "with the intent that Jane engage in sexual activity for which any person can be charged with a criminal offense in

32

violation of New York law." (Tr. 3037; *see* Tr. 3035 (second element of Count Four requires proof of an intent to violate "New York law as alleged in the indictment")). Judge Nathan also instructed the jury on one and only one predicate state offense: a violation of N.Y. Penal Law § 130.55. (Tr. 3034, 3037). The instructions on Count Three incorporated this discussion of the elements of Count Four, and the only statute identified was N.Y. Penal Law § 130.55. (Tr. 3049-50, 3056-57).

During deliberations, the jury sent the following note:

> Under Count Four, if the defendant aided in the transportation of Jane's return flight, but not the flight to New Mexico where/if the intent was for Jane to engage in sexual activity, can she be found guilty under the second element?

(Tr. 3126). Judge Nathan determined she should refer the jury back to the jury charge on the second element of Count Four because the jury note was otherwise "too difficult to parse factually and legally." (Tr. 3126-40). Judge Nathan also pointed out that the defendant did not "seek to exclude" Jane's testimony about New Mexico, or "seek a limiting instruction with respect to that testimony." (Tr. 3153). The defendant sought reconsideration of Judge Nathan's response, raising the possibility of a constructive amendment or prejudicial variance. *Maxwell*, 118 F.4th at 268. Judge Nathan declined to reconsider her response and denied the defendant's motion. *Id.*

After the defendant's conviction, Judge Nathan denied the defendant's post-trial motion claiming a constructive amendment or prejudicial variance. *Maxwell*, 2022 WL 1294433, at *10-*16.

The defendant appealed Judge Nathan's denial. *Maxwell*, 118 F.4th at 268. She claimed that testimony about Jane's sexual abuse in New Mexico presented the jury with a basis for conviction that was distinct from the charges in the Indictment. *Id.* In the alternative, the defendant argued that this testimony resulted in a prejudicial variance from the Indictment. *Id.* The Second Circuit held that Judge Nathan's response to the jury note did not result in a constructive

33

amendment of, or prejudicial variance from, the allegations in the Indictment.  *Id.* at 268-69.  The Second Circuit explained that it agreed with Judge Nathan that the "jury instructions, the evidence presented at trial, and the Government's summation captured the core of criminality" or "the essence of a crime" of which the defendant had been given notice.  *Id.* at 268.  The Second Circuit further noted that Judge Nathan "correctly directed" the jury to the proper instruction in response to their question, which made clear that Count Four "had to be predicated on finding a violation of New York law."  *Id.*  The Second Circuit also determined that the defendant could not demonstrate that the trial evidence prejudicially varied from the Indictment or that she had been "unfairly and substantially prejudiced," as the evidence "indicated that Maxwell transported Jane to New York for sexual abuse and conspired to do the same" and "Maxwell knew that the evidence also included conduct in New Mexico"—conduct detailed in notes that she received "*over three weeks before trial.*"  *Id.* at 269 (emphasis in original).

### 2.  Discussion

The Motion rehashes the defendant's precise arguments raised before and rejected by Judge Nathan and the Second Circuit.  Section 2255 simply does not permit a defendant such a third bite at the proverbial apple.  *See Pitcher*, 559 F.3d at 123 ("It is well established that a § 2255 petition cannot be used to relitigate questions which were raised and considered on direct appeal.").  The defendant's arguments are also wrong, for the reasons explained by both Judge Nathan and the Second Circuit, but the Court need not engage with those arguments, because they are barred, and unlike certain of other claims, the defendant does not even attempt to argue that new evidence permits her to effect an end-run around the relitigation bar.

**III.    The Majority of the Defendant's Remaining Claims Are Procedurally Barred, as She Failed to Raise Them on Appeal, and In Any Event Are Meritless**

The majority of the defendant's remaining claims are also barred, because she could have, but did not, raise them on direct appeal.  The defendant's arguments in support of these claims are meritless in any event.

**A.    The Defendant's Claims Related to the Victims, Their Lawyers, and Other Attacks on the Prosecution Are Barred and Meritless**

The defendant argues her conviction must be vacated because the Government "impermissibly delegated investigative and prosecutorial functions to private plaintiff's attorneys . . . who represented civil claimants with direct financial interests in the outcome of Petitioner's criminal case."  (Mot. 7).  She claims that the lawyers "conspired and colluded with the Government and conducted the investigation for the Government."  (Mot. 8).  This is patently false.  The victims' lawyers were not a part of the prosecution team.  A team of independent, career prosecutors conducted the investigation and handled the prosecution of the defendant.  In any event, the defendant did not bring on direct appeal the contention to the contrary that she now attempts to raise—and no supposedly new evidence permits her to do so now.  Even if she were permitted to bring such a claim, it is utterly baseless.

**1.    Discussion**

**a.    The Defendant's Claims Related to the Victims' Lawyers Are Barred and Meritless**

Under settled law, the defendant is barred from raising claims related to the victims' attorneys, regardless of the supposed legal bases for such claims, because she did not do so on direct appeal.  *See Zhang*, 506 F.3d at 166.  To overcome this procedural bar, the defendant would have to demonstrate "cause for the procedural default" as well as actual prejudice, *Thorn*, 659 F.3d at 231, but she cannot make either of these showings.  The "factual basis for the claim" was clearly

35

available to the defendant, who pressed related arguments throughout the course of trial. *McCleskey*, 499 U.S. at 497-98. Nor can she establish prejudice. She has not—and cannot—meet her burden of showing that there were any errors, let alone errors that "worked to [her] *actual* and substantial disadvantage, infecting [her] entire trial with error of constitutional dimensions." *Frady*, 456 U.S. at 170 (emphasis in original).

Nor is there any substantively new evidence that would permit her to bring such a claim now. In her Motion, the defendant states that supposed "[n]ew reporting" reveals, among other things, that the victims' lawyers "instigated the SDNY investigation" and used the media to "foment" the investigation. (Mot. 8-11). She asserts that this reporting "contradict[s] the Government who informed the Courts that Boies Schiller [in particular] played no role in fomenting the investigation." (Mot. 11). But the defendant previously brought the same fundamental claim. Indeed, the defendant acknowledges that she argued before her trial that "Plaintiff's Lawyers colluded with the Government [and] instigated the investigation." (Mot. 9 n.9). Judge Nathan denied the defendant's claim, which the defendant elected not to appeal. Her claim now accordingly is barred, because even if it were deemed to rest solely on post-trial reporting or other statements, the argument remains materially the same. In short, the supposedly new evidence (which is in any event inadmissible hearsay) is substantially cumulative of the bases for what the defendant unsuccessfully claimed before Judge Nathan and thus is not sufficient to discharge her burden now.

In any event, even assuming *arguendo* that the defendant were permitted to bring her claim now (and she is not), it is meritless. As an initial matter, and contrary to the assumption underlying the defendant's claim, as discussed below, it is neither unusual nor improper for the Government to open an investigation based on articles in the media or after speaking with counsel for victims.

There is no rule to the contrary, nor would one be in the public interest.  But generalities aside, whatever role certain of the victims' lawyers in this case may or may not have played in communicating with members of the press, and whatever interest they may or may not have had in a criminal investigation being opened, does not change the reasons USAO-SDNY opened its investigation in this case—an issue that has been covered in prior litigation, and on which the record is clear.  As has been previously explained, USAO-SDNY opened its investigation in late November 2018 after a series of articles was published by the *Miami Herald* relating to Epstein, his conduct, and the circumstances of his prior conviction.  (*See* Dkt. 204 at 65; *United States v. Maxwell*, 545 F. Supp. 3d 72, 76 (S.D.N.Y. 2021)).  This circumstances surrounding the opening of the Government's investigation was litigated before Judge Nathan in connection with the defendant's motions to suppress evidence obtained through a grand jury subpoena to Boies Schiller involved in earlier civil litigation against her.  Judge Nathan denied the defendant's motions to suppress and stated, as relevant here, "The Government has represented that its present investigation into Epstein (and later Maxwell) began only following publication of the *Miami Herald* exposé in 2018.  Maxwell has made no substantial preliminary showing to the contrary." *Maxwell*, 545 F. Supp. 3d at 84.  The defendant still has not made a "substantial preliminary showing" to the contrary.  She has not made *any* non-speculative showing to the contrary, much less a sufficient one to excuse her failure to raise this issue—of which she was plainly well-aware—on direct appeal.  And that is because she cannot.

The defendant's suggestion that the Government "outsource[d]" the prosecution to the victims' lawyers or that the victims' lawyers "conducted the investigation for the Government" or acted as "[d]e [f]acto [p]rosecutors" and "agents" of the Government is not just barred, but also

baseless and nonsensical.  (Mot. 7-8[15]; *see also* Am. Mot. 2-5).[16]  There is not a single shred of evidence to support her outlandish claim.

Having allegedly established that victims' lawyers were part of the prosecution team, the defendant then asserts that *Brady* extends to evidence in their possession.  (Mot. 8, 15, 21).  But victims' lawyers were, of course, never part of the prosecution in team in this case.  It is common—and appropriate—for lawyers for victims to provide information to law enforcement.  That does not turn them into prosecutors.[17]  *See United States v. Josleyn*, 206 F.3d 144, 154 (1st Cir. 2000) ("[W]e are loath to extend the analogy from police investigators to cooperating private parties who have their own set of interests.").  Indeed, the Second Circuit has repeatedly rejected the argument that the "prosecution team" reaches anyone who provides information to the Government, including cooperating witnesses, who, unlike victims, have written agreements obligating them to

---

[15] In support of her claim that victims' lawyers conducted the investigation for the Government, the defendant points to former Attorney General William Barr's deposition by the House Committee on Oversight and Government Reform to argue that Barr admitted that the investigation into the defendant was not led by the FBI.  (Mot. 8).  But what Barr said was, "I think this was an investigation directed by the Southern District, so it involved their prosecutorial team.  It wasn't the FBI in the initial stages of the investigation, but they were essentially . . . working with the prosecutors."  (Ex. 25 at 55).  This was, indeed, a prosecution directed by USAO-SDNY who worked hand in hand with the FBI.

[16] In her Amended Motion, the defendant repeats the same arguments related to victims' counsel and cites documents—some produced through EFTA and some produced to the defendant in discovery—that do not say what she suggests they say and that do not support her arguments.  For example, she cites email correspondence and an article relating to a particular victims' attorney in support of her claim that plaintiff's counsel "drove the investigation" into the defendant in the "absence of any real investigation" by the Government (Am. Mot. 4 (citing Exs. A11, A12)), but those exhibits show that as of October 2019, the Government had not even spoken to that lawyer, who also did not represent any witness the Government called at trial.

[17] The defendant cites *Young v. United States ex rel. Vuitton et Fils S.A.*, 481 U.S. 787, 807 (1987) ("*Vuitton*") for the proposition that the Government "may not outsource prosecution to an interested private party."  (Mot. 8).  *Vuitton* is inapposite.  *Vuitton* "held that counsel for a party that is the beneficiary of a court order may not be appointed as a prosecutor in a contempt action alleging violation of that order."  *United States v. Terry*, 17 F.3d 575, 577 (2d Cir. 1994).  That has absolutely nothing to do with what occurred in this case.

cooperate with the Government.  *See, e.g.*, *United States v. Barcelo*, 628 F. App'x 36, 38 (2d Cir. 2015) (noting that the Second Circuit has "never held that the prosecution team includes cooperating witnesses"); *United States v. Garcia*, 509 F. App'x 40, 43 (2d Cir. 2013) (same); *see also United States v. Graham*, 484 F.3d 413, 417 (6th Cir. 2007) (same).

Nothing occurred here that would remotely justify a contrary ruling.  Victims' counsel did not participate in the Government's interviews beyond the particular victim counsel represented, played no role in developing prosecutorial strategy, had no involvement in grand jury proceedings, and played no role in the arrest of the defendant.  *See United States v. Blaszczak*, 308 F. Supp. 3d 736, 742-43 (S.D.N.Y. 2018) (examining relevant considerations in determining whether a joint investigation occurred); *see also United States v. Middendorf*, No. 18 Cr. 36 (JPO), 2018 WL 3956494, at *4 (S.D.N.Y. Aug. 17, 2018) (same).  The defendant does not cogently argue to the contrary (and even if she did, all such actions occurred before her conviction, and thus are plainly not "new evidence").

Taking a different tack, the defendant suggests that even if they were not members of the prosecution team, the "participation of privately interested plaintiff's attorneys in a federal prosecution constitutes a structural violation of due process."  (Mot. 20).  This proposition does not make any sense—and if upheld, it would create the perverse incentive that lawyers for victims of sexual abuse or other horrific crimes could not provide information to and assist law enforcement, because the very act of doing so would doom a prosecution.  That is not the law.

### b.  The Defendant's Claims Related to the Victims Are Barred and Meritless

In a similar effort to revive a prior, meritless argument—this time about the victims' alleged false narratives that was rejected by the jury—the defendant cites supposedly new evidence.  (*See* Mot. 12-14).  That effort also fails.

Nearly all of the evidence the defendant cites is not new at all and, thus, the defendant is barred from raising these arguments at this stage.  For example, as to supposedly new evidence:[18]

- The defendant claims that Virginia met with Alessi to get him to testify.  (Mot. 13).  In support of her argument that this represented some sort of witness interference, the defendant cites a podcast that aired on or about September 22, 2020 in which Virginia spoke to Alessi.  (*See* Ex. 47).[19]  That podcast is far from new; it aired over one year before the trial commenced in November 2021.  The podcast was available for the defendant to use in connection with her cross-examination of Alessi.

- The defendant argues that because certain victims communicated about their "sisterhood" in a group chat, their memories were contaminated.  (Mot. 13).  She points to trial testimony in support of her argument.  (Mot. 13).  Of course, trial testimony is not new evidence, and the defendant thoroughly cross-examined the victims on this very topic.  (*See, e.g.*, Tr. 1248 (cross-examination about Kate and other victims who appeared on a television show appearing "as a sisterhood of accusers"); *id.* at 2204-05 (cross-examination of Annie about being "a part of a WhatsApp group of Epstein accusers" and emailing "with other accusers" including Virginia)).

- The defendant argues that Jane "interfered" with her brother's testimony when she texted him after her testimony.  (Mot. 14).  The defendant does not cite any new evidence in support of her claim, which was fully known to her at the time of trial.  She elected not to appeal this issue presumably because Jane's brother did not testify.  Indeed, the Government disclosed the communications between Jane and her brother to the defendant upon learning of them.  (Tr. 1426). That disclosure reflected the fact that after Jane testified, she called Brian.  (Tr. 1432).  Jane told Brian that he should know that the defense attorney was an expletive and that she was shown an Interlochen application.  (*Id.* (describing 3510-020); *see also* 3510-021 (notes of meeting with Brian describing Jane calling him after her testimony and, in substance and in part, warning Brian about the defense attorney being evil, trying to twist the truth, and showing her an Interlochen application)).  As the Government explained to Judge Nathan when this issue arose during trial, the Government had followed its practice of telling every witness that they should not talk to other witnesses before the trial.  (Tr. 1428).  The Government further noted that the defendant was free to cross-examine Brian about the communications with Jane (Tr. 1426) and, significantly, that the substance of Brian's testimony had been relayed to the Government long before Jane and Brian spoke after Jane's testimony and memorialized in 3500 material that had

---

[18] Throughout this memorandum, the Government has endeavored to respond to the defendant's principal claims, as well as other claims and arguments that are at least partially developed, to the extent comprehensible.  However, the Government has not attempted to respond to all of the myriad undeveloped suggestions or allegedly factual asides in the defendant's lengthy papers, which are plainly insufficient to discharge the heavy burden on a defendant seeking to vacate a conviction under Section 2255.

[19] The defendant appears to cite Exhibit 59 (in footnote 12) in support of her argument, but as best as the Government understands the defendant's argument, it appears she intended to cite Exhibit 47.

been produced to the defendant (Tr. 1429). Ultimately, the Government elected not to call Jane's brother—who would have corroborated Jane's testimony through prior consistent statements by Jane—as a witness. (Tr. 1696).

- The defendant argues Jane testified at trial that she was "blackmailed" and [20] She cross-examined Jane about being approached by a journalist to try to make the point that she told the reporter that Epstein approached her but did not say anything about the defendant being there. (Tr. 445-46). On re-direct, Jane testified that she did not want to speak to the reporter, but had a "not so detailed" phone conversation with him because he "basically blackmailed" her by "threaten[ing] to reveal [her] identity publicly if [she] wouldn't speak with him." (Tr. 607-09). This is not "new evidence" nor new information of which the defendant was not aware.

The defendant's other arguments, which appear to rest in part on what may post-date her

trial, are equally meritless. For example:

- Many of the defendant's claims relate to Virginia and much of the supposedly "new evidence" that the defendant cites comes from Virginia's book that was published in October 2025. (*See* Mot. 12-14). As discussed below, Virginia was not a witness or a declarant at trial, and accordingly, any supposedly new evidence that would affect her credibility is immaterial to the outcome of the trial. The trial record—without any reliance on Virginia's testimony or statements offered for the truth of a matter asserted by Virginia—established that Virginia was a victim of the scheme.

- The defendant argues that a particular victim reported participating in group therapy with other witnesses "allowing for transference of testimony and contamination of memory." (Mot. 14). This is irrelevant. That victim did not testify at the defendant's trial.

-  Carolyn testified at trial about, among other things, how the defendant called Carolyn to set up appointment times for so-called massages with Epstein and asked her about school, sex toys, travel, where Carolyn lived, and her family. (*See, e.g.*, Tr. 1529-36, 1542). That testimony was corroborated by the testimony of her then-boyfriend (*see* Tr. 1751-52), FedEx records (GXs 801, 802, 803), a 2007 interview with the FBI during which she mentioned "an older lady with short black hair and an accent at Epstein's residence the first time [she] went there with Virginia" (Tr. 1553), and a 2009 deposition in which Carolyn testified under oath that the defendant called

---

[20] The Government has added limited redactions in its brief to protect victims' privacy and confidentiality interests, consistent with the Court's orders (Dkt. 825, 828, 832) and consistent with redactions in prior filings as ordered by Judge Nathan.

her to schedule sexualized massages (*see* Tr. 1559; *see also* Tr. 1560 (Carolyn 2009 deposition in which she said she spoke to, among others, the defendant when she called to see if she could give Epstein a massage)).  Apart from this significant corroboration,   Indeed, in connection with sentencing, Judge Nathan stated that she "found Carolyn to be credible and credit her testimony." (Ex. 52 at 13).  In any event, ▮▮▮▮▮▮▮▮▮▮ because Carolyn was cross-examined at length about her financial incentives to testify, her interactions with law enforcement, her civil lawsuits, and the lawyer who represented her in connection with her claim with the Epstein Victim Compensation Fund.  (*See, e.g.*, Tr. 1617-21, 1625-31, 1685-90).

At bottom, the defendant's attempt to resurrect her prior attacks on the victims or their counsel is not countenanced by Section 2255, and even if it were permitted, it does not come close to calling into question the fairness of her trial, and therefore should be rejected.

### c.   The Defendant's Miscellaneous Attacks on Her Conviction Are Barred and Meritless

The defendant sprinkles throughout this section of her Motion a number of points that too are barred, mischaracterize the record, and/or have marginal, if any, relevance.  (Mot. 15-18).  These can be quickly disposed of:

- The defendant claims that the Government "newly admits it has additional witness authored material not revealed at trial" and in support of her claim cites a brief filed by the Civil Division of USAO-SDNY on October 29, 2021—a month before trial started—in support of the FBI's motion for summary judgment related to Radar Online's FOIA requests to the FBI. (Mot. 15).  Not only was this filing publicly available, but it also does not say what the defendant suggests; the filing related to records being withheld—*i.e.*, not publicly disclosed—so as to not interfere with the prosecution of the defendant and help ensure that a "fair and impartial jury" was impaneled. (*Radar Online LLC v. FBI*, No. 17 Civ. 3956 (PGG), ECF No. 38 at 10 (S.D.N.Y. Oct. 29, 2021)).[21]

- The defendant appears to complain that she did not receive Carolyn's MySpace accounts which she hypothesizes could be "expected to undermine witness credibility." (Mot. 15).  The defendant cites Acosta's testimony regarding victims' MySpace pages in support of her argument, but what Acosta said was that "[s]ome [victims] had MySpace pages that would've been used on impeachment." (Ex. 54 at 27).  Even assuming this document was

---

[21] The Government also produced the FOIA request and related documents to the defendant in advance of trial.  (*See* SDNY_GM_02743189—SDNY_GM_02743292).

in the Government's possession, which the defendant does not carry her burden of establishing, any MySpace records for Carolyn would have been cumulative impeachment material as Carolyn was extensively cross-examined about her criminal record, her prior statements under oath, her drug use, and her mental health issues. And, in any event, Carolyn's testimony, as discussed above, was corroborated by, among other things, FedEx records and the testimony of her then-boyfriend. Moreover, the defendant ignores that she was on notice of the existence of a MySpace account for Carolyn as the Government

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████

- The defendant argues that Virginia's diary—which she hypothesizes would undermine Virginia's credibility—should have been disclosed to the defendant. (Mot. 15). But Virginia was neither a witness nor a declarant at trial, and in any event the defendant provides no basis to conclude that Virginia's diary was ever in the Government's possession. *See Maxwell*, 534 F. Supp. 3d at 323; *United States v. Collins*, 409 F. Supp. 3d 228, 239 (S.D.N.Y. 2019) ("The Government's *Brady* obligations extend only to materials within prosecutors' possession, custody or control or, in appropriate cases, that of the Department of Justice, perhaps another part of the Executive Branch, or a comparable state authority involved in the federal prosecution.").

- The defendant complains that Annie's diary was not produced to her in full. (Mot. 15-16). This was litigated before trial. The Government explained that the materials the defendant sought did not exist. (*See, e.g.*, Dkt. 100 at 11 n.2 (indicating that Annie stopped writing in her journal a month after first meeting with Epstein); Dkt. 204 at 187 (same)). And, in any event, Judge Nathan rejected the defendant's disclosure request, explaining that the "diary pages she requests are within the control of a civilian third party, not the Government, and so the Government need not (and perhaps cannot) produce them." *Maxwell*, 534 F. Supp. 3d at 323-24.

- The defendant argues that the Government had notice of Annie's complaint against Epstein in 1997. (Mot. 16 (citing Ex. 54)). Not so. As discussed below, Annie was first interviewed by the FBI in 2006. (Tr. 2097). ██████████████ made a report about Epstein to the FBI in ██████ but said nothing about the defendant. (*See* ██████████). The defendant's complaint that she did not receive any notice in discovery about Annie's allegations against Epstein (Mot. 16) is preposterous, not only because she received extensive 3500 material for Annie, but the Indictment itself was clear in its allegations relating to Annie's experience with the defendant and Epstein.

- The defendant appears to complain about not receiving a photograph of Virginia with Prince Andrew and the defendant in discovery, but in the same breath, cites that same photograph and accompanying FBI report which indicates the date the FBI obtained the photograph from ████████ and which contains a Bates stamp, making clear it was, in fact, produced to the defendant. (Mot. 16 (citing Ex. 58)). And her complaint is irrelevant as this photograph was not offered by the Government during her trial.

- The defendant complains about flight manifests not being produced to her and claims that they "would have established whether Jane flew on Epstein's plane in 1994-1997 as she

43

testified." (Mot. 16-17). The Government produced the flight manifests in its possession in discovery and both Larry Visoski and David Rodgers, Epstein's pilots, were available to be and, in fact, were questioned at trial. And the flight manifests to which the defendant cites, Exhibit 70, primarily consist of JEGE, LLC Passenger Manifests from 2005 to 2015 which have literally no bearing on "whether Jane flew on Epstein's plane in 1994-1997."

- The defendant speculates that a confidentiality agreement between her and Epstein would have proved their "employer, employee relationship" and undermined the narrative the defendant was his girlfriend. (Mot. 17). The defendant ignores that multiple witness testified and were cross-examined at length during trial about the romantic relationship between the defendant and Epstein. (*See, e.g.*, Tr. 96 (Visoski); Tr. 261-65 (cross-examination of Visoski); Tr. 783 (Alessi); Tr. 1816 (Rodgers); Tr. 1953-55 (cross-examination of Rodgers); Tr. 2370-74 (defense witness Cimberly Espinosa)).

- The defendant contends that Epstein's birthday book that was recently publicly released was not disclosed to her, arguing that "several complainants at trial wrote letters to Epstein for his birthday that would have undermined [their] credibility." (Mot. 17). The defendant—who was well aware of this book, since she "put[] it together" for Epstein[22]—does not specify which trial witnesses are in Epstein's birthday book. To the extent she suggests that Exhibit 100 was written by one of the victims who testified at trial, it is not material and, if anything, is cumulative as the victims were subjected to extensive cross-examination, including about post-abuse interactions with Epstein. (*See, e.g.*, ██████████ ████████████████████████████████████████████ ██████████████████████████████). In any event, the fact that famous people sent Epstein notes for a birthday book does not undermine the defendant's guilt or the outcome of the trial.[23]

- The defendant yet again complains about proceedings before the Honorable Robert W. Sweet, the United States District Judge who was then overseeing the *Giuffre v. Maxwell* civil litigation, claiming that she didn't receive transcripts of hearings which she speculates would reveal plaintiffs' lawyers "colluding" with the Government. (Mot. 17). This was the subject of exhaustive suppression litigation before Judge Nathan. (*See* Dkt. 134 (defendant motion to suppress); Dkt. 204 at 61-75 (Government brief setting forth relevant factual background); *see also Maxwell*, 545 F. Supp. 3d 72 (District Court opinion denying suppression motions)). The defendant received the relevant materials in discovery. (*See, e.g.*, SDNY_GM_00000834—SDNY_GM_00000905 (which includes hearing

---

[22] *See* HOUSE_OVERSIGHT_000005 at https://d3i6fh83elv35t.cloudfront.net/static/2025/09/Request-No.-1.pdf.

[23] In her Amended Motion, the defendant also complains about the Government's supposed "[f]ailure to follow witnesses and the evidence" and complains that the Government did not interview two particular individuals, including one who she claims has information regarding supposed inconsistent evidence given by a victim who testified at trial. (Am. Mot. 4-5). The defendant cites that individual's declaration, the provenance of which is unknown. In any event, the relevant victim was subjected to extensive cross-examination. And the Government followed the evidence, which resulted in a grand jury returning the Indictment, and a jury convicted the defendant of serious crimes based on that evidence.

44

transcripts)).

- The defendant appears to complain that the Government never identified ▋▋▋ as a victim, thereby denying her the opportunity to call and/or cross-examine ▋▋▋. (Am. Mot. 7). This claim is belied by the record. In accordance with Judge Nathan's June 2, 2021 order (Dkt. 297), the Government disclosed identifying information for the minor victims alleged in the Indictment, including their names, dates of birth, and attorneys. In addition, as best as the Government understands, the defendant speculates that the Government withheld statements of the victim identified at trial as ▋▋▋, who Judge Nathan concluded at sentencing was ▋▋▋▋▋▋▋▋▋▋▋▋ ▋▋▋▋▋▋. (Mot. 17-18 (citing, inter alia, ▋▋▋▋▋▋▋▋▋▋ ▋▋▋▋▋▋▋▋▋▋▋▋▋▋)). ▋▋▋ was not a witness or declarant at trial. The record at trial—in particular, the testimony of ▋▋▋▋▋—amply established that ▋▋▋ was a victim of the conspiracy. In any event, the Government produced non-testifying witness material for ▋▋▋ to the defendant in advance of trial. (*See* ▋▋▋▋ ▋▋▋▋▋▋▋▋▋).[24]

- The defendant next speculates that a detainer recorded against ▋▋▋ was canceled against him in exchange for his trial testimony. (Mot. 18). The defendant offers nothing to support this outlandish claim. The defendant also claims that ▋▋▋ perjured himself with respect to his testimony about the defendant's accent. (*Id.*). Yet she fails to explain how he perjured himself and cites no law, nor could she, establishing that his testimony constituted perjury. And that is because ▋▋▋ did not perjure himself at the defendant's trial. He was subjected to cross-examination about, among other things, ▋▋▋▋▋▋▋▋ ▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋ ▋▋▋▋▋▋▋▋▋▋.

### d.    The Defendant's Selective Prosecution Claim Is Barred and Meritless

Finally, the defendant makes a conclusory selective prosecution motion, suggesting that she was singled out for prosecution and that the Government "could have indicted the 4 named co-conspirators, or any of the 25 men that settled with the civil plaintiff's lawyers." (Mot. 19). The defendant's claim plainly could have been brought before Judge Nathan years ago, and then on direct appeal. It was not, and it thus is barred. It is also baseless.

A defendant challenging the Government's decision to prosecute her bears a heavy burden.

---

[24] The defendant acknowledges in her Motion that 3500 material indicated that "▋▋▋ gave a statement that ▋▋▋ received a settlement" (Mot. 17), but in her Amended Motion complains, citing EFTA material, that she did not know about the settlement in advance of trial. (Am. Mot. 7).

*United States v. Armstrong*, 517 U.S. 456, 463-64 (1996). Federal prosecutors retain "broad discretion to enforce the Nation's criminal laws." *Id.* at 464. "As a result, [t]he presumption of regularity supports their prosecutorial decisions and, in the absence of clear evidence to the contrary, courts presume that they have properly discharged their official duties." *Id.*; *see also, e.g.*, *Wayte v. United States*, 470 U.S. 598, 607 (1985). To establish a claim of selective prosecution, a defendant must present "clear evidence" that the decision to prosecute not only (1) "had a discriminatory effect" but was also (2) "motivated by a discriminatory purpose." *Armstrong*, 517 U.S. at 465; *United States v. Alameh*, 341 F.3d 167, 173 (2d Cir. 2003); *United States v. Fares*, 978 F.2d 52, 59 (2d Cir. 1992); *United States v. Moon*, 718 F.2d 1210, 1229 (2d Cir. 1983).

With respect to the first of the two required prongs (discriminatory effect), a defendant must establish that "others similarly situated have not generally been proceeded against because of conduct of the type forming the basis of the charge against the defendant" and that the defendant has been "singled out." *Fares*, 978 F.2d at 59; *see also Cobb v. Pozzi*, 363 F.3d 89, 110 (2d Cir. 2004) (same). With respect to the second of the two required prongs (discriminatory purpose), a defendant must establish that the Government's "selection of the defendant for prosecution has been invidious or in bad faith, i.e., based upon such impermissible considerations as race, religion, or the desire to prevent his exercise of constitutional rights." *Fares*, 978 F.2d at 59. This means more than that the Government acted with an "awareness of consequences." *Wayte*, 470 U.S. at 610. Rather, it must have "selected or reaffirmed a particular course of action at least in part because of, not merely in spite of, its adverse effects." *Id.* Where a defendant "has not shown that the Government prosecuted [her] *because of*" her protected status or conduct, her claim fails. *Id.* (emphasis in original).

The defendant's entire argument appears to be that "[n]one of the 4 named co-conspirators or the 25 men with secret settlements were indicted." (Mot. 20). The defendant, who bears the burden, does not identify those individuals, much less identify the evidence against them that allegedly warranted federal charges.[25] Merely alleging that others may have committed similar crimes and could have been prosecuted—as any defendant could allege—is not enough. Rather, as discussed above, the defendant must show, among other things, that "others similarly situated have not generally been proceeded against because of conduct of the type forming the basis of the charge against [her]." *Fares*, 978 F.2d at 59. "A similarly situated offender is one outside the protected class who has committed roughly the same crime under roughly the same circumstances but against whom the law has not been enforced." *United States v. Lewis*, 517 F.3d 20, 27 (1st Cir. 2008); *see also, e.g.*, *United States v. Olvis*, 97 F.3d 739, 744 (4th Cir. 1996) ("[D]efendants are similarly situated when their circumstances present no distinguishable legitimate prosecutorial factors that might justify making different prosecutorial decisions with respect to them."). The defendant does not make such a showing. She does not even appear to try. And even leaving aside the defendant's burden, as the history of these proceedings shows, any suggestion that USAO-SDNY did not pursue this investigation vigorously and impartially is simply false.

The defendant also fails to meet the second required prong. She does not—and cannot—establish that the prosecution was in bad faith. She makes no showing that it was based on anything other than the overwhelming evidence of her criminal conduct. She claims that her indictment

---

[25] In her July 25, 2025 interview with the Deputy Attorney General, the defendant said, "I never, ever saw any man doing something inappropriate with a woman of any age." *See* https://www.justice.gov/storage/audio-files/Interview%20Transcript/Interview%20Transcript%20-%20Maxwell%202025.07.25-cft%20(Redacted).pdf at 245. The Court need not rely upon that interview, but it appears to be in tension with the defendant's present claim.

was a "political solution" to Epstein's death while he was in the custody of the Bureau of Prisons. (Mot. 19). But she offers no support for this inflammatory claim. As established at trial, the defendant was charged with crimes because there was overwhelming evidence that she committed them. There was no scheme to prosecute the defendant for political reasons. She was prosecuted for a different and straightforward reason: because she agreed to and did assist Epstein to sexually abuse minors.[26]

### B. The Defendant's Claims Related to Government Exhibit 52, The Defendant's and Epstein's Contact Book, Are Barred and Meritless

The defendant argues that Government Exhibit 52, the defendant and Epstein's contact book, was improperly admitted at trial because it was "not authenticated by any witness." (Mot. 32; *see also* Am. Mot. 7). She also claims that the Government failed to disclose the involvement of a particular attorney in the "production" of the book. (Mot. 32). The defendant's claims are barred. The defendant chose to abandon her challenge to Government Exhibit 52 in connection

---

[26] The defendant adds that she was "precluded from asking questions [at trial] concerning investigatory techniques which would have revealed the collusion" she alleged occurred between victims' counsel and the Government. (Mot. 19). Such wholly unsupported accusations were not for the jury in weighing the guilt of the defendant and were properly precluded. *See, e.g.*, *United States v. Regan*, 103 F.3d 1072, 1082 (2d Cir. 1997) (a "selective prosecution defense is an issue for the court rather than the jury"); *United States v. Re*, 401 F.3d 828, 833 (7th Cir. 2005) (prosecuting authority's motives or views underlying its "charging decisions are not proper subjects for cross-examination and argument"); *United States v. Reese*, 933 F. Supp. 2d 579, 583 (S.D.N.Y. 2013) (precluding defendant from advancing arguments aimed at jury nullification and the overall propriety of the government's investigation). And again, the defendant could have raised her claim on appeal, she did not, and it thus is barred.

The defendant also argues within this same section of her Motion that the return of the S1 superseding indictment by a grand jury sitting in White Plains deprived her of her Sixth Amendment rights. (Mot. 20). On April 16, 2021, Judge Nathan rejected this claim on the grounds that it was moot because a grand jury sitting in Manhattan returned the S2 superseding indictment. *Maxwell*, 534 F. Supp. 3d at 326. The defendant subsequently informed Judge Nathan that she agreed that her motion to dismiss the S1 superseding indictment was "now moot" for the same reasons. (Dkt. 225; *see also* Dkt. 228 (order denying motion to dismiss the S1 superseding indictment as moot)). This claim too is thus both barred and meritless.

48

with her direct appeal.  She cannot now relitigate the claim in her Section 2255 motion.  In any event, her argument as to authentication rests on a patent falsehood.  The contact book was authenticated at trial by Juan Alessi, the former manager of Epstein's Palm Beach villa.  The discovery related to the contact book that made the provenance of the book crystal clear was produced to the defendant.  And the defendant's related claim that Alessi perjured himself is similarly both belated and frivolous.

### 1.  Relevant Facts

On October 7, 2020, the Government filed a letter relating to the Government's plan to obtain and review investigative files created and maintained by other offices  (Dkt. 63).  In that letter, the Government noted that it had received some files from an investigation conducted by the FBI's Palm Beach Resident Agency that led to the prosecution of an Epstein employee named Alfredo Rodriguez for obstruction of justice in the Southern District of Florida, *see United States v. Rodriguez*, No. 10 Cr. 80015 (KAM).  (Dkt. 63 at 4 n.3).

On or about April 7, 2021, the defendant requested that the Government disclose the FBI case file concerning the investigation of Rodriguez.  On or about April 9, 2021, the Government produced to the defendant materials that constituted the files that the Government referenced in its October 7, 2020 letter to the Court regarding the investigation that led to the prosecution in *United States v. Rodriguez*, No. 10 Cr. 80015 (KAM).  These materials included audio and video recordings and FBI 302s.[27]  One of the items produced to the defendant was a video recording of a November 3, 2009 meeting between Rodriguez and an undercover FBI employee.

---

[27] The Government made an additional production to the defendant of records relating to Rodriguez on or about November 20, 2021.

On October 18, 2021, the defendant file a motion *in limine* to exclude Government Exhibit 52. (Dkt. 390). The defendant argued that the "provenance of the exhibit is particularly troubling" as it "allegedly surfaced in connection with a former Epstein employee, Alfredo Rodriguez" who was "attempting to sell [it] to Brad Edwards [a civil lawyer who was involved in suing Epstein]." (*Id.* at 2). The defendant further noted that according to the criminal complaint in which Rodriguez was charged, Rodriguez "approached one of the lawyers and offered to sell the lawyer evidence against Mr. Epstein" and the FBI subsequently set up a "sting operation" during which the exhibit was "provided to an undercover officer in exchange for $50,000." (*Id.*). The defendant argued that Government Exhibit 52 "cannot be authenticated and no evidentiary foundation exists that would allow for [its] admission." (*Id.*). ██████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████

The Government filed its opposition to the defendant's motions *in limine*. (Dkt. 397). As relevant here, the Government stated that the "defendant [was] correct that the Government came into custody of this exhibit after a former employee of Jeffrey Epstein attempted to sell it to a civil lawyer suing Epstein." (*Id.* at 73). The Government explained that "[h]ow the Government acquired the exhibit goes, if anything, to its weight and not its admissibility." (*Id.*). The Government further explained that Government Exhibit 52 was "admissible not for the truth of the matters asserted therein (such as the accuracy of the contact information for victims), but to establish that the defendant kept contact information for relevant individuals at trial, including victims." (*Id.*). The defendant filed a reply. (Dkt. 398 at 42).

On November 1, 2021, Judge Nathan requested additional briefing regarding Government Exhibit 52.  (Nov. 1, 2021 Tr. 61-63).  On November 12, 2021, the Government filed a letter explaining that trial testimony would establish that Government Exhibit 52 was a contact book that belonged to the defendant and, therefore, admissible.  (Dkt. 457).  In that same letter, the Government again addressed the circumstances under which Government Exhibit 52 came into the possession of the FBI.  (*See id.* at 5 n.3).

On November 15, 2021, the defendant filed a letter response in which she acknowledged her understanding that Rodriguez had the book "in his possession until 2009 when he tried to sell it to Brad Edwards for $50,000."  (Dkt. 490 at 1).  The defendant requested the opportunity to conduct voir dire of the exhibit.  (*Id.* at 3).  The Government filed a response.  (Dkt. 491).

On December 2, 2021, Alessi testified at trial about, among other things, Government Exhibit 52.  Alessi personally examined Government Exhibit 52 and recognized it as a book that belonged to Epstein and the defendant, consistent with his experience working for them.  (Tr. 850).  He said it was "the same" "type of book," and appeared to be one of the "directories of Ms. Maxwell and Mr. Epstein."  (*Id.*).  He testified that Government Exhibit 52 had "exactly the same cover of the directories that I saw," the "same binding," and "exactly" the "layout" as the books he recalled.  (*Id.* at 851).  Although the books he saw were thicker and had larger font, the "format was the same."  (*Id.* at 851-52).  Alessi testified that he saw "many, many, many, many names" in Government Exhibit 52 that he recognized from the book he saw when he worked for Epstein.  (*Id.* at 851).  Although Alessi only worked in the Palm Beach house until the end of 2002, he explained that the practice during his twelve years that he worked for Epstein was to print new directories twice a year.  (*Id.* at 864).

That same day, defense counsel conducted voir dire regarding Government Exhibit 52 and Judge Nathan reserved decision on whether to admit the book during Alessi's testimony. (Tr. 871-76).  On December 8, 2021, the Government filed a letter explaining that the trial record established that Government Exhibit 52 was authentic and should be admitted.[28]  (Dkt. 533).  The defendant filed a reply letter.  (Dkt. 532).

On December 9, 2021, Judge Nathan overruled the defendant's objections and concluded that Alessi's testimony was sufficient to meet Rule 901's standard.  (Dkt. 535 at 2).  Judge Nathan found that Alessi's testimony "established an intimate familiarity with the distinctive directories used in the Palm Beach household over many years and during the time period of the charged conspiracy.  He testified that GX 52 was the same 'type of book,' with the same type of binding, cover, and information.  This testimony of the appearance, content, substance, and other distinctive characteristics of the exhibit is sufficient to satisfy Rule 901."  (*Id.* at 5).  Judge Nathan also found that the defendant's arguments as to the "Government's possession of the document . . . [did] not go to authentication."  (*Id.*).  Judge Nathan also determined the exhibit was "relevant for the non-hearsay purpose that it tends to show a link between Ms. Maxwell and the names and phone numbers listed, as well as how the information was organized."  (*Id.* at 7).  Judge Nathan directed the parties to confer and propose a limiting instruction (*id.* at 7-8), which the parties did (Dkt. 538) and which Judge Nathan delivered (Tr. 2040).

### 2.  Discussion

The defendant concedes that the "admissibility and authentication of Trial Exhibit 52 was litigated pre and during trial."  (Mot. 33).  That concession is necessary.  As described in detail

---

[28] The Government indicated that it no longer intended to call as a witness at trial an individual who worked for Epstein and who could further authenticate Government Exhibit 52.  (Dkt. 533 at 1).

above, Judge Nathan rejected the defendant's challenges to the authenticity of the exhibit after extensive briefing.  The defendant then elected not to press this claim in her direct appeal.  That ends the matter.

The defendant also contends that the Government failed to disclose the involvement of a particular attorney in the "production" of Government Exhibit 52, which constituted a *Brady* violation.  (Mot. 32, 36).  That too is both barred and wrong.  The defendant received materials in discovery that made apparent that Rodriguez attempted to sell Government Exhibit 52 to a particular plaintiff's attorney.  (*See, e.g.*, SDNY_GM_02753180; *see also* Ex. 24 (Dkt. 285-1 at 5)).  The defendant clearly understood this fact, as evidenced by her filings on the very topic.  (*See* Dkt. 390 at 2 (defendant motion referring to Rodriguez "attempting to sell [GX 52] to Brad Edwards"); Dkt. 490 (defendant letter acknowledging that Rodriguez had the book "in his possession until 2009 when he tried to sell it to Brad Edwards for $50,000"); *see also* Dkt. 397 at 73 (Government brief stating that the "defendant [was] correct that the Government came into custody of [GX 52] after a former employee of Jeffrey Epstein attempted to sell it to a civil lawyer suing Epstein"); Dkt. 457 at 5 n.3 ("It is a matter of public record that in 2009, an employee of Jeffrey Epstein, Alfredo Rodriguez, attempted to sell Government Exhibit 52 to a plaintiff's attorney.")).

Moreover, the defendant ignores that because she raises her *Brady* claim for the first time in the context of a Section 2255 motion, she must demonstrate not just an alleged violation, but also "cause" and "actual prejudice."  *Frady*, 456 U.S. at 167-68.  The defendant cannot make either of these showings.  There was no "impediment" to raising this claim as the defendant knew about the provenance of Government Exhibit 52 and litigated its admissibility.  *McCleskey*, 499 U.S. at 497-98.  Nor can she establish prejudice.  She has not—and cannot—demonstrate a substantial

53

likelihood that the outcome of her trial would have been different if the allegedly suppressed *Brady* material had been turned over before trial because she received the material and in any event, substantial evidence, even putting aside Government Exhibit 52, overwhelmingly established her guilt.

The "new" evidence the defendant cites in support of her *Brady* claim is a 2024 podcast, in which, according to the defendant, Edwards lied when he stated that Rodriguez said he had no responsive documents during a deposition. (Mot. 33-34). She claims this is important because Edwards allegedly had access to Government Exhibit 52 for approximately 3 months before he contacted the FBI. (Mot. 34). But Rodriguez's deposition and plea agreement make clear that he did not produce documents when he appeared for the 2009 deposition. (*See* Dkt. 390-2 at 3 (defendant's sealed filing); *United States v. Rodriguez*, No. 10 Cr. 80015 (KAM), ECF No. 25 at 6 (S.D. Fla. Mar. 18, 2010)). Not only is this not "new" evidence, but it is also irrelevant.

The defendant next claims that her due process rights were violated because the Government allowed Alessi to perjure himself when he testified that Government Exhibit 52 was "the same as those from Epstein's house." (Mot. 34). The defendant did not raise this contention on direct appeal and she does not cite a single shred of new evidence that would permit her to do so now. Even if she were permitted to bring such a claim, it is utterly baseless.

The defendant acknowledges that Alessi testified that Government Exhibit 52 was not the same size or in the same font as other books he recalled. (*Id.*). Judge Nathan rejected the defendant's arguments about Alessi's supposed inability to authenticate the exhibit, noting that Alessi was clear about the differences and similarities between Government Exhibit 52 and the contact books he recalled seeing at Epstein's residence: "Mr. Alessi acknowledged that GX 52 was a different version than the directories he was familiar with because GX 52 was not as thick as

54

those versions, and his name and his wife's name were in the version he observed, but neither his name nor his wife's name was in GX 52." (Dkt. 535 at 4 (citing Tr. 853, 865)). The defendant fails to explain how Alessi perjured himself. And that is because Alessi did not perjure himself at the defendant's trial. *See United States v. Lighte*, 782 F.2d 367, 372 (2d Cir. 1986) ("Perjury requires that a witness believe that the testimony he gives is false."); *United States v. Gonzalez*, 33 F.R.D. 280, 282 (S.D.N.Y. 1960) ("A bare allegation of perjury does not entitle an applicant to relief under section 2255.").

The defendant's assertion that a particular EFTA document "would have impeached the evidence of Alessi" regarding Government Exhibit 52 fares no better. (Am. Mot. 7 (citing Ex. A34 (EFTA00608040))). As an initial matter, the document was publicly available years ago. In any event, the portion of the affidavit to which the defendant cites refers to a November 3, 2009 meeting between Rodriguez and an undercover FBI employee. (Ex. A34). A video recording of the same meeting was produced to the defendant in April 2021. (*See* SDNY_GM_02753145). Accordingly, the allegedly impeaching evidence—which it was not—was available to the defendant well in advance of trial.[29]

In short, Judge Nathan correctly concluded that Alessi's testimony "sufficiently surmount[ed] Rule 901's 'minimal' bar." (Dkt. 535 at 6). There was no *Brady* or due process violation, the supposedly new evidence is not new and/or is plainly irrelevant, and the defendant chose not to bring on appeal a single one of the arguments she now presses.

---

[29] The defendant relatedly cites to the deposition of a victim's lawyer, claiming that the lawyer said the book was "created by" Rodriguez. (Am. Mot. 7). That is not what the lawyer said. What he said was, "I'm not certain exactly whose book it is." (Ex. A35; *see also* EFTA01116797). The lawyer speculated that it was Rodriguez "maintaining a copy of records in case he was worried that Epstein might try to have him killed at some point, and so this was his insurance policy." (*Id.*). In any event, that deposition was produced to the defendant in discovery.

### C.  The Defendant's Claims Related to Financial Evidence Are Barred and Meritless

The defendant claims she is entitled to relief because of the Government's purported misrepresentation of material financial evidence to "create an appearance of illicit gain."  (Mot. 36-38).  The defendant is barred from making this claim.  She also is wrong.

#### 1.  Relevant Facts

At trial, the Government called one witness from JPMorgan Chase through whom seven JPMorgan Chase documents were admitted.  (Tr. 1303-19, 1348-49; GXs 501, 502, 504, 505, 506, 507, 509).  That witness was clear that he did not have any personal involvement with the accounts or transactions in those Government Exhibits and that he had not had any interactions with the defendant or Epstein.  (Tr. 1319).  That witness was subjected to extensive cross-examination.  (Tr. 1319-48).  In its summation, the Government argued, based on those Government Exhibits, that between 1999 and 2007, Epstein gave the defendant about $30 million.  (Tr. 2884-85).

#### 2.  Discussion

The defendant is barred from raising her claim now because she did not do so on direct appeal.  *See Zhang*, 506 F.3d at 166.  To overcome this procedural bar, the defendant would have to demonstrate "cause for the procedural default" as well as actual prejudice, *Thorn*, 659 F.3d at 231; *see also McCleskey*, 499 U.S. at  497 ("cause . . . requires a showing of some external impediment *preventing* counsel from constructing or raising the claim.") (emphasis in original).  She cannot make either of these showings.  The apparent "impediment" to the defendant's counsel previously raising the claim is the demonstrable falsity of the basis for the claim.

The defendant claims that the "Government's charts mis-dated transfers and omitted exculpatory notations showing repayments or gifts."  (Mot. 37).  She similarly takes issue with "an FBI summary presented as 'Maxwell's account ledger' (GX 1453)" that she claims was "actually

56

compiled by third-party civil counsel" and that "[t]he omission of source attribution misled the jury into believing it was an official Government document." (*Id.*; *see also* Am. Mot. 12). These assertions are false. There were no financial summary charts presented by the Government and there was no Government Exhibit 1453 (or any corresponding Government Exhibit series) introduced at trial. At bottom, the financial evidence presented by the Government at trial came from underlying bank documents and the inferences to be drawn from such documents were to be drawn by the jury. The defendant's specious claims to the contrary rest on nothing.[30]

The defendant also argues that testimony suggesting that the defendant "co-owned Epstein's properties" and "co-owned Epstein Jet [sic]" is contradicted by "contemporaneous deeds, bank records, and U.K. filings" that "show that the assets were either Epstein's or held by foreign trusts unrelated to Petitioner and not derived from any of the alleged offenses." (Mot. 37). In support of this argument, the defendant cites a single document: an "agreement for sale" of a property in London, a property purchased by the defendant. (Ex. 111). The defendant ignores that Visoski testified that the defendant had a "quarter share" of the jet and that the defendant told him "[t]hat it was her jet, which, in fact, it was, because she was partial owner of the jet and she had access to it with notice." (Tr. 97). She also ignores the trial record. The Government did not argue that the defendant "co-owned Epstein's properties" (Mot. 37). The Government argued that *Epstein* owned many properties and private planes, a luxury which the defendant enjoyed along with Epstein. (*See, e.g.*, Tr. 33; Tr. 2845). Such arguments were based in the trial record, as was

---

[30] The defendant speculates that an "asset sheet" with information about Epstein's properties would undermine Jane's credibility. (Mot. 36-37). The Government does not know to what "asset sheet" the defendant refers, but in any event, at trial, the defendant cross-examined several witnesses who worked for Epstein during the relevant periods and inquired about Epstein's residences in an effort to cast doubt on Jane's recollection of events.

the Government's argument that when the defendant took millions from Epstein, "[i]t was payment for committing terrible crimes with" Epstein.  (Tr. 2885).

**D.  The Defendant's Claims Related to Pre-Indictment Delay Are Barred and Meritless**

The defendant claims that the "25-year delay between [the] alleged conduct and indictment violated due process by impairing [her] ability to present a defense [which] is revealed by trial testimony and new evidence." (Mot. 40).  She acknowledges that Judge Nathan previously denied these claims before her trial and then provided her with the opportunity to relitigate the issue post-trial.  (*Id.*).  That is precisely what happened.  The defendant's post-trial motion to vacate her conviction and dismiss the Indictment based on alleged improper pre-trial delay was denied.  The defendant elected not to appeal either of Judge Nathan's rulings.  She fails to address her procedural default.

Grasping at straws, the defendant attempts to cite supposedly "new" evidence to resurrect her claim.  But nothing she cites addresses the fact that Judge Nathan twice evaluated the defendant's speculative and baseless arguments about the Government's allegedly excessive delay in bringing charges and twice concluded that the defendant could not meet the stringent standard necessary to prevail on a claim that any alleged pre-indictment delay violated her due process rights.  Indeed, it is apparent that many of her "new" arguments are merely recycled versions of arguments that she made before Judge Nathan and that she did not raise on direct appeal.  And the remainder of her arguments could have been brought earlier, but were not—and thus they too are barred.  And, in any event, even if the defendant could validly present the claim in her Motion, her claim fails on the merits.

58

### 1.  Relevant Facts

Prior to trial, the defendant filed a motion to dismiss Counts One through Six of the S1 Indictment for alleged pre-indictment delay.  (Dkt. 137, 138).  She contended that, as a result of the passage of time, four witnesses (including Epstein and PBPD Detective Joseph Recarey) had died, unnamed Epstein employees were "lost" or "missing," unspecified witnesses had "[f]ailed or [c]orrupted" memories (including in part because of related litigations), and records had been lost or destroyed.  (Dkt. 138 at 7-14).  The Government opposed the motion.  (Dkt. 204 at 41-59).

Judge Nathan concluded that the Government "did not unfairly delay in bringing" the charges.  *Maxwell*, 534 F. Supp. 3d at 308.  Judge Nathan explained that the defendant was required to satisfy a stringent two-part test.  *Id.* at 316.  The defendant "must show both that the Government intentionally delayed bringing charges for an improper purpose and that the delay seriously damaged [her] ability [to] defendant against the charges."  *Id.*  Judge Nathan explained that there was "no evidence that the Government's delay in bringing [the] charges was designed to thwart Maxwell's ability to prepare a defense" and that the defendant failed to make the "strong showing of prejudice required to support" her claim.  *Id.* at 316-17.  Judge Nathan rejected the defendant's contention that the delay prejudiced her interests because potential witnesses had died, others had forgotten, and records had been lost or destroyed, determining that it was "highly speculative that any of these factors would make a substantial difference in her case."  *Id.* at 317.  She rejected the defendant's "vague" assertion that, among others, Epstein and Detective Recarey would have provided exculpatory evidence were they alive.  *Id.*  Judge Nathan rejected the defendant's claims on the grounds of missing witnesses, failing memories, and lost records "for similar reasons."  *Id.*  Judge Nathan stated that she would "not dismiss the indictment on Maxwell's bare assertion that numerous witnesses are engaged in a perjurious conspiracy against her."  *Id.*  Finally, she explained

59

that the defendant could renew her motion if the factual record at trial showed prejudice that the pretrial record did not. *Id.*

After the S2 Indictment was returned, the defendant moved to dismiss it for pre-indictment delay. (*See* Dkt. 293 at 22). The Government again opposed the defendant's motion. (*See* Dkt. 295 at 13-16). Judge Nathan, consistent with the law and the facts, again concluded that the defendant had "not established that she suffered prejudice and therefore any delay has not violated her rights to due process." *Maxwell*, 2021 WL 3591801, at *1; *see id.* at *5.

The defendant renewed her motion post-trial. (Dkt. 599, 600). She reiterated that she allegedly suffered substantial prejudice due to (1) the unavailability of, among others, particular Epstein employees, including Alberto Pinto, an architect who worked for Epstein, as well as other deceased "potential witnesses" "mentioned in [her] previous filings" (Dkt. 600 at 29); and (2) the unavailability of "critical documentary records"—such as certain flight records, financial documents, phone records, and property records—to challenge certain Government assertions or "test critical dates" (*id.* at 25-30). The Government opposed the defendant's motion. (*See* Dkt. 621 at 33-47).

Judge Nathan again denied the defendant's motion. *Maxwell*, 2022 WL 1294433, at *17-20. Judge Nathan explained that even if she "accept[ed] all of the Defendant's contentions in her briefing, her pre-indictment delay claim must fail because the Defendant has made no claim that the Government intentionally delayed the Indictment to gain a tactical advantage over the Defendant." *Id.* at *17. She further noted that, "[i]f anything, . . . testimony at trial supplied legitimate explanations for the Government's failure to indict the Defendant at an earlier time. For example, several witnesses testified that their cooperation with the Government's investigation was relatively recent, *e.g.*, Trial Tr. at 354 (Jane), 1245 (Kate), 1680-84 (Carolyn), suggesting that

60

an earlier prosecution was not feasible." *Id.* Judge Nathan stated that, in any event, the defendant failed at the first step of the inquiry to demonstrate that she suffered actual and substantial prejudice from delay. *Id.* She rejected the defendant's claims about "two major sets of lost evidence"—*i.e.*, documentary evidence, namely flight records, financial documents, phone records, and Epstein's property records, and four deceased witnesses, namely four employees who worked for Epstein. *Id.* at *17-18. Judge Nathan found that even if the defendant had explained what the absent documents were likely to show (which the defendant did not), she had "fail[ed] to show why the evidence, if admitted at trial, would have benefitted her case." *Id.* at *18. Judge Nathan further noted that the defendant failed to show that the "prejudicial loss of evidence was *caused* by the pre-indictment delay." *Id.* (emphasis in original). She also concluded that the defendant failed to "demonstrate prejudice by reference to the deceased potential witnesses," rejecting the defendant's speculation about the contents of their testimony and noting the defendant's failure to explain why witnesses who testified at trial who worked for Epstein or who were on the parties' witness lists could not have supplied the same information. *Id.* at *18-19. And significantly, the defendant did not demonstrate that such witnesses would have "meaningfully altered her defense" given that none "could testify directly to whether or not the Defendant and Epstein sexually abused the victims." *Id.* at *19.

### 2. Discussion

Many of the defendant's arguments regarding alleged pre-indictment delay are merely recycled versions of prior arguments that her counsel raised pre- and post-trial, which were rejected by Judge Nathan, and that the defendant elected to not raise on appeal. She has not even attempted to show cause and prejudice for such a failure. As such, the defendant is barred from making any of these claims yet again, years later. *See*, *e.g.*, *Thorn*, 659 F.3d at 231; *Bousley*, 523 U.S. at 621.

The defendant improperly seeks to resurrect her twice-rejected and abandoned-on-appeal claims that she has suffered substantial prejudice as a result of alleged pre-indictment delay due to the unavailability of certain individuals, namely, Epstein, Detective Recarey, and Pinto. (Mot. 42-43). The defendant cannot use Section 2255 to relitigate this issue. Judge Nathan definitively rejected the defendant's speculative claims regarding these three individuals. *See Maxwell*, 534 F. Supp. 3d at 317 (rejecting defendant's "vague assertions" that Epstein and Detective Recarey would have provided exculpatory testimony if they were alive); *id.* ("There are also serious doubts under all of the relevant circumstances that a jury would have found testimony from Epstein credible even if he had waived his right against self-incrimination and testified on her behalf."); *Maxwell*, 2022 WL 1294433, at *19 (noting District Court's previous consideration and rejection of defendant's claims of prejudice based on, *inter alia*, Epstein and Detective Recarey and concluding "The Defendant points to no development at trial that she believes should alter the Court's conclusion, nor is the Court aware of any such reason for reconsideration."); *id.* at *18-19 (finding the defendant failed to demonstrate actual prejudice with respect to Pinto, about whose testimony she "largely speculates" and failed to establish that the content of Pinto's alleged testimony "could not have been introduced into trial by other means" including other Epstein employees who testified at trial or who were on the parties' witness lists); *id.* at *19 ("No witness listed could testify directly to whether or not the Defendant and Epstein sexually abused the victims. Rather, each would at best provide additional corroboration of the Defendant's arguments at trial to impeach the witnesses' credibility as to particular aspects of their testimony. This falls short of substantial prejudice.").

Now, the defendant appears to suggest that she is entitled to have these claims revisited because Epstein "had access to the negotiation history of the NPA which was conducted by his

62

lawyers on his behalf." (Mot. 42). In support of her argument, she cites information that was available to her *before* her trial commenced—the OPR Report and a transcript of self-serving arguments made by Epstein's lawyers at an August 29, 2019 conference before Judge Berman. (Mot. 42 (citing Exs. 35, 148)). But she chose not to press those claims in connection with her pre- and post-trial litigation. The law does not permit her to do so now, years later. In any event, the defendant's speculative assertions do not—and cannot—"demonstrate a substantial, actual prejudice to [her] ability to defend [her]self." *United States v. Long*, 697 F. Supp. 651, 657 (S.D.N.Y. 1988); *see also United States v. Birney*, 686 F.2d 102, 105-06 (2d Cir. 1982) (a defendant's "proof of prejudice must be definite and not speculative").

The defendant's arguments with respect to "lost" or "destroyed" records (Mot. 41-42) fare no better. While these arguments do not simply regurgitate previously expressly brought and expressly rejected claims, they likewise fail. As an initial matter, most of the defendant's arguments are based on the OPR Report, which was available to the defendant *before* her trial commenced.[31] She chose not to pursue those claims pre- and post-trial in connection with her pre-indictment delay motions. Her Section 2255 motion is not an opportunity to litigate claims she

---

[31] The defendant's arguments about the OPR Report are also wrong. First, the defendant claims that Villafaña ordered lists of victims and their statements to be destroyed. (Mot. 41). That is not what the OPR Report says. It says that Villafaña sent the PBPD Chief a list of victims to notify before Epstein's state plea hearing and then asked him to destroy the list. (OPR Report at 232). And it does *not* say that Villafaña ordered victim statements to be destroyed. Second, the defendant claims that the OPR Report indicates that Acosta's emails were "lost" and "would have revealed" that the NPA was intended to preclude USAO-SDNY from indicting her. (Mot. 41). But this argument ignores the extensive OPR Report that discusses Acosta's emails, as well as the District Court's and the Second Circuit's holdings. Third, she contends that victim interview notes are missing and incomplete. (Mot. 41 (citing OPR Report at 225 n.338)). But what the report says is that OPR did not locate reports for interviews of two victims, but found undated handwritten notes by Villafaña concerning one of the two victims. (OPR Report at 225 n.338).

could have raised, but chose not to raise.  In any event, her arguments at best misapprehend and misconstrue the record.

The defendant's arguments about missing records, in particular, victim lists and victim interview notes, are entirely speculative.  The defendant, who bears the burden, does not explain how these records could have been helpful to her.  Nor could she.  Her hypothetical, bare-bones claims of prejudice do not withstand even minimal scrutiny.  She does nothing to explain how *more* reports of victim interviews would have helped her.  At best, they would likely have been silent as to the defendant, who was not the focus of USAO-SDFL's investigation, but the Court need not and should not engage in speculation, as the defendant does, because it is her burden, and she does not come close to meeting it.  The defendant hypothesizes that this evidence would have helped her, but offers no proof or basis for concluding that the records would be helpful.  This is far from the definite proof of prejudice required to state a due process claim, much less one years after conviction under Section 2255.

In connection with her arguments about the alleged prejudice she suffered due to "lost" or "destroyed" documents, the defendant cites a book written by a journalist in which she claims that Detective Recarey said "evidence was lost and destroyed."  (Mot. 42 (citing Ex. 15 at 137)).  As an initial matter, that book is far from "new" evidence; it was published in July 2021, months before the defendant's trial.  Thus a claim based on this book, too, is barred.

In any event, the defendant's claims on this front are both unsupported by the record and illogical.  The page of the book cited by the defendant refers to Detective Recarey being "rankled" by the "fact that evidence had disappeared—chiefly Epstein's computers."  (Ex. 15 at 137).  This relates to Epstein and his co-conspirators themselves destroying evidence—not any United States Attorney's Office or other component of the Department of Justice.  This topic is hardly new, as it

64

was, for example, discussed in great detail in the OPR Report.  (*See, e.g.*, OPR Report at 45-46 (referring to USAO-SDFL not having "the computer equipment removed from Epstein's home before the PBPD executed its search warrant"); *id.* at 176 (describing Villafaña's attempts to "obtain the missing computers"); *id.* at 178 (referring to "ongoing litigation concerning Epstein's missing computer equipment")).  The defendant's argument is frivolous.

In sum, the defendant's complaints about dead witnesses and supposed "lost" or "destroyed" records are nothing more than the type of self-serving, vague, speculative, and conclusory claims of prejudice that Judge Nathan previously rejected and that fall far short of meeting the "stringent standard" necessary to prevail on a claim that any alleged pre-indictment delay violates her due process rights.  *Maxwell*, 534 F. Supp. 3d at 316-17; *Maxwell*, 2021 WL 3591801, at *5.[32]

The defendant next speculates that the alleged delay "allowed witnesses to compare and then align their evidence through joint meetings with each other and their therapists" and "corrupted" witnesses' memories.  (Mot. 43-44).  With one irrelevant exception,[33] the defendant cites no new evidence in support of her argument; instead she cites segments of the trial transcript, making plain that the complaint in her Motion was one she pressed at trial and then chose not to

---

[32] The defendant baselessly claims that Epstein's death denied her "critical documents to defend herself to include for example full flight manifests."  (Mot. 42 (citing Ex. 70)).  But Exhibit 70 primarily consists of JEGE, LLC Passenger Manifests from approximately 2005 to 2015 which have literally no bearing on the conduct at trial, which related to her criminal conduct from in or about 1994 through in or about 2004.  And, in any event, the JEGE, LLC Passenger Manifests in the Government's possession were produced to the defendant.

[33] The defendant cites a 2025 interview in which a victim referred to "listening to the girls, the victims, speak on my first therapy session that we all had together" and stated that "unfortunately, only five women or six women came when there's almost a thousand women."  (Ex. 84 at 1).  This is irrelevant as that victim did not testify at the defendant's trial.  The defendant also cites a podcast in which Virginia visited Alessi (Mot. 43-44), but as described above, that podcast, which aired in September 2020, predated her trial.  (*See* Ex. 47).

appeal. Once again, her argument is barred. In any event, despite her claim to the contrary, the defendant extensively cross-examined the victims to attempt to "impeach memory." (Mot. 45). (*See, e.g.*, Tr. 1248 (cross-examination about Kate and other victims who appeared on a television show appearing "as a sisterhood of accusers"); *id.* at 1249 (cross-examination of Kate about maintaining contact with Virginia); *id.* at 2204-05 (cross-examination of Annie about being "a part of a WhatsApp group of Epstein accusers" and emailing "with other accusers" including Virginia)). The cross-examinations of the victims were extraordinary in length, vigor, and vitriol. The suggestion that the defendant was unconstitutionally stymied in her efforts to cross-examine witnesses at trial has no basis in reality.

The defendant also raises a number of other claims which, she contends, show violations of her due process rights by affecting her ability to present a defense. In so arguing, the defendant makes several assertions that are not based on new evidence and, thus, these assertions are barred. For example:

- The defendant appears to argue she is entitled to relief because ▮▮▮▮ "was contacted by the Government in 2007, noticed as a victim under the NPA and paid restitution" and because in 2011, ▮▮▮▮ gave "detailed allegations to the Government that included allegations against the [defendant] which were used for the [Crime Victims' Rights Act]." (Mot. 40). The defendant cites the OPR Report and non-testifying witness material in support of her claims, thus making clear that her argument does not rely on new evidence. Regardless, this is irrelevant. First, USAO-SDNY did not interview ▮▮▮▮ until in or about September 2019. Second, while ▮▮▮▮ was clearly and undoubtedly ▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮, the Indictment did not rely on information from ▮▮▮▮ who as discussed herein, was not a trial witness or declarant. Two of the four victims who were described in the Indictment and who testified at trial, Jane and Kate, did not cooperate with this Office's investigation until after Epstein's death in 2019.

- The defendant claims that USAO-SDFL "invited other Districts to investigate" and offered "to provide evidence from SDFL investigation." (Mot. 40 (citing Ex. 142 at 7-8 and Ex. 143 at 9); *see also* Mot. 45-46)). She relatedly and baselessly claims that USAO-SDNY "independently investigated" Epstein and his co-conspirators in 2008. (Mot. 40 (citing Ex. 128)). The claims are based on documents that pre-date her trial by years and thus are barred. They are also spurious. The USAO-SDFL filing to which the defendant cites— which was publicly filed in 2013, years before her trial—states that other districts,

66

including the Southern District of New York, "share jurisdiction and venue" with the Southern District of Florida "over potential federal criminal charges based on the alleged sexual acts committed by Epstein" who was "thus subject to potential prosecution for such acts in those districts." (Ex. 143 at 9). USAO-SDFL wrote that the petitioners in the CVRA litigation were "free" to contact the United States Attorney's Offices in those districts about "investigating and potentially prosecuting Epstein." (*Id.*). USAO-SDFL was clear that it did not have any "present knowledge" of USAO-SDNY having opened an investigation into the allegations against Epstein. (*Id.* at 9 n.9). And of course it had no such knowledge because there was no such investigation. *See supra* at 29. That USAO-SDFL wrote in a court filing that victims were "free" to contact other U.S. Attorney Offices about *Epstein* does not mean that USAO-SDNY delayed in bringing charges, especially charges against *the defendant*. As Judge Nathan recognized, the Government not indicting the defendant at an earlier time was explained by, among other things, the fact that several witnesses did not cooperate with the Government until "relatively recent[ly]." *Maxwell*, 2022 WL 1294433, at *17.

The defendant's other arguments, which appear to rest in part on information that post-dates her trial (although that does not make the information substantively new), are equally meritless. For example:

- The defendant argues that Acosta's 2025 testimony before the House Committee "reveals the Government had notice of Petitioner in 1997." (Mot. 40).[34] Acosta testified, "The first, kind of, known tip is from Marie [sic] and Annie Farmer in 1997, Maria Farmer alleging that Epstein assaulted her in New York as a minor and Annie Farmer alleging that Mr. Epstein assaulted her in New Mexico as a minor." (Ex. 54 at 30-31). To be clear, ▮▮▮▮▮ ▮▮▮▮▮ made a report about Epstein to the FBI in ▮▮▮▮ but did not say anything about the defendant. (*See* ▮▮▮▮▮▮▮▮). Annie was first interviewed by the FBI in 2006. (Tr. 2097). In any event, this is not evidence of intentional delay for tactical advantage, as Judge Nathan previously found. *Maxwell*, 2022 WL 1294433, at *17. First, none of this information is new to the defendant, who was provided with the relevant FBI reports relating to Annie and Maria Farmer in advance of trial. Second, the Government, in opposing the defendant's motion for dismissal based on pre-indictment delay, was clear that Annie had been previously interviewed by the FBI. (*See* Dkt. 204 at 49 n.17). Third, that a different investigative team focused on Epstein's conduct in the early 2000s may not have uncovered evidence about the defendant's conduct in the 1990s has no bearing on the charges that were brought against the defendant, which was brought entirely independent of the prior USAO-SDFL investigation. Fourth, Jane and Kate were never interviewed by USAO-SDFL, and had never spoken to law enforcement until they met with this Office in late August and September 2019, after Epstein's death. As Judge Nathan recognized in rejecting the defendant's post-trial pre-indictment delay motion, "If anything, . . . testimony

---

[34] Relatedly, the defendant, citing trial testimony, also suggests she is entitled to relief because "Epstein was investigated from 2005." (Mot. 40). This argument is barred. It is also meritless as described above.

at trial supplied legitimate explanations for the Government's failure to indict the Defendant at an earlier time. For example, several witnesses testified that their cooperation with the Government's investigation was relatively recent, *e.g.*, Trial Tr. at 354 (Jane), 1245 (Kate), 1680-84 (Carolyn), suggesting that an earlier prosecution was not feasible." *Maxwell*, 2022 WL 1294433, at *17.

- The defendant also seems to suggest she is entitled to relief because she claims that after Epstein's death, Barr testified in 2025 that USAO-SDNY was "looking for someone to indict for trafficking." (Mot. 41 (citing Ex. 25); *see also* Mot. 45). But Barr testified that USAO-SDNY was "doing what a U.S. Attorney Office normally does" and was "looking to . . . see if there was evidence to charge someone for participating in the trafficking." (Ex. 25 at 58). And USAO-SDNY's continued investigation led to charges against the defendant for her criminal conduct. It is of no moment that the defendant was not named in USAO-SDFL's draft indictment against Epstein (which instead further supports the point that USAO-SDFL had not been focused on the defendant and that the defendant was not covered by the NPA (*see* OPR Report at 81)). And this is certainly not a new claim as the defendant has been nothing but consistent in her attempts to claim that she is a scapegoat for Epstein and to cast aspersions on the Government for prosecuting her.

Finally, the defendant argues that USAO-SDNY "intentionally delayed indictment for political advantage." (Mot. 46). This claim is both barred and false. In connection with the post-trial briefing related to the defendant's pre-indictment delay claim, Judge Nathan "conclude[d] that the Government did not intentionally delay its prosecution." *Maxwell*, 2022 WL 1294433, at *1. Indeed, Judge Nathan explained that even if she "accept[ed] all of the Defendant's contentions in her briefing, her pre-indictment delay claim must fail because the Defendant has made no claim that the Government intentionally delayed the Indictment to gain a tactical advantage over the Defendant." *Id.* at *17. The defendant elected not to raise this issue in connection with her direct appeal, and is barred from doing so here.

In any event, the defendant's claim has no basis in the record. USAO-SDNY, of course, bore the burden of proof at trial, and as such, had every incentive to bring the case as promptly as reasonably possible. And that is what USAO-SDNY did. As described above, USAO-SDNY opened its investigation into Epstein and his co-conspirators in late November 2018. Epstein was charged by indictment on July 2, 2019. Thereafter, USAO-SDNY continued its investigation,

68

which included interviewing two victims (Jane and Kate) for the first time after Epstein's death. Those two victims were material to the investigation, as they helped form the basis of the charges in the original indictment against the defendant, which the Government sought on June 29, 2020, *less than a year* after the victims came forward.  The defendant points to no evidence that should alter Judge Nathan's prior conclusion.

### E.  The Defendant's Claims Related to Her Sentence Are Barred and Meritless

The defendant claims that her case should be remanded for resentencing because the sentence and fine "exceed[] the lawful maximum and rest[] on information and factual findings that are unreliable and inaccurate."  (Mot. 47).  The defendant's sentencing-related claims are barred.  Even if they were not, her claims are meritless.  There is no support for the propositions that Judge Nathan lacked jurisdiction to impose the sentence she imposed, that she did not properly apply the law, or that the defendant's sentence was a miscarriage of justice.

### 1.  Discussion

The defendant argues that Judge Nathan "adopted" the Probation Office's Guidelines calculation of 240 months, "admitting she made an error that she had used the 2004 guidelines." (Mot. 47).  This claim is barred as the defendant could have, but did not, raise it on direct appeal. But it is also false.  Judge Nathan applied the 2003 U.S. Sentencing Guidelines.  (*See* Ex. 52 at 39 ("Because I cannot on this record find by a preponderance of the evidence that the offense continued during that two-month window after November 1, 2004, and before early 2005, I must apply the 2003 guidelines.")).  Judge Nathan determined that a sentence of 240 months— "consistent with" the Probation Office's "recommendation" and "slightly above the guideline range" of 188 to 235 months' imprisonment—was "both sufficient and necessary—and no greater than necessary to meet the purposes of punishment."  (Ex. 52 at 88, 96).

The defendant similarly claims that Judge Nathan erred by calculating the fine under the 2004 Sentencing Guidelines and determining that the maximum fine was $250,000 rather than $200,000 under the 2003 Guidelines. (Mot. 48). This claim too is barred as the defendant did not raise it on direct appeal. And again, the claim is also irreconcilable with the record. At sentencing, Judge Nathan determined that under the 2003 Sentencing Guidelines, the range for the fine was $20,000 to $200,000 for each count. (Ex. 52 at 49 (citing U.S.S.G. § 5E1.2(c)(3))). Judge Nathan imposed the maximum fine allowable under statute—not the maximum fine under the 2003 Guidelines. Judge Nathan rejected the defendant's contention that she was unable to pay a fine (Ex. 52 at 53-54, 97) and ordered her to pay $250,000 for each of the three counts of conviction, resulting in a total fine of $750,000.[35] (*See* Ex. 52 at 97 ("The maximum amount per count is $250,000, so that is $750,000 total."); *see also* PSR ¶ 199 (citing 18 U.S.C. § 3571(b)).

The defendant next argues that Judge Nathan incorrectly sentenced her based on two non-testifying witnesses who were not named in the Indictment. In particular, the defendant asserts that the "record was not adequate to make [Virginia and Melissa] separate offense groups" and that Judge Nathan incorrectly relied on Melissa's name appearing in Government Exhibit 52, an "unreliable document." (Mot. 47). The defendant failed to raise this issue on direct appeal either, and she is therefore barred from advancing it now. *Thorn*, 659 F.3d at 231. The defendant does not even attempt to establish cause for her procedural default or actual prejudice from the default.

Even if her challenge were not barred, it should be rejected because it has no merit. In connection with sentencing, the Government objected to the Presentence Investigation Report not

---

[35] In advance of sentencing, Judge Nathan granted the defendant's motion as to multiplicity. *Maxwell*, 2022 WL 1294433, at *1. Judge Nathan determined that the three conspiracy counts were multiplicitous and entered "judgment on Count Three alone among the conspiracy counts." *Id.*

70

including two additional groups related to two victims (Virginia and Melissa) in the defendant's Guidelines calculation. (Ex. 52 at 36; *see also* Dkt. 670 at 17). Judge Nathan found that Virginia and Melissa "were minor victims of sex offenses" who "were trafficked and abused by the defendant and Epstein during the charged period" and, therefore, were considered "two additional groups of victims" under the Sentencing Guidelines. (Ex. 52 at 47; *see also id.* at 46 ("The Court finds that Virginia Roberts, who brought Carolyn and Melissa who was brought by Carolyn similarly were paid" to participate in commercial sex acts)). The record at trial—which amply established Virginia and Melissa as victims of the conspiracy (*see, e.g.*, Tr. 2874, 2882-84 (discussing evidence demonstrating the abuse of Virginia and Melissa in summation); PSR ¶¶ 55-58, 80)—supported Judge Nathan's finding, and the defendant offers no cogent argument to the contrary.

The defendant's related claim that Judge Nathan incorrectly relied on Melissa's name appearing in Government Exhibit 52 (the defendant's and Epstein's black blook) in connection with sentencing (Mot. 47) is also barred, both because it could have been brought on appeal but was not, and because it is belied by the record. Judge Nathan found that beyond the black book, the trial record "amply" established that Melissa and Virginia were victims of the conspiracy. (Ex. 52 at 51). That was plainly correct, and the defendant offers no reason to overturn the considered finding of Judge Nathan, who oversaw the trial.

The defendant next and relatedly argues that Judge Nathan improperly relied on Alessi's testimony in order to deem Virginia a victim in connection with sentencing, claiming that "[n]ew evidence reveals that 'Virginia' visited Alessi prior to trial to get him to testify" and "coerc[ed]" and "fatally compromised" Alessi's testimony. (Mot. 48). The supposedly new evidence is a podcast that aired on or about September 22, 2020 in which Virginia spoke to Alessi. (*See* Ex. 47).

71

That podcast aired over one year before the trial commenced in November 2021. And for that same reason, the podcast—which has no suggestion that Alessi was "coerc[ed]" as the defendant so claims—was available for the defendant to use in connection with her cross-examination of Alessi. Her choice to forego such cross-examination was just that—a choice. Her claim is thus barred. And in any event, it is meritless, because, as Judge Nathan explained at sentencing, the "record support[ed] that the defendant personally recruited Virginia to provide Epstein with sexualized massages when she was a minor." (Ex. 52 at 12 (Judge Nathan citing the testimony of Jane and Kate which "established that the defendant was aware that the massages were sexualized"; Alessi's testimony that the defendant approached Virginia, who visited Epstein's residence the same day; flight records that established the defendant approached Virginia before she was 18 years old; and Carolyn's testimony that the defendant instructed Virginia to show Carolyn what to do)); *see also id.* at 7 ("I do credit" Alessi's testimony that "the defendant identified and targeted Virginia after seeing her" in a parking lot).

The defendant also argues that ███████ is "an unreliable witness whose new depositions in 2022 reveal that she should not have been considered as a 'victim'" in connection with sentencing. (Mot. 48). In support of her claim, the defendant cites a June 7, 2022 letter from a "legal ethics expert." (Ex. 116).[36] This letter is not new; it was produced to the defendant in advance of sentencing. Her claim is thus barred. In any event, the defendant's argument is a red herring. ███████ was not a witness at trial, and to the extent other witnesses testified about ███████ at trial, such testimony did not include any statements by ███████ offered for the truth of the matter asserted or under one of the other exceptions listed in Rule 806. (*See, e.g.,* ██████████████

---

[36] The defendant cites Exhibit 132 in support of her argument, but it appears she intended to cite Exhibit 116.

██████████████████████████████████████████).   The trial record—without any reliance on ████████ testimony or statements by ████████—established that ████████ was a victim of the scheme.  (*See* ████████████████████████).

The defendant next claims that she "was sentenced for perjury counts stemming from Virginia Guiffre's defamation case that were severed from the indictment and never adjudicated." (Mot. 48).  The defendant could have raised this claim on direct appeal, but did not and thus it too is barred.  Her claim also misconstrues the record.  After the defendant's conviction at trial, the Government told Judge Nathan that "[i]n the event the defendant's post-trial motions are denied, the Government is prepared to dismiss the severed perjury counts at the time of sentencing, in light of the victims' significant interests in bringing closure to this matter and avoiding the trauma of testifying again." (Dkt. 574 at 1-2).  At sentencing, the Government moved to dismiss the perjury counts.  (*See* Ex. 52 at 99).

Subsequently, in connection with sentencing, the defendant objected to the inclusion in the Presentence Investigation Report of specific conduct related to the perjury counts on the grounds that the counts had not been presented to a jury and therefore, she claimed, had no bearing on the sentencing.  (*Id.* at 14).  Judge Nathan overruled the objection, noting the sentencing court's "largely unlimited" discretion "as to the kind of information it may consider" including, among other things, dropped counts of an indictment, "as long as the information is reliable and accurate." (*Id.*).  Judge Nathan concluded that "the information underlying the severed perjury charges [was] reliable." (*Id.*).  She explained that the defendant testified under oath in 2016 that: (1) "she was not aware of Epstein's scheme to recruit underage girls for sexual massages and other than Virginia, was unaware if she had interacted with anyone under the age of 18 at Epstein's properties"; (2) "[s]he never gave Annie Farmer a massage"; (3) "[s]he was unaware whether

73

Epstein possessed sex toys"; (4) "[s]he was unaware that he was engaging in sexual activity with anyone other than her in the 1990s and 2000s"; and (5) "[s]he never gave Epstein a massage." (*Id.* at 14-15).    Judge Nathan stated that the "credible testimony and evidence admitted at trial disprove[d] these assertions." (*Id.* at 15).    She further noted that the defendant's "dishonesty" during the civil deposition that made up the perjury counts, along with the defendant's "lack of full candor" regarding her treatment at the Metropolitan Detention Center ("MDC") and her "lack of candor to Pretrial Services and to the Court regarding finances" appeared "consistent with a pattern of deflection of blame." (*Id.* at 95).    The defendant was not sentenced on Counts Seven and Eight of the Indictment, but Judge Nathan considered her lies under oath in connection with sentencing, as she was permitted under Second Circuit precedent.    *See United States v. Sisti*, 91 F.3d 305, 312 (2d Cir. 1996) ("The sentencing court's discretion is largely unlimited either as to the kind of information it may consider, or the source from which it may come."); *id.* ("A sentencing court is free to consider hearsay evidence, evidence of uncharged crimes, dropped counts of an indictment and criminal activity resulting in acquittal in determining sentence."); *see also United States v. Gomez*, 580 F.3d 94, 105 (2d Cir. 2009).

In her Amended Motion, the defendant also argues that the four-level leadership enhancement under U.S.S.G. § 3B1.1 should not have been applied ██████████████ ████████████████████████████████████████ This argument was addressed by both Judge Nathan and in the defendant's direct appeal and is thus barred.    In particular, at sentencing, Judge Nathan addressed the "time overlap" (*see* Ex. 52 at 31) and ultimately concluded that the defendant led Kellen.    Judge Nathan credited the testimony of Epstein's pilots that Kellen was the defendant's assistant, in part because it was corroborated by other testimony that the defendant was Epstein's "number two and the lady of the house" in Palm Beach where much of

74

the abuse occurred and where Kellen worked. (Ex. 52 at 42; *see* Tr. 139-40, 1890).[37] The trial evidence showed that Kellen scheduled sexualized massages and took nude photographs of Carolyn. (PSR ¶ 66; Tr. 1554-55). Even after Kellen took over some of the defendant's duties, the defendant continued to manage her by virtue of her position in the house, a fact corroborated by a household manual directing staff to tend to the specific needs of Epstein, the defendant, and their guests, as well as flight records showing that the defendant and Kellen flew together on Epstein's planes dozens of times. (Ex. 52 at 42). The clear inference from this record is that the defendant instructed Kellen regarding how to schedule massages and run the part of the scheme that the defendant had previously handled, at which point Kellen switched to making calls to schedule appointments following the defendant's directions. The defendant's citation in her Amended Motion to an internal USAO-SDNY prosecution memo that pre-dated the defendant's trial does nothing to disturb Judge Nathan's finding, which was reached after presiding over the trial and which was affirmed on direct appeal. *Maxwell*, 118 F.4th at 270. Accordingly, the defendant is barred from relitigating this issue. *Sanin*, 252 F.3d at 83.

The defendant also continues to insist that she was "sentenced as if she were Epstein." (Mot. 48). This argument—which she has raised throughout the case—is barred. The supposedly "new" evidence she cites in support of her claim is Acosta's 2025 testimony in which Acosta was asked if Villafaña's judgment was that the appropriate sentence for Epstein was at a minimum,

---

[37] The defendant's claim that there was purportedly no testimony that she had "any ownership interest in Epstein's jet" (Mot. 47) is both irrelevant and incorrect. The four-level increase was based on Judge Nathan's findings that the activity was "extensive within the meaning of 3B1.1(a)" (Ex. 52 at 44), not on her ownership share of the jet or any other property. But in any event, as Judge Nathan observed, one of the pilots, Larry Visoski, "testified that Maxwell partially owned the jet." (*Id.*; *see also* Tr. 97 (Visoski testifying that the defendant had a "quarter share" of the jet and told him "[t]hat it was her jet, which, in fact, it was, because she was partial owner of the jet and she had access to it with notice"); *see also Maxwell*, 118 F.4th at 270 (affirming leadership enhancement).

under the Sentencing Guidelines, 168 to 210 months' imprisonment. (*Id.* (citing Ex. 54 at 42)). Whatever Epstein's potential Guidelines range may have been in connection with USAO-SDFL's investigation is of no matter. Judge Nathan properly calculated the defendant's Guidelines and sentenced the defendant for her own criminal conduct. Judge Nathan emphasized this point at sentencing:

> It is important at the outset to emphasize that although Epstein was, of course, central to this criminal scheme, Ms. Maxwell is not being punished in place of Epstein or as a proxy for Epstein. Like every other participant in a multi-defendant case, Ms. Maxwell is being punished for the role that she played in the criminal conduct. As to that role, the trial evidence established that Ms. Maxwell was instrumental in the abuse of several underage girls and that she herself participated in some of the abuse, and it is her conduct for which she has been convicted in the court under the laws of this country and it is her conduct for which she must be held accountable.

(Ex. 52 at 89). Judge Nathan engaged in a lengthy discussion of the sentencing factors when imposing sentence, including the defendant's "pivotal role" in "heinous and predatory" sexual abuse of minor girls. (*Id.* at 90). Judge Nathan described the defendant's crimes as "extensive" and "far-reaching" and concluded that "the damage done to these young girls was incalculable," as a result of "the painful, horrific, and lasting impact of [the] trauma" they endured. (*Id.* at 91).

Finally, the defendant argues that her "sentence should be corrected" to take into consideration her "harsh and unconstitutional treatment in MDC." (Mot. 51). As an initial matter, this claim is barred. It was litigated, considered by Judge Nathan, and not raised on direct appeal. To try to resurrect the claim, the defendant cites Barr's 2025 testimony that her "initial confinement was quite severe because she was watched 24/7." (Mot. 49; Ex. 25 at 120-21). While the testimony post-dates her conviction, it is not remotely "new" in substance. In any event, the defendant's suggestion that her sentence did not take into account her time at the MDC is contradicted by the record which reflects that Judge Nathan took the conditions of the defendant's confinement at the

76

MDC into account in imposing sentence. (Ex. 52 at 94). Judge Nathan rejected the defendant's contention that she had "been singled out for uniquely harsh and punishing treatment" and noted her agreement with the Government that many of the defendant's complaints have been "unfounded and exaggerated" and that the defendant's treatment at the MDC "was overall as good as or better than that of the typical pretrial detainee at the MDC during the pandemic." (*Id.* at 94-95). Judge Nathan, who closely oversaw the conditions of the defendant's confinement (*see, e.g.*, Dkt. 76, 92, 131, 249, 255, 257, 265, 282, 321, 329, 412, 426, 685), noted the defendant's "lack of full candor" regarding her treatment at the MDC. (Ex. 52 at 95). Moreover, the defendant cites no law to establish that the conditions of her confinement merit the relief she seeks. The defendant's renewed attempt at special treatment—without a foundation in law—should be rejected.

## IV.    The Defendant's Claims Related to Government Exhibit 51, The Green Massage Table, Are Meritless

The defendant claims that the Government "concealed" PBPD Detective Gregory Parkinson's state grand jury testimony, which allegedly conflicted with his trial testimony and "undermined the Government's only evidence, a massage table" that established the interstate commerce element of Counts Five and Six. (Mot. 5). The defendant contends that this "suppression" of the testimony by the Government constitutes a *Brady* violation. (*Id.*). The defendant is wrong (even assuming *arguendo* that the state grand jury testimony were deemed new). The defendant cannot establish a *Brady* violation for multiple, independent reasons, including because the testimony was not available to the Government and it is in any event not exculpatory. And the defendant's related claim that Detective Parkinson perjured himself is frivolous.

77

### A. Relevant Facts

Even though the Palm Beach State's Attorney's Office ("PBSA") was not part of the prosecution team, USAO-SDNY made extensive efforts to seek to obtain Detective Parkinson's testimony before the grand jury in connection with the separate investigation previously conducted by the PBSA. USAO-SDNY tracked down the clerk of court in Palm Beach who indicated that the original audio files were unplayable and represented that there were no transcripts of the grand jury presentation because their grand jury was only audio recorded without transcription. In connection with its production of Jencks Act and *Giglio* material, on October 11, 2021, USAO-SDNY provided the defendant with a cover letter which stated, as relevant here: "The Government notes that the records stamped 3522-004 reflect that Greg Parkinson testified in the grand jury in connection with the investigation conducted by the Palm Beach State's Attorney's Office, but the clerk of court has confirmed to the Government that the audio files are unplayable and, therefore, there is no record of Parkinson's grand jury testimony." 3522-004, in turn, is an "electronic court reporting witness log," which contains handwritten notes that indicate the witnesses who testified and the questions, topics, or testimony at particular time stamps.

At trial, Detective Parkinson testified that the "master bedroom" of Epstein's Palm Beach residence had "two master baths." (Tr. 1048; *see also* GX 297 (floor plan showing two bathrooms adjoining the "master bedroom")). Detective Parkinson testified that he remembered seizing a green massage table (marked as Government Exhibit 51) on October 20, 2005 from the "second floor south bathroom, where the shower was" and which he recognized from the evidence label attached to it with a property number and a barcode number. (Tr. 1089; *see also* Tr. 1068 (Detective Parkinson testimony that GX 278 is a photograph of the "master shower room, located on the second floor" "due east of where the master bed is.")). Detective Parkinson explained that

78

the other master bathroom that "has the tub in it" was on the "north side of the residence" "adjoining the master bedroom." (Tr. 1085-86; *see also* GXs 283, 284). That bathroom with a tub has a desk area; above the desk is a portrait of the defendant with a dog, and on the desk is a photograph of the defendant and stationary with the defendant's name. (*See* GX 296-R at 20:38-45, 21:11-29; *see also* GX 285). Detective Parkinson testified to recording a "walk-through video" of the October 20, 2005 search of Epstein's residence, which was admitted as Government Exhibit 296-R. (Tr. 1039-40). That recording showed the two bathrooms that adjoined the "master" bedroom. (*See* GX 296-R at 20:24-23:20). It showed the bathroom on the south side with a shower and a steam room containing, among other things, multiple electric razors (*see id.* at 22:15-19) and a couch (*see id.* at 23:05-10), and the green massage table outside the door of that bathroom laid against a wall with photographs (*see id.* at 23:11, 23:15-18).

In July 2024, Detective Parkinson's state grand jury testimony was publicly released, as a result of an action separate from this matter.[38] In his 2006 testimony, Detective Parkinson described the "large master bedroom" and two "quite large bathrooms" off of the master bedroom. (Ex. 11 at 108). Detective Parkinson then appeared to walk through a diagram of Epstein's residence, noting the "large bathroom on the south side," a "large walk-in closet" and "moving back through the bedroom, past the hallway you then enter another large bathroom which has a sink, closets, and a large bathtub." (*Id.* at 109-10). The following exchange then occurred:

> Q. Are there toilet facilities here or is it just sinks in these bathrooms?

---

[38] Exhibit 11 to the Motion is Detective Parkinson's state grand jury testimony. In July 2024, over two-and-a-half years after the defendant's trial concluded, a state court circuit judge granted a petition to release, among other things, the transcripts of the grand jury investigation conducted by the PBSA, which included Detective Parkinson's testimony. Despite the clerk of court's representations to USAO-SDNY in advance of trial, a transcript of Detective Parkinson's testimony was released and subsequently obtained by the Department of Justice in connection with EFTA. (*See* EFTA02737038).

A. I believe that there were toilets also there in the hall.

Q. All right. Did you find a massage table?

A. Yes. There was massage table in this clos – bathroom.

Q. Okay. How about massage oils? Were there massage oils up in that bathroom?

A. I believe there were. I know that we got some kind of a jar of material out of this master bedroom, one of – out of the dresser.

Q. What about out of the actual room where the massage table was?

A. That, I'm not sure. I was involved in the actual search and photography of that. Other investigators would have to comment on it.

(*Id.* at 110-11).

## B. Applicable Law

The disclosure obligations set forth in Federal Rule of Criminal Procedure 16, *Brady*, and *Giglio* apply to materials in the Government's "possession." As a general matter, though "[a]n individual prosecutor is presumed . . . to have knowledge of all information gathered in connection with his office's investigation of the case[,] . . . knowledge on the part of persons employed by a different office of the government does not in all instances warrant the imputation of knowledge to the prosecutor . . . ." *United States v. Avellino*, 136 F.3d 249, 255 (2d Cir. 1998); *see also United States v. Locascio*, 6 F.3d 924, 948-49 (2d Cir. 1993) (declining to "infer the prosecutors' knowledge simply because some other government agents knew about" additional evidence where federal prosecutors were unaware of documents in the possession of FBI agents who were "uninvolved in the investigation or trial of the defendants"); *United States v. Quinn*, 445 F.2d 940, 944 (2d Cir. 1971) (declining to impute knowledge of prosecutor in Florida to prosecutor in New York and noting that the "Department of Justice alone has thousands of employees"). The imposition of such "an unlimited duty on a prosecutor to inquire of other offices not working with the prosecutor's office on the case in question would inappropriately require [courts] to adopt a monolithic view of government that would condemn the prosecution of criminal cases to a state of

80

paralysis." *Avellino*, 136 F.3d at 255. Thus, discovery and disclosure obligations only extend to "information known to persons who are a part of the 'prosecution team' . . . who perform investigative duties or make strategic decisions about the prosecution of the case," including "police officers and federal agents who submit to the direction of the prosecutor and participate in the investigation." *United States v. Barcelo*, 628 F. App'x 36, 38 (2d Cir. 2015).

In considering whether Rule 16 and *Brady* apply to records in the possession of another government agency, a prosecutor's duty extends to such evidence only where the Government conducts a "joint investigation" with that agency or branch of government. That requires far more than mere communication, or even coordination. *See Middendorf*, 2018 WL 3956494, at *4-5; *Collins*, 409 F. Supp. 3d at 241-43 (no joint investigation between U.S. Attorney's Office and SEC where the two entities conducted a small number of joint interviews and engaged in limited sharing of information with each other); *see also United States v. Finnerty*, 411 F. Supp. 2d 428, 433 (S.D.N.Y. 2006). The factors relevant in determining whether an agency or a component of an agency are part of the prosecution team, and therefore their records are deemed to be in the "possession" of the Government, include whether the agency or component: "(1) participated in the prosecution's witness interviews, (2) was involved in presenting the case to the grand jury, (3) reviewed documents gathered by or shared documents with the prosecution, (4) played a role in the development of prosecutorial strategy, or (5) accompanied the prosecution to court proceedings." *Middendorf*, 2018 WL 3956494, at *4.

## C. Discussion

The defendant's *Brady* claim fails on multiple levels. First, USAO-SDNY had no obligation to even try to obtain Detective Parkinson's state grand jury testimony because the PBSA was plainly not part of USAO-SDNY's prosecution team. (*See generally* Dkt. 63 (Government

81

letter regarding Government's plan to obtain and review investigative files created and maintained by other offices); *Middendorf*, 2018 WL 3956494, at *4). That alone dooms the defendant's claim.

To be sure, USAO-SDNY, without being legally required to do so, took extensive steps to try to obtain the testimony. Indeed, despite the fact that the PBSA—which handled the Florida state investigation of prosecution of Epstein between approximately 2005 and 2010, long before this case—was not part of USAO-SDNY's prosecution team, USAO-SDNY requested the entire investigative file from the PBSA and reviewed that file to make appropriate disclosures. (*See* Dkt. 63 at 5-6). USAO-SDNY did not stop there, and tracked down the clerk of court in Palm Beach who indicated that the original audio files of Detective Parkinson's state grand jury testimony were unplayable and that there were no transcripts of the grand jury presentation because their grand jury was only audio recorded without transcription. USAO-SDNY disclosed this to the defendant before trial. Simply put, the defendant cannot rest a *Brady* violation on the Government failing to obtain what it did not even have to seek to obtain, yet tried to obtain. That the Government went beyond its legal obligations is laudable, not a basis to overturn the defendant's conviction.

In any event, the defendant also cannot establish a *Brady* violation because Detective Parkinson's state grand jury testimony is neither material nor exculpatory. The defendant claims that Detective Parkinson's testimony at her trial about where the massage table was found is inconsistent with his state grand jury testimony. (Mot. 5-6). In particular, she argues that his testimony at trial that the massage table was seized from Epstein's bathroom with a shower is inconsistent with his testimony in the state grand jury that the massage table was seized from an "adjacent" bathroom with a bathtub. (*Id.* at 5). Not so.

First, Detective Parkinson's state grand jury testimony and trial testimony are not inconsistent, much less materially so. It is far from clear which bathroom Detective Parkinson was

referring to in his state grand jury testimony when he described finding the massage table while executing the search warrant.[39] As relevant here, Detective Parkinson described the two bathrooms off of the large "master" bedroom and then said that he found a "massage table in this clos – bathroom" but did not specify to which bathroom he was referring. (Ex. 11 at 108-11). The exchange thus does not, as the defendant avers, make clear that Detective Parkinson identified the massage table from Epstein's "bathroom (with a shower), but a different table in an adjacent bathroom with a tub." (Mot. 5).

But even if Detective Parkinson's state grand jury testimony were clear that the massage table had been found in the bathroom with the tub as opposed to the bathroom with the shower, it would still not afford the defendant any relief. Had Exhibit 11 been available at the time of trial, the defendant could have attempted to use Detective Parkinson's state grand jury testimony to cross-examine and try to impeach him, but small differences in his testimony plainly would not have discredited Detective Parkinson when his testimony was so well-corroborated.[40] Moreover,

---

[39] The defendant claims that Detective Parkinson did not describe collecting any evidence in his grand jury testimony, but did at trial. (Mot. 5-6). But his grand jury testimony concerned the execution of the search at Epstein's Palm Beach residence on October 20, 2005, whereas the trial testimony the defendant points to relates to October 5, 2003, when Detective Parkinson went to Epstein's residence to investigate a burglary and collected evidence. (Tr. 1093-97).

[40] Detective Parkinson's testimony at trial that the massage table was seized from the bathroom with a shower is consistent with contemporaneous evidence of the search. Detective Parkinson testified at trial that he remembered seizing a green massage table (*i.e.*, Government Exhibit 51) from the "second floor south bathroom, where the shower was" and that he recognized Government Exhibit 51 from the evidence label attached to it with a property number and a barcode number. (Tr. 1089). Detective Parkinson's video of the October 20, 2005 search showed, among other things, the green massage table outside the door of the southside shower bathroom laid against a wall with photographs. (*See* GX 296-R at 23:11, 23:15-18). The PBPD property receipt from the October 2005 search warrant indicates that the green massage table was seized from the "men's bathroom – master bedroom." (Dkt. 391-1).

Detective Parkinson's trial testimony was further corroborated by Carolyn. (*See* Tr. 1521-22 (Carolyn testimony about going with Virginia to "Epstein's bedroom, into his bathroom area" that had a "toilet area," a steam room, a shower, and "an ugly polka-dotted couch" and that they "walked into the little closet area and [Virginia] was pulling out the massage table. And I was

as demonstrated by the fact that the massage table was brought into the courtroom during Detective Parkinson's testimony (*see* Tr. 1088), massage tables are mobile.  Where it was found on a particular day thus does not have the importance that the defendant conclusorily assumes.

Most importantly, even if the state grand jury testimony were construed to favor the defendant's version of the alleged facts, her claim still fails.  To succeed in overturning a conviction based on new evidence, the defendant must demonstrate that "the evidence is so material and non-cumulative that its admission would probably lead to an acquittal." *United States v. Siddiqi*, 959 F.2d 1167, 1173 (2d Cir. 1992) (defendant must demonstrate that "the evidence is so material and non-cumulative that its admission would probably lead to an acquittal").  This requires far more than inconsistencies in testimony or that the defendant could sought to use the evidence.  *Cf., e.g.*, *United States v. Malpeso*, 17 F. App'x 23, 26 (2d Cir. 2001) ("Nothing in the testimony of McLaughlin or Palazzolo is directly incompatible with the prosecution's evidence implicating Gallagher in the charged shooting.").  The defendant does not come close to meeting the required standard.

Specifically, the defendant claims that the massage table supposedly being found in the bathroom with the tub would have allowed her to argue that the "table produced at trial was not Epstein's massage table and should not have been admitted into evidence."  (Mot. 6).  That is wrong.  The "bar for authentication of evidence is not particularly high." *United States v. Al-*

---

looking at all the photos that were on the wall.")).

Relatedly, the defendant complains that the Government "repeatedly mischaracterized the table as 'the one' that Carolyn was abused on." (Mot. 35).  The defendant raised this argument after the Government's summation, requesting a limiting instruction and arguing that "there was no identification of that specific massage table as the one that was used in connection with these offenses." (Tr. 2909).  The Government explained that at a minimum, Government Exhibit 51 was seized in 2005 and the jury was permitted to infer that it was used in 2004 during the sex trafficking conspiracy.  (Tr. 2909-10).  Judge Nathan overruled the defendant's request.  (Tr. 2910).  The defendant's renewed claim is accordingly barred.

*Moyad*, 545 F.3d 139, 172 (2d Cir. 2008).  The "proponent of the evidence is not required to rule out all possibilities inconsistent with authenticity, or to prove beyond any doubt that the evidence is what it purports to be."  *United States v. Dhinsa*, 243 F.3d 635, 658 (2d Cir. 2001).  All that is required is "sufficient proof . . . so that a reasonable juror could find in favor of authenticity or identification."  *Id.*; *see* Fed. R. Evid. 901(a).  The "standard for authentication is one of reasonable likelihood and is minimal.  The testimony of a witness with knowledge that a matter is what it is claimed to be is sufficient to satisfy this standard."  *United States v. Gagliardi*, 506 F.3d 140, 151 (2d Cir. 2007).  Detective Parkinson's testimony, along with the contemporaneous photographs and video recording of the search, laid more than a sufficient foundation for the admission of the massage table.  However one reads Detective Parkinson's state grand jury testimony, it would not have resulted in the exclusion of Government Exhibit 51.[41]  Nor does the defendant, who bears the burden, explain how evidence permitting an inference that the massage table was found in the bathroom with a tub—that is, the bathroom that contained a portrait and photograph of the defendant, and the defendant's stationary—which is what she appears to suggest is the right way

---

[41] The defendant also claims that "[s]ubsequent document releases, photographs and forensic analysis of the adhesive [of the "Made in California" label] reveal that the exhibit's provenance was questionable and that the chain-of-custody records may have been altered."  (Mot. 33).  This is false.  The defendant makes this argument, as best as the Government has determined, without providing any of the supposedly new evidence or any specific information that undermines the authenticity of the massage table.  Detective Parkinson testified that he remembered seizing a green massage table which he recognized from the evidence label attached to it with a property number and a barcode number.  (Tr. 1089).  That testimony, along with the contemporaneous evidence of the search introduced at trial, was more than sufficient to satisfy Rule 901.  The defendant's arguments about the chain of custody do not go to admissibility.  (*See* Dkt. 535 at 5 ("[I]t is well settled that any flaws in the chain of custody bear only on the weight of the evidence, and not on its admissibility.")).  Further, the defendant appears to suggest that the Government affixed the "Made in California" sticker to the massage table "post-seizure" because photographs of the massage table taken during the October 2005 search did not show the label.  (Mot. 35).  This claim is both false and preposterous.

to read the prior grand jury testimony, would have been helpful to her at trial.  If anything, that inference would appear *inculpatory*.

The defendant's claim fails for all of these reasons.  But it also fails because, contrary to the premise of her claim, the massage table was not the "only evidence" (Mot. 5) of interstate commerce.  In addition to the massage table, there were FedEx exhibits and testimony that established that Epstein caused packages to be sent from New York to Carolyn in Florida.  (*See* Tr. 1541-42 (Carolyn testimony that Epstein sent her packages, including lingerie, from Manhattan, New York to her home in West Palm Beach, Florida); Tr. 1542 (Carolyn testimony that she gave her address to the defendant because the defendant asked Carolyn for her address "[b]ecause Jeffrey Epstein wanted to send me some items"); GXs 801, 802, 803 (FedEx records of packages sent to Carolyn when Carolyn was 15 years old)).  Those same records showed that the defendant was using the same account to send packages from Epstein's office during the same time period.  (*See* GX 801, 802, 803 (defendant's name on FedEx account invoices)).  Indeed, the Government argued that these FedEx records also satisfied the interstate commerce element in its summation.  In particular, the Government argued, "*So when Carolyn got packages from New York*, when she was abused on a massage table that was manufactured in California, that proves that there was at least a minimal effect on interstate commerce, which is all that's required for [Count Six]."  (Tr. 2894-95 (emphasis added)).  The defendant's claim that the massage table was the "only exhibit adduced to fulfill the Government's required jurisdictional element of interstate commerce" (Mot. 6) is simply false.

The defendant also argues "there is a reasonable probability that were would have been a different result" at trial if the massage table had been excluded (Mot. 6) because Juror 50 said, in a post-trial interview, that the table "was crucial in interstate commerce."  (Ex. 7 at 21 (April 2022

86

docuseries)).  However, as explained above, the defendant cannot come close to showing that the massage table would have been excluded had she had the state grand jury transcript.  In any event, that the massage table may have been important to the one particular juror does not negate the existence of the FedEx records, or prove that, without the table, the defendant would likely have been acquitted—and that is the showing the defendant must make.  *See Siddiqi*, 959 F.2d at 1173.

The defendant next claims that the Government "knew or should have known" that Detective Parkinson's testimony about the location from which he seized the massage table was "was a lie."  (Mot. 35).  As an initial matter, as explained above, the precise location was of far less importance than the defendant assumes, and it being found in *her bathroom*, as she appears to suggest the state grand jury testimony shows, certainly would not have resulted in an acquittal.  But in any event, the defendant does not show that the witness lied, much less that the Government understood him to have lied (and the latter proposition makes no sense, because the Government did not have the transcript that supposedly shows the "lie").

For good reason, "[a] bare allegation of perjury does not entitle an applicant to relief under section 2255."  *Gonzalez*, 33 F.R.D. at 282.  Moreover, perjury "requires that a witness believe that the testimony he gives is false."  *Lighte*, 782 F.2d at 372.  Detective Parkinson—who did not have access to his 2006 state grand jury testimony—testified in 2021 about a search he conducted in October 2005, more than 15 years earlier.  Any differences in his recollection—which are far from clear, as discussed above—"alone do not add up to perjury."  *United States v. Sanchez*, 969 F.2d 1409, 1415 (2d Cir. 1992).  And given that the Government did not have access to Detective Parkinson's state grand jury testimony at the time of the trial, the defendant's claim that the Government should have known of this supposed perjury is nonsensical.  "When false testimony is provided by a government witness without the prosecution's knowledge, due process is violated

87

only if the testimony was material and the court [is left] with a firm belief that but for the perjured testimony, the defendant would most likely not have been convicted.  In contrast, where false testimony is provided with the prosecution's knowledge, a conviction cannot stand if there was a reasonable likelihood that the testimony affected the judgment of the jury or that it may have had an effect on the outcome of the trial." *Salazar-Espinosa v. United States*, No. 11 Civ. 0247 (LAK), 2011 WL 2946166, at *2 (S.D.N.Y. July 11, 2011); *see also Boisen v. United States*, 181 F. Supp. 349, 351 (S.D.N.Y. 1960) ("The knowing use by the government of [perjured] testimony in order to obtain a conviction would, if proved, be grounds for vacation of conviction under section 2255. But a defendant has the burden of making a showing, not only that material perjured testimony was used to convict him but that it was knowingly and intentionally used by the prosecuting authorities in order to do so.").  In short, the defendant "has failed to make out even a *prima facie* case" that Detective Parkinson "gave false testimony at trial, let alone that he did so perjuriously, that the government knew of any such perjury," or that the allegedly perjured testimony "probably would have affected the result in this case." *Salazar-Espinosa*, 2011 WL 2946166, at *3; *see also Lamberti*, 22 F. Supp. 2d at 86 ("As none of the perjured testimony was material to the conviction of [the defendant] and as the independent evidence overwhelmingly demonstrates [the defendant's] guilt of narcotics conspiracy, his motion to vacate his conviction is denied.").  The defendant does not come close to what is required.

## V.    The Defendant's Additional EFTA-Related Claims Are Barred and Meritless

Finally, the defendant levels allegations of misconduct at the Government that are divorced from reality.  She claims, citing supposedly new EFTA documents, that the Government "relied upon evidence that [it] knew or should have known was false" and failed to disclose certain

88

documents. (Am. Mot. 8-11). As an initial matter, not all of these materials are new to her.[42] Nor do the ones that appear to be new support or permit her to repeat arguments she made years ago or that she could have made years ago. For example, the defendant claims that the EFTA documents "exposed" "[t]imeline [p]roblems" with respect to the victims (Am. Mot. 8), but the defendant vigorously cross-examined the victims about, among other things, their recollection about the timeline of events and repeatedly made arguments about the victims and their memories, which the jury rejected.

Indeed, multiple of the defendant's claims do not appear tied to EFTA documents at all, but instead are just attacks on Government witnesses or evidence the jury considered—and thus are wholly improper under Section 2255. She claims, for instance, that the Government falsely suggested to the jury that photographs of Epstein's New York residence from the FBI's July 2019 search were "Epstein's home in the time period" he abused Jane. (Am. Mot. 8). The FBI agent who testified was clear that the photographs of the search were from July 2019 and defense counsel cross-examined the agent about the fact that the photographs of the search were from 2019 rather than the 1990s, when Epstein and the defendant sexually abused Jane (*see* Tr. 1391-93). In any event, this precise issue was litigated at trial. (Dkt. 523, 525). Judge Nathan carefully reviewed the photographs of Epstein's New York residence from the 2019 search and admitted certain

---

[42] Certain of the EFTA documents the defendant attaches or cites were in fact, disclosed, to the defendant in advance of trial. (*See, e.g.*, Ex. A40, A43 (FBI report of interview of an individual disclosed in advance of trial)). Others are pages of internal USAO-SDNY memos that summarize what certain individuals told the Government, as disclosed to the defendant in testifying and non-testifying witness material in advance of trial. (*See, e.g.*, Exs. A38, A42, A52). As another example, in support of her claim that the Government relied on evidence that it knew or should have known was false, the defendant cites an email from counsel for another individual contesting certain allegations made by victims. (*See, e.g.*, Exs. A39, A49, A55). It is of no relevance that counsel for another individual contested certain victims' allegations. In any event, the defendant vigorously contested the allegations of the victims who testified at her trial and is not permitted to use her Motions to relitigate the outcome of her trial.

photographs with redactions to ensure that the admitted photographs were probative of how the residence appeared at the earlier time. (Tr. 1146-53). Judge Nathan explained, "Whether those photos taken in 2019 are probative of how the apartment appeared in 1994 is a question of relevance under Rule 401 to be balanced with 403, not of authentication. . . . Jane's testimony about the distinctive characteristics of Epstein's apartment captured in the photos that the Court will admit are a sufficient basis under 901(b)(4) which permits authentication based on the appearance, contents, substance, internal patterns or other distinctive characteristics of the item taken together with all of the circumstances." (Tr. 1148-49). The defendant's attempt to, yet again, relitigate another issue decided at her trial is barred.

As another example, the defendant claims that "[i]ndependent photographic evidence" demonstrates that Epstein's New Mexico ranch did not exist in 1994 through 1997 and, therefore, that Jane could not have been abused in New Mexico when she was 15 or 16 years old in approximately 1995 or 1996. (Am. Mot. 9-10). And yet, several witness testified about the ranch's existence at that very time and were subjected to cross-examination about the very same topic. (*See, e.g.*, Tr. 142 (Visoski testimony that Epstein purchased his ranch "in approximately 1994. I'd call it the mid '90s."); Tr. 237-38 (cross-examination of Visoski about the ranch being under construction in the 1990s); Tr. 803-04 (Alessi testimony that he traveled to the ranch in approximately 1994 or 1995); Tr. 1808-09 (Rodgers testimony that he started flying to New Mexico in 1993); Tr. 1849 (Rodgers testimony about a 1997 flight log indicating travel to New Mexico by Epstein, the defendant, and Jane, and Rodgers's understanding that Epstein stayed at his New Mexico ranch when he flew to New Mexico); Tr. 1852 (Rodgers testimony regarding a 1996 flight log reflecting Epstein and the defendant traveling to New Mexico); Tr. 1946-47 (cross-examination of Rodgers about the ranch being under construction in the 1990s)). Moreover, Annie

testified about going to Epstein's ranch in the spring of 1996 (Tr. 2069-70).  In any event, the defendant pressed this argument about "Jane's story" being "wrong" with respect to Epstein's New Mexico ranch and accused Jane of "deliberately . . . attempt[ing] to move the timeline back to make herself younger when she was with Epstein."  (Tr. 2944-46).  At bottom, the defendant— who chose not to raise these arguments on direct appeal—does not even attempt to explain her procedural default.  Her belated complaints are not cognizable now.

In sum, the defendant misconstrues and ignores the trial record in an apparent attempt to re-hash arguments made by her counsel at trial, rejected by the jury, and not brought on direct appeal.  That is not permissible under Section 2255, and merely asserting that EFTA documents support her belated claims does not discharge her burden.  She has not come close to demonstrating a single constitutional violation that undermined the fairness of her case.

## VI.    The Defendant Is Not Entitled to a Hearing

Finally, the defendant seeks an evidentiary hearing.  (Mot 1; Am. Mot. 2).  She is not entitled to one.  Where a Section 2255 motion and the records of the case show that a defendant is entitled to no relief, a court need not grant a hearing just because the defendant requests one.  28 U.S.C. § 2255(b); *McLean v. United States*, No. 12 Civ. 1954 (RJS), 2016 WL 3910664, at *8 (S.D.N.Y. July 13, 2016) ("A petitioner is not entitled to a hearing, however, if 'the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief.'" (quoting 28 U.S.C. § 2255(b))).

"To warrant a hearing, the motion must set forth specific facts supported by competent evidence, raising detailed and controverted issues of fact that, if proved at a hearing, would entitle [the defendant] to relief."  *Gonzalez v. United States*, 722 F.3d 118, 131 (2d Cir. 2013).  "Airy generalities, conclusory assertions and hearsay statements will not suffice because none of these would be admissible evidence at a hearing."  *United States v. Aiello*, 814 F.2d 109, 113-14 (2d Cir.

1987).  Nor will allegations that are "vague, conclusory, or palpably incredible." *Gonzalez*, 722 F.3d at 130; *see also Puglisi v. United States*, 586 F.3d 209, 213 (2d Cir. 2009) ("[B]ald allegations unsupported by evidentiary facts do not" warrant a hearing).  In sum, "[i]f it plainly appears from the motion, exhibits, and record of prior proceedings that the [movant] is not entitled to relief, the judge must dismiss the motion."  *Brudi v. United States*, No. Civ. 962 (JPO), 2014 WL 6390302, at *2 (S.D.N.Y. Nov. 17, 2014).

The Motions here fail for numerous reasons, including that nearly all of the claims therein are fully barred, the evidence of the defendant's guilt was overwhelming, and her arguments are conclusory and inconsistent with both the law and the record.  There is no need whatsoever for a hearing.  *See, e.g.*, *United States v. Robinson*, No. 20 Cr. 415 (KMW), 2025 WL 1603916, at *3 (S.D.N.Y. June 6, 2025) ("[T]he Court concludes that the parties' written submissions are sufficient to decide [defendant's] motion, and that no hearing is required."); *United States v. Lopez-Cabrera*, Nos. 11 Cr. 1032-14 (PAE), 21 Civ. 7804 (PAE), 2023 WL 2612582, at *3 (S.D.N.Y. Mar. 23, 2023) (denying hearing where the defendant "does not identify any issue of fact, let alone a controverted issue of consequential fact of the sort that an evidentiary hearing would assist the Court to resolve"); *Orbach v. United States*, No. 11 Cr. 111 (NRB), 2017 WL 5632815, at *7 (S.D.N.Y. Nov. 7, 2017) (denying request for hearing where "[t]he existing record is conclusive that petitioner is not entitled to relief on any theory presented to this Court").  Nor is a hearing costless.  *See generally Chang v. United States*, 250 F.3d 79, 86 (2d Cir. 2001) (affirming denial of a hearing, noting it "avoided the delay, the needless expenditure of judicial resources, the burden on trial counsel and the government, and perhaps the encouragement of other prisoners to make similar baseless claims").[43]

---

[43] The defendant also requests that the Court allow her to amend her Motion "one more time as she is aware of substantial additional information that if she is able to review it would further prove

92

## CONCLUSION

For the foregoing reasons, the defendant's Motions should be denied, without a hearing, and the Court should find that the defendant has not made a substantial showing of a denial of a federal right, and that, pursuant to pursuant to 28 U.S.C. § 1915(a)(3), any appeal taken from the denial would not be in good faith.

Dated: New York, New York
       May 19, 2026

                              Respectfully submitted,

                              JAY CLAYTON
                              United States Attorney for the
                              Southern District of New York

                    By:    s/ _____
                              Lara Pomerantz
                              Assistant United States Attorney
                              (212) 637-2343

---

the Governments [sic] misconduct that resulted in prejudice at her trial." (Am. Mot. 17). But the defendant has already amended once, and her lengthy papers make repeated baseless claims of Government misconduct, unmoored from law, logic, or the record. Her victims deserve finality. *See Mui*, 614 F.3d at 53. She should not be permitted another attempt to level unsupported, false allegations of Government misconduct, particularly given the length of her papers, and when her request to amend further is conclusory. *See, e.g.*, *Beniquez v. Johnson*, No. 21 Civ. 1467 (PAE), 2023 WL 3948738, at *19 n.11 (S.D.N.Y. June 12, 2023) ("courts retain the discretion to deny that leave in order to thwart tactics that are dilatory, unfairly prejudicial or otherwise abusive, or where amendment would be futile").

## **AFFIRMATION OF SERVICE**

I, Lara Pomerantz, affirm under penalty of perjury as follows:

1.      I am an Assistant United States Attorney in the Southern District of New York.

2.      On May 19, 2026, I caused a copy of the foregoing to be served on the defendant by certified mail at the following address:

Ghislaine Maxwell
Register No. 02879-509
FPC Bryan
Federal Prison Camp
P.O. BOX 2149
Bryan, Texas 77805

Dated: May 19, 2026
        New York, New York

s/ _____
Lara Pomerantz
Assistant United States Attorney
(212) 637-2343