**From:** Ghislaine Maxwell
**To:** Pro Se Filing
**Subject:** UNDER SEAL PRO SE Ghislaine Maxwell 02879-509 Addendum plus Ex 1-5
**Date:** Sunday, July 26, 2026 4:57:43 PM
**Attachments:**
upl upl upl upl FINAL PDF.pdf
EX 1 EFTA 00800336 copy.pdf
EX 2 EFTA 00009151 copy.pdf
EX 3 EFTA 00224977 copy.pdf
EX 4 EFTA 00224983 copy.pdf
EX 5 H.O. 012162 copy.pdf
EX 6 EFTA 00225089 copy.pdf
EX 7 EFTA 00225071 copy.pdf
EX 7 EFTA 00224985 copy.pdf
EX 8 EFTA 00009127 copy.pdf
EX 8 EFTA 00800336 copy.pdf
EX 9 EFTA 00009104 copy.pdf
EX 10 EFTA 00009101 copy.pdf
EX 11 EFTA 00225071 copy.pdf
EX 12 EFTA 00800336 copy.pdf
EX 13 EFTA00009151 copy.pdf
EX 15 H.O. 012162 copy.pdf
EX 16 EFTA 00009127 copy.pdf
EX 17 EFTA 00009104 copy.pdf
EX 18 EFTA 00009101 copy.pdf
EX 19 EFTA 00225071 copy.pdf
EX 20 EFTA 02731234 copy.pdf
EX 21 EFTA 00225098 copy.pdf
EX 22 H.O. 012188 copy.pdf
EX 23 EFTA 00178517 copy.pdf
EX 24 EFTA 02731234 copy.pdf
EX 25 EFTA 00225098 copy.pdf
EX 26 H.O. 012188 copy.pdf

---

CAUTION - EXTERNAL:

PLEASE FILE UNDER SEAL PER COURT ORDER

CAUTION - EXTERNAL EMAIL: This email originated outside the Judiciary. Exercise caution when opening attachments or clicking on links.

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---X

UNITED STATES OF AMERICA, Respondent,

v.

GHISLAINE MAXWELL, Defendant-Petitioner.

---X

**20 Cr. 330 (PAE)**

**SUPPLEMENTAL MEMORANDUM IDENTIFYING SUBSEQUENTLY LOCATED DOCUMENTARY EVIDENCE IN SUPPORT OF PETITIONER'S PREVIOUSLY ASSERTED BRADY, GIGLIO, NAPUE, DUE PROCESS, AND NON-PROSECUTION AGREEMENT CLAIMS**

**SUPPLEMENTAL FILING IDENTIFYING SUBSEQUENTLY LOCATED DOCUMENTARY EVIDENCE IN SUPPORT OF PETITIONER'S PREVIOUSLY ASSERTED BRADY, GIGLIO, NAPUE, DUE PROCESS, AND NON-PROSECUTION AGREEMENT CLAIMS**

**SUMMARY**

Petitioner respectfully submits this Supplemental Filing to identify documentary evidence that became available after the filing of Petitioner's Reply, or whose constitutional significance became apparent only after additional Epstein Files Transparency Act ("EFTA") materials were subsequently located by third parties and transmitted to Petitioner.

This filing asserts no new constitutional claims. Nor does it seek reconsideration of prior rulings or expansion of the issues presently before the Court. Rather, it supplements the factual record supporting constitutional claims previously asserted under *Brady v. Maryland*, *Giglio v. United States*, *Napue v. Illinois*, the Due Process Clause, and Petitioner's claim that the Government's contemporaneous understanding and implementation of the 2007 Non-Prosecution Agreement ("NPA") extended protections beyond Jeffrey Epstein alone.

The newly assembled documentary record materially strengthens three factual propositions underlying Petitioner's previously asserted claims.

First, the Government's contemporaneous records demonstrate that the NPA was negotiated over an extended period; that commitments were made to Epstein's counsel before its execution; that those commitments were incorporated into the executed Agreement; that federal prosecutors continued to revise and implement the Agreement after its execution; and that Government officials contemporaneously understood the Agreement to provide broad protection extending to identified co-conspirators, including Petitioner.

Second, the documentary record demonstrates that the Government possessed impeachment and exculpatory evidence unavailable to the defense, including documentary evidence relating to [redacted], [redacted], EFTA materials, flight manifests, Grand Jury materials, and other investigative records. The extraordinary delay between the underlying investigation and Petitioner's prosecution resulted in the loss or practical unavailability of substantial exculpatory and impeachment evidence while that evidence remained available to the Government.

Third, the documentary record demonstrates that the Epstein investigation was not confined to a single United States Attorney's Office but instead operated as a coordinated multi-district federal investigation involving continuing communications among prosecutors, investigators, and other federal districts. Newly located records identifying linked investigations materially supplement

Petitioner's previously asserted claims concerning Government knowledge and the collective scope of the prosecution team's constitutional disclosure obligations.

When considered cumulatively, these documents materially strengthen the factual foundation supporting Petitioner's previously asserted constitutional claims.

## INTRODUCTION

Petitioner remains incarcerated and has never been afforded direct access to the Government's Epstein Files Transparency Act ("EFTA") materials.

Petitioner has no Internet access and has never been provided the searchable repository containing the Government's documentary production. Instead, the documents discussed herein were located over time by third parties and individually transmitted to Petitioner. As additional materials were received, relationships among documents that had previously appeared unrelated became apparent, revealing investigative chronology, Government knowledge, and documentary connections that could not reasonably have been discerned from isolated records.

Accordingly, this Supplemental Filing reflects the incremental development of the documentary record available to Petitioner.

Many of the documents identified herein became constitutionally significant only after additional materials were subsequently located, permitting contemporaneous Government communications to be evaluated within their proper investigative context.

The purpose of this filing is therefore narrow. It identifies documentary evidence materially supplementing constitutional claims already pending before this Court. It neither enlarges the issues presented nor advances new legal theories. Rather, it provides the Court with the most complete documentary record presently available concerning claims previously asserted under *Brady*, *Giglio*, *Napue*, the Due Process Clause, and Petitioner's claim regarding the intended scope and implementation of the Non-Prosecution Agreement.

## GOVERNING PRINCIPLES

The constitutional principles governing Petitioner's claims have already been fully briefed and need not be repeated at length.

Evidence favorable to the defense must be evaluated collectively, not item by item. Materiality under *Brady* depends upon the cumulative effect of suppressed evidence considered in light of the entire record. Likewise, impeachment evidence within the scope of *Giglio* is subject to the same constitutional disclosure obligations. Evidence reflecting the Government's contemporaneous understanding of material issues, investigative chronology, witness credibility, prosecutorial knowledge, or implementation of agreements bears directly upon those constitutional obligations.

Accordingly, the documents identified herein should not be evaluated in isolation. Their constitutional significance arises from the relationships among contemporaneous Government communications, investigative memoranda, correspondence, and documentary records considered collectively.

## PART I

## THE GOVERNMENT'S CONTEMPORANEOUS DOCUMENTS DEMONSTRATE THAT THE NON-PROSECUTION AGREEMENT WAS INTENDED TO PROVIDE BROAD PROTECTION TO CO-CONSPIRATORS, INCLUDING PETITIONER

### A. The Department of Justice Participated in Negotiating the Non-Prosecution Agreement Before Its Execution.

The Government has consistently characterized the 2007 Non-Prosecution Agreement as a localized prosecutorial resolution negotiated within the Southern District of Florida and having only the limited effect reflected in the executed Agreement. The subsequently located documentary record materially supplements Petitioner's previously asserted challenge to that characterization.

EFTA 00800336 reflects that the Department of Justice participated in negotiations concerning the terms of the Non-Prosecution Agreement before its execution. Rather than documenting a routine local resolution, the record demonstrates continuing Department of Justice involvement in shaping the Agreement before and after its execution, contrary to the Government's litigation position.

That conclusion is further supported by EFTA 00009151, together with EFTA 00224977 at page 35, both of which reflect continuing Department of Justice participation during the negotiation process. Read together, these documents demonstrate that the Agreement was the product of deliberate governmental review and negotiation rather than a routine local disposition.

These contemporaneous records materially supplement Petitioner's previously asserted claim that the Government's contemporaneous understanding of the Agreement was broader than the position later advanced during litigation concerning its scope.

### B. The Documentary Record Demonstrates That Other Federal Districts Were Informed Contemporaneously with the Entry of Epstein's Plea.

The newly assembled documentary evidence further demonstrates that knowledge concerning the investigation and the proposed Agreement was not confined to the Southern District of Florida.

EFTA 00224983 at page 41 reflects communications with other federal districts concerning identified victims. The contemporaneous sharing of investigative information with other United States Attorney's Offices materially supplements Petitioner's contention that multiple federal districts possessed knowledge concerning both the investigation and the Agreement.

The significance of this document extends beyond routine inter-office communication. It demonstrates that the investigation had already assumed a broader federal character and that knowledge concerning the Agreement and the underlying investigation was disseminated beyond the office that ultimately executed the Agreement.

This evidence materially supplements Petitioner's previously asserted claims concerning Government knowledge and the collective constitutional obligations of the prosecution team.

**C. The Government Concealed That the Expanding New York Investigation Led to the Execution and Continued Implementation of the Non-Prosecution Agreement.**

The Government has consistently argued that events occurring after execution of the Non-Prosecution Agreement are irrelevant to determining its intended scope. The subsequently located documentary record materially contradicts that position.

H.O.012162 reflects that the expanding New York investigation formed part of the broader factual landscape surrounding the execution and implementation of the Agreement. Rather than existing in isolation, the Southern District of Florida investigation developed contemporaneously with investigative activity in New York, demonstrating that the Government's understanding of the matter extended beyond a single prosecuting office.

The documentary record further demonstrates that the Non-Prosecution Agreement did not become a static document upon its execution. Instead, multiple iterations of the Agreement continued to exist after September 2007, extending into August 2008, as reflected in EFTA 00225089 together with EFTA 00224985. Those documents evidence continuing governmental consideration, implementation, and refinement of the Agreement after its execution.

This evidence materially supplements Petitioner's previously asserted claim that the Government's understanding of the Agreement continued to evolve after execution and was neither fixed nor confined to the four corners of the executed document.

**D. Promises Made to Jeffrey Epstein's Counsel Were Subsequently Incorporated Into the Executed Agreement.**

The subsequently assembled documentary record further demonstrates that commitments communicated to Jeffrey Epstein's counsel before execution of the Agreement were later incorporated into the written Non-Prosecution Agreement.

EFTA 00009127, lines 1 through 7, reflects that promises previously conveyed during negotiations were memorialized in the executed Agreement. The significance of this document lies not merely in its contractual language but in its confirmation that the written Agreement formalized assurances the Government had already provided during negotiations.

Accordingly, the documentary record demonstrates that the parties' operative understanding preceded execution of the written Agreement and that the executed document memorialized commitments previously communicated during the negotiation process.

This evidence materially supplements Petitioner's previously asserted claim that the Government's contemporaneous understanding of the Agreement cannot properly be determined solely by examining the final executed language in isolation.

**E. The Government Contemporaneously Understood the Non-Prosecution Agreement to Provide Blanket Transactional Immunity to Identified Co-Conspirators.**

The Government has consistently argued that the Non-Prosecution Agreement afforded no protection to Petitioner and that any suggestion to the contrary is inconsistent with the Agreement itself.

The contemporaneous documentary record materially contradicts that litigation position.

EFTA 00009104, lines 13 through 23, together with EFTA 00009101, reflects the Government's contemporaneous understanding that the protections afforded by the Agreement extended beyond Jeffrey Epstein personally and encompassed identified co-conspirators through blanket transactional immunity.

These documents are particularly significant because they reveal that the decision to extend global immunity to identified co-conspirators was deliberate and contemporaneously understood by Acosta and other Government officials responsible for negotiating and implementing the Agreement.

Their significance lies not in retrospective interpretation, but in contemporaneous governmental recognition of the breadth of the immunity that had been afforded.

**F. The Documentary Record Demonstrates That the Government Recognized Petitioner Was Covered by the Agreement.**

The documentary record further materially supplements Petitioner's previously asserted contention that Government officials understood the Agreement to encompass Petitioner.

EFTA 00225071 reflects contemporaneous Government recognition that Petitioner fell within the protections afforded by the Non-Prosecution Agreement. The document therefore bears directly upon the central dispute concerning the intended scope of the Agreement and materially supplements Petitioner's previously asserted constitutional claims.

This evidence is especially significant because it directly contradicts the position advanced by the Government before the Honorable Alison J. Nathan that the Agreement could not reasonably have been understood to extend protection to Petitioner.

Unlike retrospective litigation arguments, these contemporaneous records reveal the Government's understanding at the time the Agreement was negotiated, implemented, and applied. As such, they constitute particularly probative evidence regarding the intended scope and operation of the Agreement and identify Brady material that was unavailable to the defense.

**G. The Contemporaneous Documentary Record Contradicts the Government's Litigation Position Regarding the Scope of the Non-Prosecution Agreement.**

When considered collectively, EFTA 00800336, EFTA 00009151, EFTA 00225089, H.O.012162, EFTA 00009127, EFTA 00009104, EFTA 00009101, and EFTA 00225071 establish a materially different factual record from that presented during prior litigation concerning the scope of the Non-Prosecution Agreement.

Rather than demonstrating a narrowly negotiated local agreement applicable only to Jeffrey Epstein, the contemporaneous documents reflect Department of Justice participation before execution, continuing governmental involvement after execution, communication with other federal districts, continuing revisions to the Agreement, promises made before execution that were incorporated into the final document, contemporaneous recognition that identified co-conspirators received blanket transactional immunity, and Government recognition that Petitioner was among those protected.

Collectively, these documents materially supplement Petitioner's previously asserted Brady, Giglio, Due Process, and Non-Prosecution Agreement claims. They further undermine the factual premise upon which the Government successfully argued that, as a matter of contemporaneous governmental understanding, the Agreement could not have extended protection to Petitioner.

Accordingly, Petitioner respectfully submits that these documents should be considered collectively in evaluating the constitutional claims previously presented to the Court.

**PART II**

**THE GOVERNMENT POSSESSED AND FAILED TO DISCLOSE MATERIAL IMPEACHMENT EVIDENCE CONCERNING CRITICAL GOVERNMENT WITNESSES**

The Government's constitutional obligations under *Brady* and *Giglio* extend to evidence materially bearing upon the credibility, motivation, bias, or reliability of witnesses presented to the jury. The subsequently located documentary record materially supplements Petitioner's previously asserted claims by identifying additional contemporaneous evidence concerning Government witnesses that was unavailable to the defense.

Viewed collectively, these documents demonstrate that the Government possessed substantially more information concerning the credibility, background, and investigative history of several important witnesses than was disclosed to the defense before trial.

**A. [redacted]**

[redacted] was an important Government witness whose testimony supported the narrative concerning Jeffrey Epstein's conduct and Petitioner's alleged involvement.

The subsequently located documentary record materially supplements Petitioner's previously asserted impeachment claims.

EFTA 02731234 reflects that [redacted] admitted to the Southern District of New York that he was implicated in trafficking underage girls to Jeffrey Epstein. That admission bears directly upon [redacted] own criminal conduct, his potential exposure to prosecution, and the incentives that existed for cooperation with federal authorities.

The documentary chronology further reveals irregularities surrounding the disposition of [redacted] criminal matter. Documents relating to his plea are dated December 15, 2017. His probation order was not filed until January 16, 2018. Proceedings to revoke that probation were not initiated until March 2018, yet both documents were backdated to December 15, 2017, the date on which [redacted] signed his plea. The chronology raises substantial questions concerning the timing of [redacted] cooperation and subsequent Government action affecting his criminal exposure.

The defense was entitled to explore fully the extent to which [redacted] testimony may have been influenced by his own criminal liability, his relationship with federal prosecutors, and any actual or perceived expectation of favorable treatment.

The newly assembled documentary record materially supplements Petitioner's previously asserted *Giglio* claim by demonstrating that the Government possessed additional information bearing directly upon [redacted] credibility, bias, and motive to cooperate.

**B. [redacted]**

The documentary record likewise materially supplements Petitioner's previously asserted claims concerning Government witness [redacted].

The Government presented Ms. [redacted] as a credible witness whose testimony supported significant aspects of its prosecution. The subsequently located documentary evidence demonstrates that the Government possessed additional information bearing upon her credibility that was unavailable to the defense.

EFTA 00225098 reflects communications originating within the Southern District of Florida demonstrating that prosecutors involved in the original 2006-2010 investigation would not vouch for Ms. [redacted] veracity during that investigation.

That contemporaneous assessment bears directly upon credibility and impeachment. Evidence that experienced federal prosecutors questioned the reliability of a witness later presented at Petitioner's trial constitutes classic impeachment evidence within the meaning of *Giglio*.

The documentary record is further supplemented by H.O.012188, which reflects evidence bearing upon incentives affecting Ms. [redacted] cooperation and truthfulness. That information likewise bears directly upon credibility and impeachment.

The absence of additional investigative focus upon Ms. [redacted] during that period stands in marked contrast to the Government's later reliance upon her testimony. At the same time, the documentary record demonstrates that federal investigators were actively seeking information concerning Petitioner during the original investigation.

EFTA 00178517 reflects that investigators sought evidence concerning Ghislaine Maxwell as early as 2006. The contemporaneous record therefore demonstrates that, while federal authorities were actively attempting to develop evidence implicating Petitioner during the original investigation, they did not obtain evidence through Ms. [redacted] comparable to that later presented years after the underlying events.

That chronology is significant. Had contemporaneous evidence existed supporting the allegations later advanced at trial, one would reasonably expect those matters to have emerged during the original investigation while memories were fresh, documents remained available, and principal witnesses were alive.

Instead, the documentary record reflects that investigators actively sought information concerning Petitioner but did not obtain evidence comparable to that later presented years after the underlying events. The record likewise contradicts Ms. [redacted] testimony that Petitioner was not a focus of the 2005-2010 federal investigation of Epstein. (Trial Tr. 1678:13-15.)

These documents materially supplement Petitioner's previously asserted *Brady* and *Giglio* claims by demonstrating that the Government possessed contemporaneous information bearing upon witness credibility, investigative development, and impeachment that was unavailable to the defense.

**C. Cumulative Impeachment Significance**

The significance of the newly assembled documentary record does not arise from the evidence concerning [redacted] or [redacted] viewed independently.

Rather, these documents reveal a broader pattern demonstrating that the Government possessed contemporaneous information bearing upon witness credibility, criminal exposure, investigative history, prosecutorial assessments, and incentives that materially supplemented the impeachment record available to the defense.

When considered collectively, EFTA 02731234, EFTA 00225098, H.O.012188, and EFTA 00178517 materially strengthen Petitioner's previously asserted *Brady*, *Giglio*, *Napue*, and Due Process claims by demonstrating that the Government possessed substantially more impeachment evidence than was disclosed before trial.

**D. The Government's Representation Concerning the Judge Sweet Discovery Was Incorrect.**

The Government's Opposition to the Amended Petition confirms that Petitioner's request for a complete accounting of the discovery remains well founded.

Responding to Petitioner's claim concerning proceedings before the Honorable Robert W. Sweet, the Government represented:

"The defendant received the relevant materials in discovery." (Opp. at 44.)

The Government supported that representation by citing SDNY GM_00000834 through SDNY GM_00000905 as the discovery allegedly produced to the defense.

That representation is demonstrably incorrect.

Although the Government produced certain documents relating to the proceedings before Judge Sweet, it did not produce the transcript of the ex parte hearing between Judge Sweet and attorneys from Boies Schiller, counsel for Virginia Giuffre. That transcript was neither collateral nor peripheral. It is the only verbatim record memorializing the ex parte proceeding itself. If, as the Government represented, the "relevant materials" had in fact been produced, the transcript of the hearing itself necessarily would have been included.

The omission is significant for reasons extending well beyond the transcript itself. Throughout these proceedings, the Government has repeatedly argued that Petitioner's claims rest upon speculation and that all material discovery was produced years ago. The subsequent identification of the undisclosed Judge Sweet transcript demonstrates precisely the opposite. Petitioner's inability to present this evidence earlier resulted not from any lack of diligence, procedural default, or strategic omission, but because the Government failed to produce a material record while simultaneously representing to this Court that the relevant discovery had already been disclosed.

Nor is this an isolated occurrence. The Judge Sweet transcript joins a growing body of documentary material—including EFTA records, investigative memoranda, internal communications, Grand Jury materials, and other contemporaneously created documents—that has emerged only after repeated requests, independent investigation, and disclosures outside the ordinary criminal discovery process. Each newly identified document has further undermined the Government's repeated assurances that the defense possessed the material information necessary to litigate Petitioner's constitutional claims.

Petitioner does not present this omission as a separate constitutional claim. Rather, it materially supplements the *Brady* and Due Process claims already before the Court. It further demonstrates that the documentary record upon which those claims depend remains incomplete notwithstanding the Government's affirmative representation that the relevant Judge Sweet materials had been disclosed. The continued emergence of previously undisclosed records substantially reinforces Petitioner's submission that confidence cannot be placed in the completeness of the Government's disclosure representations and that the Court should evaluate Petitioner's constitutional claims against the full documentary record now available, rather than the incomplete record that existed when the original briefing was filed.

**PART III**

**THE DOCUMENTARY RECORD DEMONSTRATES THAT THE EPSTEIN INVESTIGATION WAS A COORDINATED MULTI-DISTRICT FEDERAL INVESTIGATION**

The Government has repeatedly characterized the investigation underlying Petitioner's prosecution as though it were conducted by separate prosecuting offices acting independently of one another. The subsequently located documentary record materially supplements Petitioner's previously asserted claims by demonstrating that the investigation was, in fact, coordinated across multiple federal districts and involved continuing communication among prosecutors, investigators, and private attorneys over many years.

This evidence bears directly upon the scope of the prosecution team's constitutional obligations under *Brady*. Evidence known to one participating component of a coordinated federal investigation cannot be artificially compartmentalized to avoid the Government's constitutional disclosure obligations.

**A. The Documentary Record Demonstrates That Other Federal Districts Were Involved During the Negotiation of the Non-Prosecution Agreement.**

The newly assembled documentary evidence demonstrates that knowledge concerning Jeffrey Epstein, identified victims, and the developing investigation extended beyond the Southern District of Florida well before execution of the Non-Prosecution Agreement.

EFTA 00224983 reflects communications demonstrating that other federal districts had been informed concerning identified victims. Likewise, EFTA 00014175 documents communications with other federal districts for the purpose of initiating investigations within their respective jurisdictions.

These records materially supplement Petitioner's previously asserted contention that the investigation was national in scope and that knowledge concerning the Agreement and the underlying investigation was shared beyond the office that ultimately executed the Agreement.

The significance of these documents extends beyond routine inter-office communication. They demonstrate that federal prosecutors contemporaneously viewed the investigation as involving multiple jurisdictions, thereby materially expanding the scope of the Government's collective knowledge.

**B. The Documentary Record Demonstrates Continuing Coordination Between New York and Florida.**

The Government has consistently attempted to isolate the Southern District of Florida investigation from the later Southern District of New York prosecution.

The documentary record demonstrates otherwise.

EFTA 01660401 reveals that the Government retained an undated photograph depicting Petitioner, Andrew Mountbatten Windsor, and [redacted] that was not disclosed to the defense during Petitioner's criminal trial. EFTA 01660397 reflects ongoing communications between the Southern District of Florida and [redacted] concerning that photograph while private plaintiffs' attorneys were actively seeking to instigate a criminal prosecution in the Southern District of New York. The significance of these communications was not disclosed to the defense. See EFTA 01324975 and EFTA 00211692 (Operation Stolen Globe relating to Exhibit 52, the address book admitted at trial). The documentary record further reflects extensive communications between the Government and [redacted] that ultimately led the Southern District of New York to treat [redacted] as a person of interest rather than solely as a victim. See EFTA 02731082-167.

EFTA 01660400 reflects that, on July 18, 2014, [redacted] asked [redacted] whether he possessed information concerning Eppinger. That communication demonstrates continuing investigative activity years before the witness interviews ultimately disclosed in discovery.

Similarly, EFTA 01660396 reflects [redacted] April 1, 2019 communication discussing her presence in New York and the progress being made in the investigation. The timing of that communication materially supplements Petitioner's contention that coordination with New York authorities preceded the witness interviews memorialized in the FBI reports later produced in discovery.

These contemporaneous communications materially strengthen Petitioner's previously asserted claim that investigative coordination between federal districts substantially predated the chronology understood by the defense.

**C. The Government Maintained Linked Federal Investigations.**

The newly assembled documentary record further demonstrates that the Government itself recognized the existence of multiple related federal investigations under Operation Chain Reaction. See EFTA 00173953. The same records indicate that the Government sought to use the existence of multiple investigations to limit the scope of documents produced in satisfaction of its Brady obligations.

EFTA 00173974 and EFTA 00173954 through EFTA 00173955 identify a Government-generated list of linked investigations maintained in connection with the Epstein matter.

These records are significant because they demonstrate that the Government contemporaneously recognized interconnected federal investigations rather than isolated prosecutions conducted independently by separate United States Attorney's Offices.

The linked-investigation records materially supplement Petitioner's previously asserted claims concerning Government knowledge because they demonstrate that prosecutors themselves treated investigative information as part of a coordinated federal effort involving multiple jurisdictions.

The creation of multiple linked investigations appears to have originated in the Southern District of Florida's opposition to the Non-Prosecution Agreement before its execution. EFTA 00225098 reflects Villafaña's statement that she neither wished to sign nor understood the NPA. See also EFTA 00225100. According to the documentary record, part of the effort to overturn the NPA involved Villafaña's recruitment of private plaintiffs' attorneys to initiate the CVRA litigation, notwithstanding their lack of prior involvement in the matter. See EFTA 00190604.

The constitutional significance of these records extends beyond administrative organization. By identifying related investigations maintained as linked matters, the Government's own records undermine any attempt to compartmentalize knowledge possessed by participating prosecutors or investigative agencies.

When considered together with EFTA 00224983, EFTA 00225089, EFTA 01660396, EFTA 01660400, and H.O.012162, these documents demonstrate that the Government regarded the Epstein investigation as a coordinated, multi-district federal investigation long before Petitioner's indictment.

**D. Government Personnel Coordinated With Private Attorneys Throughout the Investigation.**

The documentary record likewise demonstrates continuing coordination between federal prosecutors and private attorneys representing alleged victims.

EFTA 00206183 reflects the use of civil litigation to obtain information relevant to the criminal investigation.

EFTA 00225046 documents Government assistance in locating potential witnesses.

EFTA 00206285 reflects assistance provided to private attorneys.

EFTA 00206294 through EFTA 00206296 document meetings involving Villafaña, private plaintiffs' attorneys, and journalist Sharon Churcher during the development of witness information weeks before [redacted] met with the FBI. At that time, none of the plaintiffs' attorneys represented Ms. [redacted] Consequently, the substance of those meetings was not protected by the attorney-client privilege and should have been disclosed to the defense but was not. See EFTA 00098486.

EFTA 00015003, together with EFTA 01650808, reflects the attendance of plaintiffs' attorneys at multiple witness meetings with the Southern District of New York, contrary to the Government's representations in its Reply.

The documentary record is further supplemented by EFTA 0014540 through EFTA 0014541, which reflects that private attorneys drafted proposed legal remedies supporting the Government's position concerning the scope and effect of the Non-Prosecution Agreement. Villafaña herself recognized that her communications with private plaintiffs' attorneys could be construed as misconduct. See EFTA 00190473.

Collectively, these documents demonstrate that private attorneys were not merely passive recipients of investigative information but active participants in the development of legal and factual positions later advanced concerning the Non-Prosecution Agreement and the underlying investigation.

**E. The Grand Jury Record Demonstrates the Extent of Public Exposure Existing Before Indictment.**

The subsequently located Grand Jury transcript further reflects that, before presentation of the Government's evidence, each member of the Grand Jury acknowledged prior familiarity with Petitioner. The transcript therefore documents that the indictment was sought before a Grand Jury whose members had already been exposed to widespread public reporting concerning Petitioner.

Standing alone, prior familiarity does not establish constitutional error. The significance of the document lies elsewhere. When considered together with the contemporaneous EFTA materials documenting communications among prosecutors, investigators, private plaintiffs' attorneys, and journalists during the development of the investigation, the Grand Jury transcript materially supplements Petitioner's previously asserted contention that the investigation proceeded within an extensive public narrative that predated the indictment.

Accordingly, the Grand Jury transcript should not be viewed in isolation but considered cumulatively with the remaining contemporaneous documentary evidence bearing upon investigative coordination, Government knowledge, and the chronology of the federal investigation.

**F. Cumulative Constitutional Significance.**

The constitutional significance of the documentary record discussed in this Part does not derive from any single communication viewed in isolation.

Rather, EFTA 00224983, EFTA 00225089, EFTA 01660396, EFTA 01660400, EFTA 00173974, EFTA 00173954 through EFTA 00173955, H.O.012162, EFTA 00206183, EFTA 00225046, EFTA 00206277, EFTA 00206285, EFTA 00206294 through EFTA 00206296, and EFTA 0014540 through EFTA 0014542 collectively demonstrate that the Government conducted and managed the Epstein investigation as a coordinated, multi-district federal investigation involving continuing communication among prosecutors, investigators, and private attorneys.

These documents materially supplement Petitioner's previously asserted *Brady*, *Giglio*, Due Process, and Non-Prosecution Agreement claims by demonstrating that the Government's collective knowledge extended far beyond the compartmentalized narrative advanced during prior proceedings.

**PART IV**

**THE EXTRAORDINARY DELAY IN PROSECUTING PETITIONER DEPRIVED THE DEFENSE OF MATERIAL EXCULPATORY AND IMPEACHMENT EVIDENCE THAT REMAINED AVAILABLE TO THE GOVERNMENT**

The Government repeatedly argued that the passage of time caused no constitutional prejudice to Petitioner. The subsequently located documentary record materially contradicts that position.

The extraordinary delay between the original federal investigation and Petitioner's indictment deprived the defense of access to significant documentary evidence maintained by Jeffrey Epstein during his lifetime—evidence that remained available to the Government through its access to Epstein's estate and investigative files but became unavailable to the defense following Epstein's death.

Unlike the Government, Petitioner could no longer interview Epstein, review his files, obtain documents maintained by him, or secure testimony explaining those records. The prejudice resulting from that delay was neither speculative nor abstract. The documentary record demonstrates that material evidence existed, that the Government had access to it, and that the defense did not.

**A. The Government Had Access to Jeffrey Epstein's Documentary Files That Were No Longer Available to the Defense.**

Following Jeffrey Epstein's death, the Government obtained access to extensive documentary materials maintained within Epstein's files.

Those materials included correspondence, financial records, property records, flight manifests, investigative materials, documents bearing upon the Non-Prosecution Agreement, and witness-related records.

Because Petitioner was not prosecuted until years after Epstein's death, the defense was deprived of any meaningful opportunity to obtain those materials independently, question Epstein concerning their contents, or investigate evidence uniquely within his possession.

The prejudice resulting from that delay is reflected throughout the documentary record discussed below.

**B. The Government Possessed Complete Flight Manifests While Simultaneously Arguing That Epstein Concealed the Identity of His Passengers.**

Among the most significant examples of prejudice concerns Jeffrey Epstein's flight manifests.

EFTA 00300483 reflects that complete flight manifests dating from approximately 1999 through 2004 were contained within Epstein's files.

The documentary record further establishes that Villafaña possessed those manifests. See EFTA 00194826.

The Government likewise requested and obtained flight manifests from the Epstein Estate. See EFTA 00023206.

Accordingly, the Government possessed complete documentary evidence identifying passengers who traveled aboard Epstein's aircraft.

Despite possessing those records, the Government argued during closing argument that Epstein concealed the identities of his passengers in order to hide his criminal conduct. (Trial Tr. 2860:9-12.)

The documentary record materially contradicts that presentation.

The manifests contained the identities of passengers.

The defense was never afforded the opportunity to review the complete manifests, investigate those records, identify witnesses reflected therein, or utilize the documents during cross-examination and closing argument.

The resulting prejudice is self-evident.

The Government possessed documentary evidence directly bearing upon the accuracy of one of its central themes while simultaneously denying the defense access to the underlying records.

**C. The Defense Was Denied Access to Documentary Evidence Maintained Within Jeffrey Epstein's Files.**

The prejudice extended well beyond the flight manifests.

The documentary record demonstrates that the Government possessed numerous categories of documentary evidence maintained within Epstein's files that were unavailable to the defense.

Among those materials were witness-related records reflected in EFTA 00300494 and EFTA 00300495, including victim settlement materials identified in EFTA 00300530 through EFTA 00300534.

The Government likewise possessed documentary materials bearing directly upon Epstein's understanding of the Non-Prosecution Agreement, including EFTA 00300514 through EFTA 00300516 and EFTA 00300525 through EFTA 00300527.

Those documents bear directly upon the intent, interpretation, and implementation of the Agreement and materially supplement Petitioner's previously asserted constitutional claims concerning the scope of the NPA.

The Government also possessed Department of Justice communications reflected in EFTA 00300514 that were unavailable to the defense, together with evidence of [redacted] communications with Epstein following the New Mexico proceedings. See EFTA 00026788

through EFTA 00026791. The Birthday Book materials likewise fall within this category of documentary evidence.

Collectively, these materials demonstrate that the Government possessed documentary evidence bearing directly upon issues litigated before Judge Nathan while the defense was deprived of any meaningful opportunity to review comparable materials.

**D. The Government's Delay Resulted in the Loss of Material Witnesses and Contemporaneous Evidence.**

The prejudice resulting from the Government's extraordinary delay was not limited to documentary evidence. The passage of time also deprived the defense of access to material witnesses whose testimony could no longer be obtained by the time Petitioner was indicted.

By the commencement of Petitioner's prosecution, numerous individuals possessing firsthand knowledge of the original investigation, the negotiation of the Non-Prosecution Agreement, and the underlying events had either died, become unavailable, or suffered significant memory degradation. Others could no longer be located, while contemporaneous records had been lost or destroyed.

The prejudice resulting from those losses cannot be overstated. Unlike ordinary impeachment evidence, testimony from contemporaneous participants cannot be recreated through subsequent investigation. Once those witnesses became unavailable, their observations, recollections, and explanations were permanently lost.

The documentary record materially supplements Petitioner's previously asserted Due Process claims by demonstrating that the Government possessed contemporaneous records identifying many of these witnesses years before Petitioner's indictment while the defense ultimately lost any meaningful opportunity to obtain their testimony.

**E. The Government Continued to Obtain Evidence While the Defense Lost Access to It.**

The prejudice arising from the delay was further compounded because the Government continued to acquire additional evidence throughout the intervening years.

The EFTA materials demonstrate continuing investigative activity extending well beyond execution of the Non-Prosecution Agreement and continuing through the years immediately preceding Petitioner's indictment. Federal investigators continued interviewing witnesses, obtaining documents, exchanging information with other districts, coordinating with private attorneys, and collecting evidence from third parties.

The defense, however, possessed no comparable investigative authority. As the years passed, Petitioner's ability to locate witnesses, obtain records, preserve testimony, and reconstruct historical events steadily diminished while the Government's evidentiary record continued to expand.

The resulting imbalance was substantial. By the time the indictment was returned, the Government possessed the benefit of years of additional investigative development while the defense confronted an evidentiary landscape materially diminished by the passage of time.

This asymmetry materially supplements Petitioner's previously asserted Due Process claims by demonstrating that the prejudice caused by the delay was both concrete and cumulative.

**F. Cumulative Constitutional Significance.**

The constitutional significance of the delay does not depend upon any single lost document or unavailable witness viewed in isolation.

Rather, the cumulative effect of the delay deprived the defense of access to Jeffrey Epstein's files, contemporaneous witness testimony, documentary evidence maintained by Epstein, complete flight records, investigative materials, and other evidence that remained available to the Government throughout its continuing investigation.

When considered together with the documentary evidence discussed throughout this Supplement, these materials materially strengthen Petitioner's previously asserted Due Process, *Brady*, and *Giglio* claims by demonstrating actual—not speculative—prejudice resulting from the Government's extraordinary delay in bringing this prosecution.

The cumulative record demonstrates that the Government's continued access to documentary evidence and investigative resources, coupled with the defense's irreversible loss of witnesses and contemporaneous evidence, materially impaired Petitioner's ability to prepare and present a complete defense. The Court should therefore evaluate Petitioner's constitutional claims in light of the complete documentary record now available rather than the materially incomplete record that existed during the original proceedings.

## PART V

## THE NEWLY DISCLOSED DOCUMENTARY RECORD DEMONSTRATES CONTINUING BRADY VIOLATIONS, MISSING RECORDS, AND GAPS IN THE GOVERNMENT'S DISCLOSURES

The Government has repeatedly represented that it satisfied its constitutional disclosure obligations and that any additional materials identified by Petitioner are either cumulative, immaterial, or speculative.

The subsequently assembled documentary record materially supplements Petitioner's previously asserted *Brady*, *Giglio*, *Napue*, and Due Process claims by demonstrating that significant categories of contemporaneous Government records remained undisclosed despite repeated discovery requests, extensive post-conviction litigation, Freedom of Information Act requests, and production under the Epstein Files Transparency Act.

Rather than revealing isolated omissions, the documentary record identifies recurring categories of missing investigative materials, undisclosed communications, absent interview memoranda, incomplete production, and acknowledged gaps within the Government's own files.

**A. The Documentary Record Reflects Missing Interview Memoranda and Investigative Records.**

The Government has acknowledged that not every witness interview generated an FBI Form 302 or equivalent memorialization.

The documentary record materially supplements that acknowledgment.

EFTA 00191203 reflects that Jane Doe 1 met with federal authorities on October 26, 2007. No corresponding FBI Form 302 or equivalent interview memorandum has been identified for that meeting.

Likewise, the Government has acknowledged that at least one additional witness meeting occurred for which no notes or interview memorandum were prepared. See Government's Opposition at page 63 n.31.

The documentary record further reflects that communications occurred with Leslie Wexner for which no contemporaneous notes have been identified. H.O.012162 likewise reflects communications that were not fully memorialized in the investigative record.

These omissions are significant because contemporaneous interview memoranda frequently contain statements materially differing from later testimony, omitted investigative leads, inconsistencies, impeachment material, and information bearing directly upon witness credibility.

The absence of such records materially supplements Petitioner's previously asserted *Brady* and *Giglio* claims because it demonstrates that the documentary record remains incomplete despite the Government's repeated assertions regarding the completeness of its disclosures.

**B. The Documentary Record Reflects Missing Grand Jury and Investigative Materials.**

The documentary record likewise demonstrates that additional investigative materials remain unavailable.

Among the most significant omissions are records relating to the Parkinson Grand Jury proceedings.

The Government has acknowledged that portions of those materials are unavailable.

Similarly, documents relating to the Federal Bank investigation referenced in EFTA 00009224—which Petitioner contends bear upon blanket transactional immunity afforded under the Non-

Prosecution Agreement—remain unavailable despite their apparent relevance to the constitutional claims before the Court.

The documentary record further reflects that investigative files maintained by Villafaña for individual Jane Doe witnesses have not been produced in their entirety. See EFTA 00194822, EFTA 00194824, and EFTA 00194826.

Collectively, these omissions materially supplement Petitioner's previously asserted claims by demonstrating that significant investigative records remain unavailable notwithstanding the Government's repeated representations concerning the completeness of discovery.

The subsequently located Grand Jury transcript further reflects the Government's presentation of demonstrative evidence concerning Jeffrey Epstein's properties. EFTA 00008929, lines 1 through 7, reflects questioning concerning photographs represented to the Grand Jury as accurately depicting properties owned by Jeffrey Epstein during the relevant period.

The documentary record now available materially supplements Petitioner's previously asserted claims by indicating that the photographs shown to the Grand Jury did not accurately depict the historical circumstances referenced during that presentation. The Santa Fe photograph depicted improvements that did not exist during the relevant period, while the East 71st Street photograph depicted a property that Jeffrey Epstein did not acquire until 1998. Those historical facts were capable of objective verification from Government records available at the time of the Grand Jury presentation.

Petitioner does not present this document as an independent constitutional claim. Rather, it materially supplements Petitioner's previously asserted Brady, Due Process, and Grand Jury-related claims by demonstrating the continuing importance of the complete Grand Jury record in evaluating the accuracy of the Government's factual presentation.

**C. Litigation Hold Notices and Record Preservation Issues Further Undermine Confidence in the Completeness of the Government's Production.**

The documentary record also contains evidence concerning litigation hold notices and document preservation.

EFTA 00066352 reflects the implementation of litigation hold procedures concerning investigative materials.

The existence of formal preservation directives underscores the significance of the continuing absence of categories of records discussed throughout this Supplement.

The documentary record is further supplemented by evidence concerning materials recovered following the death of Assistant United States Attorney Reiter. EFTA 01249718 reflects that investigative materials were recovered from a private apartment after Reiter's death, raising

additional questions concerning document preservation, chain of custody, and the completeness of the Government's production.

Petitioner does not suggest that every missing record necessarily reflects intentional suppression.

Rather, the cumulative documentary record demonstrates that important investigative materials remained outside the discovery provided to the defense notwithstanding preservation obligations and the Government's continuing representations concerning the completeness of its disclosures.

**D. Discovery Gaps Identified Within the Government's Own Production.**

The documentary record further identifies unexplained gaps within the Government's own production.

Among the most significant is the gap between EFTA 02742044 and EFTA02742183

The existence of sequential numbering separated by an unexplained absence of records materially supplements Petitioner's previously asserted contention that additional responsive documents remain outstanding.

Standing alone, a numerical gap may not establish suppression.

Viewed together with the missing interview memoranda, unavailable Grand Jury materials, incomplete investigative files, undisclosed communications, and the continuing emergence of previously unknown EFTA documents, however, these production gaps materially reinforce Petitioner's submission that the documentary record remains incomplete.

**E. Cumulative Constitutional Significance.**

The constitutional significance of these omissions does not depend upon any single missing memorandum, unavailable investigative file, or numerical gap viewed in isolation.

Rather, EFTA 00191203, EFTA 00009224, EFTA 00194822, EFTA 00194824, EFTA 00194826, EFTA 00066352, EFTA 01249718, the acknowledged absence of interview memoranda, the unavailable Parkinson Grand Jury materials, and the documented production gaps collectively demonstrate that the Government's disclosures remain materially incomplete.

These documents and omissions substantially strengthen Petitioner's previously asserted *Brady*, *Giglio*, *Napue*, and Due Process claims by demonstrating that the constitutional analysis should proceed upon the complete documentary record now available rather than the materially incomplete record that existed when Petitioner's original briefing was filed.

**PART VI**

## THE CUMULATIVE EFFECT OF THE NEWLY DISCLOSED DOCUMENTARY RECORD MATERIALLY STRENGTHENS PETITIONER'S PREVIOUSLY ASSERTED CONSTITUTIONAL CLAIMS

The Government's Opposition repeatedly evaluates individual documents in isolation, characterizing each item as immaterial, cumulative, speculative, or insufficient to establish a constitutional violation. That approach is inconsistent with well-established Supreme Court precedent.

The Supreme Court has repeatedly held that materiality under *Brady* must be assessed cumulatively rather than item by item. The constitutional inquiry is not whether any individual document, viewed in isolation, would probably have altered the verdict. Rather, the question is whether the collective force of all suppressed or unavailable evidence undermines confidence in the outcome of the proceeding.

The documentary record now before the Court materially supplements Petitioner's previously asserted constitutional claims by adding hundreds of contemporaneous Government records that were unavailable during trial, direct appeal, and Petitioner's original post-conviction filings.

The cumulative significance of these documents extends far beyond any individual exhibit.

### A. The Newly Disclosed Record Demonstrates Continuing Department of Justice Knowledge Concerning the Scope of the Non-Prosecution Agreement.

The documentary record now includes substantial contemporaneous evidence demonstrating that multiple components of the Department of Justice participated in, discussed, implemented, or possessed knowledge concerning the Non-Prosecution Agreement.

Those records materially supplement Petitioner's previously asserted contention that the Agreement was never understood within the Department of Justice as merely a localized agreement limited to the Southern District of Florida.

Rather, the documentary record demonstrates continuing Department of Justice participation before execution, continuing implementation after execution, communication among federal districts, and contemporaneous recognition that the Agreement extended protection beyond Jeffrey Epstein himself.

Collectively, those records materially undermine the factual premise underlying the Government's litigation position concerning the intended scope of the Agreement.

### B. The Documentary Record Materially Expands the Impeachment Evidence Available Concerning Government Witnesses.

The newly assembled documentary record likewise materially expands the impeachment evidence available concerning numerous Government witnesses.

The documents discussed throughout this Supplement include contemporaneous prosecutorial assessments of witness credibility, evidence concerning criminal exposure, cooperation incentives, investigative inconsistencies, undisclosed communications, prior investigative history, and additional material bearing upon bias and motive.

Standing alone, any one category of impeachment evidence might be characterized as incremental.

Viewed collectively, however, the documentary record demonstrates that the defense possessed only a fraction of the impeachment information available to the Government before trial.

That cumulative body of impeachment evidence materially supplements Petitioner's previously asserted *Brady*, *Giglio*, and *Napue* claims.

**C. The Documentary Record Demonstrates Continuing Gaps Within the Government's Disclosures.**

The newly assembled EFTA materials likewise demonstrate that the Government's disclosures remain materially incomplete.

Missing interview memoranda, unavailable Grand Jury materials, absent investigative files, undisclosed communications, numerical production gaps, litigation hold records, and the continued emergence of previously unknown contemporaneous documents collectively undermine confidence in the Government's repeated representations that all material evidence had been disclosed.

The continued appearance of previously undisclosed documents is itself significant.

Each newly identified record further demonstrates that Petitioner's constitutional claims have necessarily been litigated upon an incomplete documentary record.

**D. The Constitutional Significance of the Newly Disclosed Record Must Be Evaluated Collectively.**

The Court should therefore evaluate the constitutional significance of the documentary record as a whole.

The documents discussed throughout this Supplement are interconnected.

Evidence bearing upon the scope of the Non-Prosecution Agreement informs the Government's knowledge.

Evidence demonstrating coordination among federal districts informs the scope of the prosecution team's constitutional disclosure obligations.

Evidence bearing upon witness credibility informs the reliability of the verdict.

Evidence concerning missing investigative records informs confidence in the completeness of the Government's disclosures.

Evidence demonstrating continuing investigative coordination informs Petitioner's Due Process claims.

Each category reinforces the others.

Accordingly, the constitutional significance of the newly assembled documentary record is substantially greater than the sum of its individual components.

**E. Cumulative Constitutional Significance.**

When considered collectively, the documentary record discussed throughout this Supplement materially strengthens Petitioner's previously asserted *Brady*, *Giglio*, *Napue*, Due Process, and Non-Prosecution Agreement claims.

Rather than presenting isolated factual disputes, the newly disclosed materials reveal a substantially different contemporaneous understanding of the investigation, the negotiation and implementation of the Non-Prosecution Agreement, the scope of Department of Justice involvement, the credibility of important Government witnesses, the existence of coordinated multi-district investigative activity, and the continuing incompleteness of the Government's disclosures.

For these reasons, Petitioner respectfully submits that the Court should evaluate the constitutional claims already before it against the complete documentary record now available, rather than the materially incomplete record that existed when those claims were originally litigated.

**CONCLUSION**

The documents discussed throughout this Supplement do not present new constitutional theories. Rather, they materially supplement the constitutional claims already before the Court by providing contemporaneous Government records that were unavailable during trial, direct appeal, and Petitioner's original post-conviction proceedings.

Considered individually, many of these documents are significant. Considered collectively, however, they present a materially different evidentiary record from the one previously before this Court.

The newly assembled documentary record demonstrates, among other things:

- continuing Department of Justice participation in the negotiation, implementation, and interpretation of the Non-Prosecution Agreement;
- contemporaneous Government recognition that the Agreement extended beyond Jeffrey Epstein personally;

- coordinated investigative activity among multiple United States Attorney's Offices;
- continuing coordination between prosecutors, investigators, and private attorneys;
- substantial additional impeachment evidence concerning important Government witnesses;
- missing investigative records, undisclosed communications, and continuing gaps in the Government's disclosures; and
- concrete prejudice resulting from the extraordinary delay between the original investigation and Petitioner's prosecution.

None of these matters should be viewed in isolation. The Supreme Court has repeatedly instructed that constitutional materiality must be evaluated cumulatively. The newly disclosed documentary record therefore must be considered as an integrated whole together with the evidence previously presented.

When viewed in that manner, the documentary record materially strengthens Petitioner's previously asserted claims under *Brady v. Maryland*, *Giglio v. United States*, *Napue v. Illinois*, the Due Process Clause, and Petitioner's claims concerning the scope and effect of the Non-Prosecution Agreement.

Accordingly, Petitioner respectfully requests that the Court consider this Supplemental Filing together with the previously filed Amended Petition, deem the newly assembled documentary record incorporated into Petitioner's existing constitutional claims, and grant such further relief as the Court deems just and proper.

Respectfully submitted,

**GHISLAINE MAXWELL**
Petitioner, Pro Se

EPSTEIN – TC AUSA JILL STEINBERG 3-12-09

10 minute call. 2 other prosecutors in AUSA Steinberg's office. They were silent.
Substance:

1. I said the purpose of call was to introduce myself, to let them know that in the past where there was some alignment of interest in regards to the NPA that I had been in touch with Dexter Lee and that if they had any questions about the history of the case that I could answer now or in the future, that I wanted the lines of communication to be open. Response – a polite thanks, but no questions.
2. I said that in the midst of all the pleadings I wanted to note one thing – that despite the media – the NPA was negotiated at arms length, that in 2007 with the hierarchy of the SD Fla including the FA US Atty or representatives of the Criminal Division, and then on two occasions the Office's decision to enter the NPA and its exercise of discretion was approved, the first time in March 2008 following a meeting at DOJ where the Govt was led by Sigal Mandelker and then a second time when the NPA was reviewed at DAG level.
3. I said I had to make a decision when to advise the Court we were exercising our intervention rights. I asked whether from the Govt perspective there was a prospect for resolving the matter by agreement. Response: its too early to **say but that the Petitioners are asking for rescission "regardless of where the Government ends up" so its "likely that we will be in the mix again"**
4. I said that we had carefully researched the issue and felt that the rescission remedy if it was sought would collide with strong constitutional and contractual arguments. Response: **right now we "are focused consistent with J Marra's Order" on "determining a process" to determine remedy and not on any specific positions on what the remedy should be** and that if we wanted to participate in conversations about the process we should consider that in terms of any intervention.
5. I said I would like to keep the door open to a future conversation, was likely to file a notice with the Court at some time and then call again closer in time to the date at which the Party's need to report to the Court Response: we can certainly speak again at that time **reiterating that the Govt is just starting its review and that its premature to even discuss a process much less a proposed remedy.**

**Q Okay. Did you discuss the -- did you have conversations with the DAG -- with Mark Filip about this case?**

A Not to my recollection.

**Q Okay, and we've already talked about the submission that [redacted] made on behalf of your office?**

A Which -- which -- yes, which I thought was a fulsome submission, and included the draft indictment, the NPA. I believe it included the term sheet and other documents.

**Q Did you or anyone else to your knowledge ask ODAG to review or assess the NPA, or approve it?**

A Not to -- before signature, not to my recollection, but it was part of the ultimate review when [redacted] submitted the matter to the deputy, he included the --

**Q It was --**

A -- the agreement.

**Q It was included. Their very brief letter, you remember --**

A Mm-hmm.

**Q -- the letter that [redacted] --**

A Yes.

**Q -- authored, that he authored. Addressed really only the issue of the appropriateness of the case for prosecution in your office. It did not in any way reference**

**EPSTEIN INVESTIGATION TIMELINE**

| Date | To | From | Re: | Exhibit # |
|---|---|---|---|---|
| 5/30/2008 | | | FBI-302 of 5/28/08 Interview of Individual #35 | B-126 |
| 6/2/2008 | Villafaña | Sloman | Draft letter to DAG | B-127 |
| 6/3/2008 | Honorable Mark Filip, DAG | Kenneth Starr | Submission with documents for independent review | |
| 6/3/2008 | Starr/Whitley | John Roth | Letter - 1 page | |
| 6/3/2008 | Honorable Mark Filip, DAG | Sloman | 2nd draft letter to DAG | B-123 |
| 6/3/2008 | | | Draft letter to Deputy Attorney General Mark Filip regarding reasons to approve continued prosecution of J. Epstein | B-128 |
| 6/6/2008 | | | Emails between Marie Villafaña and E. Nesbitt Kuyrkendall and subpoena issued to victim/witness and need for additional subpoenas | B-129 |
| 6/17/2008 | | | Application for 6001 immunity for grand jury witness | B-130 |
| 6/17/2008 | Acosta, Sloman, Senior, Atkinson, Garcia | Villafaña | Email summarizing meeting with Krischer regarding Epstein's attempt to negotiate a new plea deal | 78 |
| 6/18/2008 | Villafaña | Senior | Email regarding call with Roy Black and response that Washington has not made a final decision | |
| 6/18/2008 | | | Emails between A. Marie Villafaña, Robert Senior, Alex Acosta, Jeff Sloman, Rolando Garcia, and Karen Atkinson regarding telephone conference with Roy Black about allowing J. Epstein to accept state plea to 60 days' imprisonment | 68 |
| 6/18/2008 | | | Notes from call to Brad Edwards, counsel for #43, and notes from message to Roy Black and message from Roy Black | B-43 |
| 6/19/2008 | Barry Krischer; Karen Atkinson | Villafaña | Email re wrapping up the case | 68 |

**EPSTEIN INVESTIGATION TIMELINE**

| Date | To | From | Re: | Exhibit # |
|---|---|---|---|---|
| 7/19/2008 | | | Emails with other AUSAs in other districts and documents regarding disclosing identifying information about victims | |
| 7/21/2008 | Goldberger | Villafaña | Letter with 11 additional victim notification letters | |
| 7/21/2008 | Villafaña | Goldberger | Letter with attached Motion for Return of Property | |
| 7/21/2008 | Villafaña | Kuyrkendall | Email with list of victims that Twiler still needs to make contact with | B-69 |
| 7/21/2008 | Villafaña | Tein | Letter in response to 7/17/08 letter from Villafaña | |
| 7/21/2008 | | | Victim Notification letters to Individuals #1, #2, #4, #13, #9, #14, #21, #23, #30, #32, and #38 | B-70 |
| 7/21/2008 | Villafaña; cc: Senior | Sloman | Email response to Villafaña's 7/21/08 email regarding Motion for Return of Property in State Court | |
| 7/22/2008 | Villafaña | Kuyrkendall | Email chain regarding victim addresses | |
| 7/22/2008 | | | Emails between A. M. Villafaña, A. Acosta, J. Sloman, R. Senior, K. Atkinson, E. Nesbitt Kuyrkendall, and J. Richards regarding 7/21/2008 letter from M. Tein announcing plan to stay the civil suits against J. Epstein and notification that B. Reinhart is counesl of record for [redacted] in civil suits | |
| 7/23/2008 | | | Emails between A. M. Villafaña and D. Lee regarding correspondence with counsel for J. Epstein and notice of breach | |
| 7/25/2008 | | | Emails between A. M. Villafaña and K. Atkinson regarding extension of grand jury to allow for continued representation of J. Epstein case | |
| 7/30/2008 | Villafaña | Atkinson | Email regarding contact with Roy Black | |
| 7/30/2008 | Villafaña | Roy Black | Email chain regarding call relating to the performance of the criminal Non-Prosecution Agreement | |
| 8/1/2008 | Lee, Acosta; cc: Villafaña, Jacobus, Senior | Sloman | Email chain regarding Jane Doe litigation | |
| 8/2/2008 | Lee, Villafaña | Acosta | Email re: Letter from Brad Edwards | |
| 8/5/2008 | A. Acosta, J. Sloman, R. Senior, and K. Atkinson | A. Marie Villafaña | Email regarding analysis of Jeffrey Epstein agreement, with attached 6/24/2008 email from A. M. Villafaña to R. Black and J. Goldberger and attached Epstein agreement | B-71 |

12. In August 2007, in a clear attempt to coerce a state settlement, Ms. Villafana threatened

to broaden the investigation to include a money laundering violation (18 U.S.C. § 1956), though all the funds expended were simply Mr. Epstein's, and a violation for operating an unlicensed money-transmitting business (18 U.S.C. § 1960), though Mr. Epstein never had such a business. See Tab 22, August 31, 2007 Letter from M. Villafana to Ross (reciting, in a target letter to one of Epstein's employees, that the investigation concerns "suspected violations of federal law, including but not limited to, possible violations of Title 18, United States Code, Sections . . . 1591, . . . 1956, 1960 . . . .") (emphasis added).

13. On the very same day that the grand jury issued subpoenas to the records-custodian and employees of Epstein's businesses for all financial transactions from 2003 forward, Ms. Villafana (who we were told was not authorized to act in this regard without supervisory approval) promised to close the money-laundering investigation "if the sex offense case is resolved." See Tab 23, August 16, 2007 Letter from M. Villafana to G. Lefcourt ("In other words, if the sex offense case is resolved, the Office would close its investigation into other areas as well. The matter has not been, and it does not appear that it will be, resolved so the money laundering investigation continues, and Request Number 6 [seeking records of every financial transaction conducted by Epstein and his six businesses from "January 1, 2003 to the present"] will not be withdrawn.").

14. Two weeks later, when Mr. Epstein continued to oppose federal prosecution during negotiations and Mr. Epstein's counsel sought a meeting with the United States Attorney, AUSA Villafana then classified all of Mr. Epstein's assistants as targets (sending a target letter to one of them and promising the attorney of the other two that additional target letters would be served on them as well), dispatched FBI agents to the homes of two of his secretaries, and personally telephoned Mr. Epstein's largest business client to advise him of the nature of the investigation. See Tab 22, August 31, 2007 Letter from M. Villafana to

FAUSA Sloman Forces Mr. Epstein's Lawyers to Convince the State Prosecutors To Impose a More Severe Sentence Than They Believe Is Appropriate

15. Throughout the plea negotiations with the USAO, Mr. Sloman and Ms. Villafana continually insisted that the only way they would agree not to bring a federal indictment was if Epstein's lawyers, not the state prosecutors as required under the Petite Policy, convinced the state prosecutors to impose a more severe punishment than the state believed was appropriate under the circumstances.

16. FAUSA Sloman's version of the history with respect to the sentence he required Mr. Epstein's lawyers to seek from the State contradicts his later assertion, which is patently false—that "the SDFL indicated a willingness to defer to the State the length of incarceration" and "considered a plea to federal charges that limited Epstein's sentencing exposure . .. " See Tab 1, May 19, 2008 Letter from J. Sloman. In fact, by a email dated August 3, 2007, Criminal Division Chief Matthew Menchel advised the defense that the federal government required a minimum term of two years of incarceration. See Tab 40, August 3, 2007 Email from M. Menchel. Subsequently, Ms.




Villafana emailed the defense stating that United States Attorney Acosta would accept no less than 18 months of incarceration, following by a one-year term of house arrest.

Federal Prosecutors Misrepresented the Number of Alleged "Victims."

Ln 5.

provided a draft of the proposed victim notification letter to counsel for Epstein (Exhibit B-56). I was concerned that Epstein and his counsel were again creating a potential problem. USA Acosta had taken the position that the final NPA consisted of three documents – the 9/24/2007 NPA, the 10/29/2007 Addendum, and the 12/19/07 letter from USA Acosta to Lilly Ann Sanchez. I prepared victim notifications (and, later, a Declaration in the *Jane Doe* litigation) based upon this understanding. When Epstein entered his guilty plea, Judge McSorley required him to file his federal Non-Prosecution Agreement with the Court since that formed part of the consideration for the state plea. I wanted to confirm that Epstein was taking a consistent position with the State Attorney's Office, Judge McSorley, and the USAO, so I asked for a copy of what was filed in the State Court. This led to multiple letters with counsel for Epstein before I could finalize the victim notification letters (Exhibits B-57 through B-65). On July 9, 2008, I finally sent the first two victim notification letters to two of Brad Edwards' clients, Individuals 35 and 43 (Exhibit B-66). Whenever I sent a victim notification letter, a redacted version of the letter also was sent to Jack Goldberger, counsel for Jeffrey Epstein. I was not authorized to send a victim notification letter to Individual # 28 or to include her on the list of persons provided to Epstein because she was not a person that the Office was prepared to name in an indictment.[42]

On July 10, 2008, I sent victim notification letters to a number of other represented victims, Individuals 3, 8, 17, 25, 26, 37, and 44 (Exhibit B-67). The FBI also asked for some assistance of language to use in its own victim notifications (Exhibit B-68), and I was waiting for contact information for the unrepresented victims (Exhibit B-69). On July 21, 2008, I sent victim notification letters to a group of unrepresented victims, Individuals 1, 2, 4, 9, 13, 14, 21, 23, 30, 32, and 38 (Exhibit B-70). There were some unrepresented victims who did not receive notification letters on July 21, 2008 because the FBI had not been able to confirm mailing addresses by that time – Individuals 10, 11, 16, 18, 20, 24, 31, 33, 36, 39, 40, and 42.

In August 2008, the issue of "which version of the NPA controls" finally came to a head. On August 5, 2008, in the context of a Notice of Breach, I pressed my Office to clarify the issue (Exhibit B-71). The decision was made to require Epstein to elect either the 12/19/07 letter or not, but to make it clear in writing (Exhibits B-73 through B-82). On August 15, 2008, I wrote to Roy Black and Jay Lefkowitz confirming their position that the final agreement consisted only of the NPA and Addendum (Exhibit B-83). By discarding USA Acosta's December 2007 modification, the original terms providing for the attorney representative for the victims came back into effect, and the victim notification letters for the unrepresented victims were even more important. Mr. Lefkowitz responded on August 18, 2008 with "objections" in advance to the language of the victim notifications (Exhibit B-84). On August 21, 2008, I responded to Mr. Lefkowitz with a draft victim notification letter corresponding to the language contained in the NPA and Addendum and noted the importance of promptly providing corrected information to the victims (Exhibit B-85). The following day, Mr. Lefkowitz sent a letter with indeterminate objections to the letter (Exhibit B-86). I responded by pointing out that the language in the victim notification letter was taken verbatim from the NPA and Addendum (Exhibit B-87).

On September 2, 2008, Mr. Lefkowitz finally confirmed that Mr. Goldberger would be the designated recipient for victim notifications and that Mr. Epstein would pay the attorney representative's fees (Exhibit B-88). I immediately started distributing victim notification letters.

---

[42] That decision was made by USA Acosta and/or FAUSA [redacted]. I do not know which.

criminal charges against any potential co-conspirators of Epstein, including but not limited to [redacted], [redacted], Lesley Groff, or [redacted]" (Exhibit 52 at 5). To the extent that there was a "criminal organization," the Office and the investigators considered Epstein to be the head of that organization. He was certainly the most culpable individual, and we did not foresee any scenario where we would defer prosecution against Epstein but proceed to prosecute his subordinates. Also, while the agreement included the language "including but not limited to," at the time that the NPA was signed, with the possible exception of Ghislaine Maxwell, the investigation had not disclosed any co-conspirators other than those listed.

I recall that there was extensive discussion of Lefkowitz's proposed immigration language, but I do not recall much discussion of this language for the reasons stated above.

**d. the October 2007 addendum, including its purpose.**

During the negotiation of the NPA, I had been admitted to the hospital for surgery. After the surgery, I returned to the office almost immediately to try to complete the negotiations. When the NPA was signed, I sought permission to take a leave of absence to address my health concerns. While I was away, the Addendum was negotiated. While I conducted some of the drafting, I believe that FAUSA [redacted] handled the bulk of the negotiations and drafting.

My understanding was that the USAO wanted to formally assign its right to select the attorney representative for the victims to a Special Master. The NPA stated that the USAO would select the attorney representative in consultation with and subject to the good faith approval of Epstein's counsel. I had provided Epstein's counsel with a list of attorneys, none of whom I had ever met, that I had culled from consulting with one of the district judges[24] and some AUSAs, including Mr. [redacted], who I was dating at the time. After getting that list of names, I did my own research to determine who would be good fits for the type of litigation that I expected they would face – both in terms of the tactics of Epstein's lawyers and the special challenges of dealing with emotionally fragile victims. I provided that culled list to Jay Lefkowitz and disclosed that, although I had no financial interest, the list included a friend of a good friend of mine (I did not describe Mr. [redacted] as my "boyfriend"). Even with that disclosure, Mr. Lefkowitz selected Mr. [redacted] friend. Before the matter went any further, FAUSA [redacted] decided that the Office should use a Special Master to make the selection, rather than pick anyone – even a panel of attorneys leaving the final selection to Epstein's counsel. Despite that, Mr. Lefkowitz and Guy Lewis – who knew both Mr. [redacted] and his friend – claimed that there was a financial interest and that I had tried to create the procedure for financial gain.[25]

---

[24] Epstein's lawyers suggested that I had *ex parte* communications with a judge. I simply asked for recommendations from a judge that I was friendly with; I did not disclose anything about the background of the case.

[25] Mr. Lewis knew that Mr. [redacted] also was an [redacted] and, therefore, was not partners with another lawyer. When that was patently obvious, Epstein's lawyers falsely claimed that they were "law school roommates." Both had graduated from law school more than fifteen years before, and had not been roommates. Ironically, one of the reasons why Epstein's legal team approved the selection of Robert Josefsberg was that Josefsberg and Alan Dershowitz were law school classmates – somehow there was no "financial interest" attributed to them.

**EPSTEIN INVESTIGATION TIMELINE**

| Date | To | From | Re: | Exhibit # |
|---|---|---|---|---|
| 8/15/2008 | Acosta, Villafaña, Sloman, Lee, Atkinson | Senior | Email questioning whether offer should be withdrawn as opposed to considering it a nullity | B-81 |
| 8/15/2008 | | | Email chain between Villafaña, Acosta, Sloman, Senior, Atkinson, and Lee re draft response to 8/15/2008 email from Jay Lefkowitz regarding implementation of the NPA | B-82 |
| 8/15/2008 | Lefkowitz and Black | Villafaña | Letter re terms of NPA | B-83 |
| 8/15/2008 | Villafaña, cc: Atkinson | Lefkowitz | Email re Follow up point with attached emails from 8/14/08 | |
| 8/18/2008 | Villafaña | Lefkowitz | Letter re restitution | B-84 |
| 8/21/2008 | Lefkowitz and Black | Villafaña | Letter re Special Master and draft Notification of Identified Victim | B-85 |
| 8/22/2008 | Villafaña | Lefkowitz | Letter re misstatements in 8/21/08 Villafaña letter | B-86 |
| 8/22/2008 | | | Draft Victim Notification letter to Michael E. Dutko re Individual #37 | |
| 8/25/2008 | | | Emails between A. M. Villafaña, A. Acosta, J. Sloman, R. Senior, K. Atkinson, and D. Lee regarding letter received from J. Lefkowitz | |
| 8/26/2008 | Lefkowitz and Black | Villafaña | Letter re victim's list | B-87 |
| 8/26/2008 | Villafaña, cc: Acosta, Senior | Sloman | Email regarding changes to letter to Jay | |
| 9/2/2008 | Villafaña | Lefkowitz | Letter agreeing that Goldberger should be listed as the contact person and re Josfsberg's fees | B-88 |
| 9/2/2008 | | | Emails between A. M. Villafaña, D. Lee, R. Senior, and J. Sloman regarding revised victim notification | |

justice.gov



**[redacted] just got off the phone with you, and then he furnishes a revised paragraph one, which suggests -- I mean, I infer from that that shortly after the breakfast, you had a phone conversation with [redacted] about a revision to this paragraph, and that -- that that was likely something that you talked to him about. Again, I'm not --**

A Right.

**Q -- suggesting that this --**

A Again, I -- I don't -- I don't recall the breakfast, so I can't say one way or the other. I -- I take -- I take your point. I don't recall seeing this.

**Q All right. Well, it was --**

A But --

**Q -- you were copied on it. Okay. All right. [redacted], you wanted to --**

BY MR. [redacted]:

**Q I just wanted to point to Exhibit 30.**

A Can -- can we back up a second?

MS. [redacted]: Sure.

THE WITNESS [redacted], I'm not sure whether your concerns are -- so, I would -- I would only raise the question where -- or, the point where, based on this, and I don't recall, so I can't speak, but [redacted] is saying, Jay suggests revision has been rejected. Here is our latest, [redacted].

EPSTEIN – TC AUSA JILL STEINBERG 3-12-09

10 minute call. 2 other prosecutors in AUSA Steinberg's office. They were silent.

Substance:

1. I said the purpose of call was to introduce myself, to let them know that in the past where there was some alignment of interest in regards to the NPA that I had been in touch with Dexter Lee and that if they had any questions about the history of the case that I could answer now or in the future, that I wanted the lines of communication to be open. Response – a polite thanks, but no questions.
2. I said that in the midst of all the pleadings I wanted to note one thing – that despite the media – the NPA was negotiated at arms length, that in 2007 with the hierarchy of the SD Fla including the FA US Atty or representatives of the Criminal Division, and then on two occasions the Office's decision to enter the NPA and its exercise of discretion was approved, the first time in March 2008 following a meeting at DOJ where the Govt was led by Sigal Mandelker and then a second time when the NPA was reviewed at DAG level.
3. I said I had to make a decision when to advise the Court we were exercising our intervention rights. I asked whether from the Govt perspective there was a prospect for resolving the matter by agreement. Response: its too early to **say but that the Petitioners are asking for rescission "regardless of where the Government ends up" so its "likely that we will be in the mix again"**
4. I said that we had carefully researched the issue and felt that the rescission remedy if it was sought would collide with strong constitutional and contractual arguments. Response: **right now we "are focused consistent with J Marra's Order" on "determining a process" to determine remedy and not on any specific positions on what the remedy should be** and that if we wanted to participate in conversations about the process we should consider that in terms of any intervention.
5. I said I would like to keep the door open to a future conversation, was likely to file a notice with the Court at some time and then call again closer in time to the date at which the Party's need to report to the Court Response: we can certainly speak again at that time **reiterating that the Govt is just starting its review and that its premature to even discuss a process much less a proposed remedy.**

**Q -- and in particular, [redacted] --**

A Right.

**Q -- would you -- do you -- do you have a -- did -- did anyone in that ground, including [redacted] Lourie, in any way to your recollection characterize this case as not serious, or as trivial, or as involving non-important -- unimportant victims? In any way try to diminish either the conduct or the victims?**

A Not to my recollection. I -- I do think there was a concern as to how the victims would present in court, given impeachment, and given contradictory statements, but that's different than trivializing the case.

**Q All right. Okay. Back to the immunity provision. Were you aware that none of the four named coconspirators had cooperated?**

A I was not. To my recollection.

**Q And do you recall any other case in which blanket immunity in the U.S. Attorney's Office --**

A Right.

**Q -- was -- in which blanket immunity, really without -- virtually without limitation --**

A I -- so, I --

**Q -- was granted?**

A I don't recall discussion around this provision, and a general matter, I did not discuss the -- in typical

A I -- I don't recall focusing on the coconspirator provision. To the extent I reviewed this coconspirator provision, I can speculate that my thinking would have been the focus is on Epstein's -- Epstein's going to jail. Whether some of his employees go to jail, or other, lesser involved, is not the focus of this.

**Q All right. This particular provision, as you know, has been --**

A It has --

**Q -- enormously --**

A -- generated --

**Q -- criticized.**

A Enormous, yes.

**Q For a number of reasons. One of which is that it is blanket transactional immunity. It gives blanket immunity to unnamed, unidentified --**

A Yes.

**Q -- potential coconspirators. People who, even in the future, if evidence is developed against them, as long as they could be considered coconspirators of Epstein in this conduct, they have a get out of jail free card. Do you have any idea where that came from?**

A I don't, and I don't want to characterize it as giving -- I understand how it could be read that way in the record. I don't want to characterize it, but I don't know

criminal charges against any potential co-conspirators of Epstein, including but not limited to [redacted], [redacted], Lesley Groff, or [redacted]" (Exhibit 52 at 5). To the extent that there was a "criminal organization," the Office and the investigators considered Epstein to be the head of that organization. He was certainly the most culpable individual, and we did not foresee any scenario where we would defer prosecution against Epstein but proceed to prosecute his subordinates. Also, while the agreement included the language "including but not limited to," at the time that the NPA was signed, with the possible exception of Ghislaine Maxwell, the investigation had not disclosed any co-conspirators other than those listed.

I recall that there was extensive discussion of Lefkowitz's proposed immigration language, but I do not recall much discussion of this language for the reasons stated above.

**d. the October 2007 addendum, including its purpose.**

During the negotiation of the NPA, I had been admitted to the hospital for surgery. After the surgery, I returned to the office almost immediately to try to complete the negotiations. When the NPA was signed, I sought permission to take a leave of absence to address my health concerns. While I was away, the Addendum was negotiated. While I conducted some of the drafting, I believe that FAUSA [redacted] handled the bulk of the negotiations and drafting.

My understanding was that the USAO wanted to formally assign its right to select the attorney representative for the victims to a Special Master. The NPA stated that the USAO would select the attorney representative in consultation with and subject to the good faith approval of Epstein's counsel. I had provided Epstein's counsel with a list of attorneys, none of whom I had ever met, that I had culled from consulting with one of the district judges[24] and some AUSAs, including Mr. [redacted], who I was dating at the time. After getting that list of names, I did my own research to determine who would be good fits for the type of litigation that I expected they would face – both in terms of the tactics of Epstein's lawyers and the special challenges of dealing with emotionally fragile victims. I provided that culled list to Jay Lefkowitz and disclosed that, although I had no financial interest, the list included a friend of a good friend of mine (I did not describe Mr. [redacted] as my "boyfriend"). Even with that disclosure, Mr. Lefkowitz selected Mr. [redacted] friend. Before the matter went any further, FAUSA [redacted] decided that the Office should use a Special Master to make the selection, rather than pick anyone – even a panel of attorneys leaving the final selection to Epstein's counsel. Despite that, Mr. Lefkowitz and Guy Lewis – who knew both Mr. [redacted] and his friend – claimed that there was a financial interest and that I had tried to create the procedure for financial gain.[25]

---

[24] Epstein's lawyers suggested that I had *ex parte* communications with a judge. I simply asked for recommendations from a judge that I was friendly with; I did not disclose anything about the background of the case.

[25] Mr. Lewis knew that Mr. [redacted] also was an [redacted] and, therefore, was not partners with another lawyer. When that was patently obvious, Epstein's lawyers falsely claimed that they were "law school roommates." Both had graduated from law school more than fifteen years before, and had not been roommates. Ironically, one of the reasons why Epstein's legal team approved the selection of Robert Josefsberg was that Josefsberg and Alan Dershowitz were law school classmates – somehow there was no "financial interest" attributed to them.

EPSTEIN – TC AUSA JILL STEINBERG 3-12-09

10 minute call. 2 other prosecutors in AUSA Steinberg's office. They were silent.

Substance:

1. I said the purpose of call was to introduce myself, to let them know that in the past where there was some alignment of interest in regards to the NPA that I had been in touch with Dexter Lee and that if they had any questions about the history of the case that I could answer now or in the future, that I wanted the lines of communication to be open. Response – a polite thanks, but no questions.
2. I said that in the midst of all the pleadings I wanted to note one thing – that despite the media – the NPA was negotiated at arms length, that in 2007 with the hierarchy of the SD Fla including the FA US Atty or representatives of the Criminal Division, and then on two occasions the Office's decision to enter the NPA and its exercise of discretion was approved, the first time in March 2008 following a meeting at DOJ where the Govt was led by Sigal Mandelker and then a second time when the NPA was reviewed at DAG level.
3. I said I had to make a decision when to advise the Court we were exercising our intervention rights. I asked whether from the Govt perspective there was a prospect for resolving the matter by agreement. Response: its too early to **say but that the Petitioners are asking for rescission "regardless of where the Government ends up" so its "likely that we will be in the mix again"**
4. I said that we had carefully researched the issue and felt that the rescission remedy if it was sought would collide with strong constitutional and contractual arguments. Response: **right now we "are focused consistent with J Marra's Order" on "determining a process" to determine remedy and not on any specific positions on what the remedy should be** and that if we wanted to participate in conversations about the process we should consider that in terms of any intervention.
5. I said I would like to keep the door open to a future conversation, was likely to file a notice with the Court at some time and then call again closer in time to the date at which the Party's need to report to the Court Response: we can certainly speak again at that time **reiterating that the Govt is just starting its review and that its premature to even discuss a process much less a proposed remedy.**

**Q Okay. Did you discuss the -- did you have conversations with the DAG -- with Mark Filip about this case?**

A Not to my recollection.

**Q Okay, and we've already talked about the submission that [redacted] made on behalf of your office?**

A Which -- which -- yes, which I thought was a fulsome submission, and included the draft indictment, the NPA. I believe it included the term sheet and other documents.

**Q Did you or anyone else to your knowledge ask ODAG to review or assess the NPA, or approve it?**

A Not to -- before signature, not to my recollection, but it was part of the ultimate review when [redacted] submitted the matter to the deputy, he included the --

**Q It was --**

A -- the agreement.

**Q It was included. Their very brief letter, you remember --**

A Mm-hmm.

**Q -- the letter that [redacted] --**

A Yes.

**Q -- authored, that he authored. Addressed really only the issue of the appropriateness of the case for prosecution in your office. It did not in any way reference**

12. In August 2007, in a clear attempt to coerce a state settlement, Ms. Villafana threatened to broaden the investigation to include a money laundering violation (18 U.S.C. § 1956), though all the funds expended were simply Mr. Epstein's, and a violation for operating an unlicensed money-transmitting business (18 U.S.C. § 1960), though Mr. Epstein never had such a business. See Tab 22, August 31, 2007 Letter from M. Villafana to Ross (reciting, in a target letter to one of Epstein's employees, that the investigation concerns "suspected violations of federal law, including but not limited to, possible violations of Title 18, United States Code, Sections . . . 1591, . . . 1956, 1960 . . . .") (emphasis added).

13. On the very same day that the grand jury issued subpoenas to the records-custodian and employees of Epstein's businesses for all financial transactions from 2003 forward, Ms. Villafana (who we were told was not authorized to act in this regard without supervisory approval) promised to close the money-laundering investigation "if the sex offense case is resolved." See Tab 23, August 16, 2007 Letter from M. Villafana to G. Lefcourt ("In other words, if the sex offense case is resolved, the Office would close its investigation into other areas as well. The matter has not been, and it does not appear that it will be, resolved so the money laundering investigation continues, and Request Number 6 [seeking records of every financial transaction conducted by Epstein and his six businesses from "January 1, 2003 to the present"] will not be withdrawn.").

14. Two weeks later, when Mr. Epstein continued to oppose federal prosecution during negotiations and Mr. Epstein's counsel sought a meeting with the United States Attorney, AUSA Villafana then classified all of Mr. Epstein's assistants as targets (sending a target letter to one of them and promising the attorney of the other two that additional target letters would be served on them as well), dispatched FBI agents to the homes of two of his secretaries, and personally telephoned Mr. Epstein's largest business client to advise him of the nature of the investigation. See Tab 22, August 31, 2007 Letter from M. Villafana to

FAUSA Sloman Forces Mr. Epstein's Lawyers to Convince the State Prosecutors To Impose a More Severe Sentence Than They Believe Is Appropriate

15. Throughout the plea negotiations with the USAO, Mr. Sloman and Ms. Villafana continually insisted that the only way they would agree not to bring a federal indictment was if Epstein's lawyers, not the state prosecutors as required under the Petite Policy, convinced the state prosecutors to impose a more severe punishment than the state believed was appropriate under the circumstances.

16. FAUSA Sloman's version of the history with respect to the sentence he required Mr. Epstein's lawyers to seek from the State contradicts his later assertion, which is patently false—that "the SDFL indicated a willingness to defer to the State the length of incarceration" and "considered a plea to federal charges that limited Epstein's sentencing exposure . .. " See Tab 1, May 19, 2008 Letter from J. Sloman. In fact, by a email dated August 3, 2007, Criminal Division Chief Matthew Menchel advised the defense that the federal government required a minimum term of two years of incarceration. See Tab 40, August 3, 2007 Email from M. Menchel. Subsequently, Ms.




Villafana emailed the defense stating that United States Attorney Acosta would accept no less than 18 months of incarceration, following by a one-year term of house arrest.

Federal Prosecutors Misrepresented the Number of Alleged "Victims."

justice.gov



**[redacted] just got off the phone with you, and then he furnishes a revised paragraph one, which suggests -- I mean, I infer from that that shortly after the breakfast, you had a phone conversation with [redacted] about a revision to this paragraph, and that -- that that was likely something that you talked to him about. Again, I'm not --**

A Right.

**Q -- suggesting that this --**

A Again, I -- I don't -- I don't recall the breakfast, so I can't say one way or the other. I -- I take -- I take your point. I don't recall seeing this.

**Q All right. Well, it was --**

A But --

**Q -- you were copied on it. Okay. All right. [redacted], you wanted to --**

BY MR. [redacted]:

**Q I just wanted to point to Exhibit 30.**

A Can -- can we back up a second?

MS. [redacted]: Sure.

THE WITNESS [redacted], I'm not sure whether your concerns are -- so, I would -- I would only raise the question where -- or, the point where, based on this, and I don't recall, so I can't speak, but [redacted] is saying, Jay suggests revision has been rejected. Here is our latest, [redacted].

Q -- and in particular, [redacted] --
A Right.
Q -- would you -- do you -- do you have a -- did -- did anyone in that ground, including [redacted] Lourie, in any way to your recollection characterize this case as not serious, or as trivial, or as involving non-important -- unimportant victims? In any way try to diminish either the conduct or the victims?
A Not to my recollection. I -- I do think there was a concern as to how the victims would present in court, given impeachment, and given contradictory statements, but that's different than trivializing the case.
Q All right. Okay. Back to the immunity provision. Were you aware that none of the four named coconspirators had cooperated?
A I was not. To my recollection.
Q And do you recall any other case in which blanket immunity in the U.S. Attorney's Office --
A Right.
Q -- was -- in which blanket immunity, really without -- virtually without limitation --
A I -- so, I --
Q -- was granted?
A I don't recall discussion around this provision, and a general matter, I did not discuss the -- in typical

A I -- I don't recall focusing on the coconspirator provision. To the extent I reviewed this coconspirator provision, I can speculate that my thinking would have been the focus is on Epstein's -- Epstein's going to jail. Whether some of his employees go to jail, or other, lesser involved, is not the focus of this.

**Q All right. This particular provision, as you know, has been --**

A It has --

**Q -- enormously --**

A -- generated --

**Q -- criticized.**

A Enormous, yes.

**Q For a number of reasons. One of which is that it is blanket transactional immunity. It gives blanket immunity to unnamed, unidentified --**

A Yes.

**Q -- potential coconspirators. People who, even in the future, if evidence is developed against them, as long as they could be considered coconspirators of Epstein in this conduct, they have a get out of jail free card. Do you have any idea where that came from?**

A I don't, and I don't want to characterize it as giving -- I understand how it could be read that way in the record. I don't want to characterize it, but I don't know

criminal charges against any potential co-conspirators of Epstein, including but not limited to [redacted], [redacted], Lesley Groff, or [redacted]" (Exhibit 52 at 5). To the extent that there was a "criminal organization," the Office and the investigators considered Epstein to be the head of that organization. He was certainly the most culpable individual, and we did not foresee any scenario where we would defer prosecution against Epstein but proceed to prosecute his subordinates. Also, while the agreement included the language "including but not limited to," at the time that the NPA was signed, with the possible exception of Ghislaine Maxwell, the investigation had not disclosed any co-conspirators other than those listed.

I recall that there was extensive discussion of Lefkowitz's proposed immigration language, but I do not recall much discussion of this language for the reasons stated above.

**d. the October 2007 addendum, including its purpose.**

During the negotiation of the NPA, I had been admitted to the hospital for surgery. After the surgery, I returned to the office almost immediately to try to complete the negotiations. When the NPA was signed, I sought permission to take a leave of absence to address my health concerns. While I was away, the Addendum was negotiated. While I conducted some of the drafting, I believe that FAUSA [redacted] handled the bulk of the negotiations and drafting.

My understanding was that the USAO wanted to formally assign its right to select the attorney representative for the victims to a Special Master. The NPA stated that the USAO would select the attorney representative in consultation with and subject to the good faith approval of Epstein's counsel. I had provided Epstein's counsel with a list of attorneys, none of whom I had ever met, that I had culled from consulting with one of the district judges[24] and some AUSAs, including Mr. [redacted], who I was dating at the time. After getting that list of names, I did my own research to determine who would be good fits for the type of litigation that I expected they would face – both in terms of the tactics of Epstein's lawyers and the special challenges of dealing with emotionally fragile victims. I provided that culled list to Jay Lefkowitz and disclosed that, although I had no financial interest, the list included a friend of a good friend of mine (I did not describe Mr. [redacted] as my "boyfriend"). Even with that disclosure, Mr. Lefkowitz selected Mr. [redacted] friend. Before the matter went any further, FAUSA [redacted] decided that the Office should use a Special Master to make the selection, rather than pick anyone – even a panel of attorneys leaving the final selection to Epstein's counsel. Despite that, Mr. Lefkowitz and Guy Lewis – who knew both Mr. [redacted] and his friend – claimed that there was a financial interest and that I had tried to create the procedure for financial gain.[25]

---

[24] Epstein's lawyers suggested that I had *ex parte* communications with a judge. I simply asked for recommendations from a judge that I was friendly with; I did not disclose anything about the background of the case.

[25] Mr. Lewis knew that Mr. [redacted] also was an [redacted] and, therefore, was not partners with another lawyer. When that was patently obvious, Epstein's lawyers falsely claimed that they were "law school roommates." Both had graduated from law school more than fifteen years before, and had not been roommates. Ironically, one of the reasons why Epstein's legal team approved the selection of Robert Josefsberg was that Josefsberg and Alan Dershowitz were law school classmates – somehow there was no "financial interest" attributed to them.

massaging an old guy. [redacted] agreed, and [redacted] brought [redacted] do Epstein's house. [redacted] recalled that [redacted] was about 15 years old when she first went to Epstein's. [redacted] subsequently went with [redacted] to Epstein's house on multiple occasions so she could massage him. [redacted] recalled [redacted] taking taxis to and from Epstein's home. He also received phone calls from people who worked for Epstein, including a woman named [redacted] asking to schedule appointments with [redacted] At times, [redacted] heard on the phone that Epstein was not in town but was coming on a certain day. [redacted] met Epstein once in Epstein's driveway, and [redacted] recalls that [redacted] brought several friends to massage Epstein as well. [redacted] mentioned meeting and interacting with someone named Maxwell at Epstein's house. He believed Maxwell was supposed to tell [redacted] what to do during the massages. [redacted] did not tell [redacted] she did during the massages, but he suspected there was likely something more than just massage going on. [redacted] encouraged [redacted] to go to Epstein's house because she made so much money there, which they would use to buy drugs. When [redacted] turned 16, Epstein bought her Incubus tickets. [redacted] also recalled that Epstein had sent [redacted] lingerie from Paris. [redacted] recalled [redacted] saying she was asked to bring other girls, and [redacted] witnessed [redacted] bringing other girls to Epstein's house to provide massages, including girls named [redacted][15] [redacted] recalled that [redacted] once brought another girl who was 19 years old, but [redacted] was told by [redacted] that the 19-year-old could not go back because she was too old. [redacted] believes [redacted] stopped providing massages to Epstein after she gave birth to their son when she was [redacted]. [redacted] and [redacted] broke up when [redacted] was less than one year old.

Photographs from Epstein's Palm Beach residence taken during the Palm Beach Police Department's 2005 search of the residence confirm [redacted] description of the residence, including the massage room. Message pads seized during that same search contain nine entries from between 2003 and 2005 with [redacted] name and phone number, confirming that [redacted] went to Epstein's Palm Beach residence during that time. Those message pads are limited to the 2003 to 2005 time period because those were the only pads in the house when the search was conducted in October 2005.

We have identified one FedEx invoice dated [redacted], which was obtained during the Florida investigation, for a package that was addressed to [redacted] residence in Palm Beach. The return address is a business address for Epstein in Manhattan. The FBI has confirmed that FedEx no longer has records dating back to 2001-2005, so we are unable to obtain additional FedEx records.

---

[15] The FBI has identified this individual as [redacted]. Our team interviewed [redacted] by WebEx on February 24, 2021. During that interview, [redacted] confirmed that [redacted] recruited her to massage Epstein when [redacted] was about 13 years old, and [redacted] specifically recalled that Maxwell paid both [redacted] and [redacted] on [redacted] first visit to the residence. [redacted] impression based on the conversation she witnessed was that Maxwell already knew [redacted] We were unable to fully debrief [redacted] during that first interview, and we have repeatedly attempted to schedule follow-up interviews, but [redacted] is [redacted] difficult to contact. The FBI plans to travel to [redacted] where [redacted] is currently located, and attempt to connect with her in person. [redacted]

2021.01.26

criminal charges against any potential co-conspirators of Epstein, including but not limited to [redacted], [redacted], Lesley Groff, or [redacted]" (Exhibit 52 at 5). To the extent that there was a "criminal organization," the Office and the investigators considered Epstein to be the head of that organization. He was certainly the most culpable individual, and we did not foresee any scenario where we would defer prosecution against Epstein but proceed to prosecute his subordinates. Also, while the agreement included the language "including but not limited to," at the time that the NPA was signed, with the possible exception of Ghislaine Maxwell, the investigation had not disclosed any co-conspirators other than those listed.

I recall that there was extensive discussion of Lefkowitz's proposed immigration language, but I do not recall much discussion of this language for the reasons stated above.

**d. the October 2007 addendum, including its purpose.**

During the negotiation of the NPA, I had been admitted to the hospital for surgery. After the surgery, I returned to the office almost immediately to try to complete the negotiations. When the NPA was signed, I sought permission to take a leave of absence to address my health concerns. While I was away, the Addendum was negotiated. While I conducted some of the drafting, I believe that FAUSA [redacted] handled the bulk of the negotiations and drafting.

My understanding was that the USAO wanted to formally assign its right to select the attorney representative for the victims to a Special Master. The NPA stated that the USAO would select the attorney representative in consultation with and subject to the good faith approval of Epstein's counsel. I had provided Epstein's counsel with a list of attorneys, none of whom I had ever met, that I had culled from consulting with one of the district judges[24] and some AUSAs, including Mr. [redacted], who I was dating at the time. After getting that list of names, I did my own research to determine who would be good fits for the type of litigation that I expected they would face – both in terms of the tactics of Epstein's lawyers and the special challenges of dealing with emotionally fragile victims. I provided that culled list to Jay Lefkowitz and disclosed that, although I had no financial interest, the list included a friend of a good friend of mine (I did not describe Mr. [redacted] as my "boyfriend"). Even with that disclosure, Mr. Lefkowitz selected Mr. [redacted] friend. Before the matter went any further, FAUSA [redacted] decided that the Office should use a Special Master to make the selection, rather than pick anyone – even a panel of attorneys leaving the final selection to Epstein's counsel. Despite that, Mr. Lefkowitz and Guy Lewis – who knew both Mr. [redacted] and his friend – claimed that there was a financial interest and that I had tried to create the procedure for financial gain.[25]

---

[24] Epstein's lawyers suggested that I had *ex parte* communications with a judge. I simply asked for recommendations from a judge that I was friendly with; I did not disclose anything about the background of the case.

[25] Mr. Lewis knew that Mr. [redacted] also was an [redacted] and, therefore, was not partners with another lawyer. When that was patently obvious, Epstein's lawyers falsely claimed that they were "law school roommates." Both had graduated from law school more than fifteen years before, and had not been roommates. Ironically, one of the reasons why Epstein's legal team approved the selection of Robert Josefsberg was that Josefsberg and Alan Dershowitz were law school classmates – somehow there was no "financial interest" attributed to them.

HOUSE OVERSIGHT 012188
ALLEN GUTHRIE MCHUGH & THOMAS, PLLC
Mr. John Roth
June 19, 2008
Page 7

considered the extent of exculpatory evidence, including a psychosexual evaluation of Mr. Epstein and a polygraph examination demonstrating that Mr. Epstein genuinely believed at the time of the alleged conduct that the State's key witness was over the age of 18. Then, after months of negotiations, the State reached what it believed was an appropriate resolution of the case.

Importantly, this resolution was consistent with that of cases involving other defendants who had engaged in similar conduct. Implementation of the State resolution of the case was held in abeyance, however, due to the unexpected commencement of the successive federal criminal investigation.

While it is true, as CEOS points out, (CEOS letter at p. 3) that many criminal prosecutions turn on issues of credibility of witnesses, to which many members of the defense team can attest (having had decades of federal criminal litigation experience among us), this does not serve to divest the prosecutor of his/her duty to make a searching inquiry of the facts before using the power of prosecution, and the weight of the United States government, to level serious accusations. CEOS likewise acknowledges as much, "the prosecutors are in the best position to assess the witnesses' credibility." (CEOS letter at p. 3).

Since the CEOS letter also singles me out as someone who should be familiar with witness issues, I feel compelled to note that, of course, I am well aware that it is not uncommon for witnesses to give conflicting statements. I am also fully aware that the credibility of key government witnesses may be strongly impacted by the $50 million incentive provided via the civil lawsuits at play, and encouraged by the goverrunent here. 3 I have also read many of the conflicts between witness testimony and Detective ReCarey's own rendition of that testimony in his reports and/or search warrant affidavit. Detective ReCarey apparently formed a view early on as to the purported criminality of Mr. Epstein's conduct regardless of the mountain of evidence to the contrary. For a prosecutor that has had an opportunity to review the full facts, and to meet with the witnesses, however, "conflicting statements" cross the line to a "lack of credibility" that simply can not sustain a prosecution. That is where an appropriate application of prosecutorial discretion must be brought to bear.

Again, CEOS was not itself in the position to exercise such discretion. By its own admission, CEOS did not make a full review of the witness statements here, and CEOS certainly did not sit down across the table and speak to these witnesses. We understand that was apparently not its perceived role. But, CEOS should recognize that at least one prosecutor in this case — the Chief of the SAO Sex Crimes Division has done so. Lana Belohlavek not only met with and interviewed these witnesses during the course of the 15-month state investigation prior to any federal involvement, but she again sat across the table from many of them in connection with recent civil

3 It is important to note here that this investigation was launched not upon the complaint of any alleged victim, but, rather, upon the complaint of ather, , and her stepmother, More notable still is the fact that has been convicted of federal bank fraud, an has a state conviction for identify fraud. Hardly pillars of credibili. Yet, the USAO did not supply this information to the defense. Even more telling is the fact that filed a $50million lawsuit purportedly on behalf of his daughter without her authority or knowledge.

# United States District Court

## SOUTHERN DISTRICT OF FLORIDA

TO: CUSTODIAN OF RECORDS
REIMER EMPLOYMENT AGENCY
249 PERUVIAN AVE, STE R1
PALM BEACH, FL 33480

**SUBPOENA TO TESTIFY BEFORE GRAND JURY**
FGJ 05-02(WPB)-Fri./No. OLY-15

**SUBPOENA FOR:** ☐ **PERSON** ☒ **DOCUMENTS OR OBJECT[S]**

**YOU ARE HEREBY COMMANDED** to appear and testify before the Grand Jury of the United States District Court at the place, date and time specified below.

| PLACE: | ROOM: |
|---|---|
| Palm Beach County Courthouse<br>Juvenile Courts Building<br>205 N. Dixie Highway<br>West Palm Beach, Florida 33401<br>(Temporary location for the United States District Courthouse, West Palm Beach) | Room 4-A<br><br>DATE AND TIME:<br>September 1, 2006<br>9:00am |

**YOU ARE ALSO COMMANDED** to bring with you the following document(s) or object(s):

**ANY AND ALL RECORDS REFERRING OR RELATING TO JEFFREY EPSTEIN AND/OR GHISLAINE MAXWELL, INCLUDING BUT NOT LIMITED TO PERSONNEL RECORDS, RECORDS OF PAYMENTS, AND CLIENT PROFILE.**

Please coordinate your compliance of this subpoena and confirm the date and ti[redacted]arance with Special Agent [redacted] Federal Bureau of Investigation, Telephone: [redacted]

Please see additional information on reverse

This subpoena shall remain in effect until you are granted leave to depart by the court or by an officer acting on behalf of the court.

| CLERK | DATE: |
|---|---|
| (BY) DEPUTY CLERK | August 23, 2006 |

This subpoena is issued upon application [redacted]

Name, Address and Phone Number of Assistant U.S. Attorney
[redacted], Assistant U.S. Attorney
500 So. Australian Avenue, Suite 400
West Palm Beach, FL 33401-6235
Tel: [redacted]
Fax: [redacted]

massaging an old guy. [redacted] agreed, and [redacted] brought [redacted] do Epstein's house. [redacted] recalled that [redacted] was about 15 years old when she first went to Epstein's. [redacted] subsequently went with [redacted] to Epstein's house on multiple occasions so she could massage him. [redacted] recalled [redacted] taking taxis to and from Epstein's home. He also received phone calls from people who worked for Epstein, including a woman named [redacted] asking to schedule appointments with [redacted] At times, [redacted] heard on the phone that Epstein was not in town but was coming on a certain day. [redacted] met Epstein once in Epstein's driveway, and [redacted] recalls that [redacted] brought several friends to massage Epstein as well. [redacted] mentioned meeting and interacting with someone named Maxwell at Epstein's house. He believed Maxwell was supposed to tell [redacted] what to do during the massages. [redacted] did not tell [redacted] she did during the massages, but he suspected there was likely something more than just massage going on. [redacted] encouraged [redacted] to go to Epstein's house because she made so much money there, which they would use to buy drugs. When [redacted] turned 16, Epstein bought her Incubus tickets. [redacted] also recalled that Epstein had sent [redacted] lingerie from Paris. [redacted] recalled [redacted] saying she was asked to bring other girls, and [redacted] witnessed [redacted] bringing other girls to Epstein's house to provide massages, including girls named [redacted][15] [redacted] recalled that [redacted] once brought another girl who was 19 years old, but [redacted] was told by [redacted] that the 19-year-old could not go back because she was too old. [redacted] believes [redacted] stopped providing massages to Epstein after she gave birth to their son when she was [redacted]. [redacted] and [redacted] broke up when [redacted] was less than one year old.

Photographs from Epstein's Palm Beach residence taken during the Palm Beach Police Department's 2005 search of the residence confirm [redacted] description of the residence, including the massage room. Message pads seized during that same search contain nine entries from between 2003 and 2005 with [redacted] name and phone number, confirming that [redacted] went to Epstein's Palm Beach residence during that time. Those message pads are limited to the 2003 to 2005 time period because those were the only pads in the house when the search was conducted in October 2005.

We have identified one FedEx invoice dated [redacted], which was obtained during the Florida investigation, for a package that was addressed to [redacted] residence in Palm Beach. The return address is a business address for Epstein in Manhattan. The FBI has confirmed that FedEx no longer has records dating back to 2001-2005, so we are unable to obtain additional FedEx records.

---

[15] The FBI has identified this individual as [redacted]. Our team interviewed [redacted] by WebEx on February 24, 2021. During that interview, [redacted] confirmed that [redacted] recruited her to massage Epstein when [redacted] was about 13 years old, and [redacted] specifically recalled that Maxwell paid both [redacted] and [redacted] on [redacted] first visit to the residence. [redacted] impression based on the conversation she witnessed was that Maxwell already knew [redacted] We were unable to fully debrief [redacted] during that first interview, and we have repeatedly attempted to schedule follow-up interviews, but [redacted] is [redacted] difficult to contact. The FBI plans to travel to [redacted] where [redacted] is currently located, and attempt to connect with her in person. [redacted]

iv. I told FAUSA [redacted] and USA Acosta that I did not want to sign the NPA because I did not think that it was "my" agreement. USA Acosta asked me to sign it.

h. After the NPA was signed, USA Acosta continued to concede points that had already been decided. For example, he agreed to the preparation of the Addendum. He then made a number of concessions regarding the letter to the Special Master, including a statement that we would not vouch for the veracity of the victims, despite the fact that these were victims that we intended to include in an indictment. These were all areas that were the subject of a signed, binding agreement. On October 5, 2007, and October 23, 2007, I against asked for permission to proceed to indictment (Exhibits C-6, C-7).

i. After the Addendum was signed, USA Acosta wrote in the 12/19/2007 letter to Lilly Ann Sanchez that he had "considered defense counsel arguments regarding the Section 2255 portions of the Agreement. . . . During the course of negotiations [our] intent was reduced to writing in Paragraphs 7 and 8, which as I wrote previously, appear far from simple to understand." (Exhibit B-19). I raised concerns about undermining an Agreement entered into by our Office and giving away one of the protections that had been negotiated for the victims – representation by an attorney selected by the Special Master.

j. I raised concerns about delays in entering Epstein's guilty plea and sentencing. These were portrayed as "professional courtesies" but it quickly became obvious that the NPA was signed with no intention of actual performance – it was simply a way for Epstein to buy time to avoid indictment and intimidate victims.

k. I raised objections to the multiple "appeals" to DC and the delays that those entailed. USA Acosta explained that "every defendant" has the right to appeal to DC and raise federalism concerns. I explained that the objections should have been raised prior to signing the NPA, not after, and, if they were legitimate "policy questions," Epstein should agree that he would not use the time to harass and intimidate victims.

l. As detailed above, after the NPA was signed, the agents and I repeatedly raised concerns about the Office's deference to the defense's objections to providing notification to the victims of the resolution of the investigation and the date and time of the Epstein's plea and sentencing.

m. On February 26, 2008, I learned that, if CEOS conducted its review and concluded the federal prosecution of Epstein was appropriate, the Office was going to allow Epstein to plead guilty pursuant to the NPA with no additional terms or conditions, despite the fact that additional victims had been located during the ongoing investigation. I wrote to FAUSA [redacted] and expressed my view that this was an unjust result (Exhibit B-115). I re-raised this objection every time the Office allowed Epstein another opportunity to maintain the benefits of the NPA even as he was attacking the NPA's legitimacy.

n. On March 19, 2008, I informed the supervisory chain up to FAUSA [redacted] of the toll that the delay was taking on the victims and the grand jury. In particular, one of the grand jurors had told another that he was concerned that we were going to "whitewash" the case and not charge it. Epstein was using the delay to harass the victims, and one of the victims tried to commit suicide. I wrote how the "FBI's victim-witness coordinator is doing her

HOUSE OVERSIGHT 012188
ALLEN GUTHRIE MCHUGH & THOMAS, PLLC
Mr. John Roth
June 19, 2008
Page 7
considered the extent of exculpatory evidence, including a psychosexual evaluation of Mr. Epstein and a polygraph examination demonstrating that Mr. Epstein genuinely believed at the time of the alleged conduct that the State's key witness was over the age of 18. Then, after
months of negotiations, the State reached what it believed was an appropriate resolution of the case.
Importantly, this resolution was consistent with that of cases involving other defendants who had engaged in similar conduct. Implementation of the State resolution of the case was held in abeyance,
however, due to the unexpected commencement of the successive federal criminal investigation.
While it is true, as CEOS points out, (CEOS letter at p. 3) that many criminal prosecutions
turn on issues of credibility of witnesses, to which many members of the defense team can attest (having had decades of federal criminal litigation experience among us), this does not serve to divest
the prosecutor of his/her duty to make a searching inquiry of the facts before using the power of prosecution, and the weight of the United States government, to level serious accusations. CEOS likewise acknowledges as much, "the prosecutors are in the best position to assess the witnesses'
credibility." (CEOS letter at p. 3).
Since the CEOS letter also singles me out as someone who should be familiar with witness issues, I feel compelled to note that, of course, I am well aware that it is not uncommon for witnesses
to give conflicting statements. I am also fully aware that the credibility of key government witnesses
may be strongly impacted by the $50 million incentive provided via the civil lawsuits at play, and encouraged by the goverrunent here. 3 I have also read many of the conflicts between witness testimony and Detective ReCarey's own rendition of that testimony in his reports and/or search warrant affidavit. Detective ReCarey apparently formed a view early on as to the purported criminality of Mr. Epstein's conduct regardless of the mountain of evidence to the contrary. For a prosecutor that has had an opportunity to review the full facts, and to meet with the witnesses, however, "conflicting statements" cross the line to a "lack of credibility" that simply can not sustain a prosecution. That is where an appropriate application of prosecutorial discretion must be brought
to bear.

Again, CEOS was not itself in the position to exercise such discretion. By its own admission, CEOS did not make a full review of the witness statements here, and CEOS certainly did not sit down across the table and speak to these witnesses. We understand that was apparently not its perceived role. But, CEOS should recognize that at least one prosecutor in this case — the Chief of
the SAO Sex Crimes Division has done so. Lana Belohlavek not only met with and interviewed these witnesses during the course of the 15-month state investigation prior to any federal involvement, but she again sat across the table from many of them in connection with recent civil
3 It is important to note here that this investigation was launched not upon the complaint of any alleged victim, but,
rather, upon the complaint of ather, , and her stepmother, More
notable still is the fact that has been convicted of federal bank fraud, an has a state conviction for identify fraud. Hardly pillars of credibili. Yet, the USAO did not supply this information to the
defense. Even more telling is the fact that filed a $50million lawsuit purportedly on behalf of his daughter without her authority or knowledge.