**From:** Ghislaine Maxwell
**To:** Pro Se Filing
**Subject:** UNDER SEAL Ghislaine Maxwell - 02879509 Addendum Ex 26 - 41
**Date:** Sunday, July 26, 2026 4:56:53 PM
**Attachments:** EX 27_EFTA 00178517 copy.pdf
EX 28_EFTA 00224983 copy.pdf
EX 29_EFTA 00014175 copy.pdf
EX 30_EFTA 01660401 copy.pdf
EX 31_EFTA 01660397 copy.pdf
EX 32_EFTA01324975 copy.pdf
EX 33_EFTA 00211692 copy.pdf
EX 34_EFTA 02731082-167 copy.pdf
EX 35_EFTA 01660400 copy.pdf
EX 37_EFTA 00173953 copy.pdf
EX 39_EFTA_00173954 copy.pdf
EX 40_EFTA 00173955 copy.pdf
EX 41_EFTA 00225098 copy.pdf

---

CAUTION - EXTERNAL:

Please file under SEAL per order of the Court

CAUTION - EXTERNAL EMAIL: This email originated outside the Judiciary. Exercise caution when opening attachments or clicking on links.

# United States District Court
## SOUTHERN DISTRICT OF FLORIDA

TO: CUSTODIAN OF RECORDS
REIMER EMPLOYMENT AGENCY
249 PERUVIAN AVE, STE R1
PALM BEACH, FL 33480

**SUBPOENA TO TESTIFY BEFORE GRAND JURY**
FGJ 05-02(WPB)-Fri./No. OLY-15

**SUBPOENA FOR:**
☐ **PERSON** ☒ **DOCUMENTS OR OBJECT[S]**

**YOU ARE HEREBY COMMANDED** to appear and testify before the Grand Jury of the United States District Court at the place, date and time specified below.

| PLACE: | ROOM: |
|---|---|
| Palm Beach County Courthouse<br>Juvenile Courts Building<br>205 N. Dixie Highway<br>West Palm Beach, Florida 33401<br>(Temporary location for the United States District Courthouse, West Palm Beach) | Room 4-A<br><br>DATE AND TIME:<br>September 1, 2006<br>9:00am |

**YOU ARE ALSO COMMANDED** to bring with you the following document(s) or object(s):

**ANY AND ALL RECORDS REFERRING OR RELATING TO JEFFREY EPSTEIN AND/OR GHISLAINE MAXWELL, INCLUDING BUT NOT LIMITED TO PERSONNEL RECORDS, RECORDS OF PAYMENTS, AND CLIENT PROFILE.**

Please coordinate your compliance of this subpoena and confirm the date and time of your appearance with Special Agent [redacted] Federal Bureau of Investigation, Telephone: [redacted]

Please see additional information on reverse

This subpoena shall remain in effect until you are granted leave to depart by the court or by an officer acting on behalf of the court.

| CLERK | DATE: |
|---|---|
| (BY) DEPUTY CLERK | August 23, 2006 |

This subpoena is issued upon application [redacted]

Name, Address and Phone Number of Assistant U.S. Attorney
[redacted], Assistant U.S. Attorney
500 So. Australian Avenue, Suite 400
West Palm Beach, FL 33401-6235
Tel: [redacted]
Fax: [redacted]

EFTA00178517

**EPSTEIN INVESTIGATION TIMELINE**

| Date | To | From | Re: | Exhibit # |
|---|---|---|---|---|
| 7/19/2008 | | | Emails with other AUSAs in other districts and documents regarding disclosing identifying information about victims | |
| 7/21/2008 | Goldberger | Villafaña | Letter with 11 additional victim notification letters | |
| 7/21/2008 | Villafaña | Goldberger | Letter with attached Motion for Return of Property | |
| 7/21/2008 | Villafaña | Kuyrkendall | Email with list of victims that Twiler still needs to make contact with | B-69 |
| 7/21/2008 | Villafaña | Tein | Letter in response to 7/17/08 letter from Villafaña | |
| 7/21/2008 | | | Victim Notification letters to Individuals #1, #2, #4, #13, #9, #14, #21, #23, #30, #32, and #38 | B-70 |
| 7/21/2008 | Villafaña; cc: Senior | Sloman | Email response to Villafaña's 7/21/08 email regarding Motion for Return of Property in State Court | |
| 7/22/2008 | Villafaña | Kuyrkendall | Email chain regarding victim addresses | |
| 7/22/2008 | | | Emails between A. M. Villafaña, A. Acosta, J. Sloman, R. Senior, K. Atkinson, E. Nesbitt Kuyrkendall, and J. Richards regarding 7/21/2008 letter from M. Tein announcing plan to stay the civil suits against J. Epstein and notification that B. Reinhart is counesl of record for [redacted] in civil suits | |
| 7/23/2008 | | | Emails between A. M. Villafaña and D. Lee regarding correspondence with counsel for J. Epstein and notice of breach | |
| 7/25/2008 | | | Emails between A. M. Villafaña and K. Atkinson regarding extension of grand jury to allow for continued representation of J. Epstein case | |
| 7/30/2008 | Villafaña | Atkinson | Email regarding contact with Roy Black | |
| 7/30/2008 | Villafaña | Roy Black | Email chain regarding call relating to the performance of the criminal Non-Prosecution Agreement | |
| 8/1/2008 | Lee, Acosta; cc: Villafaña, Jacobus, Senior | Sloman | Email chain regarding Jane Doe litigation | |
| 8/2/2008 | Lee, Villafaña | Acosta | Email re: Letter from Brad Edwards | |
| 8/5/2008 | A. Acosta, J. Sloman, R. Senior, and K. Atkinson | A. Marie Villafaña | Email regarding analysis of Jeffrey Epstein agreement, with attached 6/24/2008 email from A. M. Villafaña to R. Black and J. Goldberger and attached Epstein agreement | B-71 |

**From:** [redacted]
**To:** [redacted]
**Cc:** [redacted]
**Subject:** Epstein issue with State Attorney's Office
**Date:** Tue, 04 Aug 2009 17:16:38 +0000
**Importance:** Normal

---

It is Tuesday, so there must be a new issue with Epstein. This one potentially involves the Palm Beach County State Attorney's Office so I included poor [redacted] on the email chain.

Here are the two issues:

First, I have heard from several sources that Epstein is trying to convince (or perhaps has already convinced) the SAO to give him "cooperation credit" to shorten the length of his home confinement based upon "cooperation" that he is giving to the Feds in the Bernie Madoff case. As you probably remember, a couple of weeks ago some newspapers reported that Epstein is cooperating with FBI in the Madoff prosecution and that was the real reason for him receiving such a light sentence. After those newspaper reports came out, the AUSA prosecuting the Madoff case called me asking who Epstein was and stating in no uncertain terms that Epstein is not cooperating. Nonetheless, I can imagine our good friends (Goldberger, Lefkowitz, and others) telling the SAO that Epstein actually is cooperating and that the USAO agrees that he should have his sentence reduced. Now, this could all be rumor, but [redacted] and I have heard it from so many different places (Town of Palm Beach PD, plaintiffs' attorneys, etc.), that it seems like someone should reach out to the SAO to make sure that they aren't being told any lies. I, of course, am happy to do so, but I didn't know if you felt that the contact should be made by [redacted] or [redacted]

I also just pulled the state docket sheet and found another motion to "correct" Epstein's sentence that we were never told about. Docket entry 7 in the procurement of child prostitution case reads: "Agreed Order that the Order of Community Control is Corrected to Delete Special Condition #26 and #27." Something tells me that there was no "correction," this was a "change" that takes out things we considered important. [redacted] – Can you get this from the courthouse and fax it to me? Case number is 502008CF009381AXXXMB.

Second, if new allegations or new victims come to light, are we allowed to investigate their claims? If we cannot, or if there is jurisdiction in another district, can we refer to allegations to another USAO to investigate? There are two very specific items that I would like to investigate further that relate to the S.D.Fl.. Also, as you recall, we never were able to advance our investigation regarding the New York victims, and none of them were included in our list of identified victims. The prosecutors on the Madoff case have asked if they can use some of our evidence – or at least speak with me and the FBI agents -- to prosecute Epstein regarding conduct in New York.

Thank you.

[redacted]
Assistant U.S. Attorney
Southern District of Florida
500 East Broward Boulevard, 7th Floor
Ft. Lauderdale, FL 33394
[redacted]

[redacted]

**From:** [redacted]
**To:** [redacted] (MM)(FBI)" [redacted]
**Subject:** Re: Hi There,
**Date:** Tue, 29 Apr 2014 16:37:32 +0000
**Importance:** Normal

---

Hi [redacted],

Thank you for getting back to me on your day off!

I just remember when the tabloids sent their photographer out, they took note of the date on the back which was in 1997 and possibly took a picture of it but as I do not want to contact the tabloids right now, I just need the evidence to ensure that is correct. If you can, when you get back to the office, is there any chance you could have a look to see if there in fact a date mentioned or photographed, it would be very helpful and I would be more than appreciative.

Have a nice day!!

[redacted]

O[redacted], 29 April 2014 12:23 PM, [redacted] (MM)(FBI)" [redacted] wrote:

Hi [redacted]

I'm away from the office today. I don't recall the photo having a date on it but I will review the file when I get a chance.

---

**From:** [redacted]
**To:** [redacted]MM)(FBI)
**Sent:** Tue Apr 29 12:18:49 2014
**Subject:** Hi There,

G'da[redacted]n,

I was just wondering if by chance you might have the original dates of the photos you copied from our original meetings, oddly enough I have every other original photo but the one with Prince Andrew and that's no good as I am in need of just the date on the picture. You're my last chance on these dates unless by good fortune this picture shows up. Sorry to be a pain, I hope I'm not to much a bother. Just trying to do get something accomplished!

Hope all is well!!

All the best,

[redacted]

EFTA01660397

**From:** [redacted]
**To:** <[redacted]
**Subject:** [redacted]
**Date:** Tue, 10 May 2016 21:56:31 +0000
**Importance:** Normal

---

Hi [redacted],

I'm going through discovery on a case and part of that is a picture of me with Prince Andrew, do you recall seeing the date on the back and was it recorded. Did I receive the original back or was it kept as evidence? I know it's been a long time but anything helps.

I hope you've been well!! Still fighting the good fight!!

Kindly,
[redacted]

Sent from my iPhone

AC/161/2015

S.J. QUINNEY COLLEGE OF LAW
THE UNIVERSITY OF UTAH

PAUL G. CASSELL
Ronald N. Boyce Presidential Professor of Criminal Law
Telephone: 801-585-5202
cassellp@law.utah.edu

July 31, 2015

[redacted]
Assistant Commissioner
Specialist Crime and Operations
[redacted]
New Scotland Yard
[redacted]
London SW1H 0BG

Re: International Sex Trafficking by Jeffrey Epstein and Ghislaine Maxwell
Ref: AC/SCO/82/201582/2015

Dear Commissioner [redacted]:

I write on behalf of my client – [redacted] I sent you a letter on May 4, 2015 (and an amended letter a few days later). I received your response on May 11, 2015, indicating that you would look into matter and be back in touch in due course.

Having not heard back from you, I wanted to follow up to see how your investigation is proceeding. And I wanted to reiterate [redacted] offer to help you in any way possible in your investigation.

Thank you in advance for any information you can provide.

Sincerely,

Paul G. Cassell

cc: Brad Edwards, Esq.
Sigrid McCawley, Esq.
Jack Scarola, Esq.

**Cc:** [redacted] "[redacted]"
<[redacted]>
**Subject:** [redacted]

[redacted]

Thank you again for meeting with us today. We very much appreciate your time. I am attaching the following documents for your review:

1. Complaint in the defamation case against Ghislaine Maxwell (just today, Judge Sweet denied Maxwell's motion to dismiss today);
2. Declarations that [redacted] filed in the CVRA case;
3. The Rule 56.1 statement recently filed in the CVRA case;
4. The redacted 302

Please let us know what other information we can provide or if you have any further questions.

Best,
Pete

---

The information contained in this electronic message is confidential information intended only for the use of the named recipient(s) and may contain information that, among other protections, is the subject of attorney-client privilege, attorney work product or exempt from disclosure under applicable law. If the reader of this electronic message is not the named recipient, or the employee or agent responsible to deliver it to the named recipient, you are hereby notified that any dissemination, distribution, copying or other use of this communication is strictly prohibited and no privilege is waived. If you have received this communication in error, please immediately notify the sender by replying to this electronic message and then deleting this electronic message from your computer. [v.1]

**From:** "[redacted]. (USAFLS)" </O=USA/OU=FLS/CN=RECIPIENTS/CN=AVILLAFANA>
**To:** "[redacted]. (MM) (FBI)" <[redacted]>
**Cc:** "[redacted]. (MM) (FBI)" <[redacted]>
**Subject:** RE: Inquiry regarding an old case
**Date:** Wed, 27 Apr 2016 21:40:36 +0000
**Importance:** Normal

---

Thank you so much.

[redacted]
Assistant U.S. Attorney
Southern District of Florida
[redacted]

---

**From:** [redacted]. (MM) (FBI) [mailto:[redacted]]
**Sent:** Wednesday, April 27, 2016 5:40 PM
**To:** [redacted]. (USAFLS)
**Cc:** [redacted]. (MM) (FBI)
**Subject:** RE: Inquiry regarding an old case

I will check with ELSUR tomorrow to see if we are still in custody of the recording.

-------- Original message --------
From: "[redacted]. (USAFLS)" <[redacted]>
Date: 04/27/2016 5:19 PM (GMT-05:00)
To: "[redacted]. (MM) (FBI)" <[redacted]>, "[redacted]. (MM) (FBI)" <[redacted]>
Subject: Inquiry regarding an old case

Hi [redacted] and [redacted] – We are trying to settle the "Jane Doe" litigation and the attorneys in the case are trying to get a copy of the undercover recording in "Operation Stolen Globe," which was the investigation of Epstein's former butler (Alfredo Rodriguez) who tried to sell the piece of evidence that he stole from Epstein's house. I explained that we can't turn over that evidence; the attorney would have to make a FOIA request to the FBI; but I agreed to find out whether the tape still exists. Can you find out whether FBI still has custody of the tape? If you do have it, please maintain it until a FOIA request is made and FOIA counsel can determine whether or not it needs to be produced.

Thank you so much!

[redacted]
Assistant U.S. Attorney
Southern District of Florida
[redacted]

*PRIVILEGED - ATTORNEY WORK PRODUCT/DELIBERATIVE PROCESS*
*CONFIDENTIAL - SUBJECT TO FED. R. CRIM. P. 6(e)*

**MEMORANDUM**

**TO:** Geoffrey S. Berman, U.S. Attorney
[redacted]

**FROM:** AUSAs [redacted]

**DATE:** December 19, 2019

**RE:** Investigation into Potential Co-Conspirators of Jeffrey Epstein

---

This memorandum details the investigative steps taken since the indictment of Jeffrey Epstein in this District on July 2, 2019 and analyzes the extent to which certain of Epstein's associates and employees may or may not be criminally liable for their conduct during their employment with Epstein.

## I. Background

On July 2, 2019, a federal grand jury in the Southern District of New York returned a sealed indictment (the "Indictment") charging Jeffrey Epstein with one count of sex trafficking of minors, in violation of 18 U.S.C. § 1591, and one count of conspiracy to commit sex trafficking of minors, in violation of 18 U.S.C. § 371.

The prosecution memorandum in support of that indictment detailed the evidence gathered regarding Epstein and his associates during our Office's pre-indictment investigation. That evidence revealed that beginning in at least 2002, Epstein enticed and recruited dozens of minor girls to engage in sex acts with him, for which he paid the victims hundreds of dollars in cash. He undertook this activity in at least two different locations, including his mansion in Manhattan, New York (the "New York Residence") and his estate in Palm Beach, Florida (the "Palm Beach Residence"). In both New York and Florida, Epstein perpetuated this abuse in similar ways. Victims were initially recruited to provide "massages" to Epstein, which would be performed nude or partially nude, would become increasingly sexual in nature, and would typically include one or more sex acts, including groping and direct or indirect contact with victims' genitals. Epstein paid his victims hundreds of dollars in cash for each separate encounter.

Moreover, Epstein actively encouraged certain of his victims to recruit additional girls to be similarly sexually abused. He incentivized his victims to become recruiters by paying these victim-recruiters hundreds of dollars for each additional girl they brought to him. In this fashion, Epstein created a vast network of underage victims – as young as 14 – in locations including New York and Palm Beach. In creating and maintaining a network of minor victims whom he

abused, Epstein worked with others, including employees and associates who facilitated his exploitation of minors by, among other things, contacting victims and scheduling their sexual encounters with Epstein, both in New York and in Florida.

Epstein was arrested on July 6, 2019, and the Indictment against him was unsealed on July 8, 2019. That same day, our Office held a press conference asking anyone with information, including any victims, to come forward and meet with investigators. In the wake of the press conference, numerous victims and witnesses came forward and were interviewed by the FBI and our Office.

On or about August 10, 2019, Epstein committed suicide while in custody at the Metropolitan Correctional Center. Since his death, we have continued the investigation that remained ongoing following the return of the Indictment against Epstein into potential co-conspirators. In particular, that investigation focused on Ghislaine Maxwell, [redacted] and Leslie Groff. This memo details the steps taken in this investigation since July 2019, summarizes the potential charges for the conduct at issue, and analyzes the evidence against certain of Epstein's associates and employees: [redacted] Leslie Groff, and Ghislaine Maxwell. The potential charges against Maxwell will be further analyzed in a separate prosecution memorandum, which is expected to seek authorization to charge Maxwell with federal offenses for her role in facilitating the transport of minors for illegal sex acts.

## II. Investigative Steps Taken

Since the Indictment was unsealed on July 5, 2019, our Office and the FBI have been contacted by numerous potential witnesses—both directly and through their attorneys. Every unrepresented person who contacted the investigative team—either through the FBI tip line or by calling our Office—was contacted in the first instance by an FBI agent for an initial screening interview. The FBI then provided our Office with the names and contact information of individuals who appeared to have information pertinent to our investigation. The AUSAs and case agents then conducted follow up interviews of those identified individuals. In addition, the investigative team initiated contact with numerous witnesses about whom we learned both through our investigation and through press reporting. Although some individuals declined to be interviewed, we ultimately conducted dozens of witness interviews and proffers. At the same time, following the unsealing of the Indictment, our Office and the FBI took numerous additional investigative steps, including the execution of search warrants, the review of financial records and other documents, and meetings with attorneys for numerous subjects of the investigation.

This section walks through the information gathered during our continuing investigation since Epstein's arrest in July 2019. First, we summarize interviews conducted with victims who were abused as minors. Second, we summarize interviews conducted with victims who were abused as adults. Third, we summarize interviews conducted with victims who were not abused. Fourth, we summarize interviews with individuals who are subjects of the investigation. Fifth, we summarize our interview with one victim, [redacted]

[redacted]. Finally, we walk through other investigative steps, such as attorney proffers, search warrants, and document review.

*A. Interviews of Victims Who Were Abused As Minors*

1. [redacted]

Since the unsealing of the Indictment, we have been in regular contact with attorneys who represent [redacted]. Over the course of multiple proffers, all conducted between March 2019 and July 2019, [redacted] has described how she was recruited to engage in sexual contact with Epstein in approximately [redacted], at the age of approximately 14. While at a New York City club, [redacted] met another teenager who described having worked for a rich man, giving topless massages—and recruiting other girls to do the same—and invited [redacted] to make money this way. At the time, [redacted] was living by herself and supporting herself financially, having moved away from a difficult home life.

[redacted] ultimately visited Epstein's New York residence to engage in sexual massages and other sex acts at least dozens of times between approximately [redacted], all while she was a minor.[1] During these visits, [redacted] performed erotic massages on Epstein, including being partially or fully nude while she massaged him. Most or all of the massages performed by [redacted] would end with Epstein masturbating and ejaculating; during some of the massages, Epstein touched the genitals of [redacted] with his hand or with a vibrator or sex toy. [redacted] also reported a hazy memory of [redacted] participating in an incident in which [redacted] was nude with Epstein in his bed. [redacted] could not recall the details of any sex acts that occurred during that interaction with [redacted] Epstein ordinarily paid [redacted] $300 in cash after a massage was completed. During an earlier visit, [redacted] recalls Epstein asking her how old she was and her truthfully telling Epstein that she was 14 years old.

After [redacted] initial meetings with Epstein, he asked her, in sum and substance, to recruit other girls for the same activity. Over approximately the next two years, [redacted] estimates that she brought dozens of girls to Epstein to provide massages at his New York residence, starting with girls she knew from her community and eventually strangers whom [redacted] met at bars, clubs, or other locations. [redacted] would describe to the girls what was expected, *i.e.*, that they would provide erotic massages to Epstein, while nude, and that Epstein might touch them or ask them to touch him. [redacted] would schedule appointments for the

[1] [redacted] provided a detailed description of Epstein's New York residence, which was corroborated by photographs taken by the FBI during the execution of a search warrant there in July 2019.

girls by phone with Leslie Groff.[2] Although [redacted] recalls meeting Groff on at least one occasion at her office to pick up some money, she did not have extensive interactions with Groff and did not tell Groff her age.

Each time [redacted] brought a girl to Epstein, [redacted] was paid $300, and the other girl would also receive $300, always in cash. After [redacted] brought a girl to Epstein, he would sometimes either tell [redacted] to bring the girl again, if he liked her, or tell [redacted] not to bring the girl again. [redacted] noticed that the girls Epstein liked were generally younger and more petite. Epstein would tell [redacted] "you know what I like," which she took to mean underage, petite girls. Epstein would occasionally indicate his displeasure with [redacted] for bringing a particular girl, including expressing to [redacted] that he did not like dark-skinned girls. Later on, as [redacted] grew older and knew fewer young girls to bring, she brought older girls, which Epstein expressed displeasure about. [redacted] recalls at least one occasion when she saw a girl show Epstein an ID to prove she was under 18.

2. [redacted]

During interviews conducted between March and July 2019, [redacted] described how she was recruited to provide Epstein with sexualized massages at his Palm Beach residence when she was approximately 14 years old. [redacted] estimates that she herself performed more than ten sexualized massages and that she also recruited approximately 20 to 30 additional girls who were similarly abused by Epstein in Florida.

When [redacted] first encountered Epstein, she was a high school dropout, living away from home and supporting herself financially. She recalls being recruited by a young girl named [redacted] at a party who told [redacted] and her friend [redacted] that they could make $200 by giving a massage to an older man. [redacted] agreed to go to Epstein's Palm Beach residence, and she ultimately participated in at least ten massages, which became increasingly sexual over time. She recalled that Epstein would instruct her to pinch his nipples while he masturbated, and that she was often instructed to take her clothes off and perform the massage while nude. During the massages, Epstein would touch her genitals with a vibrator or his hand. She recounted that Epstein would frequently push things further to see how far he could go. On at least one occasion, Epstein brought another woman, [redacted] into a sexualized massage with [redacted] During this encounter, [redacted] who was an adult at the time, engaged in sex acts with [redacted] at Epstein's direction.

---

[2] A message slip recovered from a trash pull from Epstein's Palm Beach residence during the first Florida investigation included a message from "[redacted] The phone number associated with that message appears on toll records for one of [redacted] friends from the same period.

[redacted]

Epstein asked [redacted] to bring other girls for massages, which she did. Initially, Epstein simply asked her to "bring a friend" and told her he would pay her to bring other girls. Later, after a few experiences of [redacted] bringing victims who balked at the sexual nature of the massages, Epstein told her not to bring girls unless they knew what to expect. [redacted] understood this to mean she should warn girls to expect they would need to take off their clothes, and that Epstein would touch them and masturbate. She then conveyed as much in recruiting new victims.

[redacted] estimates that over the course of several years, she recruited approximately 20 to 30 girls for Epstein, all of whom were approximately 15 to 20 years old.[4] [redacted] believes that most of the girls she recruited were minors. Epstein would occasionally indicate to [redacted] which girls he liked and which girls he disliked, and she noticed he preferred the younger minors she brought, and that he preferred petite blonde girls. [redacted] usually coordinated these appointments with [redacted] or [redacted].[5] [redacted] specifically recalls that [redacted] would occasionally call [redacted] and say that she was in New York, that Epstein would be arriving in Florida soon, and that she wanted to know if [redacted] could "work" when he arrived. [redacted] also recalled [redacted] personally taking her to the massage room on some occasions, where she would set up the massage table. [redacted] also recalls [redacted] paying her after some of these encounters.

When [redacted] first met Epstein, she told him she was 18 because her friend had told her to lie about her age. In truth, she was approximately 14 or 15 at the time, and was wearing braces, and recalls that it would have been obvious that she was very young. Initially, [redacted] similarly told other girls she brought to Epstein to say they were older because her friend had given her that instruction. Over time, however, based on her observations of the girls that Epstein seemed to prefer—and the sheer number of minors she brought to the house without issue—[redacted] came to believe that Epstein wanted younger girls and did not care if the girls told him their true ages. For this reason, [redacted] stopped telling the girls she recruited to lie about their ages. She stated that the girls she recruited looked very young, and she believes it would have been obvious to anyone that they were underage.

When the Florida investigations became public, after [redacted] had stopped visiting Epstein, she recalls having a phone conversation with [redacted] in which [redacted] stated, in sum and substance, that [redacted] would be taken care of if she didn't say anything.

---

[4] Message pads recovered from Epstein's Palm Beach residence during the first Florida investigation include messages with [redacted] full name and phone number. The messages appear to refer to scheduling appointments and recruiting other girls, *e.g.*: "She has a female friend for you, please call back as soon as possible." Additionally, the message pads include messages with names of individuals [redacted] identified as other victims.

[5] Contemporaneous phone records reflect numerous calls between [redacted] and [redacted]

On August 27, 2019, we met with [redacted] in New York. [redacted]

3. [redacted]

During prior interviews conducted between April and July 2019, [redacted] described how between approximately [redacted], she went to Epstein's Florida residence approximately 20 times to participate in sexualized massages, receiving payments of $200 for each visit. [redacted] recalled that she told Epstein her true age, which was 17. [redacted] Specifically, [redacted] explained that she would typically deposit cash from Epstein in her bank account right away. [redacted] provided a notebook in which she noted deposits she made; based on her dates of deposits, it appears the abuse began in approximately [redacted], weeks past her sixteenth birthday. The records also appear to show that cash payments from Epstein continued through [redacted], several months before her eighteenth birthday.

Similar to other victims, [redacted] was recruited by a high school friend, who told her she could make money by giving a massage. She recalls Epstein telling her that they could travel together after she turned 18, and that once she turned 18 he would be able to help her with a modeling career. She ultimately stopped going to Epstein's residence because she felt disgusted by her interactions with him.

[redacted] generally scheduled the massages through [redacted] [redacted] recalled that [redacted] would sometimes call from New York to schedule massages in advance of Epstein's arrival in Florida, and [redacted] specifically recalls [redacted] mentioning on calls that [redacted] was in New York at the time.[6] [redacted] also recalled [redacted] personally taking her to the massage room on some occasions. [redacted] specifically recalled telling [redacted] that she was in high school and could not provide massages at certain times due to school conflicts. She also reported that Epstein asked her to bring girls who looked like her, which she took to mean blonde girls her age. [redacted] brought two seventeen-year-old girls to Epstein's house for massages, for which [redacted] was also paid. [redacted] has reported that the massages became increasingly sexual over time, and included Epstein

---

[6] Contemporaneous phone records reflect numerous contacts between [redacted] and [redacted] A comparison of call records against logs of Epstein's flights on his private jet reflects several sets of calls during times when [redacted] appears to have been in New York City with Epstein. For example, on [redacted], [redacted] and [redacted] had three calls spread throughout the afternoon; later that night, flight records reflect that [redacted] and Epstein flew from [redacted] to West Palm Beach.

touching her genitals and using a vibrator on her genital area, including under her underwear. [redacted] also recalled that Epstein asked her for intercourse, but she refused.

On August 27, 2019, we met with [redacted] in New York. [redacted]

4. [redacted]

We have interviewed [redacted] on three occasions. First, on September 19, 2019, [redacted] was interviewed in [redacted] During this interview, [redacted] described how she met Epstein and Ghislaine Maxwell and described in general terms how her relationship with them evolved. She did not want to discuss specific incidents of abuse in detail during this interview.

In [redacted], When [redacted] was about 13 years old [redacted], Maxwell and Epstein approached her while she was sitting outside at a picnic table with her friends.[7] Epstein told [redacted] that he gives scholarships and asked about [redacted] background. When [redacted] told Epstein that she lived [redacted], Epstein asked for her [redacted] phone number so that they could connect. About six weeks later, after [redacted] had returned home [redacted] and had turned 14, someone called from Epstein's office asking [redacted] to have tea with Epstein. They accepted the invitation, and both [redacted] had tea with Epstein at his Palm Beach residence, during which he explained that he likes to mentor and give scholarships.[8]

After that meeting, [redacted] began spending more time with Epstein and Maxwell. Between approximately [redacted], Maxwell or an assistant would regularly call [redacted] house phone to invite [redacted] to visit with Epstein. [redacted] recalls Epstein having a number of different assistants, including Leslie Groff and [redacted][9] When she was still 14 years old, [redacted] travelled to New York to visit with Epstein and Maxwell. During that trip, Epstein and Maxwell took [redacted] shopping and picked out clothing for her, including white underwear. [redacted] does not recall any sexual contact occurring until after that trip to New York. After that trip, [redacted] frequently went to Epstein's Palm Beach residence. While there, Epstein would

---

[redacted]

[redacted]

[9] [redacted] worked as Maxwell's assistant in [redacted]. [redacted]

have [redacted] rub his feet, and he often gave her cash, which he claimed was for her to use for voice lessons.

Epstein first sexually abused [redacted] when she was 14 years old at his Palm Beach residence. The two were discussing [redacted] desire to be [redacted], and Epstein told [redacted] that she needed to be comfortable in her underwear. Epstein then pulled his pants down, pulled [redacted] into his lap and began masturbating. Epstein told [redacted] a photographer might do this to her, so she needed to be prepared. After that first incident, Epstein increasingly sexually abused [redacted] After a few months of abusing [redacted] on his own, Epstein began abusing [redacted] with Maxwell present. Eventually, Epstein also had other young girls or women participate in sex acts with [redacted] could not recall the names of all of these other females, but she vaguely remembers meeting [redacted] once. She also recalled Epstein's assistant, [redacted] being involved in sexual contact. Many of these instances occurred in the context of massages, during which [redacted] would be present when other girls would provide sexualized massages to Epstein.

For the next approximately two years, Epstein continued sexually abusing [redacted] by, among other things, fondling her genitals and using vibrators to touch her genitals. During that period, Epstein also photographed [redacted] while wearing only underwear.[10] [redacted] recalled travelling to New York and New Mexico with both Epstein and Maxwell during this period. She indicated that both Epstein and Maxwell participated in sexual encounters with her during this period, but she was not at that point prepared to go into more details regarding the specifics of the contact. [redacted] recalled that either Groff or Maxwell would arrange her travel.

When [redacted] was a senior in high school, Epstein paid for her to move to [redacted]. He continued abusing [redacted] there, and eventually raped her in his New York residence. [redacted] recalled meeting famous friends of Epstein's, including Prince Andrew, but she never had any sexual encounters with any of Epstein's friends. [redacted] remained in contact with Epstein until [redacted], when she was 21 years old.

Second, on November 14, 2019, [redacted] was re-interviewed in [redacted] During this interview, [redacted] clarified her memory of the timing of her interactions with Epstein and Maxwell. She recalled [redacted] when she was 13 years old, shortly before she turned 14 [redacted]. She recalled first travelling on Epstein's private jet when she was 14 years old, when she travelled to New York. Epstein first engaged in sexual contact with [redacted] when she was 14 years old. [redacted] began her senior year in New York in [redacted], so she moved to New York in [redacted] when she was about 17 years old, then began attending school in New York in the fall after turning 18 years old. Given that timing, she believes she may have been 18 when Epstein raped her in New York.

---

[10] Multiple photographs of [redacted] were recovered from Epstein's Palm Beach residence during the first Florida investigation.

*PRIVILEGED - ATTORNEY WORK PRODUCT/DELIBERATIVE PROCESS*
*CONFIDENTIAL - SUBJECT TO FED. R. CRIM. P. 6(e)*

[redacted] recalled travelling to New Mexico with Epstein approximately three times. Maxwell was present for each of those trips. She went more frequently to New York, but Maxwell was not around as often during the New York trips because Epstein and Maxwell did not live in the same residence in New York. [redacted] could not recall whether Maxwell would call her to make appointments to see Epstein while in New York. She generally recalled assistants calling to invite her to see Epstein. [redacted] recalled that Maxwell was much more present when she first met Epstein and that Maxwell made travel arrangements for [redacted] during her earlier trips with Epstein. [redacted] also recalled at least one incident of sexual abuse in New York when she was a minor during which Maxwell was present, but she explained that Maxwell was present for more instances of abuse in Florida. [redacted] did not wish to discuss the details of incidents of abuse during this meeting.

Third, on December 17, 2019, [redacted] was interviewed for a third time in [redacted] She recalled that when she was still living in [redacted] (before she moved to [redacted] when she was 17 years old), she would speak with Maxwell on the phone about plans to travel with Epstein. She also recalled flying on Epstein's private jet with Maxwell. When asked to describe specific instances of abuse before she moved to [redacted], [redacted] described sexual assaults ranging from Epstein masturbating in her presence to Epstein touching her genitals with a vibrator to Epstein engaging in oral sex with her to Epstein raping her. When asked which specific acts Maxwell was physically present for, [redacted] indicated that she was not entirely sure. She could only specifically recall instances in which Maxwell was in the room while Epstein masturbated and directed [redacted] to touch his nipples. She could not recall specifically whether Maxwell was present when Epstein touched [redacted] genitals or engaged in other sexual contact with her. [redacted] did not recall Maxwell ever touching her during an instance of sexual abuse with Epstein.

[redacted]

5. [redacted]

We have interviewed [redacted] on three occasions.

First, on August 27, 2019, [redacted] met with us in New York. During that interview, [redacted] described meeting Ghislaine Maxwell [redacted] lived at the time, when [redacted] was about 17 years old. Maxwell talked about her boyfriend, Jeffrey, and how much he was going to like [redacted] One day when Epstein was [redacted] Maxwell invited [redacted] to come to Maxwell's residence, where she was introduced to

Epstein. During that first meeting, Maxwell told [redacted] that Epstein needed a massage every day and asked [redacted] to give Epstein a massage. Maxwell then brought [redacted] up to a bedroom where Epstein was in a robe. While Maxwell waited outside the room, Epstein removed the robe and got onto the bed. [redacted] then massaged Epstein. During the massage, Epstein rolled over, touched [redacted] and put her hand on his penis.

After that first sexual assault, Maxwell repeatedly called [redacted] who was still 17, and invited her to see Epstein at Maxwell's residence [redacted]. During these visits, Epstein engaged in sexual contact with [redacted] At the time, [redacted] was not in school but still lived with [redacted].[11] [redacted] is confident Maxwell knew her age because Maxwell got her an expensive gift for her 18th birthday.

Eventually, Maxwell and Epstein invited [redacted] to travel with them to Palm Beach, Paris, the Virgin Islands, and New York. Every time [redacted] travelled with Epstein, he engaged in sexual contact with her. This included sexualized massages during which Epstein used a vibrator to touch her genitals. [redacted] recalled times that she resisted Epstein's advances, and Maxwell encouraged her to do what Epstein wanted, saying things like "don't be silly" to minimize the conduct. On one occasion, Maxwell encouraged [redacted] to wear a schoolgirl uniform for Epstein. When [redacted] resisted, Maxwell responded, "don't be so frigid." On one occasion, Maxwell asked [redacted] if she knew someone who could give Epstein "a blow job" because Maxwell did not feel like doing so that day.

Maxwell also made comments about Epstein's sexual preferences, noting that he preferred younger looking females and wanted to constantly have sex. [redacted] understood that Maxwell was Epstein's girlfriend, but she came to understand that Maxwell allowed Epstein to engage in sexual contact with other people, as long as it did not include intercourse. Nevertheless, Epstein raped [redacted] on multiple occasions, and he told [redacted] not to tell Maxwell about the rapes because it violated their understanding. Maxwell also asked [redacted] to bring other girls to engage in sex with Epstein and repeatedly asked [redacted] to engage in sex acts with Epstein. Maxwell continued to ask [redacted] to engage in sexualized massages with Epstein into her 20s. Over the years, Leslie Groff would contact [redacted] to invite her to meet Epstein and would make her travel arrangements.

Second, on September 19, 2019, [redacted] met with us in New York. During this interview, she again described meeting Maxwell when she was 17 years old. Maxwell then introduced [redacted] to Epstein, and during that first meeting, Maxwell encouraged [redacted] to give Epstein a full body massage. Maxwell then waited outside the room while [redacted] gave Epstein a massage, during which Epstein put her hand on his penis. After the massage was over, Maxwell asked how it went, whether [redacted] had fun, and whether Epstein liked it. Maxwell then paid [redacted] for the massage.

---

[redacted]

When [redacted] turned 18, Maxwell gave her a gift with a card signed by both Epstein and Maxwell. [redacted] also recalled Maxwell telling someone else at a later date that Maxwell met [redacted] when she was 17 years old. [redacted] was not certain whether she began travelling with Epstein and Maxwell before or after her 18th birthday. After she was 18 or 19 years old, [redacted] recalls Maxwell saying she was getting too old to have a child with Epstein. Maxwell also told [redacted] that Epstein needed sex three to four times per day.

Third, on December 15, 2019, we met with [redacted]

[redacted] still could not recall whether she first traveled with Epstein and Maxwell when she was 17 or when she was 18. She was certain, however, that she was 17 years old during at least the first two instances when Epstein sexually assaulted her [redacted]. Both instances occurred at Maxwell's residence [redacted]. [redacted] had previously described the first instance, which involved Maxwell encouraging her to provide Epstein a massage and waiting outside the bedroom while [redacted] massaged Epstein, and Epstein first sexually abused [redacted]

Sometime after leaving Maxwell's residence following that first incident of abuse, [redacted] received a call from Maxwell. On the call, Maxwell said [redacted] was a "clever girl" and that "Jeffrey was very impressed," so Maxwell wanted to schedule a return visit. [redacted] agreed and sometime later, she returned to Maxwell's London residence. When [redacted] arrived, Maxwell told her, in substance, that Maxwell was relieved [redacted] was there because otherwise "it falls to me," which [redacted] understood to mean that Maxwell had to provide Epstein with sexualized massages if no one else was available. After this conversation, Maxwell walked [redacted] to a bedroom and opened the door. Inside the room, Epstein was fully nude and standing facing Maxwell and [redacted] Maxwell said "I'll leave you to it," and left. [redacted] did not wish to discuss the details of the sexual abuse that occurred during this second massage at this time. After the massage, Maxwell asked if [redacted] had a nice time, and then changed the subject to chat about [redacted] upcoming plans.

6. [redacted]

On September 28, 2019, [redacted] was interviewed in New York. [redacted] explained at the outset of the interview that her recollection had been refreshed by reviewing the journal she kept while in high school which we are in the process of obtaining. [redacted] met Epstein in [redacted] and worked in some capacity for Epstein. Between [redacted], when [redacted] was 16 years old and a junior in high school [redacted], she took two trips to meet with Epstein.

First, [redacted] told [redacted] that Epstein was interested in meeting her and helping her with college. Epstein then paid for [redacted] to fly out [redacted] to New York [redacted]. While in New York, [redacted] stayed [redacted]. [redacted] saw Epstein twice during this New York trip. During the first meeting, Epstein bought [redacted] tickets to see the Phantom of the Opera and met with them before the show at his New York residence. During that meeting, Epstein asked [redacted] about her life and offered to help her with her education. During the second meeting, Epstein took [redacted] to see the movie 12 Monkeys. Epstein sat between [redacted] during the movie and touched [redacted] inappropriately throughout the movie. In particular, Epstein touched [redacted] leg, stroked her arm, and held her hand.

Second, [redacted], [redacted] flew alone to New Mexico, where she spent a weekend with Epstein and Ghislaine Maxwell. [redacted] recalls that [redacted] spoke with Epstein on the phone about this trip. [redacted] all knew that Maxwell would be on the trip, which made them feel more comfortable about [redacted] traveling alone.[12] Epstein paid for [redacted] to fly to New Mexico and arranged for a driver to take her to Epstein's New Mexico ranch. Once at the ranch, [redacted] spent time with Maxwell, who expressed interest in [redacted] background and life. [redacted] specifically remembers telling Maxwell that she was a junior in high school because they discussed her homework, her plans for the upcoming senior year, and her desire to attend college.

During this trip to New Mexico, [redacted] recalls several instances of conduct that made her feel uncomfortable. First, Maxwell encouraged [redacted] to massage Epstein's feet with her and showed [redacted] how he liked to have his feet rubbed. Second, [redacted] went to the movies with Epstein and Maxwell to see Primal Fear, and outside the theater, Maxwell pulled down Epstein's sweatpants a bit in a joking manner. During the movie, Epstein again held [redacted] hand and stroked her arm, but he did not appear to be trying to hide this contact from Maxwell. Third, Maxwell insisted on giving [redacted] a massage during which [redacted] was either partially or fully nude. The massage took place in a room with an open door leading to the next room where Epstein was located, such that Epstein may have been able to observe [redacted][13] During the massage, Maxwell rubbed [redacted] chest, touching the sides of her breasts. Finally, one morning, Epstein came into [redacted] room, got into bed with her, and said he wanted to cuddle. [redacted] said she needed to go to the bathroom, and left the room. [redacted] does not recall having any other contact with Epstein or Maxwell after the New Mexico trip.

---

[redacted]

[redacted]

7. [redacted]

[redacted] was interviewed on July 31, 2019, August 27, 2019 and November 21, 2019, all in New York.

First, during the July 31, 2019 interview, [redacted] said that when she was 17 years old [redacted] Epstein sexually assaulted her in New Mexico, Florida, and Paris.[14] [redacted] first met Epstein through [redacted] who worked as a masseuse for Epstein and introduced Epstein as someone who could help [redacted] was on the verge of homelessness and had nowhere else to go. [redacted] first introduced [redacted] to Epstein at a hotel [redacted]. During that first meeting, Epstein expressed interest in [redacted] background and offered to pay for her to travel and attend school.

After that first meeting, Epstein invited [redacted] to his home in New Mexico. During that first trip, Epstein asked [redacted] to give him a massage. [redacted] was present in the massage room, and both [redacted] and [redacted] were in swimsuits. At first, Epstein asked [redacted] to remove her top and began fondling [redacted] froze as Epstein turned to her and began to fondle her genitals. During this first interview, [redacted] was too distressed to describe any other details regarding this assault. She explained, however, that after that first incident, when she was still 17, she travelled with Epstein to other residences where he sexually assaulted her. In particular, [redacted] recalled during this interview that Epstein assaulted her in New Mexico, Florida, and Paris on four occasions when she was 17 years old. Two of the assaults involved Epstein sneaking into her room at night and raping her. [redacted] asked not to discuss the details of those assaults during this first interview.

In [redacted], Epstein paid for [redacted] to travel to [redacted] for school. In [redacted], [redacted] turned 18 [redacted]. After turning 18, [redacted] continued to spend time with Epstein for approximately two more years. During that two-year period, Epstein paid for [redacted] to attend school [redacted] for three months-long periods.[15] When she was not in school, [redacted] either travelled with Epstein or resided at an apartment he provided for her [redacted] in New York. During that same period, Epstein continued to engage in sexual contact with [redacted] Eventually the stress of continued abuse led [redacted] to develop an eating

---

[14] As indicated below, during a subsequent interview, [redacted] clarified that she was in fact assaulted in New Mexico, New York, Florida, and the Virgin Islands when she was 17 years old. Although Epstein engaged in sexual contact with her in other locations, including Paris, she was 18 years old when those incidents took place.

[15] We have identified message pads recovered during the first Florida investigation referencing instances in which "[redacted] called for Epstein during this period.

disorder. When [redacted] confided in Epstein about her eating disorder [redacted], he paid for her to fly to Arizona and then essentially disowned her, cutting off contact.

While travelling with Epstein, [redacted] became familiar with the people in his world, including [redacted] Leslie Groff, Ghislaine Maxwell, and Jean Luc Brunel. [redacted] provided us with copies of photographs she still had from her time with Epstein, including photographs featuring Epstein, [redacted] Maxwell, and Brunel.

[redacted] recalled that [redacted] was approximately five years older than [redacted] and acted as Epstein's assistant. In that capacity, [redacted] arranged the scheduling for Epstein's flights on his private jet and coordinated with his pilots and house staff to arrange for Epstein's travel. As described above, [redacted] was present when Epstein sexually assaulted [redacted] in a massage room at Epstein's New Mexico residence. [redacted] could not recall, however, whether she ever expressly discussed her age with [redacted] During this first interview, [redacted] was too distressed to discuss instances of sexual assault in detail, but she indicated that [redacted] was present for and participated in two assaults before [redacted] turned 18, and believed that during these assaults, [redacted] touched [redacted][16] [redacted] also recalled that [redacted] took photographs of [redacted] while at Epstein's Virgin Islands residence. Although [redacted] could not be completely sure, she believed that those photographs were taken when she was 17 years old. [redacted] did not recall whether she was clothed in the photos or if anyone else was in the photos.[17]

As [redacted] travelled with Epstein [redacted], she noticed a lot of girls coming and going to and from Epstein's residences in New York and Palm Beach. [redacted] recalled that these girls would stay for about an hour or so. They appeared young, but [redacted] but did not know whether any were under the age of 18. [redacted] recalled [redacted] saying generally that the girls were there to see Epstein.

[redacted] recalled that [redacted] became Epstein's girlfriend [redacted]. [redacted] met [redacted] after returning from her first trip [redacted]. [redacted] knows that [redacted] was 18 years old when they met. For about two years, [redacted] was [redacted] roommate when they travelled with Epstein, and they shared an apartment in [redacted] New York. As a result, the two became good friends. [redacted] referred to herself as Epstein's girlfriend, but in general, she and [redacted] did not discuss the details of their sexual activity with Epstein.

---

[16] As descried below, during a subsequent interview, [redacted] clarified that she only recalled one instance of sexual abuse when she was a minor for which [redacted] was present. [redacted] also clarified that she does not have a memory of [redacted] touching her during any instances of abuse.

[17] When executing a search warrant at Epstein's New York residence, the FBI recovered multiple photographs of [redacted] in which she is nude or partially nude and appears to be in a tropical location.

*PRIVILEGED - ATTORNEY WORK PRODUCT/DELIBERATIVE PROCESS*
*CONFIDENTIAL - SUBJECT TO FED. R. CRIM. P. 6(e)*

[redacted] understood Ghislaine Maxwell to be Epstein's "partner," who also handled scheduling along with [redacted] Her impression was that Maxwell's relationship with Epstein was more focused on business than personal matters.

[redacted] explained that Leslie Groff arranged payments for [redacted] schooling and also coordinated her commercial flights. [redacted] did not see Groff as often as she saw [redacted] and Maxwell because Groff did not travel with Epstein.

Second, during the August 27, 2019 interview, [redacted] provided additional details regarding her interactions with other people in Epstein's circle during her time travelling with Epstein. First, [redacted] explained that she understood [redacted] to be Epstein's assistant. [redacted] responsibilities included shopping, travel arrangements, and coordinating with Epstein's pilots. During the time [redacted] was travelling with Epstein [redacted], [redacted] went wherever Epstein did. During this same period, when Epstein was in New York, [redacted] resided in the same building [redacted] as [redacted] did, though in a different apartment. When in New York, [redacted] would sometimes call [redacted] and instruct her to come to Epstein's New York residence.

[redacted] again indicated that [redacted] was present for the first time Epstein assaulted her and was somehow involved in the second time Epstein assaulted her, but she was not emotionally prepared to describe the details of the assaults during this interview. [redacted] does not recall speaking explicitly with [redacted] about her age, but she does recall that [redacted] was present with Epstein and others for [redacted] 19th and 20th birthdays. When asked who else attended those birthdays, [redacted] recalled that Epstein and [redacted] were present as well.

When asked who else she recalled being associated with Epstein [redacted] mentioned that a female named [redacted] whose last name [redacted] could not recall, was present during an instance when Epstein sexually assaulted [redacted] in Virgin Islands. [redacted] recalled that [redacted] was older than [redacted] Again, though, [redacted] was not emotionally prepared to describe the details of that assault. [redacted] recalled that Leslie Groff booked [redacted] travel [redacted] for school. [redacted] also recalled that Ghislaine Maxwell often travelled with Epstein and would sleep in Epstein's room when they travelled. More generally, [redacted] explained that she did not discuss Epstein's sexual abuse with anyone, including [redacted] Maxwell, Groff, and [redacted] because she felt that it was taboo and not something she should mention.

[redacted] recalled two instances when Epstein asked her to provide massages to other men, both of which took place after [redacted] turned 18. First, [redacted] massaged Jean Luc Brunel, but the massage did not involve any sexual contact. Second, when [redacted] was at Epstein's Paris residence, Epstein instructed her to massage Harvey Weinstein there. When [redacted] went into the massage room, Weinstein directed [redacted] to remove her shirt. [redacted] refused, and in response, Weinstein became angry and told [redacted] to tell [redacted] or Weinstein's assistant Bonnie

to come instead. [redacted] left and told Epstein what happened. Epstein apologized to [redacted] for putting her in that position.

Third, during the November 21, 2019 interview, [redacted] provided additional details regarding certain instances of abuse and clarified her memories of her interactions with Epstein before turning 18. [redacted] recalled that when she was about 17 years old [redacted] introduced her to a man named Joseph Alvarez, a/k/a "Gypsy," [redacted], who taught both sisters how to give massages. Alvarez then introduced [redacted] to Epstein, and she began travelling with him. Later [redacted], [redacted] introduced [redacted] to Epstein. That first meeting took place at a hotel [redacted], where [redacted] met both Maxwell and Epstein. During the meeting, [redacted] massaged Epstein's feet while he asked [redacted] about her life and background. [redacted] told him she wanted to go back to school, and Epstein offered to pay for her to attend school [redacted]. Following that meeting, Epstein called [redacted] on multiple occasions, sometimes with Leslie Groff connecting the calls. Eventually, Epstein committed to paying for [redacted] to attend school [redacted]. In response, [redacted] gave up the room in the apartment where she was living, gave notice to her job, and prepared to travel [redacted].

A few weeks before [redacted] left [redacted], Epstein invited [redacted] to New Mexico, and she accepted the invitation. [redacted] then travelled to Epstein's New Mexico residence in [redacted] when she was still 17 years old. She recalls Epstein, Maxwell, [redacted] and other females whose names she does not remember being at the residence when she arrived. [redacted] remained at the New Mexico residence for a couple of days before returning [redacted]. Early on in the visit, Maxwell took [redacted] horseback riding, and [redacted] told Maxwell about her life and background. Although [redacted] does not specifically recall saying her age, she believes Maxwell would have had strong indications of her age based on that conversation. Later during that same trip, [redacted] went swimming in the pool with [redacted]. As they got out of the pool in their swimsuits, Epstein called them over to give him a massage in a nearby massage room. Once inside the massage room, Epstein removed [redacted] top, began masturbating, and touched [redacted] breasts and genitals. Epstein then touched [redacted] genitals. [redacted] froze and began crying, but Epstein continued to touch her genitals and masturbate until he ejaculated. [redacted] recalled that [redacted] seemed at ease, as though this was a normal occurrence. [redacted] never spoke about the incident with [redacted].

After [redacted] returned [redacted], Epstein called her multiple times, both to discuss her plans to attend school and to invite her on another trip. [redacted] agreed to go on another trip with Epstein [redacted], when she was still 17. In or around [redacted], she flew [redacted] to New York, where she visited Epstein at his New York residence. Once there, Epstein brought [redacted] alone into the dining room where he reached down her pants and fondled her. From New York, [redacted] flew with Epstein, Maxwell, [redacted] and another female to Palm Beach, where the group stayed at Epstein's Palm Beach residence for a few days. One of the nights in Palm Beach, Epstein came into the room where [redacted] was sleeping and raped her. The same group then flew from Palm Beach to the Virgin Islands, where they stayed on at Epstein's Virgin Islands residence. One of the nights on the island, Epstein again came into the

room where [redacted] was sleeping and raped her. The same group then flew back to Palm Beach.[18] From there, [redacted] believes she flew back to [redacted]

After that trip, Epstein paid for [redacted] to travel to Spain in approximately [redacted] and attend school there. While in Spain, [redacted] turned 18 in [redacted]. At the end of the semester in the spring of [redacted], Epstein paid for her to fly back to the Virgin Islands and rejoin him at his Virgin Islands residence.[19] Over the next approximately two years, Epstein periodically paid for [redacted] to travel [redacted] to attend school for months at a time. When [redacted] was not attending school, she travelled with Epstein to his various residences. During the periods she was with Epstein, her understanding was that either [redacted] or Maxwell scheduled Epstein's massages. She recalled thinking that the masseuses she saw were about her age (18 or 19 years old).

[redacted]

8. [redacted]

On September 10, 2019, we met [redacted] with [redacted]

On November 4, 2019, we interviewed [redacted] in [redacted] In or around [redacted], when [redacted] was approximately 16 years old, a friend of hers named [redacted] asked if

---

[18] We have identified flight records for Epstein's private jet corroborating [redacted] account of this trip. In particular, flight records [redacted]

[19] The metadata for some of the nude photographs of [redacted] recovered from Epstein's New York residence suggest that the photos were created [redacted], which would be consistent with [redacted] second trip to the Virgin Islands.

[redacted]

she wanted to make money by giving a massage to a billionaire. [redacted] said yes, and [redacted] connected her with a young man named [redacted][21] who gave [redacted] a ride to Epstein's Palm Beach residence. [redacted] told [redacted] to lie and say she was 18 years old. Once at the residence, [redacted] met [redacted] then [redacted] brought [redacted] to the massage room while [redacted] waited downstairs. [redacted] then gave Epstein a massage, during which Epstein masturbated and groped [redacted] genitals and buttocks. At the end of the massage, Epstein offered to pay [redacted] if she brought other girls to engage in similar acts. During that initial meeting, [redacted] lied and said she was 18 years old and in college. [redacted] then went downstairs and gave [redacted] her phone number.

After that first encounter, [redacted] began bringing other girls to massage Epstein. To coordinate the massage appointments, [redacted] spoke on the phone with [redacted] [redacted] continued bringing girls to Epstein's Palm Beach residence for approximately two more years until she was 18 years old and the police began investigating Epstein. In total, [redacted] estimates she went to Epstein's Palm Beach residence once or twice a month. She recalled that Epstein often went weeks without coming to Florida. When [redacted] brought a new girl, Epstein always paid [redacted] $200 himself. Sometimes [redacted] would bring girls up to the massage room, and sometimes [redacted] did. [redacted] would wait downstairs for about an hour until the girl came back down, then [redacted] would go up to talk with Epstein and get paid by him. [redacted] did not recall any of the girls she brought being upset after a massage, as she always warned them what to expect. [redacted] only recalls dealing with [redacted] and never met or spoke with Maxwell, [redacted] or Groff.

In total, [redacted] brought about six different girls to give sexualized massages to Epstein. All except one were minors. At one time, [redacted] brought someone in her 20s, and [redacted] told [redacted] not to bring her again, though he did not say why. All the other girls [redacted] brought were younger looking, thinner girls. [redacted] told everyone she brought to say they were 18 years old. [redacted] did not recall having any personal conversations with [redacted] and does not know whether [redacted] knew how old she or any of the girls she recruited were. [redacted] recalled that [redacted] occasionally asked [redacted] to bring a specific girl. [redacted] recalls referring to the girls she recruited as her "friends" to [redacted] Eventually, some of the girls [redacted] brought began recruiting other girls themselves. [redacted] recalled walking into the massage room with a recruit at some point and seeing [redacted] and Epstein leaving the shower/steam room together, which led her to believe they had a sexual relationship. The police approached [redacted] in 2006, after which she never spoke with Epstein or [redacted] again.

9. [redacted]

[redacted] was interviewed on July 14, 2019 in [redacted] When she was

---

[redacted]

approximately 13 or 14, [redacted] a friend of hers named [redacted] recruited [redacted] to give massages to Epstein at his Palm Beach residence. Over a period of approximately two years, [redacted] frequently went to his residence and engaged in massage sessions with Epstein, during which he touched her breasts and genitals, used a vibrator on her genital area, and masturbated in front of her. [redacted] also became a prolific recruiter and estimates that she may have brought as many as one hundred underage girls to Epstein's Palm Beach residence for massages.[22] [redacted] became pregnant at the age of 15, after which Epstein no longer wanted to see her, but he allowed [redacted] to continue recruiting other girls for massages. [redacted] received $200 for each massage she performed and for each massage performed by a girl she brought to Epstein's Palm Beach residence.

[redacted] recalled that the first time a new girl gave Epstein a massage, Epstein would often ask [redacted] to stay in the massage room with the new girl. [redacted] remembered that [redacted] would sometimes bring girls up to the massage room, but [redacted] would then leave before the massage began. [redacted] would sometimes pay [redacted] following massages. [redacted] also provided [redacted] with gifts from Epstein, including a bikini, and baby shower gifts when [redacted] became pregnant.

[redacted] recalled that she primarily scheduled massages through [redacted] over the phone. When scheduling an appointment for a new girl, [redacted] would call, say she had "someone" for Epstein and would describe what the girl looked like. Occasionally [redacted] would pick [redacted] up and drive her to Epstein's Palm Beach residence. [redacted] recalled [redacted] saying things like, "you know what Jeffrey likes." [redacted] also believed that [redacted] knew [redacted] was in high school, but she could not recall a specific conversation in which [redacted] told [redacted] her age or that she was in high school.

[redacted] recalled lying and telling Epstein that she was 16 years old when they met. She also told Epstein that the girls she recruited were all 16 or older. [redacted] recalled one incident, however, when Epstein was angry with her for bringing an older girl who was about 18. As a result, [redacted] understood that Epstein wanted younger girls. [redacted] recalled bringing girls to Epstein's residence approximately twice per week, most of whom were between the ages of 14 and 16.

[redacted] ultimately stopped recruiting girls to massage Epstein after she was approached by the FBI [redacted] During the initial Florida investigation, [redacted] spoke with Epstein's attorneys. Although [redacted] could not recall the names of any of these attorneys, she recalled that they pressured her to lie and tell investigators that she had told Epstein she was 18 years old. [redacted] recalled Epstein's lawyers suggesting that if she told the truth, her child would be taken away

[22] We have identified message pads recovered during the first Florida investigation referencing "[redacted] At least one of these messages indicates that [redacted] is bringing another female to Epstein's residence.

from her because she engaged in recruiting activities. [redacted]

10. [redacted]

[redacted] was interviewed on September 12, 2019 in New York. [redacted] regularly visited Epstein's Palm Beach residence from approximately [redacted], when she between 16 and 18 years old. When [redacted] was about 16 years old and a sophomore in high school [redacted], she was recruited by a friend named [redacted][23] [redacted] explained that [redacted] could make money by giving nude massages to an older man. [redacted] agreed and went with [redacted] to Epstein's Palm Beach residence, where she believes she met [redacted] While [redacted] waited in the kitchen, [redacted] went up to the massage room, where she engaged in a paid sexualized massage with Epstein. Over the ensuing months, [redacted] returned to Epstein's Palm Beach residence many times to engage in paid sexualized massages. The sexual abuse escalated to include oral sex and rape. [redacted] stopped going to Epstein's residence [redacted] when she was in college and the police approached her.

[redacted] described Epstein giving her cash and gifts, including a rental car. She also recalled that Epstein helped with her college essays. Epstein also sent [redacted] flowers in connection with her performance in a high school play.[24] [redacted] indicated that Epstein took multiple nude photographs of her in his Palm Beach residence.

[redacted] generally described [redacted] as being frequently present at the Palm Beach house. [redacted] would frequently call [redacted] to tell her when Epstein would be in town and to schedule massages. During at least some of these conversations, [redacted] told [redacted] that she was calling from New York. [redacted] also recalled being paid primarily by Epstein, but sometimes by [redacted] or someone named Alfredo.[25] [redacted] indicated that she believes [redacted] knew she was underage; however, [redacted] did not recall any specific conversations or discussions of her age with [redacted] Nor could [redacted] remember any discussions she had with [redacted] of details of her life that would have been suggestive of age, such as high school classes or extracurricular activities. [redacted] explained, though, that she openly talked with Epstein about taking the SATs and applying for college and would work on her college application essays at Epstein's home. She

[23] [redacted] was interviewed during the Florida investigation and reported engaging in multiple paid sexualized massages with Epstein at his Palm Beach residence when she was a minor. [redacted] also admitted to bringing two other minor girls, including [redacted] to provide Epstein with sexualized massages.

[24] We have identified messages recovered from Epstein's Palm Beach residence during the first Florida investigation referencing "[redacted] which appear to corroborate [redacted]s contact with Epstein.

[25] The FBI has identified this individual as a housekeeper who is now deceased.

also recalled that [redacted] organized drivers to pick [redacted] up from [redacted] where she lived.

[redacted] also recalled instances in which [redacted] walked [redacted] to the massage room and set up the table while there were sex toys visible in the room. [redacted] also recalled one instance in which [redacted] came into the massage room when [redacted] was still naked after a sexualized massage. However, [redacted] did not recall any specific conversations she had with [redacted] about sex. [redacted] remembered [redacted] asking her to bring other girls that looked like [redacted] over to Epstein's home.

[redacted] recalled seeing Maxwell at the house only a few times, and did not have any substantive conversations or interactions with her.

[redacted] referred to [redacted] as Epstein's "sex slave" and believed that Epstein had "bought" [redacted] told [redacted] that [redacted] was one of Epstein's girlfriends. When [redacted] was 16 years old, [redacted] engaged in sex acts with [redacted] at Epstein's direction.

After the police began investigating Epstein in 2005, [redacted] received a call from a girl named [redacted][26] who also went to Epstein's Palm Beach residence for massages. [redacted] asked if [redacted] if she had spoken with law enforcement and added that [redacted] would be "taken care of" if she did not talk.

11. [redacted]

On September 18, 2019 [redacted] was interviewed in [redacted] When [redacted] was either 16 or 17 years old, [redacted] a friend of hers named [redacted][27] told [redacted] she could make $200 by giving a massage in her underwear to an older man. [redacted] agreed and went to Epstein's Palm Beach residence with [redacted] on one occasion. When [redacted] and [redacted] arrived at Epstein's Palm Beach residence, a woman named [redacted] greeted [redacted] and [redacted] and had them wait downstairs. At some point [redacted] said Epstein was ready, and both girls went up to the massage room. Both girls got undressed, Epstein came into the room, both girls started massaging him, and then Epstein told [redacted] to leave. Epstein then masturbated and touched [redacted] genitals with a vibrator. At the end of the massage, [redacted] went back downstairs to where [redacted] was waiting. Epstein came down and paid both [redacted] and [redacted] Sometime later, [redacted] told [redacted] that [redacted] reached out to ask whether [redacted] would come back. [redacted] refused and never saw Epstein again.

---

[26] We have identified this individual as [redacted] who participated in an interview, which is summarized below.

[27] The FBI is still trying to identify this individual.

*PRIVILEGED - ATTORNEY WORK PRODUCT/DELIBERATIVE PROCESS*
*CONFIDENTIAL - SUBJECT TO FED. R. CRIM. P. 6(e)*

12. [redacted]

On October 15, 2019, [redacted] was interviewed in [redacted], when [redacted] was approximately 16 years old and living in Palm Beach, her friend [redacted][28] invited her to give a back massage to a nice older guy for $200. [redacted] agreed and went with [redacted] to Epstein's Palm Beach residence, where [redacted] engaged in a sexualized massage with Epstein. For about the next two years, until she was about 18 years old [redacted], [redacted] provided paid sexualized massages to Epstein approximately once per week. At some point, Epstein began bringing his girlfriend [redacted] into the room during these massages to engage in sex acts with [redacted] at Epstein's direction. [redacted] recalled that Epstein sent her to a David Copperfield show for her 18th birthday. [redacted] also brought one of her friends to massage Epstein, but the friend only went to Epstein's Palm Beach residence once.

Epstein's assistant [redacted] would often call [redacted] to schedule massage appointments. Although [redacted] discussed her age with Epstein, she does not recall explicitly discussing her age with [redacted] Occasionally, [redacted] walked [redacted] to the massage room, but she was never involved in any sexual contact. Either Epstein or [redacted] paid [redacted] after each massage. Around the time [redacted] turned 18, she stopped receiving calls inviting her to massage Epstein.

[redacted], [redacted] was contacted by the FBI and interviewed. [redacted] did not recall [redacted] or anyone else connected to Epstein contacting her during that investigation.

13. [redacted]

On October 16, 2019, [redacted] was interviewed in [redacted] When [redacted] was about 15 or 16 years old and living in Florida, a girl from her high school named [redacted] asked if she wanted to give a man a massage for $200. [redacted] agreed and went with [redacted] to Epstein's Palm Beach residence. Once there, Epstein met [redacted] in the kitchen and brought her to the massage room while [redacted] waited downstairs. While in the massage room, Epstein asked [redacted] to remove her clothes. [redacted] then massaged Epstein while undressed. Epstein then paid [redacted] and she left.

When [redacted] returned for a second massage, Epstein used a vibrator to touch her genitals, after which he paid her $200. Over the next few months, [redacted] returned to Epstein's Palm Beach residence about ten more times to provide Epstein with paid sexualized massages. After that first massage, [redacted] called [redacted] to schedule each of her subsequent massages. [redacted] also brought a friend of hers to massage Epstein once and was paid $200 for bringing her. [redacted] never told Epstein or [redacted] her age, but she did recall telling Epstein that she was in high school and a cheerleader.

---

[28] We believe this individual to be [redacted]

14. [redacted]

On October 16, 2019, [redacted] was interviewed in [redacted] When [redacted] was about 15 years old [redacted], her friends [redacted] and [redacted] asked if she wanted to give a man a massage for money. [redacted] agreed and later went with [redacted] to Epstein's Palm Beach residence. Upon arriving, an Asian woman directed [redacted] and [redacted] to go up to the massage room. When they got to the room, a tall woman with short brown hair, whom [redacted] now believes to be Maxwell, walked out of the shower in a towel, handed [redacted] lotion, and said "I think you'll be needing this more than me," then left. Epstein then entered in a robe and got on the massage table. [redacted] and [redacted] began massaging Epstein, then [redacted] left, at which point, [redacted] removed her clothes, and Epstein touched her genitals. During the massage, [redacted] told Epstein that she was 16 because [redacted] had told her to lie and say she was 16, when she was in fact 15 years old. After the massage, [redacted] gave [redacted] $200 and said that she ([redacted] was also paid $150. They then left together. [redacted] never returned and never saw Epstein again.

15. [redacted]

[redacted] was interviewed on July 11, 2019 in Florida. [redacted], when [redacted] was 14 years old, some of her friends, including [redacted] recruited her to give Epstein a massage at his Palm Beach residence, during which Epstein touched [redacted] breasts and genitals. [redacted] recalled a "lady" with black hair meeting her and [redacted] in Epstein's kitchen before the massage, but [redacted] did not speak with the lady or learn her name. Rather, [redacted] spoke exclusively with the lady. [redacted] did not participate in any other massages with Epstein, but she subsequently recruited one other minor girl to give Epstein a paid sexualized massage.

16. [redacted]

[redacted] was interviewed on July 11, 2019 in [redacted], when [redacted] was about 16 years old, her friend [redacted] recruited her to give Epstein massages at his Palm Beach house. [redacted] provided Epstein with two massages and was sexually abused during both. During the first, Epstein touched [redacted] breasts and genitals. The second involved more extensive abuse, which [redacted] did not want to describe during our interview. [redacted] recalled that a petite blonde woman named [redacted] who appeared to be in her early 20s, took [redacted] upstairs to the massage room before both massages. After both massages, [redacted] paid [redacted] $200. After the first massage, [redacted] took [redacted] phone number, and, subsequently, [redacted] called [redacted] to invite her back. After the second massage, [redacted] did not want to return, but [redacted] called four or five times and pressured her to return. [redacted] ultimately did not return.

[29] We have identified these individuals as [redacted] and [redacted] whose interviews are described above.

17. [redacted]

[redacted] was interviewed on July 12, 2019 in [redacted], when [redacted] was 17 years old and working as a model [redacted], her friend [redacted] invited her to Epstein's Palm Beach residence. [redacted] was a 19-year-old model and told [redacted] that she was Epstein's girlfriend. Epstein gave [redacted] and [redacted] cash to go shopping, and they purchased underwear together at the mall. They returned to Epstein's house, and Epstein asked [redacted] to try on the underwear for him. [redacted] felt as though she could not say no, and complied. That same weekend, [redacted] invited [redacted] to come to Epstein's Palm Beach residence to receive a massage from a masseuse. She was told Epstein would not be present, and so she agreed. Shortly after [redacted] undressed for the massage, the masseuse left the room, and Epstein entered. He insisted that [redacted] flip onto her back (thereby exposing her breasts), so that he could show her what he had learned from a chiropractor about "adjustments." Epstein then rotated her shoulders and hips, but did not touch her chest. After this experience, [redacted] refused to return to the house and never saw or spoke with Epstein again.

18. [redacted]

[redacted] was interviewed on July 12, 2019 in [redacted] when [redacted] was about 16 years old, a friend of hers named [redacted] recruited [redacted] to give Epstein a sexualized massage at his Palm Beach residence. During the first massage, [redacted] was in the room with [redacted] Approximately one month later, [redacted] told [redacted] that "they" asked for [redacted] to come back. [redacted] returned for a second massage, this time by herself. During both massages, Epstein instructed [redacted] to remove her clothes and used a vibrator to touch [redacted] genitals while he masturbated. [redacted] recalled telling Epstein that she was in high school. She recalled another woman inside the house when she arrived, but she did not recall the woman's name or appearance.

19. [redacted]

[redacted] was interviewed on July 13, 2019, in New York. [redacted], when [redacted] was approximately 14 years old, another young woman befriended [redacted] outside her school [redacted]. [redacted] described the young woman as white and slim with mid-length brown hair, but [redacted] could not recall the young woman's name or any other identifying details.[31] After [redacted] and the young woman became friends, the young woman invited [redacted] to Epstein's Manhattan residence. Over approximately the next year, [redacted] provided Epstein with

---

[30] [redacted] was interviewed during the Florida investigation and reported engaging in multiple paid sexualized massages with Epstein at his Palm Beach residence when she was a minor. [redacted] also admitted to bringing two other minor girls, including [redacted] to provide Epstein with sexualized massages.

[31] We have not identified this individual.

nude massages at the Manhattan residence, during which Epstein touched her breasts and masturbated. [redacted] was paid $300 in cash following each massage. [redacted], while [redacted] was massaging Epstein, he asked her to get on top of him, which she did, and he then raped her despite her protests to stop. After the rape, [redacted] stopped going to Epstein's residence and did not see him again.

[redacted] recalled that either Epstein himself or a secretary would schedule [redacted] massage appointments. [redacted] also recalled that the secretary would be near the entrance to the house when [redacted] arrived for massages and sometimes paid [redacted] after the massages. [redacted] cannot recall the secretary's name or appearance. [redacted] also remembered that a maid would sometimes bring her to the massage room, but again she did not recall the name or appearance of any particular maid.

20. [redacted]

[redacted] was interviewed on July 17, 2019 in [redacted], when [redacted] was 16 years old, a friend of hers named [redacted] recruited [redacted] to give Epstein a massage at his New York residence. [redacted] went to Epstein's New York residence and provided him with massages on two occasions. During both massages, Epstein masturbated, touched [redacted] and used a vibrator on her genitals. [redacted] recalled Epstein telling her: "you look so young." [redacted] brought a 19-year-old friend to Epstein's New York residence to give Epstein a massage, after which Epstein paid her $200. [redacted] recalls that she was given the phone number of a woman to call to schedule massage appointments. That same woman contacted [redacted] to tell her not to bring that friend again because she was too old, but [redacted] could not recall the woman's name and could not provide a description of the woman.

21. [redacted]

[redacted] was interviewed on July 26, 2019 in New York. [redacted] was recruited by three of her friends—named [redacted] and [redacted] to perform a massage for Epstein at his New York residence [redacted], when [redacted] was about 17 years old. [redacted] only met Epstein once and was accompanied by [redacted] on that visit. When [redacted] and [redacted] arrived at Epstein's New York residence, an older woman in her 40s or 50s, who appeared to be a secretary, answered the door, but [redacted] does not recall the woman's name or any other identifying characteristics. The secretary directed [redacted] and [redacted] to the massage room, where they met Epstein. During the massage, Epstein touched [redacted] genitals and directed her to touch his genitals. After the massage, the same secretary provided [redacted]

[32] We have identified [redacted] as [redacted] who, together with [redacted] recruited minor girls for sexualized massages with Epstein in New York [redacted]

*PRIVILEGED - ATTORNEY WORK PRODUCT/DELIBERATIVE PROCESS*
*CONFIDENTIAL - SUBJECT TO FED. R. CRIM. P. 6(e)*

and [redacted] with a white envelope containing cash. [redacted] never saw or spoke with Epstein again.

22. [redacted]

[redacted] was first interviewed on August 1, 2019 in New York. [redacted], when [redacted] was 16 and working as a model in New York, she was introduced to Epstein. On multiple occasions [redacted], [redacted] went to Epstein's Manhattan residence to engage in sexualized massages in exchange for money. During these sessions, Epstein masturbated and touched [redacted] genitals with a vibrator. The abuse escalated over time to include oral sex, and during her last meeting with Epstein, he raped her. Epstein knew [redacted] age, because she told him during their first meeting that she was 16.

Shortly after [redacted] met Epstein, he offered her an apartment in his building [redacted], and [redacted] accepted. Upon moving into the building, [redacted] met a woman named [redacted] (whom we believe to be [redacted] who lived in a different apartment in the same building. [redacted] recalled asking [redacted] when they first met whether she [redacted] should be scared or concerned about Epstein. In response, [redacted] brushed the concerns off, saying something like "you're fine." They did not otherwise interact much.

[redacted] recalled that on one occasion, [redacted] purchased white lace underwear for [redacted] at Epstein's direction. Epstein subsequently took pictures of [redacted] wearing the underwear. On another occasions, [redacted] recalled Epstein telling [redacted] that [redacted] was his "best little cocksucker." Additionally, [redacted], [redacted] was [redacted], and [redacted] wired [redacted] money so that she and [redacted] could travel to Paris and stay at Epstein's home there (though Epstein was not in Paris at the time they visited). [redacted] also recalled at least one instance when [redacted] called her to schedule a massage appointment with Epstein.

After Epstein raped [redacted] she decided to return home, and Epstein agreed to pay for her flight home. [redacted] recalled that someone named Ghislaine, whom [redacted] believed to be Epstein's assistant, emailed the plane ticket to her.

On September 18, 2019, [redacted] was re-interviewed [redacted]. In addition to confirming the information she provided during her prior interview, [redacted] provided additional details regarding her interactions with Epstein's employees.

[redacted] again stated that [redacted] worked for Epstein as an assistant. At some point Epstein said something about having [redacted] put [redacted] on his schedule. Both Epstein and [redacted] would call and/or text [redacted] to schedule massages with Epstein at his New York residence. [redacted] also sent [redacted] money via Western Union from Epstein when [redacted] was travelling in Europe. In addition, [redacted] recalled an instance in which Epstein forced her to perform oral sex on him while he sat on a cushion in a hallway inside his New York residence.

As [redacted] pulled away from Epstein's crotch, she saw [redacted] standing the hallway. [redacted] said "oh," then laughed, and walked away. Following that incident, Epstein bragged to [redacted] in front of [redacted] that [redacted] was his "best little cocksucker." In response, [redacted] said something like, "oh, good to know." [redacted] recalled hearing Epstein make this comment about her to [redacted] on more than one occasion. She also recalled that Epstein would refer to her as "one of my girls" to [redacted]

On a separate occasion, Epstein directed [redacted] to purchase new underwear for [redacted] He specified that [redacted] should go to Victoria's Secret and buy white underwear. Sometime later, [redacted] gave [redacted] a pair of white underwear. Epstein later photographed [redacted] in the underwear, but [redacted] was not present for those photographs. [redacted] could not recall whether [redacted] ever paid her for massages. [redacted] did not recall ever talking about her own life, background, or age with [redacted]

After [redacted] moved away from New York and stopped seeing Epstein, an assistant named [redacted] reached out to her on Epstein's behalf to schedule a return trip to visit Epstein. Following that call, [redacted] sent [redacted] a round-trip plane ticket to visit Epstein. [redacted] recalled that Ghislaine Maxwell was the name associated with the Expedia account that booked the ticket. [redacted] did not end up using the tickets. [redacted] never met [redacted] or Maxwell in person.

[redacted] explained that her only interaction with [redacted] was when [redacted] first moved into the apartment building on East 66th Street. [redacted] knocked on [redacted] door to check on her. [redacted] asked whether she [redacted] was safe here, and [redacted] reassured her that she was fine and safe.

23. [redacted]

[redacted] was interviewed on August 6, 2019 in New York. [redacted] when [redacted] was about 14 years old and attending high school [redacted], a friend named [redacted] invited her to give a rich guy a massage. [redacted] agreed and accompanied [redacted] to Epstein's New York residence. Upon arriving, [redacted] went with [redacted] to the massage room, where they massaged Epstein together. During the massage, Epstein masturbated and touched [redacted] genitals with a vibrator. Afterwards, Epstein paid both [redacted] and [redacted]

---

[redacted]

[34] We have identified [redacted] as [redacted] who, together with [redacted] recruited minor girls for sexualized massages with Epstein in New York. [redacted]

Epstein subsequently invited [redacted] to return, and over the next month, [redacted] engaged in paid sexual massages with Epstein at his New York residence approximately twice per week. [redacted] also knew that a girl named [redacted] was bringing girls to Epstein. After about a month, [redacted] began bringing other minor girls to massage Epstein, and Epstein paid [redacted] for each girl she brought. She recalled bringing as many as three or four minor girls to Epstein in a single week. [redacted] continued bringing girls to Epstein until she was 17 years old [redacted]. Sometimes [redacted] would participate in the massages, and sometimes she would wait outside the massage room. [redacted] also recalled a few occasions when Epstein directed her to engage in sex acts with a tall blonde girl, whose name she did not recall, but who we believe to be [redacted]. [redacted] did not recall whether she explicitly discussed her age or the ages of the girls she brought with Epstein. She stopped seeing Epstein after learning from the news that he was in trouble with law enforcement.

Other than Epstein, [redacted] recalled speaking with Leslie Groff on the phone when scheduling massages. Primarily, though, [redacted] recalled that Groff would answer the phone and then transfer her call to Epstein.

24. [redacted]

On September 18, 2019, [redacted] was interviewed in [redacted]. When [redacted] was about 15 years old [redacted], she was living [redacted] and went on a field trip to New York, where [redacted] was living at the time. [redacted] was staying at Epstein's New York residence, and [redacted] went there to visit her. While there, an assistant, whose name [redacted] does not recall, showed her around the mansion and took a clothed photograph of [redacted]. At some point, [redacted] mentioned to the assistant that she was on a high school field trip. The assistant took down [redacted] contact information, and then [redacted] left to go shopping.

A few weeks after [redacted] returned to [redacted] from the field trip, Epstein's assistant called her to say that Epstein wanted to meet her and invited [redacted] to see a David Copperfield show in Las Vegas. [redacted] accepted the invitation, and her mother coordinated with Epstein's assistant to arrange the logistics. [redacted] met up with [redacted], Epstein, and a few other females whose names she does not recall in Las Vegas, where they all saw the show. From there, the group went to Epstein's private jet and flew to New Mexico. During the flight, Epstein asked [redacted] her age, and she truthfully said she was 15 years old.

[redacted] and [redacted] then stayed on Epstein's New Mexico ranch for a few days. One day, a redheaded female on the trip asked to give [redacted] a massage.[35] [redacted] believes she saw a camera in the corner of the massage room. The redhead directed [redacted] to take off her clothes and then massaged her genital area. The next day, a middle-aged woman whose name [redacted]

[35] We have not been able to identify this individual.

does not recall (but who is *not* Ghislaine Maxwell), told [redacted] that Epstein wanted to see her. Epstein then took [redacted] up to his bedroom, where he asked her to give him a massage. Epstein then used a vibrator to touch [redacted] genitals. The next day, Epstein gave [redacted] and [redacted] cash to go shopping. Later in the trip, Epstein bought [redacted] white underwear from Victoria's Secret and photographed her wearing them.

At some point during this trip, Ghislaine Maxwell arrived on the property, but [redacted] did not interact with her. At the end of the trip, Epstein asked [redacted] what she wanted for her future. [redacted] said she wanted to go to college, and Epstein wrote her a $5,000 check, which [redacted] did eventually use to help pay for college. After [redacted] returned home, someone reached out and invited her to Epstein's island, but [redacted] declined and never saw Epstein again.

*B. Interviews of Victims Who Were Abused As Adults*

1. [redacted]

[redacted] was interviewed on August 27, 2019 in New York. [redacted] reported being sexually abused by Epstein as an adult. [redacted] is [redacted]. When [redacted] was over the age of 18, she met Ghislaine Maxwell in California through a man named Gypsy, who was teaching [redacted] to be a professional masseuse. Maxwell eventually recruited [redacted] to fly to Palm Beach to provide massages both Maxwell and Epstein. When [redacted] first arrived at Epstein's Palm Beach residence, Maxwell told her she would be fine and just to do whatever Epstein likes.

Over the next approximately three years, [redacted] travelled with Epstein and Maxwell as their masseuse, including on their trip to Africa with President Clinton. [redacted] provided normal massages to Maxwell multiple times. [redacted] also massaged Epstein, who forced her to engage in an escalating series of sexual acts with him. [redacted] recalled that Epstein raped her approximately a dozen times over the three years she travelled with him. She never discussed the abuse with anyone else in Epstein's circle, including Maxwell.

[redacted] recalled that Leslie Groff and Maxwell coordinated the travel logistics for her and Epstein. She recalls that Groff was right outside the closed door to Epstein's office on one occasion when Epstein forced [redacted] to perform oral sex on him, but she does not know whether Groff knew what was happening inside the office. [redacted] believed Epstein was going behind Maxwell's back when he abused her and did not think Maxwell knew anything about Epstein's sexual advances toward her. Throughout her time with Epstein, [redacted] felt very isolated and was not aware that Epstein was abusing any other victims, including [redacted]

*PRIVILEGED - ATTORNEY WORK PRODUCT/DELIBERATIVE PROCESS*
*CONFIDENTIAL - SUBJECT TO FED. R. CRIM. P. 6(e)*

2. [redacted]

On September 18, 2019, [redacted] was interviewed in [redacted] reported being sexually abused by Epstein as an adult. When [redacted] was about 18 years old in or around [redacted], she travelled to New York to work as a model. While in New York, [redacted] met David Blane at a nightclub. Blane subsequently introduced [redacted] to Epstein and brought her to Epstein's New York residence for a dinner party, where [redacted] gave Epstein her phone number. Subsequently, [redacted] contacted [redacted] to invite her to Epstein's private island. [redacted] accepted the invitation, and [redacted] arranged her travel. [redacted] subsequently had dozens of interactions with Epstein over the next year, during which she travelled to both the Virgin Islands and Palm Beach with him. During these trips, [redacted] met [redacted] and Ghislaine Maxwell. [redacted] understood that [redacted] was Epstein's girlfriend.

At some point, Epstein offered to pay [redacted] $200 if she massaged him. [redacted] agreed, and ended up giving Epstein multiple massages, during which Epstein engaged in sexual contact with her. [redacted] did not feel comfortable discussing the details of the sexual contact during this interview. [redacted] recalled [redacted] telling her that Epstein wanted a massage on at least some occasions, and [redacted] noticed that there were often numerous girls around Epstein's residences. [redacted] did not know if any of those girls were minors. Epstein told [redacted] though, that everyone, including [redacted] was over the age of 18.

[redacted] also recalled taking one trip with [redacted] during which they travelled to Las Vegas and then to New Mexico with Epstein. Before the trip, [redacted] told Epstein that [redacted] was underage, and Epstein said that was fine. During that trip, [redacted] recalled Maxwell engaging in sexual conversations, such as discussions of masturbation, but she did not recall Epstein being discussed during those conversations.

3. [redacted]

[redacted] was interviewed on July 17, 2019 in New York. [redacted] reported being sexually abused by Epstein as an adult. [redacted] knew and interacted with Epstein between approximately [redacted]. In [redacted], when [redacted] was 17 years old, she met Epstein through [redacted] who had been previously introduced to Epstein by a mutual friend. At their first meeting, Epstein specifically asked [redacted] her age and told her, in substance, that they could not interact until she turned 18.[36] After her 18th birthday, Epstein began having [redacted] give him massages, during which he used a vibrator to touch her genitals. A short time later, Epstein took [redacted] and [redacted] on a trip to his Virgin Islands residence. During that trip, Epstein directed [redacted] to give him a massage, during which he raped her. Between [redacted], Epstein had intercourse with [redacted] on multiple occasions. [redacted]

[36] By 2007, Epstein knew he was under investigation for sexualized massages with minors. He pled guilty to a state solicitation of a minor charge in 2008.

described the first few of these instances as forcible and explained that eventually she stopped resisting.

[redacted] recalled that Leslie Groff would schedule her massage appointments with Epstein and make her travel arrangements. Groff worked in an office inside Epstein's New York residence during the times [redacted] visited, and [redacted] met her many times. [redacted] also recalled that an assistant named [redacted] would sometimes cover for Groff and run errands for Epstein. [redacted] also knew that [redacted] worked as Epstein's assistant until she got married in or around 2011, and that [redacted] was Epstein's girlfriend.

When Epstein was serving his jail sentence, [redacted] visited him while he was on work release at his office and engaged in sexual conduct with him there. After Epstein completed his sentence, [redacted] did not have any other sexual encounters with him, but she occasionally worked for him by running errands or cleaning his house. In or around [redacted], Epstein paid [redacted] $10,000 to marry a young woman who was a foreign national and whom Epstein wanted to be able to stay in the United Sates. The two were married for about four years, then divorced in [redacted]. [redacted] ceased all communication with Epstein after the divorce in [redacted].

4. [redacted]

On October 24, 2019, [redacted] was interviewed in New York. [redacted] reported being sexually abused by Epstein as an adult. [redacted] is [redacted] met Epstein in New York in approximately [redacted] when she was about 20 years old. At the time, [redacted] was [redacted] and had limited financial resources. A friend of [redacted] from [redacted] named [redacted] suggested that [redacted] could provide massages to a man who paid really well. [redacted] agreed and began providing Epstein with paid massages at his New York Residence. During either the first or second massage, Epstein engaged in sexual contact with [redacted] After that, [redacted] began providing Epstein with paid sexualized massages multiple times per week. The appointments were scheduled at first by [redacted] and then by either Leslie Groff or [redacted] recalls being paid for the massages by Epstein, Groff, [redacted] and Bella Klein. Within a few months of meeting Epstein, [redacted] moved into Epstein's apartment building on 66th Street in New York.

In or around [redacted], [redacted] travelled with Epstein to his residences in the Virgin Islands, New Mexico, and Palm Beach. At some point, Epstein escalated his sexual contact with [redacted] by raping her. As she spent more time with Epstein, he became more controlling about her appearance. For example, Epstein limited [redacted] food intake, bought her white underwear to wear, and made [redacted] cut her hair short and die it blonde. During this same period, Maxwell was present for trips [redacted] took with Epstein to the Virgin Islands. [redacted] specifically recalls participating in conversations during which Maxwell provided [redacted] and others, including [redacted] with tips on how to please Epstein sexually. She recalled Maxwell describing Epstein as needing a lot of sex, and Maxwell encouraged [redacted] and other girls to engage in sexual activity with Epstein.

*PRIVILEGED - ATTORNEY WORK PRODUCT/DELIBERATIVE PROCESS*
*CONFIDENTIAL - SUBJECT TO FED. R. CRIM. P. 6(e)*

Eventually, [redacted] became aware that Epstein's actual girlfriend was [redacted] On different occasions, Epstein directed [redacted] to engage in sexual activity with other women in the contexts of massages, including [redacted] and [redacted] as well as women named [redacted][37] [redacted] and [redacted] [redacted] also recalled introducing [redacted] to Epstein, but she was not present when Epstein sexually abused [redacted] [redacted] also recalled seeing [redacted] Jean Luc Brunel, and [redacted] at Epstein U.S. Virgin Islands home during 2007. On at least one occasion, [redacted] took [redacted] shopping and mentioned during the shopping trip that Epstein liked white underwear. When travelling to the Virgin Islands, [redacted] would collect everyone's passports and hold them until the end of the trip.

At some point, [redacted] heard about a news article saying Epstein was a child molester. [redacted] confronted Epstein about the article, and he denied any knowing contact with minors. Epstein explained the situation by claiming that someone had shown him a fake ID suggesting she was 18 years old.

About a year after meeting Epstein, during a trip to the Virgin Islands, [redacted] posted a message on her MySpace page complaining about being stuck on an island with a horrible girl named [redacted] referencing [redacted] Epstein learned of the post and became enraged. He sent [redacted] back to New York and directed her to move out of the 66th Street building. Following this incident, [redacted] continued to have contact with Epstein, but she spent less time with him. Epstein subsequently paid for [redacted] to attend massage school, which she completed in around [redacted]

Epstein and Maxwell both asked [redacted] to find other young women to massage Epstein, but [redacted] never actually recruited anyone to do so. Epstein in particular said the younger a girl looked, the better. [redacted] recalled a conversation during which Epstein referred to Maxwell as too old, and Maxwell responded that Epstein liked girls too young. [redacted] also recalled that [redacted] would go to night clubs to pick up new girls to provide sexualized massages. [redacted] recalled girls bringing other girls to massage Epstein. [redacted] never asked how old these girls were, but they looked young. [redacted] recalled that Brunel would bring girls to meet Epstein, but she does not know whether any engaged in sexual activity. She does recall, however, Brunel commenting that Epstein liked "them young."

Around the time Epstein went to jail, [redacted] asked [redacted] to meet her at Epstein's New York Residence to go through stuff in the basement. Once [redacted] arrived, [redacted] directed her to throw away vibrators and nude photographs of young women. [redacted] then paid [redacted] for

---

[37] We believe this woman to be [redacted] who recruited other adult victims for Epstein in New York. The FBI made contact with [redacted] in [redacted] earlier this month. She provided contact information for an attorney who represents her, and we are attempting to contact the attorney to request an interview.

helping with that task. [redacted] also recalled [redacted] and Epstein both telling her that if anyone in the press approached her, [redacted] should not say anything.

[redacted] recalled two instances in which Epstein directed her to provide massages to other men, both of which occurred in or around 2011 or 2012. First, Epstein instructed [redacted] to massage Leon Black at Epstein's New York residence. [redacted] attempted to give Black an ordinary massage, but Black began initiating sexual contact, at which point [redacted] ran out of the room. [redacted] complained to Epstein, who laughed it off as a funny incident. [redacted] also recalled a woman named [redacted] being directed to massage Black, and afterwards, [redacted] told [redacted] that she had provided Black with oral sex during the massage. Second, Epstein instructed [redacted] to provide a massage to Jes Staley in Epstein's New York residence. [redacted] attempted to give him an ordinary massage, but he forced [redacted] to touch his genitals and then raped [redacted] Afterwards, [redacted] complained to Epstein, who said he left it to [redacted] and Staley to decide whether to engage in sex. After this incident, [redacted] began to distance herself from Epstein. Epstein did not pay [redacted] for providing these massages to Black or Staley, but Epstein was paying for [redacted] to finish her massage school at the time, so she felt indebted to him.

5. [redacted]

On August 26, 2019, [redacted] was interviewed in New York. [redacted] reported being sexually abused by Epstein as an adult. When [redacted] was 19 years old in [redacted] she was working at a coffee shop where a blonde Eastern European woman named [redacted] approached her and recruited her to give a wealthy man a massage. [redacted] told [redacted] that she made money for each woman she recruited and assured [redacted] that it would just be a massage and nothing more. [redacted] agreed and later went to Epstein's New York residence to perform a massage. During the massage, Epstein directed [redacted] to remove her clothes, and after she complied, he masturbated and touched her breasts and genitals. [redacted] asked Epstein to stop, but he continued to assault her until he ejaculated. Afterwards, Epstein paid [redacted] in cash. [redacted] recalled that a maid walked her up to the massage room and walked her out of the residence after the massage, but she did not know the maid's name or recall any identifying characteristics. [redacted] attempted to get [redacted] to return for another massage with Epstein, but [redacted] never returned.

6. [redacted]

On August 28, 2019, [redacted] was interviewed in New York. [redacted] reported being sexually abused by Epstein as an adult. In approximately [redacted] when [redacted] was about 22 years old, she met a woman named [redacted] who appeared to be in her mid-20s, in [redacted] At the time, [redacted] was studying to be a massage therapist, and [redacted] said that her boss, Ghislaine Maxwell, was looking for someone to replace [redacted] was interested, so [redacted] took a picture of [redacted] face to show to her bosses. Shortly thereafter, someone called [redacted] and arranged to fly her from [redacted] to New York. Once in New York, [redacted] provided a massage

to Maxwell at her residence. At the end of the massage, Maxwell told [redacted] to give her partner, Jeffrey, "what he wants" and added "Jeffrey always gets what he wants." Maxwell then paid [redacted] $100. Later that same day, [redacted] went to Epstein's New York residence to massage him. He asked for a foot massage, and during the massage, he used his foot to touch her breasts and crotch through her clothing. At the end of the massage, Epstein fondled her genitals and buttocks through her clothing as [redacted] was leaving. [redacted] then left and never heard from Epstein or Maxwell again.

7. [redacted]

On August 28, 2019, [redacted] was interviewed in New York. [redacted] reported being sexually abused by Epstein as an adult. [redacted] explained that she previously did not recall who recruited her, but [redacted] helped her remember that it was a woman named [redacted] who was a [redacted] woman with long dark hair.[38] When [redacted] was about 20 years' old living in New York in or around 2000, she met [redacted] at a club. [redacted] eventually invited her to meet a friend on the Upper East Side, and [redacted] agreed. [redacted] then brought [redacted] to Epstein's New York Residence. Once there, a woman who appeared to be Epstein's personal assistant, but whose name [redacted] cannot recall, greeted them and had them wait. Epstein then invited [redacted] and [redacted] into the massage room, where [redacted] and [redacted] gave Epstein a massage. During the massage, Epstein directed [redacted] and [redacted] to engage in sexual contact with each other and also engaged in sexual contact with [redacted] The encounter ended when someone knocked on the door and called for Epstein, who left in a rush. [redacted] and [redacted] then left. The next day, [redacted] invited [redacted] to return, but [redacted] declined and never saw Epstein again.

8. [redacted]

On August 28, 2019, [redacted] was interviewed in New York. [redacted] generally reported being "sexually trafficked" by Epstein as an adult; however, [redacted] was emotional throughout the meeting and unable to provide details regarding her experiences. She stated generally that Epstein, Maxwell, [redacted] and Groff all ruined her life, but she was too distressed to answer questions about what each of those individuals did. We have repeatedly contacted [redacted] attorney (she is represented by [redacted]) to schedule a follow-up interview, but to date her attorney has not been able to coordinate another interview.

9. [redacted]

[redacted] ([redacted]) was interviewed via VTC on August 29, 2019. [redacted] reported being sexually abused by Epstein as an adult. In or around [redacted] when

[38] The FBI has tentatively identified this individual as [redacted]. We believe she resides in [redacted], and the FBI is attempting to contact her.

*PRIVILEGED - ATTORNEY WORK PRODUCT/DELIBERATIVE PROCESS*
*CONFIDENTIAL - SUBJECT TO FED. R. CRIM. P. 6(e)*

[redacted] was about 20 years old and living in New York, a young woman named [redacted] approached her at a coffee shop where she worked. [redacted] hung out with [redacted] a couple times and then asked [redacted] if she wanted to make money by giving a massage to her boss. [redacted] said she had done it before and it was easy. [redacted] agreed and accompanied [redacted] to Epstein's New York residence. Once there, a maid whose name [redacted] does not recall let the two into the house and took [redacted] to the massage room while [redacted] waited in the kitchen. Once [redacted] was in the massage room, Epstein entered the room in a towel and laid on the massage table. During the massage, Epstein touched [redacted] breasts and genitals while masturbating. After the assault, Epstein left, and the maid returned to bring [redacted] down to the kitchen, where [redacted] gave [redacted] $400. Afterwards, [redacted] asked if [redacted] wanted to return, but [redacted] declined. [redacted] then told [redacted] that she made $600 per recruit and asked [redacted] if she wanted to help recruit. [redacted] again declined.

10. [redacted]

[redacted] was interviewed on September 12, 2019 in New York. [redacted] reported being sexually abused by Epstein as an adult. When [redacted] was in her early 20s [redacted] she was living in New York and working as a model. A booker recommended that she meet with Epstein because he could help her modeling career. [redacted] ended up visiting Epstein's New York residence on one occasion. Upon arrival, she was greeted by a female assistant whose name she does not know. [redacted] then met with Epstein alone in a room with a massage table. At first, Epstein told [redacted] he could help her find modelling work with Victoria's Secret. Eventually, though, Epstein aggressively approached [redacted] and attempted to touch her genitals. Epstein offered to pay [redacted] money, but she refused to take anything from him. [redacted] saw a large vibrator in the room, which she picked up and threw at Epstein before leaving. She never saw him again.

11. [redacted]

On October 23, 2019, [redacted] was interviewed in New York. [redacted] reported being sexually abused by Epstein as an adult. In [redacted] when [redacted] was 27 years old and working as a model in Los Angeles, a friend of hers introduced her to Epstein as someone who worked for Victoria's Secret and could help with her modeling career. Epstein then arranged to meet with [redacted] in his hotel room in Los Angeles. An assistant named Kimberly called [redacted] to tell her the time and place of the meeting. During the meeting, Epstein told [redacted] to undress and then groped her buttocks. [redacted] resisted and decided to leave. Before [redacted] left, Epstein handed her $100. [redacted] never saw Epstein again.

---

[39] We believe this individual to be [redacted] described above.

12. [redacted]

On October 23, 2019, [redacted] was interviewed in New York. [redacted] reported being sexually abused by Epstein as an adult. In or about [redacted] when [redacted] was about 22 years old, she was working as a model in New York and met a young woman named [redacted] (believed to be [redacted] at a club. [redacted] told [redacted] about a man who liked to help people and had connections in the modelling world. [redacted] asked if [redacted] would be willing to give him a massage while only in her underwear, and [redacted] agreed. [redacted] subsequently went with [redacted] to Epstein's New York residence. Upon arriving, [redacted] took [redacted] to the massage room, had her undress, and then left. [redacted] then provided Epstein a massage during which he attempted to touch her and began masturbating. After the massage, Epstein paid [redacted] $300, after which [redacted] went down to the kitchen where [redacted] was waiting for her. [redacted] never returned and never saw Epstein again.

13. [redacted]

On October 23, 2019, [redacted] was interviewed in New York. [redacted] reported being sexually abused by Epstein as an adult. In or about [redacted] when [redacted] was about 26 years old, she was working as professional masseuse [redacted]. Another professional masseuse connected [redacted] with Epstein, who hired [redacted] to massage him and others at his New Mexico ranch for about the next three years. [redacted] recalls that Epstein would come to his ranch approximately three or four times per year, and during most of those visits, she would be asked to come to the ranch to provide massages. While at the ranch, [redacted] provided massages to Ghislaine Maxwell and multiple young women who appeared to be models. [redacted] also provided Epstein with massages, during which he would engage in sexual contact with her. Around [redacted], [redacted] saw [redacted] whom [redacted], at the ranch in Maxwell's office, but [redacted] did not speak with [redacted] understood that Maxwell was Epstein's girlfriend and ran the house. Maxwell encouraged [redacted] to bring friends out to the ranch to provide massages, and emphasized that she wanted pretty, young women. [redacted] brought one professional masseuse her own age once to the ranch.

14. [redacted]

On October 23, 2019, [redacted] was interviewed in New York. [redacted] reported being sexually abused by Epstein as an adult. In [redacted] when [redacted] was 18 years old and modeling in New York, she met a young woman named [redacted] (believed to be [redacted] at a night club. [redacted] told [redacted] that she could make easy money by giving a massage in her underwear. [redacted] agreed and ended up giving Epstein paid sexualized massages on several occasions at his New York residence. Each massage was scheduled by [redacted] and a maid whose name [redacted] does not know would show [redacted] to the massage room and pay her after each massage. At some point, Epstein connected [redacted] with Jean Luc Brunel for a modeling interview. [redacted] also went on one trip to the Virgin Islands with

Epstein and other young women. While on the island, [redacted] provided Epstein with a massage during which he attempted to force her into more sexual activity than she was comfortable with. [redacted] became upset, and she was sent home. She never saw Epstein again.

C. *Interviews of Witnesses Who Were Not Sexually Abused*

1. Juan Alessi

Juan Alessi was interviewed on July 13, 2019 in Florida. Juan Alessi ("Mr. Alessi") worked for Epstein as the house manager at his Palm Beach residence from the early 1990s until the end of 2002. Additionally, his wife, Maria Alessi, ("Ms. Alessi") also worked at Epstein's Palm Beach residence. Mr. Alessi recalled that in or about 1993, Ghislaine Maxwell took charge of managing Epstein's residences in Palm Beach, New York, New Mexico, the Virgin Islands, and Ohio. Around that time, Epstein specifically instructed Mr. Alessi to go to Maxwell for orders. Mr. Alessi described Maxwell as extremely demanding and compared working under her to "slavery."

Mr. Alessi recalled that his relationship with Epstein began to deteriorate beginning in approximately 2000, when Maxwell instructed Mr. Alessi and other house staff not to make eye contact or be in the same room with Epstein. Around this same period, Mr. Alessi recalled that Epstein received approximately three massages per day when he was staying at his Palm Beach residence. Mr. Alessi understood most of the masseuses to be professional massage therapists from around the Palm Beach area, several of whom provided massages for Epstein's guests, including business partners and prominent people, at the Palm Beach residence. At first, Mr. Alessi was responsible for scheduling Epstein's frequent massage appointments, but during the last several weeks of his employment, [redacted] was hired as Epstein's personal assistant and began scheduling the appointments instead.

Closer to the end of his tenure, Maxwell asked Mr. Alessi to compile a list of all hotels and spas around the area of Palm Beach. After Mr. Alessi compiled the list, Maxwell instructed him to drive her around to each location. Maxwell would enter each location, then return with business cards of massage therapists. Mr. Alessi recalls one such incident in or around the summer of 2002 when he drove Maxwell to Mar-a-Lago and waited for her to receive a massage there. After Maxwell returned to the car, she observed a young girl, whom Mr. Alessi later learned was named [redacted] and instructed Mr. Alessi to stop the car. Maxwell got out of the car and went to speak with [redacted] for about 20 to 25 minutes before returning. Later that same day, Mr. Alessi saw [redacted] come to Epstein's Palm Beach residence. Over the next several months, [redacted] returned just about every day to the Palm Beach residence to give Epstein massages. Mr. Alessi recalls learning that [redacted] was also traveling with Epstein to other locations, and he recalls [redacted] bringing other girls about her age to the Palm Beach residence to massage Epstein. Mr. Alessi understood that [redacted] was under the age of 18 but did not know what [redacted] was doing in the "massages" with Epstein.

Mr. Alessi also recalled that a young girl named [redacted] used to come to the Palm Beach residence regularly. He recalled that [redacted] was [redacted] and that she and her mother visited Epstein's Palm Beach residence multiple times. Mr. Alessi and his wife both picked [redacted] up [redacted] and understood that [redacted] was a friend of Epstein's. Mr. Alessi recalled that [redacted] travelled with Epstein at least one time and eventually moved to [redacted] with Epstein's help. Mr. Alessi observed Epstein kiss [redacted] on the cheek and pat her on the bottom.

In total, Mr. Alessi saw "hundreds" of girls at Epstein's Palm Beach residence, but he believed the majority to be in their 20s. Toward the last few months of his employment, Mr. Alessi began seeing younger girls, most of whom were brought to the residence by [redacted] Maxwell instructed Mr. Alessi not to ask these girls their ages or speak to them. Mr. Alessi recalls that Maxwell hired younger girls to come to the Palm Beach residence, including two girls whom Mr. Alessi knew to be in high school, but whose names he could not recall. Mr. Alessi believed most of the young women who came to the house to be professional masseuses, but he also recalled cleaning up after massages and finding sex toys in the room, which he then washed. Mr. Alessi also recalled that Maxwell kept a basket filled with sex toys in her room and that Maxwell was occasionally inside the massage room with the young women who came to the house.

Mr. Alessi also recalled more generally that many young women would be topless or naked by the pool. At the very end of his tenure, Mr. Alessi told Epstein that he should slow down, that "these girls" would get him in trouble. Epstein remarked that it was fine, and that "these girls only care about money." When Mr. Alessi left Epstein's employment, Epstein told him: "I hope you keep your mouth shut."

2. Maria Alessi

Maria Alessi was interviewed on July 13, 2019 in Florida. Ms. Alessi worked for Epstein at his Palm Beach residence from the mid 1990s until the end of 2002. Ms. Alessi primarily worked outside of the house, often shopping and running errands, so she was not able to observe most of the visitors to the house. When asked who, if anyone, she specifically recalls coming to the Palm Beach residence, Ms. Alessi recalled Ghislaine Maxwell frequently visiting the residence with Epstein. Ms. Alessi believed that Maxwell was Epstein's personal assistant. She also recalled seeing [redacted] at the Palm Beach residence. She also recalled seeing girls in their 20s or 30s around the house.

3. Gregory Bledsoe

Dr. Gregory Bledsoe was interviewed by telephone on July 22, 2019. Bledsoe is a doctor who was hired by the Secret Service to provide backup medical services for Bill Clinton during a trip to Africa in 2002 on Epstein's private jet. Bledsoe recalled that Ghislaine Maxwell and four

young women, including [redacted] a masseuse named [redacted] and a model named [redacted] accompanied Epstein on the trip.[40] Bledsoe stated that there were no minors on the flight. He did remark, though, that he found it odd that Epstein would bring four women on the trip, and he witnessed Epstein grabbing [redacted] buttocks on the plane. Bledsoe also noticed that [redacted] appeared to be intentionally positioning herself in front of the bedroom door so that no one other than Epstein and his entourage could go inside the bedroom on the plane. Otherwise, though, Bledsoe did not recall any suspicious or inappropriate behavior during the trip.

4. <u>Richard Barnett</u>

Richard Barnett was interviewed on September 16, 2019 in New York. Barnett was the chief engineer and property manager for Epstein's New York residence from approximately 1995 through approximately 2014. Barnett had never been interviewed previously, and he was fully cooperative in the interview. He explained that he was hired by Maxwell and his job was primarily to keep the property in full working order, which included maintenance of mechanical operations including the elevators, HVAC operations, electrical work, and other structural aspects of the house. He also occasionally visited other Epstein properties for similar purposes. Barnett has formal training as an engineer. He had little day-to-day interaction with Epstein, and primarily reported to Maxwell until around 2007 or 2008, and then to [redacted] He described having seen many young women at the property, but none with whom he interacted directly; he was instructed not to speak to guests at the house. During the initial Florida investigation, he was told by Epstein's attorneys that Epstein had inadvertently patronized an underage prostitute, and as a result, he did not know the scope of Epstein's misconduct until his arrest in 2019.

*D. Interviews of Subjects of the Investigation*

1. [redacted]

[redacted] was first interviewed with her attorney present and pursuant to a proffer agreement on July 12, 2019 in [redacted] was born in [redacted] and spent her childhood in [redacted] graduated high school in [redacted] and when she was about 18 or 19 years old, she left [redacted] to travel as a model. [redacted], who connected her with a modeling agency in [redacted] In or around late [redacted] moved to [redacted] where she married her first husband in [redacted]. They ultimately divorced [redacted]. Before she began working for Epstein in [redacted] continued modeling while also working at her husband's [redacted] and obtaining her associate's degree from [redacted]. After leaving Epstein's employ in early [redacted] obtained her bachelor's degree in [redacted] and her master's degree in [redacted]. She is currently employed

[40] Flight logs for this trip confirm that these individuals were all on Epstein's private jet. The FBI has not yet been able to identify contact information for [redacted]

[redacted].

In or around [redacted], when [redacted] was in her early 20s, she met Epstein through the modeling community. Around [redacted], Epstein offered [redacted] a job working as an assistant. Around early [redacted], [redacted] began working as an assistant for Epstein, and she remained his employee until early [redacted]. [redacted] reported to [redacted] [redacted] who reported to Ghislaine Maxwell.

[redacted] responsibilities included running errands and scheduling appointments. As a result, [redacted] scheduled numerous massages for Epstein. According to [redacted] Epstein expected to have two massages every day: one in the morning and one in the afternoon. [redacted] and [redacted] were responsible for ensuring that these massages were confirmed when Epstein was in Palm Beach. Leslie Groff was responsible for scheduling the massages when Epstein was in New York.

At some point, Epstein began forcing [redacted] to engage in sexual encounters, which were coercive and nonconsensual. [redacted] was very distressed when discussing these incidents and did not want to describe them in detail during our first meeting. At least some of these encounters involved [redacted] providing Epstein with his massages while at his Virgin Islands residence. As a result, [redacted] was aware that Epstein's massages were usually sexual. [redacted] described how Epstein had two groups of girls who provided massages in his Palm Beach and New York homes: one group was of professional masseuses who gave actual massages to Epstein's friends, and the second group consisted of younger girls who were not professional masseuses and who only gave massages to Epstein. [redacted] explained that she implicitly understood at the time, and now realizes fully that Epstein was engaging in sexual contact with the second group of girls.

When scheduling massage appointments, either [redacted] or Epstein would provide [redacted] with the names of girls to call for massages, but for the most part [redacted] called to confirm massage appointments. [redacted] also recalled that [redacted] would sometimes ask [redacted] to call some of the masseuses and ask if they have another girl to bring. [redacted] would occasionally show girls to the massage room and set up the massage table. [redacted] believed it was possible Epstein had asked [redacted] to pay the girls, but she cannot recall for certain. [redacted] typed up a list of girls to call in Palm Beach and printed copies.

[redacted] recalled certain details that signaled to her, in retrospect, that girls in this second group were minors. For example, she was asked to help find SAT prep courses for one girl, and she recalled girls mentioning school and their parents. That said, [redacted] was [redacted] was not at the time familiar with the SAT or the fact that it is typically taken by high school students. [redacted] explained that, at the time of the relevant conduct, she never consciously realized that any of the girls involved in sexualized massages were underage. She now realizes in retrospect, that she should have known that at least some of these girls were minors.

[redacted] also recalled [redacted] frequently photographing other women, including taking nude photos of [redacted] understood that Maxwell kept binders of those nude photos in her home in New York.

In 2005, Epstein directed [redacted] to collect all contact books and computers from his Palm Beach residence and provide them to a man who met [redacted] at the residence. [redacted] was present for the conversation in which Epstein gave [redacted] these instructions. Sometime later in 2005, [redacted] also asked [redacted] to take the contact books from the Virgin Islands and shred them. Epstein was under investigation at the time.

On September 10, 2019, we met in [redacted] with [redacted] and her attorney for a second proffer, during which we further discussed her year working for Epstein. During [redacted] employment for Epstein, she, [redacted] and [redacted] all had apartments in Epstein's 66th Street building in New York. [redacted] recalled times when [redacted] photographed [redacted] and recalled that Maxwell had binders of nude photos of women posing in Epstein's different residences.[41] Generally, during her year working for Epstein, [redacted] noticed that Epstein received two massages per day. Leslie Groff scheduled the massages in New York, while [redacted] and [redacted] scheduled the massages in Palm Beach.

[redacted] understood that Maxwell was Epstein's ex-girlfriend. Maxwell would give [redacted] directions about tasks to carry out, such as errands for the houses. [redacted] also recalled one instance in New Mexico when Maxwell told [redacted] that if she found a pretty girl, she should get the girl's number so that the girl can massage Epstein.

Also during this proffer, we reviewed certain documents, such as message pads, recovered from Epstein's Palm Beach residence during the first Florida investigation, with [redacted] She confirmed that she wrote one message for Epstein from Jean Luc Brunel that referenced having a teenage girl for Epstein to meet. [redacted] distinctly recalled Maxwell commenting on how funny that particular message was. [redacted] also confirmed that at least one message referenced someone who was being scheduled to massage Epstein being in high school. [redacted] also recalled at least one girl wanting to talk about college, and another girl named [redacted] discussing the SAT. [redacted] recalls discussing [redacted] SAT classes with Maxwell at some point and also recalls ordering SAT prep books for her.

[redacted] knew that [redacted] shared an apartment in New York with [redacted] She recalls [redacted] left the apartment and stopped spending time with Epstein after developing an eating disorder. [redacted] also met [redacted] believed [redacted] was over the age of 18 when she met her. [redacted] also knew that [redacted] recruited girls for Epstein in

---

[41] [redacted] description of these binders is consistent with the binders of photographs recovered from Epstein's New York residence during the execution of a search warrant there in July 2019.

New York and shared an apartment with [redacted][42] who also helped [redacted] find girls to massage Epstein. [redacted] also recalled a young woman named [redacted] travelling with Epstein.

[redacted] provided [redacted] with training regarding how to make scheduling calls and was [redacted] direct supervisor. During the year [redacted] worked for Epstein, [redacted] would primarily take responsibility for calling to confirm massage appointments when she was in New York and planning to travel to Palm Beach. [redacted] recalls Epstein wanted his massages confirmed either the night before or morning of each appointment.

[redacted] recalled that there were certain girls, such as [redacted] and [redacted] who would come to the Palm Beach residence with other girls and wait in the kitchen while the girls they brought massaged Epstein. In those circumstances both the girl who gave the massage and the girl who waited in the kitchen would be paid. [redacted] stated that although in retrospect she believes there were indications that some of the individuals providing massages to Epstein were especially young or in high school, she did not know at the time that certain individuals were underage. She did understand generally, though, that at least some massages involved sex acts because she was required to perform such acts in the context of massages for Epstein.

At some point when she was in Miami with Epstein and [redacted] was directed to drive to Palm Beach to meet someone there. Both [redacted] and Epstein told [redacted] to drive to Palm Beach. [redacted] did not understand what was going on, but she recalls Epstein saying something happened with a visa. Epstein and [redacted] directed [redacted] to gather computers and directories from the Palm Beach house and give them to a man who would meet [redacted] there. [redacted] gave [redacted] the phone number of the person [redacted] was to meet in Palm Beach. [redacted] followed these instructions and gave the computers and directories from Palm Beach to a man who met her at Epstein's Palm Beach residence.[43]

After [redacted] completed that task in Palm Beach, [redacted] asked [redacted] to gather the directories from Epstein's Virgin Islands residence and bring them back to New York. [redacted] reminded [redacted] to check every building on Epstein's island for the directories. [redacted] followed this instruction and brought the directories to Maxwell's house in New York, where she gave them to [redacted] then told [redacted] to shred the directories in Maxwell's house. [redacted] also recalled an instance when Darren Indyke met with her and told her that if she ever needed help she should not talk to the police.

---

[42] [redacted] appears on a number of logs for Epstein's private jet. The FBI has identified two potential addresses for [redacted] and is attempting to contact her.

[43] Materials from the search warrant executed by the Palm Beach Police Department in 2005 confirm that computers appeared to have been removed from Epstein's Palm Beach residence prior to the search.

[redacted] advised that she was also extensively sexually abused by Epstein during her year as his employee. Although we did not delve into specific detail about all of those events, she described having been required to provide sexual massages, similar to many other victims we have interviewed in this case. [redacted] was primarily required to provide Epstein with sexualized massages at his residences in the Virgin Islands and New Mexico, though she recalls one such massage in Palm Beach. Epstein conveyed to [redacted] that her job responsibilities included providing sexual massages to him. [redacted] recalled having about five sexual encounters with both Epstein and [redacted] who was Epstein's girlfriend at the time. [redacted] did not feel that she could decline to engage in sexual activity with Epstein. Her job depended on relenting to his advances, and she knew that he had guns, some of which he kept in his bedroom. After about a year, [redacted] was finally able to quit and return to living with her husband.

2. [redacted]

[redacted]

On October 7, 2019, [redacted] attorneys provided us with an attorney proffer, during which they explained how [redacted] met Epstein and how Epstein abused her over several years, beginning when she was 18 years old. It was during the course of this abuse that Epstein brought [redacted] into some of his massages to participate in sex acts with other girls. The attorney proffer detailed how Epstein controlled every aspect of [redacted] life—including her physical appearance, her weight, and her clothing—for years. This controlling behavior took multiple abusive forms, including forcing [redacted] to have multiple plastic surgeries, forcing her to engage in BDSM, referring to her as his "sex slave," insulting her, and physically abusing her, including by choking her and throwing her down a set of stairs. Additionally, her attorneys provided us with a photograph of [redacted] and [redacted] who both appear very thin—together wearing t-shirts that read "Don't Feed the Pig." [redacted]

[redacted]

---

[redacted]

*PRIVILEGED - ATTORNEY WORK PRODUCT/DELIBERATIVE PROCESS*
*CONFIDENTIAL - SUBJECT TO FED. R. CRIM. P. 6(e)*

[redacted]

First, on October 11, 2019, [redacted] participated in an interview during which she walked us through her background, how she met Epstein, and the general contours of her relationship with him. [redacted] was [redacted] and began modeling in Europe in her early teens. In approximately [redacted], when [redacted] was 18 years old, she received a visa to travel to New York to work as a model for Karin Models, which was owned by Jean Luc Brunel. [redacted] was in New York for a few weeks before she met Epstein. During that time, employees of the agency told [redacted] that she owed the company money for her travel and housing, but she also needed to lose weight before she could go on any castings. [redacted] did not end up going on any castings because in [redacted] she met Epstein at Jean Luc Brunel's birthday party. After speaking briefly with Epstein at the party, [redacted] received a call from Epstein's assistant, [redacted] [redacted][45] a few days later, inviting her to Palm Beach. [redacted] eventually agreed to travel to Epstein's Palm Beach residence, and during that first trip, Epstein engaged in sexual contact with [redacted] in a massage room. A few days later, [redacted] flew with Epstein, [redacted] [redacted] [redacted] and [redacted] [redacted] to the Virgin Islands. She remained there for a few days before flying back to New York.

In October 2003, Epstein paid for [redacted] to fly back to [redacted] so that she could finish high school there. [redacted] then returned to [redacted] in or around [redacted], at which point Epstein offered to let her stay in an apartment in his building on 66th Street in New York. [redacted] agreed, and after that, she travelled everywhere Epstein went, including his residences in New York, Palm Beach, the Virgin Islands, New Mexico, and Paris. Eventually, [redacted] began travelling with Epstein less and less over the ensuing years. [redacted] remained in a relationship with Epstein until August 2010.

Earlier on, [redacted], [redacted] travelled often with Epstein and [redacted] [redacted] who was [redacted] roommate and close friend. [redacted] [redacted] [redacted] [redacted] [redacted] and Ghislaine Maxwell also travelled with Epstein, and Jean Luc Brunel was also close friends of Epstein. Earlier on, Maxwell slept in Epstein's room when they traveled together, but eventually, [redacted] began sleeping in Epstein's room. [redacted] recalled that other assistants who worked for Maxwell and/or Epstein were [redacted] [redacted] [redacted] [redacted] [redacted] [redacted][46] and [redacted] [redacted] [redacted] was unsure whether [redacted] was an

---

[45] The FBI has been unable to obtain contact information for [redacted] [redacted]

[46] The FBI is attempting to identify contact information for [redacted]



EFTA_00022504

EFTA02731125

assistant as well. [redacted] recalled that Epstein would pit the women in his circle against each other and encouraged a lot of secrecy. [redacted] also recalled that a woman named [redacted] introduced some young women to Epstein in New York.

In or around 2006, Epstein told [redacted] that [redacted] had been arrested for a drug charge, and to save herself, she set up Epstein to be investigated. [redacted] was familiar with [redacted] as someone who gave Epstein sexualized massages. At some point later, [redacted] learned that the charges against Epstein related to prostitution. [redacted] recalls that her general sense at the time was that Epstein was being treated unfairly and that the women were setting him up to get money. [redacted] emphasized that she now realizes that narrative was not true, but she accepted Epstein's version of events at the time. To reinforce this narrative, Epstein repeatedly provided [redacted] with examples of women he claimed were blackmailing him. Epstein also told [redacted] that if she was ever approached, she should not talk and should either tell Epstein or find a lawyer. [redacted] recalled being interviewed by Epstein's attorneys around the time of the first investigation, and she remembers going into the interview with the goal of being on Epstein's "side." During the interview, she described sex acts she had with other women together with Epstein in Florida.

Eventually, Epstein told [redacted] and [redacted] that he was going to jail for soliciting a prostitute. Epstein told them that the women he had engaged in sex acts with had lied to him about their ages. When Epstein went to jail in 2008, [redacted] became closer with [redacted] and they remained good friends for years until Epstein was arrested in 2019, at which point [redacted] attorneys advised her to stop speaking with [redacted]

While Epstein was serving his first jail sentence in Florida, [redacted] frequently visit him. She also recalled that [redacted] and Brunel often visited Epstein. During that same period, [redacted] began [redacted]. After Epstein was released from jail, in or around 2009, Epstein became increasingly aggressive and irritable with [redacted] At one point in 2009, Epstein became particularly violent with [redacted] so she left. He then convinced her to return, but again in 2010, he was violent with her, and she ended the relationship. Until about 2012, [redacted] Epstein's plane, and he would have sex with her on some of those trips. In 2012, [redacted] began working as [redacted] at her own company, and she stopped having sex with Epstein. [redacted]

In the last year or so before Epstein's 2019 arrest, he would check in with [redacted] whenever a news article that referenced her was published. [redacted] explained that because of her association with Epstein, she has not been able to maintain steady employment or build new relationships. [redacted] told Epstein about these difficulties, and they came to an agreement that Epstein would double whatever money she was able to make through her work as [redacted] He also covered medical expenses for her and paid for her attorneys when she was deposed in 2015. [redacted] also noticed that whenever negative articles were published, Epstein would wire her money. This included a $100,000 wire shortly after the Miami Herald

series was published in November 2018. [redacted] believed Epstein sent her this money because he felt guilty for the trouble the articles caused her.

Second, on October 15, 2019, we met with [redacted] for another proffer, during which she reviewed in more detail certain aspects of her experiences with Epstein. [redacted] recalled that before the first investigation into Epstein, he had a number of nude photos of women in his residences, but at some point after the investigation, there were far fewer of those photographs in his Florida and Paris residences. Once Epstein was in jail, [redacted] would visit him frequently. When he was in jail, Epstein would have his lawyer Darren Indyke and a paralegal bring him a computer, which he used to have video sex with [redacted] While Epstein was on work release, a number of women visited him at his office and would watch movies with him on a couch. At some point when Epstein was on work release, [redacted] was put on his approved driver list and would drive him back to jail at night in a suburban with a mattress in the back. Most nights, she and Epstein would park near the jail and have sex in the back of the car. Epstein seemed friendly with the guards at the jail, but she does not know why he was permitted these freedoms.

Shortly after [redacted] met Epstein, he pushed her to have a threesome with another woman. [redacted] ultimately agreed, and Epstein subsequently brought [redacted] into the massage room with other young women to engage in sex acts. The first time this took place was in Epstein's Palm Beach residence with [redacted] who was a minor at the time. During that massage, Epstein directed [redacted] and [redacted] to massage him and then engage in sexual contact with each other and with him. [redacted] had a few such experiences with [redacted] At the end of each sexual encounter, Epstein would send [redacted] out of the massage room. [redacted] recalled that [redacted] or another member of the household staff would sometimes set up the massage room. [redacted] does not recall seeing [redacted] receive money. Epstein did not pay [redacted] for engaging in sex acts, but he would give [redacted] $100 bills as pocket money when they went on new trips together.

Although [redacted] knew [redacted] was a senior in high school, she believed [redacted] was at least 18 because of an instance when Epstein sent the two of them to an adult store where they were carded before entering. [redacted] produced an ID and was permitted to enter the store, so [redacted] assumed that [redacted] was at least 18 years old. [redacted] also recalls [redacted] bringing a friend to massage Epstein and talking about wanting to go to college. [redacted] explained that in [redacted] most high school seniors are 18 or 19, but she now knows that [redacted] was 17 at the time.

In additional to [redacted] [redacted] recalled having sexual encounters at Epstein's direction with a young woman named [redacted] and a young woman named [redacted] in the Palm Beach residence. Each took place in the massage room. Both [redacted] and the other girl would massage Epstein, then Epstein would direct the girls to engage in sexual activity with each other and with him. Each encounter ended with Epstein ejaculating, at which point he would direct [redacted] to leave the room, while the other girl stayed in the room and got dressed.

More generally, [redacted] understood that Epstein received one to two massages per day from women in Palm Beach. All of the young women appeared to be [redacted] age, but she did not know for sure how old they were. In addition to the three girls with whom she had sexual contact, [redacted] recalled masseuses named [redacted] [redacted] and [redacted] One of Epstein's assistants—either [redacted] or [redacted] would walk the girls up to the massage room prior to each massage. [redacted] also recalled that some of these girls would bring friends and wait in the kitchen while the friends gave Epstein a massage. [redacted] heard the assistants scheduling massage appointments, but [redacted] was not generally involved in scheduling. She believes she may have reached out to [redacted] at some point to schedule a massage, though she is not certain. [redacted] may have occasionally answered the phone in Epstein's Palm Beach residence and taken messages, but that was not her primary responsibility, so she did not do so frequently.

[redacted] knew that some masseuses, who were older than the other masseuses who only massaged Epstein, provided traditional, non-sexual massages to herself, Maxwell, and [redacted] [redacted] was not initially sure what was going on in the massage room with Epstein. Although she learned from her own experience that he engaged in sexual activity during massages, she was unsure whether every massage appointment involved sexual activity, or just some. Before Epstein went to jail, the frequency of his massages slowed and eventually stopped entirely.

When [redacted] was in New York, she did not stay in Epstein's New York residence, so she was not as familiar with his massage routine there as she was with his routine in Palm Beach. She did recall, however, multiple occasions when Epstein brought her into the massage room in his New York residence for sexual encounters with him and other women. [redacted] also recalled some such experiences at Epstein's Virgin Islands residence, including at least one encounter with [redacted] [redacted] and a woman named [redacted] [redacted] did not recall encounters with other women in New Mexico, but she recalls some sexual encounters with Epstein and an older woman at Epstein's Paris residence.

Third, on October 25, 2019, we conducted our final proffer with [redacted] during which she provided additional details regarding her time with Epstein. When asked about Epstein's massage routine at his New York residence, [redacted] recalled that he would usually have a morning and afternoon massage, both of which were ordinarily scheduled by Leslie Groff. The women coming over to give these massages appeared similar in age and general appearance to the young women who came for massages in Florida. Again, [redacted] did not know the ages of these young women, though she believed they were around her age. Epstein stopped getting regular massages after he completed his jail sentence.

[redacted] did not recall people coming for regular massages in the New Mexico residence, but there was a massage room at that residence. In the Virgin Islands, one or two

women came to give Epstein massages, but [redacted] believes they were licensed masseuses. They would go into the massage room with Epstein.

As to the young women who gave massages in Florida and New York, [redacted] does not expressly recall seeing anyone pay those girls, but she acknowledged that it was reasonable to think that they were getting paid. Looking back, [redacted] realizes that Epstein probably had her leave the room after each sexual encounter with another girl so that he could pay the girl. [redacted] recalled that Epstein made her believe that [redacted] [redacted] and [redacted] were attracted to her and wanted to engage in sex with her. In retrospect, she realizes that was not true, and she is embarrassed that she believed him.

[redacted] was also aware that Epstein's assistants gave Epstein massages, and she believed [redacted] [redacted] and [redacted] [redacted] were each sexually involved with Epstein at some point. Epstein would refer to the group of assistants and girlfriends who traveled regularly with him as his "family." [redacted] impression was that the only person Epstein saw as his equal was Maxwell. Epstein and Maxwell talked openly about sex. [redacted] recalled one instance when Maxwell was with a group of girls at Epstein's Virgin Islands property and discussed oral sex and erotic books to read.

[redacted] [redacted] and [redacted] were all dependent on Epstein, which was in contrast to Maxwell, who was much older than those three. [redacted] remarked that the longer a woman was around Epstein, the harder it was to get out, and she has no idea how [redacted] managed to leave. She remarked that [redacted] only "got out" by getting married, and [redacted] "got out" by becoming [redacted].

[redacted] also reviewed the details of her interactions with Brunel. She recalled that Brunel would encourage her to be good to Epstein and massage his feet for him. [redacted] believed that Brunel and Epstein had a close relationship, and she heard them talk about women and sex in front of her. In or around early [redacted] Brunel brought a young girl, who was about 15 years old, to Epstein's Virgin Islands residence. [redacted] assumed as much because Epstein commented that the girl was 10 years younger than [redacted] but [redacted] does not know her exact age, nor does she know whether anyone engaged in sexual contact with the girl and does not recall the girl's name. During her years with Epstein, [redacted] visa was sponsored by Brunel's modeling agency, even though she was not working. Epstein told [redacted] that he paid Brunel $1 million to keep her in the country. As a result, [redacted] felt that Epstein could have her deported with a single phone call to Brunel. In 2011, Epstein and Brunel refused to help renew [redacted] visa, but she was able to obtain one through her work as [redacted]

[redacted] explained that for years she and [redacted] both thought that Epstein was the victim of a witch hunt targeting a wealthy man. She now realizes that Epstein was abusive, and she is embarrassed that she believed his manipulative narrative for so long. More recently, [redacted] told [redacted] about some of the physically abusive behavior Epstein engaged in toward her, and [redacted] expressed surprise, saying she did not have similar experiences.

[redacted]

3. [redacted]

[redacted] attorneys provided attorney proffers to us on July 31, 2019, September 6, 2019, and October 18, 2019. These proffers covered [redacted] personal background, introduction to Epstein, sexual abuse she experienced at Epstein's hands, and job responsibilities for Epstein. Her attorneys said that scheduling massages was just one small part of [redacted] job. They also asserted that [redacted] did not know that the massages involved sexual contact or that any masseuses were minors. Following these meetings, [redacted] proffered with us, pursuant to a proffer agreement, on two occasions. The information she provided in those proffers closely tracked the information provided by her attorneys in their proffers and accordingly do we not separately summarize the attorney proffers below. We agreed with her attorneys, however, that for purposes of these two proffers, we would not discuss [redacted] obstructive conduct during the first investigation.

On November 26, 2019, we interviewed [redacted] in New York. [redacted]

[redacted] [redacted] then moved to [redacted] to live with her husband and his family. While there, [redacted] worked at [redacted] and attempted to find some modeling jobs. [redacted]

As a result, [redacted] was extremely isolated and alone [redacted]. [redacted] to support herself. After about a year, in or around [redacted] a coworker mentioned a wealthy couple who was looking for a personal assistant and invited [redacted] to meet them in [redacted] agreed and flew to [redacted] where she met Epstein, Maxwell, and [redacted] [redacted] From there, [redacted] flew with that same group to New York. During this trip, [redacted] tried to sell

herself as an ideal personal assistant for Epstein and Maxwell. [redacted] flew back [redacted]

[redacted] was back in [redacted] for about a month before Maxwell called her and asked her to fly out to Palm Beach. [redacted] agreed and was on a plane the next day. She then spent a few days at Epstein's Palm Beach residence, during which she was formally hired as Maxwell's personal assistant. She then continued travelling with Epstein and Maxwell and never returned [redacted]. Shortly after [redacted] was hired, Epstein instructed her to take a bath with him, during which he told her "you go the job, now you just have to keep it." Epstein then engaged in sexual contact with [redacted] and [redacted] understood that her job was dependent on her willingness to submit to Epstein's sexual demands.

[redacted] responsibilities included coordinating travel for Epstein and his entourage, managing his houses, completing shopping, organizing schedules and binders for each house, digitizing photographs, and running errands. For her first few years of employment, [redacted] reported directly to Maxwell, and she worked out of Maxwell's house when they were in New York. When in New York, [redacted] would occasionally stay at Epstein's New York residence, but she primarily resided in an apartment in Epstein's building on 66th Street. When Epstein got out of jail, [redacted] no longer reported to Maxwell and instead worked out of Epstein's residence when they were in New York.

During the time she worked for Epstein, [redacted] travelled with him wherever he went. Each morning, either Epstein or Maxwell would give [redacted] a list of tasks to complete for the day. When Epstein was in Palm Beach, [redacted] was responsible for scheduling his daily massages. Typically in Palm Beach, Epstein would receive a morning massage and an afternoon massage. Maxwell and [redacted] taught [redacted] how to schedule massages using a directory that was kept in Maxwell's office. Maxwell or Epstein would tell [redacted] who from the directory to call for a particular massage. Typically, [redacted] would call to schedule massages a day ahead of time. [redacted] believed that the people she was calling were experienced masseuses. If one masseuse could not make an appointment, she would either tell Maxwell or Epstein, or she would ask the masseuse whether they could refer anyone else. Eventually, [redacted] was shown how to edit the directory on the computer,[47] and she would update the directory with new contact information for new masseuses when told to do so.

[redacted] recalled that some of the masseuses were regulars, while others came less frequently. Maxwell and other guests would sometimes get massages as well, and those

---

[47] This appears to be the directory that [redacted] was instructed to remove from Epstein's Palm Beach and Virgin Islands residences. As discussed above, [redacted] was also instructed to remove the computers from Epstein's Palm Beach residence, which appears to have included the computer on which [redacted] edited the directory. As result, law enforcement has not recovered a copy of this directory.

massages were provided by people on the same directory list as the people who massaged Epstein. When asked what types of reasons these people gave when they could not make appointments, [redacted] said she recalled some saying they had to work and one referencing soccer practice.

When a masseuse arrived at the Palm Beach residence, generally someone would meet her in the kitchen. [redacted] would then take her up to the massage room. If it was a masseuse's first time, [redacted] would show her the table, lotions, and towels. [redacted] would then leave and tell Epstein that his massage was ready. [redacted] would typically then go run errands while Epstein received his massage, and she was sometimes present when a massage finished. Sometimes multiple girls would give Epstein massages at the same time, but [redacted] did not recall anyone bringing a girl for a massage and then waiting for that girl inside the house. [redacted] did not really talk with any of the masseuses or learn about their personal lives. She did recall, though, one girl saying that she was on break from college [redacted], and she recalls another who was pregnant. [redacted] believed that Epstein usually paid the masseuses, but a couple of times he asked her to pay them. [redacted] recalled paying the masseuses around $200 per massage.

When asked to name the masseuses she remembered, [redacted] listed several names, including [redacted] [redacted] [redacted] [redacted] [redacted] [redacted] [redacted] [redacted] and [redacted] [redacted] She recalled that [redacted] was attending college and that [redacted] had a baby at some point, but she did not know much about [redacted] [redacted] or [redacted] [redacted] remembered one time when [redacted] called and asked how much Epstein would pay to have sex with one of the masseuses. [redacted] was shocked and told [redacted] that Epstein "doesn't do that." [redacted] did not mention the conversation to Epstein because she worried he would get mad at her and she felt uncomfortable bringing it up.

[redacted] also did not think that sexual abuse was taking place during the massages for several reasons. She explained that some massages were provided by men,[49] and that no one ever acted like anything was wrong. The masseuses would also call [redacted] and ask to come back, so [redacted] did not believe anything abusive was taking place. [redacted] also walked in on some of Epstein's massages, and the masseuses she saw in the massage room on those occasions were clothed. Epstein also asked [redacted] to provide him massages on a couple occasions, but they never turned sexual. As a result, [redacted] did not connect massages with sexual activity.

---

[48] [redacted] was interviewed during the first Florida investigation. During that interview [redacted] said that when [redacted] was 23 years old, Maxwell recruited her to work as an assistant at Epstein's Palm Beach residence. She eventually gave massages to Epstein, [redacted] [redacted] and [redacted] [redacted] Her massages with Epstein included sexual contact.

[49] No other witness has described any male masseurs providing massages to Epstein or anyone else in Epstein's circle.

[redacted] viewed the masseuses as her peers – *i.e.*, young adults in their early 20s – and it never [redacted] her mind that any of them were minors. In [redacted] view, Epstein was the head of the household, and everyone did what he said. [redacted] did recall Epstein telling her that he was paying for an SAT tutor for [redacted] but [redacted] never took the SATs because [redacted] so she did not know what that test was or what it meant. She has recently learned that it is a test that someone would ordinarily take in high school, but she did not know that at the time.

[redacted] only learned that Epstein was sexually abusing minors when news articles started coming out about it. She recalled being shocked, angry, and disappointed. She was particularly angry with Epstein for manipulating her to help orchestrate the abuse of other women. During the first investigation, Epstein showed [redacted] some of the masseuse's MySpace pages in which they claimed to be 18 or referenced drug use. [redacted] felt that she had nowhere to go, and her reputation was ruined in the press, so she did not think she could get another job. [redacted] said that she still feels awful and wishes she could apologize to the victims. She also said that she wishes she had been interviewed during the first investigation so that she could have told someone that she was being abused and explained that she did not recruit or procure girls—she just met them when they came to the house.[50]

On December 4, 2019, we conducted a second proffer with [redacted] in New York. This proffer focused on the $250,000 payment she received from Epstein in late 2018 and on the sexual abuse she experienced while working for Epstein.

With respect to the 2018 payment, [redacted] explained that between approximately 2016 and 2018, she and her husband experienced financial difficulties. [redacted] was still in touch with Epstein and saw him every other month or so. During those meetings, [redacted] told Epstein about her financial troubles. Then one day in early December 2018, Leslie Groff emailed [redacted] inviting her to visit with Epstein at his residence in New York. [redacted] accepted the invitation and once again told Epstein about her financial difficulties. In response, Epstein made a call to his accountant, Rich Kahn, and directed Kahn to wire $250,000 to [redacted] Epstein told [redacted] not to tell anyone about the payment, but he did not say why. [redacted] assumed Epstein did not want her husband to feel badly about accepting such a gift. The last time Epstein provided [redacted] with money before that transaction was a $100,000 gift for her wedding [redacted].

Notwithstanding Epstein's instruction to the contrary, [redacted] told her husband about the $250,000 payment, and they used it to deal with their financial problems. [redacted] mentioned the payment she received to [redacted] who responded that she had recently received a payment of

[50] We did not discuss the end of her relationship with Epstein during this proffer. As discussed below, we covered that time period during our second proffer with [redacted]

$100,000 from Epstein. [redacted] said that Epstein called her one day and asked if she could use money, and when she said yes, he sent her the money. [redacted] believed Epstein was being generous because during their prior conversations about her financial difficulties, Epstein had told [redacted] that she would always be safe and he would always take care of her.

When asked about the Miami Herald series, [redacted] said she was aware as early as April 2018 that a reporter for the Miami Herald was working on a story about Epstein. [redacted] was aware of the series the day it was published in November 2018, and she recalls that she received the email from Groff inviting her to meet with Epstein within a day or two of the series' publication. Although [redacted] recalled mentioning the series when she met with Epstein in early December, she does not recall the details of what they discussed and did not believe the payment and articles were related.

With respect to Epstein's sexual abuse, [redacted] reiterated that Epstein first engaged in sexual contact with her shortly after she was hired when he directed her to take a bath with him and indicated that her job depended on engaging in sex acts with him. [redacted] explained that she did not feel that she had a choice because she did not want to lose her job, which had finally helped her feel financially secure. Epstein paid for [redacted] housing, travel, clothing, and food, in addition to paying her a salary, which began at approximately $35,000 per year, then increased annually until she was earning a bit over $100,000 per year. When Epstein went to jail, she took a pay cut to $75,000, which remained her salary until she left her job when she married her husband [redacted]. Epstein also paid for [redacted] attorney when she was deposed in [redacted] lawsuit.

For approximately the next several years, from approximately [redacted] until around the time Epstein went to jail in 2008, Epstein engaged in frequent sexual contact with [redacted] Over that period, [redacted] could only recall a small number of trips she took with Epstein during which he did not engage in some sort of sexual contact with her. Usually this contact involved Epstein bringing [redacted] to a bedroom and giving her explicit instructions regarding how to touch him and how to position herself while he masturbated on the bed. Additionally, Epstein frequently snuck into [redacted] room while she was sleeping and woke her up by fondling her. [redacted] insisted that she had no memory of any sexual contact taking place in any massage room with Epstein or in the context of any massage at all. During this period, [redacted] had a small number of serious boyfriends, and Epstein knew about those boyfriends but still engaged in sexual contact with [redacted] did not want to engage in any sexual contact with Epstein but felt obligated to do so in order to keep her job.

The sexual contact slowed sometime before Epstein went to jail and evolved into Epstein just asking [redacted] to sleep in his bed but not engaging in sexual contact. As this contact slowed, [redacted] believes Epstein was spending more of his time with [redacted] who was his girlfriend. After Epstein was released from jail, [redacted] no longer slept in his bed, and they no longer had any sexual contact.

[redacted] explained that she did not quit her job because she did not know where else she could go and was completely dependent on Epstein. She had no friends outside of Epstein's world, no education, and no family to support her. Epstein was also controlling in other aspects of [redacted] life. He would become enraged if she made a mistake or did not follow his instructions about travel plans precisely. Epstein also controlled [redacted] physical appearance. He made her cut her hair short and dye it blonde. He also selected her clothes and would comment on her body and encourage her to lose weight. [redacted] was aware that Epstein was similarly controlling of [redacted] Epstein also controlled where [redacted] lived, as she travelled with him wherever he went and was required to be on call 24/7. [redacted] also recalled that Epstein and Maxwell had [redacted] sign a healthcare proxy assigning them responsibility if anything happened to her. [redacted] was also required to sign a confidentiality agreement.

[redacted] recalled three instances during which Epstein directed [redacted] to engage in sexual activity while another woman was present. First, shortly after she took the job, [redacted] was directed by Maxwell and Epstein to engage in sexual contact with them at Epstein's Virgin Islands residence. [redacted] does not remember how this incident began or ended, but she remembers Maxwell being naked in the bedroom with her and Epstein and directing [redacted] regarding how to sexually touch Epstein. Second, in or around [redacted], Epstein directed [redacted] and a woman named [redacted] [redacted][51] who was in her 20s, to engage in sexual contact with each other and with him at his Virgin Islands residence. Third, in or around [redacted], Epstein directed [redacted] and a woman named [redacted] [redacted] who was in college, to engage in sexual contact with each other and him at his New York residence.

The most violent form of sexual abuse [redacted] experienced occurred when she and Epstein were alone in the gym at Epstein's Palm Beach residence. While [redacted] was doing sit-ups, Epstein closed the blinds to the windows and then roughly pulled [redacted] pants down and aggressively raped her. That is the only time [redacted] recalled Epstein having intercourse with her.

[redacted] did not tell Maxwell about the other incidents of sexual contact with Epstein because she was afraid Maxwell would become angry and that [redacted] would lose her job. [redacted] understood that Maxwell was Epstein's girlfriend and that she viewed the other girls Epstein had sex with as trash that should be quickly disposed of. [redacted] did not want Maxwell to think of her that way. She recalled, though, one instance on Epstein's birthday in or around 2002 at Epstein's Virgin Islands residence when Maxwell directed [redacted] and other young women to get naked, wrap themselves in saran wrap and take photographs while posing around Epstein as he sat on a massage table. Maxwell also directed [redacted] and the other young women to put paint on their breasts and press them on a canvass to give to Epstein as a birthday present. [redacted] also recalled a time when Maxwell discussed techniques for giving oral sex in [redacted] presence. [redacted] does not know, though, whether Maxwell engaged in any sexual contact with any other women.

---

[51] The FBI has not yet identified this individual.

After Epstein came out of jail, [redacted] responsibilities increased as she stepped into the role that Maxwell previously held running all of his homes. [redacted] did not recall scheduling massages for Epstein anymore after he came back from jail. [redacted] separated from Epstein in 2012 [redacted]. At first, [redacted] tried to restructure her job responsibilities so that she would not have to travel so much with Epstein, but Epstein rejected that plan and encouraged [redacted] to leave her position and move in with her husband. By the time she got married [redacted], [redacted] was no longer Epstein's employee. From there, [redacted] was managing [redacted].

[redacted] was ashamed of the sexual abuse she experienced and did not tell anyone about it for years, including her husband. The first people [redacted] disclosed this abuse to were the attorneys who currently represent her. Because her husband did not know about Epstein's sexual abuse, he viewed Epstein as [redacted] father-figure and encouraged her to remain in touch with him after they were married.

At the end of the interview, [redacted] said that she wished she could tell the victims that she would never knowingly facilitate their abuse. She emphasized that she would not knowingly help put someone through what she went through.

### *E. Interview of* [redacted]

On September 9, 2019, we interviewed [redacted] in New York. [redacted]. During this interview, we discussed with [redacted] the process of her recruitment and her interactions with Maxwell. We also discussed at a high level her allegations that she was "lent out" to other individuals by Epstein to engage in sex acts with them.[52]

At the beginning of the interview, [redacted] emphasized that [redacted] When asked to describe how she first came into contact with Epstein, [redacted] referenced what she called her "training period" with Epstein and Maxwell, which began in or around [redacted] also indicated that she previously believed she was 15 when she first met Maxwell, but the "records" showed that she was in fact 16 years old. She explained that she met Maxwell at Mar-a-Lago, [redacted], and where Maxwell recruited her to come to Epstein's Palm Beach residence to massage Epstein. At the residence, Maxwell and Epstein both interviewed [redacted] and then [redacted] began

[52] As described in more detail below, we have been unable to corroborate [redacted] accounts of being "lent out" to other men for sex. We have, however, been able to corroborate her account of being recruited by Maxwell, being sexually abused by Epstein, and recruiting other minor girls to provide paid sexualized massages to Epstein at his Palm Beach residence.

massaging Epstein. During the massage, Epstein and Maxwell asked [redacted] questions about her background and difficult family life, and she told them truthfully how old she was. Epstein and Maxwell then directed [redacted] to take off her clothes, and the massage became sexual.

During what [redacted] refers to as her "training period," Maxwell and Epstein taught [redacted] about how to engage in sex acts. For example, Maxwell and Epstein taught [redacted] how to perform oral sex and how to engage in anal stimulation. During this same period, [redacted] also recalls many conversations during which Maxwell and Epstein would tell [redacted] to look for and recruit young females. They directed [redacted] to find young females who looked like the girl next door. [redacted] explicitly remembered Epstein saying the "younger the better" and that he did not want "black girls." [redacted] understood that these recruits would give paid sexualized massages to Epstein at his Palm Beach residence.

Maxwell taught [redacted] how to recruit younger girls for Epstein by taking [redacted] on shopping trips, during which Maxwell would demonstrate how to recruit girls and would make [redacted] practice doing so. Maxwell taught [redacted] to recruit young girls by saying, "I know this really nice guy who likes to help people out," adding "you can make some money," and noting that the man could help the girl with her education or being a model. Maxwell criticized [redacted] for being "bad" at recruiting girls and would show [redacted] how easily Maxwell could recruit girls.

[redacted] followed these instructions and told the girls she recruited that they would have to give massages, but not normal massages. When girls agreed to the proposition, [redacted] would exchange numbers with them. [redacted] would then describe the girl to Epstein, who would decide whether he wanted to meet with them. If the girl was acceptable, then Maxwell would schedule the girl to come to the Palm Beach residence at a particular date and time. [redacted] recalled getting in trouble for not bringing enough girls and for not bringing the "right" girls for Epstein. [redacted] was usually paid $200 for each girl she brought. If Epstein liked a girl [redacted] brought in, he would give her $300 as an extra incentive. Usually Epstein paid [redacted] but sometimes he told her to get money from Juan Alessi. Epstein would occasionally take the phone number of a girl himself after a massage if he liked her.

[redacted] vividly recalled a conversation with Maxwell and [redacted] during which they were all smoking cigarettes inside Epstein's Palm Beach residence. During this conversation, [redacted] asked Maxwell how she handled Epstein being with so many girls. Maxwell responded that it took the "pressure off" Maxwell having "to do it." [redacted] added that the more girls they recruited the less they would "have to do" themselves. [redacted] understood that Epstein had a sex addiction.

When [redacted] recruited girls, she would have them meet her at her home, and then she would get a ride. Sometimes [redacted] would give her rides, and sometimes Juan Alessi would give her rides. Upon arriving at Epstein's Palm Beach residence, either Juan Alessi, Maria Alessi, Maxwell, or [redacted] would answer the door. [redacted] would then bring the girl up

to the massage room and would stay in the room for the massage with them. [redacted] did not recall recruiting anyone in New York and believes she only recruited girls in Florida. In total, [redacted] believe that she brought no more than 20 girls to Epstein. She expressed sincere remorse for having recruited girls to be abused by Epstein.

[redacted] described herself as subservient during her time with Epstein and recalled quitting her job [redacted] at Epstein's direction. [redacted] said that she initially believed she started travelling with Epstein about six months after her "training period," but upon reviewing Mar-a-Lago records and flight records, she realized she took her first trip with Epstein only three months after being recruited. [redacted] recalled travelling very frequently, either weekly or every other week, with Epstein. When she travelled to New York, she would stay in an apartment in Epstein's building on 66th Street. During one such trip, [redacted] left for a walk and was gone for a few hours, after which Maxwell and Epstein were angry that she had not stayed in the apartment and waited for them to contact her. In response to that incident, Maxwell bought [redacted] a cellphone and told [redacted] to stay in Epstein's New York residence and only leave when Epstein directed her to go to a sex store or go recruit girls (though, as mentioned above, [redacted] never successfully recruited any girls in New York). [redacted] never slept over in Epstein's Palm Beach residence, but she recalled that eventually Epstein gave her money to pay for her own apartment in Florida, which enabled her to move out of her parents' home.

During her period travelling with Epstein, [redacted] spend most of her time with Epstein, Maxwell, and [redacted] When that group spent time watching television or movies together, Maxwell would sometimes initiate sexual contact by taking off her clothes and telling [redacted] to give her oral sex. Maxwell would also involve [redacted] in the sexual contact, all while Epstein was present. On one such occasion, Maxwell used a sex toy on [redacted] in a way that was physically painful to [redacted] As [redacted] spent more time with Epstein, though, Maxwell became less directly involved in sexual contact. At some point, [redacted] began using drugs so heavily that Epstein said he did not want her around anymore. She still maintained some contact with him, though, and when she turned 19 [redacted], Epstein and Maxwell paid for [redacted] to travel to [redacted] for massage therapy school.

[redacted] also mentioned someone named [redacted] who was [redacted] who was also good at recruiting girls. She also said that someone named [redacted] [redacted] would recruit girls for Epstein.

[redacted] initially described [redacted] [redacted] as a "mastermind" at finding girls. [redacted] first claimed that she had personally watched [redacted] recruit girls, but she did not provide additional details. [redacted] recalled meeting [redacted] in [redacted] after her "training" was complete and she had already "proven" herself. Shortly before that first meeting, Epstein described [redacted] as one of his "favorites." Epstein then brought [redacted] to [redacted] house in [redacted], where

---

[53] The FBI has not yet identified this individual.

[redacted] Epstein, and [redacted] all engaged in sexual contact with each other. [redacted] recalled that [redacted] already knew exactly what to do and what Epstein liked sexually. [redacted] recalled Epstein saying that other than Maxwell, [redacted] was the best for picking up girls. When asked to describe specific instances in which [redacted] personally observed [redacted] recruit someone, [redacted] said she did not recall actually seeing [redacted] recruiting anyone, and added that she and [redacted] did not really get along, and [redacted] did not see her much. When asked whether [redacted] had other sexual experiences with [redacted] she said there were "tons" and "too many to count."

[redacted] generally described Maxwell and Epstein directing her to engage in sex acts with other men. Although we did not delve into the details of this topic, [redacted] volunteered some information about it, [redacted]. [redacted] used the term "lent out" to describe instances in which Maxwell or Epstein directed her to have sexual contact with other men. Her first memory of being "lent out" was after Epstein paid for her to get an apartment in Florida and after Maxwell had gotten her a cellphone. One day, Maxwell told [redacted] to massage Glen and Eva Dubin and explicitly told [redacted] that she had to do to Glen what [redacted] did for Epstein, which [redacted] understood to mean engage in sex acts. [redacted] added that at some point, Maxwell and Epstein told [redacted] that they were going to "test me out" with other people, which she needed to do in order to be a "real" massage therapist. With respect to Prince Andrew,[54] [redacted] recalled that Maxwell told [redacted] that she was going to meet a prince and should make him happy and do the exact same things for him that she did for Epstein because the prince was a good friend of Maxwell's.

[redacted] explained that she was "lent out" so many times that she began using drugs, and she cannot estimate how many times she was "lent out" to other people. She recalls being "lent out" to some people multiple times, and some people just once. Sometimes Maxwell would direct [redacted] to engage in sex acts with other men, and sometimes Epstein would do so. When in New York, either Maxwell or Epstein would call [redacted] to the massage room and direct her to engage in sex with a man there. [redacted] said that she was never paid by any of these other men for the sexualized massages she provided. [redacted] does not recall any conversations about money taking place in front of any of the men to whom she was "lent out." [redacted] also mentioned Alan Dershowitz, but we did not fully explore the details of her interactions with him.

When asked whether she was aware of any other girls who were "lent out" like [redacted] she said that [redacted] [redacted] was a participant in sex acts with "lots" of third parties. She also said that [redacted] [redacted] was "lent out" and that [redacted] and [redacted] were "lent out" together.[55]

---

[54] We are in the process of obtaining the name of a lawyer who represents Prince Andrew. Once we have this contact information, we plan to request an interview.

[55] This is inconsistent with [redacted] account. [redacted] does not recall ever being told to have sex with any men other than Epstein. This is also inconsistent with [redacted] account. [redacted] described being sexually abused by Epstein, but she did not describe ever being told to have sex with any men other than Epstein.

*PRIVILEGED - ATTORNEY WORK PRODUCT/DELIBERATIVE PROCESS*
*CONFIDENTIAL - SUBJECT TO FED. R. CRIM. P. 6(e)*

[redacted] also recalled being "lent out" with a woman named [redacted] and with [redacted] added that there were more girls whose names she could not think of at the time.

[redacted] noted that [redacted] came into the picture toward the end of [redacted] time with Epstein, so she did not know much about her.

[redacted]

[redacted] account of being recruited by Maxwell, abused by Maxwell and Epstein, engaging in paid sexualized massages with Epstein as a minor, recruiting other minors to engage in paid sexualized massages with Epstein, and travelling to other locations with Epstein are all consistent with other evidence and corroborated, in significant part, by employment records at Mar-a-Lago, flight records for Epstein's private jet, and other witnesses. In particular, Juan Alessi confirms that [redacted] frequently visited Epstein's Palm Beach residence to provide Epstein with massages and often brought other young girls to the residence to massage Epstein. Alessi knew that [redacted] was a minor and knew that [redacted] travelled with Epstein. In addition, Maria Alessi and [redacted] both recalled seeing [redacted] with Epstein. Moreover, her account of these experiences is remarkably consistent with the experiences of other victim-recruiters, such as [redacted] and [redacted]

[redacted] number of the men [redacted] has publicly identified as people to whom she was "lent out" have vociferously denied her allegations. No other victim has described being expressly directed by either Maxwell or Epstein to engage in sexual activity with any other men. [redacted] and [redacted] recalled Epstein asking her to massage Harvey Weinstein and that during the massage Weinstein directed [redacted] to remove her shirt. When [redacted] refused and left, Epstein apologized and did not ask her to massage any other men again. [redacted] recalled Epstein asking her to massage Leon Black and Jes Staley, both of whom engaged in sexual contact with her against her will during the massages. Moreover, according to [redacted] when she complained to Epstein about the sexual contact, he laughed and told [redacted] that it was up to her whether to engage in sex during those massages.

[redacted]

---

[56] The FBI has not yet identified this individual.

[redacted]

[redacted] In [redacted] wrote a partially fictionalized account of her experienced with Epstein and Maxwell. In the memoir, [redacted] described a number of incidents that she has since admitted did not in fact take place. These include descriptions of a sexual encounter with a Nobel Prize winning scientist and a scene in which [redacted] [redacted] is caught with cocaine in her room and fired. The memoir also mentions Alan Dershowitz, but does not claim that [redacted] engaged in sex acts with him. She did not raise those claims until 2014.

Also in [redacted] when [redacted] was still writing her memoir, she exchanged emails with Sharon Churcher, a reporter for the Mail on Sunday. In one email, [redacted] asked Churcher to help her put together a list of Epstein's well-known associates so that [redacted] could include them in her memoir. In response, Churcher wrote, "Don't forget Alan Dershowitz. JE's buddy and lawyer. Good name for your pitch… We all suspect Alan is a pedo and tho no proof of that, you probably met him when he was hanging with JE."

As for [redacted] account of her interactions with Prince Andrew [redacted] a photograph of [redacted] with Prince Andrew and Maxwell, as well as [redacted] recollection that Maxwell also introduced her to Prince Andrew. [redacted] Prince Andrew, who has publicly denied the allegations

[redacted] we asked whether she recalled any other females who may have been present with her during these sexual interactions. In response, [redacted] said that [redacted] and more girls whose names should could not recall, had all participated with [redacted] in sexual encounters with other men at the direction of either Epstein or Maxwell. However, [redacted] and [redacted] have very different memories. [redacted] who as noted above, did recall meeting [redacted] on one occasion, did not recall Epstein or Maxwell ever asking her to have sex with any other men. Nor did she recall ever being present when [redacted] engaged in sex acts with other men. Similarly, although [redacted] described numerous instances of sexual abuse, she did not describe ever being directed by Epstein or Maxwell to engage in sex acts with another man. She, too, did not recall ever being present when [redacted] engaged in sex acts with other men.

[redacted] also described visiting [redacted] residence in [redacted] and engaging in sexual activity with [redacted] and Epstein there. However, we have been unable to gather any evidence to

suggest that [redacted] ever resided in [redacted] Rather, the information provided by other witnesses and corroborated by travel records, suggests that [redacted] resided in Epstein's building on 66th Street in New York and otherwise travelled with Epstein wherever he went.

Of particular significance in evaluating [redacted] account of [redacted] participation in sexual abuse, [redacted] description of [redacted] conduct was internally inconsistent within our single interview with her. At first, [redacted] stated that [redacted] was a "mastermind" recruiter and said that she had personally witnessed [redacted] recruit minor girls to engage in paid sexualized massages with Epstein. When asked to describe specific instances in which she observed [redacted] recruiting girls, [redacted] said that she had never seen [redacted] recruit anyone and had not actually spent much time with [redacted] By contrast, when asked whether she recalled any other instances in which [redacted] was present for sexual activity, [redacted] said there were "tons" and "too many to count."

Additionally, in or around 2016, [redacted] was deposed [redacted] admitted to lying about her employment history on her resume, admitted to burning handwritten notes that she had made about her experiences with Epstein and Maxwell, and admitted that she inaccurately told a reporter that she was abused by Epstein for four years when she was only with him for about two years. She also confirmed that she was paid a total of nearly $200,000 for the statements and photo of Prince Andrew that she provided to Sharon Churcher, and she admitted to exchanging emails with Churcher about how "big headlines" would help [redacted] sell her memoir. [redacted] also admitted that she had previously claimed that the FBI told her they were aware of 40 other Epstein victims, when in fact the FBI never told her how many victims they had identified. She further claimed that the FBI told her that Epstein had cameras watching her at all times, including while in the bathroom (we are not aware of any such cameras). At one point during her deposition, [redacted] became particularly combative when pressed to describe in detail any specific times she recalled when Maxwell directed her to have sex with another person. Eventually, [redacted] cursed in her response, saying, "She's the one who brought me to be trafficked by Jeffrey Epstein in the fucking first place."

Substantially all of the individuals accused by [redacted] of engaging in misconduct have publicly denied the allegations. These denials include public statements made by Dershowitz and Prince Andrew, who both deny engaging in any sexual contact with [redacted] And as noted below, Maxwell, through counsel, has similarly disputed substantial aspects of [redacted] account.

Finally, [redacted] has engaged in a continuous stream of public interviews about her allegations, many of which have included sensationalized if not demonstrably inaccurate characterizations of her experiences. The most recent example arose this month when [redacted] publicly claimed that the FBI had warned her of a "credible" death threat. In fact, both the FBI and our Office have repeatedly told [redacted] that there are *no* credible threats to her safety.

Nevertheless, [redacted] has stated both publicly and during a meeting of victims at the FBI's New York office that the FBI has identified a credible threat against her.

[redacted]

*F. Additional Investigative Steps*

In addition to conducting numerous witness interviews, we have met with attorneys for other subjects of the investigation, executed search warrants, reviewed financial records, and reviewed numerous documents in an effort to evaluate and corroborate witness accounts.

1. Attorney Meetings

a. Counsel for Ghislaine Maxwell

On October 8, 2019, Maxwell's attorneys provided us with an attorney proffer. During the meeting, her attorneys described Maxwell's background and upbringing. She was born in France in 1961 and raised in Paris. In the early 1990s, she began traveling to the United States more often as her father expanded his business there, and she met Epstein through a friend of her father's while in the United States. In 1991, he father died, and his company collapsed, leaving Maxwell with limited financial resources. Epstein supported Maxwell both emotionally and financially after her father's death, and they began a romantic relationship in 1992. Early on in the relationship, Epstein was very secretive and kept Maxwell in the dark about other parts of his life, including other girlfriends he had. During the earlier period of their relationship, Maxwell was not allowed to look at Epstein's message sheets or answer his phones.

By around the mid-1990s, Maxwell only saw Epstein about half the days in any given month, and they were physically intimate less often. Around that same time, Maxwell began managing Epstein's properties. Epstein paid Maxwell a salary, and she would give him weekly reports regarding his various properties. In 1996, they hired Kimberly Galindo[57] and [redacted] as assistants to help with Maxwell's management responsibilities. By the late 1990s, Maxwell wanted to marry and have a child with Epstein. Although Epstein refused to marry her, he told Maxwell that he would have a child with her, which was why Maxwell decided to stay with him.

[57] The FBI has not yet identified this individual.

Around the late 1990s, Epstein began using testosterone patches, which made him more aggressive. Their relationship began to deteriorate, and Maxwell stopped sleeping in the same room as Epstein. In or around 1999 or 2000, Maxwell stopped having sex with Epstein. At that time, Epstein was dating a woman named [redacted].[58] In or around [redacted] Maxwell ended her romantic relationship with Epstein and began dating other men. Around the same time, Maxwell met [redacted] in Hawaii and ended up hiring her to be Maxwell's personal assistant to replace [redacted] Shortly after [redacted] was hired, though, Epstein made clear that [redacted] would be his assistant instead. Maxwell trained [redacted] regarding how to manage Epstein's houses, and eventually [redacted] took over Maxwell's responsibilities.

Between about 2001 and 2003, Maxwell continued travelling with Epstein, even though they fought frequently, because Epstein wanted her to continue managing his properties. It was during this period that Maxwell met [redacted] Maxwell does not recall meeting [redacted] and she primarily recalls speaking with Leslie Groff on the phone.

In 2003, Maxwell began a long-term relationship with Ted Wight, and she remained in a committed relationship with him until 2010. As a result of that relationship, Maxwell spent less and less time with Epstein. She was not present in 2005 when the Palm Beach Police Department searched Epstein's Palm Beach residence, and she was not contacted or interviewed during that investigation. Maxwell understood that Epstein pled guilty to having sex with an "underage prostitute," and she did not visit him in jail.

Throughout their relationship, Epstein asked Maxwell to connect him with massage therapists, but she insists that she only hired adults for that role. She recalled Epstein getting one massage per day, and she believed that the massages were not sexual in nature. Maxwell did engage in sex acts with Epstein and other adult women, but she denies ever doing so with minors. Maxwell categorically denies any involvement in recruiting minors for sex with Epstein. Maxwell's attorneys claimed that she has a medical condition making some of the public allegations regarding certain sex acts involving Maxwell physically impossible. They did not provide any additional details regarding the nature of the condition or which acts it impacted. They added that she could be intimate with Epstein, but not every day because of this condition.

At the conclusion of the proffer, Maxwell's attorneys walked through the public allegations against their client and explained their views of why the individuals making those claims were not credible. In doing so, they emphasized that Maxwell had not invoked her Fifth Amendment privilege against self-incrimination when she was deposed as a part of [redacted] lawsuit.[59] Although they discussed several witnesses during this portion of the

[58] The FBI has not yet identified this individual.
[59] We have reviewed the transcripts of Maxwell's two-part deposition in 2016, which was taken in connection with [redacted] defamation suit against Maxwell. During the deposition, Maxwell admitted to being in a romantic relationship with Epstein from the early 1990s through

meeting, they primarily focused on three victims: [redacted] and [redacted] First, they highlighted a number of inconsistencies within [redacted] account, including prior accounts of abuse that [redacted] has since admitted to fabricating in her memoir. They also pointed out that [redacted] account of being forced to have sex with other men differs dramatically from that of other victims of Epstein's abuse. Second, they noted that [redacted] was an adult when she met Epstein and that she had admitted to lying and saying that she had video evidence of her abuse, when she did not. Finally, they noted that flight logs show that Maxwell was "never" in New Mexico in [redacted], which is when [redacted] says Maxwell engaged in inappropriate behavior with her.[60] Maxwell denies [redacted] allegations.

b. Counsel for Leslie Groff

Leslie Groff worked as Epstein's primary New York-based assistant from at least in or about 2001 through the summer of 2019. Her responsibilities included, among other things, scheduling Epstein's massages at the New York residence. Generally, Groff would call victims to schedule massage appointments, but she had limited interactions with the victims beyond scheduling. In addition to scheduling massage appointments, Groff would also book flights for girls who travelled to meet Epstein at his various residences. Groff made these arrangements by phone from the New York office where she worked for Epstein. She spent little time in Epstein's residence and thus had few in-person interactions with victims.

---

in or around 2000. She also described acting as his employee and being tasked with running his various properties. She claimed to have spent very little time with Epstein in the 2000s.

Throughout the deposition, Maxwell took virtually every opportunity she could to call [redacted] a liar and to accuse both [redacted] and her attorneys of feeding "vicious lies" to the press. She denied any awareness that any minors other than [redacted] ever massaged Epstein, and she denied any knowledge of any sexual contact between Epstein and any minors. She also denied knowing that Epstein engaged in sexual activity during the course of massages. Maxwell admitted during her deposition to meeting both [redacted] and [redacted] but denied any awareness that Epstein had sexual contact with them. She claimed not to recall [redacted] age and claimed that she only saw [redacted] at Epstein's Palm Beach residence and that [redacted] was with her mother on all of those visits. Maxwell also claimed that she had never given anyone, including Epstein, a massage, though she admitted to showing people where "pressure points" are located on a hand and foot. She denied ever showing anyone how to massage Epstein. She also denied ever having sexual contact with [redacted]

[60] It is true that the flight logs for Epstein's private jet do not show Maxwell flying on his plane to New Mexico in [redacted]; however, it is still possible that Maxwell took a commercial flight to New Mexico. Given the passage of time, it has not been possible to obtain records of such travel.

In any event, Maxwell admitted during her 2016 deposition that she met [redacted] at Epstein's New Mexico residence. Although that admission does not include a date, she has admitted under oath to meeting [redacted]

On July 18, 2019, we gave a reverse proffer to Leslie Groff, during which we explained that numerous victims had indicated that she was responsible for scheduling massages during which they were sexually abused. We encouraged Groff to meet with us for a proffer so that she could share her story and explain her role. Subsequently, on August 7, 2019, we had a phone call with Groff's attorney during which he indicated that he would not bring Groff in for a proffer and had advised her to invoke her Fifth Amendment privilege against self-incrimination if she is subpoenaed to testify. In recent weeks, we have reached back out to Groff's attorney to convey that we will not be able to provide her with any sort of agreement if she does not proffer with us. He appeared to understand our position and is considering whether to bring Groff in for a proffer.

c. Counsel for Jean Luc Brunel

In August and September of 2019, we had multiple phone calls with an attorney for Jean Luc Brunel. On our last call, the attorney indicated that Brunel was not willing to meet with us for a proffer and would invoke his Fifth Amendment privilege against self-incrimination if subpoenaed to testify in the grand jury.

d. Counsel for Leslie Wexner

On July 25, 2019, counsel for Wexner provided us with an attorney proffer. Wexner is the billionaire founder and CEO of L Brands (formerly Limited Brands) corporation, which controls Victoria's Secret, among other retail brands. It has been publicly reported that Wexner and Epstein had a close relationship and that Epstein managed Wexner's finances from the 1990s through the 2000s.

During our meeting, Wexner's attorneys indicated that Wexner had no knowledge of any inappropriate or unlawful activity with young women by Epstein. The attorneys emphasized Wexner's relationship with Epstein was more professional than social. The attorneys also explained that over his years handling Wexner's finances, Epstein stole or otherwise misappropriated several hundred million dollars from Wexner. That misconduct, together with fees that Epstein paid himself for his services to Wexner, appears to account for virtually all of Epstein's wealth.

Wexner first met Epstein in the 1980s through a mutual friend who recommended Epstein as a financial adviser. After a couple other acquaintances recommended Epstein as well, Wexner brought Epstein on to help with his investments. Over time, Epstein became more involved in Wexner's finances until Epstein controlled all of Wexner's personal finances with virtually no oversight. In 1991, Epstein obtained a power of attorney from Wexner, which enabled Epstein to handle the purchase and sale of real estate and other assets on Wexner's behalf. At some point in 1998, Epstein sold himself the New York residence in which he resided until his arrest in 2019 at a deeply discounted price. The New York residence had previously

belonged to Wexner, but the Wexners had moved out of it in 1995. Epstein also sold himself a private plane that previously belonged to Wexner at a deeply discounted price.

In the 1990s, Epstein told Wexner that he had other clients and that Wexner did not need to pay Epstein because Epstein was having fun and they would settle up later. Epstein introduced Wexner to a number of other people as his clients, and Wexner interacted with other prominent people who knew Epstein, such as Prince Andrew, professors at Harvard, and a sultan in Dubai. Epstein had no formal role in L Brands or Victoria's Secret. At some point, Wexner heard a rumor that Epstein might be holding himself out as connected to Victoria's Secret, but when Wexner asked Epstein about it, Epstein denied doing so.

Epstein handled Wexner's personal business affairs until 2007, when Wexner learned that Epstein had stolen or otherwise misappropriated several hundred million dollars from Wexner. Around that time, Epstein told Wexner that he was having legal problems involving an overly aggressive police chief and some sort of massage. Epstein said he was being blackmailed and it could get messy, so it would be best for Wexner's wife to take over the family finances. In response, Wexner's wife looked into the state of their finances and discovered that Epstein had misappropriated a significant amount of the family's funds. For example, Epstein frequently bought property on behalf of the Wexners and then sold it to himself for a fraction of the cost. The Wexners then decided to cut off Epstein. When confronted, Epstein tried to convince Wexner's wife that she did not understand the financials and insisted that he had the Wexners' best interests at heart. The Wexners did not want to bring unnecessary public attention to the issue, so they withdrew the power of attorney, and hired counsel to negotiate a private settlement with Epstein. As a result of those negotiations, Epstein agreed to return $100 million to the Wexners, which he did in January of 2008. At that point, Wexner severed all ties with Epstein, and he has not seen or spoken to Epstein since.

Wexner knows nothing about the [redacted] claim from [redacted] and explained that at the time, Epstein owned a property adjacent to the Wexners about a half mile way from the Wexners's property. The Wexners's security team is not aware of any inappropriate incident taking place on the Wexners's property, and the Wexners first heard about [redacted] allegations from public reporting this year.

2. <u>Search Warrants</u>

In July and August 2019, we obtained and the FBI executed search warrants for Epstein's residences in New York and the Virgin Islands. We subsequently obtained warrants to search all electronic devices, drives, and discs seized from those residences. The FBI is continuing to review the extraordinarily large amount of data contained on those devices and is working with our filter team to complete a privilege review of that data. In addition, we have reviewed the materials obtained during the Palm Beach Police Department's October 2005 search of Epstein's Palm Beach residence.

Based on our review of these materials thus far, we have identified some victims who appear in photographs maintained in Epstein's residences. Of particular note, we have identified photographs of [redacted] and [redacted] at Epstein's residences. It bears noting that, contrary to some news reports, these searches did not reveal any cameras in any of the bedrooms or massage rooms.

3. Financial Records

Together with the FBI, we have reviewed a number of financial documents regarding Epstein's, Maxwell's, [redacted] and [redacted] finances. We have also been in touch for counsel representing JP Morgan, Deutsche Bank, and TD Bank, each of which have held accounts related to Epstein or his associates.

Epstein held the bulk of his finances at JP Morgan from the early 2000s until 2013, when he opened multiple accounts at Deutsche Bank and transferred his funds from JP Morgan to Deutsche Bank. In 2019, Deutsche Bank closed Epstein's accounts, and his funds from those accounts were primarily transferred to the Bank of Puerto Rico. Epstein's accounts appeared to be exclusively for the purpose of holding his own money. His Deutsche Bank accounts included checking accounts, money market accounts, and brokerage accounts for his charities, his consulting company Southern Trust Company, Inc., and several trusts, most of which appear to have been established to handle payments for Epstein's various expenses in connection with his properties and planes. We have not identified any accounts that are consistent with Epstein handling or investing other people's money.

Additionally, in the fall of 2019, counsel for TD Bank reached out and informed us that several individuals and entities associated with Epstein held accounts at TD Bank, including accounts held by [redacted] Epstein was not a signatory on any of the accounts, and TD Bank is in the process of closing all of the accounts.

On September 12, 2019, we met for several hours with counsel for Deutsche Bank, which held the majority of Epstein's finances from 2013 through 2019. Their presentation was extremely thorough, including a 50-page summary of their analysis. The presentation broke down Epstein's finances into a number of useful categories, including listing various types of transactions by type and recipient. At a high level, there was no immediate indication of financial criminal activity or misconduct, including based on our analysis and the internal investigation that continues to be in progress at Deutsche. Additionally, as referenced above, there do not appear to be any signs that Epstein was trading on behalf of any clients in Deutsche accounts during the period when he was a client, between 2013 and 2019.

We are continuing to receive additional documents from JP Morgan,[61] and the FBI is continuing to review financial records for any evidence of potential misconduct or potential obstruction.

4. Additional Document Review

Finally, as we have met with new witnesses, we have re-evaluated documents and records obtained pre-indictment for any corroborating information of new victim accounts. In particular, we have found numerous message pads featuring the names of victims who have spoken with us, which were found either in trash pulls or during the search of Epstein's Palm Beach residence during the 2005 Florida investigation. Additionally, we have identified some flight logs within the records obtained from one of Epstein's pilots that reflect instances during which certain victims flew on Epstein's private jet.

## III. Legal Landscape

We have considered the applicability of three different criminal charges to the conduct revealed during the course of our investigation. This section walks through the elements and basic contours of each statute and summarizes the applicable statutes of limitations.

### *A. Sex Trafficking of Minors*

In the original Indictment, we charged Epstein with sex trafficking of minors, in violation of Title 18, United States Code, Section 1591. This statute has the following elements:

(1) That the defendant knowingly recruited, enticed, harbored, transported, provided, or obtained by any means a person, or aided and abetted the same;
(2) In or affecting commerce;
(3) Knowing the fact that the victim had not yet attained the age of 18 years old;
(4) Knowing the victim would be caused to engage in a commercial sex act; and
(5) That venue is proper in the Southern District of New York.

[redacted]

[61] These productions include messages exchanged between Jes Staley and Epstein around the period when [redacted] [redacted] recalled being raped by Staley during a massage at Epstein's New York residence. [redacted]

[redacted]

[redacted]

[redacted]

[redacted]

---

[redacted]

[redacted]

[redacted]

[redacted]

> [redacted]

> [redacted]

> [redacted]

[redacted]

[redacted]

[redacted]

*B. Transportation of Minors*

Title 18, United States Code, Section 2423 makes it a crime to transport minors with the intent to engage in criminal sexual activity. That crime has the following elements:

(1) That the defendant knowingly transported a victim, or aided and abetted the same;
(2) Across state lines;
(3) At the time of the transportation, the victim was less than 18 years old;
(4) The defendant transported the victim with the intent that the victim engage in "sexual activity for which any person can be charged with a criminal offense;" and
(5) That venue is proper in the Southern District of New York.

Title 18, United States Code, Section 2423(a) provides:

> A person who knowingly transports any individual under the age of 18 years in interstate or foreign commerce, or in any Territory or Possession of the United States, with intent that such individual engage in prostitution, or in any sexual

> activity for which any person can be charged with a criminal offense, shall be fined under this title or imprisoned not more than ten years, or both.

"To secure a conviction under § 2423(a), the government . . . must prove beyond a reasonable doubt that the defendant: (1) knowingly transported a minor across state lines and (2) with the intent that the minor engage in sexual activity for which some person could be criminally charged." *United States v. Vargas-Cordon*, 733 F.3d 366, 375 (2d Cir. 2013).

[redacted]

[redacted]

[redacted]

---

[redacted]

[redacted]

C. *Enticement of Minors*

We have also considered Title 18, United States Code, Section 2422(b), which makes it a crime to entice a minor to engage in illegal sexual activity. The enticement statute was enacted in February 1996, and the version of the statute in effect at that time provided: "Whoever, using any facility or means of interstate or foreign commerce, including the mail, or within the special maritime and territorial jurisdiction of the United States, knowingly persuades, induces, entices, or coerces any individual who has not attained the age of 18 years to engage in prostitution or any sexual act for which any person may be criminally prosecuted, or attempts to do so, shall be fined under this title or imprisoned not more than 10 years, or both."

To prove a violation of the enticement statute, the Government must prove four elements: "that an individual (i) used a facility of interstate commerce; (ii) to knowingly persuade, induce or entice, or to attempt to persuade, induce or entice; (iii) any individual who is younger than eighteen-years old; (iv) to engage in sexual activity of a criminal nature." *United States v. Brand*, 467 F.3d 179, 201-02 (2d Cir. 2006). [redacted]

D. *Statute of Limitations*

The conduct revealed during our investigation spanned from approximately 1994 through approximately 2005. [redacted]

---

[66] As discussed below, we anticipate recommending transportation of minors charges against Maxwell and will prepare a separate prosecution memorandum regarding those charges. That prosecution memo will detail the applicable state statutes for the conduct relevant to the proposed charges against Maxwell.

[redacted]

[redacted]

[redacted]

[redacted]

---

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

**IV. Analysis**

In light of the evidence gathered during our investigation, as well as the legal tools available, in this section, we evaluate whether there is sufficient evidence to charge [redacted]

---

[69] The term "sexual abuse" is defined as including "the employment, use, persuasion, inducement, or coercion of a child to engage in, or assist or another person to engage in, sexually explicit conduct or the rape, molestation, prostitution, or other form of sexual exploitation of children, or incest with children." 18 U.S.C. § 3509(8). The term "sexually explicit conduct" means "actual or simulated (A) sexual intercourse [. . .] (C) masturbation; [or] (D) lascivious exhibition of the genitals or pubic area of a person[.]"

[redacted] Leslie Groff and/or Ghislaine Maxwell with a federal crime and, if so, whether such charges would be in the interests of justice.

*A.* [redacted]

[redacted]

[redacted]

[redacted]

[redacted]

1. <u>Evidence That</u> [redacted] <u>Conspired to Sex Traffic Minors</u>

[redacted]

[redacted]

[redacted]

[redacted]

*a. Knowledge of Sex Acts*

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

*b. Knowledge of Age*

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

---

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

*PRIVILEGED - ATTORNEY WORK PRODUCT/DELIBERATIVE PROCESS*
*CONFIDENTIAL - SUBJECT TO FED. R. CRIM. P. 6(e)*

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

*B.* [redacted]

[redacted]

[redacted]

[redacted]

*C.* [redacted]

[redacted]

[redacted]

[redacted]

[redacted]

*D. Leslie Groff*

[redacted]

*E. Ghislaine Maxwell*

[redacted]

[redacted]

[redacted]

**From:** [redacted]
**To:** "[redacted]
**Subject:** [redacted] Jane doe 102
**Date:** Fri, 18 Jul 2014 19:15:50 +0000
**Importance:** Normal

---

Hi [redacted],

Still ploughing through the case and going to places w this i never dreamed but all is good.

I hate to bother you about the past but I remember you saying you we're familiar w the Ron Eppinger case and knew someone from the inside that personally was there at the time. I'm not going after Eppinger or anything like that just putting together pieces of a puzzle that's not so nice to remember.

I know Eppinger was arrested in 01' and not for any charges I brought against him but for illegally transporting women from Chez Republic and soliciting them for prostitution but what I'm trying to figure out is what year I was with him and when I was sent to Charlie's place (club owner of hot chocolates bar & restaurant in Ft.Lauderdale).

I'm not even sure you would even remember but I was hoping for a long shot. I appreciate any relevant info about this that you can remember or even get me in touch w the kind gentleman who took good care of me once I got to the police station in Ft. Lauderdale, tell him it would be a privilege to speak w someone who actually took the time to care empathetically about someone else they hardly knew me & let him know that I'm actually am advocate for speaking out about these ruthless crimes.

I'm so sorry again to plague you w my troubles!!

Kindest Regards,
[redacted] cell

Sent from my iPhone

SENSITIVE BUT UNCLASSIFIED

OFC-TP-15-12392
SODOFC-15-12392
Date of Report: May 18, 2015

**MEMORANDUM**

**Date:** May 18, 2015

**To:** [redacted]
Assistant Special Agent in Charge
Special Operations Division

**From:** [redacted]
Director
OCDETF Fusion Center

**Subject:** Target Profile: [redacted]; [redacted]; [redacted]; Jeffrey EPSTEIN; [redacted]; [redacted]; [redacted]; [redacted]; [redacted]; [redacted]; [redacted]; [redacted]; [redacted].; and [redacted].

---

**WARNING**

This product contains sensitive proprietary law enforcement information which may be either classified or the subject of stringent caveats. This product is compiled from multi-agency databases and open sources, and should not be treated as a finished investigative product. OCDETF suggests advising your prosecuting attorney(s) of this intelligence product. The recipient and attorney(s) are advised that this product may not be referenced in affidavits, indictments, extradition documents, other court related documents, press releases, or duplicated as a part of the discovery process without the express written permission of the OCDETF Fusion Center and the originating agencies. This product is provided to your agency for lead purposes only and may not be disseminated to third parties without approval of the originating agencies. Further, investigative action based upon this information should be coordinated with the contributing agencies. This product should be destroyed in a manner consistent with its classification upon determination that retention is no longer necessary to support an investigation, prosecution or related activity.

---

| | |
|---|---|
| **Date of Request:** | April 28, 2015 |
| **Case File Number / Agency:** | C1-11-0049 GDEP: YNL3B (DEA) |
| **OCDETF Case Number:** | NY-NYS-0829 |
| **OCDETF Operation Name:** | Chain Reaction |
| **Requestor / Agency / Telephone Number:** | [redacted] |
| **OFC Unit Chief / Telephone Number:** | [redacted] |
| **OFC Desk Officer / Telephone Number:** | [redacted] |
| **OFC Intelligence Analyst / Telephone Number:** | [redacted] |
| **SOD OSF Contact / Telephone Number:** | [redacted] |

Agency information contained herein:

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| ☐ ATF | ☑ CBP | ☑ DEA | ☐ DOC | ☐ DOL OIG | ☑ DSS | ☐ AFP | ☐ NCA/SOCA | ☐ BOP | ☑ DOS |
| ☑ FBI | ☑ ICE | ☐ IRSCI | ☐ USMS | ☐ USPIS | ☐ USSS | ☐ NZP | | ☑ FINCEN | |

☐ FBI Guardian Incident

SENSITIVE BUT UNCLASSIFIED

SENSITIVE BUT UNCLASSIFIED

OFC-TP-15-12392
SODOFC-15-12392
Date of Report: May 18, 2015

## Table of Contents


**ANALYTICAL FINDINGS** ..... **1**

*Background:* ..... *1*
- *Analytical Findings:* ..... *1*

**TARGET 1 – [redacted]** ..... **4**

BIOGRAPHICAL/IDENTIFYING DATA ..... 4
ADDRESSES ..... 5
COMMUNICATIONS ..... 5
*Telephone Numbers* ..... *5*
BORDER CROSSINGS ..... 5
*Border Crossings - Air* ..... *5*
LINKED INVESTIGATIONS ..... 6
CRIMINAL HISTORY/NCIC ..... 6
*Offline NCIC* ..... *6*
FINANCIAL INFORMATION ..... 7
*USAR – Unified Suspicious Activity Report(s)* ..... *7*
ASSETS ..... 7
*Financial Account(s)* ..... *7*

**TARGET 2 – [redacted]** ..... **8**

BIOGRAPHICAL/IDENTIFYING DATA ..... 8
ADDRESSES ..... 8
COMMUNICATIONS ..... 8
*Telephone Numbers* ..... *8*
BORDER CROSSINGS ..... 8
*Border Crossings - Air* ..... *8*
LINKED INVESTIGATIONS ..... 9
CRIMINAL HISTORY/NCIC ..... 9
*Offline NCIC* ..... *9*
FINANCIAL INFORMATION ..... 10
*USAR – Unified Suspicious Activity Report(s)* ..... *10*

**TARGET 3 – [redacted]** ..... **11**

BIOGRAPHICAL/IDENTIFYING DATA ..... 11
ADDRESSES ..... 11
COMMUNICATIONS ..... 11
*Telephone Numbers* ..... *11*
*Websites, Email Addresses, IP Addresses* ..... *11*
BORDER CROSSINGS ..... 12
*Border Crossings - Air* ..... *12*
LINKED INVESTIGATIONS ..... 12
CRIMINAL HISTORY/NCIC ..... 12
*Offline NCIC* ..... *12*

OFC-TP-15-12392
SODOFC-15-12392
Date of Report: May 18, 2015

FINANCIAL INFORMATION .......... 13
*USAR – Unified Suspicious Activity Report(s)* .......... *13*

**TARGET 4 – JEFFREY EPSTEIN .......... 14**

BIOGRAPHICAL/IDENTIFYING DATA .......... 14
ADDRESSES .......... 14
COMMUNICATIONS .......... 15
*Telephone Numbers* .......... *15*
*Websites, Email Addresses, IP Addresses* .......... *15*
BORDER CROSSINGS .......... 15
*Border Crossings - Air* .......... *15*
CORPORATE/BUSINESS AFFILIATIONS .......... 15
LINKED INVESTIGATIONS .......... 16
CRIMINAL HISTORY/NCIC .......... 17
*Offline NCIC* .......... *17*
FINANCIAL INFORMATION .......... 19
*USAR – Unified Suspicious Activity Report(s)* .......... *19*
*UCTR – Unified Currency Transaction Report(s)* .......... *19*
*CTR – Currency Transaction Report(s)* .......... *19*
ASSETS .......... 20
*Financial Account(s)* .......... *20*
FAMILY MEMBER/ASSOCIATE IDENTIFYING INFORMATION .......... 21
*Associates* .......... *21*

**TARGET 5 – [redacted] .......... 22**

BIOGRAPHICAL/IDENTIFYING DATA .......... 22
ADDRESSES .......... 22
COMMUNICATIONS .......... 22
*Telephone Numbers* .......... *22*
*Websites, Email Addresses, IP Addresses* .......... *23*
BORDER CROSSINGS .......... 23
*Border Crossings - Air* .......... *23*
LINKED INVESTIGATIONS .......... 23
CRIMINAL HISTORY/NCIC .......... 24
*Offline NCIC* .......... *24*
FINANCIAL INFORMATION .......... 25
*USAR – Unified Suspicious Activity Report(s)* .......... *25*
*UCTR – Unified Currency Transaction Report(s)* .......... *25*
ASSETS .......... 26
*Financial Account(s)* .......... *26*

**TARGET 6 – [redacted] .......... 27**

BIOGRAPHICAL/IDENTIFYING DATA .......... 27
ADDRESSES .......... 28
COMMUNICATIONS .......... 28
*Telephone Numbers* .......... *28*

OFC-TP-15-12392
SODOFC-15-12392
Date of Report: May 18, 2015


*Websites, Email Addresses, IP Addresses* ........ *28*
BORDER CROSSINGS ........ 28
*Border Crossings - Air* ........ *28*
CORPORATE/BUSINESS AFFILIATIONS ........ 29
LINKED INVESTIGATIONS ........ 29
CRIMINAL HISTORY/NCIC ........ 29
*Offline NCIC* ........ *29*
FINANCIAL INFORMATION ........ 30
*USAR – Unified Suspicious Activity Report(s)* ........ *31*
*CTR - Currency Transaction Report(s)* ........ *31*
ASSETS ........ 31
*Financial Account(s)* ........ *31*

**TARGET 7 – [redacted] ........ 32**

BIOGRAPHICAL/IDENTIFYING DATA ........ 32
ADDRESSES ........ 32
COMMUNICATIONS ........ 32
*Telephone Numbers* ........ *32*
*Websites, Email Addresses, IP Addresses* ........ *32*
LINKED INVESTIGATIONS ........ 33
CRIMINAL HISTORY/NCIC ........ 33
*Offline NCIC* ........ *33*
FINANCIAL INFORMATION ........ 34
*USAR – Unified Suspicious Activity Report(s)* ........ *34*
*UCTR – Unified Currency Transaction Report(s)* ........ *34*
*CTR - Currency Transaction Report(s)* ........ *35*

**TARGET 8 – [redacted] ........ 36**

BIOGRAPHICAL/IDENTIFYING DATA ........ 36
ADDRESSES ........ 36
COMMUNICATIONS ........ 36
*Telephone Numbers* ........ *36*
*Websites, Email Addresses, IP Addresses* ........ *36*
BORDER CROSSINGS ........ 37
*Border Crossings - Air* ........ *37*
LINKED INVESTIGATIONS ........ 37
CRIMINAL HISTORY/NCIC ........ 37
*Offline NCIC* ........ *37*
FINANCIAL INFORMATION ........ 38
*USAR – Unified Suspicious Activity Report(s)* ........ *38*

**TARGET 9 – [redacted] ........ 39**

BIOGRAPHICAL/IDENTIFYING DATA ........ 39
ADDRESSES ........ 40
COMMUNICATIONS ........ 40
*Telephone Numbers* ........ *40*

OFC-TP-15-12392
SODOFC-15-12392
Date of Report: May 18, 2015


*Websites, Email Addresses, IP Addresses* ..... *40*
LINKED INVESTIGATIONS ..... 40
CRIMINAL HISTORY/NCIC ..... 41
*Offline NCIC* ..... *41*
FINANCIAL INFORMATION ..... 41
*USAR – Unified Suspicious Activity Report(s)* ..... *42*
ASSETS ..... 42
*Financial Account(s)* ..... *42*

**TARGET 10 – [redacted] ..... 43**

BIOGRAPHICAL/IDENTIFYING DATA ..... 43
ADDRESSES ..... 43
BORDER CROSSINGS ..... 43
*Border Crossings - Air* ..... *43*
LINKED INVESTIGATIONS ..... 44
CRIMINAL HISTORY/NCIC ..... 44
*Offline NCIC* ..... *44*
FINANCIAL INFORMATION ..... 45
*USAR – Unified Suspicious Activity Report(s)* ..... *45*
*CTR - Currency Transaction Report(s)* ..... *45*

**TARGET 11 – [redacted] ..... 47**

BIOGRAPHICAL/IDENTIFYING DATA ..... 47
ADDRESSES ..... 47
COMMUNICATIONS ..... 47
*Telephone Numbers* ..... *47*
LINKED INVESTIGATIONS ..... 47
CRIMINAL HISTORY/NCIC ..... 48
*Offline NCIC* ..... *48*
FINANCIAL INFORMATION ..... 49
*USAR – Unified Suspicious Activity Report(s)* ..... *49*
ASSETS ..... 49
*Financial Account(s)* ..... *49*

**TARGET 12 – [redacted] ..... 50**

BIOGRAPHICAL/IDENTIFYING DATA ..... 50
ADDRESSES ..... 50
COMMUNICATIONS ..... 50
*Telephone Numbers* ..... *50*
LINKED INVESTIGATIONS ..... 51
CRIMINAL HISTORY/NCIC ..... 51
*Offline NCIC* ..... *51*
FINANCIAL INFORMATION ..... 52
*USAR – Unified Suspicious Activity Report(s)* ..... *52*
ASSETS ..... 53
*Financial Account(s)* ..... *53*

OFC-TP-15-12392
SODOFC-15-12392
Date of Report: May 18, 2015

**TARGET 13 – [redacted] ........ 54**
BIOGRAPHICAL/IDENTIFYING DATA ........ 54
ADDRESSES ........ 54
COMMUNICATIONS ........ 55
*Telephone Numbers ........ 55*
BORDER CROSSINGS ........ 55
*Border Crossings - Air ........ 55*
LINKED INVESTIGATIONS ........ 55
CRIMINAL HISTORY/NCIC ........ 56
*Offline NCIC ........ 56*
FINANCIAL INFORMATION ........ 57
**TARGET 14 – [redacted] ........ 58**
BUSINESS IDENTIFYING DATA ........ 58
ADDRESSES ........ 58
COMMUNICATIONS ........ 59
*Telephone Numbers ........ 59*
LINKED INVESTIGATIONS ........ 59
FINANCIAL INFORMATION ........ 59
ASSOCIATE IDENTIFYING INFORMATION ........ 60
*Associates ........ 60*
**TARGET 15 – [redacted]. ........ 61**
BUSINESS IDENTIFYING DATA ........ 61
ADDRESSES ........ 61
COMMUNICATIONS ........ 62
*Telephone Numbers ........ 62*
LINKED INVESTIGATIONS ........ 62
FINANCIAL INFORMATION ........ 62
ASSOCIATE IDENTIFYING INFORMATION ........ 63
*Associates ........ 63*

OFC-TP-15-12392
SODOFC-15-12392
Date of Report: May 18, 2015

****CAUTION****
**This product may contain active hyperlinks to internet websites and email addresses. Please use caution when navigating the contents of this publication. Hyperlinks will be identified in red.**

# Analytical Findings

**Background:** A request was submitted by the Drug Enforcement Administration (DEA) New York, NY for all reporting available to the OCDETF Fusion Center (OFC) for [redacted]; [redacted]; [redacted]; Jeffrey EPSTEIN; [redacted]; [redacted]; [redacted]; [redacted]; [redacted]; [redacted]; [redacted]; [redacted]; [redacted]; [redacted]; [redacted].; and [redacted]. DEA reporting indicates the above individuals are involved in illegitimate wire transfers which are tied to illicit drug and/or prostitution activities occurring in the U.S. Virgin Islands and New York City.

- **Analytical Findings:** This Target Profile product was prepared from a series of queries against the available OFC databases. Reporting relative to the subjects was found in Customs and Border Protection (CBP); DEA; DOS Non-immigrant Visas (DOS NIV); Diplomatic Security Service (DSS); Federal Bureau of Investigation (FBI); Financial Crimes Enforcement Network (FinCEN) Gateway; and Immigration and Customs Enforcement (ICE) databases as well as the commercial database Accurint.

  Through a phone conversation, the requestor indicated recent financial information on the targets would be beneficial to the investigation.

  - **Financial Information (Bank Secrecy Act Warnings Apply):**
    **Analyst's Note 1:** Many of their financial reports listed below include many/all of the targets as multiple subjects.
    **Analyst's Note 2:** Only financial reporting from 2010 through 2015 is included in this report. Older financial information on the targets is available.

    - [redacted] is a subject of three 2015 USARs totaling $4,193,637. See attachment 1 for more information.
    - [redacted] is a subject of three 2015 USARs totaling $4,193,637. See attachment 1 for more information.
    - [redacted] is a subject of three 2015 USARs totaling $2,754,983. See attachment 1 for more information.
    - Jeffrey EPSTEIN is a subject of seven USARs (4 in 2015, 2 in 2014, and 1 in 2013) totaling $5,672,921. See attachment 1 for more information.
    - Jeffrey EPSTEIN and [redacted] are subjects together in three Unified Currency Transaction Reports (UCTR) (1 in 2014 and 2 in 2013) totaling $102, 648. [redacted] reportedly conducted transactions on Jeffrey EPSTEIN's behalf. See Jeffrey EPSTEIN's financial information section for more information.

OFC-TP-15-12392
SODOFC-15-12392
Date of Report: May 18, 2015

- Jeffrey EPSTEIN is a subject of eight CTRs (2 in 2011 and 6 in 2010) totaling $233,397. [redacted] is an additional subject of one of these CTRs. See attachment 2 for more information.
- [redacted] is a subject of a 2015 USAR for $157,898. See attachment 1 for more information.
- [redacted] is a subject of a 2014 UCTR for $40,000 in which he conducted a withdrawal(s) on behalf of [redacted]. See [redacted] financial information section for more information.
- [redacted] is a subject of three USARs (2 in 2015 and 1 in 2014) totaling $4,236,995. See attachment 1 for more information.
- [redacted] and [redacted] are subjects of a 2011 CTR in which [redacted] conducted USD and Euro transactions on behalf of [redacted]. See [redacted] financial information section for more information.
- [redacted] is a subject of two USARs (1 in 2015 and 1 in 2013) totaling $1,077,898. See attachment 1 for more information.
- [redacted] and [redacted] are the subjects of three 2013 UCTRs totaling $157,152. FinCEN indicates [redacted] cashed negotiable instruments the businesses' behalf. See [redacted] financial information and corporate/business affiliations sections for more information regarding the UCTRs and [redacted], respectively.
- [redacted] and [redacted] are the subjects of 22 CTRs (1 in 2013, 9 in 2012, 7 in 2011, and 5 in 2010) totaling $730,000. See attachment 3 for more information.
- [redacted] is a subject of three 2015 USARs totaling $2,754,983. See attachment 1 for more information.
- [redacted] is a subject of two 2015 USARs totaling $4,079,102. See attachment 1 for more information.
- [redacted] is a subject of three 2015 USARs, totaling $4,193,637. See attachment 1 for more information.
- [redacted] and [redacted]. are subjects together in two CTRs (2011 and 2010) in which [redacted] conducted deposits on the company's behalf. See [redacted] financial information section for more information.
- [redacted] is a subject of two 2015 USARs totaling $4,079,102. See [redacted] financial information section for more information. [redacted] is the subject of a 2012 USAR for $45,107. See [redacted] financial information section for more information.
- [redacted] is a subject of two 2015 USARs totaling $4,079,102. See [redacted]nancial information section for more information.
- [redacted] [redacted]. Is a subject of two 2015 USARs totaling $4,079,101. See attachment 1 for more information
- [redacted]. is a subject of three 2015 USARs totaling $4,193,637. See attachment 1 for more information.

OFC-TP-15-12392
SODOFC-15-12392
Date of Report: May 18, 2015

- **Cases and Contacts:** The targets are subjects in the following case:

| Agency/Location | Case Number | Date Opened | Case Status/Date | File Title/ Operation Name | Case Agent(s)/ Phone No. |
|---|---|---|---|---|---|
| DEA/ New York, NY | C1-11-0049 | 12/17/2010 | Pending Judicial | [redacted] | [redacted] |

OFC-TP-15-12392
SODOFC-15-12392
Date of Report: May 18, 2015

[redacted]

[redacted]

OFC-TP-15-12392
SODOFC-15-12392
Date of Report: May 18, 2015

[redacted]

## *Criminal History/NCIC*

### Offline NCIC

**GUIDANCE NOTE**

An Offline NCIC report lists other law enforcement agencies that have previously queried the same individual. This report does not necessarily mean the agencies listed on the offline NCIC report have additional documents on that individual. By default, OFC requests will query NCIC for the last 2 years of data unless otherwise requested by the requestor.

The table below is a summary by Agency. The detailed information is contained in the corresponding attached Offline NCIC file, i.e. "Offline NCIC Results for Target 1 (MM/DD/YYYY HH:MM:SS).xls", which provides the date/time and Agency ORI terminal the target was queried. When contacting the appropriate LE agency, the LE agency will need the specific information outlined in the attachment to provide further details regarding their initial query.

Offline NCIC inquiries are records where individuals were queried by local, state or federal law enforcement (LE) agencies at a particular point in time. Offline NCIC checks identify the law enforcement agencies that have previously queried a target. For example, using Offline NCIC checks can provide the following insight:

- Knowing what other agencies are inquiring about your target can be a primary de-confliction tool in bringing various agencies together.
- Pinpointing geographical locations where target previously traveled.
- Discovering target associations based on vehicle stops.

[redacted]

OFC-TP-15-12392
SODOFC-15-12392
Date of Report: May 18, 2015

## *Financial Information*

**WARNING**

The enclosed information was collected and disseminated under provisions of the Bank Secrecy Act (the BSA) and U.S. Department of the Treasury regulations implementing the BSA. See 31 U.S.C. 5311, et seq.; 31 CFR Chapter X. The information is sensitive in nature and is to be treated accordingly. The information may be used only for a purpose consistent with a criminal, tax, or regulatory investigation or proceeding, or in the conduct of intelligence or counterintelligence activities, including analysis, to protect against international terrorism. See 31 U.S.C. 5311. The information cannot be further released, disseminated, disclosed, or transmitted without prior approval of the Director of Financial Crimes Enforcement Network or his authorized delegate. Suspicious activity reports filed under the BSA must be treated with particular care given that they contain unsubstantiated allegations of possible criminal activity, akin to confidential informant tips. Unauthorized release of information collected under the BSA may result in criminal or civil sanctions.

**WARNING**

Note – SAR Usage: This report contains a Suspicious Activity Report (SAR) of suspected criminal activity, filed by a U.S. financial institution. SARs are **utli** evidence, but contain information that, when further investigated, **may** produce evidence of criminal activity. Law enforcement personnel that use SAR information as part of investigative efforts **may not**: 1) Confront a customer of a financial institution with a SAR, or 2) Include a SAR as an attachment to an affidavit or other legal document. If it is anticipated that there may be a need to disclose the actual SAR filing as part of a judicial proceeding, law enforcement personnel must coordinate that potential disclosure with FinCEN's Office of Chief Counsel. The prohibition regarding SAR disclosure does not preclude law enforcement personnel from discussing a SAR filed by a bank, or the contents of such SAR, with Federal bank supervisory personnel. Federal bank supervisory agencies, along with FinCEN, promulgated the regulations requiring banks to report suspicious activity by filing SARs. Accordingly, these agencies have access to SARs and have the authority to provide direction with regard to the handling and disclosure of SARs. Notwithstanding the general prohibition on the re-dissemination of a SAR without the prior approval of FinCEN, law enforcement personnel may, without prior authorization, disclose a SAR to *appropriate domestic* law enforcement personnel and prosecutors working on the same or a related investigation, or to such domestic law enforcement personnel that are part of the same joint task force, *provided* the disclosing agency satisfies the conditions set forth in the *Re-dissemination Guidelines for Bank Secrecy Act Information* (November 28, 2007).

[redacted]

OFC-TP-15-12392
SODOFC-15-12392
Date of Report: May 18, 2015

[redacted]

OFC-TP-15-12392
SODOFC-15-12392
Date of Report: May 18, 2015

[redacted]

## *Criminal History/NCIC*

### Offline NCIC

**GUIDANCE NOTE**

An Offline NCIC report lists other law enforcement agencies that have previously queried the same individual. This report does not necessarily mean the agencies listed on the offline NCIC report have additional documents on that individual. By default, OFC requests will query NCIC for the last 2 years of data unless otherwise requested by the requestor.

The table below is a summary by Agency. The detailed information is contained in the corresponding attached Offline NCIC file, i.e. "Offline NCIC Results for Target 1 (MM/DD/YYYY HH:MM:SS).xls", which provides the date/time and Agency ORI terminal the target was queried. When contacting the appropriate LE agency, the LE agency will need the specific information outlined in the attachment to provide further details regarding their initial query.

Offline NCIC inquiries are records where individuals were queried by local, state or federal law enforcement (LE) agencies at a particular point in time. Offline NCIC checks identify the law enforcement agencies that have previously queried a target. For example, using Offline NCIC checks can provide the following insight:

- Knowing what other agencies are inquiring about your target can be a primary de-confliction tool in bringing various agencies together.
- Pinpointing geographical locations where target previously traveled.
- Discovering target associations based on vehicle stops.

OFC-TP-15-12392
SODOFC-15-12392
Date of Report: May 18, 2015

[redacted]

## *Financial Information*

**WARNING**

The enclosed information was collected and disseminated under provisions of the Bank Secrecy Act (the BSA) and U.S. Department of the Treasury regulations implementing the BSA. See 31 U.S.C. 5311, et seq.; 31 CFR Chapter X. The information is sensitive in nature and is to be treated accordingly. The information may be used only for a purpose consistent with a criminal, tax, or regulatory investigation or proceeding, or in the conduct of intelligence or counterintelligence activities, including analysis, to protect against international terrorism. See 31 U.S.C. 5311. The information cannot be further released, disseminated, disclosed, or transmitted without prior approval of the Director of Financial Crimes Enforcement Network or his authorized delegate. Suspicious activity reports filed under the BSA must be treated with particular care given that they contain unsubstantiated allegations of possible criminal activity, akin to confidential informant tips. Unauthorized release of information collected under the BSA may result in criminal or civil sanctions.

**WARNING**

Note – SAR Usage: This report contains a Suspicious Activity Report (SAR) of suspected criminal activity, filed by a U.S. financial institution. SARs are **not** evidence, but contain information that, when further investigated, **may** produce evidence of criminal activity. Law enforcement personnel that use SAR information as part of investigative efforts **may not**: 1) Confront a customer of a financial institution with a SAR, or 2) Include a SAR as an attachment to an affidavit or other legal document. If it is anticipated that there may be a need to disclose the actual SAR filing as part of a judicial proceeding, law enforcement personnel must coordinate that potential disclosure with FinCEN's Office of Chief Counsel. The prohibition regarding SAR disclosure does not preclude law enforcement personnel from discussing a SAR filed by a bank, or the contents of such SAR, with Federal bank supervisory personnel. Federal bank supervisory agencies, along with FinCEN, promulgated the regulations requiring banks to report suspicious activity by filing SARs. Accordingly, these agencies have access to SARs and have the authority to provide direction with regard to the handling and disclosure of SARs. Notwithstanding the general prohibition on the re-dissemination of a SAR without the prior approval of FinCEN, law enforcement personnel may, without prior authorization, disclose a SAR to *appropriate domestic* law enforcement personnel and prosecutors working on the same or a related investigation, or to such domestic law enforcement personnel that are part of the same joint task force, *provided* the disclosing agency satisfies the conditions set forth in the *Re-dissemination Guidelines for Bank Secrecy Act Information* (November 28, 2007).

[redacted]

OFC-TP-15-12392
SODOFC-15-12392
Date of Report: May 18, 2015

[redacted]

OFC-TP-15-12392
SODOFC-15-12392
Date of Report: May 18, 2015

[redacted]

## Offline NCIC

**GUIDANCE NOTE**

An Offline NCIC report lists other law enforcement agencies that have previously queried the same individual. This report does not necessarily mean the agencies listed on the offline NCIC report have additional documents on that individual. By default, OFC requests will query NCIC for the last 2 years of data unless otherwise requested by the requestor.

The table below is a summary by Agency. The detailed information is contained in the corresponding attached Offline NCIC file, i.e. "Offline NCIC Results for Target 1 (MM/DD/YYYY HH:MM:SS).xls", which provides the date/time and Agency ORI terminal the target was queried. When contacting the appropriate LE agency, the LE agency will need the specific information outlined in the attachment to provide further details regarding their initial query.

Offline NCIC inquiries are records where individuals were queried by local, state or federal law enforcement (LE) agencies at a particular point in time. Offline NCIC checks identify the law enforcement agencies that have previously queried a target. For example, using Offline NCIC checks can provide the following insight:

- Knowing what other agencies are inquiring about your target can be a primary de-confliction tool in bringing various agencies together.
- Pinpointing geographical locations where target previously traveled.

OFC-TP-15-12392
SODOFC-15-12392
Date of Report: May 18, 2015

[redacted]

## *Financial Information*

**WARNING**

The enclosed information was collected and disseminated under provisions of the Bank Secrecy Act (the BSA) and U.S. Department of the Treasury regulations implementing the BSA. See 31 U.S.C. 5311, et seq.; 31 CFR Chapter X. The information is sensitive in nature and is to be treated accordingly. The information may be used only for a purpose consistent with a criminal, tax, or regulatory investigation or proceeding, or in the conduct of intelligence or counterintelligence activities, including analysis, to protect against international terrorism. See 31 U.S.C. 5311. The information cannot be further released, disseminated, disclosed, or transmitted without prior approval of the Director of Financial Crimes Enforcement Network or his authorized delegate. Suspicious activity reports filed under the BSA must be treated with particular care given that they contain unsubstantiated allegations of possible criminal activity, akin to confidential informant tips. Unauthorized release of information collected under the BSA may result in criminal or civil sanctions.

**WARNING**

Note – SAR Usage: This report contains a Suspicious Activity Report (SAR) of suspected criminal activity, filed by a U.S. financial institution. SARs are **not** evidence, but contain information that, when further investigated, **may** produce evidence of criminal activity. Law enforcement personnel that use SAR information as part of investigative efforts **may not**: 1) Confront a customer of a financial institution with a SAR, or 2) Include a SAR as an attachment to an affidavit or other legal document. If it is anticipated that there may be a need to disclose the actual SAR filing as part of a judicial proceeding, law enforcement personnel must coordinate that potential disclosure with FinCEN's Office of Chief Counsel. The prohibition regarding SAR disclosure does not preclude law enforcement personnel from discussing a SAR filed by a bank, or the contents of such SAR, with Federal bank supervisory personnel. Federal bank supervisory agencies, along with FinCEN, promulgated the regulations requiring banks to report suspicious activity by filing SARs. Accordingly, these agencies have access to SARs and have the authority to provide direction with regard to the handling and disclosure of SARs. Notwithstanding the general prohibition on the re-dissemination of a SAR without the prior approval of FinCEN, law enforcement personnel may, without prior authorization, disclose a SAR to *appropriate domestic* law enforcement personnel and prosecutors working on the same or a related investigation, or to such domestic law enforcement personnel that are part of the same joint task force, *provided* the disclosing agency satisfies the conditions set forth in the *Re-dissemination Guidelines for Bank Secrecy Act Information* (November 28, 2007).

[redacted]

OFC-TP-15-12392
SODOFC-15-12392
Date of Report: May 18, 2015

# TARGET 4 – Jeffrey EPSTEIN

## *Biographical/Identifying Data*

| | Information | Source |
|---|---|---|
| **Full Name:** | Jeffrey Edward EPSTEIN | ICE ROI, PA07QK13PA0002-003 |
| **Alias:** | Jeffrey E. EPSTEIN | FinCEN BSA ID 31000062289100 |
| **DOB:** | 01/20/1953 | FinCEN BSA ID 31000062289100 |
| **SSN:** | [redacted] | FinCEN BSA ID 31000062289100 |
| **Driver's License Number and State:** | [redacted] U.S. Virgin Islands | FinCEN BSA ID 31000062289100 |
| | [redacted] | ICE Subject Record P8529715900CWP |
| **Occupation:** | Investment Advisor | FinCEN BSA ID 31000062289100 |
| | Accountant | FinCEN BSA ID 20112031315534 |
| **Business/Employer:** | SLK DESIGNS LLC | FinCEN BSA ID 31000053179085 |
| | HYPERION AIR, INC. | FinCEN BSA ID 31000031627861 |
| **Agency Identifier(s):** | ICE P6B38569000CPA | ICE Subject Record P6B38569000CPA |
| | ICE P8529715900CWP | ICE Subject Record P8529715900CWP |

***Analyst's Note:*** *See the corporate/business affiliations section for more information regarding SLK DESIGNS LLC and* [redacted]*, INC.*

## *Addresses*

***(R) – Residential (B) – Business (U) – Unknown (M) – Mailing Company/Post Office (C) – Criminal***

| Type | Address | Date of Info. | Source |
|---|---|---|---|
| R | [redacted] | 03/06/2015 | FinCEN BSA ID 31000062289100 |
| M | [redacted] | 03/06/2015 | FinCEN BSA ID 31000062289100 |
| R | [redacted] | 03/06/2015 | FinCEN BSA ID 31000062289100 |
| B | [redacted] | 03/06/2015 | FinCEN BSA ID 31000062289100 |
| B | [redacted] | 03/06/2015 | FinCEN BSA ID 31000062289100 |

SENSITIVE BUT UNCLASSIFIED

OFC-TP-15-12392
SODOFC-15-12392
Date of Report: May 18, 2015

## Communications

### Telephone Numbers

*(R) – Residential (B) – Business (M) – Mobile (U) – Unknown (P) - Pager/Beeper (V) - VOIP*

| Type | Number | Address | Subscriber/Affiliation to Target | Date of Info. | Source |
|---|---|---|---|---|---|
| M | [redacted] | See Analyst's Note | Jeffrey E. EPSTEIN | 03/06/2015 | FinCEN BSA ID 31000062289100 |
| R | | See Analyst's Note | Jeffrey E. EPSTEIN | 03/06/2015 | |
| B | | See Analyst's Note | See Analyst's Note | 03/06/2015 | |
| B | | See Analyst's Note | See Analyst's Note | 03/06/2015 | |
| B | | See Analyst's Note | See Analyst's Note | 03/06/2015 | |
| B | | See Analyst's Note | See Analyst's Note | 03/06/2015 | |
| **Analyst's Note:** Specific subscriber/corresponding businesses names for the above business phone numbers were not listed. | | | | | |

### Websites, Email Addresses, IP Addresses

| Website/Email Address/IP Address | Subscriber/Affiliation to Target | Source |
|---|---|---|
| [redacted] | Jeffrey E. EPSTEIN | FinCEN BSA ID 31000062289100 |

## Border Crossings

### Border Crossings - Air

| Source: Customs and Border Protection (CBP) | | | |
|---|---|---|---|
| **Date/Time** | **Departure Airport** | **Arrival Airport** | **Flight Number/Airline** |
| 05/06/2014 | Charles de Gualle Int. | JFK Int. | 006/Air France |
| 04/29/2014 | JFK Int. | Charles de Gualle Int. | 011/Air France |
| 02/19/2014 | Charles de Gualle Int. | JFK Int. | 022/Air France |
| 02/09/2014 | JFK Int. | Charles de Gualle Int. | 009/Air France |

## Corporate/Business Affiliations

| Name, Address, Phone | Corp. Number/Filing Type | Status | Affiliation of Target to Corp./Business | Corp./Business Officers | Source |
|---|---|---|---|---|---|
| [redacted] LLC [redacted] Qtrs. Ste B3 St Thomas, Virgin Islands, U.S. 00802 | Aircraft Number: [redacted] | Active | Signor | [redacted], Accountant | FinCEN BSA ID 31000031627861; Accurint |

SENSITIVE BUT UNCLASSIFIED

OFC-TP-15-12392
SODOFC-15-12392
Date of Report: May 18, 2015

| Name, Address, Phone | Corp. Number/Filing Type | Status | Affiliation of Target to Corp./Business | Corp./Business Officers | Source |
|---|---|---|---|---|---|
| **Details:** FinCEN indicates EPSTEIN and [redacted] are signors for [redacted] LLC. *Analyst's Note: FinCEN indicates this company provides aircraft maintenance. Accurint indicates this business consists of one 2001 Bell 430 aircraft (S/N: 49078) which was registered on 09/06/2013.* | | | | | |
| SLK DESIGNS LLC [redacted]. New York, NY 10065 [redacted] | Not Listed | Active | Association | Not Listed | FinCEN BSA ID 31000053179085 |
| **Details:** EPSTEIN and SLK DESIGNS LLC are listed as subjects together in a 2014 USAR. FinCEN indicates EPSTEIN sent SLK DESIGNS LLC $20,000 from an external bank account in 2014. | | | | | |

## *Linked Investigations*

| Agency/Location | Case Number | Date Opened | Case Status/Date | File Title/ Operation Name | Case Agent(s)/ Phone No. |
|---|---|---|---|---|---|
| DEA/ New York, NY | C1-11-0049 | 12/17/2010 | Pending Judicial | [redacted] | [redacted] |
| **Details:** The Requestor's case | | | | | |
| FBI/ Miami, FL | 31E-MM-108062 | 07/25/2006 | Active | EPSTEIN, JEFFREY [redacted] | [redacted] |
| **Details:** FBI reporting indicates Jeffrey EPSTEIN and Ghislaine MAXWELL are companions (FBI FD-302, 31E-MM-108062, 07/08/2013). | | | | | |
| ICE/ Paris, France | PA07QK13P A0002 | 06/07/2013 | Closed/ 10/03/2013 | OPERATION ANGEL WATCH/RCSO PRESENSE/ TRANSITING INFO SHARING | [redacted] |
| **Details:** ICE reporting indicates Jeffrey EPSTEIN was convicted in 2008 of procuring a person under age 18 for prostitution in Florida (ICE ROI, PA07QK13PA0002-003). | | | | | |
| ICE/ Las Vegas, NV | LV15HT09L V0009 | 02/02/2009 | Pending/ 01/27/2010 | [redacted] | [redacted] |
| **Details:** ICE reporting indicates Jeffrey EPSTEIN pled guilty on 06/30/2008 on charges relating to solicitation of prostitution and procurement of minors to engage in prostitution (ICE ROI, LV15HT09LV0009-003) | | | | | |

SENSITIVE BUT UNCLASSIFIED

OFC-TP-15-12392
SODOFC-15-12392
Date of Report: May 18, 2015

| Agency/Location | Case Number | Date Opened | Case Status/Date | File Title/ Operation Name | Case Agent(s)/ Phone No. |
|---|---|---|---|---|---|
| ICE/ West Palm Beach, FL | WP07QI06 WP0011 | 07/28/2006 | Closed/ 07/28/2008 | Jeffrey EPSTEIN (ET AL) | [redacted] |
| **Details:** ICE reporting indicates Jeffery EPSTEIN pled guilty on 06/30/2008 to state offences relating to solicitation of prostitution and procurement of minors to engage in prostitution (ICE Subject Record P8529715900CWP). | | | | | |

## *Criminal History/NCIC*

### Offline NCIC

GUIDANCE NOTE

An Offline NCIC report lists other law enforcement agencies that have previously queried the same individual. This report does not necessarily mean the agencies listed on the offline NCIC report have additional documents on that individual. By default, OFC requests will query NCIC for the last 2 years of data unless otherwise requested by the requestor.

The table below is a summary by Agency. The detailed information is contained in the corresponding attached Offline NCIC file, i.e. "Offline NCIC Results for Target 1 (MM/DD/YYYY HH:MM:SS).xls", which provides the date/time and Agency ORI terminal the target was queried. When contacting the appropriate LE agency, the LE agency will need the specific information outlined in the attachment to provide further details regarding their initial query.

Offline NCIC inquiries are records where individuals were queried by local, state or federal law enforcement (LE) agencies at a particular point in time. Offline NCIC checks identify the law enforcement agencies that have previously queried a target. For example, using Offline NCIC checks can provide the following insight:

- Knowing what other agencies are inquiring about your target can be a primary de-confliction tool in bringing various agencies together.
- Pinpointing geographical locations where target previously traveled.
- Discovering target associations based on vehicle stops.

| Agency ORI | Count | First Contact | Last Contact | Agency ORI Phone |
|---|---|---|---|---|
| CBP CYRIL E KING AP INTL ARRIVALS | 30 | 05/22/2013 | 05/02/2015 | [redacted] |
| US CUST SERV ENFORCEMENT SYSTEMS NEWINGTON | 145 | 05/11/2013 | 05/02/2015 | |
| FL DEPT OF LAW ENFORCEMENT COMMAND CENTER | 8 | 05/29/2013 | 05/01/2015 | |
| NY STATE DIV CRIMINAL JUSTICE SVCS ALBANY | 12 | 06/12/2013 | 04/28/2015 | |
| DRUG ENFOR ADMIN NEW YORK | 5 | 04/24/2015 | 04/24/2015 | |

OFC-TP-15-12392
SODOFC-15-12392
Date of Report: May 18, 2015

| | | | | |
|---|---|---|---|---|
| DHS ICE INVEST RAC ST THOMAS USVI | 1 | 04/13/2015 | 04/13/2015 | [redacted] |
| CUSTOMS AND BORDER PROTECTION | 13 | 05/12/2013 | 04/03/2015 | [redacted] |
| US CUSTOMS SERVICE ENF SECURITY NEWINGTON | 14 | 06/02/2013 | 03/01/2015 | [redacted] |
| DHS ICE INVEST SAC MIAMI | 2 | 02/26/2015 | 02/26/2015 | [redacted] |
| FBI NOPU | 1 | 12/01/2014 | 12/01/2014 | [redacted] |
| CUSTOMS AND BORDER PROTECTION BEDFORD L G | 4 | 10/13/2014 | 11/30/2014 | [redacted] |
| CBP LOGAN INTERNATIONAL AIRPORT | 3 | 10/13/2014 | 11/30/2014 | [redacted] |
| US CUSTOMS SERV AIRPORT BAGGAGE I&C NEWARK | 20 | 03/12/2014 | 10/23/2014 | [redacted] |
| CUSTOMS AND BORDER PROTECTION | 2 | 05/16/2014 | 10/23/2014 | [redacted] |
| CUSTOMS AND BORDER PROTECTION | 15 | 03/11/2014 | 10/07/2014 | [redacted] |
| US SECRET SERV UNIFORM DIV WASHINGTON | 1 | 08/12/2014 | 08/12/2014 | [redacted] |
| U S SECRET SERVICE WHITE HOUSE DIVISION | 1 | 08/12/2014 | 08/12/2014 | [redacted] |
| CUSTOMS AND BORDER PROTECTION | 6 | 10/15/2013 | 05/06/2014 | [redacted] |
| US CUSTOMS SERV INSPECTION CONTROL CLAYTON | 5 | 04/19/2014 | 04/20/2014 | [redacted] |
| USC MARCH AFB OFFICE OF ENFORCEMENT RIVERSIDE | 4 | 06/06/2013 | 03/27/2014 | [redacted] |
| CBP SEATTLE INTL AIRPORT | 5 | 03/19/2014 | 03/20/2014 | [redacted] |
| USC SEA-TAC AIRPORT PASS PROC I&C SEATTLE | 1 | 03/19/2014 | 03/19/2014 | [redacted] |
| CBSA ASFC HQ IBQ | 1 | 03/17/2014 | 03/17/2014 | [redacted] |
| DOJ U S ATTORNEY GENERAL'S OFFICE ST THOMAS | 1 | 01/08/2014 | 01/08/2014 | [redacted] |
| CUSTOMS AND BORDER PROTECTION | 2 | 11/27/2013 | 11/27/2013 | [redacted] |
| USC OFF INVESTIGATIONS LEVITTOWN | 3 | 09/10/2013 | 11/15/2013 | [redacted] |
| HARVARD UNIVERSITY CAMPUS POLICE | 1 | 11/06/2013 | 11/06/2013 | [redacted] |
| CBP JFK INTERNATIONAL AIRPORT | 3 | 06/03/2013 | 10/01/2013 | [redacted] |
| CUSTOMS AND BORDER PROTECTION | 1 | 09/14/2013 | 09/14/2013 | [redacted] |
| VIRGIN ISLANDS POLICE DEPARTMENT | 1 | 06/28/2013 | 06/28/2013 | [redacted] |

OFC-TP-15-12392
SODOFC-15-12392
Date of Report: May 18, 2015

| | | | | |
|---|---|---|---|---|
| FBI CJIS DIVISION | 3 | 05/14/2013 | 05/28/2013 | [redacted] |

## Financial Information

**WARNING**

The enclosed information was collected and disseminated under provisions of the Bank Secrecy Act (the BSA) and U.S. Department of the Treasury regulations implementing the BSA. See 31 U.S.C. 5311, et seq.; 31 CFR Chapter X. The information is sensitive in nature and is to be treated accordingly. The information may be used only for a purpose consistent with a criminal, tax, or regulatory investigation or proceeding, or in the conduct of intelligence or counterintelligence activities, including analysis, to protect against international terrorism. See 31 U.S.C. 5311. The information cannot be further released, disseminated, disclosed, or transmitted without prior approval of the Director of Financial Crimes Enforcement Network or his authorized delegate. Suspicious activity reports filed under the BSA must be treated with particular care given that they contain unsubstantiated allegations of possible criminal activity, akin to confidential informant tips. Unauthorized release of information collected under the BSA may result in criminal or civil sanctions.

**WARNING**

Note – SAR Usage: This report contains a Suspicious Activity Report (SAR) of suspected criminal activity, filed by a U.S. financial institution. SARs are **not** evidence, but contain information that, when further investigated, **may** produce evidence of criminal activity. Law enforcement personnel that use SAR information as part of investigative efforts **may not**: 1) Confront a customer of a financial institution with a SAR, or 2) Include a SAR as an attachment to an affidavit or other legal document. If it is anticipated that there may be a need to disclose the actual SAR filing as part of a judicial proceeding, law enforcement personnel must coordinate that potential disclosure with FinCEN's Office of Chief Counsel. The prohibition regarding SAR disclosure does not preclude law enforcement personnel from discussing a SAR filed by a bank, or the contents of such SAR, with Federal bank supervisory personnel. Federal bank supervisory agencies, along with FinCEN, promulgated the regulations requiring banks to report suspicious activity by filing SARs. Accordingly, these agencies have access to SARs and have the authority to provide direction with regard to the handling and disclosure of SARs. Notwithstanding the general prohibition on the re-dissemination of a SAR without the prior approval of FinCEN, law enforcement personnel may, without prior authorization, disclose a SAR to *appropriate domestic* law enforcement personnel and prosecutors working on the same or a related investigation, or to such domestic law enforcement personnel that are part of the same joint task force, *provided* the disclosing agency satisfies the conditions set forth in the *Re-dissemination Guidelines for Bank Secrecy Act Information* (November 28, 2007).

### USAR – Unified Suspicious Activity Report(s)

**Analyst's Note:** *EPSTEIN is a subject of seven USARs. See Attachment 1 for more information.*

### UCTR – Unified Currency Transaction Report(s)

| BSA ID | Date of Transaction | Amount | | Subject(s)/Persons Involved in Transaction | Filing Institution/ Location |
|---|---|---|---|---|---|
| | | In | Out | | |
| 31000040594074 | 01/31/2014 | $0 | $60,775 | [redacted]; **Jeffrey EPSTEIN** | Deutsche Bank Trust Company Americas/ [redacted]. New York, NY 10154 POC: [redacted] |
| 31000038320027 | 12/19/2013 | $0 | $21,150 | | |
| 31000036626342 | 11/15/2013 | $0 | $20,723 | | |
| **Details:** FinCEN indicates [redacted] conducted transactions on behalf of **EPSTEIN** which affected account 35266976. | | | | | |

### CTR – Currency Transaction Report(s)

***Analyst's Note:*** *See attachment 2 for more information.*

OFC-TP-15-12392
SODOFC-15-12392
Date of Report: May 18, 2015

# Assets

## Financial Account(s)

*(P) – Personal (C) – Casino (B) – Business (U) – Unknown (S) – Securities*

| Account Owner/ Address | Institution Name/Address | Account Number | Account Type | Source |
|---|---|---|---|---|
| Jeffrey EPSTEIN/ [redacted] Qtr. B3 St. Thomas, Virgin Islands, U.S. 00802 | BNP Paribas/ [redacted] Paris, 75009 France | [redacted] | P | FinCEN BSA ID 31000049066241 |
| | | [redacted] | P | FinCEN BSA ID 31000049066241 |
| Jeffrey EPSTEIN/ [redacted] Qtr. B3 St. Thomas, Virgin Islands, U.S. 00802 | Deutsche Bank Trust Company Americas/ [redacted]. New York, NY 10154 | [redacted] | U | FinCEN BSA ID 31000040594074 |
| Jeffrey EPSTEIN/ [redacted] Qtr. B3 St. Thomas, Virgin Islands, U.S. 00802 | Fortis Banque/ [redacted] Paris, 75008 France | [redacted] | P | FinCEN BSA ID 31000001301346 |
| Jeffrey EPSTEIN/ [redacted] Qtr. B3 St. Thomas, Virgin Islands, U.S. 00802 | Highbridge Capital Corporation/ [redacted] Grand Cayman, Cayman Islands BWI | [redacted] | S | FinCEN BSA ID 20101910292960 |
| Jeffrey EPSTEIN/ [redacted] Qtr. B3 St. Thomas, Virgin Islands, U.S. 00802 | HSBC Private Bank SA/ [redacted] Geneva 3 CH1211 Switzerland | [redacted] | S | FinCEN BSA ID 31000001301346 |
| | | [redacted] | S | FinCEN BSA ID 31000001301346 |
| Jeffrey EPSTEIN/ [redacted] Qtr. B3 St. Thomas, Virgin Islands, U.S. 00802 | HSBC Paris/ [redacted] Paris, 75015 France | [redacted] | P | FinCEN BSA ID 20101910292960 |
| Jeffrey E. EPSTEIN/ [redacted]. Suite 10B New York, NY 10065 | JP Morgan Chase Bank, N.A./ [redacted]. New York, NY 10065 | [redacted] | U | FinCEN BSA ID 20111191187434 |
| Jeffrey EPSTEIN/ [redacted] Qtr. B3 St. Thomas, Virgin Islands, U.S. 00802 | JP Morgan Chase Bank, N.A./ [redacted]. New York, NY 10065 | [redacted] | B | FinCEN BSA ID 20103162812934 |
| | | [redacted] | B | FinCEN BSA ID 31000031627861 |

OFC-TP-15-12392
SODOFC-15-12392
Date of Report: May 18, 2015

| Account Owner/ Address | Institution Name/Address | Account Number | Account Type | Source |
|---|---|---|---|---|
| **Details:** FinCEN indicates [redacted], [redacted], and [redacted] are additional signors for account [redacted] and [redacted] is an additional signor for accounts [redacted] and [redacted]. FinCEN indicates account [redacted] is a business account for [redacted], INC. | | | | |
| Jeffrey EPSTEIN/ [redacted] Qtr. B3 St. Thomas, Virgin Islands, U.S. 00802 | Valartis Bank AG/ [redacted] Zurich 8021 Switzerland | [redacted] | S | FinCEN BSA ID 31000016351947 |
| **Details:** FinCEN indicates [redacted] is an additional signor for this account. | | | | |

## *Family Member/Associate Identifying Information*[1]

### Associates

| Name | Relationship to Target | DOB | SSN | Source |
|---|---|---|---|---|
| [redacted]) | Associate | [redacted] | [redacted] | FinCEN BSA ID 31000048471995 |
| **Details:** [redacted] and Jeffrey EPSTEIN are subjects together in a 2014 USAR. FinCEN indicates [redacted] was EPSTEIN's personal assistant and would act as a recruiter and facilitator for EPSTEIN's illicit activities. ***Analyst's Note:*** [redacted] *name was listed on the DOS NIV application as the sponsor of* [redacted] *(Target 6).* | | | | |

[1] Note: Names indicated with an * (asterisk) will be detailed further.

OFC-TP-15-12392
SODOFC-15-12392
Date of Report: May 18, 2015

[redacted]

OFC-TP-15-12392
SODOFC-15-12392
Date of Report: May 18, 2015

[redacted]

OFC-TP-15-12392
SODOFC-15-12392
Date of Report: May 18, 2015

# Criminal History/NCIC

## Offline NCIC

**GUIDANCE NOTE**

An Offline NCIC report lists other law enforcement agencies that have previously queried the same individual. This report does not necessarily mean the agencies listed on the offline NCIC report have additional documents on that individual. By default, OFC requests will query NCIC for the last 2 years of data unless otherwise requested by the requestor.

The table below is a summary by Agency. The detailed information is contained in the corresponding attached Offline NCIC file, i.e. "Offline NCIC Results for Target 1 (MM/DD/YYYY HH:MM:SS).xls", which provides the date/time and Agency ORI terminal the target was queried. When contacting the appropriate LE agency, the LE agency will need the specific information outlined in the attachment to provide further details regarding their initial query.

Offline NCIC inquiries are records where individuals were queried by local, state or federal law enforcement (LE) agencies at a particular point in time. Offline NCIC checks identify the law enforcement agencies that have previously queried a target. For example, using Offline NCIC checks can provide the following insight:

- Knowing what other agencies are inquiring about your target can be a primary de-confliction tool in bringing various agencies together.
- Pinpointing geographical locations where target previously traveled.
- Discovering target associations based on vehicle stops.

[redacted]

OFC-TP-15-12392
SODOFC-15-12392
Date of Report: May 18, 2015

# Financial Information

**WARNING**

The enclosed information was collected and disseminated under provisions of the Bank Secrecy Act (the BSA) and U.S. Department of the Treasury regulations implementing the BSA. See 31 U.S.C. 5311, et seq.; 31 CFR Chapter X. The information is sensitive in nature and is to be treated accordingly. The information may be used only for a purpose consistent with a criminal, tax, or regulatory investigation or proceeding, or in the conduct of intelligence or counterintelligence activities, including analysis, to protect against international terrorism. See 31 U.S.C. 5311. The information cannot be further released, disseminated, disclosed, or transmitted without prior approval of the Director of Financial Crimes Enforcement Network or his authorized delegate. Suspicious activity reports filed under the BSA must be treated with particular care given that they contain unsubstantiated allegations of possible criminal activity, akin to confidential informant tips. Unauthorized release of information collected under the BSA may result in criminal or civil sanctions.

**WARNING**

Note – SAR Usage: This report contains a Suspicious Activity Report (SAR) of suspected criminal activity, filed by a U.S. financial institution. SARs are **not** evidence, but contain information that, when further investigated, **may** produce evidence of criminal activity. Law enforcement personnel that use SAR information as part of investigative efforts **may not**: 1) Confront a customer of a financial institution with a SAR, or 2) Include a SAR as an attachment to an affidavit or other legal document. If it is anticipated that there may be a need to disclose the actual SAR filing as part of a judicial proceeding, law enforcement personnel must coordinate that potential disclosure with FinCEN's Office of Chief Counsel. The prohibition regarding SAR disclosure does not preclude law enforcement personnel from discussing a SAR filed by a bank, or the contents of such SAR, with Federal bank supervisory personnel. Federal bank supervisory agencies, along with FinCEN, promulgated the regulations requiring banks to report suspicious activity by filing SARs. Accordingly, these agencies have access to SARs and have the authority to provide direction with regard to the handling and disclosure of SARs. Notwithstanding the general prohibition on the re-dissemination of a SAR without the prior approval of FinCEN, law enforcement personnel may, without prior authorization, disclose a SAR to *appropriate domestic* law enforcement personnel and prosecutors working on the same or a related investigation, or to such domestic law enforcement personnel that are part of the same joint task force, *provided* the disclosing agency satisfies the conditions set forth in the *Re-dissemination Guidelines for Bank Secrecy Act Information* (November 28, 2007).

[redacted]

OFC-TP-15-12392
SODOFC-15-12392
Date of Report: May 18, 2015

[redacted]

[redacted]

OFC-TP-15-12392
SODOFC-15-12392
Date of Report: May 18, 2015

[redacted]

OFC-TP-15-12392
SODOFC-15-12392
Date of Report: May 18, 2015

[redacted]

## Offline NCIC

**GUIDANCE NOTE**

An Offline NCIC report lists other law enforcement agencies that have previously queried the same individual. This report does not necessarily mean the agencies listed on the offline NCIC report have additional documents on that individual. By default, OFC requests will query NCIC for the last 2 years of data unless otherwise requested by the requestor.

The table below is a summary by Agency. The detailed information is contained in the corresponding attached Offline NCIC file, i.e. "Offline NCIC Results for Target 1 (MM/DD/YYYY HH:MM:SS).xls", which provides the date/time and Agency ORI terminal the target was queried. When contacting the appropriate LE agency, the LE agency will need the specific information outlined in the attachment to provide further details regarding their initial query.

Offline NCIC inquiries are records where individuals were queried by local, state or federal law enforcement (LE) agencies at a particular point in time. Offline NCIC checks identify the law enforcement agencies that have previously queried a target. For example, using Offline NCIC checks can provide the following insight:

- Knowing what other agencies are inquiring about your target can be a primary de-confliction tool in bringing various agencies together.

- Pinpointing geographical locations where target previously traveled.
- Discovering target associations based on vehicle stops.

[redacted]

## *Financial Information*

**WARNING**

The enclosed information was collected and disseminated under provisions of the Bank Secrecy Act (the BSA) and U.S. Department of the Treasury regulations implementing the BSA. See 31 U.S.C. 5311, et seq.; 31 CFR Chapter X. The information is sensitive in nature and is to be treated accordingly. The information may be used only for a purpose consistent with a criminal, tax, or regulatory investigation or proceeding, or in the conduct of intelligence or counterintelligence activities, including analysis, to protect against international terrorism. See 31 U.S.C. 5311. The information cannot be further released, disseminated, disclosed, or transmitted without prior approval of the Director of Financial Crimes Enforcement Network or his authorized delegate. Suspicious activity reports filed under the BSA must be treated with particular care given that they contain unsubstantiated allegations of possible criminal activity, akin to confidential informant tips. Unauthorized release of information collected under the BSA may result in criminal or civil sanctions.

**WARNING**

Note – SAR Usage: This report contains a Suspicious Activity Report (SAR) of suspected criminal activity, filed by a U.S. financial institution. SARs are **not** evidence, but contain information that, when further investigated, **may** produce evidence of criminal activity. Law enforcement personnel that use SAR information as part of investigative efforts **may not**: 1) Confront a customer of a financial institution with a SAR, or 2) Include a SAR as an attachment to an affidavit or other legal document. If it is anticipated that there may be a need to disclose the actual SAR filing as part of a judicial proceeding, law enforcement personnel must coordinate that potential disclosure with FinCEN's Office of Chief Counsel. The prohibition regarding SAR disclosure does not preclude law enforcement personnel from discussing a SAR filed by a bank, or the contents of such SAR, with Federal bank supervisory personnel. Federal bank supervisory agencies, along with FinCEN, promulgated the regulations requiring banks to report suspicious activity by filing SARs. Accordingly, these agencies have access to SARs and have the authority to provide direction with regard to the handling and disclosure of SARs. Notwithstanding the general prohibition on the re-dissemination of a SAR without the prior approval of FinCEN, law enforcement personnel may, without prior authorization, disclose a SAR to *appropriate domestic* law enforcement personnel and prosecutors working on the same or a related investigation, or to such domestic law enforcement personnel that are part of the same joint task force, *provided* the disclosing agency satisfies the conditions set forth in the *Re-dissemination Guidelines for Bank Secrecy Act Information* (November 28, 2007).

OFC-TP-15-12392
SODOFC-15-12392
Date of Report: May 18, 2015

[redacted]

OFC-TP-15-12392
SODOFC-15-12392
Date of Report: May 18, 2015

[redacted]

OFC-TP-15-12392
SODOFC-15-12392
Date of Report: May 18, 2015

[redacted]

## Criminal History/NCIC

### Offline NCIC

**GUIDANCE NOTE**

An Offline NCIC report lists other law enforcement agencies that have previously queried the same individual. This report does not necessarily mean the agencies listed on the offline NCIC report have additional documents on that individual. By default, OFC requests will query NCIC for the last 2 years of data unless otherwise requested by the requestor.

The table below is a summary by Agency. The detailed information is contained in the corresponding attached Offline NCIC file, i.e. "Offline NCIC Results for Target 1 (MM/DD/YYYY HH:MM:SS).xls", which provides the date/time and Agency ORI terminal the target was queried. When contacting the appropriate LE agency, the LE agency will need the specific information outlined in the attachment to provide further details regarding their initial query.

Offline NCIC inquiries are records where individuals were queried by local, state or federal law enforcement (LE) agencies at a particular point in time. Offline NCIC checks identify the law enforcement agencies that have previously queried a target. For example, using Offline NCIC checks can provide the following insight:

- Knowing what other agencies are inquiring about your target can be a primary de-confliction tool in bringing various agencies together.
- Pinpointing geographical locations where target previously traveled.
- Discovering target associations based on vehicle stops.

[redacted]

OFC-TP-15-12392
SODOFC-15-12392
Date of Report: May 18, 2015

# *Financial Information*

**WARNING**

The enclosed information was collected and disseminated under provisions of the Bank Secrecy Act (the BSA) and U.S. Department of the Treasury regulations implementing the BSA. See 31 U.S.C. 5311, et seq.; 31 CFR Chapter X. The information is sensitive in nature and is to be treated accordingly. The information may be used only for a purpose consistent with a criminal, tax, or regulatory investigation or proceeding, or in the conduct of intelligence or counterintelligence activities, including analysis, to protect against international terrorism. See 31 U.S.C. 5311. The information cannot be further released, disseminated, disclosed, or transmitted without prior approval of the Director of Financial Crimes Enforcement Network or his authorized delegate. Suspicious activity reports filed under the BSA must be treated with particular care given that they contain unsubstantiated allegations of possible criminal activity, akin to confidential informant tips. Unauthorized release of information collected under the BSA may result in criminal or civil sanctions.

**WARNING**

Note – SAR Usage: This report contains a Suspicious Activity Report (SAR) of suspected criminal activity, filed by a U.S. financial institution. SARs are **not** evidence, but contain information that, when further investigated, **may** produce evidence of criminal activity. Law enforcement personnel that use SAR information as part of investigative efforts **may not**: 1) Confront a customer of a financial institution with a SAR, or 2) Include a SAR as an attachment to an affidavit or other legal document. If it is anticipated that there may be a need to disclose the actual SAR filing as part of a judicial proceeding, law enforcement personnel must coordinate that potential disclosure with FinCEN's Office of Chief Counsel. The prohibition regarding SAR disclosure does not preclude law enforcement personnel from discussing a SAR filed by a bank, or the contents of such SAR, with Federal bank supervisory personnel. Federal bank supervisory agencies, along with FinCEN, promulgated the regulations requiring banks to report suspicious activity by filing SARs. Accordingly, these agencies have access to SARs and have the authority to provide direction with regard to the handling and disclosure of SARs. Notwithstanding the general prohibition on the re-dissemination of a SAR without the prior approval of FinCEN, law enforcement personnel may, without prior authorization, disclose a SAR to *appropriate domestic* law enforcement personnel and prosecutors working on the same or a related investigation, or to such domestic law enforcement personnel that are part of the same joint task force, *provided* the disclosing agency satisfies the conditions set forth in the *Re-dissemination Guidelines for Bank Secrecy Act Information* (November 28, 2007).

[redacted]

OFC-TP-15-12392
SODOFC-15-12392
Date of Report: May 18, 2015

[redacted]

OFC-TP-15-12392
SODOFC-15-12392
Date of Report: May 18, 2015

[redacted]

OFC-TP-15-12392
SODOFC-15-12392
Date of Report: May 18, 2015

[redacted]

## *Criminal History/NCIC*

### Offline NCIC

**GUIDANCE NOTE**

An Offline NCIC report lists other law enforcement agencies that have previously queried the same individual. This report does not necessarily mean the agencies listed on the offline NCIC report have additional documents on that individual. By default, OFC requests will query NCIC for the last 2 years of data unless otherwise requested by the requestor.

The table below is a summary by Agency. The detailed information is contained in the corresponding attached Offline NCIC file, i.e. "Offline NCIC Results for Target 1 (MM/DD/YYYY HH:MM:SS).xls", which provides the date/time and Agency ORI terminal the target was queried. When contacting the appropriate LE agency, the LE agency will need the specific information outlined in the attachment to provide further details regarding their initial query.

Offline NCIC inquiries are records where individuals were queried by local, state or federal law enforcement (LE) agencies at a particular point in time. Offline NCIC checks identify the law enforcement agencies that have previously queried a target. For example, using Offline NCIC checks can provide the following insight:

- Knowing what other agencies are inquiring about your target can be a primary de-confliction tool in bringing various agencies together.
- Pinpointing geographical locations where target previously traveled.
- Discovering target associations based on vehicle stops.

OFC-TP-15-12392
SODOFC-15-12392
Date of Report: May 18, 2015

[redacted]

## *Financial Information*

**WARNING**

The enclosed information was collected and disseminated under provisions of the Bank Secrecy Act (the BSA) and U.S. Department of the Treasury regulations implementing the BSA. See 31 U.S.C. 5311, et seq.; 31 CFR Chapter X. The information is sensitive in nature and is to be treated accordingly. The information may be used only for a purpose consistent with a criminal, tax, or regulatory investigation or proceeding, or in the conduct of intelligence or counterintelligence activities, including analysis, to protect against international terrorism. See 31 U.S.C. 5311. The information cannot be further released, disseminated, disclosed, or transmitted without prior approval of the Director of Financial Crimes Enforcement Network or his authorized delegate. Suspicious activity reports filed under the BSA must be treated with particular care given that they contain unsubstantiated allegations of possible criminal activity, akin to confidential informant tips. Unauthorized release of information collected under the BSA may result in criminal or civil sanctions.

**WARNING**

Note – SAR Usage: This report contains a Suspicious Activity Report (SAR) of suspected criminal activity, filed by a U.S. financial institution. SARs are **not** evidence, but contain information that, when further investigated, **may** produce evidence of criminal activity. Law enforcement personnel that use SAR information as part of investigative efforts **may not**: 1) Confront a customer of a financial institution with a SAR, or 2) Include a SAR as an attachment to an affidavit or other legal document. If it is anticipated that there may be a need to disclose the actual SAR filing as part of a judicial proceeding, law enforcement personnel must coordinate that potential disclosure with FinCEN's Office of Chief Counsel. The prohibition regarding SAR disclosure does not preclude law enforcement personnel from discussing a SAR filed by a bank, or the contents of such SAR, with Federal bank supervisory personnel. Federal bank supervisory agencies, along with FinCEN, promulgated the regulations requiring banks to report suspicious activity by filing SARs. Accordingly, these agencies have access to SARs and have the authority to provide direction with regard to the handling and disclosure of SARs. Notwithstanding the general prohibition on the re-dissemination of a SAR without the prior approval of FinCEN, law enforcement personnel may, without prior authorization, disclose a SAR to *appropriate domestic* law enforcement personnel and prosecutors working on the same or a related investigation, or to such domestic law enforcement personnel that are part of the same joint task force, *provided* the disclosing agency satisfies the conditions set forth in the *Re-dissemination Guidelines for Bank Secrecy Act Information* (November 28, 2007).

[redacted]

OFC-TP-15-12392
SODOFC-15-12392
Date of Report: May 18, 2015

[redacted]

OFC-TP-15-12392
SODOFC-15-12392
Date of Report: May 18, 2015

[redacted]

OFC-TP-15-12392
SODOFC-15-12392
Date of Report: May 18, 2015

# Criminal History/NCIC

## Offline NCIC

**GUIDANCE NOTE**

An Offline NCIC report lists other law enforcement agencies that have previously queried the same individual. This report does not necessarily mean the agencies listed on the offline NCIC report have additional documents on that individual. By default, OFC requests will query NCIC for the last 2 years of data unless otherwise requested by the requestor.

The table below is a summary by Agency. The detailed information is contained in the corresponding attached Offline NCIC file, i.e. "Offline NCIC Results for Target 1 (MM/DD/YYYY HH:MM:SS).xls", which provides the date/time and Agency ORI terminal the target was queried. When contacting the appropriate LE agency, the LE agency will need the specific information outlined in the attachment to provide further details regarding their initial query.

Offline NCIC inquiries are records where individuals were queried by local, state or federal law enforcement (LE) agencies at a particular point in time. Offline NCIC checks identify the law enforcement agencies that have previously queried a target. For example, using Offline NCIC checks can provide the following insight:

- Knowing what other agencies are inquiring about your target can be a primary de-confliction tool in bringing various agencies together.
- Pinpointing geographical locations where target previously traveled.
- Discovering target associations based on vehicle stops.

[redacted]

# Financial Information

**WARNING**

The enclosed information was collected and disseminated under provisions of the Bank Secrecy Act (the BSA) and U.S. Department of the Treasury regulations implementing the BSA. See 31 U.S.C. 5311, et seq.; 31 CFR Chapter X. The information is sensitive in nature and is to be treated accordingly. The information may be used only for a purpose consistent with a criminal, tax, or regulatory investigation or proceeding, or in the conduct of intelligence or counterintelligence activities, including analysis, to protect against international terrorism. See 31 U.S.C. 5311. The information cannot be further released, disseminated, disclosed, or transmitted without prior approval of the Director of Financial Crimes Enforcement Network or his authorized delegate. Suspicious activity reports filed under the BSA must be treated with particular care given that they contain unsubstantiated allegations of possible criminal activity, akin to confidential informant tips. Unauthorized release of information collected under the BSA may result in criminal or civil sanctions.

OFC-TP-15-12392
SODOFC-15-12392
Date of Report: May 18, 2015

**WARNING**

Note – SAR Usage: This report contains a Suspicious Activity Report (SAR) of suspected criminal activity, filed by a U.S. financial institution. SARs are **not** evidence, but contain information that, when further investigated, **may** produce evidence of criminal activity. Law enforcement personnel that use SAR information as part of investigative efforts **may not**: 1) Confront a customer of a financial institution with a SAR, or 2) Include a SAR as an attachment to an affidavit or other legal document. If it is anticipated that there may be a need to disclose the actual SAR filing as part of a judicial proceeding, law enforcement personnel must coordinate that potential disclosure with FinCEN's Office of Chief Counsel. The prohibition regarding SAR disclosure does not preclude law enforcement personnel from discussing a SAR filed by a bank, or the contents of such SAR, with Federal bank supervisory personnel. Federal bank supervisory agencies, along with FinCEN, promulgated the regulations requiring banks to report suspicious activity by filing SARs. Accordingly, these agencies have access to SARs and have the authority to provide direction with regard to the handling and disclosure of SARs. Notwithstanding the general prohibition on the re-dissemination of a SAR without the prior approval of FinCEN, law enforcement personnel may, without prior authorization, disclose a SAR to *appropriate domestic* law enforcement personnel and prosecutors working on the same or a related investigation, or to such domestic law enforcement personnel that are part of the same joint task force, *provided* the disclosing agency satisfies the conditions set forth in the *Re-dissemination Guidelines for Bank Secrecy Act Information* (November 28, 2007).

[redacted]

OFC-TP-15-12392
SODOFC-15-12392
Date of Report: May 18, 2015

[redacted]

OFC-TP-15-12392
SODOFC-15-12392
Date of Report: May 18, 2015

[redacted]

## *Criminal History/NCIC*

### Offline NCIC

**GUIDANCE NOTE**

An Offline NCIC report lists other law enforcement agencies that have previously queried the same individual. This report does not necessarily mean the agencies listed on the offline NCIC report have additional documents on that individual. By default, OFC requests will query NCIC for the last 2 years of data unless otherwise requested by the requestor.

The table below is a summary by Agency. The detailed information is contained in the corresponding attached Offline NCIC file, i.e. "Offline NCIC Results for Target 1 (MM/DD/YYYY HH:MM:SS).xls", which provides the date/time and Agency ORI terminal the target was queried. When contacting the appropriate LE agency, the LE agency will need the specific information outlined in the attachment to provide further details regarding their initial query.

Offline NCIC inquiries are records where individuals were queried by local, state or federal law enforcement (LE) agencies at a particular point in time. Offline NCIC checks identify the law enforcement agencies that have previously queried a target. For example, using Offline NCIC checks can provide the following insight:

- Knowing what other agencies are inquiring about your target can be a primary de-confliction tool in bringing various agencies together.
- Pinpointing geographical locations where target previously traveled.
- Discovering target associations based on vehicle stops.

[redacted]

OFC-TP-15-12392
SODOFC-15-12392
Date of Report: May 18, 2015

[redacted]

## Financial Information

**WARNING**

The enclosed information was collected and disseminated under provisions of the Bank Secrecy Act (the BSA) and U.S. Department of the Treasury regulations implementing the BSA. See 31 U.S.C. 5311, et seq.; 31 CFR Chapter X. The information is sensitive in nature and is to be treated accordingly. The information may be used only for a purpose consistent with a criminal, tax, or regulatory investigation or proceeding, or in the conduct of intelligence or counterintelligence activities, including analysis, to protect against international terrorism. See 31 U.S.C. 5311. The information cannot be further released, disseminated, disclosed, or transmitted without prior approval of the Director of Financial Crimes Enforcement Network or his authorized delegate. Suspicious activity reports filed under the BSA must be treated with particular care given that they contain unsubstantiated allegations of possible criminal activity, akin to confidential informant tips. Unauthorized release of information collected under the BSA may result in criminal or civil sanctions.

**WARNING**

Note – SAR Usage: This report contains a Suspicious Activity Report (SAR) of suspected criminal activity, filed by a U.S. financial institution. SARs are **not** evidence, but contain information that, when further investigated, **may** produce evidence of criminal activity. Law enforcement personnel that use SAR information as part of investigative efforts **may not**: 1) Confront a customer of a financial institution with a SAR, or 2) Include a SAR as an attachment to an affidavit or other legal document. If it is anticipated that there may be a need to disclose the actual SAR filing as part of a judicial proceeding, law enforcement personnel must coordinate that potential disclosure with FinCEN's Office of Chief Counsel. The prohibition regarding SAR disclosure does not preclude law enforcement personnel from discussing a SAR filed by a bank, or the contents of such SAR, with Federal bank supervisory personnel. Federal bank supervisory agencies, along with FinCEN, promulgated the regulations requiring banks to report suspicious activity by filing SARs. Accordingly, these agencies have access to SARs and have the authority to provide direction with regard to the handling and disclosure of SARs. Notwithstanding the general prohibition on the re-dissemination of a SAR without the prior approval of FinCEN, law enforcement personnel may, without prior authorization, disclose a SAR to *appropriate domestic* law enforcement personnel and prosecutors working on the same or a related investigation, or to such domestic law enforcement personnel that are part of the same joint task force, *provided* the disclosing agency satisfies the conditions set forth in the *Re-dissemination Guidelines for Bank Secrecy Act Information* (November 28, 2007).

[redacted]

OFC-TP-15-12392
SODOFC-15-12392
Date of Report: May 18, 2015

[redacted]

[redacted]

OFC-TP-15-12392
SODOFC-15-12392
Date of Report: May 18, 2015

# Criminal History/NCIC

## Offline NCIC

**GUIDANCE NOTE**

An Offline NCIC report lists other law enforcement agencies that have previously queried the same individual. This report does not necessarily mean the agencies listed on the offline NCIC report have additional documents on that individual. By default, OFC requests will query NCIC for the last 2 years of data unless otherwise requested by the requestor.

The table below is a summary by Agency. The detailed information is contained in the corresponding attached Offline NCIC file, i.e. "Offline NCIC Results for Target 1 (MM/DD/YYYY HH:MM:SS).xls", which provides the date/time and Agency ORI terminal the target was queried. When contacting the appropriate LE agency, the LE agency will need the specific information outlined in the attachment to provide further details regarding their initial query.

Offline NCIC inquiries are records where individuals were queried by local, state or federal law enforcement (LE) agencies at a particular point in time. Offline NCIC checks identify the law enforcement agencies that have previously queried a target. For example, using Offline NCIC checks can provide the following insight:

- Knowing what other agencies are inquiring about your target can be a primary de-confliction tool in bringing various agencies together.
- Pinpointing geographical locations where target previously traveled.
- Discovering target associations based on vehicle stops.

[redacted]

OFC-TP-15-12392
SODOFC-15-12392
Date of Report: May 18, 2015

## *Financial Information*

**WARNING**

The enclosed information was collected and disseminated under provisions of the Bank Secrecy Act (the BSA) and U.S. Department of the Treasury regulations implementing the BSA. See 31 U.S.C. 5311, et seq.; 31 CFR Chapter X. The information is sensitive in nature and is to be treated accordingly. The information may be used only for a purpose consistent with a criminal, tax, or regulatory investigation or proceeding, or in the conduct of intelligence or counterintelligence activities, including analysis, to protect against international terrorism. See 31 U.S.C. 5311. The information cannot be further released, disseminated, disclosed, or transmitted without prior approval of the Director of Financial Crimes Enforcement Network or his authorized delegate. Suspicious activity reports filed under the BSA must be treated with particular care given that they contain unsubstantiated allegations of possible criminal activity, akin to confidential informant tips. Unauthorized release of information collected under the BSA may result in criminal or civil sanctions.

**WARNING**

Note – SAR Usage: This report contains a Suspicious Activity Report (SAR) of suspected criminal activity, filed by a U.S. financial institution. SARs are **not** evidence, but contain information that, when further investigated, **may** produce evidence of criminal activity. Law enforcement personnel that use SAR information as part of investigative efforts **may not**: 1) Confront a customer of a financial institution with a SAR, or 2) Include a SAR as an attachment to an affidavit or other legal document. If it is anticipated that there may be a need to disclose the actual SAR filing as part of a judicial proceeding, law enforcement personnel must coordinate that potential disclosure with FinCEN's Office of Chief Counsel. The prohibition regarding SAR disclosure does not preclude law enforcement personnel from discussing a SAR filed by a bank, or the contents of such SAR, with Federal bank supervisory personnel. Federal bank supervisory agencies, along with FinCEN, promulgated the regulations requiring banks to report suspicious activity by filing SARs. Accordingly, these agencies have access to SARs and have the authority to provide direction with regard to the handling and disclosure of SARs. Notwithstanding the general prohibition on the re-dissemination of a SAR without the prior approval of FinCEN, law enforcement personnel may, without prior authorization, disclose a SAR to *appropriate domestic* law enforcement personnel and prosecutors working on the same or a related investigation, or to such domestic law enforcement personnel that are part of the same joint task force, *provided* the disclosing agency satisfies the conditions set forth in the *Re-dissemination Guidelines for Bank Secrecy Act Information* (November 28, 2007).

[redacted]

OFC-TP-15-12392
SODOFC-15-12392
Date of Report: May 18, 2015

[redacted]

OFC-TP-15-12392
SODOFC-15-12392
Date of Report: May 18, 2015

[redacted]

# *Criminal History/NCIC*

## Offline NCIC

**GUIDANCE NOTE**

An Offline NCIC report lists other law enforcement agencies that have previously queried the same individual. This report does not necessarily mean the agencies listed on the offline NCIC report have additional documents on that individual. By default, OFC requests will query NCIC for the last 2 years of data unless otherwise requested by the requestor.

The table below is a summary by Agency. The detailed information is contained in the corresponding attached Offline NCIC file, i.e. "Offline NCIC Results for Target 1 (MM/DD/YYYY HH:MM:SS).xls", which provides the date/time and Agency ORI terminal the target was queried. When contacting the appropriate LE agency, the LE agency will need the specific information outlined in the attachment to provide further details regarding their initial query.

Offline NCIC inquiries are records where individuals were queried by local, state or federal law enforcement (LE) agencies at a particular point in time. Offline NCIC checks identify the law enforcement agencies that have previously queried a target. For example, using Offline NCIC checks can provide the following insight:

- Knowing what other agencies are inquiring about your target can be a primary de-confliction tool in bringing various agencies together.
- Pinpointing geographical locations where target previously traveled.
- Discovering target associations based on vehicle stops.

[redacted]

OFC-TP-15-12392
SODOFC-15-12392
Date of Report: May 18, 2015

## Financial Information

**WARNING**

The enclosed information was collected and disseminated under provisions of the Bank Secrecy Act (the BSA) and U.S. Department of the Treasury regulations implementing the BSA. See 31 U.S.C. 5311, et seq.; 31 CFR Chapter X. The information is sensitive in nature and is to be treated accordingly. The information may be used only for a purpose consistent with a criminal, tax, or regulatory investigation or proceeding, or in the conduct of intelligence or counterintelligence activities, including analysis, to protect against international terrorism. See 31 U.S.C. 5311. The information cannot be further released, disseminated, disclosed, or transmitted without prior approval of the Director of Financial Crimes Enforcement Network or his authorized delegate. Suspicious activity reports filed under the BSA must be treated with particular care given that they contain unsubstantiated allegations of possible criminal activity, akin to confidential informant tips. Unauthorized release of information collected under the BSA may result in criminal or civil sanctions.

**WARNING**

Note – SAR Usage: This report contains a Suspicious Activity Report (SAR) of suspected criminal activity, filed by a U.S. financial institution. SARs are **not** evidence, but contain information that, when further investigated, **may** produce evidence of criminal activity. Law enforcement personnel that use SAR information as part of investigative efforts **may not**: 1) Confront a customer of a financial institution with a SAR, or 2) Include a SAR as an attachment to an affidavit or other legal document. If it is anticipated that there may be a need to disclose the actual SAR filing as part of a judicial proceeding, law enforcement personnel must coordinate that potential disclosure with FinCEN's Office of Chief Counsel. The prohibition regarding SAR disclosure does not preclude law enforcement personnel from discussing a SAR filed by a bank, or the contents of such SAR, with Federal bank supervisory personnel. Federal bank supervisory agencies, along with FinCEN, promulgated the regulations requiring banks to report suspicious activity by filing SARs. Accordingly, these agencies have access to SARs and have the authority to provide direction with regard to the handling and disclosure of SARs. Notwithstanding the general prohibition on the re-dissemination of a SAR without the prior approval of FinCEN, law enforcement personnel may, without prior authorization, disclose a SAR to *appropriate domestic* law enforcement personnel and prosecutors working on the same or a related investigation, or to such domestic law enforcement personnel that are part of the same joint task force, *provided* the disclosing agency satisfies the conditions set forth in the *Re-dissemination Guidelines for Bank Secrecy Act Information* (November 28, 2007).

[redacted]

OFC-TP-15-12392
SODOFC-15-12392
Date of Report: May 18, 2015

[redacted]

OFC-TP-15-12392
SODOFC-15-12392
Date of Report: May 18, 2015

[redacted]

OFC-TP-15-12392
SODOFC-15-12392
Date of Report: May 18, 2015

[redacted]

OFC-TP-15-12392
SODOFC-15-12392
Date of Report: May 18, 2015

## Criminal History/NCIC

### Offline NCIC

**GUIDANCE NOTE**

An Offline NCIC report lists other law enforcement agencies that have previously queried the same individual. This report does not necessarily mean the agencies listed on the offline NCIC report have additional documents on that individual. By default, OFC requests will query NCIC for the last 2 years of data unless otherwise requested by the requestor.

The table below is a summary by Agency. The detailed information is contained in the corresponding attached Offline NCIC file, i.e. "Offline NCIC Results for Target 1 (MM/DD/YYYY HH:MM:SS).xls", which provides the date/time and Agency ORI terminal the target was queried. When contacting the appropriate LE agency, the LE agency will need the specific information outlined in the attachment to provide further details regarding their initial query.

Offline NCIC inquiries are records where individuals were queried by local, state or federal law enforcement (LE) agencies at a particular point in time. Offline NCIC checks identify the law enforcement agencies that have previously queried a target. For example, using Offline NCIC checks can provide the following insight:

- Knowing what other agencies are inquiring about your target can be a primary de-confliction tool in bringing various agencies together.
- Pinpointing geographical locations where target previously traveled.
- Discovering target associations based on vehicle stops.

[redacted]

OFC-TP-15-12392
SODOFC-15-12392
Date of Report: May 18, 2015

## Financial Information

**WARNING**

The enclosed information was collected and disseminated under provisions of the Bank Secrecy Act (the BSA) and U.S. Department of the Treasury regulations implementing the BSA. See 31 U.S.C. 5311, et seq.; 31 CFR Chapter X. The information is sensitive in nature and is to be treated accordingly. The information may be used only for a purpose consistent with a criminal, tax, or regulatory investigation or proceeding, or in the conduct of intelligence or counterintelligence activities, including analysis, to protect against international terrorism. See 31 U.S.C. 5311. The information cannot be further released, disseminated, disclosed, or transmitted without prior approval of the Director of Financial Crimes Enforcement Network or his authorized delegate. Suspicious activity reports filed under the BSA must be treated with particular care given that they contain unsubstantiated allegations of possible criminal activity, akin to confidential informant tips. Unauthorized release of information collected under the BSA may result in criminal or civil sanctions.

**WARNING**

Note – SAR Usage: This report contains a Suspicious Activity Report (SAR) of suspected criminal activity, filed by a U.S. financial institution. SARs are **not** evidence, but contain information that, when further investigated, **may** produce evidence of criminal activity. Law enforcement personnel that use SAR information as part of investigative efforts **may not**: 1) Confront a customer of a financial institution with a SAR, or 2) Include a SAR as an attachment to an affidavit or other legal document. If it is anticipated that there may be a need to disclose the actual SAR filing as part of a judicial proceeding, law enforcement personnel must coordinate that potential disclosure with FinCEN's Office of Chief Counsel. The prohibition regarding SAR disclosure does not preclude law enforcement personnel from discussing a SAR filed by a bank, or the contents of such SAR, with Federal bank supervisory personnel. Federal bank supervisory agencies, along with FinCEN, promulgated the regulations requiring banks to report suspicious activity by filing SARs. Accordingly, these agencies have access to SARs and have the authority to provide direction with regard to the handling and disclosure of SARs. Notwithstanding the general prohibition on the re-dissemination of a SAR without the prior approval of FinCEN, law enforcement personnel may, without prior authorization, disclose a SAR to *appropriate domestic* law enforcement personnel and prosecutors working on the same or a related investigation, or to such domestic law enforcement personnel that are part of the same joint task force, *provided* the disclosing agency satisfies the conditions set forth in the *Re-dissemination Guidelines for Bank Secrecy Act Information* (November 28, 2007).

[redacted]

SENSITIVE BUT UNCLASSIFIED

OFC-TP-15-12392
SODOFC-15-12392
Date of Report: May 18, 2015

[redacted]

OFC-TP-15-12392
SODOFC-15-12392
Date of Report: May 18, 2015

[redacted]

## *Financial Information*

**WARNING**

The enclosed information was collected and disseminated under provisions of the Bank Secrecy Act (the BSA) and U.S. Department of the Treasury regulations implementing the BSA. See 31 U.S.C. 5311, et seq.; 31 CFR Chapter X. The information is sensitive in nature and is to be treated accordingly. The information may be used only for a purpose consistent with a criminal, tax, or regulatory investigation or proceeding, or in the conduct of intelligence or counterintelligence activities, including analysis, to protect against international terrorism. See 31 U.S.C. 5311. The information cannot be further released, disseminated, disclosed, or transmitted without prior approval of the Director of Financial Crimes Enforcement Network or his authorized delegate. Suspicious activity reports filed under the BSA must be treated with particular care given that they contain unsubstantiated allegations of possible criminal activity, akin to confidential informant tips. Unauthorized release of information collected under the BSA may result in criminal or civil sanctions.

**WARNING**

Note – SAR Usage: This report contains a Suspicious Activity Report (SAR) of suspected criminal activity, filed by a U.S. financial institution. SARs are **not** evidence, but contain information that, when further investigated, **may** produce evidence of criminal activity. Law enforcement personnel that use SAR information as part of investigative efforts **may** **not**: 1) Confront a customer of a financial institution with a SAR, or 2) Include a SAR as an attachment to an affidavit or other legal document. If it is anticipated that there may be a need to disclose the actual SAR filing as part of a judicial proceeding, law enforcement personnel must coordinate that potential disclosure with FinCEN's Office of Chief Counsel. The prohibition regarding SAR disclosure does not preclude law enforcement personnel from discussing a SAR filed by a bank, or the contents of such SAR, with Federal bank supervisory personnel. Federal bank supervisory agencies, along with FinCEN, promulgated the regulations requiring banks to report suspicious activity by filing SARs. Accordingly, these agencies have access to SARs and have the authority to provide direction with regard to the handling and disclosure of SARs. Notwithstanding the general prohibition on the re-dissemination of a SAR without the prior approval of FinCEN, law enforcement personnel may, without prior authorization, disclose a SAR to *appropriate domestic* law enforcement personnel and prosecutors working on the same or a related investigation, or to such domestic law enforcement personnel that are part of the same joint task force, *provided* the disclosing agency satisfies the conditions set forth in the *Re-dissemination Guidelines for Bank Secrecy Act Information* (November 28, 2007).

OFC-TP-15-12392
SODOFC-15-12392
Date of Report: May 18, 2015

[redacted]

OFC-TP-15-12392
SODOFC-15-12392
Date of Report: May 18, 2015

[redacted]

OFC-TP-15-12392
SODOFC-15-12392
Date of Report: May 18, 2015

[redacted]

## Financial Information

**WARNING**

The enclosed information was collected and disseminated under provisions of the Bank Secrecy Act (the BSA) and U.S. Department of the Treasury regulations implementing the BSA. See 31 U.S.C. 5311, et seq.; 31 CFR Chapter X. The information is sensitive in nature and is to be treated accordingly. The information may be used only for a purpose consistent with a criminal, tax, or regulatory investigation or proceeding, or in the conduct of intelligence or counterintelligence activities, including analysis, to protect against international terrorism. See 31 U.S.C. 5311. The information cannot be further released, disseminated, disclosed, or transmitted without prior approval of the Director of Financial Crimes Enforcement Network or his authorized delegate. Suspicious activity reports filed under the BSA must be treated with particular care given that they contain unsubstantiated allegations of possible criminal activity, akin to confidential informant tips. Unauthorized release of information collected under the BSA may result in criminal or civil sanctions.

**WARNING**

Note – SAR Usage: This report contains a Suspicious Activity Report (SAR) of suspected criminal activity, filed by a U.S. financial institution. SARs are **not** evidence, but contain information that, when further investigated, **may** produce evidence of criminal activity. Law enforcement personnel that use SAR information as part of investigative efforts **may not**: 1) Confront a customer of a financial institution with a SAR, or 2) Include a SAR as an attachment to an affidavit or other legal document. If it is anticipated that there may be a need to disclose the actual SAR filing as part of a judicial proceeding, law enforcement personnel must coordinate that potential disclosure with FinCEN's Office of Chief Counsel. The prohibition regarding SAR disclosure does not preclude law enforcement personnel from discussing a SAR filed by a bank, or the contents of such SAR, with Federal bank supervisory personnel. Federal bank supervisory agencies, along with FinCEN, promulgated the regulations requiring banks to report suspicious activity by filing SARs. Accordingly, these agencies have access to SARs and have the authority to provide direction with regard to the handling and disclosure of SARs. Notwithstanding the general prohibition on the re-dissemination of a SAR without the prior approval of FinCEN, law enforcement personnel may, without prior authorization, disclose a SAR to *appropriate domestic* law enforcement personnel and prosecutors working on the same or a related investigation, or to such domestic law enforcement personnel that are part of the same joint task force, *provided* the disclosing agency satisfies the conditions set forth in the *Re-dissemination Guidelines for Bank Secrecy Act Information* (November 28, 2007).

OFC-TP-15-12392
SODOFC-15-12392
Date of Report: May 18, 2015

[redacted]

Requestor: [redacted]
Prepared by: [redacted]

OFC-TP-15-12392
SODOFC-15-12392
Date of Report: May 18, 2015

## Table of Contents


**ANALYTICAL FINDINGS** .......... **1**

*Background:* .......... *1*

- *Analytical Findings:* .......... *1*

**TARGET 1 – [redacted]** .......... **4**

BIOGRAPHICAL/IDENTIFYING DATA .......... 4
ADDRESSES .......... 5
COMMUNICATIONS .......... 5
*Telephone Numbers* .......... *5*
BORDER CROSSINGS .......... 5
*Border Crossings - Air* .......... *5*
LINKED INVESTIGATIONS .......... 6
CRIMINAL HISTORY/NCIC .......... 6
*Offline NCIC* .......... *6*
FINANCIAL INFORMATION .......... 7
*USAR – Unified Suspicious Activity Report(s)* .......... *7*
ASSETS .......... 7
*Financial Account(s)* .......... *7*

**TARGET 2 – [redacted]** .......... **8**

BIOGRAPHICAL/IDENTIFYING DATA .......... 8
ADDRESSES .......... 8
COMMUNICATIONS .......... 8
*Telephone Numbers* .......... *8*
BORDER CROSSINGS .......... 8
*Border Crossings - Air* .......... *8*
LINKED INVESTIGATIONS .......... 9
CRIMINAL HISTORY/NCIC .......... 9
*Offline NCIC* .......... *9*
FINANCIAL INFORMATION .......... 10
*USAR – Unified Suspicious Activity Report(s)* .......... *10*

**TARGET 3 – [redacted]** .......... **11**

BIOGRAPHICAL/IDENTIFYING DATA .......... 11
ADDRESSES .......... 11
COMMUNICATIONS .......... 11
*Telephone Numbers* .......... *11*
*Websites, Email Addresses, IP Addresses* .......... *11*
BORDER CROSSINGS .......... 12
*Border Crossings - Air* .......... *12*
LINKED INVESTIGATIONS .......... 12
CRIMINAL HISTORY/NCIC .......... 12
*Offline NCIC* .......... *12*

FINANCIAL INFORMATION .......... 13
*USAR – Unified Suspicious Activity Report(s)* .......... *13*

**TARGET 4 – JEFFREY EPSTEIN .......... 14**

BIOGRAPHICAL/IDENTIFYING DATA .......... 14
ADDRESSES .......... 14
COMMUNICATIONS .......... 15
*Telephone Numbers* .......... *15*
*Websites, Email Addresses, IP Addresses* .......... *15*
BORDER CROSSINGS .......... 15
*Border Crossings - Air* .......... *15*
CORPORATE/BUSINESS AFFILIATIONS .......... 15
LINKED INVESTIGATIONS .......... 16
CRIMINAL HISTORY/NCIC .......... 17
*Offline NCIC* .......... *17*
FINANCIAL INFORMATION .......... 19
*USAR – Unified Suspicious Activity Report(s)* .......... *19*
*UCTR – Unified Currency Transaction Report(s)* .......... *19*
*CTR – Currency Transaction Report(s)* .......... *19*
ASSETS .......... 20
*Financial Account(s)* .......... *20*
FAMILY MEMBER/ASSOCIATE IDENTIFYING INFORMATION .......... 21
*Associates* .......... *21*

**TARGET 5 – [redacted] .......... 22**

BIOGRAPHICAL/IDENTIFYING DATA .......... 22
ADDRESSES .......... 22
COMMUNICATIONS .......... 22
*Telephone Numbers* .......... *22*
*Websites, Email Addresses, IP Addresses* .......... *23*
BORDER CROSSINGS .......... 23
*Border Crossings - Air* .......... *23*
LINKED INVESTIGATIONS .......... 23
CRIMINAL HISTORY/NCIC .......... 24
*Offline NCIC* .......... *24*
FINANCIAL INFORMATION .......... 25
*USAR – Unified Suspicious Activity Report(s)* .......... *25*
*UCTR – Unified Currency Transaction Report(s)* .......... *25*
ASSETS .......... 26
*Financial Account(s)* .......... *26*

**TARGET 6 – [redacted] .......... 27**

BIOGRAPHICAL/IDENTIFYING DATA .......... 27
ADDRESSES .......... 28
COMMUNICATIONS .......... 28
*Telephone Numbers* .......... *28*

iv. I told FAUSA [redacted] and USA Acosta that I did not want to sign the NPA because I did not think that it was "my" agreement. USA Acosta asked me to sign it.

h. After the NPA was signed, USA Acosta continued to concede points that had already been decided. For example, he agreed to the preparation of the Addendum. He then made a number of concessions regarding the letter to the Special Master, including a statement that we would not vouch for the veracity of the victims, despite the fact that these were victims that we intended to include in an indictment. These were all areas that were the subject of a signed, binding agreement. On October 5, 2007, and October 23, 2007, I against asked for permission to proceed to indictment (Exhibits C-6, C-7).

i. After the Addendum was signed, USA Acosta wrote in the 12/19/2007 letter to Lilly Ann Sanchez that he had "considered defense counsel arguments regarding the Section 2255 portions of the Agreement. . . . During the course of negotiations [our] intent was reduced to writing in Paragraphs 7 and 8, which as I wrote previously, appear far from simple to understand." (Exhibit B-19). I raised concerns about undermining an Agreement entered into by our Office and giving away one of the protections that had been negotiated for the victims – representation by an attorney selected by the Special Master.

j. I raised concerns about delays in entering Epstein's guilty plea and sentencing. These were portrayed as "professional courtesies" but it quickly became obvious that the NPA was signed with no intention of actual performance – it was simply a way for Epstein to buy time to avoid indictment and intimidate victims.

k. I raised objections to the multiple "appeals" to DC and the delays that those entailed. USA Acosta explained that "every defendant" has the right to appeal to DC and raise federalism concerns. I explained that the objections should have been raised prior to signing the NPA, not after, and, if they were legitimate "policy questions," Epstein should agree that he would not use the time to harass and intimidate victims.

l. As detailed above, after the NPA was signed, the agents and I repeatedly raised concerns about the Office's deference to the defense's objections to providing notification to the victims of the resolution of the investigation and the date and time of the Epstein's plea and sentencing.

m. On February 26, 2008, I learned that, if CEOS conducted its review and concluded the federal prosecution of Epstein was appropriate, the Office was going to allow Epstein to plead guilty pursuant to the NPA with no additional terms or conditions, despite the fact that additional victims had been located during the ongoing investigation. I wrote to FAUSA [redacted] and expressed my view that this was an unjust result (Exhibit B-115). I re-raised this objection every time the Office allowed Epstein another opportunity to maintain the benefits of the NPA even as he was attacking the NPA's legitimacy.

n. On March 19, 2008, I informed the supervisory chain up to FAUSA [redacted] of the toll that the delay was taking on the victims and the grand jury. In particular, one of the grand jurors had told another that he was concerned that we were going to "whitewash" the case and not charge it. Epstein was using the delay to harass the victims, and one of the victims tried to commit suicide. I wrote how the "FBI's victim-witness coordinator is doing her