| | |
|---|---|
| **From:** | Ghislaine Maxwell |
| **To:** | Pro Se Filing |
| **Subject:** | UNDER SEAL PER ORDER OF COURT GHISLAINE Maxwell 02879-509 ADD EX 42-48 |
| **Date:** | Sunday, July 26, 2026 4:56:38 PM |
| **Attachments:** | EX 42 EFTA 00225100 copy.pdf<br>EX 43 EFTA00190604 copy.pdf<br>EX 44 EFTA 00224983 copy.pdf<br>EX 45 EFTA 00225089 copy.pdf<br>EX 46 EFTA 01660396 copy.pdf<br>EX 47 EFTA 01660400 copy.pdf<br>EX 48 H.O. 012162 copy.pdf |

and were delaying for strategic reasons; (13) repeatedly ceding our discretion to the defense, for example, agreeing that they could review and comment on victim notification letters and decide whether or not we could provide notice; (14) even after the NPA was signed, continuing to water it down, with the Addendum, the 12/19/07 Acosta letter, and then later offering Epstein the option of not having to provide the attorney-representative for the victims; (15) refusing to allow the agents and I to notify the victims about the terms of the NPA and about the change of plea; (16) allowing Epstein to continue to enjoy the benefits of the NPA even after he failed to promptly perform its terms and filed specious delays in order to try to negotiate better terms or win a battle of attrition; (17) refusing to defend me from the false allegations of prosecutorial misconduct; (18) refusing to step in and protect the victims from harassment from Epstein's attorneys when Epstein was "appealing" to DC; and (19) allowing Epstein to repeatedly breach the NPA and then claim that he just got bad advice from his lawyers and "cure" the breaches.

At various times during the investigation, negotiations, etc., I spoke with a number of people about my disagreements with the Office, including my supervisor, [redacted], my co-counsel, [redacted] Special Agents [redacted] and [redacted] AUSAs [redacted], [redacted]. [redacted], and DOJ Trial Attorneys [redacted]. On several occasions, I drafted emails about re-assigning the case because the Office's handling of the matter was so contrary to my methods. I shared at least one of these with Ms. [redacted] (Exhibit C-4). She counseled against sending it. The agents asked me not to leave the case because they believed that, if I left, the case would simply disappear. I couldn't disagree with them.

Criminal Chief [redacted] response to my email in July 2007 was, in my mind, inappropriate and meant to intimidate. It is, quite frankly, unheard of, for a Criminal Chief to engage in plea negotiations without the line AUSA's knowledge, much less blessing. And the offer that was made was inexplicable. To this day, I do not understand the NPA – 24 months/18 months – it is a completely random amount of time. Allowing a federal defendant to plead guilty to state charges also is completely unheard of. No one has ever explained to me where the idea originated from. For Mr. [redacted] to suggest that my judgment was questionable or that I was unable to handle "major" cases was obviously meant to "put me in my place." In my July 13, 2007 response to Mr. [redacted], I wrote:

> With respect to your questions regarding my judgment, I will simply say that disagreements about strategy and raising concerns about the forgotten voices of the victims in this case should not be classified as a lapse in judgment. This Office should seek to foster spirited debate about the law and the use of prosecutorial discretion. I know of other instances where disagreements about the application of the law to different defendants and defense attorneys has resulted in a call for the resignation of the AUSA who dared to challenge the Executive Office's conclusions. I find that very disheartening. However, my first and only concern in this case (and my other child exploitation cases) is the victims. If our personality differences threaten their access to justice, then please put someone on the case whom you trust more, and who will also protect their rights.

After my response to Mr. [redacted], I know that he spoke with [redacted], who was Chief of Appeals at the time, about moving me to the Appellate Section.

The results of the disagreements catalogued above were communicated to me (orally or via e-mail) as decisions of the Executive Division. They sometimes followed extensive debate. They

On about July 3, 2008, Jane Doe #1 and Jane Doe #2 learned, through telephones conversations had between Mr. Edwards and AUSA Villafaña, that the U.S. Attorney's Office and Epstein might be in the process of finalizing some sort of plea arrangement. Accordingly, they filed an emergency motion seeking to protect their rights under the CVRA, including in particular their right to confer about the proposed plea arrangement.

Mr. Edwards – and thus his clients -- first learned of the Non-Prosecution Agreement on or after July 9, 2008, when the Government filed its responsive pleading to Jane Doe's emergency petition. That pleading was the first public mention of the non-prosecution agreement and the first disclosure to Mr. Edwards and his clients. Epstein, through his attorneys, knew that the victims had not been informed about the plea arrangement.

On July 9, 2008, AUSA Villafaña sent a victim notification to Jane Doe #1 via her attorney, Mr. Edwards, which is attached as Exhibit 6 to the Villafaña Declaration. That notification contains a written explanation of some of the terms of the Non-Prosecution Agreement between Epstein and the U.S. Attorney's Office. A full copy of the terms was not provided. This was the first time that Jane Doe #1 was told that the arrangement blocked any possibility of federal criminal charges being filed against Epstein. A notification was not provided to Jane Doe #2 because the agreement limited Epstein's liability to victims whom the United States was prepared to name in an indictment.

On July 11, 2008, the Court held a hearing on the victims' emergency motion. During the hearing, the Government discussed in open court various provisions of the Non-Prosecution Agreement. At the conclusion of the hearing, victims' counsel and the Government agreed to



EFTA00190604

**EPSTEIN INVESTIGATION TIMELINE**

| Date | To | From | Re: | Exhibit # |
|---|---|---|---|---|
| 7/19/2008 | | | Emails with other AUSAs in other districts and documents regarding disclosing identifying information about victims | |
| 7/21/2008 | Goldberger | Villafaña | Letter with 11 additional victim notification letters | |
| 7/21/2008 | Villafaña | Goldberger | Letter with attached Motion for Return of Property | |
| 7/21/2008 | Villafaña | Kuyrkendall | Email with list of victims that Twiler still needs to make contact with | B-69 |
| 7/21/2008 | Villafaña | Tein | Letter in response to 7/17/08 letter from Villafaña | |
| 7/21/2008 | | | Victim Notification letters to Individuals #1, #2, #4, #13, #9, #14, #21, #23, #30, #32, and #38 | B-70 |
| 7/21/2008 | Villafaña; cc: Senior | Sloman | Email response to Villafaña's 7/21/08 email regarding Motion for Return of Property in State Court | |
| 7/22/2008 | Villafaña | Kuyrkendall | Email chain regarding victim addresses | |
| 7/22/2008 | | | Emails between A. M. Villafaña, A. Acosta, J. Sloman, R. Senior, K. Atkinson, E. Nesbitt Kuyrkendall, and J. Richards regarding 7/21/2008 letter from M. Tein announcing plan to stay the civil suits against J. Epstein and notification that B. Reinhart is counesl of record for [redacted] in civil suits | |
| 7/23/2008 | | | Emails between A. M. Villafaña and D. Lee regarding correspondence with counsel for J. Epstein and notice of breach | |
| 7/25/2008 | | | Emails between A. M. Villafaña and K. Atkinson regarding extension of grand jury to allow for continued representation of J. Epstein case | |
| 7/30/2008 | Villafaña | Atkinson | Email regarding contact with Roy Black | |
| 7/30/2008 | Villafaña | Roy Black | Email chain regarding call relating to the performance of the criminal Non-Prosecution Agreement | |
| 8/1/2008 | Lee, Acosta; cc: Villafaña, Jacobus, Senior | Sloman | Email chain regarding Jane Doe litigation | |
| 8/2/2008 | Lee, Villafaña | Acosta | Email re: Letter from Brad Edwards | |
| 8/5/2008 | A. Acosta, J. Sloman, R. Senior, and K. Atkinson | A. Marie Villafaña | Email regarding analysis of Jeffrey Epstein agreement, with attached 6/24/2008 email from A. M. Villafaña to R. Black and J. Goldberger and attached Epstein agreement | B-71 |

provided a draft of the proposed victim notification letter to counsel for Epstein (Exhibit B-56). I was concerned that Epstein and his counsel were again creating a potential problem. USA Acosta had taken the position that the final NPA consisted of three documents – the 9/24/2007 NPA, the 10/29/2007 Addendum, and the 12/19/07 letter from USA Acosta to Lilly Ann Sanchez. I prepared victim notifications (and, later, a Declaration in the *Jane Doe* litigation) based upon this understanding. When Epstein entered his guilty plea, Judge McSorley required him to file his federal Non-Prosecution Agreement with the Court since that formed part of the consideration for the state plea. I wanted to confirm that Epstein was taking a consistent position with the State Attorney's Office, Judge McSorley, and the USAO, so I asked for a copy of what was filed in the State Court. This led to multiple letters with counsel for Epstein before I could finalize the victim notification letters (Exhibits B-57 through B-65). On July 9, 2008, I finally sent the first two victim notification letters to two of Brad Edwards' clients, Individuals 35 and 43 (Exhibit B-66). Whenever I sent a victim notification letter, a redacted version of the letter also was sent to Jack Goldberger, counsel for Jeffrey Epstein. I was not authorized to send a victim notification letter to Individual # 28 or to include her on the list of persons provided to Epstein because she was not a person that the Office was prepared to name in an indictment.[42]

On July 10, 2008, I sent victim notification letters to a number of other represented victims, Individuals 3, 8, 17, 25, 26, 37, and 44 (Exhibit B-67). The FBI also asked for some assistance of language to use in its own victim notifications (Exhibit B-68), and I was waiting for contact information for the unrepresented victims (Exhibit B-69). On July 21, 2008, I sent victim notification letters to a group of unrepresented victims, Individuals 1, 2, 4, 9, 13, 14, 21, 23, 30, 32, and 38 (Exhibit B-70). There were some unrepresented victims who did not receive notification letters on July 21, 2008 because the FBI had not been able to confirm mailing addresses by that time – Individuals 10, 11, 16, 18, 20, 24, 31, 33, 36, 39, 40, and 42.

In August 2008, the issue of "which version of the NPA controls" finally came to a head. On August 5, 2008, in the context of a Notice of Breach, I pressed my Office to clarify the issue (Exhibit B-71). The decision was made to require Epstein to elect either the 12/19/07 letter or not, but to make it clear in writing (Exhibits B-73 through B-82). On August 15, 2008, I wrote to Roy Black and Jay Lefkowitz confirming their position that the final agreement consisted only of the NPA and Addendum (Exhibit B-83). By discarding USA Acosta's December 2007 modification, the original terms providing for the attorney representative for the victims came back into effect, and the victim notification letters for the unrepresented victims were even more important. Mr. Lefkowitz responded on August 18, 2008 with "objections" in advance to the language of the victim notifications (Exhibit B-84). On August 21, 2008, I responded to Mr. Lefkowitz with a draft victim notification letter corresponding to the language contained in the NPA and Addendum and noted the importance of promptly providing corrected information to the victims (Exhibit B-85). The following day, Mr. Lefkowitz sent a letter with indeterminate objections to the letter (Exhibit B-86). I responded by pointing out that the language in the victim notification letter was taken verbatim from the NPA and Addendum (Exhibit B-87).

On September 2, 2008, Mr. Lefkowitz finally confirmed that Mr. Goldberger would be the designated recipient for victim notifications and that Mr. Epstein would pay the attorney representative's fees (Exhibit B-88). I immediately started distributing victim notification letters.

[42] That decision was made by USA Acosta and/or FAUSA [redacted]. I do not know which.

**From** [redacted]
**To:** "[redacted]
**Subject:** [redacted]
**Date:** Mon, 01 Apr 2019 15:31:15 +0000
**Importance:** Normal

---

Hi [redacted]

Long time since the last time we spoke and I'm just in NYC at the moment and was thinking of calling you to catch you up on all the wonderful updates I've had recently against Epstein & Co. If it's not too much trouble and your able to talk sometime soon it would be much to my delight!! I hope you have been well and look forward to catching up with you!!

Best Wishes,

[redacted]

**From:** [redacted]
**To:** "[redacted]
**Subject:** [redacted] Jane doe 102
**Date:** Fri, 18 Jul 2014 19:15:50 +0000
**Importance:** Normal

---

Hi [redacted]

Still ploughing through the case and going to places w this I never dreamed but all is good.

I hate to bother you about the past but I remember you saying you we're familiar w the Ron Eppinger case and knew someone from the inside that personally was there at the time. I'm not going after Eppinger or anything like that just putting together pieces of a puzzle that's not so nice to remember.

I know Eppinger was arrested in 01' and not for any charges I brought against him but for illegally transporting women from Chez Republic and soliciting them for prostitution but what I'm trying to figure out is what year I was with him and when I was sent to Charlie's place (club owner of hot chocolates bar & restaurant in Ft.Lauderdale).

I'm not even sure you would even remember but I was hoping for a long shot. I appreciate any relevant info about this that you can remember or even get me in touch w the kind gentleman who took good care of me once I got to the police station in Ft. Lauderdale. tell him it would be a privilege to speak w someone who actually took the time to care empathetically about someone else they hardly knew me & let him know that I'm actually am advocate for speaking out about these ruthless crimes.

I'm so sorry again to plague you w my troubles!!

Kindest Regards,
[redacted]
[redacted] cell

Sent from my iPhone

3
HOUSE OVERSIGHT 012162
KIRKLAND &ELLIS LLP
12. In August 2007, in a clear attempt to coerce a state settlement, Ms. Villafana threatened

to broaden the investigation to include a money laundering violation (18 U.S.C. § 1956), though all the funds expended were simply Mr. Epstein's, and a violation for operating an unlicensed money-transmitting business (18 U.S.C. § 1960), though Mr. Epstein never had such a business. See Tab 22, August 31, 2007 Letter from M. Villafana to Ross (reciting, in a target letter to one of Epstein's employees, that the investigation concerns "suspected violations of federal law, including but not limited to, possible violations of Title 18, United States Code, Sections . . . 1591, . . . 1956, 1960 . . . .") (emphasis added).

13. On the very same day that the grand jury issued subpoenas to the records-custodian and employees of Epstein's businesses for all financial transactions from 2003 forward, Ms. Villafana (who we were told was not authorized to act in this regard without supervisory approval) promised to close the money-laundering investigation "if the sex offense case is resolved." See Tab 23, August 16, 2007 Letter from M. Villafana to G. Lefcourt ("In other words, if the sex offense case is resolved, the Office would close its investigation into other areas as well. The matter has not been, and it does not appear that it will be, resolved so the money laundering investigation continues, and Request Number 6 [seeking records of every financial transaction conducted by Epstein and his six businesses from "January 1, 2003 to the present"] will not be withdrawn.").

14. Two weeks later, when Mr. Epstein continued to oppose federal prosecution during negotiations and Mr. Epstein's counsel sought a meeting with the United States Attorney, AUSA Villafana then classified all of Mr. Epstein's assistants as targets (sending a target letter to one of them and promising the attorney of the other two that additional target letters would be served on them as well), dispatched FBI agents to the homes of two of his secretaries, and personally telephoned Mr. Epstein's largest business client to advise him of the nature of the investigation. See Tab 22, August 31, 2007 Letter from M. Villafana to

FAUSA Sloman Forces Mr. Epstein's Lawyers to Convince the State Prosecutors To Impose a More Severe Sentence Than They Believe Is Appropriate

15. Throughout the plea negotiations with the USAO, Mr. Sloman and Ms. Villafana continually insisted that the only way they would agree not to bring a federal indictment was if Epstein's lawyers, not the state prosecutors as required under the Petite Policy, convinced the state prosecutors to impose a more severe punishment than the state believed was appropriate under the circumstances.

16. FAUSA Sloman's version of the history with respect to the sentence he required Mr. Epstein's lawyers to seek from the State contradicts his later assertion, which is patently false—that "the SDFL indicated a willingness to defer to the State the length of incarceration" and "considered a plea to federal charges that limited Epstein's sentencing exposure . .. " See Tab 1, May 19, 2008 Letter from J. Sloman. In fact, by a email dated August 3, 2007, Criminal Division Chief Matthew Menchel advised the defense that the federal government required a minimum term of two years of incarceration. See Tab 40, August 3, 2007 Email from M. Menchel. Subsequently, Ms.
4
HOUSE OVERSIGHT 012163
KIRKLAND &ELLIS LLP
Villafana emailed the defense stating that United States Attorney Acosta would accept no less than 18 months of incarceration, following by a one-year term of house arrest.

Federal Prosecutors Misrepresented the Number of Alleged "Victims."

Ln 5.