| | |
|---|---|
| **From:** | ghislaine maxwell |
| **To:** | Pro Se Filing |
| **Subject:** | Motion 59 e Ghislaine Maxwell 02879509 DKT 1:20 Cr. 330 (PAE) |
| **Date:** | Tuesday, September 22, 2026 10:07:16 PM |
| **Attachments:** | FINAL FINNY Maxwell_Rule_59e_Final.pdf<br>FINAL FINNY JN MaxwellRequestfor_Judicial_Notice_Google_Earth_[redacted]pdf |

---

**CAUTION - EXTERNAL:**

Exhibits to follow in separate email due to size limitations

**CAUTION - EXTERNAL EMAIL:** This email originated outside the Judiciary. Exercise caution when opening attachments or clicking on links.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| GHISLAINE MAXWELL, Petitioner, - v. - UNITED STATES OF AMERICA, Respondent. | 1: 20 Cr. 330 (PAE)<br>1: 25 Civ. 10468 (PAE) |

**MEMORANDUM OF LAW OF GHISLAINE MAXWELL, PRO SE, IN SUPPORT OF HER MOTION PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 59(e)TO ALTER OR AMEND THE JUDGMENT**

SEPTEMBER 22, 2026

GHISLAINE MAXWELL 02879-509
Petitioner, Pro Se

## TABLE OF CONTENTS

PRELIMINARY STATEMENT 1

I. THE NEW MEXICO ATTORNEY GENERAL'S POST-ORDER COMPLAINT SUPPLIES NEW EVIDENCE OF SDNY'S ACCESS TO THE NEW MEXICO INVESTIGATIVE FILE 2

II. NEWLY RELEASED EFTA DOCUMENTS SUPPORT PETITIONER'S CONTENTION THAT AN EXPANDING NEW YORK INVESTIGATION DROVE THE NPA AND THAT MAIN JUSTICE WAS INVOLVED 3

A. Any Ambiguity in the Agreement Must Be Construed Against the Government as Drafter 4

B. The OPR Record Could Not Resolve Materials It Excluded 6

III. THE COURT MADE A MATERIAL ERROR OF FACT CONCERNING MAIN JUSTICE APPROVAL AND PETITIONER'S PRESENTATION 7

A. The Coconspirator Provision Was Deliberate, Not Incidental 7

IV. THE COURT DID NOT RESOLVE WHETHER BRAD EDWARDS WAS THE CONFIDENTIAL WITNESS IDENTIFIED IN GOVERNMENT RECORDS CONCERNING EXHIBIT 52 8

A. The Later Edwards Account Conflicts with the Government's Affidavit and the Rodriguez Deposition 9

V. THE COURT DID NOT ADDRESS THE MATERIAL ISSUE OF A SHARED THERAPIST AND LONGSTANDING COORDINATION AMONG SDFL, SDNY, PLAINTIFFS' ATTORNEYS, AND WITNESSES 10

A. Civil Counsel Voluntarily Supplied Witness Material to the Government 11

B. The 2008–2011 History Matters 12

VI. THE COURT DID NOT ADDRESS THE ABSENCE OF THE EPSTEIN MATTER FROM ACOSTA'S FEDERAL RECORDS VAULT 13

VII. THE COURT DID NOT ADDRESS ADDITIONAL INTERRELATED EVIDENCE BEARING ON DISCLOSURE, CREDIBILITY, AND CHRONOLOGY 14

A. Estate Cooperation, Passenger Manifests, and Defense Access 14

B. [redacted] and Undisclosed Benefit Evidence 15

C. The Undisclosed Farmer Letter 15

D. Parkinson, Grand-Jury Access, and the Massage Table 16

E. Chronology, New Mexico, Farmer, and Contemporaneous Records 17

F. Juror 50 and Evidence That Did Not Exist at the Rule 33 Hearing 19

VIII. THE COURT DID NOT ADDRESS THE SIGNIFICANCE OF LONGSTANDING COORDINATION AMONG PLAINTIFFS' COUNSEL, THE GOVERNMENT, AND THE PRESS BEGINNING IN 2008 20

IX. THE COURT DID NOT ADDRESS THE DISCLOSURE CHRONOLOGY INDICATING THAT THE GOVERNMENT MAY NOT HAVE COMPLIED WITH THE COURT'S CONTINUING-DISCLOSURE ORDERS 20

X. THE COURT DID NOT ADDRESS THE EVIDENTIARY QUESTIONS CONCERNING THE SWEET COMMUNICATIONS, THE HRH PHOTOGRAPH, THE FARMER DIARY, AND THE CONFIDENTIALITY AGREEMENT 21

A. The Sweet Communications 21

B. The HRH Photograph 21

C. The Farmer Diary 22

D. The Confidentiality Agreement 22

XI. THE COURT DID NOT ADDRESS FORMER ATTORNEY GENERAL BARR'S LATER TESTIMONY CONCERNING MDC AND PETITIONER'S INCARCERATION 22

XII. THE COURT DID NOT ADDRESS NEW EVIDENCE THAT PETITIONER COULD NOT HAVE RAISED EARLIER CONCERNING PREJUDICE FROM THE DELAYED PROSECUTION 23

XIII. THE COURT'S CHARACTERIZATIONS OF PETITIONER'S EFTA PRESENTATION CANNOT BE DIVORCED FROM THE ACCESS IT DENIED 25

XIV. THE COURT SHOULD ADDRESS PETITIONER'S EARLIER LETTERS REQUESTING ACCESS, REDACTION RELIEF, RECONSIDERATION, AND A CERTIFICATE OF APPEALABILITY 26

XV. MATERIAL EVIDENCE PRESENTED IN PETITIONER'S AUGUST 19, 2026 SUPPLEMENTAL SUBMISSION MUST BE EXPRESSLY ADDRESSED 26

XVI. PUBLIC REDACTION OF EFTA MATERIAL DID NOT RESOLVE THE GOVERNMENT'S PRETRIAL DISCLOSURE OBLIGATIONS 27

XVII. THE COURT DID NOT ADDRESS THE RECAREY EVIDENCE AND THE INTEGRITY AND COMPLETENESS OF THE PALM BEACH INVESTIGATIVE RECORD 28

XVIII. THE COURT SHOULD RECONSIDER SELECTIVE PROSECUTION IN LIGHT OF LATER-DISCLOSED COCONSPIRATOR AND COMPARATOR EVIDENCE 28

XIX. THE COURT DID NOT ADDRESS THE FULL CHRONOLOGY EVIDENCE CONCERNING HOUSEHOLD RULES, EAST 71ST STREET, NEW MEXICO, AND AGE 29

XX. THE COURT DID NOT ADDRESS THE DISTINCT CONTENT OF THE BIRTHDAY BOOK, CAROLYN MATERIAL, AND OTHER CONTEMPORANEOUS RECORDS 30

XXI. PROCEDURAL DEFAULT CANNOT REST ON CONFLATING A PREVIOUSLY KNOWN SUBJECT WITH LATER EVIDENCE THAT DID NOT EXIST OR WAS NOT DISCLOSED 30

XXII. THE JUDGMENT DID NOT RESOLVE PETITIONER'S PRESERVED CONTENTIONS ON THE RECORD ACTUALLY PRESENTED 31

A. Constructive Amendment 31

B. Sentencing Contentions 32

C. Exhibit 52 33

XXIII. CUMULATIVE MATERIALITY, FACTUAL DEVELOPMENT, AND A CERTIFICATE OF APPEALABILITY 33

**CASES CITED**

In re Steinhardt Partners, L.P., 9 F.3d 230 (2d Cir. 1993)

In re von Bulow, 828 F.2d 94 (2d Cir. 1987)

Kyles v. Whitley, 514 U.S. 419 (1995)

Leka v. Portuondo, 257 F.3d 89 (2d Cir. 2001)

New Mexico v. United States Department of Justice et al., No. 1:26-cv-02762 (D.D.C.)

Phang v. Blanche, No. 1:26-cv-01417 (EGS) (D.D.C.)

Radar Online v. FBI, Dkt. 38

United States v. Gottesman, 122 F.3d 150 (2d Cir. 1997)

United States v. Hernandez, 242 F.3d 110 (2d Cir. 2001)

United States v. Jackson, 345 F.3d 59 (2d Cir. 2003)

United States v. Reyes-Arzate, 91 F.4th 616 (2d Cir. 2024)

United States v. Stein, 541 F.3d 130 (2d Cir. 2008)

United States v. Thorn, 659 F.3d 227 (2d Cir. 2011)

**PRELIMINARY STATEMENT**

Petitioner Ghislaine Maxwell respectfully moves under Federal Rule of Civil Procedure 59(e), as applicable through Rule 12 of the Rules Governing § 2255 Proceedings, to alter or amend the judgment denying her motion under 28 U.S.C. § 2255. This motion does not seek a second decision on an unchanged record. It identifies material first disclosed after the Court's July 27, 2026 order directing Petitioner not to make additional filings. It identifies material matters presented but not resolved, factual premises contradicted by newly released Government records, and claims rejected for want of proof after Petitioner was denied meaningful access to the very records required to supply that proof.

The Court described Petitioner's EFTA presentation as a collection of isolated pages of uncertain provenance, a "ragtag" collection of documents. Petitioner had no ability to contextualize isolated pages drawn from millions of pages she had no ability to review. Petitioner is incarcerated without ordinary computer or Internet access, had no practical means to search the enormous production, and was denied the access and factual development she requested. The constitutional claims were not a series of unrelated complaints about individual pages. The pages supplied evidence bearing upon linked Brady, Giglio, Napue, due-process, and ineffective-assistance claims. The resulting prejudice had to be assessed cumulatively, not document by document. See Kyles v. Whitley, 514 U.S. 419, 436–37 & n.10 (1995).

At Dkt. 869 at 65 n.25 this court adopted the Government's opposition as to matters not addressed in full. Incorporation cannot substitute for deciding the constitutional question actually presented. Nor can a newly disclosed Government record be treated as though it could have been introduced on direct appeal. Federal Rule of Appellate Procedure 10(a) confines the ordinary appellate record to the district-court papers, exhibits, transcripts, and docket; Rule 10(e) permits correction, not the initial introduction of later-disclosed evidence. Section 2255 was the procedurally proper forum for that evidence and the factual development it required.

Reconsideration is warranted where controlling law or material facts were overlooked or where correction is necessary to prevent manifest injustice, and where new material could not have been found earlier through reasonable effort. Petitioner invokes that narrow function. For each issue below, the question is not whether an old label can be attached to the claim, but whether the later evidence materially changed the record on which the prior ruling rested and whether the Court resolved the proposition Petitioner actually presented.

Where possible, this motion begins with the judgment's own premise and places beside it the record the judgment did not address. The resulting contradictions require no characterization: they identify the material facts overlooked, the disputes requiring development, and the conclusions that cannot stand on the record actually presented.

That evidence bears directly on both disclosure and chronology. Dkt. 63, the Government's discovery plan, did not identify the New Mexico investigative material now alleged to have been in Government possession. The New Mexico file is expected to contain evidence relevant to Petitioner's constructive-amendment and chronology claims, including evidence concerning whether the large Zorro Ranch residence presented to the grand jury and Court existed during the charged timeframe. Petitioner further contends that witnesses identified through the New Mexico investigation, but not located or identified by the defense, could address the 1994-1997 ranch chronology in ways that conflict with Jane's trial account. The Court should permit targeted development of what New Mexico supplied, when SDNY received it, and what was disclosed to the defense.

## I. THE NEW MEXICO ATTORNEY GENERAL'S POST-ORDER COMPLAINT SUPPLIES NEW EVIDENCE OF SDNY'S ACCESS TO THE NEW MEXICO INVESTIGATIVE FILE

After the Court's July 27, 2026 order directing Petitioner not to make additional filings, the New Mexico Attorney General filed a complaint against the United States Department of Justice and Todd Blanche. Petitioner identifies that filing as **No. 1:26-cv-02762 (D.D.C.)** filed August 5, 2026. The

complaint states that New Mexico fully cooperated with SDNY and provided its investigative material, including victim and witness interviews. See Compl. at 5 para. 7, 6 para. 24, 7 para. 29. EFTA00019188 is further identified as reflecting that SDNY invited New Mexico to submit questions to be incorporated into victim interviews. These matters post-date the Court's filing restriction and could not have been presented earlier.

## II. NEWLY RELEASED EFTA DOCUMENTS SUPPORT PETITIONER'S CONTENTION THAT AN EXPANDING NEW YORK INVESTIGATION DROVE THE NPA AND THAT MAIN JUSTICE WAS INVOLVED

The court's judgment rejected Petitioner's NPA presentation in part because the documents she cited did not expressly use the words "New York." The newly released materials supply what Petitioner previously could only infer. The later-produced House Oversight record supplies contemporaneous Government evidence inconsistent with treating the NPA as an agreement plainly understood by all participants as a purely local SDFL disposition. In its May 19, 2008 letter to Epstein's counsel, SDFL itself described the September 24, 2007 agreement as a "global resolution of state and federal liabilities." HOUSE OVERSIGHT 012197–012203. The same letter states that Epstein's counsel had received meetings at the "highest levels" of both SDFL and DOJ's Child Exploitation and Obscenity Section ("CEOS"), that SDFL afforded counsel an opportunity to seek review by the Assistant Attorney General, and that an independent review was thereafter facilitated at the "highest levels of the Department of Justice." Id. The contemporaneous Government description of a "global resolution," coupled with Criminal Division participation and review at Main Justice, materially undermines the premise that the NPA was understood as an exclusively local agreement whose meaning and operation were confined to SDFL. EFTA00190438.

Acosta's own communication supplies the Court's missing words. He described Epstein and his assistants as calling victims in New York to arrange "appointments" for Epstein's return to New York

and explained that the conduct fell within federal jurisdiction. EFTA00190464–67, relevant passage at page EFTA00190465. The judgment's premise that Petitioner's evidence did not expressly identify New York cannot be reconciled with Acosta's express description of calls to New York victims arranging appointments for Epstein's return to New York.

The underlying records are more specific. EFTA00224953 is identified as showing that New York staff, including Epstein's longtime assistant Lesley Groff, were subpoenaed before the NPA was executed. EFTA00190432 reflects federal awareness of a victim involved in a parallel FBI matter, and EFTA00190477 reflects subpoenas to New York victims. EFTA00190379 reflects Epstein's effort to resolve liability for all criminal activity known to the United States when he entered the plea. The full letter, EFTA00190378–00190379, was signed by USAO Villafaña for Acosta. Collectively, these records directly answer the Court's premise that Petitioner's New York contention lacked documentary support.

The same record also shows participation above the district level before execution. Attorneys at the highest levels of the Department of Justice were involved in negotiations of the NPA through the Child Exploitation and Obscenity Section ("CEOS") before the agreement was signed in September 2007. That evidence directly conflicts with the Government's statements to Judge Nathan that DOJ was not involved until after the NPA was signed. Dkt. 204 at 37, 39. The evidence must be assessed alongside the drafting history, communications with Main Justice, the final-week changes, and records showing continued investigation after the initial agreement. These documents were not available or disclosed to the defense or they certainly would have been placed before the Court at district level and at the appellate level.

**A. Any Ambiguity in the Agreement Must Be Construed Against the Government as Drafter**

The newly released documents also establish genuine uncertainty about which iteration of the agreement and which addenda governed. EFTA00190374, dated August 2008, and related

communications refer to modifications and to September, October, and December agreements or addenda. One communication reportedly states that paragraphs 7 and 8, including subparagraphs 7(a)–(c), were included in an October addendum; another discusses a December 19 modification, EFTA00190614. The Government itself argues that it has not identified an "operative document (or set of documents)." The record therefore cannot be reduced to a single self-explanatory document without determining what was agreed, when, and by whom. Defense discovery did not extend beyond June 30, 2008, and OPR stated that it did not "evaluate subjects . . . on [the] basis of that subsequent information." Defense had no insight into documents or negotiation history past 20 June 2008.

The judgment emphasized Acosta's statement on the next deposition page that the agreement was limited to SDFL. Dkt. 869 at 22–23. Petitioner does not omit that testimony. She contends that it must be reconciled with promises inferred by the lawyers questioning Acosta in his 2019 deposition. EFTA00009126:21–25, 00009127:1–6. The affirmative evidence includes Acosta's addition of global language to the NPA—language unnecessary if the agreement was intended to be purely local to the SDFL. EFTA00009424:15–25, 00009425:1–12. When asked why the standard restrictive language attached to pleas was missing, Acosta stated that he "could not speak to it." EFTA00009112. The lawyers questioning Acosta characterized the coconspirator provision as providing blanket transactional immunity, EFTA00009102:14–17, and Acosta acknowledged that the provision could be "read in the record" that way. These affirmative acts and communications are relevant ambiguity evidence under the principles governing Government-drafted agreements. The Government has argued that Petitioner's lack of evidence is "fatal" to her defense; Petitioner contends that the very evidence necessary to litigate the issue was concealed from the defense by the Government.

Plea agreements are construed according to contract-law principles, tempered by due-process concerns for fairness, and construed strictly against the Government because it is the drafting party and occupies an overwhelmingly superior bargaining position. United States v. Reyes-Arzate, 91 F.4th 616, 621–22 (2d Cir. 2024); United States v. Gottesman, 122 F.3d 150, 152 (2d Cir. 1997).

Accordingly, waivers contained in plea agreements are applied narrowly and construed strictly against the Government. United States v. Hernandez, 242 F.3d 110, 113 (2d Cir. 2001). The Court should not resolve Government-drafted ambiguity in the Government's favor, particularly where the Government retained and concealed the drafting history from the defense and the record now reveals multiple iterations, addenda, and review outside SDFL.

**B. The OPR Record Could Not Resolve Materials It Excluded**

The Government argued that later documents were adequately encompassed by OPR. But OPR stated that it did not evaluate subjects on the basis of information arising after the period it reviewed. Post-June 2008 communications, later modifications, and records revealing how the Government and Epstein's counsel understood the agreement therefore cannot be dismissed on the theory that OPR already supplied a complete account. The Court relied at ER 25 n.13 on OPR's account of a supervisor who stated that the NPA was not global. Yet that same supervisor told OPR that he had "little recollection" of the Epstein matter, had no involvement in assessing the case or deciding how to resolve it, and was on holiday during the final negotiations. OPR 168 n.242; OPR 37 n.59. The Court relied on the statement that only the 4 named alleged co-conspirators were covered. Whereas EFTA00225071 reveals that Maxwell was the exception and was covered by the NPA (Ragsdale letter).

The judgment declared that SDNY 'went above and beyond its disclosure obligations.' Dkt. 869 at 29. The same judgment nevertheless relied on OPR to reject claims involving categories OPR expressly excluded and records that later emerged outside the expected federal repository. The court's praise for the scope of a search cannot answer or replace the inquiry into whether the identified federal repositories, dates, custodians, drafts, addenda, and approval communications were actually searched and then disclosed in accordance with Brady and its progeny.

## III. THE COURT MADE A MATERIAL ERROR OF FACT CONCERNING MAIN JUSTICE APPROVAL AND PETITIONER'S PRESENTATION

The judgment stated that Petitioner did not argue that the Criminal Division approved the NPA and did not address the Ashcroft Memorandum. Petitioner did both. See Amended Petition at 24. The question on reconsideration is not whether the Court agrees with those arguments, but whether the judgment rested on the materially incorrect premise that the arguments were not made.

The later records reinforce the point. EFTA00009083:12–13 and EFTA00009115:14 are identified as testimony that the NPA was negotiated from Washington by senior Criminal Division officials. EFTA00009151 is identified as showing that the Deputy Attorney General reviewed the NPA and its terms. EFTA00800336, Point 2, identifies approval by Sigal Mandelker, Assistant Attorney General, together with review at Main Justice. H.O. 012197–012683. These sources bear directly on the premise that Main Justice's participation was neither argued nor evidenced.

That error matters because the prior NPA adjudication proceeded on a materially thinner record. Petitioner does not ask the Court to disregard the mandate on an unchanged record. She asks the Court to determine whether *later* Government evidence materially alters the factual predicate concerning negotiation, approval, intended scope, and the coconspirator promise. See United States v. Thorn, 659 F.3d 227, 231 (2d Cir. 2011).

### A. The Coconspirator Provision Was Deliberate, Not Incidental

The judgment noted that the coconspirator provision had been added with little discussion or consideration. ER 21. Newly released House Oversight material related to the OPR is identified as stating that "every word was carefully considered by the Federal Prosecutors." Acosta's deposition is further identified as confirming that the agreement could be read to provide blanket transactional immunity to coconspirators. EFTA00009102:14-17 and related pages. Communications concerning the coconspirator provision are largely absent from the record. Given the documented care devoted to the

wording of the agreement, Petitioner contends that the absence of a record explaining the intent behind this provision warrants targeted factual development rather than an inference that it was incidental.

The Government cannot rely on the disappearance of its own final-stage records regarding the NPA. EFTA00009223:1–18 and EFTA00009224:1–2 are identified as recording Acosta's inability to recall whether he discarded, destroyed, or otherwise disposed of official records and confirming that no Epstein documents were found in his Federal Records Vault. At minimum, the absence requires targeted discovery into custodians, repositories, retention, searches, and the missing final-week drafts of the NPA. It cannot fairly be used as a reason to resolve the resulting ambiguity against Petitioner.

## IV. THE COURT DID NOT RESOLVE WHETHER BRAD EDWARDS WAS THE CONFIDENTIAL WITNESS IDENTIFIED IN GOVERNMENT RECORDS CONCERNING EXHIBIT 52

The Court treated Edwards's involvement with Alfredo Rodriguez and Exhibit 52 as previously known. That did not resolve the question presented by Petitioner. The later evidence concerns whether Edwards was the confidential witness identified in Government records relating to the acquisition, custody, development, or production of Exhibit 52; whether the Government possessed responsive confidential-source information; and whether benefits, agreements, or contemporaneous investigative activity bore on provenance and potentially impeachment material.

Exhibit 97, a Government affidavit, identifies a confidential witness involved in the production of Exhibit 52. Radar Online v. FBI, Dkt. 38 at 28–29, is identified as confirming that the Government maintained confidential-witness records in the Epstein matter. Those records were not produced to the defense. The question whether Edwards was the referenced source was not answered merely by observing that his general involvement was public.

EFTA00207136 supplies a direct, contemporaneous description of Operation Stolen Globe. In the March 22, 2010 email, an AUSA requested grand-jury subpoenas “in the Operation Stolen Globe matter” for telephone numbers supplied in connection with the Epstein investigation. The existence of

Operation Stolen Globe was identified only in the later EFTA files and was not available to the defense at trial or to argue on direct appeal.

That contemporaneous record materially strengthens Petitioner's request for the complete Operation Stolen Globe file, including the attachment identified as excel_subpoena_info.xls, the separate spreadsheet containing the additional telephone numbers, the grand-jury subpoenas and returns, all four Rodriguez deposition CDs and records concerning the defective disks, and communications identifying the participating agents, prosecutors, sources, and recipients. Those materials bear directly on the scope of the joint investigation, Government possession and constructive possession, the provenance and custody of Exhibit 52, and what investigative or impeachment information was withheld from the defense.

EFTA00224991 is separately identified as placing Operation Stolen Globe in the Epstein investigation chronology, with EFTA00211693 linking that operation to Rodriguez and the address book. EFTA02766464 is identified as reflecting that additional persons and materials were within the investigative stream. The later EFTA record therefore supplies a factual predicate that was not available in the appellate record.

**A. The Later Edwards Account Conflicts with the Government's Affidavit and the Rodriguez Deposition**

In a 2024 interview, Edwards reportedly described material events differently from the Government affidavit, including whether Rodriguez had stated that he possessed responsive material. Rodriguez's July deposition at page 245 reportedly shows that Rodriguez did make such a statement and that Edwards anticipated a second deposition. Rodriguez July Dep. at 245. Evidence first published in 2024 could not have been presented at trial, at the Rule 33 hearing, or on direct appeal as part of the original record. The Court should compare the sources directly rather than characterize the later claim as a repetition of the earlier authentication dispute.

The materiality is practical. The Government used Exhibit 52 as evidence whose authenticity, custody, and creation mattered. If an undisclosed confidential source participated in producing it, or if Government records contradicted the account supplied to the defense, the information bore on cross-examination, source bias, chain of custody, and the reliability of the exhibit. The information also bore on the evidence used to adduce that [redacted] was a victim of the charged conspiracy, notwithstanding that she was a non-testifying witness. Petitioner seeks either express resolution on the complete record or narrow discovery and in-camera review of the identified confidential-source files.

## V. THE COURT DID NOT ADDRESS THE MATERIAL ISSUE OF A SHARED THERAPIST AND LONGSTANDING COORDINATION AMONG SDFL, SDNY, PLAINTIFFS' ATTORNEYS, AND WITNESSES

The claim was not that civil counsel became prosecutors by label. It was that Government knowledge of common witness-development channels, financial and professional relationships, organized contacts, and information volunteered by private counsel bore on Brady impeachment, Giglio bias, source independence, constructive possession, and the cumulative reliability of accounts presented as mutually corroborative. A shared therapist also supplied a potential conduit through which victim information could pass between witnesses. That possibility bears on Brady disclosure and impeachment because the defense was entitled to investigate whether apparently independent accounts had been influenced by common information channels.

The trial addressed communications among some witnesses, including group chats. The later EFTA evidence is different. It is offered to establish previously undisclosed common conduits extending over years: a shared therapist; overlapping civil counsel; Government-facilitated victim services and travel; support persons attending meetings; joint or coordinated witness contacts; and information volunteered by financially interested private actors. The existence of such channels does not itself establish that any witness's memory was false. It materially affects whether apparently similar

accounts were genuinely independent and what investigation and cross-examination the defense could have undertaken.

EFTA00190574 is identified as demonstrating cooperation among Randee Kogan, Edwards, and SDFL in 2008. EFTA01650808 is identified as reflecting an Edwards meeting in Florida with SDNY and a victim who referenced visiting Randee Kogan. EFTA00153657 is identified as showing a plaintiffs' attorney coordinating with SDNY and Randee Kogan regarding eligibility for victim funds; EFTA00153653 as coordination with SDNY for victim services; EFTA00010265 as Government-funded victim travel; EFTA01649965 as identifying attorneys, including Kuvin, with whom the Government coordinated victim services; and EFTA01649960 as permitting a "victim support person" at Government contacts. Considered together, these documents are offered as evidence contradicting the premise that the relevant accounts were developed through wholly independent channels.

**A. Civil Counsel Voluntarily Supplied Witness Material to the Government**

EFTA00023751–52 is identified as an email transmitting contemporaneous notes prepared by an investigator or paralegal who attended a deposition of [redacted] because the first deposition volume could not be located. Petitioner states that the defense did not receive those notes. If civil counsel voluntarily provided the notes to prosecutors, the pertinent § 2255 questions are what entered Government possession, how it differed from the deposition ultimately produced, whether it contained favorable or impeachment information, and whether it was disclosed.

The voluntary disclosure also may bear upon work-product waiver, although that issue must be determined from the actual communication and recipient. See In re Steinhardt Partners, L.P., 9 F.3d 230, 235 (2d Cir. 1993); In re von Bulow, 828 F.2d 94, 100–01 (2d Cir. 1987) Privilege doctrine is not the end point. Once witness information entered the prosecution's files or a joint investigative stream, the Court was required to address disclosure, use, and materiality.

**B. The 2008–2011 History Matters**

The later documents trace collaboration to the NPA period and beyond. Petitioner identifies records showing plaintiffs' counsel working with SDFL in 2008, assisting efforts to overturn the NPA through CVRA litigation, locating potential victims, and participating in contacts that preceded formal FBI interviews. See Petition at 27. A post-trial 2022 press interview by Edwards indicated that Villafaña told him about use of the CVRA to challenge the NPA; EFTA00190604 reflects Villafaña and Edwards discussing a plea and Edwards filing the CVRA thereafter. The record further identifies 2011 meetings involving Sharon Churcher, Villafaña, and Edwards. Petitioner contends that the Government elected not to call [redacted] based on information concealed from the defense. Had the defense possessed evidence of the Churcher–Villafaña–Edwards meetings, including allegations that the SDNY subsequently deemed unreliable, the Defense could have made a materially different decision whether to call [redacted] EFTA00206285 reflects that Villafaña opened an investigation based on the meeting with Churcher and Edwards and allegations paid for by Churcher before [redacted] FBI interview days later; the same record reflects Villafaña's concern that Edwards used the "new investigation" to obtain a litigation advantage. Petitioner contends that this is materially different from the "commonplace" conduct described at ER 38. The communications arising from meetings among these participants, including Churcher as a member of the press, are not rendered privileged merely by Edwards's participation; a court declaration at EFTA00098486 states that Edwards did not represent [redacted] at the relevant time and therefore no client attorney privilege attached.

The Court should therefore address the distinct questions Petitioner raised: actual and constructive Government possession; joint investigative activity; records of private witness development; financial or litigation interests; undisclosed common intermediaries; and cumulative impeachment. Rejection of a "de facto prosecutor" label did not decide any of those questions.

The Government stated that because [redacted] was a non-testifying witness no disclosure or Brady obligations attached. This is in direct contradiction to case law. The Government could not extinguish

its Brady obligations by electing not to call [redacted] at trial. The Second Circuit has expressly held that "[t]he fact that [a witness] did not testify at the defendants' trial presents no obstacle to application of Brady and its progeny." *United States v. Jackson*, 345 F.3d 59, 71 (2d Cir. 2003). Indeed, the contrary rule "would permit the government to avoid disclosure of exculpatory or impeachment material simply by not calling the relevant witness to testify." *Id.*; see also *Leka v. Portuondo*, 257 F.3d 89, 102–03, 106 (2d Cir. 2001) (granting habeas relief based upon suppression of favorable information supplied by a witness who did not testify); *Kyles v. Whitley*, 514 U.S. 419, 441–54 (1995) (evaluating suppressed favorable statements, including statements of an informant whom the prosecution did not call).

## VI. THE COURT DID NOT ADDRESS THE ABSENCE OF THE EPSTEIN MATTER FROM ACOSTA'S FEDERAL RECORDS VAULT

The absence of the entire Epstein file from Acosta's Federal Records Vault is not a collateral archival concern. It explains why defense and appellate counsel lacked the drafts, approval communications, communications concerning the coconspirator clause, direct communications between Acosta and Main Justice, and contemporaneous understandings now emerging through EFTA and congressional production. OPR did not cure that deficiency, particularly where it excluded later material. Nor could counsel litigate on direct appeal with records that the Government had not preserved in the expected repository or produced to the defense. This was a matter of interest at appeal as the judges expressly asked the question to which a less than candid response was offered by the Government.

The missing file intersects with the judgment's NPA conclusions. The Court stated that the coconspirator clause was added with little discussion. The newly released drafting materials reportedly state that each clause was material and carefully considered. Acosta reportedly testified that the clause

could be read as blanket transactional immunity for coconspirators. Main Justice and the Deputy Attorney General reviewed the agreement. And correspondence refers to multiple versions and addenda. Where the Government's official repository is empty, those later-released records materially alter the record and justify targeted factual development.

## VII. THE COURT DID NOT ADDRESS ADDITIONAL INTERRELATED EVIDENCE BEARING ON DISCLOSURE, CREDIBILITY, AND CHRONOLOGY

### A. Estate Cooperation, Passenger Manifests, and Defense Access

EFTA00023702 is identified as reflecting Estate-provided deposition material; EFTA00019127 is identified as reflecting volunteered information; EFTA00023208 is identified as reflecting Estate cooperation and assistance, including investigators visiting Epstein properties and the Estate volunteering updates; and EFTA00020668 and EFTA00080576 is identified as reflecting agreement to provisions concerning Petitioner.  House Oversight deposed Estate executor Darren Indyke. Although the official transcript has not been released, Petitioner identifies an unofficial recording/transcript in which Indyke states at approximately 9:05, and again near page 122, that the Estate fully cooperated with the Government, including in 2019.

In light of the Estate's cooperation with the Government, the Birthday Book, flight manifests, the Farmer/Ward letter, and Carolyn's MySpace material require reevaluation. The Government argued that Petitioner had not carried her burden to show Government access to Carolyn's MySpace material. But evidence that the Estate gave the Government access to Epstein-related files, depositions, other materials, and investigative findings materially changes the possession-and-access inquiry. Civil actions against the Executors included allegations in New York Supreme Court that they recruited victims and associates for Epstein's sex-trafficking enterprise and assisted that scheme. The Estate's documented cooperation with the Government must be examined against that background. The defense did not have comparable access to the Estate's files or investigators. Private conduct may constitute

state action where the private actor becomes a willful participant in joint activity with the Government or where Government pressure or significant encouragement makes the challenged conduct fairly attributable to the Government. See United States v. Stein, 541 F.3d 130, 146–53 (2d Cir. 2008). The question here requires factual development concerning the degree of Government direction, encouragement, use, and access—not an assumption that the Estate remained wholly private for disclosure purposes.

**B. [redacted] and Undisclosed Benefit Evidence**

Dkt. 867-1 attached or identified [redacted] signed plea agreement. The Government relied on [redacted] to establish that [redacted] was a victim of the charged conspiracy and to corroborate [redacted] while arguing that he had "nothing to gain from testifying." Tr. 3012:7–8. The June 7, 2021 Giglio material, 3516-005 at 2, reportedly states that [redacted] detainer was removed in 2020 but does not disclose the plea, and the stated dates reportedly conflict with the plea paperwork. [redacted] also changed a material identification detail: on January 3, 2021, he reportedly described no British accent, 3516-002 at 3, but at trial testified to a British accent. Tr. 1748:13–20. The signed plea, disclosure record, and inconsistent accent descriptions should be compared directly.

**C. The Undisclosed Farmer Letter**

The Court adopted the Government's arguments at ER 65 n.25 but did not directly address the Farmer letter or the Government's failure to disclose the letter. Petitioner contends that the letter contradicts Farmer's trial testimony that Thailand was discussed before the New Mexico trip, Tr. 2141:12-22, and her testimony concerning the absence of later contact with Epstein or Maxwell, Tr. 2092:1-15. The letter also identifies a witness who could have addressed the Farmer trip, the date of the New Mexico visit, and the Thailand chronology. Petitioner further identifies Tr. 2517:5-15 as placing the relevant event in 1997 rather than 1996. The point is not cumulative impeachment: a

contemporaneous letter and an identified witness could materially test the chronology presented at trial.

**D. Parkinson, Grand-Jury Access, and the Massage Table**

The Parkinson claim included two distinct propositions. First, his grand-jury testimony was favorable to the defense because it described separate bedrooms and undermined the Government's portrayal of Maxwell's relationship with Epstein. Second, Petitioner challenged Parkinson's trial claim that he personally seized and carried the massage table from the residence. The judgment addressed location but not the asserted false seizure statement. The cumulative prejudice inquiry also included evidence that [redacted] received a deal; that [redacted] stated that [redacted] testimony was coerced; that victim payments under the NPA supplied an incentive, H0-012188; and that Juror 50 later described the massage table as significant. Petitioner further contends that the table depicted in 2019 photographs of East 71st Street—used to corroborate Jane's memory of a massage room and table in 1994—was represented as the same table from Palm Beach that was brought into the courtroom. Petitioner contends that these matters must be assessed cumulatively rather than in isolation.

EFTA00026743 and EFTA00026746 are identified as demonstrating federal access to the state grand-jury material, and EFTA00225073 as showing receipt of the state file. A newly filed complaint by the New Mexico Attorney General separately alleges that, on September 17, 2019, New Mexico transmitted its *entire* investigative file to the Department of Justice as part of a collaboration led by SDNY with the District of New Mexico, including victim interviews, police reports, and recorded interviews. New Mexico v. United States Department of Justice et al., No. 1:26-cv-02762, Compl. 5–7, material never disclosed to the defense. The grand-jury transcript reportedly limits Parkinson's responsibility to search and photography, while the trial transcript records that he carried the table out. G.J. 111:5–10, 114:21–25, 115:1–6; Tr. 1088:3–6, 1089:16–20. EFTA01085223 is identified as showing that the table appeared on a plaintiffs' attorney exhibit list, bearing on custody and access. The

defense could not effectively cross-examine without the contradictory grand-jury testimony and custody information.

The judgment itself records that the 2024 release of Parkinson's transcript proved the Palm Beach clerk's earlier representation inaccurate. Dkt. 869 at 59–60. That admitted failure is not collateral. It makes the Government's actual access, requests, receipt, follow-up, and disclosure concrete factual questions and defeats any assumption that the historical file was complete merely because the prosecution relayed what the clerk had said.

The judgment found that the quoted grand-jury passage did not identify which of two bathrooms Parkinson meant; that any location discrepancy could have been an innocent lapse rather than perjury; and that the search video and Carolyn's testimony corroborated the table's location. Dkt. 869 at 62–64. It further stated that Carolyn's testimony and GXs 801–03—FedEx records reflecting packages sent from New York to Carolyn in Florida and Petitioner's use of the same account—separately established interstate commerce. Id. at 64–65. That conclusion does not answer Petitioner's contention. Evidence of an interstate shipment, without the required nexus to the charged sex-trafficking conduct and the count-specific theory submitted to the jury, does not by itself establish the statutory commerce element. The Government's summation assertion at Tr. 2894–95 is advocacy, not a substitute for proof of that nexus. Juror 50's later statement that the table was ‘crucial’ to interstate commerce further confirms that the table was not merely cumulative on the issue. The motion therefore preserves the contention that the table was the critical commerce evidence while separately arguing that the Court did not address whether the later Parkinson and custody evidence undermined its authentication and provenance.

**E. Chronology, New Mexico, Farmer, and Contemporaneous Records**

The New Mexico issue is not merely whether some building existed at Zorro Ranch. It is whether the particular large residence shown to the New York federal grand jury existed during the period

attributed to the witness's visit. Petitioner identifies EFTA00008946 and EFTA00008928:1–7, historical Google Earth imagery, and construction records as showing that the depicted residence was constructed years later. If the Government affirmatively presented a later residence as the site of an earlier event, the discrepancy bears on the age, credibility, of the witnesses at the relevant time and due process.

The chronology problem is broader. To corroborate Jane's testimony, the Government told the grand jury that Petitioner imposed household rules beginning in 1994, including a rule not to look Epstein in the eyes; the Court later concluded that the rules facilitated Epstein's abuse beginning in 1994. Petitioner contends that the evidence proved that the rules did not begin until 2000 or 2001. EFTA02731118 places their commencement in that later period, and Government witness Alessi likewise testified at trial to the later chronology. Tr. 806:6–9, 784:9–12. The Government also told the grand jury that Epstein owned East 71st Street in 1994. EFTA00008994; EFTA00008927:24–25; EFTA00008928:1–7. Yet Petitioner contends that records prove that the property remained under Wexner's control and was not owned by Epstein until 1998. EFTA02731146–02731147. The Government introduced 2019 photographs, which the Court treated as corroborating Jane's memory of the interior in 1994. Petitioner contends that the Government knew those photographs did not depict the property as it existed in 1994. These discrepancies, taken together, support Petitioner's contention that the chronology was repeatedly moved backward to impact the age of the witnesses at the relevant time. On Petitioner's chronology, Jane would have been approximately nineteen or twenty when she went to the ranch. Petitioner also supplied affidavits from [redacted] and Kevin Moran to challenge the 1994 timeline. The same chronological problem applies to Kinnerton Street: Petitioner contends that Kate would have been approximately twenty or twenty-one when the property was purchased and subsequently became habitable. The Ward/Farmer materials, diary, Birthday Book, passenger manifests, and property records are additional contemporaneous tests of the chronology and age of the witness.

**F. Juror 50 and Evidence That Did Not Exist at the Rule 33 Hearing**

Petitioner recognizes that Juror 50's nondisclosure was litigated. The present Rule 59(e) issue, however, concerns evidence that was not part of the record available for direct appeal. The Paramount+ material post-dated Judge Nathan's ruling and was not part of the appellate record. Reporting published in 2024 supplies additional dates and statements bearing on the sequence. Crawley reports that she spoke with Juror 50 on December 31, days before his Daily Mail interview. Petitioner contends that this new chronology does not align with the factual premise on which the earlier credibility determination rested.

The later evidence is offered not simply to repeat that Juror 50 had failed to disclose abuse. Judge Nathan's determination proceeded on the understanding that Juror 50 had not shared his abuse story with the media before the relevant interview sequence. Crawley's later account states that he discussed the matter with her "on the record." Petitioner contends that this is a significant factual development unavailable on direct appeal because it was not part of the record. The later reporting also states that Crawley spoke with other jurors about deliberations and that jurors discussed or concealed their own abuse experiences, although no juror admitted such abuse during the Rule 33 proceedings. Juror 50 further stated in the Paramount+ interview that he spoke after another juror revealed that juror's own abuse. These later statements bear on the completeness of the prior inquiry and the factual basis for the credibility findings.

The Court held that Judge Nathan necessarily rejected the contention that Juror 50 recognized his questionnaire error before the Daily Mail interview, and that later reporting merely rehashed earlier material. Dkt. 869 at 17–18 & n.11. Petitioner contends that the 2024 reporting and Paramount+ material add facts not contained in the Rule 33 record: the December 31 contact with Crawley, the asserted on-the-record disclosure, contacts with other jurors concerning deliberations and abuse, and Juror 50's account that he spoke after another juror revealed abuse. Those matters could not have been

added to the direct-appeal record merely because the general subject of Juror 50's nondisclosure was already known. See Fed. R. App. P. 10(a), (e).

## VIII. THE COURT DID NOT ADDRESS THE SIGNIFICANCE OF LONGSTANDING COORDINATION AMONG PLAINTIFFS' COUNSEL, THE GOVERNMENT, AND THE PRESS BEGINNING IN 2008

The later-produced record does not begin with contacts shortly before the Maxwell prosecution. Petitioner identifies a history beginning in 2008 in which plaintiffs' attorneys worked with SDFL personnel, pursued CVRA litigation directed at undoing or circumventing the NPA, located and developed potential witnesses, and interacted with members of the press. She further identifies 2011 contacts among plaintiffs' counsel, Government personnel, and journalist Sharon Churcher before a formal FBI interview. The historical sequence matters because it bears on the origin, independence, incentives, and transmission of information later relied upon by the SDNY.

The issue is not resolved by observing that civil attorneys represented victims or communicated with prosecutors. Petitioner's point is that a sustained, mutually reinforcing relationship among civil counsel, Government personnel, and the press generated Government knowledge of witness development and impeachment information long before trial. The Court was required to address what information entered Government hands, what private-source biases were known, and whether allegedly independent accounts had in fact common origins or intermediaries.

## IX. THE COURT DID NOT ADDRESS THE DISCLOSURE CHRONOLOGY INDICATING THAT THE GOVERNMENT MAY NOT HAVE COMPLIED WITH THE COURT'S CONTINUING-DISCLOSURE ORDERS

Petitioner identified an apparent discrepancy between the Government's disclosure chronology and the obligations imposed by Dkts. 63, 68, 207, and 239. The issue is not the abstract existence of Brady obligations. It is whether the identified orders required continuing production, whether responsive material was then in Government possession or accessible through cooperating agencies or actors, and whether the production occurred within the schedule the Court directed.

The four orders and the corresponding production dates should be considered in sequence. If Dkt. 68 or another order required production without regard to the Government's unilateral view of relevance, a later assertion that withheld information would have been cumulative does not establish compliance. The Court should determine what was possessed, when it was reviewed, when it was produced, and whether an identified order was ignored or misconstrued. Petitioner does not characterize noncompliance as established until the orders and production record are compared directly.

## X. THE COURT DID NOT ADDRESS THE EVIDENTIARY QUESTIONS CONCERNING THE SWEET COMMUNICATIONS, THE HRH PHOTOGRAPH, THE FARMER DIARY, AND THE CONFIDENTIALITY AGREEMENT

### A. The Sweet Communications

Petitioner requested communications involving Judge Sweet that she contends fell within a broad Government subpoena and should therefore have been obtained or produced. The Government produced ex parte communications between itself and Sweet that Petitioner had not requested, but did not produce the requested communications. Petitioner expects the requested material to bear on cooperation between Government personnel and plaintiffs' counsel before 2018. That expectation must be tested through the actual subpoena and communications; the discrepancy itself warranted an answer rather than silence from the Court.

### B. The HRH Photograph

The Government responded to Petitioner's photograph contention by pointing to a different photograph. EFTA01660401 is identified as suggesting that an undated or 1997 photograph existed in Government hands and would bear on plaintiffs' counsel assisting a renewed investigation in 2011. The Court should address the photograph Petitioner identified, not seek to deflect and dispose of the contention through a reference to an entirely separate image.

### C. The Farmer Diary

Petitioner argued that Farmer's attorney acknowledged after trial that Farmer kept a diary during the period of her association with Epstein and Maxwell, contrary to an earlier representation by plaintiffs' counsel to the Government. The later-released Farmer letter increases the diary's significance because it reportedly indicates that Thailand was not discussed until after the New Mexico trip. That chronology bears on the accuracy of trial testimony, the completeness of disclosure, and the need to obtain the diary or establish what portions were reviewed by the Government.

### D. The Confidentiality Agreement

The Government characterized the withheld confidentiality-agreement material as cumulative. Petitioner disputes that characterization and invokes Judge Nathan's continuing-disclosure order, which she understands to require production even where the Government did not regard an item as independently significant. If the order foreclosed unilateral withholding on cumulative-relevance grounds, the Government's response did not resolve their noncompliance.

## XI. THE COURT DID NOT ADDRESS FORMER ATTORNEY GENERAL BARR'S LATER TESTIMONY CONCERNING MDC AND PETITIONER'S INCARCERATION

Petitioner's MDC claim cited former Attorney General William Barr's 2025 House testimony. The Government itself quoted Barr as stating that Petitioner's "initial confinement was quite severe because she was watched 24/7." Opp'n 76 (citing Pet. 49; Ex. 25 at 120–21) . Judge Nathan had already found that Petitioner endured "additional isolation and surveillance," a finding the judgment repeats. Dkt. 869 at 53. Yet the judgment resolved the claim by repeating the earlier sentencing assessment without addressing Barr's later testimony. The Court's own words and Barr's later testimony therefore identify the overlooked factual issue; this is not an abstract effort to relitigate prison conditions.

## XII. THE COURT DID NOT ADDRESS NEW EVIDENCE THAT PETITIONER COULD NOT HAVE RAISED EARLIER CONCERNING PREJUDICE FROM THE DELAYED PROSECUTION

Petitioner's delayed-prosecution claim now rests on information that was unavailable at trial and on direct appeal: later-disclosed Estate cooperation; missing or destroyed historical Government records; Acosta's entire Epstein file deleted, missing 302s and witness statements, grand-jury and investigative materials not supplied to the defense; the development over time of common contacts among complainants, counsel, therapists, support persons, and Government personnel; and the loss of access to Epstein and other sources. The passage of time is not itself prejudice; however, the delay permitted press contamination and prejudice to develop regarding all aspects of the trial. The specific inquiry is how the delay impaired identified defenses and whether the Government gained a tactical or evidentiary advantage from materials unavailable to Petitioner. EFTA00225084, EFTA00190609. Petitioner further identifies the Government's response at footnote 31 as confirming that at least one 302 is missing, and EFTA00225084 as indicating that Villafana may not have retained records concerning more than one witness.

The resulting prejudice was concrete. The Government argued at footnote 24 of its response that it produced [redacted] 302s, but Petitioner states that those productions concerned interviews beginning in 2019. The Government further argued that any additional 302 would be cumulative. Petitioner disputes that analysis. Earlier interview records could identify with whom [redacted] interacted, supply a chronology materially different from the trial chronology, and disclose information concerning a settlement that Petitioner states appeared in the [redacted] 302 but was neither produced nor acknowledged by the Government. With Epstein deceased, the Government obtained access to a universe of Estate material while the defense lacked comparable access to evidence needed to test the prosecution chronology and witness accounts. Judge Nathan's discovery order imposed affirmative and continuing disclosure obligations on the Government. Those obligations frame the prejudice inquiry: whether favorable material in the Government's possession, or obtainable from participating federal,

state, and local investigative actors, was timely disclosed rather than withheld as supposedly cumulative.

The Government's characterization of missing interview materials as merely "cumulative" cannot substitute for examination of the materials themselves. That proposition has acquired particular significance since the Court's judgment. In *Phang v. Blanche*, No. 1:26-cv-01417 (EGS), ECF No. 43, at 12 (D.D.C. Sept. 16, 2026), Judge Emmet G. Sullivan rejected the Government's assertion that underlying FBI interview notes could be withheld because they were "substantially similar to" and therefore duplicative of the resulting FD-302 reports. Judge Sullivan specifically found that "[t]he underlying handwritten notes are not duplicates of the FD-302 interview reports." *Id.* The significance here is not that *Phang* establishes a Brady rule; it does not. Rather, it confirms the fallacy in assuming that an FBI interview record is interchangeable with a later 302—or that undisclosed interview material may be dismissed as "cumulative" without examining what it actually contains. That distinction is especially consequential where the missing material could establish a different chronology, identify interactions with persons other than Petitioner, reveal investigative leads, or otherwise supply favorable information absent from the reports actually disclosed.

The delayed-prosecution prejudice analysis must also account for the later-disclosed Acosta promises and NPA drafting history. Petitioner contends that those materials bear on what protections were promised to coconspirators, what the Government understood the agreement to accomplish, and what evidence was unavailable to the defense when it was required to investigate and litigate those issues.

The Court should distinguish an argument that could have been made in general terms from later evidence supplying the factual basis for it. Evidence that did not exist, was not disclosed, or was outside the appellate record could not have been presented earlier. Each delayed-prosecution item should be tied to its disclosure date, its concrete effect on investigation or cross-examination, and the first procedurally available opportunity to present it.

## XIII. THE COURT'S CHARACTERIZATIONS OF PETITIONER'S EFTA PRESENTATION CANNOT BE DIVORCED FROM THE ACCESS IT DENIED

Petitioner challenges the Court's descriptions of her EFTA presentation as a ‘ragtag’ collection or as documents of unknown provenance. Those descriptions cannot be separated from the procedural record: Petitioner repeatedly sought practical access to public and unredacted EFTA material, lacked ordinary computer and Internet access, and was denied the means necessary to search and organize an enormous production. A court cannot deny access and the means of substantiation and then treat the resulting limitations as proof that substantiation does not exist.

Further the Government failed to comply with Judge Nathan’s order Dkt 68 which stated in its relevant part, that the Government [which] includes all current former Federal State and local prosecutors, law enforcement officers and other officers to have participated in the prosecution or investigation that led to the prosecution for the offense or offenses for which the defendant is charged… that The Government has an affirmative obligation to seek from such sources … the government must disclose to the defense all information favorable to an accused material to either guilt or punishment. The Government failed to disclose the EFTA documents which clearly fall within this Order.

Docket 63, was filed, 10/ 7/20, it is the government's discovery plan. Docket 68, was filed 11/5/20. J. Nathan's discovery order. Docket, 207. Filed 4/16/21. J. Nathan denied the non prosecution agreement. Docket 239, filed 4/ 23/21 in which the government confirmed it did not use search terms relevant to the NPA. (page 5. Dkt 239)

Petitioner further relies on Judge Sullivan’s observations in Phang concerning the practical distinction between public disclosure and meaningful access. The Court's assumption that public release of EFTA material rendered that material meaningfully available to Petitioner is difficult to reconcile with the practical reality recognized in Phang v. Blanche, No. 1:26-cv-01417 (EGS) (D.D.C. June 25, 2026). In addressing the ability of an investigative journalist to make meaningful use of the

EFTA production, Judge Sullivan recognized the essential role of journalists who, "through their reporting are able to mediate the contents of the Epstein Files for the general public." ECF No. 16 at 25. The distinction between technical publication and meaningful access is critical here. If a professional investigative journalist with unlimited Internet access, research tools, and the ability personally to review the EFTA database requires meaningful access to the underlying records in order to identify, synthesize, and report their significance, the mere placement of millions of pages into the EFTA Library cannot reasonably be treated as meaningful access by an incarcerated pro se Petitioner who has no Internet access, no computer, and no ability to search that database. The comparison is not offered as authority for the merits. It illustrates the practical access problem the Court was required to address before drawing adverse inferences from the form of a pro se incarcerated litigant's submission and branding it as "ragtag."

## XIV. THE COURT SHOULD ADDRESS PETITIONER'S EARLIER LETTERS REQUESTING ACCESS, REDACTION RELIEF, RECONSIDERATION, AND A CERTIFICATE OF APPEALABILITY

Petitioner asks that the record include the letter accompanying her first petition in which she sought assistance with redactions, and the later request for appealability or certification in which she sought access to EFTA documents already in the public domain. The judgment reportedly referenced only her request for unredacted material. The distinction matters because a request for workable access to public documents did not depend upon entitlement to unredacted law-enforcement material.

## XV. MATERIAL EVIDENCE PRESENTED IN PETITIONER'S AUGUST 19, 2026 SUPPLEMENTAL SUBMISSION MUST BE EXPRESSLY ADDRESSED

Petitioner's August 19, 2026 supplemental submission, Dkt. 867-1, identified evidence that became available after the Reply or whose constitutional significance emerged only as additional EFTA records were located. Its omission from a procedural history would not, standing alone, establish that it was overlooked. The material issue is whether the judgment resolved the substantive

propositions presented there before characterizing related claims as unsupported, previously available, cumulative, or speculative.

Dkt. 867-1 included the [redacted] plea and Giglio issue; the Ward/Farmer communications; the Acosta Federal Records Vault evidence; Main Justice and New York evidence concerning the NPA; Estate cooperation and passenger manifests; Edwards, Operation Stolen Globe, and Exhibit 52; plaintiffs' counsel and common-intermediary evidence; and additional chronology and impeachment material. The Court should state whether it considered those propositions and decide them on the record actually presented. Incorporation of an opposition filed before or without substantive treatment of the supplemental evidence does not answer whether that later evidence materially altered the constitutional analysis.

## XVI. PUBLIC REDACTION OF EFTA MATERIAL DID NOT RESOLVE THE GOVERNMENT'S PRETRIAL DISCLOSURE OBLIGATIONS

The fact that an EFTA page is publicly redacted does not establish that the underlying information was unavailable to the Government before trial, immaterial, or properly withheld from the defense. Public-release redactions may reflect privacy, investigative, statutory, or third-party interests unrelated to Brady or Giglio. The relevant questions are what the Government possessed in unredacted form, when it possessed it, whether the information was favorable or impeaching, and what was disclosed to the defense.

Where Petitioner identified a specific redacted document and explained its apparent relationship to a claim, the Court could order in-camera review, direct the Government to identify the corresponding trial-production Bates number, or permit protected disclosure to counsel. Rejecting the claim because Petitioner could not state the concealed content would impose an impossible burden created by the redaction itself. This point is distinct from a demand for wholesale public release of unredacted EFTA material.

## XVII. THE COURT DID NOT ADDRESS THE RECAREY EVIDENCE AND THE INTEGRITY AND COMPLETENESS OF THE PALM BEACH INVESTIGATIVE RECORD

Petitioner identified evidence that Palm Beach investigative materials remained in Detective Recarey's possession outside the ordinary repository and that materials located after his death had to be returned. Petitioner need not allege alteration, destruction, or intentional concealment. The narrower issue is whether the historical investigative file used by federal prosecutors was complete. EFTA01085223 is identified as showing the massage table on a plaintiffs' attorney exhibit list, suggesting that the table passed through or was accessible within a private litigation evidentiary stream , with no preservation of custody rather than remaining continuously secured in an official law-enforcement repository with rigorous chain of custody compliance.

The record should establish what materials existed; what was found outside the official repository; whether it was inventoried; whether federal prosecutors obtained it; whether it included favorable, impeaching, chain-of-custody, or witness-development information; and whether responsive material was disclosed. The Recarey issue bears directly on Petitioner's inability to establish the completeness of a Government record that the judgment treated as sufficient.

## XVIII. THE COURT SHOULD RECONSIDER SELECTIVE PROSECUTION IN LIGHT OF LATER-DISCLOSED COCONSPIRATOR AND COMPARATOR EVIDENCE

The judgment held that the selective-prosecution claim was procedurally barred and stated on the merits that Petitioner had not identified another person who assisted Epstein in a comparable manner or an EFTA record revealing an uncharged confederate. ER 39–41. Petitioner contends that later EFTA records bear directly on that factual premise. EFTA00173201–203 is identified as a previously unknown list of alleged coconspirators that included men. EFTA00037556, an August 25, 2019 Government communication, reportedly states that the team was focused on charges against a different coconspirator and was engaged with counsel for all coconspirators.

Petitioner further identified Wexner and Leon Black as real persons requiring comparison and cited EFTA02766464 and EFTA02766477 concerning Wexner, plaintiffs' counsel, and related arrangements. The existence of a name in a file does not establish that the person was similarly situated or that a charging decision was unconstitutional. It does, however, answer the narrower premise that Petitioner identified no persons or records capable of comparison and supports targeted development of conduct, evidence, cooperation, plea, settlement, and charging circumstances.

## XIX. THE COURT DID NOT ADDRESS THE FULL CHRONOLOGY EVIDENCE CONCERNING HOUSEHOLD RULES, EAST 71ST STREET, NEW MEXICO, AND AGE

Petitioner's chronology argument extended beyond the date of the New Mexico residence. EFTA02731118 is identified as an SDNY memorandum reflecting that Alessi placed the household rules or no-eye-contact practices beginning in 2000, while the trial testimony is identified as placing them in 2001–2002. Tr. 806:6–9; 784:9–12. Those dates should be compared against any argument or presentation placing the same practices in 1994–1997. The issue is whether later practices were used to corroborate materially earlier alleged conduct.

The same analysis applies to East 71st Street. The relevant comparison is the precise property, occupancy, or configuration proposition; the date range attributed to the witness; the objective ownership, construction, or occupancy record; and the witness's age. A premises discrepancy matters only when tied to the testimony and a count or material credibility determination; once tied, it is not collateral.

For New Mexico, the controlling comparison remains the particular residence shown or described to the New York federal grand jury, its objective construction chronology, the date assigned to the alleged event, and the witness's resulting age. The Government's knowledge or ability to know the discrepancy must be established before characterizing the issue under Napue. If knowledge cannot be shown, the same record may still bear on Brady, chronology, credibility, and prejudice.

## XX. THE COURT DID NOT ADDRESS THE DISTINCT CONTENT OF THE BIRTHDAY BOOK, CAROLYN MATERIAL, AND OTHER CONTEMPORANEOUS RECORDS

Knowledge that a physical birthday book existed is not equivalent to possession or knowledge of particular entries, accompanying letters, or later-disclosed contents. Petitioner attached or identified a specific entry associated with a witness and contends that separate letters described when or how persons met Epstein in ways that conflict with trial testimony. The Court should compare the actual contents with what the defense possessed before trial rather than treat general knowledge of the book as dispositive.

Petitioner also contends that the Estate volunteered records, depositions, and investigative findings that could include witness-related material concerning Carolyn, including MySpace evidence. The present record does not permit an assertion that the Estate in fact supplied any particular MySpace item. The proper question is whether such material existed in the Estate collection, whether the Government requested or received it, and whether responsive favorable or impeaching information was disclosed. EFTA00019129, EFTA00023207–08, EFTA00023702.

The Farmer diary, birthday-book material, passenger manifests, Ward communications, property records, and contemporaneous online material share a constitutional function: each tests later recollection through a record created closer to the events. Their collective force cannot be measured by dismissing each item as independently cumulative.

## XXI. PROCEDURAL DEFAULT CANNOT REST ON CONFLATING A PREVIOUSLY KNOWN SUBJECT WITH LATER EVIDENCE THAT DID NOT EXIST OR WAS NOT DISCLOSED

For each claim found defaulted, the Court should identify whether the merits were also reached, what evidence was actually available at trial and on direct appeal, what evidence arose later, and whether cause and prejudice were addressed. Evidence that did not yet exist could not have been

presented earlier. Evidence existing in Government files but suppressed presents a different cause inquiry. Public availability years later does not establish availability at the procedurally relevant time.

The same distinction governs the podcasts, documentaries, books, later interviews, congressional releases, EFTA productions, and Estate disclosures. The final record should identify the speaker or author, publication date, relevant statement, date Petitioner learned of it, and the first procedurally available opportunity to present it. A previously litigated subject is not necessarily the same claim when later evidence materially changes the factual predicate.

Nor could direct appeal ordinarily supply the missing factual forum. Federal Rule of Appellate Procedure 10(a) defines the appellate record; Rule 10(e) permits correction, not initial development of post-record facts. Section 2255 was the mechanism in which those facts could be developed. Procedural default should not be imposed for failing to perform an act the appellate rules did not permit.

## XXII. THE JUDGMENT DID NOT RESOLVE PETITIONER'S PRESERVED CONTENTIONS ON THE RECORD ACTUALLY PRESENTED

### A. Constructive Amendment

The Court held that the constructive-amendment claim was the same claim rejected on direct appeal: the trial instructions and summation tied Count Four to New York law and New York travel, and the admission of New Mexico evidence did not alter the charged theory. Dkt. 869 at 30–34. Petitioner does not accept that characterization or waive the claim. She further submits that the later objective construction, property, and grand-jury records present an additional and distinct question: whether the Government used a later residence to corroborate an earlier alleged event and withheld or overlooked favorable chronology evidence. The Court must address both the preserved constructive-amendment contention and the later-evidence issues under Brady, Napue, and due-process standards.

**B. Sentencing Contentions**

The judgment states that Judge Nathan selected the 2003 Guidelines Manual and calculated a fine range of $20,000 to $200,000 on each count, but imposed $250,000 on each of three counts. Dkt. 869 at 46–49. Section §3571(b)(3) supplied a statutory ceiling; it did not make the above-Guidelines fine self-justifying. The judgment did not address whether the sentencing court identified the fine as an upward variance, gave an adequate count-specific and § 3553(a) explanation, made the findings required by 18 U.S.C. § 3572 and U.S.S.G. § 5E1.2, considered ability to pay, or relied on disputed financial information. Petitioner preserves the contention that a $750,000 fine exceeding the applicable Guidelines ceiling required lawful notice, support, and explanation.

The judgment also upheld consideration of conduct alleged in the severed and later-dismissed perjury counts. Dkt. 869 at 49–51. Petitioner does not concede that the allegations were reliable, accurately proved, properly noticed, or lawfully used in the manner employed. She preserves all record-supported objections, including the distinction between abstract authority to consider reliable uncharged conduct and the constitutional and procedural adequacy of the particular findings made here.

The Court separately upheld the additional victim groups and leadership enhancement, noting that the latter was affirmed on appeal and relying in part on Petitioner's July 24, 2025 interview. Id. at 49–53. Petitioner disputes the judgment's use and characterization of that interview and does not waive any contention based on later evidence, inaccurate chronology, disclosure failures, lack of supervision, or the distinction between remaining 'around' Epstein and directing a criminal participant. The mandate rule does not authorize disposition of a materially different factual record without addressing why the later evidence fails to alter the predicate. The MDC issue is separately addressed above because Petitioner identifies later testimony by former Attorney General Barr that the judgment did not discuss.

### C. Exhibit 52

The judgment relied on Alessi's testimony, the limiting instruction, discovery concerning Edwards's known role in Rodriguez's attempted sale, and its characterization of EFTA00608040. Dkt. 869 at 54–57. Petitioner does not concede that Alessi's testimony established the identity, integrity, creation, or unbroken custody of GX 52, or that disclosure of Edwards's general involvement satisfied the Government's obligations concerning confidential-source records, benefits, investigative accommodations, contradictory accounts, and provenance. Those later, document-specific issues were not resolved by the original Rule 901 ruling or limiting instruction.

## XXIII. CUMULATIVE MATERIALITY, FACTUAL DEVELOPMENT, AND A CERTIFICATE OF APPEALABILITY

The evidence must be considered cumulatively: New York and Main Justice involvement; missing NPA records and multiple drafts; confidential-source evidence concerning Exhibit 52; longstanding Government-private witness development; common intermediaries; Estate cooperation and manifests; [redacted] Parkinson; Farmer and New Mexico chronology; the diary and birthday book; and the later Juror 50 evidence. The constitutional question is whether the combined favorable evidence undermines confidence in the result and whether unresolved factual disputes required development—not whether any single page independently compelled vacatur.

If the present record does not permit resolution, the appropriate alternative is narrow development tied to identified documents and disputes: Rule 6 discovery; Rule 7 expansion; in-camera review and protected disclosure of unredacted confidential-source materials; identification of production Bates numbers; the NPA drafts and repository-search record; Estate production inventories; passenger manifests; relevant grand-jury materials; and an evidentiary hearing under § 2255(b). Petitioner does not request an unrestricted inquiry into every Epstein file.

The Court held that a hearing requires specific facts supported by competent evidence that create a detailed, consequential factual dispute, and that conclusory assertions, hearsay, and speculation are insufficient. Dkt. 869 at 65–67. Petitioner's request should be measured claim by claim under that standard. The identified NPA drafts and approval records, confidential-source files, Estate production inventories, grand-jury-access records, and specific Government communications are defined evidentiary subjects. Where the submitted page is incomplete or redacted, Petitioner requests in-camera review or record expansion before testimony; where competing authenticated records establish a material dispute, she requests a hearing limited to that dispute. This staged request does not depend on an 'airy generality' or a demand to explore every file.

The judgment stated that there was 'no fact' fairly put in dispute with potential to affect the result. Dkt. 869 at 66. Its own account of the later Parkinson transcript—an existing official record previously reported nonexistent—demonstrates otherwise. The identified disputes concerning Government access, NPA approval and scope, confidential-source records, Estate productions, witness-development channels, and chronology likewise concern ascertainable documents, custodians, dates, and communications. They are the specific, controverted factual issues the judgment stated were required.

If substantive relief is denied, a certificate of appealability should issue on the cumulative-Brady methodology; the treatment of genuinely later evidence as previously available; denial of meaningful EFTA access followed by reliance on lack of substantiation; the NPA/Main Justice and missing-record issues; confidential-source and Government-private cooperation issues; and the denial of factual development. Reasonable jurists could debate both the constitutional rulings and the procedures used to resolve them.

**CONCLUSION**

For the foregoing reasons, Petitioner respectfully requests that the Court alter or amend the judgment under Rule 59(e). Alternatively, she requests narrowly tailored discovery under Rule 6,

expansion of the record under Rule 7, in-camera review and protected disclosure where appropriate, an evidentiary hearing under 28 U.S.C. § 2255(b), reconsideration of the certificate of appealability, and such other relief as the Court deems just and proper.

Dated: September 22, 2026

Respectfully submitted,

/s/ Ghislaine Maxwell
Ghislaine Maxwell, Pro Se
02879-509

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

UNITED STATES OF AMERICA,

Respondent,

-v-

GHISLAINE MAXWELL,

Petitioner.

20 Cr. 330 (PAE)

25 Civ. 10468 (PAE)

**PETITIONER GHISLAINE MAXWELL'S REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF HER MOTION PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 59(e)**
**TO ALTER OR AMEND THE JUDGMENT**

Petitioner Ghislaine Maxwell respectfully requests, pursuant to Federal Rule of Evidence 201, that the Court take judicial notice of two narrow categories of materials submitted in support of her motion under Federal Rule of Civil Procedure 59(e): (1) Google Earth historical imagery of Zorro Ranch in Stanley, Santa Fe County, New Mexico, dated October 5, 1997 and July 31, 2005, together with the corresponding on-screen source-attribution information; and (2) specified public court records in State of Florida v. [redacted], Case No. [redacted], Circuit Court of the Fifteenth Judicial Circuit, Palm Beach County, Florida. The request is confined to facts capable of accurate and ready determination and to the existence, dates, contents, and legal effect of the public court filings. Petitioner does not ask the Court to judicially notice disputed testimonial inferences or to treat allegations in another proceeding as true.

## I. GOVERNING STANDARD

Federal Rule of Evidence 201 permits judicial notice of an adjudicative fact that is not subject to reasonable dispute because it is generally known within the trial court's territorial jurisdiction or "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). When a party requests judicial notice and supplies the necessary information, the Court "must take judicial notice." Fed. R. Evid. 201(c)(2). Judicial notice may be taken "at any stage of the proceeding." Fed. R. Evid. 201(d).

The Second Circuit has also made clear that courts routinely take judicial notice of documents filed in other courts, not for the truth of disputed factual assertions in the other litigation, but to establish the fact of the litigation and the existence and contents of the related filings. Kramer v. Time Warner Inc., 937 F.2d 767, 774 (2d Cir. 1991). That is the limited use requested here with respect to the [redacted] records.

## II. GOOGLE EARTH HISTORICAL IMAGERY OF ZORRO RANCH

The Google Earth materials permit a direct comparison of the same Zorro Ranch location at materially different points in time. The October 5, 1997 historical image is identified by Google Earth as a black-and-white aerial image whose underlying imagery is attributed through Google Earth's on-screen "Data attribution" panel to the U.S. Geological Survey. The July 31, 2005 historical image is identified by Google Earth as a natural-color aerial image whose underlying imagery is attributed through the same on-screen mechanism to NMRGIS, the New Mexico

Resource Geographic Information System. The attribution captures were independently re-confirmed on September 13, 2026.

The October 5, 1997 image depicts the ranch before construction of the later main residential compound: no main residence structure is visible, while the July 31, 2005 image depicts a large developed residential compound, outbuildings, formal access roads, cleared and landscaped areas, and a substantially altered ground footprint. The two images use the same identified camera position, permitting the Court to compare the physical site rather than rely on a verbal reconstruction.

The significance is narrow but material to the Rule 59(e) motion. Petitioner contends that trial evidence used a later image and physical configuration of Zorro Ranch as corroboration of testimony concerning an earlier visit. The historical imagery supplies a date-specific, independently reproducible means of determining what structures were, and were not, present at the location during the relevant period. Petitioner does not ask the Court to judicially notice the credibility of any witness or the ultimate inference to be drawn. She asks the Court to notice the dated imagery, its source attribution and metadata, and the objectively visible difference in the site's physical development between October 1997 and July 2005.

The official August 5, 2026 Interim Report of the New Mexico Survivors' Truth Commission independently states, based on Santa Fe County Assessor information, that the three-story 28,636-square-foot main residence was constructed in 1999. Petitioner submits the pertinent pages as corroborative public material. The request does not depend on accepting the Commission's broader conclusions concerning Epstein or Zorro Ranch.

**III. THE [redacted] FLORIDA COURT RECORDS**

Petitioner separately requests judicial notice of the official public docket and specified docket entries in State of Florida v. [redacted], Case No. [redacted], Circuit Court of the Fifteenth Judicial Circuit, in and for Palm Beach County, Florida. The official docket is publicly accessible through the Palm Beach County Clerk of the Circuit Court & Comptroller's eCaseView system by searching that case number. The docket identifies [redacted] as the defendant and contains [redacted] docket entries.

First, Docket Index No. [redacted] is an Order of Revocation of Probation entered March 1, 2018, nunc pro tunc December 15, 2017, by Circuit Judge Samantha Schosberg Feuer. The docket material states that [redacted] probation "was terminated the same day of plea by the courts" and

directs the reader to the attached plea agreement. The Clerk's electronic certification information identifies a June 8, 2026 re-certification and Unique Reference No. [redacted]. Petitioner requests notice of the existence, filing date, and contents of the official court record and of the court action reflected in it.

Second, Docket Index No. [redacted] is a Waiver of Rights Sheet filed December 15, 2017 and signed by [redacted] and his counsel. Paragraph 11 states that no promises or representations induced the plea other than those contained in the written plea agreement, and that the only promises or representations made to [redacted] were those listed in that agreement. Petitioner requests notice of the existence, filing date, and contents of that official docket entry, not judicial notice of disputed extrinsic facts.

These records matter because the Rule 59(e) motion challenges the treatment of the [redacted] material and the cumulative significance of evidence bearing on benefits, inducements, cooperation, and disclosure. The Florida court records are not offered to establish by judicial fiat why [redacted] acted as he did. They are offered to establish what the Florida court record itself shows concerning the disposition of his probation and the written terms to which his plea documents expressly refer. The evidentiary significance of those noticed facts remains for the Court to evaluate together with the existing Maxwell record.

## IV. THE REQUEST IS LIMITED AND PROCEDURALLY PROPER

This request does not ask the Court to enlarge Rule 59(e) into a vehicle for relitigating the case. The materials are offered for the limited purposes identified in the accompanying motion: to permit accurate consideration of objective, date-specific physical evidence concerning Zorro Ranch and of public judicial records concerning [redacted] Rule 201(d) expressly permits judicial notice at any stage of the proceeding, and Kramer permits notice of court filings for their existence and contents without treating disputed assertions in another proceeding as true.

The Google Earth exhibits are likewise submitted as fixed exhibits rather than as an invitation to conduct independent Internet research. Each image is accompanied by identifying date, location, camera information, and the source-attribution panel for the same historical view. The Court therefore can determine precisely what is being presented and the limited factual propositions for which notice is sought.

## V. MATERIALS SUBMITTED

**Exhibit A:** Google Earth Web historical image of Zorro Ranch dated October 5, 1997, with underlying imagery attributed by Google Earth to the U.S. Geological Survey.

**Exhibit B:** Google Earth on-screen data-attribution capture for the October 5, 1997 historical image, independently re-confirmed September 13, 2026.

**Exhibit C:** Google Earth Web historical image of Zorro Ranch dated July 31, 2005, with underlying imagery attributed by Google Earth to NMRGIS.

**Exhibit D:** Google Earth on-screen data-attribution capture for the July 31, 2005 historical image, independently re-confirmed September 13, 2026.

**Exhibit E:** Pertinent pages of the August 5, 2026 New Mexico Survivors' Truth Commission Interim Report addressing construction and improvements at Zorro Ranch.

**Exhibit F: Public docket and identifying information for State of Florida v. [redacted], Case No. [redacted], Circuit Court of the Fifteenth Judicial Circuit, Palm Beach County, Florida, including the official Palm Beach County Clerk eCaseView access information and citations to Docket Index Nos. [redacted] and [redacted] Official Clerk eCaseView: [redacted] electronic-certification verification: [redacted]**

**The underlying [redacted] court records are publicly accessible through the Clerk's official electronic docket. Exhibit F is supplied as a roadmap to the official source; Petitioner does not represent that certified paper copies are attached.**

**CONCLUSION**

For these reasons, Petitioner respectfully requests that the Court take judicial notice of Exhibits A through F for the limited purposes stated above and consider the noticed materials in resolving Petitioner's motion under Federal Rule of Civil Procedure 59(e).

Dated: September 22, 2026

Respectfully submitted,

/s/ Ghislaine Maxwell

Ghislaine Maxwell

Petitioner, pro se

**[PROPOSED] ORDER**

Upon consideration of Petitioner's Request for Judicial Notice in Support of Her Motion Pursuant to Federal Rule of Civil Procedure 59(e) to Alter or Amend the Judgment, and any opposition thereto, the request is GRANTED to the extent set forth below.

The Court takes judicial notice of the existence and contents of the submitted Google Earth historical-imagery exhibits, including the dates, location, displayed technical information, source-attribution information, and objectively visible physical features of the site. The Court does not, by judicial notice, adopt any disputed testimonial inference or ultimate factual conclusion drawn from those images.

The Court further takes judicial notice of the existence, filing dates, contents, and court actions reflected in the specified public records in State of Florida v. [redacted] Case No. [redacted]. The Court does not take judicial notice of disputed factual assertions in the Florida proceeding for their truth.

The noticed materials may be considered for the limited purposes identified in Petitioner's Rule 59(e) motion.

SO ORDERED.

Dated: ____________________

___________________________________

PAUL A. ENGELMAYER
United States District Judge