**From:** ghislaine maxwell
**To:** Pro Se Filing
**Subject:** Motion 59e EXHIBITS 1 Ghislaine Maxwell 1: 20 Cr. 330 (PAE)
**Date:** Tuesday, September 22, 2026 10:26:19 PM
**Attachments:** 59e Exhibits Batch 1 (EX 1-46).pdf
59e Exhibits Batch 2 EX 47-58.pdf

**CAUTION - EXTERNAL:**

Exhibits Batch 1
Batch 2 of Total of 3 Batches
1 email to follow

**CAUTION - EXTERNAL EMAIL:** This email originated outside the Judiciary. Exercise caution when opening attachments or clicking on links.

# 59 (e) EX 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

In the Matter of the Application of the United States Of America for a Search and Seizure Warrant for 27 electronic devices seized on August 12, 2019 from Little Saint James in the Virgin Islands.

**TO BE FILED UNDER SEAL**

**Agent Affidavit in Support of Application for Search and Seizure Warrant**

SOUTHERN DISTRICT OF NEW YORK) ss.:

[redacted], being duly sworn, deposes and says:

## I. Introduction

### A. Affiant

1. I have been a Task Force Officer with the Federal Bureau of Investigation ("FBI") since 2017. As such, I am a "federal law enforcement officer" within the meaning of Federal Rule of Criminal Procedure 41(a)(2)(C), that is, a government agent engaged in enforcing the criminal laws and duly authorized by the Attorney General to request a search warrant. I am also a detective with the New York Police Department ("NYPD") and have been employed by the NYPD for approximately thirteen years. I am currently assigned to investigate violations of criminal law relating to the sexual exploitation of children as part of an FBI Task Force. I have gained expertise in this area through classroom training and daily work related to these types of investigations. As part of my responsibilities, I have been involved in the investigation of sex trafficking cases, and have participated in the execution of search warrants for electronic devices and electronic storage media.

2. I make this Affidavit in support of an application pursuant to Rule 41 of the Federal Rules of Criminal Procedure for a warrant to search the electronic device specified below (the "Subject Device") for the items and information described in Attachment A. This affidavit is based

upon my personal knowledge; my review of documents and other evidence; my conversations with other law enforcement personnel; and my training, experience and advice received concerning the use of computers in criminal activity and the forensic analysis of electronically stored information ("ESI"). Because this affidavit is being submitted for the limited purpose of establishing probable cause, it does not include all the facts that I have learned during the course of my investigation. Where the contents of documents and the actions, statements, and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.

**B. The Subject Devices**

3. The Subject Devices were all recovered from a search of a private island in the U.S. Virgin Islands, known as Little Saint James, which is an approximately 75 acre island located approximately four miles off the southeast coast of St. Thomas Island (the "Virgin Islands Residence") on or about August 12, 2019. The Virgin Islands Residence consists of multiple structures, including a main residence as well as several other smaller structures on the island, including a pool house, sheds, a beach house, an office, and multiple cabanas. However, as detailed below, JEFFREY EPSTEIN, who was a Target Subject of this Investigation until his death in August 2019, is the only known occupant of the Virgin Islands Residence. The Subject Devices are particularly described as follows:

a. A gray Mac desktop computer labeled "kitchen mac," which was recovered from a desk in the main residence on the island ("Subject Device-1");

b. A silver Mac laptop labeled "JE big laptop," bearing serial number W89111772QT, which was recovered from a desk in the main residence on the island ("Subject Device-2");

c. A silver MacBook Pro bearing serial number c02qm0gugwdp, which was recovered from a desk in the main residence on the island ("Subject Device-3");

d. A silver iPad model A1567 bearing serial number dmpql25ng5ypy, which was recovered from a desk in the main residence ("Subject Device-4");

e. A silver iPad model A1567 bearing serial number dmpql1rmg5y, which was recovered from a desk in the main residence ("Subject Device-5");

f. A silver Mac desktop computer bearing serial number c02nm1m0fy14, which was recovered from a desk in the pool house on the island ("Subject Device-6");

g. A silver Mac desktop computer, which was recovered from a desk in a cabana on the island ("Subject Device-7");

h. A Toshiba Laptop, which was recovered from a box on the floor near a desk in a shed on the island ("Subject Device-8");

i. An HP laptop bearing serial number cnd81368v5, which was recovered from a desk in a shed on the island ("Subject Device-9");

j. A silver Mac desktop computer, which was recovered from a desk in a cabana on the island ("Subject Device-10");

k. A silver Macbook desktop computer, which was recovered from a desk in a cabana on the island ("Subject Device-11");

l. A Dell Inspiron Tower computer model D19M QCNFA335, which was recovered from a desk in the beach house on the island ("Subject Device-12");

m. A silver Mac desktop computer model A1311 bearing serial number W804736DDAS, which was recovered from a desk in the beach house on the island ("Subject Device-13");

n. A Unfi video bearing mac ID 1829f b4fbe426ea90, which was recovered from a server rack inside a shed on the island ("Subject Device-14");

o. A Unifi Server bearing mac ID 1735K 788A20463234-8uuu9f, which was recovered from a server rack inside a shed in on the island ("Subject Device-15");

p. An HP server with four 500 GB drives, bearing serial number MXQ3220187, which was recovered from a shed on the island ("Subject Device-16");

q. A Panasonic KX TDE100 computer bearing serial number KX-TDa0104 9LCCD005398, which was found on a server rack in a shed on the island ("Subject Device-17");

r. A 6 bay with 146 GB drives bearing serial number MXQ824A1R, which was found on a server rack in a shed on the island ("Subject Device-18");

s. A silver Mac desktop computer, which was recovered from a desk in a cabana on the island ("Subject Device-19");

t. An HP desktop tower model 260-A010, bearing serial number cnv7160050, which was recovered from the maintenance office on the island ("Subject Device-20");

u. An HP tower model 260-A010, bearing serial number cnv716004y, which was recovered from the maintenance office on the island ("Subject Device-21");

v. A Mac desktop computer model A1312, bearing serial number w89524czspj, which was recovered from the maintenance office on the island ("Subject Device-22");

w. A Lenovo tower machine type 90J0, bearing serial number mj07yg6u, which was recovered the maintenance office on the island ("Subject Device-23");

x. A Lenovo tower bearing serial number 153306g2umjxekgx, which was recovered the maintenance office on the island ("Subject Device-24");

y. An HP Tower bearing serial number CNV74213Ms 570-P056, which was recovered the maintenance office on the island ("Subject Device-25");

z. A Unifi cloudkey with FCCID: SWX-UCCK IC 6545A-UCCK and Mac ID 1843kb4fbe4d30c69-dcrgm9, which was found on a server rack in a shed on the island ("Subject Device-26"); and

aa. A red Nikon digital camera, which was recovered on a file cabinet next to a desk in a cabana on the island ("Subject Device-27").

4. Subject Device-1 through Subject Device-25 are all computers and/or storage devices capable of storing electronic picture and message files.

5. Subject Device-26 is a device that identifies a user to a service over the Internet. It acts as a key that allows users to access other data on other devices, such as Subject Device-1 through Subject Device-25.

6. Subject Device-27 is a digital camera capable of taking and storing electronic picture files.

7. The Subject Devices have all been transported by the FBI from the Virgin Islands to FBI offices in the Southern District of New York. At this time, all of the Subject Devices are presently located in the Southern District of New York.

**C. The Subject Offenses**

8. For the reasons detailed below, I believe that there is probable cause to believe that the Subject Device contains evidence, fruits, and instrumentalities of violations of Title 18, United States Code, Sections 1591 (sex trafficking of minors), and 371 (sex trafficking conspiracy) (the "Subject Offenses"). The Target Subjects of this investigation are known and unknown co-conspirators of JEFFREY EPSTEIN, including but not limited to [redacted].

## II. Probable Cause and the Initial Search Warrants

### A. Probable Cause Regarding the Target Subjects' Commission of the Subject Offenses

9. On or about July 2, 2019, a grand jury in the Southern District of New York returned an Indictment charging JEFFREY EPSTEIN with violations of Title 18, United States Code, Section 1591 (sex trafficking of minors); and Title 18, United States Code, Section 371 (sex trafficking conspiracy). A copy of the Indictment is attached hereto as Exhibit A and is incorporated by reference. EPSTEIN was arrested pursuant to the Indictment on or about July 6, 2019, and had been detained pending trial at the Metropolitan Correctional Center ("MCC") in New York, New York.

10. On or about August 10, 2019, the Bureau of Prisons confirmed that JEFFREY EPSTEIN had been found unresponsive in his cell at the MCC that morning, and was pronounced dead shortly thereafter.

11. Notwithstanding EPSTEIN's death, the sex trafficking investigation that led to his indictment remains ongoing. In particular, Count One of the Indictment alleged that EPSTEIN conspired with others to traffic minors, and further identified three individuals who worked for EPSTEIN (identified in Exhibit A as "Employee-1", "Employee-2," and "Employee-3") and facilitated EPSTEIN's abuse of minor girls by, among other things, arranging victims' encounters with EPSTEIN and paying victims after these encounters. The individual identified in Exhibit A as "Employee-2" is [redacted], a Target Subject of this investigation.

12. On or about November 28, 2018, the *Miami Herald* began publishing a series of articles relating to the defendant, his sexual misconduct with minors, and a previous investigation into his conduct in Florida from in or about 2005 through 2008. The article included information about [redacted] role in EPSTEIN's sexual abuse of minors. Based on my participation

in this investigation, I have learned that bank records obtained by the Government appear to show that just days later, on or about December 3, 2018, the defendant wired $250,000 from a trust account to [redacted]. This course of action, and in particular its timing, suggests that EPSTEIN was attempting to influence [redacted], who might have been able to provide information against him in light of the recently re-emerging allegations.

13. As set forth in Exhibit A, from at least in or about 2002, up to and including at least in or about 2005, JEFFREY EPSTEIN sexually abused multiple minor girls in Manhattan, New York; West Palm Beach, Florida; and elsewhere. During that time and continuing to the present, EPSTEIN possessed and controlled a residence, which is described in Exhibit A as "the New York Residence."

14. As further set forth in paragraphs 8 through 10 of Exhibit A, from at least in or about 2002, up to and including at least in or about 2005, EPSTEIN sexually abused numerous minor victims at the New York Residence. In particular, and as alleged in the Indictment, when a victim arrived at the New York Residence, she would be escorted to a room inside the New York Residence with a massage table, where she would perform a massage on EPSTEIN. The victims, who were as young as 14 years of age, were told by EPSTEIN or other individuals to partially or fully undress before beginning the "massage." During the encounter, EPSTEIN would escalate the nature and scope of physical contact with his victim to include, among other things, sex acts such as groping and direct and indirect contact with the victims' genitals. EPSTEIN typically would also masturbate during these sexualized encounters, ask victims to touch him while he masturbated, and touch victims' genitals with his hands or with sex toys. Following each encounter, EPSTEIN or one of his employees or associates paid the victim in cash.

15. As set forth in paragraphs 12 through 13 of Exhibit A, to further facilitate his ability to abuse minor girls in New York, JEFFREY EPSTEIN asked and enticed certain of his victims to recruit additional minor girls to perform "massages" and similarly engage in sex acts with EPSTEIN. When a victim would recruit another minor girl for EPSTEIN, he paid both the victim-recruiter and the new victim hundreds of dollars in cash. EPSTEIN knew that his victims were underage, including because certain victims told him their age.

16. One of the victims identified in paragraph 22 of Exhibit A is Victim-1. As part of the FBI's investigation of EPSTEIN, I have participated in interviews with Victim-1, along with other law enforcement officers.[1] Based on my participation in those interviews and my conversations with other law enforcement officers, I know that Victim-1 has provided the following information, in substance and in part:

a. Between approximately 2002 and 2005, EPSTEIN sexually abused Victim-1 on multiple occasions in the New York Residence. This sexual abuse all occurred when Victim-1 was under the age of 18.

b. During that same period, Victim-1 observed multiple floors of the New York Residence and numerous individual rooms within the New York Residence. Victim-1 has provided detailed descriptions of certain aspects of the interior of the New York Residence, including Victim-1's memory of specific details regarding the layout, furnishings, decorations, and

---

[1] In meetings with the Government, Victim-1 has disclosed that, approximately a decade ago, she committed marriage fraud in order to obtain a green card and, subsequently, U.S. citizenship. She has also disclosed personal substance abuse, primarily involving the abuse of prescription drugs, during various periods between the early 2000s and 2019. Victim-1 has also disclosed having worked for approximately a year at a "happy-ending" massage parlor, performing paid sex acts. Victim-1 is currently pursuing a civil damages claim against EPSTEIN for his sexual abuse of her. Information provided by Victim-1 has proven reliable and has been corroborated by independent evidence, including documents and records obtained during the investigation and the accounts of other victims whom Victim-1 has never met.

floor pattern of various areas within the New York Residence. Among other details, Victim-1 recalled that EPSTEIN typically abused her in a room she described as a "massage room," (the "Massage Room"), which contained a massage table, and was decorated with artwork depicting naked women, hung on walls that appeared to be adorned with fabric. In describing the sexual abuse that occurred in the Massage Room, Victim-1 has stated that EPSTEIN would often touch her genital area with a vibrating sex toy during these abusive encounters.

<u>The Search of the New York Residence</u>

17. On or about July 6, 2019, the Honorable Barbara Moses, United States Magistrate Judge, signed a search warrant authorizing a search of the New York Residence. The search warrant is attached as Exhibit B and incorporated by reference herein.

18. At approximately 6 p.m. on or about July 6, 2019, law enforcement officers (the "Search Team") commenced executing the search warrant at the New York Residence. JEFFREY EPSTEIN had been arrested on the charges contained in the Indictment shortly before the execution of the search warrant. Based on the Search Team's observations during an initial search of the New York Residence, at approximately 7 p.m., the Search Team stopped the search and froze the scene in order to seek a new search warrant. On or about July 7, 2019, the Honorable Barbara Moses, United States Magistrate Judge, signed a search warrant authorizing a search of the New York Residence (the "Second Warrant"). The Second Warrant is attached as Exhibit C, and incorporated by reference herein. At approximately 2:30 a.m., the Search Team resumed the search, and commenced searching pursuant to the Second Warrant. Later on July 7, 2019, the Honorable Barbara Moses, United States Magistrate Judge, signed a third search warrant to search and seize certain electronic media stored on discs seized during the execution of the Second

Warrant (the "Compact Disc Search Warrant"). The Compact Disc Search Warrant is attached as Exhibit D, and incorporated by reference herein.

19. During the execution of the warrants described above in the New York Residence, the Search Team located evidence of the Subject Offenses. In particular, the Search Team located the following, among other things, the following:

a. Inside the New York Residence, the Search Team observed a room that, based on my participation in interviews of Victim-1, appears to be consistent with Victim-1's descriptions of the Massage Room. The room contained a table covered with a sheet, and appeared to be a massage table. The room also contained several vibrating sex toys. The walls appeared to be covered in a type of felt-like tapestry fabric. I further observed two paintings and three photographs hanging on the walls of the Massage Room. The paintings and photographs depict nude females. One of the photographs appears to depict a nude girl. Thus, it appears that the Massage Room was in substantially the same condition as Victim-1 observed the room more than 18 years ago.

b. Inside a safe in a closet on the third floor, the Search team discovered and seized, among other items, several binders containing sleeves of compact discs, most of which are labeled with handwriting. In total, the binders contain dozens of compact discs. Some discs contain the word "Zorro" or "LSJ." Based on my conversations with law enforcement agents who have participated in this investigation, I believe the name "Zorro" refers to Zorro Ranch, EPSTEIN's property in New Mexico, and the name LSJ refers to Little Saint James, *i.e.*, the Virgin Islands Residence. The majority of the discs contain titles that include female names. Some of the discs in the binders seized by the Search Team have titles that appear to refer to trips or vacations.

c. In the drawer of a dresser in a room on the Fifth floor of the New York Residence, the Search team discovered and seized, among other items, a shoebox (the "Shoebox") containing numerous compact discs. The majority of the discs are labeled, in handwriting, with female names. One disc is marked "Thai Massage." Another disc is marked "Blonde Girl Photo Shoot." Yet another disc is marked "Misc. Girls Nude/Dinner--Scientists." The discs in the Shoebox were seized by the Search Team. In another drawer of that same dresser, the Search Team discovered loose polaroid photographs depicting young, nude females who, based on the training and experience of law enforcement officers who observed them, appear to be teenagers.

d. In a closet on the Fifth Floor of the Manhattan Residence, the Search Team discovered, among other items, a box marked "women/old photos." The box contained, among other items, approximately seven compact discs, which are labeled with hand-written titles. One disc is marked "nudes 00-24." Another is labeled "Photographer--[redacted] '03" The remaining discs contain titles that include female names. All of the foregoing discs were seized by the Search Team.

e. In that same closet, the Search Team discovered numerous black binders containing what appear to be print outs of digital photographs (with file names underneath) and compact discs. The binders appeared to contain, among other photographs, photographs of nude or partially nude young girls, some of which are in sexually suggestive poses. Based on the training and experience of law enforcement officers who observed them, some of the young girls appear to be teenagers, some of whom appear to be under the age of 18.

<u>The Virgin Islands Residence</u>

20. Based on my review of property records, I believe that JEFFREY EPSTEIN has been the owner of the Virgin Islands Residence since at least in or about 1998. In particular, it

appears that an entity named "L.S.J., LLC" held title to the Virgin Islands Residence from in or about 1998. In or about 2011, L.S.J., LLC transferred title to the Virgin Islands Residence to an entity named "Nautilus, Inc.," for $10. On the transfer paperwork, EPSTEIN signed as the "sole member" of L.S.J., LLC and as the "president and sole beneficial owner" of Nautilus, Inc.

21. In addition, I believe that up until his arrest, the Virgin Islands Residence was JEFFREY EPSTEIN's principal residence. In particular, I have reviewed sex offender registration data, and have learned that, on or about June 17, 2019, EPSTEIN listed the Virgin Islands Residence as his primary residence. At the time of EPSTEIN's arrest on or about July 6, 2019, I and other law enforcement officers conducted an inventory search of EPSTEIN's personal effects, and observed that EPSTEIN was carrying a driver's license that listed the Virgin Islands Residence as EPSTEIN's home address.

22. Based on my participation in this investigation, I have reason to believe that EPSTEIN and his co-conspirators committed the Subject Offences in and around the Virgin Islands Residence. Some of the evidence of that conduct was recovered from the New York Residence. In particular, based on my conversations with law enforcement agents who have conducted an initial review (the "Reviewing Agents") of the compact discs seized at the New York Residence as described in paragraphs 15(b)-(e) above (the "Seized Discs"), I have learned that the discs contain approximately thousands of nude or partially nude photographs of girls or young women, many of which are in sexually suggestive poses. Based on my conversations with the Reviewing Agents, who have particular training and experience relating to child erotica and visual depictions of children in child exploitation cases, I have learned that the Reviewing Agents believe that many of the nude or partially nude images they have reviewed appear to depict girls under the age of 18. Certain of these images appear to have been taken at a tropical location, and/or were labeled "LSJ"

either in the image file name, or on the compact disc that contained the image. Based on the foregoing, I believe that a portion of the foregoing photographs appear to have been taken at the Virgin Islands Residence. In addition, I have learned that some of the file names are marked [redacted] which are the initials of [redacted]. As set forth below, I have interviewed an individual who has reported that [redacted] photographed her at the Virgin Islands Residence. Accordingly, I believe that a portion of these photos may have been taken by [redacted].

23. Further, based on my conversations with law enforcement agents who have conducted an initial review of the Seized Discs, I have learned the following:

a. Many of the photographs appear to be labeled with file names that include "LSJ," which I believe stands for Little St. James, which is the name of the Virgin Islands Residence.

b. As discussed above, photographs seized from the New York Residence appear to depict nude or partially nude young girls, and a portion of those photos appear to have been taken at the Virgin Islands Residence, based on the fact that (i) some of the photos appear to have been taken in a tropical location, and (ii) some of the file names of the photographs and/or the labels on the discs containing the files of nude or partially nude young girls in a tropical location are marked "LSJ," *i.e.*, the Virgin Islands Residence.

c. Among the photographs seized from the New York Residence, the Reviewing Agents identified partially-nude photographs of a young girl, labeled with the name of a particular individual ("Individual-1"). The photographs appear to depict Individual-1 on a beach in what appears to be a tropical location similar to the landscape of the Virgin Islands Residence.

24. In or about August 2019, I participated in an interview of Individual-1, with her counsel present. Based on my personal observations, I believe that the photographs described in Paragraph 21(c) depict Individual-1. I have also spoken with another law enforcement agent who

interviewed Individual-1 on a separate occasion in or about July 2019, with her counsel present. During the course of these interviews, Individual-1 stated, in sum an substance that she met EPSTEIN in 2003 when she was approximately 17, and that she travelled to several of EPSTEIN's properties, including properties in New Mexico, Florida, and the U.S. Virgin Islands, *i.e.*, the Virgin Islands Residence, before she turned 18. EPSTEIN paid for the trips, and would give Individual-1 money and gifts while she traveled with him. During these trips, EPSTEIN sexually abused and assaulted Individual-1 on approximately four different occasions, all of which occurred before she turned 18. Individual-1 reported that EPSTEIN raped her during two of these incidents. Indivdual-1 recalled that one or more of these instances of sexual abuse occurred on the Virgin Islands Residence. Individual-1 further reported that, when she was approximately 17, [redacted] asked to photograph her, and did in fact photograph Individual-1 at the Virgin Islands Residence.

25. In or about August 2019, I and another law enforcement officer interviewed an individual ("Individual-2") who regularly performed work for JEFFREY EPSTEIN as a contractor at the Virgin Islands Residence from approximately 1999 to 2005 or 2006. Individual-2 reported that, on several occasions, Individual-2 observed photographs of what appeared to be nude or partially nude young girls in several locations throughout the main residence of the Virgin Islands Residence. Individual-2 recalled a photograph depicting [redacted] and two girls, all of three whom were topless; Individual-2 estimated that the two girls in the photograph appeared to be approximately 15 or 16 years old. Individual-2 knew [redacted] to be EPSTEIN's [redacted] at that time.

26. Based on my review of flight logs from a private jet owned by JEFFREY EPSTEIN, I have learned that [redacted] traveled to the U.S. Virgin Islands at least approximately

once a month between October 2001 and November of 2005. These records do not include any travel [redacted] may have taken on commercial airlines.

27. For all of these reasons, I am aware that [redacted] has spent significant time at the Virgin Islands Residence and that evidence of her involvement, and potentially the involvement of other co-conspirators, may be located at the Virgin Islands Residence. In particular, flight logs from EPSTEIN's private jet reflect that the individual identified in the Indictment as "Employee-3" traveled to the U.S. Virgin Islands on approximately nine separate occasions. These records do not include any travel Employee-3 may have taken on commercial airlines. As set forth in the Indictment, Employee-3 scheduled victims' encounters with EPSTEIN.

The Search of the Virgin Islands Residence

28. On or about August 11, 2019, United States Magistrate Judge Ruth Miller of the District of the Virgin Islands signed a warrant authorizing the search of the Virgin Islands Residence (the "Virgin Islands Warrant"). The Virgin Islands Warrant is attached as Exhibit E, and incorporated by reference herein. The next day, other law enforcement agents and I executed the Virgin Islands Warrant at the Virgin Islands Residence.

29. Based on my personal participation in the August 12, 2019 search of the Virgin Islands Residence, as well as my conversations with other law enforcement agents who participated in that same search, and my review of documents prepared by other law enforcement agents who participated in that same search, I have learned that during the August 12, 2019 search of the Virgin Islands Residence:

a. Subject Device-1 was recovered from a desk in the main residence on the island.

b. Subject Device-2 was recovered from a desk in the main residence on the island.

c. Subject Device-3 was recovered from a desk in the main residence on the island.

d. Subject Device-4 was recovered from a desk in the main residence on the island.

e. Subject Device-5 was recovered from a desk in the main residence on the island.

f. Subject Device-6 was recovered from a desk in the pool house on the island.

g. Subject Device-7 was recovered from a desk in a cabana on the island.

h. Subject Device-8 was recovered from a box on the floor near a desk in a shed on the island.

i. Subject Device-9 was recovered from a desk in a shed on the island.

j. Subject Device-10 was recovered from a desk in a cabana on the island.

k. Subject Device-11 was recovered from a desk in a cabana on the island.

l. Subject Device-12 was recovered from a desk in the beach house on the island.

m. Subject Device-13 was recovered from a desk in the beach house on the island.

n. Subject Device-14 was recovered from a server rack inside a shed on the island.

o. Subject Device-15 was recovered from a server rack inside a shed in on the island.

p. Subject Device-16 was recovered from a shed on the island.

q. Subject Device-17 was found on a server rack in a shed on the island.

r. Subject Device-18 was found on a server rack in a shed on the island.

s. Subject Device-19 was recovered from a desk in a cabana on the island.

t. Subject Device-20 was recovered from the maintenance office on the island.

u. Subject Device-21 was recovered from the maintenance office on the island.

v. Subject Device-22 was recovered from the maintenance office on the island.

w. Subject Device-23 was recovered the maintenance office on the island.

x. Subject Device-24 was recovered the maintenance office on the island.

y. Subject Device-25 was recovered the maintenance office on the island.

z. Subject Device-26 was found on a server rack in a shed on the island.

aa. Subject Device-27 was recovered on a file cabinet next to a desk in a cabana on the island.

**B. Probable Cause Justifying Search of the Subject Devices**

30. Based on my training, experience, and participation in this investigation, I believe that there is probable cause that evidence of the Subject Offenses, such as photographs of EPSTEIN's victims and co-conspirators, will be found on the Subject Devices. In particular, information provided by Individual-1, with whom EPSTEIN engaged in sex acts at the Virgin Islands Residence while Individual-1 was a minor, confirms that EPSTEIN engaged in conduct relevant to the Subject Offenses at the Virgin Islands Residence. In addition, photographs on the Seized Discs recovered during the search of the New York Residence depict other young and partially nude girls photographed at the Virgin Islands Residence, which suggests that EPSTEIN brought those girls to the Virgin Islands Residence and that, consistent with the accounts provided by Individual-1, Victim-1 and other victims identified in the Indictment, EPSTEIN likely sexually abused them at the Virgin Islands Residence and maintained evidence of that abuse there on the Subject Devices. Moreover, evidence of co-conspirators' presence at the Virgin Islands Residence at times when victims were abused, including photographs, may also be found on the Subject Devices. Indeed, as noted above, Individual-2 has observed a photograph of [redacted] partially-nude young girls at the Virgin Islands Residence, suggesting that similar photographs may have been saved on the Subject Devices. Similarly, there is probable cause to believe that evidence of victims' and/or co-conspirators' travel arrangements, contact information, and communications will be located on the Subject Devices.

31. Moreover, though the sexual abuse described above occurred principally between approximately 2002 and 2005, as evidence recovered from the New York Residence including the

Seized Discs makes clear, EPSTEIN continued to maintain substantial evidence of the Subject Offenses up until the time he was arrested in 2019. Indeed, as described above, in addition to the Seized Discs, Epstein continued to maintain a "massage room" complete with a massage table and various sex toys that remained similar in makeup and appearance to descriptions of the same room provided by Victim-1 based on Victim-1's encounters with EPSTEIN in 2004. Accordingly, there is probable cause to believe that the Subject Devices, which were seized from a residence where EPSTEIN and his co-conspirators committed the Subject Offenses, will similarly contain evidence of the Subject Offenses.

32. In addition, I believe that evidence of the Subject Offenses, including but not limited to photographs/evidence created at the Virgin Islands Residence, may be located on the Subject Devices because (i) the Virgin Islands Residence was the location of multiple photo shoots of young girls; (ii) the Virgin Islands Residence appears to have been, for the last several years and up until the time of his arrest, EPSTEIN's primary residence; and (iii) given its location, the Virgin Islands Residence is JEFFREY EPSTEIN's most private residence. Therefore, given that EPSTEIN has maintained evidence of the Subject Offenses in the New York Residence, he is likely to have similarly maintained some of that evidence in the Subject Devices maintained at the Virgin Islands Residence. Moreover, given that there is probable cause to believe that JEFFREY EPSTEIN and others, including [redacted], conspired to commit the Subject Offenses, evidence of EPSTEIN's involvement in trafficking minors would also be relevant to the investigation of, and any future charges against, other members of the conspiracy, such as [redacted].

33. According to international flight records that I have reviewed, a private jet owned and utilized by Epstein has traveled to or from the U.S. Virgin Islands at least on or about April

14, 2019; May 5, 2019; May 18, 2019; and June 11, 2019. Accordingly, there is probable cause to believe that EPSTEIN was present at the Virgin Islands Residence a short time before the recovery of the Subject Devices.

34. Based on my training and experience in investigating individuals who engage in sex trafficking of minors, and who sexually exploit minors, such individuals often maintain photographs of their victims, and/or other erotic images of minors, at their residences. Individuals who engage in such offenses often hoard such images in the privacy of their residences. In particular, data related to their illegal activity is often stored on their computers.

35. In my training and experience, individuals who store nude and/or sexually suggestive photographs of minors on compact discs or other external storage devices typically access those images from computers and other electronic devices in order to view those images, and individuals who store such materials on compact discs typically store similar files on other computing devices and storage devices.

36. Like individuals engaged in any other kind of activity, individuals who engage in sex trafficking of minors store records relating to their illegal activity and to persons involved with them in that activity on electronic devices such as the Subject Device. Such records can include, for example, logs of online communications with co-conspirators; email correspondence; contact information of co-conspirators, including telephone numbers, email addresses, and identifiers for instant messaging and social medial accounts; travel records for victims and/or co-conspirators; payment records for victims and/or co-conspirators; and/or photographs of victims and/or co-conspirators. Individuals engaged in criminal activity often store such records in order to, among other things, (1) keep track of co-conspirator's contact information; (2) keep a record of illegal transactions for future reference; (3) remain in contact with co-conspirators and victims; (4) enable

payment of co-conspirators and victims; and (4) store exploitative photographs for future sexual gratification.

37. Computer files or remnants of such files can be recovered months or even years after they have been created or saved on an electronic device such as the Subject Devices. Even when such files have been deleted, they can often be recovered, depending on how the hard drive has subsequently been used, months or years later with forensics tools. Thus, the ability to retrieve from information from the Subject Devices depends less on when the information was first created or saved than on a particular user's device configuration, storage capacity, and computer habits.

38. Based on the foregoing, I respectfully submit there is probable cause to believe that evidence of the Target Subjects' commission of the Subject Offenses is likely to be found on the Subject Devices.

## III. Procedures for Searching ESI

### A. Review of ESI

39. Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) will review the ESI contained on the Subject Device for information responsive to the warrant.

40. In conducting this review, law enforcement may use various techniques to determine which files or other ESI contain evidence or fruits of the Subject Offenses. Such techniques may include, for example:

- surveying directories or folders and the individual files they contain (analogous to looking at the outside of a file cabinet for the markings it contains and opening a drawer believed to contain pertinent files);

- conducting a file-by-file review by "opening" or reading the first few "pages" of such files in order to determine their precise contents (analogous to performing a cursory examination of each document in a file cabinet to determine its relevance);
- "scanning" storage areas to discover and possibly recover recently deleted data; scanning storage areas for deliberately hidden files; and
- performing electronic keyword searches through all electronic storage areas to determine the existence and location of search terms related to the subject matter of the investigation. (Keyword searches alone are typically inadequate to detect all information subject to seizure. For one thing, keyword searches work only for text data, yet many types of files, such as images and videos, do not store data as searchable text. Moreover, even as to text data, there may be information properly subject to seizure but that is not captured by a keyword search because the information does not contain the keywords being searched.)

41. Law enforcement personnel will make reasonable efforts to restrict their search to data falling within the categories of evidence specified in the warrant. Depending on the circumstances, however, law enforcement may need to conduct a complete review of all the ESI from the Subject Device to locate all data responsive to the warrant.

**B. Return of the Subject Device**

42. If the Government determines that the Subject Device is no longer necessary to retrieve and preserve the data on the device, and that the Subject Device is not subject to seizure pursuant to Federal Rule of Criminal Procedure 41(c), the Government will return the Subject Device, upon request. Computer data that is encrypted or unreadable will not be returned unless law enforcement personnel have determined that the data is not (i) an instrumentality of the offense, (ii) a fruit of the criminal activity, (iii) contraband, (iv) otherwise unlawfully possessed, or (v) evidence of the Subject Offenses.

**IV. Conclusion and Ancillary Provisions**

43. Based on the foregoing, I respectfully request the court to issue a warrant to seize the items and information specified in Attachment A to this affidavit and to the Search and Seizure Warrant.

44. In light of the confidential nature of the continuing investigation, I respectfully request that this affidavit and all papers submitted herewith be maintained under seal until the Court orders otherwise.

[redacted]
Task Force Officer
Federal Bureau of Investigation

Sworn to before me on
September __, 2019

HON. JAMES L. COTT
UNITED STATES MAGISTRATE JUDGE

**Attachment A**

## I. Devices Subject to Search and Seizure

The devices that are the subject of this search and seizure warrant (the "Subject Devices") are described as follows:

The Subject Devices were all recovered from a search of a private island in the U.S. Virgin Islands, known as Little Saint James, which is an approximately 75 acre island located approximately four miles off the southeast coast of St. Thomas Island (the "Virgin Islands Residence") on or about August 12, 2019. The Virgin Islands Residence consists of multiple structures, including a main residence as well as several other smaller structures on the island, including a pool house, sheds, a beach house, an office, and multiple cabanas. The Subject Devices are particularly described as follows:

a. A gray Mac desktop computer labeled "kitchen mac," which was recovered from a desk in the main residence on the island ("Subject Device-1");

b. A silver Mac laptop labeled "JE big laptop," bearing serial number W89111772QT, which was recovered from a desk in the main residence on the island ("Subject Device-2");

c. A silver MacBook Pro bearing serial number c02qm0gugwdp, which was recovered from a desk in the main residence on the island ("Subject Device-3");

d. A silver iPad model A1567 bearing serial number dmpql25ng5ypy, which was recovered from a desk in the main residence ("Subject Device-4");

e. A silver iPad model A1567 bearing serial number dmpql1rmg5y, which was recovered from a desk in the main residence ("Subject Device-5");

f. A silver Mac desktop computer bearing serial number c02nm1m0fy14, which was recovered from a desk in the pool house on the island ("Subject Device-6");

g. A silver Mac desktop computer, which was recovered from a desk in a cabana on the island ("Subject Device-7");

h. A Toshiba Laptop, which was recovered from a box on the floor near a desk in a shed on the island ("Subject Device-8");

i. An HP laptop bearing serial number cnd81368v5, which was recovered from a desk in a shed on the island ("Subject Device-9");

j. A silver Mac desktop computer, which was recovered from a desk in a cabana on the island ("Subject Device-10");

k. A silver Macbook desktop computer, which was recovered from a desk in a cabana on the island ("Subject Device-11");

l. A Dell Inspiron Tower computer model D19M QCNFA335, which was recovered from a desk in the beach house on the island ("Subject Device-12");

m. A silver Mac desktop computer model A1311 bearing serial number W804736DDAS, which was recovered from a desk in the beach house on the island ("Subject Device-13");

n. A Unfi video bearing mac ID 1829f b4fbe426ea90, which was recovered from a server rack inside a shed on the island ("Subject Device-14");

o. A Unifi Server bearing mac ID 1735K 788A20463234-8uuu9f, which was recovered from a server rack inside a shed in on the island ("Subject Device-15");

p. An HP server with four 500 GB drives, bearing serial number MXQ3220187, which was recovered from a shed on the island ("Subject Device-16");

q. A Panasonic KX TDE100 computer bearing serial number KX-TDa0104 9LCCD005398, which was found on a server rack in a shed on the island ("Subject Device-17");

r. A 6 bay with 146 GB drives bearing serial number MXQ824A1R, which was found on a server rack in a shed on the island ("Subject Device-18");

s. A silver Mac desktop computer, which was recovered from a desk in a cabana on the island ("Subject Device-19");

t. An HP desktop tower model 260-A010, bearing serial number cnv7160050, which was recovered from the maintenance office on the island ("Subject Device-20");

u. An HP tower model 260-A010, bearing serial number cnv716004y, which was recovered from the maintenance office on the island ("Subject Device-21");

v. A Mac desktop computer model A1312, bearing serial number w89524czspj, which was recovered from the maintenance office on the island ("Subject Device-22");

w. A Lenovo tower machine type 90J0, bearing serial number mj07yg6u, which was recovered the maintenance office on the island ("Subject Device-23");

x. A Lenovo tower bearing serial number 153306g2umjxekgx, which was recovered the maintenance office on the island ("Subject Device-24");

y. An HP Tower bearing serial number CNV74213Ms 570-P056, which was recovered the maintenance office on the island ("Subject Device-25");

z. A Unifi cloudkey with FCCID: SWX-UCCK IC 6545A-UCCK and Mac ID 1843kb4fbe4d30c69-dcrgm9, which was found on a server rack in a shed on the island ("Subject Device-26"); and

aa. A red Nikon digital camera, which was recovered on a file cabinet next to a desk in a cabana on the island ("Subject Device-27").

## II. Review of ESI on the Subject Devices

Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) are authorized to review the ESI contained on the Subject Device for evidence, fruits, and instrumentalities of violations of Title 18, United States Code, Sections 1591 (sex trafficking of minors), and 371 (sex trafficking conspiracy) (the "Subject Offenses") described as follows:

1. Evidence concerning the identity or location of the owner(s) or user(s) of the Subject Devices

2. Evidence concerning the identity or location of, and communications with, co-conspirators of Jeffrey Epstein, including [redacted]

3. Any documents or communications with or regarding victims or potential victims of the Subject Offenses;

4. Documents or records reflecting payments to victims and/or co-conspirators including but not limited to bank and financial records, spreadsheets, ledgers, account listings, check and wire records, and documents reflecting cash withdrawals.

5. Any photographs of victims or potential victims of the Subject Offenses.

6. Any nude, partially nude, or sexually suggestive photographs of individuals who appear to be teenage girls, or younger.

7. Records or other items that evidence ownership, control, or use of, or access to devices, storage media, and related electronic equipment used to access, transmit, or store information relating to the Subject Offenses, including, but not limited to, sales receipts, warranties, bills for Internet access, handwritten notes, registry entries, configuration files, saved usernames and passwords, user profiles, e-mail contacts, and photographs.

8. Any child erotica, defined as suggestive visual depictions of nude minors that do not constitute child pornography as defined by 18 U.S.C. § 2256(8).

If the Government determines that any of the Subject Devices is no longer necessary to retrieve and preserve the data on the device, and that any of the Subject Devices is not subject to seizure pursuant to Federal Rule of Criminal Procedure 41(c), the Government will return any such Subject Device, upon request.

# 59 (e) EX 2

Pursuant to the terms of the Agreement, following Mr. Epstein's sentencing, the U.S. Attorney's Office provided Mr. Epstein's counsel with a list of the individuals whom it was prepared to name in an indictment as victims of an offense enumerated in 18 U.S.C. § 2255, and none of those names will be deleted. By his agreement, Mr. Epstein sought to resolve liability for all criminal activity known to the United States as of the time of his plea and sentencing, and he is responsible for damages to all victims of that criminal activity.

Copies of the victim notifications will continue to be provided to counsel for Mr. Epstein. Please let me know whether I should continue to list Mr. Goldberger as the point of contact for the civil litigation. Regarding your suggestion on the content of the notification letters, I intend to use the same format that was used in the letters previously approved by Messrs. Goldberger and Tein, except that I will include the language from the September and October agreements. I have enclosed a draft herewith. Because I previously provided the victims with incorrect information–albeit with the approval of Mr. Epstein's counsel–it is imperative that I correct the error promptly. Accordingly, if you have any substantive objections to the letter, please advise me by tomorrow afternoon.

Sincerely,

R. Alexander Acosta
United States Attorney

By: [signature]
A. Marie Villafaña
Assistant United States Attorney

cc: Karen Atkinson, Chief, Northern Division

# 59 (e) EX 3

**Villafana, Ann Marie C. (USAFLS)**

**From:** Kuyrkendall, E N. (FBI) <E.Kuyrkendall@ic.fbi.gov>
**Sent:** Thursday, May 29, 2008 12:19 PM
**To:** Villafana, Ann Marie C. (USAFLS)
**Subject:** RE: Epstein

Marie,

The NY agents made contact with [redacted] today. She met them at the door with her attorney's card. (she is connected to a target in another FBI investigation) I'll explain later. Anyway, she contacted the agent a few minutes ago and sounded surprised when she was informed it was about Epstein. She switched the conversation immediately about coming to Grand Jury on Tues. The agent left the door open to contact her if she decides to talk to her. I think we should let her travel down here and let Jason and I attempt to interview her prior to putting her in the GJ. What do you think? I told the NY agent if [redacted] should reach out to her again to provide her with my name and information as her contact once she gets down here. I do not know if she plans on getting her attorney involved or not. His info is as follows: Diarmuid White of White and White, 148 E. 78th Street, NY NY 10075, telephone number [redacted]. I have a feeling she will reach out to Epstein, so it could get interesting. We have to schedule time for her in front of GJ. Let me know.

Nesbitt

---

From: Villafana, Ann Marie C. (USAFLS) [Ann.Marie.C.Villafana@usdoj.gov]
Sent: Thursday, May 29, 2008 9:03 AM
To: Sloman, Jeff (USAFLS); Senior, Robert (USAFLS)
Cc: Atkinson, Karen (USAFLS); Kuyrkendall, E N.; Richards, Jason R.
Subject: Epstein

Hi Jeff and Bob. I received Jeff's e-mail stating that the DAG agreed to meet with epstein's people. Does this mean that Tuesday is off? I need to let the gj coordinator know.

Also, I am sure that you remember [redacted] She was the person whom we initially classified as a victim until epstein's attorneys complained. Well, nesbitt has just interviewed a girl who was 14 or 15 when she first went to epstein's house who reports that epstein told her that he had sex with [redacted]. ([redacted] probably would have been 15 or 16 when this conversation occurred.) The girl also reports that she told epstein her true age and epstein told her that he doesn't care about age.

I know that epstein's people will, no doubt, continue to tell the dag and others that epstein didn't know about the girls' ages so I thought you should know.

Please let me know about tuesday so I don't needlessly spoil nesbitt's sunday. And, any chance the case was discussed with the ag when he was in town?

Thanks.

# 59 (e) EX 4

his 14-year-old girlfriend and later digitally penetrated her. The SDFL has prosecuted numerous violations of 18 U.S.C. § 2422 where the "facility of interstate commerce" – generally the internet and telephones – are used by a defendant and an undercover pretending to be the parent of a minor, to arrange for a meeting that the defendant hopes will result in sexual activity. There is nothing extraordinary about Epstein's case except the large number of victims involved.

Epstein's counsel neglected to inform you that the age range of the victims includes girls as young as 14, and glosses over the fact that Epstein did not simply engage in "solo self-pleasuring" in front of the victims. Instead, with each visit, he pressured the victims to allow him to engage in more and more sexual activity – fondling breasts and vaginas, digital penetration, use of a vibrator on their vaginas, performing oral sex on them, having them perform oral sex on his adult girlfriend, and engaging in sexual intercourse. Counsel also neglected to inform you that many girls did affirmatively tell Epstein their true ages and he told several that he "did not care about age."

Epstein's conduct was not "purely local." He and his assistants called and sent text messages to victims in Palm Beach County from other states to arrange "appointments" for his upcoming visits to Palm Beach. And, while in Palm Beach, Epstein and his assistants called victims in New York to arrange "appointments" for his return to New York. Epstein wired money to some victims and sent gifts through the mails. This case falls squarely within federal jurisdiction.

Epstein also falsely claims that certain facts related to the resolution of the case were hidden and later discovered by his lawyers. For example, they complain about the proposed use of a guardian ad litem, stating that "Mr. Epstein's counsel later established that all but one of these individuals were adults, not minors." It was AUSA Villafaña who told Epstein's counsel that all of the victims but one had already reached the age of majority, which was one reason why the guardian ad litem procedure proposed by Epstein's counsel would not work. Likewise, AUSA Villafaña disclosed to Epstein's counsel that one of the five attorney-representatives that she recommended for consideration by Epstein's counsel was a "good friend" of a "good friend." Despite the disclosure of this relationship, Epstein's counsel selected that person, before the SDFL, on its own, decided to use an independent Special Master to make the selection.

Epstein's counsel states that the "USAO eventually asserted that it could not vouch for the veracity of any of the claims that these women might make," but neglects to disclose that the SDFL made that statement *at Epstein's request* to avoid the suggestion that the SDFL was involving itself in the outcome of civil litigation.

Epstein's counsel have repeatedly attacked the SDFL and the FBI for classifying the victims as "victims." As you know, all Justice Department employees have the obligation to identify victims and to notify them of their rights. "Victims" are defined by law, not by self-selection. The girls whom have been identified by the FBI and the SDFL fall within the legal definition – they were all minors who engaged in illicit sexual activity with Jeffrey Epstein, at his request, in exchange for money. From interviewing them, the FBI Special Agents, the FBI Victim-Witness Coordinator, and AUSA Villafaña all feel confident that they suffered harm, in a

# 59 (e) EX 5

On behalf of the SDFL and the victims in this case, please expedite the review and decision of the issues under consideration.

Sincerely,

R. Alexander Acosta
United States Attorney

By:

Jeffrey H. [redacted]
First Assistant United States Attorney

Encls.

cc: [redacted], Chief
Criminal Division
A. [redacted]
Assistant U.S. Attorney
[redacted]
Assistant U.S. Attorney

# 59 (e) EX 6

**Villafana, Ann Marie C. (USAFLS)**

| | |
|---|---|
| **From:** | Senior, Robert (USAFLS) <RSenior@usa.doj.gov> |
| **Sent:** | Monday, June 23, 2008 10:06 AM |
| **To:** | Villafana, Ann Marie C. (USAFLS); Kuyrkendall, E N. (MM) (FBI); Richards, Jason R. (MM) (FBI) |
| **Cc:** | Atkinson, Karen (USAFLS) |
| **Subject:** | RE: Trip to New York, etc. |

21

Ok. Marie, hoping to hear from DAG's office today giving the green light. Let's talk when that decision is made.

---

**From:** Villafana, Ann Marie C. (USAFLS)
**Sent:** Monday, June 23, 2008 9:15 AM
**To:** Kuyrkendall, E N. (FBI); Richards, Jason R. (FBI)
**Cc:** Atkinson, Karen (USAFLS); Senior, Robert (USAFLS)
**Subject:** Trip to New York, etc.

We will not be interviewing [redacted] in New York. Her attorney gave a copy of the grand jury subpoena to Epstein's lawyers. They, in turn, promptly sent it on to Washington complaining, yet again, about me. So, I do not want to do an interview with him present, and we will have to put her in the grand jury.

Given that, let's take the New York section out of the indictment so we can present the indictment Tuesday morning. Then we can do [redacted] interview in the afternoon with plans to supersede. It probably makes sense to wait on the rest of the interviews until we hear what [redacted] has to say, so let's plan to do the New York trip in a few weeks.

Bob – I will revise everything accordingly and send it down to you. We have another girl from Florida, so I will replace our New York Jane Doe with her.

*A. Marie Villafaña*

Assistant U.S. Attorney

500 S. Australian Ave, Suite 400

West Palm Beach, FL 33401

Phone 561 209-1047

Fax 561 820-8777

# 59 (e) EX 7

| Bates Range | Description | Privilege(s) Asserted |
|---|---|---|
| Suppl. Box 3 P-013836 Thru P-013837 | Palm Beach Daily News Article, "Attorneys want Jeffrey Epstein Agreement Thrown Out," with attorney's notes written on margin | Atty work-product |
| Suppl. Box 3 P-013838 Thru P-013841 | Letter from Paul Cassell to Wifredo A. Ferrer, December 10, 2010, Subject: Request for Investigation of Jeffrey Epstein Prosecution, with underlines, written notes, and comments by DOJ attorney | Atty work-product |
| Suppl. Box 3 P-013842 | Email from Dexterr Lee to Ruth Plagenhoef (OPR), February 25, 2011, 4:31 p.m., Re: Request for OPR Investigation – Jeffrey Epstein Non-Prosecution Agreement | Atty work-product Atty-client privilege |
| Suppl. Box 3 P-013843 Thru P-013844 | E-mail, Marie Villafana to Andrew Lourie, Rolando Garcia, and Karen Atkinson, September 19, 2007, 4:33 p.m., RE: Plea Agreement | Atty work-product atty-client privilege |
| Suppl. Box 3 P-013845 Thru P-013846 | E-mail, Andrew Lourie to Marie Villafana, September 19, 2007, 4:21 p.m., RE: Epstein, with internal U.S. Attorney's Office e-mails attached | Atty work-product |
| Suppl. Box 3 P-013847 Thru P-013849 | E-mail, Marie Villafana to Andrew Lourie, Rolando Garcia, and Karen Atkinson, September 18, 2007, 11:43 a.m., RE: Draft Agreements?, with e-mail from Jay Lefkowitz (September 18, 2007, 11:09 a.m.) attached | Atty work-product |
| Suppl. Box 3 P-013850 | E-mail, Marie Villafana to Alex Acosta, Andrew Lourie, Rolando Garcia, Karen Atkinson, and John McMillan, September 18, 2007, 9:31 a.m., RE: Epstein Negotiations | Atty work-product |
| Suppl. Box 3 P-013851 Thru P-013853 | E-mail, Marie Villafana to Rolando Garcia and Andrew Lourie, September 17, 2007, 10:35 a.m., RE: Epstein [providing update re plea negotiations] | Atty work-product |
| Suppl. Box 3 P-013854 | E-mail, Marie Villafana to Andrew Oosterbaan, September 13, 2007, 8:10 p.m., RE: Epstein, with e-mail from Andrew Oosterbaan (September 13, 2007, 7:54 p.m.), attached | Atty work-product |
| Suppl. Box 3 P-013855 | E-mail, Marie Villafana to Jeff Sloman and Andrew Lourie, September 10, 2007, 5:24 p.m., RE: FBI | Atty work-product Atty-client privilege |
| Suppl. Box 3 P-013856 Thru P-013857 | E-mail, Marie Villafana to Jeff Sloman, September 6, 2007, 5:47 p.m., RE: Epstein, with e-mail from Jeff Sloman (September 6, 2007, 5:35 p.m.), attached | Atty work-product Atty-client privilege |

# 59 (e) EX 8

| Date | To | From | Re: | Exhibit # |
|---|---|---|---|---|
| 8/30/2007 | | | United States' Surreply to Replies filed by Witness William Riley and Intervenor Jeffrey Epstein re Motion to Quash Grand Jury Subpoenas and Sealed Document Tracking Form and Supplemental Ex Parte Declaration | |
| 8/31/2007 | | | Meeting (US: Drew Oosterbaan, Marie Villafaña, Nesbitt Kuyrkendall and Jason Richards) | |
| 9/4/2007 | Jeff Sloman | Marie Villafaña | 9/4/2007-9/6/2007 Emails between Jeff Sloman and Marie Villafaña regarding planned participation of FBI ASAIC at 9/7/07 meeting with Epstein defense team | 44 |
| 9/6/2007 | A. Marie Villafaña | Gerald Lefcourt | Beller and Gany are represented by Nat Dershowitz. NES is working on getting the extra documents requested and the certification. | |
| 9/6/2007 | Nathan Z. Dershowitz | A. Marie Villafaña | Questioning representation of [redacted] and [redacted] | |
| 9/6/2007 | Nathan Z. Dershowitz | A. Marie Villafaña | Subpoena for Leslie Groff to appear for Grand Jury on 9/18/07 and anticipated topics | |
| 9/6/2007 | Nathan Z. Dershowitz | A. Marie Villafaña | Subpoenas for Harry Beller and Eric Gany to appear before GJ on 9/11/07. | |
| 9/7/2007 | | | 9:31 am draft Plea Agreement | |
| 9/7/2007 | | | 9:43 am draft Non-Prosecution Agreement | |
| 9/7/2007 | | | 1:15 pm draft Non-Prosecution Agreement | |
| 9/7/2007 | | | 1:17 pm draft Plea Agreement | |
| 9/7/2007 | | | Meeting (US: Alexander Acosta, Drew Oosterbaan, Jeff Sloman, Marie Villafaña, and John McMillan, DEF: Kenneth Starr, Jay Lefkowitz, and Lilly Sanchez) | |
| 9/10/2007 | | | 5:17 pm draft Non-Prosecution Agreement | |
| 9/10/2007 | J. Sloman | A. Marie Villafaña | Email re negotiations | 46 |
| 9/10/2007 | J. Sloman, J. McMillan | A. Marie Villafaña | Email re state grand jury proceedings | 45 |
| 9/10/2007 | Jeff Sloman, Andrew Lourie | A. Marie Villafaña | Email re FBI | 45 |
| 9/10/2007 | Lefcourt | Villafaña | Email with 4 page NPA attached (RFP3) | 47 |

# 59 (e) EX 9

**Villafana, Ann Marie C. (USAFLS)**

**From:** Jay Lefkowitz <JLefkowitz@kirkland.com>
**Sent:** Friday, August 15, 2008 10:53 AM
**To:** Villafana, Ann Marie C. (USAFLS)
**Cc:** Atkinson, Karen (USAFLS); Roy BLACK; Martin Weinberg
**Subject:** Re: Follow-up point

Marie - thanks for responding to my email. You have narrowed down some of the implementation issues.

As I told you this morning, we cannot accept your contention that Mr. Epstein is bound by an agreement he didn't sign as opposed to one he did sign, particularly in light of my written communications to your office dated December 21, 2007 and December 26, 2007. However, before we can make a determination whether to adopt the December language as you have now explained it, we need to confer with our client, which we will be able to do within the next two weeks.

I look forward to speaking with you soon to resolve these issues.

Jay

---

**From:** "Villafana, Ann Marie C. (USAFLS)" [Ann.Marie.C.Villafana@usdoj.gov]
**Sent:** 08/14/2008 03:27 PM AST
**To:** Jay Lefkowitz
**Cc:** "Atkinson, Karen (USAFLS)" <Karen.Atkinson@usdoj.gov>; "Roy BLACK" <RBLACK@royblack.com>
**Subject:** RE: Follow-up point

Dear Jay:

The modification contained in the December letter is clear and simple, that is why we were not surprised by Mr. Epstein's and his attorneys' actions affirming acceptance of the modification. Mr. Epstein's acceptance of the modification by pleading guilty was equally clear and simple -- it followed written communications from Mr. Sloman and myself that read: "Mr. Epstein has until the close of business on Monday, June 30, 2008, to comply with the terms and conditions of the agreement between the United States and Mr. Epstein (as modified by the U.S. Attorney's December 19th letter to Ms. Sanchez), including entry of a guilty plea, sentencing, and surrendering to begin his sentence of imprisonment."

As clearly stated in the December letter, only those "individuals whom [the United States] was prepared to name in an Indictment as victims of an enumerated offense" are the beneficiaries of the agreement. That is the list of names that I provided to Messrs. Goldberger and Tein following the change of plea. Under the September/October agreement, all "individuals whom [the United States] has identified as victims" are the beneficiaries, so I would prepare a supplement to the earlier list to include identified victims whom we were not yet prepared to name in an indictment.

Again, as stated in the letter, the modification replaces paragraphs 7 and 8 of the Agreement, including paragraphs 7A through 7C that are included in the October Addendum. This means that Mr. Epstein's waiver

# 59 (e) EX 10

**on notice that they're being difficult?**

A I -- I -- that's fair.

**Q Okay. In the course of that being difficult, 19a is an e-mail to you from [redacted] on September 18 in which she represents that -- or, explains that the defense is -- is -- that things are kind of falling apart with the negotiations, and she fears the deal is going to fall apart completely.**

MR. TODD: Should we take a quick break here? You're losing your voice.

[redacted]: I'm fine.

MR. TODD: You could probably use a minute.

[redacted]: All right. We'll take a break.

THE WITNESS All right.

[redacted]: A four minute break.

MR. TODD: Four minutes, that's --

[redacted]: Okay.

(Off the record.)

BY [redacted]:

**Q Back on the record. Looking at Exhibit 19c, you say -- you write to [redacted] [redacted] regarding whether you're available to -- at a time when she's going to be hashing out language. You advise her that -- but I -- "I don't think I should be part of negotiations. I'd rather leave that to you if that's okay."**

A Yes.

# 59 (e) EX 11

has prosecuted any number of cases.

**Q In -- again, just to keep --**

A Right.

**Q -- perspective and context, the final week that this was being negotiated, [redacted] Lourie was in Washington, and bouncing back and forth on the weekends, because he was in transition to the front office here in the criminal division in this building. That's a factor in terms of being able to give attention to some details. Would you agree with that? It could be a factor?**

A So, it could be a factor. On the other hand, I'd say that [redacted] wasn't leaving the department. He is professional. He knows his stuff, and you would expect a professional -- if they're reviewing a document, whether they're on vacation, whether they're looking to move from one part of the department to another, that you would expect them to review it, you know, fulfilling their -- their responsibility to sort of focus in and make sure that -- that it's -- that it encompasses what it should. And that's not a criticism of [redacted]. That -- that's saying that, well, that might be a factor. That doesn't lessen from my perspective reliance on his expertise.

**Q Mm-hmm. Understood. After the NPA was signed --**

A Right.

**Q -- and [redacted] came back --**

# 59 (e) EX 12

where this could have come from.

I was -- I would have reviewed this for the policy concerns. Did it do the -- the sort of the bullet points, and my assumption, rightly or wrongly, would have been that [redacted] and [redacted] would have looked at this, and that this was -- was appropriate. I understand your point.

**Q All right, and I believe the point you were referring to is that when I use the term jail -- get out of jail free card, that you recognize this is limited to your district?**

A And that's an important point --

**Q Of course.**

A -- to recognize.

**Q Of course, but nonetheless, this does give blanket immunity to people -- you have no idea who they might be, correct? If you had focused on it, would that have raised some question in your mind?**

A If -- if there was a discussion like what we're having here, then it very possibly could have raised. It's difficult to say it would have, but I understand your concern.

**Q All right, and the named individuals, [redacted] are all individuals who were described in the pros memo and so on, and the pros memo does identify that at least one of these**

# 59 (e) EX 13

**idea why that might be the case?**

A I can't, and my recollection was after -- after several issues that took place, the department had some sort of records retention software that automatically retained these e-mails. Is that not accurate?

**Q There was a -- there was a switchover from --**

A Right.

**Q -- a period in which that record retention responsibility resided with each U.S. Attorney's Office, and at the switchover, it became centralized.**

A Right.

**Q And this appears to have sort of gotten lost in the --**

A Been caught in the switchover. I -- my recollection is that there was some automatic retention mechanism --

**Q Okay.**

A -- and I can't address that, although there's certainly a fulsome -- a fulsome record.

**Q But just to ask the inevitable question --**

A Right.

**Q -- did you take any action to discard, destroy, or dispense with any official records --**

A Not --

**Q -- related to this matter?**

# 59 (e) EX 14

A Not to my recollection. I think there's a fulsome record, and not to my recollection.

**Q All right, and is there any particular gap that you've discerned in the records that we've provided to you?**

A Not that I recall. Do you have the e-mails that I sent, out of curiosity?

**Q We do.**

A Okay. So, you have the sent, but not received.

**Q Yes.**

A Just checking.

**Q And likewise, we retrieved from the federal records center --**

A Right.

**Q -- records that were boxed up and sent there, hard copy documents, after your term ended, and there is nothing that relates to the Epstein case. There were records that were maintained that were kept in the main office --**

A Right.

**Q -- after you left, because it was an ongoing matter, but it -- do you have any idea why there are not any in the records of yours --**

A So --

**Q -- that were sent?**

A So, I have a recollection that when I left, there were some binders that I passed along to [redacted], because it was

# 59 (e) EX 15

**DOCUMENT: Call log memo, "EPSTEIN - TC AUSA JILL STEINBERG 3-12-09"**

**DATE: March 12, 2009**

**EFTA NUMBER: EFTA00800336 (1 page)**

**SOURCE: DOJ Epstein Files Transparency Act production, retrieved via epstein-data.com full-text corpus**

***** THE KEY 2009 DOCUMENT FOR THIS RESEARCH THREAD *****

**This is the earliest-dated document found referencing Jill Steinberg. It is a memo-to-file/notes memorializing a 10-minute phone call the (unnamed) author placed to AUSA Jill Steinberg's office in the Northern District of Georgia, with two other (silent) prosecutors also on the line. See the STATUS file and Claude's analysis in "Claude Answers re Steinberg" for commentary, including a working hypothesis — based on a corroborating 2017 invoice (EFTA00587295) and CVRA docket records — that the caller was Epstein's own defense counsel (most likely Martin G. Weinberg, Roy Black, or Jay Lefkowitz — the three attorneys formally listed as "intervening lawyers" for Epstein in the CVRA case), not a government official.**

EPSTEIN - TC AUSA JILL STEINBERG 3-12-09
10 minute call. 2 other prosecutors in AUSA Steinberg's office. They were silent.
Substance:
1. I said the purpose of call was to introduce myself, to let them know that in the past where there was some alignment of interest in regards to the NPA that I had been in touch with Dexter Lee and that if they had any questions about the history of the case that I could answer now or in the future, that I wanted the lines of communication to be open. Response – a polite thanks, but no questions.
2. I said that in the midst of all the pleadings I wanted to note one thing – that despite the media – the NPA was negotiated at arms length, that in 2007 with the hierarchy of the SD Fla including the FA US Atty or representatives of the Criminal Division, and then on two occasions the Office's decision to enter the NPA and its exercise of discretion was approved, the first time in March 2008 following a meeting at DOJ where the Govt was led by Sigal Mandelker and then a second time when the NPA was reviewed at DAG level.
3. I said I had to make a decision when to advise the Court we were exercising our intervention rights. I asked whether from the Govt perspective there was a prospect for resolving the matter by agreement. Response: its too early to say but that the Petitioners are asking for rescission "regardless of where the Government ends up" so its "likely that we will be in the mix again"
4. I said that we had carefully researched the issue and felt that the rescission remedy if it was sought would collide with strong constitutional and contractual arguments. Response: right now we "are focused consistent with J Marra's Order" on "determining a process" to determine remedy and not on any specific positions on what the remedy should be and that if we wanted to participate in conversations about the process we should consider that in terms of any intervention.
5. I said I would like to keep the door open to a future conversation, was likely to file a notice with the Court at some time and then call again closer in time to the date at which the Party's need to report to the Court Response: we can certainly speak again at that time reiterating that the

Govt is just starting its review and that its premature to even discuss
a process much less a proposed remedy.

# 59 (e) EX 16

**From:** [redacted]
**To:** [redacted]
**Subject:** FW: Excel spreadsheet/ phone co. info
**Date:** Mon, 22 Mar 2010 13:05:17 +0000
**Importance:** Normal
**Attachments:** excel_subpoena_info.xls

---

Hi [redacted] I forgot to send this to you eons ago. Can you prepare grand jury subpoenas in the Operation Stolen Globe matter for these numbers?

[redacted]
Assistant U.S. Attorney
500 S. Australian Ave, Suite 400
West Palm Beach, FL 33401
[redacted]

---

**From:** [redacted]
**Sen**[redacted]
**To:** [redacted]
**Subject:** Excel spreadsheet/ phone co. info

Hi [redacted]

Sorry this has taken so long. Attached is a list of phone numbers and the corresponding phone company info for the massage lists in California, New Mexico, and the Virgin Islands. I also have Epstein's numbers from the island on this excel sheet .

I'm still working on Epstein, Maxwell, and [redacted] numbers from NY, NM, etc. and will attach those in a separate spreadsheet. There's around 150 additional of those numbers.

I also have copies of 2 of 4 of the CD's of Alfredo's depos. There's a problem with a couple of the disks. Do you want me to drop off what I have copied to you?

As far as Alfredo's case, is there anything that you'd like me to work on?

Again, sorry it's been several weeks since I checked in with you.

Have a good weekend,

[redacted]

[redacted]
FBI Miami Division
505 Flagler Dr. Ste. 500
West Palm Beach, FL 33401
[redacted]

# 59 (e) EX 17

| Date | To | From | Re: | Exhibit # |
|---|---|---|---|---|
| 6/15/2009 | Villafaña | Lefkowitz | Letter re Josefsberg's fees | |
| 6/16/2009 | Villafaña | Katherine W. Ezell | Email with attachment | |
| 6/17/2009 | Lefkowitz | Villafaña | Letter in response to Lefkowitz's 6/15/09 letter | 89 |
| 6/19/2009 | Villafaña | Lefkowitz | Letter re discussion regarding ongoing obligations per NPA | |
| 7/6/2009 | Villafaña | Spencer Kuvin | Letter requesting copy of NPA | |
| 7/7/2009 | Lefkowitz | Villafaña | Letter in response to 6/19/09 letter | |
| 7/8/2009 | Villafaña | Critton | Letter re NPA with attached Defendant Epstein's Motion to Dismiss Plaintiff's Complaint (Jane Doe #8) | |
| 7/31/2009 | Villafaña | Spencer Kuvin | Letter with follow up request for NPA | |
| 8/4/2009 | Spencer Kuvin | Villafaña | Letter in response to request for NPA | |
| 8/5/2009 | | | Respondent BB's Motion to Supplement the Record (4D09-2554) | |
| 8/20/2009 | | | Jeffrey Epstein's Response to Motion to Supplement the Record (4D09-2554) | |
| 9/1/2009 | Roy Black | A. Marie Villafaña | Draft of letter regarding breach of Non Prosecution Agreement with handwritten attorney (Villafaña) notes | |
| 9/1/2009 | Sloman | Roy Black | Letter re Epstein wanting to transfer his supervision from State of Florida to the Virgin Islands | 90 |
| 9/17/2008 | | | Draft of letter regarding transfer of supervision to the Virgin Islands with attorney | |
| 9/18/2009 | Black | Villafaña | Letter in response to transfer of supervision to the Virgin Islands (Villafaña) notes | 91 |
| 9/29/2009 | Hon. Jeffrey Colbath | Adam Horowitz | Letter that Epstein violated his No-Contact Order on 9/16/09 by coming within 10 feet of Horowitz's client, Individual #44, Jane Doe No. 4. | |
| 10/21/2009 | Villafaña | Roy Black | Response to 9/18/09 letter | |
| 10/29/2009 | | | Open file and request USAO# (2009R02690, Operation Stolen Globe) | |

# 59 (e) EX 18

> well that no under age women were on board and no illicit activities took place. RRA also inappropriately attempted to take the depositions of these celebrities in a deliberate effort to bolster Rothstein's lies.

*Exhibit D*, p. 17.

At a hearing attended by Edwards in the United States Bankruptcy Court for the Southern District of Florida in the matter of *In Re Rothstein, Rosenfeldt, Adler, P.A., debtor*, on August 4, 2010, Scherer argued before the court:

> In November we filed a lawsuit in State Court and we alleged that as part of Mr. Rothstein and the firm, and the firm's employees, and maybe some of the firm's attorneys, conspired to use the Epstein[redacted]litigation in order to lure $13.5 million worth of my victims, my clients, into making investments in these phony settlements…And as we alleged in that State Court proceeding…that sometime in October, that my clients were invited into the Rothstein firm with Mr. Rothstein, and he explained that with Mr. Edwards representing [redacted] a victim of Mr. Epstein, and these are kind of sensational allegations and it's been printed widely…So he used the real case in order to defraud my clients into investing into these phony settlements…I believe that Mr. Rothstein and others in the firm also told that story to a lot of other people... In addition, as we have alleged, that Mr. Edwards and the firm put sensational allegations in the [redacted] case that they knew were not true, in order to entice my clients into believing that Bill Clinton was on the airplane with Mr. Epstein…And to the extent that any lawyers from the RRA firm, former lawyers, made a ton of money or however Mr. Farmer [Edwards's current law partner] talked about it…So we know it wasn't just Mr. Rothstein spinning the tale, there were a lot of people in the firm.

*See Hearing Transcript, pgs. 17-22, Exhibit D,* attached hereto. Scherer further explained to that the Complaint only "names Rothstein. It does not name Mr. Edwards…it lays out the facts and says other people in the firm… we want to see the documents and see whether they had involvement." *See Exhibit D*, p. 22, lines 1-8. The documents to which Scherer refers are boxes of files relating to the [redacted]/Epstein case which Rothstein and others used as bait to entice the plaintiffs into investing in the Epstein cases. *See Exhibit D*, p. 22-23. These documents were not produced before the case settled.

# 59 (e) EX 19

**Privilege Log – Dated 2-23-2011**

**[redacted], Jaffe, Weissing, [redacted], Fistos & Lehrman**

| [redacted] | DATE | TO | FROM | DESCRIPTION | OBJECTION |
|---|---|---|---|---|---|
| 11240-11245 | 06/22/2009 | Katherine Ezell | [redacted] | Article:Bear Stearns | Joint W/P Priv. |
| 11248-11250 | 06/22/2009 | Amy Ederi | [redacted] | Article:Bear Stearns | Joint W/P Priv. |
| 11255-11259 | 06/23/2009 | Katherine Ezell | [redacted] | USAO Chose [redacted] conversation | Joint W/P Priv. |
| 11269-11281 | 06/30/2009 | Stuart Mermelstein | [redacted] | RE:Epstein Depo;possible deponents | Joint W/P Priv. |
| 11316-11319 | 06/28/2009 | Katherine Ezell | [redacted] | Discussion about possible witness from Switzerland | Joint W/P Priv. |
| 11332-11336 | 08/04/2009 | Spencer Kuvin | [redacted] | FW:Transcript of Alfrefo Rodriguez Depo and Copperfeild and Clinton's whereabouts | Joint W/P Priv. |
| 11340-11341 | 08/05/2009 | Mercedes [redacted] | [redacted] | RE:Epstein vs.Jane Doe No.101 & 102 | Joint W/P Priv. |
| 11348-11358 | 08/06/2009 | Adam Horowitz | [redacted] | RE:Motion for protective order/discussion | Joint W/P Priv. |
| 11430-11434 | 08/27/2009 | Spencer Kuvin | [redacted] Edwards | Discussion RE:Wexner involvement | Joint W/P Priv. |
| 11443 | 09/17/2009 | Katherine Ezell | [redacted] Edwards | Wexner served subpoena [redacted] | Joint W/P Priv. |
| 11541-11542 | 09/29/2009 | Katherine Ezell | Bradley [redacted] | RE:Leslie Wexner & Bob | Joint W/P Priv. |
| 11551-11559 | 10/01/2009 | Spencer Kuvin | [redacted] | RE:Meeting w.Stanely Arkin | Joint W/P Priv. |
| 11585-11586 | 10/14/2009 | Adam Horowitz | [redacted] | RE:Epstein;Larry Visoski confirmed | Joint W/P Priv. |
| 11675-11676 | 10/29/2009 | Stuart Mermelstein | [redacted] | RE:Leslie Wexner attorney info | Joint W/P Priv. |

NOT A CERTIFIED COPY

# 59 (e) EX 20

**From:** [redacted]) <[redacted]>
**Sent:** Monday, October 21, 2019 6:40 AM
**To:** Gloria Allred <[redacted]>; [redacted]) <[redacted]>
**Cc:** [redacted]) <[redacted]>; [redacted]. (NY) (FBI) <[redacted]>
**Subject:** RE: Urgent. I have a new alleged victim of E I have a new client who was a victim of Epstein. She is willing to fly to New York for the victim meeting on Oct. 23. May I call you at 5:45 P.M. to discuss ?

Gloria,

We will make ourselves available to meet with your new client on 10/23. Because the victim meeting is being run by the FBI, their victim services folks are handling travel logistics. I'm cc'ing [redacted], who should be able to hopefully help coordinate travel. Would you please provide [redacted] with your new client's name as it appears on her ID, date of birth, email address, and phone number?

Thanks,
[redacted]

[redacted]
Assistant United States Attorney
Southern District of New York
1 St. Andrew's Plaza
New York, NY 10007
[redacted]

**From:** Gloria Allred <[redacted]>
**Sent:** Friday, October 18, 2019 5:02 PM
**To:** [redacted]) <[redacted]>
**Cc:** [redacted]) <[redacted]>
**Subject:** Urgent. I have a new alleged victim of E I have a new client who was a victim of Epstein. She is willing to fly to New York for the victim meeting on Oct. 23. May I call you at 5:45 P.M. to discuss ?

**Gloria Allred**
**Allred, Maroko & Goldberg**
6300 Wilshire Blvd., Suite 1500
Los Angeles, CA 90048
[redacted]
*www.amglaw.com*
*www.gloriaallred.com*
<image003.jpg>
<image004.png>

This message is CONFIDENTIAL and may contain legally privileged information intended only for the addressee. If you are not the addressee you may not use, forward, copy or disclose to anyone any information contained in this message. IF YOU RECEIVED

# 59 (e) EX 21

**From:** Brittany Henderson <[redacted]>
**To:** "[redacted]>
**Cc:** Brad Edwards <brad@epllc.com>, "[redacted]>, "[redacted]>
**Subject:** Re: Jeffrey Epstein
**Date:** Thu, 30 Apr 2020 02:29:20 +0000
**Importance:** Normal
**Inline-Images:** image001.png

---

Thank you for the info!! I will definitely call you tomorrow.

Hope you are all staying safe up there!

Brittany Henderson, Esq.
Edwards Pottinger LLC
425 North Andrews Ave, Suite 2
Fort Lauderdale, FL 33301
www.epllc.com

On Apr 29, 2020, at 10:20 PM, [redacted]> wrote:

Hi Brittany - OVS is only available for victims that their crimes were committed in New York State. We can ask for the 12 sessions through HQ but Randee will need to request per the new procedures we have set in place with her.

Call me tomorrow if you have any questions. I also wanted to make sure that you got my message about OVS for victims that we have not interviewed; that we will be unable to provide a formal police report/FBI crime verification form for them. I did give OVS the case number but if they decide they need the verification form to open up a claim we will need to speak to them. I have discussed with Mandy whis copied here.

Let me know if you have questions.
Stay well!
[redacted]

-

On Apr 29, 2020 3:42 PM, Brittany Henderson <[redacted]> wrote:
[redacted],

I have attached the OVS application for [redacted]. Please let me know if you need anything else. If she is approved, she is going to treat with Randee Kogan.

Thank you so much!

<image001.png>

**Brittany Henderson**
**Trial Attorney**

425 North Andrews Avenue, Suite 2
Fort Lauderdale, Florida 33301
[redacted] | www.epllc.com

EDWARDS
POTTINGER LLC

# 59 (e) EX 22

**Villafana, Ann Marie C. (USAFLS)**

**From:** Villafana, Ann Marie C. (USAFLS) <AVillafana@usa.doj.gov>
**Sent:** Monday, July 21, 2008 12:31 PM
**To:** Kuyrkendall, E N. (MM) (FBI)
**Subject:** RE: Addresses

Are there any girls who have not been contacted yet?

*A. Marie Villafaña*
Assistant U.S. Attorney
500 S. Australian Ave, Suite 400
West Palm Beach, FL 33401
Phone 561 209-1047
Fax 561 820-8777

---

**From:** Kuyrkendall, E N. (FBI)
**Sent:** Monday, July 21, 2008 11:23 AM
**To:** Villafana, Ann Marie C. (USAFLS)
**Subject:** Addresses

Marie,

Here is a copy of the most up-to-date addresses. Twiler told me that Randy was telling her that Edwards has been talking to some of the victims that she is counseling and that he is encouraging them that 18 months is not long enough of a sentence for Epstein. I am not sure who she is referring to but that Randy is having to provide additional counseling. If you have any questions regarding this you might want to speak directly to Twiler.

Talk to you soon.

Nesbitt

# 59 (e) EX 23

**From:** "[redacted]
**To:** "[redacted]
**Cc:** "[redacted]
<[redacted]
**Subject:** Epstein - Documents to be approved
**Date:** Tue, 01 Oct 2019 16:52:45 +0000
**Importance:** Normal
**Attachments:** RSVP_Questionnaire.docx; Draft_RSVP_language.docx

---

Hello [redacted]

Please find attached two documents that need to be reviewed and approved by NY. The first document is a the RSVP questionnaire and the second document is draft language for emails to be sent at a later date. Please let me know if you have questions.

[redacted]

[redacted]
Program Manager
Victim Services Division
FBIHQ, Room 3329
Telephone: [redacted]
Cell: [redacted]
Fax: [redacted]
E-mail: [redacted]

THIS DOCUMENT IS INTERNAL AND MAY NOT BE RELEASED OUTSIDE THE FBI WITHOUT PRIOR AUTHORIZATION
CONFIDENTIALITY NOTICE -- This e-mail (including attachments) is covered by the Electronic Communication Privacy Act, 18 U.S.C. sections 2510-2512, is for the sole use of the intended recipient(s) to which it is addressed and may contain confidential and sensitive material that requires protection from unauthorized disclosures. Recipients shall not disclose any Personally Identifiable Information (PII) contained in this email (including attachments) without the prior written or electronic consent of the FBI and shall take such actions as are necessary to prevent unauthorized access to such information by a person other than the intended recipient(s). Do not disseminate this email, or its contents, to anyone who does not have an official need for access. If you are not an intended recipient and received this communication in error, you are hereby notified that any retention, review, dissemination, distribution, or copying of this communication is strictly prohibited. Please notify the sender by a separate e-mail and delete this message and any attachments. Any misuse of unauthorized disclosure can result in both civil and criminal penalties.

# 59 (e) EX 24

**From:** [redacted]>
**To:** "[redacted]>
**Subject:** Fwd: FW: FBI Victim Services Division Briefing for Victims of Jeffrey Epstein
**Date:** Mon, 30 Sep 2019 23:38:21 +0000
**Importance:** Normal
**Attachments:** image001.png
**Inline-Images:** image003.jpg

---

-

---------- Forwarded message ----------
From: VictimServices <[redacted]>
Date: Sep 27, 2019 5:19 PM
Subject: FW: FBI Victim Services Division Briefing for Victims of Jeffrey Epstein
To: [redacted]

Emails have been sent, below is a copy sent to the [redacted] email box that I included in our data set when creating the mail merge.

Angela – good to send that email to the attorneys, emails below for reference

| Attorney | Email |
|---|---|
| Gloria Allred | [redacted] |
| Alexandra Marina Conlon | |
| Brad Edwards | |
| Robert Glassman | |
| Robert Josefsberg | |
| Kimberly Lerner | |
| Sigrid McCawley | |
| Colleen Mullen | |
| Jack Scarola | |
| Spencer Kuven | |

Have a good weekend all and let's get a conference call together for some time Monday

-Paul

---

**From:** VictimServices
**Sent:** Friday, September 27, 2019 5:14 PM

**To:** VictimServices <[redacted]>
**Subject:** FBI Victim Services Division Briefing for Victims of Jeffrey Epstein

Federal Bureau of Investigation
Victim Assistance Program
New York Division

---

September 27, 2019

RE: Case Number: [redacted]

Dear Victim Services COPY,

The FBI Victim Services Division invites you to attend a meeting with FBI Victim Services representatives and members of the FBI NY Field Office and the U.S. Attorney's Office for the Southern District of New York to learn more about the victim services that may be available to you. While we will not be able to provide specific details about the active investigation, we will provide you with information about the types of services we can provide and that you are entitled to, and Victim Specialists will be on site to try to address any specific questions you may have.

These meetings will be held in two different locations, New York and Florida. Please choose which meeting you prefer to attend:

Date: October 15, 2019
Time: 10:00 AM
Location: 2030 SW 145th Avenue, Miramar, FL 33027

Date: October 23, 2019
Time: 10:00 AM
Location: 290 Broadway, New York, NY 10007

Participation is limited to you and one support person. If you are interested in attending, please respond by October 4, 2019 to [redacted] with your name, and if you choose, the name of one support person who will accompany you, as well as the meeting location you wish to attend. We will follow up with additional information to finalize your attendance.

Thank you,

FBI Victim Services Division

# 59 (e) EX 25

**From:** "Jackson, Angela (NY) (FBI)" [redacted]
**To:** "Allen, Amanda L. (DO) (FBI)" [redacted]
**Subject:** Re: Re: New Victim for treatment
**Date:** Fri, 08 May 2020 14:37:49 +0000
**Importance:** Normal

---

Thank you

-

On May 8, 2020 10:35 AM, "Allen, Amanda L. (DO) (FBI)" [redacted] wrote:
Good to go. I added it in SP.

---

**From:** Jackson, Angela (NY) (FBI) [redacted]
**Sent:** Friday, May 8, 2020 10:34 AM
**To:** Allen, Amanda L. (DO) (FBI) [redacted]
**Subject:** Fwd: Re: New Victim for treatment

Amanda see below.

-

---------- Forwarded message ----------
From: "Young, Amanda N. (NY) (FBI)" [redacted]
Date: Apr 24, 2020 1:51 PM
Subject: Re: New Victim for treatment
To: "Jackson, Angela (NY) (FBI)" [redacted]
Cc: "Allen, Amanda L. (DO) (FBI)" [redacted]
Yes, she is a known victim. We met with her last year in person with Brad present. She spoke with a VS in FL as well.

---

**From:** Jackson, Angela (NY) (FBI) [redacted]
**Sent:** Friday, April 24, 2020 1:49:27 PM
**To:** Young, Amanda N. (NY) (FBI) [redacted]
**Cc:** Allen, Amanda L. (DO) (FBI) [redacted]
**Subject:** Fwd: New Victim for treatment

Hi Mandy - please see below. Has she met with you?
Thanks
Angela

-

---------- Forwarded message ----------
From: Randee Kogan [redacted]
Date: Apr 24, 2020 1:27 PM
Subject: New Victim for treatment
To: "Jackson, Angela (NY) (FBI)" [redacted] "Allen, Amanda L. (DO) (FBI)" [redacted] "Collicelli, Lynn M. (DO) (FBI)" [redacted] Beth Carrus

[redacted]
Cc:
Good afternoon everyone,

I hope you and your families are all safe. I wanted to inform you that [redacted] requested a therapy appointment as a result of her victimization by Mr. Epstein. I wanted to get your approval for the 12 sessions prior to her appointment next week. I believe she had met and interviewed with the FBI already. If you need any further information or have any questions, please do not hesitate to reach out. Thank you so much for your assistance and support!

Randee Kogan, M.S., L.M.H.C.
Licensed Psychotherapist
5700 Lake Worth Road, Suite 110
Greenacres, Florida 33463
[redacted]

# 59 (e) EX 26

Jack,

Are you able to tell us whether there was a protective order entered in the civil suit, or any other type of agreement that would govern disclosing materials from the civil case with us? When you shared the deposition, we assumed there were no such restrictions, but I wanted to check.

Thanks,

[redacted]

---

**From:** Jack Scarola <[redacted]>
**Sent:** Thursday, September 10, 2020 3:46 PM
**To:** [redacted]) <[redacted]>
**Cc:** [redacted]) <[redacted]>; [redacted] (USANYS) <[redacted]>
**Subject:** Re: 12/04/09 [redacted]. vs Epstein Deposition Transcript

Please let me know if you are able to locate the transcript.

On Sep 10, 2020, at 11:30 AM, [redacted]) <[redacted]> wrote:

Jack,

Thanks for your email. We will likely reach out to your adversary in the deposition to ask for a copy, but I wanted to check to see whether you had already done so.

Thanks,

[redacted]

---

**From:** Jack Scarola <[redacted]>
**Sent:** Wednesday, September 9, 2020 9:53 AM
**To:** [redacted]) <[redacted]>; [redacted]) <[redacted]>; [redacted] (USANYS) <[redacted]>
**Subject:** Fwd: 12/04/09 [redacted]. vs Epstein Deposition Transcript

The email exchange below confirms our inability to locate the first volume of [redacted] deposition. However, attached are fairly detailed notes of Paralegal/Investigator Mike Danchuk, who attended the deposition and recorded these notes contemporaneously. [redacted] appears to have held nothing back, and the notes certainly paint a picture of the kind of troubled young women who were particularly susceptible to Epstein's pattern of recruitment, grooming and victimization.

Sent from my iPad

Begin forwarded message:

**From:** "Chris R. Rodgers" <[redacted]>
**Date:** September 8, 2020 at 3:30:51 PM EDT
**To:** Jack Scarola <[redacted]>
**Cc:** Mary McCann <[redacted]>, "Wendy P. Calvet" <[redacted]>, [redacted]
**Subject: FW: 12/04/09 [redacted]. vs Epstein Deposition Transcript**

Jack, below is the "Unable to locate" response from Prose Court Reporting. Visual Evidence, the videography service used, also confirmed on Friday that a copy of the video is no longer available. I have attached Mike Danchuk's notes from that deposition.

**From:** toni proseflorida.com <[redacted]>
**Sent:** September 7, 2020 7:03 AM
**To:** Chris R. Rodgers <[redacted]>
**Subject:** RE: 12/04/09 [redacted]. vs Epstein Deposition Transcript

**Chris,**

**I have searched our records and archives and I am unable to locate Volume I of this deposition from 2009.**

**Sincerely,**
**Toni**

*****************************************************************************************************
** | Privileged and Confidential | Electronic communication is not a secure mode of communication and may be accessed by unauthorized persons. This communication originates from the law firm of Searcy Denney Scarola Barnhart & Shipley, P.A. and is protected under the Electronic Communication Privacy Act, 18 U.S.C. S2510-2521. The information contained in this E-mail message is privileged and confidential under Fla. R. Jud. Admin. 2.420 and information intended only for the use of the individual(s) named above. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution, or copy of this communication is strictly prohibited. Personal messages express views solely of the sender and shall not be attributed to the law firm. If you received this communication in error, please notify the sender immediately by e-mail or by telephone at (800) 780-8607 and destroy all copies of the original message. Thank you.
*****************************************************************************************************
**

# 59 (e) EX 27

deposition by then-Palm Beach Chief of Police Michael Reiter, in which he stated that Epstein, a billionaire with many powerful friends, had received special treatment in both his plea deal and the terms of his incarceration. Although federal investigators at one point produced a draft 53-page indictment against Epstein, he was eventually allowed to plead guilty to only two relatively minor state charges and receive a short term of incarceration: 13 months in the county jail, during which he went to the office every day, and one year of community control, during which he traveled frequently to New York and his private island in the Virgin Islands.

The Daily Beast has now discovered another instance in which Epstein apparently received special consideration: As a convicted sex offender, he is required by law to undergo an impartial psychological evaluation prior to sentencing and to receive psychiatric treatment during and after incarceration. This is because child molesters tend to be repeat offenders with high rates of recidivism. According to a source in law enforcement, however, Epstein was allowed to submit a report by his private psychologist, Dr. Stephen Alexander of Palm Beach, Florida, whose phone has since been disconnected with no forwarding information.

The Daily Beast's second article provided details about Epstein's systematic abuse of underage girls at his Palm Beach mansion, where members of his staff allegedly recruited and paid a parade of teenagers, most of them 16 or younger, to perform daily massages that devolved into masturbation, groping, and sometimes full-blown sexual contact. It also revealed a monetary relationship between Epstein and Jean Luc Brunel, a frequent visitor to whom he gave $1 million around the same time that Brunel was starting his MC2 modeling agency. Some of the young girls MC2 recruited from overseas —often from Eastern Europe and South America—are known to have been passengers on Epstein's private jets.

The U.S. Attorney General's Office in Florida says that it is against policy to confirm or deny the existence of an investigation. Jeffrey Epstein's lawyer, Jack Goldberger, says he has no knowledge of an ongoing probe, and he told The Daily Beast, "Jeffrey Epstein has fully complied with all state and federal requirements that arise from the prior proceedings in Palm Beach. There are no pending civil lawsuits. There are not and should not be any pending criminal investigations, given Mr. Epstein's complete fulfillment of all the terms of his non-prosecution agreement with the federal government."

Read more: http://www.businessinsider.com/hedge-funder-joseph-epstein-investigated-for-child-trafficking-2010-7#ixzz1FxAJrdFa

------------

**From:** [redacted]. (USAFLS) <[redacted]>
**Sent:** Monday, March 14, 2011 11:27 AM
**To:** [redacted]. (USAFLS); [redacted] (USAFLS); [redacted] (USAFLS); [redacted] (USAFLS); [redacted] (USAFLS)
**Subject:** FW: Cassell or Edwards commenting to press re Jane Doe suit
**Attachments:** Duke of York to face fresh questions as Epstein case takes new twist - Telegraph.pdf.zip

Thought you should see this. Don't know if we need to file anything with the court about disclosing matters before the court to the press? Or whether it appears that Edwards may be trying to use the new criminal investigation to assist him in his defense of Epstein's civil suit against him (or in Edwards' counterclaim for defamation)?

The agents fly to [redacted] today to interview the witness.

# 59 (e) EX 28

Nick Pryer
Assistant Features Editor
Mail on Sunday

This e-mail and any attached files are intended for the named addressee only. It contains information which may be confidential and legally privileged and also protected by copyright. Unless you are the named addressee (or authorised to receive for the addressee) you may not copy or use it, or disclose it to anyone else. If you received it in error please notify the sender immediately and then delete it from your system. Please be advised that the views and opinions expressed in this e-mail may not reflect the views and opinions of Associated Newspapers Limited or any of its subsidiary companies. We make every effort to keep our network free from viruses. However, you do need to check this e-mail and any attachments to it for viruses as we can take no responsibility for any computer virus which may be transferred by way of this e-mail. Use of this or any other e-mail facility signifies consent to any interception we might lawfully carry out to prevent abuse of these facilities.
Associated Newspapers Ltd. Registered Office: [redacted].

---

This e-mail and any attached files are intended for the named addressee only. It contains information, which may be confidential and legally privileged and also protected by copyright. Unless you are the named addressee (or authorised to receive for the addressee) you may not copy or use it, or disclose it to anyone else. If you received it in error please notify the sender immediately and then delete it from your system. Please be advised that the views and opinions expressed in this e-mail may not reflect the views and opinions of Associated Newspapers Limited or any of its subsidiary companies. We make every effort to keep our network free from viruses. However, you do need to check this e-mail and any attachments to it for viruses as we can take no responsibility for any computer virus which may be transferred by way of this e-mail. Use of this or any other e-mail facility signifies consent to any interception we might lawfully carry out to prevent abuse of these facilit!

ies.
Associated Newspapers Ltd. Registered Office: [redacted].

---

**From:** [redacted] (USAFLS) <[redacted]>
**Sent:** Wednesday, March 09, 2011 4:33 PM
**To:** [redacted] (USAFLS); [redacted] (USAFLS); [redacted] (USAFLS); [redacted], [redacted] (USAFLS); [redacted] (USAFLS)
**Cc:** [redacted] (FBI)
**Subject:** Highly Confidential -- Preliminary Investigation of Additional Crimes of Jeffrey Epstein and Others

**Importance:** High

As all of you know, there has been much in the press lately about revelations by [redacted] regarding her relationship with Jeffrey Epstein and his introduction of her to a number of highly placed world and business leaders. Ms. [redacted] was one of the victims identified in our initial investigation of Jeffrey Epstein, although at the time we were only able to speak to her briefly on the telephone, and the agency and the office were unwilling to spend the funds to fly a group to [redacted] to interview her without an assurance that she would provide complete information.

Through speaking with the press, Ms. [redacted] made contact with Brad Edwards and his investigator, [redacted] Fisten, who in turn, reached out to me, and I to Special Agent [redacted], regarding these new allegations. (They

# 59 (e) EX 29

**From:** "[redacted])" <[redacted]>
**To:** "[redacted])" <[redacted]>
**Cc:** "[redacted] (USANYS)" <[redacted]>
**Subject:** Re: Epstein Estate update
**Date:** Mon, 09 Nov 2020 15:09:30 +0000

---

Thanks, I can join a call this afternoon, as long as you're ok taking the lead. I'll be continuing to review images at a snail's pace during all of my calls today.

On Nov 9, 2020, at 9:55 AM, [redacted]) <[redacted]> wrote:

Given that today is the deadline, I would be fine pushing this call to tomorrow to make more time today. Or if you'd prefer I can just deal with this call alone this afternoon.

Sent from my iPhone

Begin forwarded message:

**From:** "Weinstein, Marc A." <[redacted]>
**Date:** November 9, 2020 at 9:49:47 AM EST
**To:** "[redacted])" <[redacted]>, "[redacted])" <[redacted]>
**Cc:** Andrew Tomback <[redacted]>
**Subject: Epstein Estate update**

[redacted] and [redacted]:

Would you have time for a call this afternoon to give you an update on a new development?

Thanks,
Marc

**Marc A. Weinstein** | Partner

Chair, White Collar Defense

**Hughes Hubbard & Reed LLP**
[redacted]

This message contains confidential information and is intended only for the individual named. If you are not the named addressee you should not disseminate, distribute or copy this e-mail. Please notify the sender immediately by e-mail if you have received this e-mail by mistake and delete this e-mail from your system. E-mail transmission cannot be guaranteed to be secure or error-free as information could be intercepted, corrupted, lost, destroyed, arrive late or incomplete, or contain viruses. The sender therefore does not accept liability for any errors or omissions in the contents of this message, which arise as a result of e-mail transmission. If verification is required please request a hard-copy version.

# 59 (e) EX 30

SOURCE: epstein-data.com full_text_corpus (text-layer extract)
Bates: EFTA00020668, page 0
----------------------------------------------------------------------

From: '
To: "Weinstein Marc A."
, Andrew Tomback
Cc: "I
Subject: RE: SDNY investigation
Date: Mon, 27 Jul 2020 14:40:53 +0000
Marc,
Received, and thank you.
Best,
From: Weinstein, Marc A.
Sent: Monday, July 27, 2020 10:22
To:
<
; Andrew Tomback .cc
>
Cc:
ca;
Subject: RE: SDNY investigation
We are in receipt of your July 26, 2020 letter. On behalf of the Co-Executors of the Estate of Jeffrey E. Epstein, we can confirm the following: (i) Section 2.5(B) of The 1953 Trust has not been and will not be used by the Co-Executors to suggest that any current or former employee who chooses to meet or provide information to law enforcement as part of any ongoing investigation will be retaliated against in any way, or will lose any employment benefit, or any other benefit, inheritance, or bequest under the 1953 Trust as a result of meeting with or providing information to law enforcement; (ii) the Co-Executors have not made any distributions to Ghislaine Maxwell and will notify the United States Attorney's Office for the Southern District of New York in advance of any disbursement to her during the pendency of the criminal proceeding against her in the Southern District of New York; and (iii) the Co-Executors are not prepared at this time to waive any applicable privileges, including the attorney-client privilege, with respect to any materials obtained or seized by the Government.
Please let us know if you have additional questions.
Best regards,
Marc
Marc A. Weinstein I Partner
Chair, White Collar Defense
Hughes Hubbard & Reed LLP
One Battery Park Plaza, 17th floor I New York, NY 10004-1482
Office
I Cell
I I Fax +1 (212) 299-6460
Th.5 message cortars con`identia. information and is intended only fur the ind:vidua. named. If yea arc rut the rarreo addressee you should hot
d.ssem:rate, distribute or copy this e mai. Please notify to sender immeCiate.y by e mai. if you have Tece:ved this e mai. by mistake and delete this e
ma:l from your system. E rna:l transmission cannot be guaranteed to be secure or error free as :'formation could be ttercepted. cerrapted. lost,
EFTA00020668

SOURCE: epstein-data.com full_text_corpus (text-layer extract)
Bates: EFTA00020668, page 1
----------------------------------------------------------------------

From:
Sent: Sunday, July 26, 2020 2:51 PM
To: Weinstein, Marc A.
Cc:
Subject: RE: SDNY investigation
<
; Andrew Tomback
CAUTION: This email was sent by someone outside of the Firm.
Andy, Marc,
Following up on our recent discussions, please see the attached letter from our Office.
Regards,
Assistant U.S. Attorney
Southern District of New York
EFTA00020669

# 59 (e) EX 31

<[redacted]>
**Cc:** [redacted]) <[redacted]>; [redacted] (USANYS)
<[redacted]>
**Subject:** [EXTERNAL EMAIL] - RE: Discovery questions

Thank you so much for these—very helpful (and sorry I didn't realize the message pad scans also had the same pages without post-its!)

On these:

- Yes, please send over the copy of the gj transcript disc when you can.
- Found the original scans from the FL file—thank you!
- Yes, please get us the paper evidence from NY, VI, and Reiter as soon as you can.
- We'll take the FBI file whenever you can get it to our office.
- My understanding from past FBI cases is that CART completes some sort of paperwork documenting the dates on which they conduct data extractions. We need that for all of the extractions in this case, please (It may not be 302s).
- On the evidence from disks, understood. In order to give you more time, we are going to tell the defense attorneys that the materials are available for them to review in-person if they want to schedule a time to come down to the FBI office, but that in the meantime we are still working on getting copies of non-nude images to produce to them.

---

**From:** [redacted]) (FBI) <[redacted]>
**Sent:** Wednesday, August 19, 2020 2:21 PM
**To:** [redacted]) <[redacted]>; [redacted] <[redacted]>; [redacted]) <[redacted]>
**Cc:** [redacted]) <[redacted]>; [redacted] (USANYS)
<[redacted]>
**Subject:** RE: Discovery questions

Hey all, below is a summary of the discovery items you've requested.

Message Pad Scans: The message pads were scanned with the post it notes on them and the very next page is the page without the post it note, so the pages are back to back.

Papers from Miami case file (grand jury testimony): This is a disk – I can copy it and send it over to you.

Evidence scans: Are you referring to the scans from the FL file? We sent those over with the original message pad scans last year. If you need that again, let us know and we can get another copy over to you. As far as paper evidence from the NY and VI searches, and the paper provided by Reiter, we can get that over to you by the end of the week.

FBI file: We have that ready for you.

CART: There are no 302s regarding the extraction of devices.

Evidence from disks: This is a large volume and we've been working on this and removing nude/semi nude images. This is the only thing that would be difficult to complete by Friday. If we could have a little more time to pull this together, that would be very helpful.

# 59 (e) EX 32

| DEF. NO. | PLF. NO. | DATE OFFERED | MARK | ADMIT TED | DESCRIPTION OF EXHIBITS |
|---|---|---|---|---|---|
| | 62. | | | | Passenger lists for flights taken by Jeffrey Epstein |
| | 63. | | | | Letter from Jeffrey Epstein to Alberto Pinto regarding house island p |
| | 64. | | | | Jeffrey Epstein's bank statements |
| | | | | | Jeffrey Epstein's tax returns |
| | 65. | | | | MC2 emails involving communications of Jeffrey Epstein, Jeff Fuller, [redacted], Pappas Suat, Jean Luc Brunel and Amanda Grant |
| | 66. | | | | DVD of plea and colloquy taken on 6-30-08 |
| | 67. | | | | Transcript of plea and colloquy taken on 6-30-08 |
| | 68. | | | | Massage Table |
| | 69. | | | | Lotions taken from Jeffrey Epstein's home during search warrant |
| | 70. | | | | Computers taken from Jeffrey Epstein's home during search warrant |
| | 71. | | | | Vibrators, dildos and other sex toys taken from Jeffrey Epstein's hom during search warrant |
| | 72. | | | | No Contact Orders entered against Jeffrey Epstein |
| | 73. | | | | Criminal Score Sheet regarding Jeffrey Epstein |
| | 74. | | | | Documents evidencing Jeffrey Epstein's Community Control and Probation |
| | 75. | | | | Jeffrey Epstein's Sex Offender Registration |
| | 76. | | | | Jeffrey Epstein's Booking photograph |
| | 77. | | | | CAD calls to 358 EL BRILLO WAY, PALM BEACH FL 33480 |
| | 78. | | | | List of Jeffrey Epstein's House contacts |
| | 79. | | | | Documents related to Jeffrey Epstein's investments |

# 59 (e) EX 33

Q. Looking at the photograph on this slide, does this accurately depict that property?

A. Yes, it does.

Q. And we've been talking about the properties that Epstein owned during this time period. Did he also own a private jet?

A. Yes.

Q. Is it fair to say that he was a multimillionaire during this time period?

A. Yes.

Q. During the 1990's did Epstein have an employee [redacted] who ran his house in Palm Beach?

A. Yes, he did.

Q. What was his job?

A. His job was making sure that everything in the house ran smoothly. He referred -- he described that Epstein liked to have his house run live a five-star hotel; that everything had to be in its proper place. So he was responsible for managing that.

Q. Have you interviewed [redacted]?

A. Yes.

Q. How many times?

A. Twice.

Q. And is the information you're about to provide based on your interviews with [redacted]?

# 59 (e) EX 34

A. Yes, she did.

Q. Was that to the property you testified about earlier? The townhouse on the Upper East Side?

A. Yes.

Q. When [redacted] traveled to New York City, did she stay at Epstein's townhouse in New York City?

A. Yes, she did.

Q. Did she recall that Maxwell and Epstein took her shopping on one of her early trips to New York City?

A. Yes.

Q. Did she remember them buying her anything?

A. She recalled them buying her white cotton underwear. Her description was that they were, like, little girls underwear.

Q. From ages 14 to 17, did Epstein ask [redacted] to periodically fly to New York for weekends at that townhouse in New York?

A. I'm sorry, say it again?

Q. You testified that she began traveling to New York City at age 14. Did she then periodically travel to New York City in a similar manner from ages 14 to 17?

A. Yes.

Q. Were there times when she traveled on those trips when she flew on Epstein's private jet?

A. Yes.

# 59 (e) EX 35

**From:** [redacted]
**To:** [redacted] (MM)(FBI)" [redacted]
**Subject:** Re: Hi There,
**Date:** Tue, 29 Apr 2014 16:37:32 +0000
**Importance:** Normal

---

Hi [redacted],

Thank you for getting back to me on your day off!

I just remember when the tabloids sent their photographer out, they took note of the date on the back which was in 1997 and possibly took a picture of it but as I do not want to contact the tabloids right now, I just need the evidence to ensure that is correct. If you can, when you get back to the office, is there any chance you could have a look to see if there in fact a date mentioned or photographed, it would be very helpful and I would be more than appreciative.

Have a nice day!!

[redacted]
On[redacted] 29 April 2014 12:23 PM, [redacted](MM)(FBI)" <[redacted] wrote:
Hi [redacted]

I'm away from the office today. I don't recall the photo having a date on it but I will review the file when I get a chance.

---

**From:** [redacted]
**To:** [redacted]MM)(FBI)
**Sent:** Tue Apr 29 12:18:49 2014
**Subject:** Hi There,

G'da[redacted],

I was just wondering if by chance you might have the original dates of the photos you copied from our original meetings, oddly enough I have every other original photo but the one with Prince Andrew and that's no good as I am in need of just the date on the picture. You're my last chance on these dates unless by good fortune this picture shows up. Sorry to be a pain, I hope I'm not to much a bother. Just trying to do get something accomplished!

Hope all is well!!

All the best,
[redacted]

# 59 (e) EX 36

**From:** "[redacted] (NY) (FBI)" <[redacted]>
**To:** "[redacted]. (NY) (FBI)" <[redacted]>
**Subject:** Epstein updates
**Date:** Sun, 25 Aug 2019 16:34:51 +0000
**Importance:** Normal

---

10-4

SSA [redacted]
FBI New York

On Aug 25, 2019 11:46 AM, "[redacted]. (NY) (FBI)" <[redacted]> wrote:

All,

After much engagement with HQ over the past 48 hours, and our efforts to both consolidate and limit the reporting requirements, HQ is now requesting updates in a conference call to be held daily at 1530. You should all receive the bridge line information tomorrow. Trust me, nothing you're thinking right now hasn't already been communicated to the highest levels. IMO, this is largely driven by DOJ. Is it inconvenient? Yes. Regardless, we'll need to support the calls because those you all deal with in CID are in the exact same position as you. We should support each other and push through.

Based on all my calls with HQ, here are some of my thoughts on how we should go forward:
Many questions I'm receiving are driven by media reporting (e.g. Maxwell, NM residence search, etc.). If you see sustained reporting on one aspect, get ahead of it. For example...media has been all over the location and role of Maxwell as a co-conspirator. I advised that based on the volume and quality of evidence we have, the team is currently focused on charges for a different co-conspirator. However, we're engaged with Counsel for all co-conspirators. Kill the rumor before it gets legs in the minds of senior leadership.

With regard to interviews or other investigative techniques, stay general unless we have significant information. You could say, "we conducted interviews of 14 MCC Corrections Officers and continued with the financial analysis but don't have anything signficant to report." Only give names of an interviewee if there was something significant.

If we don't have significant results to report, it's ok to say so. Be mindful that most, if not all, of what you say will be pushed to the seventh floor.

[redacted] - Tuesday is a big day with the hearing so be prepared to talk it on Monday and beyond. You can provide the approximate number of victims expected to attend and any efforts we have in making that happen (coordinating transportation, etc.). On Tuesday you'll give the read out of the hearing. In your reporting over the next few days/weeks, stay focused on the investigation of the co-conspirators and stay tight with SDNY on conversations they're having with Counsel and the direction we're headed towards charges.

[redacted] and on Wednesday [redacted] - I've continually expressed to HQ how C-19 and C-2 are tight on the drug/sex case. You guys can speak together about that case. Clearly we're focused on analysis of the phones as well as the nature and timing of likely charges.

[redacted] - I talked to [redacted] and know that you guys have a couple big interviews to do that will determine if the PC case has any legs or if gets shut down. I would focus on advising of the timing of those interviews.

[redacted] - I've included you here FYSA. Let me know if you want the bridge line details as well.

Enjoy your Sunday.
[redacted]

[redacted]
New York Field Office
Criminal - Branch C
[redacted] Desk
[redacted] Cell

# 59 (e) EX 37

UNCLASSIFIED//LAW ENFORCEMENT SENSITIVE
FEDERAL BUREAU OF INVESTIGATION
Criminal Investigative Divisions
15 August 2019
(U) Jeffrey Epstein
90A-NY-3151227 (UNSUB(S); Jeffrey Epstein-Victim; Death Investigation)
31E-NY-3027571 (Epstein, Jeffrey; Child Sex Trafficking)
15 August SITREP
U Falun and Associates
(U//LES)
(U//LES)
(Co-conspirator)
DOB
Case
Type
Initiated
N/1
Intelligence
Details
Sources
HUMINT
FISUR
Citizenship
FOB
Location
Financials
New York.
NY
OGA Liaison
Access to
Weapons
(Co-conspirator)
Details
DOB
Case
Type /
Initiated
Intelligence
Sources
I
N/A
HUMINT
FISUR
Citizenship
FOB
Location
Financials
OGA Liaison
I
Miami, FL
Access to
Weapons
(U//LES)
(Co-conspirator)
Citizenship
DOI3
Case Type /
Initiated
Intelligence
Sources
Details
N/A
HUMINT
FISUR
FOB
Location
Financials
New Canaan,
CT
OGA Liaison
Access to
Wea ons
(U) LAW ENFORCEMENT SENSITIVE The information marked ill "LES) in this document it the prop eny of FM and maybe distnbisml within the Federal Government (and ns carnation). US imelligence. law enfonzernent public safety or pro mtionefficiah tent individuals wills a need in kiwi, Dismbuum beyond theseCOMICS without FBI authonation is pmhihiml. Precaution *Mild be taken to mime this infoommon ss moved senior &swayed in a wanner thii prieludes unauthorized access. Infonnium hrieuse the LES casein may DX he used in legal pmemlings asthma first receiving allthOdLit1011 Awn the originating agency. Rmipmus are mhilmed (torn subsequent') porting the information ranked LES on ? weteine or an unchnntinl neneort 0140U01 This donatneta it meant as a summon of nprailleam investigative highlights and NOT as a maprehetiove review ofthe immigration. The araformation tontine.' La thit commun.:non Ls NOT lobe lampooned Win my formal cc informal UTItICA6xuntem withoulthe authorianta of the FBI /1024121001. eminent:rearm Division Program Marugemem Unii Chief. Unauthorized meatdos infonnmon may J.:yin:Jac
th, pnuM1< t.!crtilfi.vntri ind
himi of human sources. or cremeteat
mitieanon no the Falk swami of the inut4:4 tau. o
UNCLASSIFIED//LAW ENFORCEMENT SENSITIVE

# 59 (e) EX 38

MORAL BUREAU OF IMIESTIGA7XtM
UNCLASSIFIED//LAW ENFORCEMENT SENSITIVE
(U//LES) Ghislaine Maxwell (Co-conspirator)
Ghislaine Maxwell
.. -_
000
Case Type
/ Initiated
Intelligence
Sources
Details
N/A
HUMINT
FISUR
Citizenship
POB
Location
Financials
OGA Liaison
Boston, MA
Access to
Weapons
(U//LES) I
(Co-conspirator)
Case Type/
DOB
Initiated
Intelligence
Sources
Details
HUMINT
N/A
FISUR
Citizenship
POB
Location
Financials
New York
OGA Liaison
I
NY
Access to
Weapons
(U//LES) Jean-Luc Brunel (Co-conspirator)
? runel
DOB
Case Type /
Initiated
Intelligence
Details
Sources
N/A
HUMINT
FISUR
Citizenship
POB
Location
Financials
OGA Liaison
Access to
Weapons
(U//LES)
(Co-conspirator)
___
Case Type /
DOB
Details
Initiated
Intelligence
Sources
HUMINT
FISUR
Citizenship
POB
Location
Financials
j
OGA Liaison
London
Access to
Weapons

# 59 (e) EX 39

a
t t .

I
g
Ff. TT
1
g?
1
sali)
4kW/
FEDERAL BUREAU OF IIIWESTIGATiON
(U//LES)
(Co-conspirator)
DOB
Case Type /
Initiated
Intelligence
Sources
Details
HUMINT
N/A
FISUR
izenship
POB
Location
Financials
OGA Liaison
Ohio
Access to
Weapons
(U//LLS)
(Former Girlfriend)
DOB
Case

Type /
Initiated
Intelligence
Details
Sources
N/A
HUMINT
FISUR
Citizenship
POB
Location
Financials
US
Belarus
OGA Liaison
Belaro
Access to
Weapons

# 59 (e) EX 40

## Privilege Log – Dated 2-23-2011

## [redacted], Jaffe, Weissing, [redacted], Fistos & Lehrman

| [redacted] | DATE | TO | FROM | DESCRIPTION | OBJECTION |
|---|---|---|---|---|---|
| 02420-02421 | 05/08/2009 | [redacted] J. [redacted] | Mercedes C. [redacted] | Jane Doe II v. Epstein | Joint-privilege |
| 02435 | 09/15/2009 | [redacted] J. [redacted] | Lisa [redacted] | Jane Does v. Epstein | Joint-privilege |
| 02438 | 09/18/2009 | [redacted] J. [redacted] | Adam Horowitz | Jeffrey Epstein DC# W35755 | Joint-privilege |
| 02462 | 09/22/09 | Spencer Kuvin | Bradley J. [redacted] | [redacted] v. Epstein – Defendant, Jeffrey Epstein"s Response to Plantiff [redacted]"s Motion for Protective Order | Joint-privilege |
| 02476-02477 | 09/25/2009 | Spencer Kuvin | [redacted] J. [redacted] | [redacted] v EPSTEIN hearing | Joint-privilege |
| 02516 | 10/06/2009 | [redacted] J. [redacted] | Katherine W. Ezell | Meeting with Leslie Wexner | Joint-privilege |
| 02554-02559 | 08/03/2009 | Adam Horowitz | Bradley J. [redacted] | NEW ASSIGNMENT – NEW ALBANY – RUSH? – Fwd: Federal Subpoena | Joint-privilege |
| 02584 | 08/11/2009 | [redacted] J. [redacted] | Kikka M. Claudio | Out of state subpoenas | Joint-privilege |
| 02618 | 08/04/2009 | [redacted] J. [redacted] | Kikka M. Claudio | Proposal Request | Joint-privilege |
| 02627-02628 | 09/18/2009 | Bradley J. [redacted] | Adam Horowitz | Report this as a parole violation | Joint-privilege |
| 02672-02673 | 10/09/2009 | Spencer Kuvin | [redacted] J. [redacted] | Subpoena Info | Joint-privilege |
| 02727 | 08/03/2009 | Spencer Kuvin | [redacted] J. [redacted] | Transcript of Alfredo Rodriguez deposition | Joint-privilege |
| 02896 | 06/08/2009 | Bradley J. [redacted] | Spencer Kuvin | Hearing to Un-seal | Joint-privilege |
| 03009-03010 | 08/07/2009 | Adam Horowitz | Jacquie [redacted] | Motion to stay | Joint-privilege |
| 03028-03029 | 09/21/2009 | Bradley J. Edwards | Adam Horowitz | Mark Epstein | Joint-privilege |
| 03038 | 10/06/2009 | Bradley J. Edwards | Stuart Mermelstein | Meeting with Leslie Wexner | Joint-privilege |
| 03131-03132 | 08/06/2009 | Adam Horowitz | Bradley J. [redacted] | Epsteins assets | Joint-privilege |

NOT A CERTIFIED COPY

# 59 (e) EX 41

Epstein and other young women. While on the island, [redacted] provided Epstein with a massage during which he attempted to force her into more sexual activity than she was comfortable with. [redacted] became upset, and she was sent home. She never saw Epstein again.

### C. *Interviews of Witnesses Who Were Not Sexually Abused*

1. Juan Alessi

Juan Alessi was interviewed on July 13, 2019 in Florida. Juan Alessi ("Mr. Alessi") worked for Epstein as the house manager at his Palm Beach residence from the early 1990s until the end of 2002. Additionally, his wife, Maria Alessi, ("Ms. Alessi") also worked at Epstein's Palm Beach residence. Mr. Alessi recalled that in or about 1993, Ghislaine Maxwell took charge of managing Epstein's residences in Palm Beach, New York, New Mexico, the Virgin Islands, and Ohio. Around that time, Epstein specifically instructed Mr. Alessi to go to Maxwell for orders. Mr. Alessi described Maxwell as extremely demanding and compared working under her to "slavery."

Mr. Alessi recalled that his relationship with Epstein began to deteriorate beginning in approximately 2000, when Maxwell instructed Mr. Alessi and other house staff not to make eye contact or be in the same room with Epstein. Around this same period, Mr. Alessi recalled that Epstein received approximately three massages per day when he was staying at his Palm Beach residence. Mr. Alessi understood most of the masseuses to be professional massage therapists from around the Palm Beach area, several of whom provided massages for Epstein's guests, including business partners and prominent people, at the Palm Beach residence. At first, Mr. Alessi was responsible for scheduling Epstein's frequent massage appointments, but during the last several weeks of his employment, [redacted] was hired as Epstein's personal assistant and began scheduling the appointments instead.

Closer to the end of his tenure, Maxwell asked Mr. Alessi to compile a list of all hotels and spas around the area of Palm Beach. After Mr. Alessi compiled the list, Maxwell instructed him to drive her around to each location. Maxwell would enter each location, then return with business cards of massage therapists. Mr. Alessi recalls one such incident in or around the summer of 2002 when he drove Maxwell to Mar-a-Lago and waited for her to receive a massage there. After Maxwell returned to the car, she observed a young girl, whom Mr. Alessi later learned was named [redacted] and instructed Mr. Alessi to stop the car. Maxwell got out of the car and went to speak with [redacted] for about 20 to 25 minutes before returning. Later that same day, Mr. Alessi saw [redacted] come to Epstein's Palm Beach residence. Over the next several months, [redacted] returned just about every day to the Palm Beach residence to give Epstein massages. Mr. Alessi recalls learning that [redacted] was also traveling with Epstein to other locations, and he recalls [redacted] bringing other girls about her age to the Palm Beach residence to massage Epstein. Mr. Alessi understood that [redacted] was under the age of 18 but did not know what [redacted] was doing in the "massages" with Epstein.

# 59 (e) EX 42

[redacted]

**From:** Weinstein, Marc A. <[redacted]
**Sent:** Thursday, April 22, 2021 6:50 AM
**To:** [redacted]>; [redacted]>;
[redacted]
**Cc:** [redacted]>
**Subject:** RE: following up

[redacted]:

The investigator did not see anything of interest in the Florida home. I am checking to confirm on New Mexico.

Regards,
Marc

**Marc A. Weinstein** | Partner

Chair, White Collar Defense

**Hughes Hubbard & Reed LLP**
[redacted]

This message contains confidential information and is intended only for the individual named. If you are not the named addressee you should not disseminate, distribute or copy this e-mail. Please notify the sender immediately by e-mail if you have received this e-mail by mistake and delete this e-mail from your system. E-mail transmission cannot be guaranteed to be secure or error-free as information could be intercepted, corrupted, lost, destroyed, arrive late or incomplete, or contain viruses. The sender therefore does not accept liability for any errors or omissions in the contents of this message, which arise as a result of e-mail transmission. If verification is required please request a hard-copy version.

**From:** [redacted]>
**Sent:** Wednesday, April 21, 2021 6:28 PM
**To:** Weinstein, Marc A. <[redacted]>;
[redacted]
**Cc:** [redacted]>
**Subject:** RE: following up

**CAUTION: This email was sent by someone outside of the Firm.**

Hi Marc,

I hope all is well. Following up on the below.

Thanks very much,
[redacted]

**From:** Weinstein, Marc A. <[redacted]
**Sent:** Monday, April 12, 2021 5:57 PM
**To:** [redacted]>; [redacted]>;
[redacted]

# 59 (e) EX 43

[redacted]

**From:** Weinstein, Marc A. <[redacted]>
**Sent:** Monday, September 14, 2020 11:51 AM
**To:** [redacted]>
**Cc:** Andrew Tomback <[redacted]>; [redacted]>; [redacted]>
**Subject:** RE: SDNY investigation

[redacted], we have the transcript of [redacted] deposition.

Regards,
Marc

**Marc A. Weinstein** | Partner
Chair, White Collar Defense

**Hughes Hubbard & Reed LLP**
[redacted]

This message contains confidential information and is intended only for the individual named. If you are not the named addressee you should not disseminate, distribute or copy this e-mail. Please notify the sender immediately by e-mail if you have received this e-mail by mistake and delete this e-mail from your system. E-mail transmission cannot be guaranteed to be secure or error-free as information could be intercepted, corrupted, lost, destroyed, arrive late or incomplete, or contain viruses. The sender therefore does not accept liability for any errors or omissions in the contents of this message, which arise as a result of e-mail transmission. If verification is required please request a hard-copy version.

**From:** [redacted]) <[redacted]>
**Sent:** Friday, September 11, 2020 1:40 PM
**To:** Weinstein, Marc A. <[redacted]>
**Cc:** Andrew Tomback <[redacted]>; [redacted]>; [redacted]>
**Subject:** RE: SDNY investigation

**CAUTION: This email was sent by someone outside of the Firm.**

Thanks, Marc. We'll look forward to hearing from you, and thanks for your assistance with this.

**From:** Weinstein, Marc A. <[redacted]>
**Sent:** Friday, September 11, 2020 1:35 PM
**To:** [redacted]>
**Cc:** Andrew Tomback <[redacted]>; [redacted]>; [redacted]>
**Subject:** RE: SDNY investigation

Thanks [redacted]. It wasn't clear to me from the call that it was the plaintiff's deposition that you were after, as opposed to another witness in the case. Now that it's clear, we will see if we can track it down.

Regards,
Marc

**Marc A. Weinstein** | Partner
Chair, White Collar Defense

**Hughes Hubbard & Reed LLP**
[redacted]

This message contains confidential information and is intended only for the individual named. If you are not the named addressee you should not disseminate, distribute or copy this e-mail. Please notify the sender immediately by e-mail if you have received this e-mail by mistake and delete this e-mail from your system. E-mail transmission cannot be guaranteed to be secure or error-free as information could be intercepted, corrupted, lost, destroyed, arrive late or incomplete, or contain viruses. The sender therefore does not accept liability for any errors or omissions in the contents of this message, which arise as a result of e-mail transmission. If verification is required please request a hard-copy version.

**From:** [redacted]) <[redacted]>
**Sent:** Friday, September 11, 2020 1:30 PM
**To:** Weinstein, Marc A. <[redacted]>
**Cc:** Andrew Tomback <[redacted]>; [redacted]>; [redacted]>
**Subject:** RE: SDNY investigation

**CAUTION: This email was sent by someone outside of the Firm.**

# 59 (e) EX 44

A. No.
Q. At that point, how were you feeling about Maxwell and Epstein?
A. I think, you know, again, I felt conflicted because I had had -- I had been on this trip, which is something I never could have done without, you know, Epstein's support. But I -- so I felt I should be grateful for that.
But the experience that I had with Maxwell and Epstein in New Mexico was so uncomfortable that I didn't -- you know, I was very much hoping I would never have to be around them again. Then I felt sort of guilty about that because of -- you know, again, because they had paid for this trip.
Q. From that point on, did you have any contact with Maxwell and Epstein?
A. I did not.
Q. Did there come a time when you told someone about your experiences with Maxwell and Epstein?
A. Yes.
Q. Who did you first tell?
A. I had a brief conversation with my mom just acknowledging that something uncomfortable had happened, but I didn't go into any details with her about that.
Q. What did you tell your mom?
MS. MENNINGER: Objection, your Honor. Hearsay.
THE COURT: I'll hear from you, counsel.

# 59 (e) EX 45

**UNITED STATES OF AMERICA, v.
GHISLAINE MAXWELL,**



journal entry, it is harder for you to remember the events in the New Mexico trip versus the New York trip?
MS. POMERANTZ: Objection, your Honor.
THE COURT: Overruled.
A. Yes.
Q. You've told the government it was harder for you to disaggregate discussions about those two trips?
A. I'm sorry, to disaggregate discussions with who?
Q. You had discussions about going to New York with certain people, your sister, I think you said?
A. Right.
Q. You had discussions about going to New Mexico with people, I think you said, before you went?
A. Before I went.
Q. Yes.
A. Yes.
Q. You said you spoke with Mr. Epstein on the phone; correct?
A. About going to Thailand. I don't remember about going to New Mexico.
Q. You spoke to him between the time you went to New York and the time you went to New Mexico.
A. Correct.
Q. You spoke with him on the phone?
A. Yes.
Q. You did not ever speak with Ghislaine Maxwell on the phone?

# 59 (e) EX 46

A. Yes.
Q. Now I want you to flip to the last page. Those are the records for Annie Farmer?
A. Yes.
Q. Why don't you look at that last entry. That's a flight on July 20th, 1997; correct?
A. Yes.
Q. What city did this flight depart from?
A. DUS, which is Düsseldorf, Germany.
Q. Where did it arrive?
A. EWR, which is Newark Airport, New Jersey.
Q. Is this the earliest border entry in the TECS system for Annie Farmer?
A. Yes.
Q. Does this report show any border crossings for Annie Farmer in 1996?
A. No.
MR. EVERDELL: One moment, your Honor.
THE COURT: Okay.
MR. EVERDELL: No further questions, your Honor.
THE COURT: Ms. Pomerantz.
MS. POMERANTZ: Thank you, your Honor.
CROSS-EXAMINATION
BY MS. POMERANTZ:
Q. Good afternoon.

# 59 (e) EX 47

**From:** "[redacted]>
**To:** "Weinstein, Marc A." <[redacted]
**Cc:** "[redacted]>, "[redacted]>, "[redacted]
<[redacted]
**Subject:** RE: [EXTERNAL] Re: following up
**Date:** Sun, 24 Oct 2021 21:54:43 +0000
**Attachments:** 2021.10.24_Subpoena_to_Estate.pdf

---

Hi Marc,

Please see the attached subpoena. Thanks.

---

**From:** Weinstein, Marc A. <[redacted]
**Sent:** Sunday, October 24, 2021 1:46 PM
**To:** [redacted]>
**Cc:** [redacted]>; [redacted]>;
ATomback@mclaughlinstern.com
**Subject:** RE: [EXTERNAL] Re: following up

Yes, c/o the two Co-Executors.

Thanks!

**Marc A. Weinstein** | Partner
Chair, White Collar Defense

**Hughes Hubbard & Reed LLP**
[redacted]

This message contains confidential information and is intended only for the individual named. If you are not the named addressee you should not disseminate, distribute or copy this e-mail. Please notify the sender immediately by e-mail if you have received this e-mail by mistake and delete this e-mail from your system. E-mail transmission cannot be guaranteed to be secure or error-free as information could be intercepted, corrupted, lost, destroyed, arrive late or incomplete, or contain viruses. The sender therefore does not accept liability for any errors or omissions in the contents of this message, which arise as a result of e-mail transmission. If verification is required please request a hard-copy version.

---

**From:** [redacted]>
**Sent:** Sunday, October 24, 2021 1:43 PM
**To:** Weinstein, Marc A. <[redacted]
**Cc:** [redacted]>; [redacted]>;
[redacted]
**Subject:** Re: [EXTERNAL] Re: following up

**CAUTION: This email was sent by someone outside of the Firm.**

Thanks very much. I can send a subpoena. Should it be addressed to the estate?

On Oct 24, 2021, at 1:34 PM, Weinstein, Marc A. <marc.weinstein@hugheshubbard.com> wrote:

I believe it's ready to go. Can you send us a subpoena for those records?

**Marc A. Weinstein** | Partner
Chair, White Collar Defense

**Hughes Hubbard & Reed LLP**
[redacted]

This message contains confidential information and is intended only for the individual named. If you are not the named addressee you should not disseminate, distribute or copy this e-mail. Please notify the sender immediately by e-mail if you have received this e-mail by mistake and delete this e-mail from your system. E-mail transmission cannot be guaranteed to be secure or error-free as information could be intercepted, corrupted, lost, destroyed, arrive late or incomplete, or contain viruses. The sender therefore does not accept liability for any errors or omissions in the contents of this message, which arise as a result of e-mail transmission. If verification is required please request a hard-copy version.

On Oct 24, 2021, at 11:00 AM, [redacted]> wrote:

**CAUTION: This email was sent by someone outside of the Firm.**

Hi Marc,

Thanks so much, and apologies for pestering while you're on trial. Were you able to process these materials?

Thanks,

[redacted]

**From:** Weinstein, Marc A. <[redacted]
**Sent:** Thursday, October 21, 2021 4:26 PM
**To:** [redacted]>
**Cc:** [redacted]>; [redacted]>;
[redacted]
**Subject:** Re: [EXTERNAL] Re: following up

[redacted], my apologies as I'm on trial and the paralegal who would prepare the production is also the paralegal at the trial. We have a day off tomorrow so let me see if she can get it processed tomorrow.

**Marc A. Weinstein** | Partner
Chair, White Collar Defense

**Hughes Hubbard & Reed LLP**
[redacted]

This message contains confidential information and is intended only for the individual named. If you are not the named addressee you should not disseminate, distribute or copy this e-mail. Please notify the sender immediately by e-mail if you have received this e-mail by mistake and delete this e-mail from your system. E-mail transmission cannot be guaranteed to be secure or error-free as information could be intercepted, corrupted, lost, destroyed, arrive late or incomplete, or contain viruses. The sender therefore does not accept liability for any errors or omissions in the contents of this message, which arise as a result of e-mail transmission. If verification is required please request a hard-copy version.

On Oct 21, 2021, at 3:12 PM, [redacted]> wrote:

**CAUTION: This email was sent by someone outside of the Firm.**

Hi Marc,

Just checking in on this – do you have a sense of timing? We very much appreciate your efforts to obtain these documents, but we're mindful of the approaching trial date.

Thanks,

[redacted]

**From:** [redacted])
**Sent:** Thursday, October 14, 2021 10:08 AM
**To:** 'Weinstein, Marc A.' <[redacted]>
**Cc:** [redacted]>; [redacted]>; [redacted]
**Subject:** RE: [EXTERNAL] Re: following up

Hi Marc,

Thanks. We'd very much appreciate receiving this as soon as possible. We are scheduled to begin trial next month, and we would like to produce these materials to defense counsel in discovery immediately upon receipt.

Thanks,

[redacted]

**From:** Weinstein, Marc A. <[redacted]
**Sent:** Wednesday, October 13, 2021 9:56 PM
**To:** [redacted]>
**Cc:** [redacted]>; [redacted]>; [redacted]
**Subject:** RE: [EXTERNAL] Re: following up

We should be able to produce that next week.

**Marc A. Weinstein** | Partner
Chair, White Collar Defense

**Hughes Hubbard & Reed LLP**
[redacted]
marc.weinstein@hugheshubbard.com

This message contains confidential information and is intended only for the individual named. If you are not the named addressee you should not disseminate, distribute or copy this e-mail. Please notify the sender immediately by e-mail if you have received this e-mail by mistake and delete this e-mail from your system. E-mail transmission cannot be guaranteed to be secure or error-free as information could be intercepted, corrupted, lost, destroyed, arrive late or incomplete, or contain viruses. The sender therefore does not accept liability for any errors or omissions in the contents of this message, which arise as a result of e-mail transmission. If verification is required please request a hard-copy version.

**From:** [redacted]>
**Sent:** Wednesday, October 13, 2021 9:05 PM
**To:** Weinstein, Marc A. <[redacted]

**Cc:** [redacted]>; [redacted]
[redacted]>; [redacted]
**Subject:** Re: [EXTERNAL] Re: following up

**CAUTION: This email was sent by someone outside of the Firm.**

Marc,

Thanks very much. Do you have a timeframe for when you expect the production to be available?

Thanks,

[redacted]

On Oct 13, 2021, at 5:42 PM, Weinstein, Marc A. <marc.weinstein@hugheshubbard.com> wrote:

[redacted],

We've gathered the flight logs and will prepare them for production. Sorry for the delay.

Best regards,
Marc

**Marc A. Weinstein** | Partner
Chair, White Collar Defense

**Hughes Hubbard & Reed LLP**
[redacted]
marc.weinstein@hugheshubbard.com

This message contains confidential information and is intended only for the individual named. If you are not the named addressee you should not disseminate, distribute or copy this e-mail. Please notify the sender immediately by e-mail if you have received this e-mail by mistake and delete this e-mail from your system. E-mail transmission cannot be guaranteed to be secure or error-free as information could be intercepted, corrupted, lost, destroyed, arrive late or incomplete, or contain viruses. The sender therefore does not accept liability for any errors or omissions in the contents of this message, which arise as a result of e-mail transmission. If verification is required please request a hard-copy version.

On Oct 7, 2021, at 5:16 PM, [redacted]> wrote:

**CAUTION: This email was sent by someone outside of the Firm.**

Hi Marc,

Checking in on this. Would it be helpful to have a call to discus the status of this request?

Thanks very much,

[redacted]

**From:** [redacted])
**Sent:** Friday, September 24, 2021 11:25 AM
**To:** Weinstein, Marc A. <[redacted]
**Cc:** [redacted]>;
[redacted]
**Subject:** RE: following up

Hi Marc,

Following up on this, can you let us know the status of this?

Thanks,

[redacted]

**From:** Weinstein, Marc A. <[redacted]
**Sent:** Friday, August 27, 2021 4:06 PM
**To:** [redacted]>
**Cc:** [redacted]>; [redacted]>;
[redacted]
**Subject:** Re: following up

Allison,

Sorry for the delay, as I'm away this week. I should have something for you next week.

Regards,
Marc

**Marc A. Weinstein** | Partner
Chair, White Collar Defense

**Hughes Hubbard & Reed LLP**
[redacted]

This message contains confidential information and is intended only for the individual named. If you are not the named addressee you should not disseminate, distribute or copy this e-mail. Please notify the sender immediately by e-mail if you have received this e-mail by mistake and delete this e-mail from your system. E-mail transmission cannot be guaranteed to be secure or error-free as information could be intercepted, corrupted, lost, destroyed, arrive late or incomplete, or contain viruses. The sender therefore does not accept liability for any errors or omissions in the contents of this message, which arise as a result of e-mail transmission. If verification is required please request a hard-copy version.

On Aug 23, 2021, at 9:24 AM, [redacted]> wrote:

**CAUTION: This email was sent by someone outside of the Firm.**

Hi Marc,

Following up on this, could you please let us know the status of our request for flight manifests? Thanks very much for looking into this.

Best,

[redacted]

**From:** Weinstein, Marc A. <[redacted]
**Sent:** Thursday, April 22, 2021 6:50 AM
**To:** [redacted]>; [redacted]>;
[redacted]
**Cc:** [redacted]>
**Subject:** RE: following up

[redacted]:

The investigator did not see anything of interest in the Florida home. I am checking to confirm on New Mexico.

Regards,
Marc

**Marc A. Weinstein** | Partner

Chair, White Collar Defense

**Hughes Hubbard & Reed LLP**
[redacted]

This message contains confidential information and is intended only for the individual named. If you are not the named addressee you should not disseminate, distribute or copy this e-mail. Please notify the sender immediately by e-mail if you have received this e-mail by mistake and delete this e-mail from your system. E-mail transmission cannot be guaranteed to be secure or error-free as information could be intercepted, corrupted, lost, destroyed, arrive late or incomplete, or contain viruses. The sender therefore does not accept liability for any errors or omissions in the contents of this message, which arise as a result of e-mail transmission. If verification is required please request a hard-copy version.

**From:** [redacted]>
**Sent:** Wednesday, April 21, 2021 6:28 PM
**To:** Weinstein, Marc A. <[redacted]>;
[redacted]
**Cc:** [redacted]>
**Subject:** RE: following up

**CAUTION: This email was sent by someone outside of the Firm.**

Hi Marc,

I hope all is well. Following up on the below.

Thanks very much,
[redacted]

**From:** Weinstein, Marc A. <[redacted]
**Sent:** Monday, April 12, 2021 5:57 PM
**To:** [redacted]>; [redacted]>;
[redacted]

**Cc:** [redacted]>
**Subject:** RE: following up

[redacted],

We can confirm that we are not aware of any historical surveillance video. We will be back to you later this week on the other materials.

Best regards,
Marc

**Marc A. Weinstein** | Partner

Chair, White Collar Defense

**Hughes Hubbard & Reed LLP**
[redacted]

This message contains confidential information and is intended only for the individual named. If you are not the named addressee you should not disseminate, distribute or copy this e-mail. Please notify the sender immediately by e-mail if you have received this e-mail by mistake and delete this e-mail from your system. E-mail transmission cannot be guaranteed to be secure or error-free as information could be intercepted, corrupted, lost, destroyed, arrive late or incomplete, or contain viruses. The sender therefore does not accept liability for any errors or omissions in the contents of this message, which arise as a result of e-mail transmission. If verification is required please request a hard-copy version.

---

**From:** [redacted]>
**Sent:** Monday, April 12, 2021 2:15 PM
**To:** [redacted]>; Weinstein, Marc A. <[redacted]
**Cc:** [redacted]>
**Subject:** RE: following up

**CAUTION: This email was sent by someone outside of the Firm.**

Marc and Andy,

Thanks for your time last week. We wanted to follow up on with you on our conversation last week. When can we expect to get the materials discussed?

Thanks again,
[redacted]

---

**From:** [redacted]>
**Sent:** Wednesday, March 31, 2021 1:59 PM
**To:** Weinstein, Marc A. <[redacted]
**Cc:** [redacted]>; [redacted]>
**Subject:** RE: following up

Thanks, talk to you then. We can use this conference line: [redacted]

---

**From:** Weinstein, Marc A. <[redacted]
**Sent:** Wednesday, March 31, 2021 1:52 PM
**To:** [redacted]>; [redacted]

**Cc:** [redacted]>; [redacted]>
**Subject:** RE: following up

3:30 works for us.

**Marc A. Weinstein** | Partner

Chair, White Collar Defense

**Hughes Hubbard & Reed LLP**
[redacted]

This message contains confidential information and is intended only for the individual named. If you are not the named addressee you should not disseminate, distribute or copy this e-mail. Please notify the sender immediately by e-mail if you have received this e-mail by mistake and delete this e-mail from your system. E-mail transmission cannot be guaranteed to be secure or error-free as information could be intercepted, corrupted, lost, destroyed, arrive late or incomplete, or contain viruses. The sender therefore does not accept liability for any errors or omissions in the contents of this message, which arise as a result of e-mail transmission. If verification is required please request a hard-copy version.

---

**From:** [redacted]>
**Sent:** Wednesday, March 31, 2021 1:35 PM
**To:** Weinstein, Marc A. <[redacted]
**Cc:** [redacted]>; [redacted]
[redacted]>
**Subject:** RE: following up

**CAUTION: This email was sent by someone outside of the Firm.**

Thanks very much— would it be possible to speak slightly later on Monday, perhaps at 3:30 or later? Alternatively, we're available between 10:30 and 2 p.m. on Monday.

---

**From:** Weinstein, Marc A. <[redacted]
**Sent:** Wednesday, March 31, 2021 10:58 AM
**To:** [redacted]>; [redacted]
**Cc:** [redacted]>; [redacted]>
**Subject:** RE: following up

[redacted], how about Monday at 2:30pm?

**Marc A. Weinstein** | Partner

Chair, White Collar Defense

**Hughes Hubbard & Reed LLP**
[redacted]

This message contains confidential information and is intended only for the individual named. If you are not the named addressee you should not disseminate, distribute or copy this e-mail. Please notify the sender immediately by e-mail if you have received this e-mail by mistake and delete this e-mail from your system. E-mail transmission cannot be guaranteed to be secure or error-free as information could be intercepted, corrupted, lost, destroyed, arrive late or incomplete, or contain viruses. The sender therefore does not accept liability for any errors or omissions in the contents of this message, which arise as a result of e-mail transmission. If verification is required please request a hard-copy version.

**From:** [redacted]>
**Sent:** Wednesday, March 31, 2021 9:33 AM
**To:** [redacted] Weinstein, Marc A. <[redacted]
**Cc:** [redacted]>; [redacted]
[redacted]>
**Subject:** following up

**CAUTION: This email was sent by someone outside of the Firm.**

Marc and Andy,

Hope you're both doing well. Are you available for a call early next week? We wanted to follow up with you on an aspect of our previous document requests.

Thanks very much,

[redacted]

[redacted]
Assistant United States Attorney
Southern District of New York
[redacted]
New York, NY 10007
[redacted]

# 59 (e) EX 48

**6. Provide a detailed description of all settlement negotiations conducted in this matter in which you took part or of which you were otherwise aware, including all terms of settlement that were discussed, considered, and rejected during the negotiations. Identify all individuals who participated in those negotiations, including government personnel and defense counsel. In each case, identify all participants and describe the discussions that occurred.**

Please see my response to Question A.3.

**7. Describe the interactions by you, or anyone else within the USAO, with any employees of the Palm Beach County State Attorney's Office concerning the federal or state investigation of Mr. Epstein, the terms of a proposed resolution of the case, and the terms of the federal non-prosecution agreement, including the terms of Mr. Epstein's incarceration.**

As noted above, my first interaction with anyone from the Palm Beach County State Attorney's Office about the Epstein case was at the Project Safe Childhood Conference in Washington, DC, when State Attorney Barry [redacted] introduced himself to USA Acosta and me and started railing against the victims and the case.

My next interaction was with ASA [redacted] at some later date. I was in her office, I believe on another matter, and I mentioned the case. She said that she "hated" the case and that she "hated" prostitution cases. She stated that some of the girls were not really victims because they had been paid "thousands of dollars." I was a bit taken aback because Ms. [redacted] was the supervisor of the division charged with prosecuting child sex offenses, including child prostitution cases and, by definition, child prostitutes receive money.

Although not personal interactions, I also had collected and reviewed the state grand jury transcript, indictment, and the state investigative materials. I had conferred with former ASAs about the use of the grand jury in the case, which was very unusual. In Florida, only capital cases need to be presented to a grand jury – all other cases can proceed by Information – and one ASA in Palm Beach County handles the presentation of all of the cases to the grand jury. This case was unusual because it was presented to a grand jury unnecessarily and it was not presented by the regular grand jury ASA. The State Attorney also had told the press that a variety of charges had been presented to the grand jury and the jurors had selected the lowest charge of solicitation of prostitution (with no designation of age). The transcript gave no indication that multiple charging options were presented, and the jurors were only provided with evidence about one victim, not all of the victims who had been the subjects of the investigation.

I believe that the next interaction was on September 12, 2007, when I attended a meeting at the State Attorney's Office with [redacted] and [redacted]. Jay Lefkowitz, Gerald Lefcourt, and Jack Goldberger attended on behalf of Mr. Epstein, and State Attorney [redacted] and ASA [redacted] were present. At some point in the past, one of Epstein's attorneys had falsely told State Attorney [redacted] that a person from the USAO had referred to the SAO as "a joke." Messrs. [redacted] and [redacted] and I had to spend the first several minutes of the meeting convincing State Attorney [redacted] that no one had ever said such a thing. After crossing that hurdle, we got to the core of the meeting, which was whether the SAO was in agreement with filing charges and seeking a sentence consisting with the terms of the NPA – that is, a plea to an

# 59 (e) EX 49

is -- is something that is absent, and that's the sort of typical language that you find in a -- I think in pretty much any federal plea agreement, which is, this agreement only -- the defendant understands that this agreement only binds the U.S. Attorney's Office for whatever district he or she is in, or --

A Right.

Q -- you know, and that -- and that truly what you would call global dispositions are unusual --

A Right.

Q -- for the federal government.

A And I would note, you know, and this is after the fact that it does say this district agrees.

Q Okay. Understood, and it's also has you as a party, not the Department of Justice.

A Right.

Q But it does omit that standard language, and do you know whether that was done sort of by mistake, or consciously?

A I -- I have no -- I can't speak to that.

Q All right. another piece is phrasing that you injected at the -- when you addressed the first -- where it was -- it was toward the end. Where --

A Right.

Q -- you talked about injecting the best efforts

# 59 (e) EX 50

**Cc:** [redacted]>
**Subject:** RE: following up

[redacted],

We can confirm that we are not aware of any historical surveillance video. We will be back to you later this week on the other materials.

Best regards,
Marc

**Marc A. Weinstein** | Partner

Chair, White Collar Defense

**Hughes Hubbard & Reed LLP**
[redacted]

This message contains confidential information and is intended only for the individual named. If you are not the named addressee you should not disseminate, distribute or copy this e-mail. Please notify the sender immediately by e-mail if you have received this e-mail by mistake and delete this e-mail from your system. E-mail transmission cannot be guaranteed to be secure or error-free as information could be intercepted, corrupted, lost, destroyed, arrive late or incomplete, or contain viruses. The sender therefore does not accept liability for any errors or omissions in the contents of this message, which arise as a result of e-mail transmission. If verification is required please request a hard-copy version.

---

**From:** [redacted]>
**Sent:** Monday, April 12, 2021 2:15 PM
**To:** [redacted]>; Weinstein, Marc A. <[redacted]
**Cc:** [redacted]>
**Subject:** RE: following up

**CAUTION: This email was sent by someone outside of the Firm.**

Marc and Andy,

Thanks for your time last week. We wanted to follow up on with you on our conversation last week. When can we expect to get the materials discussed?

Thanks again,
[redacted]

---

**From:** [redacted]>
**Sent:** Wednesday, March 31, 2021 1:59 PM
**To:** Weinstein, Marc A. <[redacted]
**Cc:** [redacted]>; [redacted]>
**Subject:** RE: following up

Thanks, talk to you then. We can use this conference line: [redacted]

---

**From:** Weinstein, Marc A. <[redacted]
**Sent:** Wednesday, March 31, 2021 1:52 PM
**To:** [redacted]>; [redacted]

# 59 (e) EX 51

**From:** "[redacted])" <[redacted]>
**To:** "[redacted])" <[redacted]>
**Subject:** Fwd: Discovery questions
**Date:** Thu, 20 Aug 2020 22:26:51 +0000

---

The box is on the back table in my office.

Sent from my iPhone

Begin forwarded message:

**From:** "[redacted]) (FBI)" <[redacted]>
**Date:** August 20, 2020 at 6:16:56 PM EDT
**To:** "[redacted])" <[redacted]>, "[redacted])"
<[redacted]>
**Cc:** "[redacted]" <[redacted]>, "[redacted])"
<[redacted]>, "[redacted] (USANYS)" <[redacted]>
**Subject: RE: Discovery questions**

Hey all,

Just wanted to send a quick email to detail what is being given today. There is a box of media, including VHS, cassette, and microcassettes, and newspaper articles that were provided by Reiter.

On the thumbdrive is a spreadsheet outlining what is included; items highlighted in blue are included. You will notice a comment "see disk tracking spreadsheet" in items not highlighted; this spreadsheet will be included in the disk copies we send over that will detail how many images total and how many removed.

There are loose disks which include 1B evidence scans, 1D1-1D5 evidence items, LSJ 3D imaging, and the FBI file.

Separately, we will keep you updated as we continue to work on the redactions and will let you know as soon as we finish with the disks.

Let us know you have any questions.
-[redacted]

Special Agent [redacted]
FBI New York Field Office
Child Exploitation/Human Trafficking
C: [redacted]

---

**From:** [redacted]) <[redacted]>
**Sent:** Wednesday, August 19, 2020 8:43 PM
**To:** [redacted]) <[redacted]>
**Cc:** [redacted]) (FBI) <[redacted]>; [redacted] <[redacted]>; [redacted]

[redacted]) <[redacted]>; [redacted] (USANYS) <[redacted]>
**Subject:** [EXTERNAL EMAIL] - Re: Discovery questions

I'll be in the office tomorrow.

Sent from my iPhone

On Aug 19, 2020, at 8:18 PM, [redacted]) <[redacted]> wrote:

Great, thanks very much. I'm not in the office right now, but hopefully someone from the team can grab these. If not, I can find a paralegal to take them.

---

**From:** [redacted]) (FBI) <[redacted]>
**Sent:** Wednesday, August 19, 2020 7:24 PM
**To:** [redacted]) <[redacted]>; [redacted] <[redacted]>; [redacted]) <[redacted]>
**Cc:** [redacted]) <[redacted]>; [redacted] (USANYS) <[redacted]>
**Subject:** RE: Discovery questions

Sure no problem. I can bring those over tomorrow as well.

---

**From:** [redacted]) <[redacted]>
**Sent:** Wednesday, August 19, 2020 7:22 PM
**To:** [redacted]) (FBI) <[redacted]>; [redacted] <[redacted]>; [redacted]) <[redacted]>
**Cc:** [redacted]) <[redacted]>; [redacted] (USANYS) <[redacted]>
**Subject:** [EXTERNAL EMAIL] - RE: Discovery questions

Perfect, thanks! Yes, I think we should take the vhs tapes and microcassettes to get them converted, if that's ok.

---

**From:** [redacted]) (FBI) <[redacted]>
**Sent:** Wednesday, August 19, 2020 7:20 PM
**To:** [redacted]) <[redacted]>; [redacted] <[redacted]>; [redacted]) <[redacted]>
**Cc:** [redacted]) <[redacted]>; [redacted] (USANYS) <[redacted]>
**Subject:** RE: Discovery questions

That sounds great. Thank you. We are definitely open to them scheduling a time if need be.

I will check in with CART again and get back to you.

As far as the paper evidence and case file, we can drop that off to your office sometime tomorrow evening. Just working on putting it all on a disk/thumbdrive for you. Also, FYI, included in the boxes from Reiter are vhs tapes and microcassettes. Would you like us to turn these over to you as well? Let me know your thoughts on this.

Thanks!

---

**From:** [redacted]) <[redacted]>
**Sent:** Wednesday, August 19, 2020 7:01 PM
**To:** [redacted]) (FBI) <[redacted]>; [redacted] <[redacted]>; [redacted])

<[redacted]>
**Cc:** [redacted]) <[redacted]>; [redacted] (USANYS)
<[redacted]>
**Subject:** [EXTERNAL EMAIL] - RE: Discovery questions

Thank you so much for these—very helpful (and sorry I didn't realize the message pad scans also had the same pages without post-its!)

On these:

- Yes, please send over the copy of the gj transcript disc when you can.
- Found the original scans from the FL file—thank you!
- Yes, please get us the paper evidence from NY, VI, and Reiter as soon as you can.
- We'll take the FBI file whenever you can get it to our office.
- My understanding from past FBI cases is that CART completes some sort of paperwork documenting the dates on which they conduct data extractions. We need that for all of the extractions in this case, please (It may not be 302s).
- On the evidence from disks, understood. In order to give you more time, we are going to tell the defense attorneys that the materials are available for them to review in-person if they want to schedule a time to come down to the FBI office, but that in the meantime we are still working on getting copies of non-nude images to produce to them.

---

**From:** [redacted]) (FBI) <[redacted]>
**Sent:** Wednesday, August 19, 2020 2:21 PM
**To:** [redacted]) <[redacted]>; [redacted] <[redacted]>; [redacted]) <[redacted]>
**Cc:** [redacted]) <[redacted]>; [redacted] (USANYS)
<[redacted]>
**Subject:** RE: Discovery questions

Hey all, below is a summary of the discovery items you've requested.

Message Pad Scans: The message pads were scanned with the post it notes on them and the very next page is the page without the post it note, so the pages are back to back.

Papers from Miami case file (grand jury testimony): This is a disk – I can copy it and send it over to you.

Evidence scans: Are you referring to the scans from the FL file? We sent those over with the original message pad scans last year. If you need that again, let us know and we can get another copy over to you. As far as paper evidence from the NY and VI searches, and the paper provided by Reiter, we can get that over to you by the end of the week.

FBI file: We have that ready for you.

CART: There are no 302s regarding the extraction of devices.

Evidence from disks: This is a large volume and we've been working on this and removing nude/semi nude images. This is the only thing that would be difficult to complete by Friday. If we could have a little more time to pull this together, that would be very helpful.

If it's helpful to talk through some of this via phone, we are happy to do that as well.

Special Agent [redacted]
FBI New York Field Office
Child Exploitation/Human Trafficking
C: [redacted]

---

**From:** [redacted]) <[redacted]>
**Sent:** Tuesday, August 18, 2020 6:41 PM
**To:** [redacted] <[redacted]>; [redacted]) <[redacted]>
**Cc:** [redacted]) (FBI) <[redacted]>; [redacted])
<[redacted]>; [redacted] (USANYS) <[redacted]>
**Subject:** [EXTERNAL EMAIL] - RE: Discovery questions

Thanks so much, [redacted]. Really appreciate all the work you and [redacted] are putting in on this. Let's touch base tomorrow to figure out the timeline for the discovery issues.

---

**From:** [redacted] <[redacted]>
**Sent:** Tuesday, August 18, 2020 6:40 PM
**To:** [redacted]) <[redacted]>; [redacted]) <[redacted]>
**Cc:** [redacted]) (FBI) <[redacted]>; [redacted]) <[redacted]>;
[redacted] (USANYS) <[redacted]>
**Subject:** Re: Discovery questions

Hey guys,

Apologies but today I was out In the field on surveillance and [redacted] was also out of the office so we've not been able to connect on these discovery questions. We will be back in the office tomorrow and will dive into this as best we can. We have several calls tomorrow, one of which is with Tony Figuero but well do our best to get on this list. That being said I don't want to make you any promises that everything will be compiled by tomorrow and that we will have an answer to all of your questions but we can jump on a call tomorrow if you like to square some of this away.

[redacted] I did receive your "pages from Miami_case_docs" PDF.

-[redacted]

**Detective** [redacted]

**NYPD / FBI**

**Child Exploitation Human Trafficking Task Force**

**Office:** [redacted]

**Cell:** [redacted]

**Fax:** [redacted]

---

**From:** [redacted]) <[redacted]>
**Sent:** Tuesday, August 18, 2020 6:03 PM
**To:** [redacted]) <[redacted]>; [redacted] <[redacted]>
**Cc:** [redacted]) (FBI) <[redacted]>; [redacted])
<[redacted]>; [redacted] (USANYS) <[redacted]>
**Subject:** RE: Discovery questions

Hi [redacted] and [redacted]

Sorry to pester, but would you be able to let us know whether it is realistic to expect that you'll be able to get us these materials tomorrow or Thursday?

Thanks,
[redacted]

---

**From:** [redacted]) <[redacted]>
**Sent:** Tuesday, August 18, 2020 4:41 PM
**To:** [redacted]) <[redacted]>; [redacted] <[redacted]>
**Cc:** [redacted]) (FBI) <[redacted]>; [redacted]) <[redacted]>;
[redacted] (USANYS) <[redacted]>
**Subject:** RE: Discovery questions

Hi [redacted] and [redacted]

The drive you provided us has some scans on it (looks like they're scans of the message pads). As I recall, there was a larger scanning project, during which the FBI scanned all of the paper that was vouchered in evidence. Are you able to provide us with all of those scans this week?

With respect to the message pads in particular, I think you mentioned that they were scanned both with post-it notes on them and also without the post-it notes. The version on this drive just looks like it has the post-it note scans.

Thanks,

[redacted]

---

**From:** [redacted]) <[redacted]>
**Sent:** Tuesday, August 18, 2020 4:45 AM
**To:** [redacted] <[redacted]>
**Cc:** [redacted]) (FBI) <[redacted]>; [redacted]) <[redacted]>;
[redacted]) <[redacted]>; [redacted] (USANYS) <[redacted]>
**Subject:** RE: Discovery questions

Sorry, got a bounceback for [redacted] too. I'm just attaching the one page I referenced in my email below. Hopefully that will go through.

---

**From:** [redacted])
**Sent:** Tuesday, August 18, 2020 4:40 AM
**To:** '[redacted]' <[redacted]>
**Cc:** [redacted]) (FBI) <[redacted]>; [redacted]) <[redacted]>;

[redacted]) <[redacted]>; [redacted] (USANYS) <[redacted]>
**Subject:** FW: Discovery questions

[redacted],

I got a bounceback from your account for the below email because the attachment was too big. Hopefully it went through for [redacted] so she can see it. If not, please let me know.

Thanks,
[redacted]

---

**From:** [redacted])
**Sent:** Tuesday, August 18, 2020 4:33 AM
**To:** [redacted] <[redacted]>; [redacted]) (FBI) <[redacted]>
**Cc:** [redacted]) <[redacted]>; [redacted]) <[redacted]>; [redacted] (USANYS) <[redacted]>
**Subject:** Discovery questions

Hi [redacted] and [redacted],

Thanks so much for your help with the Maxwell discovery so far. I have some follow-up questions about the most recent batch you provided, and wanted to check in on the longer term tasks we discussed last month.

Below are some questions regarding the discovery [redacted] dropped off a few days ago with requests for additional items:

- The last page of the attached appears to be a photograph of a disc. The label on the disc seems to suggest it contains grand jury transcripts. Have you given us those transcripts?
- The message pad scans you provided still have post-it notes on top of several of the message pad pages. I think [redacted] mentioned that each pad had been scanned twice, but I'm only seeing one copy of each pad—and those copies all of post-its on them. That's true of nearly every "Notebook" pdf you provided in the "Message pad scans" folder. Would you please get us a scans of these without post-its on them?
- It looks like we're still missing SW returns for the 20 mag 6719 warrant and for the NH premises warrant. Would you please get us copies of those returns?

Following up on our conversation last month, I think we're still waiting on the below items from you guys. Would you please be able to get us these this week?

- Full FBI sentinel file
- CART paperwork regarding the extraction of data from all devices seized during the investigation
- All 302s regarding the extraction of data from any seized devices and the review of images (both digital and hard copy) seized during the investigation, including from Epstein's properties.
- Scans of the files Reiter provided to the FBI and provide us with all of those scanned materials
- Scans of all hard copy documents, including photos, in the possession of the FBI that have not yet been scanned, including anything seized during any searches. Please produce to SDNY all of those scans, except any nude or partially nude images. For nude or partially nude images, please provide us with a log detailing how many such images were scanned, where they were from, and where they are being stored.
- Copies of the contents of all the discs that were seized and searched pursuant to search warrants to a platform for review. Then please produce to SDNY a copy all of those materials, except any nude or partially nude images. For nude or partially nude images, please provide us with a log detailing how many such images were located, where they were from, and where they are being stored.

Please let me know if you have any questions or if it would be useful to hop on a call.

Thanks very much,

[redacted]

[redacted]
Assistant United States Attorney
Southern District of New York
1 St. Andrew's Plaza
New York, NY 10007
[redacted]

# 59 (e) EX 52

informed [redacted] Litigation Counsel and Ethics Advisor Dexter Lee. AUSA Lee opined that he did not see a conflict. As soon as I became aware of these allegations, reported myself to the Office of Professional Regulation on or about April 21, 2008.

3. *The Alleged Unprecedented Extension of Federal Law and the Allegations of Political Motivation for the Prosecution.*

It is my hope that this letter has sufficiently explained how thoroughly this matter has been reviewed, how seriously the issues have been considered, and how additional delays may adversely affect the case going forward and, more importantly, the victims. I have attached the proposed indictment for you to consider the nature and gravity of the crimes. *See* Tab G. You are invited to evaluate whether I, along with U.S. Attorney Acosta, Criminal Division Chiefs Menchel and, later [redacted], Deputy Criminal Division Chiefs Lourie, followed by Rolando [redacted], and AUSA [redacted] have somehow steered this investigation toward "an unprecedented extension of federal law"despite being simultaneously and/or subsequently reviewed by CEOS, DAAG Mandelker, and AAG Fisher. I also hope that the reputations of the above-mentioned professional prosecutors combined with the documented layers of methodical and thorough review of all issues raised by Epstein are enough to summarily dismiss the idea that this matter is politically motivated. It seems incomprehensible how Messrs. Starr and Whitley could expect *further* review when the due process rights of their client have been considered and reconsidered to the point of absurdity.

With respect to the other allegations of misconduct leveled against investigators and prosecutors, similarly false allegations were made against the local police detective who first investigated the case. Those false allegations apparently were accepted as true and were not investigated or challenged by the State Attorney's Office and, when coupled with the immense pressure brought to bear upon the State Attorney by some of these same lawyers who represent Epstein today, resulted in a single felony charge related to only two of the more than 20 victims identified in the state investigation. Contrary to the claims of Epstein's attorneys, the SDFL is *not* trying to prosecute Epstein more harshly because of his political friends or his financial status; rather, the SDFL is attempting to follow Department policy by treating Epstein like all other criminal defendants – charging him with the most serious readily provable offenses. The SDFL has even continued to allow Epstein the opportunity to perform his obligations under the Non-Prosecution Agreement despite his numerous breaches of and attacks on the terms to which he already agreed.

Without attempting to address each and every allegation, I would like to highlight some of the misstatements contained in counsels' letter, to provide some sense of counsels' conduct throughout this case, particularly after their attempts at legal persuasion failed. Throughout the case, counsel have misrepresented the facts of the case to our Office, CEOS, and the press. For example, Epstein's counsel reference to this case as "precedent-shattering," suggests that all of the victims were at least 16 years old, and that the conduct "was purely local in nature." The SDFL has prosecuted several "sex tourism" cases where the "john" communicated via telephone with an undercover "pimp" in the SDFL to meet minor females to engage in prostitution. All were charged and convicted of violating 18 U.S.C. § 1591. The SDFL has charged and convicted a 21-year-old man of violating 18 U.S.C. § 2423 when he traveled to Florida to meet



imageFORMULA Ca

# 59 (e) EX 53

On about July 3, 2008, Jane Doe #1 and Jane Doe #2 learned, through telephones conversations had between Mr. Edwards and AUSA Villafaña, that the U.S. Attorney's Office and Epstein might be in the process of finalizing some sort of plea arrangement. Accordingly, they filed an emergency motion seeking to protect their rights under the CVRA, including in particular their right to confer about the proposed plea arrangement.

Mr. Edwards – and thus his clients -- first learned of the Non-Prosecution Agreement on or after July 9, 2008, when the Government filed its responsive pleading to Jane Doe's emergency petition. That pleading was the first public mention of the non-prosecution agreement and the first disclosure to Mr. Edwards and his clients. Epstein, through his attorneys, knew that the victims had not been informed about the plea arrangement.

On July 9, 2008, AUSA Villafaña sent a victim notification to Jane Doe #1 via her attorney, Mr. Edwards, which is attached as Exhibit 6 to the Villafaña Declaration. That notification contains a written explanation of some of the terms of the Non-Prosecution Agreement between Epstein and the U.S. Attorney's Office. A full copy of the terms was not provided. This was the first time that Jane Doe #1 was told that the arrangement blocked any possibility of federal criminal charges being filed against Epstein. A notification was not provided to Jane Doe #2 because the agreement limited Epstein's liability to victims whom the United States was prepared to name in an indictment.

On July 11, 2008, the Court held a hearing on the victims' emergency motion. During the hearing, the Government discussed in open court various provisions of the Non-Prosecution Agreement. At the conclusion of the hearing, victims' counsel and the Government agreed to

# 59 (e) EX 54

80804-MARRA/JOHNSON (S.D. Fla. 2008), on July 25, 2008, Epstein filed a motion for a stay. That motion claims that the civil action is "a counterpart to a pending federal criminal action." The basis for that claim, so far as Jane Doe #1 and Jane Doe #2 can tell, is the federal Non-Prosecution Agreement. Epstein should not be permitted to use provisions in the Agreement to his advantage in private litigation without disclosing those provisions to the parties he is opposing. Indeed, as a simple matter of fairness to the victims, *see* 18 U.S.C. § 3771(a)(5) (victims right to "fairness"), the provisions should be disclosed.

In sum, the Court should direct the Government to reveal to the victims what it has done to resolve the case by ordering production of the full Non-Prosecution Agreement and any accompanying addenda to the agreement.

THE GOVERNMENT SHOULD BE REQUIRED TO PRODUCE THE REPORT OF INTERVIEW WITH JANE DOE #1

The Government apparently has a report of interview indicating that two named FBI agents met with Jane Doe #1 on about October 26, 2007. The Government, however, has declined to produce it.

The Government should be directed to produce this information to Jane Doe #1. Of course, a criminal defendant would be entitled to such a report. *See* Fed. R. Crim. P. 16(a)(1)(A) & (B). As an innocent victim in this matter, Jane Doe #1 should be treated with at least the same consideration. *See* 18 U.S.C. § 3771(a)(8) (victim's right to "be treated with fairness"). Jane Doe #1 requested this report in her letter regarding the proposed stipulated facts (see Exhibit 2 to this filing), a request that the Government has simply ignored.



EFTA00190609

# 59 (e) EX 55

One such condition to which Epstein has agreed is the following:

> "Any person, who while a minor, was a victim of a violation of an offense enumerated in Title 18, United States Code, Section 2255, will have the same rights to proceed under Section 2255 as she would have had, if Mr. Epstein had been tried federally and convicted of an enumerated offense. For purposes of implementing this paragraph, the United States shall provide Mr. Epstein's attorneys with a list of individuals whom it was prepared to name in an Indictment as victims of an enumerated offense by Mr. Epstein. Any judicial authority interpreting this provision, including any authority determining which evidentiary burdens if any a plaintiff must meet, shall consider that it is the intent of the parties to place these identified victims in the same position as they would have been had Mr. Epstein been convicted at trial. No more; no less."

On July 9, 2008, Jack Goldberger wrote me a letter with some objections to the Proposed Notification. Although he had several requests for changes, he stated: "Rather, a simple one page notification directed only to the recipient, *and limited to the information currently on the first page of your draft memorandum would suffice.*"

This, to me, is a written assent that the quoted language is, in fact, one of the conditions to which Epstein has agreed. So, I think that we do have a written, binding agreement comprised of the three documents that, as far as I know, were filed with the state court with Jack Goldberger's approval. (I am waiting to hear back from the ASA.)

Here again is what I provided to the State Attorney's Office, for your records.

<<Epstein Agrmt001.pdf>>

I am concerned that we were adamant before Epstein's plea that we had a complete agreement and nothing more was necessary and now taking the position that we do not have an operative document (or set of documents).

Alex, does the Black and Goldberger correspondence described above allay your concerns? Or would you still like me to raise this issue with Roy whenever he gets back to me?

Thank you, sorry for the lengthy e-mail.

*A.* [redacted] *Villafaña*

Assistant U.S. Attorney

500 S. Australian Ave, Suite 400

West Palm Beach, FL 33401

Phone [redacted]

Fax [redacted]

---

**From:** [redacted], [redacted] C. (USAFLS)

# 59 (e) EX 56

**From:** "[redacted]. (USAFLS)" </O=USA/OU=FLS/CN=RECIPIENTS/CN=AVILLAFANA>
**To:** "[redacted]. (MM) (FBI)" <[redacted]>, "[redacted]. (MM) (FBI)" <[redacted]>
**Subject:** Inquiry regarding an old case
**Date:** Wed, 27 Apr 2016 21:19:44 +0000
**Importance:** Normal

---

Hi [redacted] and [redacted] – We are trying to settle the "Jane Doe" litigation and the attorneys in the case are trying to get a copy of the undercover recording in "Operation Stolen Globe," which was the investigation of Epstein's former butler (Alfredo Rodriguez) who tried to sell the piece of evidence that he stole from Epstein's house. I explained that we can't turn over that evidence; the attorney would have to make a FOIA request to the FBI; but I agreed to find out whether the tape still exists. Can you find out whether FBI still has custody of the tape? If you do have it, please maintain it until a FOIA request is made and FOIA counsel can determine whether or not it needs to be produced.

Thank you so much!

[redacted]
Assistant U.S. Attorney
Southern District of Florida
[redacted]

# 59 (e) EX 57

agreement or deferred prosecution in favor of state prosecution in the way that the Epstein case was handled. I believed that the fairest course was to consult with the victims before the execution of any agreement.

The second significant departure from my regular practice was the victim notification procedure. Never before or since have I shared "drafts" of victim notifications with counsel for the defendants. The CVRA places the entire burden of complying with the Act on the government and the court and provides that a "person accused of the crime may not obtain any form of relief under this Chapter." 18 U.S.C. § 3771(d)(1) (2004). But, in this case, I was required to provide draft victim notification letters, rewrite them due to objections from defense counsel, and refrain from sending them altogether. My protestations appear in my emails, and were shared with the agents, my legal assistant, and my supervisors.

With regard to FBI policies and practices, I understood that the FBI had its own victim notification procedures. I had previously worked with [redacted] on other cases (and worked with her on other cases after the Epstein investigation). I did not know the details of what FBI included in its letters or when they were sent. I did not instruct FBI on what to send or when to send it. My general rule is to tell agencies to follow their regular procedures. I don't remember saying anything different in this case. I did not see any FBI letters in this case prior to collecting the FBI letters to Brad Edwards' clients in connection with the *Jane Doe v. United States* litigation. I did not instruct the FBI to include the language about the case being under investigation and that they should be patient.

2. **Identify all victims in this case to whom written or oral notifications were made, when and how each notification was made, and the contents of the notifications. Explain why notifications were made to some victims, and not to others, and who was responsible for those decisions.**

On the attached chart (Exhibit B-1), I listed all of the individuals identified as victims during the state investigation, the federal investigation, or after Epstein entered his state guilty plea, but who were brought to my attention by various attorneys. The chart lays out how and when each was contacted. Due to the passage of time, it is impossible for me to give exact dates and the exact content of each conversation. Also, there are some victims that I specifically remember meeting with. There are some that I know I did not meet with. There are others that I believe I met with, but I am not certain. I have qualified my answers on the chart accordingly.

On August 4, 2006, I prepared 24 Victim Notification Letters for victims who had been identified during the state investigation. (Exhibit 12.) These were provided to Special Agent [redacted] to hand-deliver to victims during interviews. I decided to prepare these letters and I decided on the content of those letters.

On August 11, 2006, 18 amended letters were prepared. (Exhibit 13.) These letters clarified that the recipients were victims and/or witnesses, since we had not yet been able to confirm that they were minors during the time of their encounters with Epstein and we were still working to confirm federal jurisdiction. People who had already received the August 4, 2006

---

responsible officials remain obliged to ensure that all such delegated responsibilities are discharged. The Attorney General designates the following responsible officials: . . . For cases in which charges have been filed—the U.S. Attorney in whose district the prosecution is pending."))

# 59 (e) EX 58

where this could have come from.

I was -- I would have reviewed this for the policy concerns. Did it do the -- the sort of the bullet points, and my assumption, rightly or wrongly, would have been that [redacted] and [redacted] would have looked at this, and that this was -- was appropriate. I understand your point.

**Q All right, and I believe the point you were referring to is that when I use the term jail -- get out of jail free card, that you recognize this is limited to your district?**

A And that's an important point --

**Q Of course.**

A -- to recognize.

**Q Of course, but nonetheless, this does give blanket immunity to people -- you have no idea who they might be, correct? If you had focused on it, would that have raised some question in your mind?**

A If -- if there was a discussion like what we're having here, then it very possibly could have raised. It's difficult to say it would have, but I understand your concern.

**Q All right, and the named individuals, [redacted] are all individuals who were described in the pros memo and so on, and the pros memo does identify that at least one of these**