**From:** ghislaine maxwell
**To:** Pro Se Filing
**Date:** Tuesday, September 22, 2026 11:58:42 PM
**Attachments:** 59e Exhibits Batch 3 EX 57-78 with Index.pdf

---

**CAUTION - EXTERNAL:**

**CAUTION - EXTERNAL EMAIL:** This email originated outside the Judiciary. Exercise caution when opening attachments or clicking on links.

## 59 (e) Exhibits — Batch 3 (EX 57–78) — Index


| EX | Document | Pages | PDF page |
|---|---|---|---|
| 57 | H.O.021593 (012593-683) | 2 | 2 |
| 58 | EFTA00009151 | 1 | 5 |
| 59 | EFTA00153653 | 2 | 7 |
| 60 | EFTA00190378 | 1 | 10 |
| 61 | Exhibit 52 p.11 | 1 | 12 |
| 61.1 | Exhibit 52 p.11 | 1 | 14 |
| 61.2 | Exhibit 52 p.11 | 1 | 16 |
| 61.3 | Exhibit 52 p.11 | 1 | 18 |
| 61.4 | Exhibit 52 p.11 | 1 | 20 |
| 62 | Exhibit 52 p.13 | 1 | 22 |
| 63 | Exhibit 52 p.14 | 1 | 24 |
| 64 | Dkt. 869 at 22-23 | 2 | 26 |
| 65 | Dkt. 869 at 29 | 1 | 29 |
| 66 | Dkt. 869 at 65 n.25 | 1 | 31 |
| 67 | EFTA00009424-25 | 2 | 33 |
| 68 | Exhibit 97 Rodriguez criminal complaint affidavit | 5 | 36 |
| 69 | Dkt. 869 at 30-34 | 5 | 42 |
| 70 | Dkt. 869 at 46-49 | 4 | 48 |
| 71 | Dkt. 869 at 49-51 | 3 | 53 |
| 72 | Dkt. 869 at 53 | 1 | 57 |
| 73 | Dkt. 869 at 54-57 | 4 | 59 |
| 74 | Dkt. 869 at 59-60 | 2 | 64 |
| 75 | Dkt. 869 at 62-64 | 3 | 67 |
| 76 | Dkt. 869 at 65-67 | 3 | 71 |
| 77 | Dkt. 869 at 66 | 1 | 75 |
| 78 | EFTA02731146-47 | 2 | 77 |

# 59 (e) EX 57

settlements by Epstein are to be construed as admissions or evidence of
civil or criminal liability or a waiver of any jurisdictional or other
defense as to any person, whether or not her name appears on the list
provided by the United States.
11. Epstein shall use his best efforts to enter his guilty plea and be
Page 4 of 7
HOUSE OVERSIGHT 012592
sentenced not later than October 26, 2007. The United States has no
objection to Epstein self-reporting to begin serving his sentence not
later than January 4, 2008.
12. Epstein agrees that he will not be afforded any benefits with respect to
gain time, other than the rights, opportunities, and benefits as any other
inmate, including but not limited to, eligibility for gain time credit
based on standard rules and regulations that apply in the State of
Florida. At the United States' request, Epstein agrees to provide an
accounting of the gain time he earned during his period of
incarceration.
13. The parties anticipate that this agreement will not be made part of any
public record. If the United States receives a Freedom of Information
Act request or any compulsory process commanding the disclosure of
the agreement, it will provide notice to Epstein before making that
disclosure.
Epstein understands that the United States Attorney has no authority to require the
State Attorney's Office. to abide by any terms of this agreement.„
-Iiiti!AW4Nigii#06*iiiMitg*WHaii4a104:Attorne
"
best efforts to ensure compliance with these procedures which cinpl
understandsstein tha
9.,00 and to use his
44cP;*(01 he ncccssary
0.00 Epstein also understands that it is.:
efforts to IPPYMPe.the. Judge of the 15th Judicial Circuit to acce
.
recommendation,regarding.the sentence to be imposed, and understands that the *NM: todo
•ation
In consideration of Epstein's agreement to plead guilty and to provide compensation
in the manner described above, if Epstein successfully fulfills all of the terms and conditions
of this agreement, the United States also agrees that it will not institute any criminal charges
against any potential co-conspirators of Epstein, including but not limited to
Lesley Groff, or______________________ Further, upon execution of this
agreement and a plea agreement with the State Attorney's Office, the federal Grand Jury
investigation will be suspended, and all pending federal Grand Jury subpoenas will be held
in abeyance unless and until the defendant violates any term of this agreement. The
defendant likewise agrees to withdraw his pending motion to intervene and to quash certain.
grand jury subpoenas. Both parties agree to maintain their evidence, specifically evidence
requested by or directly related to the grand jury subpoenas that have been issued, and
including certain computer equipment, inviolate until all of the terms of this agreement have
been satisfied. Upon the successful completion of the terms of this agreement, all
outstanding grand jury subpoenas shall be deemed withdrawn.
Page 5 of 7
HOUSE OVERSIGHT 012593
By signing this agreement, Epstein asserts and certifies that each of these terms is
material to this agreement and is supported by independent consideration and that a breach
of any one of these conditions allows the United States to elect to terminate the agreement
and to investigate and prosecute Epstein and any other individual or entity for any and all
federal offenses.
By signing this agreement, Epstein asserts and certifies that he is aware of the fact that
the Sixth Amendment to the Constitution of the United States provides that in all criminal
prosecutions the accused shall enjoy the right to a speedy and public trial. Epstein further
is aware that Rule 48(b) of the Federal Rules of Criminal Procedure provides that the Court
may dismiss an indictment, information, or complaint for unnecessary delay in presenting
a charge to the Grand Jury, filing an information, or in bringing a defendant to trial. Epstein
hereby requests that the United States Attorney forthe Southern District of Florida defer such
prosecution. Epstein agrees and consents that any delay from the date of this Agreement to
the date of initiation of prosecution, as provided for in the terms expressed herein, shall be
deemed to be a necessary delay at his own request, and he hereby waives any defense to such
prosecution on the ground that such delay operated to deny him rights under Rule 48(b) of
the Federal Rules of Criminal Procedure and the Sixth Amendment to the Constitution of the
United States to a speedy trial or to bar the prosecution by reason of the running of the statute
of limitations for a period of months equal to the period between the signing of this
agreement and the breach of this agreement as to those offenses that were the subject of the
grand jury's investigation. Epstein further asserts and certifies that he understands that the
Fifth Amendment and Rule 7(a) of the Federal Rules of Criminal Procedure provide that all
felonies must be charged in an indictment presented to a grand jury. Epstein hereby agrees

and consents that, if a prosecution against him is instituted for any offense that was the subject of the grand jury's investigation, it may be by way of an Information signed and filed by the United States Attorney, and hereby waives his right to be indicted by a grand jury as to any such offense.
//I
///
///
Page 6 of 7
HOUSE OVERSIGHT 012594
By signing this agreement, Epstein asserts and certifies that the above has been read and explained to him. Epstein hereby states that he understands the conditions of this Non-Prosecution Agreement and agrees to comply with them.
R. ALEXANDER ACOSTA
UNITED STATES ATTORNEY
Dated:_______________ By:
Dated: 77a,
Dated:
Dated:
A. MARIE VILLAFARA
ASSISTANT U.S. ATTORNEY
GERALD LEFCOURT, ESQ.
COUNSEL TO JEFFREY EPSTEIN
LILLY ANN SANCHEZ, ESQ.
ATTORNEY FOR JEFFREY EPSTEIN
Page 7 of 7
HOUSE OVERSIGHT 012595
By signing this agreement, Epstein asserts and certifies that the above has been read and explained to him. Epstein hereby states that he understands the conditions of this Non-Prosecution Agreement and agrees to comply with them.
R. ALEXANDER ACOSTA
UNITED STATES ATTORNEY
Dated:________________ By:
A. MARIE VILLAFARA
ASSISTANT U.S. ATTORNEY
Dated:
Dated:
Dated:
JEFFREY EPSTEIN',
RALD EFCOUR ESQ.
COUNSEL TO JEFFREY EPSTEIN
LILLY ANN SANCHEZ, ESQ.
ATTORNEY FOR JEFFREY EPSTEIN
Page 7 of 7
HOUSE OVERSIGHT 012596
By signing this agreement, Epstein asserts and certifies that the above has been read and explained to him. Epstein hereby states that he understands the conditions of this Non-Prosecution Agreement and agrees to comply with them.
R. ALEXANDER ACOSTA
UNI1EIl STATES ATTORNEY
Dated:_______________ By:
A. MARIE VILLAFANA
ASSISTANT U.S. ATTORNEY
Dated:
JEFFREY EPSTEIN
Dated:
GERALD LEFCOURT, ESQ.
COUNSEL TO JEFFREY EPSTEIN
Dated: q--cA1J0.?"--
Z, ESQ.
ATTORNEY FOR JEk FREY EPSTEIN
Page 7 of 7
HOUSE OVERSIGHT 012597
TAB 22
HOUSE OVERSIGHT 012598
08/31/2007 13:03 FAX 5618021787
USA0 WFB FL
Q002
US_ Department of Justice
United States Attorney
Southern District of Florida
500 4outh Australian Ave., Suite 400
Tfesr Palm Redd, FL 33401
(561) 6264711
August 31, 2007

# 59 (e) EX 58

**Q Okay. Did you discuss the -- did you have conversations with the DAG -- with Mark Filip about this case?**

A Not to my recollection.

**Q Okay, and we've already talked about the submission that [redacted] made on behalf of your office?**

A Which -- which -- yes, which I thought was a fulsome submission, and included the draft indictment, the NPA. I believe it included the term sheet and other documents.

**Q Did you or anyone else to your knowledge ask ODAG to review or assess the NPA, or approve it?**

A Not to -- before signature, not to my recollection, but it was part of the ultimate review when [redacted] submitted the matter to the deputy, he included the --

**Q It was --**

A -- the agreement.

**Q It was included. Their very brief letter, you remember --**

A Mm-hmm.

**Q -- the letter that [redacted] --**

A Yes.

**Q -- authored, that he authored. Addressed really only the issue of the appropriateness of the case for prosecution in your office. It did not in any way reference**

# 59 (e) EX 59

**From:** "[redacted]>
**To:** "[redacted]>
**Subject:** Fwd: Jeffrey Epstein
**Date:** Thu, 30 Apr 2020 02:31:49 +0000
**Importance:** Normal
**Inline-Images:** image001.png

---

I sent u the live safaris 😼

-

On Apr 29, 2020 10:31 PM, "[redacted]> wrote:
Ok

-

On Apr 29, 2020 10:28 PM, "[redacted]> wrote:
We should talk. I dont think ovs will accept that as a crime since it has to be physical on ny state soil.

-

On Apr 29, 2020 10:25 PM, "[redacted]> wrote:
Ah ok. Yea her abuse happened in Florida. She was a part of our indictment out of New York as one of the victims listed in it. She received calls from NY to participate in massages in florida. Does that make a difference for ovs?

-

On Apr 29, 2020 10:12 PM, "[redacted]> wrote:
Thats what I thought. So she's not eligible for ovs.

-

On Apr 29, 2020 10:12 PM, "[redacted]> wrote:
[redacted] was a vic in FL.

-

On Apr 29, 2020 9:53 PM, "[redacted]> wrote:
Was she a victim in New York? See below

-

---------- Forwarded message ----------
From: Brittany Henderson <[redacted]>
Date: Apr 29, 2020 3:42 PM
Subject: Jeffrey Epstein
To: "[redacted]>
Cc: Brad Edwards <[redacted]>

[redacted],

I have attached the OVS application for [redacted]. Please let me know if you need anything else. If she is approved, she is going to treat with Randee Kogan.

Thank you so much!

EDWARDS POTTINGER LLC
**Brittany Henderson**
**Trial Attorney**
425 North Andrews Avenue, Suite 2
Fort Lauderdale, Florida 33301
[redacted] | www.epllc.com

# 59 (e) EX 60

**U.S. Department of Justice**

*United States Attorney*
*Southern District of Florida*

*500 S. Australian Ave, Ste 400*
*West Palm Beach, FL 33401*
*([redacted]) 820-8711*
*Facsimile:* [redacted]

August 21, 2008

DELIVERY BY ELECTRONIC MAIL
Jay P. Lefkowitz, Esq.
Kirkland & Ellis LLP
Citigroup Center
153 East 53rd Street
New York, New York 10022-4675

Roy Black, Esq.
Black Srebnick Kornspan & Stumpf P.A.
201 S. Biscayne Blvd, Suite 1300
Miami, FL 33131

Re: Jeffrey Epstein

Dear Jay and Roy:

Thank you for your response to my earlier letter. The U.S. Attorney's Office shares in your desire to implement all of the terms of the Non-Prosecution Agreement. As you are aware, the jointly-approved Special Master, Judge [redacted], has already selected an attorney representative, [redacted] Josefsberg, who was accepted by both parties. The Office has conferred with Mr. Josefsberg, who has agreed to continue in that role. In October 2007, Mr. Josefsberg expended time, effort, and funds in preparing to serve as the attorney representative, and he will need a written confirmation from you that his future fees and expenses will be paid in accordance with the terms of the Non-Prosecution Agreement. Please provide me with a copy of that correspondence for my file.

With that matter settled, I believe that the requirement for a joint written submission to the Special Master has been extinguished. Nonetheless, I have no objection to attempting to create a joint statement to assist Mr. Josefsberg in serving his duties. Regarding your suggestion that we ask Judge [redacted] to "offer the final word on how certain clauses should be interpreted and satisfied," I believe that the Agreement speaks for itself.

# 59 (e) EX 61

credible trial testimony established that the defendant took steps to make Jane comfortable and encouraged her to engage in illegal sex acts with Epstein.

Paragraphs 39 to 45 which describe specific conduct involving Kate, I think the specific request here -- well, first, was that it should be removed from the PSR because Kate was not a victim of the crimes charged in the indictment, and then, alternatively, that it be moved to a different paragraph with a heading offense behavior not part of relevant conduct. I don't see that this is necessary. I overrule the objection. Conduct involving Kate may be considered at sentencing her testimony revealed additional details of the defendant's method of identifying and introducing to Epstein young girls for sexualized massages. Her testimony also established the defendant's knowledge of the sexualized nature of massages with Epstein.

Paragraph 43, the defendant contends this paragraph should include a sentence that Kate was above the age of consent at all times. I think the paragraph says that Kate was age 17 or above at all relevant times, and I have no objection to including that she was above the age of consent at all times based on the trial evidence, so I will make that change to paragraph 43 of the PSR.

Paragraph 54, the defendant objects that there's no evidence that Epstein paid for Annie's trip to Thailand. That

# 59 (e) EX 61.1

credible trial testimony established that the defendant took steps to make Jane comfortable and encouraged her to engage in illegal sex acts with Epstein.

Paragraphs 39 to 45 which describe specific conduct involving Kate, I think the specific request here -- well, first, was that it should be removed from the PSR because Kate was not a victim of the crimes charged in the indictment, and then, alternatively, that it be moved to a different paragraph with a heading offense behavior not part of relevant conduct. I don't see that this is necessary. I overrule the objection. Conduct involving Kate may be considered at sentencing her testimony revealed additional details of the defendant's method of identifying and introducing to Epstein young girls for sexualized massages. Her testimony also established the defendant's knowledge of the sexualized nature of massages with Epstein.

Paragraph 43, the defendant contends this paragraph should include a sentence that Kate was above the age of consent at all times. I think the paragraph says that Kate was age 17 or above at all relevant times, and I have no objection to including that she was above the age of consent at all times based on the trial evidence, so I will make that change to paragraph 43 of the PSR.

Paragraph 54, the defendant objects that there's no evidence that Epstein paid for Annie's trip to Thailand. That

# 59 (e) EX 61.2

credible trial testimony established that the defendant took steps to make Jane comfortable and encouraged her to engage in illegal sex acts with Epstein.

Paragraphs 39 to 45 which describe specific conduct involving Kate, I think the specific request here -- well, first, was that it should be removed from the PSR because Kate was not a victim of the crimes charged in the indictment, and then, alternatively, that it be moved to a different paragraph with a heading offense behavior not part of relevant conduct. I don't see that this is necessary. I overrule the objection. Conduct involving Kate may be considered at sentencing her testimony revealed additional details of the defendant's method of identifying and introducing to Epstein young girls for sexualized massages. Her testimony also established the defendant's knowledge of the sexualized nature of massages with Epstein.

Paragraph 43, the defendant contends this paragraph should include a sentence that Kate was above the age of consent at all times. I think the paragraph says that Kate was age 17 or above at all relevant times, and I have no objection to including that she was above the age of consent at all times based on the trial evidence, so I will make that change to paragraph 43 of the PSR.

Paragraph 54, the defendant objects that there's no evidence that Epstein paid for Annie's trip to Thailand. That

# 59 (e) EX 61.3

credible trial testimony established that the defendant took steps to make Jane comfortable and encouraged her to engage in illegal sex acts with Epstein.

Paragraphs 39 to 45 which describe specific conduct involving Kate, I think the specific request here -- well, first, was that it should be removed from the PSR because Kate was not a victim of the crimes charged in the indictment, and then, alternatively, that it be moved to a different paragraph with a heading offense behavior not part of relevant conduct. I don't see that this is necessary. I overrule the objection. Conduct involving Kate may be considered at sentencing her testimony revealed additional details of the defendant's method of identifying and introducing to Epstein young girls for sexualized massages. Her testimony also established the defendant's knowledge of the sexualized nature of massages with Epstein.

Paragraph 43, the defendant contends this paragraph should include a sentence that Kate was above the age of consent at all times. I think the paragraph says that Kate was age 17 or above at all relevant times, and I have no objection to including that she was above the age of consent at all times based on the trial evidence, so I will make that change to paragraph 43 of the PSR.

Paragraph 54, the defendant objects that there's no evidence that Epstein paid for Annie's trip to Thailand. That

# 59 (e) EX 61.4

credible trial testimony established that the defendant took steps to make Jane comfortable and encouraged her to engage in illegal sex acts with Epstein.

Paragraphs 39 to 45 which describe specific conduct involving Kate, I think the specific request here -- well, first, was that it should be removed from the PSR because Kate was not a victim of the crimes charged in the indictment, and then, alternatively, that it be moved to a different paragraph with a heading offense behavior not part of relevant conduct. I don't see that this is necessary. I overrule the objection. Conduct involving Kate may be considered at sentencing her testimony revealed additional details of the defendant's method of identifying and introducing to Epstein young girls for sexualized massages. Her testimony also established the defendant's knowledge of the sexualized nature of massages with Epstein.

Paragraph 43, the defendant contends this paragraph should include a sentence that Kate was above the age of consent at all times. I think the paragraph says that Kate was age 17 or above at all relevant times, and I have no objection to including that she was above the age of consent at all times based on the trial evidence, so I will make that change to paragraph 43 of the PSR.

Paragraph 54, the defendant objects that there's no evidence that Epstein paid for Annie's trip to Thailand. That

# 59 (e) EX 62

inconsistent and unreliable. I overrule this objection. Carolyn testified at trial that Virginia first brought her to Epstein's residence when she was 14 years old. I found Carolyn to be credible and credit her testimony. I'm not persuaded by the arguments to the contrary. Moreover, @Sean's credible testimony corroborated Carolyn's recollection.

Paragraph 59, the defendant makes two objections. Same objection to Carolyn being 14. For the reasons I've stated, that's overruled. She objects to Carolyn's assertion that she visited Epstein's residence more than a hundred times. I overrule that objection. Again, I credit Carolyn's testimony. She testified that she went to the house "over 100 times." I reject the suggestion that this is improbable based on Epstein's travel schedule.

Paragraphs 61 and 62 again object to Carolyn's age, and I overrule for the same reasons.

Paragraph 64, three objections. First, the defendant objects to Carolyn's assertion that she visited the Palm Beach residence over a hundred times and her assertion that she was 14. For the reasons I've given, I overrule those objections. She objects to the assertion that Carolyn stopped performing sexualized massages in 2001 when she was 18 years old and argues that the evidence indicates she was 17 years old. We're going to take up the issue of this timing question with respect to the issue of which Guidelines Manual controls. So I'll skip

# 59 (e) EX 63

that for now.

Paragraph 72, defendant objects to the assertion that Epstein briefly penetrated Carolyn's vagina with his penis because her trial testimony the defense claims is contradicted by a 2009 deposition testimony. I overrule this objection. Again, I credit Carolyn's testimony. Carolyn plainly testified to this at trial.

Paragraph 74, the defendant again objects to the assertion as to the age and timing. Again, we'll pick up on that issue when we discuss the appropriate guideline manual.

Paragraphs 75 and 76 the defendant objects to the inclusion of these paragraphs in the presentence report because the perjury counts have not been presented to a jury, and so she contends have no bearing on the sentence in this case. I do overrule this objection. A sentencing court's discretion is largely unlimited as to the kind of information it may consider. It's free to consider evidence of uncharged crimes, dropped counts of an indictment, criminal activity resulting in acquittal in determining sentence. *United States v. Bennett*, 839 F.3d 153 (2d Cir. 2016). I may consider the information as long as the information is reliable and accurate. For the following reasons, I do conclude the information underlying the severed perjury charges is reliable. The defendant testified under oath in 2016 that she was not aware of Epstein's scheme to recruit underage girls for sexual massages and other than

# 59 (e) EX 64

States Attorney's Manual as prohibiting non-prosecution agreements that purported to bind other districts absent express written approval by certain officials, which were indisputably not granted as to the 2007 Epstein NPA). *Annabi* thus "control[led] the result." *Id*. at 265. The Circuit affirmed the denial of Maxwell's motion without an evidentiary hearing. *Id*.

On April 10, 2025, Maxwell petitioned the Supreme Court for a writ of certiorari, on the question whether the NPA bound districts other than SDFL. *Maxwell v. United States*, No. 24-1073, 2025 WL 1117438, at *1–2 (Apr. 10, 2025). On October 6, 2025, the Supreme Court denied certiorari. *Maxwell*, 146 S. Ct. 93 (2025).

***Assessment***: This claim has been rejected by the Circuit (and by Judge Nathan, twice), and the Supreme Court has declined to review the denial of that claim. Maxwell does not argue there has been any "intervening change in the law" that might exonerate her. *Chin*, 622 F.2d at 1092. There is none. This claim is thus procedurally barred. *See Pitcher*, 559 F.3d at 123; *Sanin*, 252 F.3d at 83; *Mui*, 614 F.3d at 53.

Maxwell counters by again seizing on the EFTA. She argues that certain records, released under that statute, reveal that the NPA was intended to bind districts outside SDFL, precluding her SDNY prosecution. She relatedly claims that the Government violated its *Brady* obligations by not disclosing these to her in connection with her prosecution.

The Court first addresses the records to which Maxwell points, and then her *Brady* claim. The records fall into four categories.

First, Maxwell portrays certain EFTA records as revealing that the NPA gave "blanket transactional immunity" to all co-conspirators of Epstein's. *E.g.*, Pet. Supp. at 6 (citing Exs. 22–33); Reply Supp. at 16. But to reach that conclusion, Maxwell distorts those materials. For example, her unauthorized supplement cited and attached a single page from OPR's 2019

interview of Acosta, during which the *questioner* stated that the NPA conferred "blanket immunity" on co-conspirators. Significantly, Acosta responded that, although he "underst[ood] how it could be read that way," he did not "want to characterize it" as conferring such immunity. Supp. Ex. 18 at 1 (EFTA00009101, *i.e.*, Bates stamp of document released under the EFTA). In any event, even if the EFTA records could be read to imply that the co-conspirator immunity clause covered Maxwell, the Second Circuit's decision in *Annabi*—as the Circuit held on Maxwell's appeal—holds that such a grant of immunity would bar only *USAO-SDFL* from charging her, and not USAO-SDNY or offices in other districts. *See Maxwell*, 118 F.4th at 263 (NPA's scope "*expressly limited*" to SDFL (emphasis in original)). And the EFTA documents cited by Maxwell drive home that point. On the very next page of OPR's Acosta interview (which Maxwell omitted), for example, Acosta emphasized that "an important point . . . to recognize" was the fact that the NPA was "limited to" SDFL. EFTA00009102.

Second, Maxwell claims that other EFTA records indicate that DOJ officials outside USAO-SDFL participated in negotiating and approving the NPA. Their involvement, she asserts, means the agreement bound the entire Department, including SDNY. *E.g.*, Pet. Supp. at 4–5, 7. Even assuming the truth of her factual assertions, Maxwell's take on the legal implications is wrong. As the Second Circuit recognized, the operative U.S. Attorney's Manual (now called the Justice Manual) stated unequivocally:

> No district or division shall make any agreement, including any agreement not to prosecute, which purports to bind any other district(s) or division without the express written approval of the United States Attorney(s) in each affected district and/or the Assistant Attorney General of the Criminal Division.

*Maxwell*, 118 F.4th at 264 (quoting United States Attorney's Manual § 9-27.641 (2007)). The EFTA records cited by Maxwell do not in any respect suggest that the U.S. Attorney for SDNY

# 59 (e) EX 65

after the signature of the NPA." Pet. Supp. at 6. EFTA00190632 is an email chain from August 2008, among Acosta and other members of USAO-SDFL, that appears to reflect a discussion among those persons concerning a possible future agreement with Epstein that might supersede the 2007 NPA. But that document does not bespeak any violation by USAO-SDNY of a disclosure obligation. Even assuming it was not produced to Maxwell in connection with her prosecution, it is not material or favorable to her. And its non-production to her did not cause her prejudice. The dispositive agreement as to the scope of USAO-SDFL's agreement with Epstein was the NPA, executed 11 months before the August 2008 email exchange. And EFTA00190632, which consisted of internal communications within USAO-SDFL, did not purport to alter, and legally could not have altered, the meaning of the executed agreement. *See LaSalle Bank Nat. Ass'n v. Nomura Asset Cap. Corp.*, 424 F.3d 195, 206–08 (2d Cir. 2005). Even if these email communications had brought about negotiations towards a possible superseding agreement with Epstein, these could not have modified the original agreement unless and until they resulted in bilateral assent to a new agreement. *See Dallas Aerospace, Inc. v. CIS Air Corp.*, 352 F.3d 775, 783–85 (2d Cir. 2003). And Maxwell has not adduced any evidence that the 2007 Epstein NPA was ever superseded or modified by any later agreement. To the contrary, her counsel argued for years—in the district court, in the Second Circuit, and in the certiorari petition to the Supreme Court—that the 2007 NPA was the only operative agreement. EFTA00190632 does not assist Maxwell, and the other documents relating to the NPA released under the EFTA do not, either.[15] The petition's assertion that there was a *Brady* breach as a result of the Government's ostensible non-production of those documents in

[15] Nor do the other EFTA documents Maxwell cites. These are likewise irrelevant or undermine her claims. *See, e.g.*, Pet. Supp. at 6 (citing EFTA documents ending in 225618, 225483, 225489, 225490, 225493, 225494, 225522, 225491, 225532, 190477).

# 59 (e) EX 66

summation, these records separately established the use of interstate commerce in connection with the charged offenses. Tr. at 2894–95.[24]

For all these reasons, this claim is meritless.

### D. Remaining Claims, Including Related to EFTA Documents

Maxwell makes dozens of other claims that are conclusory and unsupported, mainly citing documents disclosed pursuant to the EFTA. Many of these documents were produced to Maxwell in discovery. *See, e.g.*, Pet. Supp. Exs. 40, 43. Others reflect internal USAO-SDNY memoranda that summarize what certain individuals told the Government—the contents of which were produced to Maxwell in its productions of Jencks Act material, which the Government produced both as to testifying and non-testifying witnesses. *See, e.g.*, Pet. Supp. Exs. 38, 42, 52. And the remaining documents are at best irrelevant to—and many undermine—her claims. *See, e.g.*, Pet. Exs. 39, 49, 55. Maxwell's remaining claims are all meritless.[25]

### E. Maxwell's Request for a Hearing

Maxwell seeks an evidentiary hearing on her claims. She is not entitled to one.

---

[24] Maxwell argues that, but for the admission of the massage table, she would not have been convicted. She bases this claim on Juror 50's statement during a post-trial interview that the table had been "crucial in interstate commerce." Pet. Ex. 7 at 21 (April 2022 docuseries). But, for the reasons above, the massage table would have been admitted regardless of whether Maxwell had had access to Detective Parkinson's 2006 grand jury transcript. Even had it not been, that reported comment by a single juror does not come close to showing that Maxwell otherwise likely would have been acquitted. *See United States v. Siddiqi*, 959 F.2d 1167, 1173 (2d Cir. 1992).

[25] As to the arguments not addressed in full in this decision, the Court adopts by reference the arguments by the Government in its opposition, which comprehensively dispatches these. *See, e.g.*, Opp'n at 49–52 (arguing that other miscellaneous arguments by Maxwell likewise fail); *see also Miranda v. Bennett*, 322 F.3d 171, 177 (2d Cir. 2003) (where habeas petition is facially inadequate, district court may deny it "with the tersest of orders"); *Rivera v. United States*, No. 92 Civ. 7726, 1993 WL 464747, at *3 (S.D.N.Y. Nov. 12, 1993) (appropriate for district court not to discuss each of petitioner's frivolous claims).

# 59 (e) EX 67

A Correct.
Q And is it possible -- does it -- is it reasonable that one of them might have come up with a solution for you to your problems?
A And that's the point that I'm --
Q Okay.
A -- trying to make. It's certainly possible, and it's difficult to reconstruct that 12 years after the fact.
Q All right. All right. I want to go back to wind up this -- this concern about engagement with the federal -- I mean, engaging the federal system into the state process. 21b is the exhibit that is your comments really on the very final version of --
A Right.
Q -- the NPA on September 24, and the -- the language is quite striking to us in this regard, looking at the -- at the first e-mail there, you've talked about deleting the petite policy portion upon [redacted] recommendation, and inserting global resolution language which you've proposed.
And then you then say, "I'm not comfortable with requiring the state attorney to enter into a joining recommendation," and then you propose essentially taking out a mention of the state attorney's office regarding the -- the sentence recommendation, and then you also note, "I'm not comfortable with requiring a state court to stick with our

timeline," and you ask that the reference be softened -- your term is to soften.

You also use soften below when you talk about your -- making it -- a concern about making Epstein an agent of the U.S. regarding negotiations. So, you're really -- and then at the very top, in the -- in the later follow up e-mail, you express concern about, "Do we really need to set a date for his reporting? I'm very nervous about that. If I were a judge, I would be upset by the federal government telling a state court how to manage their calendar. Can we delete?"

A Right.

Q So, clearly you're very mindful, right, of the importance of not injecting the federal sovereign into the state sovereign.

A Correct.

Q Fair? All right, but yet, this whole set up, the whole NPA did require certain actions to occur, however they came about, in the state, because of the federal requirement.

A Yes.

Q And why was that a good idea?

A In hindsight, the complexity that this took on clearly is something that -- that if I was advising a fellow U.S. Attorney today, I would say, think it through. I do think it would have played differently if he had actually not

# 59 (e) EX 68

**AFFIDAVIT**

I, Christina J. Pryor, being duly sworn, do state and attest as follows:

1. I am a Special Agent with the Federal Bureau of Investigation (FBI) and have been so employed for three (3) months. I am currently assigned to the Safe Streets Task Force, Miami Field Division, FBI Squad PB-2. Prior to joining the Miami Field Division, I attended the FBI Academy in Quantico, Virginia, for five (5) months where I received training in federal criminal laws and investigation techniques, including the laws related to obstruction of justice.

2. This affidavit is based upon my own personal knowledge of the facts and circumstances surrounding the investigation, and information provided to me by other law enforcement officers. This affidavit does not purport to contain all the information known to me about this case but addresses only that information necessary to support a finding of probable cause for the issuance of a criminal complaint charging Alfredo Rodriguez with obstruction of official proceedings, in violation of Title 18, United States Code, Section 1512(c).

3. On October 27, 2009, agents of the FBI met with and interviewed a cooperating witness ("CW"). The CW reported that, while conducting discovery in a pending civil case before the United States District Court for the Southern District of Florida, he came into contact with Alfredo Rodriguez ("Rodriguez"), who was a subpoenaed witness in the civil case.

4. Rodriguez had been interviewed by FBI agents on January 18, 2007, in connection with a federal criminal investigation into the sexual exploitation of minors. Prior

to being interviewed by FBI, Rodriguez had also been contacted and interviewed by local police detectives, and had been asked to produce documents related to the criminal investigation. The civil litigation involving the CW related to civil damages claims made by victims of the criminal activity that formed the basis of the state and federal criminal investigations.

5. The CW explained to agents that Rodriguez had been deposed under oath on two occasions. The first deposition occurred on July 27, 2009, and the second deposition was conducted on August 9, 2009. In connection with those depositions, Rodriguez was served with a subpoena duces tecum that called for the production of several types of documentary evidence. The CW was present for both depositions and Rodriguez testified that he had no documents responsive to the subpoena duces tecum.

6. In August 2009, after the conclusion of the second deposition, the CW received a phone call from Rodriguez. Rodriguez informed the CW that he had additional information that he had not previously disclosed to any law enforcement agency or any of the civil attorneys. Rodriguez described the information as, the Holy Grail or Golden Nugget and explained that he had compiled lists of additional victims in the case and their contact information. Rodriguez explained that the information contained hundreds of additional victims and their phone numbers from diverse geographic locations, including New York, New Mexico, and Paris, France.

7. Rodriguez asked the CW to pay him $50,000.00 and, in return, Rodriguez would turn over the documents relating to the victims. In his initial and subsequent

communications with Rodriguez, the CW explained to Rodriguez that he was under subpoena to turn over such information and that it would be illegal for Rodriguez to demand money for turning over the information. Rodriguez persisted that he would only turn over the information in his possession in exchange for $50,000.00.

8. On October 28, 2009, in a consensually-monitored phone call, the CW telephoned Rodriguez. Rodriguez again indicated that he would not turn over the information relating to the additional victims without monetary compensation. Rodriguez was told that an associate of the CW would be in touch with him regarding the information and exchange. The associate that the CW referred to was, in fact, an undercover employee (UCE) of the FBI.

9. On October 29, 2009, the FBI UCE contacted Rodriguez via telephone. Rodriguez again explained that he would only turn over the information in exchange for monetary compensation. The UCE advised Rodriguez that it would take several days to acquire the funds and that once the funds were obtained, he/she would contact Rodriguez. During the conversation, Rodriguez admitted that he knew that the information was relevant to the FBI's criminal investigation and was called for by the investigation. Rodriguez explained that he had not turned over the information to the FBI because: (1) it was his "property" and he should be compensated for it; and (2) he was afraid that the target of the investigation would make him "disappear" or otherwise harm him, and the information was his "insurance policy."

10. On November 2, 2009, the UCE made contact with Rodriguez via telephone.

In that conversation, Rodriguez and the UCE continued the discussion regarding the purchase of the documents and scheduled a meeting for the following day.

11. On November 3, 2009, Rodriguez met with the UCE at a predetermined location. During the meeting, Rodriguez produced a small bound book and several sheets of legal pad paper containing hand written notes. Rodriguez explained that he had taken the bound book from his former employer's residence while employed there in 2004 to 2005 and that the book had been created by persons working for his former employer. Rodriguez discussed in detail the information contained within the book, and identified important information to the UCE. In addition, Rodriguez admitted he had previously lied to FBI. Rodriguez asked the UCE about the $50,000.00, took possession of the money, and began counting it.

12. Rodriguez was then detained for Obstruction of Official Proceedings, Title 18, U.S. Code, Section 1512(c), and questioned. After *Miranda* warnings were administered by agents, Rodriguez waived his rights and signed a written waiver of those rights. Rodriguez admitted that he had the documents and book in his possession and had never turned them over to local law enforcement or the FBI. In addition, Rodriguez advised he had witnessed nude girls whom he believed were underage at the pool area of his former employer's home, knew that his former employer was engaging in sexual contact with underage girls, and had viewed pornographic images of underage girls on computers in his employer's home. Rodriguez was then released from custody for further investigation.

13. The items that Rodriguez had attempted to sell to the UC for $50,000.00

were reviewed by an agent familiar with the underlying criminal investigation. As Rodriguez had described, the items contained information material to the underlying investigation that would have been extremely useful in investigating and prosecuting the case, including the names and contact information of material witnesses and additional victims. Had those items been produced in response to the inquiries of the state law enforcement officers or the FBI Special Agents, their contents would have been presented to the federal grand jury.

Based upon the foregoing, your affiant believes that probable cause exists to believe that, from at least as early as January 18, 2007 through on or about November 3, 2009, in Palm Beach County, in the Southern District of Florida, and elsewhere, Alfredo Rodriguez did corruptly conceal a record, document, or other object, with the intent to impair the object's availability for use in an official proceeding and otherwise corruptly obstructed or impeded an official proceeding, in violation of Title 18, United States Code, Section 1512(c).

FURTHER YOUR AFFIANT SAYETH NAUGHT.

CHRISTINA J. PRYOR, SPECIAL AGENT
FEDERAL BUREAU OF INVESTIGATION

Sworn to and subscribed before me
this ___1___ day of December, 2009.

LINNEA R. JOHNSON
UNITED STATES MAGISTRATE JUDGE

# 59 (e) EX 69

discovery—a claim that is tellingly not joined in by any of Maxwell's trial or post-trial counsel—is conclusory, cynical, and wrong.

In sum, the EFTA materials Maxwell cites do not support relief. The prosecution team went above and beyond its disclosure obligations, and fully complied with *Brady*, by collecting information outside its possession, including from USAO-SDFL, and conducting reasonable searches of those materials. *See, e.g.*, *United States v. Avellino*, 136 F.3d 249, 255 (2d Cir. 1998) (although "individual prosecutor is presumed . . . to have knowledge of all information gathered in connection with his office's investigation of the case[,] . . . knowledge on the part of persons employed by a different office of the government does not in all instances warrant the imputation of knowledge to the prosecutor" (cleaned up)); *United States v. Locascio*, 6 F.3d 924, 948–49 (2d Cir. 1993) (declining to "infer the prosecutors' knowledge simply because some other government agents knew about" certain evidence, where prosecutors were unaware of documents possessed by FBI agents "uninvolved in the investigation or trial of the defendants"); *United States v. Quinn*, 445 F.2d 940, 944 (2d Cir. 1971) (similar).

**3. Claim Three: Constructive Amendment of the S2 Indictment**

Maxwell's petition next, briefly, claims that Counts Three and Four of the S2 Indictment were constructively amended, in violation of the Fifth Amendment's Grand Jury Clause, with respect to the victim referred to as "Jane." Pet. at 38–40; Pet. Supp. at 12–16. That claim reiterates an argument which Judge Nathan and the Second Circuit rejected. And Maxwell's petition does not cite any new information in support of it.

***Relevant background***: Count Three of the S2 Indictment charged Maxwell with conspiring with Epstein to transport minors with the intent to engage in criminal sexual activity, in violation of 18 U.S.C. § 371. S2 Indictment ¶¶ 16–19. Count Four charged Maxwell, under

18 U.S.C. §§ 2423(a) and 2, with the substantive offense of transporting a minor with intent to engage in criminal sex acts with Epstein, in violation of New York Penal Law § 130.55. *Id.* ¶¶ 20–21.

At trial, the Government presented substantial evidence that Maxwell had transported Jane to New York—and aided and abetted Epstein in doing so—with the intent that Jane engage in sex acts with Epstein at his Manhattan townhouse. Jane, for example, testified that, at age 14, she began traveling with Maxwell and Epstein to New York, usually on Epstein's private jet. Tr. at 315–16. Between ages 14 and 16, she traveled with them approximately "ten times," including "[f]rom Palm Beach to New York City, and also Sante Fe, New Mexico." *Id.* Jane also testified that she had repeatedly been sexually abused by Epstein in the massage room of his Manhattan townhouse, including with Maxwell present. *Id.* at 319–21. She also testified that she traveled with Epstein and Maxwell to Epstein's New Mexico ranch at approximately age 15 or 16, where she was abused by Epstein. *Id.* at 321–23. Jane testified that Maxwell helped arrange for her to travel, from her home in Palm Beach, to join Maxwell and Epstein. *Id.* at 323–24.

At the conclusion of trial, Judge Nathan instructed the jury that Count Four alleged that Maxwell had knowingly transported Jane "with the intent that Jane engage in sexual activity for which any person can be charged with a criminal offense in violation of New York law." Tr. at 3037; *see also id.* at 3035 (instructing jury that the second element of Count Four required proof of intent to violate "New York law as alleged in the indictment"). Judge Nathan charged the jury on one predicate New York offense, New York Penal Law § 130.55, thus keying Count Four to travel to New York. *Id.* at 3034, 3037. As to Count Three, Judge Nathan referred back to her instructions on Count Four. *Id.* at 3050. She also stated that, with respect to the overt acts under

Count Three, the Indictment alleged that, as to Jane, between approximately 1994 and 1997, when Jane was under age 17, "Maxwell participated in multiple group sexual encounters with Epstein and Jane in New York and Florida," and that, in approximately 1996, Jane had been enticed to travel from Florida to New York for sexual abuse at Epstein's New York home, in violation of New York Penal Law § 130.55. *Id.* at 3056–57.

In summation, Government counsel argued, in support of conviction on Count Four, that the evidence showed that Maxwell had "knowingly transported Jane" "to New York," intending for Jane to engage in "sexual activity for which any person can be charged with a criminal offense under New York law." *Id.* at 2891. Government counsel argued: "[W]hen Epstein flew Jane to New York and Maxwell aided and abetted him, that's enough [to convict Maxwell on Count Four], too." *Id.* at 2892. And, as to venue for Count Four, counsel stated: "[Y]ou heard about Jane's trips to Manhattan, which is in the Southern District of New York. . . . That's more than enough for venue." *Id.* at 2897–98.

During deliberations, the jury sent the following note: "Under Count Four, if the defendant aided in the transportation of Jane's return flight, but not the flight to New Mexico where/if the intent was for Jane to engage in sexual activity, can she be found guilty under the second element?" *Id.* at 3126. Terming the note "difficult to parse factually and legally," Judge Nathan referred the jury back to her instructions regarding the second element of Count Four. *Id.* at 3126–40. She also noted that Maxwell's counsel had not sought to exclude Jane's testimony regarding her travel to and from, or her abuse in, New Mexico, or a limiting instruction with respect to that testimony. *Id.* at 3153. Maxwell's counsel sought reconsideration as to that response, suggesting a possible constructive amendment or prejudicial variance. *See Maxwell*, 118 F.4th at 268. Judge Nathan denied that request. *Id.*

After the jury's verdict, Maxwell moved to vacate her convictions under Counts One, Three, and Four, pursuant to Rule 33. *Maxwell*, 2022 WL 1294433, at *10. She argued that the jury might have convicted her of intending for Jane to engage in illegal sex acts in New Mexico, rather than New York, which would represent a constructive amendment of the S2 Indictment (or, alternatively, a prejudicial variance from it). *Id.* Judge Nathan denied the motion. *Id.* She noted, *inter alia*, that "the majority of Jane's testimony discussing travel" had pertained to trips to New York and her sexual abuse there, and that Jane had testified about "specific details" of Epstein's Manhattan townhouse and the sexual acts that occurred within it. *Id.* at *12. And, she noted, Jane had testified that Maxwell had assisted in making such travel arrangements, and that "[c]orroborating evidence included flight records to New York and photos of Epstein's New York residence matching Jane's description." *Id.*

Maxwell appealed, claiming that Jane's testimony concerning the sexual abuse she experienced in New Mexico had given the jury a factual basis to convict her other than on the theory alleged in the S2 Indictment. *Maxwell*, 118 F.4th at 268. The Second Circuit, in affirming Maxwell's convictions, rejected that argument. *Id.* It held that Judge Nathan's response to the jury's note had not resulted in a constructive amendment of, or a prejudicial variance from, the Indictment's allegations. *Id.* at 268–69. As to constructive amendment, the Circuit "agree[d] with [Judge Nathan] that the jury instructions, the evidence presented at trial, and the Government's summation captured the core of criminality." *Id.* at 268. Although the jury note was "ambiguous in one sense, it was clear that it referred to the second element of Count Four of the Indictment." *Id.* And Judge Nathan thus had "correctly directed the jury to that instruction," which, in turn, "accurately instructed that Count Four had to be predicated on finding a violation of *New York law*." *Id.* at 268–69 (emphasis added and citation omitted). The

Circuit reasoned that the jury had convicted Maxwell of "conduct that was the subject of the grand jury's indictment." *Id*. at 269.

The Circuit also rejected Maxwell's claim of a prejudicial variance. For reasons "similar" to those underlying its rejection of the constructive amendment claim, the Circuit held, the trial evidence "did not prove facts materially different from the allegations in the Indictment." *Id*. (citation omitted). The evidence had shown that "Maxwell transported Jane to New York for sexual abuse and conspired to do the same." *Id*. That evidence was also admitted reflecting sexual abuse of Jane in New Mexico was of no moment. Nor could Maxwell could demonstrate any "substantial prejudice," because she had received—"*over three weeks before trial*"—notes of an interview with Jane "recording the abuse she suffered in New Mexico." *Id*. (emphasis in original).

***Assessment***: Maxwell's claim here is identical to that which Judge Nathan and the Second Circuit rejected. Maxwell does not offer any basis on which to disturb those rulings. This claim is foreclosed by the mandate rule, and meritless for the reasons stated by Judge Nathan and the Circuit.

**B. Claims Procedurally Defaulted by Maxwell's Failure to Raise Them on Direct Appeal**

Maxwell's petition contains six additional claims that she could have raised on direct appeal, but did not. It alleges that (1) victims' lawyers improperly acted as de facto prosecutors; (2) she was selectively prosecuted; (3) inaccurate financial evidence presented at trial falsely created the impression that she had profited from her conspiracy with Epstein; (4) the 25-year gap between the conduct underlying her crimes and her indictment gave rise to a violation of due process; (5) Judge Nathan erred in imposing a slightly above-Guidelines sentence; and (6) Maxwell's and Epstein's black contact book should have been excluded at trial. These claims

# 59 (e) EX 70

naming any of them) posits. Maxwell's implication that most or all of these persons were known long ago to law enforcement is also at odds with the OPR report's findings, as to information known to DOJ. *See, e.g.*, OPR Report at 167 n.238 (Villafaña told OPR: "[N]one of . . . the victims that we spoke with ever talked about any other men being involved in abusing them. It was only Jeffrey Epstein."), 168 ("[USAO-SDFL] had not indicated interest in prosecuting anyone other than the four named female assistants [in the 2007 Epstein NPA] . . . OPR concludes that the evidence does not show that Acosta, Lourie [a USAO-SDFL supervisor], or Villafaña agreed to the non-prosecution provision to protect any of Epstein's political, celebrity, or other influential associates."). Regardless, Maxwell does not adduce any evidence that (1) had these ostensible co-conspirators existed, their testimony would have exculpated Maxwell; (2) these witnesses would have been available, had the charges against her been brought earlier, but no longer were as of trial; or (3) the Government deliberately delayed indictment to inhibit Maxwell's ability to call them in her defense.

Maxwell thus has not shown any cause or prejudice for her failure to raise this claim on direct appeal. And, for the reasons cogently and repeatedly explained by Judge Nathan, this claim is meritless.

**5. Claim Eight: Sentencing Defects**

Maxwell next claims that Judge Nathan erred in imposing a 240-month sentence and a $750,000 fine. She makes numerous arguments to this end. Each is barred and substantively baseless.

***Relevant background***: At sentencing, after resolving Maxwell's remaining objections to the factual findings in the Presentence Investigation Report ("PSR"), Sent'g Tr. at 6–7, Judge Nathan heard argument from both sides on the calculation of the advisory Guidelines range. The

defense argued that the 2003 Guidelines Manual applied, and that it yielded a range of 51 to 63 months' imprisonment. *Id*. at 18–19. The Government argued that the 2004 Guidelines Manual applied, and that it yielded a range of 360 to 660 months' imprisonment. *Id*. at 21–25.

As to the applicable version of the Guidelines Manual, Judge Nathan found that the 2004 manual would increase Maxwell's Guidelines range, and that the Government had not shown by a preponderance that the conspiracy had extended into November and December 2004. *Id*. at 37–39. To avoid an *ex post facto* problem in which Maxwell was subject to a higher sentence on account of law that entirely post-dated her offense, Judge Nathan therefore applied the 2003 Manual. *Id*. at 39.

In calculating the advisory Guidelines range under that Manual, Judge Nathan found certain enhancements to apply, including for (1) pattern of activity, under U.S.S.G. § 4B1.5(b), based on Maxwell's participation in prohibited sexual misconduct with minors on multiple occasions, *id*. at 39–41; (2) leadership, under U.S.S.G. § 3B1.1(a), based on Maxwell's having functioned as an organizer or leader in criminal activity involving five or more participants or that was otherwise extensive, *id*. at 41–44; (3) undue influence, under U.S.S.G. § 2G1.1, based on the significant age gaps between Epstein and Maxwell and their minor victims, and at least one victim's financial instability, *id*. at 44–47; and (4) additional victim groups, under U.S.S.G. §§ 3D1.4 and 2G1.1(d)(1), based on certain minor victims, *id*. at 47–49.

Applying the 2003 Manual, Judge Nathan calculated the Guidelines as recommending a sentence between 188 and 235 months' imprisonment and a fine, on each count, between $20,000 and $200,000. *Id*. at 49.

Judge Nathan heard argument from both sides on how the 18 U.S.C. § 3553(a) factors applied, and heard statements by five victims. *Id*. at 60–79.[19] Judge Nathan then set out her assessment of the factors favoring a high sentence. These included that Maxwell had "directly and repeatedly and over the course of many years participated in a horrific scheme to entice, transport, and traffic underage girls, some as young as 14, for sexual abuse by and with Jeffrey Epstein." *Id*. at 88–89. Maxwell had played a "pivotal role in facilitating" their abuse "through a series of deceptive tactics." *Id*. at 90. And, as a "sophisticated adult woman," Maxwell had "provided an initial veneer of responsibility and even safety," which enabled her to "manipulate[] the victims and normalize[] sexual abuse through her involvement, encouragement, and instruction." *Id*. The damage done to these "young girls" was "incalculable." *Id*. at 91. As mitigating factors, Judge Nathan noted, Maxwell was then more than 60 years old; did not have any criminal history; and had experienced a "demanding father" and the death of her brother early in life. *Id*. at 93. But, Judge Nathan noted, even at sentencing, Maxwell had continued to "blame[] others" and did not "express remorse or acceptance of responsibility." *Id*. at 95. She imposed a slightly above-Guidelines sentence of 240 months' imprisonment and a $750,000 fine ($250,000 on each of Counts Three, Four, and Six). *Id*. at 96–97.[20]

***Assessment***: Maxwell makes numerous arguments why her sentence was legally erroneous. Each was either rejected or foregone on direct appeal. Each is also meritless.

---

[19] Judge Nathan received three additional victim impact statements in writing. Sent'g Tr. at 69.

[20] Before sentencing, Judge Nathan determined that the three conspiracy counts in the S2 Indictment were multiplicitous, and thus entered judgment on only Count Three among these, leaving three total counts of conviction. *See Maxwell*, 2022 WL 1294433, at *1.

Case 1:20-cr-00330-AJN Document 694 Filed 08/21/22 Page 49 of 60

*a. 2003 vs. 2004 Guidelines Manual*

Maxwell argues that Judge Nathan errantly calculated her Guidelines range based on the more punitive 2004 Manual. *See* Pet. at 47. That claim was not brought on direct appeal. And its premise is false. Judge Nathan explicitly applied the 2003 Manual, as Maxwell had requested. *See, e.g.*, Sent'g Tr. at 39, 48–50.

*b. $750,000 Fine*

Maxwell argues that Judge Nathan erred by imposing a $250,000 fine on each of Counts Three, Four, and Six, because the Guidelines range was lower (*i.e.*, $20,000–$200,000) for each count. *See* Pet. at 48. That claim is also barred and wrong. As Judge Nathan recognized at sentencing, under *United States v. Booker*, 543 U.S. 220 (2005), Guidelines ranges are advisory, not binding, and they are "only one factor that [courts] must consider in deciding the appropriate sentence." *Id*. at 88. The offenses charged in Counts Three, Four, and Six each permitted a fine of up to $250,000—the fine which Judge Nathan imposed. *See* 18 U.S.C. § 3571(b)(3); *see also id*. §§ 371, 2423(a), 1591(a), 1591(b)(2).

*c. Victim Groups*

Maxwell argues that Judge Nathan, in calculating the advisory Guidelines range, wrongly treated two non-testifying victims as comprising "separate offense groups." Pet. at 47. That claim is also barred and incorrect. Judge Nathan found those two victims—Virginia and Melissa—to be "minor victims of sex offenses" perpetrated by Epstein and Maxwell, and thus comprised "two additional groups of victims" under U.S.S.G. § 2G1.1(d)(1). Sent'g Tr. at 47. That finding was well supported by the trial record. *See, e.g.*, Sent'g Tr. at 12 (such established that Maxwell "personally recruited Virginia to provide Epstein with sexualized massages when she was a minor"); Tr. at 2874, 2882–84 (Government counsel's summation, discussing evidence proving abuse of Virginia and Melissa); PSR ¶¶ 55–58, 80.

# 59 (e) EX 71

*a. 2003 vs. 2004 Guidelines Manual*

Maxwell argues that Judge Nathan errantly calculated her Guidelines range based on the more punitive 2004 Manual. *See* Pet. at 47. That claim was not brought on direct appeal. And its premise is false. Judge Nathan explicitly applied the 2003 Manual, as Maxwell had requested. *See, e.g.*, Sent'g Tr. at 39, 48–50.

*b. $750,000 Fine*

Maxwell argues that Judge Nathan erred by imposing a $250,000 fine on each of Counts Three, Four, and Six, because the Guidelines range was lower (*i.e.*, $20,000–$200,000) for each count. *See* Pet. at 48. That claim is also barred and wrong. As Judge Nathan recognized at sentencing, under *United States v. Booker*, 543 U.S. 220 (2005), Guidelines ranges are advisory, not binding, and they are "only one factor that [courts] must consider in deciding the appropriate sentence." *Id.* at 88. The offenses charged in Counts Three, Four, and Six each permitted a fine of up to $250,000—the fine which Judge Nathan imposed. *See* 18 U.S.C. § 3571(b)(3); *see also id*. §§ 371, 2423(a), 1591(a), 1591(b)(2).

*c. Victim Groups*

Maxwell argues that Judge Nathan, in calculating the advisory Guidelines range, wrongly treated two non-testifying victims as comprising "separate offense groups." Pet. at 47. That claim is also barred and incorrect. Judge Nathan found those two victims—Virginia and Melissa—to be "minor victims of sex offenses" perpetrated by Epstein and Maxwell, and thus comprised "two additional groups of victims" under U.S.S.G. § 2G1.1(d)(1). Sent'g Tr. at 47. That finding was well supported by the trial record. *See, e.g.*, Sent'g Tr. at 12 (such established that Maxwell "personally recruited Virginia to provide Epstein with sexualized massages when she was a minor"); Tr. at 2874, 2882–84 (Government counsel's summation, discussing evidence proving abuse of Virginia and Melissa); PSR ¶¶ 55–58, 80.

*d. Perjury-Related Conduct*

Maxwell argues that she "was sentenced for perjury counts" on which she had not been convicted. Pet. at 48. This argument is likewise barred and meritless.

On April 16, 2021, Judge Nathan granted Maxwell's pretrial motion to sever the perjury charges from those charging sex abuse–related conduct. Dkt. 207. After Maxwell's conviction at trial on certain of the latter counts, Maxwell's counsel objected to two paragraphs in the PSR describing her acts that were alleged to constitute perjury. *See* Sent'g Tr. at 14. Judge Nathan overruled that objection. *Id*. She noted that a "sentencing court's discretion is largely unlimited as to the kind of information it may consider" in determining the appropriate sentence—including "evidence of uncharged crimes" and "dropped counts of an indictment"—provided that the information was "reliable and accurate." *Id*. (citing *United States v. Bennett*, 839 F.3d 153 (2d Cir. 2016)). She found the information underlying the severed perjury charges "reliable." *Id*. As she explained, the evidence at trial had put the lie to Maxwell's sworn statements at the 2016 deposition (1) stating that she was unaware of a scheme by Epstein to recruit underage girls for sexual massages and was unaware whether she had ever interacted with anyone under age 18, other than Virginia, at Epstein's properties; (2) denying having ever given Annie Farmer a massage; (3) stating that she was unaware whether Epstein possessed sex toys; (4) stating that she was unaware of Epstein engaging in sexual activity with anyone other than her in the 1990s and 2000s; and (5) denying that she ever gave Epstein a massage. *Id*. at 14–15. Judge Nathan also noted Maxwell's pattern of dishonesty to the Court, including in statements regarding her finances and the conditions of her confinement at the Metropolitan Detention Center. *Id*. at 94–95. At the conclusion of the sentencing hearing, the Government moved to dismiss the perjury

counts, out of respect for victims' interests in closure and avoiding the trauma of testifying again; Judge Nathan granted that motion. *See* Dkt. 670 at 7 n.1; Sent'g Tr. at 99.

Maxwell's present challenge to her sentencing is thus meritless. Maxwell was never sentenced on the perjury counts, which were dismissed. And it was lawful and appropriate for Judge Nathan to take into account Maxwell's acts of perjury, notwithstanding that these charges had not been put before the jury and were later dismissed on the Government's motion. *See, e.g.*, *Bennett*, 839 F.3d at 161 n.5 ("the sentencing court's discretion is largely unlimited . . . as to the kind of information it may consider," including "evidence of uncharged crimes" and "dropped counts of an indictment" (cleaned up)); *United States v. Gomez*, 580 F.3d 94, 105 (2d Cir. 2009) (same); *United States v. Sisti*, 91 F.3d 305, 312 (2d Cir. 1996) (same).

*e. Leadership Enhancement*

Maxwell argues that the four-level leadership enhancement, under U.S.S.G. § 3B1.1, should not have been applied because she did not overlap with, and thus could not have supervised, Epstein assistant Sarah Kellen. *See* Pet. Supp. at 11–12. Maxwell claims that, "by 2002," she had "largely exited the Epstein household and [] Kellen had taken over." *Id*. at 12. This particular argument is barred by the mandate rule. It is wrong for the reasons found by Judge Nathan and the Second Circuit. And it is squarely contradicted by Maxwell's recent admissions in an interview with the Deputy Attorney General.

At sentencing, Maxwell's counsel made the same argument. *See* Sent'g Tr. at 32 (stating that Kellen and Maxwell "did not overlap"). Judge Nathan rejected it, finding that the evidence established by a preponderance that Maxwell had supervised Kellen, a "knowing participant in the criminal conspiracy." *Id*. at 42. Her supervision was established by the testimony of two of Epstein's pilots, who testified that Kellen was Maxwell's assistant. *Id*. Judge Nathan found that

# 59 (e) EX 72

*f. Conditions of Confinement at MDC*

Maxwell argues that her 240-month sentence was excessive in light of the conditions she experienced during pretrial and pre-sentencing detention at the Metropolitan Detention Center ("MDC"). Pet. at 49–51. She states that she was "harshly treated like no other inmate," including by being held in solitary confinement. *Id.* This claim is barred and meritless as a basis to challenge her sentence.

At sentencing, Judge Nathan acknowledged that "conditions in the MDC have been extremely difficult for all inmates" since the COVID-19 pandemic began, including due to "extended periods of lockdown, health risks, and the lack of access to legal and social visits and programming and the like." Sent'g Tr. at 94. Judge Nathan also noted that Maxwell had "endured additional isolation and surveillance" beyond that imposed on the "typical pretrial detainee," based on her being "a high-profile defendant charged and convict[ed] of sex offenses against minors." *Id.* Judge Nathan thus expressly took such factors into account in imposing the sentence. *See id.* Judge Nathan "largely reject[ed]," however, Maxwell's contention that she had been "singled out for uniquely harsh and punishing treatment." *Id.* "To the contrary," "many" of Maxwell's grievances had proven "unfounded and exaggerated," and her "treatment at MDC was overall as good as or better than that of the typical pretrial detainee at the MDC during the pandemic." *Id.* at 94–95. Judge Nathan noted that Maxwell had been "provided extensive access to computers and legal materials," allowing her to prepare fully for trial and sentencing. *Id.* at 95. Judge Nathan stated that Maxwell's "lack of full candor" regarding her treatment at the MDC was "consistent with a lack of candor to Pretrial Services and to the Court regarding [Maxwell's] finances" and with Maxwell's "dishonesty" during the civil depositions

# 59 (e) EX 73

that were the basis of the perjury counts. *Id*. Judge Nathan found Maxwell's behavior "consistent with a pattern of deflection of blame." *Id*.

Maxwell's counsel did not raise this argument on direct appeal. It is thus procedurally defaulted. And, for the reasons stated by Judge Nathan, this challenge is without merit.

**6. Claim Nine: Admission at Trial of Maxwell's and Epstein's Contact Book**

Maxwell argues that the black contact book that she and Epstein used ("GX 52") should not have been admitted at trial because it was "not authenticated by any witness." Pet. at 32; *see also* Pet. Supp. at 7. She relatedly argues that the Government did not disclose the purported role of an attorney in the events by which GX 52 came into the Government's custody. Pet. at 32.

These claims, too, are procedurally barred and meritless.

***Relevant background***: On October 7, 2020, before trial, the Government filed a letter describing its plan to obtain and review investigative files held by other offices, to ensure it made adequate disclosures to Maxwell. Oct. 7 Ltr. at 1. It noted that it had received certain files from an investigation by the FBI's Palm Beach Resident Agency, which had led to the 2010 prosecution of Epstein employee Alfredo Rodriguez for obstruction of justice by SDFL-USAO. *See id*. at 4 n.3; *United States v. Rodriguez,* No. 10 Cr. 80015 (KAM) (S.D. Fla.).

On or about April 7, 2021, Maxwell asked that the Government produce to her the FBI case file related to the Rodriguez investigation. Opp'n at 49. On or about April 9, 2021, the Government produced to Maxwell the materials referenced in its October 7 letter regarding that investigation. *Id*. These included audio and video recordings, and FBI 302s.[23] *Id*. One item produced was a video recording of a November 3, 2009 meeting between Rodriguez and an undercover FBI employee. *Id*.

[23] The Government made an additional production to Maxwell of Rodriguez-related records on or about November 20, 2021. Opp'n at 49 n.27.

On October 18, 2021, Maxwell's counsel filed a motion *in limine* to exclude GX 52. Dkt. 390. The motion argued that the provenance of the exhibit was "troubling," because it had surfaced in the context of Rodriguez's "attempting to sell [it] to [Bradley] Edwards," a private lawyer then civilly suing Epstein. *Id*. at 6. The motion noted that, according to the criminal complaint against Rodriguez, the FBI, on learning of this attempt, had set up a "sting operation," during which GX 52 was provided to an undercover officer in exchange for $50,000. *Id*. Based on these events, Maxwell's motion argued that GX 52 could not be authenticated and was thus inadmissible. *Id*.

The Government's opposition acknowledged that it had obtained custody of GX 52 "after a former employee of [] Epstein attempted to sell it to a civil lawyer suing Epstein." Dkt. 397 at 74. But, it argued, the manner in which the Government had acquired the exhibit went at most to its weight, not its admissibility. *Id*. And, it argued, GX 52 was admissible not for the truth of the matters asserted in it (*e.g.*, the accuracy of victims' contact information), but to establish the fact that Maxwell had kept such contact information. *Id*. In further support of GX 52's admission, the Government later represented that trial testimony would also establish that GX 52 was a contact book that had belonged to Maxwell. Dkt. 457. Judge Nathan reserved decision on whether to admit GX 52.

At trial, on December 2, 2021, Juan Alessi, the former manager of Epstein's Palm Beach villa, examined GX 52 and testified that he recognized it as a book belonging to Epstein and Maxwell, based on his experience working for them. Tr. at 850. He testified that it was "the same" "type of book," and that it appeared to be one of the "directories of Ms. Maxwell and Mr. Epstein." *Id*. He testified that GX 52 had "exactly the same cover of the directories that I saw," the "same binding," and "exactly" the "layout" as other books of Epstein's and Maxwell's that

he remembered seeing. *Id.* at 851. Although other books of theirs had been thicker and had larger font, the "format was the same." *Id.* at 851–52. And, he testified, there were "many, many, many, many names" listed in GX 52 that he recognized from another contact book he had seen while working for Epstein. *Id.* at 851. During the 12 years he had worked for Epstein, Alessi testified, new directories were printed for Epstein twice a year. *Id.* at 864.

On December 9, 2021, Judge Nathan overruled Maxwell's objections and stated that she would receive GX 52. Alessi's testimony, she stated, satisfied the authentication requirements of Federal Rule of Evidence 901. Dkt. 535 at 2. That testimony, she stated:

> established an intimate familiarity with the distinctive directories used in the Palm Beach household over many years and during the time period of the charged conspiracy. He testified that GX 52 was the same "type of book," with the same type of binding, cover, and information. This testimony of the appearance, content, substance, and other distinctive characteristics of the exhibit is sufficient to satisfy Rule 901.

*Id.* at 5. Judge Nathan agreed with the Government that the manner in which the Government came to possess GX 52 did not bear on the exhibit's authentication. *Id.* And she agreed that the exhibit was "relevant for the non-hearsay purpose that it tends to show a link between [] Maxwell and the names and phone numbers listed, as well as how the information was organized." *Id.* Judge Nathan later gave a limiting instruction, agreed on by the parties, that GX 52 could be considered not for the truth of the matters asserted in it, but instead only to the extent jurors found it relevant to "show a link, if any, between [] Maxwell and the names and phone numbers listed" and how the information was organized. Tr. at 2040; *see also* Dkt. 538.

***Assessment***: On direct appeal, Maxwell did not challenge the decision to receive GX 52 at trial (or the denial of Maxwell's motion *in limine* to exclude it). This claim is thus barred as a basis for § 2255 relief, as Maxwell does not even attempt to show cause and prejudice for her

decision not to raise it on appeal. And, for the reasons stated by Judge Nathan, the claim is meritless.

Maxwell makes several counterarguments, all frivolous. She argues, for instance, that a document disclosed under the EFTA "would have impeached" Alessi's testimony regarding GX 52. Pet. Supp. at 7 (citing Ex. 34, *i.e.*, EFTA00608040). That exhibit is a single page from the public criminal complaint against Rodriguez, filed on December 9, 2009. *See* Ex. 34. It does not impeach Alessi's testimony at all. If anything, the complaint indicates that additional evidence inculpated Maxwell. It states, for example, that, in a *Mirandized* post-arrest interview, Rodriguez had stated that "he had witnessed nude girls whom he believed were underage at the pool area of [Epstein's] home, knew that [Epstein] was engaging in sexual contact with underage girls, and had viewed pornographic images of underage girls on computers in [Epstein's] home." *Id*.

As for Maxwell's related claim that the Government violated its *Brady* obligations by ostensibly not disclosing Edwards's involvement in the procurement of GX 52, that argument is demonstrably false (and procedurally barred). Materials the Government produced in discovery laid bare Edwards' involvement. *See* Opp'n at 53 (citing, *inter alia*, SDNY_GM_02753180). Maxwell cited multiple such documents in the instant petition. *See, e.g.*, Pet. Ex. 24 at 5. And her counsel's pretrial filings repeatedly reference the facts of which Maxwell now professes unawareness. *See, e.g.*, Dkts. 390 at 6 (defense motion *in limine* to exclude GX 52, stating that Rodriguez "attempt[ed] to sell [GX 52] to Brad Edwards"), 490 at 1 (defense supplemental letter, stating that Rodriguez possessed GX 52 "until 2009 when he tried to sell it to Brad Edwards").

Maxwell's counsel did not raise this argument on direct appeal. It is thus procedurally defaulted. And, for the reasons stated by Judge Nathan, this challenge is without merit.

# 59 (e) EX 74

testimony by them at specific time stamps. *Id*. Importantly, in describing that production to Maxwell's defense team, the Government stated that the records "reflect that [] Parkinson testified in the grand jury in connection with the investigation conducted by the Palm Beach State's Attorney's Office, but the clerk of court has confirmed to the Government that the audio files are unplayable and, therefore, there is no record of Parkinson's grand jury testimony." *Id*.

At Maxwell's trial, Detective Parkinson testified that the "master bedroom" of Epstein's Palm Beach villa had "two master baths." Tr. at 1048; *see also* GX 297 (floor plan reflecting two bathrooms adjoining "master bedroom"). He testified that he had seized the green massage table, GX 51, on October 20, 2005 from the "second floor south bathroom, where the shower was," and that he recognized it from its evidence label that bore unique identifying numbers. Tr. at 1089. Detective Parkinson stated that the other master bathroom had a "tub" and was located on the "north side of the residence," also "adjoining the master bedroom." Tr. at 1085–86; *see also* GXs 283–84.

Detective Parkinson testified to recording a "walk-through video" of the October 20 search of the Palm Beach home, which was admitted at trial as "GX 296-R." Tr. at 1039–40. The recording showed the two bathrooms adjourning the master bedroom. GX 296-R at 20:24–23:20. It showed the green massage table, lying against a wall with photographs, outside the door to the south bathroom with a shower. *Id*. at 23:11, 23:15–18. In the north bathroom with a bathtub, there was a desk with a photograph of Maxwell, stationery with Maxwell's name on it, and a portrait above the desk, depicting Maxwell with a dog. *See id*. at 20:38–45, 21:11–29; *see also* GX 285.

In July 2024, after Maxwell's direct appeal, a state court circuit judge granted a petition to release, *inter alia*, the grand jury transcripts from the investigation into Epstein by the Palm

Beach State's Attorney's Office. Opp'n at 86 & n.38. These included a transcript of Detective Parkinson's testimony—proving inaccurate the clerk of court's earlier representation to USAO-SDNY that that transcript did not exist. *Id.*; *see* Pet. Ex. 11 ("Parkinson GJ Tr."). In his 2006 grand jury testimony, Detective Parkinson described the "large master bedroom" and the two "large bathrooms" adjoining it. Parkinson GJ Tr. at 108–10. He appeared to walk through a diagram of Epstein's residence, noting the "large bathroom on the south side," a "large walk-in closet," and, "moving back through the bedroom, past the hallway you then enter another large bathroom which has a sink, closets, and a large bathtub." *Id.* at 109–10. He then gave the following testimony:

> Q. Are there toilet facilities here or is it just sinks in these bathrooms?
>
> A. I believe that there were toilets also there in the hall.
>
> Q. All right. Did you find a massage table?
>
> A. Yes. There was [a] massage table in this clos -- bathroom.
>
> Q. Okay. How about massage oils? Were there massage oils up in that bathroom?
>
> A. I believe there were. I know that we got some kind of a jar of material out of this master bedroom, one of -- out of the dresser.
>
> Q. What about out of the actual room where the massage table was?
>
> A. That, I'm not sure. I was involved in the actual search and photography of that. Other investigators would have to comment on it.

*Id.* at 110–11.

***Assessment***: Maxwell's § 2255 claim of a *Brady* violation based on the SDNY prosecution team's not having produced this grand jury testimony to her before trial fails on the merits. Maxwell does not allege facts supporting that the SDNY prosecution team had custody (or awareness) of the grand jury transcript. Second, she is wrong that, had Parkinson's state grand jury testimony been disclosed, it would have had a material effect on the outcome of trial.

# 59 (e) EX 75

whether the other entity "(1) participated in the prosecution's witness interviews, (2) was involved in presenting the case to the grand jury, (3) reviewed documents gathered by or shared documents with the prosecution, (4) played a role in the development of prosecutorial strategy, or (5) accompanied the prosecution to court proceedings." *Id*.

Maxwell's § 2255 claim based on an ostensible breach of the SDNY prosecution team's disclosure obligations fails for multiple reasons.

First, neither Detective Parkinson nor any other person involved in the 2005–2010 PBPD investigation into Epstein was part of the SDNY prosecution team. USAO-SDNY opened its investigation into Epstein (and later Maxwell) in 2018, at least eight years after the PBPD's investigation concluded. *See* Opp'n at 89. Notwithstanding the lack of an obligation to do so, USAO-SDNY requested, reviewed, and disclosed to Maxwell discoverable materials from the investigative file for that investigation (and that held by the Palm Beach State's Attorney's Office). *Id.*; *see also* Dkt. 63 at 5–7. And it contacted the clerk of court in Palm Beach, who—through no apparent fault of USAO-SDNY—provided errant information that USAO-SDNY relayed to Maxwell's defense team. The prosecution team did not violate *Brady* or any other disclosure obligations by conveying to the defense the information it was given. It acted with appropriate solicitude for Maxwell's rights and interests.

Second, Detective Parkinson's grand jury testimony is neither material nor exculpatory as to Maxwell. Maxwell claims that Detective Parkinson perjured himself by testifying at her trial that he found the massage table in the south bathroom with a shower; Maxwell portrays his earlier testimony before the Palm Beach grand jury as stating that he found the massage table in the north bathroom with a bathtub. *See* Pet. at 5–6. That, however, mischaracterizes his grand jury testimony. There, Detective Parkinson stated that "there was [a] massage table in this []

bathroom," but the transcript does not reflect which bathroom he was referring to. Parkinson GJ Tr. at 110–11. Maxwell has thus not shown an inconsistency with his later trial testimony.

Third, even assuming that Detective Parkinson had testified unequivocally before the grand jury that he had found the massage table in the north bathroom with a tub and not the south bathroom, Maxwell's claim would still fail. She has not shown that testimony errantly identifying the particular bathroom would have been perjurious, as opposed to inadvertently incorrect. *See United States v. Gonzalez*, 33 F.R.D. 280, 282 (S.D.N.Y. 1960) ("A bare allegation of perjury does not entitle an applicant to relief under section 2255."); *United States v. Lighte*, 782 F.2d 367, 372 (2d Cir. 1986) ("Perjury requires that a witness believe that the testimony he gives is false."); *see also Salazar-Espinosa v. United States,* No. 11 Civ. 247, 2011 WL 2946166, at *2 (S.D.N.Y. July 11, 2011) ("When false testimony is provided by a government witness without the prosecution's knowledge, due process is violated only if the testimony was material and the court [is left] with a firm belief that but for the perjured testimony, the defendant would most likely not have been convicted."). And had there been such an inconsistency between Detective Parkinson's 2006 and 2021 testimony as to this particular, such would have been highly unlikely to impeach Detective Parkinson's credibility, given that the search had occurred more than 16 years before his trial testimony, and his testimony in general, and about finding the massage table in the house in particular, was corroborated by other testimonial, documentary, and video evidence. *See, e.g.,* GX 296-R at 23:11, 23:15–18 (search video showing massage table laid against a wall with photographs, outside door of south bathroom with shower); Tr. at 1521–22 (Carolyn's testimony that she went with Virginia to "Epstein's bedroom, into his bathroom area" with a "shower," from which Virginia "pull[ed] out the massage table" while Carolyn "look[ed] at all the photos that were on the wall"). The

massage table would still assuredly have been admitted at trial, as it would have still easily cleared the relatively low bar for authentication. *See, e.g.*, *United States v. Dhinsa*, 243 F.3d 635, 658 (2d Cir. 2001) (Rule 901 does not require proponent of evidence to "rule out all possibilities inconsistent with authenticity, or to prove beyond any doubt that the evidence is what it purports to be"); *United States v. Gagliardi*, 506 F.3d 140, 151 (2d Cir. 2007) ("standard for authentication is one of reasonable likelihood" and is "minimal"; "testimony of a witness with knowledge that a matter is what it is claimed to be is sufficient to satisfy this standard"). And had the massage table been found in the north bathroom with a bathtub—as Maxwell claims Detective Parkinson's 2006 grand jury reflects—that fact would have further *inculpated* her, because that bathroom was the one containing Maxwell's photo, portrait, and personalized stationery.

Fourth, contrary to Maxwell's claim, the massage table was far from the "only evidence" of interstate commerce adduced at trial. Pet. at 5. FedEx records and victim testimony independently established that Epstein caused packages to be sent from New York to Carolyn in Florida. *See, e.g.,* Tr. at 1541–42 (Carolyn's testimony that Epstein sent lingerie and other items from Manhattan to her home in West Palm Beach), 1542 (Carolyn's testimony that she gave her home address to Maxwell, because Maxwell had asked for it "[b]ecause Jeffrey Epstein wanted to send me some items"); GXs 801–03 (FedEx records reflecting packages sent to Carolyn when she was 15 years old). And the FedEx records showed that Maxwell had used the same account to send packages from Epstein's office during the same time period. GXs 801 at 8, 802 at 4–5, 803 at 7 (FedEx account invoices with Maxwell's name). As the Government argued in

# 59 (e) EX 76

summation, these records separately established the use of interstate commerce in connection with the charged offenses. Tr. at 2894–95.[24]

For all these reasons, this claim is meritless.

**D. Remaining Claims, Including Related to EFTA Documents**

Maxwell makes dozens of other claims that are conclusory and unsupported, mainly citing documents disclosed pursuant to the EFTA. Many of these documents were produced to Maxwell in discovery. *See, e.g.*, Pet. Supp. Exs. 40, 43. Others reflect internal USAO-SDNY memoranda that summarize what certain individuals told the Government—the contents of which were produced to Maxwell in its productions of Jencks Act material, which the Government produced both as to testifying and non-testifying witnesses. *See, e.g.*, Pet. Supp. Exs. 38, 42, 52. And the remaining documents are at best irrelevant to—and many undermine—her claims. *See, e.g.*, Pet. Exs. 39, 49, 55. Maxwell's remaining claims are all meritless.[25]

**E. Maxwell's Request for a Hearing**

Maxwell seeks an evidentiary hearing on her claims. She is not entitled to one.

---

[24] Maxwell argues that, but for the admission of the massage table, she would not have been convicted. She bases this claim on Juror 50's statement during a post-trial interview that the table had been "crucial in interstate commerce." Pet. Ex. 7 at 21 (April 2022 docuseries). But, for the reasons above, the massage table would have been admitted regardless of whether Maxwell had had access to Detective Parkinson's 2006 grand jury transcript. Even had it not been, that reported comment by a single juror does not come close to showing that Maxwell otherwise likely would have been acquitted. *See United States v. Siddiqi*, 959 F.2d 1167, 1173 (2d Cir. 1992).

[25] As to the arguments not addressed in full in this decision, the Court adopts by reference the arguments by the Government in its opposition, which comprehensively dispatches these. *See, e.g.*, Opp'n at 49–52 (arguing that other miscellaneous arguments by Maxwell likewise fail); *see also Miranda v. Bennett*, 322 F.3d 171, 177 (2d Cir. 2003) (where habeas petition is facially inadequate, district court may deny it "with the tersest of orders"); *Rivera v. United States*, No. 92 Civ. 7726, 1993 WL 464747, at *3 (S.D.N.Y. Nov. 12, 1993) (appropriate for district court not to discuss each of petitioner's frivolous claims).

"To warrant a hearing, the motion must set forth specific facts supported by competent evidence, raising detailed and controverted issues of fact that, if proved at a hearing, would entitle [the defendant] to relief." *Gonzalez v. United States*, 722 F.3d 118, 131 (2d Cir. 2013). "Airy generalities, conclusory assertions and hearsay statements will not suffice because none of these would be admissible evidence at a hearing." *United States v. Aiello*, 814 F.2d 109, 113–14 (2d Cir. 1987). Nor will "vague, conclusory, or palpably incredible" assertions. *Gonzalez*, 722 F.3d at 130; *see also Puglisi v. United States*, 586 F.3d 209, 213 (2d Cir. 2009) ("bald allegations unsupported by evidentiary facts do not" warrant a hearing). "If it plainly appears from the motion, exhibits, and record of prior proceedings that the [movant] is not entitled to relief, the judge must dismiss the motion" without a hearing. *Brudi v. United States*, No. 14 Civ. 962, 2014 WL 6390302, at *2 (S.D.N.Y. Nov. 17, 2014); *see McLean v. United States*, No. 12 Civ. 1954, 2016 WL 3910664, at *8 (S.D.N.Y. July 13, 2016) (same); 28 U.S.C. § 2255(b).

For the reasons reviewed in depth above, Maxwell's petition falls very far from the mark. Nearly all its claims are procedurally barred; the overwhelming testimonial and documentary evidence adduced at trial conclusively established her guilt; and her petition's claims are demonstrably meritless, and generally based on speculation, distortions, and/or outright falsehoods. There is no fact that Maxwell fairly puts in dispute that has any potential to disturb the outcome of her trial.

In these circumstances, there is no requirement to hold an evidentiary hearing. *See, e.g.*, *United States v. Lopez-Cabrera*, No. 11 Cr. 1032 (PAE), 2023 WL 2612582, at *3 (S.D.N.Y. Mar. 23, 2023) (no hearing where defendant did not "identify any issue of fact, let alone a controverted issue of consequential fact of the sort that an evidentiary hearing would assist the Court to resolve"); *United States v. Robinson*, No. 20 Cr. 415, 2025 WL 1603916, at *3

(S.D.N.Y. June 6, 2025) (same); *Orbach v. United States*, No. 11 Cr. 111, 2017 WL 5632815, at *7 (S.D.N.Y. Nov. 7, 2017) (same).[26]

**CONCLUSION**

For the reasons above, the Court denies Maxwell's petition for relief pursuant to 28 U.S.C. § 2255. Maxwell has not made a substantial showing of a denial of a constitutional right, and appellate review is therefore not warranted. *See* 28 U.S.C. § 2253(c)(2); *Love v. McCray*, 413 F.3d 192, 195 (2d Cir. 2005).

The Court certifies that any appeal from this order would not be taken in good faith; *in forma pauperis* status is thus denied for purposes of an appeal. *See Coppedge v. United States*, 369 U.S. 438, 445 (1962).

The Clerk of Court is respectfully directed to mail a copy of this decision to Maxwell at the address on file; terminate all pending motions; and close case 25 Civ. 10468.

SO ORDERED.

PAUL A. ENGELMAYER
United States District Judge

Dated: August 25, 2026
New York, New York

[26] For similar reasons, the Court denies Maxwell's requests to supplement her petition again and to take additional discovery.

# 59 (e) EX 77

"To warrant a hearing, the motion must set forth specific facts supported by competent evidence, raising detailed and controverted issues of fact that, if proved at a hearing, would entitle [the defendant] to relief." *Gonzalez v. United States*, 722 F.3d 118, 131 (2d Cir. 2013). "Airy generalities, conclusory assertions and hearsay statements will not suffice because none of these would be admissible evidence at a hearing." *United States v. Aiello*, 814 F.2d 109, 113–14 (2d Cir. 1987). Nor will "vague, conclusory, or palpably incredible" assertions. *Gonzalez*, 722 F.3d at 130; *see also Puglisi v. United States*, 586 F.3d 209, 213 (2d Cir. 2009) ("bald allegations unsupported by evidentiary facts do not" warrant a hearing). "If it plainly appears from the motion, exhibits, and record of prior proceedings that the [movant] is not entitled to relief, the judge must dismiss the motion" without a hearing. *Brudi v. United States*, No. 14 Civ. 962, 2014 WL 6390302, at *2 (S.D.N.Y. Nov. 17, 2014); *see McLean v. United States*, No. 12 Civ. 1954, 2016 WL 3910664, at *8 (S.D.N.Y. July 13, 2016) (same); 28 U.S.C. § 2255(b).

For the reasons reviewed in depth above, Maxwell's petition falls very far from the mark. Nearly all its claims are procedurally barred; the overwhelming testimonial and documentary evidence adduced at trial conclusively established her guilt; and her petition's claims are demonstrably meritless, and generally based on speculation, distortions, and/or outright falsehoods. There is no fact that Maxwell fairly puts in dispute that has any potential to disturb the outcome of her trial.

In these circumstances, there is no requirement to hold an evidentiary hearing. *See, e.g.*, *United States v. Lopez-Cabrera*, No. 11 Cr. 1032 (PAE), 2023 WL 2612582, at *3 (S.D.N.Y. Mar. 23, 2023) (no hearing where defendant did not "identify any issue of fact, let alone a controverted issue of consequential fact of the sort that an evidentiary hearing would assist the Court to resolve"); *United States v. Robinson*, No. 20 Cr. 415, 2025 WL 1603916, at *3

# 59 (e) EX 78

On July 18, 2019, we gave a reverse proffer to Leslie Groff, during which we explained that numerous victims had indicated that she was responsible for scheduling massages during which they were sexually abused. We encouraged Groff to meet with us for a proffer so that she could share her story and explain her role. Subsequently, on August 7, 2019, we had a phone call with Groff's attorney during which he indicated that he would not bring Groff in for a proffer and had advised her to invoke her Fifth Amendment privilege against self-incrimination if she is subpoenaed to testify. In recent weeks, we have reached back out to Groff's attorney to convey that we will not be able to provide her with any sort of agreement if she does not proffer with us. He appeared to understand our position and is considering whether to bring Groff in for a proffer.

c. Counsel for Jean Luc Brunel

In August and September of 2019, we had multiple phone calls with an attorney for Jean Luc Brunel. On our last call, the attorney indicated that Brunel was not willing to meet with us for a proffer and would invoke his Fifth Amendment privilege against self-incrimination if subpoenaed to testify in the grand jury.

d. Counsel for Leslie Wexner

On July 25, 2019, counsel for Wexner provided us with an attorney proffer. Wexner is the billionaire founder and CEO of L Brands (formerly Limited Brands) corporation, which controls Victoria's Secret, among other retail brands. It has been publicly reported that Wexner and Epstein had a close relationship and that Epstein managed Wexner's finances from the 1990s through the 2000s.

During our meeting, Wexner's attorneys indicated that Wexner had no knowledge of any inappropriate or unlawful activity with young women by Epstein. The attorneys emphasized Wexner's relationship with Epstein was more professional than social. The attorneys also explained that over his years handling Wexner's finances, Epstein stole or otherwise misappropriated several hundred million dollars from Wexner. That misconduct, together with fees that Epstein paid himself for his services to Wexner, appears to account for virtually all of Epstein's wealth.

Wexner first met Epstein in the 1980s through a mutual friend who recommended Epstein as a financial adviser. After a couple other acquaintances recommended Epstein as well, Wexner brought Epstein on to help with his investments. Over time, Epstein became more involved in Wexner's finances until Epstein controlled all of Wexner's personal finances with virtually no oversight. In 1991, Epstein obtained a power of attorney from Wexner, which enabled Epstein to handle the purchase and sale of real estate and other assets on Wexner's behalf. At some point in 1998, Epstein sold himself the New York residence in which he resided until his arrest in 2019 at a deeply discounted price. The New York residence had previously

belonged to Wexner, but the Wexners had moved out of it in 1995. Epstein also sold himself a private plane that previously belonged to Wexner at a deeply discounted price.

In the 1990s, Epstein told Wexner that he had other clients and that Wexner did not need to pay Epstein because Epstein was having fun and they would settle up later. Epstein introduced Wexner to a number of other people as his clients, and Wexner interacted with other prominent people who knew Epstein, such as Prince Andrew, professors at Harvard, and a sultan in Dubai. Epstein had no formal role in L Brands or Victoria's Secret. At some point, Wexner heard a rumor that Epstein might be holding himself out as connected to Victoria's Secret, but when Wexner asked Epstein about it, Epstein denied doing so.

Epstein handled Wexner's personal business affairs until 2007, when Wexner learned that Epstein had stolen or otherwise misappropriated several hundred million dollars from Wexner. Around that time, Epstein told Wexner that he was having legal problems involving an overly aggressive police chief and some sort of massage. Epstein said he was being blackmailed and it could get messy, so it would be best for Wexner's wife to take over the family finances. In response, Wexner's wife looked into the state of their finances and discovered that Epstein had misappropriated a significant amount of the family's funds. For example, Epstein frequently bought property on behalf of the Wexners and then sold it to himself for a fraction of the cost. The Wexners then decided to cut off Epstein. When confronted, Epstein tried to convince Wexner's wife that she did not understand the financials and insisted that he had the Wexners' best interests at heart. The Wexners did not want to bring unnecessary public attention to the issue, so they withdrew the power of attorney, and hired counsel to negotiate a private settlement with Epstein. As a result of those negotiations, Epstein agreed to return $100 million to the Wexners, which he did in January of 2008. At that point, Wexner severed all ties with Epstein, and he has not seen or spoken to Epstein since.

Wexner knows nothing about the [redacted] claim from [redacted] and explained that at the time, Epstein owned a property adjacent to the Wexners about a half mile way from the Wexners's property. The Wexners's security team is not aware of any inappropriate incident taking place on the Wexners's property, and the Wexners first heard about [redacted] allegations from public reporting this year.

2. <u>Search Warrants</u>

In July and August 2019, we obtained and the FBI executed search warrants for Epstein's residences in New York and the Virgin Islands. We subsequently obtained warrants to search all electronic devices, drives, and discs seized from those residences. The FBI is continuing to review the extraordinarily large amount of data contained on those devices and is working with our filter team to complete a privilege review of that data. In addition, we have reviewed the materials obtained during the Palm Beach Police Department's October 2005 search of Epstein's Palm Beach residence.