**From:** ghislaine maxwell
**To:** Pro Se Filing
**Subject:** Ghislaine Maxwell 1:20Crim330 (PAE)I
**Date:** Wednesday, September 23, 2026 6:05:43 AM
**Attachments:** Batch4_EX79-93.pdf

---

**CAUTION - EXTERNAL:**

Batch 4 Exhibits 59 e

**CAUTION - EXTERNAL EMAIL:** This email originated outside the Judiciary. Exercise caution when opening attachments or clicking on links.

## 59 (e) Exhibits — Batch 4 (EX 79–93) — Index

| EX | Document | Pages | PDF page |
|---|---|---|---|
| 79 | Tr. 3012:7-8 | 1 | 2 |
| 80 | Tr. 806:6-9 | 1 | 4 |
| 81 | Tr. 784:9-12 | 1 | 6 |
| 82 | Tr. 869:17-18 n.11 | 1 | 8 |
| 83 | Tr. 869:53 | 1 | 10 |
| 84 | G.J. Testimony Parkinson p.111 | 1 | 12 |
| 85 | G.J. Testimony Parkinson p.114 | 1 | 14 |
| 86 | G.J. Testimony Parkinson p.115 | 1 | 16 |
| 87 | OPR p.168 n.242 | 1 | 18 |
| 88 | OPR p.37 n.59 | 1 | 20 |
| 89 | Docket 239 | 1 | 22 |
| 90 | Radar Online v. FBI, Dkt. 38 | 33 | 24 |
| 91 | Dkt. 207 | 34 | 58 |
| 92 | Dkt. 63 | 8 | 93 |
| 93 | Dkt. 38 | 6 | 102 |

# 59 (e) EX 79

have just stacked lie on top of lie on top of lie. That doesn't make any sense for a whole host of reasons.

First, if these women are lying, then that means all of the witnesses who backed them up are lying too. The ex-boyfriends, Matt, Dave, Shawn, they must be lying. Juan Alessi must be lying. That's simply nonsensical for the ex-boyfriends. Matt, Dave, and Shawn have nothing to gain from testifying here. They have no reason whatsoever to lie. No motive. Why would they come here and lie to you?

The same goes for Juan Alessi. The defense spent a lot of time trying to dirty Alessi up. You know why they did that? It's because his testimony is incredibly powerful evidence that backs up so much of what these other witnesses say. But their arguments about him are really just silly. They spent time talking about the money and the gun.

Remember, Mr. Alessi told you himself he stole money from Jeffrey Epstein and he paid it back. Some police report says that he was also looking for a gun. So what? Does that mean that he would make up an entire story about the defendant? No. And you know he told you the truth because he was corroborated by other evidence. Flight records confirmed that Jane and Virginia flew on Epstein's planes when they were minors, just like he told you. The pilots confirmed that Juan Alessi drove passengers up to the tarmac, just like he told you. The household manual showed you in black and white that

# 59 (e) EX 80

A. I don't know.
MR. PAGLIUCA: Objection. Leading.
THE COURT: All right. Sustained.
A. I don't know.
THE COURT: Sorry. Sustained.
The jury will disregard the answer.
Q. What other homes did you understand Mr. Epstein owned during the time you worked for him?
A. During the time we work for him, he own Zorro Ranch. He own the private island in the Caribbean, Little St. James, that we used to call Little St. Jeff, and right outside St. Thomas. Also he had a home that I never visit in New York, a very large home in New York. And he had a home in Paris, France. And I think they have -- he had a home at Columbus, Ohio.
Q. During the approximately ten years when you worked for Mr. Epstein, do you know how he traveled to his different homes?
A. He traveled on his private planes.
Q. How many times have you flown on Mr. Epstein's private planes?
A. None. I'm sorry. I flew with Ms. Maxwell in a small plane, the first plane that he purchase, he had, it was a -- I think it's called a Hawker, Hawker. Small plane. We flew with Ms. Maxwell to an engagement in Miami and flew back. That's it. That's the only time I flew with him.



Q. Other than the New Mexico property and the Palm Beach property, have you visited any other of Mr. Epstein's properties?
A. The island.
Q. About when did you visit the island?
A. The island I visit for maybe two hours.
Q. I'm sorry, about what year or approximately?
A. I can't remember.
Q. Was it during your employment with Mr. Epstein?
A. Yes, of course.
Q. For about how long were you on the island?
A. Oh, for two hours. We --
Q. Mr. Alessi, could you speak into the microphone, please.
A. We went to a vacation with my wife in a cruise line. And the cruise line was supposed -- it did stop in St. Thomas. And the people from the island pick us up and they show us the island. Very, very exclusive, beautiful island.
Q. Could you describe the island.
A. Yes. The island had -- the main structures of the island was not one house, but there were different pavilions, different parts of the house. And it had a -- I think it was in the center, it had the pool, and the kitchen/dining room area was the biggest structure that I saw when I went there. It was the kitchen/dining room area.
Q. What properties, if any, of Ms. Maxwell's did you visit



during your employment with Mr. Epstein?
A. I visit Ms. Maxwell's townhome in London.
Q. About when was that?
A. I cannot tell you exactly what year, but it was also before my departure.
Q. Was it sometime when you were still working for Mr. Epstein?
A. Of course. Yes.
Q. How did you come to visit Ms. Maxwell's home in London?
A. She invite us to see her house.
Q. For about how long were you there?
A. Five minutes.
Q. Can you describe what you saw?
A. I saw -- I think it was a townhome, two floors. I think the -- the front door was either red, a red front door, and we saw just the living room. And we went upstairs and it was a -- I think it was a bathroom. And we saw her bedroom upstairs. It was a pretty small place. There was not a big structure.
Q. What, if any, rules did Ms. Maxwell tell you to follow as an employee of Mr. Epstein's?
A. Oh, there were many, many, many rules.
Q. What are some that you remember?
A. From rules about presentation of the dishes, presentation of the table; there were rules about the way we should be dressed; there were rules about how we are to address



Mr. Epstein, address Ms. Maxwell; rules about cleanliness; there was rules about what to shop, what the shopping list. There were tremendous amount of instructions were given to me.
Q. Were those oral rules or written rules?
A. Most of it oral rules.
Q. Were there ever any written rules?
A. Yes. At the end of my stay, I think it was at the last year, 2001, maybe 2002, I receive from Ms. Maxwell this booklet. There were rules how to handle the houses. It was not only for the house in Palm Beach, it was also written for the other properties.
Q. Who gave you that booklet of rules?
A. I think it was Ms. Maxwell.
Q. And what did she tell you when she gave you that booklet?
A. This is what we're going to do it, and this is what has to be done from now on.
Q. Did you read the entire booklet?
A. Yes.
Q. What do you remember being in the booklet?
A. It was like 30 pages, probably more of checklist, incredible amount of work, enough work for ten people, not for one and a half. It was -- it was -- I'm sorry to say, but it was very degrading to me. Most of the pages, they were just unbelievable to me. They were written for the employees. And it was -- I wasn't hire to do that type of work.

# 59 (e) EX 81

working for him, that's it.
Q. How many structures were on Mr. Epstein's Palm Beach property?
A. In the beginning, it was just the main house and the pool house. At the end -- almost at the end of my staying there, they constructed a staff quarters. There was a house separate from the main residence, and it was in there there were three bathrooms, three bedrooms, a small living room, dining room, and it was a very large laundry room, the staff house.
Q. That third structure, that staff house, about when was it built?
A. I have to say 1999, 2000.
Q. Do you remember the cabana being on the property the entire time you worked for Mr. Epstein?
A. Yes, I do.
Q. What color was the main house when you first started working for Mr. Epstein?
A. The main house was white, and I painted, and it was pink after I painted.
Q. Was it still pink when you left in 2002?
A. Yes, it was still pink.
Q. Other than Mr. Epstein, who else, if anyone, gave you instructions about your job responsibilities during your employment?
A. Ms. Maxwell.



Q. About when did you first meet Ms. Maxwell?
A. I met Ms. Maxwell around 1991.
Q. Do you know her full name?
A. Ms. Ghislaine Maxwell.
Q. When you first met Ms. Maxwell, what did she look like?
A. She was a pretty girl, tall, brunette.
Q. For how long did you know Ms. Maxwell?
A. Since I -- since she came to the house until I left.
Q. In 2002?
A. Yes.
Q. Do you think you would recognize her if you saw her in person again?
A. Yes.
Q. Do you see her in the courtroom today?
A. Yes, I think she is with a black sweater.
Q. Would you please point her out?
A. (Indicating) At the corner.
MS. COMEY: Would the record please reflect that the witness has identified the defendant?
THE COURT: The record so reflects.
Q. Mr. Alessi, about how often did you interact with Ms. Maxwell while you were working for Mr. Epstein?
A. On a daily basis.
Q. Why did you interact with her on a daily basis?
A. Because I had all the orders from Mr. Epstein where I



suppose it was passed to Ms. Maxwell, and she would interact with me directly.
Q. So did you primarily receive your instructions from Ms. Maxwell?
A. Yes, I did.
Q. What, if any -- what kinds of instructions do you remember Ms. Maxwell giving you over the time that you worked for Mr. Epstein?
A. Many, many instructions. From cleaning the house to the way we should serve, the way the kitchen should be handled, the way the shopping list should be done and the cleanliness of the house.
Q. By what name did Ms. Maxwell call you?
A. She call me John.
Q. Is that your name?
A. Well, my name is -- she call me John, and Mr. Epstein called me John, but my name is Juan.
Q. Do you know where she call you John instead of Juan?
A. John is translation for Juan.
Q. Over your years of employment, based on your observations of Ms. Maxwell and Mr. Epstein, what was your understanding of the nature of their relationship?
A. They were -- Ms. Maxwell was the girlfriend of Mr. Epstein. I understand she was the lady of the house.
Q. What, if anything, did Ms. Maxwell tell you about her role



in Mr. Epstein's life?
A. From the day she came to the house, she -- she right away took over, and she mentioned to me that she was going to be the lady of the house, and also she was in charge of other homes, other properties.
Q. Whose other properties was she in charge of according to her?
A. Of Mr. Epstein.
Q. What was your relationship with Mr. Epstein like before you met Ms. Maxwell?
A. It was cordial.
Q. How, if at all, did that change after you met Ms. Maxwell?
A. It changed gradually from being cordial to be more -- more -- just professional, in a professional manner. Our conversation with him were less and less and less.
Q. What, if anything, did Ms. Maxwell tell you about whether you could speak directly to Mr. Epstein?
A. Well, only I was supposed to speak to Mr. Epstein when he asked me questions.
Q. What, if anything, did Ms. Maxwell tell you about eye contact?
A. At the end of my stay, it was a time when she says Jeffrey doesn't like to be looked at his eyes. You should never look at his eyes. Just look at another part of the room and answer to him.

# 59 (e) EX 82

**GHISLAINE MAXWELL,**



does not want me to elicit. I think what he will say is something referring to the content of the exhibit. I don't want to elicit that if your Honor has ruled that I cannot.

THE COURT: Fair enough.

I mean, it sounds like he gave two responses to the question, right. One is, I saw the date and it's a later date; the other is my name has been removed, my name's not in it, my wife's name is not in it. He hasn't provided that testimony, so I don't know -- it's a logical inference which you may be making. I don't know it's a logical inference that he would make.

MS. COMEY: Your Honor, at this point I'll rest on the logical inference that I think the Court can make based on the record before it. I'll move on.

THE COURT: So what I'm going to do is sustain the foundation objection at this point. I'll tell the jury to disregard the testimony that he believes it to be a later version of the book from his time.

I'll allow the voir dire, and we'll take it from there.

MS. COMEY: Yes, your Honor.

MR. PAGLIUCA: Thank you, your Honor.

MS. COMEY: Your Honor, I apologize.

(Counsel conferred)

MS. COMEY: Your Honor, I think Ms. Moe would like to

# 59 (e) EX 83

**GHISLAINE MAXWELL,**



does not want me to elicit. I think what he will say is something referring to the content of the exhibit. I don't want to elicit that if your Honor has ruled that I cannot.

THE COURT: Fair enough.

I mean, it sounds like he gave two responses to the question, right. One is, I saw the date and it's a later date; the other is my name has been removed, my name's not in it, my wife's name is not in it. He hasn't provided that testimony, so I don't know -- it's a logical inference which you may be making. I don't know it's a logical inference that he would make.

MS. COMEY: Your Honor, at this point I'll rest on the logical inference that I think the Court can make based on the record before it. I'll move on.

THE COURT: So what I'm going to do is sustain the foundation objection at this point. I'll tell the jury to disregard the testimony that he believes it to be a later version of the book from his time.

I'll allow the voir dire, and we'll take it from there.

MS. COMEY: Yes, your Honor.

MR. PAGLIUCA: Thank you, your Honor.

MS. COMEY: Your Honor, I apologize.

(Counsel conferred)

MS. COMEY: Your Honor, I think Ms. Moe would like to

# 59 (e) EX 84

during the times of these events?

THE WITNESS: Correct.

MS. BELOHLAVEK: Okay. All right. Thank you very much.

A JUROR: One more.

THE WITNESS: I think there's another question.

MS. BELOHLAVEK: Oops. Sorry.

A JUROR: Is there any other evidence that the girls were in his house besides the one tape, besides what they're saying?

THE WITNESS: He did have two cameras, two covert hidden cameras inside his house for security purposes. We did locate that computer.

I reviewed the images in the computer, and within that computer there are photographs of girls that I had previous interviewed that appears to be them.

However, because it's so grainy, so snowy, a positive rec -- a positive identification is -- you know, it's hard to -- unless you show it to the girl, is this you?

# 59 (e) EX 85

forgot.

MS. BELOHLAVEK: In or at his home. Not in sex acts though.

THE WITNESS: No, not in sex acts. They were conducting surveillance from the outside.

A JUROR: I know. Did you do any telephone research or was everything done over cell phones?

THE WITNESS: Everything was done over cell phones.

MS. BELOHLAVEK: All right.

Thank you very much Detective Recarey.

(Witness excused.)

(WITNESS GREGORY PARKINSON)

MS. DUGGAN: Okay. Would you raise your right hand?

THE WITNESS: Yes.

MS. DUGGAN: Do you swear or affirm the testimony you're about to give today will be the truth, the whole truth, and nothing but the truth, so help you got?

THE WITNESS: Yes, I do.

EXAMINATION

# 59 (e) EX 86

BY MS. BELOHLAVEK:

Q. Okay. Would you introduce yourself to the grand jurors, please?

A. Good morning, ladies and gentlemen.

My name is Gregory Parkinson.

Q. How -- how long have you been employed as a law enforcement officer?

A. I have been in business 40 years now. I started on October 25th of 1966.

Q. And where were you working then?

A. I worked for the West Palm Beach Police Department, where I served for 34 years, until I retired on July 3rd of the year 2000.

I had the 4th of July off and went to work the next day as an investigator for the State Attorney's Office where I worked for 3 years.

I left on February 14th of 2003, had the weekend off, and then took over a management position with the Town of Palm Beach Police Department, where I am still currently employed.

Q. What is your position with Palm Beach Police Department?

A. I hold the rank of police officer, but I also hold the title of civilian where I am in charge of the crime scene investigation unit, the

# 59 (e) EX 87

Lourie described the promise not to prosecute "potential co-conspirators" as "unusual," and told OPR that he did not know why it was included in the agreement, but added that it would be "unlike me if I read that language to just leave it in there unless I thought it was somehow helpful." Lourie posited that victims who recruited other underage girls to provide massages for Epstein "theoretically" could have been charged as co-conspirators. He told OPR that when he saw the provision, he may have understood the reference to unnamed "co-conspirators" as "a message to any victims that had recruited other victims that there was no intent to charge them."

Acosta did not recall any discussions about the non-prosecution provision. But he told OPR that Epstein was always "the focus" of the federal investigation, and he would have viewed the federal interests as vindicated as long as Epstein was required to face "meaningful consequences" for his actions. Acosta told OPR that when he reviewed the draft NPA, "[t]o the extent I reviewed this co-conspirator provision, I can speculate that my thinking would have been the focus is on Epstein[ ] . . . going to jail. Whether some of his employees go to jail, or other, lesser involved [individuals], is not the focus of this." Acosta also told OPR that he assumed Villafaña and Lourie had considered the provision and decided that it was appropriate. Finally, Sloman, who was not involved in negotiating the NPA, told OPR that in retrospect, he understood the non-prosecution provision was designed to protect Epstein's four assistants, and it "never dawned" on him that it was intended to shield anyone else.

This broad provision promising not to prosecute "any potential co-conspirators" is troubling and, as discussed more fully later in this Report, OPR did not find evidence showing that the subjects gave careful consideration to the potential scope of the provision or whether it was warranted given that the investigation had been curtailed and the USAO lacked complete information regarding possible co-conspirators. Villafaña precipitously revised a more narrow provision sought by the defense. Given its evolution from a provision sought by the defense, it appears unlikely to have been designed to protect the victims, and there is no indication that at the time, the subjects believed that was the purpose. However, the USAO had not indicated interest in prosecuting anyone other than the four named female assistants, and OPR found no record indicating that Epstein had expressed concern about the prosecutive fate of anyone other than the four assistants and unnamed employees of a specific Epstein company. Accordingly, OPR concludes that the evidence does not show that Acosta, Lourie, or Villafaña agreed to the non-prosecution provision to protect any of Epstein's political, celebrity, or other influential associates.[242]

### H. OPR's Investigation Did Not Reveal Evidence Establishing That Epstein Cooperated in Other Federal Investigations or Received Special Treatment on That Basis

One final issue OPR explored stemmed from media reports suggesting that Epstein may have received special treatment from the USAO in return for his cooperation in another federal

242 As previously stated, Sloman was on vacation when Villafaña included the provision in draft plea agreements and did not monitor the case or comment on the various iterations of the NPA that were circulated during his absence. Menchel left the USAO on August 3, 2007, before the parties drafted the NPA.



WhatsApp

# 59 (e) EX 88

include concurrent time." The email primarily concerned other issues, and Villafaña did not explain what the resolution she had in mind would entail.[57] Villafaña requested to be advised, "[i]f anyone has communicated anything to Epstein's attorneys that is contrary to this." Villafaña, who was aware that Menchel and Lourie had been in direct contact with defense counsel about the case, explained to OPR that she made this request because "people were communicating with the defense attorneys," and she suspected that those communications may have included discussions about a possible plea.

In response to Villafaña's email, Menchel notified Villafaña that he had told Sanchez "a state plea [with] jail time and sex offender status may satisfy the [U.S. Attorney]," but Sanchez had responded that it "was a non-starter for them."[58] During his OPR interview, Menchel had no independent recollection of his conversation with Sanchez and did not remember why the defense deemed the proposal a "non-starter." However, Menchel explained that he would not have made the proposal to Sanchez without Acosta's knowledge. He also pointed out that in numerous emails before the June 26, 2007 meeting, he repeatedly noted that Acosta was still deciding what he wanted to do with the Epstein case. Acosta agreed, telling OPR that although he did not remember a specific conversation with Menchel concerning a state-based resolution, Menchel would not have discussed a potential resolution with Sanchez "without having discussed it with me."

### 1. Acosta's Explanation for His Decision to Pursue a State-based Resolution

Subsequent events showed that the decision to resolve the case through state charges was pivotal, and OPR extensively questioned Acosta about his reasoning. In his OPR interview, Acosta explained the various factors that influenced his decision to pursue a state-based resolution. Acosta said that although he, Sloman, and Menchel "believed the victims" and "believed [Epstein] did what he did," they were concerned "about some of the legal issues . . . and some of the issues in terms of testimony."[59] Acosta also recalled discussions with his "senior team" about how the victims would "do on the stand."

Acosta told OPR that "from the earliest point" in the investigation, he considered whether, because the state had indicted the case, the USAO should pursue it.

---

57 Villafaña explained to OPR that she intended to recommend a plea to a federal conspiracy charge and a substantive charge, "consistent with the Ashcroft Memo, which would be the most readily provable offense," with "a recommendation that the sentence on the federal charges run concurrent with the state sentence, or that [Epstein] would receive credit for time in state custody towards his federal release date." *See* n.65 for an explanation of the Ashcroft Memo.

58 Villafaña was then in trial and on July 4, 2007, likely before reading Menchel's email, Villafaña responded to defense counsel regarding the demand for records and also noted, "If you would like to discuss the possibility of a federal resolution . . . that could run concurrently with any state resolution, please leave a message on my voicemail."

59 In commenting on OPR's draft report, Sloman stated he had no involvement in assessing the Epstein case or deciding how to resolve it, and that OPR should not identify him as among the people upon whom Acosta relied in reaching the two-year-state-plea resolution through the NPA. However, Sloman also told OPR that he had little recollection of the Epstein case, while Acosta specifically recalled having discussed the case with both Sloman and Menchel.



Not

# 59 (e) EX 89

Case 1:20-cr-00330-PAE Document 274-39 Filed 04/21/26 Page 24 of 109



With respect to Attorney-1's inbox, the Government previewed in its October 7, 2020 letter that it planned to review the inbox—which is voluminous[2]—using search terms to identify witness statements and *Giglio* material. Those search terms did not include search terms relevant to the NPA, and the Government has not searched Attorney-1's inbox for communications relating to the NPA. Instead, because the Government obtained these materials with an eye towards identifying any additional witness statements or *Giglio* material that might not otherwise be contained in the FBI Florida File, the Government ran search terms specific to this case, focusing on the names of victims, Government witnesses, and Ghislaine Maxwell. The Government's review of the emails responsive to its search terms remains ongoing, and the Government will produce any non-duplicative documents that warrant disclosure. The Government expects this to be a limited set of documents that will be produced along with other Jencks Act and *Giglio* material. Of course, should the Government identify any exculpatory material during this review, including with respect to the NPA, it will promptly produce such material.

As the foregoing illustrates, the Government has taken an expansive approach to discovery and is close to completing its review of files from other agencies for Jencks Act and *Giglio* material. Thus far, the Government has not identified potential *Brady* material with respect to the NPA during its review. To the extent the Government identifies potential *Brady* material with respect to the NPA, that is, material that supports Maxwell's reading of the NPA as discussed above, or any other exculpatory material, the Government will promptly produce it. However,

---

[2] More specifically, it appears that OPR obtained an entire snapshot of Attorney-1's inbox, spanning several years, and encompassing all of Attorney-1's emails during that time period. In other words, the inbox is not specific to the Epstein investigation, and it contains a high volume of communications relating to other cases and other internal SDFL matters. The snapshot provided by OPR contains emails and their attachments, both inbound and outbound, totaling more than 300,000 documents.

# 59 (e) EX 90

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF YORK

----------------------------------------------------------------- X

RADAR ONLINE LLC and JAMES ROBERSON,

Plaintiffs,

-v-

FEDERAL BUREAU OF INVESTIGATIONS,

Defendant.

----------------------------------------------------------------- X

17 Civ. 3956 (PGG)

**MEMORANDUM OF LAW IN SUPPORT OF THE FEDERAL BUREAU OF INVESTIGATION'S MOTION FOR SUMMARY JUDGMENT**

AUDREY STRAUSS
United States Attorney
Southern District of New York
86 Chambers Street, Third Floor
New York, New York 10007
Telephone: (212) 637-2751

KIRTI VAIDYA REDDY
Assistant United States Attorney
– Of Counsel –

TABLE OF CONTENTS


PRELIMINARY STATEMENT .......... 1

BACKGROUND .......... 2

I. Criminal Proceedings Against Jeffrey Epstein .......... 2

II. Radar Online's FOIA Request and This Action .......... 3

ARGUMENT .......... 4

III. Standard of Review .......... 4

IV. The FBI Conducted an Adequate Search for Responsive Records .......... 4

V. FBI Properly Withheld Responsive Records and Information Pursuant to FOIA Exemption 7(A) .......... 6

A. The Records Were Compiled for Law Enforcement Purposes .......... 8

B. Disclosure of the Records Would Interfere with Pending Criminal Proceedings .......... 8

C. The FBI's Assertion of Exemption 7(A) Was Timely .......... 10

VI. The FBI Properly Withheld Responsive Records and Information Under Additional Exemptions .......... 12

A. The FBI Properly Withheld Information Pursuant to FOIA Exemption 3 .......... 12

B. FBI Properly Withheld Information Pursuant to FOIA Exemption 5 .......... 15

C. FBI Properly Withheld Information Pursuant to FOIA Exemptions 6 and 7(C) .......... 17

D. FBI Properly Withheld Records and Information Pursuant to FOIA Exemption 7(D) .......... 20

E. The FBI Properly Withheld Records and Information Pursuant to FOIA Exemption 7(E) .......... 22

VII. FBI Has Satisfied Its Duty to Segregate and Release Any Non-ExemptInformation .......... 24

CONCLUSION .......... 25

TABLE OF AUTORITIES

page(s)

Cases

*Abdelfattah v. ICE*,
851 F. Supp. 2d 141 .......... 25

*ACLU v. U.S. Dep't of,*
*Def.*, 628 F.3d 612 (D.C. Cir. 2011).......... 4

*Adamowicz v. I.R.S.*,
552 F. Supp. 2d 355 (S.D.N.Y. 2008).......... 5, 12

*Adamowicz v. IRS*,
402 Fed. App'x 648 (2d Cir. 2010).......... 21

*Allard K. Lowenstein Int'l Human Rights Project v. Dep't of Homeland Sec.*,
626 F.3d 678 (2d Cir. 2010).......... 23

*Am. Civil Liberties Union v. United States Dep't of,*
*Def.*, 901 F.3d 125 (2d Cir. 2018) .......... 4

*Amnesty Int'l USA v. CIA*,
728 F. Supp. 2d 479 (S.D.N.Y. 2010).......... 7

*Animal Welfare Inst. v. Nat'l Oceanic & Atmospheric Admin.*,
370 F. Supp. 3d 116 (D. D.C. 2019) .......... 16, 17

*Ass'n of Retired R.R. Workers v. U.S. R.R. Retirement Bd.*,
830 F.2d 331 (D.C. Cir. 1987) .......... 14

*Associated Press v. U.S. Dep't of Defense*,
554 F.3d 274 (2d Cir. 2009).......... 18, 20

*Barney v. I.R.S.*,
618 F.2d 1268 (8th Cir.1980).......... 8

*Bibles v. Or. Natural Desert Assoc.*,
519 U.S. 355 (1997).......... 20

*Blackwell v. FBI*,
646 F.3d 37 (D.C. Cir. 2011) .......... 23, 25, 26

*Brennan Ctr. v. Dep't of Homeland Sec.*,
331 F. Supp. 3d .......... 22

*Brunetti v. FBI*,
357 F. Supp. 2d 97 (D.D.C. 2004) *aff'd*, 124 F.3d 1309 (D.D.C. 1997) .......... 6

*Carney v. DOJ*,
19 F.3d 807 (2d Cir. 1994)........................................................................................ 4

*CIA v. Sims*,
471 U.S. 159 (1985)............................................................................................... 4, 13

*Conti v. U.S. Dep't of Homeland Sec.*,
No. 12 Civ. 5827 (AT), 2014 WL 1274517 (S.D.N.Y. Mar. 24, 2014)................................... 26

*Crooker v. Bureau of Alcohol, Tobacco, and Firearms*,
789 F.2d 64 (D.C. Cir. 1986)........................................................................................ 7

*Curcio v. FBI*,
No. 89-0941, 1990 WL 179605 (D.D.C. Nov. 2, 1990)........................................................ 11

*Dep't of Interior v. Klamath Water Users Protective Ass'n v.*,
532 U.S. 1 (2001)....................................................................................................... 16

*Dep't of Justice*,
296 F. Supp. 3d 109 (D.D.C. 2017)................................................................................ 12

*Diamond v. FBI*,
707 F.2d 75 (2d Cir. 1983)........................................................................................... 21

*DOD v. FLRA*,
510 U.S. 487 (1994)..................................................................................................... 18

*Doherty v. U.S. Dep't of Justice*,
775 F.2d 49 (2d Cir. 1985)........................................................................................... 23

*Equal Emp't Opportunity Comm'n v. Lutheran Soc. Servs.*,
186 F.3d 959 (D.C. Cir. 1999)....................................................................................... 16

*Exch. Comm'n v. Dresser Indus.*,
628 F.2d 1368 (D.C. Cir. 1980)..................................................................................... 14

*Federal Labor Relations Auth. v. U.S. Dep't of Veterans Affairs*,
958 F.2d 503 (2d Cir. 1992)......................................................................................... 18

*Ferguson v. FBI*,
957 F.2d 1059 (2d Cir. 1992)...................................................................................... 8, 21

*Ferguson v. FBI*,
No. 89 Civ. 5071 (RPP), 1995 WL 329307, at *2 (S.D.N.Y. June 1, 1995),
*aff'd*, 83 F.3d 41 (2d Cir. 1996)...................................................................................... 5

*Ford v. DOJ*,
208 F. Supp. 3d 237 (D.D.C. 2016)................................................................................ 25

*Garcia v. U.S. Dep't of Justice*,
181 F. Supp. 2d 356 (S.D.N.Y. 2002) ........ 5, 20

*Gonzalez v. USCIS*,
475 F. Supp. 3d 334 (S.D.N.Y. 2020) ........ 25

*Grand Cent. Partnership, Inc. v. Cuomo*,
166 F.3d 473 (2d Cir. 1999) ........ 16

*Halpern v. FBI*,
181 F.3d 279 (2d Cir. 1999) ........ 8, 19, 20

*Heffernan v. Azar*,
317 F. Supp. 3d 94 (D.D.C. 2018) ........ 12

*In re Grand Jury Proceedings*,
851 F.2d 860 (6th Cir. 1988) ........ 15

*Jett v. FBI*,
139 F. Supp. 3d 352 (D.D.C. 2015) ........ 25

*John Doe Agency v. John Doe Corp.*,
493 U.S. 146 (1989) ........ 4, 8, 22

*Journalism Ctr. v. Office of Indep. Counsel*,
926 F. Supp. 189 (D.D.C. 1996) ........ 10

*Judicial Watch, Inc. v. U.S. Dep't of Commerce*,
337 F. Supp. 2d 146 (D.D.C. 2004) ........ 23

*Kansi v. U.S. Dep't of Justice*,
11 F. Supp. 2d 42 (D.D.C. 1998) ........ 6

*Kay v. F.C.C.*,
976 F. Supp. 23 (D.D.C. 1997) ........ 7

*Kidder v. FBI*,
517 F. Supp. 2d 17 (D.D.C. 2007) ........ 6

*Lasko v. DOJ*,
684 F. Supp. 2d 120 (D.D.C. 2010) ........ 20

*Levinthal v. Fed. Election Comm'n*,
219 F. Supp. 3d 1 (D.D.C. 2016) ........ 25

*Light v. DOJ*,
968 F. Supp. 2d 11 (D.D.C. 2013) ........ 25

*Local 32B–32J, Serv. Emps. Int'l Union, AFL–CIO v. GSA*,

1998 WL 726000 (S.D.N.Y. October 15, 1998) ........................................................... 14

*Lopez v. Dep't of Justice*,
393 F.3d 1345 (D.C. Cir. 2005) ........................................................................... 15

*Marshall v. FBI*,
802 F. Supp. 2d 125 (D.D.C. 2011) ........................................................................ 5

*Maydak v. U.S. Dept. of Justice*,
218 F.3d 760 (D.C. Cir. 2000) ............................................................................... 9

*Mayer Brown LLP v. IRS*,
562 F.3d 1190 (D.C. Cir. 2009) ........................................................................... 23

*Maynard v. C.I.A.*,
986 F.2d 547 (1st Cir. 1993) .................................................................................. 5

*McCoy v. Moschella*,
1991 WL 212208 (D.D.C. Sept. 30, 1991) ........................................................... 26

*McGehee v. U.S. Dep't of Justice*,
800 F. Supp. 2d 220 (D.D.C. 2011) ........................................................................ 5

*Murphy v. Exec. Office for U.S. Attorneys*,
789 F.3d 204 (D.C. Cir. 2015) ............................................................................. 14

*N.Y. Times v. Dep't of Justice*,
872 F. Supp. 2d 309 (S.D.N.Y. 2012)...................................................................... 5

*N.Y. Times v. USDOJ*,
235 F. Supp. 2d 522 (S.D.N.Y. 2017)..................................................................... 14

*Nation Magazine v. U.S. Customs Serv.*,
71 F.3d 885 (D.C. Cir. 1995) ............................................................................... 19

*Nat'l Assoc. of Homebuilders v. Norton*,
309 F.3d 26 (D.C. Cir. 2002) ............................................................................... 17

*New York Times Co. v. Dep't of Justice*,
No. 14 Civ. 03776 (AT) (SN), 2016 WL 5946711 (S.D.N.Y. Aug. 18, 2016)........................... 7

*New York Times v. United States Dep't of Justice*,
390 F. Supp. 3d 499 (S.D.N.Y. 2019)..................................................................... 26

*NLRB v. Robbins Tire & Rubber Co.*,
437 U.S. 214 (1978) ........................................................................................ 6, 7, 10

*Oglesby v. U.S. Army*,
920 F.2d 57 (D.C. Cir. 1990) ................................................................................. 5

*Peltier v. FBI*,
218 Fed. App'x 30 (2d Cir. 2007) ........ 15

*Perlman v. United States Dep't of Justice*,
312 F.3d 100 (2d Cir. 2002) ........ 19

*Radcliffe v. IRS*,
536 F. Supp. 2d 423 (S.D.N.Y. 2008) ........ 7

*Richardson v. DOJ*,
730 F. Supp. 2d 225 (D.D.C. 2010) ........ 20

*Robbins, Geller, Rudman & Dowd, LLP v. United States Sec. & Exch. Comm'n*,
No. 3:14-CV-2197, 2016 WL 950995 (M.D. Tenn. Mar. 12, 2016) ........ 26

*Rodriguez v. U.S. Dep't of Army*,
31 F. Supp. 3d 218 (D.D.C. 2014) ........ 14

*Roth v. United States Dep't of Justice*,
642 F. 3d 1161 (D.C. Cir. 2011) ........ 19

*SafeCard Servs., Inc. v. S.E.C.*,
926 F.2d 1197 (D.C. Cir. 1991) ........ 5

*Senate of the Com. of Puerto Rico v. U.S. Dep't of Justice*,
823 F.2d 574 (D.C. Cir. 1987) ........ 12

*Thompson v. DOJ*,
851 F. Supp. 2d 89 (D.D.C. 2012) ........ 20

*U.S. Dep't of Justice v. Landano*,
508 U.S. 165 (1993) ........ 21

*U.S. Dep't of State v. Washington Post Co.*,
456 U.S. 595 (1982) ........ 17

*United States v. Deloitte*,
610 F.3d 129 (D. D.C. 2010) ........ 17

*United States v. Eastern Air Lines, Inc.*,
923 F.2d 241 (2d Cir. 1991) ........ 14

*United States v. Nobles*,
422 U.S. 225 (1975) ........ 16

*Wilner v. NSA*,
592 F.3d 60 (2d Cir. 2009) ........ 4

*Wood v. FBI*,
432 F. 3d 78 (2d Cir. 2005) ........ 20

Statutes

5 U.S.C. § 522 ........ 22

5 U.S.C. § 522 (b)(7)(E) ........ 22

5 U.S.C. § 552(a) ........ 4

5 U.S.C. § 552(b) ........ 26

5 U.S.C. § 552(b)(3) ........ 1, 13

5 U.S.C. § 552(b)(5) ........ 15

5 U.S.C. § 552(b)(6) ........ 1, 17

5 U.S.C. § 552(b)(7) ........ 8

5 U.S.C. § 552(b)(7)(A) ........ 1

5 U.S.C. § 552(b)(7)(C) ........ 18

5 U.S.C. § 552(b)(7)(D) ........ 1, 21

5 U.S.C. § 552(b)(7)(E) ........ 1

5 U.S.C. § 552(b)(7)(F) ........ 1

18 U.S.C. § 3509 ........ 14

18 U.S.C. § 3509(d)(1)(A)(i) ........ 14

18 U.S.C. § 5038 ........ 15

Rules

Federal Rule of Criminal Procedure 6(e) ........ 1, 14

## PRELIMINARY STATEMENT

Radar Online LLC and James Robertson, a senior editor for Radar Online (collectively "Radar Online"), seek records at the core of the criminal prosecution of Ghislaine Maxwell. Congress did not intend the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552 *et seq.*, to interfere with pending criminal prosecutions. To make sure this would not happen, Congress expressly exempted records that could reasonably be expected to interfere with pending law enforcement proceedings from public disclosure under FOIA. *See* 5 U.S.C. § 552(b)(7)(A). The withheld records sought by Radar Online fall at the heart of this exemption.

The FBI's detailed declaration establishes that certain of the information withheld also falls within other FOIA exemptions. For example, the FBI withheld information specifically exempted from disclosure by the Child Victims' and Child Witnesses' Rights Act, the Juvenile Justice and Delinquency Act, and Federal Rule of Criminal Procedure 6(e) under Exemption 3. *See* 5 U.S.C. § 552(b)(3). The FBI withheld information subject to the attorney work product doctrine under Exemption 5. *Id.* § 552(b)(5). The FBI withheld the names and other personal information of individuals who were of investigative interest to the FBI, victims, government employees, and third parties under FOIA Exemptions 6 and 7(c) because disclosure clearly would, and/or could reasonably be expected to, result in an unwarranted invasion of privacy of third parties. *See id.* § 552(b)(6), (7)(C). Personal information of government employees and third parties was also withheld because its disclosure could place those individuals at risk of harm. *See id.* § 552(b)(7)(F). Records that would disclose the identity or information provided by a confidential source were withheld by the FBI under Exemption 7(D). *See id.* § 552(b)(7)(D). Finally, some of the withheld records were withheld under Exemption 7(E) because their disclosure would reveal law enforcement techniques or procedures. *See id.* § 552(b)(7)(E).

The FBI has established that its search was adequate and its withholdings under each of

these FOIA exemptions were proper. Accordingly, the Court should grant the FBI's motion for summary judgment.

## BACKGROUND

### I. Criminal Proceedings Against Jeffrey Epstein

In 2005, the Palm Beach, Florida, Police Department began investigating Jeffrey Epstein; a Palm Beach County grand jury indicted Epstein on July 19, 2006, for felony solicitation of prostitution. *United States v. Maxwell*, No. 20-cr-330, ECF No. 142, Ex. A, B (RMB) (S.D.N.Y.). Separately, the United States Attorney's Office for the Southern District of Florida and the Federal Bureau of Investigation conducted an investigation of Epstein, and in 2007, a federal grand jury indicted Epstein with solicitation of prostitution. *Id.* In September 2007, the United States Attorney's Office for the Southern District of Florida and Epstein entered into a non-prosecution agreement. *Id.*

On July 2, 2019, Jeffrey Epstein was indicted on one count of conspiracy to commit sex trafficking and one count of sex trafficking by a federal grand jury sitting in the Southern District of New York. *See* Indictment, Dkt. No. 2, *United States v. Epstein*, No. 19-cr-490 (RMB) (S.D.N.Y.). Epstein was arrested on July 6, 2019, and thereafter incarcerated at the Metropolitan Correctional Center ("MCC") until his death. *see* Docket Entry Nos. 5, 32 and 44, *United States v. Epstein*, No. 19-cr-490 (RMB) (S.D.N.Y.).

On March 29, 2021, Ghislaine Maxwell was indicted for assisting, facilitating, and contributing to Epstein's abuse of minor girls, by and among other things, helping Epstein to recruit, groom, and ultimately abuse victims known to Maxwell and Epstein to be under the age of 18. *United States v. Maxwell*, No. 20-cr-330, ECF No. 1 (S.D.N.Y.). Maxwell's trial is scheduled to start on November 29, 2021. *Id.* at ECF No. 277.

## II. Radar Online's FOIA Request and This Action

On April 20, 2017, Radar Online submitted a FOIA requests to the FBI collectively seeking "all documents relating to the FBI's investigation and prosecution of financier Jeffrey Epstein" Dkt. No. 12-2, Ex. B; *see* Declaration of Michael G. Seidel, dated June 28, 2021 ("Seidel Decl.") ¶ 6, Ex. A. On May 25, 2017, Plaintiff Radar Online initiated this action, and on August 28, 2017, Plaintiffs filed an amended complaint. ECF Nos. 1, 12. On October 5, 2017, the parties stipulated that the FBI's search obligations would be limited to records in the certain files maintained by the FBI. ECF No. 17.

From October 2017 through June 2019, the FBI processed 11,525 pages of responsive documents. Seidel Decl. ¶¶ 9-29. It produced 181 pages in full and 1,051 pages in part. Seidel Decl. Ex. EE at 160. The FBI withheld 10,107 pages in full based on FOIA Exemptions 3, 5, 6, 7(A), 7(C), 7(D), 7(E). Seidel Decl. ¶¶ 9-29. During this time, it did not assert Exemption 7(A) over all withheld material.

After Epstein's arrest, the FBI determined that the additional release of responsive material could negatively impact the pending prosecution of Jeffrey Epstein and any related investigations. Seidel Decl. ¶ 30 fn. 4. The FBI asserted Exemption 7(A) categorically over all the remaining responsive documents, except for 46 pages which were released in full. Seidel Decl. ¶¶ 30-31, 57-68. The FBI also asserted Exemption 7(A) with respect to all information withheld pursuant to other exemptions prior to July 2019. Seidel Decl. ¶ 30, Ex. EE.

The FBI has created a *Vaughn* index describing the documents that were processed prior to Epstein's arrest, as well as those records that were released in part after his arrest. Seidel Decl. Ex. EE. The documents that the FBI processed and categorically withheld after Epstein's arrest are not identified by Bates numbers and are not included in the *Vaughn* index, as that would reveal the

number of pages and descriptions of documents being withheld categorically, thereby causing the harms protected by Exemption 7(A). Seidel Decl. fn. 11.

## ARGUMENT

### III. Standard of Review

FOIA generally requires federal agencies to make documents and other material "available to the public," *see* 5 U.S.C. § 552(a), but specifically exempts nine categories of information from that requirement, *see id.* § 552(b). The nine FOIA exemptions reflect Congress's determination that "public disclosure is not always in the public interest." *CIA v. Sims*, 471 U.S. 159, 166–67 (1985).

Summary judgment is warranted in a FOIA case if the agency submits declarations that (1) supply "facts indicating that the agency has conducted a thorough search" and (2) give "reasonably detailed explanations why any withheld documents fall within an exemption." *Carney v. DOJ*, 19 F.3d 807, 812 (2d Cir. 1994). The agency's declarations are "accorded a presumption of good faith," and discovery is "unnecessary if the agency's submissions are adequate on their face." *Id.* (internal quotation marks omitted); *accord Wilner v. NSA*, 592 F.3d 60, 69 (2d Cir. 2009). An agency's justification for asserting an exemption "is sufficient if it appears logical and plausible." *Am. Civil Liberties Union v. United States Dep't of Def.*, 901 F.3d 125, 133 (2d Cir. 2018), *as amended* (Aug. 22, 2018). Accordingly, "the government's burden is a light one." *ACLU v. U.S. Dep't of Def.*, 628 F.3d 612, 624 (D.C. Cir. 2011).[1]

### IV. The FBI Conducted an Adequate Search for Responsive Records

"If an agency demonstrates that it has conducted a reasonable search for relevant

---

[1] Because an agency declaration can satisfy the government's burden on a motion for summary judgment, "Local Civil Rule 56.1 statements are not required." *N.Y. Times v. Dep't of Justice*, 872 F. Supp. 2d 309, 314 (S.D.N.Y. 2012); *Ferguson v. FBI*, No. 89 Civ. 5071 (RPP), 1995 WL 329307, at *2 (S.D.N.Y. June 1, 1995), *aff'd*, 83 F.3d 41 (2d Cir. 1996).

documents, it has fulfilled its obligations under FOIA and is entitled to summary judgment on this issue." *Garcia v. U.S. Dep't of Justice*, 181 F. Supp. 2d 356, 366 (S.D.N.Y. 2002). The agency must demonstrate that its search was "reasonably calculated to discover the requested documents." *SafeCard Servs., Inc. v. S.E.C.*, 926 F.2d 1197, 328 (D.C. Cir. 1991). An agency's search may be reasonable even if it does not return every responsive document. *See Adamowicz v. I.R.S.*, 552 F. Supp. 2d 355, 361 (S.D.N.Y. 2008). An agency must only search those "files likely to contain responsive materials (if such records exist)." *Oglesby v. U.S. Army*, 920 F.2d 57,68 (D.C. Cir. 1990). Where an agency's declaration demonstrates that it has conducted a reasonable search, "the FOIA requester can rebut the agency's affidavit only by showing that the agency's search was not made in good faith." *Maynard v. C.I.A.*, 986 F.2d 547, 560 (1st Cir. 1993).

The FBI undertook thorough and complete searches for documents responsive to the Radar Online's requests. The FBI's declaration detailing the manner in which it indexes its files and searches its general case management system demonstrates the reasonableness of this search. Seidel Decl. ¶¶ 32-42. First, the FBI searched both its FOIA Document Processing System ("FDPS") and its Central Records System ("CRS") in response to Radar Online's request. Seidel Decl. ¶ 42. The search of FDPS yielded responsive records from a previous index search of the CRS (which had been done in response to a prior first-party FOIA request made by Epstein on his own behalf). Seidel Decl. ¶ 42. To ensure that there were no additional records responsive to Radar Online's request outside of the FDPS results, the FBI conducted a supplemental electronic search of the CRS using the search term "Jeffrey Epstein," which yielded no additional responsive records. *Id.* Courts have routinely found that electronic searches of the CRS fully meet the standards of adequacy and reasonableness established under the FOIA. *See, e.g.*, *Marshall v. FBI*, 802 F. Supp. 2d 125, 132-33 (D.D.C. 2011); *McGehee v. U.S. Dep't of Justice*, 800 F. Supp.

2d 220, 229-30 (D.D.C. 2011). Thus, the FBI's search for responsive records was reasonable.

## V. The FBI Properly Withheld Responsive Records and Information Pursuant to FOIA Exemption 7(A)

As indicated in the *Vaughn* index submitted by the FBI, *see* Seidel Decl. Ex. EE, all of the records that were withheld by the FBI in full or in part that fall within the scope of FOIA Exemption 7(A).[2] Exemption 7(A) exempts from disclosure "records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information . . . could reasonably be expected to interfere with enforcement proceedings." 5 U.S.C. § 552 (b)(7)(A). In enacting Exemption 7(A), "Congress recognized that law enforcement agencies had legitimate needs to keep certain records confidential, lest the agencies be hindered in their investigations." *NLRB v. Robbins Tire & Rubber Co.*, 437 U.S. 214, 224 (1978). Most importantly, Congress sought "to prevent harm to the Government's case in court" by preventing litigants from obtaining "earlier or greater access to agency investigatory files than they would otherwise have." *Id.* (internal quotation omitted).[3]

"To fit within Exemption 7(A), the government must show that (1) a law enforcement proceeding is pending or prospective and (2) release of the information could reasonably be expected to cause some articulable harm." *Amnesty Int'l USA v. CIA*, 728 F. Supp. 2d 479, 525 (S.D.N.Y. 2010) (internal quotation marks omitted). The government's burden under the second prong is not high; the government need only show that "disclosure of particular kinds of investigatory records . . . would generally interfere with enforcement proceedings." *Robbins*

---

[2] For those records or parts of records withheld in full pursuant to Exemption 7(A), the Court need not reach the applicability of other exemptions if it concludes that FBI's withholdings under Exemption 7(A) were proper.

[3] Exemption 7(A) also protects records that, if released, could interfere with post-trial criminal proceedings, such as an appeal. *See, e.g.*, *Kidder v. FBI*, 517 F. Supp. 2d 17, 27-28 (D.D.C. 2007); *Kansi v. U.S. Dep't of Justice*, 11 F. Supp. 2d 42, 44 (D.D.C. 1998).

*Tire*, 437 U.S. at 236 (quotation marks omitted); *Radcliffe v. IRS*, 536 F. Supp. 2d 423, 437 (S.D.N.Y. 2008). In doing so, the government must demonstrate a "rational link" between the requested public disclosurea nd interference with the government's ongoing or prospective investigations or proceedings. *See Crooker v. Bureau of Alcohol, Tobacco, and Firearms*, 789 F.2d 64, 67 (D.C. Cir. 1986); *New York Times Co. v. Dep't of Justice*, No. 14 Civ. 03776 (AT) (SN), 2016 WL 5946711, at *7 (S.D.N.Y. Aug. 18, 2016).

The government is not required to make a specific factual showing with respect to each withheld document that disclosure would actually interfere with a particular enforcement proceeding. *See Robbins Tire*, 437 U.S. at 236. Rather, the showing of harm under Exemption 7(A) may be made on a categorical basis. *Id.* That is, federal courts may make generic determinations that disclosure of particular types of records could reasonably be expected to interfere with the type of enforcement proceeding at issue. *Radcliffe*, 536 F. Supp. 2d at 437 (quoting *Barney v. I.R.S.*, 618 F.2d 1268, 1273 (8th Cir.1980)).

**A. The Withheld Records Were Compiled for Law Enforcement Purposes**

As a threshold matter, all of the records withheld by FBI pursuant to Exemption 7(A) were "compiled for law enforcement purposes," and thus satisfy the threshold requirement of Exemption 7. 5 U.S.C. § 552(b)(7). The government has the burden of proving that records were compiled for law enforcement purposes. *Ferguson v. FBI*, 957 F.2d 1059, 1070 (2d Cir. 1992). Documents are compiled for law enforcement purposes within the meaning of the statute both where the documents, when originally created, were generated for a law enforcement purpose, and where the documents, although originally created for a non-law enforcement purposes, are later assembled as part of a law enforcement investigation. *John Doe Agency v. John Doe Corp.*, 493 U.S. 146, 154-55 (1989).

The withheld records were either generated or compiled in furtherance of the FBI's

investigation of criminal child prostitution involving Epstein. Seidel Decl. ¶ 55. In this Circuit, all records compiled in the course of an investigation by the FBI are deemed to be for law enforcement purposes. *Halpern v. FBI*, 181 F.3d 279, 296 (2d Cir. 1999) ("all records of investigations compiled by the FBI are for law enforcement purposes"); *see also* Seidel Decl. ¶ 55(describing authority conferred upon the FBI to investigate violations of federal law). The withheld records thus were compiled for a law enforcement purpose within the meaning of Exemption 7(A).

**B. Disclosure of the Records Would Interfere with Pending Criminal Proceedings**

"The principal purpose of Exemption 7(A) is to prevent disclosures which might prematurely reveal the government's cases in court, its evidence and strategies, or the nature, scope, direction, and focus of its investigations, and thereby enable suspects to establish defenses or fraudulent alibis or to destroy or alter evidence." *Maydak v. U.S. Dept. of Justice*, 218 F.3d 760, 762 (D.C. Cir. 2000). Here, as logically and plausibly explained in the Declaration of Maurene Comey, the Assistant United States Attorney for the Southern District of New York prosecuting the criminal action against Ghislaine Maxwell, release of the records would interfere with the pending criminal case by revealing the FBI's investigative interests, the scope and focus of the FBI's investigation into Epstein and his associates, including Maxwell, the physical or documentary evidence gathered by the FBI, and witness and source statements and administrative materials,. Comey Decl. ¶¶ 1, 9-10, 12-21. The withheld records include interview reports and notes; federal grand jury subpoenas and the records received in response to such subpoenas; documents provided by state and local law enforcement agencies; communications between the FBI and other government agencies regarding the criminal investigation; communications within the FBI regarding the criminal investigation; envelopes used to organize

and store documents and other evidentiary documents; bulky exhibit cover sheets, transmittal forms, letters routing slips, some of which contain the names of witnesses, including victim-witnesses and subjects of the investigation; background and contact information regarding witnesses, including victim-witnesses, and subjects of the investigation; and internet printouts, including of material relating to victim-witnesses. Comey Decl. ¶ 11.

The Comey Declaration explains that the withheld records "document information and evidence gathered during an FBI investigation, the sources from and techniques through which such information and evidence was gathered, methods used to obtain the information and evidence, the manner in which information is organized, the methods used to analyze the information and evidence, witnesses, including victim-witnesses and subjects of the investigation, and the focus of an investigation." *Id.* "Release of the entirety of the records at issue in this litigation [would] allow Maxwell earlier or greater access to agency investigatory files than she otherwise would have through the criminal discovery process." *Id.* ¶ 13. Exemption 7(A) was enacted precisely to prevent such an end run around the rules governing criminal discovery. *Robbins Tire*, 437 U.S. at 224.

Additionally, the Comey Declaration details how the release of the withheld information could impede the upcoming criminal trial by influencing witness testimony. The records "include information about which witnesses may be expected to testify at trial, include details that are not publicly known or known to other witnesses, and include information and documents authored by potential trial witnesses." Comey Decl. ¶ 15. These records also include "potential trial exhibits that the government anticipates will be entered into evidence, many of which the potential trial witnesses have not seen." *Id.* The records also include information prosecutors obtained pursuant to grand jury subpoenas. *Id.* ¶ 19. The premature release of these materials

could allow “witnesses to shape their testimony to conform with other evidence gathered during the investigation.” *Id.* ¶ 13. It would allow witnesses to “consider specific evidence and the volume of evidence prior to trial, which [also] may influence their testimony.” *Id.* ¶ 14. This type of harm is a cognizable basis to withhold records under Exemption 7(A). *Journalism Ctr. v. Office of Indep. Counsel*, 926 F. Supp. 189, 192 (D.D.C.1996) (Exemption 7(A) applies where “[w]itnesses with access to such information could easily alter, conform or construct their testimony depending upon the information disclosed”).

Finally, the release of these categories of records could reasonably be expected to impair the ability to seat a fair and impartial jury in the *Maxwell* trial. Comey Decl. ¶¶ 17-18. Premature public disclosure of potential trial exhibits and witness statements “could reasonably be expected to influence potential juror’s perception of the witnesses and the evidence to be presented at trial.” *Id.* ¶ 17. And potential jurors’ consideration of records that will not be presented at trial “may impact the consideration jurors give to the actual evidence.” Such potential harms are more than sufficient “to trace a rational link between the nature of the document and the alleged likely interference” with the pending criminal trial. *NY Times*, 2016 WL 5946711, at *7.

As the Comey Declaration logically and plausibly articulates the manner in which release of the withheld information could reasonably be expected to impede a pending criminal trial, the FBI has met its burden of establishing the applicability of Exemption 7(A).

**C. The FBI’s Assertion of Exemption 7(A) Was Timely**

Plaintiffs have suggested that the FBI did not timely assert Exemption 7(A) over records that were processed prior to Epstein’s arrest and withheld under other FOIA exemptions, because the FBI did not identify Exemption 7(A) as a basis for withholding at the time those records were processed. But FOIA exemptions are not waived simply because they were not identified in initial

rounds of processing. An agency is only required to identify all exemptions at issue prior to the conclusion of the district court proceedings. *Curcio v. FBI*, No. 89-0941, 1990 WL 179605, *3 (D.D.C. Nov. 2, 1990). Following Epstein's arrest, while it was still in the midst of processing responsive records, the FBI determined that the previously-withheld information was also exempt under Exemption 7(A), and promptly notified the plaintiffs of its assertion of the additional exemption. And the FBI asserted Exemption 7(A) over all such information in this summary judgment motion and in its *Vaughn* index. Seidel Decl., Ex. EE.

So long as the FBI asserts all exemptions during the course of the district court proceedings, as it did here, it has not waived the exemption. *See, e.g.*, *Heffernan v. Azar*, 317 F. Supp. 3d 94, 119 n.14 (D.D.C. 2018) (holding that the agency did not waive exemptions asserted for the first time in the government's reply submission, as it was asserted before summary judgment was complete and before appellate review); *EPIC v. Dep't of Justice*, 296 F. Supp. 3d 109, 122 (D.D.C. 2017) ("[T]he document production process is a fluid one at the district court level, and it often includes contemporaneous review and continuous production determinations by agency-defendants. Thus . . . the government is entitled to articulate fully all of the justifications for withholdings that it makes prior to the Court's ruling on summary judgment . . . ."); *Adamowicz v. IRS*, 552 F. Supp. 2d 355, 361 n.2 (S.D.N.Y. Mar. 31, 2008) ("[W]hile 'an agency may waive the right to raise certain exemptions if it fails to raise them prior to the district court ruling in favor of the other party' . . . . the failure to raise an exemption prior to an adverse determination does not give rise to waiver." (citation omitted)).

The assertion of Exemption 7(A) over the previously-processed records following Epstein's arrest is also timely because of changed factual circumstances, specifically Epstein's indictment and his anticipated criminal trial. A "substantial change in the factual context of the case" can be a

permissible basis for an agency to assert a FOIA exemption for the first time even when district court proceedings are concluded and a case is on appeal, which is the time when the assertion of new exemptions is generally prohibited. *See Senate of the Com. of Puerto Rico v. U.S. Dep't of Justice*, 823 F.2d 574, 581 (D.C. Cir. 1987). That the FBI determined that Exemption 7(A) was applicable after the commencement of a new criminal case against Epstein does not demonstrate bad faith or gamesmanship by the government, but was due instead to a significant change in circumstances. The FBI therefore properly asserted Exemption 7(A) with respect to all withheld materials, including those that were processed prior to Epstein's arrest.

## VI. The FBI Properly Withheld Responsive Records and Information Under Additional Exemptions

As all of the information at issue was properly withheld under Exemption 7(A), the Court need not reach the applicability of other exemptions. Yet to the extent the Court deems it necessary to reach this issue, as detailed in the Seidel Declaration and the accompanying *Vaughn* index, much of the withheld information is also properly withheld under FOIA Exemptions 3, 5, 6, 7(C), 7(D), and 7(E).[4]

### A. The FBI Properly Withheld Information Pursuant to FOIA Exemption 3

FOIA Exemption 3 applies to records "specifically exempted from disclosure by statute,"

---

[4] Unlike the documents processed prior to Epstein's arrest, which are described in the FBI's *Vaughn* index, the documents processed after Epstein's arrest were categorically withheld under Exemption 7(A). As noted above, no *Vaughn* index is required for records withheld categorically under Exemption 7(A). Moreover, the FBI cannot reveal the volume and precise nature of such documents without thereby revealing information protected by Exemption 7(A). However, the FBI has reviewed the records categorically withheld and determined that they also contain information protected from disclosure under FOIA Exemptions 3, 5, 6, 7(C), 7(D), and 7(E). The FBI is therefore asserting those exemptions to protect information in the categorically-withheld documents, as well as in the documents described on the *Vaughn* index. Should the Court find that Exemption 7(A) does not apply to the categorically-withheld records and that further information is necessary to adjudicate the FBI's assertion of additional exemptions with respect to these records, the FBI can provide such further detail.

provided that the statute "requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue." 5 U.S.C. § 552(b)(3). In evaluating an agency's invocation of FOIA Exemption 3, courts must consider whether the statute identified by the agency is a statute of exemption as contemplated by Exemption 3, and second, whether the withheld material satisfies the criteria of the exemption statute. *CIA v. Sims*, 471 U.S. 159, 167 (1985). Exemption 3 differs from other FOIA exemptions in that its applicability depends less on the detailed factual contents of specific documents; the sole issue for decision is the existence of a relevant statute and the inclusion of withheld material within the statute's coverage. *Ass'n of Retired R.R. Workers v. U.S. R.R. Retirement Bd.*, 830 F.2d 331, 336 (D.C. Cir. 1987).

In invoking Exemption 3, the FBI relies on three statutes that preclude disclosure of the documents sought by Radar Online. First, the Child Victims' and Child Witnesses' Rights Act, 18 U.S.C. § 3509, "qualifies as an Exemption 3 withholding statute," *Rodriguez v. U.S. Dep't of Army*, 31 F. Supp. 3d 218, 237 (D.D.C. 2014), and prohibits disclosure of "the name or any other information concerning a child" victim of crime, 18 U.S.C. § 3509(d)(1)(A)(i). This statute justifies the FBI's withholding of information relating to minor children victims and witnesses as part of the child prostitution investigation of Epstein. Seidel Decl. ¶ 49.

Second, the FBI's withholding of the grand jury materials plainly falls under Rule 6(e)'s shield of "matters occurring before the grand jury." Fed. R. Crim. P. 6(e). Rule 6(e) is treated as a statute for purposes of Exemption 3 "because the Congress has enacted it into positive law." *Murphy v. Exec. Office for U.S. Attorneys*, 789 F.3d 204, 206 (D.C. Cir. 2015); *see Local 32B–32J, Serv. Emps. Int'l Union, AFL–CIO v. GSA*, 1998 WL 726000, at *6 (S.D.N.Y. October 15, 1998) ("It is well established that [Fed. R. Crim. P. 6(e)], which imposes a general requirement of secrecy for information relating to the grand jury process, qualifies as an Exemption 3

withholding statute.”). “The purpose of grand jury secrecy, as enshrined in Rule 6(e), is to ensure the proper functioning of the grand jury system.” *N.Y. Times v. USDOJ*, 235 F. Supp. 2d 522, 530 (S.D.N.Y. 2017). In the Second Circuit, the relevant inquiry is whether the information at issue “may tend to reveal what transpired before” the grand jury. *United States v. Eastern Air Lines, Inc.*, 923 F.2d 241, 244 (2d Cir. 1991); *see also Lopez v. Dep’t of Justice*, 393 F.3d 1345, 1349 (D.C. Cir. 2005).

Here, the FBI properly withheld grand jury subpoenas under Exemption 3. *Lopez*, 393 F.3d at 1350 (“All grand jury subpoenas . . . fall within FOIA’s third exemption.”). Records revealing the names of recipients of federal grand jury subpoenas and the specific records subpoenaed by a federal grand jury, as well as copies of specific records provided pursuant to federal grand jury subpoenas, also tend to reveal the scope of the grand jury’s investigation, and therefore fall within the ambit of Rule 6(e). Seidel Decl. ¶ 50; *see Peltier v. FBI*, 218 Fed. App’x 30, 32 (2d Cir. 2007) (affirming withholding of grand jury subpoenas, materials and information, and dates of grand jury testimony under Rule 6(e)); *In re Grand Jury Proceedings*, 851 F.2d 860, 866 (6th Cir. 1988) (holding that the “general rule” is that documents obtained by grand jury subpoena are protected under Rule 6(e).

Third, the FBI’s reliance on the Juvenile Justice and Delinquency Act, 18 U.S.C. § 5038, is also appropriate under Exemption 3. The Juvenile Justice and Delinquency Act, 18 U.S.C. § 5038, protects from disclosure all information and records relating to any juvenile delinquency proceeding, unless the release is necessary to meet certain circumstances described within the statute. Here, the FBI withheld records that contain arrest information and criminal history of third party juveniles, which falls within ambit of the Juvenile Justice and Delinquency Act. Seidel Decl. ¶ 51.

**B. FBI Properly Withheld Information Pursuant to FOIA Exemption 5**

Exemption 5 of FOIA exempts from disclosure "[a]gency documents which would not be obtainable by a private litigant in an action against the agency under normal discovery rules (e.g., attorney-client, work-product, executive privilege)." *Grand Cent. Partnership, Inc. v. Cuomo*, 166 F.3d 473 (2d Cir. 1999) (citation omitted); *see also Dep't of Interior v. Klamath Water Users Protective Ass'n v.* , 532 U.S. 1, 8 (2001). The attorney work product privilege protects documents and other memoranda prepared by an attorney in anticipation of litigation, *see Hickman v. Taylor*, 329 U.S. 495, 509-10 (1947), and is designed "to avoid chilling attorneys in developing materials to aid them in giving legal advice and in preparing a case for trial." *John Doe Corp. v. United States*, 675 F.2d 482, 492 (2d Cir. 1982). The attorney work product doctrine exempts from disclosure "mental impressions, conclusions, opinions, or legal theories of an attorney or other representative of a party concerning the litigation." Fed. R. Civ. P. 26(b)(3). Without such protection, an entity would have to choose between protecting its litigation prospects by "scrimp[ing] on candor and completeness," or prejudicing its litigation prospects, by disclosing "assessment of its strengths and weakness . . . to litigation adversaries." *United States v. Adlman*, 134 F.3d 1194, 1200 (2d Cir. 1998).

The privilege sweeps very broadly. It includes within its scope "factual material, including the result of a factual investigation." *In re Grand Jury Subpoena Dated July 5, 2005*, 510 F.3d 180, 183 (2d Cir. 2007). It encompasses both civil and criminal matters. Indeed, although "the work-product doctrine most frequently is asserted as a bar to discovery in civil litigation, its role in assuring the proper functioning of the criminal justice system is even more vital. The interests of society and the accused in obtaining a fair and accurate resolution of the question of guilt or innocence demand that adequate safeguards assure the thorough preparation

and presentation of each side of the case." *United States v. Nobles*, 422 U.S. 225, (1975). The work product privilege applies with equal force to documents prepared by investigators acting at the direction of attorneys. *See Nobles*, 422 U.S. at 238-39 (holding that work product "protect[s] material prepared by agents for the attorney as well as those prepared by the attorney himself"); *In re Grand Jury Subpoena Dated Oct. 22, 2001*, 282 F.3d 156, 161 (2d Cir. 2002) ("[T]he work product privilege applies to preparation not only by lawyers but also [by] investigators seeking factual information.").

The FBI has withheld five memoranda under Exemption 5. Seidel Decl. ¶ 54. Four of the memoranda are internal FBI documents that describe actions being taken by the FBI, at the direction an AUSA, to gather evidence for the potential prosecution of Epstein and his associates or in connection with potential civil forfeiture proceedings regarding Epstein's assets. *Id.* One memorandum is from an FBI investigator to an AUSA, relating to the value of asset owned by Epstein, that was gathered at the AUSA's behest in connection with the potential prosecution and forfeiture proceedings. *Id.*

Here, the Assistant United States Attorney involved in the prosecution of Epstein directed the FBI to gather information relating to his assets, and the documents at issue were prepared while the government was conducting an investigation that was reasonably expected to result in an indictment and/or civil forfeiture proceedings. *Id.*; *see Nobles*, 422 U.S. at 238 (lawyers "rel[ied] on the assistance of investigators and other agents in the compilation of materials in preparation for trial" so that those materials share the protections of attorney work product). The fact that Epstein was later indicted in the Southern District of Florida demonstrates that these documents were prepared or gathered in anticipation of litigation. Furthermore, the Seidel Declaration explains how disclosure this information would interfere with the government attorney's ability to properly

prepare their legal strategies and gather evidence. Seidel Decl. ¶ 54.

### C. FBI Properly Withheld Information Pursuant to FOIA Exemptions 6 and 7(C)

Exemption 6 protects from disclosure "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6). The statutory language concerning files "similar" to personnel or medical files encompasses any "information which applies to a particular individual . . . sought from government records." *U.S. Dep't of State v. Washington Post Co.*, 456 U.S. 595, 602 (1982). Under Exemption 6, a court considers whether the "public interest in disclosure outweighs the individual privacy concerns." *Nat'l Assoc. of Homebuilders v. Norton*, 309 F.3d 26, 35 (D.C. Cir. 2002) (internal quotation marks omitted). But the "only relevant public interest in disclosure to be weighed in this balance is the extent to which disclosure would . . . contribut[e] significantly to public understanding *of the operations oractivities of the government*." *DOD v. FLRA*, 510 U.S. 487, 495 (1994).

Even more protective of privacy interests, Exemption 7(C), 5 U.S.C. § 552(b)(7)(C), exempts from disclosure records or information compiled for law enforcement purposes where its production "could reasonably be expected to constitute an unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(7)(C). Under Exemption 7(C), a court again "balance[s] the public interest in disclosure against the [privacy] interest." *Associated Press v. U.S. Dep't of Defense*, 554 F.3d 274, 284 (2d Cir. 2009). In this analysis, "[t]here is only one relevant public interest, that of opening agency action to the light of public scrutiny." *Id.* at 284 (quotation marks and brackets omitted). "The [FOIA requester] must show that the public interest sought to be advanced is a significant one, an interest more specific than having the information for its own sake and . . . must also show the information is likely to advance that interest." *Id.*

The information withheld under Exemptions 6 and 7(C) directly implicates the privacy interests of third parties, including the names of third parties who were of investigative interest to the FBI, identifying information regarding third party victims, identifying information of third party witnesses, including confidential informants, names of FBI special agents and victim specialists, names of local law enforcement personnel, and names of local government personnel. Seidel Decl. ¶¶ 73-83. As described in the *Vaughn* index, documents that fall within these exemptions include witness statements containing intimate details relating to third parties, phone logs, private social media information, photographs, law enforcement records, and flight logs. Seidel Decl. Ex. EE.

All of these individuals have strong privacy interests that are protected by FOIA exemptions. "[A]n individual has a general privacy interest in preventing dissemination of his or her name and home address." *Federal Labor Relations Auth. v. U.S. Dep't of Veterans Affairs*, 958 F.2d 503, 510 (2d Cir. 1992). "That privacy interest also extends to third parties who may be mentioned in investigatory files, as well as to witnesses and informants who provided information during the course of an investigation." *Nation Magazine v. U.S. Customs Serv*., 71 F.3d 885, 894 (D.C. Cir. 1995).

Similarly, third parties who were of investigative interest to the FBI "have a cognizable privacy interest protected by the FOIA privacy exemptions." *Perlman v. United States Dep't of Justice*, 312 F.3d 100, 106 (2d Cir. 2002) (finding that witnesses and third parties to an INS report of investigation "possess strong privacy interests, because being identified as part of a law enforcement investigation could subject them to 'embarrassment and harassment'"). In fact, the privacy interests of third parties are "perhaps even stronger" because "the material in question demonstrates or suggests that they had at one time been subject to criminal investigation." *Halpern*, 181 F.3d at 297. Disclosing personal information about these individuals could result in

negative professional and social repercussions, and subject them to harassment or embarrassment. Seidel Decl. ¶ 73,

It is also well-established that cooperating witnesses, some of whom provided information under an assurance of confidentiality, have a substantial interest in insuring that their relationship to an investigation remains secret. *Roth v. United States Dep't of Justice*, 642 F. 3d 1161, 1173 (D.C. Cir. 2011). Exposing the identity of these individuals would have a grave impact on FBI investigations, as the FBI has obtained information in confidence, and release of these records will prevent such cooperating individuals from honestly relating pertinent facts on an investigation. Seidel Decl.¶ 82. Additionally, such exposure could lead to the harassment, intimidation, legal or economic detriment or harm of these individuals. *Id.*

Further, government investigative personnel, local law enforcement and other government employees have legitimate privacy interests in the protection of their names as associated with a high-profile criminal investigation. *See, e.g.*, *Thompson v. DOJ*, 851 F. Supp. 2d 89, 99 (D.D.C. 2012) (protecting the names of and identifying information about FBI Special Agents and support personnel, third parties with investigative interest to the FBI, third parties merely mentioned in documents related to the FBI's criminal investigation of plaintiff, local law enforcement officers, and third parties interviewed by the FBI during the investigation); *Lasko v. DOJ*, 684 F. Supp. 2d 120, 133 (D.D.C. 2010) (protecting the identities of DEA Special Agents and state and local law enforcement officers), aff'd per curiam, No. 10–5068, 2010 WL 3521595, at *1 (D.C. Cir. Sept. 3, 2010); *Richardson v. DOJ*, 730 F. Supp. 2d 225, 236 (D.D.C. 2010) ("[T]he EOUSA properly [withheld] the identities of and personal information about all the third parties mentioned in the records responsive to plaintiff's FOIA request, whether or not these third parties are law enforcement officers or support personnel."). These individuals may be subject to harassment or embarrassment if their identities are disclosed," and this interest "raises a measurable privacy

concern that must be weighed against the public's interest in disclosure." *Wood v. FBI*, 432 F. 3d 78, 88 (2d Cir. 2005); *Halpern*, 181 F.3d at 297 (holding that FBI agents and other government employees have an interest against the disclosure of their identities to the extent that disclosure might subject them to embarrassment or harassment in their official duties or personal lives); *Garcia v. U.S. Dep't of Justice*, 181 F. Supp. 2d 356, 373-74 (S.D.N.Y. 2002) (finding identities of FBI investigators not significantly probative of agency conduct).

On the other side of the scale, "[t]he only relevant public interest in the FOIA balancing analysis is the extent to which disclosure of the information sought would shed light on an agency's performance of its statutory duties or otherwise let citizens know what their government is up to." *Bibles v. Or. Natural Desert Assoc.*, 519 U.S. 355, 355-56 (1997) (quotation marks and citations omitted). The disclosure of the identifying information of these individuals would not shed any additional light on Government conduct, *see Associated Press*, 554 F.3d at 288-89, and thus the information was properly withheld under Exemption 6 and 7(C).

### D. FBI Properly Withheld Records and Information Pursuant to FOIA Exemption 7(D)

Exemption 7(D) exempts from disclosure agency records "compiled for law enforcement purposes . . . by criminal law enforcement authority in the course of a criminal investigation" if release of those records "could reasonably be expected to disclose" the identity of, or information provided by, a "confidential source." 5 U.S.C. § 552(b)(7)(D); *see also U.S. Dep't of Justice v. Landano*, 508 U.S. 165, 171 (1993). "[A] source is confidential within the meaning of Exemption 7(D) if the source 'provided information under an express assurance of confidentiality or in circumstances from which such an assurance could be reasonably inferred.'" *Landano*, 508 U.S. at 165. The promised confidentiality can only be waived by the source.

*Adamowicz v. IRS*, 402 Fed. App'x 648, 653 (2d Cir. 2010); *see also Ferguson v. FBI*, 957 F.2d 1059, 1068 (2d Cir. 1992) ("[W]e reject the idea that subsequent disclosures of the identity of a confidential source . . . requires full disclosure of information provided by such a source."). Further, the status of the investigation does not change the applicability of this exemption. *Diamond v. FBI*, 707 F.2d 75, 76–77 (2d Cir. 1983) (documents do not lose their 7(D) exemption due to the passage of time).

Here, the FBI withheld the names and identifying information of confidential sources, as well as the information they provided under express or implied assurances of confidentiality. Seidel Decl. ¶¶ 87-91. These sources are considered to be confidential because they furnish information only with the understanding that their identities and the information they provided will not be divulged outside the FBI. Seidel Decl. ¶¶ 87, 91. Information provided by these sources is singular in nature, and if released, could reasonably be expected to reveal their identities. Seidel Decl. ¶ 87. Revealing such information would dissuade individuals from speaking freely with the FBI. *Id.* In addition, release of these records would have a chilling effect on other witnesses, potentially cause the source harm or subject them to retaliation, and hamper law enforcement efforts to detect and prevent criminal activity. Seidel Decl. ¶ 91. This is especially so where, as here, the investigation concerns a highly publicized and powerful individual and the intimate personal details of young or vulnerable individuals. Sources providing information to the FBI should be secure in the knowledge that their assistance and their identities will be held in confidence. *Id.* Accordingly, this Court should uphold the FBI's assertion of Exemption 7(D) to protect the identities and information provided by confidential sources.

**E. The FBI Properly Withheld Records and Information Pursuant to FOIA Exemption 7(E)**

Exemption 7(E) exempts from disclosure law enforcement records where release "would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law." 5 U.S.C. § 522 (b)(7)(E). In order to invoke Exemption 7(E), the Government must make a "threshold showing 'that the materials be records or information compiled for law enforcement purposes.'" *Brennan Ctr. v. Dep't of Homeland Sec*., 331 F. Supp. 3d at 97 (quoting *John Doe Agency v. John Doe Corp.*, 493 U.S. 146, 148 (1989)).

Law enforcement "techniques and procedures" encompass "how law enforcement officials go about investigating a crime." *Allard K. Lowenstein Int'l Human Rights Project v. Dep't of Homeland Sec.*, 626 F.3d 678, 680-81 (2d Cir. 2010). The FBI is not required to show that the disclosure of information regarding the "techniques and procedures" in question could reasonably be expected to risk circumvention of law a result of disclosure. *See id.* at 681. Such information is "categorically exempt from FOIA disclosure 'without need for 'demonstration of harm.'" *Iraqui Refugee Assistance Project v. U.S. D.H.S.*, 12-cv-3461 (PKC), 2017 WL 1155898, at *5 (S.D.N.Y. Mar. 27, 2017) (quoting *Lowenstein*, 626 F.3d at 681). While Exemption 7(E) generally covers only "investigatory records that disclose investigative techniques and procedures not generally known to the public," *Doherty v. U.S. Dep't of Justice*, 775 F.2d 49, 52 n.4 (2d Cir. 1985), "even commonly known procedures may be protected from disclosure if the disclosure could reduce or nullify their effectiveness," *Judicial Watch, Inc. v. U.S. Dep't of Commerce*, 337 F. Supp. 2d 146, 181 (D.D.C. 2004); *see also Freedom of Press Found. V. Dep't of Justice*, 493 F. Supp. 3d 251, 271-72 (S.D.N.Y. 2020) (holding that, even if public knows of general existence of a technique

Case 1:20-cv-03395-EGS Document 27-3 Filed 10/29/21 Page 31 of 83

or procedure, Exemption 7(E) protects the details of how such techniques and procedures are used in particular cases). Exemption 7(E) sets a "low bar for the agency to justify withholding," *Blackwell v. FBI*, 646 F.3d 37, 42 (D.C. Cir. 2011).

The FBI has invoked Exemption 7(E) to withhold seven categories of information: (1) collection and analysis of information that would reveal investigative techniques; (2) sensitive file numbers; (3) the dates and types of investigations, such as "preliminary" or "full", (4) the target, dates and scope of surveillance, (5) information located within the FBI's FD-515 forms used to report investigative accomplishments, such as an arrest; (6) database identifiers or printouts; and (7) monetary payments or funding needed for investigative purposes. The Seidel Declaration explains how each of these categories of information pertains to "how law enforcement officials go about investigating a crime." *Lowenstein*, 626 F.3d at 682; *see* Seidel Decl. ¶¶ 98-112. Although not required to do so, the FBI has also described for each category how release of such information could reasonably be expected to create a risk of circumvention of the law. *Id.*

Courts have been unequivocal that information from the type of databases described in the Seidel declaration fall squarely within Exemption 7(E). *See, e.g., Lowenstein*, 626 F.3d at 682 ("[F]ocusing on [particular] targets constitutes a 'technique or procedure.'"); *Gonzalez v. USCIS*, 475 F. Supp. 3d 334, 352 (S.D.N.Y. 2020) (affirming withholdings under Exemption 7(E) for identification codes, law enforcement event numbers, law enforcement case numbers and categories, FBI numbers and URLs for internal law enforcement database web addressed); *Shapiro v. DOJ*, -- F. Supp. 3d --, 2017 WL 908179, at *11 (D.D.C. Mar. 6, 2017) (holding that sensitive case file numbers are not merely administrative, but serve a law enforcement purpose and disclosure risks circumvention of law); *Ford v. DOJ*, 208 F. Supp. 3d 237, 253 (D.D.C. 2016) (information related to dates and types of FBI investigations, including whether they are

full or preliminary in nature, as well as internal email addresses and intranet information, properly exempted); *Levinthal v. Fed. Election Comm'n*, 219 F. Supp. 3d 1, 8 (D.D.C. 2016) (citing cases holding that "information connected to law enforcement databases," including metadata and codes facilitating access, navigation, and data retrieval, "qualifies for exemption under 7(E)"). Other information implicated by the Request, such as details concerning when and how the FBI utilizes surveillance tactics and devices, is also squarely protected by the exemption. *See McCoy v. Moschella*, 1991 WL 212208, at *5 (D.D.C. Sept. 30, 1991) (disclosure "would permit a sophisticated requester . . . to avoid specific identifying patterns of activity, thus making the FBI's task of identifying logical subjects more difficult"). The FBI therefore meets the "low bar" for justifying its withholdings under Exemption 7(E). *Blackwell,* 646 F.3d at 42.

## VII. FBI Has Satisfied Its Duty to Segregate and Release Any Non-ExemptInformation

FOIA requires that "[a]ny reasonably segregable portion of a record shall be provided to any person requesting such record after deletion of the portions which are exempt under this subsection." 5 U.S.C. § 552(b). "An agency withholding documents under Exemption 7(A) does not need to justify its segregability determination document by document, as the exemption allows agencies to justify withholding based on categories of documents." *New York Times v. United States Dep't of Justice*, 390 F. Supp. 3d 499, 518-19 (S.D.N.Y. 2019). Instead, the government satisfies its obligation by explaining why the categories of records do not contain reasonably segregable non-exempt information. *Robbins, Geller, Rudman & Dowd, LLP v. United States Sec. & Exch. Comm'n*, No. 3:14-CV-2197, 2016 WL 950995, at *9 (M.D. Tenn. Mar. 12, 2016).

Moreover, nonexempt portions of documents may "be withheld if they are inextricably intertwined with the exempt portions." *Conti v. U.S. Dep't of Homeland Sec.*, No. 12 Civ. 5827

(AT), 2014 WL 1274517, at *25 (S.D.N.Y. Mar. 24, 2014) (quotation marks omitted). "The agency is entitled to a presumption that it complied with its obligation to disclose reasonablysegregable material." *Id*.

In the present case, FBI has already produced 1,232 pages of records, with appropriate redactions, in response to the Radar Online's FOIA requests. Seidel Decl. ¶ 114. The records withheld in full by FBI do not contain any reasonably segregable non-exempt information. *Id.* With regard to the records withheld in full under Exemption 7(A), the Comey Declaration explains why each category of records is exempt from disclosure, and further states that, to the extent there is non-exempt information contained in the records withheld under Exemption 7(A), that information is intertwined with exempt information and cannot reasonably be segregated without risking interference with the Maxwell prosecution. Comey Decl. ¶ 23. The public speculation and unfounded theories about Maxwell's involvement make segregation particularly difficult because the provision of information related to Epstein without complete context risks compounding the unfounded speculation. As to the remaining records withheld in full, either the records are privileged in their entirety or any non-exempt information in the documents is inextricably intertwined with exempt information, such that segregating any non-exempt information would be of little to no informational value. *See* Seidel Decl. ¶ 47. Accordingly, FBI has satisfied its obligation to reasonably segregate any non-exempt portions of the records withheld in full.

## CONCLUSION

For the foregoing reasons, the Court should grant the government's motion for summary judgment.

# 59 (e) EX 91

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 4/16/21

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

United States of America,

–v–

Ghislaine Maxwell,

Defendant.

20-cr-330 (AJN)

OPINION & ORDER

ALISON J. NATHAN, District Judge:

In June 2020, a grand jury returned a six-count indictment charging Ghislaine Maxwell with facilitating the late financier Jeffrey Epstein's sexual abuse of minor victims from around 1994 to 1997. The Government filed a first (S1) superseding indictment shortly thereafter, which contained only small, ministerial corrections. The S1 superseding indictment included two counts of enticement or transportation of minors to engage in illegal sex acts in violation of the Mann Act and two counts of conspiracy to commit those offenses. It also included two counts of perjury in connection with Maxwell's testimony in a civil deposition. Trial is set to begin on July 12, 2021.

Maxwell filed twelve pretrial motions seeking to dismiss portions of the S1 superseding indictment, suppress evidence, and compel discovery. After the parties fully briefed those motions, a grand jury returned a second (S2) superseding indictment adding a sex trafficking count and another related conspiracy count.

This Opinion resolves all of Maxwell's currently pending pretrial motions other than those seeking to suppress evidence, which the Court will resolve in due course. The motions, and this Opinion, deal exclusively with the S1 superseding indictment and do not resolve any issues

related to the newly added sex trafficking charges. For the reasons that follow, the Court denies Maxwell's motions to dismiss the S1 superseding indictment in whole or in part. It grants her motion to sever the perjury charges for a separate trial. It denies her motion to further expedite discovery.

The Court provides a brief summary of its conclusions here and its reasoning on the pages that follow:

- Maxwell moves to dismiss all counts based on a non-prosecution agreement between Jeffrey Epstein and the U.S. Attorney for the Southern District of Florida. The Court concludes that the agreement does not apply in this District or to the charged offenses.
- Maxwell moves to dismiss all counts as untimely. The Court concludes that the Government brought the charges within the statute of limitations and did not unfairly delay in bringing them.
- Maxwell moves to dismiss the Mann Act counts because they are too vague, or in the alternative to require the Government to describe the charges in greater detail. The Court concludes that the charges are specific enough.
- Maxwell moves to dismiss the perjury counts because, in her view, her testimony responded to ambiguous questioning and was not material. The Court concludes that these issues are best left for the jury.
- Maxwell moves to sever the perjury counts from the Mann Act counts so that they can proceed in a separate trial. The Court concludes that severance is appropriate and will try the perjury counts separately.
- Maxwell moves to strike language from the indictment that she believes is superfluous and to dismiss conspiracy counts she believes are redundant. The Court concludes that these motions are premature before trial.
- Maxwell moves to compel the Government to immediately disclose certain categories of evidence. The Court concludes that she is not entitled to do so, but the Court will order Maxwell and the Government to confer on a discovery schedule.
- Maxwell moves to dismiss all counts because a grand jury in White Plains, rather than Manhattan, returned the S1 superseding indictment. Because a jury in Manhattan returned the S2 superseding indictment, the motion appears moot.

**I. Jeffrey Epstein's non-prosecution agreement does not bar this prosecution**

In September 2007, under investigation by both federal and state authorities, Jeffrey Epstein entered into a non-prosecution agreement ("NPA") with the Office of the United States Attorney for the Southern District of Florida. Dkt. No. 142 at 1-2. Epstein agreed in the NPA to plead guilty in Florida state court to soliciting minors for prostitution and to serve eighteen months in a county jail. *Id.* In exchange, the U.S. Attorney's Office agreed not to charge him with federal crimes in the Southern District of Florida stemming from its investigation of his conduct between 2001 and 2007. *Id.* It also agreed not to bring criminal charges against any of his "potential co-conspirators." *Id.*

As a recent report from the Department of Justice's Office of Professional Responsibility observed, the NPA was unusual in many respects, including its breadth, leniency, and secrecy. OPR Report, Gov. Ex. 3, Dkt. No. 204-3, at x, 80, 175, 179, 260–61. The U.S. Attorney's promise not to prosecute unidentified co-conspirators marks a stark departure from normal practice for federal plea agreements. This provision appears to have been added "with little discussion or consideration by the prosecutors." *Id.* at 169, 185. The report concluded that the U.S. Attorney's negotiation and approval of the NPA did not amount to professional misconduct, but nonetheless reflected "poor judgment." *Id.* at 169.

Only the NPA's effect, and not its wisdom, is presently before the Court. Maxwell contends that the NPA bars this prosecution, because she is charged as a co-conspirator of Jeffrey Epstein and the NPA's co-conspirator provision lacks any geographical or temporal limitations. The Court disagrees for two independent reasons. First, under controlling Second Circuit precedent, the NPA does not bind the U.S. Attorney for the Southern District of New York. Second, it does not cover the offenses charged in the S1 superseding indictment.

**A. The non-prosecution agreement does not bind the U.S. Attorney for the Southern District of New York**

United States Attorneys speak for the United States. When a U.S. Attorney makes a promise as part of a plea bargain, both contract principles and due process require the federal government to fulfill it. *See Santobello v. New York*, 404 U.S. 257, 262 (1971); *United States v. Ready*, 82 F.3d 551, 558 (2d Cir. 1996). The question here is not whether the U.S. Attorney for the Southern District of Florida had the power to bind the U.S. Attorney for the Southern District of New York. The question is whether the terms of the NPA did so. Applying Second Circuit precedent and principles of contract interpretation, the Court concludes that they did not.

In *United States v. Annabi*, the Second Circuit held: "A plea agreement binds only the office of the United States Attorney for the district in which the plea is entered unless it affirmatively appears that the agreement contemplates a broader restriction." 771 F.2d 670, 672 (2d Cir. 1985) (per curiam). This is something akin to a clear statement rule. Single-district plea agreements are the norm. Nationwide, unlimited agreements are the rare exception. Applying *Annabi,* panels of the Second Circuit have stated that courts cannot infer intent to depart from this ordinary practice from an agreement's use of phrases like "the government" or "the United States." *United States v. Salameh*, 152 F.3d 88, 120 (2d Cir. 1998) (per curiam); *United States v. Gonzalez*, 93 F. App'x 268, 270 (2d Cir. 2004). Those are common shorthand. A plea agreement need not painstakingly spell out "the Office of the United States Attorney for Such-and-Such District" in every instance to make clear that it applies only in the district where signed.

Maxwell asks this Court to draw the opposite conclusion. The provision of the NPA dealing with co-conspirators does not expressly state that it binds U.S. Attorneys in other districts. It does not expressly state that it applies in other districts. The relevant language, in

its entirety, reads as follows: "the United States also agrees that it will not institute any criminal charges against any potential co-conspirators of Epstein." Dkt. No. 142-1 at 5. Under *Annabi, Salameh, and Gonzalez*, a statement that "the United States" agrees not to prosecute implies no restriction on prosecutions in other districts.

Two provisions of the NPA refer specifically to prosecution in the Southern District of Florida. The first states that the U.S. Attorney for the Southern District of Florida will defer "prosecution in this District" if Epstein complies with the agreement. Dkt. No. 142-1 at 2. The second states that no prosecution "will be instituted in this District, and the charges against Epstein if any, will be dismissed" after he fulfills the agreement's conditions. Maxwell contends that the lack of similar language in the co-conspirator provision must mean that it lacks any geographical limitation. If anything, that language reflects that the NPA's scope was expressly limited to the Southern District of Florida. It is not plausible—let alone "affirmatively apparent", *Annabi*, 771 F.2d at 672,—that the parties intended to drastically expand the agreement's geographic scope in the single sentence on the prosecution of co-conspirators without clearly so saying.

Without an affirmative statement in the NPA's text, Maxwell turns to its negotiation history. Under Second Circuit precedent she may offer evidence that negotiations of the NPA between the defendant and the prosecutors included a promise to bind other districts. *See United States v. Russo*, 801 F.2d 624, 626 (2d Cir. 1986). She alleges that officials in the U.S. Attorney's Office for the Southern District of Florida sought and obtained approval for the NPA from the Office of the Deputy Attorney General and communicated with attorneys in other districts. Any involvement of attorneys outside the Southern District of Florida appears to have been minimal. Maxwell has already received access to an unusually large amount of information

about the NPA's negotiation history in the form of the OPR report and yet identifies no evidence that the Department of Justice made any promises not contained in the NPA. The OPR report reflects that the Office of the Deputy Attorney General reviewed the NPA, but only after it was signed when Epstein tried to get out of it. OPR Report at 103. Other documents show that attorneys in the Southern District of Florida reached out to other districts for investigatory assistance but not for help negotiating the NPA. Dkt. No. 204-2. Nor would direct approval of the NPA by the Office of the Deputy Attorney General change the meaning of its terms. No evidence suggests anyone promised Epstein that the NPA would bar the prosecution of his co-conspirators in other districts. Absent such a promise, it does not matter who did or did not approve it.

Second Circuit precedent creates a strong presumption that a plea agreement binds only the U.S. Attorney's office for the district where it was signed. Maxwell identifies nothing in the NPA's text or negotiation history to disturb this presumption. The Court thus concludes that the NPA does not bind the U.S. Attorney for the Southern District of New York.

**B. The non-prosecution agreement does not cover the charged offenses**

The NPA would provide Maxwell no defense to the charges in the S1 superseding indictment even against an office bound to follow it. The NPA bars prosecution, following Epstein's fulfillment of its conditions, only for three specific categories of offenses:

> (1) "the offenses set out on pages 1 and 2" of the NPA; namely, "any offenses that may have been committed by Epstein against the United States from in or around 2001 through in or around September 2007" including five enumerated offenses;
>
> (2) "any other offenses that have been the subject of the joint investigation by the Federal Bureau of Investigation and the United States Attorney's Office"; and
>
> (3) "any offenses that arose from the Federal Grand Jury investigation."

Dkt. No. 142-1 at 2. The NPA makes clear that the covered charges are those relating to and deriving from a specific investigation of conduct that occurred between 2001 and 2007.

Maxwell contends that the NPA's co-conspirator provision lacks any limitation on the offenses covered. The Court disagrees with this improbable interpretation. The phrase "potential co-conspirator" means nothing without answering the question "co-conspirator in what?" The most natural reading of the co-conspirator provision is that it covers those who conspired with Epstein in the offenses covered by the NPA for their involvement in those offenses. Thus, it would cover any involvement of Maxwell in offenses committed by Epstein from 2001 to 2007, other offenses that were the subject of the FBI and U.S. Attorney's Office investigation, and any offenses that arose from the related grand jury investigation.

The Court has no trouble concluding that the perjury counts are not covered by the NPA. Those charges do not relate to conduct in which Maxwell conspired with Epstein and stem from depositions in 2016, more than eight years after Epstein signed the NPA. Maxwell now concedes as much, though her motion sought to dismiss the S1 superseding indictment in its entirety, perjury counts and all.

The Mann Act counts, too, fall comfortably outside the NPA's scope. The S1 superseding indictment charges conduct occurring exclusively between 1994 and 1997, some four years before the period covered by the Southern District of Florida investigation and the NPA. The NPA does not purport to immunize Epstein from liability for crimes committed before the period that was the subject of the FBI and U.S. Attorney's Office investigation. Maxwell's protection is no broader. The Court thus concludes that the NPA does not cover the offenses charged in the S1 superseding indictment.

**C. Maxwell is not entitled to an evidentiary hearing**

In the alternative to dismissing the indictment, Maxwell requests that the Court conduct an evidentiary hearing as to the parties' intent in the NPA. The Court finds no basis to do so.

The cases Maxwell cites where courts held hearings on the scope of a plea agreement mostly involved oral agreements where there was no written record of the full set of terms reached by the parties. All of them involved defendants with first-hand knowledge of negotiations who claimed prosecutors breached an oral promise. "An oral agreement greatly increases the potential for disputes such as . . . a failure to agree on the existence, let alone the terms, of the deal." *United States v. Aleman*, 286 F.3d 86, 90 (2d Cir. 2002). Thus, an evidentiary hearing may be necessary to determine the terms of an agreement never committed to writing. This is no such case. The NPA's terms are clear. Beyond the NPA itself, an extensive OPR report details its negotiation history. No record evidence suggests that prosecutors promised Epstein anything beyond what was spelled out in writing. The Court agrees with the Government that Maxwell's request for a hearing rests on mere conjecture.

For the same reason, the Court will not order the discovery on the NPA. In any case, it appears that the Government has already produced two of the documents Maxwell seeks in her motion—the OPR report and notes mentioned in a privilege log. Of course, the Government's disclosure obligations would require it to disclose to Maxwell any exculpatory evidence or evidence material to preparing the defense, including any evidence supporting a defense under the NPA. The Government shall confirm in writing within one week whether it views any evidence supporting Maxwell's interpretation of the NPA as material it is required to disclose, and, if so, whether it has disclosed any and all such evidence in its possession.

## II. The indictment is timely

### A. The indictment complies with the statute of limitations

Federal law imposes a five-year limitations period for most non-capital offenses. 18 U.S.C. § 3282(a). Recognizing the difficulty of promptly prosecuting crimes against children, Congress has provided a longer limitations period for "offense[s] involving the sexual or physical abuse, or kidnaping" of a minor. 18 U.S.C. § 3283. Until 2003, the operative version of § 3283 allowed prosecution of these offenses until the victim reached the age of twenty-five. Congress further extended the limitations period in the PROTECT Act of 2003, Pub. L. No. 108-21, 117 Stat. 650, to allow prosecution any time during the life of the victim.

The parties agree that the Mann Act charges are timely if subject to the PROTECT Act, but untimely under the general statute of limitations for non-capital offenses or the pre-2003 version of § 3283. Maxwell contends that the charged offenses do not qualify as offenses involving the sexual or physical abuse or kidnapping of a minor and are thus governed by the general statute of limitations. Alternatively, she contends that the pre-2003 version of § 3283 applies because the charged conduct occurred prior to 2003. The Court concludes that statute of limitations in the PROTECT Act applies and that the charges are timely.

#### 1. The Mann Act charges are offenses involving the sexual abuse of minors

Maxwell does not dispute that the facts alleged in the S1 superseding indictment involve the sexual abuse of minors. The indictment charges that Epstein sexually abused each of the alleged minor victims and that Maxwell allegedly enticed them to travel or transported them for that purpose. Instead, Maxwell contends that charged offenses do not qualify as offenses involving the sexual abuse of minors because sexual abuse is not an essential ingredient of each statutory offense. *See Bridges v. United States*, 346 U.S. 209, 221 (1953). In Maxwell's view,

for example, it is possible to transport a minor with intent to engage in criminal sexual activity and not follow through with the planned sexual abuse, and so sexual abuse is not an essential ingredient of the offense. Maxwell makes the same argument for the enticement and related conspiracy charges.

This approach is analogous to the "categorical approach" employed by courts to evaluate prior convictions for immigration and sentencing purposes. *See Taylor v. United States*, 495 U.S. 575, 602 (1990). Generally speaking, the "categorical approach" requires that courts "look only to the statutory definitions—i.e., the elements" of the relevant offense to determine if the provision applies "and not to the particular facts underlying those convictions." *Descamps v. United States*, 570 U.S. 254, 261 (2013) (internal quotation marks omitted). Whether a statute requires a categorical or case-specific approach is a question of statutory interpretation. To determine whether Congress used the word "offense" in a statute to refer to an offense in the abstract or to the facts of each individual case, the Court must examine the statute's "text, context, and history." *United States v. Davis*, 139 S. Ct. 2319, 2327 (2019).

Though it has not authoritatively settled the question, the Second Circuit has strongly suggested that Maxwell's approach is the wrong one. In *Weingarten v. United States*, 865 F.3d 48, 58–60 (2d Cir. 2017), the Second Circuit discussed at length how the text, context, and history of § 3283 show that Congress intended courts to apply the statute using a case-specific approach. The Third Circuit reached the same conclusion in *United States v. Schneider*, 801 F.3d 186, 196 (3d Cir. 2015).

The Court sees no reason to depart from the reasoning in *Weingarten*. First, "[t]he Supreme Court's modern categorical approach jurisprudence is confined to the post-conviction contexts of criminal sentencing and immigration deportation cases." *Weingarten*, 865 F.3d at 58.

To the extent that the categorical approach is ever appropriate in other contexts, it is inappropriate here.

The Court begins with the statute's text. Statutes that call for application of the categorical approach typically deal with the elements of an offense in a prior criminal conviction. *Id.* at 59. "The language of § 3283, by contrast, reaches beyond the offense and its legal elements to the conduct 'involv[ed]' in the offense. That linguistic expansion indicates Congress intended courts to look beyond the bare legal charges in deciding whether § 3283 applied." *Id.* at 59–60 (alteration in original) (quoting § 3283). Maxwell cites one case holding otherwise, but that case involved a venue statute presenting significantly different concerns. *See United States v. Morgan*, 393 F.3d 192, 200 (D.C. Cir. 2004). The Supreme Court has likewise held that a statute which uses the language "an *offense that . . . involves* fraud or deceit in which the loss to the victim or victims exceeds $10,000" is "consistent with a circumstance-specific approach." *Nijhawan v. Holder*, 557 U.S. 29, 32, 38 (2009) (emphasis added). Thus, the word "involves" generally means that courts should look to the circumstances of an offense as committed in each case. This reading accords with a robust legislative history indicating that Congress intended to apply § 3283 to a wide range of crimes against children. *See Weingarten*, 865 F.3d at 60; *Schneider*, 801 F.3d at 196.

The purposes underlying the categorical approach do not apply here either. For statutes dealing with prior convictions, "[t]he categorical approach serves 'practical' purposes: It promotes judicial and administrative efficiency by precluding the relitigation of past convictions in minitrials conducted long after the fact." *Moncrieffe v. Holder*, 569 U.S. 184, 200–01 (2013). In the context of § 3283, there is no prior conviction to assess, and the jury will determine in the first instance whether "the defendant engaged in the applicable abusive conduct." *Weingarten*,

865 F.3d at 60. Maxwell nonetheless contends that using a case-specific approach for § 3283 would be impractical because the Government would need to prove conduct beyond the elements of the offense. It may be true that this approach requires the Government to prove some additional facts, but any statute-of-limitations defense presents factual issues (including, at least, when the alleged conduct took place). This is not a serious practical problem and does not justify setting aside the statute's language and apparent purpose.

Maxwell relies primarily on *Bridges v. United States,* 346 U.S. 209 (1953), to urge this Court to cast *Weingarten* aside. The Supreme Court in *Bridges* addressed a statute that extended the limitations period for defrauding the United States during the Second World War. In that case, the Supreme Court first concluded that making false statements at an immigration hearing was not subject to the extended limitations period because it lacked any pecuniary element as required by the statute. *Id.* at 221. Then, as an alternative basis for its holding, it explained that the offense did not require fraud as an "essential ingredient." *Id.* at 222. It reached that conclusion in large part because the statute's legislative history made clear that Congress intended it to apply only to a narrow class of war frauds causing pecuniary loss. *Id.* at 216.

As the Second Circuit explained in *Weingarten*, Congress had the opposite intent in the enacting in the PROTECT Act. *Weingarten*, 865 F.3d at 59 & n. 10. "In passing recent statutes related to child sex abuse, including extensions of the § 3283 limitations period, Congress 'evinced a general intention to "'cast a wide net to ensnare as many offenses against children as possible.'"' *Id.* at 60 (quoting *Schneider*, 801 F.3d at 196 (quoting *United States v. Dodge*, 597 F.3d 1347, 1355 (11th Cir. 2010) (en banc))). The primary basis for *Bridges*' holding—legislative history supporting a narrow interpretation—does not exist here. Instead, both the statute's plan meaning and its legislative history suggest it should apply more broadly.

Based on the statute's text, context, and history, the Court follows *Weingarten* and concludes that the appropriate inquiry is whether the charged offenses involved the sexual abuse of a minor on the facts alleged in this case. There is no question that they did. The Court thus concludes that § 3283 governs the limitations period for the charges here.

**2. The 2003 amendment to the statute of limitations applies to these offenses**

Maxwell next contends that because the charged conduct took place before the PROTECT Act's enactment, that statute did not lengthen the statute of limitations applicable to her alleged offenses. Here too, the Second Circuit has provided guidance in its decision in *Weingarten*. Although the court did not provide a definitive answer there, it explained that the view Maxwell now takes conflicts with established principles of retroactivity and the decisions of at least two other circuit courts. *Weingarten*, 865 F.3d at 58 & n.8; *see Cruz v. Maypa*, 773 F.3d 138, 145 (4th Cir. 2014); *United States v. Leo Sure Chief*, 438 F.3d 920, 924 (9th Cir. 2006).

The Supreme Court has set out a two-step framework to determine whether a federal statute applies to past conduct. *See Landgraf v. USI Film Products*, 511 U.S. 244, 280 (1994). Courts look first to the language of the statute. If the statute states that it applies to past conduct, courts must so apply it. *Weingarten*, 865 F.3d at 54. Otherwise, the statute applies to past conduct unless doing so would create impermissible retroactive effects. *Id.*

The Court begins with *Landgraf*'s first step. To assess a statute's meaning here, courts must consider the text of the statute along with other indicia of congressional intent, including the statute's history and structure. *See Enter. Mortg. Acceptance Co., LLC, Sec. Litig. v. Enter. Mortg. Acceptance Co.*, 391 F.3d 401, 406 (2d Cir. 2004).

Section 3283, as amended by the PROTECT Act, broadly states that "[n]o statute of limitations that would otherwise preclude prosecution for an offense involving the sexual or physical abuse, or kidnaping, of a child under the age of 18 years shall preclude such prosecution during the life of the child." The statute lacks an express retroactivity clause, but courts have held that no such clause is necessary, including for this particular statute. *See Leo Sure Chief*, 438 F.3d at 923. The statute's plain language unambiguously requires that it apply to prosecutions for offenses committed before the date of enactment. Instead of simply providing a new limitations period for future conduct, Congress stated that *no* statute of limitations that *would otherwise preclude* prosecution of these offenses will apply. That is, it prevents the application of any statute of limitations that would otherwise apply to past conduct.

Courts have reached the same conclusion for other statutes employing similar language. The Eighth Circuit has held that the 1994 amendments to § 3283, which allowed prosecution of sex crimes against children until the victim reached age twenty-five, applied to past conduct. *See United States v. Jeffries*, 405 F.3d 682, 684–85 (8th Cir. 2005). The Second Circuit has observed that the Higher Education Technical Amendments of 1991, Pub. L. No. 102-26, 105 Stat. 123, illustrates language that requires a statute's application to past conduct. *See Enter. Mortg. Acceptance Co., LLC, Sec. Litig.*, 391 F.3d at 407. That statute eliminated the statute of limitations for claims on defaulted student loans by stating that "no limitation shall terminate the period within which suit may be filed." *Id.* The PROTECT Act's language is quite similar.

The history of § 3283 confirms Congress's intent to apply the extended limitations period as broadly as the Constitution allows. With each successive amendment to the statute, Congress further extended the limitations period, recognizing that sex crimes against children "may be difficult to detect quickly" because children often delay or decline to report sexual abuse.

*Weingarten*, 865 F.3d at 54. Congress enacted the limitations provision of the PROTECT Act because it found the prior statute of limitations was "inadequate in many cases." H.R. Conf. Rep. No. 108-63, at 54 (2003). For example, a person who abducted and raped a child could not be prosecuted beyond this extended limit—even if DNA matching conclusively identified him as the perpetrator one day after the victim turned 25." *Id.*

Maxwell makes no argument based on the statute's text. Instead, she contends that because the House version of the bill included an express retroactivity provision absent from its final form, the Court should infer that Congress did not intend the statute to apply to past conduct. However, the legislative history makes clear that Congress abandoned the retroactivity provision in the House bill only because it would have produced unconstitutional results. The Supreme Court has explained that a law that revives a time-barred prosecution violates the Ex Post Facto Clause of the Constitution, but a law that extends an un-expired statute of limitations does not. *Stogner v. California*, 539 U.S. 607, 632–33 (2003). Senator Leahy, who co-sponsored the PROTECT Act, expressed concerns in a committee report that the proposed retroactivity provision was "of doubtful constitutionality" because it "would have revived the government's authority to prosecute crimes that were previously time-barred." 149 Cong. Rec. S5137, S5147 (Apr. 10, 2003) (statement of Sen. Leahy). Congress removed the provision shortly thereafter for this reason. The removal of the express retroactivity provision shows only that Congress intended to limit the PROTECT Act to its constitutional applications, including past conduct—like Maxwell's—on which the statute of limitations had not yet expired.

Both the text and history of the PROTECT Act's amendment to § 3283 reflect that it applies Maxwell's conduct charged in the S1 superseding indictment. The Court could stop here.

However, it also concludes that even if the statute were ambiguous, it would properly apply to these charges.

At *Lanfgraf*'s second step, the Court asks whether application of the statute to past conduct would have impermissible retroactive effects. "[A] statute has presumptively impermissible retroactive effects when it 'takes away or impairs vested rights acquired under existing laws, or creates a new obligation, imposes a new duty, or attaches a new disability, in respect to transactions or considerations already past.'" *Weingarten*, 865 F.3d at 56 (quoting *Landgraf*, 511 U.S. at 290). Thus, applying a new statute of limitations to previously time-barred claims has an impermissible retroactive effect. *Enter. Mortg. Acceptance Co., LLC, Sec. Litig.*, 391 F.3d at 407. Applying it to conduct for which the statute of limitations has not yet expired does not. *Vernon v. Cassadaga Valley Cent. Sch. Dist.*, 49 F.3d 886, 890 (2d Cir. 1995).

Maxwell concedes that these offenses were within the statute of limitations when Congress enacted the PROTECT Act. Thus, the Act did not deprive her of any vested rights. Maxwell contends that it is unfair to allow the Government to prosecute her now for conduct that occurred more than twenty years ago, but there is no dispute that Congress has the power to set a lengthy limitations period or no limitations period at all. It has done so here, judging that the difficulty of prosecuting these offenses and the harm they work on children outweighs a defendant's interest in repose. Maxwell's fairness argument is a gripe with Congress's policy judgment, not an impermissibly retroactive application of the statute. The Court concludes that § 3283 allows her prosecution now.

**B. The Government's delay in bringing charges did not violate due process**

"As the Supreme Court stated in *United States v. Marion*, the statute of limitations is 'the primary guarantee against bringing overly stale criminal charges.'" *United States v. Cornielle*,

171 F.3d 748, 751 (2d Cir. 1999) (cleaned up) (quoting *United States v. Marion*, 404 U.S. 307, 322 (1971)). There is a strong presumption that an indictment filed within the statute of limitations is valid. To prevail on a claim that pre-indictment delay violates due process, a defendant must show both that the Government intentionally delayed bringing charges for an improper purpose and that the delay seriously damaged the defendant's ability defend against the charges. *See id.* This is a stringent standard. "Thus, while the [Supreme] Court may not have shut the door firmly on a contention that at some point the Due Process Clause forecloses prosecution of a claim because it is too old, at most the door is barely ajar." *DeMichele v. Greenburgh Cent. Sch. Dist. No. 7*, 167 F.3d 784, 790–91 (2d Cir. 1999).

The Court sees no evidence that the Government's delay in bringing these charges was designed to thwart Maxwell's ability to prepare a defense. However, it is enough to say that Maxwell does not make the strong showing of prejudice required to support this sort of claim. Maxwell contends that the Government's delay in bringing charges has prejudiced her interests because potential witnesses have died, others have forgotten, and records have been lost or destroyed. It is highly speculative that any of these factors would make a substantial difference in her case.

Maxwell first points to several potential witnesses who have passed away. These include Jeffrey Epstein and his mother, one individual Maxwell believes worked with one of the alleged victims in this case, and a police detective who investigated Epstein in Florida. She contends they all would have provided exculpatory testimony were they alive today. Courts have generally found that vague assertions that a deceased witness might have provided favorable testimony do not justify dismissing an indictment for delay. *See, e.g.*, *United States v. Scala*, 388 F. Supp. 2d 396, 399–400 (S.D.N.Y. 2005). The Court agrees with this approach. Maxwell

provides no indication of what many of these potential witnesses might have testified to. The testimony she suggests the detective might have offered—that witnesses in the Palm Beach investigation did not identify Maxwell by name—is propensity evidence that does nothing to establish her innocence of the charged offenses. There are also serious doubts under all of the relevant circumstances that a jury would have found testimony from Epstein credible even if he had waived his right against self-incrimination and testified on her behalf. *See United States v. Spears*, 159 F.3d 1081, 1085 (7th Cir. 1999).

Maxwell's arguments that the indictment should be dismissed because of the possibility of missing witnesses, failing memories, or lost records fail for similar reasons. These are difficulties that arise in any case where there is extended delay in bringing a prosecution, and they do not justify dismissing an indictment. *United States v. Marion*, 404 U.S. 307, 325–26 (1971); *see United States v. Elsbery*, 602 F.2d 1054, 1059 (2d Cir. 1979).

Finally, the Court finds no substantial prejudice from the pretrial publicity this case has garnered. Maxwell contends that lengthy public interest in this case has transformed her reputation from that of Epstein's friend to a co-conspirator. And she also alleges—without evidence—that her accusers fabricated their stories based on media allegations. The Court will not dismiss the indictment on Maxwell's bare assertion that numerous witnesses are engaged in a perjurious conspiracy against her. And the Court will take all appropriate steps to ensure that the pretrial publicity in this case does not compromise Maxwell's right to a fair and impartial jury.

The Court thus concludes that Maxwell has failed to establish actual prejudice from the Government's delay in bringing charges. She may renew her motion if the factual record at trial shows otherwise. On the present record, neither the applicable statute of limitations nor due process bars the charges here.

## III. The indictment describes the charged offenses with specificity

Maxwell seeks to dismiss the Mann Act counts for lack of specificity or in the alternative to compel the Government to submit a bill of particulars providing greater detail of the charges. The Court concludes that the charges in the S1 superseding indictment are clear enough.

Under Federal Rule of Criminal Procedure 7, an indictment must contain "a plain, concise, and definite written statement of the essential facts constituting the offense charged." The indictment must be specific enough to inform the defendant of the charges and allow the defendant to plead double jeopardy in a later prosecution based on the same events. *United States v. Stavroulakis*, 952 F.2d 686, 693 (2d Cir. 1992). "Under this test, an indictment need do little more than to track the language of the statute charged and state the time and place (in approximate terms) of the alleged crime." *United States. v. Tramunti*, 513 F.2d 1087, 1113 (2d Cir. 1975). In addition to dismissal, "Rule 7(f) of the Federal Rules of Criminal Procedure permits a defendant to seek a bill of particulars in order to identify with sufficient particularity the nature of the charge pending against him, thereby enabling defendant to prepare for trial, to prevent surprise, and to interpose a plea of double jeopardy should he be prosecuted a second time for the same offense." *United States v. Bortnovsky*, 820 F.2d 572, 574 (2d Cir. 1987).

The S1 superseding indictment sets out the elements of each charged crime and the facts supporting each element. Nonetheless, Maxwell contends that the indictment is too vague because it refers to open-ended time periods, describes conduct like "grooming" and "befriending" that is not inherently criminal, and does not identify the alleged victims by name.

Maxwell's first argument fails because the Government need only describe the time and place of charged conduct "in approximate terms." *Tramunti*, 513 F.2d at 1113. The details are subject to proof at trial. "[T]he Second Circuit routinely upholds the 'on or about' language used

to describe the window of when a violation occurred." *United States v. Kidd*, 386 F. Supp. 3d 364, 369 (S.D.N.Y. 2019) (quoting *United States v. Nersesian*, 824 F.2d 1294, 1323 (2d Cir. 1987)). "This is especially true in cases of sexual abuse of children: allegations of sexual abuse of underage victims often proceed without specific dates of the offenses." *United States v. Young*, No. 08-cr-285 (KMK), 2008 WL 4178190, at *2 (S.D.N.Y. Sept. 4, 2008) (collecting cases). As here, these cases frequently involve alleged abuse spanning a lengthy period of time, and witnesses who were victimized as children may struggle to recall the precise dates when abuse occurred. The indictment adequately describes the time and place of the charged conduct.

Maxwell next contends that allegations of noncriminal conduct render the charges impermissibly vague. The Court disagrees. Rule 7 requires only that the language of the indictment track the language of the statute and provide a rough account of the time and place of the crime. *Tramunti*, 513 F.2d at 1113. The language of the S1 superseding indictment does so. The Government's decision to provide more details than those strictly required does not hamper Maxwell's ability to prepare a defense. Maxwell's argument that some of the conduct alleged is not inherently criminal goes to the merits of the Government's case, not the specificity of the charges.

Finally, Maxwell argues that the indictment is vague because the government does not provide the names of the alleged victims. The Court sees no basis to require that the alleged victims' names be included the indictment. The names of victims, even if important, generally need not appear there unless their omission would seriously prejudice the defendant. *See United States v. Stringer*, 730 F.3d 120, 127 (2d Cir. 2013); *United States v. Kidd*, 386 F. Supp. 3d 364, 369 (S.D.N.Y. 2019). Maxwell likely knows the identity of the alleged victims described in the indictment at this point because the Government has provided extensive discovery on them.

Moreover, the Government has agreed to disclose their names in advance of trial. There is thus no unfairness here. *See Stringer*, 730 F.3d at 126. As discussed below, the Court will require the parties to negotiate and propose a full schedule for all remaining pretrial disclosures.

**IV. The perjury charges are legally tenable**

The Court turns next to Maxwell's motion to dismiss the perjury counts stemming from her answers to questions in a deposition in a civil case. She contends that these charges are legally deficient because the questions posed were fundamentally ambiguous and the questions were not material to the subject of the deposition. The Court concludes that the charges are legally tenable and Maxwell's defenses are appropriately left to the jury.

The applicable perjury statute imposes criminal penalties on anyone who "in any proceeding before or ancillary to any court . . . knowingly makes any false material declaration." 18 U.S.C. § 1623(a). Testimony is perjurious only if it is knowingly false and is material to the proceeding in which the defendant offered it.

**A. The questions posed were not too ambiguous to support a perjury charge**

The requirement of knowing falsity requires that a witness believe that their testimony is false. *United States v. Lighte*, 782 F.2d 367, 372 (2d Cir. 1986). As a general matter, "[a] jury is best equipped to determine the meaning that a defendant assigns to a specific question." *Id.* Courts have acknowledged a narrow exception for questions that are so fundamentally ambiguous or imprecise that the answer to them cannot legally be false. *Id.* at 372, 375; *see also United States v. Wolfson*, 437 F.2d 862, 878 (2d Cir. 1970). A question is fundamentally ambiguous only if reasonable people could not agree on its meaning in context. *Lighte*, 782 F.2d at 375. The existence of some arguable ambiguity does not foreclose a perjury charge against a witness who understood the question.

At a minimum, Maxwell's motion is premature. Courts typically evaluate whether a question was fundamentally ambiguous only after the development of a full factual record at trial. *See, e.g.*, *United States v. Markiewicz*, 978 F.2d 786, 808 (2d Cir. 1992). The evidence at trial may shed further light on whether the questions posed were objectively ambiguous in context or whether Maxwell subjectively understood them. In any event, the Court has closely considered each of the categories of questions that Maxwell argues are ambiguous. None of the alleged ambiguities Maxwell identifies rise to the level supporting dismissal of the charges. The context of the questions and answers, in conjunction with the Government's evidence, could lead a reasonable juror to conclude that the statements were perjurious. Truth and falsity are questions for the jury in all but the most extreme cases. The Court declines to usurp the jury's role on the limited pretrial record.

**B. A reasonable juror could conclude that Maxwell's statements were material**

Maxwell also argues that the perjury counts should be dismissed because none of the allegedly false statements were material to the defamation action. In a civil deposition, a statement is material if it has a natural tendency to influence the court or if a truthful answer might reasonably lead to the discovery of admissible evidence. *United States v. Gaudin*, 515 U.S. 506, 509 (1995); *United States v. Kross*, 14 F.3d 751, 753–54 (2d Cir. 1994). Like knowing falsity, materiality is an element of the offense and thus ordinarily must be "decided by the jury, not the court." *Johnson v. United States*, 520 U.S. 461, 465 (1997). Only the most extraordinary circumstances justify departure from this general rule. *United States v. Forde*, 740 F. Supp. 2d 406, 412 (S.D.N.Y. 2010) (citing *Gaudin*, 515 U.S. at 522–23).

The charged statements do not fall within this narrow exception. Maxwell contends that the questions did not relate to the sex trafficking and sexual abuse allegations at the center of the

civil case, but that is not the legal standard. The Government may prevail if it proves that Maxwell's answers could have led to the discovery of other evidence or could influence the factfinder in the civil case. *See Gaudin*, 515 U.S. at 509; *Kross*, 14 F.3d at 753–54. At trial, a reasonable juror could conclude that truthful answers to the questions may have permitted the plaintiff to locate other victims or witnesses who could have corroborated the plaintiff's testimony. The factual disputes relating to materiality are at least enough to preclude pretrial resolution. In criminal cases, courts must guard against "invading the 'inviolable function of the jury' in our criminal justice system," and if the "defense raises a factual dispute that is inextricably intertwined with a defendant's potential culpability, a judge cannot resolve that dispute on a Rule 12(b) motion." *United States v. Sampson*, 898 F.3d 270, 281 (2d Cir. 2018).

The Court concludes that the perjury charges are legally tenable and appropriately presented to the jury.

**V. The perjury charges must be severed and tried separately**

Although the perjury charges are legally tenable, the Court concludes that the interests of justice require severing those counts and trying them separately. Trying the perjury counts together with the Mann Act counts would require admitting evidence of other acts likely to be unduly prejudicial. It would also risk disqualifying Maxwell's chosen counsel based on their involvement in the earlier civil case.

Rule 14(a) of the Federal Rules of Criminal Procedure allows a court to order separate trials if joining all offenses in a single trial would prejudice the defendant. A defendant seeking severance must show significant unfairness to outweigh the burden on the court of conducting multiple trials. *United States v. Walker*, 142 F.3d 103, 110 (2d Cir. 1998). The harm to the defendant must be more than "solely the adverse effect of being tried for two crimes rather than

one." *United States v. Werner*, 620 F.2d 922, 929 (2d Cir. 1980). Though this standard is demanding, the Court concludes that, due to unique features of the perjury counts, Maxwell meets it here. Trying all counts together would compromise Maxwell's right to the counsel of her choice and risk an unfair trial.

Trying the perjury counts together with the Mann Act counts would risk an unfair trial on each set of counts. First, it would introduce unrelated allegations of sexual abuse, which would potentially expose the jury to evidence that might otherwise not be admissible. In particular, a joint trial would potentially expose the jury to a wider swath of information regarding civil litigation against Epstein that is remote from Maxwell's charged conduct. This presents a significant risk that the jury will cumulate the evidence of the various crimes charged and find guilt when, if considered separately, it would not do so. *See United States v. Halper*, 590 F.2d 422, 430 (2d Cir. 1978). Second, the evidence presented on the Mann Act counts may prejudice the jury's ability to fairly evaluate Maxwell's truthfulness in her deposition, a critical element of the perjury counts. The Court has concerns that a limiting instruction may be inadequate to mitigate these risks given the nature of the allegations involved.

Importantly, a joint trial is also likely to require disqualification of at least one of Maxwell's attorneys from participating as an advocate on her behalf. The perjury counts likely implicate the performance and credibility of her lawyers in the civil action—two of whom represent her in this case. The New York Rules of Professional Conduct generally forbid a lawyer from representing a client in a proceeding in which the lawyer is likely also to be a witness. N.Y. R. Prof'l Conduct § 3.7(a). Maxwell's counsel in the civil action and the deposition may be important fact witnesses on the perjury counts. Even if counsel were not required to testify, trying all counts together could force Maxwell to choose between having her

counsel testify on her behalf on the perjury charges and having them assist her in defending the Mann Act charges.

The Second Circuit has recognized that witness testimony offered by a party's attorney presents serious risks to the fairness of a trial. *See Murray v. Metro. Life Ins. Co.*, 583 F.3d 173, 178 (2d Cir. 2009). The lawyer might appear to vouch for their own credibility, jurors might perceive the lawyer as distorting the truth to benefit their client, and blurred lines between argument and evidence might confuse the jury. *Id.* Disqualification of counsel also implicates Maxwell's Sixth Amendment right to be represented by the counsel of her choice. *See, e.g.*, *United States v. Kincade*, No. 15-cr-00071 (JAD) (GWF), 2016 WL 6154901, at *6 (D. Nev. Oct. 21, 2016). The prejudice to Maxwell is especially pronounced because the attorneys who represented her in the civil case have worked with her for years and are particularly familiar with the facts surrounding the criminal prosecution. *See United States v. Cunningham*, 672 F.2d 1064, 1070–71 (2d Cir. 1982).

The Court is of course cognizant of the burden separate trials may impose on all trial participants. But much of the proof relevant to the perjury counts and the Mann Act counts does not overlap. In particular, materiality for statements made in a civil deposition is broad, and evidence on that question is unlikely to bear on the other charges here. *See Kross*, 14 F.3d at 753–54; *Gaudin*, 515 U.S. at 509. Although some allegations of sexual abuse are relevant to both sets of charges, many are not. At a minimum, this will expand the scope of the trial far beyond the narrower issues presented. And while the Court agrees with the Government that at least some of Maxwell's concerns are overstated, there is little question that the jury's consideration of the nature of the defamation action will require a significant investment of time and resources to provide the requisite context.

The balance of these considerations favors severance. “Motions to sever are committed to the sound discretion of the trial judge.” *United States v. Casamento*, 887 F.2d 1141, 1149 (2d Cir. 1989). In its discretion, the Court concludes that trying the perjury counts separately will best ensure a fair and expeditious resolution of all charges in this case.

## VI. Maxwell’s motion to strike surplusage is premature

Maxwell moves to strike allegations related to one of the alleged victims from the S1 superseding indictment as surplusage. The Court declines to do so at this juncture.

Federal Rule of Criminal Procedure 7(d) allows a court to strike surplusage from an indictment on a defendant’s motion. “Motions to strike surplusage from an indictment will be granted only where the challenged allegations are not relevant to the crime charged and are inflammatory and prejudicial.” *United States v. Hernandez*, 85 F.3d 1023, 1030 (2d Cir. 1996) (cleaned up). Courts in this District generally delay ruling on any motion to strike until after the presentation of the Government’s evidence at trial, because that evidence may affect how specific allegations relate to the overall charges. *See, e.g.*, *United States v. Nejad*, No. 18-cr-224 (AJN), 2019 WL 6702361, at *18 (S.D.N.Y. Dec. 6, 2019); *United States v. Mostafa*, 965 F. Supp. 2d 451, 467 (S.D.N.Y. 2013).

Maxwell contends that the allegations related to “Minor Victim-3” are surplusage because the indictment does not charge that Minor Victim-3 traveled in interstate commerce or was below the age of consent in England where the alleged activities took place. Thus, she argues, these allegations do not relate to the charged conspiracy and instead reflect an attempt to introduce Minor Victim-3’s testimony for impermissible purposes.

The Court will not strike any language from the S1 superseding indictment at this juncture. The standard under Rule 7(d) is “exacting” and requires the defendant to demonstrate

clearly that the allegations are irrelevant to the crimes charged. *United States v. Napolitano*, 552 F. Supp. 465, 480 (S.D.N.Y. 1982). The indictment does not allege that the alleged victim traveled in interstate commerce or was underage during sexual encounters with Epstein. But the Court cannot rule out that the allegations may reflect conduct undertaken in furtherance of the charged conspiracy or be relevant to prove facts such as Maxwell's state of mind. *See United States v. Concepcion*, 983 F.2d 369, 392 (2d Cir. 1992). The Court will follow the well-worn path of others in this District and reserve the issue for trial. Maxwell may renew her motion then.

**VII. Maxwell's motion to dismiss multiplicitous charges is premature**

Maxwell's motion to dismiss either the first or third count of the S1 superseding indictment as multiplicitous is also premature. Maxwell contends that the Government has alleged the same conspiracy twice in the indictment. "An indictment is multiplicitous when it charges a single offense as an offense multiple times, in separate counts, when, in law and fact, only one crime has been committed." *United States v. Chacko*, 169 F.3d 140, 145 (2d Cir. 1999). "The multiplicity doctrine is based upon the double jeopardy clause of the Fifth Amendment, which assures that the court does not exceed its legislative authorization by imposing multiple punishments for the same offense." *United States v. Nakashian*, 820 F.2d 549, 552 (2d Cir. 1987) (cleaned up).

"Where there has been no prior conviction or acquittal, the Double Jeopardy Clause does not protect against simultaneous prosecutions for the same offense, so long as no more than one punishment is eventually imposed." *United States v. Josephberg*, 459 F.3d 350, 355 (2d Cir. 2006). "Since *Josephberg*, courts in this Circuit have routinely denied pre-trial motions to dismiss potentially multiplicitous counts as premature." *United States v. Medina*, No. 13-cr-272

(PGG), 2014 WL 3057917, at *3 (S.D.N.Y. July 7, 2014) (collecting cases). The Court therefore denies Maxwell's motion to dismiss multiplicitous counts without prejudice.

## VIII. The parties shall negotiate all remaining disclosures

Maxwell moves to compel the Government to produce certain documents she believes it has in its possession and has failed to produce. She also seeks accelerated disclosure of the Government's witness list, Jencks Act material, *Brady* and *Giglio* material, co-conspirator statements, and Rule 404(b) material. Based on the Government's response in briefing and letters the parties have since submitted to the Court, it appears that most of these requests have been overtaken by events. Accordingly, although the Court concludes that Maxwell is not entitled to expedite this discovery based on the arguments in her motion papers, the Court will require the parties to confer on an overall schedule for all remaining pretrial disclosures.

### A. The Court accepts the Government's representations that it has disclosed all *Brady* and *Giglio* Material

The Supreme Court's decisions in *Brady v. Maryland*, 373 U.S. 83 (1963) and *Giglio v. United States*, 405 U.S. 150 (1972) require the Government to disclose to defendants certain evidence that will aid their defense. *Brady* requires disclosure of exculpatory evidence. Under *Giglio*, the Government has a duty to produce "not only exculpatory material, but also information that could be used to impeach a key government witness." *United States v. Coppa*, 267 F.3d 132, 135 (2d Cir. 2001) (citing *Giglio*, 405 U.S. at 154). As a general rule, "*Brady* and its progeny do not require immediate disclosure of all exculpatory and impeachment material upon request by a defendant." *Id.* at 146. "[A]s long as a defendant possesses *Brady* evidence in time for its effective use, the government has not deprived the defendant of due process of law simply because it did not produce the evidence sooner." *Id.* at 144.

Maxwell requests an order directing immediate disclosure of all *Brady* and *Giglio* material and also requests a few specific documents she contends the Government has failed to disclose. The Court begins with the specific requests. The requested materials include (1) records of witness interviews in connection with an ex parte declaration in support of a response to a motion to quash subpoenas; (2) an unredacted copy of two FBI reports; (3) pages from a personal diary that is in the custody of a civilian third party; and (4) copies of all subpoenas the Government has issued for Maxwell's records as part of its investigation in this case.

The Government represents that it is cognizant of its *Brady* obligations, that is has reviewed the witness interviews and one of the FBI reports, and that neither set of documents includes exculpatory information not previously disclosed. The Court has no reason to doubt the Government's representation in this case that it is aware of its Brady obligations and that it has complied and will continue to comply with them. And because the witness statements are covered by the Jencks Act, the Court cannot compel production of such statements under the terms of the statute. *See* 18 U.S.C. § 3500; *Coppa*, 267 F.3d at 145. Next, the Government represents that it has already produced an unredacted copy of the other requested FBI report, and so that request is moot. The diary pages she requests are within the control of a civilian third party, not the Government, and so the Government need not (and perhaps cannot) produce them. *See United States v. Collins*, 409 F. Supp. 3d 228, 239 (S.D.N.Y. 2019). Finally, Maxwell's request for copies of all subpoenas the Government has issued is overly broad and lacks a legal basis. Maxwell is not entitled to compel production of these documents.

The Court also will not issue an order requiring the immediate disclosure of *Brady* and *Giglio* material. The Government has represented that it recognizes its obligations under Brady and that it has complied, and will continue to comply, with such obligations. The Court has no

reason to doubt these representations given its expansive approach to document production thus far in this case. The Government has agreed in its recent letter to produce *Giglio* material six weeks in advance of trial. The parties shall negotiate the specific timing, but assuming a schedule along those lines is met, the Court concludes that Maxwell will be able to effectively prepare for trial. *See Coppa*, 267 F.3d at 144.

**B. Jencks Act material and co-conspirator statements**

Maxwell also seeks to expedite discovery of Jencks Act material and non-exculpatory statements of co-conspirators that the government may offer at trial. The Jencks Act, 18 U.S.C. § 3500, "provides that no prior statement made by a government witness shall be the subject of discovery until that witness has testified on direct examination." *Coppa*, 267 F.3d at 145. The statute therefore prohibits a district court in most cases from ordering the pretrial disclosure of witness statements unless those statements are exculpatory. "A coconspirator who testifies on behalf of the government is a witness under the Act." *In re United States*, 834 F.2d 283, 286 (2d Cir. 1987). The Court therefore lacks the inherent power to expedite these disclosures. In any case, the Government has agreed to produce all Jencks Act material at least six weeks in advance of trial.

The Court also rejects Maxwell's alternative request for a hearing to determine the admissibility of co-conspirator declarations. Co-conspirator statements may often be admitted at trial on a conditional basis. If the Court determines that the Government has not met its burden to show that the conditionally admitted statements were made in furtherance of the charged conspiracy, the Court should provide a limiting instruction or, in extreme cases declare a mistrial. *United States v. Tracy*, 12 F.3d 1186, 1199 (2d Cir. 1993). Although conditional admissions can pose a problem, a pretrial hearing is unnecessary here because the Government

has committed to producing co-conspirator statements at least six weeks in advance of trial to allow Maxwell to raise any objections. Maxwell will have adequate time to object to any proffered co-conspirator testimony following the Government's Jencks Act disclosures.

**C. Witness list**

As a general matter, "district courts have authority to compel pretrial disclosure of the identity of government witnesses." *United States v. Cannone*, 528 F.2d 296, 300 (2d Cir. 1975). In deciding whether to order accelerated disclosure of a witness list, courts consider whether a defendant has made a specific showing that disclosure is "both material to the preparation of the defense and reasonable in light of the circumstances surrounding the case." *United States v. Bejasa*, 904 F.2d 137, 139–140 (2d Cir. 1990) (cleaned up).

Maxwell has made a particularized showing that the Government must produce a witness list reasonably in advance of trial. The nature of the allegations in this case—decades-old allegations spanning multiple locations—present considerable challenges for the preparation of the defense. However, the Government's proposed disclosure schedule—which will afford Maxwell at least six weeks to investigate testifying witness statements—allows Maxwell significantly more time to review disclosures than schedules adopted in most cases in this District. *See, e.g.*, *United States v. Rueb*, No. 00-CR-91 (RWS), 2001 WL 96177, at *9 (S.D.N.Y. Feb. 5, 2001) (thirty days before trial); *United States v. Nachamie*, 91 F. Supp. 2d 565, 580 (S.D.N.Y. 2000) (fourteen days before trial). In addition, on April 13, 2021, the Government produced over 20,000 pages of interview notes, reports and other materials related to non-testifying witnesses. After considering the circumstances, including the complexity of the issues in this case and what the defense has already received and likely learned in the course of discovery, the Court concludes that the Government's proposal is generally reasonable.

**D. Rule 404(b) material**

Maxwell's final discovery request is for early disclosure of evidence the Government seeks to offer under Federal Rule of Evidence 404(b). Under Rule 404(b), if the prosecutor in a criminal case intends to use "evidence of a crime, wrong, or other act" against a defendant, the prosecutor must "provide reasonable notice of the general nature of any such evidence that the prosecutor intends to offer at trial" and must "do so in writing before trial—or in any form during trial if the court, for good cause, excuses lack of pretrial notice." The Government represents that it will notify the defense of its intent to use 404(b) evidence at least 45 days in advance of trial to allow Maxwell to file any motions in limine to be considered at the final pretrial conference. The Government's proposal will give Maxwell an opportunity to challenge admission of that evidence and to bring to the Court's attention any issues that require resolution before trial. "This is all that Rule 404(b) requires." *United States v. Thompson*, No. 13-cr-378 (AJN), 2013 WL 6246489, at *9 (S.D.N.Y. Dec. 3, 2013). The Court concludes this schedule is generally reasonable, although additional time to enable briefing and resolution in advance of trial is strongly encouraged.

The Court's denial of Maxwell's requests to compel pretrial disclosures does not preclude the parties from negotiating in good faith for an expedited discovery timeline that will account for Maxwell's specific concerns. "[I]n most criminal cases, pretrial disclosure will redound to the benefit of all parties, counsel, and the court." *United States v. Percevault*, 490 F.2d 126, 132 (2d Cir. 1974). In general, the Court will require the parties to negotiate a final, omnibus schedule to propose to the Court. The Court concludes that the disclosure of all of the above materials approximately six to eight weeks in advance of trial is appropriate and sufficient.

Given the complexities of the case and the addition of two counts via the S2 indictment, the Court encourages the parties to agree to approximately eight weeks.

**IX. The S2 superseding indictment moots Maxwell's grand jury challenge**

The Court has not received supplemental briefing on the motions in light of the return of the S2 superseding indictment and so does resolve any such issues here.[1] However, Maxwell's motion seeking to dismiss the S1 superseding indictment because it was returned by a grand jury sitting at the White Plains courthouse appears moot. Maxwell argued that the use of a grand jury drawn from the White Plains Division in this District did not represent a fair cross-section of the community, because her trial would proceed in the Manhattan Division. A grand jury sitting in Manhattan returned the S2 superseding indictment. By April 21, 2021, Maxwell shall show cause why her grand jury motion should not be dismissed on that basis.

**Conclusion**

The Court DENIES Maxwell's motions to dismiss the indictment as barred by Epstein's non-prosecution agreement (Dkt. No. 141), to dismiss the Mann Act counts as barred by the statute of limitations (Dkt. No. 143), to dismiss the indictment for pre-indictment delay (Dkt. No. 137), to dismiss the Mann Act counts for lack of specificity (Dkt. No. 123), to dismiss the perjury counts as legally untenable (Dkt. No. 135), to strike surplusage (Dkt. No. 145), to dismiss count one or count three as multiplicitous (Dkt. No. 121), and to expedite pretrial disclosures (Dkt. No. 147). The Court GRANTS Maxwell's motion to sever the perjury counts for a separate trial (Dkt. No. 119).

[1] The parties shall negotiate and propose a schedule for any available additional or supplement rulings in light of the filing of the S2 indictment.

Case 1:20-cr-00330-AJN Document 207 Filed 04/16/21 Page 34 of 34

The Court ORDERS the Government to confirm within one week whether it considers any evidence related to negotiation of the non-prosecution agreement to constitute *Brady* or Rule 16 material and, if so, to confirm that it has or will disclose such evidence.

The Court further ORDERS the parties to negotiate a final schedule for all pretrial disclosures that remain outstanding, including: *Brady*, *Giglio*, and Jenks Act materials, including co-conspirator statements; non-testifying witness statements; testifying witness statements; the identity of victims alleged in the indictment; 404(b) material; and the Government's witness list. The Court also requires the parties to negotiate a schedule for any additional or supplemental motions briefing in light of the S2 indictment. The Court ORDERS a joint proposal to be submitted by April 21, 2021. If agreement is not reached, the parties shall submit their respective proposals.

The Court further ORDERS Maxwell to show cause by April 21, 2021 why her motion to dismiss the S1 superseding indictment under the Sixth Amendment (Dkt. No. 125) should not be denied as moot.

SO ORDERED.

Dated: April 16, 2021
New York, New York



ALISON J. NATHAN
United States District Judge

# 59 (e) EX 92

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

October 7, 2020

**VIA ECF**

The Honorable Alison J. Nathan
United States District Court
Southern District of New York
United States Courthouse
40 Foley Square
New York, New York 10007

**Re: *United States v. Ghislaine Maxwell*, 20 Cr. 330 (AJN)**

Dear Judge Nathan:

The Government respectfully submits this letter to provide additional information in response to the Court's prior inquiry regarding the Government's plan to obtain and review other investigative files, created and maintained by other offices, which are related to the above-referenced case. In particular, at the initial conference in this matter on July 14, 2020, the Court asked the Government about its plan to ensure timely review the files of other agencies for potential disclosures in this case and highlighted the Court's expectation that the Government would be thoughtful and probing in its assessment of such a review. Consistent with the Government's commitment to take a thorough and transparent approach to its disclosure obligations, this letter outlines the relevant investigative files of which the Government is currently aware and describes the Government's approach as to each.

## I. Background Regarding the Government's Rule 16 Discovery Productions

The charges in this case arise out of an investigation conducted by the United States Attorney's Office for the Southern District of New York ("USAO-SDNY"), the Federal Bureau of Investigation ("FBI") New York Office, and the New York Police Department (the "NYPD") (collectively, the "Prosecution Team"). That investigation was opened in 2018 and remains ongoing. The Government has copies of the full investigative files for this case from the USAO-SDNY, the FBI New York Office, and the NYPD (the "Prosecution Team Files"). The bulk of the productions to date have come from the Prosecution Team Files. The Government is continuing to review the Prosecution Team Files for any additional materials that warrant disclosure.

Specifically, to date, the Government has produced approximately 328,863 pages of discovery to the defense in this case. Those materials include, among other things, photographs, documents seized during searches, search warrants, search warrant applications, financial records, travel records, property records, phone records, law enforcement reports, and other subpoena

returns. The Government is continuing the process of reviewing and preparing productions of electronic discovery materials, which include extractions of data from numerous electronic devices. The Government expects that it will meet the November 9, 2020 deadline for the completion of electronic discovery productions. Additionally, the Government recognizes that its disclosure obligations are ongoing, and the Government will continue to review the Prosecution Team Files for any additional discoverable or exculpatory materials. In particular, the Government is aware of its obligations under *Brady v. Maryland*, 373 U.S. 83 (1963) and its progeny, and will promptly produce any exculpatory material of which it becomes aware.

The Government's Rule 16 discovery productions do not include witness statements or material under *Giglio v. United States*, 405 U.S. 150 (1972) and its progeny, consistent with the common practice and law within this Circuit. As indicated in a prior letter, the Government intends to produce all such materials to the defense well in advance of trial.[1] Specifically, although the parties have not yet conferred regarding a schedule for disclosure of witness statements, the Government is prepared to produce all statements and impeachment material for witnesses it expects to call at trial as early as four weeks prior to trial. Additionally, the Government is prepared to produce any statements by witnesses who it does not expect to call at trial as early as eight weeks prior to trial, subject to restrictions to protect those individuals' privacy to be negotiated by the parties.

**II. Applicable Law Governing Disclosure of Other Investigative Files**

The disclosure obligations set forth in Federal Rule of Criminal Procedure 16, *Brady*, and *Giglio* apply to materials in the Government's "possession." As a general matter, though "[a]n individual prosecutor is presumed . . . to have knowledge of all information gathered in connection with his office's investigation of the case[,] . . . knowledge on the part of persons employed by a different office of the government does not in all instances warrant the imputation of knowledge to the prosecutor . . . ." *United States v. Avellino*, 136 F.3d 249, 255 (2d Cir. 1998) (citations omitted); *see also United States v. Locascio*, 6 F.3d 924, 948-49 (2d Cir. 1993) (declining to "infer the prosecutors' knowledge simply because some other government agents knew about" additional evidence where federal prosecutors were unaware of documents in possession of FBI agents who were "uninvolved in the investigation or trial of the defendants"); *United States v. Quinn*, 445 F.2d 940, 944 (2d Cir. 1971) (declining to impute knowledge of prosecutor in Florida to prosecutor in New York and noting that the "Department of Justice alone has thousands of employees"). The imposition of such "an unlimited duty on a prosecutor to inquire of other offices not working with the prosecutor's office on the case in question would inappropriately require [courts] to adopt 'a monolithic view of government' that would 'condemn the prosecution of criminal cases to a state of paralysis.'" *Avellino*, 136 F.3d at 255 (quoting *United States v. Gambino*, 835 F. Supp. 74, 95 (E.D.N.Y. 1993)). Thus, discovery and disclosure obligations only extend to "information known

---

[1] The Government recognizes that its *Brady* obligations include the disclosure of witness statements containing exculpatory information. To date, the Government is not aware of any exculpatory material contained in any witness statements, but it will continued to review its files, including witness statements, for such material. If the Government becomes aware of any *Brady* material from any source, it will promptly disclose such material to the defense.

to persons who are a part of the 'prosecution team' . . . who perform investigative duties or make strategic decisions about the prosecution of the case," including "police officers and federal agents who submit to the direction of the prosecutor and participate in the investigation." *United States v. Barcelo*, 628 F. App'x 36, 38 (2d Cir. 2015) (quoting *United States v. Stewart*, 433 F.3d 273, 298 (2d Cir. 2006)).

In considering whether Rule 16 and *Brady* apply to records in the possession of another government agency, a prosecutor's duty extends to reviewing such evidence only where the Government conducts a "joint investigation" with that agency or branch of government. *See United States v. Middendorf*, No. 18 Cr. 36 (JPO), 2018 WL 3956494, at *4-5 (S.D.N.Y. Aug. 17, 2018) (no joint investigation between Government, Public Company Accounting Oversight Board ("PCAOB") and Securities and Exchange Commission ("SEC") where PCAOB was not involved in witness interviews or developing prosecutorial strategy, and SEC was not involved in the grand jury presentation, reviewing the fruits of the Government's investigation, or developing prosecutorial strategy); *United States v. Collins*, 409 F. Supp. 3d 228, 241-43 (S.D.N.Y. 2019) (no joint investigation between U.S. Attorney's Office and SEC where the two entities conducted a small number of joint interviews and engaged in limited sharing of information with each other); *United States v. Finnerty*, 411 F. Supp. 2d 428, 433 (S.D.N.Y. 2006) (no joint investigation between Government and New York Stock Exchange ("NYSE") where documents sought were "the product of an investigation that was undertaken by the NYSE of its own practices, and there [wa]s no suggestion that the Government participated in that investigation").

Moreover, the involvement of agents from one component of an agency in an investigation does not render the entirety of that agency part of the prosecution team. *See, e.g.*, *United States v. Stein*, 424 F. Supp. 2d 720, 723 (S.D.N.Y. 2006) ("While the prosecution's disclosure obligation in some circumstances may extend to materials beyond the knowledge of the individual prosecutors assigned to a case, it does not extend to the collective knowledge of the entire United States government or even to the entire government agency concerned."); *see also Locascio*, 6 F.3d at 949 (refusing to impute to AUSAs knowledge of reports prepared by FBI agents who were "uninvolved in the investigation or trial of the defendants"); *cf. United States v. Ghailani*, 687 F. Supp. 2d 365, 372 (S.D.N.Y. 2010) (holding that, in the context of a speedy trial motion, other members of the Department of Justice who were involved in making decisions about timing and progress of the case were part of the "government" for Rule 16 purposes).

As the foregoing precedents recognize, the factors relevant in determining whether an agency or a component of an agency are part of the prosecution team, and therefore their records are in the "possession" of the Government include whether the agency or component: "(1) participated in the prosecution's witness interviews, (2) was involved in presenting the case to the grand jury, (3) reviewed documents gathered by or shared documents with the prosecution, (4) played a role in the development of prosecutorial strategy, or (5) accompanied the prosecution to court proceedings." *Middendorf*, 2018 WL 3956494, at *4.

**III. The Government's Plan to Review Certain Files from the Florida Investigation**

A. Relevant Background Regarding the Florida Investigation (2005-2010)

Between approximately 2005 and 2010, and as detailed further below, members of the Palm Beach Police Department, the Palm Beach State's Attorney's Office, the U.S Attorney's Office for the Southern District of Florida ("USAO-SDFL"), and the FBI's Palm Beach Resident Agency (the "FBI Florida Office") conducted a separate investigation and prosecution of Jeffrey Epstein for his sexual abuse of minors in Florida (the "Florida Investigative Team" and the "Florida Investigation," respectively). The Prosecution Team in this case had no involvement in the Florida Investigation, which predated the instant investigation by approximately eight years.[2] Similarly, the Florida Prosecution Team and the agencies involved in the Florida Investigation have had no involvement in the investigative, charging, or prosecutorial strategy decisions of the Prosecution Team in this case. Accordingly, under the governing law of this Circuit as discussed above, there is no basis for deeming the Florida Prosecution Team a part of the current Prosecution Team, and the Government does not believe it has any legal obligation to obtain or review the investigative files of those agencies. As discussed below, however, the Government is nevertheless prepared to go significantly above and beyond its disclosure obligations by requesting files from the Florida Investigation that have at least some potential to contain materials that could be relevant to the instant case, and by reviewing and producing those materials as appropriate in this case.[3]

[2] As detailed herein, during the course of its investigation, the Prosecution Team has gathered some documents related to the Florida Investigation, principally consisting of the FBI Florida Office's case file for the Florida Investigation. Those materials are being treated as a part of the Prosecution Team's files and will be produced, to the extent covered by Rule 16 or any other disclosure obligation, to the defendant in this case.

[3] In addition to the Florida Investigation, the Government is aware, through public reporting among other means, of a number of other investigations into matters relating to Jeffrey Epstein. For example, it has been publicly reported that local agencies in the U.S. Virgin Islands, Paris, and London have conducted and may still be conducting investigations into Epstein, which may include investigation into his sexual abuse of minors. There has also been public reporting regarding investigations into Epstein's finances, including an investigation by the U.S. Attorney's Office in the U.S. Virgin Islands, and into the conditions of Epstein's confinement while serving his sentence following the Florida Investigation. Additionally, the USAO-SDNY conducted an investigation into Epstein's suicide and is currently prosecuting two corrections officers as a result of that investigation. *See United States v. Noel and Thomas*, 19 Cr. 830 (AT). Separately, the FBI Florida Office investigated and ultimately prosecuted an employee of Epstein's named Alfredo Rodriguez for obstruction of justice, *see United States v. Alfredo Rodriguez*, 10 Cr. 80015 (KAM), and the Prosecution Team has received some files from that case. The Government does not intend to further seek out or review the investigative files of any such cases, which are completely unrelated to the subject matter of the instant prosecution and/or have been conducted by entities that are not part of this Prosecution Team and, in some instances, the Department of Justice.

Case 22-1426, Document 87-3, Page 99 of 109



B. The Government's Plan for Obtaining and Reviewing Certain Files from the Florida Investigation

As an initial matter, beginning during the course of its investigation, the Government has obtained the entirety of the FBI Florida Office's case file from the Florida Investigation. The Government has already made productions from that file, is continuing to review that file, and intends to produce at the appropriate point any additional material in that file warranting disclosure in this case. That file includes, among other things, any FBI-302 of any relevant witness interview; any relevant materials obtained pursuant to federal grand jury subpoena as part of that investigation; and any relevant material seized during a search of Epstein's Palm Beach residence conducted as part of that investigation. The Government believes the FBI file contains substantially all of the prior witness statements made during the Florida Investigation, including, if applicable, any prior statements made by witnesses the Government intends to call at trial in this case.

In total, the Government has identified six potential sources of material related to the Florida Investigation, and has been requesting and reviewing materials from those sources as follows:

*First*, the Palm Beach Police Department ("PBPD") opened its investigation into Jeffrey Epstein in or about 2005. During the course of that investigation, the PBPD, among other things, conducted numerous witness interviews, issued multiple subpoenas for documents,[4] and executed a search warrant at Epstein's Palm Beach Residence. In or about 2006, the PBPD referred its investigation to the FBI Florida Office. It is the Government's understanding that the PBPD provided its entire investigative file to the FBI Florida Office. As discussed above, the Prosecution Team already has a copy of the full FBI Florida Office file and, as such, has been reviewing and will continue to review the PBPD file for any material that warrants disclosure in this case. Additionally, the Government has contacted the Records Specialist at the PBPD, who informed the Government that the PBPD has no additional investigative files beyond what it already provided to the FBI Florida Office. Out of an abundance of caution, however, the Government asked the Records Specialist to provide the Prosecution Team with a copy of the files still in PBPD's possession related to the Florida Investigation. In response, the PBPD Records Specialist provided the Government with 60 pages of documents, which the Prosecution Team reviewed for any material that is non-duplicative and warrants disclosure in this case. The Prosecution Team has identified five of those pages as non-duplicative and intends to produce those five pages as part of its next discovery production to the defense.

*Second*, the Palm Beach State's Attorney's Office (the "PBSA"), working with the PBPD, among other agencies, handled the Florida state investigation and prosecution of Jeffrey Epstein between approximately 2005 and 2010 (when Epstein completed his sentence). As a result of that investigation and prosecution, Epstein pled guilty to procuring an underage girl for prostitution and soliciting a prostitute. Prior to September 14, 2020, the Prosecution Team had never received any documents directly from the PBSA and did not have the PBSA's full investigative file.

[4] As detailed below, these subpoenas were issued by the Palm Beach State's Attorney's Office.

Although the PBSA is not part of the Prosecution Team, the Government has nevertheless communicated with the PBSA and requested that the PBSA provide the Prosecution Team with its entire investigative file, to the extent it still exists. In response, on September 14, 2020, the PBSA provided the Prosecution Team with an electronic copy of its entire case file regarding the Florida Investigation, which consists of 4,421 pages of documents, 43 audio files, and 6 video files. The Government is reviewing that file for any material that is non-duplicative of other material previously obtained and that warrants disclosure in this case.

*Third*, the FBI Florida Office conducted a prior federal investigation into Jeffrey Epstein between approximately 2006 and 2010. As noted above, the electronic files from the FBI Florida Office are accessible by the FBI New York Office, which has provided the Government with a complete set of FBI electronic files from both its Florida Office and its New York Office for this case. The Government has reviewed those files for discoverable materials. The physical files from the FBI Florida Office, which are contained in approximately 24 boxes, have all been transferred to the FBI New York Office and are in the possession of the Prosecution Team. Those files have been scanned and put into an electronic review platform. The Government has previously reviewed those files and is continuing to do so for discoverable materials. In addition, and as noted above, some items from the FBI Florida Office file have already been produced as part of prior discovery productions in this case.

*Fourth*, the USAO-SDFL participated in the federal investigation of Jeffrey Epstein between approximately 2006 and 2010. Before today, the Prosecution Team had never received any documents from the USAO-SDFL and did not have the USAO-SDFL's investigative file. Indeed, aside from notifying the SDFL at an executive level that the SDNY was opening its own Epstein investigation in 2018, the Prosecution Team had no substantive communications with the USAO-SDFL about the Prosecution Team's investigation or prosecution until after indicting this case. However, after the initiation of this prosecution, the Government communicated with the USAO-SDFL and requested that the USAO-SDFL provide the Prosecution Team with a copy of its entire investigative file, so that the Prosecution Team could review the files for material that warrants disclosure in this case. The USAO-SDFL agreed to provide its entire file, which is contained in approximately 28 boxes, to the Prosecution Team. Accordingly, the Government hired a vendor to copy the entire USAO-SDFL file and load that file into an electronic review platform. The Government received the electronic copy of the USAO-SDFL file from the vendor today and intends to review that file for materials that warrant disclosure in this case.

*Fifth*, internal Department of Justice emails relating to the prior Florida Investigation have been gathered by the Department of Justice's Office of Professional Responsibility ("OPR"), as part of its unrelated investigation into the resolution of the prior Florida Investigation.[5] In particular, during the course of its investigation, OPR gathered a significant volume of emails, to the extent they had been preserved and remained accessible, from a number of USAO-SDFL attorneys, including a number of supervisors in that office and the primary line Assistant U.S. Attorney who worked on the Florida Investigation ("Attorney-1").

---

[5] This OPR investigation has been publicly acknowledged by the Department of Justice.

Although the Government does not believe it has any obligation to gather or review emails sent or received by attorneys at the USAO-SDFL as part of their separate, prior investigation, the Government nonetheless intends to gather and review the emails sent to or from Attorney-1 to the extent those emails were preserved and gathered by OPR. As noted, Attorney-1 was the primary line assistant on that investigation, and Attorney-1's emails are thus the most likely to contain communications with or regarding potential witnesses. The Government has already obtained Attorney-1's emails from OPR, and given the volume, the Government intends to load those emails into an electronic review platform and then conduct targeted searches of those emails for terms relevant to this case, including the defendant's name and the names of victims and witnesses. Based on our understanding of the USAO-SDFL investigation, we do not believe that there are a substantial number of overlapping victims or witnesses between that investigation and this prosecution. But to the extent searches of Attorney-1's emails reveal non-duplicative *Giglio* or 3500 material for any such victims or witnesses, the Government will produce any such identified material consistent with any schedule for pre-trial disclosures set by the Court. The Government does not intend to request or review emails for any other USAO-SDFL or Department of Justice attorney or otherwise perform a comprehensive review of the internal e-mails of that prosecutor's office from its wholly separate investigation, including by asking for any other material gathered by OPR as part of its investigation.

*Sixth*, beginning in or about 2019, attorneys with the United States Attorney's Office for the Southern District of Georgia ("USAO-SDGA") were designated to participate in the representation of the United States in civil litigation brought by Epstein victims for violations of the Crime Victim Rights Act ("CVRA") by the USAO-SDFL in connection with the Florida Investigation after the USAO-SDFL was recused from that civil litigation. The Government intends to contact the USAO-SDGA and ask whether it (a) had any substantive communications with witnesses relevant to this prosecution during its participation in the CVRA civil litigation, or (b) gathered any information regarding the defendant, Ghislaine Maxwell. If so, the Government will request any and all records regarding those topics and will review those records for materials that warrant disclosure in this case. Otherwise, the Government does not intend to request or review any materials from the USAO-SDGA.

* * *

As noted above, none of these other offices or agencies has played any role in the investigation or prosecution of this case. In particular, none of these offices and agencies has participated in witness interviews or taken any other investigative steps with the Prosecution Team. Nor did any representative of these other offices or agencies play any role in developing strategy, making charging decisions, or presenting this case to the grand jury. Accordingly, although the Government maintains that none of these agencies is part of the Prosecution Team in this case, given the similarity of the nature of the conduct investigated in this case and the conduct investigated by those other offices and agencies, the Government is prepared to undertake the extensive efforts described above to obtain and review additional material. The Government will continue to produce any portion of those materials that warrants disclosure in this case, including in connection with its production of *Giglio* and 3500 material.

**IV. Conclusion**

Consistent with its representations to the Court at the initial conference in this matter, the Government is committed to maintaining a thorough, careful, and comprehensive approach to its disclosure obligations. The Government is prepared to address any questions the Court may have or to provide any additional information upon request.

Respectfully submitted,

AUDREY STRAUSS
Acting United States Attorney

By: ______________________________
Maurene Comey / Alison Moe / Lara Pomerantz
Assistant United States Attorneys
Southern District of New York
Tel: (212) 637-2324

Cc: *All counsel of record*, via ECF

# 59 (e) EX 93

COHEN & GRESSER LLP

800 Third Avenue
New York, NY 10022
+1 212 957 7600 phone
www.cohengresser.com

Mark S. Cohen
+1 (212) 957-7600
mcohen@cohengresser.com

Christian R. Everdell
+1 (212) 957-7600
ceverdell@cohengresser.com

August 10, 2020

**VIA ECF**

The Honorable Alison J. Nathan
United States District Court
Southern District of New York
United States Courthouse
40 Foley Square
New York, New York 10007

**Re: *United States v. Ghislaine Maxwell*, 20 Cr. 330 (AJN)**

Dear Judge Nathan:

On behalf of our client, Ghislaine Maxwell, we respectfully submit this letter motion seeking the Court's assistance with two critical issues that greatly impact Ms. Maxwell's ability to receive a fair trial on the schedule set by the Court. First, we request that the Court enter an order directing the government to disclose to defense counsel the identities of the three alleged victims referenced in the indictment ("Victims 1-3"), subject to the restrictions of the protective order entered by the Court, so that Ms. Maxwell and defense counsel can meaningfully investigate the alleged conduct, which is now over 25 years old. Second, we request that the Court enter an order directing the Bureau of Prisons ("BOP") to release Ms. Maxwell into the general population and provide Ms. Maxwell with increased access to the discovery materials while she is detained so that she can meaningfully participate in the preparation of her defense.

**1. Disclosure of Victim Identities**

The Court should order the government to disclose the identities of Victims 1-3 to defense counsel, subject to the restrictions of the protective order, because Ms. Maxwell cannot prepare for or receive a fair trial without this information. Moreover, the requested disclosure is authorized under the law in this Circuit, and is narrowly-tailored and reasonable under the circumstances of this case.

Here, it is clear from the face of the indictment that the government's case is based on the accounts of Victims 1-3, the three individuals specifically referenced in the indictment. It is therefore critical for the defense to know the names of these individuals as soon as possible, so

The Honorable Alison J. Nathan
August 10, 2020
Page 2

that we can mount an effective defense investigation and adequately prepare for trial. This is especially true in this case where the alleged misconduct took place on unspecified dates roughly 25 years ago in multiple locations—namely, New York, Florida, New Mexico, and the United Kingdom—and where the central figure, Jeffrey Epstein, is alleged to have engaged in misconduct with dozens, if not hundreds, of alleged victims. The defense should not have to speculate which of these individuals are Victims 1-3 referenced in the indictment.

It is now almost six weeks since Ms. Maxwell's arrest, and the government is just now beginning to produce Rule 16 discovery, despite confirming to the Court that discovery would begin as soon as the Court entered a protective order. Moreover, the government still has not confirmed to the defense the identities of Victims 1-3. Ms. Maxwell was arrested on July 2, 2020. On July 14, 2020, during her arraignment and bail hearing, the government indicated that it had "begun preparing an initial production" and would be "prepared to produce a first batch of discovery as soon as a protective order [was] entered by the Court."[1] The Court entered the protective order on July 30, 2020. (Dkt. 36). The following day, July 31, 2020, defense counsel contacted the government and requested disclosure of the identities of Victims 1-3. The government refused to do so, stating that it would only disclose the identities of alleged victims through its production of Rule 16 discovery, or as part of its production of Jencks Act material closer to trial. That same day, per the government's request, the defense provided a hard drive to load the Rule 16 discovery. However, the government did not make its first production until after 2:00 p.m. on Wednesday, August 5, 2020.

The government's initial production was a subset of non-electronic discovery materials, totaling nearly 13,000 pages, which the defense expeditiously reviewed for high-level content. Upon initial review, the materials contain certain records related to one specific individual. However, nothing in the production specifically identifies this individual as Victim 1, 2, or 3. The defense should not be required to speculate whether this individual is one of the three alleged Victims, and if so, which one. Moreover, the initial production does not appear to contain any materials identifying the other two alleged Victims. Although the government has indicated that it will provide additional discovery on a rolling basis, if the initial production is any guide, it seems unlikely that later productions will sufficiently identify the remaining alleged Victims. Furthermore, the defense should not be forced to wait almost two additional weeks until August 21, 2020 (the deadline for the production of initial non-electronic discovery) or potentially months until November 9, 2020 (deadline for the completion of all discovery) before learning information that is vital to the defense. Ms. Maxwell's right to a fair trial depends on the defense's ability to adequately investigate the charges against her, and that investigation will be significantly impaired until we know for certain the names of Victims 1-3.

---

[1] July 14, 2020 Tr. at 12:14-17; *see also id*. at 12:25-13:3 ("Following the entry of [the] protective order . . . the government is prepared to make a substantial production of discovery.").

District courts have the inherent authority to compel pretrial disclosure of the identities of government witnesses. *See United States v. Cannone*, 528 F.2d 296, 301 (2d Cir. 1975). Such disclosure is warranted when there is a specific showing that the disclosure is material to the preparation of the defense and reasonable in light of the circumstances surrounding the case. *See id.* at 302; *United States v. Rueb*, No. 00 CR. 91 (RWS), 2001 WL 96177, at *9 (S.D.N.Y. Feb. 5, 2001) (ordering disclosure of government witness list where defendant "ha[d] met his burden to show a particularized need that outweighs the possible dangers of disclosure").[2] This principle has been applied in sex crimes cases, where the right of the defendant to prepare a defense can outweigh the privacy interests of alleged victims referenced in the indictment and warrant the disclosure of their identities. *See United States v. Warme*, No. 09CR19A, 2009 WL 427111, at *2 (W.D.N.Y. Feb. 20, 2009) (ordering government to disclose identity of sex crime victim where "defendant's ability to adequately prepare a defense against this charge is significantly compromised without being advised of the identity of the alleged victim"); *see also id.* ("Absent knowing the identity of Victim 1, the defendant is precluded from investigating the facts surrounding the crime charged.").

The defense's narrowly-tailored request, which only seeks the disclosure of the identity of Victims 1-3, and not the government's entire witness list, is also reasonable in light of the circumstances of this case. And because the protective order prohibits Ms. Maxwell, defense counsel, and others on the defense team from disclosing or disseminating the identity of any alleged victim or potential witness referenced in the discovery materials (Dkt. 36 ¶ 5), the disclosure will have no impact on the privacy interests of Victims 1-3. Nor is there any basis for the government to claim that there is a risk that witnesses will face intimidation or refuse to testify.[3] To the contrary, many alleged victims have already chosen to speak on the record in criminal proceedings in the Epstein case and in this case; to file civil suits against Mr. Epstein, Ms. Maxwell and others, and to provide deposition testimony and discovery in those suits; and to give interviews to the press and other television and film productions. Moreover, Victims 1-3 are no longer minors, but are now adults in their late 30s or early 40s, which provides additional assurance that they will be willing to appear for trial. Disclosure is therefore warranted here.

---

[2] In determining whether to order pretrial disclosure of the identity of witnesses, some district courts have considered the following factors: (1) Did the offense alleged in the indictment involve a crime of violence? (2) Have the defendants been arrested or convicted for crimes involving violence? (3) Will the evidence in the case largely consist of testimony relating to documents (which by their nature are not easily altered)? (4) Is there a realistic possibility that supplying the witnesses' names prior to trial will increase the likelihood that the prosecution's witnesses will not appear at trial, or will be unwilling to testify at trial? (5) Does the indictment allege offenses occurring over an extended period of time, making preparation of the defendants' defense complex and difficult? (6) Do the defendants have limited funds with which to investigate and prepare their defense? *Rueb*, 2001 WL 96177, at *7-8 (citation omitted). The Second Circuit, however, has not adopted these factors, nor do they constitute an exhaustive list of factors that the Court may consider in determining whether to disclose the identities of alleged victims.

[3] Notably, the government did not argue at the bail hearing that Ms. Maxwell posed a danger to the community. (*See* 7/14/2020 Tr. at 37:15-21).

*See Warme*, 2009 WL 427111, at *2 (ordering government to disclose identity of sex crime victim where "the government has not demonstrated that disclosing the identity to the defendant would subject the victim to a significant risk, or to increase the likelihood that victim will refuse to appear or testify").

With each day that passes without knowing the identities of Victims 1-3, the defense is losing crucial time to conduct a meaningful investigation and prepare its defense so that Ms. Maxwell can receive a fair trial on the schedule set by the Court. For these reasons, we respectfully request the Court to order the government to disclose the identities of Victims 1-3 to defense counsel, consistent with the provisions of the protective order.

**2. Ms. Maxwell's Conditions of Confinement and Access to Discovery**

We also seek the Court's assistance to improve Ms. Maxwell's conditions of confinement at the Metropolitan Detention Center ("MDC"), and her access to the discovery in this case, so that she can meaningfully participate in her defense. As discussed below, Ms. Maxwell has been treated less favorably than a typical pretrial detainee, and this has impacted her ability to assist in her defense.

It has become apparent that the BOP's treatment of Ms. Maxwell is a reaction to the circumstances surrounding the pretrial detention and death of Mr. Epstein. On July 6, 2019, Mr. Epstein was arrested and detained at the Metropolitan Correctional Center ("MCC") on sex trafficking charges, and was subsequently assigned to the MCC's Special Housing Unit ("SHU") due to risk factors for suicide and safety concerns. After an apparent suicide attempt on July 23, 2019, Mr. Epstein was transferred to suicide watch and then psychological observation. On August 10, 2019, Mr. Epstein's body was discovered in his cell. Thereafter, the government indicted the two correctional officers who were assigned to the SHU at the time of Mr. Epstein's death.

As a result of what occurred with Mr. Epstein, Ms. Maxwell is being treated worse than other similarly situated pretrial detainees, which significantly impacts her ability to prepare a defense and be ready for trial on the schedule set by the Court. Since arriving at the MDC over a month ago, on July 6, 2020, Ms. Maxwell has been held under uniquely onerous conditions. Ms. Maxwell has been confined alone in an area outside of the general population for the entire 36-day period (40 days if we include her confinement in New Hampshire), which is over three weeks longer than the 14-day quarantine period required for all new arrivals to the MDC under current COVID-19 protocols, and there is no indication that this will change. She continues to be surveilled 24 hours a day by security cameras and by multiple prison guards, many of whom do not appear to be regular MDC personnel. These prison guards constantly observe Ms. Maxwell and take notes on her every activity, including her phone conversations with defense counsel. Until recently, Ms. Maxwell was subjected to suicide watch protocols, including being woken up every few hours during the night and being forced to wear special clothing, despite the

fact that she, unlike Mr. Epstein, has never been suicidal and was never diagnosed as exhibiting risk factors for suicide. Her cell is searched multiple times a day and she has been forced to undergo numerous body scans. In addition, Ms. Maxwell's access to the standard prison resources available to other pretrial detainees in the general population has been extensively curtailed or eliminated altogether.

This treatment threatens Ms. Maxwell's Sixth Amendment right to participate in her defense. This case will require time-consuming review of voluminous discovery materials. Ms. Maxwell must therefore have adequate time to review the materials, to confidentially take notes on them, and to discuss them with her attorneys. But there currently is no such structure in place. Indeed, although the government agreed that Ms. Maxwell would have access to a hard drive containing the discovery in the MDC, it is our understanding that the hard drive containing the first production has not yet been made available to Ms. Maxwell.

Defense counsel understands that the BOP has proposed (but not yet implemented) a procedure that would permit Ms. Maxwell to use a computer on her floor to review discovery materials during the three-hour period each day that she is not confined to her cell. But there are two significant flaws in this proposal:

- The three-hour period is specifically designated to be used by Ms. Maxwell for recreation, exercise, and personal hygiene, including showers. The BOP should not be permitted to force Ms. Maxwell to choose between maintenance of her physical and mental health and participating in her own defense.

- Even if Ms. Maxwell were to forgo personal maintenance altogether, three hours a day is on its face an insufficient amount of time for reviewing documents in a complex case with voluminous document discovery, such as this one. As an illustration, the government's first set of production materials consists of nearly 13,000 pages of documents. Assuming it takes Ms. Maxwell an average of one minute to review each page of those materials, based on the BOP's proposed cap of three hours per day of review, Ms. Maxwell would conceivably finish reviewing this first set of documents at the earliest by mid-November 2020. This is entirely unworkable under the schedule set by the Court.

Ms. Maxwell does not seek special treatment at the MDC; but she does ask that she not be specially disfavored in her treatment in detention, especially when it comes to preparing her defense to conduct that allegedly took place over 25 years ago. In light of the voluminous discovery that we expect to receive, Ms. Maxwell would normally be spending 40 hours a week or more reviewing the discovery. Ms. Maxwell should be granted a comparable amount of time

to review the discovery in the MDC so that she can engage in her defense full-time. We therefore request that Ms. Maxwell:

- Be released to the general population and be granted the privileges given to other pretrial detainees.

- Be given significantly increased access to a computer terminal in order to review the discovery in this case.

* * *

For the reasons set forth above, we respectfully submit that the Court should grant Ms. Maxwell's motion.

Respectfully submitted,

/s/ Christian R. Everdell
Mark S. Cohen
Christian R. Everdell
**COHEN & GRESSER LLP**
800 Third Avenue, 21st Floor
New York, New York 10022
(212) 957-7600

cc: All counsel of record (via ECF)